UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 888 |
| v. | ) | Violations: Title 18, Sections 371, |
| | ) | 666(a)(1), 1001(a)(2), 1343, 1346, |
| | ) | 1951(a), 1962(c), and 1962(d) |
| ROD BLAGOJEVICH, | ) | |
| ALONZO MONK, | ) | Judge James B. Zagel |
| JOHN HARRIS, and | ) | MAGISTRATE JUDGE COX |
| ROBERT BLAGOJEVICH | ) | **Second Superseding Indictment** |

FILED
FeB 4, 2010
FEB - 4 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

## COUNT ONE

The SPECIAL FEBRUARY 2008-2 GRAND JURY charges:

1.    At times material to this Second Superseding Indictment:

### Relevant Entities and Individuals

a.    Defendant ROD BLAGOJEVICH was the Governor of the State of Illinois.  He was elected Governor in 2002 and was reelected Governor in 2006.  ROD BLAGOJEVICH previously served as a Member of the United States House of Representatives from the Fifth Congressional District in Illinois.

b.    Friends of Blagojevich was established in or about June 2000 and was a private entity existing under the laws of Illinois as a campaign committee for the purpose of supporting the election of defendant ROD BLAGOJEVICH as Governor of Illinois, and was the principal campaign fundraising vehicle for ROD BLAGOJEVICH.   Friends of Blagojevich

maintained offices at 4147 North Ravenswood, Chicago, Illinois.   Although various individuals, including, at times, Christopher Kelly, Alonzo Monk, and Robert Blagojevich, held the office of chairman of Friends of Blagojevich, at all times the activities and financial affairs of Friends of Blagojevich were controlled and directed by ROD BLAGOJEVICH, for whose benefit Friends of Blagojevich was operated.

      c.    Christopher Kelly was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH.   Kelly served as Chairman of Friends of Blagojevich from in or about early 2004 until in or about August 2005.   With the knowledge and permission of ROD BLAGOJEVICH, Kelly at times exercised substantial influence over certain activities of the Office of the Governor.

      d.    Antoin Rezko was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH. With the knowledge and permission of ROD BLAGOJEVICH, Rezko at times exercised substantial influence over certain activities of the Office of the Governor.

      e.    Alonzo Monk was a long-time associate of defendant ROD BLAGOJEVICH, and among other things served as his general counsel while a Member of Congress, as campaign manager for his 2002 and 2006 gubernatorial campaigns, on his transition team after his election in November 2002, and as

2

his Chief of Staff from in or about January 2003 until in or about December 2005. Beginning in or about early 2007, Monk worked as a lobbyist, doing business as AM3 Consulting, Ltd. As a lobbyist, Monk principally represented businesses with interests involving Illinois state government, including businesses in the horse racing industry. In addition, Monk served as Chairman of Friends of Blagojevich from in or about December 2006 to in or about July 2007.

f. Robert Blagojevich is the brother of defendant ROD BLAGOJEVICH. Beginning in or about August 2008, Robert Blagojevich served as the chairman of Friends of Blagojevich.

g. Beginning in or about late 2005, John Harris was employed by the State of Illinois as the Chief of Staff to the Governor, defendant ROD BLAGOJEVICH.

h. Stuart Levine was a member of the Illinois Health Facilities Planning Board and the Board of Trustees of the Teachers' Retirement System.

i. The Illinois Health Facilities Planning Board ("Planning Board") was a commission of the State of Illinois, established by statute, whose members were appointed by the Governor of the State of Illinois. State law required an entity seeking to build a hospital, medical office building, or other

3

medical facility in Illinois to obtain a permit, known as a "Certificate of Need," from the Planning Board prior to beginning construction.

        ii.     The Teachers' Retirement System of the State of Illinois ("TRS") was a public pension plan created by Illinois law for the purpose of providing pension, survivor, and disability benefits for teachers and administrators employed in Illinois public schools except in the City of Chicago. TRS was funded by annual contributions from teachers, their employers, and the State of Illinois, as well as investment income.  The activities of TRS were directed by a Board of Trustees.  Certain of the trustees, among them Stuart Levine, were appointed by the Governor, while other trustees were elected by teachers and annuitants. Among its other responsibilities, the Board of Trustees reviewed and voted to approve or reject proposals by private investment management companies to manage funds on behalf of TRS.

        i.     William F. Cellini, Sr., was a Springfield, Illinois, businessman and had longstanding relationships and influence with TRS trustees, including Stuart Levine, as well as TRS staff members.

        j.     Capri Capital was a real estate asset management company based in Chicago, Illinois, that invested funds on behalf of TRS.  Thomas Rosenberg was a principal and part owner of Capri Capital.

4

### Duties and Powers of the Office of Governor

k.      The Office of the Governor of the State of Illinois ("Governor's Office") was entrusted with extensive duties including, among other things, supporting, approving and vetoing legislation; appointing directors and key administrators of state departments, agencies, and boards; issuing executive orders; authorizing expenditures of certain grant funds; annually proposing a budget and overseeing the expenditure of state funds; and otherwise setting priorities and direction for the State of Illinois. As chief executive of the State of Illinois, the Governor was responsible for administration of all areas of the executive branch of state government not under the authority of the other constitutionally-elected officials. The Office of the Governor employed staff members to assist the Governor in performing his duties.

l.      Shortly after his election on November 4, 2008, as President of the United States, Barack Obama resigned his position as United States Senator from Illinois, creating a vacancy in that office. As Governor of Illinois, defendant ROD BLAGOJEVICH had the duty under Illinois law, 10 ILCS 5/25-8, to appoint a replacement, who would serve the approximately two years remaining in Barack Obama's term as United States Senator.

## Illinois Laws

m.    In or about September 2008, the Illinois General Assembly enacted Public Act 95-971, effective January 1, 2009, that, among other things, prohibits business entities with aggregate state contracts or pending state contract bids of more than $50,000 from making campaign contributions to any political committee established to promote the candidacy of, among others, a candidate for the office of Governor.  This law also prohibits such contributions by affiliated entities and affiliated persons of such business entities.

## THE ENTERPRISE

2.    At times material to this indictment, defendant ROD BLAGOJEVICH, Christopher Kelly, Antoin Rezko, Alonzo Monk, the Office of the Governor of Illinois, and Friends of Blagojevich were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce.  This enterprise is referred to for purposes of this count as the "Blagojevich Enterprise."  The Blagojevich Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## PURPOSE OF THE ENTERPRISE

3.      The primary purpose of the Blagojevich Enterprise was to exercise and preserve power over the government of the State of Illinois for the financial benefit of defendant ROD BLAGOJEVICH, both directly and through Friends of Blagojevich, and for the financial benefit of his family members and associates.

## THE RACKETEERING VIOLATION

4.      From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, together with Christopher Kelly, Alonzo Monk, William F. Cellini, Sr., John Harris, Robert Blagojevich, Antoin Rezko, Stuart Levine, and others known and unknown, being persons employed by and associated with an enterprise, namely the Blagojevich Enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of the Blagojevich Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5), that is, through the commission of the racketeering acts set forth in **Paragraph 45** below:

7

## MEANS AND METHODS OF THE ENTERPRISE

5.     Defendant ROD BLAGOJEVICH, Kelly, Monk, Cellini, Harris, Robert Blagojevich, Rezko, Levine, and others, used and agreed to use the powers of the Office of the Governor, and of certain state boards and commissions subject to influence by the Office of the Governor, to take and cause governmental actions, including: appointments to boards and commissions; the awarding of state business, grants, and investment fund allocations; the enactment of legislation and executive orders; and the appointment of a United States Senator; in exchange for financial benefits for themselves and others, including campaign contributions for ROD BLAGOJEVICH, money for themselves, and employment for ROD BLAGOJEVICH and his wife.

### Sharing Financial Benefits from State Actions

6.     In a series of conversations that began in 2002 and continued after defendant ROD BLAGOJEVICH was elected Governor in November 2002, ROD BLAGOJEVICH and Monk, along with Kelly and Rezko, agreed that they would use ROD BLAGOJEVICH's position as Governor and Monk's position as Chief of Staff for financial gain, which would be divided among them, with the understanding that the money would be distributed after ROD BLAGOJEVICH left public office.   ROD BLAGOJEVICH and others later implemented this agreement, as further described below.

8

### The Pension Obligation Bond Deal

7.     In or about 2003, defendant ROD BLAGOJEVICH, Monk, Kelly, and Rezko, agreed to direct lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds to a company whose lobbyist agreed to provide hundreds of thousands of dollars to Rezko out of the fee the lobbyist would collect, and Rezko in turn agreed to split the money with ROD BLAGOJEVICH, Monk, and Kelly.

### Maintaining Control Over TRS

8.     In or about the spring of 2003, Kelly, Rezko, Cellini, and Levine agreed that Kelly and Rezko would use their influence with the Blagojevich administration to assist Cellini and Levine in maintaining influence over the activities of TRS, and in return, Cellini and Levine would use their influence with TRS to cause TRS to invest in funds, and to use the services of law firms, selected by Kelly and Rezko, at times in exchange for substantial contributions to Friends of Blagojevich.

### The Solicitation of Ali Ata

9.     In or about late 2002, Ali Ata, an Illinois businessman who was solicited by Rezko to make political contributions to defendant ROD BLAGOJEVICH, brought a $25,000 check to Rezko's offices, where Ata met with ROD BLAGOJEVICH. During that meeting, ROD BLAGOJEVICH asked Rezko

if Rezko had talked to Ata about positions in the administration, and Rezko said that he had. In or about July 2003, after discussions with Rezko about possible state appointments, Ata gave Rezko another $25,000 check payable to ROD BLAGOJEVICH's campaign. Shortly after this, Ata had a conversation with ROD BLAGOJEVICH at a fundraising event, during which ROD BLAGOJEVICH indicated that he was aware Ata recently had made another substantial contribution to ROD BLAGOJEVICH's campaign, and told Ata that he understood Ata would be joining his administration. Ata replied that he was considering taking a position, and ROD BLAGOJEVICH said that it had better be a job where Ata could make some money. ROD BLAGOJEVICH ultimately appointed Ata as the executive director of the Illinois Finance Authority.

### The Solicitation of Joseph Cari

10. On or about October 29, 2003, when Joseph Cari, a national Democratic fundraiser, was traveling on a plane with defendant ROD BLAGOJEVICH, Kelly, and Levine to a Blagojevich fundraiser in New York hosted by Cari, he spoke with ROD BLAGOJEVICH, who discussed Cari's background as a national fundraiser and ROD BLAGOJEVICH's interest in running for President. ROD BLAGOJEVICH said it was easier for governors to solicit campaign contributions because of their ability to award contracts and give legal work, consulting work, and investment banking work to campaign

contributors, and that Kelly and Rezko were his point people in raising campaign contributions.   ROD BLAGOJEVICH also said there were state contracts and other state work that could be given to contributors who helped ROD BLAGOJEVICH, Rezko, and Kelly, and that Rezko and Kelly would follow up with Cari in relation to the discussion that had just occurred.

11.    During the October 29, 2003, fundraiser, Levine told Cari that there was a plan in place in the Blagojevich administration pursuant to which Rezko and Kelly would pick consultants to do business with State of Illinois boards, and, thereafter, the consultants would be asked to make campaign contributions.

12.    Sometime after October 2003, Rezko told Cari that Rezko had a close relationship with the Blagojevich administration, that Rezko had a role in picking consultants, law firms and other entities to get state business, and that defendant ROD BLAGOJEVICH's Chief of Staff, Monk, helped implement Rezko's choices for state work.   Rezko also said that, in exchange for raising money for ROD BLAGOJEVICH, the Blagojevich administration would be helpful to Cari's business interests.

13.    On or about March 5, 2004, Cari met with Kelly, who said he was following up on Cari's conversations with defendant ROD BLAGOJEVICH, Rezko, and Levine.  Kelly asked for Cari's help in raising money on a national level for ROD BLAGOJEVICH.  When Cari said he was not inclined to help,

Kelly pushed Cari to assist and said that helping ROD BLAGOJEVICH would be good for Cari's business interests and that Cari could have whatever Cari wanted if he agreed to help.

## Campaign Contributions Solicited for TRS Investments

14.    In or about March 2004, Lobbyist A met with Christopher Kelly to ask how two clients of Lobbyist A could become eligible to manage investments for TRS.    Kelly informed Lobbyist A that TRS was Rezko's area, and subsequently told Lobbyist A that he had spoken with Rezko, and that it would require a $50,000 campaign contribution to defendant ROD BLAGOJEVICH for a firm to get on TRS's list of recommended fund managers.

## The Attempted Extortion of Capri Capital

15.    In or about April 2004, Rezko, Kelly, and Levine agreed that they would use their influence and Levine's position at TRS to prevent Capri Capital from receiving a potential $220 million allocation from TRS unless Capri Capital or one of its principals, Thomas Rosenberg, agreed to make a payment, such as by arranging to raise a significant amount of money in campaign contributions for the benefit of defendant ROD BLAGOJEVICH. At Levine's direction, Cellini assisted the plan by indicating to Rosenberg that Capri Capital had not yet received its $220 million allocation from TRS because of its failure to make political donations to ROD BLAGOJEVICH.

16.     On or about May 11, 2004, after Rosenberg threatened to expose the extortion attempt, Rezko, Kelly, Levine, and Cellini agreed that in light of Rosenberg's threat it was too risky to continue demanding money from Rosenberg or to block the $220 million allocation to Capri Capital.   Rezko subsequently told Levine that defendant ROD BLAGOJEVICH had been told about the attempt to extort Rosenberg, and that ROD BLAGOJEVICH had agreed that Capri Capital should receive the $220 million allocation because of Rosenberg's threat, but felt that Rosenberg should receive nothing further from the State of Illinois.

17.     After the discussion involving Kelly, Rezko, Levine, and Cellini on or about May 11, 2004, Cellini and Levine took steps to conceal the extortion plan, including by using their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation.

### Benefits Given to ROD BLAGOJEVICH and Alonzo Monk

18.     To ensure that defendant ROD BLAGOJEVICH and Monk would continue to give Rezko substantial influence regarding matters such as appointments to boards and commissions, the selection of candidates for state employment, and the awarding of state contracts, grants, and investment fund allocations, Rezko gave certain benefits to ROD BLAGOJEVICH and Monk, including the following:

a.   In or about late August 2003, Rezko directed to ROD BLAGOJEVICH's wife a payment of $14,369, purportedly in connection with a real estate transaction involving property at 850 North Ogden Avenue, Chicago, Illinois, for which transaction ROD BLAGOJEVICH's wife had not performed any services.

b.   From in or about October 2003 to in or about May 2004, Rezko, through his real estate development company, provided ROD BLAGOJEVICH's wife with payments of $12,000 a month, purportedly for real estate brokerage services.

c.   In or about January 2004, while Rezko's real estate development company was paying ROD BLAGOJEVICH's wife $12,000 a month, Rezko directed to ROD BLAGOJEVICH's wife a payment of $40,000, purportedly for brokerage services in connection with the sale of property at 1101 West Lake Street, Chicago, Illinois, even though the sale of the property had been arranged without the assistance of ROD BLAGOJEVICH's wife.

d.   From in or about the spring of 2004 until in or about 2006, Rezko provided to Monk a number of $10,000 cash gifts to pay for various items, such as a car and home improvements, which cash gifts totaled approximately $70,000 to $90,000.

## The Search for Employment for ROD BLAGOJEVICH's Wife

19.     After the real estate business of defendant ROD BLAGOJEVICH's wife became the subject of critical media coverage, ROD BLAGOJEVICH directed Harris to try to find a paid state board appointment or position for her. During several conversations in or about early 2008, ROD BLAGOJEVICH informed Harris that ROD BLAGOJEVICH wanted his wife put on the Pollution Control Board, which pays salaries to its board members. When Harris told ROD BLAGOJEVICH that his wife was not qualified for the position, ROD BLAGOJEVICH told Harris to find other employment for his wife.

20.     In or about the spring of 2008, around the time that defendant ROD BLAGOJEVICH's wife passed a licensing examination that allowed her to sell financial securities, ROD BLAGOJEVICH asked Harris and others to set up informational or networking meetings for his wife with financial institutions that had business with the State of Illinois in hopes that those businesses would assist in getting ROD BLAGOJEVICH's wife a job. Harris subsequently arranged meetings between ROD BLAGOJEVICH's wife and officials at two financial institutions that had business with the State of Illinois. When ROD BLAGOJEVICH concluded that officials at these institutions were unhelpful in finding ROD BLAGOJEVICH's wife a job, ROD BLAGOJEVICH told Harris that he did not want the institutions receiving further business from the State of

Illinois.

## Solicitation of United States Congressman A

21.    In or about 2006, after United States Congressman A inquired about the status of a $2 million grant for the benefit of a publicly-supported school, defendant ROD BLAGOJEVICH instructed Harris not to release the grant until further direction from ROD BLAGOJEVICH, even though ROD BLAGOJEVICH previously had agreed to support the grant and funding for the grant had been included in the state's budget.

22.    In response to inquiries by a high-ranking state official as to whether the grant money could be released, defendant ROD BLAGOJEVICH informed the official that ROD BLAGOJEVICH wanted it communicated to United States Congressman A that United States Congressman A's brother needed to have a fundraiser for ROD BLAGOJEVICH.

23.    Defendant ROD BLAGOJEVICH told Lobbyist A that ROD BLAGOJEVICH was giving a $2 million grant to a school in United States Congressman A's district and instructed Lobbyist A to approach United States Congressman A for a fundraiser.

24.    After defendant ROD BLAGOJEVICH learned from Harris that the school had started to incur expenses that were to be paid with the grant funds, ROD BLAGOJEVICH initially resisted the release of the grant money, and then

ultimately agreed to the release of certain of the grant funds to cover incurred

expenses, but only on a delayed basis, even though no fundraiser had been held.

### Solicitation of Children's Memorial Hospital

25.   On or about October 8, 2008, defendant ROD BLAGOJEVICH

advised Lobbyist A that he intended to take official action that would provide

additional state money to Children's Memorial Hospital, and that ROD

BLAGOJEVICH wanted to get $50,000 in campaign contributions from the Chief

Executive Officer of Children's Memorial Hospital ("the Children's CEO").

26.   On or about October 17, 2008, defendant ROD BLAGOJEVICH

called the Children's CEO to tell him of his intent to increase the Illinois

Medicaid reimbursement rate for speciality-care pediatric physicians.  Shortly

before this, ROD BLAGOJEVICH had directed Deputy Governor A to initiate

such an increase, which Illinois providers of pediatric healthcare, including

Children's Memorial Hospital, had actively supported for years.

27.   On or about October 22, 2008, at defendant ROD BLAGOJEVICH's

direction, Robert Blagojevich spoke with the Children's CEO and asked him to

arrange to raise $25,000 for ROD BLAGOJEVICH prior to January 1, 2009.

28.   On or about November 12, 2008, after the Children's CEO had not

returned additional phone calls from Robert Blagojevich, and no political

contributions from the Children's CEO or other persons associated with

Children's Memorial Hospital had been received, defendant ROD BLAGOJEVICH spoke to Deputy Governor A about the increase in the Medicaid reimbursement rates for specialty-care pediatric physicians, asking whether "we could pull it back if we needed to. . . ." As a result of this conversation, Deputy Governor A instructed the Department of Healthcare Services to stop its work on increasing the reimbursement for specialty-care pediatric physicians.

### Solicitation of Racetrack Executive

29.    On or about November 13, 2008, defendant ROD BLAGOJEVICH told Robert Blagojevich that he wanted campaign contributions to be made by the end of the year by Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill pending in the Illinois legislature that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill "). At that time, as ROD BLAGOJEVICH knew, Monk had been trying to arrange a contribution from Racetrack Executive, and ROD BLAGOJEVICH had set a goal of raising $100,000 in contributions from and through Racetrack Executive.

30.    Defendant ROD BLAGOJEVICH had further conversations with Monk about the Racing Bill after it was passed by the Illinois legislature on or about November 20, 2008. In those conversations, ROD BLAGOJEVICH and

18

Monk discussed whether and when ROD BLAGOJEVICH would sign the Racing Bill, and whether and when Racetrack Executive would arrange for campaign contributions to ROD BLAGOJEVICH.  On or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Racetrack Executive would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made.  As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

31.   After meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Racetrack Executive.  During that visit, Monk communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

32.   After meeting with Racetrack Executive on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now."  ROD BLAGOJEVICH responded, "good," and "good job."

33.   On or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view."   ROD BLAGOJEVICH agreed to call Racetrack Executive.

### Solicitation of Highway Contractor

34.   On or about September 18, 2008, defendant ROD BLAGOJEVICH, Monk, and Robert Blagojevich met with Construction Executive, who was both an executive with a company that manufactured and distributed road building materials and a representative of a trade group involved with the construction of roads.  In that meeting, ROD BLAGOJEVICH said that he was planning on announcing a $1.5 billion road building program that would be administered through the Illinois Toll Highway Authority (the "Tollway") and that he might authorize an additional $6 billion road building program later on.   Shortly thereafter in the conversation, ROD BLAGOJEVICH asked for Construction Executive's help in raising contributions for ROD BLAGOJEVICH's campaign by the end of the year.  After Construction Executive left the meeting, ROD BLAGOJEVICH instructed Monk to try to get Construction Executive to raise $500,000 in contributions.  As ROD BLAGOJEVICH knew, Monk subsequently had a series of conversations with Construction Executive about the possibility

of Construction Executive arranging for campaign contributions to ROD BLAGOJEVICH.

35.    On or about October 6, 2008, defendant ROD BLAGOJEVICH told Lobbyist A that he would make an announcement concerning a $1.8 billion project involving the Tollway and that Monk would approach Construction Executive to ask that he raise substantial campaign contributions.  ROD BLAGOJEVICH further said that he could have announced a larger amount of money for road projects, but wanted to see how Construction Executive performed in raising contributions, and he added words to the effect of "If they don't perform, fuck 'em."

36.    On or about October 22, 2008, approximately one week after defendant ROD BLAGOJEVICH publicly announced a portion of a $1.8 billion program to upgrade interchanges on the tollway system, ROD BLAGOJEVICH called Construction Executive, spoke with him about the $1.8 billion program, and asked how he was coming with fundraising.

### Efforts to Obtain Personal Advantage in Exchange For State Financial Support for the Tribune Company

37.    Beginning in or about October 2008, and continuing until on or about December 9, 2008, defendant ROD BLAGOJEVICH, on multiple occasions, instructed Harris to communicate to individuals at the Tribune Company that ROD BLAGOJEVICH would withhold proposed state financial support that

would benefit the Tribune Company, publisher of the Chicago Tribune newspaper, unless the Tribune Company fired editorial board members who had been critical of ROD BLAGOJEVICH.

## Efforts to Obtain Personal Financial Benefits for ROD BLAGOJEVICH in Return for his Appointment of a United States Senator

38.     Beginning in or about October 2008, and continuing until on or about December 9, 2008, defendant ROD BLAGOJEVICH, with the assistance of Harris and Robert Blagojevich, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

39.     Defendant  ROD  BLAGOJEVICH  engaged  in  numerous conversations with others, at times including Harris and Robert Blagojevich, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.   At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third

parties.

40.     Defendant ROD BLAGOJEVICH and others devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a.     Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b.     A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c.     A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by Harris, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

d.     Employment for the wife of ROD BLAGOJEVICH with a union organization or lobbying firm, or on corporate boards of directors;

e.     A highly paid leadership position with a newly-created not-for-

profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

      f.    Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Senate Candidate A, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Senate Candidate A.

      41.    Defendant ROD BLAGOJEVICH discussed with others means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

      42.    On or about December 4, 2008, defendant ROD BLAGOJEVICH instructed Robert Blagojevich to contact a representative of Senate Candidate A, and advise the representative that if Senate Candidate A was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed Robert Blagojevich to

communicate the urgency of the message, and to do it in person, rather than over the phone.  Robert Blagojevich agreed to do so, and thereafter arranged a meeting with an associate of Senate Candidate A.

43.    On or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed Robert Blagojevich to cancel his meeting with the associate of Senate Candidate A, and Robert Blagojevich agreed to do so.

## Concealment

44.    Defendant ROD BLAGOJEVICH, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the Blagojevich Enterprise.

## THE PATTERN OF RACKETEERING ACTIVITY

45.    The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act #1
### (The Pension Obligation Bond Deal)
### (Paragraph 7 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #1.

a.      In or about 2003, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

## ROD BLAGOJEVICH

defendant herein, committed an act involving bribery, that is, conspired to commit bribery with Alonzo Monk, Christopher Kelly, and Antoin Rezko, in that ROD BLAGOJEVICH agreed to accept property, namely money, which he was not authorized by law to accept, knowing that the property was promised and tendered with the intent to cause ROD BLAGOJEVICH to influence the performance of acts related to his employment as Governor of the State of Illinois, namely, the awarding of lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds, in violation of 720 ILCS 5/33-1(d) and 720 ILCS 5/8-2.

b.      In or about 2003, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

## ROD BLAGOJEVICH

defendant herein, committed an act involving bribery, that is, ROD

BLAGOJEVICH agreed to accept property, namely money, which he was not authorized by law to accept, knowing that the property was promised and tendered with the intent to cause ROD BLAGOJEVICH to influence the performance of acts related to his employment as Governor of the State of Illinois, namely, the awarding of lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds, in violation of 720 ILCS 5/33-1(d).

## Racketeering Act #2
## (Solicitation of United States Congressman A
## (Paragraphs 21–24 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #2.

a. Beginning in or about 2005 and continuing through in or about 2006, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from United States Congressman A and United States Congressman A's brother, with the consent of United States Congressman A and United States Congressman A's brother, under color of official right, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b. Beginning in or about 2005 and continuing through in or about 2006, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, committed an act involving bribery, that is, attempted to commit bribery, in that ROD BLAGOJEVICH attempted to solicit and agreed to accept property and personal advantage, namely political contributions,

28

pursuant to an understanding that defendant ROD BLAGOJEVICH would improperly influence the performance of an act related to his employment and function as Governor of the State of Illinois, namely, the provision of a $2 million grant for the benefit of a publicly-supported school, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

### Racketeering Act #3
### (Solicitation of Children's Memorial Hospital)
### (Paragraphs 25–28 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #3.

a.    Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, with the consent of the Chief Executive Officer and Children's Memorial Hospital under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b.    Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH

defendant herein, committed an act involving bribery, that is, attempted to commit bribery, in that ROD BLAGOJEVICH attempted to solicit and agreed to accept property and personal advantage, namely political contributions, pursuant to an understanding that ROD BLAGOJEVICH would improperly influence the performance of an act related to his employment and function as Governor of the State of Illinois, namely, increasing reimbursement rates for specialty-care pediatric physicians, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

c.   Paragraphs 2 through 42 of Count Three are realleged and incorporated as though fully set forth herein.

On or about October 17, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and the Children's CEO in Florida, in which ROD BLAGOJEVICH told the Children's CEO that ROD BLAGOJEVICH had approved an increase in the reimbursement rate for specialty-care pediatric physicians, in violation of Title 18, United States Code, Sections 1343 and 1346.

### Racketeering Act #4
### (Solicitation of Racetrack Executive)
### (Paragraphs 29–33 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #4.

a.     Beginning on or about December 3, 2008, and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did conspire with Alonzo Monk and others to commit extortion, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Racetrack Executive and two horse racing tracks with which Racetrack Executive was affiliated, with the consent of Racetrack Executive and the horse racing tracks under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b.     Beginning on or about December 3, 2008, and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH

32

defendant herein, along with Alonzo Monk, committed an act involving bribery, that is, conspired to commit bribery, in that ROD BLAGOJEVICH, with the assistance of Monk, solicited and agreed to accept property and personal advantage, namely political contributions, pursuant to an understanding that ROD BLAGOJEVICH would improperly influence the performance of an act related to his employment and function as Governor of the State of Illinois, namely, the signing of a bill that had passed the Illinois legislature and that would financially help the Illinois horse racing industry, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-2.

      c.      Paragraphs 2 through 42 of Count Three are realleged and incorporated as though fully set forth herein.

On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Alonzo Monk in Miami, Florida, in which ROD BLAGOJEVICH agreed with Monk that, in order to obtain the campaign contribution sought from Racetrack Executive in exchange for a

33

prompt signing of the Racing Bill, it would be better "from a pressure point of view" for ROD BLAGOJEVICH himself to call Racetrack Executive to discuss the timing of signing the Racing Bill, in violation of Title 18, United States Code, Sections 1343 and 1346.

## Racketeering Act #5
## (Solicitation of Highway Contractor)
## (Paragraphs 34–36 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #5.

a.    Beginning in or about September 2008 and continuing through December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Construction Executive (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Construction Executive, with the consent of Construction Executive and his employer under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b.    Beginning in or about September 2008 and continuing through December 9, 2008, in the Northern District of Illinois, Eastern Division, and

35

elsewhere,

### ROD BLAGOJEVICH

defendant herein, along with others, committed an act involving bribery, that is, attempted to commit bribery, in that ROD BLAGOJEVICH, solicited and agreed to accept property and personal advantage, namely political contributions, pursuant to an understanding that ROD BLAGOJEVICH would improperly influence the performance of an act related to his employment and function as Governor of the State of Illinois, namely, increasing funding for road building programs, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

## Racketeering Act #6
### (Efforts to Obtain Personal Financial Benefits for Rod Blagojevich in Return for his Appointment of a United States Senator) (Paragraphs 38–43 Above)

Defendant ROD BLAGOJEVICH committed the following acts, any one of which alone constitutes the commission of Racketeering Act #6.

a. Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did conspire with Robert Blagojevich, John Harris, and others to commit extortion in relation to the appointment of a United States Senator, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b. Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, and Robert Blagojevich, and others did attempt to commit extortion in relation to the appointment of a United States Senator, which

37

extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right, in violation of Title 18, United States Code, Sections 1951(a) and 2.

c.    Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH

defendant herein, along with Robert Blagojevich, John Harris, and others, committed an act involving bribery, that is, conspired to commit bribery, in that ROD BLAGOJEVICH, with the assistance of others, solicited and agreed to accept property and personal advantage, pursuant to an understanding that ROD BLAGOJEVICH would improperly influence the performance of an act related to his employment and function as Governor of the State of Illinois, namely, the appointment of a United States Senator, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-2.

d. --- l.    Paragraphs 2 through 42 of Count Three are realleged and incorporated as though fully set forth herein.

On or about the following dates, defendant ROD BLAGOJEVICH, for the purpose of executing the above-described scheme, did knowingly cause to be

38

transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely phone calls, as further described below and in the corresponding indictment count, in violation of Title 18, United States Code, Sections 1343 and 1346:

| Racketeering Act | Date | Description |
|---|---|---|
| 6(d) | 11/1/2008 | Phone call between ROD BLAGOJEVICH in Illinois and Robert Blagojevich in Nashville, Tennessee, as such conversation relates to the Senate seat, and as more fully described in Count 4 of this indictment |
| 6(e) | 11/7/2008 | Phone call between ROD BLAGOJEVICH and John Harris, in Chicago, Illinois, and Advisor A, in Washington, D.C., as more fully described in Count 5 of this indictment |
| 6(f) | 11/10/2008 | Phone call between ROD BLAGOJEVICH, John Harris and others, in Chicago, Illinois, and various advisors in Washington, D.C., and New York City, as more fully described in Count 6 of this indictment |
| 6(g) | 11/12/2008 | Phone call between ROD BLAGOJEVICH, in Chicago, Illinois, and Advisor A in Washington, D.C. (Sessions 533, 535, and 537), as more fully described in Count 7 of this indictment |

| | | |
|---|---|---|
| 6(h) | 11/12/2008 | Phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 541), as more fully described in Count 8 of this indictment |
| 6(i) | 11/12/2008 | Phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 546), as more fully described in Count 9 of this indictment |
| 6(j) | 11/13/2008 | Phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 624), as more fully described in Count 10 of this indictment |
| 6(k) | 11/13/2008 | Phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 627), as more fully described in Count 11 of this indictment |
| 6(l) | 12/4/2008 | Phone call between ROD BLAGOJEVICH and Deputy Governor A in Chicago, Illinois, and Advisor A in Washington, D.C., as more fully described in Count 13 of this indictment |

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1, 2, and 3 of Count One, and Paragraph 2 of Count Three, are hereby realleged and incorporated as if fully set forth herein.

### The Racketeering Conspiracy

2.    From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, together with Christopher Kelly, Alonzo Monk, William F. Cellini, Sr., John Harris, Robert Blagojevich, Antoin Rezko, and Stuart Levine, being persons employed by and associated with an enterprise, namely the Blagojevich Enterprise, which enterprise engaged in, and the activities of which affected, interstate commerce, did conspire and agree, with each other and others known and unknown to the Grand Jury, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Blagojevich Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of:

   a.    multiple acts indictable under the following provisions of federal law:

       i.    Title 18, United States Code, Section 1951(a) (extortion, attempted extortion, and conspiracy to commit extortion);

ii.    Title 18, United States Code, Sections 1341, 1343, and
1346 (mail fraud and wire fraud); and

b.    multiple acts involving bribery, including conspiracy and
attempt, chargeable under the following provisions of Illinois
law:

720 ILCS 5/33-1(d) and (e) (bribery);

720 ILCS 5/8-2, and 5/8-4 (conspiracy and attempt)

3.    Defendant ROD BLAGOJEVICH agreed that a conspirator would

commit at least two acts of racketeering activity in the conduct of the affairs of

the enterprise.

## Means and Method of the Conspiracy

4.    It was part of the conspiracy that defendant ROD BLAGOJEVICH,

along with Kelly, Monk, Cellini, Robert Blagojevich, Harris, Rezko, and Levine,

and others, used and agreed to use the powers of the Office of the Governor and

of certain state boards and commissions subject to the influence of the Office of

the Governor, to take and cause governmental actions, including: appointments

to boards and commissions; the awarding of state business, grants, and

investment fund allocations; the enactment of legislation and executive orders;

and the appointment of a United States Senator; in exchange for financial

benefits for themselves and others, including campaign contributions for ROD

BLAGOJEVICH,   money   for   themselves,   and   employment   for   ROD

42

BLAGOJEVICH and his wife.

5.     It was further part of the conspiracy that defendant ROD BLAGOJEVICH permitted Kelly and Rezko to exercise substantial influence over certain activities of the Office of the Governor, as well as state boards and commissions with members appointed by the Governor, with the knowledge that Kelly and Rezko would use this influence to enrich themselves and their associates.     In return, Kelly and Rezko provided benefits to ROD BLAGOJEVICH by (a) generating millions of dollars in contributions to Friends of Blagojevich, and (b) providing financial benefits directly to ROD BLAGOJEVICH and his family members.

6.     It was further part of the conspiracy that defendant ROD BLAGOJEVICH and other members of the conspiracy committed various acts in furtherance of the conspiracy, as more fully described, and incorporated herein, at Paragraphs 6 through 43 of Count One.

7.     It was further part of the conspiracy that defendant ROD BLAGOJEVICH, and other members of the conspiracy, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the conspiracy;

In violation of Title 18, United States Code, Section 1962(d).

## **COUNT THREE**

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraph 1 of Count One is hereby realleged and incorporated as if fully set forth herein.

2.      At times material to this Second Superseding Indictment:

a.      Defendant ROD BLAGOJEVICH, Monk, and Harris, while serving as officers and employees of the State of Illinois, and Levine, while serving as a Trustee of TRS and a member of the Planning Board, were bound by the following laws, duties, policies, and procedures:

i.      As Governor, defendant ROD BLAGOJEVICH was a constitutional officer and as such, at the outset of each term as Governor, was required to take an oath of office to support the Constitution of the United States and the Constitution of the State of Illinois, and to faithfully discharge the duties of the office of Governor to the best of his ability.

ii.      Pursuant to Article VIII, Section 1(a) of the Constitution of the State of Illinois, public funds, property and credit shall be used only for public purposes.

iii.      As officers and employees of the State of Illinois, defendant ROD BLAGOJEVICH, Monk, and Harris owed a duty of honest services and a duty of loyalty to the people of the State of Illinois in the

44

performance of their public duties.

iv.     As a Trustee of TRS, Levine owed a fiduciary duty, a duty of honest services, and a duty of loyalty to the beneficiaries of TRS and was required to act solely for their benefit. As a member of the Health Facilities Planning Board, Levine owed a duty of honest services and a duty of loyalty to the people of the State of Illinois in the performance of his duties on the Health Facilities Planning Board.

v.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-3(c) and (d)), defendant ROD BLAGOJEVICH, Monk, and Harris, and Levine, each was prohibited from committing the following acts in his official capacity:  (1) performing an act in excess of his lawful authority, with intent to obtain a personal advantage for himself or others; and (2) soliciting or knowingly accepting, for the performance of any act, a fee or reward which he knows is not authorized by law.

vi.     Pursuant to the criminal laws of the State of Illinois (720 ILCS 5/33-1(d) and (e)), defendant ROD BLAGOJEVICH, Monk, and Levine each was prohibited from: (1) receiving, retaining, or agreeing to accept any property or personal advantage which he was not authorized by law to accept, knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the

employment or function of his public office; and (2) soliciting, receiving, retaining, or agreeing to accept any property or personal advantage pursuant to an understanding that he would improperly influence or attempt to influence the performance of any act related to the employment of any public officer or public employee.

      vii.    Pursuant to the criminal laws of the State of Illinois (50 ILCS 105/3), defendant ROD BLAGOJEVICH, Monk, and Levine each was prohibited from being, in any manner, financially interested, either directly or indirectly, in any contract or the performance of any work in regard to which he may have been called upon to act.

      3.    From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, defendants ROD BLAGOJEVICH and ROBERT BLAGOJEVICH, together with Alonzo Monk, John Harris, Christopher Kelly, William F. Cellini, Sr., Antoin Rezko, Stuart Levine, and others, acting with the intent to defraud and to deceive, devised and participated in a scheme to deprive the people of the State of Illinois and the beneficiaries of TRS of their intangible right to the honest services of ROD BLAGOJEVICH, Harris, Monk, and Levine.

## Overview of the Scheme

4.    It was part of the scheme to defraud that defendants ROD
BLAGOJEVICH and ROBERT BLAGOJEVICH, together with Monk, Harris,
Kelly, Cellini, Rezko, Levine, and others, used and attempted to use the powers
of the Office of the Governor, and of certain state boards and commissions
subject to influence by the Office of the Governor, to take and cause official
actions, including: appointments to boards and commissions; the awarding of
state business, grants, and investment fund allocations; the enactment of
legislation and executive orders; and the appointment of a United States
Senator; in exchange for financial benefits for themselves and others, including
campaign contributions for ROD BLAGOJEVICH, money for themselves, and
employment for ROD BLAGOJEVICH and his wife, thereby materially
breaching the duty of loyalty owed by ROD BLAGOJEVICH, Harris, Monk, and
Levine.

## Sharing Financial Benefits from State Actions

5.    It was further part of the scheme that, in a series of conversations
that began in 2002 and continued after defendant ROD BLAGOJEVICH was
elected Governor in November 2002, ROD BLAGOJEVICH, Monk, Kelly, and
Rezko, agreed that they would use ROD BLAGOJEVICH's position as Governor
and Monk's position as Chief of Staff for financial gain, which would be divided

among them, with the understanding that the money would be distributed after ROD BLAGOJEVICH left public office.  The defendants and their co-schemers later implemented this agreement, as further described below.

## The Pension Obligation Bond Deal

6.      It was further part of the scheme that in or about 2003, defendant ROD BLAGOJEVICH, Monk, Kelly and Rezko, agreed to direct lucrative state business relating to the refinancing of billions of dollars in State of Illinois Pension Obligation Bonds to a company whose lobbyist agreed to provide hundreds of thousands of dollars to Rezko out of the fee the lobbyist would collect, and Rezko in turn agreed to split the money with ROD BLAGOJEVICH, Monk, and Kelly.

## Maintaining Control Over TRS

7.      It was further part of the scheme that in or about the spring of 2003, Kelly, Rezko, Cellini, and Levine agreed that Kelly and Rezko would use their influence with the Blagojevich administration to assist Cellini and Levine in maintaining influence over the activities of TRS, and in return, Cellini and Levine would use their influence with TRS to cause TRS to invest in funds, and to use the services of law firms, selected by Kelly and Rezko, at times in exchange for substantial contributions to Friends of Blagojevich.

## The Solicitation of Ali Ata

8.     It was further part of the scheme that in or about late 2002, Ali Ata, an Illinois businessman who was solicited by Rezko to make political contributions to defendant ROD BLAGOJEVICH, brought a $25,000 check to Rezko's offices, where Ata met with ROD BLAGOJEVICH. During that meeting, ROD BLAGOJEVICH asked Rezko if Rezko had talked to Ata about positions in the administration, and Rezko said that he had.  In or about July 2003, after discussions with Rezko about possible state appointments, Ata gave Rezko another $25,000 check payable to ROD BLAGOJEVICH's campaign.  Shortly after this, Ata had a conversation with ROD BLAGOJEVICH at a fundraising event, during which ROD BLAGOJEVICH indicated that he was aware Ata recently had made another substantial contribution to ROD BLAGOJEVICH's campaign, and told Ata that he understood Ata would be joining his administration. Ata replied that he was considering taking a position, and ROD BLAGOJEVICH said that it had better be a job where Ata could make some money.   ROD BLAGOJEVICH ultimately appointed Ata as the executive director of the Illinois Finance Authority.

## The Solicitation of Joseph Cari

9.     It was further part of the scheme that on or about October 29, 2003, when Joseph Cari, a national Democratic fundraiser, was traveling on a plane

with defendant ROD BLAGOJEVICH, Kelly, and Levine to a Blagojevich fundraiser in New York hosted by Cari, he spoke with ROD BLAGOJEVICH, who discussed Cari's background as a national fundraiser and ROD BLAGOJEVICH's interest in running for President. ROD BLAGOJEVICH said it was easier for governors to solicit campaign contributions because of their ability to award contracts and give legal work, consulting work, and investment banking work to campaign contributors, and that Kelly and Rezko were his point people in raising campaign contributions. ROD BLAGOJEVICH also said there were state contracts and other state work that could be given to contributors who helped ROD BLAGOJEVICH, Rezko, and Kelly, and that Rezko and Kelly would follow up with Cari in relation to the discussion that had just occurred.

10.     It was further part of the scheme that during the October 29, 2003, fundraiser, Levine told Cari that there was a plan in place in the Blagojevich administration pursuant to which Rezko and Kelly would pick consultants to do business with State of Illinois boards, and, thereafter, the consultants would be asked to make campaign contributions.

11.     It was further part of the scheme that sometime after October 2003, Rezko told Cari that Rezko had a close relationship with the Blagojevich administration, that Rezko had a role in picking consultants, law firms and other entities to get state business, and that defendant ROD BLAGOJEVICH's

Chief of Staff, Monk, helped implement Rezko's choices for state work. Rezko also said that, in exchange for raising money for ROD BLAGOJEVICH, the Blagojevich administration would be helpful to Cari's business interests.

12.     It was further part of the scheme that on or about March 5, 2004, Cari met with Kelly, who said he was following up on Cari's conversations with defendant ROD BLAGOJEVICH, Rezko, and Levine. Kelly asked for Cari's help in raising money on a national level for ROD BLAGOJEVICH. When Cari said he was not inclined to help, Kelly pushed Cari to assist and said that helping ROD BLAGOJEVICH would be good for Cari's business interests and that Cari could have whatever Cari wanted if he agreed to help.

## Campaign Contributions Solicited for TRS Investments

13.     It was further part of the scheme that in or about March 2004, Lobbyist A met with Christopher Kelly to ask how two clients of Lobbyist A could become eligible to manage investments for TRS. Kelly informed Lobbyist A that TRS was Rezko's area, and subsequently told Lobbyist A that he had spoken with Rezko, and that it would require a $50,000 campaign contribution to defendant ROD BLAGOJEVICH for a firm to get on TRS's list of recommended fund managers.

## The Attempted Extortion of Capri Capital

14.   It was further part of the scheme that in or about April 2004, Rezko, Kelly, and Levine agreed that they would use their influence and Levine's position at TRS to prevent Capri Capital from receiving a potential $220 million allocation from TRS unless Capri Capital or one of its principals, Thomas Rosenberg, agreed to make a payment, such as by arranging to raise a significant amount of money in campaign contributions for the benefit of defendant ROD BLAGOJEVICH. At Levine's direction, Cellini assisted the plan by indicating to Rosenberg that Capri Capital had not yet received its $220 million allocation from TRS because of its failure to make political donations to ROD BLAGOJEVICH.

15.   It was further part of the scheme that on or about May 11, 2004, after Rosenberg threatened to expose the extortion attempt, Rezko, Kelly, Levine, and Cellini agreed that in light of Rosenberg's threat, it was too risky to continue demanding money from Rosenberg or to block the $220 million allocation to Capri Capital. Rezko subsequently told Levine that defendant ROD BLAGOJEVICH had been told about the attempt to extort Rosenberg, and that ROD BLAGOJEVICH had agreed that Capri Capital should receive the $220 million allocation because of Rosenberg's threat, but felt that Rosenberg should receive nothing further from the State of Illinois.

16.    It was further part of the scheme that after the discussion involving Kelly, Rezko, Levine, and Cellini on or about May 11, 2004, Cellini and Levine took steps to conceal the extortion plan, including by using their influence and Levine's position at TRS to ensure that Capri Capital received its $220 million allocation.

## Benefits Given to ROD BLAGOJEVICH and Alonzo Monk

17.    It was further part of the scheme that to ensure that defendant ROD BLAGOJEVICH and Monk would continue to give Rezko substantial influence regarding matters such as appointments to boards and commissions, the selection of candidates for state employment, and the awarding of state contracts, grants, and investment fund allocations, Rezko gave certain benefits to ROD BLAGOJEVICH and Monk, including the following:

a.    In or about late August 2003, Rezko directed to ROD BLAGOJEVICH's wife a payment of $14,369, purportedly in connection with a real estate transaction involving property at 850 North Ogden Avenue, Chicago, Illinois, for which transaction ROD BLAGOJEVICH's wife had not performed any services.

b.    From in or about October 2003 to in or about May 2004, Rezko, through his real estate development company, provided ROD BLAGOJEVICH's wife with payments of $12,000 a month, purportedly for real estate brokerage

services.

      c.    In or about January 2004, while Rezko's real estate development company was paying ROD BLAGOJEVICH's wife $12,000 a month, Rezko directed to ROD BLAGOJEVICH's wife a payment of $40,000, purportedly for brokerage services in connection with the sale of property at 1101 West Lake Street, Chicago, Illinois, even though the sale of the property had been arranged without the assistance of ROD BLAGOJEVICH's wife.

      d.    From in or about the spring of 2004 until in or about 2006, Rezko provided to Monk a number of $10,000 cash gifts to pay for various items, such as a car and home improvements, which cash gifts totaled approximately $70,000 to $90,000.

### The Search for Employment for ROD BLAGOJEVICH's Wife

18.    It was further part of the scheme that after the real estate business of defendant ROD BLAGOJEVICH's wife became the subject of critical media coverage, ROD BLAGOJEVICH directed Harris to try to find a paid state board appointment or position for her. During several conversations in or about early 2008, ROD BLAGOJEVICH informed Harris that ROD BLAGOJEVICH wanted his wife put on the Pollution Control Board, which pays salaries to its board members. When Harris told ROD BLAGOJEVICH that his wife was not qualified for the position, ROD BLAGOJEVICH told Harris to find other

employment for his wife.

19.    It was further part of the scheme that, in or about the spring of 2008, around the time that defendant ROD BLAGOJEVICH's wife passed a licensing examination that allowed her to sell financial securities, ROD BLAGOJEVICH asked Harris and others to set up informational or networking meetings for his wife with financial institutions that had business with the State of Illinois in hopes that those businesses would assist in getting ROD BLAGOJEVICH's wife a job.  Harris subsequently arranged meetings between ROD BLAGOJEVICH's wife and officials at two financial institutions that had business with the State of Illinois.  When ROD BLAGOJEVICH concluded that officials at these institutions were unhelpful in finding ROD BLAGOJEVICH's wife a job, ROD BLAGOJEVICH told Harris that he did not want the institutions receiving further business from the State of Illinois.

### Solicitation of United States Congressman A

20.    It was further part of the scheme that in or about 2006, after United States Congressman A inquired about the status of a $2 million grant for the benefit of a publicly-supported school, defendant ROD BLAGOJEVICH instructed Harris not to release the grant until further direction from ROD BLAGOJEVICH, even though ROD BLAGOJEVICH previously had agreed to support the grant and funding for the grant had been included in the state's

budget.

21.   It was further part of the scheme that, in response to inquiries by a high-ranking state official as to whether the grant money could be released, defendant ROD BLAGOJEVICH informed the official that ROD BLAGOJEVICH wanted it communicated to United States Congressman A that United States Congressman A's brother needed to have a fundraiser for ROD BLAGOJEVICH.

22.   It was further part of the scheme that defendant ROD BLAGOJEVICH told Lobbyist A that ROD BLAGOJEVICH was giving a $2 million grant to a school in United States Congressman A's district and instructed Lobbyist A to approach United States Congressman A for a fundraiser.

23.   It was further part of the scheme that after defendant ROD BLAGOJEVICH learned from Harris that the school had started to incur expenses that were to be paid with the grant funds, ROD BLAGOJEVICH initially resisted the release of the grant money, and then ultimately agreed to the release of certain of the grant funds to cover incurred expenses, but only on a delayed basis, even though no fundraiser had been held.

## Solicitation of Children's Memorial Hospital

24.   It was further part of the scheme that on or about October 8, 2008, defendant ROD BLAGOJEVICH advised Lobbyist A that he intended to take

official action that would provide additional state money to Children's Memorial Hospital, and that ROD BLAGOJEVICH wanted to get $50,000 in campaign contributions from the Chief Executive Officer of Children's Memorial Hospital ("the Children's CEO").

25.     It was further part of the scheme that on or about October 17, 2008, defendant ROD BLAGOJEVICH called the Children's CEO to tell him of his intent to increase the Illinois Medicaid reimbursement rate for speciality-care pediatric physicians. Shortly before this, ROD BLAGOJEVICH had directed Deputy Governor A to initiate such an increase, which Illinois providers of pediatric healthcare, including Children's Memorial Hospital, had actively supported for years.

26.     It was further part of the scheme that on or about October 22, 2008, at defendant ROD BLAGOJEVICH's direction, defendant ROBERT BLAGOJEVICH spoke with the Children's CEO and asked him to arrange to raise $25,000 for ROD BLAGOJEVICH prior to January 1, 2009.

27.     It was further part of the scheme that on or about November 12, 2008, after the Children's CEO had not returned additional phone calls from defendant ROBERT BLAGOJEVICH, and no political contributions from the Children's CEO or other persons associated with Children's Memorial Hospital had been received, defendant ROD BLAGOJEVICH spoke to Deputy Governor

A about the increase in the Medicaid reimbursement rates for specialty-care pediatric physicians, asking whether "we could pull it back if we needed to. . . ." As a result of this conversation, Deputy Governor A instructed the Department of Healthcare Services to stop its work on increasing the reimbursement for specialty-care pediatric physicians.

## Solicitation of Racetrack Executive

28.    It was further part of the scheme that on or about November 13, 2008, defendant ROD BLAGOJEVICH told defendant ROBERT BLAGOJEVICH that he wanted campaign contributions to be made by the end of the year by Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill pending in the Illinois legislature that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). At that time, as ROD BLAGOJEVICH knew, Monk had been trying to arrange a contribution from Racetrack Executive, and ROD BLAGOJEVICH had set a goal of raising $100,000 in contributions from and through Racetrack Executive.

29.    It was further part of the scheme that defendant ROD BLAGOJEVICH had further conversations with Monk about the Racing Bill after it was passed by the Illinois legislature on or about November 20, 2008. In those conversations, ROD BLAGOJEVICH and Monk discussed whether and

when ROD BLAGOJEVICH would sign the Racing Bill, and whether and when Racetrack Executive would arrange for campaign contributions to ROD BLAGOJEVICH. On or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Racetrack Executive would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

30. It was further part of the scheme that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Racetrack Executive. During that visit, Monk communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

31. It was further part of the scheme that after meeting with Racetrack Executive on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now." ROD BLAGOJEVICH

responded, "good," and "good job."

32.   It was further part of the scheme that on or about December 4, 2008,
Monk asked defendant ROD BLAGOJEVICH to call Racetrack Executive and
to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this
would be better "from a pressure point of view."  ROD BLAGOJEVICH agreed
to call Racetrack Executive.

### Solicitation of Highway Contractor

33.   It was further part of the scheme that on or about September 18,
2008, defendants ROD BLAGOJEVICH and ROBERT BLAGOJEVICH, and
Monk, met with Construction Executive, who was both an executive with a
company that manufactured and distributed road building materials and a
representative of a trade group involved with the construction of roads.  In that
meeting, ROD BLAGOJEVICH said that he was planning on announcing a $1.5
billion road building program that would be administered through the Illinois
Toll Highway Authority (the "Tollway") and that he might authorize an
additional $6 billion road building program later on.  Shortly thereafter in the
conversation, ROD BLAGOJEVICH asked for Construction Executive's help in
raising contributions for ROD BLAGOJEVICH's campaign by the end of the
year.  After Construction Executive left the meeting, ROD BLAGOJEVICH
instructed Monk to try to get Construction Executive to raise $500,000 in

contributions. As ROD BLAGOJEVICH knew, Monk subsequently had a series of conversations with Construction Executive about the possibility of Construction Executive arranging for campaign contributions to ROD BLAGOJEVICH.

34.    It was further part of the scheme that, on or about October 6, 2008, defendant ROD BLAGOJEVICH told Lobbyist A that he would make an announcement concerning a $1.8 billion project involving the Tollway and that Monk would approach Construction Executive to ask that he raise substantial campaign contributions. ROD BLAGOJEVICH further said that he could have announced a larger amount of money for road projects, but wanted to see how Construction Executive performed in raising contributions, and he added words to the effect of "If they don't perform, fuck 'em."

35.    It was further part of the scheme that, on or about October 22, 2008, approximately one week after defendant ROD BLAGOJEVICH publicly announced a portion of a $1.8 billion program to upgrade interchanges on the tollway system, ROD BLAGOJEVICH called Construction Executive, spoke with him about the $1.8 billion program, and asked how he was coming with fundraising.

**Efforts to Obtain Personal Financial Benefits for ROD BLAGOJEVICH
in Return for his Appointment of a United States Senator**

36.    It was further part of the scheme that beginning in or about October 2008, and continuing until on or about December 9, 2008, defendant ROD BLAGOJEVICH, with the assistance of Harris and defendant ROBERT BLAGOJEVICH, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

37.    It was further part of the scheme that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including Harris and Robert Blagojevich, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.  At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

38.    It was further part of the scheme that defendant ROD

BLAGOJEVICH and his co-schemers devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a.    Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b.    A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c.    A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by Harris, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

d.    Employment for the wife of ROD BLAGOJEVICH with a union organization or lobbying firm, or on corporate boards of directors;

e.    A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large

contributions by persons associated with the President-elect; and

   f. Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Senate Candidate A, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Senate Candidate A.

   39. It was further part of the scheme that defendant ROD BLAGOJEVICH discussed with his co-schemers means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

   40. It was further part of the scheme that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to contact a representative of Senate Candidate A, and advise the representative that if Senate Candidate A was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to

communicate the urgency of the message, and to do it in person, rather than over the phone.  ROBERT BLAGOJEVICH agreed to do so, and thereafter arranged a meeting with an associate of Senate Candidate A.

41.  It was further part of the scheme that on or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to cancel his meeting with the associate of Senate Candidate A, and ROBERT BLAGOJEVICH agreed to do so.

42.  It was further part of the scheme that defendant ROD BLAGOJEVICH, and other participants in the scheme, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the scheme.

43.  On or about October 17, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and the Children's CEO in Florida, in

which ROD BLAGOJEVICH told the Children's CEO that ROD BLAGOJEVICH

had approved an increase in the reimbursement rate for specialty-care pediatric

physicians;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FOUR

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.     On or about November 1, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and
ROBERT BLAGOJEVICH,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and ROBERT BLAGOJEVICH in Nashville, Tennessee, in which ROBERT BLAGOJEVICH gave ROD BLAGOJEVICH an update on the solicitation of campaign contributions from Construction Executive and Racetrack Executive, and they discussed potential contributions from Senate Candidate C and Senate Candidate A;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FIVE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.      On or about November 7, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and John Harris, in Chicago, Illinois, and Advisor A, in Washington, D.C., in which ROD BLAGOJEVICH, Harris, and Advisor A discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SIX

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.    On or about November 10, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a conference call between ROD BLAGOJEVICH, John Harris and others, in Chicago, Illinois, and various advisors in Washington, D.C., and New York City, in which they discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SEVEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.    On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH, in Chicago, Illinois, and Advisor A in Washington, D.C. (Sessions 533, 535, and 537), in which they discussed a proposal where, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization would be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT EIGHT

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.     On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 541), in which ROD BLAGOJEVICH proposed that, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT NINE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.      On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and a labor union official in Washington, D.C. (Session 546), in which ROD BLAGOJEVICH informed the union official that it was a very real possibility that Senate Candidate B could get the United States Senate appointment, and again raised his interest in employment by a not-for-profit organization;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.      On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 624), in which they discussed presenting to United States Congressman A a proposal by ROD BLAGOJEVICH that a not-for-profit organization be set up and that the connection between setting up this organization and the awarding of the U.S. Senate seat would be "unsaid";

In violation of Title 18, United States Code, Sections 1343 and 1346.

73

## COUNT ELEVEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.      On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Advisor B in Michigan (Session 627), in which ROD BLAGOJEVICH asked Advisor B to call Lobbyist A and ask Lobbyist A to present to United States Congressman A ROD BLAGOJEVICH's proposal that a not-for-profit organization be set up and that, while it would be unsaid, this would be a "play" to obtain a financial benefit for ROD BLAGOJEVICH in return for the awarding of the United States Senate seat;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TWELVE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.     On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Alonzo Monk in Miami, Florida, in which ROD BLAGOJEVICH agreed with Monk that, in order to obtain the campaign contribution sought from Racetrack Executive in exchange for a prompt signing of the Racing Bill, it would be better "from a pressure point of view" for ROD BLAGOJEVICH himself to call Racetrack Executive to discuss the timing of signing the Racing Bill;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT THIRTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1 through 42 of Count Three are realleged and incorporated as if fully set forth herein.

2.     On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH and
ROBERT BLAGOJEVICH,

defendants herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and Deputy Governor A in Chicago, Illinois, and Advisor A in Washington, D.C., in which ROD BLAGOJEVICH said that if he gave the Senate seat to Senate Candidate A, there would be "tangible political support . . . specific amounts and everything . . . . some of it up front";

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FOURTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1(a) and 1(b) of Count One are realleged and incorporated as though fully set forth herein.

2.    Beginning in or about 2005 and continuing through in or about 2006, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from United States Congressman A and United States Congressman A's brother, with the consent of United States Congressman A and United States Congressman A's brother, under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIFTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), and 1(f) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, with the consent of the Chief Executive Officer and Children's Memorial Hospital under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT SIXTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.    Paragraphs 1(a), 1(b), and 1(f) of Count One are realleged and incorporated as though fully set forth herein.

2.    Beginning in or around October 2008, and continuing to on or about December 9, 2008, at Chicago, in the Northern District of Illinois, Eastern Division,

### ROD BLAGOJEVICH,

defendant herein, as an agent of the State of Illinois, corruptly solicited and demanded things of value, namely political contributions from the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, increasing reimbursement rates for specialty-care pediatric physicians, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT SEVENTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning on or about December 3, 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, conspired with Alonzo Monk and others, to commit extortion, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Racetrack Executive and two horse racing tracks with which Racetrack Executive was affiliated, with the consent of Racetrack Executive and the horse racing tracks under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm.

3.     It was part of the conspiracy that on or about December 3, 2008, defendant ROD BLAGOJEVICH spoke with Monk about Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill that had been passed by the Illinois legislature on November 20, 2008, that would require certain Illinois casinos to give money to

a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). As ROD BLAGOJEVICH knew, Monk had been talking with Racetrack Executive prior to December 3, 2008, about making a campaign contribution to ROD BLAGOJEVICH. During their conversation on or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Racetrack Executive would not make a contribution by the end of the year if ROD BLAGOJEVICH signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

5.     It was further part of the conspiracy that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Racetrack Executive. During that visit, Monk communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

6.     It was further part of the conspiracy that after meeting with Racetrack Executive on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed

because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

7.    It was further part of the conspiracy that on or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Racetrack Executive.

8.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH and Monk did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT EIGHTEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning on or about December 3, 2008, and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH, and
ALONZO MONK,

defendants herein, did conspire with each other and others, to corruptly solicit and demand things of value, namely political contributions for the benefit of ROD BLAGOJEVICH, a agent of the State of Illinois, from Racetrack Executive and two horse racing tracks with which Racetrack Executive was affiliated, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the signing of a bill that had passed the Illinois legislature and that would financially help the Illinois horse racing industry, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008, in violation of Title 18, United States Code, Section 666(a)(1)(B).

3.     It was part of the conspiracy that on or about December 3, 2008, defendant ROD BLAGOJEVICH spoke with defendant MONK about Racetrack Executive, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill that had been passed by the Illinois legislature on November 20, 2008, that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). As ROD BLAGOJEVICH knew, MONK had been talking with Racetrack Executive prior to December 3, 2008, about making a campaign contribution to ROD BLAGOJEVICH. During their conversation on or about December 3, 2008, ROD BLAGOJEVICH indicated to MONK that he was concerned that Racetrack Executive would not make a contribution by the end of the year if ROD BLAGOJEVICH signed the Racing Bill before the contribution was made. As a result, MONK and ROD BLAGOJEVICH agreed that MONK would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

4.     It was further part of the conspiracy that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, defendant MONK visited Racetrack Executive. During that visit, MONK communicated to Racetrack Executive that ROD BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

5.    It was further part of the conspiracy that after meeting with Racetrack Executive on or about December 3, 2008, defendant MONK reported to defendant ROD BLAGOJEVICH that MONK had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now."   ROD BLAGOJEVICH responded, "good," and "good job."

6.    It was further part of the conspiracy that on or about December 4, 2008, defendant MONK asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view."   ROD BLAGOJEVICH agreed to call Racetrack Executive.

7.    It was further part of the conspiracy that defendants ROD BLAGOJEVICH and MONK did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

<u>Overt Acts</u>

8.    In furtherance of the conspiracy and to effect its objects and purposes, defendants ROD BLAGOJEVICH and ALONZO MONK committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.   On or about December 3, 2008, in a meeting at the Friends of Blagojevich offices, defendant ROD BLAGOJEVICH indicated to defendant MONK that he was concerned that Racetrack Executive would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made and, as a result, MONK and ROD BLAGOJEVICH agreed that MONK would speak with Racetrack Executive to ensure that Racetrack Executive would make a contribution by the end of the year.

b.   On or about December 3, 2008, after meeting with defendant ROD BLAGOJEVICH, defendant MONK visited Racetrack Executive and communicated to Racetrack Executive that ROD  BLAGOJEVICH was concerned that Racetrack Executive would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

c.   On or about December 3, 2008, after meeting with Racetrack Executive, defendant MONK reported to defendant ROD BLAGOJEVICH that MONK had said to Racetrack Executive, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Racetrack Executive that the contribution has "got to be in now," to which  ROD BLAGOJEVICH responded, "good," and "good job."

d.   On or about December 4, 2008, defendant MONK asked defendant ROD BLAGOJEVICH to call Racetrack Executive and to suggest that

ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Racetrack Executive.

All in violation of Title 18, United States Code, Section 371.

## COUNT NINETEEN

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or about September 2008 and continuing through December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Construction Executive (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Construction Executive, with the consent of Construction Executive and his employer under color of official right, and induced by the wrongful use of actual and threatened fear of economic harm;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT TWENTY

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or around September 2008, and continuing to on or about December 9, 2008, at Chicago, in the Northern District of Illinois, Eastern Division,

### ROD BLAGOJEVICH,

defendant herein, as an agent of the State of Illinois, corruptly solicited and demanded things of value, namely political contributions from Construction Executive (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Construction Executive, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, funding for road building programs, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT TWENTY-ONE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

> ROD BLAGOJEVICH, and
> ROBERT BLAGOJEVICH,

defendants herein, did conspire with John Harris and others to commit extortion in relation to the appointment of a United States Senator, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right.

3.     It was part of the conspiracy that defendant ROD BLAGOJEVICH, with the assistance of defendant ROBERT BLAGOJEVICH and Harris, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

4.     It was further part of the conspiracy that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including Harris and defendant ROBERT BLAGOJEVICH, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.  At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

5.     It was further part of the conspiracy that defendant ROD BLAGOJEVICH and his co-conspirators devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a.     Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

      b.    A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

      c.    A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by Harris, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

      d.    Employment for the wife of ROD BLAGOJEVICH with a union organization or lobbying firm, or on corporate boards of directors;

      e.    A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

      f.    Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Senate Candidate A, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Senate Candidate A.

6.    It was further part of the conspiracy that defendant ROD
BLAGOJEVICH discussed with his co-conspirators means by which he could
influence the President-elect to assist ROD BLAGOJEVICH in obtaining
personal benefits for himself and his wife, including by appointing as United
States Senator a candidate whom ROD BLAGOJEVICH believed to be favored
by the President-elect. At times, ROD BLAGOJEVICH attempted to further this
goal by conveying messages, directly and with the assistance of others, to
individuals whom he believed to be in communication with the President-elect.

7.    It was further part of the conspiracy that on or about December 4,
2008, defendant ROD BLAGOJEVICH instructed defendant ROBERT
BLAGOJEVICH to contact a representative of Senate Candidate A, and advise
the representative that if Senate Candidate A was going to be chosen to fill the
Senate seat, some of the promised fundraising had to occur before the
appointment.  ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to
communicate the urgency of the message, and to do it in person, rather than
over the phone.  ROBERT BLAGOJEVICH agreed to do so, and thereafter
arranged a meeting with an associate of Senate Candidate A.

8.    It was further part of the conspiracy that on or about December 5,
2008, following the publication that day of a newspaper article reporting that
defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection

with an ongoing federal investigation, ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to cancel his meeting with the associate of Senate Candidate A, and ROBERT BLAGOJEVICH agreed to do so.

9.     It was further part of the conspiracy that defendants ROD BLAGOJEVICH and ROBERT BLAGOJEVICH, and Harris, and others, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT TWENTY-TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH, and
ROBERT BLAGOJEVICH,

defendants herein, and others did attempt to commit extortion in relation to the appointment of a United States Senator, which extortion would obstruct, delay, and affect commerce, in that the defendants attempted to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT TWENTY-THREE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,
ROBERT BLAGOJEVICH, and
JOHN HARRIS,

defendants herein, did conspire with each other and others, to corruptly solicit and demand things of value, for the benefit of ROD BLAGOJEVICH, an agent of the State of Illinois, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the appointment of a United States Senator, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008, in violation of Title 18, United States Code, Section 666(a)(1)(B).

3.      It was part of the conspiracy that defendant ROD BLAGOJEVICH, with the assistance of defendants ROBERT BLAGOJEVICH and HARRIS, and

others, sought to obtain financial benefits for himself and his wife, in return for

the exercise of his duty under Illinois law to appoint a United States Senator to

fill the vacancy created by the election of Barack Obama as President of the

United States.

4.   It was further part of the conspiracy that defendant ROD

BLAGOJEVICH engaged in numerous conversations with others, at times

including defendants HARRIS and ROBERT BLAGOJEVICH, certain high-

ranking employees of the Office of the Governor, and certain political

consultants, regarding the advantages and disadvantages of selecting various

candidates for the Senate vacancy and as a part of those considerations, ROD

BLAGOJEVICH and others devised and set in motion plans by which ROD

BLAGOJEVICH could use his power to appoint a United States Senator to

obtain financial benefits for himself and his wife.   At times ROD

BLAGOJEVICH directed others, including state employees, to assist in these

endeavors, including by performing research and conveying messages to third

parties.

5.   It was further part of the conspiracy that defendant ROD

BLAGOJEVICH and his co-conspirators devised and discussed means of using

ROD BLAGOJEVICH's power to appoint a United States Senator in exchange

for financial benefits for himself and his wife, which benefits would take the following forms, among others:

      a.     Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

      b.     A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

      c.     A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by defendant HARRIS, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

      d.     Employment for the wife of ROD BLAGOJEVICH with a union organization or lobbying firm, or on corporate boards of directors;

      e.     A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

f.    Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Senate Candidate A, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Senate Candidate A.

6.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH discussed with his co-conspirators means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

7.    It was further part of the conspiracy that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to contact a representative of Senate Candidate A, and advise the representative that if Senate Candidate A was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to communicate the urgency of the message, and to do it in person, rather than

over the phone.  ROBERT BLAGOJEVICH agreed to do so, and thereafter arranged a meeting with an associate of Senate Candidate A.

8.     It was further part of the conspiracy that on or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to cancel his meeting with the associate of Senate Candidate A, and ROBERT BLAGOJEVICH agreed to do so.

9.     It was further part of the conspiracy that defendants ROD BLAGOJEVICH, ROBERT BLAGOJEVICH, HARRIS, and others, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

Overt Acts

10.     In furtherance of the conspiracy and to effect its objects and purposes, defendants ROD BLAGOJEVICH, ROBERT BLAGOJEVICH, JOHN HARRIS, and others committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.   On or about November 1, 2008, defendants ROD BLAGOJEVICH and ROBERT BLAGOJEVICH, discussed potential contributions from Senate Candidate C and Senate Candidate A.

b.   On or about November 6, 2008, defendants ROD BLAGOJEVICH and HARRIS discussed attempting to obtain a highly paid leadership position with an organization known as "Change to Win" for ROD BLAGOJEVICH in exchange for ROD BLAGOJEVICH appointing a particular individual to the vacant Senate seat.

c.   On or about November 6, 2008, defendant ROD BLAGOJEVICH met with a labor union official who he believed to be in contact with the President-elect in regard to the vacant Senate seat, and suggested to the labor union official that ROD BLAGOJEVICH would appoint Senate Candidate B to the vacant Senate seat in exchange for ROD BLAGOJEVICH being named the Secretary of Health and Human Services.

d.   On or about November 7, 2008, defendants ROD BLAGOJEVICH, HARRIS, and Advisor A, discussed financial benefits that ROD BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate.

e.   On or about November 10, 2008, defendants ROD BLAGOJEVICH, HARRIS, and others discussed financial benefits that ROD

101

BLAGOJEVICH could request in exchange for the appointment of Senate Candidate B to the United States Senate.

f.      On or about November 12, 2008, defendant ROD BLAGOJEVICH and Advisor A discussed a proposal where, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization would be set up where ROD BLAGOJEVICH would be employed when he was no longer governor.

g.      On or about November 12, 2008, defendant ROD BLAGOJEVICH and a labor union official (Session 541) had a discussion in which ROD BLAGOJEVICH proposed that, in exchange for the appointment of Senate Candidate B to the United States Senate, a not-for-profit organization be set up and funded where ROD BLAGOJEVICH would be employed when he was no longer governor.

h.      On or about November 12, 2008, defendant ROD BLAGOJEVICH and a labor union official (Session 546) had a discussion in which ROD BLAGOJEVICH informed the union official that it was a very real possibility that Senate Candidate B could get the United States Senate appointment, and again raised his interest in employment by a not-for-profit organization.

i.   On or about November 13, 2008, defendant ROD BLAGOJEVICH and Advisor B (Session 624) had a discussion in which they discussed presenting to United States Congressman A a proposal by ROD BLAGOJEVICH that a not-for-profit organization be set up and funded and that the connection between setting up this organization and the awarding of the U.S. Senate seat would be "unsaid."

j.   On or about November 13, 2008, defendant ROD BLAGOJEVICH and Advisor B (Session 627) had a discussion in which ROD BLAGOJEVICH asked Advisor B to call Lobbyist A and ask Lobbyist A to present to United States Congressman A ROD BLAGOJEVICH's proposal that a not-for-profit organization be set up and that, while it would be unsaid, this would be a "play" to obtain a financial benefit for ROD BLAGOJEVICH in return for the awarding of the United States Senate seat.

k.   On or about December 4, 2008, defendant ROD BLAGOJEVICH, Deputy Governor A, and Advisor A had a discussion in which ROD BLAGOJEVICH said that if he gave the Senate seat to Senate Candidate A, there would be "tangible political support  . . . specific amounts and everything . . . . some of it up front."

l.   On or about December 4, 2008, defendant ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to contact a

representative of Senate Candidate A, and advise the representative that if Senate Candidate A was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment.   ROD BLAGOJEVICH instructed ROBERT BLAGOJEVICH to communicate the urgency of the message, and to do it in person, rather than over the phone. ROBERT BLAGOJEVICH agreed to do so.

m.    On or about December 4, 2008, defendant ROBERT BLAGOJEVICH arranged a meeting with a representative of Senate Candidate A, after getting direction from defendant ROD BLAGOJEVICH to contact the representative of Senate Candidate A in order to advise the representative that if Senate Candidate A was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment.

n.    On or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed defendant ROBERT BLAGOJEVICH to cancel his meeting with the associate of Senate Candidate A.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWENTY-FOUR

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.      Paragraphs 1(a) and (b) of Count One are realleged and incorporated as though fully set forth herein.

2.      In 2005, the Federal Bureau of Investigation was investigating corruption and fraudulent conduct relating to the Office of the Governor of Illinois and related entities and individuals (the "Investigation").  As of March 16, 2005, the following matters, among others, were material to the Investigation:

a.      Whether defendant ROD BLAGOJEVICH and his associates solicited business entities for campaign contributions for the benefit of ROD BLAGOJEVICH in exchange for obtaining or keeping state contracts and other business opportunities with State agencies, boards, and commissions;

b.      Whether defendant ROD BLAGOJEVICH and his associates solicited individuals for campaign contributions for the benefit of ROD BLAGOJEVICH as a condition of obtaining state employment and appointments to state boards and commissions;

c.      Whether defendant ROD BLAGOJEVICH and his associates required that campaign contributions for the benefit of ROD BLAGOJEVICH be in certain amounts in order for the contributors to obtain state employment,

appointments to state boards and commissions, state contracts, and other business opportunities with state entities;

d.     Whether, after becoming Governor of Illinois, defendant ROD BLAGOJEVICH kept informed of the individuals and entities contributing to his political campaign and the amounts of the contributions.

2.     On or about March 16, 2005, in Chicago, in the Northern District of Illinois, Eastern Division,

ROD BLAGOJEVICH,

defendant herein, did knowingly and willfully make materially false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the Government of the United States, when ROD BLAGOJEVICH, interviewed by agents of the Federal Bureau of Investigation in the presence of his counsel, stated in sum and substance that:

Since the time that he became governor,

(i)     ROD BLAGOJEVICH has tried to maintain a firewall between politics and government; and

(ii)    ROD BLAGOJEVICH does not track, or want to know, who contributes to him or how much they are contributing to him;

Whereas, in truth and in fact, as ROD BLAGOJEVICH then well knew, these statements were false;

In violation of Title 18, United States Code, Section 1001(a)(2).

## FORFEITURE ALLEGATION ONE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     The allegations contained in Count One and Count Two are realleged and incorporated by reference for the purposes of alleging forfeiture pursuant to Title 18, United States Code, Section 1963.

2.     As a result of the violations of Title 18, United States Code, Sections 1962(c) and 1962(d), as alleged in the foregoing indictment,

### ROD BLAGOJEVICH,

defendant herein:

a.     has acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.     has interests in, claims against, and property and contractual rights affording sources of influence over, the enterprise, described in Count One, which the defendant established, operated, controlled, conducted, and participated in the conduct of, and conspired to do so, in violation of Title 18, United States Code, Section 1962, thereby making all such interests, claims, and property and contractual rights subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1963(a)(2); and

c.     has property constituting and derived from proceeds obtained,

directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1963(a)(3).

3.      The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3) include but are not limited to:

    (a)      All funds, certificates of deposit, letters of credit and assets held by Ravenswood Bank, DuQuoin State Bank, First Suburban National Bank, and Community Bank of DuPage in the name of or on behalf of Friends of Blagojevich; and

    (b)      Approximately $438,370.

4.      To the extent that the property and the proceeds described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 1963, as a result of any acts or omission by the defendant:

        cannot be located upon the exercise of due diligence;

        have been transferred or sold to, or deposited with, a third party;

        have been placed beyond the jurisdiction of the Court;

        have been substantially diminished in value, or;

        have been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the

defendant up to the value of the proceeds and property described above as being

subject to forfeiture, including:

    a.    Real property located at 1736 18th Street, NW, Apartment 303, Washington, DC, 20009-6105 and legally described as follows:

        Lot 2075, Block 0133, Map 40 D
        PIN: 0133 // 2075

    b.    Real property located at 2934 Sunnyside Avenue, Chicago, Illinois, and legally described as follows:

        LOT 24 AND THE SOUTH 20 FEET OF LOT 25 IN BLOCK 52 IN RAVENSWOOD MANOR, BEING A SUBDIVISON OF PART OF THE NORTH ½ OF SECTION 12, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
        PIN: 13-13-121-031;

Pursuant to Title 18, United States Code, Section 1963.

## FORFEITURE ALLEGATION TWO

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     The allegations contained in Counts Three through Thirteen are realleged and incorporated by reference for the purposes of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     As a result of the violations of Title 18, United States Code, Sections 1343 and 1346, as alleged in the foregoing indictment,

ROD BLAGOJEVICH,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section, 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all right, title and interest in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offenses.

3.     The interests of the defendant subject to forfeiture pursuant to Title 18, United States Code, Section, 981(a)(1)(C) and Title 28, United States Code, Section 2461(c) include but are not limited to approximately $438,370.

4.     If any of the property subject to forfeiture and described above, as a result of any act or omission of the defendant:

Cannot be located upon the exercise of due diligence;

Has been transferred or sold to, or deposited with, a third party;

111

Has been placed beyond the jurisdiction of the Court;

Has been substantially diminished in value; or

Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), including

    a.    Real property located at 1736 18th Street, NW, Apartment 303, Washington, District of Columbia, 20009-6105 and legally described as follows:

           Lot 2075, Block 0133, Map 40 D
           PIN: 0133 // 2075

    b.    Real property located at 2934 Sunnyside Avenue Chicago, Illinois, and legally described as follows:

           LOT 24 AND THE SOUTH 20 FEET OF LOT 25 IN BLOCK 52 IN RAVENSWOOD MANOR, BEING A SUBDIVISON OF PART OF THE NORTH ½ OF SECTION 12, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
           PIN: 13-13-121-031;

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
F O R E P E R S O N

_____
UNITED STATES ATTORNEY

112