UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) No. 08 CR 888 |
| v. | ) Hon. James. B. Zagel |
| | ) |
| ROD BLAGOJEVICH, et al. | ) |

## GOVERNMENT'S MOTION TO LIMIT EXTRAJUDICIAL COMMENTS

The United States of America, by and through PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully moves this Court for an order limiting extrajudicial statements by the parties and their counsel during pendency of the trial, and, in support of this motion, states as follows.

## INTRODUCTION

This case has attracted extensive media attention, to say the least. In the weeks immediately preceding the trial, defendant Rod Blagojevich and his counsel, with the help of a retained public relations firm, have appeared on radio and television shows, and were quoted in numerous news articles, making statements that ventured into areas the Court has precluded from being addressed before the jury. Yesterday, after the direct and cross-examination of the government's second witness, Lon Monk, was completed, both defendant Rod Blagojevich and his counsel made statements to the press, on camera, giving their takes on Monk's testimony, and in particular, his credibility, in what essentially amounted to mini-closing arguments on the topic.

As demonstrated below, defendant Rod Blagojevich's efforts to manipulate media coverage to gain favorable attention and thereby to, directly or indirectly, influence the

jury, has reached a level that requires court intervention. Accordingly, the government respectfully requests that this Court enter an order prohibiting all parties and counsel, during the pendency of the trial, from making extrajudicial statements that a reasonable person would believe could be publicly disseminated, expressing opinions, questions, or commentary regarding the merits of this case (excluding bare facts regarding scheduling matters or other materials that are a part of the public record).

## DISCUSSION

### I. Applicable Law

"Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, 314 U.S. 252, 271 (1941). As the Supreme Court explained in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), "the theory on which our criminal justice system is founded" is that:

> The outcome of a criminal trial is to be decided by impartial jurors, who know as little as possible of the case, based on material admitted into evidence before them in a court proceeding. Extrajudicial comments on, or discussion of, evidence which might never be admitted at trial and ex parte statements by counsel giving their version of the facts obviously threaten to undermine this basic tenet.

*Id.* at 1070.

"Society has the right to expect that the judicial system will be fair and impartial to all who come before it." *Levine,* 764 F.2d at 596-97. In this sense, "[t]he concept of a fair trial applies both to the prosecution and the defense." *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969) (upholding gag order on attorneys, witnesses, and parties); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 254 (7th

Cir. 1975) (stating, "the Government is entitled to a fair trial.") "The vigilance of trial courts against the prejudicial effects of pretrial publicity also protects the interest of the public and the state in the fair administration of criminal justice." *United States v. Brown*, 218 F.3d 415, 424 (5th Cir. 2000) (upholding gag order on attorneys, parties, and witnesses). Accordingly, the Court "must consider the fundamental interest of the public in insuring the integrity of the judicial process" in imposing restrictions for the purpose of preventing prejudicial outside interference with an impartial trial. *Levine*, 764 F.2d at 596-97.

Courts are obligated to take steps to "protect their processes from prejudicial outside interference." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Chicago Council of Lawyers*, 522 F.2d at 254. "Neither prosecutors, counsel for defense, the accused, witnesses, court staff[,] nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Sheppard*, 384 U.S. at 363.

As the Seventh Circuit has recognized, once a trial begins, "there is likely to be the most intense news coverage[,] which therefore creates the most need to ensure that inadmissible opinions or statements do not encroach upon the laboratory conditions of the trial." *Chicago Council of Lawyers*, 522 F.2d at 256. Statements of trial counsel carry substantial danger, since the public tends to believe counsel have special access to information, making their comments "especially authoritative." *Gentile*, 501 U.S. at 1074. Statements of the parties also pose significant risks, as "trial participants, like attorneys, are privy to a wealth of information that, if disclosed to the public, could

3

readily jeopardize the fair trial rights of all parties." *Brown*, 218 F.3d at 428 (affirming gag order on attorneys, parties, and witnesses) (internal quotations omitted); *Tijerina*, 412 F.2d at 666-67 (same); *cf. In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984) (affirming gag order on trial witnesses).

The Supreme Court has held that a court may restrict extrajudicial statements of the parties and their counsel in order to protect the proceedings from prejudicial external influences. *Gentile*, 501 U.S. at 1075; *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n. 18 (1984); *Shepherd* 384 U.S. at 363 (stating that a "trial court might well . . . proscribe[] extrajudicial statements by any lawyer, party, witness, or court official, which divulged prejudicial matters"). In imposing such restrictions, the Court must balance the  defendant's right to a fair trial and the public's interest in the fair administration of justice against the parties' and the public's competing interests in free expression and comment. Accordingly, any restrictions on speech protected by the First Amendment must be narrowly tailored, that is, no more extensive than necessary to preserve the parties' rights to a fair trial. *Chicago Council of Lawyers*, 522 F.2d at 249; *Brown*, 218 F.3d at 423.

Although courts have differed regarding precisely where the line must be drawn with respect to such prohibitions, *compare Levine*, 764 F.2d at 599 (holding that a ban on all statements about "the merits" of a case is overbroad); *Tijerina*, 412 F.2d at 663, 667 (affirming ban on comments concerning "the merits of the case, the evidence, actual or anticipated, the witnesses[,] or rulings of the Court"), the Supreme Court has

held that a court may prohibit comments to the press that have a substantial likelihood of materially prejudicing the trial. *Gentile*, 501 U.S. at 1075 (plurality); *id*. at 1082 (O'Connor, J., concurring) (upholding the constitutionality of a state bar rule limiting the extrajudicial comments of lawyers that created a substantial likelihood of materially prejudicing the trial). *See United States v. Scarfo*, 263 F.3d 80, 92-93 (3d Cir. 2001); *Brown*, 218 F.3d at 428; *United States v. Salameh*, 992 F.2d 445, 447 (2d Cir. 1993); cf. Model Rule of Professional Conduct 3.6(a) (adopting *Gentile* standard); Illinois Rule of Professional Conduct 3.6(_) (2010).[1] This is because such regulations apply to a narrow class of speech, are viewpoint-neutral, apply equally to all participants in a case, and merely postpone speech until after the trial, rather than prohibiting it. *Id.*

Whereas the Court is limited with respect to imposing restrictions on the press, it has more leeway to impose restrictions on the parties. *See Gentile*, 501 U.S. at 1074-75 (holding that in the case of restraints on the speech of trial participants, rather than the press, a more permissive standard is constitutionally permissible). In order to protect the trial process from outside influences, the Court has the power to prevent the participants from making extrajudicial comments that may prejudice the

---

[1] Prior to the Supreme Court's decision in *Gentile*, the Seventh Circuit and other courts held that, given the First Amendment interests at stake, gag orders may only reach comments that pose a "clear and present danger" or a "substantial and imminent threat" to a fair trial. *See Chicago Council of Lawyers*, 522 F.2d at 251; *see also Levine*, 764 F.2d at 595. While the Seventh Circuit has not addressed this issue since the Supreme Court's decision in *Gentile*, the Fifth Circuit has determined that *Gentile* "foreclosed" application of the stricter test. *See Brown*, 218 F.3d at 427.

jury. In order to satisfy society's "overriding interest that justice be done in a controversy between the government and individuals" and its expectation of "fair trials designed to end in just punishments," an order against extrajudicial statements must apply to all parties to a controversy, *Tijerina*, 412 F.2d at 666. *See also Levine v. United States Dist. Ct.*, 764 F.2d 590, 596-97 (9th Cir. 1985) (upholding gag order on attorneys)(noting that, although the Sixth Amendment is a limitation on the government and does not give the prosecution the right to a fair trial, "the need to restrict publicity is [not] lessened when the publicity is caused by the actions of the defense, rather than the prosecution."); *Tijerina*, 412 F.2d at 666 (rejecting defendant's suggestion that "because the [gag] order was entered for their protection, they cannot be charged with a violation," and upholding gag order on attorneys, witnesses, and parties).

## II.     An Order is Needed in This Case.

### A.     Public Statements of Rod Blagojevich and His Counsel

In the weeks leading up to the start of the trial in this matter, defendant Rod Blagojevich has doggedly pursued a public relations campaign. Appearing on scores of television interviews, as well as a reality show, and hosting a weekly radio show, Blagojevich used these platforms to try his case in the public realm, often going beyond declaring innocence and instead misrepresenting pretrial developments in the court case and making inflammatory comments regarding the prosecutors. As just one example, defendant Rod Blagojevich repeatedly falsely claimed that the prosecution kept him from discussing the recorded calls, patently ignoring that, in fact, there are

6

strict rules governing the release of Title III recordings, and the fact that he did not object to this Court's sealing of the tapes.

In the week immediately preceding the trial, defendant Blagojevich stepped up his publicity campaign. He and his lawyers appeared on television and radio shows, and were quoted in numerous newspaper articles, frequently venturing into statements regarding information and arguments that both defendant and his counsel knew or reasonably should have known that they would not be permitted to put before the jury. For example, on May 30, 2010, in an article published in the Southtown Star, defense attorney Sam E. Adam was quoted as saying, "Yes, we will argue that much of this was just politics as usual." As defense counsel was aware, in its May 6, 2010 ruling on the government's Consolidated Motions in Limine, including the government's motion to preclude nullification arguments including "politics as usual," R. 349 at 3-4, this Court noted that "an argument that a defendant was simply following usual custom and practice is not a defense," R. 349, 5/6/10 Ruling at 4-5.

On the same day, May 30, defendant Rod Blagojevich's regular radio show on WLS, defendant made a variety of statements alleging "outrageous government conduct," including suggestions that government agents improperly investigated him, improperly asked questions about his personal life, wasted significant resources investigating him, and trumped up charges against him. These statements were made despite the court's May 6, 2010 order, which stated:

> The prosecution offers several suggestions of arguments that might be
> made. All of them are barred. Two of the arguments (selective prosecution
> and outrageous government conduct, including a government conspiracy

against a specific individual) may be presented to the court for a ruling but not to the jury.

R. 349, 5/6/10 Ruling at 4-5.

On June 2, 2010, the evening before jury selection began, defense attorney Aaron Goldstein appeared on the television program "Chicago Tonight." Among other things, Mr. Goldstein stated that the defense intended to offer evidence about various legislative accomplishments of defendant Rod Blagojevich to demonstrate that defendant Blagojevich "was a good governor" who cared about people and, in particular, that defendant Blagojevich passed certain health care legislation and, therefore, was not someone who would extort a children's hospital. In its May 6th ruling, the Court noted that the likelihood of "good acts" evidence being admissible in this case "is sufficiently remote that I require counsel for the defense to seek an admissibility ruling before any reference to good acts evidence is made in the presence of the jury." R. 349, 5/6/10 Ruling at 3.

On the same television show, Mr. Goldstein stated that the defense is "going to try to put in all the tapes." Any such comment would be barred during the trial under the Court's May 6, 2010 ruling that "'Neither side may suggest, even in the most oblique way, that it possesses favorable evidence that the Court excluded." R.349, 5/6/10 Ruling at 2.

Earlier the same day, defendant Rod Blagojevich appeared on the "Don and Roma" radio show to discuss jury selection in this case. During this appearance, Blagojevich made reference to a comment that a prospective juror had made on the

8

juror's written jury questionnaire, which was not a public document and which would not be relevant or admissible at trial.

Immediately before trial, defendant Rod Blagojevich and his attorneys announced plans to communicate regularly with the public while the trial is pending. First, defendant Rod Blagojevich indicated his intention to use "twitter" to communicate with the public throughout the trial, though the Court has made it clear that he will not be allowed to "tweet" while in the courtroom. Further, on June 2, 2010, defendant Rod Blagojevich appeared on the "Don and Roma" radio show on WLS radio, where it was announced that, although his own weekly radio show would be put "on hiatus" during the pendency of the trial, he would routinely appear as a "contributor" on WLS radio to discuss the trial.

After the trial began, defense counsel made it clear that they intended to make public statements concerning the testimony of trial witnesses, after the witnesses' direct and cross-examinations had been completed. On June 9, 2010, Sam Adam Jr. told reporters that the defense "won't say anything publicly about Lon Monk's testimony until after the defense has cross-examined him." Chicago Sun-Times Live Blog post of June 9, 5:24 p.m. The implication was that the defense attorneys would speak about Monk's testimony after the direct and cross-examination of Lon Monk was concluded.

True to their word, yesterday evening, defendant Rod Blagojevich and his attorneys stood before reporters and their cameras in the lobby of the Dirksen Federal Building and gave a detailed account of their views concerning Monk's testimony.

9

Defendant Rod Blagojevich stated:

> Today, uh, was, uh in many ways, from a personal standpoint, a very sad day. Uh, both Patti and I uh, um sat through the testimony of someone who I considered one of my dearest friends. Uh, it was very sad to see uh, uh, my old friend on the stand testifying to uh, uh, statements that he made, acknowledging uh, that those statements were not true.

> Um, I want to commend my lawyer Sam Adam, Jr., for the work he did to, I think go along way towards establishing the truth. Uh, but what as, as my old friend was testifying and, and *saying things that he knew weren't true*, I couldn't help but think about the times we spent together. I couldn't help but to think about his mother, uh and his father. Especially his father and, and the shame that his father probably feels. And of course, I felt a real deep sadness for him. And uh, knowing that uh, he's made statements, said things that were not true, and is now going to spend time in jail for something uh, that he didn't do. And so, it was a very very sad day today from a personal standpoint. Uh, but from the standpoint of getting the truth out, I think we made real strides uh, in establishing what the truth is.

> See you tomorrow.

A few minutes later, defense attorney Sam Adam Jr. stepped up to the reporters

and the cameras:

REPORTER:

> How did you think today's cross went of Lon Monk?

ADAM:

> Well uh, it's a bitter sweet day in, in a lot of ways. In my opinion, um, it came out and anybody who was sitting in the courtroom was able to see that this was uh, a man that was saying what he needed to say to get a deal. That he would tell a story and then change that story, and then after he told the second story change it back to another one. Um.

> End of the day, when it comes to it, he couldn't tell you one deal that they had done that was illegal, he couldn't tell you one dollar that the Governor took. In fact he said uh, very clearly that he took cash but the Governor never did and never would have approved of anyone taking

cash. He couldn't name one deal that the Governor attempted, he couldn't name one deal that the Governor did anything, he couldn't name one State Action that he was asked to do. Nothing!

Well, number one, if he's the main person in it, you would think he would, could remember the thing that he was supposed to have done wrong. He couldn't name one, not one single crime that took place, not one single attempt that took place. What I mean, the Governors here charged with, like you say, attempted extortion. Who did he attempt to extort? He couldn't name one person, he couldn't name of thing, he couldn't name one dollar. Who the? I'm still waiting to find out who he attempted to extort.[2]

The above statements, opinions, and viewpoints regarding Lon Monk's testimony, credibility, and family members, as well as the day's courtroom proceedings, were widely broadcast by the media in the Chicago area. Television channels 2 and 9 aired the statements of both Rod Blagojevich and his counsel; channel 5 currently has videos of both statements on its website. The website of Chicago News Cooperative has the video of Blagojevich statement. The Chicago Tribune, Chicago Sun-Times, and the SouthTown Star printed articles in today's papers, and all of those papers posted articles on their websites highlighting the statements of defendant Rod Blagojevich, as did WBEZ-91.5

. **B. An Order is Required To Protect the Fairness of the Proceedings**

By the foregoing actions, and others, defendant Rod Blagojevich and his counsel have "demonstrated a desire to manipulate media coverage to gain favorable

---

[2] This is an unofficial transcript taken from the videos available at: http://www.nbcchicago.com/blogs/ward-room/Blagojevich_Attorney__Monk__Couldn _t_Name_One_Deal___Nothing___Chicago.html; and http://www.nbcchicago.com/blogs/ward-room/Zagel-Agrees-to-Release-Tapes-964064 49.html.  The emphasis is our own.

attention." *See Brown*, 218 F.3d at 429. They repeatedly have made inflammatory statements to the press, and have "openly forecast"their intent to continue to do so. *See In re Russell*, 726 F.2d at 1010. In sum, their actions "clearly foreshadow" that, without a gag order, there is a real possibility of this trial becoming "a circus show performed outside the courtroom." *Levine*, 764 F.2d at 597-8.

The circumstances of this case fall well within those of other cases in which district courts have imposed gag orders, and appellate courts have approved them. *See also Levine*, 764 F.2d at 596-97 (upholding gag order); *Brown*, 218 F.3d at 418 (same). *See also In United States v. Cutler*, 815 F. Supp. 599, 605 (E.D.N.Y. 1993)(denying motion to dismiss contempt charge based upon violation of gag order, in which a defense attorney launched a public relations campaign, making public statements that the prosecutors had a personal vendetta against his client, did not want a fair fight, and had brought trumped-up charges, and further claimed that taped conversations being used by the government were not crimes and were "'snippets deliberately taken out of context by the prosecutors.'" and that "'[w]hen the whole tapes are played, not just the snippets,'" his client would be vindicated. *Id.* at 606 (quoting statement).

This Court has previously entered such an order under circumstances similar to those presented by this case. In *United States v. Calabrese*, 2007 WL 2075630 (N.D. Ill. July 13, 2007), this Court entered such an order in a highly publicized trial involving the Chicago Outfit. There, defense counsel disclosed in the early stages of the trial a sealed portion of the government's *Santiago* proffer, and one of the defense

lawyers made "arguably prejudicial" comments on a blog. *Id.* at *2. This Court found that these and any future statements to the press about the merits of the case had a "substantial likelihood" of prejudicing the parties' ability to receive a fair trial. *Id.* at *2-3. The Court found that such comments to the press were likely to increase the volume of press coverage and contribute to "a carnival-like atmosphere." *Id.* at *2. The Court determined that "[c]ommentary or spin" from lawyers was particularly likely to prejudice jurors, hindering their ability to remain impartial and to decide the case solely based on evidence presented in court:

> The risk that jurors will be prejudiced by news reports that simply recite that which happened in open court is quite small. Even if seen, heard, or read, such reports merely reiterate that to which the juror has already been exposed. Commentary or spin is different. It does not merely reiterate what has already been before the jury; it applies the speaker's own gloss to material presented to the jury. It is, at best, comprised of material suitable for closing argument. There is a time for closing argument-it comes at the end of the case, not at the end of each court day

*Id.* at *3. After considering and rejecting alternatives to a gag order, such as change of venue and sequestration, the Court determined that a gag order applicable to" lawyers appearing in the case and parties" was necessary to protect the parties' rights to a fair trial. *Id.* at *2-3.

The defense's constant media barrage has reached the point where it poses a substantial likelihood of materially prejudicing the trial in this case. Although the jury has been ordered to avoid reviewing any media reports concerning the trial and all discussions with others concerning the case, and the government assumes that the jury will be conscientious about following the Court's instructions, the more intense the

13

media attention becomes, the greater the likelihood that a juror will inadvertently be exposed to prejudicial external influences. The defendant cannot be permitted to create an atmosphere that substantially increases the risk of tainting the jury with external influences. Less restrictive alternatives, such as repeating the instructions the Court has already given and questioning jurors about contacts they may report in the future will not suffice. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 563-64 (1976). An order prohibiting counsel and the parties from making certain extra-judicial comments regarding the case is clearly "the least restrictive and most effective means" of ensuring a fair trial in this case. *See Calabrese*, 2007 WL 2075630, at *2; *Levine*, 764, F.2d at 599-600 (rejecting alternatives after detailed discussion); *see also Brown*, 218 F.3d at 430-31.

## Conclusion

For all of the following reasons, to ensure the fairness of the trial, the government respectfully requests that this Court enter an order prohibiting the parties and counsel, during the pendency of the trial, from making extrajudicial statements that a reasonable person would believe could be publicly disseminated, expressing

14

opinions, questions, or commentary regarding the merits of this case (excluding bare

facts regarding scheduling matters or other materials that are a part of the public

record).

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:    /s/ Debra Riggs Bonamici
REID SCHAR
CHRISTOPHER NIEWOEHNER
CARRIE HAMILTON
LAURIE BARSELLA
DEBRA RIGGS BONAMICI
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 3rd Floor
Chicago, Illinois  60604

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

**Government's Motion to Limit Extrajudicial Comments**

was served on June 16, 2010, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

> Respectfully submitted,
> PATRICK J. FITZGERALD
> United States Attorney
>
> BY:    /s/ Debra Riggs Bonamici
> DEBRA RIGGS BONAMICI
> Assistant United States Attorneys
> United States Attorney's Office
> 219 S. Dearborn St., 3rd Floor
> Chicago, Illinois  60604
> (312) 353-3741