UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

            v.

ROD BLAGOJEVICH and
ROBERT BLAGOJEVICH,

      Defendants.

No. 08 CR 888 -1, 6
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

## I. BACKGROUND

This order involves a motion to intervene filed in the ongoing criminal proceeding against former Illinois governor Rod Blagojevich and his brother Robert Blagojevich.

On June 1, 2010, Chicago Tribune Company, New York Times Company, Illinois Press Association, and Illinois Broadcasters' Association (collectively "Press Intervenors") filed a Motion to Intervene and for Immediate Access to Names of Jurors in the trial of Rod and Robert Blagojevich. In their motion, Press Intervenors sought to intervene "for the limited purpose of objecting to an anonymous jury trial and seeking immediate access to the names of jurors during this public criminal trial." Press Intervenors argued that both the common law and First Amendment mandate a presumption of public access to jurors names, and that there is no justification for withholding the names until after the verdict is returned. Press Intervenors made no request for a hearing. The motion was noticed for presentment on June 3, the day voir dire was scheduled to begin. On June 2, potential jurors came to the courthouse to complete juror questionnaires. That afternoon, I informed the venire that their names would not be made public

and that the names of the jurors selected for the trial would be released only after the verdict was delivered.

On the morning of June 3, Press Intervenors presented their motion to the Court. The government objected, arguing that there is no qualified right of access to juror names before the verdict is returned, and even if there were such a right, non-disclosure would be justified to protect Defendants' right to a fair trial in this case. Press Intervenors maintained that the First Amendment right of access to criminal proceedings generally attaches to voir dire and includes the names of the jurors. In this case, the personal safety of the jurors is not at issue, and the "hypothetical problem" of contact from bloggers could be more effectively (and less restrictively) dealt with by properly instructing the jurors. Access is most important in cases of great public interest, and the press could, as it had in the past, help to deter intentional misrepresentations by jurors and uncover any relevant omissions that could lead to the dismissal of certain jurors.[1]

After finding that the motion was untimely,[2] and denying the motion for intervention, I

---

[1] It is worth noting that Press Intervenors were not asking for a hearing on the issue of intervention or the issue of the release of juror names. It is entirely possible that this issue may be being litigated for reasons that bear less on the media's view of what is necessary in the coverage of this trial and more on vindication of general principles of access that media has long claimed is nearly constitutionally absolute. The press traditionally (and consistently), with a reasonable view of their own interests, often defends principles which are not closely related to their immediate concerns. At the July 22nd hearing, I noted that the Chicago Tribune printed as news (not opinion) an article which states only one purpose for seeking access to juror identities in this case. The article entitled "Identities of Blagojevich Jurors Could Be Made Public," by John Chase, states that Press Intervenors "want the jurors' names, [sic] so they can try to interview them about their deliberations after the verdict." http://www.chicagotribune.com/news/local/blagojevich/ct-met-blagojevich-jurors-20100702,0,5771825.story (visited July 16, 2010). Press Intervenors disavowed this statement as a complete representation of their position and I accept their disavowal.

[2] For what it is worth, I do not dispute the time-counting reasoning of the Court of Appeals on my decision not to allow intervention. On May 17, 2010, fourteen days before the

addressed the merits of the motion.  Essentially, I explained that the withholding of names was

necessary to protect the jurors from outside influence, and therefore, to protect the Defendants'

right to a fair trial.  I had personally received several unsolicited communications from

opinionated members of the public, which was itself evidence of the potential that the jurors, the

decision makers here, could face similar contact.  I disagreed with holding in *United States v.*

*Wecht*, 537 F.3d 222 (3d Cir. 2008), a case relied upon heavily by the Press Intervenors, noting

that it contained no specific analysis of the facts before the court.  Press Intervenors appealed my

ruling.

On appeal, the Seventh Circuit vacated the deferred-disclosure order. *United*

*States v. Blagojevich*, - - - F.3d - - - -, 2010 WL 2649879, at *7 (7th Cir. July 12, 2010). The

Court rejected an absolute right of access to the names of the jurors, but required that a hearing

be held so that the parties may present evidence, alternatives may be considered, and findings of

fact may be made.  I held this hearing on July 22, 2010.

---

motion to intervene was filed, I announced  to members of the media (including one individual
who I know to be an editor of the Tribune) an unambiguous decision to withhold the jurors'
names. *See, e.g.,* Jeff Coen and Bob Secter, "Judge to Shield Blagojevich Trial Jurors'
Identities," CHICAGO TRIBUNE (May 17, 2010) at
http://www.chicagobreakingnews.com/2010/05/judge-to-shield-blagojevich-trial-jurors-
identities.html (visited July 20, 2010).  The Court of Appeals declined to count that day as the
start of a running of time to intervene, because I did not enter the order formally. Informal
announcements even made in the presence of the Intervenor may not present an occasion to file
objections.  While the Press Intervenors might stand on solid ground with regard to the timing of
their motion, the fact remains that their timing ought to count for something against them.  Their
sense of urgency on this issue may be questioned when they waited fourteen days to move to
intervene, and even after prevailing on appeal they allowed six days to pass before requesting a
status hearing (rather than a hearing on the merits). Finally I note I held a hearing and issue this
opinion with fourteen days of the date Press Intervenors set for a status at which the hearing was
requested.

## II. THE FACTS AND EVIDENCE

That this is a highly publicized case is not in dispute. The international media coverage in this case has been thorough and extensive, both before and during the trial. *See, e.g.*, Bob Secter and Jeff Coen, "The Prosecution Rest...," CHICAGO TRIBUNE (July 15, 2010); Richard Roeper, "Blago on the Stand?" CHICAGO SUN TIMES (July 15, 2010); Associated Press, "Prosecution Rests in Blagojevich Corruption Trial," BOSTON GLOBE (July 15, 2010); "Rod Blagojevich Says He'll Testify in his Own Defense," NBC TODAY SHOW (July 14, 2010); Mark Guarino, "Rod Blagojevich Defense: Advisers Gave Him Bum Advice," CHRISTIAN SCIENCE MONITOR (July 13, 2010); Peter Slevin, "Blagojevich: Musings of Ex-Governor Include Bleep the Public, Oprah for Senator," WASHINGTON POST (July 13, 2010); James Warren, "When Adversity Comes Calling, Some Actually Answer the Door," NEW YORK TIMES (July 11, 2010); Mike Robinson and Michael Tarm, "Aide: Blago Hid From Staff," NEWSDAY (July 9, 2010); Lauren Etter, "Obama is Invoked at Blagojevich Trial," WALL STREET JOURNAL (June 25, 2010); Michael Tomasky, "The Blago Trial," GUARDIAN.CO.UK (July 8, 2010); Toby Harnden, "Tawdry Tale of the Senate Seat for Sale," SUNDAY TELEGRAPH (July 4, 2010); Sean Hannity, "Inside the Blago Courtroom," FOX (June 25, 2010); "United States: Corruption Trial Begins for Former Illinois Governor Rod Blagojevich," THAI PRESS REPORTS (June 7, 2010); Jeff Coen and Bob Secter, "A Little Swagger in the Court," CHICAGO TRIBUNE (June 2, 2010); Cheryl Corley, "Next Stop on Blagojevich's PR Tour: Court," NPR ALL THINGS CONSIDERED (June 2, 2010); Peter Slevin, "Illinois Prepares for Blago Trial," WASHINGTON POST (June 2, 2010); Doug Belkin, "As Blagojevich Seeks Fame, Chicago Asks: Is He Nuts?" WALL STREET JOURNAL (June 1,

2010); Judy Keen, "Taking the Stage on the Stand, Former Illinois Governor's Corruption Trial Promises to Offer Some High Drama," USA TODAY (May 28, 2010); Associated Press, "Prosecutors Fight Blagojevich Effort to Postpone Trial," BOSTON GLOBE (May 11, 2010).[3] In addition, Defendant has made numerous television appearances in the time leading up to the trial.[4] Numerous Internet blogs have discussed the proceedings at length.[5] Each day of trial, members of the public have lined up for the chance to sit in on the proceedings, and in an overflow courtroom a live audio feed streams for additional members of the press and public.

During the time leading up to trial, as well as during the trial, I have received several communications from opinionated members of the public. At a July 12, 2010 hearing on this matter, I explained the number and content of certain unsolicited e-mails I received regarding this trial. I noted that for the most part, these e-mails seemed to be an attempt to be persuasive to the reader. On July 13, 2010, I informed the parties of two voice mails and a letter I had received, all

---

[3] This is but a small sample of the thousands of articles and transcripts produced by a Westlaw search.

[4] Together, Defendant and his wife have made more than 35 television appearances from the time of arrest, on programs including *Late Show with David Letterman, Good Morning America, Today*, and *Celebrity Apprentice, and I'm a Celebrity . . . Get Me Out of Here*. See Gov't Ex. 1.

[5] *See, e.g.*, "Andy Martin on the Rod Blagojevich Trial," http://contrariancommentary.wordpress.com/2010/07/14/andy-martin-on-the-rod-blagojevich-trial/ (visited July 15, 2010); "Is Blago Judge Protecting Obama?" http://theruleoflaw.blogspot.com/2010/07/is-blago-judge-protecting-obama.html (visited July 15, 2010); "Judge Keeping Very Tight Reins on Blago Trial," http://www.bluegrassbulletin.com/2010/06/judge-keeping-very-tight-reins-on-blago-trial.html (visited July 15, 2010).; "Friday Audio Dump: Blagojevich Cursing Obama Over Senate Seat," http://michellemalkin.com/2010/07/02/friday-audio-dump-blago-cursing-obama-over-senate-seat/ (visited July 15, 2010); "Ex-Blago Chief of staff: Obama Knew of Senate Seat Sale Plot--and What About Alexi?" http://marathonpundit.blogspot.com/2010/06/ex-blago-chief-of-staff-obama-knew-of.html (visited July 15, 2010).

expressing, either directly or indirectly, some opinion of the proceedings or my conduct in them.[6]

One call consisted mostly of obscenities.[7]  In the other, the caller explained that "the federal

government has developed a new kind of electronic where they can copy exactly the voice of

someone and then pretend that they are that person."  The caller then suggested that this

technology may be in use at this trial, in an attempt to fraudulently implicate Defendant Rod

Blagojevich through faked recordings.  The letter, claiming to be from President Barack Obama

(written on a facsimile of White House stationery, though postmarked Cedar Rapids, Iowa), is a

notice that pursuant to his executive powers, the President has decided to dismiss Defendant Rod

Blagojevich and has ordered me to close the case against him.[8]

On July 19, a member of the public called my office and repeatedly asked my assistant

whether, at the close of the day's proceedings, he might have a chance to stand up in court and

tell me that he thought I was being unfair and that I should allow all of the recordings of

Defendant to be played (a view expressed publicly and consistently by Defendant Rod

Blagojevich).  On July 20, I received an e-mail from a person claiming to be the King of Japan.

The author explains that she was told by Defendant Rod Blagojevich that Blagojevich would

---

[6] The transcripts and audio recordings of these voice mails, as well as copies of the letter and an e-mail discussed *infra* are attached as exhibits to this order.

[7] This call does not specifically reference Defendant Rod Blagojevich, however, the U.S. Marshals, after hearing the call, conducted an interview with the caller and determined that he was expressing his discontent with certain rulings I had made in this case.  The caller admitted that he had heard the evening news and felt compelled to speak his mind.

[8] The evidence I discuss here was the same evidence I referenced in my June 3rd denial of Press Intervenors' motion (except for the voice mail referring to the faking of recordings which post-dates my initial denial).  It is evidence I considered in deciding then, and it is evidence I consider in my decision now.

leave an envelope containing a check for $200,000 at an office in the Thompson Center. When author tried to pick up the envelope, she was told it was not there. In the e-mail, the author asks that the Court arrange for the collection of the money.

On one other occasion, I was stopped on the street by a member of the public (who I did not recognize) and advised that I should take into account the "guilt" of the voters who elected Defendant governor.

The government points out that there have been several instances of individuals not related to this case seeking to insert themselves into the proceedings, in one instance by filing an uninvited amicus brief asserting a mass government conspiracy (docket entry 441), and in another by filing a "counterclaim" seeking $10 billion as well as certain records pertaining to the theft and sale of her grandchildren - records she claimed were taken from Defendant Rod Blagojevich's office in the course of the government's investigation (docket entry 376). Subsequently, this individual attempted to enter the courtroom against the Marshals' orders, became disruptive, and was eventually charged and convicted of contempt of court. As I iterated in my initial denial of the Press Intervenors' motion, the extraordinary attention being paid to this case leads not only to the expression of opinions, but also to the view that the trial is an opportunity to be noticed.

Also presented by the government is a sampling of cases in which jurors were exposed to unsolicited outside influence. These cases involved jurors receiving letters and threatening phone calls, and being followed and confronted by strangers (both out in public and, in one case, outside a juror's home).

7

Attached to Press Intervenors' initial motion to intervene is the affidavit of Matt O'Connor, an editor for the Courts/Metro section of the *Chicago Tribune*, in which he declares that in his more than 35 years of reporting, including 15 years of covering court proceedings in this courthouse, there has been a long history of "an open, public jury selection process, which includes public access to juror names in both routine and high profile cases." He further avers that he has personally routinely observed the names and hometowns of jurors stated in open court during voir dire, with rare exceptions usually in cases where the safety of the jurors was a concern. Press Intervenors also include copies of model jury instructions regarding various forms of electronic communication.

## III. DISCUSSION

In moving to intervene, Press Intervenors argue that there exists at least a qualified right of access to the identities of impaneled jurors in a criminal case while the trial is pending. According to Press Intervenors, both the First Amendment and the common law mandate a presumption of public access to the jurors' names, and this presumptive right attaches no later then the swearing and impaneling of the jury. This presumption of openness may be overcome only by a showing that closure is necessary to "preserve higher values and is narrowly tailored to serve that interest." Only threats to jurors' safety or jury tampering may justify the withholding of the jurors' names, and Press Intervenors maintain that in this case no such evidence has been presented. The potential for unsolicited juror contact or the publishing of background stories about the jurors exists in every high-profile case, movants argue, but such hypothetical and generalized concerns are not enough to overcome the presumption that they assert exists. At the June 22nd hearing, Press Intervenors explained that obtaining the names once the jury is

impaneled enables them not only to do human interest reporting on individual members, but also to protect the public and the judicial process by fulfilling a "watch-dog" role and exposing any problems with juror conduct. Also, Press Intervenors note that transparency is an interest in and of itself that is served by immediate disclosure.

In support of their argument, Press Intervenors rely primarily on *Press-Enterprise Company v. Superior Court of California*, 464 U.S. 501, 510 (1984), in which the Court recognized a rebuttable presumption, rooted in the First Amendment, that jury selection is a public process, and *United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008), which extended this presumption to encompass the jurors' names. In *Wecht*, the Court vacated the district court's order restricting access to the jurors' names, finding that there is a presumptive First Amendment right of access to the names of both prospective and impaneled jurors and that there was insufficient evidence of threats or harassment to jurors to overcome the presumption.

In its opinion on appeal in this case, the Seventh Circuit rejected an absolute right of access to jurors' names. In finding a presumption in favor of disclosure, the Seventh Circuit declined to rely on the First Amendment, an approach embraced by *Wecht* Court.[9] The Court

---

[9] I note that I am not persuaded by the majority's opinion in *Wecht*, and I agree with the Seventh Circuit that *Wecht* is not dispositive in this case. However, even if the *Wecht* analysis is correct, and there is a First Amendment right of access to juror names, this case can be distinguished from *Wecht* in two important ways. First, the names of the jurors in this case will be made public once the verdict is entered, whereas in *Wecht*, the district court gave no indication that the names would be made available at any time after the trial. 537 F.3d at 230. Second, in this case, there is evidence that outside forces may attempt to influence jurors or at the very least that unsolicited contact is a real possibility. I relied on this evidence in making my initial ruling and continue to rely on it here. Although in *Wecht* the district court referred to certain threats made by the defendant to non-jurors, it included no finding of fact about them in the record and declined to rely on them in deciding to impanel an anonymous jury. *Id.* at 241, n.35. Therefore, even if the *Wecht* approach is correct, the facts and evidence in this case elevate concerns of improper jury contact beyond hypothetical and generic, and are sufficient to overcome any First

9

noted that in this case, "[t]he right question is not *whether* names may be kept secret, or disclosure deferred, but *what justifies* such a decision." *Blagojevich*, 2010 WL 2778838, at *3 (7th Cir. 2010) (emphasis in original). The presumption in favor of disclosure, rooted in both the common law and the Jury Selection and Service Act, 28 U.S.C. §§ 1861-78, cannot be overcome without affording the parties an opportunity to present evidence. *Id.* at *5. Only then, held the Court, can the trial judge make findings of fact, address the interests at stake, and discuss alternatives to closure.[10] *Id.* Barring some "unusual risk," jurors' names must be disclosed. *Id.*

I am bound by the Seventh Circuit's holding on appeal, and therefore begin my analysis with a presumption that the names of the jurors in this case should be disclosed. Improper contact with a juror during the course of a trial is governed by a presumption as well; such contact is presumptively prejudicial to the defendant. *United States v. Harbin*, 250 F.3d 532, 544 (7th Cir. 2001) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)). Attempts to communicate with a juror, even if heartfelt and impartial, pose a danger to the rights of the person on trial and his opponent are discouraged. Actions which have a significant potential of intimidating jurors or disturbing their tranquility to the point that they lose the ability to rationally consider the evidence or follow instructions are also to be discouraged.

That such actions can and do occur is undisputed. But the simple fact that this conduct *might* occur does not justify any level of juror anonymity. There must be a significant risk that

_____

Amendment presumption of openness that might exist.

[10] The Seventh Circuit's holding has not been heretofore delineated, and establishes requirements that had not been clearly enunciated in this circuit.

the conduct will occur in order to overcome the presumption.[11]  In this case, such a risk exists,

and the presumption of openness is overcome.

There is precedent in this district for deferred disclosure of juror names.  In *United States v. Black*, 483 F. Supp. 2d 618 (N.D. Ill. 2007), another high-profile criminal prosecution in this district, Judge St. Eve deferred release of the jurors' names.[12]  She found no right of access under the First Amendment, but noted that even if such a right exists, releasing juror names during the pendency of the trial posed an unnecessary threat to the defendant's Sixth Amendment rights.  In considering the effects of disclosure, Judge St. Eve rightly found a "risk that, during the course of the trial, jurors will be subjected to improper and presumptively prejudicial contact." *Id.* at 630-31 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966); *United States v. Koubriti*, 252 F. Supp. 2d 418, 422 (E.D. Mich. 2003); *United States v. Warner*, Nos. 02 CR 506-1, 02 CR 506-4, 2006 WL 2583722, **49-51 (N.D. Ill. Sept.7, 2006)).  Also present was the potential transformation of "jurors' personal lives into public news" which, may "unnecessarily interfere with the jurors' ability or willingness to perform their sworn duties." *Id.* (citing *In re Globe Newspaper Co.*, 920 F.2d 88, 95 (1st Cir. 1990); *United States v. Brown*, 250 F.3d 907, 918 (5th Cir. 2001)).  Although she discussed no evidence of either risk, Judge St. Eve found that these concerns "counsel in favor of prohibiting access to juror names during the pendency of trial," notwithstanding any First Amendment right of access that might exist.

---

[11] I note here that I am not dealing with considerations that justify a fully anonymous jury.

[12] In *Black,* as here, the parties knew the identities of the twelve jurors and six alternates, and voir dire proceedings were open to the media and members of the public.  483 F. Supp. 2d at 624.   While the Seventh Circuit seems to overrule, at least partly, Judge St. Eve's ruling rejecting a presumption in favor of disclosing the jurors' names, it does appear to endorse Judge St. Eve's approach to deferred disclosure.

11

Here, not only do the same risks exist, but there is evidence that if jurors' names are made public, they will be subjected to improper outside contact. It is true that the possibility of jurors being inappropriately contacted by phone is not a new one, but the possibility of contact by e-mail or through social networking sites is relatively recent, and the ubiquity of these media is astounding. I have already received several communications by e-mail, telephone and in writing. All of these communications are clearly an attempt to somehow influence the decision maker in this case. Although the voice mails and forged letter are clearly the work of "cranks and gadflies," (as they are referred to by Press Intervenors), they would most likely be distressing to a juror who receives them. A parade of insults from a stranger, while perhaps less startling to a judge, is no doubt alarming to most people. Another caller insisted that he be allowed to express his view of the trial thus far to me in the courtroom at the end of the day's proceedings, and yet another e-mail received only days ago, explains that its author, the King of Japan, was told by Defendant Rod Blagojevich that the defendant would pay him $200,000.[13] While some may be quick to discount a conspiracy theorist and forger, it is highly likely that a juror would be disturbed that such people have been able to obtain their personal contact information. It is easy to see how contact like this could interfere with a jurors' ability to perform his sworn duties. Furthermore, one must bear in mind that when such communication is made, and it is clear that

---

[13] In addition to the receipt of unsolicited communications, I have been approached in person by a member of the public expressing an opinion on this case, and there have been two unauthorized filings by unrelated parties, one of whom had to be removed by the U.S. Marshals and was later charged for her conduct. While such conduct may certainly occur in any high-profile case, the fact that it has already occurred in this case raises more than the spectre that prejudicial contact with jurors might well occur.

third parties have access to a juror's contact information, that juror's concern may extend unitl well after the trial is over, when he is no longer under the watchful eye of the court.

Perhaps more problematic than the contacts from "cranks and gadflies" are the well-reasoned and articulate e-mails I have received which are clearly attempts to persuade me and influence my decision-making. Such communications seem to be an example of the prevailing public view that individuals should express their views regardless of their knowledge or skill.[14] There is little emphasis today in media or entertainment on the notion of withholding judgment until all the facts are in.[15] "I think, therefore I am," a precept of Western philosophy, seems to have been supplanted by "I feel, therefore I opine."

Also apparent in contemporary media is that the request for individual expression seems to revolve entirely on highly publicized events. There seem to be few requests for public input on more obscure issues such as arms treaties and city parks, as well as other topics that have transited quickly across the public horizon. The events on which members of the public are

---

[14] *See, e.g.,* "What Are Your Ideas for How to Stop the Spill?" a CNN.com online survey inviting readers' ideas on how to stop the massive BP oil spill that occurred in April 2010, located at http://ac360.blogs.cnn.com/2010/06/09/what-are-your-ideas-for-how-to-stop-the-spill/ (visited July 23, 2010).

[15] *See, e.g.,* "Poll - van der Sloot, Guilty or Innocent?" NEWSVINE.COM, http://myview-222.newsvine.com/_news/2010/06/03/4459727-poll-van-der-sloot-guilty-or-innocent (visited June 23, 2010); "CNN Viewers: Williams 'Guilty' In Atlanta Child Murders," CNN.COM, http://www.cnn.com/2010/CRIME/06/11/atlanta.murders.poll.ireport/index.html?iref=allsearch (visited July 23, 2010); *and* "FOX News Poll: Majority Says O.J. Simpson Guilty of Robbery," FOXNEWS.COM, http://www.foxnews.com/story/0,2933,298304,00.html (visited June 23, 2010), and most pointedly, "Poll: Blagojevich Winning (Sort of) with Dems," CHICAGO NEWS COOPERATIVE, http://www.chicagonewscoop.org/poll-blagojevich-winning-sort-of-with-dems/ (visited June 23, 2010), in which it is reported that an Illinois poll conducted one week into the trial revealed that "68 percent of Republicans saying Blagojevich should be convicted and sent off to prison, compared to only 44 percent of Democrats."

invited and encouraged to opine are those currently in the news.[16] It is undisputed that this case has received intense media coverage, and it is reasonable to infer that this coverage is one underlying cause for the many communications I have thus far received. Another factor unique to this case is the personal interest of the voters in the outcome of the proceedings.[17] Nearly 3.5 million citizens of this state voted in the 2006 gubernatorial election in which Defendant Rod Blagojevich won his second term in office. A reading of public comments on news stories about the trial demonstrates, at least anecdotally, that many voters have a personal opinion that either Defendant Rod Blagojevich had betrayed their trust, or that the government has unfairly deprived them of their governor.[18]

Press Intervenors argue that there is no "unusual risk" in this case that would justify the deferred disclosure of juror names. They cite to several comments I have made including comments that indicate that certain forms of outside influence "are all problems we've dealt with before," and that the receipt of certain communications by judges is not uncommon. According to the Press Intervenors, these comments reveal that the situation currently before me is in no

---

[16] *See supra*, n. 14.

[17] The only case in my personal experience that could be comparable was *People v. Richard Speck,* and that case was in the news for months not years, and generated far less information than this case, demonstrating that the term "high-profile" can be used to describe varying degrees of publicity. Furthermore, *Speck,* just as in many high profile cases, involved a defendant accused of doing bad things to a certain few people. This case, in contrast, presents allegations that implicate the personal interests of all the residents (and especially voters) of this state.

[18] *See, e.g.,*
http://discussions.chicagotribune.com/20/chinews/ct-met-blagojevich-trial-0709-20100708/10 (visited July 23, 2010);
http://discussions.chicagotribune.com/20/chinews/ct-met-blagojevich-0707-20100706/10 (visited July 23, 2010);
http://discussions.chicagotribune.com/20/chinews/ct-met-blagojevich-trial-0722-20100721/10 (visited July 23, 2010).

way exceptional. They argue: "There have always been cranks and gadflies that will send letters or stand up in the courtroom and tell the jury what to do." However, just because such issues have arisen in the past does not mean that they cannot justify deferred disclosure, that they are not "unusual" in the context of the dozens of trials held in this courthouse each year. Courts everywhere have dealt with the threat of prejudicial contact in high profile cases - sometimes by deferred disclosure, *see, e.g., In re Globe Newspaper Co.,* 920 F.2d 88, 91 (1st Cir.1990), by anonymity, *see, e.g., United States v. Calabrese,* 515 F. Supp. 2d 880 (N.D. Ill. 2007); by sequestration, or by special instruction.

Press Intervenors maintain that the fact that "cranks and gadflies" may now reach jurors by e-mail and phone "is a difference of degree, not of kind" and should not overcome the presumption of openness. But it is a difference in kind. A person standing up in court attempting to make his voice heard is not the same as a "gadfly" appearing at a juror's home, calling him on the phone, or bombarding him with e-mails. Such invasions of privacy by strangers -- whether a harmless "gadfly" or "crank," a person who is out of touch with reality, or a well-informed opinionated citizen who might typically write a letter to the editor -- can lead to, at worst, fear and intimidation on the part of the juror, or, at least, a preoccupation by what is being said about them in the media (assuming their names have been made public).

Press Intervenors cite *United States v. Antar*, 38 F.3d 1348, 1363 (3d Cir. 1994) for the proposition that threats to the deliberative process must be "actual and specific, not conclusory and generic[,]" and the court "must articulate findings of the actual expectation of an unwarranted intrusion upon deliberations or of a probability of harassment of jurors." Such threats are real in this case, and not generic or ordinary. In the months leading up to trial, through to July 20, 2010 (two days before this hearing), I have received numerous

15

communications by e-mail, phone, letter, and in person. At least one communication has bordered on threatening (and is certainly harassing), others have expressed a wide variety of opinions on both the Defendants' guilt or innocence as well as evidence presented, and still others have alleged certain unverified (and often incredible) facts in connection with this case. Furthermore, the government has presented instances in which jurors in other publicized cases have been pestered by letter, phone, package delivery, and in person. Press Intervenors discount these accounts because none of these incidents has resulted in a mistrial based solely on the outside communications. Essentially, Press Intervenors argue that any threat of prejudicial contact is "speculative" until a juror on *this* case *actually receives* a harassing phone call, letter, electronic post or visit from a third party which would result in a mistrial. This basically requires me to wait for the prejudicial contact to occur before I can evaluate the threat that it might occur. I do not believe that this is what the Court of Appeals had in mind. Moreover, in order to "test" the likely possibility that harassment would occur in the way that Press Intervenors suggest, I would have to release the names, thereby precluding any possibility of protecting the jurors identities down the road. Again, I do not think this is what was contemplated by the Seventh Circuit or the common law tradition on which its opinion is founded. The common-law tradition and applicable statute make it clear that judges may take preventative measures where justice requires. *Blagojevich*, 2010 WL 2778838, at *5.

Press Intervenors' evidence in this matter is telling in that it helps to demonstrate the unique nature of this case. As reflected by the declaration of Matt O'Connor, I and other judges have released the names of jurors in most cases, even in many high-profile cases. Deferred disclosure is not justified in every criminal case, nor even in every high-profile criminal case. *Id.* at *7. However, the case before me is not a typical example of even the relatively small number

16

of high-profile cases.[19] It is a case of intense media scrutiny and involves a colorful Defendant who has, since the day of his arrest, thrust himself and the question of his guilt in the spotlight. He has consistently, publicly commented on potential evidence in this case and what it would show,[20] inviting the views of the court of public opinion.[21] He maintains a Twitter account urging members of the public to follow along for updates and asserts "I am innocent and look forward to clearing my name." *See* http://twitter.com/governorrod (visited July 23, 2010). For a person of his public stature this is exceptional conduct. Persons well known for their activities in business, politics, sports and entertainment overwhelmingly either avoid the public or let attorneys or publicists issue generic statements on their behalf.

In addition to the risks of disclosure to the public, the press' investigation itself also presents significant risks that the jurors will be distracted and unable to fulfill their sworn duties, and that such investigation would "undermine the jurors' ability to adhere to the Court's repeated instructions not to read, watch, or listen to any media coverage regarding this case." *Black*, 483 F. Supp. 2d at 631. Although the law recognizes only limited circumstances in which an individual right of privacy is actionable against the media, jurors may well feel a sense of

---

[19] Included in O'Connor's list is the corruption trial of former Chicago Heights mayor Charles Panici, No. 92 CR 213, a case over which I presided and in which the juror names were publicly disclosed. The amount of publicity received in these two cases is incomparable.

[20] *See, e.g.,* "Blagojevich Wants Tapes Played In Court," NEW YORK TIMES (Feb. 10, 2010), at http://www.nytimes.com/2010/02/11/us/11blago.html (visited July 23, 2010); *and* On the Record with Greta "Blago: 'President Obama Could Help Prove My Innocence,'" FOXNEWS.COM (April 27, 2010) at http://www.foxnews.com/story/0,2933,591562,00.html (visited July 23, 2010).

[21] While, unlike Kevin Trudeau, Defendant Rod Blagojevich has not instructed his devoted supporters to bombard the court with e-mails proclaiming his innocence, the substance of his media appearances does enhance the risk of improper contact with jurors in this case. *See F.T.C. v. Trudeau*, 606 F.3d 382, 384 (7th Cir. 2010).

17

invasion that accompanies a personal investigation, and knowledge that the media is conducting

such an investigation carries a significant risk that jurors will not be able to function effectively.

At the very least, jurors whose lives are thrust into the media spotlight will be curious and

tempted to seek out media coverage of them personally.[22]

In addition to the general risks of disclosure, disclosure at this point in the trial poses

additional hazards. In this case, all of the potential jurors were informed on the afternoon of June

2, 2010 that their names would be disclosed only at the end of the trial. As Judge Posner points

out in his dissent from the denial of a rehearing *en banc*, were I to renege on this promise now

"the jurors may well be upset, concerned for their privacy, fearful of the prospect of harassment

. . . and angry at having been induced by false pretenses to agree to take months out of their life

to perform jury service." *United States v. Blagojevich*, - - - F.3d - - - -, 2010 WL 2767760, at *2

(July 14, 2010). Such reactions are likely to interfere with the jurors' ability to perform their

duties.

Of further concern in releasing the names at this point is the possible impairment of

judicial authority. As I explained in my July 13, 2010 order in this matter, the judge is the

neutral in an adversary system. Jurors see the judge as a protector and arbiter of fairness and

---

[22] Also, potentially disturbing to jurors is an investigation which involves interviews of
friends, family, neighbors and co-workers; however, I doubt this is a major concern in this case
because the media has not, to my knowledge, sent cameras to jurors' homes or investigators to
interview friends and neighbors, nor does it appear that such tactics were employed in the jury
investigation connected with the trial of former Governor George Ryan. *United States v. Warner*,
No. 02 CR 506, 2006 WL 2931903 (N.D. Ill. Oct. 13, 2006); *United States v. Warner*, 498 F.3d
666 (7th Cir. 2007). However, a consistent pattern of such conduct by the press might justify
preventive actions by the trial judge. I do note, however, that Press Intervenors in this case have
not committed to conducting a non-intrusive investigation, and, were I in their shoes, I would
likely refrain from doing so as well even if the intervenors were able to state (I think, truthfully
here) that they have not engaged in such practices. The Press Intervenors do not speak for or
represent all media.

civility. For the judge to revoke his or her assurance that the jurors' privacy would be protected could result in a sense of distrust and lend a sense of illegitimacy to the process and the judge's role. In a case with divergent views about which arguments are legitimate, some of which have already played out in the presence of the jury, there is an unacceptable risk that one or more jurors might doubt the reliability of the instructions I give them.

A final issue is the question of which twelve names should be released. This jury panel consists of twelve members who will deliberate and reach a verdict, and six (now five) alternates who will not participate in the deliberations.[23] In a case such as this, where disclosing the jurors' names poses substantial risks of improper contact, a purely theoretical option would be to release only the names of twelve of the jurors, thereby preserving the temporary anonymity of and reducing the risk of contact to the alternates. We do not know and cannot know exactly which twelve jurors will decide the Defendants' fate, and there have certainly been instances where jurors have been excused from service and replaced by an alternate even during deliberations. Furthermore, the jurors themselves do not know at this point who has been designated as an alternate (a common practice) and this enables them each to remain engaged throughout the trial. To speculate publicly as to which twelve jurors will deliberate may not only turn out to be inaccurate, but may also affect the focus and engagement of those who think they will not be participating in the deliberations.

The amount of media attention in this case, the personal connection of the voters to one of the defendants, the public statements and appearances of Defendant Rod Blagojevich, and the number and quality of communications I have received lead to my judgment that the unusual

---

[23] I note that I have already excused one juror due to illness in the family. At this time, the jury panel consists of seventeen members, the jury consists of twelve members.

risks associated with releasing the jurors' names during trial overcome the presumption of disclosure. Compounding these general risks of disclosure are the risks specific to this case, which stem from the fact that jurors were told at the start of selection that their names would be withheld until after a verdict is entered.

The fact that the presumption has been overcome does not necessarily justify withholding the jurors' names if there is some lesser way to prevent the harm I have discussed.

While there exist in theory some alternatives to deferred disclosure, many of these alternatives would no doubt impose significant hardship on members of the jury. One alternative would be to instruct jurors not to answer calls, listen to voice mails, or open e-mails and letters from numbers and addresses they do not recognize and to change their privacy settings on all social networking sites. Or, similarly, jurors could be required to surrender their cell phones and computers.[24] While this may reduce the potential for receiving unsolicited contact, it would certainly make life unnecessarily difficult, especially for those jurors who are employed and must conduct their work by phone and e-mail during their lunch breaks, evenings and days off from jury service. Moreover, as Judge St. Eve pointed out in *Black*, "public reports discussing the jurors' specific identities (or other personal information about the jurors) also would undermine the jurors' ability to adhere to the Court's repeated instructions not to read, watch, or listen to any media coverage regarding this case." 483 F. Supp. 2d at 631. An instruction not to answer calls or correspondences from those who appear to be strangers does nothing to address this problem.

---

[24] Another related option would be for court-appointed staff to set up a system whereby all jurors' e-mails and electronic communications would be screened prior to opening; however, this is not only burdensome to both the jurors and the court, but it is also intrusive and difficult to execute in terms of determining who approved contacts are and how they might change over the course of the trial.

Press Intervenors note the presumption that juries will obey the Court's instructions in support of their argument that instructions prohibiting the use of certain electronic communication will suffice to minimize the risk of prejudicial contact. *See, e.g., Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 439 (7th Cir. 1997); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999). But, in this case, I cannot rely solely on instructions. First, much of my concern lies not with the conduct of the jurors, but with that of outsiders. I have little doubt that the jurors in this case would do their best to follow the instruction to alert the court or its staff to any contact from outsiders, but it is that contact itself that concerns me. Instructions will not curtail such contact. Furthermore, Press Intervenors seem to brush aside concerns that my judicial authority would be undermined and my ability to bind jurors to instructions impaired were I to renege on my promise to the jurors of deferred disclosure. However, these issues must be addressed.

First, the presumption that jurors will follow instructions is certainly rebuttable, and reneging on a promise involving the revelation of jurors' identities during the trial may certainly be enough to overcome that presumption. *See Bruton v. United States*, 391 U.S. 123, 135 (1968) (noting that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").

Second, Press Intervenors seem to give great weight to the presumption that jurors will follow instructions, but little weight to the presumption that a juror will be truthful (even if mistaken or inaccurate) during voir dire and in the questionnaires. *See United States v. Huguenin*, 950 F.2d 23, 30 (1st Cir. 1991) (agreeing with the Fifth and Sixth Circuits that there is a presumption that veniremen tell the truth on voir dire, even in response to "sensitive and

potentially embarrassing questions.") (citations omitted). This makes little sense, and Press Intervenors fail to make clear why one presumption should be given more weight than another, especially in light of the fact that release of the jurors' names at this time might well distract or disturb jurors to a point where they may be unable or unwilling to follow instructions.

Sequestration at this point during the trial would also result in significant hardship on the jurors. As the Seventh Circuit seemed to acknowledge in its opinion, sequestration generally is an extreme alternative. *Blagojevich*, 2010 WL 2778838, at *5-6. At the time I expressed my views about deferred disclosure (on June 1, 2009 and May 17, 2010), the trial was expected to last anywhere from twelve to sixteen weeks. A three-to-four-month period of sequestration might be unduly burdensome on individual jurors, and the possibility of sequestration would have created a serious risk that the jury pool would have been significantly depleted. In addition, the recent long-term sequestration in *People v. Simpson*, demonstrates its undesirability for such a length of time as well as the profound disservice to those involved.[25] Furthermore, ordering sequestration midway through a trial would be even more burdensome and inappropriate where the jury was never advised of the possibility to begin with. Jurors would need to find child and elder care solutions (five jurors have school-age children and two of those jurors have children under the age of 5), make arrangements with spouses and family, and address work issues all within a matter of days. They would be plucked from their lives for a substantial period of time,

---

[25] The issue of sequestration is discussed in Mary Strauss's article *Sequestration*, 24 Am. J. Crim. L. 63 (1996). There, Strauss examines the costs and benefits of sequestration generally and also in the context of the nine-month O.J. Simpson trial. Aside from the great financial costs of sequestration, Strauss discusses the significant psychological effects of long-term sequestration, as well as the threat it poses to the judicial process. Among those dangers are: (1) the possibility of impaneling a non-representative jury; (2) a jury's "rush to judgment" during deliberations; and (3) unfair alignment with one side. *Id.* at 106-16. To their credit, Press Intervenors do not appear to urge sequestration here.

the duration of which no one can be sure. The jurors in this case were never warned that sequestration was an option, and had they known, at least some of them might have sought to be excused on the basis that such an arrangement would result in undue hardship.[26] To impose this alternative on them now would be unthinkable.[27]

Because alternative methods of protecting the jurors from improper contact are not satisfactory, I find that the jurors' names should not be made public prior to the entry of a verdict. There is little precedent involving the unique circumstances surrounding this case, and it is set against a relatively new backdrop of public openness via blogs, electronic communication, and social networking sites. As a result, there is, I think, some degree of judgment necessary to determine the best way to protect the legitimate interests put forth by both sides. Of the interests cited by Press Intervenors, both human interest reporting and juror investigations can be conducted once the names are released at the end of the trial. Any issues raised by juror investigations can be addressed and remedied even after the trial is over. However, the risks that jurors will be improperly contacted, or may be unable to perform their sworn duties either due to stress, distraction, or a lack of trust in my instruction implicate far weightier public interests in this case than the interest of the Intervenors in pre-verdict rather than post-verdict revelation of jurors' names. Under these circumstances, the danger of a mistrial resulting from juror

---

[26] Compounding the hardship would be the change in schedule that would most likely accompany a decision to sequester. Customarily, trials in which the jury is sequestered are held five or five and a half days a week.

[27] Another alternative addressed at trial was the possibility of releasing the jurors' names to the movants on the condition that they refrain from contacting the jurors and from publishing their names prior to verdict. The Chicago Tribune has declined to pursue this option. Notwithstanding its usual practice not to publish juror names prior to verdict, the Tribune is "reluctant to enter into such an agreement that would restrict [its] freedom to publish potentially newsworthy material." I understand this view, find it to be a reasonable one, and would most likely hold the same view were I the movant in this case.

misconduct is less likely than the possibility of prejudice to Defendants or the United States resulting from outside contact or other risks I have discussed. With all this in mind, I find that deferred disclosure would be the most effective and least-burdensome way to protect Defendants' interests in a jury free from improper influence and confident in the given instructions and stature of the judge, as well as the public's interest in a fair judicial process.

## IV. CONCLUSION

For the foregoing reasons, Press Intervenors' motion for immediate public access to jurors' names during this criminal trial is denied, and the government's motion to limit public release of juror names is granted. Jurors' names will be made public after a verdict is returned.

ENTER:

James B. Zagel
United States District Judge

DATE: July 26, 2010

24

# Exhibit 1

Voicemail received 4/21/2010 9:37 PM
From 773 727 4829

Fuck you, Judge Zagel.  You fucking arrogant bitch ass mother fucker. Fuck you,
fuck you, James B. Zagel.  Fuck you.

# Exhibit   2



## THE WHITE HOUSE

### WASHINGTON

### MAY 27,2010

Dear friend Judge Zagel:

This is a notice of my president executive powers. I'm giving notice that the Rod Blagojevich trial will be dismissed without further proceedings. Case is Permanently closed. That is my executive order, and a non-changeable order at that.

Sincerely,

Barack Obama

USA FIRST-CLASS FOREVER

CEDAR RAPIDS IA 524

27 MAY 2010 PM 1 L

Judge James B. Zagel
219 S. Dearbourne ST.
Chicago, Illinois 60604

6060481702

THE WHITE HOUSE
WASHINGTON, DC 20500

# Exhibit 3

Received 6/23/2010 8:52 AM
From 863 701 5126

Hello, Judge Zagel?

This is a woman named Jeanette Blar(sp?), and I just wanted to let you know that
the federal government has developed a new kind of electronic where they can
copy exactly the voice of someone and then pretend that they are that person. And
they developed it, I don't know if they used it on Ron Bagelvich, but I'll always
wonder if he's guilty or not. So, if you want to, give me a call at area code 863
701 5126.

# Exhibit 4

## TELEPHONE CALL DETAILS

Monday, July 19
Call to 312 435 5713
Between 2:00 - 4:00 p.m.
Caller number (trunk) 1325-xx

The male caller began asking general questions about how he could observe the trial. He asked questions about getting in and if the public is allowed entry to the courtroom. He also asked if he could speak up at the end of the trial day. I explained that only the Judge, lawyers and defendants are allowed to speak in the courtroom. He asked his question about speaking up in a few different ways. He was surprised at my answer, even asked me if I was sure about it. He assumed he could have a chance to comment in court. He said that he thought the Judge was unfair with Blagojevich, and he should be allowed to play all or more of the tapes in court.

The caller had an Eastern European accent, and his demeanor was excited and slightly agitated. I suspected that he might have been in the courthouse when he called, but I have no evidence of that.

I believe that the same caller had called previously (on another day). It was a brief call, and the caller ranted about the unfairness of the tapes, but was not specific or clear about his reason for calling.

# Exhibit 5

July 20, 2010

To: ALL THE JUDGES

FROM: IAM (SELENA ERIKA NICHOLE WILSON)

**Chief Judge James F. Holderman**

| | |
|---|---|
| Judge Wayne R. Andersen | Judge Virginia M. Kendall |
| Magistrate Judge Martin C. Ashman | Judge Matthew F. Kennelly |
| Judge Marvin E. Aspen | Magistrate Judge Arlander Keys |
| Magistrate Judge Geraldine Soat Brown | Magistrate Judge Young B. Kim |
| Judge Elaine E. Bucklo | Judge Charles P. Kocoras |
| Judge Ruben Castillo | Judge Joan Humphrey Lefkow |
| Judge David H. Coar | Judge Harry D. Leinenweber |
| Magistrate Judge Jeffrey Cole | Judge George W. Lindberg |
| Judge Suzanne B. Conlon | Magistrate Judge P. Michael Mahoney |
| Magistrate Judge Susan E. Cox | Judge Blanche M. Manning |
| Judge John W. Darrah | Judge George M. Marovich |
| Magistrate Judge Morton Denlow | Magistrate Judge Michael T. Mason |
| Judge Samuel Der-Yeghiayan | Magistrate Judge Nan R. Nolan |
| Judge Robert M. Dow Jr. | Judge John A. Nordberg |
| Magistrate Judge Sheila Finnegan | Judge Charles R. Norgle, Sr. |
| Judge Robert W. Gettleman | Judge Rebecca R. Pallmeyer |
| Magistrate Judge Jeffrey T. Gilbert | Judge Philip G. Reinhard |
| Judge Joan B. Gottschall | Presiding Magistrate Judge Sidney I. Schenkier |
| Judge John F. Grady | Judge Milton I. Shadur |
| Judge Ronald A. Guzman | Judge Amy J. St. Eve |
| Judge William T. Hart | Magistrate Judge Maria Valdez |
| Judge William J. Hibbler | Judge James B. Zagel |
| Judge Frederick J. Kapala | |
| Judge Wayne R. Andersen | Judge Virginia M. Kendall |
| Judge Marvin E. Aspen | Judge Matthew F. Kennelly |
| Judge Elaine E. Bucklo | Judge Charles P. Kocoras |
| Judge Ruben Castillo | Judge Joan Humphrey Lefkow |
| Judge David H. Coar | Judge Harry D. Leinenweber |

Judge Suzanne B. Conlon

Judge John W. Darrah

Judge Samuel Der-Yeghiayan

Judge Robert M. Dow Jr.

Judge Robert W. Gettleman

Judge Joan B. Gottschall

Judge John F. Grady

Judge Ronald A. Guzman

Judge William T. Hart

Judge William J. Hibbler

Judge Frederick J. Kapala

Judge Martin C. Ashman

Judge Geraldine Soat Brown

Judge Jeffrey Cole

Judge Susan E. Cox

Judge Morton Denlow

Judge Sheila Finnegan

Judge Jeffrey T. Gilbert

Judge George W. Lindberg

Judge Blanche M. Manning

Judge George M. Marovich

Judge John A. Nordberg

Judge Charles R. Norgle, Sr.

Judge Rebecca R. Pallmeyer

Judge Philip G. Reinhard

Judge Milton I. Shadur

Judge Amy J. St. Eve

Judge James B. Zagel

Judge Arlander Keys

Judge Young B. Kim

Judge P. Michael Mahoney

Judge Michael T. Mason

Judge Nan R. Nolan

Judge Maria Valdez

Dear Judges,

I want to apologize to you for having to write to you all. I have a judge I think by Blagojevich however I don't have your name. I am IAM, I am King of Japan and are eager to get to my home and places. I use (Selena Erika Nichole Wilson) for law. I am in Municipal, Civil, and State law in which is ward I think.

I am told by Gov. Rod Blagojevich to go to the office on Randolph at the Thomson building and get my envelope, he told me what's inside it's my check for the amount 200,000 dollars. I went there and have asked, and even recently last week I went there and I called, but I was only told no there wasn't any thing for me and also to call back.

Blagojevich told me to leave as soon as the incident happened. An incident that has high security going on with it. I tried to get my envelope, however it wasn't there when I went

to pick it up. Another thing judge I am a King as I mentioned above and are ignored by the people that I have to rent from I let them know I am a king and they ignored me and my writing. I learned in school they are not suppose to. I am a paralegal student at Robert Morris. I learned King and Heir and civil in King Law. I learned who and how to write also. I learned other things and am trying to practice, however I am blocked from normal living.

I have to go walk around and travel in other ways with a lot of people connected to my head and vision, although I am ok, I want it to stop. They talk to each other while using me and they interrupt my company, I have someone to be with and it isn't right that he has to be with me under these conditions. Now judge, I have learned that I will have an operation that can get rid of the whole thing but as for now I am bothered with individuals commenting on who I am with, what I vision at times , routs I should take, are interrupted  so that these people can have me there way and other things.
I don't know all the individuals and have reported, the numbers are HR494594 to CPD officer Moser.

I haven't heard any thing from him but this is *right* and I understand. Back to Blagojevich, I want my money (the envelope he told me about) to leave please, so may I have court to pick it up please.

Sincerely

IAM (Selena Erika Nichole Wilson)
PO BOX 12714 Seattle Washington 98111
PO BOX 53470 Chicago Illinois 60653
Number 206-255-0619