IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 08 CR 888 |
| | ) | Honorable James B. Zagel |
| ROD BLAGOJEVICH | ) | |

MOTION TO DISMISS CHARGES OF HONEST SERVICES, BRIBERY AND
EXTORTION PURSUANT TO *SKILLING V.  UNITED STATES*

NOW COMES Rod Blagojevich, by and through his counsel, and moves this Court to dismiss the counts alleging deprivation of honest services, bribery and extortion based upon the Supreme Court's narrowing of the honest services statute in *Skilling v. United States, infra.*  Blagojevich hereby incorporates by reference previously-filed motions[1] regarding dismissal of the honest services and bribery/extortion counts as well as arguments made before the Court. In support of this Motion, Blagojevich states the following:

---

[1] This includes, for example: Motion to Continue, 3/11/10, Doc. 264; Motion to Dismiss 'Honest Services' Counts, 4/27/10, Doc, 331; Defendant's Motion for Pretrial Rulings on Jury Instructions Relating to Mail Fraud Allegations & Defendant's Renewed Motion for Continuance or to Stay Proceedings, 4/27/10, Doc. 334; Appellate litigation initiated by Notice of Appeal, 5/7/10, Doc. 350 and all related documents in the District Court, the Seventh Circuit Court of Appeals and the United States Supreme Court; Renewed Motion to Continue Trial, or alternatively, Motion to Preclude Playing Recordings Before the Supreme Court Rules on Constitutionality of 18 U.S.C. Section 1346, 5/17/10, Doc. 373; Motion to Continue, 6/1/10, Doc. 414; Defendant Rod Blagojevich's Motion to Continue In Light Of the Supreme Court's Opinion on Honest Services, 6/24/10, Doc. 448; Motion to Reconsider, 6/24/10, Doc. 449; Defendant Rod Blagojevich's Omnibus Motion for Relief Based on the Supreme Court's Ruling on Honest Services, 6/28/10, Doc. 452; Defendant Rod Blagojevich's Motion to Continue for One Week Upon the Close of the Government's Case, 7/12/10, Doc. 493; Motion for Judgment of Acquittal, 7/13/10, Doc. 498; Memorandum In Support of Defendant's Motion for Judgment of Acquittal, 7/18/10, Doc. 505; Proposed Jury Instructions, 7/24/10, Doc. 517 and 7/25/10 Doc. 518; Motion for Reconsideration of Jury Instructions and Formal Objections, 7/25/10, Doc. 519; Objections to Jury Instructions, 7/29/10, Doc. 533; Motion for Judgment of Acquittal (Post-Trial Motion), 9/13/10, Doc. 572.

## THE HONEST SERVICES COUNTS

The Supreme Court's holding in *Skilling* is clear and unambiguous:

> Congress intended §1346 to reach at least bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that §1346 criminalizes *only* the bribe-and-kickback core of pre-*McNally* case law.

*Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010).

In *Skilling*, the Supreme Court "pare[d] that body of [honest services] precedent down to its core: In the main, the pre-*McNally* cases involved fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived. Confined to these paramount applications, § 1346 presents no vagueness problem." *Skilling,* at 2928. Outside of these "paramount applications," however there remains a vagueness problem which is present in the instant case.

A critical element of the *Skilling* ruling was the reinforcement of fundamental notice and due process requirements. The Supreme Court ruled that to satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling* at 2927-28.

Distilled down to its essence, prosecution under the honest services statute is only constitutional if it alleges a "paradigmatic case[ ] of bribes and kickbacks."

2

*Ryan v. U.S.*, No. 10 C 5512, December 21, 2010 Memorandum Opinion and Order (Pallmeyer, J.), Slip Opinion[2] at 2, *citing Skilling* at 2896. Under these strict parameters, the law of honest services is no longer in a state of "chaos," as characterized by Justice Scalia in his dissent from denial of certiorari in *Sorich v. United States,* 129 S.Ct. 1308, 1311 (2009) (considered to be the pre-cursor to the *Skilling* opinion). The Supreme Court "salvaged" the honest services statute by unambiguously narrowing its application to only the "core" pre-*McNally* type cases that fall within the ambit of honest services deprivation. *Skilling,* at 2931.

The "core" does not include campaign contribution cases – particularly not campaign contribution cases where there is no allegation of an express[3] or explicit *quid pro quo*. In fact, there was no pre-*McNally* case cited by the *Skilling* Court that involved straight campaign contributions, as alleged in Blagojevich's case.

The only way for a campaign contributions honest services case to be constitutional post-*Skilling* is with a reinforced requirement of an express *quid pro quo*. Anything less harkens back to the age of the unconstitutionally vague pre-*Skilling* framework.

In denying Governor Ryan's motion to vacate, Judge Pallmeyer characterized the conduct in the *Ryan* case as ". . . well-recognized before his conviction as conduct

---

[2] The *Skilling* case was recently analyzed in depth by Hon. Judge Pallmeyer in the case of *George Ryan v. United States* (wherein Governor Ryan filed a 2255 petition based primarily on *Skilling* which was denied). Insofar as Judge Pallmeyer noted that "*Skilling* is unquestionably relevant here and warrants examination of Ryan's conviction", the same is true here: the Ryan opinion is worthy of review in the instant case.

[3] As described, *infra,* the words express and explicit should have their ordinary meaning in the context of honest services/campaign contributions cases. The terms express and explicit may be used interchangeably in this Motion.

that falls into the 'solid core' of honest services fraud.  Such conduct was identified by the Court in *Skilling* as the proper target of § 1346."  Ryan Opinion, at 4, *citing Skilling* at 2930-31.

To the contrary, the conduct of which Blagojevich is accused does not fall into the 'solid core' of cases.  The honest services statute, as applied to Blagojevich remains vague.  Blagojevich's case is different from that of *Skilling* or even *Ryan* where arguably, the conduct that is proscribed by the statute is foreseeably illegal. The campaign contributions context of honest services law can only be deemed constitutional when there is an explicit or express *quid pro quo*.  In the Blagojevich case, there exists no *quid pro quo* to satisfy the constitutional requirements.

An overarching lesson from *Skilling* is that criminal statutes are to be construed narrowly.  The *Skilling* court relied in part on "rule of lenity" in the interpretation of the honest services statute noting the concerns of "(1) fair notice and (2) arbitrary and discriminatory prosecutions."  *Skilling,* at 2933.

As Judge Pallmeyer noted in the *Ryan* decision, "the Supreme Court acknowledged [in *Skilling*] that due process requires any 'penal statute [to] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"  Ryan Opinion, at 4, *citing Skilling*, at 2927-28.

In the *Ryan* case, as Judge Pallmeyer noted, the Seventh Circuit ruled that there may be a viable challenge to the statute if the defendants "could not have

4

known that the conduct underlying their convictions could be considered 'depriv[ing] another of the intangible right of honest services." Ryan Opinion, at 4, *citing U.S. v. Warner,* 498 F.3d 666, 697 (7th Cir. 2007) (quoting 18 U.S.C. §1346). A distinction between the *Ryan* case and Blagojevich's case is evinced in Judge Pallmeyer's ruling: "Ryan clearly understood 'what conduct was prohibited' and could not have been surprised that he was subject to prosecution." Ryan Opinion, at 4. This is because Ryan was accused of conduct involving personal gain – not campaign contributions. Blagojevich, on the other hand, never engaged in any foreseeably criminal conduct (i.e., an express *quid pro quo*).

In fact, much is made of the fact that three Illinois Governors have been indicted under honest services laws since 1974. However, only one case involved campaign contributions as opposed to private gain: Blagojevich. Blagojevich's case sits squarely outside the 'core paradigmatic' cases properly brought under the honest services statute.

Because the Blagojevich case alleges *only campaign contributions,* and there is no allegation of bribery or kickbacks to Blagojevich personally, the requirement of an express or explicit *quid pro quo* is critical. *See, McCormick v. United States,* 500 U.S. 257, 273 (1991). Blagojevich could not have known in advance that speculation and interpretation of his alleged state of mind would form the basis of a criminal prosecution. As Justice Scalia aptly noted, "It is simply not fair to prosecute someone for a crime that has not been defined until the judicial decision that sends him to jail." *Sorich v. United States,* 129 S.Ct 1308 (2009) (Scalia, J.,

5

dissenting).  The *Skilling* decision then echoed the same concern at 2927-28 (ruling
that to satisfy due process, "a penal statute [must] define the criminal offense [1]
with sufficient definiteness that ordinary people can understand what conduct is
prohibited and [2] in a manner that does not encourage arbitrary and
discriminatory enforcement.")

*McCormick, supra,* and *Evans v. United States,* 504 U.S. 255 (1992), remain
settled law today with regard to campaign contribution cases.  *See* Ryan Opinion, at
20 (noting that "*Skilling* has [not] unsettled" the "settled law" of *Evans* and
*McCormick*). The Court in *McCormick* ruled:

> [T]o hold that legislators commit the crime of federal
> extortion when they act for the benefit of constituents or
> support legislation furthering the interests of some of
> their constituents, shortly before or after campaign
> contributions are solicited and received from those
> beneficiaries, is an unrealistic assessment of what
> Congress could have meant by making it a crime to obtain
> property from another, with his consent 'under color of
> official right.'

*McCormick*, at 272.

In *McCormick*, the Supreme Court recognized that campaign contributions
are essential for politicians and crafted a standard to clearly delineate criminality
from legal conduct.  The court held that a link between a campaign contribution and
an official act would be a crime of extortion only if there was an "explicit" *quid pro
quo. McCormick*, 500 U.S. at 271, & n9.  The Court continued:

> Political contributions are of course vulnerable if induced
> by the use of force, violence, or fear.  The receipt of such
> contributions is also vulnerable under the Act as having

6

been taken under color of official right, but only if the payments are made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act. In such situations the official *asserts* that his official conduct will be controlled by the terms of the promise or undertaking.

*McCormick,* at 273.

Indeed, the Court had the opportunity to allow for a non-express *quid pro quo* to be the standard (see Justice Stevens' dissent in *McCormick*, 500 U.S. at 282-83 (Stevens, J., dissenting)). The Majority, however, used the words "explicit" and "asserts." *McCormick,* at 273.

That standard still controls. The *Evans* case[4] did not change the standard for straight campaign contribution cases. *Evans* was a case where the defendant was accused of taking $7,000 in *personal cash bribes* and a one-time campaign donation for $1,000. The Supreme Court's primary focus was on the cash bribes to the official. The Court's stated goal was to avoid a "winks and nods" approach to circumvent the statute. More importantly, *Evans* did not involve a strictly campaign contribution case. Indeed, recently, the Sixth Circuit acknowledged that "*Evans* modified the standard in *non*-campaign contributions cases." *United States v. Abbey*, 560 F.3d 513, 517-18 (6th Cir. 2009) (emphasis added).

---

[4] *Evans, supra,* was decided a year after *McCormick* and ruled: "The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Evans,* at 274 (Kennedy, J., concurring).

*McCormick* applies here. Moreover, the explicit *quid pro quo* requirement was fortified by the *Skilling* Court's concern regarding the arbitrary and/or discriminatory nature of the honest services prosecutions. *Skilling* at 2927-28, 2933. Without allegations of an explicit or express *quid pro quo*, campaign contributions honest services prosecutions are ripe for the very danger the *Skilling* Court sought to avoid. If an implicit or perceived connection between the official's actions and a campaign contribution (absent an express *quid pro quo*) is sufficient for an honest services prosecution, this will allow for prosecutors to selectively, arbitrarily and discriminatorily choose whom to investigate and prosecute. Once again, landing right back in the morass of the 'chaotic' pre-*Skilling* honest services arena.

To permit the instant prosecution would condone prosecuting conduct barred by *Skilling* whereby there is no notice and the perception of an unasserted mental state becomes the basis for conjecture, speculation and interpretation by prosecutors and government agents eager to build a criminal case. In a (post-*Skilling*) honest services prosecution, there must necessarily be a communication of an explicit or express *quid pro quo* which constitutes a bribe or kickback.

In the Ryan Opinion, Judge Pallmeyer noted that, "Ryan's prosecution, like [Former Governor Otto] Kerner's[5] before it, targeted conduct that remains at the core of honest services fraud." Ryan Opinion, at 5.

---

[5] *United States v. Isaacs,* 493 F.2d 1124, 1150 (7th Cir. 1974).

Blagojevich's case is different from both the Kerner and Ryan prosecutions. Blagojevich's case does not fall into the "core" or "paradigmatic" cases – unlike those cases, the Blagojevich prosecution alleges strictly campaign contributions as opposed to personal bribes or kickbacks.

Neither Ryan nor Kerner's cases were based on campaign contributions – both prosecutions alleged personal financial gain, not campaign contributions.

Of note, in *Isaacs,* there were actually *two campaign contributions* allegedly given to Kerner by the same entity representing a racetrack, whose *personal cash* to Kerner was the subject of Kerner's prosecution and convictions. However, Kerner who was charged and convicted under honest services, was not charged with any crime related to the campaign contributions – he was only charged and convicted of his taking of personal money. Simply put, campaign contributions are a different beast from personal enrichment schemes (the core, paradigmatic honest services cases permitted by *Skilling*.)

In *Ryan,* Judge Pallmeyer noted that "Ryan is correct that a campaign contribution can be deemed a bribe only if the money is given in return for a commitment to take (or not take) a specific action." Ryan Opinion, at 19, citing *McCormick,* at 273 (requiring "an explicit promise or undertaking by the official to perform or not to perform an official act.")

In the post-*Skilling* world of honest services prosecutions, an allegation that a public official took action because of a campaign contribution no longer fits into the parameters of §1346. The Supreme Court, in narrowing §1346 down to the pre-

*McNally* core of honest services cases held that only the cases that fall within the well established framework (the 'core paradigmatic cases' of self-enrichment) are constitutional. Without proof (an express *quid pro quo*), speculation regarding the intentions surrounding a campaign contribution cannot pass constitutional muster.

There are also far-reaching First Amendment implications in the Blagojevich prosecution[6]. Such implications are cause for concern in any campaign contribution honest services prosecution where there does not exist an express or explicit *quid pro quo.* There is an inherent 'solicitation' when an individual contributes to a campaign. The entire point of campaign donations is that donors wish to see their interests or their causes advanced by the public official to whom they donate. As such, there are First Amendment protections on campaign contributions. *See, Citizens United v. Federal Election Commission,* 130 S.Ct. 876 (2010). There is a clear difference and distinction between giving money to a public official personally and making a campaign contribution – the law recognizes as such and protects the campaign contributions sphere.

To hold otherwise in the instant case would chill the First Amendment rights regarding campaign contributions. As the Supreme Court ruled in *Citizens United,* "Prolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at the law's meaning and differ as to its application." *Citizens United,* at 891. The only way to preserve the integrity of the First Amendment and follow *Skilling* is to abide by *McCormick's* express *quid pro*

---

[6] Blagojevich filed his *Motion to Dismiss Based on Violation of the First Amendment* on June 8, 2010, (Pacer Document 432) and hereby incorporates by reference the relevant arguments contained within that Motion.

*quo* requirement. That provides adequate notice to both the public official and the donor as to what conduct is foreseeably criminal. Certainly, more proof should be required than that which is alleged here – interpretations and speculation as to what Blagojevich was thinking.

Worth noting is that the government and the Supreme Court indicated that they do not believe that a straight campaign contributions case falls into the "solid core" of honest services. The *Skilling* Court cited to the government's brief in *Skilling* which enumerated over two dozen cases it saw as examples of "solid core" cases, none of which alleged straight campaign contributions as part of bribery or kickbacks. *Skilling* at 2930.

Based on *Skilling* and *McCormick,* the proper finding here is that a campaign contribution, absent an express *quid pro quo*, is not an "honest services" bribe in post-*Skilling* jurisprudence.

To permit the government to quietly slide this campaign contributions case through the Court would contravene and circumvent the goal of the Supreme Court in *Skilling,* which salvaged the statute only by narrowing its application. It was the over-expansion of the statute that led the Court to 'pare down' the cases in *Skilling*, and the Blagojevich prosecution would fall back squarely into the middle of the chaos that the Court sought to eradicate.

The prosecution of honest services in this case proves even more egregious in light of the fact that the government charged Blagojevich with violation of honest services *prior to Skilling.* The government then obtained a second superseding

indictment to pro-actively mitigate any potential fallout from the then-highly-anticipated *Skilling* decision.  The government added additional counts but kept the honest services counts alive.  This conduct is part of what Justice Scalia pointed to in his dissent in *Sorich*, noting that honest services prosecutions "invite abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct."  *Sorich,* at 1310.

In an extraordinarily high-profile trial such as this case, this Court should uphold a narrow application of the statute, in line with the Supreme Court's trajectory on these cases[7].  Particularly in light of the narrow application in *Skilling* and the Court's reliance on the rule of lenity, this Court should dismiss the honest services counts because, *inter alia,* the alleged criminal nature of the conduct here was not foreseeable.[8]  Insofar as *McCormick* is the law of the land, requiring an express *quid pro quo* in campaign contribution cases, Blagojevich could not and did not foresee his actions as being possibly criminal.

---

[7] It bears commenting on the fact that there is a developing split in the Circuits about what level of explicitness is required with regard to an alleged campaign contribution *quid pro quo*.  *See United States v. Gamin*, 510 F.3d 134, 142 (2nd Cir. 2007) (Sotomayor, J.) (holding that a campaign contributions case requires proof of an "explicit *quid pro quo*," meaning "an express promise"); *United States v. Siegelman*, 561 F.3d 1215 , 1226, 1228 (11th Cir. 2007 (holding that "explicit" does not mean "express").  *United States v. Blandford*, 33 F. 685, 696 (6th Cir. 1994) ("*Evans* instructed that by 'explicit' *McCormick* did not mean express"), but see *United States v. Abbey*, 560 F.3d 513, 517-18 (6th Cir. 2009) ("*Evans* modified the standard in non-campaign contribution cases.")

[8] With respect to vagueness and the rule of lenity, the Supreme Court has recognized that "[w]hen interpreting a criminal statute, we do not play the part of mind reader."  *United States v. Santos*, 128 S. Ct. 2020, 2026 (2008).

Webster's Dictionary defines "*explicit*" as: "fully revealed or expressed without vagueness, implication, or ambiguity: leaving no question as to meaning or intent." The word "*express*" is defined as "directly, firmly, and explicitly stated." It is that "ordinary meaning" that is critical to this determination. *Skilling*, at 2927-28 ("To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness *that ordinary people can understand what conduct is prohibited . . .*'") (emphasis added). The due process concern of fair notice in honest services cases, put to rest in *Skilling,* is resurrected by the Blagojevich prosecution.

Evidence at the first trial did not show an express or explicit *quid pro quo*. Rather, the evidence demonstrated attempts by Blagojevich *not to violate* the law. No evidence presented at trial showed Blagojevich ever engaged in an express *quid pro quo*.

In the case of Governor Siegelman of Alabama, a case in which the Supreme Court vacated and remanded back to the Eleventh Circuit for consideration in light of *Skilling,* a similar campaign contribution prosecution is at issue[9]. *Siegelman v. United States,* 130 S.Ct. 3542 (2010).

The following, argued by Siegelman in his brief on remand to the Eleventh Circuit[10], is apropos to Blagojevich's case and worth noting:

> Cases do not knock on prosecutors' doors fully grown,
> asking to be prosecuted or not based on evidence already
> compiled. Instead, prosecutors choose which cases to

---

[9] Briefing before the Eleventh Circuit concluded in the Fall of 2010 and oral argument was held on January 19, 2011. As it may apply to Blagojevich's case, the Eleventh Circuit's ruling is 'one to watch.'

[10] Seigelman Brief at 36-37.

> *build.* Prosecutors (and their investigatory colleagues)
> start building cases when the evidence is only embryonic,
> and is just enough to make them believe that there is
> something worth investigating. Then they cajole and
> subpoena and dig and convince, to *make* the case. The
> first crucial step, and the step where arbitrariness and
> discrimination can first take root, is the step of deciding
> whether a given official is worth *investigating* or not.

Therein lies the vagueness problem with the application of the honest

services law to campaign contributions cases that do not have an express *quid pro*

*quo*. The government is put in the powerful and dangerous position of interpreting,

speculating and crafting retroactive states of mind to suit a prosecution based on

the alleged intent of the defendant – with no tangible, express, or explicit element

provided. This is clearly what the Supreme Court intended to protect against in

*Skilling*.


Specific Relief Sought: Dismissal of Honest Services Counts (3-13):

This Court should dismiss the counts alleging honest services deprivations,

along with any other relief the Court deems appropriate. A brief summary of the

honest services charges, each of which should be dismissed, follows:

**Count 3** alleges a scheme to deprive honest services (and realleges and

incorporates paragraph 1 of count 1, which describes the entities involved in the

alleged conspiracy). **Counts 4 – 13** allege specific allegations of wire fraud as part of

the alleged scheme to defraud (and counts 4-13 incorporate and reallege count 3 -

scheme to defraud).

14

Each of the wire fraud honest services counts (counts 4-13) charges Blagojevich with a violation of the statute based upon brainstorming sessions and conversations which took place over the telephone.

Specifically:

**Count 4** alleges honest services violation regarding a **Nov. 1, 2008 phone call** (government Tab 8) between Rod and Robert Blagojevich, regarding alleged solicitations of campaign contributions from Gerald Krozel, John Johnston, and potential contributions from Blair Hull and Jesse Jackson,, Jr.

In the phone call, Rod never, at any point, directs Robert to solicit a campaign contribution from anyone in exchange for anything. There is surely no express *quid pro quo* asserted or communicated by Blagojevich. Rather, Rod told Robert to coordinate with Monk regarding asking Hull for a contribution and Rod joked about the fact that Hull thought he could be Senator.

**Count 5** alleges honest services deprivation regarding a **Nov. 7, 2008 phone call** (government Tab 33) between Blagojevich, John Harris and Fred Yang in which financial benefits were discussed that Blagojevich could request as part of the appointment of Valerie Jarrett.

On the call, Blagojevich discussed the possibility of being appointed Secretary of Health and Human Services (HHS). Blagojevich never said he asked Balanoff for HHS in exchange for appointing Valerie Jarrett. Although both HHS and Valerie Jarrett were discussed at the meeting with Balanoff, as Blagojevich states on the

recorded call, Blagojevich never made a connection between the two when he presented the HHS request to Balanoff.

**Count 6** alleges honest services deprivation regarding a **Nov. 10, 2008 phone call** (government Tab 34) between Blagojevich and various advisors (John Harris, Bill Knapp, Doug Sosnik, Fred Yang, and Bill Quinlan) in which financial benefits were brainstormed as part of a Valerie Jarrett appointment. Blagojevich discussed with his advisors opportunities he had in his political and personal career. The Senate seat appointment was discussed in the conversation, as well as opportunities for Blagojevich to be made HHS Secretary, to be put on the board of a non-profit 501(c)(4) organization or the head of Change to Win, a national organization related to SEIU. While these ideas were discussed and brainstormed, Blagojevich took no action in the conversation, nor was any action agreed to be taken by Blagojevich, Harris, or any other advisors.

**Count 7** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** (government Tab 44) between Blagojevich and Fred Yang in which they discussed an idea for a not-for-profit ("Change to Win") where Blagojevich could work after he was no longer governor as part of a Jarrett appointment. It is uncontroverted in the record that no action was ever taken beyond this brainstorming session between Blagojevich and his advisor, Yang.

**Count 8** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** (government Tab 47) between Blagojevich and Balanoff in which they discussed a proposal to set up a not-for-profit where Blagojevich could work after he was no

16

longer governor, in exchange for the appointment of Jarrett. In the call, Blagojevich pointed out to Balanoff that he understood that Rahm Emanuel is the only one authorized to speak on behalf of President Obama. Blagojevich explained to Balanoff that he intended to start a 501 (c)(4) organization. Blagojevich then stated that maybe someone in the Obama administration could help expedite the creation of that organization.

**Count 9** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** (government Tab 49) between Blagojevich and Balanoff in which Blagojevich informed Balanoff it was a real possibility that Jarrett could get the appointment and again raised his interest in a not-for-profit. There is no offer of a *quid pro quo* to appoint Jarrett in exchange for a 501(c)(4) organization. As such, neither Blagojevich nor Balanoff took any further action following the conversation. There was no follow up on either side.

**Count 10** alleges honest services deprivation regarding a **Nov. 13, 2008 phone call** (government Tab 60) between Blagojevich and Doug Scofield in which they discussed presenting to Rahm Emanuel a proposal for a not-for-profit set up.

On the call, Blagojevich discussed who could call Rahm Emanuel to suggest the 501(c)(4) idea, but agreed with Scofield that whoever does call Emanuel should make clear that creating such an organization *is not related to any other discussions*.

Once again, as with all of the ideas bounced around in these calls, no follow up was done and no action taken. Rahm Emanuel was never called by Scofield,

Wyma or anyone else following Blagojevich's discussion about creating a 501(c)(4) organization.

**Count 11** alleges honest services deprivation regarding a **Nov. 13, 2008 phone call** (government Tab 62) between Blagojevich and Doug Scofield in which Blagojevich asked Scofield if he would call John Wyma and ask if he would call Rahm Emanuel to suggest creating a 501(c)(4) organization, to put the idea in Emanuel's head.

Notably, Scofield then asked about Valerie Jarrett and Blagojevich said whether Valerie Jarrett is appointed or not, he wants Scofield to ask Wyma to call Rahm about the 501(c)(4) idea.

Neither John Wyma, Doug Scofield nor Blagojevich ever called Rahm Emanuel about the 501(c)(4) idea. Scofield testified that Wyma never conveyed the message to Emanuel. Moreover, Blagojevich never followed up with Scofield or Wyma about calling Emanuel.

**Count 12** alleges honest services deprivation regarding a **Dec. 4, 2008 phone call** (government Tab 88) between Blagojevich and Lon Monk in which they discussed John Johnston and the racetrack (Johnston was Monk's client). At one point in the call, Monk suggests to Blagojevich that in order to obtain campaign contributions sought from Johnston, it would be better "from a pressure point of view" for Blagojevich himself to call Johnston. Monk made the affirmative statement and Blagojevich agreed (Blagojevich answers in the affirmative "yeah, good" to Monk's suggestion).

However, Blagojevich never actually called Johnston following the call. Neither Blagojevich nor Monk followed up with Johnston or ever received a contribution.

It should be noted that in a recording from the FOB Office on December 3, (government Tab 87), Monk and Blagojevich agree that Monk will go to Johnston to ask for a contribution that Johnston had committed to giving but that Monk should be clear it is not "one for the other" and Monk will ask him "without crossing the line." Blagojevich said in the recording he wanted to make sure there was separation between the contribution and the bill signing. Monk testified in fact that he and Blagojevich on the recordings were figuring out ways how *not* to extort John Johnston.

**Count 13** alleges honest services deprivation regarding a **Dec. 4, 2008 phone call** (government Tab 91) between Blagojevich, Deputy Governor Bob Greenlee and Fred Yang where they discussed Jesse Jackson, Jr. as a potential Senate candidate. In the call, Blagojevich told Yang there was "tangible political support… specific amounts and everything… some of it up front" regarding Jackson.

Immediately after this call with Yang and Greenlee terminated, Blagojevich phoned Greenlee and explained to Greenlee that Blagojevich was presenting Yang with a pretext to leverage and elevate Jackson in the eyes of the Washington establishment, and that Blagojevich's actual play was to appoint Lisa Madigan in exchange for a legislative deal with Speaker of the Illinois House Michael Madigan.

\*    \*    \*

19

Each of the honest services wire fraud counts share traits in common – there is no action taken, the allegations are based upon speculation and inference in the absence of an express *quid pro quo*, and the calls invariably include brainstorming, a lot of talk, and political strategy. The foundational requirements of due process, and the holding in *Skilling* compel the dismissal of these counts. These wire fraud allegations do not provide sufficient grounds for honest services prosecution. Try as it may, the government cannot squeeze these phone calls (featuring a variety of political brainstorming sessions where no follow up occurred) into the "core" "paradigmatic" honest services prosecutions that survive *Skilling's* narrowed application of the statute.

## THE BRIBERY AND EXTORTION COUNTS[11]

*Skilling* imparts a critical lesson about the interpretation of all criminal laws: to be constitutional, and provide due process of law, there must be proper notice to what conduct is criminal so that individuals know where the line is drawn. *See, Skilling* at 2927-28 ("To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"); *Skilling* at 2933 (The due process concerns are "(1) fair notice, and (2) arbitrary and discriminatory prosecutions.").

---

[11] Defendant hereby incorporates argument from the preceding sections.

20

The bribery allegations in this case do not comport with the due process requirements which are based in the United States Constitution, and reinforced by *Skilling*. Bribery (18 U.S.C. 666) contains the element that the defendant "acted corruptly."

The bribery statute does not adequately define "corruptly" in the campaign contribution context. In fact, even the Committee Comment to the Seventh Circuit Pattern Jury Instruction notes: "The definition of "corruptly" set forth above is derived from *United States v. Bonito*, 57 F.3d 167, 171 (2nd Cir. 1995). The term has been defined somewhat differently in the context of other criminal statutes. See, e.g., *Roma Construction Co. v. Russo*, 96 F.3d 566, 573-74 (1st Cir. 1996)."

This does not provide proper notice. This problem is compounded in the campaign contribution context, because there is a due process requirement that there be an allegation of an express or explicit *quid pro quo* (as detailed *supra*).

There is no definiteness to this term, and it does not provide sufficient notice so that an individual could foresee with certainty what conduct would fall in the ambit of §666.

Additionally, extortion and bribery are considered "…two sides of the same coin," regarding the requirement of an express or explicit *quid pro quo* in campaign contribution cases. *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).

The same argument (regarding the requirement of an express or explicit *quid pro quo* in bribery cases) applies to the extortion statute (18 U.S.C. 1951).[12]

---

[12] *See Evans*, 504 U.S. at 260 (recognizing that at common law, "[e]xtortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.'").

21

Blagojevich's charges for violation of §1951 should be dismissed for the same vagueness and lack of notice problems that exist in the honest services and bribery counts.

In addition, in a campaign contributions case, the requisite state of mind to prove a Hobbs Act extortion charge is also vague and provides insufficient notice. It must be proven that the defendant had the "intent to obtain something from another *which the defendant knows he is not entitled to receive* with knowledge that it is the product of actual or threatened force, violence, fear or the defendant's office." Seventh Circuit Pattern Jury Instruction 4.08, Committee Note from "Specific Intent/General Intent" Instruction.

In a case where a public official is the recipient of a campaign contribution (or solicits a campaign contribution) and there is no express *quid pro quo*, the "intent to obtain something from another which the defendant knows he is not entitled to receive" simply does not exist. Absent an express *quid pro quo*, public officials are entitled to receive campaign contributions.

Furthermore, to prove this charge without an express *quid pro quo*, the government can only allege an interpretation or speculation about what the official was thinking. This contradicts the basic principles in *Skilling*.

The bribery counts 16, 19, 20, and 23 and the extortion counts 14, 15, 17, 19, 21, and 22 should be dismissed along with any other relief the Court deems appropriate.

## ALTERNATIVE REQUEST FOR A PRE-TRIAL JURY INSTRUCTIONS CONFERENCE[13]

If the Court does not grant Blagojevich's requests to dismiss these Counts, as an alternative, Blagojevich requests that Court conduct a pre-trial jury instructions conference. A similar request was made (and denied) prior to the first trial. However, circumstances have changed. Most significantly, the *Skilling* decision was handed down mid-trial (June 24, 2010). In addition, Judge Pallmeyer's ruling in the *Ryan* case provides additional guidance and clarity.

During the first trial, jury instructions on the honest services counts were hastily crafted and submitted to the jury over defense objections. There was no updated Pattern instruction for guidance post-*Skilling*, and the defense objects to the use of the same instruction at the retrial.

In fact, there were fundamental problems with the jury instructions. The jury instructions in the first trial, drafted by the government and to which the defense objected in large part, do not meet the standard, pursuant to *Skilling*. For example, Government Instruction 23 (modified) which the government tagged to the end of Defendant's Instruction No. 33 (over objection) reads:

> "The government is not required to prove that the
> defendant knew that his acts were unlawful."

This directly contradicts the ruling in *Skilling,* which strongly reinforced the notice requirement of due process, detailed *supra. See, Skilling* at 2927-28 ("To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2]

---

[13] Defendant hereby incorporates argument from the preceding sections.

in a manner that does not encourage arbitrary and discriminatory enforcement."') (*cited in* Ryan Opinion at 4); *Skilling* at 2933 (The due process concerns are "(1) fair notice, and (2) arbitrary and discriminatory prosecutions.").

In addition, even the instructions that cited to the *Skilling* case cite to portions of *Skilling* that cite to other cases, minimize the significance of the holding of *Skilling*, and do not relate to the facts of Blagojevich's case. *See*, for example the citation to *Skilling* following Government Instruction No. 52[14]:

> *Skilling v. United States*, – U.S. – , 2010 WL 2518587 at
> *27 (U.S. June 24, 2010) ("The actual deception that is
> practised is in the continued representation of the
> employee to the employer that he is honest and loyal to
> the employer's interests.") (quotation omitted); *id.* at 43
> (honest-services cases "involved offenders who, in
> violation of a fiduciary duty, participated in bribery or
> kickback schemes")"

*See also,* Government Instruction No. 54 which cited:

> *Skilling v. United States*, – U.S. – , 2010 WL 2518587 at
> *25 (U.S. June 24, 2010) (noting that, in *McNally v.
> United States*, 483 U.S. 350 (1987), which involved a
> scheme involving kickbacks from an insurance agent, the
> "prosecutor did not charge that [,] in the absence of the
> alleged scheme, the Commonwealth would have paid a
> lower premium or secured better insurance.")

*See also,* Government 47:

> "a scheme to defraud citizens of their right to a public
> official's honest services is a plan or a course of action
> in which the public official schemes to violate his fiduciary
> duty to the public by demanding, soliciting, seeking, or
> asking for a bribe, or by agreeing to accept a bribe. A

---

[14] The instruction stated: "The phrase "intent to defraud" means that the acts charged were done knowingly with the intent to deceive or cheat the public in order to deprive the public of the public official's honest services through bribery."

> public official owes a fiduciary duty of honesty and loyalty
> to act in the public's interest, not for his own enrichment."

Adding the word "bribe" or "bribery" as an afterthought to the instructions does not comport with *Skilling* nor provide the jury with proper instructions.

Because *Skilling* unambiguously holds that there can be no violation of honest services without a bribe or kickback, the bribery or kickback element must be found by the jury in order for them to even consider an honest services violation. This principle was not upheld by the instructions. For example, *see*, Government Instruction No. 52:

> The phrase "intent to defraud" means that the acts
> charged were done knowingly with the intent to deceive or
> cheat the public in order to deprive the public of the
> public official's honest services through bribery.

This instruction is misleading to the jury. The jury would have no idea that it must find bribery beyond a reasonable doubt first – and that there must be unanimity on the bribery act(s). This instruction, as with all of the honest services instruction, if given, should be preceded by an instruction telling the jury that it must first find bribery beyond a reasonable doubt; only then can it consider whether a "scheme to defraud" existed.

Moreover, the bribery that must be found as a predicate must be as part of a direct, express *quid pro quo* if it involves the alleged solicitation of campaign contributions. However, the jury instructions did not define it in this manner. Government Instruction No. 50 provided, instead, that:

> Bribery can be committed when the public official solicits
> or accepts a benefit or benefits with the understanding

25

> that, in exchange for a specific requested exercise of his
> official power, the public official will exercise the influence
> of his position or decision-making to the benefit of the
> bribe payor as specified opportunities arise.

This creates an impression that the assertion or communication of an express *quid pro quo* is not required. This is erroneous. The "specified opportunities [that may] arise" must be part of the alleged *quid pro quo*.

These aforementioned examples demonstrate the need for a pre-trial conference on jury instructions. However, to the extent that the Court is not inclined to conduct a pre-trial instructions conference, the defense seeks leave to submit revised proposed instructions.

## CONCLUSION

The Supreme Court's ruling in Skilling compels this Court to dismiss the charges alleging violations of honest services wire fraud, bribery and extortion.

WHEREFORE, Defendant Rod Blagojevich prays that this Court will dismiss the honest services, bribery and extortion counts, and provide any other remedy appropriate. In the alternative, Blagojevich seeks a pre-trial jury instructions conference.

Respectfully Submitted,

/s/ Lauren Kaeseberg

One of the Attorneys for
Rod Blagojevich

**Counsel for Rod Blagojevich**
SHELDON SOROSKY
AARON GOLDSTEIN
LAUREN KAESEBERG
ELLIOTT RIEBMAN
6133 S. Ellis
Chicago, IL 60637
(773) 752-6950