UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

v.

ROD BLAGOJEVICH.

No. 08 CR 888-1
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

On February 8, 2011, I issued an order regarding the manner of selection and the conditions of jury service for the continued trial of twenty counts of the indictment in this case. *See* Appendix 1; *see also* [D.E. 603]. The Defendant and certain Press Intervenors challenge some aspects of that order. *See* [D.E. 612, 615]. The Government has offered its views as well. *See* [D.E. 622].

The propriety of a similar order in the first jury trial in this case was the subject of prior opinions. *See United States v. Blagojevich*, 612 F.3d 558 (7th Cir. 2010), *rehearing en banc denied*, 614 F.3d 287 (7th Cir. 2010); *see also United States v. Blagojevich*, No. 08 CR 888, 2010 WL 2934476 (N.D. Ill. July 26, 2010). All of the considerations which led me to conclude that jurors should serve anonymously during the prior trial still exist today, and for those reasons I adhere to my prior ruling that during selection and service the jurors shall be identified by number only. My opinion explaining this conclusion was not appealed and is not explicitly challenged by the Press Intervenors now.

Two aspects of the ruling are challenged now, one of which is a slight variation from the prior protocol.[1] The first aspect is the delay of the release of juror names for a period of hours

---

[1] The Press Intervenors raised a third matter as well: the suggestion that after any verdict the court should provide a courthouse space for jurors who are willing to meet with the press to do so immediately after the verdict. This was the practice after the first trial and will be followed again after this trial. I do not blame counsel for being unaware of what was done previously because not one juror was willing to meet with the media immediately after the verdict. It is understandable that counsel would infer that an arrangement for post-trial interviews was not made. There is no controversy on this point.

following delivery of the verdict. The second is the destruction of the juror questionnaires of the deliberating jurors.

*Release of the Jurors' Names*

The jurors' names should not be released immediately. This is so, in part, because the conduct of some media after the names were released was improper and, in some instances, abusive. Jurors deserve respect for their privacy and security after their service has concluded and, even if this were not so, the judicial process is harmed if qualified jurors are unwilling to serve because they do not want to endure what some jurors in this case experienced. Indeed, this was my concern even prior to what happened after the first trial. I was reluctant to delay release without a showing that such media conduct would occur. It is judicial policy that requires such a showing be made.[2] Another reason for preserving anonymity for a short period of time is to permit juror recovery from fatigue. This often follows deliberations after lengthy trials.

---

[2] A showing with respect to post-trial anonymity was never at issue in the earlier proceeding. Neither the Government nor the Defense sought it. Providing jurors with long-term anonymity has been limited to a small class of cases into which this trial does not fit. There were some showings of short-term need even before the first trial. *See* Kenneth J. Melilli, *Disclosure of Juror Identities to the Press: Who Will Speak for the Jurors?*, 9 CARDOZO PUB. L., POL'Y & ETHICS J. 1, 1-2 (2009). ("In recent years, we have witnessed increased attempts by the press to conduct post-verdict interviews of jurors. In highly-publicized cases, it has become fashionably newsworthy to discover the reasons for the verdict of the interviewed juror, as well as the other jurors. As a result, private citizens, having concluded their services as jurors, are sometimes subjected to repeated and harassing solicitations from the press. In some cases, newspapers will assign a team of four or five reporters to badger jurors. Jurors and former jurors have been physically pursued with questions, filmed while attempting to eat, telephoned at home, approached at their homes, followed by camera crews, and forced to deal with the press camped outside their homes. Former jurors have been forced to move quickly away from trailing reporters, to tell reporters to get away, to physically push away harassing reporters, and to live away from their homes to avoid the press. Jurors have also been contacted during deliberations by the press. Jurors whose identities have been published have been threatened, as have their families. One such juror was even the victim of a retaliatory criminal act." (supporting footnotes omitted)). This article was not presented to the court when the matter was remanded for such a showing to be made. At that time, there was an adequate showing of cause ready to be made and a need to reach a prompt decision so that the intervenors could appeal any ruling with which they disagreed. Neither intervenors nor the parties submitted the article for judicial consideration.

2

Actual events following the verdict in the previous trial confirmed the need for delay in release. According to the United States Marshal's Office, several jurors expressed concern about the release of their names. In response, the Marshal's Office contacted local police to inform them of the presence of a juror in their jurisdiction, and a Deputy Marshal instructed the jurors to call if they had problems.

Most jurors reported that media were waiting outside their homes before they arrived home. Some jurors did make brief statements and asked the reporters to leave, and the request was honored. One juror who refused to give an interview was subjected to several hours of phone calls, and someone from the media knocked on her door at regular intervals until almost midnight. When she requested that the knocking stop, the reporter said it was his job to attempt to get an interview and would knock every fifteen minutes whether she answered the door or not.

Another juror reported that the media was camped outside her home for several days, that she felt unsafe returning home and stayed with her daughter. Her son-in-law, an attorney, received phone calls at his law firm and at his home even after declaring that neither he nor his mother-in-law wished to make any comment. Their home is in a gated community to which the media gained access and used it to knock on his door several times the first day after the trial. The juror was also the target of a voicemail from a caller referring to the juror as an "idiot...I hope bad things happen to you." This call required a federal investigation. *See* Appendix 2 (report of Deputy United States Marshal).

There was a helicopter flying over a house where a juror was staying. *See* Ira Glass, "Last Man Standing," *This American Life,* (aired on NPR December 3, 2010) *available at* http://www.thisamericanlife.org/radio-archives/episode/421/last-man-standing.

Defendant, in a well-argued brief, requests that I keep the names of the jurors from the public for a period of great length, perhaps even years. He may be right, but I am reluctant to keep jurors'

names concealed for an extended period of time simply because a case is high profile. In time, the necessity for greater juror anonymity may be proved. *See generally* Nancy J. King, *Nameless Justice: The Case for the Routine Use of Anonymous Juries in Criminal Trials*, 49 VAND. L. REV. 123 (1996).

The government defends delayed release on the grounds that it provides an opportunity to brief jurors on the best means of protecting themselves from intense media scrutiny. This might include: information on communicating with responsible media so that they understand the jurors' wishes; ground rules which allow a civilized process for those jurors who are willing to speak; using helpful equipment, such as a "No Trespassing" sign (likely to be provided by the Marshal's service) to put on their property; what the police should be asked to do and how they should be asked, or how to monitor or close a phone line. Some jurors with financial means may wish to retain private security and ought to be given the time to do so. Most importantly, jurors should be informed of who to call for various security problems and given a contact in the Marshal's Office. Even for those who are willing to speak, it is best to give them the time to consider what it is they want to say.

The government suggests that the jurors' names be released at 9 a.m. on the day after the verdict. They suggest that a "time certain" would help things to be more orderly. I had concluded a period of eight hours would be adequate for this purpose, but I am now convinced that this time period is not a practical alternative. The return of an afternoon verdict would result in disclosure of names around midnight or later. The government's suggestion seems a sensible one, and I am adopting it with the modification that the period before release should be no less than twelve hours. Essentially, we are telling the jurors how to protect their own privacy. There is little they will be able to do in the early hours of the morning, and they are likely to need rest and quiet time after the pressure of deliberations. They should be allowed to have that time. One-half day is not too much.

The Press Intervenors argue that they lose the immediacy of the event, that the public interest is at its peak immediately after delivery of the verdict. Counsel for the Press Intervenors argued "If you look at events, there is a story in America that lasts 15 minutes a day, a couple of days, and then passes." He offered no specific proof of this.

While I acknowledge that may be the case with many stories, certainly it is not always so, and I don't believe it is so with this case. A complex criminal trial leaves many tales to tell and many to tell them (witnesses, lawyers, experts) and future decisions about which to speculate. High-profile cases don't die quickly. According to defense counsel, a Google search using the prompt "Blagojevich juror" (as of February 13 of this year) yields some 230,000 results; I doubt they all came into existence in the first twelve hours after the verdict.

In this very case, coverage of the trial and the jurors went on for several months after the verdict was delivered. Experience has shown this is not a "15 minutes a day" story.

I alter my current order to provide that jurors' names will be released at 9 a.m. on the morning of the first calendar day after the verdict is read and at least twelve hours after the reading of the verdict.

*Juror Questionnaires*

In the first trial, I informed the prospective jurors that I would destroy their questionnaires after the trial. I did this - and I told them I did this - because I expected complete candor in their answers without fear of public embarrassment over purely private matters.

I carried out that promise and destroyed the questionnaires because I believed it to be my duty to keep my promise to those who served on the jury. I had indicated in my order of February 8, 2011, that I would follow the same procedure. But, in the interval between February 8 and the day of the hearing on the Press Intervenors' motion, my opinion has changed. I believe that I can secure candor by allowing jurors to object to release of any part of the questionnaire that would subject

5

them to unjustified public embarrassment or harassment. I had recalled that several jurors examined in the first trial did not remember that their questionnaires were to be destroyed and, in some of those cases, I saw that even these jurors did not hold back in their answers. I now believe that total destruction of the questionnaires is unnecessary to achieve an effective voir dire and an effective jury selection process.

One result of my decision to preserve the questionnaires allows me to defer answering the question of whether those papers should be produced. Many of the answers to questions identify routine personal information which will be available to the media after the jurors' names are released. Other answers to questions may have played no role in any decision any lawyer or I made in jury selection. None of this can be determined before the fact. The media's desire to have the questionnaires of jurors who are selected to hear the case so that they can investigate the jurors during the trial cannot, in any event, be accommodated if the jurors are to remain anonymous until after the verdict. If their names are not known, then investigation will be postponed.

For the reasons expressed in my opinion after the Seventh Circuit's remand order in the first trial, I find that it is necessary for jurors to again remain anonymous during, and for a brief period after, trial if they are to decide the case on the basis of the evidence presented in court and not on the views of outsiders, as I explained in my prior opinion. See *Blagojevich*, 2010 WL 2934476.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: February 28, 2011

Order Form (01/2005) Case: 1:08-cr-00888 Document #: 603 Filed: 02/08/11 Page 1 of 2 PageID #:4845

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 CR 888-1 | **DATE** | February 8, 2011 |
| **CASE TITLE** | UNITED STATES v. BLAGOJEVICH | | |

**DOCKET ENTRY TEXT:**

Order respecting jury selection and service. Any objector must file objections and briefs in support of them by February 17, 2011. Opposition to objections shall be filed by February 22, 2011.

## STATEMENT

The methods adopted by the Northern District of Illinois in its plan implementing the Jury Selection and Service Act will apply generally. The following special procedures and rules are adopted for this trial.

A randomly selected list of potential jurors will be asked to state whether they will be able to serve in a trial which will ordinarily be heard on no more than four days a week for a period of several weeks. The personnel of the court's jury office will determine whether to accept any claim of good cause by a juror who seeks to be excused from extended jury service. Prospective jurors whose claims of good cause are denied by the jury office will be permitted to assert their claim during voir dire, at which time the court will determine whether to excuse such a juror.

Persons ordered to appear for duty in this case will be required to complete a questionnaire approved by the court after conferring with counsel for the parties. To help ensure full candor of responses, the prospective jurors will be informed that the questionnaires will be destroyed after trial.

Due to the length and nature of this trial, court personnel will use a name check procedure to determine whether any prospective juror has experienced arrest, prosecution, or conviction for a violation of state or federal criminal law. The questionnaire will also ask for this information from each prospective juror. Where appropriate, prospective jurors will be asked to clarify their personal history on this (or any other) subject.

Prospective jurors will be identified by number rather than name throughout the proceedings. Persons selected for jury service will remain anonymous throughout their service. The prospective jurors will be informed of this condition of their service. The names of the jurors who participated in deliberations on the merits of the case will be publicly released eight hours after their verdict is returned. With the exception of this eight hour delay in releasing the jurors' names, these procedures regarding disclosure of jurors' names are the same procedures used in the first trial.

## STATEMENT

The reasons for adoption of the same procedures were set forth in my prior order of July 26, 2010. *See United States v. Blagojevich*, No. 08 CR 888-1, 6, 2010 WL 2934476 (N.D. Ill. July 26, 2010). Though that order was not appealed, there was in fact adequate time to secure a ruling on appeal. The jury in the first trial did not return its verdict until twenty-two days after the entry of my order of July 26, 2010. Even more time might have been available if intervenors had sought a prompt hearing after remand. From July 12th to July 19th (the day I set the hearing date for the release of jurors' names), intervenors made no request to be heard. From the date of the hearing to the date of my ruling on remand there passed four days. *See United States v. Blagojevich*, 612 F.3d 558 (7th Cir. 2010); *United States v. Blagojevich*, 614 F.3d 287 (7th Cir. 2010) (denial of rehearing en banc); *Blagojevich*, 2010 WL 2934476 (order after remand). If my order had been appealed, it could have been timely reviewed by the same panel of the Court of Appeals that remanded the matter for further consideration in its opinion on July 12th.

The one change from my earlier procedure is the delay of some hours from the time of verdict to the release of the voting jurors' names. Incidents occurring after juror names were released following the first trial counsels the wisdom of providing a short delay in releasing jurors' names, even after the verdict is returned.

In light of the prior proceedings on this issue, I think it is wise to set deadlines for objections, if any, to the provisions of this order. This will ensure that any objector or defender of this order may be able to secure a prompt hearing, a prompt ruling, and if appropriate, a speedy appeal. Furthermore, prospective jurors will be informed of the precise level of anonymity they will have as prospective jurors or actual jurors before the voir dire is begun and without delay to the April start of trial.

I have set slightly shorter deadlines than might otherwise be provided because the issues have been fully briefed and heard in both this Court and the Court of Appeals. Updating the briefs is likely to consume little time. Moreover, I conclude that, in light of my ruling of July 26th, any potential objector or new intervening objector would be well aware that the same procedures I approved in the first trial would be basically the same ones I would apply at retrial.

Any objector must file its objections and briefs in support of them by February 17, 2011. Any objection to the provisions of this order filed after that date will be denied as untimely. I authorize objectors to incorporate by reference its prior briefs in this Court and the Court of Appeals in support of its objections to this order. If there is opposition to objections, as there were in the first trial, the briefs in support of opposition (which may also incorporate prior papers by reference) shall be filed by February 22. The matter will be heard during the last full week of February and, absent extraordinary circumstances, decided no later than February 28.



**U.S. Department of Justice**

United States Marshals Service

*Northern District of Illinois*

Chicago, IL 60604

MEMORANDUM TO:   U.S. District Court Judge James B. Zagel

FROM:   DUSM Owen M. Cypher

SUBJECT:   **USA v. Rod Blagojevich post-trial juror complaints.**

At the conclusion of the USA v. Rod Blagojevich trial, Deputy U.S. Marshal Owen Cypher personally made contact with each juror on the case, at the request for Judge James B. Zagel. After the jury had reached a verdict and was discharged from service, the names of the juror were released to the media. Several of the jurors expressed some concern about their names being released to the public and the Court asked DUSM Cypher to address those concerns.

The U.S. Marshals Service immediately contacted the local jurisdictions in which each juror and alternate juror of the Blagojevich Trial lived in, to advise those law enforcement agencies that there was a juror living in their towns, and to expect media network to be in the vicinity of the jurors homes.

DUSM Cypher spoke to each juror and alternate juror, individually, the day after the trial. He advised the jurors that their local police departments were aware of the fact that there was a Blagojevich juror living in their area and media presence around the juror's home might be high for a period of time. DUSM Cypher also told the jurors that if they experienced a situation that needed immediate law enforcement attention to call 911 immediately.

Most all of the 12 jurors said that once they were discharged from their service as a juror they has some type of contact with the media. Most said that they returned home immediately after leaving the courthouse and found the media already waiting outside their homes. Some of the jurors elected to speak with the media, others did not. Those that elected to give interviews reported that the media left the area shortly after giving a statement. Juror's Jacklyn Ferino, Cynthia Parker, and Stephen Wlodek told DUSM Cypher that they decided to give a brief statement to reporters that were waiting at their homes. All three said that once they gave statements and told reporters that they didn't wish to be contacted again, the reports seemed satisfied and within 30 minutes all were gone.

Other jurors reported that they elected not to give any comments, and went into their

homes, ignoring the media. Melissa Barrett said that she had declined to give an interview. She said that her home phone rang for several hours the first night, and at one point her elderly mother answered the phone. Someone from the media tricked her mother into putting Melissa on the phone. Additionally, someone from the media knocked on her door every half an hour until almost midnight. When she asked them to stop knocking, the reported told Melissa that it was their job to attempt to get an interview and that they had to knock, every 15 minutes, whether she answered the door or not.

The juror that drew the most attention from the media and news reporters was JoAnn Chiakulas. Chiakulas told DUSM Cypher that from the moment the trial ended, she felt like the harassment from the media started for her. She said that she never wished to give a statement or make comments about her verdict. The media portrayed her as "The Lone Hold-Out Juror". This name was used by some media outlets after other jurors reported that during the deliberation process, many of the counts in the indictment were an 11 to 1 vote, with Chiakulas being the "1" vote.

DUSM Cypher spoke many times to JoAnn Chiakulas and her son-in-law, Paul Chronis, during the two weeks following the trial. Both Chiakulas and Chronis told DUSM Cypher that Chiakulas was scared, uncomfortable, and felt harassed by the media and the public's reaction to the verdict in the Blagojevich Trial. Chiakulas lives in a townhouse community in Willowbrook, Illinois. She told DUSM Cypher that the media was "camped" outside her home for several days after the trial and Chiakulas said that she didn't feel safe returning to her home after the trial. Chiakulas said that she felt so worried about her safety that she stayed with her daughter and son-in-law for almost two weeks following the trial. Additionally, Paul Chronis reported that he was receiving phone calls at the law firm where he works and at his home from members of the media, even after continually telling them that he and JoAnn had no comment about the trial or the verdict. Chronis and his family lives in gated community in Willowbrook. He reported that somehow the media had been able to gain access through the community's private gate and knock on his door several times the first day after the trial.

Perhaps the most troublesome encounter for Chiakulas was a phone call that she received from an individual not associated with the media or news outlet. On Saturday, August 28, 2010, at 9:23 PM, Paul Chronis sent DUSM Cypher an email regarding a disturbing voicemail that was left on JoAnn Chiakulas' phone. The caller said "You are an idiot. You cost the taxpayer's money and I hope bad things happen to you." Chronis provided DUSM Cypher with the phone number from which the call was made from, which was retrieved from caller id.

DUSM Cypher immediately called the phone number that was provided by Chronis. A man answered the phone. DUSM Cypher identified himself as a Deputy U.S. Marshal and asked the man for his name. The man said that his name was ▮▮▮▮. DUSM Cypher informed the ▮▮▮ that he was being contacted because he was suspected of leaving threatening messages on a federal juror's phone. ▮▮▮ immediately admitted to leaving the message on Chiakulas' phone and said that he felt like giving her a piece of his mind. DUSM Cypher advised ▮▮▮ that threatening a federal juror is a violation of federal law and asked ▮▮▮ what he meant by his statement "I hope bad things happen to you (Chiakulas)." ▮▮▮ said that he meant no harm by his statement and said that he was only referring to karma. ▮▮▮ stated that he never meant for the phone call to be taken as a threat to Chiakulas. DUSM Cypher advised him that such statements were certainly viewed as threats by the United States Marshals Service and further calls from him to Chiakulas would be investigated and presented to the U.S. Attorney's office for

prosecution. ▮ said that he was extremely sorry for leaving the message and that he would never call Chiakulas again.

DUSM Cypher stayed in close contact with Paul Ojerino, Deputy Chief of the Willowbrook Police Department, during the weeks following the Blagojevich Trial. DUSM Cypher requested that extra police patrols be conducted at the Chiakulas and Chronis residence, just as an extra precaution. DUSM Cypher advised Chief Ojerino of the media attention and phone calls that Chiakulas had been receiving and of Chiakulas' concerns for her own safety. Chief Ojerino assured DUSM Cypher that extra police patrols were being conducted since the trial had ended and would continue until the media presence ended.

After the end of the second week following the trial, Chronis reported to DUSM Cypher that media attention had died down considerably and JoAnn's life was getting back to normal. Chronis thanked DUSM Cypher, the Marshals Service, and the Court for their concern for JoAnn's safety and her wish for privacy. DUSM Cypher told Chronis to keep his contact information and to call if he or Chiakulas ever needed any further assistance.