UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA     )
    )
    v.     )      No. 08 CR 888
    )      Hon. James B. Zagel
ROD BLAGOJEVICH, et al.     )

### GOVERNMENT'S CONSOLIDATED
### MOTIONS *IN LIMINE* IN ADVANCE OF RETRIAL

The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully moves the Court, *in limine*, as follows:

### INTRODUCTION

This Court has held that its rulings on the motions *in limine* before the first trial will govern the second trial as well, without the need to re-file previous motions. In light of questioning and arguments pursued by defendant in the first trial, the government makes this motion, *in limine*, to prohibit specific types questions and arguments under the Court's prior orders.

I.      **Motion to Preclude Questions and Comments that Invite Jury To Speculate Regarding Content of Unplayed or Unrecorded Conversations, and Portions of Such Conversations**.

Beginning before the first trial of this case and continuing through the present, defendant has made a campaign of asserting (falsely) in motions, press releases, and public statements that recordings of intercepted conversations not played in the first trial would exonerate defendant, and of suggesting that the government intentionally

chose and presented recordings and portions of recordings out of context, so as to mislead the jury and the public regarding defendant's statements and conduct. This Court has made clear that the defendant is free to propose the introduction of any recorded conversations he wishes, and that any such recordings may be presented to the jury, so long as they are relevant and otherwise admissible. The Court has also made clear that the Court, rather than the government, is the final arbiter of what is, and what is not, presented to the jury. Yet the defense has continued to suggest otherwise.

On May 6, 2010, before the first trial, the Court ruled:

Neither prosecution nor defense may comment to the jury on evidentiary rulings made by this Court. *See Solles v. Israel*, 868 F.2d 242, 245 (7th Cir. 1989) (deeming improper prosecutor's comments on excluded evidence in the presence of the jury); *Rutledge v. Cook County*, No. 06 C 6214, 2009 WL 3187904, at *6 (N.D. Ill. Sept. 30, 2009) ("Counsel have a duty to argue all grounds of relevance during the hearing on the motions in limine. Once the court has ruled, counsel are not free to decide for themselves that, in context, the evidence is actually admissible.") Such comments ask the jury to consider matters that are irrelevant to what it must decide, in any criminal case, that is, whether, on the basis of the evidence presented, the prosecution has proven its case beyond a reasonable doubt. The jury is not allowed to speculate on evidence it has not heard. Nor is it to decide whether a trial has been legally fair to either side. If rulings are made in error, the place to challenge them is in the higher courts.

I also doubt the tactical value of the argument that "we would win this case if only the jury could hear the case we think should have been heard rather than the case the court allowed us to present." Both sides, not just one, are precluded by the rules from using certain evidence that they might like to offer. If arguments suggest a trial is unfair because one side was not allowed to put some of its evidence before the jury, it would be a rare case that the other side could not make the same argument. If that occurs the verdict is produced not by a legitimate trial. Rather there will be a free for all in which both sides offer every piece of inadmissible

2

evidence in order to get it excluded by the Court. In closing arguments, both sides would claim that, had the judge found their excluded evidence admissible, they would win. Each side would hope for a jury's favorable speculation as to what that unheard evidence might be. Such procedure is just plain lawless. *Neither side may suggest, even in the most oblique way, that it possesses favorable evidence that the Court excluded.*

R. 349 (emphasis added). Pursuant to these rulings, the government moves, *in limine*, to preclude questioning of the types illustrated below.

### Unplayed Recordings

During the first trial, the defense pursued questioning that elicited evidence concerning the quantity of unplayed and unrecorded conversations and portions thereof in existence, and compared those figures to the quantity of recordings that were presented to the jury. For example, in cross-examining Special Agent Daniel Cain, defense counsel pursued the following line of inquiry:

Q    So there were 5,000 sessions of people talking on all of these phone wiretap sessions, correct?

A    Phones and microphones.

Q    Phones and microphones. And you indicated that 1100, 1,100 are pertinent conversations, correct?

A    Yes.

Q    And you also -- you have those transcript binders in front of you, do you still?

A    Yes, I did.

Q    And those are a total of 100 calls -- or 100 sessions?

A    No, 100 conversation.

Q    100 conversations. So of the 1100 pertinent conversations in those

3

binders are 100 sessions or conversations?

A No, it's 100 conversations that are in the binder and 1100 sessions with talking. Thee may be more than one session to a conversation.

6/9/11Tr. 62-63. Obviously, these questions highlighted the irrelevant fact that the jury would be hearing a relatively small percentage of the total number of conversations recorded pursuant to the court-authorized wiretaps and listening devices.

Q And William, Bill, Quinlan was the general counsel of Rod Blagojevich?

A Yes.

Q And you recorded -- there were at least 127 times that Rod Blagojevich spoke with William, Bill, Quinlan?

A I don't know the number of times, sir.

 *   *   *

Q 127 times that Bill Quinlan spoke to Rod Blagojevich, does that sound like an accurate number to you?

A I have no idea.

6/9/11Tr. 67-68.  The apparent purpose of these questions was set up an irrelevant comparison between the total number of recorded conversations involving defendant and Quinlan and the number of such conversations presented at trial.

### *Conversations, or Portions of Conversations, Minimized or Not Recorded*

The defense also questioned Special Agent Cain regarding the fact that portions of recorded conversations had been minimized, or not recorded, by agents.

Q Now, you talked a little bit about minimization.

A Yes.

4

Q       And minimization is basically when the agent decides not to record a conversation?

A       Yes.

        *               *               *

Q        Were you stricter than required under law regarding minimization?

A       At times.

Q       At times. So that means more conversations were not recorded based on your decision to be stricter?

A       Not necessarily based on my decision to be stricter.

Q       Well, the simple fact is, more conversations were minimized than allowed by law, is that correct?

A       At times.

Q       Now, you kept track of each time a call came in, is that correct?

A       Yes.

Q       And you kept track of the hours of conversations, is that correct?

A       Yes, that's part of the recording system.

Q       And it was 116 hours that were minimized, is that correct?

A       I don't know that.

6/9/11Tr. 66, 68. The above questions were obviously designed to establish the irrelevant facts that a substantial portion of conversations capturable by the wiretaps and listening devices were not recorded, and that government agents were responsible for minimizing non-pertinent interceptions, and thereby to urge the jury to speculate about portions of conversations that were not recorded, as well as the agents' motives in making minimization decisions.

5

None of the foregoing questions were designed, or reasonably could be expected to, elicit relevant evidence. The percentage of the total number of intercepted conversations, or portions of intercepted conversations, presented to the jury has no relevance to any of the issues the jury must decide in this case. Likewise, while the manner in which agents conducted the court-authorized interceptions and handled minimizations may be relevant to the legal question of whether the interceptions were conducted consistent with statutory requirements, that is not a matter to be considered by the jury. *See* R. 349 (barring references to other matters of fact and law related to issues requiring decision by the Court, rather than the jury). Not only do questions designed to elicit such evidence serve no legitimate purpose, they focus the jurors' attention on evidence that is not before them, and act as a suggestion that other evidence, favorable to the defense, is being withheld from the them. Particularly where, as here, the defendant has repeated this very suggestion in and out of court, such questions should be prohibited. *See Berry v. Deloney*, 28 F.3d 604, 609 (7th Cir.1994) (holding that "district court acted within its discretion in precluding plaintiff's counsel from admitting evidence that would have merely invited the jury to speculate that [the defendant] suppressed evidence helpful to the plaintiff").[1]

---

[1]     On direct examination during the first trial, Special Agent Daniel Cain provided details regarding the wiretaps and listening devices that included the number of conversations actually recorded, and explained the process of minimizing non-pertinent calls. It is anticipated that SA Cain will testify in the upcoming trial regarding the wiretaps and listening devices; however, the government does not intend elicit information regarding the numbers or minutes of conversations intercepted or testimony concerning minimization procedures. In lieu of such testimony concerning
(continued...)

## II. Motion to Exclude Evidence and Argument Concerning Lawfulness and Non-Corrupt Conduct.

In the first trial, this Court ruled:

> That a defendant has led an exemplary life before and after he is charged with stealing his first million dollars may be relevant at a sentencing hearing. It is not relevant on the question of whether his guilt has been proven. This is a principle well recognized in this Circuit. *United States v. Burke*, 781 F.2d 1234, 1239 (7th Cir. 1985) (Character evidence "does not speak to the question whether the accused committed the crime.").
>
> It has been applied in this District in cases charging misconduct by elected officials. *United States v. D'Arco*, No. 90 CR 1043, 1991 WL 264504, at *1 (N.D. Ill. 1991) (Lindberg, J.) ("Evidence that defendant acted lawfully on other occasions is inadmissible to prove that he acted lawfully on the occasions alleged in the indictment."); *United States v. Finley*, 708 F. Supp. 906, 914 (N.D. Ill. 1987) (Rovner, J.) (precluding arguments and evidence of non-corrupt actions); *United States v. Davis*, 673 F. Supp. 252, 261 (N.D. Ill.1987) (Williams, J.) (precluding evidence of "the fact that the defendant in uncharged transactions discharged his function as alderman in a non-corrupt fashion."). Other federal circuits apply this rule. See e.g., *U.S. v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978).
>
> The Federal Rules of Evidence prescribe a national rule which allows a limited method by which a person accused of crime can offer evidence of good character from witnesses who are familiar with the defendant's reputation. Fed. R. Evid. 404(a)(1). ("evidence of a person's character...is not admissible for the purpose of proving action...on a particular occasion..."). Even when character is admissible it is provable

---

[1](...continued)

minimization, the government will seek an instruction from the Court, to be given when the first intercepted conversation is played, explaining the procedures the government is required to following in conducting court authorized interceptions, explaining the use of asterisks in the transcripts of intercepted conversations to signal missing portions of such conversations, and directing the jurors not to speculate regarding the substance of conversations, or portions of conversations, that are not before them.

To be clear, the government does not by this motion seek to preclude proper testimony concerning the substance of conversations that were not recorded pursuant to the court-authorized wiretaps and listening devices.

only through opinion or reputation, not specific acts. Fed. R. Evid. 404(b) & 405. There is no claim here that a trait of character of any person is an essential element of the charge or defense.

<div align="center">*          *          *</div>

These are general rules applicable to this sort of evidence. The specific nature of both the alleged good acts and the alleged offense may, under certain circumstances, be related in ways that might allow the good acts to be admitted for carefully limited purposes. Fed. R. Evid. 404(b) & 405(b). The chance that this may be the case is sufficiently remote that I require counsel for the defense to seek an admissibility ruling before any reference to good acts evidence is made in the presence of the jury. The prosecutors are under a similar obligation with respect to uncharged bad acts. See Fed. R. Evid. 404(b).

Despite these rulings, the defense pursued during the first trial lines of questioning designed to elicit evidence of particular good or non-corrupt acts of the defendant, and the Court sustained objections to such questions. For example, in cross-examining Doug Scofield, defense counsel pursued this line of questioning:

Q    Nonetheless, on boards and commissions, you are aware consolidation that of the Governor initiated it, is that correct?

A    Yes, that's right.

Q    And consolidation is a fair way of saying that there was a reform done on boards and commissions?

A    There was some done, yes, sir.

Q    And are you also aware of other reforms that Rod Blagojevich did. For example, are you aware that he instituted the first of its kind healthcare for all the kids of the State of Illinois?

<div align="center">*          *          *</div>

Q    Without saying how good it was, you're aware that there was healthcare reform done by Governor Blagojevich?

<div align="center">8</div>

          *        *        *

Q      You're aware there was ethics reform under Governor Blagojevich?

          *        *        *

Q      You're aware of death penalty reform?

          *        *        *

Q      Are you aware of what All Kids is?

A      Yes, sir.

Q      What is All Kids?

          *        *        *

Q      There was acts by the Governor to prohibit smoking across the state, are you aware of that?

6/30/10 Tr. 112-13.

In addition, the defense raised with several witnesses the fact that they never heard defendant expressly stating his intention to exchange state business for campaign contributions or other financial benefits. For example, in cross-examining Kelly Glynn, the Finance Director of Friends of Blagojevich during the period May 2002 through August 2004, the defense inquired as follows:

Q      And you never heard either Mr. Rezko or Mr. Kelly say: Oh, we're going to offer Mr. X or Mr. Y some state business if they contribute, did you?

          *        *        *

Q      And you never heard any bundler say to you: Oh, I could raise a fortune but you gotta get us some state business, did you?

7/6/10Tr.34-35.

Similarly, in cross-examining Bradley Tusk, the defense inquired:

Q     And Governor Blagojevich never said to you: Hey, before we
      approve any of these bills, let's make sure we get a contribution
      from someone who might be favored by these bills, did he?

      *               *               *

Q     Did Governor Blagojevich ever say to you: Bradley, come to me
      with any bill that might favor a certain group so we could get a
      contribution out of them, I want to get that contribution before we
      sign that bill?

      *               *               *

Q     Now, did the Governor ever say to you: I'm not approving a certain
      bill unless I get a contribution from a party?

6/21/10Tr.27-28. This Court sustained objections to all of the foregoing questions. *Id.*,

7/6/10Tr.34-35.

       As this Court has already ruled, neither evidence of prior occasions in which

defendant acted lawfully (such as, by soliciting donations without offering official acts

in return), nor evidence of accomplishments and good acts as governor or otherwise

(such as, "All Kids"), is relevant to show that defendant acted lawfully in relation to the

charged crimes. Likewise, a witness's having never heard defendant expressly state

his intent to commit a shakedown is not relevant to whether defendant committed the

charged crimes and poses the additional problem of misleadingly suggesting that

defendant could not be convicted without proof that he made such an express

statement. Moreover, none of the above lines of inquiry satisfied Fed. R. Evid. 405(a)'s

requirements for character evidence. Thus, all questions of the type illustrated above

should be prohibited and, absent prior permission from the Court, the defense should

be barred from referring to specific non-corrupt conduct or "good acts" in opening

statements. *See United States v. Kemp*, 362 F. Supp. 2d 591, 593 (E.D. Penn. 2005) (excluding evidence despite defendant's references in opening statement).

## III. Motion to Exclude Opinion Evidence Regarding Legality, and Regarding Usual and Normal Practices.

Before the first trial, the government moved to preclude questions designed to elicit lay opinions concerning legality, except in limited circumstances. Noting that such opinions would in most instances be inadmissible, the Court ruled that the issue would be addressed on a question-by-question basis, and during the trial, objections were made and sustained on this basis. In particular, for example, in cross-examining Special Agent Cain, the defense inquired as follows.

> Q     Now, it's not illegal to raise funds for a campaign fund, is that correct?
>
> A     Correct.
>
> Q     And it's not illegal to solicit campaign funds, is that correct?
>
> A     Correct.
>
> Q     It's not illegal to contribute to a campaign fund, is that correct?

6/9/10 Tr. 55-56.

Similarly, in cross-examining Kelly Glynn, the defense asked:

> Q     To your knowledge -- now, Mr. Blagojevich was angry at these three men because he felt they did not contribute as much as he felt they should contribute, correct?
>
> A     Correct.
>
> Q     There's nothing wrong about that, is there?

11

7/6/10 Tr. 42. An objection to the last question was sustained. *Id.*

In cross-examining Doug Scofield, the defense asked,

Q "Mr. Scofield, you never did anything wrong, did you?"

6/30/10 Tr. 195. The Court sustained an objection to this question. *Id.*

In addition, the defense asked Thomas Balanoff these questions, and the Court sustained the government's objections:

Q So then the supposed impropriety here is based on not anything said but on your mere understanding.

  \*    \*    \*

Q ....[I]f there is any impropriety here, it's because of your understanding.

6/29/10 Tr. 95-96.[2]

Under settled law, "lay testimony offering a legal conclusion is inadmissible." *E.g., United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) (collecting cases). Based on this principle, the court has barred testimony such as whether certain conduct was, or was believed to be, legal or illegal, legitimate or illegitimate, or proper or improper, or whether certain conduct satisfied an element at issue in the case. See, e.g., *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980)(affirming prohibition of cross-examination of co-conspirator witness regarding the witness's views of whether he or the defendant "conspired" or otherwise engaged in conduct that was "unlawful"

---

[2] These questions are designed to elicit testimony constituting both an opinion regarding the "propriety" of the defendant's actions and speculation regarding the defendant's state of mind.

or "willful"); *United States v. Wantuch*, 525 F.3d 505, 512-15 (7th Cir. 2008)(holding that it was improper for government to ask witness to opine whether the defendant believed his conduct to be "legitimate" or legal); *United States v. Van Eyl*, 2004 WL 1557331, at *3 (N.D. Ill. July 8, 2004), aff'd, *United States v. Van Eyl*, 468 F.3d 428, 437 (7th Cir. 2006) (holding that it was within district court's discretion to exclude, *in limine*, opinions by defendant's coworkers, including the coworkers' use of legally and morally charged words, regarding the legality or propriety of the defendant's conduct, and to find that the government's argument that everyone else "could tell there was a fraud" and the defendant was no different violated the court's *in limine* ruling). Legal conclusions fail to meet the requirements of Fed. R. Evid. 701 in that they are not help ful to the jury. *See Noel*, 581 F.3d at 496. Not only are legal conclusions by lay witnesses they not helpful, they invite mistakes and confusion in that they may be based on misunderstandings of the law, and the jury may rely on these misunderstandings, rather than on the legal instructions provided by the Court.

The government requests that questions of the type illustrated above be prohibited absent prior notice and a ruling from the Court that in the particular circumstances such evidence is relevant and admissible.

## IV.    Motion in Limine to Bar Evidence and Arguments Regarding Custom and Practice.

This Court ruled prior to the first trial that:

. . . [A]n argument that a defendant was simply following usual custom and practice is not a defense. *See United States v. Stirling*, 571 F.2d 708, 736 (2d Cir. 1978) (testimony related to the "normalcy" or "usualness" of

certain business practices was inadmissible and irrelevant to the issue before the court). Individuals are obliged to follow the law, and not an illegal custom or practice. Laws are often enacted just for the purpose of ending toxic customs and practices. . . .

R. 349 at 5.

Despite this ruling, the following questions were put to Kelly Glynn in the first trial:

Q    Now, I believe you said that Mr. Blagojevich, like most people in public life, wanted to raise a lot of money to show that they had a lot of money in the till, so to speak, so people would not challenge them politically, right?

A    Correct.

Q    And that was normal and common amongst most public officeholders, wasn't it?

A    Yes, it is.

Q    So he wasn't different than anyone else in seeking those goals, was he?

7/6/10 Tr. 43. The Court sustained the government's objection to this questioning. *Id.*

Because the question of whether particular conduct is, or may be described as, "normal" has no relevance to whether such conduct is proscribed by law, questions of the type illustrated above should be barred.

## V.    Motion *in Limine* to Bar State of Mind Evidence In the Absence of Proper Evidentiary Foundation.

In multiple oral rulings during the first trial, this Court conditioned the admission of multiple recorded conversations on the laying of a proper foundation establishing the relevance of the proffered evidence to the defendant's state of mind,

14

and excluded the recordings absent such foundation. The Court recently repeated that ruling in the context of the defendant's renewed motion to play excerpts of recorded conversations.  See R. 608, 623.

The same evidentiary issue arose repeatedly during the first trial in the context of cross-examination questions designed to suggest, without any evidentiary support, that the defendant was influenced by, or relied upon, statements or actions of others during the relevant time frame.

### *Questions Regarding the Absence of Objections by Others*

For example, in questioning several witnesses, the defense inquired whether any lawyers objected to certain plans by defendant regarding the Senate seat.

Q       Is that fair to say that based on that conversations, there were no objections presented by any of these lawyers during the conversation?

               *               *               *

Q       Well, you spoke about your opinion as to this HHS, is that correct?

A       Yes, sir.

Q       And you indicated that you didn't think it was likely, is that correct?

A       I told him it was very unlikely, yes, sir.

Q       Based, obviously, on your years of experience and your knowledge of some of the key players in this, is that correct?

A       I'm not sure exactly what you mean. I'm sorry.

Q       Well, based on your years of experience, you believe that this was an unlikely possibility?

A  That's fair to say.

Q  And that was what you expressed to the Governor?

A  I did.

Q  Did you in any way express that this was wrong?

6/30/10 Tr. 130. Objections to questions regarding whether anyone raised objections, and whether Scofield advised defendant that doing so would be "wrong" were sustained. *Id.*

Nevertheless, the defense returned to the same questions, and the government's further objections were sustained:

Q  There was also discussion about Rod's request for HHS?

A  Yes, that's right.

Q  Were there any objections made at this meeting?

     *     *     *

Q  Well, after this meeting, you continued to have conversations with Rod Blagojevich?

A  Yes, that's right.

Q  You continued to agree with Rod Blagojevich?

6/30/10 Tr. 147.

Similarly, in cross-examining Bob Greenlee, the defense pursued a lengthy line of questions focusing on Greenlee's use of the term "legitimate ask" in a conversation with the defendant.

Q  And the entire context of this conversation, as well as all the other

16

conversations before this, was HHS in the context of the Senate Seat, is that correct?

A    Yes, sir.

Q    And you said: "And I think it's a totally legitimate ask." And then Governor Blagojevich says: "What's that?" And you said: "I said I think it's a totally legitimate ask." Is that correct?

A    Those are my words, yes.

Q    Now, the word "ask" is referencing the request for HHS for the Senate Seat, is that correct?

A    That's correct.

Q    And you said, "it was legitimate," is that correct?

A    Those are my words, yes.

Q    And you understand "legitimate" means "lawful," is that correct?

A    No, that's not what I meant by that, no.

Q    That's not what you meant by that?

A    No.

Q    Okay. But you understand that "legitimate" means lawful, is that correct?

A    No, that's not -- that's not the way that I understand it.

Q    That's not the way you understand it?

A    Yeah.

        *            *            *

Q    So you're saying -- your understanding of "legitimate" does not mean "lawful" appropriate to the rules, is that fair to say?

17

A     If I had been asked and I meant to say lawful, I would have said "legal" I wouldn't have said "legitimate."

Q     What do you understand "legitimate" to mean?

A     What I understood the term "legitimate" to mean is appropriate under the circumstances.

Q     Appropriate under the circumstances.

A     Appropriate in terms of the scope of that -- of the -- of that which he was being asked to perform.

*          *          *

Q     So "legitimate" to you meant appropriate, is that correct?

7/12/10 Tr. 135.

The purpose of these questions was obviously to suggest that defendant relied on the opinions of others in determining whether certain actions were legal or illegal, and took certain actions based on the opinions of other, whether affirmatively stated or inferred from the absence of objection. Such opinions would only be relevant if supported by an evidentiary foundation establishing that defendant relied on them. In the absence of the fulfillment of that condition, that is, without evidence establishing that defendant in fact actually relied on the absence of objections, testimony concerning statements made by others, or the failure of certain individuals to object to proposals under consideration, fails the test of relevancy because it has no tendency to make a fact of consequence more or less likely.

It is axiomatic that a criminal defendant, like any other party, has no right to introduce irrelevant evidence. Precedent clearly establishes that district courts are

entrusted to make relevancy determinations, including whether to exclude evidence that purportedly bears on a defendant's state of mind, and to exclude evidence the trial court determines – based on the facts of the particular case – to be lacking sufficient foundation for its relevance. A defendant's election not to testify does not then insulate his proposed state of mind evidence from foundational requirements, and as with all evidence, the proponent of the evidence bears the burden to show its relevance. *See United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994) (defendant bears duty of demonstrating admissibility). Moreover, even relevant evidence may be excluded if, despite having some probative value, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or waste of time. Fed. R. Evid. 403.

Seventh Circuit precedent upholds the exclusion of defense evidence as to state of mind where the requisite foundation has not been laid, and where the defendant could have, but did not, supply the foundation through his own testimony. *United States v. Scott*, 660 F.2d 1145, 1165-67 (7th Cir. 1981)(affirming district court's exercise of discretion to preclude evidence of statements made to a defendant, offered to show the defendant's mental state, because there was an insufficient foundation that the statements, which reflected the speaker's state of mind, actually had an effect on defendant's state of mind). *See also United States v. Hollister*, 746 F.2d 420, 423 (8th Cir. 1984) (upholding exclusion of evidence related to violent propensities of defendant's accomplice in the absence of evidence showing that defendant's knowledge

19

of this propensity contributed to defendant's reasonable fear or death or serious bodily harm if he did not participate in robbery); *United States v. Stanfa*, 685 F.2d 85, 89 (3d Cir. 1982) (excluding evidence of gangland slayings of witnesses in absence of proof that defendant had knowledge of the slayings when he testified falsely before the grand jury).

Thus, defendant should be prohibited from asking such as those illustrated above without first establishing, through his own testimony or through other evidence, foundation for the relevance of such testimony to defendant's state of mind.

### Questioning Concerning Events Related to the Racetrack Bill and CMH That Transpired After Defendant's Arrest

Because events and statements regarding the Children's Memorial Hospital ("CMH") or the racetrack bill that occurred after defendant's arrest on December 9, 2008 have no relevance to the charged offenses, the government does not plan to introduce evidence of such matters in the upcoming retrial.

As this Court will recall, in the first trial, Patrick Magoon was not questioned on direct examination regarding anything that occurred after December 9, 2008. However, during cross-examination the defendant elicited from Magoon testimony regarding the fact that the pediatric reimbursement rate increase went through at some point in January. At closing, the defense argued that the rate increase went through in January, essentially arguing "no harm, no foul" and suggesting that Bob Greenlee was lying when he testified that he held up the increase at what he understood to be defendant's direction. The Court sustained the government's

objections to his argument on the ground that the argument misleadingly suggested that the increase went through as planned, which was incorrect. Because Magoon's knowledge is limited to the facts that the increase was supposed to go through on January 1, 2009, and that it in fact went through later in January, he could provide no relevant testimony regarding what caused the increase to be delayed, and what caused it to be put through eventually. Accordingly, the government moves, *in limine* to preclude any questioning of Patrick Magoon (or any other witness) regarding whether and when the pediatric rate increase occurred. In the event that the defense can establish its relevance, it should be required to present evidence concerning the process by which the increase was delayed in its own case.[3]

Regarding the racetrack bill, in the first trial, the government did not elicit any testimony regarding events or statements regarding the racetrack bill that took place after defendant's arrest but, rather, proved only that the bill had not been signed at the time of the defendant's arrest. Nevertheless, in cross-examining John Johnston, the defendant elicited the fact that defendant signed on December 15, 2009, after being arrested and released on bond in this case. 6/21/10Tr. 85-86. Because the defendant's actions after his arrest and release on bond are irrelevant to charged offenses related to the racetrack bill in that they post-date the charged offense conduct, in the

---

[3]    Rule 611(b) of the Federal Rules of Evidence provides:
Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

upcoming retrial, the government once again does not intend to elicit testimony regarding defendant's post-arrest signing of the racetrack bill, and will offer an exhibit recounting the written history of the bill, redacting any history after December 9, 2008. For the same reasons, the government moves, *in limine*, to preclude defendant from cross-examining any witness regarding such matters. In the event that defendant is able to provide evidentiary foundation establishing the relevance of the December 15, 2009 signing of the racetrack bill to his defense, the government requests, pursuant to Fed. R. Evid. 611(b), that defendant be required to present such evidence as part of the defense case, recalling witnesses if necessary.

### Evidence of Events and Statements Related to the Senate Seat Occurring After Public Disclosure of Government Wiretaps.

With respect to the Senate Seat, the government does not intend to introduce any evidence concerning statements or events occurring after December 5, 2008, the date upon which it became publicly known that the federal government was secretly recording the defendant's conversations, and defendant agreed that Robert Blagojevich should cancel his upcoming fundraising meeting with Raghu Nayak, who had offered bribes in exchange for the defendant appointing Jesse Jackson, Jr. to the Senate seat. The government's rationale is that defendant's actions after the wiretaps became public were mostly acts of concealment, and in any event are not necessary to prove the defendant's affirmative efforts to bring his attempt to obtain financial benefits in

exchange for the Senate seat appointment to fruition.[4] The defendant should be barred from raising such matters in cross-examining the government's witnesses on relevance grounds. To any extent that defendant can establish the relevance of such matters to his own defense,[5] he should be required to do so in his own case.

---

[4] In the first trial, the government elicited a small amount of evidence concerning post-December 5, 2008 events and statements, specifically, testimony from Harris and Greenlee regarding the lack of any progress regarding the naming of a new Senator during the period from December 6 to December 8, 2008, and testimony from Harris concerning a meeting with Jesse Jackson, Jr. that took place on December 8, 2008.

[5] The government notes that it is highly unlikely that such events or statements could shed light on defendant's prior state of mind, in light of the significant change in circumstances brought about by the disclosure of the wiretaps. Statements offered under Rule 803(3) must be "contemporaneous with the . . . event sought to be proven; [that is,] it must be shown that the declarant had no chance to reflect – that is, no time to fabricate or misrepresent his thoughts." *United States v. Macey*, 8 F.3d 462, 467 (7th Cir. 1993) (citations omitted) (upholding exclusion of statement made four hours after event because defendant "had time to fabricate a story"). Moreover, as the Supreme Court has recognized, exculpatory statements about past events are precisely the sort "which people are most likely to make even when [it is] false." *United States v. Williamson*, 512 U.S. 594, 600 (1994).

## VI.  Conclusion

For the aforementioned reasons, the government respectfully requests that its motions *in limine* be granted.

<div style="margin-left: 40%;">

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:    /s/ Debra Riggs Bonamici
      REID SCHAR
      CHRISTOPHER NIEWOEHNER
      CARRIE HAMILTON
      DEBRA RIGGS BONAMICI
      Assistant United States Attorney
      United States Attorney's Office
      219 S. Dearborn St., 3rd Floor
      Chicago, Illinois  60604

</div>

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

### GOVERNMENT'S CONSOLIDATED
### MOTIONS *IN LIMINE* IN ADVANCE OF RETRIAL

was served on April 11, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:    /s/ Debra Riggs Bonamici
DEBRA RIGGS BONAMICI
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 3rd Floor
Chicago, Illinois 60604
(312) 353-3741