IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 08 CR 888 |
| | ) | Honorable James B. Zagel |
| ROD BLAGOJEVICH | ) | |
| | ) | |

**RESPONSE TO THE GOVERNMENT'S
CONSOLIDATED MOTIONS IN LIMINE IN ADVANCE OF RETRIAL**

NOW COMES Rod Blagojevich, by and through his counsel, and respectfully responds to the government's Consolidated Motions in Limine (Dkt. #657). In support, Blagojevich states as follows.

The government's Consolidated Motions In Limine In Advance of Retrial makes arguments and requests to circumscribe defense counsel in such a manner that it appears the only request left out by the government is that the defense not be allowed to use the words "not" and "guilty" in the same sentence. To extend a boxing analogy previously used by this Court: granting the government's motions would be akin to throwing Blagojevich into a boxing ring with one arm tied behind his back.

This Court sustaining the government's motions would prevent the defense from effectively cross examining the government witnesses and in effect deprive the defendant of his rights to a fair trial, effective assistance of counsel, due process, confrontation and the right to present a defense. U.S. Const. Amend. V, VI. These

1

constitutional rights are not platitudes but fundamental rights every defendant in America has and that Courts must enforce.

The government's submission makes clear it is willing to 'throw away' the Bill of Rights in order to win. This Court is the arbiter of justice and must temper the government's unfair requests. The government's motions should be denied as a whole. However, Blagojevich addresses each in turn.

I.      Government "Motion to Preclude Questions and Comments that Invite Jury to Speculate Regarding Content of Unplayed or Unrecorded Conversations, and Portions of Such Conversations" (at 1), including, "Unplayed Recordings" (at 3); and "Conversations, or Portions of Conversations, Minimized or Not Recorded" (at 4)

Blagojevich takes issue with the government's assertion that: (1) he has "made a campaign of asserting (falsely) in motions, press releases, and public statements that recordings of intercepted conversations not played in the first trial would exonerate defendant; and (2) suggesting that the government intentionally chose and presented recordings and portions of recordings out of context, so as to mislead the jury and the public regarding defendant's statements and conduct." (Government Motion at 1-2). This Court has previously actually commented that the defendant has to 'deal with' a certain unfairness because the government essentially has carte blanche to introduce whatever statements and recordings it chooses because they are admissions of a party-opponent (or alleged co-conspirators) and the defendant 'has to find' an exception to the hearsay rule.

2

With this particular motion in limine, the government seeks to prohibit testimony regarding the specific number of recordings made and the amount labeled "pertinent" by the F.B.I. However, the government first introduced this very testimony on direct examination of Agent Cain. For example, the government elicited the following on direct examination of Agent Cain:

Testimony of Agent Cain, June 9, 2010, at 25-26:

> Q In relation to all the wiretaps from 2008 on your chart, approximately how many sessions in total in which there was talking were intercepted at some point?
>
> A Approximately 5,000.
>
> Q Of those 5,000, how many did the FBI determine were pertinent conversations in relation to this investigation?
>
> A Approximately 1100.
>
> Q Does that mean there were actually 1100 different conversations?
>
> A No.
>
> Q Why not?
>
> A Because as we discussed before, sometimes conversations were interrupted by call waiting or people placed on hold. There could be several sessions in one conversation.

The follow-up questions by the defense were appropriate. In addition, the sheer number of calls occurring during the wiretap period is relevant to the determination by the jury.

The government would like to paint a skewed picture of Blagojevich participating in a linear scheme. The vast number of conversations evinces the exact opposite. Moreover, the government introduced testimony at the first trial that Blagojevich spent little time working (Bob Greenlee testified the Governor came into the office 2-8 hours a week). (Testimony of Bob Greenlee, July 8, 2010, at 19). The extraordinary number of calls Blagojevich made from his home line is relevant to impeach this testimony.

Merely because the government has a theory does not mean the defense must subscribe to it. The government introduced this very evidence at the first trial, and while the government has the right to elect not to introduce it at the retrial, it cannot prohibit the defense from doing so. (Also, as discussed, *infra*, the government's suggestion of an instruction "in lieu of" testimony is inappropriate and unconstitutional).

Contrary to the government's assertion, there was no attempt by the defense to get the jury to speculate as to what was said on unplayed/unrecorded calls,. Indeed, the government's motion in this section is entitled "Motion to Preclude Questions and Comments that Invite Jury to Speculate Regarding *Content* of Unplayed or Unrecorded Conversations, and Portions of Such Conversations" (at 1)

4

(emphasis added). The government's example in its motion only relates to the number of recorded conversations – not their content.

Blagojevich strenuously objects to the government's request that the defense be barred from asking about minimization techniques. (Motion at 6-7, n.1).

A court's discretion in evidentiary rulings is circumscribed by the rules of evidence *and* the defendant's constitutional right to present a defense. See, e.g., *Chambers v. Mississippi,* 410 U.S. 284 (1973). A defense may rightfully include questions directed at the integrity and effectiveness of the investigation tactics and techniques. In fact, it is the duty of effective counsel (and the right of the defendant) to cross-examine regarding mistakes or incompetence on the part of witnesses. *Kyles v. Whitley*, 514 U.S. 419, 441-53 (1995). This includes examination based on the lack of evidence, or even attenuated issues like potential incompetence of the investigation. *Id.*

Moreover, the government repeatedly states that the questions asked by defense counsel are not relevant. This is erroneous – the government itself elicited the information from its witness, and the defense cross-examined *within the scope* of the government's direct examination. Additionally, the government still seeks to introduce this testimony (because it *is* relevant), but seeks now to have the Court take the place of Agent Cain.

The government's request that the Court provide testimony in the form of an 'instruction' is untenable. The government's request is that "in lieu of such testimony concerning minimization," described in the preceding sentence as

5

"information regarding the numbers or minutes of conversations intercepted or testimony concerning minimization procedures", the Court should take the place of the Agent and provide factual information to the jury in the form of an "instruction." (Motion at 7). The government wants the Court to "explain[] the procedures the government is required to follow in conducting court authorized interceptions, explaining the use of asterisks in the transcripts of intercepted conversations to signal missing portions of such conversations. . ." (Motion at 7).

The Court cannot substitute for the testimony of a witness. This testimony is evidence which can only be elicited from a witness. Contravening that would eviscerate Blagojevich's right to confront the evidence and witnesses against him. (U.S. Const. Amend. VI).

This factual information goes to the heart of the government's evidence in this case: the wiretaps. Blagojevich certainly has a constitutional right to confront that evidence and the means by which it was procured. Applying the government's request to another scenario, for example, is akin to the government introducing DNA evidence but barring the defense from questioning the lab analyst about the methodology. This is untenable.

In addition, the jury would see the Court not as impartial but rather as an extension of the government. The Court's testimony vis-à-vis "instruction" would also bolster the government's witness and its evidence. This is wholly improper and unconstitutional.

II. **Government "Motion to Exclude Evidence and Argument Concerning Lawfulness and Non-Corrupt Conduct" (at 7)**

The government incorrectly asserts that defense counsel elicited evidence of "good acts" in an improper manner at the first trial. (Motion at 7-8). To the contrary, the government questioned its witnesses, to which the defense simply followed up with on cross-examination. This cross-examination was within the scope of the direct examination. Fed. R. Evid. 611(b).

Throughout the trial, the government criminalized and demonized non-criminal acts including, but not limited to, political fundraising and Governor Blagojevich's efforts to fundraise from individuals and interest groups. The jury was poisoned by the insinuations of the government. Generally speaking, citizens do not like the practice of their public officials asking for contributions from lobbyists and vested interest groups. Yet, it is legal.

However, after the government puts its spin on these legal activities made to look nefarious, the government seeks to prevent the defense from asking questions to ensure that it is made clear that the conduct *raised by the government in its questions*, however distasteful, is not criminal.

This issue could be solved if the government did not introduce non-charged conduct throughout its entire case. If the government confined its evidence to the actual indicted, charged conduct, this trial would likely be half the time.

The government's cited examples (at 8) involve issues that the government itself raised on direct examination of its witnesses. The government cites to a question by the defense during the cross examination of Doug Scofield regarding the

7

consolidation of boards and commissions. (Motion at 8). The government elicited testimony regarding boards and commissions from numerous witnesses including: Lon Monk, Bradley Tusk and John Harris. Moreover, on the direct examination of Doug Scofield, the government asked him questions about boards and commissions and specifically with regard to Chris Kelly. For example:

Testimony of Doug Scofield, June 29, 2010, at 13:

> Q   What, if anything, do you recall Chris Kelly saying?
>
> A   Well, I think Chris was a strong voice for slowing down reform in general, and boards and commissions in particular.
> I think as we moved through transition in the early stages of government, there was a sense that these boards and commissions were potentially important, potentially of interest to the Governor that he could possibly put people in there that were, you know, helpful to the new Governor.

It was then appropriate for the defense to ask Scofield the follow up questions to which the government objects.

Relevance is defined as something which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The fact that Blagojevich had a history of supporting children's health care is a factor the jury should consider regarding (1) why he wanted to be Secretary of Health and Human Services and (2) whether or not an oblique phrase "good to

8

know" was a direct order to Deputy Governor Bob Greenlee to hold up the rate increase.

The government mischaracterizes these questions as general good deeds or non-corrupt acts. The questions by the defense were specific, relevant and essential for effective counsel to ask because said questions were directly related not only to the questions raised by the government on direct, but related to the defendant's case and his lack of criminal intent.

The government cites at some length to the testimony of Kelly Glynn who testified primarily regarding Count 24, the §1001 false statement allegation which is the basis of the one conviction from the first trial. Defense counsel believes it is moot to reference Glynn's testimony. However, to address the government's contentions, with regard to the testimony of Glynn, the defense questions were proper. The government elicited the following on direct:

Testimony of Kelly Glynn, July 6, 2010, at 15:

> Q    As part of your job, did you keep track of which bundlers were raising the most money for Friends of Blagojevich?
>
> A    Yes, I did.
>
> Q    While you were at Friends of Blagojevich, who were the top bundlers or fundraisers for Defendant Blagojevich?
>
> A    Chris Kelly, Tony Rezko, Milan Petrovic, John Wyma, Paul Rosenfeld.

Testimony of Kelly Glynn, July 6, 2010, at 21:

9

Q       Who do you recall being present for --
        Well, let me ask you this, do you remember
        each of them individually or do you remember them
        collectively?

A       Collectively.

Q       Who do you recall being present for these
        meetings?

A       Chris Kelly, Lon Monk, John Wyma, Rod
        Blagojevich; Holy Stein, my co-worker, was also
        present.

Testimony of Kelly Glynn, July 6, 2010, at 21-22:

Q       What was generally discussed during these
        meetings?

A       We would talk about fundraising goals,
        individuals who were going to raise a certain amount
        of money. We would talk about people who were
        noncommittal, people who maybe needed a call from
        the Governor or a potential meeting.
                        * * *
Q       To your recollection, who would ask about
        specific individuals in the fundraising meetings?

A       Rod Blagojevich.

Q       What, to your recollection, was Defendant
        Blagojevich asking about when it came to specific
        individuals?

A       We would be going through a list of people who
        had made commitments or who had not made commitments
        and he would ask -- he would sort of yell out, "what
        about Niranjan Shah?" or "what about Lou Sussman?"
        "What are they doing?" "What are they doing?"

Q       When he said "what are they doing," what did you
        understand he was --

A       What are they helping to raise for a specific

event or during this time period, what are they
doing for him.

Testimony of Kelly Glynn, July 6, 2010, at 24:

Q   And, again, was this in the context, in the 2004
    time period, of discussing specific individuals and
    what they had contributed or trying to raise for
    Defendant Blagojevich?

A   Yes.

Testimony of Kelly Glynn, July 6, 2010, at 26:

Q   Now, were there ever times that you were asked to
    provide any documents to Mr. Kelly or Mr. Monk?

A   Yes.

Q   Who asked you to provide documents?

A   Chris Kelly and Lon sometimes.

Q   What were you asked to provide?

A   The spreadsheet we had just looked at often. We
    would print it out. Sometimes Chris would call in
    the morning and say, "get a call, it's ready," "Rod
    is going to make calls today," Rod is going to make
    calls," I'm going to make Rod make calls," and so
    we'd print out call sheets for him. Actually, it
    was an Excel spreadsheet with phone, name, and what
    the ask would be.

Testimony of Kelly Glynn, July 6, 2010, at 30:

Q   What was he asking you?

A   He asked how much this event was going to do.
    And then he would say, "I hear we're going to hit
    $5,000," as if he already knew. And then we would
    walk around and he would say: What did so-and-so

11

do? Or, you know, "why is he in here?" as if this
guy didn't do enough.

The questions on cross-examination were within the scope as well as a

necessary part of effective cross-examination.   Government questioning of Glynn,

Scofield and others created the erroneous implication that non-criminal acts were

actually criminal.  Cross-examination that cut away at this implication was proper

and should be permitted.

### III.    Government "Motion to Exclude Opinion Evidence Regarding Legality, and Regarding Usual and Normal Practices" (at 11)

On pages 11-12, the government contends that the defense attempted to

introduce "lay testimony offering a legal conclusion" which is inadmissible.

This is an over-generalization and incorrect.

Federal Rule 701 permits a non-expert witness to testify to an opinion or

inference so long as the opinion or inference is (a) rationally based on the perception

of the witness and (b) helpful to a clear understanding of the witness' testimony or

the determination of a fact in issue. . ."   In other words, the standard with regard to

lay opinions is whether the opinion, rationally based on the perception of the

witness, will assist the jury in understanding the witness' testimony or the

determination of a fact in issue.  The defense questions conform to this standard.

The government's questions left many issues hanging in the air, with the

impression that there was something sinister or nefarious about non-charged and

non-criminal conduct.  In response, the defense properly asked questions that aided

12

in a "clear understanding of the witness' testimony or the determination of a fact in issue." Rule 701.

Further, if the Court grants the government's motion with regard to this issue, the defense seeks a similar order to be held against the government. The government elicited testimony (violative of its own objections) from John Harris regarding a statement that was made by Bill Quinlan in regard to discussions about a 501(c)(4) and the Senate seat:

> Q    And what was the response at this point?
>
> A    At this time Bill was more vocal. We both said to him, you can't talk about that. And Bill was more direct in his admonishment, "Governor, you can't even joke about that, don't even talk like that, don't even think like that," or words to that effect, meaning whether you're serious or not, don't say things like that.
>
> Q    Was anything further said at that second conversation about that topic?
>
> A    No, other than admonishing him not to say that to anyone else.

(John Harris testimony, June 22, 2010, at 38). Eliciting this conversation would clearly violate this motion in limine.

As the old saying goes, 'what's good for the goose, is good for the gander,' and fairness compels that the government should be held to the same rules as the defense.

The government attempts to characterize the defense questions as seeking "legal conclusions" which simply is not the case. That is not what the questions do.

Rather, they were questions regarding the witness' actions – in many cases impeached in their court testimony.

First, addressing the government's objection to questions directed to Agent Cain, it is appropriate to ask Agent Cain the questions cited by the government in its motion (at 11). Agent Cain is a Special Agent of the F.B.I. who oversaw the wiretapping in this case and authored the affidavit in the wiretap authorization request. He oversaw the operation and monitoring agents who all had instructions regarding what was legal/illegal and/or pertinent. The government should not be permitted to rely on Agent Cain's legal opinions in order to bring this case but then balk at questions to him regarding the legality of that same or similar conduct, within the confines of his knowledge, to which defense questions were curtailed.

With respect to the testimony of Kelly Glynn and Doug Scofield (motion at 11-12), the government objects to the following questions by the defense:

[Glynn:]

> Q: To your knowledge - - now, Mr. Blagojevich was angry at these three men because he felt they did not contribute as much as he felt they should contribute, correct?
>
> A: Correct.
>
> Q: There's nothing wrong about that, is there?

[Scofield:]

> Q: Mr. Scofield, you never did anything wrong, did you?

It also appears that the government violated their position in the cross-examination of Robert Blagojevich. It is curious that the government objects to these questions by the defense but it asked Robert Blagojevich (during his cross-examination) similar questions about whether something was "wrong" no less than seven (7) times:

Testimony of Robert Blagojevich, July 2, 2010, at 25-26:

> Q    But you didn't understand Freveletti saying because the firm is not getting work, they're not going to contribute?
>
> A    Listen, he's nibbling around trying to get a state contract for a contribution, that's how I was reading this.
>
> Q    Which is wrong?
>
> A    Yes.
>
> Q    Absolutely wrong?
>
> A    Yeah.
>
> Q    No question in your mind?
>
> A    Yeah.

Testimony of Robert Blagojevich, July 2, 2010, at 74-75:

> Q    Now, when you spoke with Bedi, you understood him to be saying that Raghu Nayak was willing to do accelerated fundraising by the end of the year if your brother were to choose Jesse Jackson?
>
> A    Yes.
>
> Q    That's what you understood Bedi to be saying?
>
> A    Yes.

15

Q       You understood that to be wrong?

A       Understood what to be wrong?

Q       You understood what Bedi was proposing was wrong?

A       It was outlandish. Yes, wrong.

Q       Because it would be trading a state government action, an appointment of a senator, in exchange for campaign contributions, right?

A       Yes.

Q       So there is no confusion in your mind, this was clearly wrong?

A       Yes.

Testimony of Robert Blagojevich, July 2, 2010, at 76:

Q       And you say:
        "And I don't know if you want to listen to this or not."
        And you said that because you knew it was wrong.

A       Yes.

Testimony of Robert Blagojevich, July 2, 2010, at 79:

Q       He made an outrageous wrong proposal to you about trading the Senate Seat for campaign contributions?

A       Yes, he did.

Testimony of Robert Blagojevich, July 2, 2010, at 85:

Q       And, again, it was clear to you he was offering a campaign contribution, $6 million in campaign contributions if Jackson were appointed?

A     That's correct.

Q     And you knew that was wrong?

A     Yes.

The government conveniently ignores it own line of questioning on the cross-examination of Robert Blagojevich but accuses the defense of violating the Court's order and the rules of evidence.

However, dealing specifically with Glynn and Scofield, the government's objections should have been overruled at the first trial, and similar questions should be permitted at the retrial. As discussed in the previous section, *supra*, defense questions of Glynn went directly to the government's direct testimony. Likewise, Scofield's testimony, *supra*, opened the door to the defense questions. Questions by the defense directed to Glynn and Scofield were appropriately tailored to confront their direct testimony.

IV.    **Government "Motion in Limine to Bar Evidence and Arguments Regarding Custom and Practice" (at 13)**

This in limine request by the government is puzzling in many ways. For starters, the request begins with a quote from the Court's order that "[i]ndividuals are obliged to follow the law, and not an illegal custom or practice." (Motion at 14). Immediately following that citation, the government asserts that the following questions were improperly asked of Kelly Glynn in the first trial:

Q:    Now, I believe you said that Mr. Blagojevich, like most people in public life, wanted to raise a lot of money to show that they had

> a lot of money in the till, so to speak, so people would not challenge them politically, right?
>
> A: Correct.
> Q: And that was normal and common amongst most public officeholders, wasn't it?
> A: Yes, it is.

(Motion at 14).

This is an example of how the government's request misses the point. The defense questions regarding "normal and common" practices have nothing to do with attempting to justify illegal conduct because it is a customary practice. The government continues to criminalize the political process and campaign fundraising. It is perfectly legal to "want[] to raise a lot of money" to gain political strength as a candidate. The government's attempts to criminalize and demonize this in front of the jury can only be confronted by defense questions tempering the government's improper inferences.

In addition, the government's opening statement at the first trial included an argument that "money is power":

> One of the things you're going to learn in the course of this trial is that, in politics, money is power. The more money in that campaign fund, the more power Defendant Blagojevich could wield as governor, and the Inner circle knew this.
>
> So part of the plan was to try to build up that campaign fund because they knew the more money n that campaign fund, the more power Defendant Blagojevich could yield and the more opportunity they would have to try and personally profit from decisions he was making as governor.

(Government Opening Statement, at 12)

18

Through cross-examination, the defense properly attempted to re-characterize the government's improper inferences that Blagojevich's conduct was illegal.

## V. Government "Motion in Limine to Bar State of Mind Evidence In the Absence of Proper Evidentiary Foundation" (at 14), including, "Questions Regarding the Absence of Objections by Others" (at 15)

The government's overall proposition that "cross-examination questions [were] designed to suggest, without any evidentiary support, that the defendant was influenced by, or relied upon, statements or actions of others during the relevant time frame" is not accurate.

First, the defense must point out the government's unfair and circular strategy. The government objects to the introduction of calls by the defense that show Blagojevich's state of mind. Then, after these calls are successfully kept out of evidence, the government argues that because the calls are not admitted, there is no evidence that supports that Blagojevich was influenced by the "absence of objections by others" (i.e. content of the non-admitted calls). The government's objection to evidence of Blagojevich's state of mind occurs even though the government knows that the recordings do indeed show the effect upon Blagojevich of conversations with key advisors (including suggestions, encouragement and lack of objections) on Blagojevich's state of mind.

The cases cited by the government in this section of its motion are not on point. This is not a case where a defendant claiming duress cannot establish his knowledge of the accomplice's violent past (as in *United States v. Hollister*, 746 F.2d

420, 423 (8th Cir. 1984) (cited in Government Motion at 19), nor is it a case where a defendant cannot establish evidence that he knew of gangland slayings, thus justifying his false testimony before a grand jury (as in *United States v. Stanfa*, 685 F.2d 85, 89 (3d Cir. 1982) (cited in Government Motion at 20). To the contrary, facts of this case demonstrate that in call after call, conversation after conversation, ideas build on each other, and brainstorming sessions stretch over the course of days. Each individual's input (or lack of objection) is taken into account by Blagojevich; his further ideas are brainstorming, clearly affected by the input (or lack of objections) by others. This is clear in the recorded conversations – both played at trial and unplayed. A foundation for this evidence does exist.

It is extremely relevant that Blagojevich's trusted advisors not only (1) did not object to topics, suggestions and ideas in the recorded conversations, and also (2) affirmatively suggested and encouraged those continued discussions.

The jury is charged with deciding whether the government can prove beyond a reasonable doubt that Blagojevich formed the intent to commit the charged crimes of wire fraud, attempted extortion, conspiracy to commit extortion, bribery and bribery conspiracy. It is relevant to the jury's determination that all the advisors and counsel that conversed with Blagojevich continuously and at all times encouraged and supplemented Blagojevich's brainstorming and ideas. No one said, "you can't do that."

Ignorance may not be a defense but an affirmative belief that one's conduct is legal (e.g., good faith) certainly is admissible as a defense theory. Where state of

mind or willfulness is an element of the offense, "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment . . . ." *Cheek v. United States*, 498 U.S. 192, 203-04 (1991). In accord with *Cheek*, a defendant is entitled to wide latitude to introduce evidence which tends to show lack of specific intent and "evidence on the question of intent ... may take a wider range than is allowed in support of other issues. *Id*. The Court is not permitted under the Sixth Amendment right to a jury trial to take away from the jury the question of the subjective state of mind of the accused. In *Cheek*, the Court ruled:

> We thus disagree with the Court of Appeals' requirement that a claimed good-faith belief must be objectively reasonable if it is to be considered as possibly negating the Government's evidence purporting to show a defendant's awareness of the legal duty at issue. Knowledge and belief are characteristically questions for the factfinder, in this case the jury. Characterizing a particular belief as not objectively reasonable transforms the inquiry into a legal one, and would prevent the jury from considering it. . . . It was therefore error to instruct the jury to disregard evidence of Cheek's understanding that, within the meaning of the tax laws, he was not a person required to file a return or to pay income taxes and that wages are not taxable income, as incredible as such misunderstandings of and beliefs about the law might be. But there can be no doubt that this decision approves of the admission of the evidence to begin with.

*Id.*, 498 U.S. at 203.

Not only is Blagojevich entitled to present this evidence to show the effect on his subjective state of mind, it also shows objectively (from the recordings) he was affected.

Moreover, that witnesses are now testifying and/or inferring that conversations to which they were a party and never objected was wrong or illegal is cross-examination material that impeaches their testimony. Blagojevich has a fundamental right to challenge the credibility of the testimony of these witnesses. This is one critical way in which these witnesses must be confronted pursuant to the Sixth Amendment.

This government request attempts to prevent evidence that Blagojevich's brainstorming ideas and conversations were not objected to as "wrong" or whether objections were made (by any of Blagojevich's advisors) to said ideas. (Motion at 15-16).

It must be noted that preventing the defense from asking these basic questions denies Blagojevich the right to confront the witnesses and potentially impeach their testimony. Witnesses were paraded before the jury who testified to various statements made by Blagojevich and inferred that they were criminal or, at the least, distasteful or wrong. Again, the defense has the right to question these witnesses about their 'new' post-cooperations interpretations. The witnesses, now, as they sit before the judge and jury, towing the line of the government (testifying and/or inferring that these things were wrong), are contradicted by the fact that they never spoke up at the time to say so. This goes directly to their credibility. To deny Blagojevich the ability to ask these questions erodes away the most basic fundamental rights to effective cross-examination and confrontation. U.S. Const. Amend. VI.

22

It must be specifically addressed that the government's objection to the defense asking Greenlee what he "understood [the word] legitimate" to mean reeks of unfairness and even hypocrisy. The government spent countless hours at the first trial asking witness after witness 'what they understood Blagojevich to be saying' or 'what they understood Blagojevich to mean,' etc. Here, in this example offered by the government, (at 17), the defense is asking Greenlee what he understood to be the meaning of 'legitimate,' – a word that *he* used. For once, a witness was asked what *he, himself,* meant by something, and not that he play the role of a mind reader. This irony undercuts the government's objection.

Moreover, Greenlee answered the questions. He was capable of answering and there was no impropriety in asking the questions to begin with. These were perfectly 'legitimate' questions (pun intended) and the government's request should be denied.

To the extent that the lack of objections (or affirmative support) from his advisors and lawyers contributed to his good faith and lack of intent, these facts are relevant for the jury's determination of this case.

**VI.    Government "Motion in Limine to Bar State of Mind Evidence In the Absence of Proper Evidentiary Foundation" (at 14), including, "Questioning Concerning Events Related to the Racetrack Bill and CMH That Transpired After Defendant's Arrest" (at 20);**

If the government's motion is granted, the jury would be left with the impression that, with regard to the pediatric rate increase, when Blagojevich asked

23

Greenlee whether it could be held up, and then responded "good to know" when Greenlee replied affirmatively, that the increase was held up indefinitely and never put through. This is not accurate.

Likewise, with the Racetrack Bill, the government wants to let the jury believe that for nefarious reasons, the Bill sat on the desk of the Governor and was never signed or acted upon. This, too, is not accurate.

By nature of the adversarial system, the government will take a side and ardently argue its theory. By negating the ability of the defense to present *its side* of events, the adversarial nature is taken out of the equation. The fact that the prosecution believes a certain fact means something is fine – but it is not to be the only interpretation or the only presentation to the jury.

And, contrary to the government's arguments, the defendant has an absolute right to cross-examine on these points and present his own theories through cross-examination. To disable this function of the defense is a violation of the rights to confrontation, the right to present a defense, and unconstitutionally shifts the burden.

Moreover, a witness like Bob Greenlee, who testifies to something as subjective as the phrase "good to know" being a directive, can only effectively be cross-examined by allowing the defense to ask the question of whether the rate increase actually went through. Otherwise, the government is essentially bolstering its witness by omission of this critical fact.

Ultimately, the weight of this evidence is up to the jury. It is not a question of admissibility, but rather of weight. The government is certainly free to argue that the rate increases and the signing of the Racetrack Bill were remedial measures by Blagojevich. It is up to the jury to fact-find, and to make a determination as to how much weight to give to those facts. Outright exclusion is not appropriate.

### VII. Government "Motion in Limine to Bar State of Mind Evidence In the Absence of Proper Evidentiary Foundation" (at 14), including, "Evidence of Events and Statements Related to the Senate Seat Occurring After Public Disclosure of Government Wiretaps" (at 22).

This is a grossly unfair request by the government. The government's theory now is that, in terms of this case, time stopped on December 5, 2008.

The indictment in this case alleges an ongoing conspiracy up and through December 9, 2008. In fact, in no less than ten (10) counts, the indictment names a conspiracy which the government alleges continued through December 9, 2008. [1]

In addition, when the government was seeking wiretap re-authorizations in this case, it filed regular progress reports to update the Chief Judge and request additional allowances. The government filed one such report on December 5, 2008 (the date the government now claims should be the 'end' of the case). In that progress report, the government sought an additional extension authorizing further

---

[1] The indictment alleges that "From in or about 2002 to on or about December 9, 2008" Blagojevich and co-defendants "acting with the intent to defraud and to deceive, devised and participated in a scheme to deprive the people of the State of Illinois. . ." (Count 3). See also, counts 15, 16, 17, 18, 19, 20, 21, 22 and 23, charging bribery and extortion conspiracies which also allege that the conduct extended through December 9, 2008.

wiretapping beyond December 5th. (Ten Day Progress Report, December 5, 2008, at 8).

Also, when Blagojevich was arrested and U.S. Attorney Patrick Fitzgerald gave his press conference, he publicly alleged that Blagojevich was in the midst of a political crime spree that was stopped by his arrest.

Clearly, the government alleges that Blagojevich's alleged criminal activities were ongoing until he was arrested. However, it now appears that the facts of what happened in the days leading up to Blagojevich's arrest are inconvenient for the government. These facts do not show the actions of a man who was committing a crime. Before Blagojevich was able to make a Senate appointment, the government arrested him, and thereby salvaged its alleged arguments of 'attempt.'

Yet, there is one question that surrounds the "leak" to the *Chicago Tribune* – Who leaked it? The government appears to have no interest in 'who leaked it.' A "leak" can only be made by a party who has knowledge. Certainly Blagojevich did not know that he was being secretly tape-recorded by the government. Therefore, it would be absurd to assert that Blagojevich was responsible for this "leak." However, the government certainly knew that Blagojevich was being secretly tape-recorded. It is interesting that this "leak" is the basis for the government's brand new submission that on December 5th, "it became publicly known that the federal government was secretly recording the defendant's conversations" and therefore the post-December 5th conversations are irrelevant and should be barred from

26

evidence. (Motion at 22). A far more effective argument is that the "leak" came from the government's cup of water, so to speak.

One can effectively argue that the government (knowing that Blagojevich was being secretly tape-recorded) "leaked" this information with the hope that, after hearing news that John Wyma was "wearing a wire," Blagojevich would make incriminating statements on the secretly-recorded conversations. To the contrary, even though the government's "bait" was laid out in the newspaper, Blagojevich did not say anything incriminating in the post-December 5th recorded conversations (because he was not engaged in criminal activity).

Allow the defense to be perfectly clear. The defense does not have any direct knowledge that the government caused this "leak." The defense has actual knowledge that *it* is not responsible for this leak (because Blagojevich did not know he was being secretly recorded or that John Wyma was cooperating with the government). However, the defense does know that the government was the only party to this case that had knowledge of those facts. The defense argument is only in response to the government's submission to bar evidence essential to Blagojevich's defense and is based on fundamental fairness. It is simply unjust for the government to use investigative tactics such as the "leak" and then profit from this tactic by barring the defense from introducing relevant evidence that the government feels is not in its favor.

Instead of acknowledging the facts for what they are – that Blagojevich did not demonstrate criminal intent in the post-December 5th recordings – the

government develops a new story that all of Blagojevich's innocent thoughts and conversations, post-December 5th, were for concealment.

The government attempted to bait Blagojevich into making inculpatory statements on recorded conversations via a public leak (of which any defense counsel would be in contempt of court by the same actions), and then, when the Blagojevich did not say anything inculpatory, the government now maintains that those *exculpatory* and *innocent* conversations and actions are 'irrelevant' and therefore inadmissible. Certainly, if Blagojevich made incriminating statements post-December 5th, the government would strongly argue that those statements were relevant and admissible.

The government's interpretation of relevance is sorely misunderstood. For purposes of this trial, the government considers anything that doesn't help its case to be not relevant. Fortunately, this Court knows that this is not the standard.

A fact is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Indeed, the government's relevancy argument is belied by the fact that it introduced evidence at the first trial regarding events and conversations which occurred after December 5th. Now that the government doesn't like the inference made from that evidence, it changes course and decries that its own evidence is 'not relevant'.

The government's argument is also misleading factually. The leak to the *Tribune* resulted in an article stating the Wyma was wearing a wire on his person.

Thus, according to the government, in the mind of Blagojevich, the "risk" would be an in-person discussion with Wyma.   Remember, there was no reason at that time to believe that Blagojevich's telephones were being tape-recorded.  If there was original criminal intent in Blagojevich's mind or "cover up" intent on the part of Blagojevich, this baiting technique by the government surely would have resulted in frantic calls and conversations displaying such conduct by Blagojevich.  No such phone conversations exist.

The leak never alleged to the public that Blagojevich's phones or office were tapped – any and all conversations that were overheard and recorded by the government after December 5, 2008 are clearly relevant.  Again, as with the previous section, these are issues of weight to be decided by the jury.

*     *     *

WHEREFORE, for the foregoing reasons, each of the government's motions *in limine* should be denied.

Respectfully submitted,

/s/ Lauren Kaeseberg

One of the attorneys for
Rod Blagojevich

Attorneys for Rod Blagojevich
Sheldon Sorosky
Aaron Goldstein
Lauren Kaeseberg
Elliott Riebman
158 w. Erie
Chicago, IL 60654