IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 08 CR 888 |
| | ) | Honorable James B. Zagel |
| ROD BLAGOJEVICH | ) | |

MOTION TO STRIKE THE JURY PANEL
AND BEGIN JURY SELECTION ANEW
<u>DUE TO OVERWHELMING BIAS</u>

NOW COMES Rod Blagojevich and hereby moves this Court to strike the current jury panel and begin jury selection anew. In support of this motion, Blagojevich states as follows:

I. <u>Blagojevich cannot possibly receive a constitutionally fair trial with the current jury panel</u>

The jury selection process in this case has revealed that Blagojevich cannot receive a fair trial and an impartial jury. Where there exist doubts about a potential juror's bias, those doubts must be resolved against allowing the juror to sit on the jury. *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) ("Doubts regarding bias must be resolved against the juror.") The Court in this case has allowed jurors to remain in the pool in violation of Blagojevich's Fifth and Sixth Amendment rights to a fair trial and an impartial jury. Further, the entire panel of jurors is tainted. The Court should strike the pool and begin jury selection anew with more stringent safeguards and standards in place.

1

After being dismissed for cause (based on hardship), Juror 101 spoke with reporter John Cody in an interview on WBBM radio[1]. In that interview, Juror 101 said she "definitely thinks he cannot get a fair trial" and that "many potential jurors talked about the case–even though they were told not to discuss it during the selection process." *Id.* Juror 101 stated:

> "Sitting in the room with other potential jurors, they all had a very strong opinion on him," she said. "Even though we were asked not to speak about it to each other … so many people would walk in there after their interview and say, 'Oh he's guilty already.'
>
> When you have an opinion of something, you can't turn it off right away."

*Id.*

These comments by Juror 101 are significant and should give this Court pause. Her comments demonstrate the inability to obtain an impartial jury from this panel and also that jurors in this pool directly contradicted the Court's orders. Further, if "so many people would walk in there after their interview and say, 'Oh he's guilty already'," then these jurors' oral answers (upon which the Court strictly relied because their questionnaires indicated bias) do not suffice.

The questionnaire answers clearly provide more insight into the jurors' beliefs and biases than do the jurors' in-court responses. When filling out the questionnaires, the jurors were able to take as much time as they needed and were instructed to answer the questions thoughtfully, honestly and thoroughly. In

---

[1] *See*, "Blago Juror Candidate: He Can't Get Fair Trial" available at: *http://chicago.cbslocal.com/2011/04/26/dismissed-blago-juror-he-wont-get-fair-trial/*

addition, there was a sense of anonymity when the questionnaires were filled out. When jurors were then individually brought into court to sit completely alone in the jury box, many gave different answers after rehabilitative prompts by the Court. The palpable scrutiny of the Court, the government, the defense and large media presence pressured prospective jurors into giving what sounded like the "right" or perhaps "politically correct" answers. In no way can these oral answers be relied upon over the intense bias expressed in the jurors' questionnaires.

Few and far between was there a potential juror (if any) who gave assurances of impartiality, fairness, lack of bias, and a presumption of innocence that satisfy the constitutional mandate. To be considered truly rehabilitated from the bias expressed in a questionnaire, a juror must give final, unequivocal, credible assurances that he or she can put aside any prior biases and judge this case appropriately. *United States v. Allen*, 605 F.3d 461, 465 (7th Cir. 2010). Moreover, as discussed below, such rehabilitation is only proper where the juror expressed a general bias, not a bias *directed* at a *specific* defendant or case.

To the contrary, in Blagojevich's case, after admonishment by the Court as to what the proper standard is, most jurors' answered that 'they understand,' 'they believe they can,' and/or 'they will try' to put aside their opinions of Blagojevich and judge this case solely on the evidence presented in court.

That is simply not enough. The case law is clear. The jury selection process in this case does not rise to the level of determining fairness that is required.

3

If "a juror has formed an opinion as to the issue to be tried," that juror must be removed for cause. *Reynolds v. United States*, 98 U.S. 145, 155 (1878), cited in *United States v. Allen*, 605 F.3d 461, 467 (7th Cir. 2010) (Wood, J., dissenting). Moreover, "if a court mistakenly seats a juror who should have been struck for cause the error is a structural one, and a new trial is required." *Allen*, 605 F.3d at 467 (Wood, J., dissenting), citing *Gray v. Mississippi*, 481 U.S. 648 (1987). The jurors' answers in the Blagojevich case do not rise to the level of "final, unequivocal, credible assurances' of impartiality and fairness" that are mandated by law. *Allen*, 605 F. 3d at 465.

It must also be determined *unequivocally* that the prospective juror can "relinquish her prior beliefs" (*Thompson v. Altheimer & Gray,* 248 F.3d 621, 626 (7th Cir. 2001) or "lay aside her biases or her prejudicial personal experiences" (*United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000)).

The jury selection process in this case falls far short of ensuring Blagojevich is tried by a fair and impartial jury. Exacerbating the problem was the deliberate and unwarranted dismissal of the only two jurors who used the word "innocent" in their questionnaires. In addition, the Court's refusal to strike 116, 121, and 160 (in addition to others) who all stated firmly and unequivocally that they believe Blagojevich is guilty was improper. Likewise, the Court erred in overruling Blagojevich's motions for cause directed at jurors 163 and 187, an active Cook County Prosecutor and a Federal Probation Officer who works in this District. These individuals, no matter how professional they may be, cannot possibly set

4

aside their formed opinions and their trained minds with regard to their occupations. Their occupations have trained and ingrained them to be aligned with the government. They would be deserters to the government team if they found Blagojevich not guilty. It is outrageous and in contravention of the purpose of peremptory strikes to force Blagojevich to utilize peremptories on these jurors who so clearly should be stricken for cause.

The fundamental unfairness present in jury selection for this trial has even caught the attention of the public and the media, with one headline reading: "Think Blagojevich Is Guilty? Join His Jury!"[2] In addition, a legal commentator noted[3]:

> "If someone said to me when I was a judge, 'I think the defendant's guilty,' I wouldn't lecture that person and say, oh you have to follow the law and decide it on the facts," [Judge Jeanine] Pirro said. "I'd bounce them. The first thing you've got to do is to make sure that jury is ready to listen, not that they already formed an opinion. It's just not right."

While defense counsel is fully cognizant of the fact that public opinion and news stories are far from legal precedent, this Court should at least be wary of the decreasing lack of confidence the public has in the ability for Blagojevich to get a fair trial. The biases expressed by the current jury pool undermine the public's confidence in this trial.

---

[2] Available at http://blogs.suntimes.com/blago/2011/04/think_blagojevich_is_guilty_jo.html

[3] "Judge Criticizes Zagel's Handling of Blago Jury Selection," available at: http://www.wlsam.com/Article.asp?id=2173822&spid=

Blagojevich seeks a fair trial and an impartial jury and is presumed innocent. Practically every juror who remains in the pool has expressed doubt (or even flat-out disagreement) about this foundational principle. Blagojevich simply cannot receive a fair trial under the current circumstances.

Juror 101's recounting of what was said behind closed doors further tarnishes the entire selection process in this case and demonstrates that these jurors' biases cannot be "set aside" as suggested by the Court.

As the possibilities stand now for who will ultimately end up on this jury, it is inconceivable for Blagojevich to have a fair trial and impartial jury. Not only are his most basic, fundamental constitutional rights violated, but public trust in the system has been and will be greatly compromised.

II. **Case law and legal precedent compel this Court to grant Blagojevich's instant request**

This Court has committed an abuse of discretion in permitting biased jurors to remain in the jury pool for the Blagojevich retrial. To illustrate this point, a recent Seventh Circuit decision, *United States v. Allen*[4], is worthy of brief analysis. The *Allen* majority found a questionable prospective juror in that case provided sufficient unequivocal assurances of impartiality to the Court; the dissent opined that the juror should have been struck for cause.

In *Allen*, the defendant was charged and ultimately convicted of child pornography charges. Prospective jurors completed written questionnaires which

---

[4] 605 F.3d 461, 467 (7th Cir. 2010)

asked in part "whether anything would make it difficult for a prospective juror to be fair, to which one prospective juror replied 'yes' because of an incident in which a man had attempted to kidnap her [child many years prior]." *Allen*, at 463. When the judge inquired with the juror if "'that experience would somehow prejudice you against the defendant in this case,' the prospective juror replied, 'yes.'" *Id.* The judge followed up with an instruction to the juror: "both sides are entitled to fairness and, actually, a clean slate in your mind so that whatever exists in your past does not carry over and influence the decision in this case, and asked her once more whether she could be open-minded, perhaps set the experience aside, and give Allen the presumption of innocence. She replied that she could." *Id.*, at 463-64. Defense counsel was permitted to question the juror and asked her if "the nature of the charges alone would make it difficult for you to be fair to both parties" to which she replied "yes." *Id.* at 464.

At that point, the judge instructed her: "There is not anything wrong with having an impact, but it is whether, just the nature of the charges, you find so offensive that you will not give the guy the benefit of the doubt?" *Id.* at 464. She replied, "I would give him the benefit of the doubt until everything is presented, yes." *Id.* at 464. When the defense moved to strike the juror for cause, the challenge was denied and the problematic juror was impaneled (all peremptories had already been exercised).

The Seventh Circuit analyzed the case under the constitutional guarantees of due process of law and the right to an impartial jury, Amendments V and VI. *Allen*,

7

at 464. The Seventh Circuit affirmed the defendant's conviction ruling that the juror satisfied the constitutional mandates, providing "final, unequivocal, and credible assurances" that she can set aside any biases she might hold. *Allen*, at 464-65. The Court based its findings on a number of reasons – all of which support Blagojevich's position.

The Seventh Circuit found that the "unrelatedness of Allen's case and of the kidnapping attempt suggest that any bias was minimal" and did not rise to other cases in which trial judges determined a juror was not able to overcome bias. See, *Allen* at 465, citing *Thompson v. Altheimer & Gray,* 248 F.3d 621, 626 (7th Cir. 2001) which the *Allen* Court characterized as "[t]he relationship between the case's ultimate issue and the juror's prior experience was precise coincidence, thus forming a strong bias or predisposition to find against a certain party" and that in *Thompson*, the ultimate issue was the spuriousness of the employees claim and juror manifested a belief, based on his experience as an employer that "some claims against employers are spurious." *See* also, *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (finding implied bias where the juror "had some personal experience that is similar or identical to the fact pattern at issue").

It is critical to note that in *Allen*, the Seventh Circuit found that the "juror's prior experience was wholly unrelated to whether Allen committed the crimes for which he was indicted, much less any specific evidentiary issues such as Allen's state of mind or the identity of [the child pornography] kidbot. . . . [The juror's] belief has nothing to do with whether any particular defendant is guilty of

8

committing crimes against children." *Allen* at 465. The *Allen* juror even noted, "this crime has nothing to do with that crime." *Allen* at 465. The Court further ruled: "Neither at voir dire nor on appeal has Allen's counsel been able to explain how the prospective juror's experience related directly to the issues on this trial in such a way that the district court was beyond the bounds of its discretion to find the prospective juror able to weigh the evidence impartially." Allen at 465.

Precisely the opposite is true in the instant case. These prospective jurors' biases and opinions bear directly on Blagojevich himself and their presumptions of guilt. Simply put, it is unconstitutional and an abuse of discretion for the Court to allow jurors to survive a cause challenge where they have indicated they are biased *against this particular defendant* and have reached conclusions or have opinions *about this particular case*. See *Allen*, at 465, where the Court noted that the juror had a general "predisposition to find certain criminals heinous, not to find certain people criminals, and in any event was related only tangentially to Allen's crimes." Allen, at 465. There is nothing "tangential" about the jurors' opinions and biases against Blagojevich in the instant case.

Justice Wood's dissent in *Allen* raises a number of problems that exist in the Blagojevich case. Justice Wood found that the juror's assertions were not unequivocal and that:

> Juror 31's offer to give Allen the benefit of the doubt occurred only after the court had misleadingly told her that "there [was] not anything wrong with [the kidnapping attempt] having an impact" on her perception of Allen's case. But there is everything wrong with that.

9

> Her duty, as a juror, was to approach Allen's case without any predisposition.

*Allen*, at 468 (Wood, J., dissenting).

In the instant case, jurors' biases were not cured by similar instructions and questions from the Court including instructions that it is acceptable for a juror to have certain opinions or biases so long as they are put aside when deciding this case.

Moreover, Blagojevich has a right to a jury that does not include jurors who hold politicians in such low regard that it will affect their deliberations. See *Allen* at 468 (Wood, J., dissenting) (Allen has a right to a jury that did not include people who might, because they consider child abusers especially heinous, vote to convict Allen just because the evidence showed that *someone* was involved with child pornography.) Blagojevich has the absolute right to impartial jurors who do not equivocate on his presumption of innocence or their ability to judge this case. *Allen* at 465, citing *Gonzalez*, 214 F.3d at 1111 (In *Allen*, the prospective juror "told the judge what she would do, not that she would merely 'try.'")

Blagojevich's request in the instant motion is in accord with Supreme Court precedent as well. In fact, the seminal case of *Irvin v. Dowd*, 366 U.S. 717 (1961) (in which defendant's conviction for murder and death sentence were vacated and remanded for new trial based on insufficient safeguards to obtain an impartial jury) compels that the Court grant Blagojevich's request. Because much of the Supreme Court opinion rings eerily true in Blagojevich's case, the language from *Irvin* is apropos and must be noted.

In *Irvin*, there had been six murders which gained extensive news coverage. *Irvin*, 366 at 719-20 ("The crimes, extensively covered by news media in the locality, aroused great excitement and indignation throughout [the area] . . .Shortly [after defendant's arrest], the Prosecutor [ ] and [ ] police officials issued press releases, which were intensively publicized.") The Supreme Court opined:

> It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people . . . In fact, on the second day devoted to the selection of the jury, the newspapers reported that "strong feelings, often bitter and angry, rumbled to the surface," . . . A few days later the feeling was described as "a pattern of deep and bitter prejudice against the former pipe-fitter." Spectator comments, as printed by the newspapers, were "my mind is made up"; "I think he is guilty"; and "he should be hanged."
>
> Finally, and with remarkable understatement, the headlines reported that "impartial jurors are hard to find."

*Irvin*, 366 U.S. at 726-27. Those words echo profoundly in the instant case.

Ultimately in *Irvin*, the Supreme Court ruled that

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver, 333 U.S. 257; Tumey v. Ohio, 273 U.S. 510.* "A fair trial in a fair tribunal is a basic requirement of due process. " *In re Murchison, 349 U.S. 133, 136.* In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord

11

> Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b.
>
> * * *
>
> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. Illinois, 123 U.S. 131; Holt v. United States, 218 U.S. 245; Reynolds v. United States, supra.*

*Irvin*, 366 U.S. at 722-23. Further, the Court took note of the fact that:

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, "You can't forget what you hear and see." With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.

12

> *Stroble v. California, 343 U.S. 181*; *Shepherd v. Florida, 341 U.S. 50* (concurring opinion); *Moore v. Dempsey, 261 U.S. 86*.

*Irvin*, 366 U.S. at 728.

The *Irvin* case, as with *Allen* which followed it, requires that the current jury panel be struck. As much as the jurors may have, in good faith, tried to uphold the perceived standards espoused by the Court in voir dire, there can be little faith in their ability to actually hold those standards throughout the trial and into deliberations. As was the case in *Irvin*:

> With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. See *Delaney v. United States, 199 F. 2d 107*. Where one's life is at stake -- and accounting for the frailties of human nature -- we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards. Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved . . .

*Irvin*, 366 U.S. at 727-28.

Finally, if the Court will indulge one more block quote from *Irvin*, the following cautionary language should be noted:

> More than one student of society has expressed the view that not the least significant test of the quality of a

13

> civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

*Irvin*, 366 U.S. at 729-30 (Frankfurter, J., concurring).

\*   \*   \*

Legally and factually, Blagojevich's request has merit and should be granted. The only way to ensure that Blagojevich receives a constitutionally sound trial is to strike the current panel. Jury selection must begin anew with a more comprehensive questionnaire and voir dire. A stricter standard and more stringent process is needed.

However, if the Court is so inclined, Blagojevich would seek a change of venue out of state, potentially to the Federal courthouse in Hammond, Indiana

where perhaps the venire pool may be drawn from a group less hostile to Blagojevich (and still close enough to Chicago to be convenient for the Court and the parties).

If the Court does not grant this request, then Blagojevich would at the very least seek a detailed instruction after the jury is impaneled with admonishments about the presumption of innocence, the government's burden, and the duties of the jurors to judge this case impartially. This request can in no way cure the errors that have already occurred and the taint that exists in the current panel. However, if the Court denies Blagojevich's motion, the defense seeks at least a glimmer of a hope of some fairness on this jury.

WHEREFORE, for all of the foregoing reasons, the jury panel should be stricken and jury selection should begin anew.

Respectfully Submitted,
/s/ Lauren Kaeseberg

**Attorneys for Rod Blagojevich**
SHELDON SOROSKY
AARON GOLDSTEIN
LAUREN KAESEBERG
ELLIOTT RIEBMAN
158 W. Erie
Chicago, IL 60654