IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 08 CR 888 |
| | ) | Honorable James B. Zagel |
| ROD BLAGOJEVICH | ) | |

**ROD BLAGOJEVICH'S**
**MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant ROD BLAGOJEVICH, by his attorneys, pursuant to Rule 29(a) of

the Federal Rules of Criminal Procedure, respectfully moves this Honorable Court

to enter judgment of acquittal on every count[1].  In support thereof, Blagojevich

states the following:

> Treating speech (even obscene speech) as the 'substantial
> step' would abolish any requirement of a substantial step.
> It would imply that if *X* says to *Y,* 'I'm planning to rob a
> bank,' *X* has committed the crime of attempted bank
> robbery, even though *X* says such things often and never
> acts. The requirement of proving a substantial step serves
> to distinguish people who pose real threats from those
> who are all hot air. . .

*United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008).  The government has

established through its case-in-chief that the purported conversations to which its

witnesses testified amount to nothing more than "hot air."  *Id.* There were no crimes

---

[1] The government has provided the defense with a redacted/revised indictment which has
renumbered the remaining counts.  However, for the purpose of this motion, the original count
numbers from the Second Superseding Indictment are used.  The remaining counts to which this
motion applies are counts 3, 5-23.  Count 24 resulted in a conviction after the first trial; the
government subsequently dismissed counts 1, 2 and 4.

nor attempt crimes proven in the government's case.  A finding of not guilty is appropriate on every count.

While for the purposes of this motion, the evidence must be construed in the light most favorable to the government, this standard "is not so heavily weighted in favor of the prosecution that in ruling on this motion the Court must blindly and uncritically accept that every inference the prosecution argues can reasonably be drawn from the circumstantial evidence in the record." *United States v. General Elec. Co.*, 869 F. Supp. 1285, 1290 (S.D. Ohio 1994).

Even in the light most favorable to the government, it is just as likely that Blagojevich's words which show lack of intent were not criminal, versus the government's theory that the witnesses' interpretations demonstrate a crime. There is a lack of proof of the intent of Blagojevich in this case.  Judgment of acquittal should enter.  The parade of government witnesses testified to understandings and interpretations without showing that Blagojevich ever expressly intended to commit a crime.

"[W]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt."  *United States v. Harris*, 942 F.2d 1125, 1129-30 (7th Cir. 1991).  The court must enter judgment of acquittal if the trier of fact is called upon to choose between reasonable probabilities of equal weight, one innocent and the other guilty. *Id.*; *see also United States v. Miller*, 761 F. Supp. 1368, 1380-81 (S.D. Ind. 1991) (granting motion for acquittal where circumstantial evidence

failed to establish defendant's intent; "[w]here the government's evidence is equally strong to infer innocence of the crime charged as it is to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal").

The government's evidence overall introduced no proof of intent of Blagojevich, but rather, mere 'talk.' This reliance on inferences from speech is not only violative of the First Amendment (political speech falls within the protection of the First Amendment), but it also does not comport with the law of attempt. It is as the Seventh Circuit ruled in *United States v. Gladish*, cited *supra*: "Treating speech (even obscene speech) as the 'substantial step' would abolish any requirement of a substantial step. . ."

To prove a crime of attempt, the government must establish that the defendant acted with specific intent to commit the underlying offense, and in addition took a substantial step toward its completion. *United States v. Leiva*, 959 F.2d 637 (7th Cir. 1992), citing, *United States v. Cea,* 914 F.2d 881, 887 (7th Cir. 1990). The Seventh Circuit has reiterated that, "[t]o be guilty of an attempt you must intend the completed crime and take a 'substantial step' toward its completion. *Gladish,* at 650, citing *Braxton v. United States,* 500 U.S. 344, 349 (1991); *United States v. Cote,* 504 F.3d 682, 687-88 (7th Cir. 2007).

In *United States v. Morris*, 549 F.3d 548, 550 (7th Cir. 2008), the Seventh Circuit, citing *Gladish,* ruled that:

> The purpose of the law of attempt is to nail a person who by his conduct has shown that had the attempt not been interrupted he would very likely have completed the crime that he attempted. As we explained recently in

[*Gladish*], 'a person who demonstrates by his conduct that he has the intention and capability of committing a crime is punishable even if his plan was thwarted. The 'substantial step' [required for conviction of attempt] toward completion is the demonstration of dangerousness, and has been usefully described as 'some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.' You are not punished just for saying that you want or even intend to kill someone, because most such talk doesn't lead to action. You have to do something that makes it reasonably clear that had you not been interrupted or made a mistake . . . you would have completed the crime. That something marks you as genuinely dangerous – a doer and not just a talker.

The government's evidence does not provide sufficient proof that Blagojevich ever attempted to commit a crime. In the words from *Morris*, *supra*, all that has been shown in this case it the 'talking, not the doing.'

Utilizing the standard of viewing the evidence in the light most favorable to the government, the very most that could be found is that the government may have put in evidence of an attempt to attempt. That is not a crime. Additionally, attempt to conspire is not a crime; conspiracy to attempt is not a crime. See *United States v. Wilson,* 116 F.3d 1066 (5th Cir. 1997), citing *United States v. Meacham*, 626 F.2d 503, 507-09, n.7 (5th Cir. 1980) (holding that "conspiracy to attempt" is not offense under drug conspiracy statutes and noting that "it would be the height of absurdity to conspire to commit an attempt, an inchoate offense, and simultaneously conspire to fail at the effort"). There was no proof that Blagojevich ever made a substantial step.

**THE COURT SHOULD ENTER JUDGMENT OF ACQUITTAL OR DISMISS THE WIRE FRAUD COUNTS**

This case was prepped as an old honest services prosecution. Yet, try as it might, the government cannot legally squeeze this case into the old honest services framework. The government has improperly introduced evidence that *may* have been relevant in a pre-*Skilling* prosecution but is no longer criminal. Most obviously in this trial, the government did this by introducing evidence of the comments by Blagojevich upon the conviction of George Ryan (on the first day of the government's case), the testimony of David Keahl along with the ethics manual, and the government ended its case with its final witness introducing the Oaths of office taken by Governor Blagojevich.

Blagojevich renews and incorporates his *Motion to Dismiss Charges of Honest Services, Bribery and Extortion Pursuant to Skilling v. United States*. Indeed, each argument contained in the Motion to Dismiss pursuant to *Skilling* rings true now. Based on evidence put in by the government, the motion is arguably more compelling now. For the purposes of this Rule 29 motion, the arguments in the honest services motion should lead to findings of acquittal on each of the wire fraud/scheme to defraud counts. The government has not proven beyond a reasonable doubt that Blagojevich violated the honest services statute.

Honest services wire fraud now only includes fraud through bribery or kickbacks. *Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010) ("Congress intended §1346 to reach at least bribes and kickbacks. Reading the statute to

5

proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that §1346 criminalizes *only* the bribe-and-kickback core of pre-*McNally* case law.")

The government has failed to establish proof beyond a reasonable doubt that Blagojevich committed bribery. A finding of bribery (or kickbacks) is a predicate to an analysis of honest services wire fraud. However, even if the Court deems that honest services wire fraud can be analyzed absent a finding on bribery, there is insufficient evidence to convict on honest services as well.

Judgment of acquittal should be granted on each count in the indictment alleging wire fraud and scheme to deprive. **Count 3** alleges a scheme to deprive honest services. **Counts 5 – 13** allege specific allegations of wire fraud as part of the alleged scheme to defraud.

Each of the wire fraud/honest services counts (counts 5-13) charges Blagojevich with a violation of the statute based upon conversations, talk and brainstorming sessions which took place over the telephone.

Specifically:

**Count 5** alleges honest services deprivation regarding a **Nov. 7, 2008 phone call** between Blagojevich, John Harris and Fred Yang in which financial benefits were discussed that Blagojevich could request as part of the appointment of Valerie Jarrett.

On the call, Blagojevich discussed the possibility of being appointed Secretary of Health and Human Services (HHS). Blagojevich never said he asked Balanoff for HHS in exchange for appointing Valerie Jarrett. Although both HHS and Valerie Jarrett were discussed at the meeting with Balanoff, as Blagojevich states on the recorded call, Blagojevich never made a connection between the two when he presented the HHS request to Balanoff.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 6** alleges honest services deprivation regarding a **Nov. 10, 2008 phone call** between Blagojevich and various advisors (John Harris, Bill Knapp, Doug Sosnik, Fred Yang, and Bill Quinlan) in which financial benefits were brainstormed as part of a Valerie Jarrett appointment. Blagojevich discussed with his advisors opportunities he had in his political and personal career. The Senate seat appointment was discussed in the conversation, as well as opportunities for Blagojevich to be made HHS Secretary, to be put on the board of a non-profit 501(c)(4) organization or the head of Change to Win, a national organization related to SEIU. While these ideas were discussed and brainstormed, Blagojevich took no action in the conversation, nor was any action agreed to be taken by Blagojevich, Harris, or any other advisors.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 7** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** between Blagojevich and Fred Yang in which they discussed an idea for a not-for-profit ("Change to Win") where Blagojevich could work after he was no longer governor as part of a Jarrett appointment. It is uncontroverted in the record that no action was ever taken beyond this brainstorming session between Blagojevich and his advisor, Yang.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 8** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** between Blagojevich and Balanoff in which they discussed an idea to set up a not-for-profit where Blagojevich could work after he was no longer governor, and an appointment of Jarrett. In the call, Blagojevich pointed out to Balanoff that he understood that Rahm Emanuel is the only one authorized to speak on behalf of President Obama. Blagojevich explained to Balanoff that he intended to start a 501 (c)(4) organization. Blagojevich then stated that maybe someone in the Obama administration could help expedite the creation of that organization.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 9** alleges honest services deprivation regarding a **Nov. 12, 2008 phone call** between Blagojevich and Balanoff in which Blagojevich informed Balanoff it was a real possibility that Jarrett could get the appointment and again raised his interest in a not-for-profit. There is no offer of a *quid pro quo* to appoint Jarrett in exchange for a 501(c)(4) organization. Neither Blagojevich nor Balanoff took any further action following the conversation. There was no follow up on either side.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 10** alleges honest services deprivation regarding a **Nov. 13, 2008 phone call** between Blagojevich and Doug Scofield in which they discussed presenting to Rahm Emanuel an idea for a not-for-profit set up.

On the call, Blagojevich discussed who could call Rahm Emanuel to suggest the 501(c)(4) idea, but agreed with Scofield that whoever does call Emanuel should make clear that creating such an organization *is not related to any other discussions*.

Once again, as with all of the ideas bounced around in these calls, no follow up was done and no action taken. Rahm Emanuel was never called by Scofield,

Wyma or anyone else following Blagojevich's discussion about creating a 501(c)(4) organization.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 11** alleges honest services deprivation regarding a **Nov. 13, 2008 phone call** between Blagojevich and Doug Scofield in which Blagojevich asked Scofield if he would call John Wyma and ask if he would call Rahm Emanuel to suggest creating a 501(c)(4) organization, to put the idea in Emanuel's head.

Notably, Scofield then asked about Valerie Jarrett and Blagojevich said whether Valerie Jarrett is appointed or not, he wants Scofield to ask Wyma to call Rahm about the 501(c)(4) idea.

Neither John Wyma, Doug Scofield nor Blagojevich ever called Rahm Emanuel about the 501(c)(4) idea. Scofield testified that Wyma never conveyed the message to Emanuel. Moreover, Blagojevich never followed up with Scofield or Wyma about calling Emanuel.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 12** alleges honest services deprivation regarding a **Dec. 4, 2008 phone call** between Blagojevich and Lon Monk in which they discussed John Johnston and the racetrack (Johnston was Monk's client). At one point in the call, Monk suggests

to Blagojevich that in order to obtain campaign contributions sought from Johnston, it would be better "from a pressure point of view" for Blagojevich himself to call Johnston. Monk made the statement and Blagojevich answered in the affirmative, "yeah, good" to Monk's suggestion.

However, Blagojevich never actually called Johnston following the call. Neither Blagojevich nor Monk followed up with Johnston. FOB never received a contribution.

It should be noted that in a recording from the FOB Office on December 3, 2008, (a recording played in court) Monk and Blagojevich agree that Monk will go to Johnston to ask for a contribution that Johnston had committed to giving but that Monk should be clear it is not "one for the other" and Monk will ask him "without crossing the line." Blagojevich said in the recording he wanted to make sure there was separation between the contribution and the bill signing.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**Count 13** alleges honest services deprivation regarding a **Dec. 4, 2008 phone call** between Blagojevich, Deputy Governor Bob Greenlee and Fred Yang where they discussed Jesse Jackson, Jr. as a potential Senate candidate. In the call, Blagojevich told Yang there was "tangible political support… specific amounts and everything… some of it up front" regarding Jackson.

Immediately after this call with Yang and Greenlee terminated, Blagojevich phoned Greenlee and explained to Greenlee that Blagojevich was presenting Yang with a pretext to leverage and elevate Jackson in the eyes of the Washington establishment, and that Blagojevich's actual play was to appoint Lisa Madigan in exchange for a legislative deal with Speaker of the Illinois House Michael Madigan.

Testimony at trial alleged that other individuals' 'understandings' of what they claim to believe Blagojevich may or may not have meant. There is no sufficient proof of criminal intent.

**The Court Should Enter Judgment of Acquittal on the Extortion Allegations (Counts 14, 15, 17, 19, 21, and 22 ) and Bribery Allegations (Counts 16, 19, 20 (and 23, conspiracy to solicit a bribe))**

In order to obtain a conviction based on an official's acceptance of campaign contributions, the government must show that the "payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *United States v. Giles*, 246 F.3d 966 (7th Cir. 2001). See also, *United States v. Allen,* 10 F.3d 405 (7th Cir. 1993) and *McCormick v. United States,* 500 U.S 257 (1991). The Seventh Circuit held, in *Giles,* 246 F.3d at 972:

> After all, campaign contributions often are made with the hope that the recipient, if elected, will further interests with which the contributor agrees; there is nothing illegal about such contributions. To distinguish legal from illegal campaign contributions, it makes sense to require the government to prove that a particular contribution was made **in exchange for an explicit promise or undertaking by the official**.

The Supreme Court's ruling in *Skilling* has reiterated the importance of the fundamental requirement that in a campaign contribution case, the solicitation must be explicit. *Skilling v. United States*, 130 S. Ct. 2896, 2930 (2010) (where the Court cited to the government's brief which enumerated over two dozen cases it saw as examples of "solid core" cases, none of which alleged straight campaign contributions as part of bribery or kickbacks). The allegations in this case do not comport with the *Skilling* decision; applied to the facts of this case, the statute is far too broad, vague and does not provide proper notice as required by the Due Process clause of the U.S. Constitution. *Skilling* at 2927-28 ("To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"); *Skilling* at 2933 (The due process concerns are "(1) fair notice, and (2) arbitrary and discriminatory prosecutions.").

Extortion and bribery are considered "…two sides of the same coin," regarding the requirement of an express or explicit *quid pro quo* in campaign contribution cases. *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).

Bribery (18 U.S.C. 666) contains the element that the defendant "acted corruptly." "A person acts corruptly when that person acts with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties." 18 U.S.C. § 666(a)(1)(B). The government has not proven this element.

13

In a case where a public official is the recipient of a campaign contribution (or solicits a campaign contribution) and there is no express *quid pro quo*, the "intent to obtain something from another which the defendant knows he is not entitled to receive" simply does not exist. Absent an express *quid pro quo*, public officials are entitled to receive campaign contributions.

Furthermore, to prove this charge without an express *quid pro quo*, the government can only allege an interpretation or speculation about what the official was thinking. This contradicts the basic principles in *Skilling*.

The government's evidence, even take in the light most favorable to the government does not sufficiently establish that Blagojevich ever solicited a contribution "in exchange for an explicit promise or undertaking by the official." *Giles*, 246 F.3d at 972.

To sustain a charge of bribery, the government must prove, *inter alia*, that the defendant solicited something of value corruptly *with the intent to be influenced* or rewarded in connection with some business, transaction or series of transactions of the government. The evidence presented by the government does not sufficiently establish that Blagojevich ever had the intent to be influenced by contributions for state action.

None of the allegations establish an express quid pro quo or an (attempt) bribery or extortion – even in the light most favorable to the government. Accordingly, acquittal is required on each of these counts.

14

Moreover, Blagojevich renews his request to enter judgment of acquittal on all charges where the government's evidence was attempt to attempt or attempt conspiracy or conspired to attempt.

## Rahm Emanuel/Chicago Academy Allegation:

<u>Count 14</u> alleges that Blagojevich attempted to commit extortion, in that he attempted to obtain political contributions from Rahm Emanuel and Ari Emanuel, under color of official right for a fundraiser from Emanuel's brother, Ari Emanuel, in exchange for the release of $2 million in grant funds to Chicago Academy.

Dr. Donald Feinstein, executive director of the AUSL/Chicago Academy school, testified that the school received all their money in December 2006. Feinstein admitted that he never talked to Emanuel about the grant since the press conference announcing the grant, and never spoke to Blagojevich about it. The only words attributed to Blagojevich about this issue are from Tusk who claims that the issue arose on a call with Blagojevich where Tusk stated that Blagojevich said something to the effect of, "where's the grant?, where's my fundraiser." No follow up was ever done on the 'fundraising' side of the alleged issue. The school received its grant money.

No elements of extortion – including *quid pro quo* – are satisfied by the alleged conduct.

## Magoon/Children's Memorial Hospital Allegations:

<u>Count 15</u> alleges that from about October 2008 through December 9, 2008, Blagojevich attempted to commit extortion in that Blagojevich attempted to obtain

15

political contributions from Patrick Magoon and Children's Memorial Hospital under color of official right, and induced by fear of economic harm.

<u>Count 16</u> alleges that from about October 2008 through December 9, 2008, Blagojevich corruptly solicited and demanded political contributions from Magoon and CMH, intending to be influenced and rewarded in connection with doctor reimbursement rates. (18 USC 666(a)(1)(B) and 2).

The government did not provide sufficient evidence to convict Blagojevich of (attempt) extortion or bribery of Magoon or Children's Memorial Hospital. There was no evidence whatsoever at trial that Blagojevich tried to shake down Children's Memorial Hospital.

Greenlee testified that he met with Children's Memorial Hospital representatives in the Thompson Center along with Magoon and discussed the children's pediatric reimbursement rate that Magoon was seeking and they discussed budget issues. Greenlee then talked to Blagojevich about the rate increase in late September or early October. Greenlee testified that he instructed Maram to move forward with it.

The government introduced a phone call on November 12, 2008, where Blagojevich asked Greenlee if it was possible to pull back the funding for the pediatric rate increase for budgetary concerns. Greenlee responded that was is possible. Blagojevich said "good to know". From that conversation, Greenlee testified that he understood this to be an order and he pulled back on the increase.

16

Greenlee admitted at trial that he (Greenlee) interpreted the question from Blagojevich as an order. There was no testimony that Blagojevich asked Greenlee or anyone else to tell Magoon, or anyone at Children's Memorial Hospital, that he might *not* do the pediatric rate increase.

Magoon testified that he received a phone call from Blagojevich in which Blagojevich said he approved a $10 million increase and asked him not to mention it until after January 1st. Magoon testified that Blagojevich did not bring up fundraising nor did Magoon. Magoon testified he received a phone call from Robert Blagojevich October 22 asking if he would raise $25,000 by the end of the year. Magoon said he would have to think about it, though he did not have an intention to raise money. Magoon testified he felt pressured because the phone calls were close in time. Magoon did not return Robert Blagojevich's calls.

Magoon is also familiar with political fundraising and lobbying. It is insufficient evidence that Magoon may have made a connection in *his* mind when he received the call many days later regarding fundraising. The testimony from trial is insufficient to establish that Blagojevich engaged in any attempt to extort or bribe Magoon.

**Johnston/Racetrack Allegations:**

**Count 17** alleges that from about December 3 through 9, 2008, Blagojevich conspired with Monk and others to commit extortion in the form of political contributions from Johnston. (18 USC 1951(a) and 2).

**Count 18** alleges conspiracy to solicit a bribe (political contributions in exchange for signing the racing bill) (18 USC 666(a)(1)(B)) as well as conspiracy under 18 USC 371. Count 18 also alleges that the preceding allegations are "overt acts."

The government did not provide sufficient evidence to convict Blagojevich of (attempt) extortion, bribery (or conspiracy to do so) of Johnston. Testimony regarding the alleged John Johnston solicitation was that Blagojevich and Monk discussed a possible fundraiser by Johnston to occur prior to the first of the year. This fundraiser was for funding that had previously been committed to by Johnston. While Johnston claimed at trial that he felt like the fundraiser request and the signing of the bill were connected there is no credible basis that there was a *quid pro quo*. It is Blagojevich's intent that controls - not what Johnston may or may not have believed. It is critical for the court to remember that Johnston is himself deeply entrenched in politics and lobbying, had hired Lon Monk as his lobbyist and was intimately familiar with the legislative process and campaign contributions that are made to public officials who support his industry – and in the offer of proof, Johnston testified he contributed to legislators including the Illinois Senate President while the racing bill was pending. Whether or not Johnston believed the acts were "connected" does not establish Blagojevich's intent. The testimony from trial is insufficient to establish that Blagojevich engaged in any attempt to extort or bribe Johnston.

**Krozel/Roadbuilders Allegations:**

18

<u>**Count 19**</u> alleges attempt to commit extortion in that from September 2008 through Dec. 9, 2008, Blagojevich attempted to obtain political contributions from Krozel under color of official right and induced by use of fear of economic harm.  (18 USC 1951(a) and 2).

<u>**Count 20**</u> alleges attempt bribery in that from September 2008 through Dec. 9, 2008, Blagojevich attempted to obtain political contributions from Krozel in connection with the tollway program.  (18 USC 666(a)(1)(B) and 2).

The government did not provide sufficient evidence to convict Blagojevich of (attempt) extortion or bribery of Krozel.  Testimony at trial was that in September 2008, Monk met with Blagojevich and Krozel in the FOB Office about fundraising. Krozel testified they also talked about tollway programs including a $1.8 billion program that was about to be announced and a $5 billion program in 2009.  Krozel said the tollway programs would help his company and industry.  Monk testified Blagojevich talked about the ethics bill and Krozel said he would see if he could help with fundraising.  Monk testified that after the meeting Blagojevich said they need to get $500,000 from him.  Monk testified the $1.8 billion tollway project was announced October l5, 2008.  On cross-examination, Monk testified that Blagojevich never told him to tell Krozel he would not do the $6 billion program if he did not contribute.

Harris testified that in 2008 Blagojevich was looking at options involving the tollway and implementing programs to continue construction.  Harris also testified that the other programs required legislative approval.  There was testimony that if

19

Blagojevich approved the $6 billion program, it could compete with attempts at passing the capital bill.

Wyma testified that on October 6, 2008, he met with Blagojevich in the FOB office. Wyma testified that Blagojevich said he would announce a $1.8 billion tollway plan and had Monk go to Krozel for a $500,000 contribution. Wyma testified that Blagojevich allegedly said he wanted to see how the roadbuilders performed and if they did not perform, "f--- them." Wyma testified that he interpreted the "f--- them" and that Blagojevich never said he would not announce the program if the road builders didn't 'perform.'

Krozel testified that he felt pressured by Blagojevich to contribute and that Blagojevich might not do a bigger tollway announcement for $6 billion if he did not. On cross-examination, Krozel testified that Blagojevich had already announced the $1.8 billion program before he asked if Krozel could support him with fundraising. Krozel admitted that when he first talked to the FBI, he told the F.B.I. he did not feel pressured by Blagojevich.

Again, this testimony is insufficient to establish guilt. There is no credible evidence that this was a quid pro quo or a bribery. That Blagojevich may have used colorful language, does not make this a bribery or extortion. Blagojevich never improperly solicited Krozel, nor sent anyone else to do so.

<u>Senate Seat allegations:</u>

<u>Count 21</u> alleges that Blagojevich conspired with Robert Blagojevich and Harris to commit extortion in relation to appointing a senator. (18 USC 1951 and 2).

<u>Count 22</u> alleges that between October 2008 and Dec. 9, 2008, Blagojevich and Robert and others attempted to commit extortion with various individuals in relation to the senate seat, under color of official right. (18 USC 1951(a) and 2).

The government did not provide sufficient evidence to convict Blagojevich of (attempt) extortion or bribery or conspiracy (Count 23) in relation to the senate seat.

Even in a light most favorable to the government, the evidence is insufficient to establish conspiracy, extortion, bribery or any attempts. As detailed supra, Blagojevich never directed anyone to, and never himself engaged, in any illegal dealings for the senate seat. Blagojevich considered and discussed options and "plays" – ranging from ambassadorships to HHS to Change to Win to a health care non-profit to a Lisa Madigan deal. This was political talk – it was negotiations, advisory sessions and political horse-trading. Blagojevich never corruptly solicited anyone. Blagojevich never engaged in (or attempted to engage in) a quid pro quo with Jesse Jackson Jr. or his representatives. An analysis of the calls and testimony introduced by the government shows that there was never an intent to commit a crime.

No elements of conspiracy, bribery, extortion or attempt are sufficiently established by the government's evidence. Judgment of acquittal should enter.

21

With regard to the allegations of conspiracy, the government has not proven that Blagojevich ever agreed to enter into a conspiracy nor that there existed a unified purpose or that he ever acted in furtherance of a conspiracy.

Even taking the government's evidence in the light most favorable, there is no credible evidence that Rod Blagojevich agreed to be a part of a conspiracy. There is no sufficient evidence to show that Blagojevich took actions in furtherance of a conspiracy.

To prove conspiracy, the government must establish (1) an agreement, (2) an unlawful object, (3) knowledge and specific intent (and, in a §371 prosecution, (4) an overt act). Mere knowledge without agreement does not meet the element of knowledge and intent. The conspirators must know of the conspiracy's purpose and must knowingly participate in it. This knowing participation must be to achieve an unlawful objective. The defendant must also intend to participate in the conspiracy. Moreover, conspiracy to commit a specific offense only exists when there is sufficient evidence of at least the degree of criminal intent required for the substantive offense. *Ingram v. United States*, 360 U.S. 672 (959). The § 371 conspiracy requires proof of an overt act.

The essence of any conspiracy is the agreement. That was not proven in the government's case. Even viewing the evidence in a light most favorable to the government, the evidence is insufficient to establish that Blagojevich knew of an alleged conspiracy or intended to join it. *See United States v. Stephenson*, 53 F.3d

836, 846 (7th Cir. 1995) ("participatory link must be demonstrated with substantial evidence").

The result is a "hopeless variance" in the proof between the crime charged and the evidence presented at trial. *See United States v. Freeman*, 208 F.3d 332, 340-43 (1st Cir. 2000); *United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988) ("'If an indictment alleges one [scheme], but the evidence can reasonably be construed only as supporting a finding of multiple [schemes], the resulting variance . . . is reversible error if the appellant can show that he was prejudiced thereby.'"). The evidence presented in this case, even when viewed in the light most favorable to the government, is insufficient to prove the purpose of the conspiracy or a single scheme to defraud. There is prejudice to Blagojevich by the variance between the scheme charged in the indictment and the schemes supported by evidence. *See United States v. Williams*, 272 F.3d 845, 863 (7th Cir. 2001). It would be untenable to submit these charges to the jury charging a conspiracy to which there is insufficient proof that Blagojevich even knew of its existence, let alone was a member.

Courts are bound to scrutinize criminal conspiracy charges carefully to make certain that its wide net does not "ensnare the innocent as well as the culpable." *Dennis v. United States*, 384 U.S. 855, 860 (1966). The government again in this trial tried to impute Monk and Rezko's criminal acts to Blagojevich. This was highly prejudicial particularly because there is no credible evidence that Blagojevich ever entered into a conspiracy.

23

Moreover, the allegations in this case attempt to criminalize actions that Blagojevich was legally entitled and permitted to do (e.g., trying to help his wife find work; considering appointing himself to the Senate, etc.). To allege these acts as part of a conspiracy is improper. These facts cannot sustain a finding of a conspiracy.

For example, it would have been legal and permissible for Patti to work for the state or to be on a board. Taken in the light most favorable to the government, this charge cannot be sustained. Allegations regarding the Pollution Control Board do not allege any wrongdoing at all – the allegation serves only to prejudice the defendant for something that is legal and commonplace. Moreover, testimony regarding the meetings set up for Patti after she passed her Series 7 exam show that the meetings were for networking and to learn about the business. No one was asked to give Patti a job at these organizations in exchange for state business. There was no criminal element presented by the government. Even regarding Blagojevich's comment to Harris (about the institutions not doing state business), made in frustration when Patti's follow-up calls went unreturned, Harris testified that Blagojevich was agitated and that was the end of it – there was no follow up by Harris or Blagojevich.

## MOTION TO DISMISS INDICTMENT BASED UPON VIOLATIONS OF THE FIRST AMENDMENT

The recordings and evidence in this case show that Blagojevich was engaged in routine political conversations and the legitimate solicitation of campaign

contributions from long-standing supporters. The charges in this case violate Blagojevich's rights to freedom of speech and expression. U.S. Const. Amend. I. Political speech and campaign contributions specifically are protected under the First Amendment. *Citizens United v. Federal Election Commission,* 130 S.Ct. 876 (2010) (campaign contributions protected under First Amendment).

Blagojevich hereby renews and incorporates his previously-filed Motion to Dismiss Based on the First Amendment. The violations should result in acquittal and dismissal of the indictment.

## MOTION TO DISMISS PORTIONS OF INDICTMENT TO WHICH THE GOVERNMENT PRESENTED NO EVIDENCE

There are many allegations contained in the indictment to which the government provided no evidence or testimony. These allegations should be dismissed and stricken from the indictment. By advance leave of Court, the defense seeks to present these arguments orally in Court.

To make Blagojevich's position clear – the allegations to which the government has presented no evidence should be barred from evidence if the defense puts on a case, in the event this Motion for directed verdicts is denied. It would be fundamentally unfair for the government to elect not to present evidence on charges in the indictment, then have the defense put on a case (not addressing the allegations from the indictment that were omitted in the government's case-in-chief), only to then permit the government to raise the allegations it had already omitted from its case.

25

The allegations to which the government introduced no evidence should be stricken and dismissed *instanter*.

## MOTION TO DISMISS INDICTMENT DUE TO CONSTRUCTIVE AMENDMENT AND DUPLICITY/MULTIPLICITY

The indictment in this case contains impermissible multiplicity and duplicity. See generally, *United States v. Tanner,* 471 F.2d 128, 138 (7th Cir. 1972); *Gerberding v. United States,* 471 F.2d 55, 28 (8th Cir. 1973); *United States v. Krol,* 374 F.2d 776, 778-79 (7th Cir. 1967).

In addition, Blagojevich presents a somewhat unique argument that the indictment in this case has been constructively amended by the government's abandonment of a significant number of allegations. Blagojevich is cognizant of the fact that constructive amendment arguments are traditionally made when the government broadens the indictment rather than narrows it. However, in the instant case, the government's change in position during the trial can be sufficient to work a constructive amendment of the indictment even where the court does not formally alter the elements of the offense in the jury charge. *United States v. Beard,* 436 F.2d 1084 (5th Cir.1971). Additionally, the harm to Blagojevich is that but for the extensive prejudicial evidence presented, particularly with regard to honest services violations, the grand jury likely would not have indicted in the first place.

The indictment should be dismissed.

26

\*　　　　\*　　　　\*

Additionally, defendant seeks leave of court to renew this motion or parts of this motion at the close of evidence in this case (should any of the counts survive the instant motion).

WHEREFORE, for all of the foregoing reasons, this Court should enter judgment of acquittal on every count (Counts 3, 5-23) and dismiss the indictment.

Respectfully Submitted,

/s/ Lauren Kaeseberg
One of the Attorneys for
Rod Blagojevich

**Attorneys for Rod Blagojevich**
SHELDON SOROSKY
AARON GOLDSTEIN
LAUREN KAESEBERG
ELLIOTT RIEBMAN
158 W. Erie
Chicago, IL 60654