UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 08 CR 888 |
| v. | ) | Hon. James B. Zagel |
| | ) | |
| | ) | |
| ROD BLAGOJEVICH, et al. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT
ROD BLAGOJEVICH'S MOTION FOR JUDGMENT OF ACQUITTAL,
<u>ARREST OF JUDGMENT, OR NEW TRIAL</u>**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     Defendant is Entitled to No Posttrial Relief Based On
        Purported Pretrial Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Defendant is Entitled to No Posttrial Relief Based On
        Purported Errors in Jury Selection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.     Defendant Is Not Entitled to Posttrial Relief Based On
        Purported Trial Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

V.      Defendant is Not Entitled to Posttrial Relief Based On
        Purported Instructional Errors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

VI.     There Were No Overarching Errors Warranting Posttrial Relief . . . . . . . 114

VII.    The Jury's Verdicts Were Supported by Ample Evidence. . . . . . . . . . . . . 122

VIII.   The Court Properly Denied Defendant's Motions for Mistrial . . . . . . . . . 125

IX.     Defendant's Requests for Miscellaneous Relief Should Be Denied. . . . . . 126

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ROD BLAGOJEVICH, et al. ) | No. 08 CR 888<br>Hon. James B. Zagel |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT
ROD BLAGOJEVICH'S MOTION FOR JUDGMENT OF ACQUITTAL,
ARREST OF JUDGMENT, OR NEW TRIAL**

The United States of America, by its attorney, Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully submits the following response in opposition to defendant Rod Blagojevich's Motion for Judgment of Acquittal, Arrest of Judgment, or New Trial.

## INTRODUCTION

Defendant seeks to overturn the judgment of the jury with claims that his prosecution was unjust, and that his trial was marred by improper and unfair tactics and bias. In making these arguments, defendant disregards what the evidence at trial established, and what the jury concluded—that defendant knowingly engaged in a scheme to abuse his power as Governor in exchange for personal financial gain. In reality, there was no bias, manipulation, or unfairness on the part of the prosecution, judge or jury. Defendant was fairly convicted by a jury of his peers based on overwhelming evidence, and his post-trial motions therefore should be denied.

# ARGUMENT

## I.  Applicable Legal Standards

Defendant seeks relief under Rules 29(c), 33, and 34 of the Federal Rules of Criminal Procedure.[1] To obtain relief under any of these rules, the defendant must meet a high burden.

In order to obtain judgment of acquittal under Fed. R. Crim. P. 29(c), the defendant must establish that, "consider[ing] the evidence in the light most favorable to the prosecution, [and] drawing all reasonable inferences in the government's favor, . . . no rational jury could have found the defendant to have committed the essential elements of the crime." *United States v. Macari*, 453 F.3d 926, 936 (7th Cir. 2006) (citations and internal quotation marks omitted).  Such relief should be denied unless the Court finds that "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (citing *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999)).

In order to obtain a new trial under Fed. R. Crim. P. 33, the defendant must establish that a new trial is required "in the interests of justice." A new trial may be granted based on errors or omissions during trial, but only where such errors or

---

[1] Defendant also purports to seek relief under Fed. R. Crim. P. 34, but he develops no argument or claim that the indictment or information fails to charge an offense, or that the court lacked jurisdiction of the charged offense.  *See* Fed. R. Crim. P. 34. This claim is one of a number of defendant's posttrial claims that are undeveloped and therefore waived.  *See United States v. Collins*, 604 F.3d 481, 487 n.2 (7th Cir. 2010) (perfunctory and undeveloped arguments unsupported by pertinent authority are waived); *United States v. Berkowitz*, 927 F. 2d 1376, 1384 (7th Cir. 1991) .

omissions jeopardize the substantial rights of the defendant. *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (citation omitted), *overruled on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005). In determining whether to grant a new trial, a court should exercise "great caution" and be "wary of second guessing the determinations of the . . . jury." *United States v. Gillaum*, 372 F.3d 848, 857-58 (7th Cir. 2004) (citing *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir.1993)). It is well-settled that a Rule 33 motion should be granted based on insufficient evidence only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998).

As demonstrated below, defendant has not come close to meeting any of the applicable standards for relief.

## II. Defendant is Entitled to No Posttrial Relief Based on Purported Pretrial Errors.

### A. The Court Properly Granted the Government's Motions in Limine.[2]

Contrary to defendant's contention, this Court committed no error, much less harmful error, in granting the government's pretrial motions *in limine*. It is well settled that neither a defendant's right to offer testimony, nor his right to cross-examination, is absolute. *E.g., Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (stating that "[t]he accused does not have an unfettered right to offer testimony that

---

[2] Defendant mischaracterizes the government's motions *in limine* as being intended to preclude lines of questioning, arguments, and tactics that had been "successfully employed" by the defense during the first trial. Mot. 11-12. As stated in the government's motion and the supporting reply, the relief sought by the government was to bar irrelevant and misleading inquiry and arguments already ruled improper by the Court, and thus ensure a fair and orderly trial. R. 657 at 1, R. 666 at 1.

is . . . inadmissible under standard rules of evidence"); *Tyson v. Trigg*, 50 F.3d 436, 444 (7th Cir. 1995) (stating that "[a] court does not violate the Constitution every time it sustains an objection to the testimony of one of the defense witnesses, or for that matter every time it excludes one of those witnesses altogether"); *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (noting that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross examination based on concerns about, among other things, harassment, prejudice, [and] confusion of the issues"). In this case, the limits set by the Court prior to trial conformed to the Rules of Evidence and were reasonable; whether considered singly or in combination, the Court's pretrial rulings in no way impinged on the defendant's Fifth or Sixth Amendment rights.

### 1.    Wiretapping Procedures and Minimization

As this Court correctly determined, neither the existence or number of conversations not played or recorded, nor the manner in which agents conducted court-authorized interceptions, were relevant to any matter to be decided by the jury, and the presentation of evidence and arguments concerning these issues posed a substantial risk of confusing and misleading the jury. Such evidence and arguments were therefore properly excluded pursuant to Fed. R. Evid. 401 and 403.[3]

---

[3] Unlike its other pretrial rulings concerning evidence, the Court's exclusion of this evidence was not conditional pending the laying of a foundation of relevance. Nevertheless, as discussed below, despite the Court's ruling, defendant was able to put these issues before the jury in cross-examining Special Agent Daniel Cain, and in the defendant's trial testimony.

In his posttrial motion, Mot. 13-15, defendant repeats the same claims made before and during trial,[4] that the existence of unplayed and unrecorded conversations, and the minimization procedures that led to certain conversations not being recorded, were relevant and admissible to show his "innocent intent." Specifically, defendant argues that he was entitled to introduce this evidence in order to (1) contradict the "false impression" created by the government that "there was a linear scheme at work," and that "all of the conversations involving Blagojevich were criminal in nature," *id.* at 13; (2) show "that Blagojevich talked to his advisors and others about the facts at issue in this case, on calls other than what the government presented," and that defendant had "innocent intent," *id.* at 13; and (3) show that the government had unfairly and misleadingly "cherry-picked" and "redacted" the calls it presented, *id.* at 13-14. Defendant's protestations notwithstanding, it is obvious that the evidence defendant sought to admit did not, in itself, have any tendency to show that unplayed or unrecorded conversations were "non-criminal" or "innocent." Only by speculating about the content of those conversations—that is, by assuming that the conversations reflected "innocent intent"—could this evidence be relevant to defendant's intent, or to

---

[4] In addition, it was repeatedly claimed in extrajudicial public statements made by defendant and his counsel that playing "all" the tapes would establish defendant's innocence. *See* R. 439, 704.

5

the motives of government agents in conducting the interceptions.[5] The Court correctly rejected defendant's efforts to urge jurors to engage in this type of speculation.[6]

The Court likewise properly rejected defendant's effort to introduce the proffered evidence to show purported "mistakes" and "incompetence" on the part of agents in conducting the court-authorized interceptions. The jury in this case was not called upon to determine the propriety of the agents' conduct and, to the contrary, at the time the government's motion *in limine* was granted, this Court had already determined that the agents had acted properly. Under these circumstances, defendant was not entitled to make unfounded, general attacks on "the competence of the investigation," *see United States v. Jackson*, 540 F.3d 578, 590 -591 (7th Cir. 2008) (affirming district court's exclusion of cross-examination of agent concerning recantation of government witness on grounds that the recantation was only marginally relevant and presented the risk of confusing the issues).

---

[5] For the same reasons, the existence and number of unplayed or unrecorded conversations had no place in "piecing together" meaning, as suggested by defendant, Mot. 15. It is the content, rather than the number, of the conversations that matters.

[6] Defendant also takes issue with the Court's additional rationale that this evidence was not admissible for the purpose of showing that defendant acted lawfully on other occasions, and the bank robbery analogy used by the Court to illustrate its point. Mot. 14. Contrary to defendant's contention, the Court did not "fundamentally misunderstand" defendant's argument. Instead, the Court correctly noted that, even if the unrecorded and unplayed conversations established that defendant "talked to his advisors and others about the facts at issue in this case, on calls other than what the government presented," *id.* at 13, and that those conversations reflected that defendant acted lawfully during those conversations, those facts would not make it any more or less likely that defendant acted unlawfully in connection with the charged offenses and, thus, would nevertheless be irrelevant and inadmissible.

6

Because the circumstances are clearly distinguishable, defendant's reliance on *Kyles v. Whitley*, 514 U.S. 419 (1995), is misplaced. The Court in *Kyles* did not, as defendant suggests, uphold a general right to challenge the reliability of the government's investigation in all cases. Instead, it held that evidence reflecting poorly on both cooperating witnesses and the government's investigators should have been disclosed to defendant, because that evidence could have been used both to impeach the cooperating witnesses and to challenge the reliability of the government's investigation. *See* 514 U.S. at 441-46, 446, n. 15. In contrast to this case, the probative force of the cooperators' testimony in *Kyles* depended in significant part on the circumstances in which it was collected, that is, without being subjected to scrutiny by the agents despite red flags in the cooperators' stories. *Id.* Here, the Court found that the court-authorized interceptions were made properly, conscientiously, and under the regular supervision of the Chief Judge, and the probative force of the intercepted conversations presented to the jury in no way depended on whether other conversations were not recorded (particularly since the defendant was free to testify[7]

---

[7] Defendant inaccurately claims that he was precluded from offering such testimony. Mot. 15. In fact, defendant was prohibited only from drawing unnecessary attention to redactions marked by asterisks, but was free to, and did, testify about relevant unrecorded and unplayed conversations. *See* 5/27/11 a.m. Tr. 40-43, 49-50; 5/31/11 a.m. Tr. 80-81; 5/31/11 p.m. Tr. 58-59, 74-75, 89-90, 115; 6/1/11 a.m. Tr. 49, 50, 51-52, 56, 101-103; 6/1/11 p.m. Tr. 10, 87-88; 6/2/11 a.m. Tr. 26-27, 28, 62, 92-93, 94, 107, 112, 117, 120, 123; 6/2/11 p.m. Tr. 69-70; 6/7/11 p.m. Tr. 21-22. In addition, one of the jury instructions specifically stated that the jury could consider conversations described in testimony. Moreover, during the course of defendant's testimony, counsel repeatedly used transcripts to refresh defendant's recollection in a manner that made clear that the conversations about which defendant was testifying had been recorded.

regarding his independent recollection of relevant unrecorded and unplayed conversations).[8]

Moreover, it was made perfectly clear to jurors that they were not hearing every conversation in which defendant engaged during the relevant time period, and this precluded any possible prejudice, even if the Court's ruling were erroneous.[9]  Because the jury was well aware that every one of defendant's conversations was not played or recorded, under all of these circumstances, as the Court correctly found, the only purpose to be served by focusing the jury's attention on unplayed and unrecorded conversations was an improper one—that is, to confuse the issues and distract and mislead the jury by "attempting to suggest by the back door that the government ha[d]

---

[8] The Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973), is equally unavailing.  As discussed below, this Court excluded certain recorded statements of the defendant, not by applying the hearsay rule or other evidentiary rules "mechanistically," but by properly enforcing "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *See id.* at 302.

[9] Defendant incorrectly states that Special Agent Cain testified regarding wiretap procedures and categorizations such as "pertinent," and that an instruction was given "in lieu of" Special Agent Cain's testimony. Mot. 14, 15.  In the retrial, Agent Cain provided minimal testimony regarding wiretap procedures.  The Court explained to the jury reasons for their not hearing all of the recorded conversations, and instructed the jury to draw no conclusions from a part of a tape not being played or included in the transcript, but it did so *only after* the defense violated the Court's prior orders by (1) inquiring regarding unplayed conversations and raising the issue of minimization on cross examination of Agent Cain; and (2) in defendant's testimony, by drawing attention to redactions marked by asterisks, in an attempt to suggest that the government was deliberately withholding from the jury evidence favorable to the defense, 6/1/11 a.m. Tr. 73-81. In addition, as stated earlier, the defendant and others testified regarding conversations that were not recorded or not played, and the defense made a point of using transcripts of unplayed conversations in examining defendant.

deliberately eliminated favorable evidence." 6/1/11 a.m. Tr. 73 -81. This suggestion was false and improper, and the Court acted well within its discretion in excluding the proffered evidence and arguments.

### 2. Good Acts and Politics as Usual

Defendant raises one specific challenge to the Court's exclusion of evidence of defendant's accomplishments in office and other good or non-corrupt conduct: he claims that the Court erred in granting the government motion *in limine* to bar evidence related to defendant's interest in, and history of supporting, children's health care.[10] Any remaining challenges to the Court's ruling on this motion are waived as undeveloped.

Contrary to defendant's contention, Mot. 16-17, defendant's interest in children's health care was not probative of defendant's criminal intent or lack thereof. Defendant argues that this evidence was admissible to explain "why he believed he was qualified to be Secretary of Health and Human Services." *Id.* What was at issue, however, was whether defendant knowingly sought to exchange the Senate seat appointment for the

---

[10] Defendant engaged in a pattern of offering evidence of non-corrupt conduct to prove that he acted lawfully in connection with the charged offenses. In addition to evidence related to his interest in children's health care, defendant also sought to introduce evidence concerning a 501(c)(4) organization he had formed earlier and from which he had not profited, in order to prove that he would not have profited from the 501(c)(4) organization he discussed in connection with the Senate seat. Defendant contends, Mot. 146, that the exclusion of the proffered 501(c)(4) evidence evinced bias on the part of the Court. To the contrary, the Court's rulings, issued both before and during trial, excluding evidence of non-corrupt conduct were correct and in no way reflected judicial bias. What defendant fails to acknowledge is that there is a difference between good acts and good faith.

position of HHS Secretary—not whether defendant believed that such an exchange would be a fair one, or whether he believed that he would make a good Secretary if an agreement were reached. Thus, defendant's reasons for viewing himself as qualified for the HHS cabinet post were not relevant to the jury's inquiry.

Nor, as defendant contends, was evidence related to defendant's interest in children's health care admissible to show "whether or not he would form the intent to shake down Children's Memorial Hospital." *See id.* at 17. The issue at trial was not whether defendant *would* form the intent to extort CMH and its CEO, but whether he did so. Needless to say, defendant's interest in children's health care shed no light on his statement to Bob Greenlee that it was "good to know" that he had discretion to hold back the reimbursement rate increases for children's health providers. Indeed, if anything, defendant's interest in children's health care arguably made CMH and Magoon more, rather than less, attractive as victims, as defendant was likely to see an exchange of a rate increase for campaign contributions as a "win-win" situation unlikely to attract scrutiny.

Defendant argues generally that the Court's exclusion of evidence concerning non-corrupt political conduct prevented him from showing that he engaged in lawful political activity rather than crimes, and allowed the government to "demonize" or "criminalize" lawful political activity. As the Court noted, "[T]here is legal horse trading. There's also illegal horse trading . . . ," 5/31/11 p.m. Tr. 127-131, and the jury's job was to determine whether defendant engaged in one or the other by applying the legal standards provided by the Court, not by judging defendant's conduct against the

10

conduct of others. Conduct is criminal if it violates statutory prohibitions; allegations that such violations are commonly committed do not make such conduct less so. As the Court correctly held, R. 349 at 4-5, this type of "politics as usual" argument is not a valid legal defense.

Defendant insists that he was not arguing "politics as usual" but the fact that defendant did not expressly argue that the jury should not convict him because others had gotten away with the same conduct, Mot. 18, is of no moment. It is equally improper to suggest, as defendant sought to do, that conduct satisfying all of the elements of a charged offense cannot be criminal because it comports with the usual custom and practice in the "political world," *see id.* at 17, or that, "[T]he potential appointment of Health and Human Services is a political act, not a crime. Blagojevich was convicted of being a politician, and participating in what he believed to be a legal manner," *see id.* at 41. These arguments plainly suggest that conduct should be overlooked, even if it is technically illegal, because it is proper, necessary, or simply the way of life in politics. *See, e.g., United States v. Warledo*, 557 F.2d 721, 730 (10th Cir. 1977) (affirming exclusion of evidence offered to explain the defendants' motives as irrelevant to whether their activity was "wrongful" under the Hobbs Act); *United States v. Boardman*, 419 F.2d 110, 114 (1st Cir. 1969) (affirming exclusion of evidence regarding the defendant's political beliefs because they were irrelevant to whether he acted knowingly and deliberately); *United States v. Stirling*, 571 F.2d 708, 735-36 (2d Cir. 1978) (denouncing efforts to defend a securities fraud case by implying that the charged criminal activities amounted to proper and routine business practices). Thus,

11

defendant's claims were simply another species of nullification argument, and the law is plain that it is improper for the defendant to suggest in *any* way that the jury should acquit the defendant even if it finds that the government has met its burden of proof. *See, e.g., United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.") (citations omitted).

In light of defendant's repeated acknowledgment, on tape and in his testimony, that he would not exchange official actions for personal financial benefits—in other words, that he knew where the line between legal and illegal exchanges was drawn—in this case, any variation of the "politics as usual" argument was highly likely to mislead and confuse the jury, and was properly excluded under Fed. R. Evid. 403. See Def. Transcript Binder Tab 3; 5/26/11 p.m. Tr. 52-53; 5/27/11 a.m. Tr. 70-73, 84-85; 5/31/11 a.m. Tr. 25-26, 64-65, 83; 5/31/11 p.m. Tr. 5, 67-73, 108 (pay to play in context of campaign contributions in exchange for Senate seat is "illegal"); 6/1/11 a.m. Tr. 43-44; 6/2/11 p.m. Tr. 74.

In any event, even if the exclusion of evidence concerning these matters were erroneous, such error was clearly harmless. First, the focus of defendant's defense was not that he exchanged official acts for personal benefits not knowing that his actions were illegal but, rather, that he never exchanged or sought to exchange official acts for

12

personal benefits.  Defendant presented this defense to the jury with respect to all of

the charged conduct, including the attempted shakedown of CMH.  *See*, for example:

> Q:  Rod, did you ever hold up the Chicago Academy school grant in order to get campaign contributions?
>
> A:  No. . . .
>
> Q:  Did you try to get campaign contributions in exchange for that school grant?
>
> A:  No."

5/26/11 p.m. Tr. 52-53.

> Q:  Did you ever attempt to shake down anybody for the Senate seat?
>
> A:  Absolutely not.
> Q:  Did you ever threaten anybody in exchange for the Senate seat?
>
> A:  Absolutely not.
>
> Q:  Did you ever demand anything in exchange for the Senate seat?
>
> A:  Absolutely not.

6/1/11 a.m. Tr. 43-44.

> Q:  Did you ever shake down Mr. Magoon?
>
> A:  No.
>
> Q:  Did you ever threaten Mr. Magoon to have a fundraiser for you?
>
> A:  No.
>
> Q:  Did you ever threaten Mr. Magoon to contribute campaign contributions to you?
>
> A:  No. . . .

13

Q:     Did you ever ask Mr. Magoon or have anyone ask Mr. Magoon a fundraiser in exchange for going forward with this pediatric rate increase?

A:     No.

Q:     Did you ever hold up this pediatric rate increase in order to get a fundraiser from Mr. Magoon?

A:     No.

5/31/11 p.m. Tr. 5.

Q:     Now, are you aware of the allegations against you regarding this recapture bill?

A:     Yes.

Q:     And are you aware of who Johnny Johnston is?

A:     Yes.

Q:     Rod, did you ever shake down Johnny Johnston?

A:     No.

Q:     Did you ever hold up this recapture bill in order for you to get campaign contributions?

A:     No.

Q:     Did you ever threaten Johnny Johnston with holding up this recapture bill so that you could get a campaign contribution?

A:     No.

5/26/11 p.m. at 101.

Second, despite the Court's rulings, defendant managed to put his interest in children's health care and the concept of "politics as usual" before the jury on several occasions. First, defendant repeatedly commented in his testimony on his interest in

14

children's health care, as well as well as on the early death of a relative at CMH. 5/31/11 p.m. Tr. 6, 26, 123. With respect to legal political activities, defendant commented on the need for fundraising multiple times. For example, when asked why defendant wanted to get a commitment for contributions from Johnston and other supporters, defendant answered that funds are needed to run a competitive campaign and then interjected: "And this is the system that we have in America, the U.S. Supreme Court has ruled its protected by the First Amendment." 5/27/11 a.m. Tr. 40. The Court sustained an objection by the government, but the answer was not stricken. *Id.*

Similarly, in his testimony regarding a recorded conversation with Doug Scofield regarding the possibility of trading the Senate seat for contributions to a new Section 501(c)(4) organization (Gov. Binder Tab 29) in which defendant asked Scofield, "But it's very commonplace, is it not, doing things like that?" defendant explained that he "was asking Doug if this is a common thing in politics, and he said it's not unusual." 6/2/11 a.m. at 37-38. Again, an objection was made and sustained, but defendant's answer was not stricken.

In addition, testifying about a conversation with John Harris regarding the Senate seat, the following was presented:

> Q:  And then you say, "Okay, now we should get something for that, couldn't I?" What were you saying there, Rod?
>
> A:  Just that. I'm asking John Harris his advice and his opinion on whether or not if, in fact, there's an interest by President Obama or Rahm or whomever for Valerie Jarrett, is there a potential *horse trade*—legal, always predicated on being legal—where there's something that I might

15

be able to get as part of that horse trade. That's what I'm asking him, what does he think about that."

5/31/11 p.m. at 121-22 (emphasis added).

In each of the above cases, and others, defendant conveyed to the jury the theme that he engaged only in lawful political activity or intended to do so and, thus, if there were any error in excluding evidence of good acts and non-corrupt conduct here, such error was harmless.

### 3.    Lay Opinions Regarding Legality[11]

Without identifying any particular evidence that he should have been, but was not, permitted to introduce, defendant challenges the Court's pretrial ruling barring lay opinions regarding legality without prior permission from the Court. Any error is thus waived as undeveloped.

Even if not waived, defendant's argument lacks merit. The Court was correct in requiring an advance ruling regarding admissibility, given the potential confusion to be caused by improper opinions on this subject. *See United States v. Locke*, 643 F.3d 235, 241 (7th Cir. 2011) ("[A] witness's opinion that the facts in a case meet the elements of the charged crime will likely constitute unhelpful testimony because it merely tells the jury what result to reach.") (citing *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009)); *United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994) (holding

---

[11] Defendant's arguments regarding purportedly improper questioning of witnesses by the government, and regarding the Court's decision to prohibit defendant from testifying regarding the belief that his conduct was legal are discussed *infra*, at 118 and 59.

16

that a court may properly preclude lay opinions regarding whether the conduct in issue was "unlawful" or "wilful," or whether the defendants "conspired," as the witnesses may misapprehend the legal relevant legal standards and the testimony may confuse the jury) (quoting *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980)); *United States v. Wantuch*, 525 F.3d 505, 512-15 (7th Cir. 2008)(holding that it was improper for government to ask witness to opine whether defendant believed his conduct to be "legitimate" or legal); *United States v. Van Eyl*, 2004 WL 1557331, at *3 (N.D. Ill. July 8, 2004), *aff'd*, *United States v. Van Eyl*, 468 F.3d 428, 437 (7th Cir. 2006) (holding that it was within court's discretion to exclude opinions regarding the legality or propriety of the defendant's conduct and including legally and morally charged words). There was no error.

### 4. Lack of Objections from Others

Defendant challenges, again without specificity, the Court's ruling granting the government's motion *in limine* to preclude questioning of the government's witnesses regarding a lack of objection by others.[12] His claim is thus waived as undeveloped.

Even if not waived, the claim has no merit. Contrary to defendant's suggestion, the Court did not exclude outright evidence of the absence of objections but, rather, granted the government's motion to require the laying of a proper foundation establishing that the lack of objections was meaningful to defendant, prior to putting the issue before the jury. This was entirely proper. A criminal defendant, like any

---

[12] Defendant's challenge to rulings made by the Court during trial are discussed *infra* at 59.

other party, is properly required to comply with the Federal Rules of Evidence. *See United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994) (defendant bears duty of demonstrating admissibility). It is not a violation of defendant's rights to require such compliance. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (holding rule precluding admission of polygraph evidence in court martial proceedings did not violate accused's right to present a defense). Although in different circumstances it may have been permissible to allow cross-examination on the subject with the expectation that foundation would be laid a later time, here, where, based on the first trial, it was clear that the eventual laying of foundation was by no means guaranteed, it was reasonable and prudent for the Court to preclude such cross-examination unless and until the necessary foundation was laid in the defense case. Ultimately, defendant chose not to testify regarding the absence of objections by others, and did not attempt to call witnesses, such as John Harris, in his own case. Thus there is no possibility that any error in the Court's ruling on the government's motion was not harmless.

### 5. Evidence Concerning Events After December 5, 2008

Once again, the Court required that defendant lay a proper foundation of relevance before raising before the jury events related to the racetrack bill and CMH that occurred after defendant's arrest, and events related to the Senate seat that occurred after the Chicago Tribune's publication of an article disclosing that defendant had been recorded by government investigators.[13]  The Court's pretrial order did not

---

[13] The Court granted the government's motion in limine to bar cross-examination
(continued...)

18

bar this evidence outright.[14]  Whereas the government did not, as defendant claims, Mot. 22, play numerous calls that occurred after December 5 (and in fact played only two December 5 calls related to the cancellation of the meeting with Nayak), defendant testified at length regarding post-December 5, 2008 conduct related to the Senate seat and CMH, but strategically avoided testifying regarding post-arrest conduct related to the racetrack (that defendant signed the racetrack bill six days after his arrest), presumably because that evidence ran counter to his testimony that he had avoided signing the bill to avoid any appearance of impropriety and public criticism, particularly in light of a call he received from Chris Kelly who advised that he was in the process of seeking a pardon.  Contrary to defendant's suggestion, Mot. 18, the government did not present evidence at the retrial related to the racetrack bill being signed or the CMH rate increase becoming effective.

### B.    The Court Properly Denied the Defendant's Motions *in Limine*.

As an initial matter, contrary to defendant's suggestion, the mere number of defense motions denied by the Court has no significance.  Mot. at 24-31.  Instead, it merely reflects the number of non-meritorious motions filed by the defense.[15]  The only

---

[13](...continued)
of the government's witnesses concerning these matters as beyond the scope of direct and irrelevant in the absence of a foundation for relevance to be laid, if at all, the defendant's case.

[14] The government addresses the Court's decision to exclude such evidence at trial *infra*, at 73.

[15] As a general matter, defense motions denied by the Court frequently fell into
(continued...)

question pertinent to defendant's request for posttrial relief is whether the Court denied *meritorious* motions filed by the defense. The answer to that question is no, it did not.

### 1. Defendant's Efforts to Exclude Evidence

The defendant argues that the Court improperly admitted evidence that was no longer relevant after *Skilling* was decided, or was cumulative. Mot. 24-25. Specifically, defendant argues that the following evidence should have been excluded, Mot. at 26:

- Evidence related to Patti Blagojevich obtaining a job through the defendant's use of his official position;

- Evidence related to the defendant's efforts to trade the Senate seat for campaign contributions from Emil Jones;

---

[15](...continued)

one of several categories: (1) motions for which relief was clearly legally unavailable, filed essentially as press releases, *e.g.*, R. 634 (Motion by Rod Blagojevich to Dismiss the Second Trial and Proceed to Sentencing in the Interest of Justice and Saving Taxpayer Funds); R. 608 (Motion by Rod Blagojevich to Present at Trial the Innocent Intent of Governor Blagojevich to appoint Lisa Madigan to the Senate Vacancy by Playing Relevant Excerpts of Government-Taped Recorded Conversations); and R. 614 (Motion by Rod Blagojevich to Lift the Protective Order in its Entirety); (2) motions supported by no legal authority whatsoever, *e.g.*, R.683 (Motion by Rod Blagojevich in limine to Bar Certain Evidence and Arguments in Accord with the Court's Order granting the Government's Motions in Limine); (3) motions that were previously explicitly waived by the defendant in a prior filing that the defendant himself signed, R. 617, 621 (motions filed to suppress the recordings), *see* Motion For Order Permitting the Playing of All Tapes and Waiver of Rights, R. 241 (where defendant stated that he "knowingly, intentionally, willfully, and voluntarily waives any right that he possess to move to suppress . . . recordings"); and (4) motions that simply repeated requests previously made and denied, *e.g.*, R. 331, 452, 618 (motions seeking dismissal of honest services counts); R. 649 (Motion by Rod Blagojevich for Discovery of 302 Summaries of President Obama). Obviously, a rule that held that a court could be found to be biased based solely on the number or proportion of motions it denied would serve only to encourage parties to file as many non-meritorious motions as possible.

- Defendant's statement after the conviction of former Governor Ryan;

- Two videos of the defendant's oath of office;

- Evidence related to defendant's efforts to obtain the firing of members of the Chicago Tribune editorial staff;

- Evidence regarding the State ethics exam taken annually by defendant; and

- Evidence regarding money spent on clothing.

All of this evidence was clearly relevant to the charged crimes. First, evidence related to defendant's efforts to use his position as Governor to obtain a job for his wife, and to trade the Senate seat appointment for campaign contributions from Emil Jones, were specifically charged in the second superseding indictment as part of the wire fraud scheme, and were relevant to prove the existence of, and defendant's involvement in, the charged scheme, as well as to prove defendant's intent. *See* R. 231 (Second Superseding Indictment, Count 3, ¶¶ 18-19; ¶¶ 4, 36-37, 38(f)). Second, defendant's statement made after the conviction of former Governor George Ryan, as well as the defendant's taking of the State ethics exam, demonstrated the defendant's intent, and his knowledge that he could not personally benefit from State action, and that personal benefits included more than just cash or campaign contributions. Evidence related to defendant's being sworn in as Governor proved that, in fact, the defendant was properly sworn in and the sitting governor at the time of the charged crimes and that he understood that he owed a duty to the people of Illinois. Evidence related to the Tribune editorial board was not presented in the government's case-in-chief but, rather, was properly used during the cross-examination of the defendant as evidence

21

of the defendant's lack of credibility as well as his intent. *See infra*, at 105. Finally, evidence concerning defendant's financial circumstances was direct evidence of the defendant's motive to commit the charged crimes, and evidence of his personal expenditures demonstrated that his financial difficulties were of defendant's own making.

None of this evidence was rendered irrelevant or inadmissible by *Skilling v. United States*, — U.S. — , 130 S. Ct. 2896 (2010). In *Skilling*, the Supreme Court ruled that honest services fraud under 18 U.S.C. § 1346 is limited to schemes to defraud involving bribes or kickbacks. *Skilling v. United States*, — U.S. — , 130 S. Ct. 2896 (2010). Because this case involved bribes, *Skilling* did not affect it. Nothing in the Court's decision in *Skilling* supports defendant's contention that the evidence defendant sought to exclude was irrelevant or inadmissible.

Defendant's reliance on *Old Chief v. United States*, 519 U.S. 172, 191–92 (1997), is entirely misplaced. "This is not a case in which a highly prejudicial form of evidence was admitted when another, less prejudicial form was available." *See United States v. Gaytan*, 2011 WL 3528753, *6 (7th Cir. 2011). Defendant asked the Court to exclude evidence, not to require that the government present evidence in a different form. In sum, *Old Chief* provides no authority for excluding the challenged evidence.

Moreover, even if the challenged evidence had been admitted under Fed. R. Evid. 404(b), there would have been no error. None of the evidence was admitted merely to show "propensity," as defendant claims, but rather, was admitted for legitimate reasons falling well within the limits of Fed. R. Evid. 401 and 403. In

22

several cases, the evidence was admitted with limiting instructions (*e.g.*, evidence related to the State ethics exam, evidence related to expenditures), which further ensured that the evidence would not be misused by the jury. Finally, to any extent that the Court erred in admitting the evidence, the error was clearly harmless in light of the overwhelming evidence of defendant's guilt.

## 2. Defendant's Efforts to Admit Recordings

The defendant also complains that all of the recordings he wanted admitted should have been admitted under Fed. R. Evid. 807, which is often referred to as the "residual hearsay" exception. Rule 807, in pertinent part, provides as follows:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Rule 807.

Under this exception, a hearsay statement must meet five requirements to be admissible: (1) circumstantial guarantees of trustworthiness; (2) materiality; (3) probative value; (4) the interests of justice; and (5) notice. *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999). "Critical to the admission of a hearsay statement under [Rule 807] is a finding by the district court that the statement is trustworthy." *Id.* As the Seventh Circuit has emphasized, the residual exception to the hearsay rule should be narrowly construed. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 631 (7th Cir. 2006); *Akrabawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998) ("We

23

begin by noting this circuit's emphasis on narrowly construing the residual provision to prevent it from becoming the exception that swallows the hearsay rule.").

Without identifying a single specific recording, or providing any detailed analysis, defendant essentially argues all parts of all of the recordings he sought to have admitted satisfied the stringent tests for admission of Rule 807. This is insufficient, as the admissibility of such recordings must be determined on a case-by-case basis. The issue is thus insufficiently developed and waived. Even if not waived, the type of blanket ruling requested by the defendant clearly would not have served the interests of justice; to the contrary, admitting all parts of all conversations on the wiretap under Rule 807, as defendant requested, would have obliterated the concept of "hearsay" and the Rules of Evidence. Such a ruling would have been particularly inappropriate given that defendant knew he was under investigation during the period of the wiretap and was specifically informed at one point that his conversations might have been recorded. And not a single statement the defendant offered under Rule 807 was provided in an open setting, under oath, or under penalty of perjury. *See United States v. Hooks*, 848 F.2d 785, 797 (7th Cir. 1988) ("A declarant's statement is trustworthy when it is made under oath and subject to prosecution for perjury, is given without coercion, and is corroborated by other testimony or evidence.").

The defendant's Rule 807 argument is further undermined by his stated theory of admissibility. First, the defendant incorrectly suggests that in the instant case "the alleged crime is the discussion of campaign fundraising." Mot. 28. Of course, the charged crimes were, in their simplest form, the defendant's trading State action for

24

personal benefits, not "the discussion of campaign fundraising." Second, despite his claim to the contrary, many of the conversations defendant sought to introduce were in no way relevant to the charged crimes. Third, although the conversations were in English, many of them required testimony from a witness to explain background and context in order for the jury to have a full understanding of what was being discussed.

Indeed, the example provided by defendant is a perfect illustration of why the wholesale admission of all recordings was impermissible under Rule 807. The defendant cites a recorded overhear conversation between Lon Monk and defendant on December 3, 2008, in which Monk and defendant conspire to shakedown John Johnston. (Mot. 28; Gov. Transcript Binder Tab 59). The defendant takes out-of-context two arguably exculpatory phrases used during the conversation. Both Monk and defendant testified about the conversation. Monk placed the disputed phrases in context based on the totality of the conversation, and explained how defendant and Monk were conspiring to shakedown Johnston which, when the conversation is taken as a whole, is clear. The defendant disputed Monk's interpretation of the conversation and provided his own version. As this example illustrates, this is not a case where the conversations were trustworthy and clear on their face.

The alternative suggested by defendant—to simply play hundreds of hours of tapes without anyone explaining the content of the tapes—not only fails to meet the requirements for admission under Rule 807, but would have resulted in mass confusion and waste of time. See Fed. R. of Evid. 403. Although the defendant repeatedly argues

throughout his motion that tape-recordings would have "corroborated" his testimony, the issue of "corroboration" was one left open by the Court *and never pursued by the defendant*. The Court repeatedly ruled during the hearings on defendant's motions to admit certain calls that, while the calls were hearsay in the first instance, if the defendant's statements about certain recorded conversations were challenged during cross-examination, the calls would likely be admissible as prior consistent statements under Fed. R. Evid. 801(d)(1)(B). Had the defendant chosen to do so, he could have sought to admit them to "corroborate" his version of the conversation. Defendant, however, never sought to admit any recordings as prior consistent statements after cross-examination, presumably because his version of the conversations was never challenged, and thus no such corroboration was required. Accordingly, the Court's conditional exclusion of the subject recordings provides no basis for posttrial relief.

### C. The Court Properly Denied the Defendant's Motions to Suppress.

#### 1. Motion to Suppress Wiretap Recordings Based on Inadequate and "Misleading" Affidavits

Defendant argues, again without specificity, that the Court deprived him of a fair trial by denying his motion to suppress evidence based upon the government's failure to provide probable cause in support of the wiretap applications (R. 621). Mot. 31. In his posttrial motion, defendant provides no grounds, factual or legal, in support of this proposition. Defendant simply claims that "[a]t a minimum this Court should have granted the defendant an evidentiary hearing" with respect to the claims made in his motion to suppress. *Id.*

26

The Court denied this motion to suppress, after full briefing and argument by the parties. Defendant has provided no basis, let alone any new basis, for why the Court's ruling deprived him of a fair trial, or why this Court should reconsider its ruling on the motion to suppress in this posttrial motion. Accordingly, any claim for relief based on the Court's denial of defendant's "Motion to Suppress Based on Misleading the Judge and the Failure to Recite Probable Cause" is waived. To any extent such claims are not waived, the government incorporates by reference the arguments made in its original response to the defendant's motion, R. 633.

### 2. Motion to Suppress Based on Improper Minimization

Prior to trial, defendant sought suppression based on purported deficiencies in the government's minimization efforts. R. 617. Defendant argued that suppression was required because (1) too many calls (or too much of certain calls) had been minimized, as well as that (2) too few of the calls involving William Quinlan had been minimized. *Id.* In his posttrial motions, defendant appears to have abandoned the claim, previously rejected by the court, that suppression was required because too many calls were minimized.[16] He continues to maintain, however, that suppression was required because the government improperly failed to minimize calls involving William Quinlan, and therefore obtained access to communications protected by the attorney-client privilege. Mot. 32.

---

[16] To any extent that this is not the case, the government incorporates by reference its Response to Defendant's Motion to Suppress Based on Improper Minimization, R. 645, and its filings related to one of defendant's motions to continue, which also addressed the minimization issue, R. 648, 654.

27

Nevertheless, defendant fails to identify any particular conversation that should have been minimized but was not, or any conversation that should have been minimized to a greater degree than it was. Defendant also fails to identify any concrete harm that purportedly resulted from the investigator's exposure to purportedly privileged communications. Thus, he has waived any error related to the minimization of potentially privileged communications.

Even if not waived, defendant's motion lacks merit. The Court was correct in denying defendant's suppression motion because (1) the government's efforts to comply with requirements related to minimization were not inadequate; (2) defendant waived any claim of attorney client privilege with respect to the wiretaps; (3) defendant waived any right to seek suppression of the wiretaps; and (4) none of the conversations involving William Quinlan were privileged. *See* R. 645.[17] Thus, even if defendant's claim were not waived, there would be no basis for relief. *See, e.g., United States v. Mansoori*, 304 F.3d 635, 646-649 (7th Cir. 2002).

---

[17] Defendant states, Mot. 33, that he revoked his waivers, thus suggesting, without supporting authority, that he was entitled to do so. Defendant requested, and the Court reasonably declined, relief from the waiver, and defendant has not specifically challenged that aspect of the Court's ruling. *See* Fed. R. Crim. P. 12(e). Defendant cites, and the government is aware of, no basis on which the defendant may unilaterally revoke his prior waivers. Thus, posttrial relief is precluded.

### D.     The Court Properly Denied Defendant's Motion to Dismiss.

This Court properly denied defendant's pretrial motion to dismiss based on the Supreme Court's opinion in *Skilling*.  As discussed above, because this case charged defendant with honest services fraud involving bribery, the Supreme Court's decision in *Skilling* had no impact on this prosecution.

Contrary to defendant's contention, the Court in *Skilling* neither expressly nor implicitly excluded cases involving the offering or giving of campaign contributions from the bribe and kickback "core" of honest services fraud.  In *Skilling*, the Court excluded from the reach of § 1346 pure conflict-of-interest cases, and upheld the constitutionality of the statute as applied to cases involving bribes and kickbacks.  *Id.* at 2931–32. The Court did not limit the reach of the statute to any specific type of bribery or kickback scheme, and did not exclude any others.  *See United States v. Lupton*, 620 F.3d 790, 804 (7th Cir. 2010) ("What supports Lupton's conviction is substantial evidence showing the existence, intent, and advancement of his scheme, not the precise means by which he planned to carry it out.") Thus, the mere fact that none of the bribery-kickback cases specifically listed in *Skilling* as examples of cases falling within the pre-*McNally* core of honest services fraud under §1346 involved campaign contributions in no way suggests that the Court intended to exclude campaign contribution cases from the reach of the statute.   To the contrary, in defining the scope of § 1346, the Court relied on, in addition to pre-*McNally* case law, "federal statutes proscribing—and defining—similar crimes," and cases interpreting such statutes, which clearly encompass schemes involving exchanges of official acts for

29

campaign contributions. *Skilling*, 130 S. Ct. at 2933-34 (citing 18 U.S.C. §§ 201(b), 666(a)(2), 41 U.S.C. § 52(2), *United States v. Ganim*, 510 F.3d 134, 147–149 (2d Cir. 2007) (Sotomayor, J.), *United States v. Whitfield*, 590 F.3d 325, 352–353 (5th Cir. 2009), and *United States v. Kemp*, 500 F.3d 257, 281–286 (3d Cir. 2007)). Because the second superseding indictment charged defendant with a bribery scheme, rather than, for example, a pure conflict of interest scheme, the honest services charges contained therein fell well within the "core" of honest services cases preserved under *Skilling* and defendant was not entitled to their dismissal.

Nor was defendant entitled to dismissal due to the purported absence of allegations or evidence of a "quid pro quo." The second superseding indictment charged (and the evidence ultimately proved) that defendant sought to obtain personal financial benefits in exchange for specific official acts, including the appointment of a United States Senator, the signing of legislation benefitting the horse racing industry, and approval of a reimbursement rate increase for pediatric doctors. Regardless of whether the bribe took the form of campaign contributions, the government was not required to allege (or prove) that the bribe payer and the official expressed their agreement to exchange official acts for personal benefits in so many words. "The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *United States v. Evans*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring); *accord United States v. Giles,* 246 F.3d 966, 972 (7th Cir. 2001); *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007). The law does

not (and did not prior to *Skilling*), permit defendants to insulate themselves from prosecution under §1346 simply by the shrewd use of inconspicuous language.

Defendant's prosecution did not rest on "speculation and interpretation of [defendant's] alleged sate of mind" which defendant could not foresee, as defendant claims; nor was this a case of "perceived" or "speculative" connections between the official actions defendant sought to trade, and the personal benefits he sought to receive. Instead, the second superseding indictment alleged, and the evidence proved, that defendant knowingly set out to trade specific official acts for personal benefits, including campaign contributions. Defendant was a skilled communicator who knew how to get his point across, and succeeded in doing so, as the evidence showed. Any possible doubt is resolved based on the fact that defendant was also convicted of bribery and extortion offenses based on the same efforts to exchange official actions for personal benefits. There is no due process violation here. *See Skilling*, 130 S. Ct. at 2933-934 ("A criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds.").[18]

Likewise, potential First Amendment concerns related to campaign contributions do not render § 1346 unconstitutionally vague as applied in this case. "The First Amendment does not protect political contributions made in return for an

---

[18] For all the same reasons, defendant's suggestions that the Seventh Circuit's current and proposed pattern instructions regarding 18 U.S.C. § 1346, 1951 and 666 misstate the law lack merit. Defendant's challenges to the instructions provided to the jury are discussed more fully *infra*, at 38.

explicit promise by the official to perform an official act." *United States v. Jackson*, 72 F.3d 1370, 1376 (9th Cir.1995); *see also Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected.").

There was no error in the Court's denial of defendant's pretrial motion to dismiss.

### E. The Court Properly Denied Defendant's Motions for Discovery and Admission of Evidence.[19]

This Court properly rejected defendant's requests for discovery of evidence that either did not exist, or that was completely irrelevant to any issue in the case, as well as a request for a hearing on these discovery issues.

#### 1. "Missing" Phone Calls

Inexplicably, defendant repeats in his posttrial motion the claim that he was entitled to discovery of recordings of two telephone calls or, failing that, a hearing to determine why the recordings were not preserved. Mot. 44. As defendant is well aware, neither recording ever existed. The first call the defendant cites is a call between John Harris and another individual that allegedly occurred on December 8, 2008. *Id.*

---

[19] Defendant makes, but fails to develop, the argument that the Court should have granted his motion for original tapes. Mot. 34. The argument is waived and, in any event, lacks merit given that the recordings produced to defendant were duplicate originals.

32

Although the call was not recorded on the wiretaps, Harris provided information about the call to the government during an interview session and that information was provided to the defendant. Harris was never entirely certain of where he was when he took the call or the phone line on which the call occurred. Thus, the likely reasons why the call was not intercepted are that Harris took the call on a non-wiretapped phone line, or that the call took place during a time his phone line was not being monitored. As the records provided to the defense make clear, there was no break in the wiretaps and no deletion of recordings that would account for this call not being recorded. The call was simply one of many that occurred during the fall 2008 time period, but were not recorded.

Nonetheless, the defendant was provided with Harris' recollection of the phone call. The government never disputed Harris' recollection of the call. Moreover, defendant testified about a conversation he had with Harris on December 8, 2008, during which Harris informed him about the content of the phone call at issue. 6/2/11 p.m. Tr. 69-70. Defendant's testimony on this issue was never challenged by the government. For whatever reason, the defendant chose not to call Harris in the defendant's case to testify about the phone call (probably because the content of the phone call between Harris and the other individual was not in dispute, and did not actually support a defense to the charges).

In short, as to the Harris phone call, there was no recording, and defendant provided no basis to hold a hearing to further address the issue. The content of the

conversation was admitted during the trial and thus there is no possibility that the Court's failure to hold a hearing related to the this issue caused prejudice to defendant.

The second call at issue, one between a member of the United States Attorney's Office and another individual (hereafter referred to as "the second call") also was not recorded. In addition, neither individual who participated in the phone call was called as a government witness at trial. Thus, this phone call presented no *Giglio* issue whatever. Nor did the call contain anything of an exculpatory nature as to the defendant and, therefore, it did not contain *Brady* material. Indeed, the defendant's statement that the second call "would have supported Blagojevich's defense, provided proof of innocent intent and corroborated the Madigan deal," Mot. 44, is wholly untrue and without any basis whatsoever. There was no error in the government not providing a second, unrecorded phone call to the defendant and no hearing was required on the issue. Defendant's unsupported claim, Mot. 45, that the failure to record the challenged calls constituted Constitutional error is baseless.

### 2. Obama 302 Report

The defendant complains that his inability to review a report of President Barack Obama somehow prejudiced him. According to the defendant, the President's public statements impeach Tom Balanoff because the President publicly stated that "no one attempted to broker a deal with Blagojevich" on the President's behalf. Mot. 46. The problem with defendant's argument is that the President's public statements are completely consistent Balanoff's testimony and with the facts and the other relevant facts, and therefore are not impeaching. Balanoff testified that the President (then

34

Senator) asked Balanoff to advocate for Valerie Jarrett for the Senate seat. Banaloff never testified that the President asked Balanoff to broker any deal for Valerie Jarrett or engage in any type of deal-making. And, in fact, no such directive was ever provided by the President to Balanoff. Further, the government never argued that the President directed, requested, or in any way suggested to Balanoff that Balanoff engage in deal-making for Valerie Jarrett. Consistent with defendant's efforts throughout the trial and his filing, defendant simply makes up facts that never existed and then suggests that information was unfairly withheld which could have been used to impeach the facts he has invented.

Defendant also argues, without any explanation, that this report was needed in order to question certain witnesses. Not surprisingly, defendant fails to explain how that could possibly be true, particularly given the fact the defendant received all of the reports of statements by those witnesses.

Finally, the defendant argues the report would have undercut the government's opening statement. The opening statement was not evidence. Rather, it explained that the defendant repeatedly committed the crime of attempting to shakedown the President, which crimes were complete upon the "ask" by the defendant regardless of whether they made their way to the President (which they did not). Since the report at issue did not undercut the evidence, it clearly did not undercut the statements of the lawyers. There was no error here and, even if there was, it could not possibly have resulted in prejudice.

### 3.    Recorded Conversations Related to Lisa Madigan

Defendant argues, without any supporting authority or detailed analysis, that the Court erred in rejecting his pretrial request to introduce 98 recordings purportedly related to Lisa Madigan.  Defendant's challenge to the Court's denial of this motion is therefore waived as undeveloped.[20]

In addition, defendant fails to acknowledge that the Court's pretrial rulings were subject to being revisited during the trial.  Defendant's challenges to the Court's denial of admission of recorded conversations which defendant sought to introduce is discussed *infra*, at 84.  Suffice it to say here that the Court's pretrial rulings on defendant's request to admit these recordings provides no basis for posttrial relief.

### 4.    Motion to Produce Rezko and Levine

The defendant complains, without supporting authority, that the Court erred in declining to enter an order allowing the defendant to interview either Antoin Rezko or Stuart Levine prior to trial.  Mot. 48-50.  Defendant misrepresents the Court's statements and ruling on the issues, and the validity of his claims, and provides no legal authority that supports his claim.

On February 14, 2011, the defendant filed a motion (also without supporting legal authority) seeking pretrial access to both Rezko and Levine.  R. 610.  In response to the motion, the government wrote letters to counsel for both Rezko and Levine, copying defendant's counsel, indicating that defendant's counsel was interested in

---

[20]  To any extent that the Court deems the issue not waived, the government incorporates by reference the arguments made in its original response, R. 609.

36

meeting with them ahead of trial, and that the government had no objection to such meetings. *See* Letters attached as Gov. Ex. 1 and 2.

On February 23, 2011, the Court held a status hearing at which the defendant's motion to interview Rezko and Levine was addressed. During the hearing, the Court noted that although it did not believe that it had the power to force either Rezko or Levine to meet with defense counsel ahead of trial,[21] it did have the power to force both Rezko and Levine to appear at trial. In addition, the Court offered to provide defense counsel with the opportunity to question both Rezko and Levine outside the presence of the jury so that defense counsel could determine whether they wanted to call either Rezko or Levine as witnesses.

At trial, defense counsel never subpoenaed Rezko or Levine, never sought the Court's assistance in procuring their appearance, and never sought to question either Rezko or Levine outside the presence of the jury. The defendant was provided with voluminous reports for both Rezko and Levine, yet in the instant motion (as well as the February 14th motion) defendant fails to cite any facts from the reports that he wanted to elicit at trial.

Defendant never even acknowledges that he could have called Rezko in his own case or that he was provided the unique opportunity of being allowed to question Rezko outside the presence of the jury to determine whether Rezko's testimony would be

---

[21] To date, defendant has offered, and the government is aware of, no legal precedent for permitting a Court to force a represented witness to meet ahead of trial with a defendant or defendant's counsel.

helpful. Moreover, defendant goes so far as to suggest that the Court's responses to these specific requests demonstrate bias on the part of the Court. The Court's failure to exercise some previously unrecognized (and non-existent) legal authority to force either Rezko or Levine to meet with defense counsel ahead of trial is not evidence of bias. Given the lengths to which the Court went to provide access to Rezko and Levine to the defendant, defendant's allegations make plain that defendant's cries of bias in this case are entirely baseless.

## III. Defendant is Entitled to No Posttrial Relief Based on Purported Errors in Jury Selection.

### A. Defendant's Challenges for Cause

The Constitution guarantees criminal defendants "due process of law" and the right to "an impartial jury." U.S. Const. amends V, VI; *Skilling*, 130 S. Ct. at 2912-13. These mandates are satisfied where a prospective juror has given final, unequivocal assurances, deemed credible by the judge, that for purposes of deciding the case, he can set aside any opinion he might hold, relinquish his prior beliefs, or set aside his biases or prejudicial personal experiences. *United States v. Allen*, 605 F.3d 461, 464 -465 (7th Cir. 2010) (omitting citations and internal quotations).

Prior beliefs concerning matters material to the case do not constitute bias in and of themselves. *Thompson v. Altheimer & Gray*, 248 F.3d 621, 624-25 (7th Cir. 2001). Only contestable beliefs about material matters that are irrational or unshakable constitute bias, because such beliefs render the juror unable to faithfully apply the law. *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal

38

quotations omitted)). In determining whether assurances of impartiality given by a prospective juror are credible, a court acts properly and within its discretion by considering the juror's emphasis, volume, inflection, and demeanor. *Allen*, 605 F.3d at 465. Jurors are not expected to express themselves "carefully or even consistently . . . ." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). Any erroneous failure to exclude a juror for cause is harmless unless that juror is actually seated. *United States v. Martinez-Salazar*, 528 U.S. 304 (2000); *United States v. Polichemi*, 219 F.3d 698, 705-06 (7th Cir.2000).

In this case, in jury questionnaires filled out before voir dire, a fair number of prospective jurors indicated that they had seen or heard public reports related to the case and, based on those reports, had formed opinions regarding defendant's guilt. During voir dire, this Court carefully and conscientiously followed up on these responses with probing questions and explanations of the requirements of the law and jury service, in an effort to determine whether or not the prospective jurors could set aside his or her prior opinions and decide the case impartially.

In some cases, the Court, after further questioning, found that the the juror's assurances of impartiality credible, and concluded that the juror would and could serve impartially. In others, however, despite assurances from the juror that the juror believed that he or she could set aside prior beliefs and be fair, the Court was not convinced, and excluded the juror for cause. For example, Juror 104 indicated that she thought, based on what she had heard, that the defendant was guilty. When the Court asked if she could put aside her opinion and decide the case on what she saw and heard

39

in the courtroom only, she responded that she "would hope so." Assessing her manner in answering this question and others like it, the Court was not satisfied that Juror 104 could be fair and struck her for cause. Similarly, Juror 210 stated in her questionnaire that she had heard media reports that defendant was guilty as charged. When the Court followed up on this response, Juror 210 indicated that she believed that she could set this opinion aside. Upon further questioning, however, Juror 210 responded that she believed it would take effort, but felt confident that she could set aside her views based on media reports. Despite this response, based on an assessment of Juror 210's manner in answering the Court's questions, the Court was not satisfied that she could be fair and impartial, and on this basis, struck Juror 210 for cause. These are just two examples. In toto, the record reflects that, far from merely accepting jurors' assurances at face value, the Court scrutinized the jurors oral responses and demeanor, and drew its own conclusions regarding each juror's ability to serve as an impartial juror and to decide the case based solely on the evidence and law.

### 1.    Juror 174

Defendant challenges the Court's decision not to excuse for cause eleven jurors. Only one of these jurors, Juror 174, ultimately was seated. Defendant argues that Juror 174 stated on his jury questionnaire that "the way things were going I figured possibly he'd be guilty," and that the Court never followed up on this response. Defendant is mistaken. The Court did follow up on Juror 174's response during voir dire and, upon questioning by the Court, Juror 174 stated that he did not look at news

on the internet, and indicated that he could and would set aside any outside influences in deciding the case if he were selected as a juror. After observing his responses and demeanor, the Court credited Juror 174's assurance of impartiality. Defendant offers nothing that undermines the Court's assessment. The Court was well within its discretion in declining to strike Juror 174 for cause.

Since Juror 174 is the only juror who defendant challenged for cause and who sat on the jury, his complaints about other cause challenges are, in effect, moot. As the Supreme Court has found, even if the Court should have stricken other potential jurors for cause and, thereafter, the defendant used peremptory challenges to remove those jurors, there is no error as long as the jury that sat in judgment was fair and impartial. *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) ("We hold . . . that if the defendant elects to cure [a cause] error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based constitutional right."). *See also United States v. Polichemi*, 219 F.3d 698, 705-06 (7th Cir. 2000). Although relief is precluded by defendant's inability to demonstrate that his case was decided by a jury that included biased jurors, we address the complaints defendant levels at the other potential jurors the Court declined to excuse. As demonstrated below, the Court properly exercised its discretion and authority in addressing both parties' motions to exclude jurors for cause.

41

### 2.      Jurors 163 and 187

Defendant challenges the Court's decision not to excuse two prospective jurors, Juror 163 and Juror 187, based on their jobs.   Neither of these prospective jurors ultimately was seated. Juror 163 was a career prosecutor in the Cook County State's Attorney's Office, and Juror 187 was a United States Probation Officer.  This Court questioned both of these prospective jurors carefully regarding their work and the potential impact their jobs might have on their ability to be impartial.  In response to the Court's questions, Juror 163 stated that she worked in the felony review section of the States Attorney's Office and that her role was to review evidence and determine whether there it was sufficient to justify moving forward with prosecution.  She said that in some cases she had decided that there was insufficient evidence to go forward, even though she believed that the target of the investigation was guilty.  She also said that she had recommended that prosecutions go forward in only 60-75 % of cases she reviewed. Without reservation, she said that she could be impartial in deciding this case.

Juror 187 stated that she had appeared before the Court, and that she may have met one of the defense lawyers.  She said that she did *not* know the prosecutors, and could not remember having a case with any of them. She assured the Court that any interactions she may have had with the prosecutors or defense counsel would not affect her ability to be fair.  She also assured the Court that, although she had a "not overly favorable" view of politicians, she could set aside her general views about politicians and base her decision in the case solely on the evidence.

The Court reasonably concluded based on their answers to the Court's questions and on their demeanor that Jurors 163 and 187 could and would decide the case impartially, based solely on the facts and law provided by the Court. Defendant disputes this determination solely based on the prospective jurors' jobs and, in the case of Juror 187, instances in which the juror came in contact with the Court and defense counsel through her job. "[G]overnment employment alone is not, and should not be, enough to trigger the rule under which an employee is disqualified from serving as a juror in a case involving her employer." *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000). In light of the credible assurances given by both jurors that they could and would be fair, the mere fact of their employment did not provide cause for their being excused.

### 3. Jurors Challenged for Prior Opinions Based on News Coverage

In the case of the remaining challenged prospective jurors, defendant relies heavily, if not exclusively, on responses to questions contained in the juror questionnaire, and ignores responses given by the jurors to the Court's questioning during voir dire. It is clear, though, that "the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more" is insufficient to establish bias. *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* Thus, the most important evidence relevant to determining bias is whether the prospective juror provided assurances, deemed

43

credible by the Court, that he or she could suspend prior beliefs and decide the case impartially. *See Thompson v. Altheimer & Gray*, 248 F.3d at 626-27. In each of the following cases, the Court properly determined, based on careful questioning and observation of the juror's demeanor, that the prospective juror would decide the case impartially, based solely on the facts and the law.

Juror 116 made several comments on the jury questionnaire that indicated that, based on news reports, he had reached the conclusion that defendant was guilty. However, after questioning by the Court, this prospective juror indicated that he could set aside his previous views.[22]

Juror 121 made several comments on his jury questionnaire requiring follow up. First, he stated, based on news reports, that "it sounds like Mr. Blagojevich is lucky he wasn't convicted." He also stated the belief that "obviously there was a good reason to indict." However, when questioned about his ability to set his prior opinions aside, Juror 121 stated, "first impressions stick with you," but, if he heard all the evidence, he "could make fair decision." With respect to his views regarding the indictment, the Court explained the difference between probable cause at the grand jury level and proof beyond a reasonable doubt at the trial, and Juror 121 acknowledged that he understood. Defendant's only complaint at this point is that the Court did not follow

---

[22] Contrary to defendant's characterization of the Court's questioning (as an "attempt to sanitize [the prospective juror's] answers"), it was apparent that the Court's questions were properly designed to distinguish between prospective jurors who could, and prospective jurors who could not, set aside prior beliefs regarding the defendant's guilt or innocence.

up on what the prospective juror meant by "a fair decision." Defendant fails, however, to explain how such follow up would have made a difference. The Court's failure to have Juror 121 define "fair decision" provides no basis to undermine the Court's determination that the juror could and would be impartial.

Juror 160 also gave several responses on his jury questionnaire requiring follow up. The Court explained the requirements of jury service, including the need to set aside any prior beliefs or information received outside the trial, and Juror 160 indicated by nodding "yes" that he understood the Court's explanation of the legal requirements for jury service. Juror 160 stated that he felt he had the ability to set aside all extraneous information and views, and assured the Court that his previous views would not be a barrier to deciding the case based solely on the facts. In addition, the juror stated that he was critical of *both* political parties, but that those views would not affect his ability to be fair. He also said that his pending bankruptcy proceedings would not affect his ability to be fair. The prospective juror ended by saying that "honestly," he thought he could put extraneous matters to one side. The Court reasonably credited Juror 160's answers to the Court's close questioning, and the defense has provided no reason to doubt the Court's determination.

Juror 164 suffered from a war injury that required medication and inhibited his ability to remain seated for extended periods of time. The prospective juror noted, however, that he had previously sat on a jury, and described the medication he took as merely "annoying." The Court advised that a juror with a similar problem had served on a previous jury and had been permitted to stand when necessary. With that, Juror

45

164 assured the Court that he would be able to serve. With respect to responses on the juror questionnaire regarding media coverage, the prospective juror said he believed he could keep any information he had seen in the media "off the scales." After listening to Juror 164's answers and observing his demeanor, this Court reasonably credited his assurances of impartiality.[23]

Juror 170 said on her questionnaire that it would take a strong case by the defendant to convince her that he was not guilty. After the Court explained that the defendant was not obligated to present a defense, Juror 170 acknowledged that she understood that was the law, and assured the Court that she would "follow the law." Contrary to defendant's suggestion, there is no reason why the Court's determination that Juror 170 would be impartial, made after questioning her and observing her demeanor, should be overridden by answers provided on the jury questionnaire.

Juror 176 advised that she had given money to CMH, and that her son had been treated there, but did not suggest that this fact would affect her ability to be fair. With respect to pretrial publicity, this prospective juror expressed familiarity with motions filed by the defense, and gave no indication that she had formed a belief regarding the defendant's guilt or innocence. She claimed that service could prove a hardship if she were not paid by her employer, but she did not say that she would not be paid.[24] Thus,

_____

[23] Several aspects of defendant's description of this prospective juror's comments are inconsistent with government counsel's notes.

[24] Based on the notes of government counsel, Juror 176 did not, as defendant contends, say that she would not get paid but, rather, stated that service would be a
(continued...)

there was no valid reason to excuse Juror 176 for cause, as the Court correctly determined.

Juror 193 expressed some difficulty with the prospect of judging another individual. In follow up questions, the prospective juror indicated that, based on what she had heard, she thought defendant was guilty. However, Juror 193 assured the Court that she could put opinions off to the side and decide the case based solely on the evidence. She said that she would listen to the entire trial and be open, that she believed she could be open-minded, and that she could (despite reservations regarding judging) decide the case if the government proved its case. After the Court explained the juror's duties, Juror 193 said that she had no issue with assuming her duty as a citizen.

Juror 198 stated, in response to Question 78 on the jury questionnaire that she had formed the opinion, based on what she had heard and read in the news, that defendant tried to use his office for personal gain. However, when asked whether she could set aside her opinions and be fair, Juror 198 assured the Court that she believed that she could and would be fair. The Court credited Juror 198's assurances, and defendant has provided no basis for reconsidering the issue.

## B. The Government's Challenges for Cause

A trial judge may exclude for cause any juror who is "unable to render impartial jury service." 28 U.S.C. § 1866(c)(2). A court has discretion in determining whether to

---

[24](...continued)
hardship *if* she did not get paid.

excuse a prospective juror for cause, based on the court's observations and assessment of the juror's credibility and demeanor during voir dire. *See United States v. Brodnicki*, 516 F.3d 570, 574 (7th Cir. 2008). Contrary to defendant's contentions, there was no abuse of discretion in the Court's exclusion of jurors for cause over defendant's objection.[25]

Juror 101 was properly excluded for cause based on hardship. She had two jobs, and said she would suffer hardship if she could not work. Before being formally excused, however, Juror 101 spoke to the media about the case, in violation of the Court's express instructions. Thus, even putting aside the issue of hardship, Juror 101 was properly excluded for cause.

Juror 104 was questioned regarding answers on her questionnaire. After careful questioning and observation, the Court found that Juror 104's answers were not credible. The defense does not challenge this determination.

Juror 106 had financial and childcare issues that would make it difficult for her to serve. She advised that her mortgage was "underwater," that she was currently experiencing extremely tight financial circumstances, and that the financial problems

---

[25] Although defendant has not made a formal objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), he does comment on the number of people of color the government challenged for cause. During jury selection, defendant expressed the same concern, Mot. 56, n.9, and the Court indicated its view that it was apparent that the government's challenges were made for other, valid reasons. The Court did not, as defendant contends, "dismiss th[e] issue out of hand." *Id*. Notably, the jury that ultimately decided the case was made up of on lone white male and eleven women, three of them women of color.

she was suffering had been going on for two and a half years. The Court reasonably excluded this juror for cause.

Juror 108 stated her name in open court immediately after being told, "Don't tell me your name." In the short questioning that followed, it was clear that Juror 108 did not understand English.

Juror 114 advised that she could not judge anyone. The judge questioned her extensively on the subject, and based on her answers and demeanor, reported that he had significant concerns about her answers. Thus, Juror 114 was properly excused for cause, and the defense does not challenge this determination.

Juror 119's responses to questions on the jury questionnaire reflected a lack of candor, as well as personal experiences that suggested a lack of impartiality, and statements that raised questions regarding his ability to decide the case based solely on the evidence and the law provided by the Court. First, Juror 119 disclosed on his questionnaire the fact that he had been convicted of crimes, but failed to disclose a DUI arrest in 2008 on his questionnaire. With respect to convictions he did disclose, Juror 119 reported that the had been convicted, after a jury trial, of assault & battery, and volunteered the comment that he knew what it is like to be convicted. Juror 119 also described an incident in which he had been the victim of a large fraud perpetrated on him by a friend, an incident which appeared to have affected him. Finally, Juror 119 made a comment that, even with follow up, was difficult to assess: "History will reveal the truth." In sum, this juror presented a number of issues that, singly and in combination, raised doubts about his ability to serve as an impartial juror.

49

Juror 123 did not appear for service on the first day he was called. When questioned on the second day, he explained that he was starting new job and would need to attend training. The Court properly excused this juror for cause on the basis of his expressed hardship and of his lack of reliability which suggested that he would be a problematic juror.

Juror 134 indicated that she was planning to leave the state during the upcoming weekend, and then showed up for jury service the following Monday. The Court properly found that this juror's circumstances were volatile and unpredictable, and that there was a reasonable likelihood that she would need to be excused sometime during the trial. This obviously was an appropriate basis for excusing Juror 134 for cause.

Juror 139 was related by marriage to the late Tommy Briscoe who, in the early 1990s was charged and convicted of honest services fraud and other offenses in connection with his job as the president of the Chicago Local of the American Postal Workers Union. Although the prospective juror indicated that she was close to Briscoe,[26] she failed to disclose on her questionnaire that she had a relative who had been convicted of a crime. In addition, a potential government witness had reported that he and another individual had paid kickbacks to Tommy Briscoe in the 1980s or 1990s. At the time of jury selection, the government had not made a final determination regarding whether the government witness would testify, and did not

---

[26] Defendant states that Juror 139 was not close to Briscoe; government counsels' notes reflect the opposite.

plan to make a final determination on the issue until later in the trial. There was a legitimate concern that, during cross-examination, the government witness might say something regarding Briscoe.

Juror 155 presented a host of issues that made it obvious that his ability to serve impartially was unpredictable. Beginning with his personal history, Juror 155 reported that he attended law school and took a masters course to avoid military service in Vietnam, and that he quit law school after only one year. Next, Juror 155 disclosed a litigious background and traits that raised questions regarding his ability to work with others. He reported having gone to small claims court on multiple occasions and described a particular incident in which he obtained an $800 judgment and, when the judgment-debtor left town without paying, Juror 155 continued over the course of several years to use the internet to track him down. In voir dire, Juror 155 said that he did not regard himself as a "people person." With respect to prior jury service, Juror 155 reported having served once, and in that case he was the foreperson. With respect to his exposure to media coverage of the case, Juror 155 indicated on his questionnaire that he followed this case in the media "extensively to moderately" yet, in voir dire, he claimed that he all he knew about the case was the outcome of the first trial, a claim the Court found not credible, particularly in light of the comment on his questionnaire that the defendant's wife had a "foul mouth." The Court expressed the reasonable view, based on Juror 155's comments and demeanor, that he appeared to be a person who knows one right way, and cannot be flexible. Based on all these considerations, the Court was legitimately concerned about Juror 155's ability to work

51

well with other jurors, particularly in the event that he was not elected foreperson, and reasonably excluded him for cause on that basis.[27]

Juror 173 was properly excluded based on financial hardship. Specifically, she was 21 years old and was the sole provider for her 2 year-old daughter. Her employer had been upset that she had responded to her summons, and she expressed concern that she would not get paid and might lose her job if she served on the jury. In fact, Juror 173 was not paid for the day that she came to fill out the jury questionnaire. As the Court noted that, given her educational and employment background, if Juror 173 were to lose her job, she would have a hard time finding another. It is worth noting here that there were several issues that might have concerned defendant, including the fact that Juror 173 had taken her daughter to CMH several times (a point relied upon by the defense in challenging other jurors for cause), that Juror 173 had stated on the jury questionnaire that she believed defendant had done corrupt things, and had said in voir dire that everyone at work thought defendant was corrupt.

Juror 171 said in her questionnaire that she believed defendant was innocent. When questioned in voir dire, however, her demeanor raised suspicions. After close questioning and observation, the Court determined that Juror 171 was not telling the truth but, rather, was attempting to avoid jury service. Defendant offers nothing that contradicts the Court's conclusion. The juror was properly excused for cause.

---

[27] Obviously, the Court did not find fault with Juror 155 because his *verdict* was unpredictable but, rather, because is ability to work with other jurors and serve impartially could not be predicted.

Juror 172 was properly excused for cause because he failed to disclose on his questionnaire the fact that he had been convicted of a gambling offense. Defendant offers no basis for challenging this exclusion.

Juror 213 was excused for hardship based in part on her job and in part on the fact that she had two upcoming different court dates in two different cases, and it was apparent that she felt she needed to appear in court as scheduled. Based on Juror 213's answers and demeanor, the Court determined that she strongly did not want to sit on the jury, and reasonably concluded that those feelings would affect her ability to be fair. The Court properly excused Juror 213 for cause on this basis.

In sum, the Court conducted careful, individualized questioning of each of the prospective jurors and made a determination about each juror's ability to serve impartially, and the Court's determinations were reasonable and fully supported by the record.

## C.    The Jury Questionnaire

Without any citations to legal authority, defendant argues that three questions should have been omitted, and that nine questions recommended by defendant ought to have been included, in the questionnaire provided to the jury. Mot. 60-63. Defendant's complaints do not come close to establishing a basis for posttrial relief.

First, defendant contends that questions 55 and 56 should have been omitted because they, in effect, "condemned the system" of which defendant was a part. The exact opposite is true. Questions 55 and 56 were designed to identify potential jurors who had preconceived notions regarding politicians and political activities; in other

53

words, to identify potential jurors who may have already "condemned the system," and may thus have been biased against the defendant. Given that defendant is a politician and the allegations relate to his political activities, it was prudent to determine whether any of the potential jurors held preconceived views about politics and politicians in general, as well as specific views regarding the defendant on trial. There was no error, and no potential prejudice, in including these questions.

Second, defendant contends that Question 83 served to indoctrinate the jurors with the notion that the government's evidence was pre-approved. *Id.* at 60-61. In reality, Question 83 inquired whether any of the prospective jurors had any opinions regarding wiretaps that could interfere with their ability to be fair. The government was entitled to know of such bias, as it could lead a juror to decide the case based on previously-held personal opinions, rather than on the evidence and law provided to him or her in court. There was no error, and no potential prejudice, in including Question 83 in the jury questionnaire.

The nine questions which defendant claims should have been included in the questionnaire all related to media coverage of the case, specifically addressing: (1) the prospective jurors' predictions regarding how peer pressure and media coverage might affect them personally (Questions 92 and 98); (2) the potential jurors' exposure to media accounts specifically related to the "first trial" (Questions 93-97); and (3) perceived bias in the national news media (Question 99). None of these questions was necessary, and all of them posed potential problems; thus, the Court did not err by declining to add these nine questions to the already lengthy questionnaire. Moreover,

54

defendant has identified, and the government can discern, no concrete harm resulting from the Court's failure to include the requested questions.

The jurors' exposure to media coverage was treated extensively elsewhere in the questionnaire. Thus, all of the proposed questions were cumulative, and none of them were necessary. In addition, with respect to Questions 93-97, there was no need to draw the prospective jurors' attention specifically to coverage of the "first trial" and, indeed, just the opposite was true. Rather than exposing the prospective jurors to information of which they might not be aware (that there was a first trial), it was more appropriate to ask more general, open-ended questions to determine what information the jurors had been exposed to, without exposing them to more.

Question 99 was vague and had no particular relevance to the case. Defendant provides, and the government can discern, no special reason why potential jurors should have been questioned regarding their opinions of the state of modern journalism.

Questions 92 and 98 posed the risk of *suggesting* to the potential jurors that service on the jury would be difficult and unpleasant, and that they were likely to be treated in the way that jurors in the first trial were treated. In fact, the Court had taken steps to protect the prospective jurors from media assaults. In sum, the proposed questions potentially planted seeds of concern in the minds of jurors and served no purpose since there was no reason to doubt that any prospective jurors who had substantial concerns would raise them with the Court during voir dire.

Accordingly, none of the purported errors in the jury questionnaire provide any basis for posttrial relief.

### D. Denial of Defendant's Motion to Strike the Jury Panel

In arguing that the Court erred by declining to strike the entire jury panel, defendant claims that, despite the Court's exclusion of numerous prospective jurors for cause, many biased jurors remained in the pool, making it impossible to empanel an impartial jury. Mot. 63. This argument, like defendant's arguments with respect to individual potential jurors, rests on a faulty premise: that the members of the jury pool not excused for cause were biased. As discussed above, although a number of prospective jurors came to court having formed opinions regarding the defendant's guilt or innocence based on media coverage, the Court excluded those jurors who could not set their prior opinions aside and serve impartially, and the jury that ultimately was empaneled was impartial.

Contrary to defendant's contention, statements made by Juror 101 do not support his claim that the entire jury pool was tainted and should have been stricken. Juror 101, who sat for a radio interview while jury selection was ongoing, described negative opinions about defendant expressed by other prospective jurors as they waited to find out whether they would be called to serve on the jury. What defendant fails to acknowledge, however, is that only four potential jurors who might have been present during the time these opinions were expressed remained in the pool after cause challenges, and those jurors, as well as Juror 101, were questioned by the Court with counsel from both parties present. Thereafter, neither defendant nor the government

sought to excuse any of the questioned jurors, and to date defendant has never argued that the questioned jurors who ultimately were seated were biased. If anything, this incident showed that the Court had in fact excluded the jurors who could not serve impartially, and that those who remained in the pool lacked bias.

Finally, it should be noted that it is not surprising that a significant number of prospective jurors were familiar with defendant's case, and had formed opinions concerning defendant's guilt or innocence. Defendant engaged in an unprecedented national media campaign, executed with the help of retained public relations firm, for the purpose of influencing public opinion, and that campaign was bound to have some impact, even if it was not the impact defendant had hoped for. The record reflects, however, that through careful questioning and observation during jury selection, biased jurors were excluded, and the potential jurors not excluded for cause were able and willing to serve as impartial jurors. Defendant's rhetoric does not change that reality.

### E.    Estimate Regarding Length of Trial

In advance of trial, the government provided the Court with its best estimate of the length of the trial  In doing so, the government included estimates of the testimony of all witnesses it might call, and this included witnesses who ultimately were not called to testify. This was the only prudent course for the government to take in light of the reality that jurors are likely to be far more disappointed by a trial that runs longer than projected, than by a trial that ends sooner than anticipated. There was no intent to "manipulate" jury selection. And, in fact, the estimate given by the Court (10

57

weeks) was consistent with the overall length of the trial, beginning with jury selection and ending with the return of the verdict.

In any event, defendant cites, and the government can discern, no reason to believe that citizens who are able to serve on a jury in a long case are less qualified or more likely to be biased in favor of one side or the other than those who are able to serve on a jury in a short case, but not a long one. The jurors who served in this case did so conscientiously and without bias. Defendant has provided no reason for believing otherwise.

### F.    Removal of Juror 125

Defendant challenges the Court's decision to remove Juror 125, once again made without analysis or citation to any authority. The argument is waived and, in any event, lacks merit.

As defendant concedes, Juror 125 knowingly disobeyed the Court's express instructions not to remove her notes from the jury room. Disobeying the Court's instructions is a valid basis for removing a juror during trial. *United States v. Vega*, 72 F.3d 507 (7th Cir.1995) (removal of notes from jury room). This type of misconduct, serious in itself, also reflects a risk that the juror will violate other rules imposed by the Court in the future. Here, that risk was particularly strong in light of information indicating that, when another juror confronted Juror 125 about continuing to write down questions to which the Court sustained objections after being admonished by the Court not to do so, Juror 125 reportedly expressed the intention to continue taking such notes. Defendant makes much of the fact that, when questioned about her

58

misconduct, Juror 125 readily admitted it. As the Court recognized, however, although candor was important, it did not render the misconduct meaningless.

Under all the circumstances, the Court properly excused Juror 125 and, given that defendant has made no showing of prejudice, any possible relief is precluded.

### G. Defendant Has Not Established His Entitlement to a New Trial.

Defendant asserts, without any factual support or analysis whatever, that the jury that decided this case was not fair and impartial. The claim is false, and no new trial is required.

## IV. Defendant Is Not Entitled to Posttrial Relief Based on Purported Trial Errors.

### A. Limitations on Defendant's Testimony

#### 1. Defendant's Purported Belief that His Conduct Was Legal

In ruling on the admission of various motions in limine, and on recordings defendant sought to admit, this Court held that defendant would be required to lay a proper evidentiary foundation, through his own testimony or through the testimony of other witnesses or other evidence, before certain evidence would be admitted for the purpose of proving state of mind. Defendant provides a description of certain proceedings on May 20, 2011, in which he claims the Court made statements he relied upon in deciding to testify.[28] In the absence of a transcript of those proceedings, the government is unable to comment on the accuracy of defendant's description. What is

---

[28] Defendant has submitted an affidavit in support of this assertion. Putting aside the credibility of defendant's affidavit, it bears noting that the defendant sought no rulings regarding the admissibility of testimony before taking the stand.

clear, however, is that whatever the Court's comments may have been, they were made in a context peripheral to the topic of defendant's potential testimony, that, at that time, the Court did not issue a ruling on what defendant could and could not say about the legality of his conduct should he elect to testify, and that the defense never sought or obtained an advance ruling from the Court permitting him to testify regarding his belief that his conduct was legal.

On June 1, 2011, however, the Court ruled that defendant would be precluded from testifying generally that he believed his conduct was "legal," but that defendant was "perfectly free" to say that he thought he could engage in the charged conduct because he did not think it amounted to exchanging official actions for personal benefits, that is, conduct the defendant admitted he knew was illegal. 6/1/10 Tr. 41-42.

What led to the Court's ruling was the fact that, in his testimony up to that point, defendant repeatedly had attempted to introduce before the jury, through the back door, defenses based on advice of counsel and "politics as usual," despite the facts that (1) he had conceded he could not establish the elements of the advice of counsel defense, and the Court had ruled based on the evidence presented through various motions and responses prior to both the initial trial and the retrial, that no advice of counsel defense was appropriate; and (2) the Court had previously ruled that no evidence or arguments could be presented that raised the specter of "politics as usual." In this way, defendant repeatedly tied his alleged good faith belief in the legality of his conduct with (1) information and advice he received from "advisors" who were lawyers; and (2) his perception of the way things are done in the world of "politics."

60

With respect to advice of counsel, defendant argued, before, during, and after the trial, 6/1/11 a.m. Tr. 21; Mot. 73, that he was *not* pursuing an advice of counsel defense[29] but, rather, that he intended only to present a good faith defense to negate intent to defraud. Yet the factual underpinning of his good faith defense included the argument that he relied on the advice of his advisors, who were licensed lawyers. The defendant did not make this argument just once, but came back to it again and again during his testimony, repeatedly referencing discussions with his "lawyer," and making sure that his "lawyer" was seen as being involved in all decision-making. The following are examples of the comments made by defendant during his testimony relevant to the issue of advice of counsel:

• 5/27/11 a.m. Tr. 50 (Defendant testifies that, after receiving a call from Mary Stewart indicating that Chris Kelly wanted to speak to him, ". . . I immediately had Mary [Stewart] find Bill Quinlan for me *so that I could talk to Bill Quinlan my lawyer, the governor's lawyer, about what do I do about this, how do I handle this, because I*

---

[29] In order to show that the defendant relied upon the advice of counsel in good faith, a defendant must satisfy five elements:

    (1) before taking action,

    (2) defendant in good faith sought the advice of an attorney whom he considered competent,

    (3) for the purpose of securing advice on the lawfulness of possible future conduct,

    (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, and

    (5) then acted strictly in accordance with the advice of his attorney.

*United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008).

*wanted to be very careful that I don't get caught up in something that I'm not aware of that isn't — that is potentially wrong and could very well be wrong.*")

• 5/31/11 p.m. Tr. 63 (Defendant testifies that, after learning of the Wyma article, "I immediately sought — began to try to find Bill Quinlan to get — to call me. *That was my first instinct was to get ahold of my lawyer, Bill Quinlan, and find out what he knew and kind of share some insights with me.*")

• 5/31/11 p.m. Tr. 67 (Regarding the call of December 5, after defendant learned about the imminent Tribune article about Wyma, admitted by the defense as an excited utterance, "And then I was reconstructing for Bill Quinlan, *my lawyer*, basically, you know, spilling whatever I knew, whatever was coming into my mind to him about that call, about that conversation about the fundraising requests from Patrick Magoon in connection with Dusty Baker calling me. And so I was relating this to Bill Quinlan and the Vondra part of it as well because I was basically trying to find out from Quinlan do you think I said something wrong? *Could I have done — could I have stumbled into crossing a line of some sort?* That's what I was doing here. Q: Why were you telling Bill Quinlan that? A: Because Bill Quinlan's my general counsel, he's my lawyer and he was in many ways, you know, a — he was in many ways — you know, he — *I talked to him about everything that was remotely connected to anything that was on legal issues or pending investigation and all the rest because I wanted to be careful not to do anything wrong.*")

• 5/31/11 p.m. Tr. 68 (In relation to talking to Bill Quinlan about defendant's conversation with Wyma about CMH: "Q: Why were you telling Bill Quinlan that? A: Because Bill Quinlan's my general counsel, *he's my lawyer* and he was in many ways, you know, a — he was in many ways — you know, he — *I talked to him about everything that was remotely connected to anything that was on legal issues or pending investigation and all the rest because I wanted to be careful not to do anything wrong.*')

• 5/31/11 p.m. Tr. 80-83 (Defendant testifies about people he relied on to make decisions, specifically including Bill Quinlan, ". . . Bill Quinlan who was my general counsel, and there was nothing I would do of any magnitude that I felt I needed to discuss with my general counsel, my lawyer Bill Quinlan. There was a time where the federal investigations were, I felt, at a critical point. It was a fish-or-cut-bait period I thought, and I thought I'd get my, quote-unquote, clean bill of health, and I was super careful to make that whatever I decided to do that I was — properly discussed it and thought it out and fully disclosed to Bill Quinlan, my general counsel, and others, my ideas and my thoughts before I reached a decision. So Quinlan was — in many ways Bill Quinlan was indispensable. Q: Now, you spoke about Bill Quinlan. He was your general counsel. A: Yes. Q: What is a general counsel? A: A general counsel is the governor — forgive me. He's the lawyer to the governor. He or she are the governor's lawyer, and their responsibility is to properly provide legal advice on what a governor

62

can and cannot do. And so I relied heavily on Bill Quinlan, A, because I felt I should; *B, this was a particularly dangerous time, as far as I was concerned, and I wanted to make sure everything I did was — did not cross lines.* Q: What – what did you understand Bill Quinlan's experience was as a lawyer and in government? A: Bill Quinlan worked for me from 2005 until it all came tumbling down. Prior to that, he was — he was an attorney for Mike Madigan's legislative staff. So not only did he bring his legal know-how in terms of just his education as a lawyer — he went to Georgetown University Law School, which is a very good school — he had the experience of state government having worked on Speaker Madigan's staff as a lawyer. His father was corporation counsel, the lawyer to Mayor Daley's father." [Objection sustained; defendant continues] "So that's Quinlan. He was one of the top lawyers, top 40 under 40 lawyers he was recognized. He was considered a very good lawyer . . . . [Objection sustained; answer not stricken.])

• 5/31/11 p.m. Tr. 85 (Defendant testifies regarding Bob Greenlee, "He's an *Ivy leaguer, Yale University, University of Chicago law school, and he was a lawyer who clerked for federal district court judge in Indiana,* so he brought that . . . "[Objection sustained; answer not stricken.])

• 5/31/11 p.m. Tr. 101 ("Q: Did you also have several conversations with Bill Quinlan about the Senate seat? A: Yes. *I talked to Bill Quinlan about it constantly, continuously, almost every day.* Almost every day. Q: Did you have conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat? A: I had several conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat. Q: Do you recall at all having a conversation with Mr. Quinlan and Mr. Harris in which there was a discussion about a 501(c)(4), and Mr. Quinlan and/or Mr. Harris specifically told you don't even joke about that when it comes to the Senate seat? A: No, I don't recall anything like that because Quinlan and I and Harris talked about 501(c)(4)s long after that a lot. Q: And did they ever say, hey, don't even joke about that issue? A: No. In fact, to varying degrees, they both encouraged me to explore the idea and see whether or not it made sense connection with the Senate appointment.")

(Emphasis added.)

These passages obviously implied that defendant viewed the advice of his advisors as legal advice. The problem with this defense theory is that, although "a lawyer's fully informed opinion that certain conduct is lawful (followed by conduct strictly in compliance with that opinion) can negate the mental state required for some crimes, including fraud," advice of counsel is not a "free-standing defense." *United*

*States v. Joshua*, 2011 WL 3436937, *7 (7th Cir., August 8, 2011) (citing *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008)).. Thus, for a defendant to say that his state of mind was affected by advice he received from lawyers is to present an advice of counsel defense in general good faith clothing. When combined with defendant's repeated comments regarding "legality," the suggestion was clearly made that defendant believed, based on advice of lawyers, that his conduct was lawful.[30]

Moreover, defendant was also limited by his own testimony, recorded statements, and public comments, indicating that he knew he could not exchange official acts for personal benefits. In light of this testimony, general testimony that defendant "believed that his conduct was legal" posed a serious risk of hopelessly confusing and misleading the jury.

As a legal matter, none of the charges in the second superseding indictment required proof that defendant knew his actions were illegal. Thus, testimony that defendant believed his actions were legal (or did not know his actions were illegal) was irrelevant to any issue in the case. The same is true of the specific arguments defendant sought to make. If defendant actually believed that exchanging the Senate seat appointment for the HHS cabinet post or a new 501(c)(4) organization position would be a legal "political job swap," *see* Mot. 72, or that any exchange of official action

---

[30] Defendant later specifically sought to introduce testimony explaining that his belief in the legality of his action was also based on his observations and experiences in politics, and on his knowledge of history. The Court barred this evidence, and properly so as, apart from questions of accuracy and similarity, such evidence tended to bleed into various forbidden "politics as usual" arguments.

for campaign contributions was legal as long as defendant did not expressly state the quid pro quo (and the government does not concede that he did believe these things), such evidence would only prove that defendant was mistaken as to the law, which is no defense. *See Cheek v. United States*, 498 U.S. 192 (1991) (generally, a defendant's mistaken understanding of what the law requires is no defense to a criminal prosecution).[31]

After testimony concluded on the afternoon of May 31, 2011, the government raised with the Court concerns about defendant's continuing efforts to interject into the proceedings the unsupported and improper issues of advice of counsel and politics as usual. The government gave as examples the defendant's: (1) repeated references to Quinlan as "his" lawyer; (2) failure to mention that he had private criminal counsel at all relevant times;[32] and (3) use of the phrase "horse trading."

The Court agreed that defendant had suggested in his testimony that because nobody stopped him, he thought his conduct was legal, even if he never said those exact words, and that this suggestion amounted to an implicit advice of counsel defense. The Court noted that this presented a problem for the defense because defendant could not satisfy the elements of an advice-of-counsel jury instruction. The Court stated that,

---

[31] Defendant claims that he would have testified that Bill Quinlan told him these things, Mot.72. However, in his voir dire, defendant did not stress advice given to him by Quinlan as a factor leading to his purported belief that his conduct was legal. Nor did defendant proffer any specific conversation with Quinlan on the subject.

[32] And, as to some of these lawyers, defendant had not waived the attorney-client privilege. Ultimately, a stipulation was presented stating that defendant also had outside counsel.

in light of defendant's testimony, he would instruct the jury that there was no advice of counsel defense in this case.

The Court also noted that defendant's testimony suggested that horse trading is normal in politics because there *is* legal horse trading, but that, standing alone, that suggestion was misleading because "[t]here's also illegal horse trading." The Court commented that a "politics as usual" instruction should be given unless the defense called an expert witness to clarify that there are some "deals" you can make and others you cannot make. The Court expressed concern with the dilemma of requiring an instruction to avoid misleading the jury, but wanting to avoid an instruction that was too specific.

In addition, the Court found that defendant's attempts to put these matters before the jury was deliberate and not accidental, and noted that, rather than simply being limited to counsel, defendant himself had made a deliberate effort to put matters before the jury that specifically had been excluded by the Court, namely, the death of defendant's cousin at CMH.[33]

The following day, defendant moved *in limine* to be permitted to testify that he at all times believed his conduct was legal. 6/1/11 a.m. Tr. 4. The government objected on the grounds that such testimony was irrelevant because, given the elements of the

---

[33] Defendant expresses bewilderment at the Court's determination that defendant's efforts to put excluded matters before the jury were intentional. Mot. 73. It simply is not possible to read the transcript of defendant's testimony (much less to have observed it in person) without concluding that defendant deliberately attempted to squeeze into his testimony extraneous details and facts he viewed as helpful, even when he knew full well that those matters had been excluded by the Court.

particular crimes with which defendant was charged, it was not necessary that defendant know what he is doing is illegal. The government also argued that defendant's proposed testimony would also interject the issue of "politics as usual." This Court requested an order of proof in order to assess the relevance of the proposed testimony. 6/1/11 a.m. Tr. 6. The Court explained that an order of proof was necessary because some of what defendant proposed appeared relevant, while other parts did not, and because without an order of proof, the jury would be exposed to unanticipated, and non-responsive testimony that was improper. *Id.*

Defendant's testimony on voir dire included the statement that he believed everything he was doing, and all his trades, were legal. 6/1/11 a.m. Tr. 8. Defendant then went on to give examples of what he considered legitimate political horse trades, that is, trades that did not involve personal benefits but, rather, that involved trading of support on legislative issues. *Id.* at 19-20.

To begin with, the Court found that the accuracy of some of defendant's examples of legitimate political horse trading were speculative, and that others were not analogous to the charged offenses. 6/1/11 a.m. Tr. 21. The Court also expressed concern that presenting to the jury recorded conversations with certain lawyers, and claiming that his understanding of what was legal and what was not was based on those conversations, would open the door to waiving privilege with respect to conversations he had had with other lawyers. The Court then explained that *Cheek v. United States*, 498 U.S. 192, 199 (1991), the case upon which the defense relied in

67

seeking permission to introduce this testimony, presented a different situation and therefore was not controlling.[34]

The government then argued that allowing defendant to express his opinion (at the time of relevant events) regarding the legality of his actions would confuse and mislead the jury because none of the charged offenses required defendant to know that his conduct was illegal. *Id.* at 28.

The Court then took into consideration the fact that defendant had previously testified, and stated in many of the recorded conversations, that he was aware that exchanges of official action for personal benefits, "one for the other," were not legal, and found that this testimony was distinct from the testimony defendant was now offering, namely, that he "thought [such exchanges were] okay." 6/1/11 a.m. Tr. 34. The Court then considered the proposed testimony in the context of the 501(c)(4) proposal. There the evidence established, and defendant did not contest, that the proposal was a trade "one for the other." 6/1/11 a.m. Tr. 36. The government argued that the general statement "I thought it was legal" would be confusing in that context. *Id.* at 37-38. Of course, excluding general testimony that he thought the trade was legal did not rule

---

[34] The Supreme Court held in *Cheek* that a defendant's good faith belief that his conduct was legal was a valid defense to certain criminal tax laws requiring a finding of "willfulness," meaning, a finding that the defendant knowingly and intentionally violated a legal duty of which he was aware. *Cheek v. United States*, 498 U.S. 192 (1991). None of the offenses of which defendant was convicted include a comparable willfulness element.

out the admission of more specific testimony— such as, that defendant believed that the trade was legal because the 501(c)(4) was not a personal benefit.

Ultimately, in light of the fact that it was not necessary to prove that defendant knew his conduct was illegal, and therefore the question of whether or not defendant thought he was acting legally was not relevant, and in light of defendant's prior testimony establishing that he knew that "one for the other" trades involving personal benefits were illegal, the Court precluded defendant from testifying that he honestly believed that "one for the other" was legal. 6/1/11 a.m. Tr. 40-42. On the other hand, the Court made clear that defendant was free to testify, consistently with his testimony up to that point, that he did not believe that he was trading official acts for personal benefits (and thus by implication that he did not think he was acting illegally.) Under Fed. R. Evid. 401 and 403, this ruling was reasonable and correct. It in no way precluded defendant from presenting his defense. To the contrary it allowed him to pursue the good faith defense he had pursued all along, without straying into areas that could well lead the jury to decide the case on improper bases. See 6/1/11 a.m. Tr. 30-31.

Citing general Constitutional principles, defendant vehemently argues that his rights have been trampled and that the limits placed on him by the Court can only be the product of extreme bias against him. He never, however, presents an analysis of the actual harm these limits caused him. In fact, defendant was free to present the defenses he pursued all along— that he would not and *did not* trade official actions for personal benefits and that, in any event, he did not believe he was doing so. Moreover,

69

as indicated above, defendant managed to squeeze in a substantial amount of testimony that in practical effect put before the jury the general claim that he at all times intended to act legally, and believed he was acting legally. Indeed some of this testimony was presented *after* the morning of June 1, 2011, when the Court ruled that evidence concerning defendant's belief that his conduct was legal would be excluded. The following are representative examples of such testimony:

• 5/26/11 p.m. Tr. 39, 40 (Defendant testifies that his oath meant that he would obviously follow the Constitution and laws of the State, and he followed his oath.)

• 5/26/11 p.m. Tr. 96 ("Q: What was your intent with regard to fundraising once this ethics bill passed?  A: My intent after the ethics bill passed was to fully comply with the new ethics bill whether I liked it or not.  Q: Did — what was your understanding as to whether anything prohibited you from asking for campaign contributions prior to this law changing?  A: No — my understanding and my knowledge was that there were absolutely no prohibitions from asking any contractors or businesses or corporations that would be prohibited afer January 1st or on or after January 1st, prior to that, *it was perfectly, absolutely legal*, and it was a common practice up until the law would change after the 1st of the year.")

• 5/27/11 a.m. Tr. 20 (States that all of his fundraising efforts were meant to "raise as much campaign funds *legally* as we could by the end of the year.")

• 5/27/11 a.m. Tr. 73 (States, with respect to the 12/3/08 conversation with Monk at FOB's offices: "Again, be careful, *follow the law, don't cross any lines, don't condition the promise of campaign contributions on me signing the bill*.  Don't—be careful, be careful how you convey it, be careful how you say it, be careful you *follow the law*.")

• 5/31/11 p.m. Tr. 108 (In reference to "pay to play" call on October 31, 2008 between Greenlee and defendant, "Q: When you said pay to play, what were you saying?  A: *That's illegal*.  That's not something that I want to do and he shouldn't want to do.")

•5/31/11 p.m. Tr. 121-122 (In reference to a call with Harris at Tab 7 in the Government Binder: "Q: And then you say, 'Okay, now we should get something for that, couldn't I?'  What were you saying there, Rod?  A: Just that.  I'm asking John Harris his advice and his opinion on whether or not if, in fact, there's an interest by President Obama or Rahm or whomever for Valerie Jarrett, is there a potential horse

trade — *legal, always predicated on being legal* — where there's something that I might be able to get as part of that horse trade. That's what I'm asking him, what does he think about that.")

• 6/1/11 p.m. Tr. 34 (Regarding Tab 14, "Q: When you said, 'So I cannot dismiss that real possibility, if they f'ing treat me with f'ing, you know, irrelevance and I don't get something good,' what were you saying there, Rod? A: That, again, facing what I was facing, the dynamic as I saw it, what I was talking about, you know, if they — if there was pressure to appoint President Obama's senator and it wasn't something that was *legally good*, in my mind, that I can always appoint myself senator." [Objection sustained; answer not stricken.])

• 6/1/11 a.m. Tr. 50-51 (Defendant testifies, "Q: How often did you speak to Bill Quinlan? A: *I would speak to Bill Quinlan constantly and continuously, I think on average three times a day, some days I would speak to him five times a day, there may be days where I spoke to him more than that.* These are just over the telephone, there would be other times I would be with him in person. But I would say, comfortably on average, three times a day, including weekends, Saturday and Sundays. So if you would take all seven days and quantify them, those phone calls with Quinlan would reach an average of somewhere around three times a day. Q: And during this conversation you had on November 1, 2008, a little later in the morning, did you talk about the Senate seat with Mr. Quinlan. A: Yes, I did. Q: And did you talk to Mr. Quinlan frequently about the Senate seat. *A: Yes; I spoke to Bill Quinlan about the Senate seat throughout this whole period of time and even before this period of time, constantly, continuously, repeatedly, and repetitively.*")

• 6/2/11 a.m. Tr. 37-38 (Regarding Tab 29, "Q: And further down on line 7, page 3, you say: 'How do you make a deal like that? I mean, *it's got to be legal, obviously*, but, but it's very commonplace, is it not, doing things like this?' When you say 'how do you make a deal like that, it's gotta be legal obviously,' what were you saying there, Rod? A: *Any decision I would ultimately make on the Senate seat had to be legal, obviously*." [Objection is sustained, but the answer is not stricken; the testimony is later quoted by the defense in closing argument.])

• 6/2/11 a.m. Tr. 40-41 (Regarding Tab 29, "Q: Did you think you could do good by having a 501(c)(4)? A: I thought the idea of doing that, *that would be legal*, obviously, could do a lot of good." [Objection sustained; answer not stricken.])

• 6/2/11 a.m. Tr. 69-70 (Regarding Tab 40, says "I'm testing with John Harris, you know, new thoughts that are in my mind in terms of potential criterion to take into consideration [with respect to the Senate seat]. First, our legal situation. Again, very fearful of what was happening and *making sure that whatever we did was legal* and so I don't cross because I feel I'm going to get my clean bill of health.")

• 6/6/11 a.m. Tr. 51-52 (On cross-examination, referring to Tab 29, discussion regarding whether it is worth giving Prizker the Senate seat if Pritzker can raise money: "Q: Those were your words, correct? A: Ah — Q: Yes or No? A: This is what I said on the call, which *I also said how do you do a deal like this, it has to be legal, obviously. I said that earlier in the same call, and everything I talked about was predicated on that very simple proposition* — Q: The answer to my question is yes? A: — how do you do a deal like that. I said that, yes.")

• 6/2/11 p.m. Tr. 72-75 (On cross-examination, regarding whether the 501(c)(4) organization is connected to the Senate seat during the discussion with Scofield on Tab 44, "Q: When you said 'not necessarily' was it possible it was going to be in the near term connected to the Senate seat. A [over objection]: How do you do a deal like that? *It's got to be legal obviously, If it was legal, who knows. We thought it was, I certainly did, everybody else seemed to think so, too, that's why we were talking about these things.* But I was not yet in the position to decide it. I was gathering options." [Answer stricken as non-responsive, but defendant nevertheless succeeded in putting the answer before the jury.])

(Emphasis added.)

It is well settled that neither a defendant's right to offer testimony, nor his right to cross-examination, is absolute. *E.g., Taylor v. Illinois*, 484 U.S. 400, 410 (1988). In this case, the limits set by the Court were carefully drawn in a way that allowed defendant to put on a complete defense while preventing the confusion and prejudice that would almost certainly result from the specific testimony he proposed. The Court acted well within its discretion in imposing the limits and, in any event, given that defendant was not precluded from presenting his defense, and that he managed to put before the jury all of the claims he says he was entitled to make, any error in the Court's ruling was harmless.[35]

---

[35] The Seventh Circuit's recent decision in *United States v. Joshua*, 2011 WL 3436937 (7th Cir., August 8, 2011), decided after the trial in this case, makes clear that the Court was correct in limiting the defendant's ability to present an advice of counsel
(continued...)

## 2. Events that Occurred After December 5, 2011

### a. Events Related to the Racetrack Bill and CMH That Transpired After Defendant's Arrest

Contrary to defendant's contention, this Court did not improperly, much less unconstitutionally, impinge on defendant's right to present a defense by excluding evidence concerning events related to the racetrack bill and CMH that transpired after defendant's arrest. Defendant sought to present evidence establishing that he ultimately did sign the racetrack bill—albeit after he was arrested and then released on bond. This evidence was irrelevant to the issue of defendant's guilt on charges related to defendant's efforts to extort campaign contributions from John Johnston in exchange for signing the bill. At the time of defendant's arrest, the bill had been sitting on defendant's desk, unsigned, for over ten days. When defendant finally did sign the bill, he did so with the knowledge that he had been charged with federal offenses related to the exchange of official acts in his capacity as governor for personal, financial benefits, and that those offenses included allegations regarding his efforts to extort campaign contributions in exchange for signing the racetrack bill.

Under these circumstances, the only purposes that could be served by the admission of evidence concerning defendant's eventual signing of the racetrack bill would be (1) to suggest that, because defendant eventually signed the bill, he intended to do so all along and any delay was unintentional; and (2) to urge nullification. The

---

[35](...continued)
defense where the elements of the defense could not be met.

second purpose is of course legally improper. The first purpose is illogical and misleading, as well as contrary to defendant's own testimony. When defendant testified concerning this matter, he presented a different defense altogether, namely, that he hesitated signing the bill for fear of the type of criticism he had received after signing the first recapture bill, and then intentionally delayed signing due to a contact from Chris Kelly regarding his efforts to obtain a pardon. Evidence that defendant went ahead and signed the bill without first determining anything about Chris Kelly and the pardon would have undermined defendant's own testimony.[36] Thus, there was no error in precluding this testimony, and any error was harmless.[37]

Likewise, there was no error, much less any Constitutional violation, in the Court's excluding evidence regarding the pediatric doctors' reimbursement rate increase becoming effective two weeks after it was supposed to, in late January 2009. This evidence was irrelevant to the question of whether the defendant did or did not cause the increase to be delayed while he attempted to obtain a campaign contribution.

---

[36] Notably, while defendant testified about post-December 5 events related to the Senate seat and CMH and post-arrest events related to CMH, he did not do so in relation to the racetrack bill and understandably so—evidence that he signed the bill shortly after his arrest would have directly contradicted his defense, which attempted to explain his reasons for delay in signing the bill.

[37] Defendant complains that he was precluded from calling his brother, Robert Blagojevich to testify, and claims that the government used his brother as leverage against defendant and, even after dismissing his charges, held the possibility of prosecution over his head. These claims are unsupported. In reality, the defense discussed with prosecutors the possibility of offering portions of Robert's trial testimony under Fed. R. Evid. 804 but ultimately decided not to pursue that option. Presumably, this was because Robert's testimony directly contradicted that of defendant regarding Jesse Jackson Jr.

It therefore was not impeaching of Greenlee's testimony that he understood defendant to be telling him to hold up the increase when defendant told him it was "good to know" that he had the discretion to hold up the increase.

In any event, defendant put the evidence before the jury when he testified that he found out that the increase had been held up after his arrest and release on bond, and immediately directed that the increase be put into effect.

Defendant complains about his inability to cross examine Greenlee regarding the fact that the rate increase went into effect, but fails to acknowledge that Greenlee resigned the day after defendant's arrest, and has no personal knowledge of what happened to the rate increase after he left the Office of the Governor.

Defendant also complains about his inability to present corroborating evidence regarding CMH and the racetrack, but he never made an offer of proof on the issue. Similarly, he complains about being cut off by the Court, Mot. 80, but never explains why defendant never got around to explaining to the jury the term, "tangible legal support," characterized by defendant as "one of the most important quotes in the case."

### b. Evidence of Events and Statements Related to the Senate Seat Occurring After Public Disclosure of Government Wiretaps

Defendant argues that his right to present a defense was unconstitutionally restricted by the Court's exclusion of evidence of regarding defendant's actions related to the Senate seat after defendant learned, through a Chicago Tribune article, that John Wyma was cooperating with the government and that the government had secretly recorded the defendant's conversations. Immediately after defendant received this information, defendant agreed that Robert Blagojevich should cancel his upcoming fundraising meeting with Raghu Nayak, who had offered bribes in exchange for the defendant appointing Jesse Jackson, Jr. to the Senate seat. Defendant's statements and conduct regarding the Senate seat in the three days between his receipt of information regarding the secret recordings and his arrest simply had no relevance to any matter at issue in the case. They were not probative of defendant's state of mind at an earlier time, that is, at the time he was conspiring and attempting to extort or solicit things of value in exchange for the Senate seat. With respect to statements, the admission of which is barred by the hearsay rule unless covered by an exception, if as is the case, statements are not probative of defendant's state of mind during relevant time periods, then they were not admissible under Fed. R. Evid. 803(3). *See generally, United States v. Williamson*, 512 U.S. 594, 600 (1994) (noting that exculpatory statements about past events are precisely the sort "which people are most likely to make even when [it is] false"); *United States v. Harvey*, 959 F.2d 1371, 1375 -76 (7th

Cir. 1992) (affirming exclusion of evidence not relevant to defendant's state of mind at the time of the charged offenses).

Accordingly, defendant was properly barred from introducing statements related to the Senate seat made after the government's recordings were made public, both under both Rule 803(3) and Rule 611(b).

## B.     Admission of Evidence of Defendant's Prior Conviction

Defendant contends that the Court erred in admitting evidence of defendant's conviction for making false statements to agents of the FBI because (1) the conviction was not final; and (2) its probative value was outweighed by the risk of unfair prejudice and therefore should have been excluded under Fed. R. 403.  Defendant is incorrect on both points.

Rule 609(a)(2) of the Federal Rules of Evidence provides that:

> For the purpose of attacking the character for truthfulness of a witness . . . evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness.

The fact that a court has not yet imposed sentence or entered judgment on a jury's verdict in no way precludes the admission of a conviction for impeachment purposes under Fed. R. Evid. 609(a)(2). A jury's verdict is sufficiently final and certain to warrant a "presumption of correctness," see Advisory Committee Notes to Rule 609(e), particularly where, as here, the Court has rejected the defendant's motion for judgment of acquittal or new trial.

It is the jury's verdict of guilty, beyond a reasonable doubt, that proves that the defendant committed an offense involving an act of dishonesty or false statement, and it is the commission of the offense that is probative of defendant's character for untruthfulness. Neither the entry of formal judgment nor the imposition of sentence adds anything to the conviction's probative value. *See United States v. Klein*, 560 F.2d 1236, 1241 (11th Cir. 1977) ("Where the guilty verdict is introduced for impeachment purposes, . . . it can be distinguished from a conviction only on the basis of a procedural requirement which is 'nothing more than a ministerial act.'") (quoting *United States v. Canaday*, 466 F.2d 1191 (9th Cir. 1972)). Thus the admission of a conviction upon which formal judgment has not yet been entered serves the purpose intended by Fed. R. Evid. 609,that is, to ensure that the jury has access to evidence directly relevant to the defendant's credibility. Accordingly, federal courts repeatedly have rejected the notion that entry of judgment on a finding of guilt is required before a conviction may be utilized under Rule 609. *See, e.g., United States v. Mitchell*, 886 F.2d 667, 670-71 (4th Cir. 1989) (upholding district court's order permitting cross-examination of defendant based on prior convictions as to which defendant had not yet been sentenced, and for which the time for appeal had not yet run) (citing *United States v. Duncan*, 598 F.2d 839, 864 (4th Cir. 1979) (holding that a court's acceptance of a jury's verdict is "a sufficient predicate for the use of the 'verdict' for impeachment" in a subsequent trial); *United States v. Smith*, 623 F.2d 627, 630–31 (9th Cir.1980) (holding that there is a "conviction" for the purpose of Fed. R. Evid. 609 when there has been a verdict of guilty, even if the judgment of conviction has not been entered or sentence imposed);

*United States v. Vanderbosch*, 610 F.2d 95, 96-97 (2d Cir. 1979) (holding that jury verdict of guilty prior to entry of judgment is admissible for impeachment purposes if it meets the other requirements of Rule 609) (collecting cases); *United States v. Rose*, 526 F.2d 745, 747 (8th Cir. 1975) ("We find no significant difference between the jury's finding of guilt and the entry of judgment thereon as far as probative value for impeachment purposes."). The reasoning of these cases has particular force where, as here, the district court already has denied a motion for judgment of acquittal or new trial.

Defendant argues that the fact that Fed. R. Evid. 609(e) specifically provides that a conviction may used for purposes of impeachment even though an appeal is pending indicates that, before such time as an appeal is ripe, it is not final. Just the opposite is true. Rule 609(e) is one of inclusion, not exclusion. It recognizes that standards of finality applicable in other contexts are not applicable to the context of impeachment. Excluding evidence of conviction based on the fact that formal judgment has not been entered would elevate form over substance, and thwart the purpose of Fed. R. Evid. 609, which is to ensure that the jury has access to information bearing directly on credibility.

Pursuant to the plain language of the rule, evidence of a conviction involving dishonesty or false statement is automatically admissible for impeachment purposes under Fed. R. Evid. 609(a)(2), without regard to the probative value/prejudicial effect balancing test applicable under Fed. R. Evid. 609(a)(1), and without regard to Fed. R. Evid. 403. *United States v. Kuecker*, 740 F.2d 496, 501 (7th Cir. 1984) (holding that

79

trial court has "no discretion to prevent introduction, for impeachment purposes, of evidence of prior convictions for crimes involving dishonesty or false statement"). Convictions of crimes involving dishonesty and false statements are singled out for mandatory admission because such convictions are so "peculiarly probative of credibility," *see* Advisory Committee Notes to 1974 Enactment, that their probative value conclusively outweighs any risk of unfair prejudice. Thus, there was no balancing to be done, and the Court properly admitted this evidence.

Contrary to defendant's contention, there was nothing improper about the government's use of the term "convicted liar" during cross examination. *United States v. Turner*, 2011 WL 2674937, *8 (7th Cir. July 11, 2011) (holding prosecutor does not err by referring to defendant as "liar" in argument) (quoting *United States v. Catalfo*, 64 F.3d 1070, 1080 (7th Cir. 1995) (internal quotations omitted)). Here, the credibility of the defendant was at issue. Defendant argues that the term "convicted liar" was incorrect because defendant was convicted of false statements, rather than of being a liar. Rationally speaking, however, defendant was convicted of conduct that in common parlance is lying; therefore he was (and is) a convicted liar. Finally, defendant speculates that the jury may have inferred (or remembered) that defendant's conviction resulted from related proceedings, and that the offense was charged in the same indictment as the one the jury considered. There was nothing in the prosecutor's question, however, that made the connection, and the indictment the jury was provided was redacted to remove the false statement count. Moreover, the jury was instructed to base its deliberations only on the evidence presented at trial, and was instructed not

80

to consider defendant's earlier conviction as evidence of guilt on the charged offenses. The jury is presumed to have followed these instructions. *See United States v. Joshua*, 2011 WL 3436937, *6 (7th Cir., August 8, 2011) (citing *United States v. Clarke*, 227 F.3d 874, 883 (7th Cir.2000)). There was no error here. *See also infra* at 118-19.

### C. Exclusion of Wiretap Recordings

The defendant also complains that he was prevented from introducing recordings that allegedly corroborated his testimony. In large part, defendant complains that from the first trial to the second trial, the Court unfairly changed its view of admissibility of calls by the defense. This complaint misrepresents the nature of the Court's rulings in a number of respects. First, there were a number of calls that the defense sought to admit at the first trial to which the government made no objection on admissibility. That was not the case at the second trial. The government objected to the admissibility of virtually each one of the calls to which it not did lodge an objection at the first trial. Therefore, when the Court ruled the calls inadmissible at the second trial, it was not changing its ruling. Rather, it was ruling for the first time on a government objection to admissibility.

Second, contrary to defendant's claim that during the first trial the Court issued a blanket ruling of admissibility of 16 recordings, in fact the Court conditionally admitted certain recordings based on a number of things, including the nature of defendant's testimony, which necessarily included cross examination. These rulings were entirely consistent with the Court's rulings at the second trial that some recordings would be potentially admissible as prior consistent statements if the

81

defendan's testimony were to be attacked or challenged in certain ways. In fact, certain of the calls on defendant's list of "admitted" calls include two calls about which the Court ruled at the first trial that the Court needed to voir dire the defendant outside the presence of the jury in order to determine the admissibility of the recording.

Third, certain of the recordings defendant sought to admit at the second trial were admitted at the first trial not by defendant, but rather by the government or co-defendant Robert Blagojevich. The Court's determination at the second trial that these same recordings were inadmissible because they were offered by the defendant under particular factual and legal theories is clearly not a change in course from the rulings on admissibility at the first trial. Further, the defendant's position that somehow the Court's decision on the admissibility of evidence in the first trial would be forever binding on the Court is simply not the law. The Court, if it chooses to do so, can reconsider rulings and the government can present new or different arguments as to why certain pieces of evidence are not in fact admissible. In fact, the Court indicated that it had witnessed the defense repeatedly make inadmissible, inappropriate and barred questions and argument during both the first and second trials and stated that this did impact its rulings at various stages of the second trial.

The defendant also argues that the Federal Rules of Evidence are unfair in that the rules barred admissibility of certain evidence he wanted to admit. This argument obviously has no merit generally and, specifically to the recordings about which defendant complains, defendant fails to acknowledge that he testified about nearly every recorded conversation which the Court did not permit him to admit and publish.

82

The Court's enforcement of evidentiary rules that prohibited the defendant from going a step further and admitting and publishing recordings to which there was no valid hearsay exception was legally correct and fair.

Defendant recycles an old argument that the vast majority of the calls would have somehow corroborated that he was using Valerie Jarrett and Congressman Jackson as leverage to make the Lisa Madigan deal happen. These arguments fail to take into account that any calls that actually supported defendant's "leverage" theory would have been in direct conflict with defendant's actual trial testimony. Defendant repeatedly testified that in fact he had not decided what he was doing with the Senate seat and, particularly during the period of time when Jarrett was an active candidate for the Senate seat, defendant had made no decision about Lisa Madigan. Defendant also testified that he was always considering himself and in fact had not made a decision about Lisa Madigan until just before his arrest.

Defendant argues that the calls were admissible because they reflected his state of mind. However, defendant testified to virtually each one of the calls that he sought to admit and publish. In addition, the Court left open the possibility that the calls could be admitted and published as prior consistent statements if defendant was challenged on the call through cross examination. Defendant did not seek the admission of any recording as a prior consistent statement, and with good reason. Defendant was not challenged on cross examination regarding the vast majority of the calls to which he testified. For the few on which he was challenged, the recordings themselves were not prior consistent statements but rather highlighted defendant's

misleading testimony about the calls. In fact, one such call is one about which defendant now surprisingly complains, specifically, the call with Dennis Hastert. Although he was not allowed to admit and publish the call on direct, defendant testified about that very call and put a misleading slant on the statement that was made regarding "quid pro quo." Defendant was able to do so because he had not played the call and rather simply testified about the call. In fact, defendant was challenged on this misrepresentation on cross-examination based on what was actually said in the call rather than his testimony. Tellingly, defendant never sought to admit the recording as a prior consistent statement because the call itself was not consistent with his testimony about the call.

Finally, the defendant complains that somehow the jury was influenced by the fact that the government had so many tapes and the defense had so few. As stated elsewhere, relevance and admissibility is determined item by item, not by how many or how few exhibits a particular party has admitted. In fact, the defense successfully, albeit inappropriately and contrary to Court order, repeatedly used transcripts and references to recordings to "refresh recollection" of the defendant in front of the jury. The manner in which the refreshing of recollection was done made it clear to anyone in the courtroom that the calls about which defendant was testifying had been recorded.

The following is the government's response to the individual recordings about which defendant claims the Court unfairly changed its ruling concerning admissibility:

      **1.**      **CMH - Robert Cell 1130**

The defendant testified on direct about this call and the government did not contest the substance of this call. 05/31/11 Tr. 58-60. Defendant argues that this call showed that he was concerned about contacting Patrick Magoon about a fundraiser at this time. In fact, the call does not show that. The call shows only that defendant instructed his brother not to call Patrick Magoon. Defendant himself was the only person who could establish that he was in any way concerned, and he did testify to this fact.

### 2. Racetrack

**Home 553, Home 845 & 847, Robert Cell 1563**

Each one of these calls was offered and admitted by the government at the first trial. No hearsay exception applied to these calls for defendant in the second trial. Defendant's argument is that these calls show that he had learned that Johnston committed to make a contribution. Defendant testified to this and was not challenged. In fact, the government embraced this fact as part of its own theory of guilt and admitted calls in its case-in-chief that were consistent with these calls.

**Home 1108**

During the first trial, the Court did not rule that this call was admissible. The Court ordered the defense to redact the call and resubmit for consideration, and the defendant never did. During the second trial, the defendant testified about the substance of this call and his testimony was not contested. In his motion, defendant now argues that this call shows that defendant was concerned about the connection between the Chris Kelly pardon and racetrack bill. In fact, that argument runs directly

counter to defendant's own testimony at trial. Defendant testified that in fact he was not concerned about any such connection at the time of this call (November 27).

**Monk Cell 360**

This call was not offered in the first trial by any party. At the second trial, the content of this call was consistent with defendant's testimony and his testimony was not contradicted. To the contrary, it was embraced by the government.

**Blagojevich Cell 117**

This call was not offered in the first trial by any party. Defendant testified at length about this call and was able to admit and publish another call with Bill Quinlan on the same day about the same subject matter, which was more detailed.

### 3. Senate Seat

**Home 126**

The government did not object to the admission of this call at the first trial. At the second trial, the government objected. During the second trial, defendant testified about this call. 06/01/11 a.m. Tr. 56. In fact, defendant testified as to the exact language about which he now complains he was not able to publish to the jury. The defendant's testimony was not contested.

**Home 477**

During the first trial, the Court conditionally admitted this recording depending upon the nature of the testimony and after defendant's testimony. During the second trial, defendant testified about this call. 06/02/11 a.m. Tr. 28. In fact, defendant testified as to the exact language about which he now complains he was not able to

publish to the jury. The defendant's testimony was not contested. This call and the manner in which defendant testified about this call is a good example of defendant inappropriately putting the advice of counsel defense before the jury after specifically being ordered that he could not do so.

**Home 482 and 497**

The Court did not admit these calls in the first trial but, rather, the Court stated that he would voir dire the defendant outside the presence of the jury regarding these calls. During the second trial, defendant testified repeatedly about conversations that he had with Quinlan about the Senate seat that were much more substantial than these two calls. For example, here are a few excerpts from defendant's testimony concerning conversations with Quinlan:

Q: Did you also have several conversations with Bill Quinlan about the Senate seat?

A: Yes. I talked to Bill Quinlan about it constantly, continuously, almost every day. Almost every day.

Q: Did you have conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat?

A: I had several conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat.

Q: Do you recall at all having a conversation with Mr. Quinlan and Mr. Harris in which there was a discussion about a 501(c)(4), and Mr. Quinlan and/or Mr. Harris specifically told you don't even joke about that when it comes to the Senate seat?

A: No, I don't recall anything like that because Quinlan and I and Harris talked about 501(c)(4)s long after that a lot.

Q: And did they ever say, hey, don't even joke about that issue?

87

A:     No.  In fact, to varying degrees, they both encouraged me to explore the idea and see whether or not it made sense connection with the Senate appointment.

5/31/11 p.m. at 101.

Q:     Did you have conversations with Bill Quinlan about the 501(c)(4)?

A:     I did.  Constantly and continually.

Q:     And November 10th and 11th did you discuss the 501(c)(4) with Mr. Quinaln?

A:     Yes, I did.

Q:     And what was your understanding his position was regarding the 501(c)(4) idea?

A:     He thought it was a good idea.  He — he did the legal research to see how you put it together, and we discussed whether or not that was something that we can consider doing in connection with a possible Senate appointment of Valerie Jarrett.

Q:     And on November 10th, did you have a conversation with Mr. Harris and Mr. Quinlan?

A:     I did, and many others.

Q:     So is it your understanding that you had more than one conversation with Mr. Quinlan and Mr. Harris?

A:     Yes; and other people, right.

Q:     In that telephone conversation you had with Mr. Harris and Mr. Quinlan, did you ask the question: 'So anybody wanna argue why I should appoint Valerie Jarrett in exchange for nothing?' Mr. Quinlan said: 'I'm not going to argue that, I would argue appointing Valerie Jarrett.  You get something that is helpful to you and then you got a way to get, get what you can, get from appointing Lisa Madigan or appointing Louanner or appointing Gery Chico.'  Did you say that to Mr. Quinlan on November 10th and did he say that to you?

A:     Yes.

88

Q:     And you had — how many conversations like this did you have with Mr. Quinlan?

A:     I talked to Bill Quinlan 3 or 4 times a day and on weekdays sometimes 5, sometimes 6 times a day on the telephone, and then I would see him in person a lot as well and those are hard to quantify, but I would say, you know, 3 to 5 to 7, who knows, on a given day.

Q:     And these conversations you had with Mr. Quinlan regarding the 501(c)(4), how did that affect your state of mind when talking about the Senate seat and the 501(c)(4)?

A:     That it was doable. I even asked him that and he said it was. That it was — that it's something we should consider the idea and pursue the idea and see where it goes, and that it could do the things that I was hoping to do. And that it was along the lines of us looking at other models —

6/2/11 a.m. Tr. 28.

**Home 548**

During the first trial, the Court conditionally admitted this recording depending upon the nature of the testimony and after defendant's testimony. During the second trial, defendant testified about this call. 06/02/11 a.m. Tr. 62. In fact, defendant testified as to the exact language said by Bill Quinlan, and his testimony was not contested.

**10/11/08 Overhear**

During the first trial, this call was admitted by Robert Blagojevich. Defendant was not a participant in this conversation and there was no exception to the hearsay rule that applied for defendant.

**Home 577**

During the first trial, the Court conditionally admitted this recording depending upon the nature of the testimony and after defendant's testimony. Contrary to defendant's claim, it is not clear on its face how this went to defendant's state of mind regarding the allegations at issue regarding the Senate seat.

**Home 912**

This call was offered and admitted by the government at the first trial. Defendant repeatedly testified that he was always considering a number of candidates and this was not disputed.

**Home 971**

During the first trial, the Court did not admit this call and in fact stated that it was unlikely to come in under any circumstance but would wait to hear testimony. At the second trial, there was abundant testimony about this call. This testimony was not contested and, in fact, defendant admitted the list discussed during the call during his testimony and testified at length about the list. Defendant testified about a variety of calls in which he directed people to do this same thing. 06/01/11 a.m. Tr. 50 (defendant testified to a November 1, 2008 conversation with Greenlee where he tells Greenlee to jot down ideas for Madigan deal); 06/02/11 a.m. Tr. 94 (defendant testified about call with Greenlee on November 21, 2008, to come up with list for things in exchange for Lisa Madigan). In fact, defendant presented more direct evidence on this issue through his testimony than this call with Harris would have provided.

90

**Home 985**

During the first trial, the Court conditionally admitted this recording as a prior consistent statement depending upon the nature of the testimony and after defendant's testimony. During the second trial, defendant testified about this call and this testimony was not disputed.

**Home 1081**

The government did not object to the admission of this call at the first trial. At the second trial, the government objected. During the second trial, defendant testified that he talked with Gery Chico. 05/31/11 Tr. 90. Defendant does not offer a basis as to why this call should have been admitted or how it would have been helpful to the defendant if the entire call was put into evidence.

**Home 1329, FOB 546, FOB 548**

Defendant testified about these conversations. 06/02/11 a.m. Tr.107-123. His testimony was not challenged and in fact was embraced by the government. He testified at length about calls with Senators Reid (107) and Menendez (112). He also testified on redirect about the Menendez conversation. 06/07/11 a.m. Tr. 88-89. He was able to repeatedly testify to the very reason he now gives for wanting the call admitted.

**Robert Cell 2615**

During the first trial, this call was offered by Robert Blagojevich. During the second trial, the government's proof regarding the attempt to trade the Senate seat for the $1.5 million from Nayak ended on December 5, 2008. This call took place on December 6, 2008 about a prospective meeting that might occur, offered in an attempt

to prove defendant's state of mind prior to the call, which is specifically barred by Rule 803(3). The argument is that this would have shown that it was not one for the other. But defendant testified that his whole deal was about a mortgage foreclosure bill, and thus the call would not have corroborated that testimony.

**FOB 571**

During the first trial, the government did not object to admissibility of certain sections of this call. The government did object at the second trial. Defendant testified about this call and was not challenged. 06/22/11 a.m. Tr. 120.

### D. Redaction of Wiretap Recordings Admitted by the Government

Defendant argues without authority or analysis that he should have been permitted to admit portions of calls not introduced by the government pursuant to Fed. R. Evid. 106. The Court ruled on defendant's objections to the government's redactions in meticulous detail. Defendant has provided no basis for revisiting the issue. The argument is undeveloped and thus waived; to any extent that the argument is not waived, the government incorporates by references the written and oral arguments regarding this issue prior to trial.

### E. Limits on Cross Examination

Defendant complains that he was denied the ability to conduct meaningful cross-examination of government witnesses, but fails to identify a single question, let alone topic area, that was inappropriately precluded by the Court. In fact, defendant was allowed every opportunity to conduct proper, relevant, probing cross-examination and repeatedly chose not to do so. Instead, defense counsel chose to ask objectionable,

inappropriate, and barred questions repeatedly, which led to numerous government objections, most of which were sustained by the Court. Defendant also complains that the inappropriate and objectionable actions of defense counsel at the first trial somehow should not have affected the rulings at the second trial. Defendant fails to acknowledge that the Court repeatedly indicated that it made certain rulings and allowed certain questions at the first trial based on representations by defense counsel that were not upheld or were violated. Defendant also fails to recognize that there were certain questions and topic areas on cross examination to which the government did not object at the first trial, but did so object at the second trial. Defendant's overall complaint is really that he was not allowed to ask whatever question he wanted whenever and however many times he wanted to ask it, without regard to the Federal Rules of Evidence and the Court's rulings. This position is untenable under the law and unsupported by the record.

Defendant complains that he was not able to test the credibility of "cooperating" witnesses and claims that the government "elicited half-truths or misleading testimony from witnesses to which the defense was prohibited from exposing." Mot. 110. The defendant uses John Wyma as an example, claiming that the government elicited misleading testimony regarding Wyma's motivation for cooperating. In fact, that very issue was argued during Mr. Wyma's cross-examination during the first trial and the Court told defense counsel what questions he would allow. Defense counsel then choose to ask different questions, which were objected to and sustained. Because of that, before Mr. Wyma's testimony during the second trial, the government raised the

same issue with the Court to prevent defense counsel from asking questions it knew were barred in front of the jury. Defense counsel made his argument as to what questions he sought to ask and why. The Court made rulings regarding what questions defense counsel could ask and, again, defense counsel chose to ask different questions, which were objected to and sustained. It was clear in both the first and second trials that defense counsel made strategic decisions about which questions he would ask Mr. Wyma about the Provena subpoena and his motive to cooperate. In addition, during the second trial, defense counsel intentionally asked Mr. Wyma questions the Court had specifically barred him from asking.

For example, prior to Mr. Wyma's cross-examination, the government moved to bar the defense from asking Mr. Wyma any questions about Patrick Magoon and an alleged relationship to the Illinois Hospital Association. The Court granted the motion and specifically directed defense counsel not to do so. Yet, within minutes of the Court telling counsel he could not raise the IHA with Mr. Wyma, defense counsel proceeded to ask Mr. Wyma about Mr. Magoon and the IHA. Ironically, this very subject matter is one about which the defendant complains he should have been allowed to pursue. Mot. 116. Defendant offers no explanation as to why and completely leaves out the fact that he violated the Court's order on this topic area anyway. This behavior was repeated throughout the trial with virtually every witness. The only explanation for counsel's decisions is that they were strategic decisions about how cross examination of the government witnesses would be conducted. In fact, such objectionable, albeit strategic, decision making on the part of the defendant is precisely what the Court

94

witnessed during the first trial and sought to prevent during the second trial. Despite its best efforts in accord with the law, the Court noted during the second trial that the defendant was still able to "smuggle" certain information into the trial before the jury.

This same strategic thinking was most apparent with respect to defense counsel's questioning of Robert Greenlee. On May 12, 2011, defense counsel sought permission to voir dire Mr. Greenlee regarding his motivation to cooperate with the government. Counsel took Mr. Greenlee through a series of well-crafted questions regarding his cooperation with the government, including questions (all of which Mr. Greenlee answered affirmatively) that he was approached by the FBI on December 9, 2008, heard his voice on tape, hired an attorney, was scared, was worried and scared about being prosecuted and was worried and scared about going to jail, that he continued to cooperated with the government and remained scared about going to jail and being prosecuted. The Court approved those questions being asked in front of the jury. Once the jury was brought back in, however, defense counsel did not ask the approved series of questions. Rather, defense counsel asked Mr. Greenlee to confirm the following: that he was approached by the FBI on December 9, 2008, heard his voice on tape, the FBI left, he was scared, he hired an attorney, began to cooperate and continued to cooperate for two and a half years. Defense counsel skipped all the questions about Mr. Greenlee's worry and fear of being prosecuted and going to jail and instead asked an objectionable question he had not asked during the voir dire, which was whether Mr. Greenlee had been prosecuted. This was a very clear strategic decision by defense counsel. The questions regarding Mr. Greenlee's fear of prosecution

95

and jail arguably would have undercut the defense theory at trial that no one, including the defendant and all of his advisors, believed that they were doing anything wrong. However, those were the proper questions to challenge Mr. Greenlee's motivation to cooperate. Instead, defense counsel intentionally chose to ask a clearly objectionable question in front of the jury and not on voir dire, in an effort to insert a barred argument before the jury that did not properly challenge Mr. Greenlee's motivation to cooperate. Contrary to defendant's complaint, his "inability" to ask questions that challenged the "cooperating" witnesses' credibility was of his own strategic making, rather than of any error of the Court.

Defendant's complaints about the limits placed on his cross-examinations of Patrick Magoon, Gerald Krozel, and John Johnston are also misplaced. Defendant's efforts to ask additional questions about historical contributions those witnesses made to his campaign and other politicians was part of an improper effort to argue that political insiders could not be victims of extortion, and those questions were correctly excluded.

With respect to Magoon, Blagojevich first inaccurately describes the evidence of Magoon's prior contributions. Magoon's proffered testimony demonstrated that he had no involvement in any contributions made by the Illinois Hospital Association ("IHA")—they were made by a separate IHA PAC board, of which he was not a member—and his maximum personal contribution to defendant in any year was $1,000, a far cry from the $25,000 that defendant sought from him in 2008.

96

Nonetheless, defendant argues that evidence of Magoon's contributions was relevant to defendant's state of mind. Mot. 116. But this, of course, could be true only if there were evidence that defendant was aware of the contributions that Magoon had made. Defendant could not establish this connection through Magoon, who did not interact with defendant with respect to contributions; thus it would have been improper to elicit the information from Magoon without that link. It also did not ultimately matter—defendant subsequently testified, without contradiction from the government, that he was aware that Magoon had contributed money to him and had done a fundraiser for another state senator. 5/31/11 p.m. Tr. 22-23. Defendant was then free to introduce additional evidence about those contributions, such as by recalling Magoon or admitting documents, but chose not to do so.

Defendant also suggests that evidence of Magoon's other contributions would have undercut Magoon's testimony that "he felt extorted by merely being asked by Blagojevich's brother for a campaign contribution." Mot. 116. That, of course, was not Magoon's testimony. Magoon said that he felt that defendant was linking the fate of the rate increase to the request for a contribution because: (1) Robert Blagojevich made the request 5 days after defendant called Magoon to let him know about the potential increase; and (2) Robert Blagojevich asked Magoon to make the contribution before January 1, 2009, after defendant told Magoon to keep quiet about the rate increase until that same date. Thus, Magoon did not suggest, nor did the government argue, that defendant's mere asking for a contribution was the basis of the extortion charge.

97

Defendant's arguments with respect to Johnston and Krozel are similarly flawed. As a factual matter, Krozel actually did testify about his earlier fundraising efforts for Blagojevich, 5/16/11 p.m. Tr. 6-8; the Court precluded questions only about contributions that Krozel made to other politicians or on behalf of trade associations. 5/17/11 a.m. Tr. 56-61. In addition, defendant testified, again without contradiction from the government, that he was aware that Johnston was a historical contributor who gave $300,000 to defendant's campaign, and also contributed to others as well. 5/26/11 p.m. Tr. 102-03, 105.

Nonetheless, defendant argues that additional evidence of Johnston's and Krozel's prior contributions should be have been admitted because those contributions were made under the "same circumstances" as the contributions that Blagojevich sought in 2008. Mot. 118. That is simply wrong—the earlier contributions were not the result of analogous circumstances, nor did defendant demonstrate in his proffers of those witnesses that earlier contributions had any effect on how either Johnston or Krozel viewed defendant's statements and actions.

At root, defendant sought to admit evidence of other, unrelated political contributions by Magoon, Johnston, and Krozel to support the argument he made in his opening statement – that "political insiders and millionaires" could not be extortion victims. 5/2/11 Tr. 10 (Opening Statement) ("They also talked to you about these so-called victims, Patrick Magoon and John Johnston and Jerry Krozel. They want you to believe that these political insiders and millionaires are victims.") This was an

98

improper argument from the start, and the Court was correct to preclude other irrelevant evidence from the trial.

## F.     Rulings During Defense Case

Defendant claims that the defense's efforts to present their case-in-chief were marred by rulings of the Court that forced him to present evidence more rapidly than he chose, and precluded him from presenting evidence that carefully went through the recorded conversations offered by the government.  As a matter of fact, the defense went through the recorded calls in painstaking detail, and was permitted to present to the jury his understanding of the calls.[38]  Defendant's claims of bias related to this issue are unsupported by the record.  Other arguments made by the defendant are similar.  Defendant argues that his ability to present evidence regarding Johnston was restricted; yet defendant did testify regarding prior contributions by Johnston.[39]

### 1.     Cross Examination of Jesse Jackson, Jr.

Defendant argues that the Court improperly allowed the government to cross-examine Jesse Jackson, Jr. about an incident in which defendant indicated to Jackson that defendant did not hire Jackson's wife for a state job because Jackson had

---

[38] Contrary to defendant's contention, there was nothing improper in the government's questioning regarding the recorded conversations. Government witnesses properly testified regarding background and context of the conversations, as well as their understanding of comments made directly to them by defendant. There was no testimony comparable to the type of "personal feelings" that were found improper in *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000).

[39] The circumstances surrounding Johnston's contributions to Clayborn and Johnston's contributions to defendant were entirely different.

refused to make a $25,000 contribution to defendant. Defendant asserts that this was improper because the government raised one possible way in which the direct examination could open the door to the topic matter before the examination, but then pointed out a different way that the door was opened after the actual direct. Mot. at 119.

In fact, the government consistently argued that the incident was properly admitted during cross because it explained the relationship between Jackson and defendant. Regardless, defendant does not provide any legal support for his suggestion that the Court could consider only the arguments advanced by the government before it actually knew the actual questions and answers in the direct. To the contrary, as the Court pointed out to the defense before the start of Jackson's direct, the door could be opened by either Blagojevich's questions or Jackson's answers on direct, and this exactly what happened. As the Court found, at least one question and one answer during the direct raised questions about Jackson's history of contributions with defendant, bringing testimony about the $25,000 contribution request within the scope of direct. Thus, the evidence was relevant, within the scope of direct, and not unduly prejudicial and it was properly admitted. Moreover, in light of all the evidence of defendant's guilt, it is clear that, even if erroneous, the admission of this testimony could not possibly have had an impact on the jury's verdict.

### 2. Limits on Testimony of Rahm Emmanuel

Defendant also complains that the Court improperly limited the testimony of defense witness Rahm Emanuel. Mot. at 20. Again, there was no error.

100

At the time the defendant chose to call Emanuel, the defendant had not testified. Nonetheless, the defendant indicated he wanted to elicit several hearsay conversations from Emanuel, including one in which the defendant had not even participated. In particular, the defendant wanted Emanuel to testify about: (a) a conversation Emanuel had with the defendant on November 8, 2008; and (b) a conversation Emanuel had with several individuals, but not the defendant, in December 2008. Both conversations were hearsay. In the first, the defendant wanted to elicit his own statements through Emanuel without having to testify, and provided no non-hearsay basis to the Court for admitting the statements. Likewise, the defendant provided the Court with no non-hearsay basis for the admission of the second conversation. Nor would the second conversation have had any relevance absent the defendant's testimony that indicated he had knowledge of the conversation.

Even now the defendant fails to provide a non-hearsay basis for the admission of the Emanuel conversations. Rather, the defendant falls back on his argument that these conversations would have "corroborated" other testimony. Again, as addressed in detail above, the defendant's "corroboration" argument might have made sense had the defendant testified about the relevant conversations, been attacked, and then offered Emanuel's testimony as prior consistent statements or general "corroboration." The defendant, however, chose another sequence and attempted to introduce Emanuel's testimony ahead of the defendant's own testimony. Accordingly, the Court did not error in barring introduction of the hearsay statements the defendant attempted to offer through Emanuel.

101

### G. Cumulative Errors

Contrary to defendant's contention, the purported errors cited by defendant were not errors at all, and any possible errors, whether considered singly or in combination, could not possibly jeopardized defendant's substantial rights. *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (citation omitted), *overruled on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005).

### H. Admission of Evidence Introduced by Government

#### 1. Timeline Summaries

There was no error in the admission of the government's timeline summaries. In its case-in-chief, the government introduced voluminous audio recordings of conversations involving the defendant, as well as documentary evidence related to various aspects of the charged the scheme. By necessity, these exhibits were through the testimony of witnesses with personal knowledge, and as result, the jury was prevented from receiving the evidence in chronological order. Moreover, the jury's review in court was further complicated by the fact that many of the audio recordings contained discussions of multiple topics and, as a result, the jury was unable to review together all of the exhibits related to any particular aspect of the charged scheme. The government's timelines accurately summarized, in chronological order, the dates of, and parties to, recorded conversations, and information contained in documentary evidence, related to: (1) the Health and Human Services cabinet post; (2) a position at, and funding for, a 501(c)(4) corporation; (3) campaign contributions from supporters of Jesse Jackson, Jr.; and (4) the racetrack bill.

Rule 1006 provides that, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed. R. Evid. 1006. Here, the original recordings and transcripts were presented to the jury, but in a form that did not allow the jury conveniently to examine them in chronological or topic order. Under Fed. R. Evid. 611(a), the Court had discretion over the mode and order of interrogating witnesses and presenting evidence, and it was well within the Court's discretion to find, as it did, that the government's timeline summaries would help make the presentation of evidence in this case "effective for the ascertainment of the truth . . . ." Fed. R. Evid. 611(a).

Seventh Circuit precedent supports the admission of accurate and reliable summaries of previously-admitted exhibits in order to materially assist the jury in understanding complex or difficult evidence. Specifically, the appellate court has upheld the admission of summaries that place information contained in documentary evidence in chronological order. *United States v. Petty*, 132 F.3d 373, 378-79 (7th Cir. 1997) (holding that chronological lists of relevant telephone calls, and the telephone numbers from which they were placed, summarized from computer-generated telephone records, were admissible under Fed. R. Evid. 1006); *United States v. Conley*, 826 F.2d 551, 560 (7th Cir. 1987) (upholding admission of chronological charts showing "what the defendant was doing in relation to his taxes and financial activities" during the relevant period). Other courts have done likewise. *See, e.g., United States v. Gray*,

2005 WL 3059482 (N.D. Ohio Nov. 15, 2005) (rejecting argument that defendants were entitled to a mistrial based on the presence of government timelines in the jury room during deliberations despite district court's refusal to admit timelines in evidence, and holding such summaries could have been admitted in evidence) (citing *United States v. Bray*, 139 F.3d 1104, 1112-13 (6th Cir. 1998) (upholding admission of summaries, "not in lieu of the evidence they summarize, but in addition thereto")).

The government's timelines were also consistent in form with charts admitted in other cases. For example, in *United States v. Stoecker*, 215 F.3d 788, 792 (7th Cir. 2000), the Seventh Circuit upheld the admission of five charts which summarized the testimony of various witnesses, detailing the stocks the defendant had pledged as security for various loans, and demonstrating that, in several instances, the same stock was pledged to more than one bank, which the government contended were needed because the jury might forget these details during the course of a long trial. In affirming the admission of the government's summary charts, the court in *Stoecker* relied on *United States v. Swanquist*, 161 F.3d 1064, 1070 (7th Cir. 1998) (in which the Seventh Circuit upheld the admission of charts comparing the defendant's "disclosed" loans with defendant's "actual outstanding loans") and *United States v. Robbins*, 197 F.3d 829, 837 (7th Cir. 1999) (in which the court upheld the admission of an exhibit "recapitulat[ing] numerous and voluminous exhibits that had already been introduced into evidence and that were difficult to sort out.") *See also United States v. Turner*, 400 F.3d 491, 498 (7th Cir. 2005) (upholding admission of charts summarizing defendant's bank records for a five-year period and the testimony of an I.R.S. agent who analyzed

104

those records).  Similarly, the Seventh Circuit has upheld the admission of summaries which sort information derived from voluminous documents into relevant groups. *Robbins*, 197 F.3d at 837 (upholding the admission of charts which sorted information derived from telephone records, hotel and truck rental receipts, and credit card charges, into groups related to the various trips which a cooperating witness testified he took at the direction of the defendants).

Defendant claims, without specificity, that the timeline summaries were prejudicial and cumulative, and that they invaded the province of the jury.  This undeveloped claim is waived.  Even if not waived, the claim lacks merit.  The charts set forth information from voluminous exhibits previously admitted in evidence in an accurate and non-argumentative manner, placing the information in a form that materially assisted the jury in understanding the exhibits.  The summaries did not contain inferences drawn from the evidence but, instead, was limited to factual details concerning the recordings and other evidence.  The summaries were in no way prejudicial and for this same reason, any error in admitting them was harmless.

## 2.    608(b)

Nor was it error for the Court to permit cross-examination of the defendant regarding his criminal activity related to the Chicago Tribune.  Mot. at 126-27.

Pursuant to the Court's request, prior to cross-examining the defendant about issues related to his actions against the Chicago Tribune's editorial board, the government requested a sidebar to address the issue.  Blagojevich Tr. 6/2/11 a.m. at 86.  The questions at issue went to demonstrate that the defendant was attempting to have

the Chicago Tribune editorial board fired in exchange for providing funding to the Tribune Company in relation to the purchase of Wrigley Field. The evidence directly contradicted the defendant's statements that he did not link state action and personal benefits to himself.

In response to the offer of proof by the government, the defendant argued the evidence was irrelevant and not impeaching. The Court ruled otherwise, noting that it was impeaching of the defendant's implicit statements and testimony in other situations that the defendant did not premise state action on personal benefits. *Id.* at 87-89.

Thereafter, the defendant was generally questioned about his efforts to have John Harris communicate to a member of the Tribune Company that the Tribune editorial board should stop writing negative articles about the defendant and that the defendant wanted members of the editorial board fired before he would approve Wrigley Field financing. *Id.* at 90-96. The defendant denied he conditioned the Wrigley Field financing on the firing of the editorial board. *Id.* at 94. While the government questioned the defendant about recorded statements he made that appeared to contradict that answer, the government did not offer or seek admission of any extrinsic evidence to attempt to demonstrate the defendant's answer was false. Therefore, the government complied with Fed. R. Evid. 608(b).

During the defendant's testimony related to the Tribune, the defendant admitted he had asked Harris to communicate to the Tribune Company that the editorial board should "lay off" on the defendant—that is, to stop writing negative articles and

106

editorials about the defendant. *Id.* at 95-96. Thereafter, the government questioned the defendant about a statement he made after his arrest on a television news show. *Id.* at 96-99. The government used a demonstrative exhibit, which it never offered for admission in evidence, that was a transcript of a portion of the television interview. *Id.* at 96. In the television interview, the defendant directly contradicted his courtroom testimony and stated that he never directed Harris to tell the Tribune to "lay off" on the defendant. *Id.* at 96-97. Far from error, this was classic impeachment. The defendant's courtroom testimony was directly contradicted by a prior statement he made on national television. It was entirely appropriate to confront defendant with this inconsistency. The questioning was relevant and, since it went directly to the defendant's credibility, not unduly prejudicial under Rule 403. In addition, the government never offered for admission any extrinsic evidence to prove up a specific instance of misconduct.

Once again, the Court's evidentiary ruling was not erroneous, and any error was harmless.

## V.    Defendant is Not Entitled to Posttrial Relief Based on Purported Instructional Errors.

### A.    *Skilling* and Instructions Relating to Charged Offenses

As discussed in the government's response to defendant's claim that the Court should have granted defendant's motion to dismiss based on the Supreme Court's decision in *Skilling*, *supra*, and as argued repeatedly throughout this litigation, defendant's claim that proof of an express statement of a quid pro quo by defendant

was required in order to convict defendant of any of the charged offenses, and particularly those involving campaign contributions, is simply not correct. The instructions given to the jury made clear that a quid pro quo was required and that, in the case of counts involving campaign contributions, defendant could be convicted only if he "demand[ed], solicit[ed], [sought], or ask[ed] for, directly or indirectly, or agree[d] to accept money or property, believing that it would be given in exchange for a *specific requested exercise of his official power*." Nothing more was required. *See McCormick v. United States*, 500 U.S. 257, 273 (1991); *Evans v. United States*, 504 U.S. 255, 268 (1992) (holding that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.")

Defendant challenges the instruction dealing with the express/explicit issue, which read,

> It is not necessary that the defendant's solicitation or demand for a thing of value in exchange for influence or reward with respect to state business be communicated in express terms. The proposed exchange may be communicated in any manner, and need not be communicated in any specific or particular words, so long as the public official intends to solicit or demand something of value in exchange for influence or reward with respect to a specific item of state business.

Mot. 133. Defendant argues that this instruction was misleading because it eliminated the need to show that the quid pro quo was "stated in express terms" and that the "receiver must understand the message." This argument is wrong, because the instruction merely states that no specific words need be used, as long as the exchange is understood. This is an accurate statement of the law in this Circuit. *See Evans,* 504

108

U.S. at 274 (Kennedy, J., concurring); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 1992) (holding that there is no requirement of an expressly stated quid pro quo); *see also United States v. Siegelman*, 561 F.3d 1215, 1226 (11th Cir. 2009) (holding that the agreement must be explicit, but not express, and collecting cases). Thus, the instruction provided to the jury correctly stated the law, and to the extent that the defendant's proposed instruction Nos. 16, 17, 26, 27, 29 were inconsistent, the Court was correct in declining to give them.

Defendant asserts, without any supporting authority, that the jury must be instructed as to the order in which it must find the necessary elements of honest services fraud (*i.e.*, bribery first). The instructions related to bribery were provided together with those related honest services fraud, and no more was required.

Defendant's proposed instruction based on *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007) (Instruction No. 31) was properly rejected because in the context of the facts of this case, it was misleading. This case involved no payments made "in the usual course of business."

Moreover, contrary to defendant's contention, the law does not require unanimity with respect to the means by which a wire fraud is committed; therefore no specific unanimity instruction regarding acts of bribery was required. *See Richardson v. United States*, 526 U.S. 813, 817 (1999) (citing *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (plurality)). Nor is unanimity required regarding overt acts. *United States v. Griggs*, 569 F.3d 341, 343-44 (7th Cir. 2009).

Defendant's "substantial step" instruction was also properly refused. As discussed *infra*, the defendant is incorrect when he argues that speech cannot be a substantial step and that, therefore, his proposed substantial step instruction should have been given. The instruction proposed by the defendant did not accurately state the law and would have been highly misleading in the context of this case, where verbal acts were the means by which all of the charged crimes were committed.

The other instructions related to the elements of the offenses of conviction, Mot. 136-40, were either cumulative of other instructions and therefore unnecessary, or incorrect or misleading. In particular, since there was no claim that defendant should be convicted of conspiring to attempt, an instruction on that point was not needed. Nor was it necessary to instruct the jury that campaign contributions are protected by the First Amendment as long as they are not given in exchange for official acts. The distinction between contributions obtained in the context of an exchange and contributions obtained outside that context was clearly spelled out in the other instructions; putting before the jury First Amendment issues would only have caused confusion.

In sum, the instructions given to the jury specifically related to the charged offenses, and other instructions proposed by the defendant were properly declined. In any event, no purported instructional error in the offense-related instructions provides a basis for posttrial relief.

## B. Good Faith

Defendant argues that modifications made to the pattern good faith instruction "eviscerated" defendant's good faith defense. This argument is unfounded.

First, the good faith instruction provided to the jury was an accurate statement of the law. The instruction provided that (1) good faith was inconsistent with the requisite mental state for each of the charged offenses; (2) the burden was not on the defendant to prove his good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud; and (3) the government was not required to prove that the defendant knew his acts were unlawful. Defendant does not challenge the substance of these three points, but claims merely that including the third item with the other two diluted the effect of the instruction. All the instructions were read together, and there is no reason to believe that printing these three propositions on the same page had any effect. Nevertheless, given that no party is entitled to have an instruction given with any particular wording or format, it is clear that this claim provides no basis for relief.

The instruction also included language that defendant challenges here. The language was added as a result of the defendant's repeated efforts to put before the jury claims suggesting that he could not, or should not be convicted because (1) he did not know his conduct was unlawful; (2) he relied in good faith on the advice of lawyers; and (3) he believed his conduct was nothing more than legal political activity. The additional language read, "In the context of this case, good faith means that the defendant acted without intending to exchange official actions for personal benefits."

111

The Court offered to instruct the jury on the elements of the advice of counsel defense which, given the defendant's inability to satisfy the elements, could have been understood as directing the jury to disregard all of the evidence regarding defendant's discussions with lawyers. But the government was reluctant to accept that instruction because, at the time, the government could locate no direct precedent for the giving of such an instruction. Therefore, the government took a more conservative approach and suggested the language that was ultimately used, which focused on evidence the jury could rely on in finding good faith, rather than on a lack of evidence showing good faith reliance on legal advice. Now, with the benefit of the Seventh Circuit's opinion in *United States v. Joshua*, 2011 WL 3436937 (7th Cir., August 8, 2011), it appears that an advice of counsel instruction recommended by the Court would have been proper. The language that was actually used, however, was considerably more favorable to the defense.

Contrary to defendant's contention, defendant was not precluded from testifying that he did not exchange official acts for personal benefits and did not intend to. In fact he did so repeatedly. *See* discussion, *supra*, at 59-70. And as a matter of fact, the additional language comported with the defendant's testimony that he (1) at all times attempted to follow the law; and that he (2) did not, and did not intend to, exchange official acts for personal benefits. Had the jury believed defendant's testimony, the good faith instruction as given would have pointed the jury to acquittal. Accordingly, even if the instruction was erroneous, any error was harmless.

112

**D.     Refused Instructions Not Related to Charged Offenses**

**1.     Unrecorded Conversations**

Defendant complains that the Court declined to give a proposed instruction instructing the jury to "give testimony regarding phone conversations the same consideration you give to other evidence in the case including the recordings that were played." The Court was correct in refusing this instruction. There was no justification for directing the jury regarding the weight to give different types of evidence, and thus the instruction misstated the law. In any event, the stated goal of the instruction was accomplished, because the Court did instruct the jury that they could consider conversations described in testimony.

**2.     Personal Opinions and Bias**

Defendant challenges the Court's refusal to give an instruction at the end of the case to set aside personal opinions and biases. The government objected to the instruction on the ground that it posed the risk of raising issues the jury had set aside. The Court properly declined to give the instruction and any error was clearly harmless.

**E.     Number of Exhibits**

Defendant argues that he was prejudiced by the lack of exhibits that went back to the jury room. It cannot seriously be argued that the Court should have admitted inadmissible evidence so that the jury would have more defense exhibits when it deliberated. The admissibility of evidence must be determined item by item; it is not

a numbers game. The Court's decisions in this regard were correct, and any possible error was harmless.[40]

## VI. There Were No Overarching Errors Warranting Posttrial Relief.

### A. Double Jeopardy

Defendant asserts, without a shred of legal authority, that the retrial in this case violated double jeopardy principles. Apart from being undeveloped and therefore waived, the claim is frivolous. There was no Constitutional violation in conducting a retrial after the jury in the first trial failed to reach a verdict. Nor was there impropriety in the government's exercise of its discretion in dismissing certain charges and streamlining its presentation of evidence for the retrial. As stated above, the government did not seek to preclude "effective" defense tactics; to the contrary, the government asked the Court to preclude evidence and arguments that were improper under settled law. The fact that the Court agreed to grant the government's motions proved that the motions were sound, rather than that the Court was biased. As is the case in any retrial, both parties gained insights from the conduct of the first trial; this fact raises no double jeopardy issue. The mistrial here was unfortunate, but unavoidable by either of the parties. Double jeopardy principles provide defendant with no grounds for posttrial relief.

---

[40] With regard to his argument regarding the absence of wiretap recordings on defendant's side of the ledger, defendant cites to reports of public comments by the jurors after trial. Such comments may not be considered. Fed. R. Evid. 606(b).

**B.      Purportedly Pre-empted Defense Theories**

As discussed extensively elsewhere, defendant was fully able to present his defenses to the jury, and none of his legitimate defense theories were in fact "pre-empted" as he claims, Mot. 142.  Defendant *conceded* that he could not satisfy the elements of an advice of counsel defense.  Particularly in light of the Seventh Circuit's recent decision in *United States v. Joshua*, 2011 WL 3436937 (7th Cir., August 8, 2011), it is clear that advice of counsel and good faith or lack of intent premised on reliance on the advice of counsel cannot be distinguished.  The Court was correct in limiting evidence and arguments that misleadingly suggested that an advice of counsel defense was made out, when that was not the case. In any event, as demonstrated above, there was no possible prejudice because defendant repeatedly managed to get his pseudo-advice of counsel defense before the jury.

**C.      Purported Bias on the Part of the Court**

Defendant's overwrought and hyperbolic claims of bias and misconduct on the part of the Court are utterly unfounded. Most of the "evidence" of bias relied upon by defendant consists of adverse legal and evidentiary rulings by the Court.  Judicial rulings alone, however, "almost never" establish bias. *Liteky v. United States*, 510 U.S. 540, 551 (1994) (in context of recusal).  Moreover, as demonstrated above, the Court's legal and evidentiary rulings were correct.

Defendant contends that the Court improperly "formed a closed mind to the evidence" and improperly made findings of facts with respect to evidentiary rulings. Mot. 145. As the Supreme Court stated in *Liteky*, however:

115

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Liteky*, 510 U.S. at 555. Here, the Court showed no signs of "deep-seated favoritism or antagonism."

As stated by the Second Circuit in *In re J.P. Linahan, Inc.*, 138 F.2d 650 (2d Cir. 1943) (quoted with approval in *Liteky*, 510 U.S. at 551):

> Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.

*In re J.P. Linahan, Inc.*, 138 F.2d at 654.

This Court was entitled to form opinions as a result of what it learned in the first trial of this case. As the Court said in *Liteky*, "It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky*, 510 U.S. at 551.

Defendant complains that the Court unfairly expressed distrust in defense counsel, for example, by "keeping a tight leash" on examinations. Mot. 144. Rather than a product of bias, however, the Court's scrutiny clearly was the result of its observation of numerous instances in which the defense deliberately asked improper questions, and put improper and barred material before the jury.

> Not establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom

116

> administration-even a stern and short-tempered judge's ordinary efforts
> at courtroom administration-remain immune.

*Liteky*, 510 U.S. at 555-56; *see also Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008) (holding that Court's admonitions regarding counsel's method of questioning on cross-examination and improper objections, even though made with obvious frustration and in front of the jury, did not indicate bias, but reflected legitimate concern for the manner and mode of presentation of evidence).

In sum, contrary to defendant's contention, prior to and continuing through the trial in this case, the Court did nothing more, and nothing less, than attempt to protect the fairness of the proceedings, as it was obliged to do. There simply was no bias here.

## D.     Purportedly Improper Tactics by the Government

### 1.     "Tactics"

Defendant claims, without authority or analysis, that case was marred from the start by improper joinder, public statements made at the time of his arrest, and an "unconstitutional gag order." All of these claims are waived as undeveloped and, in any event they are meritless. Joinder was proper under Fed. R. Evid. 8(b), statements at the time of defendant's arrest could not possibly have prejudiced defendant's trial, held nearly two years later, during which time defendant conducted an unprecedented media campaign, and no gag order prejudicing defendant was entered. Thus, none of these "tactics," singly or in combination, provide grounds for posttrial relief.

117

## 2.    Purportedly Improper Questioning

The defendant complains about certain questions the government asked the defendant on cross-examination. Mot. at 150-52. All of the questions were proper. *See also supra* at 80.

First, the defendant complains that government was permitted to ask him whether he was a "convicted liar." In fact, the defendant was convicted of lying to the FBI. In the first trial, the defendant was convicted under Title 18, United States Code, Section 1001, for making false statements (*i.e.* lying) to the FBI. Thus, the question of whether the defendant was a "convicted liar" was entirely appropriate. According to the defendant, the government should only have been permitted to ask whether the defendant was "convicted of making a false statement to the FBI." The defendant's proposal is form over substance. In essence, the question endorsed by the defendant and the one that actually was asked are the same question.

The defendant also complains the Court had a "double standard" because it sustained the government's objection to a defense question to Rajinder Bedi regarding whether he was "a thief." There was no double standard. In fact, the defense elicited from Bedi that he had been convicted of retail theft. The defendant, however, thereafter chose to ask an overly broad question, without reference to a conviction, suggesting that Bedi was, generally, "a thief." The objection to such a broad, generalized question was properly sustained. Had the defense asked Bedi whether, in fact, he was a "convicted thief" (which in essence they already had elicited), such a question would have been proper. Since the government limited its question to the fact

118

that the defendant was a "convicted liar," any comparison to the defendant's improper question to Bedi is inapt.

Second, the defendant complains that the government was permitted to ask the defendant questions about whether the Jackson, Jr. offer of campaign contributions was "illegal," but that the defendant was not permitted to more generally testify about whether other exchanges were "legal." Again, the situations are dissimilar. On direct examination, the defendant repeatedly stated he would not trade the Senate seat to Jackson, Jr. for $1.5 million in campaign contributions because it would be improper to do so. The government's questions sought to explore, purely in the context of the Jackson, Jr. offer, the defendant's statements that he would not be involved in such a deal because he believed it was improper. The defendant's statements in this regard were particularly important given that, on December 4, 2008, the defendant sent his chief fundraiser to interact with the same individual, Raghu Nayak, whom the defendant had testified on direct examination he knew was offering improper benefits.

The Court addressed the defendant's argument that somehow the questioning about the defendant's understanding of the Jackson, Jr. offer opened the door to general questions about illegality. 6/7/11 p.m. Tr. 32-33. First, the Court noted the questions on cross-examination, in part, went to the issue of whether the defendant knew the name of the offense that he testified was an improper offer. Second, the Court noted that it was the defendant's position that, in fact, the offer was illegal and, therefore, there was no opening of any doors. Finally, the Court noted that the door could not be opened to the defendant's opinion of the legality of the other Senate seat

119

transactions because those opinions were irrelevant and could not properly be put before the jury. Accordingly, the Court properly addressed the issue at the time of trial and the Court's ruling was not error.

Finally, third, the defendant argues that the government was permitted to ask improperly phrased questions. Despite having the transcripts of the defendant's cross-examination, the defendant does not cite a specific question that was improper. Accordingly, this argument is undeveloped and waived. Without more, it is difficult to respond other than to note that often questions were phrased broadly because the defendant repeatedly refused to answer more straightforward questions. Rather, the government repeatedly found itself in situations where broad questions (*e.g.* "In any conceivable way . . .") were necessary to attempt to get a straightforward answer from a defendant who was often purposefully evasive during cross-examination.

### 3. Purportedly Improper Arguments

Defendant complains that the government's argument analogizing defendant to a police officer soliciting a bribe was inapt because, unlike a police officer, the defendant could legally ask for campaign contributions. Contrary to this contention, defendant could *not* legally seek contributions in exchange for official acts, which is what the indictment alleged, and the evidence showed, he did. Thus the analogy was apt, and the argument proper. Even if erroneous, the argument was plainly harmless, given that the analogy was clearly a rhetorical device that the jury was free to accept or reject, and that the Court instructed the jury that the statements of lawyers were not evidence.

Next, defendant argues that the government argued that the jury needed to answer only a single question to find defendant guilty. Defendant is mistaken. The government's argument was that the *central* question the jury needed to answer was whether the defendant tried to get a personal benefit in exchange for official acts. The government went on to provide detailed descriptions of all the elements of each charged offense. There was no suggestion that the other elements were unnecessary or unimportant. To the contrary, the government's presentation made it very clear that the jury needed to consider each element with respect to each crime, and that it could only convict if it found that the government had proven each element beyond a reasonable doubt. The government did not skip over "materiality" or any other of the elements of the charged offenses. Nor did the government misrepresent the elements of the charged crimes by pointing out with evidence and argument that honest services fraud, bribery, and extortion under color of law, at their heart, all focus on a public official's violations of his duty to the public.

Defendant argues, without citation or analysis, that it was improper for the government to suggest that the jurors take notes during its argument. There was nothing improper about this suggestion; it merely facilitated the jury's absorption of the government's lengthy and detailed argument.

The rest of defendant's arguments are merely disagreements with the inferences the government properly asked the jury to draw from the evidence. All of those inferences were supported by the evidence, and none of the arguments were improper.

## VII. The Jury's Verdicts Were Supported by Ample Evidence.

Based on his own innocent interpretations of the evidence, defendant argues that the evidence was insufficient to support the jury's verdicts of guilty. A defendant's ability to offer innocent explanations for the evidence against him does not come close to establishing what is necessary to obtain a judgment of acquittal, namely, that "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *See United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (citation omitted).

### A. Substantial Step

Defendant argues that the evidence was insufficient to support the jury's verdicts of guilty on the attempt charges (Counts 12 and 19) based on the premises that (1) speech cannot constitute a substantial step; and (2) the evidence established that defendant engaged only in speech, or more specifically "hot air." Mot. 3-4. Neither premise is accurate.

First, while it true that speech that fairly can be characterized as "hot air" or "just talk" is insufficient to constitute a substantial step, *United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008), it is not the law that a defendant can never take substantial step through speech. Whether particular speech amounts to a substantial step depends on the nature of the speech and the nature of the crime. For example, in *Gladish*, defendant communicated in explicit terms over the internet with an individual he believed to be a minor female, specifying sexual conduct he "would" engage in with her, but he never indicated that he would travel to the other side of the

state to meet her, or invited her to meet him. The court found defendant's communications inadequate to establish a constitute a substantial step toward inducing a minor to engage in sexual activity. In contrast, in *United States v. Chambers*, 642 F.3d 588, 594 (7th Cir. 2011), the court held that a defendant's efforts to groom a minor for a sexual encounter by discussing sexual activities and plans to meet by phone and email, obtaining the victim's home address and inquiring about hotels in the area, amounted to a substantial step toward the commission of the same crime. Indeed, in the context of extortion, spoken solicitations and threats can amount not only to substantial steps, but also to completed crimes.

Second, the evidence in this case established that defendant did more than "just talk" with respect to exchanging official acts for personal, financial benefits, and thus the evidence supported the jury's verdicts on the attempt charges as well as the other charges. Among other things, the evidence showed that defendant personally solicited from Tom Balanoff a prestigious, high-paying cabinet post in exchange for appointing to the Senate the individual he understood was President-elect Obama's preference. Defendant also directed his brother to meet with a supporter of Jesse Jackson, Jr. to arrange to obtain campaign contributions "up front" in exchange for appointing Congressman Jackson to the Senate. Similarly, defendant directed his brother, Robert Blagojevich, and his friend, John Wyma, to solicit campaign contributions from Patrick Magoon in exchange for putting into effect a reimbursement rate increase for pediatric doctors.

Contrary to defendant's contention, the evidence of defendant's conduct was not limited to the speculations and interpretations of the government's witnesses. The jury had the opportunity to hear the defendant's own words on tape, the testimony of witnesses, and the defendant's own version of events from the witness stand, and was free to draw its own conclusions. Far from mere speculation, the evidence presented to the jury in this case amply, even overwhelmingly established defendant's intent to trade official actions for personal gain. To use the terms of the court in *United States v. Morris*, 549 F.3d 548, 550 (7th Cir. 2008), relied upon by defendant, the evidence amply supported the jury's conclusion that defendant was a "doer" who fully intended to complete the charged attempt crimes, rather than a "talker" who merely blew "hot air." Defendant provides no basis for overturning the jury's determination.

## B.  Fraud Counts

Defendant argues that the argument he made in his Motion to Dismiss pursuant to *Skilling* "should lead to findings of acquittal" on each of honest services fraud counts. Mot. 3-4. As discussed *supra*, defendant's *Skilling* arguments lack merit, and they in no way establish that there was insufficient evidence to support the jury's verdict on the honest services fraud counts. The evidence proved, and the jury concluded beyond a reasonable doubt, that defendant schemed to obtain personal benefits in exchange for specific official acts. Given that the jury also convicted defendant on bribery and extortion counts, it cannot seriously be argued that the evidence, viewed in a light most favorable to the government, proved only conduct prosecutable prior to *Skilling*. Defendant's count-by-count assertions that the evidence

proved only "talk" are irrelevant, as the mere existence of alternative innocent interpretations of the evidence do not suffice to meet the standard for obtaining a judgment of acquittal. The jury necessarily found, beyond a reasonable doubt, that the defendant did more than "just talk" with respect to each of the counts of conviction. It was entitled to reject defendant's testimony and theories of defense, and defendant has offered nothing that undermines the jury's conclusion.

### C.    Bribery and Extortion Counts

Defendant repeats his argument that his convictions cannot stand due to the lack of evidence of intent and an explicit quid pro quo in the context of the bribery and extortion-related offenses. The evidence was, contrary to this contention, sufficient to establish that defendant knowingly attempted and conspired to exchange specific official acts—namely, the Senate seat appointment, signing of the racetrack bill, putting into effect the physicians' reimbursement rate increase—for personal gain. Defendant has not met the high burden of establishing insufficiency on these counts either.

## VIII.  The Court Properly Denied Defendant's Motions for Mistrial.

Defendant's claim that the Court should have granted its motions for mistrial are undeveloped and thus waived. As a practical matter, the arguments made in defendant's previous motions overlap with issues addressed elsewhere in his posttrial motion, and are answered in elsewhere in this response. In any event, the Court did not err, much less abuse its discretion, in declining to grant defendant a mistrial.

## IX.    Defendant's Requests for Miscellaneous Relief Should Be Denied.

### A.    The Protective Order Should Remain Intact.

The defendant argues that the jointly agreed to protective order in the instant case should be vacated because there is no longer any need for its protections given that the jury has rendered its verdict.  The defendant is wrong.

The protective order was put in place for numerous reasons, not the least of which was to protect the privacy interests of numerous individuals and entities mentioned in various discovery materials, including grand jury statements protected by Fed. R. Crim. P. 6(e), wiretap recordings, and reports of interview. These individuals and entities have legitimate privacy concerns that are not outweighed by any interest defendant may have in obtaining unfettered discretion to disclose whatever discovery materials he wants to whomever he wants.

In addition, the government relied on the protective order in providing the defendant access to extensive materials that were not required to be provided to the defendant through discovery.  Instead of exhaustively redacting various reports of interview, or insisting that the reports only be viewed in the office space of the United States Attorney's Office, the government provided unredacted copies of numerous reports to the defendant with the understanding the materials would be safeguarded consistent with the protective order.  Had the government known the defendant would now seek to undo the protective order, the government would never had provided the defendant the complete access he repeatedly requested to the reports and wiretaps. In fact, the privacy issues related to these materials is so significant that the protective

126

order specifically notes that the materials "remain the property of the United States" and that at the end of the proceedings in this case "shall be destroyed, unless otherwise ordered by the Court." R. 67, ¶3. For those materials withheld pursuant to Court order, they too must be "returned to the United States or destroyed" when they are no longer necessary to the proceedings. *Id.*

Further the protective order specifically notes that the materials provided to the defense will be "utilized . . . solely in connection with the defense of this case and for no other purpose . . . ." *Id.* at ¶4. In addition, the protective order bars distribution of discovery materials except to a very limited group of people involved with the case. *Id.* In the face of this agreed-upon language, the defendant now proposes to lift the protective order and apparently freely distribute the discovery materials to whomever he wants whenever he wants although such distribution has nothing to do with the defense of his case in a court of law.

The protective order should not be lifted and the defendant should remain bound by its requirements.

## B. Defendant's Convictions Do Not Violate the First Amendment or Principles of Federalism.

Finally, the defendant argues his convictions violate the First Amendment and precepts of federalism. The defendant's argument is undeveloped and therefore waived. Even if not waived, the argument lacks merit in that the jury convicted the defendant after being specifically instructed as to the elements of each crime. Extortion, bribery, and wire fraud are not protected by the First Amendment. Nor is there a federalism

127

concern of Constitutional magnitude where the defendant repeatedly violates federal criminal statutes. Accordingly, these arguments provide no basis for posttrial relief.

## CONCLUSION

For all of the foregoing reasons, defendant falls far short of meeting the high standards required for overturning the jury's verdict. Therefore, the government respectfully requests that defendant Rod Blagojevich's motion for judgment of acquittal, arrest of judgment or new trial be denied.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


BY:  /s/ Debra Riggs Bonamici
REID SCHAR
CHRISTOPHER NIEWOEHNER
CARRIE HAMILTON
DEBRA RIGGS BONAMICI
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 3rd Floor
Chicago, Illinois 60604
(312) 353-3741



**U. S. Department of Justice**

United States Attorney
Northern District of Illinois

| | | |
|---|---|---|
| Reid J. Schar<br>Assistant United States Attorney | Dirksen Federal Building<br>219 South Dearborn Street, Fifth Floor<br>Chicago, Illinois 60604 | Direct Line: (312) 353 8897<br>Fax: (312) 886 0657 |

February 17, 2011

**VIA U.S. MAIL**

Jeffrey B. Steinback
53 West Jackson Blvd., Suite 1454
Chicago, IL 60604

                 Re:    <u>Stuart Levine</u>

Dear Mr. Steinback:

As you are aware, defendant Rod Blagojevich is currently under indictment in a case pending before Judge James Zagel. The trial date for defendant Blagojevich is April 20, 2011.

We have learned that counsel for defendant Blagojevich wish to interview your client, Stuart Levine, ahead of defendant Blagojevich's trial.

By this letter the government informs you it has no objection to Mr. Levine meeting with counsel for defendant Blagojevich, although we acknowledge that the decision to participate in any such meeting is entirely within your discretion.

Please let me know if you have any questions about this matter.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:                            

REID J. SCHAR
Assistant United States Attorney
219 South Dearborn Street, 5th Flr.
Chicago, Illinois 60604

cc: Sheldon Sorosky (counsel for Rod Blagojevich)

Exhibit 1



**U. S. Department of Justice**

United States Attorney
Northern District of Illinois

| | | |
|---|---|---|
| Reid J. Schar | Dirksen Federal Building | Direct Line: (312) 353 8897 |
| Assistant United States Attorney | 219 South Dearborn Street, Fifth Floor | Fax: (312) 886 0657 |
| | Chicago, Illinois 60604 | |

February 17, 2011

**VIA E-MAIL & U.S. MAIL**

Joseph J. Duffy
William P. Ziegelmueller
Stetler & Duffy, Ltd.
11 S. LaSalle Street, Suite 1200
Chicago, IL 60603

        Re:    Antoin Rezko

Dear Counsel:

        As you are aware, defendant Rod Blagojevich is currently under indictment in a case pending before Judge James Zagel. The trial date for defendant Blagojevich is April 20, 2011.

        We have learned that counsel for defendant Blagojevich wish to interview your client, Antoin Rezko, ahead of defendant Blagojevich's trial.

        By this letter the government informs you it has no objection to Mr. Rezko meeting with counsel for defendant Blagojevich, although we acknowledge that the decision to participate in any such meeting is entirely within your discretion.

        Please let me know if you have any questions about this matter.

        Very truly yours,

        PATRICK J. FITZGERALD
        United States Attorney

By:                              
        REID J. SCHAR
        Assistant United States Attorney
        219 South Dearborn Street, 5th Flr.
        Chicago, Illinois 60604

cc: Sheldon Sorosky (counsel for Rod Blagojevich)

Exhibit 2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the following document:

**Government's Response In Opposition to Defendant
Rod Blagojevich's Motion for Judgment of Acquittal,
Arrest of Judgement or New Trial**

was served on August 23, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:     /s/ Debra Riggs Bonamici
DEBRA RIGGS BONAMICI
Assistant United States Attorneys
United States Attorney's Office
219 S. Dearborn St., 3rd Floor
Chicago, Illinois  60604
(312) 353-3741