UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 888-1 |
| | ) | Judge James B. Zagel |
| | ) | |
| ROD BLAGOJEVICH | ) | |

## GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT

The United States, by and through PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits the following Government's Objections to the Presentence Report, stating as follows:

## INTRODUCTION

The first step in the sentencing process is a proper calculation of a Sentencing Guideline range. In the instant case, the government proposed to the Probation Department a straightforward calculation of the Sentencing Guidelines that, in several ways, was conservative in its analysis, based only on conduct that was affirmatively found beyond a reasonable doubt by the jury. With the exception of one issue, the Probation Department is in agreement with the government's analysis of the Guidelines.

Title 18, U.S.C. § 3553(a) sets forth the factors to consider when determining a sentence that is sufficient, but not more than necessary. District courts, while not bound by the Sentencing Guidelines, must take them into account in calculating a defendant's sentence. *See Booker v. United States*, 125 S.Ct. 738, 767 (2005). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to

secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

The correct offense level is 42. As will be discussed in greater detail below, the government's analysis of the Sentencing Guidelines to reach a level 42 is both honest and accurate. Defense counsel has derided the properly calculated sentencing range as "draconian and harsh and cruel" and suggested that the government was manipulating the guidelines. (Sheldon Sorosky as quoted in the Chicago Sun-Times, 9/15/11). To the contrary, an application of the facts (proven beyond a reasonable doubt at trial) to the guidelines requires no interpretive leaps or twists of logic. Defendant and at times the probation office, on the other hand, ignore established facts and the plain language of the guidelines.

As described in its separate filing addressing the § 3553 factors, the government does not dispute that, under the circumstances of this case, the sentence recommended by the correctly calculated guidelines is greater than necessary to achieve the goals of sentencing. Nevertheless, the Court must start with the guidelines as a benchmark, and only from that point should the Court consider the other § 3553 factors.

## THE PROPER CALCULATION OF BLAGOJEVICH'S SENTENCING GUIDELINE RANGE

With a single exception, which will be discussed below, the government is in agreement with the Probation Department's calculation of the Sentencing Guidelines. The government also notes, as does the Probation Department, that the government is not seeking to include in the Sentencing Guideline calculations conduct beyond the

2

counts of conviction, although such conduct has been proven by a preponderance of the evidence and therefore could be made a part of the Guideline calculations. *See United States v. Horne*, 474 F.3d 1004, 1006-07 (7th Cir. 2007).

The government's single objection to the Probation Department's Guideline calculations deals with the issue of valuing the bribes that Blagojevich sought in relation to the Senate seat bribery, extortion, and fraud. The Presentence Report incorrectly calculated the value of the bribes that Blagojevich attempted to obtain as zero and, therefore, miscalculated the increase in Blagojevich's offense level under Guideline § 2C1.1(b)(2). In short, the PSR attributed no value whatsoever to Blagojevich's repeated efforts to obtain jobs and campaign contributions in relation to the Senate seat extortion and bribery. In the Probation Department's view, those crimes have no impact on Blagojevich's Guideline range. As will be demonstrated, the value of the bribes is not unknowable. The value is easily quantified and was accepted by Blagojevich himself during the commission of the offenses and his testimony at trial. At a minimum, defendant attempted to obtain a $1.5 million bribe in exchange for naming Congressman Jesse Jackson, Jr. to the United States Senate. The Guidelines provide for an enhancement based on the amount Blagojevich sought to obtain.

## A. The Bribes Blagojevich Sought for the Senate Seat are Quantifiable and Enhance Blagojevich's Sentence.

The PSR calculates the value of the bribes requested by Blagojevich to be $125,000, corresponding in an increase, under USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)(F), of 10 levels to Blagojevich's offense level. The PSR accepts certain values attributed

to the Johnston/racetrack bribe ($100,000) and the Children's Memorial Hospital/Magoon bribe ($25,000). But, the PSR fails to attribute any value to the bribes Blagojevich sought in relation to the Senate seat, instead simply valuing the bribes at "zero" because they are either, according to the PSR, speculative or difficult to value. Blagojevich's version takes matters a step further, suggesting that there should be no increase to the offense level for any of Blagojevich's bribe efforts because he received no "benefit" and was not going to confer an "illegal benefit." (Def. Version at 34-39). The PSR errs in attributing no bribe value for Blagojevich's efforts in the Senate seat bribery and extortion schemes. As for Blagojevich's position, Blagojevich misunderstands Guideline § 2C1.1, and simply ignores critical language in the Guideline.

**1. Blagojevich's Guideline Analysis of Loss is Legally Incorrect and Should be Rejected**

The "benefit" received language of § 2C1.1(b)(2) on which Blagojevich focuses refers to a benefit received by the bribe payor, not the public official receiving the bribe. *See* USSG § 2C1.1, Application Note 3. Blagojevich's entire analysis is, therefore, premised on a section of the Guideline the government and the Probation Department are not suggesting applies to him in this case. In addition, Blagojevich's focus on whether *he* provided an "illegal benefit" is simply nonsensical. Bribe payors typically pay bribes to public officials to obtain otherwise legal benefits (*e.g.* contracts, licenses, permits, help with legislation, approval of funding, etc.).

4

In terms of calculating an increase to the offense level under § 2C1.1(b)(2), the focus in the instant case is on "the value of anything obtained or *to be obtained* by a public official or others acting with a public official." (emphasis added). Blagojevich completely ignores the following language from the Background note of § 2C1.1: "Offenses involving attempted bribery are frequently not completed because the offense is reported to authorities or an individual involved in the offense is acting in an undercover capacity. Failure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain. Therefore, solicitations and attempts are treated as equivalent as the underlying offense."

Blagojevich's proposal of a zero loss figure reads both the text of Guideline § 2C1.1 and the background commentary out of the Guideline Manual, and argues for no increase in offense level unless there was an actual bribe obtained by a public official. Such a result is directly contrary to the language in Guideline § 2C1.1. Indeed, the very cases Blagojevich cites demonstrate that his position is incorrect. *See United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997) (citing and quoting *United States v. Tejada-Beltran*, 50 F.3d 105, 109 (1st Cir. 1995) ("The failure to consummate a bribe neither detracts from the donor's culpability nor renders the amount involved ineligible for use in setting the donor's offense level; the guidelines treat solicitations and attempts as equivalent to completed offenses") and *United States v. Falcioni*, 45 F.3d 24, 27 (2d Cir. 1995) (noting that the amount of "intended loss" does not become zero "[s]imply because the government's crime prevention efforts prove

successful.")).  In *United States v. Carroll*, 346 F.3d 744, 746 & n.4 (7th Cir. 2003), also cited by Blagojevich, the Seventh Circuit affirmed an enhancement based on a proposed bribe of $1,000,000 that was never ultimately received by the public official as part of the calculation to determine the proper adjustment under § 2C1.1(b)(2).

Blagojevich also argues that his loss should be zero because his victims were not going to give into his demands and pay the bribes.  (Def. Version at 35).  In essence, Blagojevich argues that because his victims refused to be victimized, his crimes were not really all that bad.  The language and commentary of Guideline § 2C1.1 reject Blagojevich's argument and account for this very situation (and others where, for instance, the victim is actually an undercover government agent who will never pay a bribe) by noting that the offense level is increased by the amount of money a defendant seeks to obtain, regardless of success.  The fact Blagojevich's victims did not want to pay the bribes does not lessen Blagojevich's culpability under the guidelines. This makes sense because there were consequences for those victims who did not pay: Blagojevich put a hold on the CMH money, refused to sign the racetrack legislation, and refused to consider certain Senate candidates on the actual merits of their candidacy for the Senate seat.[1]

---

[1]  The defendant's version cites at length a number of Seventh Circuit cases that address various aspects of § 2C1.1.  Because Blagojevich has misinterpreted the relevant provision at issue in determining his increased offense level under § 2C1.1(b)(2), most of the cases are inapt.  In addition, contrary to Blagojevich's proposed interpretation of Guideline § 2C1.1, several of the cases address bribe payments that were never received or accepted.  *See United States v. Carroll*, 346 F.3d 744, 746 (7th Cir. 2003) (in which the district court used a $1,000,000 requested bribe
(continued...)

2.    **The PSR's Calculation of Blagojevich's Guideline Range is Wrong Because it Failed to Value his Requested Bribes in Exchange for the Senate Seat**

In the instant case, the determination of an increased offense level under § 2C1.1(b)(2) depends upon the value of the campaign contributions (or jobs) Blagojevich sought to obtain in relation to the Senate seat, CMH funding, and the racetrack legislation. The Court should make a reasonable estimate of those bribe values. Making a reasonable estimate of the bribes is entirely consistent with the Guidelines approach of quantifying measures of aggregate harm. For example, both loss and drug quantity need only be reasonably estimated for Guidelines purposes. *See United States v. Green*, 648 F.3d 569, 583 (7th Cir. 2011) ("We have stated on many occasions that loss calculations need only be a reasonable estimate of loss."); *United States v. Krasinski*, 545 F.3d 546, 552 (7th Cir. 2008) ("A district court may use a reasonable estimate of the quantity of drugs attributable to a defendant for guideline purposes."). In fact, Application Note 3 of § 2C1.1 cross-references Application Note 3 of Guideline § 2B1.1, which directly addresses the issue of valuing loss amount. Application Note 3 of § 2B1.1 notes that the "court need only make a reasonable estimate of the loss," which includes "intended loss," and the Court's loss calculation

_____

[1](...continued)
that was never received to increase the defendant's offense level under 2C1.1(b)(2)); *United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997); *Muhammad*, 120 F.3d at 688. Finally, to the extent there is minimal discussion in the case law regarding increased offense levels for unsuccessful efforts to obtain bribe payments, that is likely because the issue is non-controversial and straightforward. Where there are concrete bribe amounts sought, and Guideline § 2C1.1 clearly directs use of those amounts to calculate an increase in offense level, there is nothing to discuss.

is entitled to "appropriate deference" because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon the evidence."

Although the PSR acknowledges that the application notes of § 2C1.1 specifically reference the use of Application Note 3 of § 2B1.1 to determine loss, the PSR states that "because there is no loss involved in the instant offense, this officer did not find that an intended loss analysis is appropriate when determining the 'value of anything obtained or to be obtained.'" PSR at 16, lines 480-482. Nowhere does either § 2C1.1 or § 2B1.1 require an actual loss in order for a court to value a requested bribe. Rather, § 2C1.1(b)(2) makes clear that an increase occurs based on the "value of anything obtained *or to be obtained.*" (emphasis added). Therefore, § 2C1.1 specifically acknowledges there will be times where a court will need to make a reasonable estimate of an intended benefit based on the value of the bribe a public official sought to obtain. Without any analysis whatsoever, the PSR reads this requirement out of the Guidelines. A very plain, and simple reading of § 2C1.1 makes clear that valuing intended bribe benefits is at times necessary and expected.

There can be no doubt about how Blagojevich valued his corrupt decisionmaking with respect to his official acts. He articulated the numbers repeatedly. As for the Johnston bribery, Blagojevich stated he wanted to obtain $100,000 from Johnston. Indeed, $100,000 from Johnston is noted on the spreadsheet Blagojevich used to track his FOB fundraising goals (Gov. Ex. FOB 1). Likewise, Blagojevich told Wyma he wanted a $50,000 bribe from Magoon and CMH, which bribe request was later lowered

to $25,000. The $25,000 bribe figure was written down by Wyma (Gov. Ex. FOB 1). In addition, the CEO of CMH testified he was asked to raise $25,000 for FOB.[2]

Finally, there is the issue of the value of the bribes Blagojevich attempted to obtain in relation to the Senate seat. Here, the PSR errs by attributing no value whatsoever to Blagojevich's bribe efforts and, in doing so, effectively provides no punishment to Blagojevich for the most venal of his crimes—those regarding the Senate seat.[3] This outcome is directly contrary to the evidence and the law, and inconsistent with the PSR's approach to the racetrack and CMH bribes. As with those bribes, Blagojevich himself acknowledged the amount he sought to obtain, and that value results in an offense level enhancement.

The PSR makes several inaccurate statements and conclusions with respect to the senate seat. First, the PSR states "the 'value of anything obtained by the public official,' in regard to his attempts to obtain a position with HHS or not-for-profit agency cannot be determined." PSR at 17, lines 510-512. Thereafter, the PSR makes no effort whatsoever to even estimate a potential value for these positions, although there is

---

[2] Although it is the government's position that $50,000 is the proper amount that should be attributed to Blagojevich in relation to the CMH bribe, the PSR used the $25,000 sum. Since the difference between the two does not affect Blagojevich's Guideline calculation, the government is not objecting to the use of the $25,000 amount.

[3] The PSR does acknowledge that an upward departure might be appropriate if the value of the bribes were unknown or did not adequately reflect the seriousness of the offense. PSR lines 1020-1023.

evidence from which such estimates could be made. For instance, the salary for the HHS position could be used to estimate a value.[4]

In addition, Blagojevich himself placed a value on the job he sought at a 501(c)(4) not-for-profit in exchange for naming a U.S. Senator. When discussing a job at Change to Win, Blagojevich noted he would "like a 4-year contract for a million a year or somethin'. . . . Or 750 or whatever. It'd have to be good." (Gov. Call Binder Tab 19, pg. 6). Under Blagojevich's own articulation of the salary he wanted from a 501(c)(4) in exchange for the Senate seat, over a 4-year period (the apparent length of a contract he wanted), Blagojevich self-estimated that amount, on the low end, at $3 million. The Court could find this is a reasonable estimate of the value Blagojevich sought to obtain in exchange for the Senate seat.[5] The PSR's failure to make any effort to value these benefits is error. *See United States v. Quinn*, 359 F.3d 666, 680-681 (4th Cir. 2004) (finding a sentencing court should make estimates of value under §

---

[4] In that case, a reasonable estimate would be the salary ($191,300) for four years (the last five Secretaries of HHS have served at least four years), which totals approximately $765,200. Alternatively, one could value the benefit of the Senate seat at a salary of $167,100 for the remaining 2 years of the term, which totals approximately $334,200.

[5] Blagojevich was repeatedly clear that he wanted a job that paid significantly more than the approximately $170,000 he was making as governor. Taking even an extremely conservative view, the Court could attribute a salary of $200,000 to Blagojevich's 501(c)(4) efforts, which would yield a four-year total of $800,000. *See* Call 263, Gov. Call Binder Tab 15 (during which Blagojevich is informed that private foundations pay between $200,000 and $500,000); *see also* Call 403, Gov. Call Binder Tab 25 (during which Blagojevich stated a job at Change to Win would need to pay between $250,000 and $350,000 for him to take it immediately).

2C1.1(b)(2) even in cases where the bribery was not completed, and those estimations need not be determined with precision).

Second, the PSR's conclusion that it cannot value Blagojevich's efforts to obtain campaign contributions from Jesse Jackson, Jr. in exchange for the Senate seat is error in several respects. Again, in making this determination the PSR makes no effort to attribute *any* bribe amount to Blagojevich's attempted bribery. In doing so, the PSR makes several statements that are wrong as a matter of fact, and correctly rejected by the jury.

For instance, the PSR states that "[t]he defendant was convicted of considering accepting a bribe for the appointment. There is no evidence he would not [sic] have actually accepted the bribe, because the Lisa Madigan deal was his first choice and there was evidence it could happen." PSR at 18, lines 543-544. Blagojevich was not convicted of "*considering* accepting a bribe." (emphasis added). Blagojevich was convicted of conspiracy to solicit a bribe, attempted extortion, and fraud through attempted bribery in relation to the Jackson, Jr. bribe. In addition, Blagojevich falsely testified at trial that Lisa Madigan was his first choice, he was never going to appoint Jackson, Jr., and that he was not even considering bribes in relation to Jackson, Jr. This defense was rejected by the jury because it was plainly false. The evidence was clear that Blagojevich found the bribes from the Jackson, Jr. camp to be well worth his consideration. *See* Gov. Call Binder Tab 66, pg. 2 and Gov. Call Binder Tab 67 (Count Thirteen of the wire fraud scheme, a count of conviction, in which Blagojevich stated he could cut a deal for Jackson, Jr. that would include bribes). On the afternoon of

11

December 4, 2008, Blagojevich sent his chief fundraiser, Robert Blagojevich, to Raghu Nayak, the individual who had offered the $1.5 million bribe, to start obtaining the bribe money (Gov. Call Binder Tab 69).

The PSR's decision to second-guess the jury's findings of guilt beyond a reasonable doubt on these issues based on significantly less information than was provided to the jury is clearly erroneous and should be rejected. The Court should not adopt the PSR's factual finding and these findings should be stricken from the PSR.[6]

Also error is the PSR's repeated endorsement of certain of Blagojevich's statements. For instance, the PSR states "the telephone recordings and other evidence also reflect Mr. Blagojevich was only considering accepting the offer for the appointment of Jesse Jackson, Jr., if he was unable to obtain the political deal for the appointment of Lisa Madigan." PSR at 18, lines 529–531. It is not clear what "other evidence" the PSR is referring to, but this statement is not even consistent with Blagojevich's false trial testimony. At trial, Blagojevich testified that he was never going to appoint Jackson, Jr. The PSR draws conclusions based on a review of wiretap transcripts without benefit of trial testimony, statements of witnesses, and without regard to the jury's verdict. The PSR also states that "the evidence does support that

---

[6] In addition, the PSR's decision to give credence to Blagojevich's argument that he had not definitively decided to name Jackson, Jr., is error. Even if Blagojevich never intended to name Jackson, Jr., the evidence was clear that Blagojevich attempted to obtain bribe payments by suggesting that he would name Jackson, Jr. senator. Even if Blagojevich was ultimately lying about naming Jackson, Jr. to the senate seat, he was trying to obtain bribe payments, and those payments can and should be valued.

until the date of his arrest, Mr. Blagojevich was pursing [the Lisa Madigan] option, and individuals, such as Mr. Emanuel, had agreed to broker such a deal with Mr. Madigan." PSR at 18, lines 532-534. This is simply wrong, as the Court well knows. The evidence demonstrated that Blagojevich had done essentially nothing to pursue the Lisa Madigan option and on the evening before his arrest Blagojevich stated he was considering taking the Senate seat himself depending on the outcome of Antoin Rezko's sentencing. Again, these statements should be struck from the PSR and not adopted by the Court. In any event, these statements has no bearing on the value of the bribe because Blagojevich effectively stopped pursuing the Jackson, Jr. bribe on December 5, 2008, once the Chicago Tribune published a story related to Blagojevich having been recorded.

The issue, then, is valuing the bribes that Blagojevich sought from representatives of Jackson, Jr. Clearly that number is not zero.[7] In finding the number to be zero, the PSR has effectively deferred the issue of the value of the bribes

---

[7] Applying the PSR's position that Blagojevich attempted to obtain a bribe, but the bribe amount was speculative and therefore should be valued at zero, would mean a public official could seek repeated bribes from various individuals without consequence to his offense level unless definitive numbers were decided upon. According to the PSR's analysis, the Sentencing Guidelines allow a corrupt public official to avoid a significant sentence by simply being vague about the amount of requested bribe money. The Sentencing Commission's statements, in both the text of § 2C1.1 and its commentary, refute the PSR's strained efforts. Indeed, the PSR's analysis would create such uncertainty that it would deter law enforcement from stopping bribery schemes before fruition, effectively allowing a defendant to engage in more corruption.

to the Court. The evidence demonstrates, by more than a preponderance, that the value of the bribes sought was $1.5 million.

Blagojevich repeatedly said he had been offered $1.5 million in campaign contribution bribes to name Jackson, Jr. to the Senate seat.[8] Blagojevich noted the $1.5 million number to Robert Greenlee in October 2008: "we were approached pay to play. That, you know, he'd raise me 500 grand, an emissary came, then the other guy would raise a million, if I made [Jackson, Jr.] a Senator." (Gov. Call Binder Tab 5). Blagojevich repeated the $1.5 million number ten days later: "They promised $1.5 million. . .through third parties." (Blagojevich Home Line Call 475, pg. 8–9). On the morning of December 4, 2008, the day Blagojevich sent his brother to get the bribes, Blagojevich told John Harris: "Well, he's come to me with, through third parties, you know with offers of campaign contributions and help. . . . You know what I mean? 1.5 million they've, they're throwin' numbers around." (Gov. Call Binder Tab 66, pg. 2). On the afternoon of December 4, 2008, Blagojevich sent his chief fundraiser, Robert Blagojevich, to Raghu Nayak, the individual who had offered the $1.5 million bribe, to start obtaining the bribe money (Gov. Call Binder Tab 69). During his trial testimony,

---

[8] The evidence demonstrates that the amount of the bribe Nayak offered was actually $6 million, which Nayak communicated to Robert Blagojevich through hand gestures. But, because Robert Blagojevich misunderstand the hand gestures to indicate that Nayak was offering $1.5 million, the bribe number presented to Blagojevich was $1.5 million. Although the bribe offer was actually $6 million, the government is not seeking to hold Blagojevich accountable under the Sentencing Guidelines for $6 million. Rather, the government is seeking to hold Blagojevich accountable for the $1.5 million bribe offer that was actually communicated to Blagojevich, that Blagojevich understood to be the bribe offered, and that Blagojevich tried to obtain.

Blagojevich admitted he had been offered $1.5 million in bribes. 6/7/11 Tr. 51-52, 65. Blagojevich never disputed that $1.5 million was the bribe offer, but rather argued he never intended to take the bribe—a contention rejected by the jury's guilty verdict.[9]

Indeed, the $1.5 million number is the *only* number that was discussed in the context of obtaining bribe money in relation to Jackson, Jr. and the Senate seat. Accordingly, the $1.5 million is the amount attributable to Blagojevich in his efforts to obtain something of value under § 2C1.1(b)(2) in relation to the Senate seat.

The total value of the bribes Blagojevich sought to obtain in relation to his criminal activity is $1,625,000 ($1,500,000 (Senate seat), plus $100,000 (Johnston), plus $25,000 (CMH)), corresponding in an increase, under USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)(I), of 16 levels to Blagojevich's offense level. This yields a final offense level of 42 and a Guideline range of 360 months to life.

### B. The PSR Correctly Increases Blagojevich's Offense for his Aggravating Role in the Offense.

The PSR correctly notes that pursuant to Guideline § 3B1.1(a), Blagojevich's offense level should be increased 4 levels because Blagojevich was an organizer or

---

[9] Blagojevich was convicted of wire fraud in Count Thirteen, which charged, as in furtherance of the wire fraud scheme, Blagojevich's phone call on December 4, 2008, with Robert Greenlee and Fred Yang in which Blagojevich specifically noted that the advantage of Jackson, Jr. was that representatives of Jackson, Jr. were offering bribes. In order to find that phone call in furtherance of the wire fraud scheme and convict Blagojevich, the jury necessarily must have found that Blagojevich was attempting to obtain bribes. Even if the jury had not made such a finding, this Court could easily find by a preponderance of the evidence presented at trial that Blagojevich's scheme included attempting to obtain concrete bribes in exchange for naming Jackson, Jr. the senator.

leader of a criminal activity that involved five or more participants or was otherwise extensive. The government expects Blagojevich will object to this adjustment.

In Blagojevich's version to the Probation Department, Blagojevich misrepresents the government's position and suggests that the government is arguing for the aggravating role adjustment simply because Blagojevich was governor and therefore the "boss" of several other participants in the criminal activity. (Defendant Version at 40). The 4-point aggravating role adjustment is appropriate because Blagojevich, regardless of his technical title, was: (a) the leader of the criminal activity who was the only person who stood to benefit from his illegal schemes; and (b) the individual who directed others' actions in relation to the criminal activity. While Blagojevich implies that he was simply along for the ride while others independently made decisions that were all meant to benefit him (Defendant Version at 43), the facts demonstrate that is untrue.

Blagojevich exercised decision-making authority in the criminal activity, recruited and thereafter directed others involved in the criminal activity to research certain information to assist him in the criminal activity, and was the person who ultimately determined how to put his criminal plans into action. These are all factors in determining the degree of Blagojevich's aggravating role and lead to the conclusion the adjustment is appropriate. *See* Guideline § 3B1.1, Application Note 4. In addition, the criminal activity revolved around obtaining benefits, including highly paid, prestigious jobs and campaign contributions, solely for Blagojevich.

16

In relation to the Senate seat, it was Blagojevich who directed his brother to obtain a $1.5 million bribe and Blagojevich who directed Doug Scofield (who did not work for the State of Illinois) to communicate an extortionate message seeking millions of dollars in contributions to a 501(c)(4) organization Blagojevich would control. Further, it was Blagojevich who directed Deputy Governor Robert Greenlee to research ambassadorships and non-profit jobs Blagojevich could request in exchange for the Senate seat. Blagojevich, in preparing to ask for Secretary of HHS in exchange for the Senate seat, directed Harris to research prior HHS secretaries. In addition, Blagojevich repeatedly directed Harris, Greenlee, and others to assist him in refining his extortionate Senate seat requests. Further, Blagojevich directed his brother and chief fundraiser to request campaign contribution bribes from the CEO of CMH in relation to the CMH extortion.

As to whether there were five or more participants in the criminal activity, as set forth in detail in the trial and the government version, the following individuals among others[10] were involved in the criminal activity and criminally responsible for assisting the activity: (1) Rod Blagojevich; (2) John Harris; (3) Lon Monk; and (4) seven others noted at page 46 of the government's version.[11]

---

[10] Antoin Rezko and Chris Kelly were plainly participants in defendant's criminal scheme, but for purposes of the guideline calculation, the government has elected not to rely on conduct for which there is no guilty finding.

[11] The PSR states that the SEIU president was a "participant" in the criminal activity and therefore is relevant to the § 3B1.1(a) analysis. PSR at 19. The SEIU president was not a participant in the criminal activity as that term is defined, the

(continued...)

Not only does Blagojevich qualify for a 4-level adjustment based on his leadership role in criminal activity involving five or more participants, Blagojevich also qualifies for the 4-level adjustment because he was a leader and organizer of criminal activity that was "otherwise extensive." Among other factors a court may consider in determining whether criminal activity is "otherwise extensive" is the total number of individuals (whether legally defined as "participants" or not) involved in the activity, the breadth and orchestration of the criminal activity, the amount of money involved, and the length of the criminal activity. *United States v. Diekemper*, 604 F.3d 345, 354 (7th Cir. 2010).

Taking just the 2008 conduct, Blagojevich perpetrated at least three extortions and involved numerous people beyond those who knowingly participated in Blagojevich's fraud scheme. For instance, Greenlee testified that in order to complete certain of the research assignments for Blagojevich related to the Senate seat, Greenlee required the assistance of other members of Blagojevich's staff. In addition, Blagojevich repeatedly and constantly schemed about ways to profit from the Senate seat appointment. The various illegal benefits Blagojevich discussed obtaining in exchange for the appointment included: (a) an ambassadorship; (b) various federal cabinet level positions including Secretary of HHS; (c) a newly formed job just for Blagojevich at Change to Win; (d) a job as the head of a private organization;

---

[11](...continued)
government has never suggested that he was, and he should not be included in the Section 3B1.1(a) analysis. The government objects to the inclusion of this individual as a participant and asks that his inclusion be stricken from the PSR.

(e) positions on paid corporate boards for either Blagojevich or his wife or both; (f) obtaining millions of dollars of contributions to a 501(c)(4) organization at which Blagojevich would obtain a high-paying job; and (g) obtaining $1.5 million in campaign contributions. Blagojevich went beyond scheming and actually orchestrated and then attempted to implement certain of these exchanges.

In addition to the Senate seat shakedown, Blagojevich's criminal activities include two additional and extensive extortions related to CMH and Johnston. In the CMH shakedown, Blagojevich involved his brother, and attempted to involve Wyma and Monk, to assist in the shakedown. Blagojevich eventually had a $8 million to $10 million reimbursement rate increase held up to implement his extortionate plans. As these details, as well as the ones laid out more thoroughly at trial and in the government version make clear, Blagojevich's criminal activity was "otherwise extensive."

In response to the overwhelming evidence of Blagojevich's leadership role in the criminal activity, Blagojevich argues the adjustment is being applied simply because he was the "boss" of other people. In making this argument, Blagojevich suggests he "did not direct" any other individual in any portion of the criminal activity. (Defendant Version at 40). Those arguments fly in the face of the evidence. The adjustment is being applied because Blagojevich, regardless of his title, repeatedly directed other members of the criminal activity to assist him in criminal efforts meant to benefit him. The Court heard the evidence to this effect from the witness stand and through the phone calls, with the above-recited facts simply a sampling of repeated actions by

19

Blagojevich that demonstrate his leadership role.[12]  Because the adjustment is not being applied on the basis of his title, Blagojevich's "double-counting" argument (Defendant Version at 43) is flawed.  Blagojevich receives adjustments because he was a public official, and, because his criminal activity independently involved his leadership and supervision of the criminal activity.  There is no double-counting and Blagojevich can not cite a single case where a court concluded double-counting existed for an adjustment as a public official under § 2C1.1, and separately as a leader of the criminal activity under § 3B1.1.

Accordingly, the PSR correctly adjusts Blagojevich's sentence 4-levels for his aggravating role in the criminal activity.

## C.   Other Objections to the PSR

The PSR makes statements that appear to be interpreting certain phone calls or evidence presented at trial, or making conclusions of fact based solely on transcripts of certain recorded calls.  *See* PSR at 9, lines 196-198; PSR at 10, lines 252-254; PSR at 11, lines 282-286; PSR at 12, lines 348-353.  To the extent that the PSR is simply reiterating statements from Blagojevich's version, without adopting those statements as true and accurate interpretations of the evidence, the government has no objection but requests the PSR be amended to note that these statements are attributable to

---

[12]  Blagojevich's argument in his version that not only was he not a leader or organizer, but he was the one being taken advantage of by others (Defendant Version at 43), is yet another example of Blagojevich refusing to accept responsibility for his role in the criminal activity for which he was convicted and is, of course, belied by the evidence.

Blagojevich's version alone. If, however, these statements are findings of fact by the PSR, the government objects and requests that they be stricken. The Probation Department is not in a position to make factual findings about the interpretation of certain phone calls or evidence without having been present for the trial or reviewed all of the evidence, including trial transcripts of witnesses who participated in certain phone calls explaining those calls. Since the PSR is part of the official record at sentencing and beyond, the PSR should be corrected.

Accordingly, the government objects to any statement in the PSR, including those noted below, in which the PSR provides its own interpretations of the evidence and phone calls presented at trial. The Court should not adopt the PSR as written. To assist the Court, below is a table summarizing the various statements in the PSR that should either be amended to be clarified or struck in their entirety:

| Page & Line Number | PSR Statement | Objection |
|---|---|---|
| Page 9, lines 196-198 | "Mr. Wyma noted that Children's thinks Defendant Blagojevich may block the rate increase and, in response, Mr. Blagojevich indicated he did not want to discuss the fundraiser in the same conversation as the rate increase." | Statement is an inaccurate interpretation of the recording and evidence and either should be stricken in its entirety or amended to state "defendant contends." |
| Page 10, lines 252-254 | "The defendant points to the November 11, 2008, conversation with Mr. Scofield, which supports he was trying to make a deal to obtain the not-for-profit | The call does not support defendant's claim. If the PSR is opining or finding that Blagojevich was trying to make a deal to obtain a not-for-profit job |

| | agency position legally." | for the Senate seat legally, that statement is inaccurate, and contrary to the recordings and testimony. The statement should either be stricken or clarified to indicate it is Blagojevich's position he was trying to obtain the position legally. |
|---|---|---|
| Page 11, lines 282-286 | "The telephone calls from mid-November to the date of his arrest, December 8, 2008, reflect that Defendant Blagojevich's first choice is to select Lisa Madigan in return for the agreement that Michael Madigan would pass certain legislation." | This is an overbroad statement that is contrary to the evidence. It should either be stricken or modified to indicate that "In certain telephone calls from Mid-November, defendant said that Lisa Madigan was his first choice. . ." |
| Page 12, lines 348-353 | "Furthermore, there is not a preponderance of evidence that the bribe offered by emissaries of Jesse Jackson, Jr. was 'to be received' as the telephone records, corroborated by Mr. Emanuel, reflect appointing Lisa Madigan was the defendant's first choice and the deal to make that happen was moving forward." | If the PSR is opining or finding that Blagojevich was not trying to obtain a bribe in relation to appoint Jesse Jackson, Jr. to the Senate seat, that statement is inaccurate, and contrary to the recordings and testimony. The statement should either be stricken or clarified to indicate it is the defendant's position. |
| Page 18, lines 529–531. | "However, the telephone recordings and other evidence also reflect Mr. Blagojevich was only considering accepting the | Statement is an inaccurate interpretation of the recording and evidence and either should be stricken in its |

| | offer for the appointment of Jesse Jackson, Jr., if he was unable to obtain the political deal for the appointment of Lisa Madigan." | entirety or amended to state "defendant contends." |
|---|---|---|
| Page 18, lines 532-534. | "Furthermore, the evidence does support that until the date of his arrest, Mr. Blagojevich was pursing [the Lisa Madigan] option, and individuals, such as Mr. Emanuel, had agreed to broker such a deal with Mr. Madigan." | Statement is an inaccurate interpretation of the recording and evidence and either should be stricken in its entirety or amended to state "defendant contends." |
| Page 18, lines 543-544. | "The defendant was convicted of considering accepting a bribe for the appointment. There is no evidence he would not [sic] have actually accepted the bribe, because the Lisa Madigan deal was his first choice and there was evidence it could happen." | Statement is an inaccurate interpretation of the guilty verdicts, recordings and evidence. The first sentence should be stricken. The second sentence should either be stricken in its entirety or amended to state "defendant contends." |
| Page 19, line 585 | The PSR states that the SEIU president was a "participant" in the criminal activity. | The SEIU president was not a participant in the criminal activity and his inclusion as a participant should be stricken from the PSR. |

23

## <u>CONCLUSION</u>

For the foregoing reason, the government requests the Court sustain the government's objections to the PSR, and reject the defendant's objections to the PSR.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    <u>s/Reid Schar</u>
REID J. SCHAR
CHRISTOPHER S. NIEWOEHNER
CARRIE E. HAMILTON
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-3500

24

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned Assistant United States Attorney hereby certifies that the following documents:

<u>**GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE REPORT**</u>

were served on November 30, 2011, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/Reid Schar
REID SCHAR
Assistant United States Attorney
219 S. Dearborn Street
Chicago, IL 60604
(312) 353-8897

25