UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 08 CR 888 |
| | ) | Hon. James B. Zagel |
| ROD BLAGOJEVICH | ) | |

## ROD BLAGOJEVICH'S SUBMISSION
## IN RESPONSE TO PRESENTENCE REPORT AND
## IN AID OF SENTENCING

CAROLYN PELLING GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614

SHELDON SOROSKY
AARON GOLDSTEIN
LAUREN KAESEBERG
ELLIOTT RIEBMAN
158 West Erie
Chicago, Illinois 60654

*Attorneys for Defendant Rod Blagojevich*

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

I. Specific Substantive Responses To The PSR Advisory Sentencing Guideline
Calculations .................................................................................................... 2

   A. Mr. Blagojevich's Sentence Should Not Be Increased Pursuant To U.S.S.G ............... 2

   B. The PSR Correctly Concluded That Mr. Blagojevich's Sentence Should Not Be
Increased Based On The Discussion Of Money From Jackson Supporters ................... 7

   C. The PSR Incorrectly Applied The §3B1.1(a) Adjustment When Mr. Blagojevich
Did Not Exert A Leadership Role In The Counts Of Conviction Independent Of
His Job Title ........................................................................................................ 13

      1. Mr. Blagojevich Did Not Exert A Leadership Role Or Direct Others In
Criminal Activities ....................................................................................... 13

      2. Mr. Blagojevich's Activities Were Not "Otherwise Extensive" Under
U.S.S.G .......................................................................................................... 17

      3. Application of the U.S.S.G .............................................................................. 17

II. The Correct Advisory Guideline Range ............................................................... 19

III. Factors That Warrant Departure Below The Advisory Guideline Range .............. 20

   A. Nature and Circumstances Of the Offense – 18 U.S.C 3553 ................................ 20

      1. No Financial Benefit – No Public Harm From Counts Of Conviction ................. 20

      2. Absence Of Ill Intent Is Critical Mitigation Evidence ....................................... 21

         a. Mr. Blagojevich's Understanding Of The Law ............................................. 22

         b. Mr. Blagojevich's Intent ............................................................................. 24

            i. Castles In The Air .................................................................................. 24

            ii. An Opportunity To Achieve A Good Result ........................................... 25

            iii. No Decisions Were Made On The Senate Appointment ......................... 26

            iv. Clean Bill Of Health ............................................................................. 28

            v. Knowledge of History ........................................................................... 28

            vi. Advice And Observation Indicated That It Was Acceptable To
Receive A Benefit In Exchange For The Senate Appointment ............... 29

            vii. Mr. Blagojevich's Response To News Of Wyma's Cooperation
And Being Taped .................................................................................. 39

**TABLE OF CONTENTS**
(continued)

Page

B. History And Characteristics Of the Defendant 18 U.S.C. 3553 .................................. 42

   1. Mr. Blagojevich's Legislative Initiatives Were Value Based ............... 44

   2. Mr. Blagojevich's Concern For Others.................................................. 50

   3. Family Concerns..................................................................................... 52

C. General and Specific Deterrence – 18 U.S.C. 3553 ................................... 54

D. Avoidance of Unwarranted Sentencing Disparity – 18 U.S.C. 3553 ........... 60

   1. Defendants and/or Participants In This Case .................................... 60

   2. Defendants In Other Cases.................................................................. 66

CONCLUSION ............................................................................................... 68

## INTRODUCTION

Defendant Rod Blagojevich responds to the Presentence Investigation Report dated September 23, 2011 (the "PSR") and sets forth his position on the appropriate sentence. Mr. Blagojevich objects to the PSR on two issues that affect the advisory sentencing guideline range. The first is calculation of value of payment obtained or to be obtained pursuant U.S.S.G. §2C1.1(b)(2). The second is the application of four-point leader organizer enhancement provided for in U.S.S.G. §3B1.1(a). Properly calculated, Mr. Blagojevich's advisory sentencing guidelines are a level 22, which corresponds to a prison sentence of 41 to 51 months.

Looking beyond the applicable advisory Guideline range, careful consideration of the sentencing factors set forth in 18 U.S.C. §3553(a) yields the conclusion that a sentence significantly less than the properly calculated 41-51 month advisory guideline range would be "sufficient but not greater than necessary"[1] to achieve the purposes of sentencing. First, the "nature and circumstances of the offense"[2] are that Mr. Blagojevich received no monetary gain, and, with respect to the political acts at issue in the counts of conviction, caused no public harm. The absence of monetary gain coupled with the lack of harm for the official actions at issue make this case unique among any other case in the Seventh Circuit or any other federal circuit applying the U.S.S.G. §2C1.1 guideline. Indeed, no defendant has ever been punished under the §2C1.1 guideline for nonexistent campaign contributions linked to desirable official actions. Second, the overwhelming evidence from the wire intercepts was that Mr. Blagojevich attempted to follow the law as he understood it to be. Third, Mr. Blagojevich's own "history and characteristics"[3] present a strong case for a below guideline sentence. Throughout his political career, Mr. Blagojevich demonstrated commitment to policies and initiatives that significantly

---

[1] 18 U.S.C. §3553(a)
[2] 18 U.S.C. §3553(a)(1)
[3] Id.

benefitted many Illinois citizens —particularly children, women, the elderly, and the economically disadvantaged. Mr. Blagojevich's profound devotion to his wife and young children, and the devastation that his absence will cause his family provide further support for the exercise of leniency in his sentencing. Fourth, specific and general deterrence objectives[4] have already abundantly been satisfied as Mr. Blagojevich can never again hold public office and the public has already witnessed the financial and personal ruination Mr. Blagojevich has suffered in connection with this case. Finally, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"[5] argues powerfully for the exercise of leniency in sentencing.

I.    **Specific Substantive Responses To The PSR Advisory Sentencing Guideline Calculations**

    A. **Mr. Blagojevich's Sentence Should Not Be Increased Pursuant To U.S.S.G. §2C1.1 Because There Was No Payment To Be Obtained.**

The PSR found the total amount of "value to be obtained" to be $125,000 based on conduct related to the seeking of campaign contributions from Patrick Magoon and John Johnston. The total amount of "value to be obtained" should be zero. The government has not met its burden of establishing by the preponderance of the evidence that Mr. Blagojevich either obtained or was to obtain $125,000.[6]

The PSR correctly concluded that the adjustment provided for in U.S.S.G. §2C1.1(b)(2) for the "value of the payment, the benefit received or to be received in return for the payment, [or] the value of anything obtained or to be obtained" cannot properly be calculated by appealing to

---

[4] 18 U.S.C. §3553(a)(1) (B) and (C)

[5] 18 U.S.C. §3553(a)(6)

[6] In analyzing the Jesse Jackson Jr. allegations, the PSR explained, "[T]here is not enough evidence to support that this is the amount the defendant could obtain or thought he could obtain." (PSR p. 18, lines 537-538) The reasoning is correct and applies with equal force to the Magoon and Johnston campaign contribution requests.

the intended loss analysis that would apply to computations under U.S.S.G. §2B1.1 as advocated by the government. (PSR p. 16, lines 479-482). In that connection the Probation Officer specifically (and properly) found, "[T]here is no loss involved in the instant offense." (PSR p. 16 lines 480-481) The PSR should have followed this line of reasoning to conclude that neither could there be value obtained (or to be obtained) when no prospect of receipt of the $125,000 in requested campaign contributions ever existed.

In order meet its burden to establish a $125,000 figure for the value of a payment obtained or to be obtained pursuant to U.S.S.G. §2C1.1, the government would have to establish by a preponderance of the evidence that Mr. Blagojevich either received or was to received a payment of this precise value. There is no evidence to support this proposition. Both Magoon and Johnston testified that they had no intention of ever making these campaign contributions to Mr. Blagojevich nor ever agreed to do so. The PSR recognized these facts. (PSR p. 9, lines 191-192, p. 10, lines 220-221)

Regarding Magoon, the government's position is that the value of the payment to be obtained was $50,000 because the figure was once discussed at a fundraising meeting (Government's Version Of the Offense "Government's Version" p. 45). The PSR rejected this figure, reasoning that although Mr. Blagojevich might have thought about a $50,000 figure, only $25,000 was ever discussed with Magoon. (PSR p. 17, lines 490-492) However, the $25,000 figure was nothing more than the initial request made to Magoon by Robert Blagojevich, the chief fundraiser for Friends Of Blagojevich ("FOB"). In fact, Robert testified at the first trial that during the phone call with Magoon, Robert asked Magoon if he would hold a fundraiser, to which Magoon asked "How much are you looking for?" (July 9, 2010 Tr. at pp. 96-97) Robert told Magoon, "somewhere between 10 and 15" and "we are shooting for 25." Id. Magoon, who

3

had never committed to raise or contribute money in any amount, did not return Robert Blagojevich's calls. On November 14, 2008, Mr. Blagojevich instructed his brother not to call Magoon on the topic any more. Mr. Blagojevich himself *never* called or asked Magoon about fundraising.[7] Given that there was no Magoon contribution or fundraising and there was never going to be a Magoon contribution or fundraising, "shooting for 25" is a fundraising goal. It is not the value of a payment received or to be received as contemplated by U.S.S.G. §2C1.1.

The same holds true with the campaign contribution request of Johnston with the added wrinkle that Johnston lobbyist Lon Monk, who doubled as Blagojevich fundraiser, was actually lying to Mr. Blagojevich about the contribution being forthcoming. In reality, all that was actually forthcoming was Monk's $24,000 in lobbying payments from Johnston which Monk collected during the December 3, 2008 meeting with Johnston in which he purportedly discussed the contribution to FOB.

According to the PSR, the government's "evidence" that a $100,000 payment was to be obtained is Monk's testimony from the first trial that he overheard Mr. Blagojevich asking for a $100,000 campaign contribution from Johnston and an FOB spreadsheet that listed a prior Johnston commitment of $100,000. (PSR p. 9, lines 208-209). The government's position is that there existed a tacit understanding between Monk and Johnston that $100,000 was the agreed upon amount. Johnston, who, unlike Monk, is the critical witness as to the campaign contribution request made of him, never testified about any specific amount being requested. As for the FOB spreadsheet relied upon by the government, this is nothing more than a roster of hoped-for contributions dating back to early 2008 – before the racetrack legislation was even a prospect – based on the 2006 Johnston contribution. More often than not, as is well known, listed goals for political campaign contributions are rarely actually met. The spreadsheet itself is

---

[7] At one point Mr. Blagojevich indicated to Robert that he might call Magoon himself, but never did.

evidence that the amounts are merely goals in that there are listed "high" and "low" amounts. Had the figures been carved in stone there would not have been a range.

Moreover, the trial testimony made it clear that not only was there not going to be a $100,000 contribution from Johnston, there was never going to have been *any* contribution from Johnston. At trial, Johnston testified that he never told Monk that he was going to make a campaign contribution to FOB. (June 21, 2008 Tr. p. 28) Rather, Johnston testified, he merely deflected the questions. (*Id.*) For his part, Monk admitted that he lied and exaggerated when he spoke to Mr. Blagojevich about a possible campaign contribution from Johnston. That Mr. Blagojevich may have discussed some inchoate goal of $100,000 based on projections from past years while he was being lied to by Monk about a contribution that had no hope of happening is does not establish the value of a payment received or to be received pursuant to U.S.S.G. §2C1.1.

If hoped for amounts were the standard for calculating benefit pursuant to §2C1.1(b)(2), then public officials sentenced under this guideline could see swings in their criminal sentences of *decades*[8] based solely on the loftiness of their hopes and dreams of possible future benefits. This cannot be and is not the law. Indeed, Application Note 7 to §2C1.1(b)(2) specifically provides "for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater." This provision clearly evidences the guidelines' intention to punish economic facts rather than unwarranted aspirations. Indeed, as interpreted by the Seventh Circuit in *United States v. Muhammad*, 120 F.3d 688, 701 (7th Cir. 1997), this language indicates that the purpose of section 2C1.1 is "to measure the true harm from the crime – i.e. the greater of the bribe or benefit." In short, in order for the §2C1.1(b)(2)

---

[8] The §2C1.1(b)(2) guideline makes reference to the §2B1.1 loss table which provides for guideline adjustments from 0 to 30 based on loss, or in the case of §2C1.1(b)(2), benefit amount. 30 points corresponds to a difference of decades at most places in the Sentencing Guideline table.

guideline to be logically applied, there must be a showing of economic benefit conferred or imminently to be conferred upon the public official.

Although the §2C1.1(b)(2) guideline can, in some instances, apply to attempted harm, there must be some principled distinction between viable attempts to collect a specific bribe amount and mere fundraising goals, as in this case[9]. The cases in which a defendant has been held responsible for benefit that did not did not come to pass share the common feature that the defendant actually offered a clearly illicit bribe in a particular dollar amount that was definitively established by the evidence.[10] Here, the counts of conviction involve legal and desirable official actions on one side, and on the other side, hoped for campaign contributions or possible political benefits that (unlike the outright bribes in the reported §2C1.1 cases) would not even have been illegal barring the finding of an improper connection with (admittedly proper) governmental actions.

These facts do not support the dramatic 16 level (Government's Version p. 45) augmentation of Mr. Blagojevich's advisory sentencing guideline range argued for by the government. Indeed, the reading of the §2C1.1 guideline advanced by the government is an entirely novel and wholly unsupported application of this guideline. To the credit of the Probation Office, the PSR notes (1) as "Factors That May Warrant A Departure", that both "victims" of requests for campaign contributions indicated that they never intended to make any

---

[9] A Note in the Background section of §2C1.2 provides that attempts are treated as equivalent to the underlying offense because "offenses involving attempted bribery are frequently not completed." The arguments set forth in this section are not that the payment value was not established because it was an attempt. The argument, rather, is that the government failed to meet its burden of establishing the value by a preponderance of the evidence because the figures themselves were insufficiently precise.

[10] *See e.g. United States v. Muhammad*, 120 F.3d 688 (7th Cir. 1997) (Juror offered defendant $2,500 to fix the verdict but defendant refused); *United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997) (defendant tried to give intended bribee an envelope containing $4,000 but intended bribee would not take the envelope); *United States v. Carroll*, 346 F.3d 744 (7th Cir. 2003) (after completing a portion of the visa for cash scheme defendant offered an illicit $1 million bribe to his predecessor who was cooperating with the government).

contributions and (2) as "Factors That May Warrant A Sentence Outside Of The Advisory Guideline Range" that although defendant was "convicted of multiple acts of attempted solicitation of bribes and attempted extortion, Mr. Blagojevich did not actually receive any money or benefits." (PSR p. 33, lines 1018-1019 and 1036-1037)

The fact of the matter, as alluded to in the PSR, is that there exists *no reported Seventh Circuit case*, and *no reported case from any circuit* in the United States of America analyzing the §2C1.1(b)(2) guideline provision in which the defendant neither received a payment of any value for his or her official action nor conferred any improper benefit for that official action. Set forth at pages 35-38 of the Defense Probation Submission, appended to the PSR, is a summary of every reported Seventh Circuit case applying the §2C1.1(b)(2) guideline provision. As these examples make clear, the facts of this case have no analog in reported case law. Defendants are simply not charged and punished based on campaign contributions or other political payments they never received in exchange for official actions that were proper and desirable.

### B. The PSR Correctly Concluded That Mr. Blagojevich's Sentence Should Not Be Increased Based On The Discussion Of Money From Jackson Supporters.

The PSR rejected the government's position that the $1.5 million numbers that were being "thrown around" regarding a possible campaign contribution from Jesse Jackson Jr. supporters could properly be used to increase Mr. Blagojevich's sentence pursuant to §2C1.1(b)(2). The PSR specifically found that "there was not a preponderance of the evidence to support" this benefit amount. (PSR p. 18, lines 535-536)

The PSR was correct. As clearly demonstrated by the wire intercepts, as of December 8, 2008, Mr. Blagojevich had not reached any decision about the senate seat appointment. He had made no determination to appoint Jackson Jr. He had made no decision to accept any amount from Jackson Jr. supporters much less the $1.5 million amount argued for by the government. A

7

December 8, 2008 call between Mr. Blagojevich and Mr. Harris finds Blagojevich telling Harris that even at that late date, one day before his arrest, Mr. Blagojevich was only then "thinking about starting to make some decisions and acting." (Home 1634 and 1636)[11] Indeed, later in the same call, Blagojevich tells Harris "Right now if I had to make the pick today it would be Gery Chico I think" Id. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both Mr. Blagojevich and the government's own witnesses confirm on tape that as of the first week of December 2008, Mr. Blagojevich had made no decisions about the senate seat appointment. Based on these facts, there cannot and does not exist proof by a preponderance that the Jackson Jr. option was imminent much less that a $1.5 million payment was forthcoming.

The government's utter failure of proof of a $1.5 million payment obtained or to be obtained from Jackson Jr. is further established by the very calls the government has relied upon. As set forth at p. 28-30 of Mr. Blagojevich's submission to probation, the calls set forth in the Government Version pp. 21-22 all end with discussion of alternate options to Jackson Jr. including the Madigan option[12] and specifically stating that Jackson would only be an option if Madigan was not.

In a December 4, 2008 conversation, (Home 1334) Blagojevich told his brother that he will objectively consider Jackson and that Jackson's people were "throwing money around." However, he called the consideration of Jackson "war gaming" and clearly stated that this was an

---

[11] The wire intercept transcripts will be cited by identifying the phone that yielded the intercepted conversation followed by the Session number.

[12] As will be discussed in more detail below, the Madigan option was the legal option of appointing Lisa Madigan to the senate in exchange for political cooperation from her father, House Speaker, Michael Madigan.

option only if it did not work out with Lisa Madigan. In the second December 4, 2008 conversations between Blagojevich and his brother (Home 1357), Blagojevich spoke to his brother about "elevating" Jackson but made it clear that he was exploring the possibility in order to frighten the Washington establishment politicians (who had all indicated they did not want Jackson, Jr.) and to spur them into action in assisting Mr. Blagojevich to make a deal with Michael Madigan. The third conversation on the Jackson option was a December 4, 2008 conversation among Blagojevich, Greenlee, and Yang. (Home 1351) Later in the same conversation, however, Blagojevich made it clear that the appointment of Lisa Madigan remained his number one option. Blagojevich stated, "Yeah, listen. Fred if we cut the deal with them, she's [Lisa Madigan's] the one" and "Listen, Jackson's not realistic unless they reject the deal." Mr. Blagojevich testified at trial consistently with what he communicated in these conversations. Mr. Blagojevich testified, "I'm saying, just that, that throughout this entire conversation in all the conversations in this period that had to do with Congressman Jackson, that he was – he was not—that Lisa Madigan was the first option, and the Madigan deal was the first option." (June 2, 2011 Tr. p. 20) Mr. Blagojevich was not ambivalent about his intention never to appoint Jackson Jr., stating on December 1, 2008 ███████████████████████████

███████████████

        Whatever one might conclude as to whether or when the Madigan option might have materialized, there can be no doubt that the possible appointment of Lisa Madigan was the option that occupied the most extensive and consistent discussion in the wire intercept evidence. There exist approximately 100 recorded calls in which Mr. Blagojevich discusses appointing Lisa Madigan with his friends and advisors. Discussion of the Madigan option commenced as early

as November 1, 2008 ▮▮▮▮ and extended until 8:43pm on December 8, 2008, the last recorded call before Mr. Blagojevich's arrest.

Indeed, reliable evidence indicates that although long discussed in the absence of concrete action,[13] by December 8, 2008 the Madigan option was on its way to becoming reality.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In a conversation at

---

[13] At trial, questions were raised as to why, if the Madigan option were indeed a genuine plan of Mr. Blagojevich's, he waited so long and talked so much about it without taking concrete action. One explanation is that the politics were sensitive and Mr. Blagojevich wanted the approach to Michael Madigan to be through the right people so that it had a chance of success. As Mr. Blagojevich testified, he knew that it was time to take action on the Madigan option in early December, but was afraid of having the idea rejected. (June 2, 2011 Tr. p. 62). The stakes were high. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This possibility would have necessarily delayed the timing of the senate appointment. Mr. Blagojevich's own personality issues might also have contributed to the delay in action. As described in the letters of both Robert and Julie Blagojevich, Mr. Blagojevich had consistent problems making decisions, which issues, in their view, contributed to the events that formed the basis of this criminal case.
[14] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮         ▮▮▮▮▮

8:43 pm the same day, ironically the last wire intercept before he was arrested, Mr. Blagojevich shared some of this incredibly sensitive information about this significant progress on the Madigan deal with Deputy Governor Greenlee. As the intercept and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ make clear, Mr. Blagojevich's plan to incite the national Democrats to action with Michael Madigan by threatening a Jackson appointment was working. Mr. Blagojevich told Greenlee, "Yeah, that's workin' out. Rahm is worried about Jesse Junior now and he is pressin' Harris about Lisa, and he has actually offered to possibly get involved and try to make the deal." (Home 1678) Mr. Blagojevich was arrested at his home at 6am on the morning of December 9, 2008. Consequently, no approach was made to Michael Madigan by Rahm Emanuel or anyone else and the Lisa Madigan appointment was never allowed to play itself out.

As recognized in the PSR, although Mr. Blagojevich was convicted of considering acceptance of payment for the Jackson senate appointment, the government failed to establish a $1.5 million benefit received or to be received from Jackson Jr. supporters. Mr. Blagojevich had made no decision on the senate appointment as of December 9, 2008 as his words and those of the government's own witnesses on the wire intercepts clearly establish. In addition there has been zero reliable evidence about the $1.5 million number advanced by the government – just that Jackson supporters were "throwin' numbers around." This obvious speculation falls far short of satisfying the government's legal obligation to establish a credible benefit figure by a preponderance of the evidence. *See e.g. United States v. Sapoznik,* 161 F.3d 1117 (7th Cir. 1998) (Vacating and remanding the district court's sentencing determination when the government asserted that gambling revenue earned in exchange for a bribe of a public official was $6 million but when the government failed to meet its burden to establish that the $6 million was net rather than gross revenue for the gambling operation).

11

Significantly, the PSR was able to reach this conclusion as to zero value of payment with respect to the Jackson information despite the fact of the convictions on Counts 10, 19 and 20 involving the Jackson allegations. The Probation Department's finding is altogether supportable and reasonable, as the mere fact of a conviction carries no implication as to the amount of loss pursuant to U.S.S.G. §2B1.1 or §2C1.1(b)(2). Indeed, loss amounts and benefit values are often among the most hotly contested sentencing issues – all against the backdrop of jury convictions. This PSR conclusion indicates that it would likewise be appropriate to decline application of the $25,000 benefit for the Magoon related conduct and the $100,000 benefit for the Johnston related conduct despite the fact of convictions on these counts when, as here, the government has failed to establish the value of the payment obtained or to be obtained by a preponderance of the evidence. Mr. Blagojevich faces a serious advisory sentencing guideline range even without any upward adjustment for non-existent payments pursuant to §2C1.1(b)(2). There is no reason to stretch application of this guideline provision beyond the bounds of sustainable precedent to account for nonexistent economic harm.

## C. The PSR Incorrectly Applied The §3B1.1(a) Adjustment When Mr. Blagojevich Did Not Exert A Leadership Role In The Counts Of Conviction Independent Of His Job Title.

The PSR recognized that Mr. Blagojevich sought the advice of others in connection with the counts of conviction, but concluded that he had final decision- making authority and directed others with respect to the convicted conduct. (PSR p. 20, lines 595-598) On that basis, the PSR applied the 4-point sentencing enhancement provided for in U.S.S.G. § 3B1.1(a) in addition to the 4-point sentencing enhancement provided for in U.S.S.G. § 2C1.1(b)(3) which applies to an elected public official in a high-level decision making or sensitive position. That guideline application is in error.

12

To the credit of the Probation Office, in the PSR section entitled "Factors That May Warrant A Departure" the PSR notes:

> [M]any of the criminal participants were individuals already involved in criminal activity and likely associated themselves with the defendant, a high-level elected official (for which he received a four-level enhancement), as advisors and campaign fundraisers to further their own money-making schemes. Furthermore, although at times, they were directed by the defendant, they also provided advice and suggestions regarding criminal activity to the defendant.

(PSR p. 32, lines 1010-1014) These recognitions should properly have translated into the finding of the inapplicability of the § 3B1.1(a) adjustment.

Mr. Blagojevich did not occupy a leadership role *vis-a-vis* the other participants in the case and did not direct them in criminal activities. In addition, the two consecutive 4-point enhancements based on the same fact of Mr. Blagojevich's position as governor constitute impermissible double counting.

### 1. Mr. Blagojevich Did Not Exert A Leadership Role Or Direct Others In Criminal Activities.

According to Application Note 4 to U.S.S.G. § 3B1.1, "[I]n distinguishing a leadership and organizational role from one of mere management or supervision, titles such as....'boss' are not controlling." The Government's Version specifically ignores the admonishment in this application note, arguing that Mr. Blagojevich should receive the 4-point leader organizer adjustment because he was "the most powerful person involved in the criminal activity," because he was "the governor of the State of Illinois," and because "he was the literal boss of several participants in the criminal activity." (Government's Version, p. 45-46) Not only is the government's argument no basis on which to apply the guideline, but it is a specifically enumerated basis on which *not to* apply this adjustment.

Mr. Blagojevich did not direct 5 or more individuals in criminal activities in connection with any of the charged offenses. In connection with the Counts involving Magoon, Mr.

13

Blagojevich asked his brother, Robert, his chief fundraiser to call Mr. Magoon. Robert Blagojevich placed the call and politely asked if Magoon would host a year-end fundraiser. Robert placed additional calls thereafter but never spoke to Mr. Magoon who did not call him back. Without more, it is questionable as to whether this request on the part of Mr. Blagojevich's chief fundraiser can be interpreted as criminal conduct. All of the other directions given by Mr. Blagojevich in connection with the events involving Magoon were normal, licit instructions imparted in his role as Governor. He asked Deputy Governor Greenlee to consider the reimbursement rate increase, a legal and appropriate task for the Deputy Governor. According to Greenlee, Mr. Blagojevich later asked him about the possibility of holding the rate increase back for budgetary reasons. Greenlee interpreted (misinterpreted in defendant's view) this as a directive to hold up the increase. As the wire intercepts bear out, Mr. Blagojevich issued no such directive.

The facts related to the charges involving Johnston likewise reveal no leadership role for Mr. Blagojevich. In fact, they reveal the opposite. Mr. Monk, in his hopelessly conflicting roles of Johnston lobbyist and Blagojevich fundraiser, was clearly stringing Mr. Blagojevich along about a campaign contribution from Johnston that was not going to materialize, while lobbying Blagojevich to enact Johnston's legislation. At the same time, Mr. Monk was being paid handsomely by Johnston for his efforts as a lobbyist. Indeed, Monk testified that when it came to relating to Mr. Blagojevich the substance of his campaign contribution discussion with Johnston, he was "embellishing," "exaggerating," and "lying." (June 14, 2010 Tr. p. 32) Tape transcripts reveal the depth of Monk's manipulation of and lies to Mr. Blagojevich in that Monk is on tape pledging to Mr. Blagojevich that Chris Kelly had no role in the events surrounding Johnston, but placing a call to Kelly minutes later to keep him up to date on the very latest

14

regarding Mr. Blagojevich's time frame for signing Johnston's favored bill. Testimony and wire intercept evidence involving Harris likewise reveal that Harris substituted his own judgment for requests made of him by Mr. Blagojevich whenever he felt like it.

Thus while Mr. Blagojevich might have been the nominal boss of his advisors in relation to these events, the truth is that his advisors were running him with their conflicted interests and outright lies.

When it came to the Magoon allegations, the evidence is that Mr. Blagojevich was not leading but being led. Mr. Blagojevich met with Robert and John Wyma on October 22, 2008. In that meeting they discussed a potential fundraiser from Patrick Magoon. Mr. Blagojevich suggested they ask for a $50,000 fundraiser. John Wyma[15] told Mr. Blagojevich $50,000 was too high and said to request $25,000. Mr. Blagojevich agreed. Mr. Blagojevich then asked if Wyma would ask Magoon for the fundraiser. Wyma again disagreed and told Mr. Blagojevich that Robert should make the request. Mr. Blagojevich again obliged and Robert was the one who called Magoon. In this situation, as with many others, Mr. Blagojevich sought and took advice from people he trusted. Mr. Blagojevich followed rather than led.

With respect to the allegations surrounding the senate seat appointment, the evidence likewise shows that Mr. Blagojevich took more advice than he gave as to what to do and how to proceed. For example, Harris gave Mr. Blagojevich detailed instruction as to how he should conduct a conversation with Obama representative, Tom Balanoff. During a November 6, 2008 call between Blagojevich and Harris (Home 317, 319 and 321), Mr. Blagojevich asked Harris dozens of specific questions and Harris provided dozens of specific directives on such topics as

---

[15] Unbeknownst to Mr. Blagojevich, at the time of this conversation, John Wyma was acting as a government agent and informant.

15

the tone Mr. Blagojevich should adopt (Harris says, "be blunt with em"), the words Mr. Blagojevich should use (Harris scripts out, "But how does this choice help the unfinished business for my family?"), and the expectations Blagojevich should have of Balanoff (Harris says, "Yeah they're the ones askin' for it so they gotta make the argument.") In addition, Harris came up with the Change To Win option to Mr. Blagojevich.

That Mr. Blagojevich asked his advisors to research certain issues such as the identity of prior Secretaries of Health and Human Services and Change to Win and 501(c)(4) options does nothing to change this analysis. These research tasks were not tantamount to direction in criminal activity and had nothing to do with the ultimate decision making as to how to handle the senate seat appointment. Indeed, there was never any decision-making in connection with the senate seat as the only thing that happened was exhaustive discussion with no resolution. On these facts, there is no basis by which to conclude that Mr. Blagojevich was an organizer or leader of 5 or more participants. Significantly, the government did not seek a supervisory role adjustment for Rezko as they now do for Blagojevich notwithstanding the fact, as set forth in the November 3, 2011 Government Sentencing Memorandum submitted in the Rezko case, (Docket #739) ("Government Rezko Sentencing Memorandum") and abundantly supported by the evidence, Rezko "devised" and "implemented" the scheme in which he was charged and convicted. (Rezko Sentencing Memorandum p. 1)

### 2. Mr. Blagojevich's Activities Were Not "Otherwise Extensive" Under U.S.S.G. § 3B1.1.

The PSR does not address the applicability of the "otherwise extensive" adjustment pursuant to U.S.S.G. § 3B1.1. In the Government's Version, the government argues that the criminal activity was otherwise extensive because: (1) other staffers assisted in research about senate seat options and (2) numerous possible benefits were discussed at one time or another in

16

connection with the senate seat appointment. (Government's Version p. 47) Both arguments are unavailing. The notion that Deputy Governor Greenlee sharing a research assignment – about which there is nothing inherently wrong – with staffers makes the conduct extensive is ridiculous. That numerous potential benefits were discussed in connection with the senate seat appointment does not make the conduct extensive – it makes the thought process laborious. U.S.S.G. § 3B1.1(a) relates to extensive criminal *activity.* Thoughts and brainstorming, however comprehensive, are mental processes – not activities.

### 3. Application of the U.S.S.G. § 3B1.1 Enhancement Is Impermissible Double Counting Based on The Applicability of the U.S.S.G. § 2C1.1(b)(3) Enhancement.

The PSR applied the 4-point enhancement pursuant to U.S.S.G. § 3B1.1. The application is erroneous because it fails to recognize that the only reason that Mr. Blagojevich had any ability to direct any of his advisors, to the limited extent he did, when they were not lying to him or telling him what to do, was that he was their titular boss because he was the Governor. Not only is this an unacceptable basis for the leader organizer enhancement (See Application Note 4 to U.S.S.G. § 3B1.1), but it is precisely the same factual basis for the 4 point adjustment pursuant to U.S.S.G. §2C1.1(b)(3) which applies "if the offense involved an elected public official or any public official in a high-level decision-making or sensitive position." In essence, Mr. Blagojevich suffers the 4-point U.S.S.G. §2C1.1(b)(3) enhancement "because he was the governor." He cannot also legally be saddled with the U.S.S.G. § 3B1.1 enhancement "because he was the governor."

Impermissible double counting occurs under the sentencing guidelines when two upward adjustments under the guidelines are premised on the same conduct. *United States v. Haines,* 32 F.3d 290, 293-4 (7th Cir. 1994); *United States v. Beith,* 407 F.3d 881 (7th Cir. 2005). In *United States v. Kopshiver,* 6 F.3d 1218 (7th Cir. 1993), the Court overturned the defendant's sentence

17

based on impermissible double counting when the same facts used to justify an enhancement for the "unusually vulnerable victim" factor were also used in support of the "unusually serious psychological injury" adjustment. In so doing, the Seventh Circuit reasoned that "the district court really drew from the same well" in setting out the considerations for the application of the two adjustments in that both focused on the identity of the victim.

In this case, the government states that Mr. Blagojevich falls within the U.S.S.G. § 2C1.1 guideline with base offense level 14 because "the defendant was a public official (the governor)" (Government Version p. 44). The defense does not disagree. The government further asserts that Mr. Blagojevich should receive the 4-point sentencing adjustment contained in U.S.S.G. § 2C1.1(b)(3) because "the offense involved an elected public official who also served in a high-level decision-making or sensitive position'" quoting Application Note 1(C) to U.S.S.G. § 2C1.1. Again, the defense does not disagree. This guideline selection and 4-point adjustment are more than adequate to punish Mr. Blagojevich for the limited manner in which his title and position allowed him to request things of his advisors.

The fact of the matter, as was abundantly demonstrated at both trials, was that Rod Blagojevich did not have control over his advisors. They poorly and improperly encouraged him, directed him, used him, lied to him, embarrassed him, and led him into the morass of a 6-year investigation that resulted in the destruction of his life and career. He chose advisors poorly as it turned out and regrets those choices profoundly. We do not argue that there should be no enhancement for Mr. Blagojevich's role as governor – we include the appropriate enhancement based on U.S.S.G. §2C1.1(b)(3) in the proper calculation below. However, he did not exercise a force of personality, iron fist, type of leadership that would be necessary to support a further additional 4-point enhancement based on § 3B1.1(a) particularly where his role as governor has

already been extensively accounted for and punished. Therefore the § 3B1.1(a) adjustment cannot properly be applied.

## II.    The Correct Advisory Guideline Range

The correct advisory sentencing guideline calculation is as follows:

| | |
|---|---|
| Base offense level for U.S.S.G. § 2C1.1(a)(2) | 14 |
| More than one bribe/extortion U.S.S.G. § 2C1.1(b)(1) | 2 |
| No benefit pursuant to U.S.S.G. § 2C1.1(b)(2) | 0 |
| Elected public official, high-level decision-making or sensitive position pursuant to U.S.S.G. § 2C1.1(b)(3) | 4 |
| No organizer leader pursuant to U.S.S.G. § 3B1.1(a) | 0 |
| Obstruction based on Count 24 App. Note 4, U.S.S.G. § 3C1.1 | 2 |
| **Advisory Guideline Range** | level 22 |

Level 22 corresponds to an advisory guideline range of 41 to 51 months which is a departure point for consideration of an appropriate sentence sufficient but not greater than necessary to punish the convicted conduct.

## III.    Factors That Warrant Departure Below The Advisory Guideline Range

### A.  Nature and Circumstances Of the Offense – 18 U.S.C. §3553(a)(1)

#### 1.  No Financial Benefit – No Public Harm From Counts Of Conviction

Critical to understanding this case is the inescapable fact that Mr. Blagojevich did not receive a single cent in connection with the conduct charged in the indictment. Nor did the counts of conviction involve Blagojevich taking a single cent of the taxpayers' money to enrich himself or his friends or supporters. There was no fundraiser from Magoon. There was no contribution from Johnston. Mr. Blagojevich received no benefit whatsoever in connection with the senate seat appointment. He received no contribution from Mr. Emanuel in connection with the Chicago Academy or from Mr. Krozel in connection with the tollway project. Nor was there

any ill effect on critical projects or legislation. The pediatric rate increase went into effect only because of Mr. Blagojevich (whereas the Illinois Hospital Association, Magoon and/or Children's Memorial Hospital had not succeeded in obtaining legislative action), as Mr. Magoon testified in the first trial. Yet Magoon did not have a fundraiser for Mr. Blagojevich and refused to even return calls from Robert Blagojevich. The Racetrack Bill became law (and no contribution was made to FOB). The senate seat went to a candidate never discussed in connection with any of the government's allegations (and Blagojevich received nothing for the appointment). The Chicago Academy got their athletic field built in the projected time frame for construction. The $1.8 billion tollway project went through as planned. These facts make this case unlike any other bribery case existing in reported case law in the Seventh Circuit or indeed in any reported federal case in the nation. In the unique circumstances in which Mr. Blagojevich received nothing and withheld nothing, the notion that he should be punished as if he were a dangerous recidivist felon (as advocated by the government) is as offensive to notions of justice and fair play as it is to common sense.

Furthermore, the vast majority of the "conduct" captured on the tapes was not "conduct" at all but what Mr. Blagojevich referred to in his testimony as "preliminary conceptual discussions." (June 1, 2010 Tr. p. 58) As Mr. Blagojevich explained from the witness stand, and as evidenced by the tape recorded conversations, Mr. Blagojevich intended to collect ideas and options and measure one against the other (June 1, 2010 Tr. p. 59). It is relevant for sentencing that the vast majority of the actions that were discussed never happened at all. The recorded conversations consisted principally of exchanges between Blagojevich and others in what was believed to be the private space of frank discussions and free expression between trusted advisors and friends.

## 2. Absence Of Ill Intent Is Critical Mitigation Evidence

In considering the nature and circumstances of the offense in this case, it is also important to consider Mr. Blagojevich's intent and the issue of whether he believed, as he testified at the second trial, that his actions were legal. Mr. Blagojevich has been consistent and adamant in proclaiming his innocence. He has done so by his decision to proceed to trial, rather than pleading guilty and cooperating with the government, as have so many others involved in this investigation. He has done so by his statements to the press[16] and his challenges to the prosecution. The belief in his innocence will doubtlessly be the basis for an argument from the government that he should be punished more severely because of what they would characterize as a failure to come to terms with his own misconduct. To judge Mr. Blagojevich's insistence on his innocence fairly, however, it is necessary to consider whether or not his words and his actions were consistent with innocent intent and an honest belief he was following the law.

A full and fair analysis of the tape transcripts reveals that Mr. Blagojevich sincerely believed that his actions were proper under the law as he understood it at the time. This fact, while it does not negate the charges of which he was convicted, is critical to understanding Mr. Blagojevich's conduct during and after the trial and in evaluating a reasonable and just punishment in this case.

### a. Mr. Blagojevich's Understanding Of The Law

While discussing the possibility of a 501(c)(4) issue advocacy organization, Mr. Blagojevich inquired of advisor Doug Scofield, "How do you make a deal like that? I mean its gotta be legal obviously..." (November 11, 2008, Home 493) In the context of the fundraising

---

[16] The fact that Mr. Blagojevich was, from the outset, a public person familiar and comfortable with the media provides partial explanation for Mr. Blagojevich's many public statements about the case. It is notable, however, that since the time of the verdict in the second trial, Mr. Blagojevich has conscientiously avoided press attention based on respect for the jury process and for this Court.

request of Magoon, Wyma testified, "Rod said that he did not want to mix government and fundraising" (July 13, 2010, Tr.) such that Robert rather than Blagojevich was to discuss fundraising with Magoon. In discussing the fundraising request to Johnston, Monk explicitly stated to Mr. Blagojevich that he was going to approach Johnson "without crossing the line" and that when discussing a possible campaign contribution and the Racetrack Bill with Johnston he would make it clear that "one has nothing to do with the other." (December 3, 2008, 2:13pm, FOB Office).[17]

Mr. Blagojevich's understanding of the law was that if there was no explicit quid pro quo between governmental action and benefit then there was no illegality.

[18] Based on the jury verdict, Mr. Blagojevich's understanding of the law was insufficiently nuanced.[19] His convictions are based primarily on the testimony of Magoon, Johnston, and Balanoff who provided their subjective interpretation that there existed an improper linkage between the benefits discussed and the official action at issue. In circumstances such as these, however, when the benefits discussed (campaign contributions and political appointments) are inherently legal absent improper linkage, there exists an understandable ambiguity in the contours of appropriate action in the mind of the government actor.

---

[17] During the first trial, Monk admitted on cross-examination that the import of this conversation was to follow rather than to evade the law.

[18] During the trial, the Court expressed the concern that Mr. Blagojevich had not sought expert legal advice. Clearly, Mr. Blagojevich could have profited from more comprehensive legal advice than he was given. However, the fact that Mr. Blagojevich selected an attorney versed in campaign financing laws and ethical responsibilities rather than in the area of criminal defense is, if anything, additional evidence for his innocent intent.

[19] As this is not the forum for discussion of the proper contours of a Hobbs Act and honest services prosecution, the basis of the convictions will be assumed solely for the purposes of this Memorandum.

The United States Supreme Court has clearly recognized the ambiguity that is involved when campaign contributions or other inherently licit conduct are the subject of a Hobbs Act criminal prosecution. *In McCormick v. United States*, 500 U.S. 257, 273 (1991), the Supreme Court held that the receipt of political contributions violated the Hobbs Act "only if the payments were made in return for an explicit promise or undertaking by the official to perform or not perform an official act."[20] The *McCormick* Court reasoned that it would risk prosecuting legal and unavoidable conduct to allow campaign contributions to support a Hobbs Act prosecution absent an explicit quid pro quo because under our political system, politicians were constantly soliciting money and routinely attempting to support legislation for the benefit of constituents. *McCormick*, 500 U.S. at 273. In *United States v. Allen*, 10 F.3d 405 (7th Cir. 1993), the Seventh Circuit indicated that extension of the *McCormick* quid pro quo formulation to bribery cases was reasonable. Common to cases analyzing the McCormick standard is the recognition that holding "that a politician committed extortion merely by acting for some constituents' benefit shortly before or after receiving campaign contributions from those constituents" would risk criminalizing common and acceptable conduct. *Allen*, 10 F.3d at 441. Given that this case involved fundraising attempts and discussions about a senate seat appointment – all intrinsically lawful actions – there exists a level of ambiguity as to the contours of legally permissible conduct.

### b. Mr. Blagojevich's Intent

In attempting to analyze the hundreds of wire intercepts in which Mr. Blagojevich discussed the senate appointment with his advisors, several themes emerge which are germane to

---

[20] In *Evans v. United States*, 504 U.S. 225, 268 (1992), the Supreme Court refined the *McCormick* formulation holding that to sustain a conviction, "the Government need only show that a public official has obtained payment to which he was not entitled, knowing that the payment was made in return for official acts."

the analysis of Mr. Blagojevich's intent. None of this information is offered, for present purposes, to challenge the criminal convictions in this case. The themes explain and provide insight, however, into the manner in which Mr. Blagojevich conceptualized the senate appointment. They reveal that while insufficiently disciplined, Mr. Blagojevich's thoughts were not to unjustly enrich himself at the expense of his constituency, but rather to work his way toward a senate appointment who provided him with some political benefit and who was also good for the people of the State of Illinois.

### i.  Castles In The Air

The best summary of Mr. Blagojevich's view of the senate appointment are his own candid words on the topic, spoken in what he believed to be confidence, in a conversation with advisor ▇▇▇▇:



▇▇▇▇▇▇▇▇▇▇▇▇▇ These words provide the context of all of Mr. Blagojevich's discussions about the senate appointment.

### ii.  An Opportunity To Achieve A Good Result

Unquestionably, Blagojevich saw the senate appointment as an opportunity.[21] But he did not, as has been argued by the government, view the senate appointment purely a chance for personal profit. He viewed the appointment, rather, as an opportunity that might be politically beneficial to him while also being good for the people of the State of Illinois. (See e.g.

---

[21]The quintessential formulation of this is the November 5, 2008, (Home 281) "f****ing golden" quote which was, in point of fact, not made in reference to an economic benefit for Blagojevich)

24

November 4, 2008, Home 171 and 173, referring to the senate appointment as an opportunity to do "something good for the people of Illinois and for me" and [REDACTED]

[REDACTED] )

One option fitting the criteria of being good for the people of the State of Illinois as well as for Mr. Blagojevich, was the option of appointing Lisa Madigan to the senate in exchange for an arrangement with her father, speaker of the Illinois House of Representative Michael Madigan, to support legislative initiatives Blagojevich believed were critical to the State. These initiatives included a Capital Bill, which would have created 500,000 Illinois jobs, and an expansion of health care benefits, all without raising the state income tax. The Madigan candidacy was the topic of over 100 wire intercept calls, many of which make it clear that Blagojevich was considering this possibility despite its distastefulness as benefitting a political nemesis, because he thought it was the most beneficial for the People of Illinois. In a [REDACTED]

[REDACTED] call with [REDACTED] Blagojevich says of the senate appointment, [REDACTED]

[REDACTED]

[REDACTED] Numerous additional calls evidence the fact that Blagojevich seriously considered Lisa Madigan's candidacy based on its benefits to Illinois.

(See e.g. [REDACTED]

[REDACTED]

[REDACTED] )

The Lisa Madigan candidacy was not, as claimed by the government, merely a back up option after the Health and Human Services and 501(c)(4) options failed. Rather, it was discussed right from the beginning of the tapes and (contrary to what the government told the

jurors in closing argument) during the time that Blagojevich was in the midst of discussions with Obama representatives. See e.g. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. In fact, Balanoff testified that during both his November 3 and 6, 2008 meetings with Blagojevich, Blagojevich discussed appointing Lisa Madigan to the senate, citing the possibility of advancing key legislative priorities. (June 29, 2010 Tr. p. 16 and 26)

### iii. No Decisions Were Made On The Senate Appointment

Critical to the proper analysis of this case is the fact that the wire intercept conversations were just that – conversations. In discussing the possibility of a Health and Human Services appointment with his advisors, for example, Blagojevich recognized that this was "extremely unlikely" (November 7, 2008, Home 374) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Throughout the wire intercepts, Blagojevich refers to his discussions with his advisors as "wargaming" and "brainstorming."

Part of the reason that discussions about the senate appointment resided chiefly in the theoretical was that Blagojevich had his own timetable for the senate appointment. He wanted a slow and "deliberate" (November 7, 2008, Home 374) process and refused to be rushed into a decision. See e.g. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ and December 8, 2008 (Home 1678) (Blagojevich stated that he was going to wait to make the appointment until January 6, 2009).

The result was that discussions of the senate appointment, although lengthy and numerous, were never conclusive. On November 1, 2008 ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Blagojevich demonstrated this ambivalence

throughout the time period in which he was meeting with Balanoff regarding the Jarrett candidacy, suggesting that even if the Health and Human Services and 501 (c)(4) discussions he had with Balanoff had been met with more receptivity, Blagojevich might not have proceeded along this course. On November 7, 2008 (Home 375), for example, Blagojevich told Scofield that he would meet with Balanoff and Stern but that he was "not gonna make any decisions by any means." Indeed Balanoff's testimony evidenced the fact that Blagojevich was avoiding contact with Balanoff after the November 6, 2008 meeting.

The indecision was chronic, extending up until the last wire intercepts. On November 26, 2008 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

On December 1, 2008 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ On

December 8, 2008 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇

### iv.  Clean Bill Of Health

Repeatedly, throughout the wire intercepts, Mr. Blagojevich discussed with numerous individuals his desire to obtain a "clean bill of health" in connection with the ongoing governmental investigations of Rezko, Levine, and Cellini. Mr. Blagojevich followed these investigations closely. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Blagojevich not only desired but believed that if the truth was told,[22] he would be exonerated in connection with the ongoing investigations. This fact is additional evidence of his lack of ill intent.

### v. Knowledge of History

As Mr. Blagojevich's offer of proof at trial made clear, he is a student of history. There existed historical examples of political appointments being offered in exchange for desired political action. One such example was the offer to Ronald Reagan of cabinet positions and ambassadorships not to run against President Ford. Another was Earl Warren, then governor of California, being offered the next Supreme Court vacancy in exchange for his political support of Dwight D. Eisenhower. Unfortunately, the distinction between personal and political benefit, as discussed below, was never related to Mr. Blagojevich by any of his advisors and was not understood by Mr. Blagojevich to have been critical.

### vi. Advice And Observation Indicated That It Was Acceptable To Receive A Benefit In Exchange For The Senate Appointment

All of Mr. Blagojevich's advisors specifically discussed benefit to Blagojevich in exchange for the senate seat in open and obvious terms without ever telling him that there was anything improper about this concept.[23] Indeed, the recorded conversations indicate that Mr. Blagojevich's advisors counseled[24], agreed, encouraged, and supported the idea that he should obtain a personal benefit in exchange for the senate seat appointment. The relevance of these

---

[22]

[23] The omission was not caused by lack of opportunity. Based on estimates (due to minimization time), General Counsel ▮▮▮ logged ▮▮▮ conversations with Blagojevich ▮▮▮

[24] An advice of counsel defense was discussed and rejected at trial. However, information as to the advice Mr. Blagojevich received from his advisors, including General Counsel ▮▮▮, is highly relevant mitigation evidence to demonstrate Mr. Blagojevich's belief that he was not violating and his intention not to violate the law.

clear facts is not that the advisors rather than Mr. Blagojevich are responsible for the counts of conviction. The point is that Mr. Blagojevich believed that it was acceptable for him (as well as the State of Illinois) to receive a benefit in exchange for the senate appointment and that this belief was not unreasonable based on such numerous conversations with so many people he trusted. Furthermore, the wire intercepts show that the line between proper and improper conduct regarding the senate appointment was not as clear as one might think. Individuals holding themselves out as representatives of President Obama, nationally prominent democratic political consultant, ███████, and former Republican Speaker of The United States House of Representatives, ███████ all discussed political benefits to Blagojevich in exchange for the senate appointment.

*Preparation For And Early Meetings With Obama Representative Balanoff*

Before November 1, 2008, individuals who purported to be acting as Obama representatives were reaching out to Mr. Blagojevich about the senate seat appointment. In mid-October 2008 media consultant Marilyn Katz had made contact with Blagojevich advisor John Harris. On November 3, 2008, (Home 149) Harris told Blagojevich about Katz's contact, "Yeah she was talking about (Obama's) friends around the country that would be appreciative and their ability to help with fundraising." Blagojevich rejected the suggestion that he connect the senate seat appointment to fundraising, telling ███████ on November 8, 2008 ███████

On November 1, 2008, ███████ Blagojevich General Counsel ███████

29



In a conversation with ████ a day later, on November 2, 2008, ████

The first meeting between Blagojevich and Obama representative Tom Balanoff was on November 3, 2008. As of that time, Balanoff discussed the candidacy of Jan Schakowsky[25] as Obama had not yet raised the Jarrett candidacy with Balanoff.[26] Blagojevich, who already knew of Obama's interest in the Jarrett appointment from sources other than Balanoff,[27] discussed the possibility of a Jarrett appointment with his counsel

*Preparing For And Making The Health And Human Services Ask*

Mr. Blagojevich informed his advisors about Balanoff's second request for a meeting to take place on November 6, 2008 and again asked for advice about what he should say to Balanoff at that meeting. In the November 6, 2008 discussion, (Home 319 and 321) Blagojevich advisors told him how to respond, "if Balanoff comes in and tells us Jarrett." Harris counseled Blagojevich to say, "So I have to think about the unfinished business we have and my family" to

---

[25] This was the first of many individuals who approached Mr. Blagojevich to advance their own candidacy for the senate seat or that of an individual they supported.

[26] According to Balanoff's testimony, Obama first raised Jarrett's candidacy with him in a call on the evening of November 3, 2008.

[27] On November 2, 2008, Rahm Emanuel had called Harris and raised Jarrett's candidacy.

which Mr. Blagojevich responded, "Okay, this is good." Harris continued the script, "But how does this choice help the unfinished business or my family....Get blunt with 'em." Mr. Blagojevich asked, "Just say it like that and I don't have any specific things in mind, right?" to which Mr. Harris responded, "Right...Yeah, they're the ones askin' for it so they gotta make the argument."

On November 7, 2008, (Home 403, 405, 406, and 408) Blagojevich shared the content of his November 6, 2008 conversation with Balanoff[28] with Harris and Yang. Blagojevich opened the conversation by telling them, "Balanoff came back with a message directly from Obama, Valerie Jarrett." Blagojevich then launched into a recitation of the conversation. Blagojevich stated, "he suggested – you know talked about Valerie Jarrett but didn't really suggest anything tangible or concrete which was not unexpected." Blagojevich then outlined what he said to Balanoff in response -- which approach had been sketched out for him by Harris earlier that morning, "I then mentioned to him you know my dilemma which is you know you guys all leave town and you're they're out in Washington doing great and exciting things I'm left here"... "Um so you know.....I'm in a position where I can't do anything where whereas I wanna be active to do things I care about....so I threw out, so I said to him, uh Health, Department of Health and Human Services"..."maybe its really unrealistic but if it was available to me I could do Valerie Jarrett in a heartbeat."

Far from hiding from his advisors the words he used in his conversation with Balanoff, Mr. Blagojevich laid out the conversation in close to the same terms to which Balanoff testified – complete with the words that seem to tie the senate seat appointment to his requested position. No one expressed a single word of warning, of shock, or of consternation. Not even Balanoff expressed any surprise about Blagojevich's Health and Human Services suggestion. Balanoff

---

[28] That day, Balanoff requested that he and Blagojevich meet alone and Blagojevich obliged.

31

testified that he met Jarrett at the AON Center to update her about his discussion with Blagojevich about the possibility of her senate appointment. During that conversation, Balanoff described Blagojevich's mention of the Health and Human Services Appointment as "goofy stuff." Indeed, it was not Blagojevich's suggestion of a possible appointment for himself that concerned Balanoff, but the possibility that Blagojevich might not heed the message and appoint Jarrett. As to the latter possibility, Balanoff had a strong opinion and a threat. Balanoff testified that he was ready to tell Blagojevich that Jarrett was a good decision for him "and if he wasn't willing to make those kinds of decisions then he couldn't necessarily count on Service Employees International Union (SEIU) support again." (June 29, 2010 Tr. p. 32-3)

*Preparing for the "Change To Win" And 501(c)(4) Asks*

On November 7, 2008, (Home Phone Session 403, 405, 406, and 408) Mr. Blagojevich discussed the approach by Obama representatives and his options with Harris and Yang. Harris explained to Yang that Blagojevich should think about becoming the National Director of the Change To Win Campaign – an idea that emanated from Harris not Blagojevich:

| | |
|---|---|
| YANG | Whose idea was this? |
| BLAGOJEVICH | Harris |
| YANG | That's John, that's just wow. |

Harris went on to explain of this proposition, "We haven't approached them on it yet."

Blagojevich considered whether he should make the Jarrett appointment outright with nothing in return



*Additional Discussions of 501(c)(4) In Response To The "Thankful And Appreciative" Message From Obama Representatives*

On a November 11, 2008 (Home 487) call between Mr. Blagojevich and Mr. Harris, Harris delivered a message to Blagojevich from Wyma who was delivering a message from soon to be Chief Of Staff, Rahm Emanuel. The message – that the "president elect would be very pleased if you appointed Valerie Jarrett and he would be, ah, 'thankful and appreciative' those are the operative words." Harris explained to Blagojevich that he had merely said "okay" since he "didn't wanna engage him in our negotiations and discussions about our back channel stuff."

On November 11, 2008, (Home 493) Blagojevich had a conversation with Doug Scofield in which Blagojevich asked Scofied, "how about a 501(c)(4)" "so I can advocate children's health care?" Mr. Blagojevich inquired, "How do you make a deal like that? I mean its gotta be legal obviously, but….But it's very commonplace is it not? Doing things like this?" Mr.

Scofield responded that a 501(c)(4) is "not unusual" and went on to instruct Blagojevich, "I think you should leverage it for whatever's most helpful to you." Mr. Scofield counseled Blagojevich that while it is "good" to have Obama being "grateful and appreciative," "they could add some substance to that" and "negotiate a little bit." Scofield went even further and told Blagojevich that the Obama people need to "make the value a little more tangible." In response to Blagojevich's follow up question, "What's the value," Mr. Scofield answered, "Well, I, I don't know unless its tangible."

On November 12, 2008, Mr. Blagojevich asked Harris whether Blagojevich's concerns about how to position himself in the private sector were "ridiculous" to which Harris responded, "No it's not ridiculous" and went on to explain to Blagojevich that while Blagojevich was not a natural deal-maker like other former governors who would naturally transition to the private sector, Blagojevich was a "values governor" who needed to pursue something in that arena (Home 521).

*The 501(c)(4) Ask And Blagojevich's Discussion Of The Ask With Advisors*

By November 12, 2008, and armed with the encouragement of advisors Harris, Yang, Greenlee, Scofield and Quinlan, Blagojevich discussed with Balanoff the concept that he make Jarrett senator and have a 501(c)(4) set up for issue advocacy. (Home 546) Blagojevich inquired of Balanoff, "What do you think about that concept, that idea?" to which Balanoff responded, "Hey I think it's great you know...but hey, what you, you and I a lotta times think something's great...it's unfortunate that other people don't I think it's a great idea." In the same conversation, Blagojevich told Balanoff that he should use his judgment as to how the 501(c)(4) idea should be discussed with the Obama people to which Balanoff responded, "Yeah."

On November 12, 2008



[29]

Balanoff himself was as nonplussed about Blagojevich's 501(c)(4) suggestion as he was about the Health and Human Services idea. Balanoff's testimony illustrates that his only concern was that Blagojevich might not do as Obama asked. Balanoff's response again was to suggest a threat to Blagojevich. Balanoff testified that he told Alexi Giannoulias about the Jarrett appointment, "I'm still ready to say to the Governor that politically it's a good thing for Illinois

___

[29] Government witness John Harris testified at trial that he and Messrs. Quinlan and Blagojevich had a conversation in the late summer of 2008 in which Quinlan warned Mr. Blagojevich not to even joke about the 501(c)(4). There exists no transcript evidence of any such sentiment or any such warnings by either Harris or Quinlan. Indeed, many transcripts reveal that their approach was the opposite – to condone and to encourage the notion that Mr. Blagojevich could use the senate appointment to negotiate for a 501(c)(4).

and a good thing for him and if he doesn't do that, then he can't count on our political support anymore." (June 29, 2010 Tr. p. 46)

As with the Health and Human Services suggestion, not only did Blagojevich's advisors, including his counsel, not tell him that there was any problem with connecting the senate seat appointment to the possibility of personal benefit to Blagojevich, they came up with the ideas for the possible personal benefit to Blagojevich and told Blagojevich that Obama's people should be making the connection between the benefit and the appointment more explicit.

*Blagojevich's Ambition To "Publically Announce It"*

That Mr. Blagojevich saw no illegality in trying to link the senate seat appointment to a 501(c)(4) organization or "Change to Win" PAC was further evident in his spoken intention to make public announcements about these matters. In a November 12, 2008 conversation with Harris, (Home 521) Mr. Blagojevich stated that he would not be "averse to being up front" about establishing a 501(c)(4) to push a health care reform agenda, proposing that he would publically announce the 501(c)(4) and have Jarrett, as senator, involved in advocating on behalf of the organization. Blagojevich made similar statements about the "Change To Win" PAC, stating that he planned to "publically announce it." (November 6, 2008, Home 321)

Indeed, the fact that the Health and Human Services position would have required senate confirmation was ▮▮▮▮▮▮▮▮▮ the very reason that Blagojevich would never receive such a position.

Again, the jury concluded that Mr. Blagojevich's actions were wrongful and we do not challenge that conclusion in this Memorandum. Mr. Blagojevich's numerous conversations with advisors reveal that neither he nor they recognized that discussion about these various options or Blagojevich's approach to Balanoff could be considered illicit acts. This fact is relevant, not to criticize or lay blame with Mr. Blagojevich's advisors, but rather provide context for Mr. Blagojevich's lack of ill intent.

The context of Blagojevich's conversations with his advisors is that it is appropriate and expected that he should receive some form of benefit in connection with the senate seat appointment. Harris described asking Balanoff for an appointment or position as a "reasonable request" (Home 262) and Greenlee described Blagojevich asking to be appointed as Health and Human Services Secretary as a "totally legitimate ask." (Home 255) Approaches by Obama representatives, though certainly more cautious and polished, in the "thankful and appreciative" "operative words" formulation, even contain suggestions of the same.

When Blagojevich spoke about the senate appointment with ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



No one discussed a distinction between a personal and political benefit. No one cautioned Blagojevich not to speak in terms of a quid pro quo in connection with the senate appointment. No one so much as suggested that the requests Blagojevich made to Obama representative Balanoff were improvident much less illegal. So numerous and so detailed are Mr. Blagojevich's discussions of potential benefits in connection with the senate seat appointment with advisors, including discussions with General Counsel ▮▮▮▮▮ as well as with nationally prominent political figures who were not in Blagojevich's inner circle, that it is reasonable to assume that Mr. Blagojevich did not view his words as illegal. The jury has concluded that Mr. Blagojevich was incorrect in that belief. However, the context of Mr. Blagojevich's open discussion with advisors is relevant to consideration of his intent, which did not include breaking the law as he understood it.

### vii. Mr. Blagojevich's Response To News Of Wyma's Cooperation And Being Taped

Late on the evening of December 4, 2008, Mr. Blagojevich learned that the Chicago Tribune was about to run a story that Wyma was cooperating with the federal government, that

Wyma had worn a wire, and that Blagojevich might have been on tape. Immediately following this revelation, Mr. Blagojevich engaged in a series of calls with ████████████████████

████████████████. The calls, which it is clear that no one suspects are being taped, reflect a genuine astonishment on Mr. Blagojevich's part that he could be alleged to have done anything illegal. While the jury found differently, Mr. Blagojevich's response to the news of the investigation and taping is relevant to the sentencing determination in this case because Mr. Blagojevich's behavior was that of an innocent man. █████████████████████



Mr. Blagojevich's own words, spoken in confidence to his closest advisors, are powerful evidence that he did not intend to violate the law and, even as of December 4, 5, and 6, days before his arrest, had no concept that he could be found guilty of having done so. Robert Blagojevich wrote to the Court in support of his brother. He described conversations with Mr. Blagojevich when Robert took the position of chair of FOB fundraising in which Mr. Blagojevich assured Robert that Robert could rely on the "political judgment" and "expertise" of

"Lon Monk, Bill Quinlan, John Harris, and John Wyma" to do "everything properly." Robert Blagojevich, who occupied a uniquely close position in connection with the events at issue in this case, opined:

> I do not believe that my brother, Rod, ever intended to commit a crime....Countless times he spoke to me about doing the right thing while he was in office. I believe he surrounded himself with advisors whom he believed would help him govern ethically and legally.

That Mr. Blagojevich's trust in many of his advisors turned out to be misplaced does not alter, and may in part explain, how an individual with honest intentions could find himself in Mr. Blagojevich's current position. Even accepting the jury verdict as correct at this phase of the proceedings, Mr. Blagojevich's lack of ill intent should be considered in evaluating an appropriate sentence.

### B. History And Characteristics Of the Defendant 18 U.S.C. §3553(a)(1)

Rod Blagojevich is an intrinsically good, kind, and decent man. He was and is a politician, which can cause him to be perceived as shallow and self-promoting.[31] However, his track record as governor reveals a genuine commitment to initiatives that benefitted the middle and lower middle class. As Mr. Blagojevich explained to the Probation Officer there was "nothing intellectual about my politics" (PSR p. 24, line 749). Instead, as a man who grew up in a working class Serbian family, Mr. Blagojevich allowed his politics to be driven by his life experiences. Significantly, Mr. Blagojevich often promoted his policies at his own political cost, suffering the fallout that came along with it. A prime example of this is the All Kids legislation, which provided universal health coverage to all Illinois children, many of whose parents lacked private health insurance.

---

[31] As the Court is well aware, during Mr. Blagojevich's testimony during the second trial, he often gave long winded answers during direct examination that attempted to portray himself in a positive light and during cross examination talked over his own counsel's objections.

41

Mr. Blagojevich came from nothing such that his rise to national prominence as a Congressman and later as Governor of the State of Illinois astonished Mr. Blagojevich and his family alike. He related to the Probation Officer that his mother, who worked waiting tables and later at a grocery store and for the CTA, borrowed against her wages to purchase the World Book Encyclopedia for the family when it first came out. At some point during his political career, Mr. Blagojevich noted with pride and gratitude that he came to have his own entry in that encyclopedia.

Growing up, both Mr. Blagojevich and his brother, Robert, always worked. They started a shoeshine business when Mr. Blagojevich was 9 and Robert was 10 or 11 and collected 25 cents plus tips, all of which went to their parents for their college fund. In high school and college years, Mr. Blagojevich was constantly employed working as a pizza deliveryman, in a meatpacking plant, and in a lucrative job on the Alaska pipeline where he worked for 2 summers and for which he missed his high school graduation.

Academics did not come easily to Mr. Blagojevich. He attended the University of Tampa for college and then, after raising his grade point average was able to transfer to Northwestern University., where he earned a B.A. in history. After college, Mr. Blagojevich attended Pepperdine Law School in California where he earned a grade point average of only 72.89% (with 70% being required for graduation). (PSR p. 26, lines 822-823) After he graduated, Mr. Blagojevich took a series of jobs as a State's Attorney and in small law firms. Mr. Blagojevich first ran for political office in 1992 when he ran for state representative and won. In 1996, he ran for United States Congress and won. He ran for governor and was elected in 2002 and 2006.

As he transitioned into politics and rose in prominence, Mr. Blagojevich was always conscious about surrounding himself with advisors who had better educational pedigrees than he

42

did – many of whom had earned Ivy League college degrees or law degrees from Harvard or the University of Chicago. Mr. Blagojevich could recite the resumes of many of these advisors as evidenced by his direct testimony in the second trial. As discussed in Section III.A.2.b.vi above, many of these advisors were on tape with Mr. Blagojevich discussing the senate seat appointment and other circumstances that became the subject of the instant case. All of them cooperated with the government and many testified against Mr. Blagojevich.

As Congressman and later as Governor, Mr. Blagojevich was always somewhat of a political outsider. His devotion to his wife, Patti, and two daughters, Amy and Annie, led him to opt for returning home from Washington D.C. nearly every weekend as a Congressman and from Springfield as Governor rather than staying around to socialize with other politicians or attend the countless events to which governors are invited. As Patti Blagojevich told the probation officer, Mr. Blagojevich was a good and loyal husband and father who ""always wanted to be home' with her and his daughters" such that he "would only be away to work 'the minimum amount' possible to perform his jobs well as a United States Congressman and Governor." (PSR p. 23, lines 720-723) Indeed, while Mr. Blagojevich was Governor, and to his distinct political detriment, he maintained his family home in the Ravenswood area of Chicago rather than taking permanent residence in the Springfield Governor's mansion to ensure that his daughters could maintain a normal life (PSR p. 23, lines 723-725). Devotion to his wife and daughters has been a constant in Mr. Blagojevich's life before, during, and after the legal investigations into his conduct commenced in May 2004.

### 1. Mr. Blagojevich's Legislative Initiatives Were Value Based.

At 12 years of age, Mr. Blagojevich's first cousin, Eli, passed away. Eli and Mr. Blagojevich had grown up as almost as brothers due to the closeness of the families and the many nights and weekends that Eli spent at Mr. Blagojevich's family home. In the aftermath of

43

this tragic loss, Eli's parents, small business owners who did not have adequate health insurance coverage, lost everything they had paying for Eli's medical bills. This experience had a profound effect on Mr. Blagojevich and was instrumental in his commitment to providing health care for all children.

Without question, the political initiative about which Mr. Blagojevich cared the most deeply was the All Kids legislation. In 2005 the Illinois General Assembly passed All Kids legislation, which had been proposed and championed by Mr. Blagojevich. All Kids was the first universal coverage program for children in the nation. All Kids is available to all uninsured children without regard to income[32], health, status or citizenship and allows parents to obtain health insurance with premiums scaled to family income. More than 400,000 more children have received healthcare since All Kids was enacted.

A Kaiser Commission Report *A Race To The Top: Illinois' All Kids Initiative* prepared by Teresa A. Coughlin and Mindy Cohen of the Urban Institute in August 2007 concluded (p. 23):

> Illinois is one of a few states to have recently enacted a major health care initiative designed to reduce the number of uninsured within its borders. Within a few months of implementing All Kids, the country's first universal coverage program for children, about 50,000 previously ineligible children now have coverage. The initiative appears to enjoy wide support, from the governor to legislators to consumer advocates to providers. *While broad support appears to be important, strong leadership from the governor was cited as being especially critical to the program's enactment and implementation.*

(emphasis added).

Mr. Blagojevich secured passage of the All Kids legislation despite immediate, personal, political detriment. In 2005 when Mr. Blagojevich sought passage of All Kids, the action required the assent of Speaker of The Illinois House of Representatives, Michael Madigan. In exchange for granting that agreement, Mr. Madigan demanded that Blagojevich sign and not

---

[32] All Kids has a sliding payment scale requiring higher payments from families who earn more. The All Kids program also does not exclude those with preexisting conditions.

veto legislation that capped medical malpractice awards. Mr. Madigan favored that legislation to appease the powerful insurance company lobby, which was gearing up for a battle that could have been politically and financially costly for Mr. Madigan. Mr. Blagojevich agreed to the deal with Mr. Madigan in order to secure passage of All Kids. However, as Blagojevich well knew, the agreement to cap awards proved costly to him. The stance cost him hundreds of thousands of dollars in contributions from the personal injury bar (as evidenced by the marked decline in contributions from this group between the 2002 and 2006 elections) while cementing the influence of his chief political rival, Michael Madigan, with the business community.

The fallout was worth it to Mr. Blagojevich. Countless personal stories and expressions of gratitude from families with sick children have been communicated to Mr. Blagojevich and his wife over the years. An August 25, 2010 letter to Mr. Blagojevich from a family[33] whose son passed away at age 9 from Rhabdoid cancer is one example. The family wrote Mr. Blagojevich to thank him for the role he played, through passing the All Kids legislation, of allowing their son and brother to be given the opportunity for treatment. Although their son passed away a year and five months after diagnosis, the family extolled Mr. Blagojevich having giving him the opportunity to fight the cancer through numerous surgeries and medication and for the chance to spend more time with him.

Other appreciative Illinois citizens from diverse backgrounds also wrote to Mr. Blagojevich to share their observations on the tremendous effects of the All Kids program. A registered nurse wrote to Mr. Blagojevich on February 1, 2009 to inform him that based on her profession, she was aware of the significance of the All Kids legislation which "guarantees the best healthcare for all of Illinois children." The individual went on to state:

---

[33] Letters not submitted in connection with sentencing are discussed without providing the names of the authors in deference to the writers who were not aware that the letters might become public at the time they were written and sent to Mr. Blagojevich. The Court is in receipt of these letters.

I know Mr. Governor that every, man, woman, and child, will never forget the changes you worked so hard for in order to make their lives better. They will never forget the peace of mind that you brought their families knowing that everything will be all right if their children were to suddenly get ill. And most of all, they will never forget that you were not like those who said, but you were one that did.

In an undated letter to Governor Blagojevich, another Illinois citizen echoed the same sentiment writing, "Thanks to you Rod Blagojevich, every family can afford health insurance – from a family making $9,000 a year to a small business owner making $90,000 a year…" He continued, "Every family in Illinois needs to thank you that children can go to see the doctor or go to the hospital when needed."

While attending college at Northwestern, Mr. Blagojevich suffered the loss of two other first cousins, Patsy, who died at 39, and Carol, who died at 27, both from breast cancer. This experience and the understanding that early detection of breast and cervical cancer could have a substantial lifesaving impact led Mr. Blagojevich to bypass the legislature and enact through executive order a law providing access to mammograms and cervical cancer screenings and follow up treatment for 153,000 uninsured lower income women. In a July 8, 2005 letter, the Head of the Division of General Surgery at the Evanston Hospital recognized Mr. Blagojevich's "commitment to access for all." Another Illinois citizen wrote on September 16, 2011 letter that the free cervical cancer screening provided by this law may have saved her life as it allowed her to identify and treat the presence of her precancerous cells.

Mr. Blagojevich was also responsible, through use of the amendatory veto power and the "Rewrite To Do Right" campaign in January 2008, for providing health care coverage for 300,000 dependent young adults in Illinois.

Growing up around numerous elderly, lower income relatives, Mr. Blagojevich saw first hand the isolation that could result in old age after the loss of a spouse. Again through the use of

the amendatory veto power, during the transit crisis, Mr. Blagojevich succeeded in both averting a transit budget crisis and in getting free rides for all Illinois seniors. This was the first and only expansion of public transportation of this sort in the United States. What to most would seem a relatively minor piece of legislation had tremendous ripple effects. A citizen wrote to Mr. Blagojevich about a neighbor subsisting on $600 a month in social security payments who was able, because of the free rides for seniors program, to regularly visit her sister in a nursing home a few miles away, a "luxury" she was not able to afford before the program. A senior citizen wrote that the free rides program made her "life better" in that she was able to "go everywhere and anywhere" despite having needed to give up her car because of the expense. Another senior citizen who works part-time wrote that she was able to help her grandson go to law school because of the money she was able to save because of Mr. Blagojevich's free rides for seniors program.

Mr. Blagojevich was also active in providing other types of support for working class families, twice raising the minimum wage and enacting numerous educational programs for disadvantaged children. For more fortunate children, Mr. Blagojevich arranged community service opportunities in the effort to open their minds to community service projects. One individual who benefitted from such a service opportunity wrote to Mr. Blagojevich thanking him for arranging his day of community service and spending time with him in the process.

While it is certainly the case that many politicians champion and pass particular legislation, Mr. Blagojevich set priorities and took action based on deep-seated values and a sincere desire to help people. As was picked up on a November 27, 2008 conversation between Mr. Blagojevich

In an 8:43pm call on December 8, 2008 (Home 1678), the last call before Mr. Blagojevich was arrested, he was speaking to Greenlee about a poverty conference the next day. Greenlee told Blagojevich he did not have to go, but Blagojevich said that he was going to attend because he had committed to it.

Another instance of Mr. Blagojevich attempting to advance the interests of the people of the State of Illinois became a topic of his criminal trial. One of the options for the senate seat appointment, and the one that was a constant front runner for Mr. Blagojevich, was to make a deal with Michael Madigan in which Lisa Madigan would be appointed to the senate seat and Mr. Madigan would then assist Mr. Blagojevich of passing a number of legislative initiatives beneficial to the people of the State. Mr. Blagojevich discussed this option in a December 3, 2008 call

While the prosecution cross-examined Mr. Blagojevich on his purported self-interest and selected tapes they believed supported their position, they have not and cannot offer any legitimate counter to these conversations. These are Mr. Blagojevich's own words, spoken at a time when he had no concept that his words would ever be heard again must less combed through and excerpted in a criminal trial. They evidence his genuine concern for political actions in exchange not for his own economic benefit or career advancement, but for the good of the People of the State of Illinois.

### 2.  Mr. Blagojevich's Concern For Others

The discussion of the various legislative initiative championed by Mr. Blagojevich are themselves powerful evidence of his care and concern for people at a macro level. Letters submitted to the Court in connection with Mr. Blagojevich's sentencing demonstrate that he was also concerned with individuals he encountered and their particular needs. Sister Rosemary Connelly, Executive Director of Misericordia, in a September 20, 2011 letter to the Court shared her observations that Mr. Blagojevich was willing to confront the bureaucracy for the good of the most vulnerable citizens. Sister Rosemary wrote:

> As Governor, Mr. Blagojevich, on many occasions, helped us to be able to reach out to meet the residential needs of more vulnerable people by challenging the system to do the work it was created to do. The only reward Mr. Blagojevich received was the joy of knowing more children and adults with disabilities would have the joy of living at Misericordia. There were no other conditions attached.

Sean Schultz, a 26-year-old friend and neighbor of Mr. Blagojevich's, submitted a September 22, 2011 letter to the Court in which he described Mr. Blagojevich's caring attention to his neighborhood:

> Rod also spent hours upon hours walking, driving, and running around his neighborhood, talking to regular folks, helping them with any problem they had no matter how small, making improvements to our neighborhood and city. He didn't care if it gained him press or not, he simply took care of our neighborhood because it was the right thing to do.

49

Tracey Whitmer, a former intern of Mr. Blagojevich's, echoed the same sentiment in her letter to the Court, describing Mr. Blagojevich's genuine concern for his constituents and practice of making time for individual meetings with people and recollection of details they provided him of their lives and their struggles.

Elizabeth McCollum, long time friend of the Blagojevich family, wrote of Mr. Blagojevich's easy rapport with her father with whom he shared Serbian descent and of Mr. Blagojevich's attendance of her father's funeral in a simple small town service during the time that Mr. Blagojevich was Governor. Mrs. McCollum also shared her observation of the fact that Mr. and Mrs. Blagojevich made the controversial decision to maintain residence in their family home rather than to move to the Springfield Governor's mansion because of their belief that this was in the best interests of Amy and the soon to be born Annie.

Julie Blagojevich, Robert's wife, wrote of the attention that Mr. Blagojevich always gave to her son, Alex, taking time off to entertain Alex during summer visits and planting traces of Santa for Alex to find at Christmas time. Alex Blagojevich, now 28 years old, also wrote in support of his uncle. Alex described Mr. Blagojevich's ability to draw him out and engage him because of genuine care and concern and related a childhood experience in which he was trying (unsuccessfully) to learn to dive and suffered criticism from other family members but only enthusiasm and encouragement from Mr. Blagojevich. Mary Ann Oklessen's September 20, 2011 letter to the Court discusses an instance in which Rod and Patti drove 100 miles west of Chicago to provide company and solace to Mrs. Oklessen and her husband at a time when their daughter's absence and distance had become overwhelming. As recounted in the September 19, 2011 letter to the Court of Mr. Blagojevich's first cousin, April Whitmer, when her mother

passed away, Mr. Blagojevich wrote her a letter so personal, profound and kind that she saved and cherished it for years.

### 3. Family Concerns

Mr. Blagojevich's wife, Patti, and his daughters Amy and Annie cannot fathom the possibility of losing their friend, caregiver, confidant, and champion for any significant length of time. Amy is now 15 years old. Although she has continued to perform well in school (currently ranking second in her class in high school), she is also attending counseling in connection with the current criminal case against her father (PSR p. 23, lines 697-699). At 8, Annie cannot fully understand what has taken place and cannot begin to fathom a forced separation from her father.

Before, during, and after this case, Mr. Blagojevich has devoted himself to the care, attention, and emotional well-being of his girls. As described in an October 8, 2011 letter to the Court from Julie Blagojevich:

> [Mr. Blagojevich] loves his family dearly. He is a loving father. He is attentive to his daughters, Amy and Annie. I have seen my brother-in-law curled up with both daughters in his family room watching iCarly or Hannah Montana or Disney. He seemed a contented man snuggling with his children. I've never seen him angry with either daughter. He has always shown them great patience, love, and affection.

Debbie Senoff Langford, the principal of Rogers Park Montessori School (where Amy attended school for 11 years before graduating to high school, and where Annie has attended since she was 3) wrote a September 2, 2011 letter to the Court. In it she described Mr. Blagojevich as a loving and caring father who doted on his girls no matter how busy his public life became and made every effort to attend parent conferences, performances, class events, and school functions. Mrs. Langford's letter made a point of mentioning that Mr. and Mrs. Blagojevich did not request or even allow special treatment for themselves or for their girls during the time that Mr. Blagojevich was Governor, but rather integrated seamlessly into the school community.

51

Amy and Annie's ice-skating coach, Kathy Murphy, shared similar observations of Mr. Blagojevich's devotion to his family. Mrs. Murphy, whose children have attended sleepovers and vacations with the Blagojevich family, wrote of Mr. Blagojevich's affection for his wife and children and opined that he was "a wonderful father and husband" who would attend Amy and Annie's skating events with enormous pride.

Those close to the Blagojevich family have expressed the strong opinion that Mr. Blagojevich's absence would be devastating for his family. Principal Langford writes from direct observation of Amy and Annie:

> I know the prospect of Rod leaving his family has already caused a lot of anxiety stress and uncertainty for the children. Their tenuous financial situation, coupled with losing their family home, and the loss of their father will have a lasting impact on children so young. I am gravely concerned about how the girls will adapt to Rod leaving for an extended period of time.

Ice-skating coach Murphy writes, "[Mr. Blagojevich] needs to be with his family to help them grow and mature into lovely young ladies. Children are fragile. Every day that he is gone, the girls are the ones that will suffer the most." Julie Blagojevich's letter echoes the same concern, observing, "[t]earing Rod away from his family will place enormous hardship on all of them. It could potentially crush a close family unit. A lengthy prison sentence will change the girls. They will not be the people they were growing up."

Friend and neighbor Sean Schultz described his observations of the connection and love between Mr. Blagojevich and his daughter, Amy. Mr. Schultz met them at the Illinois State Fair in Springfield nine years ago, when Mr. Schultz was just 15. Mr. Schultz observed that Mr. Blagojevich was able to successfully balance his professional life with spending time with his family and stated:

> The beautiful friendship and love he shares with Patti and the kids is something I think we all could agree, the world needs more of these days. Rod's absence from

his children's lives would just destroy them, It would break their hearts and tear the safe and loving home/world they have had around them apart.

Sister Rosemary of Misericordia wrote expressing the hope that the Court would exercise compassion such that the sentence will be one that gives "hope to the daughters that one day they will be a family again and that they will not be deprived of their father indefinitely."

### C. General and Specific Deterrence – 18 U.S.C. §3553(a)(2(B) &(C)

For the past 7 years, Mr. Blagojevich and his family have lived under the cloud of a wide ranging federal investigation,[34] a federal indictment, and two criminal trials. Every aspect of Mr. Blagojevich's political conduct and financial situation has been extensively scrutinized[35]. The family endured the 6 a.m. arrest of Mr. Blagojevich at the home he shared with his wife and daughters on December 9, 2008 (when helicopters followed Mrs. Blagojevich as she delivered her daughters to school). Julie Blagojevich's letter recounts her experience babysitting Annie immediately after Mr. Blagojevich's arrest so that the Blagojevichs could meet with their attorneys. According to Julie's letter, that night, Annie repeatedly looked outside her window, choked up, and told Julie that she was afraid of the FBI outside. She was only 5 years old at the time. The anguish that Mr. Blagojevich has felt at seeing the trauma his wife and children have

---

[34] Mr. Blagojevich, for years, and despite his awareness that the prosecution was targeting him, voluntarily cooperated with the government. Indeed, he sat for two lengthy interviews consisting of hundreds of questions on a variety of topics, one in September 2004 and one in March 2005. From the hundreds of questions he answered in 150 pages of FBI 302 interview notes with a complete transcript, he was charged with only two false statements and convicted of one regarding whether or not he "tracked" campaign contributions – a topic that was only tangentially related to the charges in the instant case and which almost certainly did not have any material effect on the government's investigation.

[35] Despite an investigation into Blagojevich

there has not been substantive evidence of wrongdoing between Rezko and Blagojevich. Neither have there been any allegations of campaign fund irregularities, tax avoidance, or marital infidelity by Blagojevich – although all were aggressively investigated by the prosecution. Neither has there been evidence of improper dealings between Blagojevich and Stuart Levine or between Blagojevich and Bill Cellini who, it was revealed during the recent trial of Mr. Cellini, never dealt with Blagojevich. No Rezko or Cellini related conduct are before the Court for sentencing purposes.

gone through over the course of the last several years has been enormous and far exceeds the personal pain he has undergone.

From and after December 9, 2008 there have been 3 more years of trial preparation, trial, and post conviction waiting. As recounted in the PSR, this has taken a toll on Mr. Blagojevich's mental and physical health (PSR p. 25—26, lines 782-815). Worse yet, as discussed in the letter submitted by principal Langford, it has resulted in "anxiety, stress and uncertainty" for Amy and Annie. To Patti Blagojevich, as told to the probation officer, the case has created the feeling that the family is "in a bunker." (PSR p. 24, lines 730-731).

Relentless and often cruel media coverage has added to the pain experienced by the Blagojevich family. On December 9, 2008, after Mr. Blagojevich's 6 am arrest, United States Attorney Patrick Fitzgerald proclaimed that then Governor Blagojevich was "arrested in the middle of a political corruption crime spree." Mr. Fitzgerald told the national press, "Governor Blagojevich has taken us to a truly new low," and that, "the conduct would make Lincoln roll over in his grave." As of December 9, 2008, Mr. Blagojevich had not been convicted of any misconduct and, by law, was an innocent man. The national press was quick to pick up on Fitzgerald's lead and soon stories of "crime", "corruption" and "scandal" filled printed news and the airways. It was against this backdrop that Mr. Blagojevich went to the press himself to exercise his First Amendment Rights to remind the nation and the world that he was, by law, an innocent man.

Curiously, although the government would later explain the timing of Mr. Blagojevich's arrest by claiming that he was on the verge of "selling" the senate seat to Jesse Jackson, Jr., the government's own wire intercept evidence revealed that on December 8, 2008, at 8:43 pm (Session 1678), the very last wire intercept conversation before Blagojevich's arrest, Mr.

Blagojevich told Greenlee that he was unlikely to make any decision on the senate appointment until January 6, 2009. Mr. Blagojevich's December 8, 2008 meeting with Jesse Jackson, Jr. and Harris was nothing more than a red herring in that no fundraising was even discussed at the meeting. Indeed, as of December 8, 2008, the only action that was truly imminent was that of Rahm Emanuel offering to approach Michael Madigan to attempt to broker the entirely licit deal in which Blagojevich would appoint Lisa Madigan to the senate seat in exchange for Michael Madigan assisting Mr. Blagojevich in passing his favored legislative initiatives.

Mr. Blagojevich's response to the press coverage for good or for bad was to go on the offensive. He fought impeachment. He spurned offers to step aside as governor as being "temporarily incapacitated" in exchange for full pay and security detail. He went on the news circuit. He proclaimed his innocence. He challenged the prosecution to play all of the tapes, "the good, the bad, and the ugly." Whatever one might think of this approach, what is certain is that it is consistent with Mr. Blagojevich's lack of criminal intent in connection with the charged conduct and with his genuine belief in his innocence.[36]

Then there were the more fantastic appearances – the Elvis impersonation, the *Celebrity Apprentice* stint for Mr. Blagojevich, Second City, the Costa Rica tarantula-eating episode for Patti on a show in which her appearance was substituted for that of her husband. A near universal misconception about these appearances was that Rod and Patti Blagojevich thought that they were made to garner public support for their cause. Nothing could be further from the truth. Mr. and Mrs. Blagojevich never suffered from any illusions. These appearances were intended to be and were humiliating and demeaning. As set forth in the PSR, Mr. and Mrs. Blagojevich were willing to participate in these shows "because they needed the money to

---

[36]As noted above, since the return of the jury's verdict, Blagojevich has made every effort to avoid public comment on the case.

support their daughters." (PSR p. 25, lines 765-767). Mr. Blagojevich explained to the Probation Officer that after the arrest, he lost his "wherewithal to earn a living" in that many past friends and contributors would not even talk to him any more (PSR p. 25, lines 769-771). Mr. Blagojevich explained that he and his wife "were willing to suffer the 'indignity' to be able to maintain their residence and to keep the children in their schools so they had stability." (PSR p. 25, lines 767-768). In the letter of Mrs. Langford, principal of the costly private Montessori school to which Mr. Blagojevich was referring, she alluded to the same facts, "At times attending private school has been financially burdensome for the family and I know sacrifices have been made in order to pay tuition."

The current situation for the Blagojevich family is dire. They spent every available cent on their legal bills and have decimated any savings. Their finances are now such that they must sell their family home. Amy and Annie are frightened and confused. Mr. Blagojevich will most certainly lose his $65,000 state pension which, based on his life expectancy, is an economic loss of more than $1.6 million that the will undermine the financial security of the Blagojevich family forever.

All of these facts and the indisputably dire circumstances in which the Blagojevich family now finds themselves are powerful argument that the goals of specific and general deterrence have already been abundantly met in this case. Mr. Blagojevich will never again hold public office. He has lost his career and his reputation. His family is close to bankruptcy. He has suffered every kind of public ridicule and humiliation imaginable – to the point that foreign tourists can often be found posing for photos on the outside staircase to his family home. The last seven years of investigation, arrest and trial have been like a nightmare from which he can never awaken. Worst for Mr. Blagojevich is the thought that his own errors are the cause of suffering

for his wife and his girls. In these circumstances it is an outright certainty that Mr. Blagojevich could not and would not ever again engage in conduct similar to that which was the subject of the instant convictions.

General deterrence concerns have likewise been more than adequately met. Anyone who has heard even a fraction of the story about Mr. Blagojevich's case and convictions has come to understand that allegations such as those leveled against Mr. Blagojevich result in personal ruination, public scorn, and criminal conviction. That message need not be amplified with a severe prison sentence for Mr. Blagojevich. Certainly, no one having seen what happened to Mr. Blagojevich would want to receive the same treatment in any circumstances.

In addition, to address policy concerns of general deterrence, and by way of responding to the argument that Blagojevich merits more severe punishment for not having learned the lesson from the Ryan prosecution, brief discussion is warranted.[37] The discussion also serves as a response to the argument that Mr. Blagojevich needs to be sentenced to a substantial prison term in order to send a message that Illinois style political corruption will no longer be tolerated. First and foremost, Mr. Blagojevich was not on trial and is not to be sentenced for every problem with Illinois politics that has existed since the 1960s. He is on trial for specific conduct in which he engaged in 2008 and is to be sentenced as an individual rather than a symbol. Furthermore, the misconduct with which Mr. Blagojevich was charged was dissimilar in many ways from that which was charged against former Governor Ryan, or other Illinois governors implicated in criminal misconduct.

---

[37]The facts set forth in this section also serve to provide context by which to evaluate the charged but unproven claims of efforts by Blagojevich and his advisors to improperly obtain campaign contributions from 2002 through 2004. The Government Version (p. 31-42), while declining to argue that these alleged facts affect the advisory guidelines calculation, spends 11 pages discussing conduct featuring Rezko, Kelly, Levine and others of which Blagojevich was tried but not convicted and in which Blagojevich, even under the government's recitation of events, has minimal direct involvement.

Mr. Blagojevich was never alleged to have misused the Inspector General's ("IG") Office as was Ryan. Blagojevich hired formed United States Attorney's Office supervisor Zee Scott as head of the IG, an individual with whom he had no personal relationship. When he learned of allegations of misconduct by Rezko, he immediately sent him to the IG and told Rezko he had done so. Blagojevich was not alleged to have allowed his friend and advisors to do business with the State of Illinois as was Ryan. Blagojevich pushed for and passed a March 2007 Executive Order that no Blagojevich family member could lobby agencies under the governor's control for state contracts. In addition, Blagojevich signed Ethics Legislation in November 2003 requiring his unpaid advisors to disclose their financial interests just as the Governor was required to do. Blagojevich was never alleged to have pressured state employees to engage in fundraising as was Ryan. In fact, Blagojevich had a policy not to accept campaign contributions from state employees and returned them when they were offered. Blagojevich was not alleged to have encouraged state employees to engage in fundraising while on the government clock as was Ryan. A September 23, 2011 letter to the Court from Kurt Warnstedt related that when he assisted the Blagojevich gubernatorial campaign in 2001, Blagojevich asked that he resign from his current position as a 5th Congressional District staffer so that he was not being paid as a staffer while working on a political campaign. Blagojevich was not alleged to have accepted gifts or trips from supporters as was Ryan. In fact, when Congressman Gutierrez offered the free use of his home in Puerto Rico to the Blagojevich family, Mr. Blagojevich told him that if he used the home he wanted to pay. There have been no allegations of improprieties with Blagojevich's campaign fund. Indeed it was revealed that he did not pay for suits,[38] trips, or sports tickets out of that fund even though it would have been defensible to do so, and

---

[38]Not only did Mr. Blagojevich not use his campaign fund to buy suits, but turned down his tailor's offer to supply him with suits free of charge.

reimbursed the fund for $11,000 when a fundraising trip was expanded to include the family and some vacation time. In addition, Mr. Blagojevich has not been alleged to have committed any tax offense and indeed systematically overpaid his taxes for each year investigated by the government.

The fact that Mr. Blagojevich did not engage in the same conduct for which George Ryan was charged obviously does not address the conduct of which Mr. Blagojevich was convicted. However, it is an answer to critics who have endlessly stated that Mr. Blagojevich learned nothing from the experience of George Ryan and that he needs to be punished more severely on that basis. The fact of the matter is that Mr. Blagojevich did learn from many of the issues that arose in the Warner/Ryan trial and took concrete steps to try to prevent similar issues from arising in his administration.

### D. Avoidance of Unwarranted Sentencing Disparity – 18 U.S.C. §3553(a)(6)

18 U.S.C. § 3553(a)(6) provides that one factor to be considered in arriving at a just sentence is the avoidance of unwarranted sentencing disparities between defendants with similar records found guilty of similar misconduct.

#### 1. Defendants and/or Participants In This Case

Comparing the sentences that either have been, or are likely to be imposed on other defendants and/or participants in the allegations involving Mr. Blagojevich yields the conclusion that – contrary to the policies enumerated in 18 U.S.C. § 3553(a)(6) – even a fraction of the sentencing recommendation contained in the Government Version would punish Mr. Blagojevich in a grotesquely disproportionate manner.

Lon Monk pled guilty to a scheme to commit wire fraud in connection with the conduct related to John Johnston and also admitted to taking $70,000 to $90,000 in cash payments from Tony Rezko on 9 occasions (unrelated to and unbeknownst to Mr. Blagojevich). Under Mr.

59

Monk's plea agreement, his projected sentencing range was between 37 and 46 months. However, Monk's plea agreement provides for a §5K1.1 departure and an agreed sentence of 24 months.

John Harris pled guilty to conspiracy to solicit a bribe related to discussions with Mr. Blagojevich in connection with the senate seat appointment. His projected sentencing range is calculated at between 70-87 months. However, Harris' plea agreement contemplates a §5K1.1 departure of 50% off the low end of the guideline range for cooperation and Harris testified that he understands that he is eligible for probation.

John Wyma came under investigation in a bribery scheme unrelated to Mr. Blagojevich involving obtaining improper lobbying benefits in connection with Tony Rezko. Mr. Wyma was not charged in that scheme. Wyma acted as the confidential informant on the basis of whose information the government was able to obtain a warrant for the wire intercepts used in this case.

Joseph Cari pled guilty to shaking down a Virginia investment firm for $850,000 when he told the investment firm that they had to award a lucrative finders fee to a Rezko associate or lose their business with the Illinois teacher's pension fund. Mr. Blagojevich had no involvement in or awareness of this conduct. Mr. Cari testified at Mr. Blagojevich's first trial, although the testimony was sufficiently limited and feeble that he was not called upon for the second trial. Cari's plea agreement provided a guideline range of 37 to 46 months with an agreed §5K1.1 departure of one third off the low end of the guideline range. Cari was sentenced to 9 months of home confinement and 3 years probation.

Stuart Levine was charged with broad ranging misconduct including money laundering and extortion, for a series of unquestionably illicit schemes (none of which involved Mr. Blagojevich) in which Levine amassed millions of dollars in profits. Levine pled guilty and

agreed to cooperate. His plea agreement, which outlines 41 pages of Levine's brazen financial schemes, provides that Levine intended to cause over $20 million in loss. Levine's advisory guideline level is 43, which corresponds to a sentence of life imprisonment, but his plea agreement provides for a §5K1.1 departure and agreed sentence of 67 months. Levine plumbed depths of personal corruption never even conceived of by Mr. Blagojevich. Significantly, in the recent trial involving defendant Bill Cellini, Mr. Rosenberg testified that in response to what he perceived to have been a threat from Stuart Levine, he threatened to go to the FBI and/or to go to Blagojevich to tell him about Levine's attempt to extort Rosenberg for FOB campaign contributions. The testimony suggests that Mr. Blagojevich was not perceived to have been personally corrupt and indeed that he was viewed as a person who would not have countenanced Levine's illicit behavior.

On November 21, 2011, Tony Rezko was sentenced to a 10 and a half year prison term. Commentators lost no time in presuming to substitute their judgment for that of this Court proclaiming that this term serves as a floor for Mr. Blagojevich. The assumption is misguided. Mr. Rezko's conduct bore no similarity to the conduct of which Blagojevich stands convicted. Rezko made millions of dollars from a veritable smorgasbord of schemes he "devised" and "implemented." (Government Rezko Sentencing Submission, p. 1) Blagojevich made nothing on his convicted counts. Rezko stands convicted of two distinct cases and numerous schemes aimed at enriching himself. Blagojevich's convictions involved discussion that was found (based on witnesses' subjective beliefs) to have improperly linked intrinsically licit actions with political or personal benefit.

Rezko corrupted the Illinois Planning Board and thereby the process by which it is determined where hospitals are built and corrupted the Teacher's Retirement System, and

61

thereby jeopardized the pensions of thousands of Illinois teachers and hundreds of millions of dollars in taxpayer funds – the latter providing particular offense to sentencing judge Amy St. Eve based on news reports of her comments at sentencing. In total, Rezko intended \$9,675,000 of documented and supported financial loss in the case before Judge St. Eve and \$4,120,756 in loss in connection with the fraudulent loan scheme involving GECC that is before this Court. Blagojevich's convicted counts, on the other hand, involved discussion of beneficial legislative initiatives and a legally mandated role to make a senate appointment and resulted in no harm. The legislative initiatives all passed and the People of Illinois got their senator.

With respect to Blagojevich's presumed (but never convicted) role in Rezko's misconduct, it is indisputable that notwithstanding the government's position that Blagojevich participated in plans to profit, Rezko took all of the corrupt Aramanda payments for himself, that Blagojevich had no knowledge of the fraud on Illinois Financial Authority, and that Blagojevich had no information about Rezko's fraud on the City of Chicago and on Cook County.[39] Indeed, the government's sentencing filing in the Rezko case even concedes, "Contrary to Rezko's suggestion that he engaged in fraud only because he was invited to do so by Blagojevich, part of Rezko's fraud against the state was done without Blagojevich's knowledge and to benefit only Rezko." (Government Rezko Sentencing Submission p. 34)

Rezko was also found to have lied to Judge St. Eve about his finances which deceit was the subject of the government's motion to revoke Rezko's bond, which application was granted by the Court. Rezko's deceptions to Judge St. Eve included, among other things, failing to report

---

[39]The Government Sentencing submission in the Rezko case trots out the payments to Patti Blagojevich for work at Rezko's real estate company. These allegations were made under the pre Skilling honest services law and did not involve bribes or any explicit connection between the benefit received and any official action. The allegations were not the subject of any convictions and, even under the government's recitation of the evidence, do not meet the standard of being established by the preponderance of the evidence for proper use at sentencing (which the government concedes they are not attempting to do in Mr. Blagjevich's case).

and disguising a $3.5 million payment he received from Lebanon, failing to disclose and disguising a $200,000 transfer he received from overseas a month later, and failing to report another $700,000 payment wired to his wife, Rita, from Lebanon.

In short, only those with a superficial and incomplete understanding of Mr. Blagojevich's case could attempt to equate his conduct with that of Mr. Rezko and the Court should, as it certainly will, reject the notion that media sound byte comparisons should be given and credence whatsoever.

With the exception of Harris (and inconclusive information on Wyma) every one of these other defendants received substantial cash benefits for this misconduct. Mr. Blagojevich, on the other hand received no financial benefit in connection with the misconduct that forms the basis of this sentencing and even the benefits that were charged were in the realm of possible political benefits rather than the flat out personal corruption of cash bribes engaged in by others in this and related cases. Nevertheless, the government argues for a sentence for Mr. Blagojevich many times higher than that which will likely be imposed on any of these individuals. Even after accounting for cooperation, as is undeniably proper under the law, the disparity is unwarranted and unjust.

Recently, in the case of *United States v. King*, 1:08-CR-00274 (a case which involved one of the defendants in the alleged Abramoff /Greenberg Traurig lobbying scheme),[40] Maryland District Court Judge Ellen Segal Huvelle considered the issue of disparate sentences for defendants who participated in similar misconduct. In that case, the government sought sentences between 6 months home confinement and 27 months for most codefendants and a sentence of 39 months for Abramoff. The government put forth a 121-151 month guideline

---

[40]The alleged scheme involved lobbyists providing lavish travel, meals, and sports tickets to public officials with the expectation of the performance of official acts for the lobbyists' clients.

calculation for King that differed from that used for the other defendants based on a change in the law and on the fact that King pled not guilty and went to trial.[41]  While the Court ultimately agreed with the government that the change in the law might have justified the change in the government's guideline position, the Court was deeply troubled by the notion of widely disparate punishment being justified on the basis that a defendant exercised their right to trial.  The Court stated that although it was constitutionally proper for the government to afford leniency to a cooperator, the government could not retaliate against a defendant for exercising his constitutional right to trial. *Citing United States v. Mazzaferro*, 865 F.2d 450, 460 (1st Cir. 1989) ("The law is clear beyond peradventure that a sentence based on retaliation for exercising the constitutional right to stand trial is invalid."); *United States v. Rolfsema*, 468 F.3d 75, 79 (1st Cir. 2006)("[T]he government may not vindictively seek to raise a defendant's sentence solely because of the defendant's exercise of a constitutional right."); *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009)(The government may afford leniency to those who plead guilty as long as there is no indication that the government has retaliated against the defendant for proceeding to trial.)

Given the enormity of the guideline range calculated by the government, there exists a substantial possibility that the prosecution hopes to send a strong message to Mr. Blagojevich that after two trials and years of investigation that they have defeated him.  This possibility is all the more plausible when Mr. Blagojevich's frequent and often strident public expressions of innocence are added to the mix.  It is understandable that in a high profile case that has necessitated two trials, emotions run high on both sides.  However, none of these realities excuse the exorbitant and grotesque disparity between the sentence the government advocates for Mr.

---

[41]Taking the position that Blagojevich should receive a supervisory role adjustment while not advocating such an adjustment for devisor and implementer, Rezko, would be the precise type of disparate use of the Sentencing Guidelines objected to by the Court in *King*.

Blagojevich (who received nothing) and that which the government has acceded to for other defendants in this and related cases (who profited enormously).

## 2. Defendants In Other Cases

Comparing the sentences that have been imposed on other defendants convicted of conduct broadly similar to that of which Mr. Blagojevich was found guilty in unrelated cases also yields the conclusion that – contrary to the policies enumerated in 18 U.S.C. § 3553(a)(6) – even a fraction of the sentencing recommendation argued for by the government would punish Mr. Blagojevich in a disproportionate manner.

Despite the disparities mentioned before, the case that bears the most superficial resemblance to Mr. Blagojevich's case is the case involving Blagojevich's predecessor, former Governor George Ryan. Mr. Ryan was convicted after trial of a racketeering conspiracy involving 18 counts of mail fraud, tax evasion, and making false statements to FBI agents. Mr. Ryan was found guilty of various misconduct which was alleged to have taken place while he was Illinois Secretary of State including allegations of steering valuable state contracts to his friends in return for consideration purportedly valued at $167,000 or more to Mr. Ryan and his family members. In addition, Mr. Ryan was convicted of irregularities in connection with the Citizens For Ryan ("CFR") fundraising operations. The government asserted (and the defense opposed the position) that those fundraising operations were related to the infamous License For Bribes investigation which bore connection to the tragic car accident resulting in the loss of all 6 children in the Willis family. Mr. Ryan was also convicted of installing a close friend as the head of the Illinois Inspector General's Office to allegedly assist in covering up for his misconduct. Mr. Ryan was sentenced to a 78 month prison term. Mr. Ryan's co-defendant, Larry Warner, was convicted of acting as a lobbyist for companies who sought state contracts and leases with the Illinois Secretary of State's Office (for which the government contended he

received approximately $3 million). After proceeding to trial, Mr. Warner was sentenced to a 41-month prison term.

Related to the Warner/Ryan case was the trial of former Ryan Chief of Staff, Scott R. Fawell. Mr. Fawell was convicted of 9 counts of racketeering and fraud including false statements to the Grand Jury, theft, and filing false tax returns in connection with allegations of improper diversion of state resources to fund Mr. Ryan's election campaigns. After proceeding to trial, Mr. Fawell was sentenced to 78 months.

Dan Rostenkowski was a United States Congressman from Illinois and Chairman of the House Ways and Means Committee, another well-known Illinois politician charged with criminal wrongdoing. Mr. Rostenkowski was charged for conduct that included using his government expense account to purchase cars for his personal use, using government payroll checks to compensate employees for providing personal services for him, and obstruction of justice. Mr. Rostenkowsi pled guilty to some misconduct and was sentenced to 17 months in prison.

Ed Vrydolyak, another Illinois politician who served as a prominent alderman, was charged with participating in a bribery scheme with Stuart Levine. Mr. Vrydolyak pled guilty to mail and wire fraud in connection with a $1.5 million kickback scheme involving a developer to whom Mr. Vrydolyak had ties. The plea agreement specifically provided that Mr. Vrydolyak was not providing assistance in any government investigations. The government recommended a 41 month sentence. Mr. Vrydolyak was initially sentenced by Judge Milton Shadur to probation. The government appealed this sentence and on the resentence before Judge Kennelly, he was sentenced to 10 months in prison and 5 months home confinement.

With the exception of Scott Fawell, each one of these defendants was found to have obtained an illegal benefit in connection with their misconduct. Mr. Ryan, Mr. Warner, Mr. Fawell, and Mr. Rostenkowski all went to trial and Mr. Vrydolyak, although pleading guilty, did not cooperate with the government. Mr. Blagojevich was charged with improper linkage between campaign contributions and/or political benefits and official action. This conduct bears none of the hallmarks of personal corruption and greed as do the allegations at issue in these other cases. Notwithstanding these facts, the government seeks to punish Mr. Blagojevich to multiples of the terms to which any of these defendants were sentenced. The position is unwarranted, violative of the policy set forth in 18 U.S.C. § 3553(a)(6), and profoundly unjust.

## CONCLUSION

Mr. Blagojevich has become, in connection with this case, a tragic figure – an individual who went from a twice elected governor, one who enacted historic and significant legislation and ran an enormously successful fundraising apparatus, to an impeached, unemployed criminal defendant, abandoned by all of his advisors and friends; a figure drawing public ridicule and scorn. The Court has seen and heard all of the evidence in two trials of this case. Mr. Blagojevich asks this Court to consider that information, but to take account as well of the additional information from the government's own wire intercepts that is included and discussed in this Submission as well as Defendant's Probation Submission. This context includes the novelty of a political corruption case in which the defendant received no economic benefit and the legislation at issue was good. It includes the plethora of indications of Mr. Blagojevich's innocent intent, as well as the information about his sincere desire to help people, his critical role as husband and father, and the reality of his conduct compared to that of other related and unrelated players in this investigation. All of these factors argue powerfully for a compassionate and proportionate sentence as does the fact that despite a strong and seemingly defiant exterior,

no one is more acutely aware of the tragedy that has become of his life's work and aspirations as

is Mr. Blagojevich himself.

Respectfully submitted,

ROD BLAGOJEVICH

By: /s/ *Carolyn Gurland*
One of His Attorneys

CAROLYN GURLAND
2 North LaSalle Street
17th Floor
Chicago, Il 60614
(312) 420-9263
cgurland@comcast.net

SHELDON SOROSKY
AARON GOLDSTEIN
LAUREN KAESEBERG
ELLIOTT RIEBMAN
158 West Erie
Chicago, Illinois 60654

*Attorneys for Defendant Rod Blagojevich*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the following document:

**ROD BLAGOJEVICH'S SUBMISSION IN RESPONSE TO THE PRESENTENCE
REPORT AND IN AID OF SENTENCING**

was served on November 30, 2011, in accordance with the Fed. R. Crim. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/Carolyn Gurland
Carolyn Pelling Gurland
One of the Attorneys
For Rod Blagojevich
