UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

12.7-11

DEC - 7 2011

**JUDGE JAMES B. ZAGEL**
**UNITED STATES DISTRICT COURT**

UNITED STATES OF AMERICA

08 CR 888 - 1

ROD BLAGOJEVICH

REDACTED JURY INDICTMENT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 888 |
| | ) | Violations: Title 18, Sections 371, |
| | ) |   666(a)(1), 1343, 1346, and 1951(a) |
| v. | ) | |
| | ) | |
| | ) | Judge James B. Zagel |
| ROD BLAGOJEVICH, | ) | |
| | ) | **Indictment** |

## COUNT ONE

1.      At times material to this Indictment:

### Relevant Entities and Individuals

a.      Defendant ROD BLAGOJEVICH was the Governor of the State of Illinois.  He was elected Governor in 2002 and was reelected Governor in 2006.  ROD BLAGOJEVICH previously served as a Member of the United States House of Representatives from the Fifth Congressional District in Illinois.

b.      Friends of Blagojevich was established in or about June 2000 and was a private entity existing under the laws of Illinois as a campaign committee for the purpose of supporting the election of defendant ROD BLAGOJEVICH as Governor of Illinois, and was the principal campaign fundraising vehicle for ROD BLAGOJEVICH.  Friends of Blagojevich maintained offices at 4147 North Ravenswood, Chicago, Illinois.  Although various individuals, including, at times, Christopher Kelly, Alonzo Monk, and

Robert Blagojevich, held the office of chairman of Friends of Blagojevich, at all times the activities and financial affairs of Friends of Blagojevich were controlled and directed by ROD BLAGOJEVICH, for whose benefit Friends of Blagojevich was operated.

        c.     Christopher Kelly was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH.

        d.     Antoin Rezko was a Chicago-area businessman and a principal campaign fundraiser for defendant ROD BLAGOJEVICH.

        e.     Alonzo Monk was a long-time associate of defendant ROD BLAGOJEVICH, and among other things served as his general counsel while a Member of Congress, as campaign manager for his 2002 and 2006 gubernatorial campaigns, on his transition team after his election in November 2002, and as his Chief of Staff from in or about January 2003 until in or about December 2005. Beginning in or about early 2007, Monk worked as a lobbyist, doing business as AM3 Consulting, Ltd. As a lobbyist, Monk principally represented businesses with interests involving Illinois state government, including businesses in the horse racing industry. In addition, Monk served as Chairman of Friends of Blagojevich from in or about December 2006 to in or about July 2007.

f.      Robert Blagojevich is the brother of defendant ROD BLAGOJEVICH. Beginning in or about August 2008, Robert Blagojevich served as the chairman of Friends of Blagojevich.

g.      Beginning in or about late 2005, John Harris was employed by the State of Illinois as the Chief of Staff to the Governor, defendant ROD BLAGOJEVICH.

## Duties and Powers of the Office of Governor

h.      The Office of the Governor of the State of Illinois ("Governor's Office") was entrusted with extensive duties including, among other things, supporting, approving and vetoing legislation; appointing directors and key administrators of state departments, agencies, and boards; issuing executive orders; authorizing expenditures of certain grant funds; annually proposing a budget and overseeing the expenditure of state funds; and otherwise setting priorities and direction for the State of Illinois. As chief executive of the State of Illinois, the Governor was responsible for administration of all areas of the executive branch of state government not under the authority of the other constitutionally-elected officials. The Office of the Governor employed staff members to assist the Governor in performing his duties.

i.      Shortly after his election on November 4, 2008, as President of the United States, Barack Obama resigned his position as United States Senator from Illinois, creating a vacancy in that office. As Governor of Illinois,

3

defendant ROD BLAGOJEVICH had the duty under Illinois law, 10 ILCS 5/25-8, to appoint a replacement, who would serve the approximately two years remaining in Barack Obama's term as United States Senator.

### Illinois Laws

j.      In or about September 2008, the Illinois General Assembly enacted Public Act 95-971, effective January 1, 2009, that, among other things, prohibits business entities with aggregate state contracts or pending state contract bids of more than $50,000 from making campaign contributions to any political committee established to promote the candidacy of, among others, a candidate for the office of Governor. This law also prohibits such contributions by affiliated entities and affiliated persons of such business entities.

k.      Defendant ROD BLAGOJEVICH and Harris, while serving as officers and employees of the State of Illinois, were bound by the following laws, duties, policies, and procedures:

i.      As Governor, defendant ROD BLAGOJEVICH was a constitutional officer and as such, at the outset of each term as Governor, was required to take an oath of office to support the Constitution of the United States and the Constitution of the State of Illinois, and to faithfully discharge the duties of the office of Governor to the best of his ability.

ii.      As officers and employees of the State of Illinois, defendant ROD BLAGOJEVICH and Harris owed a duty of honest services and

4

a duty of loyalty to the people of the State of Illinois in the performance of their public duties.

2.      From in or about 2002 to on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, defendant ROD BLAGOJEVICH together with Robert Blagojevich, Alonzo Monk, John Harris, and others, acting with the intent to defraud and to deceive, devised and participated in a scheme to deprive the people of the State of Illinois of their intangible right to the honest services of ROD BLAGOJEVICH and Harris.

## Overview of the Scheme

3.      It was part of the scheme to defraud that defendant ROD BLAGOJEVICH together with Robert Blagojevich, Monk, Harris, and others, used and attempted to use the powers of the Office of the Governor to take and cause official actions, including: the awarding of state business and grants; the enactment of legislation and executive orders; and the appointment of a United States Senator; in exchange for financial benefits for themselves and others, including campaign contributions for ROD BLAGOJEVICH and employment for ROD BLAGOJEVICH and his wife, thereby materially breaching the duty of loyalty owed by ROD BLAGOJEVICH and Harris.

## The Search for Employment for ROD BLAGOJEVICH's Wife

4.    It was further part of the scheme that after the real estate business of defendant ROD BLAGOJEVICH's wife became the subject of critical media coverage, ROD BLAGOJEVICH directed Harris to try to find a paid state board appointment or position for her.  During several conversations in or about early 2008, ROD BLAGOJEVICH informed Harris that ROD BLAGOJEVICH wanted his wife put on the Pollution Control Board, which pays salaries to its board members.  When Harris told ROD BLAGOJEVICH that his wife was not qualified for the position, ROD BLAGOJEVICH told Harris to find other employment for his wife.

5.    It was further part of the scheme that, in or about the spring of 2008, around the time that defendant ROD BLAGOJEVICH's wife passed a licensing examination that allowed her to sell financial securities, ROD BLAGOJEVICH asked Harris and others to set up informational or networking meetings for his wife with financial institutions that had business with the State of Illinois in hopes that those businesses would assist in getting ROD BLAGOJEVICH's wife a job.  Harris subsequently arranged meetings between ROD BLAGOJEVICH's wife and officials at two financial institutions that had business with the State of Illinois.  When ROD BLAGOJEVICH concluded that officials at these institutions were unhelpful in finding ROD BLAGOJEVICH's

6

wife a job, ROD BLAGOJEVICH told Harris that he did not want the institutions receiving further business from the State of Illinois.

## Solicitation of United States Congressman Rahm Emanuel

6.     It was further part of the scheme that in or about 2006, after United States Congressman Rahm Emanuel inquired about the status of a $2 million grant for the benefit of a publicly-supported school, defendant ROD BLAGOJEVICH instructed Harris not to release the grant until further direction from ROD BLAGOJEVICH, even though ROD BLAGOJEVICH previously had agreed to support the grant and funding for the grant had been included in the state's budget.

7.     It was further part of the scheme that, in response to inquiries by a high-ranking state official as to whether the grant money could be released, defendant ROD BLAGOJEVICH informed the official that ROD BLAGOJEVICH wanted it communicated to Congressman Emanuel that Congressman Emanuel's brother needed to have a fundraiser for ROD BLAGOJEVICH.

8.     It was further part of the scheme that defendant ROD BLAGOJEVICH told John Wyma that ROD BLAGOJEVICH was giving a $2 million grant to a school in Congressman Emanuel's district and instructed Wyma to approach Congressman Emanuel for a fundraiser.

9.     It was further part of the scheme that after defendant ROD BLAGOJEVICH learned from Harris that the school had started to incur

7

expenses that were to be paid with the grant funds, ROD BLAGOJEVICH initially resisted the release of the grant money, and then ultimately agreed to the release of certain of the grant funds to cover incurred expenses, but only on a delayed basis, even though no fundraiser had been held.

## Solicitation of Children's Memorial Hospital

10. It was further part of the scheme that on or about October 8, 2008, defendant ROD BLAGOJEVICH advised Wyma that he intended to take official action that would provide additional state money to Children's Memorial Hospital, and that ROD BLAGOJEVICH wanted to get $50,000 in campaign contributions from Patrick Magoon, the Chief Executive Officer of Children's Memorial Hospital.

11. It was further part of the scheme that on or about October 17, 2008, defendant ROD BLAGOJEVICH called the Magoon to tell him of his intent to increase the Illinois Medicaid reimbursement rate for speciality-care pediatric physicians. Shortly before this, ROD BLAGOJEVICH had directed Robert Greenlee to initiate such an increase, which Illinois providers of pediatric healthcare, including Children's Memorial Hospital, had actively supported for years.

12. It was further part of the scheme that on or about October 22, 2008, at defendant ROD BLAGOJEVICH's direction, Robert Blagojevich spoke with

Magoon and asked him to arrange to raise $25,000 for ROD BLAGOJEVICH prior to January 1, 2009.

13.   It was further part of the scheme that on or about November 12, 2008, after Magoon had not returned additional phone calls from Robert Blagojevich, and no political contributions from Magoon or other persons associated with Children's Memorial Hospital had been received, defendant ROD BLAGOJEVICH spoke to Greenlee about the increase in the Medicaid reimbursement rates for specialty-care pediatric physicians, asking whether "we could pull it back if we needed to. . . ." As a result of this conversation, Greenlee instructed the Department of Healthcare Services to stop its work on increasing the reimbursement for specialty-care pediatric physicians.

## Solicitation of John Johnston

14.   It was further part of the scheme that on or about November 13, 2008, defendant ROD BLAGOJEVICH told Robert Blagojevich that he wanted campaign contributions to be made by the end of the year by John Johnston, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill pending in the Illinois legislature that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). At that time, as ROD BLAGOJEVICH knew, Monk had been trying to arrange a contribution from

Johnston, and ROD BLAGOJEVICH had set a goal of raising $100,000 in contributions from and through Johnston.

15. It was further part of the scheme that defendant ROD BLAGOJEVICH had further conversations with Monk about the Racing Bill after it was passed by the Illinois legislature on or about November 20, 2008. In those conversations, ROD BLAGOJEVICH and Monk discussed whether and when ROD BLAGOJEVICH would sign the Racing Bill, and whether and when Johnston would arrange for campaign contributions to ROD BLAGOJEVICH. On or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Johnston would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Johnston to ensure that Johnston would make a contribution by the end of the year.

16. It was further part of the scheme that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Johnston. During that visit, Monk communicated to Johnston that ROD BLAGOJEVICH was concerned that Johnston would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

17. It was further part of the scheme that after meeting with Johnston on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Johnston, "look, there is a concern that

there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Johnston that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

18. It was further part of the scheme that on or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Johnston and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Johnston.

## Solicitation of Gerald Krozel

19. It was further part of the scheme that on or about September 18, 2008, defendant ROD BLAGOJEVICH, Robert Blagojevich, and Monk met with Gerald Krozel, who was both an executive with a company that manufactured and distributed road building materials and a representative of a trade group involved with the construction of roads. In that meeting, ROD BLAGOJEVICH said that he was planning on announcing a $1.5 billion road building program that would be administered through the Illinois Toll Highway Authority (the "Tollway") and that he might authorize an additional $6 billion road building program later on. Shortly thereafter in the conversation, ROD BLAGOJEVICH asked for Krozel's help in raising contributions for ROD BLAGOJEVICH's campaign by the end of the year. After Krozel left the meeting, ROD

11

BLAGOJEVICH instructed Monk to try to get Krozel to raise $500,000 in contributions. As ROD BLAGOJEVICH knew, Monk subsequently had a series of conversations with Krozel about the possibility of Krozel arranging for campaign contributions to ROD BLAGOJEVICH.

20.     It was further part of the scheme that, on or about October 6, 2008, defendant ROD BLAGOJEVICH told Wyma that he would make an announcement concerning a $1.8 billion project involving the Tollway and that Monk would approach Krozel to ask that he raise substantial campaign contributions. ROD BLAGOJEVICH further said that he could have announced a larger amount of money for road projects, but wanted to see how Krozel performed in raising contributions, and he added words to the effect of "If they don't perform, fuck 'em."

21.     It was further part of the scheme that, on or about October 22, 2008, approximately one week after defendant ROD BLAGOJEVICH publicly announced a portion of a $1.8 billion program to upgrade interchanges on the tollway system, ROD BLAGOJEVICH called Krozel, spoke with him about the $1.8 billion program, and asked how he was coming with fundraising.

**Efforts to Obtain Personal Financial Benefits for ROD BLAGOJEVICH in Return for his Appointment of a United States Senator**

22.     It was further part of the scheme that beginning in or about October 2008, and continuing until on or about December 9, 2008, defendant ROD

BLAGOJEVICH, with the assistance of Harris and Robert Blagojevich, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

23.    It was further part of the scheme that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including Harris and Robert Blagojevich, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.  At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

24.    It was further part of the scheme that defendant ROD BLAGOJEVICH and his co-schemers devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

13

a. Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b. A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c. A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by Harris, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

d. A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

e. Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from United States Congressman Jesse Jackson, Jr., whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Congressman Jackson.

14

25.    It was further part of the scheme that defendant ROD BLAGOJEVICH discussed with his co-schemers means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

26.    It was further part of the scheme that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed Robert Blagojevich to contact a representative of Congressman Jackson, and advise the representative that if Congressman Jackson was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment.    ROD BLAGOJEVICH instructed Robert Blagojevich to communicate the urgency of the message, and to do it in person, rather than over the phone.   Robert Blagojevich agreed to do so, and thereafter arranged a meeting with an associate of Congressman Jackson.

27.    It was further part of the scheme that on or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed Robert

15

Blagojevich to cancel his meeting with the associate of Congressman Jackson, and Robert Blagojevich agreed to do so.

28. It was further part of the scheme that defendant ROD BLAGOJEVICH, and other participants in the scheme, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of and the acts done in furtherance of the scheme.

29. On or about October 17, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Patrick Magoon in Florida, in which ROD BLAGOJEVICH told Magoon that ROD BLAGOJEVICH had approved an increase in the reimbursement rate for specialty-care pediatric physicians;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT TWO

1.     Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.     On or about November 7, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and John Harris, in Chicago, Illinois, and Fred Yang, in Washington, D.C., in which ROD BLAGOJEVICH, Harris, and Yang discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Valerie Jarrett to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT THREE

1.    Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.    On or about November 10, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a conference call between ROD BLAGOJEVICH, John Harris and others, in Chicago, Illinois, and various advisors in Washington, D.C., and New York City, in which they discussed financial benefits which ROD BLAGOJEVICH could request in exchange for the appointment of Valerie Jarrett to the United States Senate;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FOUR

1. Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2. On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH, in Chicago, Illinois, and Fred Yang in Washington, D.C. (Sessions 533, 535, and 537), in which they discussed a proposal where, in exchange for the appointment of Valerie Jarrett to the United States Senate, a not-for-profit organization would be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT FIVE

1.     Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.     On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Thomas Balanoff, a labor union official in Washington, D.C. (Session 541), in which ROD BLAGOJEVICH proposed that, in exchange for the appointment of Valerie Jarrett to the United States Senate, a not-for-profit organization be set up where ROD BLAGOJEVICH would be employed when he was no longer governor;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SIX

1.      Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.      On or about November 12, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Thomas Balanoff, a labor union official, in Washington, D.C. (Session 546), in which ROD BLAGOJEVICH informed Balanoff that it was a very real possibility that Valerie Jarrett could get the United States Senate appointment, and again raised his interest in employment by a not-for-profit organization;

In violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SEVEN

1.      Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.      On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Doug Scofield in Michigan (Session 624), in which they discussed presenting to Rahm Emanuel a proposal by ROD BLAGOJEVICH that a not-for-profit organization be set up and that the connection between setting up this organization and the awarding of the U.S. Senate seat would be "unsaid";

In violation of Title 18, United States Code, Sections 1343 and 1346.

22

## COUNT EIGHT

1.      Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.      On or about November 13, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Doug Scofield in Michigan (Session 627), in which ROD BLAGOJEVICH asked Scofield to call Wyma and ask Wyma to present to Rahm Emanuel ROD BLAGOJEVICH's proposal that a not-for-profit organization be set up and that, while it would be unsaid, this would be a "play" to obtain a financial benefit for ROD BLAGOJEVICH in return for the awarding of the United States Senate seat;

In violation of Title 18, United States Code, Sections 1343 and 1346.

23

## COUNT NINE

1.      Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.      On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH in Chicago, Illinois, and Alonzo Monk in Miami, Florida, in which ROD BLAGOJEVICH agreed with Monk that, in order to obtain the campaign contribution sought from Johnston in exchange for a prompt signing of the Racing Bill, it would be better "from a pressure point of view" for ROD BLAGOJEVICH himself to call Johnston to discuss the timing of signing the Racing Bill;

In violation of Title 18, United States Code, Sections 1343 and 1346.

24

## COUNT TEN

1.  Paragraphs 1 through 28 of Count One are realleged and incorporated as if fully set forth herein.

2.  On or about December 4, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between ROD BLAGOJEVICH and Robert Greenlee in Chicago, Illinois, and Fred Yang in Washington, D.C., in which ROD BLAGOJEVICH said that if he gave the Senate seat to Congressman Jackson, there would be "tangible political support . . . specific amounts and everything . . . . some of it up front";

In violation of Title 18, United States Code, Sections 1343 and 1346.

## **COUNT ELEVEN**

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a) and 1(b) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or about 2005 and continuing through in or about 2006, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from United States Congressman Rahm Emaneul and United States Congressman Emanuel's brother, with the consent of United States Congressman Emanuel and United States Congressman Emanuel's brother, under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

26

## COUNT TWELVE

The SPECIAL FEBRUARY 2008-2 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), and 1(f) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Patrick Magoon, the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, with the consent of Magoon and Children's Memorial Hospital under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

27

## COUNT THIRTEEN

1.      Paragraphs 1(a), 1(b), and 1(f) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or around October 2008, and continuing to on or about December 9, 2008, at Chicago, in the Northern District of Illinois, Eastern Division,

ROD BLAGOJEVICH,

defendant herein, as an agent of the State of Illinois, corruptly solicited and demanded things of value, namely political contributions from Patrick Magoon, the Chief Executive Officer of Children's Memorial Hospital, and Children's Memorial Hospital, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, increasing reimbursement rates for specialty-care pediatric physicians, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FOURTEEN

1.      Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning on or about December 3, 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, conspired with Alonzo Monk and others, to commit extortion, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Johnston and two horse racing tracks with which Johnston was affiliated, with the consent of Johnston and the horse racing tracks under color of official right.

3.      It was part of the conspiracy that on or about December 3, 2008, defendant ROD BLAGOJEVICH spoke with Monk about Johnston, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially benefit from a bill that had been passed by the Illinois legislature on November 20, 2008, that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). As ROD BLAGOJEVICH knew, Monk had been talking with Johnston prior to December 3, 2008, about making a campaign contribution to ROD

29

BLAGOJEVICH. During their conversation on or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Johnston would not make a contribution by the end of the year if ROD BLAGOJEVICH signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Johnston to ensure that Johnston would make a contribution by the end of the year.

5.     It was further part of the conspiracy that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Johnston. During that visit, Monk communicated to Johnston that ROD BLAGOJEVICH was concerned that Johnston would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

6.     It was further part of the conspiracy that after meeting with Johnston on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Johnston, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Johnston that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

7.     It was further part of the conspiracy that on or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Johnston and to

suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Johnston.

8.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH and Monk did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIFTEEN

1.     Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.     Beginning on or about December 3, 2008, and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendants herein, did conspire with each other and others, to corruptly solicit and demand things of value, namely political contributions for the benefit of ROD BLAGOJEVICH, a agent of the State of Illinois, from Johnston and two horse racing tracks with which Johnston was affiliated, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the signing of a bill that had passed the Illinois legislature and that would financially help the Illinois horse racing industry, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008, in violation of Title 18, United States Code, Section 666(a)(1)(B).

3.     It was part of the conspiracy that on or about December 3, 2008, defendant ROD BLAGOJEVICH spoke with Lon Monk about Johnston, who, as ROD BLAGOJEVICH knew, managed horse racing tracks that would financially

32

benefit from a bill that had been passed by the Illinois legislature on November 20, 2008, that would require certain Illinois casinos to give money to a fund that would be used to help the Illinois horse racing industry (the "Racing Bill"). As ROD BLAGOJEVICH knew, Monk had been talking with Johnston prior to December 3, 2008, about making a campaign contribution to ROD BLAGOJEVICH. During their conversation on or about December 3, 2008, ROD BLAGOJEVICH indicated to Monk that he was concerned that Johnston would not make a contribution by the end of the year if ROD BLAGOJEVICH signed the Racing Bill before the contribution was made. As a result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Johnston to ensure that Johnston would make a contribution by the end of the year.

4. It was further part of the conspiracy that after meeting with defendant ROD BLAGOJEVICH on or about December 3, 2008, Monk visited Johnston. During that visit, Monk communicated to Johnston that ROD BLAGOJEVICH was concerned that Johnston would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

5. It was further part of the conspiracy that after meeting with Johnston on or about December 3, 2008, Monk reported to defendant ROD BLAGOJEVICH that Monk had said to Johnston, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the

33

timeliness of the commitment," and made it clear to Johnston that the contribution has "got to be in now." ROD BLAGOJEVICH responded, "good," and "good job."

6.     It was further part of the conspiracy that on or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Johnston and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Johnston.

7.     It was further part of the conspiracy that defendants ROD BLAGOJEVICH and Monk did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

Overt Acts

8.     In furtherance of the conspiracy and to effect its objects and purposes, defendant ROD BLAGOJEVICH and Alonzo Monk committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.     On or about December 3, 2008, in a meeting at the Friends of Blagojevich offices, defendant ROD BLAGOJEVICH indicated to Monk that he was concerned that Johnston would not make a contribution by the end of the year if he signed the Racing Bill before the contribution was made and, as a

result, Monk and ROD BLAGOJEVICH agreed that Monk would speak with Johnston to ensure that Johnston would make a contribution by the end of the year.

      b.    On or about December 3, 2008, after meeting with defendant ROD BLAGOJEVICH, Monk visited Johnston and communicated to Johnston that ROD BLAGOJEVICH was concerned that Johnston would not make a contribution to ROD BLAGOJEVICH if the Racing Bill was signed before the contribution was made.

      c.    On or about December 3, 2008, after meeting with Johnston, Monk reported to defendant ROD BLAGOJEVICH that MONK had said to Johnston, "look, there is a concern that there is going to be some skittishness if your bill gets signed because of the timeliness of the commitment," and made it clear to Johnston that the contribution has "got to be in now," to which ROD BLAGOJEVICH responded, "good," and "good job."

      d.    On or about December 4, 2008, Monk asked defendant ROD BLAGOJEVICH to call Johnston and to suggest that ROD BLAGOJEVICH would sign the Racing Bill, because this would be better "from a pressure point of view." ROD BLAGOJEVICH agreed to call Johnston.

All in violation of Title 18, United States Code, Section 371.

## COUNT SIXTEEN

1.    Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.    Beginning in or about September 2008 and continuing through December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, in the form of political contributions for the benefit of ROD BLAGOJEVICH from Gerald Krozel (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Krozel, with the consent of Krozel and his employer under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT SEVENTEEN

1.      Paragraphs 1(a), 1(b), and 1(e) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or around September 2008, and continuing to on or about December 9, 2008, at Chicago, in the Northern District of Illinois, Eastern Division,

ROD BLAGOJEVICH,

defendant herein, as an agent of the State of Illinois, corruptly solicited and demanded things of value, namely political contributions from Gerald Krozel (who was both an executive with a company that supplied materials for road construction, and a representative of a trade group involved with the construction of roads), and from the company that employed Krozel, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, funding for road building programs, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT EIGHTEEN

1.      Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did conspire with Robert Blagojevich, John Harris and others to commit extortion in relation to the appointment of a United States Senator, which extortion would obstruct, delay, and affect commerce, in that they agreed to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right.

3.      It was part of the conspiracy that defendant ROD BLAGOJEVICH, with the assistance of Robert Blagojevich and Harris, and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

4.      It was further part of the conspiracy that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including Harris and Robert Blagojevich, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the

advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife. At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

5. It was further part of the conspiracy that defendant ROD BLAGOJEVICH and his co-conspirators devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a. Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b. A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c. A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a

transaction suggested by Harris, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

      d.    A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

      e.    Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Congressman Jesse Jackson, Jr., whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Congressman Jackon.

      6.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH discussed with his co-conspirators means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

      7.    It was further part of the conspiracy that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed Robert Blagojevich to contact

a representative of Congressman Jackson, and advise the representative that if Congressman Jackson was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed Robert Blagojevich to communicate the urgency of the message, and to do it in person, rather than over the phone. Robert Blagojevich agreed to do so, and thereafter arranged a meeting with an associate of Congressman Jackson.

8. It was further part of the conspiracy that on or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed Robert Blagojevich to cancel his meeting with the associate of Congressman Jackson, and Robert Blagojevich agreed to do so.

9. It was further part of the conspiracy that defendant ROD BLAGOJEVICH, Robert Blagojevich, and Harris, and others, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT NINETEEN

1.      Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.      Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, and others did attempt to commit extortion in relation to the appointment of a United States Senator, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, for the benefit of ROD BLAGOJEVICH, from various individuals, with the consent of those individuals under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT TWENTY

1.       Paragraphs 1(a), 1(b), 1(e) through 1(g), and 1(l) of Count One are realleged and incorporated as though fully set forth herein.

2.       Beginning in or about October 2008 and continuing through on or about December 9, 2008, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROD BLAGOJEVICH,

defendant herein, did conspire with others, to corruptly solicit and demand things of value, for the benefit of ROD BLAGOJEVICH, an agent of the State of Illinois, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, the appointment of a United States Senator, the State of Illinois being a State government that received in excess of $10,000 in federal funding in a twelve-month period from January 1, 2008, to December 31, 2008, in violation of Title 18, United States Code, Section 666(a)(1)(B).

3.       It was part of the conspiracy that defendant ROD BLAGOJEVICH, with the assistance of Harris, Robert Blagojevich and others, sought to obtain financial benefits for himself and his wife, in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States.

4.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH engaged in numerous conversations with others, at times including Harris and Robert Blagojevich, certain high-ranking employees of the Office of the Governor, and certain political consultants, regarding the advantages and disadvantages of selecting various candidates for the Senate vacancy and as a part of those considerations, ROD BLAGOJEVICH and others devised and set in motion plans by which ROD BLAGOJEVICH could use his power to appoint a United States Senator to obtain financial benefits for himself and his wife.  At times ROD BLAGOJEVICH directed others, including state employees, to assist in these endeavors, including by performing research and conveying messages to third parties.

5.    It was further part of the conspiracy that defendant ROD BLAGOJEVICH and his co-conspirators devised and discussed means of using ROD BLAGOJEVICH's power to appoint a United States Senator in exchange for financial benefits for himself and his wife, which benefits would take the following forms, among others:

a.    Presidential appointment of ROD BLAGOJEVICH to high-ranking positions in the federal government, including Secretary of Health and Human Services or an ambassadorship;

b.    A highly paid leadership position with a private foundation dependent on federal aid, which ROD BLAGOJEVICH believed could be

44

influenced by the President-elect to name ROD BLAGOJEVICH to such a position;

c. A highly paid leadership position with an organization known as "Change to Win," consisting of seven affiliated labor unions, which, in a transaction suggested by HARRIS, could appoint ROD BLAGOJEVICH as its chairman with the expectation that the President-elect would assist Change to Win with its national legislative agenda;

d. A highly paid leadership position with a newly-created not-for-profit corporation that ROD BLAGOJEVICH believed could be funded with large contributions by persons associated with the President-elect; and

e. Substantial campaign fundraising assistance from individuals seeking the United States Senate seat and their backers, including from Congressman Jackson, whose associate ROD BLAGOJEVICH understood to have offered $1.5 million in campaign contributions in return for ROD BLAGOJEVICH's appointment of Congressman Jackson.

6. It was further part of the conspiracy that defendant ROD BLAGOJEVICH discussed with his co-conspirators means by which he could influence the President-elect to assist ROD BLAGOJEVICH in obtaining personal benefits for himself and his wife, including by appointing as United States Senator a candidate whom ROD BLAGOJEVICH believed to be favored by the President-elect. At times, ROD BLAGOJEVICH attempted to further this

45

goal by conveying messages, directly and with the assistance of others, to individuals whom he believed to be in communication with the President-elect.

7.      It was further part of the conspiracy that on or about December 4, 2008, defendant ROD BLAGOJEVICH instructed Robert Blagojevich to contact a representative of Congressman Jackson, and advise the representative that if Congressman Jackson was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment.      ROD BLAGOJEVICH instructed Robert Blagojevich to communicate the urgency of the message, and to do it in person, rather than over the phone.  Robert Blagojevich agreed to do so, and thereafter arranged a meeting with an associate of Congressman Jackson.

8.      It was further part of the conspiracy that on or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed Robert Blagojevich to cancel his meeting with the associate of Congressman Jackson, and Robert Blagojevich agreed to do so.

9.      It was further part of the conspiracy that defendant ROD BLAGOJEVICH, Harris, Robert Blagojevich, and others, did misrepresent, conceal and hide, and cause to be misrepresented, concealed, and hidden, the acts done in furtherance of the conspiracy and the purposes of those acts.

46

<u>Overt Acts</u>

10.    In furtherance of the conspiracy and to effect its objects and purposes, defendant ROD BLAGOJEVICH, John Harris, Robert Blagojevich and others committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.    On or about November 6, 2008, defendant ROD BLAGOJEVICH and Harris discussed attempting to obtain a highly paid leadership position with an organization known as "Change to Win" for ROD BLAGOJEVICH in exchange for ROD BLAGOJEVICH appointing a particular individual to the vacant Senate seat.

b.    On or about November 6, 2008, defendant ROD BLAGOJEVICH met with a labor union official who he believed to be in contact with the President-elect in regard to the vacant Senate seat, and suggested to the labor union official that ROD BLAGOJEVICH would appoint Valerie Jarrett to the vacant Senate seat in exchange for ROD BLAGOJEVICH being named the Secretary of Health and Human Services.

c.    On or about November 7, 2008, defendant ROD BLAGOJEVICH, Harris, and Fred Yang, discussed financial benefits that ROD BLAGOJEVICH could request in exchange for the appointment of Jarrett to the United States Senate.

47

d.    On or about November 10, 2008, defendant ROD BLAGOJEVICH, Harris, and others discussed financial benefits that ROD BLAGOJEVICH could request in exchange for the appointment of Jarrett to the United States Senate.

e.    On or about November 12, 2008, defendant ROD BLAGOJEVICH and Fred Yang discussed a proposal where, in exchange for the appointment of Jarrett to the United States Senate, a not-for-profit organization would be set up where ROD BLAGOJEVICH would be employed when he was no longer governor.

f.    On or about November 12, 2008, defendant ROD BLAGOJEVICH and Thomas Balanoff, a labor union official (Session 541), had a discussion in which ROD BLAGOJEVICH proposed that, in exchange for the appointment of Jarrett to the United States Senate, a not-for-profit organization be set up and funded where ROD BLAGOJEVICH would be employed when he was no longer governor.

g.    On or about November 12, 2008, defendant ROD BLAGOJEVICH and Thomas Balanoff, a labor union official (Session 546) had a discussion in which ROD BLAGOJEVICH informed Balanoff that it was a very real possibility that Jarrett could get the United States Senate appointment, and again raised his interest in employment by a not-for-profit organization.

h. On or about November 13, 2008, defendant ROD BLAGOJEVICH and Doug Scofield (Session 624) had a discussion in which they discussed presenting to Rahm Emanuel a proposal by ROD BLAGOJEVICH that a not-for-profit organization be set up and funded and that the connection between setting up this organization and the awarding of the U.S. Senate seat would be "unsaid."

i. On or about November 13, 2008, defendant ROD BLAGOJEVICH and Scofield (Session 627) had a discussion in which ROD BLAGOJEVICH asked Scofield to call Wyma and ask Wyma to present to United States Congressman A ROD BLAGOJEVICH's proposal that a not-for-profit organization be set up and that, while it would be unsaid, this would be a "play" to obtain a financial benefit for ROD BLAGOJEVICH in return for the awarding of the United States Senate seat.

j. On or about December 4, 2008, defendant ROD BLAGOJEVICH, Greenlee, and Yang had a discussion in which ROD BLAGOJEVICH said that if he gave the Senate seat to Congressman Jackson, there would be "tangible political support . . . specific amounts and everything . . . . some of it up front."

k. On or about December 4, 2008, defendant ROD BLAGOJEVICH instructed Robert Blagojevich to contact a representative of Congressman Jackson, and advise the representative that if Congressman

Jackson was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment. ROD BLAGOJEVICH instructed Robert Blagojevich to communicate the urgency of the message, and to do it in person, rather than over the phone. Robert Blagojevich agreed to do so.

l.     On or about December 4, 2008, Robert Blagojevich arranged a meeting with a representative of Congressman Jackson, after getting direction from defendant ROD BLAGOJEVICH to contact the representative of Congressman Jackson in order to advise the representative that if Congressman Jackson was going to be chosen to fill the Senate seat, some of the promised fundraising had to occur before the appointment.

m.     On or about December 5, 2008, following the publication that day of a newspaper article reporting that defendant ROD BLAGOJEVICH had been surreptitiously recorded in connection with an ongoing federal investigation, ROD BLAGOJEVICH instructed Robert Blagojevich to cancel his meeting with the associate of Congressman Jackson.

All in violation of Title 18, United States Code, Section 371.