168

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )  No. 08 CR 888
4          Government,              )
                                    )
5  vs.                              )  Chicago, Illinois
                                    )
6  ROD BLAGOJEVICH,                 )  June 4, 2010
   ROBERT BLAGOJEVICH,              )
7                                   )
            Defendants.             )  9:26 o'clock a.m.
8

9                         VOLUME 3
10              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
11                      AND A JURY

12

13  For the Government:

14              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
15              BY:  Reid J. Schar
                    Carrie E. Hamilton
16                  Christopher Niewoehner
                Assistant United States Attorneys
17              219 South Dearborn Street
                Suite 500
18              Chicago, Illinois 60604

19

20

21  Court Reporter:

22              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
23                    Room 2504
                Chicago, Illinois 60604
24                  (312) 435-5895

25

1   APPEARANCES   (continued:)

2

    For Defendant Rod Blagojevich:
3

            KAPLAN & SOROSKY
4           BY:  Sheldon M. Sorosky
            158 West Erie
5           Chicago, Illinois 60610
            (312) 640-1776
6

            LAW OFFICE OF SAMUEL E. ADAM
7           BY:  Samuel Forbes Adam
                 Samuel Adams, Jr.
8           6133 South Ellis Avenue
            Suite 200
9           Chicago, Illinois 60637
            312-726-2326
10

11          OFFICES OF AARON B. GOLDSTEIN
            BY: Aaron Benjamin Goldstein
12          6133 South Ellis
            Chicago, Illinois 60637
13          (773) 752-6950

14          OFFICES OF LAUREN FAUST KAESEBERG
            BY:  Lauren Faust Kaeseberg
15          2140 N. Lincoln Park West
            Suite 307
16          Chicago, Illinois 60614
            (773) 517-0622
17

            LAW OFFICES of MICHAEL GILLESPIE
18          BY:  MICHAEL GILLESPIE
            53 West Jackson Boulevard
19          Suite 1420
            Chicago, Illinois 60604
20          (312) 726-9015

21

22

23

24

25

170

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    WITNESS                                              PAGE

3      VOIR DIRE EXAMINATION

4      By the Court.................................... 202

5

6

7    EXHIBITS

8      ................................................

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

172

1      (The following proceedings were had in open
2       court:)
3          THE CLERK:  2008 CR 888, United States versus
4    Blagojevich for trial.
5          MR. SCHAR:  Good morning, Your Honor.
6          Reid Schar, Chris Niewoehner and Carrie
7    Hamilton on behalf of the United States.
8          MR. SOROSKY:  Your Honor, I would ask if we
9    could have a sidebar for one moment?
10         THE COURT:  It's too late for that.
11         MR. SOROSKY:  Okay.
12         THE COURT:  I want challenges for cause.
13         MR. SOROSKY:  Your Honor, we would like to
14   make some arguments concerning that and we feel it
15   might not be appropriate to make those arguments in
16   open court.  We'd ask -- because there are things
17   contained in the questionnaires that perhaps --
18         THE COURT:  Why don't you start by making the
19   motion and seeing if I grant it, because I've read
20   the questionnaires.
21         MR. SOROSKY:  Okay.
22         MR. SCHAR:  Before we start, just one global
23   issue that I wanted to bring certainly to defense
24   attention and your Honor's attention.
25         There were several individuals that were

:27AM

:27AM

:27AM

:27AM

:28AM

1  yesterday either on the questionnaire or I think in
2  their answers indicated they were teachers, some of
3  whom potentially had accounts at TRS.  TRS is,
4  obviously, a victim in this case and we wanted to
5  just flag that in case there are any additional
6  cause challenges that they would want to make in
7  relation to that potential issue.
8           THE COURT:  Okay.  We can start with the
9  defense's first challenge for cause.
10          MR. ETTINGER:  101.
11          MR. SCHAR:  No objection, Judge.
12          MR. SOROSKY:  101.
13          THE COURT:  Granted.
14          MR. ETTINGER:  104, Judge.
15          THE COURT:  Right.  The prosecution's next.
16  Do you have another one?
17          MR. SCHAR:  Before we get to 104?
18          THE COURT:  Yeah.
19          MR. SCHAR:  Yes, Judge.  We would move for
20  cause on 102.  This was the individual, Judge, who
21  was --
22          THE COURT:  No, I remember 102.
23          You have a view on this?
24          MR. SOROSKY:  We would object.  We strongly
25  feel that it she very bland in all of her answers

:28AM
:28AM
:29AM
:29AM
:29AM

1 and certainly did not say anything which would

2 indicate that she could not be a fair and

3 open-minded juror.

4           THE COURT:  The basis for your challenge with

5 respect to 102 was her views on judgment?

6           MR. SCHAR:  Yes, Judge.

7           THE COURT:  I'm granting this challenge for

8 cause.  It's a judgment call.  I thought about this.

9 But this was an individual who spent a great deal of

10 time speaking with utter sincerity about the duty,

11 which I think she regarded as religiously based, not

12 to judge people.  And she spent a lot of time on

13 that issue.  She actually presented us with a

14 narrative as opposed to a simple answer to the

15 question.

16           At the end, she did state that after all of

17 the evidence, then she would be capable of making a

18 judgment.  Weighing the passion of her views with

19 respect to not judging against what I regarded as a

20 perfunctory and forced answer that she would be able

21 to judge, it's my judgment that she would not be

22 able to bring herself to judgment and I grant the

23 challenge for cause.

24           Next one for the defense?

25           MR. SOROSKY:  104.

1    MR. SCHAR:  That I would object to, Judge.

2    MR. ETTINGER:  I'm sorry?

3    MR. SCHAR:  I'm sorry, we would object to

4  that one.

5    MR. ETTINGER:  Judge, our basis, we believe

6  the law says there has to be an unequivocal

7  statement that the jurors can be fair, and this

8  juror said she doesn't believe -- he doesn't believe

9  what he heard or read will affect the process and we

10 submit that that's not good enough.  It has to be

11 unequivocal and "doesn't believe" is not

12 unequivocal.

13    MR. SOROSKY:  I also would add, Your Honor,

14 that in response to your questions, this juror

15 stated it would be difficult to render a verdict,

16 those were his exact words in response to your

17 question, and he used the phrase as my colleague

18 Mr. Ettinger believed, I don't believe he could do

19 whatever the specific questions you asked about that

20 mandated and required a fair and impartial juror.

21 He used the words a few times or the phrase a few

22 times "I do not believe that I could do that."  So

23 the mere fact that he said I don't believe that he

24 could do what was required and it would be difficult

25 to render a verdict, I think those two phrases prior

176

1  to the answer of the very specific and succinct

2  questions that you asked him preclude him from being

3  a fair and impartial juror and therefore he should

4  be excluded to cause.

5          MR. SCHAR:  Judge, again, we continue to

6  object.  I don't remember all that.  Mr. Sorosky is

7  quoting off the questionnaire, but the question

8  seemed clear to us that he said he would make a

9  decision based on the evidence that was in the

10 courtroom.

11         THE COURT:  I'm denying the challenge for

12 cause.  What I found over the years is, the best

13 jurors are usually those who recognize that it

14 sometimes may be difficult to reach judgments.  I

15 actually don't think I've ever heard a juror say "it

16 would be easy" and if I did hear a juror say it

17 would be easy, I'd be inclined to distrust that

18 juror.  I deny the challenge for cause.

19         I'm assuming there is no challenge with

20 respect to 103.

21         MR. SCHAR:  No.

22         THE COURT:  Okay.  What's next?  It's the

23 government's turn.

24         MR. SOROSKY:  Does the government go or do we

25 go?

177

1        THE COURT:  The government goes now.

2        MR. SCHAR:  Judge, this is not a cause

3  challenge, but we did want to flag that 106, I think

4  you had provided us and provided the defense with a

5  piece of paper.

6        THE COURT:  Yes, I did.

7        MR. SCHAR:  And I'm not sure whether that was

8  ever followed up on.

9        THE COURT:  It was not followed up on partly

10  because of the -- two reasons; one is is the length

11  of time that passed between the subject of the piece

12  of paper and the trivial nature of what it was.  So

13  I have no problem with it.

14        MR. SCHAR:  Very good.

15        THE COURT:  That may be slightly different

16  with the next group.

17        MR. SCHAR:  I think the next one for the

18  government would be 110.

19        By the way, I hear the defense is objecting,

20  they don't have a cause to 109.

21        MR. SOROSKY:  What?  Are we next?

22        THE COURT:  No, you can respond to 110.

23        MR. SCHAR:  Judge, if I could make a few

24  arguments in relation to 110.

25        THE COURT:  Well, I want to see his response

1  first.

2      (Brief pause)

3          MR. SOROSKY:  Your Honor, the government's

4  explained to us why they don't want 110.

5          THE COURT:  And you want them to explain that

6  to you before you tell me what your position is?

7  Because you might agree?

8          MR. SOROSKY:  Well, I don't know that we

9  would agree, but their basis, Judge.

10          THE COURT:  Go ahead.

11          MR. SCHAR:  Judge, this is an individual who

12  failed to answer numerous questions, and as of this

13  point, actually, he did not answer and we do not

14  have an answer for question 70 which dealt with the

15  Title 3 question, or 72 that dealt with views on law

16  enforcement.  They did not disclose on the

17  questionnaire that they're actually working four

18  days a week, ten hours a day in a landscaping

19  business, that also goes to the issue whether or not

20  there's a hardship.  I think there are additional

21  questions that failed to be answered.  I believe

22  there's also an arrest of conviction for which there

23  was no explanation on that particular questionnaire.

24  And based on the lack of information that was

25  provided in the first instance and the failure to

1 answer questions that are obviously of significant
2 importance to the government related to views, as
3 well as potential hardship since there's an
4 indication that they're now working four days a
:37AM 5 week, although that wasn't disclosed, we're moving
6 for cause.

7         THE COURT:  The only observation I would
8 make, and this may count for the defense waiting to
9 see, this was a juror who seemed to me to determine
:38AM 10 not to reveal anything about himself, and if asked
11 directly, gave as little information as possible.

12         The truth is, with respect to this particular
13 juror, if it came down to deciding whether to
14 exercise a peremptory challenge against this juror,
:38AM 15 I don't think either side would know what to do with
16 him.  I mean, you just don't know anything about
17 this individual.  And part of it is is because this
18 individual did not want you to know anything about
19 him and I don't have much of an opinion about this
:38AM 20 individual.  So I think that's the government's
21 quandary and maybe the defense's quandary, too.
22 This is an unknown.

23         MR. SOROSKY:  Well, I think when Your Honor
24 stated this juror did not care to reveal a great
:39AM 25 deal about himself, I don't know that that, in and

1  of itself, is any sin --

2          THE COURT:  No, but --

3          MR. SOROSKY:  -- that should bother someone

4  from being a juror.

5          THE COURT:  The government's position is, as

6  I understand it is, if you take a look at the

7  questions or the questions he didn't answer.  And

8  sometimes a juror doesn't answer a question because

9  there are a lot of the questions here, they're going

10  kind of fast because they want to stop answering

11  questions in the questionnaire and they miss a

12  couple, and I think the government is concerned

13  because I don't think that in this case that's --

14  they don't think in this case that's why questions

15  weren't answered.  And even his demeanor was, this

16  is somebody who thought very carefully about every

17  answer he gave, he paused before every answer, and

18  this is the source of the government's concern, and

19  the issue is is whether you should have concern or

20  not.

21          MR. ETTINGER:  Judge, our position is, the

22  government has not stated grounds for cause.  This

23  juror said he had not formed an opinion on this

24  case, he can decide this case on the basis of what

25  he hears in court.

1          THE COURT:  I'm going to postpone ruling on

2    this one.  So that objection is entered and

3    continued.

4          It's the defense turn.

5          MR. SOROSKY:  Juror number 107.

6          THE COURT:  Okay.  I'm assuming there is

7    nothing to 105 and 106, so we go to 107.

8          And your grounds?

9          MR. SOROSKY:  Well, juror number 107

10   indicated that he had been impaneled as a federal

11   grand juror in this building, relatively recently.

12         THE COURT:  2002.

13         MR. SOROSKY:  Pardon me?

14         THE COURT:  To September 2002, and according

15   to what he said, he would have ended his service

16   sometime around the end 2003, beginning 2004.

17         MR. SOROSKY:  Right.  So I would assume,

18   being a grand juror, he probably severed for

19   18 months.

20         THE COURT:  Right.  He said 18 months.

21         MR. SOROSKY:  Right.  And, therefore, every

22   day that he came to his job as a federal grand

23   juror, he probably met and spoke with Assistant

24   United States Attorneys and dealt with witnesses who

25   were going to testify for the government and

1    probably dealt with many law enforcement officers.
2    And, with all due respect, if someone had worked in
3    Mr. Adam's office for 18 months, I'm sure the
4    government would say, well, I don't know if that
5    person could be a fair and impartial juror, and if
6    Mr. Adam said, oh, no, he really didn't work for me,
7    he worked for my associates, or colleagues, or
8    partners, the government would say that doesn't make
9    any difference.  And I think that's what we have
10   here.
11          This person has probably been tainted more
12   than any other juror into the belief that what the
13   government presents is correct, that the government
14   is the true light, and that the defendants are the
15   bad guys, if you will.  And to say it any other way
16   is just not looking at it fairly and accurately.
17          And, in fact, he answered one question when
18   he said he considers the media hearsay and not
19   evidence, and he said that because he really knows
20   what's going on.  And in the one sense, what he said
21   is accurate.  Obviously, if you're in a federal
22   grand jury, you really know what's going on, and
23   then when the media says something they obviously
24   don't know the whole story, they have the narrow
25   sliver and undoubtedly is hearsay.

1       So I just don't see how this person can be a
2  fair and impartial juror, because should there be
3  deliberations, he would have the background, if you
4  will, and have been infected by all that he heard in
5  the grand jury proceeding.
6       And the one thing a grand jury proceeding is
7  is a one-sided proceeding.  If you think about court
8  as a three-sided proceeding with the defense,
9  prosecution, and the judge in the middle, at a grand
10 jury there is no judge and there is no defense.
11 There is only a prosecutor and FBI agents presenting
12 evidence to citizenry.  It's a one-sided proceeding.
13 And this juror has been the victim, if you will, of
14 that influence for 18 months and it's all come from
15 the government.  Now how could he possibly be a
16 neutral and detached juror after that experience?
17 It's absolutely impossible, no one could be and,
18 therefore, we move he should be excluded.
19      MR. ETTINGER:  Judge, on behalf of Robert
20 Blagojevich, we want to add, on Page 23 of his
21 questionnaire, he held fund-raisers for Children's
22 Memorial Hospital, which will be an issue in this
23 case, on contributions.  So we believe there is an
24 implied bias and move for cause.
25      THE COURT:  What question?

:43AM

:44AM

:44AM

:44AM

:45AM

184

1          MR. ETTINGER:  I'm sorry?

2          THE COURT:  What question?

3          MR. SOROSKY:  Page 23.

4          THE COURT:  It says he held fundraisers for

5    Children's Memorial Hospital?

6          MR. ETTINGER:  Yes.

7          THE COURT:  I'm denying the challenge for

8    cause.  And in all honesty, if somebody had worked

9    in Mr. Adam's office a number of the years ago for

10   18 months, I would deny the government's challenge

11   for cause.

12          The government?

13          MR. SCHAR:  Judge, the next would be 112.

14          THE COURT:  Your grounds?

15          MR. SCHAR:  Judge, the grounds for this is,

16   this is the individual who indicated that her

17   brother had been falsely accused of a crime.  She

18   indicated twice that she was very mad at that time,

19   or still very mad now about what happened at that

20   time.  Said she didn't think it would affect her but

21   she was still really mad at the time, and that was

22   after a long pause, kind of a sigh from a demeanor

23   perspective.

24          In terms of -- I think you followed up

25   eventually to ask, do you think you could make a

185

1 decision just on the evidence, she indicated she

2 would do her best, but, that was her quote, would do

3 her best but, and she never finished.

4        She then had issues with the Title 3 question

5 where she thought it was an invasion of rights to

6 privacy.  You explained the issue to her.  She still

7 thought it was a right to privacy problem, I think

8 you again followed up with her and see if she could

9 be fair, she said probably, yes.

10       So when you add a combination of factors, and

11 I think she's only getting paid for one day of jury

12 service as well, from a hardship perspective, but

13 the combination of factors for the cause challenge,

14 we were left with the impression that she had not

15 decided that she could fully fair.

16       THE COURT:  The defense?

17       MR. SOROSKY:  If I could respond briefly.  I

18 don't think anyone who either themselves or had a

19 close family member falsely accused of a crime

20 wouldn't say they were upset by it.  Who wouldn't

21 be?  And, however, she clearly stated that she could

22 be a fair and impartial juror notwithstanding that,

23 that it was a long time ago.  Also, it was quite

24 apparent from her answers to the questions that her

25 brother, who was the victim of this false

1 accusation, was arrested by local police officers,

2 not federal officers, and she indicated that the

3 first time the case went to court the judge

4 apologized and dismissed the case.  So I don't see

5 how that, in any way, would keep her from being a

6 fair and impartial juror.

7           Concerning the comment about invasion of

8 privacy, I think if asked the naked question, how do

9 you feel about your conversations being overheard or

10 wiretapped by the government, I don't know anyone

11 who wouldn't say, "well, isn't that invasion of my

12 privacy."  And then when you explain to them, well,

13 under the law, if we're investigating a crime, law

14 enforcement could do certain things, then they might

15 say, oh, well, I understand maybe that's proper.

16 But the naked question, how do you feel about the

17 government wiretapping your conversations, there's

18 nothing wrong or improper or unfair about someone

19 asking the question, "well, isn't that an invasion

20 of my privacy," and that's all she did in the

21 questionnaire.

22           THE COURT:  You can stop now.

23           MR. SOROSKY:  Thank you.

24           THE COURT:  The challenge is denied.

25           MR. ETTINGER:  Judge, our next one is 109.

187

1          MR. SCHAR:  No objection, Judge.

2          THE COURT:  Granted.

3          You have another?

4          MR. SCHAR:  Judge, 114.

5          THE COURT:  Which number?

6          MR. SCHAR:  114.

7          THE COURT:  Okay.

8          MR. ETTINGER:  We agree, Judge.

9          THE COURT:  Yeah.  Granted.

10          Defense?

11          MR. SOROSKY:  Our next is 115 -- 113.

12          THE COURT:  113 is your objection?

13          MR. SOROSKY:  Yes.

14          THE COURT:  Government?

15          MR. SCHAR:  We object.

16          MR. SOROSKY:  We felt all the answers that

17  this man gave that he not be a fair and impartial

18  juror.

19          THE COURT:  This one, too, is a judgment

20  call.  He did tell us that he had strong opinions

21  about politics or politicians, he checked that off,

22  didn't give any details in the answer when I asked

23  him about it.  I think this is an intelligent,

24  disciplined person who can cast aside whatever

25  preconceptions he has about politicians as a class

188

1  and make an individual judgment.  The challenge is

2  rejected.

3          MR. SCHAR:  I believe it's 117, Judge.

4          MR. ETTINGER:  We agree, Judge.

5          THE COURT:  Granted.

6          The defendant?

7          MR. ETTINGER:  We agree.

8          THE COURT:  No, no, your motion.

9          MR. ETTINGER:  115, Judge.

10         THE COURT:  The government's position on 115?

11         MR. SCHAR:  We do not agree, Judge.

12         THE COURT:  Okay.  Your reasons?

13         MR. SOROSKY:  I believe that this woman

14 indicated, in response to a number of critical

15 questions that Your Honor asked her, she said, in

16 open court, she could possibly, and I underscore

17 the word "possibly," put those things aside and

18 render a fair verdict, and I think the fact that she

19 possibly could do it as opposed to certainly do it,

20 in and of itself, is enough to preclude her from

21 being a fair and fair and impartial juror.

22         MR. SCHAR:  You actually followed up with

23 additional questions after that which indicated

24 that -- asked her if she understands she could only

25 reach a verdict based on what happens in the

:52AM

:53AM

:53AM

:53AM

:53AM

189

1    courtroom and she said she could follow that rule.

2         THE COURT:  I'm rejecting the challenge for

3    cause.

4         The government?

5         MR. SCHAR:  Judge, I think number 120

6    indicated she could not be fair to defendant Rod

7    Blagojevich, so that would be a cause challenge for

8    the government as well.

9         MR. SOROSKY:  We agree as well.

10        THE COURT:  120 is excluded.

11        Next, the government's?

12        MR. ETTINGER:  That was the government.

13        MR. SOROSKY:  118, Judge.

14        THE COURT:  118 you're talking about?

15        MR. ETTINGER:  Yes, your Honor.

16        THE COURT:  This was also a hardship claim as

17   well.

18        MR. ETTINGER:  Yes.

19        THE COURT:  The government's view?

20        MR. SCHAR:  I think, Judge, if there's a

21   hardship, there's a hardship, otherwise --

22        THE COURT:  I think there's adequate showing

23   of hardship in this particular case.  Granted.

24        The next one?

25        MR. SCHAR:  I think it's us.  In terms of a

1  hardship issue/cause, I think 122 is the individual
2  who was called back later.  We don't have an issue
3  striking that individual for hardship.
4          THE COURT:  122, is there an objection?  That
5  was the one we had at the side.
6          MR. ETTINGER:  Yes, we want him, Judge.
7  We're not joining hardship.
8          THE COURT:  His hardship excuse, I think,
9  does is not persuasive to me because -- the economic
10 hardship is not persuasive to me because he holds an
11 interesting but very low-paying job.  I think in the
12 questioning I asked him if it was -- if it was
13 customary being paid as people with sore eyes in
14 peanuts and then I amended that to peanut, and he
15 nodded.
16         His other hardship is one of deep personal
17 concern, and one that if we attempted to
18 accommodate, would interrupt the trial essentially
19 for two days at a time.  So I'm accepting the
20 noneconomic hardship excuse.
21         Okay.  Others?
22         MR. SOROSKY:  You now.
23         THE COURT:  No, it's your turn.
24         MR. SOROSKY:  120, Your Honor.
25         MR. SCHAR:  We already struck that.

:56AM
:57AM
:57AM
:58AM
:58AM

1        THE COURT:  Yeah, 120 is out.  It was agreed
2  to, I believe.
3        MR. SOROSKY:  124.
4        THE COURT:  124.  Okay, grounds?
5        MR. SCHAR:  We don't agree, Judge.
6        THE COURT:  Go ahead.
7        MR. SOROSKY:  In one question, specifically
8  questioned 46, this juror answered, she said she
9  volunteered it would not be fair for me to be a
10  juror after watching TV, those were her exact words.
11  And in question 44, she said that she didn't trust
12  politicians.  And in question 69, she indicated she
13  came from a very close-knit family and she always
14  talked about things with her family and it would be
15  very, very difficult for her not to talk about this
16  case with her family.  And I think if you put the
17  intermix of all three of those, she certainly could
18  not be a fair and impartial juror.
19        MR. NIEWOEHNER:  Your Honor, she did laid it
20  out.  When you explained the reason for the
21  questions, she couldn't talk to her family, she
22  showed no hesitation in terms of things she
23  understood and would follow that rule.  So we don't
24  think that would be any reason to dismiss her.
25        And in terms of her other answers, she

192

1  actually affirmatively grasped what Your Honor said,
2  she -- the explanation was I understand you can't
3  judge a book by its cover and that she would wait to
4  see the evidence.  So it wasn't just okay, I could
5  be fair, she actually affirmatively expressed the
6  concept, grasped it, and therefore we think she
7  could be fair and not be denied for cause.
8          MR. ETTINGER:  Judge, we believe what she
9  said was, when you asked her about putting her
10 political beliefs aside and for her to be fair and
11 impartial, I've got my notes that she said "I
12 believe so," and our position is that's not an
13 unequivocal response that she can be a fair juror.
14 "I believe so" is not enough.
15         THE COURT:  So you would reject as
16 insufficiently sincere the formula found in many
17 religions in which you recite the canon "I believe,"
18 that that's not enough?
19         MR. ETTINGER:  I --
20         THE COURT:  I'm sorry, I'm making an
21 observation that I probably shouldn't have made.
22 But I will say that I believed her and I'm rejecting
23 the challenge for cause.
24         Another one?
25         MR. SCHAR:  Judge, 126, I suspect, is not

:00AM
:01AM
:01AM
:01AM
:02AM

1    going to be joining us for the duration of our
2    trial, so we'll move for cause.
3           THE COURT:  Oh, yes.
4           MR. S. F. ADAM:  There's no objection on that
5    one.  No objection on 126.
6           THE COURT:  Yes.
7           For you?  Do you have another one?
8           MR. SOROSKY:  Who am I to challenge the
9    government's wisdom, Your Honor, on 126.
10          Our next is 125.
11          MS. HAMILTON:  Judge, we don't believe that
12   this should be struck for cause.
13          MR. SOROSKY:  If I may respond briefly.  In
14   question 46, here is a man who is called to be a
15   fair and impartial juror and the answer is "I
16   already believe Blagojevich to be guilty."  I don't
17   know what more compelling argument a lawyer could
18   make.
19          And then just to add fuel to the fire, on the
20   answer to question 65, "you heard the reports from
21   the radio, TV, and Internet and it's, like,
22   something like 52 counts against him," and he seems
23   to be implying because he has more counts against
24   him, he's more guilty than if he had fewer counts
25   against him.  And then --

194

THE COURT:  I think you may be misleading

that one.  He is reporting what he thinks he

remembers he heard.  I mean, there are reasons to

object to this juror, but not remembering correctly

the number of counts is, I think, not one of them.

MR. SOROSKY:  No, no, no, I'm not talking on

his memory.  What have you heard or read, and he

said I heard there was something like 52 counts

against him.

THE COURT:  Right.

MR. SOROSKY:  I don't mean to seize on the

number 52 as opposed to 56 or 64, or anything of

that nature, but what I am saying is, he seems to be

implying because there are 52 counts, he's guilty

because there are so many counts.

THE COURT:  I don't think so.  Basically, the

issue is, what do you make of his original expressed

opinion, and the law is very clear that the fact

that somebody expresses an opinion and holds a view

does not, in and of itself, require their excuse.

Irvin versus Dowd is still the law, as old as that

case is, and it's more than 40 years old, and that

is is that people are asked can you put that aside

and decide the case on the basis of the evidence

that you hear in the courtroom, and Irvin versus

1 Dowd involved precisely the same kind of case that
2 we have here, that is to say, a case that would be
3 difficult to find anybody who had not heard of that
4 case.  And he did say, I think, that he could put
5 that aside, and the issue is whether -- and I
6 certainly believed that he believes it when he said
7 it, the question is is can he do it, which is a more
8 difficult one and the government may speak now.

9        MS. HAMILTON:  Judge, I think that this
10 prospective juror did exactly what we wanted a juror
11 to do, he was honest about his opinions and his
12 preconceived notions, and he listened very intently
13 as you explained to him what the law would require.
14 You gave two options as to whether he would actually
15 do that or not, you gave him door number one or door
16 number two.  After listening to what you instructed
17 him, he chose the right door.  He had been honest
18 about what he believed, and then after listening to
19 what you told him he would be required, he said he
20 could do it, that's what we expect from jurors and
21 there's no reason to be struck for cause.

22        MR. ETTINGER:  Judge, our only problem with
23 that is, we think there should have been door number
24 three, that the defendants, both of them are
25 presumed innocent and the government has to prove it

196

1    beyond a reasonable doubt.  I believe door two was,
2    do they start out on equal footing.
3          MR. SOROSKY:  If I may comment on my
4    colleague's comments about the Court's comments
5    about the doors.  I believe the Court said door
6    number one is that the defendant is guilty and --
7          THE COURT:  No, door number one is, the
8    defendant has to show that he's innocent, and door
9    number two was the prosecution has to prove beyond a
10   reasonable doubt that he's guilty.
11         MR. SOROSKY:  Well, all due respect, Your
12   Honor, I believe you stated door number one, the
13   defendant is guilty but that you, as a juror, would
14   be willing to listen and do your best; door number
15   two is, I believe you stated, the scales are
16   perfectly balanced and you'll give both sides a fair
17   trial.
18         THE COURT:  That was, in fact, one of the
19   things I said, but it was not all that I said.
20         MR. SOROSKY:  Right.
21         THE COURT:  The issue is not the question.
22   I'm quite sure that he understands what his duty is.
23   He evinced no hesitation in the questionnaire about
24   conceding the burden of proof on the government that
25   no inference could be drawn from the fact that they

197

have been indicted.  The question is--and I began

saying I have no doubt about his sincerity--the

question is, does he have the ability to do that.

          MR. SOROSKY:  Your Honor, let me say this,

too, and I don't mean to beat a dead horse but --

          THE COURT:  The question isn't dead yet.

          MR. SOROSKY:  Okay.  Your Honor quotes an old

case of 40 years, and while that's still the law,

our media has advanced in 40 years and it's changed

very much, and in the case Your Honor cited, there

was, undoubtedly, a great deal of publicity about

that case.  But here, in this specific case, in

addition to all the media publicity, we had the

opening statement by United States Attorney

Fitzgerald who was just played and played and

played, and perhaps that is the basis of this

juror's belief.  We don't know.  And perhaps that

could be the little extra granule of sugar just in

the interest of fairness that could perhaps --

          THE COURT:  My decision is based on the

general tenor of his answers when I spoke to him,

upon his level of education, and I think he can and

will base his decision on the evidence he hears in

court and nothing else.  I reject the challenge for

cause.

198

1        It's the government's turn.

2        MR. SCHAR:  No other cause challenges, Your

3 Honor.

4        MR. SOROSKY:  No other cause challenges,

5 Judge.

6        MR. SCHAR:  Judge, two quick things --

7        THE COURT:  We have 19 jurors in the pool.

8 We have one juror objection to and challenge for

9 cause that I have entered and continued.  So that's

10 a possible 19, and there is one juror about whom I

11 wish to confer with counsel off to the side.

12     (Proceedings heard at sidebar on the record.)

13        THE COURT:  This is a hardship issue on --

14        MR. ETTINGER:  111?

15        THE COURT:  Juror 111, who no one has

16 challenged, and correctly so.  This is an individual

17 who is supervising on international flights, her

18 husband is, in his circles, a fairly well-known

19 labor lawyer.  Her excuse was -- she had a

20 suggestion, actually, in the questionnaire about

21 childcare issues, but she didn't raise it, and this

22 is a person of some means, so I don't think it as an

23 issue.  The excuse was that she was leaving on a

24 cruise June 6th through the 13th, it will interfere

25 with her vacation and provide necessary documents.

1   And because she's an intelligent person, this is not

2   something she raised because it's not much of an

3   excuse, but I did get an e-mail from her this

4   morning -- Donald got an e-mail from her this

5   morning, which basically said it's not just a

6   cruise, it's something having to do with her

7   mother's 55th wedding anniversary.  But she did an

8   interesting thing, she did not say that she should

9   be excused for this, what she said is, if I don't

10  know by the end of today, there's no way I could

11  rejoin the family, which indicated to me that her

12  intent was, basically, to serve on the jury and not

13  go on the cruise.

14          The question I have under those

15  circumstances, since I want to tell her today, is,

16  it occurred to me that this particular juror might

17  be the subject of a peremptory challenge, and if

18  anybody is fairly convinced that they're going to do

19  that, I'd like to know now, because then I would let

20  her go, and I won't count the peremptory challenge

21  against either.

22          MR. ETTINGER:  We would.

23          MR. S. ADAM, JR.:  We would, Judge.

24          THE COURT:  Yeah, that's what I thought.

25          MR. SOROSKY:  Could the Court consider

200

1  perhaps beginning of the trial June 14th and then
2  she could go on her cruise and come back?
3          THE COURT:  No.
4          MR. SOROSKY:  Just asking.
5          THE COURT:  It's a perfectly reasonable
6  thing.  But, in all honesty, the reason I raise this
7  is, I could not imagine the defense allowing this
8  juror to sit.
9          MR. S. ADAM, JR.:  But --
10         THE COURT:  And I thank you for Your honesty.
11         MR. S. ADAM, JR.:  May I ask the Court a
12 question?
13         THE COURT:  Yes.
14         MR. ADAM, JR.:  I know Your Honor on juror
15 102 did strike her for cause, the only thing I just
16 want to make sure is, that was the juror that you
17 asked to refill out questions 65 through 79.
18         THE COURT:  Right.
19         MR. ADAM, JR.:  We never had an opportunity
20 to see those answers and I know --
21         THE COURT:  All of her answers were correct.
22 So that means, she didn't disqualify herself on any
23 of the answers.  The only reason I knocked her out
24 is because I think she is not willing to make a
25 judgment.  There was nothing in the questionnaire.

:19AM

:19AM

:19AM

:19AM

:20AM

201

1      MR. ADAM, JR.:  I just wanted to make sure.
2  Thank you.
3      THE COURT:  Okay.
4      MR. SOROSKY:  So 111 is cause for hardship?
5      THE COURT:  Yes.
6    (Proceedings resumed in open court:)
7      MR. SOROSKY:  We would move for strike for
8  cause juror 108 because he failed to appear.
9      THE COURT:  108 is, I believe, here today.
10     MR. SCHAR:  Judge, the only last issue, now
11 that we've gone through the first series of cause
12 is, just so the record is completely clear, I did
13 not see any cause challenges or do I understand
14 there to be any cause challenges related to any of
15 the TRS affiliated individuals, and so I'm assuming
16 that there is no objection to those individuals.
17     MR. SOROSKY:  No.
18     THE COURT:  I wouldn't think so.
19     MR. SCHAR:  Thank you, Judge.
20     THE COURT:  Mr. Walker will tell you when we
21 will resume because he will know and I don't.
22    (Recess.)
23
24
25

:20AM

:17AM

:17AM

:17AM

1    (The following proceedings were had in the

2      presence of the prospective jurors in open

3      court:)

4                   VOIR DIRE EXAMINATION

5         BY THE COURT:  Those of you who are here

6    today as prospective jurors, I'm going to tell you

7    briefly why jury service matters and why it's so

8    important.

9         The first reason, the reason we have juries,

10   is that we fought a revolution so you could sit here

11   today.  The American colonists went to courts where

12   everything was decided by the king's judges, there

13   was no jury of one's peers, and this was, in fact,

14   one of the reasons for the events of July 4, 1776.

15   Your presence in this courtroom is a living symbol

16   of the birth of our nation.

17        Second, no country entrusts as much to juries

18   as this nation does.  The American way with juries

19   speaks to the world that we trust our citizens to

20   decide important cases, to do justice under law, and

21   citizens whose names are drawn at random from voters

22   lists.  Jury service demonstrates the faith of

23   democracy that we are competent to govern ourselves.

24        Third, the faithful performance of jury duty

25   is crucial to the persons involved in this case.

1  Even if our juries were not a crucial part of our

2  history, your work here would still matter.  This is

3  so because the parties to this case have submitted

4  the decision to you, your verdict is important to

5  them, it matters to them, it is significant to them,

6  and they are entitled to the very best effort you

7  can give as jurors.

8       I want to say also that this case, a criminal

9  case, the jury will have to decide whether the

10 government has proved its case.  You will not be

11 asked to decide whether you like or dislike, approve

12 or disapprove of the persons accused here.  You will

13 be asked only to decide whether the government has

14 proved the charges against the defendants beyond a

15 reasonable doubt.

16      I say these things so you might understand

17 why I believe so strongly in the value of your

18 service today.  In a moment I'm going to ask you to

19 take an oath to tell the truth, just as witnesses

20 do, and then I'm the going to ask you some

21 questions.  These questions are not asked out of

22 idle curiosity.  What I'm trying to do, and what the

23 parties are trying to do, and what the questions and

24 answers help us do is pick out of those who have

25 been called the best possible jury to hear this

particular case.  Not all juries are equally suited
to all cases.  And if you are not selected to sit on
this jury, it does not mean that you are unfit to
serve as a juror, or even if you're unfit to serve
in this case, it means only that the Court and
counsel have an opinion that other jurors might be
better for this case.

        The clerk will administer the oath to you and
then you will be questioned by me in the order of
your random numbers.  The order of the random
numbers -- or they're random, because we use the
computer program to randomize the order in which you
are called.

        One last thing before the oath is
administered.  I want to inform you, and these are
in the barest, most simplified terms that I can make
this, but the indictment in this case charges the
defendant, Rod Blagojevich, with several counts of
committing, as government of Illinois, various
criminal acts referred to as bribery or extortion,
attempted conspiracy, using phones to commit some of
these offenses, including securing campaign
contributions in exchange for certain acts, and
lying to federal investigators.

        The indictment charges the defendant, Robert

1  Blagojevich, with using wire and radio

2  communications, usually a phone, to assist in the

3  commission of other offenses, such as agreeing to

4  the performance of certain government acts and other

5  acts in exchange for something of value to Rod

6  Blagojevich.

7        The defendant and codefendant have pled not

8  guilty to each and every count.

9        Mr. Walker, would you administer the oath.

10        THE CLERK:  Would each of the prospective

11  jurors please stand and raise your right hand.

12     (Prospective jurors sworn.)

13        THE CLERK:  Please exit to my right to where

14  this court security officer is.

15        Juror 131, you will remain in the courtroom

16  and I'll give you your seat.

17     (Brief pause)

18     (Prospective juror entered the courtroom, and

19      the following proceedings were had herein:)

20      (Brief pause)

21        THE COURT:  Be seated in the courtroom,

22  please.

23        THE CLERK:  Mr. Marshal, you can allow the

24  gallery to enter, please.

25     (Brief pause)

1          THE COURT:  Number 131?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Just a moment.  It won't be long.

4      (Brief pause)

5          THE COURT:  If I speak to you, I'm going to

6  use "you," because it's kind of awkward to refer to

7  you as 131.  And I do want to tell you that we've

8  all seen the jury questionnaire and I'm not going to

9  go over each of those questions with you, but there

10  are just a few things I did want to talk to you

11  about.

12          You work for a federal government agency, is

13  that correct?

14          PROSPECTIVE JUROR:  Yes, sir, I do.

15          THE COURT:  And what do you do at work?

16          PROSPECTIVE JUROR:  I work for the Department

17  of Homeland Security, Transportation Security

18  Administration.  What I've been doing for the last

19  7 years was a security person that checks baggage as

20  it comes through before it goes on to the aircraft

21  at O'Hare Airport.

22          Here, recently, since March, I've been

23  promoted out of that into an area that's called a

24  safety specialist, where I'm in charge of safety at

25  O'Hare Airport, the current TSA employees.

1      THE COURT:  Before you worked for the federal
2 agency, what did you do?

3      PROSPECTIVE JUROR:  I worked downtown.  I
4 worked at an auditor for computer systems.

:04AM   5      THE COURT:  And how long did you do that?

6      PROSPECTIVE JUROR:  Oh, from about 1969 until
7 19- -- well, let's see.  Actually, about 2000.

8      THE COURT:  Now, did you do that all with the
9 same company or did you work for several companies?

:05AM  10      PROSPECTIVE JUROR:  I worked for several
11 companies.

12      THE COURT:  Okay.  You like your work?

13      PROSPECTIVE JUROR:  I certainly do.  Yes,
14 sir.

:05AM  15      THE COURT:  You were in the Navy?

16      PROSPECTIVE JUROR:  Yes, sir.

17      THE COURT:  For how long?

18      PROSPECTIVE JUROR:  5 years.

19      THE COURT:  And you worked with equipment and
:05AM  20 machinery then too?

21      PROSPECTIVE JUROR:  I worked with the
22 electronic equipment.  I was what they call
23 communications technician.

24      THE COURT:  The only time you ever dealt with
:06AM  25 a lawyer personally was to deal with mortgages and

1 house buying?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  Tell me about your hobbies, if

4 you have any.

5          PROSPECTIVE JUROR:  Well, I could do a lot of

6 things, mostly with my hands.  Arts and crafts, I

7 like to do gardening, I like to do scale model ship

8 building out of wood.  I used to be a hunter, but

9 I'm not anymore, not for years and years, but I

10 still like antique firearms, and I like to put

11 together a replica firearms, you know, as you can

12 buy as kits, assemble all the parts, and make a

13 shooting model out of them.  That's pretty much what

14 I've been doing here later.  I also like to finish

15 furniture.

16          THE COURT:  What do you spend most of the

17 time doing when you're not working?

18          PROSPECTIVE JUROR:  Oh, probably gardening

19 part, the fishing part, working with models.

20          THE COURT:  Do you have a garden of your own?

21          PROSPECTIVE JUROR:  Yes, sir.  A vegetable

22 garden.

23          THE COURT:  Okay.  A large garden, a small

24 garden?

25          PROSPECTIVE JUROR:  Oh, it's about 50 feet by

 1  14 feet.

 2          THE COURT:  Spend a lot of time worrying

 3  about the weather?

 4          PROSPECTIVE JUROR:  When I'm gardening in the

 5  summertime, yes, sir.

 6          THE COURT:  Do you watch a lot of television?

 7          PROSPECTIVE JUROR:  Mostly the history

 8  channel, the discovery channel, old movies.  Yes, I

 9  do.  And that's usually when I'm cooking, I have a

10  TV in the kitchen.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR:  I don't sit down and

13  watch TV.

14          THE COURT:  All right.  Do you spend a lot of

15  time following the news?

16          PROSPECTIVE JUROR:  No, not really.

17          THE COURT:  Okay.  Now, you have heard or

18  read something about this case, is that correct?

19          PROSPECTIVE JUROR:  Yes, I have.

20          THE COURT:  You indicate that this was not

21  anything that you had any particular desire to pay

22  attention to, is that correct?

23          PROSPECTIVE JUROR:  No; I probably should

24  know more about it, but I don't.

25          THE COURT:  Okay.  In your work with the

1  federal agency, do you deal a lot with other law

2  enforcement agencies?  Or do you deal at all with

3  other law enforcement agencies of the federal

4  government, the FBI, for example, or anybody else?

5          PROSPECTIVE JUROR:  Well, if we have to, if

6  there's a problem, we have to call certain law

7  enforcement agencies, that could be the airport

8  authority, that could be the FBI, it could be

9  Chicago Police Department, it could be any people

10  that our authority says that we should get in touch

11  with.  My role in that is notifying our operations

12  center and let them decide on who should be called

13  depending on the situation.

14          THE COURT:  Right.  Do you have much occasion

15  to deal with those who are called yourself?

16          PROSPECTIVE JUROR:  No, sir.

17          THE COURT:  Okay.  This case is, obviously,

18  being prosecuted by prosecutors from the federal

19  government, and some of the witnesses will be other

20  employees of the federal government, would that

21  affect your judgment in any way?

22          PROSPECTIVE JUROR:  No, I don't believe so.

23          THE COURT:  The basic question is is if an

24  FBI agent testified to something, will you be able

25  to treat that testimony the way you treat the

1  testimony of any other witness and judge the

2  testimony of any other witness?

3          PROSPECTIVE JUROR:  I believe so, yes, sir.

4          THE COURT:  You still do a fair amount of

5  your work with machines and devices of various

6  kinds?

7          PROSPECTIVE JUROR:  Well, I have work tools

8  that I have.  I have a drill press, a bandsaw,

9  sanders, hand tools, things like that.

10          THE COURT:  Okay.  And you were in at least

11  out of the business for a while, is correct?

12          PROSPECTIVE JUROR:  Yes, I did.  In between

13  jobs, after I left my profession as an auditor, I

14  was out of work for about 2 years or so, and that's

15  when I joined the transportation security

16  administration.  So I was out of work for about

17  2 years.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR:  And that's when I worked,

20  you know, part-time just to have a job.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR:  You're welcome.  Thank

23  you.

24

25      (Prospective juror exited the courtroom, and the

1      following proceedings were had herein:)

2     (Brief pause)

3     (Prospective juror entered the courtroom, and

4      the following proceedings were had herein:)

:11AM 5        THE COURT:  You're 132?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  The lawyers and I have read the

8  questionnaire, so I'm not going to go over each and

9  every question, I'm just going to ask a few things.

:12AM 10        You have a degree in nursing?

11        PROSPECTIVE JUROR:  Yes, I do.

12        THE COURT:  And how long did you work as a

13 nurse?

14        PROSPECTIVE JUROR:  I only worked a short

:12AM 15 time as a nurse and then I spent time as a home

16 maker, and went back and taught high school health,

17 and now I'm just volunteer nursing.  I still hold a

18 valid license.

19        THE COURT:  And when you were a health

:13AM 20 teacher, was it junior high in high school?

21        PROSPECTIVE JUROR:  Correct.

22        THE COURT:  Okay.  And you do some volunteer

23 work?

24        PROSPECTIVE JUROR:  I do a lot of volunteer

:13AM 25 work, probably full-time.  My husband actually calls

1 me a professional volunteer.  I volunteer at

2 community organizations.  I believe community

3 service is very important.  I don't know how much

4 you want me to go over that.

5     THE COURT:  Well, the question I was going to

6 ask you, I think you've already answered, which is

7 how much time do you devote to this.

8     PROSPECTIVE JUROR:  I devote a lot of time to

9 volunteer work.

10     THE COURT:  And how much of that is based on

11 activities related to nursing and how much isn't?

12     PROSPECTIVE JUROR:  I am the parish nurse for

13 our church and that is minimal part of my

14 volunteerism.

15     THE COURT:  Okay.  And your husband had a

16 business of his own?  A small company?

17     PROSPECTIVE JUROR:  Yes.

18     THE COURT:  Until he retired?

19     PROSPECTIVE JUROR:  He retired last year.

20     THE COURT:  Now, did you help him at all with

21 that.

22     PROSPECTIVE JUROR:  Just paperwork.

23     THE COURT:  You held a real estate license at

24 one time?

25     PROSPECTIVE JUROR:  A very short time until I

:13AM

:14AM

:14AM

:14AM

:15AM

1  started having children.

2          THE COURT:  Right.  Did you do that work?

3          PROSPECTIVE JUROR:  I'm sorry?

4          THE COURT:  Did you actually do a lot of work

5  in real estate?

6          PROSPECTIVE JUROR:  Ah, not actively, no.

7  Only a few transactions.

8          THE COURT:  And you have a brother who

9  currently is serving in Afghanistan?

10          PROSPECTIVE JUROR:  Yes, I do.

11          THE COURT:  And the only reason you have

12  dealt with lawyers yourself is for real estate?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  You're part of a neighborhood

15  watch group?

16          PROSPECTIVE JUROR:  I'm actually the

17  president of our neighborhood group, which is the

18  largest group in Joliet.

19          THE COURT:  And what are its major

20  activities?

21          PROSPECTIVE JUROR:  We are very much into

22  historic preservation.  It's an older neighborhood.

23  And we do several fund-raisers.  It is a

24  not-for-profit organization.  We put money back into

25  the neighborhood and do scholarships and grants, as

1 such, to preserve and protect the neighborhood and

2 give citizens their pertinent information on

3 criminal activity, or problems, or upcoming things

4 to do with .....

5          THE COURT:  Did this association exist before

6 you came to the neighborhood?

7          PROSPECTIVE JUROR:  Yes; it's 27 years old.

8          THE COURT:  All right. So you joined it while

9 it was still in existence?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.  Have you ever been an

12 officer in that group?

13          PROSPECTIVE JUROR:  I'm president currently.

14          THE COURT:  All right.

15          PROSPECTIVE JUROR:  We have about 500

16 members.

17          THE COURT:  Right.  And you have given

18 support at least to one political candidate for your

19 city counsel, is that correct?

20          PROSPECTIVE JUROR:  Yes, she is a member of

21 our neighborhood group.

22          THE COURT:  Any other involvement of any kind

23 in political campaigns?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  And in answer to the question of

1 whether you have strong opinions, positive or
2 negative, about politics, your answer was, "all
3 groups or affiliations your involved with are
4 bipartisan which is what I believe is essential," is
5 that still true?
6        PROSPECTIVE JUROR:  Yeah, I believe that all
7 views need to be shared in order to lead properly.
8        THE COURT:  And you have heard or read
9 something about this case, is that correct?
10        PROSPECTIVE JUROR:  Just the headlines.  I
11 haven't watched any shows or really read any
12 articles.
13        THE COURT:  Do you spend a lot of time
14 watching television or listen to radio?
15        PROSPECTIVE JUROR:  I don't find much time
16 for that.
17        THE COURT:  I'm assuming from your answer,
18 from your other answers, that your husband's
19 description of you as a full-time volunteer is
20 probably correct?
21        PROSPECTIVE JUROR:  Probably, yes.
22        THE COURT:  Okay.  Thank you.
23     (Prospective juror exited the courtroom, and the
24      following proceedings were had herein:)
25     (Brief pause)

:18AM :18AM :19AM :19AM :19AM

1          (Prospective juror entered the courtroom, and
2           the following proceedings were had herein:)
3               THE COURT:  You're number 133?
4               PROSPECTIVE JUROR:  Yes, sir.
5               THE COURT:  When did you have your hip
6      replacement?
7               PROSPECTIVE JUROR:  2000, sir, but it's worn
8      out now.
9               THE COURT:  You mean the hip has worn out?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  You're going to have to have
12     another one?
13              PROSPECTIVE JUROR:  (Nodding).
14              THE COURT:  Do you have that scheduled?
15              PROSPECTIVE JUROR:  I was told to live with
16     it as long as I could before I proceeded that way.
17              THE COURT:  It says that you're unable to sit
18     or stand for any long period of time.  How long are
19     you able to sit or stand?
20              PROSPECTIVE JUROR:  Between 20 and
21     30 minutes, sir.
22              THE COURT:  Okay.  And if you sit for 20 or
23     30 minutes, you then have to stand up?
24              PROSPECTIVE JUROR:  Yes, sir.
25              THE COURT:  And for how long do you stand up.

1           PROSPECTIVE JUROR:  10 minutes maybe,
2      5 minutes.
3           THE COURT:  What did you do when you worked?
4           PROSPECTIVE JUROR:  I was a supervisor in a
5      manufacturing plant.
6           THE COURT:  How many people did you
7      supervise?
8           PROSPECTIVE JUROR:  Between 30 and 40.
9           THE COURT:  And for how long did you do that?
10          PROSPECTIVE JUROR:  Around 18 years, maybe,
11     once I left the military.
12          THE COURT:  Okay.  You were in the United
13     States Marine Corps?
14          PROSPECTIVE JUROR:  Yes, sir.
15          THE COURT:  How long were you there?
16          PROSPECTIVE JUROR:  15 years.
17          THE COURT:  What was your rank and discharge?
18          PROSPECTIVE JUROR:  Staff sergeant under
19     medical.
20          THE COURT:  And where did you serve?
21          PROSPECTIVE JUROR:  Beirut Lebanon.
22          THE COURT:  Anywhere else?
23          PROSPECTIVE JUROR:  Stationed in Japan and in
24     the Mediterranean.
25          THE COURT:  Why did you leave after 15 years?

1          PROSPECTIVE JUROR:  Because of my injuries

2    that I received from Beirut Lebanon.

3          THE COURT:  Okay. And the only reason you

4    ever had a lawyer was for a personal matter, is that

5    correct?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  You watch a lot of television?

8          PROSPECTIVE JUROR:  Average, I guess, sir.

9    Average.

10          THE COURT:  Do you spend a lot of time

11    watching the news?

12          PROSPECTIVE JUROR:  Not very much.

13          THE COURT:  Do you have any hobbies?

14    Anything you like to do?

15          PROSPECTIVE JUROR:  Just basically archery,

16    and, like, landscaping kind of things.

17          THE COURT:  You heard or read something about

18    this case, is that correct?

19          PROSPECTIVE JUROR:  Yes, sir.  Just on the

20    news.

21          THE COURT:  You indicated that you were

22    currently unemployed and your benefits expired not

23    too many months off.  What benefits are those?

24          PROSPECTIVE JUROR:  I was currently on

25    unemployment, but now I believe I'm under social

1  security disability.  I haven't received any
2  official notification, but I did receive funds in
3  direct deposit.
4        THE COURT:  Okay.  And you do understand
5  you're paid for jury service?
6        PROSPECTIVE JUROR:  Yes, sir.
7        THE COURT:  My question to you is, with
8  respect to your sitting and standing, jurors sit
9  most of the time, and I guess that would be
10  difficult for you to do, is that correct?
11        PROSPECTIVE JUROR:  It makes me awful
12  restless, sir, and then my legs go numb and that's
13  my issue to that.
14        THE COURT:  My question to you is, and this
15  has happened before in courtrooms, and what we can
16  arrange for you to do is, you'd be in the back row,
17  you would sit and you would be entitled to stand up
18  periodically and then sit back down again.  If you
19  were allowed to do that, do you think it would be
20  possible for you to serve as an attentive juror?
21        PROSPECTIVE JUROR:  Yes, sir.
22        THE COURT:  Okay.  Thank you.
23     (Prospective juror exited the courtroom, and the
24      following proceedings were had herein:)
25     (Brief pause)

1     (Prospective juror entered the courtroom, and

2      the following proceedings were had herein:)

3          THE COURT:  Hello.

4          PROSPECTIVE JUROR:  Hi.

5          THE COURT:  You're number 134?

6          PROSPECTIVE JUROR:  Correct.

7          THE COURT:  I'm probably not going to call

8  you 134.  I'm going to use "you" because it's pretty

9  awkward to call somebody 134.

10         I have read the questionnaire and the lawyers

11 and parties in this case have read it, so I'm not

12 going to go down each question, I'm just going to

13 ask you a few.

14         PROSPECTIVE JUROR:  Sure.

15         THE COURT:  What do you do in your full-time

16 employment?

17         PROSPECTIVE JUROR:  I'm a branch manger for

18 Banco Popular.

19         THE COURT:  And how long have you had that

20 job?

21         PROSPECTIVE JUROR:  I've been there since

22 May of 2007.

23         THE COURT:  And there's a reference here to

24 DCFS youth outreach?

25         PROSPECTIVE JUROR:  Correct.  Previously, my

1  previous employment before going to the bank

2  industry, was working with these outreach services

3  which works with DCFS as a case manger.

4          THE COURT:  Okay.  And was that -- that was

5  an employment relationship?  You were employed by

6  them?

7          PROSPECTIVE JUROR:  Correct.

8          THE COURT:  And how long ago was that?

9          PROSPECTIVE JUROR:  I was there from '01 to

10 about '03.  End of '03 or early '04.

11         THE COURT:  Okay.  And how many people do you

12 supervise in the branch?

13         PROSPECTIVE JUROR:  There's 7 of us at the

14 branch.

15         THE COURT:  How large is the branch building?

16         PROSPECTIVE JUROR:  It's a transitional

17 branch with director.

18         THE COURT:  Okay.  And what's the Division

19 Street Business Society Association?

20         PROSPECTIVE JUROR:  The Division Street

21 Business Association is, basically, we help new

22 businesses have a business plan and provide kind of

23 like offices for start-ups that help -- we kind of

24 help them and guide them to get into, you know,

25 their own locations, be able to buy their own store,

1 their own business.  Kind of, like, get them

2 started, so that when they start, you know, they

3 have a good foundation so that they don't, you know,

4 basically file for bankruptcy.

5     THE COURT:  And your husband works in the

6 family business?

7     PROSPECTIVE JUROR:  Correct.

8     THE COURT:  Have you ever worked in that

9 business?  Helped out in any way?

10     PROSPECTIVE JUROR:  Only maybe, like, doing

11 demos, sampling at stores.

12     THE COURT:  Okay.  You like your work?

13     PROSPECTIVE JUROR:  Yes, I do.

14     THE COURT:  You indicate that you

15 occasionally have to testify in court or at hearings

16 with your Outreach?

17     PROSPECTIVE JUROR:  Correct.

18     THE COURT:  Was that often?

19     PROSPECTIVE JUROR:  I was in juvenile court

20 almost weekly.  You know, we'll terminate parental

21 rights, we give statuses as to the biological

22 parents, whether they working with us, were they not

23 working with us.  If we felt that the biological

24 parents weren't making anymore improvements, they

25 weren't really putting in the effort, then I would

1  petition for termination of parental rights and look

2  for an adoption home, and then once I was able to

3  find one, then I would also help fill out the

4  adoption paperwork, and so forth.

5          THE COURT:  And in that role, you, obviously,

6  dealt with people in the State's Attorney's Office,

7  is that correct?

8          PROSPECTIVE JUROR:  Correct.

9          THE COURT:  And that was, like, weekly, once

10 a week, maybe?

11         PROSPECTIVE JUROR:  It varied.  I had a lot

12 of cases, so, you know, it could have been one week,

13 you know, I had one case, the following week was

14 another case, or sometimes I had two in a week, or

15 sometimes I'd go three weeks without having to go to

16 court.  It was very sporadic and based on the

17 situation, the case.

18         THE COURT:  Were you, on an overall basis,

19 satisfied or dissatisfied with the work done in the

20 courtroom?

21         PROSPECTIVE JUROR:  I was satisfied, yeah.

22         THE COURT:  Okay.

23         THE COURT:  And on one occasion you assisted

24 the Federal Bureau of Investigation, is that

25 correct?

1      PROSPECTIVE JUROR:  That is correct.

2      THE COURT:  How long ago was that?

3      PROSPECTIVE JUROR:  Probably, I would say, in

4  late 2000, early '01, right before my graduation.

5      THE COURT:  S it was sometime ago.

6      PROSPECTIVE JUROR:  Yeah.  It was during the

7  time that I worked in a medical office that the FBI

8  came in requesting information.

9      THE COURT:  And did you deal with one

10  particular FBI agent?

11      PROSPECTIVE JUROR:  No, it was just a

12  multitude of people that came in.

13      THE COURT:  On the basis of your experience,

14  I'm going to ask you a question, some of the

15  witnesses in this case are going to be FBI agents

16  and you're going to have to judge whether they're

17  telling the truth or not, and my question is, would

18  your prior dealings with other FBI agents make it

19  difficult for you to be an honest judge of the

20  testimony of an FBI agent?

21      PROSPECTIVE JUROR:  No; probably not.

22      THE COURT:  I notice in "primary leisure

23  activities" you listed spending time with your two

24  children.

25      PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Before you had the two children,

2 did you have other leisure activities?

3      PROSPECTIVE JUROR:  Sports; swim.

4      THE COURT:  Do you spend a lot of time

:33AM   5 watching news or listening to news on the radio?

6      PROSPECTIVE JUROR:  I listen to news, well,

7 daily, and in the car, in the morning on my way to

8 work, before dropping the kids off, and then most

9 likely in the evenings on my way home.  But just

:34AM  10 like anything, I flip through the channels and

11 listen to the commentaries.

12      And during work, since I do work in a

13 financial institute, I am aware of -- you know, I'm

14 up to date.  But, for the most part, I usually do,

:34AM  15 like, by the time I get home, I just kind of

16 disconnect and spend time with my kids.

17      THE COURT:  There's a huge list of names that

18 we gave you in the questionnaire and you indicated

19 that two of those people you knew and you indicated

:34AM  20 that these are not people that you have close

21 relationships with, is that correct?

22      PROSPECTIVE JUROR:  That's correct.

23      THE COURT:  Now, you have heard something

24 about this case?

:35AM  25      PROSPECTIVE JUROR:  Yeah; I don't really

1  follow it, per se, but, you know, it's been all over
2  the news.  It's kind of difficult not to hear it.
3        THE COURT:  Right.  Am I correct to say that
4  you've heard something about this case because you
5  really couldn't avoid hearing something about this
6  case?
7        PROSPECTIVE JUROR:  Yes.
8        THE COURT:  Okay.  You did answer one
9  question that I want to ask you about, and the
10 question was, basically that we are going to advise
11 you not to read about case or listen about the case,
12 and I don't think you indicated any problem with
13 that, but it also said that the court will advise
14 you that you must avoid discussing this case with
15 friends or family during the course of the trial,
16 and you indicated that possibly that might be
17 difficult for you.  Would you tell me why?
18       PROSPECTIVE JUROR:  It's all over the news.
19 People talk about it all the time.  Even though I
20 don't choose to talk about it, I don't sit there and
21 actively look for it in conversation, but, you know,
22 just the normal -- it's on TV, it's on the radio.
23 It's kind of difficult, you know, to turn off the
24 radio, and turn off the TV, and turn off the news,
25 turn off, you know, just completely isolate myself.

1  And that's what I meant by saying it. It's not like
2  I'm actively looking for it.  I'm not actively going
3  into the newspaper to look for it or looking at CNN,
4  and so forth.  You know, it's all around.  So, you
5  know, if I bump into it, it's not like I'm actually
6  going to sit there and read it.
7        THE COURT:  So it's the media that you think
8  you would find difficult to avoid?
9        PROSPECTIVE JUROR:  Correct.
10       THE COURT:  Okay.  What my instruction would
11 be is that if you start to hear a broadcast, you're,
12 obviously, going to hear the first few words.  My
13 instruction is to turn it off, walk out of the room,
14 or do something like that, would you be able to do
15 that?
16       PROSPECTIVE JUROR:  I should be able to,
17 yeah.
18       THE COURT:  Okay.  And would you be able to
19 avoid discussing this with other people?
20       PROSPECTIVE JUROR:  Yes.
21       THE COURT:  Thank you.
22    (Prospective juror exited the courtroom8, and
23     the following proceedings were had herein:)
24
25    (Brief pause)

1          (Prospective juror entered the courtroom, and
2           the following proceedings were had herein:)
3             THE COURT:  Number 135?
4             PROSPECTIVE JUROR:  Yes, sir.
5             THE COURT:  The lawyers, everyone inside this
6  case, have all read the questionnaire, so I'm not
7  going to ask you all of those questions all over
8  again, I just have a few specific ones.
9             Were you born in the camp at Madison?
10            PROSPECTIVE JUROR:  Yes, I was.
11            THE COURT:  And what year was that?
12            PROSPECTIVE JUROR:  1944.
13            THE COURT:  You have a college degree and
14  postgraduate work, too?
15            PROSPECTIVE JUROR:  Yes, I do.
16            THE COURT:  And you're now retired?
17            PROSPECTIVE JUROR:  Yes.
18            THE COURT:  And before you retired, for
19  28 years you were a videotape librarian, is that
20  correct?
21            PROSPECTIVE JUROR:  That's correct.
22            THE COURT:  And you, obviously, have skills
23  having to do with automobiles?
24            PROSPECTIVE JUROR:  Yes.
25            THE COURT:   Where did you acquire those

1  skills?

2        PROSPECTIVE JUROR:  I went to trade school

3  after high school.

4        THE COURT:  You were employed by the Postal

5  Service, as well?

6        PROSPECTIVE JUROR:  That's correct.

7        THE COURT:   For how long?

8        PROSPECTIVE JUROR:  2 years.

9        THE COURT:  And, after that you, were a

10  United States marine?

11        PROSPECTIVE JUROR:  That's correct.

12        THE COURT:  What was your rank and discharge?

13        PROSPECTIVE JUROR:  Staff sergeant.

14        THE COURT:  And where did you serve?

15        PROSPECTIVE JUROR:  Camp Pendelton,

16  California, and Okinawa and Vietnam.

17        THE COURT:  And the only time you ever

18  consulted with a lawyer was with respect to buying a

19  house?

20        PROSPECTIVE JUROR:  That's correct, Your

21  Honor.

22        THE COURT:  You did serve on a jury?

23        PROSPECTIVE JUROR:  Yes; once.

24        THE COURT:  And that was a criminal case?

25        PROSPECTIVE JUROR:  Yes, it was.

1      THE COURT:  And the jury did reach a verdict?

2      PROSPECTIVE JUROR:  Yes.

3      THE COURT:  And it was a long time ago?

4      PROSPECTIVE JUROR:  Yes, it was.

5      THE COURT:  What do you spend most of your

6  time doing these days?

7      PROSPECTIVE JUROR:  Oh, going to fitness

8  center, going to gardens with my wife.

9      THE COURT:  Your wife is still employed?

10     PROSPECTIVE JUROR:  No, she's retired also.

11     THE COURT:  And she was a school teacher?

12     PROSPECTIVE JUROR:  Chicago public schools,

13 yes.

14     THE COURT:  Still interested in cars?

15     PROSPECTIVE JUROR:  Yes.

16     THE COURT:  The question "do you or a family

17 member have a website or a blog."  You or a family

18 member?

19     PROSPECTIVE JUROR:  A family member; a niece.

20     THE COURT:  A niece?

21     PROSPECTIVE JUROR:  A niece.

22     THE COURT:  Okay.  Do you blog yourself?

23     PROSPECTIVE JUROR:  No, I don't.

24     THE COURT:  You have, obviously, seen or

25 heard or read things about this case, is that

1  correct?

2          PROSPECTIVE JUROR:  Yes, I have.

3          THE COURT:  And you've indicated what you've

4  heard is what people have been doing and saying and

5  it's both sides of the case, is that correct?

6          PROSPECTIVE JUROR:  That's correct.

7          THE COURT:  Other than your time serving on a

8  jury, have you ever spent any time in a courtroom?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Thank you.

11      (Prospective juror exited the courtroom, and the

12       following proceedings were had herein:)

13      (Brief pause)

14      (Prospective juror entered the courtroom, and

15       the following proceedings were had herein:)

16         THE COURT:  136?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  I'm not going to go every

19  question in the questionnaire, I'm just going to ask

20  you a few things.

21         PROSPECTIVE JUROR:  Okay.

22         THE COURT:  You work in your own company?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Basically, printing work?

25         PROSPECTIVE JUROR:  Correct.

:42AM
:42AM
:43AM
:43AM
:44AM

1          THE COURT:  It says you've been at this
2   employment 23 years.
3          PROSPECTIVE JUROR:  Correct.
4          THE COURT:  Is that when you started the
5   company?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  What did you do before then?
8          PROSPECTIVE JUROR:  I worked in automobile
9   dealerships in the parts department.
10         THE COURT:  And why did you pick printing?
11         PROSPECTIVE JUROR:  My family had a print
12  shop when I was a child.
13         THE COURT:  You like the smell of the print
14  shop?
15         PROSPECTIVE JUROR:  I'm familiar with it,
16  yes.
17         THE COURT:  Yes.
18         You have employees?
19         PROSPECTIVE JUROR:  My wife is my partner, we
20  work together every day, and we have one part-time
21  employee.
22         THE COURT:  How's business?
23         PROSPECTIVE JUROR:  It's picking up.
24         THE COURT:  And I guess the only contact
25  you've had, employment contact, is your spouse

1  worked as a real estate paralegal for a lawyer, is
2  that correct?
3         PROSPECTIVE JUROR:  Yeah; like 12 years ago,
4  I believe, 15.
5         THE COURT:  The incident with your nephew,
6  you don't know what happened with that case?
7         PROSPECTIVE JUROR:  I do.
8         THE COURT:  You do?
9         PROSPECTIVE JUROR:  I do know the
10 circumstance.  He was unhappy with his boss and he
11 robbed his house.
12        THE COURT:  Okay.  Did you think he was
13 treated fairly in court?
14        PROSPECTIVE JUROR:  I think he was treated
15 more than fairly.
16        THE COURT:  You've been involved with two
17 lawsuits, one of which was a suit you brought that
18 was settled this year, is that correct?
19        PROSPECTIVE JUROR:  Correct.
20        THE COURT:  Were you reasonably satisfied
21 with the settlement?
22        PROSPECTIVE JUROR:  Time-wise, I think it was
23 perfect.
24        THE COURT:  Okay.  And the lawsuit involving
25 the accident, what happened with that?

voir dire examination                    235

1          PROSPECTIVE JUROR:  I was involved where a

2   motorcycle rode into the side of me and it was just

3   settled through insurance.

4          THE COURT:  Okay.  Other than that, basically

5   the reason you deal with lawyers is related to your

6   business, is that correct?

7          PROSPECTIVE JUROR:  No -- well, yes.  Yes.

8   Yes.  I do deal with them through the business, yes.

9          THE COURT:  The incident that happen with

10  your brother, with the loss of his job, how long ago

11  was that?

12         PROSPECTIVE JUROR:  I think, roughly, 5 years

13  ago.

14         THE COURT:  Okay.  Is he employed again?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  The answer to the question about

17  some involvement of someone you knew hiring or

18  working with a lobbyist, you indicated that you

19  weren't aware of it until after that had occurred?

20         PROSPECTIVE JUROR:  Correct.

21         THE COURT:  Was this a relative or someone

22  you knew?

23         PROSPECTIVE JUROR:  A relative.

24         THE COURT:  Okay.  Can I infer from that that

25  this was not somebody who is particularly close to

1    you or was it just something you didn't know?

2         PROSPECTIVE JUROR:  I didn't know.

3         THE COURT:  And your opinion about it is

4    essentially neutral, is that correct?

5         PROSPECTIVE JUROR:  Correct.

6         THE COURT:  How many hours a week do you

7    work?

8         PROSPECTIVE JUROR:  It depends on how busy

9    you are.  It could be anywhere from 30 to 60.

10        THE COURT:  Okay.  If you're not too busy, do

11   you have any hobbies?  Things you like to do?

12        PROSPECTIVE JUROR:  Just spend time with my

13   children and read the business books; pretty boring.

14        THE COURT:  Are you somebody who closely

15   follows the news?

16        PROSPECTIVE JUROR:  My wife would say yes.

17        THE COURT:  Your wife would say yes?

18        PROSPECTIVE JUROR:  My wife would say yes, I

19   would say --

20        THE COURT:  You're not admitting it one way

21   or the other?

22        PROSPECTIVE JUROR:  I would say it's average.

23        THE COURT:  You or a family member have a

24   website or a blog?

25        PROSPECTIVE JUROR:  Yes.

1          THE COURT:  A website or a blog, which one,

2  or both?

3          PROSPECTIVE JUROR:  I would say it's probably

4  both.

5          THE COURT:  Does your business have a

6  website?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  Do you get a lot of business over

9  the website?

10         PROSPECTIVE JUROR:  I do okay with it.

11         THE COURT:  Now, you have heard or read about

12  this case, is that correct?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Would anything you saw or heard

15  or read affect your ability to be fair in this case?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Do you understand that the

18  decision here has to be made on what you hear in the

19  courtroom and not at all on anything you heard or

20  read outside the courtroom, do you understand that?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Would it be difficult for you to

23  do that?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Thank you.

:49AM

:49AM

:50AM

:50AM

:50AM

1          PROSPECTIVE JUROR:  Thank you.

2       (Prospective juror exited the courtroom, and the

3        following proceedings were had herein:)

4       (Brief pause)

5       (Prospective juror entered the courtroom, and

6        the following proceedings were had herein:)

7          THE COURT:  I know you have a real name, but

8    in this courtroom you're 137 for a while.

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  You checked both employed full

11   time and retired.

12         PROSPECTIVE JUROR:  Yes; I'm employed

13   full-time, I'm retired from the U.S. Navy.

14         THE COURT:  And your current full-time

15   employment?

16         PROSPECTIVE JUROR:  Jobs and controls.

17         THE COURT:  And what do you do for them?

18         PROSPECTIVE JUROR:  I'm a service operations

19   agent.

20         THE COURT:  Would you tell me what that

21   means?

22         PROSPECTIVE JUROR:  Sure.  I manage 56 about

23   contracts per building, automation controls down in

24   the metro area of the city.

25         THE COURT:  And how long have you worked for

1  them?

2          PROSPECTIVE JUROR:  This current, time, I've

3  worked for them for about 3 years.  I got downsized

4  once, so I left the company for 2 years, but before

5  that I had worked for them for 5 years.  So a total

6  of 8 years.

7          THE COURT:  You were in the United States

8  Navy?

9          PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  For how long ago?

11          PROSPECTIVE JUROR:  21 years, 3 months,

12  6 days.

13          THE COURT:  You retired as commander?

14          PROSPECTIVE JUROR:   Yes, sir.

15          THE COURT:  Where were you stationed?  What

16  tours?

17          PROSPECTIVE JUROR:  Primarily on the East

18  Coast.  I did have a tour in Germany at their Naval

19  Academy as an exchange officer, and I had a tour in

20  London working for the military Sea Lift command.

21  Most of my seagoing time was either out of

22  Charleston or Jacksonville.  Did three or four trips

23  to the Meg, and about the same number of trips to

24  the Persian Gulf, and spent one tour on the U.S.

25  Sincom in Tampa, Florida which happened to coincide

1  with Desert Storm, so I deployed for 8 months.

2          THE COURT:  What sort of vessels?

3          PROSPECTIVE JUROR:  Frigates and guided

4  missile destroyers.

5          THE COURT:  Your father was in the Navy too?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR: He was probably in for 28,

9  30 years.

10          THE COURT:  You contribute to the Naval

11  Institute and the Naval Academy Alumni Association?

12          PROSPECTIVE JUROR:  That's correct.

13          THE COURT:  Anything else?

14          PROSPECTIVE JUROR:  American Cancer Society

15  and the Diabetes Association.  My older son has

16  diabetes.

17          THE COURT:  What do you do when you're not

18  working?

19          PROSPECTIVE JUROR:  You mean if I'm off on

20  vacation, like?

21          THE COURT:  For leisure.

22          PROSPECTIVE JUROR:  I read books, I mess

23  around on the computer a little bit.  I'm not as

24  active as I once was.  I used to love to sale, but

25  the opportunities just haven't presented themselves.

1       THE COURT:  It says here you also do computer
2  strategy games.
3       PROSPECTIVE JUROR:  Mess around on the
4  computer, stuff like civilization ...
5       THE COURT:  Do you mostly win or lose?
6       PROSPECTIVE JUROR:  I try to win.  If I don't
7  like the way it's going, I start --
8       THE COURT:  Start over.
9       You have heard or read about this case, is
10 that correct?
11      PROSPECTIVE JUROR:  Well, of course, you
12 know, back when it first happened I saw, you know,
13 the news blurbs on the impeachment, and whatnot,
14 but, you know, daily information I don't have, no.
15      THE COURT:  When there started to be news
16 coverage about this, did you go and seek out more
17 news coverage or did you just --
18      PROSPECTIVE JUROR:  No, I didn't.  You know,
19 I took it as it came.
20      THE COURT:  Anything about what you remember
21 affect your ability to put that out of your mind and
22 decide the case hearing the evidence?
23      PROSPECTIVE JUROR:  No, I think what's
24 probably a benefit is that I didn't collect a lot of
25 background reporting, if you will.

1          THE COURT:  Thank you.

2       (Prospective juror exited the courtroom, and the

3        following proceedings were had herein:)

4       (Brief pause)

5       (Prospective juror entered the courtroom, and

6        the following proceedings were had herein:)

7          THE COURT:  You're juror number 138?

8          PROSPECTIVE JUROR:  Yes, I am.

9          THE COURT:  I'm going to go over some of the

10   things that are in the questionnaire.  I've read it,

11   so I'm not going to do everything, and then I will

12   ask you some questions about your request for

13   deferral.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  You're employed in a hospital

16   administration?

17          PROSPECTIVE JUROR:  Yes, I am.

18          THE COURT:  And you've been in the same place

19   for a very long time?

20          PROSPECTIVE JUROR:  42 years.

21          THE COURT:  And it basically says here that

22   you do facilities work, is that correct?

23          PROSPECTIVE JUROR:  That's correct.

24          THE COURT:  And you've been doing that same

25   sort of work all the time you've been there?

:56AM

:57AM

:57AM

:57AM

:57AM

1          PROSPECTIVE JUROR:  As vice president of
2    operations for over 15 years.
3          THE COURT:  Okay.  So there were periods of
4    time where you supervised a very large number of
5    people, is that correct?
6          PROSPECTIVE JUROR:  Correct.
7          THE COURT:  The business dealing with
8    polters, is that your biggest or is it somebody
9    else's?
10          PROSPECTIVE JUROR:  It was my business.
11          THE COURT:  And is it still around?
12          PROSPECTIVE JUROR:  No; ran it about 6 years
13    in the '70s.
14          THE COURT:  Working in hospitals is a family
15    inheritance in your case?
16          PROSPECTIVE JUROR:  Yes, it is.
17          THE COURT: And the only reason you've ever
18    consulted a lawyer was in connection with a personal
19    matter?
20          PROSPECTIVE JUROR:  Correct.
21          THE COURT:  You have a generally negative
22    impression of politicians?
23          PROSPECTIVE JUROR:  In general, yes.
24          THE COURT:  Which leads to my next question:
25    Is it your view that some are okay and some are not

1 okay?

2          PROSPECTIVE JUROR:  Correct.

3          THE COURT:  You have a hobby, something you

4 like to do?

5          PROSPECTIVE JUROR:  I work on my antique car.

6          THE COURT:  And how old are those antique

7 cars?

8          PROSPECTIVE JUROR:  It's a 1984 50 SL.

9          THE COURT:  And how old does the car have to

10 be to be an antique?

11          PROSPECTIVE JUROR:  25 years.

12          THE COURT:  Okay.  I ask because I have one.

13          You spend a lot of time watching news?

14          PROSPECTIVE JUROR:  Not too much.

15          THE COURT:  You make it a point to watch the

16 news?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  You indicate that you know one of

19 the individuals on that very long list --

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  -- that we gave you.

22          And that's a person that's involved in

23 construction, is that correct?

24          PROSPECTIVE JUROR:  Right.

25          THE COURT:  And it says that you've known

:00PM

:00PM

:00PM

:01PM

:01PM

1  this person for a couple of years, is that correct?

2          PROSPECTIVE JUROR:  I knew him for a couple

3  of years because his construction company built the

4  hospital professional building.

:01PM  5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Did you have much interaction

7  with him?

8          PROSPECTIVE JUROR:  Average.

9          THE COURT:  Okay.  Was your relationship with

:01PM 10  him purely business or was there some social aspect

11  to it?

12          PROSPECTIVE JUROR:  Purely business.

13          THE COURT:  Will your relationship with him

14  influence in any way your decision on this case?

:01PM 15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Anything you've seen or heard

17  about this case affect your ability to be fair and

18  impartial?

19          PROSPECTIVE JUROR:  I think I can be fair and

:02PM 20  impartial, yes.

21          THE COURT:  What kind of dealings have you

22  had with law enforcement officers?

23          PROSPECTIVE JUROR:  Well, my son has his

24  degree in criminal justice.

:02PM 25          THE COURT:  Have you personally spent a lot

1  of time dealing with law enforcement officers?

2          PROSPECTIVE JUROR:  Not a lot, no.

3          THE COURT:  But some?

4          PROSPECTIVE JUROR:  But some.

5          THE COURT:  Do you deal -- have you dealt at

6  all with the security people at the hospital?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:    And that was when you were

9  doing operations?

10          PROSPECTIVE JUROR:  Correct.

11          THE COURT:  With respect to your deferral, I

12  would consider the deferral, but you're going to

13  have to provide certain documents and the jury

14  people will tell you what that is.

15          PROSPECTIVE JUROR:  Okay.

16          THE COURT:  And then I'll reach a decision.

17          PROSPECTIVE JUROR:  Okay.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR:  Thank you.

20      (Prospective juror exited the courtroom, and the

21       following proceedings were had herein:)

22      (Brief pause)

23

24

25          THE COURT:  We're going to break now and

1  we'll resume again at 1:15.

2

3

4      (Luncheon recess taken from 12:03 o'clock p.m.

5       to 1:15 o'clock p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )   No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )   Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )   June 4, 2010
   ROBERT BLAGOJEVICH,            )
7                                 )
             Defendants.          )   1:22 o'clock a.m.
8

9                   VOLUME 3
             TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE JAMES B. ZAGEL
                   AND A JURY
11

12
   For the Government:
13
             THE HONORABLE PATRICK J. FITZGERALD,
14           UNITED STATES ATTORNEY
             BY:  Reid J. Schar
15                Carrie E. Hamilton
                  Christopher Niewoehner
16           Assistant United States Attorneys
             219 South Dearborn Street
17           Suite 500
             Chicago, Illinois 60604
18

19

20
   Court Reporter:
21
             Blanca I. Lara, CSR, RPR
22           219 South Dearborn Street
                   Room 2504
23           Chicago, Illinois 60604
                  (312) 435-5895
24

25

APPEARANCES   (continued:)


For Defendant Rod Blagojevich:

          KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
          158 West Erie
          Chicago, Illinois 60610
          (312) 640-1776

          LAW OFFICE OF SAMUEL E. ADAM
          BY:  Samuel Forbes Adam
               Samuel Adams, Jr.
          6133 South Ellis Avenue
          Suite 200
          Chicago, Illinois 60637
          312-726-2326


          OFFICES OF AARON B. GOLDSTEIN
          BY: Aaron Benjamin Goldstein
          6133 South Ellis
          Chicago, Illinois 60637
          (773) 752-6950

          OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
          2140 N. Lincoln Park West
          Suite 307
          Chicago, Illinois 60614
          (773) 517-0622

          LAW OFFICES of MICHAEL GILLESPIE
          BY:  MICHAEL GILLESPIE
          53 West Jackson Boulevard
          Suite 1420
          Chicago, Illinois 60604
          (312) 726-9015

1  APPEARANCES   (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were had in open
2       court:)
3          THE CLERK:  2008 CR 888, United States versus
4    Blagojevich.  The court resumes in sessions.
:27AM   5      (Brief pause)
6      (Prospective juror entered the courtroom, and
7       the following proceedings were had herein:)
8          THE COURT:  You are number 140?
9          PROSPECTIVE JUROR:  Yes, sir.
:27PM  10          THE COURT:  The lawyers and I have read the
11    questionnaires, so I'm not going to go over each
12    question with you.  I just want to talk to you about
13    a few things.
14          You have a graduate degree and your major
:27PM  15    areas of study were biology and civil engineering?
16          PROSPECTIVE JUROR:  Correct.
17          THE COURT:  And you're currently employed as
18    a civil engineer, is that correct?
19          PROSPECTIVE JUROR:  Right.
:28PM  20          THE COURT:  What sort of stuff do you do?
21          PROSPECTIVE JUROR:  We are primarily road and
22    bridge design firm.
23          THE COURT:  Building bridges, design firm.
24          And how long have you worked with your
:28PM  25    present employer?

1        PROSPECTIVE JUROR:  It was 4 years in
2   January.  So 4 years, 5 months about.
3        THE COURT:  And before that?
4        PROSPECTIVE JUROR:  I spent a couple of years
5   in school, and then prior to that I worked for
6   another consulting firm.
7        THE COURT:  Doing the same kind of work?
8        PROSPECTIVE JUROR:  Similar.  More along the
9   lines of environmental construction, management-type
10  work.
11       THE COURT:  You supervise people?
12       PROSPECTIVE JUROR:  Depending on the project
13  size, yes.
14       THE COURT:  What's the most you supervised?
15       PROSPECTIVE JUROR:  Anywhere from maybe one
16  to five.
17       THE COURT:  All right.  And your parents had
18  their own business?
19       PROSPECTIVE JUROR:  Small, janitorial
20  company, yes.
21       THE COURT:  Did you help out at all?
22       PROSPECTIVE JUROR:  I did.
23       THE COURT:  Okay.  A lot or a little?
24       PROSPECTIVE JUROR:  I worked there all during
25  high school and then afterwards as well.

1       THE COURT:  And your spouse is a certified

2  public accountant?

3       PROSPECTIVE JUROR:  Correct.

4       THE COURT:  And the only time you hired a

:29PM  5  lawyer was with a dispute with a former landlord?

6       PROSPECTIVE JUROR:  That's correct.

7       Well, other than real estate transactions.

8       THE COURT:  Other than real estate.

9       PROSPECTIVE JUROR:  Yes.

:29PM  10      THE COURT:  How did the dispute work out?

11      PROSPECTIVE JUROR:  We ended up agreeing to

12  go our separate ways without any further contact

13  with each other.

14      THE COURT:  Okay.  What do you do when you're

:30PM  15  not working?

16      PROSPECTIVE JUROR:  My wife and I run, I like

17  to play golf whenever I can.

18      THE COURT:  What kind of running?

19      PROSPECTIVE JUROR:  We -- we just recently

:30PM  20  ran 10-mile, the Soldier Field 10-mile, so ...

21      THE COURT:  And how often do you run?

22      PROSPECTIVE JUROR:  As often as we can.

23      THE COURT:  How many times a week?

24      PROSPECTIVE JUROR:  Three to four.

:30PM  25      THE COURT:  Okay.  Do you run together?

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  You run at the same pace?

3        PROSPECTIVE JUROR:  We do.

4        THE COURT:  Does one of you have to hold

5    back?

6        PROSPECTIVE JUROR:  Occasionally.

7        THE COURT:  I'm not going to ask you which

8    one.

9        PROSPECTIVE JUROR:  It varies.

10       THE COURT:  When did you start doing that,

11   incidentally?

12       PROSPECTIVE JUROR:  Pardon?

13       THE COURT:  When did you start running?

14       PROSPECTIVE JUROR:  I started running when I

15   was maybe 10 or 11, my wife did as well.  We

16   restarted again when we were together in Michigan.

17       THE COURT:  Has your firm done any work with

18   Illinois Department of Transportation or the Toll

19   Highway Authority?

20       PROSPECTIVE JUROR:  Yes, sir.

21       THE COURT:  Have you personally worked on

22   those projects?

23       PROSPECTIVE JUROR:  Yes, sir.

24       THE COURT: And what's the most recent of

25   those?

1        PROSPECTIVE JUROR:  For IDOT?

2        THE COURT:  For either one.

3        PROSPECTIVE JUROR:  For IDOT I worked on one

4   yesterday.

5        THE COURT:  On when?

6        PROSPECTIVE JUROR:  Yesterday.

7        THE COURT:  Oh, okay.

8        PROSPECTIVE JUROR:  When I was in the office.

9   Our current projects are IDOT and CDOT.

10       THE COURT:  Okay.  When you worked on these

11  projects, what kind of contact did you have--with

12  IDOT projects I'm talking about--when you worked on

13  IDOT projects, what kind of contact, at what level

14  were you dealing with IDOT officials?

15       PROSPECTIVE JUROR:  I'm primarily part of the

16  production.  So I've limited contact with IDOT

17  project managers or IDOT, you know, people.  That's

18  changed in the last year or so, particularly with

19  City of Chicago contract that I've been working on.

20       THE COURT:  With the State of Illinois

21  contracts, if you dealt at all, you dealt with the

22  regular professional staff of IDOT?

23       PROSPECTIVE JUROR:  Yes, that's correct.

24       THE COURT:  Anything about that experience

25  affect your ability to be fair here?

1          PROSPECTIVE JUROR:  I don't believe so.

2          THE COURT:  And you had indicated you heard

3   or read about this case?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  And you state that based on the

6   information that you've heard, you may have a bias

7   toward a verdict toward one side or the other, is

8   that correct?

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  Do you understand that, to decide

11  this case, you can consider only the evidence that

12  you hear in court, do you understand that?

13         PROSPECTIVE JUROR:  Yes, sir.

14         THE COURT:  And part of that means that you

15  have to ignore anything you have heard or read about

16  it before.  Do you think you'd be able to do that?

17         PROSPECTIVE JUROR:  I believe that I would.

18         THE COURT:  And what that means is, if you

19  formed some form of a tentative opinion, you'd have

20  to be able to put that tentative opinion aside, do

21  you understand that?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Would you be able to do that?

24         PROSPECTIVE JUROR:  Yes, I believe I would.

25         THE COURT:  You indicated that you have some

1  concerns about evaluating the testimony of

2  cooperating individuals.  And I think, based on your

3  comment, you understand what that means; that is,

4  usually people who have agreed to plead guilty and

5  have agreed in exchange for pleading to a

6  lesser charge or an exchange of a recommendation of

7  a lesser sentence they've agreed to testify in the

8  case, do you understand that?

9           PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  And you have some concern with

11  people like that, is that correct?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  When such people testify, I give

14  an instruction to the jury, as does every other

15  judge in this building, that people who have made

16  plea bargains with the government or received any

17  kind of benefit from the government, their testimony

18  can be considered but only with caution and great

19  care.  If that was the standard under which you

20  evaluated their testimony, do you believe you could

21  fairly evaluate their testimony?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  How many hours a week do you

24  work?

25          PROSPECTIVE JUROR:  40, minimum.  It can get

1 to be quite a bit more.

2       THE COURT:  Okay.  Do you get called in the

3 middle of a project when something is ongoing or is

4 it mostly in the planning stages?

5       PROSPECTIVE JUROR:   We're a design firm, so

6 we take it from, I guess, what will be beyond

7 planning stages.  When they want actually get

8 something ready for construction, our job is to put

9 together those plans that would ultimately be bid on

10 for construction.

11       THE COURT:  Okay.  Thank you.

12    (Prospective juror exited the courtroom, and the

13     following proceedings were had herein:)

14    (Brief pause)

15    (Prospective juror entered the courtroom, and

16     the following proceedings were had herein:)

17       THE COURT:  Hi.  You're number 141?

18       PROSPECTIVE JUROR:  Yes, sir.

19       THE COURT:  You're a college graduate?

20       PROSPECTIVE JUROR:  Yes, sir.

21       THE COURT:  What was your major?

22       PROSPECTIVE JUROR:  I have a double major, in

23 biology and classical civilization.

24       THE COURT:  And what kind of work do you do

25 now?

:36PM
:36PM
:37PM
:37PM
:37PM

voir dire examination                 259

 1          PROSPECTIVE JUROR:  I do a few things.  I
 2   work at Abbott Labs during the day, it's my
 3   full-time job as a contractor, as a research tech.
 4   I have a part-time job at Lutheran General Hospital
 5   as a lab assistant tech in the laboratory.  And I
 6   teach Croatia folklore at the Croatian Cultural
 7   Center in Chicago twice a week.
 8          THE COURT:  Did you study biology because you
 9   wanted to do the lab work or did you get the lab
10   work because you studied biology?
11          PROSPECTIVE JUROR:  I guess I -- I thought
12   about medical school before, but I also thought it
13   would be interesting to work in the laboratory, but
14   now I'm in a lab coat a lot in the week.
15          THE COURT:  The dog beach?
16          PROSPECTIVE JUROR:  Yes, sir.
17          THE COURT:  Does that take a lot of your
18   time?
19          PROSPECTIVE JUROR:  In the summertime it
20   does, particularly.
21          THE COURT:  And what kind of stuff -- I've
22   seen that beach.
23          PROSPECTIVE JUROR:  The Montrose Dog Beach?
24          THE COURT:  Yeah.
25          PROSPECTIVE JUROR:  Yeah.  It's a lot of

1  work.  I think people don't realize Montrose Dog

2  Beach is the most popular beach in Chicago.  So it's

3  just, you know, always having to enforce rules and

4  stuff, but I'm getting a tan and I'm with my dog and

5  my dad, so I'm okay.

6          THE COURT:  Do you still play the violin?

7          PROSPECTIVE JUROR:  Yes, sir.  I also teach

8  music and I'm in an orchestra.

9          THE COURT:  You said you or anyone close to

10 you ever owned a business.  Who is that?

11         PROSPECTIVE JUROR:  I have cousins in Croatia

12 who have businesses.

13         THE COURT:  Okay.  You did work for a

14 candidate and mayor in another state, is that

15 correct?

16         PROSPECTIVE JUROR:  I was in young democrats

17 when I was at the University of Dayton for 1 year.

18         THE COURT:  Right.

19         PROSPECTIVE JUROR:  So I didn't really do

20 much work 'cause I had too much school work, but I

21 did attend.  Like the day there was voting, I mean,

22 he lost anyway, but we had -- you know, all the

23 young dems went to, like, a party fundraiser for

24 him.

25         THE COURT:  And you did indicate that you had

1  one other dealing with a local official which left a

2  negative impression, is that correct?

3         PROSPECTIVE JUROR:  Yes.

4         THE COURT:  And it also says here that you

5  don't -- I'll rephrase it.  You don't have a lot of

6  faith in the truthfulness of politicians, is that

7  correct.

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Okay.  Do you listen to the news

10 a lot?

11        PROSPECTIVE JUROR:  I do.

12        THE COURT:  Do you seek out news?  Is that

13 something that you are particularly interested in?

14        PROSPECTIVE JUROR:  I do like to -- if I'm at

15 work or if I'm by the Internet I'll read abc.com.

16 We get the Trib and the Sun-Times at home.

17        THE COURT:  And you listen to the radio?

18        PROSPECTIVE JUROR:  I do.

19        THE COURT:  You listen to anything in

20 particular?

21        PROSPECTIVE JUROR:  In the morning time when

22 I'm driving to work I listen to Moody Christian

23 radio.

24        THE COURT:  How much family do you still have

25 in Croatia?

1          PROSPECTIVE JUROR:  My whole family is there.

2          THE COURT:  So only a small part that's here?

3          PROSPECTIVE JUROR:  My parents and me.

4          THE COURT:  Right.  How many hours a week do

5   you work?

6          PROSPECTIVE JUROR:  I work a lot.  I work

7   about 70.

8          THE COURT:  And how many of that is at

9   Abbott?

10          PROSPECTIVE JUROR:  Well, it's a full-time

11  job, so during the day, Monday through Friday.

12          THE COURT:  And the hospital?

13          PROSPECTIVE JUROR:  I work part-time there,

14  but I don't -- I work more days there, so I'll work

15  like 6 hours, 5 to 6 hours, but it's often about 6

16  to 7 days in the next week period, and then I work

17  Mondays and Thursdays at the Croatian center

18  teaching.  So I don't really have any free time.

19          THE COURT:  All right.  Thanks.

20          PROSPECTIVE JUROR:  Thank you.

21      (Prospective juror exited the courtroom, and the

22       following proceedings were had herein:)

23      (Brief pause)

24

25

1       (Prospective juror entered the courtroom, and
2        the following proceedings were had herein:)
3           THE COURT:  You're number 142?
4           PROSPECTIVE JUROR:  Yes, I am.
5           THE COURT:  I've read the questionnaire and
6    I'm not going to go over each question, just a few
7    things I want to touch on.
8           You're self-employed?
9           PROSPECTIVE JUROR:  Yes, I am.
10          THE COURT:  And what do you do?
11          PROSPECTIVE JUROR:  Graphic arts.
12          THE COURT:  How long have you done that?
13          PROSPECTIVE JUROR:  Since my first son was
14   born, 1985 -- 1995, I'm sorry.
15          THE COURT:  Do you have anybody who works
16   with you?
17          PROSPECTIVE JUROR:  Oh, I'm self-employed.
18          THE COURT:  How do you get your business?
19          PROSPECTIVE JUROR:  Through different
20   companies.  I just have a couple of clients that I
21   work for.  I don't, you know, really need to get
22   extra business.  I'm sort of doing it part-time
23   almost.  I've been, you know, in investments.
24          THE COURT:  These are computer arts and
25   computer drawings?

1          PROSPECTIVE JUROR:  Yeah.  Yeah.  Mostly CAD

2     drawings.

3          THE COURT:  Your spouse works for an

4     accounting firm?

5          PROSPECTIVE JUROR:  Yes, Clifton Gunderson.

6          THE COURT:  And what does she do there?

7          PROSPECTIVE JUROR:  Admin.

8          THE COURT:  Okay.  You served on a jury

9     before?

10          PROSPECTIVE JUROR:  Yes, I have.  A civil

11     jury.

12          THE COURT:  Did the jury reach a verdict?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Based on your experience, you

15     thought the extraverted jurors controlled the jury?

16          PROSPECTIVE JUROR:  Yeah.  Uh-huh.

17          THE COURT:  Now, were you one of the

18     extraverted jurors or --

19          PROSPECTIVE JUROR:  No.  I made my point, no,

20     but I think -- well, I won't talk too much.  Sorry.

21          THE COURT:  And you contribute to the

22     Democratic party in the southern part of the law

23     center?

24          PROSPECTIVE JUROR:  Yes, I do.

25          THE COURT:  Is that annually?

:45PM

:46PM

:46PM

:46PM

:46PM

1    PROSPECTIVE JUROR:  Regularly on -- you know,
2  I may skip a couple of years and stuff, but ....
3    THE COURT:  And you've done volunteer work,
4  contributed money, and attended events in at least
5  one political campaign, is that correct?
6    PROSPECTIVE JUROR:  Yes.
7    THE COURT:  More than once?
8    PROSPECTIVE JUROR:  Yeah.
9    THE COURT:  You do it every 2 years or so or
10  is it more infrequent?
11    PROSPECTIVE JUROR:  No, just this past
12  election.
13    THE COURT:  Hobbies, things you do when
14  you're not working?
15    PROSPECTIVE JUROR:  I do a lot of reading,
16  running, music, I play instruments, that's about it.
17    THE COURT:  What do you do most of?
18    PROSPECTIVE JUROR:  Right now it would be a
19  balance between reading and running.
20    THE COURT:  Okay.  Most of the news you get
21  from the Internet?
22    PROSPECTIVE JUROR:  Yeah, maybe 55 percent,
23  you know.
24    THE COURT:  Right.  How much time a day do
25  you spend with news?

:47PM
:47PM
:47PM
:47PM
:48PM

1        PROSPECTIVE JUROR:  I have it on while I'm
2  working, generally CNBC, but sometimes CNN.  If I'm
3  not listening to the net, I'm listening to NPR on
4  the radio or radio WCP.  You know, I generally have
5  it on, so ....

:48PM

6        THE COURT:  And you've heard about the case?
7        PROSPECTIVE JUROR:  Yes, I have.
8        THE COURT:  Have you sought out news about
9  the case or did you just listened to what's on?

:49PM

10        PROSPECTIVE JUROR:  I've -- before -- before
11  this I sought out information.
12        THE COURT:  But you indicate that there's
13  nothing you've seen or heard that would interfere
14  with your ability to reach a fair verdict, is that

:49PM

15  correct?
16        PROSPECTIVE JUROR:  I don't think so.
17        THE COURT:  You did indicate that you might
18  have some problem following the instruction that you
19  have to avoid reading about the case or listening to

:49PM

20  any radio or television reports or reading anything
21  about the case on the Internet.  That would present
22  difficulty for you?
23        PROSPECTIVE JUROR:  To be frank, I think I
24  would, with such a high profile thing, I think, I,

:50PM

25  you know --

1          THE COURT:  The instruction to you would be

2    that if you start to hear something, you have to

3    turn it off.

4          PROSPECTIVE JUROR:  I understand.

5          THE COURT:  Now, would you regard it as

6    making it easier if you knew that, as a general

7    rule, whatever you hear on daily reports of what

8    happened at the trial, you are likely to already

9    know it, and perhaps know even more than is

10   reported, would that make it easier for you to

11   ignore the news?

12         PROSPECTIVE JUROR:  I'm not sure I follow.

13         THE COURT:  Most of the reporting about

14   trials talks about stuff that people on the jury

15   already know.

16         PROSPECTIVE JUROR:  Right.  I mean, I

17   wouldn't read editorials or anything like that, I'm

18   sure, you know, I won't do that, you know.  But I'm

19   saying that with such a high profile thing, I think

20   there's a tendency to -- you know, I understand it's

21   wrong and you're not supposed to do that, I'm

22   questioning my own ability to, you know, shut that

23   out.  I don't know.

24         THE COURT:  Right.

25         PROSPECTIVE JUROR:  I'm just trying to be

1  honest.

2          THE COURT:  Would you try to shut it out or

3  would you ignore the instruction?

4          PROSPECTIVE JUROR:  I won't -- I don't

5  think -- I don't think consciously, you know, ignore

6  the instructions, no.  I'm just saying, over such a

7  long -- unless we were sequestered, you know, I

8  think it would be tough for me, personally.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  Some people do a lot

11 better than that, but I just enjoy the news.  You

12 know, I archive news, I record news.  I've always

13 had a certain fascination with the history of news,

14 you know.  So that's all I'm saying.  But, no, I

15 wouldn't consciously seek it out or let it affect my

16 judgment, I don't think.

17         THE COURT:  Okay.  Then you answered the

18 question about certain wiretap evidence, because

19 you're asked if there's a problem and you didn't

20 check yes or no, but you made clear what it was that

21 concerned you, and that is, you said "I'd have to

22 know the circumstances and more information."

23         What you would know is, obviously, where and

24 when the wiretaps occurred.  The other thing you'd

25 know is that the evidence was lawfully acquired on

1  the basis of a warrant issued by the court.  If it

2  weren't lawfully acquired by a warrant issued by the

3  Court, you wouldn't be hearing it.

4          PROSPECTIVE JUROR:  Right.

5          THE COURT:  Is that the kind of circumstance

6  you're interested in?

7          PROSPECTIVE JUROR:  Yeah.  Right. I mean

8  yeah.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR:  Thank you.

11     (Prospective juror exited the courtroom, and the

12      following proceedings were had herein:)

13     (Brief pause)

14     (Prospective juror entered the courtroom, and

15      the following proceedings were had herein:)

16         THE COURT:  You are 143?

17         PROSPECTIVE JUROR:  Yes, sir, I am.

18         THE COURT:  You are a teacher?

19         PROSPECTIVE JUROR:  Yes, sir.

20         THE COURT:  And what do you teach?

21         PROSPECTIVE JUROR:  I teach physical

22  education.

23         THE COURT:  And you've been doing that for

24  quite a while?

25         PROSPECTIVE JUROR:  Yes, sir.

1          THE COURT:  At a high school?

2          PROSPECTIVE JUROR:  At a high school.

3          THE COURT:  And you're a volleyball coach.

4          PROSPECTIVE JUROR:  I am.

5          THE COURT:  For boys or girls?

6          PROSPECTIVE JUROR:  I am no longer coaching

7   the boys team, the last 2 years, but I have

8   continued to teach the girls team.

9          THE COURT:  Do you like your job?

10          PROSPECTIVE JUROR:  Yes, sir, I do.

11          THE COURT:  There's a reference to a family

12   business, web design.  Was that you?

13          PROSPECTIVE JUROR:  It's my sister's husband.

14   My brother-in-law.

15          THE COURT:  Did you --

16          PROSPECTIVE JUROR:  He has since sold that

17   business.

18          THE COURT:  Did you ever work in that

19   business?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Have you ever hired lawyers?

22          PROSPECTIVE JUROR:  Yes, for closings on

23   homes, wills, trusts.

24          THE COURT:  That kind of stuff.

25          PROSPECTIVE JUROR:  I'm sorry?

1      THE COURT:  That kind of stuff, not lawsuits.
2      PROSPECTIVE JUROR:  No.
3      THE COURT:  And you listed you have lawyers
4  as friends?
5      PROSPECTIVE JUROR:  Yes.  Uh-huh.
6      THE COURT:  Do these lawyers discuss their
7  business with you?
8      PROSPECTIVE JUROR:  No, not necessarily.
9  One, in particular, that's listed there was just --
10 I mean, I'm not quite sure how you would define it,
11 but he was just sworn in as someone who could be a
12 lawyer in the Supreme Court.
13     THE COURT:  Okay.
14     PROSPECTIVE JUROR:  But no.
15     THE COURT:  You have family members in the
16 military?
17     PROSPECTIVE JUROR:  My brother is not in the
18 military now but was; his wife, they're both --
19 she's actually retired.  He was just honorably
20 discharged, you know, when his time of service was
21 over.  My brother-in-law also had been a ranger in
22 the Persian Gulf war, I think.
23     THE COURT:  Were you or someone related to
24 you the victim of a home robbery?
25     PROSPECTIVE JUROR:  It was my sister-in-law,

1  my husband's sister.

2          THE COURT:  And no one was ever caught for

3  that?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  You did serve on a jury?

6          PROSPECTIVE JUROR:  I did.  It was a domestic

7  violence case here in Chicago.

8          THE COURT:  Right.  And you did reach a

9  verdict?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You thought that the thing that

12  was difficult about a jury verdict is that it had to

13  be unanimous?

14          PROSPECTIVE JUROR:  True.

15          THE COURT:  But, basically, you understand

16  that's our system?

17          PROSPECTIVE JUROR:  I do now, I didn't --

18  back then I didn't know, you know, whether it was a

19  100 percent, or a percentage, you know.

20          THE COURT:  In most of the country, it's

21  100-percent to return any verdict, there are some

22  places where you can return a verdict 10 to 2.

23          PROSPECTIVE JUROR:  All right.

24          THE COURT:  But not here.

25          PROSPECTIVE JUROR:  Not here.

1          THE COURT:  Not in this state and not in this
2    federal court either.
3          Despite what is sometimes difficult to reach
4    unanimity, do you think you could effectively serve
5    on a jury where unanimity was required?
6          PROSPECTIVE JUROR:  It was a difficult task,
7    you know, to be part of that.  So can I do it?  Yes.
8          THE COURT:  Okay.  Your husband works for a
9    public local municipal entity?
10         PROSPECTIVE JUROR:  A park district.
11         THE COURT:  A park district.  So he, not you,
12   but he deals a lot with local elected public
13   officials, is that correct?
14         PROSPECTIVE JUROR:  Yeah; daily.
15         THE COURT:  I think you also indicated that
16   you have a negative opinion of one of the defendants
17   because of the way he, and you used the words,
18   "flaunts himself on TV."  That's true?
19         PROSPECTIVE JUROR:  I think with the media
20   blitz that has surrounded this whole situation
21   and--oh, what are they called?--reality shows and
22   things like that, I think a lot of times people are
23   there to promote themselves.
24         THE COURT:  When I talked to all of you, I
25   said something to cover situations like this, and

1  what I said was is the jury is not going to be asked

2  if they like or dislike the defendant, or approve or

3  disapprove of what the defendant does, or presents

4  how either defendant presents themselves, you're

5  just going to be asked to decide whether the

6  government has proved the charges, and I'm sure you

7  understand that.  Do you think, basically, you can

8  limit your decision-making in this case to the

9  evidence and whether the charges have been proved?

10        PROSPECTIVE JUROR:  Yes, sir, I do.

11        THE COURT:  Okay.  And that would be true

12 whether you like or dislike --

13        PROSPECTIVE JUROR:  Yes, sir.

14        THE COURT:  -- the way a defendant conducts

15 himself?

16        PROSPECTIVE JUROR:  Yes, sir.

17        THE COURT:  Okay.  And when you're not

18 working, what do you do for fun?

19        PROSPECTIVE JUROR:  What do I do for fun?  I

20 get to be with my grown children, I travel.  I now

21 have a daughter who lives out of state, so I travel

22 to visit her as often as I can.  I do work a lot of

23 times year round running volleyball camps, sports

24 camps, things like that.  I also take graduate work.

25 I'm close to being finished with all the graduate

1  work that I can on our teacher's pay-scale type of

2  movement, and, you know, continuing education.

3          THE COURT:  You also put down running and

4  fitness.

:02PM  5          PROSPECTIVE JUROR:  I do.

6          THE COURT:  You do a lot of running?

7          PROSPECTIVE JUROR:  I don't like it, but I do

8  it.

9          THE COURT:  How often do you do it?

:02PM  10          PROSPECTIVE JUROR:  I actually haven't run in

11  the last probably week and a half to two weeks, I

12  kind of stained my back, but I'll try and do that at

13  least three times a week, along with some other

14  exercise.

:02PM  15          THE COURT:  What kind of distances do you do?

16          PROSPECTIVE JUROR:   What kind of distance?

17  Well, before I strained my back, I did 4 miles.

18  I've been up to at least 8, but I kinda just do it

19  to stay fit.

:02PM  20          THE COURT:  You're within the teacher

21  retirement system, is that correct?

22          PROSPECTIVE JUROR:  Yes, sir, I am.

23          THE COURT:  And you indicated that you--and

24  this is, obviously, a complaint--you indicated that

:03PM  25  the state is taking the investments and using them

1  to cover other costs.  Is that something you know

2  the details about?

3          PROSPECTIVE JUROR:  I do not sir, no.  This

4  is a general feeling and, obviously, you know, what

5  is portrayed, you know, in the press.

6          THE COURT:  Okay.  When asked about your

7  ability to evaluate the testimony of law enforcement

8  agents, your answer was that you would hope they're

9  credible and honest.  The question I have for you

10  is, are you willing to consider and judge, as you

11  would any other witness, the possibility that they

12  are not credible and maybe not honest?

13          PROSPECTIVE JUROR:  I'm not sure how to

14  answer that, sir.

15          THE COURT:  The issue is is that, and this is

16  the reason we ask this question, there are people

17  that think, well, this individual who is on the

18  witness stand is a police officer, an FBI agent, and

19  therefore I'm going to believe what they tell me.

20  But the law requires you to treat that kind of

21  witness as you would treat any other witness and

22  evaluate their testimony the same way you would

23  evaluate anybody else's and not presume that they

24  are necessarily telling the truth or that, you know,

25  they could be mistaken as well.

:03PM

:04PM

:04PM

:04PM

:04PM

1          PROSPECTIVE JUROR:  Well, if that was the

2   direct from the Court, I would follow that

3   directive.

4          THE COURT:  Thanks.

5          PROSPECTIVE JUROR:  Thank you.

6      (Prospective juror exited the courtroom, and the

7       following proceedings were had herein:)

8      (Brief pause)

9      (Prospective juror entered the courtroom, and

10      the following proceedings were had herein:)

11          THE COURT:  You're number 144?

12          PROSPECTIVE JUROR:  Yes, your Honor.

13          THE COURT:  When did you first come to this

14   country?

15          PROSPECTIVE JUROR:  It was 1970.

16          THE COURT:  And you came from the

17   Philippines?

18          PROSPECTIVE JUROR:  Uh-huh.  Yes, sir.  Yes,

19   your Honor.

20          THE COURT:  And what do you do at work?

21          PROSPECTIVE JUROR:  I'm just an assembler

22   there in a factory.

23          THE COURT:  And how long have you worked for

24   that company?

25          PROSPECTIVE JUROR:  33 years.

:05PM
:05PM
:05PM
:06PM
:06PM

1          THE COURT:  A long time.

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  You indicated that you do other

4    work, part-time work as well?

:06PM
5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  And what's that work?

7          PROSPECTIVE JUROR:  Care-giver.

8          THE COURT:  And this is for an elderly

9    person?

:06PM
10          PROSPECTIVE JUROR:  Yes, your Honor.

11          THE COURT:  And how long have you been doing

12   that?

13          PROSPECTIVE JUROR:  I've been with this lady

14   for, like, 6 months.

:06PM
15          THE COURT:  Okay.

16          THE COURT:  And have you been a care-giver

17   for other elderly people before this person?

18          PROSPECTIVE JUROR:  Yes, your Honor.

19          THE COURT:  And how long have you been doing

:07PM
20   that?

21          PROSPECTIVE JUROR:  It's only like a

22   part-time, but I work with her for, like, 15 years.

23          THE COURT:  Do you read the newspapers?

24          PROSPECTIVE JUROR:  Not so often.

:07PM
25          THE COURT:  Do you read any books?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Was your first language Tagalog?

3          PROSPECTIVE JUROR:  Yes, your Honor.

4          THE COURT:  And when did you learn English?

5          PROSPECTIVE JUROR:  I learned at school, back

6     home.

7          THE COURT:  Okay.  And you said you had some

8     difficulty understanding some of the questions we

9     asked?

10          PROSPECTIVE JUROR:  Yes, I do.

11          THE COURT:  Okay.  Thank you.

12          PROSPECTIVE JUROR:  Thank you, sir.

13     (Prospective juror exited the courtroom, and the

14      following proceedings were had herein:)

15     (Brief pause)

16     (Prospective juror entered the courtroom, and

17      the following proceedings were had herein:)

18          THE COURT:  You are number 145?

19          PROSPECTIVE JUROR:  Yes, Judge.

20          THE COURT:  Have you ever been in this

21     building?

22          PROSPECTIVE JUROR:  Yes, Judge.  I clerked

23     here for 2 years.

24          THE COURT:  Right.  You clerked for a judge

25     in this building.

1        PROSPECTIVE JUROR:  Yes, sir.

2        THE COURT:  Did you your clerkship?

3        PROSPECTIVE JUROR:  I did.

4        THE COURT:  And you are now employed working

:09PM   5   as an attorney?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  And what sort of work are you

8   doing?

9        PROSPECTIVE JUROR:  I work for a Teach For

:09PM   10  America.  We have a two-person law department, so

11  everything for the corporation; review of contracts,

12  legal agreements, risk management; it runs the

13  gamut.

14       THE COURT:  Right.  Do you enjoy the work?

:09PM   15  PROSPECTIVE JUROR:  I do.

16       THE COURT:  How long are you going to do it

17  for?

18       PROSPECTIVE JUROR:  For a long time.  Not

19  trying to change jobs.

:09PM   20  THE COURT:  Your husband is a graduate

21  student?

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  And what is he studying?

24       PROSPECTIVE JUROR:  Theater.

:10PM   25  THE COURT:  And he is still studying?

1          PROSPECTIVE JUROR:  Yes, he'll be finished
2   his dissertation in December.
3          THE COURT:  In when?
4          PROSPECTIVE JUROR:  In December.
5          THE COURT:  And how long has it been?
6          PROSPECTIVE JUROR:  5 years.  5 years.  A
7   long time.
8          THE COURT:  You did work for a state agency?
9          PROSPECTIVE JUROR:  I did.
10          THE COURT:  And what was that?
11          PROSPECTIVE JUROR:  I was an Assistant
12   Inspector General for the Inspector General's Office
13   for the State of Illinois.
14          THE COURT:  And how long did you do that?
15          PROSPECTIVE JUROR:  It was approximately
16   2 years.  May have been like two and a half years.
17          THE COURT:  And you really have not had
18   significant involvement in political work except for
19   attending events?
20          PROSPECTIVE JUROR:  No.  No.
21          THE COURT:  Hobbies?  Things you like to do?
22          PROSPECTIVE JUROR:  I love to read and cook.
23          THE COURT:  And you are, thus far, the only
24   juror who were asked certain names, of the various
25   names that we gave you you circled my name and the

1  courtroom deputy.

2        PROSPECTIVE JUROR:  I met you when I was

3  clerk here.

4        THE COURT:  Yes, you have.  Thank you.

5     (Prospective juror exited the courtroom, and the

6      following proceedings were had herein:)

7     (Brief pause)

8     (Prospective juror entered the courtroom, and

9      the following proceedings were had herein:)

:12PM  10        THE COURT:  You are number 146?

11        PROSPECTIVE JUROR:  Yes, sir.

12        THE COURT:  What do you do for a living?

13        PROSPECTIVE JUROR:  I'm a deputy sheriff.

14        THE COURT:  What county?

:13PM  15        PROSPECTIVE JUROR:  Cook.

16        THE COURT:  And what is your basic assignment

17  now?

18        PROSPECTIVE JUROR:  Courtroom services.

19        THE COURT:  Do you transport?

:13PM  20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  How long have you been doing

22  that?

23        PROSPECTIVE JUROR:  13 years.

24        THE COURT:  Anything else you do?

:13PM  25        PROSPECTIVE JUROR:  Yes, I also -- I judge

1  for professional MMA.

2        THE COURT:  You want, for the record, tell
3  everybody what MMA means?

4        PROSPECTIVE JUROR:  That's mixed martial
5  arts.

6        THE COURT:  What did you do before you joined
7  the Sheriff's Department?

8        PROSPECTIVE JUROR:  I was a roofer.

9        THE COURT:  And for how long did you do that?

10        PROSPECTIVE JUROR:  I'd say approximately 15
11  or 16 years.

12        THE COURT:  The job you have now is better?

13        PROSPECTIVE JUROR:  Much better.

14        THE COURT:  And you did criminal justice
15  studies in a community college?

16        PROSPECTIVE JUROR:  Actually, I did them at
17  31st and California.  When I first came on the
18  county they offered to pay for additional classes,
19  so I took advantage of that and did that a little
20  bit.

21        THE COURT:  Okay.  And your spouse works for
22  car dealerships?

23        PROSPECTIVE JUROR:  Yes.  Yes, she does.

24        THE COURT:  Is there anything about what
25  happened to your older brother 25 years ago that

1  would affect your ability to be fair here?

2        PROSPECTIVE JUROR:  Absolutely not.

3        THE COURT:  Tell me about your hobbies.

4        PROSPECTIVE JUROR:  Well, I like aquariums,

5  keeping fish.  I've kept reptiles all my life,

6  pretty much.

7        THE COURT:  Is your house filled with lots of

8  glass aquariums and glass cases?

9        PROSPECTIVE JUROR:  Yeah.  Yeah, it sure is.

10       THE COURT:  You indicate that you spend a

11 fair amount of time dealing with the bible and bible

12 studies and religious issues.  How much time do you

13 spend a week?

14       PROSPECTIVE JUROR:  A week?

15       THE COURT:  A week.  In hours.

16       PROSPECTIVE JUROR:  I don't -- maybe,

17 roughly, 15 hours.

18       THE COURT:  Okay.  Do you spend a lot of time

19 looking at news, TV, radio and newspapers?

20       PROSPECTIVE JUROR:   No; the time I do watch

21 TV, it's mostly the sport, again, of mixed martial

22 arts, I like to see National Geographics, wild life

23 stuff.  You know, once in a while I'll watch TV with

24 my wife, you know, some lifetime channel.

25       THE COURT:  But that would not normally be

:16PM

:17PM

:17PM

:17PM

:18PM

1  your first choice?

2          PROSPECTIVE JUROR:  I actually don't mind, as

3  long as I'm with her.

4          THE COURT:  You've heard about this case, is

5  that correct?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Heard a lot about it?  A little

8  about it?

9          PROSPECTIVE JUROR:  I'd say a little.  Just,

10 you know, listening to people at work.  You know,

11 I've heard it mentioned, I'm sure I heard it also at

12 some point in the morning.  I know my wife likes to

13 watch the news before she goes to work, so I've

14 heard some talk about it.

15         THE COURT:  Do you think any of that would

16 affect your ability to be fair?

17         PROSPECTIVE JUROR:  Absolutely not.

18         THE COURT:  Do you have any opinions about

19 this case, one way or the other?

20         PROSPECTIVE JUROR:  Not really.

21         THE COURT:  Thank you.

22     (Prospective juror exited the courtroom, and the

23      following proceedings were had herein:)

24     (Brief pause)

25     (Prospective juror entered the courtroom, and

1        the following proceedings were had herein:)

2            THE COURT:  You are 147?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Do you actually like law school?

5            PROSPECTIVE JUROR:  I love law school,

6    actually.

7            THE COURT:  Did you like college, too?

8            PROSPECTIVE JUROR:  I like law school better.

9    But yeah, I enjoyed college; very different.

10           THE COURT:  And you went to law school

11   because?

12           PROSPECTIVE JUROR:  Well, I was a math major

13   in college, I really like the logic of math, and I

14   find that very similar to some of the logic in law.

15           THE COURT:  And you have a summer associate

16   job at a large firm in Chicago, is that correct?

17           PROSPECTIVE JUROR:  Yeah, I'm starting

18   Monday.

19           THE COURT:  What other kinds of job have you

20   had, if any?

21           PROSPECTIVE JUROR:  I was a consultant for a

22   year in between college and law school.

23           PROSPECTIVE JUROR:  And what did you

24   consultant on?

25           PROSPECTIVE JUROR:  Technology consulting.

1          THE COURT:  On what kind of technology?

2          PROSPECTIVE JUROR:  I was sort of on the -- I

3    did some coding for a government project, and then I

4    did some of their requirements for a large bank for

5    updating a credit card system.

6          THE COURT:  And your sister's business?  Your

7    sister has a business?

8          PROSPECTIVE JUROR:  Yeah, she does.

9          THE COURT:  Do you help her out?

10          PROSPECTIVE JUROR:  Not with the business,

11    really.

12          THE COURT:  Have you ever worked in a family

13    business?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  And you worked as a summer law

16    clerk at a legal department in a municipality, is

17    that correct?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  How long did that last?

20          PROSPECTIVE JUROR:  About 2 and a half

21    months.

22          THE COURT:  And you were born and raised

23    here?

24          PROSPECTIVE JUROR:  Uh-huh.

25          THE COURT:  Now, your father is a business

1  executive or was?

2          PROSPECTIVE JUROR:  Was; he's retired now.

3          THE COURT:  And you said that he's been

4  involved in lawsuits?

5          PROSPECTIVE JUROR:  I don't know the

6  specifics of them, but yes.

7          THE COURT:  So he never went and sought your

8  advice?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  You did contribute money to a

11 seeker for political office.  Was that just once?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Are you an active seeker out of

14 news reports or do you just --

15         PROSPECTIVE JUROR:  I read the news a lot.

16         THE COURT:  Do you go look for news on the

17 Internet?

18         PROSPECTIVE JUROR:  Yeah; that's my main

19 source of news.

20         THE COURT:  And you asked for deferment on

21 the grounds that you won't be able to do the summer

22 associateship and your legal entire career would be

23 ruined?

24         PROSPECTIVE JUROR:   Well, not my entire, but

25 just part of it would be impacted, anyway.

:23PM
:23PM
:24PM
:24PM
:25PM

1        THE COURT:  Thank you.

2        PROSPECTIVE JUROR:  Thank you very much.

3     (Prospective juror exited the courtroom, and the

4      following proceedings were had herein:)

5     (Brief pause)

6     (Prospective juror entered the courtroom, and

7      the following proceedings were had herein:) 4.

8        THE COURT:  You're number 148?

9        PROSPECTIVE JUROR:  Yes.

10       THE COURT:  How long have you been retired?

11       PROSPECTIVE JUROR:  10 years.

12       THE COURT:  And before that, you worked for

13  the Postal Service?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  How long ago did you do that?

16       PROSPECTIVE JUROR:  I worked for the Postal

17  Service 30 years.

18       THE COURT:  And you were a letter carrier?

19       PROSPECTIVE JUROR:  Yes, sir.

20       THE COURT:  Did you have any other job there

21  other than letter carrier?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  The question "you or anyone close

24  to you ever owned a businesses" and the answer was

25  "yes, auto body shop."  Was that you or someone you

1  know?

2          PROSPECTIVE JUROR:  That was my first cousin

3  who was very close to me.

4          THE COURT:  Very close to you?

:27PM    5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Did you ever work in that

7  business with him?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Is your spouse, your wife, still

:27PM   10  working?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  And you started with the Postal

13  Service in 1970?

14          PROSPECTIVE JUROR:  Yes.

:27PM   15          THE COURT:  You were in the Navy?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  How long were you in the navy?

18          PROSPECTIVE JUROR:  3 years and, I think,

19  approximately 3 months.

:28PM   20          THE COURT:  What was your rank on discharge?

21          PROSPECTIVE JUROR:  I was an ensign something

22  equivalent to a corporal.

23          THE COURT:  And where were you stationed?

24          PROSPECTIVE JUROR:  In Virginia, north of

:28PM   25  Virginia.

1          THE COURT:  You served on two juries?

2          PROSPECTIVE JUROR:  Yes, I think I served

3    total of 3 years.

4          THE COURT:  Oh, yeah, that's right.  You did

5    list three years. Did the jury return a verdict each

6    time?

7          PROSPECTIVE JUROR:  One of them we didn't.

8          THE COURT:  Okay.  Was that because the jury

9    couldn't agree or because they settled the case?

10          PROSPECTIVE JUROR:  The one was a murder case

11    and one of the jurors couldn't -- they didn't like

12    the idea that there might be a death penalty

13    involved, so they wouldn't agree.

14          THE COURT:  Okay.  Do you have any hobbies,

15    favorite activities, something you do?

16          PROSPECTIVE JUROR:  Well, I have something

17    like a 10 by 12 plot out in the backyard that I

18    raise vegetables.

19          THE COURT:  You read anything in particular?

20          PROSPECTIVE JUROR:  I attend bible study at

21    my church, I do that.

22          THE COURT:  And it says here that you read

23    auto magazines?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Based on what I have seen in your

1 answers, you've not heard a lot about this case, is

2 that true?

3          PROSPECTIVE JUROR:  No, it's -- it's nothing

4 up close.  Nothing that I have seen.

5          THE COURT:  Do you remember any of the

6 details about the case?

7          PROSPECTIVE JUROR:  No.  No.

8          THE COURT:  And the last time you served on a

9 jury was around 1980?

10          PROSPECTIVE JUROR:  Yes, that's -- that was

11 my guess.  I don't really remember it.

12          THE COURT:  Okay.  Thank you.

13          PROSPECTIVE JUROR:  Okay.

14     (Prospective juror exited the courtroom, and the

15      following proceedings were had herein:)

16          THE COURT:  We're going to take a break now.

17 We'll resume again in 15 minutes.

18     (Recess.)

19          COURT'S LAW CLERK:  Please remain seated.

20     (Brief pause)

21     (Prospective juror entered the courtroom, and

22      the following proceedings were had herein:)

23          THE COURT:  You are number 149?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  I've read the form that you

 1  filled out, the questionnaire.  I'm not going to ask

 2  you about everything, I'm just going to ask you

 3  about a few of these things.

 4          You're now retired?

 5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  And what did you do before you

 7  were retired?

 8          PROSPECTIVE JUROR:  Well, the last 7 years

 9  before my retirement I started working in the

10  medical center, a hospital --

11          THE COURT:  It might do better if you pick up

12  the microphone.

13          PROSPECTIVE JUROR:  What? This?

14          THE COURT:  Yeah.

15          PROSPECTIVE JUROR:  Sorry.

16          And I worked as housekeeping supervisor.

17          THE COURT:  How many people did you supervise

18  as a housekeeper?

19          PROSPECTIVE JUROR:  The average was 30.

20          THE COURT:  You have to put the microphone

21  close to your mouth.

22          PROSPECTIVE JUROR:  Okay.

23          THE COURT:  Otherwise, we won't hear you.

24          And what did you do before you were at the

25  medical center?

1          PROSPECTIVE JUROR:  I was working at Marriott

2     Hotel for over 17 years.  It was executive

3     housekeeper there.

4          THE COURT:  And your husband is an

:56PM    5     electrician?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And you contribute money to a

8     charity organization?

9          PROSPECTIVE JUROR:  Yes.

:57PM   10          THE COURT:  How long have you been doing that

11     for?

12          PROSPECTIVE JUROR:  For over 20 years.

13          THE COURT:  Do you have any hobbies?

14     Anything you like to do?

:57PM   15          PROSPECTIVE JUROR:  Yes, the last is the

16     walking, I walk every day.  I really like opera, I

17     like movies, reading a book, and watch my

18     grandchildren.

19          THE COURT:  And the music you like is opera?

:57PM   20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Do you watch the news a lot?

22          PROSPECTIVE JUROR:  Not really.  Most of the

23     time I watch the Polish news because we have a

24     Polish television.

:58PM   25          THE COURT:  So you watch the Polish

1  television station?

2          PROSPECTIVE JUROR:  Yes.  American too,

3  but --

4          THE COURT:  Right.

5          Did you hear about this case on the news?

6          PROSPECTIVE JUROR:  Yes, I was in the house,

7  the newspaper.

8          THE COURT:  Do you remember what you heard?

9          PROSPECTIVE JUROR:  It's just about that it

10  will start and complete the jury.

11          THE COURT:  When you were supervising your

12  housekeeping, do you speak most of the time in

13  English or Polish?

14          PROSPECTIVE JUROR:  Most of the time --

15          THE COURT:  In what?

16          PROSPECTIVE JUROR:  -- in English and Polish,

17  too.

18          THE COURT:  Okay.  What did you study in

19  college?

20          PROSPECTIVE JUROR:  In Poland.

21          THE COURT:  And when did you come to this

22  country?

23          PROSPECTIVE JUROR:  Why?

24          THE COURT:  When.

25          PROSPECTIVE JUROR:  When?  It was 1983.

:58PM
:58PM
:59PM
:59PM
:00PM

1       THE COURT:  And you have a son working for
2  bank?
3       PROSPECTIVE JUROR:  Yes.  We have two sons.
4       THE COURT:  And you have a son who works as a
:00PM   5  have police officer?
6       PROSPECTIVE JUROR:  Yes.
7       THE COURT:  Thank you.
8       PROSPECTIVE JUROR:  You're welcome.
9    (Prospective juror exited the courtroom, and the
:00PM   10    following proceedings were had herein:)
11   (Brief pause)
12   (Prospective juror entered the courtroom, and
13    the following proceedings were had herein:)
14       THE COURT:  You are number 150?
:01PM   15       PROSPECTIVE JUROR:  I am.
16       THE COURT:  You are a software engineer?
17       PROSPECTIVE JUROR:  I am.
18       THE COURT:  What do you do?
19       PROSPECTIVE JUROR:  I program design
:01PM   20  software.
21       THE COURT:  And what does your employer do?
22       PROSPECTIVE JUROR:  Sells the software.
23       THE COURT:  Okay.  Now, is this custom made?
24  Do people ask for program and software or is this
:01PM   25  more luck for a larger mass marketer?

1          PROSPECTIVE JUROR:  We've actually moved from

2   the custom software into mass marketing.  We have a

3   flash product.

4          THE COURT:  And how long have you worked for

5   them?

6          PROSPECTIVE JUROR:  6 years.

7          THE COURT:  Who did you work for before, if

8   anybody?

9          PROSPECTIVE JUROR:  Record store.

10         THE COURT:  When did you get your degree?

11         PROSPECTIVE JUROR:  2002.

12         THE COURT:  And were you still working at the

13  record store then?

14         PROSPECTIVE JUROR:  I was.

15         THE COURT:  And how long did it take you to

16  get the job you're in now?

17         PROSPECTIVE JUROR:  2 years.

18         THE COURT:  Did you try to get other jobs

19  before then?

20         PROSPECTIVE JUROR:  I did.  There was a

21  downturn in the market.

22         THE COURT:  It says that you contribute to

23  the coalition for the homeless and the food

24  depository, is that true?

25         PROSPECTIVE JUROR:  It is.

1       THE COURT:  What do you contribute?

2       PROSPECTIVE JUROR:  In terms of value?

3       THE COURT:  Money, time, whatever you do.

4       PROSPECTIVE JUROR:  Money; and then there's

5  been a couple of food depositories, like food

6  drives, that kind of stuff.

7       THE COURT:  And how long have you been doing

8  that for?

9       PROSPECTIVE JUROR:  A couple of years.

10       THE COURT:  What do you do for fun?

11       PROSPECTIVE JUROR:  Listen to records, read,

12  movies.

13       THE COURT:  You were working in a record

14  store?

15       PROSPECTIVE JUROR:  I was.

16       THE COURT:  How long do you think they're

17  going to continue to be record stores?

18       PROSPECTIVE JUROR:  No idea.

19       THE COURT:  Did you go to work in a record

20  store because it was the only job you could find or

21  was it a job you wanted?

22       PROSPECTIVE JUROR:  Both.  At the time I put

23  my application down; I worked for the record store

24  for quite sometime.

25       THE COURT:  A big record store or a small

:03PM

:03PM

:04PM

:04PM

:04PM

1    one?

2            PROSPECTIVE JUROR:  No, it's call records

3    exchange. It's a small mom and pop, new and used

4    records.

5            THE COURT:  Are you talking about CD's or are

6    you talking about vinyl?

7            PROSPECTIVE JUROR:  Both.

8            THE COURT:  Which was the bigger part of

9    their business?

10           PROSPECTIVE JUROR:  Initially CD's and then

11   moved over to vinyl.

12           THE COURT:  You read a lot of books?

13           PROSPECTIVE JUROR:  I do.

14           THE COURT:  And you answered, in type of

15   books, you said "good ones."

16           PROSPECTIVE JUROR:  Basically, whatever my

17   wife recommends to me.

18           THE COURT:  Okay.

19           Obviously, you've heard or read some stuff.

20           PROSPECTIVE JUROR:  I have.

21           THE COURT:  Would you be able to put the

22   stuff you read or heard before you got here out of

23   the way and decide the case on the basis only of the

24   evidence you hear in the courtroom?

25           PROSPECTIVE JUROR:  I think so, but I'm not

:04PM

:04PM

:05PM

:05PM

:06PM

1  sure.

2        THE COURT:  You're employer wrote a letter

3  saying that you are a key employee, you oversee

4  basically the work product for half of the engineers

5  and implies that your absence would be ruins.

6        PROSPECTIVE JUROR:  That's correct.

7        THE COURT:  Do you find that gratifying, that

8  he thinks of you that way?

9        PROSPECTIVE JUROR:  Yeah.

10        THE COURT:  If that were not the case, would

11  you have any difficulty serving on this jury?

12        PROSPECTIVE JUROR:  I don't think so.

13        THE COURT:  You did say that you weren't

14  comfortable judging people.

15        PROSPECTIVE JUROR:  That's true.

16        THE COURT:  Does that mean you couldn't do it

17  or does that mean you just wouldn't be comfortable?

18        PROSPECTIVE JUROR:  I wouldn't be

19  comfortable.

20        THE COURT:  Okay.  Thank you.

21     (Prospective juror exited the courtroom, and the

22      following proceedings were had herein:)

23     (Brief pause)

24

25

1      (Prospective juror entered the courtroom, and
2       the following proceedings were had herein:)
3          THE COURT:  You are number 151?
4          PROSPECTIVE JUROR:  Correct.
5          THE COURT:  You are a mechanical engineer?
6          PROSPECTIVE JUROR:  Correct.
7          THE COURT:  And you have both undergraduate
8   and graduated degrees?
9          PROSPECTIVE JUROR:  Also correct.
10         THE COURT:  And you work for a steel company?
11         PROSPECTIVE JUROR:  Correct.
12         THE COURT:  And what kind of stuff do you do
13  there?
14         PROSPECTIVE JUROR:  I supervise a crew of
15  approximately 20 to 30 people.  I work at a
16  continuance caster, so it's anything from lining up
17  labor jobs to insist on turnarounds.
18         THE COURT:  And how long have you been doing
19  that?
20         PROSPECTIVE JUROR:  Approximately 2 years.
21         THE COURT:  Did you do anything before that
22  or -- did you take this job out of school?
23         PROSPECTIVE JUROR:  Out of school, correct.
24         THE COURT:  And what kind of jobs did you do
25  before that?

1          PROSPECTIVE JUROR:  Had an internship at a
2    steel mill in the south side of Chicago after my
3    junior year; somewhere prior to that I worked as a
4    bicycle mechanic; prior to that, I had an internship
5    at Argonne National Laboratory as a chemistry
6    intern; prior to that, I was in high school.
7          THE COURT:  And you worked at Argonne?
8          PROSPECTIVE JUROR:  Correct.
9          THE COURT:  And you were an extern there?
10         PROSPECTIVE JUROR:  That is correct, yes.
11         THE COURT:   When did the dog bite case
12   happen?
13         PROSPECTIVE JUROR:  That would have been
14   16 years ago.
15         THE COURT:  You have a vivid memory of that?
16         PROSPECTIVE JUROR:  I wouldn't say vivid, no.
17         THE COURT:  But it was a big thing in your
18   family at that time?
19         PROSPECTIVE JUROR:  At that time, yes.
20         THE COURT:  You donate to United Way?
21         PROSPECTIVE JUROR:  Correct.
22         THE COURT:  You get your news from radio?
23         PROSPECTIVE JUROR:  Yeah, I listen to usually
24   NPR on the car ride to work.
25         THE COURT:  Are you somebody who seeks out

1  the news, checks out things on the Internet, or do

2  you just take the news as it comes to you?

3        PROSPECTIVE JUROR:  No, I usually look every

4  day on the Internet and listen to the radio every

:11PM  5  day.

6        THE COURT:  What do you do for hobbies, for

7  fun?

8        PROSPECTIVE JUROR:  I ride bicycles, I like

9  to cook, I read quite a bit, take photographs.

:12PM  10        THE COURT:  Particular kind of reading you

11  do?

12        PROSPECTIVE JUROR:  No, not necessarily.

13  Anything that comes to me or sparks my interest.

14        THE COURT:  And the cooking part?

:12PM  15        PROSPECTIVE JUROR:  Anything in a cookbook

16  try my hand.

17        THE COURT:  You do that because you like to

18  eat it or because it's an enormous challenge?

19        PROSPECTIVE JUROR:  I'd say both.

:12PM  20        THE COURT:  And when did you start this

21  cooking part?

22        PROSPECTIVE JUROR:  Oh, 3 or 4 years ago when

23  I lived on my own.

24        THE COURT:  Thanks.

:13PM  25        PROSPECTIVE JUROR:  Of course.

1      (Prospective juror exited the courtroom, and the

2       following proceedings were had herein:)

3      (Brief pause)

4      (Prospective juror entered the courtroom, and

5       the following proceedings were had herein:)

6           THE COURT:  You are 152?

7           PROSPECTIVE JUROR:  Yes, sir.

8           THE COURT:  You are employed part-time but

9  sometimes you're needed full-time?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  Okay. What do you do?

12          PROSPECTIVE JUROR:  I'm a clinic

13  administrator.

14          THE COURT:  Give me a little more detail.

15          PROSPECTIVE JUROR:  I'm sorry?

16          THE COURT:  Give me a little more detail.

17          PROSPECTIVE JUROR:  I manage 25, 30 medical

18  people and receptionist for a five-physician

19  internal medicine practice with gastro neurology,

20  podiatry, and nutrition, as well.

21          THE COURT:  And how long have you worked

22  there?

23          PROSPECTIVE JUROR:  Oh, for 10 years.

24  Started out full-time and then just back to

25  part-time.

1       THE COURT:  And is this the kind of work
2  you've done from the beginning?
3       PROSPECTIVE JUROR:  Yes, sir.  When I first
4  started out at college, I worked with psychiatric
5  consultants abuse issues, I ran a psychiatric
6  hospital.
7       THE COURT:   And your academic training was
8  in what?
9       PROSPECTIVE JUROR:  I had a bachelor of
10  science in communications and in human services and
11  then I got a Masters in business.
12       THE COURT:  The business that you or someone
13  close to you owned in North Dakota, was that a
14  family business?
15       PROSPECTIVE JUROR:  Yes.
16       THE COURT:  A friend?
17       PROSPECTIVE JUROR:  It was my nephew.
18       THE COURT:  Okay.  The health service that
19  you work for, was that a government --
20       PROSPECTIVE JUROR:  When I worked at Montana,
21  I worked for Indian Health Service for the
22  Department of Health and Human Services, I was a
23  hospital administrator.  I had 250 employees that I
24  I supervised.
25       THE COURT:  Was that under the BIA?

voir dire examination                                    306

1          PROSPECTIVE JUROR:  IHS.

2          THE COURT:  IHS.

3          PROSPECTIVE JUROR:  My sibling works for the

4   BIA.

5          THE COURT:  Is it you, or family member, or

6   close friend who was arrested or convicted of a

7   crime?

8          PROSPECTIVE JUROR:  It was me, sir.

9          THE COURT:  And you got 15 to 22 days

10  probation?

11         PROSPECTIVE JUROR:  I was in the county jail

12  for about 20 -- 20 days.  I was released early for

13  good time, and then I was on probation for

14  approximately a year, a year and a half.  And it was

15  a long probation, but I was released early.

16         THE COURT:  How old were you?

17         PROSPECTIVE JUROR:  Early 20's.  22, maybe.

18  21 -- 22, I'd say.

19         THE COURT:  And where was this?

20         PROSPECTIVE JUROR:  Yakima, Washington.

21         THE COURT:  Do you think you were treated

22  fairly?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Any other crimes in your

25  background?

1          PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  Once was enough?

3          PROSPECTIVE JUROR:  That was.  That was

4    plenty for me.

:17PM    5          THE COURT:  Any groups or organizations that

6    you work for or contribute to?

7          PROSPECTIVE JUROR:  I financially contribute

8    to the Humane Society.  I have a third degree black

9    belt.  So I've been -- on and off my entire life

:18PM   10    I've been involved in martial arts; 25 strong years.

11          THE COURT:  Spend a lot of time looking and

12    reading the news?

13          PROSPECTIVE JUROR:  I -- I read some of the

14    newspaper just for entertainment.  I don't spend any

:18PM   15    time on the Internet.  I'm not a big believer in the

16    newspaper, but .... I've been interviewed by the

17    newspaper.

18          THE COURT:  Now, what you said here is that

19    you have heard or read about this case but you lost

:18PM   20    track of what the status has been in the last year

21    or so, is that right?

22          PROSPECTIVE JUROR:  That's correct.

23          THE COURT:  Was that because you weren't

24    particularly interested?

:18PM   25          PROSPECTIVE JUROR:  Somewhat.  I wasn't

1  particularly interested after the initial -- the

2  initial dropping of it.  But to be perfectly honest,

3  I don't really have a whole lot of recall anymore,

4  and then it just got the sensationalism, it was just

5  not interesting.

6            THE COURT:  You wrote a request for deferral,

7  I can fairly say it was contingent in nature.  It

8  wasn't something that was necessarily going to

9  happen, but it might happen and you were concerned

10 about your availability, is that correct?

11           PROSPECTIVE JUROR:  Yes, sir.  I have a

12 brother who is in liver failure, and it's like

13 anything, you don't know what's going to happen, but

14 I did want the Court to be aware of it.

15           THE COURT:  Okay.  Thank you.

16           PROSPECTIVE JUROR:  Thank you, sir.

17    (Prospective juror exited the courtroom, and the

18     following proceedings were had herein:)

19     (Brief pause)

20    (Prospective juror entered the courtroom, and

21     the following proceedings were had herein:)

22           THE COURT:  You're number 153?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  You're a legal secretary?

25           PROSPECTIVE JUROR:  Yes.

1          THE COURT:  You work for a law firm that's
2   not huge but not small either?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  And you work in the real estate
5   department?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What do you do in the real estate
8   department?

9          PROSPECTIVE JUROR:  I'm a secretary to four
10  attorneys and a paralegal.

11         THE COURT:  You or somebody close to you, a
12  family member, have a business?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  And what was that?

15         PROSPECTIVE JUROR:  My sister, she owns a
16  coffee shop at a train station, and I had a
17  girlfriend that had a freight exporting business,
18  she no longer does that, though.

19         THE COURT:  Right.  Did you work in any of
20  those businesses or help out in any of those
21  businesses?

22         PROSPECTIVE JUROR:  No, I did not.

23         THE COURT:  And your children are grown?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  You served on a jury but you

1  don't know when?

2          PROSPECTIVE JUROR:  Within about 6 years ago,

3  maybe.

4          THE COURT:  Okay. Did the jury reach a

5  verdict?

6          PROSPECTIVE JUROR:  Yes, they did.

7          THE COURT:  Do you think it was an easy case

8  or a hard case?

9          PROSPECTIVE JUROR:  It was an easy case, but

10 it turned out to be more difficult.

11         THE COURT:  What do you do for fun?

12         PROSPECTIVE JUROR:  I knit, I like to cook, I

13 read, I visit my grandchild, and watch TV a little

14 bit, and I'm on the computer.

15         THE COURT:  What do you do on the computer?

16         PROSPECTIVE JUROR:  Well, I just got an Apple

17 Computer and I'm learning how to put movies

18 together, organize my photos, that have kind of

19 stuff.

20         THE COURT:  Did you have another computer

21 before you had the Apple?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And was that a PC?

24         PROSPECTIVE JUROR:  It was a PC, but now I

25 enjoy the the Apple.

1      THE COURT:  Did you find the transition
2  difficult?
3      PROSPECTIVE JUROR:  Not really, no.
4      THE COURT:  What's your favorite kind of
:23PM  5  book?
6      PROSPECTIVE JUROR:  Mysteries.
7      THE COURT:  Are you somebody who spends a lot
8  of time watching the news, seeking the news out on
9  the Internet?
:23PM 10      PROSPECTIVE JUROR:  No.
11      THE COURT:  Have you ever worked for any law
12  firm other than the one you currently work for?
13      PROSPECTIVE JUROR:  Yes.
14      THE COURT:  And how long ago was that?
:23PM 15      PROSPECTIVE JUROR:  Over 30 years ago.
16      THE COURT:  And you've heard something about
17  this case, but you don't particularly remember much?
18      PROSPECTIVE JUROR:  Right, I do.
19      THE COURT:  If you did happen to remember
:24PM 20  something and you were sitting on the jury, would
21  you be able to put that aside and rule only on the
22  basis of what you hear in this courtroom?
23      PROSPECTIVE JUROR:  Correct.
24      THE COURT:  I take it you  haven't followed
:24PM 25  this case closely?

voir dire examination                    312

1          PROSPECTIVE JUROR:  I have not.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR:  Okay.

4      (Prospective juror exited the courtroom, and the

5       following proceedings were had herein:)

6      (Brief pause)

7      (Prospective juror entered the courtroom, and

8       the following proceedings were had herein:)

9          THE COURT:  You are 154?

10         PROSPECTIVE JUROR:  Yes, your Honor.

11         THE COURT:  And you are an attorney?

12         PROSPECTIVE JUROR:  I am.

13         THE COURT:  And, in fact, you litigate?

14         PROSPECTIVE JUROR:  Right, I do.

15         THE COURT:  And you wouldn't be or at least

16  your clients wouldn't be particularly happy if you

17  were selected for this jury?

18         PROSPECTIVE JUROR:  My clients would be

19  extremely unhappy, Your Honor.

20         THE COURT:  And one of the reasons is, you

21  have, during the period of time, a trial scheduled?

22         PROSPECTIVE JUROR:  I do not have a trial

23  scheduled, I do have court appearances that are

24  likely to happen in a different U.S. jurisdiction.

25         THE COURT:  You do realize that it's

1  extraordinarily difficult for a lawyer to complain
2  about jury service?

3          PROSPECTIVE JUROR:  I'm not complaining, Your
4  Honor.  I think my clients are complaining.  I am
5  more than happy to sit on the jury and to fulfill my
6  obligations as a U.S. citizen.

7          THE COURT:  How long have you been with your
8  firm?

9          PROSPECTIVE JUROR:  A little over 6 years.

10         THE COURT:  Is that the firm you joined out
11 of law school?

12         PROSPECTIVE JUROR:  No, it is.

13         THE COURT:  You were with another firm before
14 then?

15         PROSPECTIVE JUROR:  I was with another firm
16 in a different city for a little under 2 years.

17         THE COURT:  Okay.  Any particular litigation
18 specialty that you have?

19         PROSPECTIVE JUROR:  Yes, I litigate primarily
20 complex patent cases.

21         THE COURT:  When you are not working the
22 customary 60 hours a week, what else do you do?

23         PROSPECTIVE JUROR:  I like to run, I like to
24 travel, I like to read.

25         THE COURT:  How much time do you spend doing

:26PM
:26PM
:26PM
:27PM
:27PM

1  that?

2          PROSPECTIVE JUROR:  I travel about 3 weeks

3  out of the year, if I'm lucky; I read frequently; I

4  run as much as I possibly can; sometimes I do other

5  athletic things, as well.

6          THE COURT:  Where are you from originally?

7          PROSPECTIVE JUROR:  I'm from Fort Wayne,

8  Indiana.

9          THE COURT:  This is why you listed as one of

10 the frequent websites, among them, Yahoo, CNBC, CNN,

11 and Indiana basketball websites?

12         PROSPECTIVE JUROR:  Yes, I did the Indiana

13 basketball website, by far, the most frequently of

14 all of those.

15         THE COURT:  It says that you are counsel on a

16 patent case pending before me, you don't believe you

17 ever appeared.

18         PROSPECTIVE JUROR:  I don't recall appearing

19 before you.  I remember speaking with your minute

20 clerk.

21         THE COURT:  Is that case still pending?

22         PROSPECTIVE JUROR:  It is not.

23         THE COURT:  How long ago did it end?

24         PROSPECTIVE JUROR:  My involvement in that

25 case, I believe, was in the 2005, 2006 timeframe.

1  The case went up to appeal.  I was not involved with

2  the appeal.  I do not know officially when the case

3  ended, but I think it was a year or two ago.

4          THE COURT:  Okay.  Thank you.

5          PROSPECTIVE JUROR:  Thank you.

6      (Prospective juror exited the courtroom, and the

7       following proceedings were had herein:)

8      (Brief pause)

9      (Prospective juror entered the courtroom, and

10      the following proceedings were had herein:)

11         THE COURT:  Hi.  You're 155?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  What do you do at work?

14         PROSPECTIVE JUROR:  I'm an administrative

15 secretary.

16         THE COURT:  At a large hospital here?

17         PROSPECTIVE JUROR:  Yes, in Northwestern

18 Memorial.

19         THE COURT:  And what other kind of jobs have

20 you had?

21         PROSPECTIVE JUROR:  I've been a toddler

22 teacher, I taught drama, I was an event planner for

23 a dating service.

24         THE COURT:  How did the toddler teaching go?

25         PROSPECTIVE JUROR:  I love it.  I still miss

:29PM

:29PM

:30PM

:30PM

:31PM

1 them.

2          THE COURT:  And you have an MFA?

3          PROSPECTIVE JUROR:  No, I have a BA, I'd be

4 looking to get my MFA at some point in my future.

:31PM    5          THE COURT:  And would the MFA be in theater

6 if you got it?

7          PROSPECTIVE JUROR:  Yeah, but I need to

8 decide if that would be directing or, so .....

9          THE COURT:  What do you do in your spare

:31PM   10 time?

11          PROSPECTIVE JUROR:  I volunteer a lot with my

12 church, I perform with with theater in different

13 places, I run.

14          THE COURT:  When was your wallet stollen?

:32PM   15          PROSPECTIVE JUROR:  It was stollen about a

16 month ago.

17          THE COURT:  Did you have a lot of valuable

18 stuff in the wallet?

19          PROSPECTIVE JUROR:  No, they took my cash, my

:32PM   20 gift cards, and my CTA card, and then mailed it back

21 to me.  A very kind theft.

22          THE COURT:  You donate money, time or

23 services to the First Evangelical Free Church?

24          PROSPECTIVE JUROR:  I do.

:32PM   25          THE COURT:  How much time?

1           PROSPECTIVE JUROR:  A bible study once a
2   week, I also am part of a planning team there.  We
3   do a community care clinic every year that I am a
4   part of.  So weekly and yearly, a good chunk.
5           THE COURT:  You spend a lot of time reading
6   and dealing with the news?
7           PROSPECTIVE JUROR:  I don't.
8           THE COURT:  You said here you read the front
9   page of the Wall Street.
10          PROSPECTIVE JUROR:  Right.  I'm responsible
11  for picking up that publication for my office.  So
12  from the first floor to the fourth floor I read the
13  front page.
14          THE COURT:  You surf the Internet for news?
15          PROSPECTIVE JUROR:  I'm sent links with my
16  job.  So any news that I really come in contact with
17  is regarding science and medical advancements.
18          THE COURT:  Okay.  You say you do not have a
19  television at home?
20          PROSPECTIVE JUROR:  I have a television, but
21  I don't have a converter box, so I don't get any
22  television.  I can watch movies.
23          THE COURT:  So it's like a base?
24          PROSPECTIVE JUROR:  It's what?
25          THE COURT:  It's like a base in your house.

1      PROSPECTIVE JUROR:  I watch DVD's.

2      THE COURT:  Right.  But you have heard at

3 least a little about this case, is that correct?

4      PROSPECTIVE JUROR:  Yes, I've heard the name.

5      THE COURT:  It's hard to avoid, isn't it?

6      PROSPECTIVE JUROR:  It is, yeah.

7      THE COURT:  If you sat on this jury and by

8 some chance you heard evidence that reminded you of

9 something you heard, even overheard, would you be

10 able to put that out of your mind or leave it out of

11 your calculus when you're trying to decide whether

12 the government has proved its case?

13      PROSPECTIVE JUROR:  I believe so.

14      THE COURT:  When you were asked the question

15 about would you follow my instructions as I give it

16 to you, I believe what you meant is the one

17 difficulty you would find would be is if this were a

18 capital case.

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  And it's not that.

21      PROSPECTIVE JUROR:  Right.  So I didn't know

22 if there was another example.

23      THE COURT:  Well, most examples have to do

24 with rules.  For example, in drug cases, you

25 sometimes have jurors who think that the government

1  has no business outlawing drugs, and you have some

2  people who feel so strongly the other way that as

3  soon as they hear the accusation, they see red and

4  they can't make a decision.  And we instruct the

5  jurors that we're not asking you your opinion on

6  what the law should be, this is the law and we're

7  asking you to find certain facts, and if you find

8  these facts to be true and proven beyond a

9  reasonable doubt, the defendant is guilty, and if

10 you don't, the defendant is not guilty and no matter

11 what your personal views are, that's an example.

12         PROSPECTIVE JUROR:  Okay.  Thank you.

13         THE COURT:  Thank you.

14    (Prospective juror exited the courtroom, and the

15     following proceedings were had herein:)

16    (Brief pause)

17    (Prospective juror entered the courtroom, and

18     the following proceedings were had herein:)

19         THE COURT:  You are number 156?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Art director, graphic designer?

22         PROSPECTIVE JUROR:  Correct.

23         THE COURT:  You work in freelance now?

24         PROSPECTIVE JUROR:  I am.

25         THE COURT:  Before you were working

 1  freelance, were you employed?

 2          PROSPECTIVE JUROR:  I was.  It was a

 3  full-time art director at an agency.

 4          THE COURT:  And how long have you been

 5  working on this?

 6          PROSPECTIVE JUROR:  Since February of '09.

 7          THE COURT:  What kind of work do you do?

 8          PROSPECTIVE JUROR:  I do, like, direct mail

 9  or collateral posters, print work, some marketing.

10          THE COURT:  And this is what you studied in

11  college?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  You like the work?

14          PROSPECTIVE JUROR:  I do.

15          THE COURT:  Someone close to you -- you have

16  been asked have you ever owned a business and you

17  said yes, is that you or somebody close to you?

18          PROSPECTIVE JUROR:  An ex-husband.

19          THE COURT:  Okay.  Did you work at all in

20  that business?

21          PROSPECTIVE JUROR:  I did not.

22          THE COURT:  The only time you consulted with

23  an attorney was with respect to real estate?

24          PROSPECTIVE JUROR:  Correct.

25          THE COURT:  What do you do for fun?

:38PM

:39PM

:39PM

:39PM

:40PM

1    PROSPECTIVE JUROR:  I hang out with my dog, I
2  hang out with my boyfriend, I read a lot of design
3  magazines, I go to the movies, I play softball.  I
4  guess I kind of just do a lot of hanging out.

5    THE COURT:  How much softball do you play?

6    PROSPECTIVE JUROR:  I play on one team and I
7  have a couple of teams that ask me to sub whenever
8  they need a girl.  So once a week, mainly.

9    THE COURT:  Okay.  And the dog?

10    PROSPECTIVE JUROR:  She's awesome.  She's a
11  little dog.  I've had her for almost 3 years.  She's
12  my first dog.

13    THE COURT:  What kind of dog?

14    PROSPECTIVE JUROR:  Oh what kind of dog?  I'm
15  sorry.

16    PROSPECTIVE JUROR:  She's a little Yorkipoo.

17    THE COURT:  And why did you pick her?

18    PROSPECTIVE JUROR:  Because she was the
19  quietest out of the litter.

20    THE COURT:  Not a bad criteria.

21    You read magazines?

22    PROSPECTIVE JUROR:  I read like design
23  magazines.

24    THE COURT:  You read newspapers?

25    PROSPECTIVE JUROR:  You know, I read the Red

1  Eye once in a while if I'm on the train.

2          THE COURT:  So you're not an avid newspaper

3  reader?

4          PROSPECTIVE JUROR:  I'm not.

5          THE COURT:  You get most of your news from

6  television?

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  You spend a lot of time watching

9  television news?

10         PROSPECTIVE JUROR:  News?  No.

11         THE COURT:  How about radio?

12         PROSPECTIVE JUROR:  I listen to some

13  podcasts.

14         THE COURT:  And how about using the Internet

15  for news?

16         PROSPECTIVE JUROR:  Not for news.  I guess

17  I'm not hugely into news.

18         THE COURT:  Okay.  When I asked if you'd

19  heard or read anything about Rod Blagojevich or

20  members of his family, you checked yes and you said,

21  "I know that he's being sued and removed from

22  office, I think I noticed this from TV," is that a

23  fair summary about what you know?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And you also indicate that you

1   have heard the trial was starting soon?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  So that's about it for you and

4   your knowledge of this case?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  If you were on this jury and you

7   heard some evidence that reminded you of something

8   you may have heard, something you've by today and

9   all of a sudden you remember it, would you be able

10  to, when you went back to decide the case, to keep

11  anything you remember hearing on the news out of the

12  equation and decide this case solely on the basis of

13  what you hear in this courtroom?

14          PROSPECTIVE JUROR:  Yes, I think I can do

15  that.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR:  Thank you.

18      (Prospective juror exited the courtroom, and the

19       following proceedings were had herein:)

20      (Brief pause)

21      (Prospective juror entered the courtroom, and

22       the following proceedings were had herein:)

23          THE COURT:  You are number 157?

24          PROSPECTIVE JUROR:  Yes, I am, sir.

25          THE COURT:  Just put the microphone a little

:43PM

:43PM

:43PM

:44PM

:44PM

1 closer to your mouth.

2          PROSPECTIVE JUROR:  Okay.

3          THE COURT:  Thanks.

4          Can you hear me now?

5          PROSPECTIVE JUROR:  Yes, I can.

6          THE COURT:  I want you to tell me if there's

7 anytime when you can't hear me.

8          PROSPECTIVE JUROR:  Okay. I will.

9          THE COURT:  You're currently unemployed?

10          PROSPECTIVE JUROR: I am.

11          THE COURT:  When was the last time you were

12 employed?

13          PROSPECTIVE JUROR:  (No response.)

14          THE COURT:  How long ago?

15          PROSPECTIVE JUROR:  About 2003.

16          THE COURT:   And what did you do then?

17          PROSPECTIVE JUROR:  Customer service for a

18 printing company.

19          THE COURT:  Okay.  And you consulted with an

20 attorney when you dealt with real estate, a house?

21          PROSPECTIVE JUROR:  Yes, I did.

22          THE COURT:  You're a member of a church?

23          PROSPECTIVE JUROR:  Yes, I am.

24          THE COURT:  How much time would you spend at

25 church in a month, in an average month?

:44PM
:45PM
:45PM
:45PM
:46PM

1       PROSPECTIVE JUROR:  (No response.)

2       THE COURT:  It doesn't have to  be too exact.

3       PROSPECTIVE JUROR:  About 20 hours.

4       THE COURT:  Okay.

5       Do you read newspapers?

6       PROSPECTIVE JUROR:  Excuse me?

7       THE COURT:  Do you read newspapers?

8       PROSPECTIVE JUROR:  Somewhat.  Uh-huh.

9       THE COURT:  Do you pay a lot of attention to

10 the news?

11      PROSPECTIVE JUROR:  No.

12      THE COURT:  Now, both you and your husband

13 are unemployed?

14      PROSPECTIVE JUROR:  Yes, we are.

15      THE COURT:  How long has your husband been

16 unemployed?

17      PROSPECTIVE JUROR:  Ah, he lost his job in

18 2006.  We did part-time work just to make ends meet.

19      THE COURT:  You indicate in this letter that

20 your husband is just about out of or is already out

21 of unemployment.

22      PROSPECTIVE JUROR:  Yes, he is.

23      THE COURT:  Okay.  And you also indicated

24 that it would be difficult for you to sit in

25 judgment on another person, is that true?

1          PROSPECTIVE JUROR:  It would be very hard for

2     me to do that, sir.

3          THE COURT:  How long has that been true for?

4          PROSPECTIVE JUROR:  I don't believe I ever

5     judged anybody to that extent.

6          THE COURT:  Okay.  Thank you.

7        (Prospective juror exited the courtroom, and the

8         following proceedings were had herein:)

9        (Brief pause)

10       (Prospective juror entered the courtroom, and

11        the following proceedings were had herein:)

12          THE COURT:  You are 158?

13          PROSPECTIVE JUROR:  Yes, I am.

14          THE COURT:  You are a college graduate?

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  And you work as an engineer?

17          PROSPECTIVE JUROR:  Correct.

18          THE COURT:  What kind of engineering do you

19     do?

20          PROSPECTIVE JUROR:  Design engineer, design

21     plastic parts for packaging.

22          THE COURT:  How long have you been doing

23     that?

24          PROSPECTIVE JUROR:  Last 3 years.

25          THE COURT:  Did you have other jobs?

:48PM

:49PM

:49PM

:49PM

:49PM

1           PROSPECTIVE JUROR:  A few.

2           THE COURT:  Same kinds of jobs or --

3           PROSPECTIVE JUROR:  Same basic principal,

4  different companies, different products.

5           THE COURT:  You said that someone, you or

6  someone close to you owned a business.  Is that you

7  or someone close to you?

8           PROSPECTIVE JUROR:  A friend of mine had a

9  bike repair business.

10           THE COURT:  Did you work at all with him in

11  that business?

12           PROSPECTIVE JUROR:  Helped out every once in

13  a while.

14           THE COURT:  Do you like your work?

15           PROSPECTIVE JUROR:  Yes, I do.

16           THE COURT:  Do you really think you might

17  some day go to law school?

18           PROSPECTIVE JUROR:  Been contemplating it.

19           THE COURT:  Okay.  You might not like that

20  work as well.

21           PROSPECTIVE JUROR:  Maybe.  I'm not sure yet.

22           THE COURT: You were a witness to a drowning?

23           PROSPECTIVE JUROR:  Correct.

24           THE COURT:  And you had to testify where?

25           PROSPECTIVE JUROR:  It was in a deposition in

1  southern Indiana.

2          THE COURT:  How long ago was that?

3          PROSPECTIVE JUROR:  '93, I believe.  Well,

4  the drowning was in '93, the deposition was in '95,

5  '96.

6          THE COURT:  Are there any kind of groups or

7  organizations that you work for or donate to?

8          PROSPECTIVE JUROR:  Donated to the Boys

9  Scouts and my fraternity.

10         THE COURT:  Have you done that consistently

11 over the years?

12         PROSPECTIVE JUROR:  No, sir.

13         THE COURT:  Were you a Boy Scout?

14         PROSPECTIVE JUROR:   Yes, I was.

15         THE COURT:  For how long?

16         PROSPECTIVE JUROR:  Until I was 15, 16.

17         THE COURT:  You read a lot of news?

18         PROSPECTIVE JUROR:  On occasion.

19         THE COURT:  So you don't go searching for

20 news on the Internet every half hour or so?

21         PROSPECTIVE JUROR:  No, sir.

22         THE COURT:  Read any newspapers in

23 particular?

24         PROSPECTIVE JUROR:  Tribune, if I ever do

25 read one.

1      THE COURT:  The websites you list as sources
2  of information look to me as sites that are
3  information sites as opposed to news sites, is that
4  correct?
5      PROSPECTIVE JUROR:  Correct; they're tech
6  blogs.
7      THE COURT:  Have you seen or heard anything
8  about this case?
9      PROSPECTIVE JUROR:  Just the headlines.
10     THE COURT:  Would it be fair to say or unfair
11 to say that you're not particularly interested?
12     PROSPECTIVE JUROR:  I'm interested, but, I
13 mean, I know -- I mean, I don't know all the
14 specifics of the case yet, so ....
15     THE COURT:  Ever been summoned for a jury
16 before?
17     PROSPECTIVE JUROR:  No, sir.
18     THE COURT:  You're in your current job for
19 3 years?
20     PROSPECTIVE JUROR:  Yes, sir.
21     THE COURT:  What's the longest you've held
22 your previous job?
23     PROSPECTIVE JUROR:  I'd say about 3 years.
24     THE COURT:  Do you read any particular
25 magazines?

:52PM
:52PM
:53PM
:53PM
:54PM

1        PROSPECTIVE JUROR:  Just Wire.

2        THE COURT:  Are you a diligent reader of

3  Wire?

4        PROSPECTIVE JUROR:  I'd say so.

5        THE COURT:  And how long have you been doing

6  that?

7        PROSPECTIVE JUROR:  3 or 4 years.

8        THE COURT:  Thank you.

9        PROSPECTIVE JUROR:  Thank you.

10     (Prospective juror exited the courtroom, and the

11      following proceedings were had herein:)

12     (Brief pause)

13     (Prospective juror entered the courtroom, and

14      the following proceedings were had herein:)

15        THE COURT:  You're 159?

16        PROSPECTIVE JUROR:  That is correct.

17        THE COURT:  You have a degree from college?

18        PROSPECTIVE JUROR:  I do; from Columbia

19  College, Chicago.

20        THE COURT:  Your major was?

21        PROSPECTIVE JUROR:  Music business production

22  management, a degree in arts entertainment media

23  management.

24        THE COURT:  And what kind of work do you now

25  do?

1       PROSPECTIVE JUROR:  I work on my website
2  called couponcabin.com.  I was hired as a social
3  media director and I was recently promoted to
4  international account manager.  Also am an
5  entertainer.  On the weekends I am a dancer in MC
6  for bar mitzvahs and private events.  And I also do
7  private security for private events also at private
8  parties.  And I'm a licensed private security, so
9  I'm able to carry and conceal in the State of
10 Illinois under a corporate protective services, the
11 Private Security Act of 2004.
12      THE COURT:  Do you have a favorite among
13 those occupations?
14      PROSPECTIVE JUROR:  Doing the couponcabin and
15 also performing.
16      THE COURT:  All right.  And what was the
17 first job you had?  What's the one you've been at
18 the the longest?
19      PROSPECTIVE JUROR:  Boom entertainment.
20      THE COURT:  The second longest?
21      PROSPECTIVE JUROR:  It would be with
22 security, but that's part-time, very part-time, very
23 occasional.  But my full-time 8:00 to 5:00 would be
24 couponcabin.
25      THE COURT:  Okay.  The answer to the question

1  whether you or anyone close to you has ever owned a
2  business and the answer is yes.
3         PROSPECTIVE JUROR:  Throughout college I did
4  private events and promotions and I was partner in
5  the original Boom Entertainment Company.  So I was
6  partner in the sister company called Boom
7  Productions, but that was dissolved.
8         THE COURT:  Given all the various things you
9  do, do you have anything that you would regard as an
10 outside hobby or an outside interest?
11        PROSPECTIVE JUROR:  I mean, I play guitar,
12 listen to music.  Do the normal post-graduate
13 college activities, I would say.
14        THE COURT:  News, what is your source of
15 news?
16        PROSPECTIVE JUROR:  I would say because I'm
17 the owner of that company, definitely just going on
18 Yahoo, my home page, seeing the updates, Twitter
19 updates.  My source of friends, I would say, you
20 know, if I'm on Facebook I would see what my friends
21 post, and see some artists.  Or, you know, if I'm
22 laying in bed at night I would, you know, CNBC or
23 CNN, see what's going on.  But that would be my main
24 source, would be Internet or late night news.
25        THE COURT:  When you say see what's going on,

1  are there any particular areas of interest that you

2  have?  Things that you check in particular?

3          PROSPECTIVE JUROR:  I just recently just

4  watched between Israel and Turkey and that stuff

5  because of my family and that whole situation.  I

6  was in Israel a few years back, so .... Just the

7  whole situation semi-interesting to me because of my

8  family and relations to my religion.

9          THE COURT:  Are you the kind of person, for

10 example, who would check to see what the headlines

11 of the day are?

12         PROSPECTIVE JUROR:  I mean, not so much, not

13 on a daily basis.  If I'd come across it, if it's

14 interesting to me, I'll read it if I catch a

15 glimpse.  But I'm not, you know, an avid checker of

16 the newspaper.  Or, you know, I'll get the Red Eye

17 once in a while and see what shows are coming in

18 town, or what to do this weekend, or what the lineup

19 was at the Lalapalooza that just came out, that was

20 interesting to me.

21         THE COURT:  So it's fair to stay you're not a

22 general news reader, you're looking for things that

23 you already know would interest you, is that right?

24         PROSPECTIVE JUROR:  Correct.  If my friends

25 tell me of something, then I'll go more likely

1   research it.

2        THE COURT:  Is politics one of the subjects

3   that interest you?

4        PROSPECTIVE JUROR:  I mean, that's always

5   been, you during high campaign times or during,

6   obviously, the last election I was very interested,

7   but not to the degree of some of my associates or

8   some of friends.  I'm not very involved in politics.

9        THE COURT:  Okay.  Do you remember hearing or

10  reading anything about this case?

11       PROSPECTIVE JUROR:  I wasn't 100 percent

12  sure, you know, I just heard basic lines when it

13  came out about what had happened, and that was the

14  last of it, and so another day and then that was it.

15       THE COURT:  If you sat on a jury in this

16  case, would you be able to disregard everything you

17  heard or read before, if you happen to remember, and

18  decide this case only on the basis of you hear in

19  the courtroom?

20       PROSPECTIVE JUROR:  Absolutely.

21       THE COURT:  How much of your time would you

22  actually be working in security?

23       PROSPECTIVE JUROR:  I mean, it was as called

24  upon.  You know, as private events and then as

25  needed.

1          THE COURT:  Say in a period of 3 months, how

2     many times?

3          PROSPECTIVE JUROR:  Maybe two weekends, so

4     maybe 8 hours.

:00PM    5          THE COURT:  Okay.  And do you work in that

6     enterprise, do you work on calls?  Somebody calls

7     and says we need you?

8          PROSPECTIVE JUROR:  That would be correct.

9     My boss would just call me and say I need you this

:00PM   10     weekend, and if you can work, that would be great,

11     if not .... You know, it would be more me calling

12     him and saying, hey, do you have anything for me, he

13     would be, sure, come out this Tuesday, you could

14     work a detail.

:01PM   15          THE COURT:  Okay.  And in terms of your

16     personal entertainment, how do you get those jobs?

17          PROSPECTIVE JUROR:  I booked as an

18     entertainer.  Boom Entertainment is an entertainment

19     company, and so I just get booked as an entertainer

:01PM   20     for them.  I'm freelance entertainer, basically, but

21     they book me on no contracts.

22          THE COURT:  Ever been arrested for a crime?

23          PROSPECTIVE JUROR:  I have not.

24          THE COURT:  Ever been a victim of a crime?

:02PM   25          PROSPECTIVE JUROR:  I have not.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR:  Thank you so much for

3     your time.

4        (Prospective juror exited the courtroom, and the

5         following proceedings were had herein:)

6        (Brief pause)

7        (Prospective juror entered the courtroom, and

8         the following proceedings were had herein:)

9          THE COURT:  You are number 160?

10         PROSPECTIVE JUROR:  Yes, sir.

11         THE COURT:  You are a college graduate and

12    you have some post-graduate education?

13         PROSPECTIVE JUROR:  Yes, sir.

14         THE COURT:  In what field?

15         PROSPECTIVE JUROR:  Psychology.

16         THE COURT:  What do you do at work?

17         PROSPECTIVE JUROR:  Right now I just got a

18    new job as an editor copy check for the independent

19    media group.

20         THE COURT:  And what job did you have before

21    that?

22         PROSPECTIVE JUROR:  Before that I was doing

23    the same thing with Chicago Media Group.  I got

24    transferred to the Chicago Media Group.

25         THE COURT:  You have a brother who's a

1  lawyer?

2       PROSPECTIVE JUROR:  Yes, I do.

3       THE COURT:  Do you know what kind of law he

4  practices?

5       PROSPECTIVE JUROR:  Mostly contract.

6       THE COURT:  Do you see your brother often?

7       PROSPECTIVE JUROR:  Yes, I do; regularly.

8       THE COURT:  You were a victim of a crime?

9       PROSPECTIVE JUROR:  I have been.

10      THE COURT:  And what was that?

11      PROSPECTIVE JUROR:  It was a hate crime about

12 7 years ago in Wrigleyville.

13      THE COURT:  And someone was charged?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  And was that person convicted?

16      PROSPECTIVE JUROR:  I don't recall the result

17 of that.

18      THE COURT:  Did you have to go to court for

19 that?

20      PROSPECTIVE JUROR:  Pardon me?

21      THE COURT:  Did you have to go to court for

22 that?

23      PROSPECTIVE JUROR:  No, I didn't have to.

24      THE COURT:  Do you volunteer your time or

25 donate money to any organization?

:04PM

:04PM

:04PM

:04PM

:05PM

1          PROSPECTIVE JUROR:  I do.  Cierra Club, some
2   other organizations.
3          THE COURT:  Time or money or both?
4          PROSPECTIVE JUROR:  Yes; both.
5          THE COURT:  Both?
6          PROSPECTIVE JUROR:  Both.
7          THE COURT:  How much time in the course of a
8   month would you say you donated?
9          PROSPECTIVE JUROR:  In the course of a month?
10  Maybe 5 hours a week and over the course of a year,
11  this past year I've successful, probably $10,000.
12         THE COURT:  So it's a substantial commitment
13  to you?
14         PROSPECTIVE JUROR:  Yes; substantially.
15         THE COURT:  Your most common source of news
16  is the Internet?
17         PROSPECTIVE JUROR:  Correct.
18         THE COURT:  You check general news sources or
19  are you more interested in specific --
20         PROSPECTIVE JUROR:  Well, I get paid to read
21  the news, so I read it constantly, yes.  I read from
22  the reports as they send me stuff and I also read
23  other resources well.
24         THE COURT:  Ever get tired of the news?
25         PROSPECTIVE JUROR:  I'm a news junkie.

:05PM
:05PM
:05PM
:05PM
:06PM

1          THE COURT:  Does this mean that you've read

2    pretty much everything about --

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  -- about this case?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  And you really think you made up

7    your mind, you couldn't disregard what you've read?

8          PROSPECTIVE JUROR:  I don't believe that,

9    sir.

10          THE COURT:  Is that based on the quantity of

11    what you read?

12          PROSPECTIVE JUROR:  Pretty much in the

13    quantity of what I've read.

14          THE COURT:  Thank you.

15          PROSPECTIVE JUROR:  You're welcome.

16       (Prospective juror exited the courtroom, and the

17        following proceedings were had herein:)

18       (Brief pause)

19       (Prospective juror entered the courtroom, and

20        the following proceedings were had herein:)

21          THE COURT:  You're number 108?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  I understand that you were

24    supposed to be here yesterday but you had car

25    difficulties?

1         PROSPECTIVE JUROR:  Yes.

2         THE COURT:  What do you do for a living?

3         PROSPECTIVE JUROR:  I work at an auto parts

4    store.

:07PM  5         THE COURT:  And what do you do for them?

6         PROSPECTIVE JUROR:  I am a parts manger

7    there.

8         THE COURT:  You indicate that you're a store

9    key holder, meaning?  What does that mean?

:07PM  10         PROSPECTIVE JUROR:  When the store manger is

11   not there, I'm in charge.

12         THE COURT:  Does it also mean you can open

13   the door and lock the door?

14         PROSPECTIVE JUROR:  Correct.

:08PM  15         THE COURT:  How long have you worked there?

16         PROSPECTIVE JUROR:  About 5 years.

17         THE COURT:  You work anywhere else before

18   that?

19         The mike is working.

:08PM  20         PROSPECTIVE JUROR:  Or it's working?

21         THE COURT:  Yeah.

22         PROSPECTIVE JUROR:  Okay.

23         I did work at Continental Nissan Dealership.

24         THE COURT:  Some kind of work?

:08PM  25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And most of the time you deal

2    with customers, is that correct?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  But you do have some basic

:08PM    5    knowledge of auto mechanics?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What's your outside interests?

8    What do you do when you're not working?

9          PROSPECTIVE JUROR:  I like to work on my

:09PM   10    cars, sports; that's pretty much it.

11          THE COURT:  What kind of sports?

12          PROSPECTIVE JUROR:  Play all type of sports;

13    baseball, basketball, pretty much, like, anything.

14          THE COURT:  How many hours a week would you

:09PM   15    say you devote to playing sports?

16          PROSPECTIVE JUROR:  About 5 hours each day.

17          THE COURT:  And how about working on

18    vehicles?

19          PROSPECTIVE JUROR:  Same amount.

:09PM   20          THE COURT:  Did you find it odd that

21    yesterday you had car trouble?

22          PROSPECTIVE JUROR:  Did I find it odd?

23          THE COURT:  Yeah.

24          PROSPECTIVE JUROR:  No.

:09PM   25          THE COURT:  What do you read?  Magazines,

1  books?

2        PROSPECTIVE JUROR:  Sports magazines; pretty

3  much anything, too.

4        THE COURT:  Do you read the newspapers?

:10PM    5        PROSPECTIVE JUROR:  Not really.

6        THE COURT:  Where do you get your news from?

7        PROSPECTIVE JUROR:  Internet.

8        THE COURT:  And what do you look up on the

9  Internet?

:10PM    10        PROSPECTIVE JUROR:  Pretty much the only

11  thing I look up is just, you know, whenever I go on

12  Yahoo, the main pages or main news.

13        THE COURT:  How about radio, do you listen to

14  radio?

:10PM    15        PROSPECTIVE JUROR:  Once in a while.  Once in

16  a while I do.

17        THE COURT:  What are you looking for on the

18  radio?

19        PROSPECTIVE JUROR:  All sorts of radio

:10PM    20  stations.  I mean, 103.5 or 101.9.

21        THE COURT:  You know anything about this case

22  at all?

23        PROSPECTIVE JUROR:  Not really.

24        THE COURT:  Is that because if news comes out

:11PM    25  about this case you really don't care?

1        PROSPECTIVE JUROR:  Yeah.

2        THE COURT:  Ever been on a jury before?

3        PROSPECTIVE JUROR:  No.

4        THE COURT:  Ever been called for jury duty

5  before?

6        PROSPECTIVE JUROR:  No.

7        THE COURT:  Do you remember anything at all

8  about this case?

9        PROSPECTIVE JUROR:  Not really.

10        THE COURT:  Are you a registered voter?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Did you vote in the last

13  election?

14        PROSPECTIVE JUROR:  No, I didn't.

15        THE COURT:  How about the election before

16  that?

17        PROSPECTIVE JUROR:  No, I didn't.

18        THE COURT:  Have you ever voted?

19        PROSPECTIVE JUROR:  Yes.

20        THE COURT:  When was the most recent time you

21  voted?

22        PROSPECTIVE JUROR:  The previous year.

23        THE COURT:  Okay.  Thank you.

24     (Prospective juror exited the courtroom, and the

25      following proceedings were had herein:)

:11PM
:11PM
:12PM
:12PM
:12PM

1      (Brief pause)

2          THE COURT:  There is one more person on the

3   list, but that person has had difficulty getting

4   here and will be heard on Monday, that is number

5   139.

6          That's it for now.  What I'm going to do is

7   recess and then we can do some challenges for cause

8   and we can do the others on Monday.

9          The reason we're doing some now is because I

10  think there are some that are fairly obvious.  So

11  we'll deal with them and then again on Monday.  I'll

12  be back out at the half hour.

13     (Recess.)

14     (The following proceedings were had in open

15      court:)

16          THE COURT:  Somebody come up to the lectern.

17     (Brief pause)

18          THE COURT:  In order to preserve my

19  recordkeeping, instead of doing what I did this

20  morning I'm just going to call out a number and

21  whoever wants to speak to it can do so.

22          131?

23          MR. SCHAR:  No objection.

24          MR. ADAM, JR.:  Your Honor, if I may.  You

25  said these are just obvious and we can preserve them

:12PM

:12PM

:38PM

:38PM

:38PM

1 for Monday or --

2      THE COURT:  No, you can preserve them for

3 Monday, but there are ones that are obvious and so

4 we'll deal with those.

5      MR. ADAM, JR.:  Oh, okay.

6      MR. SOROSKY:  Concerning 131, we have an

7 objection, but based upon your earlier ruling, we

8 did not put that in the obvious category.

9      THE COURT:  That's fine.

10      132?

11      MR. ADAM, JR.:  No objection.

12      MR. NIEWOEHNER:  No objection.

13      THE COURT:  133?

14      MR. ADAM, JR.:  No objection, Your Honor.

15      MR. SCHAR:  No objection.

16      THE COURT:  134?

17      MR. SOROSKY:  We may have an objection, but

18 we'll wait until Monday on that.

19      THE COURT:  Right.

20      135?

21      MR. ADAM, JR.:  No objection.

22      MR. SCHAR:  No objection.

23      THE COURT:  136?

24      MR. SOROSKY:  We may have an objection, but

25 we'll wait until Monday.

1           THE COURT:  137?

2           MR. ADAM, JR.:  No objection, Your Honor.

3           MR. SCHAR:  No objection, Judge.

4           THE COURT:  138?

5           MR. ADAM, JR.:  Objection, obvious, Your

6   Honor.

7           MR. SOROSKY:  Do you want --

8           MR. SCHAR:  We don't agree with that, Judge.

9           THE COURT:  I am sustaining that objection,

10  the main reason I'm sustaining the objection is more

11  his hardship argument.  I might sustain it, anyway,

12  but ....

13          MR. ADAM, JR.:  Yes, your Honor.

14          THE COURT:  138?

15          MR. SOROSKY:  138 we already ruled on.

16          THE COURT:  Yeah, that's right.  Sorry.

17          139?

18          MR. SOROSKY:  That is the juror --

19          THE COURT:  That's for Monday.  Sorry.

20          MR. ADAM, JR.:  Yes, your Honor.

21          MR. SOROSKY:  Right.

22          THE COURT:  140?

23          MR. SOROSKY:  There may be some objection.

24  We'll wait until Monday on that, Judge.

25          THE COURT:  141?

1          MR. ADAM, JR.:  Objection, obvious, Your

2  Honor.

3          MR. SCHAR:  We don't object to that, Your

4  Honor.  We agree.

5          MS. HAMILTON:  We all agree.

6          THE COURT:  It's interesting that it's still

7  around.

8          MR. ADAM, JR.:  I know.  Yes, sir.

9          THE COURT:  142?

10          MR. SOROSKY:  We ask if that could be held

11  off until Monday.

12          MR. SCHAR:  We have to object on that one.

13  He seems incapable of not --

14          THE COURT:  You want to object too?

15          MR. ADAM, JR.:  Yes, Your Honor.  We object.

16  We'll do that by agreement.

17          THE COURT:  Sustained.

18          143?

19          MR. SOROSKY:  We would object.  We say it's

20  obvious.

21          MR. SCHAR:  We agree, Judge.

22          THE COURT:  144?

23          MR. ADAM, JR.:  Objection, and obvious, Your

24  Honor.

25          MR. SCHAR:  We agree, Judge.

1          THE COURT:  Yes; if no other thing, it's a

2  language difficulty.

3          MR. ADAM, JR.:  Yes, sir.

4          THE COURT:  Number 145?

:42PM  5          MR. ADAM, JR.:  May we hold that until

6  Monday, Your Honor?

7          MR. SOROSKY:  Unless you feel it's obvious.

8          THE COURT:  My concern is -- I have to look

9  at this again.  My concern is what appears in

:43PM  10  question 21 on Page 9.

11          MR. ADAM, JR.:  May I have a moment, Your

12  Honor?

13          THE COURT:  Yeah.

14     (Brief pause)

:43PM  15          THE COURT:  And it's a concern that, I think,

16  cuts against either side significantly.

17          MR. ADAM, JR.:  May we say in the abundance

18  of caution, Your Honor, to strike her for cause.

19          MR. SCHAR:  We don't object, Judge.

:44PM  20          THE COURT:  All right.

21          MR. ETTINGER:  Which one was that?

22          MR. SOROSKY:  145.

23          THE COURT:  146?

24          MR. ADAM, JR.:  No objection, Your Honor.

:44PM  25          MR. SCHAR:  No objection.

```
 1          THE COURT:  147?
 2          MR. ADAM, JR.:  Objection, obvious.
 3          MR. SCHAR:  Agree, Judge.
 4          THE COURT:  Yes, it is fairly obvious.
 5          148?
 6          MR. ADAM, JR.:  No objection.
 7          MR. SCHAR:  No objection.
 8          THE COURT:  149?
 9          MR. ADAM, JR.:  No objection.
10          THE COURT:  I have a concern with language.
11          MR. SCHAR:  As do we, Judge.
12          THE COURT:  That's my concern.
13          MR. SOROSKY:  For cause, we have no problem
14  with cause.
15          THE COURT:  Okay.
16          150?  Have you seen the letter?
17          MR. SCHAR:  I don't think we have.
18          MR. ADAM, JR.:  We have not, Your Honor.
19          THE COURT:  This is "we the employer of 150"
20  he doesn't say "150" but I made the editorial
21  change, "we, the employer of 150, he is the lead
22  senior software developer, a key employee, oversees
23  the design, build and quality of work product for
24  half of our engineers.  Over the next 4 months we
25  have three software releases promised to his
```

:44PM
:44PM
:45PM
:45PM
:45PM

1  clients."  Basically, they're saying it's a small

2  company and it's a devastating loss, and I think

3  he's telling the truth.

4         MR. ADAM, JR.:  Yes, sir.  We have no

5  objection.

6         MR. ETTINGER:  We have no objection.

7         THE COURT:  All right.

8         151?

9         MR. ADAM, JR.:  No objection, Your Honor.

10        MR. SCHAR:  No objection.

11        THE COURT:  152?

12        MR. ADAM, JR.:  We may make an objection

13 Monday, unless Your Honor thinks it's obvious.

14        MR. SCHAR:  I guess the question is, I know

15 there was a hardship that was brought up at the end.

16        THE COURT:  I'd save this one, and the reason

17 I'd save this one is that the contingency that might

18 make this a hardship is still a contingency and

19 we'll have alternates.  This is the kind of thing

20 where we can have a little leeway.  So I'm not doing

21 it now.  If somebody has other objections, they can

22 raise them on Monday.

23        MR. ADAM, JR.:  Yes, your Honor.

24        MR. SCHAR:  Judge, is she still here?  The

25 only question we'd ask -- she was the one who

1  indicated that she had a conviction out of state.
2  If that is a felony conviction, with a felony
3  conviction, technically, she can't sit.  So I don't
4  know if she is still here whether that could be
5  resolved.
6           MR. ETTINGER:  Is it a felony?
7           MR. ADAM, JR.:  I don't know.
8           THE COURT:  Is she still here?
9           THE CLERK:  Don't know.
10          THE COURT:  Maybe we can find out.
11          MR. SCHAR:  Okay.
12          MR. SOROSKY:  Your Honor, on 149, if we could
13  revisit that and perhaps hold that until Monday?
14          MR. ETTINGER:  The lady with the Polish.
15          MR. SOROSKY:  That was the juror with the
16  understanding problem, that seems to be her only --
17          THE COURT:  Yeah.  Okay.
18          MR. SOROSKY:  Could we consider that Monday?
19          THE COURT:  Yeah.
20          So we're saving 152?
21          MR. ADAM, JR.:  Yes, your Honor.
22          THE COURT:  For further investigation.
23          153?
24          MR. ADAM, JR.:  No objection.
25          MR. SCHAR:  No objection, Judge.

1          MR. ETTINGER:  No objection.

2          THE COURT:  154?

3          MR. ADAM, JR.:  Objection, obvious.

4          THE COURT:  Well, wait, wait, wait.  What I

5 think everybody has to look at, which I didn't raise

6 for obvious reasons, is his response to question 65

7 E, the meaning of which I think everybody here

8 understands.

9          MR. ADAM, JR.:  Yes, your Honor.

10          THE COURT:  So he's out.

11          155?

12          MR. SOROSKY:  No objection.

13          MR. SCHAR:  No objection, Your Honor.

14          THE COURT:  156?

15          MR. SOROSKY:  No objection.

16          MR. SCHAR:  No objection.

17          THE COURT:  Okay.  I think that's the end of

18 it for us.

19          MR. ADAM, JR.:  157, Your Honor.

20          MR. SCHAR:  157, Your Honor.

21          THE COURT:  Oh, wait.  Wait.

22       (Brief pause)

23          THE COURT:  Anyone want to say anything?

24          MR. SOROSKY:  We want to object for cause.

25          MR. SCHAR:  We agree.

1           THE COURT:  Yeah.

2           158?

3           MR. SCHAR:  No objection.

4           MR. ADAM, JR.:  No objection, Your Honor.

:50PM  5           MR. SOROSKY:  Well, could we hold that until

6    Monday?

7           THE COURT:  Sure.

8           159?

9           MR. SCHAR:  No objection.

:50PM  10          MR. ADAM, JR.:  No objection.

11          THE COURT:  We may have an issue.  I think we

12   gave you a sheet of paper on this one.

13          MR. SCHAR:  Given the age on the sheet of

14   paper --

:50PM  15          THE COURT:  How old was he?

16          MR. SCHAR:  13.

17          THE COURT:  If you don't care, I don't care.

18          MR. ADAM, JR.:  Yes, your Honor.  We don't.

19          THE COURT:  No objection.

:50PM  20          160?

21          MR. SCHAR:  That's cause, obvious.

22          MR. ADAM, JR.:  Agreed.

23          THE COURT:  Is the statement on Page 37 true

24   of this questionnaire?

:51PM  25          MR. ADAM, JR.:  The last page, Your Honor?

1          THE COURT:  Yeah.

2          MR. ADAM, JR.:  We believe so, yes, your

3   Honor.

4          THE COURT:  You mean it does not stick out in

5   anybody's memory?

6          MR. SCHAR:  He does.

7          THE COURT:  He does?

8          108?

9          MR. SOROSKY:  No objection.

10          MR. ADAM, JR.:  No objection.

11          MR. SCHAR:  I guess we'll argue that one.

12          THE COURT:  Yeah, you can argue that one

13   Monday.

14          MR. ADAM, JR.:  May I address the Court, Your

15   Honor?

16          THE COURT:  As soon they finish counting.

17          MR. ADAM, JR.:  Yes, sir.

18       (Brief pause)

19          THE COURT:  Okay, we have lost 12 by

20   agreement and I think we have 11 to which there's no

21   objection, something like that, which means we're

22   making decent progress.

23          Now, somebody wanted say something.

24          MR. ADAM, JR.:  If I may, Your Honor.  In the

25   earlier session we did causes on the ones from

1 yesterday.  Something came to our attention today by

2 a piece of paper that was given to us regarding

3 juror 113.  It is regarding questions 26 A, B,C and

4 D.

5          THE COURT:  Which -- wait.  Hang on one

6 second.

7      (Brief pause)

8          THE COURT:  He was the one on which the check

9 was not done.  I had the check done, and the check

10 turned up something, and we showed it to all of you,

11 and I anticipated that this would be raised.

12          MR. ADAM, JR.:  Yes, sir.

13          MR. SCHAR:  Again, our position is that he

14 probably be brought back and asked about it more

15 directly, which seemed to be the process today when

16 this issue came up and see if the answer is

17 consistent.

18          THE COURT:  Can I see the sheet?

19          MR. ADAM, JR.:  May I approach?

20          THE COURT: Just give it to Mr. Walker.

21      (Brief pause)

22          THE COURT:  I'll bring him back, but I'd have

23 to get an exceptional explanation.

24          MR. ADAM, JR.:   Thank you, Your Honor,

25          THE COURT:  Anything else?

1          MR. SCHAR:  I assume there would be 30
2     brought in on Monday, and if we have an opportunity
3     on Monday morning to look at those questionnaires at
4     the beginning of the day.
5          THE COURT:  We will attempt to do that.
6          MR. SCHAR:  Thank you, Judge.
7          THE COURT:  We need 40 to be sure that we
8     have a jury.  So we'll need somewhere between, let's
9     say, 8 and 12 at the end of Monday.  If we have
10    enough at the end of Monday and if we have more than
11    enough at the end of Monday, what I'm going to bring
12    that group back on Tuesday morning where we'll then
13    do the peremptories.
14         MR. ADAM, JR.:  Sure.
15         THE COURT:  And then I expect opening in the
16    afternoon on Tuesday.
17         MR. SOROSKY:  Your Honor, if we could ask one
18    thing.  Blagojevich's daughter is graduating from
19    grammar school Tuesday afternoon and I think the
20    graduation ceremony begins late afternoon.  So
21    looking at all the good progress we've made, could
22    we begin opening, perhaps, Wednesday morning?
23         THE COURT:  I would be extremely reluctant to
24    do that.  I would be willing, if all goes well, to
25    start earlier on Tuesday and end earlier.  But I

1  don't want to put us in a position where we pick the

2  jury and then we say come back later.  The reason

3  for this applies particularly to cases like this as

4  opposed to some ordinary trial.  We are asking a lot

5  of jurors in terms of the time commitment, and one

6  of the last things we want to communicate to those

7  jurors is that we're taking a half a day here or a

8  half a day there for the convenience of lawyers.

9  And given my own experience, I know that when the

10  half day is taken, even if it's not for the

11  convenience of lawyers, even when there is some

12  particularly good reason, you will have some jurors

13  who think ill of either everybody in the courtroom

14  or someone in the courtroom and you never know.

15        So I don't want to take that chance.  We are

16  going to have very few accommodations in terms of

17  time in this case.  If we have a very substantial

18  portion for completion of the opening statement and

19  it's a little early in the afternoon, that's fine.

20  But to wipe out a part of the day is going to be

21  mischief.

22        Thanks.

23        MR. SCHAR:  Thanks, Judge.

24

25

1        MR. ADAM, JR.:  Thank you, Your Honor.

2        THE COURT:  Thanks.

3

4    (Adjournment taken from 4:59 o'clock p.m. to

5     9:30 o'clock a.m. on June 7, 2010.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* * * * * * * *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

MATTER


/s/Blanca I. Lara                         date




_____        _____

        Blanca I. Lara                         Date