1527

1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4          Government,               )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   June 16, 2010
    ROBERT BLAGOJEVICH,              )
7                                    )
               Defendants.           )   9:17 o'clock a.m.
8

9                      VOLUME 9
               TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
11

12
    For the Government:
13
               THE HONORABLE PATRICK J. FITZGERALD,
14             UNITED STATES ATTORNEY
               BY:  Reid J. Schar
15                  Carrie E. Hamilton
                    Christopher Niewoehner
16             Assistant United States Attorneys
               219 South Dearborn Street
17             Suite 500
               Chicago, Illinois 60604
18

19

20
    Court Reporter:
21
               Blanca I. Lara, CSR, RPR
22             219 South Dearborn Street
                    Room 2504
23             Chicago, Illinois 60604
                  (312) 435-5895
24

25

1528

1 APPEARANCES   (continued:)

2

3 For Defendant Rod Blagojevich:

4         KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
5         158 West Erie
          Chicago, Illinois 60610
6         (312) 640-1776

7         LAW OFFICE OF SAMUEL E. ADAM
          BY:  Samuel Forbes Adam
8              Samuel Adams, Jr.
          6133 South Ellis Avenue
9         Suite 200
          Chicago, Illinois 60637
10        312-726-2326

11        OFFICES OF AARON B. GOLDSTEIN
          BY: Aaron Benjamin Goldstein
12        6133 South Ellis
          Chicago, Illinois 60637
13        (773) 752-6950

14        OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
15        2140 N. Lincoln Park West
          Suite 307
16        Chicago, Illinois 60614
          (773) 517-0622
17
          LAW OFFICES of MICHAEL GILLESPIE
18        BY:  MICHAEL GILLESPIE
          53 West Jackson Boulevard
19        Suite 1420
          Chicago, Illinois 60604
20        (312) 726-9015

21

22

23

24

25

1529

1 APPEARANCES  (continued:)

2

3 For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
         BY:  Michael D. Ettinger
5              Cheryl Ann Schroeder
         12413 South Harlem
6         Suite 203
         Palos Hills, Illinois 60453
7         (708)598-1111

8

         Edelman, Combs, Latturner & Goodwin LLC
9         BY:  Robyn S. Molaro
         120 S. LaSalle
10        Suite 1800
         Chicago, Illinois 60603
11        (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                       INDEX OF EXAMINATION

 2   WITNESS                                        PAGE

 3    JOSEPH ARAMANDA

 4    Direct Examination (Resumed) By Mr. Niewoehner... 1538

 5    Cross Examination By Mr. Gillespie............... 1561

 6    SHARI SCHINDLER

 7    Direct Examination By Mr. Schar.................. 1716

 8    Cross Examination By Mr. Goldstein.............. 1726

 9    Redirect Examination By Mr. Schar............... 1735

10    Recross Examination By Mr. Goldstein............ 1736

11    ANTHONY POPE

12    Direct Examination By Mr. Niewoehner............ 1742

13    Cross Examination By Mr. Sorosky................ 1763

14    JOSEPH CARI

15    Direct Examination By Mr. Schar................. 1775

16

17

18   EXHIBITS

19    Government's Exhibit Aramanda Check 1............ 1539

20    Government's Exhibit Aramanda Checks 1, 2 and 3.. 1541

21    Government's Exhibit Aramanda Check 2............ 1545

22    Defendant Rod Blagojevich Aramanda Exhibit No.   1576

23    1................................................

24    Defendant Rod Blagojevich Aramanda Exhibit 6..... 1589

25    Defendant Rod Blagojevich Aramanda Exhibit ...... 1593
</pre>

1    Number 11........................................

2    Government's Exhibits Chart 2 and 3.............. 1718

3    Government's Exhibit 10/6/03 Elie Check ......... 1723

4    Government's Exhibit Kaercher contract........... 1750

5    Government's Exhibit Campbell Contract........... 1754

6    Government's Exhibit Kaercher, Campbell Tax      1758

7    Returns.........................................

8    Government's Exhibit Integrated Flight Group..... 1796

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1532

1     (The following proceedings were had out of the
2          presence of the jury in open court:)
3          THE CLERK:  Please remain seated.
4          We'll resume with the case on trial.
5          THE COURT:  Counsel, approach the lectern.
6          MR. SCHAR:  Good morning, Your Honor Reid
7  Schar, Chris Niewoehner and Carrie Hamilton on
8  behalf of the United States.
9          THE COURT:  Other than the issue of release
10 of recordings, anything else?
11         MR. GILLESPIE:  Yes, there was one additional
12 issue I would like to bring to the Court's attention
13 this morning.
14         It's my understanding that the government in
15 conclusion with this witness is going to play or
16 attempt to play two tapes.  They are recorded
17 telephone conversations, the witness is not part of
18 the telephone conversation.  It's a recorded
19 telephone conversation between Stuart Levine and
20 Mr. Pekin, I believe, on both of those telephone
21 calls.
22         Judge, it would be our position that those
23 calls should not be published to Mr. Pekin.  There
24 is nothing that would indicate those calls in any
25 way affected or effected his state of mind and we

1533

1    think it's improper to publish them through him.

2           THE COURT:  The number?

3           MR. GILLESPIE:  I'm sorry, Judge.

4           MR. NIEWOEHNER:  Judge, it's 101 and 102,

5    Your Honor, in binder 3.

6        (Brief pause).

7           THE COURT:  Okay, tell me why.

8           MR. NIEWOEHNER:  Your Honor, we don't intend

9    for Mr. Aramanda to discuss the contents of the

10   call, we're just going to publish the tapes what

11   previously have been authenticated by Agent Cain.

12          They're admissible as coconspirator

13   statements.  Both Levine and Pekin are conspirators.

14   Based on the evidence to date in the case, you have

15   Lon Monk stating the broader context of the four

16   people making money and he has specific

17   conversations with Chris Kelly, with Levine,

18   indicating this is one of the ways he understands he

19   is going to make money, that ties together through

20   what Mr. Aramanda is testifying to now that Rezko

21   has set himself up through this deal, he understands

22   Stuart Levine is involved, he is sharing money.

23          And I expect Mr. Aramanda is going to say he

24   had a conversation with Mr. Rezko where Rezko stated

25   to Mr. Aramanda that this was going to be spread

1534

1 among the four, not just Rezko but Defendant
2 Blagojevich, Monk, and Kelly.
3          So the evidence demonstrates that Levine is
4 somebody that Rezko and Kelly got placed on the
5 board, they used their influence with Monk to get
6 him put there, and there is a conversation that
7 you've heard already that Pekin has with Aramanda,
8 Pekin indicates that Levine and Rezko are working
9 together on this particular deal.
10          So Pekin and Levine are both -- Levine has
11 the duty-bound services and is a member of the TRS
12 board, he is helping to steer this particular deal
13 to happen.  In the context of the conversations that
14 we're going to publish, it showed that Levine is
15 talking about Rezko and Aramanda in this particular
16 deal.
17          As coconspirator statements are admissible
18 evidence, we're not going to have Mr. Aramanda talk
19 about other than publishing parts of this while he
20 is on the stand, we're not going to have him testify
21 about it.
22          THE COURT:  So you're not going to ask him
23 questions like, "have you heard this"?
24          MR. NIEWOEHNER:  That's correct.
25          THE COURT:  So you're just going to have him

1535

1 there as a chronological devise.

2        MR. NIEWOEHNER:  Right.  He would testify to

3 his own personal knowledge of events that happened

4 around the time of this, but will not attempt to

5 opine about what is being said on the call.

6        MR. GILLESPIE:  Judge, briefly in response.

7 As counsel has indicated or I've indicated earlier,

8 these are calls between Levine and Pekin.

9 Mr. Levine is going to testify, he can comment on

10 the phone calls when they were made, how they were

11 made, who they were between, and the context of the

12 telephone calls.  It seems that would be the proper

13 way to publish those calls as opposed to having

14 Mr. Aramanda sit up here and play a call and not

15 comment on the call.

16        THE COURT:  The objection is overruled.

17        MR. GILLESPIE:  Judge, one last thing.  I

18 have some exhibits I plan on using with this

19 witness.  I have a courtesy copy for the Court, if I

20 may tender it to your clerk?  And I have a copy for

21 counsel.

22        THE COURT:  The release issue of exhibits.  I

23 have received a written plea not to release them

24 until the witness steps off the witness stand.  Has

25 the government seen this?

1536

1 　　　　　MR. SCHAR:  We saw it this morning, Judge,
2 yes.
3 　　　　　THE COURT:  You want to talk about it now.
4 　　　　　MR. SCHAR:  I disagree with some of the
5 language in there.  Your Honor has actually made
6 rulings about the propriety of the redactions, but
7 putting the contents of being essentially somewhat
8 immaterial aside, the government is not taking a
9 position on this issue.
10 　　　　　THE COURT:  All right.
11 　　　　　MS. KAESEBERG:  Your Honor, Lauren Kaeseberg
12 for Rod Blagojevich.
13 　　　　　Our position is that we believe that the
14 transcripts and recordings should be released after
15 the cross-examination is completed after a witness
16 is excused from the stand; we rest on the filings.
17 　　　　　THE COURT:  The one argument that is new in
18 the papers is that it would make it easier for a
19 witness to violate the separation order because the
20 witness could access this stuff on the Internet as
21 it's sometimes the sole source of information that
22 the witness might see.  Given the nature of this
23 case, I don't think that that's a real danger.
24 　　　　　It does counsel the government to reemphasize
25 the separation obligations of the witnesses.  It's

:50AM

:51AM

:51AM

:51AM

:52AM

1537

1 also quite clear to me that the nature of this case,

2 that the long period of time that the investigation

3 continued, the fact that many of these witnesses

4 know each other, the fact that there was speculation

:53AM 5 long before there were any formal charges that there

6 was an investigation and that witness might possibly

7 be in jeopardy, and probably a fair amount of

8 internal guessing about who was in it and who was

9 not, I don't think whatever is added by the

:53AM 10 availability on the Internet of transcripts presents

11 any menace at all for the purposes achieved by a

12 separation order. So I will continue to allow the

13 release. And, of course, examination of the

14 witnesses can disclose if there has been such.

:54AM 15 And I will give leave to the defense, if it

16 wishes to do so, to examine separation issues

17 outside the presence of the jury. Okay?

18 MR. GILLESPIE: Yes, Judge.

19 THE COURT: Show the jury in.

:55AM 20 THE MARSHAL: All rise.

21 (The following proceedings were had in the

22 presence of the jury in open court:)

23 THE COURT: Please be seated.

24 Resume the stand, please.

:56AM 25 Do you understand you're still under oath?

Aramanda - direct by Niewoehner                    1538

1          THE WITNESS:  Yes.

2            JOSEPH ARAMANDA, GOVERNMENT WITNESS

3                    PREVIOUSLY SWORN

4                DIRECT EXAMINATION (resumed)

:56AM   5  BY MR. NIEWOEHNER:

6  Q   Mr. Aramanda, when we left off yesterday

7  afternoon you had testified about a meeting you had

8  with Sheldon Pekin, do you recall that?

9  A   Yes.

:56AM  10  Q   You had testified that you had talked with

11  Sheldon Pekin about a particular transaction

12  involving a company called Glencoe Capital, do you

13  recall that?

14  A   Yes.

:56AM  15  Q   And you had talked with Mr. Pekin and you

16  understood Mr. Pekin was going to receive money as a

17  result of an investment TRS made to Glencoe Capital

18  and you discussed those funds, do you recall that

19  testimony?

:57AM  20  A   Yes.

21  Q   Now, did Pekin end up paying you money out of

22  that Glencoe Capital TRS transaction?

23  A   Yes.

24            MR. NIEWOEHNER:  Your Honor, may I approach?

:57AM  25            THE COURT:  You may.

1  BY MR. NIEWOEHNER:

2  Q   I'm going to show you what's been marked

3  Government Exhibit Aramanda Check 1.

4          MR. NIEWOEHNER:  Your Honor, the government

:57AM  5  moves to admit Government Exhibit Aramanda Check 1

6  pursuant to a 90211 certificate.

7          THE COURT:  Admitted.

8      (Government's Exhibit Aramanda Check 1 was

9       received in evidence.)

:57AM  10          MR. NIEWOEHNER:  May I publish, Your Honor.

11          THE COURT:  You may.

12      (Exhibit published to the jury.)

13  BY MR. NIEWOEHNER:

14  Q   Mr. Aramanda, what is shown by Aramanda Check 1?

:58AM  15  A   This is the check Sheldon Pekin issued to my

16  investment company.

17  Q   Is this one of the payments that Sheldon Pekin

18  made to you?

19  A   Yes.

:58AM  20  Q   Did he make more than one payment to you?

21  A   Yes.

22  Q   And can you read the date on the check?

23  A   Yes, March 5th, '04.

24  Q   And did you receive this check around March 5th,

:58AM  25  2004?

1  A   Yes.

2  Q   How was -- what was the circumstances that led

3  you receiving this check?

4  A   Based on earlier discussion where we discussed

5  developing a relationship where I would bring future

6  business to the table and that we would share these

7  fees or commissions and that he also had agreed to

8  start the sharing process with the fee that he was

9  receiving for the investment placed with Glencoe

10 Capital.

11 Q   And you had described yesterday that you were

12 going to get these payments over several

13 installments, is that correct?

14 A   Yes.

15 Q   Was this one of the first installments?

16 A   This is the first one.

17 Q   How did you physically get the check?

18 A   He called me and I went to his office and picked

19 up the check.

20 Q   What did you do -- and can you tell us what is

21 the amount of the check?

22 A   $125,000.

23 Q   And the check is made out to JRA Investments,

24 LLC, what is that entity?

25 A   That was an entity that I mentioned yesterday

1  that I owned and had a bank account also under that
2  name.
3  Q   What did you do with that check after you
4  received it from Mr. Pekin?
5  A   I deposited it in the bank.
6  Q   After you deposited the check, did you tell Rezko
7  that you received the check?
8  A   Yes.
9  Q   What did you do with the $125,000 that you
10 received pursuant to this check?
11 A   The majority of it stayed in -- I transferred it
12 to my business account, there was a portion of it
13 that Tony had asked if I would make a payment on his
14 behalf.
15        MR. NIEWOEHNER:  Your Honor, may I approach?
16        THE COURT:  You may.
17 BY MR. NIEWOEHNER:
18 Q   I'm going to you show you what's been marked
19 Nijjar Checks 1, 2 and 3.
20        MR. NIEWOEHNER:  Your Honor, may we move the
21 admission pursuant to 90211 certificates?
22        THE COURT:  Admitted.
23     (Government's Exhibit Aramanda Checks 1, 2 and 3
24      were received in evidence.)
25        MR. NIEWOEHNER:  May I publish the checks,

1  Your Honor?

2       THE COURT:  You may.

3     (Exhibit published to the jury.)

4  BY MR. NIEWOEHNER:

5  Q   If you could first look at Check 1.

6  A   Yes.

7  Q   What is the date of this check?

8  A   March 11, '04.

9  Q   And it's made out to J. Najjar, who is J. Najjar?

10 A   That was Jacqueline Najjar who was the sister of

11 Albert Najjar.

12 Q   And how much was that?

13 A   $40,000.

14 Q   If you look at Najjar Check 2.

15 A   Yes.

16 Q   And what is the date of that check?

17 A   March 11, '04.

18 Q   And, again, it's made out to J. Najjar; is that

19 the same person?

20 A   Yes.

21 Q   How much was this check made out for?

22 A   $10,000.

23 Q   Why did you write those two checks?

24 A   Tony had asked me if I would make a payment on

25 his behalf to Jacqueline Najjar who, is the sister

1  of Albert Najjar, who he had business dealings with,

2  and it's my understanding that this was some sort of

3  an interest payment.

4  Q   And focusing on March 11th, the date of the

5  check, about when did you have your conversation

6  with Rezko about this payment?

7  A   Sometime -- several days prior to this check

8  being issued.

9  Q   What did Rezko say to you in that conversation?

10 A   He had mentioned to me that he needed a favor and

11 if I could please write a check to Jacqueline Najjar

12 for her -- basically for her brother, interest3

13 payment, and if I could help him out, which I had

14 agreed to.

15 Q   Did you agree to make the payment that Rezko

16 asked you to do?

17 A   The one payment, yes.

18 Q   And that's $50,000?

19 A   Yes.

20 Q   Why did you do that?

21 A   I felt somewhat obligated.  I mean, he introduced

22 me to Pekin and also basically introduced me to the

23 opportunity going forward to make a considerable

24 amount of income through this opportunity, so I felt

25 somewhat obligated.

Aramanda - direct by Niewoehner                1544

1  Q   What did you do with the 40-thousand-dollar check
2  and the 10-thousand-dollar check that you wrote to
3  Jacqueline Najjar?
4  A   I believe I sent it to her.
5  Q   Did both those checks clear your account?
6  A   The $40,000 did, I don't recall why but for some
7  reason, there must have been a timing issue or
8  something, the 10-thousand-dollar check did not.
9  Q   And turning your attention to Najjar Check 3,
10 what did you do -- or what is Najjar Check 3?
11 A   When I found out that the 10-thousand-dollar
12 check for some reason didn't clear, I issued a
13 replacement check.
14 Q   So in total, how much of the 125-thousand-dollar
15 you got from Pekin, how much did you direct as Rezko
16 asked you to?
17 A   $50,000.
18 Q   You testified that you got two payments from
19 Pekin, is that right?
20 A   Yes.
21 Q   How much was the second payment?
22 A   Same amount, $125,000.
23     MR. NIEWOEHNER:  Your Honor, may I approach
24 again?
25     THE COURT:  You may.

1  BY MR. NIEWOEHNER:

2  Q   I'm going to show you what's been marked

3  Government Exhibit Aramanda Check 2.

4       MR. NIEWOEHNER:  Your Honor, I move to admit

:03AM  5  Aramanda Check 2 pursuant to 90211 certificate.

6       THE COURT:  You may.

7       In the event the jury is wondering what

8  90211, it's a ruling in the federal rules of

9  evidence that allows business records to come into

:04AM  10  evidence.

11    (Government's Exhibit Aramanda Check 2 was

12     received in evidence.)

13       MR. NIEWOEHNER:  May I publish, Your Honor?

14       THE COURT:  You may.

:04AM  15    (Exhibit published to the jury.)

16  BY MR. NIEWOEHNER:

17  Q   And focusing on the first page of the exhibit,

18  what does this check show?

19  A   This check shows an payment to J.R.A. Investments

:04AM  20  in the amount of $125,000 from Sheldon Pekin.

21  Q   And there's a date on this check, do you see

22  that?

23  A   Yes.

24  Q   What is it?

:04AM  25  A   April 27, '04.

1  Q   Did you receive this check around that date?

2  A   Yes.

3  Q   Now, in your first conversation with Pekin where

4  Pekin talked to you about receiving three different

5  installments, had he described to you when those

6  installments might be paid?

7  A   Yes.

8  Q   What did he say in that regard?

9  A   My recollection that the first installment

10 would -- would be paid early March, that the second

11 installment would be paid basically the end of

12 April, and the third installment would be paid in

13 August, several months after.

14 Q   And did you speak with Pekin before the second

15 payment was due?

16 A   Yes.

17 Q   Did you speak on the phone or in person?

18 A   On the phone.

19 Q   And in relation to when you received the second

20 check, about when did you talk to Pekin?

21 A   Several days to a week before.

22 Q   What did you say to Mr. Pekin on that occasion?

23 A   I told him that I'd be back in town shortly and

24 that, you know, I'd like to meet him, and, you know,

25 I thought it would be about the time that the check

:04AM

:05AM

:05AM

:05AM

:05AM

1 would be due.

2 Q   What was Pekin's response?

3 A   He said the check wasn't going to be due at the

4 end of April, that there must have been a

5 misunderstanding, and that it would be probably due

6 some time later in the next month.

7 Q   Did Pekin say anything further -- or how did you

8 respond when Pekin said that?

9 A   I told him maybe there was a misunderstanding but

10 I was pretty sure he mentioned the end of April.

11 Q   Did Pekin make any further comment?

12 A   I made a comment that I remember, "what do you

13 think that Christmas comes early," something to that

14 extent.

15 Q   What did you understand Pekin to mean when he

16 said "Christmas comes early"?

17 A   My initial reaction was that --

18        MR. GILLESPIE:  Your Honor, objection.

19        THE COURT:  I think I'm overruling the

20 objection as an objection to the question, but if

21 it's an objection to the way the answer started, I'm

22 sustaining it.

23 BY MR. NIEWOEHNER:

24 Q   Let me just rephrase the question.

25        At the time Pekin told you Christmas comes

1  early, what did you understand Pekin to mean?

2  A   I thought he meant --

3        MR. GILLESPIE:  Objection, Judge.

4        THE COURT:  Overruled.

:07AM  5  BY THE WITNESS:

6  A   I thought that he meant that since I had received

7  one fee already and was about to receive another fee

8  and I had yet to actually start working with him,

9  that this was like a gift, a Christmas present.

:07AM  10  Q   And by late April of 2004, had you done any

11  further work with Pekin to develop your potential

12  middleman business?

13  A   Having no discussions with him, no.

14  Q   And in your conversation that day with Pekin, did

:07AM  15  he agree to make the second payment immediately?

16  A   No.

17  Q   Did you talk with anyone after you spoke with

18  Pekin?

19  A   Several days later I recall having a conversation

:07AM  20  with Tony and mentioned that there must have been

21  some misunderstanding with Pekin and that I was

22  expecting a check at the end of April and that Pekin

23  was under a different impression.

24  Q   Did you say anything about "the Christmas comes

:08AM  25  early" conversation with Rezko?

1  A   Yes.

2  Q   What did you say in that regard?

3  A   He asked me how the relationship was developing

4  between Pekin and I, and I said it was developing

5  fine, that I thought I would not have problem

6  working with him in the future, I said he was a

7  little testy, he made a sarcastic remark, that it

8  was not a real deal big, and I mentioned the

9  Christmas-comes-early remark.

10 Q   Did you speak with Pekin again after you spoke

11 with Rezko?

12 A   Yes, he called me several days later, maybe a day

13 or two later.

14 Q   Did you call Pekin or did he call you?

15 A   He called me.

16 Q   What did Pekin say in that conversation?

17 A   Two things, he first said that he would like to

18 get together, that he would have the check ready.

19 Second comment was, that he had mentioned the

20 Christmas remark and hoped that I didn't

21 misunderstand it in a negative way.

22 Q   Did you actually receive then another check from

23 Pekin?

24 A   Yes.

25 Q   Was it around the day of the check?

:08AM

:08AM

:08AM

:08AM

:09AM

1  A   Around the date of the check, April 22nd.

2  Q   And how did you obtain the check?

3  A   I visited him in his office in Chicago.

4  Q   Did you ever meet any member of Pekin's family?

:09AM  5  A   Yes.

6  Q   Who did you meet?

7  A   I met his son.

8  Q   What was his son's name?

9  A   Billy.

:09AM  10  Q   How was it that you met Billy Pekin?

11  A   He was in the office down the hall from his

12  father and after I had a business meeting -- or a

13  meeting with Pekin, he invited me to lunch and we

14  stopped at to his son's office and he invited his

:09AM  15  son to join us.

16  Q   Why did you understand Billy Pekin attended your

17  lunch meeting?

18  A   His father had mentioned to me on an ongoing

19  basis as we developed a business or working

:09AM  20  relationship that he'd like to have his son be

21  involved with me.

22        MR. NIEWOEHNER:  Your Honor, at this time I

23  would ask permission to publish the call at tab 101

24  in Binder 3.

:10AM  25        THE COURT:  Leave is granted.

Aramanda - direct by Niewoehner                1551

1      (Tape played)
2   BY MR. NIEWOEHNER:
3   Q   And, Mr. Aramanda, if you can just focus on the
4   first page of the transcript, at the very top it
5   shows that this call took place on April 26th at
6   about 8:59 in the morning, is that right?
7   A   That's what it says.
8           MR. NIEWOEHNER:  Your Honor, may I publish
9   the call at tab 102?
10          THE COURT:  Yes.
11     (Tape played).
12  BY MR. NIEWOEHNER:
13  Q   And, Mr. Aramanda, if you can look to the first
14  page of this transcript.
15          That call took place on April 26th at
16  approximately 9:13 a.m., is that what that shows?
17  A   That's what it says.
18  Q   Mr. Aramanda, you can put away the transcript
19  binder.  Thank you.
20          Now, when you saw -- you said you went to
21  Pekin's office and picked up a check, is that
22  correct?
23  A   Yes.
24  Q   Did you talk to Pekin when you saw him that day?
25  A   Yes.

1  Q   What did Pekin say?

2  A   He started off by discussing the Christmas

3  comment once more.

4  Q   What did he say in that regard?

5  A   He basically indicated that it was not meant to

6  be a negative comment or sarcastic and that he was

7  just joking.

8  Q   What did you do with the second

9  125-thousand-dollar check you got from Pekin?

10  A   I deposited it into my business account in

11  Wisconsin.

12  Q   Did you make any payments on Rezko's behalf from

13  that particular check?

14  A   No.

15  Q   Did Rezko ask you to?

16  A   No.

17  Q   Did you have another conversation with Rezko

18  after you received that second check from Pekin?

19  A   I had many, but relating to this I had probably

20  one a week or two later mentioning that I had

21  received the check.

22  Q   And did you have another conversation with Rezko

23  at some point talking about this potential business

24  where you would work as a middleman?

25  A   Yes.

Aramanda - direct by Niewoehner          1553

1  Q   About when was that in relation to when you got
2  the Pekin second check?
3  A   Approximately two weeks later, two to three weeks
4  at the most.
5  Q   What did Rezko say in that conversation?
6  A   He started talking about, you know, what had
7  happened so far, what had transpired, going back and
8  referring to our original discussion about the
9  business opportunities in the future.  And basically
10 started -- said he wanted to discuss kind of a new
11 concept with me regarding this type of opportunity.
12 Q   And did he describe what your role was going to
13 be in this new opportunity?
14 A   Yes, he said that, you know, going forward that,
15 as he previously alluded to but even spent a little
16 bit more time discussing the magnitude, he felt that
17 by going forward with this this could be a really
18 big business opportunity and could relate to
19 multiple transactions over a number of years, and
20 that I would be an important part and play an
21 important role in this opportunity going forward.
22 Q   Did you understand whether Sheldon Pekin was
23 necessarily going to be involved in these
24 opportunities?
25 A   It was not discussed.  I assumed that he would

:16AM

:16AM

:17AM

:17AM

:17AM

1  probably be in some capacity, but we did not discuss

2  it specifically.

3  Q   Did Rezko talk to you about how you might be paid

4  from this new opportunity?

5  A   Yes, he mentioned that -- that I would receive a

6  salary of $250,000 a year and I expressed a little

7  surprise because it seemed to be a different concept

8  to what we had talked about.  And when I had

9  mentioned that I thought the opportunity was going

10 to be much bigger than that, he mentioned I would

11 probably receive a bonus based on the volume of

12 transactions.

13 Q   Now, when you said -- when he said you would be

14 working on a $250,000 salary with a bonus, how is

15 that different from how you understood you were

16 going to be paid before?

17 A   Well, I understood it was clear with Pekin as we

18 developed a relationship and I brought business to

19 the table, that Pekin and I when the deal was

20 consumed would basically split the fees.

21 Q   And in context to the Glencoe Capital deal, what

22 kind of money would you make or would you expect to

23 make on that deal?

24 A   $375,000.

25 Q   And when Rezko earlier talked to you about the

1  size of the fees that might be generated, what had
2  he said?
3  A  Well, the initial conversation was tens of
4  millions of dollars and I would say it would be much
5  bigger than that.
6  Q  And --
7  A  Sorry, that was not the amount of fees, that was
8  the volume of the transactions.
9  Q  And from those transactions involving tens of
10 millions of dollars, how much had you understood the
11 fees could be?
12 A  That it could easily reach $1 million or in the
13 excess of $1 million on an annual basis.
14 Q  And was that potentially a million dollars on one
15 specific transaction?
16 A  Yes.
17 Q  And could there be more than one transaction?
18 A  Yes, he anticipated that there would be more than
19 one transaction.
20 Q  So how did you react to Rezko's suggestion that
21 you might receive a salary of $250,000 potentially
22 with a bonus?
23 A  Well, I first pointed out to him that, you know,
24 this seemed to be a totally different arrangement
25 that he was suggesting we enter into than what we

:19AM

:19AM

:19AM

:19AM

:20AM

Aramanda - direct by Niewoehner                  1556

1  previously talked about and I also understood that

2  previously, you know, there would be a relationship

3  between Pekin and I.

4       So my first question was, you know, what's

5  happening to all the other potential fees that you

6  previously alluded to that could equal or exceed

7  easily $1 million a year.

8  Q   And what did Rezko say in response?

9  A   Well, you know, he said that -- you know, he said

10 this is a much bigger situation, this is a lot more

11 potential.  I asked him at that point in the

12 conversation did -- was he -- did he intend or was

13 he going to be sharing part of these fees also.

14 Q   How did Rezko respond to that question?

15 A   He said that because of the size of the

16 transactions and the anticipated volume and the

17 anticipated fees being so large, that he would be

18 sharing the transaction along with others.

19 Q   Did Rezko indicate to you who the other people he

20 was going to share the fees were?

21 A   Not initially.

22 Q   Did he at some point?

23 A   Yes.

24 Q   What did Rezko say at that point?

25 A   At the point I inquired in terms of, you know,

:20AM

:20AM

:20AM

:20AM

:21AM

1  how many people or who was going to be involved in

2  sharing these fees, he mentioned in addition to

3  himself three other names.

4  Q   What other names did he mention?

5  A   He mentioned Lon, Chris and Rod.

6  Q   Who did you understand he was talking about when

7  he said Lon, Rod and Chris?

8  A   Lon Monk, Chris Kelly and Rod Blagojevich.

9  Q   So what did you understand Rezko to be saying

10  when he indicated that the money would be split with

11  himself and those three other people?

12       MR. GILLESPIE:  Objection.

13  BY THE WITNESS:

14  A   I'm sorry, did somebody say something?

15       THE COURT:  Yeah, there was an objection, so

16  you can stop.

17       Sustained.

18  BY MR. NIEWOEHNER:

19  Q   From what Rezko said, what did you understand he

20  meant when he indicated that the money would be

21  split with Rezko and these three other individuals?

22       MR. GILLESPIE:  Objection.

23       THE COURT:  Overruled.

24  BY THE WITNESS:

25  A   I understood that he must have some arrangement

Aramanda - direct by Niewoehner                    1558

1  with the others that he mentioned and some way of
2  splitting the fees.
3  BY MR. NIEWOEHNER:
4  Q   From what Rezko said, did you understand that
5  this fee splitting was going to be done in the
6  future?
7  A   Yes.
8  Q   Had Rezko ever talked about Monk or Kelly or
9  Defendant Blagojevich being involved in this
10 business prior to that point?
11 A   No.
12 Q   And from what Rezko said, why did you understand
13 that Monk and Kelly and Defendant Blagojevich were
14 going to be receiving these fees?
15         MR. GILLESPIE:  Objection.
16         THE COURT:  The objection is sustained.
17 BY MR. NIEWOEHNER:
18 Q   From what Rezko said about splitting the fees
19 with these three other individuals, how did you
20 understand that the fees were going to be split?
21         MR. GILLESPIE:  Objection.
22         THE COURT:  Sustained.
23 BY MR. NIEWOEHNER:
24 Q   Had you ever talked with Monk or Kelly or
25 Defendant Blagojevich about this potential business?

:22AM

:22AM

:22AM

:23AM

:23AM

1  A   No.

2  Q   Did you ever talk with any of them about your

3  work with this business?

4  A   No.

5  Q   How did you react to what Rezko said?

6  A   I was surprised.

7  Q   Did you -- in that meeting, did you agree to

8  share your fees with Rezko, Kelly, Monk and

9  Defendant Blagojevich?

10  A   No.

11  Q   What did you say you were going to do?

12  A   I told him I needed to think about it and that I

13  would get back to him.

14  Q   Did you have a subsequent conversation with Rezko

15  about that topic?

16  A   Yes.

17  Q   And about when did that take place in relation to

18  the conversation you described?

19  A   My recollection that it was probably 7 weeks

20  later.

21  Q   What did you say in that conversation?

22  A   I told him I thought about it and, you know, for

23  I felt that I couldn't go forward and be involved in

24  that process.

25  Q   Did you give any reason why you didn't want to go

1  forward?

2  A  Yes.

3  Q  What reasons did you tell to Rezko?

4       MR. GILLESPIE:  Objection.

:24AM  5       THE COURT:  Overruled.

6  BY THE WITNESS:

7  A  I told him that the business that I had in

8  Wisconsin with the Papa John's Pizza restaurants was

9  experiencing more problems financially and that I

:24AM  10  felt that I needed to try to sell the business

11  before it got, you know, worse, and that it would

12  require a lot of my time and that I didn't think I'd

13  have the time to do justice to that particular role.

14  Q  Was that, in fact, the reason that you didn't

:24AM  15  want to participate in this business?

16  A  Not the main reason but it was one of the

17  reasons.

18  Q  What were the other reasons?

19  A  The other main reason, I was uncomfortable with

:25AM  20  the whole situation.  I thought it was wrong.

21  Q  Why did you think it was wrong?

22       MR. GILLESPIE:  Objection.

23       THE COURT:  Sustained.

24  BY MR. NIEWOEHNER:

:25AM  25  Q  Did you agree ultimately to participate in this

Aramanda - cross by Gillespie                1561

1 arrangement?

2 A   No.

3 Q   Did you ever try to collect the third

4 125-thousand-dollar payment that you originally had

5 spoken about with Pekin?

6 A   No.

7 Q   Did you try to?

8 A   No.

9 Q   Why didn't you?

10 A   I didn't want to be further involved in this

11 whole situation, so I never called Pekin and asked

12 for the money.

13       MR. NIEWOEHNER:  One moment, Your Honor.

14    (Brief pause).

15       MR. NIEWOEHNER:  No further questions.

16       THE WITNESS:  Excuse me, Your Honor, could I

17 have some water?

18       THE COURT:  Get some water for the witness.

19    (Brief pause)

20       MR. GILLESPIE:  Your Honor, there is a number

21 of exhibits I plan on using with this witness.  May

22 I approach and tender a courtesy copy?

23       THE COURT:  You may.

24       MR. GILLESPIE:  Thank you.

25                  CROSS EXAMINATION

1  BY MR. GILLESPIE:

2  Q   Mr. Aramanda, good morning.

3       My name is Mike Gillespie and I'm one of the

4  attorneys that represents Governor Blagojevich.

:26AM   5  A   Good morning.

6  Q   Sir, I want to back up a little bit.  Over the

7  past few days you have been testifying about

8  different transactions or business deals that you've

9  been involved in with your good friend Mr. Rezko,

:27AM   10  correct?

11  A   Yes.

12  Q   And the first deal, I believe, you told the

13  ladies and gentlemen of the jury about was you, in

14  fact, went and work for Mr. Rezko?

:27AM   15  A   Yes.

16  Q   And not only did you go and work for Mr. Rezko,

17  you, in fact, I believe, and correct me if I'm

18  wrong, in 2001 you purchased Papa John's Pizzas from

19  Mr. Rezko?

:27AM   20  A   Yes.

21  Q   And, sir, it's your testimony, is it not, that

22  that was a deal that you entered into to serve your

23  best interest, correct?

24  A   Yes.

:27AM   25  Q   And it's your testimony, sir, is it not, that

1  that was a transaction that you entered into for

2  your own benefit?

3  A   Yes.

4  Q   And that was a transaction that was done at arm's

5  length, correct?

6  A   Yes.

7  Q   You also told the ladies and gentlemen of the

8  jury about the Kjellander loan?

9  A   Yes.

10  Q   And I think you told us, again, that was

11  something that was done and you did for yourself, is

12  it true?

13  A   Yes.

14  Q   You entered into that for your benefit?

15  A   Yes.

16  Q   That's your testimony, correct?

17  A   Yes.

18  Q   Finally, you told us about another transaction or

19  deal you had with Mr. Rezko, and that was the Pekin

20  consulting agreement that you just talked about?

21  A   Yes.

22  Q   And, again, it's your testimony as it relates to

23  that deal that that, too, was done for your benefit,

24  correct?

25  A   Yes.

1  Q   When you entered into it, you did it because you

2  thought you were entering into a legitimate business

3  deal?

4  A   Yes.

5  Q   I want to back up a little bit.

6        You told the ladies and gentlemen of the jury

7  yesterday a little bit about your business

8  background.  I'm going to ask you some questions

9  about that, okay?

10 A   Sure.

11 Q   You graduated from college in 1971?

12 A   Yes.

13 Q   What was your degree in?

14 A   Business administration.

15 Q   And where did you graduate from?

16 A   California State University, Los Angeles.

17 Q   And is it fair to say that when you are studying

18 business administration you are studying the

19 practice of business, correct?

20 A   Yes.

21 Q   How to transact or how to conduct business,

22 correct?

23 A   Yes.

24 Q   And after you graduated from college, it was a

25 four-year degree?

1  A   Yes.

2  Q   You continued your education, did you not?

3  A   Yes.

4  Q   You got a CPA?

:29AM  5  A   Yes.

6  Q   What is a CPA?

7  A   It's a -- stands for certified public accountant.

8  Q   And could you explain to us how it is you

9  achieved that or got that?

:29AM  10  A   Two things primarily:  You pass a test and you

11  also need to work for a period of time for a public

12  accounting firm to get certain amount of experience.

13  Q   And you did all that?

14  A   Yes.

:29AM  15  Q   And that has to do with numbers and figures,

16  correct?

17  A   Yes.

18  Q   It is very heavily dependent or relies

19  on financial documents, true?

:29AM  20  A   Yes.

21  Q   And you continued on with your education.  In

22  fact, you got a degree from Harvard Business School,

23  did you not?

24  A   That's another degree, but I attended Harvard

:30AM  25  Business School for a special program.

Aramanda - cross by Gillespie                    1566

1  Q   What was the program, if you could tell us?

2  A   It was an executive program called Strategic

3  Marketing Management.

4  Q   And through the course of your education and

5  college and through your CPA, through the executive

6  program at Harvard Business School, how long was

7  that program?

8  A   The Harvard program?

9  Q   Yes, sir.

10 A   I believe it was six weeks, I'm not exactly sure.

11 Q   You learned a great deal about contracts, did you

12 not?

13 A   Not at Harvard, but during the course of my

14 education, yes.

15 Q   During the course of your education you learned a

16 great deal about contracts.  You learned about the

17 significance of a contract, that the contract states

18 the purposes of a contract and it tells what one

19 party is supposed to do and what another party is

20 supposed to do, correct?

21 A   For the most part, yes.

22 Q   So besides having a formal education in business,

23 you, in fact, is it a fair statement, that most of

24 your adult life you consider yourself a businessman?

25 A   Yes.

Aramanda - cross by Gillespie                1567

1  Q   In fact, when you got out of school in 1971,
2  where did you start working?
3  A   Peat, Marwick, Mitchell.
4  Q   Could you tell the folks what that is?
5  A   Peat, Marwick, Mitchell is a large international
6  accounting firm.
7  Q   What did you do for that accounting firm?
8  A   Initially I was in the audit department.
9  Q   What did you do in the audit department?  I'm
10 sorry.
11 A   We audited companies' financial statements.
12 Q   So, of course, and correct me if I'm wrong, in
13 that job it was your job to look at the financial
14 statements of companies, correct?
15 A   Financial statements, but certainly at that lower
16 level, at an entry level, accounts that were
17 included in the financial statements.
18 Q   So you looked at the books, is that true?
19 A   That's a fair statement.
20 Q   You made sure that the books were accurate, true?
21 A   Well, we looked at them to be sure what we
22 examined was accurate, yes.
23 Q   Yes, sir.
24       And you made -- what was your highest
25 position you achieved at that company?

Aramanda - cross by Gillespie                1568

1  A   I was there for two stints, two different terms,

2  and at the second term I was at a level that was

3  called supervising senior, I believe, which was

4  between what they called the senior auditor and a

5  supervisor.

6  Q   And that's a lot of hard work, would you agree

7  with me?

8  A   Yes.

9  Q   And as it relates to that job, that job did not

10  entail anything about consulting?

11  A   No, that's not true.

12  Q   What did you consult on?

13  A   The second time around I was involved with the

14  consulting department of Peat, Marwick, Mitchell.

15  They had an audit department, a tax department, and

16  a consulting department, and I managed a consulting

17  project in Alaska in 1975, I believe it was.

18  Q   It was a bad question.

19       In the course of your employment with that

20  company, was it your job to go to, for example, the

21  State's teachers system or retirement fund and seek

22  donations?  Or seek investments, I'm sorry.

23  A   No.

24  Q   And prior to this Pekin deal that you told us

25  about, had you even had any dealings with TRS?

1   A   No.

2   Q   Had you had any dealings with the Illinois State

3   Board of Investments?

4   A   No.

:33AM   5   Q   After Peat --

6       Peat what?

7   A   Peat, Marwick.

8   Q   After that, you went on to Max Factor?

9   A   Much later.

:33AM   10       Sorry.  Much later.

11  Q   And what did you do at Max Factor?

12  A   Initially I started a department for them which

13  was a combination audit and operation review

14  function.

:33AM   15  Q   And correct me if I'm wrong, that is a cosmetic

16  company?

17  A   Yes; principally.

18  Q   What were the other aspects to that company?

19  A   Well, besides cosmetics, fragrance and skin care

:33AM   20  products.

21  Q   As it relates to your job with that company, you

22  become the COO, correct?

23  A   No, the last position I had with them was senior

24  Vice President in charge of part of their

:34AM   25  international business.

1  Q   Was that in Southeast Asia?

2  A   Yes.  The last position.

3  Q   The last position, I'm sorry.

4        And as it relates to that job, you had a lot

5  of dealings with contracts, correct?

6  A   Not so much.  Not very much at all.

7  Q   What did you do internationally for that company?

8  A   I was involved in -- in helping manage the

9  operations that exists in Southeast Asia,

10  principally they're large company in Japan,

11  overseeing and providing guidance, establishing

12  budgets and helping direct their marketing efforts.

13  Q   For a cosmetic company?

14  A   Yes; for their largest division, which was

15  principally, again, cosmetics, skin care, fragrance

16  company.

17  Q   And after that did you go to Beecham?

18  A   Yes.

19  Q   What is Beecham?

20  A   Beecham at the time was one of probably four or

21  five pharmaceutical companies in the world based out

22  of London and they also had a large consumer

23  products division, and one of their divisions was in

24  Chicago, and they recruited me to come and basically

25  run that division.

Aramanda - cross by Gillespie                    1571

1  Q   And you were with that company for a number of
2  years, correct?
3  A   Yes.
4  Q   You would agree with me, sir, that with your
5  formal education in business, most of your adult
6  life has been working for companies or acting as a
7  businessman, correct?
8  A   Yes.
9  Q   And being involved in business transactions,
10 correct?
11 A   Yes.
12 Q   Now, approximately 1997 or 1998, you were out of
13 work, correct?
14 A   Yes.
15 Q   And you were out of work for how long?
16 A   My recollection would be probably a short period
17 of time, maybe up to 6 months.
18 Q   And prior to 1996 or 1997, of course, you knew a
19 man by the name of Tony Rezko?
20 A   Yes.
21 Q   And I think the way you characterized him
22 yesterday is he was and still is a very, very
23 close friend of yours, is that true?
24 A   Yes.
25 Q   You met him when?

Aramanda - cross by Gillespie                    1572

1  A   I believe it was either the end of '96 or early
2  part over '97, as I recall.
3  Q   Not only are you friendly with him, your wives
4  are friends?
:36AM  5  A   Yes.
6  Q   Your families are friendly?
7  A   Yes.
8  Q   You told us yesterday that you traveled
9  extensively with Mr. Rezko?
:36AM  10  A   I don't know -- I don't remember if I used the
11  word "extensive" but I definitely traveled a lot
12  with him.
13  Q   Well, you went Dubai?
14  A   Yes.
:36AM  15  Q   You went to Saudi Arabia?
16  A   Yes.
17  Q   Lebanon?
18  A   Yes.
19  Q   Where else did you go with Mr. Rezko?
:36AM  20  A   Internationally, I went to, I believe, we visited
21  France and Italy and I think the only other place
22  internationally we went to were the Bahamas.
23  Q   And, again, your families went on some of those
24  trips, correct?
:36AM  25  A   A couple of them.

Aramanda - cross by Gillespie                1573

1  Q   The last trip you were on with Mr. Rezko was in
2  2006, correct?
3  A   Yes.
4  Q   And where was that?
5  A   In the Middle East.
6  Q   Where at?
7  A   Oh, which country did we visit?
8  Q   Yes, sir.
9  A   We visited Jordan, Lebanon, Saudi Arabia, and
10 Dubai.
11 Q   You came back before Mr. Rezko, true?
12 A   Yes.
13 Q   And when Mr. Rezko came back, he was then
14 arrested?
15 A   I believe it was shortly thereafter, yes.
16 Q   When he got back from the trip you found that
17 shortly thereafter he was arrested?
18 A   Yes.  As I recall.
19 Q   I'm sorry?
20 A   As I recall.
21 Q   Now, you told us that in working for Papa John's
22 you eventually made it to the position of COO, is it
23 true?
24 A   Not eventually, I started out at that position
25 for him after the consulting arrangement.

Aramanda - cross by Gillespie                1574

1  Q   You started out as the COO?
2  A   I started out as a consultant and then when I
3  actually joined the company started out as COO.
4  Q   What did your position entail as the COO?
5  A   Managing his pizza operations, the Papa John's
6  Pizza operations.
7  Q   Was that the entire Papa John's franchises
8  Mr. Rezko was involved in?
9  A   Yes.
10 Q   How many stores were those?
11 A   As I recall, I believe in the 40-plus range.
12 Q   And sometime in -- so you were aware of -- you
13 had a good look at the books as it relates to those
14 franchises, correct?
15 A   Yes.
16 Q   And I think you told us that at sometime in
17 around 2001 you purchased a number of those
18 restaurants?
19 A   Not the restaurants that were in the original 40,
20 I purchased others.
21 Q   But you purchased Papa John's?
22 A   Yes, I purchased Papa John's restaurants.
23 Q   You purchased them from Mr. Rezko?
24 A   Yes.
25 Q   And in 2001 Mr. Rezko came to you and gave you

1  that opportunity or made that available to you,

2  correct?

3  A   Yes.

4         Excuse me.  I actually approached him.

5  Q   You went to Mr. Rezko?

6  A   Yes; if it was possible that I could discuss that

7  with him.

8  Q   And in 2002 you knew some of the restaurants were

9  under stress?

10  A   Yes.

11  Q   But you still decided to go ahead and purchase

12  some of the restaurants knowing that, correct?

13  A   Yes.

14  Q   And when you purchased the restaurants, Mr. Rezko

15  came to you with a price?

16  A   It was negotiated.

17  Q   Negotiated price.

18         And I think you told us yesterday it was

19  8.4 million, but does 9.4 million sound right?

20  A   If -- if you added some of the contingencies or

21  some of the possibilities going forward, it might

22  have been 9.4.  I don't recall exactly.

23  Q   And I'm going to ask you -- and you entered into

24  a contract, of course, for these restaurants?

25  A   Yes.

:38AM
:38AM
:39AM
:39AM
:39AM

1  Q   I'm going to ask you, sir, if you would please

2  look at what's been marked Aramanda Exhibit 1.

3  A   Yes.

4  Q   And that's titled "Asset Purchase Agreement,"

5  correct?

6  A   Yes.

7  Q   And if you could take a second look at it and

8  just tell me when you're done.  Just browse through

9  it.

10     (Brief pause).

11 BY THE WITNESS:

12 A   Yes.

13 BY MR. GILLESPIE:

14 Q   That is an accurate copy of the contract that you

15 signed with Mr. Rezko for the purchase of these

16 properties, true?

17 A   Yes.

18 Q   And on Page 2 --

19     MR. GILLESPIE:  Judge, first, I ask that this

20 be admitted into evidence.

21     MR. SCHAR:  No objection.

22     THE COURT:  Admitted.

23   (Defendant Rod Blagojevich Aramanda Exhibit No.

24    1 was received in evidence.)

25     MR. GILLESPIE:  Judge, I ask to publish it.

Aramanda - cross by Gillespie                 1577

1        THE COURT:  Sure.

2        MR. GILLESPIE:  Thank you.

3     (Exhibit published to the jury.)

4        MR. GILLESPIE:  You have to bear with me

5  here.

6      (Brief pause).

7  BY MR. GILLESPIE:

8  Q   I'm going to draw your attention, sir, to

9  paragraph --

10       MR. GILLESPIE:  Can everyone see that?

11       Judge, could I ask that the lights be dimmed,

12  please?

13       THE COURT:  Yeah.

14       MR. GILLESPIE:  Thank you.

15     (Brief pause)

16       MR. GILLESPIE:  Is that better?

17  BY MR. GILLESPIE:

18  Q   I draw your attention, sir, to Paragraph

19  Number 4.

20  A   Yes.

21  Q   And in Paragraph Number 4 it lays out the price

22  for the purchase, is that true?

23  A   Yes.

24  Q   And it states in the beginning of Paragraph 4 the

25  purchase price is $9,400,000 true?

1  A   Yes.

2  Q   And it continues on subpart of 4, number 1 and 2,

3  it talks about the way in which this $9.4 million is

4  to be distributed or handled, is it true?

5  A   Yes.

6  Q   The first paragraph 1 talks about an obligation

7  you have, sir, to pay Mr. Rezko $500,000, correct?

8  A   Yes.

9  Q   And it specifically states:

10     "... the sum of $500,000, the receipt of which

11      by seller is hereby acknowledged."

12      True?

13  A   Yes.

14  Q   When is it that you, sir, gave Mr. Rezko that

15  $500,000?

16  A   Ah --

17  Q   When did you write him the check, I'm sorry.

18  A   I didn't write him a check.  I wire transferred

19  some funds into his account.

20  Q   When you say you wire transferred some funds, how

21  did you do that?

22  A   By giving the bank instructions to take the money

23  that I had in an account and wire it to one of the

24  accounts that he specified.

25  Q   Did you transfer the funds via straight check or

Aramanda - cross by Gillespie                    1579

1  money?  Was it a straight money transfer?

2  A  As far as I know, yes.

3  Q  Well, not as far as you know.  You were involved

4  with this, correct?

5  A  Yeah, but I just told you I issued the bank

6  wiring instructions.  Whether they send a check or

7  they direct a deposit, it's straight from my account

8  to his account.

9  Q  And this $500,000 wasn't to purchase Rezmar food

10 stock, correct?

11 A  No.

12 Q  For --

13 A  Excuse me, Rezmar was the real estate business,

14 Rezko Enterprises was the food business.

15 Q  Okay.  And this $500,000 you say you paid to

16 Mr. Rezko, when did you pay it?

17 A  If I recall, the date was sometime in 1999.

18 Q  When in 1999?

19 A  I don't recall the exact date.

20 Q  Well, in 1999 you didn't have -- strike that.

21     You purchased these restaurants in 2001?

22 A  Yes.

23 Q  In 1999 you're telling us you transferred

24 $500,000 to Mr. Rezko, correct?

25 A  It was a slightly lesser amount.

:43AM
:43AM
:43AM
:43AM
:43AM
:44AM

Aramanda - cross by Gillespie                    1580

1  Q   How much was it?

2  A   It was over $400,000.  400 some change.

3  Q   How much was it?

4  A   I don't recall the exact amount.  It was over

5  $400,000.

6  Q   Well, why did you transfer $400,000 in cash to

7  Mr. Rezko in 1999?

8  A   It was basically an agreement between he and I as

9  a loan.

10 Q   You loaned Mr. Rezko $400,000?

11 A   Yes.

12 Q   How much did you loan him?

13 A   The exact amount was slightly over $400,000.

14 Q   Well --

15 A   As I mentioned to you before, it was over

16 $400,000.  I don't remember the dollars and cents,

17 but it was over $400,000.

18 Q   And what year was this?

19 A   I believe 1999.

20 Q   What year did you stop working?

21 A   When did I stop working?

22 Q   Yes.

23 A   I believe it was '98.

24 Q   So you hadn't had a job for a year, correct?

25 A   No, it was a short time, less than 6 months.

1  Q   You hadn't had a job for 6 months, correct?

2  A   Probably; yes.

3  Q   Not probably.  Is it true?

4  A   I'm telling you, I thought it was less than

5  6 months.  Whether it's 3 months or 4 months, I

6  don't recall.

7  Q   And you were out of work and you went to Tony

8  looking for work or he came to you to give you a

9  job?

10  A   Correct.

11  Q   While you were out of work, you're telling us,

12  you lent him $400,000?

13  A   It was during the time probably when I was a --

14  either at the time I was consulting for him or just

15  started working for him.

16  Q   When was it?

17  A   In 1999.

18  Q   When?

19  A   I don't remember the exact month.

20  Q   Well, when did you start working as a consultant

21  for him?

22  A   In 1999.

23  Q   When in 1999?

24  A   I believe it was spring or early summer of '99.

25  Q   So you start in the spring 1999 as a consultant.

1  How much were you being paid?

2  A   As a consultant?

3  Q   Yes.

4  A   I don't remember the exact amount.

5  Q   Give us a ballpark figure.

6  A   I do remember the salary six months later and

7  when I started as chief operating officer it was

8  $125,000 a year.

9  Q   Well, let's back up a little.

10 A   So the amount of the consulting agreement was on

11 a pro rata basis, less than that per month, so I

12 would assume that it would be $10,000 a month.

13 Q   Are you sure or do you assume?

14 A   I don't recall.

15 Q   You had no idea how much you were being paid,

16 correct?

17 A   I'm guessing it would've been less than $10,000 a

18 month.

19 Q   At this time you are saying Mr. Rezko owned how

20 many Papa John's restaurant?

21 A   40 plus.

22 Q   And he had to borrow $400,000 and some change

23 from you?

24 A   Yes.

25 Q   You were being -- when you were first contacted

1  by the government in this case, sir, you were being

2  investigated for this very transaction, correct?

3  A   Yes.

4  Q   Your documents were subpoenaed, true?

5  A   I don't know.

6  Q   You didn't know --

7  A   Well, I thought you were referring to this

8  document here.

9  Q   No, not this document.

10  A   You'll have to be a little clearer.

11  Q   I'm sorry.

12        As it relates to when you were first

13  contacted by the government, it was because your

14  financial statements had been subpoenaed?

15  A   Correct.

16  Q   You were under investigation?

17  A   Yes.

18  Q   You were being looked at or one of the things

19  that was being looked at was this loan.  Because you

20  had to take out a loan in this case, did you not?

21  A   No.

22        MR. NIEWOEHNER:  Objection, Your Honor, as to

23  what the government was investigating.

24        THE COURT:  The objection is sustained.

25  BY MR. GILLESPIE:

Aramanda - cross by Gillespie                    1584

1  Q   Well, in the purchasing of these Papa John's
2  franchises, didn't you have to take out a loan?
3  A   Yes, but you're jumping all over the place.  You
4  were first talking about this $500,000 and asked if
5  I took out a loan, you just assumed.  If you're now
6  jumping forward to when I purchased the restaurants
7  did I take out a loan, the answer is yes.  So I'm
8  not sure what you mean.
9  Q   All right.  What I meant was when you purchased
10 the restaurants.
11 A   Yes.
12 Q   You had to take out a loan?
13 A   Yes.
14 Q   You took out a substantial loan?
15 A   Yes.
16 Q   You took out a loan in, I believe, in the amount
17 of 7 and a half million dollars?
18 A   That's correct.
19 Q   That loan you took out in the amount of 7 and a
20 half million dollars, you're aware that the
21 documents that were subpoenaed were related to that
22 loan?
23 A   I don't know that for a fact.
24 Q   What do you know was subpoenaed by the
25 government?

:47AM
:47AM
:48AM
:48AM
:48AM

1  A   I know a lot of my working records subsequent to

2  the purchase of the business after 2001 were

3  subpoenaed.  My checking accounts, business checking

4  accounts, payroll accounts, bank accounts, I know

5  that for a fact that those were subpoenaed.

6  Q   All right.

7  A   And those were all after this transaction.

8  Q   And the 7 and a half -- this loan that you took

9  out for the purchase of these restaurants, you took

10 that from the bank, correct?

11 A   GE Capital.

12 Q   GE Capital was the bank.

13       And that 7 and a half million dollars was

14 paid directly to Tony Rezko's outstanding debt.  You

15 paid off his loan, true?

16 A   I don't know.

17       MR. NIEWOEHNER:  Objection.

18       THE COURT:  His answer is, "I don't know."

19 BY MR. GILLESPIE

20 Q   You're a businessman?

21 A   Yes.

22 Q   You told us of your vast experience in the

23 business world, true?

24 A   True.

25 Q   And you knew, sir, that 7 and a half million

1  dollars at the closing, some $7,500,000 was to be
2  distributed or given, correct?
3  A   Yes.
4  Q   And it's a fair statement, is it not, being the
5  businessman that you are, that you reviewed this
6  contract before you signed it?
7  A   Yes.
8  Q   And in reviewing the contract you knew that 7 and
9  a half million -- you had to go to the bank to get
10 that 7 and a half million-dollar loan?
11 A   Yes.
12 Q   Are you telling us you had no understanding as to
13 where that money was going?
14 A   How would I know where it was going?  He could
15 pay debt, he could put it in his pocket, he could
16 distribute it to shareholders.  There's a myriad of
17 things that he could do with that money.  The answer
18 is, I don't know.
19 Q   You know Mr. Rezko got the money?
20 A   Absolutely.
21 Q   And you're telling us you just don't know how he
22 got it or whether --
23 A   No, I didn't say I don't know how he got it.
24 You're asking me what did he do with the money and I
25 answered I don't know.  I know how he got the money.

Aramanda - cross by Gillespie                    1587

1   Q   How did he get the money?

2   A   GE Capital lent the money and it was then

3   distributed directly to him.  Whether he applied a

4   portion to some of his debt, I don't know what

5   happened next thereafter.

6   Q   Well, you do know that he had some debt, true?

7   A   Yes.

8   Q   And, in fact, I think you testified yesterday

9   that you were aware that at the time that Mr. Rezko

10  was asking you for money from the Kjellander loan,

11  his business was not doing well, true?

12         MR. NIEWOEHNER:  Objection; misstates the

13  testimony.

14         THE COURT:  The objection is sustained.

15  BY MR. GILLESPIE:

16  Q   What was your understanding of the financial

17  condition of Mr. Rezko's businesses when he took

18  money that Mr. Kjellander loaned to you?

19         MR. NIEWOEHNER:  Objection; foundation.

20         THE COURT:  The objection is sustained.

21  BY MR. GILLESPIE:

22  Q   Well, the 7 and a half million was distributed,

23  true?

24  A   I assume so.

25  Q   Okay.  And the -- if you follow down on that

:50AM

:50AM

:50AM

:51AM

:51AM

Aramanda - cross by Gillespie                    1588

1  Paragraph 4, sir, there is an additional requirement
2  that you had to sign over two promissory notes to
3  Mr. Rezko, correct?
4  A  Yes.
5  Q  And I believe the first paragraph says $950,000?
6  A  Yes.
7  Q  That's broken into two separate payments, is that
8  true?
9  A  Yes.
10 Q  And there was an additional note of $450,000,
11 correct?
12 A  Yes.
13 Q  You paid -- do you remember paying the $450,000
14 note?
15 A  Yes.
16 Q  When is it that you did that?
17 A  I believe it was May 2001.
18 Q  And the reason that you remembered that, is it
19 not, sir, is because you were shown a copy of that
20 contract?  Or that note, I'm sorry.
21 A  Yes, sir.
22 Q  Sir, I'd like you to go to Aramanda Exhibit 6 in
23 your package there.
24     When you've had -- 6, please.  I'm sorry.
25 A  Where does it say "6"?

Aramanda - cross by Gillespie                    1589

1   Q   On the bottom.

2   A   On the bottom.

3        Okay.

4   Q   That is the note that you had to deliver at the

5   time of closing, correct?

6   A   The $450,000?

7   Q   Yes, sir.

8   A   Yes.

9   Q   And it indicates on that note when it is that it

10  was paid?

11  A   Yes.

12  Q   And that's an accurate copy, correct?

13  A   Yeah, that's my signature.

14        MR. GILLESPIE:  Your Honor, may I ask that

15  that be admitted?

16        MR. NIEWOEHNER:  No objection.

17        THE COURT:  Admitted.

18      (Defendant Rod Blagojevich Aramanda Exhibit 6

19       was received in evidence.)

20        MR. GILLESPIE:  May I publish?

21        THE COURT:  You may.

22      (Exhibit published to the jury.)

23  BY MR. GILLESPIE:

24  Q   At the bottom left hand corner it indicates May

25  of 2001, is that true?

1  A   Yes.

2  Q   Is that your initials next to it?

3  A   Yes.

4  Q   And you wrote that on there to indicate when the

:53AM  5  payment was made, is that true?

6  A   Yes.

7  Q   And you did that so you would have a record that

8  there was an actual payment made, true?  And that

9  the note was paid?

:54AM  10  A   Yes.

11  Q   The second part of the agreement calls -- if I

12  could take you back to the exhibit that I believe

13  was Aramanda 1, sir.

14  A   Yes.

:54AM  15  Q   I ask you to look back at Page 2.

16       As it relates to the $950,000 that you told

17  us about, did you ever make payments on that note?

18  A   Not initially, no.

19  Q   When was it that you made payments on these

:54AM  20  notes?

21  A   The first time that I would have made a payment

22  on behalf of this note would have been in the fall

23  of -- September of -- or October of 2003.

24  Q   And where is it that that money came from?

:55AM  25  A   Ultimately the money came from his request on the

Aramanda - cross by Gillespie                     1591

1  Kjellander loan, on the Kjellander loan that was
2  dated, I believe, September 30th.
3  Q   So prior to getting the Kjellander loan you had
4  not made payments on that second note, correct?
5  A   That's correct.
6  Q   And it's your testimony, sir, that Mr. Rezko came
7  to you and said that you owe me this money for the
8  second -- for the 950-thousand-dollar note, is that
9  true?
10 A   As I said, he didn't actually specifically relate
11 to a note, but he did have that conversation with
12 me, yes.
13 Q   Well, if he didn't relate to the note, what was
14 the conversation?
15 A   That basically -- he referred to the fact that I
16 owed him money.
17 Q   Did he discuss with you what the money was for?
18 A   The money that he needed?
19 Q   Yes.
20 A   He had mentioned that he wanted me to make some
21 payments on his behalf.
22 Q   And you told us, sir, that the -- how much money
23 did you give him off the Kjellander loan?
24 A   I believe $461,000.
25 Q   But you owed him how much?

:55AM
:55AM
:55AM
:55AM
:56AM

Aramanda - cross by Gillespie                    1592

1   A   475.

2   Q   Why didn't you pay him 475 if that was for the

3   payment on the 950-thousand-dollar note?

4   A   It was never discussed why I didn't pay the extra

5   difference.  He mentioned he had a list of some

6   names that he wanted me to make payments on his

7   behalf.  I don't know that if he thought it totaled

8   475 or not.  Ultimately it was 461.

9   Q   Correct.

10          So, according to you, if it was payment for

11  this note, you owed him $14,000?

12  A   That's correct.

13  Q   You never paid him the $14,000?

14  A   No.

15  Q   Well, if I could ask you to look at Aramanda

16  Exhibit Number 11, which is the promissory note.

17          I think, sir, it would be at the very end of

18  the stack, so you don't have to continue to page

19  through it.

20  A   Yes.

21  Q   Okay.  If you could take a second to look at it.

22      (Brief pause).

23  BY MR. GILLESPIE:

24  Q   If you could check Page 2.

25      (Brief pause)

Aramanda - cross by Gillespie                    1593

1   BY MR. GILLESPIE:

2   Q   That is a copy of the note that was given to

3   Mr. Rezko from $950,000, correct?

4   A   Yes.

:57AM   5   Q   And it is signed by you, true?

6   A   Yes.

7   Q   And you're telling us that you made this payment,

8   this money that was taken from the Kjellander loan

9   and given to Mr. Rezko was for payment of this note,

:58AM   10  correct?

11  A   Partial payment.

12          MR. GILLESPIE:  Judge, I ask the note be

13  admitted.

14          MR. NIEWOEHNER:  No objection.

:58AM   15          THE COURT:  Admitted.

16      (Defendant Rod Blagojevich Aramanda Exhibit

17       Number 11 was received in evidence.)

18          MR. GILLESPIE:  I'd ask that it be published?

19          THE COURT:  You may.

:58AM   20      (Exhibit published to the jury.)

21  BY MR. GILLESPIE:

22  Q   Anywhere on that note do you indicate that that

23  $475,000 was paid?

24  A   No.

:58AM   25  Q   You wrote it on the first note, did you not, to

1  indicate that the payment was made?

2  A   Yes.

3  Q   I'd ask you to look at Page Number 2.

4        Anywhere on Page Number 2 did you initial it

5  and date it and say payment was made when you

6  received the Kjellander and you made those payments?

7  A   No.

8  Q   Now, in talking about -- well, let me back up a

9  little bit.

10       As it relates to the Papa John's pizzerias

11 that you bought, you testified yesterday that those

12 are in receivership, correct?

13 A   In 2006.

14 Q   In 2006.

15       And the loan that you took to fulfill the

16 obligation of the note went into default?

17 A   Yes.

18 Q   And, in fact, you owed money to the tune of

19 $6 million, correct?

20 A   No.

21 Q   How much do you owe?

22 A   I believe after they sold some of the

23 restaurants, I wasn't involved in the transactions

24 so I don't know if they sold all or part of the

25 restaurants, but I believe in the part of the

Aramanda - cross by Gillespie                1595

1  restaurants that they sold there was still a balance
2  left of approximately $3.4 million.
3  Q   So you only owe 3.4 million, right?
4  A   Something like that.
5  Q   And that hasn't been paid?
6  A   Correct.
7  Q   You told us that -- when is it that you went to
8  Mr. Rezko and told him you needed money as it
9  relates to the Kjellander loan?
10 A   In August of 2003.
11 Q   You told him that you were in a terrible
12 financial situation?
13 A   I didn't use the word "terrible," but I told him
14 I needed the money.
15 Q   Just prior to taking the loan out with
16 Mr. Kjellander, you took out another $600,000 loan
17 with a man by the name of Lee, correct?
18 A   Earlier; yes.
19 Q   How much prior to the -- strike that.
20     When did you take out the loan with Lee?
21 A   I don't recall the exact date.
22 Q   I'm going to show you what I'll mark as Aramanda
23 exhibit I'll mark it as 12.
24     MR. GILLESPIE:  Your Honor, may I approach?
25     THE COURT:  You may.

Aramanda - cross by Gillespie                    1596

1  BY MR. GILLESPIE:

2  Q   Have you had an opportunity to look at that, sir?

3  A   Yes.

4  Q   Would that refresh your memory?

5  A   Yes.

6  Q   When did you take out that loan?

7  A   February '03.

8  Q   I'm sorry?

9  A   February '03.

10 Q   So you took another 600-thousand-dollar loan just

11 prior or a month prior to the Kjellander loan,

12 correct?

13 A   Yes.

14 Q   Where did that money go to?

15 A   To the business.

16 Q   And as it relates to the loan you took from

17 Mr. Lee, you had to pledge certain securities, true?

18 A   Yes.

19 Q   You had to put up assets to secure the loan?

20 A   Yes.

21 Q   And when was that note due or when was that loan

22 due?

23 A   Unless I'm missing it, I don't see the term.

24 Q   So it appears that there was no term date on that

25 loan, correct?

:01AM

:01AM

:01AM

:01AM

:03AM

1  A   Correct.

2  Q   Which means there is no date that you had to pay

3  it by, correct?

4  A   Not specified, right.

5  Q   But you did have an outstanding loan of

6  600-thousand-dollar with Mr. Lee prior to going to

7  Tony and asking him who you could borrow money from?

8  A   I believe my recollection, and it's been quite a

9  while, that the note was paid off before I went to

10 Tony regarding the subsequent loan.

11 Q   How did you pay that loan?

12 A   By taking a second mortgage out of my house.

13 Q   So you had to take a second mortgage out on your

14 house to pay the loan?

15 A   To pay the Lee loan.

16 Q   To pay the Lee loan, true?

17 A   No.

18 Q   It's an individual.

19       How is it you knew Lee?

20 A   Somebody introduced me to him.

21 Q   And why didn't you just go get the second

22 mortgage on your house first?  Why did you go to

23 Lee?

24 A   I think, if my memory serves me right, I needed

25 the money relatively quickly and the process with

Aramanda - cross by Gillespie                    1598

1  the bank would take a little bit longer, and so I
2  was introduced to him and he made it available on a
3  very quick basis.
4  Q   You were introduced to him by who?
5  A   Several people.  The one person that I definitely
6  remember the name is Albert Najjar.
7  Q   Now, Najjar, is that the same individual that you
8  told us about earlier?
9  A   Regarding the payment that was made to his
10  sister.
11  Q   Yes.
12  A   Yes.
13  Q   So the same man who introduces you to Lee who you
14  get $600,000 from, you then make payments to him on
15  behalf of Mr. Rezko, correct?
16  A   About a year, a year and a half later.
17  Q   A year, year and a half later.
18       And when you took out the loan on your house,
19  that was to satisfy the Lee loan?
20  A   Yes.
21  Q   And so you still owed $600,000 even though it was
22  paid to Lee, you owed that to the bank on your
23  house?
24  A   Yes.
25  Q   And you went to Mr. Rezko and you told him

1  that -- strike that.

2        When were you able to get the loan from the

3  bank to pay off the Lee loan?

4  A  I don't recall the exact month.  I would guess

5  some time probably in June.

6  Q  June of what year?

7  A  '03.

8  Q  All right.

9  A  I'm not 100 percent sure.

10 Q  And you got the Kjellander loan in October?

11 A  Yes.

12 Q  You told us yesterday that you went to the bank

13 to get additional funds and you were unable to?

14 A  I went to GE Capital, yes.

15 Q  And you couldn't get a loan?

16 A  Yes.

17 Q  And then you went to Tony?

18 A  Yes.

19 Q  Why didn't you go back to Mr. Lee?

20 A  Because the interest rate was exorbitant.

21 Q  What was the interest?

22 A  15 percent.

23 Q  What was the interest rate you were paying on the

24 Kjellander?

25 A  10 percent.

1   Q   And when you went to Tony to borrow this money,

2   it was your understanding that this money was for

3   you, correct?

4   A   My intent was for me, yes.

:05AM   5   Q   Yes.  That this money was for you?

6   A   Absolutely.

7   Q   You explained to your very close friend the

8   financial problems you were having, true?

9   A   Yes.

:05AM   10   Q   That you had to take out a second mortgage on

11   your house, true?

12   A   Yes.

13   Q   That the business had bills that needed to be

14   paid, true?

:06AM   15   A   Yes.

16   Q   And you went to your close friend and said,

17   please help me, true?

18   A   Yes.

19   Q   And he sent to you to Kjellander?

:06AM   20   A   Yes.

21   Q   That's a man you had never met before?

22   A   No, that's not true.

23   Q   When did you meet him?

24   A   I met him on several occasions before that.

:06AM   25   Q   When did you meet him?

1  A   As I stated yesterday, I met him at Tony's house

2  at a fundraiser dinner for the Governor, and I also

3  met him at a St. Jude's charity.

4  Q   Now, since you brought it up, this fundraiser at

:06AM  5  Tony's house for the Governor, when was that?

6  A   I don't recall the exact month.  I believe it was

7  prior to the election results.

8  Q   When?

9  A   I don't recall the date.  Whenever the election

:06AM  10  was, it was prior to that.  So I'm assuming the

11  election would have been around 2002, so probably

12  several months prior to the election.

13  Q   Several months prior to the 2002 election?

14  A   I believe so.

:07AM  15  Q   Oh, you're not sure?

16  A   Yes, I'm absolutely not sure.

17  Q   You're absolutely not sure?

18  A   I'm not sure.  I don't know the exact month or

19  the date.  It was 7 or 8 years ago.  I have no idea

:07AM  20  which exact month it was in, all I do know is that

21  it happened and that I met him at Tony's house.

22  Q   Well, would you be surprised to find out that

23  that event you were at Tony's house was actually an

24  Obama fundraiser?

:07AM  25  A   It was also an Obama fundraiser.

Aramanda - cross by Gillespie                    1602

1  Q   You were at an Obama fundraiser at Tony's house,
2  correct?
3           MR. NIEWOEHNER:  Objection, Your Honor.
4           THE COURT:  The objection is sustained.
5  BY MR. GILLESPIE:
6  Q   Well, back to the Kjellander loan.
7           You went to Mr. Kjellander and you told him
8  what?
9  A   On the phone conversation I told him that, you
10  know, as Tony had indicated to him before, that I
11  needed to borrow some money and he had indicated
12  that he was interested in loaning the money and we
13  had a conversation to discuss the term and interest
14  payment on the note.
15  Q   And you told us, I believe you said, that was 10
16  percent, true?
17  A   I'm pretty sure it was 10 percent, as I recall.
18  Q   When you went and saw Mr. Kjellander, you didn't
19  have to put up any security?
20  A   I didn't go see Kjellander, but yes, you're
21  right, I did not put up any security.
22  Q   Well, you did go to Kjellander because you signed
23  a promissory note.
24  A   No, that is not true.  I never said I saw him.
25  Q   I'm sorry?

1  A   I never said I saw him and I didn't see him.

2  Q   Well, there was a promissory note, correct?

3  A   Yes.

4  Q   Where did you sign that at?

5  A   I signed it in Rezmar's office.

6  Q   You signed it at Tony Rezko's office?

7  A   Yes.

8  Q   And when you talked to Mr. Rezko about getting

9  this loan, of course he didn't tell you that this

10 was being used, this loan, was being used as a tool

11 for him to get kickbacks?

12 A   Absolutely not.

13 Q   He didn't tell you that Mr. Kjellander was

14 funneling payments to him through your loan?

15 A   No.

16 Q   You would have never partook in that, correct?

17 A   Probably wouldn't have.

18 Q   Would you or wouldn't you?

19        MR. NIEWOEHNER:  Objection.

20        THE COURT:  Overruled.

21 BY THE WITNESS:

22 A   No, if he would have stated it, I wouldn't have.

23 BY MR. GILLESPIE:

24 Q   As far as you know from talking to Tony, this was

25 just a man who was going to give you a legitimate

Aramanda - cross by Gillespie                    1604

1  loan?

2  A  Yes.

3  Q  And Tony was your very close friend?

4  A  Yes.

:09AM  5  Q  He was a person who you had told us you had taken

6  extensive trips with?

7  A  Yes.

8  Q  So if it was true that this was, in fact, a way

9  for Mr. Rezko to funnel money through Kjellander to

:09AM  10  get -- I'm sorry, through you to give to Mr. Rezko,

11  that, in fact, would have been a lie by Mr. Rezko,

12  correct?

13  A  Could you restate your phrasing?

14  Q  Yes.

:09AM  15       As far as you knew from talking to Mr. Rezko,

16  this was a legitimate loan, correct?

17  A  Yes.

18  Q  He made no mention to you that he was using you

19  as a front man to collect --

:09AM  20  A  No.

21  Q  -- his money?

22  A  No.

23  Q  You would never have gone for that?

24  A  If he had mentioned that, I wouldn't have.

:10AM  25  Q  You wouldn't have.

1          If he told you:  Listen, I need you to take
2   this money because it's a kickback coming to me, you
3   would never have done it?
4   A   Right.
5   Q   So what I'm saying to you is, your friend, Tony
6   Rezko, lied to you.
7          MR. NIEWOEHNER:  Objection, Your Honor.
8          THE COURT:  It's really out of line.  I don't
9   want his opinion.
10  BY MR. GILLESPIE:
11  Q   It's a fair statement that Mr. Rezko didn't tell
12  you that this was a kickback coming from Kjellander?
13  A   Absolutely right.
14  Q   And if he would have told you that, you wouldn't
15  have done it?
16  A   Right.
17  Q   As it relates to this loan, you went to his
18  office to pick up a check for $600,000, is that
19  true?
20  A   No.
21  Q   Where did you get this $600,000?
22  A   Kjellander either mailed it -- I believed he wire
23  transferred the money directly into my account.
24  Q   And I forget -- I'm going to show you what was
25  shown yesterday, sir, which previously has been

:10AM
:10AM
:10AM
:10AM
:10AM
:11AM

1  admitted.

2      THE COURT:  Want to stop for a second?

3      How much longer do you have.

4      MR. GILLESPIE:  A bit, Judge.

:11AM  5      THE COURT:  We'll take a break now.

6      THE MARSHAL:  All rise.

7    (The following proceedings were had out of the

8     presence of the jury in open court:)

9      THE COURT:  Fifteen minutes.

:35AM  10    (Recess.)

11      THE MARSHAL:  All rise.

12    (The following proceedings were had in the

13     presence of the jury in open court:)

14      THE COURT:  Please be seated.

:36AM  15      You may resume.

16      MR. GILLESPIE:  Thank you, your Honor.

17  BY MR. GILLESPIE:

18  Q   Mr. Aramanda, I believe when we left off you were

19  talking about the Kjellander loan.  I'm going to ask

:36AM  20  you some more questions about that.

21      You told us that as it relates to the

22  Kjellander loan, of course, you didn't have to put

23  up any collateral, right?

24  A   Yes.

:36AM  25  Q   And that was different than the loan you had with

1  Mr. Lee where you did have to put up collateral,

2  correct?

3  A   Yes.

4  Q   That was different than the loan you had taken

5  out with GE where you had to put up collateral,

6  correct?

7  A   Yes.

8  Q   And that was different than the loan you had with

9  your house where you had to take out a second

10 mortgage to get another loan?

11 A   Yes.

12 Q   And did you find it strange that you didn't have

13 to put up any collateral on $600,000?

14 A   I was surprised.

15 Q   That, of course, was shocking that you wouldn't

16 have to put up something to get that kind of money,

17 correct?

18 A   Well, I did put up a personal guarantee.

19 Q   Well, your personal guarantee is, I'll pay that

20 back, right?

21 A   Yes.

22 Q   But when I say -- excuse me.

23     When I say put something up, I mean more than

24 your signature.  I mean a house, a car, a boat.

25 A   Right.

1  Q   And you told us that you got the check, correct?

2  A   A wire transfer, yes.

3  Q   Wire transfer, I'm sorry.

4       So you got the wire transfer so the money was

:37AM  5  in your bank?

6  A   Yes.

7  Q   How many days after you got the wire transfer was

8  it that Tony Rezko, your friend, came up to you and

9  said I need you to write up some checks or pay debt

:37AM  10  for me?

11  A   Probably the same day or the day before.

12  Q   Either the same day that it was transferred to

13  your account?

14  A   Yes.

:37AM  15  Q   Do you remember when it was?

16  A   No.

17  Q   And --

18       MR. GILLESPIE:  Excuse me one second.

19       (Brief pause).

:38AM  20  BY MR. GILLESPIE:

21  Q   Do you remember, sir, going back to this

22  collateral issue, do you remember talking to the

23  U.S. Attorneys in this matter and talking to the

24  agents in this matter, correct?

:38AM  25  A   Yes.

1 Q   And one of the dates in which you talked to them

2 was November 30th, 2009, true?

3 A   If you say so.

4 Q   Well --

5 A   I don't remember the exact date.

6 Q   You were there a bunch of times?

7 A   Several times.

8 Q   That sounds about right?

9 A   Yes.

10 Q   And the agents asked you about the Kjellander

11 loan, true?

12 A   Yes.

13 Q   And did you tell the agents when you were asked

14 about the Kjellander loan that you were not that

15 surprised that Kjellander did not request any

16 collateral because Rezko was vouching for it?

17 A   I might have said that.  I mean, I don't recall

18 exactly the statement, but I could've said that.

19 Q   All right.  Are you telling us here that you are

20 surprised that he didn't ask for collateral?

21 A   Yes, initially I was surprised.

22 Q   Well, when was it that you didn't become

23 surprised?

24 A   Well, I mean after I thought about it for a few

25 moments I realized that they -- they had a close

Aramanda - cross by Gillespie                    1610

1  relationship and I thought maybe that there were
2  other reasons behind it, that he was doing it as a
3  favor to Rezko.
4  Q   Sir, I just asked you a couple of questions as to
5  whether or not you were surprised that you didn't
6  have to put up collateral.
7  A   Yes.
8  Q   And you told us unequivocally that, yes, you were
9  surprised, correct?
10 A   Yes.
11 Q   Is your testimony now, sir, that after you
12 thought about it for a few minutes, that you weren't
13 surprised?
14 A   After you refreshed my memory about the
15 discussions I had in November, I could see where I
16 would have said that and whether it was a moment or
17 two after or part of the same, you know, thought
18 process, I can't recall.
19 Q   Well, what I'm asking you, sir, is what's the
20 truth.  I'm not asking what could be.  Were you
21 surprised or weren't you surprised?
22        MR. NIEWOEHNER:  Asked and answered.
23        THE COURT:  The objection is sustained.
24
25 BY MR. GILLESPIE:

:39AM
:39AM
:39AM
:40AM
:40AM

1  Q   You told the agents you weren't surprised,
2  correct?
3          MR. NIEWOEHNER:  Objection.
4          THE COURT:  The objection is sustained.
:40AM 5  BY MR. GILLESPIE:
6  Q   Well, as it relates to this loan, you said that
7  there was a promissory note that you signed, true?
8  A   Yes.
9  Q   And it was a promissory note -- where did you
:40AM 10 sign the promissory note at?
11 A   At Rezmar's office.
12 Q   Was Mr. Kjellander present for the signing of
13 that loan or -- for that note, I'm sorry.
14 A   No.
:40AM 15 Q   Who gave you the note to sign?
16 A   I believe it was Delores, Tony's administrative
17 assistant.
18 Q   Was Tony there at the time you signed the note?
19 A   He was in the office at the time, I don't recall
:41AM 20 if he was actually witnessing the signing.
21 Q   But he was there because you were there to talk
22 to him about this note, correct?
23 A   I wasn't there to talk to him but I was there to
24 come to sign the note.
:41AM 25 Q   Did you talk to him about the note?

1  A   I don't recall.

2  Q   What were you there to talk to him about?

3  A   I was there to pick up the -- to sign the note,

4  pick up the note and sign the note.

5  Q   And that was it?

6  A   That was the main purpose.

7  Q   And you were shown a copy of the note yesterday.

8       MR. GILLESPIE:  And I'm going to ask to

9  republish, I believe it was Aramanda Government

10 Exhibit 1.

11      THE COURT:  Sure.

12    (Exhibit published to the jury.)

13 BY MR. GILLESPIE:

14 Q   You were asked some questions about this

15 yesterday and I'm going to ask you some more

16 questions about it.

17      If you look at the bottom of the note, it's

18 right above Page 104.

19 A   Yes.

20 Q   And to the very right it says "Rezko promissory

21 note," correct?

22 A   Yes.

23 Q   It doesn't say "Aramanda promissory note,"

24 correct?

25 A   Correct.

Aramanda - cross by Gillespie                    1613

1 Q   And Rezko got the majority of the money out of
2 this note, correct?
3 A   460,000, yes.
4 Q   That's the majority of the money.
5 A   Yeah.  Yeah.
6 Q   And is it your testimony, sir, that you still
7 believed that this was a legitimate loan?
8 A   Yes.
9 Q   Well, at some point Mr. Rezko gives you a list of
10 people you are to pay on his behalf, true?
11 A   Yes.
12 Q   When was that?
13 A   I believe it was either October 1st or
14 October 2nd.
15 Q   When was it you got the check?
16 A   I believe it was October 2nd.
17 Q   All right.  So he either told you on the day you
18 got the check or the day before you got the check,
19 correct?
20 A   Yes.
21 Q   And, of course, you obtaining this loan, this was
22 in the works well before the 1st or the 2nd.
23 A   Yes.
24 Q   How many weeks prior to that?
25 A   The original discussion I had with Kjellander I

1  believe was probably about a week or so prior to
2  that.
3  Q   Did he give you the list of people on a piece of
4  paper?
5  A   No.
6  Q   How was it that the list was given to you?
7  A   By phone through his administrative assistant.
8  Q   So it wasn't -- well, you were at the Rezko
9  office to sign the note?
10 A   Yes.
11 Q   Do you remember the date of that?
12 A   I believe it was September 30th.
13 Q   You weren't given the list on that day?
14 A   No.
15 Q   And you went -- was it very likely on the day you
16 picked -- strike that.
17        It was either on the 1st or the 2nd, correct?
18 A   That's my recollection.
19 Q   You remember specifically it being either the 1st
20 or the 2nd?
21 A   I know it was after the 30th because the
22 following day I had a conversation with him on the
23 phone and told him that -- that the wire transfer
24 would be received in the next couple of days.
25 Q   So it was after you got confirmation from

Aramanda - cross by Gillespie                    1615

1  Kjellander that he was going to given you the loan.
2  A   Yes.
3  Q   And he told you when he was going to give you the
4  loan?
5  A   Within the next several days, yes.
6  Q   So it wasn't after you got confirmation that you
7  knew you were getting the money that Rezko told you
8  that I need you to do me a favor?
9  A   Yes.
10 Q   And, again, you told us that this was a man who
11 you told him the financial problems you were having?
12 A   Yes.
13 Q   Did you ask Tony:  Please, let me keep this
14 money, I need it?
15 A   Yes.
16 Q   What did he say?
17 A   He understood that I had plans for it relating to
18 the business and that it was really important to me,
19 especially the larger portion of it that I had
20 designated to build a new restaurant which is the
21 most sizable portion --
22 Q   I don't mean to interrupt, but which portion?
23 A   The estimate on building the new restaurant at
24 that time was between 300 to 325,000 dollars, that
25 was a sizable portion of it, that was the answer for

:44AM
:44AM
:44AM
:44AM
:45AM

1  it.

2       So I told him why it was important and he

3  said, you know, I wish I had somewhere else to go to

4  at this point in time, but I really need you to make

5  some payments on my behalf.

6  Q   You knew, sir, that by you signing the note

7  that's titled Rezko note, by you signing that note

8  you were responsible for the paying back of that

9  money?

10  A   Yes, but I -- I don't understand quite the

11  clarification regarding the Rezko note.  That's a

12  file reminder where it could have been filed.  I

13  don't understand the correlation to Rezko note.

14  Q   You are telling us that's a file reminder?

15  A   I'm assuming that's a file reminder on the

16  bottom.

17  Q   You are assuming.  You don't know?

18  A   But I also didn't know it was a Rezko note

19  either.

20  Q   You didn't prepare that document.

21  A   Absolutely not.

22  Q   You don't know what that line is?

23  A   I don't know what that line is, no.

24  Q   But what you do know is that it says Rezko note?

25  A   Yes.

Aramanda - cross by Gillespie                    1617

1  Q   You are making an assumption or speculation about
2  this file saving stuff?
3  A   Right.
4  Q   Right.
5           Now back to the note.  You get a list from
6  his secretary?
7  A   Yes.
8  Q   Do you write the list down or the information on
9  a piece of paper?
10 A   Yes.
11 Q   How many names were given?
12 A   I believe it was five.  If you just give me a
13 second just to --
14 Q   Sure.
15    (Brief pause).
16 BY THE WITNESS:
17 A   I believe it was 5.
18 BY MR. GILLESPIE:
19 Q   I'm going to give you some names:  Al Chaib?
20 A   Yes.
21 Q   Elie Maloof?
22 A   Yes.
23 Q   Paul Moussa?
24 A   Yes.
25 Q   Semir Sirazi?

Aramanda - cross by Gillespie                 1618

1  A   Yes.

2  Q   And Alfred Roumi?

3  A   Yes.

4  Q   Those are the five people that you were told by

5  Delores that needed to be paid, right?

6  A   Yes.

7  Q   And you were told this on a telephone

8  conversation which is when?

9  A   I believe it was on the 2nd.

10  Q   And once you were given the list of names, what

11  did you do?

12  A   Well, some of the names had wire account

13  information on it and I waited to confirm in the

14  next day or two that the money was actually

15  received.  Where I had wiring instructions, I made

16  the wire transfers.

17  Q   So for certain names, and I think you went

18  through the list yesterday as to when they were wire

19  transferred --

20  A   Yes.

21  Q   -- but for certain individuals you were given

22  banking information as to where you were to wire the

23  money?

24  A   Yes.

25  Q   And certain individuals you were not?

1  A   Not initially, no.

2  Q   Were they all wires?

3  A   Yes.

4  Q   When were you given the information -- which

5  people were you given the information on initially

6  that were wire transfers?

7  A   I believe, and again I'm trying to recall --

8  Q   Sure.

9  A   --- I believe it was Al Chaib, Moussa, those two

10  stick out in my mind.  I'm not sure about the third

11  one which was Roumi, it might have been Roumi, and I

12  believe it came a day or so later.

13  Q   Of course, you had to wait for the check to

14  clear.  You wanted to make sure your wires weren't

15  going to bounce.

16  A   Right.

17  Q   As you discussed yesterday -- did you go to your

18  bank?

19  A   Yes.

20  Q   And you went on different dates, as it appears

21  these transfers were made on different dates, true?

22  A   Several days, yes.

23  Q   How many dates total?

24  A   I don't recall.  I think it was possibly three

25  different dates for the five transfers, possibly.  I

1  could be mistaken, it could be an extra day.

2  Q   So you took time out of your day, those three

3  days, and actually went to the bank and made wire

4  transfers?

5  A   I'm not sure I went to the bank all instances.

6  Obviously, I either went to the bank or I initiated

7  it over the phone.

8  Q   Well, when you go to make a wire transfer for

9  that amount, you have to go sign for that.

10  A   Eventually you have to go sign it.  I could give

11  the information, get it prepared, and then there's

12  less time involved signing the document afterwards.

13  Not after the wire transfer, but after the phone

14  conversation.

15  Q   Right.  You still have to go to the bank and sign

16  for it.

17  A   Yes.  Absolutely.

18  Q   They're not just taking your phone call and say

19  go ahead and transfer this money, right?

20  A   My recollection is, you're right.

21  Q   Right.  You have to get in your car and drive to

22  the bank, right?

23  A   Yes.

24  Q   And you did this on different days.  You went to

25  the bank more than once.

Aramanda - cross by Gillespie                          1621

1  A   Yes.

2  Q   This was an inconvenience for you on the money

3  that was your money, true?

4  A   If you call five or ten minutes of inconvenience,

5  yes.

6  Q   Well, this is $461,000 that you needed, correct?

7  A   True, but you're making reference that I'm taking

8  time out of the day, so I'm saying if you call

9  ten minutes inconvenience, yes.  The fact that I

10 wish I'd kept the money, you're right.

11 Q   Let me ask you this, why didn't you just write a

12 check on your account and give it to Tony and say,

13 you pay these people?

14 A   I didn't ask the question.

15 Q   I know.  I'm asking you.  Why didn't you do that?

16 A   Because he asked me if I would make the payments

17 on his behalf.

18 Q   And you never said to him:  Hey, Tone, this is

19 silly, why don't I just give you the check for

20 $461,000?

21 A   I thought about it.  I didn't make any comments

22 about that.

23 Q   When did you think about it?

24 A   At the time he made the request.

25 Q   But you didn't say anything?

1  A   No.

2  Q   Is it a fair to say that you do whatever Tony

3  Rezko tells you to do?

4  A   No.

5  Q   You did in this case?

6  A   Yes.

7  Q   You thought about writing him a check and giving

8  it to him but he told you to do something, so you

9  did it?

10 A   Yes.

11 Q   Okay.  And as it relates to the money that you

12 sent out to Chaib--I apologize if I'm butchering

13 it--you told us he has a relationship with

14 Mr. Rezko, correct?

15 A   Yes.

16 Q   Mr. Maloof has a relationship with Mr. Rezko,

17 correct?

18 A   Yes.

19 Q   Mr. Moussa has a relationship with Mr. Rezko,

20 correct?

21 A   Yes.

22 Q   Mr. Sirazi has a relationship with Mr. Rezko?

23 A   Yes.

24 Q   In fact, I think you told us of Mr. Sirazi, Tony

25 had an outstanding debt of $66,000 a month to that

Aramanda - cross by Gillespie                 1623

1  man, true?

2  A  I don't know if it was a full amount or it was

3  one month or two months, but he mentioned that he

4  had a monthly fee that he had to pay Sirazi.

5  Q  And, finally, Mr. Alfred Roumi.

6  A  Yes.

7  Q  You wired him $300,000 at the request of

8  Mr. Rezko?

9  A  Yes.

10 Q  And these were all friends of Tony's, true?

11 A  Friends and/or business associates.

12 Q  Friends and/or business associates.

13        So as far as you know, this money was --

14 again, please correct me if I'm wrong, this money

15 was being sent to pay, you told us, Rezko debt?

16 A  As far as I knew, yes.

17 Q  So at least as of the date early October 2003, I

18 think you told us yesterday Rezko's finances or the

19 restaurants weren't doing so well, true?

20        MR. NIEWOEHNER:  Objection.

21        THE COURT:  The objection is sustained.

22 BY MR. GILLESPIE:

23 Q  Well, you sent this money to pay Rezko's debt?

24        MR. NIEWOEHNER:  Objection.

25        THE COURT:  The objection is sustained.

Aramanda - cross by Gillespie                    1624

1  BY MR. GILLESPIE:

2  Q   Mr. Rezko told you he didn't have the money to

3  pay these people?

4  A   Correct.

5  Q   You were never told by Tony Rezko wire transfer a

6  half million dollars, $600,000, or one dollar, to

7  Governor Blagojevich?

8  A   Are you finished?  Is that a question?

9  Q   I'm asking you.

10  A   No.

11  Q   Okay.  You know how to do wire transfers,

12  obviously.

13  A   Yes.

14  Q   He never gave you a wire transfer for an account

15  in Aruba and said this is the Governor's, send it to

16  him?

17  A   No.

18  Q   The money that you got left, how much was left?

19  A   $139,000.

20  Q   What did you do with that money?

21  A   Put it in the operating account for my business.

22  Q   And besides sending the money to the people that

23  you told us about, Rezko didn't tell you, give a

24  check to Patti Blagojevich at the realty company?

25  A   No.

1  Q   He didn't say wire transfer money to any realty
2  company?
3  A   No.
4  Q   After you wired this money on behalf of your
5  friend, Mr. Rezko, when was it -- well, strike that.
6          You were still in a terrible -- take out
7  "terrible."  You were in a financial bind at this
8  point, correct?
9  A   Yes.
10 Q   And even though you signed a note obligating you
11 to pay off $600,000 at 10 percent, you only got
12 $150,000 out of that?
13 A   Yes.
14 Q   And what was your understanding as to when this
15 note was due?
16 A   Well, when I had the conversation with
17 Kjellander, we had agreed that the note would be due
18 within a year and that was the term that was
19 reflected on the agreement; however, during the
20 conversation on the phone, he mentioned there's a
21 chance that he might have to request early payment.
22 Q   I'm sorry, he said what?
23 A   He might have to request early payment.
24 Q   When he told you that he might have to request
25 early payment, this is a lot of money, $600,000.

1  Did you say how early is this going to be?

2  A  Yes.

3  Q  What did he say?

4  A  He said possibly six, it could be six months at

5  the earliest.

6  Q  And when was it that you actually paid the note?

7  A  The eventual payment of the note would have been

8  I believe it was in June.  He requested it in April.

9  Q  The actual payment was --

10  A  I issued a check at the end of April; however, I

11  called him and told him to hold it, that I was not

12  able to secure the loan in time to meet the check.

13       And I called him when I did secure the loan

14  and then told him to go ahead and deposit it.  So I

15  don't recall the exact date he deposited it, but I

16  believe it was in June.

17  Q  I'm going to show you what I'll mark as defense

18  Aramanda Exhibit A.  It's already been marked as

19  Government's Aramanda exhibit and I apologize, I

20  don't know the number.

21       MR. GILLESPIE:  Judge, I don't remember the

22  number.  It's already been admitted and published.

23  It's the Robert Kjellander Check dated 4/30.

24       THE COURT:  What is the government number?

25       MR. NIEWOEHNER:  I think it's Kjellander

Aramanda - cross by Gillespie                    1627

1  Check.
2        THE COURT:  I rather just have one number per
3  exhibit.
4        MR. NIEWOEHNER:  Government Exhibit
5  Kjellander Check 1.  May I publish it?
6        THE COURT:  You may.
7        MR. GILLESPIE:  Thank you.
8      (Exhibit published to the jury.)
9  BY MR. GILLESPIE:
10 Q   Now, I want you to take a look at the check.
11       MR. GILLESPIE:  Everyone can see it?
12 BY MR. GILLESPIE:
13 Q   That is out of your JAA Enterprises account,
14 right?
15 A   Yes.
16 Q   When is it that you set this company up?
17 A   April, I believe, of 2001.
18 Q   I didn't hear you, I'm sorry.
19 A   April, I believe, of 2001.
20 Q   Okay.
21 A   On or about.
22 Q   Now, it's dated April 30th the year 2004 as the
23 date on the check, true?
24 A   Yes.
25 Q   But I think you told us yesterday that you wrote

:56AM

:56AM

:56AM

:57AM

:57AM

Aramanda - cross by Gillespie                1628

1  that check approximately a week before because it
2  was your hopes that within nine, ten days, whatever
3  it may be, that you were going to be able to get the
4  money to cover it, essentially?

:57AM   5  A   Yes.
6  Q   So is it a fair statement, then, that you wrote
7  this check, the one that's numbered 1985, at
8  approximately the 21st of April?
9  A   It could've been.  On or about that day, yes.

:57AM   10  Q   Yeah.  You said a week before.
11         And where was it that you thought you'd be
12  able to get $625,000, approximately $624,000,
13  624,500, within seven to eight days?
14  A   I believe I had been talking to a gentleman that

:58AM   15  I mentioned yesterday, Wilton, and I thought -- I
16  thought the process would be quicker than it
17  actually turned out to be.  It turned out to be much
18  longer negotiations.
19  Q   When did you first start talking to Mr. Wilton?

:58AM   20  A   I don't recall the date.
21  Q   How about the month?
22  A   I would assume it would've been April or 2004,
23  but I'm not sure.
24  Q   Wilton was a man that Tony introduced you to?

:58AM   25  A   Yes.

Aramanda - cross by Gillespie                    1629

1  Q   And Wilton was a man that Tony was sending you to

2  to get another $600,000, correct?

3  A   Yes.

4  Q   Now, you already owed $600,000 to Mr. Lee?

5  A   I believe that $600,000 to Lee was paid the prior

6  year, I'm not sure.

7  Q   You don't know if it was paid?

8  A   No, I definitely know it was paid, I just don't

9  know the exact month.  I mentioned to you earlier

10 when you asked that question that I thought it was

11 paid in June.

12 Q   That was the outstanding mortgage?

13 A   Yes.

14 Q   So you had an outstanding second mortgage,

15 correct, in the amount of $600,000?

16 A   Yes.

17 Q   You were now on the hook for Mr. Kjellander for

18 $600,000, correct?

19 A   Yes.

20 Q   And now you were going to a third man to borrow

21 another $600,000?

22 A   Well, it wouldn't have been three

23 600-thousand-dollar loans.  The final 600,000 that

24 you alluded to would be off the previous 600,000.

25 Q   Oh, I understand that, but you still would have

1  to get a loan to pay that off.

2  A  Yes.

3  Q  So there would have been three loans until you

4  paid off the Kjellander.

:59AM  5  A  Yes.

6  Q  And when you talked to Mr. Wilton at your friend

7  Tony's -- he's the one who told you to go see him,

8  correct?

9  A  Yes.

:59AM  10  Q  Why did you write Mr. Kjellander a check prior to

11  knowing you had the money in the bank account?

12  A  When he called he had asked if it was possible

13  that he could get the payment prior to the end of

14  April.  At the time I believe I thought there was a

:00PM  15  chance that could happen.  I wrote him a check based

16  on the conversation we had a week or ten days

17  earlier, I told him I would confirm with him if the

18  funds were available.

19       I called him back at the end of the month and

:00PM  20  told him that the funds were not available and if he

21  could please hold the check.

22  Q  Your checks -- your checks, sir, in your checking

23  account come in sequential order, of course,

24  correct?

:00PM  25  A  Yes.

Aramanda - cross by Gillespie          1631

1  Q   And when I say that, I mean the check just prior
2  to 1985 would be 1984, correct?
3  A   Yes.
4  Q   And the check prior to 1984 would be 1983?
5  A   Yes.
6  Q   And when writing checks -- I'm going to take this
7  down.
8        When writing checks you go on order in your
9  bank book, you go to 1984, 1985, so forth and so on,
10 correct?
11 A   I would say yes.
12 Q   Yeah.  Sure.
13       I'm going to show you, sir, what I'm going to
14 mark as Aramanda Exhibit 12.
15       MR. GILLESPIE:  Your Honor, may I approach?
16       THE COURT:  You may.
17       MR. GILLESPIE:  Your Honor, may I stand up
18 here for a second, please?
19       THE COURT:  Sure.
20       MR. GILLESPIE:  Thanks.
21 BY MR. GILLESPIE:
22 Q   That is a check that is out of that same checking
23 account, correct?
24 A   Yes.
25 Q   And that is a copy of the check, correct?

:00PM (line 5)
:01PM (line 10)
:01PM (line 15)
:01PM (line 20)
:02PM (line 25)

Aramanda - cross by Gillespie                    1632

1  A   Yes.

2  Q   And that is the check that precedes the check you

3  wrote to Mr. Kjellander?

4  A   Yes.

:02PM     5  Q   And the date on that check is April 30th, 2004?

6  A   Yes.

7  Q   You're telling the ladies and gentlemen of the

8  jury that you wrote the check to Mr. Kjellander nine

9  days prior to that, correct?

:02PM     10  A   My recollection is that it was about a week prior

11  to that, yes.

12  Q   So the check you wrote prior to the Kjellander

13  check, which was the 21st of April, is dated after,

14  it's dated April 30th?

:02PM     15  A   Yes.

16  Q   Did you take your checks out of order?

17  A   No.  First of all, I didn't write either of those

18  checks, I signed the checks.  So they're actually

19  written by somebody paying the bills and presented

:03PM     20  to me for signature.

21  Q   Okay.

22  A   But that could've been written -- actually

23  written on the same day.

24  Q   So you -- well, they couldn't have been.  I ask

:03PM     25  you to take a look at this check.

Aramanda - cross by Gillespie                    1633

1        MR. GILLESPIE:  If I may approach again?
2        THE COURT:  You may.
3   BY MR. GILLESPIE:
4   Q   Tell me the date --
5   A   The check date on the check is April 30th '04.
6   Q   Correct.  And who was writing your checks for
7   you?
8   A   At that time my daughter was helping me with the
9   accounts payable, so she would have prepared the
10  checks.
11  Q   Did you have a standing order -- this check was
12  for payment of your mortgage?
13  A   G.E. Capital.
14  Q   Is that who your mortgage was through?
15  A   Yes.
16  Q   And you had to pay your mortgage, true?
17  A   Yes.
18  Q   And did you have a standing order with your
19  daughter that to go head and write checks but
20  post-date all of them nine or the ten days?
21  A   Well, I think sometimes when she knows that the
22  bills were going to be paid in the next week or so,
23  she would not necessarily spend every single day
24  writing checks, so she might -- I'm telling you it
25  could have happened, she could have prepared a

 1 week's worth of checks with the same day or
 2 something.
 3 Q   Well, she could have wrote this check on the day
 4 that it's signed for the date it states, April 30th,
 5 correct?
 6 A   I doubt it.  If you look on the back, it seems to
 7 be cashed actually April 29th.
 8 Q   The 29th.
 9 A   Which probably means that she wrote it not on
10 that date but probably along about the same time
11 that the Kjellander check was written.
12 Q   Sir, you did not write the Kjellander check on
13 April 30th, did you?
14 A   No.
15 Q   Right.
16 A   Nor was that check written on April 30th.
17 Q   You didn't write any of the checks.
18 A   That's what I told you.
19 Q   So you don't know when they were written.
20 A   I have a recollection about when.  You're right,
21 I don't know exactly what precise date they were
22 written.
23 Q   You told us that you remember -- so we're clear,
24 your daughter writes your checks, not you, correct?
25 A   She prepared the checks, correct.

Aramanda - cross by Gillespie                1635

1  Q   Right.  So you don't -- you're -- you've just
2  told us, you don't know when these were prepared, do
3  you?
4  A   Not exactly, no.
5  Q   Not exactly.
6       So you don't know when that check was
7  actually signed?
8  A   No.
9  Q   All right.
10      And the check, the Kjellander check, was not
11 cashed until when?
12 A   I don't know the exact date.  My recollection
13 that it was not until June.
14 Q   June.
15      MR. GILLESPIE:  Your Honor, if I may
16 approach?
17      THE COURT:  You may.
18 BY MR. GILLESPIE:
19 Q   Showing you the Kjellander check that you
20 previously identified.
21      Does it show on the back side of that check
22 when it was that it was cashed?
23 A   June 2nd it looks.
24 Q   Of what year?
25 A   Of '04.

:05PM
:05PM
:05PM
:05PM
:06PM

1  Q   Okay, of '04.

2         And you were aware, sir, were you not, that

3  on May 20th of '04, that there was an article in the

4  paper about Stuart Levine being investigated by the

5  authorities and that's why you predated that check

6  to Kjellander?

7  A   Not at all, no.  Had nothing to do with it.  I

8  predated -- the check to the bank was obviously

9  predated, too, as you indicated cashed a day early;

10 has nothing to do with that.

11 Q   Well, you did come to find Mr. Levine was being

12 investigated?

13 A   I remember reading something in the newspaper.

14 Q   And that happened to be right around May 20th?

15 A   I have no idea.

16 Q   The Wilton loan, when is it that you got it?

17 A   I don't recall the exact date.  You have the

18 agreement.  I dont' recall the date.

19         MR. GILLESPIE:  If you could bear with me for

20 a second.

21    (Brief pause).

22         MR. GILLESPIE:  Your Honor, may I approach?

23         THE COURT:  You may.

24

25 BY MR. GILLESPIE:

:06PM

:06PM

:06PM

:07PM

:07PM

Aramanda - cross by Gillespie                    1637

1  Q  I'm sorry, I think it might be in your stack
2  there.  If you could look for Aramanda Exhibit 9.
3  A  Number 9?
4  Q  Please, sir.
5      (Brief pause).
6  BY THE WITNESS:
7  A  Yes.
8  BY MR. GILLESPIE:
9  Q  Do you have it in front of, sir?
10 A  Yes.
11 Q  Thank you.
12      Does it indicate the date --
13 A  Yes.
14 Q  Sorry.
15 A  Sorry.
16 Q  No, I'm sorry.
17      When was that?
18 A  It's dated May 24th, 2004.
19 Q  All right.  And the Wilton note, if you can --
20 how many pages is it?
21 A  The actual promissory note itself seems to be --
22 I think five pages.
23      One second.
24      (Brief pause.
25 BY THE WITNESS:

1  A   No, it says six pages.

2  BY MR. GILLESPIE:

3  Q   And in addition to the note, there's a bunch of

4  attachments?

5  A   Right.

6  Q   And the attachments that you had to put for this

7  loan, unlike the Kjellander loan, was you had to

8  pledge a massive amount of security?

9  A   Yes.

10  Q   You had to pledge every one--and tell me if I'm

11  right--every one of your stores?

12  A   I believe it was every one, yes.

13  Q   I'm sorry?

14  A   I believe it was every one.

15  Q   And that was the only way in which you were able

16  to obtain this loan?

17  A   Yes.

18  Q   You haven't paid this loan either, have you?

19  A   No.

20  Q   How much do you owe on this loan?

21  A   I -- I would guess over $500,000.

22  Q   Over $500,000?

23  A   Yes.

24  Q   What was the interest that you had to pay on this

25  loan?

Aramanda - cross by Gillespie                    1639

1  A  I don't recall.
2       If you'd give me a second?
3  Q  That's okay.  I'll withdraw the question.
4       And $500,000 was approximately the amount, a
5  little less, that Tony Rezko, according to you, took
6  from you or borrowed from you, correct?
7  A  On the Kjellander loan?
8  Q  Yes.
9  A  Yes.
10 Q  And you took this loan out to pay the Kjellander
11 loan?
12 A  Correct.
13 Q  Did you ever go to Tony and say:  I want my
14 $500,000 so I could pay Mr. Wilton?
15 A  No.
16 Q  He owed you the money, correct?
17 A  No.
18 Q  But -- well, strike that.  You're right.  You
19 were paying off a debt.
20 A  Correct.
21 Q  Did you ever go to Mr. Rezko and ask him to
22 borrow money?
23 A  Not at that time, no.
24 Q  At any time?
25 A  Yes, before this.

1  Q   When?

2  A   Before I asked him to introduce me to somebody

3  for the Kjellander loan and for the Wilton.

4  Q   I'm talking about once the Wilton --

5  A   No.

6  Q   And you guys are very close friends?

7  A   Yes.

8  Q   According to you, you lent him $500,000 in 1999?

9  A   Over $400,000, yes.

10 Q   Over $400,000.

11     And did you ask him after you secured the

12 Wilton loan to borrow the money from Rezko?

13 A   No.

14 Q   Why not?

15 A   Just I did not.

16 Q   He's your dear friend, correct?

17 A   Yes.

18 Q   He borrowed 500,000 from you, correct?

19     MR. NIEWOEHNER:  Objection; misstates the

20 testimony.

21     THE COURT:  The objection is sustained.

22 BY MR. GILLESPIE:

23 Q   You are going to people who you barely know to

24 borrow this money.  You didn't have a close

25 relationship with Mr. Wilton, true?

1  A   True.

2  Q   You didn't have a close relationship with

3  Mr. Kjellander, true?

4  A   Yes.

:11PM  5  Q   But you never asked your friend for the money,

6  true?

7  A   True.

8  Q   I want to back up a little bit.

9       Yesterday, sir, you told the ladies and

:11PM  10 gentlemen of the jury about Mr. Rezko had spoken to

11 you about possibly being you work?

12 A   Actually he mentioned a Cabinet position.

13 Q   And a Cabinet position, what was your

14 understanding as to what that was?

:12PM  15 A   My understanding would have been that it was

16 various departments within the administration or

17 within the State of Illinois, heads of the

18 department, some of the key positions are sometimes

19 referred to as Cabinet positions.

:12PM  20 Q   So you were looking for a paying position?

21 A   No, I was not looking for it.  He called me and

22 asked me if I was interested.

23 Q   Well, you told him you were?

24 A   Yes.

:12PM  25 Q   So you were considering taking a paid position

1  with the administration?

2  A   I was willing to look into it, yes.

3  Q   And you were willing to look into the fact as

4  long as it was a Cabinet position or a hire

5  position, correct?

6  A   Yes.

7  Q   You wanted a certain status with that position,

8  correct?

9  A   No.

10 Q   Well, you wanted a certain paycheck with that

11 position?

12 A   I think that goes without saying.  You look at

13 various positions and if the pay meets your needs,

14 then it's something that you would consider.

15 Q   What were your financial needs at that point in

16 your life?

17 A   I had a business that was at that time, this was

18 earlier, that wasn't doing extremely bad, it was,

19 you know, making its meet.

20      It was something that I was willing to look

21 into.  We never discussed salary.  I never had any

22 idea at that point in time what a salary position

23 would paid.

24 Q   When you say this is early, please give me a time

25 frame.

1  A  Right after the election.  I mentioned yesterday

2  that the phone call came from him if I would be

3  interested looking into a possible Cabinet position,

4  that occurred after the election, I think, prior to

:13PM  5  the inauguration.

6  Q  And are we talking about the '02 election?

7  A  Yes.

8  Q  This is sometime early '03?

9  A  Either the end of '02 after the election or very

:13PM  10  early '03, yes.

11  Q  And you told us that your businesses weren't

12  doing terribly bad, does that mean they weren't

13  doing well?

14  A  That's a fair statement.

:14PM  15  Q  You weren't making money or you weren't making

16  enough money to sustain your life with those

17  businesses?

18  A  I'm not sure I would agree with that.  The

19  businesses weren't doing well, as I mentioned.

:14PM  20  Q  Well, you had to go out and borrow $600,000 on a

21  couple of occasions, correct?

22  A  Yes.

23  Q  Is it a fair statement that the businesses were

24  not sustaining your lifestyle?

:14PM  25  A  I'm not sure that's a fair statement.  I mean, I

1  hadn't thought of it that way.  I think they are two
2  different issues there.
3  Q   Well --
4  A   One issue is the business doing poorly, and
5  there's another way of making ends meet personally,
6  and I think they don't necessarily correlate with
7  each other 100 percent.
8  Q   Well, regardless, you were looking for a paid
9  position, true?
10 A   No.
11 Q   What were you looking for again?  I'm sorry.
12 A   I wasn't looking for anything.  He called me and
13 approached me and asked if I was interested in
14 looking into a Cabinet position of which I said I
15 would be interested in talking about it.
16 Q   You were interested enough that you went to talk
17 to him about it?
18 A   Yes.
19 Q   You were interested enough to talk to him about a
20 paid position, true?
21 A   Yes.
22 Q   And you knew that -- I think you told us that you
23 were offered a position.  What was the board
24 offered?
25 A   I wasn't offered a position.  We discussed a

:14PM
:14PM
:15PM
:15PM
:15PM

1  position on the Department of Aging.

2  Q   And what was your understanding as to what the

3  Department of Aging did?

4  A   I didn't have a lot of information.  I had no

5  previous information and there was a brief

6  discussion with Lon Monk about what it consisted of.

7  Q   What did it consist of?

8  A   I don't recall the details.

9  Q   When was the conversation?

10 A   The conversation, as I told you, would've been

11 somewhere between after the election and possibly

12 either right around -- up to or right around the

13 inauguration.

14 Q   And this was an unpaid position, true?

15 A   No.

16 Q   What was the pay you were going to receive?

17 A   I have no idea.

18 Q   Was it more than $10,000?

19       MR. NIEWOEHNER:  Objection, Your Honor.

20       THE COURT:  The objection is sustained.

21 BY MR. GILLESPIE:

22 Q   Well, prior to having a conversation or you and

23 Mr. Rezko talking about your possible interest in

24 getting this board position, Mr. Rezko did not tell

25 you:  Hey, you have to give the Governor $50,000 and

1  I'll put you on this board?

2  A   No.

3  Q   Never had a conversation like that whatsoever?

4  A   No.

5  Q   You decided that you did not have any interest in

6  this board position?

7  A   Subsequently, yes.

8  Q   I'm sorry, "subsequently"?

9       MR. NIEWOEHNER:  Objection; Misstates the

10 testimony.  We are not talking about a board

11 position.

12      THE COURT:  The objection is sustained.

13 BY MR. GILLESPIE:

14 Q   I apologize.  You didn't have any interest in the

15 position that you were talking about with Mr. Monk

16 which was in the Department of Aging, correct?

17 A   Right.

18 Q   And why was it that you decided that you had no

19 interest in that?

20 A   There were two reasons as I think I mentioned

21 yesterday.  One was that the actual department was a

22 little different than I thought based on the

23 original discussion.  I thought it was going to be

24 something more business-related, possibly a bit more

25 of importance.

1      Secondly, after it was discussed that it was
2  the Department of Aging and I really didn't have a
3  strong interest in that department, I also felt that
4  it would be difficult for me in the short period of
5  time to find either a replacement or somebody that
6  could manage my business that would allow me to, you
7  know, leave the business, so to speak.
8  Q   Thank you.
9      I now want to ask you a little bit about the
10  Pekin agreement that you had, okay.
11      When was it, to the best of your
12  recollection, that Mr. Rezko approached you about
13  working with Mr. Pekin?
14  A   He approached me originally without mentioning
15  Pekin's name.
16      Could I discuss the concept?
17  Q   Yes, sir.
18  A   It was the second week, middle of January,
19  somewhere about that time.
20  Q   And when is it that you first met with Mr. Pekin?
21  A   Not until probably over a month later.
22  Q   So sometime early February?
23  A   I would say possibly middle February, second or
24  third week.
25  Q   I'm sorry?

Aramanda - cross by Gillespie                1648

1  A   Second or third week of February.

2  Q   Okay.  And the way it was explained to you,

3  Mr. Rezko had to explain to you what an intermediary

4  was, true?

5  A   Correct.

6  Q   You had no idea what it was, correct?

7  A   That's true.

8  Q   And he explained to you that you would be working

9  with various state boards, correct?

10 A   Yes.

11 Q   And you had never consulted for a state board

12 before?

13 A   That's true.

14 Q   And did he tell you the board you would be

15 consulting for or contact with?

16 A   The only one he mentioned by name was TRS.

17 Q   And up to that point, you never had any contact

18 with the board itself?

19 A   True.

20 Q   He told you it would be your job or you can get

21 paid if you bring people who were looking for

22 investments to the board, is that right?

23 A   Well --

24 Q   Or investors, I'm sorry.

25 A   If I would bring, you know, reliable, after doing

:18PM

:18PM

:18PM

:18PM

:19PM

:19PM

1  due diligence and the research, reliable companies
2  that could make investments to the board.
3  Q   So the first thing he told you is, you had to do
4  due diligence.  What is due diligence?
:19PM 5  A   Due diligence is a combination of research and
6  investigate the companies to see what their success
7  rates are.  It's basically like getting referrals,
8  finding referrals, you know, to consider if that was
9  an individual as opposed to a company.
:19PM 10  Q   Well, so you would be required -- when you say to
11  do research, you have to make sure, it would be your
12  job as this intermediary to make sure that the
13  company that you were bringing to the board met
14  certain requirements?
:20PM 15  A   Yes; fair to say.
16  Q   What requirements did the TRS board have for
17  these companies?
18  A   I don't know.
19  Q   Do you have any idea?
:20PM 20  A   Other than probably something that has a really
21  good track record and success, that I think would go
22  without saying.  I don't know the particulars.
23  Q   When you say "probably," are you just guessing
24  that is what the requirements are?
:20PM 25  A   I would think that's a fair statement that that

1  would be what the requirement would be, at a

2  minimum.

3  Q   Who told you on the TRS that that was the

4  requirements that were needed, one of the

5  requirements to bring in an investor?

6  A   As I think I mentioned yesterday, I never met

7  with anybody in the TRS board.

8  Q   So you are just speculating?

9  A   Yes, I would say that.

10 Q   All right.  And due diligence, what did you have

11 to do after you did due diligence?

12 A   I don't know because I never got that far, but I

13 would think that after you've done due diligence,

14 you would make a formal recommendation, possibly

15 have meetings to discuss the recommendations in

16 order for somebody to make a decision.

17 Q   So when you say you never got that far, I'm

18 talking about when Mr. Rezko was explaining to you

19 what an intermediary did.  The first thing you told

20 us was that you had to perform due diligence,

21 correct?

22 A   Those are the words he used.

23 Q   He used.

24         And you had an understanding, as you just

25 explained to us, what that means?

1    A   Yes.

2    Q   What else was it that an intermediary was,

3    relating to you, was supposed to do?

4    A   I think, to my understanding, that that would be

5    principally the majority of the work that would be

6    required.

7    Q   So it was explained to you, sir, you had to do

8    some research on particular companies and bring them

9    to a party who was willing to invest money?

10   A   Yes.

11   Q   How long was this discussion that you had with

12   Mr. Rezko about what an intermediary did?

13   A   Very brief.  Probably ten or fifteen minutes.

14   Q   And in this ten or fifteen minutes it was related

15   to you that you would be able to make a large sum of

16   money?

17   A   Over the future, yes.

18   Q   Not over the future.  You were told that you

19   could make a percent of each investment, true?

20   A   I'm saying in the future, yes.

21   Q   I'm saying as an intermediary.

22   A   Yes; absolutely.

23   Q   Right.

24       You could make -- for example, if a company

25   invested $100 million in TRS, what would be your fee

1  on that?

2  A   Probably at least a million dollars or more.

3  Q   Okay.  So that was just on one transaction or one

4  entity that you brought to the board, right?

:22PM   5  A   That was the possibility, right.

6  Q   And the more you brought, the more money you

7  made?

8  A   The more they accepted it, the more they decided

9  to go with the things that were recommended to them,

:23PM   10  the more money you could make, yes.

11  Q   Right.  The more due diligence you did, the more

12  research you did, the more work you did, the more

13  money you made, right?

14  A   Possibly.

:23PM   15  Q   If it was accepted by the board?

16  A   Right.

17  Q   And when you had this conversation with him, were

18  you working at the time?

19  A   Yes.

:23PM   20  Q   Through the restaurants?

21  A   Yes.

22  Q   Did you have any other work?

23  A   No.

24  Q   And the restaurants were, as already explained to

:23PM   25  us, the restaurants weren't doing very well, is that

Aramanda - cross by Gillespie                    1653

1  true?
2  A   Correct.
3  Q   And about a month later, Mr. Rezko comes to you
4  and says that he has a gentleman -- does he tell you
5  he would like you to meet Mr. Pekin?
6  A   Yes.
7  Q   What else does he tell you about Mr. Pekin?
8  A   He had told me that he just -- that he was just
9  involved in a transaction with TRS that apparently
10 was just consummated.
11 Q   I didn't hear you, I'm sorry.
12 A   He had told me that Pekin -- or my understanding
13 based on what he told me is that Pekin had just
14 consummated a transaction or a deal with TRS.
15 Q   When you say Pekin had consummated, you mean the
16 deal was already done?
17 A   Yes.
18 Q   And as it was explained to you by Mr. Rezko, in
19 order to get money you had to bring -- first you had
20 to do due diligence, correct?
21 A   Yes.
22 Q   You had to do research.
23       How much research did you do as it relates to
24 the deal with Pekin?
25 A   Zero.

Aramanda - cross by Gillespie                    1654

1  Q   Not one minute, true?

2  A   True.

3  Q   And he also told you that you had to bring -- one

4  of the other key components was, you had to be the

5  one responsible for bringing the people who were

6  looking for investments to the board?

7  A   This is all on the initial conversation that took

8  place in January, it's true.

9  Q   Right.  And that's what I'm talking to you about.

10 And that's when the job was explained to you, true?

11 A   Yes, it was a hypothetical about the job going

12 into the future.

13 Q   Well, it wasn't hypothetical.  He was telling you

14 what an intermediary needed to do.  That wasn't a

15 hypothetical.

16 A   No, but you're relating it back to the Pekin

17 transaction which was already done.  That was a

18 subsequent conversation with Rezko.  Two different

19 conversations here.

20 Q   All right.  You were an intermediary for Pekin,

21 correct?

22 A   No.

23 Q   You weren't?

24         All right.  Well, what were you?  What would

25 you consider yourself?

Aramanda - cross by Gillespie                1655

1  A   The --

2  Q   What did you consider yourself?

3  A   I considered myself as being a potential -- a

4  future consulting partner with him.

5  Q   Well, I'm going to show you and I think you've

6  already identified it --

7       MR. GILLESPIE:  But I'd ask, Judge, to

8  publish Government Exhibit 7 which is the Aramanda

9  Pekin Consulting Contract.

10       THE COURT:  Yes.

11       MR. GILLESPIE:  Thank you.

12  BY MR. GILLESPIE:

13  Q   The file you have in front of you that is going

14  to be Aramanda Exhibit 10.

15  A   Yes.

16  Q   All right.  Who is J.R.A. Investments?

17  A   That's a limited liability corporation that I had

18  previously set up.

19  Q   That you had set up?

20  A   Yes.

21  Q   When did you set that up?

22  A   I don't recall.  I would imagine 6 months to a

23  year earlier.  I'm not sure exactly.

24  Q   You specifically set that company up in hopes of

25  becoming an intermediary?

:25PM

:26PM

:26PM

:26PM

:27PM

1   A   No.

2   Q   Why was that company set up?

3   A   It was initially set up for some potential

4   investments that I was considering.

:27PM   5   Q   What investments were those?

6   A   Real estate.

7   Q   With who?

8   A   Potentially.  I had not identified anything

9   specific, I just wanted to have a company set up in

:27PM   10   case I decided to pursue anything.

11   Q   So you went through the process of setting up a

12   company, correct?

13   A   Yes.

14   Q   And you had to fill out the paperwork?

:27PM   15   A   Yes.

16   Q   For properties you had no idea where they were?

17   A   At the time, yes.

18   Q   I'd like to draw attention to the first

19   paragraph.

:27PM   20        And if you could tell me when you've had a

21   chance to read it.

22        (Brief pause.)

23   BY THE WITNESS:

24   A   Yes.

:27PM   25   BY MR. GILLESPIE:

Aramanda - cross by Gillespie                    1657

1  Q   This consulting agreement is entered into the
2  28th day of February.  So would that be the day,
3  sir, that you entered into the agreement with
4  Mr. Pekin?
5  A   Yes.
6  Q   And it states that it's between you and
7  Mr. Pekin, correct?
8  A   Correct.
9  Q   And, by the way, who was it that drew up this
10 contract?
11 A   Pekin.
12 Q   When?
13 A   I would imagine within a day or two prior to the
14 signing.
15 Q   Do you know?
16 A   Do I know exactly?  No.
17 Q   Okay:
18     "... to memorialize our understanding with
19      respect to various consulting services which
20      J.R.A. Investments has already performed"
21      correct?
22 A   Or performs in the future.
23 Q   I'm sorry, I didn't mean to cut it off.
24
25     "... or agrees to perform in the future."

1  Correct?

2  A   Yes.

3  Q   If you go to Paragraph 2:

4      "Sheldon Pekin has agreed to retain the services

5      of J.R.A. Investments for the purpose of

6      assisting Sheldon M. Pekin with identifying

7      institutional investors who may have an

8      interest in making investments in the private

9      equity and other investment funds with whom

10     Sheldon Pekin maintains a marketing

11     relationship."

12     True?

13 A   True.

14 Q   So Paragraph 2 says that the purpose is that your

15 supposed to identify certain institutions that would

16 be of a benefit to Mr. Pekin, true?

17 A   True.

18 Q   And as it relates to the $250,000 that you

19 collected from Mr. Pekin, you didn't identify TRS,

20 true?

21 A   True.

22 Q   That deal was already finished, true?

23 A   Yes.

24 Q   When is it you collected that first check?

25 A   I believe it was March 5th, I think, if the check

1   was dated --

2   Q   I'm sorry?

3   A   I think it was March 5th, but it was within, you

4   know, a week or ten days after this agreement.

5   Q   So the check that you received was after you

6   signed the terms -- or you signed the consulting

7   agreement, correct?

8   A   Yes.

9   Q   Which spelled out the terms what you were

10  supposed to do in order to get paid, correct?

11  A   Yes.

12  Q   All right.  And you've already told us that you

13  took classes at Harvard Business School, true?

14  A   True.

15  Q   You had a business agree in business

16  administration, true?

17  A   True.

18  Q   And your entire adult life was in the area of

19  business, true?

20  A   Yes.

21  Q   So you are a man who was aware of the importance

22  of the wording of contracts, true?

23  A   Yes.

24  Q   Because when you signed that contract, that is

25  what you are agree to, correct?

1  A   Yes.

2  Q   Okay.

3          MR. GILLESPIE:  Judge, I had a little longer

4  to go than I initially thought if you wanted to

5  break.

6          THE COURT:  How much longer do you think you

7  have?

8          MR. GILLESPIE:  An hour, hour and a half.

9          THE COURT:  We'll break now.

10         One hour recess.

11         THE MARSHAL:  All rise.

12      (The following proceedings were had out of the

13       presence of the jury in open court:)

14         THE COURT:  You can step down.

15      (Luncheon recess.)

16

17

18

19

20

21

22

23

24

25

Aramanda - cross by Gillespie                    1661

1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No.  08 CR 888
4           Government,              )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   June 16, 2010
    ROBERT BLAGOJEVICH,              )
7                                    )
            Defendants.              )   1:45 o'clock p.m.
8
                         Volume 9
9              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES B. ZAGEL
10

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15                   Debra Riggs Bonamici
                 Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                   Room 2504
                Chicago, Illinois 60604
23                   (312) 435-5895

24

25

Aramanda - cross by Gillespie                    1662

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
           BY:  Samuel Forbes Adam
8               Samuel Adams, Jr.
           6133 South Ellis Avenue
9          Suite 200
           Chicago, Illinois 60637
10         312-726-2326

11  Also present:  Michael Gillespie
                   Arron Goldstein
12                 Lauren Kaeseberg

13

14  For Defendant Robert Blagojevich:

15         ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
16              Cheryl Ann Schroeder
           12413 South Harlem
17         Suite 203
           Palos Hills, Illinois 60453
18         (708)598-1111

19
           Edelman, Combs, Latturner & Goodwin LLC
20         BY:  Robyn S. Molaro
           120 S. LaSalle
21         Suite 1800
           Chicago, Illinois 60603
22         (708) 598-1111

23

24

25

1          THE MARSHAL:  All rise.

2        (The following proceedings were had in the

3         presence of the jury in open court:)

4          THE COURT:  Please be seated.

5           JOSEPH ARAMANDA, GOVERNMENT WITNESS,

6                  PREVIOUSLY SWORN

7             CROSS EXAMINATION (resumed)

8  BY MR. GILLESPIE:

9  Q   Mr. Aramanda, I think where we left off is, we

10 were talking about the consulting agreement you

11 signed with Mr. Pekin, correct?

12 A   Yes.

13 Q   And you signed that -- do you remember the date

14 you signed it?

15 A   28th of February of '04.

16 Q   Okay.  And how many days was it before you went

17 and picked up a check for $125,000?

18 A   Almost a week.

19 Q   You had to wait a whole week to get that

20 $125,000?

21 A   A week.

22 Q   A whole week.

23       And you didn't work for one minute, correct?

24 A   Correct.

25 Q   Okay.  Now, let's go back to Paragraph 2 of the

1  consulting agreement where it says -- I think where
2  we left off, we went through two-thirds of the
3  paragraph but I want to draw your attention to the
4  last sentence, it talks about:
5      "... other investment funds with whom Sheldon M.
6       Pekin maintains a marketing relationship ..."
7       do you see that?
8  A   Yes.
9  Q   What was your understanding as to what that
10 meant?
11 A   I understood that in addition to Glencoe Capital,
12 that he had other funds that he had a relationship
13 with.
14 Q   What were the names of those funds?
15 A   I do not know.
16 Q   But this is a man who you had a consulting
17 agreement with, correct?
18 A   Yes.
19 Q   And, according to you, told us when we began that
20 this was, according to you, a legitimate business
21 opportunity, correct?
22 A   Yes.
23 Q   This was not you funneling money for your friend
24 Tony Rezko, correct?
25 A   Correct.

:47PM
:47PM
:47PM
:47PM
:47PM

1  Q   And you can't tell us the name of one other

2  relationship that he had with an investment fund?

3  A   No, as I told you earlier, as I stated yesterday,

4  this whole opportunity was based on future -- on

5  future developments with contacts and with potential

6  investment funds, not the present day or two or a

7  week or so that you're alluding to.

8  Q   We'll talk about that, but my question to you is,

9  you cannot name --

10 A   No, I can't.

11 Q   All right.  And the contract--and you told us

12 about your familiarity with contracts and the

13 significance of contracts--the contract talks about

14 other investment funds with whom Sheldon Pekin

15 maintains a marketing relationship, correct?

16 A   Correct.

17 Q   That's part of the contract, true?

18 A   True.

19 Q   That's part of the contract that you signed,

20 true?

21 A   True.

22 Q   And how long is it that you worked -- well, I

23 won't use the word "worked," how long is it that you

24 were associated with Mr. Pekin after the signing of

25 this contract?

Aramanda - cross by Gillespie                          1666

1   A   In its entirety?

2   Q   Up until picking up the second check.

3   A   After the second check, the second check was

4   about the last meeting or discussion that we had.

5   Q   I'm sorry, approximately when was that?

6   A   End of April, '04.

7   Q   And so that is approximately 60 days?

8   A   Yes.

9   Q   And in 60 days you didn't learn one other fund's

10  name, correct?

11  A   Correct.

12  Q   You didn't go talk to one other individual or one

13  other fund that Mr. Pekin maintained a marketing

14  relationship with?

15  A   Correct.

16  Q   I'd like to draw your attention to the

17  Paragraph 3, sir.

18          And the first sentence states that you agree:

19      "... to introduce Pekin or to attempt to

20       introduce Pekin to various institutional

21       investors whom J.R.A. Investments may be

22       interested in exploring investment

23       relationships with Sheldon Pekin."

24      Do you see that?

25  A   Yes.

1  Q   The first sentence, tell us or tell the ladies

2  and gentlemen of the jury how many other

3  institutions you attempted to introduce to

4  Mr. Pekin?

:50PM  5  A   Zero.

6  Q   Tell the ladies and gentlemen of the jury how

7  many you actually introduced to Mr. Pekin?

8  A   Zero.

9  Q   It goes on to state that J.R.A. Investments --

:50PM  10  and you are J.R.A. Investments, is that true?

11  A   That's correct.

12  Q   Are there other people or employees you had at

13  that company?

14  A   No.

:50PM  15  Q   That entity is you and yourself?

16  A   Yes.

17  Q   Okay.  It says that:

18      "J.R.A. Investments shall also perform any other

19       reasonably related consulting services that

:51PM  20       Sheldon Pekin may request."

21      Do you see that?

22  A   Yes.

23  Q   What consulting services did you do on the

24  Glencoe deal?

:51PM  25  A   The Glencoe deal was over.  It was completed.

Aramanda - cross by Gillespie                    1668

1  Q   It was completed.
2          So I guess -- let me ask you the question
3  again:  What consulting services did you do on the
4  Glencoe deal?
5  A   Nothing.
6  Q   And the Glencoe deal is the deal in which you
7  collected $250,000, true?
8  A   Correct.
9  Q   And finishing up that paragraph, sir, it says:
10     "... Sheldon M. Pekin may request J.R.A.
11       Investments, LLC., such time to be activities
12       as requested by Sheldon M. Pekin."
13         How much time did Mr. Pekin ask you to spend
14  on the Glencoe deal?
15  A   As I mentioned, the Glencoe deal was consummated,
16  so the Glencoe deal was completed.
17  Q   So is the answer "none"?
18  A   None.
19  Q   And in the life of this agreement or the term of
20  this agreement that you signed with Mr. Pekin was
21  2 years, true?
22  A   Yes.
23  Q   What was the percentage of the fees that you were
24  supposed to get?
25  A   Half of the fees that Pekin got.

:51PM
:51PM
:52PM
:52PM
:52PM

Aramanda - cross by Gillespie                    1669

1  Q   Well, what were the fees that Pekin charged?

2  A   I understood it was 2 percent.

3  Q   And how did you understand that?

4  A   Because I was -- we discussed that we would

5  receive half and what is stated in here is

6  1 percent, so my understanding is that he received 2

7  percent.

8  Q   Okay, just based upon the fact that the contract

9  calls for you to receive 1, you just assume that was

10 it, correct?

11 A   Correct.

12 Q   You assumed that was half?

13 A   Correct.

14 Q   All right, let's go to paragraph 5:

15     "... in consideration for J.R.A. Investments."

16        Now that means -- "consideration" means that

17 you get paid, true?  That's what consideration is?

18 A   Yes.

19 Q   So, in other words, you shall get paid:

20     "... payable solely as a percentage of total

21     investment funds committed to Pekin clients by

22     institutional investors introduced ..."

23     through you, right?

24     Right?

25 A   Yes.

Aramanda - cross by Gillespie                    1670

1  Q   The contract calls for you to get paid to

2  actually introduce the institutions to the fund,

3  true?

4  A   Yes.

5  Q   And in talking about the $250,000 you made, you

6  didn't introduce anybody, true?

7  A   True.

8  Q   Now --

9          MR. GILLESPIE:  Judge, if I could have one

10 moment?  I'm sorry.

11         THE COURT:  Sure.

12         MR. GILLESPIE:  Thank you.

13     (Brief pause).

14         MR. GILLESPIE:  Judge, may I approach?

15         THE COURT:  You may.

16         MR. GILLESPIE:  Thank you.

17 BY MR. GILLESPIE:

18 Q   Sir, I'd ask you to go to tab 101, please.

19 A   Yes.

20 Q   And that is -- you heard that conversation played

21 earlier, that?

22 A   Yes.

23 Q   That is a conversation between Stuart Levine and

24 Mr. Pekin, is that true?

25 A   Yes.

:53PM

:54PM

:54PM

:55PM

:55PM

Aramanda - cross by Gillespie                    1671

1  Q   You weren't a party to that conversation,
2  correct?
3  A   No.
4  Q   I draw your attention to Page 2 line 13 through
5  18, and if you can just let me know when you have
6  had an opportunity to read it.
7      (Brief pause).
8  BY THE WITNESS:
9  A   Yes.
10 BY MR. GILLESPIE:
11 Q   Line 13 through 18 Mr. Levine is telling
12 Mr. Pekin that Tony is not going to -- will not do
13 business with him anymore, correct?
14 A   That's what it states.
15 Q   And Tony, it's your understanding, that's Tony
16 Rezko, correct?
17 A   Yes.
18      MR. NIEWOEHNER:  Objection, Your Honor.
19      THE COURT:  The objection is sustained.
20 BY MR. GILLESPIE:
21 Q   Well, you met Mr. Pekin -- strike that.
22      In regards to this consulting agreement, Tony
23 Rezko brought this to your attention, true?
24 A   Brought -- Tony Rezko introduced me to Pekin, I
25 gave him his phone number.

Aramanda - cross by Gillespie                    1672

1  Q  Right.  And Tony Rezko first came to you and
2  said, hey, there is a way in which you could make
3  money?
4  A  Correct.
5  Q  And Tony Rezko was the one who said, call this
6  man, Pekin?
7  A  Yes.
8  Q  All right.  It doesn't say there, sir, that the
9  Governor is going to do business, does it?
10       MR. NIEWOEHNER:  Objection.
11       THE COURT:  The objection is sustained.
12  BY MR. GILLESPIE:
13  Q  Thank you, sir.  Thank you for looking at that.
14  A  You're welcome.
15  Q  Now, when were you first advised that you could
16  come pick up your check?
17  A  When Pekin called me.
18  Q  And how many days was that after the signing of
19  the contract?
20  A  Less than a week.  The date of the check was
21  March 1st, so it's between February 28th and
22  March 5th.
23  Q  So March 5th was the date you got the call --
24  A  No, the call would have been sometime between
25  that.

:56PM

:57PM

:57PM

:57PM

:57PM

Aramanda - cross by Gillespie                1673

1  Q   He gave you some advance notice that you, in
2  fact, were going to be able to pick it up in a
3  couple of days, is that a fair statement?
4  A   I don't recall.
5  Q   And you went and you picked up the check for
6  $125,000, true?
7  A   Yes.
8  Q   And you deposited it into your account?
9  A   Yes.
10 Q   At that point did your friend, Tony Rezko, ask
11 you to write some checks?
12 A   Not at that point but shortly thereafter he asked
13 me to write one check.
14 Q   And who was that to?
15 A   Jacqueline Najjar.
16 Q   Well, isn't it a fact, sir, that Mr. Rezko also
17 asked you to write a check in the amount of $10,000
18 to Friends of Obama?
19 A   Not at that time.
20 Q   When did he ask you to do that?
21 A   I don't recall, but I don't recall any
22 relationship to this particular check.
23 Q   Well, do you remember speaking to the agents in
24 this case?
25 A   Yes.

:57PM

:58PM

:58PM

:58PM

:58PM

1  Q   And when you -- let's talk about that for a

2  second.  How many times have you spoken to the

3  agents in this case?

4  A   I'm not sure exactly.  I think three or four.

5  Q   Three or four times.  And in the three or four

6  times not only were these agents there, the U.S.

7  Attorneys were there?

8  A   It was primarily with the U.S. Attorneys.

9  Q   Which U.S. Attorneys who are at this table were

10  there?

11  A   Mr. Niewoehner.

12  Q   It was just Mr. Niewoehner?

13  A   I don't think that -- I don't know the gentleman,

14  I'm not sure.  The gentleman right behind, he was

15  there briefly for one moment, I believe, in the

16  first or second meeting, but he was not present at

17  any other time.

18  Q   All right.  And during the course of these

19  meetings that you had with them, sir, they asked you

20  specific questions about checks you wrote?

21  A   Yes.

22  Q   And not only did they ask you questions about

23  checks you wrote, they, in fact, prepared you to

24  testify here today, true?

25  A   We had discussions, yes.

1  Q  When you say you had discussions, they told you

2  the questions they were going to ask?

3  A  Most of them, yes.

4  Q  Most of the questions.

:59PM    5         What were the questions?

6  A  They went over questions.

7  Q  Did they also go over the questions you were

8  going to be asked by defense attorneys on

9  cross-examination?

:00PM    10  A  I don't know how they would know that.

11  Q  I'm sorry?

12  A  I said I don't know how they would know your

13  questions.

14  Q  Well, did they ask you questions as though it was

:00PM    15  cross-examination?

16  A  That's a different question.  And the answer is

17  yes.

18  Q  Okay.  How much time did they spend going over

19  your questions for cross-examination?

:00PM    20  A  In comparison of the overall time that I spent,

21  probably three or four meetings, I'd say less than 5

22  percent of the time.

23  Q  That's a good point.

24         What is the overall time you spent --

:00PM    25  A  Three or four meetings that I had --

1 Q   If I can finish.

2 A   I'm sorry.

3 Q   What was the overall time you spent with those

4 agents and with the U.S. Attorney's Office?

5 A   I'm not sure if it was three or four times, but

6 each meeting lasted, on the average, of about 3 and

7 a half to 4 hours.

8 Q   And in one of the meetings you had was

9 November 30th the year 2009, true?

10 A   Yes.

11 Q   And again --

12 A   I mean, as far as I know it was around that date.

13 Q   Around that time.

14      And you were asked specifically about certain

15 checks that you wrote, true?

16 A   Yes.

17 Q   And were you -- you told the agents that, did you

18 not, sir --

19 A   Excuse me.  You keep referring to "agents."  I

20 told you it was U.S. Attorneys.

21 Q   Thank you very much.  I apologize.

22      You told the U.S. Attorneys on that date that

23 in fact you wrote a 10-thousand-dollar check to

24 Friends of Obama at Mr. Rezko's request, true?

25 A   Yes.

Aramanda - cross by Gillespie                    1677

1  Q   And that was done four days after you picked up
2  the first check, true?
3  A   I don't remember the exact date, but it sounds
4  about the right time period.
5  Q   So on direct examination you were asked about a
6  check that you wrote on behalf of Mr. Rezko to
7  Jackie Najjar, do you remember that?
8  A   Yes.
9  Q   And that was the only check you were asked about,
10 correct?
11 A   Yes.
12 Q   And that was the amount of $50,000, correct?
13 A   Yes.
14 Q   And you were also asked by your friend Tony to
15 write an additional check for $10,000?
16 A   Yes.
17 Q   The check that you wrote to Mr. Najjar, when did
18 you write it?
19 A   I don't recall what the date on the check was.
20 We discussed it this morning, I believe, but I don't
21 recall the date.
22 Q   How many days after you picked up your check for
23 $125,000?
24         MR. NIEWOEHNER:  Objection.
25         THE COURT:  The objection is sustained.  You

:01PM
:01PM
:02PM
:02PM
:02PM

1    might want to alter the nature of the question.

2         MR. GILLESPIE:  Yes, sir.

3    BY MR. GILLESPIE:

4    Q   You would agree that you cut a check at the

5    request of Mr. Rezko to Mr. Najjar?

6    A   Yes.

7    Q   You don't know the exact date, correct?

8    A   It was shortly thereafter.  No, I don't remember

9    the exact date.  I looked at it this morning, you

10   showed me the check, I just don't remember the date

11   of the check.

12   Q   I'm sorry, when you say I showed you the check --

13   A   Either yesterday or today that was presented, I

14   believe, into evidence and I looked at that check

15   and I said that I signed that check and I just don't

16   recall the exact date that the check was written.

17   Q   All right.  Do you know how it is -- or do you

18   know if Tony knew you had picked up the check for

19   $125,000?

20   A   Yes.

21   Q   How do you know that?

22   A   I had a conversation with him.

23   Q   Can you tell us when that was?

24   A   Within several days after I picked up the check.

25   Q   And immediately upon telling Mr. Rezko that you

Aramanda - cross by Gillespie                    1679

1  received these funds, these $125,000, he once again

2  had you write checks out of your account?

3  A   Within several days he asked me, yes.

4  Q   Now, were these wires or were these checks?

5  A   It was a check, two checks totalling $50,000.

6  Q   Two checks?

7  A   Yes, we discussed that this morning.  It was a

8  40,000 check and a 10-thousand-dollar check.

9  Q   You have to forgive me, I forgot.

10  A   No, that's all right.  I forgot the previous

11  date.

12  Q   The first check you wrote was for $40,000?

13  A   No, I think they were simultaneously on the same

14  day.  I'm not sure, but I thought they were on the

15  same day.

16  Q   You also told us he asked you to write an

17  additional check for Friends of Obama, was that the

18  same day?

19  A   No, I didn't say that.  Earlier this morning I

20  didn't tell say that he asked me to write a check to

21  Obama.

22  Q   Did you just tell us now you did?

23  A   That's different, yes, but in the conversation

24  that you were referring to, my testimony was that he

25  asked me to write a check on his behalf and that was

Aramanda - cross by Gillespie                1680

1  to Najjar.

2  Q  So, in total, out of this first $125,000 you

3  received, you were asked to write three checks?

4  A  No, I was not.

:04PM  5  Q  Well, did you just tell us you wrote a

6  10-thousand-dollar check to Najjar?

7  A  Yes.

8  Q  Did you just tell us you wrote $40,000 check to

9  Najjar?

:04PM  10  A  Yes.

11  Q  Did you write a 10-thousand-dollar check to

12  Obama?

13  A  Yes, but that's a different question and that's

14  not how I answered the question.  You asked me:  Did

:04PM  15  he tell you to write a 10-thousand-dollar check out

16  of this $125,000 to Obama and the answer is no.

17  Q  Did he ask you to write a check after he heard

18  you got $125,000?

19  A  It was not in the same conversation and not part

:05PM  20  of it.

21  Q  When was it?

22  A  After that.

23  Q  When?

24  A  I don't recall.  It was several days to a week

:05PM  25  maybe after that.  I don't remember the exact date.

1  Q   All right.  So you already told him you received
2  the 125,000, true?
3  A   Yes.
4  Q   Okay.  In regards to the money that you wrote the
5  checks for, what was your agreement or understanding
6  as to when you were going to get that money back?
7  A   Which money?
8  Q   Let's start with $10,000 for Friends of Obama.
9  A   I wasn't sure.
10 Q   Well --
11 A   I mean --
12 Q   Go ahead.
13 A   No, I'm sorry.
14 Q   No, go ahead.
15 A   I wasn't sure exactly the time.
16 Q   Again, financially, you were having a hard time,
17 true?
18 A   Yes.
19 Q   And $10,000, you would agree with me, is a lot of
20 money?
21 A   Yes.
22 Q   And it wasn't your concern and you didn't ask him
23 when you would be getting that $10,000 back?
24 A   Not precisely, no.
25 Q   Not precisely --

:05PM
:05PM
:05PM
:05PM
:06PM

Aramanda - cross by Gillespie                    1682

1  A   I did not say am I getting it back in a day or
2  two days or a week, to that extent, no.
3  Q   To what extent did you ask him?
4  A   I had mentioned that obviously $10,000 was hard
5  to part with, but we never discussed exactly payment
6  or anything like that.
7  Q   Well, you said $10,000 was hard to part with.
8  You wanted it back?
9  A   I inferred that I wanted it back, yes.
10 Q   You inferred or you told him you wanted it back?
11 A   Possibly.
12 Q   Possibly what?
13 A   I don't recall the exact conversation exactly.
14 Q   Well, the check to Mr. Najjar, the two checks --
15 A   To his sister.
16 Q   His sister, I apologize.
17         In writing these checks, did you ask Tony:
18 Tony, why don't I, if you need to borrow some money,
19 why don't I just give you $60,000 and you cut the
20 checks to whoever you want to?
21 A   I didn't ask that.
22 Q   Why not?
23 A   Didn't think of asking that at the time.
24 Q   Did you ask him how come you're writing the
25 checks?

:06PM
:06PM
:06PM
:06PM
:07PM

1  A   No.

2  Q   Didn't cross your mind?

3  A   No.

4  Q   Did you think you were acting as a front man for

5  Mr. Rezko on a kickback at this point?

6  A   Absolutely not.

7  Q   Because if you did, if you knew that, according

8  to you, you wouldn't have engaged in this activity,

9  correct?

10  A   Correct.

11  Q   So you would agree with me that if that's what

12  happened, Mr. Rezko lied to you?

13          MR. NIEWOEHNER:  Objection.

14          THE COURT:  You know, I don't want to get

15  into lying by omission, I don't want an opinion

16  about lying.  The jury can hear the testimony, the

17  jury reaches a conclusion about who, if anybody,

18  lied or forgot or misremembered.  I don't want the

19  witness usurping the role of the jury.

20          MR. GILLESPIE:  Sorry, Judge.

21          THE COURT:  So don't ask the witness to reach

22  conclusions about whether somebody else lied.

23          MR. GILLESPIE:  Yes, Judge.

24          THE COURT:  It's a conclusion of somebody

25  else's mental state.

Aramanda - cross by Gillespie                   1684

1          MR. GILLESPIE:  Yes, sir.
2          THE COURT:  That's for them, not for you.
3          MR. GILLESPIE:  Yes, sir.
4          May I proceed?
5          THE COURT:  You may proceed.
6   BY MR. GILLESPIE:
7   Q   The second check, sir, was picked up -- is it
8   4/27, does that sound about right?
9   A   Yes.
10  Q   And you had some problems getting that check,
11  true?
12  A   Yes.
13  Q   What were the problems?
14  A   The problems was that apparently there was a
15  misunderstanding when the check was going to be
16  issued.
17  Q   Was it Tony's misunderstanding?
18  A   No, it was between me and Pekin.
19  Q   Did you tell Tony about it?
20  A   Yes.
21  Q   And the reason you told Tony about it was because
22  you wanted Tony to get the money, true?
23  A   No.
24  Q   Why did you tell Tony?
25  A   He called me or I called him, I don't recall, but

:08PM

1  we had a phone conversation several days a day or

2  two after I had spoken with Pekin.  He asked me how

3  things were going, how my relationship with Pekin

4  was developing, and he had already known based on

5  the previous conversation that I was expecting a

6  second check at the end of April and asked me if I

7  received it and I told him about the

8  misunderstanding we had.

9  Q   So, again, Tony had asked you if you had received

10 that second check?

11 A   Yes.

12 Q   And soon after telling him you did not, you were

13 able to get the second check, true?

14 A   Yes.

15 Q   And when you went--and there was a tape played

16 this morning--but when you went and picked up the

17 check, Mr. Pekin said to you something to the effect

18 of the fact that Christmas has come early, do you

19 remember that?

20 A   That's not exactly how it happened, no.

21 Q   Well, tell us how it happened.

22 A   It happened in a phone call that I had with Pekin

23 preceding the time you're talking about.  As I

24 stated on the phone call, when I mentioned to him is

25 the check ready, and my understanding that the check

Aramanda - cross by Gillespie                    1686

1 would be ready at the end of April, he said that it
2 was not supposed to be ready the end of April, it
3 was supposed to be ready at some later date, that's
4 when he made that comment --

:09PM  5 Q   And --
6 A   -- not when I met with him.
7 Q   I'm sorry?
8 A   Not when met with him.
9 Q   In asking you that Christmas has come early, he
:10PM 10 was telling you you were getting a gift?
11          MR. NIEWOEHNER:  Objection.
12          THE COURT:  The objection is sustained.
13 BY MR. GILLESPIE:
14 Q   What did you take that comment to mean?
:10PM 15 A   As I stated earlier, I took that comment to mean
16 that as a bit of sarcastic in that I had received a
17 check already and was about soon to be receiving
18 another check and that it was like a gift.
19 Q   All right.  And the second check you received now
:10PM 20 it's in total -- pardon me, I'm sorry.  It's
21 $250,000?
22 A   Yes.
23 Q   And you told us about your hard work as a COO of
24 Max Factor, correct?
:10PM 25 A   I was not a COO of Max Factor.

1  Q   Well, what was your title?

2  A   I was the senior Vice President of Max Factor.

3  Q   You told us your hard work of doing that, your

4  hard work at Beecham.  You didn't work one minute

5  for this $250,000, true?

6  A   Up until that time, yes, that's true.

7  Q   Up until that time you were paid $250,000 for not

8  one minute of work?

9  A   Yeah, but that wasn't really the intent of the

10  $250,000, it was for how much work I would do.  That

11  $250,000 was more of an investment or an advance on

12  his part for future work and future opportunities

13  where he could make a lot of money.

14  Q   I'm going to talk to you about those future

15  opportunities in a quick second, but you signed a

16  contract prior to receiving these checks, true?

17  A   Yes.

18  Q   And we went over the terms of those contracts,

19  correct?

20  A   Yes.

21  Q   Or that contract.  And the contract required for

22  you to get paid that you had to do work, correct?

23  A   In the future, yes.

24  Q   Does it say -- well, let me ask you a question,

25  I'm going to ask you to take a look at Aramanda

:10PM

:11PM

:11PM

:11PM

:11PM

1  Exhibit 10 and it's in the --
2  A  I have it in front of me.
3  Q  Could you please tell me where it says "in the
4  future"?
5  A  Let me see.  In Paragraph 2 it says that:
6       "... Pekin has agreed to retain the services of
7       J.R.A. Investments for the purposes of
8       assisting Sheldon Pekin with identifying
9       institutional investors who may have an
10      interest in making investments in the private
11      equity ..."
12         "May" to me connotes the future, it doesn't
13 mean that currently, today, yesterday, tomorrow,
14 it's something in the future.
15         Secondly, if you go to Paragraph 3:
16      "... agrees to introduce Pekin or attempts to
17      introduce Pekin to various institutional
18      investors who J.R.A. Investments believes may
19      be interested in exploring and entering into
20      investment relationships with Pekin.  Also,
21      J.R.A. Investments shall perform reasonably ...
22      consulting services that Pekin may request ..."
23         not that he currently requested that day,
24 that moment, yesterday, or the day before.  "May"
25 connotes to me in the future and that was the whole

Aramanda - cross by Gillespie                1689

1  intent behind this consulting agreement.

2  Q   So you spent a lot of time going over this

3  consulting agreement?

4  A   No, I didn't spend a lot of time going over it at

5  all.

6  Q   Did you spend any time going over it?

7  A   I read it once and I thought it reasonably

8  reflected what we wanted to talk about, but

9  obviously the discussions that we had are not all

10 memorialized in this one-page document.

11 Q   Well, let me ask you, you're signing the contract

12 and you told us the reason for the contract is to

13 put into writing what the terms of the agreement

14 were, correct?  You told us earlier?

15 A   Yes.

16 Q   Where in this contract is there any discussion

17 about this conversation you allegedly had about

18 future work?

19 A   I just read you two instances that he could

20 request and that I could bring the people in, and

21 "may request" does not mean currently at that moment

22 that he is requesting or had requested in the past

23 week or two of our conversation.

24 Q   Well, keep reading, go to Paragraph 5, if you

25 would --

Aramanda - cross by Gillespie                1690

1    MR. GILLESPIE:  Judge, if I may publish it
2  again?

3    THE COURT:  Sure.

4    MR. GILLESPIE:  Thank you.

5  BY MR. GILLESPIE:

6  Q   Now, has we established "consideration" means you
7  getting paid?

8  A   Correct.

9  Q   That sets out the terms for you to receive
10  payment, true?

11  A   Correct.

12  Q   Okay:

13      "... consideration for J.R.A. Investments
14       Services shall be payable as a percentage of
15       total investment funds ..."

16      That means you're getting a percent of
17  whatever he gets, true?

18  A   True.

19  Q   Okay:

20      "... committed to Sheldon Pekin clients by
21       institutional investors introduced through
22       J.R.A. Investments ..."

23      Correct?

24  A   Yes.

25  Q   All right.  It doesn't say for future possibility

1  introduction, it doesn't say for something that may
2  happen five years from now.
3  A   I think it's clearly inferred.
4  Q   Where is it clearly inferred in Paragraph 5?  I'm
5  sorry.
6        MR. NIEWOEHNER:  Your Honor, asked and
7  answered.
8        THE COURT:  It has been asked and answered.
9        MR. GILLESPIE:  I'm sorry.  Okay.
10 BY MR. GILLESPIE:
11 Q   Well, it's your understanding, sir, then, what
12 you're telling us is that this was for future work
13 you were going to do, correct?
14 A   Yes.
15 Q   All right.  And how much future work did you do
16 for Pekin?
17 A   The relationship did not continue beyond April,
18 so the answer is I did no future work for him.
19 Q   All right.  So you must have took those checks
20 and wrote a check back and said:  You know what, I
21 did not live up to any terms of the contract.  Did
22 you give him his money back?
23 A   No; nor did he ask for it.
24 Q   Sir, you got $250,000 for doing nothing?
25 A   That was -- that was not the intent, nor was it

1  the discussion that we had.  I got the $250,000 for

2  different reasons.

3  Q   Okay.  Well, let's talk about those reasons.

4  According to what you're telling us, that's because

5  you had some asset or some ability to introduce

6  Pekin to institutions, financial institutions,

7  correct?

8  A   Correct.

9  Q   That wasn't your attribute, that was Tony Rezko's

10  attribute.

11  A   Yes.

12  Q   So you are the middleman.  Tony Rezko is the one

13  who is going to be doing the introduction, correct?

14  A   He is going to introduce me to these potential --

15  Q   Right.

16  A   Yes.

17  Q   I'm sorry.

18      Tony Rezko has the relationship with these

19  institutions, not you.

20  A   At that time, yes.

21  Q   At what time did you get the relationship with

22  these institutions?

23  A   That didn't materialize.

24  Q   The answer is never?

25  A   Yes, the answer is never, it never continued.  I

Aramanda - cross by Gillespie                1693

1  chose not to continue.

2  Q   I'm going to ask you, sir, some questions about
3  the topic that you just talked about and that is why
4  it is you walked away from this deal, okay.

5        You told the ladies and gentlemen of the jury
6  that after you received the check -- the second
7  check, I'm sorry, from Mr. Pekin in the amount of
8  $125,000, you had a conversation with Mr. Rezko, is
9  that true?

10 A   Yes.

11 Q   And during the course of that conversation it was
12 discussed, was it not, that the terms of your
13 understanding of what you were to receive in
14 compensation was about to change, is that a fair
15 summation?

16 A   Yes, sir.

17 Q   When was this conversation?

18 A   I think I mentioned it was probably several
19 weeks, two to three weeks after receiving the last
20 check.

21 Q   All right.  And in that two to three weeks after
22 receiving the last check still hadn't found any
23 potential institutions to invest with Mr. Pekin you
24 told us, correct?

25 A   That's correct.

:17PM
:17PM
:17PM
:18PM
:18PM

1  Q   And that's because Tony Rezko didn't introduce

2  you to anybody, true?

3  A   At that time, true.

4  Q   And when you had this conversation with

5  Mr. Rezko, he had -- let me back up a little bit.

6  I'm sorry.

7        This is in 2004, correct?

8  A   Yes.

9  Q   I think you told us your pizza places were not

10  doing so well?

11  A   Correct.

12  Q   And your job was this consulting job, true?

13  A   Not at that time.  I hadn't started the due

14  diligence research, I had not really started the

15  consulting job yet at that time.

16  Q   All right.  You got paid 250 but you really

17  didn't do anything on the consulting end of it yet,

18  correct?

19  A   It hadn't begun, yes.

20  Q   And you said that Mr. Rezko came to you, Tony

21  came to you and said, we're going to change the

22  terms of this agreement, I'm going to pay you -- did

23  he say he was going to pay you 250,000?

24  A   No.

25  Q   Who was going to pay you 250,000?

Aramanda - cross by Gillespie                1695

1  A   Not discussed in terms of who the individual or
2  how the money was being paid.
3  Q   Well, this is an agreement you allegedly had with
4  Mr. Pekin, right?
5  A   Correct.
6  Q   Did you find it strange that Tony Rezko is
7  telling you how it is you're going to get paid now?
8  A   Keep in mind as we talk earlier, he was talking
9  about a concept going forward and the concept going
10 forward he mentioned the terms of the operation
11 going forward would be different that what we
12 previously discussed.
13 Q   My question to you is, sir, did you have this
14 conversation with Mr. Pekin?
15 A   No.
16 Q   And Mr. Pekin again is the man who you were
17 working, in a sense, you were working for him, true?
18 A   No.
19 Q   With him?
20 A   Yes -- would be working with him.
21 Q   Would be.
22     And Tony tells you that he's going to pay you
23 $250,000 plus a commission?
24 A   No --
25     MR. NIEWOEHNER:  Objection.

Aramanda - cross by Gillespie                1696

1      MR. GILLESPIE:  Withdraw the question.

2   BY MR. GILLESPIE:

3   Q   That you were going to be paid $250,000 plus a

4   commission?

5   A   It wasn't quite stated like that, but that's

6   ultimately what the conversation entailed.

7   Q   How was it stated?

8   A   It was stated that through the investments and

9   the fees that I would receive I'd be making an

10   annual salary, not that he would pay me or anybody

11   would pay me, $250,000.

12      And when I pressed a little further, he had

13   mentioned also that based on the volume of

14   transactions and the volume of business and the fees

15   involved, that I could also have a bonus.

16   Q   All right.  And he mentioned the term or the

17   amount of 250.  Did you ask him who is going to be

18   paying me that amount?

19   A   Well, I assumed I thought I knew that question --

20   excuse me, I thought I knew the answer to that

21   question.

22   Q   My question is, did you ask him?

23   A   No, I didn't feel I needed to.

24   Q   All right.  And did you ask him what the

25   commission would be?

:20PM

:20PM

:20PM

:21PM

:21PM

1  A   No.

2  Q   And $250,000 plus a commission wasn't acceptable

3  to you?

4  A   That was not the point.

:21PM  5  Q   My question to you, sir, is, was $250,000 a year

6  plus commission not acceptable to you?

7  A   If you take into context of what I said earlier,

8  the answer would be no.  It has nothing to do with

9  just the amount or the absolute amount of the

:21PM  10  salary.

11  Q   Well, is it taking into consideration the fact

12  that you just made $250,000 for doing absolutely no

13  work?

14  A   No, it's not taking into consideration anything.

:21PM  15  I stated earlier what it was in relation to, if

16  you'd like me to repeat that.

17  Q   Well, you tell us that you walked away from this

18  $250,000 a year job plus commission because of a

19  statement that Mr. Rezko gave to you about where the

:22PM  20  money was going, correct?

21  A   Yes.

22  Q   And the statement was something to the effect

23  that -- you tell me what the statement was.

24  A   You're saying that Mr. Rezko made or that I made?

:22PM  25  Q   That Mr. Rezko made to you which caused you such

1  concern.

2  A  Well, after he stated that the money was being

3  shared by he and others, I told him that I needed to

4  think about this and I'd get back to him and then I

5  got back to him later.

6  Q  Now, when you said the money was being shared by

7  he and others, you told us up to this point that you

8  believed that this was a legitimate business deal,

9  correct?

10  A  Prior to that conversation?

11  Q  Yeah.

12  A  Yes.

13  Q  As with the Kjellander loan, correct?

14  A  Yes.

15  Q  What money was he talking about that had to go to

16  him and others?

17  A  Future payments that I would collect.

18  Q  Well, and at some point he gives you a list of

19  people, correct?

20  A  No, he doesn't give me a list but he discussed it

21  with me in the conversation.

22  Q  And it's at that point when you say he first

23  mentions Governor Blagojevich?

24  A  Names including Governor Blagojevich.

25  Q  And what did he do after he mentioned it to you?

1  Walked away, true?

2  A  I told him basically when our conversation almost

3  came to an end, my recollection is I told him I'd

4  have to think about it and get back to him.

5  Q  You never got back to him?

6  A  Yes, I did get back to him.

7  Q  When?

8  A  I think it would be ten days or two weeks after

9  that, approximately, maybe a little less, I'm not

10  sure.

11  Q  And you just told him you couldn't do it, true?

12  A  Yes.

13  Q  Now, this is back in the 2004, is it not?

14  A  Yes.

15  Q  You, to this date, are still very close with

16  Mr. Rezko?

17  A  Close as somebody could be when you don't see him

18  for a year or two.

19  Q  Well, you haven't seen him for a year or two

20  because he's in prison?

21  A  Correct.

22  Q  And that's not true because according to the

23  records, you visited him in jail?

24  A  I didn't say I didn't.  Absolutely.  You didn't

25  ask that question.  I just said I hadn't seen him in

:23PM
:23PM
:23PM
:23PM
:23PM
:24PM

Aramanda - cross by Gillespie                    1700

```
 1  years, that doesn't mean I didn't visit with him.
 2  Q   Did you see him somewhere around January 4, 2009?
 3  A   That sounds about right.
 4  Q   Did you see him again in February the 8th, 2009?
 5  A   Also sounds about right.
 6  Q   And you still -- your families are still very
 7  close?
 8  A   Yes.
 9  Q   Your wife and his wife?
10  A   Yes.
11  Q   Children?
12  A   Yes.
13  Q   You still talk to him on the phone?
14  A   No.
15  Q   And you still consider him, I know you don't see
16  him as much anymore, but do you still consider him
17  one of your better friends, true?
18  A   Yes.
19  Q   Now, did you go to one of your better friends
20  after this alleged statement and say:  Tony, what
21  are you talking about that you're involved with this
22  with the government?
23  A   Did I ask him that?
24  Q   Yes.
25  A   No.
```

1  Q   This is a man who you're very close to, correct?

2  A   Yes.

3  Q   You're concerned about, true?

4  A   Yeah, I was always concerned about him.

5  Q   And so you had to be concerned that he's,

6  according to you involved, involved with this

7  activity with the Governor, right?

8  A   Yes, I was concerned.

9  Q   And you never expressed that concern to your

10  friend who you lend $500,000?

11        MR. NIEWOEHNER:  Objection; misstates the

12  testimony.

13        THE COURT:  The objection is sustained.

14  BY MR. GILLESPIE:

15  Q   You never expressed that concern to your friend

16  who you lend in excess of $400,000?

17  A   No.

18  Q   Well, you told us that you are testifying here

19  with a grant of immunity, is that right?

20  A   Yes.

21  Q   And you were -- excuse me.

22        You were -- strike that.

23        Your records were first subpoenaed sometime

24  back in 2004?

25  A   I don't recall the exact time but it sounds about

Aramanda - cross by Gillespie                      1702

1  right.

2  Q   6 years ago, somewhere around there?

3  A   Yes.

4  Q   And the records that were subpoenaed --

5         MR. GILLESPIE:  Pardon me.  I'm sorry.

6         (Brief pause.)

7  BY MR. GILLESPIE:

8  Q   You were concerned about this, that's a fair

9  statement, true?

10 A   About the last topic we were talking about?

11 Q   Yes, I'm sorry, about the last topic we were

12 talking about.

13 A   Yes.

14 Q   And you hired a number of different lawyers as it

15 relates to that?

16 A   About the overall investigation process?

17 Q   Yes.  I'm sorry.

18 A   Yes.

19 Q   So let me back up a little bit.  I'll get back to

20 that in a minute.

21        I talked to you about the dates that you went

22 and saw Mr. Rezko in prison and that was in 2009,

23 true?

24 A   Yes.

25 Q   And that was some 5 years after this alleged,

1  approximately, after this alleged conversation where

2  your friend, Tony Rezko, says that the Governor is

3  involved with some payments or something, true?

4  A   Yes.

5  Q   And the first time you mentioned to anybody, to

6  anybody about this conversation, is after you go

7  visit Mr. Rezko in jail, is that true?

8  A   Technically, yes.  Absolutely.

9  Q   Not technically.  That's the truth?

10 A   Yes.  Absolutely.

11 Q   Okay.  And back to the lawyers.  You hired some

12 lawyers in this case because you were concerned

13 about getting charged, right?

14 A   Charged -- charged?  I mean, that is kind of a

15 broad statement, but basically, yes.

16 Q   "Charged" means getting charged with a criminal

17 offense.  Is that better?

18 A   Yes.

19 Q   That concerned you?

20 A   Absolutely.

21 Q   You didn't want to go to jail?

22 A   I wasn't worried about going to jail, I was more

23 worried about just going through the process of

24 being charged.

25 Q   Well, you do know, sir, if you are charged with a

:27PM
:27PM
:27PM
:27PM
:27PM
:28PM

1  crime there is a possibility that, if you're found

2  guilty, you would go to jail?

3  A   I didn't have any fear that I was going to be

4  found guilty on that particular charge, we were

5  talking about it at that time.

6  Q   Well, you hired a lawyer?

7  A   Sure.

8  Q   His name is Chris Gair?

9  A   Yes.

10  Q   And that wasn't the first lawyer you saw,

11  actually the first lawyer you saw was a man by the

12  name of Eugene Murphy?

13  A   Yes.

14  Q   And you went and saw Eugene Murphy and actually

15  your friend, Tony Rezko, was in the office there

16  with you?

17  A   During one of the meetings, yes.

18  Q   How many meetings did you have with Mr. Murphy?

19  A   With Mr. Murphy?

20  Q   Yes.

21  A   Several.

22  Q   Between five and ten, is that fair?

23  A   Not nearly that much.  I would think that well

24  under five.

25  Q   And then you hired a lawyer by the name of Chris

1 Gair, correct?

2 A  Yes.

3 Q  And then how long were you with Mr. Gair or how

4 long were you his client?

5 A  Not for a long time.  I would imagine several

6 months.

7 Q  And then you hired another attorney by the name

8 of Terry Gillespie?

9 A  Yes.

10 Q  And how long were you with him?

11 A  Up until I believe October or so of '09, roughly.

12 Q  October of '09 would be subsequent to the visits

13 to see Mr. Rezko in jail?

14 A  Yes.

15 Q  And as it relates to your conversations with

16 these attorneys, it was your hopes, when you first

17 met with Mr. Gair, that you would be offered

18 immunity, true?

19 A  We never discussed it initially, we discussed it

20 later.  When it was described to me what it meant

21 and, you know, what would lead up to that, yes, the

22 answer to that is yes.

23 Q  Mr. Gair explained to you what immunity was?

24 A  Yes.

25 Q  And after that discussion with him, how many

1  meetings did you have before that was discussed with

2  you?

3  A  Probably at least a couple.

4  Q  Now, when you spoke with Mr. Gair, you understood

5  that -- he asked you questions, of course, us

6  lawyers ask way too many questions, but he asked you

7  a lot of questions, right?

8  A  Yes.

9  Q  And he wanted to know and he wanted you to give

10  him as much information as he could get about

11  different topics, true?

12          MR. NIEWOEHNER:  Objection.

13          THE COURT:  The objection is sustained.

14          MR. GILLESPIE:  Your Honor, could I ask for a

15  sidebar?

16          THE COURT:  The nature of the question you're

17  asking is unnecessary and not relevant.  Why don't

18  you put the next question to him.

19  BY MR. GILLESPIE:

20  Q  Well, you are aware, sir, you did, in fact, waive

21  any privilege you had, attorney-client privilege,

22  with Mr. Gair, correct?  And you did that when you

23  met with the U.S. Attorneys, true?

24  A  After signing the immunity agreement?

25  Q  Yes.

1  A   I believe so.

2  Q   Right.  And you also waived any privilege you may

3  have had with attorney Terry Gillespie when you

4  signed -- is it a piece of paper or an agreement, an

:31PM  5  actual contract?

6  A   I signed a piece of paper that I would imagine is

7  part of an agreement.

8  Q   And you waived any privilege that you had as it

9  relates to Mr. Gillespie, true?

:31PM  10  A   I believe so.

11  Q   Speaking with Mr. Gair, he was your lawyer?

12  A   Yes.

13  Q   You wanted him to help you out?

14  A   Yes.

:31PM  15  Q   You knew that he was going to be going to the

16  government and telling them or making a proffer.

17  You know what a proffer is, correct?

18  A   Yes.

19  Q   You've made many proffers in this case, true?

:31PM  20  A   No.

21  Q   How many times did you talk to the government?

22  A   You're talking about a written proffer?

23  Q   No, no.  I'm sorry.  Statements.

24  A   If that's a statement, I thought it was a written

:31PM  25  proffer, but statements I met with the government,

Aramanda - cross by Gillespie                    1708

1  as I mentioned, I think four times.

2  Q   Again, it was your hopes that Mr. Gair would get

3  you immunity, true?

4  A   True.

5  Q   And --

6  A   Excuse me.  That's not why I went to see him.  I

7  went to see him for representation of legal advice.

8  As it turns out, one of his most serious pieces of

9  advice was that he thought it would be prudent to

10 try to get immunity as subsequent lawyer,

11 Mr. Gillespie, also said.

12 Q   Correct.  That immunity would be a good thing for

13 you?

14 A   According to the lawyers, they say it's always a

15 good thing.

16 Q   Right.  Absolutely.

17      And in your conversations with Mr. Gair in

18 2004, you never, not once, made mention of this

19 statement by Mr. Rezko that the Governor was

20 supposed to get money, true?

21 A   True.

22 Q   You never told your lawyer that?

23 A   Absolutely true.

24 Q   And you knew he was going to the U.S. Attorneys

25 to try to get you immunity, true?

Aramanda - cross by Gillespie                    1709

1  A   True.

2  Q   And you knew that the way in which he was going

3  to get you immunity was that he was going to go to

4  them and in his conversation or the materials he

5  talked to them about was substantive enough that you

6  would get immunity, true?

7  A   Probably.

8  Q   Well, that's true?

9  A   I would think so, yes.

10  Q   Right.  And the same thing goes for your

11  conversations with Mr. Gillespie.

12        Well, let me back up a little bit.  As it

13  relates to Mr. Gair, he asked you or you talked

14  specifically about Pekin?

15  A   Yes.

16  Q   And Pekin is the deal you're telling us in which

17  this conversation with Rezko about the Governor came

18  about, right?

19  A   Yes.  After Pekin.

20  Q   After Pekin.  I'm sorry.

21        And you also talked to him about Kjellander?

22  A   Yes.

23  Q   You talked to him about your GE loan?

24  A   Yes.

25  Q   And never, not once, did you mention to your

1  lawyer that Rezko said the Governor had done

2  something, correct?

3  A   Correct.

4  Q   Now, you went and got a second lawyer, you got a

5  lawyer by the name of Terry Gillespie, as you told

6  us, and he asked you a lot of questions, true?

7  A   True.

8  Q   And he never -- it was your understanding that it

9  was the same thought process, that we're going to do

10  what we can or he was going to do what he could to

11  get immunity?

12  A   Yes.

13  Q   And the same principle held true in that he was

14  going to make a proffer, or a fancy way of saying he

15  was going to talk to them, and talk to them about

16  different things such as Kjellander, correct?

17  A   Yes.

18  Q   Such as Pekin, correct?

19  A   Yes.

20  Q   Such as your GE loan, correct?

21  A   Yes.

22  Q   And he represented you up until 8 months, you

23  said 2009, right?

24  A   True.

25  Q   And you never told your second lawyer about this

:34PM

:34PM

:34PM

:34PM

:35PM

1 alleged statement where Rezko said that the Governor
2 was getting something?
3 A   I never volunteered nor was I asked by the
4 attorneys.  Basically, all of the attorneys thought
5 that the proffer was the written proffer at the time
6 basically the last check with Pekin and we never
7 discussed anything, to my recollection, beyond that
8 date.
9 Q   Let me ask you, you understand that when you go
10 to an attorney's office you have to provide him with
11 the information, correct?
12 A   Well --
13 Q   Yes or no?
14 A   Well --
15 Q   You do understand that?
16 A   Possibly.  Not in all cases, no.
17 Q   Well, before walking into the office, the lawyer
18 knows nothing about the case?
19 A   Right.  So you try to describe the whole case.
20 This was not part of the case at that time.
21 Q   You try to describe the whole case, correct?
22 A   As it pertains to me, yes.
23 Q   Well, as it pertains to you.  According to you,
24 the reason you quit this wonderful job was because
25 of this statement that Rezko made by the Governor,

1 correct?

2 A   That would the two reasons, the other reason was,

3 as I stated, that I couldn't devote the time or find

4 somebody to replace me in the business, so I

5 couldn't devote as much time as I though might be

6 necessary to pursue this.

7 Q   What is more sustentative than telling your

8 attorney or the U.S. Attorney that your dear friend

9 Mr. Rezko made a statement about the Governor taking

10 money?

11        MR. NIEWOEHNER:  Objection.

12        THE COURT:  The objection to the form of the

13 question is the sustained.

14 BY MR. GILLESPIE:

15 Q   Well, you understood -- it was your understanding

16 that -- it was your understanding that the purpose

17 of the attorney proffer that we discussed a second

18 ago to attorney Gair and attorney Gillespie was the

19 attorney could present an outline of events to the

20 United States Attorneys Office and get their

21 thoughts on events, correct?  Is that a true

22 statement?

23 A   Yes.

24 Q   And you also -- it was also your understanding

25 that if the U.S. Attorney's Office thought that

:36PM

:36PM

:36PM

:37PM

:37PM

1  these descriptions or these events were substantive,

2  that you could receive immunity?  That was your

3  understanding, true?

4  A   True.

5  Q   Okay.  I'll ask you the question again.  What

6  could be more substantive than a sitting Governor

7  taking payments?

8          MR. NIEWOEHNER:  Objection.

9          THE COURT:  The objection is sustained.

10 BY MR. GILLESPIE:

11 Q   You then met with attorney Matt -- your attorney

12 is now attorney Matt McQuaid, correct?

13 A   Correct.

14 Q   And then you waived the privilege with attorney

15 Gillespie and you waived the privilege with attorney

16 Gair, you did not waive your privilege with attorney

17 McQuaid, true?

18 A   I believe so.

19 Q   And it's your understanding that Mr. McQuaid was

20 talking to Mr. Rezko's lawyer during the course of

21 your representation?

22 A   I understood that they had at least one occasion.

23 Q   Right.  He had a conversation with Mr. Rezko's

24 lawyer, correct?

25 A   I believe so.

:37PM
:37PM
:38PM
:38PM
:38PM

Aramanda - cross by Gillespie                    1714

1  Q   And when you visited Mr. Rezko in jail, you knew
2  that he was cooperating with the government?
3  A   That's not true.
4  Q   Did you come to learn that he was cooperating
5  with the government?
6  A   Yes.
7  Q   When?
8  A   Probably, I would guess, at least four or
9  6 months, maybe longer, after the last time I
10 visited him.
11 Q   And you know --
12 A   Excuse me.  I didn't know for sure that he was, I
13 just made an assumption based on something I heard.
14 Q   All right.  You had heard he was cooperating?
15 A   Not exactly.
16 Q   In any event --
17 A   I could tell you how I heard, but it's not that I
18 heard he was cooperating.
19 Q   You knew was meeting with U.S. Attorneys?
20 A   Yes, that I did know.
21 Q   All right.  And you knew that he was meeting them
22 at their office, right?
23 A   I believe I heard that, yes.
24 Q   And you knew that he was meeting with them
25 because he was talking to them?

:38PM
:38PM
:38PM
:39PM
:39PM

1  A   Obviously if he was meeting with them, I assume
2  he was talking to them --
3  Q   Right.
4  A   -- but I don't know what you're referring by
5  that.  I don't know that he was cooperating, but if
6  he went to meet with them, I'm sure that he probably
7  talked to them.
8  Q   All right.  Well, sir, the first time -- strike
9  that.
10      You knew that your lawyer was talking with
11  Rezko's lawyer, correct?
12  A   I knew that at least on one occasion he met with
13  them.
14  Q   And it was soon thereafter was the first time you
15  mentioned to anybody about this alleged statement
16  where the Governor is taking money, correct?
17      MR. NIEWOEHNER:  Objection, Your Honor.
18      THE COURT:  The objection is sustained.
19  BY MR. GILLESPIE:
20  Q   You got your immunity deal?
21  A   Yes.
22      MR. GILLESPIE:  Judge, if I could have a
23  moment?
24      THE COURT:  Sure.
25    (Brief pause).

Schindler - direct by Schar                    1716

1      MR. GILLESPIE:  Thank you, sir.

2      THE WITNESS:  You're welcome.

3      THE COURT:  Redirect?

4      MR. NIEWOEHNER:  No redirect.

:40PM      5      THE COURT:  You can step down.

6   (Witness excused.)

7      THE COURT:  Call you're the next witness.

8      MR. SCHAR:  The government calls.

9      THE COURT:  Face me and raise your right

:41PM     10  hand.

11   (Witness duly sworn.)

12      THE COURT:  Please be seated.

13     SHARI SCHINDLER, GOVERNMENT WITNESS, SWORN

14            DIRECT EXAMINATION

:41PM     15  BY MR. SCHAR:

16  Q   State and spell your name for the Court.

17  A   My name is Shari Schindler, S-h-a-r-i

18  S-c-h-i-n-d-l-e-r.

19  Q   What do you do for a living?

:41PM     20  A   I'm a revenue agent with the Internal Revenue

21  Service.

22  Q   How long have you been employed as a revenue

23  agent with the Internal Revenue Service?

24  A   Almost 23 years.

:42PM     25  Q   Would you explain for us briefly, Agent

1  Schindler, what your duties are as a revenue agent

2  with the IRS.

3  A  Well, a revenue agent examines books and records

4  of taxpayers and businesses in order to determine

:42PM  5  the correct tax.  What I do is I work with the U.S.

6  Attorney's Office on complex financial cases.

7  Q  What is your educational background?

8  A  I have a bachelor of business administration from

9  Roanoke College.

:42PM  10  Q  Generally speaking, are you familiar with certain

11  financial documents obtained during the

12  investigation of the case now on trial?

13  A  Yes.

14  Q  In relation to the case currently on trial, were

:42PM  15  you asked to produce various summary charts related

16  to the documents obtained during this investigation?

17  A  Yes, I was.

18  Q  What of type summary charts were you asked to

19  work and are you still working on?

:42PM  20  A  Chart summary arising from bank records and

21  financial records.

22      MR. SCHAR:  Judge, may I approach?

23      THE COURT:  You may.

24  BY MR. SCHAR:

:43PM  25  Q  I'm going to show you what's been marked as

Schindler - direct by Schar                    1718

1   Government Exhibit Chart 2 and Government Exhibit
2   Chart 3.
3          Do you recognize both of those charts, Agent
4   Schindler?
5   A   I do.
6   Q   What are they, generally?
7   A   These are charts that I prepared.
8   Q   Do they fairly and accurately summarize certain
9   records that were obtained as part of this
10  investigation?
11  A   Yes.
12  Q   As well as information you received?
13  A   Yes.
14         MR. SCHAR:  Judge, we move Government Exhibit
15  Charts 2 and 3 into evidence and ask to publish.
16         MR. GOLDSTEIN:  No objection.
17         THE COURT:  Without objection, admitted.
18      (Government's Exhibits Chart 2 and 3 were
19       received in evidence.)
20      (Exhibit published to the jury.)
21  BY MR. SCHAR:
22  Q   I ask you to take a look at Government Exhibit
23  Chart 2.
24         What's the title of the chart, Agent
25  Schindler?

1  A   POB Money Fall 2003.

2  Q   And by "POB," is that an acronym for Pension

3  Obligation Bond money?

4  A   Yes.

5  Q   All right.  There's a lot of information

6  contained on this chart.  What I'm hoping you can do

7  is walk us through beginning on the left side of the

8  chart exactly what you are able to determine based

9  on the flow of money from this particular

10  transaction.

11  A   Okay, if you start all the way at the upper

12  left-hand corner of the chart, you see "State of

13  Illinois," that is the State of Illinois issuing

14  this $10 billion worth of bonds.

15        Then if you follow down from the State of

16  Illinois, there's a box entitled "Bear Stearns."

17  Bear Stearns got a contract related to the issuance

18  of the bonds.

19        Then if you follow from Bear Stearns, the

20  next box down is Springfield Consulting Group.  So

21  the arrow shows that Bear Stearns paid $809,133.96

22  on September 24, 2003, to Springfield Consulting

23  Group, LLC, which is a company controlled by Robert

24  Kjellander.

25  Q   Does the chart continue as to where a certain

Schindler - direct by Schar                    1720

1  portion of that money went --
2  A  Yes.
3  Q  -- from Mr. Kjellander?
4  A  Yes.
5  Q  I'm sorry, go ahead.
6  A  Okay.  So Mr. Kjellander then sends $600,000 to
7  Mr. Aramanda on October 2nd, 2003, and that would
8  finish off the left-hand column.
9  Q  And based on both your understanding of
10 statements that have been made, as well as the flow
11 of the check from Mr. Aramanda's business account,
12 was a right side portion of the chart produced here?
13 A  Yes.
14 Q  And can you just walk us through the five
15 categories on the top and the dates on those,
16 please.  I think beginning after October 2nd, 2003.
17 A  On October 3rd, 2003, $10,000 was transferred to
18 Al Chaib.
19        And then if you look to the right on
20 October 3rd, 2003, as well, $35,000 was transferred
21 to Paul Moussa.
22        All the way to the right, on October 8, 2003,
23 $66,000 was transferred to Semir Sirazi.
24 Q  And those three boxes at the very top of the
25 chart that are a darker red, why is that?  Is that

:45PM
:46PM
:46PM
:46PM
:47PM

1 where the money stopped?

2 A   Yes.

3 Q   Okay.  Were there still additional transfers from

4 Mr. Aramanda's business account to two other

5 individuals?

6 A   Yes; on October 7th, 2004, Elie Maloof got

7 $50,000, and then on October 6th, 2003, Alfred Roumi

8 got $300,000.

9 Q   Those are in a slightly lighter red.  Did the

10 money, as you traced it, stop with Mr. Maloof and

11 Mr. Roumi?

12 A   No.

13 Q   Okay.  Where did the money from Mr. Maloof go on

14 the same day that it was transferred into his

15 account?

16 A   So if you follow the arrow down from Mr. Maloof,

17 on October 7th he transferred $50,000 to Rezko

18 Concessions.

19 Q   And if you look to the right, so the $300,000

20 that went to Mr. Roumi's account -- by the way,

21 where is Mr. Roumi's account?

22 A   In Canada.

23 Q   A portion of that, then, gets transferred out the

24 next day?

25 A   Yes; on October 7th, 2003, $200,000 came from

1  Mr. Roumi to Rezko Enterprises.

2  Q   And did that money stay in the Rezko Enterprises

3  account?

4  A   No.

5  Q   Where did it go?

6  A   It went from Rezko Enterprises 190,000 of that on

7  October 7th went into Rezko Concessions.

8  Q   At the time that $50,000 and $190,000 went into

9  the Rezko Concessions account, if you recollect,

10 about how much money was in the Rezko Concessions

11 account?

12 A   Somewhere around 2 to 3 thousand dollars.

13 Q   The day before those transfers get put into the

14 Rezko Concessions account, was a check written?

15 A   Yes.

16 Q   Who was it written to?

17 A   It's written to Chris Kelly.

18 Q   On which account?

19 A   On the Rezko Concessions account.

20 Q   What day was it actually cashed?

21 A   It was negotiated by Mr. Kelly on October 7th,

22 2003.

23 Q   After the money had gotten into the account to

24 clear the check?

25 A   Right.

Schindler - direct by Schar                    1723

1      MR. SCHAR:  Judge, may I approach?

2      THE COURT:  You may.

3

4  BY MR. SCHAR:

:49PM    5  Q   I'm going to show you what's marked Government

6  Exhibit 10/6/03 Elie Check.

7      MR. SCHAR:  We ask to move this in pursuant

8  to 90211 certificate.

9      THE COURT:  Admitted.

:49PM   10    (Government's Exhibit 10/6/03 Elie Check was

11     received in evidence.)

12  THE ATTORNEY:

13  Q   Is that the check for which you were just

14  referring to?

:50PM   15  A   Yes.

16  Q   Which account is it drawn on?

17  A   This is from Rezko Concessions, Inc.

18  Q   What's the date of the check?

19  A   It's dated October 6th, 2003.

:50PM   20  Q   Who is it written to?

21  A   Chris Kelly.

22  Q   For how much?

23  A   $200,000.

24  Q   And at the bottom, what's the date negotiated?

:50PM   25  A   October 7th, 2003.

Schindler – direct by Schar                    1724

1  Q   After the other money had been transferred into
2  the Concessions account?
3  A   Right.
4  Q   I'd like to direct your attention now, Agent
5  Schindler, to Government Exhibit Chart 3.
6  A   Okay.
7       MR. SCHAR:  Judge, may I have one moment.
8     (Brief pause).
9       MR. SCHAR:  Because of the quality of the
10 chart, I'd ask permission to hand out this chart to
11 the jurors, if I could.
12      THE COURT:  Show me the chart.
13    (Brief pause).
14      THE COURT:  All right.  Yes.
15      MR. SCHAR:  Thank you.
16    (Exhibit published to the jury).
17 BY MR. SCHAR:
18 Q   Agent Schindler, what is the title of this
19 particular chart?
20 A   Monk cash withdrawals.
21 Q   What is it?
22 A   It's a chart that summarizes all the cash
23 withdrawals from Alonzo Monk and Laura Hirsch Monk,
24 bank accounts for the period 2003 through
25 December 2007.

1  Q   Do you understand Laura Hirsch is Mr. Monk's
2  wife?
3  A   Yes.
4  Q   How did you trace the money out for this
5  particular chart?
6  A   I went through all the bank accounts that both of
7  them had and analyzed looking for cash withdrawals
8  and cash back from deposits.
9  Q   What does the chart demonstrate?
10 A   It demonstrates that between September 2004 and
11 February 2007 there's virtually no cash withdrawn
12 from the banks.
13 Q   With the exception there appears to be one month
14 in 2005 about a 16 or 1700 dollar withdrawal?
15 A   There's actually 1800 by Mr. Monk and it looks
16 like a 200 and a 100 by Laura.
17 Q   Other than that, you didn't find any other cash
18 withdrawals largely between the end of 2004 and the
19 beginning of 2007?
20 A   Correct.
21 Q   Did you look for any cash advances on credit
22 cards?
23 A   I did.  I didn't see any.
24 Q   What did --
25 A   I'm sorry.

1     No, there weren't any.

2  Q   Did you check the financial records for any

3  checks that cashed?

4  A   Yes; and there weren't any.

5  Q   Did you check the bank records for cash deposits

6  into the accounts of Mr. Monk and his wife?

7  A   I looked for them and I didn't find any.

8          MR. SCHAR:  If I may have a moment, Judge.

9          THE COURT:  You may.

10       (Brief pause).

11         MR. SCHAR:  Nothing further at this time.

12                CROSS EXAMINATION

13  BY MR. GOLDSTEIN:

14  Q   Good afternoon, Ms. Schindler.

15  A   Good afternoon.

16  Q   I'm going to have you look at that Monk chart

17  that you were just looking at a second ago.

18  A   Okay.

19  Q   And if the jury can look at it as well.  We have

20  it up here.

21         Now, you indicated that you analyzed the cash

22  withdrawals from banks of Laura Monk or Laura Hirsch

23  Mon and Lon Monk?

24  A   Correct.

25  Q   And how many bank accounts are we talking about?

1  A  For him, I believe, there were two, and for her

2  one or two, plus he had an investment account, I

3  believe, and I also looked at all their credit card

4  accounts.

5  Q  Were you aware of any other accounts that the

6  Monks had other than those?

7  A  No.

8  Q  The bank accounts that you reviewed from Lon Monk

9  and Laura Hirsch Monk were based on interviews that

10  you had with Mr. Monk?

11  A  No.

12  Q  Where did you get the information as far as the

13  bank accounts that the Monks held?

14  A  I think originally I was given a bank account and

15  then based on looking through that bank account I

16  found leads to other bank accounts.

17  Q  Who gave you that bank account?

18  A  It just would've been something from the

19  investigation.

20  Q  How long have you been on this investigation?

21  A  A couple of years.

22  Q  Now, there are not -- you don't have months

23  indicated on this chart.  That last green bar in

24  2004, what month is that?

25  A  September.

:55PM

:56PM

:56PM

:56PM

:56PM

Schindler - cross by Goldstein                    1728

1         Wait, the last green bar?

2   Q   Correct.

3   A   It would be August.

4   Q   The last green bar is August.

5   A   There's a little -- it's really hard to see.

6   There's a little blue bar in September.

7   Q   So there's a blue bar to the right of the green

8   bar in 2004, is that correct?

9   A   That's right.

10  Q   Okay.  And how much does that little blue bar

11  right after that August green bar in 2004, what cash

12  amount does that reflect?

13  A   It looks to be about $300.

14  Q   $300.

15        And the $300 that was withdrawn in

16  September 2004, when was the previous withdrawal for

17  the blue for Alonzo Monk?

18  A   There's one in August of 2004.

19  Q   And how much is that?

20  A   Looks about the same, 300.

21  Q   And before that?

22  A   Looks like there's a 300 again in July.

23  Q   Okay.  So after September of 2004, Mr. Monk

24  stopped withdrawing from the bank for

25  approximately -- well, it's up to about, say, April

1  of 2005?

2  A  Yeah.

3  Q  Okay.  And then that approximate April of 2005

4  was how much of a cash withdrawal?

5  A  It was right around $1,800 and that was a cash

6  back from a deposit.

7  Q  Okay.  So between September and that $1800

8  withdrawal, there was no cash withdrawal for Alonzo

9  Monk?

10  A  Correct.

11  Q  And you're familiar with this investigation, is

12  that correct?

13  A  Yes.

14  Q  And it was approximately that period of time, in

15  2004, that Mr. Monk stopped taking withdrawals that

16  the investigation was going into Mr. Monk, is that

17  correct?

18  A  I don't know the exact dates.

19  Q  Were you aware of when Mr. Monk spoke to the U.S.

20  Attorney's Office?  In 2005 he spoke to them, right?

21  A  I don't know.

22  Q  And there was a investigation occurring into the

23  boards in 2004, is that correct?

24  A  I don't know the dates.  I really don't.

25  Q  Now, what this indicates is, potentially, one

1  possible indication is that Mr. Monk didn't need to

2  take cash out of the bank, is that fair?

3  A   Yes.

4  Q   So, potentially, Mr. Monk had available cash that

5  he didn't need to go to the bank for?

6  A   Yes.

7  Q   But you don't know why Mr. Monk was taking that

8  cash?

9  A   Taking what cash?

10 Q   Why Mr. Monk had available cash?

11         MR. SCHAR:  Objection.

12         MR. GOLDSTEIN:  I'll rephrase.  I apologize.

13 BY MR. GOLDSTEIN:

14 Q   Mr. Monk was not taking cash out for a period of

15 time between 2004 and really up to 2007, correct?

16 A   Correct.

17 Q   And one of the reasons he may not have been doing

18 that is because he had available cash on hand,

19 correct?

20 A   That's possible.

21 Q   Okay.  And one of the reasons he had available

22 cash on hand is someone was giving him potentially

23 hush money?

24         MR. SCHAR:  Objection.

25         THE COURT:  The objection is sustained.

1  BY MR. GOLDSTEIN:

2  Q  Well, if you can --

3       Now, we're looking at the POB money chart

4  that you discussed, and that's Government Exhibit

5  Chart 2.

6       Do you see that?

7  A  I do.

8  Q  Now, it indicates that there's money that Bear

9  Stearns received September 24th of 2003?

10 A  There's money that Bear Stearns paid.

11 Q  Paid.

12      Now, as to the Springfield Consulting Group.

13 A  Right.

14 Q  Now, let's go all the way through.

15      You indicated that the darker red indicates

16 that the money stops?

17 A  Right.

18 Q  Okay.  So then there is, as we go to the right of

19 the chart, there's an Elie Maloof $50,000 that you

20 indicate goes down to this Rezko Concessions?

21 A  That's correct.

22 Q  Okay.  And then there's Alfred Roumi, $300,000

23 that goes down to Rezko Enterprises?

24 A  200 of it goes to Rezko.

25 Q  I apologize.  200,000, and that's October 7th,

:00PM

:01PM

:01PM

:01PM

:01PM

1  2003?

2  A   Right.

3  Q   And as you look right there, that's based on your

4  analysis of the bank accounts of Rezko Concessions

5  as well as Rezko Enterprises?

6  A   That's correct.

7  Q   And for what period of time were you evaluating

8  Rezko Concessions and Rezko Enterprises?

9  A   Right around the same time as the money was paid

10 to Mr. Maloof and Mr. Roumi.

11 Q   So late 2003?

12 A   Yes.

13 Q   How big a time period were you looking at?

14 A   Well, I was -- I didn't have to look past a day,

15 but I was looking in that month of October.

16 Q   You were looking at that month of October of

17 2003, is that correct?

18 A   Yes.

19 Q   And then you evaluated the bank account of Chris

20 Kelly, is that correct?

21 A   Yes.

22 Q   And that's October 7th, 2003?

23 A   Right.

24 Q   Okay.  And the bank account of Chris Kelly

25 indicated that there was a check given from Rezko

Schindler - cross by Goldstein                    1733

1  Concessions to Chris Kelly?

2  A  Yes.

3  Q  Now, after evaluating the Rezko Concessions bank

4  account, the Rezko Enterprises bank account, and the

5  Chris Kelly bank account, did you find any money

6  that went to Rod Blagojevich?

7  A  Not directly, no.

8  Q  Well, did you see in any of these bank accounts

9  any money that went to Rod Blagojevich?

10  A  Not directly.

11  Q  Did you see any money that went -- well, strike

12  that.

13       You evaluated Rod Blagojevich's bank account,

14  correct?

15  A  Yes, I did.

16  Q  And there's no money coming in from Chris Kelly

17  indicating $200,000, is there?

18  A  No.

19  Q  And you certainly weren't looking for that, were

20  you?

21  A  (No response.)

22  Q  You're looking for money that went to Rod

23  Blagojevich?

24  A  Yes.

25  Q  You would let them know if you'd seen any money

1  that went to Rod Blagojevich, right?

2  A  Yes.

3  Q  You also reviewed the money that Joseph Aramanda

4  got from William Pekin -- or Sheldon Pekin, is that

5  correct?

6          MR. SCHAR:  Judge, objection; at this point

7  it's outside the scope.

8          THE COURT:  The objection is sustained, it is

9  outside the scope.

10  BY MR. GOLDSTEIN:

11  Q  Well, did you review money that Joseph Aramanda

12  gave to individuals, is that correct?

13  A  To these individuals, yes, on the chart.

14  Q  In order to find out if Joseph Aramanda gave to

15  those individuals, you had to look at Joseph

16  Aramanda's bank accounts, correct?

17  A  Correct.

18  Q  And when you looked through Joseph Aramanda's

19  bank accounts, did you see any money that went to

20  Friends of Obama?

21          MR. SCHAR:  Objection.

22          THE COURT:  If you want to call this witness

23  in your case, you could do so, but you are way

24  beyond the scope of what the government offered.

25          MR. GOLDSTEIN:  Thank you, Your Honor.

1  BY MR. GOLDSTEIN:

2  Q   In light of what the Judge just said, would you

3  be able to come back in Mr. Blagojevich's case?

4          THE COURT:  That's not a question to a

5  witness.  If you need this witness here and the

6  witness can be compelled by my order, you raise it

7  with me, not with the witness.

8          MR. GOLDSTEIN:  Yes, sir.

9          Thank you.

10         THE COURT:  Redirect, Mr. Schar.

11                 REDIRECT EXAMINATION

12  BY MR. SCHAR:

13  Q   Briefly, Agent Schindler.  You were asked

14  questions about money going to Rod Blagojevich at

15  this time frame.  You used the word that you did not

16  trace any money directly going to Rod Blagojevich.

17  Is the purpose of that chart to look for money that

18  you can trace, conservatively, directly from the

19  funds that are right there?

20  A   Yes.

21  Q   What's the date of the money that goes to

22  Mr. Aramanda's account?

23  A   October 2nd, 2003.

24  Q   Did you trace checks to River Realty, Defendant

25  Blagojevich's wife's account from Tony Rezko's

Schindler - recross by Goldstein                    1736

1  companies?

2  A   Yes, I did.

3  Q   What is the first date of a 12-thousand-dollar

4  check?

:06PM  5  A   October 3rd, 2003.

6         MR. SCHAR:  Nothing else, Judge.

7      (Brief pause).

8                      RECROSS EXAMINATION

9  BY MR. GOLDSTEIN:

:06PM  10 Q   Ms. Schindler, you indicated that there was money

11 that did not go to Rod Blagojevich, correct?

12 A   Yes.

13 Q   And you're talking -- Mr. Schar talked to you

14 about Patti Blagojevich?

:07PM  15 A   River Realty, yes.

16 Q   River Realty, okay.

17        Do you know anything about the work that

18 Patti Blagojevich did for Tony Rezko?

19        MR. SCHAR:  Objection.

:07PM  20        THE COURT:  Again, it's outside the scope.

21 BY MR. GOLDSTEIN:

22 Q   Well, money that went to Patti Blagojevich, you

23 can't indicate as to whether that money was earned?

24        MR. SCHAR:  Objection, Judge.

:07PM  25        THE COURT:  You know, this witness was not

1  asked why or how.  The witness was asked a simple

2  question, did money go.  That's the limit of your

3  cross-examination.

4  BY MR. GOLDSTEIN:

:07PM  5  Q   Did you review any contracts between Tony Rezko

6  and Patti Blagojevich?

7          MR. SCHAR:  Objection, Judge.

8          THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

:07PM  10  Q   Did you review any dealings, any real estate

11  dealings between Patti Blagojevich and Tony Rezko?

12          MR. SCHAR:  Objection, Your Honor.

13          THE COURT:  I think you're finished, counsel.

14          MR. GOLDSTEIN:  Thank you.

:08PM  15          THE COURT:  We'll take a fifteen-minute

16  recess.

17      (Witness excused.)

18       (Recess.)

19          THE MARSHAL:  All rise.

:08PM  20      (The following proceedings were had out of the

21       presence of the jury in open court:)

22          THE COURT:  Be seated in the courtroom.

23          Counsel, approach the lectern.

24      (Brief pause.)

:09PM  25          THE COURT:  Some observations on some of the

Schindler - recross by Goldstein                    1738

1    questions that were asked and the reasons I

2    sustained objections.  I say this because my manner

3    of ruling and my views on this are clearly

4    understood because it will go much quicker.

:09PM    5        I'm going to begin with the question "is it

6    possible."  Generally speaking, we permit questions

7    "is it possible" when you are dealing with just two

8    alternatives and there's been established in the

9    evidence some reasonable probability that one or the

:10PM   10   other is true.

11       The core issue of "is it possible" is if you

12   ask a reasonably educated person is it possible that

13   the sun is going to rise in the west tomorrow, the

14   answer is yes, it is possible.  I have heard a

:10PM   15   witness, not in this courtroom but when I sat where

16   the lawyers sit, I heard a scientist answer the

17   question whether something was possible, "yes, it is

18   possible in the same sense ..." I think quoting this

19   exactly, "yes, it is possible in the same sense that

:10PM   20   this courthouse could dissolve into dust at midnight

21   tonight, in that sense, it is possible."  So I urge

22   you to have care because, generally speaking, if you

23   just ask the "is it possible" question I'm going to

24   sustain the objection to the question.

:11PM   25       Sometimes in context it is okay, but to give

1  you another example about why "is it possible" is a
2  different question "is it possible that Brazil will
3  win the World Cup" is a very different question from
4  "is it possible that England will win the World Cup"
5  and still a different question from "is it possible
6  that Australia will win the World Cup."  The last
7  question is absurd.  The first two questions, one,
8  we're dealing with a likely contender, and in the
9  other case you're dealing with a long-shot for whom
10 it is impossible in a realistic sense.
11       So before you utter the word "possible,"
12 think about that.
13       The second question is, you start asking
14 witnesses about legal terms, and the classic example
15 of that was "substantive." The vast majority of
16 people do not understand "substantive."  You ask
17 those questions, the witness may very well be
18 confused, the jury may not understand the answer
19 even if the question is allowed.
20       And lastly, there are lots of questions,
21 particularly by the defense and a little by the
22 prosecution, in which you are asking the witness to
23 read someone else's mind.  And that was the question
24 asked of the witness about "your lawyer wanted to
25 know," I think he was referring to Chris Gair, "he

1  wanted to know."  I don't know what conceivable

2  basis of the witness' knowledge would be of what the

3  lawyer did or did not want to know.  Now, I suppose

4  one could have asked questions that would have

5  justified the witness saying yes or no.

6          Lastly, you can keep trying to ask questions

7  that indicate what a defense theory might be, but if

8  they're beyond the scope, I'm going to sustain those

9  objections.  And the problem is, if I sustain those

10  objections often enough, you may very well leave the

11  jury with the impression that whatever the answer is

12  it doesn't matter, when in fact I'm ruling on what

13  is something that is outside the scope.  So you

14  don't gain anything and you prolong the trial with

15  some minor risk that it's not good for you.

16          Bear in mind also, for both the government

17  and the defense, this jury is prepared to sit here

18  for a long time; otherwise, we wouldn't have sat

19  them.  And the first couple of weeks, maybe even

20  three weeks, everything is okay.  There's going to

21  come a period of time where if you are not incisive

22  and nonrepetitive, the jury is going to think one of

23  two things, maybe both, one is that you're eating

24  their time to no purpose, and, secondly, that you're

25  asking these repetitive questions because it is the

:13PM

:13PM

:13PM

:14PM

:14PM

Schindler - recross by Goldstein                    1741

1  opinion of the questioner that the jury is filled,

2  the jury box is filled with a bunch of idiots;

3  neither one of those impressions is particularly

4  good for the lawyer who sends that message to the

5  jury.  So these are things you can think about in

6  the interim.

7        With that, I think I've used five of our

8  fifteen minutes.

9        MR. SCHAR:  And, Judge, the government filed

10 a motion to limit comments, I think they were just

11 filed this afternoon.  I'm going to provide Your

12 Honor a copy, it's E filed, and I've provided

13 defense a copy now, obviously.

14        May I approach.

15    (Handing document).

16        THE COURT:  We can deal with this later.

17        MR. SCHAR:  Yes, judge.

18        THE COURT:  Thanks.

19    (Recess.)

20        THE MARSHAL:  All rise.

21        THE COURT:  Please be seated.

22        MR. NIEWOEHNER:  Your Honor, the government

23 calls Anthony Pope.

24        THE COURT:  Face me and raise your right

25 hand.

:14PM

:15PM

:15PM

:35PM

:36PM

1        (Witness duly sworn.)

2            THE COURT:  Please be seated.

3          ANTHONY POPE, GOVERNMENT WITNESS, SWORN

4                   DIRECT EXAMINATION

:36PM   5  BY MR. NIEWOEHNER:

6  Q   Could you state your name and spell your last

7  name, please.

8  A   Anthony Pope, P-o-p-e.

9  Q   How old are you?

:36PM  10  A   68.

11  Q   Where do you currently live?

12  A   Elmhurst, Illinois.

13  Q   What is your occupation?

14  A   I have been a CPA for about 40 years and a

:36PM  15  practicing attorney for about 30 years.

16  Q   Who do you work for?

17  A   Anthony Joseph Pope, Ltd.

18  Q   Who owns that company?

19  A   I do.

:36PM  20  Q   About how long have you worked for that company?

21  A   Maybe 30 years; 35 years.

22  Q   In terms of your law practice, what type of

23  practice do you have?

24  A   I'm what you call a tax guy.  We do income taxes,

:37PM  25  corporate, individual, estates, trusts, I also as an

1  attorney prepare legal contracts for sales and
2  acquisitions of business.
3  Q   Are you familiar with someone named Vince
4  Dibenedetto?
5  A   I am.
6  Q   How are you familiar with Mr. Dibenedetto?
7  A   I've known Mr. Dibenedetto for about 40 years.
8  We've done work for him for probably 20 years.
9  Q   What types of work have you done for Dibenedetto?
10 A   I've done tax work, I've done legal work.
11 Q   Is Dibenedetto your only client?
12 A   No, sir.
13 Q   Do you have a number of our clients, as well?
14 A   Mr. Dibenedetto would be a small fraction of our
15 practice.
16 Q   And in terms of the tax returns you did for
17 Dibenedetto, what types of tax returns would you do?
18 A   We would do personal income tax returns,
19 partnership tax returns, corporate tax returns.
20 Q   As part of -- and did you personally work on
21 preparing those tax returns?
22 A   Yes.
23 Q   As part of the process of preparing those tax
24 returns, did you get information about Dibenedetto's
25 income?

:37PM
:37PM
:38PM
:38PM
:38PM

1  A   Yes.

2  Q   Does Dibenedetto have a number of corporate

3  entities that he controls or has ownership interests

4  in?

5  A   He does.

6  Q   And as a result of working on his tax returns

7  over the last 20 years, are you generally familiar

8  with the types of businesses that Dibenedetto has

9  worked in during that time?

10  A   Yes, I am.

11  Q   Has Dibenedetto ever worked in the insurance

12  business?

13  A   Yes.

14  Q   And about when was that?

15  A   I'm guessing, but he -- he had a job at Blue

16  Cross, Illinois Blue Cross and Blue Shield a number

17  of years back.  He was probably there about 5 or

18  10 years.  He left, went on his own, formed a

19  company which did extremely well, and from there he

20  just went into other entities.

21  Q   So when he worked at Blue Cross/Blue Shield was

22  he in the insurance business?

23  A   Yes.

24  Q   And you mentioned he worked with another business

25  after that, is that right?

1  A   Yes.

2  Q   Are you familiar with a company called Discount

3  Development?

4  A   Yes, I am.

5  Q   What did Discount Development do?

6  A   That was similar to what you might call an HMO

7  but they had vendors on one side -- for example,

8  they might have a group of chiropractors, a group of

9  optometrists, various groups they call vendors and

10 then they would hook them up with a client.  They

11 might hook them up with a large corporation that had

12 1,000 employees, 2,000 employees.

13      Discount Development was the middle person.

14 They would do the administration.  They would sell

15 for very nominal rate what they called a discount

16 card where the employees of the various corporations

17 could take that card to one of maybe 1,000 or 2,000

18 chiropractors and get the services done at a

19 discount.

20 Q   And about how long was Dibenedetto involved in

21 that business?

22 A   I would guess about 10 years.

23 Q   Are you familiar with a company called DD

24 Management Services?

25 A   I am.

1  Q   What is DD Management Services?

2  A   DD Management Services is what you might think of

3  as a holding company.  It owns a number of other

4  companies or subsidiaries, if you will.

5  Q   Were you involved in the information of DD

6  Management Services?

7  A   Yes, I was.  I formed that LLC.

8  Q   Who directed you to form -- and when you say LLC,

9  what is that?

10 A   A limited liability company.  It's just another

11 form of operating business other than a corporation

12 or a limited partnership.

13 Q   Was DD Management Services an LLC?

14 A   Yes, it was.

15 Q   Who directed you to form that company?

16 A   Mr. Dibenedetto.

17 Q   About when was DD Management Services created?

18 A   That was created in -- let's see, that would be

19 the beginning of '03.  Maybe around February of '03.

20 Q   Who owns DD Management Services?

21 A   DD Management Services was owned by a number of

22 individuals, members, owners.  55 percent was owned

23 by another LLC that were Mr. Dibenedetto's children

24 and the remaining percentages were owned by four or

25 five other various people or entities.

1  Q   And in 2003 who controlled DD Management
2  Services?
3  A   The LLC that was owned by Mr. Dibenedetto's
4  children.
5  Q   And, in practice, what person directed the
6  activities of the company?
7  A   In effect, Mr. Dibenedetto.
8  Q   Why was DD Management Services created?
9  A   Originally -- well, it was created to acquire, to
10 buy various other insurance entities, insurance
11 agencies.
12 Q   Did DD Management Services, in fact, purchase any
13 other insurance agency?
14 A   Yes, it did.
15 Q   Are you familiar with a company called Kaercher
16 Insurance Agency?
17 A   Yes.
18 Q   What was Kaercher Insurance Agency?
19 A   Kaercher Insurance Agency was a Las Vegas
20 corporation that was part of the Near North
21 conglomerate, if you will, that was purchased by DD
22 Management.
23 Q   Did Kaercher have offices in Las Vegas?
24 A   Yes.
25 Q   And was Kaercher Insurance one of the companies

:42PM
:42PM
:42PM
:43PM
:43PM

Pope - direct by Niewoehner                    1748

1  that DD Management Services bought?

2  A   Yes.

3  Q   Are you familiar with a company called Campbell &

4  Associates Insurance Brokerage?

:43PM  5  A   Yes.

6  Q   What was Campbell & Associates?

7  A   Campbell & Associates was another Near North

8  entity that was also purchased by DD Management

9  Services.

:43PM  10  Q   Where was Campbell & Associates located?

11  A   Los Angeles.

12  Q   And I think you've described, there's a company

13  called Near North, is that correct?

14  A   Yes.

:44PM  15  Q   Where did DD Management Services buy both the

16  Campbell company and the Kaercher company?

17  A   Well, Near North was Chicago based, but they had

18  offices all over the place.  Two of the offices were

19  in Las Vegas and Los Angeles.

:44PM  20  Q   And what was -- was there a larger company called

21  Near North?

22  A   Near North Title, Near North Title Company.

23  Q   What did that company do?

24  A   Well, years ago it started out as a title

:44PM  25  insurance but it wound up being just an insurance

1  conglomerate, insurance agencies.

2  Q   Who owned Near North?

3  A   Mickey Siegel.

4          MR. GOLDSTEIN:  Objection.

5          MR. NIEWOEHNER:  I heard an objection.

6          THE COURT:  What's your next question?

7          MR. NIEWOEHNER:  Just the location of where

8  Mr. Siegel lived.

9          THE COURT:  You're objecting to that?

10          MR. GOLDSTEIN:  Yes.

11          THE COURT:  Sustained.

12  BY MR. NIEWOEHNER:

13  Q   Was Near North an Illinois based company?

14  A   Yes.

15  Q   In 2004, had Campbell, the Campbell insurance

16  company and the Kaercher insurance company recently

17  become available for purchase?

18  A   They did.

19  Q   What was your role in those purchases?

20  A   I was involved in the legal transaction at the

21  request of Mr. Dibenedetto.  I represented him as

22  the buyer.

23  Q   And as the attorney, what types of things did you

24  do in those transactions?

25  A   With the Las Vegas acquisition, that was owned 80

1   percent by Near North and 20 percent by another

2   individual by the name of Alan Kaercher.  We

3   purchased the stock of Near North.  So we became the

4   stockholder, the 80 percent owner taking out the

5   Near North interest.  When I say "we" I mean DD

6   Management Services, LLC.

7 Q   And were there contracts relating to that

8   transaction?

9 A   Yes.

10 Q   Were you involved in creating those contracts?

11 A   I was.

12         MR. NIEWOEHNER:  Your Honor, may I approach?

13         THE COURT:  You may.

14         MR. NIEWOEHNER:  And, Your Honor, may I also

15   move into evidence Government Exhibit Kaercher

16   contract pursuant to 90211 certificate?

17         THE COURT:  Without objection, yes.

18      (Government's Exhibit Kaercher contract was

19       received in evidence.)

20         MR. NIEWOEHNER:  May I publish that exhibit?

21         THE COURT:  You may.

22      (Exhibit published to the jury.)

23 BY MR. NIEWOEHNER:

24 Q   And, Mr. Pope, if you could look at about the

25   third page of the exhibit, the lower right hand

Pope - direct by Niewoehner                    1751

1  corner you're going to see the number EG 1197
2  underscore 106.
3       Do you see that?  We'll also put it up on the
4  screen for you if it's easier for you to find.
5  A  I'm looking for 106.
6       I do see it, yes.
7  Q  If you could look at the very top of the page,
8  and it's something called stock purchase agreement,
9  do you see that?
10 A  Yes.
11 Q  And what is this contract?
12 A  This is a contract for the purchase of the 80
13 percent stock ownership that Near North owned.  Near
14 North sold their stock to DD Management Services.
15 Nothing else changed, the corporation stayed in
16 place, it just -- it just got an additional
17 stockholder to replace Near North.
18 Q  Okay.  And if you look down, there's a section
19 that says:

20

21    "Recitals."
22     and it talks about:
23     "... Kaercher Insurance Agency, Inc., a Nevada
24     corporation is engaged in the insurance
25     brokerage business primarily in the state of

1      Nevada."

2      Do you see that line?

3  A   Yes, I do.

4  Q   Which stock was this contract dealing with or

5  what company's stock?

6  A   This would be the stock of Near North of Nevada

7  that was owned 80 percent by, I guess, Near North of

8  Chicago and 20 percent by Alan Kaercher.

9  Q   Okay.  And then that Near North of Nevada owned

10 this Kaercher Insurance entity, is that correct?

11 Prior to this transaction?

12 A   Near North and Nevada is the name of the company,

13 the shareholder would've been -- if you look in the

14 back of this document --

15 Q   Well, let me ask a different question, okay.

16 A   Yes.

17 Q   At the first line there is something that says

18 stock purchase agreement dated as of September 26th,

19 2003, do you see that?

20 A   Yes.

21 Q   And about when was this stock purchase agreement

22 executed?

23 A   September 26, '03, that's when the transaction

24 closed.

25 Q   And who is the seller in this transaction?

1  A   The seller would be Near North of Nevada.

2  Q   Who is the purchaser?

3  A   The purchaser would be DD Management Services.

4  Q   And was there negotiations for some time before

5  September 26th of 2003 about this transaction?

6  A   Yes.

7  Q   And about what time period were those

8  negotiations going on?

9  A   I'm guessing four or five, six months.

10 Q   And if you could turn--you may find it easier to

11 follow along on the screen--to the page that says

12 123 in the lower right hand corner.

13 A   That's Michael Siegel's signature.

14 Q   And is that on behalf of Near North of Nevada?

15 A   Yes.

16 Q   And if you look at the next page and looking at

17 the signature block under DD Management Services,

18 LLC, what name is there?

19 A   Vince Dibenedetto.

20     MR. NIEWOEHNER:  Your Honor, may I approach

21 again?

22     THE COURT:  You may.

23     MR. NIEWOEHNER:  And I also move into

24 evidence Government Exhibit Campbell Contract

25 pursuant to 90211 certificate.

Pope - direct by Niewoehner                    1754

1          THE COURT:  Without objection, it's admitted.

2       (Government's Exhibit Campbell Contract was

3        received in evidence.)

4          MR. NIEWOEHNER:  May I publish, Your Honor?

5          THE COURT:  You may.

6       (Exhibit published to the jury.)

7    BY MR. NIEWOEHNER:

8    Q   Now, were you involved -- you talked before about

9    the purchase of this insurance company called

10   Campbell, is that right?

11   A   Yes.

12   Q   And what is Government Exhibit Insurance Campbell

13   Contract?

14   A   This is an asset purchase agreement.

15   Q   What is an asset purchase agreement?

16   A   It's just the opposite of the other one.  In

17   other words, instead of buying the stock in the

18   company where the company stays intact, what you're

19   doing is buying the assets from the company and then

20   that company goes away.

21          So what happened here is that this entity

22   sold the assets to DD Management Services and it's

23   two subsidiaries, Campbell Entertainment and

24   Campbell Insurance.

25   Q   Okay.  And if you look at the top of the screen,

1  there's a date here on the second line, do you see
2  that?
3  A   December 11th, '03.
4  Q   What does that date represent?
5  A   That's the date this agreement closed.
6  Q   Who is the seller in this transaction?
7  A   Near North Insurance Brokerage of California.
8  Q   So is this a California insurance company you
9  were talking about before?
10 A   Yes.
11 Q   And the assets that are being sold, what assets
12 were they?
13 A   Well, you're talking about cash, there was a
14 large amount of cash; you're talking about
15 computers, office furniture, fixtures.  The big item
16 was the client list.
17 Q   What client list?
18 A   The insurance contracts in place, all those
19 clients.
20 Q   And, ultimately, what company ended up owning
21 these Campbell insurance companies?
22 A   DD Management, as I mentioned earlier, could be
23 thought of as a holding company.  It formed two
24 California LLC companies as subsidiaries, so to
25 speak; these assets were transferred to those two

1  subsidiary companies LLC's.

2  Q   So, ultimately, DD Management Services through

3  some other company owned that insurance company?

4  A   Yes.

5  Q   And who is the person who executed this contract

6  for DD Management Services?

7  A   (No response.)

8  Q   If you look at the page that has 22 on it.

9        We'll show it up on the screen.

10 A   That would be Vince Dibenedetto as the manger of

11 DD Management Services.

12 Q   Now, were there negotiations prior to December

13 of 2003 about this transaction?

14 A   Yes, same as the other one.

15 Q   About what time frame were those negotiations?

16 A   Four, five, six months.

17 Q   Now, did Dibenedetto also form a company to do

18 insurance business in Illinois?

19 A   Yes.

20 Q   Was that also a company that was owned by DD

21 Management Services?

22 A   Yes.

23 Q   Are you familiar with a company called Kaercher,

24 Campbell & Associates Brokerage, LLC?

25 A   Yes.

1 Q   What is that?

2 A   That is an Illinois LLC that was formed to buy

3 two other insurance agencies that were rolled in to

4 that LLC.  The owners of those two businesses became

5 members, owners of this new company.

6 Q   And this new company, was that owned by DD

7 Management Services?

8 A   Yes, DD Management owned the majority interest.

9 Q   And was this an insurance company also?

10 A   Yes, an insurance agency.

11 Q   And who caused this insurance agency to be

12 obtained by DD Management Services?

13 A   Vince Dibenedetto.

14 Q   Did you do tax returns for Vince Dibenedetto?

15 A   Yes, I did.

16        MR. NIEWOEHNER:  Your Honor, may I approach?

17        THE COURT:  You may.

18 BY MR. NIEWOEHNER:

19 Q   I'm going to show you what's been marked as

20 Government Exhibit Kaercher, Campbell Tax Returns.

21 A   Our office prepared this tax return.

22 Q   And is this a tax return you prepared for

23 Kaercher, Campbell?

24 A   Yes.

25 Q   Kaercher, Campbell & Associates Brokerage, LLC?

Pope - direct by Niewoehner                    1758

1  A   Yes, it is.

2  Q   Is it your office's practice to keep copies of

3  the tax returns you file?

4  A   Yes.

5  Q   Are the returns made by people with knowledge of

6  the information or from information transmitted by a

7  person with knowledge?

8  A   Yes, they are.

9  Q   And are they made at or near the time that's

10 shown on the return?

11 A   Yes.

12 Q   Are those returns kept in the normal course of

13 your business?

14 A   They are.

15       MR. NIEWOEHNER:  Your Honor, the government

16 moves into evidence Government Exhibit Kaercher,

17 Campbell Tax Returns.

18       THE COURT:  Without objection.

19     (Government's Exhibit Kaercher, Campbell Tax

20      Returns received in evidence.)

21       MR. NIEWOEHNER:  May we publish?

22       THE COURT:  You may.

23     (Exhibit published to the jury.)

24 BY MR. NIEWOEHNER:

25 Q   I'm going to focus your attention to the top

:56PM
:56PM
:56PM
:56PM
:56PM
:57PM

1  portion of the page and in the upper right hand

2  corner there's 2005, do you see?

3  A   I do.

4  Q   What does that represent?

5  A   That represents the calendar year '05, that is

6  the year which this return is being filed.

7  Q   And what entity's tax return is this?

8  A   Kaercher Campbell & Associates Brokerage, that's

9  the Illinois LLC.

10  Q   Who directed you to prepare this return?

11  A   Mr. Dibenedetto.

12  Q   Now, on the right-hand column there's a box,

13  about three boxes down that says:

14      "E, date business started."

15      Do you see that?

16  A   I do.

17  Q   What's reflected in that box?

18  A   On June 11 '04, that would be the date that this

19  LLC was formed, the date these articles of

20  organization were filed with the Illinois Secretary

21  of State's office.

22  Q   So prior to that date Kaercher, Campbell &

23  Associates Brokerage, LLC, didn't exist?

24  A   That is correct.

25  Q   Now, is this the first tax return that was filed

1  for this company?

2  A  Yes, it is.

3  Q  How do you know that?

4  A  The initial return box is checked over to the

5  left about three inches from the top, four inches

6  down.

7  Q  Okay.  So four lines from the bottom on the left

8  hand corner there is something that says "initial

9  return" and there's a check in the box?

10  A  Yes.

11  Q  And what does that mean?

12  A  That means that this is the first return.  There

13  is no previous tax return for this entity.

14  Q  And if this entity had done business in the year

15  2004, did Dibenedetto -- would Dibenedetto have

16  filed a tax return?

17  A  Yes, he would've; or perhaps the other partners

18  where the companies were rolled in would've prepared

19  something on their returns.

20  Q  Now, were there other investors other than

21  Mr. Dibenedetto who owned portions of DD Management

22  Services?

23  A  Yes.

24  Q  Are you familiar with somebody named Antoin

25  Rezko?

1  A   I know the name.

2  Q   How do you know that name?

3  A   Mr. Dibenedetto got involved with a real estate

4  project at Roosevelt and Clark with Mr. Rezko, that

5  is how I know his name, and other than what you read

6  in the papers, I've never met him or talked to him.

7  Q   Okay.  Just focus on what you learned in the

8  course of your business practices, okay?

9  A   Yes.

10 Q   You mentioned there was a project that

11 Mr. Dibenedetto was involved in with Mr. Rezko.  Do

12 you know the name of that project?

13 A   The name of the Rezko project was Roosevelt,

14 Clark Development, LP, that was a limited

15 partnership with two general partners, Rezko and

16 Mahru.

17 Q   What did that entity do?

18 A   They had some undeveloped real estate at roughly

19 around Clark and Roosevelt that I guess they were

20 going to develop and they were looking for

21 investors; limited partners, if you will.

22 Q   Did Dibenedetto or his family invest in that

23 project?

24 A   They did.

25 Q   Were you involved in that?

1  A   I was.

2  Q   How were you involved?

3  A   Dibenedetto and a number of his associates formed

4  another LLC called Roosevelt Road, LLC and he, in

:00PM  5  turn, raised a million dollars that went into this

6  Roosevelt Road, LLC; that was then invested in the

7  other limited partnership that we were just talking

8  about, Roosevelt, Clark Development, LP.

9  Q   So did Dibenedetto's group invest money in

:01PM  10  Rezko's project?

11  A   They did.

12  Q   That totaled about a million dollars?

13  A   Yes.

14  Q   And about when did that million-dollar investment

:01PM  15  get made?

16  A   That would've been around May of -- let's see,

17  May of '05 -- no, May of '02.  May of '02.

18  Q   May of 2002?

19  A   Yes.

:01PM  20  Q   So were you involved in the investment at around

21  that time?

22  A   Yes, I was.

23  Q   And as of 2005 was Dibenedetto's group still

24  invested in this Rezko project?

:02PM  25  A   They were.

Pope - direct by cross by Sorosky          1763

1  Q   To your knowledge, did Rezko himself have any

2  ownership interest in DD Management Services or any

3  other companies that it owned?

4  A   To my knowledge, he did not.

5  Q   Did Dibenedetto ever suggest to you that Rezko

6  did have some kind of ownership interest?

7  A   He did not.

8  Q   If Rezko were going to be an owner of record of

9  DD Management Services or any of its subsidiaries,

10 would you have known that?

11 A   I would know if it was on the legal documentation

12 because I prepared probably 99 percent of any legal

13 documentation that he's gotten himself into.

14 Q   And if Dibenedetto had an agreement with Rezko

15 which was a side agreement, would you have known

16 about that?

17 A   Not necessarily, not unless Mr. Dibenedetto told

18 me about it.

19 Q   Did he ever tell you about one?

20 A   He did not.

21         MR. NIEWOEHNER:  No further questions, Your

22 Honor.

23                 CROSS EXAMINATION

24 BY MR. SOROSKY:

25 Q   How are you?

Pope - direct by cross by Sorosky                    1764

1  A  I'm fine.  How are you?

2  Q  Good to see you.

3       Now, Mr. Pope, I understand that you're an

4  attorney, is that correct?

5  A  I am.

6  Q  And you're also a CPA, is that correct?

7  A  Yes, I am.

8  Q  And to quote you, you're a tax guy, right?

9  A  That's what I've been called from time to time.

10 Q  Right.

11      So would I be accurate in saying most of your

12 work involves representing people in relation to our

13 tax laws as opposed to a lawyer like Mr. Adam who

14 sits here in court representing people?

15 A  That would be a correct statement.

16 Q  Okay.  Thank you.

17      Now, and there had been two men that had been

18 talked about a great deal in your questioning by the

19 government, one man's name was Antoin Rezko, is that

20 correct?

21 A  Yes.

22 Q  And the other man's name was Vincent Dibenedetto,

23 is that correct?

24 A  Yes.

25 Q  And I believe your testimony was very clearly

1 that you did not know Mr. Rezko.

2 A  That is correct.

3 Q  And I believe your testimony was just the

4 opposite concerning Mr. Dibenedetto in that you've

5 indicated to the ladies and gentlemen of the jury

6 that you knew Mr. -- that you knew Mr. Vince

7 Dibenedetto for a long period of time, is that

8 correct?

9 A  Yes, sir.

10 Q  So to make it a little easier on me, can we call

11 Mr. Dibenedetto "Vince," is that okay?

12 A  That would be fine.

13 Q  And I'm sure you call him Vince.

14 A  I do.

15 Q  Good.

16      Now, for how long have you represented Vince,

17 approximately?

18 A  I'm guessing about 20 years.

19 Q  Okay.  And is Vince a lawyer?

20 A  Vince is not.

21 Q  Is Vince a CPA?

22 A  He is not.

23 Q  So Vince is a successful businessman but he's not

24 skilled in the areas that you are, particularly tax

25 law, would that be correct?

1  A   He's not as skilled.

2  Q   So Vince turns to you for advice in law and

3  taxes, does he not?

4  A   He does.

5  Q   Now, and you certainly have a very, very good and

6  close relationship with Vince, do you not?

7  A   Yes.

8  Q   And when you first began, he was sort of

9  beginning somewhat financially and right now at this

10 stage of his career he's a pretty successful man

11 financially, is he not?

12 A   I would say so.

13 Q   So you have been assisting Vince and perhaps even

14 the quarterback of his financial rise to some

15 extent, have you not?

16 A   I don't know if I would go that far, but ...

17 Q   You certainly have been a key coach?

18 A   Okay.

19 Q   And so he would certainly turn to you for advice,

20 would he not?

21 A   Sometimes.

22 Q   And he certainly would trust you, would he not?

23 A   Yes.

24 Q   Now, I believe you said Vince first began working

25 for Blue Cross and Blue Shield?

1  A   Yes.

2  Q   And that's an insurance company.  We all know

3  Blue Cross and Blue Shield; is that correct?

4  A   Yes.

5  Q   And approximately how long did he work for Blue

6  Cross and Blue Shield?

7  A   I'd be guessing, I'd say 5 to 10 years.

8  Q   And then after he worked for Blue Cross and Blue

9  Shield, did he form his own health insurance

10 company?

11 A   Actually it wasn't an insurance company.

12 Discount cards are not considered insurance, but he

13 did form his own company, yes.

14 Q   And I believe you said, and once again to put

15 this in street talk, he kinda connected up people,

16 ordinary people with doctors or experts who provided

17 medical services, is that correct?

18 A   It could -- it goes beyond medical.  I mean,

19 clubs, all sorts of different things.

20 Q   Okay.  And for how long did Vince have this

21 company?

22 A   I would guess 5 to 10 years.  Probably closer to

23 10 years.

24 Q   And then did he sell this company?

25 A   He did.

Pope - direct by cross by Sorosky                    1768

1  Q   And did he make a significant or huge profit in
2  the selling of his company?
3  A   Yes, he did.
4  Q   And then once -- and Vince sold this company to a
5  big corporation, is that correct?
6  A   Yes.
7  Q   And the corporation kept him on as an employee
8  because Vince was so good at what he was doing,
9  right?
10 A   They kept him on, yes.
11 Q   And is Vince still employed with this company?
12 A   Yes, he is.
13 Q   Now, separate and -- what's the name of this
14 company, just so we're clear.
15 A   It was back then known as Member Works, it was
16 registered on the NASDAQ, it's now known as Cover
17 Dough.
18 Q   Okay.  Now, in addition to Vince being an
19 employee of this company now or an executive of this
20 company, whatever, I believe your testimony was that
21 he, Vince, created a holding company, is that
22 correct?
23 A   Yes.
24 Q   And I believe you said a holding company is a
25 holding which literally buys up and holds other

:08PM

:08PM

:08PM

:08PM

:09PM

1    companies who actually run things or do things,

2    right?

3    A   Yeah.  As opposed to an operating company, it

4    would own companies that actually are operating.

5    Q   So Vince created a holding company which, in

6    effect, bought various operating companies, is that

7    correct?

8    A   Yes.

9    Q   And Vince, in plain street talk, made his

10   children be, in fact, legal owners or majority legal

11   owners of this holding company, right?

12   A   That's a correct statement.

13   Q   But even though his children are the actual legal

14   owners, Vince is the power behind the thrown, he

15   would be the one who runs the show, would you say?

16   A   I would say.

17   Q   Now, and I believe as you've already stated,

18   Vince's background and where Vince made his money

19   was insurance, is that correct?  In the insurance

20   business?

21   A   It's the discount card thing where he made his

22   big score, if you want to use that word.

23   Q   Right.  In the discount business; fine.

24         Now, completely unrelated to Vince, there was

25   an insurance agency in Chicago known as Near North

Pope - direct by cross by Sorosky                1770

1  Insurance, is that correct?

2  A   Yes.

3  Q   And Near North Insurance was a

4  multi-million-dollar company that had insurance

5  agencies in different cities throughout the United

6  States, is that correct?

7  A   Yes.

8  Q   And through circumstances completely unrelated to

9  this case, Near North Insurance Company was breaking

10 up, is that correct?

11 A   That is correct.

12 Q   And there were business opportunities for

13 businessmen in the insurance business to buy certain

14 portions of Near North Insurance, is that correct?

15 A   Yes.

16 Q   And would it be accurate to say that Vince,

17 through this holding company he created, bought the

18 Near North Insurance Company office in Las Vegas and

19 in the Near North Insurance Company in Los Angeles,

20 is that correct?

21 A   That is correct.

22 Q   And completely unrelated to all this insurance

23 business, Vince invested some money in a real estate

24 development, is that correct?

25 A   Yes.

:10PM
:10PM
:11PM
:11PM
:11PM

1          MR. NIEWOEHNER:  Objection.
2          THE COURT:  The grounds?
3          MR. NIEWOEHNER:  Completely unrelated, the
4   basis and knowledge for the witness to know if it's
5   related or not.
6          MR. SOROSKY:  I'll rephrase the question.
7   BY MR. SOROSKY:
8   Q   Vince invested money in a real estate venture,
9   did he not?
10  A   He did.
11  Q   And this real estate venture was at Clark and
12  Roosevelt Road in Chicago, Illinois?
13  A   Yes.
14  Q   That would be just approximately perhaps a mile
15  south of this building in an area known as the South
16  Loop of Chicago, right?
17  A   Yes.
18  Q   This was a development to be sort of like a
19  mini-city, right?  For homes and businesses, that
20  type of thing, right?
21  A   I'm not sure exactly what it was going to be, but
22  that's probably a fair statement.
23  Q   And I believe you said you created a limited
24  liability corporation for Vince for this real estate
25  investment and Vince invested a million dollars in

Pope - direct by cross by Sorosky                1772

1  this real estate venture, let's just call it the
2  Clark, Roosevelt Road real estate venture, is that
3  correct?
4  A   I created an LLC, a limited liability company by
5  the name of Roosevelt Road, LLC, in which Vince
6  invested $150,000 out of the total 1 million-dollar
7  investment.
8  Q   So other people also invested?
9  A   That is correct.
10 Q   And to the best of your knowledge, to put it in
11 street talk, the main owner of this Roosevelt, Clark
12 real estate development was a man by the name of
13 Tony Rezko, is that correct?
14 A   I believe there were two people involved, two
15 general partners, Rezko and Mahru.
16 Q   Rezko and a Mr. Mahru?
17 A   That's what I thought.
18 Q   Okay.  Now, when Vince bought this -- now, Vince
19 invested in this real estate venture in 2002, is
20 that correct?
21 A   Yes.
22 Q   And it was approximately two years later, two
23 years after this real estate investment that Vince
24 decided to buy these Near North Insurance Company
25 entities, did he not?

1  A   Yes.

2  Q   And did Vince ever tell you that this man who he

3  had invested in the real estate venture with was

4  going to be some sort of silent partner in this

5  insurance venture?

6  A   What man are you talking about?

7  Q   What?

8  A   What man are you talking about?

9  Q   Tony Rezko.

10  A   He did not.

11  Q   Did you ever have the slightest indication from

12  your client of 20 to 30 years that Tony Rezko was

13  going to be some sort of secret partner in this

14  deal?

15  A   I did not.

16  Q   Now, did Vince ever tell you that he was forming

17  this insurance company because he had some secret

18  plan to get state business?

19  A   No.

20  Q   And, in fact, as successful as Vince was in

21  business, these holding company insurance ventures

22  that he bought of Near North, they really weren't

23  doing that well, were they?

24  A   They'd been under water for a number of years.

25  Q   So that would be not doing that well financially,

Pope - direct by cross by Sorosky                    1774

1  right?

2  A  Yes, that would be correct.

3  Q  And if they all of a sudden got some big state

4  insurance contracts, that would take them from under

5  water to pretty successful, wouldn't it?

6         MR. NIEWOEHNER:  Objection, Your Honor.

7         THE COURT:  The objection is sustained.

8         MR. SOROSKY:  Pardon me?

9         THE COURT:  The objection is sustained.

10         MR. SOROSKY:  Okay.

11  BY MR. SOROSKY:

12  Q  Well, you never -- to the best of your knowledge,

13  these insurance companies that Vince bought, these

14  Near North purchases, they don't have any big

15  contracts with the state, big financial contracts or

16  big money-earning contracts with the State of

17  Illinois, do they?

18         MR. NIEWOEHNER:  Objection.

19         THE COURT:  The objection is sustained.

20  BY MR. SOROSKY:

21  Q  Vince never told you:  Oh, we made be under water

22  now but there are brighter days ahead, we're going

23  to get some fat contracts by the state, did he?

24  A  He did not.

25         MR. NIEWOEHNER:  Objection.

```
                    Cari - direct by Schar              1775
```

 1       THE COURT:  Grounds for your objection?

 2       MR. SOROSKY:  Nothing further.

 3       THE COURT:  Well --

 4       It's fine.

 5       MR. NIEWOEHNER:  Nothing further, Your Honor.

 6       THE COURT:  You may step down.

 7     (Witness excused.)

 8      THE COURT:  A witness?

 9       MR. SCHAR:  Yes, the government calls Joseph

10  Cari.

11       THE COURT:  Raise your right hand.

12     (Witness duly sworn.)

13       THE COURT:  Please be seated.

14     (Witness duly sworn.)

15      JOSEPH CARI, GOVERNMENT'S WITNESS, SWORN

16                DIRECT EXAMINATION

17  BY MR. SCHAR:

18  Q   Please state your name and spell your last name.

19  A   Joseph Cari, C-a-r-i is the spelling of my last

20  name.

21  Q   How old are you?

22  A   57.

23  Q   What do you do for a living?

24  A   I'm a consultant to a Merchant Bank.

25  Q   How long have you been consulting to the Merchant

Cari - direct by Schar                    1776

1  Bank?

2  A  5 years.

3  Q  Are you a lawyer by training, Mr. Cari?

4  A  I am.

5  Q  What was the last law firm in which you worked

6  under?

7  A  Ungaretti & Harris.

8  Q  What was your position in that law firm?

9  A  I was a member of the executive committee of the

10 law firm and partner.

11 Q  What type of law did you practice at Ungaretti &

12 Harris?

13 A  Corporate regulatory law.

14 Q  Can you explain to us what that means.

15 A  Yes, I would advise clients on how to deal with a

16 variety of government regulations as to how it would

17 or could affect their business.

18 Q  Mr. Cari, I want to direct your attention to the

19 spring of 2004.

20      During that time period, did you participate

21 in an attempt to extort money from a company called

22 JER in relation to JER's efforts to obtain

23 investment money from the Teacher Retirement System

24 in Illinois?

25 A  I did.

1  Q   Based on that involvement of extortion, Mr. Cari,

2  were you indicted?

3  A   Yes.

4  Q   Were you indicted for attempted extortion?

5  A   Yes.

6  Q   I direct your attention now to September 15,

7  2005.

8         Did you plead guilty in federal Court to the

9  attempted extortion of JER in relation to the

10  Teachers Retirement System?

11  A   Yes, sir.

12  Q   More specifically, sir, did you plead guilty to

13  assisting Stuart Levine in an official position with

14  the Teachers Retirement System to threaten economic

15  harm to JER so that JER would pay money?

16  A   Yes, sir.

17  Q   At the time that you pled guilty, Mr. Cari, did

18  you enter into a plea agreement with the United

19  States?

20  A   I did.

21  Q   In that plea agreement, did you make certain

22  promises?

23  A   I did.

24  Q   What, Mr. Cari, did you promise to do?

25  A   To tell the truth.

1  Q   Have you been sentenced yet?

2  A   No, sir.

3  Q   What is your understanding of the sentence that

4  you are facing if you had not cooperated with the

5  government?

6  A   A sentence of up to 6 years.

7  Q   In return for your cooperation, what did you

8  understand the government will do at the time

9  of sentencing?

10 A   The government will recommend a sentence of 2 and

11 a half years.

12 Q   Is your lawyer free to recommend any sentence

13 that your lawyer and you think are appropriate?

14 A   Yes.

15 Q   What do you have to do in order for the

16 government to make the motion to reduce your

17 sentence?

18 A   To tell the truth.

19 Q   Who decides whether you actually receive a

20 reduced sentence?

21 A   Judge St. Eve.

22 Q   Is that another federal judge in this building?

23 A   Yes, sir.

24 Q   While you were at Ungaretti & Harris, Mr. Cari,

25 were you also affiliated with a private equity firm?

Cari - direct by Schar                          1779

1   A   Yes, sir.

2   Q   What was the name of the private equity firm?

3   A   Healthpoint Capital.

4   Q   Just by way of background, what is a private

5   equity firm?

6   A   A private equity firm is a business that collects

7   a variety of pension funds and money, capital, from

8   a variety of institutions and invests that money

9   into certain strategic investments to get a high

10  return for those pension funds and institutions.

11  Q   Where was Healthpoint itself located?

12  A   New York City.

13  Q   What was your position with Healthpoint Capital?

14  A   I was on the board of directors of the firm and

15  also a managing director.

16  Q   In terms of a private equity firm, what was

17  Healthpoint Capital's business?

18  A   We specialized in investing in medical devices.

19  Q   How did Healthpoint Capital go about raising

20  money to invest?

21  A   We went around the country and presented our

22  credentials to a variety of family offices and

23  public pension funds.

24  Q   And directing your attention to the fall of 2002,

25  Mr.  Cari, at that time did you have interaction

1  with the state board called the Teachers Retirement
2  Systems?
3  A   I did.
4  Q   If I sometimes refer to it as TRS, would you
5  understand what I'm talking about?
6  A   I do, sir.
7  Q   Just by way of background, briefly, if you could,
8  what is TRS?
9  A   Teachers Retirement System is the government
10 institution or a pension fund that takes all of the
11 retirement funds for the -- for various teachers in
12 Illinois, invests that money so those teachers are
13 insured of having pensions when they retire.
14 Q   Why were you interested in TRS in the fall
15 of 2002?
16 A   Because we thought that TRS was a good
17 possibility, a source of capital for Healthpoint to
18 manage and invest.
19 Q   And when you say "we," you are referring to
20 Healthpoint?
21 A   I am, sir.
22 Q   At some point did you happen to meet an
23 individual named Stuart Levine?
24 A   I did.
25 Q   About when did you meet Stuart Levine?

Cari - direct by Schar                              1781

1  A   In the fall of 2002.

2  Q   How did you come to meet Mr. Levine?

3  A   A law partner of mine was hosting a fundraiser

4  for Jim Ryan, who was at that time the Republican

5  candidate for Governor, and Mr. Levine attended that

6  fundraiser.

7  Q   To your recollection, is that the first time you

8  met Mr. Levine?

9  A   Yes, sir.

10 Q   Did you have any substantive conversation with

11 Mr. Levine at that fundraiser, to your knowledge?

12 A   No.

13 Q   At the time of the fundraiser, did you know

14 whether Mr. Levine had a role in the TRS?

15 A   Yes, I did.

16 Q   What role did you understand him to have?

17 A   That he was a member of the board.

18 Q   When you say he's a member of the board, do the

19 board members of TRS decide how TRS money would be

20 invested?

21 A   Yes, they are the ones who make the decision as

22 to where the investments go.

23 Q   Would it be fair to say that Mr. Levine had a

24 role in determining where TRS money was directed?

25 A   Yes.

1  Q   When did the TRS board members like Mr. Levine

2  make decisions about investments?

3  A   At public meetings.

4  Q   To your recollection of the time frame, about how

5  often were TRS board meetings where they would

6  consider potential investments?

7  A   A couple of times year.

8  Q   Ultimately, was Mr. Levine helpful in getting

9  your company, Healthpoint, money from TRS?

10 A   Yes, sir.

11 Q   Was there a board meeting set for approximately

12 in April of 2003?

13 A   Yes, sir.

14 Q   Was Healthpoint attempting to get money from TRS

15 at that time?

16 A   Yes, we presented our credentials at the meeting.

17 Q   Shortly before that meeting, did you have a

18 conversation with Mr. Levine about TRS investing

19 money in Healthpoint?

20 A   Yes.

21 Q   Was this in person or over the phone?

22 A   Over the phone.

23 Q   What did you and Mr. Levine Mr. Levine discuss?

24 A   Mr. Levine shared with me that we would be on the

25 agenda at that meeting for us to present our

1  credentials and to get affirmation that we would get

2  capital from TRS into our fund.

3  Q   Did Mr. Levine give you any indication of whether

4  he would assist Healthpoint in actually getting

5  those monies?

6  A   Yes.

7  Q   What did he say?

8  A   That he was responsible for us being on the

9  agenda.

10  Q   Did TRS eventually approve several investments at

11  Healthpoint?

12  A   It did.

13  Q   In total, approximately how much money did

14  Healthpoint receive from TRS?

15  A   30, 35 million.

16  Q   Are you familiar, Mr. Cari, with the term

17  "finder" or "introductory agent" or, generally

18  speaking, in this area of business

19  "consultant"?

20  A   Yes, sir.

21  Q   Can you explain for us what a finder or

22  consultant is in the context of a company like

23  Healthpoint obtaining money from TRS.

24  A   Certainly.  A finder or a consultant will

25  identify, for a firm like Healthpoint, potential

1  public pension funds that would fit the criteria or
2  we would fit their criteria for investments.
3          That finder or that consultant would arrange
4  introductions, meetings, and try to move the process
5  along, ultimately, hopefully, for a fund to invest
6  in a firm like Healthpoint.
7  Q   Are finders and consultants typically paid?
8  A   Yes.
9  Q   In your experience, how are they paid?
10 A   Usually they're paid on a success-fee basis a
11 percentage of what net capital that was raised.
12 Q   A percentage if an investment is made?
13 A   Yes, only if an investment is made.
14 Q   And at Healthpoint you've used finders or
15 consultants in the past to help it find potential
16 matches in terms of monies to invest?
17 A   Yes.
18 Q   To your recollection, was a consultant used
19 specifically on the TRS money for Healthpoint?
20 A   No, it wasn't.
21 Q   I want to move ahead now to August of 2003.
22          At that time did you have a conversation with
23 David Willhelm about Defendant Blagojevich and his
24 administration?
25 A   I did.

1  Q   How did you know Mr. Willhelm?

2  A   David was and still is one of my closest personal

3  friends.  Our friendship started in the mid 80's.

4  He is a close friend.  He was a pallbearer for my

5  wife when she passed.

6  Q   Approximately when did your wife pass, Mr. Cari?

7  A   Approximately she passed away 2002.

8  Q   And since that time have you been on various

9  medications related to depression?

10 A   Yes.

11 Q   Are you currently taking both Paxil and

12 Bupropion?

13 A   I am.

14 Q   And do you feel any effect on your ability to

15 remember events accurately?

16 A   No.

17 Q   Any ability on your -- does it affect your

18 ability to perceive events accurately?

19 A   No.

20 Q   At the time you were talking to Mr. Willhelm, did

21 you understand him to have an affiliation with

22 Defendant Blagojevich?

23 A   Yes.

24 Q   What was that?

25 A   I knew that David had chaired the campaign for

1  Governor and had worked on the transition team.

2  Q   In relation to that conversation, was that

3  conversation in person or over the phone, to your

4  recollection?

5  A   The conversation that --

6  Q   The one with Mr. Willhelm, if you remember.

7  A   I'm not sure.

8  Q   What do you remember from the conversation?

9  A   That David wanted me to -- to meet the people

10  around the Governor.  I had supported the Governor's

11  opponent, Mr. Ryan, in the campaign, and that they

12  had thought it would be good idea for me to meet

13  with the individuals that were close to the

14  Governor.

15  Q   At this point Defendant Blagojevich won the

16  election against Mr. Ryan who was now a Governor?

17  A   Yes.  Yes, sir.

18  Q   What, if anything, did Mr. Willhelm tell you

19  about who the people close to Defendant Blagojevich

20  were?

21  A   David shared with me that Mr. Kelly and Mr. Rezko

22  were the two closest confidants of the Governor,

23  very influential with the Governor, and that he

24  thought I should meet both of them.

25  Q   When you say Mr. Kelly, who are you referring to?

:29PM
:29PM
:29PM
:30PM
:30PM

Cari - direct by Schar                    1787

1  A   Mr. Chris Kelly.

2  Q   And when you say Mr. Rezko, who are you referring

3  to?

4  A   Mr. Tony Rezko.

:30PM  5  Q   Did Mr. Willhelm ask you to go to a particular

6  meeting?

7  A   Yes.

8  Q   Who did he ask you to meet?

9  A   Mr. Kelly.

:30PM  10  Q   What, if anything, did he indicate to you why he

11  wanted you to meet with Chris Kelly about?

12  A   Just a general get-together.  That the Governor

13  was just getting started in as Governor, may have

14  some national aspirations, and that it would be a

:31PM  15  good meeting for -- for both of us.

16  Q   When you say national aspirations, what do you

17  mean by that?

18  A   That the Governor had aspirations to run for

19  Presidency some day.

:31PM  20  Q   Did you have some particular expertise, Mr. Cari,

21  in dealing with elections on a national level?

22  A   Yes.

23  Q   What was your personal expertise at that time?

24  A   In the 2000 Presidential election I was the

:31PM  25  national finance chairman for the Democratic

1 National Committee for Vice President Gore's

2 campaign for the Presidency.

3 Q   What does that mean?

4 A   I was responsible for overseeing, raising the

:31PM 5 money to the primary and the general election on

6 behalf of Vice President.

7 Q   When you say Vice President, you are talking

8 about Vice President Gore at that time?

9 A   Vice President Gore, yes.

:31PM 10 Q   Did you, in fact, agree to meet with Chris Kelly?

11 A   I did.

12 Q   Do you recall when you met with Mr. Kelly?

13 A   It was probably about 1:30 in the afternoon.

14 Q   I'm sorry, do you remember the particular day?

:32PM 15 A   I -- I don't remember, but --

16 Q   Well, would it refresh your recollection to see a

17 copy of your calendar?

18 A   It would.

19        MR. SCHAR:  May I approach, Judge?

:32PM 20        THE COURT:  You may.

21        MR. SCHAR:  I show the witness, Mr. Cari,

22 what's been marked Government Exhibit Cari Calendar

23 Group.

24 BY THE WITNESS:

:32PM 25 A   Yes, this refreshes my recollection.

Cari - direct by Schar                    1789

BY MR. SCHAR:

Q   And if I can take that back.

A   Yes, sir.

Q   Based on your Calendar and your recollection,
what was the date that you met with Mr. Kelly?

A   August 20th.

Q   2003?

A   Yes, sir.

Q   Where did you meet with him?

A   At a restaurant outside the Loop.

Q   You don't remember the name of the restaurant?

A   No, sir, I don't.

Q   Was that the first time you ever met Chris Kelly?

A   Yes, sir.

Q   Who was present for the meeting?

A   Mr. Kelly, David and myself.

Q   By "David" you are talking about Mr. Wilhelm?

A   I am.

Q   What was discussed during the meeting?

A   It was general conversation about politics.  My
experience in the 2000 Presidential election, talked
about Florida, the recount, talked about the
Governor's race.  Just a general kind of get
together with political talk.

Q   When you say the Florida recount, just in

1 relation to your fundraising with Vice President

2 Gore, what are you referring to?

3 A  The fact that I spent four weeks counting chats

4 in Florida in 2000.

5 Q  What you say "chats" --

6 A  It's just a bad word.

7 Q  What had happened in 2000 that required a

8 recount?

9      Well, you know, maybe that's an overly broad

10 question.

11      Was there a disputed election in 2000 between

12 President Bush and Vice President Gore related--or

13 later President Bush--related to the Florida

14 election?

15 A  Yes, there was.

16 Q  And did it require a recount of the Florida

17 ballots?

18 A  Several times.

19 Q  Is that what you are referring to?

20 A  Yes, sir.

21 Q  After discussing those variety of issues with

22 Mr. Kelly, Mr. Wilhelm, did the meeting end shortly

23 thereafter?

24 A  It did.

25 Q  A couple of weeks later did you have dinner with

:34PM

:34PM

:34PM

:34PM

:35PM

Cari - direct by Schar                    1791

1  Stuart Levine?

2  A   I did.

3  Q   Where was that dinner?

4  A   The Palm Restaurant.

:35PM  5  Q   Where is the Palm Restaurant?

6  A   It's in Chicago in one of the hotels on Wacker.

7  Q   Who was present for the dinner?

8  A   Just Stuart, myself and Mr. Levine.

9  Q   What was discussed during the dinner?

:35PM  10  A   Mr. Levine was very interested in trying to

11  understand the mechanisms in how you put together a

12  fundraising operation and that was the focus of most

13  of the dinner.

14  Q   What, if anything, was Mr. Levine following up

:35PM  15  on?

16  A   That he was following up on my meeting with

17  Mr. Kelly.

18  Q   Had you, in fact, Mr. Cari, told Mr. Levine about

19  your meeting with Mr. Kelly?

:36PM  20  A   No.

21  Q   Do you know how he found out?

22  A   No.

23  Q   What, if anything, was Mr. Levine doing during

24  the dinner?

:36PM  25  A   For a big part of the dinner he was taking notes

Cari - direct by Schar                    1792

1 as I was describing the kinds of organization and
2 the functions of different parts of the organization
3 when it comes to fundraising.
4 Q   What, if anything, did Mr. Levine tell you what
5 he was going to do with his notes?
6 A   He was going to share it with Mr. Rezko.
7 Q   What, if anything, did Mr. Levine tell you about
8 his relationship with Mr. Rezko or the help
9 Mr. Rezko provided to him?
10 A   That Mr. Rezko was a long-time business associate
11 and close friend and that Mr. Rezko was responsible
12 for Mr. Levine being on the state board.
13 Q   Moving head, did there come a time that you agree
14 to assist for a fundraiser in New York City for
15 Defendant Blagojevich?
16 A   Yes, sir.
17 Q   How did that involvement of fundraiser come
18 about?
19 A   It started with a conversation with my friend,
20 David Wilhelm.
21 Q   Did you think it was a good idea to raise money
22 for Defendant Blagojevich?
23 A   Yes.
24 Q   Why?
25 A   Well, several reasons:

Cari - direct by Schar                                    1793

1        One, as member of the Executive Committee of
2   my law firm, we represent a variety of clients that
3   have interests before the state and its agencies.
4        And, secondly, as a managing director of a
5   private equity firm, we had interests before several
6   of the state pension boards.
7   Q   After agreeing to assist in the fundraiser, what
8   did you do?
9   A   I called Carl McCall who was a managing director
10  also of Healthpoint Capital.  Carl lived in New York
11  and Carl was the former state comptroller of the
12  State of New York and the Democratic candidate for
13  Governor in New York in 2002.
14  Q   Through Mr. McCall, did you begin a process to
15  begin a New York fundraiser for defendant
16  Blagojevich?
17  A   Yes, Carl took the lead and really pulled it
18  together.
19  Q   And at some point prior to the fundraiser, did
20  you have breakfast with Mr. Levine in the Four
21  Seasons here in Chicago?
22  A   I did.
23  Q   As you sit here now, do you recall a particular
24  date?
25  A   I don't.

1  Q   And would it refresh your recollection to see

2  your calendar?

3  A   Yes, sir.

4          MR. SCHAR:  May I approach again, Judge?

5          THE COURT:  You may.

6          MR. SCHAR:  Again, showing the witness what's

7  been marked Government Exhibit Cari Calendar Group.

8  BY MR. SCHAR:

9  Q   I ask you to take a look at that.

10 A   Thank you.

11 Q   Does that refresh your recollection as to the

12 date of your breakfast with Mr. Levine?

13 A   Yes, sir.

14 Q   What was the date of the breakfast?

15 A   October 14th.

16 Q   What year?

17 A   2003.

18 Q   Who is present for the breakfast?

19 A   Just Mr. Levine and myself.

20 Q   What did you and Mr. Levine discuss at the

21 breakfast?

22 A   Mr. Levine shared with me that he was very

23 excited about the upcoming New York fundraiser, and

24 that he was going to use his plane to fly the

25 Governor to New York and asked me if I would like to

Cari - direct by Schar                                1795

1  go on the plane with them to New York.

2  Q   What was your response?

3  A   Yes.

4  Q   Had you told Mr. Levine about the fundraiser at

5  this point?

6  A   No.

7  Q   Did you know how he found out?

8  A   No.

9  Q   I direct your attention to October 29th, 2003.

10        Was that the day of the New York fundraiser?

11  A   Yes.

12  Q   What happened that morning?

13  A   I went to O'Hare Airport to an area where the

14  private planes were and waiting there was Stuart

15  Levine.

16        I went up to Stuart, said good morning, and

17  told him I was kind of excited seeing his plane and

18  being on a private plane.

19  Q   What was Mr. Levine's response?

20  A   That this wasn't his plane, that he'd swapped it

21  out with somebody else and he was using somebody

22  else's plane for the trip to New York.

23  Q   Eventually that morning, did you board a private

24  plane to go to New York for Defendant Blagojevich's

25  fundraiser?

Cari - direct by Schar                    1796

1  A   Yes, sir.

2  Q   Who was on the plane with you?

3  A   The Governor, John Wyma, Bradley Tusk, Stuart

4  Levine, Chris Kelly, myself, there may have been

5  some security people.

6          MR. SCHAR:  Judge, I have Government Exhibit

7  Integrated Flight Group which I would like to move

8  into evidence pursuant to a 90211 certification.

9          THE COURT:  Admitted and you may publish it.

10         MR. SCHAR:  Thank you.

11     (Government's Exhibit Integrated Flight Group

12      was received in evidence.)

13         MR. SCHAR:  May I approach?

14         THE COURT:  You may.

15     (Exhibit published to the jury.)

16 BY MR. SCHAR:

17 Q   Mr. Cari, are you looking at an invoice from

18 Integrated Flight Resources to Stuart Levine?

19 A   Yes, sir.

20 Q   At the top portion it indicates October 29, 2003?

21 A   Yes, sir.

22 Q   With an invoice cost for the flight approximately

23 of $13,205?

24 A   Yes, sir.

25 Q   Where does it indicate that the plane was going?

:40PM

:41PM

:41PM

:41PM

:42PM

Cari - direct by Schar                    1797

1  A   To Teterboro, New Jersey which is a small private
2  airport right outside of New York City.
3  Q   If we could move to Page 2 of the exhibit.
4        Does this indicate who is on the plane?
5  A   Yes.
6  Q   Is that Governor Blagojevich?
7  A   Yes.
8  Q   Stuart Levine?
9  A   Yes.
10 Q   Yourself?
11 A   Yes.
12 Q   Do you remember Hurtgen?
13 A   No.  Nick was not on that flight.
14 Q   Bradley Tusk?
15 A   Yes.
16 Q   Mr. Wyma?
17 A   Yes.
18 Q   Chris Kelly?
19 A   Yes.
20 Q   And do you know who know who Joe Morrero is?
21 A   9I know there was somebody else, I don't know if
22 that was his name.
23 Q   And was the other individual part of the detail?
24 A   Yes.
25 Q   And when I say "the detail," for Rod Blagojevich?

Cari - direct by Schar                    1798

1  A   For the Governor.  Yes, sir.
2          MR. SCHAR:  May I have one moment, Judge.
3          (Brief pause).
4
5  BY MR. SCHAR:
6  Q   During the plane ride --
7          Incidentally, was this the first time you met
8  Defendant Blagojevich or had you met him before?
9  A   We had met before.
10 Q   When had you met him or how had you met him?
11 A   I know he came to my law office in Chicago about
12 when I think he was running for the U.S. Congress.
13 Q   During the plane ride, did you have a
14 conversation with Defendant Blagojevich?
15 A   I did.
16 Q   Where were you sitting?
17 A   When the conversation happened, I was sitting to
18 the Governor's right.
19 Q   Was anyone else present from the conversation?
20 A   Other than the people sitting behind us, no.
21 Q   How did the conversation with Defendant
22 Blagojevich start?
23 A   Very amicably; general conversation.  We both
24 enjoyed reading history books and biographies, and
25 then it segued into the Presidential election of

Cari - direct by Schar                                1799

1  2000.

2  Q   And is that Presidential election 2000 that you

3  briefly described?

4  A   Yes, it is.

5  Q   What did you and Defendant Blagojevich discuss at

6  that point?

7  A   Discussed what happened in Florida and started

8  talking about the financial aspects of raising money

9  for -- on such a large scale for a Presidential

10 election.

11 Q   What, if anything, did Defendant Blagojevich tell

12 you about his aspirations on a larger scale?

13 A   That he had aspirations to run for the Presidency

14 some day.

15 Q   What did he say next?

16 A   That he thought that one of the reasons that

17 President Clinton was successful in running a

18 Democratic primary was that he was a sitting

19 Governor and as a sitting Governor he had access

20 to -- that he had an ability to raise a lot more

21 money than a sitting U.S. Senator.

22 Q   What did he say next?

23 A   That as a sitting Governor, that you're giving

24 out contracts and legal work and consulting work, et

25 cetera, and that you can go back to those people and

:44PM

:44PM

:45PM

:45PM

:45PM

1  raise money.

2  Q   What, if anything, did he tell you about the

3  people who would assist him in that endeavor?

4  A   He was very clear that Mr. Kelly and Mr. Rezko

:45PM   5  were the two point people for him, very close

6  friends, and that they were the two people that he

7  relied on.

8  Q   What, specifically, did he indicate, if anything,

9  to you that he could hand out in exchange for

:46PM   10  contributions?

11        MR. GILLESPIE:  I'll object.

12        MR. SCHAR:  I'll rephrase it, Judge.

13  BY MR. GILLESPIE:

14  Q   What, if anything, did he indicate to you that he

:46PM   15  could hand out?

16  A   Contracts for consulting work, contracts from

17  legal work, investment banking work, allocations

18  from pension funds, et cetera.

19  Q   What did you understand Defendant Blagojevich to

:46PM   20  be telling you, Mr. Cari?

21        MR. GILLESPIE:  Objection.

22        MR. SCHAR:  Judge, that's his understanding

23  of the conversation.

24        THE COURT:  Overruled.

:46PM   25  BY MR. SCHAR:

Cari - direct by Schar                    1801

1  Q   What did you understand Defendant Blagojevich to
2  be telling you, Mr. Cari?
3  A   That he would be giving out state business and
4  would go back to those people for contributions.
5  Q   What, if anything, did he ask of you?
6  A   He asked if I would be interested in helping him
7  in putting together a national fundraising
8  organization.
9  Q   What was your response?
10 A   No.
11 Q   What, if any, explanation did you give him as to
12 why you were not interested?
13 A   There were several reasons, the most important
14 was my wife that had just passed.  I was having a
15 very difficult time going on with my life.  I just
16 did not have any interest.
17        I also shared that my involvement in politics
18 and my ability to help is really on a national
19 level, never really been involved at state level.  I
20 know the rules and regulations in terms of raising
21 money on a national level, on a state level the
22 rules and regulations of the law is completely
23 different and that I just didn't feel that I had
24 that kind of an expertise.
25 Q   How did the conversation end?

Cari - direct by Schar                              1802

1  A  It ended that he wanted me to talk to Mr. Kelly
2  or Mr. Rezko.
3  Q  Did he indicate, if anything, that they would
4  follow up with you?
5  A  Yes, that one of them or both of them would reach
6  out to me and have a further dialogue or
7  conversation about what we just spoke about.
8  Q  Do you think you could identify Defendant
9  Blagojevich if you saw him again in court today?
10  A  Yes.
11  Q  Do you see him in court today?
12  A  I do.
13  Q  Where is he?
14  A  The gentleman right over there (indicating).
15  Q  He just put his hands up?
16  A  Yes.
17      MR. SCHAR:  Judge, may the record reflect
18  Defendant Blagojevich was identified by Joe Cari?
19      THE COURT:  The record should so reflect.
20  Q  Where did the plane land?
21  A  In Teterboro.
22      MR. SCHAR:  Judge, I am about to segue into
23  what happened and ask if this would be a good time
24  to break.
25      THE COURT:  We will adjourn until 9:30

:48PM
:48PM
:48PM
:48PM
:48PM

Cari - direct by Schar                    1803

1    tomorrow morning.

2         THE MARSHAL:  All rise.

3       (The following proceedings were had out of the

4        presence of the jury in open court:)

5         THE COURT:  The witness may step down.

6       (Witness temporarily excused.)

7         THE COURT:  Be seated in the courtroom or

8    leave, take your choice.

9         Counsel, approach the lectern.

10      (Brief pause).

11        THE COURT:  I'm looking at the motion.  Does

12   somebody have the motion in hand?

13        MR. S. F. ADAM:  We just got it, Judge.  We

14   haven't had a chance to read it.

15        THE COURT:  Well, turn to Page 10.

16        Looking at the point labeled "Adam," did you

17   actually say this?  You want to read it?

18        MR. ADAM, JR.:  No, of course I did, yes,

19   your Honor.  I do not accuse them of making up the

20   statement, Your Honor.

21        THE COURT:  Okay.  Since we are in open

22   court, I won't make comment on the accuracy of

23   fairness of your statement.

24        MR. ADAM, JR.:  Yes, your Honor.

25        THE COURT:  But this is a source of some

:49PM

:50PM

:51PM

:51PM

:52PM

1  concern to me, and the reason it's a source of some
2  concern to me has to do with, in some respects, how
3  we get our news today.  And the difficulty we have
4  with respect to controlling access to it, part of
5  the reason is is I've noticed when I've watched
6  television news, they do the same thing that modern
7  films do, they use fairly quick cuts, perhaps in a
8  desire to imitate MTV style, not quite as fast but
9  pretty quick, which leaves the problem of somebody
10 actually not being able to avoid hearing the
11 commentary because you turn on the television.  And
12 it's, I think, pretty much okay in many cases, if
13 you start watching the news when it begins because
14 they sort of tell you when something is coming up,
15 but even then sometimes you'll hear a lead-in that
16 basically has the substance of it.  So even a juror
17 who is trying his or her best to stay away from this
18 stuff gets exposed to it.
19        Now, I don't much care that the jury gets
20 exposed to something that happened in court because
21 the juror has already seen it, but that's not the
22 part that bothers me, the part that bothers me is
23 argument and interpretation.
24        I don't mind a lawyer giving a more or less
25 accurate summary of what a witness may have

Cari - direct by Schar                                1805

1  testified to, although there's enormous risk in that

2  because it may not be all that accurate.  And the

3  one thing I think I can enforce under the law, even

4  if I were barred from all prior restraint, is the

5  requirement of absolute accuracy in attorney

6  comments.

7          With respect to the defendant, what I read

8  here, the Defendant Rod Blagojevich --

9          MR. S. F. ADAM:  May I ask what page, Your

10  Honor?

11          THE COURT:  Back on 10.  Back on 10.

12          I think it's essentially a kind of backhanded

13  plea for sympathy, plus an argumentative

14  characterization of the witness entirely without

15  details.  And, in fact, virtually everything that

16  I've read in court papers about what one particular

17  defendant has said is absolutely devoid of details.

18  And it concerns me that this is an appeal to a form

19  of defense that the law specifically excludes.

20          When we instruct juries at the end of the

21  case, the standard instruction is you must not let

22  sympathy, prejudice, and there's a few other things,

23  influence your verdict.  Some of the things the

24  prosecution raises in these papers are statements

25  made, sufficiently enough in the past that I'm not

1   particularly concerned about them, in which one of
2   the lawyers raised as potential defenses those
3   things which are not defenses, and raised issues
4   that if they are to be presented to anybody, they
5   are to be presented to me and not to the jury.  And
6   my assumption is that that hasn't happened since, so
7   I'm not terribly concerned with that because time
8   will pass by the time we get to the verdict, but the
9   appeal to sympathy is also part.  We say that quite
10  specifically, and we say that for very good reasons,
11  not only because it's legal, a law that you can't
12  rely on sympathy, but because sympathy is a weapon
13  that can be used by both sides.  And when it's used
14  by both sides, it's going to be equally appealing to
15  the emotions, and you're not supposed to appeal in
16  the emotions.
17          So I have the one passage I have read here
18  that's been presented to me is, essentially, an
19  appeal to sympathy, which is something you're not
20  permitted to do with the jury.  So I have
21  significant concerns.
22          There are two ways, or maybe three, that we
23  can address this.  The first is is that parties can
24  sit down with each other and see if we can have some
25  kind of agreement as to what somebody might say, and

Cari - direct by Schar                                1807

1   that would be helpful to me because the last resort

2   that I have is an order barring parties and lawyers

3   from speaking.

4          The second thing, which I think is not common

5   in federal courts but I believe there's some state

6   courts that have said under these circumstances that

7   they are going to apply a right to reply rule, that

8   is the last thing I would like to do except maybe a

9   bar order, which is to say to the prosecution if you

10  think the defense lawyer has done a stand-up before

11  the cameras and said something that is outrageously

12  wrong, you can get up in front of that and do your

13  own stand-up despite whatever the Department of

14  Justice regulations are and at least make a

15  corrected reply.

16         There's an old doctrine called fighting fire

17  with fire, you don't see that much, but it's still

18  around which basically says that if one side makes a

19  ugly misrepresentation of the evidence, the other

20  side is entitled to make an equally ugly

21  misrepresentation of the evidence.  I don't want to

22  get there, I don't want to come even close.

23         I, therefore, will start first with some kind

24  of lawyerly agreement of what kinds of things can be

25  said and what kinds of things can't be said.  If you

1  can't reach that, you can make competing arguments

2  to me and I can give you my own guidelines, and we

3  can deal with the effect of the possibility of a bar

4  order.

5          I am pleased that the issue has been raised

6  early, because I don't think anything anybody has

7  said now is going to have much of an effect of any

8  kind, but I would be concerned about things said in

9  the last three or four weeks of this case.  So to

10 perhaps avoid that issue and avoid my having to face

11 it, you can talk amongst yourselves and you can tell

12 me what you think on Monday morning.

13         In the interim, I urge everyone, including

14 the parties in this case, to exercise some

15 discretion at least for the next few days before we

16 sort this out.

17         What's up tomorrow?

18         MR. SCHAR:  Judge, I believe we'll finish

19 with Mr. Cari.  I don't have a sense of cross

20 examination, but next will be Jill Hayden after that

21 Ali Ata.

22         THE COURT:  Okay.

23         MR. SCHAR:  That certainly would take us

24 through the day.

25         THE COURT:  Okay.  That will take the day?

Cari - direct by Schar                          1809

1    Everybody is agreed?

2          MR. SCHAR:  Yes, Judge.

3          THE COURT:  See you in the morning.

4          MR. SCHAR:  Oh, Judge, I see no objections to

:02PM  5    the release of whatever came in today.

6          MR. NIEWOEHNER:  Judge, there is one issue

7    with that.  I realized today that there is some

8    description of a Mickey Siegel indictment in one of

9    the contracts, can we redact that?

:02PM  10         THE COURT:  Yes, you will redact that.

11         MR. NIEWOEHNER:  Thank you.

12         MR. SOROSKY:  9:30, Your Honor?

13         THE COURT:  9:30.

14      (Adjournment taken from 5:02 o'clock p.m. to

:08PM  15       9:30 o'clock a.m. on June 17, 2010.)

16

17

18

19

20

21

22

23

24

25

3          *     *     *     *     *     *     *     *

6  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
7  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
8                          MATTER

11    /s/Blanca I. Lara                        date

16  _____        _____
17         Blanca I. Lara                         Date