2104

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )   No. 08 CR 888
4           Government,            )
                                   )
5   vs.                            )   Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )   June 21, 2010
    ROBERT BLAGOJEVICH,            )
7                                  )
            Defendants.            )   9:43 o'clock a.m.
8

9                        VOLUME 11
                 TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JAMES B. ZAGEL
                      AND A JURY
11

12
    For the Government:
13
                THE HONORABLE PATRICK J. FITZGERALD,
14              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
15                   Carrie E. Hamilton
                     Christopher Niewoehner
16              Assistant United States Attorneys
                219 South Dearborn Street
17              Suite 500
                Chicago, Illinois 60604
18

19

20
    Court Reporter:
21
                Blanca I. Lara, CSR, RPR
22              219 South Dearborn Street
                      Room 2504
23              Chicago, Illinois 60604
                   (312) 435-5895
24

25

```
 1   APPEARANCES   (continued:)

 2
     For Defendant Rod Blagojevich:
 3
             KAPLAN & SOROSKY
 4           BY:  Sheldon M. Sorosky
             158 West Erie
 5           Chicago, Illinois 60610
             (312) 640-1776
 6
             LAW OFFICE OF SAMUEL E. ADAM
 7           BY:  Samuel Forbes Adam
                  Samuel Adams, Jr.
 8           6133 South Ellis Avenue
             Suite 200
 9           Chicago, Illinois 60637
             312-726-2326
10

11           OFFICES OF AARON B. GOLDSTEIN
             BY: Aaron Benjamin Goldstein
12           6133 South Ellis
             Chicago, Illinois 60637
13           (773) 752-6950

14           OFFICES OF LAUREN FAUST KAESEBERG
             BY:  Lauren Faust Kaeseberg
15           2140 N. Lincoln Park West
             Suite 307
16           Chicago, Illinois 60614
             (773) 517-0622
17
             LAW OFFICES of MICHAEL GILLESPIE
18           BY:  MICHAEL GILLESPIE
             53 West Jackson Boulevard
19           Suite 1420
             Chicago, Illinois 60604
20           (312) 726-9015

21

22

23

24

25
```

2106

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX OF EXAMINATION

2     WITNESS                                                  PAGE

3      ALI ATA

4      Cross Examination (Resumed) By Mr. Adam, Jr...... 2109

5      MICHAEL HORST

6      Direct Examination By Mr. Schar.................. 2114

7      Cross Examination By Mr. Sorosky................ 2118

8      Redirect Examination By Mr. Schar............... 2123

9      JOHN JOHNSTON

10     Direct Examination By Mr. Niewoehner............ 2124

11     Cross Examination By Mr. S. F. Adam............. 2171

12     Redirect Examination By Mr. Niewoehner.......... 2206

13     Recross Examination By Mr. S. F. Adam........... 2209

14     DONALD FEINSTEIN

15     Direct Examination By Mr. Schar................. 2210

16     Cross Examination By Mr. Goldstein.............. 2257

17     BRADLEY TUSK

18     Direct Examination By Mr. Schar................. 2263

19     Cross Examination By Mr. Sorosky................ 2282

20     Redirect Examination By Mr. Schar............... 2308

21     Recross Examination By Mr. Sorosky.............. 2311

22     JOHN F. HARRIS

23     Direct Examination By Ms. Hamilton.............. 2320

24

25

1   EXHIBITS

2   Government's Exhibit Johnston Contribution      2131

3   Summary ........................................

4   Government's Exhibits AUSL Article i and AUSL   2216

5   Grant Article ii ...............................

6   Government's Exhibit School Photo 1 ............ 2220

7   Government's Exhibit AUSL Grant 1 .............. 2224

8   Government's Exhibits Government Exhibit AUSL    2231

9   grant 1, AUSL Grant 2, AUSL Grant 4 and AUSL

10  Grant 5 ........................................

11  Government's Exhibit School Photo 2 ............ 2234

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ata - cross by Adam, Jr.                    2109

1        THE CLERK:  All rise.

2      (The following proceedings were had in the

3       presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        You may resume.

6      ALI ATA, GOVERNMENT WITNESS, PREVIOUSLY SWORN

7            CROSS EXAMINATION (resumed)

8   BY MR. ADAM, JR.:

9   Q   Good morning, Mr. Ata.

10  A   Good morning.

11  Q   I have just a few more questions.  Not that many

12  for you.

13  A   Yes, sir.

14  Q   Mr. Ata, you told us last week that at the time

15  in which you began working as the executive director

16  at the IFA, that you and Mr. Rezko had been in

17  business together by that time, is that correct?

18  A   Yes.

19  Q   In fact, he owed you approximately $2 million by

20  the time you became the executive director?

21  A   I don't know if it was by the time.

22  Q   Is that fair to say right around that time it was

23  approximately $2 million he owed you?

24  A   I don't know exactly what he owed me as of that

25  date, but as of today I believe it's $2 million,

1  yes.

2  Q   Well, the project at Irving Park, you say you

3  loaned him a million dollars?

4  A   Yes.

:43AM    5  Q   That was before 2004, correct?

6  A   Yes.

7  Q   And the million dollars that you loaned him for

8  the Roosevelt and Clark project, that was before

9  2004, is that fair?

:44AM   10  A   I believe it was.

11  Q   So by 2004, then, approximately, $2 million you

12  owed -- or Mr. Rezko owed you, is that right?

13  A   And the 2 million probably includes profits that

14  I was to receive from those projects.

:44AM   15  Q   And at the time in which you became the IFA

16  director, did you put any of those loans that you

17  had made to Rezko on any economic interest

18  statements that you had to fill out in order to

19  become a state employee?

:44AM   20  A   I -- I believe in my -- that on my disclosure

21  statement, that I did list Roosevelt and Clark as a

22  project.

23  Q   But not the Irving Park, is that fair to say?

24  A   Not the Irving Park.

:44AM   25  Q   And at the time in which you became the IFA

Ata - cross by Adam, Jr.                    2111

1 director, you had a boss by the name of John Filan,

2 is that correct?

3 A   No, he was not my boss.

4 Q   Well, who was John Filan to you as the IFA

5 director?

6 A   He is somebody who I worked with initially and I

7 occasionally reported to him, but he wasn't my boss.

8 Q   Fair enough.

9        At any time did you tell Mr. Filan that

10 Mr. Rezko owed you $2 million, that you recall?

11 A   No.

12 Q   Or at any time did you tell Governor Blagojevich

13 that Rezko owed you $2 million?

14 A   No, I did not.

15 Q   You have told the ladies and gentlemen of the

16 jury that at some point, either right before

17 becoming the IFA director or right after that,

18 Mr. Rezko informed you that you needed to report to

19 Mr. Rezko, do you recall that?

20 A   Before I became a director.

21 Q   He told you to report to him, is that correct?

22 A   Yes.

23 Q   At any time did the Governor tell you that you

24 must report to Rezko?

25 A   No, he did not.

:45AM
:45AM
:45AM
:45AM
:45AM

Ata - cross by Adam, Jr.                           2112

1  Q   At any time did you tell the Governor that you

2  were reporting to Mr. Rezko?

3  A   No, I did not.

4  Q   John Filan, did you ever tell him that you had to

5  report to Mr. Rezko?

6  A   I did not.

7  Q   Going back just very shortly to the meeting that

8  you say you had at the offices of Rezmar in which

9  you gave Mr. Rezko a 25-thousand-dollar check and

10 the Governor was there, do you recall that?

11 A   I do recall.

12 Q   You told us that there was another person in the

13 room by the name of Jay Hoffman, is that correct?

14 A   Yes, I learned -- I didn't know Jay Hoffman at

15 that point, I learned later on that it was Jay

16 Hoffman.

17 Q   And, in fact, you told us later on after that

18 meeting, you sought the position for the Illinois

19 Capital Development director, is that correct?

20 A   Yes.

21 Q   And Mr. Rezko informed you you couldn't have that

22 because he had spoken with somebody in the

23 legislature, is that correct?

24 A   That was later, that was March time frame of '03

25 that Mr. Rezko told me I couldn't have that because

Ata - cross by Adam, Jr.                          2113

1  he had just gotten off the phone with Jay Hoffman.

2  Q   And that's the same Jay Hoffman that had been in

3  the room when you went over to Rezmar, is that

4  correct?

5  A   I believe so.

6  Q   And you came to learn that Jay Hoffman was an

7  Illinois representative, isn't that true?

8  A   Yes.

9         MR. ADAM, JR.:  May I have one moment, Your

10 Honor?

11        THE COURT:  You may.

12    (Brief pause).

13        MR. ADAM, JR.:  Thank you, Your Honor.  I

14 have no further questions, Mr. Ata.

15        MS. HAMILTON:  No redirect.

16        THE COURT:  You may step down.

17    (Witness excused.)

18     THE COURT:  Another witness.

19        MR. SCHAR:  Yes, the government calls

20 Michael.

21        THE COURT:  Face me and raise your right

22 hand.

23    (Witness duly sworn.)

24        THE COURT:  Please be seated.

25

1      MICHAEL HORST, GOVERNMENT WITNESS, SWORN

2                 DIRECT EXAMINATION

3   BY MR. SCHAR:

4   Q   Please state and spell your name for us.

5   A   My name is Michael Horst, H-o-r-s-t.

6   Q   What do you do for a living, Mr. Horst?

7   A   I'm a public accountant.

8   Q   Do you have your own business?

9   A   Yes, I do.

10  Q   What is the name of your own business?

11  A   Horst & Company.

12  Q   How long have you owned your own business?

13  A   For approximately 30 years.

14  Q   How long have you been an accountant?

15  A   About 35 years.

16  Q   Are you the sole proprietor of that business?

17  A   Yes, sir.

18  Q   Can you just briefly explain for us your

19  educational background, Mr. Horst.

20  A   I graduated from the University of Arizona with a

21  bachelor in science degree in business

22  administration and an accounting major.  I obtained

23  my certificate of certified public accountancy from

24  the University of Illinois.

25  Q   Back in late 2003 and early 2004 were you

1  familiar with an entity called the Illinois Finance
2  Authority?
3  A   No, sir.
4  Q   How about an entity sometimes referred to as the
5  IFA?  At that time had you ever heard of IFA?
6  A   No, sir.
7  Q   To your knowledge, Mr. Horst, did you ever
8  interview for the position as executive director of
9  the IFA?
10 A   No, sir.
11 Q   That's something you think you would remember?
12 A   Yes.
13 Q   Back in late 2003 did you have a full-time job as
14 an accountant?
15 A   Yes.
16 Q   Were you looking for a knew full time job?
17 A   I was not.
18 Q   Would you have taken the job as the executive
19 director of the IFA if it had been offered to you?
20 A   No, sir.
21        MR. SOROSKY:  Objection.
22        THE COURT:  Overruled.  The answer may stand
23 679.
24 BY MR. SCHAR:
25 Q   Were you interested in starting a new career in

Horst - direct by Schar                    2116

1    2003, early 2004?

2    A   No, sir.

3           MR. SCHAR:   Judge, I would like to briefly

4    republish Government Exhibit IFA Board Minutes, if I

5    may?

6           THE COURT:   You may.

7      (Exhibit published to the jury.)

8    BY MR. SCHAR:

9    Q   Mr. Horst, I want you to take a look at either

10   the computer screen in front of you or the screen in

11   the courtroom.

12          I'm showing you what's been marked Government

13   Exhibit FHA Board Minutes indicating a special

14   meeting held at 10:30, February 5th, 2004, were you

15   present for that meeting?

16   A   No, sir.

17   Q   Do you see your name on that, Michael Horst?

18   A   Yes, I do.

19   Q   Do you know any other Michael Horst?

20   A   No.

21   Q   At the top it says:

22     "Governor Blagojevich had nominated the

23       candidates, Mr. Ali D. Ata and Mr. Michael

24       Horst for the position of executive director."

25          Did you ask Defendant Blagojevich to nominate

1  you for the position of FHA director of 2004?

2  A   No.

3  Q   Do you have any idea why he did it?

4  A   No.

:52AM  5  Q   At that point had you ever met Defendant

6  Blagojevich?

7  A   No.

8  Q   Are you familiar with an individual named Chris

9  Kelly?

:53AM  10  A   Yes, sir.

11  Q   How are you familiar with Chris Kelly?

12  A   Chris Kelly's construction company rented an

13  office space in the same building as one of my

14  clients.

:53AM  15  Q   Who was that client?

16  A   Castle Construction Corporation.

17  Q   And Mr. Kelly's business was located in the

18  same --

19  A   Same building.

:53AM  20  Q   And did you have occasion to meet Mr. Kelly while

21  you were in that office building?

22  A   Yes.

23  Q   Approximately how many times would you see him a

24  year?

:53AM  25  A   Approximately 3 or 4 times a year.

1 Q   Had you met Mr. Kelly prior to the late 2003,
2 early 2004 time period?
3 A   Yes.
4 Q   At some point had you actually shared a table
5 with him at a party?
6 A   Yes, at a Christmas party held by Castle
7 Construction.
8 Q   Was that prior to the late 2003, 2004 time
9 period?
10 A   Yes.
11         MR. SCHAR:  May I have one moment, Judge.
12         (Brief pause)
13         MR. SCHAR:  Nothing further, Judge.
14                    CROSS EXAMINATION
15 BY MR. SOROSKY:
16 Q   Hello, Mr. Horst.  How are you?
17 A   Fine.  Thank you.
18 Q   I'm one of Mr. Blagojevich's lawyers and I'm
19 going to ask you some questions.
20 A   All right.
21 Q   Now, you don't know Governor Blagojevich, do you?
22 A   No, sir.
23 Q   And you didn't know him before this interview,
24 did you?
25 A   No, sir.

1  Q   And you never asked for any job in the
2  Blagojevich administration of any type, did you?
3  A   No, sir.
4  Q   And you didn't want any job in the Blagojevich
5  administration, did you?
6  A   No, sir.
7  Q   So you certainly didn't feel bad that you didn't
8  receive any job from the Blagojevich administration,
9  did you?
10  A   No, sir.
11  Q   In fact, you're a conservative, are you not?
12          MR. SCHAR:  Objection.
13          THE COURT:  The objection is sustained.
14  BY MR. SOROSKY:
15  Q   You donated to President George Bush, did you
16  not?
17          MR. SCHAR:  Objection.
18  BY THE WITNESS:
19  A   I did.
20          THE COURT:  The objection is sustained.
21  BY MR. SOROSKY:
22  Q   Now, you've been a successful certified public
23  accountant for about 30, 35 years, have you not?
24  A   Yes, sir.
25  Q   And one of your clients is Castle Construction?

:55AM
:55AM
:55AM
:55AM
:55AM

1  A   Corporation; that's correct.

2  Q   And I would assume Castle Construction is a

3  building company, is that correct?

4  A   That's right.

5  Q   And Mr. Kelly, a man by the name of Christopher

6  Kelly, he owned a roofing company, did he not?

7  A   Yes.

8  Q   And Kelly's roofing company was in the same

9  building facility as Castle Construction, was it

10  not?

11  A   Yes.

12  Q   And being the accountant for Castle Construction,

13  you would regularly go to the Castle Construction

14  offices, do you not?

15  A   I would be there possibly once a year.

16  Q   And as a result of going there, did you come to

17  meet and become acquainted with Christopher Kelly?

18  A   Yes.

19  Q   And so you and Christopher Kelly were not close

20  personal friends, were you?

21  A   No, we were not.

22  Q   But would it be accurate to say you were

23  acquaintances and developed some acquaintanceship

24  with Mr. Kelly as a result of you doing your

25  accounting work for Castle Construction?

1  A  We had very few conversations other than hellos
2  in the hallway.
3  Q  But to the best of your knowledge, Mr. Kelly knew
4  you to be a successful accountant, did he not?
:57AM  5  A  If -- I believe so, yes.
6  Q  And somewhere along the way Mr. Kelly asked you
7  if you would be interested in being interviewed for
8  a position on one of boards of the State of
9  Illinois, did he not?
:57AM  10  A  Yes, in the latter part of 2004.
11  Q  The latter part of 2004?
12  A  Yes, sir.
13  Q  Might it have been 2003?
14  A  No, sir.
:57AM  15  Q  Okay.  And you agreed to go to this interview,
16  did you not?
17  A  Yes, I did.
18        MR. SCHAR:  Objection.
19        THE COURT:  The objection is sustained.
:57AM  20  BY MR. SOROSKY:
21  Q  And when you went to this interview, you were
22  interviewed by someone who indicated he went to
23  school with Mr. Blagojevich, were you not?
24        MR. SCHAR:  Objection; scope.
:58AM  25        THE COURT:  The objection is sustained.

1          This is way beyond the scope of direct.

2    BY MR. SOROSKY:

3    Q   Well, during this interview, did you --

4          MR. SCHAR:  Objection.

5          THE COURT:  The objection is sustained.

6          MR. SOROSKY:  Very good.

7    BY MR. SOROSKY:

8    Q   Now, did you submit a resume prior to -- did you

9    submit an interview -- excuse me.

10         Did you submit a resume prior to going to

11   the -- prior to going to this interview?

12         MR. SCHAR:  Objection.

13         THE COURT:  The objection to the question as

14   asked is sustained.  If you want to ask him if he

15   submitted a resume.

16   BY MR. SOROSKY:

17   Q   Did you submit a resume?

18   A   I submitted a resume to Chris Kelly.

19   Q   To Chris Kelly.

20         Now, you don't know if anyone at the state

21   looked at your resume and felt you would be a good

22   candidate for director of the Illinois Finance

23   Authority, do you?

24   A   No.

25   Q   And you certainly -- you certainly were a CPA,

1 were you not?

2 A  Yes.

3        MR. SOROSKY:  Nothing furthers of this

4 witness.

5        MR. SCHAR:  Briefly, Judge.

6                    REDIRECT EXAMINATION

7 BY MR. SCHAR:

8 Q  Did you submit the resume in the late summer

9 of 2004, approximately?

10 A  It was the latter part of 2004, yes.

11 Q  Well after you had apparently been nominated to

12 be deputy director of IFA in late 2003, early 2004?

13 A  Based upon these documents, yes.

14 Q  Thank you.

15        MR. SCHAR:  Nothing further.

16        MR. SOROSKY:  Nothing.

17        THE COURT:  You may step down.

18     (Witness excused.)

19     THE COURT:  Next witness?

20        MR. SCHAR:  The government calls John

21 Johnston, Your Honor.

22        THE COURT:  Face me and raise your right

23 hand.

24     (Witness duly sworn.)

25     JOHN JOHNSTON, GOVERNMENT WITNESS, SWORN

1                    DIRECT EXAMINATION

2    BY MR. NIEWOEHNER:

3    Q   Could you say your name and spell your last name,

4    please.

5    A   John Johnston, J-o-h-n-s-t-o-n.

6    Q   How old are you?

7    A   48.

8    Q   Where do you currently live?

9    A   I live in the western suburbs of Chicago.

10   Q   What's your occupation?

11   A   I am a racetrack executive with Maywood Park and

12   Balmoral Park racetracks.

13   Q   What do Balmoral and Maywood Park do?

14   A   They operate horse racing facilities here in the

15   State of Illinois.

16   Q   Do you have any ownership interest in those

17   companies?

18   A   I do.

19   Q   What kind of ownership interest do you have?

20   A   I have a minority ownership interest in both of

21   the facilities.

22   Q   And do members of your family also have an

23   interest in those corporations?

24   A   Yes, they do.

25   Q   About how much does your family own of those

1  corporations?

2  A   Approximately a third.

3  Q   You mentioned there is a racetrack that is owned

4  by the Maywood Park Association, is that right?

5  A   Yes.

6  Q   Where is that racetrack located?

7  A   Unincorporated Cook County but basically the

8  Melrose Park area.

9  Q   About how many horse races are held at the

10 Melrose Park every year?

11 A   Approximately 100 racing evenings.

12 Q   About how many employees work there?

13 A   About 1,000.

14 Q   What's the name of the racetrack that's owned by

15 the Balmoral Company?

16 A   It's referred to as Balmoral Park Racetrack.

17 Q   Where is that racetrack located?

18 A   Crete, on the south side.

19 Q   About how many races are held at the Crete track?

20 A   Approximately 200 racing evenings a year.

21 Q   And about how many people work at that track?

22 A   About 1,000 also.

23 Q   How long have you worked -- have you worked at

24 the track at Melrose Park and Crete?

25 A   Over 20-plus years.

1  Q   What are your current responsibilities with
2  respect to those two tracks?
3  A   I have overall management, oversight
4  responsibility for both facilities.
5  Q   Are you the person who is primarily responsible
6  for running the businesses?
7  A   I am.
8  Q   About how long have you been the person who's
9  been primarily responsible for running the two
10 businesses?
11 A   Approximately the last 8 to 10 years.
12 Q   Do you have an agreement with the government that
13 governs your testimony today?
14 A   I do.
15 Q   And what kind of agreement do you have?
16 A   I have an immunity agreement.
17 Q   What do you understand you have to do under that
18 immunity agreement?
19 A   Come and testify before this Court today and in a
20 truthful manner.
21 Q   What would happen if you were not truthful in
22 your testimony -- or what could happen if you were
23 not truthful?
24 A   It would be illegal.  I'd be prosecuted.
25 Q   Have you ever met Rod Blagojevich?

:04AM
:04AM
:04AM
:04AM
:04AM

1  A   I have.

2  Q   Do you see that person in the courtroom today?

3  A   I do.

4  Q   Could you identify where he is sitting?

5  A   He is at the far end of that table.

6          THE COURT:  The identification has been

7  stipulated to.

8          MR. NIEWOEHNER:  Thank you, Your Honor.

9  BY MR. NIEWOEHNER:

10  Q   Do you understand that Defendant Blagojevich

11  became Governor of Illinois at some point?

12  A   I do.

13  Q   Did you meet with him before he became Governor?

14  A   I did.

15  Q   About when did you first meet with him?

16  A   Approximately the spring of 2002.

17  Q   How was it that you met Defendant Blagojevich?

18  A   I met him at a meeting that I requested to meet

19  the newly elected Democratic nominee for Governor.

20  Q   And when you say "newly elected," are you

21  referring to the primary election?

22  A   Correct.  He had won the primary.

23  Q   Who was present at that meeting?

24  A   There were several people, but myself; my father,

25  Billy Johnston; an associate of mine, and Chris

1  Kelly and the Governor, and a few other staffers.

2  Q   Was your father affiliated with the racetrack at

3  that point?

4  A   He was.

5  Q   What was his role at that point?

6  A   He was the chairman of the board of directors.

7  Q   What was the purpose of your meeting with

8  Defendant Blagojevich?

9  A   Just to introduce ourselves to him, primarily,

10  and meet him.

11  Q   Had you met Chris Kelly prior to that meeting?

12  A   No, I did not.

13  Q   After that meeting, did you meet with Kelly again

14  before the general election in November of 2002?

15  A   Yes.

16  Q   Did you meet with him more than once?

17  A   Yes.

18  Q   Did you discuss fundraising in any of those

19  meetings?

20  A   I did.

21  Q   Did you and your father make any contributions to

22  Defendant Blagojevich during the 2002 campaign?

23  A   Yes, we did.

24  Q   When you made the contributions, where did the

25  contributions come from?

1  A   Various corporations that operate at the
2  racetrack.
3  Q   Did you and your father control those
4  corporations?
:07AM  5  A   Yes.
6  Q   And after Defendant Blagojevich became Governor
7  in 2003, did you continue to make contributions to
8  him?
9  A   Yes.
:07AM  10  Q   Where did those contributions come from,
11  generally?
12  A   Similar; corporations.
13  Q   Who did you deal with from Defendant
14  Blagojevich's campaign about fundraising?
:07AM  15  A   Chris Kelly.
16  Q   And beginning in 2003, was there a particular
17  fundraising event that you particularly attended for
18  Defendant Blagojevich?
19  A   Yes, the Governor typically had an early summer,
:07AM  20  late spring fundraiser.
21  Q   And about how many people, typically, attended
22  that event?
23  A   Hundreds, if not maybe a thousand.
24  Q   When you attend that event, did you typically
:07AM  25  make a contribution around that time frame?

1  A   Yes, I did.

2  Q   Did Defendant Blagojevich run for reelection in

3  2006?

4  A   Yes.

:07AM  5  Q   And in that campaign, did you arrange for your

6  companies to make some additional contribution?

7  A   Yes, I did.

8  Q   Did you make a contribution to Defendant

9  Blagojevich in 2007?

:08AM  10  A   Yes.

11         MR. NIEWOEHNER:  Your Honor, may I approach?

12         THE COURT:  You may.

13  BY MR. NIEWOEHNER:

14  Q   I'm going to show you what's been marked as

:08AM  15  Government Exhibit Johnston Contribution Summary.

16         What is that?

17  A   This is a chart depicting the contributions we

18  made to the Blagojevich campaign over the years.

19  Q   And did you go through some of your bank records

:08AM  20  to determine where those contributions came from?

21  A   Yes.

22  Q   Were those bank records voluminous?

23  A   They were.

24  Q   Does that chart fairly and accurately summarize

:08AM  25  the documents relating to your contributions?

1  A   Yes.

2       MR. NIEWOEHNER:  Your Honor, I'm going to

3  offer Government Exhibit Johnston Contribution

4  Summary under Rule 1006.

:09AM  5       MR. ADAM, JR.:  No objection.

6       THE COURT:  Admitted.

7     (Government's Exhibit Johnston Contribution

8      Summary was received in evidence.)

9       MR. NIEWOEHNER:  May I publish it, Your

:09AM  10  Honor.

11      THE COURT:  You may.

12     (Exhibit published to the jury)

13  BY MR. NIEWOEHNER:

14  Q   Now, if you could just focus along the top black

:09AM  15  line, there is a series of names there, do you see

16  that?  Starting with "racing associations" and going

17  to the right?

18  A   Yes, I see it.

19  Q   And could you just walk through those different

:09AM  20  names and tell me what those different entities are.

21  A   Yes, they're various corporations as

22  sub-corporations within the racetrack that conduct

23  different business within the facility.

24  Q   So, for example, "Balmoral" is on there.  What is

:09AM  25  Balmoral?

Johnston - direct by Niewoehner                    2132

1  A   Balmoral is the racetrack itself.

2  Q   Okay.  And there is an entry for Maywood, what is

3  that?

4  A   That is the actual corporate account for Maywood

5  Park.

6  Q   And the other entries, there are five other ones,

7  Associates Racing Association, Coast to Coast, and

8  others.  Generally speaking, what are those other

9  entities?

10 A   The one, the Coast to Coast, is a food service

11 corporation.  Associates Racing Association is a

12 minority partner that we have in the facilities.

13 Q   Are those all different companies that you

14 control in some way?

15 A   Yes.

16 Q   And are they all related to your horse racing

17 track companies in some way?

18 A   Yes.

19 Q   And on the left-hand side there is a date column,

20 do you see that?

21 A   Yes.

22 Q   What does that column represent?

23 A   That is the date the checks were actually

24 granted.

25 Q   So, for example, on the first one it's May 17th

1  of 2002, what checks were drafted on that date?

2  A  The ones -- the -- the ones that line up across

3  that row.

4  Q  So there is a 20-thousand-dollar one for Racing

5  Associations, is that an example of that?

6  A  Yes.

7  Q  And then on the far right-hand column, there is a

8  total column, do you see that?

9  A  Yes.

10  Q  And what does that total represent?

11  A  The sum of those five checks.

12  Q  Okay.  And if you go down, do you see there are

13  lines by each year, essentially, is that right?

14  A  Yes.

15  Q  The at the bottom right-hand corner there is a

16  figure of 320,000, do you see that?

17  A  Yes.

18  Q  What does that represent?

19  A  The sum of all the contributions over the 7

20  years -- 5 or 6 years.

21  Q  Mr. Johnston, as you go through each year after

22  2002, you make a contribution in about June or July

23  of each year from 2003 through 2006, is that right?

24  A  Yes.

25  Q  And what was that contribution in relation to

1  each year?

2  A   I'm sorry, what was that?

3  Q   Was that about the time of the annual fundraiser

4  you talked about before?

:11AM  5  A   Yes.

6  Q   In 2007, you did not make a contribution around

7  the summer of 2007, is that right?

8  A   That's correct.

9  Q   Was there, in fact, still an annual fundraiser

:12AM  10  around that time frame for Defendant Blagojevich?

11  A   I believe so.

12  Q   And your contribution you made on December 28th

13  of 2007, is that correct?

14  A   Yes.

:12AM  15  Q   Why did you wait in 2007 to make a contribution

16  in December as opposed to doing it in the summer?

17  A   For a variety of reasons.  I would say, one,

18  which was that revenues were down considerably at

19  the track.  The Governor was no longer going to be

:12AM  20  running, and our philosophy on giving campaigns to

21  legislators was to provide funds for their

22  offices--fliers, radio, TV ads, radio ads,

23  staffers--and we knew that the Governor's campaign

24  fund at that point was being used for, nothing

:13AM  25  against the lawyers, but legal fees, and we weren't

1  overly excited about paying legal bills.

2  Q   So was that an intentional decision to delay the

3  timing of your contributions in 2007?

4  A   Yes.

:13AM  5  Q   Now I'm going to focus on the time period from

6  2003 to 2006.

7        In that time frame, was there anyone in

8  particular that you dealt with from Friends of

9  Blagojevich?

:13AM  10  A   Yes.

11  Q   Who is that?

12  A   Chris Kelly.

13  Q   What kind of relationship did you develop with

14  Mr. Kelly?

:13AM  15  A   It started out in the initial meeting as a

16  professional relationship and it developed into a

17  social relationship.

18  Q   So by, for example, in 2006, approximately how

19  often would you be talking with Mr. Kelly?

:13AM  20  A   Probably once a week.

21  Q   And in 2003 to 2006, did you observe Kelly and

22  Defendant Blagojevich together at times?

23  A   I did.

24  Q   And about how often might you see the two of them

:14AM  25  together in about a year?

1  A   A half dozen times.

2  Q   And what type of event did you typically see

3  Kelly and Defendant Blagojevich together at?

4  A   Generally at a fundraiser or occasionally at the

5  DuQuoin State Fair.

6  Q   What did you observe about the relationship

7  between Kelly and Defendant Blagojevich?

8  A   They were very close friends.

9  Q   And did you talk with Kelly from 2003 to 2006

10 about Defendant Blagojevich?

11 A   Yes.

12 Q   And what, if anything, did Kelly indicate about

13 his relationship with Defendant Blagojevich in that

14 time frame?

15        MR. GILLESPIE:  Objection.  Can we have a

16 date on this, please?

17        THE COURT:  The best date you can have.

18 BY MR. NIEWOEHNER:

19 Q   You had a number of conversations between '03 and

20 '06, is that right?

21 A   Yes.

22 Q   Do you recall the specific day of any of these

23 particular conversations?

24 A   Not particular days, no.

25 Q   So, generally speaking, do you recall those

1  conversations?

2  A  Which conversations are these that you're

3  referring to now?

4  Q  2003 to 2006 when you are talking to Chris Kelly,

5  do you generally recall what you were talking about?

6  A  I mean, we had many, many conversations, but --

7  Q  Right.  And so when you're talking about these

8  conversations, do you have a general recollection of

9  them as opposed to a specific recollection?

10  A  More of a general recollection.

11  Q  Okay.  And what did Mr. Kelly indicate, generally

12  speaking, about his relationship with Defendant

13  Blagojevich?

14  A  That he was very close to him and they spoke

15  often.

16  Q  Now I'm going to direct your attention to the

17  2003 to 2005 time frame now.

18         Was there a particular state policy issue

19  that you were concerned about in that time period?

20  A  Yes.

21  Q  And what was that?

22  A  Generally, our industry is regulated into doing

23  many things that we need to do.  We have to

24  either -- we have to pass legislation sometimes.

25  Q  Were you interested, in that time frame, in the

1  possibility of putting gaming devices at the horse

2  race tracks?

3  A   Yes.

4  Q   Is that something you wanted to happen?

:16AM  5  A   Yes.

6  Q   Why was that?

7  A   Because it would broaden our fan base, it would

8  create additional revenues for the breeders and the

9  horses and the horsemen.

:16AM  10  Q   Did Defendant Blagojevich have the power to allow

11  racetracks to have gaming devices at the tracks?

12  A   He had some authority over it, but also the State

13  Senate and House had probably a larger role.

14  Q   Was there going to be a law that had to be passed

:16AM  15  before you would be allowed to put gaming devices at

16  the racetracks?

17  A   Yes.

18  Q   And did the Illinois legislature ever pass a bill

19  that allowed the racetracks to have gaming devices

:17AM  20  in that time frame?

21  A   No.

22  Q   As a result, did Defendant Blagojevich ever have

23  the power to sign a bill that would allow that to

24  happen?

:17AM  25  A   No.

1  Q   I'm going to turn your attention now to 2006.

2        In that year, was there a law passed that

3  affected your racetracks?

4  A   Yes.

:17AM  5  Q   And what, generally speaking, did that law do?

6  A   That law was a tax on riverboat casinos that

7  benefited the Illinois agricultural industry in the

8  form of horse racing.

9  Q   And about when did that law go into effect?

:17AM  10  A   May of 2006.

11  Q   You understand what I'm talking about if I refer

12  to that law as the 2006 law?

13  A   Yes.

14  Q   And under the 2006 law, were your racetracks

:17AM  15  supposed to receive any money?

16  A   Yes.

17  Q   And were other parts of the horse racing industry

18  also supposed to receive money in the 2006 law?

19  A   Yes.

:18AM  20  Q   About how long did the 2006 law provide that

21  casinos would pay those tax?

22  A   It was after 2 years the legislation would sunset

23  or expire.

24  Q   So under the law, what happened in May of 2008?

:18AM  25  A   I'm sorry, could you say that again?

1  Q   Under the law, what was supposed to happen in May

2  of 2008?

3  A   In May of 2008 we tried to get the bill, which

4  had just expired, extended.

:18AM   5  Q   Okay.  And did the bill -- the 2006 law, was it

6  still in effect as of May 2008?

7  A   I believe it ended some time in May 2008.  I

8  don't know specifically which date.

9  Q   Going back to the 2006 time frame, did Defendant

:18AM  10  Blagojevich sign the 2006 law?

11  A   Yes.

12  Q   He signed it into law, I should say.

13  A   Yes.

14  Q   Was there any public signing ceremony that

:19AM  15  related to his signing of that bill in 2006?

16  A   No.

17  Q   Now, did the horse racing industry actually

18  receive any money from the casinos from May 2006

19  through May of 2008?

:19AM  20  A   No.

21  Q   Why not?

22  A   Because the riverboat casinos contested certain

23  aspects of the bill, six of them in total.

24  Q   Were there any lawsuits filed about this law?

:19AM  25  A   Yes.

1  Q   Who filed the lawsuits?

2  A   The riverboats.

3  Q   And as a result of the lawsuits, was any money

4  actually given to your racetracks?

5  A   No.

6  Q   About how much money were the casinos supposed to

7  pay the racing industry in that period under that

8  2006 law?

9  A   I don't know the exact number.  It depended.  It

10 was a percentage of their overall business, which

11 fluctuated, but it was -- it was around $30 million

12 a year, approximately, to be divided up between all

13 the entities.

14 Q   Okay.  And your racetracks would receive some

15 portion of that approximately 30 million?

16 A   Yes.

17 Q   And the reason the money wasn't being held, was

18 that because it was being held due to the lawsuits?

19 A   Yes.

20 Q   Now, in May of 2008, you said the 2006 law was to

21 expire.  Around that time frame, did you do anything

22 about the fact that the bill was going to expire?

23 A   Yes, we lobbied--"we" being defined as, you know,

24 all the entities concerned with racing--to get it

25 extended.

1  Q   Did the Illinois legislature meet in the spring

2  of 2008?

3  A   They did.

4  Q   Was there a law passed in the spring of 2008 that

5  would extend that casino tax?

6  A   No.

7  Q   So as a result, what happened to the tax?

8  A   It expired.

9  Q   I'm going to direct your attention to April

10  of 2008.

11      Did you talk with Defendant Blagojevich in

12  that month?

13  A   I did.

14  Q   Where did you talk with him?

15  A   In his Friends of Blagojevich campaign office.

16  Q   About where was that located?

17  A   Downtown Chicago, Ravenswood street, avenue.

18  Q   Was anyone present for that meeting?

19  A   Yes.

20  Q   Who else?

21  A   Myself, Lon Monk, and the Governor.

22  Q   Why was Lon Monk present for the meeting?

23  A   I asked him to arrange the meeting.  At that

24  point, he was a consultant, a lobbyist for us, and I

25  wanted to have a face-to-face with the Governor to

 1  explain to him the state of the industry.

 2  Q   How did you first get to know Lon Monk?

 3  A   I'd met him, I don't know exactly when and where,

 4  but over time when he was the Chief of Staff for the

 5  Governor.

 6  Q   And about when did you hire Monk as a lobbyist?

 7  A   It was, I believe, in the spring of 2007.

 8  Q   Why did you hire Monk?

 9  A   I hired Lon because, ah, I knew he had a good

10  relationship with the Governor and many other

11  legislators, I got along with him, and so our

12  competitors wouldn't hire him.

13  Q   What types of things did Monk do for you?

14  A   He would -- you know, he was supposed to be our

15  liaison to the Governor's Office.

16  Q   Now, going back to this meeting in April of 2008,

17  why did you want to meet with Defendant Blagojevich

18  at that meeting?

19  A   Just to try to educate him and get him up to

20  speed on the different things that were going on in

21  the industry, so if he agreed with them, that he

22  could help champion some of our causes.

23  Q   Did you talk about the 2006 law when you met with

24  Defendant Blagojevich in April of '08?

25  A   Yes.

1  Q   And what did you talk about with respect to the
2  2006 law?
3  A   I just told him that it expired, that we were
4  seeking to get it renewed.  I went through our
5  overall legislative agenda.
6  Q   Did you argue in favor of getting the 2006 law
7  extended?
8  A   Yes.
9  Q   How did Defendant Blagojevich respond to what you
10  said?
11  A   He absorbed everything I said, took it in, asked
12  some questions, you know, was very courteous, and
13  that's it.
14  Q   Did Defendant Blagojevich make a commitment
15  either way as to whether he would support extending
16  the 2006 law?
17  A   He seemed to have heard what I said, but he
18  didn't give any indications what he would do.
19  Q   Did he tell you he was not going to support
20  extending the 2006 law?
21  A   No.
22  Q   Was fundraising discussed at your meeting with
23  Defendant Blagojevich?
24  A   Just briefly.  When I was leaving, in small talk,
25  the Governor just said -- he thanked me for

Johnston - direct by Niewoehner                    2145

1  supporting him in the past and hoped I continued to
2  do so in the future.
3  Q   What did you understand Defendant Blagojevich to
4  mean when he said that?
5  A   He'd probably appreciate a future contribution
6  again.
7  Q   Now, you testified that you made your last
8  contribution to Defendant Blagojevich in December
9  of 2007, do you recall that?
10 A   Yes.
11 Q   In April of 2008, did you want to make a
12 contribution to Defendant Blagojevich at that point
13 in time?
14 A   No.
15 Q   At that point had the Illinois legislature passed
16 any bills relating to the horse racing industry that
17 Defendant Blagojevich could sign?
18 A   No.
19 Q   Did you feel any pressure to make a contribution
20 at that particular point in time?
21 A   No.
22 Q   Did you actually agree to make a contribution in
23 your April meeting with Defendant Blagojevich?
24 A   No.
25 Q   Did you make -- did you, in fact, make any

1  contribution to Defendant Blagojevich after your

2  2008 meeting?

3  A   No.

4  Q   I'm going to turn your attention now to the

5  summer or early fall of 2008.

6          Did you have a conversation with Defendant

7  Blagojevich in that time frame?

8  A   I did.

9  Q   Was that in person or over the phone?

10  A   Over the phone.

11  Q   Did you call him or did he call you?

12  A   He called me.

13  Q   What did you discuss in that call?

14  A   I believe the call was in around mid-August.  He

15  called me in my office.  It was primarily small

16  talk.  And the only thing I remember is basically he

17  was inquiring whether or not I was going to attend

18  the DuQuoin State Fair in a couple of weeks which

19  was at the end of August.

20  Q   After you spoke with Defendant Blagojevich, did

21  you meet with Lon Monk again?

22  A   Yes.

23  Q   And did you meet with him more than one time?

24  A   Yes.

25  Q   And about -- focusing on the October, November

1  time frame, did you meet with Monk in that time
2  frame?
3  A   Yes.
4  Q   Did Monk ask you in that time frame to do any
5  fundraising for Defendant Blagojevich?
6  A   Yes.
7  Q   And prior to -- and prior to those conversations
8  with Monk, had you made any contributions in 2008?
9  A   No.
10  Q   When Monk -- who initiated the idea of making a
11  contribution, did you or did he?
12  A   I never brought it up, so it was always brought
13  up by Lon.
14  Q   When Monk raised that topic, did you, in fact,
15  want to make a contribution to Defendant Blagojevich
16  in the October, November 2008 time frame?
17  A   Not necessarily.
18  Q   Did you agree to make a contribution to Monk?
19  A   No.
20  Q   Did you ever tell Monk you were not going to make
21  a contribution?
22  A   No.
23  Q   How did you generally handle Monk's requests for
24  contributions?
25  A   I would just generally try to deflect the

 1  conversation to another subject matter and never
 2  really brought it up.
 3  Q   What types of things did you talk about in terms
 4  of fundraising when Monk initiated these
 5  conversations?
 6  A   What type of what?
 7  Q   What types of things might you say to Monk when
 8  you tried to deflect the conversation?
 9  A   I would just try to just literally change the
10  subject matter.
11  Q   Did you talk about an individual named David
12  Gupta?
13  A   I did.
14  Q   Who is David Gupta?
15  A   David Gupta is a person I know who was going to
16  conduct a fundraiser for Governor Blagojevich some
17  time in the fall of 2008.
18  Q   And did you talk with Monk about Gupta when you
19  were discussing fundraising?
20  A   I did.
21  Q   What types of things did you say about Gupta?
22  A   I said that David Gupta had called me up, he'd
23  mentioned he was going to have a fundraising event
24  for the Governor, that I would probably attend.
25  Q   Did you suggest you might do any fundraising in

1  association with Gupta's event?

2  A   Yeah, I suggested that if I went I would

3  probably, you know, contribute to the event.

4  Q   Why were you talking about David Gupta event's

5  with Monk?

6  A   Because I knew it was going to be a future event

7  and that allowed me to put off the conversation

8  easily.

9  Q   Was there a reason that you did not want to tell

10 Monk that you weren't going to make a contribution?

11 A   Yes, just because I know that fundraising was

12 important to the Governor and to Lon sometimes and

13 that I didn't necessarily want to always tell them

14 no.

15 Q   All right.  Did the Illinois legislature actually

16 meet in November 2008?

17 A   They did.

18 Q   And did you have an interest in any legislation

19 that was before the Illinois legislature in November

20 of 2008?

21 A   Yes.

22 Q   And what legislation was that?

23 A   It was the extension of the bill that expired in

24 May of 2008.

25 Q   Did you try to do anything to help that

1  legislation?

2  A   Yes.

3  Q   What did you do?

4  A   I spent the two-week session, I spent most of

5  that time in Springfield.

6  Q   Did the Illinois legislature end up passing a

7  bill that extended the 2006 law?

8  A   Yes.

9  Q   What did that bill do?

10  A   It extended the expired bill for an additional

11  3 years.

12  Q   Do you understand if I refer to that bill as the

13  racetrack bill?

14  A   Yes.

15  Q   What entities were to receive money under the

16  racetrack bill?

17  A   The same entities, the 2006 was earmarked for the

18  horsemen and their racetracks.

19  Q   Were you in favor of the racetrack bill?

20  A   Yes.

21  Q   Why was that?

22  A   Because it provided much needed revenues for all

23  the sectors of the industry.

24  Q   And did you have an idea in November of 2008

25  about how much your racetracks might benefit if the

1  bill were extended?

2  A   Yes, it was approximately 1 and a half million

3  dollars a year per track, approximately 4500 a day

4  or 9,000 per day for both of our facilities.

:31AM  5  Q   So it would be $4,500 for each individual track,

6  so a total of 9,000 a day?

7  A   Correct.

8         MR. NIEWOEHNER:  Your Honor, could I publish

9  what was previously been admitted as Government

:31AM  10  Exhibit 2008 Racetrack Legislative History?

11         THE COURT:  You may.

12         MR. NIEWOEHNER:  May I also approach?

13         THE COURT:  You may do that, as well.

14      (Exhibit published to the jury.)

:31AM  15  BY MR. NIEWOEHNER:

16  Q   And looking at Government Exhibit 2008 Racetrack

17  Legislative History, could you turn to the fifth

18  page of the exhibit, the very last page.

19         And if you focus at the last couple of lines,

:32AM  20  it shows -- I'm looking at the entry that says

21  November 20th, 2008, do you see that?

22  A   I do.

23  Q   What happened on that date?

24  A   The legislation passed both the House and the

:32AM  25  Senate by an overwhelming supermajority vote.

1  Q   And did the racetrack bill become law at that
2  point?
3  A   No.
4  Q   What had to happen before it became law?
5  A   There were some procedural matters, but
6  eventually it would be sent to the Governor and he'd
7  have to either sign it, veto it, or do nothing, it
8  would become law within 60 days.
9  Q   And based on the legislative history, what day
10 was the bill sent to the Governor?
11 A   It was sent to the Governor on four days after
12 its passage on November 24th.
13 Q   Now, after that procedural step occurred on
14 November 24th, was there anything preventing
15 Defendant Blagojevich from signing that bill into
16 law?
17 A   No.
18 Q   When did you want Defendant Blagojevich to
19 actually sign the bill?
20 A   As soon as possible.
21 Q   Why did you want him to sign it as soon as
22 possible?
23 A   So that it would become effective and that part
24 of the process would be over.
25 Q   Now, you earlier mentioned that the 2006 law had

1 been challenged in lawsuits, do you recall that?

2 A  Yes.

3 Q  In November of 2008, did you anticipate that the

4 casinos might file similar lawsuits relating to the

5 racetrack?

6 A  Yes.

7 Q  And if lawsuits were filed by the casinos in

8 November of 2008, did you expect that even though

9 the law were passed, you were going to receive money

10 right away?

11 A  We didn't expect to receive money.

12 Q  What did you expect might happen if casinos filed

13 a lawsuit after the racetrack bill were passed?

14 A  That it would go into an escrow account.

15 Q  So the money would be set aside for you, is that

16 right?

17 A  Not just for me but for everybody, yes.

18 Q  Sorry.

19      So even though you weren't necessarily going

20 to collect the money right away in November of 2008,

21 did you still want the bill to be signed right away?

22 A  Yes.

23 Q  Why was that?

24 A  Basically, as I said, just to get the matter

25 resolved, the issue behind us.

1  Q   And, ultimately, did you hope to get money from
2  the racetrack bill even if it were delayed?
3  A   Yes.
4  Q   Now, what was the term that the racetrack bill
5  extended the 2006 law?  How many years?
6  A   The extension was from November of 2008 through
7  November 2001, a 3-year extension.
8  Q   Were there things in the racetrack bill that
9  meant that the tax might not actually be collected
10 for the entire 3 years?
11 A   Yes, there were some provisions in the law that
12 would preempt it from going, if they occurred, that
13 would preempt it from going its full 3 years.
14 Q   And if the bill did not go the entire 3 years, if
15 the bill didn't get signed right away, would you
16 lose days where the tax would be collected?
17 A   Yes.
18 Q   And in terms of this escrow fund you talked
19 about, would that start before the bill became law
20 or would it start after the bill became law?
21 A   After the bill became law.
22 Q   Now, from your perspective, was there any
23 significant difference between the law that passed
24 in 2006 and the racetrack bill in terms of the
25 casinos' tax?

:34AM

:35AM

:35AM

:35AM

:35AM

Johnston - direct by Niewoehner                    2155

1  A   I'm sorry, could you say that again?
2  Q   From your perspective, was there any difference,
3  was there any real difference between the 2006 law
4  and the racetrack bill in terms of how the casinos'
5  tax was going to work?
6  A   No, it was virtually very similar, if not
7  identical.
8         MR. NIEWOEHNER:  Your Honor, may I publish
9  what's been previously admitted as Government
10  Exhibit 2006 Legislative History?
11         THE COURT:  You may.
12      (Exhibit published to the jury.)
13  BY MR. NIEWOEHNER:
14  Q   And, again, Mr. Johnston, if you could just focus
15  on the very last page of the -- excuse me, the
16  second to the last page of the exhibit -- no, it is
17  the last page.  Excuse me.
18         And in 2006, how long did it take Defendant
19  Blagojevich to sign the bill from when he received
20  it from the Illinois legislature?
21  A   One day.
22  Q   Now, as part of your lobbying, did you follow
23  public statements made by different Illinois
24  governmental leaders about the racetrack bill?
25  A   I don't know which one you are referring to, but,

1  I mean, I read the papers.

2  Q   Well, in November of 2008 time frame, you were

3  following the progress of the racetrack bill, is

4  that right?

5  A   Yes.

6  Q   And as part of your lobbying, were you trying to

7  pay attention to any public statement that was made

8  by any Illinois leader who might have an --

9  A   Sure.  Absolutely.

10  Q   Did Defendant Blagojevich make any public

11  statement in that time frame that made you think he

12  wasn't going to sign the racetrack bill?

13  A   No.

14  Q   As of November 2004 -- excuse me.

15       As of November 24th of 2008, did you expect

16  that Defendant Blagojevich was, in fact, going to

17  sign the racetrack?

18  A   Yes.

19  Q   Did you talk with Monk after the 2008 racetrack

20  bill was sent to Defendant Blagojevich for

21  signature?

22  A   Yes.

23  Q   Did you have more than one conversation with

24  Monk?

25  A   Yes.

1  Q   What did you say to Monk in those conversations?

2  A   Generally, if he could get the Governor to sign

3  the bill, answer any questions that he and his staff

4  may have regarding it, but, other than that, just

5  basically try to get the Governor to sign it.

6  Q   Did you talk to Monk about when you wanted the

7  bill to be signed?

8  A   Yes; as soon as possible.

9  Q   And did you tell Monk about how much money your

10 racetracks might collect under the racetrack bill on

11 a daily basis?

12 A   Yes.

13 Q   What did you indicate to Monk?

14 A   I told him what I stated earlier, that it's

15 affecting the entities that I represented, which was

16 about $9,000 a day.

17 Q   I'm going to direct your attention to

18 December 3rd of 2008.

19      Did you go to work that day?

20 A   I did.

21 Q   Where did you go to work?

22 A   At my office at Maywood Park Racetrack.

23 Q   Did you, at the beginning of the day, did you

24 have any plans to meet with Monk?

25 A   No.

1  Q   Did you speak with Monk that day?

2  A   I did.

3  Q   And did you speak, initially, did you speak by

4  phone or in person?

5  A   By phone.

6  Q   Now, have you had the opportunity to listen to

7  recordings of two phone calls that you had with Monk

8  on December 3rd?

9  A   I did.

10 Q   And do you recall, focusing on the second call,

11 do you remember exactly the words that Monk used

12 when he was talking to you about in that call?

13 A   Well, he originally called to see if I was in the

14 office.  It was a very brief conversation.  Then he

15 called back shortly thereafter and asked two things,

16 he stated that he was coming from the Friends of

17 Blagojevich office on Ravenswood and that he also

18 asked for what I thought the quickest way to get to

19 the track was.

20 Q   And when Monk was indicating that he was leaving

21 the campaign office, was that important to you?

22 A   Yes.

23 Q   Why was that important?

24 A   Well, I thought the good was that he would get --

25 he would have the latest information on what the

1  status of the bill was, and I also thought the bad

2  was that they might--"they" meaning him and the

3  Governor--might have discussed fundraising.

4  Q   And why did you think it would be bad if Monk and

5  the Governor had been talking about fundraising?

6  A   Well, two reasons:  That wasn't, you know, of

7  much interest or importance to me at that time, and

8  also that the two being mixed together was not

9  something I cared to discuss.

10 Q   Did you know why Monk wanted exactly to talk with

11 you when he spoke with you on the phone?

12 A   No.

13 Q   From your perspective, was there any reason you

14 simply couldn't talk to Monk on the phone to discuss

15 whatever it was he wanted to talk about?

16 A   No, we could've spoken on the phone.

17 Q   Did Monk come to see you that day at the Maywood

18 Park track?

19 A   He did.

20 Q   Who met with him?

21 A   Myself, my father was in the office, and just

22 Lon.

23 Q   Why was your father at this meeting?

24 A   When Lon called and said he was on his way over

25 from the campaign office, I started thinking that

1  maybe the contribution subject might come up and

2  Billy is kind of an ornery SOB, and I knew that, if

3  he was in the conference room, that it would be less

4  likely that Lon would bring up contributions because

5  in the past Billy had rattled Lon's cage about

6  contributions once before.

7  Q   Is Billy your father?

8  A   Yes.

9  Q   Did you think Monk would be comfortable talking

10 about fundraising in your father's presence?

11 A   I thought he'd be uncomfortable talking about it.

12 Q   Now, prior to Monk's arrival at your office, did

13 you still think Defendant Blagojevich was going to

14 ultimately sign the racetrack?

15 A   Yes.

16 Q   Where in the office did you meet with Monk?

17 A   In the conference room.

18 Q   What did you discuss with Monk while your father

19 was present?

20 A   We spoke briefly some small chitchat.  Lon told

21 me about how he was going to see his ailing father.

22 We talked about Thanksgiving.  Spoke about the

23 legislation, briefly, and then we concluded that,

24 you know, he knows the subject matter very well,

25 we've gone over it many, many times with him, and

1  that was about it.

2  Q   Did you talk about the status of the racetrack

3  bill?

4  A   Yes.

5  Q   And at that point what was the status?

6  A   That it was still sitting, you know, still

7  waiting the Governor's signature.

8  Q   At some point did Monk leave the conference room?

9  A   He did.

10 Q   What happened when he left the conference room?

11 A   He asked if I could walk him out to the parking

12 lot.

13 Q   And from what Monk said, did you understand he

14 wanted your father to accompany you?

15 A   No, it appeared to me that he wanted to be alone

16 with me.

17 Q   What did your father do at that point?

18 A   He walked to his office.

19 Q   Where did you and Monk go?

20 A   We went down the stairs, you know, heading

21 towards the receptionist area where the exit was.

22 Q   Was anyone -- did you stop at any point?

23 A   Well, he stopped in the vestibule at the bottom

24 of the stairs where nobody was around and he turned

25 to me and he said, "one more thing, I spoke to the

Johnston - direct by Niewoehner                    2162

1  Governor and he's concerned that if he signs the
2  racing legislation, that you might not be
3  forthcoming with a contribution."
4  Q   Now, are those his exact words that Monk used?
5  A   I don't know if they're identical, but, you know,
6  to that effect.
7  Q   How did you respond?
8  A   I responded negatively, animated, agitated.  I
9  said, "I thought that's what the Governor might be
10 thinking."  I said, "your suggestion of contribution
11 at this time was inappropriate."
12 Q   How did Monk react?
13 A   At that point he turned to me and he said -- kind
14 of rubbed his hands together and says, "okay,
15 different subject matter:  I really need you to get
16 a contribution in by the end of the year."
17 Q   How did you react to that statement?
18 A   At that point I realized I was in an
19 uncomfortable situation.  I wanted to deflect the
20 question in the conversation and get him out the
21 door and basically told him that I supported the
22 Governor in the past, I was leaving town in a couple
23 of weeks for a family vacation, and I just shut the
24 conversation down.
25 Q   I want to go back to the first thing that Lon

:44AM
:44AM
:45AM
:45AM
:45AM

1  Monk said to you.

2       When he indicated that he spoke with the

3  Governor, what did you understand him to mean?

4  A  He's telling me that he spoke to the Governor and

5  I assumed that it was, you know, from where he was

6  coming from, earlier in the day.

7  Q  And where was Monk coming from earlier in the

8  day?

9  A  The Friends of Blagojevich office.

10 Q  Was it important to you that Monk had indicated

11 he had just spoken with Defendant Blagojevich?

12 A  Yes.

13 Q  Why?

14 A  Well, you know, the fate of the legislation

15 somewhat lied in the Governor's hands and that if

16 he's telling me what he told me, that that was a

17 concern of mine.

18 Q  And when you say the fate of the legislation was

19 in his hands, what do you mean?

20 A  Well, I meant that ultimately it was and wasn't,

21 because it could become law without his action, but

22 I meant that by him, he could delay the process.

23 Q  Who was going to decide whether to sign the bill

24 at that point?

25 A  The Governor.

1  Q   Now, when Monk went on to say words to the
2  effect, that he's concerned that if he signs the
3  bill or the legislation a contribution won't be
4  forthcoming, what did you understand Monk to mean?
5  A   I took him to mean that they were looking for a
6  contribution and that they were possibly linking the
7  two together.
8  Q   From what Monk said, what did you understand
9  Defendant Blagojevich wanted to happen first?
10  A   A contribution.
11  Q   When did Monk indicate Defendant Blagojevich
12  wanted the contribution by?
13  A   By the end of the year.
14  Q   What did you think was going to happen if you
15  didn't make a contribution?
16  A   That there could be a possible delay in the
17  Governor signing the bill.
18  Q   And why did you think there would be a potential
19  delay?
20  A   Because I thought that they might want a
21  contribution, or an assurance of a contribution,
22  before they make a decision, or for whomever, made a
23  decision on what they were going to do.
24  Q   What did you think was going to happen if you did
25  make a contribution?

 1  A   I would -- it would be speculative, but I would
 2  imagine if I'd make a contribution, they'd cash the
 3  check and sign the bill.
 4  Q   Based on what Monk said, were you concerned that
 5  Defendant Blagojevich was going to veto the
 6  racetrack bill?
 7  A   I wasn't concerned that he was going to veto it,
 8  no.
 9  Q   Were you concerned he would never sign the
10  racetrack bill?
11  A   No.
12  Q   What was your concern?
13  A   My concern was that they just delay the process.
14  Q   And why were you concerned about delaying the
15  process?
16  A   Just because we wanted to get the -- the bill
17  signed and behind us.
18  Q   And at that point how much money were your tracks
19  going to receive a day once the bill got signed?
20  A   Approximately $9,000 a day.
21  Q   Was there any question in your mind about what
22  Monk was communicating to you?
23  A   No, not at that point.
24  Q   Did you feel pressure as a result of what Monk
25  said?

1  A   Yes.

2  Q   What did you feel pressured to do?

3  A   I felt pressure -- I don't know.  I knew I was

4  never going to write a check, so I didn't ultimately

5  feel pressure, but I did not like being put in an

6  uncomfortable situation like he had put me in.

7          He was supposed to be working on my behalf to

8  further the racing's interests and he wasn't doing

9  it when he's sitting there talking about

10 contributions when I wanted to be talking about

11 things that would benefit horse racing.

12 Q   What did you understand Monk was pressuring you

13 to do?

14 A   Write a check.

15 Q   How did you feel when you heard Monk say that?

16 A   I was angry.

17 Q   And you said in response to Monk's statement, you

18 said something to the effect of, "I thought this was

19 what the Governor might be thinking," what did you

20 mean when you said that?

21 A   That I didn't think the thought probably

22 originated from Lon, I thought it probably was

23 coming from the Governor's Office, and that at that

24 point he was indeed, you know, really insistent on

25 getting the contribution in by the end of the year.

1 Q   And did you understand that that contribution was
2 linked in some way -- that the bill was linked to
3 the contribution?
4 A   I was starting to get that sense.
5 Q   Now, you also mentioned, you talked about the
6 timing of the contribution as not being appropriate,
7 do you recall that?
8 A   Yes.
9 Q   What did you mean when you said that?
10 A   What I meant by that was that there's never been
11 a discussion between myself and Lon, or anybody for
12 that matter, on correlating contributions to actions
13 or inactions, and I felt as though, for the first
14 time, that the two were starting to be linked by
15 their actions and words.
16 Q   So at that point you thought the contribution was
17 being linked to the bill signing?
18 A   Yes.
19 Q   And why did you tell Monk that the timing would
20 be inappropriate?
21 A   Because of the perception.  If I gave them a
22 check, they would cash it and then probably the bill
23 would be signed in a similar time frame and it just
24 would look wrong.
25 Q   Why did you bring up that problem?

:50AM
:51AM
:51AM
:51AM
:51AM

1  A   Because I -- I didn't want it to happen.  It
2  wasn't going to happen.
3  Q   So at that point, did you think that Monk was
4  actually linking the signing and the contribution or
5  he was just talking about there might be a
6  perception problem?
7  A   No, I think he was actually -- it was reality.
8  He was thinking it.
9  Q   He was linking it?
10  A   He was linking it.  He just wasn't perceiving it.
11  Q   Now, when Monk responded by wiping his hands and
12  saying different subjects, what did you understand
13  Monk to be saying?
14  A   That he was separating the two items in his mind.
15  Q   Which two things did you understand he was
16  separating?
17  A   The part of the conversation that we were having
18  about contributions and then the earlier
19  conversation that day about the legislation.
20  Q   Based upon what Monk said, did you actually
21  believe that the contribution and the bill signing
22  were two different matters?
23  A   No.
24  Q   Why not?
25  A   Because just 'cause he put his hands together and

1  says "a different subject matter" doesn't make it

2  so, and also he furthered the conversation, he

3  didn't put an end to it.

4  Q   And when you say he furthered the conversation,

5  what do you mean?

6  A   He came right back and said, after he said "two

7  different subject matters," he said I'd like you to

8  still make a contribution by the end of the year.

9  Q   So were you convinced, when Monk said that they

10  were two separate matters, that the bill signing and

11  the contribution were, in fact, two different

12  matters?

13  A   I wasn't convinced at that point.

14  Q   Now, you said you suggested -- or that you told

15  Monk that you had supported Blagojevich in the past,

16  do you recall that?

17  A   Yes.

18  Q   What did you mean when you said that?

19  A   I was just trying to throw out a little

20  pleasantry there, and it was a fact, and trying to

21  get him just to back off.

22  Q   And when you say you were trying to get him to

23  back off, what do you mean?

24  A   Stop furthering the conversation on that subject

25  matter.

1  Q   And you also indicated that you were going on a
2  holiday with your family, do you recall that?
3  A   Yes.
4  Q   Were you, in fact, going on a holiday with your
5  family?
6  A   Yes.
7  Q   Why did you talk about going on a holiday with
8  your family?
9  A   I was just trying to, you know, create some, you
10 know, difficulties, present some difficulties on the
11 why, other than saying, you know, "no, go fly a
12 kite" on why I wasn't going to be coming up with a
13 contribution.
14 Q   Could you have made a contribution before the end
15 of the year, if you wanted to?
16 A   Yes.
17 Q   So why were you trying -- why didn't you tell
18 Monk to go fly a kite?
19 A   Because I was concerned that when somebody is
20 asking you for something and you say no, they might
21 react negatively.  Not so much Lon, but I assumed he
22 would take that message back to the Governor's
23 Office and I didn't know what would happen.
24 Q   What were you afraid might happen if Monk took
25 the message back that you weren't going to make a

1  contribution?

2  A   I didn't know what to think at that time other

3  than it could create a delay in the bill signing.

4  Q   What did Monk do after your conversation?

5  A   I showed him the door.  I never spoke to him

6  again, never wrote the contribution check.

7  Q   Did you take any steps to even try to make a

8  contribution?

9  A   No.

10  Q   Did anyone else from Blagojevich's campaign ask

11  you for a contribution?

12  A   No.

13  Q   Were you aware that Defendant Blagojevich was

14  arrested on December 9th?

15  A   Yes.

16  Q   Had Defendant Blagojevich signed the racetrack

17  bill prior to December 9th?

18  A   No.

19       MR. NIEWOEHNER:  No further questions, Your

20  Honor.

21                 CROSS EXAMINATION

22  BY MR. S. F. ADAM:

23  Q   Good morning, Mr. Johnston.

24  A   Good morning.

25       How are you, sir.

Johnston - cross by S. F. Adam                    2172

1  Q   My name is Sam Adam.  I represent the Governor.
2  A   Okay.
3  Q   You said this morning that you're testifying
4  today under a grant of immunity?
5  A   That's correct.
6  Q   That means that you have to tell the truth, and
7  if you don't tell the truth you'd be prosecuted, do
8  you understand that?
9  A   Yes.
10  Q   But you have told the truth, haven't you?
11  A   I have.
12  Q   Now, you don't fear incrimination by your
13  testimony on anything, do you?
14          MR. NIEWOEHNER:  Objection, Your Honor.
15          THE COURT:  The objection is sustained.
16  BY MR. S. F. ADAM:
17  Q   Is there any crime that you know that you have
18  committed with respect to this horse racing
19  contribution issue that you have been engaged in?
20  A   I believe I haven't committed --
21          MR. NIEWOEHNER:  Objection.
22          MR. S. F. ADAM:  What is it, Your Honor?
23          THE COURT:  I will let his answer stand.
24  BY MR. S. F. ADAM:
25  Q   Now, Mr. Johnston, you are an officer in the

:56AM

:57AM

:57AM

:57AM

:57AM

Johnston - cross by S. F. Adam                    2173

 1  Balmoral Race Club and the Maywood Park Trotting
 2  Association, is that right?
 3  A   Yes.
 4  Q   And your family and you run the Racing
 5  Association of Illinois which controls the money
 6  with respect to the racing business that you
 7  control, is that right?
 8  A   Yes.
 9  Q   Now, you yourself, in addition to being a
10  racetrack owner, you yourself are a lobbyist, aren't
11  you?
12  A   I'm a registered lobbyist, yes.
13  Q   And besides Lon Monk, you and your family have
14  used other lobbyists, haven't you?
15  A   Yes.
16  Q   Now, as I understand your testimony here, you met
17  the Governor one time in Chicago in May around 2002,
18  is that right?
19  A   Yes.
20  Q   That was the first time you ever met him?
21  A   Yes.
22  Q   And when you met him, you talked about racing in
23  general and racetracks, and so forth, didn't you?
24  A   Yes.
25  Q   And you're very pleased to talk about racing,

1  aren't you?

2  A   Yes.

3  Q   And it's your business and you're proud of your

4  business, aren't you?

5  A   I love it.

6  Q   Love it.

7        And whenever you get a chance, you take the

8  opportunity to educate people about racing, don't

9  you?

10 A   Yes.

11 Q   And you like to do that?

12 A   Yes.

13 Q   And you did that with the Governor in May

14 of 2002, didn't you?

15 A   Yes.

16 Q   And at all times while you were talking to him,

17 he was friendly to you?

18 A   Yes.

19 Q   You were friendly to him?

20 A   Yes.

21 Q   You, in fact, have described that meeting as the

22 Governor being affable.  That's a good word for it,

23 wasn't it?

24 A   That's the word I used, yes.

25 Q   And it fit appropriately, didn't it?

1  A   Yes.

2  Q   Now, when you talked to the Governor at that time

3  about horse racing, he seemed to be interested in

4  it, to a certain degree, didn't he?

5  A   Yes.

6  Q   And after that, you saw the Governor at various

7  places such as the East Bank Club?

8  A   I don't recall that event, but I saw him at

9  several places over the years, yes.

10 Q   Hotel Alegro?

11 A   Yes.

12 Q   That's where Chris Kelly made some kind of a

13 speech there, didn't he?

14 A   That might have been -- actually, I do remember

15 going to the East Bank Club.  He was at the East

16 Bank Club, that speech.

17 Q   You saw the Governor?

18 A   Yes, to answer your question.

19 Q   And you saw the Governor at downstate racetrack

20 or state fair?

21 A   Yes.

22 Q   What was that?  DuQuoin?

23 A   DuQuoin.

24 Q   Talked to him, generally, about racing?

25 A   Yes.

1  Q   Never talked to you about campaign contributions

2  at any of those meetings, did he?

3  A   No, he did not.

4  Q   First time you ever talked to the Governor at all

:01AM   5  was when you asked for a meeting, at all about the

6  campaign, was when you asked for a meeting in 2006,

7  is that right?

8  A   I'm not --

9  Q   Let me strike that question.

:01AM   10        Did you see the Governor at the Friends of

11  Blagojevich campaign headquarters in 2006 with Chris

12  Kelly?

13  A   I can't recall in 2006.

14  Q   Let me ask you this question:  You don't recall

:01AM   15  if you did or you didn't?

16  A   Not in 2006.  I don't recall, sorry.

17  Q   Okay.  Associates of the Governor, such as Chris

18  Kelly, which you met, they never related the

19  contributions that you had made to the Governor's

:02AM   20  campaign for favorable consideration, did they?

21        MR. NIEWOEHNER:  Objection.

22        THE COURT:  Sustained.

23  BY MR. S. F. ADAM:

24  Q   Well, let me ask you this, do you recall being

:02AM   25  interviewed by FBI Special Agent Daniel Cain,

1  Special Agent Ginger Miller on the 5th of January

2  2009?  Do you remember that?

3  A  Not specifically, but I've met them both.

4  Q  You know Agent Cain, don't you?

5  A  I do.

6  Q  You know Special Agent Ginger Miller?

7  A  Yes.

8        MR. NIEWOEHNER:  Your Honor, we object to

9  this line.

10        THE COURT:  I don't know where you're going

11  with this.

12        MR. S. F. ADAM:  I'm going to ask him --

13        THE COURT:  What somebody said to him?

14        MR. S. F. ADAM:  Yes.

15        THE COURT:  No.

16        MR. S. F. ADAM:  Very well, Judge.

17  BY MR. S. F. ADAM:

18  Q  In your previous meetings with Kelly, you said

19  that developed into a social friendship, is that

20  right?

21  A  Yes.

22  Q  Kelly seemed especially interested in horse

23  racing, didn't he?

24        MR. NIEWOEHNER:  Objection; relevance.

25        THE COURT:  Sustained.

1  BY MR. S. F. ADAM:

2  Q   What did Kelly seem interested in to you?

3        MR. NIEWOEHNER:  Objection.

4        THE COURT:  The objection is sustained.

:03AM  5  BY MR. S. F. ADAM:

6  Q   When you saw Kelly on at least one occasion,

7  Kelly talked to your father, didn't he?

8        MR. NIEWOEHNER:  Objection.

9        THE COURT:  The objection is sustained.

:03AM  10  BY MR. S. F. ADAM:

11  Q   Do you recall a conversation --

12        MR. NIEWOEHNER:  (Standing up.)

13        THE COURT:  You know, if this witness has

14  something --

:03AM  15        MR. S. F. ADAM:  What, Your Honor?

16        THE COURT:  If this witness has something,

17  some testimony that you believe might be useful to

18  you, then you can call him in your case.

19        MR. S. F. ADAM:  Very well, Your Honor.

:04AM  20  BY MR. S. F. ADAM:

21  Q   Were you present when your father talked to Kelly

22  about a campaign contribution?

23        THE COURT:  I don't think you got my point.

24        MR. S. F. ADAM:  I don't think I did, either.

:04AM  25        THE COURT:  The point is, if you want to try

1  to bring this stuff out, you're going to have to do

2  it in your case, not in their case, and then you can

3  make your arguments as to why it's relevant.

4         MR. S. F. ADAM:  Thank you, Your Honor.

:04AM  5  BY MR. S. F. ADAM:

6  Q   Your father is a very frank and outspoken man,

7  isn't he?

8         MR. NIEWOEHNER:  Objection.

9         THE COURT:  The objection is sustained.  I

:04AM  10  don't see the relevance of this.

11  BY MR. S. F. ADAM:

12  Q   Well, you said he was an ornery SOB, didn't you?

13  A   Don't tell him that, but --

14  Q   No.  Some of us have been called worse than that

:04AM  15  by our sons.

16         Kelly became you and your family's main point

17  of contact with the Governor, did he not?

18  A   Yes.

19  Q   In your social relationship with Kelly, it

:05AM  20  extended to Kelly and his wife and you and your wife

21  going to different places, didn't it?

22         MR. NIEWOEHNER:  Objection.

23         THE COURT:  The objection is sustained.

24  BY MR. S. F. ADAM:

:05AM  25  Q   Now, there came a time when you traveled to New

Johnston - cross by S. F. Adam                    2180

1    York with Kelly or saw Kelly there in Yankee
2    Stadium?
3              MR. NIEWOEHNER:  Objection.
4              THE COURT:  You know, is this all you got,
5    the rest of this stuff about what other people said?
6              MR. S. F. ADAM:  No, Your Honor.  That's not
7    all I have, no.
8              THE COURT:  Well, then, why don't you go on
9    to what --
10             MR. S. F. ADAM:  Well, this is a meeting the
11   Governor brought up.
12             THE COURT:  I think that your oblique
13   approach to this is going to raise issues that you
14   can only raise in your case.  Why don't you -- no,
15   as a matter of fact, I think I know where you're
16   going with that, too, and that is going to be part
17   of your case, not part of the examination of this
18   witness --
19             MR. S. F. ADAM:  Very well, Your Honor.
20             THE COURT:  -- in their case.  You can recall
21   him.
22   BY S. F. ADAM:
23   Q  When you go to a fundraiser, any fundraiser, you
24   always leave some contribution, if you can, don't
25   you?

1          MR. NIEWOEHNER:  Objection.

2          THE COURT:  That one is overruled.

3     BY THE WITNESS:

4     A   I think if you attend the fundraiser, it would be

5     unprofessional and in poor taste not to contribute

6     towards --

7     BY MR. S. F. ADAM:

8     Q   And you described --

9          I'm sorry.  I didn't mean to interrupt you.

10    A   -- towards that fundraiser.

11    Q   And you've described your feeling as "weird" if

12    you don't leave a check, is that correct?

13    A   I thought I said unprofessional and --

14    Q   So the answer is yes.

15    A   And you wouldn't attend if you weren't going to

16    contribute.

17    Q   When you were discussing your contribution with

18    Kelly, you did not discuss the amount that you would

19    give, did you?

20         MR. NIEWOEHNER:  Objection.

21         THE COURT:  Sustained.

22    BY MR. S. F. ADAM:

23    Q   Did Kelly ever ask you to increase the amount of

24    your contribution?

25         MR. NIEWOEHNER:  Objection.

Johnston - cross by S. F. Adam                    2182

1          THE COURT:  The objection is sustained.
2   BY MR. S. F. ADAM:
3   Q   Now, House bill 1918 gave subsidies to the
4   casinos in the year 2006, is that right?
5   A   Well, it was a tax on their revenues to the
6   racetracks and the horsemen in Illinois.
7   Q   Did the racetracks that you had any control over,
8   or any others for that matter, perform any work to
9   receive that subsidy?
10          MR. NIEWOEHNER:  Objection.
11          THE COURT:  The objection is sustained.
12   BY MR. S. F. ADAM:
13   Q   Did you lobby for that passage of House bill 1918
14   in 2006?
15   A   Yes.
16   Q   Did you discuss with every or nearly every
17   legislative member individually with respect to
18   House bill 1918?
19          MR. NIEWOEHNER:  Objection.
20          THE COURT:  The objection is sustained.
21   BY MR. S. F. ADAM:
22   Q   Now, House bill 4570 renewed the subsidy or --
23   yeah, subsidy in 2008, didn't it?
24          MR. NIEWOEHNER:  Objection; Misstates the
25   testimony.

1          THE COURT:  Why don't you ask a non-leading

2    question for this one.

3          MR. S. F. ADAM:  A non-leading question, Your

4    Honor?

:09AM    5          THE COURT:  Yeah.

6    BY MR. S. F. ADAM:

7    Q   Do you know what bill supplant or extend House

8    bill 1918?

9    A   I'm not tracking your question, but it was House

:09AM   10    bill 4758 which is a 3-year extension which was

11    passed in November of 2008, I think you were trying

12    to --

13    Q   All right.  Who is the main sponsor of that bill

14    in the legislature?

:10AM   15    A   I don't recall.

16    Q   Was it Senator Molaro?

17    A   I don't recall.  I know he was the sponsor of the

18    original 1918 bill from two years prior, but I don't

19    recall who was the 4758.

:10AM   20    Q   There were other groups besides your own, such as

21    Arlington Park, Hawthorn Race Course and Fairmont

22    Park and the Harness Horsemen who were also

23    sponsoring or in favor of that bill, is that

24    correct?

:10AM   25    A   Among others.

1  Q   Yeah.  And at the same time that this was going

2  on, the casinos you said were fighting, I'm talking

3  about legally fighting the previous bill?

4  A   Yes.

5  Q   It was all in court at the same time, wasn't it?

6  A   Yes.

7  Q   Now, you used the term -- you have used the term

8  "full-card simulcasting," do you know that term?

9  A   I do.

10  Q   What does that mean?

11  A   That means that if you go to an off-track betting

12  parlor or a racetrack in Illinois, a full-card

13  simulcasting is referred to as the races that you

14  can watch being conducted in other states.  For

15  example, Churchill Downs in Louisville, Kentucky you

16  can watch that race and make wager on it, that is

17  referred to not as an in-state race but a full-card

18  simulcast race.

19  Q   So when you see the signs off-track betting, that

20  is what that means?

21  A   Yes.

22  Q   Do you have that in your racetrack?

23  A   Well, those are actually facilities that are off

24  cite in other areas.

25  Q   Thank you.

Johnston - cross by S. F. Adam                    2185

1          Now, your horse racing industry, they lobby
2  in Springfield every May since the casino
3  legislation was passed?
4  A   Yes.
5          MR. NIEWOEHNER:  Objection.
6          THE COURT:  The answer may stand.
7  BY MR. S. F. ADAM:
8  Q   Now, you said you hired Lon Monk as a lobbyist
9  for you for the racetracks?
10 A   I did say.
11 Q   And if I understand your testimony, you hired him
12 before the casinos could hire him, is that right?
13 A   Well, I don't know if they were or weren't, but
14 that was part of the consideration that I
15 contemplated.
16 Q   And in one of your interviews to the FBI, did you
17 tell the FBI that you were afraid that the casinos
18 would get Monk before you did?
19 A   I don't know if I would have used the word
20 "afraid," but that was a consideration.
21 Q   And you wanted Monk to lobby the Illinois
22 legislature for you, is that right?
23 A   Not necessarily.
24 Q   Now, on April 4th, 2008, you and Monk met the
25 Governor at his campaign headquarters, Friends of

:12AM
:12AM
:12AM
:13AM
:13AM

1   Blagojevich, and you spent about an hour with him,
2   right?
3   A   Yes.
4   Q   And, once again, you gave the Governor a talk
5   about the racing industry, right?
6   A   Yes.
7   Q   He seemed interested?
8   A   He did.
9   Q   You told the FBI that there was no quid pro quo
10  for that meeting, did you not?
11          MR. NIEWOEHNER:  Objection.
12          THE COURT:  The objection is sustained.
13  BY MR. S. F. ADAM:
14  Q   Did you use the words "quid pro quo"?
15          MR. NIEWOEHNER:  Objection.
16          THE COURT:  The objection is sustained.
17  BY MR. S. F. ADAM:
18  Q   While you were talking to the Governor, you also
19  talked to him about the casino revenue and their
20  payments to the racetrack, did you not, at that same
21  April meeting?
22  A   I don't recall, but I wouldn't be surprised that
23  the general terms and conditions of the bill were
24  discussed.
25  Q   And the Governor listened to you as you were

 1  talking to him, didn't he?

 2  A   Absolutely.

 3  Q   And what you wanted was support for the continued

 4  revenue sharing, is that right?

 5  A   I wanted him to understand the elements of our

 6  industry, that bill, other issues, and to educate

 7  him and hopefully get him to gravitate to champion

 8  some of our causes.

 9  Q   And the Governor promised nothing, isn't that

10  correct?

11  A   That's correct.

12  Q   When you walked out, this was what the Governor

13  said, did he not, "you supported me in the past and

14  I hope you will continue to do so"?

15  A   Something along those lines; very similar.

16  Q   That's what he said, isn't it?

17  A   Yes.

18  Q   There never was any follow-up by the Governor

19  calling you and asking you to give him a

20  contribution or anything like that, was there?

21  A   No, there was not.

22  Q   Now, in May, which he is about a month after that

23  happened, or in June of 2008, Monk arranged for Bill

24  Quinlan to sit down and go through every page of the

25  bill, isn't that correct, sir?

:15AM

:15AM

:15AM

:16AM

:16AM

1        MR. NIEWOEHNER:  Objection.

2        THE COURT:  The objection is sustained.

3  BY MR. S. F. ADAM:

4  Q   Do you know Bill Quinlan?

5  A   I do.

6  Q   Did you know that in the year 2008 he was the

7  Governor's legal counsel?

8  A   Yes.

9  Q   And were you present when he went through the

10  pages of the bill with you?

11        MR. NIEWOEHNER:  Objection.

12        THE COURT:  The objection is sustained.

13  BY MR. S. F. ADAM:

14  Q   Now, the bill that you hoped would pass was never

15  passed in May of 2008, was it?

16  A   No, it was not.

17  Q   In August of 2008, you met with Monk and Monk

18  asked if the Governor had called you, did he not?

19  A   Yes.

20  Q   You said no, correct?

21  A   That's not correct.

22  Q   That's not correct.  What did you tell Monk when

23  he asked you if the Governor had called you?

24  A   I said the Governor had called me.

25  Q   And what was the further conversation that you

  1  had with Monk at that time?
  2          MR. NIEWOEHNER:  Objection.
  3          THE COURT:  The objection is sustained.
  4  BY MR. S. F. ADAM:
  5  Q   Let me just clear this up.
  6          Did you tell Monk at that time that you were
  7  trying to figure out what account you were going to
  8  take a contribution out of but that was just what
  9  you said to Monk to lead him astray?
 10          MR. NIEWOEHNER:  Objection.
 11          THE COURT:  Overruled.
 12  BY THE WITNESS:
 13  A   Could you state your question again, please.
 14  BY MR. S. F. ADAM:
 15  Q   Sure.  Sure.
 16          Did you tell Monk at that August meeting that
 17  you had with him, that you were going to try to
 18  figure out what account you wanted to take a
 19  contribution out of for the Governor?  Did you tell
 20  him that?
 21  A   No.  He asked me if the Governor had called me,
 22  and I -- and asked me for a contribution.  And I
 23  said no, he didn't call me, but he did not ask me
 24  for a contribution, he asked -- it was small talk
 25  and he asked me if I was going to DuQuoin later on

1  in August, and I don't know what else was said.

2  Q   You don't remember anything else about that

3  conversation?

4  A   No.

5  Q   Okay.

6  A   Lon seemed surprised that -- he seemed surprised

7  when I told him that the Governor had not asked me

8  for a contribution.

9  Q   You said on direct examination, if I understood

10 you, that on October of 2008, you received a call

11 from a David Gupta, is that right?

12      MR. NIEWOEHNER:  Objection.  Misstates the

13 testimony.

14      THE COURT:  Ask it in a non-leading way.

15 THE ATTORNEY:

16 Q   Did you receive a call from David Gupta?

17 A   Around September of 2008.

18 Q   It was September?

19 A   September, October, some time in there.

20 Q   September or October.  All right.

21      You did accept that call, though?

22 A   Yes.

23 Q   And he called you and asked you about a

24 fundraiser for the Governor, is that right?

25      MR. NIEWOEHNER:  Objection.

:19AM

1          THE COURT:  Sustained.
2    BY MR. S. F. ADAM:
3    Q   What did David Gupta say to you?
4          MR. NIEWOEHNER:  Objection.
5          THE COURT:  Overruled.
6    BY THE WITNESS:
7    A   He just called and said, "I'm thinking about
8    hosting a fundraiser for the Governor."  I think he
9    might have given me a date, I don't recall what it
10   was, but would you attend if I did host a fundraiser
11   and I said sure.
12   BY MR. S. F. ADAM:
13   Q   Did you tell Monk about that call?
14   A   I don't know if I told Monk or Monk told me, but
15   eventually David Gupta's fundraiser came up in
16   conversation between Lon and myself.
17   Q   Was Monk concerned about that call from David
18   Gupta that you told him about?
19          MR. NIEWOEHNER:  Objection.
20          THE COURT:  The objection is sustained.
21   BY MR. S. F. ADAM:
22   Q   You said you became offended -- let me strike
23   that.
24          You do become offended, do you not, when
25   somebody tries to tell you how much to contribute?

:20AM
:20AM
:20AM
:20AM
:21AM

1          MR. NIEWOEHNER:  Objection.
2          THE COURT:  Overruled.
3    BY THE WITNESS:
4    A  I didn't say that today in this courtroom so far,
5    but I am.  I mean, that's something that I determine
6    that isn't really dictated to a donor on how to
7    give.  You give how much you are comfortable or
8    could afford to give.
9    BY MR. S. F. ADAM:
10   Q  And when Monk suggested to you the amount that
11   your contribution to Blagojevich would be, you
12   became offended with him, did you not?
13          MR. NIEWOEHNER:  Objection.
14          THE COURT:  The objection is sustained.
15   BY MR. S. F. ADAM:
16   Q  Do you know or do you have any understanding of
17   what the ethics bill in Illinois was?
18   A  If you are referring to the one from around
19   September -- could you clarify, be a little more
20   specific with your question?
21   Q  Yeah.
22          Are you aware that the ethics bill limited
23   the amount of contributions that could be given to
24   the Governor by persons who did business for the
25   State of Illinois and that it became effective in

 1  January of 2009?

 2          MR. NIEWOEHNER:  Objection to scope.

 3          THE COURT:  The objection to scope is

 4  sustained.

 5  BY MR. S. F. ADAM:

 6  Q   Monk was always asking you for political

 7  contributions, wasn't he?

 8          MR. SCHAR:  Objection.

 9          THE COURT:  Overruled.

10  BY THE WITNESS:

11  A   Yes, there was a persistent line of the

12  questioning when we got together, not all the time,

13  but it was fairly frequent.

14  BY MR. S. F. ADAM:

15  Q   Now, in November, and specifically on the 11th of

16  November 2008, you'd go to Springfield for the

17  session, did you not?

18  A   In November of 2008, yes; several times.

19  Q   And you met Monk there in the capitol building,

20  in the actual Capitol, did you not?

21  A   On one occasion I did, I ran into him.

22  Q   I'm sorry, I didn't hear you.

23  A   On one occasion, I did.

24  Q   I meant in November of 2008.

25  A   Yes.

1  Q   Again he asked you about fundraising, didn't he?

2  A   He did.

3  Q   And you particularly told him you didn't want to

4  talk about it especially because you were in the

5  capitol, correct?

6  A   Yes.

7  Q   And you know as a lobbyist and as a law-abiding

8  citizen, it's not legal to talk about fundraising in

9  the capitol?

10         MR. NIEWOEHNER:  Objection.

11         THE COURT:  The objection is sustained.

12  BY MR. S. F. ADAM:

13  Q   While you were there in the capitol, you saw

14  William Quinlan, Sr., did you not?

15         MR. NIEWOEHNER:  Objection.

16         THE COURT:  The objection is sustained.

17  BY MR. S. F. ADAM:

18  Q   William Quinlan, Sr., is how you particularize

19  the date of November 11th, isn't it?

20         MR. NIEWOEHNER:  Objection.

21         THE COURT:  The objection is sustained.

22         You know, you can recall if you want some of

23  this stuff in and it's really the better way to do

24  it.

25         MR. SOROSKY:  Very well, Your Honor.

1  BY MR. S. F. ADAM:

2  Q   How long -- strike that.

3       The legislature passed a bill that you hoped

4  they would pass, did it not, in November of 2008?

:24AM  5  A   Yes.

6  Q   What bill number was that, did you say?

7  A   House bill 4758.

8  Q   And for how long an extension did that extend the

9  subsidy?

:25AM  10  A   3 years.

11  Q   Do you know, I think from the Governor's exhibit,

12  that that bill reached the Governor's desk on

13  November 24th?

14  A   I believe that was the date, yes.

:25AM  15  Q   Were you then aware that under the law the

16  Governor legally has 60 days to sign it, or veto it,

17  or not do either?

18  A   Yes.

19  Q   And you told us this morning you never were

:25AM  20  worried about him vetoing it, is that correct?

21  A   That's what I said.

22  Q   What was your understanding, then, as to what

23  would happen if he did nothing?

24  A   That it would become law at the end of 60 days if

:26AM  25  he didn't act on it at all.

1  Q   Now, the law becomes effective either when he

2  signs it or when he does nothing 60 days it expires,

3  is that right?  Is that the way you understand it?

4  A   Or veto it, but yes.

:26AM       5  Q   Well --

6  A   Veto that out, yes.

7  Q   Throw that out because I said it would become

8  effective, right?

9  A   Yes.

:26AM      10  Q   So the most you would have to wait to get your

11  money, absent a veto, the longest you have to wait

12  is 60 days from November 24th, right?

13  A   Yes.  And we weren't seeing that money because it

14  was going into a protest fund anyways.

:26AM      15  Q   But that's an escrow fund that you hoped to get

16  some day, right?

17  A   Yes.

18  Q   Now, on November 25th, which was a day after the

19  legislature passed the law, you had dinner with

:27AM      20  Chris Kelly, did you not?

21          MR. NIEWOEHNER:  Objection.

22          THE COURT:  The objection is sustained.

23  BY MR. S. F. ADAM:

24  Q   Did Kelly tell you at any time --

:27AM      25          THE COURT:  Don't do this.

1       MR. S. F. ADAM:  All right, Your Honor.

2  BY MR. S. F. ADAM:

3  Q   Let me ask you about your own state of mind.

4       Did you have any doubt that this bill would

5  become a law either by a signature or by the

6  expiration of 60 days?

7  A   No.

8  Q   Did you tell Monk after all this became a law,

9  while it was pending on the Governor's desk, quote,

10 "work your magic" or words to that effect, end of

11 quote?

12 A   I don't think I used the words along those lines.

13 Q   Okay.  Now, as of November -- strike that.

14      As of December the 4th, only 10 days had

15 expired since the passage of the bill, right?

16 A   Yes.

17 Q   And you were continually asking Monk to get going

18 on it and try to get the signature, right?

19 A   I mean, when I spoke to him I mentioned it, yes.

20 Q   And you were getting pressure also from other

21 members of the horse racing industry because you

22 were the lead advocate of the bill, is that right?

23 A   I was one of the advocates, yes.

24 Q   And you were feeling pressure from the other

25 members of the racing association, weren't you?

1  A   Yes.

2  Q   On Thanksgiving 2008, you text Monk with one word

3  "status," is that right?

4  A   I don't know.  I don't recall if I --

:29AM    5  Q   You don't recall?

6  A   I could see myself doing something like that, I

7  don't know about on Thanksgiving day, but possibly.

8  Q   On December 3rd you and your dad met Monk in

9  Maywood, right?

:29AM   10  A   Yes.

11  Q   And you knew that Monk did not want to talk in

12  front of your father, is that right?

13  A   Yes.

14  Q   You have described Monk as being, to use your

:30AM   15  words, afraid of your father, is that right?

16  A   I think he was uncomfortable around him, yes.

17  Q   Your father is the kind of person that says what

18  he means.  He's blunt in the way he speaks, he says

19  what he means, and he means what he says, isn't that

:30AM   20  about right?

21  A   Yes.

22  Q   Monk said to you, you said, words to the effect

23  that, "Rod has a concern that if he signs the bill,

24  you won't make a contribution," is that what he

:30AM   25  said?

1   A   Could you state that again, please?

2   Q   Sure.

3           When Monk and you walk out of the presence of

4   your father, you walk where?  Downstairs?

:31AM   5   A   Yes, sir, downstairs.

6   Q   But now you're out of the presence of your

7   father, right?

8   A   Yes.

9   Q   You said Monk said something to you to the effect

:31AM   10  that "Rod as a concern that if he signs the bill,

11  you won't make a contribution," is that right?

12  A   Words to that effect, that's what he said.

13  Q   The Governor never said that to you, ever, did

14  he?

:31AM   15  A   No.

16  Q   And you don't know whether Monk was telling the

17  truth or he was lying to you, do you?

18  A   I do not know whether he was telling me the

19  truth, no.

:31AM   20  Q   But it made you angry when he said it, didn't it?

21  A   Yes.

22  Q   You said this morning that you were personally

23  concerned about making a contribution to the

24  Governor around the time or near the time that he

:32AM   25  signed the bill, if he had signed it, right?

1  A   Yes.

2  Q   Why was that a concern?

3  A   It was a concern of perception.

4  Q   Could you be a little more expletive about --

5  A   Well, state your question again, then, please.

6  Q   Sure.

7        When you say that you were concerned about

8  making a contribution at or near the time the

9  Governor signed it, had he signed it, and now you

10 say that concern was perception, what do you mean by

11 that?

12 A   That it was perception -- my concern was that

13 there could be -- that the two items were being

14 linked by the mere fact we were having a

15 conversation about the two subject matters at the

16 same time.  And though I never intended to give a

17 contribution, that if I did oblige Lon's request and

18 the check would have been deposited, the bill would

19 have been signed, we report our contributions, as

20 you can see the bill would be obvious that it was

21 signed, that in the eyes of the general public or

22 anyone, that there could be -- it would be so absurd

23 that I think people would dismiss it as an

24 oversight, but that it could be construed as

25 improper.

1  Q   So by "perception" you mean it just wouldn't look
2  good for him to sign a bill at the same time that
3  you're making a contribution?  It wouldn't look
4  good, would it?

:33AM      5  A   No, it wouldn't look good at all.

6  Q   And that's how you felt at the time?

7  A   Yes, I did.

8  Q   You said a moment ago, you didn't intend to make
9  a contribution at that time anyway, did you?

:34AM     10  A   No.

11        Yes, I did say that, that I wouldn't.

12  Q   Okay.  And you meant it when you just said it,
13  didn't you?  That you didn't really -- that's the
14  truth, you really didn't intend to make a

:34AM     15  contribution at all in December of 2008, did you?
16  To the Governor, I'm talking about.

17  A   No, that's correct.

18  Q   I'm right.  No, you did not intend to?

19  A   No, I did not.

:34AM     20  Q   All right.  Your relationship with the Governor
21  had always been friendly and cordial, had it not?

22  A   Yes.

23  Q   Did you at any time -- did you at any time call
24  the Governor and say, "Governor, are you going to

:34AM     25  sign this or not"?

1  A   No, I did not.

2  Q   You could've easily if you wanted to, couldn't

3  you?

4  A   I probably would have gotten through to him, but

5  I didn't --

6  Q   You knew him well enough to do that, didn't you?

7  A   Yes.

8  Q   You didn't need Monk to talk to the Governor, did

9  you, if you wanted to talk to him?

10  A   If I wanted to talk to him, I probably could have

11  gotten him on the line, but the channel I used was

12  Mr. Monk.

13  Q   Now, had the bill been signed and had you started

14  getting your money, it would've been 3 years, is

15  that correct?  For 3 years?

16  A   Yes, for 3 years.

17  Q   Starting with the day the law becomes effective?

18  A   Yes.

19  Q   Not the day the legislature passes, but on the

20  day it becomes effective for 3 years from that date

21  on?

22  A   Yes.

23  Q   And there's 365 days a year, right?

24  A   Yes.

25  Q   It's 9,000 a day, right?

1  A   Yes.

2  Q   Now, I'm not a good mathematician, but I figure

3  that as $255,000 per year, correct?

4  A   No, it's actually about a million-five per track,

5  per year.

6  Q   All right.  Now, in total, for all the tracks,

7  it's 83,000 a day, isn't it?

8  A   I think that's depending on the fluctuation of

9  the riverboat's business because it's a percentage

10 of the revenues, yes.

11 Q   And that's for 365 days?

12 A   Correct.

13 Q   And for 3 years, correct?

14 A   Yes.

15 Q   Now, my figures show 91,185,000 would be paid to

16 the racetracks, is that correct?  Is that about

17 right?

18 A   Not to the racetracks.  60 percent goes to

19 breeders, horsemen, farm owners, et cetera, 40

20 percent goes to the five racetracks in the state.

21 Q   Okay.  By the way, you were paying Monk for being

22 your lobbyist $125,000?

23 A   Yes.

24 Q   And that was for the 2-year contract which would

25 be 300,000, is that right?

1  A   That would be correct.

2  Q   Was he getting any bonus or was that it?

3  A   That was it.  That was enough, too.

4  Q   So as I understand your testimony here, the only

5  person with respect to Governor Blagojevich that put

6  any pressure at all on you to make a contribution

7  was your own lobbyist, the man you're paying

8  $300,000 over a 2-year period, is that correct?

9  A   That's correct.

10 Q   Your lobbyist?

11 A   My lobbyist.

12 Q   And you said that the Governor was arrested

13 December the 9th, 2008?  You said that, didn't you?

14 A   No, Mr. Niewoehner did.  But he was arrested

15 December 9th.

16 Q   That's right.  Did I say --

17 A   I thought you asked --

18 Q   Well, I'll ask the question.  Do you know he was

19 arrested on December 9, 2008, is that right?

20 A   Yes.

21 Q   All right.  And despite the arrest and despite

22 the attended pressures and so forth that it put on

23 him and his family, he signed the bill --

24        MR. NIEWOEHNER:  Objection.

25        THE COURT:  Mr. Adam, at the close of the

:37AM

:38AM

:38AM

:38AM

:39AM

Johnston - cross by S. F. Adam                    2205

1  case you can stand up and say those things.  I don't

2  want your closing argument in the questions.

3          MR. S. F. ADAM:  Yes, your Honor.

4          THE COURT:  I said this more than once, I

5  don't want to say it again.

6          MR. S. F. ADAM:  Yes, Your Honor.

7  BY MR. S. F. ADAM:

8  Q   Did the Governor, to your knowledge, did the

9  Governor sign the bill?

10  A   Yes, he did.

11  Q   And did he sign that on December 15th, 2009 --

12  2008, I'm sorry?

13  A   2008, yes, he did.

14  Q   And the money start coming in when?

15  A   They started going into an escrow account.

16  Q   Thank you.

17          MR. S. F. ADAM:  May I have a moment, Your

18  Honor?

19          THE COURT:  Sure.

20      (Brief pause).

21  BY MR. S. F. ADAM:

22  Q   And there never was a contribution made by you to

23  the Governor in the year 2008, was there?

24  A   No, there was not.

25          MR. S. F. ADAM:  Thank you.

1            Thank you very much, Mr. Johnston.

2            MR. NIEWOEHNER:  Your Honor, two questions.

3                     REDIRECT EXAMINATION

4  BY MR. NIEWOEHNER:

:40AM  5  Q   Mr. Johnston --

6            THE COURT:  Actually, let's take a break now.

7  Fifteen minutes.

8            THE MARSHAL:  All rise.

9        (The following proceedings were had out of the

:41AM  10     presence of the jury in open court:)

11           THE COURT:  Fifteen minutes.  I'd like to see

12  counsel at the side.

13       (Proceedings heard at sidebar on the record.)

14           THE COURT:  What, if anything, happened at

:41AM  15  the Friday meeting?

16           MR. SOROSKY:  We had the Friday meeting and

17  we're very close to an agreement.

18           THE COURT:  All right.  That's all I wanted

19  to know.

:42AM  20       (Proceedings resumed within the hearing of the

21        jury.)

22       (Recess.)

23           THE MARSHAL:  All rise.

24       (The following proceedings were had in the

:05PM  25     presence of the jury in open court:)

Johnston - redirect by Niewoehner                2207

1        THE COURT:  Please be seated.

2        You can proceed.

3        MR. NIEWOEHNER:  Thank you, Your Honor.

4   BY MR. NIEWOEHNER:

5   Q   Mr. Johnston, just before the break you were

6   asked a couple of questions by Mr. Adam about your

7   conversation with Lon Monk on December in your

8   offices, do you recall that?

9   A   Yes.

10  Q   And in particular, you had explained that when

11  you had indicated to Monk that the timing was

12  inappropriate for a contribution, Mr. Adam asked you

13  questions about that particular phrase you used, do

14  you recall that?

15  A   Yes.

16  Q   And I think you indicated that you thought it

17  would not look good if you made a contribution at

18  essentially at the same time the bill was signed, do

19  you recall that?

20  A   Yes.

21  Q   Now, immediately prior to that, Monk had said

22  something along the lines of "I spoke with the

23  Governor and he was concerned that if he signed the

24  bill, you wouldn't make a contribution," do you

25  recall that?

1  A   Yes.

2  Q   When Monk said that, did you understand that Monk

3  was raising a concern that it just wouldn't look

4  good?

5  A   At that point it moved from me being concerned

6  about its perception to actually it becoming

7  reality, that he was actually linking the two

8  directly.

9  Q   When you say "linking the two" what do you mean?

10 A   The contribution, his request for a contribution,

11 and the signing of the racetrack legislation.

12 Q   And what was your concern if the two were linked

13 directly?

14 A   That, once again, it would be perceived as bad,

15 but also it would be illegal.

16 Q   And putting that aside, what did you think

17 Defendant Blagojevich was going to do if you didn't

18 make a contribution?

19 A   He would delay signing the bill.

20 Q   And Mr. Adam asked you a question about when

21 would the bill become law if Defendant Blagojevich

22 did nothing for 60 days, do you recall that?

23 A   Yes.

24 Q   About how much would it cost your companies if

25 Defendant Blagojevich waited for 60 days to sign the

Johnston - recross by S. F. Adam                2209

1  racetrack bill?
2  A  It would be 9,000 a day, times 60 days, 540,000.
3          MR. NIEWOEHNER:  Thank you, Your Honor.
4          MR. S. F. ADAM:  If I may have a moment, Your
:08PM  5  Honor?
6          THE COURT:  Sure.
7        (Brief pause).
8                    RECROSS EXAMINATION
9  BY MR. S. F. ADAM:
:08PM  10  Q  Just one question, Mr. Johnston, if I may.
11          Just so that we're perfectly clear about
12  this.  The 3-year legislation does not go into
13  effect unless the Governor signs the bill or waits
14  60 days from November 24th, is that correct?
:09PM  15  A  Yes.
16  Q  So if he waited the full 60 days, which would
17  bring us to approximately January 24th, at that
18  point the 3-year period would start, is that right?
19  A  Yes.
:09PM  20  Q  Thank you.
21          MR. S. F. ADAM:  No further questions.
22          MR. NIEWOEHNER:  No further questions, Your
23  Honor.
24          THE COURT:  You may step down.
:09PM  25        (Witness excused.)

1          THE COURT:  Next witness.

2              MR. SCHAR:  The government calls Dr. Donald

3     Feinstein.

4          (Brief pause).

5              THE COURT:  Over here.

6              Face me and raise your right hand.

7          (Witness duly sworn.)

8              THE COURT:  Please be seated.

9          DONALD FEINSTEIN, GOVERNMENT WITNESS, SWORN

10                    DIRECT EXAMINATION

11    BY MR. SCHAR:

12    Q   Sir, if you would please state and spell your

13    name for us.

14    A   Dr. Donald Feinstein, F-e-i-n-s-t-e-i-n.

15    Q   Where are you currently employed?

16    A   I'm employed at the Academy for Urban School

17    Leadership.

18    Q   Keep a little bit of a distance between you and

19    the microphone, if you could.

20    A   Yes.

21    Q   Is that sometimes referred to the Academy for

22    Urban School Leader as AUSL?

23    A   Yes.

24    Q   What is the Academy for Urban School Leadership

25    or AUSL?

1  A   The Academy For Urban School Leadership is a
2  nonprofit organization that partners with the
3  Chicago Public School to train future teachers and
4  to fix failing schools.
5  Q   How long have you been affiliated with the
6  Academy For Urban School Leadership?
7  A   9 years.
8  Q   Since its inception?
9  A   Yes.
10 Q   What did you do before joining AUSL?
11 A   I was an elementary school teacher.  I taught
12 regular Ed and special education students.  I was
13 also city-wide administrator for children with
14 emotional problems for Chicago Public Schools and I
15 was an elementary principal for 22 years.
16 Q   Where were you a principal?
17 A   I was a principal at R. Nathaniel Dett Public
18 School in the Henry Horner Public Housing complex
19 and also at the Chicago Academy.
20 Q   What is your educational background,
21 Dr. Feinstein?
22 A   I have a bachelor's degree from the University of
23 Illinois at Chicago, I have as master's degree from
24 northeastern Illinois University, and my Ph.D. from
25 Loyola University of Chicago.

D. Feinstein - direct by Schar                    2212

1  Q   What is your official position at AUSL?

2  A   I'm their executive director.

3  Q   What are your job responsibilities as the

4  executive director of AUSL?

5  A   My job responsibilities are to provide overall

6  management and leadership in order for us to fill

7  our strategic mission of training teachers and

8  fixing failing schools.

9  Q   Where is the Academy for Urban School Leadership

10 or AUSL located?

11 A   We're located at 3400 North Austin.

12 Q   Now, what else is located at 3400 North Austin?

13 A   The Chicago Academy Elementary School is on the

14 first two floors and the Chicago Academy High School

15 is on the third floor and our home office is on the

16 first floor.

17 Q   What is the Chicago Academy?

18 A   The Chicago Academy is a CPS AUSL public school

19 that trains future teachers for the school district

20 and also educates the children within that building.

21 Q   When you say CPS, are you talking about Chicago

22 Public Schools?

23 A   Yes, sir.

24 Q   How is the Chicago Academy affiliated with AUSL?

25 A   Well, AUSL being an educational management

1  organization, we provide management and consulting

2  and guidance to the operation of 18 schools for the

3  Chicago Public School district and one of them being

4  the Chicago Academy.

:13PM  5  Q   Do sometimes people refer to AUSL as the Chicago

6  Academy although, technically, it's a different

7  entity?

8  A   Yes.

9  Q   Does the Chicago Academy school have a full

:14PM  10  grounds at the 3400 Austin location?

11  A   Yes.

12  Q   What does that include?

13  A   It includes an athletic field in the 250,000

14  square foot building.

:14PM  15  Q   Did the Chicago Academy always have an athletic

16  field?

17  A   No, it did not.

18  Q   I'd like to direct your attention, Dr. Feinstein,

19  to 2005.

:14PM  20       Were you and others interested in turning the

21  parking lot of the Chicago Academy into an athletic

22  facility at that time?

23  A   Yes.

24  Q   What, if anything, were you trying to do to

:14PM  25  accomplish that goal?

1  A  Well, try to socialize the idea and spread the
2  word.  It was important for us to have a high
3  quality school and in order to do that we felt you
4  needed a green space and especially for a high
5  school, a place for our high school teams to play
6  their sports.
7  Q  Who was your congressman in that location at that
8  time?
9  A  We're in the Fifth Congressional District and our
10  congressman was Rahm Emanuel.
11  Q  And did the funding for the athletic field, as
12  you understood it, ultimately come through?
13  A  Yes.
14  Q  How did it come through in that 2005 time period?
15  A  The chairman of our AUSL board, Martin J. Kozak,
16  informed me that Rahm Emanuel told him that he got a
17  2 million-dollar grant from the Governor for us to
18  build an athletic field for the Chicago Academy and
19  Chicago Academy High School students and families.
20  Q  Was there, in fact, a public announcement of that
21  grant?
22  A  After we received that word, we held a press
23  conference coinciding with the beginning of the
24  school year.
25  Q  Where was the press conference held?

:14PM
:15PM
:15PM
:15PM
:15PM

1  A   On the front steps of the Chicago Academy
2  entrance.
3  Q   So to the best of your recollection,
4  Dr. Feinstein, who was present for the press
5  conference?
6  A   We had Arne Duncan, who was the Chief Executive
7  Officer for the Chicago Public Schools; Alderman Tom
8  Allen; Congressman Rahm Emanuel.  I remember Randy
9  Dunn, who was the state superintendent for the
10 Illinois Board of Ed; Representative Joe Lyons.
11 There must have been others, I can't remember.
12 Q   When you say at the beginning of school year, was
13 this approximately September of 2005?
14 A   Yes.
15 Q   Was there some publicity related to that press
16 conference?
17 A   Yes, there was, I think, local newspaper and the
18 Sun-Times.
19 Q   I'm going to --
20         MR. SCHAR:  Judge, may I approach?
21         THE COURT:  You may.
22         MR. SCHAR:  I'd like to offer Government
23 Exhibit AUSL Article i and AUSL Grant Article ii.
24         MR. GOLDSTEIN:  No objection.
25         THE COURT:  Without objection.

1      (Government's Exhibits AUSL Article i and AUSL
2       Grant Article ii were received in evidence.)
3  BY MR. SCHAR:
4  Q   I'll show you, Dr. Feinstein, Government Exhibit
5  AUSL Article i and AUSL Grant Article ii.
6  A   All right.
7  Q   Have you seen those articles before?
8  A   Yes.
9  Q   Directing your attention to Government Exhibit
10 AUSL Grant Article ii, is that a Chicago Sun-times
11 article?
12 A   What is --
13 Q   Is that a Chicago Sun-times article?
14 A   Yes.
15 Q   What is the date of the article?
16 A   September 1st, 2005.
17 Q   And I'm going to blow up a section for the
18 screen.  Can you read that for us?
19 A   (Reading:)
20      "...  find a plan for a 2 million sports
21       facility that will allow their first new public
22       high school established on the northwest side
23       in over 30 years to expand beyond the freshman
24       class that opened with last year officials
25       announced at a press conference at the school

:16PM
:17PM
:17PM
:17PM
:18PM

D. Feinstein - direct by Schar                2217

1      at 3400 North Austin on Wednesday."

2  Q  At that time was it a 2-million-dollar grant?

3  A  Yes.

4  Q  And one more paragraph.

5      Could you just read that for us.

6  A  (Reading:)

7      "We're talking about a program that was on the

8      cover of the U.S. Department of Education's

9      newsletter recently as one of the most

10      innovative teacher training programs in the

11      country.  I'm a spittin' convert said U.S.

12      Representative Rahm Emanuel who secured the

13      2-million-dollar state grant to expand the

14      institution in his district."

15  Q  I think you indicated that there actually was a

16  State of Illinois Superintendent of Public Schools

17  was present for the press conference?

18  A  Yes.

19  Q  What happened after the press conference in

20  relation to you actually obtaining the

21  2-million-dollar grant?

22  A  I was told, and I can't recall by whom, that I

23  needed to submit the paperwork to the Department of

24  Commerce and Economic Opportunity.

25  Q  What did you do?

1  A   In order to submit the paperwork, we had to do

2  some environmental study, we had to do some traffic

3  control work, and I had to hire a civil engineer to

4  do the drawings for the field.

5  Q   Did you have an actual contact person at the

6  Department of Commerce and Economic Opportunity?

7  A   Duane Brusnighan was the contact.

8  Q   Is that who AUSL was working through to finish

9  off the grant paperwork?

10 A   Yes.

11 Q   You indicated you hired a project manger, who was

12 that?

13 A   Mike Lukich who was a license civil engineer.

14 Q   What was the role of project manger in your

15 project?

16 A   Well, it was to provide me the technical

17 assistance.  I'm not an engineer and he's built

18 fields before and he helped me walk through the

19 process and provided the technical assistance in

20 order to get the project up and running.

21 Q   And did this process take some period of time

22 into 2006?

23 A   Yes.

24 Q   Based on your understanding that the grant had

25 been -- well, at some point were you told the grant

:19PM

:19PM

:19PM

:20PM

:20PM

D. Feinstein - direct by Schar                    2219

1  had been approved?

2  A  Yes.

3  Q  Do you recall approximately when?

4  A  Well, it was before the spring of 2006 because

5  that is when we bid out for a general contractor.

6  Q  And based on your understanding that the grant

7  had been approved, did work start on the athletic

8  field project?

9  A  It did, after school was let out at the end of

10 June, beginning of the summer.

11 Q  Is that 2006 now?

12 A  2006.

13       MR. SCHAR:  Judge, may I approach again?

14       THE COURT:  You may.

15 BY MR. SCHAR:

16 Q  I'd like to show you what's been marked

17 Government Exhibit School Photo 1.

18       I ask you if you recognize that photograph.

19 A  Yes.

20 Q  What is it?

21 A  Well, that was the beginning of the project when

22 we were sort of getting -- the ground was a giant

23 concrete parking lot, in order to begin the work to

24 do all the sewer work and everything, this is when

25 we started, you know, getting rid of the concrete

1  and cement.

2  Q   Does it accurately represent that area as the

3  work was beginning?

4  A   Yes.

5          MR. SCHAR:  Judge, we move in Government

6  Exhibit School Photo 1 and ask to publish.

7          THE COURT:  Without objection; admitted.

8     (Government's Exhibit School Photo 1 was

9      received in evidence.)

10         THE COURT:  You may publish.

11    (Exhibit published to the jury.)

12 BY MR. SCHAR:

13 Q   Actually, towards the top middle, is there an

14 indication that that is the Chicago Academy?

15 A   That's the school side.

16 Q   Is that where you walk into the school?

17 A   Yes, sir.

18 Q   Can you just explain what we're looking at here

19 in this photograph?

20 A   Well, this was where prior to the beginning of

21 the project where parents and teachers and staff

22 would park their cars.  Actually they almost butt up

23 to the fence.  And that would be the main entrance

24 not for the high school but for the elementary

25 school and, obviously, we didn't park there once

1  the project began.

2  Q   Is there the beginning of the project?

3  A   Yes.

4  Q   At some point did bills start coming into the

5  AUSL for the athletic field project?

6  A   Yes.

7  Q   About when?

8  A   Well, those started coming in when we had to do

9  the environmental work and actually when I hired the

10  civil engineer, and that was approximately April,

11  May.

12  Q   Did additional bills start to come in throughout

13  the period of the summer?

14  A   Yes.

15  Q   What type of bills?

16  A   General contracting bills, subcontracting bills

17  for the work being done on the project.

18  Q   At that point did you have the grant money to pay

19  the bills?

20  A   No.

21  Q   Did you know why?

22  A   No.

23  Q   At some point did these bills begin to pile up?

24  A   Yes.

25  Q   What did you do?

1  A   At some point in time I was directed to call Paul

2  Miller in the Governor's Office and that was the

3  gentleman I would be calling.

4  Q   Did you have one conversation with Mr. Miller or

5  multiple conversations?

6  A   Multiple.

7  Q   Were they ever in person or over the phone?

8  A   Over the phone.

9  Q   What did you and Mr. Miller discuss?

10  A   I kept asking him when will the grant money be

11  forthcoming and he would just share with me he

12  didn't know where the money was coming from.

13  Q   In addition to Mr. Miller, who else did you reach

14  out to?

15  A   I reached out -- we had a lobbyist, I reached out

16  to the lobbyist, and I reached out to Congressman

17  Rahm Emanuel's office.

18  Q   Who did you speak to in Congressman Emanuel's

19  office?

20  A   At different times I spoke to his Chief of Staff

21  and probably I think she was called Deputy Chief of

22  Staff Liz Shears and Loran Anderson.

23  Q   What did you explain to them?

24  A   I explained to them that the contractors wanted

25  to get paid and the money was not forthcoming and I

D. Feinstein - direct by Schar                    2223

1  needed help in obtaining the grant that we were

2  expecting.

3  Q   What did you ask them to do?

4  A   Help me, however; call whoever you need to call

5  to get us the money.

6  Q   What response, if any, did you get?

7  A   They called and I actually recall giving them

8  Paul Miller's name and I do know that one of them

9  called Paul Miller and they had multiple

10  conversations and they just kept telling me they

11  were working on it.

12  Q   Were you feeling pressure at this point?

13  A   Very much so.

14  Q   Why?

15  A   Because people wanted to get paid and I wasn't

16  able to pay them.

17  Q   Now, this goes on throughout the summer.  During

18  the summer, about what percentage of your time were

19  you spending trying to get this money?

20  A   I felt that it consumed me.

21  Q   At a certain point as summer started to head

22  towards the new school year, did you begin to get

23  information that the project would not be completed

24  in time?

25  A   Well, I was concerned about that because the

:24PM

:25PM

:25PM

:25PM

:25PM

1 whole idea was to get the project completed before

2 the opening of the school for safety of my family

3 and my students and, obviously, also we wanted to

4 play our first football game on the field at the

5 start of the school year.

6            MR. SCHAR:  Judge, may I approach?

7            THE COURT:  You may.

8 BY MR. SCHAR:

9 Q   I show you, Dr. Feinstein, what is marked

10 Government Exhibit AUSL Grant 1.

11            I ask you if you recognize that as being the

12 document you received from your project manger?

13 A   I think, to my best of my recollection, Mike

14 Lukich --

15 Q   I'm sorry.  The question is, do you recognize

16 that?

17 A   Yes.

18 Q   Does it appear to be in the same condition as

19 when you received it originally?

20 A   Yes.

21            MR. SCHAR:  Judge, we move Government Exhibit

22 AUSL Grant 1 into evidence.

23            THE COURT:  Without objection.

24        (Government's Exhibit AUSL Grant 1 was received

25         in evidence.)

D. Feinstein - direct by Schar                     2225

1          MR. SCHAR:  Ask to publish portions of it?

2          THE COURT:  You may.

3        (Exhibit published to the jury)

4    BY MR. SCHAR:

5    Q   Is this a memo you received from your project

6    manger?

7    A   Yes.

8    Q   And is the date on the memo September 11, 2006,

9    at 5:30 p.m.?

10   A   Yes.

11   Q   Who is the memo to?

12   A   To me.

13   Q   From whom?

14   A   Mike Lukich.

15   Q   Who was Mike Lukich?

16   A   He was our civil engineer and project manger.

17   Q   What's it regarding?

18   A   It was regarding the athletic field.

19   Q   I'm going to have you read portions of it.

20         If you could you read the section that's on

21   the screen, if you would?

22   A   (Reading:)

23       "I heard some disturbing news this morning.

24        Chicagoland Paving will not make this project

25        their priority, nor expect their subcontractors

:27PM (lines 5, 10, 15, 20, 25)

1        to order additional materials or continue their
2        work.  This decision was made based upon:
3        Chicagoland has in good faith continued work,
4        completing close to 70 percent, 1.1
5        million-dollar of the contract, with pay
6        request 1 still past due.  No date or time
7        frame for future payment has been offered."
8   Q   Was this a memo from Mr. Lukich basically
9   indicating there were issues as to whether or not
10  work was going to continue on the project?
11  A   Yes.
12  Q   Does he go on to detail potential issues that now
13  have come up because of the delay in the funding?
14  A   Yes.
15  Q   Could you read the next section for us.
16  A   (Reading:)
17
18        "... revision to the current contract prices
19        most likely leading to a greater project cost.
20        The concern our office has is that we are
21        approaching mid September and there remains
22        only a limited number of construction days.
23        This is compounded by the fact that many of the
24        items to be installed are temperature sensitive
25        and need to be installed at specific

D. Feinstein - direct by Schar                    2227

1    temperature ranges.  If we miss the window, the
2    project will sit the entire winter and spring.
3    Since the contract is based on work being
4    completed this fiscal year, the contractor will
5    probably request that the contract prices be
6    revised to reflect 2007 prices."
7  Q  Could you read the next section.
8  A  (Reading:)
9    "... loss of the fall and spring athletic
10   season, the grade school and high school will
11   lose the fall and spring seasons.  The athletic
12   field facility essentially will not be even
13   used until September 2007.  The athletic
14   director will need to be notified and any
15   scheduled games that the academy will need to
16   be cancelled or moved to an alternate
17   location."
18 Q  Moving on to the next page of the exhibit,
19 Dr. Feinstein.
20 A  (Reading:)
21   "... City of Chicago permit violations not
22   completing the work in the required time frame
23   may be in violation of the city permit,
24   especially with regard to the fencing and
25   landscaping.  I will check on this one and find

1     out whether we need to get an extension."
2  Q  Are these all potential issues that were now
3  coming up?
4  A  Yes.
5  Q  Go ahead to the next section.
6  A  (Reading:)
7     "... traffic operations site maintenance:  The
8      current condition at the main entrances will
9      remain.  The unfinished condition will require
10     school staff or the contractor at additional
11     cost to maintain the area until summer.  Since
12     snow plowing the area will be difficult,
13     coupled with poor drainage that will inevitably
14     lead to icing conditions, the school will need
15     to have an alternate plan if the entrance that
16     the students, faculty, and parents use is
17     moved.  If we change the entrance, this may
18     affect the vehicular traffic, pick-up, drop-off
19     pattern which means that we will then have to
20     return to the city DOT and alderman's office
21     for approval to revise the current points of
22     egress and ingress along Austin ....
23 Q  And finally regarding this document,
24 Dr. Feinstein, the next section.
25 A  (Reading:)

D. Feinstein - direct by Schar                    2229

1      "... quality of workmanship:  If this situation
2       is resolved later than sooner, the contractor
3       will push to complete the project even in
4       marginal weather conditions and we may not get
5       the best finished product.  Although the
6       contractors guarantee us for 1 year, I am
7       thinking that some of the long-term quality
8       will suffer ..."
9   Q   Were these all issues that were brought to bear
10  on you when you were attempting to get this money to
11  resolve this?
12  A   Yes.
13  Q   Were you considering other options in terms of
14  trying to get funding -- let me ask you, did you
15  have independent at this point, did AUSL have the
16  money to pay for the project?
17  A   No.
18  Q   Were you considering other options in terms of
19  trying to get the money?
20  A   Internally, we were considering two options:  One
21  was to have my parents and students write a petition
22  to the Governor to get the money, and the second
23  option was to take out a 2-million-dollar loan.
24  Q   Take out a 2-million-dollar loan to pay for it?
25  A   Yes.

1  Q   At some point -- well, what happened next?

2  A   Well, at some point there was a breakthrough and

3  we did receive a first installment of $250,000.

4  Q   Do you know what happened in terms of causing the

5  breakthrough?

6  A   No.

7  Q   Did anyone ever explain to you what the problem

8  was?

9  A   No.

10  Q   Was the $2 million disbursed to you at one time?

11  A   No.

12  Q   To the best of your recollection, how many

13  installments were there?

14  A   Five.

15  Q   Do you know why there were five installments?

16  A   No.

17  Q   What did you have to do for each installment of

18  the grant?

19  A   I had to provide copies of expense, receipts or

20  reports, and fill out a new overall grant agreement.

21          MR. SCHAR:  May I approach, Judge?

22          THE COURT:  You may.

23  BY MR. SCHAR:

24  Q   I show you, Dr. Feinstein, what I have marked as

25  Government Exhibit AUSL Grant 1; Government Exhibit

1  AUSL Grant 2, Government Exhibit AUSL Grant 3,

2  Government Exhibit AUSL Grant 4, and Government

3  Exhibit AUSL Grant 5.

4          Do you recognize those five exhibits?

:33PM  5  A  Yes.

6  Q  What are they?

7  A  This is a copy of the grant agreement that was

8  provided by the Department of Commerce and Economic

9  Opportunity.

:33PM  10          MR. SCHAR:  Judge, we move Government Exhibit

11  AUSL grant 1, AUSL Grant 2, AUSL Grant 4 and AUSL

12  Grant 5 into evidence.

13          THE COURT:  Without objection, admitted.

14        (Government's Exhibits Government Exhibit AUSL

:33PM  15         grant 1, AUSL Grant 2, AUSL Grant 4 and AUSL

16         Grant 5 were received in evidence.)

17  BY MR. SCHAR:

18  Q  What type of information needed to be provided in

19  each of those separate grants?

:34PM  20  A  Basically, it was the activities that were

21  creating the expenses for the project.

22  Q  And were five different sets of paperwork

23  generated?

24  A  Yes.

:34PM  25  Q  Do you have to participate in doing the five

1 different grants by providing certain information?

2 A   Yes.

3 Q   Is it easier -- was it less work or more work to

4 do five grants as opposed to one grant?

:34PM   5 A   More work.

6 Q   And, ultimately those -- were those five grants

7 ultimately granted at one time?

8 A   At five different times.

9 Q   Based on your review of those documents, what

:34PM   10 where the five different dates of the different

11 grants?  If you could go through 1 to 5.

12 A   Well, the first grant September 5th, '06.

13 September 13th.

14 Q   That was the second grant?

:34PM   15 A   The second grant.

16       September 25th, third grant.  August 30th.

17 Q   August 30th?

18 A   I mean, I'm sorry, October 30th.  I apologize.

19 Q   For the fourth grant?

:35PM   20 A   The fourth grant.

21       And December 14th for the fifth grant.

22 Q   And that's all 2006?

23 A   Yes, sir.

24 Q   And the fifth grant on December 16th, did you

:35PM   25 say, sir?

1  A   December 14th.

2  Q   December 14th.  How much was that grant?

3  A   $916,000.

4  Q   You waited all the way till December to get close

5  to $1 million of your grant?

6  A   Yes.

7  Q   Now, going back to the first grant.  How much was

8  the first grant?

9  A   $250,000.

10  Q   Did it pay off all the bills that you owed when

11  you received it?

12  A   No.

13  Q   Did you continue to be concerned during this time

14  period?

15  A   Yes.

16  Q   Why?

17  A   Because there's no clear indication that I would

18  be receiving more money.

19  Q   When you added up the total of all those five

20  grants, by December had you finally received close

21  to the $2 million?

22  A   Yes.

23       MR. SCHAR:  May I approach again, Judge?

24       THE COURT:  You may.

25  BY MR. SCHAR:

D. Feinstein - direct by Schar                    2234

1 Q   Showing you Government Exhibit School Photo 2,
2 which I would also move into evidence and ask to
3 publish.
4        THE COURT:  Admitted.
5      (Government's Exhibit School Photo 2 was
6       received in evidence.)
7        MR. SCHAR:  May I publish, Judge?
8        THE COURT:  You may.
9      (Exhibit published to the jury.)
10 BY MR. SCHAR:
11 Q   Ultimately, were you able to complete the field?
12 A   Yes.
13 Q   Is that a picture from the opposite side that we
14 were looking at before when we were looking at the
15 field?
16 A   Yes.
17 Q   Dr. Feinstein, how many grants have you been
18 involved in over the course of your career?
19 A   Maybe 40, 50.
20 Q   Have you ever been involved in any other grants
21 like this one?
22 A   No.
23 Q   What was different about this grant?
24        MR. GOLDSTEIN:  Objection.
25        THE COURT:  He may answer.

:36PM
:36PM
:36PM
:36PM
:37PM

1 BY THE WITNESS:

2 A   It was unclear, the timing of the money, and it

3 was just the -- it was vague about how -- how -- how

4 the grant was being operated or handled.

5 BY MR. SCHAR:

6 Q   Have you ever had to be this persistent in trying

7 to get your money?

8 A   No.

9 Q   Have you ever been previously involved in one

10 grant that would be broken down into five different

11 grants?

12 A   No.

13          MR. SCHAR:  Judge, may I have a moment?

14          THE COURT:  Sure.

15       (Brief pause).

16          MR. SCHAR:  Thank you.

17          Nothing else, Judge.

18          THE COURT:  We'll break for lunch.  One hour.

19          THE MARSHAL:  All rise.

20       (The following proceedings were had out of the

21        presence of the jury in open court:)

22

23

24

25

D. Feinstein - direct by Schar                    2236

1        THE COURT:  You may step down.

2    (Witness temporarily excused.)

3        THE COURT:  We are adjourned.

4

5    (Luncheon recess taken from 12:37 o'clock p.m.

6     to 1:47 o'clock p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. Feinstein - direct by Schar                    2237

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   UNITED STATES OF AMERICA,       )
                                     )   No. 08 CR 888
4           Government,              )
                                     )
5   vs.                             )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   June 21, 2010
    ROBERT BLAGOJEVICH,              )
7                                    )
            Defendants.             )   1:47 o'clock p.m.
8

9                      VOLUME 11
                TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
                      AND A JURY
11

12
    For the Government:
13
                THE HONORABLE PATRICK J. FITZGERALD,
14              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
15                   Carrie E. Hamilton
                     Christopher Niewoehner
16              Assistant United States Attorneys
                219 South Dearborn Street
17              Suite 500
                Chicago, Illinois 60604
18

19

20
    Court Reporter:
21
                     Blanca I. Lara, CSR, RPR
22                   219 South Dearborn Street
                            Room 2504
23                   Chicago, Illinois 60604
                        (312) 435-5895
24

25

D. Feinstein - direct by Schar                2238

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4         KAPLAN & SOROSKY
         BY:  Sheldon M. Sorosky
5         158 West Erie
         Chicago, Illinois 60610
6         (312) 640-1776

7         LAW OFFICE OF SAMUEL E. ADAM
         BY:  Samuel Forbes Adam
8              Samuel Adams, Jr.
         6133 South Ellis Avenue
9         Suite 200
         Chicago, Illinois 60637
10        312-726-2326

11        OFFICES OF AARON B. GOLDSTEIN
         BY: Aaron Benjamin Goldstein
12        6133 South Ellis
         Chicago, Illinois 60637
13        (773) 752-6950

14        OFFICES OF LAUREN FAUST KAESEBERG
         BY:  Lauren Faust Kaeseberg
15        2140 N. Lincoln Park West
         Suite 307
16        Chicago, Illinois 60614
         (773) 517-0622
17
         LAW OFFICES of MICHAEL GILLESPIE
18        BY:  MICHAEL GILLESPIE
         53 West Jackson Boulevard
19        Suite 1420
         Chicago, Illinois 60604
20        (312) 726-9015

21

22

23

24

25

1  APPEARANCES (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The following proceedings were had out of the
2        presence of the jury in open court:)
3            COURT'S LAW CLERK:  Please remain seated.
4            THE COURT:  Counsel, do we have an issue?
5            MR. SOROSKY:  Yes, Your Honor.  The next
6    witness after this witness, it concerns that
7    witness.  Now, would you want to do it now or after
8    this witness?
9            THE COURT:  I'm sitting here.
10           MR. SOROSKY:  Okay.  I take it that means
11   now.  See, sometimes the C student gets it right.
12           Now, the next witness is going to testify to
13   certain things that the defendant Governor
14   Blagojevich said to him in a conversation.
15           The witness would then testify, if the
16   government had its way:  I thought that was illegal,
17   and then I told Mr. B and Mr. C agreed with me that
18   he, Mr. B, thought it was illegal.
19           The defense would suggest that all those
20   thoughts should be barred from evidence and the jury
21   should not be allowed to hear it and this next
22   witness should not testify to Mr. B's concurrence
23   and thought that it was illegal since we feel this
24   would be in accord with all this Court's prior
25   rulings that witnesses on the witness stand could

D. Feinstein - direct by Schar                    2241

1   not give their opinion as to what is legal and

2   illegal, that would be for the jury to decide based

3   on the Court's instructions.

4           MR. SCHAR:  Judge, I largely agree, with the

5   exception of, and in fact we filed a motion on the

6   Government's motion that you may regard as a lay

7   witness conclusions of law with a suggested limiting

8   instruction.

9           This particular witness isn't just opining

10  that it would be inappropriate, he thought this was

11  illegal.  He thought immediately that it was illegal

12  and because of that he took certain steps.  So it

13  goes to explain it.

14          I agree there should be a limiting

15  instruction and we proposed one and I would be happy

16  to hand up again what we had proposed in that

17  filing.

18          THE COURT:  Okay.  Generally speaking,

19  thoughts don't go into evidence.  People say things

20  about thoughts they had.  Am I correct to infer that

21  this witness is in a conversation with Defendant

22  Blagojevich?

23          MR. SOROSKY:  Correct.

24          THE COURT:  And some subject is mentioned?

25          MR. SOROSKY:  Correct.

D. Feinstein - direct by Schar                    2242

1          THE COURT:  And then the witness says to

2    Defendant Blagojevich, without the intermediatation

3    of why he said it, "if this is illegal"?

4          MR. SOROSKY:  No, no, the conversation is

5    very neutral.  It just relates facts.

6          THE COURT:  Okay, I want to know what the

7    conversation was, otherwise --

8          MR. SOROSKY:  The wording or the --

9          THE COURT:  Just start telling me what the

10   wording is instead of explaining to me.

11         MR. SOROSKY:  This witness has a conversation

12   with Governor Blagojevich and the Governor

13   supposedly says, according to this witness, words

14   like:  Fundraiser, tell Rod's brother to have a

15   fundraiser, or words to that effect.

16         THE COURT:  Yes.  And then what happened?

17         MR. SOROSKY:  There was no more colloquy, the

18   conversation ends.

19         THE COURT:  Okay.  Got that.

20         MR. SOROSKY:  The witness then apparently in

21   his debriefing by the FBI says --

22         THE COURT:  Tell me what he says.

23         MR. SOROSKY:  He doesn't say anything, just

24   his thoughts.

25         THE COURT:  Right.  Okay.

D. Feinstein - direct by Schar                           2243

1       MR. SOROSKY:  He does not say anything, but
2  3 years later in his debriefing by the FBI --
3       MR. SCHAR:  What he does, Judge, is he then
4  makes two phone calls immediately or shortly
5  thereafter, the reason being he believes what he's
6  been told is illegal.  One call goes to an associate
7  of Defendant Blagojevich and he explains what just
8  happened and what he thinks is happened and why he's
9  telling that associate his concern with Defendant
10 Blagojevich would reach out to that associate.
11      The second call goes to the general counsel
12 the Office of the Governor who he also explains the
13 situation to tells him to try to control
14 Blagojevich.
15      The reasons he makes both of those phone
16 calls is because of what he believed just happened.
17      MR. SOROSKY:  In the first --
18      THE COURT:  Okay, I got that part.
19      MR. SOROSKY:  Okay.
20      THE COURT:  But I need to know more.  Where
21 does this fit in with your case?
22      MR. SCHAR:  This is a conversation, this
23 episode, this episode, this is a conversation in
24 which basically Defendant Blagojevich tells him he's
25 holding up the grant because he wants a fundraiser.

D. Feinstein - direct by Schar                    2244

1       THE COURT:  What words does he use?  That's
2  this whole problem.  You're telling me what this is
3  about, you're telling me how you are going to argue
4  it, I want somebody to tell me what this witness is
5  going to say.
6       MR. SOROSKY:  Allow me to answer that, and
7  I'm just reading from his grand jury testimony which
8  is under oath:  Supposedly this witness has a
9  conversation with Governor Blagojevich asking about
10 where are the funds for the school.
11      THE COURT:  Okay.
12      MR. SOROSKY:  And the Governor allegedly
13 says, according to this witness under oath at the
14 grand jury:  Where is my fundraiser?  Tell Ron to
15 have his brother have a fundraiser."  That's all
16 this witness says.  That is the only colloquy in the
17 conversation.
18      THE COURT:  Okay.  Got it.
19      MR. SOROSKY:  Thereafter --
20      THE COURT:  Okay.  Stop.
21      Okay, he's testified to this.
22      MR. SCHAR:  (Nodding.)
23      THE COURT:  Then the next thing he says is?
24      MR. SCHAR:  The next question is, what did
25 you do next.

D. Feinstein - direct by Schar                    2245

1      THE COURT:  And then he says, I called an
2  associate of the Governor?
3      MR. SCHAR:  Yes.
4      THE COURT:  And expressed my concern?
5      MR. SCHAR:  More or less, yes.
6      THE COURT:  Then I called the Governor's
7  general counsel and expressed my concerned?
8      MR. NIEWOEHNER:  There is a little more
9  detail, but yes.
10      MR. SOROSKY:  My --
11      THE COURT:  Wait.  Wait.  Wait.
12      Okay.
13      THE COURT:  Anything after that?
14      MR. SCHAR:  He basically distances himself
15  from the entire situation.
16      THE COURT:  And his explanation for
17  distancing himself is?
18      MR. SCHAR:  Thought what was going on was
19  illegal, it was wrong.
20      THE COURT:  Okay.  Now, why is it significant
21  to you that he distances himself?  How does this go
22  along with the flow?
23      MR. SCHAR:  He distances himself and John
24  Harris -- actually, he has a conversation with John
25  Harris where John Harris gets involved in

:53PM
:53PM
:53PM
:53PM
:54PM

D. Feinstein - direct by Schar                    2246

1  administering this grant which is unusual for a

2  number of circumstances, and that obviously would

3  lead to Mr. Harris' testimony, as well.

4          THE COURT:  Now.

5          MR. SOROSKY:  Now, if I may respond.  To work

6  within the framework that Mr. Schar has presented to

7  Your Honor:  After this conversation between this

8  witness and Governor Blagojevich has occurred, the

9  witness would say, if Mr. Schar would have his way:

10  I called up Mr. B and I related to Mr. B what the

11  Governor said, I think it's illegal, what do you

12  think Mr. B.  Mr. B concurs with me that it's

13  illegal.

14          I think this should be barred from the jury's

15  ears because it would be in disagreement and not in

16  compliance and not in accord with Your Honor's

17  previous rulings that lay witnesses cannot give

18  their opinions as to what is legal and not legal.

19  It is for the jury to decide after they have heard

20  all the evidence and have been instructed in the law

21  to Your Honor.

22          MR. SCHAR:  I am not asking him, do you think

23  this is illegal.  What he's saying is he has a

24  conversation with the associate.  The reason he

25  reaches out to the associate is part of his concern

1  is the associate is both friendly with Defendant

2  Blagojevich and Rahm Emanuel and he wants to get to

3  that associate before Governor Blagojevich does and

4  makes the same request because he thinks its

5  possible and likely to happen.

6          And, in fact, somewhere down the road that

7  associate is likely to testify in this trial and

8  there's a statement where they had a conversation

9  where this issue came up.

10          So it's important to explain why he takes the

11  steps and it's important that he warns him about

12  what's happened for the very reason he's concerned.

13  Again, this is an attempt charge so it talks about

14  he's concerned that additional steps are going to be

15  taken to implement this plan.

16          MR. SOROSKY:  If I may respond briefly?

17          THE COURT:  Not until I get some more

18  information.

19          MR. SOROSKY:  Okay.

20          THE COURT:  What exactly does he remember

21  saying to the associate?

22          MR. SCHAR:  To the associate?

23          THE COURT:  Yeah.

24          MR. SCHAR:  What he remembers saying is,

25  calling up the associate, reiterating the

D. Feinstein - direct by Schar                        2248

1  conversation that he just had with Defendant

2  Blagojevich, shortly thereafter he talks to the

3  associate, and basically saying to the associate

4  that -- he says I wanted to warn the associate that

5  he should be aware of what Governor Blagojevich is

6  proposing and that he explained to him what had

7  happened, that he thought it was improper, and that

8  basically if any conversation happens, the associate

9  shouldn't take any steps or actions in relation to

10 that.

11         THE COURT:  Okay.  And what does he say to --

12 who is the other person?  Oh, the general counsel.

13         MR. SCHAR:  To the general counsel, he

14 repeats the conversation and basically tells him to

15 get his client under control, if he can.

16         THE COURT:  Does he use the word "illegal"?

17         MR. SCHAR:  I believe he does with the

18 associate, I think he also calls it stupid.  I'm not

19 sure he does with the general counsel.

20         THE COURT:  Okay.  What words does he use

21 with the general counsel?

22         MR. SCHAR:  Basically just repeats the

23 conversation that to get him under control.

24         THE COURT:  My concern here is that I don't

25 know if he's actually offering a legal opinion to

1  begin with.  If he's using words like "improper"
2  maybe he's talking about law, maybe he's talking
3  about the fact that he thinks it's morally improper.
4  And saying that something is wrong is not the same
5  thing as saying it is illegal.
6       I know that today when some people -- I don't
7  think it's true in this court, but you'll see people
8  on television who have done horrible things,
9  inexcusably moral offenses and it's no law against
10 it as if that makes it morally right.  And I don't
11 know whether at the core of this there is underlying
12 this a legal conclusion or a moral conclusion.
13      And the reason this is important is, I don't
14 think this witness is offering an opinion in
15 precisely the manner that compares with the
16 objections I've sustained.
17      Now, part of the reason of the objection is
18 lawyers, and I don't know why lawyers do this, I've
19 always followed the rule that I never ask a witness
20 a question that contained a Latin phrase because
21 they all have technical legal meanings, and "quid
22 pro quo" is one of them.  And some of this I didn't
23 allow simply because it requires, at the bottom, a
24 definition that underlies the question where
25 "improper" does not.

:58PM

:58PM

:59PM

:59PM

:59PM

D. Feinstein - direct by Schar            2250

1        So tell me why you think at the core this is
2   a legal opinion.
3            MR. SOROSKY:  Because --
4            THE COURT:  Rather than an initial reaction
5   that, you know, we can't do this.
6            MR. SOROSKY:  Because the next witness, one
7   is a lawyer.  I believe he will be portrayed to this
8   jury, and understandably and correctly so, as a very
9   intelligent, capable, and accomplished individual
10  lawyer, and I believe his testimony will basically
11  relate, and I'm just reading his grand jury
12  statement, after --
13           THE COURT:  Why don't you let me look at it.
14  It would make life easier for me.
15       (Brief pause).
16           THE COURT:  Okay.
17           MR. SOROSKY:  It would be the defense
18  position on this narrow point:  The only value,
19  evidentiary value that this testimony has is of a
20  prejudicial nature to give this witness'
21  opinion--and we're talking about a man who is going
22  to be presented to the jury as a skilled
23  accomplished attorney--that the colloquy between he
24  and one defendant was illegal.
25           Now, no matter how sage an instruction Your

1  Honor can give, that instruction will not be able to
2  undo this very accomplished attorney's testimony
3  that, in his opinion, what was said was illegal.
4  And this is corroborated by:  I then called B to get
5  the proverbial second opinion and B agrees that it's
6  illegal.
7         THE COURT:  You do have a fairly loose
8  definition of "opinion."  The fact that a lawyer
9  thinks something is illegal does not qualify as an
10  opinion.  And I have no idea this is -- well, what
11  field does this lawyer practice?
12         MR. SCHAR:  He doesn't practice law.  He went
13  to law school and he got a job as a deputy Governor.
14  He doesn't practice law and did not at all, that was
15  not part of his job.
16         And I would just note, Judge, that part of
17  what's going on here is, I believe, an attempt by
18  the defense to suggest Defendant
19  Blagojevich surrounded himself with lawyers,
20  including a guy who didn't practice law at all, and
21  then later probably suggest:  Gee, I didn't know
22  anything wrong was going on.
23         THE COURT:  I recognize that inherent in this
24  defense could be, but not necessarily so, could be
25  the kind of thing where to take it out of the field

D. Feinstein - direct by Schar                    2252

1  of law, somebody gets a heart attack and says I

2  don't understand how this happened, I saw my doctor

3  3 months ago.  Did you tell the doctor that you were

4  having chest pains?  Well, no, you know, he examined

5  me and he should know and thus told me.  And there

6  are plenty of people who think this way.

7          I will let it in to explain his conduct.  I

8  do not believe that this witness will take the

9  position that this is a formal opinion or a legal

10  and considered conclusion that the act was illegal.

11  I believe that saying "I thought it was illegal"

12  simply explains what he's doing.

13          You might very well want to bring out on

14  direct examination that this does not represent a

15  formal opinion, that he did not do the research,

16  that he didn't consult with others, and that he's

17  not a specialist in this particular field.

18          If after that direct examination and after

19  the cross-examination the defendant wants me to give

20  the cautionary instruction, I will give it.

21          It is my belief that when this witness is

22  done testifying and after cross-examination, the

23  jury will be quite, on its own, capable of

24  understanding that this is not a formal legal

25  opinion.  And given the notice I received this

D. Feinstein - direct by Schar                2253

1 morning with respect to a possible defense, we're

2 going to be spending a fair amount of time on

3 precisely what constitutes opinions of counsel.

4          So the objection is overruled on the

5 conditions that I have specified.

6          MR. SCHAR:  Thank you, Judge.

7          MR. SOROSKY:  There's one more.

8          THE COURT:  Sure.

9          MR. SOROSKY:  On the same witness.

10          THE COURT:  Okay.

11          MR. SOROSKY:  This same witness will then say

12 he talked to another executive in the Governor's

13 administration.

14          THE COURT:  This is a third person?

15          MR. SOROSKY:  No, no, this is completely

16 unrelated, same witness but --

17          MR. SCHAR:  Judge, I think I can cut to the

18 chase on this.  The witness is going to say that he

19 talked to John Filan regarding this grant.  He told

20 him there was a hold-up in the Governor's Office.

21 We're not offering that statement for the truth, it

22 actually goes to explain why he then ultimately

23 reaches out to defendant Blagojevich.

24          So if he wants a limiting when that statement

25 is offered as being offered to explain actions

:05PM

:06PM

:06PM

:06PM

:06PM

D. Feinstein - direct by Schar                    2254

1  thereafter, there is no objection to that.

2          THE COURT:  Before you offer that, we'll take

3  a break.  This is subsequent to this stuff we've

4  been talking about?

5          MR. SCHAR:  It's actually before.  It's a

6  lead to the conversation with Defendant Blagojevich.

7          THE COURT:  Okay, tell me more about it.

8          MR. SCHAR:  He basically tracks down Filan to

9  find out why the grant hasn't funded.

10         THE COURT:  It starts with Filan.

11         MR. SCHAR:  It starts with Filan.  And Filan

12 tells him the hold-up is in the Office of the

13 Governor; thereafter because of that, he ultimately

14 reaches out to Defendant Blagojevich.

15         THE COURT:  Okay.

16         MR. SOROSKY:  My response would be --

17         THE COURT:  Well, let me ask one question

18 first.  Is it disputed that the hold-up is in the

19 Office of the Governor?

20         MR. SOROSKY:  Yes.

21         THE COURT:  Because as I understood the

22 defense in this case is that the bad acts, at least

23 some of them and maybe all of them were done by

24 personnel of the Governor's Office, not the governor

25 himself.

D. Feinstein - direct by Schar                    2255

1        MR. SOROSKY:  That, undoubtedly, is a
2   substantial portion of the defense; however, on this
3   particular issue, it is 1,000 percent disputed that
4   the hold-up is in the Governor's Office.

5        THE COURT:  That's all I want to know.

6        MR. SOROSKY:  Concerning this issue, these
7   are not statements by a coconspirator in furtherance
8   of the conspiracy because I believe the next witness
9   is not considered a coconspirator and Mr. Filan is
10  not considered a coconspirator.

11       So all we have here is rank hearsay with the
12  next witness testifying that I talked to John Filan
13  and John Filan said.  And the government is only
14  offering this for the prejudicial value of what John
15  Filan said.

16       John Filan is certainly as available as a
17  witness.  If the government wants to call John
18  Filan, they certainly could call him.  There isn't
19  any need for this hearsay to go in.  It is only
20  offered for the prejudicial value and the
21  prejudicial value clearly outweighs any probative
22  value.

23       THE COURT:  I'll keep it out with respect to
24  his memory of what the government said, this is
25  trivial.

D. Feinstein - direct by Schar                2256

1        MR. SCHAR:  Can I elicit some explanation,
2  without getting into the comment, he seeks out John
3  Filan has a talk with John Filan and he reaches out?
4        THE COURT:  Sure.  But not Filan's statement.
5        MR. SOROSKY:  One last thing.  At the very
6  end of this witness' testimony, I believe the
7  government will offer some testimony regarding the
8  sentencing issue.
9        MR. SCHAR:  We won't.
10        THE COURT:  Good.
11        MR. SOROSKY:  Judge --
12        THE COURT:  Wait.  Wait, Mr. Schar.
13     (Whereupon, there was a conference between
14      counsel:)
15        THE COURT:  Okay, we're set?
16        MR. SOROSKY:  Yes.
17        THE COURT:  Thanks.
18        THE MARSHAL:  All rise.
19     (The following proceedings were had in the
20      presence of the jury in open court:)
21        THE COURT:  Please be seated.
22        You may inquire.
23        MR. GOLDSTEIN:  Thank you, Your Honor.
24
25

:09PM
:09PM
:09PM
:11PM

1        DONALD FEINSTEIN, GOVERNMENT WITNESS,

2                    PREVIOUSLY SWORN

3                    CROSS EXAMINATION

4   BY MR. GOLDSTEIN:

:12PM    5   Q   Good afternoon, Doctor.

6           You've been the executive director of the

7   Academy for Urban School Leadership since 2001, is

8   that correct?

9   A   2005.

:12PM   10   Q   2005?

11   A   Yes.

12   Q   And Chicago Academy was the first school under

13   AUSL?

14   A   Correct.

:12PM   15   Q   And as you opened, as Chicago Academy was opened,

16   there was a need for an athletic facility, is that

17   correct?

18   A   Yes.

19   Q   And the way this facility was, there was a

:12PM   20   building and right next to it was a parking lot?

21   A   Correct.

22   Q   So you saw that the parking lot should be used

23   for an athletic field?

24   A   Yes.

:12PM   25   Q   Okay.  And you went over the analysis as far as

D. Feinstein - cross by Goldstein                    2258

1  how much money this would potentially cost?

2  A   Yes.

3  Q   And you needed approximately $2 million for this

4  field, is that correct?

:12PM   5  A   Yes.

6  Q   Now, you indicated that there was a press

7  conference around late August, early September

8  of 2005 announcing this grant?

9  A   Yes.

:13PM   10  Q   Okay.  And at the press conference, you indicated

11  there was a state representative there, was there?

12  A   The State Superintendent.

13  Q   The State Superintendent?

14  A   For the Illinois State Board of Ed.

:13PM   15  Q   Was there anyone from the state legislature

16  there?

17  A   I recall Representative Joe Lyons.

18  Q   Lyons.

19  A   Alderman Tom Allen.

:13PM   20  Q   Now, Joe Lyons was a State Representative.  Was

21  there any money from the state legislature given to

22  the school?

23  A   For the field?

24  Q   Correct.

:13PM   25  A   No.

1  Q   You also indicated that Arne Duncan was there?

2  A   Yes.

3  Q   And he was at the time the CEO of the Chicago

4  Public Schools?

:13PM  5  A   Yes.

6  Q   Was there any grant money that came from the City

7  of Chicago for this field?

8  A   No.

9  Q   And Rahm Emanuel was there, as well?

:13PM  10  A   Yes.

11  Q   And he was at the time a U.S. Representative?

12  A   Yes.

13  Q   Was there any federal grant money provided to the

14  school?

:13PM  15  A   For this field at that time, no.

16  Q   So the entire $2 million grant was to come from

17  the State of Illinois?

18  A   Yes.

19  Q   And, specifically, the Governor's Office to give

:14PM  20  a grant, is that correct?

21  A   Yes.

22  Q   And in order to get this grant through, there was

23  a lot of paperwork that had to be done?

24  A   Yes.

:14PM  25  Q   And the paperwork took significant amount of time

D. Feinstein - cross by Goldstein          2260

1  to the point that in June of 2006 the work started
2  to begin, is that correct?
3  A   Yes.
4  Q   And so the work started in June of 2006, and the
5  school received all its money in December of 2006,
6  is that right?
7  A   Yes.
8  Q   Okay.  Did you ever talk to Bradley Tusk, the
9  deputy of the governor about this grant?
10 A   No.
11 Q   Did you ever talk to Rahm Emanuel about this
12 grant?
13 A   At the press conference.
14 Q   At the press conference?
15 A   Yes.
16 Q   Since the press conference, did you ever talk to
17 Rahm Emanuel about the plan?
18 A   No.
19 Q   You were in some communication with his office,
20 is that correct?
21 A   Yes.
22 Q   Your main contact -- well, did you speak to
23 Governor Blagojevich about this grant?
24 A   No.
25 Q   Your main contact in the Governor's Office or the

:14PM

:14PM

:14PM

:15PM

:15PM

D. Feinstein - cross by Goldstein            2261

1  state was a man by the name of Paul Miller, is that
2  correct?
3  A   Yes.
4  Q   And Paul Miller was a lawyer in the Governor's
5  Office, to your knowledge?
6  A   I don't know what his role was in the Governor's
7  Office.
8  Q   You had a decent amount of communications with
9  Mr. Miller?
10 A   Yes.
11 Q   And based on your communications with Mr. Miller,
12 it was your understanding that the state didn't know
13 where exactly this money was going to come from, is
14 that correct?
15 A   Yes.
16 Q   And were you aware -- did you have any knowledge
17 as far as the budgetary constraints that the state
18 was having at this time?
19 A   No.
20 Q   Were you aware of any of the bills that the state
21 was not able to pay during this period of time?
22 A   No.
23        MR. GOLDSTEIN:  Could you publish government
24 Photo Number 2?
25     (Brief pause).

:15PM
:15PM
:15PM
:15PM
:15PM
:16PM

1      MR. GOLDSTEIN:  Your Honor, if I may publish

2  the government School Photo Number 2?

3          THE COURT:  Sure.

4      (Exhibit published to the jury.)

:16PM  5  BY MR. GOLDSTEIN:

6  Q   As we're bringing that up, Doctor, the field was

7  completed, is that correct?

8  A   Yes.

9  Q   When was it completed?

:16PM  10  A   I think around October.

11  Q   October of?

12  A   2006.

13  Q   2006.  Okay.

14          And do you recall when this picture was

:16PM  15  taken?

16  A   No, I do not.

17  Q   And the field, that was the $2 million that was

18  needed to make that field, is that correct?

19  A   Yes.

:16PM  20  Q   And that field was completed in October of 2006,

21  correct?

22  A   Yes.

23  Q   And it was built solely on state funds, is that

24  correct?

:17PM  25  A   Yes.

1 Q   And all the money was paid, is that correct?

2 A   Yes.

3 Q   And it was paid by the State of Illinois granted

4 by Governor Blagojevich, is that correct?

5 A   Yes.

6       MR. GOLDSTEIN:  If I may have one moment.

7     (Brief pause).

8       MR. GOLDSTEIN:  Nothing further.

9       Thank you, Your Honor.

10       MR. SCHAR:  Nothing further.

11       THE COURT:  You may step down.

12     (Witness excused.)

13       MR. SCHAR:  The government calls Bradley

14 Tusk.

15       THE COURT:  Face me and raise your right hand

16 right.

17     (Witness duly sworn.)

18       THE COURT:  Please be seated.

19       BRADLEY TUSK, GOVERNMENT WITNESS, SWORN

20               DIRECT EXAMINATION

21 BY MR. SCHAR:

22 Q   State and spell your first name and your last.

23 A   Bradley Tusk, B-r-a-d-l-e-y T-u-s-k.

24 Q   Where do you live, Mr. Tusk?

25 A   I live in New York.

:17PM

:17PM

:18PM

:18PM

:18PM

1  Q   What do you do for a living?

2  A   I'm a what is a political consultant.

3  Q   What does that mean?

4  A   It means I help candidates and issues generally

5  run campaigns.

6  Q   What is your educational background?

7  A   I have a BA from the University of Pennsylvania

8  and a JD from the University of Chicago.

9  Q   What did you do after graduating from law school?

10 A   I worked at the New York City Parks Department

11 for the Commissioner.

12 Q   At some point did you come to take a job in

13 Chicago?

14 A   I did.

15 Q   Approximately when?

16 A   In 2003.

17 Q   What job did you take?

18 A   I was the Deputy Governor of the State of

19 Illinois.

20 Q   Under Rod Blagojevich's administration?

21 A   Yes.

22 Q   How long were you Deputy Governor of the State of

23 Illinois?

24 A   Just under 4 years.

25 Q   When did you leave?

1  A   In December of 2006.

2  Q   How did you learn about the Deputy Governor's

3  position in Illinois?

4  A   I was contacted about it by a former colleague

5  named John Wyma.

6  Q   How did you know Mr. Wyma?

7  A   We worked together in Senator Schumer's office in

8  Washington, D.C.

9  Q   Who is Senator Schumer?

10  A   He's a United States Senator from New York.

11  Q   At the time that you heard about the job as

12  Deputy Governor, what job did you have?

13  A   I was Special Assistant to Mayor Bloomberg in New

14  York City.

15  Q   Did you ultimately come to interview for the

16  position of Deputy Governor?

17  A   I did.

18  Q   About when?

19  A   In February of 2003.

20  Q   Where did you come to?

21  A   Flew to Chicago.

22  Q   With whom did you meet?

23  A   Initially I met -- ultimately met with the

24  Governor, but before that my first meeting was with

25  Mr. Wyma and Chris Kelly.

1  Q   Where did the meeting with Mr. Wyma and Chris
2  Kelly take place?
3  A   It took place at the East Bank Club in Chicago.
4  Q   Did you know who Chris Kelly was at that time?
5  A   Only from Mr. Wyma's description.
6  Q   What was Mr. Wyma's description?
7  A   That he was a roofer and a supporter of the
8  Governor's.
9  Q   Did you know why you were meeting with Mr. Kelly
10 about the Deputy Governor job?
11 A   Not specifically, other than I assumed his
12 opinion mattered to the people making the decision.
13 Q   What did you and Mr. Kelly -- or what happened in
14 the interview with Mr. Kelly?
15 A   We just talked generally.  I remember
16 specifically him asking about New York City
17 government and politics and specifically a lot of
18 questions about Mayor Giuliani and how he ran his
19 administration.
20 Q   Did you actually work for Mayor Giuliani?
21 A   I did not, no.
22 Q   After talking to Mr. Kelly, do you remember what
23 happened next?
24 A   I then went to the Thompson Center for a meeting
25 with Governor Blagojevich, Lon Monk, and there might

:20PM

:20PM

:20PM

:20PM

:21PM

Tusk - direct by Schar                    2267

1  have been a few others, I'm not sure.

2  Q   Did you interview at that time with Defendant

3  Blagojevich, Mr. Monk, and others?

4  A   Yes, I did.

5          MR. SCHAR:  Is there a stipulation on

6  identification?

7          MR. GOLDSTEIN:  So stipulated.

8          THE COURT:  So stipulated.

9  BY MR. SCHAR:

10  Q   Were you ultimately offered the job as Deputy

11  Governor?

12  A   Yes, I was.

13  Q   Did you take the job?

14  A   I did.

15  Q   Did you move you and your family to Chicago?

16  A   Yes.

17  Q   What were your job responsibilities when you

18  started as the Deputy Governor?

19  A   I oversaw policy, communications, budget and

20  legislation for the State.

21  Q   What responsibilities did you have in relation to

22  legislative matters?

23  A   I was responsible for the legislative process.

24  Q   What does that mean?

25  A   It meant I oversaw both our legislative agenda to

Tusk - direct by Schar                                    2268

1  try to help make sure they passed and then oversaw
2  the bill review process for those approximately 5 or
3  600 bills that would pass each session.
4  Q   When you say the bill review process, what are
5  you referring to?
6  A   I'm referring to a process that takes place after
7  the session when all the bills are passed or
8  compiled.  There is a full review done of each bill
9  to determine whether or not it should be signed or
10 vetoed.
11 Q   What did you do in the context of that process in
12 deciding whether to sign or not sign the bill?
13 A   I oversaw the process and ultimately either made
14 the decision or help make the decision on what to
15 do.
16 Q   When you say you made the decision what to do
17 with them, what decision were you making, Mr. Tusk?
18 A   Whether to sign a bill which would enact it into
19 law or to veto the legislation which would then send
20 it back to the legislation.
21 Q   Why weren't you taking those decisions to
22 Defendant Rod Blagojevich?
23 A   Well, I did sometimes and tried to, but it's a
24 lengthy process, there are 5 or 600 bills, and he
25 wasn't always engaged in the process, so the task

1  fell to me.

2  Q   How often was Defendant Blagojevich in the

3  office?

4  A   Initially when I started working there, he was

5  there pretty regularly and then that fell off over

6  time and I'd say about the summer or fall of 2003

7  not frequently at all.

8  Q   Were there times when you would check with

9  Defendant Blagojevich before signing a bill?

10 A   Yes; sometimes.

11 Q   What would be such an occasion?

12 A   Generally if it was an issue that that was

13 prominent in the media or if it were an issue that

14 was part of our legislative agenda.

15 Q   Were you always able to check with Defendant

16 Blagojevich before you had to make a decision as to

17 whether to sign a bill?

18 A   No, there was a, I believe, 60-day window between

19 when the bill was passed and when it had to be acted

20 upon and I was not always able to check with him.

21 Q   What did you do in a situation where you could

22 not actually check with Defendant Blagojevich as to

23 whether to sign the legislation?

24 A   I made the decision to move forward.

25 Q   Did you sometimes have to track Defendant

1  Blagojevich down at certain locations?

2  A  I did, yes.

3  Q  Where would you track him down?

4  A  On the phone wherever he was or meet him in

5  various places.

6          MR. GOLDSTEIN:  Objection.

7          THE COURT:  The answer may stand.

8  BY MR. SCHAR:

9  Q  Did you have any recollection of locations?

10  A  I do.

11  Q  Where?

12  A  I remember once instance at his tailor's shop and

13  another one at his daughter's haircut.

14  Q  Were some bills vetoed?

15  A  Yes.

16  Q  What does it mean to veto a bill?

17  A  It means to reject it, which means it will not be

18  enacted into law, and then it goes back to the

19  legislature in which case they can either override

20  the Governor's veto with I think a three-fifths

21  majority or not and the bill does not place.

22  Q  Did you try to check with Defendant Blagojevich

23  before making a decision yourself on vetoing a bill?

24  A  Yes.

25  Q  Were you always able to do that?

:23PM

:24PM

:24PM

:24PM

:24PM

1  A   Not always.

2  Q   What would happen if you were not able to check

3  with the defendant?

4  A   Ultimately a decision had to be made otherwise.

5  Q   Who made that decision?

6  A   Me.

7  Q   Now, in your time as Deputy Governor did you

8  attend any strategy meetings outside the Thompson

9  Center?

10  A   Yes.

11  Q   What was -- could you explain to us briefly what

12  a strategy meeting was.

13  A   It a generally quarterly session where the

14  Governor and his top advisers would get together,

15  talk about the legislative agenda coming up, the

16  policy agenda, big media issues, and try to plan out

17  the next few months.

18  Q   Where did these meetings typically occur?

19  A   At different locations.  Sometimes the Standard

20  Club, sometimes at the Governor's campaign office.

21  Q   Approximately how many, ballpark, how many do you

22  recall attending?

23  A   I believe I was at every one from my tenure.  So

24  if they happen roughly four times a year, figure

25  approximately 15.

:24PM

:24PM

:25PM

:25PM

:25PM

1  Q   What type of topics were discussed at these
2  meetings?
3  A   The budget, the policy agenda, the legislative
4  agenda, major media issues and initiatives.
5  Q   Who was typically present for these strategy
6  meetings?
7  A   From the Governor's side generally myself, the
8  Chief of Staff, often the policy adviser, press
9  secretary.  From the Governor's political team, his
10 pollster, his main media consultant, generally one
11 or two state legislators, and then sometimes Chris
12 Kelly, Tony Rezko and others.
13 Q   Were Mr. Rezko and Mr. Kelly officially members
14 of the Office of the Governor?
15 A   No, they were not.
16 Q   Do you know what role they had?
17 A   They had no formal role.
18 Q   In your role as Deputy Governor, did you come to
19 have involvement with the State of Illinois grants
20 to the Academy for Urban School Leadership sometimes
21 referred to as the Chicago Academy?
22 A   Yes.
23 Q   What is the first thing you remember about the
24 AUSL grant?
25 A   I remember there was a press conference to

:25PM
:26PM
:26PM
:26PM
:26PM

1 announce it I think in the fall of 2005.

2 Q   Do you recall how much the grant was for

3 originally?

4 A   I believe it was for $2 million.

5 Q   What role, if any, did you have in relation to

6 the press conference?

7 A   I was asked who should attend and I remember

8 asking or having Randy Dunn who at the time was the

9 State Superintendent of Schools to attend the press

10 conference.

11 Q   Mr. Tusk, were you in any way involved in the

12 actual decision-making for the grant?

13 A   No, I was not.

14 Q   What was the grant for?

15 A   It was for an athletic facility at the Chicago

16 Academy.

17 Q   To your knowledge, had Defendant Blagojevich

18 agreed to fund that grant?

19 A   Yes.

20 Q   At the time that the grant was announced, did you

21 know Congressman Emanuel?

22 A   I did.

23 Q   How did you know him?

24 A   He was a congressman from Chicago, support of the

25 Illinois delegation, and worked with our office on

1  various initiatives.

2  Q   Was a 2 million-dollar grant a particularly large

3  grant for the Office of the Governor?

4  A   No, it was not.

5  Q   Approximately how much money was in the

6  grant-making pool?

7  A   Generally several -- several hundred million

8  dollars at any given time.

9  Q   After the press conference where the AUSL grant

10 was announced, did you have much involvement in the

11 grant process during the first part of 2006?

12 A   No, not that I recall.

13 Q   At some point did that change?

14 A   It did.

15 Q   About when?

16 A   I believe in the summer of 2006.

17 Q   What happened in the summer of 2006?

18 A   I started hearing from Congressman Emanuel and

19 from his staff about the timing of the release of

20 the grant.

21 Q   Prior to getting those calls, were you aware that

22 there was an issue with the grant?

23 A   I was not, no.

24 Q   Was there one call or multiple calls?

25 A   Multiple calls.

1  Q   Did you have any meetings in person or always
2  over the phone?
3  A   I don't recall any meetings in person.
4  Q   Do you recall each conversation individually or
5  generally collectively?
6  A   Just collectively.
7  Q   What was discussed?
8  A   Specifically the timing of the release of the
9  grant and financial obligations that the Academy had
10 incurred and therefore their need to be paid
11 quickly.
12 Q   What was your response?
13 A   That I would look into it and try to help them.
14 Q   Did you look into it?
15 A   I did.
16 Q   Who did you go to talk to?
17 A   I remember talking to John Filan.
18 Q   And after talking to John Filan, did you go and
19 have a conversation with Defendant Blagojevich?
20 A   I did.
21 Q   Approximately when was that conversation?
22 A   I believe it was in the late summer or early fall
23 of 2006.
24 Q   At this point were you still getting phone calls
25 about the release of the money?

1  A   Yes, I was.

2  Q   Your conversation with Defendant Blagojevich, was

3  that in person or over the phone?

4  A   It was over the phone.

5  Q   Where were you?

6  A   I was at home.

7  Q   What was the purpose of the phone call?

8  A   Well, probably discussed a number of items, but

9  one of them was clearly for me to convey the issue

10 at hand that Congressman Emanuel was very upset that

11 the funding had not been released.

12 Q   Funding for what?

13 A   For the Chicago Academy.

14 Q   What did you tell Defendant Blagojevich in the

15 conversation?

16 A   That Congressman Emanuel is very upset, saying

17 that these expenses had been incurred and the school

18 couldn't meet its obligations, he wanted the money

19 released, and I let him know that.

20 Q   What was Defendant Blagojevich's response?

21 A   He said that before the grant could be released

22 he wanted Congressman Emanuel's brother to hold a

23 fundraiser for him.

24 Q   When Defendant Blagojevich said words to the

25 effect of before the grant could be released he

1  wanted Congressman Emanuel to hold a fundraiser,

2  what did you understand him to be telling you?

3  A  I understood that he was saying that the grant

4  would not be released unless a fundraiser was first

5  held.

6  Q  What was your understanding as to whether

7  Defendant Blagojevich wanted that message delivered?

8  A  I believe he did want it delivered.

9  Q  Who did you understand he wanted it delivered to?

10  A  To Congressman Emanuel.

11  Q  Mr. Tusk, did you know who Congressman Emanuel's

12  brother is or was?

13  A  Yes, I did.

14  Q  Who is Congressman Emanuel's brother?

15  A  His Ari Emanuel.  He's a Hollywood agent.

16  Q  Did you understand him to be a fairly wealthy

17  individual?

18  A  Yes, I did.

19  Q  When Defendant Blagojevich indicated to you that

20  he wanted a message delivered to Congressman Emanuel

21  that the funding would be released when Congressman

22  Emanuel's brother held a fundraiser, what was your

23  response?

24  A  I got off the phone as quickly as I could.

25  Q  Did you deliver Defendant Blagojevich's message

1  that in order to get the AUSL money released

2  Congressman Emanuel's brother was going to have a

3  fundraiser?

4  A   No, I did not.

:31PM  5  Q   Why not?

6  A   Because I believed that doing that would be both

7  illegal and unethical.

8  Q   When you say illegal, you are a lawyer by

9  training, correct?

:31PM  10  A   Yes, I am.

11  Q   Did you ever practice criminal law?

12  A   No, I have not.

13  Q   In fact, within your duties with the Office of

14  the Governor, did you have any legal duties?

:32PM  15  A   No, I did not.

16  Q   Were you a legal adviser in any way?

17  A   No, I was not.

18  Q   Do you even know one way or the other, in fact,

19  whether or not it would be illegal to do that?

:32PM  20  A   Not based on law, no.

21  Q   What did you do after your conversation with

22  Defendant Blagojevich?

23  A   I made two phone calls.

24  Q   Do you remember if it was the same day or shortly

:32PM  25  thereafter?

1  A   It was the same day.

2  Q   Who did you contact first?

3  A   I contacted John Wyma.

4  Q   Why did you contact John Wyma?

5  A   I contacted John because I knew that that he's

6  close with both Governor Blagojevich and with

7  Congressman Emanuel and it seemed to me that if

8  somebody were going to communicate that request, I

9  was concerned that John would be asked to do that,

10  and so I wanted to get to him first and make sure he

11  knew not to do it.

12  Q   And when you say John would be asked to do that,

13  who did you think was going to ask him to do that?

14  A   The Governor.

15  Q   What did you -- did you, in fact, talk to

16  Mr. Wyma that evening or later that day?

17  A   Yes, I did.

18  Q   What did you and Mr. Wyma discuss?

19  A   I relayed my conversation with him and told him

20  he needed to make sure that it did not happen.

21  Q   What was Mr. Wyma's response?

22  A   He agreed.

23  Q   You said you made two calls.  Was there another

24  call that day?

25  A   Yes, there was.

1  Q   Who was the next call to?

2  A   I called Bill Quinlan.  Bill at the time was the

3  general counsel and I believe the chief ethics

4  officer for the Governor's Office.

5  Q   What did you explain to Mr. Quinlan?

6  A   It was similar to the conversation with Mr. Wyma.

7  I let him know what had transpired, and said that he

8  needed to make sure it didn't happen, and that in

9  his capacity as Chief Ethics Officer he needed to

10 know about it.

11 Q   What specifically do you remember telling him

12 about what it is you thought he should do?

13 A   That he should put a stop to it.  I used the

14 phrase, "you need to get your client under control."

15 Q   What was Mr. Quinlan's response?

16 A   He said he would take care of it.

17 Q   Do you know what, if anything, he actually did?

18 A   No, I do not.

19 Q   Did you ever raise the issue with Mr. Quinlan

20 again?

21 A   No, I did not.

22 Q   Did you ever raise the issue of the AUSL grant

23 again with Defendant Blagojevich?

24 A   No, I did not.

25 Q   Why not?

1  A   Because I didn't want what he had proposed to
2  happen, so the last thing I wanted to do is re-raise
3  the issue and make it a possibility again.
4  Q   At that point you basically tried to distance
5  yourself from the AUSL grant?
6  A   Yes, I did.
7  Q   Who was ultimately put in charge of authorizing
8  payments for the grant?
9  A   John Harris.
10 Q   What was the process that was put in place, to
11 your knowledge?
12 A   To my knowledge, as expenses were incurred and
13 documentation received, Harris would then order the
14 release of money to cover that amount.
15 Q   Is there anything unusual about that, to your
16 knowledge?
17 A   Yeah, it was unusual.
18 Q   What was unusual about that?
19 A   I thought it was unusual for two reasons; one --
20       MR. SOROSKY:  Objection to what he thought.
21       MR. SCHAR:  701, Judge.
22       THE COURT:  Overruled.
23 BY THE WITNESS:
24 A   I thought it was unusual for two reasons:  First,
25 that the Governor's Chief of Staff would be dealing

1  so specifically with one grant; and, second, that it

2  was parceled out as opposed to just being given in

3  one full amount.

4          MR. SCHAR:  May I have a moment, Judge?

5       (Brief pause).

6  BY MR. SCHAR:

7  Q   Mr. Tusk, when you say it was unusual that the

8  Chief of Staff be involved.  Does the Chief of Staff

9  to the Governor of the State of Illinois typically

10 get involved in a 2 million-dollar grant?

11 A   No, not to my experience.

12 Q   Does he typically get involved in releasing

13 partial payments on a 2-million-dollar grant?

14 A   Not to my experience.

15          MR. SCHAR:  Nothing further.

16          THE COURT:  You may inquire.

17                  CROSS EXAMINATION

18 BY MR. SOROSKY:

19 Q   Hello, Mr. Tusk.  How are you?

20          Good to see you.

21 A   Hi, Mr. Sorosky.

22 Q   You don't mind if I call you Bradley, do you?  Or

23 Brad?

24 A   No, I do not.

25 Q   Thank you.

Tusk - cross by Sorosky                    2283

1          Now, I believe you were appointed Deputy
2   Governor in March of 2003, is that correct?
3   A   Yes, sir.
4   Q   And you served as Deputy Governor for
5   approximately 4 years, would that be correct?
6   A   Yes, sir.
7   Q   So you were basically the Deputy Governor for the
8   first term or the first 4 years of the Blagojevich
9   administration, correct?
10  A   Yes, sir.
11  Q   Now, I believe you said you went to the
12  University of Pennsylvania for your undergraduate
13  degree, is that correct?
14  A   Yes, sir.
15  Q   In fact, that would be an elite ivy league
16  school, would it not?
17  A   Yes, sir.
18  Q   And thereafter you went to the University of
19  Chicago Law School, did you not?
20  A   I did.
21  Q   And that is, literally, of all the law schools in
22  the country of the United States, that's in the top
23  ten, is it not?
24  A   I believe it is, yes.
25  Q   And before you worked for Governor Blagojevich,

Tusk - cross by Sorosky                    2284

1  you worked for Senator Schumer of New York, that is
2  United States Senator Schumer, did you not?
3  A  I did.
4  Q  And he certainly is a very prominent Democratic
5  senator, is he not?
6  A  He is.
7  Q  And after Senator Schumer you worked for Mayor
8  Bloomberg of New York, did you not?
9  A  I did.
10 Q  At the time he was a very prominent independent
11 Republican, was he not?
12 A  Yes, sir.
13 Q  And after those jobs, you interviewed for the job
14 of Deputy Governor, did you not?
15 A  I did.
16 Q  And you didn't have any local political sponsor
17 for your job, did you?
18 A  No, I did not.
19 Q  You didn't know Mayor Daley, did you?
20 A  No, I did not.
21 Q  You didn't know Speaker Madigan, did you?
22 A  No, I did not.
23 Q  You didn't know any Chicago aldermen, did you?
24 A  No, I did not.
25 Q  So when Governor Blagojevich hired you, he truly

1  hired an independent intelligent young man, did he
2  not?
3  A   I like to think so, yes.
4  Q   And I believe you said that you looked over
5  budget issues, would that be correct?
6  A   Yes.
7  Q   Legislative issues?
8  A   Correct.
9  Q   Communication issues?
10 A   Yes.
11 Q   And policy matters?
12 A   Yes, sir.
13 Q   And in the course of your duties regarding
14 legislative matters, I believe that you said that
15 you reviewed 400 to 500 bills each year that passed
16 the legislature, did you not?
17 A   Yes.
18 Q   And you had a group of people under you, a policy
19 group, that you worked with to review those bills,
20 did you not?
21 A   Yes.
22 Q   And very often there were as many as 40 to 50
23 people studying these bills and analyzing these
24 bills, right?
25 A   It could be up to that many.  That's slightly on

Tusk - cross by Sorosky                    2286

1  the high side.
2  Q   And would you say that Governor Blagojevich was
3  sort of a big picture guy and not an nitty-gritty
4  detailed guy, would that be a fair assessment of
5  him?
6  A   It would.
7  Q   So one of the reasons why he hired a bright young
8  man like you is, you were to be the nitty-gritty
9  guy, right?  While he did the big picture work?
10         THE COURT:  Are you objecting?
11         MR. SCHAR:  I am.
12         THE COURT:  No mind reading.  The objection
13  is sustained.
14         MR. SOROSKY:  I apologize.
15  BY MR. SOROSKY:
16  Q   Now, and I believe you said that very often you
17  alone decided to approve these bills because you
18  felt they would be in accord with Governor
19  Blagojevich's position, would you not?
20         MR. SCHAR:  Objection.
21         THE COURT:  The objection to the form of the
22  question is sustained.
23  BY MR. SOROSKY:
24  Q   You approved many of these bills based upon your
25  own belief that they would be in accord with

:40PM
:40PM
:40PM
:40PM
:41PM

Tusk - cross by Sorosky                    2287

1 Governor Blagojevich's position, did you not?

2 A   Yes.

3 Q   And Governor Blagojevich never said to you:  Hey,

4 before we approve any of these bills, let's make

5 sure we get a contribution from someone who might be

6 favored by these bills, did he?

7         MR. SCHAR:  Objection, Judge.

8         THE COURT:  The objection is sustained.

9 BY MR. SOROSKY:

10 Q   Did Governor Blagojevich ever say to you:

11 Bradley, come to me with any bill that might favor a

12 certain group so we could get a contribution out of

13 them, I want to get that contribution before we sign

14 that bill?

15         MR. SCHAR:  Objection.

16         THE COURT:  Sustained.

17         (Brief pause)

18         THE COURT:  I sustained it.

19         MR. SOROSKY:  Oh.  Sorry.

20 BY MR. SOROSKY:

21 Q   Now, did the Governor ever say to you:  I'm not

22 approving a certain bill unless I get a contribution

23 from a party?

24         MR. SCHAR:  Objection.

25         THE COURT:  The objection is sustained.

:41PM
:41PM
:41PM
:42PM
:42PM

1 BY MR. SOROSKY:

2 Q   Now, many of these bills were sponsored by some

3 of Governor Blagojevich's opponents, were they not?

4 A   Yes.

:42PM   5 Q   Did Governor Blagojevich ever refuse to sign a

6 bill that was good merely because it was sponsored

7 by an opponent?

8         MR. SCHAR:  Objection.

9         THE COURT:  Sustained.

:42PM   10 BY MR. SOROSKY:

11 Q   Now, were you working in the Governor's Office as

12 Deputy Governor when the pension obligation bond

13 legislation was approved?

14         MR. SCHAR:  Objection; scope.

:43PM   15         THE COURT:  It's outside the scope.

16 BY MR. SOROSKY:

17 Q   Now, let's turn to the Chicago Academy, because

18 that seems to be what the meat and potatoes of your

19 testimony is about; okay?

:43PM   20         Now, in the years that you were Deputy

21 Governor, how often did you talk to Governor

22 Blagojevich?  Once a day?  Ten times a day?  What

23 would you say?

24 A   Many times a day.

:44PM   25 Q   You talked to the Governor many times a day,

1  right?

2  A   Yes, sir.

3  Q   And would it be accurate to say that the Governor

4  was a very talkative person?

5  A   Yes, it would be.

6  Q   It would be inaccurate to say the Governor was a

7  shy person?

8  A   It would be inaccurate to say that.

9  Q   He's certainly expressive, is he not?

10  A   He is.

11  Q   And once in a while he says things and blows off

12  a lot of steam, doesn't he?

13  A   Yes.

14  Q   And when you worked with the Governor, didn't you

15  come to know that the Governor once in a while would

16  be very expressive and say certain things and just

17  sort of took it with a grain of salt and didn't take

18  it that seriously?

19  A   Yes.

20  Q   Were you familiar with the relationship between

21  Governor Blagojevich and Congressman Emanuel?

22  A   Yes, I was.

23  Q   It was a good relationship, was it not?

24  A   Yes, it was.

25  Q   And Congressman Emanuel was someone that Governor

Tusk - cross by Sorosky                    2290

1  Blagojevich truly had respect for, did he not?

2  A   I believe he did.

3  Q   And Governor Blagojevich would always be willing

4  to take Congressman Emanuel's phone calls, would he

5  not?

6  A   I don't know about always, but he took his calls.

7  Q   He took his calls much more so than he took other

8  prominent people's calls, did he not?

9  A   Yes; definitely.

10 Q   So if Governor Blagojevich wanted something from

11 Congressman Emanuel, he certainly could call him up

12 and ask for it, couldn't he?

13         MR. SCHAR:  Objection.

14         THE COURT:  He can answer this.

15 BY THE WITNESS:

16 A   I suppose he could.

17 BY MR. SOROSKY:

18 Q   Now, you had some familiarity with this grant for

19 the school, did you not?

20 A   Some; yes.

21 Q   And there was nothing out of the ordinary or

22 unusual about the request for this grant, was there?

23 A   No.

24 Q   And there was nothing out of the ordinary or

25 unusual about Governor Blagojevich approving this

:46PM

:46PM

:46PM

:47PM

:47PM

Tusk - cross by Sorosky                    2291

1  grant, was there not?

2  A   No.

3  Q   Now, I believe you said that one of your areas of

4  concentration was in budgetary matters, was it not?

5  A   Yes.

6  Q   And I believe you said this grant was approved in

7  originally the fall of 2005, is that correct?

8  A   Yes.

9  Q   And by the spring and summer of 2006, the money

10  was actually needed to fund this grant, is that

11  correct?

12  A   Yes.

13  Q   Could you tell the ladies and gentlemen of the

14  jury how much in debt the State was at this period

15  of time, approximately?

16  A   This was 2006 and I actually believe that we

17  entered that year without a budget deficit.  From my

18  recollection, I don't believe we had a budget

19  deficit that year, sir.

20  Q   No budget deficit that year?

21  A   To the best of my recollection, I believe that

22  year we did not have one.

23  Q   So now how beseiged was the State to pay out all

24  sorts of requests for good things like this school?

25  Wasn't the State constantly bombarded for requests

1  similar to the Chicago Academy from all kinds of
2  people?
3          MR. SCHAR:  Objection.
4          THE COURT:  You're dealing with -- you're
5  confusing two things in this particular case.  I'm
6  sustaining the objection.
7  BY MR. SOROSKY:
8  Q   Were the State's limited budgetary resources
9  constantly bombarded for legitimate requests?
10         MR. SCHAR:  Objection.
11         THE COURT:  What you're talking about is a
12 general state of affairs, what's at issue here is a
13 grant that had already been approved.  And if you
14 want to ask him about refusals of grants that had
15 already been granted, that would have some
16 relevance.
17         MR. SOROSKY:  Thank you, Your Honor.
18 BY MR. SOROSKY:
19 Q   There was a big press conference where this grant
20 was approved, right?
21 A   Where it was announced, yes.
22 Q   And there are many other grants that were also
23 approved by the State on other important needs,
24 correct?
25         MR. SCHAR:  Objection.

Tusk - cross by Sorosky                    2293

1      THE COURT:  The objection is sustained.
2  BY MR. SOROSKY:
3  Q   Was the State -- did the State budget have to
4  struggle and find money to fulfill all these
5  necessary grants?
6      MR. SCHAR:  Objection.
7      THE COURT:  The objection is sustained.
8  BY MR. SOROSKY:
9  Q   Now, I believe you first became aware -- or when
10  did you first become aware that there might be a
11  problem with funding this grant, approximately?
12  A   From what I recall, the summer of 2006.
13  Q   And how many phone calls did you receive not from
14  Congressman Emanuel, but from his office?
15  A   I don't recall the specific number, but many.
16  Q   Many?
17  A   Yes, sir.
18  Q   And, basically, the calls were saying where's our
19  money for this grant, correct?
20  A   Yes.
21  Q   So after receiving many calls on this topic, you
22  finally one day spoke over the phone with Governor
23  Blagojevich about it, correct?
24  A   Yes.
25  Q   And you explained the issue to Governor

:50PM
:50PM
:51PM
:51PM
:51PM

1  Blagojevich about the school being given a grant and
2  the Congressman's office was calling wanting to know
3  why the grant wasn't being funded, correct?
4  A   Yes.
5  Q   And I believe you said this conversation that you
6  had with the Governor was over the telephone, is
7  that correct?
8  A   Yes.
9  Q   And the Governor was home at the time, right?
10 A   I don't recall where he was.  I was at home.
11 Q   You were at home?
12 A   Yes, sir.
13 Q   So you worked a full day, right?  Did you not?
14 A   I presumably did, yes.
15 Q   In fact, you worked sometimes 10, 12 hours a day,
16 did you not?
17 A   I did.
18 Q   So if you were calling from your House, it
19 probably was late at night, is that correct?
20 A   I recall the call being in the evening, yes.
21 Q   Pardon me?
22 A   I recall the call took place in the evening.
23 Q   Late in the evening, right?
24 A   I don't know what time in the evening.
25 Q   But it was in the evening?

:52PM
:52PM
:52PM
:52PM
:53PM

Tusk - cross by Sorosky                            2295

1   A   Yes.

2   Q   After regular daytime working hours, right?

3   A   Yes.

4   Q   And so the Governor was either at home or perhaps

5   at some function, is that correct?

6   A   I'm not sure where he was.

7   Q   And the Governor really wasn't concentrating on

8   this issue at the time, was he?

9           MR. SCHAR:  Objection.

10          THE COURT:  They were in different places, so

11  now we have mind reading over the telephone and

12  maybe you could not ask that question.

13  BY MR. SOROSKY:

14  Q   And after you related this issue about the school

15  and the grant not being funded, did not the Governor

16  say, "where's my fundraiser?  Tell Ron to have his

17  brother to have a fundraiser," isn't that what the

18  Governor said?

19  A   Something along those lines, yes.

20  Q   I'll repeat that, "where is my fundraiser?  Tell

21  Ron to have his brother have a fundraiser," isn't

22  that what the Governor said?

23          MR. SCHAR:  Objection; asked and answered.

24          THE COURT:  Overruled.  He can answer.

25  BY MR. SOROSKY:

Tusk - cross by Sorosky                    2296

1  Q   I'll repeat it again.  Didn't the Governor say:
2  One:  "where is my fundraiser?"  Two:  "Tell Ron to
3  have his brother have a fundraiser"?
4          MR. SCHAR:  That is actually not an accurate
5  statement.  Objection.
6          MR. SOROSKY:  The "one" and the "two" is
7  mine, I took the poetic line, but other than
8  the numbers "one" and "two" --
9          THE COURT:  Rephrase it.
10 BY MR. SOROSKY:
11 Q   Didn't the Governor say, "where is my fundraiser"
12 and "tell Ron to have his brother have a
13 fundraiser," isn't that what the Governor said?
14 A   Something along those lines, that's all I recall
15 him saying.
16 Q   Let me ask you, in March of -- in March of 2009,
17 you came in from New York to Chicago to testify in
18 the grand jury, did you not?
19         MR. SCHAR:  I'm going to object.  It's not
20 impeaching.  Grand jury statement states "words to
21 the effect of" and then the quotes.
22         THE COURT:  Let me see it.
23         (Brief pause).
24         THE COURT:  Not impeaching.  Sustained.
25 BY MR. SOROSKY:

:54PM
:54PM
:55PM
:55PM
:56PM

1  Q   Now, today you said just ten minutes ago that the

2  Governor said before the grant could be released, I

3  wanted a fundraiser, isn't that what you said today?

4  A   No, what I said --

:56PM   5  Q   Or words to that effect?

6  A   I said --

7  Q   That's exactly what you said, but isn't that what

8  you said --

9          THE COURT:  Wait.  Wait.  Wait.  Wait.

:56PM   10         MR. SOROSKY:  I apologize.

11         THE COURT:  He started answering, it's our

12  custom to let him finish.

13         MR. SOROSKY:  I apologize.

14  BY THE WITNESS:

:56PM   15  A   I was asked what transpired in the direct

16  examination in the conversation and answer the

17  question by saying what the Governor communicated to

18  me was in return for the grant to be released he

19  wanted a fundraiser to take place.

:57PM   20  BY MR. SOROSKY:

21  Q   Slow down.  Just say it slower.

22  A   Sure.  I was asked in the direct examination what

23  transpired on the phone call.

24  Q   Correct.

:57PM   25  A   And what I said was that --

1  Q   Slowly.

2  A   What the Governor said to me was that he wanted a

3  fundraiser to take place in order for the grant to

4  be received.

5  Q   So he wanted -- so what you said today was, he

6  wanted a fundraiser to be had before the grant could

7  be released?

8  A   Correct.

9  Q   Okay.  He wanted a fundraiser to be had before

10  the grant could be released, but before the grand

11  jury you said "where's --"

12          MR. SCHAR:  Objection.

13          MR. SOROSKY:  "Where's my fundraiser."

14          THE COURT:  Wait.  Wait.  Wait.

15          We're dealing with "words to the effect" and

16  that's not impeaching.  I'm sustaining the

17  objection.

18  BY MR. SOROSKY:

19  Q   Now, you said that you thought this was illegal,

20  correct?

21  A   Yes.

22  Q   Did you quit your job?

23  A   No.

24  Q   Did you call the FBI or the United State's

25  Attorney or Cook County State's Attorney?

:57PM

:57PM

:57PM

:58PM

:58PM

1  A   No, I took what I believe were reasonable
2  steps --
3  Q   Yes or no.
4  A   -- to deal with the matter.
:58PM    5  Q   Yes or no.
6  A   No, I did not.
7  Q   Did you contact the Illinois State Bar
8  Association or the Attorney Registration and
9  Disciplinary Commission?  You knew the Governor was
:58PM    10  a lawyer.
11  A   No.  As I said on direct, I talked to Mr. Wyma
12  and Mr. Quinlan.
13  Q   Do you know a woman by the name of Z. Scott?
14  A   Yes.
:58PM    15  Q   What position did she have at the time?
16  A   I don't know.  I'm not sure -- your question I
17  think is to say that she was the Inspector General.
18  I don't know that she still was at the time of the
19  call.
:59PM    20  Q   Did you contact the Inspector General's Office in
21  the State of Illinois and say we have an impropriety
22  here?
23  A   I believe that the proper procedure was to --
24  Q   Yes or no, Mr. Tusk?
:59PM    25  A   The Chief Ethics Officer is a part of that

1  process, that's who I contacted.

2  Q   Mr. Tusk, I asked you a question, did you contact

3  the Office of the Inspector General?

4  A   No.

5  Q   So you thought the Governor was doing something

6  illegal but you did not contact any law enforcement

7  office?

8  A   No.

9  Q   You didn't quit your job?

10  A   No.

11  Q   You knew the Governor was a lawyer, you didn't

12  contact the Attorney Registration and Disciplinary

13  Commission, right?

14  A   I did not.

15  Q   Now, you say the Governor was a very talkative

16  man, right?

17  A   He was.

18  Q   And he certainly used a lot of profanity, did he

19  not?

20  A   He did.

21  Q   Now, whatever day this conversation occurred, you

22  talked to the Governor regularly for almost the next

23  2 years, correct?

24  A   No, I left my job several months after that call.

25  Q   Okay.  You talked to him regularly through the

:59PM
:59PM
:59PM
:00PM
:00PM

Tusk - cross by Sorosky                2301

1  next 6, 7 months?

2  A   Probably for the next month or so.

3  Q   Well, when did you leave your job?

4  A   December 2006.

5  Q   And this conversation occurred in the summer

6  of 2006, right?

7  A   Late summer or early fall.

8  Q   So you talked to him for at least 3 or 4 more

9  months on a daily basis, right?

10 A   Towards the end of my tenure, we didn't speak as

11 frequently, but yes, we continued to communicate

12 regularly after this call.

13 Q   You spoke to him on a daily basis?

14 A   For a while, yes.

15 Q   Okay.  Ever once after that comment did he ever

16 say:  Bradley, get on the f'ing phone and call

17 Congressman Emanuel, where is my fundraiser?

18 A   No, he did not.

19 Q   Did he ever say -- I believe you said that

20 Governor Blagojevich had a good friend by the name

21 of John Wyma, is that correct?

22 A   Yes.

23 Q   And you knew John Wyma was also a good friend of

24 Congressman Emanuel, right?

25 A   Yes.

Tusk - cross by Sorosky                    2302

1  Q   And you thought:  Oh my God, Governor Blagojevich
2  may ask John Wyma to contact Congressman Emanuel,
3  did you not?
4  A   I did.
5  Q   Now, you spoke to John Wyma regularly, did you
6  not?
7  A   I did.
8  Q   Did John Wyma ever tell you:  Bradley, you're
9  right, the Governor called me and asked me to call
10 Congressman Emanuel for that fundraiser?  Did that
11 ever happen?
12 A   No, Not that I recall.
13 Q   Is it not that you recall or never?
14 A   I don't ever recall a conversation like that
15 taking place.
16 Q   Isn't that the same as saying it never happened?
17 A   I don't recall that conversation taking place.
18 Q   Wouldn't you recall that?
19 A   I -- I do not recall that conversation taking
20 place.
21 Q   Did you ever hear Governor Blagojevich order or
22 ask anyone to call Congressman Emanuel to tell the
23 Congressman:  Look, if you want this grant to go to
24 the school, you or brother would have to set up a
25 fundraiser for me?

:01PM
:02PM
:02PM
:02PM
:03PM

Tusk - cross by Sorosky                    2303

1  A   No.

2  Q   And I believe you said you talked to Bill Quinlan

3  about this matter, did you not?

4  A   I did.

:03PM  5  Q   And Bill Quinlan was legal counsel to the

6  Governor, was he not?

7  A   Yes.

8  Q   And you talked to Bill Quinlan when you were

9  Deputy Governor regularly, did you not?

:03PM  10  A   Yes.

11  Q   And you and Quinlan probably talked to each other

12  ten times a day, did you not?

13  A   Yes.

14  Q   And was not one of your topics:  Oh, there's

:03PM  15  Blagojevich again shooting off his mouth, what could

16  we do about it?  Didn't that regularly occur between

17  Quinlan and you?

18        MR. SCHAR:  Objection, Judge.

19        THE COURT:  Sustained to the form of the

:03PM  20  question.

21  BY MR. SOROSKY:

22  Q   When you told this to Bill Quinlan, didn't he

23  say:  Oh, that's just him talking again, it's

24  nothing, I'll talk to him about it?  Isn't that what

:04PM  25  Bill Quinlan said?

1  A   No, not that I recall.

2  Q   Didn't he say:  I'll take care of it, don't worry

3  about it, it's nothing?

4  A   He said he would take care of it, I don't recall

5  him saying that it was nothing.

6  Q   Now, I believe you said that it was your

7  understanding of the Governor's statement that the

8  Governor wanted communicated to Rahm Emanuel that

9  Rahm Emanuel's brother needed to do a fundraiser in

10 order for the grant to be enacted, right?

11 A   Yes.

12 Q   That was your understanding of the Governor's

13 statement?

14 A   Yes.

15 Q   Yet, you don't know of anyone who ever said to

16 Congressman Emanuel:  Hey, Congressman, you want the

17 grant to go to the school, do a fundraiser?  Do you

18 know of anyone who communicated that to the

19 Congressman on behalf of the Governor?

20 A   No, I do not.

21 Q   And as we said, the Governor is certainly not a

22 shy, untalkative person, is he?

23 A   He is not untalkative.

24 Q   And he certainly gave a lot of orders when he was

25 Governor, didn't he?

:04PM

:05PM

:05PM

:05PM

:05PM

Tusk - cross by Sorosky                          2305

1  A   Yes.

2  Q   You were the subject of those orders, were you

3  not?

4        You were someone who he would tell to do

:05PM
5  things, did he not?

6  A   Yes.

7  Q   And he never told you after that conversation to

8  call Congressman Emanuel to get that fundraiser in

9  return for the grant, did he?

:06PM
10  A   No.

11  Q   Now, I believe you said you received many, many

12  calls, or many calls, from Congressman Emanuel's

13  office asking for the money to be funded for the

14  school, right?

:06PM
15  A   Yes.

16  Q   And the money was funded for the school, was it

17  not?

18  A   It was.

19  Q   Yet, there was not one call to Congressman

:06PM
20  Emanuel to say:  Hey, if you want the grant money to

21  go to the school, you gotta do a fundraiser, right?

22        MR. SCHAR:  Objection.

23        MR. SOROSKY:  The objection is sustained.

24  BY MR. SOROSKY:

:07PM
25  Q   Do you know of one call to Congressman Emanuel

Tusk - cross by Sorosky                          2306

1  from the Governor or any of the Governor's agents
2  saying:  Congressman, you want the grant money to go
3  to the school, we gotta have the fundraiser?  Do you
4  know one call like that?
:07PM   5  A  No, I do not.
6  Q  So is this whole thing just in one late-night
7  conversation the Governor blowing off some steam:
8  Where is my fundraiser?  Tell Ron's brother have a
9  fundraiser?
:07PM   10          MR. SCHAR:  Objection.
11          THE COURT:  You can save the argument for the
12  closing part of it.
13          MR. SOROSKY:  Maybe we will.
14          One moment.
:07PM   15     (Brief pause).
16  BY MR. SOROSKY:
17  Q  Now, in the year 2003, you were Deputy Governor,
18  were you not?
19  A  Yes.
:08PM   20  Q  Was there an ethics law passed in 2003 under
21  Governor Blagojevich's administration and with his
22  support concerning the reporting of wrongdoing?
23          MR. SCHAR:  Objection, Judge.
24          THE COURT:  The objection is sustained.
:08PM   25  BY MR. SOROSKY:

Tusk - cross by Sorosky                    2307

1  Q   Are you familiar with the ethics law of 2003?

2          MR. SCHAR:  Objection, Judge.

3          THE COURT:  The objection is sustained.

4  You're way beyond the scope.

5          MR. SOROSKY:  Could we have our one sidebar

6  of the day for an offer of proof?

7          THE COURT:  Sure.

8       (Proceedings heard at sidebar on the record.)

9          MR. SOROSKY:  Our position would be under the

10  ethics law which was enacted in 2003 that any State

11  employee who knows of any wrongdoing is required to

12  report it to the Inspector General, and that he,

13  Mr. Tusk, was there at the inception of the law and

14  the supporter of the law never reported it to the

15  Inspector General in light of this law.

16          THE COURT:  I gather from a period of time

17  where he was not answering the question would offer

18  his own defense, what his defense to that was is he

19  thought the appropriate way was to report it to the

20  Governor's ethics guy.  And my guess would be that

21  if the government intends to bring that out on

22  redirect if that is what he thought he was required

23  to do and if you want to ask him about the State

24  law, you're entitled to do that, but just ask him.

25       (Proceedings resumed within the hearing of the

Tusk - redirect by Schar                                    2308

1          jury.)

2     BY MR. SOROSKY:

3     Q   Are you familiar with the State ethics law of

4     2003?

:11PM  5          THE COURT:  No, I'm sustaining that objection

6     absent the scope being broadened if there is

7     redirect.

8               MR. SOROSKY:  Okay.  No further questions.

9               MR. SCHAR:  Just briefly.

:11PM 10                    REDIRECT EXAMINATION

11    BY MR. SCHAR:

12    Q   Mr. Tusk, you were asked some questions about the

13    big picture of legislation.  Did you want to be the

14    person or did you expect to be the person who was

:11PM 15    going to be making decisions upon what the State of

16    Illinois would pass or veto?

17    A   That was not my expectation upon taking the job.

18               MR. SOROSKY:  Objection.  Outside of the

19    scope of the cross.

:11PM 20               MR. SCHAR:  There was a whole section of it.

21               THE COURT:  No, it isn't.  The objection is

22    overruled.

23    BY MR. SCHAR:

24    Q   Was that your expectation of doing that?  Did you

:12PM 25    find that somebody had to make the decisions because

1  Defendant Blagojevich wasn't showing up?
2  A  Yes.
3  Q  And these are decisions needing to be made
4  because some of these laws are going to actually
5  take effect unless somebody vetoed it, correct?
6  A  Correct.
7  Q  Did you find that you could discuss these issues
8  with the Governor of the State of Illinois all the
9  time that had to make these decisions?
10 A  No, I could not always discuss it with him.
11 Q  Is it because you didn't want to discuss it or
12 you couldn't discuss it?
13 A  It was sometimes difficult to reach him.
14 Q  Did you find sometimes he was engaged in the
15 process?
16 A  No, he was not always engaged in the process.
17 Q  As for taking steps, you were asked questions
18 that you didn't go to the FBI, you didn't go to a
19 variety of agencies, did you have serious concerns
20 about what was told to you by Defendant Blagojevich?
21 A  I did.
22 Q  Did you take what you thought were reasonable
23 steps to try to stop Defendant Blagojevich to
24 communicate that message?
25 A  I did.

1  Q   That included calling Mr. Wyma and calling Mr.
2  Quinlan?
3  A   Yes, it did.
4  Q   You were asked questions about you didn't have
5  any further conversations with Defendant Blagojevich
6  about this.  Is it fair to say you didn't want to
7  have any further conversations about this topic at
8  all?
9          MR. SOROSKY:  Objection.
10          THE COURT:  Overruled.
11          THE WITNESS:  Correct.
12  BY MR. SCHAR:
13  Q   In fact, you were at this point transitioning to
14  get out of the office of the Governor, is that fair
15  to say?
16  A   I was.
17  Q   You were gone by December of 2006?
18  A   Yes, sir.
19  Q   In terms of ranting and raving, did you ever hear
20  Defendant Blagojevich rant and rave from time to
21  time?
22  A   Yes.
23  Q   Did he rant and rave about being upset that
24  something was put on the schedule that he did didn't
25  want to attend?

1  A   Yes.

2  Q   Did he rant and rave about meeting people on his

3  schedule who he didn't want to meet with?

4  A   Yes.

5  Q   Did you take those terribly seriously all the

6  time?

7  A   The meetings and events often had to happen, so I

8  understood them to be expressions of frustration.

9  Q   When he said what he said to you on that

10 telephone conversation about holding up the grant

11 for the fundraiser, did you think that was ranting

12 and raving?

13 A   No I did not.

14 Q   Did you take it very seriously?

15 A   I did.

16 Q   Did you take steps to try to communicate your

17 concerns to other individuals?

18 A   I did.

19        MR. SCHAR:  Nothing else, Judge.

20                 RECROSS EXAMINATION

21 BY MR. SOROSKY:

22 Q   I believe you testified on redirect examination

23 that you quit the Blagojevich administration or left

24 the administration some four or five months later,

25 is that correct?

Tusk - redirect by Schar                              2312

1  A   I left December of 2006.

2  Q   That was after Governor Blagojevich had completed

3  one term and was reelected, right?

4  A   It was after his reelection, just before the

5  completion of the first term.

6  Q   Right.  And didn't you only plan to stay one

7  term?

8  A   I did.

9  Q   So you left at the time you planned to leave four

10  years ago because you only planned to stay one term,

11  correct?

12  A   Correct.

13  Q   And you left to take a job with Goldman Sachs,

14  did you not?

15  A   I left to take a job with Lehman Brothers.

16  Q   With Lehman Brothers, excuse me.

17        And after you took a job with Lehman

18  Brothers, an issue arose as to whether Lehman

19  Brothers could work on the possibility of buying or

20  purchasing the Illinois lottery --

21        MR. SCHAR:  Objection.

22        THE COURT:  The objection is sustained.

23  BY MR. SOROSKY:

24  Q   Now, I believe Mr. Schar asked you if the

25  Governor said things on occasion because he was

1  frustrated?

2  A   Yes.

3  Q   And you testified that the Governor on occasion

4  said things because he was frustrated, right?

5  A   Yes.

6  Q   And he just said it once and that was it, right?

7  A   Sometimes once, sometimes repeatedly.

8  Q   And the Governor just said this statement once,

9  "where is my fundraiser?  Tell Ron's brother to have

10 a fundraiser," or words to that effect?  He just

11 said it once to you in a telephone conversation

12 sometime in the night, right?

13 A   Correct.

14 Q   And you don't know what the Governor was doing at

15 the time, do you?

16 A   No, I do not.

17 Q   And you don't know if he was frustrated about

18 whatever at the time, do you?

19 A   No, I do not.

20 Q   And just because he said that once, that's why

21 we're here on this issue today, right?

22         MR. SCHAR:  Objection.

23         THE COURT:  Don't do that.  I mean now we're

24 into mind reading into the prosecution.

25         If it's not clear, I sustained the objection.

1  BY MR. SOROSKY:

2  Q   And although he said that once, he never told you

3  after that momentary comment on the phone to call up

4  Congressman Emanuel and ask for that fundraiser in

5  return for the grant money to be dispensed, did he?

6  A   He did not.

7  Q   You talked to him almost every day or every day?

8  A   Yes.

9  Q   And you don't know of anyone who he ordered to do

10  that?

11  A   No, I do not.

12  Q   And it was your testimony that Congressman

13  Emanuel was one of the few people the Governor was

14  on good terms with in higher political circles and

15  spoke to regularly, right?

16  A   Yes.

17  Q   And, in fact, Governor Emanuel was one of the few

18  people on stage with the Governor when he was

19  reelected, was he not?

20  A   I don't --

21  Q   Not Governor, I mean Congressman Emanuel.

22  A   I don't recall.

23  Q   You don't recall that, huh?

24  A   No.

25  Q   Congressman Emanuel certainly endorsed Governor

Tusk - redirect by Schar                    2315

1  Blagojevich, didn't he?

2          MR. SCHAR:  Objection, Judge.

3          THE COURT:  The objection is sustained.

4  BY MR. SOROSKY:

5  Q   One last area and then that'll be it.

6          You previously said you worked for Mayor

7  Bloomberg, did you not?

8  A   Yes.

9  Q   Now, sometime in the fall of 2006, after this

10 comment by the Governor occurred, just before the

11 election, just before the Governor's second

12 election, did you ask Mayor Bloomberg to contribute

13 $50,000 --

14         MR. SCHAR:  Objection.

15         MR. SOROSKY:  -- to Governor Blagojevich.

16         THE COURT:  The objection is sustained.

17         MR. SOROSKY:  What?

18         THE COURT:  The objection is sustained.

19         MR. SOROSKY:  Nothing further for this

20 witness.

21         MR. SCHAR:  Nothing further.

22         THE COURT:  You may step down.

23      (Witness excused.)

24         THE COURT:  We'll take a break.

25         THE MARSHAL:  All rise.

1      (The following proceedings were had out of the
2       presence of the jury in open court:)
3          THE COURT:  Counsel, approach the lectern.
4         (Brief pause.)
5          THE CLERK:  Please be seated in the
6    courtroom.
7             THE COURT:  Who is next?
8             MR. SCHAR:  Judge, we're going to talk about
9    that.  It'll either be Mr. Brusnighan or Mr. John
10   Harris.
11            THE COURT:  Who did you say?
12            MR. SCHAR:  It'll either be Duane Brusnighan
13   or John Harris.
14            THE COURT:  I'm assuming the first name is
15   shorter of the two witnesses?
16            MR. SCHAR:  Yes.
17            MR. SOROSKY:  I assume there's a difference
18   in time between the two.
19            THE COURT:  Yeah, that's what I'm talking to.
20            MR. SCHAR:  If we decide to call
21   Mr. Brusnighan, he's a 10-minute witness.
22            THE COURT:  Okay.  See you in about
23   15 minutes.
24        (Recess.)
25            THE MARSHAL:  All rise.

1      (The following proceedings were had in the
2       presence of the jury in open court:)
3          THE COURT:  Please be seated.
4          Call a witness.
5          MR. SCHAR:  Yes, Your Honor.
6          With your permission, I would like to read a
7  stipulation.
8          THE COURT:  Sure.
9          MR. SCHAR:  Second stipulation:
10      ".... it is hereby stipulated and agreed by and
11       between the United States of America, by and
12       through its attorney, Patrick J. Fitzgerald,
13       the United States Attorney, Northern District
14       of Illinois, that Rod Blagojevich, individually
15       and through his attorney, Sheldon Sorosky, and
16       the defendant Robert Blagojevich, individually
17       and through his attorney, Michael Ettinger, the
18       following facts are and should be considered by
19       the jury to be true and accurate:
20       Stipulation number 5:  The money obtained for
21       the $2 million grant by the Academy of Urban
22       School Leadership was used to directly purchase
23       goods and equipment in interstate commerce and
24       was further provided to companies within the
25       State of Illinois that customarily purchase

1    goods and equipment in interstate commerce."
2    "Stipulation number 7:  Signing Illinois House
3    Bill 4578 into law affected or had the
4    potential to affect interstate commerce.
5    Both Maywood Park Trotting Association, Inc.,
6    and Balmoral Racing Club, Inc., operated horse
7    racing tracks that customarily purchased goods
8    and equipment in interstate commerce, and
9    customarily paid race awards to horses from
10   outside the state of Illinois.
11   If Illinois House Bill 4578 was signed into
12   law, Maywood Park Trotting Association, Inc.,
13   and Balmoral Racing Club would have had
14   additional assets available for the purchase of
15   goods and equipment in interstate commerce and
16   for the payment of awards to horses from
17   outside the state of Illinois, thus affecting
18   interstate commerce."
19        And it should be, for the record, citing
20   Illinois House Bill 475.
21        So stipulated?
22        MR. ADAM, JR.:  So stipulated.
23        MR. ETTINGER:  So stipulated.
24        THE COURT:  So stipulated.
25        There a couple of things that I might pause

Tusk - redirect by Schar                              2319

1  to explain to you, one of which is a stipulation.
2  The jurisdiction of federal courts depends, in some
3  cases, on the acts involved and alleged in the
4  indictment having some effect, sometimes even only a
5  minor effect, on interstate commerce, which is what
6  was stipulated to.
7          The second thing is is you have heard some
8  objections in which the lawyer says "beyond the
9  scope" or, in shorthand, say scope."  What that is
10 is if a witness is put on direct examination and
11 asked about certain topics A, B and C, the
12 cross-examination cannot delve into D, E and F, they
13 are separate topics.  And the reason for that is,
14 the cross-examiner can call the witness as part of
15 the cross-examiner's case and put the witness on
16 direct examination about D, E and F, that's why we
17 have the scope objection and that's what it means.
18         With that, call a witness.
19         MS. HAMILTON:  The government calls John
20 Harris.
21         THE COURT:  Face me and raise your right
22 hand.
23     (Witness duly sworn.)
24         THE COURT:  Please be seated.
25

1          JOHN F. HARRIS, GOVERNMENT WITNESS, SWORN
2                     DIRECT EXAMINATION
3    BY MS. HAMILTON:
4    Q   Good afternoon.
5           Please state and spell your name for the
6    jury.
7    A   John F. Harris, J-o-h-n F. H-a-r-r-i-s.
8    Q   Mr. Harris, how old are you?
9    A   48.
10   Q   Where do you live?
11   A   On the north side of the City of Chicago.
12   Q   What is your educational background?
13   A   I completed college and law school and graduated
14   in 1987.
15   Q   Where did you go to college?
16   A   Northwestern University.
17   Q   Where did you go to law school?
18   A   Loyola University.
19   Q   What did you do after law school?
20   A   I went on active duty in the United States Army.
21   Q   How long were you with the United States Army?
22   A   3 years as a reservist while in law school and
23   nearly 5 years as an active duty officer.
24   Q   What did you do as an active duty officer for the
25   Army?

:50PM
:51PM
:51PM
:51PM
:51PM

Harris - direct by Hamilton                    2321

1    A   I was Judge Adequate General, which is a JAG

2    officer, which is an army lawyer.

3    Q   When did you leave the Army?

4    A   I left the Army 1992.

5    Q   What did you do then?

6    A   I came to work for the City of Chicago.

7    Q   What was your first position with the City of

8    Chicago?

9    A   Assistant Commissioner of Intergovernmental

10   Affairs and Legislative Affairs for the city's

11   Department of Aviation, City of Chicago's Department

12   of Aviation.

13   Q   What was your next position with the City of

14   Chicago?

15   A   With the Department of Aviation I held a few

16   title on my first tour of duty there, left as the

17   Chief of Staff for the Chicago airport system, then

18   I went to work with the Chicago Police Department as

19   a Deputy Superintendent of Administrative Services,

20   spent 5 years in that position, returned to the

21   Department of Aviation as the first deputy

22   commissioner or chief operating officer for a period

23   of approximately 4 years, and then was appointed by

24   the mayor as budget director for the City of Chicago

25   and served in that capacity for about a year and a

1  half.

2  Q   Was that the last position you had at the City of

3  Chicago?

4  A   Yes.

5  Q   Generally, what were your duties as the budget

6  director?

7  A   I oversaw the development, the legislative

8  approval of, and execution of the City's nearly 6

9  billion dollar operating budget.

10 Q   Over the course of the various positions you held

11 with the City of Chicago, did you ever act as a

12 lawyer?

13 A   No.

14 Q   When did you leave the City of Chicago?

15 A   In late summer, early fall 2005.

16 Q   Why did you leave the City of Chicago then?

17 A   To take a position in Governor Blagojevich's

18 administration.

19 Q   What position did you take?

20 A   Chief of Staff.

21     MS. HAMILTON:  Your Honor, I ask if there is

22 going to be a stipulation on identification?

23     MR. ADAM, JR.:  Yes.

24     THE COURT:  It's stipulated that he has

25 identified Defendant Blagojevich as the person for

1  whom he knew.

2          MS. HAMILTON:  Thank you.

3  BY MS. HAMILTON:

4  Q  Mr. Harris, what do you currently do for a

5  living?

6  A  I work as an apprentice lineman electrician, I

7  work nights.

8  Q  How long have you been an apprentice lineman

9  electrician?

10  A  A year.

11  Q  At some point did you resign your position as

12  Chief of Staff for Defendant Rod Blagojevich?

13  A  Yes.

14  Q  When?

15  A  I believe it was December 12th, 2008.

16  Q  Why?

17  A  Following my arrest along with the Governor on

18  December 9th I found it untenable and unable to

19  continue to serve in that capacity.

20  Q  You said you were arrested on December 9th?

21  A  Yes.

22  Q  Was that 2008?

23  A  Yes.

24  Q  After you were arrested, did you decide to

25  cooperate with the government in its investigation?

1  A   Yes.

2  Q   Have you currently been charged with a crime?

3  A   Yes, ma'am.

4  Q   What crime have you been charged with?

5  A   Conspiracy to solicit a bribe.

6  Q   Have you pled guilty to that crime?

7  A   Yes.

8  Q   Did you plead guilty pursuant to a written plea

9  agreement with the government?

10  A   Yes.

11  Q   What is your understanding of what you are

12  required to do under the terms of that plea

13  agreement?

14  A   Cooperate fully in the government's

15  investigation, provide truthful information.

16  Q   What's your understanding of what the government

17  is required to do?

18  A   Make a recommendation in accordance with and

19  pursuant to the plea agreement to the Court when it

20  comes time for my sentencing.

21  Q   What's your understanding of what the

22  government's recommendation will be with respect to

23  your sentence?

24  A   A sentence not to exceed 35 months.

25  Q   Under the terms of the agreement, do you have the

1  ability to ask the judge for a lower sentence than
2  that?
3  A   Yes.
4  Q   What's your understanding of who will ultimately
5  decide what your sentence will be?
6  A   The judge in this case, His Honor.
7  Q   What's your understanding of what happens to the
8  agreement if you lie?
9  A   The agreement would be null and void.
10 Q   Now, you testified that you've currently pled
11 guilty to conspiracy to solicit a bribe, is that
12 right?
13 A   Yes.
14 Q   In the course of this case, did you originally
15 plead guilty to a different crime?
16 A   Yes.
17 Q   Did you plead guilty to that crime also pursuant
18 to a written plea agreement?
19 A   Yes.
20 Q   And under the terms of that agreement, did you
21 agree to cooperate with the government as you've
22 testified already?
23 A   Yes.
24 Q   Under the terms of the first plea agreement,
25 what's your understanding of what the maximum amount

Harris - direct by Hamilton                    2326

1  of jail was that you were facing?

2  A   35 months.

3  Q   And is that different from the second plea

4  agreement you are currently under?

5  A   No, it's the same agreement.

6  Q   And when you talk about the agreement, it's your

7  understanding that that's the recommendation that

8  the government is going to make, is that right?

9  A   Right.

10  Q   Is that recommendation -- well, let me ask a

11  different question.

12       Without the government's recommendation,

13  what's your understanding under your current plea

14  agreement of what the maximum amount of time you

15  face in jail is?

16  A   60 months.

17  Q   And under the terms of your first plea agreement,

18  what was your understanding of without the

19  government's recommendation what the maximum time

20  was that you were facing?

21  A   For the one count, 20 years.

22  Q   From your perspective, did you receive any sort

23  of greater benefit under the second agreement?

24  A   No.

25  Q   Why not?

1  A   Because the 35-month ceiling, if you will, is the

2  same in both agreements and the conduct was the same

3  in both agreements.

4  Q   Is the first plea agreement still in effect?

5  A   No.

6  Q   What happened to that first plea agreement?

7  A   The government withdrew the first charge.

8  Q   Was it your idea or suggestion to have that

9  charge withdrawn and have you plead a second time?

10 A   No.

11 Q   Did you agree to do so as part of your

12 cooperation with the government?

13 A   Yes.

14 Q   Mr. Harris, before you became Defendant

15 Blagojevich's Chief of Staff, had you put your name

16 in for consideration with a different position with

17 his administration?

18 A   Yes.

19 Q   When?

20 A   After the Governor won his first term in office

21 sometime in late 2002 or after the November election

22 of 2002, the Governor was building his cabinet and

23 his administration and I was recruited to put my

24 name in as Secretary of Transportation for the State

25 of Illinois.

1  Q   Who was it that approached you about that?

2  A   Congressman -- then Congressman Dan Lipinski

3  father of current Congressman Dan Lipinski.

4  Q   In connection with putting your name for

5  consideration to be Secretary of Transportation, did

6  you have an interview?

7  A   Yes, I did.

8  Q   Who was at that interview?

9  A   The Governor, the governor-elect at that time,

10  Lon Monk, Christopher Kelly, someone who I later

11  came to identify as Tony Rezko, and others that I

12  don't recall at this time.

13  Q   At the time of that interview, did you know

14  Defendant Blagojevich?

15  A   Yes.

16  Q   Did you know him well or had yo met him in

17  passing?

18  A   I had met him in a couple of social occasions, a

19  couple of political events, but didn't know him very

20  well.

21  Q   Did you know Lon Monk at the time?

22  A   No, I did not.

23  Q   And you said that there was an individual you

24  later came to know as Tony Rezko?

25  A   Yes.

:59PM

:59PM

:00PM

:00PM

:00PM

1  Q   So I take it you did not know him at the time of
2  the interview?
3  A   I knew of him but didn't know him.
4  Q   Did you have any understanding as to why
5  Mr. Rezko was at your interview to be Secretary of
6  Transportation?
7  A   No.
8  Q   Did you know Chris Kelly at the time of your
9  interview?
10 A   Yes.
11 Q   How did you know Chris Kelly?
12 A   Chris Kelly was a contractor at O'Hare Airport
13 while I was serving there and we had similar
14 friends, common friends, and had met him several
15 times in social occasions.
16 Q   Did you have an understanding as to why he was at
17 your interview for Secretary of Transportation?
18 A   I understood Chris Kelly was the Governor's
19 campaign finance chair in the Governor's first
20 election.
21 Q   Did you ultimately get the position of Secretary
22 of Transportation?
23 A   No, I did not.
24 Q   At that time were you then asked to consider
25 another position in the Blagojevich administration?

1  A   Yes.

2  Q   What position was that?

3  A   Director of Illinois Department of Corrections to

4  run the state prisons.

5  Q   Who asked you to consider taking that position?

6  A   Chris Kelly told me that the Governor wanted him

7  to ask me whether I would be interested in that

8  position.

9  Q   What was your response?

10  A   I declined and didn't think I had the requisite

11  background for that position.

12  Q   All right.  Mr. Harris, I want to focus on your

13  time as Chief of Staff for Defendant Blagojevich.

14       When did you start working for Defendant

15  Blagojevich?

16  A   The end of August, beginning of September of

17  2005.

18  Q   Who approached you about considering the position

19  of Chief of Staff?

20  A   A friend and colleague of mine from the city,

21  Jack Hartmann, who was then serving and had served

22  in the Governor's first term as the executive

23  director of the tollway system, the Illinois tollway

24  system, told me that he had put my name in for

25  consideration with the Governor and his advisers

1  because they were looking for a chief of staff and

2  he told me that he had, in effect, nominated me for

3  that position, and then I was contacted later by

4  Chris Kelly who asked me to meet with him for cup of

5  coffee and discuss an opportunity.

6  Q   Did you, in fact, meet with Chris Kelly?

7  A   Yes, I did.

8  Q   Approximately when was this?

9  A   Late June, early July 2005.

10 Q   As far as you knew, was Mr. Kelly working in the

11 office of the Governor?

12 A   No.

13 Q   What was your understanding of why Mr. Kelly was

14 involved in talking with you about possibly being

15 the new Chief of Staff for Defendant Blagojevich?

16 A   I understood from Mr. Kelly that he was an

17 adviser, part of the Governor's kitchen cabinet, if

18 you will, and continued to serve in some capacity in

19 the campaign as finance chair or some other title.

20 Q   You said that Mr. Kelly wanted to meet you for a

21 cup of coffee?

22 A   Yes.

23 Q   Did you, in fact, meet Mr. Kelly?

24 A   Yes, I did.

25 Q   What happened at that meeting?

Harris - direct by Hamilton                    2332

1  A   At that meeting he asked me whether I would

2  consider taking a job with the administration as the

3  Governor's Chief of Staff because the Governor was

4  gearing up for a reelection campaign and his current

5  Chief of Staff, Lon Monk, was going to transition to

6  the campaign and become a campaign manger and they

7  were interested in me coming on board as Chief of

8  Staff.

9  Q   Did you learn anything else about the position at

10 that time?

11 A   Yes, I understood that the Governor wanted

12 somebody who had some background in government and

13 experience in operations of government.

14       They had in the first term a team in the

15 Governor's Office not too familiar with government

16 in Illinois and Chicago, not much government

17 management or administration experience, and they

18 thought I would be a valuable asset and addition to

19 the team.

20       The Governor -- or Chris Kelly told me at

21 that time that the Governor was going to run for a

22 second term, that they all felt very confident that

23 he would win a second term, and that they had

24 political aspirations beyond a second term in the

25 Governor's Office up to and including a run for the

1  White House.

2  Q   What was your response during this meeting with

3  Mr. Kelly about the position?

4  A   I told him I'd be interested in sitting down with

:05PM 5  the Governor and if offered the position would take

6  it, but would commit to only 2 years.  Obviously I

7  would be serving at the pleasure of the Governor,

8  but I wanted to let Mr. Kelly know that my time

9  frame or my expectation at the time was to serve no

:05PM 10 more than 2 years.

11 Q   After you met with Mr. Kelly, did you meet with

12 anyone who was officially working within the office

13 of the Governor?

14 A   Yes.

:05PM 15 Q   Who?

16 A   I met with a Bradley Tusk who was then serving in

17 the capacity as deputy Governor in the Blagojevich

18 administration.

19 Q   And what happened, generally, at that meeting

:05PM 20 with Mr. Tusk?

21 A   He wanted to get know me.  He was a leading

22 figure in the administration and I believe he just

23 wanted to get to know me and meet me and get a sense

24 of comfort with me because we would be working very

:06PM 25 closely together and talk to me about the Governor's

1 programs, policies, initiatives, accomplishments,

2 and some of the ideas they had going forward.

3 Q   Did you meet with anyone else within the office

4 of the Governor?

5 A   Yes, later on I met with the Governor himself and

6 Bradley Tusk was at that meeting.

7 Q   Did you ever talk to Lon Monk, the then Chief of

8 Staff, about the position of Chief of Staff?

9 A   Yes, I did.

10 Q   And did you meet with Mr. Monk before you met

11 with Defendant Blagojevich?

12 A   Yes.

13 Q   What happened at your meeting with Mr. Monk

14 regarding the Chief of Staff position?

15 A   I had a brief meeting with him in a restaurant in

16 the West Loop of Chicago and he told me about the

17 administration, their plans, their expectations.

18 Asked me if I was interested in it if I were offered

19 a position.

20      I confirmed to him that I would be, and then

21 he told me he would be setting up a meeting with me

22 and the Governor and I should hear back from him

23 shortly.

24 Q   Did he tell you anything about what to expect

25 from the position of Chief of Staff on a general

1 basis?

2 A   Generally, they were looking to me to oversee

3 day-to-day operations of state government while the

4 Governor and Lon Monk were campaigning.

5           Bradley Tusk would be sticking around for a

6 period of time and he generally oversaw policy and

7 legislative affair matters and communications

8 matters, but that they would be looking to me to be

9 hands-on more in the administration and day-to-day

10 operations and the budget process and the

11 development of the budget, the operating budget of

12 the State of Illinois.

13 Q   So you already testified that at some point you

14 then met with Defendant Blagojevich, is that

15 correct?

16 A   Yes.

17 Q   Was anyone else at your meeting?

18 A   Bradley Tusk.

19 Q   What happened at your meeting with Defendant

20 Blagojevich regarding the position of Chief of

21 Staff?

22 A   The Governor told me that they would like me to

23 come on board and he began to tell me about the

24 accomplishments of his administration in the first

25 term, some of the things they would like to get done

1  in the second term, and that hopefully beyond that

2  he wanted to pursue a race for the presidency.

3  Q   Did you accept the position?

4  A   Yes, I did.

5  Q   And when did you start to work in the office of

6  the have Governor?

7  A   Late August, early September of that year, 2005.

8  Q   When you started at that point with the office of

9  the Governor, what was your title?

10 A   Because Lon Monk had not yet left and had delayed

11 his departure to move over and transition to the

12 campaign, a position was created for me of chief

13 operating officer to begin to know the members of

14 the cabinet, the state agencies, and get involved in

15 the budget process.

16         So I served in that capacity for

17 approximately 3 months until Lon Monk stepped down

18 as Chief of Staff and moved over to the campaign.

19 Sometime in early December I assumed the position of

20 Chief of Staff.

21 Q   Generally speaking, what were your duties as

22 Chief of Staff for Defendant Blagojevich?

23 A   I saw my duties as ensuring the Governor's

24 policies and initiatives were executed through the

25 coordination of the senior staff and members of his

1  cabinet, I set standards for and evaluated the
2  performance of state agencies under the Governor's
3  control, and other duties and tasks as assigned from
4  time to time by the Governor.
5  Q   Was it your understanding that as Chief of Staff
6  Defendant Blagojevich was relying on you for legal
7  advice?
8  A   No.
9  Q   Were there any specific circumstances under which
10 you did act as legal counsel?
11 A   Yes.
12 Q   How many?
13 A   One.
14 Q   Very generally, what were those circumstances of
15 that one time you acted as legal counsel?
16 A   In the summer of 2007, after a protracted
17 legislative session where the legislature would
18 normally recess the end of May, the Governor had
19 called a series of special sessions, power granted
20 to him under the Illinois constitution, to
21 convenient the Illinois General Assembly if there
22 was unfinished business or work to be done.
23      For over 70 days the Governor ordered the
24 General Assembly back into session to take care of
25 unfinished business.  There reached a point where

1  the Speaker of the House, Michael Madigan, ignored

2  the call for a special session and the Governor sued

3  the Speaker in state court and I joined the legal

4  team in writing the legal briefs or reviewing the

5  legal briefs that were filed in that case.

6          That was a case of special interest to me and

7  I asked the Governor's general counsel if I could be

8  special counsel on that case.

9  Q   Did you interact with Defendant Blagojevich as

10 special counsel on that case?

11 A   No, my activities were limited to reviewing

12 briefs and making edits to briefs.

13 Q   Other than that --

14 A   We did --

15 Q   I'm sorry.  Go head.

16 A   We did discuss the lawsuit, I was in the presence

17 of Mr. Quinlan, the Governor's general counsel, and

18 we would discuss our efforts on that case and give

19 him regular updates.

20 Q   Other than that one circumstance, did you act as

21 a lawyer during any other time that you were Chief

22 of Staff for Defendant Blagojevich?

23 A   No.

24 Q   When you were describing your general duties as

25 Chief of Staff, you mentioned the fact that you

:11PM
:11PM
:11PM
:12PM
:12PM

1  coordinated with senior staff, is that right?

2  A   Yes.

3  Q   What do you mean when you use the phrase "senior

4  staff"?

5  A   Soon after my appointment as Chief of Staff, I

6  reorganized the office of the Governor, made a

7  proposal to the Governor, which he concurred with,

8  to reorganize the way the office was organized.

9       And we established three deputy governor

10 positions, two of them -- as opposed to one deputy

11 Governor position in the first term.

12      Of the three deputy governors, we divided up

13 the responsibility of state agencies and operations

14 of government.  Generally speaking, one deputy

15 Governor oversaw policy, communications and

16 legislative affairs.

17      Another deputy Governor, who we call chief

18 operating officer, oversaw infrastructure

19 departments like the tollway, Department of

20 Transportation, Capital Development Board, another

21 construction related or infrastructure related

22 agencies, as well as regulatory agencies,

23 professional and financial regulatory agencies.

24      A third deputy governor oversaw public safety

25 which was the state police, the Illinois National

1  Guard, and human services which would be the
2  Department of Public Health and the Department of
3  Human Services, social-services type agencies.
4          Those three deputies along with the general
5  counsel and the director of communications or the
6  governor's press secretary, the Governor's
7  scheduler, that made up the senior staff in the
8  Governor's Office.
9          I would have regular meetings with the senior
10 staff and track progress on our initiatives, as well
11 as evaluate performances of the agencies that
12 reported to them directly.
13 Q  Did the senior staff change over the time that
14 you were there?
15 A  Yes.
16 Q  When you first started, who were the members of
17 the senior staff?
18 A  When I first started it was primarily myself,
19 Bill Quinlan as general counsel, and Bradley Tusk,
20 as the only deputy governor, and the director of
21 communications which was Cheryl Jackson at the time.
22 Q  And how did that change over time?
23 A  Over time we added the other two deputy governor
24 positions, as well as the fact that Bradley Tusk
25 departed the administration and a new deputy

:13PM

:13PM

:14PM

:14PM

:14PM

1  Governor was appointed to fill the policy

2  communications and legislative affairs function.

3  Q   And who was that?

4  A   A Ms. Sheila Nix.

5  Q   At some point did she leave?

6  A   Yes.

7  Q   And who took over for her while you were Chief of

8  Staff?

9  A   Mr. Bob Greenlee.

10  Q   Now, I believe you also mentioned, when you were

11  talking generally about your duties, the Cabinet, is

12  that right?

13  A   Yes.

14  Q   Generally speaking, what is the Cabinet?

15  A   The cabinet are the heads of the state agencies,

16  40 plus state agencies from the Department of

17  Transportation to the Director of Prisons, to the

18  Director of State Police, to Director of Public

19  Health, or the Director of Human Services.  These

20  are the agencies that deliver the services to the

21  general public and the Cabinet is the head of each

22  of those agencies.

23  Q   Now, you talked somewhat generally about your

24  duties.  What were some of your more specific

25  day-to-day duties as Chief of Staff?

1  A   On day-to-day I would review the weekly reports I
2  received from the agencies on certain metrics or
3  certain performance standards that are established
4  with the agency heads and with the members of the
5  senior staff things that we needed to monitor on a
6  weekly basis, the top two or three items that we
7  were interested in tracking, we would oversaw the
8  progress on the Governor's initiatives and policies
9  that we were rolling out a new program.  I would
10 have regular meetings with the communication staff,
11 the legal staff, the operations staff.  I oversaw
12 the office of boards -- or the director of the
13 office of boards and commissions reported to me, as
14 well as the director of the budget office reported
15 to me, so I would have constant interaction with
16 those two directors.
17 Q   Mr. Harris, I want to direct your attention to
18 the fall of 2006.
19        As Chief of Staff, was a problem involving a
20 grant to a school brought to your attention?
21 A   Yes.
22 Q   Who was the recipient of the grant brought to
23 your attention?
24 A   A school that I understood to be called the
25 Chicago Academy, I don't know if that was the formal

1 and full name of the school.

2 Q   Did you learn about the problems involving this

3 grant for the Chicago Academy from someone inside

4 the office of the Governor?

5 A   Yes, I believe it was Mr. Bradley Tusk.

6 Q   Did you also learn about the problems of the

7 Chicago Academy grant from someone outside the

8 office of the Governor?

9 A   Yes.

10 Q   Who was that?

11 A   The office of Congressman Rahm Emanuel, 5th

12 District congressman from Chicago.

13 Q   What did you learn about -- what did you

14 understand to be the problem with the grant as it

15 was brought to you?

16 A   That the some or all of the grant had not been

17 released or paid out and that there was a problem

18 with the approval or the release of the remaining

19 funds.

20 Q   What did you do when you learned about this?

21 A   I inquired -- well, Mr. Tusk told me the Governor

22 had not approved the release of the funds or would

23 not approve the release of the funds so I asked the

24 Governor about it.

25 Q   Did you have discussion with Defendant

1  Blagojevich about it?

2  A   Yes.

3  Q   Was this in person or over the phone?

4  A   I don't recall if that was in person or over the

5  phone.

6  Q   What happened in that first discussion with

7  Defendant Blagojevich about the Chicago Academy

8  grant?

9  A   He seemed to be familiar with it and told me not

10  to approve the release of funds, that he had not

11  approved the release of funds, and that suggested

12  that Bradley Tusk may have committed the funds

13  without the Governor's approval or knowledge.

14  Q   At that point was anything further said in that

15  meeting -- or in that discussion, I'm sorry.

16  A   Well, I told him that, as I understood it, that

17  the funds had been approved, that certain

18  expenditures had been undertaken by the school in

19  reliance on the grant and that I wanted to look into

20  the matter more and I told the Governor I would

21  bring it up with him again after I did a little more

22  research.

23  Q   At some point did you bring the matter up again

24  with Defendant Blagojevich?

25  A   Yes, I learned that the had school, in fact,

1  relied on the grant and had undertaken some

2  construction or improvements and that there were

3  outstanding invoices that the school had in its

4  possession.

5          I spoke to a Liz, I don't know her last name,

6  I believe she was Chief of Staff in Rahm Emanuel's

7  office, who provided me greater information, more

8  detailed information about the amount of monies that

9  the school had expended and was committed to pay and

10 that they needed the grant monies to pay those

11 outstanding invoices.

12 Q   What, if anything, did you relay to Defendant

13 Blagojevich what you had learned?

14 A   I told him that whatever the discrepancy was,

15 regardless of the origins of the grant, that the

16 school had spent the money in reliance on the grant

17 and it would be problematic for us not to pay the

18 monies that the school had committed to and the

19 invoices that they had in hand.

20 Q   Did Defendant Blagojevich react to this at all?

21 A   Yes, after I talked to him he was persuaded to

22 release the monies to pay the invoices, but his

23 instructions to say me were to release only those

24 amounts of monies that would pay the current

25 invoices that the school had in hand and asked me

1  how I would ensure that would happen.  I explained
2  to him that I would wait until I got the invoices
3  from the school before directing staff to release
4  the funds.
5  Q   So during that meeting, did Defendant Blagojevich
6  agree to the release of certain funds?
7  A   Yes, some limited funds as they related to
8  invoices already in hand.
9  Q   And this was material that you had brought to
10 him?
11 A   Yes.
12 Q   Because of that direction, did you then have to
13 go back to Defendant Blagojevich on multiple
14 occasions for approval to release parts of the
15 grant?
16 A   Yes, there was -- the invoices came in
17 intermittently, they didn't all come in at once
18 because some work was in progress but had not yet
19 been invoiced.
20      So I went back to the Governor and explained
21 to him that there was additional work that may not
22 have been invoiced but that there would be future
23 payments that we need to authorize to be released,
24 sought his approval for that condition, and received
25 his approval, and he told me to instruct him or

:20PM
:21PM
:21PM
:21PM
:21PM

1 advise him when those invoices came in and when the

2 payments would be released and, generally, the

3 amounts.

4 Q   The process that you just described, the one that

5 you needed to go back each time to Defendant

6 Blagojevich with the invoices to show that the

7 school had incurred costs, was that typical for the

8 way that you dealt with grants while you were in the

9 Office of the Governor?

10 A   I didn't actually show him the invoices, he just

11 relied on me that I had invoices.  But no, the

12 process was not typical and quite involved and I

13 didn't experience that process again.

14 Q   Now, you mentioned when you were talking about

15 some of your more specific duties as Chief of Staff,

16 that you oversaw the Director of Boards and

17 Commissions, is that right?

18 A   Yes.

19 Q   What was your role with respect to appointments

20 to state boards and commissions?

21 A   Well, by way of background, the state has its

22 Cabinet which makes up the agencies that deliver

23 state services, but it also has hundreds of boards

24 and commissions that perform vital functions,

25 functions that are created by statute for these

1    boards to oversee, and there's several hundred, over

2    a thousand members that make up these boards and

3    commissions.

4              The appointments to these boards and

5    commissions are gubernatorial appointments.  The

6    government makes the appointment.  So the boards and

7    commissions office administers the appointments to

8    these commissions, facilitates their legislative

9    approval, but they get their direction from the

10   Chief of Staff as to who to appoint and who to

11   remove from time to time.

12   Q   Over the course of your time as Chief of Staff,

13   did you have discussions with Defendant Blagojevich

14   about particular state boards that were of interest

15   to him?

16   A   Yes.

17   Q   Was one of those boards the University of

18   Illinois Board?

19   A   Yes.

20   Q   Did Defendant Blagojevich explain to you why that

21   was a board that was of interest to him?

22   A   Well, it was an interest -- it was of interest to

23   several of his supporters and allies, so it was of

24   interest to him as well.

25              It was also of interest to him because he had

1  on occasion discussed life after Governor, or when
2  he would leave office, he would like to serve in
3  some sort of adjunct professor or other capacity
4  with the University of Illinois and he just wanted
5  to make sure that he had friends and supporters and
6  allies serving on the board to facilitate that
7  request if and when he ever made it.
8  Q   Mr. Harris, generally, what is the Pollution
9  Control Board?
10  A   The Pollution Control Board is one of the State's
11  regulatory oversight boards.  They rule on matters
12  violations of Illinois pollution law or other
13  environmental laws.  They have a docket of cases
14  that are brought to them by the enforcement
15  agencies.  And the Pollution Control Board can
16  approve permits or disapprove permits, impose fines
17  on violators as the case may be.  So the Pollution
18  Control Board is one of those boards that has a very
19  defined regulatory function.
20  Q   The Pollution Control Board, are their members
21  paid or unpaid?
22  A   The Pollution Control Board is one of the few
23  paid boards in the State of Illinois.
24  Q   Approximately how much do the members of the
25  Pollution Control Board make?

Harris - direct by Hamilton                    2350

1  A   A little over $100,000 annually.

2  Q   Did you ever have any discussions with Defendant

3  Blagojevich about the possibility of his wife

4  serving on the Pollution Control Board?

5  A   Yes.

6  Q   Approximately when did those discussions take

7  place?

8  A   I believe in early 2008.

9  Q   What was the context in which those discussions

10 came up?

11 A   The context was the financial difficulty that the

12 Blagojevich family was having, the financial

13 hardship they were facing because of the declining

14 revenues, diminishing business being done by Patti

15 Blagojevich who had been a real estate broker and

16 her business was suffering, and the Governor would

17 often tell myself and other members of the senior

18 staff that their business was suffering as a result

19 of the ongoing federal investigation and that he

20 needed to find Patti a job.

21 Q   And when you say he told you he needed to find

22 Patti a job, did he make any directive to you with

23 respect to finding his wife a job?

24 A   He brought -- he suggested the Pollution Control

25 Board.  I'm not sure if Mrs. Blagojevich mentioned

1  it to him or he mentioned it to her, but, in any

2  case, he thought that might be a good position for

3  her and wanted me to look into that and also

4  research and come back to him with ideas about other

5  positions in the Governor's Office that could be

6  created for his wife.

7  Q   Now, with respect to the Pollution Control Board,

8  what, if anything, did you tell Defendant

9  Blagojevich about the possibility of his wife

10 serving on that board?

11 A   I told him I didn't think it was a good idea.  I

12 told him that she didn't meet the qualifications set

13 forth in the statute that created the board.

14        This is one of the few boards that had

15 specific qualifications enumerated in the statute

16 that board members should have, experience levels

17 they should have, background levels they should

18 have, in order to meet the criteria to be appointed

19 to the board and ultimately confirmed by the Senate,

20 because this board also required Senate

21 confirmation.

22 Q   Did you tell Defendant Blagojevich about the

23 requirements for the Pollution Control Board members

24 as it related to his wife?

25 A   Yes, I didn't believe that she met them and I

1  told him so.

2  Q   What was his response to that?

3  A   He told me that it didn't matter because other

4  board members in the past had served on the board

5  that didn't have the qualifications I discussed with

6  him and that I shouldn't be concerned about that

7  because others have done it in the past.

8  Q   When he said others have done it in the past, was

9  it your understanding he was referring to other

10  governors had made appointments in the past?

11  A   Yes; or there was current members that perhaps

12  were appointed by previous governors.

13  Q   What was your response to that?

14  A   I said be that as it may, it's still a problem

15  and could prove embarrassing for us and for Patti on

16  confirmation and I just thought it was a bad idea to

17  pursue that particular position.

18  Q   Did you tell Defendant Blagojevich anything else

19  about the position as a member of the Pollution

20  Control Board in an effort to dissuade him from

21  having you put his wife on that board?

22  A   He had asked on previous occasions what other

23  board positions are paid positions and I had told

24  him about other positions and other boards.

25          The Pollution Control Board, I pointed out to

1  him, was somewhat different than other boards

2  because they met regularly, where as other boards

3  may meet once a month and matters are brought to

4  their attention for consideration by staff and then

5  the board would vote up and down on recommendations

6  of the staff, the Pollution Control Board was a

7  different animal.  It involved quite a bit of work,

8  it met almost weekly, members were expected to read

9  through case files that would be delivered to them

10 on a weekly basis in anticipation of weekly

11 meetings.

12       So there was quite a bit of work involved,

13 and from what I understood the Governor was

14 searching for Patti earlier was, something that paid

15 but didn't involve a lot of work or a lot of time

16 because she still had responsibilities as First Lady

17 and was also a mother of two and had great deal of

18 responsibilities at home, and I pointed this out to

19 him to perhaps dissuade him from this particular

20 pursuit.

21 Q  Now, you just testified that it was your

22 understanding that Defendant Blagojevich wanted her

23 to get a job where she didn't -- I don't remember

24 the exact terms, but is it fair to say that she

25 wasn't going to work full-time?

Harris - direct by Hamilton                    2354

1  A   Yes, that's what I was understanding they were
2  looking for.
3  Q   And was that understanding based upon what
4  Defendant Blagojevich had told you?
5  A   Yes.
6  Q   After you explained the work and time commitment
7  of the Pollution Control Board members to Defendant
8  Blagojevich, what was his response?
9  A   Well, he said nevertheless he may do it, but come
10 back to him with other options working in the office
11 of Governor directly in a paid position for the
12 state as perhaps a member of his senior management
13 team.
14 Q   Now, when you say he told you to come back with
15 other positions, was it your understanding these
16 were positions that already existed or that would
17 created for his wife?
18 A   Both.  If I didn't find one that I thought
19 suitable, to come up with a job description and a
20 salary and title for his consideration.
21 Q   What, if anything, did you come back with?
22 A   I came back with one position as a senior policy
23 adviser.  There was more to the title, I don't
24 recall it at this time, but in particular areas of
25 his interest, policy initiatives, to work in the

Harris - direct by Hamilton                    2355

1  Governor's Office.
2        Told him that if he were to pursue this, that
3  it would be important that she come to work each day
4  down at the Thompson Center, or Springfield, or
5  wherever the Governor may be, and that that may not
6  meet his needs in terms of his desire for her to
7  work in a more part-time environment.
8  Q   What was his response to that suggestion?
9  A   Well, initially he said well, yeah, sure, she
10 would come to work, and then later on in the
11 conversation I said well, then, she'd have to sit in
12 on meetings and we have them early in the morning
13 and sometimes late at night.  And he said well,
14 sometimes I can talk to her at home because he
15 worked out of his home quite often.  And I said
16 well, that may be problematic appearance-wise, I
17 don't think we should entertain that approach.
18 Q   Over the course of your time as Chief of Staff,
19 did Defendant Blagojevich continue to raise the
20 issue of his wife's employment with you?
21 A   With me, as well as other members of the staff.
22 Q   At some point in 2008, did Defendant Blagojevich
23 talk with you about a particular license that his
24 wife had acquired?
25 A   Yes.

:32PM
:32PM
:32PM
:33PM
:33PM

1  Q   And what was that?

2  A   Mrs. Blagojevich had studied for and taken an

3  exam for a Series 7 license, that's what it's

4  commonly referred to.  It's a license to market

5  securities investments.

6  Q   And what, if anything, did Defendant Blagojevich

7  say to you about this license his wife had acquired?

8  A   That she had scored real high on it and he was

9  proud of her and he wanted to help her find work in

10  an industry that she could use her new license and

11  asked me to gather the names of investment houses

12  and other financial firms that we did business with

13  for his review.

14  Q   What was your response to that?

15  A   I told him she couldn't work for an entity or a

16  business that did business with us, the state, and

17  he directed me to nevertheless come up with a list,

18  review the list, see whether or not I recognized any

19  of the names of the principals in these firms and

20  asked me if perhaps I could set up a meeting with

21  them.

22  Q   What did you do?

23  A   I told him I would come up with a list and review

24  the list.

25          And then after doing so, I told him I

1  recognized two names on the list that I was willing
2  to call to set up a general informational meeting
3  with.
4  Q   And, again, what was this list?
5  A   Financial firms and financial institutions that
6  we had on record having done business with the
7  state.
8  Q   And you said you recognized a couple of the
9  names?
10 A   Well, more than a couple, but I told him a
11 couple.
12 Q   Did you, in fact, have discussions with anyone on
13 that list about Defendant Blagojevich's wife?
14 A   Yes, two individuals.
15 Q   Who were the two individuals?
16 A   A Mr. Ray Klich at Citibank and a Mr. John Rogers
17 at Ariel Capital Investments.
18 Q   Focusing first on Mr. Ray Klich.
19        You said he was from Citibank, is that
20 correct?
21 A   Yes.
22 Q   Did you have a discussion with Mr. Klich about
23 Defendant Blagojevich's wife and her search for
24 employment?
25 A   Yes.

1  Q   What did you tell him?

2  A   I told him that Patti had completed her Series 7

3  license and was looking for work in the industry.  I

4  asked him whether he'd be willing to sit down and

5  talk to her about the industry, the type of work

6  environment, the type of opportunities that are out

7  there.

8        I made clear to him that I didn't want him to

9  hire her or offer her a position.  He felt relieved

10  at that point.  And I just asked him whether he

11  would take a lunch or a meeting with her and give

12  her some advise and counsel.

13  Q   When you said you made clear to him that he

14  shouldn't hire her, why did you do that?

15  A   I didn't want him to think that's what I was

16  wanting him to do, so I just wanted to make it clear

17  that this was a general informational meeting.

18  Q   And how is it that you knew Mr. Klich?

19  A   I've known Mr. Klich for well over 10 years,

20  almost 15 years.  He is in the municipal bond

21  division of Citibank.  This is the division of

22  Citibank that issues municipal bonds; cities,

23  states, counties, other public entities that it

24  raise money to undergo projects or other

25  expenditures of local government's.

:36PM

:36PM

:36PM

:36PM

:37PM

1        In my prior capacity with the City of
2   Chicago, Department of Aviation and as Budget
3   Director, I had a number of dealings with Mr. Klich.
4   So we had a professional as well as personal
5   relationship.
6   Q   And when you talked to Mr. Klich, he agreed to
7   meet with Mrs. Blagojevich, is that correct?
8   A   Said he'd be happy to.
9   Q   And did he, in fact, meet with her?
10  A   Yes, he did.
11  Q   At some point after the meeting, did you learn
12  how the meeting went?
13  A   Yes, he called me after they completed lunch.  I
14  introduced them at a restaurant across the street
15  from the State of Illinois Building, left them to
16  themselves.
17       He called me after the meeting and said it
18  went well, and she had a lot of questions, and he
19  painted a picture for her of what the industry was
20  like.
21       And it was a pretty oblique picture because
22  at the time there was a lot of competition in the
23  industry, a lot of recent MBA grads were pouring
24  into the industry or trying to get into the
25  industry, and those that tended to succeed in the

1  industry tended to work long days, seven days a week
2  and, it was a tough business to get into.
3  Q   After you learned about the meeting from
4  Mr. Klich, did you have any discussions with
5  Defendant Blagojevich about his wife's meeting with
6  Mr. Klich?
7  A   Not right after.  You some time later.
8  Q   And what did you learn from Defendant Blagojevich
9  about Mr. Klich and his meeting with
10 Mrs. Blagojevich?
11 A   The Governor complained to me that Mr. Klich
12 wasn't returning Patti's calls or getting back to
13 her on some follow-up she was expecting and that she
14 was upset and the Governor in turn told me about it.
15 Q   And what, if anything, further happened in that
16 communication?
17 A   Nothing further at that communication.  He just
18 said "have him call her back" and I said, well, I'll
19 look into it, but I didn't think there was any
20 follow-up out of that first meeting but I may have
21 been mistaken.  But I said that I spoke to Ray, he
22 didn't understand there to be anything further, he
23 told her what he thought, and that's what Ray had
24 told me.
25 Q   What happened next?

Harris - direct by Hamilton                          2361

1  A   Soon after that I went to see John Rodgers.
2  Q   Did you hear anything further from Mr. Klich?
3  A   Some time later, could've been days or weeks, I
4  received a note from Mr. Klich, an e-mail or a
5  handwritten note, I don't recall which, but it was
6  in my desk in my office, that he had received -- I
7  believe he forwarded to me an e-mail that he
8  received from Mrs. Blagojevich and he put a note on
9  that e-mail telling me he was concerned that he may
10 be offending her, he didn't know what to do, he was
11 worried that she was growing angry with him but he
12 didn't know what else he could do for her and was
13 concerned and sent me a note to that effect.
14 Q   And at some point did you respond to that e-mail?
15 A   Yeah, we spoke, Ray and I.
16 Q   What did you tell him?
17 A   I told him, "don't worry about it, Ray, I'll take
18 care of it."
19 Q   All right.
20     And, Mr. Harris, you said that you also met
21 with Mr. Rogers, John Rodgers, is that correct?
22 A   Yes.
23 Q   Who is John Rodgers?
24 A   He is the founder and I believe president of
25 Ariel Capital Financial which is an investment

1  house.

2  Q   How is it that you know Mr. John Rodgers?

3  A   Again through my dealings with him and his firm

4  while I was in various positions in City government.

5  Q   And why is it that you contacted Mr. Rogers?

6  A   Just another resource I thought could assist

7  Mrs. Blagojevich in networking and other ideas for

8  employment.  So I set up a meeting to see him after

9  work one day and went to his offices and had a brief

10  conversation with him.

11  Q   What happened during that meeting?

12  A   We caught up on some small talk and told him

13  about Mrs. Blagojevich having received her Series 7

14  license and asked him if he would be willing to sit

15  down and meet with her or come up with names of

16  firms that he knew of that were looking for people

17  that did not do state business.

18          In response, he suggested a firm called North

19  Star.  I believe it's North Star or Star North, I

20  can't tell you exactly the name of the firm.  And

21  that he was going to meet with the individual for

22  lunch later that week and would be happy to tell him

23  that Patti might be calling.  I thanked him for his

24  time and reported back to the Governor.

25  Q   When you say you reported back to the Governor,

:40PM

:41PM

:41PM

:41PM

:42PM

1  what do you mean?

2  A  I told him I met with Mr. Rogers and he had come

3  up with the name of a firm.  And he was happy about

4  that.  He asked me to pass on the name to Patti,

5  which I did in a telephone call either later that

6  day or the next day.

7         And she told me she knew of the firm, that

8  the firm was in fact the firm that had sponsored her

9  to sit for her Series 7 exam license.  I didn't know

10 at the time but in order to take the exam, you need

11 a sponsor or a perspective employer to sponsor you

12 for the exam.  And that she didn't think there were

13 any opportunities or she said she wasn't interested

14 in any opportunities, in any case, that North Star

15 or Star North was not an option for her.

16 Q  So what happened next?

17 A  Nothing.

18 Q  Did you have any further communications with

19 Defendant Blagojevich about this?

20 A  Not for some time.  A few weeks or days.

21 Q  And then did you have another communication about

22 his wife and these meetings with Mr. Flich and

23 Mr. Rogers?

24 A  Yes.

25 Q  What did Defendant Blagojevich say?

1 A   He came to the office one day or we were in the
2 car leaving his home -- or in the State of Illinois
3 Building, he came and he was quite agitated that
4 Patti was not having any success in finding work in
5 the financial industry using her Series 7 license
6 and he was very upset and told me to make sure that
7 Citibank doesn't get anymore state work and that
8 John Rodgers doesn't get anymore state work.
9 Q   And when he said make sure that Citibank doesn't
10 get anymore state work, what did you understand him
11 to be telling you?
12 A   That they shouldn't get anymore bond deals, they
13 shouldn't have a position as one of the underwriters
14 or financial institutions that we rely upon to issue
15 state debt.
16 Q   And based on the context of that directive, what
17 was your understanding as to why Defendant
18 Blagojevich was telling you to make sure Citibank
19 didn't get more state work?
20 A   He didn't feel that they had done enough to help
21 Patti.
22 Q   What, if anything, did he say about John Rodgers?
23 A   Words to the same effect.
24 Q   And, again, what was your understanding as to
25 what he was telling you?

1  A   Make sure they didn't get anymore state business.

2  Q   And, again, based upon the context of the

3  conversation, what was your understanding as to why

4  he was telling you John Rodgers shouldn't get

5  anymore further state business?

6  A   Because they weren't willing to do more for

7  Mrs. Blagojevich.

8  Q   What was your response when Defendant Blagojevich

9  said this?

10 A   Well, I told him that we had no ability to

11 influence whether John Rodgers received state

12 business because he received his business from the

13 pension funds.  The pension funds are not

14 institutions or agencies that the Governor's Office

15 controls, that they hire investment counselors and

16 investment advisers on their own and they make

17 investments pursuant to that relationship, not a

18 relationship that comes through the Governor's

19 Office.

20 Q   And how did Defendant Blagojevich respond to

21 that?

22 A   Shrugged his shoulders and said, "well, there's

23 nothing we can do?"  I said, "no, there's nothing we

24 can do."

25 Q   What, if anything, did you do in response to that

1  directive from Defendant Blagojevich?

2  A   Nothing.

3  Q   About making sure that Citibank and John Rodgers

4  didn't get any further state business?

5  A   Nothing further.

6  Q   At some point after that did you learn that

7  Citibank was, in fact, going to get state business?

8  A   Yes, it was brought to my attention some time

9  later that Citibank had been selected or was going

10 to be selected by the Illinois Tollway Authority as

11 one of two co-managers or two underwriters to

12 undertake a bond issue, a several

13 hundred-million-dollar bond issue for the Tollway

14 Authority, funds that they needed to raise for its

15 improvement program and expansion capital program,

16 construction program, and that they were going to be

17 selected as one of the financial institutions to

18 helped the agency issue those bonds.

19 Q   Did you tell Defendant Blagojevich about this?

20 A   No, I did not.

21 Q   Why not?

22 A   I knew he would be upset.

23 Q   Did you have any concern that he would follow

24 through on the directive that he'd previously given

25 you?

1  A   Yes.

2  Q   Ultimately did Defendant Blagojevich's wife get a

3  job?

4  A   Yes, she did.

5  Q   And at that point did Defendant Blagojevich's

6  request to you to find or create a position for her

7  stop?

8  A   Yes.

9  Q   When was Defendant Blagojevich's term as Governor

10 scheduled to end?

11 A   January of 2010.

12 Q   Based upon what he told you, were you aware that

13 he had any plan for what he was going to do at the

14 end of his term in 2010?

15 A   No, no concrete plans.

16 Q   Did he tell you whether he was planning on

17 running for reelection?

18 A   He told me he did not want to run for reelection,

19 he did not intend to, it was a last resort.

20 Q   Focusing on 2008, what, if anything, did

21 Defendant Blagojevich tell you about his fundraising

22 goals for 2008?

23 A   I was present at meetings when he discussed his

24 goals.  He didn't establish his goals or tell me

25 about his goals, but I understood his goals to be

1  somewhere in the neighborhood of either 2 or

2  4 million dollars.  I wasn't sure whether or not the

3  4 million-dollar was a half year goal or a full year

4  goal.

5  Q   Based upon what he told you, did you have an

6  understand as to why he had a fundraising goal like

7  that for 2008 if he did not intend on running for

8  reelection?

9  A   No, he didn't explain to me why, but I just

10  understood it to be necessary for him to continue to

11  be effective as Governor.

12  Q   When you say it was necessary for him to be

13  effective as Governor, what do you mean?

14  A   Well, politicians often consider the size of a

15  politician's campaign fund as evidence of the

16  Governor or any elected official's support, their

17  ability to influence others, and to fend off threats

18  from others that might seek to take them on or

19  challenge them either in their own party or from

20  another party.  So the size of your campaign war

21  chest is a demonstration of your political power and

22  your support.

23          MS. HAMILTON:  Judge, I'm about to switch to

24  a the different topic, do you want me to keep going

25  or stop?

:49PM

:49PM

:49PM

:50PM

:50PM

1          THE COURT:  How much longer is your next

2  topic?

3          MS. HAMILTON:  More than ten minutes.

4          THE COURT:  Good.

5          9:30 tomorrow morning.

6          THE MARSHAL:  All rise.

7      (The following proceedings were had out of the

8       presence of the jury in open court:)

9          THE COURT:  Please be seated in the

10 courtroom.

11          Those of you in the gallery can leave or stay

12 as you see fit.

13          You can step down.

14          THE WITNESS:  Thank you.

15          (Witness temporarily excused.)

16          THE COURT:  Ms. Hamilton, how long do you

17 expect the direct to be?

18          MS. HAMILTON:  Several days, Your Honor.

19          THE COURT:  What?

20          MS. HAMILTON:  Several days.

21          THE COURT:  "Several" meaning?

22          MS. HAMILTON:  I'm going to be seeking

23 permission to publish a number of the calls that

24 would be introduced into evidence some which are

25 very lengthy.  So I think it's possible that my

:50PM

:51PM

:51PM

:51PM

:51PM

1  direct examination could take us to the end of the

2  week, the trial week.

3            THE COURT:  The remainder of this week?

4            MS. HAMILTON:  Yes.

5            THE COURT:  Do you think it'll go into next

6  week?

7            MS. HAMILTON:  I don't know.

8            THE COURT:  Okay.  That gives me an idea.

9            Anything else we have to do?

10            MR. SCHAR:  Two quick issues.  I assume there

11  is no objection to the release of whatever materials

12  in evidence today?

13            THE COURT:  Well, there is an objection but I

14  overruled it.

15            MR. SCHAR:  Thank you, Judge.

16            And, secondly, I think this has been

17  discussed with defense counsel, there was at least

18  one, maybe several transcripts that were redacted

19  incorrectly the first time around, I think there

20  were also some calls that needed several

21  modifications.  We've made those changes.  I don't

22  think the defense has an objection, what we're

23  seeking is to produce a new disk with proper

24  redacted calls but we do need access to the binders

25  at some point, probably tomorrow morning, before

:52PM

:52PM

:52PM

:52PM

:53PM

1  they start going through the calls just to replace a

2  couple of the calls if that's okay with your Honor.

3       THE COURT:  The answer is yes as long as

4  there is somebody from the defense there.

5       Anything else?

6       See you in the morning.

7    (Adjournment taken from 4:53 o'clock p.m. to

8     9:30 o'clock a.m. on June 22, 2010.)

:53PM

*      *      *      *      *      *      *      *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
                          MATTER


   /s/Blanca I. Lara                         date




_____        _____
        Blanca I. Lara                          Date