3382

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4           Government,            )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  June 30, 2010
    ROBERT BLAGOJEVICH,            )
7                                  )
              Defendants.          )  9:30 o'clock a.m.
8

9                        VOLUME 17
                 TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
                      AND A JURY
11

12
    For the Government:
13
                THE HONORABLE PATRICK J. FITZGERALD,
14              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
15                   Carrie E. Hamilton
                     Christopher Niewoehner
16              Assistant United States Attorneys
                219 South Dearborn Street
17              Suite 500
                Chicago, Illinois 60604
18

19

20
    Court Reporter:
21
                   Blanca I. Lara, CSR, RPR
22              219 South Dearborn Street
                       Room 2504
23               Chicago, Illinois 60604
                     (312) 435-5895
24

25

3383

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
         BY:  Sheldon M. Sorosky
5          158 West Erie
         Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
         BY:  Samuel Forbes Adam
8               Samuel Adams, Jr.
         6133 South Ellis Avenue
9          Suite 200
         Chicago, Illinois 60637
10         312-726-2326

11         OFFICES OF AARON B. GOLDSTEIN
         BY: Aaron Benjamin Goldstein
12         6133 South Ellis
         Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
         BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
         Suite 307
16         Chicago, Illinois 60614
         (773) 517-0622
17
         LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
         53 West Jackson Boulevard
19         Suite 1420
         Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

3384

1 APPEARANCES   (continued:)

2

3 For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5                Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    WITNESS                                          PAGE

3     DOUG SCOFIELD

4     Direct Examination (Resumed) By Mr. Schar........ 3386

5     Cross Examination By Mr. Goldstein.............. 3487

6

7

8    EXHIBITS

9     ................................................

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THE MARSHAL:  All resign.

2      (The following proceedings were had in the

3       presence of the jury in open court:)

4       THE COURT:  Please be seated.

5       You may resume.

6       MR. SCHAR:  Thank you, Judge.

7  DOUG SCOFIELD, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8            DIRECT EXAMINATION (resumed)

9  BY MR. SCHAR:

10 Q  Mr. Scofield, when we broke yesterday we had

11 played a portion of a call behind tab 24.

12       MR. SCHAR:  Judge, may I approach?

13       THE COURT:  You may.

14 BY MR. SCHAR:

15 Q  Handing the witness what is marked Transcript

16 Binder 1.

17       That is session 281 behind tab 24, I think,

18 Mr. Scofield.

19       You had explained what Families U.S.A. was,

20 is that accurate?

21 A  Yes, sir, that's right.

22 Q  And you explained your understanding of certain

23 statements made by Defendant Blagojevich regarding

24 the Senate Seat.  And, again, just for date

25 perspective, this is the day after the Presidential

Scofield - direct by Schar                3387

1  election, November 5th, 2008?

2  A  Yes, that's correct.

3      MR. SCHAR:  Judge, with your permission, we'd

4  ask to continue playing the remainder of this call

5  beginning on Page 4, at line 8, through the

6  remainder of the call.

7      THE COURT:  You may do that.

8    (Tape played)

9      THE COURT:  Stop.

10     MR. GOLDSTEIN:  Judge, I have a different

11 version.

12     THE COURT:  Why don't you consult with each

13 other.

14     (Brief pause)

15     MR. GOLDSTEIN:  I apologize.

16     THE COURT:  That's okay.

17     MR. GOLDSTEIN:  I apologize, Your Honor.

18     THE COURT:  That's fine.

19     MR. SCHAR:  May we continue, Judge?

20     THE COURT:  You may.

21    (Tape played)

22     MR. SCHAR:  Judge, I think one of the juror's

23 binder may be actually missing this call.  Would it

24 be okay if I gave this to the marshal?

25     THE COURT:  Yeah.

:50AM

:52AM

:52AM

:52AM

:04AM

Scofield - direct by Schar                    3388

1      (Brief pause).
2          MR. SCHAR:  I believe it's for the juror at
3  the end.
4          THE COURT:  Yes.
5      (Brief pause).
6  BY MR. SCHAR:
7  Q   Mr. Scofield, turning back to Page 4 of the
8  Transcript Binder.
9          Are you with me?
10  A   Yes, I am.
11  Q   This is a continuation of the conversation after
12  Defendant Blagojevich has indicated he's not giving
13  it up for f'ing nothing, he can always parachute
14  himself there.  After that statement by Defendant
15  Blagojevich which you testified about yesterday, is
16  there a discussion in any way about Defendant
17  Blagojevich having a role in healthcare in the
18  remainder of this conversation?
19  A   Not in any of the conversation we just listened
20  to, no, sir.
21  Q   He begins on Page 4, Defendant Blagojevich at
22  line 14 indicating:
23      "Look, we talked about this, you know, several
24       times, but there is nothing I could have done
25       about Obama, nothing, right."

:04AM
:04AM
:05AM
:05AM
:05AM

1       What do you understand him to be saying?
2  A   He's talking about Obama's election as President
3  and that there's nothing he could've done as a
4  candidate or a Governor to stop that or prevent it.
5  Q   At the bottom of the page, around line 39,
6  Defendant Blagojevich continues:
7       "We could a built, gone out, out of our way and
8        start establishing that, try to preempt Obama
9        in Illinois from doing anything.  That wouldn't
10       of scared him off.  It's just one more white
11       guy in Iowa.  Right?"
12       What do you understand Defendant Blagojevich to
13       be saying here?
14 A   Well, my understanding if he's talking about
15 whether politically there is something he could've
16 done politically, particularly in Illinois or as
17 someone from Illinois, that would've preempted
18 Senator Obama's success in Iowa specifically or the
19 Presidential, in general.
20 Q   Is it fair to say in the next several pages he
21 then discusses what might have happened if he had
22 decided to run for President and whether that would
23 have stopped Barack Obama from becoming President?
24 A   Yes, that's right.
25 Q   Continuing on to Page 8 -- sorry, on to 9 at line

29 Defendant Blagojevich says:

"But do you turn this into a, you gotta take a
bad thing here.  Look, I'm better off with this
guy winning than McCain, if he would've lost
with my upward mobility, you know, it doesn't
look so great right now, but it's a funny
business"?

What do you understand him to be saying there?

A  He's talking about how he can turn a bad thing,
the election of Senator Obama as President, and turn
it into a good thing, a better thing, that it's
potentially better for him that Senator Obama has
won than if Senator McCain had won.

Q  When he used the phrase "upward mobility" what
did you understand him to be referring to?

A  An upward mobility would be further election to
higher office.

Q  Was this the first conversation you had with
Defendant Blagojevich in which Defendant Blagojevich
complained about President Obama in Defendant
Blagojevich's own future?

A  No, it was not.

Q  Did you have prior conversations along a similar
line here?

A  We did.  We had many conversations like this.

1  Q   Do you remember each of them individually or
2  collectively?
3  A   I remember them collectively.
4  Q   What did you and Defendant Blagojevich discuss in
5  those conversations?
6  A   Well, particularly during the presidential race
7  as Senator Obama was having success, he'd talk about
8  Obama's success and that another Illinois leader
9  having success and doing well in the Presidency
10 would really put a halt to any chances he might have
11 or might have had for the same office and there was
12 a level of jealousy and anger regarding that.
13         Even outside of the context of the
14 Presidential election and Senator Obama's success in
15 the Presidential election, he had talked previously
16 about the difficulties he was having as Governor,
17 the investigations, widespread coverage of the
18 investigations, and that that was going to make it
19 difficult for him to either:  A, move up to another
20 office, potentially get reelected, or, generally
21 speaking, do some of the things he was hoping he
22 might want to do or be able to do after he was
23 serving as Governor.
24 Q   And over on Page 10, at line 32, Defendant
25 Blagojevich indicates:

:08AM
:08AM
:08AM
:09AM
:09AM

1    I was thinking of going out to Washington this
2      weekend, see Fred and Bill and meet with them."
3      Who did you understand him to be referring to?
4  A  He's talking about Fred Yang and Bill Knapp.
5  Q  Were those political advisers of his?
6  A  They were.  Fred was the polster for both of his
7  campaigns for Governor and Bill Knapp was the
8  television consultant for both of those campaigns
9  for Governor.
10 Q  He continues:
11      "But they're available like Sunday at 3:00
12      o'clock, Sosnick too."
13      Who did you under Sosnick to be?
14 A  Sosnick, Doug Sosnick, a political consultant in
15 D.C. who had been actually less involved in our
16 campaigns but was a fairly well-known D.C. political
17 consultant.
18 Q  Over on Page 11, line 3, Mr. Scofield, you
19 indicate:
20      "Look, I'm happily removed, you know, I'm
21      happily 6 years removed from D.C. and I'm the
22      not the biggest pro-D.C. guy.  You know, that's
23      one of the reasons for me the Senate Seat
24      doesn't make sense."
25      What were you referring to in that part of

1  the conversation?
2  A  Well, specifically I'm talking about that I've
3  moved out of D.C., I no longer live in D.C., but I'm
4  referring more specifically to his -- to
5  conversations I've had previously with
6  Mr. Blagojevich regarding his desire to appoint
7  himself as senator.  We had several conversations
8  about the open Senate Seat created by Senator
9  Obama's election and his desire to appoint himself
10 as senator.
11 Q  What had said in those prior conversations?
12 A  I told him I did not think --
13        MR. GOLDSTEIN:  Objection, Your Honor.
14        THE COURT:  Overruled.
15 BY MR. SCHAR:
16 Q  Mr. Scofield, what had you said in those prior
17 conversations?
18 A  I told him it was not a good idea to appoint
19 himself as senator.
20 Q  What was Defendant Blagojevich's response?
21 A  He disagreed.  He was it seemed to me to be quite
22 interested in appointing himself and did not like
23 the advice that I had, thought it was a bad idea.
24 Q  When you said he did not like the advice, how did
25 he react?

1  A   He would be frustrated, slightly angry, I think

2  disappointed that I wasn't agreeing with him about

3  his idea of appointing himself as senator.

4  Q   Did he continue to talk about it even after you

5  suggested he not do it?

6  A   He did.  He talked about it quite a lot.

7  Q   Beginning on line 15, Defendant Blagojevich

8  indicates:

9      "So I'm announcing my process today at 1:30,

10      what do you think of that?"

11      You say:

12      "Yeah, I saw that, just, that's just a

13      committee."

14      "Think I should do it or not, should I do this

15      event or just not do it?"

16          What are you discussing with Defendant

17  Blagojevich in that part of the conversation?

18  A   He was going to have a press conference regarding

19  the Senate Seat selection and how the Senate Seat

20  selection was going to be made and we're talking

21  about the press conference and he's asking whether

22  he should do it or not.

23  Q   At bottom of the page at line 34 Defendant

24  Blagojevich indicates:

25      "I feel like I should slow it down a little,

 1      don't you?"

 2      What did you understand him to be saying?

 3  A   That perhaps he didn't need to do the press

 4  conference and that he should slow down both public

 5  announcement about his Senate Seat selection and

 6  slow down the process as well, the selection

 7  process, maybe not do it quite as quickly.

 8  Q   Over on Page 12 at the end of the page, line 27,

 9  Mr. Blagojevich says:

10      "So I'll call you right back."

11      You said:

12      "Okay.  Bye."

13          After this conversation, did you, in fact,

14  participate in a call related to the proposed press

15  conference on November 5th related to announcing the

16  Senate Seat criteria or process?

17  A   Yes, I did participate.

18  Q   Who do you recall in on that conversation?

19  A   Mr. Blagojevich was on the call, John Harris was

20  on the call, Lucio Guerrero was on the call, I

21  believe -- I believe that's all.

22  Q   Generally, how long -- well, approximately how

23  long did the conversation last?

24  A   I don't recall for sure.  It was fairly lengthy.

25  I would guess maybe a half hour conversation, maybe

1  a little longer than that.

2  Q   Generally, what was discussed in the

3  conversation?

4  A   Specifically whether to have the press conference

5  that afternoon regarding the Senate Seat, and, if

6  they he the press, what should be the message, what

7  should be talked about at the press conference.

8  Q   Was there discussion about questions Defendant

9  Blagojevich might get about whether he was

10  considering appointing himself to the Senate Seat?

11  A   Yes, there were some significant discussion about

12  that.

13  Q   What was discussed?

14  A   It was a bit of a challenge because Mr.

15  Blagojevich was seriously considering appointing

16  himself, as I understood it, but did not want to

17  either publicly acknowledge that he was appointing

18  himself, but also wanted to answer that question in

19  a way that it didn't definitively close the door to

20  the possibility appointing himself.

21  Q   Was there a discussion using healthcare as a

22  criteria for the new senator?

23  A   There was.  In talking about qualities in a

24  senator, there was discussion that the new senator

25  should be strong on healthcare, could be somebody

1  who would potentially work with the President on

2  healthcare issues and also would agree with some of

3  the things the Governor had done.

4  Q   What, if anything, did Defendant Blagojevich say

5  he wanted to make healthcare one of the criteria?

6  A   Again, as I recall, it was in the context of

7  appointing himself to the Senate Seat, and that we

8  would talk about healthcare as being an important

9  criteria for appointing the new senator.  If he

10 ended up appointing himself as senator, his record

11 on healthcare and his interest in healthcare and the

12 things he had done, Governor Blagojevich on

13 healthcare, could be a public explanation for why he

14 was appointing, that would be a reason.

15 Q   Did you understand that that was a reason to

16 raise healthcare as a criteria?

17 A   That it was -- that is it was the reason?

18 Q   Yes.

19 A   Yes, that was the reason.

20 Q   And was it your understanding that certain of the

21 statements that were going to be made in that press

22 conference were, in fact, not accurate?

23      MR. GOLDSTEIN:  Objection; leading.

24      THE COURT:  The objection is sustained.

25 BY MR. SCHAR:

1  Q   What was your understanding, if any, as to
2  whether certain statements that were going to be
3  made at that press conference were, in fact,
4  accurate?
5  A   There were certainly some statements not were not
6  an accurate portrayal of the thinking regarding the
7  Senate Seat at that time.
8  Q   I'd like to direct your attention now, Mr.
9  Scofield, to the following day, November 6th.
10        At some point that day did you go to the
11 Thompson Center?
12 A   Yes, I did.  Yes, I did.
13 Q   Why did you go to the Thompson Center?
14 A   Tom Balanoff had called me previously to ask if I
15 would be helpful to him in scheduling another
16 meeting with the Governor to talk about the Senate
17 Seat and the now vacant Senate Seat with Senator
18 Obama's election, and that meeting was set up for, I
19 believe, in the afternoon of that day.
20 Q   What happened when you got to the Thompson
21 Center?
22 A   I believe I saw Tom briefly before the meeting, I
23 don't recall that well.  Tom -- I believe I saw him
24 and we talked for a moment before the meeting and
25 then Tom went in to the meeting with the Governor.

1  Q   Were you present for the meeting between Tom
2  Balanoff and Defendant Blagojevich?
3  A   No, I was not present for the meeting.
4  Q   What happened after the meeting?
5  A   After the meeting I'd gone back to the Thompson
6  Center hoping to catch Tom on his way out and check
7  with Tom or discuss with Tom how the meeting went.
8  I didn't see Tom, but in the lobby John Wyma was
9  sitting in the lobby, someone I knew.  I talked to
10 him.  John said, hey, you just missed Tom Balanoff,
11 he just left.
12 Q   Who is John Wyma?
13 A   John Wyma is a lobbyist.  John was very involved
14 in both the governor's campaign, somebody that's
15 close to the Governor, I know him through that, and
16 he also was the Chief of Staff when I was in D.C. so
17 I've known him for quite some time.
18 Q   What happened after you talked to Mr. Wyma?
19 A   I did go back into the Governor's Office to
20 follow up and see how the meeting went.
21 Q   Who was present when you arrived?
22 A   When I got in the office Mr. Blagojevich was
23 present, John Harris was present, Bill Quinlan was
24 present.  I know Bob Greenlee was present at some
25 point, I'm not sure if he was right when I got

Scofield - direct by Schar                    3400

1  there, but he may have been in and out as well.

2  Q   And were Mr. Quinlan and Mr. Greenlee in and out

3  of that meeting after you joined it?

4  A   Yeah, I believe so --

5          MR. GOLDSTEIN:  Objection.

6  Q   What was discussed --

7          THE COURT:  We're going to stop.  We have

8  technical difficulties with the sound system, so

9  we're going to take a very short break and somebody

10 can come in here.

11         THE MARSHAL:  All rise.

12         THE COURT:  We are in recess.

13         You might not want to go far because this

14 might be done in 5, 10 minutes.

15     (Recess.)

16         THE COURT:  You may proceed.

17         MR. SCHAR:  Thank you, your Honor.

18         THE MARSHAL:  All rise.

19     (The following proceedings were had in the

20      presence of the jury in open court:)

21         THE COURT:  Please be seated.

22 BY MR. SCHAR:

23 Q   Mr. Scofield, when we broke you had indicated

24 that you had gone, I believe, into Defendant

25 Blagojevich's office at the Thompson Center and part

1 of a meeting that was occurring after Defendant

2 Blagojevich met with Tom Balanoff on November 6th,

3 do you recall that?

4 A  Yes, that's right.

:34AM  5 Q  What do you recall being discussed in the meeting

6 with Defendant Blagojevich after the November 6th

7 meeting between him and Mr. Balanoff?

8 A  I remember asking generally how did the meeting

9 go, what happened at the meeting, did it go well.

:35AM 10      The Governor responded that it was a good

11 meeting.  We talked a bit about what was discussed

12 at the meeting.  He said that Tom had made it clear

13 that President-Elect Obama was interested in the

14 Senate Seat and that Valerie Jarrett was his

:35AM 15 preference for the Senate Seat.

16      And he also talked about communicating with

17 Tom his interest in being in the Cabinet, at HHS,

18 the position of Health and Human Services.

19 Q  At some point during that meeting did the issue

:35AM 20 of Mr. Balanoff's salary at SEIU come up?

21 A  Yes, it did.

22 Q  How did it come up?

23 A  I was asked, because SEIU is my client, I was

24 asked by John Harris.  I believe John and Mr.

:35AM 25 Blagojevich were directing the question toward me.

1  John asked me specifically, he says, do you know

2  what Tom makes, do you have any idea what his salary

3  is at SEIU.

4  Q   What was your response?

5  A   I didn't know precisely what his salary was.  As

6  I recall, I made a guess as to what it was.  I said,

7  I think it's in the neighborhood of $150,000, I

8  think the union has a good benefit package, a

9  generous benefit package, but that was my ballpark

10 as to what it was.

11 Q   What was Defendant Blagojevich's response, if

12 any?

13 A   He seemed surprised that it was -- that that's

14 where it was, that it wasn't more.  There was

15 general surprise by Mr. Blagojevich, and I think by

16 Mr. Harris as well, that it wasn't more than that.

17 Q   At some point around this time period did you

18 have a conversation with John Harris about an

19 organization called Change to Win?

20 A   Yes, I did.

21 Q   About when?

22 A   As I recall, it was soon after this meeting.  It

23 was not long after this meeting.

24 Q   Was it in person or over the phone?

25 A   It was over the phone, John called me.

1  Q   By way of background, what is Change to Win?
2  A   Change to Win is a national labor coalition, it's
3  a coalition of unions, the main union or the
4  predominant union being SEIU.
5          Essentially, it's an organization of unions
6  that left the AFL-CIO and started their own national
7  labor organization.
8  Q   What did you and Mr. Harris discuss in this
9  conversation?
10  A   John was generally looking for information about
11  Change to Win and what I knew about it, who ran it,
12  how it was run, details about the organization.
13  Q   What was your response?
14  A   Well, I told him what I knew, which wasn't a lot.
15  I said to John, I said, you know, Change to Win is
16  really more of a nationally organization, it's more
17  Andy Stern's organization, that's what Andy runs,
18  SEIU of Illinois is my client.
19          But I told him essentially very similar to
20  what I probably just said to you to describe the
21  organization:  National labor coalition, again Andy
22  Stern being the main player there and not Tom
23  Balanoff.
24  Q   Mr. Scofield, I would like to direct your
25  attention to the following day which is

:37AM
:37AM
:37AM
:37AM
:38AM

Scofield - direct by Schar                    3404

1  November 7th.

2      By this time or at some time had you talked

3  to Jerry Morrison about Mr. Balanoff's meeting with

4  Defendant Blagojevich?

:38AM  5  A  Yes, I had.

6  Q  Was that conversation in person or over the

7  phone?

8  A  It was over the phone.

9  Q  What did you and Mr. Morrison discuss?

:38AM  10  A  The day after the meeting I talked to Jerry and

11  Jerry conveyed to me that Tom --

12      MR. GOLDSTEIN:  Objection.

13      MR. SCHAR:  Judge, it's offered for purposes

14  of --

:38AM  15      THE COURT:  Overruled.

16  BY THE WITNESS:

17  A  I'm sorry, could you repeat the question.

18  BY MR. SCHAR:

19  Q  What did you and Mr. Morrison discuss?

:38AM  20  A  We had talked -- I believe we talked a couple of

21  times, we talked in general about the Governor's

22  meeting with Tom Balanoff, the Governor's interest

23  in a cabinet position, and that Tom Balanoff had at

24  some point had a discussion, my sense was he had had

:39AM  25  a discussion with Valerie Jarrett communicating the

Scofield - direct by Schar                3405

1  discussion that he had had with Governor

2  Blagojevich.  That he had communicated what he had

3  been told in the meeting, and that Jerry was

4  communicating to me that they were very skeptical

:39AM  5  about the request and said specifically, you know,

6  they, "they" being the President-Elect or the people

7  around the President-Elect or Valerie Jarrett,

8  wanted to get away from Chicago politics and were

9  not particularly interested in what he was

:39AM  10  suggesting.

11  Q   Later that morning, did you have a conversation

12  with Defendant Blagojevich?

13  A   Yes, I did.

14  Q   Did you pass on, generally, what you heard from

:39AM  15  Mr. Morrison?

16  A   Yes, I did.

17  Q   In the context of that conversation, did the

18  issue of Lisa Madigan come up?

19  A   Yes.

:39AM  20  Q   With Defendant Blagojevich?

21  A   Yes, it did.

22  Q   What did you and Defendant Blagojevich discuss in

23  relation to that?

24  A   As I recall, I had -- in that conversation with

:40AM  25  Jerry, there had been some discussion of Lisa

1   Madigan and whether -- both whether she might be
2   interested in being senator, but also whether there
3   might be some interest in her having an appointment
4   in the Obama administration, perhaps something in
5   the Justice Department or in that department.
6   Q   What, if anything, did Defendant Blagojevich
7   discuss regarding a newspaper item that morning
8   about Lisa Madigan?
9   A   He asked me if I had seen the newspaper item.
10  There was an item, as I recall, in Michael Sneed's
11  gossip column or in her column in the newspaper
12  regarding Lisa Madigan, that said she was a strong
13  candidate and was being considered for the Senate
14  Seat.
15  Q   What did Defendant Blagojevich tell you about
16  that?
17  A   He said that was an item that had been placed by
18  him or his staff or his press people.
19  Q   What was your understanding as to why that item
20  had been placed in the Michael Sneed column?
21  A   To heighten the public perception and
22  specifically the perception among people who were
23  close to President-Elect Obama that Lisa Madigan was
24  a serious candidate for the Senate Seat.
25  Q   Later that morning did you talk to Defendant

:40AM

:40AM

:40AM

:40AM

:41AM

Scofield - direct by Schar                    3407

1  Blagojevich again?

2  A   Yes, I did.

3  Q   Was that in person or over the phone?

4  A   It was on the phone.

5          MR. SCHAR:  Judge, at this point we would ask

6  permission to play the call behind tab 30.  Tab 30

7  in Transcript Binder 1 which is session 375.

8          THE COURT:  Yes.

9      (Tape played.)

10 BY MR. SCHAR:

11 Q   Mr. Scofield, returning you to Page 1 of

12 the transcript.

13         This is a call that occurred on November 7th,

14 2008, at 6:00 a.m. according to the transcript?

15 A   Yes, that's right.

16 Q   I direct you, sir, to line 3 where Defendant

17 Blagojevich says:

18      "Hey, hey, so they want to get out of Chicago

19       politics as a euphemism for they want to get

20       away from Rezko."

21         What did you understand Defendant Blagojevich

22 to be saying there?

23 A   He's reacting to the information that's being

24 passed along to him.  When he says "they" I believe

25 he means people close to the President-Elect or

1  people making a decision about the Senate Seat
2  and/or the Cabinet position.
3  Q   And is this a reference to your indication for
4  the prior the call that you testified to that you
5  passed on that they, "they" being the Obama
6  administration, wanted to get out of the Chicago
7  politics?
8  A   Yes, that's right.
9  Q   You heard that directly from Jerry Morrison, but
10 not anyone directed from anyone affiliated with the
11 President-Elect?
12 A   No, that's right, through Jerry.
13 Q   At line 15 Defendant Blagojevich indicates:
14     "I tell you something, I think this is good, you
15        know, a highly unlikely prospect is little
16        likelier, a tiny likelier."
17        What did you understand him to be saying in
18 that transcript.
19 A   I understand him to mean the highly unlikely
20 prospect, the "prospective" he's talking about is
21 his ability to be appointed to the Cabinet or to
22 receive some other position that he would be
23 interested in having in the Obama administration,
24 and that perhaps it's becoming somewhat -- somewhat
25 likelier, somewhat likelier to happen.

1  Q   Line 23 Defendant Blagojevich says:
2      "She wants it."
3      who did you understand him to be referring to
4      there?
5  A   I believe he's referring to Valerie Jarrett.
6  Q   He continues:
7      "She's that, in the transition they're starting
8      to put figure out Cabinet positions.  Now, I
9      assume Balanoff mentioned ..."
10     continues on Page 2:
11     "... this, right?  Health and Human Services?"
12     You say:
13     "Assume what?"
14     Defendant Blagojevich says:
15     "He mentioned Health and Human Services,
16     right?"
17     You say:
18     "As far as I could tell."
19        What did you understand Defendant Blagojevich
20 is saying in this section?
21 A   He's saying that he believes Valerie Jarrett
22 wants to be appointed senator, that she's involved
23 in the transition team for the new President and
24 that they are starting to choose Cabinet positions,
25 and he is asking or clarifying that Tom Balanoff

1  mentioned to her Mr. Blagojevich's interest in the
2  cabinet and specifically HHS.
3  Q   And you don't know -- let me ask, do you know one
4  way or the other whether, in fact, that message had
5  actually been communicated?
6  A   I did not know if that had been communicated, no.
7  Q   Continuing on to line 27, Defendant Blagojevich
8  indicates:
9      "You know, and maybe we can work this out and
10      give him less or whatever.  We can sort
11      something out, but I'm, I'm, I know my path to
12      be a US.  Senator, it's there it is, he's, the
13      guy will do it."
14          What did you understand Defendant Blagojevich
15  to be saying here?
16  A   He's imagining Valerie Jarrett's thought process.
17  Imagining she's thinking that we can work this out,
18  she knows the way for her to become a U.S. Senator.
19  When he says "maybe we can work this out and give
20  him less," it's referring to what he might want:
21  Maybe he wants the Cabinet position, we can give him
22  that; maybe we can give him something less, but that
23  clearly there's a path, there's a way to do it,
24  there's a way for her to reach her goal of becoming
25  a senator.

Scofield - direct by Schar                    3411

1  Q   He says:
2        "The guy will do it."
3        Who's the "guy"?
4  A   She's referring to Mr. Blagojevich.
5  Q   You said she's referring to?  Her referring to
6  him?
7  A   Yes, I'm sorry.  He's imagining or projecting
8  that she's thinking the guy who will do it, "it"
9  being appoint me U.S. Senator, is Mr. Blagojevich.
10 Q   On Page 3, down on line 27, Defendant Blagojevich
11 indicates:
12       "And then the tactical question is, Harris goes
13        to Mosena, who's real close to Valerie Jarrett,
14        close friend."
15       And he continues:
16       "Okay, and just tells Mosena look, you know,
17        tell her she could be the senator, she can, the
18        governor could appoint her."
19       Continues on to the next page:
20       "Yeah, at the right time."
21       Defendant Blagojevich finishes:
22       "Under the right, certain conditions."
23         What did you understand Defendant Blagojevich
24 was talking in this section of the transcript?
25 A   He is suggesting that John Harris, John Harris

:55AM

:55AM

:56AM

Scofield - direct by Schar                          3412

1  his Chief of Staff, can go to Mosena who I believe
2  would be David Mosena, former Chief of Staff to the
3  mayor and apparently someone close to Valerie
4  Jarrett, that John Harris could go to David Mosena
5  and essentially enlist him as perhaps an
6  intermediary, someone who can talk to Valerie
7  Jarrett, and that he could convey the message that
8  she can be the senator, she can be appointed by the
9  Governor but there are certain conditions to be met
10 to do that.
11 Q   When you say certain conditions to met to do
12 that?  What is the "that"?
13 A   The "that" is to appoint her as senator.
14 Q   On line 26, now on Page 4, Defendant Blagojevich
15 indicates:
16      "Yeah, wants out of Chicago politics?  Rezko,
17      yeah.  You may want to get out of Chicago
18      politics, but I, I subscribe to this, you know,
19      misery loves company.  You're leaving me alone
20      here.  I want to go with you over there."
21         What do you understand Defendant Blagojevich
22 was discussing in this part of the call?
23 A   Well, he's referring back to the previous
24 conversation about getting out of Chicago politics
25 being a euphemism for getting away from Tony Rezko.

1  He's complaining a bit about the possibility that
2  he, Mr. Blagojevich, would be left in Chicago
3  politics while Senator Obama, soon to be President
4  Obama, will be leaving Chicago politics, and that
5  his preference is actually to go with Senator Obama
6  and be part of his administration, that that would
7  get him out of Chicago politics and allow him to go
8  with the administration with the new President.
9  Q   On to Page 6, Mr. Scofield, beginning at line 6,
10 Defendant Blagojevich indicates:
11      "Yeah, we'll see, but I bet I'll hear from Tom
12       today.  As soon as I do I'll give you a call."
13      Defendant Blagojevich asks:
14      "How are you going to handle it?  What are you
15       going to tell him?  He might call me at home
16       and I got to be away.  I can't be near this
17       phone."
18      What are you and Defendant Blagojevich
19       discussing?
20 A  Well, he's anticipating a call from Tom, from Tom
21 Balanoff, and he's afraid that he may be calling him
22 at home and he doesn't want to talk to him at home.
23 He wants to put off a meeting with Tom, essentially.
24 He wants to enlist my help in putting off a meeting
25 with Tom.

Scofield - direct by Schar                    3414

1  Q   Continuing on line 22, same page, you say:
2      "Give me a couple of hours here, I'll just tell
3       him, hey, looks like he's going to be traveling
4       over the weekend, let's set up a time for next
5       week."
6      Defendant Blagojevich says:
7      Now, don't say I'm traveling over the weekend,
8      that, that won't be, don't do that because
9      that's, that's not truthful."
10         What are you discussing?  What do you
11  understand Defendant Blagojevich to be saying?
12  A  Well, Mr. Blagojevich had told me previously that
13  he thought he might be traveling to D.C.  and my
14  sense is, I can just convey that to Tom and let him
15  know it's not that difficult to postpone a meeting,
16  he's traveling.  And then Mr. Blagojevich tells me,
17  well, I won't be traveling over the weekend, that's
18  not truthful, that's not truthful, that's not
19  accurate.
20  Q   Do you know whether, in fact, Defendant
21  Blagojevich had a conversation with Tom Balanoff in
22  which he told Tom Balanoff he would be traveling
23  over the weekend?
24  A   No, I don't know that.
25  Q   Over on to Page 7 Defendant Blagojevich, at line

1 1 says:
2     "  Huh, I just want to avoid a meeting."
3     What did you understand Defendant Blagojevich
4     to be saying there?
5 A  Well, again, that he wants to put off having a
6 meeting with Tom to have a discussion -- to not have
7 any discussion.
8 Q  Line 20 Defendant Blagojevich says:
9     "Well, he didn't say it was ludicrous, they
10     didn't say no way."
11     You say:
12     "Right."
13     And Defendant Blagojevich says:
14     "Not, not, not that, that's not what Jerry told
15     me."
16       What do you understand Defendant Blagojevich
17 to be saying?
18 A  That, again, he's referencing our conversation
19 and what I'm passing along as to what Jerry told me,
20 and he's saying he didn't say it was ludicrous.  By
21 "it" I believe he's referring to the idea that if
22 Valerie Jarrett is appointed senator, that in
23 exchange he may be able to be appointed to the
24 Cabinet or some other position that he would like to
25 be appointed to.

1  Q   On line 30 Defendant Blagojevich says:
2      "They can't, I don't know, if they say no way, I
3       mean maybe their, their only answer there wold
4       be, oh, we promised it to somebody else.
5       That's how they'd have to do that."
6       What do you understand him to be referring to
7       in that part of the call?
8  A  Well, he means if they were saying no way, they
9  would have to have a very specific reason for doing
10 it, as in saying that they had promised a position
11 to someone else.  Again, I believe he's referring to
12 the potential of him getting an appointment,
13 specifically a Cabinet appointment, but potentially
14 something else for appointing Valerie Jarrett a
15 senator.
16 Q   Over on to Page 8, at line 3, Defendant
17 Blagojevich indicates:
18     "We got a lot of options here, man.  She's
19      picking Cabinet positions, and she has it in
20      her power.  Well, not her power but she has a
21      tremendous amount of influence on those, some
22      of those decisions."
23      What do you understand Defendant Blagojevich
24 to be saying?
25 A   Again, I believe he's referring -- "she" he's

Scofield - direct by Schar                    3417

1  referring to Valerie Jarrett, referring to the fact
2  that she is part of the process for picking Cabinet
3  positions in the new Obama administration, and that
4  she has maybe not total power but significant
5  influence over who those Cabinet members will be who
6  will be put into those positions.
7  Q   He continues on line 11:
8      "So she's holding Health and Human Services and
9       I'm holding a U.S. Senate Seat, okay.  She's
10      holding hers with two hands, just kinda
11      clinging to it, you know, little pieces of it.
12      Me, I got the whole thing wrapped around my
13      arms.  Mine, okay."
14          What did you understand Defendant Blagojevich
15  to be saying in that part of the call?
16  A   Again, the "she" he is referring to Valerie
17  Jarrett, and he says that she's holding Health and
18  Human Services, essentially a euphemism for meaning
19  she has input over the selection of who will be the
20  next Secretary of HHS.  And he says, "I'm," Mr.
21  Blagojevich, is holding the U.S. Senate Seat.
22          He goes on to say, "she's holding hers with
23  two hands kind of clinging to it," in other words,
24  she doesn't have total control over who is going to
25  be put in the Cabinet.  She is one of a group of

:01AM

:02AM

:02AM

:02AM

:02AM

1  people making the decision, though an influential
2  part of the group.
3       Then he goes on to emphasize, I've got the
4  whole thing wrapped around my arm, this is a
5  decision entirely and only, only his decision as to
6  who will be appointed U.S. Senator.
7  Q   Line 19 Defendant Blagojevich says:
8       "I'm willing to trade the thing I got tightly
9        held, to her for something she doesn't hold
10       quite as tightly."
11       What do you understand Defendant Blagojevich to
12       be saying there?
13 A   That he's saying that he is willing to make a
14 trade for the thing I have tightly held, meaning the
15 appointment of U.S. Senator, to her, Valerie
16 Jarrett, for something she doesn't hold quite as
17 tightly, again referring back to the previous
18 statement that she is holding a Cabinet position,
19 it's not as tightly, but she has tremendous
20 influence over who will be in the Cabinet.
21 Q   He continues line 21:
22       "How bad do you want what I have and can you get
23        the other person who really got this, you know,
24        who has that to do it."
25       What did you understand him to be saying in

1 that line?

2 A   Again, I think he's kind of switching again

3 talking about how Valerie Jarrett might -- might

4 view this.  "How bad do you want what I have," "I"

5 again imagining Valerie Jarrett, saying I have this

6 Cabinet position, can you give the other person, in

7 this case being Mr. Blagojevich, who's really got

8 this, meaning the Senate appointment, to do it.

9 Again, make an exchange, appoint the person senator,

10 appoint Valerie senator in exchange for the Cabinet

11 position.

12 Q   He continues:

13     "If you're her, you're Valerie Jarrett, I could

14      be a U.S. Senator in a seat I could hold."

15      What do you understand Defendant Blagojevich to

16      be saying?

17 A   Well, if you're Valerie Jarrett you have a means

18 to becoming a U.S. Senator, there's a way for you to

19 do it.  And I believe by a seat I can hold, he means

20 there's a seat that she could reelected to.  It's a

21 short-term appointment, but that in all likelihood

22 she can be reelected to the seat and have it for

23 some time.

24 Q   Line 29 Defendant Blagojevich continues:

25     "That guy is pulling it by himself, now I know

1       he's willing to give it to me, if he gets
2       something I have.  I'm holding it to some
3       extent, right?  If you're her, what do you
4       think?"
5       What do you understand Defendant Blagojevich to
6       be saying?
7  A  Again, he's imagining Valerie Jarrett to think
8  the guy, Mr. Blagojevich, is holding it by himself
9  and that she now understands that he's willing to
10 give it to her if he gets something that she has.
11 What she has is influence over who will be in the
12 Cabinet, what he has is the ability to appoint a
13 senator.
14 Q  At line 38 Defendant Blagojevich says:
15      "Got to think at least I can be ambassador to
16       Macedonia now."
17          Do you think he was making light of this
18 situation?
19 A  Yes, I think that's correct.
20 Q  Was it your understanding he wanted to be
21 Ambassador to Macedonia?
22 A  I don't think he wanted to be Ambassador to
23 Macedonia.
24 Q  Page 9 at 4 Defendant Blagojevich says:
25      "All right, you try to slow walk this a little

1      bit."
2      What did you understand Defendant Blagojevich
3      to be saying?
4   A   Referring back to the meeting with Tom Balanoff,
5   again he didn't want to meet with Tom right away.
6   Q   Did you actually have a conversation with Tom
7   Balanoff after this conversation?
8   A   I did not have a conversation with Tom, no.
9   Q   This conversation is November 7th.  Was
10  November 8th and 9th, to the best of your
11  recollection, a weekend?
12  A   Yes, that's right.
13  Q   To your recollection, did you talk to Defendant
14  Blagojevich over the weekend?
15  A   I don't believe so.
16  Q   I direct your attention now to November 10th, a
17  Monday.  Did you talk to Defendant Blagojevich that
18  day?
19  A   Yes, I did.
20          MR. SCHAR:  Judge, with your permission
21  there's a longer call that Mr. Scofield is not a
22  part of behind tab 34 which has not yet been played.
23  We'd like to play a portion of that call now
24  beginning at Page 11, line 1, which is a separation
25  point on the topic.

Scofield - direct by Schar                    3422

1        THE COURT:  And ending?

2        MR. SCHAR:  And ending at the end of the

3   conversation, Judge.

4        THE COURT:  Yes.

:07AM    5   BY MR. SCHAR:

6   Q   Mr. Scofield, before we play this call, could you

7   just remind us who Doug Sosnick is?

8   A   He is a Washington based political consultant and

9   active in Democratic politics in government for

:07AM   10   quite some time.

11      (Tape played)

12        MR. SCHAR:  Judge, at this point we ask to

13   play call 458 which is behind tab 36.

14        THE COURT:  Yes.

:17AM   15        MR. SCHAR:  For the record, that is a call on

16   November 10, 2008, 11:44 a.m. not long after the

17   last call that was just played.

18        May we proceed?

19        THE COURT:  You may.

:17AM   20      (Tape played)

21   BY MR. SCHAR:

22   Q   Mr. Scofield, turning your attention to Page 1 of

23   the transcript behind tab 36, call session 458,

24   beginning at line 4 Defendant Blagojevich says:

:21AM   25        "Hey, ha, give Balanoff a heads-up, I

Scofield - direct by Schar                    3423

1    overpromised on Jesse Jr., ah, I'll tell you
2    about this conversation I had with the Jacksons
3    but ah ... he's in the mix, all of a sudden,
4    okay?"
5    What did you understand Defendant Blagojevich
6    to be telling you in that call?
7  A   He wants me to communicate to Tom Balanoff that
8  Jesse Jackson, Jr., may be actually a candidate for
9  the Senate Seat.  He had told Tom that he was not a
10 candidate and he's telling me that he had a
11 conversation with the Jacksons now it looks like
12 Jesse Jackson, Jr., may be a candidate for the
13 Senate Seat.
14 Q   Do you know whether in fact Defendant Blagojevich
15 had a conversation with Jesse Jackson, Jr., over
16 that weekend?
17 A   No, I don't know.
18 Q   At line 12 Defendant Blagojevich interstate:
19    "And I told Balanoff and Stern no way, you know,
20    I still don't think I'll, you know, do it but
21    I'm not ruling him out."
22    What did you understand Defendant Blagojevich
23 to be saying there?
24 A   That while previously he didn't consider him a
25 candidate, now he does.  He doesn't think he'll do

1  it, seems unlikely that that he will do it, but that
2  it is a possibility.
3  Q  Line 17 Defendant Blagojevich:
4       "I know, did Joe Stroud, Joe Stroud was part of
5       it.  I'll talk to you about it when I see you."
6       What did you understand Defendant Blagojevich
7       to be saying there?
8  A  Well, he's mentioning Joe Stroud and that Joe
9  Stroud is part of the reason that Jesse Jackson,
10 Jr., now may be a candidate for the Senate Seat.
11      I know of Joe Stroud through my work in
12 politics.  He an African-American businessman owns a
13 television station and some other business
14 interests.  He is seen as a fairly prominent
15 African-American funder of campaigns.  He funded
16 most of Roland Burris' campaign for governor in
17 2002.
18 Q  When you say he funded most of Roland Burris'
19 campaign for governor in 2002, do you know how much
20 he gave?
21 A  I don't recall exactly how much he gave.
22 Q  Hundreds of thousands of dollars?
23 A  I believe more like millions of dollars.
24 Q  Over on Page 2 Defendant Blagojevich at line 9
25 says:

Scofield - direct by Schar                    3425

1       "Another option is Ken Dunkin, what about Ken
2        Dunkin?"
3       You say:
4       "Ah, interesting, I guess.  What do we get ou
5        of Dunkin?"
6       Defendant Blagojevich says:
7       "Well, I get nothing out of Valerie Jarrett,
8        okay."
9           What did you understand Defendant
10  Blagojevich to be saying there?
11  A   He is suggesting Ken Dunkin, who is a state rep,
12  maybe a candidate.  In talking about Valerie
13  Jarrett, he's saying he's not -- he's not getting
14  anything out of appointing Valerie Jarrett as
15  senator.
16  Q   Line 17 through 19 Defendant Blagojevich says:
17       "But they're not going to give me anything,
18        that's what Knapp's saying."
19           What did you understand Defendant
20  Blagojevich to be saying?
21  A   That he is saying Bill Knapp is suggesting that
22  he will not get anything personally in return for
23  appointing Valerie Jarrett senator.
24  Q   Line 20 you say:
25       "Did you go to D.C.?

Scofield - direct by Schar                                3426

1    Defendant Blagojevich says:

2    No, I just on the phone with them this

3    morning."

4        What did you understand he was telling you?

:24AM 5 A  That he didn't talk to Bill Knapp in D.C., that

6 he had a phone conversation with him that morning.

7 Q   At line 24 Defendant Blagojevich says:

8        "Knapp and Sosnick and Fred."

9        Who did you understand him to be referring

:24AM 10 to?

11 A  Again, Bill Knapp, Doug Sosnick and Fred Yang.

12 Q   You indicate on line 29:

13     "I don't know if I assume nothing, but I assume

14     less than what would be."

:25AM 15    Defendant Blagojevich says:

16    "Of course.  We're not, nothing for

17    confirmation."

18        What did you understand Defendant Blagojevich

19 to be saying?

:25AM 20 A  That he believes or he is suggesting that he

21 won't get anything in return for appointing a

22 senator that would require confirmation,

23 confirmation hearing by the U.S. Senate.

24 Q   That that's what he was being told?

:25AM 25 A  That's what he was being told.

1  Q   Page 3, line 2, Defendant Blagojevich says:
2      "But, you know, what about Patti on some, you
3       know, corporate boards, paid corporate boards
4       right now?"
5          What did you understand Defendant Blagojevich
6  to be suggesting as part of the conversation?
7  A   Well, he had been talking about being told that
8  he wouldn't get an appointment that required
9  confirmation in exchange for making the appointment
10 as senator, so he's changes his focus to Patti, to
11 Mrs. Blagojevich, and maybe she could be put on
12 corporate boards, again if he made the right Senate
13 appointment.
14 Q   You said the right Senate appointment, who are
15 you referring to?
16 A   Valerie Jarrett.
17 Q   Line 11 Defendant Blagojevich says:
18     "Yeah, Tree House, the one that what's her
19      name was on for 65 grand.  Now can't we get
20      Patti a couple of those?"
21         What did you understand "Patti" to be
22 referring to?
23 A   Tree House Foods is the corporate board that
24 Michelle Obama was on, Mrs. Obama.
25 Q   Did you think Defendant Blagojevich could be able

1  to actually trade the Senate Seat for getting his

2  wife paid corporate board positions?

3          MR. GOLDSTEIN:  Objection.

4          THE COURT:  Sustained.

5  BY MR. SCHAR:

6  Q   Did you tell Defendant Blagojevich that this was

7  not a viable option?

8  A   No, sir, I did not.

9  Q   Why not?

10 A   Well, for several reasons.  You know, I had told

11 him early on in the first meeting that I was in the

12 Governor's Office after the meeting with Tom

13 Balanoff and Andy Stern, I told him I didn't believe

14 he would be appointed to a Cabinet position.

15          He had asked directly and I said you won't be

16 appointed to HHS.  That didn't change his mind or

17 seem to have any impact on him.

18          I found it typically that was often the case.

19 I talked to him quite a lot about his desire to

20 appoint himself, the idea that he might appoint

21 himself to the Senate Seat.  I had told him several

22 times, repeatedly, that I didn't think that was a

23 good idea.  That really didn't get me anywhere other

24 than having him be frustrated with me.

25          You know, I had a desire to have a good

1  relationship with him.  I had, you know, business
2  interests and clients that I worked with them, I had
3  good clients that did good things, I didn't want to
4  endanger their relationship with the state.  When
5  you told him things he didn't want to hear, he could
6  frequently be displeased.  It was more likely he
7  would be displeased than it would change his
8  opinion.

9          And to a large extent, the things he was
10  talking about in regard to the Senate appointment,
11  to me, seemed absolutely unobtainable.  It seemed
12  absurd to me.  The idea of him being in the Cabinet
13  seemed entirely unlikely, the idea of corporate
14  boards seemed entirely unlikely.

15          And, to some extent, I kind of picked my
16  fights with him and was likely to fight over
17  something that seemed plausible and things we were
18  talking about seemed entirely implausible.

19  Q   You indicated that you had clients who had
20  interests with the state, you needed to maintain a
21  good relationship with Defendant Blagojevich.  In
22  your experience in the past, had you see
23  relationships that had literally gone south in
24  something similar, in your experience?

25          MR. GOLDSTEIN:  Objection to the form of the

 1  question.
 2         THE COURT:  The objection to the form is
 3  sustained.
 4  BY MR. SCHAR:
 5  Q   In your experience, what was your understanding
 6  of the type of mentality Defendant Blagojevich had
 7  for people who displeased him?
 8         MR. GOLDSTEIN:  Objection.
 9         THE COURT:  Overruled.
10  BY THE WITNESS:
11  A   He could be difficult.  I mean, I certainly seen
12  people who spent a lot of time and have been very
13  helpful to him who had certainly been close to him,
14  if they angered him or if he felt they were being
15  disloyal, to be treated poorly, they would be cut
16  off.
17         He had kind of an in and out view of the
18  world.  And so I was concerned about it at that
19  time.  I'd seen it.  Frankly, you know, after I left
20  the administration in early 2003, I didn't have much
21  of a relationship with him personally for a while,
22  so I had seen it before and it was a concern for me.
23  Q   Returning to the call, Mr. Scofield, at line 18,
24  Page 3, Defendant Blagojevich indicates:
25         "Okay.  And think about how we, what we say.  I

Scofield - direct by Schar                          3431

1       mean, I'll do Valerie Jarrett.  I just don't,
2       if they, but if they feel like they can do this
3       and not f'ing give me anything under, just some
4       vague assurances or something, then I'll f'ing
5       go Jesse, Jr."
6           What did you understand him to be saying?
7  A  He's stating that he will appoint Valerie Jarrett
8  but he won't appoint Valerie Jarrett in exchange for
9  nothing more than some vague assurances, that he
10 wants something more tangible in exchange for
11 Valerie Jarrett.  If he can't receive that, then he
12 could appoint Jesse Jackson, Jr., instead.
13 Q  Line 26 and 27 Defendant Blagojevich says:
14      "I mean, the arrogance of these f'ing people.
15          What do you understand him to be referring to
16 in that part of the call?
17 A  He's referring to the idea of people of -- by
18 "people" I believe he means people close to the
19 President-Elect.  The idea that he will make the
20 appointment that the President-Elect preferred in
21 exchange for nothing but vague assurances or not for
22 something more tangible or substantive.
23 Q  On Page 4 Defendant Blagojevich, at line 13,
24 says:
25          "You know, Patti, you know, a couple of

1     corporate boards, you know, she picks up

2     another 150 grand a year, whatever.  Help us

3     through these, you know, while we're, have to

4     suck it up here for the next couple of years as

5     governor.  What do you think.  Hey Dough?

6          Were you still on the phone?  Do you recall

7  those comments being made?

8  A  I don't really recall them.  I'm not sure.  We

9  got cut off at some point.

10 Q  On November 10th did you have several other

11 conversations with Defendant Blagojevich that

12 afternoon?

13 A  Yes, I did.

14 Q  Was anything discussed, Mr. Scofield, regarding

15 providing information to the newspapers?

16 A  Yes, we discussed several times his desire to

17 have the idea that Jesse Jackson, Jr., Congressman

18 Jackson, was a viable candidate for the Senate Seat,

19 we discussed his desire to have that known publicly

20 and have that disseminated in some way that it be

21 better known publicly.

22 Q  And what, if anything, did Defendant Blagojevich

23 indicate to you about the information he wanted

24 provided to the newspapers regarding discussions

25 with Jesse Jackson, Jr.?

1  A   Again, following up I believe on the previous
2  call we had had, he wanted communicated that he was
3  in discussions, the discussions were positive with
4  Congressman Jackson, and that he was -- that he was
5  becoming a strong candidate for the Senate Seat.
6  Q   Do you know whether or not, in fact, Defendant
7  Blagojevich was in good discussions with Congressman
8  Jackson on November 10th?
9  A   He had mentioned in a call that he had had a
10 discussion with the Jacksons, but no, I don't know
11 what, if any, discussions he had.
12 Q   What was your understanding of the propose of
13 providing this information to the newspapers?
14 A   Well, specifically, he was most interested in
15 people around the President-Elect seeing that Jesse
16 Jackson, Jr., was a serious candidate for the Senate
17 Seat.
18 Q   What, if anything, did you do after talking to
19 Defendant Blagojevich about providing this
20 information to the newspapers?
21 A   I reached out to Michael Sneed to see if it was
22 an item that she might have been interested in
23 running.
24 Q   What, if anything, during these other
25 conversations was discussed, Mr. Scofield, regarding

:33AM
:33AM
:33AM
:33AM
:34AM

                    Scofield - direct by Schar                3434

1  the timing of making the Senate appointment?
2  A  Well, we talked about the timing off and on
3  several times.  He -- he -- we talked about a couple
4  of different things, as I recall.  One, that he was
5  not in a hurry to make the Senate appointment.  That
6  he wanted time and he didn't want to be pressured to
7  make the Senate appointment.
8         We also talked about what he might say if he
9  was asked.  If he was asked publicly why haven't you
10  appointed a senator yet, what is taking so long, you
11  know, what's your process.
12         We talked both about his public explanation
13  for why a Senate appointment hadn't been made, and
14  also, generally speaking, his desire to take time to
15  do it.
16  Q  What was your understanding as to whether the
17  public explanation that Defendant Blagojevich was
18  going to provide was true and accurate?
19  A  I didn't believe it was an accurate explanation
20  of what his actual thought process or
21  decision-making process was about it.
22  Q  At some point did you have a conversation with
23  anyone related to the newspapers in terms of
24  providing information about Congressman Jackson?
25  A  I did.  Eventually I talked to Michael Sneed's

1  assistant or reporter assistant who works for Mike.

2  Q   I want to direct your attention to the following

3  day, November 11th.

4         Did you talk to Defendant Blagojevich again

5  that day?

6  A   Yes, I did.

7         THE COURT:  We're going to stop.  15 minutes.

8         THE MARSHAL:  All rise.

9      (The following proceedings were had out of the

10      presence of the jury in open court:)

11         THE COURT:  Court is in recess except for

12  counsel for the parties who will come to the side.

13      (Proceedings heard at sidebar on the record.)

14         THE COURT:  I previously informed counsel for

15  each side of a letter I received from juror 115 who

16  pointed out, both in her questionnaire and maybe in

17  the questioning, that she had been out of work for

18  four months.  And I guess she was regularly employed

19  before that and now she was looking for work.  She

20  has now received a conditional offer from the

21  employer contingent on her passing the background

22  check and a bunch of other things that they're

23  doing.

24         My proposal to deal with this juror is to

25  allow her to pursue this job offer probably using

:35AM

:35AM

:40AM

:40AM

:41AM

Scofield - direct by Schar                    3436

1  the Fridays which she has off to fill out whatever
2  papers have to be filled out, and then if they
3  actually make the officer to release her.
4          The letter that she sent to me was
5  accompanied by the offer letter from the company
6  itself, so it's a legitimate offer letter.
7          Does anyone wish to speak to this?
8          MR. SCHAR:  Judge, we do briefly.  I think
9  tomorrow afternoon at the end of the trial day we'll
10 have some more thoughts generally about the speed in
11 that we're going, but I think we're moving at a
12 speed greater than initially anticipated.  I think
13 the government's case is not going to last nearly as
14 long as perhaps expected.  And so it may well be
15 that with that in mind, this case is not going to go
16 as long as anticipated and would not require her to
17 actually suffer any particular harm.
18         I don't know if in combination of the fact
19 she may not actually be here through September and a
20 call from Your Honor related to see if they would
21 hold that position in abeyance for a few more weeks,
22 it may not be a significant hardship.
23         THE COURT:  No, that's ordinarily what I
24 would do in any event, because sometimes the
25 employer will say fine, the prospective employer

Scofield - direct by Schar                          3437

1  will say fine, sometimes they won't.  I'm willing to

2  make calls, but first I want to have the job offer

3  in hand.  And I think she would like the job offer.

4  So I think we'll start off that way.

5         Its my sense, too, that this case is going

6  relatively more quickly than anybody expected;

7  although, in this situation, speed is a very

8  relative term.

9         And we possibly may have reached the point at

10  which the witness--this is only a suggestion--does

11  not have to be asked about each of the sentences

12  particularly when some of the meaning seem

13  indisputable.

14         I don't object to it in the beginning because

15  there's a certain knowledge in which these people

16  operate that you have to go through a lot of this

17  stuff, but we're past approaching the point where I

18  think they are capable of understanding most of this

19  stuff on its own.  That's just my suggestion.

20

21         THE MARSHAL:  All rise.

22     (The following proceedings were had in the

23      presence of the jury in open court:)

24         THE COURT:  Please be seated.

25         You may resume.

                        Scofield - direct by Schar                    3438

1              MR. SCHAR:  Thank you, Judge.

2              At this time with Your Honor's permission we

3    would ask to play call behind tab 39 in Transcript

4    Binder 1.  This is call session 439, November 11th,

5    2008, at 9:37 a.m., tab 39.

6              THE COURT:  Give me a moment.

7         (Brief pause).

8              THE COURT:  Yes, you may.

9         (Tape played)

10   BY MR. SCHAR:

11   Q  Mr. Scofield, going back to Page 1 of the

12   transcript, at line 5, Defendant Blagojevich

13   indicates:

14      "I'm okay.  We gotta get that Jesse, Jr., thing

15       out there.  How do we do that?"

16       You say:

17       "I'll, I'll get it."

18          What are you and Defendant Blagojevich

19   talking about in that part of the transcript?

20   A  We're talking about his desire to place an item

21   in the newspaper, specifically Michael Sneed's

22   column about Jesse Jackson, Jr., being a strong

23   candidate for the Senate appointment.

24   Q  Are you still working on that at this time?

25   A  I don't believe I was, no.

Scofield - direct by Schar                    3439

1  Q   Page 2, line 30, Defendant Blagojevich says:
2        "How about a 501(c)(4) so I can advocate
3  children's healthcare.  Can't they get like Warren
4  Buffet and some of those guys to put like 10, 12, 15
5  million dollars in that?  Like right away."
6        What did you understand Defendant Blagojevich
7  was telling you in that part of the call?
8  A   That he would be interested in a 501(c)(4) or a
9  nonprofit, it's a type of nonprofit organization.
10 That he'd be interested in a 501(c)(4) that he could
11 use and be employed at or have a place to work at
12 that can advocate for children's healthcare.
13 Q   When did he want it funded based on his
14 conversation?
15 A   He says right away.  He wants it as soon as
16 possible.
17 Q   Is this the first time some issue of -- issue
18 advocacy organization had arisen in a conversation
19 between you and Defendant Blagojevich?
20 A   No.  No, it's not.
21 Q   When did it originally come up?
22 A   We had had other discussions not in context of
23 the Senate Seat, but earlier in that year.  We
24 talked increasingly again as sort of the
25 Presidential campaign went along and as Senator

1  Obama was doing well, about his frustrations with
2  his place politically, about what the investigations
3  were doing to his ability to either perhaps run for
4  reelection or run for higher office or to do what he
5  was hopeful of doing once he left office.
6          And so we had general conversations about
7  what are the kind of things or maybe what I can do
8  to rehabilitate my image, you know, a place where I
9  can work, a place I can have employment after
10 leaving the Governor's Office or finishing a second
11 term.
12 Q   Going to Page 3 line 7 Defendant Blagojevich
13 says:
14     "How do you make a deal like I can that?  I
15     mean, it's got to be legal obviously, but it's
16     very commonplace is it not?  Doing things like
17     this?
18     You reply:
19     "Ah, I mean that kind of 501(c)(4) ) is not
20     unusual."
21      What did you understand Defendant Blagojevich
22 to be saying and what was your response?
23 A   He's asking how you set up or how you can do a
24 501(c)(4), is what I took him to mean, and is it
25 common, is setting up something like that is not

1  unusual.  And my response is no, they're not

2  unusual.

3  Q   On Page 4, line 18 Defendant Blagojevich says:

4    "And if there's not a lot out there just settle

5    on Louanner.  I mean, what if I'm facing an

6    impeachment next year.  And before the storm

7    clouds really get serous I can go to Louanner

8    and say, I gotta catapult, I gotta parachute

9    out of here.  She's like, she's the one who

10    probably can make, you know would do that for

11    me, you know what I'm saying?"

12    And over to Page 5, line 19 he says:

13    "That's better that an impeachment, right?"

14    And over on line 22 Defendant Blagojevich says:

15    "That's the value of Louanner, gives me a,

16    cover my flank."

17     What did you understand Defendant Blagojevich

18  was talking about in this section of the recording?

19  A  He was talking about the possibility of

20  appointing Louanner Peters to the Senate Seat.

21  Louanner was one of his deputy governors.  He's

22  explaining that the advantage of having Louanner in

23  the Senate Seat is that he believes that Louanner is

24  someone who if she was a sitting senator and

25  impeachment was getting to be a serious threat, or

1 impeachment hearings, or facing impeachment, that

2 Louanner might be willing to step aside, she'd be

3 willing to resign the Senate Seat and if he's

4 Governor he can appoint himself.  He says catapult

5 or parachute out, you know, that's his ability to

6 appoint himself senator because Louanner would step

7 aside.

8 Q   At the bottom of Page 6 Defendant Blagojevich

9 says, at line 34:

10     "501(c)(4) advocacy 10, 15, 20 million dollars,

11      in an organization like that, but I, we can get

12      going with, you know, a board that, you know,

13      I'm comfortable with and then when I'm no

14      longer governor I go over there.  What about

15      that?

16         What do you understand him to be saying

17 there?

18 A   He is talking about a nonprofit organization,

19 someone funding a nonprofit organization.  Here,

20 specifically, I believe he's talking about setting

21 it up soon, having a board that he's comfortable

22 with so at sometime in the future when he's no

23 longer Governor it would be a place that he can go

24 and have employment and work.

25 Q   Line 7 Defendant Blagojevich says:

1       "I bet you J.B. can raise money like that for a
2        Senate Seat."
3            Who did you understand when he was referring
4    to J.B.?
5    A  He is referring to J.B. Pritzker.
6    Q  At line 12 he says:
7       "If I can get J.B. to do something like that, is
8        it worth giving him the Senate Seat?"
9            What did you understand him to be suggesting?
10   A  That if Mr. Pritzker might be willing to fund
11   this organization, he'd be willing to put the money
12   into an organization into a 501(c)(4), a nonprofit,
13   in exchange for doing that, would it be a good idea
14   or would it be worth it for Mr. Blagojevich to
15   appoint him as the senator.
16   Q  He says J.B. Pritzker.  Who is J.B. Pritzker?
17   A  He's a prominent businessman.  His family owns
18   the Hyatt Hotel chains and other business interests
19   as well.
20   Q  Is he regarded as wealthy?
21   A  Yes, he is regarded as wealthy.
22   Q  You say:
23       "Man, I don't know.  That's a hard one to do."
24        What are you saying there?
25   A  I think a couple of things.  One, while J.B.

1   Pritzker is a prominent and I think a respected

2   businessman, he's never held elected office and it

3   would be harder, I think, to choose him as senator

4   and make him a senator, and I'm trying to

5   communicate that doing it in exchange for this

6   well-funded, non-profit is a bad idea.

7   Q   Defendant Blagojevich then continues on 27:

8        "Yeah, you darn right it's hard.  But if you

9        have an organization that, you know, you go out

10       and advocate and, and he'll help fund it by

11       getting some of his billionaire friends to, to

12       invest in it, huh?"

13       YOU, you, look, I really believe you can do

14       more good than just putting Valerie Jarrett

15       there and get nothing back."

16          What did you understand Defendant Blagojevich

17  to be saying?

18  A   He begins by referencing that it's hard to put

19  J.B. in that seat, he is saying yes, it is hard, but

20  if Mr. Pritzker or perhaps someone else, in this

21  case if Mr. Pritzker, if Mr. Pritzker was willing to

22  fund that type of nonprofit, get some of his friends

23  to invest in it, that that would be better than

24  appointing Valerie Jarrett and receiving nothing

25  back in exchange for appointing Valerie Jarrett.

1  Q   Line 15 through 16 Defendant Blagojevich asks:
2       "When Obama giving up that Senate Seat, what you
3        are you hearing?"
4       He continues:
5       "...  I'm beginning to think they're going to
6        wait until they get a better sense of what I'm
7        going to do."
8          What did you understand Defendant Blagojevich
9  saying there?
10 A   I don't believe Senator Obama has actually
11 officially reassigned his Senate Seat.  He can't
12 make the appointment until -- Mr. Blagojevich can't
13 make the appointment until the senator actually
14 resigns.  So he's checking on the timing of it and
15 he's suggesting perhaps he is not resigning because
16 they're waiting to see if Mr. Blagojevich has made a
17 decision about his successor or waiting to see,
18 generally, what he's going to do about the Senate
19 Seat.
20 Q   On 25 Defendant Blagojevich says:
21      "And get Knapp pressuring me on this lame duck
22       session like I gotta do before then.  Knapp's,
23       um, I gotta tell you Knapp's a bit of a
24       quisling on this.  They got to Knapp."
25      You say:

Scofield - direct by Schar                     3446

1      "Bill says you gotta do it for the lame duck."
2      Line 34:
3      "I'm telling you now, man, they got to him."
4         What did you understand Defendant Blagojevich
5   to be telling you here?
6   A   He is suggesting that Bill Knapp is pressuring
7   him to make an appointment quickly before the lame
8   duck session of Congress, and he is suggesting that
9   they, I believe he means people close to the
10  President-Elect, have gotten the bill and convinced
11  him to pressure -- to pressure the Governor to make
12  an appointment quickly.  And he's suggesting Bill,
13  he's being a quisling, essentially being a traitor
14  because he's supporting this idea.
15  Q   Is the definition of quisling a traitor?
16  A   More or less a traitor, a collaborator.
17  Q   In one of your prior conversations had Defendant
18  Blagojevich talked about, I'm talking about prior
19  conversations that day or the day before, had
20  Defendant Blagojevich talked about his other
21  conversations with Bill Knapp from earlier?
22  A   Yes, we had talked about that.
23  Q   What had he told you about his conversations with
24  Mr. Knapp?
25  A   It was similar to this conversation.  He was

:23PM
:23PM
:24PM
:24PM
:24PM

1  saying that he didn't -- again, he was suggesting
2  that someone, meaning somebody close to the
3  President-Elect, had gotten to Bill, influence Bill,
4  put pressure on Bill to tell the governor that he
5  needed to make an appointment, needed to make an
6  appointment quickly, or perhaps he needed to appoint
7  Valerie Jarrett just because she was qualified for
8  the position, or make a suggestion that he ought to
9  do it quickly and he ought to do it without
10 anticipating really getting anything specific in
11 exchange for it.
12 Q   What was your understanding, if any, per your
13 conversations with Defendant Blagojevich about
14 whether Bill Knapp was suggesting and other advisers
15 were suggesting he should make the appointment just
16 for goodwill?
17          MR. GOLDSTEIN:  Objection.
18          THE COURT:  The objection to the form is
19 sustained.
20 BY MR. SCHAR:
21 Q   What, if anything, do you recall Defendant
22 Blagojevich saying about what Bill Knapp was
23 advocating in terms of the appointment?
24 A   That Bill was suggesting that he make it fairly
25 quickly and that Bill was suggesting that good will

Scofield - direct by Schar                3448

1  from the President or a good relationship with the

2  President, President-Elect, should be sufficient for

3  making an appointment.

4  Q   In that conversation, what was Defendant

5  Blagojevich's response to Mr. Knapp's suggestion

6  that he appoint Valerie Jarrett and expect good

7  will?

8          MR. GOLDSTEIN:  Objection; foundation.

9          THE COURT:  Are you talking about something

10  that is in this transcript?

11          MR. SCHAR:  Judge, the same conversation he's

12  been describing.

13          THE COURT:  Right.  Overruled.

14  BY THE WITNESS:

15  A   Mr. Blagojevich was frustrated.  He was

16  suggesting that it was -- it was not the

17  recommendation he wanted to follow, that Bill had

18  been influenced by others, and he was frustrated

19  with bill, thought Bill was being disloyal.

20  Q   Did he call him an quisling in that conversation,

21  as well?

22  A   I believe he did, yes.

23  Q   Over on Page 10, Defendant Blagojevich again

24  raises the 501(c)(4) on line 1, and then at line 11

25  he says:

1        "Okay, J.B. he can do that, couldn't he?"

2            Had you already in conversation,

3   Mr. Scofield, indicated that that would be hard to

4   do?

5   A   Yes, I had.

6   Q   Based on your understanding of this conversation,

7   did Mr. Blagojevich let the idea go?

8   A   No, he didn't.  He came back to it.

9   Q   At line 13 and 14 Defendant Blagojevich says:

10       "Who knows him that we know that's close to

11        him?"

12           What did you understand him to be asking?

13  A   He's asking me if I know anyone or know if I'm

14  aware of who's close to Mr. Pritzker.

15  Q   At line 22 Defendant Blagojevich says:

16       "I mean, I don't want to be the one to ask

17        something like that."

18           What did you understand he was saying?

19  A   Hat he doesn't want to be the one,

20  Mr. Blagojevich, to ask J.B. Pritzker directly to

21  invest a considerable amount of money in a

22  501(c)(4), a nonprofit organization.

23  Q   I direct your attention now, Mr. Scofield, to

24  November 12th.

25           MR. SCHAR:  Judge, we already played the call

Scofield - direct by Schar                    3450

1  but not out of this binder.

2          THE COURT:  Which is the next binder?

3          MR. SCHAR:  It will be the next binder,

4  binder 2 but not --

5          THE COURT:  Let's break now, then.

6          MR. SCHAR:  Very good, Judge.

7          THE COURT:  One hour.

8          THE MARSHAL:  All rise.

9      (The following proceedings were had out of the

10      presence of the jury in open court:)

11          THE COURT:  We are in recess except for

12  counsel who can approach the lectern.

13      (Brief pause).

14          THE COURT:  On the two motions which I have

15  before me having to do with reimbursement of fees

16  and costs.  The government has resolved some of the

17  questions I had presented, but the point they're

18  making is the shortage of certain prerequisites.  So

19  counsel for the Defendant Robert Blagojevich can do

20  whatever he thinks is appropriate.

21          With respect to the government's memorandum

22  in opposition with respect to the Skilling case, I

23  read the Skilling case the day it came out during

24  various breaks.  And I think while it probably will

25  do some good for Mr. Skilling, might possibly do

:28PM

:29PM

:30PM

:30PM

:31PM

Scofield - direct by Schar                    3451

1  some good for Conrad Black, it is unlikely to do

2  anything for this particular defendant.

3          The only question that was raised in my mind,

4  and it would have no effect on the admissibility of

5  evidence but it might have some effect on the nature

6  of the charge, is the allegation with respect to the

7  Tribune.

8          I say this not only because I note that it is

9  the one not specifically listed on Pages 8, 9 and

10  10, but because there is a reasonable argument with

11  respect to the Tribune allegations that if the

12  allegations are true, arguably it's the Governor

13  trying to bribe the Tribune rather than the bribe

14  going the other way.  And there are a variety of

15  ways to look at that allegation, but counsel for

16  both sides are free to express their views on that

17  one in particular.

18          The ex post facto objection is overruled.  I

19  think it's invalid on its face, although I

20  understand the purpose of defense counsel in making

21  the record with respect to that one.

22          So that's where we are basically.  As far as

23  I'm concerned, we're down to one possible effect of

24  Skilling on this case.

25          But as I've indicated, assuming there were no

1  charge based on that attempt, it would be evidence

2  that would be admissible without, ironically, the

3  barring against other crimes evidence.

4         With that, I will see you in about an hour.

:34PM   5

6

7     (Luncheon recess taken from 12:34 o'clock p.m.

8      to 1:44 o'clock p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scofield - direct by Schar                    3453

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4          Government,             )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  June 30, 2010
    ROBERT BLAGOJEVICH,            )
7                                  )
              Defendants.          )  1:44 o'clock p.m.
8

9                        VOLUME 17
                 TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JAMES B. ZAGEL
                     AND A JURY
11

12

    For the Government:
13
                THE HONORABLE PATRICK J. FITZGERALD,
14              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
15                   Carrie E. Hamilton
                     Christopher Niewoehner
16              Assistant United States Attorneys
                219 South Dearborn Street
17              Suite 500
                Chicago, Illinois 60604
18

19

20

    Court Reporter:
21
                   Blanca I. Lara, CSR, RPR
22                 219 South Dearborn Street
                        Room 2504
23                 Chicago, Illinois 60604
                     (312) 435-5895
24

25

1    APPEARANCES  (continued:)

2

3    For Defendant Rod Blagojevich:

4            KAPLAN & SOROSKY
             BY:  Sheldon M. Sorosky
5            158 West Erie
             Chicago, Illinois 60610
             (312) 640-1776
6
             LAW OFFICE OF SAMUEL E. ADAM
7            BY:  Samuel Forbes Adam
                  Samuel Adams, Jr.
8            6133 South Ellis Avenue
             Suite 200
9            Chicago, Illinois 60637
             312-726-2326
10

11           OFFICES OF AARON B. GOLDSTEIN
             BY: Aaron Benjamin Goldstein
12           6133 South Ellis
             Chicago, Illinois 60637
13           (773) 752-6950

14           OFFICES OF LAUREN FAUST KAESEBERG
             BY:  Lauren Faust Kaeseberg
15           2140 N. Lincoln Park West
             Suite 307
16           Chicago, Illinois 60614
             (773) 517-0622
17
             LAW OFFICES of MICHAEL GILLESPIE
18           BY:  MICHAEL GILLESPIE
             53 West Jackson Boulevard
19           Suite 1420
             Chicago, Illinois 60604
20           (312) 726-9015

21

22

23

24

25

1  APPEARANCES   (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scofield - direct by Schar                    3456

1          THE MARSHAL:  All rise.

2        (The following proceedings were had in the

3         presence of the jury in open court:)

4          THE COURT:  Please be seated.

:44PM     5          Direct examination, you may proceed.

6          MR. SCHAR:  Thank you, Judge.

7    DOUG SCOFIELD, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8              DIRECT EXAMINATION (resumed)

9    BY MR. SCHAR:

:44PM    10   Q   Mr. Scofield, directing your attention now to

11   November 12th.

12          Did you have a brief conversation with

13   Defendant Blagojevich on the morning of November

14   12th?

:44PM    15   A   Yes, I did.

16   Q   In person or over the phone?

17   A   Over the phone.

18   Q   What, if anything, did you discuss about whether

19   Valerie Jarrett was still interested in the Senate

:45PM    20   Seat on the morning of November 12th?

21   A   November 12th there started to be news reports

22   that Valerie Jarrett was not interested in the

23   Senate Seat or more specifically that she may be

24   taking a job in the administration of the White

:45PM    25   House, in the white House staff for the President.

Scofield - direct by Schar                    3457

1  Q   What was Defendant Blagojevich's response to

2  these news reports?

3  A   He thought that perhaps it was something that had

4  been -- that it wasn't accurate, that it might be

5  floated around by the President-Elect sort of part

6  of the discussions that were ongoing about the

7  Senate Seat.

8  Q   Directing your attention now to November 13th,

9  did you have a series of conversations with

10 Defendant Blagojevich on November 13th?

11 A   Yes, I did.

12 Q   Where were you at the time each of these

13 conversations?

14 A   I was in Michigan.

15         MR. SCHAR:  Judge, may I approach?

16         THE COURT:  You may.

17 BY MR. SCHAR:

18 Q   I will provide, Mr. Scofield, with what is marked

19 as Government Exhibit Transcript Binder 2.

20         MR. SCHAR:  And, Judge, with your permission,

21 I would ask to play the call behind tab 60.  Tab

22 6-0.

23         THE COURT:  Go ahead.

24         MR. SCHAR:  Thank you, Judge.  This would be

25 tab 60, Judge.  6-0.

:45PM

:45PM

:45PM

:46PM

:47PM

Scofield - direct by Schar                    3458

1      (Tape played)
2   BY MR. SCHAR:
3   Q   Mr. Scofield, directing your attention back to
4   Page 1.
5          Where were you at the time of this phone
6   call?
7   A   I was in Michigan.
8   Q   The call is November 13th at 12:21 p.m.
9          I direct your attention to Page 2, line 1,
10  you indicate:
11      "Well, I talked to Jerry this morning who said
12       their sense was, ah, Valerie doesn't want it.
13       Valerie's out.  So they didn't think they were
14       bluffing."
15      Defendant Blagojevich at line 9 says:
16      "Yeah, I don't disagree with that.  I still
17       think she might, yo know if she can get it,
18       she'd take it."
19          What do you understand Defendant Blagojevich
20  to be saying in that part of the call?
21  A   I'm communicating to him I talked to Jerry
22  Morrison.  Jerry says no, Valerie Jarrett is no
23  longer interested in being senator.  That based on
24  our prior conversation, it was not some sort of a
25  tactic or strategic maneuver on the part of the

:54PM

:54PM

:54PM

:54PM

:55PM

1    President-Elect or the people near him.

2         And I believe Mr. Blagojevich is saying, I

3    don't think she -- it looks like she doesn't want

4    it, but I believe she's still might be willing to

5    take it if she can get it.

6    Q   He continues on line 20:

7        "So I mention to Tom, you know, my 501(c)(4)

8         organization that I'd like to put together, you

9         know what I'm saying?"

10        On line 27:

11        "Yeah, you know, 10, 12, 15 million dollars,

12        that shouldn't be hard for these guys to be

13        able to get, put something like that together

14        to help them push their healthcare agenda and

15        mine."

16        What did you understand him to be telling you

17   there?

18   A   He is referring again to the 501(c)(4) that he's

19   talked about and some significant funding for that

20   organization, an organization that would be a place

21   that he could work or a place he could use talking

22   about healthcare.  He's telling me also that he

23   mentioned Tom Balanoff, that he talked to him about

24   the 501(c)(4) as well.

25   Q   Line 32 he asks:

Scofield - direct by Schar                          3460

1    "What do you think of that?"
2     And you respond:
3     "Well, do they see Families U.S.A. as that
4     already?"
5     What are you indicating there?
6  A  Well, the SEIU may not be interested in funding
7  some sort of new advocacy organization.  I'm trying
8  to suggest to him that it's perhaps not the greatest
9  or most practical idea.
10 Q  Defendant Blagojevich continues on the bottom of
11 Page 2, line 35:
12    "I don't know whether they do or not, all I'm
13    saying is, I would like help for the one I want
14    to put together."
15     What did you understand Defendant Blagojevich
16 to be saying?
17 A  Well, that the status of Families U.S.A. or what
18 SEIU thinks about that isn't particularly relevant
19 to him, he is focused on a new one that he wants to
20 start that would benefit him.
21 Q  On page 3, line 9 to 10 Defendant Blagojevich
22 says:
23    "I really believe that the worse thing Obama
24    wants is me going there."
25     What did you understand him to be saying

Scofield - direct by Schar                    3461

1  there?

2  A   That President-Elect Obama does not want

3  Mr. Blagojevich to appoint himself as U.S. Senator.

4  Q   At line 18:

5       "No, they the don't want me there anyway.  So do

6        we talk to Tom Balanoff to see if Andy Stern

7        can go to Rahm and say, hey, look, will you

8        help this guy with this 501(c)(4) on

9        healthcare?  You follow me?"

10         What did you understand him to be saying in

11  that section?

12  A   If Tom Balanoff or Andy Stern should be enlisted

13  as messengers to talk to Rahm about Mr.

14  Blagojevich's interest in starting the 501(c)(4),

15  the non-profit.

16  Q   Who is Rahm?

17  A   I'm sorry?

18  Q   Who do you understand Rahm to be?

19  A   Rahm is Rahm Emanuel.

20  Q   And at this point on November 12th, what position

21  do you understand Mr. Emanuel to have?

22  A   He's agreed -- he's going to go into the new

23  administration as the President's Chief of Staff.

24  Q   Line 25 Defendant Blagojevich continues:

25       "My, my strategic goal would be to have Rahm,

:57PM
:57PM
:57PM
:57PM
:57PM
:58PM

1      have it in his head, sooner rather than later,

2      like today, tomorrow."

3          What did you understand Defendant Blagojevich

4  to be telling you there?

5  A   That he would like Rahm to have the idea of

6  funding for a 501(c)(4) in his head as soon as

7  possible.

8  Q   Defendant Blagojevich continues at line 28:

9      "Not in connection with Senate appointment or,

10     or anything in his 5th CD."

11     You say:

12     "Okay."

13     And then Defendant Blagojevich says:

14     "You know, just sort of like hey, this is what,

15     is there a way to help him.  You guys get

16     Buffet and Warren Buffet and all these guys to

17     fund it.  You see what I'm saying, Doug" over

18     to Page 4 you say:

19     "I do, but this, this, we're not talking about

20     part of discussions for anything else."

21     Defendant Blagojevich says:

22     "Well, it's unsaid.  Do you understand what I'm

23     saying?"

24     You say?

25     "Yeah."

Scofield - direct by Schar                    3463

1    He says:

2    "It's unsaid."

3        Beginning back on Page 3 and continuing

4  through that section, what did you understand

5  Defendant Blagojevich to be saying?

6  A   That he wants the message about his interest, Mr.

7  Blagojevich's interest in the 501(c)(4) to be

8  communicated to Rahm.  I'm clarifying -- he says at

9  one point, "but not in connection with anything

10 else," again he references Warren Buffet and who

11 might fund it.  I to clarify say -- I ask him, is it

12 connected to something else or not.  And he says,

13 "it's unsaid, you understand what I'm saying?"  I

14 understood him to mean, well, it is connected, it's

15 rather obviously connected, it's all we've been

16 talking about, but I don't want that communicated

17 directly or explicitly to Rahm Emanuel.

18 Q   At lines 9 through 11 Defendant Blagojevich says:

19    "In other words" on Page 4 "in other words,

20     however, they wanna, I mean, the point is, well

21     you know what I'm saying."

22        Did you understand what Defendant Blagojevich

23 was saying?

24 A  Yes, I did.

25 Q   What did you understand him to be saying?

Scofield - direct by Schar                    3464

1  A   That he wanted Rahm Emanuel to understand that he
2  was interested in a 501(c)(4), that he was hopeful
3  that prominent wealthy contributors can fund it, and
4  his interest was related to the Senate appointment.
5  Q   Was it your understanding he just didn't want to
6  say it explicitly?
7  A   Yes, that's right.
8  Q   Page 4, line 20, Defendant Blagojevich asks:
9      "Should I just have Wyma do it?"
10     What did you understand him to be asking?
11 A   He's asking instead of Tom Balanoff or Andy Stern
12 taking the message to Rahm Emanuel, should John Wyma
13 take the message to him.
14 Q   At line 31 Defendant Blagojevich indicates:
15     "Okay, so Wyma's been an emissary."
16     Continuing on to 5:
17     "... I could have Wyma go to Rahm."
18     You indicate:
19     "If they've already gone to Wyma, Wyma will
20     have a more direct route back to them."
21     What did you understand Blagojevich to be
22 suggesting?
23 A   He is suggesting that because Wyma acted as an
24 emissary already in bring the message to him, Mr.
25 Blagojevich from Rahm, that maybe John Wyma would be

Scofield - direct by Schar                    3465

1  the appropriate or effective emissary taking the
2  message back to Rahm.
3  Q   At the bottom of the Page 6, like 36, Defendant
4  Blagojevich says:
5      "I'm afraid John is going to be afraid to convey
6       the message, maybe that's what I'm saying."  On
7       to page 6:
8       Yeah, okay, maybe that's what it is, he's going
9       to be afraid to convey the message to Rahm."
10         What did you understand Defendant Blagojevich
11 to be telling you?
12 A   My understanding would be, you know, Rahm Emanuel
13 is about to be the President's Chief of Staff, John
14 is a lobbyist, he has some -- John is a D.C.
15 lobbyist as well, that maybe it's a message that he
16 does not want to take to Rahm Emanuel because of
17 business interests or for perhaps some other reason
18 but that's the reason that comes to mind.
19 Q   At line 11 Defendant Blagojevich says:
20     "All right, so I'll have Harris talk to Wyma to
21      see if he'll do it, but I'll have Harris talk
22      to him, not me."
23         What did you understand Defendant Blagojevich
24 to be indicating there?
25 A   That Mr. Blagojevich is going to ask John Harris

Scofield - direct by Schar                    3466

1  to request that John Wyma take the message to Rahm
2  Emanuel.
3         MR. SCHAR:  Judge, at this point we ask
4  permission to play the call behind tab 61 which does
:02PM  5  not include Mr. Scofield but it's the next call
6  sequential with the prior call.
7         THE COURT:  Yes.
8      (Tape played).
9         MR. SCHAR:  Judge, at this point we ask
:04PM  10 permission to play the call behind tab 62 in the
11 binder.
12        THE COURT:  You may.
13 BY MR. SCHAR:
14 Q  Mr. Scofield, did you have another conversation
:05PM  15 with Defendant Blagojevich about 15 minutes after
16 your last conversation?
17 A  Yes, I did.
18     (Tape played).
19 BY MR. SCHAR:
:10PM  20 Q  Mr. Scofield, turning to Page 1 of the
21 transcript, this is a call at 11 -- I'm sorry, on
22 November 13th at 12:35 p.m. according to the
23 transcript?
24 A  Yes, sir, that's right.
:11PM  25 Q  At line 6 Defendant Blagojevich says:

1      "Can you call Wyma?"

2       You indicate:

3       "Yeah.  What's the message?"

4       What are you indicating?

:11PM   5  A   I'm talking about I'll call John Wyma and I want

6  to know what he wants me to say.

7  Q   Defendant Blagojevich continues:

8      "The message is, you know, ask him if he can

9       call Rahm and just say, hey look, this is

:11PM  10       unrelated to the other stuff, you know, I'd

11       like, I want to put together a 501(c)(4) for

12       healthcare."

13          What did you understand Defendant Blagojevich

14  to be telling you there?

:11PM  15  A   He is relating a message he would like me to

16  convey for Rahm about his interest in the nonprofit

17  advocacy organization.

18  Q   What he said this is unrelated to the other

19  stuff, what do you understand him to be describing

:12PM  20  there?

21  A   Unrelated to mean unrelated to the selection of

22  the senator.

23  Q   In contrast with what you just discussed in the

24  prior call?

:12PM  25  A   Yes, it is.

1  Q   Is it your understanding as to whether it was
2  related?
3  A   Yes, I think it's not unlike the other call, he
4  is describing how he would like it conveyed, though
5  it is in fact related.
6  Q   Over on Page 2 at line 2 Defendant Blagojevich
7  says:
8       "And could they, ah, you know, and is there, you
9        know, can they talk to, is there George Soros
10       and Warren Buffet all that whole, all those
11       Democrats, can, can he think, start thinking
12       about how he can help us fund it?"
13       And you say:
14       "Okay, and it's as simple as that.  You, he
15       should say it's unrelated to the other thing."
16       And Defendant Blagojevich says:
17       "If he feels like he needs to even say that."
18        What did you understand Defendant Blagojevich
19  to be saying there?
20  A   Again, he's talking about the message that he
21  wants conveyed, George Soros, Warren Buffet being
22  potential funders.  I'm trying to clarify.  He is
23  making clear to me that he does not want it
24  explicitly conveyed to Rahm that it's connected to
25  this, this being the Senate Seat or the other things

Scofield - direct by Schar                    3469

1  we were about the which was the Senate Seat, but it

2  is.

3  Q   On page 2, line 14 continues:

4      "But just say, hey look, you know what, you

5      know, ah, you should know he's interested in

6      putting this together.  In other words, he

7      should put it in his head.  You, he's saying

8      he's interested in putting together a 501(c)(4)

9      issue advocacy, ah, group, you know, like the

10     children's defense fund for, you know,

11     children's healthcare."

12         What do you understand Defendant Blagojevich

13 to be telling you there?

14 A   Again, it's important that it's in Rahm's head,

15 Rahm is still thinking about the senate selection,

16 it should be in Rahm's head that what the Governor

17 really is interested in is this nonprofit, this

18 501(c)(4) organization.

19 Q   At line 33 at bottom of the page Defendant

20 Blagojevich says:

21     "You know, so the mission for Wyma to

22     essentially put it in Rahm's head that we would

23     like them to help us, you know, fund it."

24     And over to Page 3:

25     You said:

Scofield - direct by Schar                            3470

1      "Okay."
2      Defendant Blagojevich says:
3      "Right."
4      You say:
5      "Well, I assume, wile it's not said, this is a
6      play to ... "
7      Defendant Blagojevich says:
8      "Correct."
9      You say:
10     "... put, put in play other things."
11     And Defendant Blagojevich says:
12     "Correct."
13     You say:
14     "And is this because, just so I understand it,
15     because we think there's still some life in
16     Valerie potentially or, do we have another play
17     here?"
18         What did you understand Defendant Blagojevich
19 to be saying to you and what were you confirming?
20 A   He was talking about the importance of Rahm
21 understanding what he was interested in.  I'm
22 clarifying that while he's encouraging me to
23 communicate to John Wyma that he doesn't want it
24 said explicitly that it's related to the Senate
25 Seat, I'm clarifying that it is actually related to

Scofield - direct by Schar                    3471

1   the Senate Seat.  I said, "I assume while it's not

2   said, this is in play, too," he says, "correct," I

3   said "put in play other things" and he says

4   "correct," he confirms that that's right.

5   Q   And you then add:

6       "Just so I understand because we think there's

7        still some life in Valerie potentially."

8        What were you referring to there?

9   A   If he still believes there's a chance that

10  Valerie Jarrett wants to be a senator or that they

11  would ask or be interested in Valerie Jarrett

12  becoming a senator.

13  Q   At line 12 after you've asked about Valerie

14  Jarrett, Defendant Blagojevich says:

15      "I think there's still some."

16      You say:

17      It doesn't matter to me.  I don't need to

18      know."

19      Defendant Blagojevich says:

20      "Not so much her, but possibly her, but

21      others."

22      Continuing on line 25:

23      Yeah, so is, this is Valerie or not Valerie, it

24      doesn't have to be her, okay."

25          What did you understand Defendant Blagojevich

Scofield - direct by Schar                    3472

1  to be saying in response to your question about
2  Valerie Jarrett?
3  A   He's saying he's not certain if she's still
4  interested; she may be.  He's somewhat less
5  convinced that she's interested, but if she's not
6  interested, there could be other candidates that the
7  President-Elect or those around him would be
8  interested in in being senator.
9  Q   Over on to Page 5, at top of the page line 1 you
10 indicate:
11      "All right, let me reach out to John.  Now, you
12       know, it wouldn't surprise John to say how come
13       you're calling me instead of Rod, and John may
14       call you."
15      What are you saying in that section?
16 A   Conveying to him that John Wyma may think it's
17 peculiar that I'm calling him instead of
18 Mr. Blagojevich directly.
19 Q   Defendant Blagojevich goes on:
20      "No, just say because I don't want to have that
21       conversation with him because of all the other
22       stuff that's happening, do you understand?"
23       Continues on line 11:
24       I mean, you can be up-front with him.  I still,
25       I don't wanna put him in a position where I'm

1  having that conversation with him.  I mean,
2  you, maybe you don't need to be upfront with
3  him.  Don't even ... see I don't want to have
4  the conversation with him because I don't want
5  him ever to have to answer question that, ah,
6  you know I asked him to call Rahm Emanuel on
7  this.  See what I'm saying?"
8  At line 23 Defendant Blagojevich continues:
9  "And he's got a client that's being scrutinized
10  over at the Health Facilities Planning Board."
11  What do you understand Defendant Blagojevich to
12  be saying here?
13 A   Throughout this he's emphasizing that he doesn't
14 want to have the conversation directly with John
15 Wyma because he doesn't want John to have to answer
16 any questions about this conversation because John
17 perhaps is being scrutinized for the Health
18 Facilities Planning Board or something else and that
19 Mr. Blagojevich doesn't feel comfortable having this
20 conversation with him himself.
21 Q   When he says "scrutinized," who did you think
22 Defendant Blagojevich believed was scrutinized a
23 client at the Health Facilities Planning Board?
24 A   Law enforcement authorities, the federal
25 government.

Scofield - direct by Schar                    3474

1  Q   Just to be clear, were you still in Michigan when
2  this call occurred?
3  A   Yes, sir, I was.
4  Q   After getting off the phone with Defendant
5  Blagojevich in this call, what did you do,
6  Mr. Scofield?
7  A   Not long after that I called John Wyma.
8  Q   At that point did you have a conversation with
9  Mr. Wyma?
10 A   Yes, I did.
11 Q   What did you and Mr. Wyma discuss?
12 A   Generally speaking, I tried to pass along this
13 message, though I was in many ways dismissive of the
14 message.
15      I said to John something very much like:  You
16 know, every now and then we get asked to do
17 something that's ridiculous even by our standards,
18 meaning those of us around the Governor, and said
19 but I've been asked to do it, so I'm passing it
20 along --
21      MR. GOLDSTEIN:  Objection.
22      THE COURT:  Well, if your goal to objecting
23 was to stop his answer, you succeeded.
24      Ask another question.
25      MR. SCHAR:  Thank you, Judge.

Scofield - direct by Schar                          3475

1  BY MR. SCHAR:

2  Q   What did you say to Mr. Wyma and what did

3  Mr. Wyma say to you?

4  A   I said:  John, you know, every now and then we

5  get asked --

6              MR. GOLDSTEIN:  Objection.

7              THE COURT:  For what purpose are you offering

8  this?

9              MR. SCHAR:  Judge, it goes to explain a later

10 conversation.

11             THE COURT:  You may answer.

12 BY THE WITNESS:

13 A   Again, I said, we get asked sometimes to do

14 something that's ridiculous even by our standards,

15 but I've been asked to pass this along, so I'm

16 passing it along.  I said, you know, Rod is really

17 around the bend on this Senate stuff, I'm kind of

18 stuck in the middle of it because SEIU is involved,

19 he's been talking to Tom Balanoff.  He thinks you're

20 in the middle of it because I'm told you're talking

21 to Rahm and may have had some discussions with Rahm,

22 so here's what he said to me and I'll pass it along

23 to you.

24 Q   Did you essentially pass on Defendant

25 Blagojevich's message at that point?

1  A   Yes, I did.

2  Q   Did Mr. Wyma express any concerns about the

3  message?

4  A   He did.  He -- he seemed slightly confused about

5  it.  He said what -- he asked me a couple of

6  questions:  What exactly is it I would say?  How

7  would I say this?  And he wanted to clarify that it

8  was related to the Senate Seat and Senate

9  discussions, which I had said to him I think within,

10 you know, 5 seconds of picking up the phone, but he

11 did ask for clarity on that, and I said yeah, that's

12 the idea.

13 Q   And this was the message about the 501(c)(4)

14 funding?

15 A   Correct.

16 Q   Mr. Wyma was asking whether that was related to

17 the Senate Seat?

18 A   Yes, he did.

19 Q   And you confirmed that it was?

20 A   Yes.

21 Q   Was that based on your understanding of your

22 conversations with Defendant Blagojevich?

23 A   That's right.

24 Q   In terms of actually passing the message on, what

25 was Mr. Wyma's response?

1  A   I believe he said:  Well, I'll see what I can do,

2  something like that.  He was noncommittal.  I,

3  frankly, took it to mean that I didn't believe he

4  would pass along the message.  We talked about this

:21PM  5  idea of funders, which we both found a little bit

6  implausible.  I didn't get the sense it would be

7  something he would actually pass it on.

8  Q   Shortly after your conversation with Mr. Wyma,

9  did you have another conversation with Defendant

:21PM  10  Blagojevich?

11  A   I did.

12  Q   Were you still in Michigan at the time of this

13  conversation?

14  A   Yes, sir.

:22PM  15       MR. SCHAR:  Judge, at this point I would ask

16  to play the call behind tab 63.

17       THE COURT:  Go ahead.

18    (Tape played).

19  BY MR. SCHAR:

:25PM  20  Q   Mr. Scofield, back to Page 1, it's a call

21  November 13th, same day, at 3:41 p.m. according to

22  the transcript, is that correct?

23  A   Yes, that's right.

24  Q   You indicated on line 4:

:25PM  25       "Okay, I talked to John.  John said he will, he

Scofield - direct by Schar                    3478

1    will talk to Rahm and report back."
2    Blagojevich says:
3    "Beautiful."
4    What are you indicating in that portion of the
5    call?
6  A   That I made the call, that I talked to John, and
7  I'm letting him know that he'll -- he'll talk to
8  Rahm and report back to him.
9  Q   Is that accurate?
10 A   It really was not accurate based on my calling.
11 Q   Why did you tell that to Defendant Blagojevich?
12 A   I thought it was the easiest way to convey the
13 message to him.
14 Q   Over on page 2 line 23 Defendant Blagojevich
15 says:
16    "I mean, I think we, we're gonna, I wonder if we
17    ought say something like, well, I don't know, I
18    don't wanna, I'm not gonna respond to any
19    timetable, I'm not, I'm not gonna answer that
20    question.  It's a deliberate process, it's
21    gonna take time, we got to do background checks
22    and vetting, we're checking records, we want to
23    interview people, you just can't do that in two
24    weeks."
25    What did you understand Defendant Blagojevich

Scofield - direct by Schar                    3479

1  to be practicing with you there?

2  A  He's discussing what the public response would be

3  to inquiries about a timetable for appointing a

4  senator, when a senator is going to be appointed,

5  and perhaps why one hasn't been appointed already.

6  Q  What is he suggesting he'll probably say?

7  A  The choice and care and caution with which he

8  ought to go about it.

9  Q  Based on your conversations, what was your

10 understanding as to whether that public statement

11 was going to be accurate?

12 A  I don't think that was an accurate reflection of

13 what was going on.

14 Q  Over on Page 3, top of the page, Defendant

15 Blagojevich says:

16     "I'll tell you who has no chance is Tammy

17      Duckworth, Tammy Duckworth, she has no chance.

18      Not because of her but because of who wants

19      her.  Why the F would I make Durbin's candidate

20      or Rahm's candidate?"

21      What did you understand Defendant Blagojevich

22      to be saying there?

23 A  That he's not going to appoint Tammy Duckworth

24 and apparently the reason is because either Senator

25 Durbin or Congressman Emanuel or both are supporting

1  her.

2  Q   Did Defendant Blagojevich say anything about the

3  merits of Tammy Duckworth as a Senate candidate?

4  A   No, he didn't.

5  Q   Did Defendant Blagojevich say anything about

6  whether Tammy Duckworth was good for the people of

7  Illinois?

8  A   No, he did not.

9  Q   Did you ever hear back --

10       MR. SCHAR:  Judge, that, I believe, is the

11  last call in the binder that I'll be using.

12  BY MR. SCHAR:

13  Q   Mr. Scofield, did you ever hear back from

14  Mr. Wyma?

15  A   No, I never heard back from him.

16  Q   That last call we heard was on November 13th.

17  Did your phone calls with Defendant Blagojevich fall

18  off after November 13th?

19  A   Yes, they did.  They fell off significantly.

20  Q   Did you have many conversations with Defendant

21  Blagojevich about the Senate Seat after that?

22  A   No, I did not.

23  Q   Was that the same time that Valerie Jarrett took

24  he name out and SEIU stopped participating in the

25  discussions, largely stopped participating in the

1  discussions about the Senate Seat?

2  A   Yes, it's the same time.

3  Q   What was your understanding after that point as

4  to whether you appear to have any utility to

5  Defendant Blagojevich?

6       MR. GLDSTEIN:  Objection.

7  BY MR. SCHAR:

8  Q   What was your understand as to whether Defendant

9  Blagojevich was relying on you -- well, let me

10 rephrase that one.

11      What was your understanding, if any, as to

12 whether Defendant Blagojevich --

13      MR. SCHAR:  I'm going to try a fourth time,

14 Judge.

15 BY MR. SCHAR:

16 Q   Did you have -- did Defendant Blagojevich call

17 you back after this time frame and ask you

18 repeatedly or any significant conversations about

19 policy about who the Senate choice should be?

20      MR. GOLDSTEIN:  Objection; leading.

21      THE COURT:  Overruled.

22 BY THE WITNESS:

23 A   No, I don't recall having any policy discussions

24 with him regarding the senator.

25 BY MR. SCHAR:

:29PM
:29PM
:29PM
:30PM
:30PM

1  Q   I'm going to switch topics, Mr. Scofield, and
2  direct your attention to an organization called the
3  Academy for Urban School Leadership.
4          Are you familiar with that organization?
5  A   Yes, I am.
6  Q   How are you familiar with it?
7  A   An employee in our company has been a board
8  member there, we also had them as a client.  We've
9  done some pro bono work for the organization and
10 have had them as a client also.
11 Q   Directing your attention to 2006, at some point
12 did you have a conversation with Bradley Tusk about
13 the Academy for Urban School Leadership?
14 A   Yes, I did.
15 Q   Do you recall where that conversation occurred?
16 A   It took place in his office, the Governor's
17 Office in the Thompson Center.
18 Q   Who raised the issue of Academy For Urban
19 Leadership?
20 A   I did.  I had a question for him about it.
21 Q   What was the purpose of your raising it?
22 A   I was curious.  I had been asked, I believe, by
23 my employee about a project for a high school that
24 was run by AUSL, the Academy for Urban School
25 Leadership, it was a project they needed funding for

:30PM

:30PM

:30PM

:30PM

:31PM

:31PM

1  and the funding had been delayed and I had been

2  asked to see if I can check and see if perhaps

3  Bradley might have any information for me about the

4  status of the project or why it was delayed.

5  Q   Id you raise the status of the project with

6  Mr. Tusk?

7  A  I did, I asked him.

8  Q   What was Mr. Tusk's response?

9        MR. GOLDSTEIN:  Objection.

10        MR. SCHAR:  Prior consistent statement.

11        THE COURT:  Overruled.

12  BY MR. SCHAR:

13  Q   What was Mr. Tusk's response?

14  A  He said -- it was clear that he knew about it.

15  He immediately said, you know, I know all about this

16  project, I've got a problem with this project, I'm

17  trying to work it out, they need funding, it's all

18  wrapped up in an argument that Rod is having with

19  Rahm.  Rod sees it as Rahm's project, it's in his

20  district, Rahm is advocating for it, but Rod wants

21  Rahm to do a fundraiser and he's not doing it, and

22  until I can kind of get this issued resolved, I

23  don't think I can take care of the money, and

24  essentially, you know, there's nothing you can do

25  and kind of recommend you stay out of it.

Scofield - direct by Schar                    3484

1  Q   Was that, effectively, the end of the
2  conversation?
3  A   That was all he said.
4  Q   At some point did you have several conversations
5  with Defendant Blagojevich on helping to get his
6  wife a job?
7  A   Yes, sir, I did.
8  Q   When did those conversations occur?
9  A   They occurred predominantly, I would say, early
10 2008, perhaps late 2007 somewhere as well.
11 Q   Do you recall each of those conversations
12 individually or collectively?
13 A   No, I remember them collectively.
14 Q   What did you and Defendant Blagojevich discuss?
15 A   I found that increasingly in the second term he
16 seemed concerned about both his future, both
17 politically and professionally, and how that related
18 to his financial situation.
19        So we had several conversations in which he
20 said, you know, I don't know what I'm going to be
21 able to do after the second term.  And he talked a
22 lot about Mrs. Blagojevich's difficulty with her
23 realty business.  That scrutiny of her clients,
24 press accounts about her clients, perception of
25 investigations had made it difficulty for her realty

:32PM

:33PM

:33PM

:33PM

:33PM

1 business.  Her realty business was struggling.

2        That she had recently gotten a license, a

3 financial services license of some sort, and that he

4 was thinking about job opportunities and things that

5 she could do.

6 Q  What, if anything, did he ask you to do?

7 A  He asked me again about SEIU, is there anything

8 at SEIU, you know.  He asked about their pension

9 funds, he knew the pension fund investments that

10 that thought be something that was appropriate for

11 Mrs. Blagojevich given the new license that she had.

12 Q  What did you agree to do, if anything?

13 A  I agreed to talk to Jerry Morrison and/or Tom

14 Balanoff and I said I would check and see.

15        It didn't make much sense to me that she

16 would be employed to SEIU, nor did it for Jerry or

17 Tom, but Tom agreed to have an interview.  And I

18 believe he kind of an informational interview where

19 he talked to her about potentially things that might

20 be available.

21 Q  Do you know one way or the other if she -- were

22 you part of the conversation?

23 A  No, I was not.

24 Q  Do you if she was ultimately?

25 A  She was never hired by SEIU.

Scofield - direct by Schar                 3486

1  Q   What, if anything, during these conversations had
2  Defendant Blagojevich told you about credit card
3  debt?
4  A   He talked about more once about the difficulty
5  they were having financially and that they had a lot
6  of credit card debt and it was significant.
7  Q   At some point did you have a conversation with
8  Defendant Blagojevich about Defendant Blagojevich
9  getting his wife a job within his own
10 administration?
11 A   That was one of the things he was considering or
12 talking about at least both in the administration
13 and perhaps something in the campaign as well.
14         MR. SCHAR:  May I have a moment, Judge.
15         THE COURT:  You may.
16         MR. SCHAR:  Nothing further.
17         THE COURT:  You want a short break?  You can
18 have it, if you would like.
19         MR. GOLDSTEIN:  Thank you, Your Honor.
20         THE COURT:  15 minutes.
21         THE MARSHAL:  All rise.
22     (The following proceedings were had out of the
23      presence of the jury in open court:)
24         THE COURT:  We're in recess.
25         You may step down.

Scofield - cross by Goldstein                    3487

1    (Recess.)
2         THE MARSHAL:  All rise.
3    (The following proceedings were had in the
4     presence of the jury in open court:)
5         THE COURT:  Please be seated.
6                    CROSS EXAMINATION
7  BY MR. GOLDSTEIN:
8  Q  Good afternoon, Mr. Scofield.
9  A  Good afternoon.
10 Q  I want to start at the beginning, but before we
11 get there I just want to discuss an issue with you
12 that you just recently raised, and that is tab 63
13 from binder 2.  That's a call on November 13th,
14 2008, at 3:41 p.m., do you recall that call?
15 A  Yes, sir.
16 Q  Now, I want to go over a few things that were
17 said that the government did not go over with you.
18      So I want you to look at Page 2 and start
19 with line 4, and it says:
20    "You know, look, I, here's my sense."
21    And I want to move to line 10:
22    "So, you know, if you get the right message to
23    him and they want to get Valerie back on the
24    table, you know, that might still not be a bad
25    play, 501(c)(4), who knows.  I don't know.

:56PM
:57PM
:57PM
:57PM
:58PM

Scofield - cross by Goldstein                    3488

1          They come back.  John had heard the same thing
2          presumably from Knapp that like that for Rahm,
3          this is a wanna get Valerie out of the White
4          House play."
5          Who's speaking there?
6  A   I'm speaking, sir.
7  Q   That's you.
8          Now, if we go forward to Page 2, line 34, now
9  right before that, it's your understanding that the
10 Governor was talking about making this a deliberate
11 process, is that correct?
12 A   Yes, I think he was talking more about his public
13 explanation of the process.
14 Q   Public explanation, making it a deliberate
15 process, right?
16 A   Yes.
17 Q   And you say on line 34:
18     "Yeah, this is too important to rush."
19      Did you say that?
20 A   Yes, sir, I did.
21 Q   When you said "yeah," what did you mean by that?
22 A   Well, I think "yeah" speaks for itself.  "Yeah"
23 means yes.
24 Q   You're agreeing, correct?
25 A   I'm agreeing in this portion with the public

:58PM
:58PM
:58PM
:58PM
:59PM

Scofield - cross by Goldstein                    3489

1   explanation, yes, sir.

2  Q   Well, let's go forward to Page 3, line 22:

3      "Yeah, well, that's true.  I got, the only

4       agreement is with, ah, look, the only person

5       who's worth doing because they can offer

6       something, and it's worth while, and there's

7       benefit, is Valerie."

8       Who said that?

9  A   I said that.

10  Q   That isn't really an agreement.  You actually

11  said that, correct?

12  A   That's my statement, yes, sir.

13  Q   You brought up, after Valerie Jarrett had taken

14  her name out of the so-called race, you said the

15  only one worth doing because they can offer

16  something was Valerie, is that correct?

17  A   Yeah, that's essentially accurate.  Yes, sir.

18  Q   Those are your words.  Not a misquote?

19  A   No, I believe it's correct.

20  Q   Now, let's go back.

21      You started as Deputy Governor in Governor's

22  Office office in 2003, is that correct?

23  A   Yes, sir.

24  Q   And how long did you last as Deputy Governor in

25  Rod Blagojevich's administration?

Scofield - cross by Goldstein                    3490

1  A   Not long.  Less than 3 months.

2  Q   You said you left for personal and professional

3  reasons?

4  A   Yes, that's right.

5  Q   And one of the professional reasons you indicated

6  was, I think the words you said, was you were

7  uncomfortable with Chris Kelly's and Tony Rezko's

8  involvement, is that correct?

9  A   Yes, sir, that's right.

10  Q   Now, your uncomfortableness you expressed this to

11  Lon Monk, is that correct?

12  A   Yes, I did.

13  Q   And I think you said, quote, I think I missed the

14  memo, or words to that effect, is that correct?

15  A   That's correct.

16  Q   Now, while you were Deputy Governor and actually

17  even before your involvement with Governor

18  Blagojevich, you would call him constantly, is that

19  fair to say?

20  A   During the campaign and the transition, yes,

21  regularly.

22  Q   And even at late hours, is that right?

23  A   Yes, it is.

24  Q   Now, you addressed your concerns, though, to Lon

25  Monk, is that correct?

Scofield - cross by Goldstein                    3491

1  A   Yes, that's right.

2  Q   And you didn't address your concerns to Rod

3  Blagojevich, did you?

4  A   I don't know that I directly expressed concerns

5  about Tony or Chris to Mr. Blagojevich.  I would

6  tell you that I may have, I don't recall for sure.

7  Q   You do not recall addressing your concerns to Rod

8  Blagojevich?

9  A   That's true.

10 Q   You do recall this one sentence of "I think I

11 missed the memo to Lon Monk," which happened now

12 about 7 years ago?

13 A   I do remember that.

14 Q   And you don't recall any conversations with Rod

15 Blagojevich about that subject, do you?

16 A   Not specific conversations, no.

17 Q   Now, you also raised other concerns, professional

18 concerns, of why you left the administration, is

19 that correct?

20 A   Yes, that's right.

21 Q   And one of the reasons you raised was the lack of

22 reform, generally, is that correct?

23 A   I believe what I said was lack of interest or

24 commitment in reform.

25 Q   Lack of interest and commitment to reform.

:01PM

:02PM

:02PM

:02PM

:02PM

Scofield - cross by Goldstein                    3492

1   A   Reform issues.

2   Q   That was reform?

3   A   Yeah, that's right, we talked specifically about

4   boards and commissions as well.

:02PM   5   Q   Well, you were there for a total of 3 months?

6   A   Slightly less, I believe.

7   Q   And you worked for Luis Gutierrez before, is that

8   right?

9   A   I did.

:02PM   10   Q   And you worked also for Alderman Bernard Hanson

11   as well?

12   A   That's right.

13   Q   And you worked for a company that helped Mayor

14   Daley's campaign, is that correct?

:03PM   15   A   Yes.  Some time ago, yeah.

16   Q   So based on your experience, 3 months is pretty

17   short time for reform to be accomplished, is that

18   fair to say?

19   A   I wasn't basing my concerns on the ability to

:03PM   20   accomplishing it within the time I was there, I was

21   basing my concerns on my belief about the commitment

22   to the issue.  It was an issue we talked about a lot

23   during the campaign.

24   Q   The commitment to the issue of reform.

:03PM   25       Well, you understand that, as to reform, a

1 lot of these reforms need legislative approval, is
2 that correct?
3 A   Many of them do, sure.  Not all of them but many
4 of them, yes, sir.
5 Q   Not all, but many of them.
6 A   Yeah.
7 Q   We certainly don't want to go around around the
8 legislature too much, do we?
9       MR. SCHAR:  Objection.
10       THE COURT:  The objection is sustained.
11 BY MR. GOLDSTEIN:
12 Q   Well, you know who Michael Madigan is?
13 A   Yes, sir, I do.
14 Q   He was a the Speaker of the House in 2003?
15 A   Yes.
16 Q   And when the issue of boards and commissions was
17 raised, Michael Madigan was opposed to the
18 consolidation of boards and commissions, is that
19 correct?
20       MR. SCHAR:  Objection.
21       THE COURT:  Time and frame.
22 BY MR. GOLDSTEIN:
23 Q   In 2003 while you were Deputy Governor and you
24 were dissatisfied with the lack of reform, you
25 understood that Michael Madigan was opposed to the

:03PM
:03PM
:03PM
:04PM
:04PM

1  reforming of boards and commissions?

2  A  I remember, generally, during that time period

3  that he was not supportive of it.  I don't remember

4  a lot of details about the SPEAKER'S position

5  regarding boards and commissions.

6  Q  And it's fair to say, based on your

7  understanding, that the Speaker of the House is a

8  powerful position?

9  A  It is.

10 Q  So in order to institute a lot of these reforms,

11 you would need the Speaker of the House's approval

12 and agreement?

13 A  You would for some, you wouldn't for others.  It

14 certainly true that you would for some of them.

15 Q  You also knew who Tom Cross was?

16 A  Yes.

17 Q  Who is Tom Cross?

18 A  Tom Cross is the House Minority Leader, the House

19 Republican leader.

20 Q  And it's your understanding in 2003 while you

21 were Deputy Governor that Tom Cross was against the

22 consolidation of the reforms of the boards and

23 commissions as well?

24 A  I can't say I remember much about Mr. Cross'

25 position on it, and certainly not from my time as

1  Deputy Governor.

2  Q   Nonetheless, on boards and commissions, you are

3  aware consolidation that of the Governor initiated

4  it, is that correct?

:05PM    5  A   Yes, that's right.

6  Q   And consolidation is a fair way of saying that

7  there was a reform done on boards and commissions?

8  A   There was some done, yes, sir.

9  Q   And are you also aware of other reforms that Rod

:05PM    10 Blagojevich did.  For example, are you aware that he

11 instituted the first of its kind healthcare for all

12 the kids of the State of Illinois?

13        THE COURT:  Would you spare us the campaign

14 speech until afterwards, because you characterize

:06PM    15 something.  You asked him about a specific thing

16 that he was aware of, that's fine, but you also tell

17 us how wonderful this thing was, that's not fine.

18        MR. GOLDSTEIN:  Fair enough.

19 BY MR. GOLDSTEIN:

:06PM    20 Q   Without saying how good it was, you're aware that

21 there was healthcare reform done by Governor

22 Blagojevich?

23        MR. SCHAR:  Objection.

24        THE COURT:  The objection is sustained to the

:06PM    25 question.

Scofield - cross by Goldstein                3496

1  BY MR. GLDSTEIN:

2  Q   You're aware there was ethics reform under

3  Governor Blagojevich?

4         MR. SCHAR:  Objection, Judge.

5         THE COURT:  The objection is sustained.

6  BY MR. GLDSTEIN:

7  Q   You're aware of death penalty reform?

8         THE COURT:  The objection is sustained.

9         What you could do is instead of giving it the

10  label "reform," identify the specific act and ask

11  him if he's aware of that specific act.

12         MR. GOLDSTEIN:  Thank you.  Appreciate it.

13  BY MR. GOLDSTEIN:

14  Q   Are you aware of what All Kids is?

15  A   Yes, sir.

16  Q   What is All Kids?

17         MR. SCHAR:  Objection.

18         THE COURT:  Now I'm sustaining the objection.

19  BY MR. GOLDSTEIN:

20  Q   There was acts by the Governor to prohibit

21  smoking across the state, are you aware of that?

22         MR. SCHAR:  Objection.

23         THE COURT:  I think you are well beyond the

24  scope of the examination.

25  BY MR. GOLDSTEIN:

:06PM (line 5)
:06PM (line 10)
:06PM (line 15)
:07PM (line 20)
:07PM (line 25)

1  Q   Well, Mr. Scofield, you talked about reform and
2  that was one of the reasons, the professional
3  reasons you left Governor Blagojevich's
4  administration, is that right?
:07PM   5  A   That's right.
6  Q   Is it fair to say you're unaware of a lot of the
7  reforms that took place while you were either there
8  or after you left?
9          MR. SCHAR:  Objection.
:07PM  10          THE COURT:  The objection to the form of the
11  question is sustained.
12  BY MR. GOLDSTEIN:
13  Q   Mr. Scofield, nonetheless, you decided to leave,
14  is that correct?
:07PM  15  A   Yes, sir, I did.
16  Q   And you left 3 months into Governor Blagojevich's
17  administration, is that correct?
18  A   That's roughly correct, yes, sir.
19  Q   Fair to say you weren't satisfied at that time,
:07PM  20  is that correct?
21  A   That's correct to say for a number of reasons,
22  yes.
23  Q   And you left your position as Deputy Governor.
24  You were getting paid by the State as Deputy
:08PM  25  Governor, is that correct?

1  A   That's correct.

2  Q   And you left your position 3 months into it to do

3  what?

4  A   I started my own company.

5  Q   You started your own company after you left

6  Governor Blagojevich's administration?

7  A   That's correct.  More accurately, my wife, who

8  was a communications professional, had a

9  communications company in Washington, D.C.  When we

10 came back to Chicago for me to help run then

11 Governor Blagojevich's campaign, she put that on

12 hold.  She was always hopeful she would get back to

13 that.  So my wife and I started that company.  We

14 called it the same thing as her company in

15 Washington.  So we were essentially starting in

16 Chicago what she had done in Washington, D.C.

17 Q   Okay.  You are starting a company from the ground

18 up, is that fair to say?

19 A   That's fair to say; sure.

20 Q   Now, after you left, you lost contact with Rod

21 Blagojevich, is that correct?

22 A   I lost personal contact.  I had very little

23 personal contact with him, yes, sir.

24 Q   That was for approximately a little over 2 years,

25 is that fair to say?

Scofield - cross by Goldstein                    3499

1   A   Roughly, yes.

2   Q   But you maintained regular contact with Lon Monk?

3   A   Yes, sir, I did.

4   Q   Did Lon Monk ever tell you he was taking cash?

5           MR. SCHAR:  Objection.

6           THE COURT:  Sustained.

7   BY MR. GOLDSTEIN:

8   Q   Now, you talked about, generally, that Governor

9   Blagojevich had a good understanding of fundraising,

10  is that what you said yesterday?

11  A   Yes, I believe that's right.

12  Q   You cannot recall a specific conversation with

13  Rod Blagojevich regarding this supposed interest or

14  concern about fundraising, is that correct?

15  A   I'm sorry, sir, can you say it again?

16  Q   Can you name one specific conversation you had

17  with Rod Blagojevich about fundraising, indicating

18  that he had a good understanding of the fundraising?

19  A   Yes, I could recall specific conversations.

20  Q   When was that conversation?

21  A   Well, I think I could recall numerous

22  conversations.

23  Q   Do you have a specific conversation where you had

24  with the Governor about fundraising?

25          THE COURT:  He's asking you if you can recall

Scofield - cross by Goldstein                3500

1  on a specific day or time or generally a certain
2  particular conversation you had.
3         THE WITNESS:  Yes, I can.
4  BY MR. GOLDSTEIN:
5  Q   Well, you lost contact with the Governor
6  March 2003 through the mid 2005, is that correct?
7  A   That's about right, yes.
8  Q   So between March 2003 and mid 2005 you had no
9  conversations with the Governor, is that correct?
10 A   I -- I believe I would have run into the Governor
11 in some events, but I wouldn't say I had no
12 conversations with him.  I didn't talk to him on the
13 phone during that time.  I had very little
14 conversation with him.
15 Q   You had no conversation with the Governor during
16 that time period about fundraising, is that correct?
17 A   I think that is correct, yes, sir.
18 Q   And in March of 2005, you had no contact with
19 Governor Blagojevich, is that correct?
20 A   Not that I can recall, sir.
21 Q   And you had no conversations in March 2005 about
22 fundraising with the Governor?
23 A   I don't believe so, no.
24 Q   Now, we talked about you leaving and why you
25 left.  Despite you leaving, you then resumed contact

:10PM
:10PM
:11PM
:11PM
:11PM

Scofield - cross by Goldstein                    3501

1  with the Governor in mid 2005?

2  A   Yes, sir.

3  Q   And despite your dissatisfaction as to the

4  reforms, you helped Governor Blagojevich in his

:11PM  5  reelection efforts, is that correct?

6  A   That's right.

7  Q   Were you paid to help in Governor Blagojevich's

8  reelection efforts?

9  A   No, I was not.

:12PM 10  Q   So you volunteered to help this man become

11  Governor again, is that correct?

12  A   Yes, sir, I did.

13  Q   Now, let's fast forward to 2008.

14       You were working --

:12PM 15  A   I'm sorry, I didn't hear you.

16  Q   2008.  I apologize.

17       You were working on your own at that point in

18  time, is that correct?

19  A   Yes, we had our --

:12PM 20  Q   With your wife, the consulting group?

21  A   Yes.

22  Q   And at that time you were a lobbyist/consultant?

23  A   We had a public relations, public affairs and

24  government relations firm.  So we did a lot of

:12PM 25  public relations, a lot of work with media, but yes,

1 that is not entirely what we did, but certainly

2 that's part of what we did.

3 Q   In 2008 were you paid by Rod Blagojevich?

4 A   In 2008?  No, sir.

:12PM 5 Q   In 2008 were you paid by State of Illinois 2008?

6 A   No, I was not.

7 Q   But you had conversations with Rod Blagojevich,

8 is that correct?

9 A   Yes.

:13PM 10 Q   And they're a little more sparse toward the

11 beginning and then they got more frequent towards

12 the middle end of 2008, is that fair to say?

13 A   I think they were probably more frequent in the

14 spring and then again in this time period that we're

:13PM 15 covering now.

16 Q   You spoke to Rod Blagojevich as an adviser, is

17 that fair to say?

18 A   I -- my sense has always been outside the

19 campaign and the campaign work that I do, that I

:13PM 20 don't know how much of an adviser -- I don't know

21 how much he was calling me for advice.

22 Q   Well, he would ask you questions, right?

23 A   Sometimes.  Certainly, yeah.

24 Q   You saw some of these calls, there are a lot of

:13PM 25 questions, is that fair to say?

1  A   I think there's probably more statements than
2  questions, but they're certainly questions as well.
3  Q   Okay.  Well, we'll get into that.
4        You gave him advice, is that correct?
5  A   At times I gave him advice, sure.
6  Q   And your understanding was that he trusted your
7  advice, is that correct?
8  A   I don't think he always trusted my advice.  He
9  trusted my advice at times.
10  Q   That was your understanding, right?
11  A   I'd say that's fair, yeah.
12  Q   Now, you had multiple conversations about the
13  Senate Seat in 2008, right?
14  A   Yes, sir.
15  Q   And on November 3rd of 2008, you received a call
16  from Tom Balanoff, is that correct?
17  A   That's right.
18  Q   What did Tom Balanoff want you to do?
19  A   Specifically, he wanted me to set up a meeting
20  for Tom and for Andy Stern with the Governor.
21  Q   Pertaining to what?
22  A   Pertaining largely with the pending Senate
23  vacancy and who the appointment to the senator would
24  be.
25  Q   Now, Tom Balanoff, you said, he was the President

Scofield - cross by Goldstein                    3504

1  of SEIU in Illinois?

2  A   Right.

3  Q   And SEIU, what is there a relationship to you in

4  2008?

:15PM  5  A   They're a client of our company.

6  Q   Now, when you say client, what does SEIU have you

7  do?

8  A   They were a government relations client for our

9  company.

:15PM  10  Q   Government relations client, what does that mean,

11  if you can give some detail.

12  A   In this instance, SEIU is a labor union, the

13  biggest labor union in the State of Illinois.  They

14  have issues pending before state government.  I

:15PM  15  would help them with policy, I would help them with

16  their relationships with the Governor, people in the

17  Governor's Office, advise them on policy issues,

18  help them to reach their legislative goals as it

19  pertains to state government.

:15PM  20  Q   What was your relationship with Tom Balanoff?

21  A   My professional relationship or generally

22  speaking?

23  Q   Yes, professional relationship.

24  A   Well, Tom was the President of the state counsel

:16PM  25  so Tom was my client.

Scofield - cross by Goldstein                    3505

1  Q   Did you have frequent contact with Tom Balanoff?

2  A   I didn't have frequent contact with Tom, no.

3  Q   How long had you known Tom at this time in 2008?

4  A   I've known Tom for quite a while.  I had known

5  him when I was Chief of Staff to Congressman

6  Gutierrez.  I probably know Tom for 10 years,

7  perhaps.

8  Q   You got along with Tom Balanoff?

9  A   Yes, sir.

10 Q   Besides a professional relationship, he was a

11 friend of yours?

12 A   I like Tom very much.  We weren't personal

13 friends in the sense that we socialized, but we were

14 certainly friendly.

15 Q   SEIU is a client of yours.  Was this a paying

16 client?

17 A   Yes, sir.

18 Q   How much did the SEIU pay you?

19        MR. SCHAR:  Objection.

20        THE COURT:  Overruled.

21 BY THE WITNESS:

22 A   I'm sorry?

23 BY MR. GLDSTEIN:

24 Q   How much did SEIU pay you as a consultant?

25 A   I believe at the time that we had a monthly

1  retainer contract with them, I believe they paid

2  $5,000 a month.

3  Q   Now, on November 3rd Tom Balanoff asked to you

4  set up an appointment with Rod Blagojevich, is that

5  correct?

6  A   Yes, that's right.

7  Q   And you set up that meeting?

8  A   I called -- I called Mr. Blagojevich's scheduler

9  and asked that it be set up.

10  Q   That's Mary Stewart?

11  A   Correct.

12  Q   So on November 3rd you took Tom Balanoff and Andy

13  Stern to see Blagojevich, is that correct?

14  A   Yes, that's right.

15  Q   That was at the inner office of the Thompson

16  Center?

17  A   Yes, sir.

18  Q   Who was present for the meeting with Rod

19  Blagojevich and Tom Balanoff?

20  A   Tom was present, Andy Stern was present, I was

21  present, the Governor was present, John Harris was

22  present for at least some of the meetings, I believe

23  it may have been most of the meeting.  I can't

24  recall for sure, it seem to me that perhaps Bill

25  Quinlan might have been in and out for part of the

Scofield - cross by Goldstein                    3507

1  meeting, I don't recall for certain.

2  Q   With Andy Stern and Balanoff, is that correct?

3  A   Yes.

4  Q   Now, after that meeting on November 3rd with

5  Balanoff, Stern, yourself and Mr. Blagojevich and

6  Mr. Harris, you then escorted Mr. Stern and

7  Mr. Balanoff out of the building, is that correct?

8  A   Yeah, we walked toward the front office of the

9  Governor's, yes.

10  Q   You then came back and spoke to Rod Blagojevich,

11  is that correct?

12  A   Yes, that's right.

13  Q   And which room did you go back to to speak to

14  Rod?

15  A   It was in the Governor's Office.  So there's kind

16  of a back area and there's a front area.  As I

17  recall, they were in the front area of his office.

18  Q   And in the Governor's Office present were John

19  Harris, is that correct?

20  A   Yes, John Harris was present.

21  Q   And John Harris is an attorney and the Chief of

22  Staff of the Governor, is that correct?

23  A   Yes, sir, that's correct.

24  Q   And also present were William Bill Quinlan, who

25  is an attorney and the general counsel of the

Scofield - cross by Goldstein                    3508

1  Governor's, is that correct?

2  A  Yes, sir.

3  Q  And also present was Robert Greenlee who is an

4  attorney and the Deputy Governor of Rod Blagojevich

5  at this time in 2008, is that correct?

6  A  I have less -- Mr. Greenlee was there for at

7  least part of the discussion.  I don't recall for

8  sure if he was there for all of it.  I believe he

9  may have been there for most of it.

10  Q  How long was this discussion?

11  A  I would guess around a half hour, perhaps a

12  little more.

13  Q  One of the things you all talked about was Lisa

14  Madigan and the possibility of her being a Senate

15  candidate, is that correct?

16  A  Yes, I think after the meeting there was some

17  brief discussion of that.

18  Q  Well, "brief discussion," what do you mean by

19  "brief discussion"?

20  A  On that day, on the 3rd, I remember more -- maybe

21  I'm misunderstanding your question.  I -- are you

22  asking --

23  Q  How long was the conversation pertaining to Lisa

24  Madigan as a possible Senate appointee?

25  A  And you're asking during the meeting with Andy

Scofield - cross by Goldstein                    3509

1  Stern and Tom Balanoff or the meeting afterwards?

2  Q   No, the meeting after.

3  A   I don't recall a discussion about Lisa Madigan

4  afterward.  There was some discussion about it, I

5  don't recall how long or how much.

6  Q   Did you have a conversation with the FBI, as well

7  as the U.S. Attorney, on February 18th, 2009?

8  A   I don't remember the exact date.  I had

9  discussions with them, I can't say the exact date.

10 Q   You had several discussions with FBI and U.S.

11 Attorneys?

12 A   I did.

13 Q   And did you not, in fact, tell the FBI and U.S.

14 Attorneys that during your meeting with Blagojevich

15 on November 3rd Blagojevich engaged in a lengthy

16 discussion about possibly appointing Lisa Madigan to

17 the Senate position?  Do you recall saying that to

18 the FBI agents, as well as the U.S. Attorneys?

19 A   I don't recall that exact phrase.  If I saw it, I

20 might recall it more.

21        I recall talking about a conversation about

22 Lisa Madigan and her appointment.  If you're asking

23 me if I remember it was very lengthy, I don't

24 remember that specifically, no, sir.

25 Q   Nevertheless, Lisa Madigan's name was discussed?

:20PM

:20PM

:20PM

:21PM

:21PM

Scofield - cross by Goldstein                3510

1  A   Yes, that's right.

2  Q   And it was your understanding from talking to Rod

3  Blagojevich that J.B. Pritzker was going to have

4  lunch with Rod Blagojevich?

:21PM   5  A   Yes, I do recall that.

6  Q   And it was your understanding from the

7  conversation you had with Rod Blagojevich on

8  November 3rd that Rod Blagojevich believed J.B.

9  Pritzker was an emissary for Lisa Madigan?

:21PM  10  A   I do remember him telling me that, yes, sir.

11  Q   Now, if we could fast forward for a second here.

12       On November 6th you had another meeting with

13  Rod Blagojevich, is that correct?

14  A   Yes, that's right.

:21PM  15  Q   It was actually a couple of meetings because the

16  first one -- well, strike that.

17       You had one meeting and that was after the

18  meeting with Tom Balanoff and Rod Blagojevich, is

19  that correct?

:22PM  20  A   Yes, that's right.

21  Q   You were not present for the meeting with

22  Balanoff and Rod, but you came afterwards and you

23  spoke to Rod Blagojevich, is that correct?

24  A   Yes, sir, that's correct.

:22PM  25  Q   And based on that conversation, it was your

Scofield - cross by Goldstein                    3511

1  understanding that Rod Blagojevich had actually met

2  with J.B. Pritzker, is that correct?

3  A  Yes, I believe he told me that at that meeting.

4  Q  And it was your further understanding that J.B.

5  Pritzker told Rod Blagojevich that Madigan was

6  interested in the Senate Seat?

7  A  Yes, I recall Mr. Blagojevich saying that to me,

8  yes.

9  Q  And when I say "Madigan," he was referring to

10 Lisa Madigan being interested in the Senate Seat, is

11 that correct?

12 A  Yes, that's right.

13 Q  So based on those conversations you had, it's

14 fair to say, it was your understanding that Rod

15 Blagojevich was in discussions with the Madigans or

16 emissaries regarding the Senate Seat?

17 A  Well, it's accurate to say that that is what

18 Mr. Blagojevich told me.  Yes, that's what he told

19 me.

20 Q  You had no reason to disbelieve that?

21 A  No, I really didn't.

22 Q  Now, back to November 3rd.

23        And this is the meeting with Bill Quinlan,

24 John Harris, Bob Greenlee, Rod Blagojevich and

25 yourself, okay.

Scofield - cross by Goldstein                    3512

1        Now, the entire meeting Bill Quinlan was
2   there, is that correct?
3   A   It was -- it was fairly informal.  As best I can
4   recall, I believe Bill Quinlan was there for the
5   entire time.  I'm not sure I can remember that for
6   sure.  It was not a particularly formal meeting, but
7   to the best of my memory I think he was there.
8   Q   Besides Lisa Madigan being discussed, you
9   mentioned that the idea of HHS was discussed, is
10  that correct?
11  A   Yes, that's right.
12  Q   To the best of your recollection, what do you
13  recall being discussed as to HHS during that meeting
14  in which Bill Quinlan, John Harris, and Bob Greenlee
15  were present?
16  A   I remember Mr. Blagojevich bringing up
17  proactively:  This is something I'd be interested
18  in, I'm interested in a Cabinet position.  If I'm
19  going to be in the Cabinet, his general point was
20  HHS, which is the Department of Health and Human
21  Services and oversees the federal agency most
22  involved in healthcare.  It would be something he
23  that he was most interested in.  He felt that was an
24  area of interest, an area of expertise.  That if he
25  were choosing a Cabinet position that he wanted the

:23PM

:23PM

:24PM

:24PM

:24PM

1  most, that HHS would be the one he would be

2  interested in.

3  Q   And after he said that, what did Bill Quinlan

4  say?

:24PM  5  A   I don't know that I recall what Bill Quinlan

6  said, if anything.

7  Q   Do you recall what John Harris or Bob Greenlee

8  said?

9  A   Specifically no, sir, I don't.

:24PM  10  Q   Is that fair to say that based on that

11  conversations, there were no objections presented by

12  any of these lawyers during the conversation?

13        MR. SCHAR:  (Standing up.)

14        THE COURT:  I don't see the relevance of

:25PM  15  this, so I'm sustaining the objection.

16  BY MR. GOLDSTEIN:

17  Q   Well, you spoke about your opinion as to this

18  HHS, is that correct?

19  A   Yes, sir.

:25PM  20  Q   And you indicated that you didn't think it was

21  likely, is that correct?

22  A   I told him it was very unlikely, yes, sir.

23  Q   Based, obviously, on your years of experience and

24  your knowledge of some of the key players in this,

:25PM  25  is that correct?

Scofield - cross by Goldstein                3514

1  A   I'm not sure exactly what you mean.  I'm sorry.

2  Q   Well, based on your years of experience, you

3  believe that this was an unlikely possibility?

4  A   That's fair to say.

5  Q   And that was what you expressed to the Governor?

6  A   I did.

7  Q   Did you in any way express that this was wrong?

8          MR. SCHAR:  Objection, Judge.

9          THE COURT:  The objection is sustained.

10  BY MR. GOLDSTEIN:

11  Q   Well, after you left this meeting, was it your

12  understanding that you should not in any way be

13  involved with Governor Blagojevich?

14          MR. SCHAR:  Objection.

15          THE COURT:  Objection to the form of that

16  question is sustained.

17  BY MR. GOLDSTEIN:

18  Q   After this meeting, did you call the authorities?

19  A   No, sir, I didn't.

20  Q   In fact, there was a state law enforcement

21  authority there in Bill Quinlan, is that correct?

22          MR. SCHAR:  Objection.  Not correct, Judge.

23          THE COURT:  You want to come over to the

24  side.

25

Scofield - cross by Goldstein                    3515

1      (Proceedings heard at sidebar on the record.)
2          THE COURT:  Would you tell me your basis for
3   believing that Quinlan, apart from the fact that he
4   was a lawyer, was a law enforcement officer?
5          MR. GOLDSTEIN:  He is general counsel, part
6   of the Governor's Office.
7          THE COURT:  Have you ever looked at the
8   Illinois law on what defines a law enforcement
9   officer?  I suspect you haven't.
10         MR. GOLDSTEIN:  I can't cite a specific law,
11  Judge.
12         THE COURT:  No.  There is a very specific
13  meaning for a law enforcement officer and being a
14  lawyer does not make you a law enforcement officer.
15         You are, for example, by virtue of being
16  general counsel of the Governor of the State of
17  Illinois not entitled to make arrests, you are not
18  entitled to carry a weapon.  Don't be careless with
19  the language.
20         If your defense is going to be based on the
21  proposition that what these people didn't think was
22  illegal and therefore the Governor shouldn't thought
23  have thought that it was illegal, if you want to say
24  that, that's fine, but it's very important that you
25  don't elevate the circumstances and the duties of

:30PM
:30PM
:31PM
:31PM
:31PM

Scofield - cross by Goldstein                      3516

 1  the individuals.

 2       Moreover, it might help you to know that,

 3  generally speaking, under Illinois law and federal

 4  law and under the constitution, a law enforcement

 5  officer has no reason to make an arrest, a law

 6  enforcement can wait.

 7       So don't play the game with the questions.

 8  Just ask him what happened, when.  And as far as

 9  this thing about nobody told him not to do it, if

10  you made a tactical decision that that's a good way

11  to go, fine, but you don't have to worry about it

12  until the government says somebody told him not to

13  do it, you can assume that nobody told him not to do

14  it, no law enforcement officer told him not to do

15  it.  If you want to do this, that's fine, but you

16  are stepping over the line, the same way you stepped

17  over the line with respect to this stuff about the

18  Governor and, in my opinion, you're sort of stepping

19  on yourself.

20            MR. GOLDSTEIN:  Is that --

21            THE COUERT:  You're sort of stepping on

22  yourself.

23            MR. GOLDSTEIN:  Which one are you talking

24  about?

25            THE COUERT:  He's talking about reforms of

Scofield - cross by Goldstein                    3517

1  boards and commissions and you are talking about a
2  piece of reform was a smoking gun.
3          MR. GOLDSTEIN:  Well --
4          THE COUERT:  This doesn't help you.
5          MR. GOLDSTEIN:  I will say, I will say, this
6  witness elicited by direct examination said he was
7  generally dissatisfied with reform and reform not
8  taking place, this is what they did.
9          THE COURT:  Then what you could question him
10 about, but you don't want to this, is what he meant
11 by reform.  What you are doing when you're saying
12 are you aware of this reform or that reform, is
13 you're arguing with him.
14         MR. GOLDSTEIN:  I'm asking him what the basis
15 of his understanding is.
16         THE COURT:  But no, you didn't.  You said,
17 "are you aware of this reform," that's arguing with
18 him. You are challenging him in a way you are not
19 permitted to do.
20         Now, the truth is there is there is
21 cross-examination to be had with this witness and it
22 would be nice for your client if you actually did
23 it.
24     (Proceedings resumed within the hearing of the
25     jury.)

Scofield - cross by Goldstein                    3518

1          THE COURT:  You may proceed.

2          MR. GOLDSTEIN:  Thank you, Your Honor.

3    BY MR. GLDSTEIN:

4    Q   Now, after this meeting on November 3rd, 2008,

5    you spoke to Rod Blagojevich on November 5th of

6    2008, is that correct?

7    A   Yes, sir, I did.

8    Q   And at 9:38 a.m. he asked you about what we could

9    get for this, referring to the Senate Seat, do you

10   recall him asking you that question?

11   A   I recall, I don't have the transcript in front of

12   me but --

13   Q   And you agreed you said, "I think so," is that

14   correct?

15   A   If you're asking me about a specific call, I

16   think I'd like to look at it.

17   Q   Well, it's not a call that any of the jurors have

18   just yet, so I want to just talk to you generally

19   about it.

20   A   Okay.

21   Q   And, generally, about the issue.

22          You didn't express your disagreement on

23   November 5th about asking for HHS, is that correct?

24   A   I don't know that I recall -- I don't know that I

25   remember the call specifically.

Scofield - cross by Goldstein                3519

1  Q   Well, and you believed that Tom Balanoff was
2  someone who would be a good emissary in this ask?
3  A   I -- I remember, yes, I remember saying that.  I
4  believe Tom suggested that that would be the case,
5  and yes, I agreed with that.
6  Q   And Tom Balanoff was your client, is that
7  correct?
8  A   SEIU was my client, yes.
9  Q   And you -- well, not he, but SEIU was paying you
10 at this time?
11 A   That's correct.
12 Q   And after November 8th you set up a meeting to
13 have between Tom Balanoff and Rod Blagojevich, is
14 that correct?
15 A   We set up two meetings.  They were both before
16 November 8th.
17 Q   I apologize.  November 6th.
18 A   That's right.  Yes, sir.
19 Q   Let me take a step back.
20         November 3rd you had a meeting with Rod
21 Blagojevich after the meeting with Andy Stern and
22 Tom Balanoff, correct?
23 A   Yes, that's right.
24 Q   And one of the things discussed was asking for
25 HHS, is that correct?

:32PM
:32PM
:32PM
:32PM
:33PM

Scofield - cross by Goldstein                    3520

1  A   Yes, that's correct.

2  Q   And you understood, as you said on direct, that

3  Rod Blagojevich was asking for HHS to personally

4  benefit himself, is that fair to your understanding?

5  A   He wanted the appointment for himself, certainly,

6  yes.

7  Q   He wanted the appointment for himself.

8         Well, after that conversation, you then made

9  another appointment between Tom Balanoff and Rod

10  Blagojevich, is that correct?

11  A   Yes, that's correct.

12  Q   Your client, you had, based on your understanding

13  of what Rod Blagojevich told you, you had Tom

14  Balanoff meet with Rod Blagojevich?

15  A   Tom asked for a meeting and I helped to arrange

16  it, yes.

17         MR. GOLDSTEIN:  May I approach, Your Honor?

18         THE COURT:  You may.

19  BY MR. GOLDSTEIN:

20  Q   Mr. Scofield, I just gave you binder number 1 and

21  I want you to look at call session 281, tab 24.

22         Are you there?

23  A   Yes, sir.

24  Q   Good.

25         Now, I want to turn your attention to Page 3,

Scofield - cross by Goldstein                    3521

1  line 19 through line 27.

2        Are you there?

3  A  Yes, sir.

4  Q  I'm not going to read the entire thing, but when

5  you read that, what is your understanding of what

6  Rod Blagojevich told you?

7  A  Lines 19 through 27?

8  Q  Correct.

9  A  Well, I think he's referring to the Russian

10  reference is about UN ambassador, and then he is

11  joking about his nephew and his nephew not being old

12  enough to be appointed U.S. Senator.

13  Q  Did you take that to be a serious comment or a

14  joking comment?

15  A  Regarding his nephew?

16  Q  Correct.

17  A  I believe he was joking about his nephew.

18  Q  So this was a paragraph about Rod Blagojevich

19  appointing his nephew?

20  A  Yes, and I -- I think that's correct, he was

21  joking about it.

22  Q  Now, you talked about UN ambassador, is that

23  right?

24  A  He mentioned it before that.

25  Q  And just before that Rod Blagojevich says:

Scofield - cross by Goldstein                    3522

1      "That will never happen, UN ambassador, I'll
2       take that."
3          What's your response to Rod Blagojevich when
4  he said that?
5  A  On line 18 I say "yeah."
6  Q  And go further down that page, line 31, Rod
7  Blagojevich says:
8      "I mean, I, I got this thing and it's fucking
9       golden."
10         What did you understand him to mean by that?
11 A  Well, I meant "this thing" was his ability to
12 appoint a senator, by "golden" he meant it was very
13 valuable.
14 Q  And what was your response?
15 A  My response was "right."
16 Q  And is it fair to say what you meant by "right"
17 is you're agreeing?
18 A  It's fair to say you can take that impression
19 away.
20 Q  Well, you were there.  You were on this
21 conversation.  You said "right," right?
22 A  That's what I said, yes, sir.
23 Q  And you meant it as agreement, is that correct?
24 A  Well, unfortunately, sir, in some of these
25 instances, what I'm telling him, what I'm saying to

:36PM
:36PM
:37PM
:37PM
:37PM

Scofield - cross by Goldstein                3523

1  him is not exactly what I am thinking.  But if your
2  question is, is that what I said?  Yes, that's
3  correct, that's what I said.
4  Q   I guess what you're saying is that you're lying
5  to the Governor?
6  A   No, that's not exactly what I'm saying.  It is an
7  impression that was not exactly what was in my mind
8  at the time.
9         So it was misleading, I was telling him what
10 I thought he wanted to hear.  I talked a little bit
11 about the reasons for that, so it was something that
12 I thought he wanted to hear and it was not an
13 accurate portrayal of what I was thinking at the
14 time.
15 Q   Is that fair to say your testimony right here is
16 that you were placating the Governor?
17 A   I think that's fair to say.
18 Q   So it was your understanding that Rod Blagojevich
19 was trying to trade this job for a job and you were
20 misleading him saying "yeah"?
21 A   There are times that I did that, yes, sir.
22 Q   Were you at all concerned with saying these
23 things?
24         MR. SCHAR:  Objection.
25         THE COURT:  The objection is sustained.

1  BY MR. GOLDSTEIN:

2  Q   Were you concerned at all during this time that

3  you were agreeing with him about this issue?

4           MR. SCHAR:   Objection.

5           THE COURT:   The objection is sustained.

6  BY MR. GOLDSTEIN:

7  Q   If you can turn to Page 6 and go to line 12, Rod

8  Blagojevich says:

9       "Okay, this is what, so f'ing galling about

10          these f'ing jettison all of that to do what I

11          thought was, was right and I know it was right,

12          and that is EPA does what it's got to do and

13          let the courts decide, which they did."

14          What did you understand Rod Blagojevich was

15  saying at that time?

16  A   Well, this is in the context of talking about the

17  Presidential primary.  It's after he's talking about

18  Alderman Mel's landfill.  I think he's saying that

19  he did the right thing in investigating Alderman

20  Mel's involvement in that having the EPA investigate

21  it and that that was the right thing to do.

22  Q   After this call on November 5th of 2008, what did

23  you do?

24  A   Are you looking for a general time period or

25  immediately after the call?  I'm not sure what you

:39PM

:39PM

:40PM

:40PM

:41PM

Scofield - cross by Goldstein                          3525

1   mean.
2   Q   Did you coordinate or participate in a conference
3   call after this call?
4   A   I didn't coordinate it, but there was a
5   conference call after this call, yes.
6   Q   And that was after the Governor told you about
7   the value of this appointment, is that correct?
8   A   Right.  Yes, that's right.
9   Q   Now, if we can go back to that call again we were
10  just talking about, and that is session 281, tab 24.
11          Now, you talked about you placating the
12  Governor.  I want you to look at line 22, Page 10.
13          Are you there?
14  A   What page, sir?  I'm sorry.
15  Q   Page 10.
16  A   Yes, sir.
17  Q   (Reading:)
18       "Yeah, well look, there is a bright side here to
19        look at, which is you've got, you, you have
20        something that's both important and valuable
21        and, you know, kind of increasingly looks like
22        a President who certainly has a, you know, has
23        a horse and an interest in the horse winning,
24        you know, that's a good place to be, and, you
25        know, lots of possibilities could grow from

:41PM
:41PM
:42PM
:42PM
:42PM

Scofield - cross by Goldstein                    3526

1       that."
2       Is that you speaking?
3   A   Yes, it is.
4   Q   When you made that statement, did you believe it?
5   A   No, sir, I really didn't believe it.
6   Q   So you were placating Rod Blagojevich here?
7   A   Well, that's right.  I already told him that I
8   didn't believe he was going to be in the Cabinet, he
9   was not going to be in HHS, didn't seem to stop his
10  interest.  So yes, I made a decision that I wasn't
11  going to --
12  Q   You made a decision?
13  A   That I wasn't going to continue arguing with him
14  about it.
15  Q   You were going to encourage him?
16  A   At times it can be taken as encouragement, sure.
17  Q   You read this -- I don't want to know what you
18  meant by it in 2008.  I want to know as a witness
19  right now as you stand here, what do you take that
20  to mean?
21          MR. SCHAR:  Objection.
22          THE COURT:  Overruled.
23  BY THE WITNESS:
24  A   I take it to mean that the President is
25  interested in -- he has a candidate that he's

1  interested in, and that the Governor has things he's
2  interested in exchange for that Senate Seat and that
3  possibly something could come of that that he
4  wanted.
5  Q   "Important and valuable" you said, is that
6  correct?
7  A   That's right.
8  Q   Your words.
9  A   Uh-huh.
10 Q   What did you mean by important and valuable?
11 A   Well, important certainly means that a Senate
12 Seat is an important thing.  It's important for any
13 number of reasons.  Valuable, again, I think I'm
14 telling him what he wanted to hear.
15     It was clear to me that he had a personal
16 interest in what he could use the Senate Seat for
17 himself.  I know what the interest was, he said it
18 was HHS.
19     So I am saying back to him, in some sense,
20 what I thought he wanted to hear.  I already told
21 him my opinion.  My opinion didn't dissuade him from
22 pursuing it.
23 Q   So let's take the three words, "important and
24 valuable."  "Important" did you believe it was
25 important?

:43PM
:44PM
:44PM
:44PM
:44PM

Scofield - cross by Goldstein                    3528

1  A   Did I believe it was important?  Yes.
2  Q   Did you believe it was valuable?
3  A   What I believed?  You're asking me what I
4  believed?
5  Q   What you believed in 2008, November 5th at
6  11:06 a.m.
7  A   Yeah, I believed it was valuable, but not in the
8  sense that he did.  I believe it was valuable in
9  that if you're a Governor with an appointment to the
10  Senate, that there are probably ways, politically,
11  that it can be valuable to you.  It is something
12  that has value, that's what I believed, yes.
13  Q   At this point what did you understand the Senate
14  Seat to be valuable to Rod Blagojevich?
15  A   What did I believe?  I didn't --
16       MR. SCHAR:  I object to that.
17       THE COURT:  The objection is sustained.
18  BY MR. GOLDSTEIN:
19  Q   Was the word "valuable" a truthful word to Rod
20  Blagojevich at that time?
21  A   I'm not sure I know what you mean.  I'm sorry.
22  Q   Were you telling Rod Blagojevich what you
23  believed at that time when you said "valuable"?
24  A   In the way that he would understand it?  No, I
25  don't think it was truthful in the way he would

Scofield - cross by Goldstein                     3529

1    understand it, no, sir.

2    Q   So this was another placating, is that correct?

3    A   Yes, sir.

4    Q   Telling him what he wants to hear?

5    A   Yes, sir.  There is quite a lot of that.

6    Q   Encouraging him?

7            MR. SCHAR:  Objection.

8            THE COURT:  You're asking him if he thought

9    that was encouraging him?

10           MR. GOLDSTEIN:  Yes.

11           THE COURT:  The objection is overruled.

12   BY THE WITNESS:

13   A   Well, I don't think he needed much encouragement,

14   but I think he could take this as encouragement

15   potentially, yes.

16   BY MR. GOLDSTEIN:

17   Q   And you weren't concerned about encouraging him

18   to do this?

19           MR. SCHAR:  Objection, Judge.

20           THE COURT:  The objection is sustained.

21   BY MR. GOLDSTEIN:

22   Q   Now, November 6th of 2008, there was a meeting

23   between Tom Balanoff and Rod Blagojevich, right?

24   A   Yes, that's right.

25   Q   And you were not present for that meeting?

Scofield - cross by Goldstein                3530

1   A   No, I was not.

2   Q   And it was only Tom Balanoff and Rod at this

3   meeting?

4   A   I believe that's right.

5   Q   But you got to the office after the meeting took

6   place?

7   A   Yes, that's right.

8   Q   And at the meeting after the meeting between Tom

9   and Rod, who was present?

10  A   John Harris was present, Bill Quinlan was

11  present, and again I believe Bob Greenlee was

12  present.

13  Q   And at this meeting you had talked about Lisa

14  Madigan was discussed, is that correct?

15  A   Again, this is the November 6th meeting, sir?

16  Q   Correct.

17  A   Yes, that's right.

18  Q   There was also discussion about Rod's request for

19  HHS?

20  A   Yes, that's right.

21  Q   Were there any objections made at this meeting?

22          MR. SCHAR:  Objection.

23          THE COURT:  Sustained.

24  BY MR. GOLDSTEIN:

25  Q   Well, after this meeting, you continued to have

Scofield - cross by Goldstein                3531

1  conversations with Rod Blagojevich?

2  A   Yes, that's right.

3  Q   You continued to agree with Rod Blagojevich?

4        MR. SCHAR:  Objection.

5        THE COURT:  The objection is sustained.

6  BY MR. GOLDSTEIN:

7  Q   After this meeting, did you encourage Rod

8  Blagojevich in his efforts to get HHS?

9  A   I -- I don't know that I did.  I think that there

10 were many times when he mentioned his interest in

11 HHS.  There were times that I agreed with him.  He

12 may very well have taken it as encouragement.  I

13 certainly did not try to go out of my way to

14 encourage him.

15 Q   Mr. Scofield, could you look at tab 30 in your

16 binder.

17        Are you there?

18 A   Yes.

19 Q   Page 1, line 19:

20    "Yeah, I, look, it all starts with, if they

21      don't want it, then there's nothing to talk

22      about, as long as we know they want it then."

23      Who made that statement?

24 A   I did.

25 Q   When you said on line 21, "as long as we, you

Scofield - cross by Goldstein                    3532

1  know," who did you mean by "we"?

2  A   Speaking generally I think both the Governor and

3  supporters.   "We" in that instance probably means

4  Rod Blagojevich and us.

5  Q   And who?

6  A   And us.

7  Q   Now, at this time as you said SEIU was your

8  client, is that correct?

9  A   That's right.

10 Q   And you were engaged in talking to SEIU to have

11 meetings with Rod Blagojevich at this time, correct?

12 A   Tom Balanoff had asked me twice to set up

13 meetings, yes.

14 Q   Is it fair to say you were taking action in

15 furtherance of what Rod Blagojevich wanted?

16 A   I don't know that that is fair to say.  Tom

17 Balanoff asked me to set up the meeting.

18 Q   Did Rod Blagojevich ask you to set up a meeting?

19 A   With Tom?

20 Q   Yes.

21 A   No, I don't believe Rod asked me to set up a

22 meeting.

23 Q   Rod asked you to do some things in connection to

24 his request for HHS, correct?

25 A   I'm not sure I recall things he asked me to do in

Scofield - cross by Goldstein                    3533

1  his request for HHS.

2  Q   Well, you were talking to Jerry Morrison about

3  this deal, is that correct?

4  A   Jerry and I talked, yes.

5  Q   And who were you talking to Jerry Morrison on

6  behalf of?

7  A   I was talking to Jerry Morrison because he worked

8  for my client.

9  Q   Well, what did you talk to Jerry Morrison about?

10  A   Jerry and I talked about the meetings, we talked

11  about the meetings and the meetings getting set up.

12  Q   What meetings?

13  A   Both the November 3rd meeting and November 6th

14  meeting.

15  Q   With whom?

16  A   With Tom and Rod Blagojevich.

17  Q   So you were talking to Jerry Morrison about

18  meetings between Rod Blagojevich and Tom Balanoff?

19  A   Yes, that's right.

20  Q   If you could look to Page 3 of that same tab, I

21  want you to look at the bottom of the page, line 31,

22  going on to Page 4.

23          Are you there?

24  A   Uh-huh.  Yes, sir.

25  Q   Rod Blagojevich says:

Scofield - cross by Goldstein                     3534

1      "Okay, and just tell Mosena, look, you know,
2       tell her she could be the senator she can, the
3       Governor could appoint her."
4       And you say:
5       "Yeah, at the right time."
6       What did you mean by "yeah, at the right time"?
7   A   I think in the context of this conversation,
8   we're talking about the timing of when the senator
9   will be appointed.  So I think it's referring to the
10  timing of the appointment.
11  Q   Well, you understood:
12      "Okay, and just tell Mosena, look, you know,
13       tell her she could be the senator she can, the
14       Governor could appoint her."
15      What did you understand Rod Blagojevich to be
16       saying there?
17  A   He was talking about using David Messina, I
18  believe, as an intermediary on communicating a
19  message to Valerie Jarrett that she could be
20  senator, that the Governor could make that
21  appointment.
22  Q   And your response was, yeah?
23  A   Yes, that's right.
24  Q   Did you agree with Rod Blagojevich what he said
25  at that time?

1  A   That is what I said, yes.

2  Q   I know that's what you said.  Did you agree with

3  him?

4  A   I didn't -- I didn't agree with him.

:53PM   5  Q   So you --

6  A   I did give him the impression that I agreed with

7  him, but no, sir, I did not agree with him.

8  Q   I want you to turn to Page 8.

9      Are you there?

:54PM   10  A   Yes.

11  Q   Line 3, Rod Blagojevich says:

12      "We got, we got a lot of options here, man.

13      She's, ah, she's picking Cabinet positions and

14      she has it in her power.  Well, not her power,

:54PM   15      but she has tremendous amount of influence on

16      those, some of those decisions.  You agreed

17      with that."

18      Now, those last four words, "you agree with

19  that," what did you understand Rod Blagojevich to be

:54PM   20  saying there?

21  A   I believe he's asking me if I agreed that Valerie

22  Jarrett has a lot of influence over who is going to

23  be in the Cabinet.

24  Q   And your answer was what?

:54PM   25  A   Was, "oh, very much so."

1  Q   Did you believe that at the time?

2  A   I did believe that.  I think she did have a lot

3  of influence over who was going to be in the

4  Cabinet.

5  Q   Going further, line 11, Rod Blagojevich says:

6       "So she's holding Health and Human Services and

7        I'm holding a U.S. Senate Seat, okay, she's

8        holding hers with two hands, just kind of

9        clinging to, you know, little pieces of it.

10       Me, I got the whole thing wrapped around my

11       arms, mine, okay."

12       You then respond:

13       "Right."

14          Fair to say when you said "right" you were

15  agreeing with Rod Blagojevich?

16  A   Yes.

17  Q   Were you actually agreeing with him?

18  A   Well, sir, again, I would say in this specific

19  paragraph what he's describing is his assessment of

20  Valerie Jarrett and how much control she has over

21  the Cabinet, he's talking about how much control he

22  has over the Senate appointment, so there's probably

23  more factual agreement, more actual agreement, in

24  that than some other responses.

25  Q   You weren't placating at that time?

Scofield - cross by Goldstein                    3537

1  A  Well, in general, sir, since I thought the whole
2  idea of him being in the Cabinet was both unlikely
3  in that I couldn't really influence it because I had
4  told him already he wasn't going to do it, in
5  general, in many of these conversations, I am
6  placating him.
7          Now, are you asking me -- there's some facts
8  to this statement about the strength with which she
9  has control over the Cabinet --
10 Q  Mr. Scofield --
11 A  -- and he has over the Senate appointment so --
12 Q  You said you couldn't influence Rod Blagojevich
13 is that correct?
14 A  "No response."
15 Q  Is that correct?
16 A  I believe I couldn't influence him over his
17 desire to be in the Cabinet.
18 Q  Despite that you continued to talk to Rod
19 Blagojevich, is that correct?
20 A  Yes.  He continued to call me, yes.
21 Q  He continued to call you.
22          Well, this call, call session 3475, tab 30,
23 if you can look on Page 1.
24          Are you there?
25 A  Yes, sir.

Scofield - cross by Goldstein                    3538

1  Q   What does this refer to whether it's an incoming
2  call or outgoing call to Rod Blagojevich?
3  A   It's incoming call.
4  Q   So that would indicate that you called him?
5  A   Yes, sir, that's correct.  But the reason --
6  Q   Well --
7  A   If I could explain.
8  Q   On session 281, tab 24.
9  A   Uh-huh.
10 Q   November 5th, 2008, was this an incoming call or
11 outgoing call?
12 A   When Governor Blagojevich wanted to speak to
13 someone, he had Mary Stewart call on the phone.
14 Mary Stewart would call them and say would you
15 please call the Governor at home.  So I would
16 assume, I haven't looked at all of them, that
17 virtually all of the tabs are incoming calls.  But
18 the Governor would place the call and have you
19 return the call to him.
20 Q   Let me ask again, is that an incoming call or an
21 outgoing call?
22 A   It's an incoming call that reflected that he has
23 Mary Stewart to have me call him.
24 Q   So you pick up the phone and you dial Rod
25 Blagojevich's number to call him, is that correct?

Scofield - cross by Goldstein                    3539

1  A   That's correct, and I did so because he asked me.

2  Q   No one made you call him, is that correct?

3  A   Physically, forcibly?

4  Q   Correct.

5  A   No one made me call him.  He requested that I

6  call him.

7  Q   And he wasn't paying you any money to be his

8  adviser?

9  A   No, that's correct.

10 Q   SEIU was paying you 5 grand a month, is that

11 correct?

12 A   That's correct.

13 Q   So you decided to act with him that wasn't paying

14 you at all, that was the pressure you felt?

15 A   I'm not sure what you mean by that.

16 Q   Well, didn't you want to protect your client,

17 SEIU?

18 A   Yes, I did.

19 Q   And you didn't see any problem as far as

20 protecting your client engaging in this?

21        MR. SCHAR:  Objection.

22        THE COURT:  The objection is sustained to

23 that question.

24 BY MR. GOLDSTEIN:

25 Q   Were you worried at all during these

:58PM

:58PM

:59PM

:59PM

:59PM

Scofield - cross by Goldstein                    3540

1  conversations that you were going to lose your

2  business with SEIU?

3          MR. SCHAR:  Objection, Judge.

4          THE COURT:  Overruled.

:59PM    5  BY THE WITNESS:

6  A  I had a good relationship with SEIU.  I was not

7  particularly worried that I was going lose my

8  business, but I was quite uncomfortable with the

9  position that I felt SEIU was being put in.

:59PM    10 BY MR. GLDSTEIN:

11 Q  So uncomfortable that you called no law

12 enforcement authorities?

13         MR. SCHAR:  Objection to that.

14         THE COURT:  Would you please stop doing that.

:00PM    15 BY MR. GOLDSTEIN:

16 Q  Did you call any law enforcement authorities

17 relating to this?

18         MR. SCHAR:  Objection, Judge.

19         THE COURT:  The objection is sustained.

:00PM    20 BY MR. GOLDSTEIN:

21 Q  Did you raise -- strike that.

22         You indicated you were uncomfortable with the

23 position you were in pertaining to this whole

24 situation, is that correct?

:00PM    25 A  Yes, sir, that's right.

Scofield - cross by Goldstein                    3541

1  Q   And your uncomfortableness, was that -- did you
2  have uncomfortable feelings on November 6th of 2008?
3          MR. SCHAR:  Objection, Judge.
4          THE COURT:  The objection is sustained.
5  BY MR. GOLDSTEIN:
6  Q   Were you uncomfortable November 6th of 2008?
7          MR. SCHAR:  Objection.
8          THE COURT:  The objection is sustained.
9  BY MR. GOLDSTEIN:
10  Q   You made appointments so that Rod Blagojevich can
11  meet with Tom Balanoff, correct?
12  A   I helped to arrange the meetings, yes.
13  Q   Your client and Rod Blagojevich to meet, you
14  helped to arrange those meetings?
15  A   Yes, that's right.
16  Q   Now, if you could turn to tab 36.
17          Are you there?
18  A   Yes.
19  Q   If you could turn to Page 2.
20          Are you there?
21  A   Yes, sir.
22  Q   On line 9 Rod Blagojevich says:
23      "Another option is Ken Dunkin.  What about Ken
24      Dunkin?"
25      Your response is:

:00PM (line 5)
:00PM (line 10)
:01PM (line 15)
:01PM (line 20)
:01PM (line 25)

Scofield - cross by Goldstein                    3542

1       "Ah, interesting I guess.  What do we get out
2       of Dunkin?"
3           When you said "what do we get out of Dunkin,"
4  what did you mean by that?
5  A   I believe I meant what is the interest in Ken
6  Dunkin, why would it be worthwhile to appoint Ken
7  Dunkin.
8  Q   You said "what do we get out of Dunkin"?
9  A   Uh-huh.
10 Q   What did you mean by get out of?
11 A   I don't know that I recall specifically what I
12 meant, but I will say this, most of my relationship
13 with the Governor was around politics and campaigns.
14 So many times when I'm thinking about the Senate
15 Seat, I'm thinking of it in terms of politics.  So
16 Ken Dunkin is an interesting suggestion, I'm not
17 sure it makes any sense politically.
18 Q   So when you were thinking of it politically, all
19 your conversations in regards to the Senate Seat
20 were political thoughts as far as what can be gotten
21 out of these things?
22          MR. SCHAR:  Objection, Judge.
23          THE COURT:  Sustained.
24 BY MR. GOLDSTEIN:
25 Q   If you could turn to Page 3, please.

:02PM
:02PM
:02PM
:02PM
:03PM

Scofield - cross by Goldstein                    3543

1        Line 2 Rod Blagojevich says:
2      "But, you know, what about Patti on some, you
3       know, corporate boards, paid corporate boards
4       right now.  Can they help us that way."
5      You said:
6      "I think they could."
7        When you said "I think they could," what did
8   you mean by that?
9   A  I think the words speak for themselves.  But,
10  again, it doesn't express what I was thinking about
11  it.
12  Q  You were placating again?
13  A  Yes, sir.
14  Q  Is it fair to say that was a lie?
15  A  I think it is misleading, yes.  There are times
16  when I'm misleading, that's true.
17  Q  So when on line 11 Rod Blagojevich says:
18      "Yeah, Tree House Foods, the one that what's her
19       name was on for 65 grand.  Now can't we get
20       Patti a couple of those?"
21      You said:
22      "I think they could help."
23      Is that placating again?
24  A  It is.
25  Q  Well, when in line 16 Rod Blagojevich said:

:03PM
:04PM
:04PM
:04PM
:04PM

1        "I want you to think about that."

2            What did you understand Rod Blagojevich to be

3    saying when he told you that?

4    A   He's asking me in general -- I think he's asking

5    me to think about corporate boards and what

6    corporate boards she can be on.

7    Q   When he said "think about that," what did you

8    understand when he asked you the question to think

9    about that?  What was he doing there?  What was your

10   understanding what he was doing there?

11           MR. SCHAR:  Objection.

12           THE COURT:  The objection is sustained.

13   BY MR. GOLDSTEIN:

14   Q   Further down on Page 3, line 28, you say:

15       "Well, I tell you, I have thought about that a

16        lot this weekend.  I had since, you know, I

17        didn't say much to Jerry on Friday, but I did

18        say, I said, you know, let's not BS each other

19        hear, Jerry, this is a huge act.  I mean, you

20        know Valerie Jarrett, give me an f'ing break,

21        why should Valerie Jarrett be senator?  You

22        know."

23        On to Page 4:

24        "... and, by the way, Valerie Jarrett isn't

25        exactly SEIU's kind of senator, Jerry, and then

Scofield - cross by Goldstein                    3545

1    you know, they get it, they understand, 'cause
2    there's no reason for her to be senator.  So I
3    think unless, you know, unless they're willing
4    to step up to the plate, but they could step
5    up, I agree, they could step up to the plate in
6    other ways.  Corporate, I don't know, help with
7    something in labor, you know.  Well, put some
8    pressure on SEIU, make it."
9        Are those your words that you said on that
10   day and time?
11   A   Yes, sir, they were.
12   Q   Now, let's go back to Page 3, you said:
13       "Well, I tell you, I have thought about that a
14        lot this weekend."
15        Mr. Scofield, did you think a lot about that
16   that weekend?
17   A   No, sir, I don't believe I did.
18   Q   That was a lie?
19   A   I don't recall thinking about it a lot that
20   weekend, no.
21   Q   Then you said:
22       "I didn't say much to Jerry on Friday, but I did
23        say, you know, let's not be BS each other here,
24        Jerry."
25        Did you say that to Jerry?

Scofield - cross by Goldstein                    3546

1  A   I don't recall specifically what I said to Jerry
2  about this.  Jerry Morrison and I had several
3  conversations about the senate appointment.  I can't
4  recall if I said those exact words to him or not.
5  Q   "This is a huge ask," what did you mean when you
6  said that?
7  A   I don't recall exactly what I meant.  It's
8  certainly a large and important decision to appoint
9  a senator, I think that's what I'm speaking to.
10 Q   Appoint a senator, that's not ask.  Let's see if
11 we can look this over again.
12      "This is a had huge ask."  If you don't
13 recall what you meant, that's fine, but what I'd
14 like to ask is what you understand you were saying
15 at this point, "this is a huge ask"?  When you said
16 the word "ask" who did you understand was asking?
17 A   I think in this context it's SEIU.
18 Q   Asking what?
19 A   Asking -- they're interested in Valerie Jarrett
20 being appointed senator.
21 Q   Asking of whom?
22 A   Of Governor Blagojevich.
23 Q   You go further and you say:
24      "I mean, you know, Valerie Jarrett, give me an
25        f'ing break."

Scofield - cross by Goldstein                    3547

1    What did you mean when you said that?
2  A  You know, sir, I really don't recall.  This is a
3  conversation that I -- I don't think this statement
4  really reflects what I was thinking at the time.  I
5  really don't.
6       To the degree it does, Valerie Jarrett was
7  somebody who had never held elected office.  I think
8  it is true that asking for someone whose never held
9  elected office to be appointed senator is a
10 significant request, I think that's true.
11 Q  Was this placating or just lying to the governor?
12 A  I think there are several instances,
13 unfortunately, where I was placating him.
14      I'd already had discussions with him, I'd
15 already told him my opinion, I had lengthy
16 discussions with him about appointing himself as
17 senator which he did not like to hear.
18      And I reached a point in these discussions
19 where I decided, that:  One, talking to him and
20 trying to persuade him otherwise wasn't going to
21 make a difference --
22 Q  Let's talk about that?
23 A  -- and that I really didn't want to argue with
24 him about it.
25 Q  You said that you gave your opinion as to the

1  Governor taking the Senate Seat himself, is that

2  correct?

3  A   Yes, that's right.

4  Q   Is that the topic that you were talking about as

5  far as having disagreements with him or having a

6  disagreement with him?

7  A   Yeah.  Well, that's one of them.

8  Q   How many conversations did you have with the

9  Governor about him appointing himself?

10 A   I think there were several.  I don't recall

11 exactly.  There were several.

12 Q   And how many times did you express disagreements

13 to the Governor?

14 A   I believe several.

15 Q   Approximately how many times, do you know?

16 A   2, 3, 4.

17 Q   2, 3, 4.  Several.  Okay.

18         And the Governor disagreed with you?

19 A   The Governor did.  He didn't like my reasoning

20 and I think he was clearly interested in appointing

21 himself.

22 Q   And, to your knowledge, the Governor had that

23 ability to appoint himself, is that correct?

24 A   Yes, he did.

25 Q   And after you disagreed with him, you just went

Scofield - cross by Goldstein                    3549

1  ahead and placated him the rest of the way?
2  A   I reached a point on the discussions about the
3  Cabinet position and things that were going to
4  happen after this where he's talking about the
5  corporate boards, or he's talking about the
6  501(c)(4), yes, I made a decision that it was not
7  worth arguing with him about it.
8          I also, sir, thought that it was entirely
9  implausible what he wanted, thought there was no
10 likelihood that it would happen.  So I believed, I
11 wish I had believed differently, but I certainly
12 believed that by agreeing with him was not going to
13 make it happen.  Frankly, I thought some of his
14 suggestions were absurd.
15 Q   Did you just say by agreeing with him it wouldn't
16 happen?
17 A   What I said, what I was trying to convey was that
18 if I placated him it did not make it any likelier
19 that he would become a Cabinet member.
20          By placating him, I didn't believe it made it
21 any likelier there would, you know, some large
22 amount of money for a 501(c)(4).
23 Q   What about encouraging him?  I mean, placating is
24 different than encouraging would you agree with
25 that?

:11PM
:11PM
:11PM
:11PM
:12PM

1  A   I think there's a difference.  I think it could

2  be seen either way.

3  Q   Well, when you encouraged him, did you believe

4  that would stop him from going forward?

5  A   I'm sorry, I don't understand the question.

6  Q   Well, Mr. Scofield, is it fair to say that you're

7  a lobbyist?

8  A   I'm a registered lobbyist, yes, that's right.

9  Q   What do lobbyists do?  What is the basic

10 definition of a lobbyist?

11 A   I don't know that I know the most basic

12 definition.  They work on behalf of their clients,

13 typically with government and elected officials to

14 help them reach their public policy goals or their

15 funding goals.

16 Q   You advocate on behalf of clients to government

17 officials, is that correct?

18 A   That's part of it, yes.

19 Q   So if you have a client that asks you to advocate

20 on behalf of a government official on a particular

21 issue, if you reach an agreement, obviously, you

22 then go forward with doing that, is that correct?

23 A   Certainly that's part of it.

24 Q   If the government official that you're lobbying

25 disagrees with what it is you're proposing, do you

Scofield - cross by Goldstein                3551

1  just stop right there?

2  A  It depends on the circumstance; not always.

3  Q  Now, going back to Page 3 of tab 36, line 35, you

4  said:

5      "Why should Valerie Jarrett be senator?  You

6        know.  And, by the way, Valerie Jarrett isn't

7        exactly SEIU's kind of senator, Jerry."

8          What did you mean when you said that?

9  A  I don't remember precisely.  Valerie Jarrett is

10 somebody who was not particularly close to SEIU, she

11 was not somebody who came out of the labor movement.

12 That's, I think, generally, what I was trying to

13 convey.

14 Q  Was that, then, an accurate statement?

15 A  That Valerie Jarrett isn't exactly SEIU's kind of

16 senator?  I think taken in and of itself, that's an

17 accurate statement.

18 Q  You understood, though, that SEIU was advocating

19 for Valerie Jarrett, is that correct?

20 A  Yes, I did.

21 Q  But it was your understanding that Valerie

22 Jarrett was not SEIU's kind of senator?

23 A  That was my opinion, yes.

24 Q  Now, right after SEIU's kind of senator you said

25 "Jerry," are you there indicating what you told

:13PM

:13PM

:14PM

:14PM

:14PM

Scofield - cross by Goldstein                    3552

1  Jerry Morrison?
2  A  I think that's right.
3  Q  Did you actually tell Jerry Morrison that?
4  A  Jerry and I had a few conversations about this
5  and I recall this generally, and I think we had -- I
6  don't know if I used those words, I don't recall.
7  We generally had some conversations about this,
8  yeah.
9  Q  So did you tell Jerry Morrison that Valerie
10 Jarrett isn't exactly SEIU's kind of senator?
11 A  I don't know if I used those words exactly.  I
12 believe we had conversations about whether Valerie
13 was typically the type of senator they would
14 advocate for or the type of person they would
15 support.  I believe that's right.  I don't recall
16 exactly.
17 Q  You then said:
18     "And then you know they get it, they
19      understand."
20         What did you mean when you said that?
21 A  I don't remember for sure, sir.  I really don't.
22 Q  You don't know what you meant when you said:
23     "And then you know they get it, they
24      understand"?
25 A  Well, I think I'm -- it sounds like I'm referring

Scofield - cross by Goldstein                3553

1  to SEIU or Jerry in that they have an opinion as
2  well that, typically speaking, she might not be
3  their first choice for senator.
4  Q   So what you are conveying there is that they
5  understood that Valerie Jarrett was not SEIU's kind
6  of senator, is that correct?
7  A   I think that's generally right.
8  Q   Is that true?
9  A   Is what true?
10  Q   That they, SEIU, understood that Valerie Jarrett
11  was not their kind of senator?
12  A   I don't think I can speak for what SEIU thought
13  at this time.  Jerry and I had some conversations,
14  they were general conversations, I'm not sure I can
15  convey -- I can't really speak for SEIU on that.
16  Q   But at this time you were speaking for SEIU.
17  When you said "they understand" I guess you were
18  speaking for SEIU then, right?
19  A   I was trying to portray what I thought that they
20  were thinking about the senator, yeah.  I think
21  that's right.
22  Q   Is that, to the best of your knowledge, an
23  accurate description of what they knew?
24  A   I really don't recall because I don't recall
25  precisely my conversations with Jerry.

:15PM
:16PM
:16PM
:16PM
:16PM

Scofield - cross by Goldstein                    3554

1  Q   Going on further to line 4:
2        "'cause there's no reason for her to be
3         senator."
4             What did you mean about that?
5  A   Well, again, I think we're talking about her
6  general qualifications.  And although she is a very
7  accomplished person, she had not held elected
8  office, she was not necessarily the type of person
9  who would be at the top of the list for a Senate
10  Seat.  So I think I'm talking generally about her
11  background and qualifications.
12  Q   So when you said there's no reason for her to be
13  senator, was that an accurate statement?
14  A   "No reason" seems to me a little extreme.  She's
15  an accomplished person and probably perfectly
16  capable of doing the job.
17  Q   Going on further to line 6:
18        "So I think unless, you know, unless they're
19         willing to step up to the plate, but they could
20         step up, I agree, they could step up to the
21         plate in other ways corporate.  I don't know
22         help with something in labor, you know, or put
23         some pressure on SEIU."
24             When you said "step up the plate," what did
25  you mean by that?

Scofield - cross by Goldstein                3555

1  A   Well, again, I think I'm essentially parroting
2  back to the Governor what he was hoping would happen
3  in regard to the Senate Seat.
4  Q   Was it a lie?
5  A   It was misleading.  It didn't characterize my
6  true feelings about it.
7  Q   Well, even though you're lying at this time, when
8  you said "they can step up," what did you try to
9  convey with those words, "they could step up"?
10 A   I was just agreeing with what he had been saying
11 previously.
12 Q   Well, you would agree that when you -- you could
13 agree with someone just by saying "yes," correct?
14 Is that fair to say?
15 A   That would be one way to agree, sure.
16 Q   This is a little more than agreement, would you
17 agree?
18 A   No, I don't think I would say it's more than
19 agreement.  It's agreeing with what he said
20 previously.
21 Q   But they could step up, step up to the plate,
22 that's just agreement?
23         MR. SCHAR:  Objection, Judge.
24         THE COURT:  The objection is sustained.
25 BY MR. GOLDSTEIN:

:17PM
:18PM
:18PM
:18PM
:18PM

Scofield - cross by Goldstein                    3556

1  Q   As you read that today, is it your understanding
2  that those were encouraging words?
3           MR. SCHAR:  Objection.
4           THE COURT:  The objection is sustained.
5  BY MR. GOLDSTEIN:
6  Q   Going back to Page 1 on this, there's a mention
7  of Joe Stroud.
8  A   Yes, sir.
9  Q   Do you recall him?
10 A   Yes.
11 Q   And you indicated that Joe Stroud was a prominent
12 African-American businessman?
13 A   Yes, that's who I understand him to be.
14 Q   And, to your knowledge, he had raised campaign
15 funds for other candidates, is that correct?
16 A   Yes, that's right.
17 Q   Now, in your discussions with Rod Blagojevich you
18 indicated -- or you indicated on direct examination
19 that you reached out to the media regarding Jesse
20 Jackson, Jr., is that correct?
21 A   Yes, that's correct.
22 Q   And when you reached out to the media regarding
23 Jesse Jackson, Jr., what exactly did you tell any of
24 these media members?
25 A   Well, I only reached out to one media member.

:19PM
:19PM
:19PM
:20PM
:20PM

1  Q   And who was that?

2  A   It was -- I reached out to Michael Sneed, I

3  talked once to her assistant.

4  Q   And what did you tell her?

5  A   I told her -- him, I told him something to the

6  effect of I think Jesse Jackson, Jr., is increasing

7  his profile and he's had some good conversations

8  with Governor Blagojevich and that I wouldn't

9  discount him as a potential candidate to fill the

10  Senate Seat.

11  Q   What was the reason for telling Michael Sneed

12  that?

13  A   Governor Blagojevich had asked me to do it.  I

14  understood the reason to be a tactic.  He wanted

15  publicly understood that Jesse Jackson, Jr., was a

16  candidate because he believed he was in negotiations

17  potentially with the President-Elect or people

18  around the President-Elect and he wanted them to

19  think there were other strong candidates other than

20  their preferred candidate Valerie Jarrett.

21  Q   So is it fair to say that Jesse Jackson, Jr., was

22  used as a negotiating tool?

23          MR. SCHAR:  Objection.

24          THE COURT:  The objection is sustained.

25  BY MR. GOLDSTEIN:

:20PM

:20PM

:21PM

:21PM

:21PM

Scofield - cross by Goldstein                    3558

1  Q  Well, you understood from Rod Blagojevich that he
2  did not want to select Jesse Jackson, Jr., to the
3  Senate Seat, is that correct?
4  A  It was my understanding that he found it highly
5  unlikely.
6  Q  And you said that it was your understanding that
7  leaking this to Michael Sneed was helping or was for
8  Rod Blagojevich to elevate Jesse Jackson, Jr.'s
9  chances in regard to his negotiations, is that
10 correct?
11 A  I think that's fair to say.
12 Q  And it was you that made the call?
13 A  Yes, I made the call.
14 Q  Based on his request?
15 A  Yes, sir.
16 Q  If you can turn to tab 39, please.
17       Are you there?
18 A  Yes, sir.
19 Q  On Page 2, line 25, you said:
20    "I, you know, look, the President can be
21     helpful, he should be grateful and appreciative
22     and helpful."
23       That was you speaking, is that correct?
24 A  Yes, that's correct.
25 Q  And you understood that there was communications

:21PM

:22PM

:22PM

:23PM

:23PM

Scofield - cross by Goldstein                3559

1  to Rod Blagojevich that Barack Obama indicated he
2  would be grateful and appreciative, do you recall
3  that?
4  A  Yes, I do.
5  Q  And you went ahead and said he should be grateful
6  and appreciative and helpful.  When you said
7  "helpful" what did you mean by that?
8  A  Again, I was repeating what he had said to me
9  repeatedly and agreeing with his belief that the
10 President should be helpful to him personally.
11 Q  Did you believe the President should be helpful?
12 A  I didn't believe he should be helpful by
13 appointing to a Cabinet position or doing something
14 for him personally, no, I didn't.
15 Q  You didn't believe that?
16 A  No, I didn't.
17 Q  Why didn't you believe that?
18      MR. SCHAR:  Objection.
19      THE COURT:  The objection is sustained.
20 BY MR. GOLDSTEIN:
21 Q  So this was placating again?
22 A  Yes, sir.
23 Q  If you could turn to Page 9, please.
24      Are you there?
25 A  Yes, sir.

Scofield - cross by Goldstein                    3560

1  Q   Line 3 said:
2      "Well, look, it's not entirely outlandish to
3       say, look, we're all your friends who want you
4       to leverage this.  I mean, the President being
5       grateful is fine.  I think everybody would say
6       that's a good first step, but, you know, for
7       me, at least I think you gotta add something to
8       that.  I mean, everybody sees taking care of
9       Barack's person there is value in it, but you
10      gotta make the value I think a little more
11      tangible."
12      Did you say those words?
13 A   Yes, sir, I did.
14 Q   Now, line 4 to 5, you said:
15     "Look, we're all your friends who want you to
16      leverage this."
17      What did you mean "by leverage this"?
18 A   Again, sir, I think I'm repeating to him what
19 I've heard him say to me now over and over again
20 over the last few days.
21 Q   You're parroting him now, is that fair to say?
22 A   That's correct, at times, yes.
23 Q   And you thought that parroting Rod Blagojevich
24 would make him stop?
25         MR. SCHAR:  Objection.

Scofield - cross by Goldstein                    3561

1         THE COURT:  The objection is sustained.
2    BY MR. GOLDSTEIN:
3    Q   What did you think he would be doing by
4    parroting?
5         MR. SCHAR:  Objection.
6         MR. GLDSTEIN:  The government made an
7    objection.  I didn't hear the ruling.
8         THE COURT:  Did you?
9         MR. SCHAR:  Yes.
10        MR. GOLDSTEIN:  I don't want to speak for
11   you.
12        THE COURT:  Stop what?
13        MR. GOLDSTEIN:  I'm sorry?
14        THE COURT:  Make him stop what?  I mean, I
15   understand your question, but they lack a few
16   premises as to what his purpose was in the first
17   place and what he thought that it might result in.
18   BY MR. GOLDSTEIN:
19   Q   Okay.  My parroting, repeating, agree, with the
20   Governor, what did you expect to accomplish?
21        MR. SCHAR:  Objection.
22        THE COURT:  Why don't you ask him if he
23   expected to accomplish anything first.
24   BY MR. GOLDSTEIN:
25   Q   What --

1        MR. GLDSTEIN:  I must confess, could you
2   repeat the question?
3        THE COURT:  Did you expect to accomplish
4   anything?
5   BY MR. GOLDSTEIN:
6   Q   That.
7   A   I really didn't expect to accomplish anything.
8   What I -- many times what I expected to accomplish
9   was, I wouldn't have to have further arguments about
10  these types of issues as I did with encouraging him
11  not to appoint himself as senator.
12       So I thought that he had decided on a course
13  of action, and I really thought that there was very
14  little that I could do or say that would change his
15  course of action.
16  Q   You thought he had decided on a course of action,
17  yet if we just skip ahead, he asked you a question
18  on line 14:
19      "Well, I hear you but what, what value, what's
20       the value?"
21       He asked you a question.  Now, you understood
22  that as he already had this course of action
23  decided?
24  A   I -- I -- to me, it was quite clear he had the
25  course of action decided.  For several days now he's

:27PM

:28PM

:28PM

:28PM

:28PM

1  been talking almost exclusively about the Senate

2  Seat and what he might get in return for the Senate

3  Seat.

4  Q   So you didn't understand this question to be a

5  question?

6          MR. SCHAR:  Objection, Judge.

7          THE COURT:  The objection is sustained.

8  BY MR. GOLDSTEIN:

9  Q   Let's go back up here.

10         You said:

11      "I mean the President being grateful ..."

12      I'm on line 5 to 6:

13      "I mean the President being grateful is fine, I

14       think everybody would say that's a good first

15       step, but, you know, for me at least I think

16       you gotta add something to that."

17      What did you mean by that?

18 A   Again, sir, I was repeating what I've heard from

19 him.

20         I also would say that in the context of this

21 call, the Governor, he was complaining to me about

22 other advisers, specifically Bill Knapp.  I mean, he

23 was complaining that some advisers had disagreed

24 with what he wanted to do.

25 Q   But there were advisers that disagreed with him?

:28PM

:29PM

:29PM

:29PM

:29PM

1  A  That's right, and one of them was compared

2  essentially a quisling.

3  Q  There was -- you spoke about Bill Knapp, right?

4  A  Yes, that's right.

5  Q  Do you know the relationship Bill Knapp had with

6  Governor Blagojevich?

7  A  Yeah, I do.

8  Q  And, to your knowledge, after November 13th, the

9  Governor continued to talk to Bill Knapp, is that

10 correct?

11 A  I don't know that.  I could -- I would imagine

12 that he did, but I don't know what conversations had

13 with Bill during that period of time.

14 Q  And you were present with Bill Knapp and Governor

15 Blagojevich back in the transition period, right?

16 A  Yes, I was.

17 Q  Bill Knapp would disagree with the Governor?

18 A  Yes, he would.

19 Q  Bill Knapp was not fired by the Governor?

20 A  No, he was not.

21 Q  He continued to stay close to him through 2008,

22 is that correct?

23 A  He was still close to him in 2008, that's right.

24 Q  Line 8:

25    "But you know, for me ..."

Scofield - cross by Goldstein                    3565

1        When you said "for me" what were you saying?
2  A   I'm referring to myself.  "For me" I think is
3  self-explanatory.
4  Q   Okay.
5        "For me at least I think you gotta add something
6         to that."
7        What was the something?
8  A   I don't know what the something was.  I didn't
9  believe he was going to get something added to it,
10 certainly not the Cabinet, certainly not a corporate
11 board.
12 Q   But at this time you believed he should get
13 something for it?
14 A   No, I never believed he should get something for
15 it like that.
16 Q   You think something should have been added, is
17 that correct?
18 A   Did I believe that something should have been
19 added?
20 Q   Yes.
21 A   No, I didn't believe that, sir.
22 Q   Did you say something should be added?
23 A   Yes, I do say that here.
24 Q   Did you understand from reading this that what
25 you meant was something should be added?

Scofield - cross by Goldstein                    3566

1        MR. SCHAR:  Objection.

2        THE COURT:  The objection is sustained.

3   BY MR. GOLDSTEIN:

4   Q   (Reading:)

5       "I mean everybody seems taking care of Barack's

6        person, there's value in it, but you gotta make

7        the value I think a little more tangible."

8        What did you mean by the word "tangible"?

9   A   I didn't believe he would get anything tangible

10  out of it unless it was some sort of political

11  benefit.

12  Q   What did you mean by the word "tangible"?

13  A   By the word "tangible" what I meant was he wants

14  something tangible out of it and I'm agreeing with

15  him.

16  Q   What did you mean by the word "tangible"?

17       MR. SCHAR:  Objection.

18       THE COURT:  The objection is sustained.

19       MR. GLDSTEIN:  I don't think he's answered

20  this but ....

21       If I may have just one moment, Your Honor?

22       THE COURT:  Sure.

23     (Brief pause).

24       MR. GOLDSTEIN:  I apologize.

25  BY MR. GOLDSTEIN:

Scofield - cross by Goldstein                    3567

1  Q   Please turn to Page 3.
2          Are you there?
3  A   Yes, sir.
4  Q   Line 7 Rod Blagojevich says:
5       "How do you make a deal like that?"
6          When Rod Blagojevich said "how do you make a
7  deal like that," what did you understand him to
8  mean?
9  A   He's talking about the 501(c)(4), and he's
10 mentioned the 501(c)(4) and someone like Warren
11 Buffet funding it.
12 Q   Well --
13 A   So he's talking about the 501(c)(4) and again his
14 ability to appoint a senator and whether that can be
15 done to make a deal for a nonprofit or 501(c)(4).
16 Q   So when he said "deal," it was your understanding
17 that he was referencing 501(c)(4) in regards to the
18 Senate Seat, is that correct?
19 A   That's correct.
20 Q   That's what the word "deal" is talking about,
21 right?
22          Then he goes on to say:
23       "I mean, it's got, got to be legal obviously."
24          What did you understand Rod Blagojevich to
25 say after he said "how do you make a deal like that,

Scofield - cross by Goldstein                    3568

1  I mean it's got to be legal obviously," what did you
2  understand him to be saying?
3  A  Well, I think you have to read the whole
4  sentence.  "I mean, it's got to be legal obviously
5  but it's very commonplace, is it not, doing things
6  like this," I think he's referring -- the second
7  half of that paragraph refers to the 501(c)(4) and
8  setting up the 501(c)(4).
9  Q  There are three dots after the "but," that's
10 called an ellipse, are you aware of that?
11 A  I am aware of that.
12 Q  Okay.  That indicated, because you heard the
13 call, that there was a time between, a pause between
14 the "but" and the next "but," is that correct?
15 A  Yes, that's right.
16 Q  So it was your understanding that those first two
17 sentences, "how do I make a deal like that, I mean
18 it's got to be legal obviously" was separated by a
19 pause, and then there was a next sentence "but it's
20 very commonplace, is it not," is that a fair
21 description of how that call went forward?
22 A  Well, I think it's -- there are lots of pauses on
23 calls, so I'm not sure that the pause indicates
24 specifically the break or what he means.
25 Q  You agree there was a pause, right?

:35PM
:35PM
:35PM
:35PM
:36PM

Scofield - cross by Goldstein                    3569

1  A   Ah --
2  Q   As indicated by the ellipse?
3  A   Yeah, that's probably accurate, there was a
4  pause, that's right.
:36PM  5  Q   And what you're saying is "how do you make a deal
6  like that, I mean it's got to be legal obviously" he
7  was referencing setting up the 501(c)(4), is that
8  what you're saying?
9  A   I'm sorry?
:36PM  10  Q   Well, is it fair to say that your understanding
11  of "I mean it's got to be legal obviously" after
12  "how do you make a deal like that," it was your
13  understanding that Rod Blagojevich was trying to do
14  this legally?
:36PM  15          MR. SCHAR:  Objection, Judge.
16          THE COURT:  The objection is sustained.
17  BY MR. GOLDSTEIN:
18  Q   Well, do you understand what the term "legal"
19  means?
:37PM  20          THE COURT:  Are you almost done?
21          MR. GOLDSTEIN:  Ah, no.
22          THE COURT:  Then go on to something that's
23  appropriate to ask.
24  BY MR. GOLDSTEIN:
:37PM  25  Q   Page 4, line 11, Rod Blagojevich says:

1      "If I get nothing back from Obama then, I'm

2      going in another direction, you know what I'm

3      saying?"

4      And you say:

5      "I think you should leverage it for whatever's

6      most helpful to you."

7          What did you mean by saying "I think you

8   should leverage it for whatever's most helpful to

9   you"?

10  A   Again, this is a conversation that I didn't want

11  to engage in.  I made a decision I wasn't going to

12  argue with him about it.  He had made his decision

13  and I was not going to get in a conflict with him

14  about it.  I, to be honest, regret that, but

15  that's -- that was my decision here.

16  Q   Did you think about what you said before you said

17  it?

18  A   To be honest, calls with Mr. Blagojevich could be

19  long and rather meandering and move around to many

20  different points and, to be candidate, I wasn't

21  always entirely 100-percent focused on these phone

22  calls.

23  Q   So you weren't focused?

24  A   I didn't say that, I said I wasn't always

25  entirely focused on it.

1  Q   Well --

2  A   So if your question is did I think about it

3  before I said it, my thought process was, I've

4  decided I am going to agree with the Governor.

5  Q   When you said "I think you should leverage it for

6  whatever is most helpful to you," I understand what

7  you were thinking in your head, what were you trying

8  to communicate to Rod Blagojevich by saying that?

9  A   I was trying to communicate that I was agreeing

10 with him.  I didn't want to argue with him.

11 Q   Now, Page 6, at the bottom, line 34, Rod

12 Blagojevich says:

13     "501(c)(4) issue advocacy 10, 15, 20 million

14      dollars in an organization like that, but I, we

15      can get going in, you know, a board that, you

16      know, I'm comfortable with and then when I'm no

17      longer Governor I go over there, what about

18      that?"

19     You said after that on line 6:

20     "I think it's worth exploring."

21        When you said "I think it's worth exploring,"

22 what did you mean by that?

23 A   Again, I'm trying to move the conversation along,

24 wrap it up, not confront him.

25 Q   I understand you're trying to move it along, but

Scofield - cross by Goldstein                    3572

1  you said these words:
2      "I think it's worth exploring."
3       what did you mean when you said "I think it's
4       worth exploring"?
5          MR. SCHAR:  Objection, Judge.
6          THE COURT:  The objection is sustained.
7  BY MR. GOLDSTEIN:
8  Q   Just going back to Page 4 when you talked about
9  leveraging it for whatever's most helpful to you,
10  Rod Blagojevich said:
11      "You agree with that, don't you?"
12       And you said:
13      "I do."
14          When you said "I do," what did you mean by
15  that.
16  A  Well, the words, I think, are fairly obvious, but
17  it doesn't convey my thinking at the time.
18  Q   I hope that's the only time you were lying when
19  you said "I do."
20          MR. SCHAR:  (Standing up)
21  BY MR. GOLDSTEIN:
22  Q   If we can move to tab 60.
23          MR. GLDSTEIN:  Whenever Your Honor wants to
24  take a break.
25          THE COURT:  I think it would be good if we

Scofield - cross by Goldstein                    3573

1  finish this.
2          MR. GOLDSTEIN:  I'm sorry?
3          THE COURT:  I think it would be good if we
4  finish this, so why don't you just keep going.
5          MR. GOLDSTEIN:  All right.  Thank you.
6        (Brief pause).
7  BY MR. GOLDSTEIN:
8  Q   Now, on Page 2 of tab 60, the government went
9  over line 27 to 31 and they didn't repeat line 32,
10 so I want to ask what you understood was meant when
11 the Governor said:
12      "What, what do you think of that?"
13          What did you understand the Governor to be
14 doing when he said "what do you think of that"?
15 A  Well, he's asking a question, though in my
16 experience with the Governor frequently when asked
17 questions like this, he was not so much actually
18 asking for advice but looking for affirmation or
19 confirmation of what he was thinking.
20 Q   Mr. Scofield, you listened to several calls here
21 on the witness stand and also when you were talking
22 to the government, is that correct?
23 A  Yes, that's right.
24 Q   And you listened to calls that weren't played for
25 the jury, as well?

Scofield - cross by Goldstein                    3574

1   A   Yes, we did.

2   Q   Do you recall any calls that you listened to

3   where Governor Blagojevich argued with you?

4   A   There were earlier calls where we talked about

5   him appointing himself as senator, where yes, we had

6   disagreements, where he disagreed with my opinion.

7   Q   He disagreed with your opinion?

8   A   Yes, that's right.

9   Q   Do you know around when those calls were?

10  A   Probably fairly early in this process.  It was

11  only ten days or so that I was talking to him about

12  this so ....

13  Q   So after this disagreement, there were continuing

14  to be conversations with him, is that correct?

15  A   Yes, that's correct.

16  Q   If you can move to tab 62, I believe it's binder

17  2.

18          Are you there?

19  A   Yes.

20  Q   Now, you had this conversation with the Governor

21  on November 13th, 2008, is that correct?

22  A   Yes, that's correct.

23  Q   And this was a discussion about John Wyma, is

24  that right?

25  A   Yes, that's right.

Scofield - cross by Goldstein                    3575

1  Q   And the Governor was asking you to call John
2  Wyma, is that right?
3  A   Yes, that's right.
4  Q   And he wanted you to call John Wyma to discuss
5  more about this 501(c)(4)?
6  A   He wanted me to essentially enlist John Wyma to
7  act as a emissary to Rahm Emanuel regarding the
8  governor's interest in the 501(c)(4), yes.
9  Q   What did you understand Governor Blagojevich to
10 be asking you to do to tell John Wyma?
11 A   He asked me quite clearly to ask John Wyma to
12 call Rahm Emanuel and suggest to Rahm Emanuel that
13 what Rod Blagojevich was interested in was a
14 501(c)(4), an organization that could potentially be
15 funded by wealthy donors, wealthy democratic donors,
16 and that that's what the government was interested
17 in, and that if they were thinking about the senate
18 appointment and the Senate Seat, what the Governor
19 was interested in was a 501(c)(4) organization.
20 Q   Did you disagree with the Governor when he asked
21 you to do this?
22 A   No, I didn't, though I encouraged him to have
23 someone else make the call.
24 Q   Did you talk to John Wyma?
25 A   Yes, sir, I did.

Scofield - cross by Goldstein                3576

1   Q   Did you communicate the message he wanted
2   delivered?
3   A   I don't know that I communicated it exactly, but,
4   generally speaking, I passed along the message.  I
5   passed it along in a dismissive manner, but I passed
6   it along, yes.
7   Q   Now, if you can turn to tab 63, you actually
8   received a call from Rod Blagojevich on 3:41 p.m.,
9   do you recall that?
10  A   Yes, I do.
11  Q   And if you can turn to Page 2 -- actually we went
12  over this.  I don't want to go over that again.  We
13  did go over this call.
14        Now, if we could take a step back.  You
15  talked about a conversation you had with Bradley
16  Tusk, do you recall that?
17  A   Yes, sir, I do.
18  Q   And that was in 2006?
19  A   Yes, that's correct.
20  Q   And there was a conversation about this school,
21  isn't that correct?
22  A   Yes, that's right.
23  Q   After this conversation with Bradley Tusk, did
24  you follow up with Bradley Tusk?
25  A   No, I had one conversation with Bradley.

:46PM

:47PM

:47PM

:48PM

:48PM

1  Q   Did you follow up with Rod Blagojevich after this
2  conversation?
3  A   No, I did not.
4  Q   Now, in 2008, for a period of about 10 to 15 days
5  in November, you had approximately 20 calls with Rod
6  Blagojevich, is that correct?
7  A   I don't remember the number.  That sounds about
8  right.
9  Q   So it was approximately two calls a day?
10 A   Yes, sir, that sounds about right.
11 Q   Memorable calls, right?
12 A   More memorable than you could probably imagine,
13 sir.
14 Q   And it's fair to say that during many of these
15 calls you were agreeing with Rod Blagojevich?
16 A   It's fair to say that during some of these calls,
17 perhaps many, I conveyed agreement or gave him the
18 sense of agreement, yes, that's right.
19 Q   And it's fair to say that during these calls you
20 encouraged Rod Blagojevich?
21      MR. SCHAR:  Objection, Judge.
22      THE COURT:  The objection is sustained.
23 BY MR. GOLDSTEIN:
24 Q   Is it fair to say as to the subject of the Senate
25 Seat, that you took activity, you took action to

:48PM
:48PM
:49PM
:49PM
:49PM

Scofield - cross by Goldstein      3578

1 help out Rod Blagojevich?

2 A  I -- I think that is probably fair to say.

3 Q  Mr. Scofield, you never did anything wrong, did

4 you?

5         MR. SCHAR:  Objection, Judge.

6         THE COURT:  I think I previously said that

7 we're not interested in the legal opinions of

8 witnesses unless they are qualified experts, which

9 this witness is not, and I don't want to keep

10 hearing these questions and having to rule.  So the

11 objection is sustained.

12         MR. GLDSTEIN:  Thank you, Your Honor.

13 BY MR. GOLDSTEIN:

14 Q  Well, you made several calls to arrange meetings

15 to discuss --

16     (Noise, interruption in the courtroom.)

17 BY THE WITNESS:

18 A  I'm sorry, there's a door creaking.  I didn't

19 catch it.  I'm sorry.

20 BY MR. GLDSTEIN:

21 Q  I apologize.

22        You made several calls and took action in

23 furtherance of Rod Blagojevich trying to exchange a

24 job for a job?

25         MR. SCHAR:  Objection.

:50PM
:50PM
:50PM
:50PM
:50PM

Scofield - cross by Goldstein                    3579

1          THE COURT:  Asked and answered.

2    BY MR. GOLDSTEIN:

3    Q   Mr. Scofield, on December 9, 2008, the FBI came

4    to your House, is that correct?

5    A   Yes, sir.

6    Q   And that was approximately 6:25 a.m. in the

7    morning?

8    A   It was early.

9    Q   You weren't too happy about it, were you?

10   A   I'm not sure it's a visit that anybody would like

11   to have.

12   Q   Understood.

13          After that meeting, you had the FBI exit your

14   back door, is that correct?

15          MR. SCHAR:  Objection, Judge.

16          THE COURT:  Sustained.

17   BY MR. GOLDSTEIN:

18   Q   After that meeting, you then spoke to the

19   government several times, is that correct?

20   A   Yes, sir, that's right.

21   Q   Approximately how many times did you speak to the

22   government regarding Rod Blagojevich?

23   A   I don't recall the number.  Several times.

24   Q   Do you recall if there were U.S. Attorneys with

25   you when you had conversations with the government?

Scofield - cross by Goldstein                    3580

1  A   Yes.

2  Q   Also present during these conversations were FBI

3  agents?

4  A   Yeah, there was one FBI agent.

:52PM  5  Q   And you also hired a lawyer?

6        MR. SCHAR:  Objection, Judge.

7        THE COURT:  The objection is sustained.

8  BY MR. GOLDSTEIN:

9  Q   Mr. Scofield, have you ever been charged with any

:52PM  10  crime in connection to this?

11  A   No, sir, I haven't.

12        MR. GOLDSTEIN:  Sorry.  One moment, Your

13  Honor.

14        THE COURT:  Sure.

:52PM  15    (Brief pause).

16  BY MR. GOLDSTEIN:

17  Q   Mr. Scofield, you wanted to maintain a good

18  relationship with Rod Blagojevich, is that correct?

19  A   Yes, sir, that's fair to say.

:53PM  20  Q   And it's fair to say that you wanted a good

21  relationship with Rod Blagojevich because that would

22  affect your business?

23  A   That was part of the reason.

24  Q   And it affected your business in that you

:53PM  25  potentially would lose money if you didn't have a

1  good relationship with Rod Blagojevich?

2  A   That was possible, yeah.

3  Q   And it's fair to say that you agreed and placated

4  Rod Blagojevich, even lied to Rod Blagojevich,

5  because of your financial interest?

6  A   No, I wouldn't agree with that statement, sir.

7  Q   Is SEIU still a client of yours?

8  A   No, they're not.

9       MR. GOLDSTEIN:  Nothing further.

10       THE COURT:  How long is your redirect?

11       MR. SCHAR:  15 minutes.

12       THE COURT:  Tomorrow morning, 9:30.

13       THE MARSHAL:  All rise.

14      (Adjournment taken from 4:54 o'clock p.m. to

15       9:30 o'clock a.m. on July 1, 2010.)

16

17

18

19

20

21

22

23

24

25

:54PM

:54PM

:54PM

1

2          *       *       *       *       *       *       *       *

3

4

5   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

7                            MATTER

8

9

10    /s/Blanca I. Lara                        date

11

12

13

14

15   _____        _____

16        Blanca I. Lara                        Date

17

18

19

20

21

22

23

24

25