3583

1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4           Government,              )
                                     )
5  vs.                               )   Chicago, Illinois
                                     )
6  ROD BLAGOJEVICH,                  )   July 1, 2010
   ROBERT BLAGOJEVICH,               )
7                                    )
              Defendants.            )   9:30 o'clock a.m.
8

9                         VOLUME 18
                   TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE JAMES B. ZAGEL
                       AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                    Room 2504
                Chicago, Illinois 60604
23                 (312) 435-5895

24

25

3584

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4         KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
5         158 West Erie
          Chicago, Illinois 60610
6         (312) 640-1776

7         LAW OFFICE OF SAMUEL E. ADAM
          BY:  Samuel Forbes Adam
8              Samuel Adams, Jr.
          6133 South Ellis Avenue
9         Suite 200
          Chicago, Illinois 60637
10        312-726-2326

11        OFFICES OF AARON B. GOLDSTEIN
          BY: Aaron Benjamin Goldstein
12        6133 South Ellis
          Chicago, Illinois 60637
13        (773) 752-6950

14        OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
15        2140 N. Lincoln Park West
          Suite 307
16        Chicago, Illinois 60614
          (773) 517-0622
17
          LAW OFFICES of MICHAEL GILLESPIE
18        BY:  MICHAEL GILLESPIE
          53 West Jackson Boulevard
19        Suite 1420
          Chicago, Illinois 60604
20        (312) 726-9015

21

22

23

24

25

3585

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3586

1                    INDEX OF EXAMINATION

2    WITNESS                                        PAGE

3     DOUG SCOFIELD

4     Redirect Examination By Mr. Schar................ 3593

5     Recross Examination By Mr. Goldstein............. 3601

6     DAVID KEAHL

7     Direct Examination By Mr. Schar................. 3607

8     Cross Examination By Mr. S. Adam, Jr.:.......... 3626

9     SHARI SCHINDLER

10    Direct Examination By Mr. Schar................. 3636

11    Cross Examination By Mr. Goldstein.............. 3678

12    Cross Examination (Resumed) By Mr. Goldstein..... 3708

13    Redirect Examination By Mr. Schar............... 3716

14    ROBERT WILLIAMS

15    Direct Examination By Ms. Hamilton.............. 3718

16    Cross Examination By Mr. S. Adam, Jr.:.......... 3757

17    Redirect Examination By Ms. Hamilton............ 3786

18    MICHAEL WINTER

19    Direct Examination By Mr. Niewoehner............ 3787

20    Cross Examination By Mr. Gillespie.............. 3818

21

22

23    EXHIBITS

24     Government's Exhibit 2004 Ethics Training and      3610

25      Government Exhibit Ethics Training Summary ......

1   Government Exhibit $12,000 checks, Government      3635
2   Exhibit 12/17/02 check, Government Exhibit
3   8/27/02 check, Government Exhibit 12/1...........
4   Government Exhibit Chart 4, Government Exhibit     3637
5   Chart 5, Government Exhibit Chart 6, Government
6   Exhibit Chart 7, Government Exhibit Chart 8,
7   Government Exhibit Chart 9, Government Exhibit
8   Chart 10, Government Exhibit Chart 11,
9   Government Exhibit Chart 12 and Government
10  Exhibit Chart 13 ................................
11  Government's Exhibit 2001 Contract .............. 3728
12  Government's Exhibit 01/21/04, Check 2 .......... 3745
13  Government's Exhibit 1/22/04 Subcontractors...... 3749
14
15
16
17
18
19
20
21
22
23
24
25

3588

 1      (The following proceedings were had out of the
 2          presence of the jury in open court:)
 3          THE CLERK:  The case on trial, United States
 4   versus Blagojevich, et al.
 5          THE COURT:  This is just to tell you what
 6   we're going to do.
 7          The defendant has filed three motions for
 8   mistrial.  All of the motions for mistrial are
 9   denied, but since the jury is not out and the
10   witness is here, we will give Mr. Goldstein a chance
11   to ask his questions and see where we go from there.
12          MR. SCHAR:  Very well.
13          THE COURT:  And that's it.
14      (Recess.)
15          THE CLERK:  Please remain seated.
16          This court resumes in session.  We'll resume
17   with the case on trial.
18          Counsel.
19          MR. SCHAR:  Good morning, Your Honor.
20          Reid Schar, Chris Niewoehner and Carrie
21   Hamilton on behalf of United States.
22          MR. GOLDSTEIN:  Aaron Goldstein on behalf of
23   Rod Blagojevich.
24          MR. SCHAR:  Judge, very briefly.  I'm
25   starting with the redirect and then recross.

1          THE COURT:  After the offer of proof.

2          MR. SCHAR:  The next witness is an individual

3   named David Keahl who is going to basically testify,

4   he's mostly a publication witness to some ethics

5   test taken by Defendant Blagojevich.

6          Within that ethics testing there is

7   discussion of bribery and also bribery is the

8   following.  Obviously, we're not intending -- the

9   point of it is not to inform the jury as to what the

10  elements of bribery are or anything like that, that

11  will clearly come from Your Honor.

12         I want to raise it with Your Honor in case

13  you thought an instruction would be appropriate.

14  Obviously, that's a discretionary call, but they are

15  going through the next witness hear some discussion

16  of bribery and what it means.

17         The next witness after that is a re-call of

18  Agent Schindler.  We have an additional chart binder

19  that we would like to give to the jury.  I don't

20  know if it makes sense to take a break, if not, we

21  can easily pass those out.  It would not take long,

22  I think.

23         And then lastly, from a scheduling

24  perspective, Judge, we just wanted to confirm next

25  week is a three-day week.

3590

1          THE COURT:  Three-day week.

2          MR. SCHAR:  Thank you.

3          THE COURT:  Now go over what you started

4   with.  I'm not sure I understand this.

5          MR. SCHAR:  The witness that is coming next

6   is going to testify that Defendant Blagojevich took

7   ethics training in 2004 through 2008.  It's an

8   on-line ethics training.  We intend to put in

9   through this witness the 2004 ethics training which

10  lays out a variety of different things, explaining

11  what conflicts and interests are and bribery,

12  simplistically, in a couple of true, false answer

13  questions.  It defines for the defendant, obviously,

14  the government's position is, it defines clearly

15  that you cannot take official action in exchange for

16  some type of personal benefit and he was on notice

17  at that time.

18          THE COURT:  And this training was taken

19  because a requirement of state law?

20          MR. SCHAR:  Yes.

21          THE COURT:  You have views on this?

22          MR. ETTINGER:  Judge, I just heard the tail

23  end.

24          THE COURT:  It's not you.  It's not your

25  client.

3591

1       MR. GOLDSTEIN:  Your Honor, the fact that it
2 is now being put in, we could have asked questions
3 of all the witnesses about these particular issues,
4 so we don't want this evidence coming in, this
5 particular exhibit, to show what the government
6 wants it to show.
7       THE COURT:  The other witnesses would've
8 talked about the ethics training of the government?
9       MR. GOLDSTEIN:  No, but we could have framed
10 the cross-examination of these particular witnesses;
11 John Harris in particular.
12       THE COURT:  And you'd ask him about?
13       MR. GOLDSTEIN:  We'd ask him about the
14 particular ethics training.
15       THE COURT:  That he took?
16       MR. GOLDSTEIN:  Yes, and his understanding of
17 what the Governor took, as well.
18       MR. SCHAR:  They asked Mr. Harris about the
19 ethics training.
20       THE COURT:  I thought you did.  And I was
21 curious because in the ancient days when I was an
22 employee of the State of Illinois, I don't recall
23 ethics training, but I guess the General Assembly
24 decided it was a good idea.
25       I think this is a different issue and I think

3592

1   they are entitled to do it.  I think I will tell the
2   jury that whatever definitions and principles
3   underlay the ethics training, they are not to
4   consider them as statements of the law as it exists
5   in this case and they'll get that from me at the end
6   of the case.

7           Where is Mr. Scofield?

8           MR. SCHAR:  We'll get him right now, Judge.

9       (Brief pause).

10          THE COURT:  Mr. Goldstein, ask away.

11          MR. GOLDSTEIN:  I have no further
12   cross-examination.

13          THE COURT:  Wait.  Wait.  Wait.  I have a
14   motion here which says I ought to find a mistrial
15   because I stopped you from doing certain things.
16   This is your chance to show what it was I stopped
17   you from doing.

18          MR. GOLDSTEIN:  I believe it's clear from --

19          THE COURT:  No, it's not clear.  I'm giving
20   you an opportunity to make an offer of proof.  If
21   you decline that opportunity, it's your right to do
22   so.

23          MR. GOLDSTEIN:  We decline.

24          THE COURT:  Okay.

25      (Brief pause).

Scofield - redirect by Schar                    3593

1        THE MARSHAL:  All rise.

2       (The following proceedings were had in the

3        presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        You may proceed.

6        MR. SCHAR:  Thank you, Judge.

7  DOUG SCOFIELD, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8                  REDIRECT EXAMINATION

9  BY MR. SCHAR:

10  Q   Mr. Scofield, yesterday on cross-examination you

11  were asked some questions about transcripts that

12  indicated that calls were incoming to Defendant

13  Blagojevich from you.  Do you remember those

14  questions?

15  A   Yes, sir.  Yes, I do.

16  Q   Mr. Scofield, how is it that you came to call

17  Defendant Blagojevich?

18  A   His assistant, Mary Stewart, would call me and

19  ask that I call Mr. Blagojevich.

20  Q   To the best of your knowledge, other than calling

21  Mary Stewart, do you know whether Defendant

22  Blagojevich called anyone else himself?

23  A   I don't believe he did.  I don't know that I can

24  recall a time that he called me directly.

25  Q   You were asked whether anyone forced the phone

1  into your hand and pressed the numbers for you.

2  When the Governor of the State of Illinois asked you

3  to call, Mr. Scofield, did you believe that that was

4  a call that you could ignore?

5          MR. GOLDSTEIN:  Objection; leading.

6          THE COURT:  Sustained to the form.

7  BY MR. SCHAR:

8  Q   What, if anything, did you believe you should do

9  when the Governor of the State of Illinois called

10 you?

11 A   I believe that I should return the call.

12 Q   You were asked some questions about a

13 November 6th meeting that occurred after a meeting

14 between Defendant Blagojevich and Tom Balanoff at

15 the Thompson Center, do you recall that?

16 A   Yes, I do.

17 Q   You were, in particular, asked questions about

18 what Defendant Blagojevich told you about a supposed

19 conversation he had with J.B. Pritzker, do you

20 remember that?

21 A   Yes, sir.

22 Q   Do you know whether, in fact, Defendant

23 Blagojevich actually talked to Mr. Pritzker about

24 Lisa Madigan?

25 A   No, I don't.

1  Q   Do you know one way or the other whether J.B.
2  Pritzker actually talked with Defendant Blagojevich
3  about Lisa Madigan's supposed interest in the Senate
4  Seat?
5  A   No, I don't know.
6  Q   Do you know one way or the other whether Lisa
7  Madigan is being used as a stalking horse?
8  A   No, I don't.
9  Q   Do you know whether or not you were being used,
10 one way or the other, to pass information on to SEIU
11 and Tom Balanoff?
12 A   No, I don't.
13 Q   You went through you a number of transcripts
14 yesterday on cross-examination and statements which
15 you had made, statements which you agreed with what
16 Defendant Blagojevich was saying.
17       Had you talked prior to that to Defendant
18 Blagojevich about whether he should appoint himself
19 to the Senate Seat?
20 A   Yes, I had.
21 Q   Briefly, what had you told him?
22 A   I told him I didn't think it was a good idea, I
23 didn't think it was good for him, I didn't think it
24 was the right thing to do.
25 Q   And had he agreed with you?

1  A   No, he didn't agree.

2  Q   Do you know, one way or the other, Mr. Scofield,

3  what Defendant Blagojevich said about you to others

4  after you told him he should not take the Senate

5  Seat?

6         MR. GOLDSTEIN:  Objection, Your Honor.

7         THE COURT:  Overruled.

8  BY THE WITNESS:

9  A   No, sir, I don't.

10 BY MR. SCHAR:

11 Q   Had you talked to Defendant Blagojevich about

12 whether he could get the position of Secretary of

13 Health and Human Services?

14 A   Yes, I had.

15 Q   Briefly, what had you told him?

16 A   I told him I didn't believe he would get that

17 appointment.

18 Q   Did Defendant Blagojevich then stop talking about

19 it with you?

20 A   No, he didn't.

21 Q   To your knowledge, did that stop him from asking

22 for it?

23 A   No, it did not stop him.

24 Q   Had you told Defendant Blagojevich that naming

25 J.B. Pritzker to the Senate Seat in relation to

1  getting funding for a 501(c)(4) would be hard to do?

2  A  Yes, I --

3        MR. GOLDSTEIN:  Objection.

4        THE COURT:  Overruled.

5  BY MR. SCHAR:

6  Q  Was your answer yes?

7  A  Yes, I told him it would be hard to do.

8  Q  Did that stop him from talking about it?

9  A  No.

10 Q  What was your understanding as to whether you

11 were going to be able to dissuade Defendant

12 Blagojevich from doing what he wanted with the

13 senate seat?

14 A  I strongly believed I would not.

15 Q  Did you think that you were being asked for your

16 advice in these discussions?

17 A  No, I really didn't.

18 Q  At some point did you make a decision as to how

19 you were going to handle this situation?

20 A  Yes, I did.

21 Q  What did you decide to do?

22 A  I decided that given what I had done previously

23 and that hadn't changed his mind, that I was going

24 to not oppose him and listen and essentially tell

25 him what he wanted to hear.

1  Q   Was it your understanding, Mr. Scofield, from

2  your phone calls with Defendant Blagojevich that

3  Bill Knapp had told Defendant Blagojevich he should

4  name Valerie Jarrett to the Senate Seat and hope for

:59AM  5  goodwill?

6  A   Yes, it was.

7  Q   What did Defendant Blagojevich call Bill Knapp

8  after Bill Knapp had provided that advise to you?

9  A   He called him a quisling.

:59AM  10  Q   What is a quisling?

11  A   Someone who is a traitor, a collaborator to be

12  more specific.  Someone who is disloyal.

13  Q   From your perspective, in terms of being able to

14  help your client and yourself, did you think,

:00AM  15  Mr. Scofield, you could have the Governor of the

16  State of Illinois think of you as a traitor?

17  A   No, I didn't.

18  Q   You were asked some questions as to whether or

19  not you were an adviser.  Did Defendant Blagojevich

:00AM  20  talk to you about the Senate Seat around

21  November 13th?

22  A   Yes, he did.

23  Q   Was that approximately the same time Valerie

24  Jarrett took her name out of the running for the

:00AM  25  vacant Senate Seat?

1  A   Yes, it was about the same time.

2  Q   As of November 13th was that Senate Seat filled?

3  A   No, it wasn't.

4  Q   After November 13th, you basically did not talk

5  to Defendant Blagojevich again about the Senate

6  Seat?

7  A   I hardly talked to him at all.

8  Q   Was that because you were reaching out to him and

9  he wouldn't take your calls?

10  A   No.

11  Q   Was he reaching out to you?

12  A   No, he wasn't.

13  Q   He stopped?

14  A   Yes, that's right.

15  Q   With Valerie Jarrett taking her name off?

16  A   Yes.

17  Q   You were asked questions about a call which

18  Defendant Blagojevich stated:

19       "I've got this thing and it's f'ing golden

20        and I'm not, I'm just not giving it up for

21        f'ing nothing.

22      Do you remember that call?

23  A   Yes, I do.

24  Q   Right before that Defendant Blagojevich made a

25  joke about giving the Senate Seat to his nephew, do

Scofield - redirect by Schar                    3600

1   you remember that?

2   A   Yes, do.

3   Q   When Defendant Blagojevich stated "I've got this

4   thing and it's f'ing golden and I'm just not giving

:01AM   5   it up for f'ing nothing," Mr. Scofield, did you

6   think he was joking?

7   A   No, I didn't think he was joking.

8   Q   What did you understand he was saying to you?

9   A   I understood him to be saying that he thought his

:01AM   10  ability to appoint a senator was valuable, golden,

11  and that he was not going to surrender that valuable

12  thing without receiving something for his personal

13  benefit in return for making the appointment.

14  Q   Sir, was there anything you found about this

:01AM   15  situation that was a joke?

16          MR. GOLDSTEIN:  Objection.

17          THE COURT:  Sustained to the form.

18  BY MR. SCHAR:

19  Q   Did you take this situation very seriously?

:02AM   20  A   Yes, sir, I did.

21          MR. SCHAR:  Nothing further, Judge.

22          THE COURT:  Recross.

23

24

:02AM   25

1                    RECROSS EXAMINATION

2   BY MR. GOLDSTEIN:

3   Q   Good morning, Mr. Scofield.

4   A   Good morning, sir.

5   Q   You were asked questions about J.B. Pritzker.

6   Were you aware that the Governor spoke to J.B.

7   Pritzker about the Madigan deal November 6th and

8   November 14th?

9   A   Well I was he told me that, yes.  He told me

10  that, yes, sir.

11  Q   You don't have personal knowledge whether he did

12  or didn't?

13  A   Of whether he spoke with J.B. Pritzker?

14  Q   Correct.

15  A   No, I have no personal knowledge whether he did.

16  Q   Okay.

17          Now, you said that you felt it necessary to

18  return the call to the Governor of the State of

19  Illinois, is that correct?

20  A   Yeah.

21  Q   In 2003, after 3 months of being Deputy Governor,

22  you chose to quit, is that correct?

23  A   I chose to leave when the circumstances became a

24  little more complicated.  I was willing to stay and

25  then I was told I could go, but yes, I left around

1  3 months.

2  Q   And you chose not only to quit your job as Deputy

3  Governor for the State of Illinois, you then lost

4  contact with Governor Blagojevich for 2 years, is

:03AM    5  that correct?

6  A   Most personal contact, yes.

7  Q   And you did that all on your own?

8  A   Yes, sir, I did.

9  Q   You didn't feel threatened that you had to talk

:03AM    10  to him for those 2 years, did you?

11  A   I -- I don't believe he called during those

12  2 years.

13  Q   And you didn't feel pressured in any way, did

14  you?

:03AM    15  A   I'm not sure I understand.  Pressured to do what?

16  Q   Pressure to stay in 2003.  You left.

17  A   It was a difficult decision.

18  Q   It was a difficult decision.

19  A   Yes.

:04AM    20  Q   You jumped out on your own in 2003?

21       MR. SCHAR:  Objection.

22       THE COURT:  I believe that's been asked and

23  answered.  That objection is sustained.

24  BY MR. GOLDSTEIN:

:04AM    25  Q   Mr. Scofield, you talked about discussions in

1  which Governor Blagojevich discussed appointing
2  himself to the Senate Seat, do you recall that?
3  A   Yes.
4  Q   And you said you disagreed with him, is that
5  correct?
6  A   That's correct.
7  Q   And you listened to all the calls you had with
8  Governor Blagojevich, is that correct?
9  A   Yes, I believe so.
10 Q   And some of those calls have not been played for
11 the jury, to your knowledge, is that correct?
12        MR. SCHAR:  Objection.
13        THE COURT:  The objection is sustained.
14 BY MR. GOLDSTEIN:
15 Q   Do you recall any calls where this conversation
16 about disagreeing about appointing himself was
17 discussed that you listened to?
18 A   Yes, I do.
19 Q   Okay.  And Governor Blagojevich continued to talk
20 to you, is that correct?
21 A   Yes, that's correct.
22 Q   Was he yelling at you when he disagreed?
23 A   I don't recall if he was yelling.  I recall he
24 was frustrated.
25 Q   At what date did you decide to say:  You know

1  what, I'm just going to agree with him from now on?
2  What date did that occur?
3  A  I don't recall that I recall a date.  I told him
4  early on that I didn't believe he was going to be
5  appointed to the Cabinet and that didn't change his
6  interest in being in the Cabinet, so it would have
7  been around that time.
8  Q  Around that time?  Around the time in which you
9  told him that?
10  A  No, I'd say the days following when it was clear
11  to me that his interest was not diminished, or that
12  my opinion had not changed his interest.
13  Q  As I understand, your decision was to just agree
14  with everything?
15  A  No, I didn't say that.
16  Q  Was your decision also to encourage Governor
17  Blagojevich?
18          MR. SCHAR:  Objection.
19          THE COURT:  The objection is sustained.
20  BY MR. GOLDSTEIN:
21  Q  Mr. Scofield, you said you took this seriously,
22  is that correct?
23  A  Yes, sir.
24  Q  When the government asked you if you took it
25  seriously and you said yes, what did you mean by

1  that?

2  A   To me "did you take it seriously" is a

3  straightforward question.  I thought it was

4  something that was a serious matter.

:06AM  5  Q   This is a serious matter the discussions you had

6  with Rod Blagojevich?

7  A   Yes, I think that's fair.

8  Q   Is that correct?

9  A   Yes.

:06AM  10  Q   And during those 10 days in which you spoke

11  around 20 times, you didn't stop conversations,

12  correct?

13  A   I'm not sure I know what you mean by stop

14  conversations.

:06AM  15  Q   You didn't cut off conversations, you didn't say

16  "I gotta go," did you?

17  A   Well, I think there were times that I said I had

18  to go or tried to cut the conversation short --

19  Q   You continued to call?

:07AM  20       MR. SCHAR:  Objection.  If he could finish.

21  BY MR. GOLDSTEIN:

22  Q   I apologize.  Please finish your answer.

23  A   There were certainly times that I tried to cut

24  conversations short.  It's very difficult to do with

:07AM  25  him.

1 Q   And as serious as you took it, you continued to
2 make appointments between Tom Balanoff and Rod
3 Blagojevich?
4 A   Well, I'm not sure what you mean by "continued."
5 I helped to make two appointments; they were early
6 on.
7 Q   You helped Rod Blagojevich in this trade that you
8 took seriously.
9        MR. SCHAR:  Objection, Judge.
10        THE COURT:  Sustained.
11 BY MR. GOLDSTEIN:
12 Q   Did you help Rod Blagojevich in his efforts?
13        MR. SCHAR:  Objection.
14        THE COURT:  Sustained.
15        MR. GOLDSTEIN:  Nothing further.  Thank you,
16 Your Honor.
17        THE COURT:  Further redirect?
18        MR. SCHAR:  No.
19        THE COURT:  You may step down.
20     (Witness excused.)
21     THE COURT:  Next witness?
22        MR. SCHAR:  David Keahl.
23        THE COURT:  Face me and raise your right
24 hand.
25     (Witness duly sworn.)

:07AM
:07AM
:08AM
:08AM
:08AM

1          THE COURT:  Please be seated.
2          DAVID KEAHL, GOVERNMENT WITNESS, SWORN
3                DIRECT EXAMINATION
4    BY MR. SCHAR:
5    Q   Sir, could you please state your name and spell
6    your name for the record.
7    A   David Keahl, that's D-a-v-i-d K-e-a-h-l.
8    Q   Where are you currently employed?
9    A   State of Illinois, Office of the Executive
10   Inspector General.
11   Q   What is the Office of the Executive Inspector
12   General?
13   A   It's an independent state agency whose primary
14   purpose is to investigate misconduct by the state
15   employees under its jurisdiction.
16   Q   How long have you been employed there?
17   A   Since October of 2003.
18   Q   What job do you currently have with the Office of
19   the Executive Inspector General?
20   A   I'm the director of ethics training and
21   compliance.
22   Q   What are your job responsibilities as director of
23   Ethics Training and Compliance?
24   A   I oversee an state mandated ethics training
25   program for the employees under our jurisdiction.

Keahl - direct by Schar                    3608

1  Q   Do you have any involvement with actually
2  investigating allegations that are made to the
3  office --
4  A   No.
5  Q   -- of the Inspector General?
6  A   No, I do not.
7  Q   What type of ethics training -- what are the
8  requirements of ethics training?
9  A   The basic requirements are that state employees
10 participate in the training on an annual basis and
11 our office sets the standards for that training.
12 Q   Who is supposed to take the ethics training?
13 A   All state employees under our jurisdiction, as
14 well as constitutional officers and appointees.
15 Q   Is this training that came about due to the State
16 Officials and Employees Ethics Act?
17 A   Currently yes, that's true.
18 Q   Who signed that act?
19 A   Governor Blagojevich.
20 Q   How is the ethics training administered?
21 A   Most state employees participate in an Internet
22 based program.  So they log in using their computer
23 and complete a, roughly, 80 to 100 screen program.
24 Q   What type of information is typically presented
25 through the on-line computer training?

Keahl - direct by Schar                          3609

1  A   Lessons about ethics related laws, such as the

2  prohibitions applied to state employees relative to

3  certain political activities while they're being

4  paid by the state; prohibitions that prohibit state

:11AM   5  employees from accepting certain gifts related to

6  their official duties; and other things such as

7  official misconduct and bribery.

8  Q   Do you track who his taking the ethics training?

9  A   We do.

:11AM   10  Q   How do you do that?

11  A   Again, for those employees that take the training

12  on-line, it's an automated system based on an

13  individual log-in I.D. and password that was

14  assigned to the employee.  When they complete the

:12AM   15  lesson materials on-line, that system automatically

16  records their participation.

17  Q   In relation to the case now on trial, Mr. Keahl,

18  were you asked to review records to determine

19  whether Defendant Rod Blagojevich took the ethics

:12AM   20  training in each year from 2004 to 2008?

21  A   I was.

22  Q   What did you determine?

23  A   He did.

24        MR. SCHAR:  Judge, may I approach?

:12AM   25        THE COURT:  You may.

1  BY MR. SCHAR:

2  Q   Mr. Keahl, I show you what's been marked
3  Government Exhibit Ethics Training Summary and
4  Government Exhibit 2004 Ethics Training and ask you
:12AM  5  if you recognize those two exhibits?

6  A   I do.

7  Q   Is one of those charts a summary chart that your
8  office put together in relation to the yearly ethics
9  training for Defendant Rod Blagojevich?

:13AM  10  A   It is.

11  Q   The other is the ethics training that was
12  actually given in 2004?

13  A   It is.

14       MR. SCHAR:  Judge, we move each of those
:13AM  15  exhibits into evidence, Government Exhibit 2004
16  Ethics Training and Government Exhibit Ethics
17  Training Summary.

18       MR. GOLDSTEIN:  We restate our objection.

19       THE COURT:  Sure.  It's overruled.

:13AM  20     (Government's Exhibit 2004 Ethics Training
21      and Government Exhibit Ethics Training
22      Summary were received in evidence.)

23       MR. SCHAR:  Permission to publish Government
24  Exhibit Ethics Training Summary, Judge.

:13AM  25       THE COURT:  You may.

                        Keahl - direct by Schar                3611

1        (Exhibit published to the jury.)
2    BY MR. SCHAR:
3    Q   I know it's difficult to read, Mr. Keahl, perhaps
4    you can just -- I'm just going to ask you some
5    questions about it.
6            THE COURT:  Turn the lights down.  Maybe that
7    will help, maybe it won't.
8    BY MR. SCHAR:
9    Q   That's the left-hand portion of the summary chart
10   which you have, Mr. Keahl, is that fair to say?
11   A   Yes, it is.
12   Q   And what are the dates on the left side?
13   A   The years in which the training was conducted.
14   Q   So 2004, 2005, 2006, 2007 and 2008?
15   A   That is correct.
16   Q   This is a summary chart for whom in terms of
17   taking the training?
18   A   Rod Blagojevich.
19   Q   And does that indicate the date on which
20   Defendant Blagojevich took the ethics training each
21   year and the amount of time that was spent on the
22   ethics training for each of those years, the first
23   being at the top 2004, and 2005, 2006, 2007 and at
24   the bottom 2008?
25   A   That is correct.

Keahl - direct by Schar                          3612

1        MR. SCHAR:  Judge, permission to publish
2   Government Exhibit Ethics Training 2004.
3        THE COURT:  Leave is granted.
4      (Exhibit published to the jury.)
5   BY MR. SCHAR:
6   Q   I believe you have that document in front of you,
7   Mr. Keahl, but is this the ethics training that was
8   given to state employees in 2004?
9   A   Yes.
10  Q   Including Defendant Rod Blagojevich?
11  A   Yes.
12  Q   By way of background, is this a printout of the
13  actual on-line computer training?
14  A   It's a printout of the text that would appear on
15  the on-line program, yes.
16  Q   So it's a paper document indicating what was
17  provided on-line to Defendant Blagojevich?
18  A   That is correct.
19  Q   I want to direct your attention now to the table
20  of context on Page 3.
21        And is this just an overview of the training
22  that was provided in 2004 to Defendant Blagojevich
23  through the on-line ethics program?
24  A   Yes, it is.
25  Q   There's a section about accepting gifts and

Keahl - direct by Schar                3613

1  attending events, participating in criminal
2  activities, there's a section on more laws and
3  compliance, including, among others, bribery,
4  official misconduct, and conflicts of interest?
5  A   That is correct.
6  Q   At the bottom of the page --
7          MR. SOROSKY:  Your Honor, Your Honor, could
8  we have a sidebar for one moment?
9          THE COURT:  This is the one you want?
10         MR. SOROSKY:  This is the one.
11         THE COURT:  Sure.
12      (Proceedings heard at sidebar on the
13       record.)
14         MR. SOROSKY:  Judge, it would seem the
15  defendant's position that even if Blagojevich
16  violated certain ethics rules under the Skilling
17  decision now, under the old law perhaps violating
18  ethics rules can be some proof and some evidence of
19  deprivation of honest services, but under the new
20  law now as come down by Skilling, conceivably one
21  could violate certain ethics rules and it may not be
22  a violation of bribery.  So I don't know what
23  purpose any of this has.
24         THE COURT:  Well, you have two choices here:
25  Number one, I can tell the jury what may be a

1  violation of state regulations, it's not necessarily
2  a violation of federal law, which is what I intended
3  to do.
4        In the alternative, we can take the jury out,
5  we can have them revise the exhibits that only shows
6  training with respect to bribery and kickbacks,
7  which maybe is not the best thing for your client.
8  It's better to tell them it's a general ethics
9  training and tell them not all breaches of ethics
10 are necessarily violations of law.
11        MR. SCHAR:  And, Judge, let me just add, the
12 proof is not trying to coincide with the elements of
13 the ultimate instructions.  Obviously, you're going
14 to deal with it and we're all going to abide by the
15 Skilling decision.  But clearly, abundantly clearly,
16 one of the defenses here is that somehow I didn't
17 know what I was doing was wrong, I had all these
18 really smart people around me, and how was I
19 supposed to figure out that trading X for Y in terms
20 of getting personal benefit would have been improper
21 to do.
22        In fact, this training demonstrates in 2004
23 he was instructed that you can't do largely what he
24 was doing and that you can't put family and other
25 things ahead of the State of Illinois.

1         So, generally, the relevant time surges, but

2    it's more relevant to rebutting what's clearly been

3    a defense that's been presented which is somehow he

4    was adrift without knowing exactly what it is that

5    was wrong.

6         MR. SOROSKY:  Well, first we take the

7    position that this is completely inadmissible

8    because what the government is attempting to do is

9    to show the jury that there's a certain ethical

10   standard, that the defendant violated that ethical

11   standard, and so therefore he must be guilty of

12   something.

13        The defendant is only guilty of something if

14   he violates this criminal statute, He's not guilty

15   of something if he violates the ethical standard.

16   And, therefore, this is highly prejudicial and the

17   prejudice is so great it outweighs any probative

18   value.

19        And perhaps, perhaps, this may have been

20   admissible under the old honest services law, but it

21   is absolutely, I believe, inadmissible under the new

22   interpretation of honest services under the Skilling

23   decision because under that decision honest services

24   becomes the bribery and one could conceivably

25   violate all sorts of ethics rules and also not

 1  commit bribery.
 2        On the other hand, I would certainly
 3  acknowledge if you commit bribery you also violate
 4  ethics rules, but it is highly prejudicial to show
 5  that he violated ethics rules because the jury is
 6  going to think well, if he violated ethics rules,
 7  he's obviously guilty.  And there isn't any
 8  instruction Your Honor can give, no matter how sage
 9  and wise that instruction may be, which would remove
10  that taint from the jury's mind that he violated the
11  ethics rules.  It is almost like saying he violated
12  another law and so therefore he's guilty of the
13  charge he's on trial for.
14        THE COURT:  I heard the opening statement,
15  once I heard the opening statement the validity of
16  that objection--which I don't accept because I
17  believe the jury will follow instructions--once that
18  opening statement is made, once the tenor of the
19  questions asked has been revealed to this jury, it
20  is quite clear that this is admissible because it's
21  quite clear his theme is he didn't know what he was
22  doing, that he was misled, and this is something
23  that a jury might be able to say is informative on
24  what he did know and whether he was capable of being
25  misled by his various, according to the opening

1  statements, ill-chosen assistants.

2          The objection is overruled.

3          MR. SOROSKY:  One last question.

4          Now, for the record, of course, we object.

5          THE COURT:  Yeah.

6          MR. SOROSKY:  Now, what are our two choices

7  after this?

8          THE COURT:  Well, what you can do is you can

9  have them excise everything that deals with general

10 stuff not related to bribery and kickbacks, but the

11 difficulty with that from your point of view is is

12 it looks like he received specific training dealing

13 only with bribery and kickbacks which makes it much

14 worse for you.

15         MR. SOROSKY:  I understand.

16         And then when would Your Honor give your

17 cautionary instruction?  Right after this witness

18 testifies?

19         THE COURT:  Probably right after the witness

20 testifies, depending on the nature of the cross

21 because you're going to have to have a decision as

22 to whether you cross at all.

23         MR. SOROSKY:  Correct.

24         THE COURT:  But it'll be right away.  I will

25 not be waiting until the end.

1      MR. SOROSKY:  Thank you.

2        (Proceedings resumed within the hearing of

3         the jury.)

4          MR. SCHAR:  May I proceed, Judge?

5          THE COURT:  You may proceed.

6          MR. SCHAR:  Thank you.

7  BY MR. SCHAR:

8  Q   Mr. Keahl, at the bottom of the page there is a

9  date stamp that indicates July 27th, 2006.  Could

10 you just explain why the date is off from 2004?

11 A   That's simply the date on which this copy of the

12 training was downloaded from the training system.

13 Q   And it is just put on the date stamp from that

14 particular date?

15 A   That is correct.

16 Q   But it is a 2004 training?

17 A   It is, in fact.

18 Q   Let's just direct your attention now to Page 4.

19      Can you just read the introduction to this

20 training for us.

21 A   (Reading:)

22     "... Dear State Employee, you and I carry a

23      vital responsibility, protecting the

24      public trust.  To earn that trust, we must

25      live up to the highest possible ethical

Keahl - direct by Schar                                    3619

1    standards in everything we do.  To teach
2    you the rules and give you the tools you
3    need, my office, working with the Office
4    of the Executive Inspector General, has
5    created the Ethics Training Program.  I am
6    taking this training and it is mandatory
7    for all state employees."
8  Q   Move on to the next page.  If you could move the
9  microphone a little closer to you.  We could hear
10 you a little better.  Thank you.
11        For the record, Page 5 of the training.  Go
12 ahead, Mr. Keahl, if you could read this to us.
13 A   (Reading:)
14    "... when I became Governor of this great
15    state, one of my most urgent goals was to
16    return honor to public service and restore
17    citizens' trust in their government.  In
18    2003 we passed the strongest and most
19    thorough ethics legislation in the history
20    of Illinois.  With this training, you and
21    I have another opportunity to build our
22    knowledge of our ethical responsibilities.
23    Thank you for your service to the people
24    of Illinois.  Sincerely, Governor Rod R.
25    Blagojevich."

1  Q   I'd like to direct your attention now to Page 8.
2        If you could read that.
3  A   (Reading:)
4        "... never forget that, as a state worker,
5         you have the public's trust.  To keep that
6         trust, you must follow our state's ethics
7         rules.  By following the rules, you are
8         also following the law.  If you break
9         these rules, you will pay a price.  You
10        can lose your job and you can go to jail."
11 Q   Directing your attention now to Page 10.
12        Please read that, Mr. Keahl.
13 A   (Reading:)
14        "... I'm already an ethical person, why do
15        I need to take this training?
16       Because the old way of doing things isn't
17        good enough.  Just because something has
18        been done in the past doesn't mean that it
19        is right.  This training tells you what we
20        expect of you now and going forward."
21 Q   I'd like to move ahead now to Page 62, a section
22 that deals with more laws and compliance.
23        Mr. Keahl, if you could just read for us the
24 sections that's addressed as part of this on-line
25 ethics training.

Keahl - direct by Schar                          3621

1  A  (Reading:)
2      "... in this lesson you will learn about
3      bribery, solicitation misconduct, official
4      misconduct and penalties for it, conflicts
5      of interest, how our ethics compliance
6      program works."
7  Q  I'd like to move ahead now to Page 66.
8          Go ahead and read that for us, Mr. Keahl.
9  A  (Reading)
10     "... bribery:  For example, you could lose
11     your job for failing to report a case of
12     bribery.  Bribery is when a state official
13     or employee asks for or accepts something
14     of value, like money or free roofing
15     services, in exchange for taking or not
16     taking (Or convincing someone else to take
17     or not take) an official action.  For
18     example, a state trooper who takes money
19     in exchange for not giving a speeding
20     ticket is accepting a bribe.  Bribery is a
21     Class II felony.  If you take a bribe, you
22     could go to jail.  You could also get in
23     trouble for failing to report a bribe,
24     since this is also a crime."
25 Q  Page 68, the next page, Mr. Keahl.

1          Is this one of the true and false questions
2    that you had previously testified were
3    periodically in this training?
4    A   Yes, it is, one of those questions.
5    Q   Could you read Page 68 for us.
6    A   (Reading).
7         "Bribery:  Anita is an inspector with the
8          state agency that licenses businesses to
9          sell liquor.  During an inspection of
10         Rosy's Pub, she finds numerous violations:
11         Unsanitary beer taps, not posting a state
12         liquor license, and more.  Mark, the
13         manger of Rosy's, tells her she'll have an
14         unlimited bar tab there for as long as she
15         likes if she can make the citations for
16         those violations disappear.  The manger
17         didn't offer her cash, so this can't be
18         bribery:  True or false?"
19   Q   The next page, Page 69, Mr. Keahl.
20   A   (Reading:)
21        "Correct answer:  False.  Bribery is when a
22         state official or employee accepts
23         something of value for a personal
24         advantage, such as an unlimited free bar
25         drink, in exchange for taking some

:29AM
:29AM
:29AM
:30AM
:30AM

Keahl - direct by Schar                3623

1    official action.  Bribery doesn't have to
2    involve cash.  Mark is committing bribery
3    just by making this offer.  Anita will
4    also be committing bribery if she accepts
:30AM    5    it."
6  Q   I want to move ahead now to Page 76.
7        If you could read this section for us, Mr.
8  Keahl.
9  A   (Reading:)
:30AM    10     "Official misconduct and penlites:  It is
11     also official misconduct to do something
12     you're not authorized to do to benefit
13     yourself.  For example, if you let a car
14     dealer know you work for the Governor's
:31AM    15     Office in order to get a better deal.  Ask
16     for or accept money, or something else of
17     value in exchange for doing a favor."
18  Q   Moving ahead to Page 77.
19        Read the section on conflicts of interest,
:31AM    20  Mr. Keahl.
21  A   (Reading:)
22     "Conflicts of interest:  Finally, you need
23      to avoid conflicts of interest.  A
24      conflict of interest is when your own
:31AM    25      interests conflict with the interests of

1      the state.  A conflict of interest could

2      lead you to put your own interests before

3      your duties to the state, or at least make

4      it look that way to the public.  Think of

5      Lola whose brother, Daniel, is a partner

6      in a construction firm that's up for a

7      state contract.  Lola works for the agency

8      that will award the contract.  She has a

9      conflict of interest.  If the state

10     chooses Lola's brother's firm, even if

11     it's because it's the best firm for the

12     job, it could look like Lola did them a

13     special favor.  Lola should report her

14     conflict of interest to her agency's

15     ethics officer or to the office of the

16     Executive Inspector General who can help

17     her decide what to do."

18  Q   Moving ahead to Page 81 -- I'm sorry, 78.  Sorry

19  Mr. Keahl, 78.  If you would read that.

20  A   (Reading:)

21     "Top 10, number 9:  If you even think you

22     have a conflict of interest, report it.  A

23     conflict of interest is any situation

24     where it could look like you put your own

25     personal interest before your obligation

Keahl - direct by Schar                    3625

1      to the state.  If you're not sure whether
2      a situation involves a conflict of
3      interest, ask your agency's ethics
4      officer."
5  Q  Page 81 now, at the bottom portion.
6        Beginning with the sentence "you need,"
7  Mr. Keahl, if you could.
8  A  (Reading:)
9       "You need to be careful about actual
10       conflicts of interest and apparent ones.
11       If people think you're in a position to
12       put your own or your family's interests
13       ahead of the state's, that's bad enough.
14       If you have an actual or potential
15       conflict of interest, contact your
16       agency's ethics officer or the Office of
17       Executive Inspector General for guidance
18       on what to do.
19  Q  Finally, Page 82, if you could read that for us,
20  sir.
21  A  (Reading:)
22       "The State of Illinois Ethics Program:  As
23        you've learned in this course, reporting
24        ethical and legal violations is your
25        responsibility.  We have the public's

Keahl - cross by S. Adam, Jr.                    3626

1      trust.  We must earn it again and again by

2      being ethical, by following the law, and

3      by reporting it when others don't.  Report

4      any violation you become aware of to your

5      agency's ethics officer or to the office

6      of executive Inspector General.  You can

7      reach the office of the Executive

8      Inspector General by calling its hot line

9      number (866) 814-1113.

10 Q   Mr. Keahl, while the training in each year change

11 from time to time, is the concept effectively the

12 same?

13 A   The general concepts, yes.

14      MR. SCHAR:  I have nothing else, Judge.

15                CROSS EXAMINATION

16 BY MR. S. ADAM, JR.:

17 Q   Good morning, sir.

18 A   Good morning.

19 Q   I just have a few questions for you.

20      How long have you been doing this training or

21 been the head of this training?

22 A   I've been involved in it since 2003.

23 Q   Now, you have told us that since 2003 all state

24 employees for the State of Illinois must take this

25 training, is that correct?

1  A   I believe what I said was all state employees
2  under our office's jurisdiction.
3  Q   And can you tell us what your jurisdiction is?
4  A   It applies to executive branch employees that
5  fall under the Governor's Office and Lieutenant
6  Governor's Office and state public universities.
7  Q   We've heard a little bit today about the ethics
8  officer for a particular branch or part of the
9  executive branch.  Who is the state's ethics officer
10 for the Office of the Governor?
11 A   Currently it's a member of the Governor's legal
12 staff.
13 Q   Back in 2003, 2004, 2005, 2006, do you know who
14 that ethics officer was?
15 A   To the best of my recollection it was also a
16 member of the Governor's legal staff.
17 Q   And when you say legal staff, would that be the
18 general counsel to the Governor?
19 A   Yes.
20 Q   In 2005 the legal counsel for the Governor was a
21 person by the name of Bill Quinlan, is that correct?
22 A   To the best of my recollection.
23 Q   And 2006, as well, is that right?
24 A   To the best of my recollection.
25 Q   And I won't belabor it, 2007 and '8, is that

:35AM
:35AM
:35AM
:35AM
:35AM
:36AM

1  fair?

2  A   Again, to the best of my recollection, yeah.

3  Q   And Bill Quinlan was a lawyer.  Of course, he

4  would be general counsel, is that fair?

5  A   I believe that to be the case.

6  Q   One of the things that you just brought out today

7  was that if you had any questions regarding whether

8  something is ethical or not, you go and ask

9  questions of that ethics officer; true?

10 A   Yes, we encourage employees to do that.

11 Q   That's the whole point to the training is, that

12 you don't want crimes to take place at all, correct?

13 A   That is correct.

14 Q   And that if you have any questions, you should go

15 to either a supervisor, is that fair?

16 A   I think that's probably good advice.  I would

17 think an ethics officer might be better.

18 Q   Or the ethics officer, is that right?

19 A   That's correct.

20 Q   As you just said, the best person to go to for

21 advice on whether something was right or wrong, if

22 you didn't know, would be Bill Quinlan, correct?

23        MR. SCHAR:  Objection, Judge.

24        THE COURT:  The objection is sustained.

25 BY MR. S. ADAM, JR.:

Keahl - cross by S. Adam, Jr.                3629

1  Q   Well, you have shown us a package here today.
2  The very last question on this packet is question
3  10, is that true?
4  A   Let me look at the packet.
5      (Brief pause).
6  BY THE WITNESS:
7  A   Yes.
8          MR. S. ADAM, JR.:  May I publish that to the
9  jury, Your Honor?
10         THE COURT:  Sure.
11         MR. S. ADAM, JR.:  Thank you.
12     (Exhibit published to the jury.)
13         THE COURT:  You want the lights dimmed?
14         MR. S. ADAM, JR.:  It won't be that long.
15 BY MR. S. ADAM, JR.:
16 Q   Question 10, the last question asks:
17     "Who can you contact with questions about
18      ethics or state law or to report a
19      possible violation?"
20     Correct?  That is the correct?
21 A   That is correct.
22 Q   (Reading:)
23     "A, your supervisor.  B, your agency's
24      ethics officer.  C, the Office of the
25      Executive Inspector General.  D, all of

:37AM
:37AM
:38AM
:38AM
:38AM

Keahl - cross by S. Adam, Jr.                3630

1      the above."

2     Correct?

3  A   Correct.

4  Q   And the answer there is D, is that right?

5  A   That is correct.

6  Q   Report it to all of them if you have any

7  questions, true?

8  A   That is correct.

9  Q   Now, the Governor of the State of Illinois, who

10  is his supervisor?

11          MR. SCHAR:  Objection.

12          THE COURT:  The objection is sustained.

13  BY MR. S. ADAM, JR.:

14  Q   Well, the Governor of the State of Illinois, as

15  you have told us, his agency's ethics officer is

16  Bill Quinlan, true?

17          MR. SCHAR:  Objection.

18          THE COURT:  You know, it's a little

19  repetitive.

20          MR. S. ADAM, JR.:  Yes, Your Honor.  Yes,

21  Your Honor.  Yes, Your Honor.

22  BY MR. S. ADAM, JR.:

23  Q   At any time that you know of, Bill -- or the

24  office of the General Counsel to the Governor, they

25  were required to take these tests as well, correct?

Keahl - cross by S. Adam, Jr.                    3631

1  A   That is correct.
2  Q   And you know Bill Quinlan took these tests as
3  well, don't you?
4  A   I believe he did.
:39AM   5  Q   And he passed them, isn't that correct, sir?
6          MR. SCHAR:  Objection.
7          THE COURT:  The objection is sustained.
8          MR. S. ADAM, JR.:  May I have one moment?
9          THE COURT:  Sure.
:39AM  10      (Brief pause).
11  BY MR. S. ADAM, JR.:
12  Q   I got my marching orders.
13          You've been doing this since 2003 up to the
14  present day, correct?
:40AM  15  A   That is correct.
16  Q   One of the things that I believe you've told us
17  on your direct examination was, that if someone sees
18  or knows about a crime taking place, such as
19  bribery, they must report it, is that fair?
:40AM  20  A   That is correct.
21  Q   And if someone were to report it, would you know
22  whether something was reported or not, in your job?
23  A   I would not.
24  Q   You would not.
:40AM  25          Who would know that?  Where would someone get

Schindler - direct by Schar                    3632

1  that information?

2         MR. SCHAR:  Objection.

3         THE COURT:  The objection is sustained.

4  BY MR. S. ADAM, JR.:

5  Q   Can you tell us where the reporting must be made?

6         MR. SCHAR:  Objection.

7         THE COURT:  The objection is sustained.

8  You're way outside the scope.

9         MR. S. ADAM, JR.:  Yes, Your Honor.  Yes,

10 Your Honor.

11        I've nothing further.

12        THE COURT:  Any redirect?

13        MR. SCHAR:  No redirect.

14        THE COURT:  You may step down.

15     (Witness excused.)

16     MR. SCHAR:  Judge, the government recalls

17      Agent Shari Schindler.

18        MR. SOROSKY:  Your Honor, are you going to

19 give the instruction?

20        THE COURT:  Yeah.

21     (Brief pause).

22        THE COURT:  Do you understand you're still

23 under oath?

24        THE WITNESS:  I do.

25        THE COURT:  If we would pause for a moment.

:40AM

:41AM

:41AM

:41AM

:41AM

Schindler - direct by Schar                          3633

1          Members of the jury, you've just heard a
2   witness testify about ethics training for the State
3   of Illinois.  During the course of that, he talked
4   about and gave you examples of questions regarding
5   bribery, conflict of interests, and similar things.
6          You should understand that under Illinois
7   law, a regulation, even a statute, covering subjects
8   like this are not necessarily the same as the
9   federal law.
10         In my instructions at the end of the case I
11  am going to define to you what is unlawful under
12  federal criminal law and those definitions are the
13  ones that count in this case.  The definitions and
14  examples given in the testimony you've just heard
15  are not necessarily the standards you will apply
16  when reaching your verdict and you should not treat
17  them as binding statements of federal law applicable
18  here.
19         With that instruction, you may proceed.
20         MR. SCHAR:  Thank you, Judge.
21         Judge, we have a number of documents that
22  we'd like to put into evidence in relation to
23  Ms. Schindler.  They're all certified, but for the
24  record I do need to describe the Government
25  Exhibits, if I may have permission to do that now.

1        THE COURT:  You may.

2        MR. SCHAR:  Government Exhibit $12,000

3  checks, Government Exhibit 12/17/02 check,

4  Government Exhibit 8/27/02 check, Government

5  Exhibit 12/17/02 wire, Government Exhibit 2002

6  Blagojevich Tax Return, Government Exhibit 2003

7  Blagojevich Tax Return, Government Exhibit 2004

8  Blagojevich Tax Return, Government Exhibit 2005

9  Blagojevich Tax Return, Government Exhibit 2006

10 Blagojevich Tax Return, Government Exhibit 2007

11 Blagojevich Tax Return, Government Exhibit 2008

12 Blagojevich Tax Return, Government Exhibit 2002

13 Blagojevich IRS Transcript, Government Exhibit 2003

14 River Realty Tax Return, Government Exhibit 2004

15 River Realty Tax Return, Government Exhibit 1/21/04

16 Check, Government Exhibit 1/22/04 Check, Government

17 Exhibit 1/23/04 Check, Government Exhibit American

18 Express 22006 Subgroup, Government Exhibit American

19 Express 61009 Subgroup, Government Exhibit American

20 Express 85000/86008 Subgroup, Government Exhibit

21 American Express 22006 Group, Government Exhibit

22 American Express 61009 Group, Government Exhibit

23 American Express 73006/74004 Group, and finally

24 American Express 8500/86008 Group.

25        We move all those into evidence, Judge.

1      THE COURT:  Admitted.

2     (Government Exhibit $12,000 checks,

3      Government Exhibit 12/17/02 check,

4      Government Exhibit 8/27/02 check,

5      Government Exhibit 12/17/02 wire,

6      Government Exhibit 2002 Blagojevich Tax

7      Return, Government Exhibit 2003

8      Blagojevich Tax Return, Government

9      Exhibit 2004 Blagojevich Tax Return,

10      Government Exhibit 2005 Blagojevich Tax

11      Return, Government Exhibit 2006

12      Blagojevich Tax Return, Government Exhibit

13      2007 Blagojevich Tax Return, Government

14      Exhibit 2008 Blagojevich Tax Return,

15      Government Exhibit 2002 Blagojevich IRS

16      Transcript, Government Exhibit 2003 River

17      Realty Tax Return, Government Exhibit 2004

18      River Realty Tax Return, Government

19      Exhibit 1/21/04 Check, Government

20      Exhibit 1/22/04 Check, Government

21      Exhibit 1/23/04 Check, Government Exhibit

22      American Express 22006 Subgroup,

23      Government Exhibit American Express 61009

24      Subgroup, Government Exhibit American

25      Express 85000/86008 Subgroup, Government

1      Exhibit American Express 22006 Group,

2      Government Exhibit American Express 61009

3      Group, Government Exhibit American Express

4      73006/74004 Group, and finally American

:45AM   5      Express 8500/86008 Group were received in

6      evidence.)

7          SHARI SCHINDLER, GOVERNMENT WITNESS,

8                 PREVIOUSLY SWORN

9                 DIRECT EXAMINATION

:43AM  10  BY MR. SCHAR:

11  Q   Agent Schindler, can you just remind us of what

12  position you hold.

13  A   I'm a revenue agent with the Internation Revenue

14  Service.

:45AM  15  Q   Briefly, what are your duties as a revenue agent?

16  A   A revenue agent's duties are to look at tax

17  returns, examine tax returns of the taxpayer's books

18  and records and determine if the tax is correct.

19  Q   And in that role are you familiar with many of

:45AM  20  the financial documents obtained in relation to this

21  case?

22  A   I am.

23  Q   You previously testified about several charts.

24      In relation to the case currently on trial,

:46AM  25  were you asked to produce additional charts, as

1  well?

2  A   Yes.

3          MR. SCHAR:  Judge, may I approach?

4          THE COURT:  You may.

5  BY MR. SCHAR:

6  Q   I'm going to show you, Agent Schindler, what is

7  marked as Government Exhibit Chart 4, Government

8  Exhibit Chart 5, Government Exhibit Chart 6,

9  Government Exhibit Chart 7, Government Exhibit Chart

10  8, Government Exhibit Chart 9, Government Exhibit

11  Chart 10, Government Exhibit Chart 11, Government

12  Exhibit Chart 12 and Government Exhibit Chart 13 and

13  ask you if you are familiar with those exhibits?

14  A   I am.  I prepared these.

15  Q   And do they, Agent Schindler, fairly and

16  accurately summarize certain records that were

17  obtained as part of the investigation?

18  A   Yes.

19          MR. SCHAR:  Judge, we move each of the

20  exhibits, Government Exhibit Chart 4 through and

21  including Chart 13 into evidence.

22          THE COURT:  Admitted.

23        (Government Exhibit Chart 4, Government

24         Exhibit Chart 5, Government Exhibit Chart

25         6, Government Exhibit Chart 7, Government

Schindler - direct by Schar                3638

1      Exhibit Chart 8, Government Exhibit Chart
2      9, Government Exhibit Chart 10, Government
3      Exhibit Chart 11, Government Exhibit Chart
4      12 and Government Exhibit Chart 13 were
5      received in evidence.)
6          MR. SCHAR:  Judge, move to publish Chart 4.
7    We do have chart binders which given what happened
8    last time in terms of it might be a little easier if
9    we could provide those to the jurors.
10         THE COURT:  Put a chart up, any chart.  Let
11   me see it.
12     (Brief pause).
13         THE COURT:  Okay, binders.
14         MR. SCHAR:  Judge, with your permission, I
15   will provide them to the marshal.
16         THE COURT:  Yeah.
17     (Brief pause).
18   BY MR. SCHAR:
19   Q   Directing your attention, Agent Schindler, to
20   Chart 4 which is in the binders as well.
21         If you could tell us, what is the title of
22   this Chart 4?
23   A   "Summary of Income Rod and Patricia Blagojevich
24   2002 to 2008."
25   Q   What is Chart 4?

1  A   This is a chart that summarizes their salaries
2  and other income that they earned during the years
3  2002 through 2008.
4  Q   What is the underlying basis for the chart that
5  you produced, Chart 4?
6  A   The tax returns and W-2's.
7  Q   What is a W-2?
8  A   A W-2 is a form that an employer gives to an
9  employee to tell them how much they earned during
10 the year.
11 Q   In terms of Defendant Rod Blagojevich's salary,
12 what was that salary from?
13 A   Well, in the early years, I think 2002 and '03,
14 it was from the House of Representatives and then it
15 turned into the State of Illinois.
16 Q   And in terms of Patricia Blagojevich's salary,
17 what was that derived from?
18 A   That was derived from River Realty, her
19 corporation, and an appraisal company.
20 Q   What about in 2008?
21 A   2008 it was from the Christian Industrial League.
22 Q   Below the salaries themselves is a line for other
23 income.  What is indicated by "other income"?
24 A   Other income would be any other income that is
25 reported on tax return, net.  So it would be any

:49AM

:50AM

:50AM

:50AM

:50AM

Schindler - direct by Schar                    3640

1  rental income, capital gains, capital losses,

2  investment income, interest, dividends, that type of

3  thing.

4  Q   When you say "rental income" is it net rental

5  income?

6  A   Yes, it would be net.  So on your tax return you

7  show your rental income and then you offset it with

8  your expenses, and so this would be the net of those

9  two.

10 Q   What about flow through profit from River Realty,

11 could you explain what that is?

12 A   River Realty is Patricia Blagojevich's

13 corporation and it's called an S corporation.  It's

14 a regular corporation, it's just a fancy tax term.

15 And the corporation itself doesn't pay tax, the

16 person who is the shareholder ends up paying tax on

17 any of the profits.  So you have to put the profits

18 on your tax return, which she did.

19 Q   Could you just go through each of years what the

20 total income was.

21 A   In 2002 it was $310,091.  2003, $243,468.  2004,

22 $392,392.  2005, $304,249.  2006, $284,819.  2007,

23 $238,920.  2008, $226,795.

24 Q   Is it fair to say it peaked in 2004?

25 A   Yes.

Schindler - direct by Schar                    3641

1  Q   And I direct your attention to Government Exhibit
2  Chart 5, also in the binders.
3        What's the title of this chart?
4  A   Rod and Patricia Blagojevich salaries for tax
5  returns 2002 through 2008.
6  Q   You say "salaries," what is not included in this
7  particular chart?
8  A   Well, the only thing included in this chart is
9  the salaries that they earned, the total amount of
10 money that they earned from employment.  So all of
11 the other income is not included here.
12 Q   That would flow through, interest, dividend, net
13 rental would not be included in this?
14 A   Right.
15 Q   Would you just explain to us what we're looking
16 at?
17 A   Well, the red line is a graph showing the amount
18 of Mr. Blagojevich's salary from 2002 through 2008,
19 and the blue line would be Patricia's income.
20 Q   And on the left-hand side, the vertical column,
21 is the amount of money and the bottom is the yearly
22 salary?
23 A   Right.
24 Q   Again, to indicate that the chart peaks in 2004
25 and declines thereafter?

Schindler - direct by Schar                    3642

1  A   Yes, for Patricia.

2  Q   Move on to Chart 6, Government Exhibit Chart 6

3  which is also in the binders.

4       What is the title of this chart?

5  A   Total income Rod and Patricia Blagojevich 2002

6  through 2008.

7  Q   Left side is the total amount of money through

8  income and the bottom is the yearly amount?

9  A   Correct.

10  Q   Again, what does the chart indicate, Agent

11  Schindler?

12  A   This shows total income and it shows that it

13  peaks in 2004 and then starts moving downward.

14  Q   Now, I'm going to refer you back to Chart 2 which

15  I think you testified about the first time that you

16  testified.

17       MR. SCHAR:  May I approach, Judge?

18  BY MR. SCHAR:

19  Q   I show you what's been marked Government Exhibit

20  Chart 2.

21  A   Thank you.

22  Q   Just for reference, can you note the date that

23  the $600,000 went from Robert Kjellander,

24  Springfield Consulting to Joe Aramanda?

25  A   October 2nd, 2003.

Schindler - direct by Schar                                    3643

1  Q   I want to move on now to Chart 7 in the binder.
2          What is the title of Chart 7?
3  A   Rezko Entities Checks to River Realty
4  January 1st, 2001 to December 9th, 2008.
5  Q   What did you review in order to produce this
6  chart?
7  A   I reviewed bank records of River Realty.
8  Q   What do the charts show?
9  A   It shows all the checks that River Realty
10 received from any entity controlled by Mr. Rezko.
11 Q   And there is one check on December 17th, 2002,
12 what is the next check after that?
13 A   August 27th, 2003.
14 Q   For how much?
15 A   14,369.50.
16 Q   Where is it from?
17 A   It's from 850 North Ogden, LLC.
18 Q   Who is affiliated with 850 Ogden, LLC?
19 A   Tony Rezko.
20 Q   Do a series of 12-thousand-dollar payments start
21 on October 3rd, 2003?
22 A   Yes.
23 Q   And can you just walk us through how many
24 12-thousand-dollar payments there are?
25 A   There are eight 12-thousand-dollar payments from

:55AM

:56AM

:56AM

:56AM

:57AM

1 October 2003 until May 3rd, 2004.

2 Q   When is the last payment?

3 A   May 3rd, 2004.

4 Q   Did you find any other payments after May 3rd,

5 2004?

6 A   No.

7 Q   There is a 40-thousand-dollar payment on

8 January 22nd, 2004, was that an additional check

9 from Rezmar?

10 A   Yes.

11 Q   On the same day that the December 17th, 2002

12 check from Rezmar, was there another wire into the

13 account of River Realty?

14 A   Yes, there was.

15        MR. SCHAR:  May I approach, Judge?

16        THE COURT:  You may.

17 BY MR. SCHAR:

18 Q   I show you what is marked and now in evidence

19 Government Exhibit 12/17/02 Wire, ask you if you

20 recognize that, Agent Schindler?

21 A   Yes, I do.  This is a wire into River Realty's

22 bank account.

23        MR. SCHAR:  Permission to publish, Judge?

24        THE COURT:  You may.

25     (Exhibit published to the jury.)

1  BY MR. SCHAR:

2  Q   What's the date of the wire on the left-hand

3  side, Agent Schindler?

4  A   It's December 17th, 2002.

5  Q   Who is the wire from?

6  A   It is from Chicago Title and Trust Company.

7  Q   To which beneficiary?

8  A   To River Realty, Inc.

9  Q   For how much?

10  A   47,556.80.

11  Q   Do you understand this wire is from a closing

12  from a particular piece of property?

13  A   Yes; it's commission.

14  Q   Who provided this check to River Realty on the

15  day of the closing?

16  A   This wire?

17  Q   Sorry; the money.

18  A   Oh, this was from Chicago Title so this was from

19  a closing.  This would have been the seller's

20  portion of the commission.

21  Q   So it's a check from the seller, it appears, from

22  a piece of property to Patricia's Blagojevich

23  company, 8River Realty?

24  A   Right.

25  Q   Who was the buyer of that particular piece of

:59AM

 1 property?

 2 A   It was Tony Rezko.

 3 Q   Is that what occasioned the 79-thousand-dollar

 4 check --

:59AM   5 A   Yes.

 6 Q   -- that we saw previously on your chart?

 7 A   Right.

 8 Q   So on December 17th there was money that came in

 9 both from the seller and the buyer of that

:00AM   10 particular piece of property?

11 A   That's correct.

12          MR. SCHAR:  May I approach again, Judge?

13          THE COURT:  You may.

14 BY MR. SCHAR:

:00AM   15 Q   I show you, Agent Schindler, what is now in

16 evidence Government Exhibit 2004 Blagojevich Tax

17 Return, 2003 River Realty Tax Return, and 2004 River

18 Realty Tax Return.

19          What are those?

:00AM   20 A   These are certified copies of tax returns that

21 were filed with the IRS.

22          MR. SCHAR:  Judge, permission to publish

23 those exhibits?

24          THE COURT:  You may.

:00AM   25    (Exhibit published to the jury.)

1    BY MR. SCHAR:

2    Q   Show you first what's marked Government

3    Exhibit 2004 Blagojevich Tax Return.

4        Is that the official certification of the

5    Internal Revenue Service of that tax return?

6    A   Yes.

7    Q   Moving now to the first page of the tax return,

8    the top portion, who is it a tax return for?

9    A   Rod and Patricia Blagojevich for 2004.

10   Q   And a little bit further down in the income

11   section, what's the total income for 2004 year on

12   this tax return?

13   A   375,063.

14   Q   Moving to the next page, is the tax return

15   signed?

16   A   Yes, it's signed by Rod and Patricia Blagojevich.

17   Q   Moving ahead now to the W-2 information.

18       Again, Agent, can you explain to us what a

19   W-2 is.

20   A   A W-2 is a form that is required for an employer,

21   the person you work for, to summarize the wages that

22   you earned during the year, the taxes that were

23   withheld, and any other withholdings.

24   Q   The first W-2 to Patricia Blagojevich from a

25   company called Appraisal Research?

:01AM

:01AM

:02AM

:02AM

:02AM

Schindler - direct by Schar                3648

1  A   Yes.

2  Q   For $15,000?

3  A   Right.

4  Q   The next W-2 for Defendant Rod Blagojevich for

5  the State of Illinois?

6  A   Yes.

7  Q   His salary?

8  A   Right.

9  Q   And the last W-2 salary was 147,950.

10 A   Yes.

11 Q   The next W-2 is from River Realty, Patricia's

12 company to Patricia Blagojevich?

13 A   Yes.

14 Q   For $160,000?

15 A   Right.

16 Q   In your review of this tax return, is there any

17 indication that any of the money she received was

18 affiliated in any way to Tony Rezko?

19 A   No.

20 Q   In any tax return that you reviewed from 2002 to

21 2008, is there any indication just by looking at the

22 tax return of an affiliation with Tony Rezko?

23 A   No.

24 Q   Did you review the 2004 and 2003 River Realty tax

25 returns where the Rezko checks were going?

Schindler - direct by Schar                    3649

1  A   Yes, I did.

2  Q   And in the 2004 tax return, Government Exhibit

3  2004 River Realty Tax Return, again that's the cover

4  page of an official certification from the Internal

:05AM  5  Revenue Service for the 2004 River Realty Tax

6  Return?

7  A   Right.

8  Q   The tax return for River Realty, the address is

9  2934 West Sunnyside?

:05AM  10  A   Yes.

11  Q   How much money is recorded as earnings for River

12  Realty in 2004?

13  A   The gross receipts are $343,419.

14  Q   On a corporate tax return like this -- let me ask

:05AM  15  a different question first.

16       Is there any indication from looking at this

17  tax return that any of the money that went into

18  River Realty was in any affiliated with Tony Rezko?

19  A   No.

:05AM  20       MR. GOLDSTEIN:  Objection; leading.

21       THE COURT:  Overruled.

22  BY MR. SCHAR:

23  Q   How about in the 2003 tax return?

24  A   There is no indication of --

:06AM  25  Q   And --

 1        Sorry.
 2  A   There's no indication of money from Mr. Rezko.
 3  Q   In any River Realty tax return is there any
 4  indication of money from Mr. Rezko?
 5  A   No.
 6  Q   To your understanding, do corporations like this
 7  actually have to report where they got their money
 8  from?
 9  A   Yeah, they have to report the money, they don't
10  have to say who it's from.
11  Q   And in this case, there is no indication of where
12  it was from?
13  A   Right.
14  Q   I want to move ahead now, if I may, Agent
15  Schindler, to Chart 8.
16        Government Exhibit Chart 8 is in the binder.
17  Are you with me, Agent Schindler?
18  A   Yes, I am.
19  Q   What is the title of this chart?
20  A   Money flow, Lake Aberdeen.
21  Q   What is it?
22  A   It is a chart that shows the flow of money for
23  one transaction for commission that was earned by
24  River Realty coming through Rezko, Rezmar Realty.
25  Q   Can you walk us through the flow of this chart,

:06AM
:06AM
:06AM
:06AM
:07AM
:07AM

Schindler - direct by Schar                    3651

1  what information you provided on this.

2  A   Well, you want me just to take you through it?

3  Q   If you could, please.

4  A   Okay.  The upper left-hand box, Chicago Title

5  Rezmar Realty, on January 21st, 2004.

6       This is a Chicago Title check or wire, I'm

7  not sure which one, I think it's a check, for

8  $40,000 to Rezmar Realty for a commission on the

9  Lake Aberdeen deal.

10       On the next day, January 22nd, 2004, Rezmar

11  Corporation wrote a check to River Realty for

12  $40,000.

13       That check was deposited into River Realty

14  and the bank account balance in River Realty, after

15  it was deposited, was 106,588.12.

16       Right after it was deposited on January 23rd,

17  2004, River Realty wrote a check to Patricia

18  Blagojevich for $40,000 which was then deposited

19  into Patricia and Rod's personal bank account.

20  Q   Prior to the deposit of that 40-thousand-dollar

21  check into the personal bank account of Defendant

22  Blagojevich, how much money was in that personal

23  bank account?

24  A   8,414.97.

25  Q   The day after the $40,000 was deposited in the

Schindler - direct by Schar                3652

1  personal bank account, was a series of checks
2  written?
3  A   Yes.
4  Q   That is what is indicated on the bottom right
5  part of the chart?
6  A   Correct.  That shows the date of the checks, the
7  sequentially numbered check numbers, the amounts,
8  and who they are made payable to.
9  Q   How much is the total?
10 A   $38,010.
11         MR. SCHAR:  Judge, may I approach?
12         THE COURT:  You may.
13 BY MR. SCHAR:
14 Q   I'm going to show you what's already in evidence
15 as Government Exhibit 1/21/04 check, Government
16 Exhibit 1/22/04 check, and Government Exhibit
17 1/23/04 check.
18 A   Okay.
19         MR. SCHAR:  Judge, could we have permission
20 to publish?
21         THE COURT:  You may.
22     (Exhibit published to the jury.)
23 BY MR. SCHAR:
24 Q   In reference to the chart you just described --
25 well, first, let me show you what's been marked as

:09AM

:09AM

:09AM

:09AM

:10AM

Schindler - direct by Schar                    3653

1  Government Exhibit 1/21/04 check.
2          Which check is that?
3  A   That is the check from Chicago Title and Trust
4  Company to Rezmar Realty for $40,000 that would
5  correspond to the upper left-hand box on the chart.
6  Q   And that was January 21st, 2004?
7  A   Correct.
8  Q   I Know it's hard to read, the left side towards
9  the middle of it says to Rezmar Realty?
10 A   Right.
11 Q   Moving on to Government Exhibit 1/22/04 check,
12 the next day was -- well, why don't you describe
13 what it is we're looking at.
14 A   This is a check from Rezmar Corporation, it says
15 that in the upper left-hand corner of the check,
16 dated January 22nd, 2004, for $40,000 and it's
17 payable to River realty, Inc.
18 Q   And that's the middle box on your chart?
19 A   Right.
20 Q   Finally, Government Exhibit 1/23/04 check the
21 following day.
22 A   This is a check from River Realty, Inc., dated
23 January 23rd, 2004 for $40,000 payable to Patricia
24 Blagojevich.  So this would be the bottom left-hand
25 box on my chart.

:10AM

:10AM

:10AM

:11AM

:11AM

1  Q   Who appears to have signed that check?

2  A   Patricia Blagojevich.

3  Q   You can put those aside, Agent Schindler.

4      We're going to move ahead now to Chart 9 in

5  the exhibit binder.

6      What is chart 9 -- well, what's the title of

7  Chart 9?

8  A   Rod and Patricia Blagojevich Annual Cash Flow.

9  Q   What is this chart, Agent Schindler?

10 A   This is a chart that shows -- compares the

11 inflows of money into Patricia and Rod's checking

12 accounts -- or all the bank accounts, and compares

13 it to the outflows of money, the money they are

14 actually spending.

15 Q   And the blue line or the aquamarine line is what?

16 A   The blue line is inflows and the R and G red line

17 is outflows.  So inflows would be anything coming

18 in, any income coming in -- well, not just income,

19 any inflows of money:  So gifts, loans, wages,

20 rentals, gross receipts; any money that's coming in;

21 some insurance settlements.

22 Q   There was an insurance settlement coming in?

23 A   Yes.

24 Q   And in terms of rents, I think when you talked

25 about that the last time you talked about net rental

1 income, does this just include all rental income?

2 A  This is all rental money that they received,

3 money they get for rents, and then the rental

4 expenses that they paid would be reflected in the

5 outflows column.

6 Q  How about wages?

7 A  Wages would be the net amount of the paychecks

8 that went into the bank, that would be inflows.

9 Q  Inflows.

10 A  Yes.

11 Q  How about investment income?

12 A  That would be in inflows, any money that they

13 actually got.

14 Q  How about money from River Realty?

15 A  That would be any money that they took out of

16 River Realty.  So Patricia's salary and then any

17 money that they transferred out from there.

18 Q  How about just cash transfers from different

19 accounts, would that be included?

20 A  No, no, no transfers are included in this.

21 Q  Okay.  Outflows, what would be included in

22 outflows?

23 A  Outflows is anything that they spent money on.

24 So ATM withdrawals, debit credit purchases, credit

25 card purchases, checks written.

:13AM

:13AM

:13AM

:13AM

:14AM

Schindler - direct by Schar                    3656

1  Q   And based on the chart, in 2003 are the

2  outflows -- well, the left side is the amount of

3  money for inflows and outflows and the horizontal

4  one is yearly?

:14AM    5  A   Yes.

6  Q   In 2003 are the outflows substantially ahead of

7  the inflows?

8  A   Yes.

9  Q   In 2004 are outflows ahead of inflows?

:14AM   10  A   Yes.

11  Q   In 2005 are inflows ahead of outflows?

12  A   Yes.

13  Q   In 2006, again outflows greater than inflows?

14  A   Yes.

:14AM   15  Q   In 2007, outflows slightly greater than inflows?

16  A   Yes.

17  Q   And 2008, almost a wash?

18  A   Yeah, inflows are slightly higher.

19  Q   So would this indicate that the largely over the

:14AM   20  course of time period the outflows of money were

21  greater than the inflows of money?

22  A   Yes.

23  Q   Moving on to Chart 10.

24  A   Okay.

:15AM   25  Q   What is the title of Chart 10?

1  A   Rod and Patricia Blagojevich Total Card Debt

2  Monthly Balance January 2002 Through December 9,

3  2008.

4  Q   What on the left-hand line?

5  A   The left-hand column --

6  Q   Sorry, column.

7  A   -- the amount of money, so that's the value of

8  the debt, and then across the bottom would be the

9  time from January of '02 through November of '08.

10 Q   How did you go about producing this chart?

11 A   This I went through all their credit cards, all

12 Rod and Patricia's credit cards, and calculated the

13 balance at the end of every month.

14 Q   About how many credit cards did they have over

15 this time period?

16 A   They probably had maybe 8 or 9 credit cards over

17 this time period.

18 Q   Can you explain the -- well, what is -- just an

19 overall matter, what does the chart indicate from

20 2002 to 2008?

21 A   Overall, it indicates that debt has increased

22 over time, credit card debt.

23 Q   And could you explain briefly what the spikes

24 indicate at various portions where there is a spike

25 and then it goes down?

1 A  Well, when there is a spike it indicates that the

2 credit card was used for big purchases or it doesn't

3 paid directly the next month.

4        So each spike represents some spending.  And

5 then, alternatively, the downward spikes indicate

6 credit cards being paid down or paid off.  Sometimes

7 they used other credit cards to pay credit cards,

8 sometimes transfers of money from River Realty came

9 in and paid off the credit cards.  But, overall, the

10 balances keep going up over time.

11 Q  Moving on to Chart 11.

12        What's the title of this chart?

13 A  Rod and Patricia Blagojevich Consumer Credit

14 Balances December 31st, 2007 through December 9th,

15 2008.

16 Q  And on the left-hand column, what are the totals?

17 A  Again, it's the value of the amount of the

18 balances and then across the bottom will be time.

19 Q  When you say consumer credit card balance, is

20 this debt?

21 A  This is debt, yes.

22 Q  And this chart is December of '07 to

23 December 9th, 2008?

24 A  Right.

25 Q  What did you use to calculate the debt for this

:16AM

:17AM

:17AM

:17AM

:17AM

Schindler - direct by Schar                    3659

1  particular chart as compares to the credit card
2  chart?
3  A   This one has all the credit card balances and, in
4  addition, there is a home equity line of credit
5  added on which is a loan where their house is the
6  collateral, but it's not mortgage, it's a line of
7  credit.
8  Q   Were the first mortgages on any of the properties
9  that they owned used?
10 A   No.
11 Q   So this would be just credit card debt and
12 additional second mortgages or second loans against
13 the house?
14 A   Right.
15 Q   What can you tell us about the flow of money in
16 relation to this chart?
17 A   From December '07 through December '08 their
18 credit balances went up drastically.
19 Q   And between about April of '08 rising line to
20 about August of '08, what caused that uptick from
21 about 170,000 to close to 220,000?
22 A   They started drawing off their home equity line
23 of credit.
24         MR. SCHAR:  Judge, if you would like me to
25 continue?

:17AM

:18AM

:18AM

:18AM

:19AM

1          THE COURT:  No, we're going to take a break.

2          THE MARSHAL:  All rise.

3        (The following proceedings were had out of

4         the presence of the jury in open court:)

:19AM   5          THE COURT:  15 minutes.

6        (Recess.)

7          THE MARSHAL:  All rise.

8          THE COURT:  Please be seated.

9          You may resume.

:42AM  10          MR. SCHAR:  Thank you, Judge.

11

12  BY MR. SCHAR:

13  Q   Agent Schindler, when we left, I think we were in

14  the chart binder and you had certain government

:42AM  15  charts before you.  What I'd like to do now is

16  direct your attention to Government Exhibit Chart

17  12.

18  A   Okay.

19  Q   What is the title of Chart 12?

:42AM  20  A   Rod and Patricia Blagojevich Top 10 Categories of

21  expenditures January 2002 through December 9th,

22  2008.

23  Q   And when you say "expenditures," what are you

24  referring to?

:43AM  25  A   I'm referring to money spent, things that were

1  purchased.

2  Q   From January 2002 to December 9th, 2008?

3  A   Correct.

4  Q   What, exactly, did you do to be able to produce

5  this chart?

6  A   I went through all of Mr. And Mrs. Blagojevich's

7  financial records.  I went through bank accounts,

8  credit cards, other type of financial accounts and

9  looked for all the money that they spent.

10 Q   Did that include looking at every charge, every

11 debit, every credit card used?

12 A   Yes.

13 Q   After that doing that, did you characterize the

14 expenses in some way?

15 A   Yes, I did.  I started categorizing them into

16 types of expenses.

17 Q   And is that indicated on the left-hand column of

18 the chart?

19 A   Yes.

20 Q   How do you account -- some of these, obviously,

21 are purchases of goods for items, how did you

22 account for returns?

23 A   I subtracted returns out.  So if there was a

24 credit card charge or a debit card charge and then

25 subsequently credited back or returned, then I just

1   netted it out, I took it away.

2   Q   Can you walk us through the -- and on the bottom

3   is the amount of money spent on each particular

4   category?

5   A   Right.

6   Q   Going up to $450,000 in the far right end?

7   A   Right.

8   Q   Can you just walk us through the different

9   categories beginning with medical, how you

10  categorized it.

11  A   So, okay, the top of the chart, "Medical," that

12  would be anything related to doctors or

13  prescriptions, anything like that.

14       The next category is "Travel," and that was

15  things like hotels, rental cars, airfare, expenses,

16  sightseeing type of things.

17       The next is "childcare," and that was any

18  checks written to childcare providers.

19       "Retail Store" would be anything that was a

20  retail purchase that I couldn't put into another

21  category.  For instance, Target, I didn't know what

22  was actually purchased at the store, so I just put

23  it in the retail store category.  If I had known

24  what exactly was purchased, I could've categorized

25  it into a different category like toys, or household

1  expenses.

2          The next category is "private school," and

3  that was checks written for tuition or any other

4  checks written to school that the children go to.

5          The next column is "groceries and

6  convenience," and that would be anything like Jewel,

7  or Dominick's, or 7-Eleven, any kind of stores like

8  that.

9          The next is "House Expenses" which would have

10  been any kind of expenses, big purchases relating to

11  the house, like some construction-type expenses, and

12  I think there was like blinds, that type of

13  purchases.

14          Then "Rental Expenses" that would be any of

15  the expenses related to the rental properties that

16  the Blagojevichs own.  So things like condo fees

17  and --

18  Q   Other than their main residence, what other

19  properties do the Blagojevich's own?

20  A   They have a condo in Chicago that they rent out

21  and a condo in Washington, D.C., that they rent out.

22  Q   What would go into rental expenses for those two

23  additional properties?

24  A   That would be the condo fees for both the

25  properties and the mortgage payments on the

Schindler - direct by Schar                    3664

1  mortgages that they have.

2  Q   Those are, from your review, were those primarily

3  offset by rental income coming in from those two

4  properties?

5  A   Right.

6  Q   So that would not be indicated in this chart?

7  A   Right.  Those are just expenses.

8  Q   I'm sorry, and the Sunnyside debt?

9  A   The Sunnyside debt is the mortgage payments

10 related to their house in Chicago that they live in.

11 Q   And what was the last category, the number one

12 expenditure, clothing?

13 A   That's "Clothing," so any kind of purchases

14 indicated that was for clothing.  So the department

15 stores, clothing stores, shoe stores, that type of

16 thing.

17 Q   From your review, was the clothing mostly adult

18 clothing?

19 A   Mostly.

20 Q   And how much -- in terms of clothing, what was,

21 approximately, the total amount of clothing spent

22 between January 2002 through December 9th, 2008, the

23 amount of money spent?

24 A   It was over $400,000.

25 Q   Moving on to Chart 13, what is the title of Chart

:47AM
:47AM
:47AM
:47AM
:47AM

Schindler - direct by Schar                    3665

1  13?

2  A   Rod and Patricia Blagojevich Expenditures, Top 15

3  Payees Greater Than $10,000 January 2002 through

4  December 9th, 2008.

5  Q   And the same time period?

6  A   Yes.

7  Q   And when you say top 15 over 10,000 for

8  expenditures, what does this chart indicate?

9  A   This indicates the amount of money that was spent

10 on two particular entity and it's the top 15 of

11 those.

12 Q   Instead of category now you're talking about

13 specific --

14 A   Specific entity.

15 Q   Entity.

16     All right, can you just walk us through the

17 top 15 beginning at Citibank mortgage.

18 A   So number 1 is Citibank mortgage, $392,463.36,

19 and that is the mortgage on their home.

20     Number 2 is Tom James Company/Oxford

21 Clothing, and that's 205,706.72.

22 Q   What is that?

23 A   That is a company that makes custom suits and

24 clothing.

25 Q   Sorry; go ahead.

1  A   Number 3 is Countrywide Home Mortgage and that's

2  a mortgage on one of the rental properties and

3  that's 127,861.76.

4          Number 4 is Private School.  Do you want me

5  to read the amounts for each?

6  Q   If you can just walk us through what the

7  categories are.

8  A   Okay.  Number 5 is Saks Fifth Avenue.

9  Q   What is Saks Fifth Avenue?

10 A   That's a retail store, department store.

11         Number 6 is Jewel, which is a grocery store.

12         Number 7 is nanny which is childcare

13 provider.

14         Number 8 is U.S. Bank Home Mortgage and

15 that's another of the rental properties, mortgages.

16         Number 9, Waterford Condominium, that's the

17 condo fees for the Washington, D.C., rental

18 property.

19         Number 10, Geneva Custom Shirts, which is a

20 custom shirt maker.

21         Number 11, Neiman Marcus which is another

22 department store.

23         Number 12 is cash, which would be ATM

24 withdrawals and checks to cash.

25         Number 13, People's Gas, that's the gas

:49AM

:49AM

:49AM

:50AM

:50AM

1  company.

2      Number 14, Demos Painting and Decorating,

3  Inc.

4      And number 15, Com. Ed.

5  Q   In your review of the expenditures -- by the way,

6  for the condominium expenditures, was it primarily

7  offset by income coming in for the rents?

8  A   Right.

9  Q   Did you see, especially in the most recent years,

10 any car expenses or significant car expenses?

11 A   No.

12 Q   How about any payments to Winston & Strawn, the

13 law firm?

14 A   No.

15 Q   I'm going to show you what is now in evidence as

16 Government Exhibit American Express 85000/86008

17 Subgroup, Government Exhibit American Express 61009

18 Subgroup, and American Express 22006 Subgroup.

19     Are those representative portions of various

20 American Express statements for the Blagojevichs?

21 A   Yes.

22     MR. SCHAR:  Judge, may I have permission to

23 publish various pages out of these exhibits?

24     THE COURT:  Sure.

25 BY MR. SCHAR:

1  Q   First I'd looking at American Express 6009

2  Subgroup.

3       Is this a statement for a credit card,

4  American Express credit card, for Rod Blagojevich?

5  A   Yes, December.

6  Q   December 2006?

7  A   Yes.

8  Q   And what is the charge on 12/11/06?

9  A   Tom James Company, Franklin, Tennessee, custom

10 clothier for $20,000.

11 Q   Moving on to Government Exhibit American Express

12 8500/86008, is this a different card in the name of

13 Patricia Blagojevich?

14 A   Yes.

15 Q   And the closing date on this was December 2003?

16 A   Right.

17 Q   What was the balance?

18 A   $13,570.17.

19 Q   And at the beginning of the statement each month,

20 was there an indication of returns?

21 A   Yes, payments and returns.

22 Q   In this case there is a return for $1,082 for

23 Bloomingdale's?

24 A   Right.  On November 30th.

25 Q   At the bottom there are charges to Neiman Marcus?

1  A   Yes.

2  Q   Moving over to Bates Stamp 00204 for the record,

3  do you see the top of the Bloomingdale's entry, does

4  that correspond to the return that we saw

:54AM  5  previously?

6  A   Yes, for $1082.06.

7  Q   On November 29th are there two additional charges

8  at Bloomingdale's?

9  A   Yes, there's one for $2,604.56 it says Maximilian

:54AM  10  Furs, and there's another one for $3,800.81 for

11  Maximilian Furs, as well.

12  Q   I want to move ahead now to a statement of

13  December 2006, Bates Stamp 539.

14      Again, the same credit card in the name of

:55AM  15  Patricia Blagojevich?

16  A   Yes.

17  Q   Is there a charge in relation to a hotel in

18  Mexico?

19  A   Yes, on December 19th, '06.

:55AM  20  Q   For how much?

21  A   $9,423.44.

22  Q   And next page, Bates Stamp 540 for the record,

23  12/21/06, do you see two charges to Saks there?

24  A   Yes, one is $1,847.55, it says Rena Lang day

:55AM  25  dress; I guess it's "Wang" I don't know.  $2,264.55

1  on December 21st also for the same company, a

2  jacket.

3  Q   Moving on to Government Exhibit American Express

4  Subgroup 2206.

5        Is this a different credit card for American

6  Express in the name of Rod Blagojevich?

7  A   Yes.

8  Q   The first statement here is January of 2005?

9  A   Correct.

10 Q   What's the balance?

11 A   $13,994.11.

12 Q   There are several returns indicated in January of

13 '05?

14 A   Yes, from Saks Fifth Avenue.

15 Q   Totaling about $12,000 in return?

16 A   Somewhere afternoon there, yes.

17 Q   For the record, moving on to bates stamp 866 of

18 the exhibit.

19        It's charges from December 2004?

20 A   Yes.

21 Q   What's the first one?

22 A   December 23rd, 2004, Saks Fifth Avenue,

23 $17,704.09 for some clothing; skirt and jacket;

24 skirts.

25 Q   And at the bottom two on this page.

Schindler - direct by Schar                    3671

1  A   The bottom two, December 31st is a charge at
2  Fleet Feet, which is a shoe store, it says it's a
3  shoe store purchase, $716.12.  And then again
4  December 31st, Saks Fifth Avenue again, for it
5  appears to be clothing, $677.94.
6  Q   The next Page, Bates stamp 867 for the record.
7  A   Again, December 31st, $6,408.85, Saks Fifth
8  Avenue again for some more clothing.
9          And then on January 2nd, Target, for $63.96.
10         And January 3rd, Saks Fifth Avenue again for
11 a blouse, $242.
12 Q   Moving ahead now to February of 2006, at Bates
13 Stamp 961, same credit card, what was the balance at
14 that time?
15 A   $9,157.95.
16 Q   And moving over to Bates Stamp 963, were there
17 purchases in January of 2006?
18 A   Yes.
19 Q   Can you just walk us through the ones that are
20 there.
21 A   Sure.  January 16th, 2006, is a charge at Saks
22 Fifth Avenue for basket weave tie, $179.85.
23         January 17, '06, Neiman Marcus, $215.84,
24 that's for Tabarone, which I believe is a tie.
25         January 20th, '06, Geneva Custom Shirts,

1  $2,590.

2       January 25th, '06, Tom James Company Custom

3  Clothier for $7,781.26.

4  Q   Moving ahead to May 2006, Bates Stamp 983 for the

5  record.  Same credit card in the name of Rod

6  Blagojevich.  What's the balance on May 3rd, 2006?

7  A   $30,227.49.

8  Q   And April of 2006, what are the charges?

9  A   April 10th, 2006, Saks Fifth Avenue for $1,302.55

10  for outerwear and ties.

11       April 12, '06, Tom James Company, Custom

12  Clothier, $18,026.27.

13       And then Four Seasons on 4/19 for $55.41.

14  Q   Moving ahead to the next month, Bates Stamp 992,

15  if you can read us the returns and then the new

16  charges.

17  A   On May 11th is a return for $763 for ties and

18  outerwear, and then on June 2nd there is a return at

19  Saks Fifth Avenue for ties, $359.70.

20  Q   And what are the last two in terms of the charges

21  there?

22  A   May 25th is the charge to Saks Fifth Avenue for

23  ties, $664.79.

24       May 26th, 2006, Geneva Custom Shirts, $2,973.

25  Q   Moving ahead now to Bates Stamp 1024, moving

Schindler - direct by Schar                    3673

1  ahead in time to November 2006, same credit card for

2  Defendant Rod Blagojevich, what's the balance?

3  A   $6,128.80.

4  Q   Now Bates Stamp 1026, beginning with the Tom

:01PM  5  James Company, can you read the charges there?

6  A   Sure.  On October 30th, 2006, Tom James Company

7  $4,911.  On October 31st, Allen Edmond Shoes,

8  $406.57.  And there's an American Express fee on

9  November 2nd for $40.  And on November 2nd, '06,

:01PM  10  Saks Fifth Avenue ties $692.15.

11  Q   Moving ahead to Bates Stamp 862-89 now.  Moving

12  ahead in time to November 2007, what was the credit

13  card balance on Defendant Blagojevich's credit card

14  at that time?

:02PM  15  A   $14,915.21.

16  Q   Moving ahead to Bates Stamp 91 for the

17  November 2007 time period.

18        Can you take a look at the actual paper

19  exhibit.

:02PM  20  A   Yes.

21  Q   The Bates is EG0862-0091.

22  A   I don't have that in front of me, I don't think.

23        MR. SCHAR:  May I approach, Your Honor?

24        THE COURT:  You may.

:03PM  25  BY MR. SCHAR:

Schindler - direct by Schar                    3674

1  Q   Can you just read us the charges in October
2  of 2007.
3  A   In October, it looks like 8th, 2007, Saks Fifth
4  Avenue, $773.90 and it's for four ties.
5          October 15th, 2007, Saks Fifth Avenue, ties,
6  $196.20.
7          October 19th, 2007, Timeless Toys, $81.42.
8          October 22nd, '07, Geneva Custom Shirts,
9  $1,970.
10         October 22nd, '07, Tom James Company,
11 $12,000.
12 Q   Moving ahead now in time to February, close of
13 date February of 2008, Bates Stamp 1113.
14         February of 2008, what is Defendant
15 Blagojevich's credit card balance?
16 A   $15,364.34.
17 Q   Moving to the last page at 1115 of the charges
18 for that month, what's the first charge?
19 A   January 5th, 2008, Saks Fifth Avenue, ties,
20 $201.65.
21 Q   What is the third charge?
22 A   January 7th, '08, Saks Fifth Avenue, ties,
23 $201.65.
24 Q   What's the fifth charge?
25 A   January 16th, '08, Allen Edmond's Shoes, $343.35.

:04PM
:04PM
:05PM
:05PM
:05PM

1 Q   What's the next charge?

2 A   January 22nd, '08, Allen Edmond's Shoes, $343.35.

3 Q   What's the last charge in January of 2008?

4 A   January 31st, 2008, Tom James Company,

5 $13,758.65.

6 Q   Moving ahead now to March of 2008, Defendant

7 Blagojevich's credit card, what's the balance?

8 A   $4,959.88.

9 Q   Moving down that page, what's the first charge on

10 February of '08?

11 A   February 9th, 2008, Saks Fifth Avenue, ties,

12 $201.65.

13 Q   How about the next one?

14 A   February 14th, '08, Saks Fifth Avenue, ties,

15 $185.30.

16 Q   How about the last one on that page?

17 A   February 18th, '08, Neiman Marcus, three ties,

18 $594.05.

19 Q   Moving ahead to Bates 123 for the record, charges

20 toward the end of February and March of 2008, what's

21 the first entry?

22 A   February 18th, 2008, Neiman Marcus, two ties,

23 $397.85.

24 Q   And the next entry?

25 A   February 21st, '08, Geneva Custom Shirts, $1695.

Schindler - direct by Schar                    3676

1  Q   The next entry is for Allen Edmond's?

2  A   February 2nd, '08, $1259.45.

3  Q   Next entry?

4  A   March 2nd, '08, Fleet Feet Sports, $151.65.

:07PM   5  Q   Next entry.

6  A   March 4th, '08, Neiman Marcus, tie, 196.20.

7  Q   Moving ahead now to Bates 175 in the exhibit,

8  closing date October 3rd, 2008, what's the credit

9  card balance?

:08PM   10  A   $8,556.11.

11  Q   At the bottom of the page, what are the first two

12  charges in September of 2008?

13  A   September 4th, 2008, Fleet Feet Sports, $93.33.

14          September 12, '08, Saks Fifth Avenue, shoes,

:08PM   15  $744.19.

16  Q   And moving ahead to Bates 177, September of 2008,

17  can you read us the charges on that.

18  A   September 12th, 2008, Saks Fifth Avenue, ties,

19  $214.99.

:08PM   20          September 12th, 2008, Saks Fifth Avenue,

21  underwear and ties, $575.51.

22          September 14th, 2008, American Grow, $70.56.

23          September 17th, 2008, Saks Fifth Avenue,

24  three ties, $231.53.

:09PM   25          September 18th, '08, Geneva Custom Shirts,

1  $1,411.

2          September 19th, '08, Cubs tickets, $160.

3          September 24th, '08, Tom James Company,

4  $5,000.

:09PM  5  Q   Moving ahead now to Bates 181, the closing date

6  November 4th, 2008, what's the credit card balance

7  for Defendant Blagojevich's credit card?

8  A   $9,854.15.

9  Q   At the bottom of that page there is a return of

:09PM  10  certain ties?

11  A   Yes; three ties.

12  Q   How much is the return?

13  A   $644.97.

14  Q   Moving ahead to Bates 183, late October 2008,

:10PM  15  what's the first purchase on October 4th?

16  A   Saks Fifth Avenue, ties, $214.99.

17  Q   What's the next Saks purchase?

18  A   October 20th, 2008, two ties, $429.98.

19  Q   What's the next?

:10PM  20  A   October 23rd, 2008, Saks Fifth Avenue, three

21  ties, $214.99.

22  Q   What's next?

23  A   October 24th, Land's End Clothing, $148.23.

24  Q   And what's next?

:10PM  25  A   October 28th, '08, Fleet Feet Sports, $536.52.

Schindler - cross by Goldstein                    3678

1  Q   Moving ahead to Bates 188, closing date for

2  December 4th, 2008, what's the credit card balance

3  for Defendant Rod Blagojevich's credit card on that

4  date?

:11PM    5  A   $6,161.17.

6  Q   Was there a return on that page?

7  A   Yes, on November 11th there is a return at Fleet

8  Feet Sports for $270.11.

9  Q   And on November 8th, below that, was there a

:11PM   10  purchase of Fleet Feet?

11  A   Yes, for $743.80.

12  Q   What's next?

13  A   November 14th, 2008, Saks Fifth Avenue, two ties,

14  $429.98.

:11PM   15  Q   Moving on to Bates Stamp 190 throughout November,

16  what's the first purchase?

17  A   November 16th, 2008, two ties at Saks Fifth

18  Avenue, $429.98.

19  Q   Third purchase?

:11PM   20  A   Neiman Marcus a tie for $211.09.

21  Q   The last purchase?

22  A   December 2nd, '08, Tom James company, $4,000.

23          MR. SCHAR:  Nothing else, Judge.

24                 CROSS EXAMINATION

:12PM   25  BY MR. GOLDSTEIN:

1  Q   Good afternoon, Agent Schindler.

2  A   Hi.

3  Q   Now, you indicated that you evaluated all the tax

4  returns of the Blagojevichs, isn't that correct?

5  A   Yes.

6  Q   Do you have the tax returns in front of you?

7  A   I do.  I have three of them.

8  Q   Could you turn to the 2002 Blagojevich tax

9  return.

10        Do you have that in front of you?

11 A   No, I don't.

12        MR. GOLDSTEIN:  May I approach, Your Honor?

13        THE COURT:  You may.

14 BY MR. GOLDSTEIN:

15 Q   I'm handing you Government Exhibit 2002

16 Blagojevich Tax Return.

17 A   Okay.

18 Q   Is that the 2002 tax return of the Blagojevichs?

19 A   Yes.  It looks like it is, yes.

20 Q   Could you look at the second page, please.

21        This page (indicating).  Could you look at

22 line 69.

23        Do you see that line?

24 A   Yes.

25 Q   Could you explain to the ladies and gentlemen of

Schindler - cross by Goldstein                3680

1   the jury what 69 is?

2   A   Line 69 is the total payments that got credited

3   to the Blagojevichs to the IRS.

4   Q   So 69 is the amount of tax paid to the IRS, is

5   that correct?

6   A   That's the amount withheld, the amount like for

7   estimated taxes.

8   Q   So that's money that went to the IRS?

9   A   Yes.

10  Q   How much is indicated on line 69?

11  A   $72,548.

12  Q   And on line 70, can you indicate to the ladies

13  and gentlemen of the jury what that line indicates?

14  A   Line 70 would be the amount overpaid.  So in this

15  case it's 7,518, which you have a choice to get it

16  refunded or you can carry it over to the next year.

17  Q   And the Blagojevichs on 2002, what did they do?

18  Did they get it refunded or did they roll it over?

19  A   They rolled it over to the next year.

20  Q   Do you have Government Exhibit 2003 Tax Return?

21  A   No.

22  Q   If I may hand that to you.

23      If you can look at the second page, as well.

24  A   Okay.

25  Q   And this time it is line 68, what is line 68?

Schindler - cross by Goldstein                3681

1  A   Again, that's the total payments made on their
2  account with the IRS.
3  Q   So that's the amount of money that went to the
4  U.S. Internal Revenue Service, is that correct?
5  A   Yes.
6  Q   How much was given to the IRS for the 2003 tax
7  returns of the Blagojevichs?
8  A   $62,362.
9  Q   And the next line indicates the amount that was
10 overpaid?
11 A   Right.
12 Q   How much was overpaid?
13 A   $24,572.
14 Q   And the next line indicates an opportunity to
15 have it refunded to them, is that correct?
16 A   Right.
17 Q   How much did the Blagojevichs choose to have
18 refunded to them?
19 A   Zero.
20 Q   So 24,000, a little over $24,000 they overpaid in
21 taxes and they took zero, is that correct?
22 A   They carried it forward for the next year.
23 Q   So for that period they didn't take $24,000, is
24 that correct?
25 A   No.

:15PM
:15PM
:15PM
:15PM
:15PM
:16PM

Schindler - cross by Goldstein                    3682

1  Q   You have, I believe, 2003?

2  A   2004.

3  Q   Yes.  Okay.  Could you look at the 2004 tax

4  return.

5  A   Sure.

6  Q   And I think this one, it is line 70, what does

7  line 70 indicate?

8  A   It's a combination of all the payments that were

9  made on their behalf during the year to the IRS.

10 Q   So that's the amount of money paid to the IRS in

11 the year 2004, is that correct?

12 A   Yes.

13 Q   Okay.  How much did the Blagojevichs pay the IRS

14 in 2004?

15 A   $104,976.

16 Q   How much did they overpay to the IRS?

17 A   $17,166.

18 Q   And was any amount refunded to the Blagojevichs

19 in 2004?

20 A   No, they carried that forward to 2005.

21 Q   Now, we'll go to 2005 of the Blagojevich's tax

22 return, page 2 I believe --

23 A   Page 4.

24 Q   Page 4.  And this would be line 71.

25         What does 71 indicate?

Schindler - cross by Goldstein                          3683

1  A   $66,330 paid in.

2  Q   And a little over 66,000 was paid to whom?

3  A   To the IRS -- no, this is from withholdings and

4  estimated taxes, not like they wrote a check.

5  Q   But that's over the years that amount was paid to

6  the Internal Revenue Service for the United States

7  government, is that correct?

8  A   Yes.

9  Q   And that is a total of $66,330, is that correct?

10 A   Yes.

11 Q   And how much did the Blagojevichs pay that year?

12 A   $11,974.

13 Q   And how much was refunded to them back?

14 A   Zero.  They elected to carry it forward to the

15 next year.

16 Q   And we would go to 2007.

17     Now, this time we are on line 72.

18 A   Okay.

19 Q   What does 72 indicate?

20 A   Total payments to the IRS, $47,667.

21 Q   And so $47,667 was paid to the federal

22 government, IRS, is that correct?

23 A   Yes.

24 Q   And how much was overpaid?

25 A   $15,697.

1  Q   And I see it indicates that the Blagojevichs

2  actually did take some amount of money back.  How

3  much did they take back?

4  A   They elected to take $5,697 as a refund and

5  10,000 went to their estimated 2008 taxes.

6  Q   2008, this is the 2008 Blagojevich tax returns,

7  is that correct?

8  A   Yes.

9  Q   And line 71, what does that indicate?

10  A   $41,565 was paid to the IRS that year.

11  Q   By the Blagojevichs, is that correct?

12  A   Yes.

13  Q   And the next line it indicates how much was

14  overpaid?

15  A   $15,498.

16  Q   Does it indicate that any amount of refund was

17  taken?

18  A   No, they elected to carry it forward to 2009.

19  Q   Now, as you analyzed Rod and Patti Blagojevich's

20  tax return, you talked about Chart number 7.

21      Do you have the chart in front of you?

22  A   I do.

23      Okay.

24  Q   So now Chart 7 is Rezko entity's checks to River

25  Realty, isn't that correct?

:19PM

:19PM

:19PM

:20PM

:20PM

Schindler - cross by Goldstein                     3685

1    A   Yes.

2    Q   And it indicates money that was paid to River

3    Realty from any Rezko related company, is that fair

4    to say?

:20PM   5    A   Yes.

6    Q   It is correct that Rod and Patti Blagojevich paid

7    taxes on this amount that was given to them, is that

8    correct?

9    A   Yes.

:21PM   10   Q   And as you analyzed the tax returns from 2002 to

11   2008, they paid all their taxes, is that correct?

12   A   As far as I know, yes.

13   Q   And there was no reporting problems; they didn't

14   withhold any income, is that correct?

:21PM   15           MR. SCHAR:  Objection.

16           MR. GOLDSTEIN:  I apologize.  I'll rephrase,

17   I apologize.

18   BY MR. GOLDSTEIN:

19   Q   All the income that Patti and Rod Blagojevich

:21PM   20   earned each year was reported to the IRS?

21           MR. SCHAR:  Objection.

22           THE COURT:  The objection is sustained.

23   BY MR. GOLDSTEIN:

24   Q   2002, you evaluated the tax returns of the

:21PM   25   Blagojevichs, isn't that correct?

Schindler - cross by Goldstein                3686

1  A   Yes.

2  Q   And all the income was reported that they

3  received in 2002?

4          MR. SCHAR:  Objection.

:21PM  5          THE COURT:  I think you may be confusing

6  evaluation with audit.  They are two separate

7  processes.

8  BY MR. GOLDSTEIN:

9  Q   Are you familiar -- have you ever audited before?

:22PM  10  A   Yes; it's my job.

11  Q   That's your job as an auditor?

12          Well, what you did here in analyzing these

13  tax returns and income and expenses, and all that,

14  would you call what you did an audit?

:22PM  15  A   I looked them over.  I suppose I could call it an

16  audit, yes.

17  Q   And on the audit that you did, is it fair to say

18  that all the income that Patti Blagojevich received

19  was reported on her taxes?

:22PM  20  A   Yes.

21  Q   And all the income that Rod Blagojevich was

22  reported on his taxes?

23  A   On his tax return, yes.

24  Q   Excuse me?

:22PM  25  A   On his tax return, yes.

1  Q   Now, if you can go to Chart 8, please.

2  A   Okay.

3  Q   Now, the second box to the left, it indicates

4  that there was a bank balance after the January 23rd

5  deposit of $106,588.12, is that correct?

6  A   Yes.

7  Q   So before that 40-thousand-dollar deposit, there

8  was, if my math is correct, $66,588.12, is that

9  correct?

10 A   Well, the same -- not to be picky, but on the

11 same day that the 40,000 deposit was made, there was

12 another check.  There two checks made in the same

13 deposit.

14 Q   And that was a 35-thousand-dollar check, is that

15 correct?

16 A   Yes.

17 Q   And that 35-thousand-dollar check was not from

18 Tony Rezko, is that correct?

19 A   You know, I'd to look at the check.  I know it's

20 not from Tony Rezko, I'm not sure about 35 --

21 Q   And it was --

22        I'm sorry?

23 A   I'm not positive it was $35,000, but I know it

24 was not from Mr. Rezko.

25 Q   Okay.  So the other commission check that was

Schindler - cross by Goldstein                    3688

1  received by Patti Blagojevich right around that same
2  time, you're not exactly sure of the amount but
3  you're sure it's not from Tony Rezko, is that
4  correct?

:24PM  5  A   Correct.

6  Q   Okay.  So the amount that was in the River Realty
7  bank account had enough amount of money to pay for
8  these expenses before this 40-thousand-dollar check
9  was submitted, is that correct?

:24PM  10  A   Yes.

11  Q   Okay.  So the $40,000, you can't say what money
12  that was in River Realty's bank balance January 23rd
13  actually went towards these expenses, is that
14  correct?

:25PM  15  A   That's correct.

16  Q   Now, if you can turn to Chart 11.

17        Are you there?

18  A   Yeah.

19        THE COURT:  I would ask you how much time you

:25PM  20  have left?  Because if it's a short time, we'll

21  continue; if it's a longer time, we'll take a break

22  now.

23        MR. GOLDSTEIN:  Just about 15 to 20 minutes.

24        THE COURT:  Let's take a break.

:25PM  25        THE MARSHAL:  All rise.

1      (The following proceedings were had out of

2       the presence of the jury in open court:)

3         THE COURT:  Court is in recess.

4

5      (Luncheon recess taken from 12:25 o'clock

6       p.m. to 1:46 o'clock p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Schindler – cross by Goldstein                3690

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4            Government,             )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   July 1, 2010
    ROBERT BLAGOJEVICH,              )
7                                    )
             Defendants.            )   1:46 o'clock p.m.
8

9                        VOLUME 18
                 TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
                      AND A JURY
11

12   For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20   Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                    Room 2504
                Chicago, Illinois 60604
23                 (312) 435-5895

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
           (312) 640-1776
6
           LAW OFFICE OF SAMUEL E. ADAM
7          BY:  Samuel Forbes Adam
                Samuel Adams, Jr.
8          6133 South Ellis Avenue
           Suite 200
9          Chicago, Illinois 60637
           312-726-2326
10

11         OFFICES OF AARON B. GOLDSTEIN
           BY: Aaron Benjamin Goldstein
12         6133 South Ellis
           Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
           Suite 307
16         Chicago, Illinois 60614
           (773) 517-0622
17
           LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
           53 West Jackson Boulevard
19         Suite 1420
           Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

1 | APPEARANCES (continued:)

2

3 | For Defendant Robert Blagojevich:

4 |         ETTINGER, BESBEKOS, PARISI
         BY:  Michael D. Ettinger
5 |              Cheryl Ann Schroeder
         12413 South Harlem
6 |         Suite 203
         Palos Hills, Illinois 60453
7 |         (708)598-1111

8

         Edelman, Combs, Latturner & Goodwin LLC
9 |         BY:  Robyn S. Molaro
         120 S. LaSalle
10 |         Suite 1800
         Chicago, Illinois 60603
11 |         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Schindler - cross by Goldstein                    3693

1          (The following proceedings were had out of
2           the presence of the jury in open court:)
3              THE CLERK:  Please remain seated.
4              We'll resume with the case on trial.
:46PM    5              THE COURT:  Counsel.
6              MR. SCHAR:  Judge, briefly, just a couple of
7    quick issues, one in terms of schedule of the day.
8              After Agent Schindler we have two additional
9    witnesses.  I'm not sure how long it will be and
:46PM   10   whether it will take us through the afternoon.
11   Given, unfortunately, the holiday schedule, we were
12   unable to secure the other witnesses the way we
13   wanted today.  I'm hoping you will be forgiving of
14   that situation.
:47PM   15             THE COURT:  How forgiving I am depends on how
16   short you are.
17             MR. SCHAR:  I think through the first break
18   and probably after, but I'm not sure if it will take
19   us to 5:00.
:47PM   20             THE COURT:  All right.
21             MR. SCHAR:  When Agent Schindler is done, I
22   believe we're done with the Binder Chart in Binder 3
23   of the calls.  I know it's getting crowded, I don't
24   know if you want to permit the jury to take those
:47PM   25   binders out.

Schindler - cross by Goldstein                    3694

1          THE COURT:  I believe the jury would

2    unanimously, particularly if you see where they put

3    them and the narrowness of the way they have to

4    walk, they're stepping over the stuff, I'm sure

5    they'd be happy.

6          MR. SCHAR:  We'll still be using the Binder 1

7    and Binder 2 but not the other one.

8          Our next witness is Bob Williams who there is

9    a petition for immunity for.  I don't know if you

10   want to do that now or whether you want to take a

11   break after Agent Schindler to do that.

12         THE COURT:  I rather do it now.

13         MR. SCHAR:  Okay, we will arrange to have him

14   brought in.

15         And the last thing before I turn it over to

16   Mr. Niewoehner for one additional issue, is that if

17   there is time, what we would like at the end of the

18   day is address some scheduling issues related to the

19   remainder of the trial.

20         THE COURT:  Sure.

21         MR. NIEWOEHNER:  Your Honor, there is one

22   other matter that we need to resolve before the

23   cross-examination of Michael Winter who will be the

24   last witness for the afternoon.  So we can either

25   take that up now or at the break, whatever your

1    preference would be.

2          THE COURT:  Well, since the jury is cooling

3    their heels and they know I'm out here, we can take

4    it up now.

5          MR. NIEWOEHNER:  Your Honor, I expect

6    Mr. Winter will testify about Patti Blagojevich

7    working at Rezmar, that will be the basic topic he

8    will address.  And Mrs. Blagojevich did have a

9    contract that governed that or reported to govern

10   that relationship.

11         I have spoken to defense counsel about this.

12   It's my understanding that Mr. Gillespie intends to

13   ask some questions of Mr. Winter along the lines of

14   what Michael Winter's understanding of the way that

15   contract came from.

16         In particular, I think the evidence will show

17   that Brian Hynes was somebody who participated in

18   the drafting of that contract, he was a lawyer at

19   Shefsky & Froelich.  The government's view is that

20   that would be irrelevant hearsay for Mr. Winter who

21   had nothing to do with the contract's drafting or

22   formation.

23         He was aware of it, he was aware that there

24   was a contract, but beyond that he had nothing to do

25   with the creation, or negotiation, or anything else

1  of the contract.

2          So we would ask to bar any questions of

3  Mr. Winter about where that contract came from as

4  either hearsay or 403.  Hearsay because it is being

5  offered for the truth, and in fact some lawyer did

6  review it, particularly Mr. Hynes or any lawyer, for

7  that matter, and this is potential confusion as to

8  whether this was legal or not which seems to be the

9  indication.

10          THE COURT:  Yes or no?  And if yes, why?

11          MR. GILLESPIE:  Judge, if the government

12  plans on asking him about the contract, I do plan on

13  asking him what he knows about the contract.

14          I'm not going to ask him to get into specific

15  terms of the contract because I don't think he has

16  any information.  But just to throw out that there

17  was a contract, I think, one, under the rule of

18  completeness, I'm not going to ask what he talked to

19  Mr. Hynes about, but he knows, he's testified -- not

20  testified, but he's given information to the agents

21  back in 2007, some 3 years ago, that he was aware of

22  fact that this contract was drawn up by an attorney,

23  by Mr. Hynes, and that after it was drawn up by

24  Mr. Hynes it was passed on to Mrs. Blagojevich.

25          So I don't believe it's a hearsay problem and

1  I believe it's relevant and I don't see why it
2  should be excluded.
3          THE COURT:  What use are you going to make of
4  it?
:51PM
5          MR. GILLESPIE:  I'm sorry?
6          THE COURT:  What use are you going to make of
7  it?
8          MR. GILLESPIE:  Yes, sir.
9          THE COURT:  Well, that's what I want to know.
:51PM
10 I mean, what use are you going to make of it?  Why
11 is it of use to you?
12         MR. GILLESPIE:  Oh.  It's of use to me
13 because it's clear that it's government's position,
14 just based upon the wording that counsel just used,
:51PM
15 that this word "contract" is a sham, is that it's
16 meaningless.  If it's put out there that this is a
17 contract, the jury is left to believe:  Well, was
18 this just printed up by Mr. Rezko?  Was this given
19 by Mrs. Blagojevich?  I think the jury has a right
:51PM
20 to know where the contract came from.
21         THE COURT:  And if Mr. Hynes, the lawyer, was
22 called to testify, he would say what?
23         MR. GILLESPIE:  I'm assuming, Judge, he would
24 say that he prepared the contract and he presented
:51PM
25 the contract to Mr. Rezko and Mrs. Blagojevich and

1  that it was signed.

2          THE COURT:  Okay, that part I got, but --

3          MR. NIEWOEHNER:  Judge, I don't actually

4  intend to mention contract.

5          THE COURT:  Does that solve your problem?

6          MR. GILLESPIE:  If I can have a second,

7  judge, just to confer?

8      (Brief pause).

9          MR. GILLESPIE:  Judge, again, I think, per

10 the indictment, it's the government's allegation

11 that Mrs. Blagojevich was getting paid for work that

12 she was not doing, that this was a means in which

13 Mr. Rezko was passing money on to the Blagojevich

14 family.

15         I think the fact that there actually was a

16 contract that was prepared by Mr. Hynes in this

17 case, the contract was assigned between the parties,

18 it would be relevant, in my humble opinion, that

19 that goes to that particular issue, as to whether or

20 not she was a ghost payroller or whether she was

21 actually doing work, and, as importantly, whether

22 she was doing work as termed by the contract.

23         THE COURT:  I still don't quite get it, and

24 the reason I don't quite get it is, if the

25 government were going to contend that this is a sham

1 arrangement, it doesn't make any difference if
2 there's a contract or no contract, it can still be a
3 sham arrangement either way.
4          So the fact that there is a contract, and
5 that some lawyer wrote it up doesn't seem to me to
6 help either side, which I think is why they're
7 willing to forgo reference to the contract.
8          I just don't see why it helps you unless you
9 want to operate on some kind of evidentiary
10 foundation, which I don't think you can lay, which
11 is that when there is a contract, it is factually
12 more likely that this deal is an honest deal, and I
13 don't think you're going to do that.
14          MR. GILLESPIE:  I would agree with the Court
15 on that.  And, of course, whether or not the
16 contract in and of itself leads this to be a
17 legitimate deal or it lends credibility to our
18 contention or to our true belief that it is an
19 actual working relationship that they have, I think
20 is a question of fact to be presented to the jury.
21
22          THE COURT:  The question I have is, the
23 witness is going to be examined basically on --
24 well, maybe not.  Let me ask you this question:  Are
25 you going to ask him what her terms of employment

Schindler - cross by Goldstein                          3700

1 were, apart from the contract?

2          MR. NIEWOEHNER:  I think the term that is

3 significant for this witness would be that she was

4 paid on a monthly basis of approximately 12,000

5 something dollars a month, so that would be

6 something we would elicit.  As to whether by

7 contract or some other mechanism, it isn't

8 important.

9          THE COURT:  It was a term of employment, is

10 what you want?

11          MR. NIEWOEHNER:  Yes.

12          MR. GILLESPIE:  Judge, if I may --

13          THE COURT:  Wait.  Let me finish.

14          MR. GOLDSTEIN:   I'm sorry.

15          THE COURT:  And I think an undisputed fact

16 between the parties that the term of employment is

17 $12,000 a month.

18          MR. NIEWOEHNER:  If I could have just one

19 second, Your Honor.

20          THE COURT:  Yes.

21          (Brief pause)

22          MR. SCHAR:  Your Honor, I should have been

23 more clear.  This witness would not be putting the

24 contract, there is another witness, however, who I

25 think would put in the contract.

1          THE COURT:  Okay.

2          MR. NIEWOEHNER:  I think the point that we

3   would object to is not that there was a contract,

4   but whether a lawyer drafted it up, to your point,

5   whether a lawyer drafted it up or someone else did

6   is not material to any issues in the case.

7          THE COURT:  Okay, I got it.

8          Okay, there's a contract.  Everybody agrees

9   there is a contract.

10          MR. GILLESPIE:  Yes, Your Honor.

11          THE COURT:  Now, his point is the fact that

12   it was drafted by lawyer, what difference does that

13   make?

14          MR. GILLESPIE:  Judge, again, I think, of

15   course none of us are sitting in those 12 jurors'

16   seats, but to say that wouldn't make a difference to

17   any of the jurors, I don't think how we can do that.

18          It's in direct context to the contract--and

19   as counsel, I believe, just stated, the contract is

20   going to be coming in--it's in direct context to how

21   she's getting paid, the amount she's getting paid,

22   the work she's expected to be done is laid out by

23   that particular contract.

24          THE COURT:  Okay, I got that, but why does it

25   matter who drafted it?

Schindler - cross by Goldstein                    3702

 1          MR. GILLESPIE:  I'm sorry?
 2          THE COURT:  Why does it matter who drafted
 3 it?
 4          MR. GILLESPIE:  It would be our position,
 5 Judge, it would be significant because it's the
 6 government's contention that there is this il- -- I
 7 was going to say improper, but illegal relationship
 8 established between the Governor, Mrs. Blagojevich,
 9 and Mr. Rezko, and if it's just thrown out there
10 that there was a contract that set these terms,
11 there is no understanding as to how this contract
12 was prepared or who prepared it.
13          Just to ask the witness --
14          THE COURT:  Well, wait, wait, wait.  Now that
15 I understand the argument, this is like some of the
16 other arguments that I anticipate hearing, that it
17 must be legal because there was a lawyer in the
18 room, or to cite Mr. Adam's repeated reference to 40
19 under 40, is that somehow a lawyer is imprimatur.
20 And I don't think it works even in the days when
21 people had a lot more respect for lawyers than they
22 do today.  But I don't get the fact that if there
23 was a lawyer who did it, unless you're going to talk
24 about some kind of intimate relationship with this
25 entire deal had by this lawyer and then we can hear

1   by the lawyer.

2           MR. GILLESPIE:  I'm sorry?

3           THE COURT:  Unless there was some intimate

4   relationship to the event with respect to this

5   lawyer.  If it's a contract, it's fine, but that a

6   lawyer drafted it strikes me as utterly irrelevant.

7   It doesn't help you in any legitimate argument.

8           Now, if you're going to make an argument

9   that one indicia of the legitimacy of this

10  transaction is that a lawyer drafted the contract,

11  which is, I think, where you're getting to, I don't

12  think you got an evidentiary basis for making that

13  assertion that a lawyer may or may not know what

14  underlies this stuff.  The lawyer may make a

15  perfectly legitimate piece of paper, but he doesn't

16  know if the transaction is legitimate.  Unless he's

17  intimately associated with how the deal was made and

18  what the relationship is between the parties, then I

19  don't think you get anywhere with that.

20          Lawyers are not guarantors.  They may,

21  arguably, be guarantors of some aspects of the

22  contract, but they are not guarantors of the

23  execution of it, and the issue the government is

24  going to raise is the execution of the contract.

25          MR. GILLESPIE:  In that same vein, Judge,

1 it's my understanding that Mr. Winter, the witness

2 who is going to testify, and I know counsel can

3 correct me if I'm wrong, is not familiar with the

4 terms of this contract or familiar with what the

5 contract called for or specified, then if the gist

6 of his testimony is is that she didn't do anything

7 which warranted payment of the sum of money as

8 termed by the contract, then I think his whole

9 testimony is irrelevant.

10          THE COURT:  No, but that's a different issue.

11 What we're talking about is is the government

12 proposes to put on a witness who said we have a

13 contract, these are its terms, and under these terms

14 she didn't deserve the money.

15          Is that about it?

16          MR. NIEWOEHNER:  Yeah.

17          THE COURT:  Roughly.

18          MR. NIEWOEHNER:  The big picture, yes.

19          THE COURT:  So, basically, I don't see what

20 the lawyer has to do with this.

21          MR. GILLESPIE:  If I might ask, Judge, is it

22 my understanding that if this witness is going to

23 say he is intimately involved with this contract,

24 he's going to be able to testify as to the intimate

25 details of this contract but not how it's prepared?

1        THE COURT:  I don't even know that he has to
2   talk about the intimate details.  Usually the basic
3   details are:  You will do X for us and we will pay
4   you Y.  And if that's what he's talking about -- if
5   it's one of these things which says you do 40 hours
6   a week and we pay you $100 an hour, that's fine.  If
7   you start talking to him about default provisions
8   and a bunch of other stuff, no.

9        So if he understands what the consideration
10  on both sides is, what Mrs. Blagojevich is supposed
11  to give to them and what they are supposed to give
12  in return, it's hard to believe that he wouldn't be
13  familiar with those basics if he's qualified to
14  testify about this at all.  Then, if he says she
15  gave us this, she's supposed to give us this, we
16  gave her that, and he testifies I was in the office
17  constantly and we never got this and we paid her for
18  that, that's his testimony.

19       MR. GILLESPIE:  Sure, Judge.  But,
20  historically, this isn't a man who worked for this
21  company.  Was a consultant for this company but he's
22  not a man who was president or vice president or a
23  supervisor.

24       THE COURT:  He's being tested, I'm assuming,
25  on his observations, and we'll see if he's got

1  adequate observations to make that point.

2          MR. GILLESPIE:  Okay.

3          THE COURT:  If you cross examine him and it

4  turns out he's in the office one hour a week and

5  it's important to know how many hours that the

6  employee was in the office, maybe he's not competent

7  to do that.  But it may not simply be an attendance

8  issue, there may be other issues as well, and we

9  have to see if he's got a reasonable basis to say

10 it, but we'll see.

11         MR. GOLDSTEIN:  Yes, Your Honor.

12         Would I be allowed to ask, Judge, or just

13 simply say that your understanding this wasn't drawn

14 up by either Mrs. Blagojevich or Mr. Rezko, and

15 because if it's the lawyer issue, that it's just a

16 third-party.

17         THE COURT:  Do you care?

18         MR. NIEWOEHNER:  The understanding would come

19 from hearsay.  He didn't do it, so the only way to

20 acknowledge this is that somebody else told him

21 where it came from, so I don't think it's relevant

22 for the truth of the matter.

23         THE COURT:  Yes, then it probably is hearsay.

24 And, you know, if this is a big issue, you can

25 probably prove it some other way and you might even

Schindler - cross by Goldstein                    3707

1  get a stipulation, I don't know.  I don't want to go

2  off on this track, particularly in the context of

3  this case where it seems to me that the lawyer's

4  presence at certain times has a significance in this

5  case that it might not have in other cases.

6          MR. GILLESPIE:  Thank you, Your Honor.

7          MR. NIEWOEHNER:  Thank you.

8          MS. HAMILTON:  Your Honor, we're here for

9  petition of immunity for Rod Blagojevich.

10          THE COURT:  I have seen the petition and the

11  requisite letter from the DOJ.

12          You are Robert Williams?

13          MR. WILLIAMS:  Yes, sir.

14          THE COURT:  And you are represented by

15  counsel here?

16          MR. CAMPBELL:  Yes, Judge.  Terry Campbell.

17          THE COURT:  I'm going to enter an order in a

18  few moments which grants you immunity.  Has your

19  lawyer explained that to you?

20          MR. WILLIAMS:  Yes, sir.

21          THE COURT:  This means that you are immune

22  from the use of any statement you might make on the

23  witness stand, the use of any statement you might

24  make to prove any charge against you personally; do

25  you understand that?

:04PM
:05PM
:05PM
:05PM
:06PM

Schindler - cross by Goldstein                    3708

1              MR. WILLIAMS:  Yes, sir.

2              THE COURT:  The only way you can get in

3    trouble with respect to what it is you say on the

4    witness stand is if you commit perjury, in which

:06PM  5    case you can be prosecuted for that; do you

6    understand this?

7              MR. WILLIAMS:  Yes, sir.

8              THE COURT:  And you have conferred with your

9    lawyer?

:06PM  10             THE WITNESS:  Yes, sir.

11             THE COURT:  Anything further?

12             MS. HAMILTON:  No, Your Honor.

13             THE COURT:  The order is signed and entered.

14             THE MARSHAL:  All rise.

:08PM  15        (The following proceedings were had in the

16         presence of the jury in open court:)

17             THE COURT:  Please be seated.

18             You may resume.

19             MR. GOLDSTEIN:  Thank you, Your Honor.

:08PM  20        SHARI SCHINDLER, GOVERNMENT WITNESS, SWORN

21                CROSS EXAMINATION (resumed)

22    BY MR. GOLDSTEIN:

23    Q   Okay, Ms. Schindler, what I'd like you to do is

24    turn to Chart 11.

:08PM  25    A   Okay.

1 Q   Just briefly, this indicates Rod and Patricia

2 Blagojevich consumer credit balance, is that

3 correct?

4 A   Yes, sir.

5 Q   And does that include the home equity loan?

6 A   Yes, this one does.

7 Q   Do you know how much that home equity loan was

8 for?

9 A   The total amount of credit?

10 Q   I'm sorry?

11 A   You mean the amount of credit that it was for?

12 Q   Correct.

13 A   Not off the top of my head, I don't know.

14 Q   Now, could you look at Chart number 12.

15 A   Okay.

16       MR. GOLDSTEIN:  Your Honor, may I publish

17 this?

18       THE COURT:  Sure.

19       You want the jury to turn to it in the books?

20       MR. GOLDSTEIN:  Yeah, they can turn to it in

21 the books, or whatever is most convenient.

22 BY MR. GOLDSTEIN:

23 Q   Now, on this chart is the top 10 categories of

24 expenditures, is that correct?

25 A   Yes.

Schindler - cross by Goldstein                          3710

1  Q   So the top category is the least amount and the
2  bottom category is the most, is that correct?
3  A   The top category on the chart or the top in
4  meaning highest amount?
5  Q   Highest.
6  A   The highest value is at the bottom, the lowest is
7  at the top.
8  Q   Much better said than I did.
9        So that's your understanding, the medical is
10 the least amount?
11 A   Of the top 10, yes.
12 Q   Now, we went over the IRS form that the
13 Blagojevichs' prepared and it was from 2002 to 2008,
14 is that correct?
15 A   Yes.
16 Q   Now, it's my understanding that the total amount
17 of taxes paid during that period was $458,492, is
18 that your understanding of the total amount of taxes
19 paid by the Blagojevichs during that period?
20 A   I never added it up.
21 Q   You never added it up?
22 A   No.
23 Q   Does that sound like an accurate number to you?
24 A   I really have no idea.
25 Q   Well, on this chart, where would you put that

:10PM

:10PM

:11PM

:11PM

:11PM

Schindler - cross by Goldstein                3711

1  figure $458,492 on this chart?  Where would it go?
2  A  The taxes paid were paid off -- they were
3  withheld from the paychecks.  They were not
4  expenditures that were paid out of the funds
5  available to spend.
6        So all on this chart is money that was
7  actually spent using a credit card, or a debit card,
8  or a check.  So the taxes that were withheld from
9  the paycheck never got into the stream of money to
10 be used.
11 Q  But the amount of taxes, would it be fair to say,
12 would be more than -- would be the highest amount on
13 that chart, is that correct?
14 A  I don't know.  I never added it up.
15 Q  Okay.
16        Now, if I can show you Chart 13.
17        MR. GOLDSTEIN:  Permission to publish, Your
18 Honor?
19        THE COURT:  You may.
20     (Exhibit published to the jury.)
21 BY MR. GOLDSTEIN:
22 Q  Now, number 12, do you see that?
23 A  Yes.
24 Q  It says "cash," what does cash mean?
25 A  Cash would be any ATM withdrawal or any checks to

:11PM
:12PM
:12PM
:12PM
:12PM

Schindler - cross by Goldstein                3712

1  cash.

2  Q   So you evaluated cash withdrawals by the

3  Blagojevichs, is that correct?

4  A   I evaluated all their expenditures, yes.

:13PM   5  Q   Okay.  And one of the expenditures was cash

6  withdrawn from the bank, is that correct?

7  A   Yes.

8  Q   And the total between January 2002 and

9  December 9, 2008 was $26,863.74?

:13PM   10  A   Yes.

11  Q   So from January 2002 to December 9, 2008, there

12  was a consistent withdrawal of cash by the

13  Blagojevichs, is that correct?

14  A   I didn't analyze the pattern.

:13PM   15  Q   Okay.  You do recall -- you remember that chart

16  you analyzed with Lon Monk?

17  A   Yes.

18  Q   But you didn't analyze it in this case?

19  A   No.

:13PM   20  Q   You didn't see anything in your analysis of the

21  Blagojevichs anywhere similar to Lon Monk?

22          MR. SCHAR:  Objection, Judge.

23          THE COURT:  Sustained.

24  BY MR. GOLDSTEIN:

:14PM   25  Q   Now, if you can look at Chart 10, please.

1  A   Okay.

2  Q   Now, the credit card debt, could you explain how

3  you analyzed the credit card debt?

4  A   I went through all the credit cards and I

5  analyzed, looked at the end of the month for every

6  credit card, and then I added them all up.  So that

7  on January 31st '02 I added up all the balances that

8  were owed on the credit cards at that point in time.

9  Q   So you basically just took the credit card

10 statements and added the totals for each month, is

11 that correct?

12 A   Yes, except for sometimes the credit card

13 statement might end on the 13th, so I actually had

14 to go through and compute the credit card balances

15 at the end of every month.

16 Q   Okay.  Now, you did a similar analysis as to the

17 checking account, is that correct?

18 A   Of the balance in the checking account?

19 Q   Yes.

20 A   No.

21 Q   Well, did you review expenditures or checks

22 written by the Blagojevichs?

23 A   Yes.

24 Q   Okay.  And you basically looked at checking

25 account or saving account statements monthly, is

1  that correct?

2  A   That's correct.

3  Q   And then you just added those together, is that

4  correct?

:15PM  5  A   Added what together?

6  Q   Added the total expenditures or the total

7  withdrawals?

8  A   Oh, yes.

9  Q   Is it fair to say based on your analysis of the

:16PM  10  credit cards and checking accounts, that the

11  expenditures or the payments by Rod and Patricia

12  Blagojevich were made by credit card or check?

13  A   The payments were either made by credit card or

14  check or debit card or occasionally a cash advance

:16PM  15  from a credit card.

16  Q   These payments were easily traceable, by your

17  analysis, is that correct?

18  A   Yes.

19  Q   Now, in your analysis of all the bills paid, did

:16PM  20  you find any bills paid by Tony Rezko?

21  A   No.

22  Q   Did you see any of this credit card debt paid by

23  Tony Rezko?

24  A   No.

:17PM  25         MR. GOLDSTEIN:  If I could have just one

Schindler - cross by Goldstein                3715

1  moment.

2      (Brief pause).

3  BY MR. GOLDSTEIN:

4  Q   Now, if we can go back to Chart 12 again and

5  publish that.

6          Now, the bottom indicates the clothing.

7  Based on your analysis, was any of this clothing

8  paid for by the Friends of Blagojevich fund?

9  A   No, this was all just from their personal funds.

10 Q   Out of pocket from the Blagojevichs, is that

11 correct?

12 A   Yes.

13 Q   And based on your analysis of the tax returns,

14 was any of this clothing written off by the

15 Blagojevichs?

16 A   Not that I saw, no.

17 Q   When I say "written off," did they indicate it as

18 an expenditure?

19 A   No, they didn't.

20 Q   So they received no tax benefit from all the

21 money that they paid for clothing, is that correct?

22 A   That's correct.

23 Q   Now, we spoke just briefly about any bills paid

24 by Tony Rezko.  Did you find in your analysis any

25 bills paid by Lon Monk?

Schindler - redirect by Schar                    3716

1  A   Any bills of?

2  Q   Of the Blagojevichs.

3  A   Of the Blagojevichs?  No.

4  Q   Based on your analysis of all the bills and

5  expenditures, did you find any bills paid by Chris

6  Kelly?

7  A   No.

8          MR. GOLDSTEIN:  Nothing further.

9          MR. SCHAR:  One moment.

10      (Brief pause).

11                  REDIRECT EXAMINATION

12  BY MR. SCHAR:

13  Q   You were asked questions whether or not the

14  Blagojevichs reported all their income on the tax

15  returns?

16  A   Yes.

17  Q   Are you aware one way or another that the

18  Blagojevichs made the tax returns public?

19  A   Yeah, I believe they were made public.

20  Q   So they didn't, from your analysis, they didn't

21  underreport on the publicly disclosed tax returns?

22  A   That's right.

23          MR. SCHAR:  Nothing further.

24          MR. GOLDSTEIN:  Nothing further.  Thank you.

25          THE COURT:  You may step down.

:18PM
:18PM
:19PM
:19PM
:19PM

1      (Witness excused.)

2          MR. SCHAR:  Judge, we would like to finish

3  the publication of one call before the next witness.

4  It would behind tab 34 in Transcript Binder 1.

5          THE COURT:  Members of the jury, I do want to

6  inform you that each of you should have, I think, 3

7  or 4 binders.  Some of those binders you will not

8  need them again and at the next break or at the end

9  of the day we'll take them out of the box so the

10  obstacle course would be reduced.

11          MR. SCHAR:  Judge, for the record, I think

12  the two binders we won't need anymore will be the

13  chart binder and transcript binder 3, transcript 1

14  and 2 we will still be using.

15          Judge, for the record, behind tab 34.  A

16  portion of the call was previously played yesterday,

17  I believe yesterday, November 10, 2008, with the

18  speakers being Rod Blagojevich, Fred Yang, Patti

19  Blagojevich, Bill Quinlan, Bill Knapp, and Sosnik,

20  we would ask to play 8 through page -- the top of

21  page -- well, the bottom of Page 10, would be the

22  portion that we did not play yesterday.

23          MR. S. ADAM, JR.:  Your Honor, we object to

24  playing this without a witness.

25          THE COURT:  That objection is overruled.

1        You can proceed.

2      (Tape played.)

3        MS. HAMILTON:  Your Honor, at this time the

4  government calls Robert Williams.

5        MS. HAMILTON:  And, Judge, I will not be

6  using the transcript binders.  We, actually, won't

7  be using them for the rest of the afternoon.

8      (Brief pause).

9      MS. HAMILTON:  We call Robert Williams.

10        THE COURT:  Face me and raise your right

11  hand.

12      (Witness sworn.)

13        THE COURT:  Please be seated.

14      ROBERT WILLIAMS, GOVERNMENT WITNESS, SWORN

15                DIRECT EXAMINATION

16  BY MS. HAMILTON:

17  Q   Good afternoon.

18        Could you state and spell your name for the

19  jury.

20  A   Certainly.  My name is Robert Williams,

21  R-o-b-e-r-t, w-i-l-l-a-m-s.

22  Q   Mr. Williams, what city do you live in?

23  A   I live in Naperville, Illinois.

24  Q   What do you do for a living?

25  A   I am currently the CFO of a financial services

1    company.

2  Q   How long have you been there?

3  A   Approximately 27 months.

4  Q   Mr. Williams, briefly, what is your educational

5    background?

6  A   I have a B.A. degree from Macalester College and

7    an M.B.A. from the University of Chicago.

8  Q   Mr. Williams, are you testifying here today

9    pursuant to an immunity order?

10 A   Yes, I am.

11 Q   What is your understanding of what that means?

12 A   My understanding is that as long as I am truthful

13   in what I say, that I cannot be prosecuted

14   criminally for anything that I testify regarding

15   today.

16 Q   What's your understanding of what might happen to

17   you if you do not testify truthfully?

18 A   If I do not testify truthfully, I can be

19   criminally prosecuted for perjury.

20 Q   Mr. Williams, at some point in your career, did

21   you work for a company called Rezmar?

22 A   Yes, I did.

23 Q   When did you work at Rezmar?

24 A   From 1998 through 2007.

25 Q   What was your position at Rezmar?

1  A   I was the chief financial officer.

2  Q   What is Rezmar?

3  A   Rezmar Corporation was a real estate development

4  company located here in Chicago.

5  Q   Who were the owners of Rezmar when you worked

6  there?

7  A   Antoine Rezko and Daniel Mahru.

8  Q   What were your duties as the CFO for Rezmar?

9  A   I was responsible for overseeing the accounting

10 function within the company, which included

11 everything from trying to find construction

12 financing for real estate developments that the

13 company did, to reviewing checks that would

14 ultimately be signed, to reviewing monthly financial

15 statements for the company and the various entities

16 that the company developed its projects under.

17 Q   When you say the various entities that it

18 developed its projects under, what do you mean?

19 A   Rezmar would set up what is called a single

20 purpose LLC, limited liability corporation, for each

21 of its development projects.

22         And, typically, the ownership of those LLC's

23 were Mr. Mahru and Mr. Rezko and then that entity

24 would acquire the property that would then be

25 developed into some kind of townhome or condominium

Williams - direct by Hamilton                    3721

1  project.

2  Q   And as CFO, what were your duties with respect to
3  those individual entities or LLC's?

4  A   I basically oversaw the accounting for each of
5  those entities, as well; everything from, again,
6  reviewing receipts and disbursements for those
7  entities.

8         I also would be involved with the financial
9  institutions at the banks that did the lending, the
10 construction lending for those projects.  I
11 typically on a periodic, usually monthly basis,
12 submitted some kind of a draw to each of those
13 companies -- excuse me, each of those banks, because
14 it was the banks that finance the actual
15 construction.  So each month we would typically
16 submit a package to the banks asking them to fund
17 the activity or the work that had been done at the
18 project for the prior month.

19 Q   And is that what you mean when you use the word
20 "draw"?

21 A   Yes.

22 Q   What you just described in terms of your duties
23 with respect to the individual entities or LLC's, is
24 that one of the ways that you were aware of the
25 various projects that were under way at Rezmar at

1 any given time?

2 A  Yes, it is.

3 Q  Were there other ways that you were aware of the

4 projects that Rezmar had going at any given time?

5 A  We, typically, as a company had development

6 meetings on a periodic basis.  We attempted to have

7 them weekly, usually had them at least every other

8 week.

9      Those meetings would include people from the

10 construction company that we used.  We had a captive

11 construction company again owned by Mr. Mahru and

12 Rezko that would act as the general contractor for

13 each of the projects that we developed.

14      We had a marketing team that would actually

15 market, hire people to be on-site at the different

16 projects to sell the townhomes or the condominiums

17 that were being developed at the project.

18      We had a legal department that would be part

19 of these meetings.  And we also had project

20 managers, more often than not, that would be part of

21 these periodic meetings.

22 Q  I want to break those down a little bit.

23      One of the phrases you used in your answer

24 was you said a captive construction company, what do

25 you mean by that?

Williams - direct by Hamilton                    3723

1  A   Mr. Mahru and Mr. Rezko set up a company called
2  Chicago Construction Services and Chicago
3  Construction Services served as the general
4  contractor for the projects that it developed.  And
5  Chicago Construction Services was responsible for
6  obtaining contracts with each of subcontractors that
7  would then do the actual work of building the
8  townhomes or the condominiums in the given projects.
9  Q   You also talked about a marketing team, is that
10 right?
11 A   Yes.
12 Q   What was that?
13 A   We had an individual responsible for the
14 marketing, a vice president of marketing for the
15 company, and then we also hired staff to actually
16 sit at the projects as they're being built, and one
17 of the first things we would do is build a model
18 home or put a model trailer at the site, and these
19 people were responsible for selling the homes to
20 individuals that came by and wanted to see what the
21 project would eventually be.
22 Q   And you said you hired staff.  Was this staff
23 Rezmar employees?
24 A   They became Rezmar employees, yes.
25 Q   You also mentioned project managers?

1  A   Yes.

2  Q   What did you mean by that?

3  A   A project manger was somebody who handled the

4  work on a given job other than more likely than not

5  the marketing and construction.

6          They coordinated with the vice president and

7  the marketing and the vice president of

8  construction, but their job dealt with everything

9  from dealing with community groups that were in the

10 area and making certain that the community groups

11 were up to speed with what was being planned and

12 sometimes placating the community groups in the

13 area.  In other cases they dealt with the city, you

14 know, personnel at the city who were responsible for

15 ultimately approving zoning of the project.  So they

16 had, typically, any number of different

17 responsibilities other than the construction and the

18 marketing for the project.

19 Q   So, Mr. Williams, the reason that you were

20 talking about the construction team, the marketing

21 team, the project managers, is because you were

22 talking about the development meetings, is that

23 right?

24 A   Yes.

25 Q   So, generally, what was discussed at the

Williams - direct by Hamilton                    3725

1  development meetings where these groups and yourself
2  would get together?
3  A   We would typically go through each of the
4  projects to discuss the various aspects of each of
5  them.  Where were we at in the zoning process, for
6  instance; where were we at in the construction
7  process; how was the marketing going; how many units
8  have we sold in the prior week; what was the traffic
9  at the given project in the prior week.
10         We tried to make certain that we would not
11 only discuss projects that were currently ongoing,
12 but we'd also discuss projects that were on the
13 horizon, if you will; sites that we might be
14 investigating to do future developments on.
15 Q   Mr. Williams, do you know Patti Blagojevich?
16 A   Yes, I do.
17 Q   How do you know Mrs. Blagojevich?
18 A   I met Mrs. Blagojevich a number of times in the
19 Rezmar office.
20 Q   Did you meet her through any particular Rezmar
21 project?
22 A   I first came to know Mrs. Blagojevich about the
23 time that Rezmar acquired a cite on Irving Park Road
24 here in Chicago.
25 Q   And approximately when was that?

1  A   That was December of 2002 when we actually

2  acquired the site.

3  Q   Did Mrs. Blagojevich work through a company?

4  A   Yes, she did.  She worked through a company

:45PM   5  called River Realty, Inc.

6  Q   And you mentioned that you met her through Rezmar

7  actually acquiring a property, is that right?

8  A   Yes.

9  Q   Through the course of your work as CFO with

:46PM   10  Rezmar, did you learn that as part of the closing of

11  that property, that Mrs. Blagojevich was paid?

12  A   Yes.

13  Q   How did you learn that?

14  A   Well, as part of the acquisition process, I had

:46PM   15  the opportunity to review the closing statement and

16  noticed that River Realty, Inc., was one of the

17  brokerage companies that was paid as part of the

18  closing as part of our acquisition, Rezmar's

19  acquisition of the property.

:46PM   20  Q   With the review of the records, was she paid by

21  the seller or was she paid by Rezmar as part of the

22  closing documents?

23  A   It was my interpretation of the closing documents

24  she was paid by the seller.

:46PM   25  Q   Now, prior to the actual closing of the deal, had

1 you also learned about Mrs. Blagojevich's

2 involvement in this project through some of the

3 development meetings you just described?

4 A  Yes.

5 Q  Through your review of the closing documents,

6 approximately how much was Mrs. Blagojevich paid by

7 the seller as part of Rezmar's acquisition of that

8 property in December of 2002?

9 A  The commission paid to River Realty, Inc., was

10 approximately $40,000.

11 Q  Now, around the time of the closing in December

12 of 2002, did Mr. Rezko come to you and request

13 anything?

14 A  Yes, he did.

15 Q  What did he ask you?

16 A  He came to me asking me to review a real estate

17 brokerage agreement that provided for an additional

18 commission to be paid to River Realty, Inc.

19         MS. HAMILTON:  Your Honor, may I approach?

20         THE COURT:  You may.

21         MS. HAMILTON:  I'm going to show the witness

22 what is marked Government Exhibit 2001 Contract.

23         (Brief pause)

24         MS. HAMILTON:

25 Q  Mr. Williams, do you recognize Government

:47PM
:47PM
:47PM
:47PM
:48PM

Williams - direct by Hamilton                    3728

1    Exhibit 2001 Contract?

2    A   Yes, I do.

3    Q   What is this?

4    A   This is a brokerage agreement, a Chicago

5    Association of Realtors MLS brokerage agreement

6    between Rezmar Corporation and River Realty, Inc.

7    Q   Is this a copy of the document you just testified

8    Mr. Rezko showed you in connection with paying a

9    commission to Mrs. Blagojevich?

10   A   Yes, it is.

11          MS. HAMILTON:  Your Honor, I move for the

12   admission of Government Exhibit 2001 Contract.

13          THE COURT:  Without objection, admitted.

14       (Government's Exhibit 2001 Contract was

15        received in evidence.)

16          MS. HAMILTON:  I ask permission to publish?

17          THE COURT:  You may.

18       (Exhibit published to the jury.)

19   BY MS. HAMILTON:

20   Q   Do you see the top of the contract?

21   A   Yes.

22   Q   We'll try to blow it up for the jury, as well.

23          What is it that line number 14 reflects?

24   A   It states that the term of the agreement shall be

25   from February 1, 2001 until February 1, 2003.

1  Q   Now, you said that Mr. Rezko came to you in

2  approximately December of 2002, is that correct?

3  A   Yes.

4  Q   Prior to Mr. Rezko showing you this contract in

5  December of 2002, had you seen this contract before?

6  A   No, I had not.

7  Q   Were you aware this contract existed?

8  A   No, I was not.

9  Q   Aside from this contract between Rezmar and River

10  Realty, were you aware of Rezmar having entered into

11  a similar kind of contract with any other brokerage

12  firm or entity?

13  A   No, I was not.

14  Q   And after this time, December of 2002, were you

15  aware of Rezmar entering into a similar contract

16  with any other entity?

17  A   No, this contract was unique.

18  Q   I want to direct your attention now to the last

19  page of the document.

20         What does the last page of this document

21  reflect?

22  A   It reflects the compensation structure that will

23  be followed pursuant to the agreement.

24  Q   And did you use this as part of calculating the

25  commission to be paid to River Realty as requested

1  by Mr. Rezko?

2  A   Yes, this contract included a sliding scale, as I

3  referred to it, compensation whereby based upon the

4  purchase price of the asset acquired, the

5  compensation paid from Rezmar to River Realty

6  varied.

7  Q   So how is it that you compensated the commission

8  that Rezmar was going to pay to River Realty as part

9  of its acquisition of this property?

10  A   The acquisition price of the property on Irving

11  Park Road was slightly less than $4 million, as I

12  recall.  And at the time I then, pursuant to this

13  agreement, took the purchase price and multiplied it

14  by the 2 percent since it fell within the

15  one-million-one dollar to four-million-dollar range

16  and multiplied the 2 percent times the purchase

17  price and determined that the commission to be paid

18  was, I believe, $79,303.

19        MS. HAMILTON:  Your Honor, may I approach

20  again?

21        THE COURT:  You may.

22        MS. HAMILTON:  I'm going to show the witness

23  Government Exhibit 12/17/02 check.

24  BY MS. HAMILTON:

25  Q   Mr. Williams, do you recognize that?

Williams - direct by Hamilton                    3731

1  A   Yes, I do.

2        MS. HAMILTON:  Your Honor, actually this is

3  already in evidence, so I ask permission to publish

4  it.

:52PM   5        THE COURT:  Leave is granted.

6        (Exhibit published to the jury.)

7  BY MS. HAMILTON:

8  Q   What is this?

9  A   This is a check drawn on Rezmar Corporation

:52PM  10  account payable to River Realty, Inc., in the amount

11  of $79,303 dated December of 2002.

12  Q   And this is the check that you wrote?

13  A   Yes.

14  Q   And is this your signature?

:52PM  15  A   Yes, it is.

16  Q   Now, you indicated that the closing documents

17  reflected that the seller paid Mrs. Blagojevich a

18  commission fee, as well, is that right?

19  A   Yes, it is.

:53PM  20  Q   Now, this commission fee was paid outside of

21  those documents?

22  A   Yes, it was.

23  Q   Was that, in your experience, typical or not

24  typical for closings?

:53PM  25  A   It was not typical.

Williams - direct by Hamilton                    3732

1  Q   Did you have any understanding, based upon what
2  Mr. Rezko told you, as to why it was there was a
3  second commission paid to Mrs. Blagojevich's company
4  outside of the closing documents?
5  A   Nothing other than the contract that he showed
6  me.
7  Q   Mr. Williams, after that December 2002 check we
8  just looked at in connection with the Irving Park
9  project, did there come a time when Mr. Rezko
10 directed you to write another check to River Realty?
11 A   Yes, it was.
12 Q   And approximately when was that?
13 A   Approximately August of 2003.
14 Q   What is it that Mr. Rezko said to you at that
15 time?
16        MR. GILLESPIE:  Objection; foundation.
17 BY MS. HAMILTON:
18 Q   Where did the conversation with Mr. Rezko take
19 place?
20 A   In the Rezmar offices.
21 Q   Was anyone else there?
22 A   No, it was Mr. Rezko and me.
23 Q   What is it that Mr. Rezko said to you at that
24 time?
25 A   He came to me saying that he wanted to try to get

1  a check to Mrs. Blagojevich in the proximate amount
2  of $15,000.
3  Q   Did he say why?
4  A   No.
5  Q   What was your response?
6  A   I told him that I would try to see how we might
7  be able to relate a payment to Mrs. Blagojevich's
8  company in the proximate amount of $15,000 because
9  he had said that he wanted to get the payment to her
10 but have it related to one of the projects.
11 Q   To your knowledge, had Mrs. Blagojevich worked on
12 any projects that had closed around that time?
13 A   No.
14 Q   Other than the Irving Park project that we just
15 talked about, were you aware of her working on any
16 other Rezmar related projects between December
17 of 2002 and August of 2003?
18 A   I was not.
19 Q   So what was your response to Mr. Rezko's request?
20 A   I told him that I would review the activity at
21 the different projects for Rezmar that were going on
22 at the time and try to determine if there was a way
23 to relate a check in the approximate amount to one
24 of the projects and I would get back to him.
25 Q   After you told Mr. Rezko that, what do you do?

Williams - direct by Hamilton                    3734

1  A   I went back and looked at a couple of different
2  projects that we had and noticed that there had
3  recently been a closing at a project of ours that's
4  called St. John's Park that was owned by an LLC
5  called 850 North Ogden, LLC.
6  Q   And what did you do?
7  A   The contract price that we had received at the
8  closing when multiplied by 2 1/2 percent provided a
9  commission that was in the range of $15,000, and 2
10 1/2 percent was a common co-op brokerage commission
11 amount that Rezmar paid in its given projects when
12 there was a co-op broker involved.
13 Q   To your knowledge, Mr. Williams, had
14 Mrs. Blagojevich or River Realty been involved in
15 any way in the sale of that unit?
16 A   No.
17 Q   To your knowledge, did Mrs. Blagojevich or River
18 Realty have any affiliation with the 850 Ogden, LLC,
19 at all?
20 A   I do not believe she did.
21 Q   What did you do next?
22 A   Once I determined that the 2 1/2 percent of the
23 sales price for the unit that had closed
24 approximated the $15,000, I went back to Mr. Rezko
25 and made mention of that fact to him, and based upon

:55PM

:56PM

:56PM

:56PM

:57PM

Williams - direct by Hamilton                    3735

1   that discussion he then asked me to prepare a check
2   or have a check prepared in that amount payable to
3   River Realty, Inc., or drawn upon the 850 North
4   Ogden, LLC, project.
5   Q   What did you do next?
6   A   Based upon his agreement to prepare the check, I
7   went and asked my staff to prepare a check in the
8   amount of approximately $15,000 payable to River
9   Realty, Inc., drawn on the 850 North Ogden account.
10  Q   And, sir, why did you do that if it was your
11  understanding that Mrs. Blagojevich and River Realty
12  had actually not been involved in the sale of that
13  unit at all?
14  A   Because Mr. Rezko had asked me to do so.
15          MS. HAMILTON:  Your Honor, at this time I
16  would ask to publish what is already in evidence as
17  Government Exhibit 8/27/03 check.
18          THE COURT:  Yes.
19          MS. HAMILTON:  And I'd ask permission to
20  approach the witness and provide a copy.
21          THE COURT:  You may.
22      (Exhibit published to the jury.)
23  BY MS. HAMILTON:
24  Q   Sir, the copy is not great, but do you recognize
25  that check?

:57PM
:57PM
:58PM
:58PM
:58PM

Williams - direct by Hamilton                    3736

1   A   Yes, I do.

2   Q   And what is that?

3   A   It's a check drawn upon 850 North Ogden, LLC, in

4   the amount of $14,369.50 in August of 2003 payable

5   to River Realty, Inc.

6   Q   And is this the check that you drafted based upon

7   the directive that you just testified about?

8   A   Yes, it is.

9   Q   Now, the signature on the check, whose signature

10  is that?

11  A   That's Mr. Rezko's signature.

12  Q   Why is it that you didn't sign this check?

13  A   Once the check was prepared, I went back to

14  Mr. Rezko and gave him the check and asked him to

15  sign the check because I told him I did not believe

16  it was appropriate to sign the check.

17  Q   After you gave the check to Mr. Rezko and told

18  him that, what happened next?

19  A   The check was signed and I believe through either

20  Mr. Rezko directly or through his assistant it was

21  provided to Mrs. Blagojevich.

22  Q   How did you account for this check in Rezmar or

23  its affiliated LLC's records?

24  A   The check was accounted for as a commission

25  expense in the books of 850 North Ogden, LLC.

Williams - direct by Hamilton                    3737

1  Q   Why was it reported in that way?

2  A   It was reported in that way at the direction of

3  Mr. Rezko with my concurrence because it was

4  purportedly a commission for that project.

5  Q   Was that accurate?

6  A   No, it was not.

7  Q   After that August of 2003 check to River Realty,

8  did Mr. Rezko come to you again about writing a

9  check to River Realty?

10  A   Yes, he did.

11  Q   When was the next time Mr. Rezko directed you to

12  write a check to River Realty?

13  A   Approximately October of 2003.

14  Q   And where did that conversation take place?

15  A   In the Rezmar offices.

16  Q   At that time, in October of 2003, what did

17  Mr. Rezko say to you?

18  A   He came to me and asked me to prepare a check to

19  River Realty in the amount of $12,000 and stated

20  that Mrs. Blagojevich was going to be doing some

21  consulting work on behalf of Rezmar Corporation

22  pursuant to an agreement that provided for her to be

23  paid $12,000 a month.

24  Q   Did he give you a copy of the signed agreement?

25  A   No, he did not.

Williams - direct by Hamilton                    3738

1  Q   Did he ever show you a copy of the signed
2  agreement?
3  A   I do not believe Mr. Rezko showed me a copy of
4  the signed agreement.  I believe I saw a draft of
:01PM
5  the agreement at one time, but I did not receive it
6  from Mr. Rezko, I do not believe.
7  Q   After that discussion in October of 2003 with
8  Mr. Rezko, what did you do?
9  A   I had a check prepared in the amount of $12,000
:01PM
10 payable to River Realty, Inc., and I signed the
11 check and I believe gave it to either Mr. Rezko or
12 his assistant.
13         MS. HAMILTON:  Your Honor, at this time I'd
14 ask permission to publish what's already in evidence
:02PM
15 as Government Exhibit $12,000 check.
16         THE COURT:  You may do so.
17         MS. HAMILTON:  And ask permission to approach
18 the witness and provide a copy.
19         THE COURT:  You may do that, too.
:02PM
20    (Exhibit published to the jury.)
21         THE COURT:  For your information, we'll be
22 taking a break shortly.
23 BY MS. HAMILTON:
24 Q   Mr. Williams, directing your attention to the
:02PM
25 first page of that document, what is that?

Williams - direct by Hamilton                    3739

1   A   The first page of the document is a check drawn
2   on Rezmar Corporation account payable to River
3   Realty, Inc., in the amount of $12,000 dated
4   October 3, 2003.

:02PM     5   Q   And that's your signature, sir?

6   A   Yes, it is.

7   Q   When did you draft this check in relation to
8   Mr. Rezko's directive to you that Mrs. Blagojevich
9   should start to receive $12,000 payments?

:02PM    10   A   I believe it was the same day.

11   Q   The next check in the exhibit, what is that, sir?

12   A   It's another check drawn on a Rezmar corporation
13   account that I signed dated November 4, 2003, in the
14   amount of $12,000 payable to River Realty, Inc.

:03PM    15   Q   And, again, was this at Mr. Rezko's directive?

16   A   Yes, it was.

17   Q   The next page, sir, what is that?

18   A   Another check made payable to River Realty, Inc.,
19   on a Rezmar Corporation account dated December 3,

:03PM    20   2003, in the amount of $12,000 that I signed.

21   Q   And, again, was this at Mr. Rezko's directive?

22   A   Yes.

23   Q   The next check, what's that?

24   A   A check on a Rezmar Corporation account payable

:03PM    25   to River Realty, Inc., dated January 7, 2004, in the

1  amount of $12,000 that I signed.

2  Q   And is it, again, at Mr. Rezko's directive?

3  A   Yes.

4  Q   The next check, what's that?

5  A   A check again in the amount of $12,000 to River

6  Realty, Inc., on a Rezmar Corporation account that I

7  signed dated February 5th, 2004.

8  Q   And, again, that was also at Mr. Rezko's

9  directive?

10  A   Yes.

11  Q   The next page, what does that reflect?

12  A   Another check in the amount of $12,000 payable to

13  River Realty, Inc., in the amount -- excuse me,

14  dated March 4, 2004, drawn on a Rezmar account.

15  Q   Also at Mr. Rezko's request?

16  A   Yes.

17  Q   The next page, sir, what does that reflect?

18  A   A 12-thousand-dollar check drawn on the Rezmar

19  Corporation account payable to River Realty, Inc.,

20  dated April 1, 2004, in the amount of $12,000 that I

21  signed.

22  Q   And this was again at Mr. Rezko's direction?

23  A   Yes.

24  Q   And the final check in that exhibit, what does

25  that reflect?

Williams - direct by Hamilton                3741

1  A   A check dated May 3, 2004, in the amount of
2  $12,000 payable to River Realty, Inc., drawn on
3  Rezmar Corporation account that I signed.
4  Q   And that was at Mr. Rezko's directive?
5  A   Yes.
6  Q   And was that the last 12-thousand-dollar check
7  that you drafted and signed to River Realty?
8  A   Yes, it was.
9       MS. HAMILTON:  Judge, you want to break now?
10      THE COURT:  15 minutes.
11      THE MARSHAL:  All rise.
12    (The following proceedings were had out of
13     the presence of the jury in open court:)
14      THE COURT:  You may step down.
15      Court is in recess.
16    (Recess.)
17      THE MARSHAL:  All rise.
18    (The following proceedings were had in the
19     presence of the jury in open court:)
20      THE COURT:  Please be seated.
21      You may resume.
22      MS. HAMILTON:  Thank you, Your Honor.
23  BY MS. HAMILTON:
24  Q   Mr. Williams, just before the break we had gone
25  through eight $12,000 checks that you wrote to River

1  Realty from October of 2003 to May of 2004.

2       How did you record those checks in Rezmar's

3  records?

4  A   They were recorded as a consulting expense in the

5  books of Rezmar Corporation.

6  Q   Why did you report them as consulting expenses?

7  A   The checks were written pursuant to the

8  consulting agreement and so with the concurrence of

9  Mr. Rezko and Mahru we considered them to be

10  consulting expense for the company.

11  Q   During that time period, October 2003 through May

12  of 2004, were you aware of any projects that

13  Mrs. Blagojevich or River Realty were consulting on?

14  A   I was not.

15  Q   At the regular meetings that you attended at

16  Rezmar during that time period, did you hear

17  anything come up regarding a project or a project on

18  the horizon involving Mrs. Blagojevich or River

19  Realty?

20  A   I do not recall any.

21  Q   Was Mrs. Blagojevich ever at any of those weekly

22  meetings?

23  A   No, she was not.

24  Q   Did you have any interaction with

25  Mrs. Blagojevich during that time period,

:24PM
:25PM
:25PM
:25PM
:25PM
:25PM

Williams - direct by Hamilton                    3743

1 October 2003 through May of 2004?

2 A  I saw her periodically in the office during that

3 time frame.

4 Q  When you say periodically, how often would you

5 see Mrs. Blagojevich in the Rezmar's offices during

6 that time period?

7 A  Might be once a month, maybe twice.

8 Q  When she came to Rezmar, did she have an office?

9 A  She did not.

10 Q  Would she come alone or would she have her

11 children with her?

12 A  She often had her children with her.

13 Q  When Mrs. Blagojevich came to Rezmar the times

14 that you saw her, did you typically see her

15 interacting with the same person?

16 A  Typically when she was in our office, she was

17 with Mr. Rezko.

18 Q  Were you aware of any new projects that were

19 started by Rezmar during that time period, October

20 2003 through May of 2004?

21 A  No.

22 Q  Now, you've indicated the last check that you

23 wrote to River Realty based upon the consulting

24 agreement Mr. Rezko told you about was in May of

25 2004, is that right?

1  A   Yes.

2  Q   Why is it that the 12-thousand-dollar check

3  stopped at that time?

4  A   Mr. Rezko informed me that we would not be

5  writing anymore checks to Mrs. Blagojevich's company

6  after that May 2004 check.

7  Q   Now, during that period of time that you were

8  writing the 12-thousand-dollar checks, did Mr. Rezko

9  direct you to issue another check to River Realty

10 for Mrs. Blagojevich?

11 A   Yes, he did.

12 Q   When was that?

13 A   In January 2004.

14 Q   What happened at that time?

15 A   Mr. Rezko came to me with a check from Chicago

16 Title and Trust, I believe, made payable to Rezmar

17 Realty in the amount of $40,000, and he asked that I

18 deposit that check into a Rezmar Corporation account

19 and in return write a check to River Realty, Inc.,

20 in the same 40-thousand-dollar amount.

21         MS. HAMILTON:  Your Honor, may I approach?

22         THE COURT:  You may.

23         MS. HAMILTON:  I'm going to show the witness

24 what's marked as Government Exhibit 01/21/04 Check

25 2.

Williams - direct by Hamilton                    3745

BY MS. HAMILTON:

Q   Do you recognize that document?

A   Yes, I do.

Q   What is that?

A   It's a check drawn on Chicago Title and Trust
Company in the amount of $40,000 made payable to
Rezmar Realty.

Q   Is this the check that you just testified about
that Mr. Rezko gave to you in January of 2004?

A   Yes, it is.

        MS. HAMILTON:  Your Honor, I'd ask for the
admission of Government Exhibit 01/21/04, Check 2.

        MR. S. ADAM, JR.:  No objection.

        THE COURT:  Admitted.

    (Government's Exhibit 01/21/04, Check 2 was
      received in evidence.)

        MS. HAMILTON:  And I'd ask to publish.  I'm
just going to publish the top portion of the
document.

        THE COURT:  Leave is granted.

    (Exhibit published to the jury.)

BY MS. HAMILTON:

Q   Mr. Williams, focusing on that top portion of the
document, what does that reflect?

A   It's information provided by the title company

Williams - direct by Hamilton                    3746

1  basically describing the parties to the agreement,

2  the property address related to the transaction and

3  the amount of the check.

4  Q   The buyer on here is listed as Lake and Aberdeen,

5  LLC, was that a Rezmar related entity?

6  A   No, it was not.

7  Q   Do you know anything about Lake and Aberdeen,

8  LLC?

9  A   No, I do not.

10  Q   The seller was listed as 1101 West Lake Street,

11  LLC, is that a Rezmar related LLC?

12  A   No, it is not.

13  Q   Do you know anything about that LLC?

14  A   No, I do not.

15  Q   Is it fair to say, Mr. Williams, from your

16  knowledge, did this check have anything to do with

17  any Rezmar related entity LLC or project?

18  A   I do not believe that it does.

19  Q   And you indicated the check itself was written

20  out to Rezmar Realty, is that right?

21  A   Yes, it is.

22  Q   Is that an entity that existed at this time as

23  far as you knew?

24  A   No.

25  Q   After Mr. Rezko gave you this 40-thousand-dollar

Williams - direct by Hamilton                3747

1  check to Rezmar Realty, what did you do?

2  A   As he requested, we deposited this check into a

3  Rezmar Corporation bank account and then in return

4  we prepared a check made payable to River Realty,

5  Inc., in the amount of $40,000.

6           MS. HAMILTON:  Your Honor, at this time I'd

7  ask permission to publish what's already in evidence

8  as Government Exhibit 1/22/04 check.

9           THE COURT:  Granted.

10      (Exhibit published to the jury.)

11          MS. HAMILTON:  And may I approach to give the

12  witness a copy?

13          THE COURT:  You may.

14  BY MS. HAMILTON:

15  Q   And, Mr. Williams, you're welcome to look at the

16  screen if that's easier for you, as well.

17          What is it we're looking at here?

18  A   We're looking at a check in the amount of $40,000

19  dated January 22, 2004, drawn on a Rezmar

20  Corporation account payable to River Realty, Inc.,

21  that I signed.

22  Q   And is this the check that you indicated you

23  wrote at Mr. Rezko's direction in relation to the

24  Rezmar Realty check that we looked at?

25  A   Yes, it is.

:30PM

:31PM

:31PM

:31PM

:31PM

:31PM

1  Q   How is it that you accounted for this check in
2  the Rezmar records?
3  A   The check had no net effect in the Rezmar
4  records.  Because of the check that we received, we
5  received a 40-thousand-dollar check and in return
6  wrote a 40-thousand-dollar check, so our cash
7  balance increased and then decreased and because I
8  was not aware of any entity on Lake Street that had
9  anything to do with Rezmar, we simply reflected it
10 as having no effect on Rezmar's books.
11 Q   What did you do with this check after you wrote
12 it?
13 A   I believe I gave it to Mr. Rezko or his
14 assistant.
15 Q   Now, at around the same time as the writing of
16 this 40-thousand-dollar check, were you aware that
17 the Blagojevichs owed subcontractors money in
18 relation to work that had been done on their home?
19 A   Yes, I was.
20 Q   And were these subcontractors that had a
21 relationship with Rezmar?
22 A   Yes, they were.
23 Q   And at around the same time, January 22, 2004,
24 did you receive a copy of a document outlining the
25 amount of money that the Blagojevichs owed to those

Williams - direct by Hamilton                    3749

1 subcontractors?

2 A  Yes, I did.

3        MS. HAMILTON:  Your Honor, may I approach?

4        THE COURT:  You may.

5        MS. HAMILTON:  I'm going to show Government

6 Exhibit 1/22/04 Subcontractors.

7 BY MS. HAMILTON:

8 Q  Do you recognize that document?

9 A  Yes, I do.

10 Q  What is this document?

11 A  It is a summary of work or at least a summary of

12 the subcontractors by trade for the work being done

13 at 2934 Sunnyside and the amounts that those

14 subcontractors are owed, had been paid and

15 ultimately are to be paid.

16 Q  Did you receive a copy of this document at or

17 around the date indicated there, January 22nd, 2004?

18 A  Yes, I believe I did.

19        MS. HAMILTON:  Your Honor, we move for the

20 admission of Government Exhibit 1/22/04

21 Subcontractors.

22        THE COURT:  Admitted.

23      (Government's Exhibit 1/22/04

24      Subcontractors was received in evidence.)

25        MS. HAMILTON:  May I publish?

1        THE COURT:  You may.

2      (Exhibit published to the jury.)

3        MS. HAMILTON:  I need to do it on the Elmo.

4  BY MS. HAMILTON:

5  Q   All right.  Before I zoon in, what is it that

6  we're looking at, Mr. Williams?

7  A   This is a list by trade; in other words, by the

8  type of work that was done, for the subcontractors

9  that were engaged, working on the residence at 2934

10  Sunnyside showing the total amount of the contract

11  that they were expected to be paid, as well as an

12  amount that had been paid as of the date the

13  schedule had been prepared, as well as the total

14  remaining balance or balance due.

15        And there's a column that shows this request,

16  which I interpret to be the amount to be paid at

17  that time to the various subcontractors, and then

18  finally a future balance; in other words, an amount

19  remaining to be paid to the subcontractors after

20  this request amount is paid.

21  Q   There's handwriting at the bottom that says "this

22  copy given to Patti B. and Bob, 1/22/04," do you

23  recognize that handwriting?

24  A   Yes.

25  Q   Whose handwriting is that?

1  A   That's Ken Haldeman's handwriting.

2  Q   Who is he?

3  A   Ken Haldeman was our vice president of

4  construction working with Chicago Construction

5  Services and Rezmar at the time.

6  Q   And had he given you a copy of this at or around

7  January 22nd of 2004?

8  A   Yes.

9  Q   All right.  I'm going zoom in, then.

10        The subcontractors listed, what is the first

11  one?

12  A   Demos painting.

13  Q   And is that a subcontractor that worked with

14  Rezmar?

15  A   Yes, it is.

16  Q   And it was your understanding that they had done

17  work at the Blagojevich home?

18  A   Yes, it was.

19  Q   And the next one is also Demos, what is the next

20  one?

21  A   Edon.

22  Q   And what is that?

23  A   Edon was a carpentry company.

24  Q   And was it your understanding that that Rezmar

25  related subcontractor had done work on the

Williams - direct by Hamilton                    3752

1  Blagojevich home?

2  A   Yes, it was.

3  Q   And the next one?

4  A   Abco.

:36PM    5  Q   What is that?

6  A   It's short for Abco Electric, they were an

7  electrical contractor.

8  Q   And was it your understanding that that Rezmar

9  related subcontractor had done work on the

:37PM   10  Blagojevich home?

11  A   Yes, it was.

12  Q   What is the next one listed?

13  A   Isokern.  Isokern was a company that Rezmar used

14  primarily for fireplaces, for ventless fireplaces in

:37PM   15  the townhomes that we built.

16  Q   Was it your understanding that Isokern was Rezmar

17  related subcontractor that had done work on the

18  Blagojevich home?

19  A   Yes, it was.

:37PM   20  Q   And what is the next one?

21  A   Minooka.

22  Q   And what is that?

23  A   I'm not as familiar as Minooka as the others on

24  this list, but they had done work, to the best of my

:37PM   25  recollection, for Rezmar projects.

1  Q   And what about the next one?

2  A   Siegel's.

3  Q   What's that?

4  A   Siegel's was a supply company.  They supplied

5  doors, trim, and such for houses, townhouses, or

6  condominiums.

7  Q   And the next one?

8  A   Regal Flooring.

9  Q   What was that?

10  A   Primarily a hardwood flooring company but they

11  also did tile work for Rezmar.

12  Q   Was it your understanding that Regal Flooring had

13  done work on the Blagojevich home?

14  A   Yes.

15  Q   What is the next one?

16  A   SCE.

17  Q   What is that?

18  A   SCE, Ltd, was a company that worked with Rezmar

19  and provided shelving.

20  Q   What is the next one?

21  A   RayWray.

22  Q   What is RayWray?

23  A   I characterize them as a carpentry company who

24  did fine carpentry work, special inserts, if you

25  will, above fireplaces, things of that nature.

1  Q   Was it your understanding that they had done work
2  on the Blagojevich home?
3  A   Yes, it was.
4  Q   The next one is Advance, what is that?
5  A   Advance Welding, a company that Rezmar used on
6  its projects for ornamental railing and other steel
7  type work.
8  Q   Was it your understanding that Advance had done
9  work on the Blagojevich home?
10  A   Yes, it was.
11  Q   And then the final one is Squeaky Clean, what's
12  that?
13  A   Squeaky Clean was a cleaning company that we used
14  in our projects.
15  Q   And I want to move over now, you said this
16  request, again what was it that this request
17  indicated?
18  A   This request indicated, in my opinion, the amount
19  to be paid to the various subcontractors at that
20  time.
21  Q   And I'll zoom out.
22      At that time, this document, what is the date
23  at the top?
24  A   January 22, 2004.
25  Q   And what was the total amount for this request as

Williams - direct by Hamilton                    3755

1  of January 22, 2004?

2  A   $39,966.68.

3  Q   Mr. Williams, through your work with and in

4  relationship with Mr. Rezko, did you know Chris

5  Kelly?

6  A   Yes, I did.

7  Q   Did you see him at the Rezmar offices?

8  A   Frequently.

9  Q   When you say frequently, approximately how often

10  would you see him at the Rezmar offices?

11  A   Typically weekly, oftentimes daily, sometimes

12  more than once a day.

13  Q   At sometime did Mr. Rezko approach you about the

14  fact that he needed to get money to Mr. Kelly?

15  A   Yes, he did.

16  Q   When was that?

17  A   In I believe it was about November of 2005, he

18  came to me saying that he needed to help Chris and

19  get some money to Chris.  And he presented me a time

20  with an invoice in the amount of I believe it was

21  $187,000 payable to Century Roof Consultants and

22  payable by an entity that was called, I believe,

23  Roosevelt Clark, LLC.

24  Q   What was Century Roof Consultants as far as you

25  knew?

:40PM

:40PM

:40PM

:41PM

:41PM

1  A   A company that I was not familiar with.

2  Q   And this invoice, had you ever seen this invoice

3  before?

4  A   Not before Mr. Rezko showed it to me.

:41PM

5  Q   And what was it that Mr. Rezko asked you to do

6  with this invoice?

7  A   He wanted it to be paid.

8  Q   What was your response?

9  A   My response to him was that the entity that the

:41PM

10 invoice was directed to did not exist, as far as I

11 knew, and that the company did not have the funds to

12 pay the invoice at that time.

13 Q   So what happened next?

14 A   Mr. Rezko took the invoice back and to the best

:42PM

15 of my recollection said we would revisit the issue

16 again.

17 Q   And was the issue revisited?

18 A   Yes, it was.

19 Q   And, ultimately, what happened?

:42PM

20 A   Ultimately, and I believe it was March of 2006,

21 there were six different payments made to Century

22 Roof Consultants for approximately same $187,000.

23 Q   Did Mr. Rezko ever tell you why it was that he

24 needed to get that amount of money to Mr. Kelly?

:42PM

25 A   No, he did not.  After repeated attempts for me

Williams - cross by S. Adam, Jr.                3757

1  to find out, he never did.
2       MS. HAMILTON:  Nothing further.
3                CROSS EXAMINATION
4  BY MR. S. ADAM, JR.:
5  Q   Good afternoon, Mr. Williams.
6  A   Hello, sir.
7  Q   How are you?
8  A   I'm all right.  Thank you.
9  Q   Now, Mr. Williams, you testified to a number of
10 things here regarding Tony Rezko and Rezmar
11 Corporation, is that correct?
12 A   Yes, sir.
13 Q   And you were familiar and actually worked with
14 Mr. Rezko himself from 1998 to approximately 2007,
15 is that correct?
16 A   Yes, sir.
17 Q   And in 1998 did you start off as being a CFO for
18 Rezmar?
19 A   Yes, I did.
20 Q   Now, Rezmar wasn't actually the legal title of
21 the corporation?
22 A   Rezmar Corporation.
23 Q   Do you know of a Rezmar Development?
24 A   Not that it was a legal entity that I was
25 involved with.

1  Q   And you've already told us that you didn't know

2  of a Rezmar Realty, is that correct?

3  A   Yes, sir.

4  Q   In 1998 can you tell us the proximate holdings of

:43PM  5  the Rezmar Corporation?

6  A   With respect to its assets?

7  Q   Yes; generally speaking, as far as the

8  development side of it.

9  A   Well, again, each of developments was in its own

:44PM  10  entity, so there was not a consolidated statement

11  for Rezmar that combined all those entities.

12  Q   And so each particular project would have its own

13  corporation set up for that particular project, is

14  that right?

:44PM  15  A   An LLC was set up for each of those projects and

16  that LLC was the entity under which the business was

17  conducted.

18  Q   Now, beginning in 1998 and working your way

19  through 2007, were you familiar with how properties

:44PM  20  were acquired by the Rezmar Corporation?

21  A   Yes.

22  Q   And, in fact, one of the ways that properties are

23  acquired is, if Mr. Rezko or Mr. Mahru happened to

24  like a particular property and Rezmar can invest in

:44PM  25  that particular property, is that fair?

1  A   That is fair.

2  Q   In fact, one of the things that would take place

3  between 1998 and 2007 is, people or real estate

4  agents or real estate brokers could bring

5  Mr. Rezko's attention to certain property all on the

6  north side of Chicago, is that fair?

7  A   Throughout Chicago, I would say, yes, sir.

8  Q   In fact, there is a thing in real estate called

9  prospecting, are you familiar with that?

10 A   Tangentially, yes, sir.

11 Q   Yes.

12      What that means is that if somebody things

13 that Mr. Rezko has a particular need for a

14 particular property, they can bring that property to

15 Mr. Rezko's attention and he can determine whether

16 he wishes to purchase that or become a partner in

17 that, or something to that effect, is that fair?

18 A   Yes, sir.

19 Q   And, in fact, one of the entities that you've

20 already told us about in 2001 that came to the

21 attention of Mr. Rezko was the property on Irving

22 Park Road, is that correct?

23 A   Yes.

24 Q   And, in fact, it was called the Irving Park, LLC,

25 is that true?

1  A   I believe it was called Irving Park Development,

2  LLC, yes, sir.

3  Q   Irving Park Development.  Thank you.

4        Who brought that to the attention of

5  Mr. Rezko, if you know?

6  A   I believe Mrs. Blagojevich brought it to his

7  attention.

8  Q   That's Patti Blagojevich, is that correct?

9  A   Yes, sir.

10  Q   In fact, you told us that purchase was for

11  $4 million, is that correct?

12  A   Approximately, yes, sir.

13  Q   And, in fact, as you have already told us,

14  Mrs. Blagojevich actually represented the seller in

15  that particular sale, is that correct?

16  A   Yes.

17  Q   And you also told us that Mrs. Blagojevich also

18  represented at the same time the Rezmar Corporation,

19  true?

20  A   Yes.

21        MS. HAMILTON:  Objection.

22        THE COURT:  The objection is sustained.

23  BY MR. S. ADAM, JR.:

24  Q   Did Mrs. Blagojevich represent the Rezmar

25  Corporation in that particular purchase?

1  A   I was not aware of it until after the closing.

2  Q   Oh, after the closing you became aware that there

3  was a contract between Mr. Rezko and

4  Mrs. Blagojevich, is that fair?

5  A   Between Rezmar Corporation and River Realty,

6  Inc., yes, sir.

7  Q   And, in fact, Mr. Rezko at that time was your

8  boss, true?

9  A   Yes.

10  Q   And Mr. Rezko could enter into contracts without

11  consulting you, correct?

12  A   Correct.

13  Q   Mr. Rezko, in fact, as you found out in 2002, did

14  enter into contracts that you didn't know about,

15  correct?

16  A   Yes.

17  Q   That was not an uncommon occurrence in your

18  experience in dealing with Mr. Rezko, isn't that

19  correct?

20  A   I did not know all of the transactions that

21  Mr. Rezko entered into, yes.

22  Q   To be fair here, one of the things you did not

23  know was that Mr. Rezko, in 2003, entered into a

24  contract with Brian Hynes on the Lake and Aberdeen

25  property, isn't that correct, sir?

1          MS. HAMILTON:  Objection.

2          THE COURT:  The objection is sustained.

3   BY MR. S. ADAM, JR.:

4   Q   Did you know if Mr. Rezko -- strike that.  I'll

5   give you a time period.

6          In July, July 22nd of 2003, did you know

7   whether or not Lake and Aberdeen had entered into a

8   contract for the Rezmar Development to be its agent

9   in any purchase on Lane and Aberdeen?

10  A   I did not.

11  Q   Mr. Rezko did not run that by you, is that

12  correct?

13  A   That is correct.

14  Q   In fact, you had come to learn that Lake and

15  Aberdeen has an address of 1101 West Lake Street,

16  Chicago, Illinois, true?

17  A   Yes, sir.

18      (Cellular phone ringing.)

19          MR. S. ADAM, JR.:  Perhaps that was

20  Mr. Rezko.

21      (Brief pause).

22  BY MR. S. ADAM, JR.:

23  Q   At the time in which -- strike that.  I lost my

24  train of thought.

25          All right.  Okay.  July 22nd of 2003, you

1 were still working as the CFO, is that correct?

2 A   Yes, sir.

3 Q   And did you come to learn that, in fact, Lake and

4 Aberdeen had been purchased by a person by the name

5 of Brian Hynes?

6 A   I did not know that.

7 Q   As you sit there now, you did not know that?

8 A   I did not know that.

9 Q   Well, is it fair to say that in January of 2004,

10 specifically January 21st I believe, Mr. Rezko

11 brought you a check from the Chicago Title company,

12 isn't that correct?

13 A   That is correct.

14 Q   And when he brought you that check, it was for a

15 significant amount of money, true?

16 A   It was for $40,000.

17 Q   That's a significant amount, wouldn't you say?

18 A   Yes.

19 Q   And when Mr. Rezko brought you that check, it was

20 for Lake and Aberdeen, correct?

21 A   It was.

22 Q   Now, that was something, according to what you

23 have told us, you didn't know had anything to do

24 with Mr. Rezko, correct?

25 A   That's correct.

1  Q   Now, you have been in this real estate area
2  business how long?
3  A   In different aspects, for over 20 years.
4  Q   In your 20 years experience, does Chicago Title
5  and Trust send out $40,000 checks to persons who are
6  not involved in a transaction?
7          MS. HAMILTON:  Objection.
8          THE COURT:  No.
9          MR. S. ADAM, JR.:  Yes, Your Honor.
10 BY MR. S. ADAM, JR.:
11 Q   Let me ask you this, when you got that $40,000
12 check from Mr. Rezko, did you ask him:  Mr. Rezko,
13 this is 40 grand!  Man, where did this come from?
14 A   I would expect we had some conversation about
15 where the check came from.
16 Q   And, in fact, didn't Mr. Rezko tell you,
17 Mr. Williams, that he and Brian Hynes had been
18 involved in a contract to purchase 1101 West Lake?
19          MS. HAMILTON:  Objection.
20          THE COURT:  Objection is sustained.
21          This is a little outside the scope.  In fact,
22 a lot outside the scope.  If what you are trying to
23 establish are the things that Mr. Rezko can tell
24 about, that is something else.
25          MR. S. ADAM, JR.:  Yes, Your Honor.

Williams - cross by S. Adam, Jr.                3765

1  BY MR. S. ADAM, JR.:

2  Q   Was it your understanding that Mr. Rezko had been

3  involved in a transaction regarding 1101 West Lake

4  or Lake and Aberdeen, LLC?

5          MS. HAMILTON:  Objection; asked and answered.

6          THE COURT:  Yes, it was asked and answered.

7  BY MR. S. ADAM, JR.:

8  Q   Did you ever see a contract in which Rezmar

9  Development was listed as the cooperating office for

10  1101 Lake Street, level number 2, to be purchased by

11  Brian Hynes?  Have you ever seen a contract like

12  that?

13          MS. HAMILTON:  Objection.

14          THE COURT:  The objection is sustained.

15  BY MR. S. ADAM, JR.:

16  Q   Is it fair to say that as of January 21st of

17  2004, you were not aware of any contract on Lake and

18  Aberdeen regarding Mr. Rezko, is that fair?

19  A   That's fair to say.

20  Q   Is it also fair to say that you were not aware of

21  a contract regarding 1101 West Lake Street that had

22  listed Patti Blagojevich as the buyer's designated

23  agent for that sale?  Were you aware of that?

24          MS. HAMILTON:  Objection.

25          THE COURT:  The objection is sustained.

1        You know, if you want to prove that such a

2   contract existed, you can do this, but not through

3   hearsay.

4        MR. S. ADAM, JR.:  Yes, Your Honor.  Yes,

5   Your Honor.

6   BY MR. S. ADAM, JR.:

7   Q   Were you aware that Mrs. Blagojevich was a

8   licensed real estate agent?

9   A   Yes.

10  Q   Were you aware that she was a licenses real

11  estate broker?

12  A   Yes.

13  Q   Were you aware that she was also a certified -- I

14  keep saying -- a certified appraiser, a certified

15  appraiser in real estate?

16  A   I was not aware of that.

17  Q   And you have told us that you came to see

18  Mrs. Blagojevich on a number of occasions at Rezmar

19  throughout this particular time period, 2003 into

20  early 2004, correct?

21  A   Yes.

22  Q   And during those times she would meet with Tony

23  Rezko, is that right?

24  A   Yes.

25  Q   Were you present for any conversations that

1  Mrs. Blagojevich had with Mr. Rezko during that

2  time?

3  A   I may have been involved in a brief conversation

4  or two.

5  Q   And is it fair to say that you would go handle

6  your business and they would continue to talk?

7  A   Yes.

8  Q   Were you aware that Mrs. Blagojevich would speak

9  to Mr. Rezko on the telephone during that period of

10 time?

11 A   Without talking to Mr. Rezko about it, it would

12 have been hard for me to know that he had.

13 Q   Correct.  You don't know how many times they

14 spoke on the phone, is that fair?

15 A   That's fair.

16 Q   Now, there's something in the real estate called

17 road trips, isn't that fair?

18 A   I would like you to describe road trips and then

19 I'll let you know.

20 Q   Well, have you heard that term in the business?

21 A   I would consider a road trip to be a visit to

22 different properties.

23 Q   And when you say different properties, you mean,

24 say if Mr. Rezko were interested in a property on

25 Peterson, you would take a road trip to that Peter

1  property, is that fair?

2  A   Yes.

3  Q   How many road trips did you go on with Mr. Rezko

4  in 2003 and 2004?

5  A   A limited number.

6  Q   How many did Mrs. Blagojevich go on with him, to

7  your knowledge?

8  A   I -- I don't know.

9  Q   You don't know.

10        How many properties did she bring Mr. Rezko

11  in, say, July 2003 to May of 2004 that she had

12  gotten of the MLS?

13  A   I don't know how many.

14  Q   How many properties did Mr. Rezko ask her to

15  consult on during that period?

16  A   None that we talked about.

17  Q   None that you know, is that correct?

18  A   That would be correct.

19  Q   So is it fair to say, Mr. Williams, that there's

20  two people who can tell what they talked about, what

21  they spoke about it, and what the terms of that that

22  they spoke about it, would be Mr. Rezko and

23  Mrs. Blagojevich, is that fair?

24        MS. HAMILTON:  Objection.

25        THE COURT:  Objection to the form of the

1 question is sustained.

2      MR. S. ADAM, JR.:  Yes, Your Honor.

3 BY MR. S. ADAM, JR.:

4 Q   You have told us that Mr. Rezko came to you near

5 the end of August of 2003 and asked you to write a

6 check for approximately $14,369.50?  I meant

7 approximately, but that's the check you wrote, is

8 that correct?

9 A   He came to me telling me that he wanted to get

10 Mrs. Blagojevich a check in the amount of

11 approximately $15,000.

12 Q   Now, when he told you that, didn't he, in fact,

13 tell you that he wanted to give it to River Realty?

14 A   He may have said River Realty or he may have said

15 both, Patti or -- excuse me, Mrs. Blagojevich and/or

16 River Realty.

17 Q   But isn't it true that when you wrote that check

18 or had that check written, it was not to Patti

19 personally, correct?

20 A   That is correct.

21 Q   It was to River Realty, true?

22 A   Yes.

23 Q   Now, at the time when he asked you that, it was

24 sometime before August 27th of 2003 because that's

25 the date the check was written on, correct?

1  A   It might have been that day.

2  Q   Well, I mean --

3  A   It was not prior to writing the check.

4  Q   What do you mean it was not prior to writing the

5  check?

6  A   Well, the check is dated -- let me look at the

7  check.

8  Q   We have to say what exhibit it is.

9  A   It's Government Exhibit 8/27/03 Check, it's dated

10 August 27, 2003.

11 Q   And are you saying that that's the day, it's your

12 recollection that he came to you and asked you to

13 write that?

14 A   It may very well have been.

15 Q   Well, if you can recall now, weren't there two

16 separate meetings that he came to you and asked you

17 for approximately a 15-thousand-dollar check and

18 then you told him you'd get back to him and at some

19 later period you did get back to him and you said

20 this is where we can get this 2 1/2 percent from?

21 A   He came to me asking me to prepare a check to

22 Patti as quickly as we could.

23 Q   And --

24 A   I believe it was the same day that we had the

25 subsequent conversation and prepared the check.

1  Q   Now, prior to that, were you privy to any

2  conversation between Patti and Rezko regarding

3  $15,000?

4  A   I was not.

5  Q   Do you know of any contract that you are aware of

6  between Patti and Mr. Rezko prior to him asking you

7  for that check?

8  A   I believe I had stated that I was not aware of a

9  contract with her or her company that required the

10 check to be written.

11 Q   So is it fair to say that by the mere virtue of

12 the fact he to you and asked you, there was

13 obviously some contact between Mr. Rezko and Patti

14 regarding the $15,000 prior to him asking you for

15 that?

16         MS. HAMILTON:  Objection.

17         THE COURT:  The objection for the form of the

18 question is sustained.

19 BY MR. S. ADAM, JR.:

20 Q   When you had that check written --

21         MR. S. ADAM, JR.:  And if we may republish

22 that, if I may Your Honor?

23         THE COURT:  Sure.

24    (Exhibit published to the jury.)

25 BY MR. S. ADAM, JR.:

1  Q   This is pretty bad but let me ask you:  Looking

2  at Government Exhibit 8/27/03 Check, now you say

3  that's the check you had written, is that correct?

4  A   Yes.

5  Q   Now, you have told us that when you had that

6  written, you didn't feel too comfortable about it

7  because what you had to do, from what Mr. Rezko

8  asked you to do, was find some property and take 2

9  1/2 percent from that so you could get approximately

10 that commission, is that right?

11 A   I needed to find a property -- I needed to find a

12 way to provide $15,000 at Mr. Rezko's request

13 attributable to some property.

14 Q   Now, that didn't sit too well with you, is that

15 right?

16 A   I did not know why.  I was not aware why it was

17 earned, why it was required.

18 Q   Well, let ask you, having Mr. Rezko ask you to

19 move money from one account to another, even though

20 they weren't necessarily involved in the same deal,

21 it wasn't an unusual occurrence, was it?

22 A   Money moved between the companies, yes.

23 Q   In fact, there were a number of occasions,

24 Mr. Williams, outside of anything to do with Patti

25 Blagojevich, there were a number of occasions when

 1  Mr. Rezko would ask you to take things like earnest
 2  money from one property and use that earnest money
 3  on another property that wasn't connected to the
 4  first one, correct?
 5  A   That was done.
 6  Q   That is against the ethical rules in real estate,
 7  isn't that true?
 8          MS. HAMILTON:  Objection.
 9          THE COURT:  The objection is sustained.
10  BY MR. S. ADAM, JR.:
11  Q   Was it your understanding that that was against
12  the ethical rules in real estate?
13          MS. HAMILTON:  Objection.
14          THE COURT:  The objection is sustained.
15  BY MR. S. ADAM, JR.:
16  Q   Can you tell us what earnest money is?
17  A   Earnest money is money that is provided by
18  potential buyers of townhouses, condominiums, homes,
19  on a given project.
20  Q   And that money is supposed to sit where, once
21  it's given by the person that gives the earnest
22  money?
23  A   It sits in an account for the selling entity.
24  Q   Now, to take that money and use it in another
25  property is not what that earnest money is for, is

1  that true?

2  A   That would be true.

3  Q   And Mr. Rezko asked you to do that on a number of

4  occasions, didn't he?

:00PM    5  A   Yes.

6  Q   And you did it, didn't you?

7  A   Yes.

8  Q   It's one of the reasons why you're testifying

9  under the grant of immunity, is that correct?

:01PM    10        MS. HAMILTON:  Objection.

11        THE COURT:  The objection is sustained.

12  BY MR. S. ADAM, JR.:

13  Q   Are you testifying under a grant of immunity?

14  A   Yes, I am.

:01PM    15  Q   But that wasn't the only time that Mr. Rezko --

16  well, strike that.

17        When Mr. Rezko would ask you to have money

18  that was set aside for one purpose under the earnest

19  money, signed, and used in another area, did you

:01PM    20  inform the person that had given that escrow money

21  that that was being done?

22  A   No.

23  Q   So is it fair to say that Mr. Rezko asked you to

24  do those things and you did them without knowledge

:01PM    25  of that person?

1  A   Yes.

2  Q   That wasn't the only area, correct?

3       In fact, Mr. Rezko also stated to you, asked

4  you to move money from escrow accounts regarding low

:01PM   5  income construction projects, didn't he?

6  A   Low income housing projects?

7  Q   Yes.

8  A   Yes.

9  Q   Tell us what Mr. Rezko -- well, strike that.

:01PM   10      He would ask you to take money that was set

11  aside in escrow on one property and use it to fund

12  another property not connected with the first,

13  correct?

14  A   To temporarily do so, yes.

:02PM   15  Q   Can you tell us what escrow money is?

16  A   Escrow money is monies collected on a given

17  project, typically to be used for a specific repair

18  or real estate tax or some other cost of that

19  project.

:02PM   20  Q   Well, when Mr. Rezko asked you to move money from

21  one escrow project and use it on another, did you do

22  it?

23  A   Yes, it was done.

24  Q   Did you inform the person who had given the

:02PM   25  escrow money that that was being done?

1  A   No.

2  Q   In August 27th of 2003, you gave a check to

3  Mr. Rezko to give to River Realty or Patti

4  Blagojevich for that $14,369.50, is that correct?

5  A   Yes.

6  Q   Anywhere on the check itself does it say that

7  it's a commission payment?

8  A   Not on the check here itself.

9  Q   And you gave the check and solely the check to

10  Mr. Rezko to give to Mrs. Blagojevich, is that

11  correct?

12  A   Yes.

13  Q   You didn't give any documentations that this was

14  a commission check, did you?

15  A   Not that I recall.

16  Q   You didn't write on the back of it that this was

17  a commission check, did you?

18  A   Not on the back of the check, no.

19  Q   Was there anything on the front or back of that

20  check to signify that this was for a commission?

21  A   Not on the document produced there.

22  Q   850 North Ogden, LLC, that's on the upper

23  left-hand corner, is that correct?

24  A   Yes.

25  Q   That was a company was formed for that particular

Williams - cross by S. Adam, Jr.                    3777

1  development, correct?

2  A   Yes.

3  Q   That was a development that was being done by

4  Mr. Rezko, correct?

:04PM  5  A   Mr. Rezko was one of the members of the LLC, yes.

6  Q   And so for Mr. Rezko to give a check to Patti

7  Blagojevich from one of his own companies, did not

8  signify that this had anything to do with a

9  commission, did it?

:04PM  10         MS. HAMILTON:  Objection.

11         THE COURT:  You are asking for an opinion and

12  I'm sustaining the objection.

13         MR. S. ADAM, JR.:  Yes, Your Honor.

14  BY MR. S. ADAM, JR.:

:04PM  15  Q   You have told us that you were not upset but

16  taken aback by Mr. Rezko asking you to do this.  Did

17  you ever talk to Mrs. Blagojevich about it?

18  A   Not that I recall.

19  Q   You did know who Mrs. Blagojevich was, correct?

:04PM  20  A   Yes.

21  Q   You did know her husband was the State of

22  Illinois Governor, correct?

23  A   Yes.

24  Q   You did understand that should something not be

:05PM  25  occurring that was necessarily good, that that very

Williams - cross by S. Adam, Jr.                3778

1  well may bring an investigation on to your company,
2  didn't you?
3          MS. HAMILTON:  Objection.
4          THE COURT:  The objection is sustained.
5  BY MR. S. ADAM, JR.:
6  Q   Is it fair to say that after that check was
7  written to Mrs. Blagojevich, you continue to see her
8  at Rezmar?
9  A   Periodically; yes.
10 Q   And periodically talked to her, correct?
11 A   Occasionally; yes.
12 Q   Now, you had come to find out, as you have told
13 us, that Mr. Rezko then asked you, Mr. Williams, to
14 begin to give $12,000 a month to Patti
15 Blagojevich -- well, strike that. $12,000 a month to
16 River Realty, correct?
17 A   Yes.
18 Q   And in that conversation that you had with him,
19 it was in the beginning of October, true?
20 A   Yes.
21 Q   And in the beginning of October, that's when you
22 found out that Mr. Rezko had entered into a contract
23 with Mrs. Blagojevich, correct?
24 A   He stated that he had an agreement with her, yes.
25 Q   And you believed Mr. Rezko, correct?

:05PM
:05PM
:05PM
:05PM
:05PM
:06PM

Williams - cross by S. Adam, Jr.                3779

1  A   Yes.

2  Q   And, in fact, in 2003, you knew Mr. Rezko to be a

3  big developer in the City of Chicago, correct?

4          MS. HAMILTON:  Objection.

5          THE COURT:  The objection is sustained.

6  BY MR. S. ADAM, JR.:

7  Q   You knew that he had won a number of awards for

8  his development business, correct?

9          MS. HAMILTON:  Objection.

10         THE COURT:  The objection is sustained.

11 BY MR. S. ADAM, JR.:

12 Q   Was it your understanding that he was a major

13 developer in the Chicagoland area?

14         MS. HAMILTON:  Objection.

15         THE COURT:  The objection is sustained.

16 BY MR. S. ADAM, JR.:

17 Q   When Mr. Rezko asked you to begin to give these

18 $12,000 a month checks, again you understood that

19 those were going to River Realty which was owned by

20 Patti Blagojevich, correct?

21 A   Yes.

22 Q   And, again, that was the wife of the Governor,

23 correct?

24 A   Yes.

25 Q   Did you ask Mrs. Rezko -- strike that.

1        Did you ask Mrs. Blagojevich about why she

2   was getting those checks?

3   A   I do not recall doing so, no.

4   Q   You had them made and given to her through third

5   persons, correct?

6   A   Correct.

7   Q   But you did find out -- strike that.

8        Mr. Rezko did inform you that she was

9   consulting, correct?

10  A   That's what he stated when we started to write

11  the checks, yes.

12  Q   You said you saw a draft of the contract, is that

13  right?

14  A   I recall doing that, yes.

15  Q   But you as the CFO never got an actual paper copy

16  of the contract itself?

17  A   That is correct.

18  Q   So is it fair to say, once again, Mr. Rezko is

19  entering into contracts outside of your knowledge?

20       MS. HAMILTON:  Objection.

21       THE COURT:  The objection is sustained.

22  BY MR. S. ADAM, JR.:

23  Q   You have told us, when they asked you, that in

24  January of 2004 you became aware that there had been

25  some construction done at the Governor's home, is

:07PM

:07PM

:07PM

:07PM

:08PM

1  that correct?

2  A  Yes.

3  Q  Now, can you tell the ladies and gentlemen of the

4  jury approximately how long does it take to go from

5  agreeing to purchase a property of the size of 4

6  million, closing on that property, approximately, in

7  your experience?

8  A  A number of months, typically.

9  Q  And on, say, a property that's 750,000, would

10 that be approximately the same amount of time from

11 contract to closing?

12 A  I think it could be less than that.

13 Q  Well, how much less would you say?

14 A  I think you could do that in 30 days.

15 Q  You could do that in 30 days?

16        When it came Lake and Aberdeen, do you know

17 when any contract was entered into?  Do you know the

18 time period?

19        MS. HAMILTON:  Objection.

20        THE COURT:  The objection is sustained.

21 BY MR. S. ADAM, JR.:

22 Q  At any time in January of '04 did Mr. Rezko

23 instruct you, since you wrote the checks, to write a

24 check -- well, strike that.  I'm sorry.

25        MR. S. ADAM, JR.:  If I may publish again

1  Government Exhibit 1/22/04.

2          THE COURT:  Does the jury need to see it or

3  do you just want to refresh his recollection?

4          MR. S. ADAM, JR.:  I was just going to show

:09PM  5  it, but I'll do it any way Your Honor wishes.

6          THE COURT:  It's up to you.

7          MR. S. ADAM, JR.:  I'll just publish it real

8  quick.

9          THE COURT:  Sure.

:09PM  10     (Exhibit published to the jury.)

11  BY MR. S. ADAM, JR.:

12  Q   And I'll be very brief with this.

13          Taking a look here at all these entities.

14  You have on the left hand side Demos, D-o-m-o-s?

:09PM  15  A   D-e-m-o-s.

16  Q   D-e-m-o-s.

17          Edon, E-d-o-n; Abco, all that on that list,

18  is that right?

19  A   Yes, sir.

:10PM  20  Q   At any time did Mr. Rezko ask you to write a

21  check on behalf of the Governor to any of those

22  entities?

23  A   There were four checks written to those entities.

24  Q   Four checks?

:10PM  25  A   There were four checks written to those entities.

Williams - cross by S. Adam, Jr.                    3783

1  Q   What checks were written?

2  A   If you look in the pay to date column, you see

3  four checks, one to Minooka, one to Siegel's, one to

4  SCE, and one to RayWray.

:10PM  5  Q   And where did those checks come from?

6  A   I believe those checks were drawn on the account

7  of Chicago Construction Services.

8  Q   On Chicago Construction Services, is that right?

9  A   Yes.

:10PM  10  Q   And those checks were actually repaid by the

11  Blagojevichs, weren't they?

12  A   Yes, they were.

13  Q   So -- well, you did answer my question, 100

14  percent right; you did.

:10PM  15       They sent out that money to cover the cost,

16  but Mr. Blagojevich and Mrs. Blagojevich paid back

17  those costs, didn't they?

18  A   As I recall, over a year later, yes, they paid

19  back those costs.

:11PM  20  Q   And, in fact, didn't Chicago --

21       What's it called?  Chicago --

22  A   Construction Services.

23  Q   Didn't they also get an extra $5,000 service fee?

24  A   I believe they received a 5 percent fee.

:11PM  25  Q   Oh, 5 percent fee.  What did that come out to as

1  far as numbers; money?

2  A   I would believe it was probably somewhere in the

3  neighborhood of 5 percent of the 72-thousand-dollar

4  number that was on the prior schedule, so somewhere

:11PM  5  in the neighborhood of 35, 3600 dollars.

6  Q   And that's an extra fee that they received for

7  doing that service, is that true?

8  A   That was the typical fee that the construction

9  company received.

:11PM  10         MR. S. ADAM, JR.:  May I have one moment,

11  Your Honor?

12     (Brief pause).

13  BY MR. S. ADAM, JR.:

14  Q   Once again, I have to ask you other questions,

:12PM  15  sir.

16         You are familiar that Rezmar Development was

17  trying to develop a property at Roosevelt and Clark,

18  is that correct?

19  A   Rezmar was involved with the development of a

:12PM  20  property at Roosevelt and Clark, yes.

21  Q   And you have told us that at some point in

22  October of 2003, Mr. Kelly started to receive money

23  for his roofing business, is that right?  From

24  Rezmar?

:12PM  25  A   No, I believe the invoice that Mr. Rezko first

1  showed me was dated November of 2005 after Rezmar's

2  related entity had sold the project at Roosevelt and

3  Clark.

4  Q   So this later on in 2005, 2006 time frame, is

5  that fair?

6  A   Yes.

7  Q   Okay.  You being the CFO of Rezmar Corporation

8  knew that Mr. Kelly had invested close to $2 million

9  into that Roosevelt and Clark project, correct?

10 A   Mr. Kelly was an investor, I don't recall how

11 much he invested.

12 Q   Well, a significant amount of money, is that

13 fair?

14 A   I believe that was the case.

15 Q   And by significant, I mean more than the $187,000

16 that Rezmar was paying him back.  It was more in the

17 tune of at least 7 figures, correct?

18 A   I do not know exactly how much it was.

19 Q   Well, is it fair to say that at the time in which

20 that $187,000 check went to Mr. Kelly, he had given

21 Rezmar more than 187,000 at that point?

22 A   I do not know that for certain.

23        MR. S. ADAM, JR.:  Nothing further.  Thank

24 you.

25        THE COURT:  Redirect?

1    MS. HAMILTON:  May I have one moment, Your

2 Honor?

3         THE COURT:  Sure.

4      (Brief pause).

:14PM  5         MS. HAMILTON:  Briefly, Your Honor.

6

7

8                 REDIRECT EXAMINATION

9 BY MS. HAMILTON:

:14PM  10 Q  Mr. Williams, I believe you testified on cross

11 that with respect to the Irving Park transaction,

12 that Mrs. Blagojevich represented the seller in that

13 transaction.  Do you know one way or the other what,

14 if anything, she did on behalf of the seller?

:15PM  15 A  I do not have any specific knowledge of that.

16         MS. HAMILTON:  That's all, Judge.

17         MR. S. ADAM, JR.:  Nothing further.

18         THE COURT:  You may step down.

19      (Witness excused.)

:15PM  20         THE COURT:  Your next witness.

21      (Brief pause).

22      THE COURT:  Your next witness.

23      (Brief pause)

24         MR. NIEWOEHNER:  Your Honor, the government

:15PM  25 calls Michael Winter.

Winter - direct by Niewoehner                    3787

1          THE COURT:  Face me and raise your right
2    hand.
3        (Witness duly sworn.)
4          THE COURT:  Please be seated.
:15PM  5        MICHAEL WINTER, GOVERNMENT WITNESS, SWORN
6                    DIRECT EXAMINATION
7    BY MR. NIEWOEHNER:
8    Q   Would you state your name, please.
9    A   Michael Winter.
:16PM  10   Q   How old are you?
11   A   43.
12   Q   Where do you currently live?
13   A   Deerfield, Illinois.
14   Q   How are you currently employed?
:16PM  15   A   I am self-employed.
16   Q   Self-employed doing what?
17   A   I do real estate investments.
18   Q   And how long have you done real estate
19   investments?
:16PM  20   A   For approximately 5 years.
21   Q   And where are your investments located?
22   A   Throughout the United States.
23   Q   And what sort of -- give us a sense of the scale
24   of the projects that you work on.
:16PM  25   A   I'm involved with several projects in Southern

1  California that, you know, are several hundred units

2  each, I have a project in South Florida that's, you

3  know, 25 units.

4  Q   Could you put the microphone a little closer to

5  you?

6  A   Sure.

7  Q   And about how much money are those projects

8  worth?

9  A   It's questionable in this world, but, you know,

10 the projects in L.A. probably have a gross market

11 value of between 75 and 100 million, and, you know,

12 that's typically the size of the projects I've been

13 involved in.

14 Q   You are testifying today pursuant to an agreement

15 with the government?

16 A   I am.

17 Q   Is that an immunity agreement?

18 A   It is.

19 Q   What do you understand that immunity agreement to

20 mean?

21 A   That so long as I tell the truth, what I say

22 won't be held against me.

23 Q   What could happen if you did not tell the truth?

24 A   I could be prosecuted for perjury.

25 Q   I'm going to direct your attention back to the

1  spring of 2003.

2       What were you doing for a living at that

3  point in time?

4  A  I was doing consulting work for a company called

5  the Rezmar Corporation.

6  Q  Prior to 2003, what had you done for a living?

7  A  I was a banker for a number of years.

8  Q  About how many years were you a banker?

9  A  For the 15 preceding years.

10 Q  Did you have any particular area of expertise in

11 banking?

12 A  For most of my career I financed real estate

13 transactions throughout the United States.

14 Q  Did you meet Antoin Rezko in the course of

15 working on some of those deals?

16 A  I did.

17 Q  And how was it that you met Rezko?

18 A  I was introduced to Mr. Rezko through a

19 third-party and had several meetings with him and

20 financed several projects for him through a number

21 of years.

22 Q  And you said you began working as a consultant in

23 2003.  Before you began at Rezmar, did you have any

24 conversations with Rezko about what position you

25 might hold there?

Winter - direct by Niewoehner                3790

1  A  We had several conversations.  Initially the

2  thought was -- initially when I first started there,

3  nothing was defined.  Subsequent to that, there was

4  a point in time where we contemplated that I would

:18PM  5  become the president of Rezmar, but ultimately I

6  served as a consultant for Rezmar through my time

7  there.

8  Q  Did you have an office with Rezmar?

9  A  I had an office at Rezmar, yes.

:18PM  10  Q  Where was your office at Rezmar?  What was the

11  street address?

12  A  853 North Elston.

13  Q  And when you worked at Rezmar as a consultant,

14  did you work full time?

:19PM  15  A  I did.

16  Q  And where, physically, did you work?

17  A  Physically where my office was located?

18  Q  Yes.

19  A  If you were to go in the front door of Rezko --

:19PM  20  I'm sorry, at Rezmar and continue walking straight,

21  my office was on the left.

22  Q  And were you typically there Monday through

23  Friday?

24  A  I was there most days, unless I was traveling.

:19PM  25  Q  Did you travel very often for work?

1  A   I traveled maybe two days a month.

2  Q   And was that -- did Tony Rezko also have an

3  office in that same office space?

4  A   He did.

5  Q   What did you do when you first started working as

6  a consultant for Rezmar?

7  A   Initially I spent a fair amount of my time

8  reviewing the various development projects that

9  Rezmar was involved in and then that slowly tapered

10 off and I spent all of my time focusing on one large

11 scaled development they were working on in the South

12 loop.

13 Q   And when you were initially looking at all the

14 projects that Rezmar was working on, did you become

15 familiar with the different projects that Rezmar was

16 working on in that time frame?

17 A   I did.

18 Q   And how was Rezmar doing financially at that

19 time?

20 A   Rezmar was struggling.

21 Q   Did you also become familiar through that process

22 with the number of business opportunities that Rezko

23 was working on?

24 A   You have to clarify that question.

25 Q   As you were reviewing some of the things that

1  Rezmar was working on, did you also have

2  conversations with Tony Rezko about business

3  opportunities that he was working on?

4  A  Yes.

5          MR. GILLESPIE:  Objection; foundation.

6          THE COURT:  I don't think it's necessary for

7  this one.  The objection is overruled.

8  BY MR. NIEWOEHNER:

9  Q  And you continued to work -- for example, in 2003

10  were you still working with Rezmar?

11  A  I was.

12  Q  In fact, how long did you continue to work with

13  Rezmar?

14  A  I worked there through the spring of 2005.

15  Q  And I direct your attention to about December of

16  2004.

17          Did you switch offices at that point?

18  A  We did.

19  Q  Where did you go at that point?

20  A  We moved to an office space in the Sears Tower.

21  Q  So focusing on this time frame when you were in

22  the Elston office, did you talk with Rezko about

23  some of the business opportunities that he was

24  working on?

25  A  Yes.

:20PM

:20PM

:20PM

:21PM

:21PM

Winter - direct by Niewoehner                3793

1  Q   Are you familiar with a company called the Near
2  North Insurance Company?
3  A   I am.
4  Q   What is that?
5  A   Near North Insurance is a company that was
6  focused on property and casualty insurance and title
7  insurance located in Chicago on LaSalle Street.
8  Q   And after you started working with Rezmar in the
9  spring of 2003, did you talk with Rezko about the
10 Near North Insurance Company?
11 A   Yes, there was a couple of instances we discussed
12 Near North.
13 Q   And in those conversations, what did Rezko
14 indicate to you about Near North?
15        MR. GILLESPIE:  Foundation.
16        THE COURT:  Lay a foundation for this one.
17 BY MR. NIEWOEHNER:
18 Q   You said you had more than one conversation, is
19 that correct?
20 A   I had two conversations that I can recall.
21 Q   And were those while you were working in the
22 Rezmar Elston offices?
23 A   Yes.
24 Q   Do you recall those conversations, generally?
25 A   Yes.

1  Q   What did Rezko indicate to you in those

2  conversations?

3  A   He indicated to me that --

4        MR. GILLESPIE:  Judge, I'm sorry.  I'm going

5  to object unless there is clarification as to which

6  conversation we're talking about.

7  BY MR. NIEWOEHNER:

8  Q   I think you are testifying about these

9  conversations, generally speaking, is that right?

10 A   That is correct.

11 Q   What did Rezko indicate to you, generally, in

12 these conversations?

13 A   That Near North was going to be sold and he

14 wanted to see if I had any ideas who potentially

15 could buy pieces or the whole Near North Insurance.

16 Q   And did you understand that Rezko himself had a

17 relationship with Near North?

18        MR. GILLESPIE:  Objection; leading.

19        THE COURT:  The objection is sustained.

20 BY MR. NIEWOEHNER:

21 Q   From what Rezko said -- did Rezko indicate that

22 he had some sort of relationship with Near North in

23 these conversations?

24 A   Yes, he did.

25 Q   What relationship did he indicate he had?

1  A   He had a relationship with the principal, Mickey
2  Siegel, from Near North.
3  Q   Are you familiar with somebody named Vince
4  Dibenedetto?
5  A   I am.
6  Q   Who is Vince Dibenedetto?
7  A   I know him as a friend of Mr. Rezko's, as well
8  somebody in the insurance business.
9  Q   Did you see Dibenedetto at the Rezmar's offices
10 in 2003 and 2004?
11 A   Yes.
12 Q   About how often?
13 A   He was there fairly often.
14 Q   And when you saw Mr. Dibenedetto, who was he
15 with?
16 A   He would be there meeting with Tony.
17 Q   Was Dibenedetto an investor in any of the
18 projects that Rezko owned?
19 A   He was.
20 Q   Were there any in particular?
21 A   He was an investor in the Roosevelt Clark
22 project.
23 Q   And did you ever interact with Dibenedetto in
24 relationship with the Roosevelt and Clark project?
25 A   There was a point where we were identifying

1  prospective insurers for the Roosevelt Clark project

2  and Vince Dibenedetto had brought a team in to make

3  a representation on an OCIP insurance policy.

4  Q   And is that a kind of insurance policy?

5  A   It is.

6  Q   Now, this Roosevelt and Clark project, did you

7  have any significant involvement with the project

8  when you worked at Rezmar?

9  A   I did.

10 Q   What was your role with respect to the Roosevelt

11 and Clark project?

12 A   For the first few months I was at Rezmar, I

13 described that I spent time looking at their

14 business in totality; after several months, I

15 basically spent all of my time kind of supervising

16 the Roosevelt Clark project.

17 Q   And what was the Roosevelt and Clark project?

18 A   The Roosevelt Clark project is a 62-acre parcel

19 of land bound by Roosevelt Street to the north, 18th

20 Street to the south, Clark Street to the east, and

21 river to the west.  It encompasses, as developed,

22 although, you know, it encompassed almost 5,000

23 residential dwelling units and almost a million feet

24 of retail space.

25 Q   And in the spring of 2003, who were the primary

1 owners of the Roosevelt and Clark property?

2 A   Roosevelt Clark was owned by a limited

3 partnership, the general partners of that limited

4 partnership were Tony Rezko and Dan Mahru.

5 Q   And in the spring of 2003, what was the condition

6 or the state of development for the Roosevelt and

7 Clark project?

8 A   It was vacant land.

9 Q   In terms of dollars, about how much money was it

10 going to take to develop that Roosevelt and Clark

11 project?

12 A   It would have taken a couple of hundred million

13 dollars just to put the infrastructure, the roads,

14 and the various systems in place, and then it would

15 be hundreds of millions of dollars to develop the

16 site.

17 Q   Beginning in about the fall of 2003, who was

18 primarily responsible for overseeing the day-to-day

19 operations of the Roosevelt and Clark development

20 project?

21 A   I was.

22 Q   Were there other people who were working on that

23 project?

24 A   Many.

25 Q   And were you, as in the role of overseeing the

1  operations, were you generally familiar with what
2  the other people were doing with respect to that
3  project?
4  A   I was.
5  Q   And were there outside firms that were working on
6  this project?
7  A   Yes, there were many other firms working on this
8  project.
9  Q   What types of firms were working on it?
10 A   There were architecture firms, engineering firms,
11 legal, bonds.  There was many, many outside
12 professionals involved in this project.
13 Q   And what was your role in working with those
14 outside firms?
15 A   Would go to meetings, was involved in
16 discussions, and was involved in, you know, kinda
17 piecing all the parts together.
18 Q   Now, I think you said you stopped working with
19 Rezmar in approximately the spring of 2005, is that
20 right?
21 A   That is right.
22 Q   And at that point, where was the state of
23 development of the Roosevelt and Clark project?
24 A   Nothing had happened, as far as there had been no
25 development on the site.

1  Q   It was still dirt?

2  A   Yes; still dirt without access.

3  Q   Who took over the Roosevelt and Clark project

4  after you left?

5  A   Well, the ownership -- there was a transfer of a

6  significant part of the ownership long after I left,

7  the day-to-day management of the project was being

8  run by Mike Rumman.

9  Q   And where did Michael Rumman come from?

10 A   He was somebody who was a friend of Mr. Rezko and

11 his background was that he, I think, worked for one

12 of the utility companies for a while and had worked

13 most recently in charge of CMS which is a government

14 agency.

15 Q   All right.  I'm going to focus your attention on

16 the time frame 2003 and 2004 when you were working

17 the Elston offices.

18 A   Okay.

19 Q   In that time frame, did you see Rod Blagojevich

20 in the Rezmar offices?

21 A   I did.

22        MR. NIEWOEHNER:  Is there a stipulation?

23        MR. GILLESPIE:  Yes.

24        MR. NIEWOEHNER:  Your Honor?

25        THE COURT:  The Defendant Rod Blagojevich is

1 stipulated to.

2 BY MR. NIEWOEHNER:

3 Q   And about how often did you see Defendant

4 Blagojevich at the Elston Rezmar offices during that

5 time?

6 A   He was there often.

7 Q   About how often had you seen him in a month?

8 A   A couple of times.

9 Q   Were there times -- and when you saw Defendant

10 Blagojevich, who did you typically see him with?

11 A   Typically he was with Chris Kelly and Lon Monk

12 and Tony Rezko.

13 Q   Were there times that you saw all four, Defendant

14 Blagojevich, Rezko, Kelly and Monk together at the

15 Rezmar offices?

16 A   Most of the time the four of them were together.

17 Q   When you saw them, where would you typically see

18 him?

19 A   They would meet in the back conference room at

20 Rezmar.

21 Q   Now, are you familiar with Defendant

22 Blagojevich's wife?

23 A   I am.

24 Q   What is her name?

25 A   Patti Blagojevich.

1  Q   Focusing on the time frame of 2003 and 2004 when

2  you worked at the Rezmar offices, did you ever see

3  Mrs. Blagojevich there?

4  A   I did.

5  Q   And after you began working with Rezmar, was

6  Mrs. Blagojevich ever paid money on a monthly basis

7  by Rezmar?

8  A   She was.

9  Q   And about how much was she paid on a monthly

10 basis?

11 A   I believe it was about $150,000 annualized, so 12

12 to 13,000 dollars a month.

13 Q   How did you first hear that Mrs. Blagojevich was

14 going to be getting paid on a monthly basis by

15 Rezmar?

16 A   Tony called me into his office and made me aware

17 that he was --

18       MR. GILLESPIE:  Objection.  I'm sorry, I just

19 ask for foundation, please.

20 BY MR. NIEWOEHNER:

21 Q   In this conversation with Mr. Rezko, do you

22 recall approximately when that took place?

23 A   The fall of '03.

24 Q   Was anyone else present for this conversation?

25 A   No.

Winter - direct by Niewoehner                    3802

1  Q   What did Mr. Rezko say to you in that
2  conversation?
3  A   He said that he was going to hire Patti as a
4  consultant and asked me to get her involved in
5  things that I was doing, to the extent I could, to
6  justify paying her.
7  Q   And when he indicated to justify paying her, what
8  did you understand Mr. Rezko to mean?
9          MR. GILLESPIE:  Objection.
10         THE COURT:  Overruled.
11 BY THE WITNESS:
12 A   I understood him to mean that if he was going to
13 pay her, you know, we should try and get some value
14 for her services.
15 BY MR. NIEWOEHNER:
16 Q   How did you react to what Mr. Rezko said?
17 A   I thought it was a bad idea.
18         MR. GILLESPIE:  I'm sorry.  Objection as to
19 relevance.
20         MR. NIEWOEHNER:  I'll rephrase it.
21 BY MR. NIEWOEHNER:
22 Q   What did you say when Mr. Rezko indicated that
23 Mrs. Blagojevich was going to be paid on a monthly
24 basis?
25         MR. GILLESPIE:  Judge, same objection.

Winter - direct by Niewoehner                    3803

1          THE COURT:  Overruled.
2   BY THE WITNESS:
3   A   I told Tony I thought it was a bad idea.
4   BY MR. NIEWOEHNER:
:31PM   5   Q   Did you explain why?
6          MR. GILLESPIE:  Judge, objection.
7          THE COURT:  I'll sustain it.
8   BY MR. NIEWOEHNER:
9   Q   What, if anything, did you say to Mr. Rezko about
:31PM   10  hiring or paying Mrs. Blagojevich on a monthly
11  basis?
12         MR. GILLESPIE:  Same objection.
13         THE COURT:  The objection is sustained.
14  BY MR. NIEWOEHNER:
:31PM   15  Q   Well, you did say that Mr. Rezko indicated that
16  he wanted Mrs. Blagojevich to be involved, or
17  something along those lines, is that correct?
18  A   Yes.
19  Q   Did Mr. Rezko give you any particular direction
:31PM   20  in terms of what Mrs. Blagojevich should work on?
21  A   We discussed her getting involved in some way
22  with the Roosevelt Clark project.
23  Q   What did you understand Mr. Rezko wanted you to
24  do with respect to Mrs. Blagojevich and the
:32PM   25  Roosevelt and Clark project?

1  A  He told me his contemplation was that she would

2  have some role in the marketing of development sites

3  or townhome sites.

4  Q  What did you understand Mrs. Blagojevich's work

5  experience to be during this conversation?

6  A  I understood that Mrs. Blagojevich's background

7  was in running a small real estate entity, a real

8  estate company on the north side of the city.

9  Q  Had you requested that Rezmar hire somebody with

10 Mrs. Blagojevich's work experience to work on any of

11 your projects?

12 A  No.

13 Q  Did you need for someone -- at that time did you

14 have any need for someone with Mrs. Blagojevich's

15 experience to work on the Roosevelt and Clark

16 project?

17      MR. GILLESPIE:  Objection.

18      THE COURT:  Overruled.

19 BY THE WITNESS:

20 A  No.

21 BY MR. NIEWOEHNER:

22 Q  And from your knowledge of the company, did

23 Rezmar need to pay anybody with Mrs. Blagojevich's

24 work experience on a monthly retainer?

25      MR. GILLESPIE:  Objection.

 1           THE COURT:  Overruled.
 2   BY THE WITNESS:
 3   A   No.
 4   BY MR. NIEWOEHNER:
 5   Q   After that conversation with Defendant
 6   Blagojevich -- excuse me.
 7           After that conversation with Rezko, did
 8   Mrs. Blagojevich begin working at Rezmar on a
 9   monthly retainer?
10   A   She did.
11   Q   And after she began, did you have a later
12   conversation with Rezko about Mrs. Blagojevich?
13   A   We did.
14   Q   And approximately when was that conversation in
15   relation to when she started working?
16   A   Kind of the beginning, winter of '04.
17   Q   And do you mean -- the beginning meaning like
18   December of --
19   A   Exactly.
20   Q   Okay.
21           Where did that conversation take place?
22   A   In Tony Rezko's office.
23   Q   Was anyone else present?
24   A   No.
25   Q   What did you say to Mr. Rezko in that

Winter - direct by Niewoehner                    3806

1  conversation?

2  A   It was becoming increasingly obvious to me the

3  kind of dire financial straits that Rezmar was

4  experiencing and I told Mr. Rezko that I thought

5  that it was illogical to be paying current income to

6  someone who conceivably was filling the role as a

7  broker, which is typically a position that is

8  compensated in the form of commissions following a

9  sales event.

10         So I told him I thought that it was kind of

11 unfair to have Mrs. Blagojevich getting --

12         MR. GILLESPIE:  Objection; characterization.

13         THE COURT:  We'll stop the answer there.  Ask

14 another question.

15 BY MR. NIEWOEHNER:

16 Q   So you told -- when you indicated to Mr. Rezko

17 that Mrs. Blagojevich could be paid on a commission

18 basis, what did you mean?

19 A   Typically brokers are paid on a commission basis,

20 meaning that they get compensated after a sales

21 event.  If Mrs. Blagojevich was going to participate

22 in selling property, it made more sense to me that

23 instead of taxing the company on a monthly basis --

24         MR. GILLESPIE:  Objection.

25 BY THE WITNESS:

:34PM
:34PM
:34PM
:35PM
:35PM

1  A  -- then for this type of work --

2      MR. GILLESPIE:  Judge, I'm sorry.  I'm going

3  to object to what made sense to him.

4      THE COURT:  I think what's clear now is what

5  his position was and that it was related to

6  Mr. Rezko, I think maybe you should move to the next

7  step.  So I'm sustaining the objection.

8  BY MR. NIEWOEHNER:

9  Q   How did Mr. Rezko respond when you brought your

10 concerns about how much Mrs. Blagojevich was being

11 paid?

12 A  He suggested that maybe he would move

13 Mrs. Blagojevich to another one of his companies.

14 Q  Did Mrs. Blagojevich continue to work at Rezmar

15 -- or excuse me.

16      Did Mrs. Blagojevich continue to be paid on a

17 monthly basis after your conversation with

18 Mr. Rezko?

19 A  I don't know.

20 Q  At some point did Mrs. Blagojevich stop receiving

21 monthly payments?

22 A  That's my understanding.

23      MR. GILLESPIE:  Judge, objection to

24 foundation as to his understanding.

25 BY MR. NIEWOEHNER:

1  Q   At some point did you learn that she stopped
2  being paid?
3  A   Yes.
4          MR. GILLESPIE:  Foundation?
5          THE COURT:  How did you learn this.
6  BY MR. NIEWOEHNER:
7  Q   Do you recall how you learned of that fact?
8  A   I don't recall.
9  Q   Now, as a result of Mr. Rezko's original request
10 that you involve Mrs. Blagojevich in some of your
11 projects with respect to the Roosevelt and Clark,
12 what did you do?
13 A   I met with Mrs. Blagojevich a few times to
14 discuss the project in a generic form, and I recall
15 inviting Mrs. Blagojevich to one of our monthly
16 meetings that we had with Lehman Brothers.
17 Q   Now, what was -- what is Lehman Brothers?
18 A   Lehman Brothers was a large financial institution
19 headquartered in New York.
20 Q   And how was it that you were meeting with Lehman
21 Brothers?
22 A   I had introduced Lehman Brothers to the Roosevelt
23 Clark project and they had made a $50 million
24 mezzanine loan to help fund the predevelopment cost
25 of the project.

:36PM

:37PM

:37PM

:37PM

:37PM

1  Q   So what was the purpose of your meetings with
2  Lehman Brothers?
3  A   On a monthly basis we met with Lehman Brothers to
4  discuss the status of the project and also to
5  discuss Lehman's involvement with the project going
6  forward.
7  Q   Could you move the microphone closer to you?
8  That would be helpful.   Thank you.
9  A   Sure.
10  Q   To your knowledge, did Mrs. Blagojevich have any
11  background in finance or mezzanine loans?
12  A   Not to my knowledge.
13  Q   Why did you invite her to this meeting?
14  A   Because Mr. Rezko asked me to try and get
15  Mrs. Blagojevich involved in the project and I
16  thought that it would be helpful for her to sit in
17  on this type of meeting.
18  Q   Do you recall Mrs. Blagojevich doing anything
19  during the meeting?
20  A   I do not.
21  Q   Did she do anything with respect to Lehman
22  Brothers after that meeting?
23  A   Not that I'm aware of.
24  Q   Did she attend any further meetings with Lehman
25  Brothers?

:38PM
:38PM
:38PM
:38PM
:38PM

1  A   No.

2  Q   Did Mrs. Blagojevich have any involvement in any

3  other aspects of the Roosevelt and Clark project?

4  A   Not that I'm aware of.

5  Q   Did Mr. Rezko ask you that you involve

6  Mrs. Blagojevich in any other aspect of it?

7  A   Other than what I testified previously related to

8  her potentially selling or identifying sales

9  opportunities for some of the developments lots or

10 the townhome lots.

11 Q   And in 2003 and 2004 -- or, actually, let me back

12 up.  What is a development lot?

13 A   The Roosevelt Clark site was 62 acres.  In that,

14 there were going to be 30 pads for condominium

15 towers, apartment towers, and then another 500 or so

16 pads for townhouses.

17        So a development lot could be a pod of

18 townhouses, it could be a pad for a condo tower, it

19 could be a pad for an apartment building.

20 Q   And in 2003, 2004, was the Roosevelt and Clark

21 project at the point where you actually had any

22 development sites?

23 A   In 2003 and 2004 and continuing until today,

24 Roosevelt Clark is a site that has no access.

25 There's no roads.  You can't even get to the site.

:39PM
:39PM
:39PM
:39PM
:40PM

1  So, no, and there was nothing to sell.

2  Q   So in 2003, when was the earliest that you felt

3  there might even be development sites to market?

4  A   Well, the infrastructure work probably would've

5  taken 3 years to do.  So assuming that would be the

6  case, you might be out in the market, to market

7  development sites, maybe a year prior to that.  So

8  at least a couple of years out.

9  Q   At that point, from your perspective, was there

10 anything for Mrs. Blagojevich to do in terms of

11 marketing aspects of the Roosevelt and Clark site?

12 A   No, we weren't marketing anything at that point.

13 Q   At that point did you need anybody with

14 Mrs. Blagojevich' experience to work on the

15 Roosevelt and Clark project?

16 A   No.

17 Q   I'm going to focus your attention again in the

18 2003 and 2004 time period.

19       Did Mrs. Blagojevich have an office at

20 Rezmar?

21 A   She didn't.

22 Q   Did Rezmar have extra offices such that if she

23 wanted an office, she could have had one?

24 A   Sure.

25 Q   Did you see Mrs. Blagojevich at Rezmar in that

1  time period?

2  A   I did.

3  Q   About how often did you see her?

4  A   She was in the offices probably 2 or 3 times a

5  month.

6  Q   Was she typically by herself when she was in the

7  office?

8  A   Most of the times that I saw Mrs. Blagojevich she

9  was actually with her child, her daughter.

10 Q   And when you saw Mrs. Blagojevich in the Rezmar

11 offices, who was she typically meeting with?

12 A   Almost exclusively with Mr. Rezko.

13 Q   And did she typically stay long in the Rezmar

14 offices on the occasions you saw her?

15 A   In the occasions I saw her, she was there for

16 15 minutes or so.

17 Q   In about the spring of 2004, was Rezmar

18 considering purchasing an office building?

19 A   There was talk of Rezmar moving offices, yes.

20 Q   And what would be the purpose of Rezmar moving

21 offices?

22 A   There was a contemplation of needing more space

23 as the South loop project continued.  So there was

24 contemplation that they needed a larger office

25 space.

1  Q   And were you involved in some of these

2  conversations about possibly buying a new office

3  building?

4  A   Very peripherally I was involved in a couple of

5  conversations related to that.

6  Q   And was Mrs. Blagojevich involved in this process

7  of looking for an office building anywhere?

8  A   I know that Tony Rezko asked Mrs. Blagojevich to

9  try and identify office buildings that would fit

10  what he deemed to be the needs of the company going

11  forward.

12  Q   And to your knowledge, did Mrs. Blagojevich have

13  any expertise in buying office buildings?

14  A   No.

15  Q   From your knowledge of Rezmar, did Rezmar need to

16  pay somebody a monthly retainer to look for office

17  buildings that Rezmar could purchase?

18       MR. GILLESPIE:  Judge, I'm going to object to

19  leading.

20       THE COURT:  Sustained.

21  BY MR. NIEWOEHNER:

22  Q   Are there brokers who specialize in buying office

23  buildings?

24  A   Yes.

25  Q   How are those brokers typically paid?

1  A   Well, my experience has been they're paid on a

2  commission basis on the success of a sale.

3  Q   So if there is no sale, do those brokers get

4  paid?

5  A   No.

6  Q   If Rezmar had hired one of those brokers, would

7  Rezmar have paid the broker anything if there was no

8  purchase?

9          MR. GILLESPIE:  Objection.

10          THE COURT:  Sustained.

11  BY MR. NIEWOEHNER:

12  Q   To your knowledge, did Mrs. Blagojevich identify

13  any potential buildings that Rezmar might purchase?

14  A   I'm aware of at least one and she might have

15  identified others.  To my knowledge, it's one

16  building specifically.

17  Q   Did you visit that building?

18  A   I did.

19  Q   From your perspective, was there any issues with

20  purchasing -- was there any issues that Rezmar would

21  purchase the building?

22  A   My feeling was that the building didn't fit the

23  needs that Rezmar was looking for.

24  Q   And did Rezmar, in fact, end up buying that

25  office building?

:43PM (appears alongside lines 5, 10, 15, 20, 25)

1  A   No, they did not.

2  Q   In fact, did Rezmar end up buying any office

3  building in 2003 or 2004?

4  A   No.

5  Q   I'm going to focus your attention in the time

6  period when Mrs. Blagojevich was being paid on a

7  monthly basis.

8         Did Rezko indicate to you in that time frame

9  that Mrs. Blagojevich was working on anything with

10 respect to development sites?

11 A   There was a point in time where Mr. Rezko made me

12 aware that Mrs. Blagojevich was following up on a

13 lead for development site that was currently owned

14 by Commonwealth Edison, that's the only site I'm

15 aware of.

16 Q   And what types of -- in that time frame, what was

17 Rezmar -- or what types of properties did Rezmar buy

18 to develop?

19 A   Rezmar typically owned townhome sites throughout

20 the north side of the city.  They had done -- in an

21 earlier iteration of the company, they had done some

22 affordable housing projects in the south side, but

23 in the time that I knew them typically they were

24 focused on townhome site developments on the north

25 side of the city and they had one condo site

1  development on Chicago Avenue.

2  Q   And how many units was Rezmar typically building

3  on a site?

4  A   50 to 100.

5  Q   Again, were there brokers in the Chicago area who

6  specialized in locating development sites?

7          MR. GILLESPIE:  Objection.

8          THE COURT:  Sustained.

9  BY MR. NIEWOEHNER:

10 Q   Did you talk with Rezko about any particular

11 development sites that Mrs. Blagojevich was involved

12 in?

13 A   The only one that I discussed with him was the

14 Com. Ed. site that he brought to my attention at

15 some point.

16 Q   Did Rezmar end up purchasing that site?

17 A   No.

18 Q   In fact, in 2003 and 2004, did Rezmar purchase

19 any development sites?

20 A   No.

21 Q   I'm going to direct your attention now to the

22 summer and fall of 2004.

23          In that time frame, were you involved in any

24 way in a Rezmar project located on Peterson Avenue

25 in Chicago?

1  A  I was involved only because Mr. Rezko had asked
2  me to just take a look at it because there were
3  significant problems with the project.
4  Q  And as a result, were you involved in trying to
5  deal with some of those problems?
6  A  I was involved in trying to see if there were
7  solutions, but they were virtually unsolvable, so I
8  guess I took a look at it and spent a little time
9  with it.
10  Q  And was Mrs. Blagojevich involved in any way in
11  this Peterson project?
12  A  Yes; Mr. Rezko had asked Mrs. Blagojevich to
13  identify prospective brokers for the project.
14  Q  And did, in fact, Mrs. Blagojevich identify any
15  potential brokers?
16  A  She -- she identified a couple and we met, she
17  and I met with one, that I can recall.
18  Q  Did Rezmar ever hire that broker?
19  A  No.
20  Q  Why not?
21      MR. GILLESPIE:  Objection.
22      THE COURT:  The objection is sustained.
23  BY MR. NIEWOEHNER:
24  Q  Was the Peterson development ever actually built?
25  A  No.

1  Q   Was there anything to market -- well, let me

2  rephrase the question.

3         What was the state of the Peterson project

4  when you left in the spring of 2005?

5  A   The project was ill conceived from the standpoint

6  that it financially didn't work.  So nothing had

7  been done other than the existing building, which

8  was a 3-story office building, was demolished.  So

9  it was just a vacant piece of land.

10 Q   And, again, this project development involving

11 Peterson was that in the summer and fall of 2004?

12 A   Correct.

13         MR. NIEWOEHNER:  Nothing further, Your Honor.

14         MR. GILLESPIE:  Judge, would you like me to

15 start?

16         THE COURT:  Sure.

17         MR. GILLESPIE:  Thank you.

18

19

20                   CROSS EXAMINATION

21 BY MR. GILLESPIE:

22 Q   Sir, good evening.

23 A   Good evening.

24 Q   My name is Mike Gillespie.  I'm one of the

25 attorneys who represents Governor Blagojevich.

1          I'm going to be asking you some questions

2  this afternoon, sir.  If you don't understand me,

3  please ask me to rephrase the question.  I'd be more

4  than happy to do so.

5  A  Of course.

6  Q  I think you told us, did you not, sir, that you

7  first met Mr. Rezko in approximately the middle of

8  1990?

9  A  I didn't say that.

10 Q  When did you meet Mr. Rezko?

11 A  I probably met Mr. Rezko in 1996, '95, somewhere

12 in there would be my guest, but I don't have any

13 specific knowledge.

14 Q  So if I characterize it as somewhere mid 1990,

15 that would be okay?

16 A  Mid 1990's?

17 Q  Yes.

18 A  Yes.  Oh, I thought you said 1990.  In the mid

19 1990's would a fair characterization.

20          THE COURT:  Let's come to the side for a

21 moment.

22     (Proceedings heard at sidebar on the

23      record.)

24          THE COURT:  How long have you got with him?

25          MR. GILLESPIE:  An hour and some change.

:48PM

:48PM

:49PM

:49PM

Winter - cross by Gillespie                                3820

1      THE COURT:  The jury is beginning to look
2  numb.  We'll adjourn.
3      (Proceedings resumed within the hearing of
4       the jury.)
5      THE COURT:  We are going to adjourn.
6      Tuesday at 9:30.
7      THE MARSHAL:  All rise.
8      THE COURT:  Wait.  Wait.  Stop.  Stop.
9      I remind you again about not paying any
10 attention to news reports, the blogs, to any
11 coverage of this case in any way, and to avoid
12 anybody who wants to talk to you about it and not to
13 talk about it yourself.
14      With that, have a nice holiday.
15      THE MARSHAL:  All rise.
16     (Witness temporarily excused.)
17     (The following proceedings were had out of
18      the presence of the jury in open court:).
19      THE COURT:  Counsel wanted to address
20 scheduling for next week?
21      MR. SCHAR:  Yes, Judge.  Just before we do
22 that, I assume there are a number of exhibits that
23 went into evidence today.  We're going to be asking
24 to release those, as well as the recordings.
25      THE COURT:  Subject to the standing

:50PM
:50PM
:50PM
:52PM
:52PM

1  objection, you may release them.

2      MR. SCHAR:  Yes, in terms of scheduling,

3  Judge, things have certainly proceeded at a pace

4  that was quicker than we anticipated, I think which

5  is all for the better.  We are in the process of

6  still getting our final witnesses in order, but I

7  think it is likely that we will either rest

8  certainly not next week but the week after, and if

9  not that week, very early the following week, but

10 more likely than not, sometime the week after next,

11 understanding it's a short week next week.

12      We bring that to Your Honor's attention,

13 obviously, for a variety of reasons, not the least

14 of which is that I assume we will thereafter

15 immediately roll into the defense case.  And so we

16 would want to put defense on notice as to whatever

17 witnesses they think appropriate to be available.

18      And, in addition, the pressing issue, I

19 think, Judge, is the issue of recordings that the

20 defense intends to offer or play or attempt to offer

21 or play.

22      In the past, Your Honor has encouraged

23 defense to provide transcripts of those recordings.

24 We have received nothing.  And, obviously, our

25 position on probably most, perhaps not all, is that

1 they're going to be hearsay, and unless there are
2 certain exceptions that are met, which we'll have to
3 go on a case-by-case basis of each recordings, in
4 addition to checking the accuracy of any transcripts
5 that intend to be offered, is going to be a
6 laborious and time-consuming process.
7        So at this point we think it's appropriate
8 for your Honor to set certainly a deadline for the
9 defense to tender those.  I assume there will be
10 significant litigation on it, unless they don't
11 intend to offer any recordings.
12        THE COURT:  You want to say something, go
13 ahead.
14        MR. SOROSKY:  We've digested what they said
15 and we'll get to it.
16        THE COURT:  I have actually received, on an
17 ex parte basis, an excerpt for the defendant Robert
18 Blagojevich.
19        What I would ask Mr. Ettinger to do is take
20 another look, because some of them you may or may
21 not wish to withdraw, but the time has come when you
22 have to tell us.
23        MR. ETTINGER:  Fine.
24        THE COURT:  And what I'm setting is a
25 deadline next wednesday.  What we will probably do,

:54PM

:54PM

:54PM

:54PM

:55PM

1  because the volume submitted to me by Robert

2  Blagojevich is quite large and this would lead me to

3  believe that it is possible, though not necessarily

4  so, that for Defendant Rod Blagojevich the pile

5  might be even larger, but there are reasons why it

6  might be a lot smaller, too.

7          If you get both of them on Wednesday, I would

8  propose to start dealing with it at various times

9  beginning the next week, which means we are talking

10 about beginning with it the week of July 12th and

11 we'll see how it goes.

12         There might be a lot to do.  Worse comes to

13 worst, we'll stay late after trial.  And it is

14 possible that in terms of the defense case, we will

15 be dealing with maybe the week of July 19th, maybe

16 the government's case might go into that a little.

17 But since decent progress has been made, I believe,

18 to believe to the relief of every lawyer standing

19 before me, we'll be able to allocate time to deal

20 with them on a transcript-by-transcript basis.

21         So with that, anything else?

22         MR. GOLDSTEIN:  Your Honor, one matter as to

23 that.  I know we delivered a binder to Your Honor's

24 office.  I just want to make sure you received that.

25 We did deliver it before the trial began.

1          THE COURT:  You want to know something, you
2     did, and I have it in my -- but I want you to go
3     through yours as well.
4          MR. GOLDSTEIN:  Oka.  Good.  Just wanted to
5     make sure.
6          THE COURT:  Yes, as you mentioned it, I
7     realized I had forgotten, and the reason I have
8     forgotten is I have the defendant's Robert
9     Blagojevich on my desk, but I don't have yours.
10         MR. SOROSKY:  Two points, Your Honor.
11         THE COURT:  Sure.
12         MR. SOROSKY:  First, in light of what Your
13    Honor has seen the good progress we have made,
14    perhaps we could cover the transcript issue after
15    the government rests where the Court would be in the
16    best position after hearing the entire government's
17    case to know just how relevant they are.
18         THE COURT:  I believe there are going to be
19    two principal issues, so this is my preview to you:
20    First, much of what I've seen offered is
21    inadmissible as hearsay.  Very little of it would
22    come in under the completeness rule, that's the
23    first issue with respect to the vast majority that
24    I've read.
25         The other issue is, even when there are

1    passages for which one can make an argument based on
2    completeness without having their face turn bright
3    red, even if you assume there are some there, much
4    of what the government played did contain the kind
5    of material that the defense would want.  It's not
6    that what the government selected was an unremitting
7    picture of the defendants as villains, there were
8    references to things which I believe defense counsel
9    would want to site in closing argument as well.
10        So the government may well be respond when
11   you say I want this text to show that the defendant
12   was very clear on this or that good intention, the
13   government may very well be able to respond that
14   this is shown by other things which they have
15   played, not that they believe it, but that the
16   evidence is there.
17        Third, a lot of this admissibility will
18   depend on what the precise focus of what the defense
19   is.  Or to put it another way, the time is going to
20   come when you're going to have to tell me exactly
21   how you intend to defended this case.
22        In the course of questioning, there have been
23   several themes suggested by the Defendant Rod
24   Blagojevich, there hasn't been very much in the way
25   of suggestion by the defendant Robert Blagojevich,

1  and some of those themes are not necessarily

2  consistent.

3         Also, I have received notice of an

4  affirmative defense, which as notices of that

5  particular affirmative goes, pretty sketchy,

6  particularly toward the defense that has certain

7  technical prerequisites, and I'm going to have to

8  know how those prerequisites are going to be met.

9  Some of that, arguably, could involve recordings

10 which were not played, but there's no way I can tell

11 that if I don't know precisely what conversations

12 either of the defendants intends to rely on to

13 support the affirmative defense which has been

14 noticed.  And what a defendant says to someone, as

15 well as the response given by that particular

16 person, is absolutely crucial if there is still an

17 attempt to use that affirmative defense.

18         So we may periodically be taking part of a

19 day to deal with these issues, we may not, we'll see

20 how it goes, but the process should at least start

21 by giving the government a list of what it is you

22 intend to offer and we'll go from there.

23         But this is, basically, what I'm thinking

24 about.  Now, if, for example, that affirmative

25 doesn't get offered, it makes everything a lot

:01PM

:02PM

:02PM

:02PM

:03PM

Winter - cross by Gillespie                3827

1  simpler, but that's your decision to make, not mine.
2        With that, see you next week.
3        MR. SOROSKY:  What about witnesses, who are
4  our next witnesses?
5        THE COURT:  Wait.  Wait.  They'll tell you
6  privately and I'll leave.
7        MR. SOROSKY:  Okay.  Thank you.
8        THE CLERK:  All rise.
9     (Adjournment taken from 5:03 o'clock p.m.
10     to July 6, 2010.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

:03PM

    *      *      *      *      *      *      *      *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

MATTER


  /s/Blanca I. Lara                        date


_____        _____

       Blanca I. Lara                        Date