4107

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )  No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )  Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )  July 7, 2010
   ROBERT BLAGOJEVICH,            )
7                                 )
              Defendants.         )  9:42 o'clock a.m.
8

9                      VOLUME 20
                TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                    Room 2504
                Chicago, Illinois 60604
23                 (312) 435-5895

24

25

4108

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
           BY:  Samuel Forbes Adam
8               Samuel Adams, Jr.
           6133 South Ellis Avenue
9          Suite 200
           Chicago, Illinois 60637
10         312-726-2326

11         OFFICES OF AARON B. GOLDSTEIN
           BY: Aaron Benjamin Goldstein
12         6133 South Ellis
           Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
           Suite 307
16         Chicago, Illinois 60614
           (773) 517-0622
17
           LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
           53 West Jackson Boulevard
19         Suite 1420
           Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

4109

1  APPEARANCES   (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4110

1                          INDEX OF EXAMINATION

2     WITNESS                                          PAGE

3       GERALD KROZEL

4       Direct Examination (Resumed) By Mr. Niewoehner... 4111

5       Cross Examination By Mr. Ettinger................ 4131

6       Cross Examination By Mr. Goldstein............... 4165

7       SEAN CONLON

8       Direct Examination By Ms. Hamilton.............. 4220

9       Cross Examination By Mr. Adam, Jr............... 4243

10      Redirect Examination By Ms. Hamilton............ 4277

11      BEDI RAJINDER

12      Direct Examination By Mr. Niewoehner............ 4283

13      Cross Examination By Mr. Ettinger............... 4345

14

15

16    EXHIBITS

17      Government's Exhibits 11101 West Lake Contract   4231

18      1 and Contract 2 ................................

19      Government's Exhibit Nayak Photo ............... 4304

20

21

22

23

24

25

1        THE MARSHAL:  All rise.

2      (The following proceedings were had in the

3       presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        MR. NIEWOEHNER:  May I proceed, Your Honor?

6        THE COURT:  You may resume.

7  GERALD KROZEL, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8            DIRECT EXAMINATION (resumed)

9  BY MR. NIEWOEHNER:

10 Q   Mr. Krozel, when we left off yesterday you had

11 been describing a meeting that you had with

12 Defendant Blagojevich on September 18, 2008, do you

13 recall that?

14 A   Yes, sir, I do.

15 Q   And in the course of that meeting you had

16 discussed with Defendant Blagojevich the possibility

17 that some of the new principals in your company

18 would meet with Defendant Blagojevich, is that

19 right?

20 A   Yes, I did.

21 Q   Did, in fact, Defendant Blagojevich meet with

22 principals of your company?

23 A   Yes, we did.

24 Q   And about when in relation to September 18th, did

25 that happen?

Krozel - direct by Niewoehner                    4112

1  A   About a week after.

2  Q   Who was present for that meeting?

3  A   Lon Monk, Eric Matson, the Governor, Richard

4  Olson, and me.

5  Q   Mr. Krozel, could you pull the mike down just a

6  little bit?  Thank you.

7        Who were Eric Matson and Richard Olson?

8  A   Eric Matson and Richard Olson were the new

9  management that was taking over Prairie after the

10 February 8th purchase.

11 Q   And where did that meeting take place?

12 A   It took place at a restaurant called The My Way.

13 Q   Was there any discussion about fundraising over

14 the course of that meeting at the restaurant?

15 A   There was not.

16 Q   Now, after your lunch meeting with Defendant

17 Blagojevich at The My Way restaurant, did you have

18 further conversations with Monk?

19 A   Yes, I had.

20 Q   And did you have more than one conversation in

21 the next couple of weeks?

22 A   Yes, I did.

23 Q   And do you remember those conversations generally

24 or specifically?

25 A   They were generally, they were followups on

Krozel - direct by Niewoehner                    4113

1  fundraising.

2  Q   And in those conversations what did Monk talk to

3  you about?

4  A   Fundraising.

5  Q   And, what if anything, did Monk indicate he

6  wanted you to do?

7  A   He wanted me to report on an update on what I was

8  doing.

9  Q   Did agree to raise any funds in your

10 conversations with Monk?

11 A   No.

12 Q   At that time did you intend to raise any funds

13 for Defendant Blagojevich?

14 A   No.

15 Q   Did you tell Monk that you had no intention of

16 raising any money for Defendant Blagojevich?

17 A   No, I did not tell him that.

18 Q   Why didn't you tell Monk you weren't going to

19 raise any money?

20 A   Well, due to the fact that the tollway project, a

21 large one, the 6-billion-dollar project was still

22 there and, again, I did not want to jeopardize that.

23 Q   Why were you concerned that telling Monk that you

24 weren't going to raise money might jeopardize the

25 6-billion-dollar tollway project?

Krozel - direct by Niewoehner                    4114

1  A  Well, the Governor and Ron were very close
2  friends and I just didn't want to say that for fear
3  that something negative can happen.
4  Q  And when you say something negative could happen,
5  what were you concerned might happen?
6  A  The loss of the 6-billion-dollar program.
7  Q  Did you talk with anyone other than Monk about
8  Defendant Blagojevich in the weeks after your
9  meeting at The My Way restaurant?
10  A  Would you please repeat?
11  Q  Did you talk to anybody other than Monk about
12  Defendant Blagojevich after your meeting at The My
13  Way restaurant?
14  A  No, I didn't.
15  Q  Did you have any conversations with people in the
16  construction industry about Defendant Blagojevich
17  after your meeting at The My Way restaurant?
18  A  After the meeting at The My Way?
19  Q  Yes.
20  A  No.
21  Q  Now, did you again -- did you talk to Defendant
22  Blagojevich again after that meeting at The My Way?
23  A  Yes, I did.
24      MR. NIEWOEHNER:  Your Honor, if I can
25  approach?

1        THE COURT:  You may.

2    BY MR. NIEWOEHNER:

3    Q   I'm going to show you what's been entered into

4    evidence Government Exhibit Press Release 10/15/08.

5        MR. NIEWOEHNER:  Your Honor, may I publish

6    that exhibit?

7        THE COURT:  You may.

8      (Exhibit published to the jury.)

9    BY MR. NIEWOEHNER:

10   Q   Mr. Krozel, I'm going to direct your attention to

11   the top half of this exhibit.

12       Do you see that?

13   A   Yes.

14   Q   And do you see the date of October 15th, 2008?

15   A   Yes, I do.

16   Q   And can you just read the title of this exhibit?

17   A   (Reading:)

18      "Governor Blagojevich Launches Tomorrow's

19       Transportation Today, a progressive improvement

20       plan."

21   Q   And around this time, October 15th, 2008, did you

22   become aware that there was a public announcement

23   about the 1.8 billion dollar tollway project?

24   A   Yes.

25   Q   And was there any mention -- and were you aware

Krozel - direct by Niewoehner          4116

1  that there was some publicity about that?

2  A   I beg your pardon?

3  Q   Were you aware that there was some publicity or a

4  press release surrounding that announcement?

:46AM  5  A   Yes.

6  Q   And was there any mention in the publicity, that

7  you were aware of, of this 6-billion-dollar project?

8  A   No, not to my knowledge.

9  Q   I'm going to direct your attention now to October

:47AM  10  22nd, 2008.

11        Did you speak to Defendant Blagojevich on

12  that day?

13  A   I did.

14  Q   Did you talk in person or over the phone?

:47AM  15  A   Over the phone.

16  Q   Did you call Defendant Blagojevich or did he call

17  you?

18  A   He called me.

19  Q   Did you want to talk to Defendant Blagojevich on

:47AM  20  October 22nd?

21        MR. GOLDSTEIN:  Objection.

22        THE COURT:  Overruled.

23  BY MR. NIEWOEHNER:

24  Q   Did you want to talk to Defendant Blagojevich on

:47AM  25  October 22nd, 2008?

Krozel - direct by Niewoehner                    4117

1   A   Not really.

2   Q   Why did you agree to take the phone call?

3   A   Because he was the Governor.

4   Q   Were you concerned about not taking the

5   Governor's call?

6   A   Yes, I was.

7   Q   Why were you concerned?

8   A   Again, I was very uncomfortable with that

9   telephone call; however, I felt that I had to talk

10  to him and find out what he had to say.

11        MR. NIEWOEHNER:  Your Honor, at this time I'd

12  ask to publish the transcript at tab 2, in Binder 1

13  of the transcript.

14        THE COURT:  You may.

15        MR. NIEWOEHNER:  Your Honor, may I approach?

16        THE COURT:  You may.

17  BY MR. NIEWOEHNER:

18  Q   Mr. Krozel, if you could turn to tab 2.

19        Are you there?

20  A   Yes.

21     (Tape played).

22  BY MR. NIEWOEHNER:

23  Q   Mr. Krozel, would you turn your attention to the

24  first page of the transcript.

25

Krozel - direct by Niewoehner                    4118

1  A   I have it.

2  Q   All right.  And if you look at the very top of

3  the page, do you see this call takes place on

4  October 22nd, at about 10:17 a.m.?

5  A   That is correct.

6  Q   And I'm going to turn your attention to Page 2 of

7  the transcript, and starting at line 5, do you see

8  where Defendant Blagojevich says:

9      "Hey, Mr. Krozel, how are you?"

10  A   Yes.

11  Q   Is this recording one half of the conversation

12  you had with Defendant Blagojevich on that day?

13  A   Yes.

14  Q   Now, I'm going to turn your attention to at line

15  8 Defendant Blagojevich says:

16      "I'm doing pretty good.  We're excited about, ah

17       the tollway."

18          What did you understand Defendant Blagojevich

19  was saying when he said that?

20  A   I thought he was referring to the 1.8 billion

21  dollar section that he announced the week prior to.

22  Q   And at line 17 he starts talking about Hastert,

23  Speaker Hastert, do you see that?

24  A   Yes.

25  Q   Who did you understand he was referring to when

1 he said Speaker Hastert?

2 A  The Speaker of the House, Hastert.

3 Q  Okay.  And could you possibly just turn your mike

4 a little closer to you?  Thank you.

5        And there's also another name at line 28,

6 McPartlin, do you see that?

7 A  Yes.

8 Q  Who did you understand McPartlin was?

9 A  Brian McPartlin, he was either the chief engineer

10 or the executive director of the tollway at the

11 time.

12 Q  So when Defendant Blagojevich was talking about

13 McPartlin and Hastert, generally speaking, what did

14 you understand he was talking about?

15 A  Well, Hastert was working with the Governor on

16 the capital bill program and I knew they had some

17 sort of a working relationship, whatever that was.

18 Q  And in reference to McPartlin, what did you

19 understand that part of the conversation to mean?

20 A  That was assuming that he was talking to Brian

21 McPartlin about the tollway projects.

22 Q  And then I'll turn your attention over to Page 3,

23 and focusing your attention at line 4, Defendant

24 Blagojevich says:

25

Krozel - direct by Niewoehner                    4120

1        "Ah, Lon is here with me, so we just thought
2        we'd call to say hello, how you doing, and
3        we've got this end of year deadline rules
4        change after January 1st."
5            When Defendant Blagojevich said "how you
6  doing," what did you understand him to mean?
7  A   About the fundraising he requested.
8  Q   And what about the fundraising he requested?
9  A   I told him I was working on it.
10 Q   Well, when he said "how you doing," what did you
11 understand Defendant Blagojevich to be asking you
12 about regarding the fundraising?
13 A   An update on the progress I was making.
14 Q   And when Defendant Blagojevich went on to say:
15       "We've got this end of the year deadline rules
16       change after January 1st ..."
17            what did you understand Defendant
18 Blagojevich was referring to?
19 A   He was again reminding me of the change of the
20 law that was to take place in January.
21 Q   Is this the same law that you had talked about
22 with Defendant Blagojevich at your September 18th
23 meeting with him?
24 A   That is correct.
25 Q   Now, at line 16 Defendant Blagojevich says, on

Krozel - direct by Niewoehner                    4121

1  Page 3:
2      "The good news is, we're off and running, we've
3       got something going and there's gonna to be
4       more."
5          What did you understand Defendant
6  Blagojevich was talking about there?
7  A   That he made the announcement for the smaller
8  program and that the "going to be more" would be the
9  additional 6-billion-dollar program.
10 Q   So he was making a reference to the possibility
11 of the 6-billion-dollar tollway building program?
12 A   That is correct.
13 Q   And he continues at line 19 and says:
14     "The good news for you guys is, which is the bad
15      news for us, is after the 1st of the year, this
16      level of, well, you know, pretty much be over,
17      we won't be able to bully you guys."
18         What did you understand Defendant
19 Blagojevich to be saying there?
20 A   Again, he was reminding me of the deadline and
21 the bullying I felt was he was reminding me about
22 the law again ending and that bullying was asking
23 for money.
24 Q   And when he said "bullying" in the context of
25 asking for money, what did you understand him to

:57AM

:58AM

:58AM

:58AM

:59AM

Krozel - direct by Niewoehner                     4122

1  mean?

2  A  I understood that he more or less was telling me

3  that after January 1 there wouldn't be any -- he

4  wouldn't be able to request anymore money from our

:59AM   5  construction industry.

6  Q  So what did you understand the time frame under

7  which Defendant Blagojevich wanted you to raise

8  funds?

9  A  Well, this was going back, I think, and echoing

:59AM  10  the original meeting of the tollway of the campaign

11  contributions and what was at stake.

12  Q  So did you have an understanding from what

13  Defendant Blagojevich said as to when he wanted the

14  contributions to be made by?

:59AM  15  A  Yes.

16  Q  When was that?

17  A  January 1st.

18  Q  And at line 27 Defendant Blagojevich says:

19      "We'll be addressing at --"

:59AM  20       Or he says:

21      "... call again, ah, we'll be addressing it in

22       another week and a half, two weeks.

23            What did you understand Defendant

24  Blagojevich was saying there?

:00AM  25  A  That I would get a follow-up call to update them

Krozel - direct by Niewoehner                    4123

1   on my progress.

2   Q   And your progress on what?

3   A   Obtaining the money he requested.

4   Q   Now, in response to Defendant Blagojevich's

5   statements here, did you say anything about whether

6   you would be willing to work to raise funds for

7   Defendant Blagojevich?

8   A   I did not say that directly.

9   Q   What did you say?

10  A   That I would go back to my people.  When they ask

11  how much, I said I didn't know.  And the same thing

12  here, this is the third time that question was asked

13  with the Governor present and I told him I was

14  working on it.

15  Q   And, in fact, at that point in time, were you

16  actually working on trying to get money for

17  Defendant Blagojevich?

18  A   I was not.

19  Q   Had you had any conversations with anybody prior

20  to this call about possibly raising money for

21  Defendant Blagojevich?

22  A   Well, I talked to people and it was just in

23  casual conversations and I asked them about the

24  Governor and every time I talked to someone, it was

25  a very negative response.  So I did not discuss

1  anything other than that with those people.

2  Q   Had anything else happened prior to October 22nd

3  that affected whether you would be able to raise

4  money?

5  A   Yes.

6  Q   What else happened?

7  A   On October 1st, 2nd or 3rd, I don't remember the

8  exact date, the Illinois Road Builders Association

9  was served with a subpoena on campaign contributions

10  to the Governor.

11  Q   And had you learned about that subpoena because

12  you were an officer or your involvement with the

13  Road Builders?

14  A   Yes, because I was on the Government Affairs

15  Committee.

16  Q   And what effect had that had upon people's

17  willingness to raise money?

18          MR. GOLDSTEIN:  Objection.

19          THE COURT:  Sustained.

20  BY MR. NIEWOEHNER:

21  Q   From your perspective, did that subpoena have any

22  effect on whether you were going to be able to raise

23  money for Defendant Blagojevich?

24  A   Well, if I was going to raise money for Senator

25  Blagojevich, that had a big impact due to the fact

:01AM

:02AM

:02AM

:02AM

:02AM

1 that all the road builder people that knew about it

2 were very, very apprehensive.

3 Q   But, in fact, did you intend to raise money for

4 Defendant Blagojevich at that time?

:02AM   5 A   No.

6 Q   Did you tell Defendant Blagojevich that you had

7 no intention of raising money for him in that

8 conversation?

9 A   No.

:02AM   10 Q   Why not?

11 A   Well, again, he was the Governor, it was his idea

12 for the program, and I was really welcoming the

13 program for our industry.

14 Q   So why didn't you tell Defendant Blagojevich you

:03AM   15 weren't going to raise any money for him?

16 A   I was afraid that it could be the end of the

17 program.

18 Q   Did you understand from your conversation in this

19 phone call with Defendant Blagojevich that there is

:03AM   20 any nexus being made between the 6-billion-dollar

21 program and your fundraising?

22       MR. GOLDSTEIN:  Objection, Your Honor.

23       THE COURT:  Overruled.

24

25

Krozel - direct by Niewoehner                4126

1   BY MR. NIEWOEHNER:

2   Q   Do you remember the question?

3   A   Would you please repeat it?

4   Q   I don't either.

5          THE COURT:  You want the court reporter to

6   read it back?

7          MR. NIEWOEHNER:  Yes, if you would please,

8   Your Honor.

9       (Question read.)

10  BY THE WITNESS:

11  A   Yes.

12  BY MR. NIEWOEHNER:

13  Q   And what connection did you understand was made?

14  A   Well, in the conversation he talked about the

15  Tollway, he felt good about the first phase.  He

16  also talked about, again, the deadline, and he

17  talked about bullying, which to me "bullying"

18  meaning asking people for money, referring to what

19  he was requesting.  And they all connected, again

20  the second time, that the tollway was connected to

21  my campaign contributions.

22  Q   And when you say it was connected the second

23  time, what do you mean?

24  A   Well, the first time it was in the office.

25  Q   You're talking about the September 18th meeting?

Krozel - direct by Niewoehner                    4127

1   A   Correct.

2   Q   And who did you understand in this conversation

3   had the power to determine the 6-billion-dollar road

4   Building program?

:05AM   5   A   The Governor.

6   Q   After October 22nd, 2008, did you have any

7   further conversation with Defendant Blagojevich?

8   A   I don't remember having any.

9   Q   I'm going to direct your attention now to

:06AM   10  December 9th of 2008.

11          On that date, did you speak with agents of

12  the Federal Bureau of Investigation?

13  A   Yes, I did.

14  Q   And where did you have that conversation?

:06AM   15  A   They came to my house.

16  Q   Okay.  Roughly when in the day did they come to

17  your House?

18  A   At 6:30 in the morning.

19  Q   Had you planned to speak with the FBI agents on

:06AM   20  that day?

21  A   No.

22  Q   Were you asked questions by the FBI about your

23  meeting with Defendant Blagojevich at the FOB

24  offices on September 18th?

:06AM   25  A   Yes.

Krozel - direct by Niewoehner                    4128

1  Q   And in that interview, were you asked
2  particularly any questions about whether you felt
3  pressure from Defendant Blagojevich during that
4  meeting?
:06AM  5  A   They did.
6  Q   What did you say when the FBI agents asked you
7  those questions?
8  A   Can you be more exact?
9  Q   Sure.
:06AM  10        When the FBI agents asked you whether you
11  felt any pressure, do you remember what your answer
12  was?
13  A   Yes.
14  Q   What was your answer?
:07AM  15  A   I told them I didn't feel any pressure.
16  Q   Was that true?
17  A   No, it wasn't.
18  Q   Why did you say that?
19  A   The FBI came to my house at 6:30 in the morning,
:07AM  20  they told me the Governor had been arrested at 6:15
21  in the morning, and I thought they were coming there
22  to arrest me.
23  Q   How did you feel?
24  A   Terrified.
:07AM  25  Q   Did you continue -- so what did you want the FBI

Krozel - direct by Niewoehner                    4129

1  agents to do?

2  A  Well, they told me that they had a subpoena or

3  subpoenas, and I was afraid -- one of the

4  impressions I had, if they were going to give me a

5  subpoena, why was there two agents when there could

6  only be one.

7          And we talked and I just -- I was afraid.

8  Q  Now, did you continue to talk with Lon Monk after

9  that October 22nd conversation, that phone call?

10 A  Yes.

11 Q  And about how many times did you talk with Lon

12 Monk after that October 22nd phone call?

13 A  Two, three, four.

14 Q  Do you recall those conversations generally or do

15 you recall them specifically?

16 A  Generally.

17 Q  And in those conversations, what did Lon Monk

18 talk to you about?

19 A  An update on the fundraiser.

20         MR. GOLDSTEIN:  Objection, Your Honor;

21 foundation.

22         THE COURT:  If the answer goes no further

23 than it has thus far, the objection is overruled.

24 BY MR. NIEWOEHNER:

25 Q  These conversations took place between -- did you

 1  have any conversations with Lon Monk after December
 2  9th of 2008?
 3  A   No.
 4  Q   So in between October 22nd and December 9th, you
 5  talked with him several times, is that right?
 6  A   Several times.
 7  Q   And in those conversations that you recall
 8  generally, what was the topic Mr. Monk brought up
 9  with you?
10  A   The fundraiser.
11  Q   And in particular, what did Lon Monk want you to
12  do with respect to the fundraiser?
13  A   He wanted me to obtain funds for the Governor.
14  Q   Did you ever tell Lon Monk that you were -- well
15  strike that.
16          When you had those conversations, did you
17  intend to raise any funds for Defendant Blagojevich?
18  A   No.
19  Q   Did you tell Lon Monk that you had no intention
20  of raising any money for Defendant Blagojevich?
21  A   No.
22  Q   Why not?
23  A   Because I knew that Lon and the Governor were
24  very close friends and I was afraid to jeopardize
25  the 6-billion-dollar program.

1  Q   And by December 9th of 2008, had there been any
2  announcement that there was going to be a
3  6-billion-dollar tollway road building project?
4  A   Not to my knowledge.
5  Q   Did you actually help to raise any funds for
6  Defendant Blagojevich by that December 9th, 2008?
7  A   No.
8        MR. NIEWOEHNER:  One moment, Your Honor.
9      (Brief pause).
10       MR. NIEWOEHNER:  Nothing further, Your Honor.
11                  CROSS EXAMINATION
12  BY MR. ETTINGER:
13  Q   Good morning, Mr. Krozel.
14       My name is Michael Ettinger.  I represent
15  Robert Blagojevich.
16       Sir, you have been in the concrete industry
17  for 34 years, is that true?
18  A   No.
19  Q   How long?
20  A   About 52.
21  Q   52 years?
22  A   Yes, sir.
23  Q   And you worked for Prairie Materials for
24  52 years, is that right?
25  A   No, sir.

1  Q   How long did you work for them?

2  A   Since February of '76.

3  Q   Okay.  And that's how many years until you
4  retired?

5  A   I --

6  Q   30 something years, right?

7  A   Please rephrase that.

8  Q   You worked for Prairie Materials since the '70s,
9  correct?

10 A   Since 1976, yes.

11 Q   And you at some point in 2008 or '09 retired from
12 Prairie Materials?

13 A   I -- I gave them my letter of resignation in May
14 of '08.  They asked me to stay on and I stayed on
15 until February of '09.

16 Q   Okay.  So it was over 30 years you worked for
17 them, correct?

18 A   That's correct.

19 Q   You were their vice president, is that correct?

20 A   Yes, sir.

21 Q   Okay.  You never had any ownership in Prairie
22 Materials, did you?

23 A   No, sir.

24 Q   Okay.  Prairie Materials didn't have any state
25 contracts while you were there, did they?

1   A   Several small ones.

2   Q   But, basically, what they would do would be to

3   supply the people who had the state contracts --

4   A   That is correct.

:12AM   5   Q   -- is that right?

6           And throughout your career, you were involved

7   in different associations, correct?

8   A   Yes.

9   Q   You were involved in the Road Builders, is that

:12AM   10  right?

11  A   Yes.

12  Q   And you were involved in the Concrete Pavement

13  Association, is that right?

14  A   Yes.

:12AM   15  Q   And during your career, and certainly in the last

16  30 years, you would be involved in fundraising for

17  these organizations?

18  A   Yes.

19  Q   The organizations wouldn't donate money to

:12AM   20  different candidates, the members would, is that

21  correct?

22  A   Not correct.

23  Q   All right.  Tell me, then.

24  A   Well, the Illinois Road Builders had a PAC.

:12AM   25  Q   And that's a political action group?

1  A   Correct.

2  Q   Okay.

3  A   The concrete industry, the Illinois division of

4  the American Pavement Association, did not have a

:12AM  5  PAC.

6  Q   Okay.  So some members would contribute and the

7  other organizations, they would contribute

8  themselves, the organization, is that right?

9  A   Correct.

:13AM  10  Q   Okay.  You were in, throughout the last 20 years,

11  in policymaking in these different organizations as

12  to who you would fundraise for?

13  A   I wasn't involved on a day-to-day basis.

14  Q   No, but you would be in, I think, with the Road

:13AM  15  Builders, I think you told us yesterday, that you

16  were on a government action committee?

17  A   Government Affairs Committee.

18  Q   Okay.  And you would, on occasion, be involved in

19  the decision-making as to who got funded?

:13AM  20  A   That's correct.

21  Q   Okay.  And there's certain criteria that would be

22  used by this organization of road builders as to who

23  they're going to have fundraisers for, is that

24  right?

:13AM  25  A   That's correct.

1  Q   And one of the most important criteria, in your

2  opinion, isn't it, that the candidate or the

3  legislator or the Governor would be favorable to

4  your industry, road building?

:14AM   5  A   Yes.

6  Q   Is that right?

7  A   Yes.

8  Q   So you -- these committees and members would

9  contribute to officeholders that were in favor of

:14AM   10  road building, correct?

11  A   I suppose so.

12  Q   All right.  And you'd -- it didn't matter if they

13  were Republican or Democrats, did it?

14  A   No, it didn't.

:14AM   15  Q   Okay.  So if someone wasn't in favor of road

16  building, you wouldn't contribute to them, would

17  you?

18  A   That's not true.

19  Q   Oh, you would?

:14AM   20  A   I have contributed to people that may be weren't

21  favorable to the Road Builders.

22  Q   All right, maybe I said it wrong.

23       I mean the Road Builders Association and the

24  Concrete Pavement Association, they would generally

:14AM   25  donate to people who were in favor of their

1  policies, right?

2  A   Yes.

3  Q   Okay.  Now, isn't it true, sir, that in as far as

4  fundraising goes, once you have a fundraiser for a

5  candidate, isn't it generally true you're going to

6  be asked again the next year to have one?

7  A   Sure.

8  Q   That's common, isn't it?

9  A   Yes, it is.

10 Q   Fact, these candidates or officeholders, they

11 have lists of donors, don't they?

12 A   They do.

13 Q   Okay.  And if someone contributed to a legislator

14 or had a fundraiser for them in 2005, it's your

15 opinion they'd be asked again in 2006 and 2007,

16 wouldn't they?

17 A   Sure.

18 Q   Okay.  And throughout at least the last 10 years,

19 or from 2002 to the present -- or to 2007, you had

20 fundraisers for Governor Blagojevich, didn't you?

21 A   Are you talking about -- would you please clarify

22 who you're talking about?

23 Q   Okay.  Did the Road Builders make donations to

24 Governor Blagojevich from 2001 to 2007?

25 A   Between 2001 and 2007, yes.

1  Q   Okay.  And I think you told us yesterday that at

2  one point they raised 400,000, is that correct?

3  A   It was a consortium of different organizations

4  that the Road Builders was a part of, yes.

:16AM  5  Q   Okay.  Would it be the members or the

6  organizations that would make the contributions?

7  A   I believe that was both, that was PAC and

8  individual donations.

9  Q   Okay.  Now, you mentioned PAC, that is a

:16AM  10  political action committee, am I right?

11  A   That's right.

12  Q   Can you tell us what that is?

13  A   A political action committee is where an

14  association contributes a sum of money to the

:16AM  15  candidate.

16  Q   And who makes up this association?

17  A   The board of directors.

18  Q   I mean where do the members come from?  Where do

19  they get their money from?

:16AM  20  A   The members come from the construction industry.

21  Q   Okay, but it's separate from the construction

22  companies, is that right?

23  A   Correct.

24  Q   The political action committee does not have

:17AM  25  contracts with the State of Illinois, correct?

                    Krozel - cross by Ettinger                4138

1   A   That is correct.
2   Q   Now, you were in favor, I think you told us, of
3   the tollway construction, correct?
4   A   Yes.
5   Q   Okay.  And before this September 28th --
6           Was it the 28th?
7           The September 18th meeting at Friends of
8   Blagojevich in 2008, you had voiced your favor to
9   Monk about this tollway expansion, hadn't you?
10  A   I told him I favored a capital bill.
11  Q   Okay, you favored the capital bill that would
12  fund the tollway construction, correct?
13  A   No.
14  Q   No?  What would it fund?
15  A   The capital bill was separate.
16  Q   Okay.  Were you in favor of, for your industry,
17  expanding the tollway and repairing it?
18  A   Yes.
19  Q   Okay.  And you wanted that -- that project to go
20  forward, didn't you?
21  A   Yes.
22  Q   Okay.  Now, it ended up you had a meeting
23  September 18th, 2008, at the Friends of Blagojevich,
24  correct?
25  A   Yes.

1  Q   Okay.  And when you went there, you had
2  contributed or had fundraisers, as you told us,
3  since 2002 for Governor Blagojevich, is that right?
4  A   Yes.
5  Q   Okay.  And I think you told us that you expected
6  them or someone to ask you to have a fundraiser, is
7  that right?
8  A   I don't remember exactly saying that.
9  Q   Well, was it true?
10 A   Would you please rephrase the question?
11 Q   All right, let me -- you told us in the past
12 you've raised funds for Friends of Blagojevich or
13 for Governor Blagojevich, correct?
14 A   Correct.
15 Q   Okay.  You've told us that once you have a
16 fundraiser from someone, in your industry it's
17 common to be asked again to have another one, is
18 that right?
19 A   Yes.
20 Q   Okay.  So the last fundraiser you had prior to
21 2008 for Governor Blagojevich was when?
22 A   I did not contribute to the 2008 fundraiser.
23 Q   No, I'm saying the last time you had a fundraiser
24 prior to 2008.  Do you remember when that was?
25 A   2005, 2006, something like that.

1  Q   Okay.  So you didn't in 2007, is that right?

2  A   I did not.

3  Q   Okay.  And you wouldn't be surprised if they

4  called you up, someone called you up from Friends of

:19AM  5  Blagojevich and asked you to have another one,

6  correct?

7  A   I wouldn't have been surprised.

8  Q   Okay.  So now you go there in September of 2008,

9  correct?

:19AM  10  A   Right.

11  Q   Okay.  You've never seen my client, Robert

12  Blagojevich, prior to that date, had you?

13  A   No.

14  Q   Never met him, correct?

:20AM  15  A   I -- I said no, but I think Rob told me he met me

16  somewhere but I didn't remember where.

17  Q   Okay.  He's never been involved with fundraising

18  with you, is that correct?

19  A   Never.

:20AM  20  Q   Never asked you to have a fundraiser for anyone

21  prior to that meeting, is that correct?

22  A   That is correct.

23  Q   And, in fact, afterwards he never asked you to

24  have a fundraiser, did he?

:20AM  25  A   No.

1  Q   In fact, what happened, sir, is, at this meeting
2  you really didn't even know why Robert was there, is
3  that true?
4  A   When I first saw him, no.
5  Q   Okay.  And at the end of the meeting, you can't
6  -- the meeting took how long?
7  A   An hour, hour and ten minutes.
8  Q   Okay.  And I think you told us it was divided in
9  three parts, correct?
10 A   Correct.
11 Q   The first part I think the Governor, you said,
12 talked to you about your wife's condition, and he
13 talked about his mother-in-law's condition who had
14 just passed away, right?
15 A   He did talk about that but I don't remember him
16 saying those exact words.
17 Q   Okay.  And the second part I think you discussed
18 Emil Jones, and you told us he was president of the
19 Senate, he was retiring, someone else had to come
20 in, is that right?
21         MR. NIEWOEHNER:  Objection; misstates.
22         MR. ETTINGER:  I'll rephrase it, Judge.
23 BY MR. ETTINGER:
24 Q   What's the next topic you discussed at the
25 meeting on September --

Krozel - cross by Ettinger                    4142

1  A   The topics --
2  Q   -- the 18th?
3  A   You're putting them in the wrong order.
4  Q   Oh, okay.  Tell me, put it in the right order.
5  A   Am I allowed to do that?  I don't know.
6  Q   Yes.  Tell us what topics you discussed at this
7  hour meeting on September 28th at the Friends of
8  Blagojevich.
9  A   We talked about the personal items, as I said.
10 Q   Okay.
11 A   The Governor told me about his plan with the
12 tollway.
13 Q   Okay.
14 A   We talked about Emil Jones retiring as president.
15 Q   Okay.
16 A   And then we talked about the change of the law
17 where political contributions would be prohibited
18 after January 1.
19 Q   Okay.  Now, I think you told us yesterday that
20 you understood this ethics law, correct?
21 A   Correct.
22 Q   And basically what it meant was that anyone who
23 had contracts with the State of Illinois over a
24 certain amount of dollars, I think it's $50,000,
25 they couldn't contribute to politicians, is that

1  correct?

2  A  That is correct.

3  Q  And that law took effect January 1 of 2009, is

4  that right?

5  A  That is correct.

6  Q  And is it your understanding pursuant to that

7  law, after January 1st of 2009, none of your road

8  builders could contribute to the Governor?

9  A  No.

10  Q  No?  I'm sorry.  If they had contracts with the

11  state they couldn't contribute to him, is that

12  right?

13  A  Correct.

14  Q  And the emphasis, or at least it was brought up

15  at the meeting, that your request for fundraising

16  should take place before January 1st, 2009; they

17  explained that to you, right?

18  A  Yes.

19  Q  Okay.  And that was the Governor who explained

20  it, correct?

21  A  Please say that again.

22  Q  Did the Governor, Rod Blagojevich, explain that

23  to you at the meeting on September 28, 2008?

24  A  September 28th?

25  Q  September 18th.  I'm not trying to trick you.  I

:22AM

:22AM

:23AM

:23AM

:23AM

1  just get the date wrong.  I get blocks like that, on

2  occasion.

3         September 18th, 2008, the meeting at FOB.

4  A  Yes.

:23AM   5  Q  Okay.  Did Rob -- did Rod Blagojevich tell you

6  that they wanted you have to have the fundraiser

7  before January 1st, 2009, because of the ethics

8  bill?

9  A  Did Rob?

:24AM  10  Q  Robert -- no, not Robert.  Rod, the governor.

11  A  Did Rod?

12  Q  Yes.  Robert didn't, correct?

13  A  You're confusing me.  Would you please --

14         THE COURT:  Say it more slowly.  It's not

:24AM  15  your fault.

16  BY MR. ETTINGER:

17  Q  Sir, Robert Blagojevich, okay --

18  A  Yes.

19  Q  -- did not tell you anything about the ethics

:24AM  20  bill at the September 18th, 2008, meeting, correct?

21  A  No, he did not.

22  Q  Okay.  In fact, you can't --

23         (Noise interruption.)

24         THE COURT:  Okay, let's see what happens.

:25AM  25

1  BY MR. ETTINGER:

2  Q   Mr. Krozel, during that meeting on September

3  18th, 2008, at the Friends of Blagojevich office, no

4  one brought up forming a political action committee

5  to get around the ethics bill, did they?

6  A   No.

7  Q   In fact, would you agree that what was said to

8  you regarding the ethics bill, the tenure was to

9  comply with it, is that true?

10         MR. NIEWOEHNER:  Objection.

11         THE COURT:  Objection to the form of the

12  question is sustained.

13  BY MR. ETTINGER:

14  Q   Governor Blagojevich told you at the September

15  18th, 2008, meeting that he would -- they wanted the

16  fundraising to end before the bill took place,

17  correct?

18  A   That is correct.

19  Q   Okay.  There wasn't any conversation about

20  getting around that bill, was there?

21  A   No.

22  Q   Okay.  So that was the reason to have the

23  fundraiser at the -- that was expressed at the

24  meeting by January 1, 2009, correct?

25  A   Yes.

1  Q   Okay.  Now, did Robert Blagojevich, to the best

2  of your recollection, say one word to you at that

3  meeting?

4  A   Yes, he did talk to me but --

5  Q   Okay.  What he talked to you about was your

6  wife's illness, wasn't it?

7  A   I don't remember that.

8  Q   Okay.  And do you remember if Robert Blagojevich

9  stayed for the whole meeting?

10 A   I believe he did.

11 Q   Are you absolutely sure?

12 A   No, I'm not sure.

13 Q   So he could've left in the middle of that

14 meeting, couldn't he?

15 A   I don't think he did.

16 Q   But you don't know?

17 A   I really don't remember.

18 Q   Okay.  Now, when you got interviewed, by the way,

19 by these agents on December 9th, 2008, they came to

20 your house, right?

21 A   Yes.

22 Q   At 6:30 in the morning, correct?

23 A   Yes.

24 Q   You let them in?

25 A   Yes, I let them in.

1  Q   Okay.  You agreed to talk to them, didn't you?

2  A   Yes, because I let them in.

3  Q   Okay.  They showed you their badges that they

4  were FBI agents?

:27AM    5  A   Yes.

6  Q   Okay.  Where did you guys have the conversation

7  in your house?

8  A   In the kitchen.

9  Q   At the kitchen table?

:27AM   10  A   Yes.

11  Q   Okay.  You sat around there for about how long?

12  A   About an hour plus.

13  Q   Okay.  And they asked you about these FBI --

14  there were two of them?

:27AM   15  A   Yes.

16  Q   Were they taking notes regarding what you said?

17  A   Yes.

18  Q   One of them or two of them taking notes?

19  A   I believe both.

:27AM   20  Q   Okay.  And they asked you about this meeting that

21  you've told us about on September 18th, 2008,

22  correct?

23  A   Correct.

24  Q   And they asked you about the ethics bill,

:28AM   25  correct?

1   A   That I don't remember.

2   Q   They asked you about the tollway bill, right?

3   A   Yes, the tollway was mentioned.

4   Q   Okay.  And they asked you specifically if you

5   felt any pressure regarding the request to raise

6   money for Governor Blagojevich, correct?

7   A   Correct.

8   Q   And what you said to them was, that you did not

9   feel any pressure from either Governor Blagojevich

10  or Monk to raise money for Governor Blagojevich,

11  were those were your exact words?

12  A   That is correct.

13  Q   Okay.  And you also stated that you never felt

14  that the tollway bill depended upon your fundraising

15  efforts, is that right?

16  A   I don't remember commenting on that at all, but

17  if the FBI said I did that, they were taking notes.

18  Q   Okay.  Well, you were interviewed by the U.S.

19  Attorney's Office before your testimony today, is

20  that right?

21  A   Yes.

22  Q   Okay.  Were you shown at any point the FBI

23  reports or their notes on your interview on

24  December 9th, 2008?

25  A   I was -- I was not shown anything like that

1  today.

2  Q   Now, you were asked a question on direct

3  examination by the prosecutor about this specific

4  statement I'm asking you about, right?

5  A   Yes, I was.

6  Q   You guys discussed that prior to you testifying

7  today, didn't you?

8  A   I don't remember if we discussed that today.

9  Q   What he just asked you?

10 A   Oh, I'm sorry.  Here in court?

11 Q   Yes.

12 A   Oh, okay.  Yes.

13 Q   Maybe you don't understand me.

14     Before testifying in the court today, you had

15 conversations with the prosecutor about your

16 testimony, correct?

17 A   I did.

18 Q   Correct?

19     I'm not saying it's improper to talk to them.

20 A   I did.

21 Q   You did, right?

22 A   Yes.

23 Q   They were preparing you to testify, correct?

24 A   Yes.  Yes.

25 Q   Part of that preparation included speaking about

1  what I just read to you, your statement to the FBI

2  on December 9th, 2008, regarding feeling pressured,

3  correct?

4  A  Yes.

5  Q  So the government went over that phrase with you,

6  correct?

7  A  Yes.

8  Q  And they told you what you said, at least what

9  the FBI agent said you said on December 9th, 2008,

10  correct?

11      Okay.  I'm going to ask you again, do you

12  remember telling them that you never felt that the

13  tollway bill depended upon your fundraising efforts?

14  A  I don't remember that.

15  Q  Okay.  If it's in a report, would that refresh

16  your recollection?

17  A  Yes.  If I seen the report, yes.

18      MR. ETTINGER:  Judge, can I?

19      THE COURT:  Yes, you may.

20      MR. ETTINGER:  I'm going to mark it Robert

21  Blagojevich Defense Exhibit 1.

22      May I approach, Judge?

23      THE COURT:  You may.

24

25

1  BY MR. ETTINGER:

2  Q    You have to excuse my underlining, but I've got

3  it circled.

4       (Brief pause).

:31AM  5  BY THE WITNESS:

6  A    I did say that.

7  BY MR. ETTINGER:

8  Q    Okay.  And just for the record, let me read that

9  to you what you said to the two FBI agents on

:31AM  10  December 9th, 2008, that you never felt that the

11  tollway bill depended upon your fundraising efforts,

12  is that true?

13  A    Yes.

14  Q    That's what you told them, correct?

:31AM  15  A    Yes.

16  Q    And to this date, you have not been charged with

17  making a false statement to the FBI, have you?

18  A    No, not to my knowledge.

19  Q    Okay.  And part of that answer you gave was that

:31AM  20  you did not feel any pressure from either Governor

21  Blagojevich or Monk to raise money for Governor

22  Blagojevich, correct?

23  A    I don't remember that.

24  Q    Can I show you -- I think you already testified

:31AM  25  to it.

Krozel - cross by Ettinger                    4152

1        MR. ETTINGER:  Judge, can I show him the
2   report again?
3        THE COURT:  Sure.
4   BY MR. ETTINGER:
:31AM   5   Q   I'm going to show you Robert Blagojevich Exhibit
6   1, and this is the first sentence.
7   A   I understand now.
8   Q   So you did say that, is that right?
9   A   Yes, if it's FBI written down.
:32AM   10  Q   You didn't feel any pressure from Governor
11  Blagojevich or Monk, correct?
12  A   Yes.
13  Q   Never mentioned my client's name, Robert
14  Blagojevich, correct?
:32AM   15  A   Never.
16  Q   Now, subsequent to this meeting on September
17  18th, 2008, you didn't talk to Robert Blagojevich
18  again, did you?
19  A   No.
:32AM   20  Q   Never called you up for fundraising?
21  A   No.
22  Q   Never asked you how you doing with fundraising,
23  is that correct?
24  A   Correct.
:32AM   25  Q   In fact, I think you told us the only person you

Krozel - cross by Ettinger                    4153

 1 had talked to was Mr. Monk, is that right?
 2 A   Yes.
 3          MR. ETTINGER:  One second, Judge.
 4       (Brief pause).
 5          MR. ETTINGER:  Thank you, sir.
 6          I have no further questions.
 7          THE COURT:  We're going to take a break.
 8          THE MARSHAL:  All rise.
 9       (The following proceedings were had out of the
10        presence of the jury in open court:)
11          THE COURT:  You can step down.
12       (Witness temporarily excused.)
13          THE COURT:  Be seated in the courtroom.
14            Counsel, approach the lectern.
15          (Brief pause).
16          THE COURT:  I have three pending motions
17 which I'm going to address.
18          I have a motion for a mistrial with respect
19 to the cross-examination of Robert Williams.
20 Anybody have anything they want to add to this one?
21          MS. KAESEBERG:  We rest on our motion.
22          THE COURT:  Motion is denied.
23          There is a more extensive motion for mistrial
24 based on improper objections and rulings and
25 prevention and meaningful cross-examination, and I

Krozel - cross by Ettinger                    4154

1  will discuss some of these largely because I think
2  the defense does not understand the basis for my
3  rulings.
4        One comment I would make is, the defense
5  protests the use of the word "objection" without
6  stating a ground.  The defense does the same thing.
7  And I thought about requiring one-word grounds being
8  stated, like "scope," "hearsay," "relevance,"
9  "materiality," but the problem is is those are just
10 single words and they don't actually contain an
11 inherent legal argument, so I don't think it helps
12 anybody.
13       Or to put it another way, if the government
14 routinely stood up and said, "scope," "hearsay,"
15 "relevance," "materiality," and I sustained the
16 objection, it won't be much good to anybody, and the
17 same would be true if I imposed that requirement on
18 the defense.
19       The specific objections that are made, the
20 specific protests that are made appear on Page 2 of
21 the motion.  These are the questions that were
22 asked.  I'm paraphrasing the question, the first
23 opportunity you had to ask the Governor questions
24 and clarify was on March 16th, 2005; the question is
25 improper because it assumes that there is a need to

Krozel - cross by Ettinger                    4155

1   clarify without showing the basis of the need to
2   clarify.  In fact, there was basically an entire
3   theme in big parts of that cross-examination you
4   didn't clarify, you didn't ask him about this, you
5   didn't ask him about that, all of which assumes that
6   there is a need to clarify.  And the government's
7   position and I think the witness' position was it
8   was perfectly clear; in fact, he did state that.
9            So you could possibly have raised some need
10  to clarify, but there is a very good reason you
11  didn't--I'm speaking now to the defense--and that is
12  because the evidence you need to clarify it has
13  not yet been offered.  And it was basically
14  announced in the opening statement that there would
15  be testimony from the defendant.  And it is possible
16  if you think that there was some patent need to
17  clarify it, you can recall the agents and ask them
18  about it.
19       "Is it true to say on March 16th, 2005, you did
20        not ask one question about Cari?"
21            I don't know why you asked the question
22  because it was absolutely clear that he didn't.
23  And, in fact, he testified that he didn't mention
24  Cari deliberately.
25            One area of your question was that:

1           "The Governor's understanding of politics,

2       fundraising and state contracts, correct?"

3               This was a question that had been asked and

4    answered many times.

5               The same is true on the issue of the agent's

6    understanding of what was material.  And the same

7    thing is true about whether he showed him a state

8    contract that was connected to fundraising because

9    there was no assertion that he did.  If you think

10   this is significant in some way, you can present it

11   in your case.

12              You also have an argument implicit in all

13   this that somehow the agents are under some

14   obligation to confront him as people would be

15   required to confront someone at trial.  And unless

16   you establish that there is some duty to do so, you

17   can't ask that question.

18              You could ask that question if the defendant

19   gets up and testifies that if you had been

20   confronted you could have explained all of this.

21              The fairness of the interrogation is not

22   really at issue in the context of this case.  It

23   might be in some other cases where it's an agent and

24   a person and there's two of them or maybe two agents

25   and the person is sitting alone in the room, but

1  this is a case in which the defendant was sitting

2  with lawyers present at the time of the interview.

3         Then you had a series of questions of the

4  sort of "you didn't ask about a particular

5  contract," "you didn't ask him to look at the

6  contract," "did you bring any files for him to look

7  at," "did anyone ask for files from him." There's

8  no claim by the government that any of this was

9  done. And if it is legal for you to argue that

10 somehow the Governor was entrapped into making a

11 statement, a specific statement to the extent that

12 you have a basis for doing that, the government is

13 not going to be able to argue that they did any of

14 those things. So it's a needless waste of time to

15 refute stuff which the government isn't claiming.

16        Now, I can understand that the defense would,

17 and it's not just this case, it's a common thing for

18 criminal defense lawyers to re-characterize the

19 accusation and then try to refute an accusation the

20 government is not making, but unless it serves some

21 other purpose, all it is, again, is a needless waste

22 of time.

23        And the same thing is true with the questions

24 about "in the campaign office, were state contracts

25 discussed when they were discussing fundraising,"

Krozel - cross by Ettinger                    4158

1    the government is not contending that they were.  So
2    basically it's not only a waste of time, but it's
3    misleading because that is not exactly what the
4    government is saying.

5        And you are free to argue in closing
6    argument, assuming the prosecution survives the
7    motion at the close of its case, you're free to
8    argue if this gets to the jury, that there is no
9    evidence that they discussed state contracts at
10   these particular fundraising meetings.

11       With respect to the Danielle Stilz testimony,
12   the objection that was made not only do I understand
13   if I were in your shoes I would've made it myself,
14   and I didn't think at the time I permitted the
15   nature of the testimony that this was a frivolous
16   objection, I spent time thinking about it and I made
17   my ruling on the basis of the context and the way
18   the witness testified and the circumstances.  Under
19   other circumstances, I might not have allowed the
20   testimony, but that was a judgment call on my part,
21   and I don't criticize the objection.

22       You should not interpret my statements--I'm
23   now referring something on page 4--you should not
24   refer to my statements about what the government's
25   evidence is as a statement of my personal belief, it

:42AM
:43AM
:43AM
:43AM
:44AM

Krozel - cross by Ettinger                4159

1  is a statement as of what the government's evidence
2  is pointed to showing.  I don't think what took
3  place, and I said this took place in May of 2005, is
4  illegally irrelevant, and I've ruled on that.  The
5  one thing I do want to point out and I pointed this
6  out before, these witnesses are available and will
7  remain available and if you want to make an offer of
8  proof you can do that at any time.

9       Now, in many cases I'll even recall.  At one
10 time I did specifically mention an offer of proof
11 and it was declined.

12      And the problem is is if you say this is
13 meaningful cross-examination that I'm not letting
14 you do, well, I could possibly think that it is
15 meaningful if I knew what the answer was.  Now, some
16 of these questions I clearly am not going to allow
17 pretty much under any circumstances because they are
18 out of bounds, but sometimes it would be helpful to
19 hear what the witness actually had to say and I
20 could make a judgment on how meaningful it is.  All
21 I have in front of me is your assertions that it is
22 meaningful, but that is really just a lawyer's
23 description of their opinion of what it might be if
24 it was in the record, but it isn't.

25      So the motion is denied.

Krozel - cross by Ettinger                    4160

1          What I do want to address is the second and
2    more specific notice to the Court in affirmative
3    defenses, and the notice was helpful to me.  There
4    is one point that we have to deal with, I actually
5    thought we would have more time but maybe we won't,
6    but we got at least ten days to deal with this:  I
7    went and I looked at the Blagojevich offerings of
8    recordings and--"offerings" to be correct because
9    it's both defendants--the problem is is that in most
10   cases the only basis for getting them in over the
11   standard hearsay objection is that the statements
12   reflect state of mind.
13          Now, by "state of mind" I'm assuming that we
14   are not dealing with spontaneous exclamations as to,
15   "I think I broke my leg," that fall into that genre.
16   I think -- in fact, I'm quite sure, that what you're
17   talking about is state of mind to demonstrate
18   subsequent acts to the Hillman case, well over
19   100 years after it's decided, it's still a subject
20   of debate among the lawyers; and in some cases, some
21   kind of corroboration of testimony from a witness
22   when they're on the stand in terms of their current
23   testimony.
24          But what is generally offered is some
25   identification as to what state of mind you're

1    talking about.  And I see none of that in any of the
2    offerings.
3          I also believe that the material is offered
4    in a way that makes it extremely difficult to screen
5    it.  It basically was the rough equivalent of what
6    would in a civil case be called the discovery dump;
7    just a lot of statements.  Probably if all were
8    played, I believe the jury might be sitting there
9    and listening for perhaps two or three weeks, which
10   is a waste of time, but there may be passages buried
11   in all of that on specific dates for which a
12   reasonable claim can be made for the jury to hear a
13   few sentences of the passage.
14         And what the defense is going to have to do
15   is take a look at the documents again, edit them
16   more closely, and give me a more specific offer of
17   proof and why you want specific words.
18         Now, the government has, I believe, included
19   some of the material that you would want, anyway.
20   For example, the defendant's statements about
21   legality.  So I basically need something that is not
22   going to run afoul of the rule against what is
23   needless evidence, but some of it may work and you
24   may be able to justify it.  And I don't want to put
25   you in a position when two weeks from now or three

Krozel - cross by Ettinger                    4162

1  weeks from now and you start offering this stuff and
2  I tell you, you know, this is just not appropriately
3  offered, not an adequate justification, not
4  appropriate.  So I want to give you a chance to
5  narrow it down and tell me specifically what state
6  of mind you're talking about, because some of that
7  you might get in.
8          Lastly, with respect to my rulings,
9  generally, on motion of scope and evidence, I had
10 placed reliance upon an assertion made in opening
11 statement, which I am entitled to do, and which the
12 Defendant Rod Blagojevich has clearly not backed off
13 from, and that is is that he intends to testify.
14         MR. SOROSKY:  That he what?
15         THE COURT:  That he intends to testify, to
16 speak his own peace.  Because he intends to speak
17 his own peace, that influences my rulings on the
18 order of evidence and how it is to be presented
19 because some of the things which I have not
20 permitted to be addressed at one particular time, I
21 have put off to a later stage in the trial because I
22 have operated under the premise that these will be
23 part of the case before me in the defense phase.
24         The only way that this could not happen is a
25 way which would not prejudice the defendant because

:51AM
:51AM
:51AM
:52AM
:52AM

Krozel - cross by Ettinger                    4163

1   it would mean that I have directed the verdict
2   against the government.
3          So assuming I do not direct a verdict against
4   the government on all of the counts, there's going
5   to be a defense and some significant really
6   meaningful amount of the evidence and claims that
7   have been offered really belong as part of the
8   defense case.  And in the case of Rod Blagojevich,
9   it has been announced to me and confirmed that there
10  will be a defense case.  This is not particularly
11  relevant to the Defendant Robert Blagojevich
12  because, generally speaking, the rulings of which
13  there are complaints are rulings with respect to the
14  Defendant Rod Blagojevich.  I am not operating under
15  the premise that Robert Blagojevich will take the
16  witness stand or offer an affirmative defense, he
17  may do so, but I'm not operating on that premise.
18         With that, we're done for now.
19         MR. SCHAR:  Judge, may I make one comment?
20         THE COURT:  Sure.
21         MR. SCHAR:  Thank you.
22         Obviously there's been notice, there is now a
23  renewed more thorough notice advice of counsel, an
24  issue that has been previously discussed.  I think
25  if not today, in the very near future, we need to

Krozel - cross by Ettinger                    4164

1  have some time to have an offer of proof as to

2  precisely who the defense plans on calling and, if

3  so, lawyers, which lawyers and defendant's

4  statements, because as we get closer to this time

5  period, what appears to be clear is not only do we

6  know the transcripts but there may be implications

7  of waiver and a number of different attorneys which

8  the government has not allowed to seek potential

9  cooperation from.

10        So far that, you know, there's been no

11  particular offer of proof other than to suggest

12  we're going to hear from lawyers, we're going to

13  hear statements from the defendant presumably about

14  concrete discussions with lawyers now unnamed, and I

15  think we're now at a time where we need to address

16  this issue.

17        THE COURT:  I agree, and one of the reasons I

18  agree is that one of the reasons where the defense

19  may have a particularly sound basis for offering

20  recordings not offered by the government are those

21  recordings that involve either direct recordation of

22  things which are claimed to constitute advice of

23  counsel but also things which might corroborate

24  advice of counsel.

25        So they're going to have to do it, anyway, in

:54AM

:54AM

:55AM

:55AM

:55AM

Krozel - cross by Goldstein                    4165

1  order to make an appropriate offer into evidence of

2  those transcripts -- the recordings and the

3  accompanying transcripts I mean.  Monday of next

4  week.

5          MR. SCHAR:  Thank you, Judge.

6          (Brief pause)

7          THE COURT:  Did you like what he wrote to

8  you?  Are you going to talk some more?

9          MR. SCHAR:  I don't think we need to talk

10  some more.  Thank you.

11          THE COURT:  Okay.  Thanks.

12          MR. SOROSKY:  15 minutes?

13          THE COURT:  It's not going to be fifteen from

14  now, it's going to be ten from now.  Thanks.

15      (Recess.)

16          THE MARSHAL:  All rise.

17      (The following proceedings were had in the

18       presence of the jury in open court:)

19          THE COURT:  Please be seated.

20          MR. GOLDSTEIN:  May I proceed, Your Honor?

21          THE COURT:  You may.

22          MR. GOLDSTEIN:  Thank you.

23                  CROSS EXAMINATION

24  BY MR. GOLDSTEIN:

25  Q   Good morning, Mr. Krozel.

:55AM

:56AM

:56AM

:12AM

:12AM

1   A   Good morning.

2   Q   I'm going to go a little bit into your

3   background.

4           You indicated that you were the chairman of

5   the Illinois Division of American Concrete Pavement

6   Association, is that correct?

7   A   That is correct.

8   Q   And you were the chairman for approximately 12 to

9   14 years, is that correct?

10  A   Yes.

11  Q   And you were the vice-chairman of the national

12  ACPA, is that correct?

13  A   Yes.

14  Q   Okay.  And you served on Government Affairs

15  Committee of the Illinois Road Builders Association

16  and the National Ready Mix Concrete Association, is

17  that correct?

18  A   Yes.

19  Q   Government Affairs Committee, is that a part of

20  the Illinois Road Builders Association?

21  A   Yes, it is.

22  Q   So is it fair to say, when you served on

23  Government Affairs Committee, you're dealing with

24  government officials, is that correct?

25  A   That is correct.

Krozel - cross by Goldstein                    4167

1  Q   Are you actually working for the government or
2  are you working for these agencies?
3  A   Working for -- working for the agencies with the
4  government people.
5  Q   Okay.  And you've been in the materials business
6  for about 52 years, is that right?
7  A   Correct.
8  Q   And you were an employee up until 2009,
9  February 2009, at Prairie Materials, is that right?
10 A   Yes.
11 Q   And you said that Prairie supplies the
12 contractors who receive the state contracts, is that
13 correct?
14 A   Yes.
15 Q   And Prairie, you said, is a company that makes a
16 half a billion dollars in sales yearly?
17 A   In the past, yes.
18 Q   In the past.
19     Well, when we say "past," what's the most
20 recent year that they made half a billion dollars of
21 sales?
22 A   Probably '06.
23 Q   Okay?  It declined but it's still up in that
24 stratosphere, if I may say?
25 A   Yes.

Krozel - cross by Goldstein                4168

1   Q   Okay.  And in various positions, and particularly
2   the chairman of the Illinois division of the ACPA,
3   you met with various politicians, is that correct?
4   A   That is correct.
:14AM  5   Q   And when you met with these politicians, you were
6   promoting the concrete industry, correct?
7   A   Yes.
8   Q   And road building, in general?
9   A   Yes.
:14AM  10   Q   And you advocate on behalf of the concrete
11   industry, is that correct?
12   A   Yes.
13   Q   And as a consultant right now, are you still
14   advocating on behalf of the concrete industry?
:14AM  15   A   Because I'm still the chairman and I do a lot of
16   technical things, that's the real big connection, I
17   know things, technically.
18   Q   Okay.  So you are still the chairman of the ACPA?
19   A   Yes.
:15AM  20   Q   The American Concrete and Pavement Association,
21   the Illinois division?
22   A   Yes.
23   Q   Okay.  You yourself contribute to politicians as
24   well, is that correct?
:15AM  25   A   Would you please?

1  Q   You yourself, Mr. Krozel, you contribute to
2  politicians, campaign contributions, right?
3  A   Yes, I do.
4  Q   And you've been politically active as far as
:15AM  5  contributing for the last 25 years or so, is that
6  correct?
7  A   Approximately.
8  Q   And it's fair to say that you play both sides,
9  both Republicans and Democrats, right?
:15AM  10  A   Yes.
11  Q   You try to look for future leaders and build
12  relationships with them, is that correct?
13  A   That's true.
14  Q   And you do this because you want to help your
:15AM  15  industry, right?
16  A   Yes.
17  Q   And you first got your footing to being
18  politically active and contributing when you met Jim
19  Thompson, is that correct?
:15AM  20  A   That is correct.
21
22  Q   And you had a meeting with Jim Thompson in 1982;
23  do you remember that meeting?
24  A   I sure do.
:15AM  25  Q   You remember it well, right?

1    A   Very well.

2    Q   And at the time, they were building the

3    Eisenhower Expressway, right?

4    A   That is correct.

5    Q   And they were just building it at that time in

6    asphalt, right?

7    A   They were rehabilitating.

8    Q   Yes.  They were rehabilitating the Eisenhower in

9    asphalt, right?

10   A   Correct.

11   Q   And you went to Governor Jim Thompson and you

12   advocated on behalf of the concrete industry, right?

13   A   That's correct.

14   Q   And Jim Thompson said you gotta get politically

15   involved, right?

16   A   That is right.

17   Q   And you, then, got politically involved, right?

18   A   That's true.

19   Q   And there were contributions to Jim Thompson,

20   right?

21   A   Not by me.

22   Q   By Prairie?

23   A   By probably somebody, but not by me personally.

24   Q   Not you personally.

25   A   That's what I'm saying.

1  Q   But in this meeting with Jim Thompson, there were

2  several people there on behalf of the concrete

3  industry, right?

4  A   Yes.

5  Q   And after this meeting, your constituency and

6  these people in Prairie and the other organizations

7  contributed to Jim Thompson, right?

8  A   That's correct.  True.

9  Q   And after this meeting, there actually was

10 concrete Eisenhower Expressway?

11 A   I wouldn't say after that meeting.

12 Q   Well, eventually on the Eisenhower Expressway, to

13 this day, there is concrete on Eisenhower

14 Expressway, right?

15 A   That's -- that's correct.

16 Q   In fact, it's between Kostner and Independence

17 Avenue, right?

18 A   That's correct.

19 Q   And when you met with Jim Thompson, he told you

20 you got to get politically involved, you didn't feel

21 uncomfortable when that took place, did you?

22 A   No.

23 Q   You gladly contributed or Prairie gladly

24 contributed to Jim Thompson?

25 A   They did.

:16AM

:17AM

:17AM

:17AM

:17AM

Krozel - cross by Goldstein                    4172

1  Q   Now, let's fast forward to this September 18th,
2  2008, meeting.
3        Actually -- well, yeah, let's go to the
4  meeting.  You were asked by Lon Monk to meet with
5  Rod Blagojevich, right?
6  A   Yes.
7  Q   And at the meeting it was Rod, Robert, Lon, and
8  yourself, right?
9  A   Yes.
10 Q   And Rod arrived a little late, is that your
11 memory?
12 A   Yes, he did.
13 Q   And he told you he was thinking of announcing a
14 1.5 billion dollar Road building plan, is that
15 correct?
16 A   That's correct.
17 Q   And this 1.5 billion, this was not money owed to
18 you, is that fair to say?
19 A   Owed to me?
20 Q   Yeah.  It wasn't going to you?
21 A   No.
22 Q   It wasn't even going specifically to Prairie
23 Materials, was it?
24 A   No.
25 Q   It was going to various places and a lot of it

:17AM

:18AM

:18AM

:18AM

:18AM

Krozel - cross by Goldstein                              4173

1  had to do with road building, is that fair to say?

2  A   Correct.

3  Q   Now, Rod, when he mentioned the 1.5 billion

4  dollar plan that he was thinking about, he never

5  said, "hey, the only way we're going to get

6  this done is if you fundraise," did he say that?

7  A   No, he did not.

8  Q   Did he in any way say, "you must fundraise or I'm

9  not announcing that 1.5 billion dollar plan," did he

10 say that?

11 A   No.

12 Q   He didn't say, "I'm gonna announce it in October,

13 I need a month of fundraising from you," did he say

14 that?

15 A   No.

16 Q   In fact, he then asked you for fundraising later

17 in the conversation, right?

18 A   Yes.

19 Q   And you told him you didn't know what you could

20 do, right?

21 A   Correct.

22 Q   And he didn't then say, "I'm not going to

23 announce the 1.5 billion dollar plan," did he?

24 A   No.

25 Q   Now, you were aware of the economic situation at

1  that time in 2008, right?

2  A   Yes.

3  Q   And, in fact, you told Rod that your industry was
4  hurting?

:19AM  5  A   Yes.

6  Q   You talked about layoffs?

7  A   Yes.

8  Q   And you also knew that Illinois was hurting
9  financially?

:20AM  10  A   Yes.

11  Q   This was not a small plan, was it?

12  A   No.

13  Q   $1.5 billion, right?

14  A   Correct.

:20AM  15  Q   And you didn't get any money for road building
16  from the city, did you?

17  A   No.

18  Q   The legislature wasn't contributing any money for
19  road building, were they?

:20AM  20  A   No.

21  Q   Now, he said he was going to announce this in
22  October or November of 2008, right?

23  A   Yes.

24  Q   Is that right?

:20AM  25  A   Yes.

1 Q   And he talked to you about specific projects that

2 were going to be funded with this money, right?

3 A   Yes.

4 Q   He told you he was building an exchange, an

5 interstate exchange in between Intestate 294 and

6 Interstate 57, is that right?

7 A   Correct.

8        MR. GOLDSTEIN:  Your Honor, if I may publish

9 Government Exhibit Press Release recently admitted

10 into evidence?

11        THE COURT:  You may.

12     (Exhibit published to the jury.)

13        MR. GOLDSTEIN:  Can everyone see that?

14 BY MR. GOLDSTEIN:

15 Q   Now, if you look at that Government Exhibit,

16 Mr. Krozel, that is the press release that you

17 talked about on direct examination, is that correct?

18 A   Yes, it is.

19 Q   Okay.  Now, if you can look to the top where it

20 says "for immediate release," do you see that?

21 A   Yes.

22 Q   What's the date?

23 A   October 15th, 2008.

24 Q   Okay.  So that's the date that indicates when

25 this press release was released, right?

Krozel - cross by Goldstein                    4176

1   A   Yes.
2   Q   So when Governor Blagojevich said that we're
3   going to announce this plan and you didn't know
4   whether you can raise any money, he ended up still
5   announcing that plan, is that correct?
6   A   Yes, he did.
7   Q   And if we zoom in, it's also indicated on this
8   press release, if you look towards the bottom,
9   "projects in the Governor's new Illinois tollway
10  congestion relief program include," and it says
11  towards the bottom there, "Tri-State Tollway
12  I-294/I-57 interchange," do you see that?
13  A   Yes.
14  Q   And when this press release was released and you
15  obviously was connected with all of the things going
16  on in Springfield, you were aware that what he told
17  you he's gonna do, he did?
18  A   Yes.
19  Q   Now, he told you that there was the $1.5 billion
20  as the smaller plan, right?
21  A   Yes.
22  Q   And he also told you that there was this possible
23  6-billion-dollar plan, is that right?
24  A   Yes.
25  Q   And he said he wanted to wait on the

Krozel - cross by Goldstein                    4177

1  6-billion-dollar plan so that he could get the

2  capital bill passed, right?

3  A   Correct.

4  Q   Excuse me.

5      (Brief pause).

6  BY MR. GOLDSTEIN:

7  Q   Now, he never gave you a time when the

8  6-billion-dollar plan was going to take place?

9  A   He either indicated, I assumed, that it would be

10 January of '09.

11 Q   Well, this is very important, Mr. Krozel.  Did he

12 say in January 2009 we're going to announce the

13 6-billion-dollar plan?

14 A   At that particular moment?

15 Q   During the entire meeting on September 18th,

16 2008, did he say in January 2009 we're announcing

17 the 6-billion-dollar plan?

18 A   I can't remember.

19 Q   Well, Mr. Krozel, you made a statement, is that

20 correct, in connection to this investigation?

21 A   Yes.

22 Q   And you signed the statement, is that correct?

23 A   Yes.

24 Q   And, in fact, you read your statement to the

25 grand jury, is that correct?

Krozel - cross by Goldstein                    4178

1    A   Yes.

2    Q   So when you read this statement, you swore under

3    oath that everything was true so help you God, is

4    that correct?

5    A   Yes.

6           MR. GOLDSTEIN:  May I approach, Your Honor?

7           THE COURT:  You may.

8    BY MR. GOLDSTEIN:

9    Q   I'm showing you DEFENDANT Rod Blagojevich

10   Exhibit 21.

11          What is that, sir?

12   A   Statement of Gerald Krozel.

13   Q   Now, that's the complete statement that you

14   stated to the grand jury, is that correct?

15   A   That is correct.

16   Q   Now, I want you to look at Page 3 and I want --

17   actually, you are right there.  And I've highlighted

18   it for you, and I want you to read what you said in

19   the highlighted portion.

20   A   (Reading:)

21      "Blagojevich went on to say that -- "

22          MR. NIEWOEHNER:  Objection.

23          THE COURT:  Wait.  Wait.

24          You want him to read it out loud or read it

25   to yourself.

Krozel - cross by Goldstein                4179

1      MR. GOLDSTEIN:  He could read it first to
2  himself and then out loud, if your Honor allows.
3
4  Q  MR. NIEWOEHNER:  I don't have an objection to
5  reading it to himself?
6          THE COURT:  What?
7          MR. NIEWOEHNER:  I have don't have an
8  objection of him reading it to himself.
9          THE COURT:  You can have him read it to
10 himself but not out loud, then you can ask him
11 questions about it.
12         MR. GOLDSTEIN:  Thank you.
13    (Brief pause).
14 BY THE WITNESS:
15 A  Yes.
16 BY MR. GOLDSTEIN:
17 Q  Okay.  Now, on Page 3 of your statement you said:
18    "... Blagojevich went on to say that he could
19     expand the tollway plan to include another
20     6-billion-dollar in construction, but that he
21     did not want to announce the plan right away.
22     Blagojevich said that he wanted to announce 1.5
23     billion-dollar plan and then allow everyone to
24     work on the passage of the capital bill."
25       That's what you put in your statement,

Krozel - cross by Goldstein                    4180

1   correct?

2   A   Yes.

3   Q   And that's what Rod Blagojevich told you,

4   correct?

5   A   Yes.

6   Q   He never told you that this 6-billion-dollar plan

7   was going to take place in January of 2009?

8   A   I have no idea other than I'm sure it was

9   January.  I'm trying to think of everything in that

10  office --

11  Q   Well --

12  A   When I left that office, I was under the

13  impression it would be January, next year.

14  Q   Okay.  You were under the impression, but Rod

15  Blagojevich never told you January of 2009 that

16  6-billion-dollar plan was going to be in effect?

17  A   I gotta say he told me because I don't know where

18  I would have got that impression from.

19  Q   I want you to look in that statement and see

20  anywhere in your statement that you read to the

21  grand jury where you said that this 6-billion-dollar

22  plan was going to be announced January of 2009.

23      (Brief pause).

24  BY THE WITNESS:

25  A   It would take me a while to go through this.

Krozel - cross by Goldstein                    4181

1  BY MR. GOLDSTEIN:

2  Q   Take your time.

3       (Brief pause).

4  BY THE WITNESS:

5  A   What was your question again?

6  Q   Anywhere in that statement that you testified to

7  at the grand jury under oath did you say that Rod

8  Blagojevich told you in January of 2009 the

9  6-billion-dollar plan was going to be announced.

10 A   Obviously I didn't.  I don't see it.

11 Q   Thank you.

12       Actually, may I approach again.

13       You also said that this 6-billion-dollar plan

14 he wanted you to keep a secret?

15 A   Yes, he did.

16 Q   Okay.  In your statement that I'm going to hand

17 to you, do you at all say in your statement that you

18 submitted to the grand jury that this

19 6-billion-dollar plan was to be a secret?

20 A   I don't remember saying that at all.

21 Q   So the statement that you wrote -- well, I don't

22 know if you wrote it but you signed it, and you

23 testified to under oath in front of grand jury, you

24 never said anything about it about being a secret,

25 is that correct?

Krozel - cross by Goldstein                    4182

1  A   I don't remember saying that.

2  Q   This is the first time you told anyone that this

3  was to be a secret, is that correct?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  The objection is sustained.

6  BY MR. GOLDSTEIN:

7  Q   December 9th, 2008, when the FBI came to your

8  house, did you tell them that the 6-billion-dollar

9  plan was to be a secret?

10  A   The Governor told me not to tell anyone, so if

11  somebody tells me not to tell anybody, to me it's a

12  secret.

13  Q   Well, that's good to know.

14          Did you tell the FBI, December 9th, 2008,

15  that Rod Blagojevich told you not to tell anyone

16  about the 6-billion-dollar plan?

17  A   I don't remember.

18  Q   Did you tell the FBI when you met with them in

19  February, February 12th, 2009, did you tell them

20  that Rod Blagojevich told you that this was not to

21  be told to anyone?

22  A   Yes, I repeated it somewhere that the Governor

23  told me not to tell anyone.

24  Q   You repeated it somewhere.  Did you repeat it to

25  the FBI?

Krozel - cross by Goldstein                    4183

1  A   I don't remember.

2  Q   Well, would looking at your statement of February

3  12th, 2009, help refresh your recollection?

4  A   Yes.

5          MR. GOLDSTEIN:  May I approach, Your Honor?

6          THE COURT:  You may.

7  BY MR. GOLDSTEIN:

8  Q   Showing you Defendant's Exhibit 22, that document

9  is the report of your interview with the FBI, as

10 well as the Assistant U.S. Attorney, Mr. Niewoehner.

11         Does reading that report refresh your

12 recollection as to whether Rod Blagojevich told you

13 that you could not tell anyone about the

14 6-billion-dollar program?

15         MR. NIEWOEHNER:  Objection, Your Honor.

16         THE COURT:  You actually asked him a

17 different question.  You just changed the question.

18         MR. GOLDSTEIN:  I apologize.  I thought we

19 were talking about --

20         THE COURT:  You were talking about whether he

21 told them.

22 BY MR. GOLDSTEIN:

23 Q   If you read that report, does that refresh your

24 recollection as to whether you told the FBI as well

25 as the Assistant United States Attorney whether Rod

Krozel - cross by Goldstein                    4184

1  Blagojevich told you that this was not to be told to
2  anyone?
3  A   It's going to take me a while.
4  Q   Take your time.  Just want the truth.
5       (Brief pause).
6  BY MR. GOLDSTEIN:
7  Q   Let me ask you right now, as you read up to this
8  point, do you recall or is your memory refreshed as
9  to whether you told the FBI or the Assistant United
10 States Attorney that Rod Blagojevich told you not to
11 say tell anyone about this 6-billion-dollar plan?
12 A   I think I told them.
13 Q   You think you told them.  Did you tell the FBI
14 that?
15         MR. NIEWOEHNER:  Objection.
16         THE COURT:  The objection is sustained.
17 BY THE WITNESS:
18 Q   Would you please rephrase your question very
19 slowly?
20 BY MR. GOLDSTEIN:
21 Q   On February 12th --
22 A   February 12th.
23 Q   -- February 12th, 2009, you met with two FBI
24 agents, right?
25 A   February 12th?

Krozel - cross by Goldstein                    4185

1       MR. NIEWOEHNER:  Objection.

2       THE COURT:  The objection is sustained.

3  By THE WITNESS:

4  A   I don't remember meeting two FBI agents on

5  February 12th.  If they have a record that I met

6  with them, I believe that record.

7  BY MR. GOLDSTEIN:

8  Q   Well, if this record saying that two FBI agents

9  met with you, would that indicate to you that two

10  FBI agents met with you?

11       MR. SCHAR:  Objection.

12       THE COURT:  The objection is sustained.

13  BY MR. GOLDSTEIN:

14  Q   Is it fair to say, Mr. Krozel, that you're having

15  a little trouble remembering what occurred on that

16  date, September 18th, 2008?

17       MR. NIEWOEHNER:  Objection, Your Honor.

18       THE COURT:  The question is a little vague.

19  You might want to direct it more specifically to

20  some incident.

21  BY MR. GOLDSTEIN:

22  Q   Are you having trouble remembering whether or not

23  Rod Blagojevich told you on September 18th, 2008,

24  that the 6-billion-dollar plan was not to be told to

25  anyone?

1   A   He told me that.

2   Q   Okay.  But you don't -- strike that.

3           Now, you indicated on direct examination you

4   talked about the capital bill, is that correct?

5   A   Correct.

6   Q   And Rod Blagojevich talked to you about the

7   capital bill, is that correct?

8   A   Yes.

9   Q   And is it fair to say that you indicated you

10  didn't believe the capital bill could get done?

11  A   Correct.

12  Q   When you were talking to Rod Blagojevich on

13  September 18th, 2008, face to face, did you tell him

14  you didn't think the capital bill would get done?

15  A   No, I did not.

16  Q   In fact, you pledged to keep working on getting a

17  capital bill, isn't that correct?

18  A   Yes.

19  Q   You made your pledge to Rod Blagojevich?

20  A   Yes.

21  Q   Were you telling him the truth?

22  A   Yes.

23  Q   Did you continue to work for the capital bill?

24  A   Oh, yes, I did.

25  Q   And you certainly were working for it knowing

1  there was a chance it would get done, right?

2  A   No, I knew it would never get done, but I

3  continued to work for it.  I did not want to give

4  up.

5  Q   You didn't want to give up even though you knew

6  it was never going to happen?

7  A   Exactly.

8  Q   Okay.  Well, you knew the legislature -- or

9  legislators in Springfield, correct?

10  A   Yes.

11  Q   And your knowledge of Springfield, you were aware

12  that the state Senate had passed this capital bill

13  twice?  You're aware of that, right?

14  A   It never became reality.

15  Q   It was passed by the state Senate two times,

16  correct?

17  A   Yes; but it never became reality.

18  Q   Obviously, reality means it never got signed into

19  law, correct?

20  A   Exactly.

21  Q   And you knew Rod Blagojevich was a proponent of

22  that bill, right?

23  A   Yes, he was.

24  Q   So there was one thing holding it up, correct?

25  The House of Representatives, right?

1   A   Well, the republicans were holding it up also.

2   Q   Well, the Speaker of the House was Michael

3   Madigan, right?

4   A   Yes.

:36AM   5   Q   And he had to call that bill, right?

6   A   Yes.

7   Q   And he wasn't calling that capital bill, was he?

8   A   No.

9   Q   No.

:36AM   10      And you had a relationship with Mike Madigan,

11   right?

12   A   I know mike.

13   Q   You had influence with Mike Madigan?

14      MR. NIEWOEHNER:  Objection.

:37AM   15   A   I wouldn't say that.

16      THE COURT:  The answer may stand.

17   BY MR. GOLDSTEIN:

18   Q   You knew Rod Blagojevich since 2000, right?

19   A   Yes.

:37AM   20   Q   In fact, you worked for Rod Blagojevich in his

21   administration, right?

22   A   Clarify that, please.

23   Q   You worked on the transition team, right?

24   A   Yes.

:37AM   25   Q   So you also knew Rod Blagojevich's father-in-law

1  right?

2  A   Yes.

3  Q   So you had a relationship with the Blagojevich

4  family, is that fair to say?

:37AM  5  A   Yes.

6  Q   And you knew Rod Blagojevich as a politician, as

7  a Governor, right?

8  A   Yes.

9  Q   And you knew he was a big idea kind of guy?

:37AM  10  A   Yes.

11          MR. NIEWOEHNER:  Objection, Your Honor.

12          THE COURT:  The objection is sustained.

13  BY MR. GOLDSTEIN:

14  Q   You knew he wasn't going to give in to Mike

:37AM  15  Madigan, right?

16          MR. NIEWOEHNER:  Objection.

17          THE COURT:  Sustained.

18  BY MR. GOLDSTEIN:

19  Q   You understood that Mike Madigan's lack of

:37AM  20  support for the capital bill wasn't going to stop

21  Rod Blagojevich from trying to get that done?

22          MR. NIEWOEHNER:  Objection.

23          THE COURT:  Sustained.

24  BY MR. GOLDSTEIN:

:38AM  25  Q   You understood that Rod Blagojevich believed he

1  could get that capital bill done, right?

2          MR. NIEWOEHNER:  Objection, Your Honor.

3          THE COURT:  The objection is sustained.

4  BY MR. GOLDSTEIN:

5  Q   You weren't aware of all the political

6  maneuvering that Rod Blagojevich was doing to get

7  this done?

8          MR. NIEWOEHNER:  Objection.

9          THE COURT:  The objection is sustained.

10 BY MR. GOLDSTEIN:

11 Q   Well, Mr. Sandoval -- I fronted my question.

12 Later after that meeting on September 18th, you went

13 to meet with Martin Sandoval, is that correct?

14         MR. NIEWOEHNER:  Objection.

15         THE COURT:  How much of this do you have

16 left?

17         MR. GOLDSTEIN:  Excuse me?

18         THE COURT:  How much time have you got left?

19         MR. GOLDSTEIN:  At least half hour.

20         THE COURT:  Let's come to the side.

21    (Proceedings heard at sidebar on the record.)

22         THE COURT:  Okay, what is it you want to get

23 from this guy?

24         MR. GOLDSTEIN:  He met with Martin Sandoval

25 and that's the reason why he remembers it being

1  September 18th, and the government actually has an

2  exhibit in their exhibit binder which is the

3  calendar.  He met with Martin Sandoval and he met

4  Martin Sandoval at a fundraiser.

5            THE COURT:  And then?

6            MR. GOLDSTEIN:  And he went ahead and met

7  with Martin Sandoval and he felt no

8  uncomfortableness as to Martin Sandoval knowing what

9  Martin Sandoval and his involvement.  Martin

10 Sandoval is the head of the transportation

11 committee, he's the head of the appropriations team,

12 which meant he was --

13           THE COURT:  Wait.  Wait.  Wait.  The bottom

14 line is you're going to prove that this guy did

15 what?

16           MR. GOLDSTEIN:  Martin Sandoval?

17           THE COURT:  No, this guy.

18           MR. GOLDSTEIN:  I'm not -- I'm asking his

19 state of mind.  The government elicited --

20           THE COURT:  Wait.  Wait.  Wait.  Use the

21 proper name every time because otherwise I'm not

22 going to understand you and we're going to be here

23 for a while.

24           MR. GOLDSTEIN:  I apologize.

25           The government elicited the fact that

1  Mr. Krozel felt pressured, felt uncomfortable, yet

2  at the same day he went to a fundraiser from an

3  individual who had legislation basically pending

4  before him and he was going to fundraise for this

5  individual.  I want to elicit that Mr. Krozel didn't

6  feel uncomfortable at the Martin Sandoval fundraiser

7  which the government, you know, brought up as to

8  Mr. Krozel's state of mind.

9        THE COURT:  And how do you get to Krozel's

10  state of mind?  That he's comfortable around

11  Sandoval?

12        MR. GOLDSTEIN:  I want to ask him if he was

13  uncomfortable or if he felt pressured to go to

14  Martin Sandoval's fundraiser knowing that this

15  individual is on the State Senate, Martin Sandoval

16  is on the transportation committee, and on the

17  appropriations committee.

18        THE COURT:  Okay.

19        The government's objection?

20        MR. NIEWOEHNER:  Actually that's fine.  I'll

21  withdraw my objection.

22     (Proceedings resumed within the hearing of the

23      jury.)

24        THE COURT:  Since time has passed, put your

25  question again.

1       MR. GOLDSTEIN:  Thank you.

2  BY MR. GOLDSTEIN:

3  Q   Mr. Krozel, do you know a man by the name of

4  Martin Sandoval?

:41AM   5  A   I do.

6  Q   He is a State Senator in the Illinois

7  legislature, is that correct?

8  A   Correct.

9  Q   And Martin Sandoval is also the chairman of the

:41AM  10  Transportation Committee, is that correct?

11  A   That's correct.

12  Q   And he was also -- or is also on the

13  Appropriations Committee, is that correct?

14  A   That's correct.

:42AM  15  Q   And the Appropriations Committee authorizes money

16  to be paid for projects, is that correct?

17  A   That's correct.

18  Q   And appropriations deals with funding, is that

19  correct?

:42AM  20  A   That's correct.

21  Q   And when you went to seen Martin Sandoval, that

22  was at a fundraiser for Martin Sandoval, is that

23  correct?

24  A   It was a golf outing.

:42AM  25  Q   And it was a fundraiser for Martin Sandoval, is

 1  that correct?

 2  A   Correct.

 3  Q   And you saw Martin Sandoval shortly after you saw

 4  Rod Blagojevich, is that correct?

 5  A   I never saw Sandoval that night.

 6  Q   Well, you went to his fundraiser, correct?

 7  A   Yes.

 8  Q   And you met associates of Martin Sandoval's, is

 9  that correct?

10  A   Not really.

11  Q   Okay.  You met other politicians?

12  A   No, I met other people.

13  Q   You met other people?

14  A   Yes.

15  Q   And this was on behalf of raising funds for

16  Martin Sandoval, is that correct?

17  A   They were there for the same purpose; they were

18  contributors.

19  Q   They were contributors.  You never felt

20  uncomfortable when you went to the fundraiser for

21  Martin Sandoval, did you?

22  A   Not really.

23  Q   Now, when you were meeting with Rod Blagojevich,

24  and you indicated that you knew Rod Blagojevich for

25  some time, right?

Krozel - cross by Goldstein                    4195

1  A   Yes.

2  Q   And you felt comfortable with him, is that

3  correct?

4  A   Yes.

:43AM      5  Q   Were you feeling before the meeting,

6  September 18th, 2008, did you feel comfortable with

7  Rod Blagojevich at that time?

8  A   No.

9  Q   So you went into this meeting not knowing what

:43AM     10  the meeting was about, feeling uncomfortable, is

11  that correct?

12  A   I felt uncomfortable.

13  Q   And after the meeting, you felt uncomfortable?

14  A   Yes.

:43AM     15  Q   Now, you had a conversation with Rod Blagojevich

16  about your families, is that correct?

17  A   Yes.

18  Q   This was a personal conversation, is that fair to

19  say?

:43AM     20  A   Yes.

21  Q   And during this conversation, the entire

22  conversation, did you ever tell the guy you knew for

23  some time, you knew his family, that you felt

24  uncomfortable?

:44AM     25  A   No.

1  Q   Did you ever tell him, "Governor, you're
2  connecting the two"?  Did you ever tell him that?
3  A   Personally, no.
4  Q   Did you ever tell him this is coincidental, the
5  fact that two subjects are being raised?
6  A   I was afraid to.
7  Q   You were afraid to.
8       Right after this meeting that you said you
9  felt uncomfortable about, did you call the
10 authorities?
11 A   No.
12 Q   You called Richard Olson, right?
13 A   Yes.
14 Q   Richard Olson is the president of Prairie
15 Materials, correct?
16 A   Correct.
17 Q   The same Prairie Materials that does
18 approximately a half billion dollars in sales, is
19 that correct?
20 A   Correct.
21 Q   And you told Richard Olson that you wanted him,
22 Richard Olson, to meet Rod Blagojevich, the guy you
23 said made you feel uncomfortable?
24 A   I asked him if he'd like to.
25 Q   You didn't -- okay.

Krozel - cross by Goldstein                    4197

1        Nonetheless, you asked Richard Olson would
2   you like to meet with Rod Blagojevich?
3   A   Correct.
4   Q   The same guy you felt uncomfortable with, right?
5   A   Correct.
6   Q   Lon Monk, as well, right?
7   A   I don't know if I asked him to meet with Lon, but
8   I asked him to meet with Rod.
9   Q   September 24th, 2008, you met with Lon Monk and
10  Rod Blagojevich, right?
11  A   Yes.
12  Q   Now, before you go to that meeting, Rod was
13  talking to you about this launching, right?
14  A   Yes.
15  Q   And he was telling you that the rules were going
16  to change in 2009 that wouldn't allow him to
17  fundraise businesses or organizations such as
18  yourself, is that correct?
19  A   Yes.
20  Q   In fact, what he was trying to do is comply with
21  the law, is that correct?
22          MR. NIEWOEHNER:  Objection, Your Honor.
23          THE COURT:  The objection is sustained.
24
25

Krozel - cross by Goldstein                4198

1  BY MR. GOLDSTEIN:

2  Q   You understood his efforts were to comply with

3  that law, right?

4  A   I don't know what was in his mind.

5  Q   Well, in 2008, as you spoke to Rod Blagojevich,

6  was there anything preventing you from contributing

7  to him?

8  A   In 2008?  Nothing.  But I was not contributing to

9  him.

10  Q   I know you weren't.  You made that clear.

11         But in 2008, if you wanted to, you could've

12  contributed to Rod Blagojevich, correct?

13  A   If I wanted to.

14  Q   If you wanted to.

15         If American Concrete Pavement Association

16  wanted to contribute or create fundraisers for Rod

17  Blagojevich in 2008, they could have, correct?

18  A   They could have.

19  Q   And the Road Builders, as well, could have

20  contributed to Rod Blagojevich in 2008, is that

21  correct?

22  A   They could have.

23  Q   But in 2009 they could not, correct?

24  A   Correct.

25  Q   Based on your understanding of the law that was

1  passed, right?

2  A   Correct.

3  Q   And Rod Blagojevich told you that the law was

4  changing --

:47AM  5  A   He did.

6  Q   -- correct?

7  A   Yes.

8  Q   And he didn't say, "can you get me money in

9  2009," correct?

:47AM  10  A   Yes.

11  Q   He asked you to comply with the law to contribute

12  to him in 2008, is that correct?

13          MR. NIEWOEHNER:  Objection.

14          THE COURT:  The objection is sustained.

:47AM  15  BY MR. GOLDSTEIN:

16  Q   Now, you met with Richard Olson, Eric Matson, Rod

17  Blagojevich, Lon Monk, on September 24th, 2008, is

18  that correct?

19  A   Correct.

:47AM  20  Q   That was at The My Way restaurant, right?

21  A   Correct.

22  Q   And Richard Olson, as you said, is the president

23  of Prairie, is that correct?

24  A   Correct.

:48AM  25  Q   He's a wealthy man, is that fair to say?

Krozel - cross by Goldstein                4200

1  A   I have no idea.
2  Q   He's the president of a company that does about
3  half a billion dollars in sales annually, is that
4  correct?
5  A   Not at that time.
6  Q   Not at that time.  Was it more than 100 million
7  in sales?
8  A   Yes.
9  Q   So Richard Olson, the president of this company,
10 met with Rod Blagojevich and Lon Monk, correct?
11 A   Yes.
12 Q   And what did you all talk about on September 24th
13 of 2008?
14 A   Talked about a lot of little things:  Toronto;
15 trips; just a lot of things.
16 Q   You talked about a lot of things.  Was one of
17 those lot of things fundraising?
18 A   No.
19 Q   How long was that meeting?
20 A   I think about an hour and a half, at least.
21 Q   So for the entire hour and a half meeting at My
22 Way restaurant, there was not one mention of
23 fundraising?
24 A   I did not hear anything about fundraising.
25 Q   Now, you said you received a call on

:48AM
:48AM
:48AM
:48AM
:49AM

1  October 22nd, 2008, is that correct?

2  A   Correct.

3  Q   And when Rod Blagojevich called you on that day,

4  he never conditioned the money for the roads on your

5  fundraising efforts, did he?

6  A   No.

7  Q   He never said, "Mr. Krozel, if you contribute to

8  me, I'll give you the 6-billion-dollar project," did

9  he say that?

10  A   No.

11  Q   Did he say, "if you don't contribute to me,

12  I won't do this 6-billion-dollar project"?

13  A   No.

14  Q   October 22nd, at that point, there was an

15  announcement of 1.5 billion dollars, is that

16  correct?

17  A   1.8.

18  Q   1.8.  I apologize.

19       There was an announcement about a week prior,

20  is that correct?

21  A   Correct.

22  Q   And on that phone conversation on October 22nd,

23  2008, did Rod Blagojevich tell you he was going to

24  that away that 1.8 billion-dollar project?

25  A   No.

:49AM
:49AM
:49AM
:49AM
:50AM

1  Q   And do you have the transcripts in front of you?

2      Do you have the Transcript Binder?

3  A   The Transcript Binder?

4  Q   Yes.

:50AM   5  A   Yes.

6  Q   If you could turn to tab 2, please.

7      (Brief pause).

8  BY MR. GOLDSTEIN:

9  Q   Are you there?

:50AM   10  A   Yes.

11  Q   Now, you don't hear or you don't see in the

12  transcript your portion of the call, is that

13  correct?

14  A   Correct.

:50AM   15  Q   And you reviewed this transcript, is that

16  correct?

17  A   I did.

18  Q   Anywhere in this transcript -- well, actually,

19  before he spoke to you, do you see anywhere in that

:50AM   20  transcript that Rod Blagojevich says, "hey, we got

21  to get Jerry Krozel for this money before I give the

22  $6 billion," do you see anything in that transcript?

23  A   No.

24  Q   And if you look to Page 3.

:51AM   25      Are you there?

1  A   Now I am.

2  Q   If you look at line 7 to 8, Mr. Blagojevich says:

3     "We got this end of the year deadline and the

4     rules change after January 1st."

5     Do you see that?

6  A   Yes.

7  Q   And that's a true depiction of what was told to

8  you?

9  A   Yes.

10  Q   And so, once again, Rod Blagojevich is indicating

11  to you that the rules are going to change, is that

12  correct?

13  A   That is correct.

14  Q   And what you understood by that statement is that

15  after January 1st, Rod Blagojevich could no longer

16  receive fundraising from people such as yourself or

17  people in your industry, is that correct?

18  A   Correct.

19  Q   And he also talked about Denny Hastert, is that

20  correct?

21  A   Yes.

22  Q   And he told you, Mr. Blagojevich told you that

23  he's going to meet with Denny Hastert, is that

24  correct?

25  A   He did.

Krozel - cross by Goldstein                    4204

1  Q   Denny Hastert is the former speaker of U.S. House
2  of Representatives, is that correct?
3  A   Yes.
4  Q   And in your understanding of the political realm,
5  Danny Hastert is a fairly influential individual in
6  Illinois, is that correct?
7  A   Yes.
8  Q   And you understood that Denny Hastert was a
9  proponent of the capital bill?
10 A   Yes.
11 Q   And you understood that Speaker Hastert had a lot
12 of influence to get the capital bill done, is that
13 correct?
14 A   Correct.
15 Q   Yet, what you're saying today is that the capital
16 bill couldn't have gotten done?
17 A   Correct.
18 Q   But you don't believe Rod Blagojevich believed
19 that, is that correct?
20     MR. NIEWOEHNER:  Objection, Your Honor, as to
21 form.
22     THE COURT:  The objection is sustained as to
23 what he believed about Defendant Blagojevich's
24 thought process.
25

1  BY MR. GOLDSTEIN:

2  Q   Mr. Krozel, if you could look again on Page 3,

3  and start with line 31.

4          Rod Blagojevich said:

5      "That's the way, perfect, perfect.  I appreciate

6        it.  Thanks again for your friendship.  Yeah,

7        all the best, Jerry.  Call me if you need

8        anything, okay?  Okay, bye, bye."

9          After Rod Blagojevich said "call me if you

10 the need anything," did you ever call Rod

11 Blagojevich?

12 A   No.

13 Q   When he said, "if you need anything," did you

14 tell him, "I feel uncomfortable"?

15 A   No.

16 Q   When he said, "if you need anything," did you

17 tell him, "I feel pressured"?

18 A   No.

19 Q   When he said, "if you need anything," did you

20 tell him, "I believe you're connecting these two"?

21 A   (No response.)

22 Q   Did you say that?

23 A   No, I didn't.

24 Q   Now, after this phone conversation on October

25 22nd, 2008, you spoke to Lon Monk a couple of times,

:53AM

:53AM

:53AM

:53AM

:54AM

Krozel - cross by Goldstein                    4206

1   is that correct?

2   A   Yes.

3   Q   It was approximately between October 22nd, 2008,

4   and December 9th, 2008, about three to four times,

5   is that fair?

6   A   That sounds right.

7   Q   And you indicated on direct examination that you

8   never told Lon Monk you were not going to fundraise,

9   is that correct?

10  A   That's correct.

11  Q   Now, you spoke to the FBI, as well as the

12  Assistant United States Attorney, on February 12th,

13  2009, is that correct?

14  A   Yes.

15  Q   And present in addition to the agents and the

16  U.S. Attorney was your attorney, is that correct?

17  A   Yes.

18  Q   And you had previously given a statement to the

19  FBI agents on December 9th, 2008, is that correct?

20  A   I don't remember those dates.

21  Q   Well, you remember you gave a statement?

22  A   I remember.  If there is a record of it, you can

23  show it to me and I'd verify it.

24  Q   Okay.  Well, on February 12th, 2009, did you tell

25  the FBI, as well as Mr. Niewoehner, the Assistant

1  United States Attorney, that you told Monk there

2  wasn't going to be any money raised for Blagojevich

3  because people don't want their names in the

4  newspaper and neither do I?  Did you tell the FBI

5  agents, as well as the United State's Attorney that?

6  A  I told the United State's Attorney and Lon Monk

7  at that meeting that -- that the Road Builders were

8  not going to contribute any money to the Governor.

9  Q  Okay, let me get this straight.

10      You met with Monk a couple of times, three to

11  four times after October 22nd, 2008, correct?

12  A  That is correct.

13  Q  And, in fact, there was one particular meeting

14  with Lon Monk at the Plush Pub restaurant in

15  Norridge, do you remember that?

16  A  That's correct.

17  Q  And that was a couple of days before Thanksgiving

18  in 2008?

19  A  Yes, it was.

20  Q  And you spoke to Lon Monk, there was some

21  discussion about fundraising, correct?

22  A  Yes.

23  Q  And you told Lon Monk that there wasn't going to

24  be any money raised for Blagojevich because people

25  don't want their names in the paper and neither do

:55AM

:56AM

:56AM

:56AM

:56AM

Krozel - cross by Goldstein                    4208

1  I?

2  A  I did say that.

3  Q  You said that.

4       So when you said you never told Lon Monk that

5  you weren't going to fundraise for him, that was

6  incorrect, correct?

7  A  No.

8  Q  So you said on direct examination that you were

9  concerned because this, after all, is the Governor

10 and you knew that Lon Monk was close to the

11 Governor, right?

12 A  Correct.

13 Q  And you knew that anything you said to Lon Monk

14 would get to the Governor, right?

15 A  Yes.

16 Q  And you didn't want, for fears of the

17 6-billion-dollar program going away, you didn't want

18 to tell any of these individuals that there was

19 going to be no fundraising, correct?

20 A  That's correct.

21 Q  That's what you said on direct examination?

22 A  That's correct.

23 Q  You told Lon Monk specifically at the Plush Pub

24 that there wasn't going to be no fundraising for Rod

25 Blagojevich, isn't that correct?

Krozel - cross by Goldstein                    4209

1  A   I told him that in relation to what he was
2  talking about.
3  Q   Well, he was talking about fundraising, right?
4  A   He was talking -- he was talking about that
5  particular type of fundraising.
6  Q   Lon Monk had a meeting with you, correct?
7  A   Correct.
8  Q   And Lon Monk was meeting with you on behalf of
9  Rod Blagojevich, correct?
10 A   Yes.
11 Q   He was requesting of you fundraising?
12 A   Yes.
13 Q   And you told him there was going to be no
14 fundraising for the Governor, correct?
15         MR. NIEWOEHNER:  Objection, Your Honor.
16         THE COURT:  The objection is sustained.
17 BY MR. GOLDSTEIN:
18 Q   Well, after you told Mr. Monk that there was
19 going to be no fundraising, did you get a call from
20 Rod Blagojevich?
21 A   No.
22         MR. NIEWOEHNER:  Objection, Your Honor.
23         THE COURT:  The answer may stand.
24
25 BY MR. GOLDSTEIN:

:57AM
:57AM
:58AM
:58AM
:58AM

Krozel - cross by Goldstein                    4210

1  Q   After -- after you told Lon Monk there was going
2  to be no fundraising, did Rod Blagojevich take back
3  the 1.8 billion-dollar program?
4  A   No.
5  Q   Did Rod Blagojevich, after you told Lon Monk
6  there was going to be no fundraising, tell you
7  there's gonna be no 6-billion-dollar program to you?
8  A   No, he did not say that.
9  Q   Rod never called you after that meeting with Monk
10 and in any way threaten you, did he?
11 A   He never called me.
12 Q   He never took away this announcement, did he?
13 A   Not to my knowledge.
14 Q   And to your knowledge, he was arrested December
15 9th, 2008, is that correct?
16 A   That's correct.
17 Q   Mr. Krozel, you never felt pressured from
18 Governor Blagojevich, did you?
19 A   I sure did.
20 Q   You never felt any pressure from Lon Monk, did
21 you?
22 A   Yes.
23 Q   You felt he was connecting the two, didn't you?
24 A   No, if somebody will ask you continuously about
25 money, you feel pressured.

Krozel - cross by Goldstein                    4211

1  Q   Okay, you felt pressured to raise funds, is that
2  correct?
3  A   Yes.
4  Q   And you've been in the business for decades,
5  right?
6  A   Yes.
7  Q   And you have dealt with politicians who want you
8  to fundraise, correct?
9  A   Yes.
10 Q   You never felt there was a connection between the
11 two?
12 A   Yes.
13 Q   "Yes" what?
14 A   I felt pressure.
15 Q   You felt pressure, but you never felt there was a
16 connection?
17 A   Connection of what?
18 Q   The project, the 6-billion-dollar project, or the
19 1.8-billion-dollar project and your fundraising?
20 A   It was obvious.
21 Q   It was obvious to you?  Did he ever say it?
22 A   He never said it, but it was obvious that there
23 was a connection.
24 Q   It was obvious to you?
25 A   Why would he have ever talked about fundraising,

:59AM

:00PM

:00PM

:00PM

:00PM

Krozel - cross by Goldstein                    4212

1 then?  He would've told me how happy I should be
2 about the tollway program.
3 Q   Well, were you happy about the tollway --
4 A   Nothing should've been said about fundraising
5 then.
6 Q   Were you happy about the tollway program?
7 A   Yes.
8 Q   This was something you were advocating for,
9 correct?
10 A   Yes.
11 Q   You knew Governor Blagojevich was in favor of
12 that, is that correct?
13 A   Yes.
14 Q   And you spoke to the FBI in December 9th, 2008,
15 correct?
16 A   Yes.
17 Q   And they came to your house?
18 A   Yes.
19 Q   And this was without a U.S. Attorney, is that
20 correct?
21 A   Yes.
22 Q   Without your lawyer?
23 A   Yes.
24 Q   And you invited them in?
25 A   I was scared.

:00PM
:00PM
:00PM
:01PM
:01PM

Krozel - cross by Goldstein                    4213

1  Q   You were scared?

2  A   Yes.

3  Q   You were scared of the FBI?

4  A   Yes.

:01PM  5  Q   Did you feel they were pressuring you?

6  A   I was -- I was really terribly afraid.

7  Q   And that's how you feel right now?

8  A   When somebody comes to tell you --

9  Q   Is that how you feel right now?  You feel

:01PM  10 pressured right now?

11 A   Do I feel pressured right now?

12 Q   Yes.

13 A   I -- I don't feel relaxed.  I'm telling my story

14 now.

:01PM  15 Q   You are telling your story, but it's a different

16 story than what you told them on December 9th, 2008,

17 isn't that correct?

18 A   The FBI?

19 Q   Yes.

:01PM  20 A   There were a lot of things discussed in that.

21 Q   There were a lot of things discussed.  They asked

22 you if you felt pressured to contribute to Rod

23 Blagojevich in exchange for this program, they asked

24 you that question?

:02PM  25 A   They did.

Krozel - cross by Goldstein                    4214

1  Q   And you lied to them?
2  A   Yes.
3  Q   Is that what you're saying?
4  A   Yes.
:02PM  5  Q   You're saying you lied to the FBI?
6  A   Yes.
7  Q   And you felt pressured somehow that you would get
8  in trouble?
9  A   The FBI came into my house, told me the Governor
:02PM  10  was arrested.  At that time I was dressing my wife,
11  because for 8 years she has had a terrible
12  undiagnosed illness.  She cannot talk, she cannot
13  write, she cannot walk, she loses her balance, and I
14  wanted to get the FBI out of my house.
:02PM  15  Q   And you felt --
16  A   And I told them that, yes, because I was
17  concerned -- I just wanted to get the FBI out of my
18  house.
19  Q   You just felt that would get the FBI out of your
:02PM  20  house, is that correct?
21  A   I wasn't really wanting to answer anymore
22  questions.
23  Q   Well, you answered those questions, right?
24  A   I did answer that, yes.
:02PM  25  Q   And you sat down with them and you told them, you

Krozel - cross by Goldstein                    4215

1  told them that you didn't feel pressured by Rod
2  Blagojevich, correct?
3  A   I wanted to get them out of my house.  I was
4  afraid they were going to put me in jail.  I had no
5  idea what was going to --
6  Q   You were afraid by saying I didn't feel
7  pressured?
8  A   -- happen at that particular meeting.
9        MR. NIEWOEHNER:  Objection.
10        THE COURT:  Don't interrupt his answer.
11        MR. GOLDSTEIN:  Just one moment, Your Honor.
12     (Brief pause).
13  BY MR. GOLDSTEIN:
14  Q   Now, as to this December 9th, 2008, meeting with
15  the FBI, you said you wanted them to just get out of
16  your house, is that correct?
17  A   Yes.
18  Q   And you don't want them to come back, is that
19  correct?
20  A   No.
21  Q   And that's the same pressure you feel right now?
22  A   I feel very uncomfortable, but yet I feel, I'm
23  telling you the truth, and I really don't feel a
24  pressure right now.
25  Q   Were you ever charged, Mr. Krozel?

1  A   Got arrested a couple of times for speeding.

2  Q   In connection with this case, were you ever

3  charged with a crime?

4  A   No.

:04PM  5  Q   Okay.  Now, if we could take a step back,

6  Mr. Krozel.

7        As to the projects that Governor Blagojevich

8  proposed, you understood that Rod Blagojevich didn't

9  just hand out contracts, is that correct?

:04PM  10        MR. NIEWOEHNER:  Objection, Your Honor.

11        THE COURT:  The objection is sustained.

12  BY MR. GOLDSTEIN:

13  Q   Well, you knew and you understood that these work

14  programs had to be bid on, is that correct?

:04PM  15  A   Yes.

16  Q   So it was not Governor Blagojevich deciding who

17  got what work, is that correct?

18        MR. SCHAR:  Objection, Your Honor.

19        THE COURT:  The objection is sustained.

:05PM  20  BY MR. GOLDSTEIN:

21  Q   Your understanding was that Rod Blagojevich would

22  not just hand out work to particular people, is that

23  correct?

24        MR. NIEWOEHNER:  Objection.

:05PM  25        THE COURT:  Sustained.

1  BY MR. GOLDSTEIN:

2  Q   Your understanding was that work had to be bid on

3  in front of the Tollway Commission, is that correct?

4  A   Would you please rephrase that question?

5  Q   Well, you understood that once this money was

6  granted, let's say --

7  A   Okay.

8  Q   -- the Tollway Commission had to take bids from

9  particular companies, is that correct?

10  A   Yes.

11  Q   And Rod Blagojevich is not involved in that, is

12  that correct?

13          MR. NIEWOEHNER:  Objection.

14          THE COURT:  The objection is sustained.

15          MR. GOLDSTEIN:  Nothing further.

16          MR. NIEWOEHNER:  Nothing further, Your Honor.

17          THE COURT:  You can step down.

18      (Witness excused.)

19          THE COURT:  Who's the next witness?

20          MS. HAMILTON:  The next witness is Sean

21  Conlon.  We're going to ask permission to read a

22  stipulation before he testifies.

23          THE COURT:  Wait a second and then you can

24  read the stipulations.

25          (Brief pause.)

:05PM (line 5)
:05PM (line 10)
:05PM (line 15)
:05PM (line 20)
:06PM (line 25)

Krozel - cross by Goldstein                    4218

1          MR. SCHAR:  Reading from the second
2    stipulation:
3          "... it's hereby stipulated and agreed by and
4          between the United States of America by and
5          through its attorney, Patrick J. Fitzgerald,
6          United States Attorney for the Northern
7          District of Illinois between defendant Rod
8          Blagojevich, individually and through his
9          attorney, Sheldon Sorosky, and defendant Robert
10         Blagojevich, individually and through his
11         attorney, Michael Ettinger, the following facts
12         are and should be considered by the jury to be
13         true and accurate:
14         Stipulation number 8:  Causing the Illinois
15         Highway Toll Authority to spend additional
16         funds on road building affected or had the
17         potential to affect interstate commerce.
18         VCNA Prairie is a construction supple company
19         that makes and distributes concrete to various
20         road construction companies within the State of
21         Illinois, and that customarily purchased goods
22         and equipment in interstate commerce.
23         If the Illinois Highway Toll Authority spent
24         additional funds on road building, VCNA Prairie
25         would have had additional assets available to

:18AM

:19AM

:06PM

Krozel - cross by Goldstein                    4219

1     purchase goods and equipment in interstate

2     commerce, thus affecting interstate commerce."

3     "Stipulation 9:  A United States Senator is

4     part of the Congress of the United States and

5     sits in the United States Capital Building in

6     Washington, D.C. when Congress is in session.

7     A United States senator from Illinois has

8     offices in both Washington, D.C. and Illinois,

9     thus affecting interstate commerce.  In

10    addition, the appointment papers necessary to

11    name a replacement Senator to the United States

12    Senate must be submitted from Illinois to

13    Washington, D.C., thus affecting interstate

14    commerce."

15    So stipulated?

16       MR. SOROSKY:  So stipulated.

17       MS. HAMILTON:  Now the government calls Sean

18   Conlon.

19       THE COURT:  For your information, those

20   stipulations were read to you because the

21   jurisdiction of this court depends on some of

22   interstate commerce and other aspects of government

23   law and that's why the stipulations were read.

24    (Brief pause.)

25       THE COURT:  Face me and raise your right

1  hand.

2      (Witness duly sworn.)

3          THE COURT:  Please be seated.

4          SEAN CONLON, GOVERNMENT WITNESS, SWORN

5                  DIRECT EXAMINATION

6  BY MS. HAMILTON:

7  Q   Good afternoon.

8          Could you please state and spell your name

9  for the jury.

10 A   Sean Conlon.  S-e-a-n C-o-n-l-o-n.

11 Q   Mr. Conlon, how old are you?

12 A   I'm 41.

13 Q   Where do you live?

14 A   In Chicago.

15 Q   Where were you born?

16 A   I was born in England to Irish parents.

17 Q   When did you come to the United States?

18 A   1990.

19 Q   Why did you come to the United States in 1990?

20 A   To chase the American dream.

21 Q   At some point did you become a U.S. citizen?

22 A   Yes, I did.

23 Q   What was first job in the United States?

24 A   I was a janitor.

25 Q   Did you eventually become involved in the real

1  estate business?

2  A  I did indeed.

3  Q  How did that come about?

4  A  Kind of by accident, but I started to sell real

5  estate.

6  Q  And do you now have your own company?

7  A  I do.

8  Q  What's the name of your company?

9  A  Conlon & Co.

10 Q  What does Conlon & Co. Do?

11 A  It would be described as a real estate merchant

12 bank.

13 Q  What does that mean?

14 A  We manage real estate of our own, we invest it,

15 and also sell real estate.

16 Q  Do you represent any particular kind of real

17 estate?

18 A  Predominantly residential.

19 Q  How long have you had that company?

20 A  10 years.

21 Q  I want to direct your attention to a property

22 located at 11011 West Lake Street in Chicago.

23       Are you familiar with that property?

24 A  Yes, I am.

25 Q  How are you familiar with the property located at

Conlon - direct by Hamilton                    4222

1  1101 West Lake Street in Chicago?

2  A  I was one of the owners and developers of the

3  property.

4  Q  When you say that you were one of the developers

5  of the property, what do you mean?

6  A  A partner and I bought the building and we

7  developed it.

8  Q  Who was your partner?

9  A  Tim Sullivan.

10  Q  What was your role in the development of that

11  property?

12  A  I predominantly handled the sales process.

13  Q  What do you mean by that?

14  A  I would deal with prospective purchasers, I would

15  walk them through the property, I would explain what

16  we planned to do with it.

17  Q  Did you work with any particular brokers on your

18  side of trying to sell that property?

19  A  No, I handled the process myself.

20  Q  Generally, what was Mr. Sullivan's role in the

21  development of the property?

22  A  Tim handled the construction aspect and also a

23  lot of the paperwork and dealing with the attorneys

24  on the process.

25  Q  When you say paperwork, what kind of things are

Conlon - direct by Hamilton                     4223

1  you referring to?

2  A   Contracts, title that would be needed for the

3  property, insurance.

4  Q   With respect to the property at 1101 West Lake,

5  were there multiple units within that building?

6  A   Yes, the building had about 6 floors, some of

7  them were offices and some of them were residential

8  apartments.

9  Q   Mr. Conlon, do you know an individual named Brian

10  Hynes?

11  A   Yes, I do.

12  Q   At some point did you discuss the property that

13  you were developing at 1101 West Lake with

14  Mr. Hynes?

15  A   I did, indeed.

16  Q   Prior to you talking to Mr. Hynes, did he know

17  anything about the development you were working on?

18  A   Probably not.  It was probably mentioned in a

19  social setting and he expressed some interest in

20  seeing the property.

21  Q   When he expressed interest in seeing the

22  property, where were you in the development stage of

23  that building?

24  A   We hadn't begun to build the property out, so it

25  would've been in a very raw state.

Conlon - direct by Hamilton                          4224

1  Q   At some point was he shown the property?

2  A   Yes, at some stage we walked him through the

3  property.

4  Q   Did you have discussions with Mr. Hynes about him

5  actually wanting to purchase a unit in the property?

6  A   Yes, at some stage he expressed interest in

7  wanting to buy a whole floor as an office.

8  Q   Did you tell him what the cost would be to

9  purchase a floor within that property?

10 A   Yes, I gave him a base price.

11 Q   Which was what?

12 A   Which was $600,000.

13 Q   And what was included within that base price of

14 approximately $600,000?

15 A   It's what one would describe in real estate as a

16 vanilla box.  You basically have no walls built out,

17 you run the gas and the electric and water to the

18 unit, and that's predominantly your vanilla box and

19 then the purchaser builds the rest of the floors out

20 when they move in.

21 Q   Did the price that you informed Mr. Hynes of

22 include anything in relation to parking within the

23 building?

24 A   Yes, each floor had a couple of parking spaces

25 included with it.

Conlon - direct by Hamilton                    4225

1  Q   What was Mr. Hynes' reaction to what you proposed
2  in terms of those the proximate $600,000 for a
3  floor?
4        MR. S. ADAM, JR.:  Objection as to Hynes'
5  reaction.
6        THE COURT:  Rephrase the question.
7  BY MS. HAMILTON:
8  Q   What did Mr. Hynes say?
9  A   He was fine with it.
10 Q   Did you and Mr. Hynes engage in any negotiation
11 regarding the price?
12 A   No, we didn't, actually.
13 Q   So at some point did you receive a verbal
14 commitment from Mr. Hynes to purchase a floor for
15 $600,000?
16 A   Yes, I did.
17 Q   At that point in time in the discussions you had
18 with Mr. Hynes, was Mr. Hynes working with a broker,
19 to your knowledge?
20 A   No, he was not.
21 Q   At some point after that, did Mr. Hynes express
22 an interest in purchasing an additional floor within
23 the property at 1101 West Lake?
24 A   Yes, he did.
25 Q   And did you also discuss the price with Mr. Hynes

1  regarding that floor?

2  A  Yes, it was a higher floor, so it was going to be

3  a larger price.

4  Q  Did Mr. Hynes make a verbal commitment to that

5  second floor?

6  A  Yes, he did.

7  Q  And with respect to the second floor, did you

8  have any negotiation with Mr. Hynes regarding the

9  price?

10  A  No, I believe the price on the second, which

11  would have been the fourth floor, was about

12  $700,000.

13  Q  And Mr. Hynes agreed to purchase that floor for

14  that amount?

15  A  Yes, he did.

16  Q  And was that additional floor similar to what you

17  described in terms of the vanilla box or was it

18  different?

19  A  No, it was the same.  He was going to have to

20  build the office himself.

21  Q  And were similar things included in the price of

22  that unit?

23  A  Yes, the same thing.  When we did the shell of

24  the building, we would run the electric to the unit,

25  and water, gas, and then he would hook everything

1  himself when they build out the unit.

2  Q   And what about with respect to the parking for

3  that additional unit?

4  A   Two parking spaces.

5  Q   At some point after you received verbal

6  commitments from Mr. Hynes -- I should ask, with

7  respect to the second floor, when you received a

8  verbal commitment from Mr. Hynes to purchase the

9  second floor, to your knowledge, was he working with

10 a broker?

11 A   No, he was not.

12 Q   In all of your communications with Mr. Hynes, had

13 you dealt directly with Mr. Hynes?

14 A   Yes.

15 Q   At some point after you received those verbal

16 commitments for the two floors at 1101 West Lake,

17 was a written contract process started?

18 A   Eventually, yes.

19 Q   When you say eventually, approximately how much

20 time elapsed between your verbal commitments with

21 Mr. Hynes and the written contract to be executed?

22 A   It took about 8 months, which was a good deal of

23 time.

24 Q   Was there anything about the amount of time in

25 between the verbal commitments and executing the

:15PM
:15PM
:16PM
:16PM
:16PM

1 written contracts that also led to your

2 understanding that there was no broker involved on

3 behalf of Mr. Hynes?

4 A  Well, we had no contact from a broker and we

5 spoke to no broker, so one could assume that there

6 was no broker.

7 Q  At some point did you learn that Mr. Hynes had

8 actually executed written contracts to purchase two

9 floors at the 1101 West Lake property?

10 A  Yes, eventually we got two written contracts from

11 Mr. Hynes.

12 Q  At some point after there were written contracts

13 for the two units, did you receive a call from

14 Mr. Hynes?

15 A  Yes, Mr. Hynes called me and informed me that he

16 wanted to put a broker's name on the contract.

17 Q  Did Mr. Hynes tell you who the broker was he

18 wanted included on the contract?

19 A  Yes, he did.

20 Q  And who did he say should be included as the

21 broker?

22 A  Patti Blagojevich.

23 Q  Had you ever met Patti Blagojevich up until the

24 point when you received this call from Mr. Hynes?

25 A  No.

Conlon - direct by Hamilton                    4229

1  Q   Had you ever seen her at the property?

2  A   No.

3  Q   Had you had any communications with

4  Mrs. Blagojevich?

5  A   No.

6         MR. S. ADAM, JR.:  Objection just foundation

7  time period now, Your Honor.

8         THE COURT:  Overruled.

9  BY MS. HAMILTON:

10 Q   At any point at all with respect to the

11 development of the property at 1101 West Lake Street

12 in Chicago, did you have any discussions with

13 Mrs. Blagojevich about the unit that Mr. Hynes was

14 purchasing?

15 A   None whatsoever.

16 Q   Prior to this phone call that you received from

17 Mr. Hynes after the written contracts were executed,

18 had Mr. Hynes ever mentioned to you that

19 Mrs. Blagojevich was working as a broker for him?

20 A   No, he had not.

21 Q   Had he ever mentioned anything about a broker at

22 all?

23 A   Nothing.

24 Q   When he contacted you and said that he wanted to

25 include Mrs. Blagojevich as a broker, how did you

1  respond?

2  A  Well, obviously I was surprised because the price

3  had not taken into account that we were going to be

4  paying somebody.  So I indicated to him that I would

5  not personally be paying the broker as the seller.

6  Q  When you say that the price didn't include you

7  paying a broker, what do you mean?

8  A  We agreed to a price of $600,000 on the first

9  floor and I hadn't figured that I would be paying a

10  commission because Brian had not mentioned a broker

11  and we sold it direct to him, so I then informed him

12  if he wanted to pay a broker, that was his

13  prerogative, which it was.

14  Q  And so what, if anything, happened with respect

15  to the purchase price for the two units that

16  Mr. Hynes had already entered into a written

17  contract to purchase?

18  A  He asked that if I would increase the price to

19  take into account that a broker's commission would

20  be paid.

21  Q  Mr. Hynes proposed that?

22  A  Yes.

23  Q  And did you agree to that?

24  A  I did because it had no impact on me.

25  Q  Did you then make certain changes on the written

1  contract?

2  A  Yes, I changed the price.

3  Q  And did you also add in --

4  A  And added in the name of the broker, that was the

5  only two changes that were made.

6          MS. HAMILTON:  Judge, may I approach?

7          THE COURT:  You may.

8          MS. HAMILTON:  I'm going to show the witness

9  what is marked as Government Exhibit 1101 West Lake

10 Contract 1 and 1101 West Lake Contract 2.

11 BY MS. HAMILTON:

12 Q  Mr. Conlon, do you recognize these documents?

13 A  Yes, I do.

14 Q  Are those copies of written contracts entered

15 into for the two floors at 1101 West Lake

16 that Mr. Hynes purchased?

17 A  Yes, they are.

18          MS. HAMILTON:  Your Honor, we move for the

19 admission of 11101 West Lake Contract 1 and Contract

20 2.

21          MR. S. ADAM, JR.:  No objection.

22          THE COURT:  Without objection, admitted.

23        (Government's Exhibits 11101 West Lake Contract

24         1 and Contract 2 were received in evidence.)

25 BY MS. HAMILTON:

1  Q   I want to focus, Mr. Conlon, on 1101 West Lake

2  Contract 1.

3  A   Okay.

4         MS. HAMILTON:  Your Honor, may I have

5  permission to publish that exhibit?

6         THE COURT:  You may.

7      (Exhibit published to the jury.)

8         THE COURT:  For your information, we will

9  break in about ten minutes.

10        MS. HAMILTON:  Thank you.

11  BY MS. HAMILTON:

12  Q   All right.  So are we looking here at the first

13  page of the contract for one of the floors?

14  A   I believe so.  It's hard to see.

15  Q   I'm going to blow up just the top portion of this

16  first page and see if that helps.

17        (Brief pause).

18  BY MS. HAMILTON:

19  Q   So, Mr. Conlon, do you see at the top right hand

20  corner there's a date?

21  A   Yes.

22  Q   And what date is that?

23  A   It seems like 7/22/03.

24  Q   And it's for one of the unit at 1101 with West

25  Lake?

1  A   Correct.

2  Q   You said that after you received a call from

3  Mr. Hynes, one of the things you did was to change

4  the price, is that correct?

5  A   That's correct.

6  Q   Is that reflected on this document?

7  A   Yes, it's been changed from 600,000 to 644,000.

8  Q   Okay.  So it's difficult to read but is that line

9  17?

10 A   Yes.

11 Q   Okay.  And the figure that's written there was

12 with a dollar sign and then 644,000, is that your

13 handwriting?

14 A   It is.

15 Q   That's one of the things that you changed based

16 on conversation with Mr. Hynes?

17 A   Correct.

18 Q   All right.

19      And if we scroll down to the bottom of this

20 first page, what is it that we're looking at here,

21 the bottom left hand portion of the first page?

22 A   That is the new broker's name and that's my

23 handwriting also.

24 Q   All right.  When you say the new broker's name,

25 are you referring to where it says River Realty,

Conlon - direct by Hamilton                    4234

1  Patti Blagojevich?

2  A   Yes, the broker that was added.

3  Q   And that's your handwriting?

4  A   That's my handwriting, yes.

5  Q   And, again, you entered this based on --

6  A   On my conversation with Mr. Hynes, yes.

7  Q   Now, there are other things written on this

8  document.  Is there anything else, based on your

9  conversation with Mr. Hynes, that you changed based

10 upon that call?

11 A   No.

12 Q   So just the purchase price and the addition of

13 River Realty, Patti Blagojevich?

14 A   That's correct.

15 Q   And, Mr. Conlon, I asked you questions about any

16 interaction with Mrs. Blagojevich.  With respect to

17 River Realty --

18 A   Right.

19 Q   -- did you have any interaction with River Realty

20 or anyone on behalf of River Realty in relation to

21 1101 West Lake?

22 A   No, prior to this I've never heard of the

23 company.

24 Q   Prior to the calls from Mr. Hynes?

25 A   Prior to Mr. Hynes, correct.

1 Q  All right.  If we could go to the third page of
2 this document of 1101 West Lake.
3        And we'll try to focus again on the top.  I
4 know it's difficult to read.
5        Does this appear to be the same date,
6 7/22/03?
7 A  Yes, it does.
8 Q  And with respect to the price that's listed on
9 this contract, is that your handwriting?
10 A  That is my handwriting.
11 Q  And what is it that you wrote?
12 A  The price had changed to $721,000 from 700.
13 Q  And that was the change that you made based
14 on conversation with Mr. Hynes?
15 A  That's correct.
16 Q  And if we look again at the bottom left hand
17 portion of this contract, is that again your
18 handwriting on "River Realty, Patti Blagojevich"?
19 A  Yes, it is.
20 Q  And, again, is that a change that you made based
21 upon your call from Mr. Hynes?
22 A  Yes, that's correct.
23 Q  And with respect to this contract, is this the
24 contract you said the higher floor cost more money?
25 A  Yes.

Conlon - direct by Hamilton                    4236

1  Q   So this is the contract for the higher floor?

2  A   The one for 721.

3  Q   Yes.

4  A   Yes.  Correct.

5  Q   Other than the price changing to $721,000 and

6  including River Realty, Patti Blagojevich, did you

7  make any other change to the contract based upon

8  your conversation with Mr. Hynes?

9  A   None.

10 Q   After you made those changes, did you receive

11 another call from Mr. Hynes?

12 A   Yes, I did.

13 Q   And what did Mr. Hynes say in this call?

14 A   He needed to change the name of the broker --

15       MR. S. ADAM, JR.:  Objection; foundation.

16       THE COURT:  Foundation.

17 BY MS. HAMILTON:

18 Q   Approximately how long after the first call from

19 Mr. Hynes in which he said he wanted to add in

20 Mrs. Blagojevich as a broker did you receive the

21 second call?

22 A   I would be guessing, but it was probably a week

23 or two afterwards.

24 Q   All right.  And what did Mr. Hynes indicate

25 during that call?

1  A   That he had wanted to change the name of the
2  broker on the contract.
3  Q   Did he say who he needed to change the name to?
4  A   I believe he said he wanted to change it to
5  Rezmar.
6  Q   Did he say why?
7  A   He didn't say why, no.
8  Q   Did you ask him why?
9  A   I didn't.
10 Q   Did you learn at some point that the contract was
11 changed to reflect Rezmar as opposed to River
12 Realty?
13 A   Yes, we had suggested that Mr. Hynes come and
14 pick the contract up and make the change and initial
15 it and I believe he did that.
16 Q   If you look at Government Exhibit 1101 West Lake
17 Contract 2.
18       MS. HAMILTON:  If I could publish that, Your
19 Honor?
20       THE COURT:  You may.
21    (Exhibit published to the jury.)
22 BY MS. HAMILTON:
23 Q   If we focus again at the bottom left hand portion
24 of that contract, is that your handwriting where it
25 says Rezmar, Patti Blagojevich?

:26PM
:26PM
:26PM
:26PM
:26PM

1  A   No, it is not.

2  Q   Is it fair to say you don't know who made that

3  change?

4  A   No, I don't.

5  Q   The price at this point, was it still 644,000

6  consistent with the change that you had made on

7  Contract 1?

8  A   Yes, it was.

9  Q   And with respect to the higher unit, if you look

10 on Page 3, this is -- if we look in the lower left

11 hand portion of the contract, again this one says

12 Rezmar development, Tony Rezko, is that right?

13 A   That's correct.

14 Q   Is that your handwriting?

15 A   It is not.

16 Q   Similar to the last contract, do you know how

17 this change was made?

18 A   I can only speculate.

19         MR. S. ADAM, JR.:  Objection.

20 BY MS. HAMILTON:

21 Q   It's not your handwriting and you don't know how

22 it happened?

23 A   No, I don't.

24 Q   With respect to the price for the higher unit on

25 this contract, is it still $721,000 consistent with

Conlon - direct by Hamilton                    4239

1  the change that you made on the prior version of the
2  contract?
3  A   Yes.
4  Q   Mr. Conlon, were you at the closing for these two
5  units?
6  A   I was not.
7  Q   Did you see any of the closing documents in
8  connection with these unit?
9  A   No, I wasn't.  Since I didn't, I must not have
10  paid much attention to the closing documents.
11  Q   Was that typical in terms of your role in the
12  business at this time in July 2003?
13  A   Yes, I wasn't the detail person.
14        MS. HAMILTON:  Nothing further.
15        THE COURT:  Recess for one hour.
16        THE MARSHAL:  All rise.
17     (The following proceedings were had out of the
18      presence of the jury in open court:)
19        THE COURT:  You may step down, but you're not
20  excused.
21     (Luncheon recess taken from 12:29 p.m. to 1:40
22      p.m.)
23
24
25

:28PM
:28PM
:28PM
:29PM

Conlon - direct by Hamilton                    4240

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                    )   No. 08 CR 888
4           Government,             )
                                    )
5   vs.                             )   Chicago, Illinois
                                    )
6   ROD BLAGOJEVICH,                )   July 7, 2010
    ROBERT BLAGOJEVICH,             )
7                                   )
             Defendants.            )   1:39 o'clock p.m.
8

9                        VOLUME 20
                 TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE JAMES B. ZAGEL
                     AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                    Room 2504
                Chicago, Illinois 60604
23                 (312) 435-5895

24

25

Conlon - direct by Hamilton                    4241

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
           (312) 640-1776
6
           LAW OFFICE OF SAMUEL E. ADAM
7          BY:  Samuel Forbes Adam
                Samuel Adams, Jr.
8          6133 South Ellis Avenue
           Suite 200
9          Chicago, Illinois 60637
           312-726-2326
10

11         OFFICES OF AARON B. GOLDSTEIN
           BY: Aaron Benjamin Goldstein
12         6133 South Ellis
           Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
           Suite 307
16         Chicago, Illinois 60614
           (773) 517-0622
17
           LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
           53 West Jackson Boulevard
19         Suite 1420
           Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

Conlon - direct by Hamilton                    4242

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Conlon - cross by S. Adam, Jr.                    4243

1        THE MARSHAL:  All rise.

2       (The following proceedings were had in the

3        presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        You can be seated.

6        Go ahead.

7   SEAN CONLON, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8                   CROSS EXAMINATION

9  BY MR. ADAM, JR.:

10  Q   Mr. Conlon, how are you?

11  A   Fine.  Thank you.

12  Q   Just a little bit about your background real

13  quick.

14        I know you came over from England in 1990 and

15  you started as a janitor here in America, correct?

16  A   Correct.

17  Q   And you said you then by accident or luck got

18  into the real estate business, correct?

19  A   That's correct.

20  Q   When did that happen?

21  A   1993.

22  Q   I'm sorry, was that '93?

23  A   '93.

24  Q   And is it fair to say that you've been in the

25  real estate business since then?

Conlon - cross by S. Adam, Jr.                    4244

1    A    Yes.

2    Q    Even up to this present day?

3    A    Still in business.

4    Q    Yes, sir.

5    A    Yes, sir.

6    Q    And can you tell us what licensing you have in

7    the real estate area?

8    A    I don't anymore.  I was a licensed sales agent up

9    till probably 2004.

10   Q    2004, approximately?

11   A    Yes.

12   Q    And now you're in the banking aspect, is that

13   correct?

14   A    Both, yes.

15   Q    You do both?

16   A    I own a real estate brokerage company and a

17   merchant bank.

18   Q    Can you just give us an estimate in, oh, say '93

19   to today, approximately how many residential

20   properties have you either bought or sold?

21   A    My companies as a brokerage or me personally?

22   Q    Well, take you personally first.

23   A    100, 120.

24   Q    And is it fair to say that your company does the

25   same type of work?

Conlon - cross by S. Adam, Jr.                    4245

1   A   Yes.

2   Q   And how many businesses or residential properties

3   would you say that company has purchased?

4   A   You mean sold, the brokerage?

:41PM    5   Q   Sold.  Sold.

6   A   Maybe 10,000.

7   Q   Is it fair to say that you were involved in a

8   good many of those 10,000 sales?

9   A   Not at the brokerage but my personal property I

:41PM   10   was involved in all of them.

11   Q   In every single one of the 100, is that correct?

12   A   Yes.

13   Q   And is it fair to say in those hundreds that you

14   were involved personally, there were contracts

:41PM   15   involved in those purchases?

16   A   Yes.

17   Q   In both purchasing and selling that you were

18   involved in, correct?

19   A   Correct.

:41PM   20   Q   Is it fair to say you have a good knowledge of,

21   say, real estate contracts?

22   A   Decent.

23   Q   Decent, is that right?

24   A   Yes.

:42PM   25   Q   And have become aware that in real estate what's

Conlon - cross by S. Adam, Jr.                    4246

1  very important in contrast is that the terms of the
2  contracts are laid out in the actual written
3  contract, true?
4  A   In some cases.  Mostly we rely on a smart
5  attorney, you understand that.
6  Q   That's a good thing to do.
7         That's right, you usually get attorneys to
8  handle that, is that right?
9  A   Correct.
10 Q   Because you want to make sure it's don't
11 appropriately, true?
12 A   Correct.
13 Q   One of the things you have become familiar,
14 though, is that if you're going to -- well, strike
15 that.
16        You yourself have been involved in
17 transactions where you did the paperwork regarding
18 the contracts in real estate, true?
19 A   Yes.
20 Q   And, in fact, 1101 West Lake Street that we've
21 talked about today is one of those properties,
22 correct?
23 A   My partner and I were involved in the contract,
24 yes.
25 Q   That's to Tim Sullivan, correct?

Conlon - cross by S. Adam, Jr.                    4247

1   A   Yes.
2   Q   Well, before we get to Tim, let's talk about for
3   a second.
4           You do understand, is it fair to say, that
5   when it comes to real estate contracts, the last
6   contract entered into is the most important, is that
7   fair?
8   A   Yes.
9   Q   Because if there's ever a dispute, it's the
10  actual written words that are important, correct?
11  A   Correct.
12  Q   And so in someone that's dealing in contracts in
13  real estate, you want to make sure that everything
14  that you are supposed to do and are entitled to is
15  written in that contract, correct?
16  A   That's correct.
17  Q   Because you want to be the best you can be, isn't
18  that right?
19  A   I try.
20  Q   Well, at 1101 West Lake, the government here
21  showed you two contracts, is that correct?
22  A   Yes.
23  Q   But there were more than just two contracts
24  written in this case, wasn't there?
25  A   I would suspect so, yes.

Conlon - cross by S. Adam, Jr.                    4248

1   Q   Well, when you say "suspect so," is it fair to
2   say, Mr. Conlon, the government showed you a number
3   of different contracts on both level 2 and level 4?
4   A   Well, if you are referring to two floors, yes.  I
5   thought you were referring to 6 floors, which meant
6   there were a lot of contracts in the building.
7   Q   Fair enough.  Let's take what's occurring here in
8   this case, which is level 2, right?
9   A   2 and 4.
10  Q   2 and 4, right?
11  A   Yes.
12  Q   Now, when would you say you first put that
13  property on the market?
14  A   I would say that it was officially never in the
15  market because we were not marketing it, so we sold
16  it to people we knew or people we knew wanted the
17  pays.
18  Q   Fair enough.
19         When did the building that you actually
20  developed get built?
21  A   It was an originally building, so we rehabbed it.
22  We bought it in 2001 and we started to do the
23  construction, the main outside construction, the
24  core shell, in maybe 2003.  2002, 2003 we started.
25  Q   You started.

:43PM
:44PM
:44PM
:44PM
:44PM

Conlon - cross by S. Adam, Jr.                4249

1  A   Yeah.

2  Q   Now, it's fair to say from what you told us, I

3  believe, on direct is, even before you started doing

4  the rehab, you had met with Brian Hynes, right?

5  A   That's correct.

6  Q   Now, who's Brian Hynes?

7  A   Brian Hynes is an attorney around town.

8  Q   A real estate attorney?

9  A   I don't think so.

10 Q   Did you have -- did you have any business

11 dealings with him other than this?

12 A   No.

13 Q   So you just knew him --

14 A   Socially, yeah.

15 Q   And, in fact, before you even started to rehab

16 the building, you and he discussed it, is that

17 correct?

18 A   That's correct.

19 Q   So that would be sometime in 2002, correct?

20 A   Yes; most likely.

21 Q   In fact, when you told us that you started

22 talking to him was about 8 to 10 months before you

23 actually entered into a written contract, true?

24 A   Right.

25 Q   So that would -- in fact, when the government

Conlon - cross by S. Adam, Jr.                    4250

1  showed you Government Exhibit 1 -- I'm sorry, 1101
2  West Lake Contract 1, the date on that was July 22nd
3  of '03, correct?
4  A   Correct.
5  Q   So is it fair to say, as you said 8 to 10 months,
6  it was somewhere around September or October of 2002
7  when you first began speaking with Brian Hynes about
8  this?
9  A   Yes.
10 Q   And you say that no contract was entered into at
11 that time, is that right?
12 A   That's correct.
13 Q   Isn't it a fact -- well, strike that.
14     Who is your partner?
15 A   Tim Sullivan.
16 Q   And Tim Sullivan and you are equal partners at
17 1101 West Lake?
18 A   Correct.
19 Q   And at 1101 West Lake, the cross streets there
20 are lake and Aberdeen, is that fair?
21 A   Yes.
22 Q   Have you ever heard of Lake and Aberdeen, LLC?
23 A   I believe it's one of our LLC's.
24 Q   It's one of your LLC's?
25 A   Yes.

:45PM
:45PM
:45PM
:46PM
:46PM

Conlon - cross by S. Adam, Jr.                    4251

1  Q   And that LLC, who owns that?
2  A   Well, I'm assuming if it's the only property we
3  own at Aberdeen and Lake was one that Tim and I
4  owned, so I would suspect that's it.
5  Q   And in Lake and Aberdeen, LLC, are you an owner
6  in?
7  A   Yes, I think so.
8  Q   You are, isn't that correct?
9  A   We have 6 floors, we also owned two floors
10 separately after we converted it.  So we would have
11 several LLC's for that location.
12 Q   Did Lake and Aberdeen, LLC, purchase from Tim
13 Sullivan any floors there?
14 A   We would've divided them out in the end among
15 ourselves, so I would have owned the first floor and
16 Tim would have owned, I believe, the third floor.
17 Q   Did you buy it as Lake and Aberdeen, LLC?
18 A   I honestly don't know.
19 Q   Well, you can't recall or --
20 A   I can't recall.
21 Q   -- or did Tim handle that?  -
22 A   No, I can't recall because it's possible -- we
23 also had an Aberdeen, LLC, in Fulton where we owned
24 a parking lot, so I'm not fully sure what you are
25 referring to.

:46PM
:46PM
:46PM
:47PM
:47PM

Conlon - cross by S. Adam, Jr.                    4252

1  Q   Now, how about Tony Rezko, did you know a person
2  by the name of Tony Rezko?
3  A   No, I met him once.
4  Q   When was that?
5  A   Well, it was at an event at the Hilton.
6  Q   Other than that, you didn't know him?
7  A   No.
8  Q   Other than that you didn't use him as a broker?
9  A   No.
10 Q   Other than that, he wasn't a cooperating office?
11 You didn't Rezmar Development as a cooperating
12 office buying the property at 1101 West Lake --
13 A   No.
14 Q   -- for Lake and Aberdeen, LLC?
15 A   No.
16        MR. S. ADAM, JR.:  May I approach, Your
17 Honor?
18        THE COURT:  You may.
19 BY MR. S. ADAM, JR.:
20 Q   I'm going to show you what's been previously
21 marked Defendant's Exhibit 23.
22        Would you please take a look at that and see
23 if you recognize what that is.
24 A   It's a contract.
25 Q   And it's a contract for where?

:47PM
:47PM
:47PM
:48PM
:48PM

Conlon - cross by S. Adam, Jr.                    4253

1   A   Lake Street.

2   Q   Is that 1101 West Lake?

3   A   It is.

4   Q   Does it have a level on there?

5   A   This is for level 4, I believe.

6   Q   Level 4 is the one you told us that you did not

7   purchase, is that correct?

8   A   No, I did not.

9   Q   Can you tell us, is there a signature there for

10  seller?

11  A   Tim Sullivan, yes.

12  Q   Who is Tim Sullivan?

13  A   Tim is my partner.

14  Q   And can you tell us, do you recognize that

15  signature?

16  A   Yeah, I believe it's Tim's signature.

17  Q   It is, right?

18  A   I haven't seen it for a while, but yes.

19  Q   Who is the purchaser?

20  A   Lake and Aberdeen, LLC.

21  Q   What's the date on that contract?

22  A   9/4 --

23  Q   Looks like '02, is that fair to say?

24  A   Kind of looks like '02, yes.

25  Q   And that's right around the time that in which

Conlon - cross by S. Adam, Jr.                    4254

1  you say you began talking to Brian Hynes, right?

2  A   Yes.

3  Q   Can you tell us who is the cooperating officer

4  listed on that contract?

5  A   Tony Rezko.

6  Q   Well, Rezmar Development, isn't it?

7  A   Yes.

8  Q   Who is the agent listed?

9  A   It says Tony Rezko.

10 Q   Now, you have told us that you never had Tony

11 Rezko as an agent, is that right?

12 A   That's correct.

13 Q   Did Tim Sullivan?

14 A   No.

15 Q   That's a contract from September of '02, correct?

16 A   Correct.

17 Q   For level 4 in the same building you testified

18 here?

19 A   And do I own Lake and Aberdeen, LLC, is that

20 correct?

21 Q   Lake and Aberdeen, correct?

22 A   Do I own the LLC?

23 Q   I don't know.

24 A   Okay.  Well, I'm sure somebody could figure that

25 one out.

                    Conlon - cross by S. Adam, Jr.              4255

 1  Q   Well, I'm asking you.
 2  A   Well, you figure it out.
 3  Q   Well --
 4  A   I don't know.  I probably have about 150 LLC's.
 5  Q   You're a big-time businessman.
 6  A   No, I'm not a big-time businessman.
 7  Q   Well, you are big-time businessman --
 8        MS. HAMILTON:  Objection.
 9        THE COURT:  Go back to the lectern.
10        MR. ADAM, JR.:  Yes, sir.
11        THE COURT:  And I remind you of our rules
12  concerning demeanor with witnesses.
13        MR. S. ADAM, JR.:  Yes, Your Honor.  Yes,
14  Your Honor.
15  BY MR. S. ADAM, JR.:
16  Q   Well, isn't it a fact that you know that Brian
17  Hynes at that time owned Lake and Aberdeen, LLC?
18  A   No, I don't.
19  Q   That wasn't the only contract that came around,
20  that came about regarding 1101 West Lake, isn't that
21  right?
22  A   Mr. Hynes spent about 8 to 10 months discussing
23  buying half of Lake and Aberdeen, so I'm sure there
24  are lots of contracts.
25  Q   In fact, there is a number of them, aren't there?

Conlon - cross by S. Adam, Jr.                4256

1  A   I'm sure there probably are.

2  Q   And, in fact, you say you wrote them up, right?

3  A   Well, this is not my handwriting.  No, I didn't,

4  I negotiated it.

5  Q   You didn't write --

6  A   Nor did I write the other ones.  As I told you, I

7  was the salesperson.

8  Q   On direct examination, didn't you tell us that

9  was your handwriting?

10  A   I didn't say I wrote the contract, I said I made

11  the change to the price, if you recall --

12  Q   That's what you said you did, correct?

13  A   Yes.

14  Q   And do you remember doing that?

15  A   Well, I don't remember.  I recognize my

16  handwriting, of course.

17  Q   I don't want to fight with you, Mr. Conlon.  If

18  you could just answer the question.

19  A   Well, I'm not fully sure what the question is.

20  Q   Did you make the change to the contract regarding

21  price?

22  A   Yes.  Your question was if I wrote the contract,

23  which I didn't.

24       MR. S. ADAM, JR.:  Your Honor, I would ask

25  that the witness be told only to answer the

Conlon - cross by S. Adam, Jr.                4257

1  question.

2       THE COURT:  I think given the pattern of the

3  questions and the evident confusion and interchange

4  of languages, for which I blame neither of you, it

:51PM  5  was appropriate for him to answer it that way.

6       MR. ADAM, JR.:  Yes, sir.

7  BY MR. S. ADAM, JR.:

8  Q  Did you yourself scratch out what you said was

9  $600,000?

:52PM  10  A  Yes.

11  Q  Do you recall doing that?

12  A  It was my obviously handwriting, so I obviously

13  did it.

14  Q  I want to make sure that we're talking about the

:52PM  15  same thing.

16  A  Okay.

17       MR. ADAM, JR.:  If I may reproach, Your

18  Honor, showing Exhibit 1101 West Lake, Contract 1.

19       THE COURT:  You may.

:52PM  20       MR. ADAM, JR.:  Thank you, Your Honor.

21       And I'll go back to the lectern.

22       THE WITNESS:  Right.  Because we need to get

23  you a chair, otherwise.

24  BY MR. S. ADAM, JR.:

:52PM  25  Q  Take a look at that.

Conlon - cross by S. Adam, Jr.                4258

1  A   Yes.

2  Q   Now, that's what you say you wrote that

3  644-thousand-dollar number in, is that right?

4  A   Yes.

:52PM  5  Q   And you remember doing that?

6  A   It seems to be my handwriting.  I do remember the

7  discussion.

8  Q   And you know you're under oath?

9  A   Yes.

:52PM  10  Q   You came down here and spoke with the U.S.

11  Attorney in this case, didn't you, prior to

12  testifying?

13  A   I did.

14  Q   In fact, you came down here on November 23rd of

:53PM  15  2008 and talked to the agents, didn't you?

16  A   I did, I believe.

17  Q   In fact, you came down here and spoke with U.S.

18  Attorney Carolyn McNiven, do you recall that?

19  A   Yes.

:53PM  20  Q   In fact, also present here was your lawyer,

21  Vincent Connolly, is that right?

22  A   That's right.

23  Q   And they asked you questions, didn't they?

24  A   Lots of them.

:53PM  25  Q   And they showed you documents, didn't they?

Conlon - cross by S. Adam, Jr.                    4259

1  A   Yes.

2  Q   And you told the truth, didn't you?

3  A   I always do.

4  Q   You always do, isn't that right?

:53PM  5  A   Yes.

6  Q   Well, didn't you tell the agents as you were

7  sitting here the truth when you said, "Conlon does

8  not think he scratched out the number or wrote in

9  644,000," didn't you tell them that?

:53PM  10  A   I don't recall that.

11  Q   Would you like to see it to refresh your

12  recollection?

13  A   Yes.  Why not.

14      MR. S. ADAM, JR.:  May I approach, Your

:53PM  15  Honor?

16      THE COURT:  Yes.

17     (Brief pause).

18  BY MR. S. ADAM, JR.:

19  Q   It's right --

:54PM  20  A   Yeah, I got it.

21     (Brief pause).

22  BY THE WITNESS:

23  A   Okay.

24  BY MR. S. ADAM, JR.:

:54PM  25  Q   Is your memory refreshed?

Conlon - cross by S. Adam, Jr.                4260

1  A   No, but obviously as I stated at the time I
2  didn't recall.
3  Q   Well, you just told us a second ago you
4  recognized your handwriting, didn't you?
5  A   Which I do recognize my handwriting.
6  Q   You didn't recognize that when you spoke to the
7  agents?
8         MS. HAMILTON:  Objection.
9         THE COURT:  The objection is sustained.
10 BY MR. S. ADAM, JR.:
11 Q   Mr. Conlon, have you ever seen a contract which
12 listed $600,000 as the price you say you agreed to?
13 A   I don't recall.
14 Q   You have told the ladies and gentlemen of the
15 jury that there were two different floors that
16 Mr. Hynes was interested in?
17 A   Correct.
18 Q   What do you say was the first floor he was
19 interested in?
20 A   It was the second floor.
21 Q   Number 2, is that correct?
22 A   Yes.
23 Q   And you dealt with him on that, is that correct?
24 A   Yeah.  A lot of it obviously was verbal.
25 Q   Of course.

Conlon - cross by S. Adam, Jr.                4261

1          And you guys negotiated a price, is that what
2   you said?
3   A   Yes.
4   Q   And you told us that in that price itself were
5   things such as gas and electric and elevators,
6   things like that, true?
7   A   Well, it's standard in a building that you sell
8   that those things are hooked up.  They have to be in
9   the building to get an occupancy permit.
10  Q   That's what you're telling us, is that right?
11  A   Yes.
12  Q   You didn't put that in the contract, did you?
13  A   No, because it's pretty standard that they would
14  have to be in first to get zoning approval.
15  Q   When you say have to be in, you mean it would be
16  in the building, not in the contract?
17  A   That's right, in the building.
18  Q   And you don't recall changing that contract to
19  reflect, say, gas and electric, true?
20  A   No.
21  Q   All right.  And that's on level 2, correct?
22  A   I think that's what you are discussing.
23          MR. ADAM, JR.:  Well, if I may approach
24  again, Your Honor.
25  BY MR. ADAM, JR.:

Conlon - cross by S. Adam, Jr.                    4262

1  Q   I show you Defendant's Number 24.

2         MR. S. ADAM, JR.:  May I withdraw it and I'll

3  use the government's exhibit?

4         THE COURT:  Sure.

5         MR. S. ADAM, JR.:  Number --

6         MS. HAMILTON:  Contract 1.

7         MR. S. ADAM, JR.:  Contract 1.

8  BY MR. S. ADAM, JR.:

9  Q   Oh, it's already up there.

10        If I may approach and show Government

11 Contract 1 for 1101.

12 A   Okay.

13 Q   Take a look there.

14 A   Okay.

15 Q   Now, that's the contract for level 2, isn't it?

16 A   Yes.

17 Q   And you told us previously that you -- that it

18 was already agreed upon with you and Brian Hynes

19 about water and electric and those type of things,

20 correct?

21 A   I need to clarify that again.

22 Q   Well, now --

23 A   Well, you asked the question, do you want me to

24 answer it?

25        MR. ADAM, JR.:  Your Honor, if you would

Conlon - cross by S. Adam, Jr.                    4263

1  instruct the witness to just answer the questions.
2          THE COURT:  Repeat the question.
3  BY MR. S. ADAM, JR.:
4  Q   You have previously told us that the gas, water,
5  and electric was already agreed to by you and Brian
6  Hynes, correct?
7  A   We had it in the building, correct.
8  Q   And you also already told us that you didn't have
9  to put it in the contract because it was standard
10 practice?
11 A   Correct.
12 Q   Take a look at Government Exhibit Contract Number
13 1, line, I believe, 17.
14 A   Okay.
15 Q   Written in by hand is that you now contract for
16 gas, water, electric, elevator, and some things we
17 can't read, correct?
18 A   Correct.
19 Q   That was handwritten in by whom, Mr. Conlon?
20 A   It's not my handwriting.
21 Q   You don't know, do you?
22 A   No, I don't, but it's not -- I know my own
23 handwriting, if that's your question.
24 Q   And that's not yours?
25 A   No, it's not.

:57PM
:57PM
:58PM
:58PM
:58PM

Conlon - cross by S. Adam, Jr.                    4264

1  Q   That was done by somebody else, wasn't it?
2  A   It was probably was.
3  Q   Who told that person to put it in there?
4          MS. HAMILTON:  Objection.
5          THE COURT:  The objection is sustained.
6  BY MS. HAMILTON:
7  Q   When did that person put it in there?
8  A   I've no idea.
9  Q   Fair enough.
10         Are there any dates next to it?
11 A   I can't see any.
12 Q   What's the date of that contract?
13 A   7/22/03.
14 Q   Now, those were things, as you have told us, were
15 actually handwritten in, correct?
16 A   No, you told me it was handwritten in.
17 Q   Well, is it handwritten in?
18 A   Yes, it is.
19 Q   You also told us earlier that as a real estate
20 businessman, what's important is that the last
21 contract contain everything that's important to the
22 deal because that's what, I guess, you're contracted
23 for, true?
24 A   Correct.
25 Q   Is it fair to say that the first contract entered

Conlon - cross by S. Adam, Jr.                    4265

1  into for the second floor didn't have the

2  handwritten in gas and electric, is that fair?

3  A  Based on this, yes.

4  Q  So at some point a contract was entered into for

5  the second floor that didn't list gas and electric

6  and then at later time it is put in there, true?

7        MS. HAMILTON:  Objection.

8        THE COURT:  The objection is sustained.

9  BY MR. S. ADAM, JR.:

10  Q  I'm going to show you what has been previously

11  marked --

12        MR. ADAM, JR.:  If I may, Your Honor.

13        THE COURT:  You may.

14  BY MR. S. ADAM, JR.:

15  Q  As 1101 West Lake Street.

16        Could you please take a look at that.

17  A  Okay, it's a contract.

18  Q  What contract is that for?

19  A  It is a contract for floor 2.

20  Q  For floor 2, is that right?

21  A  Correct.

22  Q  If you take a look at line 16 -- no, I'm sorry,

23  at 15, does it list anything there regarding gas,

24  light?

25  A  No, it doesn't.

1   Q   It doesn't, does it?

2   A   No.

3   Q   At the bottom there on contract we're looking at

4   2, who is the real estate agent?

5   A   Patti Blagojevich.

6   Q   You say you wrote that in, right?

7   A   No, I didn't.  I wrote it in a different.

8           You want to see my handwriting?

9   Q   You wrote it on contract 1, true?

10  A   Correct.

11  Q   And that's the one that has the changes to it?

12  A   That seems to be, yes.

13  Q   So there was a contract prior to this that said

14  Patti Blagojevich and you didn't put it in there?

15          MS. HAMILTON:  Objection.

16          THE COURT:  The objection is sustained.

17  BY MR. S. ADAM, JR.:

18  Q   On the one you wrote in, you say you wrote her in

19  because Hynes told you he wanted a broker, correct?

20  A   Correct.

21  Q   When did that happen?

22  A   I can't recall.

23  Q   Can you give us a month?

24  A   No, he called me on the phone whenever we were

25  finally negotiating it.

Conlon - cross by S. Adam, Jr.                    4267

1   Q   Well, it looks it's in July, correct?
2   A   That's when the contract finally came in.  We
3   discussed it for a long time, as I've stated
4   previously.
5   Q   So it was prior to when you wrote it in that he
6   told you about Patti, correct?
7   A   Sorry, restate the question.
8   Q   It was prior to you writing it in that Brian
9   Hynes told you Patti Blagojevich was his broker?
10  A   No, he told me on the phone he wanted to put a
11  broker in.
12  Q   When was that?
13  A   Obviously while we were negotiating the contract
14  and he finally dropped one off, so it was some time
15  in July.
16  Q   And that's when you wrote it in?
17  A   That's correct.
18  Q   And if you look there at contract 1 -- I'm sorry.
19        If you look at Contract 1 --
20  A   Which one is Contract 1?
21  Q   Fair enough.
22        MR. ADAM, JR.:  May I publish, Your Honor?
23        THE COURT:  Sure.
24        MR. S. ADAM, JR.:  Thank you.
25        THE WITNESS:  There's a lot of contract

Conlon - cross by S. Adam, Jr.                    4268

1  floating around.
2       (Brief pause).
3  BY MR. S. ADAM, JR.:
4  Q   I'm going to show you now, if I may publish to
5  you, Government Contract Number 2.
6           If you will take a look there, this is just
7  the top half.
8  A   Okay.
9  Q   Looking at Contract 2 there, it says 1101 West
10 Lake Street, level 2, is that right?
11 A   Yes.
12 Q   Now, right around -- well, here, I'll point to
13 it.
14          Right around 15, which is right here,
15 correct?
16 A   Yes.
17 Q   What is that space?  What is that for, 15?
18 A   Other additional items, whatever they may be.
19 Q   And, in fact, that's where you can put in other
20 things that you contract for, correct?
21 A   Correct.
22 Q   Gas, electric, those type of things, true?
23 A   If you want to put them in.  They were already
24 included, so obviously that's my confusion.
25 Q   Well, in this particular contract, it doesn't

Conlon - cross by S. Adam, Jr.                    4269

1  list it, does it?
2  A   It probably didn't need to, though, because they
3  were in the building.  But, okay, I see your point,
4  it's not in there.
5  Q   It's not in there, is it?
6  A   No.  So if that's your point, correct.
7  Q   And in another contract, that they call, what the
8  government calls 1101 West Lake Street Contract 1
9  that I'm going to publish to you, tell us if you
10 recognize what that is.
11        That's the second contract, isn't it?
12 A   That is also obviously a contract and a lot of
13 things marked on it.
14 Q   And right there on line 15 was written in is gas,
15 electric, those type of things, right in this area
16 here, correct?
17 A   Correct.
18 Q   True?
19 A   Yes.
20 Q   And if we take a look right at the bottom, who is
21 the cooperating officer?
22 A   Patti Blagojevich.
23 Q   Well, that's the agent, right?
24 A   Agent.  Right.
25 Q   The office is River Realty ?

:03PM
:03PM
:03PM
:04PM
:04PM

Conlon - cross by S. Adam, Jr.                4270

1  A   River Realty.

2  Q   And that's what you wrote in, true?

3  A   That's correct.

4  Q   On this particular one, do you know who wrote in

5  gas, electric, and those type of things?

6  A   I don't --

7          MS. HAMILTON:  Objection.

8          THE COURT:  The objection is sustained.

9  BY MR. S. ADAM, JR.:

10 Q   Those weren't the only changes made to the

11 contracts, isn't that true?

12 A   Well, as you can see, there was so many scribbles

13 on it.  There were a lot of changes.

14 Q   Things got changed over and over, isn't that

15 right?

16 A   Yes.

17 Q   That's part of the negotiation process, true?

18 A   Correct.  But there were not a lot of

19 negotiations on this, but okay.

20 Q   Well, you weren't just scribbling for your

21 health, you were putting in things related to the

22 contract, correct?

23 A   I didn't do a lot --

24          MS. HAMILTON:  Objection.

25 BY THE WITNESS:

Conlon - cross by S. Adam, Jr.                4271

1  A  -- of the scribblings --
2         COURT:  It's too late.
3         It's a good idea, generally, if you hear
4  somebody to say "objection" you stop talking.
5  Actually, that's a rule.
6         THE WITNESS:  I apologize.
7         MR. S. ADAM, JR.:  May I proceed, your Honor?
8         THE COURT:  You now may proceed.
9  BY MR. S. ADAM, JR.:
10 Q  If you would take a look now at Page 2 of
11 Government Exhibit 1101 West Lake Street Contract 1,
12 there were other addendums that were made to that
13 contract, weren't there?
14 A  Yes, I can see them.
15 Q  At the bottom there it's line 23, 24, 25,
16 correct?
17 A  Correct.
18 Q  And they're handwritten in, aren't they?
19 A  Yes, they are.
20 Q  Did you write that in?
21 A  I didn't.
22 Q  Did you see this contract before testifying
23 today?
24 A  I would see it recently, yes.
25 Q  Is it fair to say that on line 24 handwritten in

1  is that the seller will provide parking to the
2  purchaser at closing?
3  A   Yes, which was always included, but --
4  Q   It wasn't in the first contract, was it?
5  A   It was standard.
6          MS. HAMILTON:  Objection.
7          THE COURT:  The objection is sustained.
8  BY MR. S. ADAM, JR.:
9  Q   Now, you have told us, and I want to make sure I
10 understand this right, not only did you and Brian
11 Hynes discuss level 2, you also discussed level 4,
12 is that right?
13 A   Correct.
14 Q   And you negotiated the price with Brian Hynes?
15 A   I did.
16 Q   You recall doing that?
17 A   I mean, listen, I don't know how many years ago
18 it was.  It's hard to recall everything that
19 happened, but we had a negotiation.
20 Q   And it was you yourself that did it?
21 A   I would have talked to Brian about the initial
22 pricing, yes.
23 Q   And what was the original price you say you
24 discussed?
25 A   We discussed $700,000.

Conlon - cross by S. Adam, Jr.                    4273

1  Q   700 was the price?

2  A   On the second unit, I believe.

3  Q   And other than discussing that, did you do

4  anything else with him?

5  A   Like what?

6  Q   Well, did you go see it with him?

7  A   He had seen the floor which he wanted, then he

8  had access for the building because he asked for a

9  key, so ...

10  Q   Who gave him the keys?

11  A   I gave him the keys.

12  Q   Are you sure of that?

13  A   I'm pretty confident.  Maybe Tim gave him the

14  keys.

15  Q   Maybe Tim did?

16  A   Yeah, I don't remember.

17  Q   Well, that's all you have to do --

18  A   Or maybe he led himself in.  Who knows.

19        MS. HAMILTON:  Objection.

20        THE COURT:  Please, do not instruct the

21  witness.

22        MR. S. ADAM, JR.:  You're right.  You're

23  right.  I'm sorry.  You're right.

24  BY MR. S. ADAM, JR.:

25  Q   I want to know how did that negotiation on price

:06PM

:07PM

:07PM

:07PM

:07PM

Conlon - cross by S. Adam, Jr.                    4274

1  on the fourth floor, level 4, occur between you and
2  Hynes, was it in person or on the phone?
3  A   I believe it was on phone.
4  Q   Can you tell us when that occurred?
5  A   No, I can't.
6  Q   How about a season?  Fall, spring, summer?
7  A   As you pointed out at the start, I have been
8  involved in a lot of real estate deals, not because
9  I'm a big deal but because that's what I do for a
10 living.
11 Q   Well, isn't it fair to say, then, that you never
12 spoke to Brian Hynes about the second floor or the
13 price?
14 A   I absolutely spoke to Brian Hynes.
15 Q   Well, when you came down here and met with the
16 U.S. Attorney and met with the FBI, didn't you tell
17 them the truth?
18 A   Yes, I did.
19 Q   Didn't you tell them on November 23rd of 2008,
20 that you did not recall a conversation with Hynes
21 about the purchase price of the second floor?
22 A   I don't recall saying that.
23 Q   Would you like to see?
24 A   I would like to see it.
25 Q   And by the second floor, what was meant was the

Conlon - cross by S. Adam, Jr.                4275

1  second floor that he was buying, correct?

2  A   The second contract.

3  Q   The second contract, correct?

4  A   Okay, I thought you meant the second floor, so I

5  need to correct myself.

6  Q   The second contract, right?

7  A   Okay.

8        MR. ADAM, JR.:  May I approach, Your Honor?

9        THE COURT:  Sure.

10  BY MR. S. ADAM, JR.:

11  Q   Okay?

12  A   Okay.

13  Q   Isn't that what you told him?

14  A   It's stated there that's what I said.

15  Q   Not only that, Mr. Conlon, didn't you tell them

16  when you came down here on October 23rd of 2008,

17  that you were not involved with Hynes purchase of

18  the fourth floor at all?

19  A   I believe what I told them, and somebody can

20  clarify this, is that Brian and I discussed the

21  initial marketing, they were for sale, and that Tim

22  dealt with a lot of the contract details, that is

23  what I believe I told them.

24  Q   Didn't you also tell them that while you may have

25  done something with him on the second floor or the

:08PM

:08PM

:08PM

:09PM

:09PM

1  level 2, that it was Sullivan that talked to him
2  about purchasing the fourth floor?
3  A  Well, I think I've stated that already.  The
4  initial contact for the sale of the property was
5  between myself and Brian, the rest of the details
6  was what Tim had handled.
7  Q  You have told us, Mr. Conlon, that you did not
8  know Patti Blagojevich, is that right?
9  A  That's correct.
10  Q  Is it fair to say, then, that you don't know of
11  any contract she had with Rezmar?
12  A  No, I wouldn't known that.
13  Q  Or any conversations that she had with Hynes?
14  A  No.
15  Q  Or Tony Rezko?
16  A  No.
17       MR. S. ADAM, JR.:  May I have one moment,
18  Your Honor?
19       THE COURT:  Sure.
20     (Brief pause).
21       MR. ADAM, JR.:  I've nothing further, your
22  Honor.
23       MS. HAMILTON:  Just to clarify, Your Honor.
24
25

Conlon - cross by S. Adam, Jr.                4277

1                    REDIRECT EXAMINATION
2   BY MS. HAMILTON:
3   Q   Mr. Conlon, do you still have a copy of the
4   Government Exhibit 1101 West Lake Street Contract 1
:10PM   5   and Contract 2 in front of you?
6   A   I think the other attorney has all 20 of those
7   contracts.
8           MS. HAMILTON:  Your Honor, may I approach?
9           THE COURT:  You may.
:10PM   10  BY MS. HAMILTON:
11  Q   All right.
12          Mr. Conlon, I just want to make sure it's
13  clear in terms of the order of things as far as you
14  remember.
:11PM   15          Looking at 1101 West Lake Street Contract 1.
16  A   Yes.
17  Q   Is this the contract that you changed --
18          Are you there?  Contract 1?
19  A   Yes, I got it.
:11PM   20  Q   Are these the contracts for the two floors where
21  you increased the price and added Mrs. Blagojevich
22  based upon your conversation with Mr. Hynes?
23  A   Contract 1 is my handwriting and my -- it's my
24  handwriting on both of them changing the price and
:12PM   25  putting in "Patti Blagojevich," that's why I recall.

Conlon - cross by S. Adam, Jr.                4278

1   Obviously, that's what I handled.
2        MS. HAMILTON:  Judge, can I publish Contract
3   1 just so the jury can see it, as well?
4        THE COURT:  You may.
5      (Exhibit published to the jury.)
6   BY MS. HAMILTON:
7   Q   Okay.
8        And when you are referring to your
9   handwriting, on here is your handwriting what you've
10  already testified to, the increase number $644,000
11  at the top?
12       If we blow that up.
13  A   Yes, it's the price, that's correct.
14  Q   And in the other place where you've identified
15  your handwriting is at the bottom left hand corner,
16  "River Realty, Patti Blagojevich," is that correct?
17  A   That's correct.
18  Q   And these are the changes that you made based
19  upon your conversation with Mr. Hynes?
20  A   Yes.
21  Q   You made no other changes or additions to that
22  contract?
23  A   No, there's none of my handwriting on there other
24  than that.
25  Q   And with respect to the third page of that

1  document, Contract 1.

2  A  Okay.

3  Q  I believe your testimony was that this was the

4  contract for the higher floor, is that right?

5  A  Right.  Again, the 721 is my handwriting.

6  Q  All right, so let's blow that up so it's clear or

7  we'll try to make it clear.

8      So 7/21 I think it's line 16 or 17, is that

9  right?

10  A  That's correct.

11  Q  Okay.  And then again the bottom left hand

12  portion, the addition of River Realty, Patti

13  Blagojevich?

14  A  That's my handwriting.

15  Q  Okay.  And your testimony, I believe, was that

16  sometime after that you got a second call from

17  Mr. Hynes?

18  A  Correct.

19  Q  And what was it that he asked you to do?

20  A  He wanted to change the broker's name.

21  Q  And the broker is to be changed to what?

22  A  To Rezmar.

23  Q  And so if we look at 1101 West Lake Street

24  Contract 2.

25  A  Yes.

Conlon - cross by S. Adam, Jr.                4280

1  Q   I believe your testimony was that your

2  handwriting does not appear on this document, is

3  that right?

4  A   No, it's not on this document.

5  Q   If you look that the purchase price for this unit

6  number 2, again line 17, the purchase price was

7  what?

8  A   644,000.

9  Q   And is that the same amount that you had

10 increased the purchase price to based on your

11 earlier conversation from Mr. Hynes?

12 A   Yes.

13 Q   And this, obviously, it's not crossed out, just

14 written in as $644,000?

15 A   Right.  Obviously, a clean contract was written

16 up at some point judging by the second one.

17 Q   And then if we go to the third page of this

18 document.

19        And I believe that Mr. Adam showed you

20 Defendant's Exhibit I think it was 23, which I

21 believe was the copy of this.  If we look at the top

22 portion of this, including the date, do you have any

23 idea where that date comes from or why the contract

24 is dated that way?

25 A   No, I don't.  I've no idea.

Conlon - cross by S. Adam, Jr.          4281

1  Q   As of September -- can you even tell what year
2  this is?
3  A   No, it's a squiggle of some description.
4  Q   Prior to the second call from Mr. Hynes, had you
5  included Rezmar Development or Tony Rezko as the
6  broker on this deal?
7  A   No.
8  Q   Was it based only on the second call from
9  Mr. Hynes to change "River Realty" to "Rezmar" that
10 "Rezmar" was then included?
11 A   Yes.
12 Q   And, again, if we look at the purchase price for
13 this higher unit, does this show the same number,
14 $721,000, that the higher floor was increased to
15 based upon Mr. Hynes' asking that a broker be put
16 in?
17 A   Yes.
18 Q   Now, you were asked some questions -- I'm sorry,
19 to take you back to Contract 1.
20 A   Okay.
21 Q   You were asked some questions about the inclusion
22 in this contract of the items listed on line 15, do
23 you remember that?
24 A   Yes, I do.
25 Q   From your perspective, knowing what you know as

1  the developer and seller of the units in this

2  building, did the inclusion of these items have any

3  significance?

4  A   No.  When you do a building, and that's why I was

5  getting a little confused by the counselor's

6  questions, but when you develop a building you have

7  to run gas, electric, and water into the building or

8  you will not get an occupancy permit from the city,

9  so hence my confusion on that.

10 Q   Just so it's clear, 1101:00 West Lake Contract 1

11 was that done before 1101 West Lake Street Contract

12 2?

13 A   We're talking about the marked as up one?

14 Q   1101 West Lake Street Contract 1, that's the one

15 you testified has your handwriting.

16 A   Yes, that was the contract that started the ball

17 rolling.

18 Q   Okay.  And then 1101 West Lake Street Contract 2,

19 was that done after contract 1?

20 A   I would say, yes.

21 Q   And those were, again, based on the discussions

22 that you had with Mr. Hynes?

23 A   Yes.  And as I explained, the initial discussions

24 I had and then my partner took over all the details.

25 The newly written contracts, obviously I don't

:16PM
:17PM
:17PM
:17PM
:17PM

Bedi - direct by Niewoehner                    4283

1  recognize all the handwriting, some of it would have
2  been my partner, the Tim.
3          MS. HAMILTON:  Nothing further.
4          MR. S. ADAM, JR.:  Nothing else.
5          THE COURT:  You may step down.
6       (Witness excused.)
7        THE COURT:  Next witness.
8        MR. NIEWOEHNER:  Your Honor, the government
9         calls Rajinder Bedi.
10          THE COURT:  Face me and raise your right
11  hand.
12       (Witness duly sworn.)
13          THE COURT:  Please be seated.
14        BEDI RAJINDER, GOVERNMENT WITNESS, SWORN
15                    DIRECT EXAMINATION
16  BY MR. NIEWOEHNER:
17  Q   Could you state your name and spell your last
18  name, please.
19  A   Rajinder Bedi, last name is B-e-d-i.
20  Q   How old are you, sir?
21  A   About 57 years.
22  Q   Where do you currently live?
23  A   I live in Chicago.
24  Q   What is your current occupation?
25  A   I am a consultant.

1  Q   What kind of consulting do you do?
2  A   I consultant on international trading matters.
3  Q   Do you work for a particular company?
4  A   I own the company.
5  Q   What's the name of that company?
6  A   Global Intec consulting.
7  Q   About when did you begin consulting, Mr. Bedi?
8  A   About June of '09.
9  Q   Do you have any other job in addition to
10 consulting?
11 A   I also publish a newspaper called the Indian
12 Reporter and World News.
13 Q   And how long -- or what position do you have with
14 that paper?
15 A   I am the publisher and the chief editor.
16 Q   How long have you been the publisher and chief
17 editor of that paper?
18 A   The started that paper -- the company was started
19 in '96, first publication came out in '98, I was out
20 of it from 2003 to 2009, and I'm back in it now.
21 Q   Do you have an agreement with the government
22 about your testimony today?
23 A   Yes, I do.
24 Q   What is your agreement?
25 A   That I will tell the truth, nothing but the

1  truth, and I have the immunity that has been
2  provided to me for -- for everything that I will
3  say.
4  Q   And what do you understand what happens if you
5  did not tell the truth?
6  A   If I didn't tell the truth, then I can be
7  prosecuted for perjury.
8  Q   Are you familiar with Rod Blagojevich?
9  A   Yes, I am.
10        MR. NIEWOEHNER:  Do we have a stipulation on
11  the identity?
12        MR. GOLDSTEIN:  We stipulate.
13        THE COURT:  Stipulated as to the
14  identification of defendant Rod Blagojevich.
15  BY MR. NIEWOEHNER:
16  Q   How did you first meet Defendant Blagojevich?
17  A   I met the former Governor when he was a
18  congressman.
19  Q   And about what time was that?
20  A   Of 2000, 2001, maybe late '99, early 2000,
21  somewhere in that range.
22  Q   And did you become involved in fundraising for
23  Defendant Blagojevich when he ran for Governor?
24  A   Yes, I did.
25  Q   What types of things did you do to help raise

1  funds for Defendant Blagojevich?

2  A   I -- I was a key adviser on the Indian community.

3  So for lack of words, I could say I would consult

4  with him as to what's the best way to help raise

5  money from the Indian community.

6  Q   Did you make any contributions yourself?

7  A   No.

8  Q   Did you participate in any fundraising events in

9  the Indian community?

10  A   Yes, I did.

11  Q   What types of things did you do in those

12  fundraising events?

13  A   I will advise him who are the key people in the

14  Indian community who had the potential to donate, I

15  will advise how to approach them, where to find

16  them, and to set up meetings, and then help -- and

17  then if I agree to do a fundraiser, then help them

18  do the fundraiser and help the Friends of

19  Blagojevich to organize with this person who is

20  hosting the fundraiser to raise the money.

21  Q   And, in fact, in the 2002 campaign, were there a

22  number of fundraisers that were held by the Indian

23  community for Defendant Blagojevich?

24  A   In the first election, yes, there were several

25  fundraisers that I have helped them and participated

1  in it and money was raised.

2  Q   After the election in 2002, did you obtain a job

3  with the State of Illinois?

4  A   Yes, I did.

5  Q   What job did you originally have with the State

6  of Illinois?

7  A   I first started as the Director of ACP Pacific in

8  the office of Trade and Investment which is part of

9  the Department of Commerce and Economic Opportunity.

10 Q   And about when are did you begin working at the

11 Department of Commerce and Economic Opportunity?

12 A   June of 2003.

13 Q   What types of things does that office do or the

14 office of Trade and Investment do that you worked

15 with?

16 A   The Office of Trade and Investment is an

17 international economic development arm of the

18 Department of Commerce and Economic Opportunity.

19        State of Illinois has ten offices now, when I

20 the started there were nine.  These offices are

21 located around the globe.  And the objective of

22 having these offices for the people of State of

23 Illinois is to help Illinois companies sell their

24 goods and services around the globe.

25        And the second key important factor that

1 helps the economic development of the State of
2 Illinois is to go around and look for foreign direct
3 investment.
4         Foreign direct investment is the investment
5 by individuals or companies around the globe in the
6 State of Illinois where they will set up their
7 operations and help create jobs.
8         So the Office of Trade and Investment runs
9 these ten offices to help Illinois companies and
10 individuals to sell their goods and services and
11 look for foreign direct investment from around the
12 globe to bring back to the State of Illinois.
13 Q   At some point did you head up the trade office?
14 A   Yes, then after I was the director of the Asia
15 Pacific, I had exceptional reports, I was asked to
16 head the Director of Emerging Markets.
17         And soon after that, my predecessor, the
18 Managing Director of the Office of Trade and
19 Investment resigned and then I was asked to take
20 that position as the Managing Director of Office of
21 Trade and Investment.
22 Q   And how long -- at some point -- or how long did
23 you continue as the head of the Trade Office?
24 A   I was head of the Trade Office from 2004 all the
25 way to 2009, April 30th, that's when I resigned.

Bedi - direct by Niewoehner                4289

1  Q   After Defendant Blagojevich won the election in
2  2002, did you continue to participate in fundraising
3  efforts for him?
4  A   No, I stopped fundraising and any political
5  activity for several reasons:  One was that the
6  Chief of Staff, Lon Monk, had sent a message that I
7  will be doing absolutely no political activity and
8  will raise no money.  And second was, we were doing
9  the ethics exams and the training which also
10 prevented from the state employees to do any
11 activity which was political.
12 Q   Now, in 2008, did you become involved in any
13 fundraising efforts for Defendant Blagojevich?
14 A   Yes, I did.
15 Q   Did you help organize any fundraising events for
16 Defendant Blagojevich in 2008?
17 A   Yes, I -- I did.
18 Q   And how was it that you got involved in the doing
19 that?
20 A   I was approached by -- by Brian Daley who
21 suggested that the campaign is in dire need of money
22 and I should meet with the brother of the Governor,
23 Rob Blagojevich, Robert Blagojevich, and discuss the
24 possibility of lending some support to help raise
25 money.

:26PM

:26PM

:27PM

:27PM

:27PM

Bedi - direct by Niewoehner                    4290

1  Q   And, in fact, did you meet with Robert
2  Blagojevich?
3  A   Yes, I did.
4          MR. NIEWOEHNER:  Is there a stipulation as to
5  identity?
6          MS. SCHROEDER:  Yes.
7          MR. ETTINGER:  Stipulated.
8          THE COURT:  So stipulated.
9  BY MR. NIEWOEHNER:
10 Q   In fact, when you met with Robert Blagojevich for
11 the first time, who was there?
12 A   When I met first time I met Brian Daley and --
13 and Robert Blagojevich.
14 Q   And do you recall about when that meeting took
15 place?
16 A   Sometime in the evening around maybe 6:00, 6:30.
17 Q   Do you remember the month the meeting took place?
18 A   I would say late summer.
19 Q   And did Robert Blagojevich ask you to do anything
20 in that meeting?
21 A   Yes, we -- we discussed several things about --
22 and one of the things was that he really wanted me
23 to help and that the Governor really needs help, so
24 I have done a lot in the past so I should help out
25 this, some advise and how we can raise money.

:27PM

:27PM

:28PM

:28PM

:28PM

1  Q   And did you discuss conducting a particular
2  fundraising event?
3  A   Yes.  Yes, I said I will advise them, I will give
4  them my best advice how to do it, and we decided we
5  would try to do something in September.
6  Q   And what thing were you going to try to do in
7  September?
8  A   We were planning to organize a fundraiser with
9  the Indian community and invite some of the former
10 donors of the Blagojevich campaign to help again
11 with raising the money.
12 Q   Did you agree to help organize that fundraiser?
13 A   Yes, I did.
14 Q   And, in fact, was there a fundraising event held
15 in September of 2008?
16 A   No, it was very difficult and I explained that to
17 -- to Robert Blagojevich, that it was -- it was
18 getting harder to convince people to donate money
19 and for some reason it did not happen.
20 Q   It did not happen because you were having
21 difficulty getting people to donate?
22 A   Yes.
23 Q   After it became clear you were not going to have
24 the fundraiser in September 2008, did you have any
25 subsequent meetings with Robert Blagojevich?

1   A   Yes, I did.

2   Q   And about when did you meet with Robert

3   Blagojevich?

4   A   I think in September.

5   Q   And what was discussed in that meeting?

6   A   Again, I think the persuasion from Robert was to

7   help raise money and that the event didn't happen,

8   so then now are we going to do it.  And I came up

9   with a new idea how to accomplish that goal, so we

10  had discussed that.

11  Q   What was that new idea?

12  A   The new idea was that we are going to invite the

13  former donors, the Indian community leaders, and

14  that Governor Rod Blagojevich will meet them, no

15  money will be raised on this event, and that the

16  Governor can use his persuasive skills to talk to

17  these people and see if he can be effective in

18  asking them to help him raise money.

19  Q   Did you have any later meetings with Brian Daley

20  and Robert Blagojevich?

21  A   Yes, I did.

22  Q   Where did that meeting take place?

23  A   One meeting took place in the office of Friends

24  of Blagojevich.

25  Q   And was anyone else present for that particular

1  meeting?

2  A  Yeah, first part was Brian Daley and Robert

3  Blagojevich and myself, and then I think Jeanne

4  Ahren got a little later.

5  Q  And what was discussed in that meeting?

6  A  We made a list of those people that we were going

7  to invite on this luncheon that I just mentioned

8  earlier where no money will be raised, and that a

9  letter will be sent from the Friends of Blagojevich,

10  and we will help adjust the letter to make it more

11  understanding and useful for the Indian community,

12  and that letter will be drafted by Jeanne Ahrens and

13  I will then help modify the letter to make it more

14  effective.

15  Q  Okay.  And who is Jeanne Ahren?

16  A  Jeanne Ahren was one of the employees at the

17  Friends of Blagojevich in the office on Ravenswood.

18  Q  Who is Brian Daley?

19  A  Brian Daley was the -- one of the political

20  workers and from the first election who then was the

21  assistant deputy chief of staff and also helped out

22  the assistant finance manger for the campaign.

23  Q  And had Daley in the past been active in

24  fundraising in the Indian community?

25  A  Yes, he had been very active in the first

:31PM

:32PM

:32PM

:32PM

:33PM

Bedi - direct by Niewoehner                    4294

1  election with me.

2  Q   So in terms of this event where there would be no

3  money raised, at some point did you settle on a date

4  where that event would be held?

5  A   Yes.  Yes.

6  Q   And when was that date?

7  A   We had, I think, maybe prior to the meeting in

8  the office, we met again in Starbucks probably in

9  Lincoln Square where the dates were set.  So the

10 31st of October was the date for the luncheon and we

11 were still toying with the idea of whether the

12 fundraiser date would be December 6 or 7 based on

13 availability.

14 Q   Okay, you mentioned a fundraiser.  Was there

15 going to be a second event after that October 31st

16 event?

17 A   Yes.  Yes, the first one was to persuade and with

18 that persuasion I was very hopeful that there will

19 be an event followed by that in we would be able to

20 raise some money.

21 Q   And when was the second event, the fundraising

22 event supposed to be held?

23 A   The finally decided date was December 6th.

24 Q   And going back to the October 31st meeting, was

25 that meeting eventually held?

1 A   Yes, that meeting was held and it was held at the

2 India House Restaurant and Banquet in Schaumburg.

3 Q   And leading up to the October 31st event at the

4 India House, did you have conversations with Robert

:34PM   5 Blagojevich?

6 A   Yes, I did.

7 Q   Did you have more than one conversation?

8 A   Yes.

9 Q   And, generally speaking, what did you talk with

:35PM   10 Robert Blagojevich about the October 31st at the

11 India House?

12 A   Well, we would discuss to make sure that they

13 have invited everybody that they need to invite,

14 have the letters sent, have the RSVP in.

:35PM   15       This was all being done by the Office of the

16 Friends of Blagojevich, I was again providing only

17 the advise on these things.

18       But I was checking on making sure, and they

19 were keeping me informed, on who had called back and

:35PM   20 who had not and what they should do or is there any

21 other person that I think they need to invite.

22 Q   Mr. Bedi, I'm going turn your attention now to an

23 individual name Raghuveer Nayak.

24       Are you familiar with that person?

:35PM   25 A   Yes, I am.

1   Q   Does Mr. Nayak go by any other name?

2   A   Raghu Nayak, or Raghu.

3   Q   How long have you known Nayak?

4   A   Oh, I have known him, I would say, about 30 years

5   now.

6   Q   How did you first meet Mr. Nayak?

7   A   When I came to this country I stayed with him.

8   He offered me to stay with him when I just got here,

9   six months after I got here.

10  Q   So you lived with him about six months at

11  that point in time?

12  A   Yeah, I stayed with him five to eight months.  I

13  don't remember, something like that.

14  Q   And did you remain in touch with Mr. Nayak after

15  that initial period --

16  A   For a long time and then there was a brief time

17  we lost contact and then we got together again.

18  Q   And about when did you reestablish contact with

19  Mr. Nayak?

20  A   That was, I think, around '98, '99.

21  Q   And by the fall of 2008, what kind of a

22  relationship did you have with Nayak?

23  A   Very good friends.

24  Q   What did Nayak do for a living in the fall

25  of 2008?

1  A   He operates surgery centers, we can call them
2  outpatient surgery places.
3  Q   And in the fall of 2008, how often would you
4  speak with Nayak?
5  A   Frequently.
6  Q   So about how many times would you talk in a day?
7  A   In a day, maybe two or three times.
8  Q   And did you call Nayak at times?
9  A   I would call Nayak sometimes, he would call me.
10 Q   And did you typically use a particular phone?
11 A   I used my cell phone and I call him on his cell
12 phone and he use his cell phone to call me on my
13 cell phone.
14 Q   Are you familiar with phone number (773)
15 457-1676?
16 A   That's correct.
17 Q   And what is that?
18 A   That's my cell phone.
19 Q   Did you have a social relationship with
20 Mr. Nayak?
21 A   Yes; a very good social relationship.
22 Q   Did you have any kind of financial relationship
23 with Mr. Nayak?
24 A   Yes, I did.
25 Q   What kind of a financial relationship did you

1  have?

2  A   He was issuing checks from his company to my

3  company and I was giving him some money back in

4  cash.

5  Q   Okay.  I'm going to focus your attention on the

6  time period of 2003 to 2008.

7       In that time frame, did you provide Nayak

8  with cash on multiple occasions?

9  A   Yes, I did.

10 Q   About how often did you provide him with cash?

11 A   Oh, maybe once or twice a month.

12 Q   And about how much -- you said that Nayak gave

13 you checks, about how much money in checks in that

14 time frame?

15 A   In the time frame from 2003 to 2008 about a

16 little bit close to 2 million, a little over.

17 Q   And in that time frame, about how much cash did

18 you give to Nayak in return for that $2 million in

19 check?

20 A   About 1.4, a little bit over maybe, somewhere

21 that in that vicinity.

22 Q   About 1.4 million?

23 A   Yes.

24 Q   And when Nayak provide these checks to you, did

25 they come from his business account or from his

1  personal account?

2  A  Business account.

3  Q  And, typically, what did you do with the checks

4  once Nayak provided them to you?

5  A  I had a company called Design Group and I

6  deposited them in that and later on I deposited some

7  of the checks in Bedi Group which was the name that

8  was changed later.

9  Q  Did you actually do any work for Nayak to justify

10 the checks he was giving you?

11 A  No.

12 Q  Did you give -- now, you said you gave Nayak

13 about 1.4 million back in exchange for the 2

14 million.  Based on your conversations with Nayak,

15 why did you understand that Nayak was willing to

16 give you more money than you were giving him back?

17 A  Well, if I go back to the first check that was

18 about $10,000, he said, "why don't you give me 7,000

19 back," so --

20 Q  So he didn't ask you to give him all the money

21 that he gave you?

22 A  Correct.  Correct.

23 Q  And why did you understand that Nayak was willing

24 to give you --

25 A  I think his tax bracket was about 30 percent.

1  Q   So did you understand that Nayak was cheating on
2  his taxes relating to these financial transactions?
3  A   Yes.
4  Q   And as a result of your transactions with Nayak,
5  did you make money?
6  A   Some.
7  Q   Some.
8      Do you know exactly how much money you made?
9  A   No, I don't.
10 Q   Was it in the hundreds of thousands of dollars?
11 A   Yeah.
12 Q   Now, was the money that you received from Nayak
13 typically reflected on your tax return?
14 A   All the money that I received from Mr. Nayak is
15 reflected on my tax returns.
16 Q   Did some of your tax returns mischaracterize the
17 cash that you then gave to Nayak?
18 A   Yes.
19 Q   So were some of tax returns inaccurate?
20 A   Yes.
21 Q   When you filed those tax returns, did you
22 understand your tax returns were inaccurate?
23 A   Yes, I did.
24 Q   Was Nayak politically active?
25 A   Yes.

Bedi - direct by Niewoehner                    4301

1  Q   How was he active?

2  A   He was very active in donating money to political

3  candidates, democrats and republicans.

4  Q   I'm going to turn your attention back to 2002

5  when you were helping with Defendant Blagojevich's

6  fundraising.

7        Was Nayak involved in those fundraising

8  efforts?

9  A   Yes, he was.

10 Q   What types of things did Nayak do?

11 A   He would help host events, he would help call

12 people, help invite people, help raise money.

13 Q   In fact, did Nayak contribute money himself?

14 A   Oh, yes.

15 Q   In 2002, did you see Nayak and Defendant

16 Blagojevich together at times?

17 A   Yes, I did.

18 Q   And what types of occasions did you see them

19 together?

20 A   On fundraisers, very rarely on events which were

21 not fundraisers, but mostly on events.

22 Q   And after Defendant Blagojevich won the election

23 in 2002, did Nayak continue to raise money?

24 A   Yes, he did.

25 Q   Now, are you familiar with a man named Jesse

1  Jackson, Jr.?

2  A   Yes, I am.

3  Q   Who is he?

4  A   He's a congressman from the State of Illinois.

:41PM  5  Q   And have you ever met Congressman Jackson?

6  A   Yes, I have.

7  Q   On more than one occasion?

8  A   Yes.

9  Q   Would you see him on different events?

:42PM  10  A   Yes, I did.

11  Q   What types of events did you see Congressman

12  Jackson?

13  A   I seen him on events if Raghu Nayak was doing at

14  his home, or if those events were elsewhere where

:42PM  15  Raghu Nayak may have hosted an event for him, or if

16  it was an event organized by Jesse Jackson, Jr.,

17  where he was invited and then I may have gone with

18  Raghu Nayak to these events.

19  Q   And the events that you are talking about at

:42PM  20  Mr. Nayak's house, what kind of events were those?

21  A   Those were fundraisers.

22  Q   For who?

23  A   For sometimes Jesse Jackson or sometimes for

24  others where Jesse Jackson was invited.

:42PM  25  Q   And did you attend other fundraising events with

1  Congressman Jackson where you say Nayak and Jackson

2  together?

3  A   Yes, I did.

4  Q   And who would typically invite you to those

5  events?

6  A   Raghu Nayak.

7  Q   Were you introduced at some point in time to

8  Jesse Jackson, Jr.?

9  A   Yes.

10 Q   Who introduced you?

11 A   Raghu Nayak.

12      MR. NIEWOEHNER:  Your Honor, may I approach?

13      THE COURT:  You may.

14 BY MR. NIEWOEHNER:

15 Q   I'm going to show you what's been marked

16 Government Exhibit Nayak Photo.

17 A   Yes, I recognize this picture.

18 Q   What is that a picture of?

19 A   I see Congressman Jesse Jackson, Jr., standing

20 with Raghu Nayak.

21 Q   Is that a fair and accurate picture of

22 Congressman Jackson and Raghu Nayak?

23 A   Yes, it is.

24      MR. NIEWOEHNER:  Your Honor, move to admit

25 and publish.

:42PM

:43PM

:43PM

:43PM

:43PM

Bedi - direct by Niewoehner                    4304

1          THE COURT:  Admitted and you may publish.
2          (Government's Exhibit Nayak Photo was received
3           in evidence.)
4          (Exhibit published to the jury.)
5   BY MR. NIEWOEHNER:
6   Q   It's a little bit difficult to see, but can you
7   identify who is on the left of that photograph?
8   A   On the left is Congressman Jesse Jackson, Jr.,
9   and on the right is Raghuveer Nayak.
10  Q   Now, you said there were times you saw Nayak with
11  Congressman Jackson together, is that right?
12  A   Have I seen them together?  Yes.
13  Q   And when you saw them together, what did you
14  observe about the relationship between Nayak and --
15  A   Very close relationship.
16  Q   Did you attend the Democratic National Convention
17  in 2008?
18  A   Yes, I did.
19  Q   Who did you attend that convention with?
20  A   I went with a few friends including Raghu Nayak.
21  Q   And where did you actually see them at the
22  convention?
23  A   Well, most of time roaming around and sometimes I
24  was in the suite of Jesse Jackson, Sr.
25  Q   How is it that you were invited to the suite of

:43PM
:44PM
:44PM
:44PM
:44PM

1  Jesse Jackson, Sr.?

2  A  Because of the relationship that Raghu Nayak has

3  with the family.

4  Q  I'm going to direct your attention now to May 10,

5  2008.

6  A  Yes.

7  Q  On that date did you attend an event in which you

8  saw Defendant Blagojevich and Congressman Jackson?

9  A  Yes, I did.

10 Q  What was the event?

11 A  The union commerce minister of India was in town,

12 the consul general of India wanted to host an event

13 in which the commerce minister could interact with

14 the elected officials of the State of Illinois.

15 Q  And --

16 A  And I advised the consul general to ask Raghu

17 Nayak to host the event, and then Raghu Nayak hosted

18 that event and that's where Rod Blagojevich was

19 invited and so was Jesse Jackson, Jr., and Raghu

20 Nayak was there.

21 Q  Who was responsible for inviting both Defendant

22 Blagojevich and Congressman Jackson to the event?

23 A  Raghu Nayak.

24 Q  And did you attend the event?

25 A  Yes, I did.

:45PM
:45PM
:45PM
:45PM
:46PM
:46PM

Bedi - direct by Niewoehner                    4306

1   Q   Did you witness any interaction between Defendant
2   Blagojevich and Congressman Jackson at the event?
3   A   Yes, after the speech of the Governor Rod
4   Blagojevich, there was a brief question and answer,
5   and in that question and answer Jesse Jackson, Jr.,
6   had an interaction with the Governor.
7   Q   What was the nature of the interaction?
8   A   I think the congressman was trying to talk about
9   the developments, economic development of Peotone
10  Airport in those questions and wanted some response
11  from -- from the Governor.
12  Q   And when you say the Peotone airport, what are
13  you talking about?
14  A   I think Jesse Jackson, Jr., is very interested to
15  have an airport in an area called Peotone and that's
16  on the south side, and he passionately believed that
17  if there was an airport or if there is an airport,
18  that it would help the economic development of that
19  region.
20  Q   And when Congressman Jackson brought up this
21  issue of the Peotone airport, how did Defendant
22  Blagojevich respond?
23  A   Well, I was sitting on the right side of the
24  Governor in between -- in between Emil Jones and --
25  and the then looking at now the Governor Pat Quinn,

Bedi - direct by Niewoehner                    4307

1  and the Governor said I'm going to give this task to
2  Rajinder Bedi, he will contact you and work with you
3  on this project.
4  Q   So what did you understand you were supposed to
5  do as a result of what Defendant Blagojevich said?
6  A   That I should contact Jesse Jackson and sit down
7  and talk to him on what he was asking for.
8  Q   Now, at that point in time what was your
9  relationship with Congressman Jackson?
10  A   My relationship?  I don't have any personal
11  relationship with Jackson, I have simply met him on
12  the events that I described earlier.
13  Q   Did you try to talk with Congressman Jackson
14  after that day?
15  A   I asked my friend, Raghu Nayak, that I need to
16  see him to discuss what went on in that event.  And
17  a couple of tries failed, either he was in
18  Washington or I was traveling overseas and it never
19  happened.
20  Q   At some point did you actually meet with
21  Congressman Jackson?
22  A   Yes, somewhere around 27th of October, Raghu
23  Nayak said he was going to meet the congressman
24  tomorrow morning "in your neighborhood," which was
25  downtown at the restaurant called 312 on Randolph

1 and LaSalle and that you should stop by if you want
2 to see him.
3 Q   And did, in fact, you meet with Congressman
4 Jackson at the 312 Restaurant?
5 A   Yes, on the morning of the 28 I went to the
6 breakfast in which Jesse Jackson, Jr., congressman,
7 was present.
8 Q   And what did you see when you first arrived at
9 the 312 Restaurant?
10 A   I saw, it appeared, that Jesse Jackson, Jr., was
11 standing up from a table in the back, shaking hands
12 with some people.  So I was up front, so I just
13 waited there.
14 Q   And at some point after you arrived at the 312
15 Restaurant, did you actually speak with Congressman
16 Jackson?
17 A   Yes, he walked up in front and said, "why don't
18 we sit here," so we sat at a table up front.
19 Q   And was there anyone else with Congressman
20 Jackson at that point?
21 A   Yes, he had his district director with him and I
22 think a driver or someone was sitting on another
23 table, I presume, was with him.
24 Q   And did you then proceed to talk with Congressman
25 Jackson for a while?

Bedi - direct by Niewoehner                    4309

1  A   I did talk with him for a while.

2  Q   And did his staff person stay with you for the

3  whole time or --

4  A   No, he was in and out.  He was working on

5  something.  They would talk briefly, he would go, he

6  would come back, he would sit.

7  Q   Was Nayak there when you first met with

8  Congressman Jackson?

9  A   When I first arrived, he had not arrived yet.

10 Q   Did he arrive at some point after you started

11 speaking with Congressman Jackson?

12 A   Yes, eventually Raghu Nayak arrived to the

13 restaurant.

14 Q   And at some point did Nayak sit down with you at

15 the table?

16 A   Yes.

17 Q   Now, before Nayak was sitting at the table, what

18 did you discuss with Congressman Jackson?

19 A   Jesse Jackson, Jr., went on this very long

20 presentation about Peotone and how it will help

21 improve the economic development in the region.

22        He was very passionate about it.  The paper

23 table cloth that was on the table, he was writing

24 and making drawings on that and very passionately

25 explaining to me about the economic development in

:50PM
:50PM
:50PM
:51PM
:51PM

Bedi - direct by Niewoehner                4310

1  the south side.

2  Q   After Nayak joined the conversation, did

3  Congressman Jackson talk about a different topic?

4  A   Yes, for some time the conversation about this

5  south side development continued, and then we ended

6  that, and at that time we three were sitting and

7  there was conversation about Jesse Jackson, Jr.'s

8  interest in getting appointed to the Senate Seat

9  which would eventually be vacated by Barack Obama if

10 he became the President of the United States.

11 Q   What did Congressman Jackson say about his

12 interest in what might become the vacant Senate

13 Seat?

14         MR. ETTINGER:  Judge, I'm going to object;

15 it's hearsay.

16         THE COURT:  Let's take a break.

17         THE MARSHAL:  All rise.

18     (The following proceedings were had out of the

19      presence of the jury in open court:)

20         THE COURT:  Fifteen minutes.

21         You can step down.

22     (Witness temporarily excused.)

23         THE COURT:  Counsel approach.

24         Where is this going?

25         MR. NIEWOEHNER:  Your Honor, what I expect

Bedi - direct by Niewoehner                    4311

1 the witness will testify about is he has a
2 conversation with Nayak and Congressman Jackson.
3 The introduction is Congressman Jackson indicating
4 he's interested in becoming appointed senator.  And
5 I'm not going to seek to admit the statement form
6 either Jackson or Nayak for the truth, but they do
7 explain what Bedi does next.
8         THE COURT:  which is?
9         MR. NIEWOEHNER:  In a nutshell, the thing
10 that is significant is they talk about the Senate
11 Seat for a bit, Nayak says to Jackson in Bedi's
12 presence, "I will raise a million dollars for Rod
13 Blagojevich if he appoints you to the Senate Seat."
14         That statement by Nayak, in conjunction with
15 some earlier conversations along the same line lead
16 Bedi that afternoon, when he meets with Robert
17 Blagojevich, to mention that Nayak is both
18 interested in doing fundraising for Blagojevich and
19 that he wants Jackson to be appointed to the Senate
20 Seat.  So it is this conversation which prompts the
21 subsequent conversation with Robert Blagojevich.
22         MR. ETTINGER:  Judge, it's hearsay.  There's
23 more coming after that.  And there --
24         THE COURT:  Well, wait.  Tell me what more is
25 coming?

1          MR. ETTINGER:  Well, there's going to be
2   conversations between Nayak and Jackson that are
3   related to Bedi about Jackson's comments on "did you
4   meet with Rod regarding the Senate Seat and maybe
5   you shouldn't discuss."  You know, relevancy, I love
6   it, but it is hearsay, and they're going to start
7   discussing about don't talk to the Blagojevich
8   brothers again because there will be a federal
9   investigation.  And I'm just going from the 302's,
10  the whole basis of Bedi's testimony from this point
11  on --
12         THE COURT:  Okay, I sort of understand where
13  you're going, but now maybe we should hear from the
14  horse.  Where is this going?
15         MR. NIEWOEHNER:  I didn't hear your question.
16         THE COURT:  Where is this going after?
17         MR. NIEWOEHNER:  Okay, what I expect -- so
18  there is this conversation that afternoon --
19         THE COURT:  Right.
20         MR. NIEWOEHNER:  -- where he says that.
21  We're then going to play a tape recording where
22  Robert Blagojevich is on the phone, I think the
23  evidence will show, with Rod Blagojevich, although
24  it's an office mike so we have only one side of the
25  conversation, but from the context and some phone

Bedi - direct by Niewoehner                    4313

1  records, we will demonstrate that it was, in fact,
2  with Rod Blagojevich.
3        And in that conversation, Robert relays what
4  Bedi has told him--I can show your Honor the
5  transcripts--but he says, essentially he's
6  willing -- Bedi is indicating that Nayak is willing
7  to do what Robert calls accelerated fundraising
8  before the end of the year if you pick Jackson,
9  essentially.
10       THE COURT:  Okay.
11       MR. NIEWOEHNER:  So that is the heart of our
12 case, essentially, is that they understand that that
13 is the offer on the table and then there is a number
14 of conversations that we are going to elicit between
15 Robert and Rod where they discuss -- they and other
16 people talk about that particular offer.
17       THE COURT:  So where you told me that you
18 stopped with this witness and Nayak is where you
19 stop?
20       MR. NIEWOEHNER:  I will go on on two other
21 things, assuming Your Honor allows that first part
22 in.  That was on October 28th.  You heard there is
23 going be an event on October 31st, and, in fact,
24 there is, and both Robert and Rod Blagojevich attend
25 that event.  And I intend to elicit from Bedi that

Bedi - direct by Niewoehner                    4314

1   he's there and that he, in fact, sees Robert talking
2   with Nayak and also sees Nayak sitting next to
3   Blagojevich at the event itself, which he's not
4   going to claim he knows what they talk about, but he
5   will fill the conversation which he will tie up,
6   there's going to be a recording of a conversation
7   that Robert Blagojevich had afterwards where the
8   import of which I believe there is also offer made
9   between Nayak to the Blagojevichs that he will raise
10  money.  So Nayak, our argument will be, repeats the
11  offer what he said to Bedi he will repeat.
12        THE COURT:  So what I have now is the
13  conversation relayed, according to what you're
14  offering me, to Robert Blagojevich, then there's the
15  Blagojevich-Blagojevich conversation, then
16  subsequent to the Blagojevich-Blagojevich
17  conversation there is an event where your witness
18  sees Nayak and Robert Blagojevich sitting together.
19        MR. NIEWOEHNER:  He sees Rod Blagojevich
20  sitting with Nayak and separately sees Nayak talking
21  to Robert, but yes.
22        THE COURT:  Right.  Basically, he sees them
23  together, maybe sees them talking, doesn't know what
24  they said.
25        MR. NIEWOEHNER:  Correct.

```
                    Bedi - direct by Niewoehner            4315
```

1          THE COURT:  Okay.  And then that's followed
2     by --
3          MR. NIEWOEHNER:  There is a recording about
4     two hours later after the event where --
5          THE COURT:  Okay.  Okay.  And that's the end
6     of it with him?
7          MR. NIEWOEHNER:  There is one other
8     conversation that I intend to elicit, which is after
9     the October 31st event, he goes on a trip, he comes
10    back about ten days later, and when he returns he
11    talks to Nayak and Nayak--and this is where
12    Mr. Ettinger was going--Nayak tells him don't pass
13    on, don't tell Robert or Rod that I will be willing
14    to make campaign contributions in exchange for Jesse
15    Jackson being appointed, and he gives him an
16    explanation, that there could be a federal
17    investigation, and, in part, for that reason I think
18    Bedi will say he then didn't have any further
19    conversations about it to anybody.
20         THE COURT:  Okay.  The answer to the last
21    thing is, it's not coming in unless there's
22    something about the cross that opens the door.
23    You're trying to meet an argument that wouldn't, I
24    think, not going to be made, and, if it is made,
25    then the door is open.

Bedi - direct by Niewoehner                    4316

1        Now, I'm clear on that one.  You want to talk
2   to me about the other two.
3        MR. ETTINGER:  Well, Judge, if they're going
4   to put in conversations between Nayak who is making
5   this offer, to raise a million dollars, he's telling
6   it to Bedi with Jackson at this meeting, at the 312
7   on October 28th, and they want to bring out that
8   whole conversation, which is hearsay--my client is
9   not present, so we know it's hearsay--they want to
10  bring all that out to allegedly explain what Bedi is
11  going to do next.
12       And Bedi is going to go meet with Robert and
13  have some discussions with Robert, and I have no
14  problem with that.  But the basis of these
15  discussions are what Nayak is saying, and also what
16  Nayak is saying Jesse Jackson is saying.  Because
17  Jesse Jackson is telling Nayak things who tells Bedi
18  and then Bedi acts with my client.  So that's my
19  problem, all this hearsay is going to get in,
20  allegedly, to explain what Bedi does with my client.
21       MR. NIEWOEHNER:  Your Honor, I'm not sure I'm
22  not totally following.
23       THE COURT:  Wait stop.
24       Go ahead.
25       MR. GOLDSTEIN:  Your Honor, first of all, we

1  do join on the objection.  There's another issue,
2  you have Raghu Nayak making a statement and he's an
3  available witness that they are not calling, they
4  are getting in all the statements of Raghu through
5  Rajinder Bedi and this is where we're not able to
6  cross Raghu Nayak.
7          Not to mention, as far as what would explain
8  why Bedi did what he did after the October 28th
9  meeting, they can simply say there was a meeting,
10  they discussed things, and then based on that he
11  went further and spoke to Robert.  I don't think
12  they need to get into the content of that
13  conversation.
14          MR. NIEWOEHNER:  We're not offering it for
15  the truth that Nayak, in fact, was going to do this;
16  he said it.  We're not offering it for the truth,
17  it's just a statement that then causes Bedi to go do
18  it.
19          Whether or not it's serious or not, Bedi
20  doesn't know and I won't elicit his opinion on it,
21  but he said that which then causes Bedi to then have
22  the conversation.  Quite frankly, if Robert
23  Blagojevich's understanding of what's being said and
24  Rod Blagojevich's understanding of what's being said
25  is critical here, it gives context for why Bedi has

:01PM
:01PM
:01PM
:01PM
:02PM

Bedi - direct by Niewoehner                    4318

1   that conversation with Robert.
2         THE COURT:  And what does Bedi say to Robert?
3         MR. NIEWOEHNER:  He says two things, there's
4   more conversation, but I think the key things are:
5   One, they're talking about Nayak raising money, and
6   he says Nayak would be willing to raise you money,
7   and he also says Nayak is interested in having
8   Jackson be appointed as senator.
9         THE COURT:  I don't see why you have to go
10  into the detail, because this witness is on the
11  stand and what you have is you have evidence that
12  there is a discussion, without the content of it,
13  about Jackson and about fundraising, this is what
14  the witness testifies to.  Then the witness
15  testifies that after this conversation, after these
16  statements, which I am not describing in detail, I
17  went to see Robert Blagojevich and this is what I
18  told him.  I don't know why you have to go into a
19  description of the conversation itself unless
20  there's going to be some kind of challenge to
21  whether he actually heard this or not.
22        And even if there is a challenge whether he
23  heard it or not, I don't know what that does for the
24  case as a whole, because even if this particular
25  witness is lying through his teeth, you still have

:02PM
:02PM
:03PM
:03PM
:03PM

1  Robert Blagojevich's answer, which is, presumably,
2  from your point of view:  Yes, great deal, let's go
3  ahead.  I'm assuming --
4          MR. ETTINGER:  It's not --
5          THE COURT:  No, this is all hypothetical
6  because I haven't heard a word of it.
7          MR. ETTINGER:  I know you are.
8          THE COURT:  And Robert Blagojevich says
9  something about the resemblance between this, which
10 is happening over sliced bread, and then you've
11 gotten all of your stuff in without going into
12 exactly what Nayak said at that particular meeting.
13 That seems to me to be appropriate, unless, of
14 course, we have some point made by the defense in
15 this case that he's fabricated all of it.
16         But even if he's fabricated all of it, if
17 your evidence is that Rod Blagojevich discussed
18 acting on it with his brother, I don't see why you
19 need the underlying details here.
20         Now, the question I have for the defense is,
21 are you in fact going to claim the guy made it up
22 out of whole cloth?
23         MR. GOLDSTEIN:  Made what out of whole cloth?
24         THE COURT:  That Nayak said these things?
25         MR. GOLDSTEIN:  As to -- I mean, I'm not sure

Bedi - direct by Niewoehner                4320

 1  I understand your question.
 2        THE COURT:  What I'm saying is is that the
 3  testimony comes in this way:  "Did you have a
 4  meeting with Congressman Jackson?"  "Yes, I did."
 5  "And did somebody else, Nayak come to the table?"
 6  "Yes."  "And in the course of that, did you discuss
 7  various things regarding Congressman Jackson's
 8  wishes or desires?"  "Yes, we did."  "What happened
 9  after that?"  "I went to talk to Robert
10  Blagojevich."  "What did you tell him?"  "I told him
11  this or that."  All of which, presumably, whatever
12  there is is on record, on tape, and then there's a
13  series of conversations, and you have people
14  operating, presumably, according to the government,
15  on the premise that this at least might be true.
16  That's the government's case.
17        You come and say, you can't believe any of
18  this, nobody ever said that to this guy, he went to
19  talk to Robert Blagojevich, the whole thing is a
20  massive fabrication.
21        Of course you have the problem if there is
22  really unpleasant things said on the tape, it
23  doesn't much help you to say that, but it's a big
24  issue for me as to what approach you're going to
25  take.

1    Because if you take that approach, that the
2  guy made it up out of whole cloth and a lot of other
3  things, that maybe there is some gigantic hoax
4  played on Robert Blagojevich, then this guy is
5  entitled to explain to you, to the jury, why it's
6  not a hoax and why he's credible.  So I'd have to
7  know how you're going to attack him.
8         MR. GOLDSTEIN:  We're not going to claim this
9  is a hoax.  I mean, certainly that there is a
10 portion of the conversation between Bedi and Robert
11 that needs more flushing out, there is more to it
12 than just what the government said, but as to that
13 element, it's not a hoax.
14        MR. ETTINGER:  Judge, I want you to know,
15 Robert Blagojevich tells Bedi that, "my brother is
16 not appointing Jesse Jackson" after this whatever
17 you want to call it.
18        That's what he says, right?
19        MR. NIEWOEHNER:  Yes, he says that.
20        MR. ETTINGER:  So you know the facts when you
21 start analyzing what's going to happen next.  We're
22 not going to say it's a hoax.
23        THE COURT:  Well, no, if you're relying on
24 that, you're clearly not going to say it's a hoax.
25        MR. ETTINGER:  Right.

1          THE COURT:  You're going to actually probably

2    implicitly say the fact that this guy said this to

3    me.

4          MR. ETTINGER:  I am.

5          THE COURT:  Okay.  So I don't see why you

6    need this.

7          MR. NIEWOEHNER:  Well, Your Honor, just two

8    things:  I think Rod Blagojevich has already

9    challenged the credibility of this entire incident

10   through the cross, for example, of John Harris.

11   They crossed John Harris on the notion that if

12   Robert Blagojevich had ever understood that

13   Congressman Jackson was willing to or supporters

14   were willing to pay, he didn't tell it to Harris or

15   at least he didn't for quite some period of time.

16   So there is the challenge that has already been

17   made.

18          MS. HAMILTON:  And that he didn't raise it in

19   the meeting he had with Jesse Jackson, Jr., the

20   clear implication being that it was made up.  So

21   then Rod Blagojevich has already challenged that

22   this was ever made, and certainly the fact that it

23   was made by Raghu Nayak as opposed to Jesse Jackson,

24   Jr., would be relevant.

25          MR. GOLDSTEIN:  Your Honor, as to the

1  December 6th conversation, I assume, they mean the

2  fundraiser --

3          MR. NIEWOEHNER:  We're talking about the

4  December 8th meeting between Congressman Jackson.

5          THE COURT:  Okay, the answer is my ruling

6  stands subject to somebody opening a door.

7          MR. SCHAR:  I assume, then, after this

8  witness is done, if the door is not open, we're not

9  going to hear argument down the road about you can't

10 really --

11         THE COURT:  The argument opens the door as

12 well as direct examination.

13         And the truth is is that the nature of this

14 conversation and the nature of what I've heard on

15 the tapes is is that it's not actually necessary

16 that we know whether any of this stuff is true or

17 not.  You could infer from some of these tapes that

18 possibly one of the defendants believed or Defendant

19 Rod Blagojevich may very well have believed he could

20 have gotten the money and still decided well, I'll

21 take the money and I won't appoint Jackson.

22         And you could very well believe that they

23 thought at the time--I'm not expressing a personal

24 opinion on whether I believe one way or

25 another--that maybe the offer was made with the

Bedi - direct by Niewoehner                    4324

1  intent we'll promise it he'll appoint and then we're
2  just not going to be able to raise the money because
3  you could always give some kind of an excuse.

4          It's, I think, more directed to mental state
5  than it is to what people actually did and whether
6  the money was there or whether the appointment was
7  there, and for that reason, what they say to each
8  other satisfies the point.

9          It's just that the hole you want to fill is
10 how does some offer get to them and you don't have
11 to go through with it if it's promptly followed by a
12 more detailed discussion among the actual
13 defendants.  It saves a little time, a little effort
14 and keeps us from going off track, so that's my
15 ruling.

16         MR. NIEWOEHNER:  Your Honor, this witness
17 tends to explain things, might I use more leading
18 questions on that specific --

19         THE COURT:  I believe that the defense will
20 not be objecting --

21         MR. ETTINGER:  Correct.

22         THE COURT:  -- to leading questions in that
23 area.

24         MR. NIEWOEHNER:  And just so I'm clear, I'm
25 allowed to elicit that there was conversation about

Bedi - direct by Niewoehner                4325

1    Jackson's interest in the Senate Seat and that there
2    ius some conversation about fundraising, those are
3    the two things?
4         THE COURT:  Those are the two things; no
5    details.
6         THE MARSHAL:  All rise.
7      (Recess.)
8         THE CLERK:  All rise.
9      (The following proceedings were had in the
10      presence of the jury in open court:)
11        THE COURT:  Please be seated.
12        You may resume.
13        MR. NIEWOEHNER:  Thank you, Your Honor.
14   BY MR. NIEWOEHNER:
15   Q   Mr. Bedi, before we broke you were describing a
16   meeting you had at the 312 Restaurant with
17   Congressman Jackson and Mr. Nayak, do you recall
18   that?
19   A   Yes, I do.
20   Q   And, Mr. Bedi, after Mr. Nayak joins the
21   conversation, was there a conversation about
22   Congressman Jackson's interest in being appointed to
23   the Senate Seat?
24   A   Yes, there was.
25   Q   And was there also conversation at that time

:11PM

:30PM

:30PM

:30PM

:30PM

Bedi - direct by Niewoehner                4326

1  about fundraising?

2  A  Yes, there were.

3  Q  Now, after -- at some point did you then leave

4  the meeting at 312?

5  A  Yes, we finished the meeting.

6  Q  Later that day did you meet with Robert

7  Blagojevich?

8  A  Yes, I did.

9  Q  Had you planned that meeting prior to

10  October 28th?

11  A  Yes, I did.

12  Q  And what was the purpose of your meeting with

13  Robert Blagojevich?

14  A  To discuss the event that was going to proceed

15  the fundraiser, the event that we were going to do

16  without raising money on the 31st of October.

17  Q  So the event was about three days later?

18  A  Yes.

19  Q  And about what time did you meet Robert

20  Blagojevich?

21  A  Sometime in the afternoon, maybe 2:30'ish,

22  something like that.

23  Q  And where did you meet with Robert Blagojevich?

24  A  In the Starbucks on Montrose close to Ravenswood,

25  somewhere in that area.

Bedi - direct by Niewoehner                    4327

1   Q   And when you met with Robert Blagojevich, did you

2   in fact talk about the October 31st event?

3   A   Yes, we did.

4   Q   About how many people did you expect were going

5   to attend the event?

6   A   Oh, 25, 30.

7   Q   And was Nayak one of the people who had been

8   invited to the event?

9   A   Yes; of course.

10  Q   Did you expect Nayak to attend the event?

11  A   Yes.

12  Q   Did you talk about Nayak with Robert Blagojevich

13  when you met to Starbucks?

14  A   Did we talk about it?  Yes.

15  Q   And are you also familiar with somebody named

16  Niranjan Shah?

17  A   Yes, I am.

18  Q   Who is Niranjan Shah?

19  A   He's one of the Indian community leaders and a

20  donor of political campaigns.

21  Q   And was Niranjan Shah somebody who had been

22  invited to the October 31st event?

23  A   I had strongly advised the Friends of Blagojevich

24  and Robert Blagojevich to invite him, yes, and he

25  was invited.

Bedi - direct by Niewoehner                    4328

1  Q   In fact, did you expect Shah to attend the event?
2  A   Yes, he was supposed to be there.
3  Q   And did you discuss Niranjan Shah with Robert
4  Blagojevich?
5  A   Yes, I did.
6  Q   Now, did you expect Defendant Blagojevich to
7  attend the October 31st event?
8  A   Yes, I did.
9  Q   And did you discuss with Robert Blagojevich what
10 Defendant Blagojevich would do at the event?
11 A   Yes, I did.  I gave my advice.
12 Q   And what was your advice you gave to Robert
13 Blagojevich?
14 A   A couple of things:  One was that the Governor
15 Blagojevich has many times mentioned that he would
16 go to India on a trade mission, and my advise was
17 that since he had never gone there and he may not
18 want to go there, so he shouldn't say that if he is
19 not going to go there because that will turn some
20 people off.
21 Q   Did you talk with Robert Blagojevich about
22 Congressman Jackson in that meeting?
23 A   Yes.
24 Q   And in what context did Congressman Jackson come
25 up?

Bedi - direct by Niewoehner                          4329

1  A   That the congressman is very interested and that
2  Raghu Nayak is very close to the congressman and
3  therefore Raghu Nayak is very interested in getting
4  the congressman appointed to the Seat of Senate
5  which if the President Obama will win presidency and
6  the seat would be vacated.
7  Q   How is it you were talking about Nayak at that
8  point in the conversation?
9  A   Well, first thing I mentioned was that he -- the
10 two leaders don't get along very well, which is
11 Niranjan Shah and Raghu Nayak, so my advise was to
12 keep comments about each of them very carefully so
13 that we don't offend anybody.
14       And second thing was that as far as Raghu
15 Nayak is concerned, again, since I was given a good
16 talk by Robert Blagojevich about how desperate the
17 money is needed, I mentioned that Raghu Nayak can
18 raise a lot of money and he's also very interested
19 in getting congressman appointed to the Senate Seat.
20 Q   And the congressman you were talking about was
21 Congressman Jesse Jackson?
22 A   Congressman Jesse Jackson, Jr.
23 Q   What did Robert Blagojevich say when you talked
24 about the possibility of Congressman Jackson being
25 appointed to the Senate Seat?

1  A   He said, "my brother will never appoint him to
2  the Senate Seat if the President Obama wins the
3  presidency."
4  Q   Did Robert Blagojevich provide any explanation as
5  to why he said that?
6  A   He said that, "Congressman Jesse Jackson, Jr.,
7  never endorsed him in his first election and has
8  never supported him, I don't see that happening."
9  Q   Did Robert Blagojevich say anything further about
10 fundraising?
11 A   And he said that Raghu Nayak can talk to the
12 governor himself about the rest.
13 Q   About how long did you actually meet with Robert
14 Blagojevich on that day?
15 A   Probably fifteen, twenty minutes.
16 Q   And after that point did you leave?
17 A   I left.
18        MR. NIEWOEHNER:  Your Honor, at this time the
19 government would ask permission to publish the
20 recording at Tab 3 of Binder 1.
21        May I approach the witness, Your Honor?
22        THE COURT:  You may.
23 BY THE WITNESS:
24 A   Thank you.
25 BY MR. NIEWOEHNER:

1  Q   Mr. Bedi, tab 3, have you found that?
2  A   (No response.)
3  Q   Mr. Bedi, have you found tab 3?
4  A   I have tab 3 in front of me of the book Binder 1.
5      (Tape played).
6
7  BY MR. NIEWOEHNER:
8  Q   Mr. Bedi, turning your attention to the first
9  page of the transcript.
10        This recording -- at the top of the
11 transcript reflects that this recording was on
12 October 28th, 2008, at approximately 4:01 p.m. in
13 the afternoon, is that correct?
14 A   That is correct.
15 Q   Was that after your meeting earlier that day that
16 you had?
17 A   That's correct.
18 Q   Now, Mr. Bedi, I direct your attention to October
19 31st.
20        Was the event that you had been planning with
21 Robert Blagojevich actually held that day?
22 A   Yes, it did happen.
23 Q   And where was it held?
24 A   At India Hall and Banquets in Schaumburg.
25        MR. NIEWOEHNER:  Your Honor, at this time if

Bedi - direct by Niewoehner                    4332

1  we could publish the call at tab 4?

2        THE COURT:  Go ahead.

3      (Tape played)

4  BY MR. NIEWOEHNER:

5  Q  Mr. Bedi, if you could just turn to the first

6  page of the transcript.

7        This call takes place at about 9:44 a.m. on

8  October 31st?

9  A  That's correct.

10  Q  And at that point, at line 5, Robert Blagojevich

11  says:

12      "You want Rod there about 12:30 or so?"  You

13      respond:

14      "Yeah, 12:35 is fine."

15        About when was the event supposed to start?

16  A  I think around 12:30, but people are mostly,

17  especially in the Indian community, late.  So I was

18  kind of planning with that in mind.

19  Q  And did you, in fact, arrive -- you arrived at

20  the India House?

21  A  I arrived a little bit earlier.

22  Q  And what did you do before the event actually

23  began?

24  A  Just make sure that the room was ready, and, you

25  know, everything was okay.  You know, just like be

1  early to the event to make sure things are going
2  well.
3      MR. NIEWOEHNER:  Your Honor, at this time
4  could I publish the call at tab 5?
5      THE COURT:  Yeah.
6    (Tape played).
7  BY MR. NIEWOEHNER:
8  Q  Mr. Bedi, this calls takes place at about 12:58
9  p.m. on October 31st, is that correct?
10 A  That is correct.
11 Q  And Robert Blagojevich at line 5 indicated that:
12     "We're five minutes away."
13         Who did you understand Robert Blagojevich was
14 referring to?
15 A  The Governor, Rod Blagojevich.
16 Q  And, in fact, did Defendant Blagojevich and
17 Robert Blagojevich show up shortly after 12:00?
18 A  Yes, they did.
19 Q  Did you brief them when they arrived?
20 A  Yes, I did.
21 Q  Who was with you when Defendant Rod Blagojevich
22 and Robert Blagojevich arrived?
23 A  I believe Raghu Nayak was with me, Harish was
24 with me, maybe one or two other people.
25 Q  And where did you greet Defendant Blagojevich?

1  A   They made back door entry on the side of the

2  banquet hall where most of the dignitary arrive.

3  Q   And what happened after -- or where did you go

4  after Defendant Blagojevich and Robert Blagojevich

5  arrived?

6  A   We walked through the room from the back door to

7  the hallway and then from the hallway all the way to

8  the room where the event was being held.

9  Q   And were people already in the room where the

10 event was going to be held?

11 A   Yes.  On the way we met Babu and Niranjan Shah.

12 And then Niranjan Shah had a brief conversation with

13 the Governor, and I think he mentioned that he

14 wasn't feeling well so he needed to go early.  So

15 there was a brief conversation and then we all

16 walked to the room and then all the people were

17 waiting in the room where we entered with the

18 Governor first.

19 Q   And when the Defendant Blagojevich entered the

20 room, what were you doing?

21 A   I was standing on the side of the Governor,

22 helping him getting introduced to these people and

23 have conversations that he was going to have with

24 them.

25 Q   And as you entered the room with Defendant

1  Blagojevich, did you see Nayak?

2  A   Nayak was in the room, yes.

3  Q   And where -- what was Nayak doing as you entered

4  the room?

5  A   We entered the room, you know, the mingling

6  started, and the Governor was focused on meeting

7  these folks who were waiting and greeting and

8  shaking hand and conversations began, and I saw

9  Raghu Nayak and Robert talking on the side.

10  Q   And could you hear what they were saying?

11  A   No.  No.

12  Q   And after the event -- so when the event took

13  place, about how long was Defendant Blagojevich

14  actually at the event?

15  A   Oh, about 35 minutes to an hour, fifty minutes,

16  somewhere there.

17  Q   And did you see Nayak speaking with Defendant

18  Blagojevich at any point during the event?

19  A   Yeah, they sat together on the -- on the table

20  and had some conversation there, yes.

21  Q   Did you yourself talk with Defendant Blagojevich

22  at any point about Congressman Jackson and the

23  Senate Seat?

24  A   I had no conversation to him about this.

25  Q   Did you talk with Robert Blagojevich at any point

Bedi - direct by Niewoehner                    4336

1  during the event about either Congressman Jackson or
2  the Senate Seat?
3  A   No, absolutely not.
4  Q   And when you saw Nayak and Defendant Blagojevich
5  sitting together and talking, could you hear what
6  they were talking about?
7  A   No, I did not.
8       MR. NIEWOEHNER:  Your Honor, at this time
9  could I publish the call at tab 6?
10      THE COURT:  Yes.
11    (Tape played).
12  BY MR. NIEWOEHNER:
13  Q   Mr. Bedi, if you could turn to the top of the
14  page, that call takes place on October 31st at about
15  5:14 p.m., is that right?
16  A   That's what I see here, yes.
17  Q   Is that after Defendant Blagojevich left the
18  fundraiser?
19  A   Yes.
20      MR. NIEWOEHNER:  Your Honor, at this time if
21  I might approach, I'm going to publish a call in
22  Binder 2, tab 57.
23      THE COURT:  Okay.
24      MR. NIEWOEHNER:  Thank you.
25  BY MR. NIEWOEHNER:

:47PM
:48PM
:49PM
:49PM
:50PM

Bedi - direct by Niewoehner                    4337

1 Q   Mr. Bedi, are you at that tab 57?

2 A   Yes, I do.

3       (Tape played).

4 BY MR. NIEWOEHNER:

:57PM    5 Q   Mr. Bedi, if you could just turn to the first

6 page of that transcript, tab 57.

7 A   Yes, I have the Binder 2, tab 57, date 11/12,

8 2008, time 8:26 p.m.

9 Q   Okay.

:58PM   10       MR. NIEWOEHNER:  Your Honor, at this time

11 could we publish call at tab 65?

12       THE COURT:  Yes.

13     (Tape played).

14       MR. NIEWOEHNER:  Your Honor, could we publish

:01PM   15 the call at Tab 67?

16       THE COURT:  Yes.

17       MR. NIEWOEHNER:  I'm sorry, Your Honor, 66,

18 actually.

19       THE COURT:  Go ahead.

:02PM   20     (Tape played).

21 BY MR. SCHAR:

22 Q   Mr. Bedi, this call was November 14th, at about

23 3:35 p.m., is that right?

24 A   Yes, on 11/14/2008 at 3:35 p.m.

:02PM   25       MR. NIEWOEHNER:  Your Honor, now may I

1  publish call 67?

2       THE COURT:  Yes.

3    (Tape played)

4  BY MR. NIEWOEHNER:

:07PM    5  Q   Mr. Bedi, if you could go to the first page of

6  that transcript, that conversation took place on

7  November 14th, 2008, at about 6:25 p.m., is that

8  right?

9  A   That is right.

:07PM    10  Q   And that's a couple of hours prior to the call we

11  listened to?

12  A   Yes.

13  Q   Now, after the October 31st India House event,

14  did you continue to talk to Robert Blagojevich?

:07PM    15  A   Yes.

16  Q   And, in fact, you mentioned before there is a

17  fundraising event that you have been talking about

18  on December 6th, is that correct?

19  A   That's correct.

:07PM    20  Q   After October 31st did you travel abroad for some

21  period of time?

22  A   Yes, I did.

23  Q   And after you came back, did you do any work on

24  that December 6th fundraiser?

:07PM    25  A   I was busy for a week, so I didn't do any

1 activity for five, six days, but then I noticed

2 things were slow so then I got involved.

3 Q   And about when in relation to December 6th event

4 did you get involved?

5 A   About week before that.

6 Q   And, in fact, did the event actually take place

7 on December 6th?

8 A   Yes, it did.

9 Q   And in the week leading up to the December 6th

10 event, did you talk to Robert Blagojevich?

11 A   Yes, I did.

12 Q   What types of things were you talking about with

13 him?

14 A   Again, the invitations have gone out, RSVP's have

15 come, we needed to print some tickets for the event;

16 things like that.

17        MR. NIEWOEHNER:  Your Honor, at this time if

18 I could publish the call at tab 89?

19        THE COURT:  You may.

20     (Tape played).

21 BY MR. NIEWOEHNER:

22 Q   Mr. Bedi, turning to the first page of that call,

23 that call took place on December 4th at 11:17 a.m.,

24 is that right?

25 A   That's right.

Bedi - direct by Niewoehner                    4340

1      MR. NIEWOEHNER:  Your Honor, at this time I'd
2  ask for permission to publish the call at tab 93?
3      THE COURT:  Yes.
4    (Tape played).
5  BY MR. NIEWOEHNER:
6  Q   Mr. Bedi, if you turn to the first page of that
7  transcript, that call takes place at approximately
8  2:43 p.m. on December 4th, do you see that?
9  A   Yes, I do.
10      MR. NIEWOEHNER:  Your Honor, at this time may
11  I publish the call at tab 94?
12      THE COURT:  Yes.
13    (Tape played).
14  BY MR. NIEWOEHNER:
15  Q   Mr. Bedi, if you go to the first page of the
16  transcript, that call is 2:57 p.m. on December 4th,
17  is that right?
18  A   That's correct.
19  Q   That's about fourteen minutes after the prior
20  call we just listened to?
21  A   Yes.
22      MR. NIEWOEHNER:  Your Honor, at this time
23  could I publish the call at tab 95?
24      THE COURT:  Yes.
25    (Tape played).

:18PM
:18PM
:20PM
:20PM
:21PM

Bedi - direct by Niewoehner                 4341

BY MR. NIEWOEHNER:

Q   And, Mr. Bedi, that call, page one of the transcript, was on December 4th at about 10:29 p.m., is that right?

A   That's correct.

        MR. NIEWOEHNER:  Your Honor, may I approach?

BY MR. NIEWOEHNER:

Q   I'm going to show you what's been marked as Government Exhibit Tribune Article.

        Do you recognize what that is?

A   Yes, I do.

Q   What is it?

A   This is an article that came on the 5th of December, Friday 5th of December, 2008, I think it's 8, in the Chicago Tribune that says --

        MR. GOLDSTEIN:  Objection, Your Honor. Objection to publishing this article.

        THE COURT:  Do you intend to publish the entire article?

        MR. NIEWOEHNER:  Just the first page of the article.

        THE COURT:  Leave is granted.

        MR. NIEWOEHNER:  Okay.

        Your Honor, I would ask to move this into evidence pursuant Rule 9026 as self-authenticating.

1        MR. GOLDSTEIN:  We object, Your Honor.

2        THE COURT:  That objection is overruled.

3        MR. NIEWOEHNER:  Your Honor, I'd ask to

4   publish that page, just the first page.  The exhibit

5   is a one-page exhibit, so just the portion that's

6   there.

7        THE COURT:  Yes.

8      (Exhibit published to the jury)

9   BY MR. NIEWOEHNER:

10  Q   And, Mr. Bedi, this is the article that appeared

11  in the morning of December 5th, 2008, is that

12  correct?

13  A   Yes.

14  Q   Was this, in fact, the headline of the paper that

15  day?

16  A   Yes, it was.

17  Q   Could you read the headline and then where it

18  says Tribune Exclusive.

19  A   (Reading:)

20      "Feds tape Blagojevich.  Tribune exclusive:

21       Advisers cooperated with corruption probe

22       sources say."

23  Q   And to the left there is two photographs, do you

24  see those?

25  A   Yes, I do.

Bedi - direct by Niewoehner                    4343

1  Q   Who are those individuals in the photographs?

2  A   On the left is John Wyma and on the right is

3  former Governor Rod Blagojevich.

4  Q   And if you can read the very first paragraph of

5  the article.

6  A   That would be hard but let me try --

7          MR. GOLDSTEIN:  Objection, Your Honor.

8          THE COURT:  The objection is sustained.

9          MR. NIEWOEHNER:  Your Honor, at this time

10 could we then publish the call at tab 96?

11         THE COURT:  Yes, you may.

12     (Tape played).

13 BY MR. NIEWOEHNER:

14 Q   Mr. Bedi, again focusing on the first page of the

15 transcript, that call is on December 5th at

16 approximately 7:25 a.m., is that correct?

17 A   That's right.

18         MR. NIEWOEHNER:  Your Honor, if I could now

19 publish the call at tab 97?

20         THE COURT:  You may.

21     (Tape played).

22 BY MR. NIEWOEHNER:

23 Q   And, again, turning to the first page of the

24 transcript, that call is at 9:30 a.m. on

25 December 5th, is that right?

:25PM

:26PM

:28PM

:28PM

:29PM

Bedi - direct by Niewoehner                    4344

1   A   That's right.

2           MR. NIEWOEHNER:  Your Honor, if I could

3   publish the call at tab 98?

4           THE COURT:  You may.

5        (Tape played.)

6   BY MR. NIEWOEHNER:

7   Q   Mr. Bedi, again just turning to the top of the

8   transcript, that call is about 9:36 a.m. on

9   December 5th, is that right?

10  A   That's correct.

11  Q   About six minutes after the prior call we

12  listened to?

13  A   Yes.

14  Q   Mr. Bedi, was there actually an event, a

15  fundraising event on December 6th?

16  A   Yes, there was.

17  Q   Did you attend the event?

18  A   Yes, I did.

19  Q   Did Defendant Blagojevich attend the event?

20  A   Yes.

21  Q   Did Robert Blagojevich attend the event?

22  A   Yes.

23  Q   Did you speak with either Defendant Blagojevich

24  or Robert Blagojevich about either the Senate Seat

25  or Congressman Jackson?

Bedi - cross by Ettinger                                4345

1   A   No, I did not.
2          MR. NIEWOEHNER:  Nothing further, Your Honor.
3          THE COURT:  How long do you think you'll be?
4          MR. ETTINGER:  15, 20 minutes.
:30PM   5          THE COURT:  That's fine.
6                    CROSS EXAMINATION
7   BY MR. ETTINGER:
8   Q   Good afternoon, Mr. Bedi.
9          My name is Michael Ettinger.  I represent
:31PM  10   Robert Blagojevich.
11   A   Okay.
12   Q   Now, I think you told us that you met Robert
13   Blagojevich through a Mr. Daley?
14   A   Yes.
:31PM  15   Q   Is that right?
16   A   That's correct.
17   Q   And I think you told us that you had a
18   conversation with Mr. Daley who wanted you to meet
19   with Robert Blagojevich regarding fundraising for
:31PM  20   his brother Rod, is that right?
21   A   That's correct.
22   Q   Is that right?
23   A   Yes.
24   Q   Okay.  So you met with Robert Blagojevich
:31PM  25   sometime in August, late August, is that fair to

1  say?

2  A  Yes.

3  Q  Okay.  And you had a discussion about -- did you

4  meet with him in person?

:31PM    5  A  Yes.

6  Q  In fact, was Mr. Daley there?

7  A  Yes.

8  Q  Remember how you guys met?

9  A  Yes, Daily Grill on Wilson and Lincoln.

:32PM    10  Q  And what kind of place was it?

11  A  Daily Grill.

12  Q  Oh, okay.  A restaurant.

13  A  Yes.

14  Q  Okay.  So you didn't talk on the phone during

:32PM    15  this meeting?

16  A  No.  No.

17  Q  Okay.

18  A  In person.

19  Q  That's how you do things regarding these

:32PM    20  fundraising, you meet in person, right?

21  A  Well, I mean, it depends.  Sometimes you talk

22  over the phone, sometimes you talk with the person;

23  it depends on what's happening.

24  Q  Okay.  But this time you met at the Daily Grill,

:32PM    25  is that correct?

Bedi - cross by Ettinger                    4347

1    A    Yes.
2    Q    And you had a conversation with Robert about --
3    was it about having a fundraising event in September
4    of 2008?
5    A    The discussion was mostly centered on the need
6    for the campaign to raise funds and that you have
7    helped the Governor in the past and we would like
8    you to help us again.
9    Q    Okay.  And you agreed?
10   A    And I said I will try, yes.
11   Q    You will try.
12   A    Yes.
13   Q    Is that right?
14   A    Yes.
15   Q    And there was a discussion about inviting former
16   donors, is that right?
17   A    Yes.
18   Q    People in the Indian community who had
19   contributed before you were going to invite?
20   A    Well, in the discussion at Daily Grill was mostly
21   an integral, a persuasive Robert Blagojevich and the
22   presence of Brian Daley, and a discussion that we
23   would like your help, and discussions continued in
24   that regard but not the specific events were
25   discussed.

Bedi - cross by Ettinger                    4348

1    Q   And did you give your opinion at this meeting
2    that it was hard to raise money at this time for
3    Governor Blagojevich?
4    A   Yes, I did.
5    Q   What did you say?
6    A   I told him that because of the publicity in the
7    newspapers and his ignoring some of the events of
8    the Indian community, it's very difficult to go back
9    and plead the Indian community to give you more
10   money.
11   Q   What about the event?  I didn't understand you.
12   A   There were some events I brought up where the
13   Governor could not come.
14   Q   He didn't show up to certain events, is that what
15   you are saying?
16   A   Indian community events where the Governor could
17   not come and therefore the community was not very
18   happy.
19   Q   Okay.  So they weren't real enthusiastic about
20   writing checks for him, is that true?
21   A   The former donors were not, yes.
22   Q   Okay.  So you came up with an idea to have the
23   leaders from the different factions in the Indian
24   community meet for lunch and have Governor
25   Blagojevich show up, is that right?

:33PM

:34PM

:34PM

:34PM

:35PM

1  A   Later in the discussion at the Starbucks, there

2  was a suggestion by me to Robert Blagojevich the way

3  to go about it is to have the Governor personally

4  address the donors, former donors to donates some

5  money to the campaign.

6  Q   All right.  I got that mixed.

7       So you had a meeting September of 2008 with

8  Robert, is that correct?

9  A   Yes, that's correct.

10 Q   And that's where this discussion came up, is that

11 right?

12 A   You're right.

13 Q   And that's where you came up with this idea, is

14 that correct?

15 A   That's correct.

16 Q   Now, this steering community event, is that what

17 this is called?

18 A   Well, this was called an event where the

19 community leaders or former donors would be invited

20 and the Governor himself will make a plea based on

21 his accomplishments to ask them to help him.

22 Q   And this meeting was going to be October 31st,

23 correct?

24 A   That's correct.

25 Q   The luncheon?

Bedi - cross by Ettinger                    4350

1  A   That's correct.

2  Q   And at this point did you plan a fundraiser in

3  September or was this later?

4  A   The plan to -- like I said earlier, the plan was

5  to do this event but we also explored the actual

6  fundraiser date which was going to be either

7  December 6th or 7th; it was not final yet.

8  Q   Okay.  So you then have a meeting with Robert

9  Blagojevich on October 28th?

10 A   That is correct.

11 Q   Okay.  And where was that at?

12 A   That's at the Starbucks on Montrose near

13 Ravenswood.

14 Q   And who was present at this meeting?

15 A   Robert Blagojevich and Rajinder Bedi.

16 Q   Okay.  The two of you?

17 A   Yes.

18 Q   This is the afternoon or in the morning?

19 A   This is afternoon, about 2:30'ish.

20 Q   Okay.  So this meeting happened after you had the

21 3:12 breakfast meeting with Jesse Jackson?

22 A   That is correct.

23 Q   And the Jesse Jackson meeting was on

24 October 28th, correct?

25 A   Same day; yes.

1  Q   Okay.  But your meeting with Robert had been
2  planned prior to the 28th, is that correct?
3  A   That is correct.
4  Q   Okay.  And the meeting with Robert, this meeting
:37PM
5  at Starbucks on the 28th, was for the purpose of
6  getting ready for the --
7  A   Event.
8  Q   -- luncheon on the 31st of October, is that
9  correct?
:38PM
10  A   You're correct.
11  Q   Okay.  So you went to this meeting with Robert.
12  So the meeting on the 28th with Robert when it was
13  originally set up, the purpose was not to talk about
14  Jesse Jackson?
:38PM
15  A   No, it wasn't.
16  Q   Is that right?
17  A   That's correct.
18  Q   Okay.  So now you have the meeting and you bring
19  up Jesse Jackson and Nayak and the Senate Seat, is
:38PM
20  that correct?
21  A   That is correct.
22  Q   Okay.  Robert didn't bring this up?
23  A   No.  No.
24  Q   Okay.  Now, I think you told us -- let me get
:38PM
25  exactly what you said.

1           You told us before that you told Robert at
2  this meeting, on the 28th of October, that Nayak can
3  raise money, correct?
4  A   Yes.
5  Q   And Jesse, Jr., is interested in the Senate Seat,
6  is that correct?
7  A   That Nayak is also very close to Jesse Jackson,
8  Jr. Family, and he's also have a great deal of
9  interest in getting appointed to the Senate Seat.
10 Q   Okay.
11 A   So there are two things.
12 Q   I gotcha.
13          And after you told Robert that, he laughed,
14 didn't he?
15 A   He spontaneously responded what his brother would
16 do.
17 Q   Okay.  And he told you, did he not, that his
18 brother would never appoint Jesse Jackson for the
19 Senate Seat because Jesse Jackson did not endorse
20 his brother, Rod Blagojevich, in his first run for
21 Governor, that's what he told you, right?
22 A   That is correct.
23 Q   Okay.  So he said it'll never happen, isn't that
24 right?
25 A   He said that his brother will not.

Bedi - cross by Ettinger                          4353

1  Q   Right.  And so when you told him about this with
2  the Senate Seat and raising money, he killed it.  He
3  said it would never happen, correct?
4          MR. NIEWOEHNER:  Objection, Your Honor.
5          THE COURT:  The objection to the form of the
6  question is sustained.
7  BY MR. ETTINGER:
8  Q   He told you his brother would never appoint him,
9  correct?
10         MR. NIEWOEHNER:  Objection.
11         MR. ETTINGER:  Asked and answered.  I
12  withdraw it.
13  BY MR. ETTINGER:
14  Q   You then left, sir, is that right?
15  A   Pardon me?
16  Q   You then left, is that correct?
17  A   After the meeting I left, yes.
18  Q   And you then had the steering committee meeting
19  on the 31st?
20  A   The meeting of community leaders for Governor
21  Blagojevich to persuade them happen on the 31st.
22  Q   Okay.  And you saw Robert there on the 31st?
23  A   Robert was there.
24  Q   Okay.  Didn't talk about the Senate Seat and
25  Jesse Jackson, did you, with him?

:40PM
:40PM
:40PM
:40PM
:40PM

Bedi - cross by Ettinger                              4354

1  A   I did not.

2  Q   Okay.  You then went and had the fundraiser, you

3  attended the fundraiser on December 6th?

4  A   Yes, I did.

5  Q   2008, is that right?

6  A   That's correct.

7  Q   Okay.  And you saw Robert there, is that right?

8  A   That's correct.

9  Q   Okay.  You didn't say a word to Robert nor did he

10 to you about the Jesse Jackson, Jr., and any senate

11 seat?

12 A   Absolutely not.

13 Q   And not fundraising either, did he?

14 A   No discussions.

15      MR. ETTINGER:  One second, Judge.

16   (Brief pause).

17      MR. ETTINGER:  That's all, Judge.

18      THE COURT:  We'll break now.

19      9:30 tomorrow morning.

20      THE MARSHAL:  All rise.

21   (The following proceedings were had out of the

22    presence of the jury in open court:)

23      THE COURT:  Anything we need to do now?

24      MR. SCHAR:  Just the release of exhibits.

25      THE COURT:  Yes, subject to the standing

Bedi - cross by Ettinger                    4355

1  objection.

2        MR. SCHAR:  Nothing else for the government.

3        THE COURT:  See you in the morning.

4      (Adjournment taken from 4:42 o'clock p.m. to

5       9:30 o'clock a.m. on July 8, 2010.)

6

7

8

9

10

11

12

13

14        *     *     *     *     *     *     *     *

15

16

17 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

18 FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

19                       MATTER

20

21

22    /s/Blanca I. Lara                     date

23

24

25

1

2    _____          _____

3              Blanca I. Lara                          Date

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25