4357

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )  No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )  Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )  July 8, 2010
   ROBERT BLAGOJEVICH,            )
7                                 )
              Defendants.         )  9:45 o'clock a.m.
8

9                    VOLUME 21
              TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
11

12  For the Government:

13            THE HONORABLE PATRICK J. FITZGERALD,
              UNITED STATES ATTORNEY
14            BY:  Reid J. Schar
                   Carrie E. Hamilton
15                 Christopher Niewoehner
              Assistant United States Attorneys
16            219 South Dearborn Street
              Suite 500
17            Chicago, Illinois 60604

18

19

20  Court Reporter:

21            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
22                  Room 2504
              Chicago, Illinois 60604
23               (312) 435-5895

24

25

4358

1   APPEARANCES  (continued:)

2

    For Defendant Rod Blagojevich:
3

            KAPLAN & SOROSKY
4           BY:  Sheldon M. Sorosky
            158 West Erie
5           Chicago, Illinois 60610
            (312) 640-1776
6
            LAW OFFICE OF SAMUEL E. ADAM
7           BY:  Samuel Forbes Adam
                 Samuel Adams, Jr.
8           6133 South Ellis Avenue
            Suite 200
9           Chicago, Illinois 60637
            312-726-2326
10

11          OFFICES OF AARON B. GOLDSTEIN
            BY: Aaron Benjamin Goldstein
12          6133 South Ellis
            Chicago, Illinois 60637
13          (773) 752-6950

14          OFFICES OF LAUREN FAUST KAESEBERG
            BY:  Lauren Faust Kaeseberg
15          2140 N. Lincoln Park West
            Suite 307
16          Chicago, Illinois 60614
            (773) 517-0622
17
            LAW OFFICES of MICHAEL GILLESPIE
18          BY:  MICHAEL GILLESPIE
            53 West Jackson Boulevard
19          Suite 1420
            Chicago, Illinois 60604
20          (312) 726-9015

21

22

23

24

25

4359

1 APPEARANCES  (continued:)

2

3 For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    WITNESS                                              PAGE

3     RAJINDER BEDI

4     Cross Examination By Mr. Goldstein............... 4361

5     ROBERT GREENLEE

6     Direct Examination By Mr. Schar.................. 4368

7     ROBERT GREENLEE

8     Direct Examination (Resumed) By Mr. Schar........ 4460

9

10

11   EXHIBITS

12     Government's Exhibit Candidate Qualifications ... 4380

13     Government's Exhibit Ambassadorships Research ... 4392

14     Government's Exhibit Tribune Group.............. 4427

15     Government's Exhibit Foundation Research ........ 4444

16     Government's Exhibit Greenlee E-Mail 1........... 4470

17     Government's Exhibit Lobby...................... 4487

18

19

20

21

22

23

24

25

Bedi - cross by Goldstein                    4361

1      THE MARSHAL:  All rise.
2     (The following proceedings were had in the
3      presence of the jury in open court:)
4      THE COURT:  Please be seated.
5      MR. GOLDSTEIN:  May I proceed, Your Honor?
6      THE COURT:  Give me one second.
7     (Brief pause).
8      THE COURT:  Yes, you may.
9   RAJINDER BEDI, GOVERNMENT WITNESS, PREVIOUSLY SWORN
10                  CROSS EXAMINATION
11  BY MR. GOLDSTEIN:
12  Q  Mr. Bedi, I just have a few questions.
13      You spoke of an individual named Raghu Nayak,
14  correct?
15  A  Yes.  Yes, I did.
16  Q  How long have you known Mr. Nayak?
17  A  About 30 years.
18  Q  About 30 years.
19      Is it fair to say the two of you are friends?
20  A  Yes, very good friends.
21  Q  Are you still friends today?
22  A  Yes.
23  Q  Okay.  And you are still in contact with him, is
24  that fair to say?
25  A  I haven't talked to him for a while.

1  Q   Okay.  How long?

2  A   I'd say a couple of months.

3  Q   A couple of months.

4      Now, you talked about an event on May 10th of

5  2008, do you recall that?

6  A   Yes, I do.

7  Q   What kind of event was that?

8  A   As I said, earlier the consul general of India

9  expressed some interest that when the commerce

10 minister, the union commerce minister, which is

11 equivalent to a federal secretary of United States

12 come to Chicago, he would like to do some

13 interaction with the elected officials of the State

14 of Illinois.

15 Q   So Mr. Nayak attended, is that correct?

16 A   That's correct.

17 Q   And yourself attended?

18 A   Yes, I did.

19 Q   And you said that the Governor was there?

20 A   Yes.

21 Q   And was Emil Jones there, as well?

22 A   Emil Jones was there.

23 Q   And Pat Quinn?

24 A   Pat Quinn was there.

25 Q   And Jan Schakowsky?

Bedi - cross by Goldstein                    4363

1  A   Yes, Schakowsky was there.

2  Q   There were other elected officials, as well?

3  A   Yes.

4  Q   You talked about on December 6th, 2008, there was

5  a fundraiser, is that correct?

6  A   That is correct.

7  Q   And it was called a Diwali celebration?

8  A   That is correct.

9  Q   Tell the ladies and gentlemen of the jury what it

10 is Diwali?

11 A   Diwali is an Indian festival of lights.  Once a

12 year almost all cultures of the Indian republic lit

13 candles around their Houses, do fireworks, and each

14 of the culture has a significance why they do that.

15         Let's say, for example, the Hindus believe

16 that on that day, Sita, who was the wife of Rama,

17 was liberated from imprisonment by another ruler

18 called Ravana.  They celebrate because one of the

19 groups was released from a prison and he said he's

20 not going to go alone, so he was told that as many

21 people can hold you, can go with you from the

22 prison.  So he wore a very large kind of robe to

23 which all the other prisoners were able to touch and

24 left the prison.  So the release of those prisoners

25 is significant and the release of that group is

1  significant.

2          And there are similar events happening in

3  other communities, so there is a very cohesive kind

4  of festival that now has become a festival of the

5  Indian cultural.

6  Q   Where on the calendar during the year does Diwali

7  occur?

8  A   Sometime in October or December.

9  Q   I'm sorry?

10 A   October or December.

11 Q   In 2008 when did Diwali take place?

12 A   I don't know the exact actual date when they

13 celebrated in India, but we -- since we are so far

14 away from the homeland, we pick a convenient day, a

15 convenient weekend near the actual date and this was

16 an event on the 6th that we decided to call the

17 Diwali event.

18 Q   So this is a cultural celebration, as well as a

19 fundraiser?

20 A   Again, you know, the whole -- the whole idea was,

21 and I'm a consultant, playing the role of a

22 consultant to the Friends of Blagojevich, so I'm

23 advising them how to go around and raise money when

24 it is very, very difficult.

25 Q   I understand.

Bedi - cross by Goldstein                4365

1  A   So I suggested that we will celebrate Diwali, the
2  Governor of the State of Illinois will come to a
3  Diwali function of the Indian community, we will say
4  you need to buy the tables, and when you buy the
5  tables the money will then be donated for the
6  political campaign.
7  Q   And this event had been planned for some time, is
8  that correct?
9  A   This event has been planned, as I said earlier,
10 on a meeting that I had with Robert Blagojevich on
11 the Starbucks on Lincoln and Western.  Not in all
12 the details, but we figured this is the way we are
13 going to do:  First we are going to invite all the
14 leaders, former donors, let the Governor make an
15 appeal, followed by we do a Diwali function, we sell
16 the table to all the donors, all these people who
17 are going to come, and then when these people will
18 give money for those tables, we will donate the
19 money to the --
20 Q   And this was an advertised event, is that
21 correct?
22 A   No, some advertisements were prepared for this
23 event, but the campaign decided not to advertise.
24 Q   Okay.  But there were -- I mean, there were
25 banners --

1      MR. GOLDSTEIN:  May I approach, Your Honor?

2      THE COURT:  You may.

3  BY MR. GOLDSTEIN:

4  Q   Mr. Bedi, I show you Exhibit Bedi 1, do you

5  recognize that?

6  A   Yes, I do.

7  Q   And this was a flier that was distributed?

8  A   This flier was prepared --

9  Q   Prepared.

10  A   -- but not distributed.

11  Q   Okay.

12  A   On the advise of the Friends of Blagojevich.

13  Q   At this event on December 6th, 2008, Robert

14  Blagojevich was present, is that correct?

15  A   That is correct.

16  Q   And Rod Blagojevich was present, is that correct?

17  A   That's correct.

18      MR. GOLDSTEIN:  One moment, Your Honor.

19      (Brief pause).

20  BY MR. GOLDSTEIN:

21  Q   Now, you spoke about the event being discussed in

22  October, but there had been discussions about an

23  event like this back in July and August, is that

24  correct?

25  A   The discussion back in July and August were to do

1 a fundraiser.

2 Q   Okay.  So --

3 A   The element of doing a Diwali function was

4 injected later.

5 Q   So the idea of a fundraiser that turned into the

6 Diwali event --

7 A   Yes.

8 Q   -- was actually being discussed back in July and

9 August?

10 A   Yes, we've been discussing it first to do

11 something in September, that didn't happen, then we

12 decided okay we're going to try again and ended up

13 happening on December the 6th.

14 Q   Thank you.

15         MR. NIEWOEHNER:  No further questions, Your

16 Honor.

17         THE COURT:  You may step down.

18     (Witness excused.)

19         THE COURT:  Next witness?

20         MR. SCHAR:  Your Honor, the government calls

21 Robert Greenlee.

22         THE COURT:  Face me and raise your right

23 hand.

24     (Witness duly sworn.)

25         THE COURT:  Please be seated.

1      ROBERT GREENLEE, GOVERNMENT WITNESS, SWORN
2                    DIRECT EXAMINATION
3    BY MR. SCHAR:
4    Q   Sir, could you please state and spell your name
5    for us.
6    A   Robert Greenlee, R-o-b-e-r-t G-r-e-e-n-l-e-e.
7    Q   How are you currently employed?
8    A   I'm currently a full time student and I work
9    part-time to support my studies.
10   Q   Mr. Greenlee, if you could speak up a little bit.
11           When you say you work part-time, what do you
12   do?
13   A   I'm an editor of a journal run by a professional
14   organization.
15   Q   You say you are a full time student, what are you
16   studying now?
17   A   I study religious history at the University of
18   Chicago.
19   Q   What is your professional background?
20   A   I'm a lawyer by training.
21   Q   What is your educational background?
22   A   I went to college at Yale University and I went
23   to law school at the University of Chicago Law
24   School.
25   Q   What did you study at Yale?

1  A   I studied philosophy and religion.

2  Q   When did you graduate from law school?

3  A   1999.

4  Q   When did you do after you graduated from law

5  school?

6  A   After I graduated from law school I clerked for a

7  federal judge and then worked for a law firm.

8  Q   What law firm?

9  A   Kirkland & Ellis.

10 Q   What type of law did you practice at Kirkland &

11 Ellis?

12 A   I'm a corporate lawyer by training, mergers and

13 acquisitions.

14 Q   By a corporate lawyer, can you just briefly

15 explain what that means.

16 A   Sure.  If a company wants to buy or sell its

17 assets or if one company wants to buy another

18 company, that type of a transaction.

19 Q   Did you eventually come to work for the State of

20 Illinois?

21 A   I did.

22 Q   Approximately when?

23 A   November of 2003.

24 Q   How did you end up getting a job at the State of

25 Illinois?

:03AM (appears in left margin at lines 5, 10, 15, 20, 25)

1  A   After leaving Kirkland & Ellis I took some time

2  off because I had a sick family member and because

3  my wife moved to Japan.

4         Following my return to Japan, I didn't feel

5  like I had the time to continue to practice

6  corporate law at that level, so I went to work for

7  the state and I applied and took a job at the budget

8  office.

9  Q   You said you took a job at the budget office?

10 A   Yes, sir.

11 Q   What was your job title?

12 A   I was a federal funds coordinator in the budget

13 office.

14 Q   What does it mean to be the federal funds

15 coordinator?

16 A   It means that I was managing the budget of state

17 agencies that received a lot of federal funding.

18 Q   How long were you with the budget office?

19 A   I worked with the budget office from November of

20 2003 to around January of 2007.

21 Q   Did your duties change at any time when you were

22 with the budget office?

23 A   They did.

24 Q   How did they change?

25 A   I was promoted in the budget office from being

1  federal funds coordinator to being deputy director.

2  Q   Could you put that microphone just a little

3  closer to you.

4  A   Is that better?

5  Q   Yes, that's better.  Thank you.

6        Did you eventually move over to a job in the

7  office of the Governor of the State of Illinois?

8  A   I did.

9  Q   About when?

10  A   January of 2007.

11  Q   How did you come to work for the Office of the

12  Governor?

13  A   In around November, December of 2006, my boss in

14  the budget office, John Filan, who was the budget

15  director at the time, asked for and received the

16  opportunity to be promoted to be the chief operating

17  officer of the State of Illinois and he asked me if

18  I would move up and work for him.  I moved up and my

19  title was Deputy Chief of Staff.

20  Q   To Mr. Filan?

21  A   Deputy Chief of Staff of the Governor's Office,

22  generally.

23  Q   What were your job responsibilities as the Deputy

24  Chief of Staff at the Governor's Office?

25  A   As the Deputy Chief of Staff I was responsible

1  for effective management of a series of about seven

2  state agencies:  Department of Revenue, Central

3  Management Services, departments of that nature;

4  organizational operational entities.

:05AM  5  Q   About how long did you do that job?

6  A   I did that job for about a year and a half.

7  Q   Did you eventually take another position in the

8  Office of the Governor?

9  A   I did.

:05AM  10  Q   What position was that?

11  A   Deputy Governor.

12  Q   How did you end up taking the position as Deputy

13  Governor?

14  A   In around June of 2008 the prior Deputy Governor,

:05AM  15  who was Sheila Nix, I guess announced that she was

16  leaving.  I'm not entirely certain of how the

17  process moved following that, but I received an

18  e-mailed around that time period from John Wyma, who

19  was a lobbyist and close friend of the Governor, and

:06AM  20  he suggested that he had suggested my name.

21  Subsequent to that, I interviewed with the Governor

22  and I was offered the position.

23  Q   Prior to becoming -- when did you actually take

24  the position of Deputy Governor?

:06AM  25  A   Around June 15th, 2008.

1  Q   Prior to becoming Deputy Governor, did you have

2  much interaction with Defendant Rod Blagojevich?

3  A   Not much.

4  Q   How about after that?

5  A   Very frequently.

6          MR. SCHAR:  I assume there is a stipulation

7  as to identification?

8          MR. GOLDSTEIN:  So stipulated.

9          THE COURT:  The identification of Defendant

10 Rod Blagojevich is stipulated to.

11 BY MR. SCHAR:

12 Q   Mr. Greenlee, what were your responsibilities as

13 the Deputy Governor in the Office of the Governor?

14 A   I was technically responsible for policy and

15 legislation.

16          This means, generally, that if there was a

17 policy that we wanted to promote, for example

18 healthcare, it was my responsibility to figure out

19 how we would implement something like that, how we

20 would get it passed legislatively, how we would find

21 a way to pay for it, and how much it would cost.

22 Q   So in that context, did you have any involvement

23 with the state budget?

24 A   I did.

25 Q   What type of involvement?

Greenlee - direct by Schar                    4374

1  A   I was not directly responsible for the -- for the
2  management of the budget office, but I was
3  responsible for communicating with the Governor
4  about budgetary impact of any policy change that
5  would be directed our way and with working with the
6  budget office in a big picture perspective to
7  explain how we could balance the budget and still
8  meet our priorities as a state.
9  Q   In the context of your work as Deputy Governor,
10 did you do any legal work?
11 A   No.
12 Q   Were you ever asked to do any legal work?
13 A   No.
14 Q   By the way, who is the ethics officer in the
15 Office of the Governor when you were there?
16 A   When I was there, Andrew Stolfe was the ethics
17 officer.
18 Q   Was it Bill Quinlan?
19 A   No.
20 Q   I want to direct your attention, Mr. Greenlee, to
21 the October 2008 time frame.
22     Generally speaking, what were you working on
23 in that time frame?
24 A   Generally speaking, in October 2008, we were
25 getting ready for the legislative veto session which

1  is a two-week period in November in which
2  legislation that had been vetoed by the Governor
3  after being passed by the General Assembly was
4  reviewed by the General Assembly for overrides and
5  some new piece of legislation passed.  I was also
6  starting to look forward to what we were doing in
7  initiatives for 2009.
8  Q   At this point was a presidential election in its
9  final stages?
10 A   It was.
11 Q   Was it your understanding that Defendant
12 Blagojevich would have the opportunity to name a
13 replacement senator for President Obama should he
14 win the election?
15 A   It was my understanding.
16 Q   Focusing on just the October time frame, did you
17 have any conversations with Defendant Blagojevich
18 about naming a replacement senator?
19 A   During the October time frame, I think that there
20 were conversations about it on a general basis
21 where, you know, he said, what if we did something
22 like this, or what if we name some candidate like
23 that, but there was no serious discussions.
24 Q   Were those conversations in person or over the
25 phone?

1  A   Generally speaking, over the phone.

2  Q   In terms of all your conversations with Defendant

3  Blagojevich, were they typically over the phone or

4  in person?

:09AM    5  A   Typically over the phone.

6  Q   Where were you typically?

7  A   Typically, I would be in the office if it was a

8  workday, or I would be at home if it was before or

9  after work time.

:09AM   10  Q   In your experience, where would Defendant

11  Blagojevich be --

12          MR. GOLDSTEIN:  Objection, Your Honor.

13  BY MR. SCHAR:

14  Q   -- to your understanding?

:09AM   15  A   To my understanding, generally speaking, he was

16  either at home or going to or from an event.

17  Q   In the time period that you were the Deputy

18  Governor, how often would Defendant Blagojevich come

19  into the office?

:09AM   20  A   During the time period in which I was the Deputy

21  Governor, he frequently came into the office after

22  an event but very infrequently other than that.  So

23  I would say two to eight hours, two to eight hours a

24  week.

:10AM   25  Q   I want to direct your attention to the end of

1 October, particular October 26th, 2008.

2     At that time did you have a conversation with

3 Defendant Blagojevich about the Senate Seat?

4 A  I did.

:10AM 5 Q  Was that conversation in person or over the

6 phone?

7 A  It was over the phone.

8 Q  Where were you?

9 A  I was in my car outside of Crunch Gym, it was a

:10AM 10 Saturday morning.

11 Q  Did you receive a call to talk to the Governor?

12 A  I did.

13 Q  What did you and Defendant Blagojevich discuss?

14 A  We discussed the Senate Seat, generally.  In

:10AM 15 particular, he communicated to me that he was

16 interested in trying to figure out how he could

17 remain relevant on a larger stage and how the

18 choices that he could make with regard to the Senate

19 Seat could put him in a position to be relevant in

:10AM 20 the larger stage, which I understood him to mean to

21 be a presidential candidate in 2016.

22 Q  Was there any discussion about specific positions

23 that Defendant Blagojevich might get in relation to

24 the Senate Seat?

:11AM 25 A  Generally speaking, he discussed four options and

 1  compared four options in terms of ways to remain
 2  relevant.
 3      He discussed the idea -- he raised with me
 4  the idea of becoming an ambassador.  He raised with
 5  me the idea of becoming Secretary of Health and
 6  Human Services, federal Health and Human Services.
 7  He raised the idea of continuing to remain Governor
 8  and appointing Lisa Madigan so that he could get
 9  different priorities accomplished at the state
10  level.  And he raised the possibility of appointing
11  himself.
12  Q   In the context that you say he raised the
13  possibility of doing these things, in relation to
14  what?
15  A   In relation to each of the first two cases,
16  appointing a senator and then receiving
17  the opportunity to be named to one of these
18  positions.
19      In the case of Lisa Madigan, appointing her
20  senator and then making a deal with Michael Madigan,
21  who is the Speaker of the House of Representatives
22  at the time.
23      And in terms of appointing him, appointing
24  himself.
25  Q   To the Senate Seat?

1  A   To the Senate Seat.  Excuse me.

2  Q   Around this time, Mr. Greenlee, were there any

3  discussions regarding the Senate process to select

4  President Obama's replacement?

5  A   Prior to the 26th, there were really no

6  discussions about it at all.

7       The week following, which was the week before

8  the election, internally in the office of the

9  Governor, we started talking about what we might

10 want to do to effectuate the process.

11 Q   Who was present for those conversations?

12 A   John Harris and myself were present.  We also

13 communicated with Bill Knapp who was one of the

14 Governor's media strategist in Washington, D.C., on

15 the issue.

16 Q   What did you and Mr. Harris discuss?

17 A   We discussed putting together a series of

18 qualifications that might be useful in interviewing

19 candidates and then potentially having some type of

20 a search team to conduct interviews on behalf of the

21 Governor.

22 Q   What did you do after your conversation with

23 Mr. Harris?

24 A   After my conversation or conversations with

25 Mr. Harris, I put together a sample list of

Greenlee - direct by Schar                                    4380

1  qualifications.  I showed it to Mr. Harris and I

2  faxed it up to the Governor.  I got their comments

3  and then I sent it to Bill Knapp for review.

4  Q   Did Bill Knapp send anything back?

5  A   He did.  He sent back his response and a separate

6  set of qualifications.

7          MR. SCHAR:  Judge, may I approach?

8          THE COURT:  You may.

9  BY MR. SCHAR:

10 Q   I show you what's marked Government Exhibit

11 Candidate Qualifications and I ask you,

12 Mr. Greenlee, to take a look at that exhibit.

13 A   Yes.

14 Q   What is it?

15 A   The top sheet of this is the material that Bill

16 Knapp sent back to me, and the bottom sheet is the

17 list that I sent to Bill Knapp.

18 Q   Is it in essentially the same condition as when

19 you produced it and got it back from Mr. Knapp?

20 A   It does.

21          MR. SCHAR:  Judge, we move Government Exhibit

22 Candidate Qualifications.

23          THE COURT:  Without objection, admitted.

24      (Government's Exhibit Candidate Qualifications

25       was received in evidence.)

Greenlee - direct by Schar                4381

1      MR. SCHAR:  May we publish?

2      THE COURT:  You may publish.

3    (Exhibit published to the jury.)

4  BY MR. SCHAR:

5  Q  Mr. Greenlee, I don't know if you can see it on

6  your screen but it is on the large screen, can you

7  explain what it is we're looking at on the second

8  page of Government Exhibit Candidate Qualifications?

9  A  Sure.  These are the qualifications that we put

10  together that would be those items that the Governor

11  was looking for in choosing a candidate for the

12  senate.

13      The first one, obviously, is healthcare,

14  which is the Governor was very concerned about this

15  period.

16      The second one is infrastructure, which

17  involves a capital bill which is an area we were

18  very concerned about.

19      Economy, the notion of taking care of senior

20  citizens and veterans.

21      And then a quality called "affinity" for the

22  average Illinoisan and then exceptional skills.

23  Q  You sent this list after you talked to Mr. Harris

24  about it to Mr. Knapp?

25  A  Yes, that's correct.

1  Q   Did he sent back a revised version?

2  A   He did.

3  Q   It says at the top "Bob," is that in reference to

4  you?

5  A   Yes, it is.

6  Q   It states:

7      "This is a good list but to me it seems too

8       self-serving, also not lofty enough, so here is

9       my choices."

10     To your understanding, who wrote that?

11  A   To my understanding, Bill Knapp wrote that.

12  Q   Is that Mr. Knapp's list after that?

13  A   Yes, that's my understanding.

14  Q   Briefly, you don't have to read the whole thing,

15  but takes us through it.

16  A   Sure.  He's suggesting, in contrast to the list

17  we put together, something that was a little more

18  focused on Washington and the Obama administration.

19  So someone who supports the agenda, someone who

20  supports the Supreme Court nominees, someone who

21  represents all of Illinoian, and then he has an

22  ethics piece at the bottom.

23  Q   After this was sent back to you, what happened to

24  it?

25  A   Nothing happened to it.

Greenlee - direct by Schar                    4383

1  Q   To your knowledge, was a list of qualifications
2  ever actually used as a criteria in picking a
3  senator?
4  A   No.
5  Q   To your knowledge, was there ever any formal
6  search process instituted by Defendant Blagojevich
7  to fill President Obama's Senate Seat?
8  A   In name we picked a search team, but there was no
9  process instituted.
10 Q   When you say in name you picked a search team,
11 what do you mean by that?
12 A   What I mean is, we determined the names of the
13 people who would be on the search but those people
14 were never necessarily contacted to tell them that
15 they would be on it and we never actually held any
16 meetings or did any search activities.
17 Q   And were these criterion or qualifications that
18 you and Mr. Harris came up ever implemented?
19 A   No.
20 Q   In the weeks or week -- again, still focusing on
21 this week leading up to the presidential election,
22 did you have several conversations with Defendant
23 Blagojevich regarding the Senate Seat?
24 A   I did.
25 Q   Do you recall each conversation separately or do

1  you remember them collectively?

2  A   I remember them collectively.

3  Q   Were they in person or over the phone, if you

4  recall?

5  A   As I recall, generally over the phone.

6  Q   What did you and Defendant Blagojevich generally

7  discuss regarding the potential vacant Senate Seat?

8  A   Generally speaking, we discussed largely two

9  topics, one being the types of positions he could be

10  appointed to in exchange for the Senate Seat.  In

11  particular, he was curious about ambassadorships

12  during this time period.

13         The second thing being whether or not he

14  should appoint himself and what the benefit of

15  appointing himself would be.

16  Q   Was there any discussion at that point of

17  Secretary to Health and Human Services?

18  A   Yes, it came up from time to time.

19  Q   At that point, Mr. Greenlee, did you yourself

20  think it likely that Defendant Blagojevich was going

21  to be able to trade the Senate Seat for the

22  Secretary of Health and Human Services position?

23         MR. GOLDSTEIN:  Objection, Your Honor.

24         THE COURT:  Overruled.

25  BY THE WITNESS:

1  A   I did not think it was likely, no.

2  BY MR. SCHAR:

3  Q   Did you tell that to Defendant Blagojevich?

4  A   No, I did not.

5  Q   Why not?

6  A   It was my experience dealing with him that if he

7  had heard news that he didn't want to believe, that

8  he would refuse to believe and then argue with you,

9  and that that was ultimately a long and painful and

10  futile process.

11        More importantly for me during this time

12  period, it was my understanding, having seen him

13  deal with other people, that to the extent that you

14  argued with him repeatedly or told him things that

15  he didn't want to hear repeatedly, that he had kind

16  of an in-or-out mentality.

17        And to the extent that you were out, he

18  wouldn't want to communicate with you.  On the basis

19  of my job and responsibilities, I didn't have the

20  ability not to communicate with him.  I needed his

21  communication to get things done, so I didn't feel

22  like I had that luxury.

23  Q   When you say you needed his communication, why

24  did you feel you needed to be, to use your term,

25  "in" with Defendant Blagojevich to do your job?

Greenlee - direct by Schar                    4386

1  A  One of the parts of my job that I was responsible
2  for was managing the legislative process from the
3  Governor's Office, which meant that after a bill had
4  been passed by both Houses of the Illinois General
5  Assembly, I was responsible to coordinate with the
6  Governor who was ultimately responsible for signing
7  and vetoing legislation, to ensure that that
8  legislation got acted on in a timely fashion.
9         If the legislation wasn't acted on soon
10 enough, what happened was the legislation would
11 become effective of its own accord even if it was
12 the preference of the Governor to veto it or to make
13 a mandatory veto to it.  So if I didn't have contact
14 with him, I wouldn't have direction on how to act on
15 these pieces of legislation.
16 Q  And even when Defendant Blagojevich was talking
17 to you, was it easy for you to get him focus on
18 legislation?
19 A  It was actually relatively difficult even when we
20 were dealing with these pieces of legislation
21 because he had a limited attention span for those
22 type of things.
23 Q  Were there times you needed to track him down
24 before certain decisions became final?
25 A  Yes, that's correct.

1  Q   Why would you need to track Defendant Blagojevich
2  down?
3  A   I would need to track him down on pieces of
4  legislation because within I believe it was 60 days
5  of having been passed to us, legislation had to be
6  acted on by the Governor's office or it would become
7  automatically law.
8       And I needed to ensure as part of my job
9  responsibilities that he had the opportunity to
10 review it and make a legislative determination,
11 which was something that he had previously
12 communicated to him that he was the ultimate
13 arbitrator of.
14      I found at times, especially when the 60-day
15 time line was coming to an end, that there was
16 numerous pieces of legislation he hadn't acted on
17 and that I had to get into his hands or else we
18 would run out of time.
19 Q   When you say you would run out of time, what was
20 going to happen at the end of 60 days?
21 A   The bill would become law automatically.
22 Q   So a decision had to be made as to whether --
23 A   To take any action.
24 Q   Let it become law or mandatorily veto it?
25 A   That's correct.

1  Q   Okay.  Where would you have to track Defendant
2  Blagojevich down to try to get the decisions that
3  you needed made for this legislation?
4  A   The easy way to do it was to go to events with
5  him because then you could capture him in a plane or
6  in a car where he had nothing else to do.  But if
7  the time was such, and at least on one occasion the
8  timing was such that there wasn't anything on the
9  schedule, I actually had to go to dinner with him
10 and his family and go through bills or else no
11 action would have been taken.
12 Q   Just to break it down.  When you say go to
13 events, what type of events?
14 A   Public speaking events, generally.
15 Q   And when you had to track him down and have
16 dinner to get answers to these bills, where did you
17 do that?
18 A   On the occasion that I had to do that, I went to
19 dinner with him and his family at Southport Lanes on
20 the north side of Chicago.
21 Q   What happened during the dinner at Southport
22 Lanes?
23 A   I sat with him and his family, we went through
24 approximately 20 pieces of legislation to decide
25 what action should be taken.

1  Q   Ultimately, were certain of the bills vetoed?

2  A   Yes.

3  Q   Would they have become law had you not gone to

4  dinner and gotten answers to these questions?

5  A   Yes, they

6  would've.

7  Q   Southport Lanes, is that a bowling alley?

8  A   It's a bowling alley, slash, bar and grill.

9  Q   You indicated that you were concerned about being

10 shut out.  You actually have seen other people shut

11 out?

12 A   Yes, I have.

13 Q   Who had you seen shut out?

14 A   I was surprised after I took my job as Deputy

15 Governor to see that my previous boss, John Filan,

16 was effectively shut out from communication with the

17 Governor.

18 Q   What did you observe?

19 A   I observed that on numerous occasions when the

20 Governor was in the office, that Mr. Filan would

21 attempt to have communications with him, go down to

22 his office, and that the Governor would do basically

23 everything in his power to avoid him.  He would hide

24 in the bathroom or hide in the back office or leave

25 early to avoid having conversations with him.

:22AM
:22AM
:22AM
:22AM
:22AM

1  Q   To your understanding, what had Mr. Filan down to
2  end up out?
3  A   To the best of my underwriting, Mr. Filan
4  insisted on talking to the Governor about budgetary
5  issues, budgetary problems, and things that the
6  Governor just didn't want to think about.  And, as
7  such, the Governor didn't want to argue with him,
8  and did his best to avoid him.
9  Q   Were there other individuals that you thought had
10 been shut out, as well?
11 A   Yes.
12 Q   I want to move, Mr. Greenlee, to the morning of
13 approximately November 3rd, I believe a day before
14 the presidential election, so around that time
15 frame.
16       Did you have a conversation with Defendant
17 Blagojevich regarding ambassadorships?
18 A   I did.
19 Q   And was that, to your knowledge, in person or
20 over the phone?
21 A   To my recollection, over the phone.
22 Q   What did you and Defendant Blagojevich discuss?
23 A   We discussed -- he asked me whether I would put
24 together a list of the types of positions that he
25 should be interested in and the types of

1  ambassadorships that should be appropriate for him

2  and we discussed the types of ambassadorships that

3  should be appropriate for him were he to appoint

4  a senator.

5  Q   When you say appropriate, what do you mean

6  appropriate?

7  A   What I mean by appropriate is, there were certain

8  ambassadorships that he didn't feel were

9  significantly high profile enough to merit, in his

10  eyes, the appointment of a senator in exchange.

11  Q   Based on that conversation, what, if anything,

12  did Defendant Blagojevich ask you to do?

13  A   He asked me to put together some research on

14  ambassadorships and the types of people who had been

15  ambassadors and, you know, what the qualifications

16  of those people were.

17  Q   What did you do?

18  A   I went on Wikipedia and I looked up

19  ambassadorships and I put together a list.

20  Q   When did you do that during the day?

21  A   I did it in the early morning before work and I

22  finished it up at work.

23  Q   Was that at the same time you were trying to work

24  on legislative things?

25  A   Yes.

1        MR. SCHAR:  Judge, may I approach again?
2        THE COURT:  You may.
3   BY MR. SCHAR:
4   Q   Showing you, Mr. Greenlee, what is marked
5   Government Exhibit Ambassadorships Research and ask
6   you if you recognize that document.
7   A   I do.
8   Q   What is it?
9   A   It's the list of positions that I put together on
10  ambassadorships, showing current ambassadors and
11  previous ambassadors.
12  Q   Would it fair to say it's in the same condition
13  as when you produced it back in approximately
14  November of 2008?
15  A   It appears to be.
16       MR. SCHAR:  Judge, we move Government Exhibit
17  Ambassadorships Research into evidence.
18       MR. GOLDSTEIN:  No objection.
19       THE COURT:  Admitted.
20    (Government's Exhibit Ambassadorships Research
21     was received in evidence.)
22       MR. SCHAR:  We move to publish?
23       THE COURT:  You may publish.
24       MR. SCHAR:  Thank you, Judge.
25    (Exhibit published to the jury.)

1

2  BY MR. SCHAR:

3  Q   Mr. Greenlee, you will see it momentarily.

4      The first page is Government Exhibit

5  Ambassadorship Research.  It says "ambassadors" on

6  the top.

7      If you can just explain what you did in order

8  to produce this document?

9  A   Sure.  What I did is I went on Wikipedia and I

10  looked up Great Britain Ambassador, and I pulled the

11  material off of it and put it into a word document

12  in understandable form.

13  Q   And is the current ambassadors, then, from

14  Wikipedia, the information as to who was the

15  ambassador at that time to Great Britain?

16  A   Yes.

17  Q   It says "car dealership owner," does that

18  indicate the background of the individual?

19  A   That's correct.

20  Q   And there is additional information of previous

21  ambassadors, as well as historical ambassadors?

22  A   That's correct.

23  Q   And you noted future presidents, why did you note

24  that?

25  A   I noted that because of the previous discussion

1  we had on the 26th about the Governor wanting to

2  remain relevant and the fact that obviously if

3  future presidents had been ambassadors suggested

4  that this is a position that would remain relevant.

5  Q   And if we could just go to the second page of

6  this document, the top indicates "France"?

7  A   That's correct.

8  Q   And about midway down it indicates "Italy"?

9  A   That's correct.

10 Q   Are there a variety of different countries that

11 you put together for this particular document for

12 Defendant Blagojevich?

13 A   Yes.

14 Q   With similar type of information in terms of your

15 research?

16 A   Yes, that's correct.

17 Q   What did you eventually do with this document?

18 A   I eventually transmitted this document to

19 Governor Blagojevich.

20 Q   When you say transmitted, you mean you gave it to

21 him?

22 A   I either gave it to him in person or faxed it to

23 him at home.

24 Q   Also on the morning of November 3rd, did you have

25 a conversation with John Harris?

Greenlee - direct by Schar                    4395

1  A   I did.

2  Q   I'm not sure you said, but what was his position

3  on the Office of the Governor?

4  A   He was the Chief of Staff.

:27AM  5  Q   Where did the conversation with Mr. Harris occur?

6  A   It occurred in my office.

7  Q   What did you and Mr. Harris discuss?

8  A   Mr. Harris came down to my office, which is

9  slightly unusual, and he told me that over the

:28AM  10  previous weekend--the 3rd was a Monday--that he had

11  received contact from Rahm Emanuel who he believed

12  to be speaking on behalf of the Obama administration

13  and that the Obama administration had a candidate

14  that they were interested in for the Senate Seat.

:28AM  15  Q   Did he provide you a name of who he understood

16  that candidate to be?

17  A   He told me that he understood the candidate to be

18  Valerie Jarrett.

19  Q   What else, if anything, do you recall from that

:28AM  20  conversation?

21  A   You know, that's the main thing that I recall of

22  the conversation.

23  Q   When you say he came down to your office, in

24  relationship to where Defendant Blagojevich's office

:28AM  25  was, where was your office?

1  A   In the 16th floor of the Thompson Center, the

2  Governor's suite.  My office was on the far north

3  end of the building, the Governor's Office was on

4  the far south end of the building, and John Harris's

5  office was next to the Governor's Office on the

6  south end of the building.

7  Q   So it fair to say you were pretty far away from

8  the actual office of where Defendant Blagojevich

9  was?

10  A   Yes.

11        MR. GOLDSTEIN:  Objection to the

12  characterization.

13        MR. SCHAR:  I'll rephrase it.

14        THE COURT:  Yeah.

15  BY MR. SCHAR:

16  Q   Is it fair to say you couldn't have been farther

17  away within the Office of the Governor in terms of

18  office space in that suite based on you being at one

19  end and Defendant Blagojevich being at the other

20  end?

21  A   That's fair to say.

22  Q   On the afternoon of November 3rd, did Tom

23  Balanoff and Andy Stern meet with Defendant

24  Blagojevich?

25  A   They did.

1  Q   Where?

2  A   At his office.

3  Q   Were you present?

4  A   I was not present.

5  Q   How do you know the meeting occurred?

6  A   Two reasons:  I now remember that he mentioned it

7  on the morning of the 3rd, and the second reason is

8  that I saw them coming into the office.

9  Q   And did you eventually learn about the meeting?

10 A   I did.

11 Q   How did you learn about the meeting?

12 A   I spoke to the Governor afterwards about the

13 meeting.

14 Q   Where did that occur?

15 A   I recollect it was in his office.

16 Q   What, if anything, do you remember from that

17 particular conversation?

18 A   I remember from that conversation that the

19 meeting that they had was one in which, you know, it

20 became clear that SEIU could act as an emissary on

21 behalf of the Obama administration, and it became

22 clear that SEIU only had an interest in not

23 appointing Jesse Jackson, and that they did not

24 specify any interest that they particularly had in

25 any particular candidate.

1  Q   That's what you remember from that conversation?

2  A   That's what I remember.

3  Q   The evening of November 3rd, did you have several

4  conversations with Defendant Blagojevich?

:30AM    5  A   I did.

6  Q   Prior to your testifying, Mr. Greenlee, did you

7  have the opportunity to listen to a variety of

8  recordings?

9  A   I have.

:30AM    10         MR. SCHAR:   Judge, may I approach?

11         THE COURT:   You may.

12  BY MR. SCHAR:

13  Q   I'm going to provide you, Mr. Greenlee, with what

14  is marked Government Exhibit Transcript Binder 1.

:30AM    15  A   All right.

16  Q   And I'm going to refer you, Mr. Greenlee, to tab

17  11.

18         MR. SCHAR:   Judge, I ask the jurors be

19  permitted to go to tab 11, as well.

:31AM    20         THE COURT:   The jurors can open to Tab 11.

21         MR. SCHAR:   Judge, with your permission, we

22  ask to play call behind Tab 11.

23         THE COURT:   Leave is granted.

24      (Tape played).

:38AM    25  BY MR. SCHAR:

1  Q   Mr. Greenlee, if you could just go to the first
2  page of the entry.
3  A   Yes.
4  Q   What's the date?
5  A   11/3/2008.
6  Q   What time?
7  A   9:23 p.m.
8  Q   Was it typical for you to receive calls from
9  Defendant Blagojevich at that type of an hour?
10 A   It was.
11 Q   Did you refuse to take those calls?
12 A   No.
13 Q   Beginning on Page 1 at line 6 through 18,
14 Defendant Blagojevich indicates:
15     "I mean, just like that was the reason they came
16      in to make sure I don't do Jesse Jackson, Jr."
17         What did you understand him to saying?
18 A   I understand that that was a reference to the
19 SEIU meeting that he had that afternoon and what
20 SEIU wanted from that meeting.
21 Q   Over on to Page 2, at line 4 Defendant
22 Blagojevich says:
23     "Oh, yeah, yeah, interestingly enough, you
24      really don't gain much, you lose, if you're
25      gonna do Jesse, Jr., go with another

:38AM
:38AM
:39AM
:39AM
:39AM

Greenlee - direct by Schar                4400

1        African-American that's not going to be such a
2        type backlash."
3            What did you understand Defendant
4   Blagojevich to mean?
5   A   What I understood him to be saying is that if you
6   were interested in choosing an African-American to
7   fill the Senate Seat, that you don't gain much by
8   selecting Jesse Jackson, Jr., but that, in fact, you
9   might actually lose support because people who did
10  not like him would result in having there being a
11  backlash first.
12  Q   When you say "you," Mr. Greenlee, who are you
13  referring to?
14  A   I'm referring to Governor Blagojevich.
15  Q   And at line 18 Defendant Blagojevich says:
16        "If they treat me without, you know, any real
17        ... if they don't have any great interest in
18        the Senate Seat, then they're not going to
19        offer anything of value, then I might just take
20        it, you know what I'm saying, Bob?"
21            What did you understand him to be saying?
22  A   Given the context of our conversations over that
23  day and other days, when he said "if they're not
24  going to offer anything of value," what I understood
25  him to mean was if they're not going to offer to

1  appoint him to a position of the type that he had
2  been discussing.
3       And that if they did not choose to do so,
4  where he says "then I might just take it," that he
5  means that I might just appoint myself.
6  Q   On line 29 Defendant Blagojevich says:
7      "I mean, the point is, you know I'm gonna, I'll
8       be here, I'm gonna be in the springtime being
9       impeached by the House with that wimp, gutless,
10      spineless Cross unable to do anything about it,
11      okay?  And I'll be saying to my, and I'll
12      be kicking myself 'cause that U.S. senator I
13      made and all those, and Obama and everybody
14      else will be not there to be there intervening.
15      You follow me?
16       What did you understand Defendant
17  Blagojevich to be saying in this section?
18  A   In this section what I understand him to be
19  saying is that he's concerned that in the spring of
20  2009, that there was a risk that he would be subject
21  to an impeachment process in the Illinois
22  legislature, and that if he selected a senator that
23  was in no way helpful to him in avoiding that
24  process, that he would, as he said, "kicking myself"
25  because he took the opportunity to appoint a senator

1  and didn't do anything to support his political

2  weakness.

3  Q   Over on Page 3, line 2 through 5 Defendant

4  Blagojevich says:

5      "Now, how much of that do I have to consider

6       when I make a decision like this, I don't know,

7       but it's a factor, is it not?"

8          What do you understand Defendant Blagojevich

9  to be saying?

10 A   What I understand him to be saying is that

11 impeachment is a factor that he needed to consider

12 in the consideration of who to appoint as U.S.

13 Senator.

14 Q   His own potential impeachment?

15 A   Excuse me?

16 Q   His own potential impeachment?

17 A   His own potential impeachment, yes.

18 Q   It's a factor in determining who the U.S. Senator

19 would be?

20 A   That's correct.

21 Q   On Page 3, line 26 at the bottom, Defendant

22 Blagojevich says:

23

24     "You know that's you're, you're long term thing

25      is far more damaged by that than it would be

1      by, uh, appointing yourself senator, right?"
2          What do you understand Defendant Blagojevich
3  to be saying?
4  A   What I understand him to be saying is that his
5  long-term political aspirations, particularly
6  running for president in 2016 which we discussed on
7  the 26th, would be more damaged by him being
8  impeached and removed from office than they would by
9  appointing himself -- Governor Blagojevich
10 appointing himself to the U.S. Senate.
11 Q   Over on Page 4, line 25, Defendant Blagojevich
12 continues:
13      "And what's his name the Speaker, uh, or the
14      president, Senate President Cullerton, he's up
15      for re-election Mell says we're gonna run
16      someone against you Cullerton unless you
17      impeach my son-in-law.  That, it is an extreme
18      thing I'm thinking.  Tribune pushes the drum
19      beat, what do you say to that?"
20          What do you understand Defendant Blagojevich
21 is talking about here?
22 A   What I understand here is that he's laying out a
23 scenario which the Illinois Senate, which had
24 previously been supportive of him, would move to
25 hold an impeachment trial and put real risk on him

1  of actually being impeached.

2          And that he believes, where he says, Tribune

3  pushes the drum beat," that the Chicago Tribune

4  would be actively supportive of that process.

5  Q   Over on Page 5, top of page line 1, Defendant

6  Blagojevich says:

7      "And I'm fearful we can't, we won't get an

8       honest press.  In fact the Tribune will  be

9       driving it.

10         What do you understand him to be saying?

11 A  What I understand him to be saying is in the

12 context of impeachment, that he's afraid that he

13 will not get what he would consider to be fair

14 stories and that the Tribune would actually be

15 actively advocating for his impeachment during that

16 time period.

17 Q   You say:

18     "Yeah.  A lot of these things are, a lot of thee

19      things are real concerns.  I mean, look, I've,

20      I've yet to see a fair story from the Tribune

21      on you.  So, you know for you to be fearful of

22      the Tribune driving it is, I think, a well

23      founded concern."

24         What are you indicating there?

25 A  I'm indicating there that I think that in the

Greenlee - direct by Schar                    4405

1   event that an impeachment process were to take

2   place, that there was reason to believe that the

3   Tribune would support the impeachment of Governor

4   Blagojevich.

5   Q   When you say:

6       "I've yet to see a fair story from the Tribune

7        on you."

8        Was that a truthful response?

9   A   No, that's not true.

10  Q   Had you seen some fair stories?

11  A   I've seen some fair stories.

12  Q   Why did you say that to Defendant Blagojevich?

13  A   I understood that he was, in this time period,

14  getting worked up about the Tribune and I was

15  telling him what he wanted to hear.

16  Q   And in the context of your in and out mentality,

17  how is it that you typically try to stay in with

18  Defendant Blagojevich?

19  A   The easiest way I found to maintain a good

20  relationship with Governor Blagojevich was,

21  basically, in the event that I could see him moving

22  to a position that I would -- I would jump in there

23  first and tell him what it was that he wanted to

24  hear.

25  Q   And did you echo what it is that he said in terms

1  of what he wanted to hear?

2  A   Yes.  Generally, yes.

3  Q   Over on 5, lines 12 and 13, Defendant Blagojevich

4  asks:

5       "Didn't they just advocate that I be impeached?"

6          What do you understand he's asking?

7  A   He's asking if in a recent article the Tribune

8  had actively advocated his impeachment.

9  Q   Blagojevich at line 20 says:

10     "How long would it take you to look into that?"

11      You said:

12      "It would take me about half hour."

13         What do you understand is being discussed

14  there?

15  A   He's asking me how long it would take for me to

16  do research on whether the article was written that

17  the Tribune had actively advocated for his

18  impeachment and I said it'd take me a half hour.

19  Q   Over on 6, top of the page, Defendant Blagojevich

20  says:

21      You pull it up, tell me what it says."

22       "Yeah, give me a second."

23       "You wanna call me?"

24       Yeah, let me call you in like ten."

25         What do you understand being discussed there?

1  A   There he's asking me to do some research on what
2  the Tribune actually said in the recent story that
3  he was talking about and I said let me pull it up
4  and that I would call him back.
5  Q   What did you do after this phone call?
6  A   I did two things:  One, I asked a staffer to
7  start pulling all articles that the Tribune had
8  written relating to the Governor on impeachment, and
9  I myself looked up this recent article and pulled it
10  up and then called him back.
11  Q   Before we get to that next call, Mr. Greenlee, at
12  this time were you aware of a deal involving the
13  Tribune Company Wrigley Field or the Chicago Cubs?
14  A   I was.
15  Q   What did the Tribune owned?
16  A   The Tribune Company, in addition to the Tribune
17  and related papers, also owned the Chicago Cubs
18  Baseball Club and Wrigley Field.
19  Q   Okay.  And briefly, if you can, can you describe
20  what you understood of the general context of a deal
21  being discussed related to the Tribune Company,
22  Chicago Cubs, and Wrigley Field?
23  A   Yeah.  Really briefly, there were ultimately two
24  deals.  There was an initial deal that started in
25  2007 in which the Tribune Company, which wanted to

1 sell Wrigley Field so that it could get cash to make

2 some of the debt service payments on its debt,

3 wanted to sell Wrigley Field to the Illinois Sports

4 Facility Authority in exchange for effectively cash

5 upfront.  In March of 2008 the deal with the Sports

6 Facility Authority fell through.

7        It's my understanding that subsequently, a

8 similar transaction by which the Illinois Finance

9 Authority would purchase Wrigley Field for cash was

10 in the process of being negotiated.

11 Q   And is sometimes the Illinois Finance Authority

12 referred to as IFA?

13 A   It is.

14 Q   After becoming Deputy Governor, did you stay

15 involved in negotiations related to that particular

16 deal?

17 A   No, I did not.

18 Q   I think you indicated you did have another phone

19 conversation a short while later?

20 A   Id id.

21 Q   Have you pulled articles per Defendant

22 Blagojevich's request?

23 A   I did.

24        MR. SCHAR:  Judge, at this point we ask to

25 play the call behind tab 12.

:47AM

:47AM

:48AM

:48AM

:48AM

Greenlee - direct by Schar                      4409

1         THE COURT:  Leave is granted.

2         MR. SCHAR:  Thank you.

3      (Tape played).

4         THE COURT:  15 minutes.

:00AM  5         THE MARSHAL:  All rise.

6      (The following proceedings were had out of the

7       presence of the jury in open court:)

8         THE COURT:  You can step down.

9      (Witness temporarily excused.)

:01AM  10     (Recess.)

11        THE MARSHAL:  All rise.

12     (The following proceedings were had in the

13      presence of the jury in open court:)

14        THE COURT:  Please be seated.

:28AM  15        You may resume.

16        MR. SCHAR:  Thank you, Judge.

17

18  BY MR. SCHAR:

19  Q   Mr. Greenlee, when we broke I think we had

:28AM  20  listened to the call behind tab 12.

21        Do you have that call in front of you?

22  A   I do.

23  Q   This is a call the evening before the

24  presidential election, November 3rd, 2008?

:29AM  25  A   Is that correct.

1  Q   Is this a call that occurred after you had done

2  some of the research related to the City Tribune

3  article?

4  A   Yes.

5  Q   On Page 1, Mr. Greenlee, line 5, you indicate:

6      "Yeah, I'm here.  I'm reading the article

7       entitled "Give It Up, Governor."

8         What do you have in front of you as to what

9  are you describing?

10 A   I had my computer in front of me and I had two

11 articles.  The one that I'm describing at first, the

12 article entitled Give It Up, Governor, is the

13 article that Governor Blagojevich asked me, the

14 article the Tribune had written about healthcare.

15 Q   Was that an article related to potentially

16 beginning -- an article of potential impeachment, an

17 article of that sort?

18 A   No, that was the second article.  I also had in

19 front of me the Chicago Tribune's endorsements of

20 various candidates and in those endorsements of

21 various candidates they had a blurb on forming a

22 committee of impeachment.

23 Q   And is that the article you're describing on

24 lines 14 through 20?

25 A   That is.

1  Q   You described those articles to Defendant
2  Blagojevich?
3  A   I did.
4  Q   Moving on to Page 3, at line 22 Defendant
5  Blagojevich indicates:
6      "Couple weeks ago and then in the extra,
7       editorial endorsement they say as opposed to
8       everything I tried to do, now it's time for
9       Madigan to convene a committee of impeachment.
10      Tribune, two weeks ago, when they endorsed
11      Madigan."
12          What do you understand Defendant Blagojevich
13 to be describing there?
14 A   I understand him to be speaking to his wife and
15 describing what I just reported to him about the
16 Tribune article.
17 Q   To your understanding, at this point were you on
18 a speaker phone?
19 A   I did.
20 Q   Line 32, Mrs. Blagojevich indicates:
21      "Tell them to go hold up that f'ing Cubs shit.
22      F' them.  F' them.  Why should you do anything
23      for Sam Zell, what kind of BS is that?"
24          What did you understand Mrs. Blagojevich to
25 be stating there?

:30AM
:30AM
:30AM
:30AM
:31AM

Greenlee - direct by Schar                    4412

1  A   I understood her to be stating there that we

2  should hold up the IFA transaction to purchase

3  Wrigley Field.

4  Q   And on page 4, line 15, you said:

5          "I mean they're not saying that they think

6  they should impeach.  They previously editorialized

7  that they should not impeach."

8          What are you indicating there?

9  A   What I'm doing is I'm telling them what the

10 article is, I'm also trying to slow them down a

11 little bit by saying, look, you know, you asked

12 about impeachment, they're not saying impeachment.

13 Q   Defendant Blagojevich continues:

14     "Well, another consideration when I come to the

15      Senate Seat, don't you think, Patti? I'm gonna

16      spend all year dealing with the Tribune

17      advocating that they have a committee on, to

18      look into impeaching me, right, Greenlee?"

19         What do you understand he's indicating there?

20 A   He's indicating there that when one consideration

21 that he had to take into account when considering

22 who to appoint to the Senate Seat was the risk that

23 he would have to spend the entire next year, this

24 2009, working, dealing with the fact that the

25 Tribune was advocating his impeachment.

Greenlee - direct by Schar                                    4413

1    Q    The bottom of the Page 4, line 32, you indicate:
2          "I mean, here's the, if you wanna get a sense
3           for how just completely out to lunch the
4           Tribune is, on David Miller they put in a
5           parens here, "He's also the only dentist in the
6           legislature.  Can he extract a governor,"
7           question mark."
8           Over on to page 5:
9           "Can he what?"
10          "Extract a governor, question mark."
11          "Extract, what does that mean?"
12          "You know like extracting a tooth."
13          What are you describing to Defendant
14          Blagojevich there?
15   A    I'm describing a portion of the same article, the
16   same endorsement article.  The portion I'm
17   describing is a portion endorsing a state
18   legislator, David Miller, in which they note that
19   he's a dentist and they ask whether it would be
20   possible for him to extract the Governor.
21   Q    And at that point Defendant Blagojevich says:
22          "Tell Patti this, hang on."
23          Does Defendant Blagojevich put his wife on
24   the phone?
25   A    He does.

Greenlee - direct by Schar                    4414

1  Q   On lines 15 to 22 do you describe the same
2  article?
3  A   I do.
4  Q   Line 27 to 28, Mrs. Blagojevich says:
5      "I know.  Yeah.  Screw them and their Cubs.  You
6        know."
7       What do you understand her to be saying?
8  A   I understood her to be saying that we should not
9  do the IFA transaction.
10 Q   Over on to 6, you indicate, on line 3:
11     "I don't mind helping Zell, but Zell should just
12       get rid of these guys, they should sell the
13       f'ing paper to someone."
14        What are you suggesting there?
15 A   What I'm suggesting here is that, you know, when
16 they're talking about the IFA transaction that we
17 should not do it, I'm saying well, look, you don't
18 do need to do the IFA transaction over, but if
19 you're concerned about the conflict of interest,
20 that Zell should potentially sell the Tribune rather
21 than, you know, as an alternative strategy to what
22 they're talking about.
23 Q   In response, Mrs. Blagojevich says:
24     "Or just fire 'em.  He owns the paper.  I mean
25       what would ha, William, William Randolph Hearst

Greenlee - direct by Schar                    4415

1     do?  Say, oh, I can't interfere with my
2     editorial board?"
3     You say:
4     "Yeah."
5     She says:
6     "They're hurting my business.  I mean, if his
7     papers were hurting his business, he'd, you
8     know, do something about the editorial board."
9         What do you understand her to be saying
10  there?
11  A   I understood her to be saying that if Sam Zell
12  wants to get the IFA deal done, then he should then
13  consider firing the editorial board to the
14  Tribune -- for the Chicago Tribune.
15  Q   At line 23, Defendant Blagojevich says:
16     "Look, put together all the stuff they say along
17      those lines.  Let's have Harris or somebody go
18      to, you know, Crane Kenney, say someone's got
19      to go to, and that Nils. And you go to Zell and
20      say, you know we got some decisions to make
21      now."
22     "And I don't know, ah, you know, with the
23      Tribune driving this stuff and Madigan trying
24      to screw me it's gonna make it hard for me to
25      govern if I gotta deal with this."

1        What do you understand Defendant Blagojevich
2   to be saying?
3   A   What I understand him to be saying is that first
4   he wants all the materials that have been put
5   together on impeachment pulled together.
6        Second, that he wants to have Mr. Harris go
7   to representatives of the Tribune Company and tell
8   them that the editorial content that he's previously
9   been complaining about with regard to the Tribune is
10  going to make it hard for him to Governor and that,
11  as a result of that, the Tribune had to find a way
12  to deal with that if the transaction were to go
13  through.
14  Q   Over on Page 7, line 11, Defendant Blagojevich
15  says:
16      "You know someone should say get rid of those
17       people.  You know we wanna help you on this,
18       but I mean we, we may not be around.  I mean,
19       this, this is the dynamic, f', he'll just
20       become a senator.  F'ing let Pat Quinn get you
21       this Wrigley deal."
22       What do you understand Defendant Blagojevich
23  to be saying there?
24  A   What I understand him to be saying is when he
25  says, "you know someone should get rid of these

1  people," he's suggesting that in the conversation

2  that Mr. Harris or someone else has with the

3  Tribune, that they're saying someone should get rid

4  of members of the editorial board.

5      And he's describing a potential conversation,

6  and the potential conversation would then suggest

7  that the state wants to help with the IFA

8  transaction, but that if the editorial content

9  continues, that the Governor would risk just

10 appointing himself senator.

11 Q   On line 20 you say:

12

13    "Yeah, look, I, you know, this, I gotta tell you

14     I think there's a lot to, there's a lot to say

15     in that.  You gotta be very, gotta be very

16     cautious on how you do it."  Defendant

17     Blagojevich says:

18 "I'm not gonna do it."

19 You say:

20    "You know be cautious on how you get Harris to

21     do it, but I gotta tell you I believe it.  I

22     believe the sentiment."

23      What do you discuss with Defendant

24 Blagojevich there?

25 A   I'm responding to the point that he's making, and

Greenlee - direct by Schar                4418

1    when I say, "I gotta tell you there's a lot to say
2    in it," what I'm saying is, look, effectively I'm
3    trying to agree with him, but that I'm also pointing
4    out when I say, "you gotta cautious about how you do
5    it or Harris does it," that I think it's wrong to
6    try to fire people over an editorial position or to
7    have that in exchange for getting a state
8    transaction done.
9    Q    Over on Page 8, line 7, Defendant Blagojevich
10   indicates:
11
12
13        "I mean, I just think we should put all this
14        together then Harris or somebody goes and talks
15        to him and say look, we've got decisions to
16        make now.  Okay?"
17        "Moving this stuff forward, you know, goes to
18        Nils or whatever.  Okay.  Someone's gotta go to
19        Zell, we wanna see him.  This is, you know, we,
20        we dealt with all their BS all this time.  It's
21        f' outrageous.  And they do, you know,
22        gratuitous thing like "extract a governor."
23        "Okay.  They're, it's a political f'ing
24        operation in there."
25        "And we're going out of our way.  What do you

1      think?"
2          What do you understand him to be describing
3  there?
4  A   I understand him to be describing the
5  conversation that he wants John Harris or someone to
6  have with the Tribune Company explaining his
7  position with regard to the IFA deal.
8  Q   On line 26 you state:
9      "I agree with that.  I mean I think you gotta, I
10      mean it's, Harris has gotta be very sensitive
11      on how you do it, but you gotta say look, we're
12      ah ..."
13      Defendant Blagojevich says:
14      "What's, there's nothing' sensitive about how
15      you do it.  What, just straight forward.  What,
16      what's so sensitive about it?"
17      "No, I don't disagree with that, you just ..."
18      Over on Page 9 Defendant Blagojevich indicates:
19      "Straightforward.  We're going out, we're
20      doing' this stuff for you.  We believe this is
21      right for Illinois.  But this is big deal to
22      the, to Zell financially."
23          What are you discussing with him there?
24  A   During this period he's continue to say, look,
25  these are the steps that Harris would have to have

1  in the conversation.

2       I then try to suggest to him that that has to

3  be -- that what he's suggesting is problematic in

4  that he needs to figure out a way to be -- or Harris

5  has to figure out a way to do it in a way that's not

6  wrong.

7       He then says, look, there's nothing sensitive

8  about that, you just have to do straightforward.

9  And what saying "straightforward" he suggests just

10 tell the Tribune that the deal is something that is

11 right for Illinois but that, more importantly, it's

12 a big deal to Zell financially, and that because

13 we're looking at doing things like this, we run the

14 risk of getting impeached.

15 Q  Continuing on that, line 6, Defendant Blagojevich

16 says:

17     "Okay, we've worked every step of the way.

18      We've gone around the legislature and found a

19      way for the very reason they want me

20      impeached."

21     "Your f'ing paper.  Okay.  Maybe we can't do

22      this 'cause they'll, this will be the grounds

23      to impeach me."

24     "You know what I'm saying?  That's the point."

25      You say:

Greenlee - direct by Schar                          4421

1        "Yeah.  No, I agree with that."
2        Defendant Blagojevich says:
3        "And maybe we can't do this now.  Fire those
4        f'ers.
5            What did you understand him to be saying
6   here?
7   A   I understand him to again be detailing what the
8   argument Harris should be making to the Tribune, and
9   the argument is that the editorial comment of the
10  Tribune is such that the grounds that they're
11  referring to for impeachment are going around the
12  legislature and that the IFA deal could be construed
13  going around the legislature.
14           So because of that, that unless the editorial
15  content changes, the state might not be able to do
16  the deal, and that, as a result of that, the desired
17  outcome for the Governor was to fire those f'ers.
18  Q   And to fire those f'ers, you're understanding is
19  referring to the editorial board?
20  A   Yeah, that's my understanding.
21  Q   On line 3, Defendant Blagojevich says:
22       "And then we'll have Harris go in and make that
23        case.  Not me."
24           What did you understand he was going to do?
25  A   He was going to talk to John Harris on going in

Greenlee - direct by Schar                    4422

1  and outlining the conversation that he previously
2  outlined.
3  Q   At the bottom of the page, line 30, Mr. Greenlee,
4  Defendant Blagojevich says:
5      "You know, one of good things you cut with Obama
6       is you, you go in there intervene with those,
7       that f'ing chairman of the party, get rid of
8       him."
9       "And get him f'ing ousted as speaker so we can
10      get Democratic stuff done.  What about that?"
11 A   Ah --
12 Q   I'm sorry, Mr. Greenlee.
13          You say:
14      "Exactly."
15      Defendant Blagojevich says:
16      "Huh?
17      You say:
18      "Exactly.
19      Although he's not gonna wanna do that.  E's not
20      gonna wanna fight hard enough."
21      Defendant Blagojevich says:
22      "No, of course not."
23          What are you talking about in that section?
24 A   In this section, Governor Blagojevich is changing
25 topics.  What he's saying is that he's talking about

Greenlee - direct by Schar                4423

1  potentially striking a deal with the Obama
2  administration with regard to the appointment of a
3  Senate candidate, and that one of the things that he
4  would consider as part of that transaction is that
5  potentially President-Elect Obama could use some
6  influence to talk to the chairman of the state
7  Democratic party, which is Michael Madigan who is
8  also the Speaker of the Illinois House, and use his
9  influence over the Illinois Democratic party to get
10 Speaker Madigan ousted as speaker of the Illinois
11 House so that more of the things that fall in line
12 with the Governor's priorities could get
13 accomplished.
14        And then I point out, on lines 8 through 10,
15 that Obama is not going to want to get involved in
16 state or local politics.  He's not going to want to
17 engage or waste political capital in a fight that
18 that would entail.
19        At line 11 Governor Blagojevich agrees with
20 me.
21 Q   In fact, that idea ever perused?
22 A   Excuse me?
23 Q   Do you understand whether that idea ever perused?
24 A   It's my understanding it was not perused, no.
25 Q   Now, I want to direct you to the following day,

Greenlee - direct by Schar                4424

1  November 4th.
2       Did you talk to Defendant Blagojevich about
3  the Tribune issue in person or on the phone again?
4  A  I spoke to him briefly about the issue over the
5  phone that next morning.
6  Q  On November 4th, was that election day?
7  A  That was election day.
8  Q  Where were you?
9  A  I was in the suburbs doing poll watching.
10 Q  When you say poll watching, what does that mean?
11 A  It means working on behalf of Democratic party
12 for the State of Illinois monitoring polling
13 stations to make sure there were no election
14 irregularities.
15 Q  Is the polling station where people vote?
16 A  Yeah, where people vote.
17 Q  What did you and Defendant Blagojevich discuss in
18 the morning of November 4th?
19 A  With regard to the IFA deal, he asked me if
20 research was continuing to be conducted and I told
21 him that yes, we had staff doing research on the
22 Tribune's articles, and then he discussed election
23 results and we talked about the Senate Seat.
24 Q  And in relation to the Tribune issue, did you
25 raise the issue or did Defendant Blagojevich raise

1  the issue?

2  A  He raised the issue.

3  Q  And, in fact, were articles being pulled together

4  as he requested?

5  A  Yes.  Yes, they were.

6  Q  The following day after the election,

7  November 5th, did you have a conversation with John

8  Harris about the Tribune?

9  A  I did.

10  Q  Where?

11  A  In his office.

12  Q  Who was present?

13  A  He and I.

14  Q  And in relation to the Tribune, what was

15  discussed?

16  A  In relation to the Tribune during this

17  conversation, I related to Mr. Harris that I had a

18  conversation on the 3rd with Governor Blagojevich

19  about the IFA deal and about the Tribune and that I

20  felt that he was ranting somewhat and I was

21  concerned about where the conversation was going.

22         And Mr. Harris told me that the Governor

23  subsequently talked to him but that he understood

24  what was going on and that he was -- he was going to

25  find a way to deal with it in which he wouldn't do

Greenlee - direct by Schar                    4426

1   anything wrong.  As a result of that conversation, I
2   was relieved that it sounded like the issue had been
3   dealt with.
4   Q   Was there another part of that conversation that
5   related to the Senate Seat, as well?
6   A   There was.
7   Q   I'm going to come back to that latter.
8           Did you, in fact, put together a series of
9   articles related to the Tribune at Defendant
10  Blagojevich's request?
11  A   I did.
12          MR. SCHAR:  May I approach, Judge?
13          THE COURT:  You may.
14  BY MR. SCHAR:
15  Q   I show you what has been marked Government
16  Exhibit Tribune Group.
17          I ask you if you recognize that?
18  A   I do.
19  Q   What is it?
20  A   This is the compilation of the articles of that
21  the Chicago Tribune put together on impeachment,
22  generally.
23  Q   And was this the research that you had done at
24  Defendant Blagojevich's request?
25  A   It was.

1  Q   Does it appear to be in the same condition as

2  when you put it together?

3  A   It does.

4        MR. SCHAR:  Judge, move Government Exhibit

5  Tribune Group into evidence.

6        THE COURT:  Admitted.

7      (Government's Exhibit Tribune Group was received

8       in evidence.)

9        MR. SCHAR:  Ask to publish?

10       THE COURT:  You may do that.

11     (Exhibit published to the jury.)

12  BY MR. SCHAR:

13  Q   Mr. Greenlee, that title "General Assembly's Talk

14  of Governor's Impeachment Press Clips," was that the

15  title that you gave to this particular research

16  project?

17  A   Yes, that's the title.

18  Q   Did you then list out various articles that were

19  included there that you had been able to put

20  together?

21  A   Yes.

22  Q   Referring to the Illinois House, Chicago Tribune,

23  and the date of the article?

24  A   Yes.

25  Q   And "indict or impeach" is that the title of the

Greenlee - direct by Schar                          4428

1    article?

2    A   Yes, that is.

3    Q   Chicago Tribune, September 29th, 2008?

4    A   Yes, that's correct.

5    Q   And, in fact, is there, not in every one, but

6    does it continue a list of articles that are

7    attached to this document that you put together, the

8    title, the date, and the Tribune?

9    A   Yes, that's the methodology we used.

10   Q   What did you ultimately do with this document?

11   A   Ultimately I sent it up to the Governor either by

12   fax or by carrier.

13   Q   I'd like to go back to November 4th, the issue of

14   the Senate Seat.

15   A   Yes.

16   Q   November 4th.

17        You were out poll watching on November 4th?

18   A   That's correct.

19   Q   Did you have several conversations with Defendant

20   Blagojevich that day?

21   A   Several; yes.

22   Q   Were they all on the phone or in person?

23   A   All were on the phone.

24        MR. SCHAR:   Judge, at this point I would ask

25   permission to play the call behind tab 18.

1        THE COURT:  Yes.

2      (Tape played).

BY MR. SCHAR:

4    Q   Mr. Greenlee, that's November 4th, at 11:28 a.m.,

5    were you out poll watching at that time?

6    A   I was.

7    Q   Over on Page 2, Defendant Blagojevich says:

8          "Greenlee, look into those ambassadors."  You

9          say:

10         "Well, I'm gonna, you know, look into it today

11         and I'll give you a prioritized list."

12            What were you and Defendant Blagojevich

13   discussing there?

14   A   He 's asking me for the list that we previously

15   discussed on ambassadorships and I told him that I

16   would look into it and give him a prioritized list.

17   Q   And, in fact, is that what you put together and

18   sent him?

19   A   Yeah, I had already done that list, I probably

20   had not sent it to him yet at this point in time.

21   Q   Back on Page 1 at line 6 Defendant Blagojevich

22   says:

23         "Emil at 8:20, you know."

24         "Maybe spend one minute at that rally, that

25         celebration just to say I was there."

 1          When he says "Emil" who do you understand
 2 him to be referring to?
 3 A   Emil Jones, formerly the president of the
 4 Illinois State Senate.
 5 Q   Prior to this call, Mr. Greenlee, did Defendant
 6 Blagojevich mention Emil Jones in relation to the
 7 Senate Seat?
 8 A   He had.
 9 Q   Do you recall the first time it was mentioned?
10 A   I recall it was probably sometime in October.
11 Q   Do you recall where the conversation occurred,
12 one way or another?
13 A   I don't recall one way or the other.
14 Q   What do you recall you and Defendant Blagojevich
15 discussing prior to this discussion of Emil Jones
16 and the Senate Seat?
17 A   I recall prior to the conversation the government
18 mentioning Emil Jones as a potential candidate and
19 suggesting that Emil Jones had asked for the -- had
20 asked for the Senate Seat, and I recollect the
21 Governor saying that he didn't see it, other than
22 his campaign fund, that there was any advantage to
23 appointing Emil Jones to the Senate.
24 Q   At some point after your phone call on November
25 4th, did Defendant Blagojevich raise Emil Jones and

Greenlee - direct by Schar                          4431

1  campaign money with you?

2  A  He did.

3  Q  Was that conversation in person or over the

4  phone, if you recall?

5  A  I don't recall.

6  Q  What do you recall being discussed in that

7  particular conversation related to Emil Jones?

8  A  In that conversation what I recollect is that

9  Governor Blagojevich suggested that one reason that

10 he might want to look at Emil Jones is that Emil

11 Jones had between 500,000 and 1 million dollars in

12 his state campaign fund and if he were appointed

13 senator, because that would involve federal

14 fundraising, that he would have no further use for

15 this state money and that it could be contributed to

16 the Governor.

17 Q  You say he would have no further use?

18 A  Mr. Jones.

19 Q  Okay.  And why wouldn't Emil Jones have any

20 further use for the 500,000 to a million dollars in

21 state funds that he had?

22 A  Because those are state campaign funds and they

23 couldn't be used for federal campaigning; different

24 fund pockets.

25 Q  Do you know one way or the other whether that

1  idea was ever pursued?

2  A  I don't know one way or the other.

3  Q  Did Defendant Blagojevich address it with you

4  again?

:52AM  5  A  He did not.

6  Q  Directing your attention now to the afternoon of

7  the 4th.

8       Were you still poll watching that day?

9  A  I was.

:52AM  10  Q  Did you have another conversation with Defendant

11  Blagojevich?

12  A  I did.

13  Q  Now, this time, Mr. Greenlee, did you know who

14  Doug Scofield was?

:52AM  15  A  I did.

16  Q  Who did you understand Mr. Scofield to be?

17  A  Mr. Scofield was an individual who was working as

18  a lobbyist at this time.  He had previously had the

19  job that I currently had.  He was the first Deputy

:52AM  20  Governor under Governor Blagojevich and he was

21  close -- close friend of the Governor's, to my

22  understanding.

23  Q  Do you know what Mr. Scofield, if anything, was

24  discussed with the Governor related to the Senate

:53AM  25  Seat?

Greenlee - direct by Schar                          4433

1  A   I --
2  Q   Prior to this points?
3  A   Prior to this point, other that conversations
4  with the Governor, I didn't have any direct
5  knowledge about what Mr. Scofield was discussing
6  with him.
7  Q   Do you know what, if anything, Mr. Scofield was
8  told prior to this conversation coming up, what
9  Mr. Scofield told Defendant Blagojevich about
10 whether Defendant Blagojevich should take the Senate
11 Seat himself?
12 A   Prior to the conversation with the Governor, I
13 knew nothing about that.
14       MR. SCHAR:  Judge, at this point I'd ask to
15 play the call behind tab 19.
16       THE COURT:  Yes, you may do that.
17     (Tape played).
18 BY MR. SCHAR:
19 Q   Mr. Greenlee, back to Page 1, please.
20       This call is at 12:19 p.m. on November 4th,
21 2008, election day?
22 A   Yes.
23 Q   Defendant Blagojevich begins, line 2, Page 1:
24     "Anyway, Obama is gonna win a landslide and
25       we'll just operate under that, and I'm on the

Greenlee - direct by Schar                    4434

1    phone with Doug.  He's always f'ing fighting
2    against, I can't take the Senate seat.  And I
3    can't stand that, his attitude.  What's his
4    f'ing angle, what's his motivation?  He says,
5    "it's gonna be awful, everybody's gonna resent
6    you for it," you know, and then he's making it
7    sound like my fellow senators would resent me,
8    which I find ridiculous."
9        What did you understand Defendant Blagojevich
10   was relaying to you here?
11   A  I understood him to be relaying to me the fact
12   that he previously had a phone conversation with
13   Doug Scofield and that Mr. Scofield had told him
14   that it was Mr. Scofield's opinion that Governor
15   Blagojevich should not appoint himself to the Senate
16   Seat.
17       And I further understood him to be telling me
18   that he believed, on the basis of this conversation,
19   that Mr. Scofield had an angle or some ulterior
20   motive for giving Governor Blagojevich the opinion
21   that Mr. Scofield gave Governor Blagojevich.
22   Q  And in the past, Mr. Greenlee, you testified
23   earlier that there were times -- well, let me
24   rephrase that.
25       Were conversations like these a factor for

:58AM
:58AM
:59AM
:59AM

1  you in terms of how you're going to respond to

2  Defendant Blagojevich when Defendant Blagojevich

3  suggested something?

4          MR. GOLDSTEIN:  Objection, Your Honor.

5          THE COURT:  Overruled.

6  BY THE WITNESS:

7  A  Yes, conversations like this were a factor to me.

8  BY MR. SCHAR:

9  Q  You actually, at line 17 through 19 say:

10      "Look, you know, I don't think he has a

11       motivation.  I'm sure he's just giving you his

12       opinion."

13          What are you explaining to Defendant

14  Blagojevich there?

15  A  I'm explaining to Governor Blagojevich that it

16  was my understanding -- it was my opinion that

17  Mr. Scofield may just be giving an unbiased opinion

18  to Governor Blagojevich, that he didn't necessarily

19  have to have an ulterior motivation for any time he

20  disagreed with Governor Blagojevich.

21  Q  On line 20 Defendant Blagojevich says in response

22  to you:

23      "Oh, he's got some, there's some motivation in

24       it on him.  There's something, he's generally

25       got my, he's got a little motivation, I don't

Greenlee - direct by Schar                    4436

1      know what it is.  He's worried Quinn's gonna

2      institute all kinds of investigations.  He'll,

3      he'll order investigations on every contract

4      that we issued."

5          What do you understand Defendant Blagojevich

6  is saying on lines 20 to 28 on page 1?

7  A   In this part of the conversation, what I

8  understand him to be saying is to be trying

9  to explain to me the types of motivations that he

10  perceived Mr. Scofield to be having in disagreeing

11  with him.  So trying to explain to me why someone

12  would disagree with him.

13  Q   Is he disagreeing with your opinion?

14  A   Yes, he is.

15  Q   On Page 2, line 12, you say:

16      "I mean, look, I would suspect that's the, you

17      know, that's the crassest motivation.  I gotta

18      tell you, I would expect more from him and I

19      guess I'm hesitant to say that that's his

20      motivation.  That may be just his opinion."

21          What are you trying to say here?

22  A   I'm trying to say that people -- I'm trying to

23  tell the Governor that people can give the Governor

24  their honest opinions without having ulterior

25  motives.

Greenlee - direct by Schar                4437

1  Q   Defendant Blagojevich at line 19 says:

2

3       "It's a subconscious thing.  He's a great guy.

4       He's not, this is not a bad thing on Doug.

5       Dough is a good, good person, but

6       subconsciously, I think he's trying, he, his

7       first reaction is, ooh, I don't want him to

8       leave, I don't want him to, you know, and so

9       now he's trying to just quickly, his mind is

10      operating, coming up with reasons on why it's

11      bad."

12         What do you understand Defendant Blagojevich

13  to be telling you?

14  A   I understand Governor Blagojevich to be telling

15  me that he believes that Mr. Scofield is disagreeing

16  with him because subconsciously Mr. Scofield was

17  concerned that he could potentially lose clients or

18  that something bad could happen to him and that, as

19  a result of that, he had to find -- Mr. Scofield had

20  to find justifications to disagree with Governor

21  Blagojevich's reasoning.

22  Q   Line 28 Defendant Blagojevich continues:

23      "You know, and I yelled at him and I said, "you

24      know, my upward trajectory is f'ing stalled if

25      not f'ing terminally wounded, you know, by

1      Obama now."  Okay?"

2          What did you understand Defendant Blagojevich

3   was saying to you?

4   A   I understood he was continuing to describe to me

5   the communication he had with Mr. Scofield and he's

6   saying that following the fact that Mr. Scofield

7   disagreed with him, that Governor Blagojevich

8   started yelling at Mr. Scofield.

9   Q   And it continues, line 34:

10        "You know?  "For the last, better than two

11        decade, uh, you know, decades, I've made

12        decisions at the expense of my family's best

13        interests, for my political career and you, you

14        know, my job as governor." And continuing on

15        page 3:

16        "And, you know, "because I'm, you know, the,

17        this, his election blocks me now from any

18        immediate upward movement or, you know, maybe

19        never have any upward movement.  You know, now

20        is the time for me to put my f'ing children and

21        my wife first for a change."

22          What do you understand he's describing to you

23   there?

24   A   What I understand he's describing to me in this

25   point is, he's continuing to describe the

1  conversation that he had with Mr. Scofield and the
2  way in which he yelled at Mr. Scofield.
3  Q   And without reading the entire section, beginning
4  on line 14 on Page 3, line 39, did you understand
5  again Defendant Blagojevich was telling you what it
6  is he had to tell Mr. Scofield when Mr. Scofield
7  suggests he should not take the Senate Seat?
8  A   Yes, I understood he continued to describe the
9  statements he made to Mr. Scofield following
10 Mr. Scofield's opinion.
11         MR. SCHAR:  May I have one moment, Judge?
12         THE COURT:  You may.
13      (Brief pause).
14 BY MR. SCHAR:
15 Q   Mr. Greenlee, I want to direct your attention to
16 the following day, November 5th.
17 A   Yes.
18 Q   Was that the day after President Obama won the
19 election?
20 A   It was.
21 Q   Now, I think previously you described a
22 conversation in that morning with John Harris
23 related to the Chicago Tribune, do you recall that?
24 A   I do.
25 Q   Was there another part of that conversation?

1  A   There was.

2  Q   What else did you and Mr. Harris discuss?

3  A   On that morning when I went into Mr. Harris'

4  office, I told Mr. Harris that I also received a

:04PM  5  call previously that morning from Governor

6  Blagojevich and that he was continued to be

7  interested in receiving ambassadorships or the

8  appointment to various U.S. Cabinet positions in

9  exchange for his appointment -- for Governor

:05PM  10  Blagojevich's appointment of the Senate Seat.

11  Q   What was Mr. Harris' response?

12  A   Mr. Harris' response was that Mr. Harris believed

13  that Governor Blagojevich was being unrealistic in

14  his expectations in ambassadorships or Cabinet

:05PM  15  positions, and that it would be better that everyone

16  would be better served to direct Governor

17  Blagojevich towards other alternative types of

18  positions that Governor Blagojevich could receive in

19  exchange for making the appointment to the Senate.

:05PM  20  Q   While you were in the office did a phone call

21  come through?

22  A   Yes, it did.

23        MR. SCHAR:  Judge, might the jurors, with

24  your permission, move to tab 23.  This call has been

:05PM  25  previously played, I'm not intending to republish

1  it, but I have a few questions on this.

2        THE COURT:  Sure.

3  BY MR. SCHAR:

4  Q  Mr. Greenlee, if you could move to tab 23.

5  A  Yes, sir.

6  Q  This is a call in the morning of November 5th at

7  9:15 a.m. between you, Mr. Harris, and Defendant

8  Blagojevich?

9  A  Yes.

10 Q  And just, generally speaking, is this call

11 address the issue of whether Defendant Blagojevich

12 could get a job at a private sector foundation

13 related to the Senate Seat?

14 A  Yes, that's a fair characterization.

15 Q  I want to direct you to Page 2, at line 19, in

16 the context of discussing these private foundations

17 you say:

18        "Yeah, no I'll do all the research myself on

19          this one.  We'll see.  Gotta have some names.

20          The other, ah, this is for when?  2010 or now?"

21        At line 25 Defendant Blagojevich says:  "Now."

22          What were you asking and what did you

23 understand Defendant Blagojevich to be saying?

24 A  What I was asking is, in relation to the notion

25 of him getting some type of a foundation job in

Greenlee - direct by Schar                    4442

1    exchange for appointment to the Senate Seat, I was
2    asking if that was something that was going to be
3    done potentially after he finished his term as
4    Governor in 2010 or beyond or whether it was
5    something he was looking at in the immediate near
6    term, meaning now.  And Governor Blagojevich
7    responded that it was something that he was
8    interested in now.
9    Q   At Page 6, line 26, Defendant Blagojevich says:
10       "Bob, when can you have it, have information for
11       us?"
12       And then on line 28 you say:
13       "I'll have it, I'll have it for you by late
14       morning, if I do solely this."
15           What are you discussing in that section?
16   A   I'm discussing here, he'd asked me for
17   information on what types of non-profits might be
18   appropriate for him to obtain a position in exchange
19   for a Senate Seat, and he'd asked me to do research
20   on what types of organizations those were.
21           What I responded is, if I did no other work,
22   if I did no other of my ordinary assigned
23   responsibilities, I could have it done by late
24   morning.
25   Q   Was researching private foundations part of your

1 ordinary assignment responsibilities?

2 A   No, it was not.

3 Q   And when you say appropriate in relation to the

4 Senate Seat, what do you mean by appropriate in

5 terms of Defendant Blagojevich?

6 A   I mean things that Defendant Blagojevich would

7 think that was appropriate for him given the

8 importance in Governor Blagojevich's mind of making

9 the appointment of U.S. Senator.

10 Q   And instead of dealing with other matters, did

11 you, in fact, do the research that Defendant

12 Blagojevich asked you to do?

13 A   I did.

14 Q   What were the results of your research?

15 A   I looked at a number of various types of

16 organizations and pulled together kinds of small

17 files on various types of organizations.

18       The results of my research is, none of the

19 organizations that Governor Blagojevich were

20 interested in, not to my surprise, were ones that he

21 wasn't qualified to pursue.  So my results were that

22 this wasn't a fruitful idea.

23       MR. SCHAR:  May I approach?

24       THE COURT:  You may.

25 BY MR. SCHAR:

1  Q   I'll show you what is part of Government Exhibit
2  Foundation Research, Mr. Greenlee, I'd ask if you
3  recognize that exhibit.
4  A   I do.
5  Q   What is it?
6  A   This is the materials that I pulled together for
7  the Governor on foundations.
8  Q   Does it appear to be in the same condition as
9  when you did that research?
10  A   It does.
11        MR. SCHAR:  Judge, we move Government Exhibit
12  Foundation Research into evidence and ask to
13  publish.
14        MR. GOLDSTEIN:  No objection.
15        THE COURT:  Admitted.
16      (Government's Exhibit Foundation Research was
17       received in evidence.)
18      (Exhibit published to the jury).
19  BY MR. SCHAR:
20  Q   Can you describe for us just what you put
21  together in this document, Mr. Greenlee?
22  A   Sure.  So I put together a list of various types
23  of nonprofit organizations, primarily focused in the
24  healthcare and human service fields because those
25  were fields that I knew that Governor Blagojevich

1  previously had expressed an interest in.

2       Basically, I put where the foundations were

3  based, what types of work that they did, what their

4  interest areas were, and I also put in the names and

5  qualifications of the CEO's where those

6  were available to me.

7  Q   And did you just give a description of those

8  types of foundations?

9  A   I did.

10  Q   Moving on to Page 2 -- I'm sorry, before we do

11  that, the first one is the Kaiser Foundation?

12  A   Yes.

13  Q   Had that specifically come up in that phone call

14  between you and Defendant Blagojevich?

15  A   Yeah, it was one that was raised.

16  Q   Families U.S.A., is that other one you did

17  research on for Defendant Blagojevich?

18  A   It was.

19  Q   Did that come up in conversations, as well?

20  A   It did.

21  Q   And the last page, Bill and Melinda Gates

22  Foundation, was that one you also did research on?

23  A   It was.

24  Q   After you put this document together, what did

25  you do with it?

Greenlee - direct by Schar                    4446

1  A   After I put it together, when the Governor came
2  into the office I reported to him on it and I
3  believe I gave it to him when he came into the
4  office.
5  Q   And, in fact, did you have a phone call with
6  Defendant Blagojevich in relation to the research
7  you were doing?
8  A   I did.
9      MR. SCHAR:  Judge, at this point I ask to
10 play the call behind tab 25.
11     THE COURT:  Leave is granted.
12    (Tape played).
13 BY MR. SCHAR:
14 Q   Turning to page 1, Mr. Greenlee.
15 A   Yes.
16 Q   There's a call on November 5th, at 12:21, p.m.
17 according to the transcript?
18 A   That's correct.
19 Q   After you begun doing research?
20 A   That's correct.
21 Q   Relating to the private foundations?
22 A   That's correct.
23 Q   At line 1 Defendant Blagojevich says:
24    "Hey."
25     You say:

:11PM
:12PM
:15PM
:16PM
:16PM

1          "Hey, what's going on?"
2          Defendant Blagojevich asks:
3          "What's going on with you?"
4          You say:
5          "Continuing to do research."
6          Defendant Blagojevich asks:
7          What'd you find out about Families USA?" You
8          say:
9          "So, it was founded by two guys, one was an
10         entrepreneur."
11         Defendant Blagojevich says:
12         "No, but how much money does the guy make?
13              What are you discussing with Defendant
14    Blagojevich there?
15  A   He's asking me for the tentative results of some
16    of the research I've done, particularly on the
17    organization families U.S.A.
18              And I started trying to tell him about the
19    people who were -- the founders who are actually
20    continuing to be the executive director and the
21    chairman of the board.  And he was advising me that
22    he was actually more interested in what their
23    salaries were.
24  Q   You say at line 10:
25       "I'm still looking.  It's hard to find people's

Greenlee - direct by Schar                    4448

1      salaries online."
2          What are you telling him?
3  A   I'm telling him I don't know the salaries.
4  Q   You then go on at line 11 and say:
5      "The other thing you should know is when you're
6         the, when you're the president or CEO of one of
7         these agencies it also, you know we talked
8         about the board director game."
9      Continuing on to page 2:
10        "Well, the, ah, the lady, whose the director,
11         the president of Robert Wood Johnson Foundation
12         is on two corporate boards and makes around
13         $250,000 a year on those, in addition to her
14         salary."
15         What are you explaining to Defendant
16  Blagojevich there?
17  A   In this part of the call, I picked up on the fact
18  that he was interested in, you know, kind of the
19  financial benefits of being an executive director
20  and I hadn't really looked for any salaries.
21         So what I did was I mentioned something that
22  I thought he would also be interested in, which is
23  the people who were executive directors often got
24  board positions and they were paid for their outside
25  board positions and it turned out that was something

1  he was very interested in.

2  Q   He says:

3       "Yeah, see, that's what we'd want."

4           What did you understand him to be saying?

5  A   What I understood him to be saying is, yes,

6  looking for things that could give him additional

7  financial benefits were what he was looking for.

8  Q   And at line 15 you say:

9       "So you should probably make it clear that that

10      would be another part of the game." And he

11      says:

12      "That's right."

13          What are you talking about there?

14 A   So, basically, what I'm suggesting to him is that

15 in his conversations with people with regard to the

16 Senate Seat that he'd been talking about, that it

17 was my understanding that this is the type of thing

18 he was interested in and I was telling him basically

19 what he wanted to hear.  And he said, "that's

20 right," and he was agreeing that that is what he was

21 interested in.

22 Q   At line 24 Defendant Blagojevich says:

23      "Okay.  Now keep looking and I'll be down there

24      soon and we can do this and then -- I'm telling

25      you that Senate Seat though, parachuting into

Greenlee - direct by Schar                    4450

1      that Senate Seat, they're gonna ask me today
2      and I'm gonna say I'm not consideration myself.
3      That the plan, you know I have no plans to
4      consider me."
5          What is Defendant Blagojevich talking about
6   in terms of what's going to happen later that day?
7   A  Later that day, we were planning to have a press
8   conference to discuss our appointment process for
9   the Senate Seat.
10         And he was telling me -- first he was telling
11  me he's coming down to attend the press conference,
12  which was not necessarily a given.  And the next
13  thing that he was telling me was that he was
14  starting to go through the process of telling me
15  what he planned and rehearsed what he planned to say
16  at the press conference, especially given the
17  question of whether he would appoint himself to
18  Senate Seat.
19  Q  And when he says:
20      "I'm gonna say I'm the not considering myself
21      ..."
22         what did you understand him to be suggesting?
23  A  I understood that if the question of whether he
24  planned to appoint himself was posed to him at the
25  press conference, that he would say that he was not

1  considering it.

2  Q   Was that true?

3  A   No.

4  Q   Over on Page 3, is this a continuation of

5  questions for the press conference?

6  A   Ah --

7  Q   Or statements for the press conference later that

8  day?

9  A   I'm sorry, what line?

10  Q   I'm sorry, beginning at line 13.  Defendant

11  Blagojevich says:

12      "I like my job.  You know there's all kinds of

13       things you can do as Governor that really are

14       important, but I'm gonna make my criteria that

15       my senator ... has to be one committed to

16       health care, especially for children."

17      "What we did in Illinois should be done all

18       across America.  There are 9 million kids

19       without healthcare, without access to

20       healthcare.  In Illinois every child has access

21       to get healthcare, that's a moral obligation,

22       okay."

23      "I gotta say that and whoever that senator is

24       that's the single most important thing I'm

25       looking for in, in the next senator someone

Greenlee - direct by Schar                    4452

1      who's gonna be an advocate, an effective
2      advocate and be able to get this done working
3      with our President.  Hat do you think of that?"
4           What did you understand Defendant
5  Blagojevich to be saying there?
6  A  Well, he's rehearsing his spiel that he plans to
7  give to the press.
8  Q  And based on your conversations, what was your
9  understanding of whether the single most important
10 criteria to be used was the next senator committed
11 to healthcare?
12          MR. GOLDSTEIN:  Objection, Your Honor.
13          THE COURT:  Overruled.
14 BY THE WITNESS:
15 A  Based on my prior conversations that day, that it
16 was not my understanding that the commitment to
17 healthcare was his most important consideration.
18 Q  That day or --
19 A  All the previous weeks.
20 Q  Had the issue of that being an important criteria
21 in relation to the Senate Seat come up in prior
22 conversation?
23 A  Only in relation to the qualifications
24 questionnaire that I sent to him.
25 Q  The qualifications that wasn't used?

1  A   That's correct.

2  Q   Okay.  Beyond that?

3  A   Beyond that, no.

4  Q   Did, in fact, Defendant Blagojevich come into the

5  office on the afternoon of November 5th?

6  A   He did.

7  Q   Was a press conference held?

8  A   Yes, there was one.

9  Q   What do you recall being discussed at the press

10 conference?

11 A   The appointment process, the fact that we had

12 nominated an appointment team, and the question was

13 raised whether he had any intent to consider

14 himself.

15 Q   And were the responses given in the context of

16 what was suggested in this phone call?

17 A   Yes, the responses were along the lines of his

18 rehearsal.

19 Q   Was the issue of healthcare raised in the press

20 conference?

21 A   Yes, to my recollection it was.

22 Q   Was a response given that was consistent more or

23 less with this phone call?

24 A   My recollection is is that it was, yes.

25 Q   Did you, in fact, have a conversation with

Greenlee - direct by Schar                    4454

1   Defendant Blagojevich at some point that afternoon?

2   A   I did.

3   Q   Where?

4   A   In the Thompson Center.

5   Q   Where in the Thompson Center?

6   A   I recollect it was in his office.

7   Q   Who was present?

8   A   Myself and him.

9   Q   What did you and Defendant Blagojevich discuss?

10  A   I provided him with information that I had

11  received with regard to the research on these

12  foundations.

13  Q   What, if anything else, was discussed after you

14  discussed the research on the private foundations?

15  A   I advised him, based on my research of the

16  foundations, that I didn't think the positions that

17  we talked about were ones that he was qualified to

18  accept.  And he suggested to me that I should just

19  keep doing research on it, keep looking for more

20  opportunities.

21  Q   Moving over to November 6th, 2008, did you come

22  to work that day, as well?

23  A   I did.

24  Q   At some point did Defendant Blagojevich come into

25  the office?

1   A   He did.

2   Q   Do you know when he arrived?

3   A   I don't know exactly when he arrived, no.

4   Q   What occurred when Defendant Blagojevich came int

5   the office?

6   A   He had a second meeting with SEIU.

7   Q   Do you know who he met with?

8   A   It's my understanding that it was Tom Balanoff.

9   Q   Were you present for the meeting?

10  A   I was not.

11  Q   What happened after the meeting?

12  A   After the meeting, myself, John Harris, and I

13  believe Bill Quinlan and Doug Scofield, met with

14  Governor Blagojevich afterwards to debrief.

15  Q   Where?

16  A   In Governor Blagojevich's Office.

17  Q   Were you present for the entire conversation or

18  were you in and out?

19  A   I was present for the entire conversation.

20  Q   What do you remember being discussed?

21  A   I remember Governor Blagojevich describing the

22  meeting to us, and I remembered him telling everyone

23  who was there that he had asked for the Health and

24  Human Services position but that it was his

25  understanding that that wasn't likely to be -- a

1  likely outcome.

2  Q   And that evening, did you have another

3  conversation with Defendant Blagojevich?

4  A   I did.

5          MR. SCHAR:  Judge, this might be a good time

6  to take a break, if it's okay with Your Honor.

7          THE COURT:  We'll resume at 1:30.

8          THE MARSHAL:  All rise.

9      (The following proceedings were had out of the

10      presence of the jury in open court:)

11         THE COURT:  You can step down.

12      (Witness temporarily excused.)

13

14     (Luncheon recess taken from 12:25 o'clock p.m.

15      to 1:30 o'clock p.m.)

16

17

18

19

20

21

22

23

24

25

Greenlee - direct by Schar                    4457

1                    IN THE UNITED STATES DISTRICT COURT
2                       NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION
3
  UNITED STATES OF AMERICA,        )
4                                  )  No. 08 CR 888
            Government,            )
5                                  )
  vs.                              )  Chicago, Illinois
6                                  )
  ROD BLAGOJEVICH,                 )  July 8, 2010
7  ROBERT BLAGOJEVICH,             )
                                   )
8            Defendants.           )  1:44 o'clock p.m.

9                            VOLUME 21
10                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JAMES B. ZAGEL
11                          AND A JURY

12
   For the Government:
13
                 THE HONORABLE PATRICK J. FITZGERALD,
14               UNITED STATES ATTORNEY
                 BY:  Reid J. Schar
15                    Carrie E. Hamilton
                      Christopher Niewoehner
16               Assistant United States Attorneys
                 219 South Dearborn Street
17               Suite 500
                 Chicago, Illinois 60604
18

19

20
   Court Reporter:
21
                      Blanca I. Lara, CSR, RPR
22                    219 South Dearborn Street
                             Room 2504
23                    Chicago, Illinois 60604
                         (312) 435-5895
24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
           BY:  Samuel Forbes Adam
8               Samuel Adams, Jr.
           6133 South Ellis Avenue
9          Suite 200
           Chicago, Illinois 60637
10         312-726-2326

11         OFFICES OF AARON B. GOLDSTEIN
           BY: Aaron Benjamin Goldstein
12         6133 South Ellis
           Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
           Suite 307
16         Chicago, Illinois 60614
           (773) 517-0622
17
           LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
           53 West Jackson Boulevard
19         Suite 1420
           Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

Greenlee - direct by Schar                    4459

1    APPEARANCES  (continued:)

2

3    For Defendant Robert Blagojevich:

4            ETTINGER, BESBEKOS, PARISI
             BY:  Michael D. Ettinger
5                 Cheryl Ann Schroeder
             12413 South Harlem
6            Suite 203
             Palos Hills, Illinois 60453
7            (708)598-1111

8

             Edelman, Combs, Latturner & Goodwin LLC
9            BY:  Robyn S. Molaro
             120 S. LaSalle
10           Suite 1800
             Chicago, Illinois 60603
11           (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Greenlee - direct by Schar                              4460

1          THE MARSHAL:  All resign.

2          THE COURT:  Please be seated.

3     You may resume.

4          MR. SCHAR:  Thank you, Judge.

5          With Your Honor's permission, I would like to

6    direct the witness, who I believe has Government

7    Exhibit Transcript Binder 1 in front of him, to tab

8    28.

9          Tab 28, Judge, we would ask Your Honor's

10   permission to play that.

11         THE COURT:  Leave is granted.

12          ROBERT GREENLEE, GOVERNMENT WITNESS,

13                PREVIOUSLY SWORN

14          DIRECT EXAMINATION (resumed)

15   BY MR. SCHAR:

16   Q   Mr. Greenlee, are you with me at tab 28?

17   A   Yes, sir.

18   Q   This is the evening of November 6th, it was after

19   the meeting which you participated in after

20   Mr. Balanoff had met with defendant Rod Blagojevich?

21   A   That's correct.

22       (Tape played).

23   BY MR. SCHAR:

24   Q   Mr. Greenlee, going back to Page 1 of the

25   transcript, in the evening of November 6th, 2008,

Greenlee - direct by Schar                    4461

1  line 15, sir, Defendant Blagojevich asks:

2      "Am I the next Donna Shalala."

3          What do you understand him to be asking in

4  the context of the meeting that occurred earlier

5  that day?

6  A  I understand him to be asking in the context of

7  the meeting that occurred earlier that day, whether

8  it was my understanding it was likely that Governor

9  Blagojevich would be appointed to be the next

10  Secretary of Health and Human Services.

11  Q  Over on to Page 2, at line 6, Defendant

12  Blagojevich says:

13      "They know that I could do it for her."

14      "Uh-huh."

15      "They also know I want something, and what I'm

16      looking for is commensurate with what I, you

17      know, place to be."

18          What do you understand Defendant Blagojevich

19  is telling you in that section, Mr. Greenlee?

20  A  I understand him to be relating to me the outcome

21  of his meeting on November 6th with SEIU.

22          And I understand him to be saying that it was

23  his understanding, as a result of the meeting, that

24  SEIU, and by association the Obama administration,

25  understood that Governor Blagojevich was willing to

Greenlee - direct by Schar                    4462

1  appoint Valerie Jarrett but that in order to do
2  something, that he would want something in return.
3  And that in return, that which he would want would
4  be, o I think the word he uses "commensurate" with
5  what he wants.  And by saying "place to be" I think
6  he's explaining it is a position of some sort.
7  Q   Over on to Page 3, beginning at the top,
8  Defendant Blagojevich says:
9       "My obstacle, can possibly, possibly, possibly
10      be remedied by Lisa Madigan.  That's a better
11      scenario for me than anything this president
12      and his candidate can do.  That's based on what
13      they offered me.  I then said, you can do
14      something that would be better than even the
15      Madigoon play.  And that is that.
16      "In other words, I could, I would do that, over
17      the Madigoon play."
18          What do you understand Defendant Blagojevich
19  is describing here?
20  A   I understand Governor Blagojevich here to be
21  describing his conversations with SEIU during the
22  November 6th meeting.
23          And what I understand him to be saying is
24  that SEIU presented some scenario which is not laid
25  out in this conversation, and that he then said that

Greenlee - direct by Schar                          4463

1  his obstacles could be remedied by Lisa Madigan
2  which was a better scenario than the former scenario
3  that's not listed here, but then that he suggested
4  that there was something that would be even more
5  beneficial to him, which was that he should receive
6  something like a position in exchange for making the
7  appointment.
8  Q   What do you understand he indicated that if he
9  received that position he would do instead of the
10 Lisa Madigan play?
11 A   Appoint Valerie Jarrett to the Senate.
12 Q   He continues on line 13:
13     "I didn't say it directly, but that's the point,
14      you know what I'm saying?"
15         When he says "I didn't say it directly,"
16 what did you understand he was telling you?
17 A   When he said that, I understood he was telling me
18 that he didn't directly say that he would appoint
19 Valerie Jarrett in exchange for being appointed to a
20 different position, but that he understood that SEIU
21 understood the communication that he had made to
22 them what his intentions were.
23 Q   Which was what?
24 A   Which was he would receive an appointment to some
25 position in exchange for making the appointment of

Greenlee - direct by Schar                                    4464

1  Valerie Jarrett to the U.S. Senate.

2  Q   On line 16 Defendant Blagojevich says:

3       "They will come back and say, can't do that,

4        right?  But they now know I can do her, if I

5        get something, right?"

6            What did you understand him to be saying?

7  A   What I understood him to be saying here was that

8  he knows that the Secretary of Health and Human

9  Services is not a possibility, but that the Obama

10 administration now understands that he would be

11 willing to appoint Valerie Jarrett if he receives

12 something, if he were able to receive in exchange

13 some position that is, as he said, commensurate with

14 appointment that he was making.

15 Q   He continues on:

16      "They don't care at all, fine they'll, I

17       couldn't say forget about it, right?  But I'm

18       not so sure they'd do that.  I mean, I'm not so

19       sure that, I just think she really wants it and

20       he wants her to have it.  Don't you?

21           What did you understand him to be saying?

22 A   I understand him to be trying to consider whether

23 the Obama administration was truly serious about

24 appointing Valerie Jarrett to the Senate or about

25 seeking the appointment of Valerie Jarrett to the

1  Senate.
2        And that when he says, "I think she really
3  wants it," he's saying that Valerie Jarrett really
4  would like to be U.S. Senator and the Obama
5  administration would like to have her appointed as
6  U.S. Senator.
7  Q   Over on to Page 5, Mr. Greenlee, line 7, you say:
8        "Well, he's gonna want it.  This is good. He's
9        not gonna put it in front of things that will
10       outright hurt him.  If it's something he
11       doesn't care about, he would do it."
12       And Defendant Blagojevich says:
13       "Putting me at Health and Human Services
14       doesn't hurt him."
15       What are you suggesting and what do you
16  understand him to be saying?
17 A   What I'm suggesting to the Governor is that if
18 the Obama administration believes that any
19 appointments that they were to make would cause a
20 political problem for them or be problematic for
21 them in anyway, that they would not pursue it.
22       And what Governor Blagojevich says in
23 response is that appointing him to the position of
24 Health and Human Services Secretary would not cause
25 a political problem for them.

1  Q   And in the next line you indicate that the Obama

2  administration may be afraid of the Rezko thing, do

3  you see that?

4  A   I do.

5  Q   And Defendant Blagojevich at line 20 he says:

6       "How do you know that?"

7        and then on line 25 you say:

8        "Look, it's the same thing that I, you know,

9        you hear about with everything else.  They are,

10       why would they not have initially invited you

11       to the, to this thing?"

12          What are you explaining to Defendant

13 Blagojevich there?

14 A   When I say that "it's the same thing that you

15 hear about with everything else, why did they not

16 invite you to this thing, I'm reminding Governor

17 Blagojevich that he was not initially invited either

18 to the announcement in Springfield of Biden,

19 president-elect Obama's running mate, or to the

20 November 4th election night rally in Grant Park.

21 Q   How did you actually know, and I want to focus on

22 the November 4th Grant Park rally, how did you

23 actually know Defendant Blagojevich was not

24 initially invited?

25 A   I knew that Governor Blagojevich was not

Greenlee - direct by Schar                    4467

1    initially invited because it was my responsibility,
2    once we started receiving press calls about it, to
3    reach out to the Obama administration -- or the
4    Obama campaign at the time, excuse me, and obtain
5    from them an invitation, a formal invitation.
6    Q    What happened?
7    A    Somewhere in the week before November 3rd, it
8    became known that there would be an election night
9    rally, it was published there would be an election
10   night rally, and our press, the Governor's Office
11   press team, became concerned at that point that we
12   had not received an invitation to this rally.
13        We were concerned that if it became known
14   that we had not received an invitation--and we had
15   not, in fact, received an invitation--that it would
16   result in a negative press story for the Governor
17   because it would be perceived that Obama was trying
18   to distance himself from Governor Blagojevich.
19        To remedy that, I reached out to Bill Knapp,
20   who was the Governor's media strategist who business
21   partner, Anita Dunn, was working closing on the
22   Obama campaign, and ask Mr. Knapp to see if he could
23   reach out to Anita Dunn and ask her to provide to us
24   a formal invitation to the Grand Park rally on the
25   condition that we weren't planning to attend.

Greenlee - direct by Schar                    4468

1  Q   What happened?
2  A   He reached out to her and she reached out to
3  their people and they issued to us a formal
4  invitation or at least, to the best of my knowledge,
5  they told us that he had been formally invited so
6  that we could advise our press people that we had,
7  in fact, been formally invited by the Obama
8  campaign.
9  Q   As part of that, was there an agreement?
10 A   We made the suggestion that we would not attend.
11 Q   The Grant Park rally?
12 A   Yes.
13 Q   You say "we" would not attend," who --
14 A   The Governor, Governor Blagojevich would not
15 taken.
16 Q   And at some point did that ultimately change?
17 A   That did change.  Election day, Governor
18 Blagojevich decided that he wanted to attend the
19 rally.
20 Q   What happened?
21 A   He let me and I believe he let our press
22 secretary, as well, that he planned to attend the
23 rally, and as a result of that, we let the
24 Governor's advance team know that he would be
25 attending the rally so that they could obtain

:09PM
:09PM
:09PM
:09PM
:10PM

Greenlee - direct by Schar                4469

1  credentials based on our invitation.

2          When they went to obtain credentials, the

3  Obama campaign raised red flags and Anita Dunn, Bill

4  Knapp's business partner, found out about it.

5          When she found out the fact that he planned

6  to come after us suggesting that he would not, she

7  got very concerned because they didn't really want

8  us to be there.  And she reached out to Bill Knapp

9  to reach out to me to ask whether he was really

10 planning to come and what this was all about.

11 Q   In fact, was there an e-mail exchange on this?

12 A   Yes, there was.  There was an e-mail chain

13 letter.

14 Q   Is it fair to say you were intimately familiar

15 with the whole background of what was occurring?

16 A   Yeah, I was the point person dealing with this.

17          MR. SCHAR:  May I approach, Judge?

18          THE COURT:  You may.

19 BY MR. SCHAR:

20 Q   Mr. Greenlee, showing you Government Exhibit

21 Greenlee E-Mail 1 and ask if you recognize that

22 e-mail.

23 A   I do.

24 Q   Was that the e-mail exchange that you previously

25 described relating to attending that function?

Greenlee - direct by Schar                    4470

1   A   It is.

2         MR. SCHAR:  Judge, we move Government Exhibit

3   Greenlee E-Mail 1 into evidence.

4         MR. GOLDSTEIN:  No objection.

5         THE COURT:  Without objection, admitted.

6      (Government's Exhibit Greenlee E-Mail 1 was

7       received in evidence.)

8         MR. SCHAR:  And ask to publish a portion of

9   it?

10        THE COURT:  You may.

11     (Exhibit published to the jury.)

12  BY MR. SCHAR:

13  Q   Looking at the top, is that an e-mail from you,

14  Mr. Greenlee, to Mr. Knapp?

15  A   It is.

16  Q   Starting actually at the bottom, which I believe

17  the string continues up, is that an e-mail from

18  Anita Dunn to Mr. Knapp?

19  A   It is.

20  Q   And does it include the initials which I think

21  you defined on the tape as WTF?

22  A   It does.

23  Q   Was that, then, forwarded on to you from

24  Mr. Knapp?

25  A   It was.

1  Q   What does Mr. Knapp say?

2  A   He says that he's -- that I'm killing him with

3  his partner, Dunn, you know, causing a problem

4  because he had to make a promise that was

5  problematic to them that we're now backing out on.

6  Q   And what was that promise?

7  A   That Governor Blagojevich would not attend.

8  Q   And you then respond to the e-mail from Mr. Knapp

9  to you indicating you are maintaining he will not

10 attend:

11     "... Emil's party is at 8:15, thinking of

12        stopping by 8:45, has TV from 9:15 to attend at

13        home, odds are he doesn't show."

14          What are you indicating to Mr. Knapp?

15 A   I'm suggesting to Bill Knapp that I still thought

16 that it was possible he wouldn't attend the rally,

17 in any event, because he had too

18 busy a schedule and because it was -- It's just -- I

19 couldn't be certain that he'd actually show up.

20 Q   And the "he" being defendant Blagojevich?

21 A   Governor Blagojevich, that's correct.

22 Q   Again, Mr. Greenlee, it's fair to say you had

23 fairly concrete information related to this issue?

24 A   That's correct.

25 Q   In response -- going back to the transcripts,

:12PM

:12PM

:12PM

:12PM

:13PM

1   Mr. Greenlee, after you say to him:
2       "Why would they not initially invited you to
3        this thing?"
4       Defendant Blagojevich responds:
5       "They invited me, they always did, that was
6        Madigan putting the S. out.  I was always
7        invited.  You honestly think they'd snub me?
8        NO way."
9          What do you understand Defendant Blagojevich
10  to be telling you?
11  A  So I had just expressed my understanding based on
12  the e-mails conversation that I had had that he
13  wasn't initially invited.
14          And Governor Blagojevich responds by
15  disputing kind of the information that I had and
16  telling me that actually it was Madigan who
17  suggested that he had not been invited and that
18  there was no way that he could've been snubbed --
19  Governor Blagojevich could've been snubbed, excuse
20  me.
21  Q  Given your earlier background with this, do you
22  have any knowledge whether Michael Madigan had
23  anything to do with this?
24          MR. GOLDSTEIN:  Objection.
25  A  To my knowledge, he had nothing to do with this.

Greenlee - direct by Schar                    4473

1        THE COURT:  The question was objectionable
2   but the answer wasn't.  The answer may stand.
3   BY MR. SCHAR:
4   Q   Over on Page 6 you say:
5        "I'm not sure about that."
6         At the top of the page.
7         And Defendant Blagojevich says:
8         "You're wrong, no way."
9         And you say:
10        "I'll show you the e-mail."
11        And he says:
12        "What e-mail?"
13          Again, is that a reference to the e-mails
14   that you just seen?
15   A   It is.
16   Q   You then in the following parts of the page walk
17   through the e-mail in trying to explain to Defendant
18   Blagojevich what had happened?
19   A   That's correct.
20   Q   Over on to Page 7, you again try to indicate,
21   line 4:
22        "I'm telling you that they, if they'd had their
23         druthers, they would've rather not invited you.
24         We made sure you got invited.  You know, and
25         when push comes to shove, obviously they

Greenlee - direct by Schar                    4474

1    invited you.  They didn't want the issue.  But
2    if they had their druthers, they wouldn't have
3    invited you."
4    Defendant Blagojevich says:
5    "See, I don't believe that.  I don't think it
6    matters at all.  I mean, I as back there.  I
7    was easily invited.  It was just me and Daley
8    back there, right?"
9        What are you trying to indicate to Defendant
10   Blagojevich and what is his response?
11   A  Again, I was trying to explain to him that it was
12   my understanding that he had not, in fact, been
13   invited.
14       And that as a result of him not being invited
15   initially, that was a suggestion that the Obama
16   administration had concerns about being seen with
17   him.
18       And kind of characteristically of, you know,
19   situations in which I disagreed with Governor
20   Blagojevich, despite the fact that I, you know, had
21   factual evidence to back me up, his response was he
22   didn't believe it, he didn't believe anything that I
23   had said on it and that he was clearly invited.
24   Q  On to line 22, Defendant Blagojevich says:
25       "Listen, you're, you're, you're, you're, you're

Greenlee - direct by Schar                    4475

1      wrong here.  And I, believe me, you're not
2      hurting my feelings, okay?
3      You say:
4      "Huh-huh."
5      "That thing there I asked for ain't gonna
6      happen.  But it, it could easily happen.  And
7      the Rezko thing's meaningless."
8          What do you understand Defendant Blagojevich
9  to be telling you there?
10 A   What I understand him to be telling me there is,
11 first, he doesn't believe what I've told him, but,
12 second, that he understands that he would not be
13 appointed to Secretary of Health and Human Services,
14 but that it would be very easy for the Obama
15 administration to do so, and that the fact that he
16 is not being appointed has nothing to do with any
17 relationship between Governor Blagojevich and Tony
18 Rezko.
19 Q   Over on to Page 8, line 8, you say:
20     "Let me ask you the question.  If they, if they
21      don't, if they don't give it to you, which, by
22      the way, I'm gonna tell you, there's nobody,
23      there's no governor more qualified than you."
24      Defendant Blagojevich says:
25      "Correct."

Greenlee - direct by Schar                4476

1      What are you doing at this point?
2  A   At this point I realized that I just had a
3  disagreement with Governor Blagojevich and that, you
4  know, based on what I said before, when you disagree
5  with him, with Governor Blagojevich, too frequently,
6  you risk the fact that he won't want to talk to you
7  again.
8         So I made the determination that it would be
9  useful to start building him up again, so I told him
10 that no one was more qualified for him to be
11 appointment even though that wasn't what I believed.
12 And he agreed with me, that he was the most
13 qualified.
14 Q   Over on Page 9 -- I'm sorry, why don't we go to
15 Page 10, at line 7, you say:
16     "They may push for is that Deval Patrick, you
17      know, the one they were talking about for
18      attorney general."
19     Defendant Blagojevich says:
20     "For Health and Human Services?"
21     You say:
22     "Yeah."
23     Defendant Blagojevich says:
24     "Who's saying that?"
25     And you respond:

1      I'm saying that that's a possibility."  What
2      are you saying there?
3  A   I'm explaining there that there's a possibility
4  that they could have other candidates for Health and
5  Human Services, including Deval Patrick.  And he
6  asked me, you know, whether I heard that from
7  someone else, and I said I suggested I was saying
8  it, throwing it out as a possibility.
9  Q   On line 17 Defendant Blagojevich says:
10      "Yeah, but you don't forget and here, he can't
11      give them a U.S. Senator that he really wants,
12      that he's close to.  You see that's the ace in
13      the hole.  The other one is, I can make me the
14      senator."
15          What do you understand Defendant Blagojevich
16  to be saying there?
17  A   I understand that Governor Blagojevich was saying
18  that Governor Blagojevich's advantage to other
19  sitting governors, and Deval Patrick in particular,
20  was that Governor Blagojevich had the opportunity to
21  appoint the U.S. Senator of the Obama's
22  administration choosing, and that the other
23  advantage he had is Governor Blagojevich had the
24  opportunity to appoint himself which he thought be
25  objectionable to the Obama administration.

Greenlee - direct by Schar                    4478

1   Q   Over on to Page 11, you begin to discuss at that
2   point what might be a response to the Obama
3   administration in relation to the request for Health
4   and Human Services?
5   A   Uh-huh.  Yes, that's correct.
6   Q   And over on 12, line 2, you say:
7       "I think they offer to try to broker something
8        with Madigan., 'cause I think they know that if
9        they sit Madigan down and squeeze him, he would
10       broker a deal.  You know?"
11       Defendant Blagojevich says:
12       "He would?"
13       You say:
14       "I think they assume that he would do it
15        because he's not gonna wanna get crosswise with
16        this president."
17       And Defendant Blagojevich says:
18       "He doesn't care, what does he care?"
19       What are you talking about in this section?
20  A   We're talking -- in the beginning part of this
21  section, we're talking about what offers the Obama
22  administration might make to Governor Blagojevich,
23  in particular brokering a deal with Speaker Madigan
24  with relation to some of the legislative roadblocks
25  that we face in the Illinois General Assembly.

1          And Governor Blagojevich is suggesting two
2    things, where he says on line 7, he would, he's
3    saying Obama would be willing to broker a deal, and
4    -- oh, no, excuse me.  When he says "he would," he's
5    saying that Speaker Madigan -- he's questioning
6    whether Speaker Madigan would be willing to sit down
7    with President Obama and broker a deal.
8          I then say I think that the Obama
9    administration assumes that Speaker Madigan would be
10   willing to sit down.  And then Governor Blagojevich
11   says "he," meaning in this instance Speaker Madigan,
12   doesn't care in this instance about the interest of
13   the Obama administration.  "What does he care," I
14   respond Speaker Madigan does care, and Governor
15   Blagojevich responds, in turn, that he believes that
16   Speaker Madigan would not care about the Obama
17   administration's interest.
18   Q   In this context, what was your understanding as
19   to what Defendant Blagojevich was saying regarding
20   the effect it would have on Michael Madigan to get
21   people like President Obama involved in brokering
22   some type of deal?
23   A   My understanding from this conversation was
24   Governor Blagojevich did not believe that the Obama
25   administration's willingness to mediate anything,

:20PM

:20PM

:21PM

:21PM

:21PM

1 mediate a negotiation would have any impact on
2 Speaker Madigan.
3 Q   On line 20 you say:
4      "President can, can f' him in a lot of little
5       races and in a lot of little ways. Defendant
6       Blagojevich says:
7       "No, you're ridiculous, ridiculously naive.
8       Cannot and will not."
9           Was that a continuation of the conversation?
10 A   It is.
11 Q   What are you discussing?
12 A   We're discussing whether the Obama administration
13 can have any impact on anything, any of the
14 legislative races that Speaker Madigan might care
15 about.
16          I'm saying that I contended that the
17 president could have some impact on those races.
18 Governor Blagojevich contended that the president
19 could not and would not expend the time on any of
20 those races and that as a result of that, that
21 anything that any mediation by him would not
22 represent a credible threat to Speaker Madigan.
23 Q   On Page 13, line 8, Defendant Blagojevich says:
24      "What you're saying to me is a very plausible
25       comeback by them.  I agree with what you're

Greenlee - direct by Schar                    4481

1      saying.  That, that is very plausible.  But
2        that is unsatisfactory to me."
3    What did you understand him to be saying?
4  A   What I understand him to be saying is that the
5  line of response that I laid out to Governor
6  Blagojevich as potentially coming from the Obama
7  administration was very plausible as a response that
8  they might give to Governor Blagojevich.  But that
9  from Governor Blagojevich's perspective, Governor
10 Blagojevich believed that those things that the
11 Obama administration had offered in response to the
12 Senate Seat were not satisfactorily commensurate,
13 was the word he used, previous to the action that he
14 was taking on their behalf.
15 Q   At line 26 Defendant Blagojevich says:
16       "Right.  All I gotta do is cut my separate deals
17        with Lisa, Madigan and Lisa, and I can get it.
18        Send her there and you don't get Valerie."
19    What do you understand him to be saying?
20 A   I understand that this is kind of a rehearsal of
21 the response that he would give to the Obama
22 administration if that was the transaction that they
23 made, and then his response would be that he could
24 deal with the Madigans separately on his on and he
25 did not need their -- the Obama administration's

Greenlee - direct by Schar                    4482

 1  input to deal with that.

 2  Q   What was your understanding as to what he wanted

 3  in the context of this conversation beyond the

 4  Madigan appointment?

 5  A   My understanding is that he wanted some

 6  appointment or some benefit to himself personally

 7  beyond what the Obama administration could offer

 8  with regard to mediation of that dispute.

 9  Q   When you say "that dispute"?

10  A   The dispute between Governor Blagojevich and the

11  Madigans.

12  Q   Over to line 14 -- sorry, on Page 14, line 6,

13  Defendant Blagojevich says:

14      "Well, let's see what happens.  I feel like you

15       know, you just take one day at a time, try to

16       execute.  I mean, I think I did as good as I

17       could today."

18          What do you understand he's referring to in

19  that regard?

20  A   I understand him to be referring to the SEIU

21  meeting.

22  Q   At line 13 Defendant Blagojevich says:

23      "Part of our next plan has to be how does

24       somebody get to Valerie Jarrett and let her

25       know, you know, the governor's, he could do,

Greenlee - direct by Schar                    4483

1      you know, this could happen for you.  Keep
2      pushing."
3          What do you understand he is suggesting at
4  line 13 through 17?
5  A  I understand he's suggesting that someone reach
6  out to Valerie Jarrett and continue to push for the
7  appointment to U.S. Senate.
8  Q  Line 26, Mr. Greenlee, you say:
9     "It might not be bad for you to have some people
10      seen entering and leaving your office, just so
11      it looks like there is a search process going."
12          What are you suggesting to him?
13  A  I'm trying to find a way to get him to do
14  interviews and to conduct a search for a senator.
15  Q  Was there a search process going on?
16  A  No.
17  Q  Page 15, line 1, you say:
18     "So I mean, if you have two or three people come
19      in and, you know, maybe they'll get real
20      interviews.  I mean, people --"
21      Over down to the bottom on 16 and 17 Defendant
22      Blagojevich says:
23     "Coming in doesn't mean that much.  Who cares,
24      just put it out there in the press."
25          What are you suggesting and what is

:24PM

:24PM

:25PM

:25PM

:25PM

Greenlee - direct by Schar                                    4484

1  Defendant Blagojevich's response?
2  A  I'm trying to find a way to get people in to
3  actually do interviews so we can conduct a search
4  for senator.
5          And he suggests that actually having people
6  come in for interviews is relatively unimportant,
7  the important thing is that he gets press stories
8  that suggest that people actually interviewed.
9  Q  That was the evening of November 6th.  Directing
10 your attention now, Mr. Greenlee, to November 7th.
11         Again, did you have several calls with
12 Defendant Blagojevich regarding the Senate Seat that
13 day?
14 A  I did.
15 Q  I'm going to direct you to tab 31.
16         MR. SCHAR:  Judge, with Your Honor's
17 permission, we'll play the call behind tab 31.
18         THE COURT:  You may do so.
19     (Tape played)
20 BY MR. SCHAR:
21 Q  Back to page 1, Mr. Greenlee, this call is at
22 1:12 p.m. on November 7th, 2008?
23 A  Yes, sir, that's correct.
24 Q  And that was Friday afternoon?
25 A  That was.

Greenlee - direct by Schar                    4485

1  Q   Where were you?

2  A   I was in the office.

3  Q   Over on to Page 10 -- I'm sorry, on Page 2, line

4  10, Defendant Blagojevich says:

5      All right, Greenlee, hey, find out if the U.S.

6      Senator's wife can also lobby Washington while

7      he's a senator, okay?  I believe Tom Daschle

8      wife's did that.  Look into the Daschles and

9      see what they did.  Her name is Linda Daschle,

10     I think she worked with Danielle, Wyma's

11     girlfriend."

12         What did you understand Defendant

13 Blagojevich is talking about here?

14 A   What I understand him to be talking about is,

15 he's asking me to find out whether a sitting U.S.

16 Senator can have a spouse who lobbies members of

17 Congress during the period in which that -- or

18 during the period in which that senator is in

19 office, so that if Governor Blagojevich appointed

20 himself, that his wife would be able to lobby.

21         MR. SOROSKY:  Objection.

22 BY MR. SCHAR:

23 Q   What did you do after you got off the phone with

24 Defendant Blagojevich?

25 A   I asked my staff to look up the congressional

1  rules to find out whether that was permissible.

2  Q   Were you provided with certain information?

3  A   I was.

4          MR. SCHAR:  May I approach, Judge?

:30PM   5          THE COURT:  You may.

6  BY MR. SCHAR:

7  Q   I show you what is marked, Mr. Greenlee, as

8  Government Exhibit Lobby and ask you if you

9  recognize this document?

:31PM   10  A   I do.

11  Q   What is this?

12  A   It's materials that I received from staff on

13  whether spouses could lobby during the period which

14  their spouse was a member of Congress.

:31PM   15  Q   So you had your staff go out and look at that

16  issue?

17  A   Yes.

18  Q   And that's what you got back?

19  A   Yes.

:31PM   20  Q   Does it appear to be in the same condition as

21  when you received it?

22  A   Yes.

23          MR. SCHAR:  Judge, we move Government Exhibit

24  Lobby into evidence.

:31PM   25          THE COURT:  Without objection, admitted.

Greenlee - direct by Schar                    4487

1      (Government's Exhibit Lobby was received in

2       evidence.)

3          MR. SCHAR:  Move to publish?

4          THE COURT:  You may publish.

:31PM   5      (Exhibit published to the jury.)

6  BY MR. SCHAR:

7  Q   Look at the first page, Mr. Greenlee.

8          Do you know whose handwriting that is at the

9  top?

:31PM  10  A   Yes, it's my of my staffers.

11  Q   And there are examples of certain senators, the

12  spouses of senators?

13  A   Spouses or family members, that's correct.

14  Q   And what's the title of this document?

:32PM  15  A   The title of the document is Employment

16  Considerations For Spouses.

17  Q   What does it indicate?

18  A   It indicates, to the best of my understanding,

19  that spouses of members of Congress can lobby

:32PM  20  Congress but that it's inappropriate to lobby the

21  spouse themselves.

22  Q   Now, after getting this research, did you have

23  another conversation with Defendant Blagojevich?

24  A   I did.

:32PM  25  Q   Was it shortly later that day?

Greenlee - direct by Schar                    4488

1  A   It was.
2         MR. SCHAR:   Judge, we ask to play the call
3  behind tab 32.
4         THE COURT:   Leave is granted.
5      (Tape played.)
6  BY MR. SCHAR:
7  Q   Back to Page 1, Mr. Greenlee, November 7th, 2008,
8  at 1:23 p.m., was that about ten minutes after your
9  last phone call?
10  A   Yes, that's correct.
11  Q   On line 1 Defendant Blagojevich says:
12      "You're checking on the other thing, right?"
13      You say:
14      "Yep, checking on."
15      And Defendant Blagojevich says:
16      "Okay."
17      And you say:
18      "You're right.  I checked, I checked with one
19      of our people who was there and, ah, both
20      Conrad and Daschle's wives are, currently."
21         What did you understand Defendant
22  Blagojevich was asking about and what did you
23  indicate?
24  A   I understood that he was asking about the
25  question regarding spouses lobbying that he had

Greenlee - direct by Schar                    4489

1  asked me about previously, and I communicated to him

2  that yes, we had done the research and that there

3  were spouses of current or recently previous members

4  of Congress who were continuing to lobby.

5  Q   At line 15 Defendant Blagojevich says:

6       Lobbying, what'd, what'd they do?  Lobby in

7        Washington?  Congress?"

8        And you say:

9        "They lobbied Washington.  They, the general

10        determination is you shouldn't lobby your

11        husband's office.  Outside of that you can

12        lobby the rest."

13           What are you talking about there with

14  Defendant Blagojevich?

15  A   Governor Blagojevich is asking me what types of

16  lobbying a spouse can do.  In particular, you know,

17  where they can lobby.  Can they lobby in Washington

18  directly versus home state, for example.

19           In response I said that they lobby in

20  Washington itself and that the determination, as I

21  understood it, was that you shouldn't lobby -- that

22  a spouse who is a lobbyist should not lobby the

23  spouse who is a Congress member.

24  Q   At line 21 Defendant Blagojevich says:

25       "Damn."

:34PM

:34PM

:35PM

:35PM

Greenlee - direct by Schar                4490

1      And you say:
2      So yes."
3         And continuing over to Page 2, he says:
4      "I mean, why not just take that and do that for
5      two years?  Huh?"
6      And you say:
7      "Which?  Doing Which?"
8      And Defendant Blagojevich says:
9      "Patti and I, we just move out to D.C."
10        What did you understand Defendant Blagojevich
11 to be talking about here?
12 A  I understand that he's now talking about again
13 appointing himself to Senate, but in this case that
14 he would also have his wife work as a lobbyist
15 during the same time period for the 2 years
16 remaining in the senatorial term.
17 Q  Mr. Greenlee, that call was on November 7th.
18 Over the next several days, did you have much
19 contact with Defendant Blagojevich?
20 A  No, not much at all.
21 Q  Was November 8th and 9th a weekend?
22 A  I was.
23 Q  On November 10th were you asked to participate in
24 a conference call?
25 A  I was not.

Greenlee - direct by Schar                4491

1   Q   Directing your attention to November 12th.

2        Did you learn particular information that day

3   regarding the Senate Seat?

4   A   I did.

5   Q   From whom?

6   A   I learned, I believe, from John Harris and I saw

7   later on CNN that Valerie Jarrett was taking a

8   position in the White House and was no longer

9   interested in Senate Seat.

10  Q   After Valerie Jarrett removed her name from

11  consideration, did you continue to discuss the

12  Senate Seat with Defendant Blagojevich?

13  A   Yes.

14  Q   I'm going to focus on the time period from

15  November 13th, the day after she removed her name or

16  about the time she removed her name to December 1st.

17       Did you continue to have a variety of

18  conversations with Defendant Blagojevich about the

19  Senate Seat?

20  A   I did.

21  Q   In person or on the phone or both, if you

22  remember?

23  A   Generally over to phone.

24  Q   Do you recall each conversation individually?

25  A   Collectively.

1  Q   What do you generally remember about these
2  conversations?
3  A   I generally remember that the conversations
4  during the time period that you are alluding to were
5  somewhat more unfocused than in the previous week or
6  so.  They really focused on three -- three things in
7  particular, the first one being my -- my ranking or
8  his ranking of various candidates in terms of the
9  order in which they would be appropriate candidates.
10 So he would ask me what my top three candidates were
11 as of that day.
12        He also talked a fair amount about appointing
13 himself to the Senate, and he talked about trying to
14 pull together some deal by which we could appoint
15 Lisa Madigan to the Senate and in exchange obtain
16 legislative approval from a number of things that we
17 cared about from her father, Michael Madigan.
18 Q   What role, if any, did you have in putting
19 together a list related to the Lisa Madigan
20 proposal?
21 A   Governor Blagojevich asked me to and I drafted a
22 list of all the possible things that we would want
23 in exchange for appointing Lisa Madigan to the U.S.
24 Senate.
25 Q   Based on that list, what was your understanding

Greenlee - direct by Schar                    4493

1  as to whether there was any realistic possibility
2  that that deal was going to happen?
3  A   Based on --
4        MR. GOLDSTEIN:  Objection.
5        THE COURT:  Sustained as to form.
6  BY MR. SCHAR:
7  Q   In terms of time frame -- well, were you familiar
8  with the list?
9  A   I drafted the list.  I was familiar with it.
10  Q   And were you familiar with the legislative
11  process in terms of trying to get certain things
12  approved?
13  A   I was; yes.
14  Q   And based on the list, did you have an
15  understanding as to whether it was realistic that
16  these things would be implemented?
17        My understanding --
18        MR. GOLDSTEIN:  Objection.
19        THE COURT:  That's a yes or no.
20  BY THE WITNESS:
21  A   Yes.
22  BY MR. SCHAR:
23  Q   What was your understanding.
24        MR. GOLDSTEIN:  Objection as to "what was
25  your understanding."

1          THE COURT:  Overruled.

2     BY THE WITNESS:

3     A   My understanding, based on the items on the list

4     and the legislative calendar, was that there was no

5     way that the items on the list could be passed

6     during the legislative period currently then in

7     session.

8     BY MR. SCHAR:

9     Q   I'm going to direct your attention to

10    approximately December 2nd, 2008.

11          Around that time, what did you do in that

12    time period?

13    A   In the time period about the week before

14    December 2nd, 2008, we received notice from the

15    Obama administration that they planned to have a

16    summit of governors in Philadelphia and we made

17    arrangements for Governor Blagojevich to attend.

18          Knowing that, you know, we hadn't made much

19    headway in the previous weeks with regard to putting

20    together a Senate appointment process.  Around the

21    time that Governor Blagojevich was going to be in

22    Philadelphia, I put together a meeting between

23    Governor Blagojevich and his Washington, D.C.

24    advisers, Bill Knapp and Fred Yang so that we could

25    discuss the senate seat appointment process and

1  hopefully get closure on it.

2  Q   Did you go to Philadelphia?

3  A   I did.

4  Q   Did a meeting occur with Mr. Yang and Mr. Knapp

5  and others?

6  A   It did.

7  Q   Where did it occur?

8  A   It occurred in the offices of a law firm in

9  Philadelphia.

10  Q   Who was present for the meeting?

11  A   I was, Governor Blagojevich, Bill Quinlan,

12  Governor's Office general counsel was, Fred Yang,

13  and Bill Knapp were.

14  Q   What happened at the meeting?

15  A   At the meeting we talked about potential Senate

16  choices, and we all came to the conclusion that

17  first choice for Governor Blagojevich was to try to

18  appoint Lisa Madigan and see whether we could get

19  those items on the list of accomplishments that we

20  put together passed in some way, shape, or form.

21       And then in the event that that didn't go

22  through, there was not really agreement but we

23  talked about a number of potential options for a

24  second or third candidate.

25  Q   Which options were discussed?

Greenlee - direct by Schar                    4496

1  A   We discussed the options of the Governor
2  appointing himself, the options of Gery Chico, Eric
3  Whitaker, and potentially a couple of other
4  candidates whose names I can't recall.
5  Q   In the context of Defendant Blagojevich
6  appointing himself again, what was the reaction?
7  A   There were some, including myself, who were open
8  to it; there were some, including Bill Knapp, who
9  were adamantly against it.
10 Q   Coming out of that meeting, was it your
11 understanding that Lisa Madigan at that point was
12 the proposed choice, potentially, for the Senate
13 Seat?
14 A   Was the conclusion that everyone at the meeting
15 reached.
16 Q   Did you come back to Chicago?
17 A   I did.
18 Q   About when?
19 A   We came back the night of December 2nd.
20 Q   Now, to your recollection, had Congressman
21 Jackson's name come up in the context of the
22 Philadelphia meeting?
23 A   It did not.
24 Q   Had it previously come up in a conversation you
25 had with Defendant Blagojevich?

Greenlee - direct by Schar                          4497

1   A   It had.

2   Q   I'm going to direct your attention to tab 6 in

3   Binder 1.

4           MR. SCHAR:  Judge, this call was already

5   played we don't have to republish.

6           THE COURT:  You want to republish it?

7           MR. SCHAR:  I do not, just want to ask

8   questions.

9   BY MR. SCHAR:

10  Q   In terms of time frame, Mr. Greenlee, to orient

11  you, this is October 31st, 2008, 5:14 p.m., part of

12  the phone call you had with Defendant Blagojevich?

13  A   Yes, that's correct.

14  Q   At line 10 Defendant Blagojevich says:

15      "I got some lady calling my house for Jesse,

16       Jr., here a little while ago."

17      You say:

18      "I'm telling ya, that guy's shameless."

19      Governor Blagojevich says:

20      "Unbelievable, isn't it.  Then I, we were

21       approached, pay to play.  That, you know he'd

22       raise me 500 grand, an emissary came, then the

23       other guy would raise a million, if I made him

24       a senator."

25          What did you understand Defendant

1  Blagojevich to be telling you here?

2  A  I understood Governor Blagojevich to be telling

3  me here that he'd been approached by emissaries

4  claiming to represent Jesse Jackson, Jr., and that

5  in the event he was to appoint Mr. Jackson,

6  Congressman Jackson to serve as U.S. Senator, that

7  they would collectively -- his supporters would

8  collectively raise 1.5 million dollars in campaign

9  contributions for the governor.

10 Q  When he used the term "pay to play" what did you

11 understand Defendant Blagojevich was referring to?

12 A  When he used the term "pay to play" I understood

13 him to be referring to an agreement to make the

14 appointment for Senate in exchange for receiving

15 campaign contributions.

16 Q  I want to move back to December 4th, 2008, over a

17 month after this last conversation regarding that.

18         On the morning of December 4th, did you talk

19 to Defendant Blagojevich?

20 A  I did.

21 Q  In person or over the phone?

22 A  Over the phone.

23 Q  What did you and Defendant Blagojevich discuss?

24 A  We were talking about an upcoming trip to

25 California and things that we were going to discuss

1  in that trip.

2  Q   Did the issue of a poverty summit come up?

3  A   Oh, yes, it did, as well.  We were going to have

4  a poverty summit on December 9th, 2008, and Governor

:45PM  5  Blagojevich asked me whether it would be possible to

6  invite Jesse Jackson, Jr.

7  Q   What was your response?

8  A   My response was yes, it's possible to do so.

9  Q   Was there any discussion about Lisa Madigan?

:45PM  10  A   To my recollection -- you know, I can't

11  recollect.

12  Q   Later on the afternoon of December 4th, did you

13  talk to Defendant Blagojevich again?

14  A   I did.

:45PM  15  Q   Who was on the phone then?

16  A   Fred Yang.

17  Q   Who was Fred Yang?

18  A   Fred Yang was the Governor's polster.

19       MR. SCHAR:  Judge, may I approach with

:45PM  20  Government Exhibit Transcript Binder 2?

21       THE COURT:  You may.

22       MR. SCHAR:  With Your Honor's permission, we

23  would seek to play the call behind tab 91.  Tab 91,

24  Transcript Binder 2.

:46PM  25       THE COURT:  Leave is granted.

1       (Tape played)

2    BY MR. SCHAR:

3    Q   Mr. Greenlee, going back to Page 1.

4    A   Yes.

5    Q   The call on December 4th, at 2:09 p.m.

6    A   That's correct.

7    Q   On Page 1, line 8, Defendant Blagojevich says:

8         "Yeah, I wanted Lucio to give that to Fred.

9          Fred, Rasmussen poll came out."

10        You said:

11        "Yeah, I saw it, governor."

12        Defendant Blagojevich says:

13        "Jesse, Jr., how about that?  Great minds think

14        alike."

15           What is being referred to in this section?

16   A   On or around the 4th, Rasmussen, which is a

17   pollster, came out with a poll showing relative

18   support for various candidates for appointment to

19   the Senate, and Governor Blagojevich and Fred Yang

20   are both referring to this poll.

21   Q   Over on to Page 2, Defendant Blagojevich at line

22   5 says:

23        Well, no, I was telling you I was leaning in

24        that direction, you know, I had no idea of any

25        poll."

:10PM

:11PM

:11PM

:11PM

:11PM

Greenlee - direct by Schar                4501

1          What did you understand Defendant Blagojevich
2   is saying at line 5 through 7 on page 2?
3   A   I understand him here to be saying to Fred Yang
4   that he had previously been leaning in the direction
5   of Jesse Jackson, Jr., before seeing the results in
6   the poll, but that the results in the poll
7   reiterated what he had been thinking.
8   Q   At line 27 you indicate:
9       "I'm not joking.  If you do Jesse Jackson, man,
10      I can't promise I'm staying."  Defendant
11      Blagojevich says:
12      "Yeah, well, don't give up on ... look,
13      Greenlee, I'd love t keep you, but at some
14      point, man.  I mean, you're asking me to do
15      Lisa Madigan?"
16          What are you indicating and what's Defendant
17  Blagojevich's response?
18  A   I'm indicating that if he appoints Jesse Jackson,
19  Jr., that I will quit, and he's indicating that to
20  the extent that it becomes a question of me quitting
21  versus appointing Jesse Jackson, Jr., that it'd fine
22  for me to quit.
23  Q   Was it a big deal in your mind to indicate you
24  might leave?
25  A   Yeah, it was the first time I'd ever suggested

:11PM

:12PM

:12PM

:12PM

Greenlee - direct by Schar                    4502

1   anything of that nature.
2   Q   Over on to Page 5, after line 5, you say:
3       "I don't, I don't know how you can justify, you
4         know, talking about a deal with someone you
5         know will not keep their deal."
6       Now to line 14 you say:
7       "Hasn't he told you more than once that he was
8         gonna, he was gonna support you and then not
9         done it."
10      Defendant Blagojevich says:
11      "Yeah, I know."
12      And you say:
13      "I mean, so, well, how could you possibly say
14        I'
15        m gonna give you the biggest prize in the world
16        and he'd say, of course, oh, I'll do this for
17        you, when you know twice before he said he was
18        gonna do it and he didn't."
19          What are you referring to in this section?
20  A   Again we're talking about appointing Jesse
21  Jackson, Jr., to the Senate and I'm raising as at
22  least one objection to making that appointment that
23  Jesse Jackson, Jr. had previously made promises of
24  support to Governor Blagojevich that to the best of
25  my knowledge had not been honored.

Greenlee - direct by Schar                4503

1          And I make that point by saying he can't a
2   deal, and then saying if you were to appoint him to
3   the Senate, as I said, the biggest prize in the
4   world, then I don't understand how Governor
5   Blagojevich could expect him to keep any promises he
6   makes.
7   Q   And at line 24 Defendant Blagojevich says:
8          "No, but some of that tangible stuff can happen
9           before it all happens.  There are tangible
10          things that can happen before.  You see."
11         What do you understand Defendant Blagojevich
12  to be telling you?
13  A   I understood Governor Blagojevich was saying by
14  "tangible stuff" that he was referring to cash that
15  could be received before any appointment was made.
16  Q   Is that a reference back to campaign
17  contributions conversations?
18  A   Yes, it is.
19  Q   And at line 30 Defendant Blagojevich says:
20          "I'll tell you right now, if I had to make the
21           decision, you know, you make the Lisa Madigan
22           play, you get everything you want and then
23           some.  They turn it down, they don't get it
24           done, fine, then it's Jesse, Jr.  I mean,
25           that's it.  I mean, Jesse, Jr., or you know, or

1      me.  I mean --"
2           In those lines bottom of 5 on to page 6,
3  what do you understand him to be saying?
4  A   I understand he's telling Fred Yang and I that
5  unless with regard to the Lisa Madigan alternative
6  everything on the list is passed, and, as he says,
7  "and then some," and that there are some additional
8  items that he hasn't yet thought of that would be
9  passed, that he would turn the deal down and then
10  move directly to Jesse Jackson, Jr.
11  Q   On Page 6 at line 9, Yang says:
12      "Is this essentially the deal with Jesse, Jr.,
13       will be that the Jacksons will support you for
14       re-election?"
15      Defendant Blagojevich says:
16      "No, there is more to it."
17      Yang says:
18      "What else?"
19      And Defendant Blagojevich says:
20      "There's tangible, concrete tangible stuff from
21       supporters."
22      Yang says:
23      "Like what?"
24      Defendant Blagojevich says:
25      "Well, like, you know, what I'm talking about."

Greenlee - direct by Schar                4505

1      What did you understand Defendant Blagojevich
2  to be saying there?
3  A   I understand Fred Yang to be asking what Jesse
4  Jackson, Jr. is offering, and Governor Blagojevich
5  is saying that there's tangible concrete stuff from
6  supporters, and by that I understood him to mean
7  campaign contributions from supporters.
8  Q   At line 19 you say:
9      "Later."
10     Defendant Blagojevich says:
11     "Political, tangible political support, Fred."
12     Yang says:
13     "Okay, all right."
14     Defendant Blagojevich says:
15     "You know.  Specific amounts and everything."
16      What did you understand Defendant
17  Blagojevich to be referring to there?
18  A   When he said, "tangible political support," I
19  understood him to be meaning campaign contributions
20  which were tangible in nature.
21      And when he says, "specific amounts and
22  everything" that confirmed my understanding, in my
23  mind, that he was referring to campaign
24  contributions of cash.
25  Q   And he continues:

Greenlee - direct by Schar                    4506

1    "And while, you know, I don't know that all of
2     that is achievable, there is, some of it
3     upfront."
4         What did you understand him to be saying?
5  A   What I understand him to be saying there is that
6  there was an amount of campaign contributions that
7  had be promised to him that he couldn't be certain
8  it was achievable in total, but that some portion of
9  the campaign contributions would be provided by
10 supporters of Jesse Jackson, Jr., before Governor
11 Blagojevich made the appointment.
12 Q   Moving ahead to Page 9, Mr. Greenlee --
13         THE COURT:  I think we're going to stop here.
14 Fifteen minutes.
15     (The following proceedings were had out of the
16      presence of the jury in open court:)
17         THE COURT:  Court is in recess.
18         Counsel come to the side for scheduling
19 issues only.
20     (Sidebar off the record.)
21     (Recess.)
22         THE MARSHAL:  All rise.
23     (The following proceedings were had in the
24      presence of the jury in open court:)
25         THE COURT:  Please be seated.

:16PM

:16PM

:16PM

:38PM

:40PM

1        You may resume.

2        MR. SCHAR:  Thank you, Judge.

3   BY MR. SCHAR:

4   Q   Mr. Greenlee, we were in the transcript behind

:40PM  5   tab 91, in transcript Binder 2, I believe we were on

6   Page 9.

7        Are you there?

8   A   Yes.

9   Q   Tab 91 at Page 9, Mr. Yang indicates on line 9:

:41PM  10      "It'd be great to have a U.S. Senator in 20100,

11       who was friendly towards you."

12       Defendant Blagojevich says:

13       "Yeah, well, Lisa Madigan won't be."

14       What is being discussed there?

:41PM  15  A   We are discussing among the potential options for

16  Senate, for appointing to the Senate, Lisa Madigan,

17  and Jesse Jackson, Jr. in particular.

18       And what Mr. Yang is suggesting is that it

19  would be good to have a U.S. Senator who's well

:41PM  20  disposed toward you in 2011 if you were pursuing

21  re-election for Governor.  And Governor Blagojevich

22  is suggesting that Lisa Madigan won't be supportive

23  of him, in any event.

24  Q   At line 22 Defendant Blagojevich says:

25      "Yeah, hold it.  You guys are missing the point.

1       The first option is getting things done for the
2       people.  Look, you got two equally repugnant
3       picks.  Okay?"
4       "Uh-huh."
5       "Two of 'em, two equally repugnant picks, on a
6       personal level.  However, I must say, having
7       some experience with both of them, if they were
8       both drowning and I could save one, I really
9       think I'd save Jesse.  Just so you, so that
10      means from a personal standpoint, he's less
11      objectionable to me than she is.
12          What do you understand Defendant Blagojevich
13  to be saying to you?
14  A  He's comparing the two options of choosing Lisa
15  Madigan and Jesse Jackson, Jr., for the Senate
16  appointment and that he believes each of them to
17  equally repugnant on a personal level; however, of
18  the two, he believes that Jesse Jackson, Jr., is
19  less repugnant than Lisa Madigan.
20  Q  Over on to Page 10, line 3, Defendant Blagojevich
21  says:
22      "Okay, fine.  So I'm prepared, you know, to
23      honestly consider two people who I have
24      personal objections to.  For the good of the
25      people and other considerations."

1          What did you understand Defendant Blagojevich
2  is saying?
3  A   I understand Governor Blagojevich here to be
4  drawing a comparison between the two choices.  Lisa
5  Madigan being the choice that's being done for the
6  good of the people and Jesse Jackson, Jr., being the
7  a choice that's being made for other considerations.
8  Q   When you say other considerations, what do you
9  understand him to be referring to?
10  A   I understood that to be referring to campaign
11  contributions pursuant to the prior parts of this
12  conversation.
13  Q   On line 10 Defendant Blagojevich says:
14      "She gives me the better opportunity for the
15      public and for people.  Therefore, it's the
16      first play.  But if they're not interested or,
17      you know, it just, if they can't, it's not
18      gonna happen and I gotta believe their f'ing
19      promises, forget about it.  No deal."
20          What do you understand him to be saying in
21  those lines?
22  A   In these lines I understand him to be saying that
23  appointing Lisa Madigan, assuming that some type of
24  arrangement can be reached with Speaker Madigan,
25  gives him a better opportunity to get

1  accomplishments made for the people of the State of
2  Illinois, but that if he can't get everything that
3  he wants passed and in the event that he could only
4  rely on promises, as he says, that he would turn
5  that down and move to another option.
6  Q   On to Page 12, Mr. Greenlee, line 31, Mr. Yang is
7  saying:
8      "What, I don't know what tangible thing that
9      Jackson would offer you that would be so
10     great."
11     Blagojevich says:
12     "His supporters, his supporters can be
13     helpful."
14     And Yang says:
15     "Okay, all right, I hear you, all right.  Well
16     --
17     And Blagojevich says:
18     "His supporters can be helpful."
19         Do you understand what Mr. Yang was asking
20  and what do you understand Defendant Blagojevich's
21  response was?
22  A   I understood Mr. Yang to be still confused about
23  what Governor Blagojevich meant by the term
24  "tangible" when he talked about tangible support.
25  And what Governor Blagojevich tried to clarify is

Greenlee - direct by Schar                    4511

1  that Congressman Jackson's supporters could be
2  helpful by which I understood him to mean could make
3  campaign contributions on behalf of Governor
4  Blagojevich.
5  Q   Over on Page 13 at line 30, Mr. Yang says:
6       "Okay, I agree, I agree with that.  But then why
7        not Eric Whitaker then?" Defendant Blagojevich
8        says:
9        "Because he's an unknown African-American whose
10       not the uber African-American.  Jesse Jackson,
11       Jr., embodies black American politics because
12       of his father, for better or for worse.  He's
13       got a base and network of political support
14       ..."
15       over on to page 14:
16       "... that can be helpful upfront and, ah, then
17        you, then you, you just see whether or not the
18        guy, then it's a crap shoot."
19           What do you understand Defendant Blagojevich
20  to be saying here?
21  A   I understand Mr. Yang to be asking why Eric
22  Whitaker was not an alternative choice to Jesse
23  Jackson, Jr., and I understand Governor Blagojevich
24  to be suggesting that Jesse Jackson, Jr., embodies
25  African-American politics, and, in addition, he has

1  a base of political supporters, and that he

2  understanding some of those political supporters can

3  or intend to be helpful, which as he said before

4  suggests making campaign contributions before any

5  appointment to the Senate has been made.

6  Q   Moving to Page 15, Mr. Greenlee, line 3, Yang

7  says:

8      "I gotta jump off in a couple minutes to do a

9        call, but here's the question Bill Knapp asked

10       me, and we talked about this earlier, Governor,

11       it's fine to speculate about Jesse and what

12       they're gonna do, but, we've all agreed, right,

13       that the Jackson option only happens if the

14       Madigan option doesn't happen; right?"

15     Defendant Blagojevich says:

16     "Correct."

17         What do you understand Mr. Yang to be saying

18  there?

19  A   I understand Mr. Yang to be saying that, you

20  know, while we've been -- while Governor Blagojevich

21  and Mr. Yang and I have been discussing the Jesse

22  Jackson, Jr., option, that the first option was to

23  try to work out some transaction regarding Lisa

24  Madigan's appointment.  And I understand that he's

25  trying to confirm that that is, in fact, the first

1  alternative.

2  Q   Was that the decision that had come out of the

3  meeting in Philadelphia a couple of days earlier?

4  A   It was.

5  Q   Mr. Yang continues at line 13:

6      "So what are we doing to make sure the Madigan

7      option is at least gonna come to fruition.  Are

8      we gonna, they gonna make any, I mean who's,

9      Bill wanted to know, for example, governor and

10     Bob, who our emissary is gonna be?"

11        What do understand Mr. Yang to be asking?

12 A   In this part of the conversation I understood

13 that Mr. Yang was asking really what we had done to

14 start moving forward on the Lisa Madigan option.

15 Q   Governor Blagojevich yes:

16     "Yeah, I don't know yet.  You know what?  Maybe

17     that f'ing horses a', Harry Reid, out to be the

18     emissary.  You know, f' you Harry Reid and

19     Menendez.  You guys f'ing do it.  Maybe they

20     should be the ones."

21        What do you understand Defendant Blagojevich

22 to be saying?

23 A   What I understand him to be saying is that he

24 hasn't given any consideration at this point to who

25 should serve as an emissary and he's throwing out

1  various options.
2  Q   To your knowledge, at this point had anything
3  been done to actually try to make the Lisa Madigan
4  deal happen?
5  A   To my knowledge, nothing had been done at this
6  point.
7  Q   Over on to Page 16 you say:
8      "What do you -- take 'em at their word?  They
9       gave you four, why not Tammy then?"  Governor
10      Blagojevich says:
11      "Yeah, get the f' outta here, Greenlee, I'll
12       f'ing fire you.  She's got no f'ing chance.
13       I'm gonna f'ing take hits in the black
14       community for Durbin and f'ing Harry Reid and
15       Rahm, f' them, and Axelrod."
16          What were you suggesting and what was
17  Defendant Blagojevich's response?
18  A   Governor Blagojevich had previously suggested
19  that Jesse Jackson, Jr. was a viable approach
20  because if the Omaha administration had given us a
21  list of -- given the Governor's Office a list of
22  four potential candidates that they would be as I
23  understood to be okay with.
24          And I suggested a different candidate on that
25  list, in this case Tammy Duckworth, might be

Greenlee - direct by Schar                    4515

1  considered as a viable alternative candidate to

2  Jesse Jackson, Jr.

3       Governor Blagojevich's response was

4  relatively dismissive of my suggestion and suggested

5  that he thought that, politically, he would take

6  flack for reaching out to that suggestion from the

7  black community.

8  Q   At line 10 and 11 you say:

9      "Yeah, I was just f'ing with you."

10      Were you actually just messing around with

11 Defendant Blagojevich?

12 A   No, I saw that he'd gotten worked up as he often

13 did when I disagreed with him, so I was backtracking

14 to kind of, you know, agree with where he was going.

15 Q   Did he just threaten to fire you, sir?

16 A   He did just threaten to fire me, yes.

17 Q   Line 14 Defendant Blagojevich says:

18     "Tammy's the best person, but, unfortunately,

19      she's their candidate, so she's out.  And so of

20      the other three, Junior, because of my love for

21      the black community, in spite of him.  You see

22      what I'm saying?"

23      What do you understand Defendant Blagojevich

24 to be saying?

25 A   I understand him here basically rehearsing a

Greenlee - direct by Schar                    4516

1  script that he could explain for why he would choose
2  Jesse Jackson, Jr., over the other potential
3  candidates suggested by the Omaha administration.
4  Q   Defendant Blagojevich says:
5     "I mean, look at it that way.  If it just comes
6        down, I just gotta pick one of the three.
7        They're all, you know, to varying degrees,
8        there's nothing left there for me.
9           What do you understand him to be saying?
10 A   What he's saying "to varying degrees, there's
11 nothing left there for me" he's saying that he can
12 get -- from each of the remaining three candidates,
13 there's no personal financial benefit that he could
14 get from appointing any of them.
15          And when he says to "varying degrees" he
16 means that there's more benefits personally that he
17 could get from appointing some over others.
18 Q   At line 33 Defendant Blagojevich says:
19    "You know, we got a lot of work to do.  But, and
20       the first option is the first option.  I
21       haven't figured out what or how to do that.  I
22       almost feel, you know, maybe it ought to come
23       to me.  If they're interested, they should come
24       to me.  Why the f' should I got to them?  They
25       should come to me."

1          What do you understand Defendant Blagojevich

2   to be saying there?

3   A   I understand his response ultimately to

4   Mr. Yang's question, of what we've been doing to

5   move forward on the Lisa Madigan option, to be that

6   he hadn't actually figured out what or how to move

7   forward on the Lisa Madigan option, and that instead

8   of us actually doing anything, that potentially the

9   Governor should just wait for Lisa Madigan to

10  come -- to reach out to him in order to move the

11  ball forward on that option.

12  Q   Defendant Yang says at line 19:

13        "I don't think we should play around.  I mean,

14         I'm not there and I don't know him.  I think --

15         I don't think we should play around.  If she's

16         our number one draft pick, we go after her."

17          What do you think Mr. Yang to be suggesting?

18  A   I understood Mr. Yang to be suggested that if as

19  we discussed in Philadelphia our first choice was to

20  try to reach some agreement with the Madigans

21  appointing Lisa Madigan, that we should take the

22  initiative and actually move toward doing something

23  on that.

24  Q   And Defendant Blagojevich says:

25        "Well, I hear what --"

Greenlee - direct by Schar                4518

1      And Yang says:
2      "You know, we're running out of time.  And if
3      you're gonna do these other options, let's
4      just, let's just know whether or not she's
5      available."
6      And Defendant Blagojevich says:
7      "Well, ah, I gotta know what my second and
8      third and fourth fallback is.  See, that's the
9      problem."
10     And Yang says:
11     "Well, I think we've got a good list of second,
12     third, and fourth."
13      What's being discussed there?
14  A   I think here Mr. Yang is basically pushing
15  Governor Blagojevich to say that we're running out
16  of time and that we need to move forward on our
17  first choice.
18          And it's my understanding that when Governor
19  Blagojevich says, look, we need to know what our
20  second, third, and fourth fallback is, that he's
21  using a tactic that he used over the course of my
22  dealings with him with some regularity is, avoid
23  making a decision until he gets multiple pieces of
24  information that may be more or less relevant; so
25  he's stalling for time.

1  Q   Over on to Page 18, Mr. Yang says, at line 4:

2       "I mean to me, the only, one of the reasons

3        commending Jackson over Whitaker is we know

4        that Jesse Jr., wants it, we don't know if

5        Erick Whitaker wants it."

6       You says:

7       "Fair point."

8       Defendant Blagojevich says:

9       "Jesse, Jr., wants it badly and desperately and

10       he's the only one who's willing to, like, offer

11       stuff."

12          What do you understand to be discussed there?

13 A   I understand Mr. Yang suggesting that Jesse

14 Jackson, Jr., has publicly expressed interest in the

15 seat and that Governor Blagojevich's responds that

16 he has expressed his interest but he says he's also

17 expressed, through intermediaries, expressed

18 interest in offering other cash campaign

19 contributions in exchange for being appointed to the

20 seat.

21 Q   Line 33, at the bottom of the page, Mr. Greenlee,

22 Defendant Blagojevich says:

23       "And she's ahead because she can offer tangible

24        things for the people.  The guy, the other guy

25        is the better public, is, is a straight up

Greenlee - direct by Schar                    4520

1      political move.  You can cut a political deal
2      there."
3      Over on to page 19:
4      "Better than I can probably with anybody else.
5      I can cut a better political deal with him,
6      trust and verify, which means you need, and you
7      need some down payment and all the rest if you
8      want to be cynical about it.  And with them you
9      need a lot of down payment.  You follow me?"
10         What do you understand Defendant Blagojevich
11  is saying?
12  A   I understand him to be saying that appointing
13  Lisa Madigan is the first choice but that to the
14  extent we can reach some of the agreed terms we
15  talked about in the list that I put together, that
16  appointing her could lead to the best results for
17  the people of the State of Illinois, but that his
18  alternative suggestion, Jesse Jackson, Jr., is an
19  easier political deal to cut, but that when he
20  refers to the term "political deal" he uses the
21  phrase "trust and verify" which he suggests means
22  you need a down payment which I understood to mean
23  that the political deal is a deal involving campaign
24  contributions and that when you need a down payment
25  that means campaign contributions made prior to the

Greenlee - direct by Schar                    4521

1  appointment of the Senate Seat.

2  Q   At line 27 and 28 Defendant Blagojevich says:

3      "Okay, so I'm in a position of strength then to

4        raise money between now and, you know, the next

5        election."

6           What do you understand that's a reference to?

7  A   I think when he refers to being in a position of

8  strength to raise money between now and the next

9  election, he's referring to the appointment of Jesse

10 Jackson, Jr., and the fact that by doing that he's

11 covered his African-American base.

12 Q   Mr. Greenlee, that call occurs at 2:09 p.m. on

13 December 4th.

14          Shortly after that call ends, did you have

15 another call with Defendant Blagojevich?

16 A   I did.

17          MR. SCHAR:  Judge, at this point we would ask

18 to play call behind tab 92.

19          THE COURT:  Leave is granted.

20          MR. SCHAR:  Thank you, Judge.

21     (Tape played)

22 BY MR. SCHAR:

23 Q   Going back to Page 1, Mr. Greenlee.

24 A   Yes.

25 Q   The call is at 2:36 p.m. on December 4th, 2:36

Greenlee - direct by Schar                    4522

1   p.m. on December 4th.
2        Is that shortly after you hung up your last
3   call with Defendant Blagojevich and Mr. Yang?
4   A   Yeah, it was right after I hung up the last call.
5   Q   At line 7 Defendant Blagojevich says:
6        "Okay, now listen, now listen to me.  You  don't
7        know what's going on here.  So you gotta be
8        careful.  Don't be talking too much."
9        You say:
10       I hear ya'."
11       Defendant Blagojevich says:
12       "I mean, you're contradicting me here, you
13       know.  It's a repugnant idea, but I need to
14       leverage that Jesse, Jr., with these f'ing
15       national people."
16       You say:
17       "I see what your play is."
18       Defendant Blagojevich says:
19       "To get the deal for Lisa and they gotta f'ing
20       ..."
21       You say:
22       "Play."
23       Defendant Blagojevich says:
24       "You follow what I'm saying?"
25       And over on to page 2 again he comes back at

:00PM (left margin, near line 5)

:01PM (left margin, near line 15)

Greenlee - direct by Schar                    4523

1      line 14 and Defendant Blagojevich says?
2      "Yeah, I want these national Democrats and
3      Obama, and I want it to be like Obama said we
4      should appoint him."
5      "I want them to f'ing see Holy f', it's gonna
6      be Jesse, Jr., if we don't f'ing get this Lisa
7      thing done."
8      You say:
9      "I got your play, yeah.  I like that."
10         What did you understand Defendant
11   Blagojevich was suggesting to you here?
12   A   I understood that in this part of the second call
13   to me, he was explaining to me that in the prior
14   call, he was explaining that the prior call was just
15   a pretext and that he was trying to give me an
16   explanation for why the prior call was all a
17   pretext.
18   Q   And that pretext was what, according to the
19   Defendant Blagojevich?
20   A   The pretext was that he needed to make it seem to
21   people in Washington, D.C., that Jesse Jackson, Jr.,
22   was a more legitimate candidate so that they would
23   be more interested in allowing him to appoint
24   himself or more willing to provide support to him in
25   appointing Lisa Madigan.

Greenlee - direct by Schar                4524

1  Q   At the time you had this conversation, did you

2  believe Defendant Blagojevich when he told you that?

3            MR. GOLDSTEIN:  Objection.

4            THE COURT:  He can answer to his personal

5  state of mind.

6  BY THE WITNESS:

7  A   At the time that he explain this to me, I did not

8  believe him.

9  BY MR. SCHAR:

10 Q   Why not?

11 A   I didn't believe him because Fred Yang, who we've

12 been on the phone with previously, had been working

13 for him for over a decade and I'd been working for

14 him for less than 6 months, so it seemed more

15 natural to me that he'd tell the truth to Yang than

16 he'd tell the truth to me.

17            In addition to this, I had no knowledge that

18 Fred Yang knew any of these D.C. people like Harry

19 Reid or Menendez, that Governor Blagojevich seemed

20 to be so concerned about, so I didn't see how that

21 would help.

22            It didn't make any sense to me that they

23 would help with the Lisa Madigan alternative because

24 we previously discussed the fact that the national

25 people couldn't be helpful on that and because he

:02PM

:02PM

:02PM

:02PM

:03PM

1  had really done nothing to get the Lisa Madigan deal
2  done.  And I guess most as well to me, it seemed
3  like he was telling the truth on the prior
4  conversation, it didn't seem like he was dissembling
5  in the previous conversation.
6  Q   Didn't seem like he was what?
7  A   He was lying in the previous conversation.
8  Q   Line 22 Defendant Blagojevich, on page 2, says --
9  by the way, I'm sorry, your reference back to the
10  indication that Defendant Blagojevich didn't
11  indicate that the national people could accept
12  Madigan, was that in reference to the call we heard
13  earlier today?
14  A   Yes, it was.
15  Q   On line 22, page 2, Defendant Blagojevich says:
16       "And, by he way, you know, who knows, it could
17       be.  I'm not gonna completely rule it out."
18           What did you understand Defendant
19  Blagojevich to be saying?
20  A   I understand after he provided me with the
21  explanation for why he wasn't actually planning to
22  appoint Jesse Jackson, Jr., he told me as an aside
23  that, in fact, he wouldn't completely rule out
24  actually appointing Jesse Jackson, Jr.
25  Q   Line 28 Defendant Blagojevich says:

Greenlee - direct by Schar                    4526

1     "Yeah, they're, I'm so f'ing anathema to these
2     f'ing people over there.  Well maybe when Jesse
3     looks like he's real, I ain't so anthema
4     either."
5     What did you understand him to be saying?
6 A  Just continuing his explanation that if it really
7 looks like Jesse Jackson, Jr., is a real
8 appointment, that he would look less anathema, he
9 would look more appealing in contrast.
10 Q  Over on to page 3, line 25, Defendant Blagojevich
11 says:
12     "And then at least I've got some, you know, then
13     it's me and Madigan fighting it out and at
14     least, at some point, maybe that Jackson
15     network will come through.  You never know."
16     What did you understand Defendant
17 Blagojevich to be saying there?
18 A  I understand again him to be talking about the
19 Jesse Jackson, Jr., appointment which he had
20 previously said he was for, and then he told me it
21 was a pretext, now he's talking about it again and
22 saying maybe the network would come through, which I
23 understood to mean that the network of campaign
24 contributors who he was talking about would come
25 through.

Greenlee - direct by Schar                    4527

1  Q   Is that the same word he used in the prior
2  conversation?
3  A   It is.
4  Q   Over on to 4, did he also describe to you the
5  potential aspects of the advantages of Congressman
6  Jackson, and I believe at line 10 and 11 he uses
7  "the double 'I' thing," what did you understand the
8  "double 'I' thing" to be?
9  A   Is this Page 4?
10 Q   Page 4, Mr. Greenlee, lines 10, 11.
11 A   When he said "double 'I' thing" he meant
12 indictment followed by impeachment.
13 Q   And line 22 through 28 Defendant Blagojevich
14 says:
15     "There's a certain immunity to being a Jackson
16      when it comes to terrorists and f'ing war
17      criminals, you know what I'm saying?"
18     "International outlaws and f'ing indicted
19      governors."
20         What did you understand him to be saying?
21 A   What I understood him to be saying was that if he
22 appointed Jesse Jackson, Jr., there may be more
23 chance that if Governor Blagojevich were indicted
24 and impeached, that he'd have support from Jesse
25 Jackson, Jr., than other people that he was

Greenlee - direct by Schar                    4528

1  potentially appointing.

2  Q   Mr. Greenlee, that call was at 2:36 p.m. on

3  December 4th.

4       I want to direct your attention to the call

5  behind tab 93.  Is that a call at 2:43 p.m., about

6  seven minutes -- well, about seven minutes later on

7  the same day?

8       MR. GOLDSTEIN:  Objection, Judge.

9       MR. SCHAR:  Judge, I would ask at this point,

10  given the chronology of events, the only thing we

11  ask is to republish this call while Mr. Greenlee is

12  on.

13       MR. GOLDSTEIN:  We objection to that, Your

14  Honor.

15       MS. SCHROEDER:  We object, as well.

16       THE COURT:  And this is going to lead to

17  questions about?

18       MR. SCHAR:  I would not ask questions

19  about this.

20       THE COURT:  No, not about this; that I

21  understood.  What are the questions that are going

22  to follow this?

23       MR. SCHAR:  Just whether or not he was aware

24  the call had been made or the contents of the call

25  and then we'll move on, Judge.  Or the chronology in

:06PM

:06PM

:06PM

:06PM

:07PM

Greenlee - direct by Schar                    4529

1  terms of the events of that day and how that call

2  then plays out between Rod Blagojevich and Robert

3  Blagojevich.

4         THE COURT:  When was this played?

5         MR. SCHAR:  It was played yesterday.

6         THE COURT:  Don't play it again.

7  BY MR. SCHAR:

8  Q   Mr. Greenlee --

9         THE COURT:  You can direct the juror's

10 attention to it.

11 BY MR. SCHAR:

12 Q   Mr. Greenlee, I want to direct you to the call

13 behind tab 93.

14         According to the transcript, was this call

15 five or six minutes after Defendant Blagojevich hung

16 up with you?

17         MR. GOLDSTEIN:  Objection; basis of

18 knowledge.

19         THE COURT:  I did not understand the timing

20 of the call to be a matter of dispute, so I'm

21 overruling the objection.

22 BY THE WITNESS:

23 A   According to the transcript, the call is at

24 2:43 p.m.

25 BY MR. SCHAR:

Greenlee - direct by Schar                    4530

1  Q   Were you aware, one way or the other, whether
2  Defendant Blagojevich, after hanging up with you on
3  the call you just described, called defendant Robert
4  Blagojevich?
:08PM  5  A   NO.
6  Q   Do you know what Defendant Blagojevich talked to
7  defendant Robert Blagojevich about in the call
8  immediately after your call?
9  A   NO.
:08PM  10  Q   Mr. Greenlee, these calls are on December 4th.
11  Between December 4th and December 9th did you
12  continue to have conversations with Defendant
13  Blagojevich regarding the Senate Seat?
14  A   Yes; from time to time.
:09PM  15  Q   Do you remember each conversation individually or
16  collectively?
17  A   Collectively.
18  Q   What do you recall, generally, being discussed?
19  A   The general question being discussed was really
:09PM  20  the Lisa Madigan appointment versus appointment
21  himself.
22  Q   I'm sorry?
23  A   Versus appointing himself.
24  Q   And as of December 9th, were you aware of any
:09PM  25  progress that had been made in terms of actually

1  implementing the Lisa Madigan option?

2  A   I was not aware of any.

3  Q   Mr. Greenlee, you can put that binder away for

4  the time being.

5        I'd like to direct your attention, sir, to

6  some interaction relating to an issue involving

7  Children's Memorial Hospital.

8        Are you familiar with an individual named

9  John Wyma?

10  A   I am.

11  Q   How do you know Mr. Wyma?

12  A   I know Mr. Wyma as a friend of the Governor's but

13  also as a friend of Bradley Tusk who is a friend of

14  mine and previously served in the same job that I

15  served at.

16        I met Mr. Wyma in 2003, shortly after I

17  started work for State of Illinois through Mr. Tusk.

18  Q   At the time you were Deputy Governor in 2008,

19  what role, if any, or job, did you understand

20  Mr. Wyma to have?

21  A   He was a lobbyist, to my understanding.

22  Q   In the context of your role as Deputy Governor,

23  how often would you actually interact with Mr. Wyma?

24  A   He called or stopped in to visit me about once a

25  month, either with regard to a particular client or

Greenlee - direct by Schar                    4532

 1  just to stop in.
 2  Q   Directing your attention, sir, to the July,
 3  August, 2002 time frame.
 4         Did you have any contact with Mr. Wyma at
 5  that time?
 6  A   I did.  Shortly after my appointment to Deputy
 7  Governor, he contacted me and asked me if I would be
 8  willing to meet with a client of his, Children's
 9  Memorial Hospital, at some point to get acquainted
10  with the hospital and understand what some of their
11  needs were from the Governor's Office.
12  Q   In the context of that conversation, did he
13  indicate who you would be meeting with?
14  A   He indicated that he would introduce me to the
15  CEO but he didn't give me any further detail.
16  Q   What occurred after that conversation?
17  A   I agreed that it would be helpful for me to
18  understand Children's Hospital's needs and I agreed
19  to set up a meeting.
20         So in August, in August or September, we met
21  with Children's Hospital.
22  Q   Where did you meet?
23  A   I met with Children's Memorial Hospital in the
24  Thompson Center in the video conference room of the
25  Governor's Office suite.

Greenlee - direct by Schar                    4533

Q   Who was present for the meeting?

A   I was; Mr. Wyma was present; Pat Magoon, who is the CEO of Children's Hospital was present; he had some staff present; I had a couple of my staffers present; Mr. Barry Maram who was then the Director of the State Department of Healthcare and Family Services, which is the state Medicaid agency, and some of his staff were present.

Q   So just again, you're there?

A   Yes.

Q   Mr. Magoon?

A   Yes.

Q   Mr. Wyma?

A   Yes.

Q   Mr. Maram?

A   Yes.

Q   Who's the Director of the Department of Healthcare and Family Services?

A   That's correct.

Q   And various staff members?

A   That's correct.

Q   What happened during the meeting?

A   During the meeting Mr. Magoon introduced himself and introduced Children's, and he told me about two issues that Children's Memorial hospital was looking

Greenlee - direct by Schar                    4534

1   for state help with.
2        The first issue was that they were looking to
3   make an expansion to their infrastructure, build a
4   new wing, and that he was looking for state capital
5   grant, a state grant or capital budget money in
6   order to make that expansion.
7        With regard to that point, I advised him that
8   the state didn't currently have a capital budget,
9   but if he was willing to work with us on getting a
10  capital budget passed, that we would certainly be
11  interested in working with him on that project.
12       He also suggested to me that Children's
13  Memorial Hospital was looking to seeking an increase
14  in certain of the rates that were charged with
15  regard to reimbursement of pediatric services
16  provided by the doctors at the hospital.
17  Q   All right.  The second issue that I want to focus
18  on and see if you can explain a little more clearly.
19       You said he was talking about changes in
20  rates related to pediatric hospitals.  Can you, in
21  layman's terms, explain what it is that means?
22  A   I can try to.
23       So the way the state Medicaid program works
24  is that people who are Medicaid eligible, who don't
25  have other insurance and meet Medicaid criteria, go

:13PM

:13PM

:13PM

:14PM

:14PM

Greenlee - direct by Schar                    4535

1   to hospitals or doctors and receive services from
2   them.
3           Rather than submitting bills to the people
4   themselves or to an insurance company, those bills
5   are submitted to the state's Medicaid agency, the
6   Department of Healthcare and Family Services, and
7   those bills are submitted based on the services that
8   are performed and repaid or reimbursed at a rate.
9           So for the hospital or for a doctor to say, I
10  would like to see my rates increased, what that
11  means is that they would like an increase in the
12  amount that they're paid back for particular
13  services that they provide to people.
14  Q   And in that context, can you give just a concrete
15  example of what that would mean?
16  A   Sure.  So that means that if a sick child -- and
17  Children's Memorial Hospital receives a lot of
18  Medicaid reimbursement because all children are
19  presumed to be Medicaid eligible because they lack
20  income of their own.
21          Any child who goes in to get a kidney
22  transplant would then have the physician at
23  Children's Hospital, or whatever hospital in the
24  state they choose to go to, reimburse the state for
25  the service of providing a kidney transplant for the

:14PM

:14PM

:15PM

:15PM

:15PM

1  service, the doctor's service that the doctor

2  renders.  So then they would bill, and the rate

3  would be the rate that the state charges for

4  reimbursement of a kidney transplant.

5  Q   And for each of the various medical things that

6  could occur, is there a particular rate that is

7  assigned for reimbursement?

8  A   Yes, there's a different rate for every type of

9  service provided.

10 Q   So for surgery A it might be $100; surgery B,

11 which is more complicated, could be $150?

12 A   Yes.  So a kidney transplant, let's say $150; a

13 broken arm, $50, something like that.

14 Q   And in the context of raising disbursement rates,

15 what did you understand Mr. Magoon was asking about?

16 A   He was asking basically for his doctors to get

17 paid more for providing the same services, and that

18 as a result of that what he suggested is that would

19 allow the hospital to provide services to more sick

20 kids.

21 Q   And was there particular rates that Mr. Magoon

22 was interested in trying to get raised?

23 A   Yes, he or his staff gave us a list of the

24 particular rates that they were interested in

25 getting increased, both current rates and proposed

Greenlee - direct by Schar                    4537

1  rates.

2          And he also told me at that time, as I

3  recollect, that the cumulative impact of that rate

4  would be, on a gross basis, 8 to 10 million dollars,

5  which would have a value of 8 to 10 million dollars,

6  which meant that for the state the value would be 4

7  to 5 million dollars.

8  Q  And when you say the gross would be 8 to 10 and

9  for the state 4 to 5, can you explain why there's a

10  difference?

11  A  Yes; Medicaid is a program that is administered

12  by the state but is jointly funded by the states and

13  the federal government.

14          So that means that when a doctor provides

15  services and then asks for reimbursement, the State

16  of Illinois immediately provides reimbursement to

17  the doctor, but then subsequently the state will

18  then send that bill on to the federal government and

19  asks for reimbursement of a share of the cost that

20  the state paid to pay back the state.

21          So because generally the state's

22  reimbursement rate is 50 percent, if the state pays

23  a bill of $100, the state would then submit its bill

24  on to the federal government and get reimbursement

25  from the federal government of $50, which is why

Greenlee - direct by Schar                    4538

1  something that is 8 to 10 million dollars in gross

2  cost to the doctors is, for the state, net cost only

3  4 to 5 million dollars.

4  Q   So if Mr. Magoon said it would be 8 to 10 million

5  dollars, is it your understanding that that would be

6  the total amount that the state being out and adding

7  about 4 to 5 million to that?

8  A   That's correct.

9  Q   And the federal government adding the rest?

10 A   That's correct.

11 Q   What was your response to Mr. Magoon when he

12 raised this issue of changing sort of the pediatric

13 reimbursement rates?

14 A   My response to him was that it was certainly

15 the type of thing that we were interested in from a

16 policy perspective.  I mean, it was one of our

17 stated goals in the administration is to find ways

18 to get more healthcare to children.  But that, you

19 know, in light of the circumstances of, you know, we

20 all faced, which is a phrase that I used for

21 everybody that came and saw us, that it might have

22 to be the case that to make it work for budget

23 purposes we may have to delay payment to hospitals,

24 generally, to ensure that we didn't spend anymore in

25 a particular year.

:17PM
:18PM
:18PM
:18PM
:18PM

Greenlee - direct by Schar                    4539

1  Q   What does that mean delaying things?

2  A   So the way it works is that when doctors submit,

3  the State of Illinois reimburses all doctors or

4  reimburses hospitals on behalf of the doctors in the

5  hospitals on a payment schedule.  So that, you know,

6  they'll reimburse at say 60 days out or 70 days out.

7       What I told him was that as a result of this,

8  it may mean that we had to move the reimbursement

9  time period for all hospitals from -- I'm just going

10 to use a number for purposes of explanation, from

11 say 70 days that it would take to be reimbursed to

12 71 days as a result of the increase in the rates.

13 Q   Is that what you explained to Mr. Magoon in that

14 meeting?

15 A   Yeah, I told him that.  He understood the

16 reimbursement cycle.

17 Q   And in that meeting, did you get any particular

18 information?

19 A   We received a list of the rates and what

20 Children's anticipated it would cost.

21 Q   What did you do after the meeting in terms of

22 looking into this issue?

23 A   After the meeting, I first gave the materials

24 that Children's provided to HFS staff and I asked

25 them to confirm that the rate changes that they were

1 suggesting were actually the right numbers, and then

2 I subsequently asked Director Maram to meet with me

3 so we could discuss.

4 Q   Did you, in fact, meet with Director Maram on the

5 issue of the rate increases?

6 A   I did.

7 Q   Where did that meeting take place?

8 A   It took place in my office.

9 Q   What did you and Mr. Maram discuss in that

10 meeting?

11 A   I asked him -- we discussed three things:  The

12 first thing is, I asked him, you know, whether the

13 rates that were provided seem like good rates and

14 whether it was something we should be pursuing.

15       To which Director Maram responded, that the

16 idea of increasing reimbursement was important and

17 it was necessary for us to do in good policy, but

18 that the rate codes, the particular items for which

19 we were going to reimburse hospitals generally for

20 these services, may be better if we use the same

21 amount of money to distribute to different codes.

22 So potentially raise the rates for broken arms more

23 than Children's wanted, and the rates for kidney

24 transplants less than Children's wanted.  So that

25 the dollar value was fine, but the mix was

Greenlee - direct by Schar                    4541

 1  different.
 2          We then discussed, you know, how we would
 3  find a way to pay for it.  And I tasked Director
 4  Maram with trying to find a way to pay for it
 5  without increasing reimbursement cycles, but that in
 6  the event that we were unable to find it, that we
 7  would then have to pay more slowly to do so.
 8          And I last asked him in terms of
 9  implementation timing, what a good time frame to
10  implement would be, and he suggested that
11  January 1st would be a good day to implement.
12  Q   January 1st, 2009?
13  A   That's correct.
14  Q   So that would be the date that the rate increase
15  would go in?
16  A   Yes, that's correct.  That's when they would
17  become effective.
18  Q   Just for purposes of clarification, you said
19  Director Maram suggested different rates.
20  Children's Memorial would come to you with a list of
21  proposes services for which the rates would go up
22  and Director Maram was suggesting that there were
23  other additional services that might be increased,
24  as well?
25  A   It was a mixture of other services or different

Greenlee - direct by Schar                    4542

1  amounts and the purpose was designed to optimize for
2  all kids across the state.
3  Q   Now, at some point after you talked to Director
4  Maram, did you talk to Defendant Blagojevich about
5  the rate increase for Children's Memorial Hospital?
6  A   I did.
7  Q   Approximately when?
8  A   Approximately late September or early October.
9  Q   Was that conversation in person or over the
10 phone?
11 A   It was over the phone.
12 Q   What did you and Defendant Blagojevich talk
13 about?
14 A   I recollect that he called me out of the blue and
15 asked me about whether I met with Children's
16 Memorial Hospital about rate increases.
17      I told him that I had.  And he asked me what
18 I thought about it.  I told Governor Blagojevich
19 that I thought, as a matter of policy, that pursuing
20 rate increases for Children's was a good idea but
21 that we had to view it in terms of the entire
22 budgetary context, by which I meant that we would
23 have to make sure that this was something that we
24 were going to pursue, that we couldn't pursue other
25 budgetary items.

1      And then, finally, he asked me whether we
2  could look into moving forward with the rate
3  increases, by which I understood him meaning that we
4  should move forward with them.
5  Q   All right.  When you mentioned the issue of the
6  budget, is that something you routinely mention?
7  A   Yes, every time he came to me with something new
8  that he wanted us to pay for as a state, I told him
9  that, look, we have to put it in terms of the
10 broader budget perspective.
11 Q   So is there anything unusual about you raising
12 that issue in this particular conversation?
13 A   It would have been very unusual if I had not
14 raised it.  That's the way I discussed any new
15 proposal.
16 Q   Did you discuss how much the rate increase would
17 cost?
18 A   I did.  I told him that it would cost 8 to 10
19 million dollars.
20 Q   During the call did you mention anything about
21 changing the particular codes that Children's
22 Memorial Hospital had wanted?
23 A   No, I didn't mention that.
24 Q   Now, when you mentioned the budget issue, if this
25 was going to be a significant budget problem, what

Greenlee - direct by Schar                    4544

1  would you have told him?

2          MR. GOLDSTEIN:  Objection, Your Honor.

3          THE COURT:  Overruled.

4  BY THE WITNESS:

5  A   If the request that Governor Blagojevich had made

6  was going to be a significant budget issue, I would

7  have told him that we couldn't do it and that we

8  would have to find some other way to pay for it

9  before we considered it.

10 BY MR. SCHAR:

11 Q   In fact, had you told Defendant Blagojevich that

12 about various things in the past?

13 A   I had told him about that about things in the

14 past, yes.

15 Q   Now, I think you indicated Defendant Blagojevich

16 said we should look into doing it, or words to that

17 effect.  When he said that, what did you understand

18 him to mean?

19 A   When he said that we should look into doing it, I

20 understood him to mean get it moving.

21 Q   Was Defendant Blagojevich's direction to you

22 typically, in your experience, how he provided such

23 direction?

24 A   In my experience --

25          MR. GOLDSTEIN:  Objection.

Greenlee - direct by Schar                    4545

1      THE COURT:  Overruled.

2      THE WITNESS:  In my experience, Governor

3  Blagojevich provided direction in exactly those

4  terms.  He would use indirect language to express

5  what he wanted to get done.

6  BY MR. SCHAR:

7  Q   How would he explain if he did not want something

8  to happen?

9  A   If he wanted just to talk about something, he

10  would raise an issue and then before saying, you

11  know, look into it, he would say, "I'm just talking

12  about this issue" or "don't do anything right now."

13      And if he didn't say "don't do anything right

14  now," the very fact that he raised the issue and he

15  said look into it would be an indication enough to

16  me that it was something he wanted to move forward

17  on.

18  Q   So, in fact, based on your conversation with

19  Defendant Blagojevich, what did you do?

20  A   I immediately called Director Maram.  I told him

21  that it was my understanding that the rate increase

22  was to move forward and that he should move forward

23  with it to be effective January 1.

24      And later that same afternoon I called John

25  Wyma and I told him that I had a conversation with

1   Governor Blagojevich about the Children's rate

2   increases and that it looked like we were going to

3   move forward on it.

4   Q   Now, was the 8 to 10 million dollars increase

5   that was at issue here a significant part of the

6   state's overall Medicaid budget?

7   A   No, the state's overall Medicaid budget in the

8   same type of gross terms that we're talking about

9   was, you know, 8 to 12 billion dollars.  So this is

10  like a tenth of a percent.  It's an extremely minor

11  amount.

12  Q   So at this point were you aware of any reason not

13  to publicly announce the rate increase?

14  A   No, there was no real reason not to publicly

15  announce it.

16  Q   Was it your job to set up press conferences?

17  A   It was.

18  Q   Would you do that on your own or would you only

19  do that with the direction from certain individuals?

20  A   I would generally lay the groundwork for, you

21  know, types of press events on my own, but I would

22  not actually set up or contact media without

23  approval from the governor.

24  Q   And in relation to this rate increase, were you

25  ever given a direction to announce a rate increase

1 or hold a press reference?

2 A  I was not.

3 Q  I want to direct your attention to November 12th

4 of 2008.

5      Did you talk to Defendant Blagojevich that

6 morning?

7 A  I did.

8      MR. SCHAR:  Judge, I believe we're going back

9 to Transcript Binder 1.

10 BY MR. SCHAR:

11 Q  By the way, Mr. Greenlee, in your conversation

12 when Defendant Blagojevich called you about the rate

13 increase, had you ever talked to him about it before

14 then?

15 A  No, I had not.

16 Q  Do you know how he was aware of it?

17 A  I don't know.

18 Q  I'm going to direct your attention now to tab 42

19 in Transcript Binder 1.

20      Are you with me, Mr. Greenlee, at tab 42?

21 A  I am.

22      MR. SCHAR:  Judge, we'd ask permission to

23 publish this call.

24      THE COURT:  You may.

25    (Tape played).

1  BY MR. SCHAR:

2  Q   Mr. Greenlee, directing you to page 1, November

3  12th, 2008, is that a call at 8:34 a.m.?

4  A   Yes.

:30PM  5  Q   Mr. Greenlee, in that phone call, was there any

6  discussion of budget issues with Defendant

7  Blagojevich?

8  A   No.

9  Q   Any discussion of the pediatric reimbursement

:30PM  10  rate?

11  A   No.

12  Q   Any discussion of Children's Memorial?

13  A   No.

14  Q   Any discussion of Patrick Magoon?

:30PM  15  A   No.

16       MR. SCHAR:  Judge, at this point if we could

17  play the call behind tab 43.

18       MR. GOLDSTEIN:  Objection to the publication.

19       THE COURT:  Overruled.

:31PM  20    (Tape played).

21  BY MR. SCHAR:

22  Q   Mr. Greenlee, based on the transcript this is a

23  call also on November 12th, 2008, at 8:43 a.m.?

24  A   Yes, based on the transcript.

:32PM  25  Q   I'll direct your attention now to the call behind

Greenlee - direct by Schar                                    4549

1  tab 44 -- no, sorry.

2       To the call behind tab 55, which means we're

3  switching binders again, Mr. Greenlee.

4       MR. SCHAR:  For the record, I've given the

5  witness Government Exhibit Transcript Binder 2.

6  BY MR. SCHAR:

7  Q   I direct your attention, Mr. Greenlee, to the

8  call behind tab 55.

9  A   Yes.

10  Q   Is this another call, Mr. Greenlee, on

11  November 12nd, 2008, in the afternoon between you

12  and Defendant Blagojevich?

13  A   It is.

14  Q   Between your call that morning that we've just

15  heard and this call, do you recollect having any

16  other discussions or phone calls with Defendant

17  Blagojevich?

18  A   I do not.

19       MR. SCHAR:  Judge, at this time we'd ask

20  permission to play the call behind tab 55.

21       THE COURT:  Leave is granted.

22    (Tape played)

23  BY MR. SCHAR:

24  Q   Mr. Greenlee, were you expecting this call

25  related to the pediatric doctor reimbursement that

:32PM

:33PM

:33PM

:33PM

:34PM

Greenlee - direct by Schar                    4550

1  day?

2  A  No, I was not.

3  Q  Directing your attention to line 2, Defendant

4  Blagojevich says:

5      "Hey."

6       You say:

7       Hey, what's going on?"

8       Defendant Blagojevich says:

9       "Pediatric doctors, the reimbursement, has that

10      gone out yet or is still on hold?"  What do you

11      understand him to be asking?

12  A  I understand two things:  The first thing I

13  understand is that this confirms that when I

14  previously said that he said look into it, that he

15  had wanted the pediatric reimbursement to move

16  forward because he asked if it had gone out yet.

17          The second thing that I see him asking is

18  whether, in fact, it's become effective yet or not.

19  Q  On line 7 you say:

20      "The rate increase."

21       He says:

22       "Yeah."

23       "It's January 1."

24       What are you indicating there?

25  A  What I'm indicating -- well, first when I say the

Greenlee - direct by Schar                    4551

1 rate increase, I'm asking to confirm if he's
2 referring to the rate increase for pediatric
3 services.
4        He confirms that, and then I tell him it's
5 scheduled to become effective January 1.
6 Q   On line 10 he says:
7      "We have total discretion over it."
8       You say:
9       "yeah."
10        What do you understand he's asking and what
11 is your response?
12 A   When he says that we have total discretion over
13 it, I understand him to be asking that if he wanted
14 not to move forward with the pediatric rate
15 increase, that he has the discretion to not move
16 forward under any circumstances, and I'm saying yes,
17 that under any circumstances you could not move
18 forward with it.
19 Q   What was your understanding as to who had
20 discretion over whether the rate increase went
21 forward?
22 A   The Governor's Office or the state had full
23 discretion, there was no other body that could force
24 the state to move forward on it or not move forward.
25 Q   Line 12 Defendant Blagojevich says:

Greenlee - direct by Schar                    4552

1      So we could pull it back if we needed to due to
2       budgetary concerns, right?"
3      You say:
4      "We sure could, yeah."
5      "Okay, that's good to know."
6          What do you understand he's suggesting in
7  that section?
8  A   In this section when he says "we could pull it
9  back if needed due to budgetary concerns, right," I
10 understand him to be suggesting to me that he's
11 rethought the rate increase in that he wants to pull
12 it back.
13         And then by me saying "we sure could," I'm
14 asking for confirmation.  When he says, "okay,
15 that's good to know," to me that was my
16 understanding that we should pull back the rate
17 increase and I moved forward accordingly.
18 Q   When he said "budgetary concerns," what do you
19 understand he was suggesting?
20 A   I understood that the term "budgetary concerns"
21 would be the public pretext used not to move
22 forward.
23 Q   Now, when was the last time Defendant Blagojevich
24 had raised the pediatric reimbursement rate issue
25 with you?

Greenlee - direct by Schar                4553

1  A   The last time he raised it was in the
2  conversation that we discussed previously when he
3  asked me to look into it.
4  Q   Had there been any discussion between that last
5  call you described earlier and this November 12th
6  call about this being a budget issue?
7  A   No, we never described it under those texture.
8  Q   Had you discussed with anyone else in the
9  Governor's Office this being a budget issue?
10 A   I had not discussed this issue in particular with
11 anybody else in the Governor's Office at all and I
12 had not discussed with him that it was a budget
13 issue.
14 Q   In fact, do you know if anyone else in the Office
15 of the Governor being aware of the rate increase?
16 A   I believe that no one else in the office of the
17 governor was aware of the rate increase.
18 Q   Who was dealing with it?
19 A   Me.
20 Q   Now, at the time of this conversation, were there
21 budget issues in the tens of millions of dollars
22 that were more significant than the pediatric
23 reimbursement rate issue?
24      MR. GOLDSTEIN:  Objection.
25      THE COURT:  Overruled --

:37PM
:37PM
:37PM
:37PM
:37PM

Greenlee - direct by Schar                    4554

1      Well, you mean "significant" in terms of the
2  amount of money?
3          MR. SCHAR:  In terms of the amount of money.
4          THE COURT:  Rephrase that question.
5          The objection is overruled.
6  BY MR. SCHAR:
7  Q   Mr. Greenlee, just by way of context, if you
8  could remind us, sir, what was your role in the
9  Office of the Governor as it related to budget
10 issues?
11 A   As it related to budget issues, it was my
12 responsibility to keep the governor advised in terms
13 of big picture budgetary trends and to make sure
14 that the budget stayed balanced in particular with
15 regard to initiatives that we wanted to pursue.
16 Q   Were you familiar with the budget issues that
17 existed in the Office of the Governor?
18 A   I was.
19 Q   At the time of this conversation, were there
20 budget issues, budgetary issues, significant sums of
21 money much greater than the pediatric reimbursement
22 rate that were at issue in the Office of the
23 Governor?
24         MR. GOLDSTEIN:  Objection.
25         THE COURT:  Overruled.

:37PM

:38PM

:38PM

:38PM

:38PM

Greenlee - direct by Schar                4555

1  BY THE WITNESS:

2  A   At this time there were far more significant

3  budget issues than this issue.

4  BY MR. SCHAR:

5  Q   And did those budget issues in fact exists at the

6  time that Defendant Blagojevich told you to move

7  forward with this?

8  A   Yes, the same budget issues existed in the time

9  of the first call.

10  Q   Was Defendant Blagojevich talking to you about

11  those other budget issues?

12  A   No, we didn't discuss them in any detail.

13  Q   Prior to this instance, Mr. Greenlee, in your

14  experience in dealing with healthcare issues, in

15  conversations with Defendant Blagojevich, had he

16  ever in the context of a healthcare initiative

17  raised an issue of budgetary concerns as a reason

18  not to move forward with something?

19  A   In the context of --

20       MR. GOLDSTEIN:  Objection.

21       THE COURT:  Overruled.

22  BY THE WITNESS:

23  A   In the context of healthcare initiatives, I'd

24  never heard him use budget as a reason not to move

25  forward with an initiative that would help people.

Greenlee - direct by Schar                    4556

BY MR. SCHAR:

Q   Based on your understanding of what you were being asked to do in this call -- well, let me ask you this, did you know why suddenly you were being asked, in your understanding, to stop this from moving forward?

A   I didn't know why I was being asked to stop this from moving forward, but I knew it wasn't budget.

Q   What did you understand -- well, just so we're clear, did you have any role in fundraising in relation to Children's Memorial Hospital?

A   No.

Q   What did you do after the phone call with Defendant Blagojevich based on the direction you understood?

A   Immediately after this phone call, I called Barry Maram, Director of the Department of Healthcare and Family Services, and I told him to hold off on the rate increase until he heard otherwise from me.

Q   Why did you do that?

A   Because my understanding after the conversation that I had with the Governor was that he wanted it to be held off.

Q   As of December 9th, what was the status of Children's Memorial rate increase?

Greenlee - direct by Schar                    4557

1   A   To my understanding, as of December 9th, it was
2   not going forward.
3   Q   At some time after this call, did you, in fact,
4   have another call with Defendant Blagojevich?
5   A   Sometime after this call I recollect having
6   another call with Governor Blagojevich on this
7   topic.
8   Q   Was it in person or on the phone?
9   A   I believe it was on the phone.
10  Q   What did you and Defendant Blagojevich discuss?
11          MR. GOLDSTEIN:  Objection; foundation.
12          THE COURT:  See if you can lay a foundation.
13  BY MR. SCHAR:
14  Q   Where were you when the conversation occurred, to
15  you recollection?
16  A   To my recollection it was in my office.
17  Q   Do you know where Defendant Blagojevich was?
18  A   I don't know.  He wasn't in the office.
19  Q   And in relation to this November 12th call, do
20  you remember how much later this other call was?
21  A   I recall it was a couple of weeks later.  It
22  wasn't the same day, but I can't recall the exact
23  date.
24  Q   What did you and Defendant Blagojevich discuss in
25  the phone call?

1  A   I recollect that Governor Blagojevich advised me
2  that Children's had fired John Wyma as a client and
3  that he advised me, I believe on that basis, that we
4  should not move forward with the rate increase.
5        To the extent that he advised me, it wouldn't
6  have made much of a difference to me because I had
7  already put it on hold.
8  Q   Did it seem to register for you at that point?
9  A   No.
10 Q   Based on the conversation of November 12th, had
11 you already implemented that direction based on that
12 conversation?
13 A   I had.
14 Q   And, again, after that second conversation which
15 Defendant Blagojevich told you to put it on hold, as
16 of December 9th what was the status of the pediatric
17 rate increase?
18 A   To my understanding, on December 9th the
19 pediatric rate increase was not moving forward.
20 Q   When you say it's not moving forward, does that
21 mean it would not go into effect?
22 A   It wouldn't happen.
23        MR. SCHAR:  We're going to switch topics.
24        THE COURT:  If we're going to switch topics,
25 let's stop now.

Greenlee - direct by Schar                    4559

1          Members of the jury, this is the end of the
2    week.  I want to remind you again that you should
3    not communicate with anyone in any way, you should
4    not permit anyone else to communicate with you in
5    way about the merits of this case or anything to do
6    with this, this includes discussing the case in
7    person, in writing, by phone, by electronic means,
8    by e-mail, text messaging, Internet chat rooms or
9    blogs, websites or other features.  This applies to
10   communicating with your fellow jurors until we give
11   you the case for deliberation.
12          In fact, it applies to communicating with
13   everyone else, including your family members, your
14   employer, people involved in this trial.
15          You should avoid any form of paper or
16   electronic source of news or commentary.  Do not
17   read, watch, or listen to any of that.  Do not try
18   to do any research about the case on your own.
19          With that, I'll see you on Monday at 9:30.
20          THE MARSHAL:  All rise.
21      (The following proceedings were had out of the
22       presence of the jury in open court:)
23          THE COURT:  You may step down.
24      (Witness temporarily excused.)
25          THE COURT:  People in the pews can sit down

1  or leave, it's your choice.

2          Counsel, approach the lectern.

3          (Brief pause).

4          THE COURT:  Anything we have to deal with

5  before we go?

6          MR. SCHAR:  Judge, briefly, just the release

7  of exhibits.

8          THE COURT:  Yes, subject to the standing

9  objection of defense.

10          MR. SCHAR:  And, secondarily, at the rate

11  we're going, Judge, I don't have much left with this

12  witness, maybe half an hour.  I would expect that

13  there is a good chance that we will be resting on

14  Tuesday.

15          THE COURT:  Okay.  That's fine.

16          I did require production of certain things

17  from the defense on Monday.  If there's a reasonable

18  possibility that you might be resting on Tuesday,

19  then I will order those things to be produced no

20  later than Monday at noon as opposed to the close of

21  business which is usually what we mean when we say a

22  day.

23          It is also possible on Monday that we will

24  have to -- we've been requested to hear a status

25  report with respect to a collateral order and we

Greenlee - direct by Schar                    4561

1  will probably do that around the noon hour on
2  Monday.
3          Anything else?
4          MR. ETTINGER:  Yes, with the tapes, after the
5  government rests, do I understand it correctly that
6  you're going to go over each tape we want to
7  introduce, the new ones when we redo it?
8          THE COURT:  What we will do is, if, for
9  example, the government rests in the morning on
10 Tuesday, if they don't rest the first thing in the
11 morning on Tuesday, if they go into Tuesday for a
12 while, what I will probably do is tell the jury that
13 we're finished for the day, that we will have to
14 deal with various other matters, and then we will
15 occupy ourselves Tuesday with that stuff, with your
16 new and shortened list whose admissibility will be
17 more easily defended by you than the ones you
18 submitted to me.
19         Anything else?
20         MR. SOROSKY:  In light of the fact the
21 government is resting much sooner than they
22 originally indicated, we thank them for that, and in
23 light of the fact that there are matters that occupy
24 the Court outside the presence of the jury after the
25 government rests, would the Court consider perhaps

:46PM
:46PM
:47PM
:47PM
:47PM

1  allowing the defense to begin its case the following

2  Monday?

3        THE COURT:  Probably not.  But the worst

4  that's going to happen to you is Wednesday morning,

:47PM   5  and it's possible you might even get Thursday

6  morning depending on the amount of time it will

7  take.  And for your purposes, Thursday morning is as

8  good as Monday morning because you just have to

9  prepare for that one day.

:48PM  10        Thanks.

11      (Adjournment taken from 4:48 o'clock p.m. to

12       9:30 o'clock a.m. on July 12, 2010.)

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \* \* \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
                        MATTER


  /s/Blanca I. Lara                    date




_____        _____
      Blanca I. Lara                      Date