5136

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )  No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )  Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )  July 14, 2010
   ROBERT BLAGOJEVICH,            )
7                                 )
              Defendants.         )  9:42 o'clock a.m.
8

9                       VOLUME 24
                TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE JAMES B. ZAGEL
                     AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                    Carrie E. Hamilton
15                  Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                    Room 2504
                Chicago, Illinois 60604
23                  (312) 435-5895

24

25

5137

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
5          158 West Erie
          Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
          BY:  Samuel Forbes Adam
8              Samuel Adams, Jr.
          6133 South Ellis Avenue
9          Suite 200
          Chicago, Illinois 60637
10         312-726-2326

11         OFFICES OF AARON B. GOLDSTEIN
          BY: Aaron Benjamin Goldstein
12         6133 South Ellis
          Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
          Suite 307
16         Chicago, Illinois 60614
          (773) 517-0622
17
          LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
          53 West Jackson Boulevard
19         Suite 1420
          Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

5138

1   APPEARANCES   (continued:)

2

3   For Defendant Robert Blagojevich:

4           ETTINGER, BESBEKOS, PARISI
            BY:  Michael D. Ettinger
5                Cheryl Ann Schroeder
            12413 South Harlem
6           Suite 203
            Palos Hills, Illinois 60453
7           (708)598-1111

8

9           Edelman, Combs, Latturner & Goodwin LLC
            BY:  Robyn S. Molaro
            120 S. LaSalle
10          Suite 1800
            Chicago, Illinois 60603
11          (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5139

1      (The following proceedings were had out of the
2        presence of the jury in open court:)
3          THE CLERK:  2008 CR 888, United States versus
4  Blagojevich, et al.
5          MR. SCHAR:  Good afternoon, Judge.
6          Reid Schar, Chris Niewoehner and Carrie
7  Hamilton on behalf of the United States.
8          MR. ETTINGER:  Good afternoon, Your Honor.
9          Michael Ettinger and Cheryl Schroeder for
10 Robert Blagojevich.
11         We've made substantial progress and we don't
12 have many to submit to you.
13         THE COURT:  Okay.
14         So we'll start with you.
15         You can state your name for the record so
16 they know you're here.
17         MR. GOLDSTEIN:  Sure.
18         Aaron Goldstein and Lauren Kaeseberg and
19 Sheldon Sorosky for Rod Blagojevich.
20         THE COURT:  Okay.
21         MR. ETTINGER:  Judge, maybe we should start
22 by going over the ones we withdrew.
23         THE COURT:  Okay.
24         MS. SCHROEDER:  October 23rd.
25         MR. ETTINGER:  October 23rd.

5140

1     MS. SCHROEDER:  The CD was the first tape.

2     THE COURT:  Which track is it?

3     MR. SCHAR:  23.

4     MS. SCHRODER:  23.

5     THE COURT:  That's out?

6     MR. ETTINGER:  Yes, Your Honor.

7     THE COURT:  Okay.

8     What else is out?

9     MR. ETTINGER:  We're withdrawing

10 December 5th, 2008.

11     THE COURT:  Okay, got that.

12     MR. ETTINGER:  We include 1, 2, 3 -- well,

13 no.

14     Judge, November 18, 2008, 1553, we're

15 withdrawing.

16     MS. SCHROEDER:  It's Robert and John Wyma.

17     THE COURT:  Okay.

18     MR. ETTINGER:  Judge --

19     THE COURT:  I had all of those on my list.

20 So I have a complete list here, which is good.

21     MR. ETTINGER:  Judge, there's a

22 November 12th, 2008 at 1506, Robert and Barry

23 Haddock, we're withdrawing that.

24     THE COURT:  Okay.

25     MR. ETTINGER:  Judge, 11/19/2008, 906, we're

5141

1 withdrawing that.  Maybe we did that one.

2        THE COURT:  You did before.  It's already

3 crossed out.

4        MR. ETTINGER:  Okay.

5        MS. MOLARO:  Judge, there's also

6 November 12th at 1611 26, Rod and Rod, we're

7 withdrawing that one.

8        THE COURT:  Okay.

9        MR. ETTINGER:  And, Judge, we can go through

10 the ones that he government agrees with us on.

11        THE COURT:  Okay, go ahead.

12        MR. ETTINGER:  Okay.  On November 11th, 2008,

13 at 1054, we agree with -- the government objected to

14 the part that we wanted to play.  We agree with the

15 government to withdraw their objectionable part, so

16 we agree on 11/11/08.

17        THE COURT:  1054 09, is that the one we're

18 talking about?

19        MR. ETTINGER:  Yes, Your Honor.

20        MR. SCHAR:  Judge, we're in agreement based

21 on cutting back that portion of the call.

22        MS. SCHROEDER:  Right.

23        THE COURT:  All right.

24        MR. ETTINGER:  We did list certain

25 transcripts or tapes that the government already

:19PM

:19PM

:20PM

:20PM

:20PM

5142

1 played, so we don't need to go over that.

2       THE COURT:  Okay.

3       Now, I have something that's color-coded,

4 something that's yellow on them, what does that

5 signify on the list?

6       MR. ETTINGER:  I did that, Judge, but,

7 unfortunately, I didn't do the others.  I assume --

8       MS. MOLARO:  Judge, I believe the yellow, the

9 stuff highlighted is ones that the government

10 already played.

11       THE COURT:  Oh, okay.

12       MS. MOLARO:  So we assumed that we are in

13 agreement on it since they already played it.

14       MR. SCHAR:  We're not withdrawing those...

15       MR. ETTINGER:  Right.

16       So 11/11 at 1227.

17       THE COURT:  So the 1227 calls are what we are

18 talking about now?

19       MS. SCHROEDER:  Right.  They agreed to

20 portions of them being played and we're in

21 agreement.

22       THE COURT:  Okay.

23       MR. ETTINGER:  So we agree with the

24 government.  So that's 1227 54.

25       MR. SCHAR:  Judge, just so it's clear,

:20PM

:20PM

:21PM

:21PM

:21PM

5143

1 certain of these are in agreement assuming that
2 Robert Blagojevich testifies.
3      MR. ETTINGER:  Right.  And he will.
4      THE COURT:  Okay.
5      MS. SCHROEDER:  He's going to testify.
6      THE COURT:  All right.  That's fine.
7      MR. ETTINGER:  Judge, December 6th, 2008, at
8 1239 we agree.
9      THE COURT:  It's okay to play it?
10      MR. SCHAR:  Yes, Judge.
11      THE COURT:  Okay.
12      MR. ETTINGER:  Judge, we --
13      THE COURT:  The one I have no marking on is
14 11/02/08 1933.
15      MR. ETTINGER:  You're right, Judge.  You're
16 right.
17      THE COURT:  So what are we talking about
18 there?
19      MR. ETTINGER:  Judge, on the November 2nd,
20 2008, at 1933, we believe this tape explains the
21 tape the government played on November 12th, 2008 at
22 8:26 p.m., and on the 12th it's between Rob and Rod.
23      THE COURT:  So this conversation explains the
24 one you want on 11/02 because it illuminates
25 something on 11/12?

5144

1        MR. ETTINGER:  Correct, Judge.  It's
2 discussion between the brothers of the Senate Seat
3 and Lisa Madigan.  We believe that -- our client is
4 going to testify that the parts that the government
5 played that they claim is tit for tat dealing with
6 Lisa Madigan, and we believe the 2nd of November,
7 the tape we're talking about now, explains that.
8        THE COURT:  Okay, let me read it.
9   (Brief pause).
10       THE COURT:  Now, is this conversation offered
11 to assist in understanding any of the ones from
12 November 12th that are already in this book?
13       MR. SCHAR:  I think it is.
14       MR. ETTINGER:  Yes.
15       THE COURT:  Which one?  Or all of them?
16       MR. ETTINGER:  The November 12th, Judge, at
17 2026, and the government played that portion of it.
18       THE COURT:  I don't find that in this book.
19       MR. SCHAR:  Well, the other portion is
20 halfway through their binder, Judge, that made it in
21 at 11/12/08.
22       THE COURT:  826?
23       MR. SCHAR:  Yes.
24       THE COURT:  Okay, I see it.
25       MR. ETTINGER:  Judge, maybe to assist you on

:24PM

:26PM

:26PM

:27PM

:28PM

5145

1  the 12th --

2          THE COURT:  I found it.

3          MR. ETTINGER:  Okay.

4          THE COURT:  I just wanted to find it.

5          Now you can tell me.

6          MS. SCHRODER:  The government started the

7  tape in the middle of Page 2 where it says "what are

8  you thinking about the Senate Seat."  We were asking

9  that the entire tape be played.  There's a portion

10 before and there's a portion after the government

11 stopped playing the tape that we were asking to be

12 played.

13         We're fine with the objection that the tape

14 start at "what are you thinking about the Senate

15 Seat" on Page 2, but we're asking that the second

16 portion be played, that the tape be played.  They

17 ended it on page --

18         MR. SCHAR:  The last two pages, I think, were

19 not played.

20         MS. SCHROEDER:  Right.  And we're asking that

21 the last two pages are played.

22         MR. SCHAR:  And, obviously, Judge, we object

23 to the last page, as well as the 11/02 call.  It's

24 state of mind on 11/12, I don't think it's relevant.

25         THE COURT:  Let's get back to the last two

5146

1  pages.  What about the last two pages?  What was
2  said about them?
3       MS. SCHROEDER:  The government was objecting
4  to the last two pages being played, and when they
5  played the tape it stopped at the top of the last
6  two pages.  We're asking that the last two pages be
7  played for state of mind as well as --
8       THE COURT:  And the first line on the last
9  two pages that you're talking about is?
10       MR. ETTINGER:  "I don't talk to anyone
11  about ..."
12       THE COURT:  All right, so we're on the same
13  page.
14       And you want to play that?
15       MS. SCHROEDER:  Correct; to the end of the
16  call.
17       THE COURT:  And you want to play the one on
18  November 2nd because?
19       MR. ETTINGER:  For completeness and state of
20  mind.
21       MS. SCHRODER:  It explains what he's talking
22  about.
23       THE COURT:  Okay.  I got it.
24       Now the government.
25       MR. SCHAR:  Judge, the first objection is

5147

1  rule of completeness as far as the intended act with
2  various conversations I don't think are viable.
3  Secondly, there is no state of mind in that call at
4  all.  It doesn't form a state of mind, otherwise
5  basically everything would come in under that
6  exception.
7         As to the last half of the 11/12 phone call,
8  the objection is as to relevance and hearsay.
9         THE COURT:  I'm sustaining the government's
10 objection with respect to November 2nd, that call is
11 out.  I'm thinking about the last part of the
12 November call.
13        MR. ETTINGER:  Judge, basically on the 12th,
14 it's going to be our position, and I believe our
15 client will testify to it, that the part the
16 government played that included "tit for tat" where
17 Robert is telling his brother you should get
18 something in return, that applies to Madigan.  And
19 our position is that the rest of the tape that
20 wasn't played, the last two pages, explains who the
21 brothers are considering, and it's Chico and some
22 other people, and it's clear from those two pages
23 that there's nothing in exchange for that.
24        Rod would get nothing in return for those
25 people being appointed and I think it shows, we

5148

1  submit, it shows Robert's state of mind regarding
2  that tit for tat; three words.
3          MR. NIEWOEHNER:  Your Honor, the tit-for-tat
4  line is at the very beginning of the portion played.
5          THE COURT:  You can play it.
6          MR. ETTINGER:  Thank you.
7          THE COURT:  Let me make a note of that so I
8  don't forget.
9      (Brief pause).
10          MR. ETTINGER:  The next one --
11          THE COURT:  Wait.  I'm an old guy.  You're
12  going too fast.
13          MR. ETTINGER:  Me, too.
14          November 17th, Judge, 2008, 859.
15      (Brief pause)
16          THE COURT:  Okay, we can go on now.
17          MR. ETTINGER:  I'm sorry, Judge?
18          THE COURT:  We can go on now.
19          MR. ETTINGER:  11/17 at 859.
20          THE COURT:  Okay.  Let me look.
21      (Brief pause).
22          THE COURT:  I got it.
23          Okay, go ahead.  This is very short, right?
24          MR. ETTINGER:  Yes, Judge.  We believe it's
25  going to come out that Robert was paid for his four

:32PM

:33PM

:33PM

:33PM

:34PM

5149

months as head of FOB, Friends of Blagojevich.  His
term was going to be over December 31st.  Rod wanted
him to stay, Robert did not want to.  Rod wanted to
give him a pay raise and Robert basically in this
conversation says he can talk about it as to why you
want to do that.  So he's basically going to testify
that he didn't want a pay raise and this is his
state of mind as to him not staying any further and
not wanting a pay raise.

     THE COURT:  I got it.  I got it.

     MR. SCHAR:  Judge, there's nothing concerning
the charge, it has nothing to do with state of mind
in any of the charged crimes, it's irrelevant.  This
is just prior good act.  There's no completeness
issue, it is not pertinent to any of the charges.

     THE COURT:  Suppose he's up on the witness
stand and he says, basically, this kind of thing
again, are you going to object to that?

     MR. SCHAR:  Yes, Judge.

     THE COURT:  So we're not really dealing with
a transcript issue, we're dealing with the subject?

     MR. ETTINGER:  Yes.

     THE COURT:  Okay.  Hypothetically, it's
closing argument, at the close of all the evidence
and you're standing up in front of jury, tell me

5150

1  what use you would make of -- I will read this as it

2  stands now in what I think is probably the best

3  possible light for Robert Blagojevich which is, he's

4  not asking for a pay raise, he's indicating that the

5  pay raise is unnecessary, he's not exactly saying no

6  but he's saying everything he could short of saying

7  no.

8           MR. ETTINGER:  Yes.

9           THE COURT:  Okay.  Now this is in evidence,

10 what are you going to say to the jury?

11          MR. ETTINGER:  I'm going to assume, Judge,

12 that the government is going to make an issue over

13 Robert getting paid, what he was getting paid.

14          THE COURT:  Okay, stop there.

15          MR. SCHAR:  No, we're not going to do.

16          THE COURT:  Yeah, I don't think they want to

17 do that.  I think they have another approach with

18 respect to him and I think that's been there from

19 the beginning.  So I don't think that's going to be

20 an issue.

21          MR. ETTINGER:  Then we don't need it.

22          THE COURT:  All right.

23          MS. MOLARO:  So we're withdrawing it?

24          MR. ETTINGER:  Yes.

25          THE COURT:  Okay.

5151

         MR. ETTINGER:  Two more, Judge.

         The first one is December 3rd, 2008, Judge,
809 between Robert and Rod.

         THE COURT:  I got it.

         MR. ETTINGER:  Judge, there's an article, and
this is on December 3rd, the day before the fourth
call that the government played where Rod tells
Robert to meet with Nayak, tells him Jesse has been
elevated, want you to communicate this to them.  And
our position is going to be, Judge, that Jesse
Jackson was the last thing, according to Robert's
state of mind, he wasn't even an issue as being a
candidate.  In the article, the brothers discuss and
Robert is telling Rod, discussing the article, and
that Jesse is not viable and Rod basically agrees
with him.  The next morning, there's a tape that the
government has agreed to, Judge, where there's a
call between the brothers at, I think, 817 or 819
and Rod tells him "I got up this morning and it's
Gery Chico I want to appoint," and on that tape Rod
says "I know I change my mind every day," and at
2:40 in the afternoon they have that Jesse Jackson
has been elevated.  And what we intend to delve into
in this telephone conversation the day before is
that Rod is not going to appoint Jesse.  So our

1  client is caught by surprise at 2:40 in the

2  afternoon and this shows the day before that he's --

3       MS. SCHROEDER:  Still of the mind that Jesse

4  Jackson is not an option, not a viable choice.

5       THE COURT:  And your position?

6       MR. NIEWOEHNER:  Your Honor, he is basically

7  reading a newspaper article.  Reading an article

8  itself is not state of mind.  It's our view that

9  this statement doesn't elaborate on his state of

10 mind, it doesn't clarify.

11      THE COURT:  How does it help him?

12      MR. ETTINGER:  Judge, we're going to show in

13 the eight days prior to December 4th, ten days

14 prior, there's eight different people that Rod

15 decided he is going to appoint, and it's all on

16 phone conversations.  It's Oprah Winfrey to -- we've

17 got them outlined.  Here, the day before, it's not

18 Jesse.

19      And what we want to explain that conversation

20 on December 4th at 2:40 in the afternoon and

21 Robert's state of mind that where he agrees to meet

22 Nayak to tell him Jesse's elevated and to explain

23 why Robert was going to meet with him and what

24 exactly Robert was going to say to Nayak, he's going

25 to testify to that, and we believe it corroborates

5153

his state of mind on that next day.

The only other comment I have about newspaper articles, we've had three or four from the government, so....

MR. SCHAR:  Not for state of mind.

THE COURT:  No, they were for other purposes.

MR. NIEWOEHNER:  Your Honor, the only other point we'd make is, in the context, it looks like even Robert is acknowledging the statements that his brother made are not true, he says a lot of chat in there at the bottom of the page, he doesn't believe what's actually in the article, anyway.

THE COURT:  And, again, I'm going to ask you, how does this help you?  You're in closing argument again.

MR. ETTINGER:  It's not crucial.  It's not crucial.

THE COURT:  Yeah.  Rod Blagojevich talked about many people, seemed to have difficulty settling on one, weighing one against the other, all of which the government is going to agree to.

MR. ETTINGER:  Yes.

THE COURT:  Because the government's argument is going to be, the only reason he had all this great uncertainty is because he was looking for the

5154

best deal as opposed to looking for the best
senator.  The former Governor's lawyers will take
exception to that, but that's what their argument is
going to be.  But this doesn't add anything.

        MR. ETTINGER:  Judge, I would submit to you
that if this was introduced, I admit, I probably
would not talk about it in closing argument, so we
can withdraw that.

        THE COURT:  Okay.  Yeah.

        MR. ETTINGER:  So we withdraw that, Judge.
One more, Judge.

        MS. SCHROEDER:  December 4th.

        MR. ETTINGER:  December 4th at 819.

        THE COURT:  Okay, that one is in front of me.

        MS. SCHROEDER:  They've agreed to the first
quote which is "I got up this morning thinking Gery
Chico" the Government objected to the second quote,
they agree to the portion that says, "so, listen,
you know, this morning I'm on Gery Chico" and then
objected to the fourth section and we'd like all
four sections played.

        THE COURT:  What is not objected to here?  I
have four sections.

        MS. SCHROEDER:  The first section.

        MR. SCHAR:  1 and 3.

5155

1           MS. SCHRODER:  Right.

2           THE COURT:  The whole 1 is unobjected to?

3           MR. SCHAR:  The first section, "I got up this

4    morning," those two sentences are not objected to.

5           THE COURT:  Okay.  So the entire 1 is okay.

6           And the entire 3 is okay?

7           MR. SCHAR:  Yes.

8           THE COURT:  So 2 and 4 are the issues?

9           MR. SCHAR:  Yes.

10          THE COURT:  All 2 and 4 --

11          MR. SCHAR:  Yes.

12          THE COURT:  -- or parts of 2 and 4?

13          MR. SCHAR:  All.

14          THE COURT:  Okay.

15          MS. SCHRODER:  One second, Judge.

16       (Brief pause).

17          MR. ETTINGER:  Judge, we'll agree 1 and 3,

18   withdraw 2 and 4.

19          THE COURT:  Okay.  So I think that's it.

20          MS. SCHROEDER:  That's it.

21          MR. SCHAR:  Judge, if I could just add one

22   thing to the record, I think we failed to do it in

23   the past, but I assume it's probably already taken

24   care of:  We submitted a number of binders that had

25   various portions for redactions.  I know the defense

5156

1  has submitted a number of different binders at

2  different times.  We'd ask, for purposes of

3  completing the record, we'd ask that all the binders

4  that have been provided to Your Honor make it into

5  the record.

6        THE COURT:  Sure.

7     (Brief pause).

8        MR. SCHAR:  Judge, is it okay if we sit

9  during this portion?

10        THE COURT:  What?

11        MR. SCHAR:  Would it be okay if we sat during

12  this portion?

13        THE COURT:  You can sit down.

14        Okay, I got the big book here.

15     (Brief pause).

16        THE COURT:  Okay.  You boldfaced the stuff

17  you wanted in?

18        MR. GOLDSTEIN:  Correct.

19        THE COURT:  Okay.  Good.

20     (Brief pause).

21        THE COURT:  And this is being offered to

22  show?

23        MR. GOLDSTEIN:  Tab 7?

24        THE COURT:  Yes.  Sorry, I should have said

25  that.

:45PM

:47PM

:48PM

:48PM

:50PM

5157

1    MR. GOLDSTEIN:  Tab 7 of our binder, we're
2 offering it primarily for state of mind and it goes
3 to, specifically, Rod Blagojevich's intent.
4    We spoke about I know at certain levels as
5 far as advice of counsel, but this explains, first
6 of all, why Rod Blagojevich did what he did.  And if
7 you look at Page 3, line 21 through 23, I don't want
8 to reveal the content of it, but --
9    THE COURT:  What did you just say?  Which
10 line?
11    MR. GOLDSTEIN:  Line 21 to 23, Page 3.
12    THE COURT:  Okay.
13    MR. GOLDSTEIN:  That indicates to Rod
14 Blagojevich what he understood was being done which
15 is --
16    THE COURT:  Yeah.
17    MR. GOLDSTEIN:  -- these individuals are
18 coming to him and it formed his state of mind as to
19 how to proceed further.
20    Second, as far as, you know, here's John
21 Harris who's an attorney who Governor Blagojevich is
22 given basically information.  And I know we spoke
23 about sort of a hypothetical of an individual that
24 just comes into a lawyer's office and discusses
25 here's my problem, here's my situation, what's your

5158

1   advice.  This is, obviously, a different scenario.

2         THE COURT:  That would actually be better

3   than what you got now.

4         MR. GOLDSTEIN:  And I understand that --

5         THE COURT:  What you got now is an employee

6   who is a subordinate who is not independent of him

7   and who probably doesn't know an awful lot about

8   this particular law and wasn't qualified as an

9   expert on it and he's being told things and I don't

10  see any kind of request for opinion.

11        So what you've got going for you here is is

12  that inside the mind of the government, it is his

13  belief that if he starts talking about this stuff to

14  his Chief of Staff who is an attorney, that this is

15  part of his belief system which leads him to

16  conclude that since Harris didn't raise an

17  objection, it was one element of his conclusion that

18  whatever political ethics are involved, it's fair

19  for him to conclude in his own mind that the act was

20  not criminal; is that basically where you are?

21        MR. GOLDSTEIN:  That's a fair assessment.

22  I'm just saying, as far as this portion, we don't

23  necessarily have the sitting in the office, the one

24  section that I'm going to give an opinion to you, at

25  the same time what's occurring and sort of the theme

:52PM

:52PM

:52PM

:53PM

:53PM

5159

1   of what we're explaining through some of these tabs

2   is that information was coming in in sort of bits

3   and pieces and the information was being relayed to

4   the individuals that Rod Blagojevich relied on as

5   far as the advice, so this is just one portion of

6   that element that is providing that information, but

7   in addition to what Your Honor stated.

8           MR. SCHAR:  Judge, we object.  And under that

9   theory, essentially every single call that John

10  Harris or Bob Greenlee, anybody on it, could come

11  in.  There's nothing in this particular call that is

12  anymore -- it's, frankly, less specific than many of

13  the calls that have already come in.

14          If that's the argument that has been made,

15  there's plenty of evidence, frankly, from the

16  government's side that's overwhelming on the number

17  of conversations.  I don't think there's anything in

18  there that goes to state of mind that is hardly

19  relevant and it's certainly hearsay and I don't

20  think the exception here makes sense.

21          MR. GOLDSTEIN:  Just one response quickly,

22  Your Honor.  As to Page 4, at the beginning of the

23  page, Rod Blagojevich is talking about we got to

24  have a discussion and we need a full discussion on

25  the process, something that they're comfortable

:53PM

:54PM

:54PM

:54PM

:55PM

5160

1  with, so that, again, is talking about the state of

2  mind, as well as the information that has come in at

3  this point and will be continuing to come in.

4      THE COURT:  Not enough information to make it

5  relevant.  Comfortable with the political process,

6  comfortable with the candidates before, comfortable

7  with his own future, comfortable with a lot of

8  things, comfortable with legality, there's nothing

9  that goes to that here.

10      I mean, if there are too many alternatives

11  and nothing to indicate that one is anymore

12  likely than the other.  I don't know how you get

13  from comfortable to he believed it was legal.  There

14  are some steps that could get you there, but, you

15  know, he's going to have to testify about what he

16  thought about and what language he used.  And maybe

17  he can do that, but if he does that -- this

18  transcript doesn't help you.

19      He can testify to this conversation, he can

20  testify to what he meant, he can testify what was

21  going on in his mind, but this does not corroborate

22  any possible version he could give.  It doesn't

23  contradict it either.  It's a zero.  So I'm keeping

24  it out.

25      Okay, number 8.  This is October 31st?

5161

1      MR. GOLDSTEIN:  Correct; and it's Section 62.
2  The bolded part starts on page --
3      THE COURT:  Yeah, I'm just reading this stuff
4  before.
5      (Brief pause).
6      THE COURT:  Okay, how does this help you?
7      I ask that because this doesn't seem to help
8  you, but since the government didn't offer it, I'm
9  assuming that maybe they don't share my view, but go
10 ahead and tell me.
11     MR. GOLDSTEIN:  This is relevant to the road
12 building count.  We heard one witness discuss that
13 one of the projects was not revealed and basically
14 the relevance of that was somehow that this was to
15 keep secret so that Governor Blagojevich somehow
16 extorted Mr. Krozel.
17     As well, Mr. Krozel testified that he didn't
18 believe what Governor Blagojevich said as far as the
19 capital bill and therefore he thought he was
20 extorted, at least one of the reasons why he thought
21 he was extorted or he felt pressured and that was
22 because he didn't think the capital bill was doable.
23     In this call, this explains the state of mind
24 of Rod Blagojevich in that he explains why and how
25 he's going to get the capital bill.  And, basically,

5162

1   what he's doing is trying to withhold as much so
2   that there's not necessarily a public outcry, but so
3   that individuals, political individuals, will
4   advocate as much as possible for that capital bill.
5   So that explains a reason why certain things were
6   withheld as opposed to putting pressure on an
7   individual to get campaign contributions.  So it
8   goes to Rod Blagojevich's state of mind as to why he
9   did and why he explained to Mr. Krozel what it is
10  he'd done.
11          MS. HAMILTON:  Judge, I guess what I would
12  say is, this sounds to amount to good acts evidence.
13  What Defendant Blagojevich wants to introduce is an
14  explanation as for why he did the various tollway
15  programs the way he did.
16          John Harris actually testified that Defendant
17  Blagojevich told him he had a number of reasons for
18  making the decision that he made with respect to the
19  smaller amount.  One of the reasons, the one that's
20  charged, is that he wanted to use this leverage in
21  fundraising, the other two are not charged reasons,
22  they're, in essence, good acts that he wants to
23  offer for "well, in this case I was using it as
24  leverage but in these cases I wasn't," I guess it's
25  sort of like trying to discount what he actually was

5163

1    doing with respect to Krozel that shouldn't come in.

2            THE COURT:  I'm letting it in.

3            Tab 11?

4            MR. GOLDSTEIN:  Tab 11, Your Honor, is the

5    same reason and rationale, as well as factual issues

6    as the previous tab, Your Honor.

7            THE COURT:  Is the government making the same

8    objection?

9            MR. SCHAR:  I guess on the first part, but on

10   the second part, Judge, at least to the second

11   section, which is on Page 6 or 7, it's extremely

12   misleading based on what they've told --

13           THE COURT:  I'm sustaining your objection,

14   I'm also sustaining the objection to the stuff in

15   the beginning.  He can make his point on the witness

16   stand and he can use whatever support he thinks he

17   would derive out of the part that I admitted.

18           Tab 12?

19           MR. GOLDSTEIN:  That is a November 1st call,

20   session, Your Honor, 83.

21      (Brief pause).

22           THE COURT:  Okay, I'm absolutely certain I

23   know why you want this but maybe you want to state

24   it briefly so it's on the record.

25           MR. GOLDSTEIN:  There's two reasons and a

:02PM

:03PM

:03PM

:04PM

:08PM

5164

subset of the first reason.  The first reason is
impeachment as to Mr. Greenlee, and the second
reason is state of mind as to impeachment.

I hope you guessed right, I hope I was right
in what your thoughts were, but there's two levels
of impeachment:  One is that Mr. Greenlee talked
about the deal regarding Lisa Madigan and his belief
that it couldn't get done, and he specifically says
"I believe Madigan would make that deal" in this
conversation.  Furthermore, he talked about Jesse
Jackson, Jr., as whether he liked him as a possible
candidate for the Senate Seat.

Mr. Greenlee said that the only reason he
said he didn't like him was because it was connected
to this, you know, campaign contributions, but
further on Page 17, Greenlee is basically talking
about that there's elements in the black community,
he says half of them, or a part of them, hate
Mr. Jackson.  So that impeaches Mr. Greenlee as to
him saying "well, I was completely for him, I had no
problems with him," he's indicating a reason why he
wouldn't like Jesse Jackson, Jr.

And then, finally, as to the state of mind,
this goes to state of mind of Rod Blagojevich as to
his ideas regarding Lisa Madigan and that deal.

5165

1      MR. SCHAR:  Judge, it's not impeaching.  The
2  deal is, that's been discussed in this section, is
3  completely different than what Mr. Greenlee talked
4  about was occurring after the list had been put
5  together well into the Thanksgiving period.  In
6  fact, I believe his transcript would show that
7  Mr. Greenlee actually made that point orally.
8      In addition, it's not impeaching on Jesse
9  Jackson, Jr. line.  He didn't say he liked Jesse
10  Jackson, Jr., or didn't like Jesse Jackson, Jr., he
11  didn't have a personal animus, but at the time, as
12  he said before, he said the change is he believed
13  was because of the money.  I'm not sure how that
14  would be impeaching or material.
15      In addition, that it did not impeach him if
16  you look at the transcript.  As to state of mind,
17  again, I'm not exactly sure what the defense theory
18  is or what Defendant Blagojevich is going to testify
19  to, as to whether he's -- the opening statement was,
20  from beginning to end, this was about Lisa Madigan,
21  and that is fundamentally belied on by the evidence.
22      In fact, some of the calls that they want to
23  put in later in November and December, I assume
24  that's, in fact, what he is going to say, but they
25  can get an offer of proof on that, but short of

:09PM

:10PM

:10PM

:10PM

:11PM

1    something how does this go to his state of mind at
2    this point?  We would be objecting to that.
3          THE COURT:  I'm sustaining the objection.  To
4    some extent, I don't even think this reaches state
5    of mind.  There are several conversations--and I
6    think the defense is going to make this point--there
7    are several conversations where you may not actually
8    be hearing what Rod Blagojevich's state of mind is
9    even when he's talking about it, because it's clear
10   from the conversations that have been played that
11   the defendant Rod Blagojevich tries out a lot of
12   ideas on a lot of different people and there are
13   lots of different alternatives.  And one of the
14   difficulties with getting stuff in on state of mind,
15   particularly something as lengthy as this, is that
16   his state of mind that is most evident is will this
17   work, will that work, or will the other thing work,
18   not whether it's a good idea or a bad idea but
19   whether it'll work, or, in the alternative, another
20   way to say it is, if I do this, who will like it and
21   who won't.
22          And there are questions about political costs
23   as well, many of them not actually dealing with his
24   personal political costs because at this time,
25   according to the transcript, he still refers to

5167

1 himself, according to some of the transcripts, as a
2 heavy hitter, he regards himself as a political
3 presence, and that's what this looks like to me.  It
4 doesn't look like state of mind that's relevant to
5 this case.  And, further, his state of mind is it's
6 basically the professional politician's charter with
7 other professional politicians, what happens if I
8 pick A, what happens if I pick B, what happens if I
9 pick C, and that's really not relevant to this --
10 well, that's not true.  It is relevant.  It's not
11 state of mind that we're talking about here.  We're
12 talking about a process he's going through.  It
13 shows nothing about what his intent is, it shows
14 nothing what is going to motivate his final
15 decision, he's just considering the alternatives,
16 and people do that all the time in politics.
17       And, in all honesty, people do that in the
18 Court of Appeals and in the Supreme Court of the
19 United States, what if we heard this way, what if we
20 heard that way, it doesn't actually show their state
21 of mind except that they are weighing alternatives.
22       And I don't know that the government disputes
23 that he's weighing alternatives.  They think that
24 some of the alternatives he's weighing and maybe
25 even attempting and getting others to go along with

5168

1  are illegal.

2        Now, he can say all of this stuff on the

3  witness stand, but I don't see this kind of stuff

4  that's inherent in Rule 803 is, you don't want to

5  put somebody in a position where they get to admit

6  evidence and the prior conversation is in without

7  some idea of reliability.

8        You don't want to permit something to go in

9  when there was some real possibility of fabrication.

10 I don't think, actually, that's the issue here, I

11 think what you got here is is no statement of mind

12 that's relevant to this case.  What you got is a man

13 who is thinking of alternatives and that's what

14 they're talking about, what if this, what if that.

15 And Greenlee impeachment is just wrong, I think it's

16 just wrong, and I recall Greenlee's testimony fairly

17 well.  So that one is offered and refused.

18        Now I go to tab 13.

19        MR. GOLDSTEIN:  Judge, just briefly before we

20 go further, maybe not on tab 12 but possibly on tab

21 7 and maybe some other calls after this, I

22 anticipate there's a possibility that after Rod

23 Blagojevich testifies these calls may then become

24 relevant and potentially admissible.  Is it possible

25 that we can revisit some of these calls after his

5169

testimony?

THE COURT:  All I'm doing now is ruling on the basis of two assumptions:  One, that you want this evidence in for the purposes you've stated, and, two, that your client is going to testify, those are the two things I'm considering.

Should there be new purposes that arise after he testifies and particularly after his cross-examination, some of this stuff you may want to revisit and I won't stop you from doing that.

MR. GOLDSTEIN:  Thank you, Your Honor.

THE COURT:  Tab 13, let me read this.

(Brief pause.)

THE COURT:  And you want this?

MR. GOLDSTEIN:  For a couple of reasons, Your Honor, one is state of mind.  As you see on Page 2 it indicates Rod Blagojevich is going through in his thought process as to this decision, and then it also further buttresses advice of counsel.  He is on the phone with Mr. Quinlan, who is the general counsel, and Governor Blagojevich is providing information to Mr. Quinlan and Mr. Quinlan is also talking about research that he's done, he talks about a historical example about appointing a senator, then he goes further on page 6 and Quinlan

5170

1 talks about that they have a lot to bargain with,

2 referencing conversations and discussing as far as

3 the subject regarding the Senate Seat and what

4 basically he's arguing with and for, and that's page

5 6 at the bottom starting on line 45.

6 So that goes, again, further throughout Rod

7 Blagojevich's state of mind as to his attorney

8 advising him and talking to him about this

9 situation, his attorney basically saying they have

10 a ton to bargain with and they discuss that further.

11 THE COURT: Bargain with for what?

12 MR. GOLDSTEIN: Regarding the Senate Seat.

13 THE COURT: No, no; what are they bargaining

14 for? What in this conversation is talked about in

15 terms not of what the governor will give appointing

16 to the Senate Seat but what he will receive?

17 MR. GOLDSTEIN: Well, some of the calls has

18 been minimized, but as far as the call that will

19 come in, they're referencing the fact that there's

20 stuff to be bargained.

21 THE COURT: Well, the one I read here is

22 $5 billion from federal aid for the State of

23 Illinois.

24 MR. GOLDSTEIN: That is certainly one thing.

25 THE COURT: And you think it would be illegal

5171

for a governor to say to the president, "I'll
appoint anybody you want if you give $5 billion to
the State of Illinois" as opposed to saying to a
President "I'll appoint whoever you want if you
manage to assemble a contribution of $250,000 to my
reelection fund"?

I think the problem with this one is is they
don't, on the face of it, get to something that
could be illegal.  And even the Obama thing with the
President is addressed in the most hypothetical way,
and the reason it's addressed in the most
hypothetical way is not because it is necessarily
illegal to say to the federal government or to a
federal officer we would do this for you if we get
an appropriation for new roads, this is the classic
political exchange and that's not anything that
somebody like him at this stage of the game would
say, hey, hold on a minute, it violates a federal
statute.

So even if it were somehow illegal to do this
kind of horse trading over an appropriation process,
even that one is not developed, it's said in the
most hypothetical kind of way.  And that's assuming
that we're all okay with what I referred to as the
lawyer in the room theory, because there's lots of

5172

1  lawyers in the room, including the man speaking
2  himself is a lawyer.  I don't think this gets you
3  anywhere.

4          Does the government want to add anything?

5          MR. SCHAR:  I don't think so, Judge.  The
6  only thing I would add is, there is no advice being
7  given, one way or another.

8          THE COURT:  Well, part from that.

9          And, in all honesty, I don't believe that the
10  governor is going to contend that he got advise.  I
11  think the governor is going to contend that he got
12  something that maybe for purposes of this we would
13  call implied advice.  Or since we're dealing with
14  not so much the actions of the lawyers who were in
15  the room but the reaction of the governor, "inferred
16  advice" is probably the best term, he has inferred
17  from silence that he can proceed.

18          And maybe that's a theory or maybe an
19  argument that could work.  I mean, you could, to
20  take a ridiculous example, have several
21  conversations with lawyer friends of yours and say,
22  "you know, I'm thinking about poisoning my wife" and
23  they don't say anything.  Could you infer from that
24  that it's somehow all right to murder your wife?
25  Well, the answer is obviously no.

5173

1      MR. SOROSKY:  You can infer they don't like
2  your wife.
3      THE COURT:  Yeah, they can infer that.
4      But we're in this position now where all
5  we're dealing with now is inferring.  And
6  consequently the fact that he doesn't ask Quinlan
7  for advice is not against their theory.  They're not
8  claiming that he asked him specifically.  You may
9  consider that by doing this he was asking for
10  advice, but that's his inference.  So the objection
11  is sustained.
12      MR. GOLDSTEIN:  There's one other issue, and
13  it's separate, and that's page 14.
14      And, Your Honor, what I'm looking at is line
15  25, there is a reference about the Medicaid
16  reimbursement which goes to Rod Blagojevich's state
17  of mind as to his desires what he wanted to do with
18  this Medicaid reimbursement.
19      THE COURT:  He can testify to that.  And if
20  they think that it's a recent fabrication, then you
21  can get this in, otherwise no.
22      16?
23      How old is Bill?
24      MR. GOLDSTEIN:  I think he is young.
25      THE COURT:  I was curious.

5174

1        MR. NIEWOEHNER:  Under 10.

2        MS. MOLARO:  5 or 6.

3

4     (Brief pause).

5        THE COURT:  This one is kind of interesting

6 because it is essentially, with some minor

7 exceptions, it's essentially a long mostly monologue

8 by your client about other people's states of mind,

9 you know, what this guy thinks, what they want in to

10 talk to me about, what one public official wants,

11 what another public official wants.  So what's his

12 state of mind that's proved by this or supported by

13 this?

14        MR. GOLDSTEIN:  His state of mind as to what

15 other people's state of mind is, Your Honor.  He's

16 also talking to Mr. Quinlan and providing

17 information, a necessary step in order for

18 Mr. Quinlan to give any advice, in order for

19 Mr. Quinlan to discuss with him whether to go

20 forward on specific issues.

21        So what's happening at this time is, facts

22 and events are occurring minute by minute.  So as

23 these events and as the information comes in to Rod

24 Blagojevich, Rod Blagojevich provides this

25 information to Bill Quinlan and they discuss it.

5175

1          While there isn't necessarily on this call
2     advice being given, there's information being
3     provided and they're discussing exactly what is
4     occurring as it's going on.
5          So it goes to one of the elements as to the
6     advice that Mr. Quinlan gives to Rod Blagojevich, as
7     well as his state of mind what Rod Blagojevich was
8     thinking at that time as to that particular issue,
9     the senate seat.
10         THE COURT:  I also have another problem with
11    what you just said.  To the extent Quinlan is giving
12    him any advice at all, it has nothing to do with the
13    law.  This is a political conversation for what
14    somebody might or might not want.  They're,
15    actually, except in the most vague way, not even
16    referring to deeds.  They're referring to what
17    people might think and might accept and might not
18    accept.
19         This, I think, doesn't show any state of mind
20    on his part that's relevant to the case here or even
21    to his defense here.  This is a political discussion
22    and he's dealing with this lawyer as part of his
23    political advice.  I just don't see any relevance to
24    this at all.  This one is really out in left field,
25    so I'm sustaining the objection which the government

5176

1 is about to make.

2          MR. SCHAR:  I am about to make it, Judge.

3 Not only is this not state of mind and not relevant

4 to the charges in this case, the only thing I would

5 add is just because it highlights what is coming

6 down the road, there is discussion in the first half

7 of this phone call which is not highlight where they

8 actually do talk about a legal issue which is the

9 honest services fraud and what it means to be able

10 to be convicted of honest services fraud based on a

11 news paper article that appeared.

12          That section they don't want in where I

13 believe Mr. Quinlan had an accurate explanation of

14 benefitting themselves and then it goes on to the

15 political discussion as Your Honor has noted.

16          THE COURT:  Next one?

17          MR. SCHAR:  That one we do not object to.

18          THE COURT:  What?

19          MR. SCHAR:  I think it's tab --

20          MR. GOLDSTEIN:  I believe it's 122.

21          THE COURT:  There's no objection to this?

22          MR. GOLDSTEIN:  Which one are you on, Your

23 Honor?

24          THE COURT:  I'm on tab 21.

25          MR. SCHAR:  I think this is being offered for

5177

1 state of mind.  I think there's one line there that
2 I understand why it might be, but the general
3 discussion, I guess, I'm not sure about.
4       THE COURT:  What is it of tab 21 you would
5 play?
6       MR. GOLDSTEIN:  The bolded portion starting
7 on Page 4.
8       THE COURT:  So it would begin with "so that
9 is what I was talking to him about this morning"?
10       MR. GOLDSTEIN:  Correct.
11       THE COURT:  And it ends with "well, why does
12 that matter if you announce," et cetera.
13       MR. GOLDSTEIN:  Correct.
14       THE COURT:  The government has an objection
15 to this or no objection?
16       MR. SCHAR:  Judge, having to do with Valerie
17 Jarrett, I'm not sure about the rest of it.
18       THE COURT:  No, but they've heard it before.
19       MR. SCHAR:  That's fine, Judge.
20       THE COURT:  I don't want to put them in the
21 awkward position of playing one sentence on a
22 recording.  So that's okay.
23       MR. SCHAR:  The only thing we would ask in
24 this transcript, and I think this is true for
25 Mr. Ettinger's transcripts as well, at times it

:37PM

:37PM

:37PM

:38PM

:38PM

5178

1 indicates "calls minimized," we request that be
2 removed and replaced with the asterisk consistent
3 with how the government did it.
4          THE COURT:  Sure.
5          Next one is no tab number.
6          MR. GOLDSTEIN:  Yes.  We need to provide that
7 to Your Honor.
8          MS. KAESEBERG:  The next one is session 259,
9 it was provided in our submissions as attachments.
10          THE COURT:  I've seen this before.  Where
11 have I seen this?  Is this something that wasn't
12 played?
13          MR. SCHAR:  I'm not sure, Judge, other than
14 the comments on different calls.
15          THE COURT:  And what's this for?
16     (Brief pause.)
17          THE COURT:  This is a mystery to you?
18          MR. GOLDSTEIN:  Sorry?
19          THE COURT:  This is a mystery to you.
20          MR. GOLDSTEIN:  I may be standing up a little
21 too log.
22          This goes to state of mind, as well as more
23 advice that -- I don't want to say advice at this
24 point, but discussions about the topic that he's
25 having with Quinlan, the general counsel, and,

:38PM
:39PM
:39PM
:40PM
:40PM

5179

specifically, there is a discussion on Page 1,
starting at line 23, about the silver lining and
that references what is further discussed more about
the topic of the senate seat with Mr. Quinlan.

THE COURT:  But like nobody answers anything.
There are questions and nobody quite gets to answer.
It's almost like they're speaking in code, except,
obviously, they're not speaking in code.

MR. GOLDSTEIN:  I mean, there is certainly
room for testimony for people to say what they
understood, not that we haven't heard that before,
but in this situation, as we've said, information
was provided in a bit-by-bit basis, so while there
was no formal sit in the office of the lawyer and
say "here's my situation, I need a memorandum
written up," we understand that, it still doesn't
necessarily mean that information can be provided to
an attorney, an attorney can look into it, think
about it, research it and then --

THE COURT:  But the information is going the
other way here.  I'm excluding it.

Actually, sometimes instead of relevance, we
ought to call it uselessness, on the grounds of
uselessness, or lack of utility, if you want a more
elegant phrase, but it's nothing.

5180

1       MR. GOLDSTEIN:  Your Honor, the next tab is
2  tab 30.  It is a fairly lengthy call.
3       THE COURT:  Okay, I'll take a look at it.
4       MR. GOLDSTEIN:  It's a 20-minute call, Your
5  Honor.
6     (Brief pause).
7       THE COURT:  Okay, I'm ready.
8       I'd like to hear what the Government has to
9  say first.
10       MR. SCHAR:  We're objecting to this on
11  hearsay grounds.  It hasn't anything to do with the
12  charges in the instant case.
13       MR. GOLDSTEIN:  Your Honor, it is relevant on
14  a couple of reasons.  Again, state of mind, this
15  goes to the Governor's state of mind at this point.
16       One theme of the government's case is that
17  Valerie Jarrett was always the, quote/unquote, play
18  up to the point in which she took her name out of
19  this.  This shows that there was more to it than
20  just Valerie Jarrett, that the governor was
21  seriously considering Lisa Madigan, he discusses
22  that.  It indicates his state of mind as to Lisa
23  Madigan.  It's a day after the election, so now it's
24  come clear of what he has to do as far as his
25  responsibility as governor appointing a senator.

:43PM

:47PM

:47PM

:48PM

:48PM

5181

1          He also, on a different subject, explains the
2     capital bill, which is, again, discussed in this
3     case as well and explains why the governor wants to
4     do certain things, strategically, as far as this
5     capital bill, and explains it to an individual, a
6     prominent individual, and he's relying on what this
7     individual is telling him and there are discussions
8     about that.
9          There's also discussion about Jesse Jackson,
10    as well, as to his state of mind regarding whether
11    he would go forward with Jesse Jackson.  There's
12    this short colloquy between this individual and the
13    governor about Jesse Jackson specifically, as well,
14    Your Honor.
15         So this entire call really does go to the
16    state of mind of Mr. Blagojevich as to what he was
17    thinking with regard to the senate seat and the
18    capital bill.
19         THE COURT:  But it adds nothing to what's
20    already in evidence and there's nothing particularly
21    special about the nature of what's been said here.
22    And, in the end, what your client is going to have
23    to cope with, and I think you've understood from the
24    beginning, is the phrase, and I use this as a
25    shorthand but he said it differently, "something for

5182

1  me."  This doesn't help you.

2       And to the extent that the things you talked

3  about that you want to put into evidence, they're in

4  evidence.  This is duplicative of what they've

5  already heard.  They've heard it themselves from his

6  mouth on the tape.  This doesn't change the

7  viewpoint, it's just cumulative evidence, that's all

8  it is.

9       And, essentially, you don't even have in this

10 particular case what I regard as a basic theme which

11 is that he was talking to a lawyer.  The person he

12 was talking to isn't a lawyer, so there's nothing

13 there.  I'm excluding it, I'm excluding it under 403

14 ground.  I'm excluding it because I don't think it

15 is relevant at all, I'm excluding it because it

16 deals with stuff that is not in dispute.  The

17 government is not going to say that he wasn't

18 considering any of the things that are discussed in

19 this.  This is not how they're going to attack him,

20 it's not going to repel anything.  It's a waste of

21 time.

22       38?

23       MR. SOROSKY:  Your Honor, one moment, if I

24 may.

25    (Brief pause).

5183

1      MR. GOLDSTEIN:  If I can just make two
2 responses, Your Honor, briefly?
3      THE COURT:  Yeah, although I wouldn't go
4 doing this too often because I've ruled, but sure.
5      MR. GOLDSTEIN:  I understand.  Just very
6 briefly, Your Honor.  As to what is in dispute and
7 not in dispute, the government has put in evidence
8 in testimony from witnesses that have indicated that
9 this Lisa Madigan was the stalking horse, it was a
10 sham, and I believe this conversation, at least,
11 contradicts.  I mean, certainly the jury can decide
12 one way or the other but --
13      THE COURT:  I don't think it contradicts
14 anything.  I think what you want to establish is
15 that he talked about this as a possibility, and even
16 in the recordings the government offered, there were
17 passages in which he was seriously talking about the
18 rough equivalent of stabbing himself in the thigh,
19 causing that pain, and going ahead and appointing
20 one particular person anyway.  There is nothing
21 here.  Just a cloud of no value to you.  And
22 whatever slight value it might have, you already
23 have it and you have it in spades.
24      So what you basically are offering is an
25 interesting name of a person who he talked to but of

5184

1   no significance and no relevance to this case.  It's
2   nothing more than a distraction.
3        Tab 28?
4        MR. GOLDSTEIN:  38, I believe, Your Honor.
5        THE COURT:  Sorry, you're right.  Tab 38.
6   This is the entire call?
7        MR. GOLDSTEIN:  Correct, Your Honor.
8        THE COURT:  This one isn't so short either
9   but it's shorter than the last one.
10       MR. GOLDSTEIN:  It is shorter.
11       THE COURT:  Let me read it.
12     (Brief pause).
13       THE COURT:  The government's view on tab 38?
14       MR. SCHAR:  Judge, again, we're objecting.  I
15   don't understand what their theory is why this comes
16   in.  And, frankly, we have a continuing problem with
17   this call and other calls where they're arguing the
18   entirety of the calls under the state of mind
19   exception where the vast of this has nothing to do
20   with anything in this case.  So I'm not sure what
21   their articulation is as to why this would be
22   admissible and arguably relevant to the topic of
23   what's going on, I'm not sure of state of mind.
24       MR. GOLDSTEIN:  Your Honor, it does go to
25   state of mind.  Mr. Blagojevich is talking to a very

:54PM

:54PM

:59PM

:59PM

:59PM

5185

1  powerful individual and the discussion, in total,
2  frames and goes to the state of mind of Blagojevich
3  because he's talking to an individual, informs his
4  later actions, and, specifically, this individual
5  suggests Valerie Jarrett and it goes to
6  Mr. Blagojevich's state of mind as to what the
7  administration is interested in as far as this
8  decision to the senate seat.

9          It also explains why Rod Blagojevich believed
10  this individual was a good emissary in regards to
11  this Lisa Madigan deal and then they also talk about
12  Mr. Madigan and talk about specifically, you know,
13  brokering a deal.

14          So it does go to state of mind, the entire
15  call.  Certainly if the whole call is going to be
16  scrapped, you know, we'll try and work it so that we
17  can get at least portions of the call in.  But that
18  being said, as to the whole call, this does frame
19  Rod Blagojevich's state of mind and it is relevant
20  to the specific factors in how he took action after
21  that.

22          THE COURT:  It seems to me that what you
23  would this for is stuff that's already been put into
24  evidence in his words, and I don't think that the
25  government is going to dispute that he said what he

5186

said.  And he was fairly explicitly about his state
of mind.

There are a couple of things the government
is going to dispute, but the suggestions came in
with respect to Valerie Jarrett and where they came
from and the analysis that your client made of the
purpose of the suggester, what more do you want?

I mean, it's really addressing something that
I don't see in dispute.  This is one of the things I
really don't see how it helps you unless the
government is going to stand here and say that the
governor really didn't believe at all who was behind
the Valerie Jarrett fuss, and I haven't heard that
from the government.

I mean, you know, this is the defense.  The
government has presented it, you're supposed to
attack their case.  You're not supposed to spend
time on byways of stuff that you're not going to
attack and that they're not going to attack.  I
don't see what this defends against, in other words.
What is this defending?  What allegation of the
government that this is defending?

MR. GOLDSTEIN:  The government, again, has
made clear through testimony of witnesses that,
specifically Lisa Madigan, was not a viable option,

5187

he never considered it, specifically early on.
Mr. Greenlee said that there was no progress made
regarding this Madigan deal from December 4th to
December 9th.  This explains what the governor was
thinking and basically the political sensitivity
that needed to have gone through in order to get
this deal done.

     The individual he's talking to through
constant -- I wouldn't say "constant" but through
conversations with this individual formed the
Governor's state of mind as to why he went forward
with this deal and what he had to go through in
order to get this deal done.

     THE COURT:  What deal?

     MR. GOLDSTEIN:  The Lisa Madigan deal.

     THE COURT:  But the deal was not done.

     MR. GOLDSTEIN:  Was not done?

     THE COURT:  The deal was not done.

     MR. GOLDSTEIN:  Well, there are reasons for
that, but it was not done.  Quite frankly, none of
the deals were done.  So what we have is is a series
of attempts, we're disputing attempts, we're
disputing an ongoing conspiracy as the government
alleges, and we're trying to attack the fact that
there was this ongoing conspiracy as to many

1 elements and it goes to his state of mind as to what
2 he wanted to do.

3        The government also talked about, in essence,
4 that the governor wasn't a good governor, he didn't
5 want to do anything for the people of the State of
6 Illinois, and the Lisa Madigan deal obviously at
7 least can be considered to rebut that factual
8 allegation that the government has put forward.

9        THE COURT:  Yeah, but you're talking about
10 what is happening on earth, and this conversation is
11 not really related to that.  That he's hearing lots
12 of stuff and that lots of people are talking to him
13 about how I want to be a senator, this doesn't
14 elucidate his state of mind when it comes down to
15 the crunch of who it is he's going to appoint and
16 why.

17        MS. KAESEBERG:  Can I add something here,
18 Your Honor?  I think with this call and the call
19 previous to this, it goes directly to Rod
20 Blagojevich's state of mind in that he is talking
21 to --

22        THE COURT:  It does not go to his state of
23 mind unless he basically talks about something as
24 being a decisive fact.  We don't have his testimony
25 about his state of mind, and I doubt that this would

5189

1 ever elucidate, but it's possible in the course of
2 his testimony that it might.  I don't know that if I
3 were him I would stand on this particular
4 conversation, but maybe in his inner heart this was
5 really crucial and then we can talk about it, but I
6 think this one is going nowhere and I think this is
7 essentially, this one in particular, is essentially
8 a waste of time, not as big a waste of time as the
9 longer conversation I excluded, but it's in the same
10 ballpark.
11          Tab 39?
12          Have I not heard this before?
13          MR. SCHAR:  Yes.
14          THE COURT:  Did I hear this as an offer of
15 proof?
16          What I'm looking at in tab 39 is Page 6, line
17 10, 11 and 12, I believe I heard those words before.
18          MR. GOLDSTEIN:  You have but not this.
19          MR. SCHAR:  Not in this call.
20          THE COURT:  Not in this call?
21          MR. SCHAR:  Correct.
22          THE COURT:  Okay.
23      (Brief pause).
24          THE COURT:  And when did that call occur?
25          MR. SCHAR:  Pardon me?

:06PM

:07PM

:08PM

:08PM

:08PM

5190

1      THE COURT:  When did that call occur, the one
2 I did hear?
3      MR. SCHAR:  That call occurred around the
4 same time, maybe several days earlier.
5      MR. GOLDSTEIN:  We believe November 7th, Your
6 Honor.
7      THE COURT:  Okay.  Thanks.
8      MR. SCHAR:  The call which I think first
9 comes up is the 7th.
10      THE COURT:  Okay.
11      He does say things in the same way over and
12 over.
13    (Brief pause.)
14      THE COURT:  The government's view?
15      MR. SCHAR:  Judge, we're objecting for
16 several reasons, one is certain portions of it are
17 redundant, but, more importantly, it's not state of
18 mind, this goes to Defendant Blagojevich recounting
19 conversations he had or heard, statements that
20 relate back.  And so actually 803 specifically says
21 you're not supposed to put in state of mind for
22 prior events and that's exactly what this is.
23      MR. GOLDSTEIN:  A couple of things, Your
24 Honor.  As to what has already been put in, the
25 government has put in certain evidence in their

5191

1    case-in-chief, it's now our turn.  I think we have
2    some right to put in evidence that we think is
3    relevant to the case.  So what I think the
4    government is implying is that this is cumulative.
5    We have case-in-chief to put in evidence and I don't
6    think cumulative should be the issue.
7            THE COURT:  Well, cumulative can be the
8    issue, that's why Rule 403 is there.  Lots of
9    lawyers think this is true, although I think,
10   ironically, this is more true of lawyers who are
11   defending civil cases than lawyers who are defending
12   criminal cases, is their belief that they can start
13   from ground zero.
14           Generally speaking, unless it's going to take
15   you a very short period of time, it's more of a
16   waste of time to determine what it is that they
17   could put in.
18           Generally speaking, you put in stuff that's
19   not cumulative, and you do that because, otherwise,
20   it's a needless waste of time.  It also tends to
21   annoy the jury, unless you picked a jury
22   deliberately because they had bad memories, and I
23   don't think this jury does.
24           But the point you have to answer is is that
25   he's just telling somebody what happened and what

:10PM
:11PM
:11PM
:11PM
:12PM

5192

1  people said, which he's perfectly able to do when

2  he's on the witness stand.  And unless he is

3  impeached on the grounds of it's prior fabrication,

4  I don't see why you need this.  You can't tell his

5  state of mind from this.  Sometimes you can tell a

6  state of mind from somebody who is merely repeating

7  an account of events, like sometimes when a child

8  who just starts crying tells a lot about the state

9  of mind, but all I have in front of me are words.

10 There's something distinctive about his tone of

11 voice?

12        MR. GOLDSTEIN:  He is reflecting, in this

13 conversation, he is specifically reflecting as to

14 what he is going through, specifically the political

15 process that he's going through and explains not

16 only what he's thinking at that time, but how he

17 goes forward in his actions.

18        In addition, he's speaking to trusted

19 advisers in this situation.  So he's explaining what

20 he's thinking, he's talking to the advisers, and the

21 advisers is giving input.

22        MS. KAESEBERG:  And by explaining things that

23 may have happened in the past, he's telling the

24 adviser what his current state of mind is, where he

25 stands now, what his belief in this moment is.

5193

1          And it's relevant that the person he's
2     speaking to is an adviser.  He has to give that
3     recounting in front of him what has occurred to
4     bring him up to date as to what Blagojevich's state
5     of mind is in this conversation.
6          THE COURT:  And his state of mind is?
7          MS. KAESEBERG:  He is informing --
8          THE COURT:  Angry?  Upset?  Afraid?
9     Uncertain?  What is that state of mind?  State of
10    mind is a generic statement.  What is the specific
11    state of mind that this shows?
12         MR. GOLDSTEIN:  Well, there is a certain
13    amount of anger.  He's talking about, as he says,
14    getting bruised and battered through the legislative
15    process.
16         THE COURT:  Right.
17         MR. GOLDSTEIN:  And he's explaining this to
18    his adviser in the context of how he can then go
19    forward from what he's thinking.  As far as what he
20    is going through, this is --
21         THE COURT:  So his state of mind is hopeful?
22         MR. GOLDSTEIN:  What?
23         THE COURT:  Hopeful, is that the state of
24    mind you're talking about?
25         MR. GOLDSTEIN:  I wouldn't say hopeful.

1      THE COURT:  Neither would I, which is why I
2 don't see the point of this.
3      I mean, state of mind is basically what you
4 were thinking at the time from which there is very
5 little to infer here, and he doesn't really say what
6 he's thinking.  To the extent that he says what he's
7 thinking, they already know this, the jury does, to
8 show that despite all of these impending setbacks.
9 And at least from what's interesting to me is that
10 most people in his position would have viewed
11 themselves as the political equivalent of being in
12 the Titanic about an hour after it struck the
13 iceberg, and it's interesting that he doesn't seem
14 to talk that way.  But I don't see his state of
15 mind, so I'm sustaining the objection.
16      Tab 45.
17      MR. GOLDSTEIN:  45, Your Honor.
18      THE COURT:  Tab 45.
19   (Brief pause).
20      THE COURT:  For your own interest, we will
21 stop at 5:00.
22      MR. GOLDSTEIN:  Thank you.
23   (Brief pause).
24      THE COURT:  All right.  I've read all of 45.
25 The government's view?

1          MR. SCHAR:  Judge, without articulation how

2     this is relevant to the charges or the specific

3     statements, we'd be objecting.

4          THE COURT:  It goes to what?  Say it again.

5          MR. SCHAR:  The specific statements that

6     somehow go to state of mind, which I assume this is

7     being offered for, without some articulation as to

8     the entirety of it, there is lots of irrelevant

9     information, hearsay.  I'm just not sure the

10    articulation as to why this is a state of mind call.

11         THE COURT:  Your turn.

12         MR. GOLDSTEIN:  Thank you, Your Honor.

13         If you look at Page 6 where the bold starts,

14    Blagojevich specifically asks "if anyone wants to

15    argue why I shouldn't appoint Valerie Jarrett in

16    exchange for nothing," and then Quinlan specifically

17    gives his opinion, so it goes to state of mind, it

18    goes to his intent, and the advice that's being

19    given.

20         Further in the call --

21         MR. SCHAR:  I'm sorry, just on that point.

22    The conversation then continues further in that call

23    into political stuff, into the Lisa Madigan arena,

24    not as if that is a comment on an improper request.

25    So that statement alone, I think, needs to be taken

5196

1 into context.

2          Sorry for the interruption.

3          MR. GOLDSTEIN:  No, no, that's fine.

4          THE COURT:  I actually think that if this

5 comes in at all, large portions of it doesn't,

6 because it seems clear to me that there'll be some

7 reliance on the statements made at Page 6, lines 43

8 through 47, through page 7, line 6, this is why they

9 want it in.  It doesn't look much like a legal

10 opinion, but, you know, he could persuade the jury,

11 and I think they have a reasonable case with putting

12 that in after he testifies.  The question is is what

13 else comes in with it, because once that goes in,

14 it's the government that wants the rest of this

15 stuff and not you.

16          MR. GOLDSTEIN:  On that same topic, Your

17 Honor, Page 18 -- actually starting on Page 17 at

18 the bottom, line 39, Blagojevich again discusses

19 Valerie Jarrett, and then Harris on Page 18 says

20 "try and cut the best deal we can," so that falls in

21 line similar to what Quinlan said earlier on Page 6.

22 So as to that issue --

23          THE COURT:  Except I don't think you like the

24 next line.

25          MR. GOLDSTEIN:  No, not --

5197

1      THE COURT:  "I know, but they're not giving
2 me anything."
3      MR. GOLDSTEIN:  No, I understand.
4      THE COURT:  If you want an idea of a word for
5 which you might possibly want to use a dictionary so
6 that it's perfectly clear, the fight in this case is
7 going to be what "me" means, that's basically one of
8 the major issues in this case, what did he mean when
9 he said "me."
10      MR. GOLDSTEIN:  We'll call Greenlee to define
11 it.
12      THE COURT:  Right.
13      MR. GOLDSTEIN:  Nonetheless, I understand
14 what you're saying, Your Honor, but if you look
15 further, there is further discussion as to, you
16 know, getting anything.
17      THE COURT:  What I'm going to do is I'm going
18 to let you confer with each other.
19      In light of the what the defense has said is
20 going to be their defense, some of it, I think,
21 belongs in, but it's only going to come in depending
22 on the nature of his testimony, and we don't know
23 what that's going to be.
24      Okay, so tab 46 is next.  Is there a
25 follow-up to this?

5198

1        MR. GOLDSTEIN:  As far as the call, no.

2        THE COURT:  Does that mean, did Quinlan later

3   come with research?

4        MR. GOLDSTEIN:  As far as a call, it's the

5   next tab.

6        THE COURT:  Good.  Let me take a look.

7      (Brief pause.)

8        MR. SCHAR:  I think it'll be illuminating as

9   to what the defendant is going to say.

10       THE COURT:  Do we have a point in time when

11  we know what Quinlan gave him in the answer to the

12  question, "there's some legal thing I want you to

13  look up"?

14       MR. GOLDSTEIN:  Well, it's answered on the

15  next tab.

16       MR. SCHAR:  The tab says 501(c)(4).

17       THE COURT:  Yes.

18       MR. GOLDSTEIN:  Your Honor, what Rod

19  Blagojevich can testify to, certainly we'll hear

20  when he testifies, as to the specifics of each of

21  these calls, if we take them together.  They're

22  relevant on their face because they go to state of

23  mind, and they go to explaining actions that Rod

24  Blagojevich took afterwards.  He's talking with his

25  attorneys.  He's asking, and here we specifically

5199

1  have the words as far as the legal thing.

2      THE COURT:  What happened after the call was

3  minimized?  Maybe the call minimization here is not

4  such a hot idea.

5      And the only reason speaking from my point of

6  view is, this does tend to show that your client

7  knew how to ask a lawyer for a legal research.  He

8  says:

9      "There's some legal thing I wanted you to look

10     up."

11     It's a little different from "I plan to do X,

12 Y and Z and I'm relying on the silence of my lawyer

13 in response to that to think that that's his view

14 that it's okay.  And 501(c)(4) I think it's very

15 doable, it goes to a specific statutory citation.

16     What's your objection?

17     MR. SCHAR:  I'm not sure we have one.

18     THE COURT:  Yeah.

19     MR. SCHAR:  Judge, I think what we're trying

20 to figure out, though, I mean, if the argument is

21 going to be that Mr. Quinlan went out and did the

22 research on 501(c)(4) and then brought it back to

23 him, they can knock themselves out, they can put it

24 in.  If it's somehow a suggestion that he may think

25 that it was okay, I had Quinlan to check and see

5200

1  specifically whether I could trade a 501(c)(4) or
2  $50 million for a senate seat, I think it's kind of
3  absurd on its face, but I'd like to know that
4  because it might form whether or not this --

5          THE COURT:  Yeah, you are entitled to be
6  informed, and they'll inform you.

7          MR. SCHAR:  Okay.

8          THE COURT:  They'll inform you of that by
9  tomorrow morning, otherwise I don't see a problem
10 with this.

11         MR. GOLDSTEIN:  I mean, the only issue, Your
12 Honor, is, he's going to testify, can he not testify
13 and then after he testifies there's a determination
14 whether these calls become relevant?  And in order
15 to give an offer of proof of what his testimony will
16 be --

17         THE COURT:  No, what he wants to know is, is
18 he going to testify that Quinlan actually gave him
19 some piece of legal advice.  We're not dealing now
20 with inferred advice, we're dealing with actual
21 words, and that you have to tell him about.

22         MR. GOLDSTEIN:  I mean, that's our objection
23 to having to talk about what his testimony will be
24 before he testifies, Your Honor.

25         THE COURT:  You have to tell him what Quinlan

5201

1 said.  I don't care about what Blagojevich says, I'm

2 not talking about Blagojevich's testimony, I'm

3 talking about Quinlan's testimony, and there is a

4 waiver of privilege.

5    MR. GOLDSTEIN:  Well, the government has

6 spoken to Quinlan.

7    MR. SCHAR:  I mean, a couple of days ago we

8 asked for an offer of proof as to what is going to

9 support this.  Did he go out and get the research

10 from Bill Quinlan, is that why he ended up trading

11 the senate seat?  It's pretty straightforward.

12    MR. GOLDSTEIN:  Our issue is providing

13 information as to what our client is going to

14 testify.

15    THE COURT:  But you could provide them with

16 information about what exhibits you might offer,

17 like a letter from Quinlan.

18    MR. GOLDSTEIN:  Well, if it's an exhibit

19 issue, I understand that; if it's a testimony issue,

20 I think that's a separate issue.

21    THE COURT:  That might be okay, but before he

22 testifies to it, when he's on the witness stand I'm

23 going to take the jury out and then he's going to

24 testify to it, then he's on the stand.

25    MR. GOLDSTEIN:  Okay.

:30PM

:30PM

:31PM

:31PM

:31PM

5202

1          THE COURT:  And if we have to take some time
2     out to deal with that, we'll take time, since we
3     have some extra time that we thought we might not
4     have.  That way you can keep it a secret until the
5     time comes when you need to put it in.  There will
6     be a voir dire outside the presence of the jury and
7     we'll see where we go.  Otherwise, I don't see a
8     problem with 49 and 55 --
9          Sorry, 46 and 49, now let's go to 55.
10          MR. GOLDSTEIN:  Actually, Your Honor, I think
11     there's a transcript that --
12          THE COURT:  That I'm missing?
13          MR. GOLDSTEIN:  Yeah.  It is session 548.
14          THE COURT:  What I'm looking at is 55 which
15     is session 577 and what's been handed to me is 548.
16          MR. GOLDSTEIN:  Yes, Your Honor, this was an
17     insert after we gave you that binder.  So this is an
18     additional call.  The one that's outside the binder
19     in your hands is an additional call separate from
20     tab 55.
21          THE COURT:  Okay.  Is this relevant to 55?
22          MR. GOLDSTEIN:  No, no.  It's just a separate
23     one.
24          THE COURT:  I got it.  Okay.  I'm reading it.
25       (Brief pause).

5203

 1          MR. GOLDSTEIN:  One other quick factor, Your
 2   Honor, is that this was a call that was in the
 3   government binder and that was at tab 52.  I don't
 4   believe it was published.
 5          MR. SCHAR:  It was not published, Your Honor.
 6          MR. GOLDSTEIN:  What we are presenting to
 7   Your Honor is the part that was redacted of tab 52.
 8          THE COURT:  Are you talking about the stuff
 9   that's on Page 4, line 12?
10          MR. GOLDSTEIN:  Actually, I apologize, Your
11   Honor.  It's actually Page 5, line 9, Page 6, line
12   4; I apologize.
13          THE COURT:  Okay.
14       (Brief pause.)
15          THE COURT:  Did I not hear a version of this
16   before?
17          MR. SCHAR:  You did.
18          THE COURT:  And what's different about this
19   that you want this in?
20          MR. GOLDSTEIN:  Well, he is discussing with
21   Mr. Quinlan, it helps explain the portion that the
22   government put in, but most importantly is he's
23   discussing this 501(c)(4) with his attorney and
24   providing him information in the process of getting
25   his understanding to form his intent, in forming his

:34PM

:35PM

:36PM

:36PM

:36PM

5204

1 intent and state of mind.

2      MR. SCHAR: Judge, actually, I assumed that
3 we didn't play it. That portion was removed from
4 the binders and left out.

5      And, secondly, at this point, he's actually
6 telling his lawyer what he had already done. To say
7 that Bill Quinlan basically is a legal adviser is a
8 dispute, obviously, but he's a political adviser and
9 here we have a rehash of what he's already done with
10 Tom Balanoff and he's going back to Quinlan and
11 telling him what he did and then he goes on to go
12 through the list of three criteria.

13      MR. GOLDSTEIN: Your Honor, he's reporting to
14 Quinlan what they had discussed prior. So he's
15 constantly updating Quinlan as to what is going on
16 in this scenario.

17      THE COURT: Now, how do we know he's updating
18 him?

19      MR. GOLDSTEIN: Well, from the previous
20 calls --

21      THE COURT: No, no, all we have now is the
22 call. How do we know he is updating Quinlan? Did
23 he have some unrecorded conversations with Quinlan?

24      MR. GOLDSTEIN: The tabs we just went through
25 where we talked about the 501(c)(4).

1      THE COURT:  Right.  But, I mean, every time
2  he met with Quinlan he was recorded?  Do we know
3  this?
4      MR. GOLDSTEIN:  Every time he met Quinlan?
5      THE COURT:  He met with Quinlan he was
6  recorded, do we know this?
7      MR. GOLDSTEIN:  He was recorded?
8      THE COURT:  Was he?
9      MR. GOLDSTEIN:  Well, as far as phone
10 conversations you're discussing?
11     THE COURT:  Any kind of conversation.
12     MR. GOLDSTEIN:  If there is any conversations
13 in FOB, I mean, my understanding is there was --
14     THE COURT:  I'm not letting this one in.
15 What we're going to do is, you're going to ask your
16 client, if you want to go through this, what he got
17 from Quinlan, what his advice was, what his
18 understanding was, what he said, and then maybe we
19 can talk about some of these transcriptions.
20     But these recordings are not going to be his
21 testimony.  He's going to have to testify and he's
22 going to have to account for this stuff and he has
23 to tell what the legal advice is, and he's going to
24 have to tell what he thought that advice was and how
25 he got it.

5206

1       And one of the problems that I have with all
2  of this is is that it may very well be that what I
3  refer to as the inferred legal advice might
4  disappear from the case.  He could get up on the
5  witness stand and say "he explicitly told me it was
6  okay."

7       And if he does something like that and you're
8  not willing to tell me one way or the another, and I
9  don't blame you, if he's going to say something, why
10 do we need this stuff?  It's just a lot of time to
11 play tapes which are ambiguous on the question that
12 you've offered them for.

13      There's lots of stuff where they're not
14 ambiguous; they're ambiguous on the issues that
15 you've offered them for.  I'm glad that I've had a
16 chance to go through this in advance, but I don't
17 know what we're going to hear and until I know what
18 we're going to hear, there's not a lot of point in
19 dealing with this.

20      His testimony is going to make a lot of this
21 stuff cumulative, and may make some of this stuff
22 irrelevant, and, in couple of cases, it might make
23 this stuff very relevant, but there's no way to make
24 that judgment.

25      Plus, we don't have his own description of

5207

1  what his state of mind is.  It would be nice to

2  know.  A lot of state of mind cases, if you read the

3  cases on state of mind, not all but many, you're

4  talking about somebody's state of mind who wasn't

5  there, never testified, they're gone for a variety

6  of reasons, and sometimes you have them under

7  circumstances that suggest some desire to fabricate.

8  We don't know that.  He could advance the cause of

9  the admissibility of some of these and he could

10  destroy them.  So basically we're just looking at

11  this on the basis now of even if he didn't testify,

12  or even if he gave the most minimal testimony

13  possible, would this still be admissible.  And some

14  of it is, but not much thus far.  So we're holding

15  fire on that one.

16      55, since this is minimized, we don't know

17  what passes after this.  This is Blagojevich:

18    "Hey."

19    Quinlan:  Hey, how are you."

20    Blagojevich:  All right, real quick before we

21    get to healthcare, let me hear the

22    constitutional requirements for the senator,

23    he's got to..."

24    and presumably Quinlan read from the

25  constitution what the requirements are to be for

5208

1   U.S. senator.

2        Okay, let's go to tab 77.

3        MR. SCHAR:  Sorry, 55, Judge, that depends on

4   or --

5        THE COURT:  55 is not in.  We're going to

6   deal with 55 when we have something else there.  I'm

7   assuming there's no objection to 55, but we'll leave

8   that for a while later.

9        77 is Page 3 to Page 5.  Let me take a look.

10       (Brief pause).

11       MR. SCHAR:  Judge, I would add, to the extent

12  the portion they're seeking which I assume to be

13  some state of mind, the remainder of the call, which

14  is just a continuation of discussion of names, puts

15  it much more in context, just this section, but

16  understanding it may depend on what he said.

17       THE COURT:  Yeah, my assumption is the

18  government is going to take the position that this

19  is not legal advice, this is political advice, and,

20  to some extent, arguably placating.

21       MR. SCHAR:  And also in terms of time frame,

22  December 31st.

23       THE COURT:  Yeah.

24       Tab 85.  Does this list exists?

25       MR. SCHAR:  The Greenlee list?

5209

1       THE COURT:  Yes, the Greenlee list?

2       MR. SCHAR:  It was admitted.

3       MR. GOLDSTEIN:  That was admitted.

4       THE COURT:  Right.

5       I'm inferring from this that your client
6  never read it?  It's a question, so I'm inferring
7  from this because:

8       "Right.  I saw it, I got the list."

9        "Blagojevich:  How does it look?"

10       I'm inferring from that, he didn't read it.

11       (Brief pause).

12       THE COURT:  You can tell me I'm wrong.

13       MR. GOLDSTEIN:  I don't -- I don't -- I
14  honestly can't give you an answer, but I don't
15  necessarily see that that's -- I mean, that's one
16  inference, but I think there's a second inference,
17  as well.

18       THE COURT:  Well, it's largely an inference
19  from other things he said in the conversation and
20  his not wanting to know a lot about details, which,
21  in all honesty, it would not be the first governor
22  who didn't.  But I am curious, did he see the list?
23  Does anybody know here now?  If no one knows, that's
24  fine.

25       MR. GOLDSTEIN:  To my understanding, he did.

5210

1          THE COURT:  Okay.  Good.

2          And we have the list?

3          MR. GOLDSTEIN:  Yes, that's been admitted.

4          THE COURT:  Right.

5          MR. SCHAR:  There's a list that was admitted

6   that was put together around Thanksgiving.

7          MR. GOLDSTEIN:  There were actually two

8   lists, one was a handwritten list that Mr. Greenlee

9   said was not his handwriting, and then the second

10  list that he said it was typed and we published it.

11         THE COURT:  And what do you want this for?

12         MR. GOLDSTEIN:  Well, Your Honor, it goes to

13  state of mind.

14         THE COURT:  What state of mind?  How would

15  you identify his state of mind?  What is the state

16  of mind you're talking about?

17         MR. GOLDSTEIN:  His state of mind, again, as

18  to the Lisa Madigan deal, so to speak.

19         Another issue is Harris, on Page 5,

20  Blagojevich asks him right at the bottom, line 47,

21  he asks if it's reasonable and realistic, and Harris

22  says yes, and then it goes on further.

23         So Harris, I believe, testified as to his

24  view as to whether this list, whether these

25  accomplishments could actually get done, so it is

5211

1  impeaching of Harris, in addition to the state of
2  mind of Rod Blagojevich's as to the Madigan deal and
3  what he wanted to get done.
4         THE COURT:  Leave off the impeachment stuff.
5         MR. GOLDSTEIN:  Okay.
6         THE COURT:  This would probably not come in
7  under any circumstances, but there might be
8  something in his testimony which he testifies to.
9         MR. SCHAR:  Judge, we ask to the end of the
10 page.
11        THE COURT:  Yeah, it'll go all the way.
12        86, tab 86.
13        MR. GOLDSTEIN:  That goes straight to page 6,
14 Judge.
15        THE COURT:  This depends again on his
16 testimony.
17        MR. GOLDSTEIN:  The other rationale for its
18 admission, Your Honor, is the impeachment of
19 Mr. Greenlee as to he thought the accomplishments
20 could not get done.  Whether he's placating or not,
21 he agreed, for the most part, with the governor as
22 to whether this is not that unrealistic, it's not
23 unrealistic at all, and that frames the state of
24 mind as to the governor how he went forward.
25        THE COURT:  But Greenlee said things the

:50PM

:51PM

:51PM

:52PM

:52PM

5212

1  governor wanted to hear, and to the extent that

2  Greenlee said things the governor wanted to hear,

3  this, you're going to argue, is part of his state of

4  mind and I don't see a dispute here.

5          MR. GOLDSTEIN:  Well, it frames the

6  Governor's interactions.

7          THE COURT:  I understand that, but the frame

8  is already there.  I mean, Greenlee did not, I

9  think, testify that he believed what he was telling

10  the governor, which makes the fact he's not denying

11  he said it to him.  So stuff like this I think is a

12  waste of time.

13          Tab 92.  Was this played?  Was any part of

14  this played?

15          MR. SCHAR:  No, Judge.

16          THE COURT:  I assume he's going to say all

17  this stuff on the witness stand?

18          MR. GOLDSTEIN:  Yes.

19          THE COURT:  Every little bit of it.

20          MR. GOLDSTEIN:  Yes.

21          THE COURT:  Probably more than once.

22          MR. GOLDSTEIN:  Depending on what Your Honor

23  allows.

24          THE COURT:  And who is Fred Yang again?

25  Polster?  Political adviser?

5213

1          MR. GOLDSTEIN:  Political adviser.

2          MR. SCHAR:  Polster.

3          MR. GOLDSTEIN:  To the left we have polster,

4    to the right we have political adviser.

5          THE COURT:  The government's position on

6    this?

7          MR. SCHAR:  Judge, actually, I assume the

8    theory is there is a discussion with the Lisa

9    Madigan deal.  Of course, the section they left out,

10   being Page 30 to 34, are sections where a number of

11   other individuals, as well, that is of concern at

12   that time.  If they want to put in the totality of

13   that section, we have no objection to it.

14         THE COURT:  Sure.  But we're not going to

15   start with that.  I want to hear him.  And some of

16   it, it is possible, will not come in, if it comes in

17   at all, until after cross-examination.

18         And this is particularly true because my

19   concern is, these statements made to a political

20   adviser-slash-polster, remember that 1803 talks

21   about motives to say something that are not

22   necessarily true.  So we may be dealing, depending

23   on the nature of his testimony, with stuff he's

24   saying to a political adviser/polster with the

25   unstated question as to how does this play, in which

5214

1  case we're not talking about his state of mind in

2  any area in which it would be admissible here, we're

3  talking about a political prognostication.  But I'm

4  not going to make too big a deal about it because

5  he's going to say these things from the witness

6  stand, anyway.

7         I think that's the 20th on the list, not

8  including the extra one that was put in, which means

9  we have 18 and 19 or so left to go.  We can stop

10 now.  We'll start again tomorrow at 10:00.

11        Also tomorrow if there's other stuff that you

12 want to bring up in terms of scheduling or anything

13 else, that would be a good time to do it.

14        And if you want say something now, go ahead.

15        MR. SCHAR:  The government has one thing we

16 would like to do at the side, Judge?

17        THE COURT:  Sure.

18        MR. SCHAR:  And the only request I would

19 make, Judge, tomorrow will technically be the end of

20 our typical trial week.  We do not know who the

21 witnesses are going to be for Monday or Tuesday or

22 who they are going to be presenting.

23        THE COURT:  Right.  They're going to tell you

24 Thursday afternoon.

25        MR. SCHAR:  Thank you, Judge.

5215

1       MR. SOROSKY:  Your Honor, if I could ask one
2   question?

3       THE COURT:  Sure.

4       MR. SOROSKY:  If we can refer back to tab 30.

5       THE COURT:  Back?  You want to go back?

6       MR. SOROSKY:  Well, I just want you to look
7   at the person involved in the conversation.  He is
8   not, if I could use the phrase, one of the usual
9   people who has regularly been involved in the case.

10      THE COURT:  Right.

11      MR. SOROSKY:  Everyone else, I think, is
12  someone who has been regularly involved.  By your
13  ruling concerning that tab, does that mean that this
14  person, I'll use the word "most likely," would not
15  be able to be called as a witness?

16      THE COURT:  Most likely.

17      MR. SOROSKY:  Because, obviously, what he
18  would testify to would be the contents of -- there
19  was no other communication between the defendant and
20  him other than this tape.

21      THE COURT:  Most likely.

22      MR. SOROSKY:  That's what I wanted to know.

23      THE COURT:  Okay, come to the side.

24

25

5216

1

2          (Proceedings heard at sidebar on the record.)

3               THE COURT:  Go ahead.

4               MR. SCHAR:  I'll do my best to explain this

5    in as a simplistic way as possible.  We just wanted

6    to put it on the record, and the government would

7    say from the beginning, we don't think it's anything

8    that needs to be perused.  An AUSA came to me this

9    morning who indicated he is part of a book group --

10              MR. SOROSKY:  Part of a what?

11              MR. SCHAR:  Book group.

12          At book group, I believe it was yesterday

13   evening, had a conversation with an individual that

14   he does not know well at, who he does not know that

15   this individual knows that this individual knows is

16   an AUSA, and in the context of the conversation the

17   person asked AUSA "what do you think," words to the

18   effect of "what do you think about the trial that's

19   going on?  Do you think Mr. Blagojevich will get

20   off" or something like that.  AUSA declined comment

21   and said he didn't know.

22          The individual at the book club then said

23   that he knew a forensic accountant who supposedly

24   knew a female juror who said that they're leaning

25   towards letting him walk, the accountant advised she

5217

said they're leaning towards letting him walk, which
is how the forensic accountant supposedly knew it
was a female juror who communicated that to the book
club member who communicated the comment to the
AUSA.  We just wanted to put it on the record.
Don't put any stock in it, but so everyone is aware
of the comment.

     THE COURT:  This is the time, Mr. Sorosky,
where you demand to find out this juror and request
her immediate removal.

     MR. SOROSKY:  No, we're not.  We're not.

     THE COURT:  If anything further develops, you
will inform us.

     MR. SCHAR:  Yes, Judge.

     THE COURT:  Thank you.

    (Proceedings resumed in open court.)

     THE COURT:  We are adjourned.


    (Adjournment taken from 5:10 o'clock p.m. to
     10:30 o'clock a.m. on July 15, 2010.)

5218

```
1

2

3              *     *     *     *     *     *     *     *

4

5

6   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

7   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

8                          MATTER

9

10

11     /s/Blanca I. Lara                    date

12

13

14

15

16   _____        _____

17          Blanca I. Lara                       Date

18

19

20

21

22

23

24

25
```