5753

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )  No. 08 CR 888
4          Government,              )
                                    )
5  vs.                             )  Chicago, Illinois
                                    )
6  ROD BLAGOJEVICH,                 )  July 21, 2010
   ROBERT BLAGOJEVICH,              )
7                                    )
              Defendants.           )  10:10 o'clock a.m.
8

9                       VOLUME 28
                 TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE JAMES B. ZAGEL
                      AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                   Room 2504
                Chicago, Illinois 60604
23                 (312) 435-5895

24

25

5754

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4        KAPLAN & SOROSKY
       BY:  Sheldon M. Sorosky
5        158 West Erie
       Chicago, Illinois 60610
6        (312) 640-1776

7        LAW OFFICE OF SAMUEL E. ADAM
       BY:  Samuel Forbes Adam
8            Samuel Adams, Jr.
       6133 South Ellis Avenue
9        Suite 200
       Chicago, Illinois 60637
10       312-726-2326

11       OFFICES OF AARON B. GOLDSTEIN
       BY: Aaron Benjamin Goldstein
12       6133 South Ellis
       Chicago, Illinois 60637
13       (773) 752-6950

14       OFFICES OF LAUREN FAUST KAESEBERG
       BY:  Lauren Faust Kaeseberg
15       2140 N. Lincoln Park West
       Suite 307
16       Chicago, Illinois 60614
       (773) 517-0622
17

18       LAW OFFICES of MICHAEL GILLESPIE
       BY:  MICHAEL GILLESPIE
19       53 West Jackson Boulevard
       Suite 1420
20       Chicago, Illinois 60604
       (312) 726-9015

21

22

23

24

25

5755

1   APPEARANCES   (continued:)

2

3   For Defendant Robert Blagojevich:

4           ETTINGER, BESBEKOS, PARISI
            BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
            12413 South Harlem
6           Suite 203
            Palos Hills, Illinois 60453
7           (708)598-1111

8

            Edelman, Combs, Latturner & Goodwin LLC
9           BY:  Robyn S. Molaro
            120 S. LaSalle
10          Suite 1800
            Chicago, Illinois 60603
11          (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cain - direct by Schar                                    5756

1          THE MARSHAL:  All rise.

2       (The following proceedings were had in the

3        presence of the jury in open court:)

4          THE COURT:  Please be seated.

5          THE COURT:  Mr. Ettinger, do you have

6  anything further?

7          MR. ETTINGER:  No, Your Honor.

8          THE COURT:  Subject to exhibits, the

9  defendant Robert Blagojevich rests.

10         Mr. Sorosky?

11         MR. SOROSKY:  At this time the defendant Rod

12  Blagojevich will rest.

13         THE COURT:  Does the government have anything

14  in rebuttal?

15         MR. SCHAR:  Judge, just briefly.  We call

16  Special Agent Dan Cain.

17         THE COURT:  Do you understand you're still

18  under oath.

19         THE WITNESS:  I do, Your Honor.

20         THE COURT:  Please be seated.

21              GOVERNMENT CASE IN REBUTTAL

22   DANIEL CAIN, GOVERNMENT WITNESS, PREVIOUSLY SWORN

23                DIRECT EXAMINATION

24  BY MR. SCHAR:

25  Q   Agent Cain, one last time, remind us where you

1  work?

2  A  I'm a special agent with the FBI.

3       MR. SCHAR:  Judge, may I approach with

4  several exhibits?

5       THE COURT:  You may.

6  BY MR. SCHAR:

7  Q  I'm going to show you, Agent Cain, what is marked

8  as Government Exhibit Call 2477, Government Exhibit

9  Rod Blagojevich Cell Calls, and a transcript that

10 corresponds with Government Exhibit 2477, I ask you

11 to review each of those exhibits.

12       Are you familiar with each of the exhibits,

13 Agent Cain?

14 A  Yes, I am.

15 Q  As to Government Exhibit Call 2477 Disk, what is

16 that exhibit?

17 A  This is a computer disk containing a recorded

18 call from the wiretap placed on Robert Blagojevich's

19 cellular telephone.

20 Q  And is it a recorded call that occurred on

21 December 5th, 2008, at approximately 8:02 a.m.?

22 A  Yes, it is.

23 Q  Is that the morning that the John Wyma article

24 appeared in the newspaper?

25 A  Yes.

Cain - direct by Schar                              5758

1  Q   And there is a transcript, I believe, that you
2  have which is not separately marked as an exhibit
3  but corresponds with the phone call, I believe?
4  A   Yes.
5  Q   And did you check to make sure that the
6  transcript was a true and accurate representation of
7  the words that are on call 2477?
8  A   Yes, it is.
9  Q   By the way, call 2477, is that Robert Blagojevich
10 cell phone line that was wiretap?
11 A   Yes.
12         MR. SCHAR:  Judge, at this time I would move
13 into evidence call 2477 Disk, as well as the
14 transcript which we made a part of Government
15 Exhibit Transcript Binder 1.
16         MR. SOROSKY:  No objection.
17         THE COURT:  Admitted.
18      (Government's Exhibit 2477 Disk was received in
19       evidence.)
20         MR. SCHAR:  And, Judge, with agreement, we
21 also -- I believe Defendant Robert Blagojevich is
22 seeking to put in call 2563 and the corresponding
23 transcript which we do not have an objection either.
24         MR. ETTINGER:  That's correct.
25         THE COURT:  Okay.

:12AM

:13AM

:13AM

:13AM

:13AM

Cain - direct by Schar                    5759

BY MR. SCHAR:

Q   Now, turning your attention, Agent Cain, to the chart that is Robert Blagojevich's cell calls.

Can you just briefly explain what that is a summary chart of?

A   Yes, this is a summary chart of calls made to and from Robert Blagojevich's cellular telephone on December the 4th, 2008, between 2:17 p.m. and 2:57 p.m. to and from Rod Blagojevich's home phone, Mary Stewart's office phone, Mary Stewart's cellular telephone, Raghu Nayak's phone, and Robert Blagojevich's cellular telephone voicemail.

Q   Where did the underlying information come from, Agent Cain, to put together that summary chart?

A   It came from line sheets which is a printout of information taken from the wiretap computer system pertaining to each session that is recorded and collected in the computer system.

Q   And to the best of your knowledge, is that a true and accurate representation of the information that was contained in the computer system as detailed on the line sheets that were produced from the wiretap on Robert Blagojevich's cell phone for that period of time?

A   Yes.

1       MR. SCHAR:  Judge, we move Government Exhibit
2  Robert Blagojevich's Cell Calls into evidence.
3       MR. ETTINGER:  No objection.
4       THE COURT:  Admitted.
5     (Government's Exhibit Robert Blagojevich's Cell
6      Calls were received in evidence.)
7       MR. SCHAR:  Permission to publish.
8       THE COURT:  Publication is granted.  Go
9  ahead.
10    (Exhibit published to the jury.)
11 BY MR. SCHAR:
12 Q  Can you just go through what each of the columns
13 is, Agent Cain, on Government Exhibit Robert
14 Blagojevich's Cell Calls.
15 A  Yes.  The first column is the date of the call.
16      The second column is the time that the call
17 occurred.
18      The directionality of the call, whether it
19 was outgoing or incoming.
20      The number is the telephone number that is
21 the dialed digits or the originating number from
22 that telephone call.
23      And the subscriber user is the subscriber
24 and/or user of that telephone.
25 Q  And when you say the number of the dialed digits,

1  you're talking about the dialed digits on Robert

2  Blagojevich's cell phone, that's the number that was

3  called or attempted to be called?

4  A   Yes.

5  Q   And I want to direct your attention about midway

6  down the chart beginning at 2:25 p.m.

7        Does this chart begin at 2:17 p.m. with a

8  call from Robert Blagojevich's cell phone to his

9  cell phone to check voicemail?

10 A   Yes.

11 Q   And thereafter are there a series of calls

12 leading up to 2:25?

13 A   Yes.

14 Q   Beginning at 2:25, is there a call from Robert

15 Blagojevich's cell phone to Mary Stewart's cell

16 phone?

17 A   Yes, there is.

18 Q   Shortly thereafter, is there another call to Mary

19 Stewart's office phone?

20 A   Yes.

21 Q   And within the same minute is there yet another

22 call to Mary Stewart's cell phone?

23 A   Yes.

24 Q   And in that minute, after 2:25, is there a call

25 to Rod Blagojevich's home phone?

1 Q   Two minutes later, is there another call to Rod
2 Blagojevich's home phone?
3 A   Yes.
4 Q   And about four minutes later, is there another
5 call to Rod Blagojevich's home phone?
6 A   Yes.
7 Q   Two minutes after that, is there another call to
8 Rod Blagojevich's home line?
9 A   Yes.
10 Q   And shortly thereafter, though within the same
11 minute, is there another attempt to call Rod
12 Blagojevich's house in a second phone number
13 affiliated with that home?
14 A   Yes.
15 Q   About five minutes later, is there another call
16 out to Rod Blagojevich's home phone?
17 A   Yes.
18 Q   And about three minutes later, is there an
19 incoming call from Mary Stewart's cell phone?
20 A   Yes.
21 Q   And at 2:43 p.m. there is an outgoing call to Rod
22 Blagojevich's home line?
23 A   Yes.
24 Q   And does that correspond with one of the phone
25 calls that was wiretapped?

1  A   Yes, it does.

2  Q   And when that call ends, shortly thereafter at

3  2:57 p.m., is there an outgoing call to a phone

4  number affiliated with Raghu Nayak?

5  A   Yes.

6  Q   Is that also one of the calls that we heard on

7  the wiretap?

8  A   Yes, it is.

9          MR. SCHAR:  If I may have one moment, Judge.

10       (Brief pause).

11          MR. SCHAR:  Nothing further at this time.

12          MR. ETTINGER:  No questions.

13          THE COURT:  You may step down.

14          (Witness excused.)

15          MR. SCHAR:  Judge, we don't have any other

16 witnesses, but there are two calls that we would

17 like to publish for the jury.

18          The first is a call -- we have a transcript

19 to pass out to the jurors.  The first would be call

20 2477 off of Robert Blagojevich's cell phone on the

21 morning of December 5th at 8:02 a.m., and the second

22 is 2563, again off of Robert Blagojevich's cell

23 phone, at 4:53, so toward the end of the day on

24 December 5th.

25          MR. SOROSKY:  Your Honor, for the record, we

:18AM

:18AM

:19AM

:19AM

:20AM

5764

1   would object.
2        THE COURT:  Your objection is overruled.
3     (Brief pause).
4        MR. SCHAR:  May we proceed?
5        THE COURT:  Not yet.
6     (Brief pause).
7        THE COURT:  Now you may proceed.
8        MR. SCHAR:  Thank you, Judge.  The first is
9   8:02 p.m. on December 5th.
10    (Tape played).
11       MR. SCHAR:  May I have one moment, Judge?
12       THE COURT:  Sure.
13     (Brief pause.)
14       MR. SCHAR:  Judge, the next audio that will
15   be played is call 2563 in the evening of December
16   5th.
17    (Tape played).
18       MR. SCHAR:  Judge, the government will rest.
19       MR. ETTINGER:  We rest.
20       THE COURT:  Members of the jury, all sides
21   have rested.  The presentation of evidence with
22   respect to this case is concluded.  I'm going to
23   return you to the jury room and give you further
24   instructions in a little while.
25       THE MARSHAL:  All rise.

5765

1          (The following proceedings were had out of the
2           presence of the jury in open court:)
3              THE COURT:  Be seated in the courtroom.
4                 Counsel, approach the bench.
5          (Brief pause).
6              THE COURT:  I believe at this stage I have an
7    admonition to make.
8              Governor, would you state your name for the
9    record, please.
10             DEFENDANT ROD BLAGOJEVICH:  Yes, Judge.  Rod
11   Blagojevich.
12             THE COURT:  Your attorneys have informed me
13   that you have made the choice not to testify in this
14   case, is that correct?
15             DEFENDANT ROD BLAGOJEVICH:  That's correct,
16   Judge.
17             THE COURT:  Under the law, there are three
18   decisions that can be made only by the defendant and
19   not the lawyer, one of those is whether or not to
20   take the witness stand.  So now I'm going to ask you
21   if it is your personal decision not to take the
22   witness stand?
23             DEFENDANT ROD BLAGOJEVICH:  Yes, Judge.
24             THE COURT:  Have you discussed the question
25   of whether or not you should testify with your

5766

1  attorneys?

2      DEFENDANT ROD BLAGOJEVICH:  Yes, Judge; fully

3  and completely.

4      THE COURT:  And after discussing it with

5  them, have you deliberated in your own mind as to

6  what your decision would be?

7      DEFENDANT ROD BLAGOJEVICH:  Yes, I have.

8      THE COURT:  And is it your decision not to

9  testify in this case?

10     DEFENDANT ROD BLAGOJEVICH:  It is my

11 decision, Judge, on the advise of my attorneys.  I

12 made the decision freely and voluntarily.

13     THE COURT:  Okay, I'm satisfied.

14     And you can return to your seat or you can

15 remain standing, it's up to you.

16     THE DEFENDANT:  What would you recommend,

17 Judge?

18     THE COURT:  Return to your seat.

19     DEFENDANT ROD BLAGOJEVICH:  Thank you.

20     THE COURT:  What I propose to do, absent

21 objections by the attorneys, is instruct the jury,

22 in the jury room rather than bring them out here, of

23 their continuing duties not to pay any attention to

24 media and to tell them that we will resume again

25 Monday at 9:30.  And that's what I intend to do

5767

1    absent objection, and I hear no objection.

2          MR. ETTINGER:  No objection, Judge.

3          MR. SOROSKY:  No objection.

4          MR. SCHAR:  No objection.

5          THE COURT:  Also, I believe after I give this

6    instruction to the jury, we will reconvene here and

7    talk about the various matters that we have to deal

8    with.

9          With that, the Court is in recess for

10   10 minutes.

11      (Recess.)

12          THE COURT:  Counsel, approach.

13          I have informed the jury of the following

14   things, I did this in the presence of the court

15   security officer as well; one, that they've heard

16   all the evidence that they're going to hear; two,

17   that we have a fair amount of work to do here before

18   the case is ready for presentation to them and

19   consequently I've ordered their return on Monday.

20          I indicated that we might well be able to

21   complete a good deal of the work in time for them to

22   be in court on Thursday, but I thought that if they

23   wanted to keep to the Friday schedule, that it would

24   be better to do it on Monday.  I informed them that

25   their schedule of deliberation will be largely

5768

determined by their choice, not mine.  I informed
them of my standard rule, which is, on timing of the
deliberations, when they start, when they end, is up
to them, the majority of vote rules, if there's a
tie, I break the vote, I break the tie.

I also informed them -- they asked the
question as to who the alternates would be.  I told
them that we do not reveal who the alternates would
be because we don't want anybody who's an alternate
juror to know they're an alternate juror and, as a
general rule, we don't want the attorneys to know
either.

They asked no questions of me, perhaps that's
because the first thing I said to them is, don't ask
me any questions.  So, basically, that's fine.

With that, I believe we have to attend two
things, one is the motions for judgment at the end
of the the case.  The defendant Rod Blagojevich
filed an extensive memorandum on this issue, and for
all practical purposes, the memorandum can stand as
it is, I don't think there's been any significant
change.  If the defendant Rod Blagojevich wants to
supplement it orally, they are free to do so.

The defendant Robert Blagojevich did not file
anything in writing, which is fine with me, you can

5769

1 continue to argue orally, if you wish.

2      And then we have to deal with the

3 instructions issues, and my first question is, has

4 anyone drafted instructions?

5      MR. SCHAR:  Judge, here's where we are in

6 terms of the government situation.  We are, I think,

7 very close to having a draft of the totality of the

8 proposed government instructions.  There are people

9 working on it right now.  I believe we could have

10 them done probably within the hour, if that's what

11 Your Honor wanted to do, and provide them to Your

12 Honor and defense counsel, and it should be a

13 complete version for the criminal charges, and then

14 we can proceed to them.  We can work on whatever

15 schedule Your Honor wants.

16      The forfeiture instructions are drafted.  I

17 handed them out to both sides, although I think they

18 only apply to Defendant Rod Blagojevich in this

19 case. And as I mentioned, I think the federal rules

20 actually require a decision prior to deliberations

21 as to whether he wishes to proceed with a jury

22 determination if there is a conviction or whether he

23 will waive that and proceed with Your Honor on issue

24 of forfeiture.  Those are not critical in resolving

25 prior to deliberations.  Again, they have been

:52AM

:53AM

:53AM

:53AM

:53AM

1  tendered and I would be happy to give Your Honor a
2  copy as well.
3        THE COURT:  My understanding is -- my guess
4  is that neither of the defendant wants to submit
5  their own separate versions of the boilerplate that
6  we usually have.  So the standard instructions I
7  think the government's version will do.
8        With respect to specific elements
9  instructions or specific evidentiary instructions,
10  my question is, does either defendant have them in
11  draft form?
12        MR. ETTINGER:  Not yet, Judge.
13        MR. SOROSKY:  No.  What we would suggest,
14  Your Honor, is if the government could tender to
15  both defendants their instructions some time today,
16  whenever they're ready, and we would digest them and
17  begin to work on our instructions and perhaps
18  sometime tomorrow, probably in the afternoon, the
19  defense would tender to the government their
20  instructions, and perhaps if it's convenient Friday,
21  we can hold an instruction conference, and I suggest
22  that, under the wisdom of Mr. Martin who is our
23  quarterback on this issue.
24        THE COURT:  The government have any problem
25  with that?

5771

1        MR. SCHAR:  Friday morning, Judge, if we
2  could.
3        THE COURT:  No, it will be Friday morning.
4        MR. SCHAR:  That's fine.
5        THE COURT:  I have a measure of a hearing set
6  for 11:00 o'clock Friday morning with respect to
7  issues raised by intervenors.  The intervenors have
8  indicated they have some concern about the issue on
9  which they intervened becoming moot.  So I have
10 communicated to the intervenors that I would
11 actually be more than willing to move that hearing
12 to Thursday so that I could make a determination
13 promptly.  And under certain circumstances, while
14 it's certainly more probable now than it was before
15 the Court of Appeals that the issue they raised
16 might be moot, it's still, at least, theoretically
17 possible that it wouldn't be.  And in the event I
18 rule against the intervenors, they will have, at
19 least, a chance to raise the issue, and they'll be
20 able to appropriately characterize to the Court of
21 Appeals the need for some urgency.  So Friday
22 morning would work out fine because I'm assuming the
23 intervenors would prefer to do the hearing on
24 Thursday.
25        MR. SOROSKY:  What time does Your Honor want

:55AM

:56AM

:56AM

:56AM

:57AM

5772

1  to do it?

2          THE COURT:  On Friday?

3          MR. SOROSKY:  Yes.

4          THE COURT:  Basically, I want to start at

5  9:00 on Friday.

6          MR. SOROSKY:  9:00 or 9:30?

7          THE COURT:  9:00.

8          Then we have the motions for judgment, and,

9  actually I would prefer, if at all possible, to

10  argue that one today, the reason I would like to

11  argue that one today is it would be helpful to

12  consideration of the instructions to determine

13  whether all of the charges remain.  If, of course,

14  none of the charges remain, we don't have to worry

15  about instructions, but if all the charges remain or

16  some of them remain, it would be good for everybody

17  to know this before we started arguing about

18  instructions.  It would be my inclination to argue

19  that this afternoon, and the reason I picked this

20  afternoon is, I suspect that counsel want to take

21  another look at those motions because there were

22  probably other things that were on your mind this

23  morning.  So you can have the rest of the morning to

24  consider that and I'll have oral argument on the

25  motions for judgment.

5773

1        Is there anything else we need to do?

2        MR. SCHAR:  Judge, housekeeping in a couple

3    of areas.  First, there were a couple of exhibits

4    this morning, permission for those to be released.

5    Secondly, I know there are -- in the transcript

6    binders there were several calls that were not

7    played and we ask that those be removed.  We will

8    produce a new one that has that removed as well so

9    when it goes back to the jury it does not include

10   something that was not presented.

11       There is an additional call that was put in

12   by the government today, we seek permission to go

13   into the jury box and insert into the binder at

14   101 A or 100 A.

15       And then there was one call that wasn't

16   played that was cross-examined on, we'd ask

17   permission to remove that call as well as it was not

18   presented to the jury.

19       THE COURT:  That's fine with me, but it's, I

20   think, useful for you to have one representative of

21   the defense while you're doing that so they can

22   verify it for themselves.

23       MR. SCHAR:  We'll make sure we do that.

24       The other housekeeping matter, Judge, I think

25   is, I'm not sure of Your Honor's practice, but I am

:58AM

:58AM

:59AM

:59AM

:59AM

5774

assuming you would like the indictment to go back to
the jury with the jury instructions.  We're in the
process of cleaning up --

THE COURT:  The usual detracted indictment.

MR. SCHAR:  Yeah, we'll redact.  The other
thing we're going to recommend is, this case in
particular, this indictment, has a lot of
individuals that have a letter numerically in some
way, we propose inserting the actual names, since
they've all heard the names at this point, just for
ease.

MR. SOROSKY:  We have no objection to that.

MR. SCHAR:  And then, lastly, there are
several sections which we will be moving to strike
because there wasn't evidence presented on them and
we'll highlight that for defense counsel when we
send over the proposed indictment.

THE COURT:  And when might you do that?

MR. SCHAR:  Today.

THE COURT:  Yes, it would make perfect sense
considering what we're doing in the afternoon.

MR. SOROSKY:  I would suggest that after we
get the government's redacted indictment to present
to the jury, perhaps we could sit down with them,
because we may have some objections and maybe they

5775

1    would agree to those objections after their
2    redactions before we approach Your Honor with it,
3    should it be necessary.
4           THE COURT:  Sure.
5           MR. SOROSKY:  Thank you.
6           MR. GOLDSTEIN:  Your Honor, one other issue.
7    May I ask the government which calls they plan on
8    taking out?
9           MR. SCHAR:  You'll see --
10          THE COURT:  That's why I want somebody there,
11   because if it turns out that there's a dispute about
12   it, you can bring it to me.
13          MR. GOLDSTEIN:  Okay.
14          THE COURT:  So what I would like to do is, I
15   would like to reconvene at 1:30, and I'll see you
16   then.
17
18
19      (Luncheon recess taken from 11:01 o'clock a.m.
20       to 1:30 o'clock p.m.)
21
22
23
24
25

5776

```
1           IN THE UNITED STATES DISTRICT COURT.
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )  No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )  Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )  July 21, 2010
   ROBERT BLAGOJEVICH,            )
7                                 )
            Defendants.           )  2:16 o'clock p.m.
8

9                       VOLUME 28
              TRANSCRIPT OF PROCEEDINGS
10     BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21                 Blanca I. Lara, CSR, RPR
                  219 South Dearborn Street
22                     Room 2504
                  Chicago, Illinois 60604
23                   (312) 435-5895

24

25
```

5777

1   APPEARANCES   (continued:)

2

    For Defendant Rod Blagojevich:
3
            KAPLAN & SOROSKY
4           BY:  Sheldon M. Sorosky
            158 West Erie
5           Chicago, Illinois 60610
            (312) 640-1776
6
            LAW OFFICE OF SAMUEL E. ADAM
7           BY:  Samuel Forbes Adam
                 Samuel Adams, Jr.
8           6133 South Ellis Avenue
            Suite 200
9           Chicago, Illinois 60637
            312-726-2326
10

11          OFFICES OF AARON B. GOLDSTEIN
            BY: Aaron Benjamin Goldstein
12          6133 South Ellis
            Chicago, Illinois 60637
13          (773) 752-6950

14          OFFICES OF LAUREN FAUST KAESEBERG
            BY:  Lauren Faust Kaeseberg
15          2140 N. Lincoln Park West
            Suite 307
16          Chicago, Illinois 60614
            (773) 517-0622
17
            LAW OFFICES of MICHAEL GILLESPIE
18          BY:  MICHAEL GILLESPIE
            53 West Jackson Boulevard
19          Suite 1420
            Chicago, Illinois 60604
20          (312) 726-9015

21

22

23

24

25

5778

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8

           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5779

1      (The following proceedings were had out of the
2       presence of the jury in open court:)
3      THE COURT:  Case on trial.
4      Counsel, you want to approach.
5          MR. SCHAR:  Good afternoon, Judge.
6          Reid Schar, Chris Niewoehner and Carrie
7   Hamilton on behalf of United States.
8          MS. KAESEBERG:  Judge, Lauren Kaeseberg,
9   Shelly Sorosky and Aaron Goldstein on behalf of
10  defendant Rod Blagojevich.
11         MR. ETTINGER:  Michael Ettinger and Cheryl
12  Schroeder on behalf of Robert Blagojevich.
13         THE COURT:  I know first we have a prominent
14  visitor in the courtroom, a judge who sits at 26th
15  and California, and I warn you, Mr. Sorosky, that
16  he's watching you closely.
17         MR. SOROSKY:  I better behave.
18         THE COURT:  The deletions and replacements,
19  have you had a chance to look at them?
20      (Brief issue.)
21         Anyone want to speak to this?
22         MR. ETTINGER:  Rule 29?
23         THE COURT:  No, this is the thing that will
24  be going to the jury.
25         MS. KAESEBERG:  Initially, we would object to

1 the indictment going back to the jury. It's our
2 position that a lot of what's contained in the
3 indictment is, essentially, testimony or alleged
4 testimony that was introduced at trial. The jury
5 instructions are capable of instructing the jury as
6 to what the defendants are charged with. And, you
7 know, we don't believe, and we'll talk about this,
8 but that the conspiracy allegations have been proven
9 beyond a reasonable doubt, and each of the
10 conspiracies are alleged, you know, realleged and
11 incorporated throughout the indictment. It's, you
12 know, I think not evidence to the jury and we
13 believe that the instructions will serve the purpose
14 of instructing the jury to what the defendants have
15 been charged with.
16　　　　　THE COURT: Leaving aside the general
17 objection, the government seems--and I'm looking
18 through now the pages I have not previously looked
19 at before--the government have seem to have done
20 precisely what it represented it would do, which is
21 to eliminate allegations on which evidence was not
22 offered, which are not a lot, it's the Teachers
23 Retirement System allegations that seem to be
24 missing, and the rest of it is substituting people's
25 names to which the jury already knows, do you have a

1  problem with those?

2      MS. KAESEBERG:  No, we don't have problems

3  with those.  The one addition that we would make

4  would be the allegation of the solicitation of

5  Children's Memorial Hospital.  We believe that it

6  should be properly stated as the attempted

7  solicitation of Patrick Magoon.  The other counts

8  that allege the similar conduct, as with John

9  Johnston and Gerald Krozel, those counts are titled

10 solicitation of those individuals.  We believe that

11 the titling that count, that allegation, as

12 solicitation of Children's Memorial is really to

13 serve only to prejudice the jury and what the

14 allegation is that the government presented is a

15 solicitation of Patrick Magoon, so we would request

16 that that language be changed.

17      THE COURT:  What page are you on?

18      MS. KAESEBERG:  16, I believe.

19      THE COURT:  Okay.

20      And what were your contrasting ones you

21 cited?

22      MS. KAESEBERG:  It says "solicitation of John

23 Johnston" as one of those allegations.  It's on page

24 57.

25      THE COURT:  Okay, let's take a look.  We'll

5782

1  compare.

2      (Brief pause.)

3          THE COURT:  Is your objection that it ought

4  to be someone's name instead of the institution?

5          MS. KAESEBERG:  Right.  For the other

6  allegations, the government doesn't allege a

7  solicitation of the racetrack industry, or the

8  construction, or tollway industry, or, you know,

9  industry or a company as an individual, and the same

10 allegation is made as to Patrick Magoon, and so it

11 should state "solicitation of Patrick Magoon" it

12 should not state "solicitation of Children's

13 Memorial Hospital."

14         THE COURT:  Do you care?

15         MS. HAMILTON:  I would note only, there is a

16 difference.  The testimony, both from our witnesses

17 and actually from defendant Robert Blagojevich, was

18 that while solicitation was made to Patrick Magoon,

19 it was for Patrick Magoon to approach people at

20 Children's, his friends and others, about raising

21 funds, and the solicitation was specifically related

22 to funds -- I mean, obviously, this is what we've

23 alleged, but to state funds to Children's Memorial.

24 So I think that there is a distinction between this

25 and the naming of John Johnston and Gerald Krozel.

5783

1  I mean, that's why this is titled differently, it
2  wasn't in error.
3          MS. KAESEBERG:  If I could just respond very
4  briefly.  What the statement "solicitation of
5  Children's Memorial Hospital" reads as that entity
6  and I don't believe that there is any evidence
7  entered that there was any attempt to solicit that
8  entity, it was all about Patrick Magoon and that's
9  what it should say in the indictment if the
10  indictment goes back to the jury.
11          MR. ETTINGER:  And we join in that, Judge.
12  And I think my client's testimony made it clear that
13  it was not Children's Memorial that was being
14  solicited or asked to have a fundraiser, it was
15  Patrick Magoon.  And if he said -- and he testified
16  that there were -- even Magoon, that he talked to
17  the board of directors.  The government -- we
18  brought out that it was not Children's Memorial, it
19  was not-for-profit corporation, they can't
20  contribute.  So putting them is prejudice that our
21  client will receive just by the name of Children's
22  Memorial.
23          THE COURT:  Well, this doesn't -- what's
24  being asked for doesn't actually cure that
25  particular problem, because what is being asked for

5784

1    instead of solicitation of Children's Memorial
2    Hospital, it is requested to say solicitation of
3    Patrick Magoon, immediately following that is the
4    following allegation:
5        "... on or about October 8th, 2008, Defendant
6         Rod Blagojevich advised John Wyma that he
7         intended to take official action that would
8         provide additional state money to Children's
9         Memorial Hospital and that Rod Blagojevich
10        wanted to get $50,000 campaign contributions
11        from the chief executive officer of Children's
12        Memorial Hospital ...."
13       I don't know that the prejudice issue is --
14   indictments, by their definition, say bad things
15   about the client --
16       MR. SOROSKY:  But it is peculiar here that
17   the government --
18       THE COURT:  I'll substitute "Patrick Magoon,"
19   it doesn't make any difference, but that's just the
20   title.
21       MS. HAMILTON:  Just the title on it?
22       THE COURT:  Right.
23       MS. KAESEBERG:  And we did receive this over
24   lunch, and so I'd ask leave that if we want to make
25   any other requests, we can do so tomorrow.

5785

1          THE COURT:  Yeah, I don't think there will
2     be, it seems routine, but I'm not going to foreclose
3     you.
4          MR. ETTINGER:  Judge, one more.  We're named
5     as an unindicted coconspirator in Count 2, and I'd
6     ask that our name, as far as being listed in the
7     first or second paragraph as an unindicted
8     coconspirator, be redacted.  I think the jury is
9     going to have enough problems with this indictment,
10    let alone having -- and I haven't seen it where a
11    defendant charged in certain counts and then named
12    as an unindicted coconspirator in a racketeering
13    conspiracy.
14          MR. SCHAR:  Page 40, Judge.
15          THE COURT:  What?
16          MR. SCHAR:  Page 40.
17          THE COURT:  Thank you.
18       (Brief pause).
19          THE COURT:  I'm unwilling to make that
20    modification.  So I'm overruling the objection.
21          Anything other than the judgment of acquittal
22    motion set for this afternoon?
23          MR. SCHAR:  Judge, we're still working on the
24    jury instructions which I'm told we'll have to
25    defense counsel shortly.  We did tender forfeiture

1  instructions and I'm going to hand a copy to Your

2  Honor.

3       Other than the issue of addressing the waiver

4  prior to deliberations beginning, I don't think

5  those need to be addressed prior to deliberations.

6       THE COURT:  Right.

7       MR. SCHAR:  It can be but --

8       THE COURT:  Well, the first thing we'll do

9  is, we'll see if this is a jury issue or not a jury

10  issue.

11       With respect to the motion for judgment of

12  acquittal, for a variety of reasons, which I would

13  be happy to explain to counsel at sidebar, we may

14  not finish it, there might be a little carryover

15  until tomorrow morning with this, but the bulk of it

16  we're going to deal with today.

17       You have now seen the memorandum.

18       MR. SCHAR:  Yes, Judge.

19       THE COURT:  And you should have a long

20  speech, hopefully not too long in response to this.

21       MR. SCHAR:  Judge, I'm not going to go count

22  by count.  I think when you look at the totality of

23  the evidence and you go through the witnesses, the

24  witness for the particular phone calls, taking again

25  the evidence in light most favorable to the

5787

government and witnesses, we'll begin with Lon Monk
in March through the various episodes and victims,
including John Johnston, Patrick Magoon, Gerald
Krozel, we combine that with John Harris and Doug
Scofield operating with the Ali Ata, Joe Cari,
Joseph Aramanda and a variety of other individuals,
I think they have laid out, just by their own
testimony, an extremely detailed conspiracy that
maintains both the racketeering substantive charge
as laid out in details, absent the sections that are
being stricken.

In each of the underlying racketeering
predicates, just premise on either bribery theory or
extortion conspiracy or extortion theory or,
obviously, the honest services which are maintained
here, for each of the various episodes that are
charged in the indictment to include -- and this
includes Bradley Tusk on the issue of AUSL, as well
as John Harris and Doug Scofield on the issue of
AUSL as well, but AUSL, the racetrack extortion, the
Children's Memorial extortion, the Krozel extortion
with the road builders, all of them, many of them,
at least, have testified to direct comments by
defendant Rod Blagojevich as to his intent to be
involved in that.

5788

1        Where there were conspiracies, we have
2   conspirators, Judge, who have actually testified
3   that they were involved, including Mr. Harris at
4   times, as well as Mr. Monk.  So when you look at
5   that evidence, again looking at it in the light most
6   favorable, on the testimony alone, I think there is
7   more than sufficient evidence to get past Rule 29.
8        Then you look at, on top of that, the
9   wiretaps themselves.  What they do is they put
10  Defendant Blagojevich, by his own words, into the
11  middle of the conspiracies that deal with Children's
12  Memorial Hospital, the racetrack, Mr. Krozel, and,
13  obviously, in some detail, the Senate Seat,
14  culminating with attempted efforts by actually
15  proactively attempting to ask for Health and Human
16  Services, as well as the 501(c)(4) supports all the
17  attempt charges, as well as the conspiracy charges,
18  again Mr. Harris' admitted his own involvement as to
19  that.
20        And then it goes to defendant Robert
21  Blagojevich, obviously, notably his own testimony
22  indicated that his brother was involved in this
23  conspiracy that related to Jessee Jackson, Jr. And
24  the phone calls make clear that defendant Rod
25  Blagojevich was involved.  Again, it sufficiently

1  gets to the jury on that issue.

2        So you could take either of them separately,

3  but when you put them both together in combination

4  of what the witnesses have said and what the actual

5  tapes show, I think it's clearly enough to get past

6  all of the Rule 29 issues.

7        As to the scheme to defraud, obviously now

8  the Supreme Court has ruled, this is a bribery

9  extortion scheme, the jury instructions cover that.

10  And all of the phone calls -- I would note that part

11  of the motion, the Rule 29 motion, dealt with this

12  particular phone call being asked for something in

13  particular.

14        Clearly, that's not the standard.  I'm sure

15  Your Honor is aware, the jury instructions make

16  clear, that the defendants don't even need to know

17  of a particular bribe's phone call, they need to

18  know that somehow interstate wires would be used.

19  And here, actually, Robert Blagojevich is making

20  calls related to the scheme.  There are multiple,

21  multiple calls, obviously, with individuals that

22  were in different states, either Fred Yang who was

23  in D.C., Doug Scofield was in Michigan for a period

24  of time.  So all the defendants need to know is that

25  there would be some form of interstate wires used,

5790

and here there's plenty of evidence to show the fact
that they were aware that there would be interstate
phone calls.  And each of these calls was in
furtherance, whether there was discussions on the
subject matter that is charged or actual
solicitations, as was the case with Mr. Balanoff,
and at least two other calls, they're all in
furtherance in some way.

I believe that leads to, Judge, Special Agent
Murphy's testimony is basically unrebutted in the
context of the two statements that he testified to
particularly related to the fire wall between
politics and government, which, again, taking Lon
Monk's testimony in the light most favorable,
clearly makes that a false statement.  And then as
to the false statement related to not wanting to
know or seeking out information about who
contributed to him, I mean, that is overwhelming in
terms of the number of witnesses, including Kelly
Glynn, Danielle Stilz, Ali Ata, Mr. Monk, Mr. Wyma.

So, basically, there was a course of conduct
from the defendant beginning shortly after the
inauguration in 2002 going through the time period
of the charged statement and continuing, really,
unstopped or unchanged up until the time of his

5791

arrest of a complete knowledge of who he was giving
strong interest and wanting to know.

So absent particularized questions about
particularized counts or the law, I think taking
everything, including documents as well, in the
light most favorable to the government, it's enough
to get to the jury on each of these counts.

THE COURT:  I think one, it's not the only
theme of the defense memorandum, is that you have
alleged a conspiracy, and in some of the substantive
counts have alleged what amount to various forms of
attempt discussion at great length about what should
be done and how to go about doing it.

And part of the defense's position is that
they have a lot of these talks but maybe you don't
have enough evidence that they passed the talking
stage and actually did something.

There are a couple of incidents where I think
that argument doesn't work, particularly on the
Children's Memorial case it doesn't work.  Although,
what was done, they could argue, was not done at the
specific behest of the defendant, although, a jury
could find that it was, that's not the issue.

What they're basically saying is, you got all
this talk about what they're going to do and then

5792

maybe not enough proof that they actually did
something.  And part of that underlying theme is,
there was an extraordinarily large amount of talk in
this case, don't see too many cases where you have
this much talk, and particularly we know exactly
what the talk was because it was recorded, but not a
lot actually got done; therefore, the defendant's
argument is, there's an equally plausible
explanation for the proposition that it was just
talk.

        And I'm also assuming that part of their
argument hinges--although they don't really say
this, but it's in their background--part of their
argument hinges on the proposition that if you
listened, as I did, to the things that the jury
listened to, you have, in many cases, really an
awful lot of talk that sounds like blowing off
steam, a lot of speculation, a lot of saying of
things as opposed to doing.

        Moreover, it's pretty clear from the timing
of what was said that you're dealing with an
individual who is becoming increasingly desperate
over a period of time, and, arguably, lost contact
with reality, the most striking of which is his
discussion about okay, I can't have any high-ranking

5793

1   political job but we can put together a trust, some
2   charitable trust, and I can work for that.  And the
3   line I thought was fairly striking was the line
4   where he said, well, so I'll be Governor for another
5   2 years and there'll be this caretaker, a group of
6   people who will take care of this 12 million-dollar
7   trust until I arrive.  And then, I think, he
8   referred to himself as the heavy hitter, at which
9   time, I believe by baseball standards, his heavy
10  hitter is a ridiculously inappropriate phrase to
11  describe him.  In political terms, this was a guy
12  who was batting 110 in class D minor leagues.
13  Although, they don't have class D minor leagues
14  anymore, they don't go below A.
15        And, basically, their point is is that what
16  you're trying to nail, at least the former
17  governor's defense is, you know, it's something
18  that's just a lot of talk, which is why they cite
19  Gladish.  And this is a really central part of their
20  argument, and that's what you should respond to.
21        MR. SCHAR:  Judge, I'm happy to respond to
22  that, because I think what we've charged, with rare
23  exceptions, is not actually the substantive charges,
24  but conspiracy, many of which actually don't require
25  an overt act --

5794

1          THE COURT:  Right.

2          MR. SCHAR:  -- or attempt which requires a

3 substantial step, or scheming which actually, in and

4 of itself, does.  When you actually go through each

5 of the various aspects of it, what you'll see is it

6 went actually went beyond talk, and we'll take it

7 one by one.

8          In the context of Children's Memorial

9 Hospital, you've already seen a reach-out to

10 Mr. Magoon.  And that, obviously, given the

11 government's view of the evidence and allegations,

12 when Mr. Magoon did not deliver, there were active

13 steps taken to hold up the particularized money.

14 You heard about that in a call that was placed, you

15 also heard from Mr. Monk and Mr. Greenlee that they

16 had an additional non-recorded call.

17          Johnston, in the racetrack, again, it wasn't

18 just talk because, in fact, what they did is they

19 met on December 3rd at the FOB office and then

20 Mr. Monk is sent out to go solicit John Johnston,

21 which is exactly what he did, with language that was

22 approved and encouraged by Defendant Blagojevich.

23 So you have action there in which the actual

24 solicitation was made specifically in exchange for

25 the signing of the bill, that was the communication

:40PM

:40PM

:40PM

:41PM

:41PM

Mr. Monk understood was happening.

He went to Mr. Krozel, again it's not talk about what we're going to do, there was actually a meeting with Mr. Krozel. And we know what was going on in Defendant Blagojevich's mind because you heard from Mr. Harris and Mr. Monk and Mr. Wyma, three separate individuals all testified that, basically, if Krozel and the road builders didn't form, they weren't going to get additional money. There was then a meeting with Mr. Krozel which he understood the solicitation of the money in exchange for state action, as he said on the stand twice, "it was obvious, it was obvious" as to what was going on.

You then overheard a recording at the FOB offices in which another phone call was placed by Defendant Blagojevich to Mr. Krozel in which he again reminded him of certain state actions they were involved in doing, again talking to him about the money and again reminding him that after the first of the year he wasn't going to be able to do that anymore.

So, again you have action of all of those. In terms of AUSL, although Mr. Tusk himself did not follow through in the request, what you have actually in furtherance is that the money was

5796

1 basically slow-walked in an attempt to ultimately
2 get the donation of some sort in the context, you
3 heard this from Mr. Harris in particular, and you
4 actually heard it from Mr. Feinstein who was
5 arguably, the victim of this, that somehow this
6 money -- well, you heard from Mr. Feinstein and you
7 understand why, that this money was slow-walking in
8 terms of being able to get it in various stages.

9　　　　What you heard from Mr. Harris, it was that
10 Defendant Blagojevich decided to slow-walk that
11 money in an effort to get what he wanted out of AUSL
12 Rahm Emanuel and Ari Emanuel. And so, again, that
13 is the attempt charge and that is a substantial
14 step.

15　　　　In terms of the Senate Seat, Judge, again,
16 look at the action that was actually taken. It
17 would be one thing, obviously, if people were just
18 sitting around and talking about things and it never
19 got past the talking stage. What did Defendant
20 Blagojevich do in this case in terms of having
21 people take action? He had Mr. Greenlee research
22 ambassadorships, he had Mr. Greenlee research
23 private foundations that he could work at, he had
24 Mr. Greenlee do other various things in order to get
25 him the information, such as having his wife lobby

5797

1    in Washington.  But he goes even further beyond
2    that, he actually made the extortionate phone calls
3    and requests himself.  He's the one who had the
4    meeting with Tom Balanoff on November 6th in which
5    in the meeting he's the one who made the
6    solicitation of Health and Human Services, this was
7    testified to by Mr. Balanoff, in exchange for naming
8    Valerie Jarrett to the Senate Seat.  This wasn't
9    just talk, that was implementation of his plan.
10         And as to the 501(c)(4), whether we agree it
11   was something that wasn't going to happen or it was
12   going to happen, he's the one who actually on the
13   morning--and it's telling, Judge--on the morning of
14   November 12th, when he finally finds out or believes
15   that Valerie Jarrett may not be interested anymore
16   and John Harris talks to him about, well, let's talk
17   about what we're going to do next, he hangs up with
18   John Harris, the very next call is to Mary Stewart
19   to get Tom Balanoff on the phone, and that call is
20   actually in one of the charged counts, it's Tom
21   Balanoff in Washington, D.C. with Defendant
22   Blagojevich soliciting him for the 501(c)(4) funding
23   in exchange for naming Valerie Jarrett.
24         So there you go in terms of action, activity,
25   it not only proves the conspiracy, it's acts in

5798

1  furtherance of the conspiracy, it proves a scheme to
2  acts in furtherance of a scheme.
3      And then, obviously, he continues to go down
4  that road, not just by talking about it, he sends
5  Doug Scofield out the next day to try to send
6  through John Wyma another message to Rahm Emanuel
7  that he wants the 501(c)(4) in exchange for Valerie
8  Jarrett.
9      So in terms of actions, in every single
10  incident, Judge, you've got stuff that goes well
11  beyond the talking stage into actual activity by the
12  defendant either directly trying to make these
13  things happen, actions, or sending other people out
14  as middlemen to make these things happen.
15      MS. KAESEBERG:  At the end of the day, I
16  mean, I believe that what Your Honor said is that
17  when you have just talk, that is an equally valid
18  proposition has to what the government has alleged.
19      The scale is tilted in this case.  The burden
20  of proof is beyond a reasonable doubt.  And even in
21  a light most favorable to the government's evidence,
22  what they've shown is a lot of talk, a lot of
23  speech, a lot of words that are spoken on the phone.
24      The Gladish citation in our memorandum is
25  very fitting.  What it says is that speech cannot be

1  a substantial step because that would essentially

2  abolish the requirement for a substantial step.  And

3  to allege that because Greenlee did some research on

4  potential, you know, jobs or positions, that would

5  mean that if I researched a crime, I've attempted to

6  commit that crime?  Or if I talk about a crime, I've

7  attempted to commit that crime?

8          I just think that the standard has been so

9  lowered by this evidence and they have not shown an

10 attempt, they have not shown a substantial step.

11 And to believe these witnesses, you know, John

12 Harris, Lon Monk, you would have to believe that

13 there's a conspiracy in this case, and the

14 government hasn't proven that there's a conspiracy.

15         It's our position that the testimony of Lon

16 Monk is incredible.  I mean, to believe that these

17 men entered into this agreement and that there were,

18 you know, these eight or nine proposals put up on an

19 easel and that he remembers one of them and the one

20 he remembers just happens to not be charged in the

21 indictment is preposterous.  I don't believe that

22 it's believable evidence.  Even in the light most

23 favorable, I don't think that you can believe Lon

24 Monk's testimony as regarding that conspiracy.

25         And at the end of the day, to believe that

5800

1  they entered into a conspiracy means that Tony Rezko
2  is part of that conspiracy.  And as we put in our
3  memorandum, the government chose not to call Tony
4  Rezko.  The defense would have the opportunity to
5  question him and undercut those ridiculous
6  allegations made by Lon Monk.  And the government
7  benefited by the letter that's included in the
8  memorandum not coming into evidence, that Rezko was
9  being pressured by the prosecutors to say the wrong
10  things about the Governor, and I believe that Your
11  Honor should that into consideration in evaluating
12  the evidence as to the conspiracy.
13          I mean, the government can come in all day
14  and say all these calls, all these things were said,
15  but there is law, there are elements to these
16  crimes, they have to prove the elements beyond a
17  reasonable doubt, and they just haven't done it.
18          To say that with, you know, honest services
19  allegations, that all that you need to know is that
20  a wire was used, there are elements to honest
21  services, and I'm going to get into the honest
22  services problems in this case in a moment, but to
23  establish a conspiracy they have to prove beyond a
24  reasonable doubt that there was an agreement entered
25  into by Blagojevich, that there was an unlawful

5801

1  objective that he was aware of, that he participated
2  in this, or that he made overt acts in furtherance
3  of the conspiracy, and it just isn't there.
4        And I believe, we believe, our position is
5  that the Seventh Circuit case of Gladish that
6  specifically says that speech is not a substantial
7  step knocks out a lot of these allegations and there
8  should be an acquittal on the conspiracy count.
9        As far as the honest services counts go, that
10 is sort of a different issue, but, you know, counts
11 4 through 13, we move to dismiss those.  We've
12 renewed the arguments that we made in our motion for
13 a mistrial, the constitutional arguments, which I
14 won't get into fully here, but we've renewed the
15 expo facto arguments.
16        You know, the government, when they initially
17 charged this case, charged the honest services
18 allegations.  At that time they had the opportunity
19 to charge bribery, charge extortion.  And,
20 literally, I think today, on the record, is the
21 first time that we've heard that the honest services
22 counts are bribery or extortion scheme.  The
23 Skilling case came down mid-trial, it says that to
24 sustain a charge of honest services there has to be
25 bribery or kickbacks.  There's no clear definition

5802

1  of what those words mean, "kickbacks," and they
2  haven't met the elements.  If they had the elements
3  to meet bribery or kickback or extortion for those
4  honest services counts, they would charge it that
5  way when they first indicted the case, and I think
6  they're going back in and trying to fill in some of
7  these facts to make those counts stand and it just
8  doesn't fit.
9        Additionally, on the honest services
10  allegations, I think it raises problems with the
11  indictment as to multiplicity and duplicity.  The
12  charge of bribery/extortion scheme through these
13  honest services counts is duplicitous to other
14  counts in the indictment where the same conduct is
15  charged as a bribery or extortion.  So for those
16  reasons, you know, we would move to dismiss and, you
17  know, judgment of acquittal or to dismiss those
18  honest services counts.
19        The last point I would make on the honest
20  services counts is that, you know, even as we
21  prepare for jury instructions, it kind of points out
22  the fundamental fairness issue here and the due
23  process right and the right to a fair trial and
24  effective assistance of counsel, that we can't
25  anticipate what a jury instruction will be on honest

5803

services.

And, granted, there has to be a case that's going to define what the jury instruction may be, but defendants have the right to not have that decision be made and thought of during their trial as the law changed during the trial. So we move to dismiss those counts.

As I said, the government has not proven a conspiracy. The substantial steps that they alleged to be any attempt or extortion or for bribery is speech or, you know -- and, again, speech directing someone to do research, there's no furtherance of a crime, there's no underlying intentions to commit any of the underlying offenses.

MR. GOLDSTEIN: Your Honor, just briefly as to some of the factual issues. As to the Children's Memorial count which Your Honor talked about as being talk and the government discussed, well, this was more than talk, the actions compared to the talk, the actions, Mr. Magoon was not pressured in any way for a fundraiser in exchange or a threat to hold back this money. Mr. Magoon as its representative, the pediatric rate increase, Mr. Magoon testified it went went through, the money went through. As to the school, the facts bear out

5804

1 differently than what this alleged talk was.  The
2 school got their money, they paid their bills, and
3 we saw the results of it, which was this field.
4         THE COURT:  About the money going through, I
5 thought there was evidence -- as originally designed
6 the money was supposed to be effective January 1,
7 and maybe I'm making a mistake on this, but I recall
8 evidence saying it didn't come through January 1, it
9 came through later, which means, you know, if money
10 came through on January 15th, that's 15 days of no
11 increase payment for pediatric specialists.  I
12 thought that was the evidence.
13         MR. GOLDSTEIN:  The only testimony that you
14 heard was Mr. Greenlee called Barry Maram about this
15 subject, that there wasn't a date assigned to it,
16 one way or the other.  Mr. Magoon then came into
17 court and said that the hospital, the rate increase
18 ended up going through and they got their money,
19 they didn't say a specific date as to exactly when
20 this occurred.
21         THE COURT:  I know they didn't, but there was
22 specific testimony that it didn't happen on
23 January 1st.
24         MR. GOLDSTEIN:  I don't believe that was the
25 testimony, but --

:51PM
:52PM
:52PM
:52PM
:53PM

1    THE COURT:  I'm pretty sure it was.

2    MR. GOLDSTEIN:  And in there's --

3    THE COURT:  And I'm not even looking at

4  Ms. Hamilton shaking her head "yes" because it's my

5  memory that that's what I heard.

6    MR. GOLDSTEIN:  Nonetheless, Mr. Magoon

7  indicated -- and what's also very important as to

8  Mr. Magoon's testimony to that issue, he was never

9  communicated of this holding up.  If you look at how

10  the actions or inactions took place, you had a call

11  that is clear that it was not an order to

12  Mr. Greenlee, Mr. Greenlee misinterpreted this call,

13  he followed through.  That the acts taken in

14  furtherance of this would mandate, basically, that

15  the Governor, in some form or fashion, communicate

16  to Mr. Magoon that the money is being held up.

17    THE COURT:  Let's just stop this.  What

18  you're doing is, you're reaching a conclusion which

19  is not at all necessary, and, to some extent, may be

20  contrary to the evidence, which is something that

21  you can be perfectly free to argue.  It doesn't work

22  at this stage.

23    But let me raise another issue.  I challenged

24  the government on the proposition that there was a

25  lot of talk and not a lot of effective action, and

5806

that's, basically, a key element, not the only
element but a key element of your argument.  The
counter to that is, a conspiracy is a crime which is
accomplished only with a significant amount of
communication.  Usually people talking to each
other, I suppose they could do it by letter, but
I've never seen a written proposal that people
conspire with one another.  Basically, conspiracy is
a crime of words, and actions help elucidate the
intent behind those words.

        In addition to that, there's nothing that
says that to have a conspiracy you have to have
anything more than an act.  That does not mean an
effective act.  You can have a conspiracy entered
into by fools and bumblers--not bunglers,
bumblers--and it's still a conspiracy.  And part of
your argument seems to be an emphasis on the fact
that not a lot, really, happened here.  But if
people entered into a conspiracy and they tried to
do something, it doesn't work very well, it's still,
generally speaking, a conspiracy.

        So conspiracies are basically founded on
talk.  Evidence is always evidence of talk.
Usually, it's some cooperating witness who says we
talked about this and we agreed to do so-and-so.

5807

1   Here, we don't have to have quite as much reliance
2   on people's accountings of what was said because a
3   lot of it was recorded.  But that's what a
4   conspiracy is, it's words.  Agreement, usually
5   manifested by words, although that is not absolutely
6   necessary, and then people do a few things, which
7   sometimes is required when you have an overt act of
8   conspiracy, but sometimes you just need some acts
9   because it describes to you what people's intent
10  was, which was to agree.
11          So that's where I see your argument and I'm
12  challenging you on that the way I challenged the
13  government on its basic argument.
14          So you want to respond to that one?
15          MR. SOROSKY:  Just sticking with Children's
16  Memorial Hospital, and I know Your Honor is very
17  familiar with the facts.  If the Governor asks the
18  question "can we hold it up for budgetary reasons,"
19  and Mr. Greenlee says "yes," and the Governor says
20  "that's good to know," I don't see any action taken
21  by the Governor.  He's just discovered or found out
22  through his questioning of an aid that if the
23  Governor wants to change his mind, he has, let's use
24  the phrase, a justifiable reason for doing it.
25          THE COURT:  What's the transcript tab?

:56PM
:57PM
:57PM
:58PM
:58PM

5808

1          MR. SCHAR:  55, Your Honor.

2          THE COURT:  55.

3          MR. SOROSKY:  I don't know if the government

4     presented any act that the -- I don't know that the

5     government presented any act that the Governor took,

6     other than his colloquy, and Mr. Greenlee says he

7     interpreted the Governor's comment "that's good to

8     know" as an order to hold it up, and then he

9     says--"he" Greenlee--to someone under him in the

10    Illinois Department of health facilities, or

11    whatever, "hold it up."

12          Now, Greenlee's interpretation that the

13    Governor's request for information "if we want to

14    hold it up, can we," that that was an order by the

15    Governor to hold it up is absurd.

16          This isn't like --

17          THE COURT:  Maybe you could believe it ---

18          MR. SOROSKY:  Maybe what?

19          THE COURT:  You could believe that maybe it's

20    not absurd, and I'll tell you why.

21          MR. SOROSKY:  Okay.

22          THE COURT:  The call starts out from which --

23    and I infer from this phone call, from the

24    transcript I'm seeing, and I could be wrong about

25    this, that either the Governor initiated the

5809

1   conversation or initiated this particular subject
2   matter, it begins this way:
3        "Blagojevich:  Hey."
4        Greenlee:  Hey.  What's going on."
5            from that I infer and a reasonable jury
6   could infer is that the Governor initiated this
7   conversation.  Then he also initiates the subject
8   matter:
9        "... the pediatric doctors, the reimbursement,
10       has that gone out yet or is that still on
11       hold?"
12       "Answer:  The rate increase?"
13       "Yeah."
14       "Greenlee:  It's January 1."
15       "And we have total discretion over it?"
16       "Yeah."
17       ".... so we could pull it back if we needed to,
18       budgetary concerns, right?"
19       "Greenlee:  We sure could, yes."
20       "Okay, that's good to know."
21           and then there's something else that is not
22   particularly pertinent to this.
23           MR. SOROSKY:  And to quote Your Honor, all we
24   have is colloquy, a conversation.
25           THE COURT:  Well, wait, wait.  You have

:00PM
:00PM
:00PM
:00PM
:01PM

5810

colloquy between a Governor and a Deputy Governor, and the Deputy Governor, who said that he went ahead and did this, and based on his experience with the Governor this is what the Governor wanted him to do. Now, a jury could credit that, and one of the reasons they could credit that is, this is a subject matter raised essentially, from Greenlee's perspective, out of the blue, "we could stop this." And the way the Governor said "budgetary concerns" a jury, and probably Greenlee, could interpret it that this was going to be the face-saving devise by which they pulled it up.

Now, none of these inferences are inevitable. A finder of fact could take a look at this and say, well, the Governor didn't really mean it or Greenlee went too far. But a reasonable finder of fact could find that, in context, this is what the Governor wanted and Greenlee did it.

Moreover, I don't know that you actually, to tax the Governor with criminal misconduct here, actually have to get into exactly what Greenlee did. And it's the same kind of interpretation that a jury may accept, which was made quite explicit by Magoon in his testimony, which is, "he calls me, he tells me you got it coming January 1st," "great Governor,"

5811

"don't tell anyone about it."  And he infers from
this, from a Governor who usually stands on top of a
building and has someone blow a trumpet so that his
announcement that he's done something for health
would be heard, and he says "don't say anything
about it," and he picks, just by coincidence,
January 1st, the day that the fundraising
restrictions take place.  This is not an inevitable
inference.  Somebody could very well interpret the
evidence exactly the way that you are suggesting,
this is all absurd, but the issue here is, could a
jury go the other way, and I'm giving you some
reasons why they could.

          MR. SOROSKY:  Suppose I say to a younger
lawyer, if I wanted to lie to Judge Zagel and say my
wife was sick and therefore I needed a two-week
continuance, would Judge Zagel give it to you, and
the younger lawyer says, oh, absolutely, he's a
humanistic, compassionate person, he would certainly
do that.  I say, oh, that's good to know.  Does that
mean I have told the younger lawyer to go to Judge
Zagel and appear before Judge Zagel and lie?  That's
what we have here.

          And with all due respect, I don't think my
analogy limps.  And you have -- and Your Honor is

5812

1  very, very well schooled in cases, and you have a
2  person, Mr. Greenlee, who on his own, on his own,
3  takes matters into his own hands, and after the
4  Governor says "oh, that's good to know," as Your
5  Honor clearly says, perhaps in his mind he is
6  thinking "I may want to hold this up," but it's not
7  a crime to think "I may want to hold it up," that's
8  not a crime.  The crime is if he does an act to hold
9  it up or orders someone to hold it up.  And it's
10  just not there.  The government's whole case on this
11  Children's Memorial Hospital is based on
12  Mr. Greenlee's absurd interpretation, because the
13  Governor asks "if I want some justifiable reason to
14  hold it up, is it there," and Greenlee says "yes,
15  it's there," ah-huh, because the Governor asks, that
16  means the Governor, and I'll quoting him, "has
17  ordered me to do it based on my past my
18  experiences," and this is just absurd.
19          This is not proof beyond a reasonable doubt
20  and this should not go to the jury because the
21  evidence just is not here on this Children's
22  Memorial Hospital matter, beyond a reasonable doubt.
23  The government has not proven a case that should go
24  to the jury on this issue.
25          THE COURT:  Want to say anything?

:04PM

:05PM

:05PM

:05PM

:06PM

5813

1        MR. SCHAR:  No, Judge.

2        THE COURT:  I'm inclined to believe that they

3    can and I don't really think it's that close a

4    question.  Much of the evidence in this case, some

5    of it explicit and some of it implicit, and this

6    also includes some of the material, maybe a lot of

7    the material in the recordings we heard, was to show

8    the relationship between the Governor and his staff

9    and what the Governor might argue is a relentless

10   brook-no-dissent approach to his own staff.

11       The Governor is free to argue that the course

12   of dealings with his staff or the thing that created

13   the staff agreed because they feared the

14   consequences of disagreeing, or probably more in the

15   case of Lon Monk, they were just tired of the

16   consequences of disagreeing.  A reasonable fact

17   finder could find that, in this context, this was

18   the reel of your client.

19       And I am not disputing the fact that you can

20   argue the contrary, and you could argue the contrary

21   and it may very well be persuasive, but a jury could

22   find, on the basis of this, beyond a reasonable

23   doubt, that these were acts carried out at the

24   Governor's will.

25       MR. SOROSKY:  My only concern, Your Honor --

5814

1      THE COURT:  Yeah.

2      MR. SOROSKY:  -- that Children's Memorial
3  Hospital is such a sainted entity, and rightly so,
4  that even the slightest tinge against this sainted
5  entity could so prejudice the jury against anybody.
6  And for a Court to rule that because someone asks
7  the question "if I want to hold it up, can I" and
8  you know the facts, for budgetary reasons, and the
9  aid says yes, you can, that that is an order to hold
10  it up or a command to hold it up, that's just not
11  proof beyond a reasonable doubt that should go to a
12  jury.

13      THE COURT:  Were there not some
14  discussions--I've forgotten the tab numbers--in
15  which the Governor personally expressed displeasure
16  at Children's Memorial Hospital, and Magoon in
17  particular?

18      MR. SCHAR:  Yes; although, I don't know the
19  tab number off the top of my head, but at one point
20  called Mr. Magoon --

21      THE COURT:  Right.

22      MR. SCHAR:  -- and, obviously, there was --

23      THE COURT:  The answer is yes.

24      MR. SCHAR:  Yes.

25      THE COURT:  The question was essentially a

5815

1  rhetorical question because I do recall what was
2  testified to.
3          And the truth is is that to the extent
4  Children's Memorial Hospital was brought into the
5  case, or, for that matter, into the life of the
6  defendant you represent, it was something he brought
7  in.  And I don't actually think this would affect
8  the ability of a competent jury and I think we have
9  a competent jury.  So it's staying in the case.
10         Now, the government has heard the essential
11 responses to my arguments made by defense counsel,
12 it's time you had your own peace.
13         MR. SCHAR:  Judge, almost all the comments,
14 they're the weight of evidence, they're going to
15 weigh the evidence.  You shouldn't believe this, the
16 jury can't believe that, there's nothing more to
17 talk, yet, obviously, they don't attempt to address,
18 nor I think can they address, the actual setting out
19 of people to do things, such as going to Johnston,
20 the meeting with Krozel, the conversation with
21 Balanoff.
22         As I understood it, the argument is, largely,
23 there's just a lot of talk.  And that's why the
24 crimes are charged the way they are, the charge is
25 scheming, conspiracy, attempts.  And, obviously, you

5816

know, to draw maybe an analogy, it's almost the
argument defense is making, I go tell someone to
kill my wife and they go out and have a meeting and
they consider doing it, but just because I talked to
them about it, you know, I get a free pass on it.
It's not -- you know, you get a free pass for not
having committed the actual murder but you don't get
a free pass for having schemed, attempted or
conspired to do it, and that's what is charged in
this particular case.

And as Your Honor aptly noted, most
conspiracies, frankly, are premised on a lot of
planning, and a lot of discussion, and a lot of
determination as to how you want to execute the
ultimate plan and then there is some action.  The
action doesn't have to be great, the action doesn't
have to be lengthy.  In this case, obviously, the
government presented a significant amount of
evidence to prove up the fact there was a conspiracy
to give, frankly, context to statements like the one
Defendant Blagojevich made on Children's Memorial
Hospital.  You need to understand the context of the
relationships, you need to understand how the
defendant talked, you need to understand from people
who dealt with him what they understood based on

5817

longstanding relationships with him.

And all of that put together, Judge, shows
that based upon what was charged in this case,
there's plenty of evidence, in the government's
view, to get to the jury on each of the counts.

THE COURT:  Those address, basically, the
general issues presented by this.  The issue is
whether, apart from this general stuff, there's any
specific issue that anyone wants to raise with
respect to specific counts other than what's already
in the memorandum.

MR. SOROSKY:  I would, Your Honor, concerning
the whole issue of Mrs. Blagojevich's real estate,
and this is an issue which is in time,
chronologically, before all the tape recordings.  So
this has nothing to do with the numerous tape
recordings we heard throughout this particular case.

And, in summary, I believe the government's
first witness, Mr. Monk, testified, for want of a
better phrase, that there was this original sin
conspiracy, if you will, between Governor
Blagojevich, Monk, Kelly and Rezko that there was to
be all sorts of activity done through the use of
state action, that was the word the government used,
and that monies would be made from this and the

5818

illegal activities would be done, monies would be
made, and some money would be set aside in a little
pot somewhere for Governor Blagojevich after he was
Governor.  And I don't mean to seem facetious, that
was Lon Monk's testimony.

        And when Monk was questioned as to what were
these illegal activities that were supposed to be
done, he said Mr. Rezko listed about eight or nine
of them, but he doesn't remember them, but he
remembers one was possibly buying an insurance
company.  It's very interesting to note that he
never mentioned--"he" Mr. Monk--never mentioned
anything about real estate.

        The evidence later went on to show, as
presented by the government, that Mrs. Blagojevich
made certain fees from her work as a realtor, and
just let me use the generic phrase, that those
schemes were, to use the street phase, steered to
her by Mr. Rezko.  And I think the government also
presented some evidence that Mrs. Blagojevich didn't
do very much work to earn those fees.  And I think
that's a fair, honest summary of what the government
presented concerning those fees.

        The government never presented any evidence
that those fees were given to Mrs. Blagojevich as

5819

1  any form of a bribe or exchange for specific conduct
2  that Governor Blagojevich did as Governor.  There
3  was no evidence as to that.
4          Now, perhaps when this case was being hatched
5  years ago and the old honest services law was in
6  effect, I'm sure my opponents could make a
7  compelling argument, weak but compelling, that
8  perhaps Mr. Rezko is being a prominent associate and
9  member of the Governor's immediate kitchen Cabinet
10 and all that, shouldn't be steering fees to the
11 Governor's wife.  But under the law as it stands
12 today, the government has to prove bribery and that
13 honest services has just become bribery.  Perhaps
14 that is a Cliffs-Notes analysis of the Skilling
15 decision, honest services stands but it's bribery
16 for a public official to deprive the citizenry of
17 honest services he has to commit bribery.
18          The government has not come close to proving
19 that those fees, those real estate fees, were any
20 form of a bribe, not close.  And, therefore, we
21 would argue that all those counts, specifically
22 relating to Mrs. Blagojevich's real estate fees and
23 all the sections of the first counts, which are
24 lengthy, concerning Mrs. Blagojevich's real estate
25 fees, should be dismissed by this Court because

:17PM

:17PM

:18PM

:18PM

:19PM

5820

1  there is just not proof beyond a reasonable doubt

2  now that should go to a jury that there was any form

3  of bribery concerning those fees.  It's just not

4  there.

5        THE COURT:  Now, is your argument at all

6  founded on the proposition --

7        MR. SOROSKY:  Pardon me?

8        THE COURT:  Is your argument founded in any

9  form on the proposition that one of the most

10 significant elements here is that Mrs. Blagojevich

11 is not charged herself with having committed an

12 offense?  This is an important element in your

13 argument or is it just a circumstance of no

14 particular significance?

15       MR. SOROSKY:  I think it's merely a

16 circumstance, Your Honor.

17       THE COURT:  Okay.

18       MR. SCHAR:  Judge, our response, actually,

19 is, there is no--at least we have a pretty good

20 understanding of the indictment--there is no count

21 that charges anyone with bribery in that regard.

22 What it shows is full benefits, and what it shows is

23 a full benefit beginning at the exact same time that

24 the pension obligation bond money was moved to

25 Mr. Rezko in $12,000 payments, and continue on,

5821

1  beginning at that point, they happen to end,

2  coincidentally, perhaps not so, at the exact same

3  time that Mr. Levine is approached by the FBI.

4       In addition to the fact that, and there was

5  significant testimony that, basically, Rezko didn't

6  use her, that they had people to do exactly what she

7  did, that she was effectively hired, I believe in an

8  accomodation to Mr. Monk, Mr. Winters, Mr. Williams,

9  largely to funnel money towards the Blagojevich

10 family.

11      In addition, there were two commissions that

12 were described in detail, one of which was entirely

13 bogus, it was just made up.  She certainly must have

14 known that because she didn't work on the actual

15 property.  The second commission you heard about was

16 one where, again, she was inserted in at the last

17 minute for $40,000.

18      What all the evidence demonstrates is that

19 this was a method and a means and a way to have

20 Mr. Rezko and the conspirators move money to

21 Mr. Blagojevich for a variety of different reasons,

22 not the least of which included, arguably, the

23 pension obligation bond which wasn't set to take

24 into effect, but, in addition, the fact that I

25 believe Mr. Monk in particular testified to the fact

5822

1    that there's an understanding that, obviously, there
2    needed to -- that Mr. Blagojevich understood that
3    they wanted to keep him happy and in power so they
4    continue to do what it is that the four of them
:21PM    5    wanted to do, and this is a way to attempt to
6    legitimize money going to her and to him.
7        So that's why it's part and parcel of the
8    scheme to the substantive racketeering count.  It's
9    not charged in a secondary substantive count as she
:22PM    10   got $12,000 and here's specifically what the
11   governor did in exchange, he's charged in a scheme
12   language as the method of means of a racketeering
13   enterprise.
14       MR. SOROSKY:  I don't remember any witness
:22PM    15   ever saying that Mrs. Blagojevich take real estate
16   fees and funnel money to the Governor.  If that
17   was -- that was never -- I don't think any witness
18   ever said that in this case.
19       MR. SCHAR:  Mr. Monk said that this was a
:22PM    20   method to get money to Mr. Blagojevich.  Whether
21   they used the word "funneling" or not, that's
22   clearly what he testified to.  And, frankly, the
23   circumstances and the circumstantial evidence
24   demonstrates, whether anyone got on the stand and
:23PM    25   said it specifically or not, the circumstantial

5823

1  evidence is there.

2          MR. SOROSKY:  I don't know that it is, per

3  se, a crime to funnel or send or give

4  Mrs. Blagojevich business, that's not a crime.

5  Someone could say, oh, it's good to be on the good

6  side to the Governor, we have to use some real

7  estate person, let's use the Governor's wife, that

8  is not a crime.

9          THE COURT:  But I thought -- leaving aside

10  some statutes having to do with income going to

11  spouses, which is not charged here, really not

12  material, I think the reason the government put on a

13  bunch of witnesses, the purport of their testimony

14  was that these fees that were unearned by the common

15  standards of real estate, that this would be a

16  ground for inferring that this was a way to get

17  income to the Governor.

18          The one thing that's not in dispute here and

19  no one has raised this question, and it's pretty

20  clear from this, that this is an intact family.

21  Live in the same house, you could infer from the

22  charts that this is a couple who does not separate

23  their income, they share their income, they support

24  each other.  There are references in your client's

25  testimony about the effect of the decline of her

5824

1  income on him.

2       Basically, you have, according to the

3  government's evidence, which I think is not in

4  dispute here, that this was a family income, which

5  does not, in and of itself, create a problem unless

6  a jury finds, as they could find, that part of the

7  portion of the family income that came from her was

8  money given to her which would not be given to

9  anybody else in the circumstances because their work

10  wasn't done.  I think that's the reason they went

11  into that and why they had to show, or at least had

12  to try to show, whether the jury accepts it or not

13  is another question, which is, she didn't actually

14  earn this.

15       But there is a fairly substantial showing

16  that this was family income and they spent the

17  family money together.  There seemed to be no

18  separate estates here, so .... which is the common

19  case when you have people who are married to each

20  other and not at each other's throat, they usually

21  don't --

22       MR. SOROSKY:  With all due respect, Judge,

23  that's a separate issue.  And that's a good point

24  for the defense to raise, but that is a separate

25  issue, money to her is not necessarily money to him,

5825

1    and that's a separate issue.

2         But the more basic issue is, does not the

3    government have to prove that this money was given

4    in exchange for--to use the words that we could not

5    use at trial but now we can use--some quid pro quo.

6    Doesn't the government have to show in order for

7    this to be a crime, that in return for receiving

8    this money Governor Blagojevich did something for

9    someone, or to quote the government, took some state

10   action in return for these fees?  And there's been

11   no proof of that.

12        THE COURT:  So you would think that, to get

13   this in, the government would have to show that not

14   only a certain amount of money went to the

15   defendant's spouse, and in exchange for this money

16   there was a specific quid pro quo, some deal, some

17   transaction which the Governor took action to

18   effectuate, is that what your position is?

19        MR. SOROSKY:  I submit that, under the law,

20   the government has to show that this is a bribe.

21        MR. SCHAR:  That's not the state of the law,

22   Judge.

23        MS. KAESEBERG:  And if I could interject and

24   elaborate on our memorandum.  The government charged

25   this as part of the conspiracy, as Mr. Sorosky said,

5826

the original sin conspiracy.  So the government, and
as we say in our motion, it has sort of this tunnel
vision, attempt facts, taking facts and trying to
fit them into a conspiracy.

The payments that were paid to Patti
Blagojevich, the witnesses testified she did work,
they saw her at the office, she was at sites, she
saw properties, she went to offices for Rezmar.  I
mean, it's in evidence that she did work for this
money. It's --

THE COURT:  I got the point that one could
say that and the jury could accept that, but there's
also evidence that that is not the case and the jury
could accept that evidence.  So the issue is, if she
didn't earn it, does it still belong in the case.

MS. KAESEBERG:  Well, I believe that the way
the government indicted the case, that the jury
couldn't believe that this was part of a conspiracy.
I mean, it's subsections of Page 13 and 14 and then
it goes into Lon Monk as the same benefit that Rezko
was supposedly giving to the Blagojevichs through
hiring Patti and giving her contracts and working
for this money, and Lon Monk is receiving $10,000 in
cash in a lot of FedEx envelopes and we're supposed
to believe that, you know, even in the light most

5827

favorable to the government, that there's no
rational trier of fact would believe that those are
the same conspiracies, that it's in furtherance of
one objective.

THE COURT:  Do you, by any chance, know who
the Everleigh sisters were?

MS. KAESEBERG:  No.  Should I?

MR. SOROSKY:  I do.  They were prostitutes at
the turn of the century in Chicago.

THE COURT:  Right.

MS. KAESEBERG:  I don't know where this is
going, but I'm going to hope it's going somewhere
good.

THE COURT:  The Everleigh sisters had a
famous place, a very nice house, their services came
at a very significant cost, and they served a
certain element of the citizenry of Chicago for many
years.  It was generally thought that they made
continuing payments to various police officials over
a number of years, and I think that that would
constitute bribery, even though you may not be able
to point to a single specific action or inaction
taken by any of those police officers.

Usually, in the old days when you actually
had buildings as opposed to telephone numbers to

5828

avail yourself of the services that the Everleigh
sisters provided, it was usually a complex of things
that they expected, not merely nonenforcement of
laws against prostitution, but if two patrons got
into a fight and somebody stabbed somebody else, the
police would be called and the reports would be
filed with respect to the fight that happened, but
the address of the location of the fight might
change.  Maybe that happens, maybe it doesn't
happen, and yet it's still bribery.  And it might be
bribery over a dozen years, let's say, or,
hypothetically, 6 years, and nothing really happens,
the police are really never called on, but they've
been paying every week.  You don't actually even
know if they would have raided the house under any
circumstance.  Maybe you would have a police chief
who said, you know, we got lots of troubles, crime
on the street, it's going wild, I don't care what
happens behind people's closed doors.  It strikes me
it's still a bribe, even though it's very difficult
to point to what the quo was for the quid, it's
still bribery.

        And I think you're construing it too
narrowly.  The holding with respect to bribery and
extortion was actually credited to my law school

5829

1  classmate, close friend, who wrote an amicus brief

2  to the Supreme Court.  And I read that brief,

3  actually, before it became semi-famous.  And he was

4  talking about the broad common law concepts of

5  bribery and extortion.  He wasn't talking

6  specifically about this, I think, unduly narrow

7  definition you have of bribery as satisfied only by

8  a more or less specific transaction between two

9  parties.

10        The quid and the pro can be fairly general in

11  nature.  And I don't know that you don't get a quid

12  pro quo if you pay a Governor under the table

13  significant sums of money over a period of time

14  simply for the purpose of maintaining good will in

15  case you might want to ask the Governor for

16  something.  And in this case, we're not quite even

17  at that hypothetical.

18        So that's my problem with  the argument, that

19  you have to tie each payment to some action, with

20  the possible exception you made installment plan

21  payments, but I don't see that formal arrangement in

22  this case.

23        So you want to talk about that one?

24        MS. KAESEBERG:  Not necessarily that each

25  payment is tied to some quid pro quo, but that to

5830

1  allege this as part of the conspiracy is

2  preposterous.  It doesn't make any sense.  It

3  doesn't fit in with the furtherance, with what the

4  purpose of the conspiracy was.  And it wasn't

5  payments under the table to a Governor.  This was

6  contract work done by Patti Blagojevich that they

7  paid their taxes on and that was put into evidence.

8  I mean, it's not conspiratorial for her to have

9  engaged in a work contract with Rezmar to receive

10 payment for the work the witnesses testified they

11 saw her at the office --

12      THE COURT:  But take the contrary, let's say

13 the jury is satisfied that she really didn't do the

14 work, or at least didn't do enough work to merit the

15 compensation, assume they reach that conclusion,

16 what happens to your argument then?

17      MS. KAESEBERG:  I didn't hear you.  If she

18 didn't do the work?

19      THE COURT:  That she didn't do enough work,

20 maybe she did some work, didn't do enough work to

21 deserve the compensation she had.  And I'm not

22 talking about a close question, I'm talking about a

23 situation which she did very little work, did it,

24 but received a very large payment.  If the jury were

25 to find that to be the case, what happens to your

5831

1 argument?

2      MS. KAESEBERG:  That's not a crime, that's

3 not conspiratorial.  I don't know if Mr. Sorosky

4 wants to elaborate.

5      THE COURT:  Well, yes, but what you're doing

6 is, you are focusing on a specific transaction as

7 the only offense that's charged.  What they're

8 charging is is there was an agreement, a plan, and

9 that this was clearly included in that plan.  Was it

10 clearly included in the plan that this income would

11 be provided in a specific way in question?  I don't

12 think that's necessary.  It's just in the plan and

13 the agreement of the conspirators, the jury finds

14 that they really thought there were tremendous

15 opportunities with this particular defendant for

16 private profit and they thought the necessities for

17 that was to make sure that he had adequate funds to

18 support his life-style.  How they did it in a

19 particular way doesn't particularly matter because

20 the quid and the quo are not the real estate deal

21 and what she was paid, it was the element of

22 gubernatorial action and gubernatorial control and

23 their interest in what they wanted to support.

24      I think you're reading a bribery and

25 extortion as just way too narrow.  I don't think

5832

1    that's what the Supreme Court meant.

2         Yes?

3         MR. SOROSKY:  Your Honor, I don't believe

4    there was ever any testimony presented by the

5    government the real estate fees Mrs. Blagojevich

6    received was any form of specific bribes to the

7    Governor.  I don't believe there was ever any

8    testimony along those lines.  And the closest thing

9    to that was Mr. Monk's testimony, and he was the

10   first witness.  And when Mr. Monk said there was

11   this original plan to participate in a lot of

12   illegal activities in return for state action by the

13   Governor and money would be made by, presumably,

14   Rezko and Kelly and from their ill-gotten gains they

15   would stash some and give some to the Governor after

16   he was out of office, now that's the government's

17   testimony.

18        Now, these fees were all earned while

19   Mr. Blagojevich was in office, and I believe under

20   the new Skilling decision, for these real estate

21   fees to be a crime, it has to be shown that it was a

22   bribe.

23        THE COURT:  Yeah, I understand what you're

24   saying, I just think you're misreading Skilling.

25        MR. SOROSKY:  Okay.

1    THE COURT:  And if you want me to give you a
2  gold-plated guarantee you're misreading Skilling,
3  I'm not going to give it to you, because all we got
4  is the one case.  But I'm telling you, the way I
5  read it is different than the way you read it, and,
6  in the end, some Court of Appeals or the Supreme
7  Court might find that you were right and I was
8  wrong, but that is the way I'm reading it.
9    MR. SOROSKY:  Well, I just close with, to the
10  best of my knowledge, the Everleigh sisters were
11  never indicted for bribery.
12    THE COURT:  I don't believe they were
13  indicted for anything, but I may be wrong because I
14  didn't read the highly acclaimed historical book
15  about them.  Some day, when I have a lot of spare
16  time, I might.
17    MR. SOROSKY:  I don't think they were ever
18  indicted.
19    THE COURT:  Anything else anybody want to
20  say?
21    MR. SOROSKY:  No.
22    THE COURT:  Okay.  I'm probably going to have
23  you back here, say, around 9:30 in the morning for a
24  short conclusion to this.
25    The reason I'm doing this is because I have

5834

:40PM

1   now, in the course of this hearing, given you some
2   indication of the way I think about these issues and
3   you may want to add something to them or say
4   something, one way or the other.  It will be very
5   short.  I would say no more than half an hour.
6           Anything else?
7           MR. SCHAR:  No.
8           MR. SOROSKY:  No nothing.
9           THE COURT:  Thanks, counsel.
10
11       (Adjournment taken from 3:41 o'clock p.m. to
12        9:30 o'clock a.m. on July 22, 2010.)
13
14
15
16
17
18          *    *    *    *    *    *    *    *
19
20
21  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
22  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
23                      MATTER
24
25

5835

1    /s/Blanca I. Lara                    date

2

3

4

5

6    _____        _____

7            Blanca I. Lara                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25