6231

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4           Government,            )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  July 27, 2010
    ROBERT BLAGOJEVICH,            )
7                                  )
            Defendants.            )  9:06 o'clock a.m.
8

9                       VOLUME 32
                TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
11

12  For the Government:

13            THE HONORABLE PATRICK J. FITZGERALD,
              UNITED STATES ATTORNEY
14            BY:  Reid J. Schar
                  Carrie E. Hamilton
15                Christopher Niewoehner
              Assistant United States Attorneys
16            219 South Dearborn Street
              Suite 500
17            Chicago, Illinois 60604

18

19

20  Court Reporter:

21            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
22                  Room 2504
              Chicago, Illinois 60604
23               (312) 435-5895

24

25

6232

1  APPEARANCES  (continued:)

2

   For Defendant Rod Blagojevich:
3
           KAPLAN & SOROSKY
4          BY:  Sheldon M. Sorosky
           158 West Erie
5          Chicago, Illinois 60610
           (312) 640-1776
6
           LAW OFFICE OF SAMUEL E. ADAM
7          BY:  Samuel Forbes Adam
                Samuel Adams, Jr.
8          6133 South Ellis Avenue
           Suite 200
9          Chicago, Illinois 60637
           312-726-2326
10

11         OFFICES OF AARON B. GOLDSTEIN
           BY: Aaron Benjamin Goldstein
12         6133 South Ellis
           Chicago, Illinois 60637
13         (773) 752-6950

14         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
15         2140 N. Lincoln Park West
           Suite 307
16         Chicago, Illinois 60614
           (773) 517-0622
17
           LAW OFFICES of MICHAEL GILLESPIE
18         BY:  MICHAEL GILLESPIE
           53 West Jackson Boulevard
19         Suite 1420
           Chicago, Illinois 60604
20         (312) 726-9015

21

22

23

24

25

6233

APPEARANCES   (continued:)


For Defendant Robert Blagojevich:

        ETTINGER, BESBEKOS, PARISI
        BY:  Michael D. Ettinger
             Cheryl Ann Schroeder
        12413 South Harlem
        Suite 203
        Palos Hills, Illinois 60453
        (708)598-1111


        Edelman, Combs, Latturner & Goodwin LLC
        BY:  Robyn S. Molaro
        120 S. LaSalle
        Suite 1800
        Chicago, Illinois 60603
        (708) 598-1111

6234

```
 1                    INDEX OF EXAMINATION

 2   WITNESS                                        PAGE

 3     CLOSING ARGUMENT ON BEHALF OF ROD BLAGOJEVICH

 4     By Mr. S. Adam, Jr................................ 6269

 5   CLOSING ARGUMENT IN REBUTTAL

 6     By Mr. Schar..................................... 6346

 7

 8

 9   EXHIBITS

10     ................................................

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6235

1      (The following proceedings were had out of the
2           presence of the jury in open court:)
3           THE CLERK:  This court will resume in
4    session.
5           Counsel, approach.
6           MR. SCHAR:  Good morning, Your Honor.
7           Reid Schar, Chris Niewoehner and Carrie
8    Hamilton on behalf of the United States.
9           MR. GOLDSTEIN:  Good morning, Your Honor.
10          Aaron Goldstein on behalf of Rod Blagojevich.
11          MR. ETTINGER:  Good morning, Your Honor.
12          Michael Ettinger on behalf of Robert
13   Blagojevich.
14          MR. SOROSKY:  Sheldon Sorosky, S-o-r-o-s-k-y,
15   on behalf of Rod Blagojevich.
16          THE COURT:  I noticed that neither defendant
17   is present.  Is their presence waived?
18          MR. SOROSKY:  Yes, Your Honor.
19          MR. ETTINGER:  Yes.
20          THE COURT:  Okay, we'll waive their presence.
21          Mr. Adam, you want to come up.
22          MR. S. ADAM, JR.:  Yes, Your Honor.
23        (Brief pause.)
24          THE COURT:  We have to deal with the missing
25   witness issue.  I don't ordinarily watch the news

6236

1  about this case and I didn't this morning, but when
2  I was watching the regular news station I saw the
3  little lines that runs below saying something to the
4  effect of "defense counsel was threatened with
5  jail."

6           I got the transcript.  I didn't use the word
7  "jail," you used the word "jail," but to put you at
8  ease, Mr. Adam, jail is not in the picture, and
9  never was in the picture.  I don't know where they
10 lock up lawyers for making objections to statements,
11 but we don't do it here, at least I don't do it
12 here, maybe somebody else in the courthouse does.

13          So if you were wondering who you were going
14 to give your watch to --

15          MR. S. ADAM, JR.:  I don't wear one.

16          THE COURT:  -- you don't have to worry about
17 that.

18          There is one argument that has been made that
19 I didn't understand, and that was an argument made a
20 right to call attention to a missing witness is part
21 of the right of the defense to attack the burden of
22 proof.  And as is fairly customary, this was an
23 argument that was made without citation to case law,
24 and I get very little case law from the defendants
25 in this case.

6237

1       But I remembered from my own distant past

2  that a period of time when I was in the Illinois

3  Attorney General's Office, because I remembered the

4  case, I remembered the author of the opinion but I

5  couldn't remember the name of the case.  It was

6  Judge Seidenfeld from the Second District.  Judge

7  Seidenfeld from the Second District, look the case

8  up, it's called People Versus Gonzalez, 125

9  Ill.App.2d, 225, which says, basically, what the

10 defense argument is.  So you can use that in the

11 future.  The only problem with Gonzalez is, it was

12 severely limited in the First District by People

13 versus Smith, 3 Ill.App3d 64, by, I believe, the

14 Third District in People versus Graham, 127

15 Ill.App2d 272, and was essentially inconsistent with

16 People versus Jones in the Illinois Supreme Court,

17 30 Ill.2d 186.  Lest you think that I spend time

18 laboriously looking all of these up, I didn't.  I

19 went to my old trial book where I found all of this

20 stuff.

21       And the limitations which were applied in

22 Smith, the way Smith re Gonzalez, makes the argument

23 inapplicable to this case under Illinois law.  It

24 was never applicable under federal law, but I just

25 note that for future reference should anybody here

:09AM

:10AM

:10AM

:10AM

:11AM

6238

1    appear in state court in the near future.

2         With that observation, the first question I

3    have is one for you, Mr. Adam -- two questions,

4    actually.  Whether it is still your intent to make

5    the argument, and, if it is, I would like you to

6    give me an example to the argument so I have context

7    in which to make the judgment.  So go ahead.

8         MR. S. ADAM, JR.:  Well, if Your Honor is

9    given me the opportunity, then I certainly will.

10   One of the areas in which I would love to make this

11   argument, Your Honor, is, let's take, for instance,

12   Patti Blagojevich and her working.

13        As the government proved up here, there was a

14   contract between Rezmar and River Realty, and that

15   contract has right in it a lawyer by the name of

16   Brian Hynes.  On the contract to sell 1101, the

17   purchaser is Brian Hynes and Patti Blagojevich is

18   the person who is doing the transaction for 1101.

19        Now, if it's wrong that she didn't work, if

20   we're wrong when we say she worked, she did these

21   things, she represented Brian Hynes, where's Brian

22   Hynes to say she didn't?  I mean, that would be the

23   first person they put in is the person she's working

24   for on the deal.

25        Now, I think it's certainly permissible that

6239

1  we note there was nobody here, Brian Hynes never
2  showed up to tell you she didn't work when they
3  brought in that she didn't work.  Now, I think
4  that's certainly --

:12AM
5          THE COURT:  Okay, no, I just a sample.
6          MR. ADAM, JR.:  Yes, Your Honor.
7          THE COURT:  Give me another two.
8          MR. S. ADAM, JR.:  Well, with all due
9  deference, Your Honor, what's is that the government
:12AM
10 is writing down my argument.
11         THE COURT:  But it's okay, I don't think they
12 would be enormously shocked by any argument you
13 make.  So why don't you try.
14         MR. SOROSKY:  Would the Court allow us to do
:13AM
15 this in an ex parte proceeding?
16         THE COURT:  This is where we're late in the
17 game and I'm not asking for all of them, I'm asking
18 for a couple more.
19         MR. SOROSKY:  I think all of Mr. Adam's
:13AM
20 arguments would be along those lines.
21         MR. ADAM, JR.:  Yes, Your Honor.
22         MR. SOROSKY:  Just with different witnesses
23 on different issues.  They all would be if the
24 government says X occurred, why didn't Y get up and
:13AM
25 say it.

6240

1          THE COURT:  Okay.  Well, the reason I ask is
2  is that Hynes is not probably the best example you
3  can give if I have correctly read your motion to
4  reconsider.  What you give is the example -- the two
5  that you lean on most of all are Rezko and Stuart
6  Levine, and I'd like to have some idea, you don't
7  have to do all of it, just give me part of it.
8          MR. S. ADAM, JR.:  Basically, what they said
9  yesterday in their opening was this deal between
10  Kjellander and Aramanda wasn't a loan, it was a
11  sham, and that Tony Rezko was the beneficiary of it
12  and they went around and showed how the money went,
13  allegedly, to Chris Kelly and then back to Rezko and
14  then into Patti Blagojevich.  Now, if that's true,
15  where's Rezko?
16          THE COURT:  Okay, I got it.
17          The government's response -- I mean, I have
18  two things in writing, so I read that stuff.
19          MR. SCHAR:  Judge, I'm not going to belabor
20  it.  I think the writing pretty sums it up, that
21  this is improper argument.  Because all it does,
22  even taking the Brian Hynes example, why isn't Brian
23  Hynes here.  Did he take the Fifth Amendment because
24  he knew he was going to incriminate himself if he
25  chose to testify and therefore he would be

6241

1    unavailable?  What about Patti Blagojevich, she's
2    been sitting in the back of the courtroom every day,
3    she was promised in opening statement.  The
4    government didn't promise any witness.  The defense
5    did, including Patti Blagojevich.  Put her on the
6    stand, let her deny that this is improper.  This is
7    the back-and-forth we're going to end up in if we go
8    down this road, and none of it, none of it is
9    relevant to this jury's finding on the evidence
10   that's actually here.  And that's what they're going
11   to be focused on, I'm going to instruct them on
12   that, anything that didn't happen in this courtroom
13   is specifically not supposed to be thought -- we'll
14   rest on the filing, Judge.

15            THE COURT:  Okay.  With respect to the motion
16   to reconsider, which, again, neglects to cite
17   authority of any kind, a precedent of any kind, my
18   main problem with this is that it comes very late in
19   the day and it comes really inexcusably late in the
20   day.

21            I made it clear on Friday at the instruction
22   conference, that I was not going to give the
23   unfavorable inference instruction, a missing witness
24   instruction, which is 3.24 in the pattern book.
25   When the instruction was given to me, it included

6242

1 virtually every witness that could possibly have
2 been called without any attempt to show actual
3 unavailability or any bias.  And, in fact, in all
4 honesty, it was candidly admitted to me that John
5 Filan shouldn't have been on the list, but he was
6 there.  So the defense asked for everyone would be
7 subject of adverse inference, which is clearly not
8 the law.

9          Hostility to the defense was mentioned, not
10 because of what the witnesses said, but what their
11 lawyer said.  A lawyer might refuse an interview
12 because it's to protect their client, not because
13 there is bias against the defendant in this case.

14          But even the issue of bias or some hostility
15 to the defendant would have been subject to remedy
16 by me had it been asked for, and it wasn't asked
17 for.  And I believe, as I said at sidebar and said
18 at the instruction conference, the reason it was not
19 asked for is because the defendants, for I think
20 sound tactical reasons, would rather have an adverse
21 inference instruction than actually have the
22 witness, and particularly in the context of this
23 case and particularly dealing with witnesses who
24 have given a variety of statements to which the
25 defendants have access.  And I made that very clear.

6243

1    And, granted, I made it clear on Friday, but
2 the case went forward with the government's opening
3 and the defendant Robert Blagojevich's argument
4 before the issue was raised again.  We're in the
5 midst of closing argument and I think it's too late
6 to do that.

7    And it does raise a question of whether what
8 I have before me is a pure practice of tactics, and
9 if they were successful, not bad tactics, rather
10 than an effort to pursue the merits of the motion.

11    But, in any event, what I indicated is if you
12 thought people wouldn't respond to subpoenas, I
13 indicated the defense in this case has every bit of
14 the power that the government has.  If a witness
15 refuses to come pursuant to a government subpoena,
16 the government has law enforcement agents who can
17 persuade the witness to appear, and if that
18 persuasion fails, we have the United States marshals
19 who, on the order of Court, will bring them in to
20 court.  We have one individual who I believe is
21 incarcerated and entirely within the authority of
22 this Court's writ.  If the defendant wanted a
23 witness and was unable to secure the voluntary or
24 even just by paper subpoena attendance of that
25 witness in court, I would have ordered the marshals

6244

1   to bring the witness to court.  If the witness was
2   still recalcitrant, I would have confined the
3   witness, that was the person who would be worried
4   about going to jail and not defense counsel.  But
5   none of that aid was asked for.
6           Moreover, one of the reasons that lawyers
7   don't want to call certain witnesses is they believe
8   that by calling the witness, they are somehow
9   endorsing the witness, commonly called the voucher
10  witness, your witness, you're vouching for what the
11  witness.  Voucher rule doesn't much apply today.
12  But one effect of calling a witness is that you have
13  to ask questions on direct examination, you can't
14  start the cross.  But that, too, is a problem that
15  the court can solve, because I can call the witness
16  as a court's witness, and when I call the witness as
17  a court's witness, the defense in this case,
18  sometimes the prosecution does this, would be able
19  to start the cross-examination, be able to dent a
20  witness, be able to draw all the bad things that
21  they think the witness will show.  All of this lies
22  within my power, and it's a power I have exercised
23  in the past; yet, that power was never invoked,
24  although the defense had an absolute right to do so.
25  So I don't believe that there was ever in this case

:20AM

:21AM

:21AM

:21AM

:22AM

6245

1  a desire by the defense to actually have these
2  witnesses here on the theory that some of what they
3  had to say would be favorable to the defense.  If
4  the defense wanted, and I understand this because
5  it's a perfectly rational approach to take is, you'd
6  rather have the witness not appear and then tax the
7  government with their nonappearance.  But the
8  government can't be blamed for their nonappearance,
9  the government can't be blamed forcing to vouch for
10 them because I would not force you to vouch for
11 them.

12      And that's the status that I explained very
13 clearly on Friday; yet, you wait until the moment
14 before closing argument is to start to make a big
15 fuss over this, particularly since I had said on
16 Friday I wasn't going to give the missing witness
17 instruction.  And I point out, according to the
18 pattern book, the missing witness instruction is
19 disfavored in the Seventh Circuit.

20      So that's where I think, basically, we are,
21 and I don't believe there's anything in this
22 reconsideration that has merit.  So I deny the
23 motion for reconsideration.

24      MR. S. ADAM, JR.:  May I just state one
25 thing, Your Honor?  And that was, it was Reid Schar

1  yesterday who made this motion again, and so we were

2  responding to that.  We didn't bring this up, it was

3  Reid Schar who asked about --

4         THE COURT:  I'm talking about this motion for

5  reconsideration I'm holding in my hand (indicating).

6         MR. S. ADAM, JR.:  Correct; and that was

7  after Mr. Schar brought this to the Court's

8  attention after Mr. Ettinger, that's all --

9         THE COURT:  But was it not your intention

10 yesterday to comment on unfavorable inferences?

11        MR. S. ADAM, JR.:  It was, Your Honor.

12        THE COURT:  And that's what I think is wrong

13 here, because you knew on Friday that I would not

14 permit that.  I made my ruling very clear.  It is

15 possible that one of your -- because you were not

16 here Friday --

17        MR. S. ADAM, JR.:  That's right.

18        THE COURT:  -- one of your co-counsel may not

19 have communicated to you, but I made it very clear

20 that you could not throw an unfavorable inference,

21 and you waited an awful long time.  And for that

22 reason, and for the reason that the motion is

23 meritless, I deny the reconsideration.

24        MR. ADAM, JR.:  Your Honor --

25        THE COURT:  No, I'm done.  What I have

6247

1  noticed over and over again is I rule and then you

2  continue to argue.  I gave you a chance to speak,

3  I've read the motion, we have a jury that's going to

4  be waiting for this argument, the jury that is

5  prepared.  If you would like to say something in two

6  sentences, you have it.

7  　　　　MR. GOLDSTEIN:  Thank you, Your Honor.

8  　　　　The government, on Page 2 of their motion,

9  specifically said:

10  　　"After hearing argument on the topic, the

11  　　Court also warned the defense that making

12  　　such an argument will result in the Court

13  　　instructing the jury that the defense had

14  　　as much opportunity as the government to

15  　　call a witness --"

16  　　　　THE COURT:  That's a different issue.  That's

17  a different issue.  That's the next issue.  That's

18  the next issue.

19  　　　　What I did is I denied on Friday the

20  unfavorable inference instruction, and that's the

21  missing witness instruction.  What we are talking

22  about now is a different instruction, not the

23  missing witness instruction, and I don't believe you

24  could possibly be confused by that.

25  　　　　What's happening now is, the government is

1  asking possibly for another different kind of
2  missing witness instruction, and that's a missing
3  witness instruction that tells the jury that you
4  can't make an adverse inference based on your
5  opposing party not calling a witness, that is to
6  say, you can't ask the jury to conclude that the
7  testimony would've been unfavorable to the
8  prosecution, that is the one thing that the
9  government wants me to instruct.  They want me to
10  instruct the reverse of the traditional missing
11  witness instruction, that is the question that's
12  before me now, that's the second question that we're
13  dealing with.
14       Now, it's also a different instruction than
15  what you were talking about because this is not an
16  instruction that goes into the regular pile of
17  instructions because I have no idea--well, I do
18  now--but I had no idea that such an instruction
19  would be necessary and its necessity has yet been
20  established.  In other words, this is an instruction
21  given only if the defense opens the door.  So it
22  stands on a different footing from the instructions
23  that are customarily assembled before we even begin
24  closing argument.  This is precisely the kind of
25  instruction that can be considered during the course

6249

1 of argument as opposed to before argument begins.

2      And I have the Government's motion, and I

3 assume you have the motion, too, and this is the

4 issue to which you can now speak to.

5      MR. GOLDSTEIN:  Your Honor, the Government's

6 motion is requesting this Court order our defense

7 argument to not argue the issue of missing

8 witnesses.  I don't see anywhere in this motion

9 where it talks about requesting a specific

10 instruction, unless I just received the motion and I

11 didn't see that.  But my understanding of this

12 motion is to preclude defense argument as to a

13 missing witness.

14      THE COURT:  Absolutely.  And, to that extent,

15 I have actually granted that motion, but your

16 co-counsel indicates that he does not intend to

17 follow it and would accept the possibility that he

18 might be in contempt for having failed to follow it.

19 If he fails to follow my instruction as to that,

20 then the issue is do I do something to repair the

21 misimpression the jury might have as to what they

22 can and cannot consider.

23      So the government actually does want me to

24 instruct that they can't consider or draw any

25 inference for or against any party for failure to

6250

1  call a witness.  There are other things that they
2  could do, but there is a rule, a rule of law which
3  they are willing to follow which counsel is against
4  it, and that was the example Mr. Schar gave of Patti
5  Blagojevich who did not testify.  And in the current
6  state of the law, given her relationship to the
7  defendant, this would be precisely the kind of
8  witness who is not equally available to other side,
9  probably, there are some circumstances where it
10  might not be.  And so under ordinary circumstances,
11  were it not for a particular provision of the law,
12  Mr. Schar could make that argument, but he can't
13  make the argument because the law is that the
14  defendant does not have to produce any witnesses
15  under any circumstances or take the witness stand in
16  his own defense, which is one of those things,
17  little rules, that bars Mr. Schar from making the
18  same kind of argument that Mr. Adam wants to make.
19  So he can't make that argument.
20        But the truth is that because that prevents
21  him from making the same kind of argument, he thinks
22  that the only way to remedy the use of a prohibited
23  argument on behalf of your client is for me to
24  instruct the jury that that argument is out of
25  bounds and that the jury cannot make an adverse

:29AM

:30AM

:30AM

:30AM

:31AM

6251

1   inference against the government because of their
2   failure to call witnesses, that, I believe, is what
3   the government wants.  And, in fact, I discussed the
4   possibility that I would do it because I thought
5   that by telling people that I might do it, it might
6   deter the use of this argument.
7        So I think they are asking me to tell the
8   jury.  I don't know if they're asking me to tell the
9   jury when it occurs or in the form of a written
10  instruction.  The government could submit a draft of
11  an instruction; although, I very much doubt I would
12  need one given the nature of the general Seventh
13  Circuit opinions on missing witness instructions,
14  and particularly that long passage from Sblendorio
15  on the issue.  So that's, basically, where we are.
16  So that's the issue you have to address.
17        MR. GOLDSTEIN:  Our position, Your Honor, is,
18  we have to wait and see what the closing argument
19  is.  We would object to any instruction in the
20  middle of defense closing.  If Your Honor -- because
21  this, quite frankly, will have to be ruled on.  The
22  government for all we know, may take a strained
23  inference to Mr. Adam's argument and say, oh, he
24  raised missing witnesses, and there may be a serious
25  question as to whether that's correct or not.  So

:31AM

:31AM

:32AM

:32AM

:32AM

6252

1   that would have to be done outside the presence of
2   the jury to determine whether an instruction is
3   proper.

4        So what I would suggest, Your Honor, and I
5   request is:  Number one, that it not be instructed
6   in the middle of the closing.  Number two, if there
7   is any discussion whatsoever to be done, it needs to
8   be done after the closing of Mr. Adam.

9        MR. SCHAR:  Judge, we actually want both.
10  You ruled.  The rule has been made.  The issue now
11  is whether Mr. Adam is going to violate the rule.
12  And if we object, and it will obviously be Your
13  Honor's decision, if he violates the ruling and Your
14  Honor agrees he violated the ruling, then the
15  instruction should be given right there.

16        And then we shouldn't have to wait until the
17  end of an argument where he repeatedly violates the
18  rulings and then we get it while the jury sits there
19  and thinks that all this may be relevant or
20  something they should be focused on, then after he
21  violated the ruling and Your Honor has cured it,
22  hopefully at some level of an inadmissibility
23  argument, it is entirely proper for the jury to have
24  it as a written instruction phrasing the nature of
25  the violation.

6253

 1          THE COURT:  Let me tell you why I am--because
 2  it's a little different from Mr. Schar's
 3  reasoning--why I am considering giving it both
 4  times.  One of the other issues yesterday that came
 5  up in our discussion was, apart from the nonexistent
 6  threat of incarceration, one of the things that I
 7  mentioned, and this is not a nonexistent issue, was
 8  that if my rulings were repeatedly violated, I would
 9  sit Mr. Adam down, which I generally think would
10  counsel Mr. Adam to put whatever things he's going
11  to say about witnesses not being called at the end
12  of his argument so he can get the rest of it in,
13  which, in all honesty, I would advise Mr. Adam to
14  consider because maybe he can tell his argument is
15  going really well and he doesn't need it and we can
16  avoid this issue.
17          But, in any event, the last thing I want to
18  do is sit defense counsel down in closing argument,
19  but I am willing to do it at one point in
20  particular, I'm willing to do it at the point where
21  I believe I can no longer repair the damage that is
22  done by instruction to the jury.
23          Now, obviously, that's not going to happen
24  the first time, but there may be a time when his
25  argument becomes so saturated and so dependent on

6254

1  witnesses not being called by the government, that I
2  feel that the nature of his argument may overwhelm
3  the jury's ability to follow the instruction.  It
4  may actually somehow get into their way of thinking
5  about the case to the point where they won't even
6  realize that they're giving credence to something I
7  have instructed not to give credence to.  And I
8  think if I start at the beginning when it first
9  happens, then there's a much greater chance that
10 Mr. Adam will be able to finish his argument which
11 is better for his client than my having to sit him.
12         It's one thing to sit a lawyer down, which I
13 think I did in this case where it's a
14 cross-examination that's obviously going nowhere,
15 it's another thing entirely to sit a lawyer down
16 during closing argument, which is absolutely the
17 last thing I would do.  That's why I'm going to
18 start doing it the first time it happens.  And if
19 Mr. Adam wants to re-order his closing argument to
20 take into account that maybe it's better at the end
21 than at the beginning, that's fine, but that's his
22 choice, not mine to make.
23         What I'm going to do is I'm going to give you
24 in writing a proposed instruction so you can have a
25 chance to look at it and I'll come back in four or

:35AM

:36AM

:36AM

:37AM

:37AM

6255

1 five minutes.

2         The only remaining issue is the degree to
3 which the government can respond by saying that the
4 defense could've called a witness that they thought
5 they disagreed.  The government may wish to try it,
6 they may wish not to try it.  It's a dangerous thing
7 to do because the rule which says the defendant is
8 not obliged to call witnesses.  On the other hand,
9 it has been done and permitted in cases where you
10 are talking about a discrete incident in which a
11 defense has vigorously disputed some particular
12 point and sometimes has succeeded, to some extent,
13 on cross-examination and, basically, the defense
14 has, through the nature of cross-examination,
15 offered evidence on its behalf, and where the
16 defense has offered evidence, sometimes that's
17 permitted.  But I'm assuming that it's unlikely to
18 happen, and all that the government will be
19 permitted to argue is the general rule of what is in
20 the instruction that I give to the jury and remind
21 them of it.  So it's a good thing that we all look
22 at that instruction before I give it, both sides.

23         The one point I would like to make is, I want
24 to put on record standard 4-7.7 of the American Bar
25 Association standards for criminal justice, this is

6256

an embodiment of defense function standards, this is
for 1993 approved in 1994, it is still the currently
approved ABA.  I'm going to read it in its entirety.
Some of it, obviously, is not material here, but
parts of it are:
          "A, 4-7.7:  In closing arguments to the
          jury, defense counsel may argue all
          reasonable inferences from the evidence in
          the record.  Defense counsel should not
          intentionally misstate the evidence or
          mislead the jury as to the inferences it
          may draw.
          B, defense counsel should not express a
          personal belief or opinion in his or her
          client's innocence or personal belief or
          opinion in truth or falsity of any
          testimony or evidence.
          Defense counsel should not make arguments
          calculated to appeal to the prejudices of
          the jury.
          Defense counsel should refrain from
          argument which would divert the jury from
          its duty to decide the case on the
          evidence."
              Personally, I don't believe B or C applies

6257

1  here, and part of A doesn't apply here, but I do
2  believe that there's serious risk that defense
3  counsel would by arguing adverse inference mislead
4  the jury as to the inferences it may draw, and I
5  also believe that such arguments would divert the
6  jury from its duty to decide the case from the
7  evidence as opposed to what's not evidence.  And
8  this is of some concern to me, and I thought I
9  should put it on the record.
10         With that, I will leave the bench and you'll
11  get copies of this.  I'll be back in about ten
12  minutes.
13      (Recess.)
14         THE CLERK:  This court will resume in
15  session.  Please be seated.
16         Counsel.
17         THE COURT:  We have last-minute instructions
18  issues?
19         MR. MARTIN:  Yes, Your Honor.  There were a
20  handful of housekeeping issues on the instructions.
21         THE COURT:  Sure.
22         MR. MARTIN:  We have informed your clerk the
23  substance of that.
24         MS. BONAMICI:  Your Honor, there are issues
25  with respect to 34, 79, 87 and 89.  I believe.

6258

1          With respect to instruction 34 --

2          THE COURT:  Hang on.

3          MS. BONAMICI:  -- the attorneys notes

4     indicate that a final resolution was not --

5          THE COURT:  I don't have 34 in front of me.

6     I have the others, but I don't have 34.

7        (Brief pause).

8          THE COURT:  Okay.

9          MR. MARTIN:  Your Honor, we object to the

10    second paragraph.  At the conference, the Court had

11    put that on hold.  Our assumption is the instruction

12    is going to be given.  We objected that it was

13    redundant and unnecessary and the Court did not

14    formally rule.

15         MS. BONAMICI:  As we discussed on Friday, it

16    is an accurate statement of the law and the

17    government believes that the jury should be informed

18    specifically that they need not find that the

19    defendants participated in all of the acts.

20         THE COURT:  What is it redundant of?

21         MR. MARTIN:  Well, it doesn't really tell the

22    jury what it has to do.  The jury has been given the

23    elements instruction which instructs the jury what

24    it has to find and then telling them that there are

25    certain things out there that they do not have to

6259

find, it doesn't give the jury much clarity and it
takes away from the unanimity requirement on the
elements, that's what the jury needs to find.  We
think it's unnecessary to give the jury instructions
about what they need not find.

     MS. BONAMICI:  This is a pattern instruction,
Your Honor.

     THE COURT:  Yeah, I'm looking.

  (Brief pause).

     THE COURT:  I'll give it over objection.

     MR. MARTIN:  Thank you, Your Honor.

     THE COURT:  What's next on the list?

     MR. MARTIN:  Your Honor, the next is
government instruction 79.  The Court has ruled this
instruction is going to be given, I just wanted to
make clear on the record that we object to the
sentence which reads "moreover, we do not need to
agree unanimously on which overt act the government
has proved."  That's a correct statement of the
Grids case; however, the Grids case was proceeded by
a case written by Judge Williams that suggested that
the unanimity instruction should be given.  We just
want to preserve our record on that point, I don't
remember if I did that at the instruction
conference.

6260

1          THE COURT:  I don't think you mentioned Judge
2  Williams opinion, which I, of course, remembered,
3  because it would be an extremely rare thing
4  suggesting that perhaps a pattern instruction might
5  not, in fact, be entirely perfect.  It doesn't
6  happen too often in the Court of Appeals.  I'm
7  overruling the objection.
8          MR. MARTIN:  Thank you, Judge.
9          MS. BONAMICI:  With respect to the
10  instruction 87, the parties have agreed to a
11  modification which we have provided to your law
12  clerk.
13          THE COURT:  Is this the handwritten at the
14  bottom?
15          MS. BONAMICI:  Yes.
16          THE COURT:  Sure.  That's fine.
17          89 is the next one?
18          MS. BONAMICI:  Yes.
19          MR. MARTIN:  Yes, Your Honor.  And if I could
20  explain this one.  The Court had asked that the
21  verdict form be modified to include specification as
22  to the false statements.
23          THE COURT:  Right.
24          MR. MARTIN:  I then realized that the
25  racketeering charge also is in the nature of a

6261

1  special interrogatory.  Once I saw that, I also
2  realized that if a jury finds the defendant not
3  guilty of either Count 1 or Count 24, it need not go
4  down the list of interrogatories.  So I pulled an
5  instruction from the Fawell case which I tendered to
6  the government last night.  They agreed to the
7  instruction, except for the last sentence of each
8  paragraph, and I tendered those to the Court.

9          We're asking that the instruction modified
10  for this case given by Judge Pallmeyer in Fawell be
11  given.  We believe the instruction is necessary
12  because the instruction in the manner the government
13  has proposed it does not tell the jury what it needs
14  to be told, and that is, you don't fill out the
15  interrogatory portion of verdict if there is a
16  finding of not guilty.

17          THE COURT:  Now, what is it that the
18  government agrees to and what don't they agree to?

19          MS. BONAMICI:  With respect to the first
20  paragraph, we agree up to the words "racketeering
21  acts" with subparagraphs, we object to the sentence
22  that follows.

23          With respect to the second paragraph, it's
24  the same thing, we agree up to "unanimously agreed
25  upon" period, and object the remaining language.

6262

1      THE COURT:  So you don't like the ifs.

2      MS. BONAMICI:  We don't like the ifs.

3  Initially, we didn't consider it problematic, but

4  upon reflection, the problem that we saw with it was

5  that by including the need-not language that appears

6  in the Fawell case, it offers the jury the

7  opportunity to really do something that they

8  shouldn't do, they shouldn't answer no, not guilty,

9  and then go on to answer the interrogatories with

10 respect to the false statements, particularly, you

11 know, either way.

12      We thought about changing that to "do not go

13 on," but then it was our view that that was too much

14 micro-managing of the jury's deliberations and too

15 much direction.  So that's our objection.

16      We also think that the language that's here

17 tells them what they need to know, which is they

18 only need to fill out the interrogatories if

19 they find that the government has proven the

20 defendant going beyond a reasonable doubt.

21      MR. MARTIN:  I just don't think the jury is

22 going to intuitively know that they don't have to

23 fill out the interrogatories if there's a not

24 guilty.  This instruction, as written, is one-sided.

25 And I appreciate everything the government has done

:37AM
:37AM
:38AM
:38AM
:38AM

6263

1  on these instructions, but I think they're

2  over-thinking this one.  If the Court is going to

3  give it in the manner the government suggests, we'd

4  ask that the instruction not be given at all.

5       THE COURT:  Let me ask one basic question,

6  what harm is done if the jury answers too many

7  questions?

8       MR. MARTIN:  Well, the harm from our

9  perspective is that, if they're just not unanimous

10 on the subparagraphs or the sub-acts, they can find

11 him not guilty, but this would suggest that they

12 have to be unanimous on the finding of not guilt, so

13 that's the harm we see.

14      MS. BONAMICI:  I'm not sure that I am

15 following that exactly.  The harm that we saw was

16 that it could produce an inconsistent answer that

17 simply by the result of the jurors' lack of

18 understanding or confusion about the process.

19      THE COURT:  I see the defense point of view,

20 I just don't see substantive harm in leaving the ifs

21 off, largely because it has to do -- it really talks

22 about nothing of substance, it talks about

23 completing a form.

24      MS. BONAMICI:  Right.

25      THE COURT:  So I'm going to give the

:38AM

:39AM

:39AM

:39AM

:40AM

6264

1  government's version.

2        Anything else left that we need a formal

3  record ruling on?

4        Oh, right.

5     (Brief pause).

6        THE COURT:  I've read it.  Do you want to say

7  anything about it?

8        MS. BONAMICI:  Is this the new one for today?

9        THE COURT:  This is a formal objection for

10 request for reconsideration, it shows it was filed

11 7/25.

12        MS. KAESEBERG:  I think we raised that

13 yesterday.

14        THE COURT:  Yeah, you did.

15        MS. KAESEBERG:  We would rest on what is

16 contained there.

17        THE COURT:  Yeah.  That's right.

18        MS. BONAMICI:  I don't think there's any

19 further arguments needed, Your Honor.

20        THE COURT:  Reconsideration is denied.

21        Did Mr. Schar just tell you something of

22 great import?

23        MS. BONAMICI:  Yeah; critical.  There is

24 another modification that is required on this

25 verdict form that nobody caught last night, and that

6265

1  is that on Page 2 of the verdict form there's a
2  reference to Congressman A rather than the name, and
3  also there's changes on some of the racketeering
4  acts.
5          MR. SCHAR:  Judge, just consistent with the
6  indictment that is going out, which took out the
7  euphemisms --
8          THE COURT:  Yeah, I know, I remember.
9          Are you going to be fixing that?
10         MS. BONAMICI:  Yes, I would be delighted to.
11 And I would ask, Your Honor, do you wish that I make
12 the other changes and provide a clean set to the
13 Court?
14         THE COURT:  Yeah.
15         MS. BONAMICI:  I will do that.
16         THE COURT:  Anybody else other than the no
17 adverse inference instruction?
18         MR. MARTIN:  No, not for the instructions.
19         MS. BONAMICI:  Not from the government, Your
20 Honor.
21         THE COURT:  Any final words on my original
22 version of the government's proposal?
23         MR. MARTIN:  Your Honor, it's the defense
24 position that we hope, of course, that the situation
25 does not arise where the instruction must be given,

1  but if it is, we'd prefer the Court's proposal.

2          The problem with the government's proposal is

3  that there is some conflict with the defendant's

4  right to remain silent and the issue of the fact

5  that the defendant would be included in the category

6  of a witness doesn't have to testify and no

7  inference should be drawn.  I think the Court's

8  instruction is more neutral and doesn't raise that

9  issue.

10          MR. SCHAR:  Judge, I think that, obviously,

11  the jury is going to be instructed specifically that

12  the defendant doesn't have to testify, this makes

13  clear that the defendant has no burden, it's the

14  accuracy of the law.  It effectively cures the

15  problem, and in particular it avoids the issue of

16  speculation specifically, which is exactly what its

17  potential harm could occur.

18          MS. KAESEBERG:  If I could just add one

19  thing.  The government's instruction 89 with respect

20  to you should not speculate why any other person

21  whose name you may have heard during the trial or

22  who is named in the indictment is not currently on

23  trial before you, and the last sentence of the

24  government's proposed instruction is somewhat

25  redundant with that instruction.

6267

1    MR. SCHAR:  We're talking about people on
2 trial, Judge, not people to be called.
3    THE COURT:  Yeah.
4    (Brief pause).
5    THE COURT:  Your concern is is that this
6 might edge over into an assumption about the ability
7 of the defendant to produce himself?
8    MR. MARTIN:  That's correct.
9    THE COURT:  I could say eliminate "although"
10 which I don't like as if it somehow minimizes.  I
11 could say "the law does not impose upon a defendant
12 in a criminal case the burden of producing any
13 witness, the law does also provide the defendant
14 with the right to produce witnesses other than
15 himself," mainly because everybody understands he
16 can produce himself, and the jury was explicitly
17 told that the defendant who was not testifying, was
18 going to testify, and they say a defendant testify,
19 and so they're not going to be confused about that
20 one.  I prefer to do it that way.
21    MR. MARTIN:  If that's the Court's
22 preference --
23    THE COURT:  Yeah, that's my preference.  I
24 mean, you can still object, but that's my
25 preference.

6268

1          MR. MARTIN:  Okay.  And the only thing we'd
2    ask, in terms of order, if that could be given next
3    to the instruction which talks about you cannot
4    infer from the defendant's failure to testify any
5    inference.
6          THE COURT:  Say that again.
7          MR. MARTIN:  We would ask that this
8    instruction be given -- if the Court could give me a
9    second, I'll give you the number.
10         THE COURT:  Right.
11       (Brief pause.)
12         MR. MARTIN:  After government's instruction
13   number 12 or before, either way.
14         THE COURT:  Do you care?
15         MR. SCHAR:  That's fine, Judge.
16         THE COURT:  Okay.
17         I think, then, we're ready.  Do you all
18   understand the delay?  The reason for the delay?
19         MR. SCHAR:  Yes, Judge.
20         THE COURT:  Good.
21         MR. SCHAR:  Judge, I know we're getting close
22   to 11:00.  I have about an hour and a half.  If for
23   some reason we start for lunch, I'm happy to get
24   started, if not --
25         THE COURT:  We'll see how it goes.  I think

closing argument on behalf of Rod Blagojevich          6269

1  given where we are, the jury might prefer a short
2  lunch break rather than a longer lunch break.  And
3  you have exactly an hour and a half because
4  Mr. Niewoehner did not use all of his allotted time.
5          MR. SCHAR:  Thank you, Judge.
6          THE COURT:  We'll be back if the jury is
7  ready or be back when the jury is ready.
8      (Recess.)
9          THE MARSHAL:  All rise.
10     (The following proceedings were had in the
11      presence of the jury in open court:)
12          THE COURT:  Please be seated.
13          Just wait one moment.
14     (Brief pause).
15          THE COURT:  You may proceed.
16          MR. S. ADAM, JR.:  Thank you, Your Honor.
17    CLOSING ARGUMENT ON BEHALF OF ROD BLAGOJEVICH
18          BY MR. S. ADAM, JR.:  Counsel, counsel for
19  the government, Your Honor.
20          Ladies and gentlemen of the jury, we made it.
21  It's been two long months and we're here.  Now, you
22  know that I'm going to come up here today and talk
23  to each and every one of you.  You know what my job
24  is.  You know what I'm going to tell you how the
25  government didn't prove their case.  You know I am.

closing argument on behalf of Rod Blagojevich     6270

1   And they didn't.

2        Now, there's a big pink elephant in the room.

3   And you know it and I know it.  They know it, they

4   know it, His Honor knows it, the audience knows it,

5   and Rod knows it.  You know what the big pink

6   elephant in the room is just like I do, but I'm

7   going to talk to you like a regular person will talk

8   to you.  You're not lawyers and judges.  You're

9   regular people.

10        I promised you in opening statement, I know

11  it; I know it.  I might not be bright, but I'm not a

12  fool.  I know it.  I promised each and single one of

13  you that Rod was going to get up there and take the

14  stand.  And in opening statement, I give you my

15  word, I meant every word of it.

16        I didn't come up here in opening statement

17  and lie to you.  I had no idea, no idea that in two

18  months of trial, they would prove nothing.  And no

19  idea that in the two months of trial they would

20  prove up everything I told you was going to happen

21  in this case for us.

22        Who could possibly know that in two months of

23  trial they were going to prove up Patti worked?  Who

24  in two months of trial, they were going to prove up

25  that Patti had a contract like I told you in opening

closing argument on behalf of Rod Blagojevich      6271

1  statement?  Who knew that?  Who knew that in opening
2  statement they were going to prove to each and every
3  single one of you that Rod didn't take a dime like I
4  told you.  Not one single dime.
5        I told you in opening statement, I gave you
6  my word, that you were going to find out that Lon
7  Monk was taking cash, cash.  Think about how he was
8  taking it, ladies and gentlemen.  He'd get a phone
9  call from Tony Rezko in the middle of the night
10 saying, hey, man, I got a book for you.  Then the
11 two of them would run over to some undisclosed
12 location and he did it old Federal Express envelope
13 filled with cash and wrapped in rubber band, and he
14 came in here to tell you, yeah, that was an advanced
15 payment on an insurance company deal that Tony Rezko
16 doesn't have.
17       Who are they kidding in this case?  I told
18 you that was going to happen in opening statement.
19 I had no idea it would be from them.  I figured Rod
20 would have to get up here, sit right here, and look
21 at you and tell you, "I didn't take cash."  They
22 proved that to you in their case.
23       Now, I didn't come in here to lie to you.
24 And if you think I did, if you honestly think I gave
25 you my word and then didn't keep it because he

closing argument on behalf of Rod Blagojevich     6272

1  didn't testify, blame me.  I'm a man, blame me.

2       I'm not Bob Greenlee.  You guys remember Bob

3  Greenlee, right?  He's a lawyer, he went to Yale,

4  and then went to the University of Chicago and

5  became a lawyer, and he got up here and he gave you

6  the biggest BS.  He's the one that kinda looked like

7  Tom Arnold and Buddy Holly had a baby.  Remember

8  those glasses?  Remember that?

9       And what does he tell you?  This is the

10  federal government.  This is the feds who came in

11  here and had this man, a lawyer.  He clerked for a

12  federal judge in the appellant the Court.  He came

13  in here and sat down and had the gall, after you

14  listened to those tapes, after you heard the tapes,

15  where everything the Governor asked him, "yes, you

16  can do it," "yes, that's a good idea."

17       You saw Aaron here, remember?  And I love

18  him, but it was a rather boring cross, it was, but

19  it stands out.  Why does it stand out?  Because he

20  went through each and every call with Bob Greenlee:

21  Bob, you said this, you told him it was legitimate,

22  it was legitimate.

23       This is the Governor of the State of Illinois

24  who has, as you found out, thousands of

25  responsibilities, to you, to you, to you, to me;

closing argument on behalf of Rod Blagojevich     6273

1  thousands of responsibilities.  And Bob Greenlee
2  told you he took more than $100,000 a year to advise
3  this man.  He's relying on him.
4         And what does he come in here and tell you?
5  Ridiculousness.  We're real people.  Real people
6  know when a guy is on the stand up there b.s.'ing
7  us.  What did he tell you?  The most ridiculous
8  statement I ever heard in court.  What did he tell
9  you?  Yes, I said those things; yes, I gave him
10  plenty of encouragement, yes.  You know why?
11  Because I was trying to disagree by agreeing.
12         Who are we kidding?  They want you, you, you,
13  to convict him of all those things because Bob
14  Greenlee was disagreeing by agreeing.
15         You heard the term, "don't make a federal
16  case out of it."  If this is the type of federal
17  case, make it all day long, then.  I promised you
18  he'd testify, and blame me if he doesn't because I'm
19  not Bob Greenlee; I'm not.
20         Bob Greenlee got up here and tried to BS
21  every single one of you and I'm not.  I told you he
22  would testify, we were wrong, I was wrong; blame me.
23         Now, what happened yesterday?  What happened
24  yesterday?  You know it's true.  When lawyers are in
25  trial, we're watching you, just like you're watching

closing argument on behalf of Rod Blagojevich        6274

1  us, just like you're watching them.  And every
2  single one of you at some point in time have
3  laughed, no on cried but certainly laughed, but you
4  paid attention.  This is one of the rare -- I've
5  never been in a case this long two months and nobody
6  went to sleep; it's shocking to me.  But you paid
7  attention.  You know what you heard, you know what
8  you saw, you know what you felt.

9        I told you in opening statement, and if you
10  think about it, for the last two months until
11  yesterday, we knew about it, was he corrupt?  No.
12  Silly?  There's no doubt.  Professional jealousy for
13  President Obama?  Certainly.  I told you, you know
14  it in your guts, he ain't corrupt.  And it was
15  proven in their case.

16        Think about what you saw and think about
17  this, ladies and gentlemen:  Beautiful presentation
18  by Mr. Niewoehner.  It was.  I admit it.  It was a
19  very good presentation.  He stood right here and for
20  three and a half hours he gave you a wonderful
21  presentation, wonderful pictures up here on the
22  board, a wonderful PowerPoint presentation, until
23  you think about it.  His presentation yesterday did
24  define this case.

25        Think about what he told you.  Hiding the

closing argument on behalf of Rod Blagojevich      6275

1  facts, complete and utter hiding of the facts.
2  There's an old saying, you're entitled to your
3  opinion, but you're not entitled to your own set of
4  facts.  He tried to pull the wool over each and
5  every single one of your eyes.  He had "law" up
6  there, he had all the instructions up there, and he
7  hesitated on here and he told you:  Oh, you gotta
8  find him guilty of Jesse Jackson because he was
9  going to take money.
10        Now, if we're honest here -- I came up here
11 and I gave you my word and I told you why I didn't,
12 and if we're honest in this case, how can we as
13 individuals, how can we ask the jury, how can I as a
14 lawyer, how can he look at you and tell you find him
15 guilty of Jesse Jackson and never mention Lisa
16 Madigan?  Never bringing it up?
17        I know how it is.  I was sitting there
18 thinking, my God, look at this, and then it hit me
19 as I'm watching, he never even talked about Lisa
20 Madigan.  The first person to mention Lisa Madigan
21 was Mr. Ettinger.  Now how can that be if he's
22 telling you the truth?  If he's giving you what you
23 are supposed to find him guilty on?  They've been
24 trying to hide this ball from day one in this case.
25        MR. SCHAR:  Objection, Judge.

closing argument on behalf of Rod Blagojevich       6276

1       THE COURT:  The objection is sustained.

2       MR. S. ADAM, JR.:  Fair enough.

3       They yesterday didn't give you all the facts.

4   How can we have a single discussion on whether or

5   not this man should be found guilty of Lisa

6   Madigan -- of Jesse Jackson and we not discuss what

7   you heard on tape?

8       On December 4th what does he say?

9       Play it, Elliot.

10      (Tape played)

11      MR. S. ADAM, JR.:  Now, how can you?

12  Yesterday when you went home, I know it, many of you

13  are thinking:  Gee, I listened for two months, I

14  didn't realize he was like that.  You couldn't.  You

15  know why?  Because he gave you a separate set of

16  facts.

17      This whole thing comes down with Jesse

18  Jackson, what was he trying to do?  He was trying to

19  leverage Jackson like I told you he was in opening

20  statement.  All that conversation with his brother

21  about paying for political stuff upfront was to

22  Jesse leverage, make Jesse think Jesse was gonna be

23  there.  Why?  Everybody knows he's got a big mouth.

24  He'll tell everybody.

25      And I told you in opening statement that when

closing argument on behalf of Rod Blagojevich        6277

1  you find out what happened when finally, according
2  to them, the buyer and the seller meet.  What
3  happened?  And they proved this in their case.  How
4  could we possibly know they were going to do this.
5  They proved it with Harris:  Not a word of
6  fundraising.
7        Jesse Jackson -- and if you don't believe
8  what I just said about his mouth, think of this:  He
9  came in with a book about himself.  Now come on!  A
10 book, a stack a book, like this, to talk about how
11 great he is and the things he's done and healthcare
12 was part of it.
13       That man wasn't selling any Senate Seat!  You
14 know what he was doing, ladies and gentlemen--and if
15 you don't believe me, think of what the evidence
16 showed--he was trying to get 300,000 people
17 healthcare.  He was trying to make sure a capital
18 bill would result.  He was trying to make sure
19 disabled veterans didn't have to pay property taxes.
20 You saw this list and the list of things.
21       He has the nerve to come up here and say
22 yesterday he wasn't following the list that Bob
23 Greenlee made for him!  What was Lisa Madigan?  How
24 do you know that?  Harris told you that Rahm was
25 calling him on December 8th.  He was working.  You

closing argument on behalf of Rod Blagojevich          6278

1   know why it didn't go through?  Because they
2   arrested him on December 9th.  And you know who
3   didn't get arrested?  Jesse Jackson, Jr.
4        When Mr. Schar gets up here, you have him
5   explain that to you.  If this is a sale of a Senate
6   Seat and they bring in Rajinder Bedi who sits up
7   here and tells you:  Oh, I was at a conversation
8   with Mr. Jackson and Nayak and they were discussing
9   all this sale and then later on I know Robert said,
10  oh, we're not gonna --
11       MR. SCHAR:  Judge, I'm going to object to
12  reference who was or was not charged.
13       THE COURT:  The objection is sustained.
14       MR. S. ADAM, JR.:  Yes, Your Honor.
15       Maybe you won't get an answer.
16       Well, here we go --
17       MR. SCHAR:  I object and ask to strike as
18  improper.
19       THE COURT:  The remark is stricken and the
20  jury is instructed to disregard it.
21       MR. S. ADAM, JR.:  May I proceed, Your Honor?
22       THE COURT:  You may.
23       MR. S. ADAM, JR.:  I'm gonna have to take a
24  break here.
25       Again, we have seen throughout this trial

closing argument on behalf of Rod Blagojevich        6279

1  that -- and I don't want to offend anybody, and, if
2  I have, don't hold that against Rod.  I have been
3  chastised, I have been held down, if that has
4  offended anybody, don't hold that against my client.
5          MR. SCHAR:  Objection.
6          THE COURT:  It's nice if we don't refer to
7  oneself and just talk about the person who is on
8  trial.
9          MR. S. ADAM, JR.:  Yes, Your Honor.
10          You saw that yesterday, didn't you?  And they
11  came up here and told you you gotta find him guilty
12  because he was trying to get those things and he was
13  leveraging Jesse Jackson.  And if I'm wrong, how did
14  they disprove it beyond a reasonable doubt?
15          Remember here, ladies and gentlemen, what
16  your job is.  Remember what my job is.  And if you
17  want to know the truth, our job is the same.  Your
18  job and our job is to make them do their job.  How
19  did they disprove to you beyond a reasonable doubt
20  that Rod was trying to sell that to Jesse and not do
21  Lisa Madigan?  The calls are too clear and that's
22  not it.
23          They tried to tell you that him talking about
24  DHS or HHS and talking about 501(c)(4) is a crime, a
25  crime, and a serious crime.  What did Lon Monk tell

closing argument on behalf of Rod Blagojevich      6280

1 each and every single one of you?  That he was in
2 the same indictment with the Governor.  What did
3 John Harris tell you?  That he's in the same
4 indictment with the Governor.  And both of them are
5 facing 20 years.  20 years those two are facing.
6          This ain't a joke.  This is serious stuff.
7 And so when they tell you and stand here with a
8 PowerPoint presentation and give you half of the
9 facts, you're going to ask why.
10         When it comes to HHS, what do we know about
11 that?  The Governor wasn't the one who instituted
12 communication between the Obama administration and
13 him.  The President of the United States, at the
14 time presidential nominee and then became
15 presidential-elect, sent emissaries to him, the
16 first one being, think of the name, Marilyn Katz,
17 remember that, that's what you heard the first
18 person to come to him --
19         MR. SCHAR:  Judge, I'm going to object.  That
20 is not the evidence.
21         THE COURT:  It was, in fact, not the
22 evidence.  The statement is stricken.  The jury is
23 instructed to disregard it.
24         MR. S. ADAM, JR.:  Well, certainly Andy Stern
25 and Tom Balanoff did, that's the evidence.  They

closing argument on behalf of Rod Blagojevich          6281

1  called up to get a meeting with him.

2          And what happened during this process?  Look,

3  we are regular folks.  I'm gonna talk to you like we

4  are adults.  We don't need like a Bob Greenlee and a

5  Doug Scofield to say, oh, I told the Governor I was

6  placating 'cause I didn't want to be called a

7  quisling, whatever you do, just don't call me a

8  quisling.  Remember all that?  Give me a break!

9  This is a grown man.  I'm gonna talk to you like

10 grown folks, like they do at Thanksgiving when they

11 say, that's the kids' table, well this is the grown

12 folks' table.  We're at the grown folks' table, all

13 right.  When the President of the United States

14 sends emissaries to you and asks you to appoint

15 somebody and you send back word after having talked

16 to your lawyer, after having talked to your Chief of

17 Staff, after having talked to your special counsel,

18 after having talked to your advisers, and they tell

19 you, yes, that's a legitimate ask, yes, you can do

20 it --

21          MR. SCHAR:  Again, objection, Your Honor.

22          THE COURT:  The objection is sustained.

23          MR. S. ADAM, JR.:  You heard the tape of

24 where he says yes, it's legitimate.

25          MR. SCHAR:  Objection, Judge.

closing argument on behalf of Rod Blagojevich        6282

1          THE COURT:  The objection is sustained.
2          I urge you to be at least a little more
3     precise in your statements.
4          MR. S. ADAM, JR.:  Very well.  Yes, Your
5     Honor.
6          Okay.  Fine.  When he's talking to his
7     advisers and he asks about 501(c)(4) and he says --
8     what is his state of mind here?  "No matter what,
9     it's got to be legal."
10          Hit it, Elliot.
11        (Tape played).
12          MR. S. ADAM, JR.:  "It's got to be legal,
13     obviously."
14          And that's not the only time he got advise
15     from his lawyer or his people.  What does John
16     Harris say when they're talking about the 501(c)(4)?
17     Tab 41.
18        (Tape played)
19          MR. S. ADAM, JR.:  That's John Harris.  What
20     do you know about John Harris?  My father brought it
21     all out like I told you in opening statement which
22     we never thought we have to be able to get to.  His
23     background is complete and utter law enforcement,
24     was a prosecutor, that's where they sit for the JAG
25     core.  They came out and he was a deputy Chicago

closing argument on behalf of Rod Blagojevich          6283

1 police superintendent, was a lawyer, telling him
2 this is legitimate!  He had no intent on bribing
3 anybody.  No intent on extorting anybody.
4          Think about it.  Look, think about who
5 they're telling you he was extorting:  The President
6 of the United States.  Give me a break!  The number
7 one law enforcement official in the world?  In the
8 world?
9          He is trying to bribe him and what happens
10 when he goes and talks to Tom Balanoff?  Look, what
11 did Tom Balanoff come in here and tell you?  Now,
12 this is the president of a labor union, the second
13 largest union in Illinois -- or, sorry, in the
14 country, the number one largest in Illinois.  What
15 did he tell you happen?  Let's just go down very
16 quickly the basic facts.
17          He is SEIU.  He wants to help the President
18 of the United States because the President of the
19 United States can help SEIU.  So what does he do?
20 He comes and have a meeting with Rod Blagojevich
21 here, the senator -- strike that.  With the Governor
22 of the State of Illinois.
23          And how does he do it?  What does he do?  He
24 comes with a number one guy in the business, Andy
25 Stern, and they sit him down and they talk to him,

closing argument on behalf of Rod Blagojevich          6284

1  and they say, yeah, what about Lisa Madigan?  No,
2  no, no.  What about Valerie Jarrett?  Does it just
3  happen that President Obama's choice for this
4  position is Valerie Jarrett and they know it before
5  they talk to him?  Come on!  You know darn well what
6  was happening.  They were feeling him out.
7          And then what happens?  Thank goodness
8  President Obama wins.  And then what did he tell you
9  happened next?  He told you what happened next
10  because on November 4th they met at the park, Grant
11  Park, and Balanoff pulls him aside and says, I just
12  got a phone call from the President, he needs to
13  talk to you, he needs to talk to you.  Okay, set up
14  an appointment.  The very next day Balanoff calls
15  Doug Scofield and the appointment is set up.
16          Now how is that set up?  If this man is
17  trying to do the bribe, if this man is trying to do
18  extort, then answer me this, why does Tom Balanoff
19  have to meet with him alone according to Tom
20  Balanoff?  The very first meeting that they had, who
21  was there?  Doug Scofield, Bill Quinlan, Mr. Harris.
22  Balanoff said, I got to meet with him alone; alone.
23          And then he comes in here and tells you that
24  during that meeting--think about this, think about
25  how ridiculous this is and they want you to convict

closing argument on behalf of Rod Blagojevich        6285

1  him of this--as soon as the Governor brought up HHS,
2  I was concerned, I was, I was offended, oh, goodness
3  me, the Governor would say something like that.  He
4  stood up here yesterday and put up on the board that
5  Balanoff took it nowhere, remember that?  He said
6  Balanoff heard it and it stopped with him.  You
7  heard Balanoff's testimony.  What did he say?
8          He stood right up here and said, the minute I
9  left the FOB from talking with the Governor ....
10  what did he do?  This is the man:  Oh, I'm so
11  offended; oh, why do you do this to me Governor;
12  oh ...  and as soon as he gets to the office what
13  does he do?  He calls Alexi Giannoulious:  Hey, can
14  I meet with Valerie Jarrett?  Do you know where the
15  meeting occurred?  Do you know where the meeting
16  happened?  What did he tell you?  President Obama's
17  transition office.  Who are we kidding that he was
18  doing the bribing!  Who are we kidding that he's
19  doing the extorting!  This is a negotiation.  And if
20  I'm wrong on that, when Tom Balanoff brings it up to
21  Valerie Jarrett, which he told you he did, nobody
22  calls the Governor?  And I mean nobody says:  We
23  just want to know, this is the first black
24  President, man, you trying to mess this up?  Nobody?
25  Alexi Giannoulious is our State Treasurer.  Alexi

closing argument on behalf of Rod Blagojevich          6286

1  Giannoulias doesn't pick up the phone and say:  Rod,
2  man, you tripping, you gotta stop this.  Something?
3          No, you know what they do?  You know what
4  occurred?  They sent that word to Rod:  We don't
5  know what to make with the HHS, but Obama would be
6  grateful and appreciative.  Now, if that's not
7  negotiating, you start high and then come low, what
8  is?  That ain't a crime.
9          What did Robert tell you?  What does Robert
10  tell you right here when he heard this conversation,
11  when he heard these things?  He figured it was a
12  political deal between two political people.  It was
13  in Rod's mind.  He never asked for --
14          MR. SCHAR:  Objection.  Objection.
15          THE COURT:  The objection is sustained.
16          MR. S. ADAM, JR.:  You heard the tapes and
17  you heard Rod on the tapes, you can infer what's in
18  Rod's mind from those tapes.
19          Heck, every time they brought a witness in
20  here it's:  What's your understanding of what X said
21  to Y and while Y was in Canada somewhere.  You can
22  infer from those tapes whether or not he was trying
23  to extort the President of the United States.
24          We heard tape after tape of him just gapping;
25  seriously, just talking.  If you put Joan and

:25AM

:25AM

:26AM

:26AM

:26AM

closing argument on behalf of Rod Blagojevich        6287

1  Melissa Rivers in the room you wouldn't get that
2  much talk, because that's how he is.  I told you
3  when this case started, as an insecure man.  His
4  family is right here, and they love him, and that is
5  one of the loveable things, but he's an insecure
6  man.  He wasn't trying to extort.  And you know how
7  you know it?  The tapes.  Thank goodness that they
8  taped him.  Can you imagine the things that they
9  would say if they weren't?  Can you imagine what
10 they would have come in here and told us if it
11 weren't on tape?  Can you imagine the things that
12 these people would have said?

13        And why?  You heard testimony from people
14 like Krozel and Johnston, and Monk, and Harris, and
15 Scofield.  And every time they got up there on
16 direct examination they said they told the FBI
17 something different.  Why?

18        I was thinking about how I would try to bring
19 my points to you, I remembered this story, and it's
20 an old story my grandma on my father's side used to
21 tell us, and it was from the old country, she said
22 before she came to America she lived there for about
23 20 years and she knew this couple and there was a
24 big strong woman, very, very outgoing and very
25 boisterous, and a little husband, and, you know,

closing argument on behalf of Rod Blagojevich       6288

1  you've seen these pictures, a tie, they'd wear a
2  suit even if it was 200 degrees outside.  And that
3  strong woman and that man had to move because they
4  couldn't afford it anymore, they couldn't afford it,
5  and the only thing they had was this little mule and
6  a cart.  And so off they go with all their
7  belongings and she's got the reigns.  And as that
8  mule is going, it tripped on the cobblestone and the
9  first thing that woman said, "that's the one."

10        She keeps going and trucking and trucking and
11  trucking.  Sure enough, right when they get to the
12  center of town, that mule stumbles again and the
13  woman grabs those reigns and yanks them back and
14  says, "hey, that's the two."

15        She keeps going and finally gets to the
16  house, and right as they're pulling up to the house,
17  boom, it stumbles again, and the woman grabs those
18  reigns, takes them back, the mule stomps, she jumps
19  out and says, "hey, that's the three" and she pulls
20  out a pistol and shot the mule dead right there.

21        The husband watching this says to her, "what
22  are you doing?  That's stupid, that's stupid, we
23  have no mule, that's stupid."  The woman looks down
24  at the mule and at the gun and at her husband,
25  "that's the one" she tells him.

closing argument on behalf of Rod Blagojevich        6289

1        That's this case!  When they ripped this man
2    out of the Governor's mansion and take him out of
3    his home at 6:30 in the morning and on broad TV,
4    they knew it, that's the one.
5            MR. SCHAR:  Your Honor, totally
6    inappropriate.
7            THE COURT:  It's supposed to be an argument
8    in summing up and I think they're objecting because
9    it's beginning to look more like a show.  So that's
10    my advise, as opposed to my ruling.
11            MR. S. ADAM, JR.:  Yes, Your Honor.
12            And when they saw all these witnesses and
13    Robert Blagojevich, who came up here for 4 months to
14    help out his brother, they weren't banking on this.
15    That's the one, that's the one:  Krozel, and
16    Johnston, and Harris, you know who they were.
17    Krozel put it to us best when the feds come
18    a-knocking.  You get a terrified, man, I mean
19    terrified.  Think what that man had gone through.
20    He told you, the only thing he wants to do in life,
21    only thing in life for him is to wake up each and
22    every morning so he can dress his invalid wife who
23    has a disease with no name.  And at 6:30 on a cold
24    December night morning, they come a-knocking, and
25    they take him into his kitchen, and they sit him

closing argument on behalf of Rod Blagojevich        6290

1  down, and they make him give statements.

2         And what does he say?  What does he say when
3  he's terrified like that?  When you know that he
4  didn't have time to prep, he didn't have time to
5  hire a guy like me.  He's just sitting there, him
6  and them.  I never felt pressured, never.  The
7  Governor and I and never felt pressured.  And that
8  was the one.  And they talked to him again, and now
9  all of a sudden, what did he tell you?  I'm
10 terrified, I can't take care of my wife.  And so now
11 the biggest case, he comes in here and tells you
12 that what Rod Blagojevich said to him can you be
13 supportive, or words to that effect, that's a bribe,
14 or attempt to bribe, or extortion.

15        We are real people.  That's not an attempted
16 bribe, that's not an attempted extortion.  That's a
17 politician asking someone to, asking him.  Think
18 about this, ladies and gentlemen.  They want you to
19 quick him, him, of bribery and extortion because he
20 gave $1.8 billion to the industry.  They got it.
21 They're trying to tell you because he was somehow
22 holding back on a 5 billion dollar plan.  Who are we
23 kidding?

24        You heard John Harris, what did John Harris
25 tell us?  Luckily my dad brought it out on cross, we

closing argument on behalf of Rod Blagojevich        6291

1  thought we had to prove it, he said there were three
2  plans, the 7-billion-dollar plan needed total
3  legislative approval, but the 5 and a half
4  billion-dollar plan had to have legislative approval
5  for a lot of it.  Rod couldn't just go out and do
6  the 6 billion-dollar plan or 5.5 billion-dollar
7  plan, that's all made up now because he's scared to
8  death.  And who could blame him!
9          There is an instruction you're going to get.
10         And if I sweat on you, I'm sorry.
11         It's an instruction you're going to get.
12 Now, think about this.  This is what the instruction
13 says:  An elected official demanding or asking for,
14 directly or indirectly, for a campaign contribution
15 by itself, does not, does not constitute bribery
16 even if the person making the contribution has
17 business pending before the official.
18         What does that say?  That if I'm a
19 politician, I can take a contribution from you even
20 if you got business before me.  It's not crime.
21 It's not bribery.  It is legal.
22         So I ask you, ladies and gentlemen, I ask you
23 a simple question:  If Krozel had business with Rod
24 and Rod was asking him for a contribution, what's
25 the crime?

closing argument on behalf of Rod Blagojevich    6292

1      MR. SCHAR:  Objection.  If he would read the
2 whole instruction.
3      THE COURT:  You want to read the --
4      MR. S. ADAM, JR.:  That's what rebuttal is
5 for.
6      THE COURT:  What?
7      MR. S. ADAM, JR.:  That's what rebuttal is
8 for, Your Honor.
9      THE COURT:  I think if you're reading my
10 instruction, you should read the whole instruction.
11      MR. S. ADAM, JR.:  Fair enough.  Fair enough.
12      You saw yesterday what they put up and then
13 the facts changed.  Here we go:
14     "However, if a public official demands,
15      solicits, seeks, or asks for, directly or
16      indirectly, or agrees to accept money or
17      property believing that it would be in
18      exchange for a specific requested exercise
19      of his official power, he has committed
20      bribery even if the money or property is
21      to be given to the official in the form of
22      a campaign contribution."
23      I was going to get to it.
24      What does that say?  That says that a
25 government official can ask for a campaign

closing argument on behalf of Rod Blagojevich        6293

1  contribution if the guy has business with him.  What
2  makes it illegal is in exchange for a specific
3  request.  It has to be a specific request that is an
4  exchange for.
5        How is a government official supposed to do
6  it?  What is he supposed to say?  I know I can ask
7  this guy for money, the question is, how do I do it?
8  I want to make sure that it's not illegal when I do
9  it, how do I do it?  And the best way to do it is
10 what?  Do the official act first, then there can
11 never be an exchange for.  And that's --
12        MR. SCHAR:  Objection, Judge.
13        THE COURT:  That objection is sustained.
14        MR. S. ADAM, JR.:  What --
15        THE COURT:  That objection is sustained.
16        MR. S. ADAM, JR.:  Yes, Your Honor.
17        It wasn't in exchange for.  He promised the
18 1.8 billion and did it, so did the announcement, and
19 then asked, promised it, and then asked for a
20 contribution, how is that violative of this?  How
21 can it be one in exchange for another in that
22 situation?
23        And Krozel told it to you.  Now, look, I'll
24 give you another example of Krozel.  He stood here
25 and told you -- or sat here and told you he was

closing argument on behalf of Rod Blagojevich          6294

1  offended, he felt pressured, remember that?
2  Remember that?  Now, look, what did he tell you the
3  facts were?  He didn't come up there and give you
4  any conclusions.  How did this man show you that he
5  was pressured?  What did he tell you happened?
6          He went to the FOB and spoke with
7  Blagojevich.  He went there and had the conversation
8  that he told you, and that is supposedly when he
9  felt pressured, that's supposedly when:  Oh, my
10  goodness, I can't believe what the Governor is doing
11  to me.  And what did he do when he left?  He got on
12  the phone and called his boss and said:  Hey, you
13  got to meet this guy, this is the guy you should
14  meet and sit down and talk to.  Who are you kidding?
15          And then he and his bosses go to lunch and
16  don't discuss fundraising, and that's what they're
17  expecting you to convict him of?  Who are we
18  kidding?  We are adults.  That's not extortion, and
19  you know it.
20          An extortion is when you call the guy up and
21  say:  Hey, I can give you X, Y and Z --
22          MR. SCHAR:  (Standing up.)
23          (Brief pause)
24          MR. SCHAR:  Objection.
25          THE COURT:  The objection is sustained.

closing argument on behalf of Rod Blagojevich       6295

1          MR. S. ADAM, JR.:  I can --
2          Oh, okay.
3          I can -- you can look at the facts here.  You
4   can look at the facts here.  Take Magoon, if I'm
5   wrong, take Magoon.  What's more likely, let's put
6   it that way, what's more likely an extortion?
7   Magoon talks to the Governor on September 23rd, and
8   the Governor says:  I'll look into it, I'll do it;
9   and doesn't have anybody, anybody call him before
10  October 17th.  That's when you put the full corps
11  press on it.  That's when.  When Magoon has asked
12  you and you can do it.
13         And what did the Governor do?  The Governor
14  calls him back on October 17th for Children's, for a
15  rate increase to Children's Memorial and every other
16  hospital in the state, and says he'll do it.  He
17  never calls him in the between, never had anybody
18  contact him in between; nothing.  That's an
19  extortion, if he did it.  To simply have his brother
20  call him five days after he's given the rate
21  increase, is this instruction, and you'll have it
22  back there:  As long as you got business and it's
23  not one for the other.  It couldn't be one for the
24  other.  He did it before he asked, before he asked.
25         MR. SCHAR:  Objection.

closing argument on behalf of Rod Blagojevich        6296

1        THE COURT:  The premise under which you are
2   operating is that it is a matter of law the official
3   cannot do his act first in order for there to be an
4   exchange, and that is not the law.
5        MR. S. ADAM, JR.:  Yes, Your Honor.
6        May I proceed?
7        THE COURT:  Yes.
8        MR. S. ADAM, JR.:  You will get the law back
9   there.  The real truth is, you'll decide whether I'm
10  right or wrong.  You decide.  That's why --
11       MR. SCHAR:  Judge, objection.
12       THE COURT:  The objection is sustained.
13       I want to reiterate, you have, as I
14  instructed you in the beginning, the sole and
15  exclusive right to decide what the facts are, then
16  you have to reply the law that I give you to those
17  facts.  The law I give you is the law you must
18  follow, whether you agree with it or not, and that's
19  the process you will go through.  You will not
20  decide the law, you will decide the facts and you
21  apply the law to those facts.
22       In this particular case, I believe that
23  perhaps Mr. Adam made a simple misstatement.
24       MR. S. ADAM, JR.:  Yes, Your Honor.
25       May I proceed?

closing argument on behalf of Rod Blagojevich        6297

1        THE COURT:  Yes.

2        MR. S. ADAM, JR.:  As you know, His Honor is

3   100 percent right.  100 percent right.

4        You will apply the law to those facts and you

5   determine whether or not he was trying to bribe

6   Magoon.

7        And there again, think about Mr. Magoon.

8   Think about what he told you.  That this was at a

9   time in which he was trying to get a rate increase.

10  What did Greenlee tell you about that time?  That

11  there was a 2 billion dollar deficit and they were

12  making cuts.  There was a budgetary concern.  Magoon

13  told you when he met with Greenlee -- Well, strike

14  that.  He didn't.  Greenlee told you when he met

15  with Magoon he told Magoon that there were budgetary

16  concerns.  Think about the call.  What did he say to

17  Greenlee?  "We can hold this up, right?"  Budgetary

18  concerns.  They act as if this was made out of whole

19  cloth, that it came from nowhere.  The man's cutting

20  $2 billion, and then they said, they're trying to

21  make this whole big thing because he says to Magoon:

22  Please don't tell anybody before January 1st,

23  please.  And I told you what's in that statement,

24  he's cutting $2 billion.  Everyone is going to come

25  to him when they think he's giving it out.  Who are

closing argument on behalf of Rod Blagojevich       6298

1  we kidding here?  That isn't extortion.  That is a
2  politician who did something that he should have
3  done, quite frankly, is give the rate increase and
4  then asked for a contribution after it was already
5  given.

6         Now, I ask you here, you've heard all this
7  talk, all this talk that the rate increase got held
8  up, that it actually got held up, and that's part of
9  this whole thing; right?  What evidence do you have
10 of that?  Think about it.  And he stood up here
11 yesterday and put up here all these things.  Did
12 they show you one document, one document, that the
13 rate increase got held up?

14        What did Greenlee tell you?  Greenlee told
15 you that after that, he took it as an order because
16 there was a question mark at the end.  That was some
17 kind of order and he called somebody named Barry
18 Maram.  Remember Greenlee told you that.  That there
19 was a phone call between Greenlee and Barry Maram.
20 You heard from Greenlee.  What evidence do you have
21 it ever got held up?  But I'll tell you this,
22 there's been no evidence, it didn't get held up.
23 And you know what that evidence was?  The best there
24 could be:  Magoon.  When was it supposed to go out?
25 When was the rate increase supposed to go out?

:42AM
:42AM
:43AM
:43AM
:43AM

closing argument on behalf of Rod Blagojevich     6299

1   January of '09.  When did he get the money --
2        MR. SCHAR:  Judge, that is a misstatement of
3   the facts.
4        THE COURT:  It is a misstatement.  I remember
5   the testimony quite well.
6        MR. S. ADAM, JR.:  May we have a moment, Your
7   Honor?  We have a transcript.
8        THE COURT:  Absolutely.
9      (Brief pause).
10       THE COURT:  You know what you could do is,
11  you could move on to something else and then come
12  back to this.  You are reserving your right to come
13  back to this.
14       MR. S. ADAM, JR.:  Will do, Your Honor.
15  Thank you, Your Honor.
16       THE COURT:  Sure.
17       MR. S. ADAM, JR.:  I left something out,
18  Monk.  That's it, Monk.  In opening statement, I
19  told you about Monk.  And it all got proved in their
20  case!  All of it!  Told you that they were best
21  friends, told you that they went to law school
22  together.  I told you that he became a lawyer, told
23  you he was a volleyball guy, or whatever they do.  I
24  told you that.  I told you that for the reason why
25  Monk got put into his place is because of his trust

closing argument on behalf of Rod Blagojevich      6300

1  for him.  And Monk even told you that, sitting right
2  there, that they went to Colorado, remember that?  I
3  was the one who did the cross.  They went to
4  Colorado and they had the families together, and Rod
5  said to Monk there, "I trust you," or words to that
6  effect, and he got in.  And that was the gatekeeper.
7        And think about all of the evidence in this
8  case when it comes to the very first part of the
9  2003, 2004, 2005, every witness that came in here
10  told you, Monk.  Jill Hayden told you of the boards
11  and commissions, she worked with Monk, Monk.  When
12  it came to state contracts, Monk.  Even Monk told
13  you that he and John Filan -- remember the POB deal?
14  John Filan was the one who worked on it, Monk.
15  That's what happened here, he never knew that Monk
16  was taking cash.  He got corrupted and that's how
17  we're here now.
18        Think about it, think about who you saw in
19  this case and that will prove my point better than
20  anyone.  Think about Bob Greenlee, think about
21  Scofield, think about even John Harris when it comes
22  to:  Oh, I was the prince of darkness but I couldn't
23  take that anymore.  Think about the people that you
24  saw.  Think about Tusk.
25        Look, you saw Bradley Tusk come in here.  You

:45AM

:45AM

:46AM

:46AM

:46AM

closing argument on behalf of Rod Blagojevich        6301

1  know, he's a bright guy.  Come on!  Would you hang
2  out with that guy?  Give me a break.  No, no way.
3  And think about Monk and he's got -- I'm sorry, Gov,
4  but you got absolute horrible judgment on people,
5  except for his new lawyers.  He's got absolute
6  horrible judgment on people.  And that's this case.
7  And they want you to find him guilty of these
8  horrible things because of that.
9          MR. SCHAR:  Objection.
10          MR. S. ADAM, JR.:  Well, strike it from the
11  record, if you will, Your Honor.
12          THE COURT:  It's stricken.
13          MR. S. ADAM, JR.:  And if I'm wrong, you
14  decide what the facts are here; you decide.  You
15  decide that.
16          Look, at the Chicago Academy.  This is nuts!
17  The Chicago Academy is one of those areas that
18  shows, that shows he did it right.  He did it right.
19  Think about what the facts are here.
20          The facts are here that Rahm Emanuel asked
21  him to give a grant to what he said he would, which
22  they got.  Now, there are some things in the middle
23  here and let's talk about them.  I'm not running way
24  from them, let's talk about them.  Bradley Tusk --
25  thanks goodness Shelly did it, because Shelly

closing argument on behalf of Rod Blagojevich      6302

1  brought it right out.  Remember Shelly did the cross

2  right here, had a polka dotted tie, all the way

3  basically to his knee, remember that?  And he asked

4  him, he says:  You called him in the late night?  He

5  said yeah, I called him in late night.  And the

6  whole thing was in one conversation?  Yeah, it was

7  in one conversation.  And what did he say?  He says:

8  I told him that Rahm Emanuel keeps calling, and Rod

9  says, he's tried calling him about a damn

10 fundraiser, you handle it.

11         MR. SCHAR:  That was not the evidence.

12         THE COURT:  The jury can decide what the

13 evidence is.

14         MR. S. ADAM, JR.:  You remember the evidence

15 and what happened and I'll break it down to you as

16 they say in street language, till it broke no more.

17 I'll break it down.

18         What happened?  Bradley Tusk said he called

19 Bill Quinlan.  And who is Bill Quinlan?  The ethics

20 officer for the Governor.  His lawyer.

21         MR. SCHAR:  Objection, Judge.

22         MR. S. ADAM, JR.:  It was evidence.  That was

23 evidence.

24         THE COURT:  I actually think that the guy

25 from the ethics office gave a different name for who

closing argument on behalf of Rod Blagojevich      6303

1  is the ethics officer.

2        MR. S. ADAM, JR.:  No, he the did not, Your

3  Honor.  He specifically said.  It was Bob Greenlee

4  who came in here and said a different name.  I was

5  the one who did the cross.

6        MR. SCHAR:  No.

7        THE COURT:  You can look up that transcript

8  too and bring it up again later.

9        MR. S. ADAM, JR.:  Thank you, Your Honor.

10        Remember the old saying, you're entitled to.

11  Your opinion, you ain't entitled to your own facts.

12        And what happened?  Bob Tusk said he went to

13  Bill Quinlan, the lawyer.  And what do we have after

14  that?  Oh, oh, you think -- fair enough, let's make

15  sure it's handled right.  Harris, when the bills

16  come in, you pay them, when the bills come in, pay

17  them immediately.

18        And you know how it happened?  They're the

19  ones who showed it up here, the darn football field

20  that got made.  And what fundraiser did he have?

21  None.  Think about it this way:  The whole evidence

22  here is supposedly that he was shaking down Rahm

23  Emanuel or Rahm Emanuel's brother, right?  Right?

24  That's it.  Who is asking for a fundraiser?  Who?

25  If this is supposedly being held up for a fundraiser

closing argument on behalf of Rod Blagojevich        6304

1  way back in March or April, or something like that,
2  May, somewhere around there, they proved to you that
3  Rod supposedly knew everything about fundraising,
4  right?  He didn't know Rahm wasn't giving him the
5  money?

:50AM

6          And lastly, and let's say practicably, if
7  this a shakedown and Rod was going by Tusk, what do
8  we know that Tusk told us about his relationship
9  with the Governor after that?  He talked to him
10  every day after that for two months.  What Governor

:51AM

11  gets caught a shakedown by Bradley Tusk who works
12  for him and he continues to talk to him every day
13  and never mentions it?

14          You heard this man cuss like a sailor, you

:51AM

15  heard it, and he didn't cuss out Brad Tusk, he
16  didn't fire Brad Tusk, he didn't say, hey, why are
17  you telling on me for?  Give me a break!  Please!
18  That's almost as ridiculous as when Bob Greenlee
19  told you he's hiding in the bathroom from John

:51AM

20  Filan.  Hiding in the bathroom?  This is the
21  Governor, all you have to do is tell the secretary
22  don't let him in.  We all heard about Mary Stewart.
23  Come on!  A man hiding in the bathroom?  He could
24  have told Brad Tusk, what's wrong with you, don't

:52AM

25  tell on me like that.

1     Seriously, I'm not trying to belittle this,
2  much, but come on.  These are feds and this is what
3  they bring you?  Come on!
4     This is a total distortion and when it's
5  broken down, you finally see it.  Name one thing.
6  He never got a dime for it, not one fundraiser for.
7  And then they want to tell you he's a liar, then
8  they tell you he's a liar.  Just yesterday, they
9  tell you that from the stand they proved that he was
10  a liar because he supposedly lied to him,
11  Mr. Murphy, Agent Murphy.  You guys heard that.
12     And yesterday standing up here when he's
13  doing his PowerPoint and he starts talking about it,
14  really?  Oh!  And then it hits you when you remember
15  the facts, when you remember what Agent Murphy
16  testified to on the stand.  What did he testify to?
17  He testified that he and I think another agent and
18  some U.S. Attorneys went and saw Rod Blagojevich on
19  March 16th of 2005.  Why?  Why?  Remember?  Remember
20  I did the cross on him?  Remember why he went there?
21  He went there because of two reasons:  They were
22  investigating Tony Rezko for state contracts and
23  fundraising and they heard from Joe Cari who after
24  the fourth or fifth time of talking to the U.S.
25  Attorneys suddenly remembered that the Governor made

closing argument on behalf of Rod Blagojevich          6306

1   a statement on the plane:  Oh, yes, you can raise
2   money because you can do fake contracts and
3   fundraising.
4          That's why they went and saw him, because
5   there was a connection between state contracts and
6   fundraising.  That's what the questions were about,
7   state contracts and fundraising.  When they asked
8   him about that --
9          MR. SCHAR:  Objection.  Again, not the
10  evidence.  I object.
11         THE COURT:  The jury can recall what the
12  evidence was and if it recalls differently from that
13  just recited to them, you could disregard the
14  statement.
15         MR. S. ADAM, JR.:  Remember?  Not that it's
16  not unusual, but I was a little animated about it.
17  When you went and saw him, did you talk to him about
18  Joe Cari's statement?  No. Why would they do that?
19  Did you bring him one state contract?  Remember I
20  asked him all that?
21         And I ask you, how did he lie when he said
22  there was a firewall between politics and government
23  in connection with state contracts and fundraising?
24  When did he lie?  What did -- name me one thing they
25  brought in here and showed you there was that

closing argument on behalf of Rod Blagojevich      6307

1  connection.

2          MR. SCHAR:  Objection.

3          THE COURT:  I think you've misstated the

4  charge against him.  I will sustain the objection.

5          MR. S. ADAM, JR.:  You will get the

6  indictment back there.  You will remember the

7  testimony.  And I ask you:  Fine, they say it didn't

8  happen that way, I ask you, tell me one, or have

9  him, tell you one state contract connected to

10 fundraising.  Name one?

11         They have 75 lists of people who sat at a

12 banquette table and 75 FOB lists to show oh, this

13 person gave, this person gave.  Did they bring you

14 one showing you a state contract based on

15 fundraising?  Just one?  No.

16         What did we learn throughout this case?  He

17 did separate government and politics.  And what

18 evidence do you have on that:  Ali Ata, Lon Monk; I

19 believe Aramanda, if I'm wrong you can correct me.

20 What did they all say?  It was Tony Rezko and Chris

21 Kelly were gonna be in the Governor's Office and we

22 helped and be part of his advisers, what couldn't

23 they do?  They couldn't have state contracts.

24         You guys wrote notes.  You wrote notes.  When

25 you get back there, look at them.  He couldn't have

closing argument on behalf of Rod Blagojevich        6308

 1  government and state contracts.  And they haven't
 2  brought you one bit of evidence.
 3          Of course the man knew about fundraising.  Of
 4  course he did.  They're the ones who proved up
 5  $23 million in 2002, a record breaker.  They're the
 6  ones who proved up $27 million in 2006.  They're the
 7  ones who brought, thank goodness, all of the
 8  conversations, all of the conversations on the tape,
 9  think of one conversation where he said this guy is
10  getting a state contract, he's gonna give a
11  contribution.  None; not one.
12          In fact, when his older brother, Robert,
13  testified, what did they prove?  Seriously!  They
14  did this.  Remember Freveletti?  What was
15  Freveletti's complaint?  I gave this man a
16  contribution, I'm not getting state contracts.  Who
17  are we kidding here?  Somehow, some way they are
18  trying to make Robert say this is a problem.  He
19  wasn't getting state contracts.  Come on!  And they
20  want you to convict him of lying.  You saw when
21  Agent Murphy was up there, 18 page report they took
22  out two lines.
23          MR. SCHAR:  Objection, Judge.
24          THE COURT:  The objection is sustained.
25          MR. S. ADAM, JR.:  Well, you also saw there

closing argument on behalf of Rod Blagojevich        6309

1  were things not in the report that he testified
2  about.  Now, why is that if I'm wrong?
3          THE COURT:  It's about 15 minutes to break.
4          MR. S. ADAM, JR.:  This would be a good one
5  if you want to do it now, Your Honor.
6          THE COURT:  Sure.
7          THE MARSHAL:  All rise.
8       (The following proceedings were had out of
9        the presence of the jury in open court:)
10         THE COURT:  Please be seated in the
11  courtroom.
12         The two items on my agenda are the delay of
13  Children's Memorial Hospital and who the ethics
14  officer was.
15         MR. S. ADAM, JR.:  May I have other counsel
16  who were looking things up?
17         THE COURT:  You don't have to do it, other
18  counsel can.
19         MR. GOLDSTEIN:  Your Honor, Patrick Magoon
20  was asked in cross-examination, Page 275, by Mr.
21  Adam:
22      "And is it fair to say that the pediatric
23       rate increase did go through?
24      ".... yes, sir."
25         That was the last day of trial, but forgive

closing argument on behalf of Rod Blagojevich       6310

1  me if I forget the date.

2         As to the ethics officer --

3         THE COURT:  The issue, I think, is narrower.

4         MR. SCHAR:  Right.

5         THE COURT:  The issue is that according to

6  Greenlee and according to the Governor on tape, it

7  was supposed to go through on January 1, quite

8  specifically, January 1.  I believe Magoon testified

9  that it didn't go through on January 1, that's why I

10 sustained the objection.

11        MR. GOLDSTEIN:  Mr. Adam specifically said:

12    "How do we know the rate increase didn't go

13     through?"

14        He said it did go through, and we have

15 testimony specifically.  We have the government

16 coming in here --

17        THE COURT:  Wait.  Wait.  Wait.  January 1.

18 Did you like not hear me?

19        MR. GOLDSTEIN:  I heard you crystal clear.

20        THE COURT:  And Magoon's testimony unrebutted

21 by anyone is, it didn't go through January 1, it

22 went through later in January, that's my memory.

23        If you tell me that that memory is incorrect,

24 that's fine, but what we're talking about here and

25 it is material in this case is January 1.

closing argument on behalf of Rod Blagojevich       6311

1        And I believe that Mr. Adam in the course of
2   his argument was very careful to say "some time
3   sometime in January," and that was not the testimony
4   that we had, the testimony was January 1.

5        And one of the difficulties I'm having
6   listening to this argument is that Mr. Adam,
7   probably because there's a lot of detail in this
8   case, occasionally slides an answer into a slightly
9   different answer and then uses that.

10       So that objection is going to remain in
11  effect unless you show me that it went into effect
12  on January 1 and you have testimony to that effect.
13  It is possible in the course of this case that
14  somebody said that and testified to that and I don't
15  remember it, but I know Magoon said it didn't come
16  through January 1st.

17       MR. GOLDSTEIN:  Where the memory is the
18  problem is what Mr. Adam said.  He said they got the
19  rate increase.  He didn't say anything about
20  January 1.  The government is putting that into
21  context.  If they want to rebut him, they can rebut
22  him.  The government got up here yesterday --

23       THE COURT:  It was not a correct statement of
24  what the expectations were.  And the truth is is
25  that January 1 is the evidence that was heard, and

closing argument on behalf of Rod Blagojevich        6312

1  there was a lot of emphasizes on January 1, it was

2  part of Magoon's rationale, according to him, for

3  being concerned about whether the raise was

4  contingent on the contribution.

5        So January 1 is a big date in this case.

6  It's not just an idle thing where somebody says

7  well, the grant is going to come through January 7th

8  and what difference does it make it's January 6 or

9  January 9.  The January 1 date is important date,

10  and it's an important date for a variety of reasons,

11  many of which were identified by your client.

12        So the objection stays sustained until you

13  can show me transcript which establishes that the

14  rate increase came through January 1st.

15        MR. GOLDSTEIN:  Again, what I will say is

16  what Mr. Adam said, that is absolutely correct, they

17  objected saying that the facts were incorrect that

18  he was asserting.  They were wrong, he was saying

19  what was right.  Now, whether you think the issue is

20  January 1 or not, they said it was held up.  He was

21  denying that it was held up.

22        THE COURT:  His statement was misleading and

23  I sustained the objection and it doesn't do you a

24  lot of good to defend it.  It would be an easy thing

25  for Mr. Adam to say no, maybe it was January 1,

:02PM

:02PM

:02PM

:03PM

:03PM

1  maybe it was a little later, but he didn't say that

2  --

3          MR. GOLDSTEIN:  He didn't get a chance to say

4  it.

5          THE COURT:  No, it's --

6          MR. GOLDSTEIN:  They were doing their

7  PowerPoint yesterday --

8          THE COURT:  No, it's because he made a

9  misstatement and it doesn't do you good to defend

10  it.  There are lots of ways he could explain why

11  this might have happened, but the basic statement is

12  wrong.

13          Now, who is the ethics officer?

14          MR. GOLDSTEIN:  Bill Quinlan.  Bradley Tusk,

15  their witness:

16      "I called Bill Quinlan.

17      Bill --"

18      Also Bill Quinlan:

19      "-- at the time was general counsel and I

20       believe the chief ethics officer for the

21       governor's office."

22          THE COURT:  I remember that testimony, I just

23  remember different testimony from someone who was

24  considerably more authoritative.

25          MR. GOLDSTEIN:  If they want to rebut it,

:03PM

:03PM

:03PM

:03PM

:04PM

closing argument on behalf of Rod Blagojevich          6314

1  they can rebut it.  Bradley Tusk, the Deputy

2  Governor, said this.  Now they're disregarding

3  saying that --

4          THE COURT:  Wait.  Wait.  Stop.

5          Who said it?

6          MR. SCHAR:  Judge, Mr. Greenlee specifically

7  said who it was.  I believe the ethics officer who

8  came in initially testified he wasn't sure, then

9  Mr. Adam asked him well, do you think it was Bill

10  Quinlan, he said it might have been or he thought it

11  might have been.

12          THE COURT:  Right.

13          MR. SCHAR:  No one was sure.  The only person

14  who was authoritative on this issue is Mr. Greenlee

15  who said specifically who it was.  And, in fact,

16  he's right, it wasn't Bill Quinlan.  The fact of the

17  matter is, it was not Bill Quinlan.

18          MR. GOLDSTEIN:  What facts do you have that

19  show that?

20          MR. SCHAR:  Well, we can argue as officers of

21  the court or we can argue as facts in terms of --

22          MR. GOLDSTEIN:  We'll argue the facts that

23  were in evidence, the facts at trial.

24          MR. SCHAR:  The facts and evidence

25  demonstrate the only person who testified

closing argument on behalf of Rod Blagojevich       6315

1  authoritatively on who it was said it was not Bill

2  Quinlan.  The facts underlying the case, whether

3  they're before the jury or not, is that it was not

4  Bill Quinlan.

5       MR. GOLDSTEIN:  Bob Greenlee, a Deputy

6  Governor, Bradley Tusk, a Deputy Governor, their

7  witness, the ethics officer came in here and said, I

8  think it was Bill Quinlan; two to one.

9       THE COURT:  Your answer "think" and not know.

10      MR. GOLDSTEIN:  Well, Quinlan --

11      THE COURT:  And the other point about this

12  that I don't understand is, I don't understand what

13  difference it makes.

14      MR. GOLDSTEIN:  Because they objected.

15      THE COURT:  No, no --

16      MR. SOROSKY:  We agree with you that you

17  don't understand what difference it makes, why honor

18  their objection.

19      MR. GOLDSTEIN:  Why are they interrupting his

20  closing argument?

21      THE COURT:  Oh, for one very simple reason:

22  You make these little slips of fact, as he did with

23  January 1--and I believe it is a slip of fact and I

24  so hold--you may little slips like that and others

25  as well, that's not the only one, what happens is is

:05PM

:05PM

:05PM

:05PM

:05PM

1  you precipitate objections.
2        And the reason you precipitate objections is,
3  not necessarily because one particular statement
4  matters, but because if you don't stand up and
5  object, you may be faced with a lawyer who thinks he
6  has more leeway than he in fact does and we wind up
7  with an enormous pass over something.
8        I sustained the objections.  If you want to
9  go back over and raise the question of a bunch of
10 people saying they think Quinlan was the ethics
11 officer, that's really important to you, and I don't
12 think it is, go head, but that's why the objections
13 are being made.
14       And what I am urging upon the lawyer making
15 the closing argument is to be very precise.  And you
16 can be very precise without giving up the
17 whispering, the loud voice, and the hand gestures.
18 None of that is inconsistent with being precise
19 about it.  That's his style.  He's fine with it.
20 But precision is very important and it's
21 particularly important in this case.
22       And besides, if he makes little factual
23 mistakes, you're giving a tactical advantage to the
24 other side.  So why fight about it?  And everything
25 he can say, there are people on your side of the

:06PM
:06PM
:06PM
:07PM
:07PM

closing argument on behalf of Rod Blagojevich     6317

1  table who have these transcripts and have everything
2  and you can go over this stuff with him.  You can do
3  it right now to make sure he's absolutely correct.
4       I would like to avoid objections.  They
5  interfere with the flow of argument.  But you open
6  the door to the government, the government is going
7  to go through it periodically.  And I don't want to
8  tax the government too greatly because there were a
9  few other things that they could've objected to and
10 didn't.  But this is one of the problems when you
11 start getting that train rolling.
12      MR. GOLDSTEIN:  It's a train of objections,
13 Your Honor.  The argument is proper, it has been
14 precise.  What Tusk said, he said, what the facts
15 were with what Magoon said, he said.  He has been
16 precise.
17      THE COURT:  Why are we discussing this if you
18 just refuse to accept my ruling?
19      MR. GOLDSTEIN:  I just wish that they didn't
20 object --
21      MR. SOROSKY:  Your Honor, we accept your
22 ruling, but if we could just seize on the Tusk
23 objection.  I believe Bradley Tusk testified that he
24 went to Bill Quinlan because he believed Bill
25 Quinlan was the ethics officer.

1          THE COURT:  But I've already done that.  If
2     you want to make a big deal out of it, go ahead.
3          MR. SOROSKY:  No, I don't want to make a big
4     deal out of it --
5          THE COURT:  Even if it's a small deal, it's
6     okay.
7          MR. SOROSKY:  Well, with all due respect to
8     quote you, "big deal," the people who are making the
9     big deal about it is the government.  And it is
10    meaningless whether Bill Quinlan is the actual
11    ethics officer or some unknown named person is the
12    ethics officer.
13         THE COURT:  Which raises the question of why
14    he bothered to say it.
15         Listen carefully, because I have addressed
16    your precise problem, and the precise problem you
17    had is, in the momentum of this kind of closing
18    argument, people make misstatements, and when they
19    make a misstatement, or even something that the
20    government thinks is a misstatement and they have a
21    reasonable basis for believing it's a misstatement,
22    you are giving them an opportunity to stop the
23    freight train.
24         You don't want them to stop the freight
25    train.  One way to guarantee that this will not

closing argument on behalf of Rod Blagojevich        6319

1  happen is to make sure he speaks with precision

2  about the testimony and about the dates.

3        And what you're doing is you're standing up

4  here talking to me when you can go over the rest of

5  the closing, because he doesn't have much longer to

6  go, and make sure you're right on all of these

7  little details.  And then instead of "objection,

8  sustained" you are going to get "objection,

9  overruled" if you get any objections at all.  It's

10 best for you.

11        And this is all I have to say, and because

12 it's all I have to say at this point, that's all you

13 have to say.

14        Thank you.

15        MR. ETTINGER:  What time?

16        THE COURT:  We're going to try to get them

17 back here by a quarter to 1:00.  We may not be able

18 to do that, but that's what we're trying for.

19        THE CLERK:  All rise.

20

21

22     (Luncheon recess taken from 1210 o'clock

23      p.m. to 1:04 o'clock p.m.)

24

25

closing argument on behalf of Rod Blagojevich        6320

1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3  UNITED STATES OF AMERICA,       )
                                   )   No. 08 CR 888
4            Government,           )
                                   )
5  vs.                             )   Chicago, Illinois
                                   )
6  ROD BLAGOJEVICH,                )   July 27, 2010
   ROBERT BLAGOJEVICH,             )
7                                  )
             Defendants.           )   1:04 o'clock p.m.
8

9                         VOLUME 32
                   TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE JAMES B. ZAGEL
                       AND A JURY
11

12  For the Government:

13             THE HONORABLE PATRICK J. FITZGERALD,
               UNITED STATES ATTORNEY
14             BY:  Reid J. Schar
                    Carrie E. Hamilton
15                  Christopher Niewoehner
               Assistant United States Attorneys
16             219 South Dearborn Street
               Suite 500
17             Chicago, Illinois 60604

18

19

20  Court Reporter:

21             Blanca I. Lara, CSR, RPR
               219 South Dearborn Street
22                  Room 2504
               Chicago, Illinois 60604
23                  (312) 435-5895

24

25

closing argument on behalf of Rod Blagojevich    6321

1  APPEARANCES  (continued:)

2

For Defendant Rod Blagojevich:

3

          KAPLAN & SOROSKY
4         BY:  Sheldon M. Sorosky
          158 West Erie
5         Chicago, Illinois 60610
          (312) 640-1776
6
          LAW OFFICE OF SAMUEL E. ADAM
7         BY:  Samuel Forbes Adam
               Samuel Adams, Jr.
8         6133 South Ellis Avenue
          Suite 200
9         Chicago, Illinois 60637
          312-726-2326
10

11        OFFICES OF AARON B. GOLDSTEIN
          BY: Aaron Benjamin Goldstein
12        6133 South Ellis
          Chicago, Illinois 60637
13        (773) 752-6950

14        OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
15        2140 N. Lincoln Park West
          Suite 307
16        Chicago, Illinois 60614
          (773) 517-0622
17
          LAW OFFICES of MICHAEL GILLESPIE
18        BY:  MICHAEL GILLESPIE
          53 West Jackson Boulevard
19        Suite 1420
          Chicago, Illinois 60604
20        (312) 726-9015

21

22

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Robert Blagojevich:

4          ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
5               Cheryl Ann Schroeder
           12413 South Harlem
6          Suite 203
           Palos Hills, Illinois 60453
7          (708)598-1111

8
           Edelman, Combs, Latturner & Goodwin LLC
9          BY:  Robyn S. Molaro
           120 S. LaSalle
10         Suite 1800
           Chicago, Illinois 60603
11         (708) 598-1111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

closing argument on behalf of Rod Blagojevich        6323

1           THE MARSHAL:  All rise.
2        (The following proceedings were had in the
3         presence of the jury in open court:)
4           THE COURT:  Please be seated.
5           You may resume.
6           MR. S. ADAM, JR.:  Thank you, Your Honor.
7           Now, yesterday the prosecution stood up here
8    and told you lots of things that I said in my
9    opening statement such as "follow the money."  I
10   did.  And I still say it:  Follow the money.  But
11   don't follow it the way they told you to follow it.
12   Don't follow it halfway through, follow it all the
13   way to where the money goes.  Follow the whole
14   thing.
15          He stood up here yesterday and put up a big
16   thing on the board here about how money from the POB
17   deal went to Bear Stearns, and then to Kjellander,
18   and then to Aramanda, and then to Rezko, and then
19   over to 5 or 6 different people, and then back to
20   Rezko, and down to Kelly.  Remember that chart
21   yesterday?
22          And then he said what happened at the time.
23   They tried to put a timing on it.  Oh, they finally
24   got their money in October and that's when Patti
25   started working for Rezko was in October and so,

closing argument on behalf of Rod Blagojevich        6324

1  obviously, that's how they got their money from the
2  POB deal.
3          But I told you to follow the money all the
4  way.  What did you learn in this case when it came
5  to the money?  What did they prove to you which we
6  thought we would have to?  What did they bring from
7  this stand right here?  Aramanda borrowed money from
8  Kjellander and paid him back with interest.
9          Who are they kidding?  They showed you the
10 $624,500 check that was paid back.  Where did that
11 money come from?  Did you see anything where Patti
12 said, oh, by the way, since you're paying
13 Kjellander, let me give you some more?  Did you see
14 Rod Blagojevich saw some checks saying, hey, you're
15 paying Kjellander back, I know you gave me my
16 kickback, here you go?  Heck, no. That was a loan.
17 And who got them in here to say it was a loan?
18 Them.  Follow the money.
19          And when you did, and when they did, who did
20 they bring in here?  Think about this.  Think about
21 this.  They brought that IRS agent on here twice,
22 two times she came in here to testify.  Two times
23 she came in here and put up charts, and put up
24 things, and spent hours.
25          If you recall, because I know you will

closing argument on behalf of Rod Blagojevich       6325

1  remember this, and I counted, 52 minutes they spent
2  proving to you that he used his American Express
3  card for clothes.  They went through -- excuse me.
4  They went through his IRS statements, they went
:06PM  5  through his bank accounts, they went through his
6  credit card, they went through his Merrill asset,
7  and what did they show you?  It was a big deal,
8  remember?  All the way down, they showed you right
9  up there, $400,000 in 6 years on suits, they brought
:07PM  10  in his own children's payments for school they had
11  on the list there.
12          For what?  For what?  To show you he paid for
13  out of his own pocket?  Not that Tony Rezko went
14  over there and paid for his suits.  He didn't even
:07PM  15  take it out of the FOB.  He paid for them himself.
16          And you want to know what is more
17  reprehensible than anything, than anything?  The
18  number one expenditure that the IRS didn't tell you
19  about, is that he paid the IRS a half a million
:07PM  20  dollars.  He, the biggest expenditure, the corrupt
21  Governor, the crook, the guy that is trying to rob
22  the state paid more in taxes than anything.  Paid
23  more in federal--get this, they are the federal
24  government--he paid federal taxes back to them, he's
:08PM  25  paying for his own prosecution.  This is crazy.

closing argument on behalf of Rod Blagojevich        6326

1       And they come in here and try to tell you:
2  Oh, because he had a statement, oh, on the tapes,
3  remember this?  This is how they did this, this is
4  how it worked, remember this?  Where they played a
5  tape where he says, "I can't afford my kid's college
6  tuition" and then, bam, they go into the suits?
7  Why?  You know why.  When you get the indictment
8  back, see if there's one thing on there that he owes
9  Macy's some money, see if he's indicted for that.
10      Do you know why he spent $400,000 on suits in
11 6 years?  Because he's a politician.  As you have
12 heard, a CEO for the State of Illinois.
13      And they showed you, they brought it in here,
14 he's on the front page of the paper every day.  They
15 have media every day.  You gotta look the part.
16 Look, we are adults.  That's the thing here.  I'm
17 not hiding from that.  We are adults.  I didn't make
18 up the system.  But, look, let's face it, people
19 today get elected for 30-second sound bytes, that's
20 how it is.  You gotta look at the man and say, okay,
21 I see him and I'm vottin' for him, that's how it is.
22 If I'm wrong on that, why did Sarah Palin spend
23 $150,000 on her wardrobe and now she's getting
24 150,000 grand a speech if I'm wrong on that.
25      This man spent that money on clothes.  And

closing argument on behalf of Rod Blagojevich      6327

1  I'll prove it to you, I'll prove it to you right
2  now.  Take everything you heard in this case and
3  throw it out, just for a second, clear your mind,
4  throw every vulgar words you heard, every tape you
5  heard and throw it out, you got 30 seconds to make a
6  decision, 30 seconds.  Now, look, there he is, here
7  he is --
8          MR. SCHAR:  Judge, objection.
9          THE COURT:  Why don't you try it a different
10 way.
11         MR. S. ADAM, JR.:  Yes, Your Honor.
12         A different way.  Well, suppose you had to
13 vote for him, let's put it that way, and you got
14 30 seconds to decide --
15         MR. SCHAR:  Again, objection.
16         THE COURT:  The objection is sustained.
17         I don't think it's really a good analogy to
18 this case.
19         MR. S. ADAM, JR.:  Fair enough, Your Honor.
20 Fair enough.  I'll move on.
21         They spent 52 minutes explaining to you about
22 suits.  When Mr. Schar gets up here, then maybe
23 you'll think about why.  It's not what I said.  Make
24 Mr. Schar come up here and tell you why they went
25 through his personal stuff like that and he ain't

:09PM

:09PM

:10PM

:10PM

:10PM

closing argument on behalf of Rod Blagojevich        6328

1  charged with any of it.  You make them tell you why
2  on national, all over the darn country, they're
3  putting on about him $400,000 on suits, and you know
4  it, and it's not to prejudice --

5         MR. SCHAR:  Objection.

6         THE COURT:  The jury can make that
7  determination, the effectiveness of that particular
8  phrase.

9         MR. S. ADAM, JR.:  Follow the money.  If this
10  man is corrupt, how do you do it?  You know how you
11  do it?  You simply have a guy who's a tailor and you
12  pay him in cash.  Not one thing like that.  Not one
13  time do you have any of that.

14         And you know they're witness, Monk, took it,
15  their witness took cash.  All you do is call up
16  Chris Kelly and say, hey, the tailor over there is
17  giving a bill, take care of it.  Not one.  He paid
18  $400,000 out of his own pocket and they say he's
19  corrupt, at the same time he's doing it so he can be
20  Governor, he's broke, man; broke!

21         When I say broke, you saw it.  They proved it
22  up.  We thought we were gonna have to.  When I say
23  broke, I mean broke.  You saw that he owes more
24  money every other year than he's bringing in, by
25  hundreds of thousands.  All you do if you're

1  corrupt, tell somebody to pay this bill.  Pay it,
2  man.
3          And the state contracts, they give you all
4  this stuff about Chris Kelly.  You know what you do
5  with Chris Kelly, you know if you are a corrupt
6  Governor what you do with Chris Kelly?  He's a
7  roofer, right?  Chris, you're not in my cabinet, go
8  down and redo the Capitol's roof, that's a
9  10-million-dollar thing, just give me mine.  Nothing
10  like that.  Not one thing.
11          And how can you convict this manner of
12  bribery and extortion and he didn't do any of that
13  or come close to any of that?  And when you hear the
14  tapes, he's all over the tape saying:  I won't do
15  that, take the Johnstons.
16          Why didn't he sign that bill?  You heard it.
17  They're going to come in here and try to tell you he
18  didn't sign the bill because he was holding it up to
19  get a contribution.  Give me a break!  He's in there
20  with Lon Monk.  You heard my cross on Monk and I
21  brought it straight out.  They were trying to make
22  Johnston not think it was one for the other so he
23  could get $9,000 a day, a multi-millionaire, so he
24  could get $9,000.  You know what happened with the
25  Johnstons?  Again, movie reel, let's talk.  Johnston

:12PM
:12PM
:12PM
:12PM
:13PM

closing argument on behalf of Rod Blagojevich        6330

1  didn't want to pay 100 grand, didn't want to do it,
2  and he says, as long as I string this guy along and
3  he signs the bill, I ain't gotta pay.  Now, that's
4  true, and that's what happened, and you know it.
5          And that's why all the time, what's he doing?
6  What happening with Monk?  What did Monk tell you
7  about the Johnstons when it came to the Governor?
8  What happened?  He said:  We all agree there's got
9  to be separation and it can't look that way, it
10 can't look like it's one for the other, oh, there'll
11 be press articles about it, I'll have the feds on
12 me, it can't be one for the other.
13         So "Johnstons is coming in today."  How many
14 times did you hear that on the tape?  It's coming in
15 today.  You know, you know.  Look, if Johnston pays
16 it and he signs the bill in the same day, what would
17 they be up here saying?  See, it's one for the
18 other.  But now because he didn't sign the bill for
19 an assignment and didn't get the money, now they're
20 changing it.  Come on!  That man wasn't extorting
21 anybody.  He wasn't bribing anybody.  He wasn't
22 intending to bribe or extort anybody.  They got the
23 bill signed and he got nothing.  And that's their
24 case?  Who are we kidding!  That man right now as we
25 sit, because they proved it up, that man is getting

closing argument on behalf of Rod Blagojevich          6331

1  9 grand a day.  You know what you can do with 9
2  grand a day?  That's what that man did, and they're
3  charging him with extorting him and he paid not a
4  dime.

:14PM 5          Now, I know I'm all over the place, I know.
6  I talk on one thing and I move to another.  I -- I
7  don't think like normal people.  Sorry.  I'm all
8  over the place.  But there is one thing I do want to
9  talk to you about that should've been around when I
:14PM 10  was talking about HHS and the 501(c)(4), an issue
11  that will go right to you:  This man never intended
12  to extort or bribe anybody in the Obama
13  administration.  That he was advised these things
14  are legal, that he was told by his lawyers and
:15PM 15  advisers you can do these things.

16          Change to Win, remember Change to Win?  Whose
17  idea was that?  Who came up with that?  That's what
18  the SEIU had this program in which you had this
19  Change to Win and Valerie Jarrett was the person in
:15PM 20  the Senate Seat, that then Change to Win could end
21  up doing healthcare and doing things for kids out
22  there, whose idea was this?  Who's talking about
23  that?  Who's getting him these things he can do and
24  telling him it's okay?  Telling him it's legitimate?
:15PM 25  Telling him it's legal?  John Harris.

1      MR. SCHAR:  Objection, judge.  There is no
2  evidence of that.
3      THE COURT:  The objection is sustained.
4      MR. S. ADAM, JR.:  Who came up with the idea?
5  John Harris.  Look at your memory.  John Harris said
6  that it was my idea, he tells them that.  Tells him
7  it's okay.  Remember, they got to prove he intended
8  to bribe somebody here.
9      And everybody is telling him this.  And I'll
10  tell you this, if I'm wrong on that, tell me one
11  time someone objected?  One time?  Tell me one
12  person that objected?  Tell me one piece of evidence
13  that came in here when he said, no, on such and such
14  a date Quinlan said "no, it's illegal," or on such
15  and such a date, "Governor, that's illegal, you
16  can't do that"?  Tell me one time?  Just one time.
17  Have them play one tape.  You had about 5500
18  conversations and not one did they play for you
19  where they say, "you can't do this Governor"?  It's
20  the exact opposite.  This man had no idea that you
21  couldn't do it because everybody told him he could,
22  and not only could, should, and not only should --
23      MR. SCHAR:  Objection.
24      THE COURT:  You've gone below that everybody
25  told him.  You must realize that that cannot

closing argument on behalf of Rod Blagojevich     6333

1  possibly be true.

2          MR. S. ADAM, JR.:  I apologize, Your Honor.

3          If you thought I meant everyone in the world,

4  then I apologize.  I'm sorry.  What I meant was

5  Harris, Scofield, Yang, those; I apologize.

6          Telling him what you do when you see Obama

7  administration, when you talk to them, make it

8  reasonable.  That's Harris, and if I'm wrong,

9  Elliot, play Tab 22.

10     (Tape played).

11         MR. S. ADAM, JR.:  That's Harris telling him

12 that.

13         Harris is telling him this is a negotiation.

14 Play 13.

15     (Tape played).

16         MR. S. ADAM, JR.:  That's his lawyer, special

17 counsel, special counsel on at least one occasion.

18         MR. SCHAR:  Objection.

19         THE COURT:  Counsel, I do not recall

20 testimony from Mr. Harris, and maybe you can remind

21 me, that he was serving as his lawyer.

22         MR. S. ADAM, JR.:  In fact, he was on

23 cross-examination by my father who brought out that

24 he was a special counsel when it came to an appeal

25 they had done.

closing argument on behalf of Rod Blagojevich      6334

1     THE COURT:  No, I'm talking about in this

2 case, in the situation that is before him now.  And

3 I don't recall testimony, if you're telling me there

4 is testimony that at the time they were discussing

5 this Harris was acting as a lawyer, then I

6 apologize, but I don't remember any such testimony.

7          MR. S. ADAM, JR.:  I'll rephrase, Your Honor.

8          John Harris was a lawyer who was his Chief of

9 Staff at the time who had previously been, at least

10 on one occasion, a lawyer for him.  We're going to

11 put it in those narrow confines.  And you just heard

12 it, you just heard him tell him all these things,

13 how to do it, that you can do.

14          Now, they're going to try to come over here

15 and tell you that's a conspiracy.  It's only a

16 conspiracy if you are intending to commit a crime.

17 How can you -- seriously, look, how is it you really

18 are intending to commit a crime and --

19          MR. SCHAR:  Objection, Judge, to instructing.

20          THE COURT:  You are edging into instructing

21 the jury on law.  In fact, actually you're not

22 edging into, I understand why you are attempting to

23 do so, but don't.

24          MR. S. ADAM, JR.:  Yes, Your Honor.

25          How is this bribing the President of the

closing argument on behalf of Rod Blagojevich     6335

1   United States?  Come on!
2        Now, I've been over there.  I'm not going to
3   continue to go over the same area here, but come on!
4        What personifies it more than anything is the
5   Tribune count or the Tribune part of the case.
6        They're telling you to convict him trying to
7   do something inappropriate with the Tribune.
8        MR. SCHAR:  Objection.
9        THE COURT:  It's really best if you just talk
10  about what the evidence is and not talk about the
11  prosecutors.
12       MR. S. ADAM, JR.:  Yes, Your Honor.
13       You will have an indictment and in that
14  indictment you will see that he's charged with
15  actions concerning the Tribune.  It'll be in the
16  indictment.
17       What's the Tribune count?  That he and John
18  Harris had a conversation or a couple of
19  conversations in which the Tribune were writing
20  editorials saying that he needs to be impeached.
21  And impeached for what?  For going around the
22  legislature and Mike Madigan.  We heard all about
23  that in these two months here, for going around
24  them.  And you found out -- and when John Harris was
25  up there, you found out what JCAR was and how JCAR

closing argument on behalf of Rod Blagojevich     6336

1  was involved in this, and they were doing things to
2  get healthcare, they were around the legislature and
3  the Governor was just doing this.  Now, what was the
4  Tribune asking him to do?  Go around the legislature
5  to give them, at a minimum, 150-thousand-dollar tax
6  advantage, at a minimum.  That's what the Tribune
7  was doing.  They were printing articles saying the
8  Governor should be impeached for going around the
9  legislature, and at the same time saying Gov, go
10  around the legislature to give us our money.
11       Now, that's the count.  And he kept saying,
12  and you'll listen to the tape, and when Mr. Schar
13  gets up here, make him play you one tape where he
14  says, "I'm not going to give them their money, I'm
15  not going to do it."
16       The entire time he's saying I'm gonna give
17  them the money, just give me some editorial support,
18  get that editorial board to say I don't need to be
19  impeached for doing what you're asking me to do.
20  Who are we kidding?
21       And the indictment is charging him with this?
22  Come on!  That this is some kind of extortion?  He
23  didn't get any editorial support, the man is
24  impeached.  Come on!  This is supposed to be a
25  federal case.  Come on!

closing argument on behalf of Rod Blagojevich      6337

1      All he said the entire time, the entire time
2  is:  I want to do this; if they keep writing these
3  things saying I should be impeached for doing it, I
4  can't do it.  That's all that was said.
5      And if I'm wrong, and if I'm wrong, then have
6  Mr. Schar come up here and explain that one fact.
7  If I'm wrong that he wasn't trying to simply give
8  them their money, to do the deal, make it happen.
9  Why did they prove up what we thought we would have
10 to, that the entire time this is going on, he's
11 trying to figure out a way to get the Cubs
12 15 million extra dollars through science and
13 technology.  Remember they were up here talking
14 about that?  That there was an extra $15 million
15 that the Sox had gotten and he wanted to make sure
16 the Cubs, who he loved, would get it at the exact
17 same time.  Come on!  That shows you he wasn't
18 trying to extort the Tribune.  And evidence did you
19 have that anybody at the Tribune was extorted?
20      MR. SCHAR:  Objection.
21      THE COURT:  The objection is sustained to the
22 last sentence.
23      MR. S. ADAM, JR.:  This is a man who we have
24 found for two months is silly without a doubt,
25 without a doubt.  I mean, come on here.  I would be

1  up here lying to you if I didn't tell you that.  I
2  mean, you have a tape about a man talking about
3  running for ambassadorship to India.  The man gave
4  serious consideration, and as much as I like him, as
5  much as his wife loves him, he's talking about
6  appointing Oprah Winfrey!  You know, these are ideas
7  but no one is going to say that's the sharpest knife
8  in the drawer, right?  But he's not corrupt.  He
9  didn't take a dime.

10       Think about their very first witness they
11  called.  I got cash from Rezko and tried to give him
12  some and he wouldn't take it.  Think about the
13  importance of what Monk said:  I never even went to
14  him because I knew he wouldn't.  That's a powerful
15  statement.  That's a thing, I can't even ask this
16  man to be corrupt.

17       When you go back to that jury room, think
18  about it.  Think about Patti.  They have said here
19  in closing arguments about Patti Blagojevich, they
20  proved to you she worked.  You remember the big
21  muscle-bound guy, Mike, ah -- the good looking guy,
22  Mike --

23       Winter, right?

24       MR. GOLDSTEIN:  Winter.

25       MR. S. ADAM, JR.:  Mike Winter.  He told you

closing argument on behalf of Rod Blagojevich          6339

1  that he was mad that she got a contract because
2  Rezko kept asking him to do something with her.  He
3  was the one, he came in here and told you, yeah,
4  Patti came in here and I had to take her to a
5  meeting, Patti came in and brought Rezko a building
6  when Rezmar is trying to move.
7          The accountant, remember the account, Rob
8  Williams came in here:  Yeah, Patti came in and she
9  talked to Rezko and they would do things.  What did
10 they bring as the very last witness in our case?
11 The contract.  Here it is, the contract.  Right
12 here.  Here is the contract.
13          Remember, Aaron cross-examined the agent
14 about it?  And who did they bring out was on the
15 very back page of the contract -- or not the very
16 back page.  You'll have this back there, I believe.
17 On page 7, Brian Hynes.  That was brought out.
18 Brian Hynes, right here on this contract.  Who was
19 the purchaser for 1101 West Lake?  Brian Hynes.  Who
20 was the real estate agent on the contract?  Patti.
21 If Patti was the real estate agent and Brian Hynes
22 wrote the contract for Rezmar and River Realty, he
23 knew she was working.  He knew she was --
24          MR. SCHAR:  Objection.
25          MR. S. ADAM, JR.:  Well, what evidence do you

closing argument on behalf of Rod Blagojevich      6340

 1  have he didn't know?
 2       MR. SCHAR:  Objection.
 3       THE COURT:  I'm sustaining the objection.
 4       MR. S. ADAM, JR.:  Remember the contract
 5  itself?  Remember they brought in Sean Conlon?
 6  Think about it, just think about this:  Brian Hynes
 7  is on the River Realty contract, Brian Hynes is the
 8  one that is buying 1101, Brian Hynes is the one
 9  that's here on the contract itself.  Who is the
10  person that came in here and testified?  Sean
11  Conlon.  Sean Conlon told you he didn't write the
12  contract and Sean Conlon told you he didn't go to
13  the closing, yet what do we know?  The check was cut
14  to her for $40,000 that had to be returned.
15       MR. SCHAR:  Objection, Judge.
16       MR. S. ADAM, JR.:  That is exactly right.
17       THE COURT:  The objection is sustained.
18       MR. S. ADAM, JR.:  You remember, you remember
19  that the check had to be returned --
20       MR. SCHAR:  Objection.
21       THE COURT:  Look, they'll remember what
22  they'll remember, and if turns out that you're right
23  about this, then they'll accept your argument.  If
24  you're wrong, then they'll disregard it.
25       MR. S. ADAM, JR.:  They can't accept it if I

closing argument on behalf of Rod Blagojevich       6341

1  don't make it.

2        THE COURT:  No, you already made it.

3        MR. S. ADAM, JR.:  Yes, Your Honor.

4        You will remember that Rezmar wrote her about

5  a $40,000 check for the work.  And everybody seems

6  to -- strike that.

7        There seems to be this idea that that's some

8  kind of kickback.  Kickback for what?  The POB money

9  got paid back.  What's the kickback for?  It's some

10 idea here!  You understand it?  Maybe I'm the one

11 that's nuts here.  Kickbacks for work is called a

12 job, man!  A job!  That's what kickback for work

13 are.  And we proved up she was working.

14       And if I'm wrong on that, if I'm wrong on it,

15 the person who came here to testify about the

16 contract was Sean Conlon, right?  Remember I stood

17 right next to him, remember all that?  He said that

18 all he did was fill in her name and fill in some

19 other stuff, and then we brought out on the

20 contract, right here.

21    (Brief pause).

22       MR. S. ADAM, JR.:  There we go.  You see

23 that?

24       For the purposes of this, you don't need to

25 see the writing, you'll have it in back, but for the

closing argument on behalf of Rod Blagojevich        6342

1  purposes of this, remember all this handwriting on
2  the side here, and then when you turn the page all
3  through here, and they brought out there were
4  parking spaces.  What did Sean Conlon tell you?  He
5  didn't do it.  He didn't put that on there.  But
6  Patti Blagojevich is right here on the contract,
7  right here, "Patti Blagojevich River Realty."
8          You know who wrote that on there, just like I
9  do.  You know who did the work on that contract,
10 just like I do.  He told him that Tim Sullivan was
11 his partner.  It was his partner.  He said that is
12 not Tim Sullivan's handwriting.  It's Patti's.
13         MR. SCHAR:  Judge, objection.
14         THE COURT:  The objection is sustained.
15         It's really not a good thing to say,
16 particularly to a jury, "you know as I know" because
17 you're not a witness, you're not sworn, and what you
18 know personally doesn't matter.
19         MR. S. ADAM, JR.:  Yes, Your Honor.  Yes,
20 Your Honor.
21         You know what I know doesn't matter, okay.
22         The last thing.  I know it's hot.  I'm
23 sweating like crazy, I know.  And it's getting late.
24         Something here needs to be said about this
25 idea that Rod Blagojevich was cutting up the state

:31PM

:31PM

:32PM

:32PM

:32PM

closing argument on behalf of Rod Blagojevich        6343

1    with Tony Rezko, and Monk, and Kelly.  That was
2    about as sad in his life as it's ever been.  This is
3    a man who said for the first time in his adult life
4    he was committing crimes other than something in
5    bead or something in college.
6           And he says that on two occasions he and the
7    Governor and Rezko sat down one time in Rezmar and
8    one time out in California and Rezko was so involved
9    in it and he remembers this is the first time in his
10   adult life committing crimes writing stuff up on the
11   chalkboard, remember that?  And he couldn't tell you
12   one deal, not one deal that was up there.
13          He even, with all due respect, tried to lie
14   to you until he got caught on cross-examination.  He
15   tried to tell you that one of the deals that may
16   have been up there was the POB deal.  Remember that?
17          But what did he tell you in the first meeting
18   he had?  Late August of 2003.  The POB deal went out
19   in June.  It couldn't have been up there.  It
20   couldn't have been.  He was making it up.  Making it
21   up.  And why, you want to honestly know why?  Think
22   of this when you go back there, think of how this
23   looks:  What did John Harris tell us he was trying
24   to get out of any conspiracy or any bribe or
25   anything?  What did he tell us?  Nothing.  He wasn't

closing argument on behalf of Rod Blagojevich        6344

1  to make a dime, he wasn't to get a job, he wasn't to

2  get a suit.  Nothing.  And then they're going to

3  recommend 3 years.

4        What did Monk tell you?  He took cash, he

5  tried to set up the state, committed criminal acts,

6  lied to the FBI, all because he comes in here and

7  say that, 24 months.  How does that man get less

8  time than Harris?

9        MR. SCHAR:  Judge, objection.

10        THE COURT:  It's an inappropriate argument.

11 The jury is instructed to disregard it.

12        MR. S. ADAM, JR.:  You know the time --

13        MR. SCHAR:  Objection, Judge.

14        THE COURT:  It's an inappropriate subject and

15 it has to be disregarded.  Don't pursue it any

16 longer.  It's not an appropriate subject to be

17 considered by the jury.

18        MR. S. ADAM, JR.:  Ladies and gentlemen, I'm

19 going to move on.

20        There may be some things I've forgotten.  I'm

21 sure there are.  As you know, I don't have notes or

22 PowerPoints and all that stuff.  So if there is

23 something I forgot, when you go back there, when you

24 argue, when you deliberate, just take some time to

25 say:  Now, what would Sam say about this?  What

closing argument on behalf of Rod Blagojevich      6345

1 would Sam say about this?  Because that's how you
2 got to fairly trash out the issues.  I know in this
3 case I told you I'd be back up here two months ago
4 asking you, find this man not guilty.  Find him not
5 guilty.  This is serious business, serious stuff,
6 and he never intended on bribing, he never intended
7 on extorting, he took an oath of office.
8          And I can't tell you what this case is about
9 any better than the one thing on tape that he said.
10    (Tape played).
11          MR. S. ADAM, JR.:  That's the tape, ladies
12 and gentlemen.  This is the man.  He is an innocent
13 man.  I beg you.  I won't have another chance to
14 talk to you.  Mr. Schar is going to have the last
15 word.  Send that man home.
16          I sincerely thank you for this entire two
17 months and for this day.  Thank you.
18          THE COURT:  We'll take a break.
19          THE MARSHAL:  All rise.
20     (The following proceedings were had out of
21      the presence of the jury in open court:)
22          THE COURT:  Court is in recess.
23     (Recess.)
24          THE MARSHAL:  All rise.
25          THE COURT:  Please be seated.

:36PM
:37PM
:37PM
:38PM
:59PM

closing argument in rebuttal - by Schar                6346

1        Mr. Schar.
2            CLOSING ARGUMENT IN REBUTTAL
3        BY MR. SCHAR:  Ladies and gentlemen, what
4    you've heard over the last day or so from defense
5    counsel basically breaks down into what I understand
6    to be three arguments:  I didn't do it.  If I did
7    it, I didn't mean to do it.  And if I did it, I
8    meant to do it because no one told me it was wrong,
9    so it's okay.
10            And from Mr. Adam, the last argument you got
11    was, a whole bunch of people came in and lied to
12    you.  The FBI and the United State's Attorneys
13    office are part of a conspiracy to frame an innocent
14    man and take him down for political reasons.  That
15    argument has no basis, but it is so desperate and
16    ridiculous on its face, I'm going to leave it until
17    later.
18            Instead, what I want to do is to begin to
19    talk to you about how you should look at the
20    evidence.  This evidence, all the evidence are
21    pieces of a puzzle and you need to take it, take the
22    pieces and turn it into a puzzle that it is.
23            And what the puzzle describes, what the
24    puzzle pieces show is it paints a picture of a
25    corrupt Governor in a variety of different places

closing argument in rebuttal - by Schar          6347

1   and at different times in a variety of different

2   corrupt acts.

3        Mr. Adam likes to talk to you about each

4   particular piece of a puzzle, he does not focus on

5   the entire piece of the puzzle, and he has suggested

6   to you that somehow all the conversations you've

7   heard about are misunderstandings, that there are

8   things that Defendant Blagojevich meant to

9   communicate that other people couldn't get, they

10  didn't understand what he was really trying to do.

11       So, first, I want to take a very quick step

12  back and talk to you about how Defendant Blagojevich

13  did this.  He is not stupid.  He is very smart.  He

14  didn't get twice elected as the Governor of the

15  State of Illinois by accident.

16       As Mr. Adam told you, he knows how to hold

17  his messages, he knows about thirty second sound

18  bites, he knows how to communicate.  That is what he

19  does for a living, he communicates, and he's good at

20  it.  He knows how to communicate a message and he

21  knows full well that the people he wants to

22  communicate with gets the message, and you see it

23  over and over again in this case.

24       November 6th, the meeting with Tom Balanoff.

25  He doesn't just go with Tom Balanoff and say:

closing argument in rebuttal - by Schar          6348

1  Mr. Balanoff, in exchange for Valerie Jarrett I want
2  to exchange Health and Human Services.  He doesn't
3  do that because he doesn't need to, because he knows
4  Mr. Balanoff gets it.
5          Instead what he says is, he talks about
6  Valerie Jarrett, and he turns it on and off, and he
7  talks about how he'd like to be Secretary of Health
8  and Human Services.  Mr. Balanoff got it, that's
9  what Defendant Blagojevich was trying to
10 communicate.
11         And you know Mr. Balanoff got it right away
12 because Defendant Blagojevich says it on tape, at
13 Tab 29, the next day:
14     "He's been told now I would do it if I got
15      this, so now she knows I can get the
16      Senate Seat for my friend."
17          He knows how to communicate.
18          November 12th, you actually heard a phone
19 call with Tom Balanoff about trying to get millions
20 of dollars from a 501(c)(4).  He doesn't say:
21 Mr. Balanoff, in exchange for my millions of dollars
22 in a 501(c)(4), I'll give you Valerie Jarrett.
23 Instead what he says at Tab 47 is:
24
25

1    "You know overnight can put 10, 15, 20

2     million dollars in an advocacy group like

3     that, couldn't they, and then they could

4     help our new senator Valerie Jarrett."

5          He knows how to tie it together, he knows

6    how to communicate it without having to make it too

7    blatant.

8          And you don't even have to rely on

9    Mr. Balanoff in that call because at Tab 50

10   Defendant Blagojevich, just within in the hour,

11   says:

12   "So, look man, she can be a senator, I want

13    this 501(c)(4) thing."

14          He knows how to communicate.

15          The next day, November 13th, he has a

16   conversation with Doug Scofield, right?  These

17   unsaid conversations that you heard Mr. Scofield

18   testify about.  He wants word to get to Wyma to get

19   to Rahm Emanuel "I want my millions of dollars for

20   501(c)(4) in exchange for Valerie Jarrett, but I

21   don't want to say it like that, it's going to be

22   unsaid."  The point would be communicated, they'll

23   get.

24          Mr. Scofield wasn't quite sure, Tab 60:

25

closing argument in rebuttal - by Schar          6350

1   "I do, but we're talking about part of the
2    discussion for anything else."
3   "Defendant Blagojevich:  Well, it's unsaid,
4    do you understand what I'm saying?
5        "It's unsaid," the connection is there;
6   they'll get it.  You don't need to be blatant about
7   it.
8        Just 15 minutes later, at Tab 62, he takes it
9   one step further.  The second call to Scofield on
10  13th, Tab 62, where he actually tells Scofield:
11  "You can let Wyma know that he can say ..."
12   this is at Page 1:
13  "... hey, look, this is unrelated to the
14   other stuff."
15       It's unrelated to the Senate Seat even
16  though he's confirmed, you wouldn't know it unless
17  you heard the call, but he has confirmed it is
18  completely related, it's one for the other.  But go
19  ahead and communicate it's not.  Why?  Because it's
20  too blatant to do it any other way.
21       And, of course, the message has to be clear,
22  otherwise Defendant Blagojevich is not going to get
23  what he wants.  He isn't going to communicate a
24  message that no one is going to understand.  He
25  wants the millions of dollars.  You heard Wyma

1  testify he heard the message immediately.

2  Mr. Scofield talked to him and he can say this is

3  unrelated, but Mr. Wyma got it instantly.  He knew

4  it was connected to the Senate Seat; it was obvious.

5          Defendant Blagojevich understands how to

6  communicate.  He's practiced at it, he has practiced

7  at it and he knows what he's doing.

8          And the law recognizes it.  The law doesn't

9  require, despite suggestions to the contrary, the

10  law does not require you can X for Y in a

11  conversation to be guilty of a crime.

12          MR. GOLDSTEIN:  Objection.

13          THE COURT:  Overruled.

14          MR. SCHAR:  In fact, what it says is, it is

15  not necessary that defendant's solicitation or

16  demand for a thing of value in exchange for

17  influence or reward with respect to state business

18  be stated in express terms, because the law

19  understands full well the way criminals work is

20  usually indirect communications, not obvious

21  communications.  The law recognizes that, it notes

22  it, and you'll be instructed on it, and that's how

23  Defendant Blagojevich operated.

24          With that in mind, let's take a quick step

25  back and go through some of the other evidence:

closing argument in rebuttal - by Schar          6352

1    Mr. Krozel, the tollway.

2          Now, you don't need to guess as to what
3    Defendant Blagojevich said when he had conversation
4    with Mr. Krozel.  You don't need to guess because he
5    made it patently clear with three different people
6    what he was thinking about with Mr. Krozel.  He made
7    it clear with Mr. Monk when he told him:

8          "People like the road builders don't come
9           up with the money, f' 'em, I won't do the
10          tollway program."

11          He made it clear with Mr. Harris who told
12    you that Defendant Blagojevich was only going to do
13    the $1.8 billion program to whet his appetite of
14    people like Mr. Krozel.  And he is following up with
15    Mr. Harris because if they didn't perform or provide
16    enough contributions, he wouldn't do the larger one.

17          And he made it perfectly clear with John Wyma
18    when he said to John Wyma:

19          I've got Lon Monk going to Krozel for
20           $500,000, and if they don't perform, f'
21           'em."

22          You don't need to guess as to what was in
23    Defendant Blagojevich's head when he was talking to
24    Mr. Krozel because he made it patently clear with
25    three separate people to get Mr. Krozel to his

closing argument in rebuttal - by Schar          6353

1  fundraising office at FOB where state business
2  shouldn't be conducted.
3          On September 18th, Mr. Krozel doesn't even
4  know what he has said to John Wyma and Lon Monk and
5  John Harris, and, in the end, it was obvious; it was
6  obvious.  In fact, when you consider that
7  conversation, it sounded like the exact same
8  conversation with Tom Balanoff, they're very
9  similar:  Defendant Blagojevich starts talking about
10 the program, talking about the 5 to 6 billion dollar
11 program that might happen "which I have the sole
12 discretion over" is what he says to Mr. Krozel,
13 that's Mr. Krozel's testimony, and then he switches,
14 "now let's talk about the fundraiser."  Mr. Krozel
15 got it when he's asked about fundraising when
16 Defendant Blagojevich goes to decide about the
17 tollway program.  Mr. Krozel got it, he understood.
18 And Mr. Niewoehner told you, that request, that's
19 attempted extortion, that's the bribery, the ask is
20 the crime.
21         And just so it's clear, Mr. Adam is wrong in
22 his facts.  He suggested the 1.8 billion dollar
23 program had already been done by the time that
24 conversation occurred.  That was September 18th, the
25 1.8 million dollars program is not until October, so

:08PM

:08PM

:08PM

:09PM

:09PM

1  again another incentive there at the time.

2       And, frankly, as you'll be instructed, it

3  doesn't matter whether the state action was first or

4  second, it's the tying the two together that's the

5  crime.

6       He just doesn't tie those together in that

7  conversation when he asked for his money, he gives

8  the message, because in October he does do the

9  1.8 billion dollars to whet the appetite and he

10  doesn't do the long-term program.

11       But within days, he'S s back to Krozel.  You

12  have one side of that conversation, Tab 2, recorded

13  at the Friends of Blagojevich Office where again he

14  starts the conversation with "we're off and running

15  with the tollway," and then he switches over to

16  fundraising.  That is what he said, and at the end

17  of the conversation he advises "we'll be back in

18  touch in a couple of weeks."

19       Ladies and gentlemen, that is attempted

20  extortion.  You have multiple witnesses -- and, by

21  the way, Mr. Adam said somehow it wasn't Defendant

22  Blagojevich's sole discretion to do that, that

23  tollway program.  Multiple witnesses suggested it

24  was, but worse, if it wasn't, he's lying to

25  Mr. Krozel about it; he is lying to Mr. Krozel.

:09PM

:09PM

:09PM

:10PM

:10PM

closing argument in rebuttal - by Schar          6355

1   Mr. Krozel came in here and told you it's clear to
2   him that Defendant Blagojevich made it clear to him
3   it was his sole discretion, he is turning the knife
4   a little bit more.
5          Now, apparently Mr. Krozel came in and lied
6   to you.  We're going to talk to you about this
7   conspiracy to lie a little bit later, but you will
8   be instructed to use your common sense.
9          So why is Mr. Krozel coming in here and lying
10  to you?  He swore to take an oath and tell the
11  truth.  I gave you a very cogent explanation of what
12  happened when the FBI came to visit him and why he
13  wasn't completely forthright.  People don't come in
14  here in federal court every day and raise their
15  right hand to tell the truth --
16          MR. GOLDSTEIN:  Objection, Your Honor.
17          THE COURT:  This one he gets to finish before
18  I rule on the objection.
19          MR. SCHAR:  Thank you, Your Honor.
20          There must be a motive for Mr. Krozel to come
21  in here and lie.  All we heard from Mr. Adam was
22  that --
23          MR. GOLDSTEIN:  Objection; motivation to lie.
24          THE COURT:  This is a proper argument.
25          MR. SCHAR:  Why?  What is he terrified about?

:10PM
:11PM
:11PM
:11PM
:12PM

closing argument in rebuttal - by Schar          6356

1  What is he afraid is going to happen to come in here
2  and tell you the truth?  The only thing is -- well,
3  we'll leave it at that.  The bottom line is, your
4  common sense tells you people lie for a reason,
5  there is not one reason for Mr. Krozel to come in
6  here and lie to you.
7          And this concept--and I'm only going to hit
8  it once in my comments--the concept of lots and lots
9  of people somehow if they really believed the things
10 that they told you they would run out and call the
11 police, go to the Inspector General or the FBI, you
12 got to take a step back sometimes in this case.
13         Remember, in 2008 this man was the sitting
14 Governor of the State of Illinois with complete
15 control and discretion over millions, if not
16 billions of dollars that affected various
17 industries.  Mr. Krozel told you, there's a cement
18 plant in Dixon that closed.  And, indeed, out of all
19 of these schemes there are victims well beyond the
20 people you've heard, people who were relying on this
21 money.  As Mr. Adam pointed out --
22         MR. GOLDSTEIN:  Objection.
23         THE COURT:  Finish this one, too, and then
24 I'll rule.
25         MR. SCHAR:  As Mr. Adam pointed out, the

closing argument in rebuttal - by Schar          6357

1  Children's Memorial rate increase affected a number
2  of different hospitals.
3          THE COURT:  Overruled.
4          MR. SCHAR:  What if they had gone to the
5  police and it was their word over someone else's,
6  would the police believe him against the sitting
7  Governor of the State of Illinois?  What if it got
8  back to Defendant Blagojevich when someone
9  complained, what would be the consequences of that?
10         It shouldn't surprise any of you that
11 numerous people you heard kept quiet even though
12 they were victims.
13         It's not a defense, anyway, that they didn't
14 go out and, I don't know, scream at the top of their
15 lungs to say they were victimized, but they should
16 have been treated differently, not a motive for them
17 to lie.
18         Children's Memorial Hospital:  Again, you
19 don't need to guess as to what is in Defendant
20 Blagojevich's mind because he tells John Wyma, he
21 tells him on October 8th:
22     "I'm doing 8 million for Children's
23      Memorial Hospital, I want to get Magoon
24      for 50."
25         Boom, he ties it together.  You don't need

1  to guess anymore as to what is in his head, Mr. Wyma
2  told you.
3          And keep in mind, Magoon was a legitimate
4  target.  Magoon had given $1,000 in any given year.
5  The fundraiser list that you saw from time to time,
6  you'll have a chance to look at it, he's not on it,
7  he's not on it as of October 8th.  IHA, you heard a
8  little bit of IHA, it's not on the list.  There is
9  nothing, nothing that brings Magoon to anyone's
10 attention until the pediatric rate increase occurs.
11 Nine weeks later, October 17th, Defendant
12 Blagojevich calls.  He knows how to communicate a
13 message and he tells Mr. Magoon, he will approve the
14 10 million but not until January 1st.  He
15 effectively told him it's not a done deal yet.  No
16 discussion whether it being conditional, he tells
17 him to keep it quiet.
18         This is the healthcare Governor, the
19 healthcare Governor who got, I think one of the
20 defense counsel mentioned 13 percent approval
21 rating, and he is seriously trying to raise funds at
22 the end of the year and he decides to sit on
23 something that is his number one issue when he needs
24 all the publicity he can get?  It makes no sense.
25         As you know, five days later he sends his

closing argument in rebuttal - by Schar          6359

1 brother out, he sends his brother out to ask for a
2 fundraiser of $25,000 by the end of the year.
3 Magoon got it.  He didn't know about Wyma, but he
4 got it.

5          And Mr. Adam suggested to you that, well,
6 what's the big deal, the thing went through.  Well,
7 you heard what the evidence was, it was supposed to
8 go through on January 1st and it didn't.  It didn't
9 get through until later in January.

10          That's what you heard, ladies and gentlemen,
11 but there's more, because although the crime has now
12 been committed, the ask has been made, the attempted
13 extortion has occurred, it's confirmed, it's
14 confirmed by events that happened after, and that's
15 November 12th.

16          Again, Tab 42, Defendant Blagojevich is
17 talking to Greenlee that morning.  He is talking,
18 having a discussion, at Tab 42, he talks with his
19 brother a short while later and his brother tells
20 him the bad news:  I'm trying to call Magoon, he
21 hasn't called me back, I've tried three times, I'm
22 quitting.

23          The next call is later in the day on
24 November 12th.  A lot of events occurred on
25 November 12th, that is the Valerie Jarrett phone

closing argument in rebuttal - by Schar          6360

1  call with Balanoff, and he gets back to Mr. Greenlee
2  later that day.  The very first thing that he raises
3  is pediatric reimbursement.
4        Now, the argument is, Greenlee got it all
5  wrong, he didn't understand.  Who better to
6  interpret what Defendant Blagojevich means than Bob
7  Greenlee?  He is on the phone with him constantly.
8  It is his job to understand what Defendant
9  Blagojevich is communicating.  Can you imagine if he
10 had gotten it wrong, the consequences to him?
11       MR. GOLDSTEIN:  Objection, Your Honor.
12       THE COURT:  Overruled.
13       MR. SCHAR:  Remember, this is the same
14 Mr. Greenlee who told you this whole pediatric thing
15 got started in a conversation with Defendant
16 Blagojevich in which Defendant Blagojevich said "we
17 should look into that," that was the instruction
18 Mr. Greenlee got and he moved forward with the rate
19 increase and he got it right.
20       The November 12th phone call told you he got
21 it right.  Defendant Blagojevich had wanted to move
22 forward at that time, but now somehow he completely
23 misinterpreted it.  Go back and listen to the phone
24 call, ladies and gentlemen.
25       Mr. Greenlee told you, this whole thing about

:17PM
:17PM
:18PM
:18PM
:18PM

closing argument in rebuttal - by Schar          6361

1  budgetary concerns, that was going to be the public
2  explanation.  He knew full well the budgetary
3  concern is not the concern, it is a pretext.  Again,
4  listen to the call, Defendant Blagojevich starts by
5  saying "we can pull it back if we need to."
6          Budgetary concern?  What other reasons, what
7  are the reasons to raise a pediatric reimbursement
8  rate on November 12th?  Suddenly Defendant
9  Blagojevich had a revelation that he needed to start
10 cutting budgets on November 12th?  He didn't have
11 any other phone calls, he didn't have any other
12 discussions of any other budget issue, healthcare
13 was his number one priority.  And, in fact, he
14 didn't even have a discussion about:  Hey, this is
15 my number one priority, how can we save this
16 program.  Nothing.  None of that.
17          This is the same guy Mr. Adam pointed out,
18 the same guy, the same defendant who three weeks
19 later, this is at Tab 82, is on the phone trying to
20 get 15 million dollars to the Chicago Cubs because
21 that's what the White Sox got, suddenly he got
22 concerned about basically what would have been 4
23 million dollars out of state pocket because of
24 federal matching funds?  Keep in mind, he just
25 announced $1.8 billion to the tollway, now he's got

1  a concern for 4 to 8 million dollars?  It doesn't
2  make any sense.  And this argument that somehow
3  there's a question mark at the end, it can't be an
4  order?  You know, I tell my daughters, "you can
5  clean up your room, right," they understand full
6  well I'm not asking, I'm telling them.  That is not
7  a deciding factor, ladies and gentlemen.
8          And, you know, frankly, at some level, it
9  doesn't much matter whether Mr. Greenlee's got it
10 right or he's got it wrong because all the
11 circumstances of that phone call tell you is that
12 the two were tied together.  There is no other
13 reason to bring up the pediatric rate increase in
14 that phone call to suggest budgetary concerns is the
15 reason to pull it back but the fact that Magoon
16 isn't calling back.  That is concrete evidence,
17 ladies and gentlemen, that, in fact, what occurred
18 before is exactly what Mr. Wyma understood and what
19 appeared to be the ask in connection to the money.
20         And plus, ladies and gentlemen, you heard a
21 later conversation from Mr. Monk and Mr. Greenlee
22 that Defendant Blagojevich reiterated it, "hold it
23 up at a later time."
24         And don't for a minute think, in the context
25 of what you have seen in this case, that there

1  aren't consequences for people who don't raise money
2  for Defendant Blagojevich.
3          You heard about it, you heard the phone call
4  at Tab 90 related to Cheryl Jackson, the president
5  of the Urban League.  She found a $750 Friends of
6  Blagojevich fundraising check.  You'll have
7  Government Exhibit 10/08/08 FOB spreadsheet, you'll
8  see a $750 check.  And Mr. Harris brings her up in
9  relation to the Senate Seat, and what is Defendant
10  Blagojevich's response?
11      "Do me a favor, don't even mention Cheryl,
12          just get her out of there.  She bounced a
13          check to me, she won't f'ing make it
14          good."
15          Defendant Blagojevich was so upset that she
16  wouldn't make good on a $750 check that bounced to
17  Friends of Blagojevich, so because of that she's
18  out.
19          The racetrack:  Again, you can't look at each
20  of the pieces individually, you got to look at the
21  whole puzzle.  You know his attitude with
22  Mr. Krozel, you know his attitude with Mr. Magoon or
23  Mr. Wyma, and now you move to the racetrack, it's
24  all part of the puzzle as to how he communicates and
25  what is going on, all occurring at the same time

closing argument in rebuttal - by Schar          6364

1   period.

2        Now, Mr. Adam tells you, both parties agree

3   there is extortion here, the question is who is

4   extorting who.  Mr. Adam tells you that, in fact, it

5   was John Johnston extorting Defendant Blagojevich.

6   Somehow he was holding up his $100,000 to get the

7   bill signed, okay.  You sat in the courtroom and you

8   heard the evidence, that is not the evidence.

9        The concept that John Johnston is extorting

10  the person who can sign the bill and is willing to

11  make a call from a pressure point of view?  It's

12  ridiculous on its face.  What you know is, what the

13  evidence has shown is, this racetrack legislation

14  was signed the day after it got to Defendant

15  Blagojevich's desk, the 2006.  What's different in

16  2008?  Well, in October he's seeking $100,000, in

17  November he's seeking $100,000, in December he's

18  seeking $100,000.  And so he gets there on

19  November 26th, you saw the e-mail, it could've been

20  signed right away and he gives Harris no explanation

21  as to why he won't signed the bill, but he knows

22  that the longer he waits, the more the pressure gets

23  applied to John Johnston.  Each day that ticks by is

24  money.

25       On December 2nd Harris has that conversation

:22PM

:22PM

:23PM

:23PM

:23PM

closing argument in rebuttal - by Schar          6365

1  with Quinlan, which you've heard, in which Quinlan
2  reports back it's Quinlan's understanding that, in
3  fact, the bill is being held up and that causes
4  Harris to be done with it, he's out, he's done, he
5  doesn't want anything else to do with it.
6          And it takes you to December 3rd and you got
7  the conversation with Lon Monk on December 3rd, this
8  is at the Friends of Blagojevich office, Tab 87.
9  The message that they decide by the end of that
10 conversation is that Monk is going to go to John
11 Johnston--again, this is the conspiracy charge--is
12 going to go to John Johnston and is going to say,
13 look, there's a concern that if he signs the bill,
14 you won't give the money.  If he signs the bill, you
15 won't give the money.
16         The only message that John Johnston possibly
17 can get from that is, if I give him the money, he'll
18 sign the bill.  He's tying them together, it's
19 crystal clear, he approves that message.
20         And this concept of he wants a week
21 separation?  Defendant Blagojevich who recommends:
22 Yeah, and let him know that I need at least a week
23 to sign the bill after I get my money.
24         First of all, the fact that they're
25 discussing the separation between the two is what

:24PM
:24PM
:24PM
:24PM
:25PM

closing argument in rebuttal - by Schar          6366

1  actually ties them together, if you think about it.
2  There is a connection now between the two.
3          That there needs to be any separation, I'll
4  get back to that point in a second, but what
5  Defendant Blagojevich is saying is:  Let him know
6  that there's going to be at least another week,
7  $63,000, in effect, after he gives me the money
8  until I sign the bill.  Of course it's going to jack
9  up the pressure on John Johnston.  That's the
10 message Monk delivers on December 3rd, they agreed
11 to the delivery.  He goes out and delivers it.  John
12 Johnston got it immediately; he got it immediately.
13         After the meeting, Mr. Monk reports back.  He
14 tells him what happened, and Defendant Blagojevich
15 says "good," that's at Tab 86.
16         Again, it's the delivery of the message, the
17 conspiracy.  The agreement to deliver the message
18 and the delivery of the message is the conspiracy,
19 attempted extortion.
20         The next day is December 4th, this is the
21 pressure-point-of-view phone call at Tab 88,
22 Defendant Blagojevich agrees to call Johnston from a
23 pressure point of view, call from a pressure point
24 of view.  He doesn't say, "well, hold on a second,
25 why would I call a contributor and put pressure on

closing argument in rebuttal - by Schar          6367

1   him?"  He agrees to do it.  And then Monk says:
2   Okay, now what are the chances that you're going to
3   sign this bill next week?  Go back and listen to
4   this call, if you will.
5        Mr. Blagojevich says "good," but he
6   hesitates.  He hesitates.  He knows exactly what
7   happens next, what Mr. Monk knows about what is in
8   Defendant Blagojevich's head, because after that
9   hesitation as to whether he will sign it, in fact,
10  in the next week Mr. Monk says:
11       "I'm telling you, he's gonna be good for
12        it, I got in his face."
13        Monk knows that what Defendant Blagojevich
14  is thinking about is his money, am I gonna get the
15  money.  And what's Defendant Blagojevich's response?
16  He's not saying, "that's not what I was thinking
17  about" or "why would we get in the face of a
18  contributor who has pending state business?"  He
19  says "okay, good."
20        Ladies and gentlemen, one of the things that
21  sometimes is difficult to do, particularly in this
22  case, is to take a step back and consider how things
23  are supposed to work in state government.
24        As Mr. Adam gets up here and says, you know,
25  "it's a good thing, he's going to put a separation,

closing argument in rebuttal - by Schar          6368

1  he's going to wait for his money and then he was
2  going for a separation in signing the bill," but
3  take a step back:  A bill shows up on the desk of
4  the Office of the Governor of the State of Illinois
5  that --
6          MR. GOLDSTEIN:  Objection, Your Honor.
7          THE COURT:  Premature.
8          Finish it.
9          MR. SCHAR:  He's got a responsibility to the
10 People of the State of Illinois.  You saw the oath
11 that he took.  He's got a responsibility to make a
12 decision based on one thing, the merits, the merits,
13 "should this bill be signed, should it not be
14 signed.  Does it help people, does it not help the
15 people.  Is it good for the People of the State of
16 Illinois or isn't it," that's it, you sign the bill,
17 don't sign the bill.
18          You don't sit around debating whether or not
19 you're going to get your money before you sign the
20 bill.  This is as backwards as it gets that tells
21 you everything you need to know about what's been
22 going on in this case.  And every once in a while
23 you just got to take that step back and ask, how
24 should this have been done if there wasn't
25 corruption going on, what was the proper way to do

closing argument in rebuttal - by Schar          6369

1  it.

2          MR. GOLDSTEIN:  Objection.

3          MR. SCHAR:  Ladies and gentlemen, that is

4  just one example --

5          THE COURT:  It's fair argument.  It's

6  overruled.

7          MR. SCHAR:  Thank you.

8          And this concept, again, whether we're

9  talking about -- by the way, we're talking about the

10  racetrack.  Then Mr. Monk is the one that says, you

11  know, "I don't want to say it's one for the other."

12  Mr. Monk told you, in fact, by saying it's not one

13  for the other, you're tying it together.  If it's

14  not one for the other, you don't have to say that.

15  And, in fact, you know--we talked about it

16  already--in the 501(c)(4) conversation, that, in

17  fact, saying it has nothing to do with it doesn't

18  mean it has nothing to do with it.  In fact, it may

19  very well have everything to do with it.

20          I mean, the classic example is, you walk up

21  to someone with a gun and you say "I'd like a

22  donation"; the gun, ignore that, it has nothing to

23  do whether you give me the donation or not.  You can

24  say what you want, it's obvious.  Krozel got it, it

25  was obvious.  Johnston got it, it was obvious.

 1  Magoon got it, it was obvious.

 2          You have to look at both the communication by

 3  the word, by action, by where it's delivered, who's

 4  delivering it, how it's being delivered, and you

 5  look at all of it as part of the puzzle.  When you

 6  do that, ladies and gentlemen, every bit of it ties

 7  in; they understood.

 8          Monk got it.  He admitted his involvement in

 9  this.  And somehow Mr. Adam would say to you, the

10  master communicator here, he didn't get it, he

11  didn't understand it.  The guy who knows how to talk

12  in thirty second sound bites --

13          MR. GOLDSTEIN:  Objection, Your Honor.

14  There's no testimony.

15          THE COURT:  Are you talking about the thirty

16  second sound bites, is that what you are objecting

17  to?

18          MR. GOLDSTEIN:  What the Governor understood.

19          THE COURT:  That objection is overruled.

20          MR. SCHAR:  Somehow these were three

21  accidental extortions that are occurring, that's the

22  argument.

23          Now, AUSL and the Tribune, I'm really not

24  going to touch.  You heard from Mr. Adam how the

25  AUSL is not what the evidence was in this courtroom.

closing argument in rebuttal - by Schar          6371

1  You're to rely on your memory on what Mr. Tusk said,

2  Mr. Monk said, Mr. Harris said, Mr. Scofield said,

3  what Mr. Wyma said, they all talked about --

4          MR. GOLDSTEIN:  Objection, Your Honor.

5          THE COURT:  Overruled.

6          MR. SCHAR:  I'm sorry, they all talked about

7  the school grant, the school grant is Chicago

8  Academy, that's what I'm talking about.  What

9  Mr. Adam described was not the evidence.  You guys

10 have the evidence, you heard the evidence.

11         The same for the Tribune, he said where are

12 all these calls?  Well, go back and listen to the

13 calls, it's laid out pretty clear.

14         Defendant Blagojevich is saying things like,

15 "before we go to the next level, it needs to be

16 communicated to them that we have real issues."  He

17 understood perfectly well what was being

18 communicated.  Go back and listen to those Tribune

19 calls.

20         Now, when it comes the Senate Seat, it's

21 clear, perfectly clear the two are tied together in

22 terms of how it's communicated.  You basically get

23 two arguments which was:  You know what, it's just a

24 bunch of talking, and it's okay, there's no one

25 stopping me from doing it, no one told me I couldn't

:31PM

:31PM

:31PM

:31PM

:32PM

1  do it until the FBI stopped me; all right, it's just
2  a bunch of talking.
3          Defendant Blagojevich's crimes are primarily
4  crimes that involve a lot of talking.  He's charged
5  with conspiracy, he's charged with attempted crimes,
6  he's charged with scheming crimes, and those are
7  crimes which, by their very nature, are a lot of
8  talk, that's what they are.
9          The classic might be of a conspiracy to rob a
10  bank.  People agree they're going to rob a bank,
11  they talk about it for a while, what's the best way
12  to do it, we're going to get a get-away car, maybe
13  they go scout the bank, maybe they do some research
14  as to which bank has the most money at any
15  particular day.  Whether they actually follow
16  through and rob the bank or not, they committed the
17  crime of conspiracy to rob a bank.
18          That's what these defendants are charged
19  with, scheming conspiracy, and the actual crime
20  itself is typically verbalized through asking for
21  things, requesting things.
22          So to somehow suggest that this just that
23  they're just talking a lot?  Well, those are the
24  crimes they're charged with.  If you think about it,
25  it makes perfect sense from a legal perspective,

:32PM
:32PM
:33PM
:33PM
:33PM

closing argument in rebuttal - by Schar          6373

1  frankly from a societal perspective, that those
2  types of crimes that you want internalized and that
3  you want people to step in and to stop before it
4  comes into fruition.  Two people agree to murder
5  someone, they walk up, they've got a gun --

6              MR. GOLDSTEIN:  Objection, Your Honor.
7              THE COURT:  Overruled.
8              MR. SCHAR:  -- they have the victim and they
9  point the gun at the victim, the police officer is
10 standing right there, they conspire to commit the
11 murder.  Now, what does the police officer do?  Does
12 the police officer wait until the person is shot and
13 say, okay, now I'm going to arrest these people?  Of
14 course not.  You step in and you arrest them for
15 conspiracy, or attempt, or scheme.  Those are the
16 crimes that are here.  I'm quite sure the victim
17 would agree, that is the way it should be.  Those
18 are the crimes, ladies and gentlemen, against the
19 Governor.

20             And this concept that there was talking only
21 and he didn't commit a crime, it doesn't work.
22 You'll have all the jury instructions and it will
23 make that perfectly clear.

24             And what's the alternative?  The FBI should
25 have actually waited based on the wrong criteria?

1  How can you wait for the $6 billion to be held up

2  before you've finally decided that, okay, now we can

3  move in?

4          The fact that many of these crimes didn't

5  bear fruit, it wasn't because the defendant didn't

6  want it to happen; he did.  The fact that the

7  victims didn't play ball didn't stop him, but the

8  FBI stopped him.  But it's not as if he gave up on

9  any of it.

10          And, of course, there was action.  Of course

11  there was action.  You heard about it.  There were

12  meetings, you heard about it, the November 6th

13  meeting.  The ask of the November 6th meeting for

14  HHS, the ask of millions of dollars for the

15  501(c)(4), you've heard those phone calls, these are

16  all things that were actions.  The statute people

17  were researching to find foundations for

18  ambassadorships; Doug Scofield had a conversation

19  with John Wyma, and of course we'll talk about it a

20  little bit later; setting up the meetings with Raghu

21  Nayak, those were all actions.

22          And, ladies and gentlemen, whether everything

23  Defendant Blagojevich wanted was realistic or not,

24  that's not a defense here.  The fact that he is

25  asking for things, which on the tape he actually

1  says he would take it in a heartbeat and clearly
2  wants, but the most realistic things to ask for is
3  not a legal defense.
4          To give a concrete example, we don't sit
5  around and say:  The two people who we were going to
6  conspire to rob the diamond out of the next door
7  neighbor's house, you know they might get away with
8  it, break the window and grab the diamond, that
9  might do, but the two people who conspired to break
10 into the vault at Tiffany's and steal thousands of
11 diamonds, the odds of that happening are so slim,
12 let it go.  It doesn't work that way, it is not a
13 defense to the crime the defendants are charged
14 with.
15         So what you get next when you get past the
16 talking is, "well, no one stopped me."  "Nobody told
17 me I couldn't do this."  "They talked to me about
18 doing it," of course that is what a conspiracy is
19 but let's put that aside.
20         Again, take a step back and consider who
21 Defendant Blagojevich is.  He has a law degree, he
22 was a criminal prosecutor.  You want to talk about
23 John Harris, he was a criminal prosecutor in state
24 court for several years.  He took the ethics exam
25 every year:  '04, '05, '06, '07, '08, and it made it

closing argument in rebuttal - by Schar          6376

1  crystal clear, as you saw and you'll have that back
2  there with you, that a bribe is a state action for
3  something of personal benefit.
4      And it doesn't have to be cash.  It's clear
5  he can't do these things.  Bill Quinlan and John
6  Harris told him, you can't trade the Senate Seat for
7  campaign contributions.  You heard about the
8  conversation with Mr. Quinlan, Mr. Harris told you,
9  in which he said don't even joke about taking
10 millions of dollars for a 501(c)(4).
11     And so when they played the section of the
12 call with the 501(c)(4) and he says to Mr. Scofield:
13     "Well, there's gotta be a legal way to do
14      that ..."
15       What they did not play --"
16     MR. GOLDSTEIN:  Objection.
17     MR. SCHAR:  -- what they did not play --
18     THE COURT:  Stop.
19     Your objection is to what?
20     MR. GOLDSTEIN:  About the conversation with
21 Harris and Quinlan, misstates a fact, there is
22 nothing discussing 501(c)(4) --
23     THE COURT:  Wait.
24     I'll give the same instruction I've give
25 before, your memory is what counts.  If you remember

:37PM

:37PM

:37PM

:37PM

:38PM

closing argument in rebuttal - by Schar          6377

1  the evidence that the prosecutor is about to cite,
2  then you can consider his argument.  If you think
3  that evidence did not exist or was different, then
4  you should disregard the argument.
5          With that admonition, you may proceed.
6          MR. SCHAR:  Thank you.
7          He knew full well, full well he couldn't do
8  this.  So when they play that Doug Scofield snippet,
9  they only play back half of it.  Remember that
10 Mr. Scofield says, "yeah, I'm sure there's a legal
11 way to do that."  Mr. Scofield understood perfectly
12 well what was being discussed.  When talking about
13 whether you can trade millions of dollars for state
14 action, there is no legal way to do that, Defendant
15 Blagojevich had already been told that, and it's
16 clear that Doug Scofield understood the question
17 wasn't about that.  It doesn't even make any sense
18 on its face.
19         So you get the blame-everyone-else argument:
20 Everyone else participated in this with me.  This
21 guy had more training in criminal background than
22 the average lawyer, and yet somehow he is the
23 accidentally corrupt Governor:  If only I'd known
24 you can't trade state action for personal benefit,
25 if only someone had told me you can't take millions

:38PM

:38PM

:38PM

:38PM

:39PM

closing argument in rebuttal - by Schar          6378

1  of dollars for state benefit I wouldn't have done
2  it.  I mean, come on, ladies and gentlemen!  Come
3  on!
4         In addition, your common sense tells you,
5  your common sense tells you that people who know how
6  to do it the right way and choose to do it the wrong
7  way know full well that they're doing it wrong.
8         He knew the proper criteria to use.  He knew,
9  he had qualifications sheets in a press conference
10 on November 5th where he stated the right criteria.
11 We'll come back to the Lisa Madigan a little later,
12 but he is trying to get things from people.  He knew
13 the proper criteria and he ignored it, and that
14 tells you he knew what he was doing was wrong.
15        And this concept that you heard through
16 cross-examination and slightly through Mr. Adam
17 somehow he surrounded himself with a bunch of
18 lawyers.  You do not recall a conversation in which
19 he said to someone, "you know, I'm really concerned
20 this might be against the law, you guys do some
21 legal research for me, let me know if this is the
22 right way of doing things."  He doesn't say that.
23 He surrounds himself with policy people, some of
24 whom had law degrees.  The conversations with Doug
25 Scofield and this defendant are no different than

closing argument in rebuttal - by Schar          6379

1   the conversations that Bob Greenlee had and John
2   Harris, and Doug Scofield even has a legal degree.
3   He's got more of a legal background than Bob
4   Greenlee.  Bob Greenlee may trumpet his attributes,
5   he's clearly a smart guy, he practiced corporate law
6   for a couple of years and he's been in state
7   government for 6, 7 years, not practicing law at
8   all, he did not give legal advice.  And, ladies and
9   gentlemen, Harris was special counsel on one issue
10  and that had nothing to do with this at all;
11  nothing.  He was his chief of staff.
12        And the whole argument kind of reeks of, "I
13  got caught and I'm innocent."  And the fact that
14  people who were conspiring with him didn't stop him?
15  That's how conspiracies work.  Yeah, John Harris can
16  step in and say, "don't do this, they were
17  conspiring."  You heard John Harris on the stand,
18  Change to Win was his idea but it was to benefit
19  this defendant, and he admitted his involvement in
20  this conspiracy; he's admitted it.  So, ladies and
21  gentlemen, the fact that John Harris didn't step in
22  and stop a coconspirator doesn't make any sense at
23  all.
24        And isn't it interesting that when you look,
25  time and time again, every time Defendant

1  Blagojevich is doing something that he shouldn't be

2  doing, quite frequently he somehow seems to

3  understand that he doesn't want to be involved in

4  it.

5          Tab 62, the conversation when he sends

6  Scofield out to get in touch with Wyma.  Wyma, it's

7  now clear, has been approached by federal authority,

8  he's got a subpoena, they talk about that in Tab 62:

9      "Defendant Blagojevich:  Hey, I don't want

10      to be one to have that conversation if

11      he's asked about it."

12          Well, if there's nothing wrong with what's

13  going on here, if it's all completely appropriate,

14  why not just pick up the phone and call Rahm Emanuel

15  himself?  Or if he wanted to do it in a more an

16  indirect way, call John Wyma!  Suddenly, though, the

17  exact time when he's breaking the law, he doesn't

18  want to be the one to have that conversation.

19          When it's go out and have someone get in

20  touch with Raghu Nayak "assume the whole world is

21  listening, don't do it on the phone," "we need to

22  get rid ..." you heard the call, "we need to get rid

23  of the people that are investigating us," but

24  somehow he has no idea what he's doing is wrong.

25          Now, ladies and gentlemen, is it any surprise

closing argument in rebuttal - by Schar          6381

1   that he ended up surrounded by a bunch of people
2   that largely agreed with what he wanted to do?  And
3   let's not forget, he's the decision maker, he's the
4   Governor, people worked for him, he didn't work for
5   them.
6           He's the one making ultimate decisions in all
7   of this, and he surrounds himself with a bunch of
8   people who largely mirror back what it is he says.
9   And at any time when you heard someone disagree with
10  him, you heard from time to time in the tapes, did
11  he ever say, "you know what?  You're right, you're
12  really smart, that's an interesting point you're
13  making, maybe I should re-think my position on it"?
14  Not once.  Not once.
15          And you just don't get it from testimony of
16  Greenlee and Scofield and Harris who tell you about
17  his in-and-out mentality, but you get it from the
18  tapes.  It's not an accident that we played a number
19  of tapes that we played.  You need to get a feel
20  what it is like to be there, understand what the
21  situation is, and part of the way we do that, we
22  tried to do that, is through tapes.
23          Mr. Adam says "where is there a single time
24  anyone told him you shouldn't do this."  Tab 34 is
25  Bill Knapp and Doug Soza on the phone telling him:

closing argument in rebuttal - by Schar          6382

1        "You should do Valerie Jarrett for
2        goodwill."  Tab 34:
3      "... do it for goodwill, that's the right
4        thing to do."
5          You don't stick your finger in the eyes of
6  the president, you do it for goodwill, you're going
7  to find that this is really valuable if you do it
8  for goodwill.  When you hear what they think about
9  that on a call, "that's a bunch of baloney."
10          And you know what happens to Bill Knapp
11  because you heard the Scofield conversation, he
12  becomes the quisling, he's the traitor, he's telling
13  Defendant Blagojevich something he doesn't want to
14  hear.  You hear it over and over, Scofield tells him
15  you probably shouldn't take the Senate Seat
16  yourself, at Tab 19, he rails on Mr. Scofield to Bob
17  Greenlee, "he's got some ulterior motive, I don't
18  know what it is."
19          And John Harris, this was in Robert
20  Blagojevich's call binder, when Robert Blagojevich
21  is talking and Defendant Blagojevich is talking and
22  Defendant Blagojevich is talking about whether John
23  Harris likes Emil Jones or Louanner, there's gotta
24  be a reason for that because Defendant Blagojevich
25  likes Louanner.  What's the reason?  "John Harris

:44PM

:44PM

:44PM

:45PM

:45PM

closing argument in rebuttal - by Schar          6383

1  must think that Louanner is passing him by."
2  There's always an explanation for why someone is
3  telling him what he does not want to hear.
4          And Mr. Greenlee, Mr. Greenlee got beat up on
5  pretty good in Mr. Adam's closing, and Mr. Greenlee
6  got beat up on pretty good on the phone calls.  Tab
7  28, when he tried to explain what was going on in
8  the Grant Park situation, "you're wrong."  In the
9  same call, he offers an opinion about what the
10  president might do, "you're ridiculous naive."
11          Tab 91, he offers an opinion on Jesse
12  Jackson, Jr., it's dismissed, "you weren't elected
13  to anything."  When he suggests Tammy Duckworth,
14  "I'll fire you."  When John Harris gives an opinion
15  you shouldn't do the $15 million for Cubs money,
16  Defendant Blagojevich agrees and then says "justify
17  it," that's at Tab 82.
18          Apparently it's all their fault.  It's Barack
19  Obama's fault that he had a call on Valerie Jarrett;
20  it's Alexis Giannoulias fault because he didn't set
21  up the meeting; it's Tom Balanoff's fault; it's
22  everyone's fault but the defendant.
23          That is not how it works.  It's no one's job
24  to stop him from committing these crimes.  It was
25  his responsibility.

closing argument in rebuttal - by Schar          6384

1          And, ladies and gentlemen, what this
2    basically boils down to is, "I didn't know I was
3    breaking the law."  That is actually not a defense.
4    You're going to be instructed as to the good-faith
5    defense.  You're going to be instructed the
6    government is not required to prove that the
7    defendant knew that his acts were unlawful.  The
8    government is not required to prove that the
9    defendant's acts were --
10          MR. GOLDSTEIN:  Objection; I ask that he read
11   from the entire instruction.
12          MR. SCHAR:  Judge, I will.
13          But, basically, it's good faith and then
14   that.  This argument that somehow this is just a
15   politician, there is no politician defense in the
16   law.  You can't say I'm a politician and therefore I
17   can take whatever helps me personally; I can trade
18   state action for what benefits me personally because
19   I'm a politician; I can ignore the people of
20   Illinois because I'm a politician and get what I
21   want.  It doesn't work that way.
22          What you are going to hear, ladies and
23   gentlemen, for purposes of Counts 16, 18, 20 and 23,
24   the good faith on the part of the defendant is
25   inconsistent with that corruptly element of the

closing argument in rebuttal - by Schar          6385

1  charge.  The burden is not on the defendant to prove
2  his good faith; rather, the government must prove
3  beyond a reasonable doubt that he acted corruptly.
4  The government is not required to prove that the
5  defendant knew his acts were unlawful.  In fact, you
6  are going to be instructed of what "corruptly" is
7  and all those parts of that explanation.
8          Now, within this context that somehow
9  everyone is supposed to stop him from committing his
10 own crimes and the fact that somehow he didn't know
11 what he was doing was wrong:  Jesse Jackson.
12 Mr. Adam spent a little time with Jesse Jackson, we
13 spend a lot of time with Jesse Jackson.  Let's go
14 through it again quickly the timeline of Jesse
15 Jackson.
16          October 31st, he finds out, Defendant
17 Blagojevich finds out, pay to play, they're offering
18 $1.5 million.  And you'll be instructed, as well,
19 that you could be guilty of extortion regardless of
20 whether or not it's a public official who comes up
21 with the idea for the money or not.  The fact that
22 people came to him with a bribe is not a defense.
23          John Harris made clear you cannot trade the
24 senate seat for campaign contributions.  This is the
25 anti-corruption Governor, he's totally outraged by

closing argument in rebuttal - by Schar          6386

1   this offer.  On November 12th he's striking out with
2   Valerie Jarrett, he has a conversation with John
3   Harris at Tab 41, what does he say?
4        "I mean, I can't believe anything he says,
5         but he's got a third-party saying to me
6         it's a heck of a lot more substantial that
7         what we're getting from the Obama people."
8            November 12th, the Governor of the State
9   Illinois is saying that people offering bribes to
10  him is more substantial than what he's getting
11  offered by the Obama people.  No outrage.  And he
12  doesn't give up with the idea.
13           Mr. Adam really didn't talk about
14  December 4th a lot.  Obviously, that's a critical
15  day.  In defendant Robert Blagojevich's binder, he
16  gets a call and starts thinking that day about Gerry
17  Chico, not Lisa Madigan.  Tab 89, just go through
18  it, look through and see what the call that day is.
19  Tab 89, he starts talking to Fred Yang:
20       "We better start taking Jesse Jackson more
21        seriously."
22           Why?  He says one of the things Jesse
23  Jackson offers is fundraising.  And he continues
24  later in the call:
25       "You can get something upfront."

closing argument in rebuttal - by Schar        6387

1    That's what he's telling Mr. Yang.
2    The next call, Tab 90, John Harris about
3     half an hour:
4    "You can objectively now look at the value
5     of Jesse Jackson."
6         He's not lying to Mr. Harris.  He tells
7  Harris, you know, Jesse is offering 1.5 million in
8  campaign contributions through supporters.  Harris
9  tells him, "it's not a factor, it shouldn't be a
10 factor," but he just keeps talking.  He says
11 "fundraiser" that day, fundraising is on his mind.
12        He explains, goes back, at Tab 91, Yang and
13 Greenlee, a call with Yang and Greenlee:
14    "Specific amounts upfront, concrete
15     tangible political support from
16     supporters, specific amounts and
17     everything."
18        He is talking about money, fundraising in
19 exchange for this Senate Seat.  Mr. Adam says to you
20 it's about healthcare endorsements and it didn't
21 come up on December 8th and therefore he's not
22 talking about it?  Focus on December 4th, he's
23 talking about fundraising.
24        And it gets even more obvious, continue to go
25 through the call at Tab 91 Mr. Yang says:

closing argument in rebuttal - by Schar          6388

1        "What's so great about Jesse?"
2        "Defendant Blagojevich:  His network of
3         supporters can be helpful and they can be
4         helpful upfront."
5            The network of supporters?  All you heard
6   about in this case, ladies and gentlemen, are the
7   Raghu Nayaks and the Rajinder Bedis.
8            Now, Mr. Adam continued it on the next phone
9   call, which is a phone call that he played a little
10  snippet of about how this is all a national play.
11  What does that mean--keep it in context of the call
12  that just happened and we'll get to what happens
13  afterwards--but what does that mean, this is all a
14  national play?
15           Mr. Adam doesn't walk you through it, so here
16  is what he wants, what Mr. Adam wants you to believe
17  or follow it through:  Defendant Blagojevich had
18  just had a conversation with Mr. Yang and
19  Mr. Greenlee in which he suggested the same Governor
20  for the State of Illinois will put in Jesse Jackson,
21  Jr., for campaign contributions.  Mr. Yang--who
22  there is no evidence, none--is in touch with some
23  amorphous national people, is supposedly to go out,
24  talk to these national people and explain to them
25  that the sitting Governor of the State of Illinois

closing argument in rebuttal - by Schar          6389

1  will take bribes to do Jesse Jackson, Jr., so you,
2  national people, you, had better get on the plane
3  really quickly and go bear-hug the Governor of the
4  State of Illinois who is willing to take bribes to
5  make sure that the Lisa Madigan deal gets done, and
6  then these people will say:  You know what?  That's
7  a good point, if he's willing to take bribes for
8  Jesse Jackson, he must be serious, we better be out
9  there and try to do Lisa Madigan.  That is
10  ridiculous, but that was the argument when you take
11  it to its only conclusion.
12          And, you know, frankly, in that phone call
13  with Mr. Greenlee, not even Blagojevich can keep up
14  the lie the entire call.  At Tab 92, page 3, he's
15  talking about:
16
17      "Well, if he does Jesse, it'll be Madigan
18       and him fighting it out and at some point
19       maybe that Jackson network will come
20       through."
21          Even he can't keep it up through the whole
22  conversation.
23          You know, Mr. Greenlee told you it was a lie,
24  he understood it was a lie, and logic tells you it
25  was a lie when you consider what's being suggested.

closing argument in rebuttal - by Schar          6390

1   And Mr. Greenlee doesn't even know what happens
2   next, which is in five minutes of getting off the
3   phone with Mr. Greenlee he calls Robert Blagojevich,
4   and that call has been gone through many times, and
5   you'll go back to it.
6          You know Defendant Rod Blagojevich is talking
7   about trading the senate seat for campaign
8   contributions in that call because that's all they
9   talk about all day.  He uses --
10         MR. GOLDSTEIN:  Objection.  What day had they
11  been talking about it all, Judge?  That is not my
12  client.  That's a misrepresentation.
13         MR. SCHAR:  I'll clear it up, Judge.
14         THE COURT:  Good.
15         MR. SCHAR:  Defendant Blagojevich has been
16  talking about that over and over again that day.  He
17  gets on the phone, he uses the exact same term,
18  "tangible political support, start showing us now,"
19  the request is going to be made to Raghu Nayak.  His
20  claim to fame here is he's offering bribes.  His
21  brother, defendant Robert Blagojevich, on the
22  witness stand practically conceded it's about
23  fundraising, and he asked contributions should not
24  be over the phone and everyone should assume the
25  whole world is listening.

:54PM
:54PM
:54PM
:54PM
:55PM

closing argument in rebuttal - by Schar          6391

1        And then, take a step back again, he is
2   directing Robert Blagojevich, who is his chief
3   fundraiser, his role is supposed to be solely to
4   raise funds to go and have this conversation with
5   Raghu Nayak who is offering the bribes.
6        Ladies and gentlemen, defendant Robert
7   Blagojevich understood at that time what was going
8   on in that phone call, now he's trying to have it
9   both ways.
10       And you heard him testify.  On direct
11  examination he doesn't want to admit that this is
12  about fundraising in exchange for the Senate Seat
13  because he's the one who goes and calls Raghu Nayak
14  to set up the meeting, but he doesn't want to say he
15  did know it was about fundraising because in the
16  context of that call everything you know about --
17       MR. ETTINGER:  Objection, Judge; that's not
18  the evidence.
19       THE COURT:  The jury will recall the evidence
20  and disregard the prosecutor's argument if the
21  evidence does not support it.
22       MR. SCHAR:  Thank you, Judge.
23       Because it looks ridiculous to say that was
24  the point of the call.  So what Mr. Ettinger gets up
25  and does is he says, "you know what?  He's like John

closing argument in rebuttal - by Schar          6392

1 Harris."

2       Well, he's not like John Harris.  John Harris

3 got up there and said, yeah, I knew it was wrong in

4 relation to the Tribune and I wasn't going to follow

5 through with it and I didn't.  Now, John Harris

6 followed through on other things and that's why he's

7 charged.

8       But that's not what Robert Blagojevich said.

9 What he said is, I didn't really understand what was

10 going on.  Well, hypothetically, if it had something

11 to do with fundraising --

12       MR. ETTINGER:  Objection; that's not the

13 evidence.

14       MR. SCHAR:  Judge, it's argument.

15       MR. ETTINGER:  No, it isn't.

16       THE COURT:  It's fair argument.  The

17 objection is overruled.

18       MR. SCHAR:  Hypothetically, if it had to do

19 with fundraising, then I wouldn't have actually done

20 anything.  The fact he won't admit to you squarely

21 he knew what it was, tells you he knew what it was.

22 He knew what it was.

23       And there's an excuse for everything.

24 There's an excuse for everything.  He's told by Bill

25 Quinlan, you heard the phone call, do not mix

closing argument in rebuttal - by Schar          6393

1  fundraising and government, and he says on direct "I
2  never did."  Mr. Niewoehner then goes through a list
3  of things where he absolutely mixed the two and he's
4  got an excuse for every one of them.

5          It's okay because my brother asked me to do
6  it, it's okay because I was doing a favor, it's okay
7  because sometimes things just happen and that's the
8  real world, it's okay because it was Mary Stewart's
9  relative, and it was okay because I was trying to
10  provide Raghu Nayak with a fundraiser, it's okay
11  because I was trying to be courteous to a guy who is
12  very likeable.  Ladies and gentlemen, there is no
13  doubt Defendant Blagojevich dragged his brother into
14  this scheme.  Robert Blagojevich made his own
15  decisions.  He could have said no.  He is no
16  shrinking Violet.

17          Mr. Ettinger told you yesterday he went nuts
18  on Defendant Blagojevich's phone call.  He could
19  have just said no, he knew it was wrong and he could
20  have said no.  He made his own decisions.  You will
21  ultimately decide whether or not he was part of the
22  conspiracy.  You don't have to be a major player in
23  a conspiracy to be guilty.  Whether you're in the
24  starting lineup or you're coming at the end of the
25  game, you're part of the game.  Whether you commit a

closing argument in rebuttal - by Schar          6394

1  huge number of crimes or one crime, you're still
2  guilty.
3          And the bottom line is, Robert Blagojevich
4  knew and he agreed to participate, and his help on
5  this point was critical because Quinlan told him you
6  couldn't do it, Harris told him you couldn't do it,
7  Greenlee told him you couldn't do it.  Defendant
8  Blagojevich needed Robert Blagojevich to help set
9  this up, and that's exactly what Robert Blagojevich
10 did.  He made the phone to Nayak, he set up the
11 meeting to begin the process of asking for these
12 bribes, that's the conspiracy; that's it.
13         Now, you know what happened that night, which
14 is the Wyma article.  It's clear why the Wyma
15 article is coming out, the Wyma article comes out
16 the next day.  Tab 96, again their own actions and
17 their own words, they have a phone call, Quinlan is
18 on the call, they wait for Quinlan to get off and
19 then they bring up the issue of the Raghu Nayak
20 meeting.  Again, their own words:
21     "Defendant Blagojevich:  It needs to be
22      cancelled, it's too obvious."
23         Ladies and gentlemen, if this was just about
24 politics, if this was just about suggesting that we
25 want more healthcare endorsements, you'd want it to

closing argument in rebuttal - by Schar          6395

1  be obvious.  There's nothing about that article that
2  would change anything; nothing.  This would just
3  have been a simple message to be communicated, but
4  it wasn't, it was a much more sinister message.
5  When the article came out, it became too obvious and
6  they cancelled the meeting.
7          Ladies and gentlemen, those conversations on
8  Jesse Jackson, Jr., are part of the puzzle, but they
9  give you a huge insight as to how these defendants,
10  particularly Defendant Rod Blagojevich, operated.
11  Once you decide he's talking about trading the
12  Senate Seat for campaign contributions on
13  December 4th, in those phone calls, and that is what
14  he is trying to do, the concept that somehow he
15  didn't know it was wrong to try to get millions of
16  dollars from a 501(c)(4), that somehow he didn't
17  mean to extort John Johnston, Jerry Krozel, Patrick
18  Magoon, ladies and gentlemen, that falls flat on its
19  face.
20          The money:  Again, ladies and gentlemen, you
21  heard the evidence, I'm not going to belabor it on
22  the money.  What you know now is that basically
23  Patti Blagojevich was not needed at Rezmar, did very
24  little for $12,000 a month.  And, in fact, there
25  were two commissions she did for nothing, that's the

closing argument in rebuttal - by Schar          6396

 1  evidence.
 2       Bob Williams, Mike Winter, Sean Conlon, Mary
 3  Piazzi, those are the four witnesses who talked
 4  about it, that's the evidence, she did nothing to
 5  get those commissions.  Bob Greenlee told you that
 6  the entire commission was made up.  Ladies and
 7  gentlemen, it was made up.
 8       By the way, this concept that he paid a bunch
 9  of money to taxes?  There's no special tax rate for
10  Defendant Rod Blagojevich.  He paid taxes just like
11  everyone else.  He paid his fair share, how that
12  somehow is a credit to him is kind of beyond.  He's
13  not charged with tax fraud.  If he'd committed tax
14  fraud, he'd be charged with tax fraud.  So how that
15  helps him is baffling.
16       Mr. Adam told you to look at the handwriting,
17  look at the handwriting.  Mr. Conlon told you, Patti
18  Blagojevich's name was put on there because Brian
19  Hynes called and said put her name on there.
20  There's not an iota of evidence, not a single
21  witness testified that was her handwriting on that
22  document, not one; not one.
23       And think about the argument through,
24  Mr. Ettinger in his opening and I think suggested
25  again here at closing that Mr. Rezko is a big fraud,

closing argument in rebuttal - by Schar          6397

 1   he's paying hush money to Lon Monk.  Obviously, you
 2   know from his testimony he was involved with all
 3   types of things with Chris Kelly, the TRS, $50,000,
 4   so apparently he is involved with fraud and
 5   everything else, but with Patti Blagojevich it's all
 6   legit.
 7          Well, if it's all legitimate then why does he
 8   go to Bob Williams and say, she's owed this money,
 9   just write her a check for $14,000 and we'll put it
10   on this because it's truly legitimate money?
11   Instead he decides, according to Mr. Adam, to
12   initiate a fraud within his own company to pay a
13   legitimate amount of money to Patti Blagojevich?  It
14   makes no sense; no sense.
15          And this concept that Brian Hynes, Brian
16   Hynes is on the contract?  What do we know about
17   Brian Hynes?  Here is what we know about Brian
18   Hynes:  He was instrumental in getting the sham of
19   $40,000 to Patti Blagojevich --
20          MR. GOLDSTEIN:  Objection, Your Honor.
21          THE COURT:  The jury will recall the
22   evidence.
23          MR. SCHAR:  That's number one.
24          Number two, what do we know about Brian
25   Hynes?  We heard this from Ali Ata is that it's

closing argument in rebuttal - by Schar          6398

1   Brian Hynes who Tony Rezko dispatches to Ali Ata
2   when Ali Ata gets a subpoena to tell him not to talk
3   to the FBI, that's what we know about Brian Hynes.
4   This is the person that they're vouching for is on
5   the contract, so he must be legitimate?
6          And, ladies and gentlemen, the brilliance of
7   the contract is, if you look at it on its face, it
8   looks real, right?  How do you know that, in fact,
9   these payments were sham payments?  Look at the
10  commission checks, this commission check, how do you
11  know it's a sham commission check?  You don't know
12  unless you start subpoenaing records, you start
13  trying to track people down to find out what really
14  happened.
15         If we just look at those documents and say
16  "fraud, see?"  You say no, I don't see it.  But when
17  Sean Conlon comes in, Marianne Piazzi comes in and
18  Bob Williams comes in Mike Winter comes in, then you
19  know what's really going on.
20         And, by the way, that Monk didn't approve?
21  Mr. Adam came up and said, you know, Monk said that
22  Defendant Blagojevich wouldn't approve of cash
23  payments and he uses that to vouch for him.  You
24  know, he vouches for him in one area but apparently
25  Monk is lying about a whole bunch of other things.

:04PM
:04PM
:04PM
:04PM
:05PM

1    Putting that contradiction aside, what he
2 didn't tell you is what Monk explained about that,
3 which is he knew that if Defendant Blagojevich found
4 he was taking cash, it could compromise the
5 conspiracy, that's what he meant by what he said
6 Defendant Blagojevich wouldn't approve.
7    And this concept that Pension Obligation
8 money got paid back?  Not a dime of it got paid
9 back.  The money got paid back with a loan Aramanda
10 took out, Aramanda then got another loan from Jay
11 Wilton and paid the money back to Bob Kjellander.
12 In fact, the money never got paid back to Jay
13 Wilton, he forgot to mention that.  Tony Rezko
14 didn't pay back the money, and, frankly, you don't
15 pay back kickbacks.
16    There's a conspiracy of liars, everyone is
17 lying to frame Defendant Blagojevich, we're trying
18 to take him down for political reasons.  This is one
19 of the great frame-ups of all time.  A group of
20 witnesses came in, we apparently encouraged them to
21 lie, the FBI encouraged them to lie, and they lied
22 and lied and lied.
23    By my count, either through cross examination
24 or through Mr. Adam's, Mr. Ettinger's closing
25 argument, I may be missing some:  Lon Monk's a liar,

closing argument in rebuttal - by Schar          6400

1  Joe Aramanda's a liar, Joe Aramanda's lawyer is
2  apparently part of the fraud because Mr. Gillespie
3  cross-examined him to suggest that somehow he is
4  passing improper information from Tony Rezko's
5  lawyer to Tony Rezko.  Tony Rezko's lawyer is a part
6  of it, Joe Cari's a part of it.  He said United
7  States Attorneys Office is part of it because,
8  remember, Mr. Gillespie suggested we gave Cari a
9  script to read in the grand jury.
10        Krozel is lying to you, Conlon is lying,
11  Greenlee is apparently clearly lying, Harris must be
12  lying, Magoon must be lying.  Wyma must be lying,
13  Mr. Ettinger suggested, because he's immunized then
14  he must be lying.  Mr. Tusk is lying.  Mr. Balanoff
15  is lying, he apparently is part of this shakedown
16  himself.  Mr. Scofield is lying.  Mr. Bedi is lying
17  because he didn't come in and tell you that Robert
18  Blagojevich told him that money wasn't going to be a
19  factor.
20        But what's amazing in this massive conspiracy
21  is that not only have all these people lied, they
22  somehow have managed to get Defendant Blagojevich on
23  the tapes you heard to frame himself.  He sounds on
24  the tapes like he is part of this massive conspiracy
25  of crime and somehow they managed to do that.

closing argument in rebuttal - by Schar          6401

1        And even worse, he's got a motive to commit
2   these crimes.  He asks, Mr. Adam asks, why did we
3   put in all this information about his finances?
4   Well, you heard him on the tapes say he is
5   financially strapped, that money is very important
6   to him.  And we proved that, in fact, it was.  He
7   had very little money left, that's why the evidence
8   is there.  It's motive evidence.  It's motive
9   evidence.
10        And it's pretty good motive evidence,
11   frankly.  He's got no money, he's spending
12   significantly, so he's got a motive to try to trade
13   that Senate Seat for something of value.  He has a
14   motive, his campaign contributions are way down,
15   that's why we put in that evidence.  He's got a
16   motive to be shaking people down before the 1st of
17   the year.
18        So what we end up with is, he's got an
19   obvious motive to commit the crimes, he sounds like
20   he's committing the crimes, and he's surrounded by
21   people who are apparently involved in criminal
22   activity all to benefit him--not them, him--and
23   somehow he has no idea.  That's the argument that's
24   being made, and the FBI is a part of it from the
25   beginning to take him down for political reasons.

closing argument in rebuttal - by Schar          6402

1          There is zero evidence of that.  Again, what
2     would be the last thing the FBI would do in October
3     while they're trying to frame an innocent man?  What
4     would be the last thing --
5          MR. GOLDSTEIN:  Objection, Your Honor.
6          THE COURT:  Overruled.
7          MR. SCHAR:  The last thing the FBI would do
8     would be to wiretap his phone.  Wiretap the phones
9     of an innocent man you're trying to frame?  Because
10    here is what you expect to hear:  The Senate Seat:
11    Well, there's only one criteria with the Senate
12    Seat, we're going to make this benefit the people of
13    the State of Illinois, period.  "Benefits for me,
14    jobs for me, millions of dollars on the 501(c)(4)?
15    "I don't want to hear anything about it," that's the
16    call you would expect to hear.
17          When Rod Blagojevich and Robert Blagojevich
18    are approached pay to play, you actually expect a
19    call to the FBI itself, to special Agent Cain:  It's
20    Rod Blagojevich, the Governor of the State of
21    Illinois, it's Robert Blagojevich, a successful
22    businessman, and say people are coming up to us --
23          MR. ETTINGER:  Objection.
24          THE COURT:  Overruled.
25          MR. SCHAR:  The most corrupt scheme from the

:09PM

:09PM

:09PM

:10PM

:10PM

closing argument in rebuttal - by Schar          6403

1  State of Illinois, millions of dollars in exchange
2  for the Senate Seat, you got to step in and stop it,
3  that's what you would expect to hear.
4          Of course, ladies and gentlemen, you don't
5  hear any of that.  Instead what you hear on those
6  tapes from these witnesses, sadly, is Defendant
7  Blagojevich engaged in a series of illegal activity,
8  some of which defendant Robert Blagojevich
9  participated in.  The witnesses are not lying, the
10 tapes are not lying.  This isn't a massive
11 conspiracy to bring down Defendant Blagojevich, and
12 your common sense tells you that what occurred here
13 is exactly what it appears to be, the puzzle looks
14 exactly what it appears to be:  Extortion, attempted
15 extortion, bribery, conspiracy to commit bribery,
16 scheming to defraud, all committed by a corrupt
17 Governor.
18         I don't know how you are going to put a price
19 on the damage that Defendant Blagojevich caused --
20         MR. GOLDSTEIN:  Objection, Your Honor.
21         THE COURT:  Overruled.
22         MR. SCHAR:  Apparently everybody is supposed
23 to say Defendant Rod Blagojevich but himself,
24 everybody is supposed to step in and stop him from
25 choosing, and he is the one who chose to commit

closing argument in rebuttal - by Schar          6404

1  these crimes.
2          We have forgotten one of the first lessons we
3  teach our children, which is, we are all responsible
4  for our own actions.  It starts with accountability.
5  Accountability so others know there are
6  consequences.  Accountability to those who have lost
7  faith in the justice system.
8          Accountability, you, ladies and gentlemen,
9  you are that accountability.  The evidence in this
10 case has proven both of these defendants are guilty
11 beyond a reasonable doubt, plain and simple.  We ask
12 you to return a verdict of guilty on all counts
13 charged in the indictment.  The time for
14 accountability for these defendants is now.
15         THE COURT:  Members of the jury, you've heard
16 all of the evidence and the arguments, I am now
17 going to dismiss you for the day.
18         Again, I want to reemphasize, particularly
19 because we've heard the evidence and arguments you
20 must be especially careful to avoid news reporting,
21 blogs, any kind of communication of that sort.
22         I did, I think, early on in the case tell you
23 that you really should not make up your mind until
24 you've heard all the evidence and arguments, that's
25 a slight misstatement.  You should not make up your

:12PM

:12PM

:12PM

:13PM

:13PM

closing argument in rebuttal - by Schar          6405

1  mind until you've heard all the evidence, and
2  arguments, and my instructions.
3          What I'm going to do is let you go now.
4  Tomorrow morning come back here at 9:30.  I will
5  instruct you then.  I will read the instructions to
6  you and then I will give you several copies of the
7  instruction, as well, so that you don't have to take
8  a lot of notes and then I will have you retire to
9  deliberate on your verdict.
10          Thank you very much.
11          THE MARSHAL:  All rise.
12      (The following proceedings were had out of
13       the presence of the jury in open court:)
14          THE COURT:  Please be seated in the
15  courtroom.
16          Counsel, come to the lectern.
17      (Brief pause.)
18          THE COURT:  Does everybody here have copies
19  of the instructions?
20          You do?
21          MR. MARTIN:  Yes.
22          THE COURT:  Okay.  That's fine.
23          My guess is, worst case, an hour to read it,
24  best case, about 50 minutes, 45 minutes.  Then what
25  I'm going to do is send the jury back.  If you

:13PM
:14PM
:14PM
:15PM
:15PM

closing argument in rebuttal - by Schar         6406

 1   noticed that I send all of the jurors back, do not
 2   become anxious.  I instruct them that they should
 3   not begin deliberation until they receive a copy of
 4   the instructions and the verdicts.  The reason I do
 5   that is so that they don't begin to deliberate until
 6   after I have removed the alternates.
 7            My practice is to bring the alternates into
 8   my chambers, tell them that they are still under the
 9   jurisdiction, they're still obliged to remain under
10   the jurisdiction of the Court.  I advise them that
11   they have to obey all of the previous rule about no
12   contact with media and not to discuss the case at
13   all, particularly with each other.  I tell them that
14   the reason for this is the possibility that they may
15   have to replace a sitting juror.  And then I let
16   them go as long as I have a contact number for them.
17            For the jurors themselves, it is my practice
18   to allow them to set their own schedule.  It's their
19   choice by majority vote, except if they're tied, in
20   which case I cast the deciding vote.
21            I've had jurors who like to be in very early
22   in the morning, I've had jurors who like to stay
23   late.  We will accommodate the jurors will on this
24   issue.
25            What I would like you to do in the interim,

:15PM

:16PM

:16PM

:16PM

:16PM

1  so that there's not the traditional pause that
2  always occurs in these cases when we send the jury
3  back, is the assembling of exhibits that you want to
4  go back to the jury room and the presentation of
5  objections, if anyone has them, to what the others
6  want, and I'd like to do that around 9:00 in the
7  morning.
8          Anything else?
9          Thank you, counsel.
10         MR. SCHAR:  I'm sorry, just one quick issue
11 that I do think we need to resolve at some point
12 tomorrow morning and I talked to Mr. Sorosky about
13 it, whether or not there is a waiver issue of
14 forfeiture should there be a guilty verdict.
15         MR. SOROSKY:  They'll have our answer first
16 thing in the morning.
17         THE COURT:  Yeah, one way or the other, it
18 doesn't make a difference to me.
19         MR. S. ADAM, JR.:  No contempt?
20         THE COURT:  I thought your argument was
21 entirely free of contemptuous conduct.
22         MR. S. ADAM, JR.:  Yes, Your Honor.  Thank
23 you.
24     (Laughter in the courtroom.)
25

1

2          THE COURT:  All right, counsel, see you in

3     the morning.

4

5          (Adjournment taken from 3:17 o'clock p.m.

6           to 9:00 o'clock a.m. on July 28, 2010.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

closing argument in rebuttal – by Schar          6409

1       *      *      *      *      *      *      *      *

2

3

4  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

6                          MATTER

7

8

9   /s/Blanca I. Lara                        date

10

11

12

13

14  _____        _____

15        Blanca I. Lara                        Date

16

17

18

19

20

21

22

23

24

25