1

1      IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )  No. 08 CR 888
4          Government,              )
                                    )
5  vs.                             )  Chicago, Illinois
                                    )
6  ROD BLAGOJEVICH,                 )  December 6, 2011
                                    )
7          Defendant.               )  10:28 o'clock a.m.

8
                 TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE JAMES B. ZAGEL
                      SENTENCING
10

11  For the Government:

12          THE HONORABLE PATRICK J. FITZGERALD,
            UNITED STATES ATTORNEY
13          BY:  Reid J. Schar
                 Carrie E. Hamilton
14               Christopher Niewoehner
            Assistant United States Attorneys
15          219 South Dearborn Street;
            Suite 500
16          Chicago, Illinois 60604

17

18  Court Reporter:

            Blanca I. Lara, CSR, RPR
19          219 South Dearborn Street
                    Room 2504
20          Chicago, Illinois 60604
                 (312) 435-5895
21

22

23

24

25

1   APPEARANCES   (continued:)

2

3   For Defendant Rod Blagojevich:

4           KAPLAN & SOROSKY
            BY:   Sheldon M. Sorosky
5           158 West Erie
            Chicago, Illinois 60610
6           (312) 640-1776

7

            LAW OFFICE OF Elliott Riebman
8           BY:   Elliott Riebman
            158 East Erie
9           Chicago, Illinois 60610
            (847) 814-2900
10

11

            OFFICES OF AARON B. GOLDSTEIN
12          BY: Aaron Benjamin Goldstein
            6133 South Ellis
13          Chicago, Illinois 60637
            (773) 752-6950
14

15          OFFICES OF LAUREN FAUST KAESEBERG
            BY:   Lauren Faust Kaeseberg
16          2140 N. Lincoln Park West
            Suite 307
17          Chicago, Illinois 60614
            (773) 517-0622
18

19          CAROLYN & GURLAND ATTORNEY AT LAW
            BY:   Carolyn Pelling Gurland
20          2 North LaSalle Street
            17th Floor
21          Chicago, Illinois 60602
            (312) 420-9263
22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   WITNESS                                          PAGE

 3     DEANNA MONROE

 4     Direct Examination By Mr. Goldstein.............. 67

 5

 6

 7   EXHIBITS

 8     ...............................................

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (The following proceedings were had in Room
2           2525, Conference Room, present:  The Court,
3           Counsel representing Mr. Blagojevich,
4          Mr. Blagojevich and Mrs. Blagojevich:)
5              THE COURT:  Hi.  Please be seated.
6              A couple of little things.
7              Are we okay on all of the tabs of the
8  recordings of the stuff that we're dealing with?
9              MR. SOROSKY:  Yes, we worked it out.  All
10  resolved.
11              THE COURT:  Okay.  And I did indicate that
12  you can play them.
13              MR. SOROSKY:  (Nodding.)
14              THE COURT:  Also, and this is specifically
15  for you --
16              DEFENDANT BLAGOJEVICH:  (Nodding.)
17              THE COURT:  There's an issue of your
18  Children's privacy --
19              DEFENDANT BLAGOJEVICH:  Uh-huh.
20              THE COURT:  -- which is protected by the law.
21  You, because they're minors, you the right to waive
22  that and I want to know if you're willing to do
23  that.
24              DEFENDANT BLAGOJEVICH:  Yes.
25              THE COURT:  So we're okay on Tab 13, we're

okay in tab 15 which are the two that weren't clear
to me.

    We had another issue I have on my list about
releasing transcripts, but somebody said that to me
and I forgot what they said.

    MR. GOLDSTEIN:  Your Honor, as far as the
calls?

    THE COURT:  Yes.

    MR. GOLDSTEIN:  Just a couple of things.
What we did was we took some calls from the chart
that we provided to Your Honor, we narrowed it down,
and then sort of what the rule we had with the
government as far as only playing what
Mr. Blagojevich said, we narrowed it down to three
tabs.

    As far as transcripts, we can provide those
transcripts to the Court, the government I believe
has them already, and those don't have any privacy
issues at all.  We would like the ability, I think
it was mentioned, to vaguely reference any calls
that do have privacy issues.  We're not going to
submit them, you know for public consumption, and I
think we had a discussion about Your Honor would
accept the calls under seal that we previously tried
to admit for sentencing purposes only, I hope that

1 explains it.

2     MR. SCHAR:  Yes, Judge, we've gotten a binder

3 which has I think now have been narrowed it down to

4 three tabs and it appears all the privacy concerns

5 are met.  If they want to release those transcripts

6 at sentencing, that's fine.

7     THE COURT:  Okay.  We're fine.

8     MR. SCHAR:  Okay.

9     THE COURT:  There is one last thing I wanted

10 to raise, and this is not an order it's advise based

11 on long experience.  A good deal of the argument for

12 mitigation in this case is the needs of the

13 defendant's children, it's a perfectly legitimate

14 argument to make, but I had on several occasions

15 encountered cases where I learned later that if the

16 full plea for mitigation was not honored, the

17 children had some difficulties because they seemed

18 to be blaming themselves, that somehow in one way or

19 another they were not good enough or wise enough to

20 do this.  Given what was reported to me in some of

21 the defendant's pleadings with respect to the impact

22 that this case has already had on the children, I'm

23 assuming that the parents are aware of this and will

24 take appropriate steps, but I wanted to make sure to

25 satisfy myself that this would be done.

:30AM
:30AM
:31AM
:31AM
:32AM

1          That's it.

2          MR. SCHAR:  Thank you, Judge.

3          (Recess.)

8

1          IN THE UNITED STATES DISTRICT COURT.
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )  No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )  Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )  December 6, 2011
                                  )
7          Defendant.             )  10:11 o'clock a.m.

8
                 TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE JAMES B. ZAGEL
                      SENTENCING
10

11  For the Government:

12             THE HONORABLE PATRICK J. FITZGERALD,
               UNITED STATES ATTORNEY
13             BY:  Reid J. Schar
                    Carrie E. Hamilton
14               Christopher Niewoehner
                Assistant United States Attorneys
15             219 South Dearborn Street;
               Suite 500
16             Chicago, Illinois 60604

17
   Court Reporter:
18
               Blanca I. Lara, CSR, RPR
19             219 South Dearborn Street
                    Room 2504
20             Chicago, Illinois 60604
                    (312) 435-5895
21

22

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19         CAROLYN & GURLAND ATTORNEY AT LAW
           BY:  Carolyn Pelling Gurland
20         2 North LaSalle Street
           17th Floor
21         Chicago, Illinois 60602
           (312) 420-9263
22

23

24

25

10

1          (The following proceedings were had in Room
2           2525, Ceremonial Courtroom:)
3              THE CLERK:  2009 CR 888, United States versus
4     Rod Blagojevich, sentencing.
5              MR. SCHAR:  Good morning, Judge.
6              Reid Schar, Chris Niewoehner, Carrie Hamilton
7     on behalf of the United States.
8              MR. SOROSKY:  Your Honor, all counsel of
9     record are present for Mr. Blagojevich, and we would
10    also like to reintroduce to Your Honor Carolyn
11    Gurland, who is a new and most capable lawyer who
12    has been added to our defense team.
13             PROBATION OFFICER:  Good morning, Your Honor.
14             Kelly Rice on behalf of probation.
15             THE COURT:  Unless there's some reason to
16    interrupt the customary practice, the first part of
17    this hearing is going to be devoted entirely to
18    determining the correct guideline.
19             I have presently before me three proposed
20    guidelines as opposed to the customary two.  I
21    believe we will begin with the defense and then the
22    prosecution.
23             You can be seated.
24             MR. SCHAR:  Thank you, Judge.
25             MS. GURLAND:  Good morning, your Honor.

1  Carolyn Gurland on behalf of Rod Blagojevich.

2         Before I start, Your Honor, is there a

3  particular -- are there particular issues within the

4  outstanding questions that you would like me to

5  focus on or would you like me to just go over the

6  law?

7         THE COURT:  I think it's fairly clear that

8  the principal issue for everybody here is the money

9  issue, and I think that's the one you want to start

10 with.

11        MS. GURLAND:  Very well, Your Honor.

12        THE COURT:  And then I want to you mention

13 everything else you think would support your version

14 of the guidelines.

15        MS. GURLAND:  All right.  Thank you, Your

16 Honor.

17        Starting with the 2C1.1(b)(2)

18 guideline, which I think the government and the

19 defense are all in agreement with the Probation

20 Office that this is the appropriate guidelines.  And

21 2C1.1(b)(2) guideline counsels that:

22        "... if the value of the payment, the benefit

23         received or to be received in return for the

24         payment, the value of anything obtained or to

25         be obtained by a public official or others

1    acting with a public official or loss to the
2    government from the offense, whichever is
3    greatest, exceeds $5,000, increased by the
4    number of levels from table 2B1.1."
5    In its submission the government calls its
6    guideline calculation of 360 to life an honest and
7    accurate range; however, the government also admits
8    that the calculation is greater than necessary to
9    punish the offense in this case.
10    The discrepancy is so extreme, Your Honor,
11    between even what the government asks and the
12    government's guideline calculation that one wonders
13    whether, while honest, the government's legal
14    position is not accurate.
15    The legal questions with respect to the
16    benefit amount are two:
17    First, under the 2C1.1(b)(2) guideline, was
18    the $25,000 fund-raising request made of Patrick
19    Magoon and was the $100,000 fund-raising campaign
20    contribution asked of John Johntson the value of
21    anything obtained or to be obtained by a public
22    official.  With respect to that issue, Your Honor,
23    probation found that it was and we disagreed with
24    the Probation Office.
25    The second issue which I will treat after

13

1   that is, under the 2C1.1(b)(2) guideline was the

2   $1.5 million number that was being discussed with

3   Jackson supporters the value of anything obtained or

4   to be obtained by a public official.  On that point,

5   Your Honor, the Probation Office found that it was

6   not and we agree with the Probation Office.

7          Starting with the 25,000 and $100,000

8   fundraising amounts, there are four reasons why the

9   defense believes that these amounts should not be

10  used to enhance the sentence pursuant to

11  2C1.1(b)(2).

12         First, contrary to the suggestion in the

13  government's submissions, the facts of conviction

14  alone do not establish the amount of the value

15  obtained.  Even after a conviction, it is the

16  government's burden to establish the amount of what

17  is obtained or to be obtained by a preponderance of

18  the evidence.  This principle is cited in the U.S.

19  v. Quinn case, 359 F.3d 666, Fourth Circuit 2004

20  which is cited in the government's brief, and it is

21  also specifically stated that the government bears

22  the burden of establishing the loss calculation with

23  reliable and specific evidence in United States v.

24  Rang, 2011 Westlaw 436 0005 D.C. Circuit 2011.

25         If the government does not meet that burden,

1  it is not that Mr. Blagojevich would not be

2  punished, it is just that the suggested guideline

3  range for punishment would be less severe.

4      In United States v. Schneider, 930 F.2d 555,

5  the Seventh Circuit explains that when the

6  government fails to prove a sentencing factor, in

7  that case economic loss, it is not the defendant

8  would go Scott free:

9      "... it is simply that the guideline awards

10     bonus punishment points for different levels of

11     proven loss beginning with $2,000.  The

12     government did not earn a bonus in this

13     case ..."

14     Second, the facts do not justify the conclusion

15     that either the $25,000 fundraising request

16     made of Patrick Magoon or the $100,000 campaign

17     contribution asked of John Johnston were the

18     value of anything obtained or to be obtained.

19     It is not disputed that Mr. Blagojevich

20     discussed asking Mr. Magoon to assist in

21     raising $25,000, and it is not disputed that

22     this is the figure that was discussed with

23     Mr. Magoon.  However, the number was a request

24     for a fundraising contribution, it was not

25     carved in stone.

Robert Blago testified at the first trial that
in one conversation with Magoon Robert said
both "somewhere between 10 and 15" and "we are
shooting for 25."  Given the realities of
fundraising that campaign goals are just hopes
and predictions based on prior years, this
number is insufficiently precise.

Indeed, it bears noting that with respect to
Mr. Magoon, he had contributed personally to
Friends of Blagojevich and he was at that time
serving as Chairman Electric of the Illinois
Hospital Association which had contributed
nearly $600,000 to Friends of Blagojevich
between 2002 and 2008.

It is all the more dangerous Your Honor, to
rely on the amount of the request when Magoon,
the party to whom the request was made, never
agreed to contribute $25,000, and, in fact,
never contributed anything.

Regarding the $100,000, it's not disputed that
Monk discussed the $100,000 figure with
Johnston or that this was the amount that
appeared on a Friends of Blagojevich
fundraising spreadsheet.  However, Johnston
never testified to any particular amount, and

1    the spreadsheet is nothing more than a list of

2    fundraising goals dating back to early 2008 the

3    time in which the racetrack legislation was not

4    a prospect.

5    The spreadsheet has a list of highs and lows,

6    further evidencing that $100,000 was not a

7    clearly established figure, nor was it an

8    agreed upon figure because, as with Monk,

9    Johnston never agreed to make a contribution in

10   any amount and, in fact, never did.

11   Third, although there are no reported cases

12   like this one in which the 2C1.1 guideline is

13   driven by fundraising requests, there is a body

14   of case law that explains the language of the

15   guideline received and to be received.

16   And this, Your Honor, I want to acknowledge the

17   background notes that the government points out

18   to the 2C1.1 guideline which talks about

19   attempt.  In the government's filing the

20   government charges that we've ignored this

21   background note; however, we embrace the

22   background note because I think it explains the

23   received or to be received language.  And that

24   background note says:

25      "Offenses involving attempted bribery are

1    frequently not completed because the offenses

2    are reported to the authority or an individual

3    involved in the offense is acting in an

4    undercover capacity.  Failure to complete the

5    offense is not less than the defendant's

6    culpability in attempting to use public

7    position for personal gain ..."

8    The case law all falls within the pattern

9    described in the note, which is that these cases

10   involving attempt, the defendant asks for a specific

11   bribe but then the victim either goes to the

12   authorities or the victim is already undercover law

13   enforcement.  In all of these cases, unlike here,

14   there is no doubt of the precise amount of an

15   illegal bribe demanded by the defendant.

16   A few examples are in order.  In United

17   States v. Mohammed the defendant approached the

18   lawyer in the case and offered to sway the result in

19   exchange for $2,500.  In United States v.  Beltran,

20   defendant provided false passports for $1,000 each.

21   In U.S. v. Falpione, defendant offered an IRS agent

22   $1,500 to get rid of a friend's tax liability, the

23   individual they approached actually went to law

24   enforcement and subsequently gave them a fake

25   receipt for $41,000, again as with the other cases

18

1   it's an attempt but the amount is not speculative.
2   In United States v. Carroll, the defendant was
3   passing out non-immigrant visas charging $10,000 per
4   visa, at a certain point a replacement came in who
5   was cooperating with the government, the defendant
6   approached that individual and said that he in
7   exchange for 250 more false visas he'd give a
8   million dollars, that benefit amount was never in
9   dispute.  And, finally, in United States versus
10   Agostino, the defendant offered a subordinate a
11   $4,000 cash payment in an envelope to agree to
12   compromise his official duties, the subordinate
13   didn't accept the payment but it was never disputed,
14   it was clearly the case that $4,000 was the amount.
15       Clearly, Your Honor, the government is
16   correct that the defendant did not actually have to
17   come into possession of a particular amount for that
18   to be the amount of the benefit under the
19   2C1.1(b)(2) guideline, that is not our argument.
20   Our argument is that in order to meet its burden of
21   establishing the upward adjustment by a
22   preponderance of the evidence the government has to
23   show that the figures that they rely upon were
24   specific, reliable figures.  That is what was done
25   in all of these reported attempt cases but it was

:21AM
:21AM
:21AM
:21AM
:22AM

1  not done in this case.

2       The figures used for Mr. Blagojevich

3  fundraising request or those requests made on his

4  behalf were not specific reliable figures because

5  they were just that, fundraising requests, not

6  illegal bribes and threats on their own.

7       When the Seventh Circuit Hill case, for

8  example, the defendant Liquor Commissioner demanded

9  the cash bribe or he would close the business, he

10 didn't suggest a figure, he demanded a particular

11 amount or else.

12      When in United States v. Marshall, Chicago

13 Heights Mayor Panici awarded a cable TV contract to

14 a franchise owned by a Panici associate for $35,000.

15 $35,000 was the number.  There were no suggestions

16 or requests.  There was a payoff offer to take or to

17 leave.  The reason that the benefit numbers are not

18 specific or reliable in Mr. Blagojevich's case is

19 that his were fundraising requests that became

20 illegal only because they were found to have been

21 improperly linked to official action.  They were not

22 outright payoff offers nor were they outright

23 threats.  Payoffs and threats can't be negotiated,

24 reduced, or in many cases ignored.  Requests can.

25      Not only did Mr. Blagojevich receive nothing,

1    there was never a clearly illegal bribe amount that
2    was communicated.  Indeed, Magoon and Johnston were
3    asked for fundraising and the goal was given, this
4    cannot be the amount of benefit under 2C1.1(b)(2).
5         Fourth, sound policy reasons support refusing
6    to apply enhancements that have a dramatic effect on
7    a sentence without clear evidence of an illicit
8    bribe amount that is because the 2C1.1 guideline
9    focuses on harm.  Application note 7 to the
10   guideline provides:
11      "... for deterrence purposes the punishment
12        should be commensurate with the gain to the
13        payor or the recipient of the bribe, whichever
14        is greater ..."
15        In U.S. v. Mohammed the Seventh Circuit
16   speaks in terms of "the true harm" from the crime.
17   Here, Mr. Blagojevich received nothing and was never
18   going to receive anything.  The amounts of money
19   discussed were fundraising requests which would have
20   been perfectly legal without what the jury found to
21   be an improper link to official action.  The amount
22   of the fundraising request should not result in a
23   dramatic guideline increase.
24        Regarding the second benefit amount, Your
25   Honor, the $1.5 million that appeared in the Jackson

discussions and for which the Probation Office has found that the government has not met its burden of establishing the figure by a preponderance of the evidence. The same legal analysis applies in broad terms as with the $25,000 amount with a few additions.

First, although the $1.5 million were numbers being discussed, the context of the conversations is, as described in the defense filing, that the numbers were being thrown around. It is also has described in the defense filing that at the end of the same conversations, it is clearly stated that Madigan would have been the first option.

This is significant not to try to refute the conviction as to government suggests, but to point out that the government has not met its burden of establishing this figure as the value of anything received or to be received.

The government complains about several policy concerns that they would have if it is the case that this sort of preliminary discussions without specificity could be punished in the way that they'd like. The government complains that unless they can punish this preliminary sort of discussion, public officials could seek repeated bribes without

1  consequence.  Well, that statement is not accurate,
2  first of all, because 2C1.1(b)(1) actually provides
3  for a two-point guideline increase when more than
4  one bribe is discussed.
5          The second criticism the government has, this
6  one of the PSR, is that the PSR has improperly
7  assumed the concept of intended loss out of the
8  guidelines.  But in point of fact, Your Honor,
9  intended loss was never in 2C1.1 guideline; rather,
10 it is a case law that developed first based on 2F1.1
11 which later became 2B1.1 which is the loss
12 guidelines, and that loss, as Your Honor I'm sure is
13 very familiar, is that one takes the greater of
14 actual or intended loss.  However, the same loss
15 isn't necessary in 2B1.1 because this guideline
16 provides for four different loss numbers and asks
17 the person applying the guideline to take the
18 highest.  So it's not necessary to have actual
19 intended, and, in any event, the 2C1.1 guideline is
20 much harsher than the 2B1.1 guideline.
21         The government criticizes the PSR also for
22 not trying harder to value the potential benefits
23 that Mr. Blagojevich discussed in connection with
24 the Senate seat.  According to the government's
25 filing, there was talk of salaries, salaries in

exchange for the Senate seat of $1 million, or maybe
$750,000, maybe $200,000, or 250, or $350,000 per
year for the Change to Win in 501(c)(4) options.
Any of these figures, the government suggests, could
be multiplied by 4 to assume a possible 4-year job.
Alternatively, the government suggests one could
average out what a Health and Human Services would
have been or even what the Senate seat salary would
have been if Mr. Blagojevich appointed himself,
forgetting of course to allow for the fact that the
Senate Seat, the appointment of himself, would have
actually been legal.

Two points about these suggestions.  First,
Your Honor, they're incorrect under the law.  Under
United States versus Sapoznik, 161 F.3d 1117,
Seventh Circuit 1998, the benefits under the 2C1.1
guideline is to be the net benefit, not the gross
benefit, such that Mr. Blagojevich's legitimate work
in these working positions would have had to be
accounted for before the benefit could be
calculated.

Second, all of the existence of these myriad
of valuation options actually suggests is the
inherent danger that results from the government's
position that discussion of certain numbers in the

absence of concrete actions should be able to drive
the benefit number.  Mr. Blagojevich should be
punished for several years more in prison depending
upon which of the many discussions one selected as
to value of the benefit.  That doesn't make sense
and it should not be the law, and it's not.

Another policy argument the government has is
that unless one can punish unspecified numbers, then
there will be an issue with defendants because maybe
when they talk about things maybe they'll be vague.
However, Your Honor, even without any benefit at all
being established, the 2C1.1 guideline yields a 24
to 30 month sentence which could, no doubt, serve as
a valid basis from which the Court could work and
apply the 3553 factors.  Furthermore, it's
reasonable that the guidelines intend to punish
specific, direct efforts to obtain an amount certain
more severely than loose talk.

The government's final policy point, I'm not
sure I perfectly understand but I think it goes
along the lines that, unless they're able to punish
benefits that are less than certain maybe law
enforcement won't be motivated in the future to stop
a bribe scheme before it comes to fruition in order
to be able to punish more corruption.  I would

25

submit that this factor can't really be taken that
seriously.  Law enforcement has to be credited with
the willingness to do their job.  It's protection of
the public that is their job, it's not how high of a
sentence they might eventually be able to impose on
a defendant that should be guiding their actions.

That concludes the presentation on the 2C1.1
guideline, and if Your Honor would like, if you want
the government to start or if you want me to go into
leader organizer.

THE COURT:  Go on to leader organizer.

MS. GURLAND:  Thank you, Your Honor.

The second substantial disagreement that the
defense has with the probation report is the
application of the 2B1.1 guideline.  This guideline
was applied to Mr. Blagojevich based on his position
as Governor or as the nominal boss of other
participants in the charged conduct.

These terms and explanations of why it was
being used were not actually a point by the defense,
rather, they appear in the government's version
submitted to probation.

As the defense has pointed out, this role is
already accounted for in 2C1.1(b)(3), as well as in
the use of the harsher 2C1.1 guideline itself.

1          The government argues that in this case
2    Mr. Blagojevich demonstrated a real leadership role,
3    vis-a-vis the other participants in the charged
4    conduct.  The defense disagrees.
5          While it is true that as the government
6    points out in their filing Mr. Blagojevich had more
7    to gain than his advisers and that on occasion he
8    asked them to do things for them, like research
9    information, it is false that Mr. Blagojevich
10   exhibited the type of leadership role that 2B1.1
11   guideline seeks to punish.
12         First, as revealed by the tapes,
13   Mr. Blagojevich sought advise and direction from his
14   advisers rather than directing them in many, many
15   cases.
16         In connection the with Magoon contribution,
17   for example, his advisers selected the amount of the
18   fundraising request, as well as the person who would
19   make it.  In terms of the Johnston fundraising
20   request, as both Johnston and Monk testified at
21   trial, neither of them were even being honest with
22   Mr. Blagojevich about the real content of their
23   discussions.  And it's important to note that Lon
24   Monk had the conflicting role of Blagojevich
25   fundraiser and Johnston lobbyist, and then he

admitted at trial to embellishing, exaggerating, and lying in relating his conversations with his boss, Johnston, to Blagojevich.  Other advisers had admitted to running Blagojevich, rather than vice versa.

With respect to the Senate appointment discussions, the facts are that Mr. Blagojevich's advisers suggested various potential personal benefit such as Change to Win to Blagojevich.  They directed him as to when he should have certain discussions about certain personal benefits and even about the specific words he should use in having those discussions.

Indeed, the argument could be made, and was made by the government at the trial, that Mr. Blagojevich did not proceed with any concrete action to make Lisa Madigan option a reality despite all of the seemingly endless discussion on the topic.  And while the government would argue that the absence of concrete action was because Mr. Blagojevich wasn't serious about the option, the better argument is the other side.  Given the numerous calls on the topic and the consistency with which the Madigan option was discussed throughout the taping it is more plausible to assume that Mr.

Blagojevich's lack of leadership ability resulted in the utter stagnation on the Senate appointment that was revealed in the tapes.

Under these circumstances, Mr. Blagojevich is less than a threat and less culpable than are individuals who have ironclad forceful influence over the people around them or the ability to take quick and decisive action.

Put simply, Your Honor, if Mr. Blagojevich had been the type of defendant to whom the 3b1.1 adjustment was intended to apply, there would have been a Senate appointment that he decided upon and one with which his advisers fell in line; that never happened.

In these circumstances to punish Mr. Blagojevich for four additional points under the 3B1.1 guideline after having already punished him under the 2C1.1(b)(3) guideline for being on a high-level supervisory position would be impermissible double counting.

The same applies for the otherwise extensive portion of 3B1.1. The argument argues that because staffers were given some research assignments and because the talk of the possible options about the Senate seat was broad, that the conduct was

29

1 otherwise extensive, but that is not enough. Under

2 3B1.1(a) refers to extensive criminal activity, not

3 extensive talk.

4 Finally, Your Honor, in response to the

5 government filing of yesterday, in that filing the

6 government criticizes Mr. Blagojevich for citing

7 transcripts that showed that he was not a leader.

8 It is not common, I would submit, to argue for

9 enhanced prison sentence for a defendant based on

10 legal arguments such as defense lawyers submit in

11 their judicial submissions. In that filing, Your

12 Honor, and for the first time, because it didn't --

13 because no transcript quotes appeared in submission

14 to probation and no transcript quotes had ever

15 appeared in the government's sentencing submissions

16 to this Court until yesterday, they came forth with

17 two transcript examples that they say support

18 Mr. Blagojevich being a leader.

19 In one he acts maybe a little bit stronger

20 with Mr. Harris and says but still -- and what he's

21 asking was the question "do I see me," asking Harris

22 for guidance and advise. The second example is the

23 same request for research that's been what the

24 government has been arguing in the other filings

25 with this court.

30

1      In closing, Your Honor, I submit that to
2  consider in these circumstances that Mr. Blagojevich
3  merits an additional four points under the 3B1.1
4  guideline after already having punished him by
5  having applied the public corruption guideline in
6  the first place and by applying the supervisory role
7  four-point adjustment already provided for in that
8  guideline would be unjust and would be inappropriate
9  under the law of the guideline, as well as
10  impermissible double counting.
11      Thank you.
12      THE COURT:  Thank you.
13      Go ahead.
14      MR. SCHAR:  Judge, I did not hear anything in
15  defense counsel's presentation that was different
16  from the briefs on the issue, and I believe the
17  government has fully briefed the issue of both
18  guideline loss of leadership, and so obviously I
19  will be relying largely on that.
20      In terms of the loss amount in particular,
21  Your Honor, defense counsel continues to focus on
22  the Section of 2C1.1 that's really not in issue
23  here, which is the benefits received section.
24      The issue should be focused instead on the
25  section of the guidelines that deals with anything

to be obtained.  And the question obviously at its
heart boils down to what was it that the defendant
was attempting to obtain and is there a way to put a
figure on that particular number.  And in this case,
by certainly more than a preponderance of the
evidence, that figure is very clear.

In both the Magoon situation, the question
was how much money did the defendant want.  And just
so we're clear, the fact that these were campaign
requests and he may not get everything that he
requests is not a factor from the government's
perspective, Your Honor, because the reality is, the
defendant wasn't in the business of returning
Monday.  He had a number that he wanted.  He
communicated that number or the number was not in
dispute in terms of what was communicated to him.
And if it turns out he would have gotten more than
that, he would have taken, and if he would have
gotten less than that he would have been
disappointed.  But if Patrick Magoon had showed up
with $25,000 and John Johnston had showed up with
$100,000 he wasn't going to be returning the money.

And in this case, Judge, the evidence is
bountiful that the numbers were very clear as to
what he wanted to obtain.  As to Mr. Magoon, not

only was the $25,000 figure communicated to
Mr. Magoon, but of course as the government put into
evidence, there was specific discussion, and John
Wyma had this conversation, of the $25,000 figure,
in fact it was higher than that at one point, it was
$50,000 but 25,000 is the number for guidelines
purposes, and, in fact, Mr. Wyma wrote down at the
time of the meeting "$25,000" on one of the
fundraising spreadsheets.

So there's no issue from the government's
perspective, it's certainly not anywhere close to a
failure of preponderance as to what the money was,
the campaign contribution the defendant wanted.

In terms of the Johnston, again the number
was on the spreadsheet, it was $100,000. Mr. Monk
testified that he was present for a conversation
which the defendant communicated the $100,000
request to Mr. John Johnston. There is not a
failure of evidence as to how much money was at
issue and how much the defendant wanted. He wanted
$100,000, he communicated 100,000. The fact that he
may not ultimately have received any of it or was
going to receive any of it is not the significant
issue in the inquiry, Your Honor, the issue is what
is it he wanted to obtain and is it an articulable

1  number, here it is.

2        As for the issue of the Senate seat.  What

3  basically the defendant is arguing is, and probation

4  has at some level accepted, is it's just too hard to

5  figure out and therefore let's just make it zero.

6  That cannot be, Your Honor, that cannot be the

7  result in situations like this.  And we laid out in

8  our papers, obviously, a variety of consequences

9  that could occur if that were the result, but it

10 makes for a basically loophole or safety area for a

11 very clever individual to say, look, we know exactly

12 how much money I'm interested, I'm not get to

13 articulate the number, you just bring it to me in a

14 bag.  And apparently despite the fact that this is a

15 clever individual, a clever defendant, and a clever

16 criminal, perhaps more clever than the average, they

17 somehow have zero punishment under the guidelines

18 for that type of situation?  It's not a sustainable

19 situation.

20        As to the Senate seat, again, and this is

21 true throughout the guidelines, clearly the issue

22 for Your Honor is to estimate what was the number

23 that was at issue.  This is how it's done in loss

24 calculations under 2B1.1, it's how it's done in drug

25 situations under 2D1.1, the question is what is a

1  reasonable estimate of what it is the defendant
2  sought to obtain.
3        As to the Jesse Jackson, Jr. money, the
4  $1.5 million, there was never a dispute as to the
5  defendant's understanding that $1.5 million, what
6  was the number that was being offered, not only is
7  it on the tapes repeatedly and we cited that in our
8  papers, beginning with Mr. Greenlee on I believe
9  October 31st, 2008 and ending on the very day he
10 sends his brother, his chief fundraiser, to the
11 person offering the bribe.  The $1.5 million again
12 is articulated that morning, December 4th, 2008.
13 There's never a dispute throughout this entire
14 period that $1.5 million was what was being offered.
15 The question came down to, did the defendant, from
16 the government's perspective, did the government
17 seek to obtain that money.
18       Again, Judge, this was not a defendant who
19 was in the business of returning campaign
20 contributions if he could've gotten them.  And on
21 December 4th of 2008, he sent his brother to the
22 person offering the $1.5 million to begin the
23 process of obtaining that money.
24       When the defendant testified, there was not a
25 dispute between the defendant and the government

1  that the $1.5 million was the offer, the dispute was

2  whether or not the defendant sought to obtain the

3  bribe.  He claimed he didn't, the jury found

4  otherwise.

5        So again, the issue from the government's

6  perspective is fairly concrete, that the number is

7  clear and easily valued.  But even if you were to

8  take the $1.5 million and push that to the side, the

9  failure to attempt to estimate any loss for the

10  Senate seat is, again, inappropriate.  We laid out

11  in our papers the variety of jobs that the defendant

12  sought, and you could estimate potential loss on any

13  one of those particular jobs.  The fact that net

14  benefit isn't in there, again, doesn't stop an

15  estimation.  And in particular, Judge, the Change to

16  Win job, this was clear on the tapes, that was just

17  going to be made up.  There is very clear

18  discussion, they don't need someone to do this,

19  they're just making this job up so the defendant

20  will name the senator.  So from that perspective,

21  it's all benefit and unnecessary benefit to the

22  defendant.

23        I don't think there is any relevance

24  whatsoever to the fact that his request for campaign

25  contributions, that campaign contributions are, to

1   use the term the defense is using "legal," the issue

2   is not legal or illegal in the sense of what it is

3   that's sought.  He wasn't asking for cocaine, we can

4   all agree that he wasn't asking for an inherently

5   illegal product, what he was asking for, though, was

6   done in an illegal way.

7        So the entire argument that somehow there's

8   relevance to be gained from the fact that the

9   campaign contribution is in and of itself an illegal

10  item is immaterial to the issue.  What he was asking

11  for, what he was committing was crimes to attempt to

12  get that.

13       As Your Honor knows having sat through the

14  trial, there were consequences to not meeting the

15  numbers the defendant wanted.  There were

16  consequences.  The Children's Memorial money was put

17  on hold because the $25,000 wasn't delivered.  He

18  had not signed the racetrack legislation because

19  $100,000 wasn't delivered.

20       So from the government's perspective, again

21  it's laid out further in the brief, the numbers are

22  concrete, they're clear, they're what the defendant

23  wanted to obtain.  To focus on whether he could or

24  could not ultimately achieve it is not material to

25  the issues here and we stand by what we wrote in our

briefs.

As to leader organizer, Judge, again, the defendant seems to want to focus, in part on the part that someone because the defendant was a Governor or the boss that alone -- somehow the government is arguing that that alone is what gets him leader or organizer. That could not be farther from the truth, that is not the premise of the leader, organizer.

First taking a step back. The double counting argument fails. What they're arguing, in essence, is this leader or organizer is already accounted for in 2C1.1 because he gets a bump up for being a public official. He gets a bump up for being a public official whether he lead anyone or not. It goes to a different harm, which is the fact a corrupt public official, a high-ranking public official is considered particularly harmful within the guidelines.

The same series of facts, and the law is clear on this, the same series of facts is also relevant to a portion of the guidelines that is aimed at a different type of harm, and the different type of harm is being an official, not a public official but anyone who leads and organizes criminal

conduct.

And in this case the defendant clearly was a leader and organizer of this criminal conduct. He repeatedly, repeatedly is the one who is leading the conversations. The fact that he was asking people around him how he should participate in a criminal activity doesn't make him any less of a leadership or organizer. He was the only one who stood to benefit, he was the only one who was the one raising these conversations in the first place. No one was running to the defendant from his crew of advisers or people -- "advisers" is even an overstatement, people who worked underneath him, for the most part, and saying here's exactly how you should trade the Senate seat for something of personal benefit to you. He is the one who raised this over and over and over again on the tapes. And to argue as he the does that somehow these people were all using him because of their conflicts in interest, he had the greatest conflict of interest of everyone here, and yet he continued to go down the road where he was trying to get things for himself in exchange for official acts.

I heard the defense say that if he had actually been a leader he would have decided upon a

39

senator.  He did.  Twice.  He decided it was going
to be Valerie Jarrett if he could get HHS, which he
ultimately could not, or if he could get millions of
dollars in a 501(c)(4), he made it clear to
Mr. Balanoff in a meeting, he made it clear on the
tapes, he made it clear with a conversation with
Mr. Balanoff on the tapes, he did decide, he just
didn't get what he wanted.  And again, these are
benefits for him.

Our papers lay out in some detail, Judge, the
number of people that he oversaw in this, it goes
through Mr. Harris, Mr. Monk, and a variety of other
individuals that are listed in the probation
department's report and the government's version.
Over and over again he was the one who was directing
what was to be done.  Research that was to be
concluded, decisions that were to be made, all that
went to his benefit.  And, clearly, there are more
than five participants here, particularly when you
include him.

In terms of the otherwise extensive, Judge,
we'll rest on the briefs on that part of the
argument.  I think it's laid out in some detail.

The only other thing I would add is,
obviously within the government's objections to the

1 PSR which was not previously addressed, there are a

2 variety--and I believe we put a chart in at pages 21

3 and 21--a variety of statements that we take issue

4 at in the PSR and as we're arguing PSR issues now we

5 would ask you to at some point today resolve those

6 objections as well in relation to striking various

7 portions or at least changing the language of

8 various portions for clarification purposes of the

9 PSR.

10          MS. GURLAND:  May I?

11          THE COURT:  Yes.

12          MS. GURLAND:  Thank you, Your Honor.  Very

13 briefly.

14          What I heard from the prosecution again and

15 again is that the standard for the amount, the value

16 of anything obtained or to be obtained from a public

17 official, I heard again and again, what did he want

18 to obtain, it's what he wanted to obtain to what he

19 wanted.  And I would submit to Your Honor that under

20 the guidelines that's not the measurement of the

21 harm.

22          The guideline is trying to measure harm, it's

23 trying to measure conduct, it's trying to have a

24 realistic view of what happened in the case and to

25 square that with the amount of punishment that's

1  going to be heaped upon a defendant, and what he
2  wanted can't be the standard, because otherwise, as
3  we pointed out in our papers, the loftiness of the
4  hopes and dreams of a person in some kind of talk
5  that they had with somebody somewhere is going to be
6  the amount that's going to result in a dramatic
7  change, decades more time in prison.  That kind of
8  imprecision is not the law, it's not what the
9  guideline intended, and it would be enormously
10 unjust for individuals coming before the Court and
11 asking for a reasonable application of that
12 guideline in their case.
13         The second point, Your Honor, is, I heard the
14 prosecution say that probation didn't figure out
15 anything for the 1.5 million because it was just too
16 hard to figure out.  With all respect to Kelly Rice,
17 I think she tried pretty hard to figure it out and I
18 don't think that she concluded that it was simply
19 too hard.  What she actually concluded in the PSR,
20 Your Honor, is that the government hadn't proven a
21 $1.5 million value of something obtained or to be
22 obtained by a preponderance, that's what she found,
23 that it was their burden and that they didn't meet
24 it.
25         I heard also the prosecution talk about the

fact that if we're not allowed to use some kind of
speculation with numbers as in the Jackson case,
it's just to risky to the government they won't be
able to make the cases.  What about the risk to the
defendant, though, Your Honor?  Isn't the risk to
the defendant about spending unnecessary decades in
prison more important than the risk to the
government?  which isn't a risk, anyway, because
under the guideline framework even if the guideline
was too low in their approximation of the judge,
3553 factors provide endless discretion in order to
adjust for whatever issues might arise.

        And, finally, Your Honor, in term of
$1.5 million, I hear the prosecution say that's the
only amount that's ever discussed.  We don't dispute
that that is an amount that was discussed.  What
we're disputing is that the government established
that that was a benefit of the value of something
that was obtained or to be obtained.  And in
instances in which there is a conversation about a
number, in which those same conversations say that
those numbers are being, quote/unquote, "throwing
around those numbers," and when in the same
conversation it closes with a specific commitment
that if the Madigan option was a realistic option,

43

1   Jackson was off the table.  In those circumstances,
2   Your Honor, the defense would submit that it would
3   be profoundly unjust to punish this man for that
4   conduct.
5        THE COURT:  Is it your position that if it
6   is, in fact, true, and I accept the proposition that
7   the Madigan deal was the only thing on the table, is
8   your position that if I assume that, I am
9   essentially held to agree to it?
10       MS. GURLAND:  It would be my position, Your
11  Honor, if either you assumed that the Madigan option
12  was still actively being considered and might have
13  happened or if Your Honor concludes that there was
14  not any kind of certainty, so in other words if
15  Madigan was the option or if Mr. Blagojevich
16  appointing himself was the option, or
17  Mr. Blagojevich appointing Gery Chico was the
18  option, or any of those things, if there was
19  uncertainty, I would submit that they have not
20  established that a $1.5 million figure was the
21  figure of a benefit received or to be received.
22       THE COURT:  So, for example, if there were 3
23  or 4 packages on the table and one of those packages
24  had "Jackson" on it, the fact that they're on the
25  table and the fact that the defendant would pick any

:51AM
:52AM
:52AM
:52AM
:53AM

44

1   one of them, the amount would still not be had?

2        MS. GURLAND:  I would say yes to that, Your

3   Honor.  I would say yes.

4        And just very briefly on the leader

5   organizer.  I hear from the prosecution that because

6   of the fact that Mr. Blagojevich raised over and

7   over again the Senate seat appointment with his

8   advisers and drew them into discussion about it, and

9   because he had the conflict, and that he was trying

10  to help himself, that those are the reasons that he

11  should receive a leader organizer enhancement, but

12  all of those things, Your Honor, I think are reasons

13  that there was a conviction on the various counts

14  but I would respectfully submit that even if those

15  things are accurate and even if we have to accept

16  them as accurate for this proceeding, they don't get

17  to the heart of what we have to determine here.  And

18  I think the heart of what Your Honor has to

19  determine, because four points in this place in the

20  guidelines is a dramatic sentencing advisory range

21  increase for Mr. Blagojevich.

22        So the answer is not whether or not the

23  government thinks that the Senate seat conduct was

24  bad.  We know they think that, the jury found it,

25  we're not here to argue that, what we're here to

45

argue is, is it appropriate after having already
made an adjustment for his supervisory role, given
that he's the boss of these people, given that he's
the Governor, is it appropriate after already giving
him four points for that, is it appropriate and is
it just to give him four more points for being a
leader.

And I would submit to the Court that in
making that decision, you have to think about
whether or not this individual demonstrated the kind
of ironclad force of personality leadership that the
guideline wants to punish because those type of
people are more dangerous and more harmful, and our
submission is that in the facts of this case that
adjustment, that additional four-point adjustment,
is not appropriate, Your Honor.

THE COURT:  Let me phrase the government's
argument in a different way.  What I think the
government is saying is, if you look at this as a
whole, all of these advisers, some of them who work
for him and some of them who don't, are laboring at
a variety of suggestions, almost all of which come
from your client, and they're laboring there to see
that these somehow come to light, but there's no
apparent benefit to any of them, all the benefit

goes to your client, why isn't he the leader?

Maybe you could say, well, he wasn't that focused, he drifted a lot, maybe he wasn't much of an organizer, but he is the one who seems to have pointed the direction to go and why does he not qualify as a leader? The phrase is "leader or organizer."

MS. GURLAND: In the law of 3B1.1, as Your Honor is very well aware of, much more so, I'm sure, than I am, there's a whole laundry list of factors that you are to consider in deciding whether or not that adjustment applies. It includes whether or not the benefit goes to a particular individual, but it includes whole slate of other factors having to do with the type of personality and the specific facts of the case in terms of how people were being directed. And --

THE COURT: So setting the goal is just a factor?

MS. GURLAND: Setting a goal is a factor. And I don't dispute with the Court or with the government that of course that's an important factor, but I think there are other factors. And in instances in which, particularly with the Senate seat discussions, we have as we've laid out in our

papers, that individuals are directing
Mr. Blagojevich, they're sometimes scripting the
language that he uses, he's asking questions,
sometimes they override, particularly in the $25,000
conduct involving Magoon and the $100,000 conduct
involving Johnston for example, they're calling the
shots.  In Magoon, the advisers decide the amount,
they decide who presents it, with the Johnston
conduct it's just a mess because the individual who
is going to approach Johnston is Johnston's
employee, and we get the testimony that on both
sides they're lying to Mr. Blagojevich, they're
saying that they're having conversations that
they're not even having.

THE COURT:  What I don't understand, the
examples you give are examples of his advisers and
his brother deciding, for example, that with respect
to Magoon it's too much, so they're making a
tactical decision, a strategic decision is made by
the leader and that's your client.  They're trying
to get what they can get and their estimate may be
lower, I don't see why that makes them independent
actors in any real sense of the word.

You know, you send somebody out for coffee
and you get very particular about these various

1  kinds of coffees, examples of which I won't give you
2  because I don't drink coffee and I don't understand
3  all those words, and somebody comes back and it's
4  not precisely the type you've asked for but it's
5  what they had in stock what he could get, it's still
6  the person who ordered the coffee.

7        MS. GURLAND:  I agree, Your Honor.  In some
8  portions of the facts in this case dealing with
9  Mr. Blagojevich's advisers, it would be as if he
10 asked them to go out and get coffee and they didn't
11 feel like going outside because it was too cold and
12 so they said that the Dunkin Doughnuts was closed
13 and so was Intelligentsia but they were open and
14 they didn't bring back any coffee, I think that
15 there is some instances like that --

16       THE COURT:  But you think that's the correct
17 analogy?

18       MS. GURLAND:  I don't know if it's the right
19 analogy, Your Honor, but I do think that the
20 advisers were running Mr. Blagojevich and I think
21 that some of them even told that to the government.

22       THE COURT:  Actually, one adviser, according
23 to this, said that on occasion they marched him
24 along, once.  No reference to this set of
25 circumstances, no questions about what circumstances

1  there might be.  There was, in fact, the person who
2  said this on the witness stand, I don't recall
3  cross-examination on this.  So what you've got is a
4  series of recordings that are dominated by your
5  client, and the possibility that on some issues the
6  staff marched him along.  But there's no indication
7  that on this issue they did, this is no indication
8  with Harris how many times this happened.  So I
9  don't know how much weight you can attach to that
10 one example, particularly when what you've got is
11 one example and one adviser.
12        At any rate, anything else you would like to
13 say?
14        MS. GURLAND:  Just in closing, that I believe
15 that some of the same information about being the
16 one who is calling the shots being a supervisor is
17 accounted for within 2C1.1 guideline because it does
18 punish the person who is in the supervisory role.
19        THE COURT:  Okay.
20        I think I'm ready to rule on the guideline
21 issue, and then we'll break for a while.
22        If you begin with the general structure of
23 the guidelines, you could read the guidelines, take
24 the position that you find out how much somebody
25 stole, or somebody took, and that's the value you

:00AM

:00AM

:01AM

:01AM

:02AM

attach to it.  And some people thought, at least in the beginning, that was the beginning and end of the guideline.  But it's not.  What somebody attempted to get but didn't is significant.  This is why the phrase "intended loss" counts.  And it's why if both sides to an agreement in a transaction are guilty of an offense and they have different views of what the deal is going to be worth to them, these two people who might be guilty in other sense will have different guidelines, because one's intent may differ from the others.

        And there has been a theme, and this is an issue in mitigation as opposed to a guideline issue, that the defendant's sentence ought to be lesser because he didn't get any money.  Got nothing to put in his pocket.  To which the government makes a response that it would have happened if we hadn't intervened.  But it doesn't matter, the government doesn't have to establish that.

        The probation officer noted that the lack of an actual exchange of benefit doesn't mean that no levels could be added.  The Sentencing Commission notes specifically says this, failure to complete an offense does not necessarily lessen a defendant's culpability.

1      So the probation officer, based on this
2  principle, accorded a benefit value of $125,000,
3  $25,000 with respect to Children's Memorial and
4  $100,000 with respect to the racetrack bill, these
5  numbers are supported by the record, and the fact
6  that Magoon might never have paid and Johnston might
7  never have paid does not stop them from being taken
8  into account.  And for purposes of this hearing, I
9  am assuming that neither of these two benefits would
10  have been paid.  That assumption may be
11  counterfactual.  I only assume it because under
12  ordinary circumstances you can't, and we don't know,
13  but I'm assuming it because it simplifies the
14  calculation.  In fact, the government of Illinois
15  had a significant power to inflict penalties on
16  those who did not pay, and maybe Johnston and Magoon
17  refused, but there's no way of knowing if for
18  example the government had not been conducting this
19  investigation that finally they may very well have
20  paid on the assumption that it was better to pay
21  than to suffer the consequences.  So the two
22  benefits are included despite my assumption that
23  they would not have been paid.
24      Some of the evaluations here with respect to
25  what was done would be extremely difficult to

1  calculate.  The value of an appointment of another

2  person is a very different type of thing to evaluate

3  the value of an appointment to a seat in the United

4  States Senate, and on top of that the value various

:06AM   5  on the character of the candidate.  The exchange

6  rate with respect to the Senate proposals did differ

7  from person to person.  For one, the defendant would

8  receive legislative assistance in passing programs

9  into law, for another person the defendant would

:07AM  10  receive cabinet level or ambassadorial appointment,

11  or some employment for the defendant after he left

12  office.  I discount them because, in my view, they

13  fell by the wayside fairly quickly, but they were

14  alive for a while.

:07AM  15       For a third person the benefit was

16  contributions to the defendant's campaign finance

17  entities.  The defendant said he would receive 1 and

18  a half million dollars in exchange for that person's

19  appointment to the Senate.  There is evidence that

:07AM  20  that figure might have been much higher, but the

21  recorded voice of the defendant speaks only of

22  $1.5 million.  It is true, on occasion, the

23  defendant seemed to recognize that maybe that would

24  not occur, but that was the benefit he had in mind.

:07AM  25  And I don't think it calls for distinguishing

between hoped for, which is language that the defense used, or believed in. It was a price that he put on it, a price he expected to receive. It was, in a very real sense when he said it, what he regarded as the demand. And if there had been more evidence with respect to this, if his brother had not apparently misunderstood the value of the offer, it might have been more.

The probation officer believed that there was no evidence that the defendant would receive this money or thought he could receive such a sum. I disagree. The persistence of the defendant in pursuit of benefits wasn't successful but it was pretty relentless. And he spoke of his intent and expectation that he would receive the benefits he wanted, and there is plenty of evidence as to what the Senate seat appointment could mean to him personally.

The strongest evidence is the defendant's own understanding of the $1.5 million was on the table if he pointed a certain person to the Senate and that is the figure that should be entered into the calculation of offense levels.

Might it be less if he settled for something less? Sure. Might he have gotten more? Sure. But

this is precisely the kind of area where you make a
reasonable valuation, and the reasonable valuation
in this case is based on his words.

        And, in fact, I don't think that any other
deal was on the table.  I don't think he could
reasonably believe that any other deal was on offer
or would be an offer.  He hoped there might be
another, but the $1.5 million is the only amount he
could've intended to obtain.  The probation officer
did not accept this because of her conclusion that
the defendant had decided not to take it.  I think
this is incorrect.  It is based on the notion that
he would not have accepted the bribe because someone
else was his first choice.  Even if this were true,
it does not mean that the defendant had abandoned
someone who was a second choice.  There are a
variety of reasons this is so.  The demands for
legislative assistance in exchange for the Senate,
which were put into evidence at trial, were quite
extensive.  And he really had no indication at all
that the provider of this support would be willing
to agree to these demands or even consider them.
All the defendant had to go on were offers from
intermediaries who would try to broker a deal, but
they had no information as to whether their attempts

1 would be successful or whether their attempts even
2 could be made.  And there is no indication that any
3 of them had any idea what the contours of that
4 proposal were.

5       They did not know whether the proposed
6 political leader would, in fact, provide legislative
7 support had any interest in any deal at all.  The
8 1.5 million was very much still on the table, and it
9 was the amount that the defendant expected to obtain
10 if he made the appointment expected by the donors.
11 And, in fact, it doesn't actually require that the
12 appointment be made.  All it required is that he got
13 the money and he could get the money and not make
14 the appointment, which meant that the fact that he
15 had a first choice and assuming that first choice
16 went through, it doesn't mean he's not going to get
17 the money.

18       And, in all honesty, I don't think the
19 evidence supports a conclusion that the proposed
20 choice was in fact his first choice.  It actually
21 points in the other direction.  It is true that the
22 defendant said so, but his actions don't back up his
23 word.  The proposal that he later deemed to be his
24 first choice is treated as an outlier, maybe even a
25 last choice from the very beginning accompanied when

:11AM
:11AM
:12AM
:12AM
:13AM

it was mentioned by extraordinarily unkind words, a
euphemism, for both Attorney General Madigan and her
father.  The idea that it was his first choice was
also compromised by a lawyer's comment that, quote,
"he was afraid of having the idea ejected."

The defendant did testify that the night
before he was arrested his thoughts before bed were
that tomorrow he would begin, and emphasized the
word "begin," his effort to make a deal to appoint
Lisa Madigan as the United States Senator.  I think
this is untrue.  I thought it was untrue when he
said it and I still think so.  I conclude that he
seized on this particular detail, particularly at
trial, because it was one of the few moves available
to him that may well have been legal, that is to say
appointing a qualified candidate for the Senate,
which the Attorney General of Illinois was, in
exchange for legislative votes for programs that
benefited the People of the State of Illinois as
opposed to putting money in his pocket or his
campaign fund.

And interestingly enough, the defendant
himself offers evidence that the Madigan deal was
not his first choice.  The defendant cites a
conversation between the two of the chief aides in

which they concluded that the defendant's first
choice was appointing himself, not the Madigan deal.
And, in fact, the defendant had stated, I believe on
the day before his arrest, that he was considering
appointing himself.  I don't think his assertion
that he was committed to his claim first choice is
credible.

And with respect to appointing himself, there
were some significant benefits to him for doing
this.  It was virtually the only thing that could
get him away from the resistance of the general
assembly on legislative matters and possibly that
things could degenerate to impeachment which would
be damaging ven if it were not successful.  He
indicated more than once how unhappy he was as
Governor, he said living with two more years of
legislative stalemate was, and I quote, "gonna be
miserable," he would have, if he went to the Senate,
almost 2 years to make a new political life and
reputation.  The only thing wrong with the plan is
that senators, in fact, make less money than
governor's of Illinois, nor do they have the help
and protection of large security details, which
makes me think that appointment of himself wasn't
his first choice either.

1      I can understand that by saying the Madigan
2  deal was his first choice he might have meant that,
3  in some respects, he considered it the best deal,
4  although I don't think this is true.  It is improper
5  to conclude, as the probation officer did, that the
6  defendant considered it the only deal he would
7  accept, or the most likely deal, or even that it was
8  a deal.  The use of the phrase "first choice" by the
9  defendant did not have the meaning or significance
10  that the probation officer assigned to it.

11      I think my conclusion in this is consistent
12  with the verdict of the jury.  The Presentence
13  Report is inconsistent with the jury's conclusions
14  as to what have been proved beyond a reasonable
15  doubt, perhaps this is so because the officer was
16  convinced the defendant would, in fact, never
17  appoint the man who supporters were offering
18  campaign contributions, I reiterate maybe this is so
19  but it does not mean that he had resolved not to
20  take the money, just that he resolved not make the
21  appointment.

22      I find that the offense level should be
23  increased not by 10 levels but by 16.

24      While this argument has been made with great
25  vigor on both sides, the fact remains that it is

:16AM
:16AM
:17AM
:17AM
:17AM

effectively moot.  The government says that the
guidelines of 30 years to life is too high, it's
inappropriate, it calls for a sentence which under
its own terms and under the terms of congressional
statute is far more than the defense justifies.
What, in fact, the government recommends is a
sentence that is essentially within the guideline
computed by the Probation Office, although on its
low end the government's recommendation is lower
than the minimum in that guideline, and at the high
end of the government's range is a sentence that is
a few months longer than the top of that guideline
range.  But, basically, we are talking about a
single guideline range.

        And it should be noted that I agree with the
government, and with the defense for that matter,
that the guideline that I believe is correctly
computed for this, which is 30 years to life, is
simply not appropriate in the context of this case.

        The more important difference, for practical
purposes -- oh, since the government has mentioned
it and it's a technical detail, I think the
government is correct in its objection to some of
the language in the Presentence Investigation
Report.  The PSR statement includes other statements

1  that should be qualified by stating that the
2  substance of these statements are what "the
3  defendant contends," this is true of all of the
4  examples listed at Pages 21 through 23 of the
5  government's sentencing memorandum except the
6  following which I designate by their place in the
7  PSR, those should be stricken in their entirety:
8  Page 11, lines 282 to 286, Page 18, lines 532 to
9  lines 534, Pages 18 lines 543 -- I'm sorry, 532 I
10 think through 534; Page 18, lines 543 to 544,
11 Page 19, line 585.
12         The more important debate between the two
13 parties, arguments between the two parties,
14 considering the government's position on its
15 recommendation, is the leader organizer, because
16 that's four points that do make a difference, a
17 meaningful difference.
18         The probation officer increased the offense
19 level by four because she found the defendant to
20 have been an organizer and leader of criminal
21 activity involved five or more participants or was
22 otherwise extensive.
23         Considering the number of the governor's
24 staff that were assisting in an effort to find a
25 place for the defendant to land and to secure

1  campaign contributions and the number of outside

2  consultants, his assistance, the defendant called

3  upon, and his own brother, the criminal activity

4  more than meets the standard of extensive criminal

5  activity, let alone the five-person number.

6      The purpose of this widespread effort was to

7  secure personal benefits to the defendant or his

8  spouse, both political and private spheres, all in

9  exchange for promise of official actions for the

10  Governor of Illinois.  His role as a leader is

11  clearly shown by his actions and not merely his

12  badge of office.

13      If John Harris were the Governor and the

14  defendant was the Chief of Staff recorded

15  conversations would demonstrate that Rod Blagojevich

16  was the leader and organizer, except of course the

17  benefits would have been flowing to the Chief of

18  Staff as opposed to the Governor.

19      The defense argument in this respect with its

20  fairly new argument that he was an easily

21  manipulated officeholder, it is not consistent with

22  what we heard on the recordings, for from the

23  testimony of the witnesses, or, for that matter,

24  what we heard from the defendant on the witness

25  stand.  Indeed, there was testimony that intimated

1 from several of the witnesses that they would rather

2 avoid talking to the Governor as opposed to

3 demanding a chance to whisper into his ear and guide

4 his actions.

5 He has said that his staff should have

6 stopped him in one way or another. Frankly, based

7 on those tapes, I don't think he was an easy man to

8 stop. He rattled on for a very long time, was

9 endlessly repetitive, and there is no question that

10 his tone of voice was demanding, he was not a

11 supplicant.

12 He did not testify that his ideas and goals

13 were planted in his mind. Those I don't think he

14 could deny, they came from him. I do believe that

15 it is absurd to contend that his staff and advisers

16 would devise criminal schemes whose only aim was to

17 benefit the defendant. The plan to get $1 million a

18 year from a union did not include a cut for his

19 advisers, nor did any other idea contain a personal

20 reward for key aides. He promised them nothing, he

21 was interested in himself.

22 There is no substance to the argument that

23 the defendant is receiving two separate

24 enhancements, one for leadership and the other for

25 holding the office of the Governor, the leader

1  organizer enhancement of four levels was
2  appropriately done.
3          With that, we will take a recess of ten
4  minutes and begin again.
5          That session may not last a particularly long
6  time because we will have a short lunch break.
7          Mr. Walker.
8          THE CLERK:  All rise.
9          This court is now in recess.
10
11
12
13
14      (Luncheon recess taken from 11:35 o'clock a.m.
15       to 12:35 o'clock p.m.)
16
17
18
19
20
21
22
23
24
25

:25AM

:25AM

:29AM

:10AM

64

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4           Government,            )
                                   )
5   vs.                           )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,              )  December 6, 2011
                                   )
7           Defendant.            )  12:35 o'clock p.m.

8
                 TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE JAMES B. ZAGEL
                      SENTENCING
10

11  For the Government:

12            THE HONORABLE PATRICK J. FITZGERALD,
              UNITED STATES ATTORNEY
13            BY:  Reid J. Schar
                   Carrie E. Hamilton
14                 Christopher Niewoehner
              Assistant United States Attorneys
15            219 South Dearborn Street;
              Suite 500
16            Chicago, Illinois 60604

17

18  Court Reporter:

19            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
19                 Room 2504
20            Chicago, Illinois 60604
                   (312) 435-5895
21

22

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19         CAROLYN & GURLAND ATTORNEY AT LAW
           BY:  Carolyn Pelling Gurland
20         2 North LaSalle Street
           17th Floor
21         Chicago, Illinois 60602
           (312) 420-9263
22

23

24

25

66

1      (The following proceedings were had in Room

2       2525, the Ceremonial Courtroom:)

3       THE COURT:  Counsel, approach.

4      (Brief pause).

5       THE COURT:  The next step is the arguments in

6  mitigation.  I've read the briefs, but particularly

7  in this case I don't think the briefs are enough, so

8  I expect you to make argument.  I may have some

9  questions with respect to this.

10       One other thing that you may want to know is,

11  I am assuming, although there's no commitment, that

12  the defendant will exercise his right of allocution.

13  It's possible during the course of this that I may

14  ask a question.  The one thing the defendant should

15  understand is, during allocution he is under no

16  obligation to answer my question.  It also may be

17  that if some question I do put to you, might be

18  better answered by him in allocution, if you tell me

19  that, I'll accept it.

20       With that, we'll begin.

21       MR. GOLDSTEIN:  Thank you, Your Honor.

22       If you don't mind, we might be slightly

23  disjointed.  We have one witness very brief.  She's

24  here we can call her right now.

25       THE COURT:  That's fine.

1       MR. SCHAR:  Judge, I just don't think it was
2  put on the record, the defendant is present in court
3  today.
4       THE COURT:  What?
5       MR. SCHAR:  The defendant is present in
6  court.
7       THE COURT:  Yes, the defendant is present.
8       MR. GOLDSTEIN:  Your Honor, we call Dr.
9  Deanna Monroe.
10       Where would you like her to sit?
11       THE COURT:  Right here (indicating).
12       MR. GOLDSTEIN:  Right here.  Okay.
13       THE COURT:  If you would face me and raise
14  your right hand.
15     (Witness duly sworn.)
16       THE COURT:  Please be seated.
17     (Witness duly sworn.)
18      DEANNA MONROE, DEFENDANT'S WITNESS, SWORN
19                  DIRECT EXAMINATION
20  BY MR. GOLDSTEIN:
21  Q   Good morning, doctor.
22       Please speak into the microphone and
23  introduce yourself to the Court what your name is
24  and what you do for a living.
25  A   I'm Dr. Deanna Monroe.

1   Q   As a doctor, who do you treat primarily?

2   A   I'm a pediatrician.

3   Q   Okay.  So you work exclusively with children, is

4   that correct?

5   A   Exclusively, yes.

6   Q   How long have you been a pediatrician?

7   A   Post residency training, 14 years.

8   Q   And do you have a practice in the City of

9   Chicago?

10  A   Yes, I do.

11  Q   And how long have you had this practice?

12  A   I worked for the University of Chicago for

13  2 years and I've been with this practice for

14  12 years.

15  Q   And in your practice that you currently are

16  engaged in, do you see a wide range of patients as

17  far as insurance coverage?

18  A   Yes, I do.

19  Q   Do you treat children who have private insurance?

20  A   Yes.

21  Q   And do you treat children who have Medicaid?

22  A   Yes.

23  Q   Do you also treat children who have what's called

24  All Kids?

25  A   Yes.

1 Q   Do you sometimes treat children who are paying

2 out of pocket, their parents are paying for the

3 amount out of their pockets?

4 A   Yes.

5 Q   Do you know what All Kids is?

6 A   Yes.

7 Q   What is All Kids?

8 A   All Kids is a program that is provided by the

9 State.  And in the past it's been called Illinois

10 Department of Public Aid exclusively, and so

11 patients really had to be relatively poor to qualify

12 for that insurance.

13        All Kids has expanded that coverage to allow

14 for people who make low wage to be able to pay a

15 sliding scale premium to still allow their children

16 to be covered by insurance.  So it's --

17 Q   And did --

18        Go ahead.  I'm sorry.

19 A   So it opens to the possibility of not just the

20 unemployed and poor to allow to cover their

21 children.

22 Q   In your experience in your practice, have you

23 seen a certain percentage of children who have the

24 All Kids program?

25 A   Yes, I have.

1  Q   And presently what percentage of your practice
2  accepts All Kids patients?
3  A   Approximately 8 percent of my practice involves
4  All Kids patients.
5  Q   And that as of the current date, is that correct?
6  A   That's current.
7  Q   Has that number increased decreased in the last
8  year and a half, 2 years?
9  A   In the last year and a half I was seeing about 4
10 percent of my practice was All Kids, and in the last
11 18 months that number has increased to 8 percent.
12 Q   What is your understanding of why that number has
13 increased?
14 A   Many people have lost their jobs and therefore
15 have lost their private insurance and All Kids has
16 been a way for them to still cover their children.
17 Q   In your practice and what you observed, are there
18 children that are getting All Kids that otherwise
19 wouldn't get healthcare coverage?
20 A   Correct.  Correct.
21 Q   In other words, the kids that have Medicaid
22 coverage, there are some kids that do not qualify
23 for Medicaid, is that correct?
24 A   Correct.  When a parent loses their job they can
25 COBRA, or the -- and that's a very high premium, or

Monroe - direct by Goldstein                    71

 1  they -- they lose their coverage, and so these
 2  children would be left uncovered unless the parent
 3  gets another job and after the waiting period gets
 4  afforded insurance.
 5  Q   So COBRA is the temporary insurance that one gets
 6  if they lose their job, is that correct?
 7  A   Yes; and COBRA is very cost-prohibitive.
 8  Q   And your understanding of All Kids is is All Kids
 9  cost-prohibitive?
10  A   No, it is not.
11  Q   And as a pediatrician and in your experience as a
12  pediatrician, do you have an opinion as to the All
13  Kids program?
14  A   Yes, I think that the goal of pediatrics is to
15  prevent illness, and so our mission is to by doing
16  so we can provide immunizations, we can provide
17  guidance to avoid health issues as an adult.  And so
18  if we can increase the number of children that are
19  allowed to be seen, then we can not only prevent
20  immunity outbreaks, we can prevent diabetes,
21  obesity, several health problems that become
22  apparent in their adult life and if we weren't able
23  to see these children then they would be prey to
24  these circumstances of both disease and preventible
25  illness.

:56AM
:57AM
:57AM
:57AM
:58AM

1  Q   So is it fair to say there's a personal interest
2  as the particular child that you treat, as well as a
3  public health concern as well?
4  A   Correct.  Correct.  It's good for the child, it's
5  good for the community.
6  Q   Okay.  And is it fair to say kids that are
7  getting the All Kids insurance program are getting
8  healthcare coverage that otherwise would not without
9  All Kids?
10 A   Correct.
11 Q   And in your experience, how important is
12 pediatric care from doctors to a kid's health?
13 A   As I stated, the goal is to immunize, prevent
14 disease, and guide them through their youth to make
15 smart choices to maintain their health so that they
16 don't become an adult health problem.  And, you
17 know, it's the start that you wish to continue
18 phenomenon.  If you get these children young, you're
19 able to help guide them.  Once they've, you know,
20 are older, their health sometimes it's harder to get
21 them back on the right track.
22 Q   In your experience, have you treated kids that if
23 you hadn't treated them, if they hadn't seen a
24 doctor, a pediatrician, that there would be an
25 consequence to that child?

:58AM

:58AM

:59AM

:59AM

:59AM

Monroe - direct by Goldstein                73

1  A   Yes.  I mean, there's a huge push for
2  immunization in a timely fashion because we've seen
3  that when that is interrupted there are health
4  outbreaks of measles and there is a lot of
5  preventible illness that we are able to, you know,
6  stave off and I have seen children succumb to
7  preventible illness.
8  Q   And it's been your experience that the All Kids
9  program has helped do that?
10 A   Correct; it's helped prevent children from
11 succumbing to preventible illness.
12 Q   Thank you, Doctor.
13         MR. SCHAR:  No questions, Judge.
14         THE COURT:  Thank you, Doctor.
15      (Witness excused.)
16         MR. GOLDSTEIN:  Your Honor, as far as timing,
17 how much longer would you like to go before your
18 break?
19         THE COURT:  We will break somewhere between
20 half an hour and 45 minutes.  And I'm assuming,
21 based on what you have submitted to me, that this is
22 more or less of a full-scale presentation on
23 mitigation, I am perfectly willing to hear.
24         MR. GOLDSTEIN:  Thank you, Judge.
25         I will start with Ms. Gurland, she will

1  present to you a brief presentation.

2          THE COURT:  All right.

3          MS. GURLAND:  Good morning, Your Honor.

4          THE COURT:  You can proceed.

5          MS. GURLAND:  Thank you.

6          In my remarks to the Court regarding

7  mitigation and in particular considering the 3553

8  factors, I will outline a number of factors that are

9  powerful arguments for leniency in sentencing.

10          The nature and circumstances of the offense,

11  the history and character of the defendant, concerns

12  of specific deterrence, general deterrence, and the

13  need to avoid unwarranted sentencing disparities

14  among similarly situated defendants all indicate

15  that the advisory sentencing guideline range and the

16  government's range of 15 to 20 years is greater than

17  necessary punishment in the unique facts and

18  circumstances of this case.

19          Starting with the nature and circumstances of

20  the offense.  It is highly relevant in determining a

21  just and appropriate sentence in this case that Rod

22  Blagojevich received not a penny on the counts of

23  conviction.

24          There was no $25,000 fundraising from Magoon

25  and there was never going to be.  Magoon refused to

1  call Robert Blagojevich back.  And, in fact, Magoon
2  never even knew that the reimbursement rate had been
3  held because no one called to tell him that or to
4  threaten him with it.

5       There was never going to be a $100,000
6  campaign contribution from Johnston.  He testified
7  that he wasn't going to give it.

8       The un-convicted conduct bears no better.
9  There was no contribution in connection with the
10 tollway, no contribution in connection with the
11 academy; no contributions.  Mr. Blagojevich received
12 nothing in connection with the Senate seat.

13      Neither did the counts of conviction result
14 in any financial harm to the State.  The end result
15 with respect to Magoon, is that the reimbursement
16 rate increase went into effect to benefit pediatric
17 doctors and Children's Memorial Hospital.  The
18 racetrack got their Bill passed and the casinos had
19 to pay them a portion of their profits.  Illinois
20 got a senator.

21      The government suggests that in making these
22 indisputable points in the defense filings is just
23 another example of the defense not facing up to the
24 convictions in this case, but that is not accurate.

25      Mr. Blagojevich has faced up to the fact of

1  the convictions.  The fact that the counts of

2  conviction do not involve personal corruption of

3  self-enrichment or the public harm of threatened or

4  promised illegalities is critical mitigation

5  evidence.

6          In order to illustrate this point in the

7  submission to the Probation Office, the defense

8  included a summary of every reported Seventh Circuit

9  case discussing the 2C1.1 guideline.  The government

10 submission has not suggested that there were any

11 that we missed.  This exercise reveals that there

12 has never been a reported case like this one; never.

13 There has never been a 2C1.1 case in which the

14 public official got nothing, in which the thing to

15 be obtained, here campaign contributions or a

16 position, were intrinsically legal goals and in

17 which the benefit exchange, legislation or Senate

18 appointment, by itself, were also appropriate and

19 legal.

20         Summarized in the submission to the probation

21 department are all 17 of the reported Seventh

22 Circuit cases discussing in which the 2C1.1

23 guideline was applied.  Of these, there are 17

24 instances of outright bribes to the public official

25 and 12 instances of dire public harm based on the

illegal action taken by the public official in
exchange for the bribe.  The government submission
calls these cases inept and the argues that maybe
there are no reported cases because the issue is so
clear.

But, Your Honor, Seventh Circuit cases
interpreting the very guideline provision at issue
in this case are not inept and the cases were not
selected because they had a detailed discussion of
2C1.1.  Indeed, some of them didn't talk about that
guideline at all.  The cases were analyzed based on
their fact patterns.

And what these fact patterns reveal is that
there has not been a Seventh Circuit in which a
defendant has been punished for request for
inherently legal benefits, such as campaign
contributions or appointments, in exchange for
proper official action such as legislation or
appointments.  There's no punishment, Your Honor,
for the linkage.

Since the time of the probation filing the
defense has also read every reported case discussing
the 2C1 guideline in the context of campaign
contributions, and that exercise, your Honor, was
not restricted to the Seventh Circuit but was

78

conducted in what people familiar with Westlaw would
know as an all fed. search, meaning that that it is
every federal jurisdiction in United States of
America.

        Based on that reading, there are only five
reported cases in which campaign contributions are
the subject of a 2C1.1 guideline adjustments.  In
all of these cases, in addition to the campaign
contributions, the public officials, who were the
defendants, engaged in unmistakable personal
corruption.  They took cash bribes or other valuable
benefits often coupled with official actions, such s
supporting illegal gambling operations, things that
truly hurt their state.

        In United States versus Whitfield,
590 F.3d 325, Fifth Circuit 2009, for example, a
Miami trial attorney arranged for campaign
contributions for two judges, but he also lend one
of them $100,000 for a down payment on his home and
paid for another's legal bills.

        In U.S. v. Zimmerman, 509 F.3d 920, Eighth
circuit 2007, a city councilman on the planning
board asked a real estate developer, who needed a
zoning variance, for money to pay his legal bills as
well as demanding campaign contributions which he

1  said the developer should simply put in the name of
2  his cousin.
3       In United States versus Chance 306 F.3d 356,
4  Sixth Circuit 2002, a sheriff demanded campaign
5  contributions but with the understanding that the
6  contributor was a mob figure and the sheriff could
7  go on to use his influence, if elected, to allow the
8  mob to promote its illegal gambling operations.
9       In United States v. Tomblin, 46 F.3d 1369,
10 Fifth Circuit 1995, a businessman approached a
11 senator's assistant and offered him a $50,000
12 campaign contribution for the senator, but also a
13 trip, and also a 10 percent share in their savings
14 and loan business, all in exchange for getting the
15 senator to bypass approvals from the Federal Home
16 Loan Board which their S & L's could not have passed
17 because it was out of regulation.
18      And the fifth case on the topic, Your Honor,
19 and the final one I will talk about is United States
20 v. Siegelman, 640 F.3d 1159, Eleventh Circuit 2011.
21 This case people might have heard of involves the
22 former governor of Alabama, Siegelman, who
23 approached the Healthsouth Chairman Scrushy and
24 promised him a seat on the Alabama Certificate of
25 Need Review Board which Scrushy could and did use to

benefit his company to the detriment of the State of
Alabama in exchange for $500,000 in campaign
contributions.  The two went through pains to
disguise the source of the campaign contributions
through a series of sham check transactions.  From
another witness to Siegelman, the Governor, came a
$9,200 motorcycle and in a manner in which Siegelman
tried to hide the payments.

Of all of these cases, which are five the in
which campaign contributions are discussed in the
context of the 2C1.1 guideline, only Siegelman
involves conviction on the basis of campaign
contributions alone.

In analyzing the case and making sure that it
was appropriate to punish Siegelman based on
campaign contributions, the Court quoted United
States Supreme Court opinion in McCormick versus
United States, 500 US 257, 1991 in which the Supreme
Court discussed cases involving only inherently
legal activity such as campaign contributions.  The
Supreme Court opined that in these type of cases the
line between legal and illegal activity might not be
altogether clear.

In analyzing the nature and circumstances of
this case, then, it is critical to note that the

1  facts of this case are absolutely unique.  Based on

2  the reported case law, using the public corruption

3  sentencing guideline, public officials are not

4  tried, convicted, or imprisoned in instances in

5  which the payment to the public official at issue

6  was an intrinsically legal act, such as campaign

7  fundraising or a political appointment and when the

8  action expected from the public official was

9  likewise entirely legal conduct.  In other words

10  again, Your Honor, the linkage alone has not been

11  punished.

12        The government contends that the case law

13  analysis is ridiculous because there are many

14  instances in which the favor ask from the public

15  official was legal, such as the award of contracts,

16  licenses, permits, or help with legislative

17  approval.  The defense is not arguing there could

18  not be a case in which the public received nothing

19  and the action asked of the public official was

20  legal, in fact this is precisely such a case.  The

21  defendant is simply pointing out that there are not

22  any such reported cases in the 2C1.1 jurisprudence.

23        And, furthermore, to the point of the

24  government's mention of the award of contracts as it

25  comes up in these cases, the fact of the matter is

82

1   that that most often comes up as an illegal act
2   because it is illegal for a public official to put
3   their fingers on the scale in the bidding process.
4           The government also makes the argument that
5   defense is wrong, that there was no harm.  And we're
6   talking now about the financial harm for the
7   particular counts of conviction, because I will
8   address later the general deterrence concerns that
9   the government has.  But talking about the offense
10  of conviction and the financial harm as a result,
11  the government argues that the harm was that the
12  reimbursement rate for pediatric doctors and for
13  Children's Memorial Hospital was delayed and that
14  the racetrack legislation was also delayed.  One
15  misconception that I think has played people from
16  the beginning of this case is the somehow Rod
17  Blagojevich reached out to hurt Children's Memorial
18  Hospital.  That was not the case.
19          The case was that Children's Memorial
20  Hospital and other pediatric doctors had been
21  lobbying for a rate increase for years.  They've
22  been courting influential politicians with offers of
23  financial and other support and they had not had any
24  luck.  Indeed, Magoon testified that he was trying
25  to convince State police makers to raise Medicaid

83

reimbursement rate for 6 to 8 years and that his
efforts included contributions to Speaker Madigan, a
fundraiser for Senate Leader Cullerton, and an
approach by Children's Memorial Hospital lobbyists
to numerous State of Illinois staffers, all of these
efforts came to not.

Rod Blagojevich alone made the right
decision, that despite the 2008 Illinois budget
crisis, the rate increase for pediatric doctors was
needed and was good policy.  The rate increase was
only possible, particularly in times of a budget
crisis, because of his efforts.

That implementation was delayed by
approximately four weeks, while regrettable, is not
the type of egregious public harm as exists in the
other reported cases.

The racetrack bill, while a desired piece of
legislation, was enacted within three weeks to when
it was presented to Mr. Blagojevich.  Hardly a
shocking delay in the realm of politics.  That bill
involved the extension of a subsidy to racetrack
owners to be financed with casino proceeds that
would be set to expire in May 2008.  Johnston, who
was part owner of several racetracks, had conducted
a sustained lobbying effort, and, incidentally,

1  Johnston, himself a registered lobbyist, had raised
2  $300,000 for Mr. Blagojevich during the time that he
3  was Governor.

4       The money that a three-week delay in the
5  passage of the racetrack bill may have cost
6  racetrack owners and benefitted casino owners who
7  did not have to pay them, is also not the type of
8  public harm as exists in reported case law.  The
9  same is true with the Senate Seat, Roland Burris and
10  then Mark Kirk have both served honorably.

11      The fact is the nature and circumstances of
12  this case are unique and argue for leniency in
13  sentencing.  Rod Blagojevich received nothing.  He
14  asked for campaign contributions and political
15  appointments, not cash in envelopes or disguised
16  political benefits to enrich himself at the expense
17  of the people of the State, and the official action
18  at issue were all beneficial actions, inarguably,
19  that took effect after a relatively short delay.

20      Still on the point, Your Honor, of the nature
21  and circumstances of the offense is a topic that was
22  discussed at length in our submissions and I will
23  not go into it as too much length in this
24  presentation, and that is Mr. Blagojevich's intent.

25      In the government's filing --

1          THE COURT:  Let me stop you.  This is just a
2   clarification question.  You began by saying that
3   the defendant received no money, had no personal
4   benefit and that also there was no financial harm to
5   the State of Illinois, and this is why this is a
6   clarification question.  In the defendant's version
7   of the offense on Page 2, you said this in italics,
8   I'll read it to you.
9          MS. GURLAND:  Okay.
10          THE COURT:  It's at the bottom of the page:
11      "In other words, Mr. Blagojevich profited not at
12       all and Illinois suffered not at all from this
13       conduct ..."
14          And the submission in response to the
15   Presentence Report, an aid at sentencing, your
16   seasoning memorandum, on Page 19, under section
17   Rumman numeral III, the heading says:
18      "No financial benefit - no public harm from
19       counts of conviction ..."
20          am I understanding that basically your
21   position is narrower, that you're citing no
22   financial harm, and you're not speaking to any other
23   possible non-financial harm that would occur?
24          MS. GURLAND:  That's correct, Your Honor.  I
25   think it would be more appropriate.

1          THE COURT:  That's fine.

2          MS. GURLAND:  Because I think those other

3   concerns, and it's my fault and certainly not of

4   Mr. Blagojevich if I was insufficiently precise, but

5   general deterrence concerns are real and I plan to

6   address them at the end of the presentation.

7          THE COURT:  Okay.  Thank you.

8          Go ahead.

9          MS. GURLAND:  In the government's filing of

10  yesterday, they argue that Mr. Blagojevich deserves

11  more punishment because his filings reveal a lack of

12  acceptance of responsibility.

13         The defense submission was a legal filing

14  based, in large part, on my selection of tapes

15  coming from the perspective of a relative outsider.

16  I don't believe that that selection of tapes or any

17  of the arguments in this submission should be used

18  against Mr. Blagojevich.

19         Beyond confusing legal filings with direct

20  statements of the defendant's I would submit that

21  this argument by the government is unfair for two

22  main reasons.

23         First, as Your Honor is well aware, there is

24  a guideline adjustment for acceptance of

25  responsibility, 2E1.1, it provides for three point

reduction in sentence if the defendant pleads guilty
well in advance of trial and a two point reduction
if the defendant accepts responsibility but later in
the process.

This two point reduction would result in a
68-month reduction off the low end of the guideline
sentence under Government's 360 to life guideline
position and the advisory guideline position, an
eight month off the low end of the defense guideline
calculation.  In other words, the 3E1.1 adjustment
is meant to apply to acceptance of responsibility.

We have never argued that Mr. Blagojevich is
eligible for this benefit.  However, the government
says not only refuse Mr. Blagojevich this benefit,
punish him even more.  But here is no basis in the
guidelines or in the 3553 framework of adjusting an
appropriate sentence for this type of position.

In effect, the government is saying if you do
not accede perfectly to our view of the case, or
your lawyers don't, then you should serve more time
in prison.  The only type of thing this argument
reveals is that it's been a long and difficult
battle for those who, unlike myself, have been
involved in this process from the beginning.  That
is understandable, but it does not justify an

excessive prison sentence for Mr. Blagojevich.

Second, and as set forth with great specificity in the defense submissions, the information about Mr. Blagojevich's discussions with his advisers was not included to voice blame on anyone else. Those arguments wouldn't excuse Mr. Blagojevich from the charged conduct, nor would it even advance his mitigation arguments. In fact, quite the contrary.

The assertion in the defense filings was that Mr. Blagojevich tried to follow the law as he understood it to be. The defense has not argued and does not argue that Mr. Blagojevich was correct in that belief. The jury has concluded differently. However, it is not implausible that Mr. Blagojevich believed that his actions conformed with the law.

When a public official is taking flagrant outright bribes in the form of cash, property, loans, vacations, jewelry, meals, or other purely personal benefits, such as the 2C1.1 cases that I read, the lines are 100 percent clear. When a public official is offering to steer a lucrative contract to a supporter and bypass the bidding process or threaten to shut down a business that won't pay them in cash, the lines are 100 percent

clear.  But when a public official requesting
campaign contributions or other inherently legal
benefits, such as political appointments for
legislative actions is involved, it can be argued
that the law is murky.

In United States versus McCormick, 500 U.S.
251, 1999, the U.S. Supreme Court held as follows:
"... whatever ethical considerations and
appearances may indicate, to hold a legislator
commit a federal crime of extortion when they
act for the benefit of constituents or support
legislation furthering the interest of some of
their constituents shortly before or after
campaign contributions are solicited and
received from those beneficiaries, is an
unrealistic assessment of what Congress could
have meant by making it a crime to obtain
property from another with his consent."

In United States versus Antico, 275 F.3d 245
Third Circuit 2001, in the discussing McCormick, the
court specifically stated that the line between
legal and illegal acceptance of money in the context
of campaign contributions or otherwise legal action
was, quote, "nuance," quote "subtle."

In addition, as discussed in detail in the

sentencing submissions, Mr. Blagojevich had a number
of conversations not just with kitchen Cabinet
advisers but with nationally prominent politicians.
These individuals did not counsel Mr. Blagojevich to
ask for personal benefits for the Senate Seat, but
they did listen to discussion of precisely such an
exchange without ever expressing a negative opinion.
Against this landscape, it is not impossible for an
individual, particularly a politician whose
experience has taught him that political horse
trading was the norm, to have held an incorrect
understanding of the law.  And for all of the
reasons set forth in the defense submission, the
defense would also submit that Mr. Blagojevich
believed at the time of the convicted actions that
his conduct was within the bounds of the law.  That
belief is all the more reasonable when the benefits
at issue for Mr. Blagojevich for campaign
contributions and possible jobs in positions in
which he could work, not cash in envelopes or hidden
corrupt personal benefits.

Our related point is the issue of perjury.
The same belief on Mr. Blagojevich's part also
indicates that despite the government's assertions
to the contrary, they have not established that

Mr. Blagojevich committed perjury when he testified
in the second trial.  The government submission
assumes perjury without a discussion.  But under the
very case cited by the government, United States
versus Dunnigan, 507 U.S. 83 1993:

    "... a defendant can testify and be convicted
     after trial and yet not have committed
     perjury."

     As an example of how that might occur, the
court wrote:

    "... the defendant may give truthful testimony
     that a jury finds insufficient to excuse
     criminal liability or prove lack of intent ..."

     It is reasonable to conclude that
Mr. Blagojevich's testimony may have fallen into one
of these two categories particularly when it's
discussed there was a reasonable basis for an
innocent but mistaken belief of legality.

     In the government's filing of yesterday they
make the argument that because Mr. Blagojevich's
focus at trial was the reality of the Madigan deal,
and in the government's assessment,
Mr. Blagojevich's focus in the defense submission
was his belief and legality of his conduct, that
somehow this discrepancy between two legal filings

means Mr. Blagojevich perjured himself at trial.
This argument is incorrect.

First, the defense submission, the one that
was filed with the Court, Your Honor, rather than
probation, at Pages 8 through 11, 24 through 26, and
48 through 49, discusses the Madigan option, stating
that it was a primary option, that it was the
subject of over 100 calls, and that the option
appeared from the first tapes to the last.

It is not inconsistent with this position to
say that Mr. Blagojevich believed that the Health
and Human Services appointment or the 501(c)(4)
appointment was legal.  It's apples and oranges.
Moreover, as the government well knows, on June 1st,
2011, Mr. Blagojevich's counsel proposed that
Mr. Blagojevich be permitted to testify--and I'm
taking this from Page 4 of the June 1st, 2011,
transcript:
     ".... that he honestly believed that what he was
      doing was legal."

And the Court determined to have an offer of
proof.  In that offer of proof, held not in front of
jury but in open court, Mr. Blagojevich testified
about his understanding and about all of the things
that the government now acuses his lawyers of saying

1  for the first time in the defense submission.  And I
2  would draw the Court's attention to the June 1st
3  2011 transcript at Page 8 through 19.
4  Mr. Blagojevich was not permitted to testify to this
5  in the presence of the jury because it was deemed
6  irrelevant to the trial, but this does not make the
7  testimony he was permitted to give perjurious.
8       Turning to the history and characteristics of
9  the defendant himself.  Mr. Blagojevich is a kind
10  and compassionate man who is sincere in his desire
11  to help people.  He came from a Serbian immigrant
12  family and grew up in the northwest side City of
13  Chicago.  His father arrived in the United States
14  age 37 after having spent 4 years in a Nazi of
15  prisoner war camp.  The family was hardworking.
16  Mr. Blagojevich's father worked in a tannery, in
17  paper, and pesticides and steel factories, as well
18  as on the Alaskan pipeline.  His mother worked at a
19  utensil factory, as a clerical employee, and with
20  the Chicago CTA.  They worked hard to provide a home
21  and an education for Rod and his brother Robert.
22       Rod and Robert did their part as well.  They
23  worked from the time they were 9 or 10 running a
24  shoe shine business while in grammar school.  Rod
25  went on to work as a pizza deliveryman, in a meat

1  packing plant, and like his dad on the Alaskan
2  pipeline in order to help pay for his education.
3  Mr. Blagojevich did go on to college and then to law
4  school.  When he was a young man at the beginning of
5  his legal career he met Patti and they began
6  dating --
7       THE COURT:  Stop for a moment.  I have a
8  question.  Nothing you didn't understand.  I want to
9  find it.
10      (Brief pause.)
11      THE COURT:  It's reported, and I really don't
12 understand this, maybe it was an inadvertent
13 statement, in the interview with the probation
14 officer and in one of either your version of the
15 offense or the sentencing memorandum, the phrase
16 that was used and it's put in quotes, meaning the
17 probation officer thought he said these actual
18 words, and so, apparently, whoever wrote the
19 sentencing memorandum, he believes he was a "good
20 Governor" explaining that he "came from nothing."
21 What I saw in this report history is that he came
22 from an immigrant family that was intact, had the
23 usual kinds of troubles but remained intact their
24 entire lives together, worked very hard for many
25 years, taught their sons the value of hard work,

raised and educated them, and they take the age of
40 as an example, produced two accomplished and
successful children.  Why is this nothing?

MS. GURLAND:  I think -- without it in front
of me, Your Honor, I think if it was a statement
that Mr. Blagojevich made to the probation officer
that was quoted, he was talking about the family,
the family "coming from nothing" meaning that they
had to work financially.

THE COURT:  The quote is that he came from
nothing.  I mean, I don't understand it.  This is
the backbone of America.  The backbone of America is
generally not speaking of people who get elected
Governor, it's people who raised them.  This is a
classic American story and it's -- I'm assuming his
use of the word "came from nothing" was somehow
inadvertent.

MS. GURLAND:  I think it referred to --
inadvertent, Your Honor, if you think that he was
trying to denigrate in any way the sacrifices that
his mother and father made for him and for his
brother, because I am certain that that would never
be anything that he would do.

THE COURT:  Okay.

MS. GURLAND:  I think that there might have

been some kind of financial concerns because, as I
understood it, one of the reasons why his mother
worked in factories and utensil factory and the CTA
is that they had some difficulty making ends meet
and that they were working class people that tried
very hard and struggled financially in order to
provide for the family, I think that's what the
reference was.

THE COURT: Okay. Go ahead.

MS. GURLAND: Mr. Blagojevich did go on to
college and then to law school. When he was a young
man beginning his legal career he met Patti and they
began dating. Around this time, as Patti
Blagojevich wrote in her letter, Rob's father
suffered a massive stroke and needed 24 hour care in
a nursing home. Part of their early courtship as a
result consisted of going to the nursing home to
visit Rod's father.

When Patti would see the elder
Mr. Blagojevich, his father's eyes would light up to
see Rod Blagojevich walk into the room. She
explained that many times coming back from some sort
of event or some sort of date they'd stop by the
nursing home just to check on Mr. Blagojevich's
father while he was sleeping.

1    When his father passed away, Mr. Blagojevich
2 spent enormous amounts of time with his mother, and
3 as described in Mrs. Blagojevich's letter, even
4 moving in for a time during her grieving process to
5 make sure she was all right.  Immediately after
6 which she moved closer to Rod and Patti Blagojevich
7 so that she could be cared for.  Mr. Blagojevich was
8 undoubtedly devoted to his mother and his father and
9 appreciative for the sacrifices that they made for
10 him growing up.
11    This appreciation and devotion resulted in a
12 lifelong affinity with working class people who were
13 struggling to provide a good living for themselves
14 and for their families.  He felt more comfortable
15 around people who had to work hard for a living than
16 he did with the people that he found himself
17 surrounded with later in life who never had to
18 struggle in life for anything.
19    When Mr. Blagojevich announced that he was
20 running for Governor and when he was successful in
21 the election, he had a victory party and the
22 announcement at the Finkl Steel Company, which is
23 the factory in which his father had worked.  And
24 it's another personal tradition of his was that the
25 next day, after a successful election, he would go

1   to the Jefferson CTA stop on the Blue Line I believe
2   it is, because that's where his mother had worked.
3   He did that to honor his mother and his father and
4   to illustrate to anybody who would have been paying
5   attention that he felt proud of where he came from.
6          Sean Schultz, a 26-year old friend and
7   neighborhood of Mr. Blagojevich, wrote to the Court
8   describing Mr. Blagojevich's caring attention to his
9   neighborhood.  This is a quote from the letter:
10      "....Rod also spent hours upon hours walking,
11        driving, and running around his neighborhood,
12        talking to regular folks, helping them with any
13        problem they had no matter how small, making
14        improvements to our neighborhood and city.  He
15        didn't care it if it impress or not, he simply
16        took care of our neighborhood because it was
17        the right thing to do."
18         Tracy Whitmer, a form intern of
19   Mr. Blagojevich's echoed the same sentiment in her
20   letter to the Court describing Mr. Blagojevich's
21   general concern for his constituents and practice of
22   making time for individual meetings with people and
23   recollection of details they provided him of their
24   lives and their struggles.
25         Sister Rosemary Connelly, Executive Director

1  of Misericordia, in a September 20th, 2011 letter to

2  the Court shared her observations that

3  Mr. Blagojevich was willing to confront the

4  bureaucracy for the good of the most vulnerable

5  citizens.  Sister Rosemary wrote:

6      "As Governor, Mr. Blagojevich on many occasions

7        helped us to be able to reach out to meet the

8        residential needs of more vulnerable people by

9        challenging the system to do the work it was

10       created to do.  The only reward Mr. Blagojevich

11       received was the joy of knowing more children

12       and adults with disabilities would have the joy

13       of living in Misericordia, there were no other

14       conditions attached."

15       Many of Mr. Blagojevich's legislative

16 initiatives, such as expanding healthcare coverage

17 for children, as we heard the pediatrician testify

18 about a few moments ago, and seniors, expanding

19 access to preschool for children whose parents

20 didn't enough money to send them, and increasing the

21 minimum wage twice were based on his childhood

22 experiences of the struggles of working class

23 people.

24       The argument is not as is set forth in the

25 government's response to the defense submissions,

1  that Mr. Blagojevich deserves extra credit or

2  special credit for legislating when he was a

3  legislator, but the fact that his background and

4  experiences drove his policies and approach is an

5  important part of his character.

6          It's a good stopping point, if you would like

7  me to --

8          THE COURT:  Okay.  We'll stop now.  We will

9  resume in one hour.

10         THE CLERK:  All rise.

11         (Recess.)

12         THE CLERK:  All rise.

13       (Brief pause.)

14         THE COURT:  Please be seated in the

15  courtroom.

16         Counsel?

17         MS. GURLAND:  Thank you, Your Honor.

18         When I left off in the 3553 presentation, I

19  was talking about the personal character of

20  Mr. Blagojevich and one very important component of

21  that is his concern for his family.

22         In fact, the most personal part of

23  Mr. Blagojevich's request for sentencing leniency is

24  his relationship with his wife and daughters and the

25  devastations that his absence would cause to his

family.

In the government filing, in the context of talking about Mr. Blagojevich's legislative accomplishments as a politician and in warning that those type of things should not be considered properly in mitigation unless they are present to an extraordinary degree, the government relies on valid case law arguments that mostly existed before the sentencing guidelines became advisory, but the point is still the same, in order for something to be taken account of in context of a sentencing it should be a factor that is extraordinary.

Mr. Blagojevich's adoration of and devotion to his wife and daughters has been present and is present to a truly extraordinary degree. As explained in Patti Blagojevich's letter to the court, when Mr. Blagojevich was first elected to the Congress his eldest daughter was then 2. He decided not to move to Washington, D.C. and not to join the political scene there or the social scene; instead, the family stayed in their Ravenswood home and his daughter remained close to Mr. Blagojevich's mother who at the time was ill with lung cancer.

Mr. Blagojevich also determined that while congressman he was not going to take advantage of

the many opportunities to take trips to exotic
locations as many other congressmen did, many of
them at the expense of the citizen.

Mr. Blagojevich determined instead that if he
wasn't able to take his daughters -- or his one
daughter at the time, he was not going to go.  The
one real trip Mr. Blagojevich did take as
congressman was to Israel, it was sponsored by the
Anti-Defamation League, for that trip
Mr. Blagojevich was able to bring his daughter, as
well as his mother-in-law.

While congressman, Mr. Blagojevich likewise
skipped numerous White House dinners and other VP
events because being with his family every minute he
could was always top priority.  Just after
Mr. Blagojevich became Governor in 2002, his second
daughter was born, his eldest daughter was just 7 at
the time.  Mr. Blagojevich was again faced with a
decision where should his family be located, and he
determined with the full support of his wife Patti
that the family would stay in their Ravenswood home
and that they would not move into the Governor's
mansion in Springfield.

It was a decision that carried a substantial
political cost, as the people in Sangamon County

1  were unhappy that he made the decision to stay in
2  Chicago and it cost him approval points with those
3  individuals.
4       In addition, Mr. Blagojevich missed many of
5  the social opportunities in Springfield that might
6  also have translated into political benefit for
7  himself.  But again, his family and the values he
8  hoped to cultivate in his daughters was more
9  important to him.
10      Mr. Blagojevich wanted to be with his wife
11 and daughters as much as possible and he also wanted
12 their upbringing to be as normal and as down to
13 earth as was possible.  That Mr. Blagojevich
14 succeeded in these goals is evidenced in the
15 observations of the principal where both of his
16 daughters attended both preschool and middle school.
17      Principal Langford wrote to the Court
18 describing Mr. Blagojevich as a living and caring
19 father.  She wrote from years of direct observation,
20 that he doted on his girls and that no matter how
21 busy his public life became, he made every effort to
22 attend parent conferences, performances, class
23 events, and social functions.
24      Mrs. Langford's letter also explained that
25 Mr. Blagojevich didn't request or even allowed

1  special treatment for himself and his wife or for
2  their girls during the time that he was Governor.
3  For school performances, for example, the school
4  offered to reserve seats for Mr. And Mrs.
5  Blagojevich and their security detail, but
6  Mr. Blagojevich opted instead to get in line with
7  the other parents.
8       Friend and neighbor Sean Schultz wrote to the
9  Court and described his observations of
10 Mr. Blagojevich and his eldest daughter, then 6, at
11 the Illinois State Fair in Springfield.  Mr. Schultz
12 described in his letter his observation of
13 Mr. Blagojevich's success in balancing his
14 professional life and his family life.  Mr. Schultz
15 wrote:
16     "... the beautiful friendship and love he shares
17       with Patti and the kids is something I think we
18       could all agree the world needs more of these
19       days.  Rod's absence from his children would
20       just destroy them, it would break their hearts
21       and tear the safe and loving home world they
22       have had around them apart."
23       After Mr. Blagojevich's arrest and
24 impeachment and during the pendency of his two
25 trials, he did not withdraw from his wife and

daughters.  In fact, his bond with them became even
closer.  Mrs. Blagojevich wrote to the Court of her
daughters and husband.  Ironically, they're even
closer now to him than ever before:

> "... we have all been together constantly for
> three years.  They depend on him in ways they
> didn't when he was governor, for rides to
> school, for help with homework, for emotional
> support throughout this whole unbelievable
> ordeal for a sense of safety and security."

Although it is accurate, Your Honor, that
many defendants have families and many defendants
loved those families, Mr. Blagojevich's devotion to
his wife and daughters has been extraordinary.  He
put them first when he was riding high on the top of
the world and he put them first after his public and
humiliating fall.  Those choices and that commitment
are extraordinary and merit consideration in the
context of the sentencing.

It his also appropriate for the Court to
consider the toll Mr. Blagojevich's absence would
have on his young family --

THE COURT:  Stop for a second.  There are a
couple of things I would like to clarify.
Throughout the various recordings, the defendant is

1  obviously disappointed in the General Assembly's
2  treatment of various of his initiatives.  Does he
3  attribute some of these difficulties in Springfield
4  to his relative absence or presence in Springfield?
5          MS. GURLAND:  I don't know if I can answer
6  what's on those tapes, Your Honor, because I have
7  not read every single wire intercept --
8          THE COURT:  Well, it's quite clear that
9  they're not passing the things he wants them to
10  pass --
11          MS. GURLAND:  That I --
12          THE COURT:  -- and things there's no question
13  he cares deeply about, but does he attribute some of
14  the difficulties with the General Assembly to the
15  fact that he has not spent enough time in
16  Springfield or as much time in Springfield as other
17  Governor's have?  Your answer to that are yes, no,
18  or I don't know.
19          MS. GURLAND:  I don't know what's on those
20  tapes, Your Honor, not those particular tapes.
21          It is also appropriate for the Court to
22  consider the toll Mr. Blagojevich's absence would
23  have on his young family.  Those close to the
24  Blagojevich family, including his daughters' school
25  principal, an ice skating coach, have written to the

107

1  Court warning of the devastation his absence for any

2  length of time would cause his family.

3          Ice skating coach Murphy wrote of

4  Mr. Blagojevich:

5      "He needs to be with his family to help them

6        grow and mature into lovely young ladies.

7        Children are fragile.  Every day he's gone the

8        girls are the ones who will suffer most."

9          THE COURT:  Let me stop you again.  I have no

10  dispute with this, and the reason I have no dispute

11  with this is this happens in dozens of cases every

12  year.  So my question to you is, why is this case

13  extraordinary in that respect?

14          MS. GURLAND:  Why is it extraordinary in

15  respect of the devastation that it would cause to

16  his family?

17          THE COURT:  An extraordinary devastation that

18  would not be found with somebody else who is a

19  devoted father being sent away?

20          MS. GURLAND:  I think that part of the

21  answer, Your Honor, lies in the first part of the

22  presentation, which is that Mr. Blagojevich has

23  always been there for his daughters.  So I imagine

24  that there might be defendants who could come before

25  the Court and who might like to talk about their

108

1  family because they think it would be good
2  mitigation evidence, but, in reality, they weren't
3  ever really there for their family in the way that
4  Mr. Blagojevich was.
5       THE COURT:  But he would be in roughly in the
6  same position as any other father who was always
7  there for his children.
8       MS. GURLAND:  If you could postulate a father
9  always there for his children.  But, Your Honor, I
10  am the mother of four children and I have seen lots
11  of dads and lots of moms and I am familiar with
12  there being a range of good parenting and a range of
13  being there for your children, and there are people
14  who are at the extreme end of the range in which
15  they are enormously devoted and dedicated to their
16  children.
17       THE COURT:  And that's the range in which --
18       MS. GURLAND:  That's the range in which
19  Mr. Blagojevich is, Your Honor.
20       THE COURT:  Okay.
21       MS. GURLAND:  And I believe that it is truly
22  extraordinary.  And I've witnessed it, I've
23  witnessed it in connection with the preparation of
24  this case.  I've witnessed what I am talking about
25  to Your Honor, it is extraordinary.

1       THE COURT:  Go ahead.

2       MS. GURLAND:  Sister-in-law Julie

3  Blagojevich's letter to the Court echoes the same

4  concern, she wrote:

5       "... carrying Rod away from his family will

6        place enormous hardship on all of them.  It

7        could potentially crush a close family unit.  A

8        lengthy prison sentence will change the girls.

9        They will not be the people they were growing."

10       Sister Rosemary of Misericordia wrote

11  expressing the hope that the Court would exercise

12  compassion such that the sentence will be one that

13  gives hope to the daughters that one day they will

14  be a family again and that they will not be deprived

15  of their father indefinitely.

16       This observation is particularly critical,

17  Your Honor, as the amount of time to which

18  Mr. Blagojevich is sentenced will fade from the

19  public reports and consideration by the end of this

20  week, but there is a very real family that will have

21  to deal with the devastation in a direct and

22  personal way on a daily basis.

23       The last point that I have, Your Honor, their

24  length, is general and specific deterrence.

25       Other counsel, by and large, will be

1 addressing the final 3553A factor that we want to

2 discuss which is unwarranted sentencing disparity.

3　　　　Specific deterrence is the most

4 straightforward.  One point on which the defense and

5 the government agree is that there is zero concern

6 that Mr. Blagojevich would ever again find himself

7 in this position.  He can never again hold public

8 office --

9　　　　THE COURT:  Is that true?

10　　　　MS. GURLAND:  I believe it is, Your Honor.

11　　　　THE COURT:  I thought the impeachment barring

12 him from ever holding public office under offices

13 created by Illinois.

14　　　　MS. GURLAND:  I think that there might be

15 separate result that obtains from the felony

16 convictions.

17　　　　THE COURT:  That would render him ineligible

18 for public office?

19　　　　MS. GURLAND:  I believe that that is

20 accurate.  And, if not, certainly as a practical

21 matter, he wouldn't be re-elected.

22　　　　THE COURT:  As a practical matter, I

23 understand your point, but I really don't the

24 assertion that he can never again hold public

25 office, while on practical sense true, is not true

:05PM

:05PM

:05PM

:05PM

:06PM

1  in the legal sense.  And I'm taking only the
2  practical sense from what you just said.
3      MS. GURLAND:  Okay, I'll stick with the
4  practical sense because of that I'm more certain
5  that he would not be able to hold public office.
6  And I think it's also in the probation report that
7  he wouldn't be able to legally, but I won't quibble
8  with Your Honor on the point.
9      Beyond the practical and possibility of
10  re-offense is that Mr. Blagojevich has already
11  suffered and suffered greatly in connection with the
12  charges of this protracted case.
13      From the time of his 6:00 a.m. arrest on
14  December 9th, 2008, his family and his home have
15  been irrevocably shattered.  He was impeached from
16  his position as Governor, he was immediately
17  proclaimed to have been a criminal, and criticized
18  and ridiculed in every form of public media in
19  Illinois and across the country.  Friends abandoned
20  him, his financial position deteriorated to the
21  point that they are now in the midst of trying to
22  sell their family home.
23      One understandable rejoinder that Your Honor
24  might have, quite rightly, is that if
25  Mr. Blagojevich didn't want all the media attention,

1 then he shouldn't have sought it out himself with
2 such numerous public appearances and defiant
3 comments in the press.

4       First, Your Honor, this was a very public
5 case.  Even if Mr. Blagojevich had said and done
6 nothing, the publicity wasn't going to go away.

7       Second, Mr. Blagojevich wanted to maintain
8 His Honor and strength because it made it easier for
9 his wife and daughters to hold their heads up during
10 what were very, very devastating media portraits of
11 them, of their family.

12       THE COURT:  And did that succeed?

13       MS. GURLAND:  Did it succeed?

14       THE COURT:  Yeah.  Were they able to hold
15 their heads up?

16       MS. GURLAND:  I think, Your Honor, that it
17 did help them in terms of dealing with the case,
18 that instead of saying they're right whatever
19 everyone says about, I'm wrong, I'm a criminal, I'm
20 bad, that Mr. Blagojevich came out and said I'm
21 going to contest this, I'm going to fight this case,
22 I think that it did help them.  I mean, I don't know
23 that directly, but I believe that that's true that
24 did help them.  It helped the daughters, I think,
25 yes, Your Honor.

1      THE COURT:  The government's argument about
2  his defending himself in public is, I think, maybe a
3  little different than you perceive it.  And bear in
4  mind, I refuse the government's request to enter a
5  bar order against the defendant telling him not to
6  speak.  And the government makes a point that he
7  might have been foolish to speak, but that's his
8  choice.  Maybe he was, maybe he wasn't.  The
9  government's argument is, that his speech was an
10 attempt to delegitimize the prosecution, challenge
11 the good faith of the prosecutors, phrase
12 essentially this case not as a legal case but as a
13 duel of some kind between himself and the United
14 State's Attorney.  And this I think the government
15 believes, coming from a lawyer, is conduct which
16 aggravates maybe not a lot, but aggravates rather
17 than mitigates the defense.  Any comment on that?
18     MS. GURLAND:  I would like to comment on
19 that, Your Honor.  First of all, and I think it's
20 important and Your Honor has already separated out
21 the words that Mr. Blagojevich used himself and the
22 words of some counsel who had appeared in the case
23 before, I mean you're talking about just of his
24 statements and not of statements of lawyers who are
25 involved in the first trial but not the second --

114

```
 1          THE COURT:  Only his.  Only his.
 2          MS. GURLAND:  I think under the Scrushy case
 3  that I had cited earlier, the Siegelman case, there
 4  is actually -- and I can get Your Honor the precise
 5  page cite, but there was in that case also, it was
 6  Siegelman, the Governor, came out and said that it
 7  was selective prosecution and said that it was
 8  unfair and he made a lot of very public statements,
 9  too.  And the Court in that case commented that
10  those statements by the defendant would not actually
11  be proper aggravation evidence, and I can get Your
12  Honor the cite.
13          THE COURT:  Assume for a minute I think it is
14  proper aggravation evidence, tell me why it
15  shouldn't be aggravating.
16          MS. GURLAND:  If it were to be?
17          THE COURT:  Yeah, if it were something I
18  could legitimately consider tell me why it wouldn't
19  be aggravating.
20          MS. GURLAND:  I think that it wouldn't -- if
21  you could legitimately consider it, I think it would
22  not be aggravating depending upon what
23  Mr. Blagojevich's position would be on that now with
24  some hindsight.  And I also think that it would
25  relevant to consider that there was a pre-jury,
```

115

1  there was pre-jury conduct and post-jury conduct,

2  and I don't know of any very conscientious

3  appearances by Mr. Blagojevich after the jury

4  verdict, and I think that there is a real sense in

5  which that event could be a bit of watershed,

6  because it's one thing before you have actually been

7  found to be guilty to be saying that you're innocent

8  with the press but --

9       THE COURT:  I'm not interested in saying "I'm

10  innocent."  He can say he's innocent all he wants

11  to.  I'm interested in his attempt to characterize

12  this not as a trial but as a kind of boxing match to

13  himself and the United State's Attorney invoking the

14  athletic analogy, which is entirely inappropriate in

15  a court proceeding, which is the point of the

16  government when they say they believe that his

17  attempt was to delegitimize the entire proceeding,

18  including this part.

19       MS. GURLAND:  I think that today, Your Honor,

20  there might be some comments that you hear from

21  Mr. Blagojevich himself --

22       THE COURT:  That's fine.

23       MS. GURLAND:  -- particularly on that topic

24  that might address those comments better than I

25  could.

1       THE COURT:  That's fine.

2       MS. GURLAND:  Finally, on the topic of media

3   appearances, Your Honor, the more fantastic public

4   appearances were done to support the Blagojevich

5   family.  Neither Mr. Blagojevich nor his wife Patti

6   had any illusions but that when Mr. Blagojevich was

7   made to look like some sort of super hero flying

8   over a city or that when Mrs. Blagojevich ate a

9   tarantula on reality television show that they were

10  doing anything other than being paid handsomely to

11  be made fun of and ridiculed.  They allowed this,

12  they did not enjoy it.

13      The payoff was that while people howled and

14  laughed over their plight and they became a laughing

15  stock, they were able to keep their girls in the

16  small and nurturing private schools that they both

17  attended for preschool and middle school and they

18  were able, at least at that time, to keep their

19  family home.

20      The bottom line is that Mr. Blagojevich could

21  never and would never re-offend.  He's already

22  endured the most severe punishment imaginable in

23  witnessing the suffering of his wife and his

24  daughters while being powerless to protect them or

25  to shelter them from any of it.

1        The fact that he suffered privately while
2   appearing strong publicly or even defiant publicly
3   does not diminish either the sincerity or the depth
4   of his devastation.

5        Finally, Your Honor, the last factor that I'd
6   like to talk with you about today in any length is
7   general deterrence.

8        The government's general deterrence argument
9   is dramatic.  They describe a course of politically
10  corrupt conduct dating back to 2002 and then they go
11  on to argue that because of what they call
12  corruption fatigue, Mr. Blagojevich has to be
13  sentenced to a truly unprecedented prison term in a
14  political corruption case to send a message.

15       Mr. Blagojevich, as Your Honor is well aware,
16  much more so than I am, has never been convicted of
17  the pre-2008 allegations.  And the government says
18  repeatedly in the their filings that they're not
19  trying to use the pre-2008 allegations as relevant
20  conduct; however, the government does rely on the
21  same material as aggravation under 3553.

22       In so doing, the government side-steps the
23  relevant conduct technical requirements but doesn't
24  lose anything because, in fact, there was no money
25  gained by Mr. Blagojevich for any of the conduct.

Then they make the general deterrence argument that
you should use all this information in its pitch for
an extreme sentence.  It would be unfair for the
un-convicted conduct to drive Mr. Blagojevich
sentence, even if used in aggravation, I would
submit to the Court that the same principles apply
as were set forth in United States v. Horne
474 F.3d 1004, Seventh Circuit 2007, that it does
not promote respect for the law to allow
un-convicted relevant conduct to determine a
defendant's sentence.

And I'm not saying, Your Honor, that you
can't consider anything that you would want to
consider in aggravation, but I am saying, Your
Honor, that when I see the un-convicted conduct
become a centerpiece of the government's argument
for an extreme sentence, that I think that the same
principles of fairness and of proportionality as are
set forth Horne should apply.

THE COURT:  I actually think what you are
arguing does not fall under general deterrence.
With respect to this defendant, it might fall under
specific deterrence, and it might fall under the
fourth factor of retribution, which is not addressed
and most people don't because there's not much you

1 can say about retribution. But there has been a
2 policy in many courts in United States in relatively
3 uncontroversial ways, and that is take a court in a
4 smaller county of Illinois, not too small but small,
5 say Macon or DeCatur, and in year one they noticed
6 that they're having a slight increase in marijuana
7 sales and decide to prosecute a bunch of people and
8 they send them away and they give them sentences of
9 a year. And then after a while they noticed this
10 has been ineffective, there have been dozens and
11 dozens of more cases than they expected. And they
12 try to raise the sentence a little, and they do, and
13 it's not effective, and by the time you get to year
14 five, same offense that they got a 18-month sentence
15 five years ago now gets a 5 or 10-year sentence,
16 because the court's philosophy is what we have done
17 thus far has not achieved general deterrence.
18      So it's not the conduct for which he wasn't
19 convicted, although I actually do have a right to
20 consider that, but that's a different argument. The
21 argument here and the argument that the government
22 is making, in part, is, that if governmental
23 corruption--and there were previous cases involving
24 governmental corruption--if that's not fading in
25 light of the previous prosecution, general

120

1 deterrence would counsel that perhaps the sentences
2 should be raised, even for an offense that is
3 exactly the same. That's what general deterrence is
4 concerned with, and there are answers to this, I'd
5 like to hear yours.

6        MS. GURLAND: Yes, Your Honor, I was getting
7 to the discussion about the use of it, the use of
8 the pre-2008 conduct was a preamble.

9        The government's general deterrence argument
10 is to Mr. Blagojevich should face a severe sentence
11 because politicians do not seem to be deterred by
12 criminal prosecutions. The problem with this
13 approach is twofold: First, the most obvious
14 indication from the amount of political corruption,
15 nationwide, from my review of the cases, Your Honor,
16 not just in the State of Illinois, is that criminal
17 prosecutions do not appear to be working to meet
18 general deterrence objectives in political
19 corruption cases.

20        The government recognizes this fact, but then
21 argues that because of corruption fatigue it
22 justifies an extreme sentence for Mr. Blagojevich.

23        Common sense dictates that if an approach is
24 not working, it's not necessarily the right strategy
25 to double down on it. It's difficult to know what

:18PM
:18PM
:19PM
:19PM
:19PM

might work to deter political corruption, and the
defense doesn't argue that it's not a significant
problem, similar to financial crimes which are just
as pervasive and intractable, but if a jail sentence
of 6 or 7 years that have been meted out in the
reported cases for high-level officials don't work,
then it is highly unlikely that the government's
more extreme numbers would fair any better.

As will be discussed by other counsel --

THE COURT:  So your problem is not with the
theory, it's just that this particular approach
won't work and therefore shouldn't be followed.

MS. GURLAND:  What I'm saying, Your Honor, is
similar to that.  What I'm saying is that I don't
think that it's a good answer to say it's not
working, so let's take what we've done before and
more than double it because maybe that will work.  I
don't think that that is a good argument I think
that there could --

THE COURT:  Wait.  Wait.  Wait.  In the
beginning your argument was that if you take a look
at the political corruption cases in the United
States, that sentences have been increasing and that
it hasn't diminished the amount of political
corruption.  And let's say that I take that as that

premise is true, you're saying that in a case like this when it's established that raising the sentence is not doing any good, then there's no justification for raising the sentence?

MS. GURLAND: That's right, Your Honor. I think that there's a second argument that's even more significant, but I think that one argument is that if it's not working, don't apply it more.

As will be discussed with other counsel, the conduct of which Mr. Blagojevich was convicted, while more news-worthy and more dramatic, was not the type of cash-grabbing personal corruption as was involved in other cases, nor was the public harm as great. So I guess the separate submission, Your Honor, is that I don't particularly think that this would the case to use to try to send an extreme message by putting someone in jail for twice what other former governors have received.

But more importantly, the government's argument actually amounts to request of this Court to sentence Mr. Blagojevich on the basis of conduct committed by other prominent Illinois politicians rather than Mr. Blagojevich himself.

In addition to Ryan and Warner and Vrdolyak and Fawell and Rostenkowski having been punished for

1 their own convictions as has already been
2 accomplished, or I guess with respect to Mr. Ryan is
3 in the process of being accomplished, the argument
4 is that Mr. Blagojevich needs to pay with his
5 conduct as well, pay for this conduct as well.  I
6 would submit to the Court that this position is
7 demonstrably unfair to Mr. Blagojevich.
8         And, indeed, the law and the spirit of the
9 sentencing guidelines clearly establish that
10 sentencing is to be an individualized process.  The
11 principle was stated in United States v. Moore,
12 543 F.3d 891, Seventh Circuit 1997 --
13         THE COURT:  Yeah, I accept that, but I don't
14 think that's really the government's argument, at
15 least not in whole.  I think the government's
16 argument is not simply that this Governor came after
17 Governor Ryan, the government's argument is his
18 conduct was morally worse because at the time he did
19 it he knew that Governor Ryan had gone to prison,
20 had committed political corruption, had indicated
21 his knowledge of it, and his satisfaction with the
22 result.  So the fact that Governor Ryan was
23 convicted is not something free floating out there.
24 This is something which the defendant himself was
25 aware, somebody in precisely the same position, who

violates his oath, maybe not in exactly the same way but violates his oath, and that state of Governor Blagojevich's mind is a factor that could be fairly taken into account as aggravating, that's the one you have to answer.

MS. GURLAND: I understand the argument, Your Honor, and there are many distinctions as other counsel are going to talk about in more detail between Mr. Blagojevich's case and George Ryan's case, but there are some facts about things that Mr. Blagojevich did when he first became Governor.

He, for example, had an independent Inspector General's Office. He appointed Z. Scott, who was formerly a supervisor at the United States Attorney's Office to head it up. When Rezko came to his attention, something that Rezko was doing came to his attention, he actually reported Rezko to the Inspector General's Office and then told Rezko he had done it. He had a policy that individuals who were employed by the state were not allowed to make campaign contributions to his campaign and had a policy of giving them back when they did. He had policies and initiatives that said that people in his administration weren't actually allowed to be lobbyists and try to do business with the State of

1  Illinois.

2        There weren't any allegations of misuse of
3  his campaign funds, there weren't any tax
4  irregularities, there weren't any problems with his
5  campaign fund.  And, indeed, not for want of
6  investigation, because I understand that there was a
7  fair bit of investigation, but he didn't misuse his
8  campaign funds at all.  And, indeed, there was
9  information that when there was a trip to Florida in
10 which his children and his wife accompanied him even
11 when it was something that was official business,
12 that he actually reimbursed the campaign fund
13 $11,000 even though it's my understanding that some
14 lawyers who were advising him at the time from a
15 prestigious law firm told him that that might not
16 even have been necessary to do.

17        So there are a number of factors and there
18 are a number of just facts about things that
19 happened with Mr. Blagojevich and from early in his
20 term that do reveal if you're trying to look at his
21 intent, an intent to learn from allegations that
22 were made in another cases.  And I think that other
23 counsel can address this more because I'll tell Your
24 Honor, you know, in all honesty, I don't feel
25 incredibly comfortable talking about George Ryan

126

1 because I did represent Larry Warner, the

2 codefendant and I feel --

3      THE COURT:  But what you said now is

4 essentially the entire answer you are capable of

5 giving to the question I asked.

6      MS. GURLAND:  That would be essentially, yes.

7      THE COURT:  Okay.

8      MS. GURLAND:  But I would like to continue,

9 Your Honor, I won't belabor the United States v.

10 Moore case because you obviously know much more

11 about it than I do, but it is I think an important

12 principle to remember that there is a concern that

13 individuals be sentenced as individuals.  And I know

14 that that's a bit at odds with the 3553(a) framework

15 which tells you that can consider general

16 deterrence; obviously, if you can consider general

17 deterrence, you can consider the policies that Your

18 Honor has very much in mind.  But there can be

19 contentions between one part of the law and another

20 part of the law and what I would submit to the Court

21 is there is intention there, because these cases and

22 the sentencing guidelines do tell us that sentencing

23 is supposed to be an individualized process.

24      In another case United States v. Harris,

25 558 F.2d 366, Seventh Circuit 1977, the Seventh

1 Circuit discussed the concern that the sentencing

2 process be objective and fair to the individual

3 defendant.

4        In United States v. Pinto, 875 F.2d 147,

5 Seventh Circuit 1989, in the context of holding that

6 the then new sentencing guidelines were

7 constitutional, the Seventh Circuit held that the

8 guidelines did not deprive the defendant of due

9 process because they focused on the offender and the

10 defense.

11        Post-guideline cases make it clear that the

12 focus on the individual is even more clear.  In

13 United States v. Gall, 552 U.S. 38 2007, the Supreme

14 Court reversed the Eighth Circuit's rejection of a

15 sentence of probation for a young man who had taken

16 part in a drug conspiracy.  The court affirmed the

17 district court's sentencing determination holding,

18 and I quote:

19     "... it has been uniform and constant in the

20      federal judicial tradition for the sentencing

21      judge to consider every convicted person as an

22      individual and every case as a unique study in

23      the human failings that sometimes mitigate,

24      sometimes magnify the crime and the punishment

25      to ensue."

1       More recently, in Pepper versus United
2  States 131 Supreme Court 1229, 2011, the Supreme
3  Court held that no limitation on information about
4  the defendant's background, character, and conduct,
5  including in that case evidence of post-sentencing
6  rehabilitation, should be imposed.
7       What's the --
8       THE COURT:  I thought actually you were
9  arguing for limitations to be imposed.
10      MS. GURLAND:  A limitation --
11      THE COURT:  Weren't you previously talking
12 about certain things that I shouldn't consider that
13 there are limitations on it and now you're quoting
14 the Supreme Court saying there should be no
15 limitations?  Is it your view that the holding of
16 the Supreme Court was a holding that there are
17 limitations for some kinds of evidence and no
18 limitations for others?
19      MS. GURLAND:  I'm not sure I understand.  Are
20 you talking about the McCormick case, Your Honor,
21 the other Supreme Court case?
22      THE COURT:  Yeah.
23      MS. GURLAND:  I'm not sure that, at least
24 from my reading of the McCormick case, I'm not sure
25 that it was standing for the principle that in

1    sentencing that there were certain things that were

2    inappropriate for the judge to consider.  My reading

3    of the McCormick case is that it was telling

4    district courts that when you're in the kind of

5    situation where you're actually talking about

6    campaign contributions that might be legal and

7    legislative action on the other side there's a

8    chance it might be legal, so be careful, so be

9    careful.

10          But I think the Pepper case is talking purely

11   in a sentencing context and it's saying if you're

12   talking about sentencing a person, that you

13   shouldn't limit the kind of information that you

14   could consider because you should really talk about

15   and think about the individual.  And even if, as I

16   think was unclear before the Pepper case, the

17   individual for whatever procedural reasons was

18   sentenced and then there was a time that they had

19   some rehabilitative conduct and then came before the

20   Court again, it made clear that the court should

21   consider everything, including what happened from

22   the time of the first sentencing to the time of the

23   second.

24          THE COURT:  Okay.  That's fine.

25          MS. GURLAND:  Put simply, the laws and

130

1 principles of basic fairness dictate that

2 Mr. Blagojevich should not be punished for

3 historical political corruption in Illinois or

4 anywhere else.

5          He is an individual who had --

6          THE COURT:  Speaking of that, I began by

7 asking you a question about the lines in two of the

8 pleadings that were filed about no harm to Illinois,

9 and I noticed that you, when you spoke out, said no

10 financial harm.  Are you conceding that there could

11 be, not asking if there is, but there could be

12 non-financial harm to the State of Illinois in a

13 case like this.

14          MS. GURLAND:  I imagine that the government

15 will stand up and make the argument that there was,

16 as was in the Gamon case that they cited, that there

17 was an undermining of the public confidence from

18 some of the actions that were at issue in the case,

19 I imagine that I would hear that from the

20 Government.  I wasn't going to make that argument in

21 mitigation, but I allowed that they will probably

22 make that case.  Although, I would point out that in

23 the Gamon case that they're going to be talking

24 about, as an example, the things that were happening

25 in that case were that the defendant was taking

:30PM

:31PM

:31PM

:31PM

:32PM

1  enormous amounts of cash, he was taking Jewelry, he
2  was taking athelic equipment, he was taking meals,
3  he was taking vacations, he was sort of a true
4  hands-in-the-pot personal corrupt individual, and I
5  believe that that's a difference, but I understand
6  that they'll make that argument and I understand
7  that that is an argument that you would make if you
8  were the government in this case.

9       THE COURT:  Okay.

10      MS. GURLAND:  Mr. Blagojevich is an
11  individual who has and will suffer his punishment as
12  an individual and that is how he should justly be
13  sentenced.

14      The final factor, Your Honor, other counsel
15  are going to talk about and that's unwarranted
16  sentencing disparities, and that applies in several
17  context here.  Disparities between Mr. Blagojevich
18  and others in the same case, disparities between
19  Mr. Blagojevich and other high profile Illinois
20  political corruption cases --

21      THE COURT:  Is someone else going to talk
22  about this?

23      MS. GURLAND:  Someone else will talk
24  particularly about George Ryan.

25      THE COURT:  Well, then, let's leave it to

1 someone else.

2      MS. GURLAND:  I was just outlining it.

3      The last two other distinctions between other

4 2C1.1 defendants and the final one, I hope there

5 will be a distinction between some of the press

6 clippings that the government provided in Exhibit A

7 because those cases are very different.

8      Your Honor, if Mr. Blagojevich were to be

9 punished at anywhere near the level that the

10 government is advocating, he would be the most

11 severely punished political corruption defendant in

12 Illinois history or in any state in the United

13 States based on this particular conduct.

14      In conclusion, there can be no doubt that

15 this is a significant case.  It's significant

16 because it involves the drama of a sitting Governor

17 being arrested at his home, impeachment proceedings,

18 hundreds of hours of tape and all the transcripts,

19 many of them very colorful and very quotable, the

20 large public persona of the defendant and the

21 strident and numerous statements of certain of his

22 lawyers.  However much publicity these factors

23 attracted, Your Honor, they're not the factors that

24 should drive the sentencing outcome in this case.

25 They are not conduct or the character to be

133

1  sentenced.  Sentencing an individual defendant is an
2  awesome responsibility because all of the arguments
3  and concerns that will be raised by the government
4  have to be weighed against what will be suffered by
5  a man and his family.  I hope and believe that Your
6  Honor will weigh all of the sentencing factors and
7  arrive at a sentencing determination that is
8  sufficient but not greater than necessary to satisfy
9  the factors set forth in 3553.  Thank you.
10         THE COURT:  Why don't you pause for a moment
11  because I wanted to ask you something that the
12  government cited.
13      (Brief pause).
14         THE COURT:  Well, I could look for a long
15  time, instead of doing that I'm going to ask the
16  government where do you cite Judge Castillo's
17  opinion, which document.
18         MR. SCHAR:  The government's sentencing
19  memorandum, on the November 30th, Judge, and it's
20  Page 12, I believe.
21      (Brief pause).
22         THE COURT:  They gave me a citation which
23  I've seen before, it's been given to me on more than
24  one occasion.  And basically your argument on this
25  particular issue is in fact in direct conflict with

1 Judge Castillo's premises, not necessarily with his
2 ruling, and I want to make sure that I'm not
3 misreading your argument, the quote runs this way,
4 from United States versus Spano:

5     "... we need not resign ourselves to the fact
6         that corruption exists in government.  Unlike
7         some criminal justice issues, the crime of
8         public corruption can be deterred by
9         significant penalties that hold all offenders
10        properly accountable.  The only way to protect
11        the public from the ongoing problem of public
12        corruption and to promote a respect for the
13        rule of law is to impose strict penalties on
14        all defendants who engage in such conduct."

15            Now, I do want to point out that Judge
16 Castillo and most judges were not burdened by being
17 elected to office do not say what elected officials
18 often say which is we're going to fix this problem
19 so that it will never occur again, because it will
20 occur again, and we are realists here and we know it
21 will occur again.  The policy of sentencing is to
22 make it occur less, we don't deal with "never"
23 because "never" is an impossibility.  But Judge
24 Castillo rests on certain premises by the public
25 corruption can be deterred by significant penalties

135

1  and that the only way to protect the public from the

2  ongoing problem of public corruption and to promote

3  respect for the rule of law is to impose strict

4  penalties on all defendants.  Am I correct in

5  believing that you disagree with his premises?

6          MS. GURLAND:  I don't disagree with the

7  premise that it's important to consider policies to

8  deter conduct, but I guess where I would depart from

9  is I don't believe -- well, first of all, it's a

10  definitional thing, Your Honor, because I don't

11  think that the defendant -- first of all, I think

12  the defendant in the Spano case that the conduct

13  that we're talking about was much more egregious --

14          THE COURT:  But he's not talking about Spano.

15  This is a general principle and it's being cited as

16  a general principle.  And you've cited many cases

17  that are not particularly tied to the facts but are

18  reciting a general principle.

19          MS. GURLAND:  In the general principle, Your

20  Honor, I would say that in order to impose a strict

21  sentence in this case or a sentence that is a

22  serious sentence in this case, given the crimes that

23  are at issue in this case, that that sentence

24  doesn't need to be anywhere near the sentence that's

25  being advocated by the government.

136

1          THE COURT:  Okay.  Thanks.

2          Who's next?

3          MR. GOLDSTEIN:  May I proceed, Your Honor?

4          THE COURT:  Yes, you may.

5          MR. GOLDSTEIN:  I'm going to speak briefly

6    and Mr. Sorosky will speak and then I will sum it

7    up, Your Honor, just for scheduling purposes.

8          As far as the disparities, and I think what

9    we have, and Your Honor has alluded to this in your

10   questions, the disparity of sentences amongst

11   districts and judges is, in some ways, in conflict

12   with general deterrence because we have a principal

13   of trying to treat everyone fairly and equally that

14   are in similar situations, as well as the principle

15   of we want to make sure we can deter crime.  So

16   disparities really, in some ways, is in conflict

17   with the general deterrent principle.

18         What I'd like to say, Your Honor, is that as

19   far as deterrence goes, I think we're missing a bit

20   of the point, and that is deterrence, general

21   deterrence, does work.  Just because there are

22   crimes as you said, Your Honor, that will never,

23   ever happen, okay, just because we have crimes that

24   occur again doesn't mean that general deterrence is

25   not working.  If you look at the history of

1 political corruption, there's been many, many
2 successful strides that the state, the country,
3 quite frankly, the world has made and a lot of that
4 has to do with general deterrence, but there is a
5 point in which general deterrence isn't the end of
6 be all.

7         And we can get into a political debate about
8 this, and we don't necessarily need to, but we do
9 have a political system which has money in it.  And
10 one problem, certainly maybe it's just the opinion
11 of the speaker right here, is that we have too much
12 money in politics and we do have a problem because
13 of the money being in politics.  And that has
14 nothing to do with whether we have general
15 deterrence or disparities, or any of these issues,
16 it's that you have so much money in politics which
17 does cause problems in these cases.

18         So general deterrence is a factor, it is
19 important, and it does work.  In this case, Your
20 Honor does not need to sentence Mr. Blagojevich
21 anywhere near to what the government is suggesting
22 for general deterrence purposes.

23         And if you may allow me to just speak
24 hypothetically.  If Mr. Blagojevich got a sentence,
25 let's say, a third of what the government is

1 suggesting, what we hypothesize when it comes to
2 general deterrence is that an individual, in this
3 case a politician, will say, you know what,
4 Blagojevich got off with 5 years, it's open season.
5 And I know it's a bit silly, it's sort of
6 exaggerates the point. That being said, there is no
7 one, no one in their right mind that will look at
8 this case and see, oh, Mr. Blagojevich got some
9 short prison sentence nowhere near what the
10 government is asking or asked and say it's open
11 season, now we can go head and do everything.
12      The amount of pain and humility and then
13 punishment that Mr. Blagojevich will receive is
14 plenty to deter generally, to politicians, to all
15 law abiding citizens.
16      So I think just because we say Blagojevich
17 got a sentence in the range of what the government
18 suggests, that somehow now it's going to send a
19 message, if an individual, a politician,
20 particularly a government officeholder, has won
21 election, they certainly feel proud about
22 themselves, they're successful, if they truly
23 believe that they can go ahead and commit crimes
24 because 5 years, let's say, was the sentence, that
25 person is not in the right state of mind and beyond

:42PM

:43PM

:43PM

:43PM

:44PM

1  deterrence.

2  So deterrence does work.  Unfortunately,

3  because of the absence of crime, we don't

4  necessarily see the results of it, but I would

5  suggest, Your Honor, that it does work.

6  That being said, we have the issues of

7  disparities, and that does, to a certain degree, go

8  against the ideas of general deterrence, but I think

9  they can work in concert.

10  And what I'd like to do, just briefly for

11  Your Honor, is going over -- the government

12  suggested five examples and I'd like to distinguish

13  them for Your Honor and then give you some other

14  examples of why there would be a disparate impact

15  against Mr. Blagojevich if you sentenced him to the

16  range that they're suggesting.

17  So the government in their exhibit, in their

18  submission of the sentencing memorandum gave five

19  examples --

20  THE COURT:  Well, let me ask one question.

21  MR. GOLDSTEIN:  Sure.

22  THE COURT:  And it has to do with your

23  position.  When I read the letters there were many

24  recommendations about what I should do.  Some

25  people, I think, thought that the appropriate remedy

1  is one that is not permitted by law, which is a very
2  long period of probation and community service of
3  awesome proportions, which basically they were
4  asking me that the appropriate method of dealing
5  with this is to essentially impose a form of slavery
6  on your client, you know, put him on probation for
7  10 years and he's got to do 3,000 hours of community
8  service each year.  Interesting thought, but not one
9  that has received the approval of any legislature in
10  this country.
11         But there was a recurrent interest or
12  recurrent thing in the letters, mostly written by
13  people who weren't lawyers, the people who were more
14  informed by government just to use the word
15  "lenient."  Am I to interrupt that the defendant in
16  this case is not asking for probation.
17         MR. GOLDSTEIN:  It's a very good question,
18  Your Honor, and I have been quoted as requesting
19  probation.  And the first thing I would just like to
20  say is that please don't hold a comment in the media
21  to somehow be held against Mr. Blagojevich --
22         THE COURT:  No, I just want to know.
23         MR. GOLDSTEIN:  Your Honor, we are asking for
24  the lowest sentence possible.
25         THE COURT:  Okay.  That's fine.  You answered

my question.

   MR. GOLDSTEIN:  Thank you, Judge.

   As to the five examples that the government gives, I submit to Your Honor that these are nowhere similar to Mr. Blagojevich's case.  And I'll briefly go over it because Your Honor has read these, but we have a Mr. Kallas who received 18 years.  And this individual was an Immigrations and Customs attorney. This person took thousands of dollars in bribes from illegal immigrants that were trying to prevent being sent out of the country.  This is nowhere close to what Mr. Blagojevich did, Your Honor.

   In fact, the government, I believe it was the FBI, searched Mr. Kallas' home, what they found were 24 immigration files and $177,000 in cash.  Besides Mr. Kallas' salary--and I believe the case was decided in approximately 2010--since 2000, besides a salary, he deposited $950,000 in his bank account. This man was receiving cash in hand, in pocket, over a strong period of time.  And talk about the consequences.  These were people that were committing crimes.  In fact, he recommended, as a member of ICE, to have a case dismissed based on a bribe.  An individual that was committing crimes against the country as being in the country

1    illegally was able to stay in the country because of
2    these bribes.  This is nowhere close to Mr.
3    Blagojevich's case.
4            You have as well Mr. Don Hill also known as
5    the Dallas City All Corruption case.  Again, this
6    was the mayor Pro Tem of Dallas.  He was an
7    individual, along with several, several other
8    people, there were many, many codefendants, he
9    received 18 years.  Again, cash in hand.  And
10   basically what he was doing was taking cash in hand
11   to allow a developer to build a certain part of
12   Dallas, which is south Dallas, cash in hand, not the
13   same as the case before Your Honor.
14           And I'm going to -- I'm not going to try to
15   pronounce the third person's name who received 28
16   years, this was the judge who was in what was called
17   the Kids For Cash racket.  Again, Your Honor, this
18   is nowhere, nowhere close to the case you have
19   before you.  This individual, as a judge, took
20   several -- actually $2.8 million in bribes.  He took
21   cash in hand from people developers and builders of
22   juvenile detention centers, then with that money he
23   sentenced, it's unclear exactly how many people were
24   directly related, but several thousand juveniles to
25   detention centers based on those bribes.  Based on

his conduct, and this is tangible harm here, 4 to 5,000 juvenile cases were dismissed because of what he did.  Nowhere near, Your Honor, what is before you.

The next case is Jonathan Bolar who received 17 years.  This is an individual in Louisiana, Gretna City, he was a councilman who extorted multiple victims in return for a lot of various land use matters.  He was extorting regular citizens coming in saying, hey, I need a variance for this, hey I need something changed as far as land use for that.  And the judge specifically said that he hustled the church for more than $30,000.  This is District Judge Lance Africk, A-f-r-i-c-k, and the quote was, "he took money on the church Altar and used it to make his Lexus payments."  This is not before you, Your Honor.  This is not Mr. Blagojevich, and these are not the crimes that he was convicted of.

And Mr. Bolar received 17 years.

Larry Langford is the final example that the government presents to Your Honor in their submission.  He received 15 years.  He was in Alabama the Birmingham mayor and the Jefferson County Commission President.  They calculated he

144

```
 1  received $241,843, I guess they really calculated
 2  specifically to the dollar, in bribes for
 3  bond-related business.  He was convicted of 60
 4  counts of conspiracy, bribery, fraud, money
 5  laundering, and filing false tax returns.  Again, he
 6  received 15 years on the bottom end of what the
 7  government is suggesting and recommending to Your
 8  Honor.  Nowhere near what Mr. Blagojevich has been
 9  convicted of, nowhere near the man that is before
10  Your Honor.
11          So I submit, Your Honor, that these
12  suggestions just are not applicable here.  And I'd
13  like to give you, if you can bear with me, just a
14  few examples of other cases that I don't even think
15  are necessarily comparable to this case, but at
16  least as far as the sentence, I think this puts us
17  in the range that is certainly more appropriate.
18          And we've spoken about it the everyone knows
19  about it, the case of George Ryan.
20          THE COURT:  What did the judge get?
21          MR. GOLDSTEIN:  The judge received 28 years.
22          THE COURT:  Fine.
23          MR. GOLDSTEIN:  That was one, and I
24  apologize, thank you for asking, Your Honor.  The
25  four of the five are within the range, the judge
```

1  received way more than that.  I believe, and the
2  government can certainly correct me if I'm wrong, I
3  believe there was certain move by the government,
4  they wanted life and I think it was certainly
5  reduced to the neighborhood of the 28.
6          THE COURT:  From your reading of the case,
7  could you determine if the sentence was influenced,
8  in part or in whole, not by the money but by the
9  damage done by the judge, the respect, trust, and
10  confidence placed in the judiciary?
11          MR. GOLDSTEIN:  Oh, absolutely.  And I
12  understand your question.  But here is one very
13  distinguishing factor, at the sentencing hearing,
14  from my readings, several, several people who were
15  adversely affected specifically by this judge, and
16  families, children and juveniles who were sentenced
17  -- like one juvenile was a young teenager who had
18  just a simple marijuana case, had no priors before,
19  and went to a detention center and received, you
20  know, Department of Corrections in I believe it was
21  Pennsylvania, his life was changed.  The whole
22  family structure changed.  I mean, the poor kid went
23  through so much because of this sentence.  Yeah, he
24  made a mistake and he committed this crime, but, for
25  the most part, especially in juvenile court, a petty

1  crime that something should not have been -- a kid

2  to be hauled away to prison, and this individual

3  was.

4          So what you had at the sentencing hearing

5  were tangible individuals, people that were clearly

6  and directly affected by these crimes by this judge.

7  Did it undermine the integrity?  Absolutely.  Of the

8  judicial system.  And I understand what Your Honor

9  is saying.  And I think, I think we would be

10  completely disingenuous, Your Honor, if we said that

11  these crimes that Mr. Blagojevich is being convicted

12  of does not affect the public trust.  It absolutely

13  does.  It absolutely does.  And we cannot say it

14  does not.

15          That being said, considering the totality of

16  all the factors that are before Your Honor, it still

17  does not warrant anywhere near the sentence that the

18  government is suggesting.

19          And thank you for your that question, Your

20  Honor.

21          As we spoke about Mr. Ryan, and to a certain

22  degree he's maybe the second elephant sitting in the

23  room, Your Honor.  And we all know the facts.  I

24  don't really want to go too much into it.  But we

25  know he received 6 and a half years.  He was the

governor of Illinois, and, granted, he was convicted
of crimes, not while he was -- not for crimes that
he committed as governor, nonetheless he was the
governor, he was convicted of 18 counts of
racketeering conspiracy, mail fraud, tax evasion,
and making false statements.  He had state contracts
that were steered to his friends, the number that I
read, and certainly the government can correct me if
I'm wrong, was a value $167,000.  And certainly
while it wasn't necessarily conduct or results that
were in front of the Court as to, you know, the
guilt or innocence phase, we certainly have a
serious tragedy that was connected to the crimes
that Mr. Ryan was involved in.  And Your Honor knows
them well.

Not to mention the conduct that Mr. Ryan did
to cover up these crimes.  The tax evasion and then
installing a close friend as Inspector General to
cover up these things.  In many ways one can say,
and I think it's very plausible, that he became
Governor because he was able to cover up these
things in what he did as Secretary of State.

So, again, for the crimes that Mr. Ryan
committed, again nowhere near what Mr. Blagojevich
stands convicted before you on, and a sentence of

1  6 and a half years.

2      Ed Vrdolyak was mentioned.  Here is an

3  individual, not as a public figure, received $1.5

4  million kickback with Stuart Levine.  He received

5  10 months.

6      I would like to present a few others and I

7  will be brief, Your Honor.

8      Efren Gonzalez, he was a State Senator in New

9  York.  His case just recently was handed down as far

10 as appeal.  Procedurally what happened was,

11 Mr. Gonzalez pled guilty and he tried to withdraw

12 his plea but that was rejected.  Mr. Gonzalez

13 received 84 months in prison.  Basic crime that he

14 was involve with was he took state money, funneled

15 that money to a charity that he controlled, and

16 approximately $400,000 basically went straight to

17 him.  That involved personal expenses, vacation

18 club, a luxury apartment, Yankees baseball tickets,

19 summer home, kids tuition, everything personal,

20 money going straight to him, cash in hand, personal

21 benefit, he received 84 months.

22      Vince Fumo, F-u-m-o, he was a Pennsylvania

23 State Senator.  He went to trial and was convicted

24 of all 137 counts against him.  The charges were

25 mail fraud, wire fraud, conspiracy, obstruction of

1  justice, and filing of false tax return.  The
2  reports were basically he was using state workers as
3  his own personal employees.  He had his state
4  workers oversee construction of his mansion, that he
5  said he was spying on his ex-wife, and Mr. Fumo had
6  his state employees working on his farm.  He
7  commandeer yachts from the Philadelphia Seaport
8  Museum for his own personal travel, as well as he
9  was investigated in a plan to basically extort a
10  utility company.  The utility company wanted
11  deregulation law passed, Mr. Fumo said he was
12  against it, he then got them to pay $17 million in a
13  charity that he controlled, he then voted for it.
14  It goes on and on and on, and I don't need to
15  belabor the point, but a lot of what occurred with
16  Mr. Fumo was not prosecuted because of obstruction
17  of justice, because of attempts to try and prevent
18  the investigation.  Mr. Fumo received 55 months in
19  prison, that was appealed by the government, the
20  trial court then upped it to 61 months, that was his
21  sentence.
22         I'd like to just make another point that
23  co-counsel talked about Don Siegelman, and Don
24  Siegelman is very important in this case.  Again, he
25  received 88 months.  And I looked on the Internet

1  and while this isn't a transcript, you know they

2  blog the trial and they have as much of detail, I

3  would just like to quote what the government said in

4  sentencing in Don Siegelman, and in many ways it is

5  what they are saying before Your Honor now:

6     ".... this is not about a defendant's First

7     Amendment speech rights, this is for starring

8     in propaganda machine to attack the system, to

9     say that this court is corrupt, that this court

10     has perpetrated an unlawful proceeding ..."

11     They go on to say:

12     "... the defendant was still Governor ..."

13     And, by the way, he actually ran for

14  Governor while he was on trial.

15     THE COURT:  He did.

16     MR. GOLDSTEIN:  And he presently has a

17  website, if you look up Don Siegelman.com, where he

18  talks about how innocent he is and how he's been

19  railroaded by the government and certainly has a lot

20  of conspiracy allegations applied to the government.

21  And why that's important, particularly looking at

22  his sentence, is Mr. Blagojevich, and he will

23  certainly address Your Honor, he did make these

24  public statements, a lot of it was I'm innocent, but

25  you are correct, Your Honor, there were other

:00PM

:00PM

:01PM

:01PM

:01PM

1 statements that did not need to be said and

2 shouldn't have been said, but it comes nowhere close

3 to what Mr. Siegelman was saying. He was alleging a

4 conspiracy going all the way up to the White House.

5 He attacked. And I hope Your Honor in no way feels

6 that Mr. Blagojevich in any way attacked you as the

7 judge or the court process. And certainly he had

8 his arguments and his attacks on the government

9 which should not have been done. That being said,

10 Mr. Siegelman here was alleging government

11 corruption to the highest level, both on the

12 judiciary, both on the executive branch, and he

13 received 88 months.

14 And, by the way, on Mr. Siegelman, the trial

15 court, this was Judge Fuller in Alabama, his offense

16 level calculation was 36 which put it to a range of

17 188 months to 235 months. Again, Mr. Siegelman

18 received 88 months.

19 There's a few others that I think are

20 appropriate as well. Linda Schrenko,

21 S-c-h-r-e-n-k-o. Granted, this was a plea bargain,

22 I understand the Court can take a difference with

23 plea bargains, but she received 8 years. She was

24 the Georgia State Superintendent of the schools, and

25 she was charged with embezzling over $600,000 in

 1 federal education funds.  She again used those
 2 personally, including some for plastic surgery, for
 3 her own personal benefit.  She received 8 years.
 4         Edwin Edwards, which Your Honor may be
 5 familiar with, was a Governor in Louisiana who
 6 received 10 years.  He was found guilty of 17 out of
 7 26 counts, including racketeering, extortion, money
 8 laundering, mail fraud and wire fraud.  I believe,
 9 if you will recall, he was running for Governor in
10 the early '90s I believe against David Duke and it
11 was the clansman versus the corrupt Governor, that
12 was sort of colloquial discussion of it.
13         Betty Lauren Maltese, she received 97 months.
14 She was again, I'm sure you know, she went to trial
15 and was found guilty, president of Cicero, helping
16 to steal $12 million of the city's funds in an
17 insurance scam.
18         One that I won't go into details with Your
19 Honor because Your Honor is infinitely familiar
20 with, Chuck Panici, the Mayor of Chicago Heights.
21 He was convicted of racketeering, extortion, and
22 bribery for a lot of money that he received
23 personally as well as connections to the mob.  He
24 received 10 years.
25         And finally -- and, again, we go on and on

but just to give a brief idea of some of the cases
that would indicate potential disparities for what
the government is recommending.

Jim Laski, he received 2 years.  He was the
Chicago City Clerk.  He took bribes as well, and it
was a plea, and obstructing justice, he was
encouraging witnesses to not talk about the bribes
that he was receiving, and that was regarding the
hired truck program.

So the cases I would suggest, Your Honor,
that I presented to you are much worse than
Mr. Blagojevich's and none of them received anywhere
near to what the government is suggesting.

And these are fairly recent in the time.  I
know, Mr. Panici was over 10, 15 years ago, but
nonetheless, these are fairly recent in time.

If we look at some of the players somewhat
connected to this case, for example Stuart Levine.
Again, your Honor knows a whole lot about
Mr. Levine.  This individual has received 67 years,
I don't need to go over the crimes that he committed
and was involved in.  And I know the government has
made the argument, and I'm sure they will make it
again and made it several times, Mr. Levine received
this quote/unquote benefit because of his

1 cooperation, he was an excellent cooperator. No one
2 here on this side says the cooperation should not be
3 valued. We agree. But what the government is
4 suggesting is Mr. Blagojevich get three to four
5 times more than Stuart Levine. I don't think anyone
6 here can say that what Mr. Blagojevich did was
7 anywhere near what Mr. Levine did.

8          Mr. Levine, and I will challenge the
9 government on this one factor, his cooperation, he
10 did cooperate, but the level of cooperation is
11 highly in doubt. And what I mean by that is, in the
12 Blagojevich case he didn't testify, he testified in
13 the Rezko case, in the Cellini case. While he was
14 in the quote/unquote cooperating, he was committing
15 crimes. While he was quote/unquote cooperating, he
16 was lying to them. I would submit, Your Honor, and
17 certainly many wiser people would maybe disagree
18 with me, what was most impactful when it came to
19 Mr. Levine as a witness were those tapes that he
20 didn't wear a wire on that they recorded him on.
21 That was the most significant.

22          I don't know if you want to wait. I hear
23 some interference in the microphones.

24          THE COURT: I think we're going to wait for a
25 minute because it's getting louder.

155

 1          (Brief pause.)

 2          MR. GOLDSTEIN:  Maybe hearing that is better

 3   than hearing me.

 4       (Brief pause).

 5          THE COURT:  Okay you can try now.

 6          MR. GOLDSTEIN:  Okay.

 7       (Phone interruption in the courtroom:)

 8          MR. GOLDSTEIN:  People texting while I'm

 9   talking?  I can't believe that, Judge.

10          I just want to wrap up this small point and

11   then I'll hand it over to Mr. Sorosky.

12          We also have the defendants in this case as

13   well as the so-called co-conspirators in this case,

14   and I understand the government has the

15   prosecutorial discretion to charge who they choose

16   to charge.  So while this is somewhat relevant to

17   disparities, it's also relevant to a just

18   punishment.  And Your Honor again, knows about Lon

19   Monk.  I submit, certainly Lon Monk was not the

20   Governor.  He was the Chief of Staff for a certain

21   period, he became a lobbyist.  But again, 70 to

22   90,000 dollars that man took in cash, he also was

23   involved in the shakedown of Johnston.  John Harris

24   was involved in many of the acts that

25   Mr. Blagojevich is convicted of.  Both of these men

1   certainly have the potential for probation at the
2   very least, will get a very much lower prison
3   sentence.
4           I don't want to put words in the government's
5   mouth, but it's fair to say they certainly see
6   Mr. Blagojevich obviously as a convicted criminal,
7   but suffice it to say a shark.  I submit to Your
8   Honor that we certainly disagree with that, but he
9   wasn't swimming with guppies.
10          What happened was, and if you look at the
11  Senate Seat, you had Marilyn Katz proposed to John
12  Harris to, in essence, tell the Governor you appoint
13  Valerie Jarrett, campaign contributions.  John
14  Balanoff sat the governor and said, hey, it's going
15  to be great for you in the business community, it's
16  going to be great for you with the unions if you
17  appoint Valerie Jarrett.  Rajinder Bedi, Raghu
18  Nayak, they tell Robert Blagojevich to then tell Rod
19  Blagojevich we, the Indian community, and Jesse
20  Jackson will raise you $1.5 million in campaign
21  contributions if you appoint Jesse Jackson to the
22  Senate seat.  Needless to say none of these people
23  have been convicted or charged of these crimes.
24          But what's at the very heart of these
25  charges, just the most basic element of these

157

1  charges is, selfishness, considering yourself over
2  the People of the State of Illinois, Mr. Blagojevich
3  has been found guilty of that.  What you have is an
4  environment that he was working in.  It does not
5  absolve him of this conduct, I want to be crystal
6  clear.  He has been convicted of these crimes, he
7  has to be punished for it, and he has to take
8  responsibility for it, but I think this sheds light,
9  when Your Honor is making a just punishment, the
10  environment that Mr. Blagojevich was, in essence, if
11  you want to excuse the term "playing in."
12      All these people -- really, no one was
13  suggesting in any way that he not think of this in a
14  selfish way.  It doesn't absolve him of this conduct
15  that he was convicted of, but I think it helps
16  explain for Your Honor what was going on in the
17  environment that was occurring while you consider
18  and think about what is a just punishment.
19      I'd like to turn it over to Mr. Sorosky for a
20  brief, then I will finish up, Your Honor.
21      THE COURT:  Sure.
22      Mr. Sorosky.
23      MR. SOROSKY:  You want to break now or what?
24      THE COURT:  No, it's been represented to me
25  that you will be short.

:12PM

:13PM

:13PM

:13PM

:13PM

1      MR. SOROSKY:  First let me say, Mr. Goldstein
2  was not under oath.
3      Your Honor, in plain street talk, the
4  government is saying send Mr. Blagojevich to jail
5  for 15 years, or more, for what he was convicted of.
6  So no matter how lofty and complex this federal
7  court may be, forgetting about the guidelines and
8  proportionality and all those important things, or
9  perhaps putting them aside, we can never forget
10 them, the Court first has to look fundamentally at
11 what Mr. Blagojevich was convicted of and what his
12 conduct, or words, or actions were within those
13 convictions and say to yourself what is a just
14 sentence for what he did.
15     And this Court must recognize that
16 Mr. Blagojevich was convicted, let me use the term,
17 four wrongs.  I don't care how many counts they are,
18 they're fundamentally four wrongs:  One is the
19 Senate seat, two is the hospital with Mr. Magoon,
20 three is the racetrack with Mr. Johnston, and four
21 is lying to a federal law enforcement officer, those
22 are the four convictions.
23     And the government could put them in all
24 sorts of multiple counts and all sorts of complex
25 legal verbiage, but those are the four convictions.

1          And I think it's incumbent upon this court as

2     any court to look at the context of the facts of the

3     case with a legal microscope and say just what did

4     Mr. Blagojevich do.  And everything I am saying is

5     based on the fact that he has been convicted, we are

6     not trying to re-litigate the case.  We stand before

7     Your Honor convicted, we accept the jury's verdict,

8     we are not fighting that at this time.

9          First let's take the Senate seat involving

10    the issue of the appointment of Valerie Jarrett.

11    This was all initiated by representatives of the

12    president-elect and they sent an emissary by the

13    name of Mr. Balanoff.  Mr. Balanoff is a pretty

14    prominent man.  He's the president a union in

15    Illinois, he was a big supporter of Mr. Blagojevich,

16    he was a big supporter for senator, and then

17    president-elect Obama.

18         President-elect Obama is a very intelligent,

19    capable man, and a good man.  He sent Mr. Balanoff

20    on a perfectly proper mission, and that mission was

21    would Governor Blagojevich do a political favor or

22    honor a political request for the president-elect

23    and appoint Valerie Jarrett to the Senate.  She was

24    a fit candidate.  It was a perfectly proper, legal

25    request.  We don't say anything against that.  This

1  was even amplified, as the court heard in the trial,

2  through then designate Chief of Staff Rahm Emanuel

3  talking to some of Mr. Blagojevich's aides or

4  assistants to encourage this appointment.

5          What was the crime that Mr. Blagojevich

6  stands convicted of, firstly, on this issue?  He

7  asked for job in return.  That's all he did at

8  first.  He asked for an appointment to the Cabinet

9  in return for that.  We accept the fact that's a

10  crime, that's illegal, he should not have done it.

11  Forgetting about perhaps how ridiculous and

12  outrageous that request was from a practical or

13  political point of view, which even Mr. Blagojevich

14  acknowledged on the tapes, that crime does not call

15  for a 15-year jail sentence.

16          Let's go on a little bit further with this

17  Valerie Jarrett issue.  After Governor Blagojevich

18  at that time was quite openly and directly told no,

19  that there was no possibility of he receiving this

20  requested Cabinet post, and when his aides told him

21  why should the President point you to that, the

22  President didn't need you to win Illinois, you're

23  not qualified for that position, and besides, you're

24  tinged with scandal, why should the President get

25  anywhere near you, and real practical things like

1  this.

2      One of Governor Blagojevich's assistance, in

3  fact it was John Harris, came up with the idea that

4  perhaps some Change to Win union program could be

5  arranged for Mr. Blagojevich in return for

6  appointing Valerie Jarrett.

7      Well, that was just talk and nothing occurred

8  with that, but that was somewhat amended to

9  Mr. Blagojevich's other crime involving Valerie

10  Jarrett where there was this idea or thought that

11  some organization would be created under the tax

12  code, under subsection 501(c)(4), or some other

13  section of the tax code, which would allow for very

14  wealthy people to contribute money to some

15  non-profit organization to promote healthcare.

16      And at the time President Obama was planning

17  on sending to Congress his healthcare package, which

18  eventually did become law.  And at the same time, or

19  previously, Governor Blagojevich had enacted this

20  All Kids program which was somewhat in accord with

21  President Obama's healthcare plan which eventually

22  became law.  And there was this thought that, and it

23  was vague, that either while Blagojevich was still

24  Governor or after he had left office and concluded

25  his term, that he would somehow go around the

1  country and campaign for healthcare along the lines
2  that he, Blagojevich, felt was wise policy and what
3  president-elect Obama felt was wise policy.  And I
4  believe the actual crime that Mr. Blagojevich stands
5  convicted of was when Mr. Blagojevich, in a
6  conversation with a man by the name of Doug
7  Scofield, who was a former aide and still a member
8  of his kitchen Cabinet, Blagojevich speaks to
9  Scofield about this plan and tells Scofield to call
10 John Wyma to ask John Wyma what Rahm Emanuel would
11 think of that plan.
12         And this is the second half, if you will, of
13 the Valerie Jarrett crime.  And in this conversation
14 with Scofield, Blagojevich says, see what Rahm
15 thinks about it, I want it to be legal, maybe we'll
16 hold a big press conference and announce it.  And I
17 know Your Honor has heard the tapes and I don't have
18 to go into every little details, but this is the
19 second half of the Valerie Jarrett crime, and there
20 isn't any doubt there was the possibility of some
21 job or paying job for Blagojevich as a result of
22 this.
23         However, with all due respect, I don't know
24 that that job would have been anymore money than any
25 other good paying job that any ex-Governor gets,

1  probably less, but there's no doubt this is a crime

2  to do this in relation to the Senate seat.  We

3  accept that.  I am just saying, that does not call

4  for a 15 to 20-year jail sentence.

5        Now, let's go on to the hospital.  And,

6  frankly, there's been a complete lack of correct

7  understanding about this hospital issue.  And I

8  think even at this late date, I think we have to

9  look at this under a legal microscope and examine

10  the facts as they are.

11        Children's Memorial Hospital wanted a stipend

12  from the state to reimburse doctors.  The $10

13  million talked about in this case was money that was

14  supposed to go to doctors who were performing

15  surgery on children whose families did not have

16  insurance and these doctors were only being

17  reimbursed by a very low and perhaps unfair rate by

18  Medicaid as provided by the State with some federal

19  supplement, whatever it may be.  And I'm not saying

20  that Children's Memorial request was unreasonable,

21  or wrong, or anything like that have, but with all

22  due respect, based on the facts of the case, when

23  Children's Memorial Hospital asked for that,

24  Mr. Blagojevich said yes, and Mr. Blagojevich said

25  yes at the time when the state was cutting

164

$2 billion from its budget and after Children's
Memorial Hospital had contributed money to Speaker
Madigan and Senator Cullerton to get this, and with
all due respect these public officeholders took the
donation and did not perform a result for Children's
Memorial Hospital, and they certainly had the
legislative power to do it.  Governor Blagojevich
said that he would do it and he said this without
receiving any donation unlike those legislators.

Now, I think everyone would agree that
Governor Blagojevich may not have been the most
hands-on Governor, and he did not know that after he
said yes, when he checked with his aides that all
the money was out of this pot and this was in
October of 2008 and he then told Mr. Magoon that
they couldn't get the money until after the 1st of
the year.

Come a few days later, Blagojevich and some
of his people are sitting around in his campaign
office and they're trying to raise contributions and
someone says well, who have you done something for
lately, and he says what he did for Children's
Memorial Hospital.  And forgetting about, and I know
it's hard to forget about, but putting aside all the
self-centered John Wane manhood language from

Blagojevich, "I want to hit Magoon for 50" and all
that kind of thing, it was John Wyma, one of the
primary witnesses for the government, I could almost
say but for Wyma Blagojevich would not be sitting
here today as a defendant, that's how important he
was as a witness and everyone knows that's true.
And just let me quote from one question I asked John
Wyma:

    "Question:  And did the Governor say at that
    meeting that he did not want to directly ask
    Magoon for money because he, Blagojevich,
    wanted to maintain a line between government
    and fundraising?"
    Wyma's answer:
    "He did."

    So here, this is not Sorosky, or Goldstein,
or Blagojevich, this is from the government's
primary, primary witness.  So it's touchy and it's
murky.

    So brother Robert calls and asks Mr. Magoon
for a contribution or a fundraiser, that's what he
asks for, a fundraiser.  And I don't know if this
ever came out at trial, but Children's Memorial
Hospital has two Boards.  One Board runs the
hospital, the other Board are millionaires or

1 prominent people who want the honor of being on the
2 Board. I don't know everyone on that latter Board
3 but we did find out during the trial that one of
4 people on this Board was the former Cub manager who
5 originally called Mr. Blagojevich to ask for this,
6 Dusty Baker. I have nothing against Dusty Baker,
7 but with all due respect, Dusty Baker was only on
8 that Board because he was a Cub manager so he could
9 bring the Cubs to some of these fundraisers to get
10 people to raise money.
11      I know there's a woman on the Board by the
12 name of Penny Pritzker, I think her last name
13 explains why she's on the Board and I speak nothing
14 ill of her.
15      And, frankly, when one gets on the Board, you
16 have the honor and privilege of being on the Board
17 of a great hospital like Children's Memorial
18 Hospital, but when you're on that Board and you're a
19 multimillionaire, you know you're getting on the
20 Board but you're going to be asked to contribute
21 some money to help the hospital, that's why you're
22 on the Board. And that's what Blagojevich asked
23 for, a fundraiser from the millionaires on the
24 Board, and his request was a $25,000 fundraiser.
25 And I think later on Robert said or in that

1 conversation, like anyone asking for money, you take
2 what you could get, he indicated they would
3 certainly accept, yes.
4          Now, this was a crime because Mr. Magoon felt
5 that this was somehow implying if he didn't do the
6 fundraiser perhaps the 10 million-dollar grant to
7 the hospital would be affected in some way.  We're
8 not fighting this.  We're not fighting this.  We
9 accept the verdict.  But that is not an offense
10 which calls for a 15 to 20-year jail sentence.  It
11 just is not.
12          Let's go on a little bit further to the
13 racetrack issue.  We all know what the racetrack
14 issue was.  Racetracks are now not making the money
15 they used to make, they're having trouble sustaining
16 themselves because those people who like to gamble
17 are now gambling at other places, wherever that may
18 be.  However, the racetrack industry is important to
19 Illinois for many reasons, and this idea came about
20 that perhaps a miniscule sliver of profits that the
21 casinos make would be diverted or sent to the
22 racetracks so that the racetracks could sustain
23 themselves and this would preserve Illinois jobs and
24 preserve Illinois industries, and the people paying
25 this would not be the taxpayers but these huge

1   multinational corporations who own the casinos and
2   are making a great deal of money and they certainly
3   could afford it.
4           And we don't criticize the legislation.  It's
5   undoubtedly perhaps good legislation.  Completely
6   unrelated to this legislation, or perhaps -- yeah, I
7   could say completely unrelated to this legislation,
8   one of the racetrack owners was a big contributor to
9   Governor Blagojevich, Mr. Johnston, had been a big
10  contributor to Mr. Blagojevich in the past, hundreds
11  of thousands of dollars, and he was responsible for
12  money, he had arranged a fundraiser for
13  Mr. Blagojevich in New York with Mr. Steinbrenner at
14  Yankee Stadium.  And, in fact, Mr. Johnston had
15  hired Lon Monk, the Governor's best friend, as a
16  lobbyist to assist in this enactment of this
17  legislation, and Mr. Monk is receiving a stipend of
18  $12,000 a month.
19          So Mr. Johnston was certainly, to quote my
20  colleague Mr. Goldstein, not a guppy.  And
21  Mr. Johnston, or at least Mr. Blagojevich, was told
22  by Mr. Monk that Johnston was going to give a
23  contribution, that Johnston was going to give a
24  contribution, and you heard the tapes and you heard
25  Monk, whether he lied, whether he embellished,

:34PM

:35PM

:35PM

:35PM

:36PM

1  whether he exaggerated, whether he really felt that

2  was the truth that it would come, Monk told

3  Blagojevich the contribution was coming.  And even

4  in some of the tape recordings between Johnston and

5  Monk, Johnston tells Monk the contribution is

6  coming.

7         So Blagojevich honestly thinks the

8  contribution is the coming.  And Blagojevich was

9  wrong in that he should've completely segregated and

10 separated the signing of the bill from the

11 contribution.  He didn't, and he was guilty, and we

12 accept that, and we're not arguing legality.  But in

13 perhaps the most damning evidence against

14 Mr. Blagojevich on this issue, when Blagojevich is

15 talking to Monk at the Blagojevich campaign office

16 about what Blagojevich should tell Monk when Monk

17 goes to see Johnston, my colleague, Mr. Adam asks

18 Mr. Monk this question, and I will read, this is, of

19 course, at the first trial:

20     "Question:  You guys ..."  meaning Blagojevich

21      and Monk "... you guys are figuring out a way

22      to make Johnston not feel extorted, isn't that

23      right?"

24         "Yeah," Monk answers.  And what occurred

25 there was, Blagojevich was trying to do something

impossible, he was trying to concoct some type of
way that maybe Monk could ask Johnston to pay the
contribution without Johnston feeling he was
extorted.  And it was impossible because Johnston
said I felt when they asked me for the money I felt
it was related to the legislation.  So maybe
Blagojevich, or undoubtedly, Blagojevich was
attempting to do an impossible thing, but at least
Monk has said they were trying to figure out a way
how not to make Johnston feel extorted.  It was an
impossible task, but at least this shows a certain
non-evil intent, if you will, and I think that has
to be factor in considering a sentence, and that
certainly, certainly does not call for a 15 to
20-year jail sentence.  And this is what he was
convicted of.

          Now, let's turn to the false statement aspect
of this case.  There isn't any dispute that
Mr. Blagojevich sat through two interviews with the
FBI and U.S. Attorneys, and each interview was quite
long, three, four hours each interview.  And you had
FBI agents and U.S. Attorneys preparing for this
interview probably for weeks.  And they asked all
sorts of pinpointed specific questions.  And the lie
that Mr. Blagojevich was found, and the only

allegation -- let me start out with this, the only
allegation that came out of this was that he lied on
two general sort of statements that, frankly, every
politician makes, and I believe the one the jury
felt the government didn't prove, one the first jury
found the defendant guilty of, and that was he does
not try to track who gives what in fundraising in
relation to state policy.

Now, you accept the fact that he was
convicted of that; however, there has been no
showing that as a result of that lie the
government's investigation was hindered in any way,
the government expended any extra money as a result
of this false statement. You don't have a situation
where someone lies and says, oh, Joe Jones was not
at that place and so the government doesn't
investigate Joe Jones and they go off on a wild
goose chase, or something of that nature.

That untruthful statement did not deter this
investigation one iota. The government did not show
that as a result of that untruthful statement in
2005 that anyone got any state contract or anyone
got any state benefit as a result of that lie. The
taxpayers did not lose one dime as a result of that
lie. Cannot justify that lie; however, that lie

172

does not call for a 15 to 20 year jail sentence.

Now, let's look at the last topic, the Senate seat involving Congressman Jackson. I began by saying we accept the fact that he has been found guilty. And I have always found in my 40 years of doing criminal defense work, the most difficult thing is to stand up in mitigation on a point where you've said you didn't do it, the jury found you guilty, and then what do you say in mitigation in response to that. And that's the situation we're in with Congressman Jackson.

As the Court well knows, the Governor has said that he never intended to appoint Congressman Jackson, never intended to take this $1.5 million campaign contribution in exchange for the Senate seat, didn't even take it very seriously, and that he wanted to use a possible Jackson appointment as a leverage to get certain prominent national democrats to broker this deal between Speaker Madigan and Governor Blagojevich.

And I'd ask you to hold that thought for one minute while I stray a bit and tell Your Honor two specific points about Governor Blagojevich, first some history about Governor Blagojevich.

We've heard about the All Kids program, and

if I could conjecture for one minute, just for one
minute, or thirty seconds, perhaps even in my
opponent's minds they each may be saying to
themselves, yeah, I guess that's maybe one good
thing this son of a gun, Blagojevich did, the All
Kids program is pretty good.  I'm not saying they'll
ever say that publicly, but they might be saying
that to themselves.

Now, let me tell you how this All Kids
program came about.  It was 2005, and all political
people in 2005, the year before are looking to the
next election of 2006.  In 2006 Governor Blagojevich
was up for reelection, and Governor Blagojevich
wanted to enact the All Kids program.  And as we all
know, particularly through this trial, there isn't
any way the All Kids program is going to be enacted
unless Speaker Madigan will go along with it.

However, at this time Speaker Madigan had
some peculiar problems of his own.  And I don't mean
bad things, because he's a good, honest, good man.
But one of the reasons why Speaker Madigan was so
powerful was he had this overwhelming majority of
democrats in the legislature.  So every district
that was a swing district, and every district which
might be slightly marginal Republican, he had

174

1  elected a democrat.  And it was through his ability
2  choosing good candidates and good campaigning, and
3  all that, that there was also one other ingredient,
4  Speaker Madigan had a huge war chest and Speaker
5  Madigan certainly did not need that
6  multimillion-dollar war chest to elect himself from
7  his own district.  But everyone knew that if any
8  Republican were to challenge one of the democrats in
9  any of these marginal districts, be they swing
10  districts or slightly Republican, Speaker Madigan
11  was there with his big war chest to defend that
12  Democratic seat, because that's how Speaker Madigan
13  maintained his strength.
14      Now, in 2005, the insurance lobby said we're
15  going to take on Speaker Madigan and we are going to
16  fund all these Republican candidates in all these
17  swing districts and marginally Republican districts
18  and attempt to defeat those democrats, because we
19  want a limit on judgments in medical malpractice
20  cases.
21      So Speaker Madigan at this time looked like
22  he would have to dig deep into his war chest, defend
23  all these seats, spend a lot of money.  I'm not
24  saying he necessarily would have lost his
25  speakership, but his great majority would have been

1  endangered and that was the essence of his political
2  strength.
3      So Speaker Madigan came up with a plan and he
4  said to the insurance lobby I'll go along with a
5  limit on judgments on medical malpractice cases if
6  you, the insurance lobby, forego your plan to defeat
7  my democrats.  That may be a beautiful plan between
8  the Speaker and the insurance lobby, but if Governor
9  Blagojevich vetoes that plan, it won't work.
10     What did Governor Blagojevich ask to go along
11  with that plan?  The enactment of All Kids the
12  speaker said yes.  Now, what did that do to Governor
13  Blagojevich?  Had the Governor said no, no, I will
14  veto that bill because in my heart of hearts I do
15  believe that there should not be a limit on medical
16  malpractice judgments.  Mr. Blagojevich's biggest
17  contributor was the Illinois Trial Lawyers
18  Association, these are the very prominent well-to-do
19  premier personal injury lawyers in the city, and
20  their names are all legend, Bob Clifford, Joe Power,
21  the Corboy & Demetrio firm, Al Hofeld, Howard
22  Schaffner, I could go on for two minutes naming all
23  these very prominent, successful, capable lawyers.
24  But they are probably the only big money group on
25  the liberal Democratic side of the aisle and they

:48PM

:49PM

:49PM

:50PM

:50PM

1  were among Mr. Blagojevich's biggest contributors.

2  So if Mr. Blagojevich were truly this shallow,

3  self-centered, non-caring person, he would have said

4  to Mr. Madigan, Mr. Speaker, no, I can't agree to

5  that, I will veto any law that limits medical

6  malpractice limits.  He could've gotten millions of

7  dollars from the trial lawyers, frankly separated

8  Mr. Madigan from the trial lawyers, and he would

9  have been the darling of the trial lawyers.

10  Mr. Madigan would have had to have expended a great

11  deal of money to defend his seats, he undoubtedly

12  would have lost some, and he would have been a

13  weaker Speaker.

14        So if all Mr. Blagojevich cared about was his

15  narrow self-serving interest, he could have helped

16  his campaign funds, he could have weakened Speaker

17  Madigan, but All Kids would not have been enacted.

18        So in this political deal between Speaker

19  Madigan and the Governor, from a political point of

20  view, the Governor was a complete loser and Speaker

21  Madigan a complete winner.  Speaker Madigan

22  maintained his majority, didn't have to expend a

23  fund, and didn't have to expend a cent.  What did

24  the Governor got?  All Kids.  And he also got a kick

25  to boot from his biggest contributor, the trial

1  lawyers.

2       Let me tell you something else about

3  Mr. Blagojevich, and I think Your Honor touched on

4  this topic where somewhere in this probation report

5  there was this comment "I came from nothing."  And

6  you're right, that's an offense comment, and I don't

7  know if Mr. Blagojevich said that or not.  But I

8  think I can say, to quote Governor Richards of Texas

9  and her famous comment, Mr. Blagojevich was not born

10 with a silver spoon in his mouth.  And as a result

11 of that that put two ingredients in Mr. Blagojevich,

12 gave him a certain drive and it gave him a certain

13 insecurity.  Let me relate the drive and then I

14 will --

15      THE COURT:  Stop for a second and finish up

16 with the Jackson comment and then conclude with what

17 you were just about to say.

18      MR. SOROSKY:  Well, this will lead to

19 Jackson.

20      THE COURT:  Why don't you get to the Jackson.

21      MR. SOROSKY:  Okay.

22      If you look at the Jackson comment, what we

23 may have with Jackson, accepting that there's guilt

24 here, is something in the nature of an included

25 offense, if I could use that phrase, by saying "in

:53PM

:53PM

:53PM

:54PM

:54PM

1 the nature of" for want of a better term.

2 Mr. Blagojevich wanted donations.  He knew that

3 Jackson wanted the Senate seat.  And maybe

4 Mr. Blagojevich is only guilty of using Jackson's

5 request to be appointed to the Senate seat and

6 desired to be appointed to the Senate seat, coupled

7 with this offer, oh, we'll raise $1,500,000 in

8 campaign contributions, tell his brother, call him

9 up, see if they'll give you a contribution.  I think

10 the words were, and I am reading from a transcript

11 of the tape, I think it's something like this:

12     "If, in fact, this is possible" "this" being the

13      appointment of Jackson "then some of this stuff

14      has to start happening now."

15         I think later on, a few sentences later:

16     "If there is tangible political support like you

17      said, start showing it."

18         And this is why I use the phrase "something

19 in the nature of an included offense" in that

20 accepting the fact that the jury found and that Your

21 Honor believes that Blagojevich was seeking some

22 type of political contribution from the Jackson

23 supporters by these statements and those were the

24 two damning statements, he's asking for a

25 contribution here.  And that's wrong and he's

guilty, but I don't know that that's anywhere near
selling a Senate seat for $1,500,000.  And once
again, this does not call for a jail sentence of
15 years in jail.

        When my colleagues have spoken in the past
and Your Honor has commented about general
deterrence, the examples of all these other corrupt
officials were so more egregious than the crimes we
have here, that we have to begin with what
Mr. Blagojevich was convicted of.  And with all due
respect, and I don't mean to be out of line when I
say this, these are rather minimal, minimally wrong,
they're not right, but they're minimally wrong
compared to the outrageous conduct that was shown in
these other cases.  That's all I have to say.

        THE COURT:  Ten minutes.

        THE CLERK:  All rise.

    (Recess.)

        THE CLERK:  All rise.

        THE COURT:  Please be seated.

        MR. GOLDSTEIN:  Thank you, Judge.  Thank you
for your indulgence.  And once again I was wrong,
Mr. Sorosky went a little longer than anticipated
and I take full responsibility for that.

        Mr. Sorosky, and you've heard the trial and

180

1  you've heard the summations here, talked about the

2  facts of the case.  I say it again, we're not here

3  to re-try this case before Your Honor.  I would like

4  to for Your Honor play a couple of excerpts of

5  calls, and there's two excerpts I want to play for

6  you to begin with.

7       The first excerpt is a series of calls that

8  we basically put together.  These were all calls

9  that were admitted at trial.  And again, what we're

10  trying to show and at least it'll shed some light is

11  that individuals that Mr. Blagojevich was speaking

12  to, were at the very least not objecting, it's not

13  encouraging, it's not cheering on what it was he was

14  doing.  It does not absolve him of these crimes, we

15  understand that.  It sheds light and puts a certain

16  amount of perspective on it.

17       So I'd like to play for Your Honor, if you

18  would allow, tab 2 in the binder that we provided to

19  Your Honor.

20       Thank you.

21  (Tape played)

22  (Brief pause).

23       MR. GOLDSTEIN:  These series of calls

24  demonstrate what was going in Mr. Blagojevich's

25  head.  And, again, they don't absolve him of the

:17PM

:17PM

:18PM

:18PM

:20PM

conduct that he was convicted of, but if you listen
to these tapes, it is repeated over and over and
over again, for whatever reason, whether it's they
don't want to talk to him anymore, they just want to
agree with him, whatever it is, from
Mr. Blagojevich's perspective it's every single
person cheering this on.

And I'll speak generally, Mr. Blagojevich
made one comment in the call talking about Rahm
Emanuel wants Valerie Jarrett:

"It looks like, huh?"
Someone who is talking to him says:
"The more interested he is, the better it is
for you, do you know what I mean?"
Mr. Blagojevich:
"Yeah."
This person then says:
"Well, see what you can get from him, see how
interested he is. So I think, you know, Health
and Human Services is really the one for you to
want, you know."
Blagojevich says:
"Yeah."
The speaker says:
"That is the position and I think --"

182

1    Mr. Blagojevich says:
2    "They think I want --"
3    And then the speaker says:
4    "It's a legitimate ask."
5    So Blagojevich asks again:
6    "What's that?"
7    "I said I think it's a totally legitimate ask."
8         Not to confuse, Your Honor, I'm putting
9    together some various calls.
10        One individual that was speaking to
11   Mr. Blagojevich called the Senate seat a gift.
12   Again assigning a value to it, assigning weight and
13   somehow like it's something to be handled in the
14   personal context.
15        When Mr. Blagojevich says:
16   "That be good, and we should think about what we
17   could get for that."
18   The person that he's talking to says:
19   "I think so."
20   "And he can help is, right?"
21   And that person says:
22   "I think --" talking about the individual that
23   they're talking about helping him "... he's
24   somebody who would be willing to say to the
25   president-elect this works for the Governor and

183

1     you ought to do it."

2     Mr. Blagojevich has another call with a

3     different individual:

4     "So anybody want to argue why I should appoint

5     Valerie Jarrett when it's an exchange for

6     nothing."

7     The person that is speaking to Mr. Blagojevich

8     says:

9     "I'm not gonna argue that, I would argue

10    appointing Valerie Jarrett you get something

11    that is helpful to you."

12    Mr. Blagojevich says:

13    "They're not giving me anything."

14    This individual says:

15    "Well know, they're trying to set the stage for

16    negotiations and to invite and negotiations for

17    something they figure they can do.  Right now

18    if you ask for 10, they're offering zero, so

19    they want you to come back with 8 so they can

20    offer 2."

21    Mr. Blagojevich says:

22    "Right."

23    They're talking about the 501(c)(4)

24    Mr. Blagojevich says:

25    "How about like $10 million to a 501(c)(4),

1    organization that supporters of mine control,
2    dedicated to providing healthcare to children
3    and working families across America?"
4    The person he's speaking to says:
5    "That sounds like a reasonable plan."
6    Mr. Blagojevich says:
7    "Yeah, yeah, give some thought to that."
8    The person responds:
9    "That sounds like something, that sounds like
10    something that is especially, you know, that
11    you could be the executive director of, that
12    sounds very reasonable."
13       This was the conversation that
14    Mr. Blagojevich had over and over and over again
15    with various, various people, intelligent people,
16    reasonable people, all treated, in particular the
17    Senate seat, in a selfish manner and that was the
18    environment he was talking on the phone with
19    throughout the period of conversations.  That is
20    mitigating, Your Honor.
21        Another series of calls, and again I'll be
22    brief, and that is on tab 3, and that has to do with
23    this Madigan appointment.  And this has been
24    relitigated.  Your Honor, knows full and well,
25    again, I really stress to you my desires not to

1  re-try this case.  I want to shed light for Your
2  Honor exactly what was going on during that entire
3  period.  This was a period of about a month and a
4  half of recordings, and the government has presented
5  many recordings for the jury and for Your Honor to
6  hear that certainly don't put him in the best light,
7  and certainly indicate, at the very least,
8  selfishness.
9        What is significant about the Madigan
10 appointment for Your Honor in sentencing is, in many
11 ways, the unselfishness of it, and the desire to do
12 good things for the People of the State of Illinois.
13 And I think what is important to know during that
14 time, that time period which he, in essence, is
15 being convicted of, there were many, many, many
16 moments where he was truly, truly trying to do what
17 was best for the People of the State of Illinois,
18 and that's tab 3.
19      (Tape played).
20        MR. GOLDSTEIN:  Your Honor, these were two
21 calls that we just put together and it's just
22 Mr. Blagojevich speaking.  And as you look at the
23 dates of the tab 3, they are somewhat early in the
24 process and somewhat later in the process.  This was
25 something that was consistently on his mind and

1 shows another side to him, another side that I hope
2 we have been able to show to you.
3       Standing before you Mr. Blagojevich is
4 convicted, and that is a side of him, and the
5 government suggests that that is his character, a
6 criminal character.  I can tell you, that isn't.
7 That is a side of him, but there are sides to him
8 that are not criminal, that are good and that are
9 decent.
10       Your Honor heard about the All Kids program,
11 I'm not going to belabor the point.  The main issue
12 on All Kids is not whether there was good policy or
13 bad policy, it was that it came from a true deep
14 belief in doing good things for people.
15       Your Honor has the submission and we've, in
16 essence, laundry list a lot of the things that
17 Mr. Blagojevich did as Governor.  This is not meant
18 to be a campaign speech.  We're not trying to get
19 Mr. Blagojevich reelected.  But there is a theme to
20 what Mr. Blagojevich did as Governor and as a
21 politician in a lot of his initiatives, the theme
22 was that he cared about people.  It really was, and
23 I've had many conversations with him.  It wasn't
24 liberal or conservative or some economic viewpoint,
25 it was a very basic concept, can I help people.  I

187

1  see that kids are underinsured, what can I do about

2  it.  It was a very basic level of kindness and

3  goodness that led him to do the policies like All

4  Kids.

5          As far as some of the initiatives to allow

6  for cancer screenings and some of the expansion of

7  healthcare.  Mr. Blagojevich and his administration

8  was sued for a lot of these initiatives, that again

9  really harmed his administration and harmed him

10 politically.  He did it truly because he thought it

11 was the right thing to do to help people.

12         And the government, I'm sure will argue, and

13 has raised to Your Honor in its submissions,

14 rightfully, that corruption breeds cynicism in the

15 general public.  They're 100 percent correct, it is

16 a problem, it does breed cynicism.  What I submit to

17 Your Honor, though, is that the citizenry also gets

18 cynical--say that 10 times--they get cynical when

19 the politicians don't do what's good for the people.

20 And some of that is for corrupt reasons, but some of

21 it is just not doing what's right for people.

22 People get cynical because they see, man, I could've

23 been helped with this, where was the government when

24 this tragedy happened.  One example is Hurricane

25 Katrina, a lot of those citizens are cynical of

government, not necessarily of any corrupt things
that occurred, but they weren't helped, they weren't
assisted, and it means something.

And what I'd like to show you just one
example, and Your Honor has all the letters, and we
videotaped a few people, and I would just like to
show you a short snippet of one individual and this
is an individual who felt so happy that this rides
for seniors was passed. Just look how she is, how
appreciative she is just by that one simple policy.

(Videotape played.)

MR. GOLDSTEIN: This is one person, but that
one policy that came from the heart affected this
one person, and that has impact, and that's a
policy--good, bad or otherwise--that impacted a
citizen. That person is not cynical because of the
good substantive policy. So if it's healthcare, or
taxes, or free rides for seniors, education,
whatever it is, these policies came from the heart
of Mr. Blagojevich. They show another side of the
man.

And again, Your Honor, thank you for
indulging us this day and I apologize that, once
again, we've gone a little too long. But I want to
give you just a personal story to really show Rod.

1 As you know I've been on this case for quite

2 sometime, it's been about 2 and a half years, and

3 they say as lawyers we're not supposed to be

4 affiliated with the client, we're supposed to just

5 keep a distance.  And it's good in principle and I

6 think it's the right value and the right ethical

7 standard to have.  It's practically impossible in a

8 case like this.

9       For two and a half years I spent so much time

10 with Mr. Blagojevich, to the detriment of seeing my

11 family.  On May 11th, 2010, my world was turned

12 upside down.  My father passed away, completely

13 unexpectedly.  And this is, as you know, June 3rd,

14 2010, is when the first trial was to begin.  I

15 dedicated my entire practice, my entire life to this

16 case and my world was turned upside down when that

17 happened.

18       That day Mr. Blagojevich gave me a call and

19 we spoke.  It wasn't about what was going on with

20 the case, it wasn't, hey, you going to be there with

21 a case.  It was a friend being a friend.  It came

22 from the heart, I know it.  That Friday was the

23 funeral and Mr. Blagojevich came to the funeral.

24 There is no press, didn't go shaking hands, he just

25 came to be a friend.  And on a side note, I want you

know, I want you to know Your Honor, the government
attorneys they said some very nice things to me as
well.  And it means a lot.  I apologize for getting
a little emotional.  What I wanted to communicate to
you, Judge, is this is another side of this man.  He
didn't try to do anything about the case.  It was
about being a friend.  As bad luck would have it, a
very similar thing happened to my co-counsel,
Ms. Kaeseberg, as you know, and this was in the
middle of the trial that her mother passed away.
Mr. Blagojevich was there, went to the funeral,
called her every single day, and that's the subject
of one of the letters that was written to Your
Honor, and I just want to quote from it briefly:
      "Three months before the first trial began
         Lauren's mother, to whom Lauren was incredibly
         close and an only child, was unexpectedly
         diagnosed with stage IV untreatable cancer.
         Lauren had been working on Mr. Blagojevich's
         case for many months and at the time her mother
         was diagnosed Lauren moved into our home in the
         suburbs to help care for her.  This was a
         difficult decision for Lauren because it meant
         risking her job.  However, it became
         immediately clear that Lauren had

Mr. Blagojevich's full support.  A

Mr. Blagojevich's not only encouraged Lauren to

work from home in the months leading up to

trial, but he leant incredible emotion support

to our family at our most difficult time.  Mr.

Blagojevich took the time to call my sister and

talk with her about her illness, about Lauren,

just offered his and Patti's support.  These

phone calls came from such a place of kindness,

there was no self-interest on the part of Mr.

Blagojevich.  I remember one call specifically

towards the end of Marsha's life when she had

the call on the speaker phone, Mr. Blagojevich

told her some wonderful things about Lauren's

work on the case which just filled Marsha with

overwhelming pride and happiness.  But Mr.

Blagojevich also went on to tell Marsha that no

matter what happened, he promised her that he

and Patti would always be there for Lauren and

our family in whatever way they could help.

When Ms. Kaeseberg's mother passed away every

single evening that week on their way home from

court Mr. Blagojevich called Lauren to tell her

'everything is going okay, please don't worry

about it,' we miss you but you need to be with

1    your family right now.'  This kindness, again

2    from a man fighting for his own life and family

3    on trial, was unmatched by anything I have ever

4    seen.  It meant a great deal to Marsha, to

5    Lauren, and to me, and to the rest of the

6    family."

7        I give these stories to your Honor not for

8    sympathy for me, not for sympathy for Ms. Kaeseberg,

9    not even sympathy for Mr. Blagojevich, what I want

10   to do and I hope I am doing is give you another side

11   of this man, another side that is not a criminal,

12   that has good character.

13       Now, more than just being a friend, you heard

14   about Mr. Blagojevich and his family.  And you know

15   the biographical information, you know his family

16   status.  I just want to go over shortly some of the

17   connection that he has with his daughters.  And

18   again, you make a very good point earlier in the

19   day, Judge, that in many ways he's not different

20   from a lot of people.  There are many, many good

21   dads out there, loyal and dedicated to their

22   children.  But it is important when we look at what

23   is a just punishment.

24       And I provided to Your Honor the defense

25   group exhibit number 1, which is a series of letters

1   that Mr. Blagojevich wrote to his daughter Amy.  And

2   it's just over time, some letters are after the

3   arrest but most of them are before he was arrested,

4   and I just want to read from a couple of them just

5   to sort of give you a flavor how close he is with

6   Amy.  On October 26, 2005, Mr. Blagojevich wrote:

7       "Dear, Amy:  Boy, oh boy, do I love you.  How's

8       it going?  Mommy tells me she heard from a

9       little birdie that you're doing well and having

10      a good time.  I sure hope so."

11          Mr. Blagojevich went on to talk about

12  politics, of course, and he talked about All Kids:

13      "Well, that's it for now, keep your fingers

14      crossed.  We hope to pass a law tomorrow to

15      help all the kids in Illinois be able to go to

16      the doctor if they have to."

17          In many ways, the All Kids program and these

18  initiatives really show where it comes from with

19  Mr. Blagojevich.  It is a very basic and simple

20  thought.  He sees his daughters, he has his life

21  experiences, and he see what can be good policies

22  for people.

23          The next day, October 27th, what would happen

24  is Amy would go away for like a class type thing for

25  about a week and Mr. Blagojevich would write to her

1  every single day, and he tells Amy:

2      "Tomorrow is Friday, which means tomorrow you

3       come back home.  I can't wait.  I can't wait to

4       see you.  I can't wait to do stuff with you.  I

5       can't wait for tomorrow."

6          In January of '06, Mr. and Mrs. Blagojevich

7  visited Amy's school and he was able to just write a

8  quick note, and Mr. Blagojevich said:

9      "Mommy and I are so grateful, we're the parents

10      of such a smart and sweet daughter.  We're

11      really happy that you're doing so well in

12      school."

13         So the question is, it's been discussed a

14 little today, what value does it have that he has a

15 family that he cares for and would be devastated

16 without him?  Although speculative, I think it's

17 pretty clear I think they will be devastated without

18 him.  Does it matter at all?  It has to be weighed

19 against the aggravating factors, and the government

20 will certainly present that soon.  We understand

21 there's a balance that has to be struck.  I suggest,

22 Your Honor, that balance is way, way, way below

23 where the government is.

24         Mr. Blagojevich's two daughters a day, let

25 alone a year, is an eternity; a day, let alone a

1  year from their father is a lifetime.  As one doctor
2  wrote in one of the letters to Your Honor:
3       "I also know how prison can affect families and
4            is not possible to unring a bell.  If you can
5            think of Amy and Annie in your sentencing and
6            how it will affect them is important.  In our
7            office, there is a sign that reads 'anything
8            you do for a child is never wasted.'"
9       Amy wrote a letter as well and talked a
10  little bit about the activities she shared with
11  Mr. Blagojevich, and she says:
12       "For the past 3 years my world has been spinning
13            out of control, but what has made it somewhat
14            bearable is my father being home almost all the
15            time.  He's been here to help me with my
16            homework, history and writing mostly, and he's
17            been here to teach me life lessons."
18       She goes on to explain how important her dad
19  is to her:
20       "As much as I have gone through already, I will
21            not be able to handle my father not being
22            around.  It's too drastic a change.  I need my
23            father.  I need him here for my high school
24            graduation, I need him if I do not get into
25            college, I've wanted to go to Northwestern

1    since the sixth grade.  I'll need him if I do
2    get in.  I'll need him when my heart gets
3    broken.  I'll need him when my dog Skittles who
4    my parents bought for us after the arrest and
5    who I love dies.  I need my father in my life."
6        Despite Mr. Blagojevich's actions, that he
7    alone is responsible for, we humbly request, Your
8    Honor, to take into account the side of
9    Mr. Blagojevich that is a loving, caring, and
10   dedicated father and husband.  Take into account the
11   impact his absence will have on such a tight-knit
12   family.  He doesn't deserve mercy because he has a
13   family, what I submit to Your Honor is his family
14   deserves mercy.  They are not the ones that have to
15   be responsible for these crimes.  And when a
16   sentence is handed down it affects everyone, it has
17   ripple effects.  Bad for the defendant's family, we
18   know that and Your Honor knows that.  The goal here
19   is to limit these ripple effects while satisfying
20   all the factors Your Honor takes into consideration.
21       Now, again, much has been said amongst a lot
22   of these submissions and writings that defense is
23   re-trying the case, we're trying to do that, we're
24   trying to play tapes.  I want to apologize to Your
25   Honor if in any way we are trying -- it appears even

1  that we're trying to do that, and that's my fault.
2  Please don't hold it against Mr. Blagojevich if in
3  any way it looks like we're trying to say the jury
4  is wrong.  The jury made findings, we respect those
5  findings, we accept those findings.
6      There's one final call I'd like to play for
7  you, and I think it's important to play just again
8  for you to get the flavor.  You can read the
9  transcript, but the words just don't come to life.
10 It's just a small snippet of a short interaction on
11 the phone between Mr. Blagojevich and his family,
12 and that's tab 1.
13     (Tape played).
14     MR. GOLDSTEIN:  Certainly not suggesting,
15 Your Honor, he should stay home because he's good at
16 cleaning the dishes.  This call, very simple call,
17 that does show in real life terms the bond that is
18 between Mr. Blagojevich and is family.  I just hope
19 that we shed light on this relationship and shed
20 light on the man.
21     I'll leave you with this, Your Honor:
22 Mrs. Blagojevich wrote you a letter as well, and she
23 ended with this:
24     "... but the punishment that he fears the most,
25     the one that is most devastating is that he

1       would not be able to see his daughters grow up,

2       that he would not be here to support his

3       daughters, to protect them from and help them

4       through what is proved to be a very cruel

5       world.  Your Honor, I ask you humbly with the

6       life of my husband and the childhood of my

7       daughters in your hands, please be merciful."

8     I echo that sentiment, Your Honor, be

9 merciful, you can satisfy all the factors,

10 deterrence, just punishment, no unfair disparities

11 by giving this man a much, much lower sentence and

12 the lowest sentence that the law allows.  You will

13 satisfy all those factors and you will create as few

14 ripples that have been caused by Mr. Blagojevich,

15 you will prevent that from happening, and I thank

16 you, Judge.

17     THE COURT:  I have a couple of questions.

18     MR. GOLDSTEIN:  Sure.

19     THE COURT:  There's a line in one of the

20 pleadings you filed comparing the Governor to other

21 defendants and asserting that he did not plead

22 guilty and cooperate, it's a statement you made.  My

23 question to you is, was there any earthly thing on

24 which the governor could cooperate?

25     MR. GOLDSTEIN:  It's an excellent question,

199

1  Your Honor, and I think the government might be able

2  to respond to this better.  As I understand it, I

3  don't think there was anything he could cooperate

4  on.  You're speaking post-arrest?

5          THE COURT:  Sure.

6          MR. GOLDSTEIN:  Post-arrest and I believe

7  that's --

8          THE COURT:  Your answer is basically you do

9  not know of one.

10         MR. GOLDSTEIN:  I do not know of one, I don't

11  believe so.

12         THE COURT:  That's what I'm asking you, and

13  that's fine.

14         The second thing is is several letters have

15  been cited.  I'm curious as to what your position is

16  with respect to the letter behind tab 3 signed by

17  his brother.

18         MR. GOLDSTEIN:  Anything specifically or --

19         THE COURT:  Well, this is a fairly --

20         MR. GOLDSTEIN:  I think I know what you're

21  talking about.  It might be best if we went to

22  sidebar if Your Honor allows.

23         THE COURT:  Well, I can put it in a different

24  way:  Whether there's any problem or conflict with

25  respect to the first, second, and fifth paragraphs?

200

1       MR. GOLDSTEIN:  I can say, Your Honor, I -- I
2  understand what Robert is saying and I think it does
3  explain a lot to Your Honor.  It doesn't excuse the
4  conduct, we're not suggesting that in any way, but I
5  think it explains it.
6       THE COURT:  That's fine.  You answered the
7  question.  Thank you.
8       MR. GOLDSTEIN:  Thank you, Judge.
9       THE COURT:  The government can stand, I just
10 want to ask what your plans are, because we're not
11 going to continue to do it today.
12      MR. SCHAR:  Judge, I have comments, we don't
13 have any witnesses.  I don't expect to be
14 particularly long, but we're happy to go tomorrow.
15      THE COURT:  And how long do you think?
16      MR. SCHAR:  Probably if there are questions,
17 probably in the neighborhood of 20 minutes, I would
18 say.
19      THE COURT:  There might be questions.
20      10:00 o'clock tomorrow morning.
21      THE CLERK:  All rise.
22    (Adjournment taken from 4:55 o'clock p.m. to
23     10:00 o'clock a.m. on December 7, 2011.)
24
25

201

*     *     *     *     *     *     *     *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


/s/Blanca I. Lara                      date



_____          _____
        Blanca I. Lara                      Date