1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4            Government,             )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   April 21, 2011
                                     )
7            Defendant.             )   10:27 o'clock a.m.

8
                         VOLUME 1
9            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES B. ZAGEL
10                   AND A JURY

11
    For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15            Assistant United States Attorneys
              219 South Dearborn Street
16            Suite 500
              Chicago, Illinois 60604
17

18  Court Reporter:

19            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
20                   Room 2504
              Chicago, Illinois 60604
21                (312) 435-5895

22

23

24

25

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:   Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:   Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:   Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

WITNESS                                                    PAGE


   Voir Dire...................................... 4



EXHIBITS

   ..................................................

1

2  (The following proceedings were had in the presence

3  of the Prospective Jurors in open court:)

4

5                         VOIR DIRE

6          THE COURT:  You are here today as prospective

7  jurors.  I'm going to make a brief talk to you

8  repeating a couple of things I said yesterday to you

9  about the why jury service matters and why it's so

10 important.

11         The first reason it's important is, and often

12 forgotten, is that we fought a revolution so you

13 could sit here today.  The American colonists went

14 to courts where everything was decided by the king's

15 judges, there was no juries of one's peers, and this

16 was, in fact, one of the reasons for the events of

17 July 4, 1776.  Your presence in this courtroom is a

18 living symbol of the birth of our nation.

19         Second, no country entrusts as much to juries

20 as this nation does.  The American way with jury

21 speaks to the world that we trust our citizens to

22 decide important cases, to do justice under law, and

23 with juries that are composed of people who are

24 selected at random from various voters lists and

25 other lists.  Jury service demonstrates the faith of

1  democracy that we are competent to govern ourselves.
2        The third thing is, the faithful performance
3  of jury duty is crucial to the parties in this case.
4  If our juries were not a significant part of
5  American history, your work here would still matter,
6  and it would matter a great deal because the parties
7  to this case have submitted the decision of the case
8  to you.  Your verdict is significant to them, it
9  matters to them, it is important to them, and they
10 are entitled to the very best effort you can give as
11 jurors.
12       I also want to say that in this case, a
13 criminal case, the jury will have to decide whether
14 the government has proved its case.  You will not be
15 asked to decide whether you like or dislike, approve
16 or disapprove of any person here, any person who has
17 been accused here.  You will be asked only to decide
18 whether the government has proved the charges
19 against the defendant beyond a reasonable doubt.
20       I believe strongly in the value of your
21 service today.  And in a moment, I'm going to ask
22 each of you to take an oath to tell the truth just
23 as witnesses do and then I will ask you questions.
24       The questions are not asked out of idle
25 curiosity, nor was the questionnaire that you filled

:29AM
:29AM
:29AM
:30AM
:30AM

1  out done out of idle curiosity.  What I am trying to

2  do, and what the parties are trying to do, and what

3  the questions and answers will help us do is to pick

4  out of those who have been called the best possible

5  jury to hear this particular case.

6          Now, not all jurors are equally suited to all

7  cases.  Those of you who are not selected to sit on

8  this jury, should not take this to mean that you are

9  unfit to serve as a juror, or even that you're unfit

10 to serve on this case, it means only that the court

11 and counsel have an opinion that other jurors might

12 be better for this case.

13         You will, incidentally, and I think perhaps

14 you already know this, be questioned by me in the

15 order of your numbers.  The order of numbers is

16 random.  They were selected out of a computer

17 randomizing machine.  You will, in fact, be

18 questioned one at a time by me.  You were all

19 assembled here for me to make this opening statement

20 to you, but you will be questioned as individuals.

21         One last thing before the oath is

22 administered.  In simplified terms, very simplified

23 terms, the indictment in this case charges one

24 defendant, Rod Blagojevich, with several counts of

25 committing, as Governor of Illinois, various

1 criminal acts referred to in various ways as bribery

2 or extortion, attempted conspiracy, using phones to

3 commit some of these offenses, including securing

4 campaign contributions in exchange for certain acts.

:32AM 5 This is, as tight a shorthand as I can possibly give

6 you.  With respect to the details of the charges and

7 the evidence, you will have to hear that for

8 yourselves and you will receive detailed

9 instructions from me on precisely what is at issue

:32AM 10 in this particular case.

11         The defendant, Rod Blagojevich, has pled not

12 guilty to each and every count.

13         Mr. Walker, would you administer the oath and

14 then escort the jury to the holding rooms.

:32AM 15         THE CLERK:  Will each of the prospective

16 jurors please stand and raise your right hand.

17     (Prospective jurors sworn.)

18         THE COURT:  Take the jury.  All rise.

19         THE CLERK:  All rise.

:33AM 20         Jurors please exit out the rear door here.

21     (Prospective jurors exited the courtroom.)

22         THE COURT:  Be seated in the courtroom.

23         Counsel, approach the lectern.

24     (Brief pause)

:34AM 25         THE COURT:  We have, I think, 4 or 5

1 no-shows.  Mr. Walker will give you the numbers.

2          The second question I have, when I was

3 reading these last night, I noticed I did not have a

4 questionnaire for number 104.  Did you?

5          MR. SCHAR:  I think we did, Judge.

6          THE COURT:  Okay, then we'll have one

7 somewhere.  Just, somehow, it's not in my package.

8          There are also some, I believe, who are

9 currently in the jury room who were told to report

10 today rather than yesterday in a couple of cases,

11 because one of them actually had some meeting that

12 was very important, we'll get you exact numbers on

13 those as well fairly soon.  I will call them in the

14 numerical order.

15          You had probably noted in looking at this

16 that one of the consequences of the random draw is,

17 the first few contained an extraordinarily large

18 percentage of people who asked to be excused.  It's

19 just the random draw and we'll deal with that.  I am

20 under the impression that many of these requests for

21 excuse will turn out to be valid, but we'll go

22 through those one by one.

23          Also, you should note, and we did this last

24 time, I do not intend to excuse anybody in open

25 court.  So if you think voir dire is going in the

1  way that shows that a person is perhaps totally

2  unqualified to sit as a juror on this or any case

3  and I just excuse the juror and send the juror back

4  to the room, I don't want you to panic in dismay.

5  We'll deal with those I excuse after a certain

6  number of jurors have been questioned, and with

7  respect to all of those, counsel will be heard,

8  which is why I am not doing it on the spot.

9           Anything anybody wants to raise with me?

10          MR. SCHAR:  Judge, briefly.  Obviously,

11  having gone through this the last time, I know you

12  do take follow-up on questions.  We, obviously, had

13  an opportunity to look through the questionnaire.

14  Typically, you hit most of them, but from time to

15  time there may be a few that we have additional

16  follow-up on, how should we raise that with Your

17  Honor?

18          THE COURT:  What you could do is you could

19  hand me a little note, since I'm going to leave the

20  bench and come back in a few minutes, in which you

21  tell me what you want to know about each particular

22  juror.

23          The best thing you can do with respect to

24  this is use as your reference point the question

25  number, which is what I put on my own sheet, what

1   questions I wanted to follow up on.  This is also
2   something that defense can do.  And you don't have
3   to worry about going all the way to the 140 or so --
4   the 40, you can -- since I'm doing them in numerical
5   order, you can start handing them out in bits and
6   pieces.  So if I get 4 or 5 at a time, that's fine.
7           Anything else?
8           MR. SCHAR:  No, Judge.
9           MR. GOLDSTEIN:  Your Honor, we did not
10  receive a 101, I don't know if Your Honor did.
11          THE COURT:  The funny thing is, I found my
12  101 in the middle of my pile.
13          MR. GOLDSTEIN:  Oh, okay.
14          THE COURT:  So maybe it's somewhere in the
15  middle of your pile.
16          MR. GOLDSTEIN:  Okay.
17          THE COURT:  Because I asked about that and
18  the government had found its.  So I felt fairly
19  confident.  I felt fairly confident about 104, but I
20  never got 104.
21          MS. KAESEBERG:  We have one additional
22  concern, Your Honor.  Particular questions in the
23  questionnaire that we objected to being inserted
24  into the questionnaire, 55 and 56, after reviewing
25  some of the answers, the questions involve

1 individual's opinions about the system, so to speak,

2 of political fundraising.

3          THE COURT:  Right.

4          MS. KAESEBERG:  Our concern, which is why we

5 haven't objected to until now, seems to come to

6 fruition, a lot of people have an objection to the

7 system.  And we don't want the government's sort of

8 theory to be indoctrinated into the jury through the

9 questionnaire.  So we ask that if you abate that,

10 potentially, by when each individual juror is

11 brought out instructing them that the system is not

12 on trial, you know, or some instruction saying the

13 system is not on trial, essentially.

14          THE COURT:  I'd be happy to do that at some

15 later point in time, but the issue is addressed in

16 another way, really, and I've had some follow-ups on

17 this.  You have jurors who are asked do you think

18 politicians take money to influence their votes,

19 it's not the exact wording but that's the point.

20 And I noticed that a very large number of people

21 said "some do."  If their position is that "some

22 do," I think we're fine, and I have some follow-ups

23 to make sure that they understand that "some" does

24 not mean all of them.  There are a couple of

25 individuals who regard the entire system as corrupt.

1  The one individual that I can think of, if you look
2  at the individual's answers as a whole, you can't
3  fail to reach the conclusion that this person is
4  embittered by life, in general, and regards pretty
5  much everything as corrupt and rotten, which,
6  generally speaking, does not make for the best kind
7  of juror.  So that person is probably not going to
8  be seated.  But I have marked those in several cases
9  where we had some idea of what their attitude is,
10 and I don't think it's going to present a problem.
11         Anything else?
12         MR. SCHAR:  No, Judge.
13         THE COURT:  Okay.  I'll see you when I see
14 you.
15         Mr. Sorosky, you are about to open your
16 mouth?
17         MR. SOROSKY:  Right.  The issue of attorney
18 Damon Cheronis, do you want to mention him to the
19 jury in any way or potential jurors?  Do you want to
20 handle that once we have a jury, should he involved
21 in the trial?
22         THE COURT:  What I would like to do is to
23 wait until we've done some preliminary screening and
24 when we get down to a group of people who could
25 potentially be jurors, we will just give them an

1 additional name in writing and say we inadvertently

2 admitted this, the standard question.  Because that

3 question, I think -- I think we should follow the

4 pattern of presenting these basic questions in

5 writing.  We did it in the questionnaire.  I think

6 it might give undo emphasizes if I were to stand up

7 and ask them a question.

8          So we'll prepare an additional question or

9 say we're amending this because there's a name that

10 has to be added.  Okay?

11         MR. SOROSKY:  And there's a Mr. Neil Howard

12 who may assist us in jury selection.  Could he sit

13 at the counsel table, just for the jury process, not

14 for the trial?

15         THE COURT:  Is this like your classic jury

16 consultant?

17         MR. SOROSKY:  In theory, yes.

18         THE COURT:  No, the bench.

19         MR. SOROSKY:  The bench.

20         THE COURT:  It's just as good.

21         MR. SOROSKY:  Okay.

22         THE COURT:  Okay.  See you soon.

23     (Recess.)

24

25

1

2

3       (The following proceedings were had out of the

4        presence of the prospective jury in open

5        court:)

6           THE CLERK:  This court resumes in session.

7  Please be seated.

8           THE COURT:  Come to the lectern.

9       (Brief pause)

10          THE COURT:  What I got from the government is

11 numbers on follow-up, what I have from the defense

12 is not exactly follow-up but an additional question.

13          And you might want to turn to, any

14 questionnaire will do, 50 through 56.  If a juror

15 answers a question which says have you done anything

16 of the following, and they say yes or no, and they

17 say whatever they say, I should ask for a "why."  In

18 other words, to take one witness, the question is:

19      "... with respect to any candidates for public

20       office, political organizations, or political

21       committees, have you, your spouse/significant

22       other, any family members, any close friends

23       ever done anything of the following:  Paid

24       work, volunteered work, raised funds,

25       contributed money, attended events."

:14AM

:15AM

:15AM

:16AM

1       I'm looking at a questionnaire in which a

2   person checked two of them.  What the defense wants

3   me to do is then do a follow-up question which says:

4       "Why did you not do paid work, why did you do

5          volunteer work, why did you not raise funds,

6          why did you not contribute money, why did you

7          attend events, like cocktail parties or

8          dinner."

9       I'm not going to ask that.  It's something

10  had it been submitted originally, I would be

11  disinclined.  What most of these questions call for

12  is person's activities rather than state-of-mind

13  explanations, and state of mind is something I

14  rarely address, largely because it doesn't tell you

15  very much, what you need to know is what people do.

16      It is true, and I think I mentioned this

17  before, we could have much deeper examinations of

18  jurors, we could give them psychological testing.

19  We don't.  Knowledge of what they do is

20  traditionally the basis on which opinions are made

21  and I am unwilling to ask, particularly since this

22  is not a follow-up question, it's a new question,

23  and it increases, with respect to 50, what was once

24  one question is now 6 additional questions.

25      With respect to 51, the "why" question is

:16AM

:16AM

:17AM

:17AM

:17AM

1  already there.  You ask "have you ever done certain

2  things" and then the answer is "yes," then please

3  explain this experience and what did it do.  I

4  believe "please explain" is the equivalent of "why."

5          With respect to question 52, "have you ever

6  been involved with a lobbyist," if the question is

7  "no" I think the question "why" is unproductive.  If

8  the question is yes, basically we have the

9  equivalent of a "why" which is the follow-up which

10  asks them to explain.  "Do you have an opinion about

11  political fundraising, if so, what is it," that, I

12  think, takes care of the "why" to a "yes" answer.

13  If the person says "no" I'm not going to ask them

14  why they don't contribute to political campaigns.  I

15  understand that, under some theories, it might be

16  useful, but we are not required to ask every useful

17  question.

18          54, "do you have strong opinions, positive or

19  negative about politics or politicians," I believe

20  inherently in that question the "why" is obvious;

21  it's there already.

22          'Do you believe that public officials

23  consider their own personal financial interest in

24  the course of making official decisions?  Yes, no,

25  or no opinion."  If the answer is "yes" where

1  perhaps the "why" would be important to know, they

2  are, in fact, asked that.  "If yes, what is your

3  opinion of this practice."

4          56 is the same structural question as 55 and

5  the same ruling.

6          And that, I think, takes care of the defense

7  requests based on the questions in the

8  questionnaire.

9          MS. KAESEBERG:  Can I ask one question on 55

10 and 56?

11         THE COURT:  Yeah.

12         MS. KAESEBERG:  If a juror answers the

13 question "do you believe that public officials

14 consider their own personal financial interests in

15 the course of making official decisions," if they

16 say "yes," if the follow-up is yes, what is your

17 opinion, if they say "I think it's unfair," we would

18 ask if that is a short answer as to that, that there

19 would be an follow-up of why and let them sort of

20 explain why they think it's unfair.

21         THE COURT:  I understand what you're after,

22 you're going into a level of examination that I

23 think is not required.  And I reiterated this

24 before, you can have very long examinations, you

25 could have testing of people's views.  We don't do

1  that.

2         Another question is "will you hold it

3  against -- " this is unrelated, it's a new question,

4  and for this reason, I think, untimely submitted,

5  but we'll discuss it, anyway, "will you hold it

6  against Mr. Blagojevich that he participated in a

7  system of political fundraising?"  I think the

8  questions of the effect of whatever attitudes they

9  have with respect to the defendant in this case are

10  covered by other questions, and this is directed to

11  a particular piece of evidence or a particular

12  practice and I don't think it's necessary.

13         And the rest of it is testing:  Can you

14  remain committed to, can you remain open-minded,

15  particularly the last one I think is actually asking

16  the jurors to take a posture directing their

17  attitude toward deliberation that is, in fact, not

18  required by law.  We've dealt with this issue before

19  when there was a question or something about don't

20  yield to the views of others.  The reason that you'd

21  like to know this, I think, is fairly obvious, but

22  the truth of the matter is, a jury discussion is, in

23  fact, a debate.  Jurors are permitted to yell to

24  each other.  I'm not encouraging a juror to do

25  anything other than what I tell the juror to do,

:21AM
:21AM
:22AM
:22AM
:22AM

1  which is don't change your mind simply because you
2  want to get a vote.  That's the standard
3  instruction, it's the instruction that has been
4  approved time and time again by the Seventh Circuit,
5  and it covers these issues.  So I'm not asking those
6  questions.

7        The government on its part just simply listed
8  a number of questions that I should follow up on,
9  and I'm going to ask those questions if I think that
10  it needs a follow-up, if it doesn't need a
11  follow-up, I'm not going to ask it.

12        With respect, incidentally, to juror 108, it
13  appears she knows you, Mr. Goldstein.  Do you know
14  her?

15        MR. GOLDSTEIN:  Let me get the --

16        THE COURT:  It's 108; no names.  The juror
17  circled your name.

18        MR. SOROSKY:  I do not know that individual.

19        THE COURT:  Okay.  All right.  So I don't
20  think we have to do much with that follow-up, but
21  I'll ask it anyway.

22        I think, then, we're basically ready to go.
23        Bring in 101.

24     (Prospective juror entered the courtroom, and
25      the following proceedings were had herein:)

:22AM
:23AM
:23AM
:24AM
:24AM

1       (Brief pause).

2           THE COURT:  This is a little awkward for me,

3   but I'm going to have to call you 101, okay?

4           PROSPECTIVE JUROR:  Okay.

5           THE COURT:  I've taken a look at your

6   questionnaire.  I'm not going to go down each

7   question, but I did want to cover a couple of them.

8           What did you do for the radio station?

9           PROSPECTIVE JUROR:  I work in the promotions

10  department, so I help plan events and deal

11  with winners information.  So when somebody calls in

12  the radio station and wins a prize.

13          THE COURT:  When you say part-time, how many

14  hours is there.

15          PROSPECTIVE JUROR:  I'm there three days a

16  week, Monday through Wednesday, from about 8:15 to

17  4:30.

18          THE COURT:  Okay.  And that doesn't change,

19  that's a regular schedule that you have.

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  And you also do some substitute

22  teaching?

23          PROSPECTIVE JUROR:  Yes, on Thursdays and

24  Fridays.

25          THE COURT:  Okay.  Does that mean, like,

1 you're available for Thursdays and Fridays,

2 sometimes you're called, sometimes you're not?

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  And what grades do you substitute

:26AM  5 for?

6          PROSPECTIVE JUROR:  Kindergarten through high

7 school.

8          THE COURT:  Okay.  So you do the entire

9 range?

:26AM  10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You can have a 5-year old one day

12 and a 17-year old the next?

13          PROSPECTIVE JUROR:  Yes; and they're equally

14 bad.

:26AM  15          THE COURT:  Okay.  It also says that you do

16 have some supervisor responsibilities.

17          PROSPECTIVE JUROR:  I have a couple of

18 interns at the radio station.

19          THE COURT:  Okay.  Do you like your work?

:27AM  20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  And how long have you been doing

22 the radio station?

23          PROSPECTIVE JUROR:  I've been there since

24 May.

:27AM  25          THE COURT:  And the substitute teaching?

1       PROSPECTIVE JUROR:  For about 2 years.

2       THE COURT:  You say you have a friend who is

3  a retired police officer?

4       PROSPECTIVE JUROR:  Yes.

5       THE COURT:  What department?

6       PROSPECTIVE JUROR:  He was in Oak Brook, I

7  don't know what department.

8       THE COURT:  Okay.  You've had family members

9  or friends who served in the militarily?

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  Particularly close friends?

12      PROSPECTIVE JUROR:  My uncle was in Vietnam.

13      THE COURT:  Okay.  Ever been in a courthouse

14  before?

15      PROSPECTIVE JUROR:  No.

16      THE COURT:  Your comment about politicians

17  was "I feel they should be respected, fair, and have

18  a job you would not want."

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  Why wouldn't you want it?

21      PROSPECTIVE JUROR:  It's a lot of

22  responsibility and a lot to go through each day and

23  it is a job that I would not want to do on a daily

24  basis.

25      THE COURT:  Okay.  You list three hobbies

1  here.

2         PROSPECTIVE JUROR:  Uh-huh.

3         THE COURT:  How much time do you spend on

4  them?

5         PROSPECTIVE JUROR:  When I have free time,

6  which is not often.

7         THE COURT:  And in the order which you give

8  them, is that the order of their importance?  Do you

9  remember what the order is?  Because I'll tell you

10 if you don't.

11        PROSPECTIVE JUROR:  I believe it was

12 scrapbooking, working out, and I like and enjoy

13 going to the movies.

14        THE COURT:  Okay.  It says you read the

15 Tribune two times a week.

16        PROSPECTIVE JUROR:  Uh-huh.

17        THE COURT:  Is that like a rigid schedule,

18 the same two days eek week?

19        PROSPECTIVE JUROR:  No; it's when I'm on the

20 train.

21        THE COURT:  Okay.  And when you listed the

22 names of three people, you also noted that you had

23 misread the question.

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  Okay.  These are people you've

1  heard as opposed to people you know.

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Now, you also answered the

4  question "no" when you were asked if you read,

5  heard, seen or anything about a trial in the summer

6  of 2010 involving Rod Blagojevich and you said no.

7          PROSPECTIVE JUROR:  Correct, I didn't.

8          THE COURT:  Is that like literally true or

9  you just didn't see much?

10          PROSPECTIVE JUROR:  No, I just didn't follow

11  it, nor did I watch it on the news or in the

12  newspaper.

13          THE COURT:  Right.  But you've heard of it?

14          PROSPECTIVE JUROR:  I've heard of it, yeah.

15          THE COURT:  Thank you.

16          PROSPECTIVE JUROR:  Thank you.

17      (Prospective juror exited the courtroom, and the

18       following proceedings were had herein:)

19      (Brief pause).

20      (Prospective juror entered the courtroom, and

21       the following proceedings were had herein:)

22          THE COURT:  I'm going to have to call you by

23  number.  You're 102?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  Okay.  I'm not going to ask you

about each of the questions.  You filled out the
questionnaire.  I'm just going to touch on a few of
them.

PROSPECTIVE JUROR:  (Nodding.)

THE COURT:  You have a list of prescription
drugs that you take.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  What do you take them for?

PROSPECTIVE JUROR:  High blood pressure,
stuff like that.

THE COURT:  Okay.  Did any of them affect the
way your mind works?

PROSPECTIVE JUROR:  Ah, it make me drowsy,
some of them make me drowsy.

THE COURT:  Okay.  You drove a forklift?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What kinds of stuff did you move
around?

PROSPECTIVE JUROR:  Spices and chemicals,
stuff like that.

THE COURT:  And you moved crates?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You've worked for the same
company?

PROSPECTIVE JUROR:  Yup.

1        THE COURT:  37 years?

2        PROSPECTIVE JUROR:  Yeah.

3        THE COURT:  Long time.

4        How long ago did you retire?

5        PROSPECTIVE JUROR:  10 years.

6        THE COURT:  When?

7        PROSPECTIVE JUROR:  10 years ago.

8        THE COURT:  10 years ago.

9        Did you ever work for anybody else other than

10  that company, do any other kind of work?

11        PROSPECTIVE JUROR:  Yeah, I used to do

12  construction.

13        THE COURT:  You said that you did serve on a

14  jury?

15        PROSPECTIVE JUROR:  Yes.

16        THE COURT:  Do you remember what kind of case

17  it was?

18        PROSPECTIVE JUROR:  Criminal.

19        THE COURT:  It says here 1976, is that about

20  right?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  And the jury did reach a verdict

23  in that case?

24        PROSPECTIVE JUROR:  No, they -- they cop a

25  plea.

1        THE COURT:  Oh, okay.

2        And it says here that you were, at least on

3   one occasion, arrested before.  What was that about?

4        PROSPECTIVE JUROR:  Fighting.

5        THE COURT:  What happened with that case?

6        PROSPECTIVE JUROR:  I beat it.

7        THE COURT:  And when was that?

8        PROSPECTIVE JUROR:  In 2002.

9        THE COURT:  And where were you arrested?

10  What police department have arrested you?

11       PROSPECTIVE JUROR:  51st Street.

12       THE COURT:  What happened with your son?

13       PROSPECTIVE JUROR:  He got killed.

14       THE COURT:  Was anybody ever charged with

15  that?

16       PROSPECTIVE JUROR:  Yeah, they had him but

17  they gave him probation.

18       THE COURT:  And that was in 1981?

19       PROSPECTIVE JUROR:  Yes.

20       THE COURT:  And you were, obviously, not

21  satisfied with that result?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  How do you think that would

24  affect you in this case if you sat on the jury?

25       PROSPECTIVE JUROR:  In my say, everybody

1  guilty.

2          THE COURT:  Okay.

3          You get most of your news from television?

4          PROSPECTIVE JUROR:  Yes; and I probably have

5  th news on, they'd be talking about it.

6          THE COURT:  Okay.  You spend a lot of time

7  listening to the news, watching the news?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Any particular station you watch?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Do you use the computer at all?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Are you active in any in

14  politics?

15          PROSPECTIVE JUROR:  Sir?

16          THE COURT:  You active in any way in

17  politics?

18          PROSPECTIVE JUROR:  No; at times vote, that's

19  it.

20          THE COURT:  Okay.  Have you paid any

21  attention to the news about this case?

22          PROSPECTIVE JUROR:  Yeah, I heard about it.

23          THE COURT:  Do you remember anything about it

24  in particular?

25          PROSPECTIVE JUROR:  The charge got dropped or

1  he got away with some of it and then other than they

2  had to try him again.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  You're welcome.

5      (Prospective juror exited the courtroom, and the

6       following proceedings were had herein:)

7      (Brief pause).

8      (Prospective juror entered the courtroom, and

9       the following proceedings were had herein:)

:38AM   10         THE COURT:  At least for today your name is

11  103.

12         PROSPECTIVE JUROR:  Yes, sir.

13         THE COURT:  What hours do you work?

14         PROSPECTIVE JUROR:  Evenings, mostly.

:39AM   15  Normally start at around 4:30.  I know I put in

16  hardship.  They said they'd try and work with me as

17  best they could for getting there late.

18         Can you hear me?

19      (Brief pause)

:39AM   20         THE COURT:  How long have you worked at that

21  particular place?

22         PROSPECTIVE JUROR:  Maybe about 8 months.

23         THE COURT:  Have you worked similar kinds of

24  places before?

:39AM   25         PROSPECTIVE JUROR:  No.

1          THE COURT:  This is your first time doing
2    that work?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Okay.  It's a nice place.

:39AM    5          PROSPECTIVE JUROR:  Oh, you've been there?
6    Yeah.

7          THE COURT:  And your main job for a number of
8    years is programmer?

9          PROSPECTIVE JUROR:  Yes.

:40AM    10         THE COURT:  And what kind of programming did
11   you do?

12         PROSPECTIVE JUROR:  Like what language or
13   what type of company was it?

14         THE COURT:  What type of company.

:40AM    15         PROSPECTIVE JUROR:  It was a database
16   management -- ah, like a database management
17   company.

18         THE COURT:  Okay.

19         PROSPECTIVE JUROR:  Consulting company.

:40AM    20         THE COURT:  Is the company still around?

21         PROSPECTIVE JUROR:  Barely.  There might be
22   maybe 5 people that work there.

23         THE COURT:  And what do you do at the
24   photography?

:40AM    25         PROSPECTIVE JUROR:  Kind of more part-time,

1  weekend warrior; portraits, special events, small

2  weddings, things like that.

3         THE COURT:  And it says you've been doing

4  that for about 2 years?

:40AM  5         PROSPECTIVE JUROR:  Uh-huh.

6         THE COURT:  Was that a like a late life

7  sudden interest?

8         PROSPECTIVE JUROR:  No, lifetime love of

9  photography, but, you know, I always had the 9:00 to

:41AM  10  5:00, and when the company kind of down-sized I

11  decided to go with that for a while.

12         THE COURT:  And you started out because you

13  wanted to be a biologist?

14         PROSPECTIVE JUROR:  Yes, that was my college

:41AM  15  major.  I did that for quite sometime too, as well.

16         THE COURT:  It says that you know people who

17  are police officers and lawyers.  Are any of them

18  particularly close to you?

19         PROSPECTIVE JUROR:  Police officers would

:41AM  20  have been former boyfriend, something like that.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR:  Lawyers, I guess I've got

23  two in my family; although, they don't practice.

24  And, you know, a couple of friends here and there,

:42AM  25  but no, you know, immediate family members that are

1  lawyers.

2       THE COURT:  And you did have a relative in

3  the Marines?

4       PROSPECTIVE JUROR:  Yes, my brother was,

5  years ago.

6       THE COURT:  You indicate that you have a

7  relative, a cousin, who was either arrested or

8  convicted on federal charges?

9       PROSPECTIVE JUROR:  Uh-huh.

10       THE COURT:  Do you remember what the charges

11  were?

12       PROSPECTIVE JUROR:  Cousin through marriage,

13  and I'm not exactly sure of the charges.  Let me

14  think about it.

15       THE COURT:  There's no law that says you have

16  to remember.

17       PROSPECTIVE JUROR:  I don't remember exactly,

18  but he did wind up serving.  He pled guilty and he

19  served time for it.

20       THE COURT:  Do you have any particularly

21  strong feelings about that, one way or the other?

22       PROSPECTIVE JUROR:  Not specifically, no.

23       THE COURT:  Is this someone who is close to

24  you?

25       PROSPECTIVE JUROR:  A cousin through

1   marriage.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  Like a first cousin.

4          THE COURT:  Someone you see a lot?

5          PROSPECTIVE JUROR:  Not anymore, no.

6          THE COURT:  And you had a family member, one

7   or two, who were victim of crimes?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  How long was that?

10          PROSPECTIVE JUROR:  One was many years ago,

11   perhaps I was, you know, 7 at the time, and one was

12   maybe about 7 years ago.

13          THE COURT:  Did that have any long-standing

14   effect on your attitude toward life, toward the

15   world, in the general?

16          PROSPECTIVE JUROR:  I can't say that it did.

17          THE COURT:  Okay.  I asked you -- you

18   indicated some difficulty not with this particular

19   case but with spending a long time serving on a jury

20   because of income issues.

21          PROSPECTIVE JUROR:  Because of what?

22          THE COURT:  Income issues.

23          PROSPECTIVE JUROR:  Yeah.  Yeah.

24          THE COURT:  I do want to tell you that

25   considering what you do and when you do it, and this

1  has occurred often, it's usually possible to do them

2  both.

3         PROSPECTIVE JUROR:  You said it's what?

4         THE COURT:  Usually possible to do them both,

5  to continue working.  I'll have to take that into

6  account, but what I will need from you is some

7  indication of what your employer has said about

8  scheduling.

9         PROSPECTIVE JUROR:  I said in the beginning,

10 they will try and work with me, so --

11        THE COURT:  So maybe, maybe not?

12        PROSPECTIVE JUROR:  Yeah, coming in.

13 Basically, if we're here every day until 4:45, that

14 would put me to work maybe about 45 minutes late.

15        THE COURT:  You work the weekends?

16        PROSPECTIVE JUROR:  Just Sunday.

17        THE COURT:  What?  Just Sunday?

18        PROSPECTIVE JUROR:  Yeah.  I'm low-man on the

19 totem pole.

20        THE COURT:  All right.  And you've consulted

21 or hired lawyers, basically, for buying a home and

22 for an auto accident?

23        PROSPECTIVE JUROR:  Yeah, like the home

24 closing and auto accident.

25        THE COURT:  Okay.  Was anything big about the

1  auto accident?

2        PROSPECTIVE JUROR:  No, I think we just, you

3  know, had one there as a precaution.

4        THE COURT:  Okay.  There's a reference to

5  friends, family members testifying as character

6  witnesses.

7        PROSPECTIVE JUROR:  For the one trial, for

8  the federal one.

9        THE COURT:  Okay.  That federal case, was

10 that in this courthouse or was it somewhere else?

11       PROSPECTIVE JUROR:  That I don't know.  That

12 I don't know.

13       THE COURT:  Okay.

14       PROSPECTIVE JUROR:  I just know that the time

15 was served in -- in Minnesota, maybe.

16       THE COURT:  Okay.  And you know somebody who

17 testifies as an expert witness often.

18       PROSPECTIVE JUROR:  A doctor, a friend of

19 mine is a doctor.

20       THE COURT:  A lot of discussions about what

21 happens in court or none?

22       PROSPECTIVE JUROR:  She won't talk about it.

23       THE COURT:  Okay.  You skipped over one

24 question.

25       PROSPECTIVE JUROR:  Did I?  I'm sorry.

1          THE COURT:  Well, there are a lot of
2    questions.  You wouldn't be the only one.
3          Have any claims or lawsuits ever been made by
4    any federal, state district, local official, or
5    government agency against you.
6          PROSPECTIVE JUROR:  No.
7          THE COURT:  A family member or close friend.
8    Now, you answered some of that, but they're talking
9    about usually -- first of all, any claims, lawsuits
10   made against you.
11         PROSPECTIVE JUROR:  No.
12         THE COURT:  Okay.  You donate money to your
13   college and various other charities?
14         PROSPECTIVE JUROR:  Uh-huh.
15         THE COURT:  You have done some volunteer work
16   and even some paid work with respect to local
17   elections?
18         PROSPECTIVE JUROR:  Here and there.
19         THE COURT:  What kind of elections?
20         PROSPECTIVE JUROR:  Well, like, what was it,
21   the Senate raised one of the candidates toward
22   election and had me follow her around for the day to
23   document her -- her run.
24         THE COURT:  And you were paid for that?
25         PROSPECTIVE JUROR:  Yes.

1        THE COURT:  And how about volunteer work?

2        PROSPECTIVE JUROR:  Volunteer work, was that

3   the political or the charitable and all of that?

4        THE COURT:  The political stuff.

5        PROSPECTIVE JUROR:  The political?  Actually,

6   I can't say that I did volunteer work.

7        THE COURT:  And you've occasionally

8   contributed money for candidates for state and local

9   elections?

10       PROSPECTIVE JUROR:  Uh-huh.

11       THE COURT:  Most of your news you get from

12  television?

13       PROSPECTIVE JUROR:  When I watch it, yes.

14       THE COURT:  You watch a lot of it or just a

15  little?

16       PROSPECTIVE JUROR:  No, I tend to watch movie

17  channels that don't have news.

18       THE COURT:  And you didn't follow the media

19  coverage of this issue?

20       PROSPECTIVE JUROR:  No.

21       THE COURT:  In fact, you said, basically, the

22  only thing you recall hearing are media clips of

23  phone calls.

24       PROSPECTIVE JUROR:  Phone calls, overall the

25  prior verdict, but, other than that, I didn't watch

1 it every day or anything like that.

2       THE COURT:  Okay.  In the course of your work

3 do you occasionally overhear political discussions?

4       PROSPECTIVE JUROR:  Probably; here and there.

5       THE COURT:  Right.  Do you draw a lot of

6 attention to it?

7       PROSPECTIVE JUROR:  Not so much because I'm

8 so busy work.  Normally, the TVs are on like the

9 sports channels, anyway, so they're talking about

10 the Lakers, and the Bulls, and things like that.

11       THE COURT:  Okay.  Thank you.

12       PROSPECTIVE JUROR:  Okay.

13    (Prospective juror exited the courtroom, and the

14     following proceedings were had herein:)

15    (Brief pause).

16    (Prospective juror entered the courtroom, and

17     the following proceedings were had herein:)

18       THE COURT:  Hi.  You're name for today is

19 104.

20       PROSPECTIVE JUROR:  Yes.

21       THE COURT:  Because I always felt it's a

22 little rude, but, still, it's our rule.

23       PROSPECTIVE JUROR:  Yes.

24       THE COURT:  I'm not going go every question

25 on this, I'm just looking for specific ones.

1        PROSPECTIVE JUROR:  Sure.

2        THE COURT:  You studied social work?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Did you practice social work?

5        PROSPECTIVE JUROR:  No.

6        THE COURT:  You have a substantial number of

7   children.

8        PROSPECTIVE JUROR:  Yes, I do, I guess.

9        THE COURT:  And your spouse is a lawyer?

10       PROSPECTIVE JUROR:  Yes.

11       THE COURT:  Do you have lengthy discussions

12  about the law with your spouse?

13       PROSPECTIVE JUROR:  Not usually.

14       THE COURT:  Right.  Does he ever talk to you

15  about it and you get bored?

16       PROSPECTIVE JUROR:  No, he never --

17       THE COURT:  Never talks about it?

18       PROSPECTIVE JUROR:  No; I don't think he does

19  anything exciting.

20       THE COURT:  He worked for some particular

21  firm, I'm not going to mention the name, from 1999

22  to 2004.  Do you know what kind of work he did for

23  that firm?

24       PROSPECTIVE JUROR:  Real estate.

25       THE COURT:  Okay.  Is he now practicing with

1 another firm?

2        PROSPECTIVE JUROR:  No.

3        THE COURT:  Is he on his own?

4        PROSPECTIVE JUROR:  No.

:52AM 5        THE COURT:  What's he doing?

6        PROSPECTIVE JUROR:  He works for John

7 Calamos, Calamos Investments.

8        THE COURT:  For who?

9        PROSPECTIVE JUROR:  Calamos Investments.

:52AM 10       THE COURT:  Okay.  Same kind of stuff, a lot

11 of real estate stuff or has he branched out?

12       PROSPECTIVE JUROR:  Yeah, a lot of real

13 estate.  He does, basically, everything.

14       THE COURT:  Do you know if in his legal work

:52AM 15 he winds up going to court on some kind of case?

16       PROSPECTIVE JUROR:  He's never been to court.

17       THE COURT:  So he's an office lawyer.

18       PROSPECTIVE JUROR:  Yes.

19       THE COURT:  All right.  And your father was a

:52AM 20 chemist?

21       PROSPECTIVE JUROR:  Yes.

22       THE COURT:  You list a school and a church as

23 part of your charitable and civic stuff.  Is that a

24 school to which some of your children go?

:53AM 25       PROSPECTIVE JUROR:  All my kids go there now,

1  yes.

2        THE COURT:  Okay.  Do you spend a lot of time

3  working, doing that kind of stuff?

4        PROSPECTIVE JUROR:  Yes; now they're all in

5  school, so I'm much more there now.

6        THE COURT:  Okay.  You have one question, I'm

7  going to read it to you.

8        PROSPECTIVE JUROR:  Only.

9        THE COURT:  And then ask you about it, the

10  question was:

11      "Do you believe that public officials make

12       official decisions to benefit contributors in

13       exchange for campaign contributions they have

14       received or believe they will receive?"

15      And you checked yes, and the next question was:

16       "If yes, what is your opinion of this

17       practice?"

18          and you said:

19      "I think it almost always happens and everyone

20       knows it."

21      And that is your view?

22        PROSPECTIVE JUROR:  Ah, honesty, I haven't

23  thought much of about it, but I guess yes.

24        THE COURT:  Okay.  One of the things that

25  you're going to be -- because I think almost

1  everybody in the world has general opinions about

2  elected officials, and not all of them are

3  particularly favorable, but what you're going to be

4  asked to deal with in this case is not whether

5  public officials, in general, do this, that or the

6  other thing, it's going to be the question of

7  whether the particular public official who is

8  charged in this case did acts which violated the

9  law.  Not acts which you may disapprove of, but

10  simply acts which violated the law.  And the

11  question you're going to be asked to do, the task,

12  is to decide whether the government has proved those

13  charges beyond a reasonable doubt.

14         So my question to you is, the fact that you

15  believe, almost always but not always, public

16  officials make these decisions in exchange for

17  campaign contributions, if you have that general

18  belief, would you still be able to give fair

19  consideration for the question of whether a

20  particular public official did it in a particular

21  set of circumstances, would you be able to separate

22  your general view and concentrate on the evidence

23  just with respect to this person?

24         PROSPECTIVE JUROR:  I believe so.

25         THE COURT:  Okay.

1          You list your primary leisure activities as
2   photography, sports, and doing stuff with your kids.
3   In what order, in terms of volume of time?
4          PROSPECTIVE JUROR:  Well, my kids, I guess,
5   right.
6          THE COURT:  Right.  And how about the
7   photography and sports?
8          PROSPECTIVE JUROR:  Oh, probably sports and
9   then photography, maybe.
10         THE COURT:  And what's the photography part?
11  Is it something you are a big fan, you got all kinds
12  of big cameras?
13         PROSPECTIVE JUROR:  I just like to take
14  pictures.
15         THE COURT:  Okay.  And the sports part?
16         PROSPECTIVE JUROR:  My kids play a lot of
17  sports, I used to play sports, so just normal ...
18         THE COURT:  Where do you get your news from?
19         PROSPECTIVE JUROR:  Mostly the Internet, some
20  TV.
21         THE COURT:  Okay.  Do you read a lot of news
22  or just a little?
23         PROSPECTIVE JUROR:  A little.
24         THE COURT:  Okay.  Children's Memorial
25  Hospital, it says:

:56AM
:56AM
:56AM
:56AM
:57AM

1

2

3       "Have you, a family member or close friend ever

4        been to or treated at Children's Memorial

5        Hospital?"

6       And the answer is "yes."

7          PROSPECTIVE JUROR:  I have some friends whose

8   children have been treated there.

9          THE COURT:  Okay.  But not your children?

10         PROSPECTIVE JUROR:  Not my children, no.

11         THE COURT:  And you have a friend who at

12   least at one time worked for the Tribune Company?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Still does or not?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Okay, now this is the last

17   question.  The question was:

18       "Have read heard or viewed any media accounts of

19        the trial, have you formed any opinion based on

20        what you have observed?"

21       You answered yes, and you said:

22        "I thought, based on what I heard, that he was

23        guilty."

24          You are sticking to that answer, that's what

25   you thought at the time?

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Now, there are probably not too

3    many people, around here at any rate, who have never

4    heard of this case, and when you said "I thought

5    based on what I heard" it raised the question in my

6    mind, because one of the things the jurors are

7    supposed to do, even if they've heard about a case

8    and even if they have an opinion based on what they

9    heard, what we ask jurors to do is put aside that

10   opinion.  We don't ask them to erase it from their

11   minds, we don't ask them to forget it, basically

12   because nobody can do that, it's not possible.

13        What we ask them to do is set aside whatever

14   they've heard before and decide the case not on what

15   they heard before, but on what they saw and heard in

16   the courtroom, and only what they saw and heard in

17   the courtroom, the evidence that's admissible.  The

18   question is, do you think you can do that?

19        PROSPECTIVE JUROR:  I would hope so.

20        THE COURT:  Okay.  You're basically

21   optimistic about that?

22        PROSPECTIVE JUROR:  I'd like to think I

23   could.

24        THE COURT:  Okay.  Thanks.

25      (Prospective juror exited the courtroom, and the

1      following proceedings were had herein:)

2          THE COURT:  106 is next, but give me a

3  second.

4          The marshal:  Yes.

5          THE COURT:  105 did not appear today and we

6  will take the appropriate steps with respect to

7  that.

8      (Prospective juror entered the courtroom, and

9       the following proceedings were had herein:)

10          THE COURT:  Hi.

11          Today your name is 106, probably not what you

12  would have picked, but that's what it is for the

13  time being.

14          I'm not going to go over each question, I'm

15  just going to go down the list and pick out a few.

16          PROSPECTIVE JUROR:  (Nodding).

17          THE COURT:  I'm going to cover two subjects,

18  one is the question you filled and the other has to

19  do with what effect jury service will have on the

20  rest of your life.

21          What do you do at work?  I mean, how do you

22  spend the day, is the question.

23          PROSPECTIVE JUROR:  For the most part, it's

24  client communications, it's prepped for work in

25  front of clients, meetings, there's a lot of e-mail,

1  phones, copying, filling out applications.

2         THE COURT:  And you have one supervisor or do

3  you work for more than one person?

4         PROSPECTIVE JUROR:  Two.

5         THE COURT:  Two.  Has been the same people

6  for a long time?

7         PROSPECTIVE JUROR:  6 years.

8         THE COURT:  Do you like the work?

9         PROSPECTIVE JUROR:  I do.

10         THE COURT:  And your spouse is employed?

11         PROSPECTIVE JUROR:  He is.

12         THE COURT:  What does he do?

13         PROSPECTIVE JUROR:  He is a switch screw

14  machinist.

15         THE COURT:  And what is that?

16         PROSPECTIVE JUROR:  He works with really,

17  really, big machines that spin metal and spit out

18  teeny, tiny little parts.

19         THE COURT:  Okay.  Do we know where those

20  parts go?

21         PROSPECTIVE JUROR:  Mostly, they're for

22  dentistry, but most of it is for gun manufacturers.

23         THE COURT:  And the job you had before, the

24  one you had before, you were an office manager?

25         PROSPECTIVE JUROR:  I was.

1        THE COURT:  You had that for 2 years?

2        PROSPECTIVE JUROR:  I did.

3        THE COURT:  How come you left?

4        PROSPECTIVE JUROR:  I did not like the owner

5    of the company.

6        THE COURT:  Good reason.

7        And you have one child?

8        PROSPECTIVE JUROR:  One.

9        THE COURT:  Your mother worked for the

10   Attorney General?

11       PROSPECTIVE JUROR:  She did.

12       THE COURT:  In Arizona?

13       PROSPECTIVE JUROR:  Yes.

14       THE COURT:  And how long -- oh, you answered

15   that question.

16       PROSPECTIVE JUROR:  She was actually there a

17   little bit longer, but a few years she was just a

18   volunteer.

19       THE COURT:  Okay.  You have a friend who is a

20   special agent with the FBI?

21       PROSPECTIVE JUROR:  I do.

22       THE COURT:  Do you know what kind of work

23   that person does?

24       PROSPECTIVE JUROR:  He is in the white

25   collar.

 1          THE COURT:  Right.

 2          PROSPECTIVE JUROR:  It's kind of finances and

 3   he's a specialist with civil rights cases.

 4          THE COURT:  All right.  After your mother

 5   stopped doing that crime victim advocate work in

 6   Arizona, did she ever do that anywhere else, work as

 7   a volunteer, other than in Arizona?

 8          PROSPECTIVE JUROR:  I don't believe so.

 9          THE COURT:  How large is the firm you work

10   for?

11          PROSPECTIVE JUROR:  There's two partners and

12   two support staff.

13          THE COURT:  Okay.  Your brother was in the

14   Marines?

15          PROSPECTIVE JUROR:  He was.

16          THE COURT:  Tell me about the burglary in

17   1999.

18          PROSPECTIVE JUROR:  Actually, I went to visit

19   my brother on base in 26 Palms and when I came home

20   my neighbors came over and told me that two young

21   people had unloaded everything that was in my house,

22   and left with it, including my bedroom furniture,

23   but they didn't call the cops.

24          THE COURT:  Did you say anything to them?

25          PROSPECTIVE JUROR:  Oh, yes.

1        THE COURT:  I gather from what you said that

2   as a result of a personal experience, this led your

3   mother into what she did?

4        PROSPECTIVE JUROR:  That's correct.

5        THE COURT:  Okay.  Now, you also said here

6   that you're currently consulting a lawyer about a

7   possible claim you might have?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Is that still going on?

10        PROSPECTIVE JUROR:  It is.

11        THE COURT:  Is the lawyer investigating that

12   claim, is that what it amounts to?

13        PROSPECTIVE JUROR:  My last communication

14   with him was that my medical file had been completed

15   and was sent to two professionals in the same field

16   as the surgeon who completed the surgery.

17        THE COURT:  Right.  Have you in fact

18   recovered from that incident?  It says here "rehab

19   and two corrective surgeries."

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Have they been successful?

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Okay.  And you had to testify in

24   a court hearing?

25        PROSPECTIVE JUROR:  Well, it wasn't a court

 1  hearing.  I had applied for an order of protection.

 2          THE COURT:  Oh, that's right.  That's right.

 3  And you believed the result of that hearing that the

 4  relief that was given helped you?

 5          PROSPECTIVE JUROR:  It did.

 6          THE COURT:  But it was very stressful and

 7  scary at the time.

 8          PROSPECTIVE JUROR:  Well, when you're fearing

 9  for your safety or your spouse's safety and your

10  child's safety.

11          THE COURT:  Well, actually pretty much all

12  court proceedings are scary and stressful.

13          PROSPECTIVE JUROR:  They are.

14          THE COURT:  Yeah.

15          But, basically, in the end, you were

16  satisfied with the result?

17          PROSPECTIVE JUROR:  I was.

18          THE COURT:  And your political act was is you

19  wrote to a city council about cable and satellite

20  providers?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  You answered the question about

23  recordings of overheard conversations, and you said,

24  and I'll repeat it to you:

25      "... I disagree with the use of recordings when

1     both parties are not made aware of the

2     recording."

3     And that's your view?

4         PROSPECTIVE JUROR:  It is.

5         THE COURT:  Okay.  My question to you is, the

6   law does, in fact, permit recordings where not both

7   sides are -- and, in fact, they permit recordings

8   where nobody who is a participant in the

9   conversation is aware of that, so that kind of

10  evidence is admissible.  My question is, would your

11  personal feeling about whether that should occur,

12  would that affect your ability to be a fair juror?

13        PROSPECTIVE JUROR:  I don't believe so.

14        THE COURT:  Okay.  And you are somewhat

15  concerned about childcare?

16        PROSPECTIVE JUROR:  I am.

17        THE COURT:  Okay.  You want to give me a

18  couple of details on that one?

19        PROSPECTIVE JUROR:  Well, I have childcare

20  available to me from 7:00 a.m. to 6:00 p.m., I have

21  to take a 6:31 train to be able to be down here, and

22  then whatever time court is released I would have to

23  take a train back, and there just aren't enough

24  hours in the day for that to be available.  And at

25  this point, my husband is going in to work late so

:10PM

:11PM

:11PM

:11PM

:12PM

Voir Dire                                              53

1    that he can drop my son off when it opens and then
2    my mom is picking him up from school after.
3              THE COURT:  How old is he?
4              PROSPECTIVE JUROR:  He's 11.
5              THE COURT:  And how tight are your finances
6    day-to-day?
7              PROSPECTIVE JUROR:  Extremely.
8              THE COURT:  And how long has that been going
9    on?
10             PROSPECTIVE JUROR:  My husband, in the
11   machine industry, it's all gone to China and I think
12   less than 10 percent of the work is done in the U.S.
13   And we went through furloughs about 2 years ago and
14   he lost his job and he just started this one and he
15   took a $5.00 an hour pay cut just to have this job,
16   so about and a half years.  I was asked to bring
17   documentation of my employer's juror policy.
18        (Handing document.)
19             THE COURT:  Thank you for bringing it in.
20        (Prospective juror exited the courtroom, and the
21         following proceedings were had herein:)
22        (Brief pause).
23        (Prospective juror entered the courtroom, and
24         the following proceedings were had herein:)
25             THE COURT:  Hello.

:12PM
:12PM
:12PM
:12PM
:13PM

 1         PROSPECTIVE JUROR:  Hello.

 2         THE COURT:  For today, your name is 107.

 3         PROSPECTIVE JUROR:  Yes.

 4         THE COURT:  I'm not going to go over the

 5  entire questionnaire with you, I'm just going to ask

 6  you about specific parts of it.

 7         What do you do at work?

 8         PROSPECTIVE JUROR:  I'm a specialist, I

 9  request pricing from manufacturers for products that

10  they make for the IT department.  So I'm, like, I

11  work for a reseller.

12         THE COURT:  You say you work for somebody who

13  basically gets prices, gets product and then resells

14  them?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  And how big is that

17  company?

18         PROSPECTIVE JUROR:  500-plus members.

19         THE COURT:  And the one you're at now, you

20  have not worked for that long?

21         PROSPECTIVE JUROR:  No, just 9 months.

22         THE COURT:  And have you worked for similar

23  businesses?

24         PROSPECTIVE JUROR:  Yes, I've worked for IBM.

25         THE COURT:  And how long did you work for

1  them?

2          PROSPECTIVE JUROR:  IBM, 4 and a half years.

3          THE COURT:  And before that?

4          PROSPECTIVE JUROR:  LaSalle Bank, ABN Amro

5  for 25 years.

6          THE COURT:  What did you do for the banks?

7          PROSPECTIVE JUROR:  All in the IT procurement

8  department.

9          THE COURT:  Okay.  So, basically, a lot of

10 this is for bid pricing?

11         PROSPECTIVE JUROR:  Yes.  Quotes, bid

12 pricing.

13         THE COURT:  Yeah.

14         Do you supervise anybody at work now?

15         PROSPECTIVE JUROR:  No, I don't.

16         THE COURT:  But you have in the past?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And when was that?

19         PROSPECTIVE JUROR:  That was when I was at

20 LaSalle Bank, ABN Amro.

21         THE COURT:  Okay.  How many did you supervise

22 then?

23         PROSPECTIVE JUROR:  Up to 22 people off and

24 on, because I was at the company for 25 years in

25 various positions.

1       THE COURT:  Your husband is a retired postal
2  police officer?

3       PROSPECTIVE JUROR:  Yes.

4       THE COURT:  How long did he work for them?

5       PROSPECTIVE JUROR:  He retired 35 years of
6  service.

7       THE COURT:  And where did he work, mostly?

8       PROSPECTIVE JUROR:  The main Post Office
9  downtown, that's where he ended at.  He was at
10 Forest Park for a while.

11      THE COURT:  Is he continuing to work at
12 anything else?

13      PROSPECTIVE JUROR:  He worked maybe a month,
14 maybe 60 days at the Illinois State Toll Authority.

15      THE COURT:  Okay.  He was in the Marine
16 Corps?

17      PROSPECTIVE JUROR:  Yes.

18      THE COURT:  For how long, if you know?

19      PROSPECTIVE JUROR:  He came out in '67, '69,
20 whether around there.

21      THE COURT:  And then went into the postal
22 service?

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  Were you shocked when they found
25 the gun in the purse?

1          PROSPECTIVE JUROR:  Absolutely.  We don't
2    want to get on that (laughing.)  I still get tears
3    in my eyes from that because I was at work and I was
4    just going to get that report; not a good feeling.
5          THE COURT:  Right.  And what did he say when
6    you came home?
7          PROSPECTIVE JUROR:  He thought it was funny
8    because he's a police officer.  But it was not a
9    good feeling.
10         THE COURT:  You were the subject of a home
11   invasion and a car theft?
12         PROSPECTIVE JUROR:  Yes.
13         THE COURT:  Were you home alone then?
14         PROSPECTIVE JUROR:  No, I was not.  I was
15   away from home when they broke in.
16         THE COURT:  Oh, when they invaded in?
17         PROSPECTIVE JUROR:  Yes.  And the car theft,
18   they just stole it from in front of my house.
19         THE COURT:  And no one was ever caught for
20   that?
21         PROSPECTIVE JUROR:  No.
22         THE COURT:  The crime with respect to your
23   brother, how long ago was that?
24         PROSPECTIVE JUROR:  That's been about
25   20 years, too.

1      THE COURT:  And somebody was convicted for

2  that?

3      PROSPECTIVE JUROR:  Yes, he was.

4      THE COURT:  The only reason you consulted a

5  lawyer is to purchase real estate?

6      PROSPECTIVE JUROR:  Correct.

7      THE COURT:  And, on occasion, your husband,

8  when he did his work, had to testify in the court?

9      PROSPECTIVE JUROR:  Yes.

10      THE COURT:  Your principal source of news?

11      PROSPECTIVE JUROR:  Probably the television.

12      THE COURT:  Now, do you watch a lot of news

13  or just a little?

14      PROSPECTIVE JUROR:  I tried to avoid it as

15  much as possible.

16      THE COURT:  Okay.  Do you listen to a lot of

17  radio?

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  And mostly Moody?

20      PROSPECTIVE JUROR:  Yes; all Moody.

21      THE COURT:  All Moody.

22      And you saw a little about this case on

23  television?

24      PROSPECTIVE JUROR:  Yeah, because, you know,

25  I really don't watch regular channels.  I watch

:18PM

:18PM

:19PM

:19PM

:19PM

1 cable that does not have a lot of commercials.

2        THE COURT:  Your employer has some concern

3 about your serving on this jury.  Have they

4 discussed that with you?

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  And they're talking about your

7 doing backup, is that what you're doing?

8        PROSPECTIVE JUROR:  My supervisor went on

9 maternity leave March 17th, and so I am the main

10 primary person doing all of the work now for the

11 role that I'm in.

12        THE COURT:  Okay.

13        PROSPECTIVE JUROR:  They have one additional

14 person that they pulled over because they also had a

15 gentleman that quit around the same time she was

16 getting ready to go on maternity leave.

17        THE COURT:  Okay.  Thank you.

18     (Prospective juror exited the courtroom, and the

19      following proceedings were had herein:)

20     (Brief pause).

21     (Prospective juror entered the courtroom, and

22      the following proceedings were had herein:)

23        THE COURT:  Your name today is 108.

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  We're not using your real name.

 1          PROSPECTIVE JUROR:  My name is Martha
 2   Morales.
 3          THE COURT:  Don't tell me your name.
 4          PROSPECTIVE JUROR:  Okay.  I'm sorry.
 5          THE COURT:  That's all right.  There's no
 6   harm done.  But I'm still going to call you 108.
 7          PROSPECTIVE JUROR:  Okay.
 8          THE COURT:  You indicated -- the question is:
 9       "Do you difficulty reading or speaking or
10        understanding written or spoken language."
11       You checked both yes and no.
12          PROSPECTIVE JUROR:  Uh-huh.  I know.  I don't
13   speak a lot of English, you know.  Only I speak a
14   little bit.
15          THE COURT:  Okay.  And you were born in
16   Ecuador?
17          PROSPECTIVE JUROR:  Yes, I was born in
18   Ecuador, but I got 41-year in Chicago -- in Chicago.
19          THE COURT:  Okay.  And how long have you been
20   working at the same place?
21          PROSPECTIVE JUROR:  5 years.
22          THE COURT:  And before you worked at the
23   place where you are now, did you do the same kind of
24   work at another place?
25          PROSPECTIVE JUROR:  Yeah, I work at another

 1  place, I work in hospital.  I work in HLF, it's
 2  laundromat, I work in my company, I work in the
 3  store, too.  I make a demo, lady.
 4          THE COURT:  Ever been on a jury before?
 5          PROSPECTIVE JUROR:  One time in 26th and
 6  California.
 7          THE COURT:  Okay.  Did you actually sit on a
 8  jury and decide the case?
 9          PROSPECTIVE JUROR:  Ah, No, they don't say --
10  only watch TV and do -- I see the case, that's all,
11  nothing else.
12          THE COURT:  Do you watch news on television?
13          PROSPECTIVE JUROR:  No, got no time.
14          THE COURT:  When you watch television, do you
15  watch English or Spanish television?
16          PROSPECTIVE JUROR:  In Spanish.
17          THE COURT:  Okay.  Thank you.
18          PROSPECTIVE JUROR:  You're welcome.
19      (Prospective juror exited the courtroom, and the
20       following proceedings were had herein:)
21          THE COURT:  109 did not appear, so we're
22  going to 110 and then we're going to take a break at
23  12:30.
24      (Brief pause).
25      (Prospective juror entered the courtroom, and

1        the following proceedings were had herein:)

2            THE COURT:  Hi.  For today your name is 110.

3            I'm not going to over the entire

4     questionnaire with you, but I'm just going to ask a

5     few particular ones.

6            Now, were you laid off previously?

7            PROSPECTIVE JUROR:  I was laid off in

8     January.

9            THE COURT:  Okay.  And what kind of work were

10    you laid off from?

11           PROSPECTIVE JUROR:  Financial services.

12           THE COURT:  And what, specifically, did you

13    do in financial services?

14           PROSPECTIVE JUROR:  Profitability analysis

15    for a credit card company.

16           THE COURT:  And your training, it says here,

17    is applied math with economics?

18           PROSPECTIVE JUROR:  That's my degree, yes.

19           THE COURT:  And you have an M.B.A. as well,

20    is that correct?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  And you just got offered a job

23    which starts on May 2nd, 2011?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Same kind of work?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And the only thing that would

3 stop that is if you flunked the background check?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And you're not likely to --

6          PROSPECTIVE JUROR:  Hopefully not.  Don't

7 plan on it.

8          THE COURT:  Okay.  And your previous

9 employment was with a large bank, is that correct?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And you have programming and data

12 modeling skills.

13          PROSPECTIVE JUROR:  Correct.

14          THE COURT:  What relative of yours was in the

15 military?

16          PROSPECTIVE JUROR:  My wife's nephew.

17          THE COURT:  When that incident occurred in

18 college, was anybody ever charged in connection with

19 that?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Do you know why they weren't?

22          PROSPECTIVE JUROR:  I just never -- it was

23 just an isolated incident.

24          THE COURT:  Okay.

25          And you went to small claims court yourself?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  You won?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  How many times did you have to go

5   to claims court?

6          PROSPECTIVE JUROR:  Just once.

7          THE COURT:  Just the one?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  So you were pretty satisfied with

10  everything?

11         PROSPECTIVE JUROR:  Yeah, except for the

12  follow-up with the defendant.  They didn't follow

13  through and --

14         THE COURT:  Actually collect.

15         PROSPECTIVE JUROR:  Collect, yes.  Until he

16  decided he had to leave the state, he couldn't.

17         THE COURT:  You did once consult a lawyer, is

18  that correct?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And that had to do with something

21  that happened with a prior employment?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  The immediate prior employment?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And you decided not to pursue it?

1        PROSPECTIVE JUROR:  Nothing has happened at
2   this point, no.
3        THE COURT:  Might something still happen?
4        PROSPECTIVE JUROR:  It could.  It's -- I
5   don't know where that's going.  My guess is, it
6   probably won't, but ....
7        THE COURT:  You said in the court hearing,
8   this is the one where you were pro se, that you
9   weren't allowed to speak because the defendant kept
10  talking?
11       PROSPECTIVE JUROR:  Yes.
12       THE COURT:  You won anyway?
13       PROSPECTIVE JUROR:  I won anyway.
14       THE COURT:  Right.
15       PROSPECTIVE JUROR:  I think he talked too
16  much.
17       THE COURT:  Right.  It's probably true.
18       You were asked a question whether you had
19  strong opinions, positive or negative, about
20  politics or politicians, and what you said:
21      "Yes I have strong opinions."
22      And you said:
23      "... not about all, but more and more I feel
24      that most politicians are corrupt in one way or
25      another."

1          That is your view?

2              PROSPECTIVE JUROR:  I think more and more

3      lately I felt that.  I never really was in politics

4      and didn't really follow it a lot, but more and more

5      I -- I guess I have seen more issues and maybe I'm

6      just paying more attention to it now.

7              THE COURT:  One of the main things that we

8      ask jurors to do is, we ask them to judge

9      individuals as individuals, not what they did or

10     what most people like them do.  And the question is,

11     if you sat on a jury like this, would you be capable

12     of making your judgment on the basis of the evidence

13     about this particular individual as opposed to what

14     you think others in the same position might have

15     done, do you think you'd be able to do that?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.  It's also clear, based on

18     your answer to another question, that--and I'm

19     trying to put this in as mild a way as I can--that

20     you do not personally hold this particular defendant

21     in this case in high regard, is that fair to say?

22             PROSPECTIVE JUROR:  I think there's -- ah,

23     yes.

24             THE COURT:  Okay.

25             PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  Now, the question is, and I think
2     I've alluded to this in my opening comment to the
3     jury is is that no one is going to ask you to
4     approve, or disapprove, or praise, or like, or
5     dislike, they're just going to ask you if the
6     government has proved its charges against the
7     defendant.
8          Now, if you don't approve the defendant or
9     you don't like the defendant, that's not what the
10    issue is.  My question is, your view, general
11    opinion now, having heard none of the evidence in
12    this case, is that you don't think much of the
13    defendant, is that going to make it impossible for
14    you, difficult for you, or make you unable to decide
15    the case on what you're supposed to decide it on,
16    which is the government's evidence?  In other words,
17    can you do your duty as a juror?
18          PROSPECTIVE JUROR:  I think I could, yeah.
19          THE COURT:  Okay.  Have you spent a lot of
20    time in sports?
21          PROSPECTIVE JUROR:  I enjoy sports.  My kids
22    play sports, I do that.
23          THE COURT:  Right.  And you actually listen
24    to Mike & Mike a lot?
25          PROSPECTIVE JUROR:  When I used to go to work

1   every morning, I did, yeah.

2          THE COURT:  Okay.  And let me ask it to you

3   in a -- I think you have told me that you could set

4   aside whatever bias you have and whatever low

5   opinion you might have as you sit here today with

6   respect to the defendant.  And I believe what you're

7   telling me is that you could, in fact, be a good

8   juror in this case, but the one thing that's

9   stopping you is the fact that you've been laid off

10  and you got a job beginning not too far future and

11  it's basically an economic disaster for you if you

12  don't take that job, is that basically what your

13  position is?

14         PROSPECTIVE JUROR:  Yes, Yes, that's a

15  perfect way to frame it.

16         THE COURT:  Right.  You could do the job

17  correctly, but it's too great a price for you, is

18  that your position?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Okay.  Thank you.

21     (Prospective juror exited the courtroom, and the

22      following proceedings were had herein:)

23

24

25

1

2

3        THE COURT:  We're going to take a one hour

4   recess.

5           The marshal:  All rise.

6           This court is suspended from 1:30 to 5:00

7   p.m.

8

9

10      (Luncheon recess taken from 12:35 o'clock p.m.

11       to 1:50 o'clock p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Voir Dire                                        70

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )   No. 08 CR 888
          Government,                )
                                     )
vs.                                  )   Chicago, Illinois
                                     )
ROD BLAGOJEVICH,                     )   April 21, 2011
                                     )
          Defendant.                 )   1:50 o'clock p.m.

VOLUME 1
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL
AND A JURY

For the Government:

          THE HONORABLE PATRICK J. FITZGERALD,
          UNITED STATES ATTORNEY
          BY:  Reid J. Schar
               Carrie E. Hamilton
               Christopher Niewoehner
          Assistant United States Attorneys
          219 South Dearborn Street
          Suite 500
          Chicago, Illinois 60604

Court Reporter:

          Blanca I. Lara, CSR, RPR
          219 South Dearborn Street
          Room 2504
          Chicago, Illinois 60604
          (312) 435-5895

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:   Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:   Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:   Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.

2       (The following proceedings were had in open

3        court:)

4          THE CLERK:  This court resumes in session.

5   Please be seated.

6          THE COURT:  Give me a moment.

7       (Brief pause)

8          THE COURT:  We are passing over 112 because

9   too much of the questionnaire has not been

10  completed.  We're asking for it to be completed in

11  the interim.

12      (Prospective juror entered the courtroom, and

13       the following proceedings were had herein:)

14         THE COURT:  Today your name is 113.

15         How long have you been -- I'm not to go over

16  everything on the questionnaire, just a few things.

17         How long have you been under treatment for

18  diabetes?

19         PROSPECTIVE JUROR:  For diabetes?

20         THE COURT:  Yeah.

21         PROSPECTIVE JUROR:  Almost 40 years.

22         THE COURT:  Has the therapy changed over a

23  period of time?

24         PROSPECTIVE JUROR:  A little bit; not much.

25         THE COURT:  So this routine which, you

1  described in your request for deferral, has been

2  going on for a very long time?

3          PROSPECTIVE JUROR:  The routine that I'm

4  doing now has probably been going on since about

5  2003.

6          THE COURT:  Now, do you actually eat at

7  pretty much the same time every day?

8          PROSPECTIVE JUROR:  Yeah; that's correct.

9          THE COURT:  And how do you check your blood

10 glucose?

11         PROSPECTIVE JUROR:  With a blood glucose

12 meter.

13         THE COURT:  Okay.  And you do that 6 times a

14 day?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Is that also specific times?

17         PROSPECTIVE JUROR:  Usually around a certain

18 time; pretty close.

19         THE COURT:  And what do you do at work?

20         PROSPECTIVE JUROR:  I'm a laboratory aid in a

21 research facility at a university.

22         THE COURT:  And, physically, what do you do

23 to do that job?

24         PROSPECTIVE JUROR:  Some lifting, some

25 moving; nothing real strenuous.

:54PM

:54PM

:54PM

:54PM

:55PM

1          THE COURT:  Have you ever served on a jury

2   before?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Have you ever been summoned for

5   jury duty before?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  You do insulin 3 times a day?

8          PROSPECTIVE JUROR:  No, actually twice a day.

9          THE COURT:  Now it's twice a day?

10         PROSPECTIVE JUROR:  Yes, twice a day.  It's

11  always been twice a day -- well, actually, when I

12  first started out it was once a day, then they put

13  me on twice a day, I'm on twice a day currently.

14         THE COURT:  Your doctor thinks that given

15  your condition, plus the need to take certain breaks

16  on a frequent basis, it would make it difficult for

17  you to serve on a jury, do you agree with him?

18         PROSPECTIVE JUROR:  Yes, I do.

19         THE COURT:  I'm going to excuse you.

20      (Prospective juror exited the courtroom, and the

21       following proceedings were had herein:)

22      (Brief pause).

23      (Prospective juror entered the courtroom, and

24       the following proceedings were had herein:)

25

:55PM

:55PM

:56PM

:56PM

:57PM

1          THE COURT:  You're number 114?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  What do you do at work?

4          PROSPECTIVE JUROR:  I'm a staff accountant.

5          THE COURT:  And you have a degree in

6    accounting, is that correct?

7          PROSPECTIVE JUROR:  Yes, I do.

8          THE COURT:  Do you also have an M.B.A.?

9          PROSPECTIVE JUROR:  Yes, international

10   business.

11         THE COURT:  And you work for a law firm?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Do you do anything specific

14   there?  Do you have specific projects?

15         PROSPECTIVE JUROR:  Well, a lot of ad hoc

16   projects, but mostly I compile financial reports,

17   month-end, close for the month and close, and just

18   reports-generating, and then I work with attorneys.

19         THE COURT:  And how long have you been at the

20   law firm?

21         PROSPECTIVE JUROR:  Well, it's gonna be

22   2 years next month.

23         THE COURT:  And before there, where did you

24   work?

25         PROSPECTIVE JUROR:  I worked at a utilities

1  company, UI.  It's called Utilities, Inc.

2          THE COURT:  The same kind of work or

3  different work?

4          PROSPECTIVE JUROR:  Yes, same kind, but more

5  of financial analysis there.

6          THE COURT:  You said on one occasion you were

7  sued.  How long ago was that?

8          PROSPECTIVE JUROR:  Oh, that's in 2007.

9          THE COURT:  Was it resolved?

10          PROSPECTIVE JUROR:  Yeah, there was like a

11  judgment, because I couldn't make it to the Court

12  so ....

13          THE COURT:  And is the judgment now paid?

14          PROSPECTIVE JUROR:  No, it's not.  Working on

15  it.

16          THE COURT:  Do you have an agreement with

17  them?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  It says here that you were called

20  to testify about something with respect to another

21  accounting firm.

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And just give me a little idea of

24  what the nature of that one was.

25          PROSPECTIVE JUROR:  It was -- okay, it was --

1  it was an issue with taxes, filing taxes, and the

2  firm was being audited by the Internal Revenue

3  Service.  So because I was an employee there, I had

4  to testify.

5          THE COURT:  How did you do that?

6          PROSPECTIVE JUROR:  Well, it wasn't in court.

7  I just meant, like, it was -- I met with two of the

8  officials, I think at Starbucks, so it was like a

9  non --

10          THE COURT:  It was as interview?

11          PROSPECTIVE JUROR:  Yeah, an interview.

12  Yeah, basically.

13          THE COURT:  And whatever happened to that?

14          PROSPECTIVE JUROR:  I don't know because

15  shortly after that I left the firm and I started

16  working somewhere else.

17          THE COURT:  Hobbies, recreational activities,

18  what do you do?

19          PROSPECTIVE JUROR:  I read a lot, and for

20  recreation, don't have time right now but I play

21  tennis so ....

22          THE COURT:  How do you get the news?

23          PROSPECTIVE JUROR:  Now it's mostly in the

24  morning, like TV.  So just catch, like, maybe

25  30 minutes of whatever is going on in WGN, and then

1    on the radio, on the way to work, driving, on the

2    radio.

3              THE COURT:  Do you ever check the news on the

4    Internet?

5              PROSPECTIVE JUROR:  Yeah.  Yes, maybe before

6    work.  So on Yahoo and MSN.

7              THE COURT:  Now, do you like check the news

8    for particular stories or do you just listen to

9    whatever is on?

10             PROSPECTIVE JUROR:  It's whatever is on.

11   It's not for specific reasons.

12             THE COURT:  I want to ask you about your

13   answer to one particular question.

14             PROSPECTIVE JUROR:  Sure.

15             THE COURT:  The question was:

16       "Do you have any personal, religious,

17        philosophical, or other beliefs that would make

18        it difficult for you to sit in judgment of

19        another."

20             And you said "yes," so would you explain that

21   to me?

22             PROSPECTIVE JUROR:  The reason I said that is

23   because I'm a Christian and I -- I just remembered

24   like a part in the Bible that says you can't judge

25   your fellow, you know, mate or fellow person, so

:01PM

:01PM

:02PM

:02PM

:02PM

1  that's the reason why I put that there.

2          THE COURT:  And what do you mean by

3  "judging"?

4          Well, let me ask it a different way.  In a

5  courtroom, generally speaking, you don't judge

6  people in the biblical sense.  You make a

7  determination of whether, for example, one side has

8  proved its case or hasn't proved its case as opposed

9  to making a judgment as to whether the person is

10  good or bad.  Now, your feeling that you shouldn't

11  judge, does that apply to both of those kinds of

12  things or would it apply only to judging whether

13  somebody is ethically good or ethically bad?

14          PROSPECTIVE JUROR:  Well, it's just to --

15  because when I was thinking about it yesterday, you

16  know, I just thought -- just so not to judge anyone

17  based on, you know, their actions, because you -- I

18  don't know how to explain this properly, but you

19  don't -- you really can't -- because you have to put

20  people in your position, you know what I mean?  You

21  have to actually see if somebody -- like I really

22  don't know how to explain it, but I know what I'm

23  trying to say, I just can't explain it properly.  I

24  don't want to be put in that position where I just

25  go, okay, this person is right versus wrong, because

1  sometimes you don't have enough evidence to say, you

2  know, if this person is doing -- is guilty or not

3  guilty, if that makes any sense to you.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  So that's the only

6  reason.

7          THE COURT:  Now, do you do some tax work?

8          PROSPECTIVE JUROR:  Yes, I do.  Well, before

9  I used to do it.

10          THE COURT:  And do you think it could come to

11  an occasion in which you looked at somebody's papers

12  and the tax returns they filed and tell them that

13  they were wrong --

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  -- the way they filed them?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And that would or would not be

18  judgment?

19          PROSPECTIVE JUROR:  In that case, it would

20  really not be judging, to me, because you're just --

21  you know what is wrong -- well, not wrong.  You just

22  know, okay, this information is not complete or is

23  not right, and so, in that instance, you're looking

24  at it, like, okay, this is not right, just, you

25  know, provide what is right, you know, in that

:04PM

:04PM

:04PM

:05PM

:05PM

1  instance, so I don't think that's judging in that
2  case.
3          THE COURT:  Okay.  Thank you.
4      (Prospective juror exited the courtroom, and the
5       following proceedings were had herein:)
6      (Brief pause).
7      (Prospective juror entered the courtroom, and
8       the following proceedings were had herein:)
9          THE COURT:  Hi.  Have a seat, please.
10         PROSPECTIVE JUROR:  Thank you.
11         THE COURT:  For today your name is 115.
12         PROSPECTIVE JUROR:  Okay.  Fair enough.
13         THE COURT:  I'm going to go over parts of
14 this questionnaire with you, but not all of it.
15         You're a lawyer?
16         PROSPECTIVE JUROR:  Yes.
17         THE COURT:  And how long have you been
18 admitted to the bar?
19         PROSPECTIVE JUROR:  Since 1985.
20         THE COURT:  So you've been around for a
21 while?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  What kind of work do you now do?
24         PROSPECTIVE JUROR:  I am general counsel for
25 a financial services company.  So I do corporate,

1  securities, some litigation management, HR, IPA.

2          THE COURT:  How long have you basically been

3  in general-counsel type of work?

4          PROSPECTIVE JUROR:  If you mean in-house?

5          THE COURT:  In-house, yeah.

6          PROSPECTIVE JUROR:  Since 1997.

7          THE COURT:  Okay.  And before that you were

8  in firms?

9          PROSPECTIVE JUROR:  Before that I was with

10 the SEC in the enforcement division and prior to

11 that I was in some state and local prosecutions.

12         THE COURT:  Okay.  You have a list of places

13 that you worked.  You were an Assistant State's

14 Attorney in Lake County?

15         PROSPECTIVE JUROR:  Correct.

16         THE COURT:  You were an Assistant Attorney

17 General in the Illinois Attorney General's Office?

18         PROSPECTIVE JUROR:  Correct.

19         THE COURT:  What were your assignments in

20 Lake County?

21         PROSPECTIVE JUROR:  I was traffic court

22 initially as a prosecutor, and then in misdemeanor

23 court, and then in Felony Review, so, obviously,

24 litigation as a prosecutor, that was in Lake County.

25 And then moving on to the Attorney General's Office,

1    I worked in the general law division, so we

2    prosecuted or defended on behalf of state regulatory

3    agencies.

4              THE COURT:  And then after that you went to

5    the SEC?

6              PROSPECTIVE JUROR:  After that I spent a

7    brief time in private practice in commercial

8    litigation, and then in approximately 1989 I went to

9    the SEC.

10             THE COURT:  And it can be fairly said that

11   you know a lot of people who work for the

12   government, you've encountered a lot of law

13   enforcement officers, and a pretty fair number of

14   attorneys?

15             PROSPECTIVE JUROR:  A fair number of what?

16   I'm sorry.

17             THE COURT:  Attorneys.

18             PROSPECTIVE JUROR:  Yes, I think that's a

19   fair statement.

20             THE COURT:  It says here that you have been

21   arrested or convicted of a crime, and it says

22   trespass.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  When was that?

25             PROSPECTIVE JUROR:  1990.

1        THE COURT:  And the charge was dismissed?

2        PROSPECTIVE JUROR:  Supervision.

3        THE COURT:  And the supervision ended and the

4   charges dismissed?

:09PM   5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  Okay.

7        Have you yourself tried cases before a jury?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  And you have, in some cases, made

:10PM  10   decisions to file criminal charges against another

11   person?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  And you did say that on certain

14   occasions you participated in various attempts to

:10PM  15   modify the federal securities law?

16        PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Did you do that when you were at

18   the SEC?

19        PROSPECTIVE JUROR:  No, I was at a company

:10PM  20   called Archipelago and as part of that role on the

21   regulatory side, we sought to change certain federal

22   securities laws that we felt were either unfair or

23   inconsistent with our business model.

24        THE COURT:  And were you changing laws or

:11PM  25   regulations?

1          PROSPECTIVE JUROR:  We were seeking to change
2     regulations, I guess, or the application of those.
3          THE COURT:  You also contributed money to
4     local and federal candidates for office and attended
5     fundraisers for local candidates?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  What kind of candidates?
8          PROSPECTIVE JUROR:  Our State Senator that's
9     located in Oak Park, so things of that nature, or
10    our village board.  I, at one point, was a member of
11    one of the agencies in our village board and so I
12    would attend certain fundraisers for those
13    individuals.
14         THE COURT:  Would you characterize yourself
15    as a politically active person or a person who on
16    occasion participated in supporting elected
17    officials?
18         PROSPECTIVE JUROR:  It depends on the issues,
19    but I certainly consider myself aware of various
20    political issues and, when necessary, I think it's
21    important to participate.
22         THE COURT:  I want to cover now, leaving
23    aside your claim for deferral on the grounds that
24    you're exceptionally busy, I'll deal with that
25    later, you express what I would say predominantly

:11PM

:11PM

:12PM

:12PM

:13PM

1  negative views about public officials and elected

2  officers, and you've expressed some preliminary

3  views with respect to opinions you've had, and in

4  one case you characterized it as a rebuttal

5  presumption, which tells me you went to law school,

6  that would not run in favor of the defendant in this

7  case.  But my question to you is whether you can

8  disregard whatever opinions you have and make a

9  judgment based on the evidence and only the evidence

10 you hear in the courtroom in reaching a verdict in

11 this case if you sat, do you understand you can do

12 that?

13          PROSPECTIVE JUROR:  Ah --

14          THE COURT:  You want me to give you some more

15 about this?

16          PROSPECTIVE JUROR:  Sure.

17          THE COURT:  And I'll tell you why I ask the

18 question.

19          PROSPECTIVE JUROR:  Sure.  Sure.

20          THE COURT:  The tone of this -- in fact, it's

21 an answer to a question that I think very clearly

22 states the problem we see here about the rules about

23 presumptions of innocence proving beyond a

24 reasonable doubt and you say:

25

1      "...well, typically, I would apply the standard.
2       I honestly feel that in this instance --"
3          and then you go on to serve would be
4   difficult to do.
5          PROSPECTIVE JUROR:  Sure.
6          THE COURT:  And what troubled me about this
7   is is you were for a very long period of time
8   engaged in a professional occupation, at least as an
9   Assistant State's Attorney, in which pretty much
10  that's what you have to do all of the time.  You get
11  a file, you may actually talk to a prospective
12  defendant, you may be personally convinced that the
13  individual is a rotten egg, but still you have to
14  sit there and say to yourself do I have enough
15  evidence.
16         PROSPECTIVE JUROR:  Sure.
17         THE COURT:  So it's something you've actually
18  done professional, you're paid to do it, and my
19  question is is why would it be difficult for you to
20  do it here?
21         PROSPECTIVE JUROR:  The -- the -- you
22  characterize it as a negative view in terms of
23  politicians, I want to recast that, I think.
24         THE COURT:  Sure.
25         PROSPECTIVE JUROR:  I think I'm more

:15PM

:15PM

:15PM

:15PM

:16PM

 1  disappointed in our political system and certain
 2  politicians.  The difficulty is, as you point out or
 3  identify, I'm fairly well-versed in the issues
 4  surrounding this matter, and while I would make
 5  every attempt to do so, I have formulated an
 6  opinion.
 7          But, again, I haven't sat in a courtroom, I
 8  haven't heard the facts, I haven't heard the
 9  arguments.  So that's why I characterize it as a
10  rebuttal presumption, can be rebutted, but at the
11  same time, I'm very familiar -- I believe I'm very
12  familiar to media reports, and otherwise, with the
13  facts, at least, as presented in the last trial and,
14  in light of those facts, it would be challenging.
15          THE COURT:  I'm not going to dispute that.
16  The question is, can you meet the challenge.
17          PROSPECTIVE JUROR:  I'm sorry?
18          THE COURT:  Can you meet that challenge?
19  Will you meet that challenge?
20          PROSPECTIVE JUROR:  If I were sworn in as a
21  juror and that determination was made, then I
22  would -- I would certainly make every good-faith
23  effort to meet that, sure.
24          THE COURT:  Is there anything about your
25  experience with the process that you went through at

1  the U.S. Attorney's Office, would any of that affect
2  your ability to be fair here?
3          PROSPECTIVE JUROR:  No.  To be fair?
4          THE COURT:  Yeah, to be fair.
5          PROSPECTIVE JUROR:  No.
6          THE COURT:  The last thing I want to go
7  through is your concern for what you're doing at
8  work.
9          PROSPECTIVE JUROR:  Uh-huh.
10         THE COURT:  And I accept the description.
11  What it says here you manage a fairly large number
12  of professionals in, and I quote "a dynamic-time
13  sensitive business" and you exercise discretion as
14  part of management and to be unavailable for a
15  certain period of time might, apart from possibly
16  jeopardizing your position, affect the company
17  itself.  The reason I'm asking this question is is
18  there used to be an old practice when you served on
19  a jury, you were lost to outside work.
20         PROSPECTIVE JUROR:  Uh-huh.
21         THE COURT:  Over the last number of years,
22  particularly in longer trials, I have found that
23  apart from the fact that we don't work on Fridays,
24  people in positions like yours are perfectly capable
25  of managing, partly because we don't take the cell

 1 phones away, we don't take computers away, and I
 2 have had jurors in positions similar to yours
 3 conduct their business and complete their business.
 4 It, in many cases, required extra work, requires
 5 extra hours.  I had one juror in one case who used
 6 to go to his office at 5:00 in the morning, which he
 7 said was a wonderful experience because he realizes
 8 that, in fact, if he goes at 5:00 in the morning he
 9 can complete the entire day's work in three hours
10 because his phone never rang.
11         So my question to you is, do you really think
12 you couldn't do it given your ability to communicate
13 with your office while here and the fact that it's
14 four days a week and not five.  Answer the question,
15 I'll take your answer.
16         PROSPECTIVE JUROR:  Okay.  Again, if I
17 were -- if it was decided and I was sworn in to be a
18 juror, I would do whatever I would have to do.
19         THE COURT:  Okay.
20         PROSPECTIVE JUROR:  The --
21         THE COURT:  And bear in mind, I'm not telling
22 you that it's a pleasant experience.
23         PROSPECTIVE JUROR:  No, no, no.  You know, as
24 has been pointed out, I've pictures and gone through
25 that entire trial process.  The challenge is just,

:19PM

:20PM

:20PM

:20PM

:20PM

1 as I wrote, that the time-sensitive nature of some
2 of the decisions that have to be made.  And I'm not
3 in any way, shape or form saying that my time is
4 more important than anyone else's who sit's on a
5 jury, all I'm saying is that, you know, the question
6 asked whether it would be hardship and I've
7 described the hardship that it would be.

8          THE COURT:  Okay.  Thank you.

9          PROSPECTIVE JUROR:  Thank you.

10      (Prospective juror exited the courtroom, and the
11       following proceedings were had herein:)

12          THE COURT:  Give me a second.

13      (Brief pause).

14          THE COURT:  Okay.

15      (Prospective juror entered the courtroom, and
16       the following proceedings were had herein:)

17          THE COURT:  You're Mr. 116?

18          PROSPECTIVE JUROR:  Yes, Your Honor.

19          THE COURT:  You are now retired?

20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  What did you do?

22          PROSPECTIVE JUROR:  I owned an auto repair
23 shop.

24          THE COURT:  Big shop, small shop?

25          PROSPECTIVE JUROR:  Small shop.

1     THE COURT:  And you did some or a good deal
2  of work yourself?
3     PROSPECTIVE JUROR:  Originally, and then it
4  became too large to do that, ten employees, so I
5  became just an owner-manager at that time.
6     THE COURT:  And how long did you have that
7  business?
8     PROSPECTIVE JUROR:  20 years.
9     THE COURT:  And at its height, how many
10 employees did you have?
11    PROSPECTIVE JUROR:  Approximately ten.
12    THE COURT:  And your father was in the same
13 business?
14    PROSPECTIVE JUROR:  My father was an auto
15 body technician.
16    THE COURT:  You did 2 years in the Army?
17    PROSPECTIVE JUROR:  Yes, Your Honor.
18    THE COURT:  What was your rank on discharge?
19    PROSPECTIVE JUROR:  Specialist 5.
20    THE COURT:  And where did you serve?
21    PROSPECTIVE JUROR:  I served in Vietnam.
22    THE COURT:  How long was the tour?
23    PROSPECTIVE JUROR:  My tour was 1 year.
24    THE COURT:  Eventually you sold your
25 business?

1          PROSPECTIVE JUROR:  About 3 years ago, yes,
2    sir.
3          THE COURT:  Okay.  And you had a lawyer for
4    that?
:24PM    5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  Have you ever had a lawyer for
7    any other reason?
8          PROSPECTIVE JUROR:  No -- ah, real estate
9    closings.
:24PM    10          THE COURT:  Did you serve on a jury before?
11          PROSPECTIVE JUROR:  Over 10 years ago, yes, I
12    did.
13          THE COURT:  Criminal or civil, if you
14    remember?
:24PM    15          PROSPECTIVE JUROR:  DUI, criminal.
16          THE COURT:  Did the jury reach a verdict?
17          PROSPECTIVE JUROR:  Yes, they did.
18          THE COURT:  You were a member of the union?
19          PROSPECTIVE JUROR:  I was a member of the
:24PM    20    union originally when I was a body technician.
21          THE COURT:  Right.  Did you keep up your
22    membership when you had the body shop?
23          PROSPECTIVE JUROR:  I took a union withdrawal
24    card at that time.
:25PM    25          THE COURT:  Okay.

1          Donate money to the Humane Society?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What do you do now?

4          PROSPECTIVE JUROR:  I'm retired.

5          THE COURT:  But what do you do now?

6          PROSPECTIVE JUROR:  As little as possible.

7          THE COURT:  Right.  What is it that you would

8 want to do if --

9          PROSPECTIVE JUROR:  I do some woodworking,

10 occasionally I'll go target shooting, things of that

11 nature; see a movie, never did that before.

12          THE COURT:  Where do you get your news?

13          PROSPECTIVE JUROR:  I'm sorry?

14          THE COURT:  Where do you get news from?

15          PROSPECTIVE JUROR:  What do I?

16          THE COURT:  Where do you get your news from?

17 Television, newspapers?

18          PROSPECTIVE JUROR:  Oh, newspapers, 10:00

19 o'clock news, basically Internet.

20          THE COURT:  Do you make a distinct effort to

21 catch the news every day?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  What papers do you read?

24          PROSPECTIVE JUROR:  The Tribune, we have a

25 local Daily Herald and the Wall Street Journal.

1          THE COURT:  You answered the question, which
2    is that everybody was asked:
3        "Have you formed any opinion based on what you
4          have observed in terms of accounts of trials?"
5          And you answered that in your opinion:
6          "... based on news accounts, my personal bias
7          is that he is guilty."
8          PROSPECTIVE JUROR:  That is correct.
9          THE COURT:  Okay.  Now, my question to you
10   is, the job of the jury--which most people can do,
11   but some can't--the job of the jury is to put aside
12   whatever attitudes they come to court with, in fact
13   to put to one side all the things that they heard
14   about before they ever got into the jury box to
15   listen to the evidence and to decide the case solely
16   on the basis of what they see and hear in the
17   courtroom.  And, in fact, to be more precise, what
18   they see and hear in terms of evidence, which is
19   offered in the courtroom, and then to determine on
20   the basis of that evidence whether the government
21   has proved its case beyond a reasonable doubt, which
22   is what the government has to do.  Now, the question
23   is, can you do that?  Can you set aside the prior --
24          PROSPECTIVE JUROR:  I believe so.
25          THE COURT:  Okay.  Then one other question,

1  and it's the last one I'm going to ask you.  Pretty
2  much every jury gets asked a question like this
3  sometime or another in almost every kind of case,
4  criminal case:
5       "... a person accused of a crime does not have
6         to testify in his defense or present any
7         evidence or present any witnesses and the
8         silence may not be used against him, can you
9         abide by this constitutional requirement?"
10      You said yes, and then you wrote:
11      "... except every chance he gets he keeps
12        saying he will testify.  I think I would hold
13        it against him if he did not testify."
14         Now, my question to you is -- my instruction
15  to you is followed by a question:  You can't hold it
16  against him.  The rule is you can't do that.  My
17  question is, will you follow my rule rather than
18  your inclination?
19         PROSPECTIVE JUROR:  All I could say is, I
20  would try but I think I would have a bias against
21  the defendant simply because of the numerous times
22  that he said he wanted to testify and would testify
23  and did not do so.  In this trial, if he didn't do
24  so, I think that would be somewhere in my mind.
25         THE COURT:  Okay.  Which leads to the next

1  question, because I didn't ask you if you would
2  abandon that thought.
3          PROSPECTIVE JUROR:  I would try.
4          THE COURT:  The question is, can you
5  disregard it when you reach a decision?
6          PROSPECTIVE JUROR:  I think I could, but I
7  can't say for sure, Your Honor.
8          THE COURT:  Okay.  Thank you.
9       (Prospective juror exited the courtroom, and the
10       following proceedings were had herein:)
11      (Brief pause).
12          THE COURT:  Give me a second.  I have a lot
13  of paper up here and I have to try to straighten it
14  out.
15      (Brief pause).
16          THE COURT:  All right.
17      (Prospective juror entered the courtroom, and
18       the following proceedings were had herein:)
19          THE COURT:  Number 117?
20          PROSPECTIVE JUROR:  Yes.
21          THE COURT:  Have you started the job?
22          PROSPECTIVE JUROR:  Yeah.
23          THE COURT:  When did you start?
24          PROSPECTIVE JUROR:  The 21st of last month.
25          THE COURT:  And what do you do?

:29PM
:29PM
:30PM
:31PM
:31PM

1    PROSPECTIVE JUROR:  I'm project coordinator,
2  subcontractor, construction.
3    THE COURT:  Right.  And what are you
4  coordinating and constructing?
5    PROSPECTIVE JUROR:  Right now I'm doing fire
6  sprinklers.  I don't even know my whole --
7  everything I do yet, I just started.
8    THE COURT:  Right.  Before you had this job,
9  what did you do?
10    PROSPECTIVE JUROR:  I worked for a
11  construction management company, all commercial
12  buildings.
13    THE COURT:  And you went to college?
14    PROSPECTIVE JUROR:  Yes.
15    THE COURT:  And in college your major area of
16  study was construction management?
17    PROSPECTIVE JUROR:  Yes.
18    THE COURT:  What led you to construction
19  management?
20    PROSPECTIVE JUROR:  I always wanted to do
21  residential side and the economy kind of slipped
22  when I was graduating, so I started commercial.  My
23  dad used to be involved in building houses and
24  stuff.
25    THE COURT:  So it's sort of the family

1  business?

2        PROSPECTIVE JUROR:  Yes.  He has nothing to

3  do with it now.

4        THE COURT:  And you basically worked for

5  companies that do this stuff?

6        PROSPECTIVE JUROR:  Uh-huh.

7        THE COURT:  Now, have you ever consulted a

8  lawyer for any reason or hired a lawyer?

9        PROSPECTIVE JUROR:  No.

10       THE COURT:  Have you dealt with lawyers at

11 all in dealing with construction?

12       PROSPECTIVE JUROR:  I don't deal with it at

13 my level, no.  I mean, I know there's cases that

14 would go on based on pay, but I was never involved.

15 I don't know any of the cases.

16       THE COURT:  It's after it's built that the

17 lawyers start coming in?

18       PROSPECTIVE JUROR:  Yeah; I've always been

19 involved in the front end, estimating, purchasing

20 part.

21       THE COURT:  What do you do for fun?

22       PROSPECTIVE JUROR:  Hang out, play coed

23 softball; just go out with my friends.

24       THE COURT:  Now, do you like building things

25 yourself?

:32PM
:33PM
:33PM
:34PM
:34PM

1        PROSPECTIVE JUROR:  Ah, no, I like to be

2   creative and crafty, but I don't -- I've never built

3   a house or I don't do any labor.

4        THE COURT:  Do you read the news?

5        PROSPECTIVE JUROR:  I watch the news a lot.

6        THE COURT:  Okay.  Do you have like a regular

7   routine for following the news?

8        PROSPECTIVE JUROR:  Yeah, I watch it in the

9   morning while getting ready, you know, here and

10  there, try to catch it when I get home, I usually

11  watch the 10:00 o'clock.

12       THE COURT:  Do you read any particular

13  magazines or books?

14       PROSPECTIVE JUROR:  No.

15       THE COURT:  Do you take a look of materials

16  in construction management, articles, things of that

17  sort, do you keep up with that?

18       PROSPECTIVE JUROR:  Not regularly.  I mean,

19  if there's something new and exciting, I'll glance

20  over and read it.

21       THE COURT:  It says here that you really have

22  no interest in the political world and with respect

23  to news about this case, you, I think, said "zoned

24  out," is it true that?

25       PROSPECTIVE JUROR:  Usually when the

1  political anything goes on, I mean, I'm watching the

2  news, you hear bits and pieces, but I'm not -- I'm

3  not interested in it.  It's usually about, oh,

4  another something corrupt or -- I have no passion,

5  no reason to watch it, listen.

6          THE COURT:  In some of these questions, you

7  say that you have heard the opinions of a lot of

8  other people about the defendant in this case, and

9  then you say that you don't know enough about the

10 facts to give or form an opinion, is that correct?

11         PROSPECTIVE JUROR:  I'm a -- I feel like I'm

12 a fair person, so based on everything I hear and

13 what I think one way, but I don't have any firm

14 evidence.  I mean, I don't follow the case, I don't

15 have any firm facts, I don't know --

16         THE COURT:  When you're a juror in a case,

17 you're supposed to actually put aside anything where

18 you don't have the facts and listen to the facts as

19 you hear them in the courtroom and decide on that,

20 and that alone.  Is that what you have in mind, that

21 that's what a juror should do?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.  And if by some chance you

24 have previously formed an opinion, one way or the

25 other, that old opinion would just go out the window

:35PM

:36PM

:36PM

:37PM

:37PM

1  and you would make a new opinion based only on the

2  evidence hear in court, do you think you'd do that?

3         PROSPECTIVE JUROR:  I'd like to -- I mean,

4  I've never been in this situation.  I would like to

5  say yes, that's how I feel.  I have based this

6  opinion on just little things.  I mean, I don't know

7  the whole case, I don't know anything, so I'd like

8  to say I would come in open-minded.

9         THE COURT:  Okay.  Thanks.

10      (Prospective juror exited the courtroom, and the

11       following proceedings were had herein:)

12      (Brief pause).

13      (Prospective juror entered the courtroom, and

14       the following proceedings were had herein:)

15         THE COURT:  Hi, you're 118 for today.

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  The first thing I want to ask you

18  about is is that when you were asked about hearing

19  or vision, you said that sometimes if there's

20  background noise, you have a hard time hearing.

21         PROSPECTIVE JUROR:  That's right.

22         THE COURT:  Are you having a hard time

23  hearing me?

24         PROSPECTIVE JUROR:  No, I am not.

25         THE COURT:  And background noise would be

1 what?  Say, a bunch of people who are now sitting?

2          PROSPECTIVE JUROR:  If there are people,

3 other people talking sometimes in, you know, the

4 surrounding area, sometimes I have a hard time

5 hearing.  For instance, if I'm in a restaurant and

6 there are other people talking, I sometimes have a

7 hard time hearing what the people I'm with are

8 saying.

9          THE COURT:  Okay.  Well, the reason I ask

10 that question is is that pretty much there are no

11 background conversations in the courtroom, but I

12 just wanted to make sure.

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  You're a substitute teacher?

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  What do you teach?

17          PROSPECTIVE JUROR:  I teach anywhere from

18 pre-K to 8th grade.  Every days is a surprise.

19          THE COURT:  And how many days a week would

20 you work, ordinarily?

21          PROSPECTIVE JUROR:  Depending on when they

22 call me.  I average about four days a week.

23          THE COURT:  Okay.  You like that work?

24          PROSPECTIVE JUROR:  It wouldn't be my first

25 choice, no.

Voir Dire                                104

1          THE COURT:  Would it make the top 10?

2          PROSPECTIVE JUROR:  Might make 10.

3          THE COURT:  Might make 10.

4          And you work for another company for, it

5  says, 22 years?

6          PROSPECTIVE JUROR:  That's correct.

7          THE COURT:  Still working for them?

8          PROSPECTIVE JUROR:  No, sir.  I was laid off,

9  that's how I started substitute teaching.

10          THE COURT:  Okay.  How long ago were you laid

11  off?

12          PROSPECTIVE JUROR:  I was laid off in 2002.

13          THE COURT:  You been a teacher before that?

14          PROSPECTIVE JUROR:  No.  I have a teaching

15  degree, and after I student taught I decided that

16  wasn't what I wanted to do my whole life, so I

17  started to work in an office.

18          THE COURT:  And worked as a temporary in a

19  government office?

20          PROSPECTIVE JUROR:  That's right.

21          THE COURT:  Was that a city office?

22          PROSPECTIVE JUROR:  It was for the State of

23  Illinois, in liquor and cigarettes.

24          THE COURT:  How long did you work there?

25          PROSPECTIVE JUROR:  I only worked there for a

1  summer.

2        THE COURT:  You ever hire a lawyer for any

3  reason?

4        PROSPECTIVE JUROR:  Pardon me?

5        THE COURT:  Ever hire a lawyer for any

6  reason?

7        PROSPECTIVE JUROR:  Other than for a will,

8  no.

9        THE COURT:  You reported a car stolen once?

10       PROSPECTIVE JUROR:  Yes.

11       THE COURT:  To whom did you report it to?

12       PROSPECTIVE JUROR:  To the police, to the

13 Chicago Police Department.

14       THE COURT:  How about the home theft?

15       PROSPECTIVE JUROR:  To the Chicago police.

16       THE COURT:  Two separate instances?

17       PROSPECTIVE JUROR:  Yes, sir.  And a long

18 time ago.

19       THE COURT:  And you dealt with the IRS?

20       PROSPECTIVE JUROR:  Recently.

21       THE COURT:  And what was that about?

22       PROSPECTIVE JUROR:  My husband retired and he

23 has a financial agency, you know, working his money

24 and they put an "x" on the wrong box and now the IRS

25 is double-checking to see -- they say we owe them

1   money, but the wrong box was crossed, so they have

2   to redo the paperwork and hopefully we don't owe

3   anything.

4          THE COURT:  Right.  Were they polite to you,

5   the IRS?

6          PROSPECTIVE JUROR:  I didn't deal with them.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  The gentleman that is

9   handling my husband's money is dealing with them.

10         THE COURT:  Okay.

11         Now, you say here that your son-in-law and

12  your family helped raise funds for a political

13  party?

14         PROSPECTIVE JUROR:  Correct.

15         THE COURT:  Now, was that something you

16  participated in?

17         PROSPECTIVE JUROR:  No, sir.

18         THE COURT:  Do you have much interest in

19  politics?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  You were asked if you have strong

22  opinions about politics and politicians, and the

23  answer you gave was:

24

25      "I don't feel any politician plays directly by

1       the book.  In order to achieve their goals,

2       they make deals but most deals include personal

3       gain."

4           The reason I read that to you is, if you sit

5   on a jury, a jury like this one, we're not going to

6   be dealing with politicians in, general, or what

7   most of them do, or what some of them do, the issue

8   is going to be whether a particular defendant in

9   this case took steps which were against the law and

10  whether the government has proved this or not proved

11  it beyond a reasonable doubt.

12          And my question is, can you separate your

13  views on what most politicians might do or might not

14  do from the decision process in which you were asked

15  to decide whether at certain specific times and in

16  certain specific ways the defendant did something

17  that violated the law and whether that's proved

18  beyond a reasonable doubt, can you do that focusing

19  on just this case?

20          PROSPECTIVE JUROR:  I believe so.

21          THE COURT:  The most important source of news

22  for you?

23          PROSPECTIVE JUROR:  Say again?

24          THE COURT:  Most important source of news for

25  you?

1        PROSPECTIVE JUROR:  Radio.

2        THE COURT:  Now, does that mean you listen to

3   news radio 10 hours a today or 10 minutes a day?

4        PROSPECTIVE JUROR:  When I leave my home and

5   go to work.  Back and forth from work.

6        THE COURT:  And you are covered by the

7   Teachers Retirement System of Illinois?

8        PROSPECTIVE JUROR:  I worked in the suburbs

9   for a small period of time, and at that time I was

10  contributing to that pension.  Now I'm working for

11  Chicago Public Schools --

12       THE COURT:  Right.

13       PROSPECTIVE JUROR:  -- so I'm in that pension

14  fund.

15       THE COURT:  It also says here that at times,

16  at least when you filed this out, you feel that the

17  former governor wasn't playing fair.

18       PROSPECTIVE JUROR:  That's correct.

19       THE COURT:  And what I want to ask you is,

20  you're not going to be deciding whether he's playing

21  fair or whether he's nice or not, you're going to be

22  asked to decide whether he committed a federal crime

23  and whether the government has proved that beyond a

24  reasonable doubt, do you understand that those are

25  two separate issues?

:46PM
:46PM
:46PM
:47PM
:47PM

Voir Dire                                        109

1      PROSPECTIVE JUROR:  Yes, sir.

2      THE COURT:  Do you understand he could be a

3 not nice man and an unfair man and still those two

4 things, by themselves, don't constitute a criminal

5 offense, do you understand this?

6      PROSPECTIVE JUROR:  Yes.

7      THE COURT:  You are also asked about a series

8 of questions about something that you've seen or

9 heard or read usually about this case, and whether

10 anything would affect you, and you answered

11 "unsure."

12      PROSPECTIVE JUROR:  That's correct.

13      THE COURT:  What did you mean by saying

14 "unsure"?

15      PROSPECTIVE JUROR:  By that I meant, until I

16 hear whatever I hear in court, I mean, I can't

17 answer that question, that particular question,

18 without knowing what else is going on to make a fair

19 decision.

20      THE COURT:  So are you telling me that what

21 you're going to rely on is what you hear in court?

22      PROSPECTIVE JUROR:  Correct.

23      THE COURT:  And not anything you heard

24 outside?

25      PROSPECTIVE JUROR:  Correct.

:47PM
:47PM
:48PM
:48PM
:48PM

1        THE COURT:  Okay.  And then there were three
2   other "sure" answers you gave and I want to go over
3   those with you.  One was the rule which says that if
4   a person does not testify on his own defense, you
5   can't hold that against him, and you were asked if
6   you could abide by that rule.  Also, there's a rule
7   which says that the defendant doesn't have to
8   present any evidence and doesn't have to prove that
9   he's innocent, the government has to prove beyond a
10  reasonable doubt that he's guilty and you're asked
11  would you be able to follow that.  And, finally, it
12  says that you can't think in any way that a
13  defendant is guilty just based on the fact that he
14  was indicted or charged with the offense, and you
15  were asked would you be able to follow that rule and
16  you said you were unsure about that, too.  Would you
17  be able to follow those rules?
18        PROSPECTIVE JUROR:  I think so.
19        THE COURT:  Thank you.
20        PROSPECTIVE JUROR:  Thank you.
21     (Prospective juror exited the courtroom, and the
22      following proceedings were had herein:)
23     (Brief pause).
24
25

1      (Prospective juror entered the courtroom, and
2       the following proceedings were had herein:)
3          THE COURT:  You are number 119?
4          PROSPECTIVE JUROR:  Yes, Your Honor.
5          THE COURT:  I'm not going to go through the
6  whole questionnaire, I'm just going to ask you a few
7  pieces about this.
8          What do you do for a living?
9          PROSPECTIVE JUROR:  I work as a technical
10  support for engineering and electromotive.
11          THE COURT:  What, basically, do you do?  What
12  kind of stuff do you do?
13          PROSPECTIVE JUROR:  Well, some of it I help
14  design, test, locomotives, add on new features,
15  things like emissions to electrical, mechanical.
16          THE COURT:  So it's designing and testing?
17          PROSPECTIVE JUROR:  Yes, Your Honor.
18          THE COURT:  And the other thing you have is
19  you own some property which you rent out?
20          PROSPECTIVE JUROR:  I used to and then sold.
21          THE COURT:  How long ago?
22          PROSPECTIVE JUROR:  In the summer, I believe,
23  of 2003.
24          THE COURT:  All right.  And you have a fair
25  number of standard skills, according to this,

1  electrician, pipefitter, fabricator?

2          PROSPECTIVE JUROR:  Yes, Your Honor.

3          THE COURT:  H Vac.

4          PROSPECTIVE JUROR:  Systems on locomotives.

5          THE COURT:  You have a relative in the Army?

6          PROSPECTIVE JUROR:  Yes, Your Honor.  A

7  nephew.

8          THE COURT:  A nephew.  Still on active duty?

9          PROSPECTIVE JUROR:  Yes, he's in Afghanistan

10 right now.

11         THE COURT:  Have you ever been arrested or

12 convicted of a crime?

13         PROSPECTIVE JUROR:  Yes, Your Honor.

14         THE COURT:  And what was that?

15         PROSPECTIVE JUROR:  I was arrested for

16 assault and battery.

17         THE COURT:  And what happened with that?

18         PROSPECTIVE JUROR:  It was a jury trial and I

19 was convicted.

20         THE COURT:  And what was the penalty?

21         PROSPECTIVE JUROR:  I was to go to anger

22 management class and then community service, I don't

23 remember, like 150 hours.

24         THE COURT:  Were you ever convicted of

25 anything else?

1       PROSPECTIVE JUROR:  No, just DUI.

2       THE COURT:  When was the most recent arrest?

3       PROSPECTIVE JUROR:  My DUI.

4       THE COURT:  In what year?

5       PROSPECTIVE JUROR:  2008.

6       THE COURT:  Did you attend the anger

7  management?

8       PROSPECTIVE JUROR:  Yes, Your Honor.

9       THE COURT:  And did you complete the course?

10      PROSPECTIVE JUROR:  Yes, Your Honor.

11      THE COURT:  Did it help?

12      PROSPECTIVE JUROR:  Ah, that's a loaded

13 question.  I don't know.  My behavior --

14      THE COURT:  Well, I noticed you're not

15 standing up and throwing the microphone at me,

16 so ...

17      PROSPECTIVE JUROR:  I'm sorry, Your Honor?

18      THE COURT:  You didn't stand and throw the

19 microphone at me, so at least it helped a little.

20      PROSPECTIVE JUROR:  Yes, Your Honor.

21      THE COURT:  Okay.  And you had a nephew who

22 had some -- was that the same nephew who was on

23 active duty?

24      PROSPECTIVE JUROR:  No, it was another nephew

25 from another sister.  She's currently deceased.

1        THE COURT:  What happened with respect to the

2   question where you were asked if you were the victim

3   of a crime?

4        PROSPECTIVE JUROR:  That issue was when if I

5   sold the property, there was a starker exchange, and

6   I had entrusted my supposed friend, who was a lawyer

7   at the time but I didn't know he was disbarred.  So

8   he put in as a manager at my escrow account, and

9   what had happened was he had convinced me to go into

10  partnership to buy property in Hawaii, and what he

11  really did is take the money and put a mortgage on

12  it and I had no clue what he was doing.  So,

13  basically, it went to zero and the property is lost,

14  the business is lost, and I don't know where he's at

15  currently.  I had investigated it.  Typical, I

16  invested everything in there.  I think the sum is

17  written down there, and I never got a dime back.

18  And, you know how those things go, you can have a

19  lot of lawyers chase it down and you'll never get

20  your money back, he already spent it.

21       THE COURT:  Which leads to my next question,

22  what happened in that case and that investigation,

23  would that affect your ability to be fair here?

24       PROSPECTIVE JUROR:  It went any further than

25  the lawyer's office.

1          THE COURT:  Yeah, but would it affect your

2    ability to be fair in this case?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  It would affect your ability to

5    be fair?

6          PROSPECTIVE JUROR:  Wait a minute.

7          THE COURT:  I'm concerned because somebody

8    ripped you off.

9          PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  My question is, the fact that

11    somebody ripped you off in some other cases, would

12    that make it difficult for you to be fair in this

13    case?

14          PROSPECTIVE JUROR:  I believe not so, Your

15    Honor.

16          THE COURT:  Thank you.

17          Were you once tried by a jury yourself?

18          PROSPECTIVE JUROR:  Yes, Your Honor, I was.

19          THE COURT:  And how long ago was that?

20          PROSPECTIVE JUROR:  It was in 2004.

21          THE COURT:  And was that one of the topics

22    you talked about before?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Talked about -- was that one of

25    the things you talked about before?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  And on the DUI, you didn't have a

3     trial, you pled guilty?

4           PROSPECTIVE JUROR:  Yes, Your Honor.

:57PM   5           THE COURT:  You're a member of rotary?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Okay.  You spend a lot of time in

8     rotary?

9           PROSPECTIVE JUROR:  I helped out with the

:57PM  10     rotary club.  We had fundraisers in Downers Grove.

11           THE COURT:  Your hobbies?

12           PROSPECTIVE JUROR:  I like boating, I kind of

13     like, basically, to fix things, kid's cars and help

14     people out.

:58PM  15           THE COURT:  What do you fix?

16           PROSPECTIVE JUROR:  Well, whatever is broken

17     around the house, anything from shingles in the

18     roof, to putting in a water heater or, you know, I

19     constructed a house once.

:58PM  20           THE COURT:  You get a lot of requests for

21     help?

22           PROSPECTIVE JUROR:  I try to stay in the

23     loop.  I usually get to contract quite a bit with

24     your girlfriend and stuff.  Right now I'm helping

:58PM  25     out my girlfriend.

Voir Dire                                    117

1    THE COURT:  Where do you get your news from?

2    PROSPECTIVE JUROR:  Usually in the morning I

3    listen to NPR on my way to work.

4    THE COURT:  Okay.

5    PROSPECTIVE JUROR:  And then I'll glance at

6    the Internet, I don't find much use with that, but

7    just some business cites I put up on the Internet so

8    I kind of get some basic idea what's going on, Wall

9    Street Journal, something like that.  But I don't

10   subscribe to a newspaper, so just keep it general.

11   THE COURT:  Do you go on the web?  Do you use

12   the Internet?

13   PROSPECTIVE JUROR:  Yes.

14   THE COURT:  Now, do you do that in a

15   systematic way, like every day you check the news?

16   PROSPECTIVE JUROR:  Yeah, I pretty much check

17   my e-mail every other day or so.

18   THE COURT:  I get the impression from the

19   questions that you answered that you didn't follow

20   this case closely in the media, you knew a little

21   about it but not a lot, is that correct?

22   PROSPECTIVE JUROR:  That's correct, Your

23   Honor.

24   THE COURT:  And then in one question, you

25   were asked about media and a variety of other

1    things, you gave the answer, your words were:

2        "History will reveal itself."

3        What did you mean by that?

4        PROSPECTIVE JUROR:  Well, when you look

5    through history, you see people like Ulysses S.

6    Grant, or something like that, of that nature, and,

7    you know, they paint a sore picture of him, and

8    there's a new book out that kind of exonerates him.

9    There was opinions written at the time by Mary Todd

10   Lincoln, and Lincoln himself, that there was a point

11   in time they didn't think he was a very good

12   general, and as time went on he came to be a better

13   general.  I can't say anything right off the top of

14   my head that --

15       THE COURT:  Well, let me ask it to you this

16   way, you're basically saying that opinions change as

17   you hear more evidence?

18       PROSPECTIVE JUROR:  Yes, sir.

19       THE COURT:  Okay.

20       Then one last question I have for you.  You

21   were asked about what you think of the testimony of

22   a law enforcement officer, a police officer, FBI

23   agent, and you said that your personal experience

24   about law enforcement is that they tend to side with

25   the plaintiffs, which I think by this you meant the

 1  people who are bringing the charge?

 2          PROSPECTIVE JUROR:  Yes, Your Honor.

 3          THE COURT:  What the law requires you to do

 4  is to judge their testimony the way you judge the

 5  testimony of anybody else and not to start out with

 6  the proposition that they're going to favor one side

 7  and not to start out with the proposition that

 8  they're public officials or well known law

 9  enforcement officials and wouldn't lie, you have to

10  start out treating them like everybody else, can you

11  do that and will you do that?

12          PROSPECTIVE JUROR:  Yes, Your Honor, I will.

13          THE COURT:  Thank you.

14          PROSPECTIVE JUROR:  Thank you.

15     (Prospective juror exited the courtroom, and the

16      following proceedings were had herein:)

17          THE COURT:  We're going to take a short

18  break.  We're not going to break in the courtroom,

19  but don't bring out another juror for the moment.

20          Counsel, you want to approach the lectern.

21     (Brief pause).

22          THE COURT:  We are going to do one thing at

23  the side, but you may have noticed I passed over

24  112.  I passed over 112 because at the beginning of

25  the questionnaire it appears that he is filling out

1    the questionnaire and then there's a period of time
2    where he starts answering one question a page or two
3    here and there, and then he starts getting many
4    pages where no questions are answered, and then a
5    few here and there.  When he was about to be called,
6    I asked the marshal to ask him to fill the rest of
7    the questions out and he stated to the marshal, to
8    my judicial assistant, that he didn't answer the
9    questions because he didn't understand the
10   questions, and that's usually the explanation for
11   something like this.  It was, clearly, the
12   explanation for the witness's English language
13   skills were challenged, the same thing.  I propose
14   to exclude him.  I propose it to you now partly
15   because I think that if I bring him out here, it
16   will cause needless embarrassment.
17           MR. SOROSKY:  We have no objection.
18           THE COURT:  Okay, then I'm excluding him.
19           And then one thing I want to deal with you is
20   at the side, at sidebar.
21       (Proceedings heard at sidebar on the record.)
22           THE COURT:  This is the criminal history
23   reports.
24           Originally when 123, certain turned up, we
25   look at it and it's a no-match.  The social security

1  numbers match but the names didn't, the gender
2  didn't, and the birth date didn't.  So that's a
3  no-match.
4          105, who didn't show up, has many arrests and
5  some convictions.
6          108, when she was very young, had what looks
7  to me a shoplifting conviction.  We're talking about
8  30 years ago, but she's gone, anyway.
9          109 he also didn't show up, he also has a
10 history.
11         None of these are major, but they are what
12 they are.
13         111, who didn't show up, has an arrest for
14 scalping.  You don't see that too often.
15         The man we just excused has a Cannabis
16 conviction and something else, I just can't read my
17 writing, but he had two of them.
18         MS. HAMILTON:  119, Your Honor?
19         THE COURT:  Yeah.
20         The lawyer, 115, I believe referred to a
21 conviction he had.  There's another thing that shows
22 up on his sheet, but I'm pretty sure it's not a
23 match, partly because it was in Los Angeles.  But if
24 necessary, we'll ask him about it.  It looked to me
25 like a street prostitution sting because it said

1  "prostitution," but I have a feeling it's not him

2  because of where it is, but it's something you

3  should make note of and we have to ask him about.

4         The 119, who we just had, actually revealed,

5  what he said about his criminal history is what the

6  record sheet shows.

7         MR. SOROSKY:  Now, previously you said the

8  man you just excused --

9         THE COURT:  Not excused.  It's 119, the last

10 one I talked to.

11        MR. SOROSKY:  So what Ms. Hamilton referred

12 to I think --

13        MS. HAMILTON:  The two Cannibis convictions

14 were for 112.

15        THE COURT:  Yeah, 112.

16        MR. SOROSKY:  All right.

17        THE COURT:  But what 119 just talked about

18 are the two things, the anger management issue and

19 the DUI, both appear on the sheet and that's all

20 that appears on the sheet.

21        I have one that comes up for 122, may or may

22 not be him, 1975, a mall theft, and then '92 --

23 well, what I got on 122 is a possible, the name and

24 social security number match, not too much of date

25 of birth.  we have for him a 1975 arrest date,

1  Hoffman Estates, felony theft, disposition

2  dismissed.  We have a possession of Cannabis case in

3  1992, Zion Police Department, paid the fine and then

4  had the usual six months of supervision and then

5  that charge gets erased for purposes of the state

6  stuff.  That's his sheet, but we're not absolutely

7  sure because we have to confirm date of birth.

8        And then 128, this looks fairly solid part of

9  it is because it's an unusual name, 128 is an

10 unusual name.  What I got here is 1982 CPD, theft,

11 charge dismissed.  2007, River Grove, DUI.  Now, I

12 haven't checked what he put on this form, so we'll

13 do that, too.

14        The reason I've told this to you now is if I

15 forget to do it, you'll remind me.

16        So that's basically where we are.  We've also

17 got a couple here who -- there's one other --

18 Something came up on 121 on criminal history, but

19 the name makes no sense.  It's, I think, derived out

20 of what sounds like the index that they have, but

21 we're going to try to nail it down, see if it's any

22 better.

23        So that's basically where we are and I think

24 we'll go on a little further.  I should be able to

25 get through the 40 we have today, if we don't, we'll

1  have some of them come back.  We have made

2  arrangements, should we wind up with too few jurors,

3  to provide more.  And I think we're okay because the

4  only thing left to hustle on is the criminal checks.

5         So that's that.  Okay?  Now, does anybody

6  want a real break or should we just continue?

7         MR. SOROSKY:  No.

8         MR. SCHAR:  Up to Your Honor.

9         THE COURT:  We'll do a few more.

10     (Proceedings resumed in open court:)

11         THE COURT:  Okay.

12     (Prospective juror entered the courtroom, and

13      the following proceedings were had herein:)

14         THE COURT:  Give me just a minute.

15         PROSPECTIVE JUROR:  (Nodding).

16     (Brief pause).

17         THE COURT:  Good afternoon, 120.

18         PROSPECTIVE JUROR:  Good afternoon.

19         THE COURT:  I am not going to ask you each

20  question, I'm just going to go over parts of it,

21  since you've already written it down.

22         PROSPECTIVE JUROR:  Okay.

23         THE COURT:  What do you do at work?

24         PROSPECTIVE JUROR:  I administer a pension

25  plan, I oversee the daily operations.  Our client

:14PM

:15PM

:16PM

1    has outsourced their pension administration to us

2    and I work with the client and our internal

3    departments to make sure everything runs smoothly.

4         THE COURT:  And is that, basically, you got

5    this one plan and you're the administrator of it?

6         PROSPECTIVE JUROR:  Yes.

7         THE COURT:  And how long have you had that

8    one?

9         PROSPECTIVE JUROR:  5 years.

10        THE COURT:  And this is to a pension as

11   opposed to health and welfare?

12        PROSPECTIVE JUROR:  Also administer health

13   and welfare, as well as 401 K, but I'm aligned to

14   the pension team, so a little bit of the other two

15   as well.

16        THE COURT:  And how long have you been doing

17   that kind of work?

18        PROSPECTIVE JUROR:  7 and a half years.  I

19   worked for another company for a year and a half

20   prior to that doing similar work.

21        THE COURT:  How did you get into benefits

22   analysis?

23        PROSPECTIVE JUROR:  Out of college I got a

24   job as an administrative assistant and at a company

25   that did just that and then became an analyst onto

1  an operations manager.

2        THE COURT:  And the kind of work your spouse

3  does?

4        PROSPECTIVE JUROR:  He's a financial

5  adviser/insurance agent.

6        THE COURT:  So the two of you spend a lot of

7  time with numbers?

8        PROSPECTIVE JUROR:  Somewhat.  We don't talk

9  about it, but yes, a little bit.

10        THE COURT:  And your father owns his own

11  business?

12        PROSPECTIVE JUROR:  Yes.

13        THE COURT:  How large a business is that?

14        PROSPECTIVE JUROR:  A small business.

15        THE COURT:  Small business.

16        You were subpoenaed over an auto accident?

17        PROSPECTIVE JUROR:  Yes.

18        THE COURT:  Did you actually go to court and

19  testify?

20        PROSPECTIVE JUROR:  I went to court and a

21  lawyer talked to me in the hallway and dismissed me.

22  I just had to basically say I saw what happened.

23        THE COURT:  You were asked about various

24  opinions you had about various things, and one

25  answer was indifferent, and I do want to confirm

1  with you that you are entitled to be indifferent,

2  you don't have to have an opinion.

3          PROSPECTIVE JUROR:  Okay.

4          THE COURT:  And also with respect to

5  questions about do you believe public officials do

6  X, Y or Z, your answer was:

7

8      "Some may; however, it's a blanket statement

9       that would not apply to all."

10          and you gave that statement two or three

11  times.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  That was your answer?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  That's good, because that's what

16  a juror is supposed to do, decide them one at a

17  time.

18          Your primary leisure activities hobbies and

19  interests?

20          PROSPECTIVE JUROR:  I'm thinking back to what

21  I put.  Spending time --

22          THE COURT:  Want me to tell you?

23          PROSPECTIVE JUROR:  Sure.

24          THE COURT:  Spending time with my kids,

25  running, cleaning, and shopping.

Voir Dire                                                    128

1          PROSPECTIVE JUROR:  That --

2          THE COURT:  The reason I ask is, the question

3    was "primary leisure activities hobbies and

4    interests," and I were in your position I would not

5    have put "cleaning."

6          PROSPECTIVE JUROR:  That's more of a

7    necessity, but takes up a lot of my time.

8          THE COURT:  Uh-huh.  Where do you get your

9    news from, if you get it at all?

10         PROSPECTIVE JUROR:  If I'm at work on lunch,

11   I'll go on cnn.com or MSNBC maybe once or twice a

12   week, that's about it.

13         THE COURT:  And you contribute something to

14   Children's Memorial, but you did that for the 5 K

15   runs?

16         PROSPECTIVE JUROR:  Correct.

17         THE COURT:  You think you can be a fair and

18   impartial juror?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  That's all I have right now.

21   Thank you.

22      (Prospective juror exited the courtroom, and the

23       following proceedings were had herein:)

24      (Brief pause).

25      (Prospective juror entered the courtroom, and

:20PM (line 5)
:20PM (line 10)
:20PM (line 15)
:21PM (line 20)

1        the following proceedings were had herein:)

2            THE COURT:  Hi.  You're 121?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Your major area of study was

5    chemical engineering?

6            PROSPECTIVE JUROR:  Yes, it was.

7            THE COURT:  And now you are a process

8    engineer?

9            PROSPECTIVE JUROR:  Yes, a process chemical

10   engineer.

11           THE COURT:  Are they different?

12           PROSPECTIVE JUROR:  No, it's chemical

13   engineer can do several different things and one of

14   them is a process engineer.

15           THE COURT:  And it says you evaluate,

16   develop, design and implement products that improve

17   safety environment or profitability?

18           PROSPECTIVE JUROR:  Yes, that's right.

19           THE COURT:  So, basically, you're a

20   development person with respect to the products?

21           PROSPECTIVE JUROR:  Well, it's not like a

22   research-type job.  It's industrial-type job where,

23   you know, we just try to make the plant safer, more

24   environmentally friendly or more profitable.

25           THE COURT:  So you're looking for improvement

1  as opposed to just continuing operations?

2        PROSPECTIVE JUROR:  That's correct.

3        THE COURT:  Who was the close friend or

4  relative who works at Wright-Patterson?

5        PROSPECTIVE JUROR:  That's my son.

6        THE COURT:  Okay.  Another engineer?

7        PROSPECTIVE JUROR:  He is.

8        THE COURT:  Same field or a different one?

9        PROSPECTIVE JUROR:  He's in general

10 engineering.

11       THE COURT:  Okay.  Is it a different son who

12 is in the Air Force?

13       PROSPECTIVE JUROR:  It's the same son.

14       THE COURT:  Same son.

15       You wrote a letter because you didn't want

16 the committee of national take over the EJ & E?

17       PROSPECTIVE JUROR:  I did.

18       THE COURT:  For some reason, I didn't ever

19 hear the end of it.  Did you win it or did you lose?

20       PROSPECTIVE JUROR:  We lost.

21       THE COURT:  Okay.  Now, in retrospect, was it

22 a terrible loss, was it as bad as you expected, or

23 could everybody get over it?

24       PROSPECTIVE JUROR:  Well, I mean, you gotta

25 get over it, but, you know, it's just the beginning,

1  as the economy improves there will be more trains,

2  it'll be more of a problem for the people that live

3  around the tracks.

4              THE COURT:  You give to United Way?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  What is APA?

7              PROSPECTIVE JUROR:  Oh, it's my wife's thing.

8  It's American Psychology Association, something like

9  that.

10             THE COURT:  Anything else, do you give to

11 anything else?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  You were asked an opinion about

14 political fundraising and you said:

15       "The more you contribute, the more likely your

16         candidate will help push your agenda."

17              Have you yourself donated to political

18 campaigns?

19             PROSPECTIVE JUROR:  No, I have not.

20 Although, on income taxes, I think years ago, I

21 probably donated a couple of bucks to the

22 presidential election, but I haven't done that for

23 years.

24             THE COURT:  And then you were asked some

25 questions about politicians putting their own

:24PM

:25PM

:25PM

:25PM

:26PM

1    interests above those of others, and your answer to

2    that series of questions."

3        "I think some do, and I think it's totally

4         wrong."

5            I'm assuming that you understand because

6    some do, not all do?

7            PROSPECTIVE JUROR:  I do.

8            THE COURT:  Is that correct?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Secondly, it's kind of an

11   open-ended question, and you talked about something

12   being wrong.  What's at stake in this case is not

13   something which may or may not be morally wrong.

14   What you're going to be asked to decide is whether

15   the government proved that a violation of a federal

16   criminal law occurred, and that's a different

17   judgment from saying that something is wrong because

18   there are all kinds of wrong things that aren't

19   crimes, do understand that?

20           PROSPECTIVE JUROR:  Yes, I do.

21           THE COURT:  And my concern is is that you

22   distinguish between the two, that you recognize if

23   something is proved that somebody did the wrong

24   thing is not the same thing as saying they committed

25   a crime, do you understand that?

1           PROSPECTIVE JUROR:  I do.

2           THE COURT:  Leisure activities?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  What's your favorites?

5           PROSPECTIVE JUROR:  My favorites are fishing,

6    that's the favorite, the others are kind of

7    secondary.

8           THE COURT:  Okay.  What are they.

9           PROSPECTIVE JUROR:  I like kayaking, I like

10   woodworking, I like working with stained glass, I

11   like racquetball.

12          THE COURT:  Right.  How days a year do you

13   fish?

14          PROSPECTIVE JUROR:  Well, probably -- I

15   probably fish a couple of weeks out of the year.

16          THE COURT:  Do you try to expand the time you

17   devote to fishing?

18          PROSPECTIVE JUROR:  Well, I came up from the

19   south where I fished much more than I do up here

20   now.  But yes, I mean, we have a little retention

21   pond behind our house so I'll go out there and throw

22   the line in every so often when I get the urge.

23          THE COURT:  What newspapers do you read?

24          PROSPECTIVE JUROR:  Well, the newspapers I

25   read are all on the Internet, and they're the Corpus

1   Christie Times, Lake Charles, American Press, the
2   Harold News and Chicago Trib.
3          THE COURT:  Can I assume because you read
4   papers from Lake Charles and Corpus Christie that
5   perhaps you lived there once?
6          PROSPECTIVE JUROR:  That's correct.
7          THE COURT:  Okay.  Are you like an avid news
8   person?  Do you, like, every day go out and see
9   what's up that day or do you just do it less
10  intently?
11         PROSPECTIVE JUROR:  Well, I usually just
12  scan, you know, scan CNN, Fox, and all the
13  newspapers that we just talked about, but, you know,
14  I don't get a newspaper and read every article in
15  there.
16         THE COURT:  And also with respect to the
17  trial that occurred in this case before, you said
18  you didn't really pay much attention to it except
19  for the final outcome, is that correct?
20         PROSPECTIVE JUROR:  That's correct.
21         THE COURT:  And you saw the defendant on a
22  television show and you think you saw his spouse on
23  another television show?
24         PROSPECTIVE JUROR:  Yes.
25         THE COURT:  Do you remember those clearly or

:28PM

:29PM

:29PM

:29PM

:30PM

1  do you just remember seeing them?

2          PROSPECTIVE JUROR:  I remember the one, the

3  Apprentice clearly, the other one was in passing.

4          THE COURT:  Okay.  And from what you've read,

5  it sounded to you like the defendant was lucky he

6  wasn't convicted?

7          PROSPECTIVE JUROR:  That's correct.

8          THE COURT:  Okay.  Now, the big question is,

9  you have to put all of those impressions aside if

10 you're going to be a juror in this case and you have

11 to decide based on the evidence you hear in this

12 courtroom and nothing else, no news reports, nothing

13 you heard before, no hearsay, no gossip, just what

14 happens in court.  Would you be able to do that?

15         PROSPECTIVE JUROR:  I mean, the first

16 impressions, you know, they stick with you, but I

17 think if I heard all the evidence, and so forth,

18 then I could definitely make a fair decision.

19         THE COURT:  Then there is another question

20 that you were asked, it says:

21     "The Court will instruct you that you may draw

22      no inference against the defendant from the

23      fact that he has been indicted."

24     And you said:

25     "I would certainly try not to, but there's,

1     obviously, good reason to indict, otherwise why

2     do it."

3          There's one thing that perhaps you don't

4     understand that I want to explain to you and that

5     is, an indictment is a decision made by a Grand

6     Jury, but the Grand Jury is not told they have to be

7     beyond a reasonable doubt that the person committed

8     the offense, all they have to do is believe that

9     there is probably cause, which is a much lesser

10    standard.  So it is perfectly possible that the

11    indictment doesn't mean anything in a criminal case

12    because to indict you don't need anywhere near the

13    proof you need to convict, do understand that?

14          PROSPECTIVE JUROR:  I do now.

15          THE COURT:  Okay.  Now, you also indicated

16    that you would like to be deferred because of

17    ongoing projects.  Would you describe the projects

18    to me, without revealing any trade secrets?

19          PROSPECTIVE JUROR:  Oh.  Well, we have in the

20    group that I am in, we have several different

21    projects going in.  Usually they're put in during

22    the turn-around time when the refinery is down where

23    they can get at the equipment and we developed these

24    projects so that during that window of time, they

25    can be put in.  Since then, since I had requested

:31PM

:32PM

:32PM

:32PM

:33PM

1 the deferral, you know, those are all set pretty

2 well, so I retracted that yesterday.

3          THE COURT:  Okay.  That's fine.  That's all I

4 wanted to know.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Thank you.

7          PROSPECTIVE JUROR:  Okay.  Thank you.

8     (Prospective juror exited the courtroom, and the

9      following proceedings were had herein:)

10    (Brief pause).

11    (Prospective juror entered the courtroom, and

12     the following proceedings were had herein:)

13          THE COURT:  Mr. 122?

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  You are now retired?

16          PROSPECTIVE JUROR:  Yes, sir.  First of

17 February of this year.

18          THE COURT:  And before that time you were

19 groundskeeper?

20          PROSPECTIVE JUROR:  Yes, sir; at a community

21 college.

22          THE COURT:  And, basically, everything that

23 was outdoor maintenance?

24          PROSPECTIVE JUROR:  Yes, sir.  The cutting

25 grass, planting flowers, taking care of shrubs,

1  trees, we did all the snow plowing, outside trash

2  removal, cleanup.  We also had a baseball team,

3  softball team, soccer team, that we worked on their

4  athletic fields.

5         THE COURT:  And did you have people that

6  worked for you?  Supervised people?

7         PROSPECTIVE JUROR:  Yes, I did supervise

8  people.

9         THE COURT:  How many?

10        PROSPECTIVE JUROR:  Usually one or two at a

11  time.  There were only four people in the

12  department.

13        THE COURT:  It also says here that you have

14  certain special training skills, which seem to be a

15  rather large number:  Welder, painter, small engine

16  repair, and woodworking.  Were those all related to

17  your job?

18        PROSPECTIVE JUROR:  Yes, sir.  We had to

19  maintain all our own equipment.  There were a lot of

20  outside things that we painted.  I learned how to

21  weld because of the necessity of keeping our

22  equipment in running order.  So it was a lot of

23  training through my job.

24        THE COURT:  Do you miss that work?

25        PROSPECTIVE JUROR:  Not yet.  I just retired

1   the 1st of February.  I'm really looking forward to

2   doing all the things that I did for the college in

3   my own home.

4                THE COURT:  Right.

5                You were in the Air Force?

6                PROSPECTIVE JUROR:  Yes, sir.

7                THE COURT:  What years?

8                PROSPECTIVE JUROR:  That was back in 1970 to

9   1974.

10               THE COURT:  What was your rank on discharge?

11               PROSPECTIVE JUROR:  Airmen First Class.

12               THE COURT:  Your home was broken into at one

13  time?

14               PROSPECTIVE JUROR:  At one time, yes, sir.

15               THE COURT:  Somebody was actually caught for

16  that?

17               PROSPECTIVE JUROR:  Yes, I caught the

18  gentleman coming out the back door, chased him to

19  his home, and then would not allow him out of the

20  house until the police got there.

21               THE COURT:  This is a neighbor?

22               PROSPECTIVE JUROR:  It was a child that lived

23  down the street from us, yes.  I wouldn't call him a

24  neighbor.  I wasn't familiar with him.

25               THE COURT:  Right.  Did you have to testify

1  at his hearing?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  And what did you think of the

4  result of the case?

5          PROSPECTIVE JUROR:  At first they let him go,

6  but when we got out in front of the courthouse he

7  followed me out and threatened me.  And there was a

8  police officer, plainclothes police officer,

9  standing next to me, when the young man left, the

10  man identified himself as a police officer and said

11  that, you know, if you go back inside and tell the

12  judge they'll re-arrest him and take care of him.

13          THE COURT:  And that's what happened?

14          PROSPECTIVE JUROR:  That's what I did, yes,

15  sir.  He then was sent to the juvenile detention.

16          THE COURT:  Do you belong to anything other

17  than AARP?

18          PROSPECTIVE JUROR:  Not right now, no.

19          THE COURT:  Have you ever belonged to other

20  stuff?  Have you ever been active in any other kind

21  of organization?

22          PROSPECTIVE JUROR:  I used to be active in my

23  union at work.

24          THE COURT:  Okay.  And you understand that

25  some public officials don't do the right thing and

1 some do, is that basically right?  Is that the way
2 you think?

3          PROSPECTIVE JUROR:  Yes, I understand that.
4 I don't think that's how everybody is, but ....

5          THE COURT:  Okay.  Your hobbies, now that you
6 have time for your hobbies?

7          PROSPECTIVE JUROR:  I'm an avid woodworker, I
8 like building all kinds of things:  Cabinets, book
9 cases, I've done coffee tables, end tables, things
10 for my grandchildren, bookshelves, pencil holders.
11 You know, it's a hobby I'm very much looking forward
12 to.

13          THE COURT:  You also listed Formula One
14 racing.

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  Where did that come from?

17          PROSPECTIVE JUROR:  I don't know.  I've been
18 Formula One IndyCar fan for 40 years and actually
19 paid to drive an IndyCar a couple of years ago.
20 Spent $1,500 at Joliet and was allowed to -- you
21 know, it was a real IndyCar.  I got up to 177 miles
22 an hour for three lapse.  It was the most exciting,
23 terrifying, thrilling, scary, experience that I've
24 ever had.  For me, being a fan, it was a dream come
25 true.  It was just unbelievable.

:39PM
:39PM
:40PM
:40PM
:40PM

Voir Dire                                             142

1      They put you in the car, tell you it will do
2  200, but you won't, and you follow a professional
3  driver.  They tell you to stay as close to the car
4  as you can.  Of course, the more you pay, the faster
5  you go, the more lapse.
6      But I paid to do 175, so when they brought me
7  in for the pit stop, they asked me, "well, you're
8  doing really good, what do you want to do," I says,
9  "well, I paid to do 175, so I want to do 175," and
10 the girl said, "okay, follow me and I'll take you to
11 175" and she took me to 177.
12     THE COURT:  Is it proper for me to conclude
13 that you think it was worth every penny?
14     PROSPECTIVE JUROR:  Every penny and more.
15     I worked a lot of overtime for that money,
16 though.
17     THE COURT:  Yeah.  Anything you like to read?
18 Magazines, newspapers?
19     PROSPECTIVE JUROR:  I have a subscription to
20 National Geographic and have a collection of about
21 70 years worth of National Geographic, that's my
22 main reading.
23     THE COURT:  Okay.  Do you get your news from
24 anywhere in particular?
25     PROSPECTIVE JUROR:  Channel 7.

Voir Dire                                    143

1          THE COURT:  What?

2          PROSPECTIVE JUROR:  Channel 7.

3          THE COURT:  Okay.  And your pension is with

4    the Illinois State University's retirement system?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Now, you did, obviously, hear a

7    little about this case.

8          PROSPECTIVE JUROR:  Yes, I heard about it.  I

9    did not follow it, but I heard about it.

10         THE COURT:  Did you ever arrive at any firm

11   opinions, one way or the other, as to how the case

12   should come out?

13         PROSPECTIVE JUROR:  No, because I never

14   really heard enough to satisfy myself to come to a

15   conclusion, you know.

16         THE COURT:  Okay.  Do you think you can be a

17   fair juror in this case?

18         PROSPECTIVE JUROR:  Yes, I do, especially

19   after your speech yesterday morning.

20         THE COURT:  Thank you.

21         PROSPECTIVE JUROR:  You're welcome.

22      (Prospective juror exited the courtroom, and the

23       following proceedings were had herein:)

24      (Brief pause).

25      (Prospective juror entered the courtroom, and

1            the following proceedings were had herein:)

2            THE COURT:  I'm not ignoring you, I'm just

3    getting papers in order.

4            PROSPECTIVE JUROR:  Yes.

5         (Brief pause).

:44PM

6            THE COURT:  You are 124?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.  You work for the food

9    service for about 20 years?

10           PROSPECTIVE JUROR:  Yes.

:45PM

11           THE COURT:  Did you work for anybody else

12   before that?

13           PROSPECTIVE JUROR:  Barbara Green Company

14   many, many years ago for a short time.

15           THE COURT:  Okay.  You volunteer at the

:45PM

16   elementary school listening to children read?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  First through fourth grade?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Still do that?

:45PM

21           PROSPECTIVE JUROR:  Third grade right now,

22   but I have done first through fourth grade.

23           THE COURT:  Now, what do you actually do when

24   you do that?

25           PROSPECTIVE JUROR:  Pick out books and then

:45PM

1  go out in the hallway and call the children out when

2  it's time and listen to them read.  And we talk, I

3  ask them questions about things in the book, and

4  their families sometimes, and we talk about things,

5  they seem to enjoy that.

6          THE COURT:  Right.  And so you're teaching

7  them in, among other things, to have a conversation?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  You like that work?

10         PROSPECTIVE JUROR:  I do; very much.

11         THE COURT:  Your husband has his own

12 business?

13         PROSPECTIVE JUROR:  He did, yes.  He's passed

14 away now.

15         THE COURT:  He was a carpenter?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  Your husband was in the Navy?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And your father was in the Army?

20         PROSPECTIVE JUROR:  No, he was in the Navy

21 also.

22         THE COURT:  In the Navy, too.

23         PROSPECTIVE JUROR:  Uh-huh.

24         THE COURT:  I take it that the experience of

25 one of your sons in high school occurred a long,

:45PM

:46PM

:46PM

:46PM

:47PM

1  long time ago?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  And you basically consulted with

4  a lawyer over basically routine stuff, is that it?

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  You served on a jury in Kane

7  County?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Did the jury reach a verdict?

10       PROSPECTIVE JUROR:  Yes, we did.  But it was

11 quite a long time ago, sir, I really don't remember

12 all the details.

13       THE COURT:  Good, because I'm not going to

14 ask you.

15       PROSPECTIVE JUROR:  Okay.

16       THE COURT:  There are some things that you

17 donate either money or time or services to, what are

18 those?

19       PROSPECTIVE JUROR:  Excuse me?

20       THE COURT:  The things you give time or money

21 to, other than the school.

22       PROSPECTIVE JUROR:  Religious organizations

23 and church, VFW, Paralyzed Veterans, that type of

24 thing.

25       THE COURT:  Right.  Is there any one

1  particular activity you devote the most to?

2       PROSPECTIVE JUROR:  Probably church.

3       THE COURT:  Okay.  And you have done some

4  work supporting people campaigning for elected

5  offices, is that correct?

6       PROSPECTIVE JUROR:  Yes.

7       THE COURT:  You've tried to raise funds for

8  some?

9       PROSPECTIVE JUROR:  Yes.

10      THE COURT:  And you've attended fundraisers

11 for others?

12      PROSPECTIVE JUROR:  Only when I was working.

13      THE COURT:  Okay.  Any particular reason you

14 do that?

15      PROSPECTIVE JUROR:  I was just asked to and I

16 had time and was glad to do it.

17      THE COURT:  Okay.  Did you have some personal

18 knowledge with the individuals you were campaigning

19 for?

20      PROSPECTIVE JUROR:  Not really.  Chris Lauzen

21 was our state in our area at that time and I had met

22 his wife and his children, and so when he needed

23 somebody, I said I would do that.

24      THE COURT:  Yea, it's basically because you

25 had a relationship with his family before then?

1          PROSPECTIVE JUROR:  Uh-huh.

2          THE COURT:  Okay.  And from one of the

3    questions you answered, I think it's your view that,

4    in some cases but not all, elected officials

:50PM  5    sometimes consider their own personal gain rather

6    than the good of the public as a whole, am I reading

7    that correctly?

8          PROSPECTIVE JUROR:  I think so; sometimes.

9          THE COURT:  But some but not all, right?

:50PM  10         PROSPECTIVE JUROR:  Yeah.

11         THE COURT:  I ask you that because one of the

12   things you have to do in this case is decide if a

13   specific elected official was proven to do certain

14   specific things which violated the law.  You're not

:51PM  15   going to be asked about all politicians or

16   politicians in general, and it seems that you

17   understood that clearly.

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  Good.

:51PM  20         Where do you get your news from?

21         PROSPECTIVE JUROR:  The local newspaper and

22   mostly TV, probably.  Don't watch a lot of it,

23   though.

24         THE COURT:  Listen to a lot of radio?

:51PM  25         PROSPECTIVE JUROR:  Just classical music, for

1  the most part.

2          THE COURT:  It's mostly music you listen to

3  on the radio?

4          PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  Now, I take it from the way you

6  answered a lot of questions is, you didn't pay much

7  attention to this case the first time around.

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And you haven't made up your

10 mind --

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  -- with what happened in this

13 case, is that correct?

14         PROSPECTIVE JUROR:  That's correct.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  Okay.

17      (Prospective juror exited the courtroom, and the

18       following proceedings were had herein:)

19      (Brief pause).

20      (Prospective juror entered the courtroom, and

21       the following proceedings were had herein:)

22         THE COURT:  Hello, 125.

23         PROSPECTIVE JUROR:  Hello.

24         THE COURT:  What do you do now?

25         PROSPECTIVE JUROR:  I'm a computer technician

:51PM

:52PM

:52PM

:53PM

1  for a junior college.

2      THE COURT:  And how long have you been doing

3  that?

4      PROSPECTIVE JUROR:  23 years.

5      THE COURT:  Was this the kind of thing you

6  were always interested in?

7      PROSPECTIVE JUROR:  Pretty much.

8      THE COURT:  You studied it in college?

9      PROSPECTIVE JUROR:  Yes.

10     THE COURT:  And you want to go to school to

11 learn a lot more about photography?

12     PROSPECTIVE JUROR:  I just do anything that's

13 of personal interest.  Right now I'm studying

14 photography.

15     THE COURT:  Studying what?

16     PROSPECTIVE JUROR:  Studying photography.

17     THE COURT:  Oh, okay.

18     You supervise people at work?

19     PROSPECTIVE JUROR:  Yes, I do.

20     THE COURT:  How many?

21     PROSPECTIVE JUROR:  Four.

22     THE COURT:  What do you do outside of work?

23     PROSPECTIVE JUROR:  I horseback ride, I hike,

24 I walk, kayak; mostly outdoor stuff.

25     THE COURT:  It says here you do stuff with

1 4 H.

2          PROSPECTIVE JUROR:  I did.  I was a 4 H

3 leader for 10 years.

4          THE COURT:  It also says here that you take a

5 lot of classes in various things?

6          PROSPECTIVE JUROR:  Yes, I do.

7          THE COURT:  You do that out of curiosity or

8 for some kind of purpose?

9          PROSPECTIVE JUROR:  Oh, no, just out of

10 curiosity.

11          THE COURT:  So you took a course in welding

12 because you like to know how to weld?

13          PROSPECTIVE JUROR:  I took a course in

14 welding so that I can learn to weld horseshoes

15 together.

16          THE COURT:  Right.  And have you used the

17 skill?

18          PROSPECTIVE JUROR:  I can weld horseshoes

19 together.

20          THE COURT:  Right.  Do you have your own

21 torch or do you have to rent?

22          PROSPECTIVE JUROR:  No, I have my own torch.

23          THE COURT:  Okay.  You have a relative in the

24 military?

25          PROSPECTIVE JUROR:  Yes, I do.

1          THE COURT:  What relative?

2          PROSPECTIVE JUROR:  She's a niece.

3          THE COURT:  She's in the Air Force?

4          PROSPECTIVE JUROR:  Yes, she is.

:55PM  5          THE COURT:  How long has she been there?

6          PROSPECTIVE JUROR:  She signed up for her

7  second term a year and a half ago.  So probably

8  8 years.

9          THE COURT:  And she's now stationed in the

:56PM  10  U.S.?

11          PROSPECTIVE JUROR:  Yes, she is.

12          THE COURT:  But previously she was overseas?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  You consulted a lawyer once for

:56PM  15  real estate?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Consult a lawyer for any other

18  reason?

19          PROSPECTIVE JUROR:  No.

:56PM  20          THE COURT:  I take it you haven't had much

21  experience with law enforcement except for some

22  thefts you reported to the college police?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  And you were interviewed by FBI

:56PM  25  with respect to a security clearance?

Voir Dire                                             153

1       PROSPECTIVE JUROR:  Right.

2       THE COURT:  Somebody else's security?

3       PROSPECTIVE JUROR:  Somebody else's security.

4       THE COURT:  And what do you belong?

5       PROSPECTIVE JUROR:  I belong to the Moose.

6       THE COURT:  Anything else?

7       PROSPECTIVE JUROR:  ASC.

8       THE COURT:  The list is longer for you later

9  in the -- the last time I looked it was welding,

10 computers, bartending, photography, I think you

11 mentioned the horseback riding before too, but now

12 I've got biking, walking, kayaking, quilting, and

13 guitar.

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  Okay.  Now, when you start one of

16 these things do you have to, like, have to give

17 something else up?

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  Where do you get your news from?

20      PROSPECTIVE JUROR:  I don't get a lot of it,

21 but maybe TV in the mornings find out what the

22 weather is like.

23      THE COURT:  So you're not like a devoted

24 reader of the news?

25      PROSPECTIVE JUROR:  I don't have time.

1          THE COURT:  Okay.  I believe you.

2          Favorite websites?

3          PROSPECTIVE JUROR:  Favorite website?

4  Maybe -- I do a lot of Microsoft because I work in

5  the field, so Microsoft technology, some of the

6  Apple iTunes.

7          THE COURT:  I'm getting the impression from

8  reading the answers to the rest of the questions

9  that you have no firm opinions at all on how this

10  trial should come out, is that right?

11          PROSPECTIVE JUROR:  That's right.

12          THE COURT:  And you understand that the

13  judgment you're going to make depends entirely on

14  what you hear in the courtroom, nothing that

15  happened before, nothing that happens outside the

16  courtroom, all you can consider is what's in the

17  courtroom itself, do you understand that?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Thanks.

20      (Prospective juror exited the courtroom, and the

21       following proceedings were had herein:)

22      (Brief pause).

23      (Prospective juror entered the courtroom, and

24       the following proceedings were had herein:)

25          THE COURT:  You're 126?

:58PM
:59PM
:59PM
:00PM

1          PROSPECTIVE JUROR:  I am.

2          THE COURT:  What do you do for a living?

3          PROSPECTIVE JUROR:  I'm an associate partner

4 for a branch strategy and marketing consulting firm.

:00PM    5          THE COURT:  Old firm, new firm?

6          PROSPECTIVE JUROR:  About 18 years old.

7 About 160 people.

8          THE COURT:  How long have you been there?

9          PROSPECTIVE JUROR:  3 years.

:00PM   10          THE COURT:  Is that basically the kind of

11 work you've done for a long time?

12          PROSPECTIVE JUROR:  For the last 10 years,

13 and then I was in branch management for major CPG

14 company, consumer packaged goods company, for

:00PM   15 15 years prior to that.

16          THE COURT:  And, according to this, you took

17 your M.B.A. in marketing?

18          PROSPECTIVE JUROR:  I did, from the

19 University of San Francisco.

:00PM   20          THE COURT:  So you knew from the beginning

21 that this is what you wanted to do?

22          PROSPECTIVE JUROR:  I did.

23          THE COURT:  Okay.

24          Ever hire any lawyers for any reason?

:01PM   25          PROSPECTIVE JUROR:  No, other than just real

1    estate transactions and my will.

2           THE COURT:  Okay.  Ever had any dealings at

3    all yourself with lawsuits?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  I take it from reading some of

6    the answers that you're not an unstinting admirer of

7    elected officials, is that correct?

8           PROSPECTIVE JUROR:  That's a fair assessment.

9           THE COURT:  All right.  What I want to make

10   sure you understand, and I'm actually sort of sure

11   you do now, that nobody is going to ask you here to

12   voice an opinion as a juror on public officials in

13   general or, for that matter, even the particular

14   public official who is in this case as to whether he

15   did a good job or didn't do a good job.

16          PROSPECTIVE JUROR:  Right.

17          THE COURT:  You're just going to have to

18   decide whether the government has proved beyond a

19   reasonable doubt whether or not he's committed an

20   offense, a violation of federal law, do you

21   understand that?

22          PROSPECTIVE JUROR:  I do.

23          THE COURT:  Are you an avid news reader?

24          PROSPECTIVE JUROR:  A lot of magazines,

25   newspapers.  I travel a lot, so I try to keep up on

 1  it.
 2          THE COURT:  Now, are you doing that for news
 3  or for exercises in --
 4          PROSPECTIVE JUROR:  Both; but primarily news.
 5          THE COURT:  Okay.  How do you get business?
 6          PROSPECTIVE JUROR:  Through networks of my
 7  own and other partners and just referrals.  I mean,
 8  we're a fairly well-known company, so a lot of
 9  things just come over the transit and then we get
10  parts of RP's that we participate in and they choose
11  us over other firms.
12          THE COURT:  I'm going to ask you in a second
13  about your current work and your assignments, but
14  before I do that, I originally started by asking you
15  the question, saying that I didn't think that you
16  were a great admirer of elected officials, and I was
17  reminded when I re-read your questionnaire that you
18  are particularly not a great admirer of the
19  particular public official whose case we're talking
20  about today, is that also true?
21          PROSPECTIVE JUROR:  Yes.
22          THE COURT:  And the same question I asked you
23  before applies again:  Do you understand that you're
24  not going to be asked to decide whether you approve
25  or disapprove of the defendant here or that you like

1  him or don't like him.

2          PROSPECTIVE JUROR:  I completely understand.

3          THE COURT:  Okay.  You want to describe the

4  work you're currently doing?

5          PROSPECTIVE JUROR:  I'm working with a

6  Fortune 500 company where we're working with four of

7  their different divisions doing a making competency

8  assessment and now we're starting to kick out

9  pilots, we're actually working with their teams to

10 develop the capability against their current

11 business issues, whether that's a consumer

12 segmentation study or a positioning study for one of

13 their brands, et cetera.

14         So it's scheduled to go through the end of

15 the year.  We're four months into it.  I'm the lead

16 partner, from a delivery perspective, with my team.

17 And it's pretty critical, so that's why I raised it

18 when I got the summons a month or so ago.

19         THE COURT:  And how do you actually do that,

20 when you talk about testing?

21         PROSPECTIVE JUROR:  We actually work with a

22 research company and we recruit, in some cases, 1200

23 consumers and then ask them a battery of different

24 questions about the brands, the competitions, what

25 their needs are, what their attitudes are, what

1   their beliefs or behaviors for this particular

2   category, which happens to be the boating industry,

3   and then from that we develop target consumers that

4   we think are the most profitable for their bands to

5   go after or they be very targeted for their

6   marketing efforts.

7           THE COURT:  Now, when you interview all these

8   people, particularly large numbers of them, is this

9   based on the premise that you can trust what they

10  say to you or do you have other ways to test the

11  legitimacy of their answers?

12          PROSPECTIVE JUROR:  Number one, you've got

13  questions that you ask if you want them in or out of

14  the survey, similar to what we're doing.  And then

15  there's also methods within the research itself that

16  you can get to not only what they state is

17  important, but based on certain questions you ask,

18  you can actually understand the kind of derived

19  importance as well, their true motivations.  So even

20  if they're not necessarily telling the truth,

21  there's a way to get to the answer.

22          THE COURT:  Thank you.

23          PROSPECTIVE JUROR:  You're welcome.

24      (Prospective juror exited the courtroom, and the

25       following proceedings were had herein:)

1      (Brief pause).

2          THE COURT:  Bring in 127.

3          We may stop after that, but we'll see.

4      (Brief pause).

:07PM 5    (Prospective juror entered the courtroom, and

6       the following proceedings were had herein:)

7          THE COURT:  127?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Where do you work?

:08PM 10       PROSPECTIVE JUROR:  Nolls Electronics build

11 parts for cell phones.

12         THE COURT:  And what do you do for them?

13         PROSPECTIVE JUROR:  We build parts for

14 hearing aids and mikes for telephones, cell phones.

:08PM 15 I work in the R & D, research and development.

16         THE COURT:  And how many people are in that

17 department?

18         PROSPECTIVE JUROR:  In just my department?

19         THE COURT:  Yeah.

:08PM 20       PROSPECTIVE JUROR:  We have like six girls

21 and then there's a lot of engineers.

22         THE COURT:  And how long have you worked for

23 them?

24         PROSPECTIVE JUROR:  A little over 30 years.

:08PM 25       THE COURT:  Has it always been an R & D?

Voir Dire                                     161

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  How did you start with them?

3      PROSPECTIVE JUROR:  Pardon me?

4      THE COURT:  How did you start with them?

5      PROSPECTIVE JUROR:  Oh, back then it was

6  assembly lines and a bunch of, you know, you did

7  individual works.

8      THE COURT:  And then you got jobs, new jobs?

9      PROSPECTIVE JUROR:  Well, a lot of the jobs

10  they shipped over to China, and then they kept the

11  R & D and they kept me.  They let a lot of people

12  go.

13      THE COURT:  In terms of employees, how many

14  fewer employees, in percentage, do they have now

15  than they used to have?

16      PROSPECTIVE JUROR:  I'm not sure percentage,

17  but I can tell you numbers.

18      THE COURT:  It's a lot of people?

19      PROSPECTIVE JUROR:  Yeah; there was probably

20  over 2,000 people that worked there.

21      THE COURT:  You have a niece who's a lawyer?

22      PROSPECTIVE JUROR:  Yes.

23      THE COURT:  You know what kind of law she

24  practices?

25      PROSPECTIVE JUROR:  No, I don't.

1          THE COURT:  Where does she practice?

2          PROSPECTIVE JUROR:  She was here in Chicago

3   but now she's down in Florida.

4          THE COURT:  Okay.  You've had relatives in

5   the military?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  A lot?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Any of them particularly close to

10  you?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  You consulted a lawyer once about

13  the accident?

14         PROSPECTIVE JUROR:  Yeah, my sons.

15         THE COURT:  Was anything ever done about

16  that?

17         PROSPECTIVE JUROR:  Yes, what it was with his

18  accident, he was in the hospital for over a week, or

19  9 days, and we were having money problems, so that's

20  what it was about.

21         THE COURT:  Okay.  Did the lawyer help you?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Do you belong to any organization

24  of any kind?

25         PROSPECTIVE JUROR:  Just the Moose.

1          THE COURT:  You indicate that it would be

2  difficult for you to go into this case with an open

3  mind.

4          PROSPECTIVE JUROR:  Yeah.

5          THE COURT:  Did you follow the case very

6  closely in the beginning?

7          PROSPECTIVE JUROR:  No, just -- just on the

8  news when it would come on the news.

9          THE COURT:  Do you know what we're asking you

10  to do is not just keep a mind open --

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  -- but basically put everything

13  you think you know off to one side --

14          PROSPECTIVE JUROR:  Right.

15          THE COURT:  -- and start clean.

16          Will you be able to do that or not?

17          PROSPECTIVE JUROR:  I don't think so, really.

18          THE COURT:  Have you participated in any kind

19  of political stuff at all?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Do you regularly vote?

22          PROSPECTIVE JUROR:  Not regularly, no.

23          THE COURT:  Where do you get most of your

24  news from?

25          PROSPECTIVE JUROR:  The TV.

Voir Dire                                    164

1      THE COURT:  Do you watch it regularly or at a
2  set time of the day, the morning, evening?
3      PROSPECTIVE JUROR:  Yes, morning and evening.
4      THE COURT:  Thank you.
5    (Prospective juror exited the courtroom, and the
6     following proceedings were had herein:)
7    (Brief pause).
8      THE COURT:  We're going to take a break now
9  for about ten minutes.
10      THE MARSHAL:  All rise.
11      THE COURT:  Counsel, let's have a sidebar.
12    (Proceedings heard at sidebar with Prospective
13     Juror and counsel:)
14      THE COURT:  Now, it's possible that you would
15  be slightly embarrassed if I asked you this out
16  there.  On the questionnaire, the questionnaire says
17  "have you ever been arrested or convicted of a
18  crime" and you answered no.  We have a criminal
19  history which may or may not be you because we don't
20  have the print, all we have is a name, and it says
21  ███████████████████ birth date.
22      PROSPECTIVE JUROR:  1/17/56.
23      THE COURT:  1/17/56.
24      And it says that these are not convictions,
25  they're just arrests.  Somebody by that name was

:12PM

:13PM

:47PM

1  arrested in Hoffman Estates on 14th of February 1975
2  for felony theft, charge was dismissed, and then we
3  have a 1992, Police Department of Zion, possession
4  of Cannabis, that disposition was six months
5  supervision, which in state court means that there's
6  no conviction, supervision goes on.  Is this you or
7  is this not you?
8          PROSPECTIVE JUROR:  Yes, sir, the Zion is me.
9  I don't remember nothing about Hoffman Estates.  Is
10 there a year?
11         THE COURT:  Well, you would have been 19.
12         But you do remember the Cannabis thing?
13         PROSPECTIVE JUROR:  Yes, sir.
14         THE COURT:  All right.  And I'm assuming you
15 did the six-month supervision and nothing happened
16 there, right?
17         PROSPECTIVE JUROR:  Yes, sir.
18         THE COURT:  Do you remember what they told
19 you when they gave you the supervision?
20         PROSPECTIVE JUROR:  (No response.)
21         THE COURT:  Do you remember what the judge
22 said?
23         PROSPECTIVE JUROR:  Just if I didn't get in
24 any trouble in the next six months, things would be
25 like nothing happened.

1          THE COURT:  Okay.  Now, do you remember you
2   said that when you filled this out you had just
3   forgotten about it, this question?
4          PROSPECTIVE JUROR:  I had just forgotten
5   about it because I wasn't convicted of anything.  I
6   didn't do any jail time or anything like that.
7          THE COURT:  Right.  And the truth is, you
8   never have been convicted.  The only part of the
9   question that is relevant is, have you been
10  arrested.
11         And you have no memory at all of being
12  19 years old getting arrested for theft and having
13  the charges dismissed the next day.  What it says
14  here, theft, felony -- no, it wasn't the next day.
15  The arrest was made February 14th, 1975, and on
16  March 21, 1975, the charge was dismissed.  So
17  there's no conviction there either.  But you don't
18  even remember that arrest?  You don't remember?
19         PROSPECTIVE JUROR:  No, I --
20         THE COURT:  It's not --
21         PROSPECTIVE JUROR:  I was fresh out of the
22  Air Force and I didn't get in any trouble.
23         THE COURT:  Do you have a scar in your right
24  arm?
25         PROSPECTIVE JUROR:  Just scars like that,

1  scrapes.

2          THE COURT:  We're going to give you a number

3  to call because we will have you come back.  Okay?

4  Thanks.

5          PROSPECTIVE JUROR:  Go with the gentleman

6  here?

7          THE COURT:  Yeah.  You're not excused,

8  incidentally, from jury duty, okay?

9          PROSPECTIVE JUROR:  Yes.

10      (Brief pause).

11      (Prospective juror exited sidebar:)

12          THE COURT:  All right, we'll get to this and

13  talk.

14      (The following proceedings were heard in open

15       court:)

16          THE COURT:  We'll have a recess.

17          (Recess.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.

20      (Brief pause)

21          THE COURT:  Counsel, come to the lectern.

22      (Brief pause).

23          THE COURT:  Some minor scheduling points.

24          We had 13 jurors left over that we didn't

25  examine.  Those 13, with another 27, would be in on

1  Monday.  I think we can do 40 in a day on Monday,

2  but we couldn't do it today because we had some

3  preliminaries to take care of today.  So I think

4  we'll be better with respect to that.

5          We're going to do some challenges for cause

6  now.

7          Wait a second.  Wait a minute.

8      (Brief pause).

9          THE COURT:  Challenges for cause now, which

10 we are doing now because it saves us some money and

11 time, mostly the money, because the jury office will

12 not make the ones who are going to go away come in,

13 wasting their time and $40 of the government's

14 money.

15         So, it's the first three pages of my list,

16 the judge's list, goes from juror 101 to juror 127,

17 and we had, in addition to that, no-shows 123, 111,

18 109, and 105.  Those individuals we called back,

19 although in the case of at least two of them I, and

20 I think the lawyers, have a pretty good idea why

21 they didn't show up.  But it's disobedience of a

22 court order and we'll have to deal with that.

23         So we'll begin with the defense.  So just

24 name one, if you want to challenge.

25         MR. GOLDSTEIN:  Just one --

Voir Dire                                      169

1       THE COURT:  And then the prosecution, so your
2  strategy is not revealed all at once.
3       MR. SOROSKY:  Can we begin with, say, 104?
4  We'll go back to possibly earlier ones, but, you
5  know, so we may want to revisit some jurors before
6  then, but we'll begin with 104, if that's okay with
7  everybody.
8       MR. GOLDSTEIN:  And specifically --
9       THE COURT:  Wait.  Wait.  Stop.  Stop.  Stop.
10       MR. SCHAR:  Judge, just a quick question.
11  Obviously, as you pointed out earlier, a fair number
12  of these individuals have hardship issues.
13       THE COURT:  Right.  We'll deal with the
14  hardship issues, too.  You can raise them, if you
15  wish.
16       MR. SCHAR:  Okay.
17       THE COURT:  And I probably should have been
18  clearer, but I expect that you would basically raise
19  that on the grounds that their hardships are so
20  compelling that they are likely to be ineffective
21  jurors and therefore should be challenged for cause.
22       You're starting with 104?
23       MR. GOLDSTEIN:  Correct.
24       THE COURT:  Now, this is the time where you
25  give me some reasons.

1       MR. GOLDSTEIN:  Thank you, Judge.

2       In 104's questionnaire, number 78, this

3   individual answered:

4       "I thought, based on what I heard, that he was

5       guilty."

6       Question number 56, in answer to the opinion of

7       his practice:

8       "I think it almost always happens and everyone

9       knows it."

10      And then when questioned by Your Honor about

11  number 78, you asked if she could put everything to

12  the side, she said "I would hope so," she shrugged

13  her shoulders and said "would like to think I

14  could," and she certainly didn't seem very clear

15  that that's what she was able to do.  She showed a

16  clear bias and inability to give Mr. Blagojevich a

17  fair trial based on her bias towards him.

18      THE COURT:  I remember this.

19      The government's position?

20      MR. SCHAR:  Judge, I thought that she --

21  obviously, she put down what she put down in the

22  questionnaire, but in answering you she made a very

23  clear effort to indicate that she could be fair.

24      THE COURT:  And --

25      MR. SOROSKY:  If I may respond briefly, Your

Voir Dire                                    171

1    Honor?  And I mean this sincerely.  Here we have a

2    woman, and this will apply to other jurors too, but

3    particular this one, here we have a woman who

4    receives a questionnaire, a very intelligent woman

5    who has all the time in the world to fill it out and

6    she fills out the questionnaire where she clearly

7    indicates she thinks Mr. Blagojevich is guilty and

8    could not possibly give him a fair trial.

9         With all due respect, I don't think any of

10   that is cured by someone sitting majestic position

11   that you are and you ask the question, well, you

12   understand, young lady, that your obligation is to

13   be fair and do you think you could be fair, and she

14   says well, okay, I think I can be fair, and then the

15   prosecution says, oh, she could be fair, and they

16   completely disregard, disregard the fact that the

17   very intelligent woman who has all the opportunity

18   in the world and time to fill out this

19   questionnaire, clearly indicates she cannot be fair,

20   and I don't think there was one iota of this woman

21   trying to get out of jury.

22        And I also would add, there might be a

23   potential conflict here with wherever her husband

24   worked, which might contribute to some of her bias.

25             THE COURT:  I don't think there is a

1  conflict.  I do want to clarify what the standard

2  is.  You can walk into a court and walk into the

3  jury box with the absolute conviction that the

4  defendant is guilty, and under the expressed limit

5  of the U.S. Supreme Court longstanding, never

6  overruled, never challenged, and, for that matter

7  the standards of the Supreme Court of Illinois, if

8  that person is capable of putting that opinion aside

9  and deciding the case on the merits and that is

10  determined to be the case, then the juror can sit.

11  So you can't do it by formula.

12         You can have in a single jury a situation in

13  which somebody says I think he's guilty, and you

14  explain to them, you know, it's not what you think

15  now, it's after you consider all the evidence, do

16  you think you can do that, and the juror says, the

17  prospective juror says, I would hope so.  And you

18  don't accept it, if you're the judge, because you

19  don't believe it, some other juror says pretty much

20  the same thing and you believe it, believe they're

21  capable of doing it, which is why when we do this

22  stuff, the juror is actually sitting there,

23  otherwise we could just do it on the questionnaires.

24         That being said, I don't have confidence that

25  she could.  The challenge for cause is sustained.

1        You have one?

2        MR. SCHAR:  Judge, you want that from the

3  government?

4        THE COURT:  Yes, from the government.

5        MR. SCHAR:  We'll just start at the

6  beginning, I know 101, she had raised a hardship

7  issue, so I just wanted to raise that, obviously,

8  with Your Honor.  She's the one who is working two

9  jobs and could be a financial hardship for her.

10  Otherwise, I think she can be fair.  So I think the

11  question goes to, you know, do you want to keep her

12  in the mix when she's obviously indicated a

13  financial problem.

14        THE COURT:  Defense view?

15        MR. GOLDSTEIN:  We object to his challenge

16  for cause.  I understand the hardship, but a lot of

17  these individuals have hardships.  I don't know that

18  it's a hardship that's absolutely a bar to her

19  service.

20        MR. SCHAR:  Judge --

21        THE COURT:  I'm sustaining the challenge.  I

22  think it's too big a distraction for her.

23        MR. GOLDSTEIN:  110, Your Honor.

24        MR. SOROSKY:  There's a couple of issues.

25        THE COURT:  Give me a second.

1          MR. GOLDSTEIN:  I'm sorry.

2       (Brief pause).

3          THE COURT:  110.

4          MR. GOLDSTEIN:  Your Honor, there's two

5   reasons we're requesting cause for this individual.

6          Number one is the hardship.  The individual

7   specifically said it would be -- was it a nightmare?

8   Disaster, it would be an economic disaster.  This is

9   an individual who received a job, he said he hasn't

10  signed a letter of agreement, but he's pretty close

11  to getting this job to start pretty soon, I think he

12  said start Monday, May 2nd, 2011.  He's not sure if

13  he'd be paid for his jury service.  He says he's the

14  primary breadwinner and his wife only works

15  part-time as a substitute teacher, said I cannot

16  jeopardize my appointment by serving on the jury.

17         MR. SCHAR:  Judge, if you agree on the

18  hardship, I understand the hardship issue.

19         THE COURT:  So you're not disputing it?

20         MR. SCHAR:  I'm not disputing it that there's

21  a hardship.

22         THE COURT:  Good.

23         For the government?

24         MR. SCHAR:  Going back in order, 102, the

25  gentleman whose son had died.

1          THE COURT:  Right.

2          MR. SCHAR:  He had also written a letter.

3          THE COURT:  Your view?

4          MR. GOLDSTEIN:  We have no objection, Your

5    Honor.

6          THE COURT:  For the defense?

7          MR. GOLDSTEIN:  115, Your Honor.  This is the

8    individual that was the lawyer, the former

9    prosecutor.

10          THE COURT:  Give me the number again.

11          MR. SOROSKY:  116.  116.

12          THE COURT:  Okay, the lawyer.

13          MR. GOLDSTEIN:  Yes.  Your Honor, there's two

14    issues with this individual.  One is a hardship, he

15    did mention the time-sensitive nature of his job and

16    the difficulty he would have, not necessarily that

17    he would lose his job but that he would actually

18    function in his job during this trial.  That's

19    number one.

20          Number two is the very obvious cause issues

21    that he expresses throughout.  This is an individual

22    who is a former prosecutor, a lawyer, who knows the

23    law, and question after question after question,

24    knowing the law, specifically says what the law

25    isn't.  The question 75 --

Voir Dire                                        176

1      THE COURT:  You don't have to go through

2  this.

3      MR. GOLDSTEIN:  Okay.

4      THE COURT:  I remember this guy vividly.

5      MR. SCHAR:  Judge, in terms of the job issue,

6  I don't view it as a hardship anymore than it would

7  be anyone else who's got a job with some

8  responsibility, it's not a financial hardship I

9  think is the difference here.  And I think you

10  thoroughly question him.  It was our take that he

11  obviously knows -- I agree with Mr. Goldstein, he

12  knows the standard, he knows how to apply the

13  standard, he knows what he needs to do to go into

14  the back and come into this courtroom with an open

15  mind about it, and he said he'd make every

16  good-faith effort to do that, and I believe that he

17  would.

18      THE COURT:  I'm denying this challenge for

19  cause and let me tell you why, my view might be a

20  little different, and the reason I thought about it

21  is, I think his only real concern is the job.  And

22  there's no reason he wouldn't know since he hadn't

23  sat on the jury before, that jobs, just as sensitive

24  as his, and in fact more sensitive than his, could

25  easily be handled in the day of modern

Voir Dire                                              177

1  communications by jurors.  I believe I had a juror
2  in one pool who managed to sell a company during the
3  week he was here.  We I think in that case had to
4  arrange some way for him to plug into the Net, which
5  we were able to do.  And they tend not to estimate
6  the significance of the day off, and they tend not
7  to understand the significance that instead of
8  meeting at 9:00 they can meet at 7:00.
9         Which means that I think he was stretching it
10 when he talked about how he had this firm
11 conviction, which is in itself a problem, because
12 he's saying that, because I don't fully understand
13 the nature of the opportunity I'll have, because
14 he's probably using an old model where, in his mind,
15 where if he served on a jury, most your life goes
16 away, unless you could borrow the judicial secretary
17 phone periodically.  I think that's what he was
18 worried about.  And I think he told the truth about
19 well, I can honestly say that, you know, I think the
20 bad is a bad guy.
21        But the one question he wasn't asked on the
22 questionnaire, and deliberately so, it's not an
23 oversight, is you don't ask the one key question,
24 that is, "well, suppose you do think that way, can
25 you put it off to one side," and the reason we don't

1  ask that question is because, in many cases, it's

2  really not crucial and it asks a question the

3  meaning of which they may not fully understand, they

4  need a full explanation.  Granted, that this guy

5  probably didn't need the explanation but most do.

6  And which is why I pressed him on it.  And if he had

7  said to me, "no, I can't," I would have taken his

8  answer, but he didn't say it.  What he kept saying,

9  and it was obvious that he was telling the truth, is

10  "it would be hard," but I believe he would do it.

11         Not only do I believe he would do it, but I

12  believe it's not going to be so hard either.  I

13  think this is well within his capacity, I think this

14  is precisely the kinds of decisions he's made as a

15  lawyer during the one period of his life, so I'm

16  rejecting the challenge.

17         MR. GOLDSTEIN:  Your Honor, may I respond,

18  just briefly?

19         THE COURT:  No, I made a ruling.  We don't

20  actually respond to rulings, just say that we don't

21  like the ruling.

22         MR. GOLDSTEIN:  Because there's another issue

23  we mentioned at the sidebar, that's all I'm bringing

24  as to question 28.

25         THE COURT:  Which question?

Voir Dire                                      179

1       MR. GOLDSTEIN:  Question 28.  I don't want to
2  reveal --
3       THE COURT:  Let me look at it.
4     (Brief pause).
5       THE COURT:  You wanted more information about
6  this?
7       MR. GOLDSTEIN:  Correct.
8       THE COURT:  About question 28?
9       MR. SOROSKY:  Well, the Court had mentioned
10 something about it.
11      MR. GOLDSTEIN:  It was something for a
12 sidebar, so I don't want to --
13      THE COURT:  No, no, question 28 on this is
14 something where the guy said he identified something
15 and told you what the disposition was.
16      MR. GOLDSTEIN:  But there is an additional
17 thing I thought the Court had found.
18      THE COURT:  I did?
19      MR. SCHAR:  Judge, I think it's an
20 out-of-state issue.
21      MR. GOLDSTEIN:  Correct.
22      THE COURT:  Oh, right.  Right.  Right.  No,
23 I'll check into that.  I'm pretty much that that's
24 not him.  But he's coming back.  No, I remember
25 exactly what it was.

1        What's next?

2        MR. SCHAR:  Judge, clearly going into

3   financial hardships, 103 was the bartender.

4   Obviously, there was no indication she could not be

5   fair, but you raised the issue of the financial

6   hardship in terms of her ability to -- I guess it's

7   compounded by the fact that it would be her ability

8   to have to go from here then into a job that would

9   go into the evening.  I suppose it's the issues of,

10  A, a financial hardship, and B, how that particular

11  financial hardship would affect her ability to be a

12  focused juror.

13       MR. GOLDSTEIN:  Your Honor, we object.  Her

14  hours were such that she could work --

15       THE COURT:  Stop.  You win.

16       Okay, who's next?

17       MR. GOLDSTEIN:  116.

18       THE COURT:  Okay, I got him.  Go ahead.

19       MR. GOLDSTEIN:  He answered two questions in

20  this questionnaire number 78, as well as number 89.

21  In 78 he said:

22      "... in my opinion, based on these counts and my

23       personal bias that he is guilty."

24          Number 89 he said as far as the defendant's

25  right to not testify, he said:

:31PM

:32PM

:32PM

:34PM

:35PM

1    ".... he can abide by the retirement except

2     every chance he gets ..." meaning the defendant

3     "... he keeps saying he would testify, I think

4     I would hold it against him if he does not

5     testify."

6          When asked by the Court if he could set that

7    aside or hold it against the defendant, he said he

8    would try but he would have bias because numerous

9    times he said that he would testify, and then you

10   asked if he would try, he said:

11       "I think I could.  Can't say for sure."

12         So he clearly was an individual that wasn't

13   certain even by the Court's questioning.  The true

14   statements occurred in these questionnaires when he

15   had the time to think about it and write it out, and

16   the true statements in these questionnaires is that

17   he's biased.  He is clearly biased.  He tried to be

18   respectful to Your Honor's questions, but didn't

19   even showed while he was shrugging his shoulders and

20   sort of nodding no when asked the question whether

21   he can be fair.

22         MR. SCHAR:  Judge, I thought that, you know,

23   he made a -- from a fundamental matter, it's not as

24   if they took these questionnaires home and

25   contemplated them for days when they wrote it down.

1  They then come in here and you explain to them in
2  much more detail what is actually required in a
3  court of law and how trial works, and this is
4  independent of this individual, which is generally.
5  So this general concept that somehow the
6  questionnaires are the holy grail is obviously not
7  something that the government considers to be
8  accurate.
9       Putting that issue aside, obviously he
10 provided certain answers to say the questionnaires,
11 and then you explained things to him more
12 thoroughly.  I think he indicated, at least as to
13 the issue of 78, he believed he could set aside and
14 do what Your Honor would ask him to do.
15      The issue of the testimony, he did say he
16 thinks he could but couldn't say for sure.  And,
17 obviously, you know, Your Honor has a better sense
18 of him in terms of being able to look him in the
19 eye, but we think he could be fair.
20      MR. GOLDSTEIN:  If I may reply briefly?
21      Your Honor, the questionnaire specifically
22 says, the one that they read on Page 2, the
23 defendant does not have to prove anything, the
24 government bears the burden of proving the guilt of
25 the defendant beyond a reasonable doubt, the burden

1  of proof is always on the government.  He read the

2  questionnaire, he sat, took time, and he

3  specifically wrote there that he couldn't do that.

4          THE COURT:  How do you know he took time?

5          MR. GOLDSTEIN:  My understanding is that they

6  came in at 9:00 o'clock yesterday.

7          THE COURT:  How do you know he took his time?

8  Maybe he wrote it fast?  And the truth is, they

9  don't get a lot of time to do their thing, and the

10  only reason they don't get a lot of time to do that

11  is, it's not one of their favorite things.  They

12  want to read, write the things, and they want to get

13  out of there.

14          The questions are designed to elicit an

15  immediate reaction, and the immediate reaction to

16  most people is not hearing a long instruction.  We

17  didn't have that little preface which says, you

18  know, you may think you know this, but you don't

19  know until it's evidence in court.  I have a vague

20  recollection of many years ago seeing a two-page

21  description in front of a questionnaire telling a

22  jury what the nature of the legal process is.  It

23  didn't work, actually.  It needs to be spoken to you

24  with examples of various kinds.  I think there's no

25  doubt in my mind, this one in particular, that he

1  won't follow the rules.  The challenge is rejected.

2         What's next?

3         MR. SCHAR:  Judge, 106 is a hardship issue.

4  Again, this is the individual that got a real

5  mortgage problem and I think she indicated that.

6         THE COURT:  Yes, I remember.

7         MR. SCHAR:  She had a childcare issue.

8         THE COURT:  Yes.  And the economic issue

9  because of the payment for jury duty, which the

10  employer does not do.  I mean, you can take jury

11  duty and they won't fire you, but you don't get

12  paid.

13         Your views on this?

14         MR. GOLDSTEIN:  We object.  I don't think

15  it's enough of a financial hardship to be stricken,

16  Your Honor.

17         THE COURT:  In her case, it is.  Challenge is

18  granted.

19         Somebody got something else?

20         MR. SOROSKY:  We do have more, Your Honor.  I

21  don't know if you want to keep going.

22         THE COURT:  Do you have anymore for the

23  government?

24         MR. SCHAR:  Yes, Judge.  At least financial

25  ones, and I think there are probably two on -- if

1  you want I could go more directly to the two that go

2  beyond the financial issues.

3          THE COURT:  Yeah.  Do that.

4          MR. SCHAR:  108 was the language problem, I

5  assume that she's --

6          THE COURT:  Yeah, I believe I informed you of

7  that.  I already did that.

8          MR. GOLDSTEIN:  As far as 108, we do object

9  as to cause for that.  This is an individual that's

10 been living in the country --

11         THE COURT:  Can't speak English.  Look at the

12 way she filled out that form, didn't understand my

13 direct instruction not to say her name.  I'm

14 granting the challenge for cause.

15         MR. SCHAR:  Judge, 119 would be a

16 non-hardship cause challenge for the government.

17         THE COURT:  Let me try to put something

18 together here.

19    (Brief pause)

20         MR. GOLDSTEIN:  What was the cause?

21         THE COURT:  What's the number before me now?

22         MR. SOROSKY:  The prosecutor said 119.

23         THE COURT:  Which one, 116 or 119?

24         MR. SCHAR:  119, Judge.

25         THE COURT:  Okay.  Yes, go ahead.

:40PM (line 5)
:40PM (line 10)
:41PM (line 15)
:42PM (line 20)
:44PM (line 25)

1       MR. SCHAR:  Judge, the argument from the
2  government's perspective on this prospective juror
3  is largely related to his criminal history.  He's
4  been convicted did both of DUI and battery.  He went
5  through penalties for the battery, at least it
6  suggested, it didn't seem that he thought the
7  penalties were useful to him.  And, obviously, I can
8  go into it specifically, but in response to answer
9  35, he responded that he knows what it's like to get
10 convicted.  He went through several times the
11 concept that history reveals itself over time.
12      I think he indicated that opinions change,
13 but we kind of looked at it, particularly given the
14 publicity around this case, that metaphor is, there
15 might be an initial indication of what the media may
16 say but over time it may be that it's completely
17 something else.
18      So when you look at it altogether, from our
19 perspective, you're dealing with an individual who
20 particularly given the fact he's gone through a jury
21 trial and been convicted himself is not someone who
22 could be fair under the circumstances.
23      MR. SOROSKY:  Your Honor, this individual was
24 probably the most honest person that walked through
25 that door.  He answered every question on the

1  questionnaire, he answered every question of Your
2  Honor, he was firm and unequivocal.  Every time you
3  asked him a question, he gave his opinions.  And the
4  fact that he was convicted means nothing.  He was
5  honest about it and he specifically talked about it.
6  He said "I know what it's like to be convicted,"
7  that's an honest statement, he was convicted and he
8  knows what it's like.
9       The fact that he was convicted twice does
10 not, in any way, create cause whatsoever.  If he
11 lied about it, if he wasn't honest with Your Honor
12 about it?  Absolutely.  But he was 100-percent
13 honest.  The only potential issue, he mentioned that
14 there was an issue with law enforcement officers,
15 but he specifically said, when you asked, and that
16 was the last question, could he be fair he said,
17 yes, I can.  He didn't waiver, he didn't pause
18 whatsoever.  He was honest with you and there is not
19 one reason for cause on him.
20       MR. SCHAR:  And, Judge, there is one other
21 thing I did not add.  He's also one who is entangled
22 in a very substantial fraud where he, himself, is a
23 victim of a substantial fraud perpetrated by a
24 friend of his which appears not to be headed towards
25 a favorable resolution for him; that's also in the

1  mix.

2          THE COURT:  No.

3          Who's next?

4          MR. GOLDSTEIN:  We are, Your Honor, and that

:48PM  5  is 117.

6          THE COURT:  Okay.

7          MR. GOLDSTEIN:  There's two reasons as to

8  117, one is a financial hardship which he indicated,

9  said she will be starting a job.

:48PM  10         THE COURT:  Yeah, I remember this stuff.  You

11  can say "financial hardship" and if I don't remember

12  I'll ask you to make it more specific.

13         MR. GOLDSTEIN:  Okay.  Good.  Thank you.

14         MR. SOROSKY:  With the financial hardship

:49PM  15  issue, we won't get into any other matters.

16         THE COURT:  Your view on financial hardship?

17         MR. SCHAR:  She just started a job.  I didn't

18  sense that that was a significant financial hardship

19  form her, but --

:49PM  20         THE COURT:  No, actually, it's less financial

21  hardship than it is "I started this job, I'm going

22  to lose the job" because there's no relationship and

23  she took a fair amount of time getting there, that's

24  basically what her position is.

:49PM  25         MR. SCHAR:  Obviously, she is going to lose

1  her job, I would agree.  I didn't --

2         THE COURT:  I can ask her again, but I think

3  that's basically the issue.  And the stuff before

4  all of this started, it was one of these things

5  where I'm going to start this job, and my impression

6  is, although I could be wrong about it, that the

7  basic meaning there is is I've been looking for a

8  job, for a while, I got this job, it's the kind of

9  job I want, I don't know what I'm doing yet, and if

10  I'm stuck on the jury, who knows if the job will be

11  there, maybe it will, maybe it won't.  We can ask

12  her.

13         But you have another reason?

14         MR. GOLDSTEIN:  In addition, question 83, it

15  asks have you seen, heard or read anything about the

16  case, she indicated:

17     "I'm a little biased based on everyone's

18      thoughts and I have formed the opinion that he

19      is guilty."

20         Showing clear bias.

21         When asked by Your Honor she paused and she

22  said she would like to say yes, to put her thoughts

23  aside.  I don't think that was the most unequivocal

24  answer.

25         THE COURT:  No, but I believed it.  So I'm

 1  rejecting the challenge for cause.

 2          MR. SOROSKY:  But we're still holding open

 3  the --

 4          THE COURT:  Exactly.

 5          MR. SCHAR:  Judge, 114 from the government.

 6          THE COURT:  114.  I remember this one.

 7          MR. SCHAR:  You need me to make arguments.

 8          THE COURT:  No, I don't think so.

 9          You want to say anything?

10          MR. GOLDSTEIN:  Yes, we object.  I assume the

11  only basis is the religious beliefs.

12          MR. SCHAR:  Well, she also had --

13          THE COURT:  I don't mind people who

14  traditionally misinterpret the phrase "judge not

15  lest ye be judged," what gave me pause with her is,

16  she doesn't know what it means, she doesn't know

17  what it means in her own mind.  So I'm dealing with

18  a wild card.  I'm dealing with somebody who may very

19  well take the position that we are not dealing with

20  the judgments of heaven, we are dealing with human

21  judgments, but she may think that, you know, this

22  comes so close to the traditional God-like judgment

23  that she shouldn't exercise it.  We have no idea

24  which way she is going to jump on this one.

25          And the other thing that impressed me about

1  it is is she is very sincere in her belief that at

2  the core of this is some belief.  This is not

3  somebody who said it in an offhand kind of way, this

4  is somebody who really believes there's a limitation

5  on her ability to judge, and because she put it down

6  in this particular questionnaire, we know what the

7  object of that is, and that's this case.  I simply

8  do not trust her ability to exercise judgment at

9  all.  So I'm granting the challenge for cause.

10         Anybody have anything else?

11         MR. GOLDSTEIN:  118.

12         THE COURT:  Okay.

13         MR. GOLDSTEIN:  Your Honor, she indicated

14  that this would be a financial hardship.  She said

15  she only gets paid for the days she works and these

16  are paycheck to pay the bills, that's as to the

17  hardship issue.  As to the bias issue --

18         THE COURT:  What number are you on?

19         MR. GOLDSTEIN:  118.

20         THE COURT:  Yes.

21         MR. GOLDSTEIN:  I hope I have it right.

22         THE COURT:  Yeah.

23         Okay, I've read that.  But she didn't ask for

24  a deferral, which is fairly unusual.

25         MR. GOLDSTEIN:  Right.  I understand.

1          THE COURT:  I don't have a deferral note in

2    here.  And usually that's -- I don't think I've cut

3    anybody out on financial hardship who has not also

4    filed a deferral.  And it's not that it's an

5    absolute necessity, it just strikes me as something

6    that is not saying as much as -- but we can save

7    that one and I can ask a follow-up question.

8          MR. GOLDSTEIN:  We have do have further

9    basis, but if you want to save it --

10          THE COURT:  Go ahead.  Give me a further

11   basis.

12          MR. GOLDSTEIN:  It's question number 78, she

13   said:

14       "I feel the former governor wasn't playing

15        fair."

16          THE COURT:  That's pretty mild --

17          MR. GOLDSTEIN:  Well --

18          THE COURT:  -- compared to some of the

19   others.

20          MR. GOLDSTEIN:  I guess it is.  It depends if

21   you're looking at it from a relative point of view

22   or from an objective point of view --

23          THE COURT:  Well, if, for example, you really

24   don't know what this stuff means.  It was one -- and

25   I didn't confront the juror with it because it

:55PM (line 5)
:55PM (line 10)
:55PM (line 15)
:56PM (line 20)
:56PM (line 25)

1  was -- it wouldn't have accomplished anything, but

2  there was one who referred to your client as "a nut

3  case."  Now, if you take that literally, that does

4  not mean guilty.

5          And I think I started asking that question

6  about, we're not talking about fair, nice, do you

7  like him, do you approve of him, disapprove of him.

8  We're talking about a very narrow issue, and I think

9  this is an individual who would understand that.

10         So I think, standing alone, that question

11  doesn't go anywhere.  Sometimes you can detect by

12  the demeanor of the juror that they really despise

13  somebody in the courtroom, although most of the time

14  when you see that in a juror's face, it's not

15  directed toward a party, it's directed toward a

16  lawyer, that's neither here nor there, and they

17  don't know anybody here well enough to get to that

18  level of fury at the lawyer.

19         MR. GOLDSTEIN:  Additionally, Your Honor,

20  there were a lot of questions where she answered

21  "unsure."

22         THE COURT:  Yeah, but I went through all of

23  them.

24         MR. GOLDSTEIN:  You did, and she specifically

25  said "I think I can follow these rules," she was

Voir Dire                                          194

1  unsure as to that answer.

2        THE COURT:  I don't think that's unsure.  I

3  just said, I don't think that that's unsure.

4        MR. GOLDSTEIN:  Are you sure?

5        THE COURT:  Yeah.  I can leave that one open.

6        MR. SOROSKY:  Your Honor, one additional

7  comment about this woman.  She is a teacher, and

8  although she substitutes presently in the Chicago

9  Public Schools, she previously was a teacher in the

10 suburban schools and I think she indicated she

11 didn't like teaching and that's why she went into

12 some other job, she worked at that job for a good

13 number of years, she got laid off and she went into

14 substitute teaching.  To refresh your memory, this

15 is the woman who said, from 1 to 10 what do you

16 regard teaching, and I think she gave a 10 being the

17 bottom.

18       THE COURT:  No, I think she said she might

19 give it a 10.

20       MR. SOROSKY:  Might give it a 10.  But she

21 did indicate on her questionnaire that she had

22 pension money in the Teachers Retirement System,

23 which might very well be a topic in this case and

24 perhaps we could go back and question her concerning

25 that before we make a final decision.

1          THE COURT:  I think it falls within that
2    category of it would be too small a matter, it's a
3    huge fund, unless somebody is going to come in and
4    testify that it imperiled the pension, which I don't
5    think anybody is going to do, no.
6          So that takes care of 118.  Anybody left?
7          MR. SCHAR:  122.
8          THE COURT:  122 we're going to have to bring
9    back for another question.  And I also want to check
10   on something with 122.  I understand why you're
11   making it -- well, let me see if there's an
12   objection.
13         MR. GOLDSTEIN:  There's no objection to 122.
14         THE COURT:  Well, against my better judgment,
15   since both sides agree, I will grant the challenge
16   for cause.
17         So you both have a ruling, see how easy it
18   is?
19         What's next?
20         MR. SCHAR:  Judge, in terms of beyond the
21   financial hardships, I'm not sure the government has
22   any other cause challenge, but I may be wrong about
23   that.
24         THE COURT:  How about the defense?
25       (Brief pause).

 1          THE COURT:  Okay.  I'm assuming from silence,
 2    there's no defense thing except for financial stuff.
 3    Now, you want to go to financial hardship?
 4          MR. SCHAR:  Sure, Judge.
 5          MR. SOROSKY:  Which juror are we speaking?
 6    What number?
 7          THE COURT:  We don't know yet.
 8          MR. SCHAR:  Judge, as to 107.  There's two
 9    issues here, and I assume because of the potential
10    financial hardship you didn't go back over the other
11    one, but this is a lady who has a prescheduled
12    flight, I think, next week or two weeks.
13          THE COURT:  Is that the only reason?
14          MR. SCHAR:  She is a financial hardship, at
15    least in the context -- or maybe it was a work
16    issue.
17          THE COURT:  I am reluctant to do financial
18    hardship in this particular case, and the reason I'm
19    reluctant to do it is, I have learned through
20    experience that when what you get is not a letter or
21    a statement from the person saying this will be a
22    terrible financial hardship and please don't do it,
23    what you get instead is a letter from the boss
24    saying "we can't let her go," you're talking about
25    somebody who has no personal feelings one way or the

1  other.

2         Not only is there only the letter from the

3  employer, she didn't check the box about hardship

4  excuses.  So I think this is something that is

:02PM  5  employer-generated.  I don't think a sane employee

6  would say something like, you know, they sent this

7  letter but they really don't need me.  So I don't

8  think that hardship works.  The plane flight, I can

9  ask another question about it.

:02PM  10        MR. SCHAR:  Obviously, if that is not there,

11  it's not an issue, then, from the government for

12  her, it's just we don't like going down that road if

13  she's going to be gone.

14        THE COURT:  I mean, because we have somebody

:03PM  15  coming up later who was supposed to be somewhere

16  else on Monday, and the way it was originally

17  phrased is somebody who has to be in so-and-so, and

18  it had sort of the aura's communicated to us in the

19  course of a long planned vacation life's dream to

:03PM  20  climb some pyramid somewhere, and, in fact, this is

21  some employer's training trip.  So we cancelled the

22  training trip.  So that's basically where I am, so

23  we have the plane flight to check with that person.

24        Anybody got anything left?

:04PM  25        MR. GOLDSTEIN:  121, Your Honor.

Voir Dire                                          198

1            THE COURT:  121.  Okay.

2            MR. GOLDSTEIN:  This individual I think

3    explained the hardship but I think retracted it,

4    but, nonetheless, showed issues of bias and that is

5    question 78 and 91.

6            And question 78 indicated:

7         "What I heard from the media, sounds like

8          Mr. Blagojevich was lucky he wasn't convicted."

9          And then on question 91, as far as the

10         indictment:

11         "Would you have any difficulty applying the

12         Court's instruction on this point?"

13         "I would certainly try not to, but there was

14         obviously good reason to indict, otherwise why

15         do it?"

16            He clearly indicated bias on that, he thinks

17   an indictment --

18            THE COURT:  Not after I told him what he need

19   to know he didn't.

20            MR. GOLDSTEIN:  After you told him what he

21   needed to know?

22            THE COURT:  Yeah, which is that an indictment

23   is not the same standard.  I mean, I dealt with both

24   of those questions specifically.  Because the answer

25   to 91 is, obviously, based on an assumption about

1  what the law requires that's wrong.  And with

2  respect to "from what I've heard from the media,"

3  the one thing that I think they all understand now

4  is that they don't decide it on what the media says.

5        The reason we ask these questions this way is

6  to prompt answers like this so the people's

7  misimpressions could be corrected.  And in this

8  case, this was the easiest because he didn't even

9  attribute it to the evidence, he attributed it to

10 the media.  So I'm rejecting the challenge.

11       Okay, this means that I think we're done with

12 this.

13       MR. GOLDSTEIN:  We do have more.

14       THE COURT:  More?

15       MR. GOLDSTEIN:  Yeah.

16       THE COURT:  What more do you have?

17       MR. GOLDSTEIN:  We have more cause requests,

18 Your Honor.

19       MR. SOROSKY:  We have two more causes.

20       MR. GOLDSTEIN:  Do you want to start on

21 Monday or --

22       THE COURT:  Go ahead.

23       MR. SOROSKY:  126 and 127, so we'll take them

24 in chronological order.

25       MR. SCHAR:  We'll take them inverse order,

1  the 127 the government doesn't have any objection

2  striking.

3          THE COURT:  127.  Yeah, that's an easy one.

4          So now we're down to 126.

5          MR. GOLDSTEIN:  Yes, 126.

6          THE COURT:  This is the master of branding.

7          MR. GOLDSTEIN:  Specifically, Your Honor, to

8  question 78 indicated:

9      "I feel the ex-governor was attempting to sell

10      the Senate seat.  I personally don't trust him

11      as an individual."

12         Number 80 is sort of an interesting question,

13  I don't know exactly what he's saying, but I think

14  it probably indicates -- specifically, he says:

15      "I saw several episodes of the Apprentice and

16      it's reinforced my opinion of him."

17          I think as Your Honor indicated --

18          THE COURT:  I believe that lay at the heart

19  of the questions I asked him based on the premise

20  that he does not think much of your client.

21          MR. GOLDSTEIN:  Correct.  And when Your Honor

22  asked questions, Your Honor asked him do you

23  understand that you can't hold it against him, he

24  said I understand it.  He may understand the

25  principle, but he still has the bias, and the bias

1 is against the defendant, and it's clear.

2        MR. SOROSKY:  And I would also add, Your

3 Honor, this man has an M.B.A.  So you're talking

4 about a very, very intelligent man who is coming to

5 fill out a questionnaire where inarticulated premise

6 is you're supposed to be a fair juror and he clearly

7 expresses open and notorious bias against

8 Mr. Blagojevich.

9        MR. GOLDSTEIN:  He also indicated he had a

10 plane ticket, a nonrefundable plane ticket during --

11        THE COURT:  I don't believe the cost of a

12 nonrefundable plane ticket is a big issue for this

13 guy, but we can deal with that later.

14        MR. SCHAR:  If you want, in terms of his

15 fairness, Judge, I think he answered that he could

16 be fair, and I think he was clear in that regard in

17 response to the questions when you laid it out.

18        Frankly, there were responses that were much

19 stronger in other questionnaires versus this one

20 than individuals that we've kept because they could

21 be fair.  I think he falls well within that

22 category.  Obviously the plane ticket is an issue,

23 but to the extent that can be resolved, I don't

24 think it's a cause challenge.

25        THE COURT:  My problem with this guy is a

1  little different from yours.  He's voicing a fairly
2  strong business reason why he can't do this.  I
3  accept that he's got two major branding products, I
4  accept the fact that he, I think, said he had to
5  spend 3 to 4 days a week at the site of whoever does
6  this thing.  And, actually, when I read the thing in
7  the beginning, I thought probably I would excuse him
8  because we're trying not to ruin people's careers
9  here, but then I decided I really don't know enough
10  about it, I don't know how long the programs are, I
11  don't know exactly what it means by having to be
12  there 3 or 4 days a week, I don't know where they
13  are.  So I'm leaving him on subject to further
14  discussion.

15         And I also think that some of the stuff he
16  was saying was not saying things that were untrue
17  but placing emphasizes on those aspects of the truth
18  that would be most likely to get him off the hook
19  for jury service.  Or, to put it in his terms, to
20  brand himself as an undesirable juror for one side
21  or another.  And we'll see.  I mean, I have an open
22  mind on this guy because I can see it both ways.
23         Anything else?
24         MR. SCHAR:  Not from the government, Judge,
25  on strikes.  I think there is a fully briefed motion

1  in limine.  I'm wondering if Your Honor had the

2  sense of when a ruling might be forthcoming in that

3  regard.

4          THE COURT:  Yes; this is your motion in

5  limine about what they can and cannot argue?

6          MR. SCHAR:  Yes.

7          MR. SOROSKY:  Well, we are going to file a

8  motion in limine, so if the Court wants both motions

9  before you rule?

10         THE COURT:  That would be swell.

11         MR. SOROSKY:  We'll try to get ours in by the

12 end of the day.

13         THE COURT:  Today or tomorrow?

14         MR. GOLDSTEIN:  Tomorrow.  Let's be safe,

15 Judge.

16         MR. SOROSKY:  Tomorrow.  Tomorrow.

17         THE COURT:  Okay.  Anything else?

18         MR. SCHAR:  No.

19         MR. SOROSKY:  That's all.

20         THE COURT:  I'll be here tomorrow if you need

21 to see me, otherwise I'll see you on Monday.

22         MR. SCHAR:  10:00 o'clock, Judge?

23         THE COURT:  Why don't you wander up here by

24 9:30.

25         MR. SCHAR:  Very good.

1       MR. SOROSKY:  And we could come tomorrow and
2  look at the questionnaires?
3           THE COURT:  I believe so.
4           MR. SOROSKY:  Thank you.
5           THE COURT:  Thank you.
6
7       (Adjournment taken from 6:12 o'clock p.m. to
8        9:30 o'clock a.m. on April 25, 2011.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

:13PM

:26PM

Voir Dire                                                        205

\*      \*      \*      \*      \*      \*      \*      \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
                        MATTER


/s/Blanca I. Lara                          date


_____          _____

        Blanca I. Lara                          Date