1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4          Government,             )
                                   )
5  vs.                            )  Chicago, Illinois
                                   )
6  ROD BLAGOJEVICH,               )  April 25, 2011
                                   )
7          Defendant.             )  10:27 o'clock a.m.

8
                        VOLUME 2
9              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
10                    AND A JURY

11
   For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15             Assistant United States Attorneys
              219 South Dearborn Street
16            Suite 500
              Chicago, Illinois 60604
17

18  Court Reporter:

19              Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
20                  Room 2504
               Chicago, Illinois 60604
21                (312) 435-5895

22

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2      WITNESS                                          PAGE

3

4        VOIR DIRE...................................... 209

5

6

7      EXHIBITS

8        ...............................................

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (The following proceedings were had out of the
2       presence of the prospective jurors in open
3       court:)
4                          VOIR DIRE
5
6          THE CLERK:  2008 CR 888, United States versus
7  Blagojevich, continued voir dire.
8          THE COURT:  We left off with 127?
9          MR. SCHAR:  Yes, Judge.
10         THE COURT:  I also have a note there is
11 something we have to pursue with respect to 122.  Is
12 there anything left other than that?
13         MR. SCHAR:  I don't believe so, Judge.
14         Or I think there was a plane ticket issue
15 with --
16         MR. SOROSKY:  It was --
17         I'll tell you the number, 117, I believe.
18         MR. SCHAR:  That was not it.
19         MR. SOROSKY:  Oh, no, no, no.  I apologize.
20 The plane ticket issue was 107.
21         MR. SCHAR:  Yes, that sounds right, Judge.
22         MR. SOROSKY:  I think the three in question
23 were a plane ticket issue on 107, there was some
24 employment issue on 117, and there also was an
25 employment issue on 127, the one you referred to.

1  So they're all 7's.

2  THE COURT:  I don't think there was a mystery

3  on 117.  That was the guy who wrote --

4  MR. SOROSKY:  No, no.  117 is a woman.

5  THE COURT:  Yeah, that's right.  The funny

6  thing is is I made no notations on that, because I

7  could always go back to the number.

8  In her case, there was a lot of discussion

9  about jobs.  And then the answer was, actually

10  between the time she wrote the request for deferral

11  and the time she came here, she had a job offer,

12  which is two weeks.

13  MR. SOROSKY:  Right.

14  THE COURT:  Which I recall, at the time I was

15  informed of the length of unemployment, to excuse

16  her.  But if we have to deal with it some more, then

17  we will.

18  MR. SOROSKY:  Then --

19  THE COURT:  Anything else from anybody?

20  MR. SOROSKY:  There was also some question

21  about 115.  It was some -- there was a question you

22  wanted to look into.

23  MR. SCHAR:  That's right, Judge, that's what

24  I was thinking of when you 127, I was thinking of

25  115.  122 has actually been struck.

1          THE COURT:  What?

2          MR. SCHAR:  122 was struck by agreement of

3     the parties, I believe.

4          THE COURT:  Oh, okay.

5          Oh, yes it was.

6          MR. SCHAR:  I was confused.  115, I think

7     there was a follow-up regarding an issue.

8          THE COURT:  Right.  Yeah, that's right.

9          We're going to begin in numerical order.  We

10    have a couple of replacements, a couple of

11    alterations.  One is number 188, who was originally

12    going to come back later than today, but to

13    compensate for some who hadn't shown up for

14    Thursday, we added that person to the list.  So that

15    person will be dealt with out of numerical order.

16         And then we have a request with respect to

17    one prospective juror, 136, I believe, who has an

18    issue today about a medical appointment.  So we're

19    going to deal with 136 first.  And I think that's

20    it.

21         You can probably sit down now.

22         MR. SCHAR:  Thank you, Judge.

23         MR. SOROSKY:  Thank you.

24    (Brief pause).

25         MR. SOROSKY:  Judge, I misspoke when I said

212

1 the petition was on juror 127.  127 has been

2 excused.  There was an employment issue on June 126.

3 You said you wanted to look into that.  I misspoke,

4 judge.  I made a mistake.

5          THE COURT:  I got that, but we're going to

6 pull the juror out in a second, so we'll deal with

7 that later.

8      (Brief pause).

9      (Prospective juror entered the courtroom, and

10       the following proceedings were had herein:)

11          THE COURT:  Hi.  Take a seat.

12          For a little while you are going to be known

13 as 136.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  I'm going to ask you some

16 questions.  I'm not going to go down this whole

17 questionnaire you filled out, I'm just going to ask

18 you about a few of them.

19          PROSPECTIVE JUROR:  Okay.

20          THE COURT:  You work for a caterer, is that

21 full-time?

22          PROSPECTIVE JUROR:  No, sir.

23          THE COURT:  Is that when they need you?

24          PROSPECTIVE JUROR:  Yes, when they need me,

25 yes.

213

1        THE COURT:  Before that you were in the Navy?

2        PROSPECTIVE JUROR:  Yes, sir.

3        THE COURT:  What did you do in the Navy?

4        PROSPECTIVE JUROR:  I was -- technically,

5  it's an aerographer mate, but it's a weather person.

6        THE COURT:  Always stationed at the same

7  place or did they move you around?

8        PROSPECTIVE JUROR:  I was moved around, yes,

9  sir.

10        THE COURT:  Did you like the work?

11        PROSPECTIVE JUROR:  I did.

12        THE COURT:  You're interested in going into

13  law enforcement?

14        PROSPECTIVE JUROR:  No, sir.  I am actually

15  interested in going into nursing.

16        THE COURT:  Okay.  And your rank on discharge

17  in the Navy?

18        PROSPECTIVE JUROR:  I was an E 5.

19        THE COURT:  E 5?

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  Tell me what happened to your

22  cousin.

23        PROSPECTIVE JUROR:  The one --

24        THE COURT:  The one you mentioned in the

25  questionnaire.

214

1          PROSPECTIVE JUROR:  He went to prison for
2   burglary in Arkansas, I believe it was.
3          THE COURT:  Did you know much about the case.
4          PROSPECTIVE JUROR:  No, sir, I didn't.
5          THE COURT:  Are you particularly close to
6   this cousin?
7          PROSPECTIVE JUROR:  Not really, no, sir.
8          THE COURT:  Anything about his experience
9   that would affect your ability to be fair here?
10         PROSPECTIVE JUROR:  No, sir.
11         THE COURT:  You're a member of a church?
12         PROSPECTIVE JUROR:  Yes, sir.
13         THE COURT:  Are you a member of anything
14   else?
15         PROSPECTIVE JUROR:  No, sir.
16         THE COURT:  Have you ever been?
17         PROSPECTIVE JUROR:  Yes, sir.
18         THE COURT:  What kinds of things were you a
19   member of?
20         PROSPECTIVE JUROR:  Well, I was a member of a
21   volleyball team.
22         THE COURT:  Okay.  That counts.  Anything.
23   Garden clubs?
24         PROSPECTIVE JUROR:  No, sir.  And a softball
25   team; sports.

1          THE COURT:  Okay.  Still play softball?

2          PROSPECTIVE JUROR:  Yes, sir, I do, and

3  volleyball.

4          THE COURT:  And volleyball?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  You read the Tribune once in a

7  while?

8          PROSPECTIVE JUROR:  Yes, sir; for the sales.

9          THE COURT:  For the sales?

10          PROSPECTIVE JUROR:  The sales paper mostly,

11  yes, sir.

12          THE COURT:  Okay.  And you use a search

13  engine, you use Google to find out stuff?

14          PROSPECTIVE JUROR:  Every now and then, yes.

15          THE COURT:  But it's not a frequent

16  occurrence?

17          PROSPECTIVE JUROR:  No, sir.

18          THE COURT:  You had a child who was a patient

19  at Children's Memorial Hospital?

20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  How long?

22          PROSPECTIVE JUROR:  2 years ago.

23          THE COURT:  How long was he there in the

24  hospital?

25          PROSPECTIVE JUROR:  He was not an inpatient.

216

1          THE COURT:  He went to see a doctor at

2  Children's Memorial?

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  Is that his regular doctor?

5          PROSPECTIVE JUROR:  No, sir.

6          THE COURT:  I take it that you didn't pay

7  much attention at all to this case?

8          PROSPECTIVE JUROR:  No, sir, I didn't.

9          THE COURT:  And where are you planning to go

10  to school or when are you planning to go to school?

11          PROSPECTIVE JUROR:  I would like to go this

12  summer.

13          THE COURT:  And what kind of program is it?

14  What are you studying?

15          PROSPECTIVE JUROR:  Nursing.

16          THE COURT:  Nursing.  And how long is that

17  course?

18          PROSPECTIVE JUROR:  The course is a one on

19  one.  The one I take this summer is about -- I think

20  it's about 4 weeks.

21          THE COURT:  Okay.  You said that somebody, or

22  anyone close to you owned a business, a small deli

23  and catering company.  Is that still in business?

24          PROSPECTIVE JUROR:  Yes, sir, it is.

25          THE COURT:  Was it a friend or a relative?

:55AM

:56AM

:56AM

:56AM

:58AM

1      PROSPECTIVE JUROR:  My mother.

2      THE COURT:  So she is still operating it?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  And you got a degree?

5      PROSPECTIVE JUROR:  Yes, sir.

6      THE COURT:  And how long ago was that?

7      PROSPECTIVE JUROR:  2004.

8      THE COURT:  And you got a nursing assistant

9   certificate as well?

10      PROSPECTIVE JUROR:  Yes, sir.

11      THE COURT:  Around the same time or later?

12      PROSPECTIVE JUROR:  The nursing certificate

13   was, I believe, 2006.

14      THE COURT:  You like to go to school?

15      PROSPECTIVE JUROR:  Yes, sir, I do.

16      THE COURT:  Thank you.

17      PROSPECTIVE JUROR:  You're welcome.

18   (Prospective juror exited the courtroom, and the

19    following proceedings were had herein:)

20   (Brief pause).

21   (Prospective juror entered the courtroom, and

22    the following proceedings were had herein:)

23      THE COURT:  You're number 128?

24      PROSPECTIVE JUROR:  Yes, sir.

25      THE COURT:  Okay.  I'm going to ask you some

:58AM

:58AM

:58AM

:59AM

1    questions.  I'm not going to go down the whole list.

2         You're a painter?

3         PROSPECTIVE JUROR:  Yes, sir.

4         THE COURT:  How long have you been a painter?

5         PROSPECTIVE JUROR:  20 years.

6         THE COURT:  Ever worked with somebody or have

7    you always been self-employed?

8         PROSPECTIVE JUROR:  I worked with other

9    companies also.

10        THE COURT:  How long have you been

11   self-employed?

12        PROSPECTIVE JUROR:  About 15 years.

13        THE COURT:  Okay.  Any particular painting

14   specialty you have?

15        PROSPECTIVE JUROR:  No, sir.

16        THE COURT:  How many hours do you work,

17   customarily?

18        PROSPECTIVE JUROR:  It various.  Sometimes

19   30, sometimes 50.  It verifies a lot.

20        THE COURT:  Any particular time of year

21   you're more busy than any other?

22        PROSPECTIVE JUROR:  Summertime.

23        THE COURT:  Okay.  Now, you mostly get hired

24   by some other guy to help out or are you the person

25   who gets hired to do the job and you --

219

1      PROSPECTIVE JUROR:  I'm the person who gets
2 hired to do the job.
3      THE COURT:  And you hire other people?
4      PROSPECTIVE JUROR:  Yes.
5      THE COURT:  Okay.
6      You have a cousin who works in the Sheriff's
7 Department?
8      PROSPECTIVE JUROR:  Yes, sir.
9      THE COURT:  Cook County?
10      PROSPECTIVE JUROR:  Yes, sir.
11      THE COURT:  Somebody you see a lot of?
12      PROSPECTIVE JUROR:  No, sir.
13      THE COURT:  Do you know what he does, other
14 than he works for the sheriff?
15      PROSPECTIVE JUROR:  At the jail, I'm not sure
16 what he does, actually.
17      THE COURT:  Okay.
18      Ever been arrested or convicted of a crime?
19      PROSPECTIVE JUROR:  Yes.
20      THE COURT:  What was that?
21      PROSPECTIVE JUROR:  DUI.
22      THE COURT:  How long ago was that?
23      PROSPECTIVE JUROR:  3 years ago.
24      THE COURT:  Whatever happened with that one?
25 What was the disposition?

:00AM

:01AM

:01AM

:01AM

:01AM

220

1       PROSPECTIVE JUROR:  I was found guilty.

2       THE COURT:  And the penalty was?

3       PROSPECTIVE JUROR:  I had to go to classes

4  and pay a fine.

:01AM    5       THE COURT:  Okay.  Ever been arrested on any

6  other occasion?

7       PROSPECTIVE JUROR:  I have been.

8       THE COURT:  And what was that for?

9       PROSPECTIVE JUROR:  When I was a kid for

:01AM   10  misdemeanor stuff.

11       THE COURT:  How long ago was that?

12       PROSPECTIVE JUROR:  20 plus years.

13       THE COURT:  Okay.  And what happened to that

14  one?

:02AM   15       PROSPECTIVE JUROR:  Dismissed.

16       THE COURT:  Okay.  Close friend, family

17  member convicted of robbery, when was that?

18       PROSPECTIVE JUROR:  I would say 1978.

19       THE COURT:  Okay.  A long time ago?

:02AM   20       PROSPECTIVE JUROR:  Yes.

21       THE COURT:  Friend or relative?

22       PROSPECTIVE JUROR:  My brother.

23       THE COURT:  Okay.  What happened to him?

24       PROSPECTIVE JUROR:  Him and another guy beat

:02AM   25  up some guy and they got arrested and convicted.

221

1        THE COURT:  Did they go to jail?

2        PROSPECTIVE JUROR:  He had work release, my

3   brother.

4        THE COURT:  Work release, okay.

5        And you yourself have been the victim of

6   burglary and auto theft and no one was ever caught?

7        PROSPECTIVE JUROR:  Correct.

8        THE COURT:  Okay.  You said you sued CTA?

9        PROSPECTIVE JUROR:  Yes.

10       THE COURT:  What for?

11       PROSPECTIVE JUROR:  I was run over by a bus

12   May 5th, 1978.

13       THE COURT:  And you lost the case?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  How come you lost the case?

16       PROSPECTIVE JUROR:  They had better lawyers

17   than I did.

18       THE COURT:  It also says you sued an employer

19   once for work injuries.  Do you mean you filed a

20   workman's comp. claim?

21       PROSPECTIVE JUROR:  No, I never sued.

22       THE COURT:  Oh, you never did.  Someone else

23   did.

24       PROSPECTIVE JUROR:  Yes.

25       THE COURT:  Okay.  And you had a lawyer for

222

1  the DUI?

2       PROSPECTIVE JUROR:  Yes.

3       THE COURT:  Did you have the lawyer for the
4  other thing?

5       PROSPECTIVE JUROR:  No.

6       THE COURT:  How old were you when the other
7  thing happened?

8       PROSPECTIVE JUROR:  Ah, 22, I believe.

9       THE COURT:  Okay.  And you testified yourself
10 in court?

11      PROSPECTIVE JUROR:  Yes.

12      THE COURT:  And that was in connection with
13 what?

14      PROSPECTIVE JUROR:  The fight me and my
15 brother got into with some guys.

16      THE COURT:  Okay.  And you classified, you
17 said the experience testifying was, and I quote you,
18 "unpleasant," is that right?

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  Very few people would give a
21 different answer.

22      PROSPECTIVE JUROR:  I understand that.

23      THE COURT:  It says you used to hand out info
24 at polling places?

25      PROSPECTIVE JUROR:  I did once, yes.

:03AM

:03AM

:03AM

:04AM

:05AM

223

1     THE COURT:  Once?  Once was enough.

2     PROSPECTIVE JUROR:  Yes.

3     THE COURT:  Ever volunteer again for any kind

4  of political work?

5     PROSPECTIVE JUROR:  No.

6     THE COURT:  Do you remember what that

7  election was for?

8     PROSPECTIVE JUROR:  A friend of mine was

9  running for committeeman at Leighton township.

10     THE COURT:  Okay.

11     You followed the media coverage of this case,

12  it says "extensively. " Every day?

13     PROSPECTIVE JUROR:  Yeah, I haven't since

14  I've been involved in this, but I have in the past,

15  yes, sir.

16     THE COURT:  When you pick up the papers, is

17  that the first thing you read?

18     PROSPECTIVE JUROR:  No.

19     THE COURT:  It's whatever comes, you read it?

20     PROSPECTIVE JUROR:  I read the sports and

21  then I go to the front.

22     THE COURT:  Okay.  Thanks.

23     (Prospective juror exited the courtroom, and the

24      following proceedings were had herein:)

25     (Brief pause).

224

1      (Prospective juror entered the courtroom, and
2       the following proceedings were had herein:)
3          THE COURT:  Hi.  Have a seat.
4          You are 130?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  Okay.  You are an events planner?
7          PROSPECTIVE JUROR:  I do social media and
8    events in my job.
9          THE COURT:  And you work for a very large
10   company whose product is often consummated at
11   events, is that correct?
12         PROSPECTIVE JUROR:  You're correct.
13         THE COURT:  Good.  Between the event planning
14   and the social media stuff, how much time is taken
15   up with each one of those?
16         PROSPECTIVE JUROR:  Right now probably 70
17   percent social media and 30 percent events, but when
18   I get into the summer and the beer festival season,
19   it'll probably be more of a 50/50 split.
20         THE COURT:  How many hours a week do you work
21   with this stuff?
22         PROSPECTIVE JUROR:  45 to 50.
23         THE COURT:  How long have you done this work,
24   this kind of work?
25         PROSPECTIVE JUROR:  Sure, I've been in this

225

1 role since November and before that it was in the
2 support role, but then previously I worked for
3 4 years in events.
4       THE COURT:  Same kind of stuff?
5       PROSPECTIVE JUROR:  Uh-huh.
6       THE COURT:  Do you like that work?
7       PROSPECTIVE JUROR:  I do.
8       THE COURT:  Your father still has his
9 business?
10       PROSPECTIVE JUROR:  He does.
11       THE COURT:  And how many -- 8 employees?
12       PROSPECTIVE JUROR:  Yeah, it's really small.
13       THE COURT:  And you have a relative or close
14 friend who works for a unit inside the Department of
15 Justice?
16       PROSPECTIVE JUROR:  My mother is an analyst
17 with the national Drug Intelligence Center.
18       THE COURT:  How long has she done that?
19       PROSPECTIVE JUROR:  I think she's been there
20 10 or 11 years.  I kind of lost track.  I've been
21 away from home so long.
22       THE COURT:  Right.  Where does she actually
23 work?
24       PROSPECTIVE JUROR:  In Johnstown,
25 Pennsylvania.

:08AM
:09AM
:09AM
:09AM
:09AM

226

1      THE COURT:  Does she talk about her work with
2  you?
3      PROSPECTIVE JUROR:  A little bit.  She's
4  usually telling me to stay away from Mexico or raids
5  because she analyzes drugs.
6      THE COURT:  Right.  And you have a close
7  friend who works in the State of Appellate Office?
8      PROSPECTIVE JUROR:  Yes, my former roommate
9  and a classmate of mine.
10      THE COURT:  Does she discuss her work with
11  you?
12      PROSPECTIVE JUROR:  A little bit.  I mean,
13  you know, we go to the movies and hang out, so if
14  she feels like talking, we do, but ...
15      THE COURT:  Does she express any strong
16  opinions about the criminal justice system?
17      PROSPECTIVE JUROR:  Does she?
18      THE COURT:  Yeah.
19      PROSPECTIVE JUROR:  Yeah.  I mean, I think
20  that because of the work she does she feels strongly
21  about the court system and does what she needs to
22  do.
23      THE COURT:  Now, does she work for defendants
24  or does she work for prosecutors?
25      PROSPECTIVE JUROR:  She works for defendants.

227

1  So she is --

2        THE COURT:  The Appellate Defenders Office.

3        PROSPECTIVE JUROR:  Yeah; so she is mostly

4  writing briefs and things.

5        THE COURT:  Okay.  And it was your father who

6  was in the Coast Guard?

7        PROSPECTIVE JUROR:  Yes, retired Coast Guard.

8        THE COURT:  And what was his rank when he

9  retired?

10        PROSPECTIVE JUROR:  He was a captain in the

11  Coast Guard, so I think that's a G 6 if you're going

12  across the branches.  I don't remember, whatever ...

13        THE COURT:  That's okay.

14        And summer is your busy season, and you

15  indicated that you might have a lot of work that you

16  wouldn't be available to do it?

17        PROSPECTIVE JUROR:  There probably would be a

18  lot of travel.  I actually brought -- because I run

19  the Twitter page and the Facebook page for our

20  business, I brought the documentation because part

21  of my job is to be on-line all day and kind of

22  engaged in conversations with people --

23        THE COURT:  Well --

24        PROSPECTIVE JUROR:  -- but then from a

25  festival perspective, yes, starting in May.

:10AM

:11AM

:11AM

:11AM

:12AM

228

1          THE COURT:  Well, some of what you do can be

2     accommodated here and some of it, obviously, can't.

3          PROSPECTIVE JUROR:  Correct.  And a lot of it

4     is weekends.  I mean, if you have no problem with me

5     getting on a plane on Thursday nights and coming

6     back on Sundays.

7          THE COURT:  Your pocket was picked on the El?

8          PROSPECTIVE JUROR:  Yes, I was headed home

9     for Christmas and someone went to my backpack and

10    took my organized --

11         THE COURT:  So did you notice it right away

12    or it wasn't until you got home?

13         PROSPECTIVE JUROR:  I was actually on my way

14    to the airport and that's when I went to check in I

15    realized it was missing.

16         THE COURT:  A well-known problem with

17    backpacks.

18         PROSPECTIVE JUROR:  Yes; I'm much more

19    careful now.

20         THE COURT:  Somebody you know or somebody who

21    is close to you, family member, was treated at

22    Children's Memorial Hospital?

23         PROSPECTIVE JUROR:  I've had a number friends

24    who've had children in the care there, kind of that

25    age where --

:12AM

:12AM

:12AM

:13AM

:13AM

229

1        THE COURT:  From time to time?

2        PROSPECTIVE JUROR:  Yeah, I mean, I can think

3    of three off the top of my head.

4        THE COURT:  Anything about that experience

5    affect your ability to be fair here?

6        PROSPECTIVE JUROR:  No.

7        THE COURT:  Okay.  Now, there's a series of

8    questions, the one question you have is can you

9    travel a lot of state during weekend breaks, the

10   answer is yes.

11       PROSPECTIVE JUROR:  Okay.

12       THE COURT:  We don't put you in hotels

13   anymore.  That is a thing in the past.

14       PROSPECTIVE JUROR:  I'm aware of that.  It's

15   okay.

16       THE COURT:  You answered the question that

17   you did not pay much attention to the trial, but you

18   did see the defendant on talk shows or reality

19   shows, and let me summarize it this way, you thought

20   he was like a little off center, is that a fair

21   characterization?

22       PROSPECTIVE JUROR:  I would say so.  I mean,

23   I didn't go out of my way to read coverage of the

24   trial, but from what I saw I just kind of felt like

25   he's --

:13AM

:14AM

:14AM

:14AM

:14AM

230

1      THE COURT:  Now, this is the important

2  question:  He's not on trial for being a little off

3  center.

4      PROSPECTIVE JUROR:  Correct.

5      THE COURT:  He's on trial for very specific

6  charges which the government has to prove beyond a

7  reasonable doubt.  Would your opinion of the fact

8  that maybe he's a little off center affect your

9  ability to be fair on the issue of whether the

10  government has proved its case?

11      PROSPECTIVE JUROR:  I don't -- I don't

12  believe so.  I mean, I think if you're laying facts

13  out in front of me, I could make the distinction.

14  It's not about his reaction to them.

15      THE COURT:  Okay.  Thank you.

16    (Prospective juror exited the courtroom, and the

17     following proceedings were had herein:)

18    (Brief pause).

19    (Prospective juror entered the courtroom, and

20     the following proceedings were had herein:)

21    (Brief pause).

22      THE COURT:  Hi.

23      PROSPECTIVE JUROR:  Good morning.

24      THE COURT:  Every time I do this, every time

25  I do this I always say to the juror you're number

231

1    so-and-so, but we've gone out of order, so you're
2    going to have to tell me your own number.
3            PROSPECTIVE JUROR:  131.
4            THE COURT:  You're 131.  Thank you.
5            You left California to come here?
6            PROSPECTIVE JUROR:  Yes, sir.
7            THE COURT:  Are you -- do you still think
8    that was the right thing to do in light of the
9    weather?
10           PROSPECTIVE JUROR:  All my family is in
11   California, so I do miss them, but you follow your
12   love sometimes, too.
13           THE COURT:  Okay.  Obviously, I'm not going
14   to ask you each of these questions, that's why we
15   ask you to fill out the questionnaire.  You have a
16   Bachelor's Degree in nutritional science, right?
17           PROSPECTIVE JUROR:  Yes.
18           THE COURT:  And you work for a food company?
19           PROSPECTIVE JUROR:  Correct.
20           THE COURT:  I'm asking you a question out of
21   idle curiosity not because it's that important:
22   When you do what you do, do you, like, specialize in
23   a specific fruit or --
24           PROSPECTIVE JUROR:  Bananas.
25           THE COURT:  Bananas.  Okay.

232

1          You answered the question about jobs and you
2     put something down, I don't know what it is, it's
3     PHFE.
4          PROSPECTIVE JUROR:  Oh, Public Health
5     Foundation Enterprises.
6          THE COURT:  Okay.  Now, what did you do for
7     them?  It's that a volunteer stuff?
8          PROSPECTIVE JUROR:  It's not.  It's a
9     nutrition counseling program.
10         THE COURT:  Okay.  And that's what you did
11    for them, you were a dietician?
12         PROSPECTIVE JUROR:  Correct.
13         THE COURT:  Just one question that's curious.
14    You indicated that there was a family member who
15    served in the military but you have no idea of where
16    and when, is that right?
17         PROSPECTIVE JUROR:  Right; my grandfather.
18         THE COURT:  A long time ago.
19         PROSPECTIVE JUROR:  Yes, a long time ago.
20         THE COURT:  You had to, you yourself, had to
21    fill out a report or report something with respect
22    to a car accident?
23         PROSPECTIVE JUROR:  Yeah.
24         THE COURT:  Do you know of anybody who was
25    issued a ticket for that one?

233

1          PROSPECTIVE JUROR:  She hit me, so I don't
2    know if she --
3          THE COURT:  Did you get a ticket?
4          PROSPECTIVE JUROR:  No.  No.
5          THE COURT:  Okay.  Do you belong to anything
6    at all?  Any group, any organization, any club,
7    anything?
8          PROSPECTIVE JUROR:  The American Dietetic
9    Association.
10         THE COURT:  Okay.  That counts.  Anything
11   else?
12         PROSPECTIVE JUROR:  That's it.
13         THE COURT:  I'm going to down your exercise
14   stuff, and there's a way you phrased this that's
15   going to lead to a question because one of things
16   you put down was triathlons, and I can't tell
17   whether you're interested in watching triathlons or
18   doing triathlons.
19         PROSPECTIVE JUROR:  Doing triathlons.
20         THE COURT:  How many do you do?
21         PROSPECTIVE JUROR:  I've done two.
22         THE COURT:  Is this something you came too
23   late?
24         PROSPECTIVE JUROR:  Yes.
25         THE COURT:  Okay.  And you came to it because

:19AM
:19AM
:19AM
:20AM
:20AM

234

1  before you used to bike or you used to run?

2         PROSPECTIVE JUROR:  A little bit of both.

3         THE COURT:  Okay.  There's one question you

4  didn't answer, "do you have an opinion about

5  political fundraising."  That could be yes, or no,

6  or no opinion.

7         PROSPECTIVE JUROR:  I have no opinion.

8         THE COURT:  Pay a lot of attention to

9  politics?

10         PROSPECTIVE JUROR:  If it's in the media, but

11  otherwise, I'd say not really.

12         THE COURT:  Now, there is some things that

13  you mentioned, and I'm going to go over them, that

14  you can remember from the stuff you read, heard or

15  saw about a trial in the summer, last summer.  The

16  question I have for you is, anything you read or

17  anything you know going to affect your ability to

18  decide this case solely on the evidence in the

19  courtroom?

20         PROSPECTIVE JUROR:  (No response.)

21         THE COURT:  Let me put it another way.

22         PROSPECTIVE JUROR:  Yeah.

23         THE COURT:  When you come into the courtroom,

24  particularly for a case that's had some publicity,

25  most people have some knowledge or at least they

think it's knowledge, because sometimes they're
sadly mistaken, they think they have knowledge about
the case that they acquired from TV or the news, and
when we have people on the jury, we don't expect
them to be able to erase that from their minds or to
forget about it completely.  In fact, I can't think
of anything that would make it more likely for you
to remember something than for me to point at it and
tell you to forget it.  What we require is is that
when you decide the case, you take everything that
you heard or read about the case outside the
courtroom, you put it off to one side, and you start
balancing the scales of evidence only with the
things that were testified to or that you heard as
evidence in court.  That's what we ask you to do, to
put any prior opinions or knowledge to one side and
reach a conclusion solely on the basis of the
evidence.  Can you do that?

       PROSPECTIVE JUROR:  Yes.

       THE COURT:  What's the flight in May, what's
that for?

       PROSPECTIVE JUROR:  I'm a godmother to my
girlfriend's child who is getting baptized.

       THE COURT:  Okay.  Thank you.

    (Prospective juror exited the courtroom, and the

236

```
 1        following proceedings were had herein:)
 2        (Brief pause).
 3        (Prospective juror entered the courtroom, and
 4         the following proceedings were had herein:)
 5           THE COURT:  Hello.
 6           PROSPECTIVE JUROR:  Hi.
 7           THE COURT:  You're 132?
 8           PROSPECTIVE JUROR:  Yes.
 9           THE COURT:  Okay.  The video store.
10           PROSPECTIVE JUROR:  Yes.
11           THE COURT:  This is the family video store?
12           PROSPECTIVE JUROR:  Well, it's an
13  independent.
14           THE COURT:  Right.
15           PROSPECTIVE JUROR:  Yeah.  But it is a
16  family --
17           THE COURT:  The family has the video store
18  and you sometimes work there?
19           PROSPECTIVE JUROR:  It's my husband's store,
20  yes, and we help by filling in or when he needs help
21  with an employee.
22           THE COURT:  How's business?
23           PROSPECTIVE JUROR:  It's slow.  It's picking
24  up.  We had closed for about 4 months, and most of
25  my main customers went to other avenues, but they're
```

:24AM
:24AM
:24AM
:24AM
:25AM

237

1 slowly coming back.

2     THE COURT:  Do you think in the long run the

3 video store is going to survive?

4     PROSPECTIVE JUROR:  It depends.  Right now

5 they put the 28-day block so like Netflix and Red

6 Box can't access to them, whereas that wasn't there

7 before.  Now that they're doing it, it's helping us.

8     THE COURT:  Okay.

9     PROSPECTIVE JUROR:  Yeah.

10     THE COURT:  Watch a lot of movies yourself?

11     PROSPECTIVE JUROR:  Yes, sir.

12     THE COURT:  Do you have strong opinions about

13 movies?

14     PROSPECTIVE JUROR:  What I like.  I like

15 comedies, dramas, I don't like Syfi, I like action,

16 I don't like horror.

17     THE COURT:  Now, how often do you work there?

18 How many hours a week?

19     PROSPECTIVE JUROR:  It -- it really varies.

20 Like last week I was there may be 2 hours, I was

21 here most of the time, granted, but we open late.

22 We open at 3:00.

23     THE COURT:  And you volunteer for the town

24 festivals?

25     PROSPECTIVE JUROR:  Yes.

238

1          THE COURT:  Do you do that every year?

2          PROSPECTIVE JUROR:  I may not do it this

3     year.  I have a bad knee that acts up, there's a lot

4     of walking to that.

5          THE COURT:  You have a son who worked for a

6     security, in a security position, a daughter who

7     works as a bank teller.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Who was in the Navy?

10         PROSPECTIVE JUROR:  That was my brother.  I

11    lived in Texas when he was in the Navy, so I don't

12    know much of where he was stationed and such.

13         THE COURT:  You answered the question about

14    hiring a lawyer for a particular kind of proceeding.

15    In the end, were you satisfied with the results of

16    that proceeding?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And that was in 2001?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Ever hire a lawyer for any other

21    reason?

22         PROSPECTIVE JUROR:  No, Your Honor.

23         THE COURT:  Who was the justice of the peace

24    in Texas?

25         PROSPECTIVE JUROR:  That was my father.

239

1          THE COURT:  Your father.

2          Dogs.  Many dogs, a few dogs?

3          PROSPECTIVE JUROR:  Five dogs.

4          THE COURT:  Five dogs.

:28AM   5          PROSPECTIVE JUROR:  I just rescued one, so

6   five.

7          THE COURT:  You read the local paper?

8          PROSPECTIVE JUROR:  My husband takes it to

9   work with him, so if I can get a copy; not usually.

:29AM   10   I read maybe front section once a week.

11          THE COURT:  You follow news on television or

12   radio?

13          PROSPECTIVE JUROR:  I tape it and then I fast

14   forward through what I want to hear, yes, I do.  I

:29AM   15   usually watch the weather, though, and the pictures

16   on channel 5.

17          THE COURT:  Okay.  And, basically, you never

18   paid much attention to this case first time around,

19   is that right?

:29AM   20          PROSPECTIVE JUROR:  No; I knew it was going

21   on, but, no.

22          THE COURT:  But you don't come to this case

23   with any preconceptions, one way or the other, about

24   how it ought to turn out, is that right?

:30AM   25          PROSPECTIVE JUROR:  You're right.

240

1

2          THE COURT:  You watch Judge Judy?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  A lot of or a little?

5          PROSPECTIVE JUROR:  When I'm at work, it's

6     on.

7          THE COURT:  Right.  It's not much like that

8     here.  I don't want you to be disappointed.

9          PROSPECTIVE JUROR:  No, that's basically

10    everybody that is married or living together is

11    basically Judge Judy.

12         THE COURT:  Okay.  Thank you.

13         PROSPECTIVE JUROR:  Thank you.

14       (Prospective juror exited the courtroom, and the

15        following proceedings were had herein:)

16       (Brief pause).

17       (Prospective juror entered the courtroom, and

18        the following proceedings were had herein:)

19         THE COURT:  Hi.  You're number 133?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Good.  You had a list of

22    prescription drugs which may or may not have side

23    effects on you.

24         PROSPECTIVE JUROR:  Correct.

25         THE COURT:  And you list the drugs, and I

241

don't want to go through them in a public record,
but would any of the side effects you have, if you
have them, affect your ability to be a fair juror?

PROSPECTIVE JUROR:  No.

THE COURT:  You just think they may make you
uncomfortable?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Okay.  That's all I want to know.

You're youngest child is 40?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Who did you refer to, friends or
relatives, with respect to the Army and the Navy?

PROSPECTIVE JUROR:  Let me see, my
brother-in-law, a couple of nephews, I have a couple
of nephews that are in the service right now.

THE COURT:  Do you know of any family member
or close friend who has been arrested or convicted
of a crime?

PROSPECTIVE JUROR:  No.

THE COURT:  And the only reason you consulted
with lawyers over the years is real estate and
probate?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Okay.  There are two questions
here to which you put question marks, and given the

242

phrasing of the question, I don't really blame you.
One was:

 "Have you or anyone close to you ever been asked
  to testify in court as a witness?"
 Have you ever had to testify in court?

   PROSPECTIVE JUROR:  I did probably about 39,
40 years ago in my sister's divorce hearing.

   THE COURT:  In what?

   PROSPECTIVE JUROR:  In a divorce hearing.

   THE COURT:  That's the only time?

   PROSPECTIVE JUROR:  That's the only I've
ever --

   THE COURT:  Has anybody filed a suit against
you or someone you know, a lawsuit?

   PROSPECTIVE JUROR:  Not to my knowledge, not
against me.

   THE COURT:  Usually you do know.  They give
you a piece of paper.

   PROSPECTIVE JUROR:  Not against me, they
haven't.

   THE COURT:  Okay.  You have a list of
basically charitable and civic organizations that
you participate in one way or the another.  Are any
of those things that take place a significant amount
of your time?

1      PROSPECTIVE JUROR:  No, I'm a hobbyist, a
2  quilter, and I make quilts for the majority of them.
3      THE COURT:  Right.  And then they sell them
4  and --
5      PROSPECTIVE JUROR:  Basically, no, they just
6  use them.  Some of them sell them, but usually, like
7  the Shriners Children Hospital, they actually use
8  them.
9      THE COURT:  Okay.  How much of time does it
10 take you?  How much time do you devote to that out
11 of a week?
12     PROSPECTIVE JUROR:  I can make one crib-sized
13 quilt, it'll take me probably two days, and I make
14 anywhere from 30 to 50 of them a year.
15     THE COURT:  Now, you do recognize, and you
16 said this in answer to several questions, that with
17 respect to politicians, you said:
18    "I believe most are honest and really believe
19     they can do good, but upon being selected find
20     out there is some pay-to-play to a certain
21     extent ... "
22     And then you also answered the question which
23 said -- in answer to the question:
24    "Do you believe that public officials make
25     official decisions to benefit contributors in

244

1 exchange for campaign contributions they have
2 received or believe they will receive?
3 And you said yes, and then you said:
4 "I don't think it's right, but I think most of
5 them do it."
6  Now, the question I want to ask you is, even
7 if you're right that most of them do it, the issue
8 before you here is not going to be whether most of
9 them do it, there is no defendant named most, and
10 there are not a lot of defendants, there's just one.
11 The question is going to be whether the government
12 can prove its case beyond a reasonable doubt that
13 this defendant did something that was against the
14 law.  So my question to you is, you can put aside
15 whatever general opinions you have about elected
16 officials and decide this case solely on the basis
17 of the evidence in this courtroom, can you do that?
18  PROSPECTIVE JUROR:  I believe I can, sir.
19  THE COURT:  Okay.  Actually, I shouldn't have
20 asked you a bunch of questions since you put it in
21 writing, you have the phrase, "quilting constantly."
22  PROSPECTIVE JUROR:  Hey, if I were at home
23 right now, I'd have my quilting machine going.  In
24 fact, in the little room I've got a quilt I'm
25 putting a binding on it.  So I am always at my

:36AM

:36AM

:36AM

:37AM

:37AM

245

1   sewing machine.

2          THE COURT:  Do you listen to anything when

3   you're quilting?  Radio?

4          PROSPECTIVE JUROR:  Pardon me?

5          THE COURT:  Do you listen to anything when

6   you're quilting?

7          PROSPECTIVE JUROR:  Oh, I usually have a

8   radio station on, yeah.

9          THE COURT:  Music or talk?

10         PROSPECTIVE JUROR:  Music.

11         THE COURT:  Yeah.  Now, there's one other

12  last question I want to ask you about.  The

13  questionnaire said:

14     "This case involves cooperating individuals

15     utilized by federal agents, do you have any

16     view about the use of cooperating individuals

17     ho would make it difficult for you to be fair

18     to either side in this case?"

19     And your answer was yes, and you said:

20     "If someone who has been convicted of crimes

21     testified, how can I be sure it's truthful if

22     he's being compensated in any way, shape, or

23     form?"

24         Which is your answer to a question with a

25  question, so I'll give you the answer to that.  The

246

1  answer is, there's no machine that will tell you
2  whether they're truthful, there is no test you can
3  administer to them.  The reason we have juries is
4  the jurors use their judgment of an individual and
5  make a determination whether that individual is
6  telling the truth.  Sometimes that's a hard decision
7  to make, sometimes it's real easy, but there's no
8  program, no computer program for that, even the ones
9  we all have in our own minds, you just have to make
10  a judgment, and the question is, would you be
11  willing to make that judgment.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Okay.

14          It actually may not be all that dissimilar
15  from the time many years ago when you had to decide
16  which child was telling you the truth.

17          PROSPECTIVE JUROR:  Right.

18          THE COURT:  Thank you.

19      (Prospective juror exited the courtroom, and the
20       following proceedings were had herein:)

21      (Brief pause).

22      (Prospective juror entered the courtroom, and
23       the following proceedings were had herein:)

24          THE COURT:  Have a seat.

25          You're 134?

247

 1          PROSPECTIVE JUROR:  Yes, sir.

 2          THE COURT:  Okay.

 3          How long have you been doing your current

 4   job?

 5          PROSPECTIVE JUROR:  It's going on 2 years.

 6          THE COURT:  And what did you do before then?

 7          PROSPECTIVE JUROR:  Homemaker.

 8          THE COURT:  Okay.  And I don't want to say

 9   this out loud, but you answered a question which

10   said, basically, that you had plans for changing

11   your life in a pretty big way?

12          PROSPECTIVE JUROR:  Uh-huh.

13          THE COURT:  Are those still your plans?

14          PROSPECTIVE JUROR:  Actually, 3 months.

15          THE COURT:  Say that again.  Speak into the

16   mike, I'm not hearing your answer.

17          THE MARSHAL:  Testing, one, two, three.

18         (Screeching noise in the courtroom.)

19          THE COURT:  Hold it at the bottom.

20          PROSPECTIVE JUROR:  Okay.  Sorry.  3 months.

21   In 3 months I'll be moving to California.

22          THE COURT:  Okay.  You pay much attention to

23   politics and elections?

24          PROSPECTIVE JUROR:  No, Your Honor.

25          THE COURT:  Do you have any particular

248

1 hobbies or activities that you do?

2      PROSPECTIVE JUROR:  Usually with my teenager

3 daughters, shopping with them, and, you know, we go

4 to church a lot.

5      THE COURT:  Anything you particularly read?

6      PROSPECTIVE JUROR:  The Bible.

7      THE COURT:  Any magazines you read?

8      PROSPECTIVE JUROR:  Women's World Magazine,

9 uh-huh.

10      THE COURT:  Now, do you read both the Bible

11 and Women's World regularly?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  Do you listen to anything on the

14 radio in particular?

15      PROSPECTIVE JUROR:  Like -- not really.

16 Like B 96, or some Christian station on the radio,

17 too.

18      THE COURT:  You listen to a lot of radio?

19      PROSPECTIVE JUROR:  Not really.

20      THE COURT:  Watch a lot of television?

21      PROSPECTIVE JUROR:  I watch a lot of cable.

22      THE COURT:  Never sat on a jury before?

23      PROSPECTIVE JUROR:  Never.

24      THE COURT:  Ever watch a show about courtroom

25 dramas?

:43AM

:43AM

:43AM

:44AM

:44AM

249

1       PROSPECTIVE JUROR:  Yes, sir.

2       THE COURT:  Thank you.

3       PROSPECTIVE JUROR:  Okay.

4    (Prospective juror exited the courtroom, and the

5     following proceedings were had herein:)

6    (Brief pause).

7    (Prospective juror entered the courtroom, and

8     the following proceedings were had herein:)

9       THE COURT:  You're number 135?

10       PROSPECTIVE JUROR:  Yes, I am.

11       THE COURT:  Okay.  You are a nurse?

12       PROSPECTIVE JUROR:  Yes, I'm a nurse.

13       THE COURT:  But your current business is

14 basically dealing with preventative medicine, is

15 that correct?

16       PROSPECTIVE JUROR:  It's basically

17 preventative, but it's giving flu and pneumonia

18 shots.

19       THE COURT:  And how many weeks out of the

20 year do you work?

21       PROSPECTIVE JUROR:  I would say it's

22 seasonal, so maybe 4 to 6.

23       THE COURT:  The questionnaire says you do

24 most of your business in October and November.

25       PROSPECTIVE JUROR:  Right.

250

1          THE COURT:  Okay.  And you work as a docent
2   for a museum, is that correct?
3          PROSPECTIVE JUROR:  Yes, that's correct.
4          THE COURT:  And it says here you work there
5   one or two days per week, generally speaking.
6          PROSPECTIVE JUROR:  Right.
7          THE COURT:  And your spouse is a physician?
8          PROSPECTIVE JUROR:  Yes, he is.
9          THE COURT:  Three children, the youngest is
10  22?
11         PROSPECTIVE JUROR:  Right.
12         THE COURT:  Tell me a little about your
13  mother.
14         PROSPECTIVE JUROR:  My mother was diagnosed
15  with pulmonary hypertension which led to heart
16  failure.  She was hospitalized.  I was taking care
17  of her, but she is better now.  She was started on
18  medicine and she is feeling much better.
19         THE COURT:  Okay.  And during a significant
20  period of time, you had to spend a lot of time to
21  attend to her, is that correct?
22         PROSPECTIVE JUROR:  Well, I pretty much was
23  visiting her in the hospital, taking her to some
24  doctors' appointments, but she does live
25  independently, you know, by herself and she does

1  drive, so ....

2         THE COURT:  Okay.  Fine.

3         Ever been in a courtroom yourself as a

4  witness?

5         PROSPECTIVE JUROR:  Never.

6         THE COURT:  Okay.  Your husband was sued but

7  was not found liable, is that correct?

8         PROSPECTIVE JUROR:  Right; he was --

9         THE COURT:  How long ago was that?

10        PROSPECTIVE JUROR:  That was, I would say,

11  maybe 5 years ago.

12        THE COURT:  Did the case go to trial or --

13        PROSPECTIVE JUROR:  It did go to trial.

14        THE COURT:  Okay.  Did you attend that trial?

15        PROSPECTIVE JUROR:  No, I did not.

16        THE COURT:  And I take it from one of your

17  answers, you do donate time to various charitable

18  organizations?

19        PROSPECTIVE JUROR:  Yes, I do.

20        THE COURT:  Now, have you ever worked or

21  given money to somebody who's a candidate for

22  office?

23        PROSPECTIVE JUROR:  No, I have not.  Mine are

24  more, you know, for regular people, ADA, the

25  Weizmann Institute, Children's Homes.

252

1          THE COURT:  Institutions, in other words.

2          PROSPECTIVE JUROR:  Right.

3          THE COURT:  Things like hospitals, museums.

4          PROSPECTIVE JUROR:  Have I ever raised money

5    for a hospital?

6          THE COURT:  No, no.  What I'm trying to get

7    at is whether the stuff that you do has a political

8    twist to it or --

9          PROSPECTIVE JUROR:  No, it does not.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  I'm a docent to the

12   Illinois Holocaust Museum.

13          THE COURT:  Yeah.  And, actually, if I'd

14   looked at the next page I would have said that you

15   clearly said I haven't been involved with political

16   fundraising.

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  And I would not have asked you

19   that question.

20          PROSPECTIVE JUROR:  That's okay.

21          THE COURT:  Is it fair to say that your

22   hobbies and activities are basically centered around

23   the stuff you volunteer to do?

24          PROSPECTIVE JUROR:  Ah --

25          THE COURT:  I didn't say entirely, I said

253

1  basically.

2       PROSPECTIVE JUROR:  I think it's fair to say

3  something like that.

4       THE COURT:  Okay.  But you also list things

5  like bike riding and exercise?

6       PROSPECTIVE JUROR:  Yes, I like to exercise.

7  I like preventative care and that's part of it.

8       THE COURT:  Okay.  Okay, two last answers I

9  want to ask you about.

10      PROSPECTIVE JUROR:  Okay.

11      THE COURT:  You said that, when you were

12  asked if you have read or heard anything about the

13  case, which we asked you in four or five different

14  ways, just so you don't miss it.

15      PROSPECTIVE JUROR:  Right.

16      THE COURT:  It says have you formed any

17  opinion on what you have observed, and what you said

18  is yes, and then you said he was caught on tape

19  doing X, Y and Z.  My question is, and I think you,

20  probably understand that this but I'll say it to

21  you, anyway --

22      PROSPECTIVE JUROR:  Right.

23      THE COURT:  -- everything that you have heard

24  or read about the case and every opinion that you

25  may or may not have had before, if you sit on this

:50AM

:51AM

:51AM

:52AM

:52AM

254

1    jury, all of that stuff has to be laid off to one

2    side and not play any part in your decision process.

3    In other words, you may have had an opinion, you may

4    have learned something, but if it's not part of the

5    evidence in this case, you cannot consider it.  What

6    we usually say to people is, you put it off to one

7    side and you decide the case solely on the basis of

8    the evidence you hear inside the courtroom and

9    that's what you put on the scales when you weigh it.

10           PROSPECTIVE JUROR:  Right.

11           THE COURT:  Would you be able to do that?

12           PROSPECTIVE JUROR:  I believe I can.  I'm not

13   so interested in politics.  I gravitate towards

14   stories that are more about regular people.  I'm

15   more of, I believe certain things for human rights

16   are black and white, that's why I do many of the

17   charities that I do and I'm involved in them, but I

18   think that a lot of the things in life are gray.

19   And so to answer your question, I think I could.

20           THE COURT:  Okay.  Then you also have a

21   reference to something you heard that the defendant

22   said about an accusation that the government is

23   withholding evidence.  Unless, for example, that's

24   proven in court, you would have to disregard, put

25   that memory of what was said off the scales of

255

1  justice, do you think you'd be able to do that?

2        PROSPECTIVE JUROR:  Yes, I do.  I'm not

3  really politically inclined.  So politics is not

4  really what I'm so interested in.  So I have watched

5  the news, I watch the news every day, and you can't

6  help but hear things that are said on the news

7  because the news is important.

8        THE COURT:  Right.

9        PROSPECTIVE JUROR:  So I was repeating what I

10 said on the news.

11       THE COURT:  Okay.  That's fine.  Thank you.

12    (Prospective juror exited the courtroom, and the

13     following proceedings were had herein:)

14    (Brief pause).

15       THE COURT:  One more and then we break.

16    (Prospective juror entered the courtroom, and

17     the following proceedings were had herein:)

18       THE COURT:  Hello.

19       PROSPECTIVE JUROR:  Hello.

20       THE COURT:  You're number 137?

21       PROSPECTIVE JUROR:  Yes.

22       THE COURT:  You majored in criminal justice

23 and sociology?

24       PROSPECTIVE JUROR:  Yes.

25       THE COURT:  And now you work for a state

256

1    agency that deals with people's claim for money of

2    one kind or another?

3         PROSPECTIVE JUROR:  Yes.

4         THE COURT:  And what you do is you provide

5    information about the process to whoever is making a

6    claim for it and to whoever is on the other side, is

7    that correct?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  And you've done that for how

10   long?

11        PROSPECTIVE JUROR:  5 years.

12        THE COURT:  And what did you do before then?

13        PROSPECTIVE JUROR:  I was a domestic violence

14   counselor.

15        THE COURT:  Okay.  And how long did you do

16   that?

17        PROSPECTIVE JUROR:  5 years.

18        THE COURT:  And who did you work for then?

19        PROSPECTIVE JUROR:  At the domestic violence

20   counseling?

21        THE COURT:  At the where?

22        PROSPECTIVE JUROR:  I'm sorry, I didn't

23   understand.

24        THE COURT:  Who did you work for when you

25   were a domestic violence counselor?

257

1          PROSPECTIVE JUROR:  Oh, it was called Mujeres
2 Latinas en Accion.
3          THE COURT:  It's basically designed to serve
4 Hispanic clients?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  And you worked as a paralegal for
7 Por Acqui & Associates.
8          PROSPECTIVE JUROR:  Yes, for 2 years.
9          THE COURT:  And what kind of stuff did you
10 work on?
11          PROSPECTIVE JUROR:  Medical malpractice and
12 work injuries.
13          THE COURT:  And you've been a Sunday school
14 teacher or are you a Sunday school teacher?
15          PROSPECTIVE JUROR:  For the past year I have
16 not.
17          THE COURT:  And you work with 3 to 5-year old
18 children?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  Very courageous.
21          PROSPECTIVE JUROR:  Yes.
22          THE COURT:  And your father owned a business
23 or owns a business?
24          PROSPECTIVE JUROR:  Yes, he does.
25          THE COURT:  And you worked in that business,

258

1  too?

2       PROSPECTIVE JUROR:  Yes.

3       THE COURT:  And your husband also works, is

4  that correct?

5       PROSPECTIVE JUROR:  He is currently employed,

6  yes.

7       THE COURT:  And what kind of work does he do?

8       PROSPECTIVE JUROR:  He's an auto mechanic and

9  he manages the office where he works.

10      THE COURT:  Okay.  And when you got the job

11 at the current agency you worked for, you also

12 applied to another state agency, is that correct?

13      PROSPECTIVE JUROR:  Yes, I did.

14      THE COURT:  And you took the job that you got

15 called for first?

16      PROSPECTIVE JUROR:  I did.

17      THE COURT:  You like your work?

18      PROSPECTIVE JUROR:  I do.

19      THE COURT:  Do you belong to anything?  Club,

20 group, organization, a union, a church, anything at

21 all?

22      PROSPECTIVE JUROR:  Yes, a union, because of

23 work.

24      THE COURT:  Okay.  And which union do you

25 belong to?

259

1      PROSPECTIVE JUROR:  Local 1065.

2      THE COURT:  An ACME local?

3      PROSPECTIVE JUROR:  ACME, yes.

4      THE COURT:  And we asked you what your
5  primary activities are and, basically, you said
6  children.

7      PROSPECTIVE JUROR:  Yes, during the day I go
8  to work and after work I am a mom.

9      THE COURT:  Okay.  And you want to miss the
10 Oprah show on May 10th.

11     PROSPECTIVE JUROR:  No.

12     THE COURT:  For which you have tickets or a
13 ticket?

14     PROSPECTIVE JUROR:  Well, we have four
15 tickets.

16     THE COURT:  Four tickets.

17     PROSPECTIVE JUROR:  Yes.

18     THE COURT:  And you did see some news
19 coverage of the first trial, is that right?

20     PROSPECTIVE JUROR:  Yes.

21     THE COURT:  What you said in answer to the
22 one question is:

23     "Media usually repeats the same information
24     which I feel would not be enough to render a
25     decision."

260

1          That is your view?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Well, you're right, it's not

4     enough to render a decision.  Your duty is to decide

5     this case solely on the basis of the evidence that

6     you hear in court, not on the basis of anything you

7     heard or read out of court, do you understand that?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Do you think you can do that?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Thank you.

12         PROSPECTIVE JUROR:  Thank you.

13       (Prospective juror exited the courtroom, and the

14         following proceedings were had herein:)

15         THE COURT:  We'll take a break now from the

16    jury, but I want counsel come to the lectern.

17          You can sit back down.

18          You can rise if you want to, but counsel come

19    to the lectern.

20       (Brief pause).

21         THE COURT:  A couple of observations I have.

22    With respect to juror 135, juror 135 filed a request

23    for deferral based on certain specific

24    circumstances.  I regard that as now withdrawn for

25    good reasons, curative reasons.  So we're okay with

261

1 that.

2     Anybody want to do a quick rundown on

3 challenges for cause in this last group or you can

4 save it, if you want to, it's up to you.

5     MR. SOROSKY:  Could we save those until the

6 end of the day?

7     THE COURT:  You want to save them?

8     MR. SCHAR:  Yeah.  Sure.

9     THE COURT:  That is probably better.

10     I would say maybe 15 minutes.

11   (Recess.)

12   (The following proceedings were had out of the

13    presence of the prospective jury in open

14    court:)

15     THE MARSHAL:  Ladies and gentlemen, please

16 remain seated.

17     THE COURT:  We're doing 138 now?

18     MR. SCHAR:  Yes, Judge.

19     THE COURT:  Yes.  Okay.

20   (Prospective juror entered the courtroom, and

21    the following proceedings were had herein:)

22     THE COURT:  Hi.  Please sit down.

23     You're 138 today?

24     PROSPECTIVE JUROR:  Yes, I am.

25     THE COURT:  Okay.  Who do you work for?

1          PROSPECTIVE JUROR:  The Chicago Tribune.

2          THE COURT:  And what do you do for them?

3          PROSPECTIVE JUROR:  Right now I run the On

4   the Town section which is weekend entertainment

5   products.

6          THE COURT:  And you have indicated to me that

7   the 10 to 12 week duration would impose a

8   significant hardship because you have no long-term

9   replacement?

10         PROSPECTIVE JUROR:  That is correct.

11         THE COURT:  Would that have been true four or

12  5 years ago?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Well, I think it's a very

15  selfless thing for you to do because there'll be a

16  tremendous book opportunity if you sat on this jury.

17         PROSPECTIVE JUROR:  Ah, that has crossed my

18  mind, but I just think that it would be -- I'm just

19  not thinking of it as a book writer.  Not that

20  interesting.

21         THE COURT:  Have you had anything to do at

22  all with the coverage of this first trial?

23         PROSPECTIVE JUROR:  Outside of conversations

24  with friends who cover it, voracious consumption of

25  what we do, reading editorials, forming opinions,

1 no.  It wasn't meant to be as flip as it sounded.

2          THE COURT:  No, actually I thought it was

3 appropriate under the circumstances.

4          You once had a relationship with a State

5 Representative?

6          PROSPECTIVE JUROR:  Yes, she's my ex-wife,

7 Elaine Nekritz.

8          THE COURT:  Did you work at all in her

9 campaigns?

10          PROSPECTIVE JUROR:  Yes, in volunteer

11 efforts, crowd control, that sort of thing.

12          THE COURT:  When did you start with the

13 Tribune?

14          PROSPECTIVE JUROR:  In 2000.

15          THE COURT:  And were you employed before

16 then?

17          PROSPECTIVE JUROR:  Yes, at Channel 11.

18          THE COURT:  And what did you do for them?

19          PROSPECTIVE JUROR:  I worked on their

20 newspaper which was called -- God, the name escapes

21 me now.  City Talk, and had some audio work, as

22 well.

23          THE COURT:  And how long did you work for

24 them?

25          PROSPECTIVE JUROR:  1 year.

264

1          THE COURT:  And before that?

2          PROSPECTIVE JUROR:  The Sun-Times.

3          THE COURT:  What did you do for the
4   Sun-Times?

5          PROSPECTIVE JUROR:  I began as a copy clerk
6   and then became a reporter and then a reporter
7   editor.

8          THE COURT:  And did you get these news jobs
9   out of college or did you do something else first?

10          PROSPECTIVE JUROR:  No, I spent a number of
11  years being a dummy and trying to be a World Class
12  amateurist cyclist and that didn't go so well, and
13  then came back from my last Olympic trials and the
14  managing editor said "what do you want to do now"
15  and I said I would like to try writing, and he said,
16  "okay, go start."

17          THE COURT:  Is your mother still employed or
18  did she retire?

19          PROSPECTIVE JUROR:  She is retired.

20          THE COURT:  And how about father?

21          PROSPECTIVE JUROR:  He is retired as well.

22          THE COURT:  I noticed that you read the
23  Tribune daily, the Sun-Times daily, and the Daily
24  Herald daily.

25          PROSPECTIVE JUROR:  Yes; absolutely.

265

1          THE COURT:  Do you read any out-of-town
2  newspapers at all?
3          PROSPECTIVE JUROR:  The New York Times, Wall
4  Street Journal.
5          THE COURT:  Thank you.
6          PROSPECTIVE JUROR:  Thank you.
7      (Prospective juror exited the courtroom, and the
8       following proceedings were had herein:)
9      (Brief pause).
10     (Prospective juror entered the courtroom, and
11      the following proceedings were had herein:)
12         THE COURT:  You are number 139?
13         PROSPECTIVE JUROR:  Yes.
14         THE COURT:  I'm not going to go over all of
15  these questions with you, but I am going to do a few
16  of them.  The first one is is you said that you're
17  taking some prescription drugs which have side
18  effects that you're aware of.  Are any of those side
19  effects the kind of thing that would prevent you
20  from being a tentative juror?
21         PROSPECTIVE JUROR:  No, I've been wide awake
22  since I've been here, all three days.
23         THE COURT:  So these are just annoying kinds
24  of things that happen to you.
25         PROSPECTIVE JUROR:  Uh-huh.

266

1       THE COURT:  Okay.

2       You owe somebody a thesis?

3       PROSPECTIVE JUROR:  University of Chicago.

4       THE COURT:  Okay.  How long?

5       PROSPECTIVE JUROR:  I have to pay them the

6   money, too, for that class so ...

7       THE COURT:  Has it been a while?

8       PROSPECTIVE JUROR:  Uh-huh.

9       THE COURT:  University of Chicago holds the

10  world's record for waiting for dissertations.

11      PROSPECTIVE JUROR:  Yes.

12      THE COURT:  You're a graphic designer?

13      PROSPECTIVE JUROR:  Uh-huh.

14      THE COURT:  How long have you done that kind

15  of work?

16      PROSPECTIVE JUROR:  My undergraduate is art,

17  and I was able to get a job in my field.  So I've

18  been doing art the whole time, so almost 20 years.

19      THE COURT:  This is like design layouts and

20  stuff like that?

21      PROSPECTIVE JUROR:  Uh-huh.

22      THE COURT:  Okay.  And this is like magazines

23  and news letters?

24      PROSPECTIVE JUROR:  Actually I work at a

25  hospital right now.  Usually I work in marketing,

1 advertising, and PR places.

2      THE COURT:  Okay.  How many hours a week do

3 you work?

4      PROSPECTIVE JUROR:  It's a 40-hour week,

5 full-time.

6      THE COURT:  Your mother worked for the postal

7 inspectors?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  How long did she do that for?

10      PROSPECTIVE JUROR:  She did that from -- I

11 think we moved here in '69 and until her death in

12 '05.  She retired from there.

13      THE COURT:  And you once worked in the

14 library of a law firm?

15      PROSPECTIVE JUROR:  Yes.

16      THE COURT:  How long did you do that?

17      PROSPECTIVE JUROR:  That was right before --

18 being an artist, I moved out to California, so it

19 wasn't -- I don't think it was a whole year.

20      THE COURT:  Okay.  You have a family member

21 in the Air Force?

22      PROSPECTIVE JUROR:  My father was in the Air

23 Force and an uncle was in the Air Force.

24      THE COURT:  You've never been arrested or

25 convicted of a crime?

:39AM

:40AM

:40AM

:40AM

:41AM

268

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  But you've had family members get

3  arrested or convicted, is that correct?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And you refer to them as young

6  idiot cousins?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  And you were the victim of a

9  crime of a burglary?

10          PROSPECTIVE JUROR:  Mostly home invasion,

11  burglary, people taking things; TV's.

12          THE COURT:  Were you present for any of

13  these?

14          PROSPECTIVE JUROR:  Pardon?

15          THE COURT:  Were you present for any of

16  these?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  And no one was ever charged for

19  that?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  You had a close friend or family

22  member who was a victim of a crime?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Serious crime?

25          PROSPECTIVE JUROR:  She didn't survive.

269

1          THE COURT:  And no one was ever charged with
2   that?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  How long ago did that occur?

5          PROSPECTIVE JUROR:  That was -- that had to
6   have been years ago, when I was 20.

7          THE COURT:  Would that experience affect your
8   ability to be fair in this case?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  And you used the legal process as
11  leverage to create money owed to you?

12         PROSPECTIVE JUROR:  Yes, I did.

13         THE COURT:  Did you do that all by yourself
14  or did you have a lawyer?

15         PROSPECTIVE JUROR:  No, I had a lawyer.

16         THE COURT:  Were you thrilled and surprised
17  that it worked or did you just disregard it?

18         PROSPECTIVE JUROR:  Actually, I guess when I
19  presented the information to the person, she's like,
20  oh, no, we can definitely at least get a lien placed
21  on the property.  A lien stayed on there for a
22  number of years until she wanted to refinance.  And,
23  of course, I guess she tried to go through
24  bankruptcy court, she was working against somebody
25  from another law firm or something.

1     THE COURT:  Yeah.

2     PROSPECTIVE JUROR:  And he's the one that

3 alerted the rest of us to the fact that she was

4 trying to go through bankruptcy court without

5 alerting anyone, any of the creditors, so it worked

6 out.

7     THE COURT:  And you had a lawyer for probate

8 issues involving your mother.

9     PROSPECTIVE JUROR:  Yeah, in California you

10 definitely have to have every i and t dotted exactly

11 the way they want, so you need someone on the ground

12 there.

13     THE COURT:  You say you testified in

14 bankruptcy court, is that right?

15     PROSPECTIVE JUROR:  I'm sorry?

16     THE COURT:  It says you --

17     PROSPECTIVE JUROR:  Yes, I did, I testified

18 in bankruptcy court that she had -- it was just that

19 she had not informed me of anything, any of the

20 goings on or anything like that.

21     THE COURT:  And it says here that you're

22 still friends with the person you sued.

23     PROSPECTIVE JUROR:  Yeah.

24     THE COURT:  But you're not engaging in any

25 money dealings.

271

1          PROSPECTIVE JUROR:  Correct.

2          THE COURT:  Okay.  You talk about friends or
3    relatives involved in labor relations stuff.  Are
4    these people who were close to you?

5          PROSPECTIVE JUROR:  I have a cousin in Kansas
6    City that worked at a labor relations law firm in
7    Kansas City.  She left there.  She's a judge now,
8    family law, though.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  And other labor relations
11   would just be union relatives.

12         THE COURT:  Okay.  Do you know what firm she
13   worked for, by any chance?

14         PROSPECTIVE JUROR:  In Kansas City.

15         THE COURT:  Okay.  And it says here your
16   aunt's husband once ran for some office in Chicago.

17         PROSPECTIVE JUROR:  I don't remember the
18   office, I just remember being told to keep my nose
19   clean.

20         THE COURT:  Okay.  Who told you to keep your
21   nose clean?

22         PROSPECTIVE JUROR:  My aunt.

23         THE COURT:  Do you remember the name -- well,
24   you actually wrote the name of that person down.

25         PROSPECTIVE JUROR:  Yeah.

1           THE COURT:  Okay.  Do you know what happened
2   to that person?
3           PROSPECTIVE JUROR:  He didn't -- he didn't
4   win, he's -- yeah, I do know, like in the long run
5   what happened to him, yes.
6           THE COURT:  Okay.  Was this somebody you were
7   close with personally?
8           PROSPECTIVE JUROR:  Yeah, he was my uncle
9   since I was -- he married her when I think I was
10  about 6 years old, maybe.
11          THE COURT:  Considering what happened to him
12  after all this was over, would that affect your
13  ability to be fair and impartial in this case?
14          PROSPECTIVE JUROR:  No.
15          THE COURT:  Okay.  And you have actually
16  written to governors?
17          PROSPECTIVE JUROR:  Yeah.
18          THE COURT:  Two of them, I see.
19          PROSPECTIVE JUROR:  Yeah.  One was -- I can't
20  even remember what the issue was, the second was the
21  park issue here, state parks.
22          THE COURT:  Did you get a response?
23          PROSPECTIVE JUROR:  I don't think so.
24          THE COURT:  Okay.  You wrote it to the
25  defendant in this case.

:45AM
:45AM
:45AM
:45AM
:46AM

273

1      PROSPECTIVE JUROR:  At that time, yes.

2      THE COURT:  Would this process and what

3  happened here affect your ability to be fair?

4      PROSPECTIVE JUROR:  No; we came up on top,

5  parks are holding.

6      THE COURT:  And you read a lot of books and

7  listen to a lot of books?

8      PROSPECTIVE JUROR:  Uh-huh.

9      THE COURT:  You were very careful to add that

10 where it looked like you might be reading a book you

11 wanted to make sure we understood that it was

12 listening to when you were in the car, right?

13     PROSPECTIVE JUROR:  Yeah, I don't like

14 reading so much as I like listening to it.  The

15 chore of reading is different.  When you listen to

16 it, you can go into multitask.

17     THE COURT:  Do you listen to much radio?

18     PROSPECTIVE JUROR:  In the car, the commute

19 to and from work.

20     THE COURT:  Music, talk radio?

21     PROSPECTIVE JUROR:  Talk radio.

22     THE COURT:  You listen to WGN a lot?

23     PROSPECTIVE JUROR:  The news in the morning

24 for the weather while I'm getting dressed for work.

25     THE COURT:  I take it from your answers, you

1  didn't pay much attention to this trial while it was

2  going on the first time.

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Thank you.

5      (Prospective juror exited the courtroom, and the

6       following proceedings were had herein:)

7      (Brief pause).

8      (Prospective juror entered the courtroom, and

9       the following proceedings were had herein:)

10         THE COURT:  Hello, 140.

11         PROSPECTIVE JUROR:  Good morning.

12         THE COURT:  You're a teacher?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  What do you teach?

15         PROSPECTIVE JUROR:  I currently teach 3, 4 of

16  classrooms.

17         THE COURT:  You're teaching little kids?

18         PROSPECTIVE JUROR:  Correct.

19         THE COURT:  What does a learning coach do?

20         PROSPECTIVE JUROR:  I was in charge of staff

21  development and working with other teachers for

22  3 years.

23         THE COURT:  Do you like teaching?

24         PROSPECTIVE JUROR:  Love it.

25         THE COURT:  Did you like being a learning

275

1  coach?

2         PROSPECTIVE JUROR:  Loved that one, too.

3         THE COURT:  Just as much, or less, or both?

4         PROSPECTIVE JUROR:  I like to combine both

5  jobs, but that's not possible.

6         THE COURT:  And you have not supervised other

7  teachers but you have mentored them.

8         PROSPECTIVE JUROR:  Correct.

9         THE COURT:  Your father still own that

10 business?

11         PROSPECTIVE JUROR:  Pardon me?

12         THE COURT:  Does your father still own that

13 business?

14         PROSPECTIVE JUROR:  He's deceased.

15         THE COURT:  He's deceased, right.

16         You or somebody close to you was the victim

17 of a smash and grab?

18         PROSPECTIVE JUROR:  My sister.

19         THE COURT:  Where was it?

20         PROSPECTIVE JUROR:  I don't recall.

21 Someplace in --

22         THE COURT:  Was she injured?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  But no one was ever caught for

25 it?

276

1       PROSPECTIVE JUROR:  No.

2       THE COURT:  Never hired a lawyer yourself for
3  any reason?

4       PROSPECTIVE JUROR:  No.

5       THE COURT:  Your son, it says here:
6     "Had a disturbing the peace situation and
7      brought to the local police station, and was
8      brought to the local police station with his
9      friends when he was about 14 or 15."

10      PROSPECTIVE JUROR:  Correct.

11      THE COURT:  Did they call you?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  Did you go down to the police
14  station?

15      PROSPECTIVE JUROR:  Yes.

16      THE COURT:  Did you think of strangling your
17  child at the time?

18      PROSPECTIVE JUROR:  For a short period of
19  time.

20      THE COURT:  For a short period of time.  And
21  what happened?

22      PROSPECTIVE JUROR:  He was peer -- he
23  appeared in front of his peers to get some community
24  service.

25      THE COURT:  Ever get arrested again?

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  So that worked the first time?

3      PROSPECTIVE JUROR:  Yes; he's a good kid.

4      THE COURT:  Now you were in a large march

5  once in support of stricter gun control?

6      PROSPECTIVE JUROR:  Correct.

7      THE COURT:  Done anything like that again on

8  any issue?

9      PROSPECTIVE JUROR:  No.

10      THE COURT:  You've written letters in support

11  of more teacher-friendly legislation?

12      PROSPECTIVE JUROR:  Correct.

13      THE COURT:  It says you belong to the

14  National Education Association, your community

15  church, Young Life, Compassion International, and

16  book clubs.  How much of your time does that take?

17      PROSPECTIVE JUROR:  Maybe 10 to 15 percent.

18  I'm pretty busy with my job, too.

19      THE COURT:  How much does the National

20  Education Association take or are you just simply a

21  member?

22      PROSPECTIVE JUROR:  I'm just a member because

23  I'm an educator.

24      THE COURT:  And you made telephone calls on

25  behalf of a congressional candidate for about an

278

1 hour?

2       PROSPECTIVE JUROR:  Correct.

3       THE COURT:  And that's because your neighbor

4 roped you into it?

5       PROSPECTIVE JUROR:  Yes.

6       THE COURT:  Okay.  And with respect to

7 questions about do you believe that public officials

8 do X, Y or Z, your answers appear basically to be

9 there are some people who are on both sides, some

10 do, some don't.

11       PROSPECTIVE JUROR:  Correct.

12       THE COURT:  You understand that in this case

13 you're going to be asked to decide whether the

14 government has proved that the defendant here was

15 one of those who does.

16       PROSPECTIVE JUROR:  Yes.

17       THE COURT:  Do you understand that?

18       PROSPECTIVE JUROR:  Yes.

19       THE COURT:  And they have to prove that

20 beyond a reasonable doubt, do you understand that,

21 too?

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  What paper do you ready?

24       PROSPECTIVE JUROR:  Daily Herald.

25       THE COURT:  You said you concentrated more on

279

1　local stories?

2　　　　PROSPECTIVE JUROR:　Correct.

3　　　　THE COURT:　What do you mean by local

4　stories?

5　　　　PROSPECTIVE JUROR:　Well --

6　　　　THE COURT:　In the area you live?

7　　　　PROSPECTIVE JUROR:　Yes.

8　　　　THE COURT:　Okay.　Watch a lot of television?

9　I know you listed your favorite programs, but do you

10　spend a lot of time listening to television?

11　　　　PROSPECTIVE JUROR:　No.

12　　　　THE COURT:　How about the radio?

13　　　　PROSPECTIVE JUROR:　In my morning drive.

14　　　　THE COURT:　Okay. Music or talk?

15　　　　PROSPECTIVE JUROR:　Mixture of both.

16　　　　THE COURT:　What?

17　　　　PROSPECTIVE JUROR:　A mixture of both.

18　　　　THE COURT:　Okay.　The teachers retirement

19　system, you just pay into that?

20　　　　PROSPECTIVE JUROR:　Correct.

21　　　　THE COURT:　You read the reports they send?

22　　　　PROSPECTIVE JUROR:　I try not to.

23　　　　THE COURT:　It says here that you've read

24　headlines about this case and you've avoided details

25　because you're not interested enough to read deeply

:54AM

:54AM

:54AM

:54AM

:55AM

280

1   into the articles, that's basically what it's been?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Do you understand that whatever

4   you may have heard or read about this case, what we

5   ask you to do is to put anything you heard or read

6   about this case out of your mind or actually out to

7   the side, and when you weigh the evidence you weigh

8   only that which you've heard, usually sworn

9   testimony and some exhibits in the courtroom, do you

10  understand that?

11         PROSPECTIVE JUROR:  Yes, I do.

12         THE COURT:  Would you be able to do that?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Thank you.

15     (Prospective juror exited the courtroom, and the

16      following proceedings were had herein:)

17     (Brief pause).

18     (Prospective juror entered the courtroom, and

19      the following proceedings were had herein:)

20         THE COURT:  Hi.  Have a seat.

21         You're 188?

22         PROSPECTIVE JUROR:  Yes, I am.

23         THE COURT:  I'm just going to go down some of

24  these, I'm not going to do the whole thing again.

25         What's your current status in your

1 employment?

2     PROSPECTIVE JUROR:  I'm supposed to be

3 starting a new job today.  I've been unemployed for

4 16 months. I have documentation that I'm starting

5 today, or supposed to start today.

6     THE COURT:  And leave that with us.  We have

7 to look at that, the documentation.

8     PROSPECTIVE JUROR:  No, problem.

9     THE COURT:  Yeah.

10     Basically, you have a degree in accounting

11 and an M.B.A. and you do a lot of work with

12 informations systems?

13     PROSPECTIVE JUROR:  Yes, I do.

14     THE COURT:  Who did you work for before?

15     PROSPECTIVE JUROR:  The company?

16     THE COURT:  Yeah.

17     PROSPECTIVE JUROR:  Axle Noble.

18     THE COURT:  And how long did you work for

19 them?

20     PROSPECTIVE JUROR:  13 years.

21     THE COURT:  Are they still in business?

22     PROSPECTIVE JUROR:  Yes.

23     THE COURT:  So they did layoffs?

24     PROSPECTIVE JUROR:  Yes.

25     THE COURT:  What percentage of their

282

1 employees did they layoff?

2      PROSPECTIVE JUROR:  I'd probably say 10 to 15

3 percent.

4      THE COURT:  Okay.  Now, most of the employees

5 are skilled employees?

6      PROSPECTIVE JUROR:  In the United States,

7 yes.  It's actually a foreign-owned company.

8      THE COURT:  Okay.  And you yourself

9 supervise, it says here, 10 people on occasion.

10      PROSPECTIVE JUROR:  Yes, I did.  I did, yes.

11      THE COURT:  And, basically, you do

12 information systems and the security that goes with

13 it?

14      PROSPECTIVE JUROR:  Information systems,

15 security, auditing, that's my background.

16      THE COURT:  You have one child now 28 years

17 old?

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  You applied for work, it says

20 here, with the FBI and the DEA, is that true?

21      PROSPECTIVE JUROR:  Yes.

22      THE COURT:  How long ago was that?

23      PROSPECTIVE JUROR:  Oh, that was probably

24 about 25 years ago.

25      THE COURT:  And you have a friend or relative

283

1 who was an FBI agent for many years?

2 　　　PROSPECTIVE JUROR:  I have a friend that used

3 -- that was an FBI agent, yes.

4 　　　THE COURT:  It says here also you have a

5 stepdaughter who is a reporter for NBC Chicago?

6 　　　PROSPECTIVE JUROR:  Yes.

7 　　　THE COURT:  Is this somebody who you are

8 particularly close to?

9 　　　PROSPECTIVE JUROR:  Yes.

10 　　　THE COURT:  You were a victim of a theft at

11 one time?

12 　　　PROSPECTIVE JUROR:  Yes.

13 　　　THE COURT:  Was anybody caught for that.

14 　　　PROSPECTIVE JUROR:  No.

15 　　　THE COURT:  You also said you were a victim

16 of discrimination.  That was involved in a lawsuit?

17 　　　PROSPECTIVE JUROR:  Yes.

18 　　　THE COURT:  And what happened with that

19 lawsuit?

20 　　　PROSPECTIVE JUROR:  We settled out of court.

21 　　　THE COURT:  Were you satisfied with the

22 settlement?

23 　　　PROSPECTIVE JUROR:  Yes.

24 　　　THE COURT:  You don't have to be.  You can --

25 　　　PROSPECTIVE JUROR:  I was okay with it.

284

1     THE COURT:  Okay.  You had a lawyer for that,
2 right?

3     PROSPECTIVE JUROR:  Yes, I did.

4     THE COURT:  Do you remember where that case
5 was tried?  What courtroom it was in?  Was it in
6 this building or another building?

7     PROSPECTIVE JUROR:  Another building.

8     THE COURT:  And you testified yourself in a
9 fraud case?

10     PROSPECTIVE JUROR:  Yes.

11     THE COURT:  And you testified as an expert
12 witness?

13     PROSPECTIVE JUROR:  Yes, I did.

14     THE COURT:  And that had to do with the data
15 and the systems and the auditing?

16     PROSPECTIVE JUROR:  Yes, it did.  Well, at
17 the time I was working more in the financial side,
18 so it dealt with theft from a money room.

19     THE COURT:  Your personal involvement in
20 politics is limited to events, a couple of events or
21 more than one event, attended political events,
22 usually fundraisers?

23     PROSPECTIVE JUROR:  Fundraisers I've been
24 involved with with other party or family members.

25     THE COURT:  Your hobbies are what?

1          PROSPECTIVE JUROR:  Skiing, golf, biking.

2          THE COURT:  When you're out of work, did you

3     have a lot of time to do that or was it a little

4     difficult to do that when you're still looking for

5     work?

6          PROSPECTIVE JUROR:  It's a little bit

7     difficult.  Looking for a job is 100-percent

8     commitment.

9          THE COURT:  You said here that a friend of

10    yours is related to the FBI agent on this case, is

11    that correct?

12         PROSPECTIVE JUROR:  It's actually not so much

13    a friend, but I had been getting therapy for an

14    injury and that particular person, their relative

15    was on this case.  So that become a point of

16    discussion.

17         THE COURT:  Do you remember the names?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Thank you.

20         You can give the paper to him.

21         PROSPECTIVE JUROR:  Thank you, sir.

22      (Prospective juror exited the courtroom, and the

23       following proceedings were had herein:)

24      (Brief pause).

25         THE COURT:  We should have 141 next.

286

1          THE MARSHAL:  Yes.

2      (Brief pause).

3          THE COURT:  We're actually going to begin

4   with 141 at 1:00 o'clock.

5          So what we're going to do is take a break now

6   and resume again at 1:00 o'clock.

7          THE MARSHAL:  All rise.

8

9

10      (Luncheon recess taken from 1205 o'clock p.m. to

11       1:00 o'clock p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

287

1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )  No. 08 CR 888
4           Government,              )
                                     )
5   vs.                              )  Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )  April 25, 2011
                                     )
7           Defendant.               )  1:34 o'clock p.m.

8                          VOLUME 2
9               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES B. ZAGEL
10                     AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15              Assistant United States Attorneys
                219 South Dearborn Street
16              Suite 500
                Chicago, Illinois 60604
17
18  Court Reporter:

19                  Blanca I. Lara, CSR, RPR
                    219 South Dearborn Street
20                       Room 2504
                    Chicago, Illinois 60604
21                     (312) 435-5895

22

23

24

25

288

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

1    THE CLERK:  All rise.

2    (The following proceedings were had in the

3    presence of the prospective jurors in open

4    court:)

5    THE COURT:  You're here today as prospective

6 jurors and I'm going to give you a little brief

7 presentation on why jury service matters, why it's

8 so important.

9    The first reason it's important, and an often

10 forgotten reason, is that we fought a revolution so

11 you could sit here today.  The American colonists

12 went to courts where everything was decided by the

13 king's judges, there was no jury of one's peers, and

14 this was in fact one of the reasons for the events

15 of July 4, 1776.  Your presence in this courtroom is

16 a living symbol of the birth of our nation.

17    Second, no country entrusts as much to juries

18 as this nation does.  The American way with jury

19 speaks to the world that we trust citizens to decide

20 important cases, to do justice under law, and juries

21 selected at random from various voters lists and

22 other public lists.  Jury service demonstrates the

23 faith of democracy that we are competent to govern

24 ourselves.

25    Third, faithful performance of jury duty is

1 crucial to the parties in this case.  If juries were
2 a new thing, they weren't a symbol of the American
3 Revolution, or of our faith in ourselves, it would
4 still matter a great deal, this is so because the
5 parties to this case have submitted the decision of
6 it to you.  It is your verdict that will resolve
7 this case.  Your verdict is significant to them, it
8 matters to them, it is important to them, and they
9 are entitled to the very best effort you can give as
10 jurors.

11       I also want to say that in this case in
12 particular, a criminal case, the jury will have to
13 decide whether the government has proved its case.
14 You will not be asked to decide whether you like or
15 dislike, approve or disapprove of the person accused
16 here.  You'll be asked only to decide whether the
17 government has proved the charges against the
18 defendant beyond a reasonable doubt.

19       I believe strongly in the value of your
20 service today.  In a moment, I am going to ask you
21 to take an oath to tell the truth just as witnesses
22 do, and then I will ask you some questions.

23       The questions are not asked out of idle
24 curiosity, nor was the questionnaire you filled out
25 done out of idle curiosity.  What I am trying to do,

1  and what the lawyers are trying to do, and what the
2  questions and answers will help us to do is to pick
3  out of those who have been called what might be the
4  best possible jury to hear this particular case.
5         Obviously, not all jurors are equally suited
6  to all cases.  If you're not selected to sit on this
7  jury, it doesn't mean that you are unfit to serve as
8  a juror, or even that you're unfit to serve on this
9  case, it means only that the Court and counsel have
10  an opinion that other jurors might be better for
11  this case.
12         You will and, incidentally, be questioned by
13  me in the order of your numbers.  The order of
14  numbers is random.  They came out of a randomized
15  list made by a computer.
16         One last thing, in simplified terms, very
17  simplified terms, the indictment in this case
18  charges one defendant, Rod Blagojevich, with several
19  counts of committing, as governor of Illinois,
20  various criminal acts referred to in various ways as
21  bribery or extortion, attempted conspiracy, using
22  phones to commit some of these offenses, including
23  securing campaign contributions in exchange for
24  certain acts.  The defendant has pled not guilty to
25  each and every charge.

292

1       Mr. Walker, would you administer the oath and
2  escort the jury.
3       THE CLERK:  Will each of the prospective
4  jurors please stand and raise your right hand.
5      (Prospective jurors sworn.)
6       THE CLERK:  Thank you.  Please be seated.
7       THE COURT:  Mr. Walker.
8       THE CLERK:  Jurors, please rise again, we're
9  going to go out the back way.  Jurors 111 and 123
10 out the back hallway, all other prospective jurors
11 please follow me.
12     (Prospective jurors exited the courtroom, and
13      the following proceedings were had herein:)
14     (Brief pause).
15      THE COURT:  I'm sure counsel understand that
16 the first two we are calling were jurors who did not
17 appear on Thursday.
18     (Brief pause).
19      THE COURT:  Are we ready?
20      Anybody missing a purse?
21     (Brief pause).
22      THE COURT:  Hi.  Have a seat.
23      You're 111?
24      PROSPECTIVE JUROR:  Right.
25      THE COURT:  Your name for today.  It's your

293

1  name for today.

2      PROSPECTIVE JUROR:  (Nodding).

3      THE COURT:  You're right-handed?

4      PROSPECTIVE JUROR:  Yeah.

5      THE COURT:  And you have a brace on your

6  right hand?

7      PROSPECTIVE JUROR:  Correct.  Broken thumb.

8      THE COURT:  And you filled this questionnaire

9  out with your right hand?

10     PROSPECTIVE JUROR:  Yup.

11     THE COURT:  Now, I understand what happened.

12     You thought that anxiety would make it

13 difficult for you to serve?

14     PROSPECTIVE JUROR:  Correct.

15     THE COURT:  How come?

16     PROSPECTIVE JUROR:  I run a small business

17 and trying to keep that up and running with time

18 away.

19     THE COURT:  So you would be anxious about the

20 business?

21     PROSPECTIVE JUROR:  Yeah.

22     THE COURT:  Not necessarily anxious about the

23 case?

24     PROSPECTIVE JUROR:  Correct.

25     THE COURT:  Okay.  What kind of business is

294

1  it?

2          PROSPECTIVE JUROR:  Advertising.

3          THE COURT:  How long have you done that?

4          PROSPECTIVE JUROR:  15 years.

5          THE COURT:  What kind of advertising?

6          PROSPECTIVE JUROR:  Promotional products.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  Customer logo

9  merchandise.

10          THE COURT:  Are you employed by a company you

11  own?

12          PROSPECTIVE JUROR:  Correct.

13          THE COURT:  And how many employees have you

14  got?

15          PROSPECTIVE JUROR:  10.

16          THE COURT:  Is that any bigger or any smaller

17  than it was a year ago?

18          PROSPECTIVE JUROR:  Smaller than it was a

19  year ago.

20          THE COURT:  You have a relative or close

21  friend that is a police officer?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  What department?

24          PROSPECTIVE JUROR:  He's on the mounted, on

25  the horse.

295

1    THE COURT:  In the Chicago Police Department?

2    PROSPECTIVE JUROR:  Yeah.

3    THE COURT:  A friend or relative?

4    PROSPECTIVE JUROR:  He's once removed

5 relative.

6    THE COURT:  Okay.  Somebody you spend a lot

7 of time with?

8    PROSPECTIVE JUROR:  Yeah; on holidays.

9    THE COURT:  You were asked if people close to

10 you have worked in various occupations, in law

11 enforcement, security, prisons, jails, attorneys of

12 various kinds, lawyers in law firms, you checked

13 most of them.  In fact, you checked everything but

14 prison, jail, detention center or probation

15 services.  You want to give me a short, hopefully

16 short, run-off?

17    PROSPECTIVE JUROR:  Mostly lawyers.

18    THE COURT:  Mostly lawyers.

19    You're in a lawsuit right now where you've

20 been sued?

21    PROSPECTIVE JUROR:  Yes.

22    THE COURT:  That's an employee sued you?

23    PROSPECTIVE JUROR:  No, we're suing an

24 employee.

25    THE COURT:  What?

296

1          PROSPECTIVE JUROR:  We're the plaintiff.

2          THE COURT:  Oh, you're the plaintiff.

3          PROSPECTIVE JUROR:  We're suing an employee.

4          THE COURT:  Oh, you sued an employee.

:45PM    5          PROSPECTIVE JUROR:  Yeah.

6          THE COURT:  How long has that case been

7  pending?

8          PROSPECTIVE JUROR:  About 2 years, and we had

9  recent settlement conversations with the judge.

:46PM   10          THE COURT:  Okay.  You have a lawyer for that

11 one?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Is that in state court --

14          PROSPECTIVE JUROR:  Ah --

:46PM   15          THE COURT:  Do you know what courthouse it

16 was in?

17          PROSPECTIVE JUROR:  It was here.

18          THE COURT:  It was here.  Okay.

19          It says here that you once testified in a

:46PM   20 court hearing, is that true?

21          PROSPECTIVE JUROR:  I'm not sure about that.

22          THE COURT:  Well, the question you asked was,

23 the question was:

24

:46PM   25

1      "... was there any sort of court hearings in the

2      case or the cases you described in the

3      proceedings ..."

4      PROSPECTIVE JUROR:  Oh, I was talking about

5 the current one with the employee.

6      THE COURT:  Settlement hearing?

7      PROSPECTIVE JUROR:  Yeah, settlement hearing.

8      THE COURT:  And you spoke there?

9      PROSPECTIVE JUROR:  Yeah.

10      THE COURT:  And you felt about that

11 experience, I think your word is "hated it."

12      PROSPECTIVE JUROR:  Yeah.

13      THE COURT:  Okay.  You're not alone.

14      Never did any volunteer work, raised funds

15 for political candidates?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  You don't think politicians ought

18 to be trusted?

19      PROSPECTIVE JUROR:  Sure.

20      THE COURT:  Like every one of them?  All the

21 way to 100 percent or --

22      PROSPECTIVE JUROR:  Probably not 100 percent,

23 but as a business owner you hear stories that don't

24 sit well.

25      THE COURT:  What are the stories mostly

:46PM

:46PM

:47PM

:47PM

:48PM

298

1  about?  You can give me the general one.

2      PROSPECTIVE JUROR:  Ah, just related to, ah,

3  making -- giving contracts to friends and family.

4      THE COURT:  Okay.  So you think that part of

5  it has to do with the bid process if you wanted some

6  state business or some city business, is that it?

7      PROSPECTIVE JUROR:  That's a good portion of

8  it, I would think, yeah.

9      THE COURT:  How about taxes, complaints about

10  taxes?

11      PROSPECTIVE JUROR:  I don't have any specific

12  thoughts related to that.

13      THE COURT:  How about regulation?

14      PROSPECTIVE JUROR:  I don't know enough about

15  it to comment.

16      THE COURT:  Okay.  Hobbies, other interests,

17  what have you got?

18      PROSPECTIVE JUROR:  Playing sports, hiking,

19  music, comedy.

20      THE COURT:  Okay. Also you have golf here. Do

21  you play golf?

22      PROSPECTIVE JUROR:  Yeah.  Golf.

23      THE COURT:  You play golf now?

24      PROSPECTIVE JUROR:  Not with this hand.

25      THE COURT:  Right.  And how about the music

1 part, is that listening or playing?

2 　　　　PROSPECTIVE JUROR:  Listening.

3 　　　　THE COURT:  The most important source of news

4 for you is the Internet?

5 　　　　PROSPECTIVE JUROR:  Yeah.

6 　　　　THE COURT:  You check it every day or not

7 every day?

8 　　　　PROSPECTIVE JUROR:  It checks me.

9 　　　　THE COURT:  It checks you?

10 　　　　PROSPECTIVE JUROR:  I mean, it's just coming

11 at you.

12 　　　　THE COURT:  Right.  Okay.

13 　　　　Now, you say your brother is the neighbor of

14 the defendant in this case.

15 　　　　PROSPECTIVE JUROR:  Correct.

16 　　　　THE COURT:  How close do they live to each

17 other?

18 　　　　PROSPECTIVE JUROR:  About six houses.

19 　　　　THE COURT:  Now, tell me what happens to your

20 business if you're on this jury?

21 　　　　Well, let me put you to you in in realistic

22 terms.  If you're on this jury, you're going to be

23 tied up probably from 9:30 to 4:00 or 4:30 every

24 day.  When you're not in the courtroom, you'll have

25 cell phones and computers.  We don't sequester

:49PM
:49PM
:50PM
:50PM
:51PM

1  anymore.  And you'll have Friday, Saturday and
2  Sunday.  So if that's what you have, tell me what
3  happens to your business?
4       PROSPECTIVE JUROR:  Well, I'm responsible for
5  about half the revenue generating.  So I have some
6  support after that, but I've no idea what that would
7  mean.  I mean, I communicate with 30 clients a day,
8  which, obviously, I couldn't.
9       THE COURT:  Thank you.
10    (Prospective juror exited the courtroom, and the
11     following proceedings were had herein:)
12    (Brief pause).
13       THE COURT:  Hi.  You're number 123.
14       PROSPECTIVE JUROR:  Yes.
15       THE COURT:  That's your name for today.
16       PROSPECTIVE JUROR:  Oh --
17       THE COURT:  Don't tell me your name.
18       PROSPECTIVE JUROR:  Huh?
19       THE COURT:  Don't tell me your name.
20       PROSPECTIVE JUROR:  Oh, I'm sorry.
21       THE COURT:  Because today your name is number
22  123.
23       PROSPECTIVE JUROR:  Oh, okay.
24       THE COURT:  What do you do for a living?
25       PROSPECTIVE JUROR:  I'm a registered nurse.

301

1      THE COURT:  And you work in a hospital?

2      PROSPECTIVE JUROR:  Yes, I do.

3      THE COURT:  What kind of stuff?  Do you have

4 a particular specialty that you work in?

5      PROSPECTIVE JUROR:  Med search and

6 pediatrics, adult research.

7      THE COURT:  You supervise anybody at work?

8      PROSPECTIVE JUROR:  At times I do.

9      THE COURT:  And how many?

10     PROSPECTIVE JUROR:  Up to 6 people.

11     THE COURT:  Are these other nurses, or

12 technicians, or what?

13     PROSPECTIVE JUROR:  Nurses, technicians.

14     THE COURT:  And how long have you been a

15 nurse?

16     PROSPECTIVE JUROR:  27 years.

17     THE COURT:  Always with the same hospital?

18     PROSPECTIVE JUROR:  Within the same system.

19     THE COURT:  Oh, okay.

20     You indicate that while you have never been

21 arrested or convicted of a crime, you have -- is it

22 a cousin in jail?

23     PROSPECTIVE JUROR:  Yes, I have.

24     THE COURT:  How long has he been there?

25     PROSPECTIVE JUROR:  He's been there a long

1  time.

2       THE COURT:  Why don't you move the microphone

3  up a little.

4       PROSPECTIVE JUROR:  He's been in jail for

5  quite a while.

6       THE COURT:  And he's been convicted of

7  something, is that correct?

8       PROSPECTIVE JUROR:  Yes.

9       THE COURT:  Is this somebody who is

10  particularly close to you?

11       PROSPECTIVE JUROR:  Ah ....

12       THE COURT:  This cousin?

13       PROSPECTIVE JUROR:  First cousin.

14       THE COURT:  But it was somebody you saw every

15  day or rarely saw?

16       PROSPECTIVE JUROR:  No.  Growing up, yeah, I

17  seen him, but as he we became adults, no.

18       THE COURT:  And you indicate that your father

19  was the victim of an attempted murder, is that

20  correct?

21       PROSPECTIVE JUROR:  That's correct.

22       THE COURT:  And somebody was caught for that?

23       PROSPECTIVE JUROR:  Yes.

24       THE COURT:  And sent to prison?

25       PROSPECTIVE JUROR:  Yes.

303

1   THE COURT:  Are you a member of anything?  Do
2 you belong to anything at all?

3   PROSPECTIVE JUROR:  Nursing organization.

4   THE COURT:  The union?

5   PROSPECTIVE JUROR:  The union, yes.

6   THE COURT:  Are you just a member or have you
7 held office in that union?

8   PROSPECTIVE JUROR:  No, I'm just a member.

9   THE COURT:  And your hobbies, things you like
10 to do?

11   PROSPECTIVE JUROR:  Dancing, watch TV at
12 times.  I have quite a few hobbies.

13   THE COURT:  What paper do you read --

14   PROSPECTIVE JUROR:  Sun-Times.

15   THE COURT:  If you read one?

16   Sun-Times?

17   PROSPECTIVE JUROR:  Yeah.

18   THE COURT:  There's one thing I don't
19 understand.  You asked to be deferred from this
20 service, presumably to serve at another time, but I
21 didn't understand what effect that has on your job.
22 I didn't understand what "displacement" means in
23 this context.

24   PROSPECTIVE JUROR:  Well, do you want me to
25 talk about the job?

304

1          THE COURT:  Yeah.

2          PROSPECTIVE JUROR:  Okay.  I work for the

3   County and right now we're going through a process

4   of where the nurses are being displaced.  The

5   hospital I particularly work at is closing down,

6   we're being displaced.  So I'm getting ready to go

7   to a new job and I have to be trained for that job,

8   that's what I meant.

9          THE COURT:  And how long is that period, that

10  orientation?

11         PROSPECTIVE JUROR:  It's hard to say.  It

12  might be a month.  They said four to six weeks.

13         THE COURT:  Okay.  Thank you.

14         THE COURT:  Okay.

15    (Prospective juror exited the courtroom, and the

16     following proceedings were had herein:)

17    (Brief pause).

18    (Prospective juror entered the courtroom, and

19     the following proceedings were had herein:)

20         THE COURT:  You are 143?

21         PROSPECTIVE JUROR:  141, sir.

22         THE COURT:  You're 141.  Let me find you.

23    (Brief pause).

24         THE COURT:  I think 141 is back in chambers,

25  but we can start, anyway.

305

1          What do you do for a living?

2          PROSPECTIVE JUROR:  I'm a registered

3  polysomic graphic technologist.  I do sleep disorder

4  studies.

5          THE COURT:  How long have you been doing

6  that?

7          PROSPECTIVE JUROR:  20 years.

8          THE COURT:  Is that a hospital-based kind of

9  practice?

10          PROSPECTIVE JUROR:  It is.  We have clinics

11  in hotels, as well.

12          THE COURT:  What sort of testing do you do?

13          PROSPECTIVE JUROR:  We monitor brain wave

14  activity, muscle tone and tension, heartbeat,

15  respiratory effort and flow, and oxygen saturation

16  during a person's sleep so that we know if they're

17  having disorders such as disruptive sleep apnea.

18          THE COURT:  This is the kind of thing you

19  occasionally see on television where they're

20  photographing somebody sleeping and there are all

21  kinds of stuff attached to him or her?

22          PROSPECTIVE JUROR:  Right; we can monitor for

23  abnormal movement behavior and nightmares and

24  things.

25          THE COURT:  How long do they have to sleep to

:59PM

:59PM

:00PM

:00PM

:00PM

306

1  get a good reading?

2       PROSPECTIVE JUROR:  Minumum is 5 hours of

3  sleep.  We try to keep them to their normal sleep

4  time.

5       THE COURT:  You like that work?

6       PROSPECTIVE JUROR:  It's fine, yeah.

7       THE COURT:  And you've done that, at least

8  from what I can see, at two separate hospitals, is

9  that correct?

10      PROSPECTIVE JUROR:  In the last 10 years.  I

11 have been out to California and back to Michigan,

12 and such.

13      THE COURT:  And your educational background

14 has basically been in science, is that correct?

15      PROSPECTIVE JUROR:  Right; University of

16 Michigan.

17      THE COURT:  And along the way you picked up

18 the tax preparation skill set?

19      PROSPECTIVE JUROR:  Yes, I started getting

20 creative with my own finances, doing stocks and

21 options, so I wanted to make sure I got my taxes

22 done right, so I did the H & R Block courses and now

23 I do everyones.

24      THE COURT:  Your home was burglarized?

25      PROSPECTIVE JUROR:  Yes, they reached in

:00PM

:01PM

:01PM

:01PM

:02PM

307

1   through a window while I was in another room.

2           THE COURT:  Stuff was taken?

3           PROSPECTIVE JUROR:  Yes, I found iPad and

4   iPod.

5           THE COURT:  Did you know it was happening

6   when you were in the house?

7           PROSPECTIVE JUROR:  No, I didn't know until

8   the actual perpetrator invaded the home next door to

9   mine and they called the police, and when they

10  arrived they checked and my window was open and they

11  asked me to check.

12          THE COURT:  Did they catch the person who did

13  that?

14          PROSPECTIVE JUROR:  Not to my knowledge.

15          THE COURT:  You listed some working with

16  attorneys and that's attorneys in Michigan.

17          PROSPECTIVE JUROR:  My brother and my

18  sister-in-law, they're married, they're both

19  attorneys.

20          THE COURT:  You hired an attorney for the

21  purchase of condo?

22          PROSPECTIVE JUROR:  Yes, through my brother's

23  practice, yeah.

24          THE COURT:  Ever been to a court hearing for

25  any reason?

308

1         PROSPECTIVE JUROR:  Not to a court hearing,
2 no.
3         THE COURT:  And when you answered the
4 question "how many attorneys, if any, have you known
5 fairly well," you put two, and those are your
6 relatives?
7         PROSPECTIVE JUROR:  Correct.
8         THE COURT:  You sought elected public office
9 yourself?
10        PROSPECTIVE JUROR:  Yes.
11        THE COURT:  Some time ago?
12        PROSPECTIVE JUROR:  Late '80s, I believe,
13 yeah.
14        THE COURT:  Was that a very large town, a
15 very small town, or a medium size town?
16        PROSPECTIVE JUROR:  It was a very small
17 suburb on the northwest side of Detroit.
18        THE COURT:  Okay.  And how did you do?
19        PROSPECTIVE JUROR:  I came in third out of
20 three, I believe.
21        THE COURT:  And your brother ran for office
22 in the township, how did he do?
23        PROSPECTIVE JUROR:  He came in second out of
24 two.
25        THE COURT:  You have written to senators and

1 congressmen about creation of a national center for
2 sleep disorders and for research under the National
3 Institute of Health Act, is that righ?

4       PROSPECTIVE JUROR:  That's right.

5       THE COURT:  You write that often or you just
6 wrote one letter?

7       PROSPECTIVE JUROR:  It was one letter, pretty
8 much a form letter, but I also visited their office
9 and talked to a staff member and each of senators
10 and the representative for my district.

11       THE COURT:  What organizations, other than,
12 of course, whatever professional organization you
13 are in yourself, what other organizations do you
14 belong to?

15       PROSPECTIVE JUROR:  Belong?

16       THE COURT:  Or participate in or give money
17 to.

18       PROSPECTIVE JUROR:  I'm life-long member of
19 alpha phi omega and National Service Fraternity,
20 started a chapter at the University of Michigan,
21 American Red Cross, American Heart Association, and
22 then professional organizations.

23       THE COURT:  Other than your own run for
24 office, I take it you haven't participated in any
25 way in political campaigns?

310

1          PROSPECTIVE JUROR:  Not in campaigns, no.

2          THE COURT:  When asked do you have an opinion

3   about political fundraising, you said "not

4   particularly."

5          PROSPECTIVE JUROR:  Not particularly.

6          THE COURT:  Does that mean like you really

7   don't have an articulated position?

8          PROSPECTIVE JUROR:  Right; as long as it's

9   done within the legal framework.

10          THE COURT:  Okay.  Your hobbies?

11          PROSPECTIVE JUROR:  The computer, web

12   surfing, reading, I play the violin, and I crochet.

13          THE COURT:  Where do you get your news from?

14          PROSPECTIVE JUROR:  Mostly the national news,

15   PBS News Hour, sometimes NPR will be on in the car,

16   but I rarely drive.

17          THE COURT:  Okay.  Are you personally deeply

18   involved in the news, in following the news, or is

19   it just when you have time you turn on a television

20   or radio?

21          PROSPECTIVE JUROR:  When I have time, and I

22   am mostly concentrating on international issues and

23   science.

24          THE COURT:  You are not a great follower of

25   the subject matter of this case, is that correct?

311

1       PROSPECTIVE JUROR:  No.

2       THE COURT:  And you have an out of town

3 speaking engagement in June which could be changed

4 but you don't want to do it the night before the

5 speech.

6       PROSPECTIVE JUROR:  Yeah.

7       THE COURT:  It may be even --

8       PROSPECTIVE JUROR:  It's in Minneapolis, the

9 meeting lasts a week, and I have all but made

10 arrangements to put that -- to cancel that.

11      THE COURT:  We can, basically, tell you.

12      PROSPECTIVE JUROR:  Okay.

13      THE COURT:  If you're on the jury, we can

14 tell you, and we can tell you right away, pretty

15 much.

16      PROSPECTIVE JUROR:  Okay.

17      THE COURT:  Did you actually work for H & R

18 Block?

19      PROSPECTIVE JUROR:  Yes.

20      THE COURT:  For how long?

21      PROSPECTIVE JUROR:  This last past season and

22 two seasons before.

23      THE COURT:  How long does that take you?  How

24 many months do you work when you do that?

25      PROSPECTIVE JUROR:  You have orientation to

312

1  new tax law in December and then January, February,

2  March, April, half of April.

3      THE COURT:  Okay.  Thank you.

4  (Prospective juror exited the courtroom, and the

5   following proceedings were had herein:)

6  (Brief pause).

7  (Prospective juror entered the courtroom, and

8   the following proceedings were had herein:)

9      THE COURT:  Hi.  You're number 142.

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  At least for today.

12      What do you do at work?

13      PROSPECTIVE JUROR:  I do sterilization for

14  our dental office, dental work.

15      THE COURT:  You want to put up the mike a

16  little closer.

17      Go ahead, tell me again.

18      PROSPECTIVE JUROR:  I do sterilization and

19  lab work for the dental office.

20      THE COURT:  How long have you done that kind

21  of work?

22      PROSPECTIVE JUROR:  9 years.

23      THE COURT:  What did you do before then?

24      PROSPECTIVE JUROR:  I was at home with the

25  children.

:09PM
:09PM
:10PM
:10PM
:10PM

313

1      THE COURT:  The practice that you work in is
2  owned by your brother?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  The person who was a member of
5  the LaSalle County Board, is this a close friend of
6  yours?

7      PROSPECTIVE JUROR:  She's my sister-in-law.

8      THE COURT:  Did you actually work in her
9  campaign?

10     PROSPECTIVE JUROR:  No.

11     THE COURT:  Did she win by a big margin or
12  small margin?

13     PROSPECTIVE JUROR:  Ah, it was an upset by a
14  big margin.

15     THE COURT:  It was an upset?

16     PROSPECTIVE JUROR:  Yes.

17     THE COURT:  Did you help her in any way?

18     PROSPECTIVE JUROR:  No.

19     THE COURT:  Your hobbies, your interests?

20     PROSPECTIVE JUROR:  Reading, running,
21  traveling.

22     THE COURT:  Which comes first, reading,
23  running or traveling?

24     PROSPECTIVE JUROR:  Reading.

25     THE COURT:  Do you watch a lot of television?

314

1       PROSPECTIVE JUROR:  No, I don't.

2       THE COURT:  Watch the news closely?

3       PROSPECTIVE JUROR:  Not very much.

4       THE COURT:  When you get your news, where do

5  you mainly get it from?

6       PROSPECTIVE JUROR:  Either in the newspaper,

7  sometimes headlines on the TV, but --

8       THE COURT:  How about the Internet, do you

9  use that at all for news?

10      PROSPECTIVE JUROR:  I do for e-mail.

11      THE COURT:  Okay.  I take it from what you've

12  written here you haven't paid much attention to this

13  case in the past, is that true?

14      PROSPECTIVE JUROR:  That's true.

15      THE COURT:  Ever been called for jury

16  service?

17      PROSPECTIVE JUROR:  Yes.

18      THE COURT:  How many times?

19      PROSPECTIVE JUROR:  Ah, every 3 years

20  probably from the past --

21      THE COURT:  And this is in the county for

22  which you live?

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  Okay.  Thank you.

25    (Prospective juror exited the courtroom, and the

315

1          following proceedings were had herein:)
2          (Brief pause).
3          (Prospective juror entered the courtroom, and
4           the following proceedings were had herein:)
5              THE COURT:  You're number 143?
6              PROSPECTIVE JUROR:  Yes, I am.
7              THE COURT:  Okay.  How large a practice is
8     the firm that you work for?
9              PROSPECTIVE JUROR:  Two people.  Myself and
10    Dr. Burgen.
11             THE COURT:  And what's the patient count?
12             PROSPECTIVE JUROR:  I see between about 30
13    people, she also sees close to that number.
14             THE COURT:  When you say you see them, do you
15    see some more often than others?
16             PROSPECTIVE JUROR:  Yes, that's true.
17             THE COURT:  I ask that question because you
18    did indicate in your request for deferral that there
19    could possibly be disastrous consequences.
20             PROSPECTIVE JUROR:  Yes.  I have a letter
21    from that practice and my partner.
22             THE COURT:  Okay.  Can you estimate how many
23    of your patients have suicidal ideations?
24             PROSPECTIVE JUROR:  Right now two, two women.
25             THE COURT:  And how do you acquire these

:14PM
:14PM
:14PM
:15PM
:15PM

316

1 patients?  Are these referrals?

2      PROSPECTIVE JUROR:  Yes; referrals from other

3 colleagues, referrals from provider lists.  I belong

4 to several provider lists.

5      THE COURT:  Right.

6      PROSPECTIVE JUROR:  For insurance companies

7 as well; referrals from former patients.

8      THE COURT:  Do you have a particular theory

9 of psychotherapy that you follow?

10      PROSPECTIVE JUROR:  Eclectic with a heavy

11 dose of inside-oriented therapy, but I use what

12 works, as best I can.

13      THE COURT:  Okay.  Something was stolen from

14 your home?

15      PROSPECTIVE JUROR:  Yes, many years ago,

16 we've had a couple of times, but it's been quite a

17 long time ago that a burglar came in stole my wife's

18 jewelry, money that my children were saving.  He was

19 not caught.

20      THE COURT:  And the incident with your mother

21 being mugged, is that in the relatively distant past

22 or is that recent?

23      PROSPECTIVE JUROR:  That's also quite

24 distant.  And the mugger was very sorry that he did

25 that.

317

1          THE COURT:  And you've seen lawyers for
2   estate planing, wills, and real estate?
3          PROSPECTIVE JUROR:  Yes, as well as my
4   practice, of course.
5          THE COURT:  Right.  And as patients or --
6          PROSPECTIVE JUROR:  Patients.
7          THE COURT:  Okay.  In the practice, do you
8   have occasion to consult with lawyers on various
9   issues or not?
10         PROSPECTIVE JUROR:  I've not yet had to do
11  that.
12         THE COURT:  Okay. And you have never been
13  asked to testify in court as an expert witness?
14         PROSPECTIVE JUROR:  No.  No.
15         THE COURT:  And your political involvement
16  has basically been writing letters to
17  representatives about mental health and insurance
18  issues?
19         PROSPECTIVE JUROR:  Yes.
20         THE COURT:  Did you get a good response or no
21  response?
22         PROSPECTIVE JUROR:  Some have been responded
23  to, there have been answers offered, and I feel that
24  some congressmen, senators, and so on, have been
25  responsive.

318

1      THE COURT:  You have the view that three
2 professionally related associations, are you
3 particularly active in any one of them?
4      PROSPECTIVE JUROR:  I used to be in the
5 American -- I'm sorry, the Illinois Art Therapy
6 Association, I served as past president of that many
7 years ago.
8      THE COURT:  And the other ones you belong
9 simply --
10      PROSPECTIVE JUROR:  I belong as a member, I
11 don't do further work with them.
12      THE COURT:  And your only political
13 contributions you have ever made have been to the
14 campaigns for President of the United States, is
15 that true?
16      PROSPECTIVE JUROR:  I was wondering about
17 that.  I can't recall others, I think there might
18 have been some, but I remember those.
19      THE COURT:  Okay.
20      And your own hobbies?
21      PROSPECTIVE JUROR:  I'm a painter.
22      THE COURT:  Painter as an art as opposed to
23 walls?
24      PROSPECTIVE JUROR:  Yes.  I have a degree --
25 well, that's correct, not a house painter but a

:18PM
:18PM
:18PM
:19PM
:19PM

painter, oil paints at this time, yeah.  I have --
before I was a psychologist I was an art therapist
and a fine art painter.

THE COURT:  Do you pay a lot of attention to
the news?  Are you a news junkie?

PROSPECTIVE JUROR:  A lot, yes.

THE COURT:  Do you use the Internet at all?

PROSPECTIVE JUROR:  A little bit, mostly
newspapers and the video media, TV, so forth, radio.

THE COURT:  Thank you.

(Prospective juror exited the courtroom, and the
 following proceedings were had herein:)

(Brief pause).

(Prospective juror entered the courtroom, and
 the following proceedings were had herein:)

THE COURT:  Hello, 144.

PROSPECTIVE JUROR:  Hello.

THE COURT:  What do you do at work?

PROSPECTIVE JUROR:  I'm sorry?

THE COURT:  What do you do at work?

PROSPECTIVE JUROR:  I'm a database
administrator.

THE COURT:  Now, what do you actually do when
you're a database administrator?

PROSPECTIVE JUROR:  I'm responsible for the

1  company's data that's stored on computers.  So I'm
2  responsible for the security of the data, the
3  performance of the systems for people who access the
4  data, and the quality of the data.
5       THE COURT:  Right.  Do you have to run tests
6  and audits to do that?
7       PROSPECTIVE JUROR:  I work with the people
8  who would run an audit to make sure it ran
9  correctly.  I'm responsible for things like the
10 encryption of the data and making sure people can't
11 get access to it.
12      THE COURT:  You also said you manage large
13 amounts of data?
14      PROSPECTIVE JUROR:  Yeah, my specialty is
15 large systems that span multiple computers.
16      THE COURT:  Are we talking terabytes here?
17      PROSPECTIVE JUROR:  Yes.
18      THE COURT:  Okay.  What's the program?
19      PROSPECTIVE JUROR:  Oh, it's a program for
20 parents and children, it's Indian Guides and Indian
21 Princess normally associated with the YMCA.
22      THE COURT:  Is this the one where the fathers
23 and daughters come together and they wear feathers
24 and stuff?
25      PROSPECTIVE JUROR:  Yes.

:21PM
:21PM
:21PM
:22PM
:22PM

1      THE COURT:  And you are a competent computer
2 in more than one language?
3      PROSPECTIVE JUROR:  Yes.
4      THE COURT:  You had a sister who was
5 convicted of a criminal offense, is that right?
6      PROSPECTIVE JUROR:  Yes.
7      THE COURT:  And you name one of them and you
8 say a few other charges?
9      PROSPECTIVE JUROR:  Yes.
10      THE COURT:  Is this one incident or has there
11 been several incidents over the years?
12      PROSPECTIVE JUROR:  She was a heroin addict
13 and she was involved in some activity that goes
14 along with that.  I don't remember all the charges
15 against her, but they're related to things like
16 stealing, I thought about it later, maybe forgery
17 might have been one of them.  I don't remember all
18 the details, but she was sentenced to 7 years.
19      THE COURT:  Now, did you see your sister a
20 lot during that period of time?
21      PROSPECTIVE JUROR:  A lot?  No.
22      THE COURT:  Have you seen your sister since
23 then?
24      PROSPECTIVE JUROR:  No.  And she's passed.
25      THE COURT:  Did you think that the legal

322

1  system treated her fairly?

2  　　　PROSPECTIVE JUROR:  Yes.

3  　　　THE COURT:  You said a family member or close

4  friend has been a victim of a crime and the crime is

5  theft.  How long ago was that and who was the

6  victim?

7  　　　PROSPECTIVE JUROR:  It was a family member

8  related to my sister.

9  　　　THE COURT:  And is that the case, you said

10  someone was in fact charged with a crime.

11  　　　PROSPECTIVE JUROR:  That was my sister.

12  　　　THE COURT:  Okay.  Only reason you hired an

13  attorney is to do real estate?

14  　　　PROSPECTIVE JUROR:  Yes.

15  　　　THE COURT:  And you spend some time with the

16  church and other charities, is that correct?

17  　　　PROSPECTIVE JUROR:  Yes.

18  　　　THE COURT:  And your contact with congressmen

19  is you call them when you want a tour of a

20  government place in Washington, D.C., right?

21  　　　PROSPECTIVE JUROR:  Correct.

22  　　　THE COURT:  You donated money to the

23  Republican party?

24  　　　PROSPECTIVE JUROR:  Yes.

25  　　　THE COURT:  A lot, a little, something in the

:23PM

:24PM

:24PM

:25PM

:25PM

323

1    middle?

2            PROSPECTIVE JUROR:  A little.

3            THE COURT:  How often?

4            PROSPECTIVE JUROR:  It was one period in the

5    2000 election.

6            THE COURT:  Okay.  Still play the drums?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  What kind of drums?

9            PROSPECTIVE JUROR:  I'm a rock drummer.

10           THE COURT:  Okay.

11           PROSPECTIVE JUROR:  Rock music, yeah.  Blink

12   clubs, at the church.

13           THE COURT:  And you've been doing this since

14   you were a boy?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Okay.  And what does your drum

17   kick consist of?

18           PROSPECTIVE JUROR:  It's a pro drum kit, it's

19   six-piece maple kit with a Paiste cymbals and a few

20   microphones.

21           THE COURT:  And how about the bike riding?

22           PROSPECTIVE JUROR:  Something I do for

23   exercise and recreation, like to ride on the Prairie

24   path and around the neighborhood.

25           THE COURT:  You indicate that you use Google

:25PM
:25PM
:25PM
:26PM
:26PM

324

1 news to search for specific topics.  Do you do a lot

2 of that?

3          PROSPECTIVE JUROR:  Not a lot.  I don't

4 follow the news all that much, but when I hear about

5 something from conversation that was interesting, if

6 I want to research it, that's how I would go find

7 out about it.

8          THE COURT:  And you didn't pay much attention

9 to this case the first time around?

10          PROSPECTIVE JUROR:  Didn't pay much

11 attention, no.  I recall a little but --

12          THE COURT:  Yeah, you do recall like the

13 results and a bunch of other things.

14          PROSPECTIVE JUROR:  Yeah.

15          THE COURT:  Okay.  Anything about that affect

16 your ability to be fair in this case?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Thank you.

19      (Prospective juror exited the courtroom, and the

20       following proceedings were had herein:)

21      (Brief pause).

22      (Prospective juror entered the courtroom, and

23       the following proceedings were had herein:)

24          THE COURT:  Hi.  You're number 145?

25          PROSPECTIVE JUROR:  Yes, I am.

325

1          THE COURT:  What do you do at work?

2          PROSPECTIVE JUROR:  I work for a dental

3     office.  I'm a treatment coordinator.

4          THE COURT:  What does that mean?

5          PROSPECTIVE JUROR:  That means I help people

6     with financial plans and appointments.

7          THE COURT:  Would you do me a favor and raise

8     the microphone.

9          PROSPECTIVE JUROR:  Okay. I make appointments

10    for people, I work on treatment planning for people

11    who need procedures done, work with insurance.

12         THE COURT:  How long have you done that work?

13         PROSPECTIVE JUROR:  Since I've been -- well,

14    at this specific job, I've been here for just

15    3 years, and probably done dental since I've been

16    18.

17         THE COURT:  So it's the same kind of work

18    you've done?

19         PROSPECTIVE JUROR:  Yeah.  Uh-huh.

20         THE COURT:  Okay.

21         PROSPECTIVE JUROR:  I mean, I was an at-home

22    mom for many years, so ....

23         THE COURT:  You have four children?

24         PROSPECTIVE JUROR:  Yes, I do.

25         THE COURT:  The youngest is 22?

326

1       PROSPECTIVE JUROR:  Uh-huh.

2       THE COURT:  You have a close friend or

3  relative who works with the FBI in forensics?

4       PROSPECTIVE JUROR:  Yes.

:29PM   5       THE COURT:  Friend or relative?

6       PROSPECTIVE JUROR:  My nephew.

7       THE COURT:  Your nephew.

8       Does he discuss his work with you?

9       PROSPECTIVE JUROR:  No.

:29PM  10       THE COURT:  Your former husband was a long

11  time police officer and still works in the security

12  field?

13       PROSPECTIVE JUROR:  Yes.

14       THE COURT:  Your husband had some kind of

:29PM  15  incident with a lawsuit, is that correct?

16       PROSPECTIVE JUROR:  Correct.

17       THE COURT:  Did you follow that lawsuit at

18  all?

19       PROSPECTIVE JUROR:  Ah ...

:30PM  20       THE COURT:  Ever go to court, look at things?

21       PROSPECTIVE JUROR:  I did, yes.

22       THE COURT:  Okay.  Were either he or you

23  satisfied by the outcome?

24       PROSPECTIVE JUROR:  No.

:30PM  25       THE COURT:  And you have used a lawyer for

327

1  wills and things of that sort?

2      PROSPECTIVE JUROR:  Yeah.

3      THE COURT:  And you testified in court

4  yourself?

5      PROSPECTIVE JUROR:  Briefly, yes.

6      THE COURT:  And that was that case you talked

7  about before, the accident case?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  And you said you were very

10 nervous?

11     PROSPECTIVE JUROR:  (Nodding.)  I'm very

12 nervous now.

13     THE COURT:  Well, I have to tell you that

14 almost everybody is when they're sitting where

15 you're sitting.

16     PROSPECTIVE JUROR:  Okay.

17     THE COURT:  You served on a jury?

18     PROSPECTIVE JUROR:  Yes.

19     THE COURT:  In Kane County?

20     PROSPECTIVE JUROR:  Yes.  Uh-huh.

21     THE COURT:  And did the jury reach a verdict?

22     PROSPECTIVE JUROR:  Yes.

23     THE COURT:  And you didn't like that service

24 too much, is that right?

25     PROSPECTIVE JUROR:  I just -- I don't, but --

328

THE COURT:  You want to tell me why?

PROSPECTIVE JUROR:  You know what?  I'm just -- I'm a little claustrophobic, so sometimes being in areas when I'm really confined can just consume me and so I just wanted to leave.

THE COURT:  Okay.  And that's what, basically, got to you about the jury service?

PROSPECTIVE JUROR:  Well, you know, it-- no, it was maybe -- maybe the confinement.  Yeah, probably that.

THE COURT:  Have you ever been called for jury service again?

PROSPECTIVE JUROR:  Was I?

THE COURT:  Yeah; ever.

PROSPECTIVE JUROR:  I might have been called one more time, but I couldn't do it due to illness.

THE COURT:  And the only kind of fundraising work and volunteer work you've done was for fundraisers for the Fraternal Order of Police, is that right? Or was it something else?

PROSPECTIVE JUROR:  Well, you know, things for school, for my children, I think more fundraising for parent teacher organization.

THE COURT:  Read a lot of news?

PROSPECTIVE JUROR:  Do I?

329

1     THE COURT:  Yeah.

2     PROSPECTIVE JUROR:  Yeah.  Uh-huh.

3     THE COURT:  Use the Internet at all?

4     PROSPECTIVE JUROR:  Uh-huh.  Every day.

5     THE COURT:  How old was your brother when he

6   was at Children's Memorial?

7     PROSPECTIVE JUROR:  He was 5.

8     THE COURT:  And how old were you then?

9     PROSPECTIVE JUROR:  I was 19.

10    THE COURT:  What's happening with your house

11  now?

12    PROSPECTIVE JUROR:  I'm a single mom and I

13  have my home up for sale because it's just

14  financially a burden for me being a single mom.  So

15  I put it up for sale.  And with the market going the

16  way it is, it's just extremely difficult.  And with

17  my work, which I brought an employee handbook, I'm

18  not allowed pay for jury duty.  I'm allowed leave,

19  but I'm not allowed pay.  So already, just the two

20  days of not working, I'm stressing about that

21  because just to make the bills for my house payment

22  and my monthly expenses, I fear I would lose my

23  home.

24    THE COURT:  Do any of your children live at

25  home?

330

1          PROSPECTIVE JUROR:  I have a son who cannot
2   find a job who lives at home.
3          THE COURT:  That's the 22-year old?
4          PROSPECTIVE JUROR:  No, he's 31 and he's a
5   diabetic.
6          THE COURT:  And where is the 22?
7          PROSPECTIVE JUROR:  The 22 kind of bounces in
8   between his dad and my household.
9          THE COURT:  Thank you.
10          PROSPECTIVE JUROR:  Thank you.
11      (Prospective juror exited the courtroom, and the
12       following proceedings were had herein:)
13      (Brief pause).
14      (Prospective juror entered the courtroom, and
15       the following proceedings were had herein:)
16          THE COURT:  Hi.
17          PROSPECTIVE JUROR:  Hi.
18          THE COURT:  For today, at least, you're
19   number 146.
20          PROSPECTIVE JUROR:  Yes, sir.
21          THE COURT:  I take it from looking at the
22   major that you elected when you were in college,
23   that you've made early choices about careers in
24   music, is that correct?
25          PROSPECTIVE JUROR:  That is correct.

331

1      THE COURT:  That started when you were little
2  or did it start a little later?
3      PROSPECTIVE JUROR:  Probably junior high.
4      THE COURT:  Okay.  And you play piano and
5  organ?
6      PROSPECTIVE JUROR:  Yes, but I'm a vocalist.
7      THE COURT:  Okay, and you're a vocalist.
8      Your standard church organ?
9      PROSPECTIVE JUROR:  Yes.
10     THE COURT:  As opposed to, say, the
11 Hammond B 3?
12     PROSPECTIVE JUROR:  Oh, that, too.
13     THE COURT:  And you are currently at a
14 church.  You are director of liturgy and music, or
15 at least that's what you were.
16     PROSPECTIVE JUROR:  I just retired, yeah.
17     THE COURT:  You just retired.
18     And how long were you there?
19     PROSPECTIVE JUROR:  12 and a half years
20 there.
21     THE COURT:  Okay.  Did you work at other
22 parishes during that period of time or did you do
23 different work?
24     PROSPECTIVE JUROR:  Around the area, too.
25     THE COURT:  And the last parish was 3700

:35PM

:35PM

:35PM

:36PM

:36PM

332

1 families?

2        PROSPECTIVE JUROR:  Uh-huh.

3        THE COURT:  Big parish.

4        PROSPECTIVE JUROR:  Big parish.

5        THE COURT:  When you said you supervised

6 people, 600 plus, are you talking about a chorus or

7 are you talking about something else?

8        PROSPECTIVE JUROR:  Well, at liturgy you

9 would do everything with worship, so I had anything

10 to do with worship and music.

11        THE COURT:  Okay.

12        PROSPECTIVE JUROR:  So the highest was 600.

13        THE COURT:  It says also that you're a member

14 of central music staff of the Archdiocese of

15 Chicago.

16        PROSPECTIVE JUROR:  Correct.

17        THE COURT:  How long did that happen?

18        PROSPECTIVE JUROR:  That's still going on.

19        THE COURT:  And how big is that central music

20 staff?

21        PROSPECTIVE JUROR:  13 people.

22        THE COURT:  You have two children, the

23 youngest is 25?

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  What are you going to do now that

333

 1  you are retired?

 2        THE COURT:  You have a nephew who works in

 3  the penitentiary?

 4        PROSPECTIVE JUROR:  Yes.

 5        THE COURT:  And a couple of friends who are

 6  lawyers that do estates and copyrights, is that

 7  right?

 8        PROSPECTIVE JUROR:  That's correct.

 9        THE COURT:  And your brother was a Navy

10  fighter pilot, is that correct?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Tell me about the robbery at your

13  apartment.

14        PROSPECTIVE JUROR:  It was -- it was while I

15  was in college and four apartments were broken into,

16  the doors were basically broken down, and they got

17  just a few things out of the apartments.

18        THE COURT:  Was anybody there when this

19  happened?

20        PROSPECTIVE JUROR:  No.

21        THE COURT:  Okay.  You use a lawyer for your

22  father's estate and that's about it?

23        PROSPECTIVE JUROR:  That's pretty much it,

24  yeah.

25        THE COURT:  And you have a friend that

334

1  applied to the FBI and used you as a reference?

2       PROSPECTIVE JUROR:  Yes.

3       THE COURT:  How long ago was that?

4       PROSPECTIVE JUROR:  Last year.

5       THE COURT:  And you served on a jury as an

6  alternate?

7       PROSPECTIVE JUROR:  Yes.

8       THE COURT:  That means you didn't sit at the

9  end of the case?

10       PROSPECTIVE JUROR:  No, just through -- I sat

11  through the case.

12       THE COURT:  Right.

13       PROSPECTIVE JUROR:  Uh-huh.

14       THE COURT:  Your only political action that I

15  can see, at least at the upper level of government

16  was, you sent communications to legislatures

17  opposing the death penalty, is that right?

18       PROSPECTIVE JUROR:  That's correct.

19       THE COURT:  And that's about all?

20       PROSPECTIVE JUROR:  That's correct.

21       THE COURT:  Never contributed money,

22  volunteered for any political campaign?

23       PROSPECTIVE JUROR:  No.

24       THE COURT:  Anything about what your husband

25  does with respect to transportation that would

335

1 affect your ability to be fair in this case?

2      PROSPECTIVE JUROR:  No, not at all.

3      THE COURT:  When you answered a couple of

4 questions about your attitudes about public

5 officials you said two separate things.  You

6 expressed the view that since public officials are

7 human, some may consider their own interests and

8 you'd hope that they would place their duties of

9 office first, that's one thing you said.

10      PROSPECTIVE JUROR:  Uh-huh.

11      THE COURT:  Second thing you said is:

12    "There is some officials who are pressured to

13     make decisions, but I believe that most offices

14     try hard not to let contributions guide their

15     decisions."

16      And that is your general belief?

17      PROSPECTIVE JUROR:  That is my general

18 belief, yes.

19      THE COURT:  What you are going to be asked

20 here to decide in this case has nothing to do with

21 general belief, it has to do with one specific

22 person and whether the government has proved its

23 charges beyond a reasonable doubt.

24      I just want to know that none of your general

25 view about politicians being mostly honest, or

1  mostly dishonest, or whatever it is, is not going to

2  influence your decision, you're only going to be

3  deciding this case on the basis of the evidence that

4  the government will present and maybe others will

5  present as to what this defendant did or did not do.

6  PROSPECTIVE JUROR:  That's correct.  I would

7  have no problem with that.

8  THE COURT:  Okay.  And you're acquaintance

9  with this case is basically headlines?

10  PROSPECTIVE JUROR:  Pretty much so, yes.

11  THE COURT:  Do you go out of your way to

12  watch a lot of news, to read papers, to see stuff on

13  the Internet?

14  PROSPECTIVE JUROR:  Not on the Internet.  I

15  read newspapers.

16  THE COURT:  Thank you.

17  PROSPECTIVE JUROR:  Thank you very much.

18  (Prospective juror exited the courtroom, and the

19  following proceedings were had herein:)

20  (Brief pause).

21  (Prospective juror entered the courtroom, and

22  the following proceedings were had herein:)

23  THE COURT:  Hello.

24  PROSPECTIVE JUROR:  Hi.

25  THE COURT:  Today you're number 147.  That's

:41PM
:42PM
:42PM
:43PM

337

1 your name for the day.

2         PROSPECTIVE JUROR:  Okay.

3         THE COURT:  I'm not going to ask you about

4 all these questions, you filled out the

5 questionnaire, I'm just going to ask you about some

6 of them.

7         You currently are a dental assistant, is that

8 correct?

9         PROSPECTIVE JUROR:  Yes.

10         THE COURT:  And what you want to be is a

11 nurse?

12         PROSPECTIVE JUROR:  Correct.

13         THE COURT:  Okay.  What do you do at the

14 dentist office?

15         PROSPECTIVE JUROR:  I assist the doctor in

16 surgeries.

17         THE COURT:  Do you like that work?

18         PROSPECTIVE JUROR:  Yes; I love it.

19         THE COURT:  You recently married?

20         PROSPECTIVE JUROR:  Uh-huh.

21         THE COURT:  You bought a house?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Owe money in the house?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And you are concerned about your

338

1  ability the keep paying those bills if you are on
2  this jury?
3          PROSPECTIVE JUROR:  Correct.
4          THE COURT:  And what does your spouse do?
5          PROSPECTIVE JUROR:  He's a chef.
6          THE COURT:  Is that what he's done all along?
7          PROSPECTIVE JUROR:  He went to college for
8  business and communications.  He's working in a
9  community center right now as a chef and he's
10 planning on opening his own restaurant.
11         THE COURT:  Does he do cooking at home?
12         PROSPECTIVE JUROR:  Yes.
13         THE COURT:  Do you not do cooking at home?
14         PROSPECTIVE JUROR:  I do, but he likes to do
15 more.
16         THE COURT:  Is he faster than you are when he
17 cooks?
18         PROSPECTIVE JUROR:  Yes.
19         THE COURT:  Do you belong to anything, do you
20 work with any organization, do you contribute money
21 to anything?
22         PROSPECTIVE JUROR:  Once in a while I work
23 with what's called Johnny and Friends, it's an
24 organization that does a retreat for disabled
25 children and their families.  I don't give to it

1 yearly, but when you go, you have to pay to be a
2 volunteer.
3      THE COURT:  Okay.  You refer to these as
4 missions?
5      PROSPECTIVE JUROR:  I also do mission trips
6 with my church.  We go to Mexico.
7      THE COURT:  And what does that organization
8 do, JAF?
9      PROSPECTIVE JUROR:  It gives the families
10 kind of a weekend or a week to not have to do their
11 daily studies every day with their children.  We
12 kind of take their kids.  If you're a volunteer, you
13 get the child for the day, you play them all day and
14 take them to activities so the parents get a break.
15      THE COURT:  You also have a cousin who you
16 say is very into politics.
17      PROSPECTIVE JUROR:  Correct.
18      THE COURT:  And in school for such.  So you
19 think you work for someone running for office?  Do
20 you know that or --
21      PROSPECTIVE JUROR:  He worked -- he
22 volunteered to help Bill Brady.
23      THE COURT:  Okay.  Do you see him often?
24      PROSPECTIVE JUROR:  Uh-huh.
25      THE COURT:  Does he ask you to contribute?

340

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  You like old movies?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  You like old novels, too?

5      PROSPECTIVE JUROR:  Correct; novels.

6      THE COURT:  And you did say -- do you listen

7  to radio much?

8      PROSPECTIVE JUROR:  Uh-huh.

9      THE COURT:  And what do you listen to?

10     PROSPECTIVE JUROR:  It's either Klove or

11  99.7, Christian music.

12     THE COURT:  Okay.  You said earlier on in

13  this questionnaire, you said:

14     "As far as this trial, I believe I've already

15      made a decision about Blagojevich."

16     PROSPECTIVE JUROR:  Correct.

17     THE COURT:  I want to ask you some questions

18  about that.

19         There are probably a lot of people around

20  here and maybe in the country who have made at least

21  a preliminary decision, one way or the other.  The

22  jury's job is a little different, because in a case

23  like this, probably the majority of the jurors when

24  they first sit down, started out with some kind of

25  opinion and what the law asks them to do is to put

341

1 that opinion aside.

2       You're not going to forget it, but you just

3 put it to one side and you try to decide this case

4 on the basis of the evidence you hear, people who

5 testify, you'll see documents.  So the only thing

6 that you're allowed to consider is what you hear in

7 the courtroom, and you've heard none of that yet.

8       PROSPECTIVE JUROR:  Uh-huh.

9       THE COURT:  So my question to you is, do you

10 think you could set aside whatever opinion you have,

11 based probably on news reports, and just do it on

12 the basis of what you hear in court?  Do you think

13 you could do that?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  And when the case was going on,

16 you didn't follow it religiously in any way, is that

17 correct?

18       PROSPECTIVE JUROR:  Correct.

19       THE COURT:  Thank you.

20    (Prospective juror exited the courtroom, and the

21     following proceedings were had herein:)

22    (Brief pause).

23    (Prospective juror entered the courtroom, and

24     the following proceedings were had herein:)

25

:48PM

:49PM

:49PM

:49PM

:50PM

342

1      THE COURT:  Hello.  For today, at least,
2  you're number 148.
3      PROSPECTIVE JUROR:  Yes, sir.
4      THE COURT:  You have a college degree.  Do
5  you have a degree -- yes, you do.
6      PROSPECTIVE JUROR:  I'm technically
7  graduating this semester.
8    (Brief pause):  what?
9      PROSPECTIVE JUROR:  I'm graduating this
10  semester
11      THE COURT:  You're graduating this semester,
12  close enough.
13      But so you're currently a student, and then
14  it says "unemployed or laid off."  Is the laid off
15  part apply to home computer technician?
16      PROSPECTIVE JUROR:  No, I'm not laid off, I'm
17  just unemployed because I just finished school.
18      THE COURT:  Okay.
19      PROSPECTIVE JUROR:  I'm not currently in
20  class, but graduate this semester.
21      THE COURT:  But the work you do now is
22  dealing with individuals' computers?
23      PROSPECTIVE JUROR:  I haven't done that for a
24  few years.
25      THE COURT:  Okay.  It's what you used to do?

343

1        PROSPECTIVE JUROR:  Uh-huh.

2        THE COURT:  Okay.  You had a friend who was

3 robbed and assaulted?

4        PROSPECTIVE JUROR:  Yeah; a few years back.

5        THE COURT:  Is this a close friend?

6        PROSPECTIVE JUROR:  Ah, grown apart slightly

7 over the years, but yes, he was was.

8        THE COURT:  Was anybody caught for that?

9        PROSPECTIVE JUROR:  I don't believe so, no.

10        THE COURT:  Do you know zero attorneys?

11        PROSPECTIVE JUROR:  I was going to ask about

12 that, actually.  I know four people who are

13 attorneys, but I've also grown apart from them and I

14 sort of was close to them before they became

15 attorneys, before started law school.

16        THE COURT:  Well, then, correct answer to

17 that one is zero.

18        I'm going to ask you about two sentences you

19 made in answer to the questionnaires we had, talking

20 about what public officials consider and don't

21 consider.  And the first one you said:

22    "Public interest must be the priority if the

23     personal interests are impossible for anyone to

24     ignore."

25    And the second thing you said is:

344

1   "This is a weakness of a system relying on

2   raising so much money for campaign."

3   Those are your views now?

4    PROSPECTIVE JUROR:  I'd say so, yes.

5    THE COURT:  Yeah.  I'm going to ask you is

6 this question, but it has a little preface to it.

7 No one is going to ask you to make a judgment of

8 whether the current system works or doesn't work or

9 is wise or unwise.  There are certain legal rules

10 that people have to follow that tell you what you

11 can do and what you can't do.  And sometimes there's

12 a little difference between what you can and can't

13 do, you just have to be careful to be one side of

14 the line rather than on the other.  But we're not

15 going to deal with any of that philosophy at all.

16 What we're going to ask a juror to do is to decide

17 whether or not the government has proven the

18 defendant in this case crossed the line and that he

19 did so beyond a reasonable doubt, and that line is a

20 line drawn by the law, not by public opinion but by

21 the law.

22   Now, do you think you will be able to

23 consider this case as an individual case and

24 consider whether this case has been proven against a

25 particular defendant?  Would you be able to do that?

 1          PROSPECTIVE JUROR:  Yes, I would.

 2          THE COURT:  Hobbies?

 3          PROSPECTIVE JUROR:  Computer games and music,

 4  socializing with friends.

 5          THE COURT:  What computer games?

 6          PROSPECTIVE JUROR:  Ah --

 7          THE COURT:  A lot of them or just a few?

 8          PROSPECTIVE JUROR:  Less these days, but a

 9  lot of them over time, sure.

10          THE COURT:  What is slashdot.org.

11          PROSPECTIVE JUROR:  It's sort of a technical

12  news aggregation site.  They just pull stories from

13  various other sources and put together all computer

14  type stuff.

15          THE COURT:  All computer type stuff?

16          PROSPECTIVE JUROR:  Yes; sometimes it's more

17  loosely related than other times, but yeah.

18          THE COURT:  Is that one of those websites

19  where people are sharing solutions to obscure

20  problems about computers?

21          PROSPECTIVE JUROR:  Uhmmm ....  I guess some

22  stories would be about that, sure.

23          THE COURT:  And according to what I read

24  here, you know that there's a case pending against

25  the former governor, but you don't know much about

:54PM

:54PM

:54PM

:55PM

:55PM

1  it at all.

2      PROSPECTIVE JUROR:  Ah, at the time that I

3  filled that out I actually didn't realize it was

4  tied or that it had already happened.

5      THE COURT:  But is it fair to say that what

6  you read in the papers or heard on TV or radio, is

7  it fair to say that you would be able to ignore all

8  of that when you deliberate in a jury?

9      PROSPECTIVE JUROR:  Yes; even that when I

10  heard it, it was very little.

11      THE COURT:  With respect to one question, the

12  question was:

13      "This case involves cooperating individuals

14      utilized by federal agents.  Do you have any

15      view about the use of cooperating individuals

16      that would make it difficult for you to be fair

17      to other side in this case."

18      What cooperating individuals are fall into

19  two basic categories.  One category is is somebody

20  who participates in activity that he knows is wrong,

21  his conscious catches up with him and he decides to

22  cooperate with the prosecutors.  This is, by far,

23  the smallest part of that category of cooperating

24  individuals.  Most cooperating individuals fall into

25  the class of people who deem themselves liable or at

347

1  least possibly to be found to have committed an
2  offense under the federal laws or other laws.  And
3  the government makes a promise to them which could
4  range from everything to not charging them at all,
5  all the way to an agreement that they'll plead
6  guilty and get a particular sentence.

7          When that happens, the defense says these
8  people are lying because they have a motive to lie,
9  they get a benefit from it.  The prosecutor will
10  say, yes, they have a motive but they tell the
11  truth.  And then there will be argument as to
12  whether there are things other than what they say
13  that support the version of the witness.

14          So you have to make a judgment as to whether
15  the cooperating individual is telling the truth or
16  not telling the truth, that's what that question
17  means.  And this is why they say, do you have any
18  view about the use of cooperating individuals that
19  would make it difficult for you to be fair to either
20  side of this case.  Do you?

21          PROSPECTIVE JUROR:  I guess if the Court
22  decides I'm capable of doing that, I'm sure I'll be
23  able to, yes.

24          THE COURT:  Okay.  The other thing you
25  express is a concern about following the Court's

:57PM

:57PM

:57PM

:58PM

:58PM

348

law.  You said probably you could but you don't know
much about the law or how the court will give it.
Actually, what we do is, we give it to you in
writing.  It's a serious of instructions.  And not
only do we give it to you in writing, I read it.
This does not necessarily mean that the instructions
are simple or easy, it means that in the vast
majority of cases, if you study them, you'll figure
out what the answer is.  But you are given written
documents as to what the law means, and you're given
copies of those so you can have them with you.  In
some cases, you can ask the Court to clarify and in
some cases the Court will, that's what that means.

        Thank you.

    (Prospective juror exited the courtroom, and the
     following proceedings were had herein:)

    (Brief pause).

    (Prospective juror entered the courtroom, and
     the following proceedings were had herein:)

        THE COURT:  You are juror 149?

        PROSPECTIVE JUROR:  Yes, that's correct.

        THE COURT:  What do you do for a living?

        PROSPECTIVE JUROR:  I'm currently unemployed.

        THE COURT:  What did you do for a living?

        PROSPECTIVE JUROR:  Director of sales and

349

1  operations for a manufacturing company.

2       THE COURT:  How long did you work for them?

3       PROSPECTIVE JUROR:  I worked for them for

4  1 year.

:00PM

5       THE COURT:  Are they still in business with a

6  lot of layoffs or are they just gone?

7       PROSPECTIVE JUROR:  Correct, a lot of

8  layoffs.

9       THE COURT:  And did you work for anybody

:00PM

10  before that?

11       PROSPECTIVE JUROR:  Yes, I did.  Another

12  manufacturing company called Houston Harvest for

13  4 years.

14       THE COURT:  Same kind of work?

:01PM

15       PROSPECTIVE JUROR:  Same kind of work.

16       THE COURT:  This is all clothing work?

17       PROSPECTIVE JUROR:  It's gift products,

18  clothing, aluminum pans.

19       THE COURT:  Okay.

:01PM

20       PROSPECTIVE JUROR:  And they were bought up

21  by another company, so, again, they got dissolved.

22       THE COURT:  You have three children, the

23  oldest is 14 and the youngest is 4?

24       PROSPECTIVE JUROR:  Correct.

:01PM

25       THE COURT:  And what does your husband do for

350

1  a living?

2  　　　　PROSPECTIVE JUROR:  He's a truck driver.

3  　　　　THE COURT:  Over-the-road trucking?

4  　　　　PROSPECTIVE JUROR:  No, for Fed Ex.

:01PM  5  　　　　THE COURT:  Okay.  The only reason you have

6  listed here for ever consulting a lawyer was to file

7  for divorce from your first husband about 10 years

8  ago, is that right?

9  　　　　PROSPECTIVE JUROR:  That's correct.

:02PM  10  　　　　THE COURT:  Was that actually contested or

11  was it agreed to?

12  　　　　PROSPECTIVE JUROR:  It was agreed to.

13  　　　　THE COURT:  Other than that, you don't hire

14  lawyers at all?

:02PM  15  　　　　PROSPECTIVE JUROR:  Not really, no.

16  　　　　THE COURT:  You put a zero there.

17  　　　　PROSPECTIVE JUROR:  Yeah.  No, I don't.

18  　　　　THE COURT:  You belong to a church?

19  　　　　PROSPECTIVE JUROR:  Yes.

:02PM  20  　　　　THE COURT:  You donate to a church?

21  　　　　PROSPECTIVE JUROR:  Yes, we go to church,

22  when we attend.

23  　　　　THE COURT:  Do you belong to anything else?

24  　　　　PROSPECTIVE JUROR:  No.

:02PM  25  　　　　THE COURT:  You or anybody you know or

351

1  anybody you're close to has never done political
2  work?  They haven't volunteered, they haven't
3  contributed money?
4          PROSPECTIVE JUROR:  No.
5          THE COURT:  Arts and crafts and dancing?
6          PROSPECTIVE JUROR:  Correct.
7          THE COURT:  Which comes first?
8          PROSPECTIVE JUROR:  Arts and crafts.  I like
9  to design, create things.
10         THE COURT:  Which arts?
11         PROSPECTIVE JUROR:  Painting, ceramics,
12 jewelry.
13         THE COURT:  Do you have a lot of it?
14         PROSPECTIVE JUROR:  Home, mostly, just around
15 my house.
16         THE COURT:  And the dancing part?
17         PROSPECTIVE JUROR:  My sister-in-law owns a
18 dance studio, so I would try to do dancing, you
19 know, dancing classes.
20         THE COURT:  If I read this correctly, you
21 didn't pay a lot of attention to the trial that was
22 going on with these charges?
23         PROSPECTIVE JUROR:  That is correct.
24         THE COURT:  Okay.  But you do remember that
25 the defendant in this case may have served as a

:02PM

:03PM

:03PM

:03PM

:04PM

352

1    lawyer to a cousin of yours?

2        PROSPECTIVE JUROR:  That is correct.

3        THE COURT:  And you conclude by that:

4        "It was a story told to me by my brother, I'm

5         not sure if it was real."

6        PROSPECTIVE JUROR:  Yeah, it was -- he had

7    said my cousin that, you know, he was a lawyer, and

8    I said I never really spoke to my cousin about it so

9    I didn't know if it was true or not.

10       THE COURT:  Can I infer from that that you

11   didn't care much in any way that you didn't want to

12   check it out?

13       PROSPECTIVE JUROR:  No, I didn't care.

14       THE COURT:  You didn't care.

15       PROSPECTIVE JUROR:  No.

16       THE COURT:  I take it you have no current

17   opinion on how this case out to come out?

18       PROSPECTIVE JUROR:  No; I'm not really much

19   into politics.

20       THE COURT:  Will you decide this case on the

21   basis of the evidence you hear and nothing else but

22   that evidence you hear in court?

23       PROSPECTIVE JUROR:  That is correct.

24       THE COURT:  The reason I ask that question

25   is, sometimes if you have seen some news, heard a

1   little something here and there, and you are sitting

2   in a jury, some piece of evidence will come up and

3   you say, oh, I remember that happening, and what you

4   are remembering is a news report.  What you have to

5   do is ignore the fact that there was a news report

6   and pay attention only to what the witness said, can

7   you do that?

8           PROSPECTIVE JUROR:  Correct.

9           THE COURT:  Thank you.

10      (Prospective juror exited the courtroom, and the

11       following proceedings were had herein:)

12      (Brief pause).

13      (Prospective juror entered the courtroom, and

14       the following proceedings were had herein:)

15          THE COURT:  You are 150 for today, that's

16  your number.

17          PROSPECTIVE JUROR:  Correct.

18          THE COURT:  How long have you been doing

19  upholstery?

20          PROSPECTIVE JUROR:  Since I was, let's see,

21  23.

22          THE COURT:  Did you start out by working for

23  somebody who was in that business?

24          PROSPECTIVE JUROR:  I worked for my dad.

25          THE COURT:  He was in the same business?

354

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Did you ever work for a company?

3 Have you always work by yourself?

4    PROSPECTIVE JUROR:  Always worked by myself.

5    THE COURT:  Is that what your dad did, too?

6    PROSPECTIVE JUROR:  Yes.

7    THE COURT:  How do you get business?

8    PROSPECTIVE JUROR:  Doing it a long time.

9 People come back, their kids come back.

10    THE COURT:  Do you have any particular

11 specialty that you do?

12    PROSPECTIVE JUROR:  Custom upholstery.

13    THE COURT:  Okay.  Do you have people who

14 work for you?

15    PROSPECTIVE JUROR:  No.

16    THE COURT:  Do you sometimes need help to do

17 the job?

18    PROSPECTIVE JUROR:  I have my brother that

19 helps me once in a while.

20    THE COURT:  Okay.  You've been sued only

21 once?

22    PROSPECTIVE JUROR:  Yes.

23    THE COURT:  And that was a slip cover shrank.

24    PROSPECTIVE JUROR:  Yes.

25    THE COURT:  And did you hire a lawyer or did

:08PM

:09PM

:09PM

:10PM

:10PM

355

1  you just pay him?

2          PROSPECTIVE JUROR:  No, actually, the fabric

3  company said they would pay if I got sued.  It was

4  their fault.

5          THE COURT:  And the only reason you ever

6  consulted a lawyer was for a will?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  It says here you know lots of

9  attorneys.

10         PROSPECTIVE JUROR:  My wife worked as a

11 paralegal for years.

12         THE COURT:  Very large firm or a small firm?

13         PROSPECTIVE JUROR:  A couple of small firms,

14 a couple of large firms.

15         THE COURT:  And so you met those lawyers?

16         PROSPECTIVE JUROR:  Yeah, all the time.

17         THE COURT:  Did they ever discuss their work

18 with you?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Did you ever discuss your work

21 with them?

22         PROSPECTIVE JUROR:  Only their wives.

23         THE COURT:  I'm going to go over some

24 questions that I think you overlooked.  They're not

25 particularly important questions, but I'll read them

356

to you:

"Have you or anyone close to you ever worked in an effort to change a law?"

PROSPECTIVE JUROR:  What do you mean by worked to change the law?

THE COURT:  Write a letter to a legislature?

PROSPECTIVE JUROR:  Not that I know of.

THE COURT:  Okay.  Ever had any particular concerns with a particular law yourself?  Did you ever have such a concern?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.

"Have you ever participated in any group concerned with crime prevention or crime victim's rights?"

PROSPECTIVE JUROR:  No.

THE COURT:  (Reading:)

"Have you or anybody close to you ever been affiliated with the Better Government Association?"

PROSPECTIVE JUROR:  My wife could've been when she was paralegal.

THE COURT:  But nothing known to you?

PROSPECTIVE JUROR:  Not to me, no.

THE COURT:  Have you ever written to an

357

1  elected or appointed government official?

2      PROSPECTIVE JUROR:  No.

3      THE COURT:  Do you belong to anything?  Do

4  you contribute to anybody?

5      PROSPECTIVE JUROR:  No.

6      THE COURT:  A church, a union, anything like

7  that?

8      PROSPECTIVE JUROR:  No.

9      THE COURT:  Have you or your spouse ever

10  volunteered to help some of these campaign for

11  political office?

12      PROSPECTIVE JUROR:  No.

13      THE COURT:  Do you have any opinion about

14  political fundraising?

15      PROSPECTIVE JUROR:  No.

16      THE COURT:  You use a computer at all?

17      PROSPECTIVE JUROR:  Very little.

18      THE COURT:  Do you go and hunt down the news,

19  newspapers, television broadcasts, the Internet, do

20  you do any of that?

21      PROSPECTIVE JUROR:  No.

22      THE COURT:  And the only time you recall

23  seeing the defendant in this case is that you saw

24  him on some game shows, that's all you remember?

25      PROSPECTIVE JUROR:  Well, as he was

:12PM

:13PM

:13PM

:13PM

:14PM

358

struggling for a while, stuff like that.

THE COURT:  And you think except for some personal considerations, you could be a fair and impartial juror in this case?

:14PM

PROSPECTIVE JUROR:  I could be fair, yeah.

THE COURT:  Now, you have given me one major reason why you ought to be deferred from jury service and that is it kills your income, is that correct?

:14PM

PROSPECTIVE JUROR:  Well, there's two other ones that came up that I didn't know about.  My mother-in-law passed away last Friday, so we have to go down on the 8th to her funeral down in Arkansas, and then we have to sell a house on Tuesday and

:15PM

Wednesday, which would be the 13th and 14th, and my wife is out on medical leave because her knees had to be replaced.

THE COURT:  Okay.  Could you hear me today when I spoke to you?

:15PM

PROSPECTIVE JUROR:  Right now, yes.

THE COURT:  But you do sometimes have some trouble with your hearing, is that correct?

PROSPECTIVE JUROR:  Certain voices I can't hear.

:15PM

THE COURT:  Okay.  Thank you.

1    (Prospective juror exited the courtroom, and the
2     following proceedings were had herein:)
3    (Brief pause)
4        THE COURT:  We're going to take a break now.
5    I don't know if we'll finish all the jurors who are
6    still in that room, but we're going to take at least
7    a few more, and then we'll deal with some challenges
8    for cause.
9        THE MARSHAL:  All rise.
10    (Recess.)
11    (The following proceedings were had out of the
12     presence of the prospective jurors in open
13     court:)
14        THE COURT:  Okay, counsel, come up to the
15    lectern.
16        We will start in numerical order, which means
17    the first person that has to be addressed is 111.
18        MR. SCHAR:  Judge --
19        THE COURT:  Feel free at any time.
20        MR. SCHAR:  Judge, I noticed that there
21    weren't certain questions asked about some issues at
22    the back end of the questionnaire, and I took from
23    that the likelihood he was going on cause as a
24    hardship.
25        THE COURT:  You're moving for cause?

360

1        MR. SCHAR:  Yes, Judge.

2        THE COURT:  You want to keep him?

3        MR. GOLDSTEIN:  We are in agreement.

4        THE COURT:  And so am I.  In fact, it was an

5   agreement from, like, the fourth question.

6        Okay.  The next one I have is 123.  This is

7   the one who asked for an excuse, which I believe is

8   true.

9        MR. SCHAR:  We'll --

10       THE COURT:  My understanding of what's

11   happened at the hospital --

12       MR. SCHAR:  We'll move for cause, Judge.

13       THE COURT:  Right.

14       You're view, counsel?

15       MR. GOLDSTEIN:  Your Honor, I don't believe

16   there was enough for cause for her, Your Honor.  So

17   we object.

18       THE COURT:  I don't know about the cause, but

19   the combination of the cause and what would be her

20   obvious discontent serving as a juror.

21       This is somebody -- well, actually, it's one

22   of two things, either she's telling me this story

23   about what happens when she gets transferred from

24   one hospital.  Although, late news has indicated

25   that maybe they might save the hospital.  From my

361

1   point of view, if it's a kind of the best thing I

2   could possibly say because I don't want to serve on

3   a jury, that says something about her.  And the

4   funny thing is is if it's perfectly sincere, it says

5   something also about her that pretty much leads me

6   to an equal conclusion that she is not the kind of

7   person I would want to have on this jury; in fact,

8   probably a no jury, although, possibly if it's a

9   week, she'd be fine.  So she's out.

10        Okay, now we've gone through a fair number of

11  them, but I think we start again at 128, that's

12  where we left off.  It's the painter.  Anybody have

13  anything to say about the painter?

14        MR. GOLDSTEIN:  Yes, Your Honor, we ask for

15  cause on 128.  It's an individual that has a

16  financial hardship, business owner, said he doesn't

17  get paid, if on the jury, can't pay the bills.  Not

18  to mention question number 53, as well as 55 and 56.

19  This individual found fundraising shady.  This is a

20  one-word answer, as well as his answers to 55 and 56

21  indicated that these practices are "shameful," that

22  was the only answer he gave.  But the financial

23  hardship is pretty clear.

24        MR. SCHAR:  Judge, we'll object.  Let me just

25  be brief.  I think his answers were luminous of his

:51PM

:52PM

:52PM

:53PM

:53PM

362

views, and, frankly, some of those questions do
elicit such a response.

In terms of his financial hardship, I think
you were the one Your Honor asked whether he could
oversee the jobs.  He said he does, which would be
an individual who can deal with the work without him
having to necessarily be there.  So for those
reasons, we would object to the cause challenge as a
hardship.

MR. GOLDSTEIN:  Your Honor, he is the
supervisor of these individuals, he is the one
that's hired, he is the one that is in charge of
everything.  So he's certainly the one that has to
answer to any questions or issues that are coming
up.  The type of business he has is basically an
on-site type of business.  It's not like you just
send the people there and move on.

As to question 55 and 56, if those questions
generally elicit an improper response or an anti
sentiment towards those questions, then I'm not
exactly sure why we have those questions if it's
just to elicit those response.  So the fact that he
gave those answers clearly indicates an individual
who is biased.

MR. SOROSKY:  Your Honor, in plain street

1  talk, I mean, this man has a seasonal occupation,

2  and warm weather is his busy season, and he says, I

3  think his exact words were, he either said this in

4  court or wrote this down, if I don't work, I don't

5  pay my bills, summer is my busy busy season.

6      I think this would put a peculiarly harsh

7  financial burden upon him, and as my colleague,

8  Goldstein, said, his answers were extremely

9  prejudicial toward the defendant.  He said, and I'm

10 just quoting, most politicians and the use of the

11 quote "are full of it."  I mean, it would be very,

12 very difficult for him to participate as a fair

13 juror considering the financial hardship he would

14 sustain, coupled with his attitude toward public

15 officeholders.

16      THE COURT:  Personally, I think you're off

17 base on this guy, both of you.  I don't believe for

18 a second his statements about his undying commitment

19 to the conviction of the defendant.  My problem is

20 is I think the reason he's saying it is because he

21 wants to get out of jury service for economic

22 reasons.  And I have a long history of not trusting

23 such jurors, particularly -- I mean, there's

24 sometimes what you got is just an immediate reaction

25 of the juror who says "I can't possibly be fair from

364

1 all I read about it," and then you ask questions,
2 "well, could you disregard all you read" and
3 eventually they come around because they don't
4 understand the question in the first place.  An
5 astonishingly large number of people think that if
6 you heard about a case you can't sit on the jury,
7 which has never been the law in the United States.
8 The standard is, can you put aside whatever opinions
9 you got, even if they're very clear opinions, can
10 you put them aside.
11         I don't think the problem is the opinions.  I
12 think this is an individual whole will not, for
13 economic reasons, be a juror open to reasoned
14 argument.  He just wants to get out of that room.
15 And what happens when he just wants to get out of
16 that room is, he tends to see which way the wind is
17 blowing, he doesn't care what the result is, and
18 whatever vote will get him out quicker, that's the
19 vote he will take.  So I'm sustaining the challenge
20 for cause.
21         MR. SOROSKY:  Thank you.
22         THE COURT:  He is 128.
23         What's next?
24         MR. SCHAR:  Judge, we don't have anything
25 until 134.

365

1          THE COURT:  You got anything before 134?

2          MR. GOLDSTEIN:  130, Your Honor.

3          THE COURT:  130.  And your grounds?

4          MR. GOLDSTEIN:  Your Honor, I have a couple

5  of grounds that I could tell Your Honor right now,

6  there is one issue I would like to address in a

7  sidebar, if that is possible, Your Honor.

8          MR. SOROSKY:  So if we could pass her,

9  perhaps --

10          THE COURT:  Yeah, we can pass her.

11          MR. SOROSKY:  Thank you.

12          THE COURT:  Okay.  You got anything until 134

13  after that?

14          MR. SOROSKY:  We do not, Your Honor.

15          THE COURT:  Okay.  Swell.

16          MR. SCHAR:  Judge --

17          THE COURT:  134.

18          MR. SCHAR:  Yes.  Obviously, there's a

19  substantive issue within the questionnaire related

20  to a personal situation.  I don't know if there's an

21  objection to this or not.

22          THE COURT:  Are you going to object to this

23  one?

24          MR. GOLDSTEIN:  Yes, Your Honor.

25          MR. SCHAR:  So let me finish.

366

1    MR. GOLDSTEIN:  Go ahead.

2    MR. SCHAR:  Judge, obviously in the

3  questionnaire she indicated, if she was going to

4  follow through what she said she was going to do,

5  she even wouldn't be here today.

6    THE COURT:  Right.

7    MR. SCHAR:  So I don't know if she meant

8  that, or she was trying to get off jury duty, or

9  she's in a type of situation where there's a kind of

10 combustibility to what's occurring in such that at

11 the time she thought it, now she's got a different

12 plan, but I don't think that's the type of person,

13 given the personal circumstances, and given that she

14 either believed it when she said it but now suddenly

15 has changed in timing or didn't believe it when she

16 said it, I fear that should she be on the jury and

17 things go in a different direction for her

18 personally, this could be a significant problem.

19    Putting aside, obviously given the personal

20 situation, calls into question her ability to be a

21 juror who's going to pay attention and be focused on

22 the issues.  So for those reasons, I don't think she

23 would make a good juror, Judge.

24    MR. GOLDSTEIN:  Your Honor, the only reason I

25 object is, in the questionnaire she did indicate

:59PM

:59PM

:00PM

:00PM

:00PM

367

that there was an immediacy to it.  When Your Honor
questioned her, she told you that she will be moving
in 3 months, which puts us out of the range of the
trial.  So it appears, and we don't know the reason,
it doesn't quite, frankly, matter, that whatever the
issue is, it's been resolved enough so that she can
sit on the jury.

       THE COURT:  Were I to infer anything from the
change of timing, I would infer end of school year.
This is somebody who has an unfortunate -- may not
be tragic, may not be particularly bad, but an
untenable relationship, and she's going to take a
child and go to another state.  And I don't get any
sense in this that this is going to come as anything
but a surprise to her partner.  I am just afraid
that the family stress that's implicit in what she
said, or in the absence of family stress the
mercurial nature of her plans for the future, make
her an unsuitable juror.  Challenge for cause is
granted.

       Anybody anything after 134?

       MR. SCHAR:  The next the government has is
138.

       THE COURT:  Anything before that?

       MR. GOLDSTEIN:  Nothing before 138, Your

1    Honor.

2          We have no objection to 138.

3          THE COURT:  Okay.  Hang on.

4       (Brief pause.)

5          THE COURT:  138, stricken for cause.  A wise

6    decision on the part of both sides.  It would've

7    been the Court's challenge if no one had challenged

8    this.  In fact, it would have been his own-self

9    challenge.

10         Okay, whose got something 8next?

11         MR. GOLDSTEIN:  The next one, Your Honor, we

12   have is 143.

13         MR. SCHAR:  We have 139, Judge.  It's about

14   two issues on 139.

15         THE COURT:  Which is the Oprah one?

16         MR. SCHAR:  It was not this one.

17         THE COURT:  Okay.

18         MR. SCHAR:  I think we're coming up on that.

19         THE COURT:  Okay, go ahead.

20         MR. SCHAR:  139 is two, Judge.  One is the

21   financial hardship, which she lays out, in terms of

22   having the mortgage payments and only one salary

23   coming in, she obviously owes money as it is.  And

24   that is combined with the potential problem in terms

25   of the answers related to the individual that was

1  her aunt's husband who went to jail.  That

2  individual is also actually implicated by one of the

3  potential witnesses in this case.  I don't want to

4  say that individual would necessarily testify, but

5  the individual does testify, there's actually

6  information that that individual is discussed about

7  the particular individual that's at issue in her

8  questionnaire.

9          MR. SOROSKY:  Could we pass this one and

10  maybe in our sidebar the government could be a

11  little more informative?

12          THE COURT:  Sure.

13          The next one?

14          MR. GOLDSTEIN:  We have 143, Your Honor, if

15  no one has anyone before that.

16          THE COURT:  Do you have anything before 143?

17          MR. SCHAR:  No, we do not.  And we do not

18  object to 143.

19          THE COURT:  Okay.  What's next?

20          MR. GOLDSTEIN:  The next one we have, Your

21  Honor, is 145.

22          MR. SCHAR:  No objection, Judge.

23          THE COURT:  One second to catch up with some

24  notes.

25      (Brief pause).

370

 1          THE COURT:  Okay, what are we looking at,
 2   145, no objection?
 3          MR. GOLDSTEIN:  Correct, Your Honor, that's
 4   an agreed one.
 5          The next one we have is 147.
 6          THE COURT:  Do you have anything before that?
 7          MR. SCHAR:  No.
 8          THE COURT:  147.  Okay.
 9          MR. GOLDSTEIN:  Your Honor, first of all, as
10   to 147, this individual has a significant financial
11   hardship.  She indicated that her and her husband
12   just got married, they bought a house, they live
13   check to check.
14          THE COURT:  Yeah, I read that.
15          MR. GOLDSTEIN:  As well, in addition to the
16   financial hardship, she indicated in her questions
17   that she's already formed opinions.  She didn't
18   indicate what her opinions were, but she indicated
19   that she already did form an opinion.  She wasn't
20   exactly being completely upfront as exactly what her
21   opinions were, but nonetheless, she said that she
22   had formed an opinion coming into this case.
23          And I think that's enough for cause, not to
24   mention the financial hardship that that is
25   something that will be on her mind throughout this

1    trial, basically divert her attention while she has

2    these significant issues going on, her mortgage, her

3    recent marriage, as well as living paycheck to

4    paycheck, Your Honor.

5              MR. SCHAR:  Judge --

6              MR. SOROSKY:  If I could just add, I believe

7    her exact wording was "I already made a decision

8    about the defendant."

9              THE COURT:  Yeah, but she passed Irvin versus

10   Dowd, the test which I'm obliged to apply, but it's

11   a complicated case for other reasons.

12             You can speak.

13             MR. SCHAR:  Judge, obviously, she indicated

14   that she could put her opinion aside and make a fair

15   decision.  And I didn't think her financial

16   hardship, or at least the way she described it, was

17   as severe as several of the others.  Her concern was

18   that they might get behind, not that, as we've heard

19   from some others, that they were going to lose the

20   house or something like this, so we object.

21             MR. GOLDSTEIN:  Your Honor, if I may just

22   briefly respond.

23             THE COURT:  No. I'm sustaining the challenge

24   for cause.

25             Whose got another one?

372

1        MR. GOLDSTEIN:  The next number we have is
2  number 150, that's the last one.
3        MR. SCHAR:  Judge, we have no objection to
4  that.
5        THE COURT:  You what?
6        MR. SCHAR:  No objection.
7        THE COURT:  What a surprise.
8        MR. SCHAR:  And then that brings us,
9  actually, to 188 that we skipped over.
10        THE COURT:  Yeah, we did skip that one.
11        MR. SCHAR:  And I think that's a cause
12  challenge as well.
13        THE COURT:  Do you have any problem with 188?
14        MR. GOLDSTEIN:  We object to cause on 188,
15  Your Honor.
16        THE COURT:  Incidentally, there's a juror
17  who's coming up tomorrow, I've ordered him to fill
18  out the form again because I cannot read his
19  handwriting.
20        MR. SCHAR:  One moment, Judge.
21     (Brief pause):
22        MR. GOLDSTEIN:  Your Honor, as to 188, we
23  agree.
24        THE COURT:  Yeah.
25        I have received a bulletin.  The bulletin

373

1 says to me that the Oprah juror is 137.  Let us see
2 if this is correct.
3     (Brief pause)
4         THE COURT:  It's Page 22.   Anyone want to
5 speak to this?
6         Well, first of all, everybody knows here that
7 this juror will survive.
8         MR. SCHAR:  It's the last year, Judge.
9         MR. GOLDSTEIN:  I think the last episode,
10 too.
11         THE COURT:  And the question becomes, because
12 I can fix this, like, not have trial that day, but
13 that seems a little over the top.
14         MR. SOROSKY:  Well, is it possible to work
15 around that day?  I don't know.  What time is the
16 show actually on?
17         THE COURT:  I don't know.
18         Does anybody know that.
19         MR. GOLDSTEIN:  Not that I know, Your Honor,
20 but I believe it's the morning.
21         MR. SOROSKY:  All these people in the
22 audience, someone should be able to assist us at
23 what time.
24         THE COURT:  Yeah, but they won't be under
25 oath and I'll disregard it.

374

1      MS. KAESEBERG:  I think that they are doing
2  multiple taping throughout day, because there is
3  usually morning taping and afternoon taping.
4      THE COURT:  So maybe we could find out.  So
5  we'll leave this one open.
6      MR. SOROSKY:  That's why we have a woman.
7      MS. KAESEBERG:  I was just there waiting for
8  it.
9      THE COURT:  Okay.  I think that takes care of
10  that, except for stuff that people want to do at
11  sidebar.
12      MR. SOROSKY:  There were some issues with
13  Thursdays people that we didn't resolve yet.
14      THE COURT:  Which were those?
15      MR. SOROSKY:  There was some question about
16  115.
17      MR. SCHAR:  These are the things we discussed
18  this morning, Judge.
19      THE COURT:  Yes, and we're going to call them
20  in and ask them the question.
21      MR. SCHAR:  We could have sidebar when we
22  come back with --
23      THE COURT:  What did you say?
24      MR. SCHAR:  After sidebar will we come back
25  in open court?

375

            THE COURT:  Yeah.  What else did you want to
inquire from the previous day stuff?

            MR. SOROSKY:  Who were some of the other
people?

            MR. GOLDSTEIN:  Just 115.

            MR. SOROSKY:  Just 115 from your perspective.

            THE COURT:  Okay.

            MR. SOROSKY:  And there was some question
about 126, juror 126.  There was some financial
hardship there with him also and you said you were
going to get back.

            THE COURT:  Yeah, we left that open.

            MR. SOROSKY:  Right.

            THE COURT:  I don't think I need anymore
information.  He told me about everything he could
tell me, the sum and substance of which is, it's a
high performance marketing and branding company,
they got two big clients, and his problem is he's
supposed to be at the client's office or
headquarters, or wherever it is, 3 to 4 days a week.
Based on information I've received on another case
involving what branding and marketing people do, I'm
disinclined to disbelieve that.  I don't know,
actually, that it's important for them to be there
for purposes of doing branding and marketing, I

376

think it's important for them to be there so nobody
pries the client out of their grasp, but that's just
a personal opinion, I could be completely wrong.  So
I'm thinking about that.  He's still on the open
list.

　　　　　MR. SOROSKY:  There was one question, juror
117, she indicated that she was starting a new job
March 21st and you also left that open also. She
started her new job March 21st.

　　　　　THE COURT:  Yeah, maybe I did.

　　　　　MR. SOROSKY:  And she indicated, I'm sure
everyone has notes as to all of the specifics.

　　　　　THE COURT:  Let's go to the side now.

　　　　(Proceedings heard at sidebar on the record.)

　　　　　THE COURT:  Okay, 130.

　　　　　MR. GOLDSTEIN:  Your Honor, 130, the reason
we brought you over to sidebar, this is the
individual with the beer company that does the
advertising.  She has for the last five days been on
Twitter with all her experiences as a juror.  She
said she is sitting in the room, she is waiting to
get kicked -- I don't want to exactly quote it, but
she is waiting for cause, that was the exact quote.
Someone who gave an indication that, it seems to me,
was going to get instructions or something.

377

1          MS. KAESEBERG:  That she was unfit to serve.

2          MR. GOLDSTEIN:  Unfit to serve.  The big

3    issue is, she's constantly in the media.

4          THE COURT:  We're going to bring her back and

5    ask her.  130, she comes back.

6          Okay, 139?

7          MR. SCHAR:  Well, Judge, if I may.  Assuming

8    this is a sidebar, her uncle is Tony Rezko,

9    obviously Tony Rezko was convicted.

10          MS. KAESEBERG:  Corruption charge of some

11    sort.

12          MR. SCHAR:  Stuart Levine had provided

13    information that obviously would be exculpatory to

14    Stuart Levine and Mr. Rezko relating to a deal that

15    also includes Vrdolyak in which Mr. Rezko was

16    steering kickbacks for jobs through Vrdolyak to

17    Levine when Levine owned a company some years ago.

18    Obviously, Mr. Levine is going to testify, not on

19    cross-examination it's possible to confront it

20    through various things he has done, and there is

21    just a connection here that causes us a degree of

22    concern as to not being able to predict what

23    happens, and obviously she had hardship as well.  I

24    think we're making our way through jurors, this is

25    not a real well-taken --

378

1        MR. SOROSKY:  Maybe you are going to let us
2   know if Levine is going to testify.
3        MR. SCHAR:  Let's assume yes, then.
4        MR. GOLDSTEIN:  I don't know.  She indicated
5   she would be unfair based on the facts of this.
6        THE COURT:  I don't think -- she doesn't
7   know.  She doesn't know.  This is her Uncle Tony, is
8   that his name?
9        MR. SCHAR:  Uncle Tony, yes.
10       THE COURT:  I'm quite sure she is not being
11  briefed on all the details.  So she's out.
12       With respect to 139, the Tweeter --
13       MR. GOLDSTEIN:  That was 139, Your Honor.
14       THE COURT:  Oh, okay.  Because I gave an
15  instruction in the jury room when you first heard
16  all this, no more Tweets, no more website.  So you
17  checked the Tweets.
18       MR. GOLDSTEIN:  I did.
19       THE COURT:  You had a massive enough staff?
20       MR. GOLDSTEIN:  It's fairly easy.
21       THE COURT:  That you have to check on Tweets?
22  They didn't check on Tweets?
23       MR. GOLDSTEIN:  I have a sneaking suspicion
24  that there were other types of checks too.
25       MR. SCHAR:  Just quickly, because you didn't

379

 1  raise it, I'm assuming there are no criminal history
 2  hits.
 3          THE COURT:  No, we have not integrated the
 4  group that comes after this.  What we got is,
 5  this -- DOB match, SSN does not match.
 6          MR. GOLDSTEIN:  That is the one you struck,
 7  139.
 8          MR. SOROSKY:  As long as we're here, I mean,
 9  on the open ones, I mean --
10          THE COURT:  No, we will probably have to call
11  them back and then when we do we'll check our number
12  against your number.
13          MR. SOROSKY:  So it would be 115?
14          THE COURT:  Right.  Right.
15          MR. SOROSKY:  115 and 126.
16          THE COURT:  Right.  Probably not tomorrow.
17          MR. SOROSKY:  And --
18          THE COURT:  What my hope is is we have a jury
19  by Wednesday, and that we close -- we open.
20          MS. HAMILTON:  You hope.
21          THE COURT:  We open on Thursday.  But we'll
22  see.  Okay.
23      (Proceedings resumed in open court:)
24          THE COURT:  Okay, I think where we are now
25  is, we have a series, not a very long series, maybe

380

1  5 or 6 venire persons who require further

2  discussion, and we'll probably try to take care of

3  that on Wednesday.  Tomorrow, we'll go as far as we

4  can, and then we will assess whether we have enough

5  to go forward.

6         We have, incidentally, the forms for service

7  on this jury distributed to the regular panels that

8  come to this building, just in case we're a little

9  short.  And without giving an actual number, which

10  makes me mild uneasy, but the jury office has

11  informed me that there was a significant number of

12  people who did have the ability to serve on a 10 to

13  12-week trial.  So I think we're okay.  And I'll see

14  you tomorrow.

15         MR. SCHAR:  Judge, very, very briefly.  Just

16  for the open record, it's my understanding that 139

17  has been struck for cause?

18         THE COURT:  What did you just say?

19         MR. SCHAR:  139 has been struck?

20         THE COURT:  Yeah, 139 has been struck.

21         MR. SCHAR:  I believe all the motions in

22  limine are now fully briefed.

23         THE COURT:  Yes, I have them.

24         MR. SCHAR:  I don't expect, obviously, to

25  deal with them this evening, but however Your Honor

381

1  ends up ruling, there are several.  Obviously, that

2  would impact, I think, in part, the opening, and

3  then already, based I think on some preliminary

4  indications from Your Honor, there are several

5  things related to the opening and general just

6  cross-examination --

7          THE COURT:  Is this a long lead-up to say

8  you'd like to know tomorrow?

9          MR. SCHAR:  I'd like to have sometime with

10  Your Honor, because I don't think it's a ten-minute

11  discussion, prior to opening statement.

12          THE COURT:  We're going to do the in limines

13  tomorrow.  We're going to finish them, one way or

14  the other.

15          MR. SCHAR:  Thank you.

16          THE COURT:  Okay?

17          MR. SOROSKY:  Thank you.

18

19          THE MARSHAL:  All rise.

20

21      (Adjournment taken from xx o'clock p.m. to xxx

22       o'clock a.m. on date, 2009.)

23

24

25

:25PM

:26PM

:26PM

:26PM

382

1

2

3          *      *      *      *      *      *      *      *

4

5

6 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

7 FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

8                              MATTER

9

10

11   /s/Blanca I. Lara                    date

12

13

14

15

16 _____        _____

17         Blanca I. Lara                    Date

18

19

20

21

22

23

24

25