634

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )   No. 08 CR 888
4           Government,            )
                                   )
5   vs.                            )   Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )   April 27, 2011
                                   )
7           Defendant.             )   9:30 o'clock a.m.

8
                        VOLUME 4
9              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
10                    AND A JURY

11
    For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15            Assistant United States Attorneys
              219 South Dearborn Street;
16            Suite 500
              Chicago, Illinois 60604
17

18  Court Reporter:

19            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
20                   Room 2504
              Chicago, Illinois 60604
21               (312) 435-5895

22

23

24

25

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY: Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

  
636

1                        INDEX OF EXAMINATION

2    WITNESS                                           PAGE

3

4      Voir Dire...................................... 637

5

6

7    EXHIBITS

8      .................................................

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          VOIR DIRE

2

3

4   (The following proceedings were had in open court:)

5           THE CLERK:  Will resume with the case, United

6   States versus Blagojevich.

7           THE COURT:  Counsel, approach.

8       (Brief pause).

9           THE COURT:  You don't actually all have to

10  come up.  You can, if you want to.

11      (Brief pause).

12          THE COURT:  The first thing we're going to do

13  are call-backs of some jurors.  The list I have

14  includes three who are going to do chambers for

15  privacy reasons and the rest we're going to do out

16  here.  These are going to be fairly short.

17          107, there's an issue about flights.  115,

18  we're going to do in the jury room.  117, is about

19  the job that was started.

20          Is 118 here?  Are we missing 118?

21          THE CLERK:  Yes, sir, we have all of them.

22          THE COURT:  Okay, 118 has to do with some

23  financials.  And also, I believe 118, when she came

24  here this morning indicated she eliminated, she

25  omitted something on her form.  And, actually,

1  Donald does not think that she omitted it, he thinks
2  it's actually not called for on the form but
3  something she thought of that we should know.
4        121, which I think we will do in chambers
5  because there's a CCH issue with respect to that
6  one.
7        116, this is the impossible-to-replace issue.
8        130, deals with an issue that we've discussed
9  at sidebar, that will be in the jury room.
10       And 137, we'll also do in the jury room.
11       None of these I think are extended, just
12 simple questions here and there.
13       When we're done with that, we will proceed to
14 those who were here yesterday and weren't examined,
15 and then in the afternoon I believe we have another
16 set of new jurors.
17       My current count is, we have, I believe, 18
18 or 19 jurors available in the worst case, and we may
19 I have 20 or 22, depending on various rulings.  This
20 indicates to me we are looking to openings next week
21 and not this week.  Just so you know.
22       We need to complete jury selection, assuming
23 there are no overlaps on peremptory challenges, we
24 need 40 we're about halfway there.
25       MS. HAMILTON:  We'll just double-check.  Our

:13AM :13AM :14AM :14AM :15AM

1   numbers were different.  We had -- not including the
2   numbers you just listed, 28 rather than 18.
3          THE COURT:  I think maybe my numbers are
4   right.  But in any event, in any event, it's still,
5   at the pace this is going, I'm still thinking next
6   week is when we begin.  But we'll go over this,
7   we'll go everybody's list, and since we're dealing
8   with numbers, it'll go by fairly quickly.
9          This is a relatively long jury selection
10  process for federal court, but it was a highly
11  publicized case.  The second time around, I'm not
12  surprised.  And I come from a system where once
13  there was a case that went from the beginning of
14  jury selection to a verdict, went 8 weeks, 6 of
15  those weeks were devoted to jury selection, which
16  sort of happens when you got, I think, 160
17  peremptory challenges a side.  Unique case.
18         With that, Mr. Walker.
19     (Brief pause).
20     (Prospective juror entered the courtroom, and
21      the following proceedings were had herein:)
22         THE COURT:  Hi.  Have a seat.
23         This is just one or two questions.
24         PROSPECTIVE JUROR:  Okay.
25         THE COURT:  This is not going to be as long

1    as last time.  It's kind of a rerun.

2            You have a plane flight?

3            PROSPECTIVE JUROR:  Yes, I do.

4            THE COURT:  And where was that to?

5            PROSPECTIVE JUROR:  Arizona.

6            THE COURT:  And that was for a week, maybe?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  And what was the purpose of that

9    one?

10           PROSPECTIVE JUROR:  Well, I have to go and

11   finalize my son's funeral stuff because he passed in

12   December, and I had to wait for the insurance

13   company to clear up the matter to release the funds.

14   So I have to go down there now and finalize

15   everything.  My last daughter is down there, and she

16   hasn't seen me since my son passed.

17           THE COURT:  And when did he pass away?

18           PROSPECTIVE JUROR:  December 30th, right

19   after Christmas.

20           THE COURT:  And the flight is scheduled for

21   May 3rd?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  And you're going for a week?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  Okay.  I just wanted to verify

1 that, and its reason, and, obviously, we're going to
2 take that into consideration.
3          Thanks.
4          PROSPECTIVE JUROR:  Thank you.
5      (Brief pause).
6      (Prospective juror entered the courtroom, and
7       the following proceedings were had herein:)
8          THE COURT:  This won't be as long as the
9 time.  It'll be a lot shorter.
10         You started the job?
11         PROSPECTIVE JUROR:  Yes.
12         THE COURT:  And how far along are you on the
13 job?
14         PROSPECTIVE JUROR:  A month.
15         THE COURT:  How big is the company?
16         PROSPECTIVE JUROR:  Like 25 people.
17         THE COURT:  Okay.  And how many people do
18 what you're supposed to do?
19         PROSPECTIVE JUROR:  Me and a part-time girl.
20         THE COURT:  And when was the last job you had
21 before this one?
22         PROSPECTIVE JUROR:  I left my previous job to
23 start this one.  So it was a month ago.  I mean, I
24 left and started a new job.
25         THE COURT:  Why did you leave the previously

1  job?

2          PROSPECTIVE JUROR:  Closer commute.

3          THE COURT:  What?

4          PROSPECTIVE JUROR:  It was too far away.

5          THE COURT:  And this one is much closer?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Have you talked to your current

8  employer to ask about what happens if you get stuck

9  here?

10          PROSPECTIVE JUROR:  I asked -- well, he

11  handed me the handbook and I don't get paid.  I

12  didn't know that.  My previous place I got paid.

13          THE COURT:  Okay.  Has your current employer

14  said anything about what happens to the job if you

15  disappeared, leaving aside the pay part?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  It would be helpful if you asked

18  them and you wrote us a letter, or a phone call is

19  enough, actually.

20          PROSPECTIVE JUROR:  What's that?

21          THE COURT:  I'd like you to ask your employer

22  if the job would still be there if you wind up

23  getting stuck here, and I'd like you to tell us his

24  answer, and you can do that by telephone; okay?

25          PROSPECTIVE JUROR:  Yes.

1              THE COURT:  Thanks.

2

3          (Prospective juror exited the courtroom, and the

4           following proceedings were had herein:)

:21AM       5          (Brief pause).

6          (Prospective juror entered the courtroom, and

7           the following proceedings were had herein:)

8              THE COURT:  You are 118?

9              PROSPECTIVE JUROR:  I am.

:22AM      10              THE COURT:  Mr. Walker told me, and I'm not

11      sure I'm confusing you with someone else, but you

12      had something you thought you should've put down on

13      the questionnaire.

14              PROSPECTIVE JUROR:  That's right.

:22AM      15              THE COURT:  Okay.  And what was that?

16              PROSPECTIVE JUROR:  My daughter's

17      father-in-law --

18              THE COURT:  Why don't you get closer to --

19              PROSPECTIVE JUROR:  My daughter's

:22AM      20      father-in-law had gone to prison and worked for the

21      state.

22              THE COURT:  Do you know what he did for the

23      state?

24              PROSPECTIVE JUROR:  No.

:22AM      25              THE COURT:  Do you know when he went to

1  prison?

2         PROSPECTIVE JUROR:  I'm not positive, no.

3         THE COURT:  Was it a long time ago?

4         PROSPECTIVE JUROR:  It was a while ago.  It

5  was before they married.

6         THE COURT:  Do you know if that person is

7  still alive?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Is this a person you personally

10 know?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Is there anything about your

13 relationship with that person and what happened to

14 him that would affect your ability to be fair here?

15        PROSPECTIVE JUROR:  I -- I don't -- I don't

16 know what happened, so I can't say.

17        THE COURT:  Okay.  You also raised a question

18 about financial hardship to serve.

19        PROSPECTIVE JUROR:  Correct.

20        THE COURT:  Would you go through that again

21 with me.

22        PROSPECTIVE JUROR:  I am a sub, a substitute

23 teacher.

24        THE COURT:  Bring the mike closer.

25        The funny thing is, this is the season when

Voir Dire                                    645

1  lots of people have their voices changed by the
2  weather.
3          PROSPECTIVE JUROR:  Okay.  I am a substitute
4  teacher and I only get paid for the days I work.  So
:23AM 5  if I'm not working, I'm not getting paid.
6          THE COURT:  I understand that part, but what
7  effect does that have on you?
8          PROSPECTIVE JUROR:  Well, I help pay the
9  bills, so ....
:24AM 10         THE COURT:  What I think you're going to have
11 to do, and you can do this by fax or you can do it
12 by e-mail, you don't have to come back here, is you
13 have to give me basically a financial statement
14 about what your income is and what your monthly
:24AM 15 expenses are.
16         PROSPECTIVE JUROR:  All right.
17         THE COURT:  And the important thing for me is
18 the monthly expenses.
19         PROSPECTIVE JUROR:  All right.
:24AM 20         THE COURT:  The kinds of bills that come in
21 every month, okay?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  And if you want to know how to do
24 that, what numbers to call, you can talk to somebody
:24AM 25 and we'll tell you how to do it, okay?

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Thanks.

3     (Prospective juror exited the courtroom, and the

4      following proceedings were had herein:)

5     (Brief pause).

6     (Prospective juror entered the courtroom, and

7      the following proceedings were had herein:)

8        THE COURT:  You're 126?

9        PROSPECTIVE JUROR:  I am.

10        THE COURT:  What I'd like to talk to you

11   about is a little more on the issue of the projects

12   that you're working on at the office.  In all

13   honesty, I don't see a terrible inherent financial

14   hardship here, but we do also consider the impact on

15   employers and items of that sort, so you want to

16   tell me a little more about that.

17        PROSPECTIVE JUROR:  So we engaged this

18   company in January, we completed a 3 and a half

19   month first phase of the project, and we're starting

20   7 pilots over -- starting in May, 3 of them, and

21   then in August will be the other 3 through December

22   of this year.  I'll personally be managing 3, 3

23   teams of about 3 to 4 people per team.  I'm the key

24   contact with the client.  They've already spent

25   $800,000 with us over the first 3 months.  This next

1  phase of work is about 3 and a half million dollars
2  to our firm, and we're only about 55 million-dollar
3  firm, so it's very significant.
4          THE COURT:  Okay.
5          PROSPECTIVE JUROR:  And we probably have to
6  delay it to start until I would come back from the
7  trial, in all honesty.
8          THE COURT:  Now, what would you actually be
9  doing when the second phase starts?
10         PROSPECTIVE JUROR:  I would be working with
11 our client teams.  There's going to be 4 of them.
12         THE COURT:  One other thing, where are they
13 located?
14         PROSPECTIVE JUROR:  Their headquarters in
15 Lake Forest, but the teams we'd be working with are
16 in Knoxville, Edgewater, Florida, Fond du Lac,
17 Wisconsin, up in Minnesota as well.  So they're
18 disbursed throughout the country.
19         THE COURT:  Now, when you did this job --
20         PROSPECTIVE JUROR:  Yes.
21         THE COURT:  -- would you personally be going
22 to each of these sites?
23         PROSPECTIVE JUROR:  I would.  And it's a lot
24 of client interaction, a lot of work sessions.  Part
25 of what we're trying to do is build their marketing

:27AM
:28AM
:28AM
:28AM
:28AM

1 capabilities within the organization.  That's why
2 we're doing pilots, it's kind of learn by doing, and
3 I need to be there to kind of help guide that
4 process.  It's not as though we stay here in
5 Chicago, work it, and then hand them, you know, a
6 finished material.  It's really engaging their teams
7 and helping them along over the next 3 to 4 months,
8 which is why -- there's a sense of urgency, as well,
9 within or client organization.  And if we were have
10 to go back to them and propose to delay it, that
11 would cause some serious consequences and we may not
12 get the work moving forward if that were the case.
13         THE COURT:  Is this -- there's, basically,
14 this one that is urgent.
15         PROSPECTIVE JUROR:  Well, that's one of my
16 clients, I'm also working with another client that's
17 been -- that I've had for about 2 and a half years
18 that myself and another part lead.  That's not as
19 urgent, I personally think I could give coverage in
20 that regard, but the one I'm referring to now is
21 significant.  And for me personally, you know, bonus
22 is part of our -- well, a large part of our
23 compensation, and if I'm not able to fulfill this,
24 just from a financial perspective, personally, it's
25 pretty significant as well.

Voir Dire                                             649

1          THE COURT:  Thanks.

2          PROSPECTIVE JUROR:  Sure.

3      (Prospective juror exited the courtroom, and the

4       following proceedings were had herein:)

:30AM      5      (Brief pause).

6          THE COURT:  In about a couple of minutes

7   we're clearing the jury room.

8      (Brief pause).

9       (The following proceedings were had in the Jury

:33AM     10       room with Court and Counsel:)

11          THE COURT:  I never thought this would be the

12   occupation of the jurors.  The record should

13   indicate I'm looking at a very large jigsaw puzzle.

14   I remember when jurors used to play cards, I

:42AM     15   remember when jurors used to play bridge, but this

16   is a joint project.

17          There's one question I did not ask you about,

18   I neglected to ask this question, and you can tell

19   from the nature of the question the reason why we're

:43AM     20   here.

21          PROSPECTIVE JUROR:  Sure.

22          THE COURT:  The question I have for you,

23   question 28, have you ever been arrested or

24   convicted of a crime, you said yes, and the

:43AM     25   explanation is "trespass:dismissed/supervision," you

Voir Dire                                          650

1  want to tell me about that?

2        PROSPECTIVE JUROR:  There was a circumstance

3  in which, basically, I was caught in the wrong place

4  at the wrong time with some friends.  The allegation

5  -- or part of the arrest was an allegation of

6  solicitation, but at the end of the day, after the

7  facts came out, the vast aspect of it was dismissed.

8  And again, Your Honor, I think this was 20 years

9  ago, but I believe the charge then was criminal

10 trespass for which I received supervision and

11 completed in public service.  I don't believe there

12 was a fine involved.

13       THE COURT:  Okay.  What the record actually

14 shows is "convicted probation" and then it says

15 "probation work program," does that sound right to

16 you?

17       PROSPECTIVE JUROR:  Yeah, I called it as

18 public service, but basically I worked in a --

19       THE COURT:  Community service.

20       PROSPECTIVE JUROR:  Community service, yes.

21       THE COURT:  And it's hard to tell what charge

22 it was.  There were two in the end, and it's hard to

23 read these things, but it appears to me that you

24 were charged originally with both disorderly conduct

25 and it says prosecution but I think that that -- I

1    think your description of it of as soliciting were

2    under the California law --

3            PROSPECTIVE JUROR:  Uh-huh.

4            THE COURT:  -- is probably more correct one.

5    So what's the background here?

6            PROSPECTIVE JUROR:  The background was that I

7    was -- I was at a party with some friends at a

8    particular location, and I knew the friends but

9    didn't know all the people there.

10           THE COURT:  Right.

11           PROSPECTIVE JUROR:  And so the view was that

12   somehow, some way, one of the -- the group of

13   friends I was with, there was somewhat unsavory

14   people, I'm sure I propositioned a lady there and

15   the allegation -- well, we didn't talk about money

16   or anything like that, but the allegation was, you

17   know, she was an undercover police officer and the

18   allegation was --

19           THE COURT:  Do you remember where you were?

20           PROSPECTIVE JUROR:  It was -- it was in, I

21   want to say, West L.A., I don't remember exactly the

22   location.  It was in an apartment in West L.A.

23           THE COURT:  So you didn't do your famous

24   Hollywood street --

25           PROSPECTIVE JUROR:  I don't know how famous

```
 1  it is --
 2          THE COURT:  It's pretty famous.
 3          PROSPECTIVE JUROR:  No.  No.  It was in an
 4  apartment complex.
 5          THE COURT:  Right.  Okay.  Did you have to
 6  deal with the bar on this one at all?
 7          PROSPECTIVE JUROR:  No.  No.  And, in fact,
 8  since that time, I've had a number of positions in
 9  which --
10          THE COURT:  Yeah, I noticed.
11          PROSPECTIVE JUROR:  Okay.
12          THE COURT:  All right.  Thanks.
13          You can step out:
14          PROSPECTIVE JUROR:  Okay.  Should I bring my
15  things or leave them here.
16          THE COURT:  No, take your things.
17      (Brief pause).
18      (Prospective juror exited the jury room, and the
19       following proceedings were had herein:)
20          THE CLERK:  The next, Your Honor, would be
21  137.
22          THE COURT:  Yeah, but give me a moment.
23      (Brief pause).
24          THE COURT:  Expression or views by counsel?
25  Anybody have any expression?
```

Voir Dire                                      653

1        MR. SOROSKY:  Based on the advise you give
2   us, you say you are a state court prosecutor who
3   doesn't like arrogant federal prosecutors who got
4   into a jam with an undercover officer which perhaps
5   could understand --
6        THE COURT:  The question was was he
7   insufficiently candid.
8        MR. GOLDSTEIN:  Your Honor, based on the last
9   two strikes that went on with a similar situation, I
10  don't recall the number, but it was male who worked
11  at bars --
12       THE COURT:  The issue in this case is, I
13  didn't ask him that question, I'm pretty sure I
14  didn't specifically ask that question, the problem
15  with the other one was I ask the question and they
16  don't tell the whole story.
17       MR. GOLDSTEIN:  Well, with this one he
18  indicated that there was a trespass, he wasn't being
19  honest with what it was.  And the questionnaire is a
20  confidential questionnaire.
21       THE COURT:  Let me hear from the other side
22  on this.
23       MR. SCHAR:  Judge, I think he answered
24  accurately.  So I think at this point our position
25  hasn't changed.

 1          THE COURT:  And your position was?

 2          MR. SCHAR:  He shouldn't go for cause.

 3          THE COURT:  And you think he should go for

 4 cause?

 5          MR. GOLDSTEIN:  Yes, Your Honor.

 6          THE COURT:  Actually, I'm surprised you're

 7 doing this and he's not, but that happens to me all

 8 the time.

 9          MS. KAESEBERG:  For what it's worth, my

10 recollection is, in open court, you did ask the

11 result of conviction.  I think he disclosed a

12 conviction which is why the criminal history was

13 such a red flag.

14          THE COURT:  Yeah, we'll check the record.  I

15 think he was quite candid today, not only was he

16 quite candid, I didn't have to push him to talk

17 about it, he just said it in the first place.

18          MS. HAMILTON:  Judge, you did ask him in open

19 court, but I don't have it in my notes that you

20 asked him about a specific conviction or any other

21 arrest.

22          THE COURT:  We'll check that.

23          MR. SCHAR:  If you did, we're not going to

24 object.

25          THE COURT:  Yeah, obviously.  Because the

 1  issue here is not what happened, the issue is is was

 2  he truthful, and so I'll have to look at the

 3  question.

 4          MS. KAESEBERG:  And I think as someone who

 5  was a former prosecutor, he said he's done jury

 6  trials, he would likely know that if he had a

 7  private issue that he didn't want to disclose in

 8  front of the media --

 9          THE COURT:  It depends what my question was.

10  And the reason you're dealing with the former

11  prosecutor, something that they have been beating a

12  client over the head with, about what he should

13  know, but the truth of the matter is is that was a

14  different issue that had to do with a very

15  restrained and informal defense in advise of

16  counsel.  I don't think it's exactly the same.  What

17  I really need is the context of the question I asked

18  him and what his answer was.  And my view will be

19  that, if I felt he was withholding, it was the kind

20  of thing he should've said, he's gone.  But he is

21  not gone on what he said today, what he said today I

22  thought was candid and truthful.  And I basically

23  have to look at the question I asked him and see

24  whether, in context, there's a basis.

25          MR. GOLDSTEIN:  One thing, Your Honor, that's

1  was one of the concerns we had with the background,

2  is that he indicated, while it looked on your sheet

3  there were two, he said there was one arrest, which

4  is a red flag for our bartender or chef, or whatever

5  he was, who indicated he had an assault but didn't

6  mention the gambling, or something to that effect,

7  that very well could have been the exact same arrest

8  that he was doing similarly to this individual.

9  This is a red flag to how --

10         MR. SCHAR:  There was a time gap between

11  that.

12         MS. HAMILTON:  There was a two-year time gap

13  with the chef.

14         MR. SOROSKY:  I also would add, Your Honor, I

15  believe you brought up the topic of an arrest with

16  him and he said --

17         THE COURT:  Don't do this, because I'm going

18  to know exactly what it is.

19         MR. SOROSKY:  But I do know, he said trespass

20  supervision.  Now, trespass, obviously --

21         MR. SCHAR:  Shelly, it's going to stay.

22         MR. GOLDSTEIN:  He also said supervision and

23  not a conviction.

24         MR. SOROSKY:  Supervision is peculiar in

25  Illinois, there isn't any other state that has

1 supervision.  Supervision applies not a conviction.
2 Apparently, he was convicted in California --
3         THE COURT:  You know, I have to judge it in
4 the context.  It depends on what I asked him and
5 whether he had answered within the ambit of the
6 question, and the reason it didn't come out is my
7 question is not keen enough, in which case he's
8 fine.  My fault that he is fine, and the other
9 depends on maybe he should've said it and that's a
10 judgment I have to make, should have said it.  Okay.
11 So he is somebody to check on.
12     (Brief pause).
13         THE COURT:  115?
14         MR. GOLDSTEIN:  You mentioned 121 in court.
15         THE COURT:  Did you find that one?
16         THE CLERK:  I did not locate a sheet.
17         THE COURT:  There was a sheet on 121, which
18 was difficult to read and I didn't understand it.
19 And I thought it was, what almost all of these
20 things are --
21         Do you have the questionnaire?
22         THE CLERK:  I do not.  You may have it.
23         THE COURT:  I do have it?
24         THE CLERK:  I think so.
25     (Brief pause).

1        THE CLERK:  If not, it's on the bench.
2        THE COURT:  But it doesn't matter.  It
3   doesn't matter.  It's not the way this last guy's
4   was, it's not intermingled among the pages.  My
5   memory was that they weren't sure it was him.  It's
6   not that common a name, but we have to track it
7   down.  And if he did it once, they can get it
8   quickly for us or we can find it in chambers because
9   we've got tons of these things.  The reason we got
10  tons of these things is, they sent us a sheet of
11  paper for everybody in which nobody was found.  So
12  we got a lot of unnecessary paper.  But that's the
13  question I had for him, which was look at this.  And
14  I believe if it is him, he's gone, but we'll see.
15  So we're just missing a piece of paper we need to
16  resolve this one.
17        So the next one is Oprah.
18        THE CLERK:  137?
19        THE COURT:  Yes, Oprah.
20        We're doing 130 last.
21      (Prospective juror entered the courtroom, and
22       the following proceedings were had herein:)
23        THE COURT:  Hi.  Have a seat there.
24        The reason you're here is I want to ask you a
25  question about Oprah, and the problem is, if you're

1  out there and I ask you a question about Oprah,

2  there is a risk that maybe they'll make fun of you

3  and I don't want that to happen.

4          PROSPECTIVE JUROR:  Thank you.

:55AM  5          THE COURT:  And what you say is you have

6  tickets for Oprah on May 10th, 2011, with friends

7  for four tickets.  We -- not "we," my assistant

8  knows somebody at the Oprah empire, we were unable

9  to find out when precisely this taping is, usually

:56AM 10  two a day, at different times.  But the question I

11  have to ask you -- and I have to tell you that

12  whether you get excused for Oprah or not is still a

13  live issue.  Ordinarily, as important as Oprah may

14  be to you, we usually don't let people off the hook.

:56AM 15  But it is possible that we could have the tickets

16  changed to a Friday if they're taping on Friday,

17  which they don't ordinarily do but sometimes they

18  do.  Would that make your life easier?

19          PROSPECTIVE JUROR:  Of course.

:57AM 20          THE COURT:  It's also possible that if we can

21  do that, we may not be able to switch four tickets,

22  we may be able to switch one.  Does that make your

23  life easier or do you have to go with your friends?

24  The one person I know who has going to Oprah eight

:57AM 25  times said that going with her friends was nice.

Voir Dire                               660

1       PROSPECTIVE JUROR:  Well, especially because
2  the four people that are going, it's been where any
3  one of us would call every day or, you know, all
4  four of us have always been just trying to get
5  tickets, you know.
6       THE COURT:  Right.  So this has been a
7  long-time project?
8       PROSPECTIVE JUROR:  Yes.
9       THE COURT:  And all I can promise you is,
10  I'll consider this, okay?
11      PROSPECTIVE JUROR:  Thank you.
12      Am I excused now?
13      THE COURT:  You certainly are.
14    (Prospective juror exited the jury room, and the
15     following proceedings were had herein:)
16    (Brief pause).
17      THE COURT:  What I have in front of me is a
18  sheet that begins "day, John William," then they
19  have the absolutely endless series of names.  The
20  first thing usually they start with is date of
21  birth, that's usually how these things start.  So
22  they run the date of birth and the date of birth
23  doesn't come up with much, and then they come up
24  with another series.  And you can see this
25  (indicating).  Then they come up with a series of

:57AM

:58AM

:58AM

:58AM

:59AM

1  names, and they finally conclude there is no
2  identifiable record in the NCIC, the identification
3  index.  But I don't notice on here, this is what
4  struck me, I don't notice on here a social security
5  number.  And usually -- we have one, for example,
6  that's coming up where what I got from NCIC is, if
7  this is a female, this sheet does not apply, if it's
8  a male, it does.  So, basically, gender, date of
9  birth, and social security number, that's what they
10 deal with.  And this is a guy -- I don't remember if
11 I asked him, and I think the reason I didn't ask him
12 is because there was a "no," but you can pass this
13 along.
14     (Handing document)
15        MR. SCHAR:  All right.  Thank you.
16     (Brief pause).
17      (The Clerk enters the room:)
18        THE CLERK:  I don't see it on the bench.
19        THE COURT:  I got it here somewhere.  I had
20 it.
21        THE CLERK:  Oh, here it is, Your Honor.
22     (Brief pause).
23        MR. SOROSKY:  Maybe if we could have the
24 government use their good offices and get this man's
25 record.

1       MR. SCHAR:  That is the record.

2       THE COURT:  That is, that's what they come up

3  with.

4       You know how we get this, right?

5       MR. SOROSKY:  No.

6       THE COURT:  We use pretrial services, which

7  is an authorized user of NCIC.

8       MR. SOROSKY:  Since the FBI has all this

9  evidence against us in the case, maybe --

10      THE COURT:  Yeah, but if this guy never been

11 arrested, there's no fingerprints, unless he applied

12 for some federal job, which is the consequence --

13 the consequences of a federal job asking people for

14 fingerprints is, I must have gotten out of this jury

15 25 positives where I got a sheet, no criminal

16 history on it, which means that if somebody put any

17 of your names in, something would come back.

18      I think I didn't ask him because he checked

19 "no," so I think I'm going to ask him now and that

20 will resolve it.

21      MR. SCHAR:  Could you tell from reading that

22 what the criminal history is?

23      MR. SOROSKY:  For the person regardless of

24 whether it's him or not.

25      MR. GOLDSTEIN:  Is it one with the various

Voir Dire                                                  663

1  aliases.

2          THE COURT:  What the criminal history is,

3  it's fairly impressive, but probably not entirely

4  consistent with the guy's background.  What we have

:04AM 5  here are three assault arrests, six burglary

6  arrests, three larceny arrests, five invasion of

7  privacy arrests, and I believe one obstructing

8  judicial process arrest, and one dangerous drugs

9  arrest, to that we have four burglary convictions,

:05AM 10 one larceny conviction and one invasion of privacy

11 conviction.  It doesn't correspond with the rest of

12 his career, but who knows.  Might be some secret

13 criminal.  Let me ask him.  Bring him in.

14     (Brief pause).

:05AM 15         THE COURT:  Be careful who is born the same

16 day.  Many things one should not do is look up their

17 own sheet.

18     (Prospective juror entered the jury room, and

19      the following proceedings were had herein:)

:05AM 20         THE COURT:  Hi.  How are.  Come in.

21         PROSPECTIVE JUROR:  Hi.

22         THE COURT:  Have a seat.

23         There is one question that I didn't ask you

24 that I pretty much asked everybody, at least I think

:06AM 25 I didn't ask you, I can't remember, usually because

Voir Dire                                    664

1  you checked the box "no," and question is have you

2  ever been arrested or convicted of a crime?

3          PROSPECTIVE JUROR:  No, I haven't.

4          THE COURT:  How about a traffic ticket?

5          PROSPECTIVE JUROR:  I had a traffic ticket

6  probably about 20 years ago.

7          THE COURT:  What was that for?

8          PROSPECTIVE JUROR:  Having my son not

9  strapped in with his seated belt.

10          THE COURT:  Right.  Were you understanding of

11  the officer's actions or did you think he was a

12  little overreaching?

13          PROSPECTIVE JUROR:  No, I understood it.  I

14  was ticked off on what had happened, but I totally

15  understood it.

16          THE COURT:  How old is your son?

17          PROSPECTIVE JUROR:  He was probably about

18  four.

19          THE COURT:  So it wouldn't necessarily be an

20  indication for embarrassment by you?

21          PROSPECTIVE JUROR:  No, absolutely not.

22          THE COURT:  I mean, one of reasons it happens

23  with police officers is they will sometimes look at

24  a father and son in the car and the son is not

25  strapped in and the son is 12 years old and the

1  trooper gets the guy out of the car and just says,

2  you know, you really ought to click him in and

3  doesn't give a ticket because the trooper has

4  children of his own and doesn't want to give this

5  son this weapon to use against the father.

6           PROSPECTIVE JUROR:  Okay.

7           THE COURT:  But that occasionally happens.

8           PROSPECTIVE JUROR:  Okay.

9           THE COURT:  And that was basically your

10 interaction with the police?

11          PROSPECTIVE JUROR:  Yes.  Yes.  I mean, I've

12 got warnings before.  I got one warning before, and

13 again that was about 20 years ago traffic, speeding,

14 but that was it.

15          THE COURT:  Okay.  Thanks.

16     (Brief pause).

17     (Prospective juror exited the jury room, and the

18      following proceedings were had herein:)

19     (Brief pause)

20          THE COURT:  The other problem with some of

21 these things is, sometimes it'll say not a match,

22 pretrial services officer, who is used to looking

23 this up, will note that it's not a match, but they

24 didn't do that in this.  But I'm satisfied he's

25 telling the truth.

1        So now we're down to Tweet.

2     (Prospective juror entered the jury room, and

3      the following proceedings were had herein:)

4        THE COURT:  Hi.  Just go to the end there and

5  have a seat.

6        PROSPECTIVE JUROR:  Okay.

7        THE COURT:  You've been Tweeting?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  According to this, you've

10  observed there are windows and a view of the lake in

11  the holding room.

12        PROSPECTIVE JUROR:  Yes.

13        And I know a building downtown, so that

14  wasn't intended to --

15        THE COURT:  And "I believe ..."  this is also

16  from you ".... usually don't dread Sunday night but

17  heading back to jury selection tomorrow has me not

18  excited as opposed to going back to work."  You

19  wrote this?

20        PROSPECTIVE JUROR:  Yes, I did.

21        THE COURT:  I'm shocked and amazed.

22        PROSPECTIVE JUROR:  I love my job.  I

23  e-mailed a copy of my fee here.  I e-mailed a sample

24  of my fee to the judges yesterday because she's

25  requested information about my job.

Voir Dire                                                              667

1        THE COURT:  You almost lost the jury summons?

2        PROSPECTIVE JUROR:  I was on vacation in

3  Hawaii for ten days before and I thought I left it o

4  my dining room table, when I came back and I

5  couldn't find it, so I was in a panic.

6        THE COURT:  Okay.  This is a problem.

7        PROSPECTIVE JUROR:  Okay.

8        THE COURT:  And the reason it's a problem is

9  it falls under the general instruction I gave to the

10 jury about not discussing the case, and anything,

11 including jury selection, is discussing the case.

12       PROSPECTIVE JUROR:  Okay.

13       THE COURT:  Now, what you may be thinking now

14 is that there's at least some risk that I might lock

15 you up, which I could do, but I'm not.  The one

16 thing that we are going to have to have is a

17 hearing, which would probably be a little time off,

18 I mean, it won't be right away, we have a lot of

19 stuff to do right away.  And what I think you ought

20 to do is bring to the hearing, you can bring a

21 lawyer of course, but that's actually not so

22 significant, bring to me somebody from the company

23 who can explain to you what it is you do, why

24 Tweeting is important, because this is something

25 that we have to be very careful about.

Voir Dire                                                                  668

1          PROSPECTIVE JUROR:  I apologize
2    wholeheartedly.  I mean, as you can see, I Tweet
3    about random things in my life, and I thought the
4    vagary of it was enough.
5          THE COURT:  No.
6          PROSPECTIVE JUROR:  I mean, I take what you
7    said very seriously, please know that.  I apologize
8    to all of you.
9          THE COURT:  It's difficult enough so that we
10   will have to address it.  The one thing I will give
11   you is, we will keep this out of the public record.
12   I suggest that you don't Tweet about this either,
13   because this is part of the case.  And the reason
14   I'm doing that is because whatever sanction I impose
15   against you, I don't think you -- it's sometimes not
16   the nicest world out there and I don't think you
17   want to be the target of people who make fun of you
18   because you did this.  So we're not going to make
19   this public.
20         PROSPECTIVE JUROR:  I'm mortified.  Again, I
21   didn't intend any wrongdoing and I apologize.
22         THE COURT:  Right.  Now, we'll deal with the
23   other consequences of this later.  And it's
24   fortunate that this was discovered, because if it
25   gone on any longer you might have said things that

1  were really unfortunate.  But it didn't, and I'm not
2  going to assume you would have, I'm just dealing
3  with what was done.
4       But you'll get a notice and we'll deal with
5  it.  You are not required, you can if you want to
6  tell your employer, but you are not required to do
7  that until you get a notice which says come in here
8  on such and such a date, okay?
9       PROSPECTIVE JUROR:  I really am sorry, Judge.
10  It wasn't my intention to violate your order.  I
11  thought the vagaries and my comment could have been
12  anybody anywhere.  Please know I had no intention of
13  saying anything specific about --
14       THE COURT:  Yeah.  I'm not accusing you of
15  subverting the jury process.
16       Okay.  Thanks.
17    (Prospective juror exited the jury room, and the
18     following proceedings were had herein:)
19       THE COURT:  More than likely I would like to
20  see if she Tweets about this.  More than anything on
21  earth, I'd like to see if she Tweets.
22       She, incidentally, was one of the jurors who
23  had commented on my best case scenario.  In many
24  ways, it's really unfortunate because she could've
25  been a decent juror, and, in fact, it would have

1  been less boring in what it is she does, but shows a
2  lack of judgment under the circumstances.
3           Having said that, does anyone want to move
4  with respect to this person?
5           MR. GOLDSTEIN:  There's agreement.
6           THE COURT:  And the agreement is?
7           MR. GOLDSTEIN:  To move to strike.
8           THE COURT:  Okay.  You're sure?  Bear in
9  mind, she could sheer up this jury.  It's a long
10 trial, somebody gets sick in a week's hiatus --
11          MR. GOLDSTEIN:  She might need an attorney
12 later.
13          THE COURT:  Okay, I'm going to strike her.
14          MR. SCHAR:  Judge, two quick issues from the
15 government while we're back in chambers.  I think we
16 reconsidered the position to avoid issues, we'll
17 withdraw the objection to 115.
18          MR. SOROSKY:  Who?
19          MR. SCHAR:  115.
20          THE COURT:  Anybody have a red pen?
21          MR. SOROSKY:  Yes, I do.
22       (Brief pause).
23          MR. SCHAR:  Just while we're back here, I
24 don't know if you want to hear on the issue of 137,
25 the Oprah tickets.  I don't want to embarrass her,

:15AM
:16AM
:16AM
:16AM
:20AM

1   in open court either, but, I mean, here's the

2   government's concern -- actually, she's very

3   emotional about the tickets.  So, obviously, it's a

4   significant issue for her.  You know, at one point

5   you had suggested maybe we'll just take an afternoon

6   or morning off --

7            THE COURT:  That was a suggestion.

8            MR. SOROSKY:  That was my suggestion.  I

9   suggested.  I still think it's a good idea.

10            THE COURT:  I would never do that.  I once in

11   a fairly important case eliminated an entire day of

12   trial because one of my jurors was anesthesiologist

13   who specialized in those operations where somebody

14   was under anesthesia for, like, 18 hours and he was

15   booked for it.  And I don't know if they were taking

16   out a heart and putting one in, but it was pretty a

17   grave thing.  And he wanted to serve on a jury, and

18   was not a native born American, I gave him a day off

19   for that reason, because of medical emergency,

20   medical necessity for someone unrelated to the case.

21   I think that's about the limit.  Oprah, never.

22            MR. SOROSKY:  I don't compare the two, but

23   what I'm suggesting is if the taping is at 7:30 --

24            THE COURT:  That kind of resolution I left

25   people off early, but to reschedule, no.

1      MR. SOROSKY:  No, I meant, we could begin a

2  little late.  There are issues we have to argue that

3  day or something.

4      MR. SCHAR:  Our concern at doing anything to

5  accommodate it, obviously, opens the floodgates for

6  --

7      THE COURT:  Well, we're past that, and the

8  reason we're past that is, I'm pretty sure they

9  don't tape on Friday, and I'm pretty sure it's a

10  dead issue.  So it's either I'm going to tell her

11  too bad about Oprah or we're going to let her go for

12  variety of reason or somebody is going to have to

13  exercise first peremptory challenge against her.  I

14  don't think this is fixable by making adjustments,

15  and my decision as to whether keeping her from Oprah

16  embitters her against the entire court system with

17  unpredictable results.

18      MR. SOROSKY:  Well, let me ask this question,

19  she said, and I'm not familiar with Oprah, in fact I

20  didn't even know they were filming before, if she's

21  on May 10th show, when is that going to be filmed,

22  do we know?

23      MR. SCHAR:  The tickets are for May 10th.  To

24  the extent you need a party to move for cause, we

25  will move for cause to accommodate her tickets.  So

:22AM

:22AM

:22AM

:23AM

:23AM

1  we're not doing it in open court.  I know Your Honor
2  will consider it with everything else.
3          MR. SOROSKY:  Before we do that, can we find
4  out if there's -- is there any way to find out the
5  next day?
6          THE COURT:  We're going to find out.  We can,
7  in fact, do that, but the initial news we had was
8  something like noon and 4:00.
9          MR. SOROSKY:  Well, even 4:00 we can live
10 with.
11         MS. HAMILTON:  They have to get there early
12 to line up.  There's a whole process there.
13         THE COURT:  I know, and the Wolf has gone to
14 Oprah several times and she's very familiar with the
15 process and she has a friend to discuss this with.
16 One accomodation I'll perfectly be willing to make
17 is, if you can get four tickets for Friday, maybe,
18 but even that is stretching it.  On the other hand,
19 Oprah is an important character in American life and
20 some people care deeply about that, and that kind of
21 accomodation can be made because it doesn't
22 interfere with the trial at all.
23         So the Oprah issue, if it were subject to
24 easy resolution, yeah, but it isn't.  We're faced
25 with something that we can't fix and the judgment I

:23AM

:23AM

:24AM

:24AM

:25AM

Voir Dire                                                    674

1 have to make, in light of the government's
2 challenge, and, in all honesty, the judgment I make
3 even if nobody challenges her, is whether this Oprah
4 stuff means something to her.  And I'm inclined to
5 believe it did based on her expression when she was
6 sitting here.
7           MR. SOROSKY:  Well, we'll discuss it amongst
8 us and we'll get back to you.
9           THE COURT:  Okay.
10      (The following proceedings were had in open
11       court:)
12           THE CLERK:  Remain seated.
13           Please remain seated.  We'll resume in
14 session.
15           THE COURT:  Counsel, approach the bench.
16           For the record, we have considered 115
17 matters where it was my judgment that the juror's
18 privacy was of significant value.  Both parties
19 agreed that the individual should be dismissed for
20 cause.
21           107 -- we did 107 in open court.
22           121 was asked a question he may have been
23 asked before and satisfied us that his answer on the
24 questionnaire and whatever answer he made in court,
25 which would be consistent with the questionnaire,

1  there's no reason to doubt it.  So 121 remains.

2        Juror 130 was, after a brief discussion,

3  dismissed by agreement of the parties.

4        And juror 137 was questioned with respect to

5  tickets that she had to Oprah and the issue of her

6  service is still open.

7        What we have left out of persons who have

8  already been questioned:  Juror 118 who was

9  questioned in open court, we need additional

10 financial data which the juror promised to deliver.

11 There a couple of here that we have to check they

12 might not still be pending but they might be.

13       Juror 157, we discussed financial hardship in

14 open court.  We did not speak to him in the jury

15 room, but what we still have left or need from him

16 is some support for the claim of financial hardship,

17 which he agreed to provide.

18       And then we also have juror 166, who needs to

19 provide financial hardship data.

20       It should also be noted that a certain number

21 of jurors, jurors who have been summoned, specific

22 juror 105, juror 109, juror 129, juror 168, are

23 no-shows.  We have applied the rule without

24 objection that two no-shows means dismissal.  As is

25 our practice, the jury office will follow up on

Voir Dire                                      676

1 these because it's our policy not to ignore
2 no-shows.  So that's where we are.
3        Sometime a little after noon we will begin
4 questioning those jurors who have been addressed
5 yesterday in a larger group who were left over.  We
6 will deal with them and then after that we have a
7 new group coming in and they get the introductory
8 talk as well.
9        So I think that's where we are.  Then I think
10 at the end of today or maybe early tomorrow morning,
11 we will all go together with our own lists and we'll
12 see what the numbers are.  There are two or three
13 decisions still floating out there.
14        Okay?  See you after the noon hour.
15        MR. SOROSKY:  1:30?
16        THE COURT:  No, they're coming in at noon.
17 The ones from yesterday that were left over that we
18 didn't get to are coming in around noon, we're going
19 to start with them.
20        MR. SOROSKY:  So what time?
21        THE COURT:  A little after noon.
22        MR. SOROSKY:  Oh.  12:00 o'clock.
23        MR. SCHAR:  12:00.
24
25

1

2          THE COURT:  Okay.  Thanks.

3      (Luncheon recess taken from 11:35 o'clock p.m.

4       to 12:00 o'clock p.m.)

:35AM 5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Voir Dire                                        678

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )  No. 08 CR 888
4            Government,             )
                                     )
5   vs.                              )  Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )  April 27, 2011
                                     )
7            Defendant.             )  12:30 o'clock p.m.

8                          VOLUME 4
9                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES B. ZAGEL
10                     AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15               Assistant United States Attorneys
                219 South Dearborn Street;
16              Suite 500
                Chicago, Illinois 60604
17

18  Court Reporter:

19              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
20                     Room 2504
                 Chicago, Illinois 60604
21                 (312) 435-5895

22

23

24

25

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4         KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
5         158 West Erie
          Chicago, Illinois 60610
6         (312) 640-1776

7
          LAW OFFICE OF Elliott Riebman
8         BY:  Elliott Riebman
          158 East Erie
9         Chicago, Illinois 60610
          (847) 814-2900
10

11
          OFFICES OF AARON B. GOLDSTEIN
12        BY: Aaron Benjamin Goldstein
          6133 South Ellis
13        Chicago, Illinois 60637
          (773) 752-6950
14

15        OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
16        2140 N. Lincoln Park West
          Suite 307
17        Chicago, Illinois 60614
          (773) 517-0622
18

19

20

21

22

23

24

25

1      (The following proceedings were had in open
2       court:)
3      (Prospective juror entered the courtroom, and
4       the following proceedings were had herein:)
5         THE COURT:  Hi.
6         PROSPECTIVE JUROR:  Hi.
7         THE COURT:  You are 176?
8         PROSPECTIVE JUROR:  Yes.
9         THE COURT:  Okay.  I'm going to ask you some
10 questions, as soon as I find my notes.  I'm not
11 going down a whole list of things you were asked in
12 the questionnaire.
13         PROSPECTIVE JUROR:  Okay.
14         THE COURT:  I'm just going to touch on a
15 couple of specific things.
16         What exactly do you do at work?
17         PROSPECTIVE JUROR:  I'm a licensed attorney,
18 but my title is Director Assistant Vice President of
19 Pollutions Claim at Zurich North America.  I
20 supervise a staff of 13 individuals where we handle
21 pollution claims or environmental claims that are
22 made on the insurance product that are sold by
23 Zurich.
24         THE COURT:  So you deal with the validity of
25 claims that may be questions of coverage?

Voir Dire                                                      681

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  Okay.  With respect to the

3  company, at large, if you know, is this a big part

4  of their business, a small part of their business,

5  or medium part of their business?

6      PROSPECTIVE JUROR:  I would say it's probably

7  a middle, mid subsection of their business.  The

8  insurance products themselves is a huge portion of

9  what the financial services company does, but the

10  pollution claims do come in under all 7 business

11  units that make up Zurich North America, so it's a

12  fairly large subsection.

13      THE COURT:  Do these claims tend to be

14  relatively large in themselves?

15      PROSPECTIVE JUROR:  A number of them are,

16  very large and complex, often involving

17  multimillion-dollar implications; although, we do

18  have some very small auto type losses that maybe

19  aren't as large.

20      THE COURT:  Okay.  Your father is a retired

21  police officer?

22      PROSPECTIVE JUROR:  Yes, he is.

23      THE COURT:  Where was he a police officer?

24      PROSPECTIVE JUROR:  The Homewood Police

25  Department, down in the south suburbs.

1          THE COURT:  Right.  And what kind of practice
2  did you have before you left, before you went to
3  where your current employment is?
4          PROSPECTIVE JUROR:  The job I had before was
5  at a family law practice where I did divorce, I also
6  did the real estate book of business there, and I
7  also handled bankruptcy cases.
8          THE COURT:  Okay.  A family practice?
9          PROSPECTIVE JUROR:  Yes.  Uh-huh.
10          THE COURT:  You have a relative in the
11  military?
12          PROSPECTIVE JUROR:  Yes, I've had my
13  grandfather, my uncle, and I currently have a cousin
14  who is serving in Afghanistan.
15          THE COURT:  Okay.  You answered yes to the
16  question about whether a family member or close
17  friend has ever been sued or been sued by someone
18  else, and talk about a close friend suing, you talk
19  about a husband being sued.  Are these cases that
20  you were, like, deeply involved in just stuff that
21  you know about?
22          PROSPECTIVE JUROR:  I was not deeply involved
23  in them but I know about them.
24          THE COURT:  So because we ask the question,
25  these were not major events in your life?

1      PROSPECTIVE JUROR:  No, they were not.

2      THE COURT:  Okay.  And you had a lawyer for

3  real estate transaction?

4      PROSPECTIVE JUROR:  Yes.

5      THE COURT:  And you testified in court

6  yourself or someone close to you?

7      PROSPECTIVE JUROR:  I have not myself

8  testified in the court.  And I don't believe I've

9  had -- aside from the friend who was involved in

10 litigation, that's, I think, how I would be

11 answering that question.

12     THE COURT:  Right.  And you characterized

13 them as nervous but vindicated since they prevailed.

14     PROSPECTIVE JUROR:  Yes.

15     THE COURT:  What do you belong to?  Groups

16 organizations, what do you support, stuff like that?

17     PROSPECTIVE JUROR:  Aside from being a member

18 of the Bar, I'm also a member of the Counsel of

19 Litigation Management which is a professional

20 organization where I hold a cochair position for

21 that organization as it relates to pollution

22 litigation.

23     THE COURT:  Right.

24     PROSPECTIVE JUROR:  Aside from church

25 affiliation, I really don't have any other sorts of

 1  associations.

 2         THE COURT:  Other than some Bar group, are

 3  you particularly active in any group or are you just

 4  a member?

 5         PROSPECTIVE JUROR:  No, just a member.

 6         THE COURT:  And your political involvement is

 7  attending a dinner benefit from a former governor of

 8  Illinois?

 9         PROSPECTIVE JUROR:  Yes.

10         THE COURT:  And you did this when you were in

11  college or law school?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  So somebody invited you?

14         PROSPECTIVE JUROR:  Yes.  In fact, I think it

15  was my mother who invited me.

16         THE COURT:  So it was not your idea?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  There are two questions that I

19  wind up almost asking every prospective juror about,

20  and that is about public officials concerning their

21  personal financial interests and public officials

22  making decisions to benefit contributors, and in

23  both cases your answer is:

24     "Yes, it happens, only sometimes."

25         And you believe that in order to move

Voir Dire                                    685

1  political agendas forward that sometimes occurs.

2          PROSPECTIVE JUROR:  Uh-huh.

3          THE COURT:  Now, we ask that as an

4  open-handed question, but I want to make sure you

5  understand, I'm quite sure you actually do but I'd

6  like to have it on the record, what's at issue here

7  is not the general proposition of what campaign

8  contributions mean or what a politician's personal

9  interests are, it's fairly narrow.  In this case the

10 jury has to decide whether the government has proved

11 beyond a reasonable doubt that a specific politician

12 violated, as he is accused of doing, certain federal

13 laws and that's all you're supposed to decide, you

14 understand that?

15         PROSPECTIVE JUROR:  Yes, I do.

16         THE COURT:  You're not going to be asked to

17 express opinions on the greater issues of campaign

18 contributions, do you understand that?

19         PROSPECTIVE JUROR:  Yes, I do.

20         THE COURT:  Hobbies?

21         PROSPECTIVE JUROR:  Personally, reading is

22 one of my big hobbies, I also do a fair amount of

23 boating with family in Michigan when the weather

24 permits.

25         THE COURT:  What kind of boat?

1          PROSPECTIVE JUROR:  It's a Bayliner 28-foot.

2          THE COURT:  What?

3          PROSPECTIVE JUROR:  28-foot, it's my parents,

4    so grew up doing boating.

5          THE COURT:  And your kids like that?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Are you somebody who really

8    pursues the news?  Is this a big part of your life,

9    you want to be up to date on everything?

10          PROSPECTIVE JUROR:  I most certainly like to

11    keep abreast of what's current and what's happening

12    out there.  The ones that particularly impact me or

13    my family I most certainly keep up to date on those

14    sorts of things, but I think probably just, you

15    know, on average, I'll look at headlines on a daily

16    basis just to see what might be out there, but

17    nothing, I would say, independently that I'm

18    reviewing on a daily basis or want to know.

19          THE COURT:  Well, let me phrase it a

20    different way.

21          PROSPECTIVE JUROR:  Okay.

22          THE COURT:  Are you the kind of person who

23    can't wait to turn on a computer and click on a

24    variety of news sources to find out, say, what's

25    happening with banking laws in Slavonia?

1        PROSPECTIVE JUROR:  No, I am not that person.
2        THE COURT:  Okay.  You took your son to
3  Children's Memorial Hospital?
4        PROSPECTIVE JUROR:  I did.
5        THE COURT:  How long ago was that?
6        PROSPECTIVE JUROR:  That would have been
7  about 3 years ago.
8        THE COURT:  And everything was fine in the
9  end?
10        PROSPECTIVE JUROR:  Yes.
11        THE COURT:  You did pay some--if I'm reading
12  this correctly--you did pay some attention to the
13  events earlier in this case but not a lot, have I
14  correctly inferred this from your answers?
15        PROSPECTIVE JUROR:  That would be accurate,
16  yes.
17        THE COURT:  Do you understand that whatever
18  you heard or read before doesn't count in this
19  proceeding, it's only what's introduced in this
20  courtroom, do understand that?
21        PROSPECTIVE JUROR:  Yes, I do.
22        THE COURT:  And will you be able to comply
23  with that rule?
24        PROSPECTIVE JUROR:  Yes.
25        THE COURT:  Thank you.

1      (Prospective juror exited the courtroom, and the
2       following proceedings were had herein:)
3      (Brief pause).
4      (Prospective juror entered the courtroom, and
5       the following proceedings were had herein:)
6           THE COURT:  You're number 177?
7           PROSPECTIVE JUROR:  Yes.
8           THE COURT:  Would you state your name --
9  don't state your name.  That's what I meant to say,
10 don't state your name.
11          Where were you born?
12          PROSPECTIVE JUROR:  India.
13          THE COURT:  And what was the first language
14 you spoke?
15          PROSPECTIVE JUROR:  Oriya.
16          THE COURT:  You indicated that you're not
17 confident in your ability to fully understand
18 English, is that correct?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  What do you do for a living?
21          PROSPECTIVE JUROR:  I work at a hospital.
22          THE COURT:  And what do you do at the
23 hospital?
24          PROSPECTIVE JUROR:  I work in the therapist,
25 hospital.

1          THE COURT:  Put the microphone close to your
2  mouth.
3          What do you do in the hospital?
4          PROSPECTIVE JUROR:  Ah, hospital therapist.
5          THE COURT:  So you deal with people who have
6  difficulty breathing?
7          PROSPECTIVE JUROR:  Yes.
8          THE COURT:  How long have you done that work?
9          PROSPECTIVE JUROR:  3 years.
10          THE COURT:  Were you trained to do that in
11  India or did you learn that here?
12          PROSPECTIVE JUROR:  Here.
13          THE COURT:  And you have asthma yourself?
14          PROSPECTIVE JUROR:  (NO response.)
15          THE COURT:  You have asthma?
16          PROSPECTIVE JUROR:  Yeah.  Yeah, I have.
17          THE COURT:  And you take medication for that?
18          PROSPECTIVE JUROR:  Yes.
19          THE COURT:  You have three children?
20          PROSPECTIVE JUROR:  Yes.
21          THE COURT:  How old is the youngest one?
22          PROSPECTIVE JUROR:  Youngest one?
23          THE COURT:  Yeah.
24          PROSPECTIVE JUROR:  16.
25          THE COURT:  And the youngest one, how old is

:46PM
:46PM
:46PM
:47PM
:47PM

1  the youngest one?

2          PROSPECTIVE JUROR:  5.

3          THE COURT:  You watch TV?

4          PROSPECTIVE JUROR:  Yes.

:47PM   5          THE COURT:  What channels do you watch?

6          PROSPECTIVE JUROR:  What channel?  7.

7          THE COURT:  Say that again.

8          PROSPECTIVE JUROR:  7.

9          THE COURT:  Channel 7.

:47PM   10          PROSPECTIVE JUROR:  (Nodding).

11          THE COURT:  Ever served on a jury before?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Have you ever been summoned for

14  jury duty?

:48PM   15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR:  You're welcome.

18      (Prospective juror exited the courtroom, and the

19       following proceedings were had herein:)

:48PM   20      (Brief pause).

21      (Prospective juror entered the courtroom, and

22       the following proceedings were had herein:)

23          THE COURT:  You are 178?

24          PROSPECTIVE JUROR:  Yes, sir.

:48PM   25          THE COURT:  You're currently unemployed?

1          PROSPECTIVE JUROR:  Yes, sir.  I'm on
2  disability.
3          THE COURT:  Okay.  When did you on
4  disability?
5          PROSPECTIVE JUROR:  Oh, it's about 5, 6 years
6  ago, back operation.
7          THE COURT:  And what did you do before then?
8  What kind of work did you do before then?
9          PROSPECTIVE JUROR:  Well, my last job before
10  that, delivery driver for a company for about
11  9 months, before that I was living off my uncle,
12  before he died he helped me, before that I was in
13  building maintenance.
14          THE COURT:  How long did you do building
15  maintenance work?
16          PROSPECTIVE JUROR:  I worked at a place
17  called Best Foods for 10 years driving a forklift
18  and various other operating machinery.
19          THE COURT:  And then you became physically
20  disabled to do that, is that right?
21          PROSPECTIVE JUROR:  Yes, that's what the
22  doctor told me.
23          THE COURT:  Did you work for Postal Service
24  at all?
25          PROSPECTIVE JUROR:  No, they didn't contact

1  me.
2          THE COURT:  Ever been arrested or convicted
3  of a crime?
4          PROSPECTIVE JUROR:  Yes, sir.
5          THE COURT:  And what was that?
6          PROSPECTIVE JUROR:  Attempted burglary of a
7  boxcar, railroad car.
8          THE COURT:  How long ago was that?
9          PROSPECTIVE JUROR:  About 30 years.
10         THE COURT:  And what was the sentence?
11         PROSPECTIVE JUROR:  6 months probation.
12         THE COURT:  Did you successfully complete the
13 probation?
14         PROSPECTIVE JUROR:  Yes, I did.
15         THE COURT:  Other than the attempted
16 burglary, have you ever been arrested for something,
17 arrested for something where you weren't acquitted?
18         PROSPECTIVE JUROR:  Yes.
19         THE COURT:  And what was that?
20         PROSPECTIVE JUROR:  They accused me of
21 stabbing my brother in a family dispute, which was
22 self-defense and that was thrown out.
23         THE COURT:  Anything else?
24         PROSPECTIVE JUROR:  Nope.
25         No, sir, I should have said.

Voir Dire                                        693

1          THE COURT:  What?

2          PROSPECTIVE JUROR:  No, sir, I should have

3    said, sorry.

4          THE COURT:  Have you been the victim of a

5    crime yourself?

6          PROSPECTIVE JUROR:  Yes.  Yes, I was.

7          THE COURT:  And what was that?

8          PROSPECTIVE JUROR:  I went to get cigarettes

9    for my girlfriend and her girlfriend and the gas

10   station was closed, and, obviously, I still had the

11   money on me, I was walking up my stairs, somebody

12   came in and stuck something on my back, said he had

13   a gun, he wanted the money, so I gave it to -- well,

14   I didn't give it him, he took it out of my pocket.

15         THE COURT:  Okay.  Was anybody ever caught

16   for that?

17         PROSPECTIVE JUROR:  No, I never -- I never

18   bothered with it.  The guy took off and I didn't see

19   him.

20         THE COURT:  Ever hire a lawyer for any

21   reason?

22         PROSPECTIVE JUROR:  Well, yeah, for my

23   attempted burglary and then my brother hired a

24   lawyer, dealing with my brother.

25         THE COURT:  Ever testified in the court

1  yourself?

2        PROSPECTIVE JUROR:  No, except on my own on

3  behalf.

4        THE COURT:  But you did testify?

5        PROSPECTIVE JUROR:  Well, not guilty, of

6  course, yes.

7        THE COURT:  But did you get up on the witness

8  stand and tell your story?

9        PROSPECTIVE JUROR:  No, it was just -- it was

10 just before; it was a bench trial.

11       THE COURT:  Okay.  Do you read anything?

12       PROSPECTIVE JUROR:  Reader's Digest, almost

13 anything I could get my hands on.

14       THE COURT:  Okay.  Where do you get your news

15 from?

16       PROSPECTIVE JUROR:  Mostly through the media;

17 newspaper, TV.

18       THE COURT:  What newspaper do you read?

19       PROSPECTIVE JUROR:  Well, probably most I get

20 the Sun-Times, but I only read that to do the

21 crossword.

22       THE COURT:  All right.  Do you watch any

23 television news?

24       PROSPECTIVE JUROR:  News?  Not particularly,

25 but occasionally.

:52PM

:53PM

:53PM

:53PM

:53PM

1          THE COURT:  Do you use a computer at all?  Do
2 you go on the Internet?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Since you can't work because
5 you're disabled, what do you do all day?

6          PROSPECTIVE JUROR:  Ah, I sit around, do, you
7 know, basic chores, go walking, do my shopping.

8          THE COURT:  Watch a lot of television?

9          PROSPECTIVE JUROR:  Yeah.  Not news, but
10 mostly --

11          THE COURT:  Whatever it is.

12          PROSPECTIVE JUROR:  Beverly hillbilly, Gun
13 Smoke, and, you know, all the old black and whites.

14          THE COURT:  Yeah.  So you like those
15 programs?

16          PROSPECTIVE JUROR:  Oh, yeah, brings back a
17 lot of old memories.

18          THE COURT:  Do you remember much about this
19 case from the news?

20          PROSPECTIVE JUROR:  No, not much, just said
21 he was convicted and, you know, the one thing and
22 everything else was thrown out.  I don't pay much
23 attention to news, except I watch the weather and
24 I'm not much into sports, except for the Black Hawks
25 which they're gone now.

1          THE COURT:  Think you'd be a fair juror?
2          PROSPECTIVE JUROR:  I'd like to think so.
3          THE COURT:  Okay.  Thank you.
4          Oh, one other thing.
5          PROSPECTIVE JUROR:  Yes, sir.
6          THE COURT:  You indicated that you may have a
7    problem affording transportation to come here, is
8    that true?
9          PROSPECTIVE JUROR:  Yes.
10          THE COURT:  How did you come here?
11          PROSPECTIVE JUROR:  Pardon?
12          THE COURT:  How did you get here today?
13          PROSPECTIVE JUROR:  I received my check from
14   the questionnaire last week, so I was able to cash
15   that and my brother -- but my brother -- yesterday,
16   my brother gave me the money to get here.
17          THE COURT:  Okay.  How much does it cost you
18   to get here?
19          PROSPECTIVE JUROR:  $8.
20          THE COURT:  Is that round trip?
21          PROSPECTIVE JUROR:  Yeah, round trip.  4.00
22   here and 4.00 back.
23          THE COURT:  Okay.  Thank you.
24          PROSPECTIVE JUROR:  Okay, thank you, Judge.
25        (Prospective juror exited the courtroom, and the

:55PM
:55PM
:55PM
:55PM

 1        following proceedings were had herein:)
 2        (Brief pause).
 3        (Prospective juror entered the courtroom, and
 4         the following proceedings were had herein:)
 5            THE COURT:  You're number 179?
 6            PROSPECTIVE JUROR:  Yes.
 7            THE COURT:  The librarian?
 8            PROSPECTIVE JUROR:  Yes.
 9            THE COURT:  And you have two degrees,
10   including an advanced degree in computer and library
11   stuff, is that right?
12            PROSPECTIVE JUROR:  That's correct.
13            THE COURT:  And this is what you wanted to do
14   all along?
15            PROSPECTIVE JUROR:  No, my original degree
16   was computer science and then I decided to get a
17   Master's in library science and changed my careers.
18            THE COURT:  And how long have you worked in
19   library science?
20            PROSPECTIVE JUROR:  Almost 4 years.
21            THE COURT:  Are you satisfied with it?
22            PROSPECTIVE JUROR:  Yes, I love my job.
23            THE COURT:  And what do you actually do at
24   the library?
25            PROSPECTIVE JUROR:  I do the website for the

1  library, I do reference, collection development,
2  programming, I do the Facebook page there, I do all
3  the technology stuff in the adult services
4  department.
5          THE COURT:  And it says here that you
6  supervise people but the people are volunteers.
7          PROSPECTIVE JUROR:  Yeah.  Just very, very
8  low-level volunteer supervision.
9          THE COURT:  How many employees does the
10 library have?
11         PROSPECTIVE JUROR:  I think it's around 50 or
12 so.  I don't know the exact number.
13         THE COURT:  Back in the middle ages when I
14 was around, the way you measured a library was how
15 many volumes it has, is that still a measure?
16         PROSPECTIVE JUROR:  Yeah, we still count how
17 many materials we have.  When you say "volumes" you
18 mean books and materials and stuff?
19         THE COURT:  Books.
20         PROSPECTIVE JUROR:  Yeah.  We also have a lot
21 of media CD's and DVD's of that sort.  So we do
22 count.
23         THE COURT:  By that standard, is this small,
24 medium or large library?
25         PROSPECTIVE JUROR:  I'd say medium sized

:58PM

Voir Dire                                        699

1  library.
2           THE COURT:  What does your husband do?
3           PROSPECTIVE JUROR:  He's a Fed Ex driver.
4           THE COURT:  And he's a part owner of another
5  kind of business?
6           PROSPECTIVE JUROR:  Yeah, he just started
7  that.  It's basically filter distribution, it's a
8  side business.
9           THE COURT:  Do you help him in his business?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Were you in some kind of business
12  together?  I don't understand the answer here.
13          PROSPECTIVE JUROR:  I think it was like 8 or
14  9 years ago, we decided to try and start a Jani-King
15  business, it was like office cleaning, but it didn't
16  really click with us and we decided to end it.  I
17  think we only did it for maybe 6 months.
18          THE COURT:  And your husband applied for
19  various law enforcement positions?
20          PROSPECTIVE JUROR:  He did.  For about a year
21  and a half he applied to a lot of the police
22  departments in various suburbs and the Cook County
23  Jail, I believe.
24          THE COURT:  Right.
25          PROSPECTIVE JUROR:  He wanted to try to be a

1  police officer, but it just became kind of tedious,
2  then he decided to stop applying because he couldn't
3  get -- you know, he wasn't getting called, and he
4  decided to go with something else instead, with
:00PM  5  business, and just stick with Fed Ex for a while.
6             THE COURT:  Okay.  Does he like his job?
7             PROSPECTIVE JUROR:  No.
8             THE COURT:  You don't have to.  There's no
9  law against it.
:01PM 10             PROSPECTIVE JUROR:  Yeah.  That's why he's
11  trying to do something else.  It's a hard job.
12             THE COURT:  Yeah.
13             PROSPECTIVE JUROR:  It's physically
14  demanding.
:01PM 15             THE COURT:  You have your credit card
16  stollen?  Was that you?
17             PROSPECTIVE JUROR:  Yes.
18             THE COURT:  Did that cause a significant loss
19  to you or --
:01PM 20             PROSPECTIVE JUROR:  No, I think they went and
21  bought like 10 cartons of cigarettes and some gas,
22  and then I just called my credit company and they
23  reimbursed me and put a stop on it.
24             THE COURT:  You hired a lawyer yourself, you
:01PM 25  and your husband, on occasion?

1      PROSPECTIVE JUROR:  Yeah, we had a lawyer
2  once.
3      THE COURT:  Okay.  Were you satisfied with
4  what the lawyer did?
5      PROSPECTIVE JUROR:  Yes.
6      THE COURT:  And you and your husband were
7  both interviewed in connection with a crime
8  perpetrated against your husband's ex-partner?
9      PROSPECTIVE JUROR:  Yeah.
10     THE COURT:  How long ago was that?
11     PROSPECTIVE JUROR:  2 years ago.
12     THE COURT:  And the accused person, they did
13  prosecute that person?
14     PROSPECTIVE JUROR:  Yeah.  Yeah, they did.
15  I'm not sure, I think he's 25 years in prison.
16     THE COURT:  Right.
17     And you once, I think it's once, you wrote a
18  letter to a government official emphasizing the need
19  to release funds for libraries?
20     PROSPECTIVE JUROR:  Yes.
21     THE COURT:  Is that just the one time?
22     PROSPECTIVE JUROR:  Yeah, that was just the
23  one time.
24     THE COURT:  And you don't actually remember
25  the person you wrote to?

1        PROSPECTIVE JUROR:  No, I don't.

2        THE COURT:  Is that something that was your

3   own idea or was that part of an organization?

4        PROSPECTIVE JUROR:  It was kind of a group

5   effort.  We were asked -- you know, requested by the

6   American Library Association to, you know, just to

7   write a letter to this person, you know, asking for

8   the funds to be released.

9        THE COURT:  The questions also asked about

10  things you belong to.

11       PROSPECTIVE JUROR:  Uh-huh.

12       THE COURT:  And you have an answer here about

13  various things.

14       PROSPECTIVE JUROR:  Uh-huh.

15       THE COURT:  Is there any particular

16  organization that with respect to either you

17  or husband takes a lot of your time?

18       PROSPECTIVE JUROR:  No.

19       THE COURT:  Are there any for which you

20  actually do some work or contribute some substantial

21  amount of money?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  And you indicated that you do

24  believe that a public official may make decisions to

25  benefit contributors so that they continue to

1    receive that money for reelection, you did say that?

2          PROSPECTIVE JUROR:  Yeah, I think I responded

3    yes.

4          THE COURT:  The one thing I want to clarify

5    here is, these are very general questions that are

6    designed to find out what one person's attitude is,

7    but this case, the trial of this case does not at

8    all involve general decisions about campaign

9    contributions, it involves whether the government

10   proves its case charging the defendant with certain

11   specific violations of federal law.  So we're not

12   going to be dealing with the general issue of

13   campaign contributions, do you understand that?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Is there anything about your view

16   on campaign contributions that will make it

17   difficult for you to be fair and impartial on that

18   issue?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Hobbies, interests, things you

21   like to do when you're not at the library?

22         PROSPECTIVE JUROR:  Swimming, running,

23   biking, knitting, reading, walking my dogs, going to

24   movies.

25         THE COURT:  You got almost all of them that

1  you listed here.

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  Is there any one you do more than

4  others?

:05PM

5          PROSPECTIVE JUROR:  Is there any what?

6          THE COURT:  Any one of those activities that

7  you do more than any other activity?

8          PROSPECTIVE JUROR:  Swimming and biking.

9          THE COURT:  Okay.  We also asked you about

:05PM

10 books, and you said you, as a librarian, you really

11 will read almost anything to which you are exposed.

12 Does that mean that there are some books that you

13 read because you feel you have to, it's an object of

14 duty for you?

:06PM

15         PROSPECTIVE JUROR:  No.  No.

16         THE COURT:  Is there any class -- usually

17 with somebody who's not a librarian, a potential

18 juror, we ask them what kind of books do you like to

19 read.

:06PM

20         PROSPECTIVE JUROR:  What kind of books do I

21 like to read?

22         THE COURT:  Yeah, but I don't want to ask you

23 that question because you already answered that one.

24 Any kind of books you hate reading?

:06PM

25         PROSPECTIVE JUROR:  Romance.

Voir Dire                                                    705

1          THE COURT:  What.

2          PROSPECTIVE JUROR:  Romance.

3          THE COURT:  Romance.

4      The most important source of news for you,

5  you said was the Internet.

6          PROSPECTIVE JUROR:  Yeah.  Yeah.  I just

7  don't watch news that afternoon.

8          THE COURT:  Now, when you're on the Internet,

9  are you systematically tracking down news or is this

10  just something you do when you have a few moments?

11          PROSPECTIVE JUROR:  Yeah, I mean, headlines,

12  if I see something that strikes me addressed on

13  Internet Service Provider, Comcast main page, then

14  I'll click on it.  But, no, not really, you know, I

15  just don't track it down.  I follow the weather a

16  lot, but...

17          THE COURT:  Right.  Now, there's no

18  particular paper, in fact no paper at all, that you

19  regularly read from cover to cover, is that correct?

20          PROSPECTIVE JUROR:  No, not regularly.

21  Occasionally I'll read the Carol Stream Press just

22  'cause it's local and has a lot to do with people I

23  know.

24          THE COURT:  And you have not read a lot about

25  this case, is that correct?

 1          PROSPECTIVE JUROR:  No.  I mean, when I was
 2  notified that I'd be, you know, coming to jury duty,
 3  I kind of figured out that this is what it was, so I
 4  read a few things after because I was curious.
 5          THE COURT:  Okay.
 6          PROSPECTIVE JUROR:  But I had no idea about
 7  the first case, I didn't follow anything.  Just
 8  didn't strike my interest.
 9          THE COURT:  Okay.  The basic rule if you
10  serve on a jury in a case is that you have to decide
11  the case on the basis of the evidence you hear in
12  court and nothing else.  Do you think you can do
13  that?
14          PROSPECTIVE JUROR:  Yes.
15          THE COURT:  Okay.  And the reason I say this
16  is is that it's possible, particularly with a case
17  like this but with other cases as well, that you may
18  have read something or heard something about it, and
19  that does not disqualify you from being a juror.
20  The only thing we ask is that whatever you heard or
21  whatever you read, even if you have an opinion, you
22  have to put it to one side.  We don't ask you to
23  forget it, that's pretty impossible to do, we ask
24  you to remember it quite clearly and just make sure
25  that it's not on the scales when you weigh the

1    evidence, do you understand that?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  And the question is, can you do

4    that and will you do that?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  I have read the letter from the

7    library and the letter for you which indicates that

8    while you're perfectly willing to serve on a jury,

9    this is not a good time to do that.  Is that still

10   true?

11          PROSPECTIVE JUROR:  Yeah, I mean, they are

12   hiring another librarian just in addition to our

13   department, so I think that helps a little but ...

14          THE COURT:  So it's still there but it's not

15   quite as urgent as it was, is that correct?

16          PROSPECTIVE JUROR:  Right.  Right.

17          THE COURT:  Okay.  And I will take that into

18   consideration, but I'll just have to weigh it, do

19   you understand that?

20          PROSPECTIVE JUROR:  Sure.

21          THE COURT:  Okay.  Thank you.

22          PROSPECTIVE JUROR:  Okay.

23       (Prospective juror exited the courtroom, and the

24        following proceedings were had herein:)

25       (Brief pause)

1        THE COURT:  We do have a no-show, this is

2   number 180, and based on my reading of the

3   questionnaire, I believe I can understand why this

4   particular juror did not appear.  We'll make

:11PM   5   inquires, but the questionnaire did display some

6   significant indications that this person did not

7   feel -- that's the wrong word, did not think, did

8   not regard herself as qualified, but we'll make

9   further inquiry.

:11PM   10        Okay, 181.

11      (Prospective juror entered the courtroom, and

12       the following proceedings were had herein:)

13        THE COURT:  You're number 181?

14        PROSPECTIVE JUROR:  That's correct.

:12PM   15        THE COURT:  I'm just going to go -- I'm going

16   to ask you some questions, I'm not going to ask you

17   every question you had in the questionnaire, that's

18   why we gave you the questionnaire so we don't have

19   to ask each one.

:12PM   20        The work you do now you've done for a very

21   long time?

22        PROSPECTIVE JUROR:  I'm retired right now.

23        THE COURT:  But the work you did, sorry.  You

24   did that for a very long time.

:12PM   25        PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Did you work for the same

2   employer throughout that period of time?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  Did you like the work?

5          PROSPECTIVE JUROR:  Of course.

6          THE COURT:  The only time you ever consulted

7   a lawyer was for a will and a trust and when you

8   wanted to buy property?

9          PROSPECTIVE JUROR:  Correct.

10          THE COURT:  Did you actually serve on a jury?

11          PROSPECTIVE JUROR:  No, I was called but he

12   pleaded guilty so we never did anything.

13          THE COURT:  Okay.  Was this in state court?

14          PROSPECTIVE JUROR:  No, it was for Cook

15   County.

16          THE COURT:  Cook County court?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  And it was one day, one jury?

19          PROSPECTIVE JUROR:  Right.

20          THE COURT:  Do you belong to anything, donate

21   money to anything?

22          PROSPECTIVE JUROR:  The church.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  I give to Goodwill.

25          THE COURT:  Now that you're retired, what do

Voir Dire                                    710

1    you do with yourself?

2          PROSPECTIVE JUROR:  I watch my grand kids, I

3    go out with my friends for lunch, clean house.

4    Clean places that haven't been cleaned for 23 years.

5          THE COURT:  How long have you been retired?

6          PROSPECTIVE JUROR:  Since July.

7          THE COURT:  Are you going to start working

8    again, ever?

9          PROSPECTIVE JUROR:  I hope not.

10          THE COURT:  Okay.  What do you read?

11          PROSPECTIVE JUROR:  What do I read?

12          THE COURT:  Yeah.

13          PROSPECTIVE JUROR:  I just got done with

14    Vonage books, the Dragon, the Girl With the Dragon

15    Tattoo, I read that series, I just finished those.

16          THE COURT:  How about the news?

17          PROSPECTIVE JUROR:  The news?  No, not

18    really.

19          THE COURT:  Do you read the papers at all?

20          PROSPECTIVE JUROR:  I read the travel section

21    on Sunday, I read the ads, other than that, I really

22    don't bother; the business section.

23          THE COURT:  How about TV news?

24          PROSPECTIVE JUROR:  TV news while I'm cooking

25    dinner.

Voir Dire                                            711

1        THE COURT:  Do you use the Internet at all?

2        PROSPECTIVE JUROR:  Yes, I do.

3        THE COURT:  Do you use it at all for news?

4        PROSPECTIVE JUROR:  No.  No.  Facebook,

:15PM   5   e-mail, do my banking on it.

6        THE COURT:  Okay.  Am I correct from the

7   answer you gave to the question, that you knew

8   something about the prior history of this case but

9   not a lot, is that correct?

:16PM  10        PROSPECTIVE JUROR:  I knew what I read in the

11  paper like the day before I was coming here, and

12  that's it.  I didn't pay a bit of attention to it

13  last year.

14        THE COURT:  You also said you also -- that

:16PM  15  part of what you knew, or read, or heard, or seen

16  was whatever your husband read in the paper.

17        PROSPECTIVE JUROR:  Yeah, he reads the paper

18  cover to cover.

19        THE COURT:  Right.  Now, when he reads the

:16PM  20  paper cover to cover, does he force you to listen to

21  his recounting?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  Does he give a lot of recounting

24  or does he just --

:16PM  25        PROSPECTIVE JUROR:  No.

1          THE COURT:  So sometimes he talks to you

2    about it and sometimes he doesn't?

3          PROSPECTIVE JUROR:  Exactly.

4          THE COURT:  And you didn't form any opinion

5    based on any of this stuff because you didn't care,

6    is that right?

7          PROSPECTIVE JUROR:  No.  Basically, yes.

8          THE COURT:  And you did request a deferment

9    because of the ability of your daughter?

10         PROSPECTIVE JUROR:  That's been taken care

11   of.

12         THE COURT:  That's been taken care of?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  And then you have another thing

15   about a vacation.

16         PROSPECTIVE JUROR:  That's in September.

17         THE COURT:  Right.  Which is unlikely to

18   interfere.

19         PROSPECTIVE JUROR:  I just put it down.

20         THE COURT:  Thank you.

21      (Prospective juror exited the courtroom, and the

22       following proceedings were had herein:)

23         THE COURT:  182.

24      (Brief pause).

25      (Prospective juror entered the courtroom, and

1          the following proceedings were had herein:)

2              THE COURT:  You're 182?

3              PROSPECTIVE JUROR:  That's correct, sir.

4              THE COURT:  The first question I want to ask

5  you about is that you indicate you have some trouble

6  with hearing and vision, is that true?

7              PROSPECTIVE JUROR:  That's correct.

8              THE COURT:  And it says here that you have

9  poor eyesight?

10             PROSPECTIVE JUROR:  Correct.

11             THE COURT:  Now, is that in both eyes or just

12 one eye?

13             PROSPECTIVE JUROR:  Left eye.

14             THE COURT:  You have decent vision in your

15 right eye?

16             PROSPECTIVE JUROR:  Correct.

17             THE COURT:  You also indicate that you have

18 some loss of hearing in your right ear, isn't that

19 correct?

20             PROSPECTIVE JUROR:  Correct.

21             THE COURT:  Can you hear me now?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Okay.  And you do have some

24 medical needs because of a condition you have, is

25 that correct?

1          PROSPECTIVE JUROR:  That's correct, Your
2     Honor.
3          THE COURT:  You have a degree in economics?
4          PROSPECTIVE JUROR:  That's correct.
5          THE COURT:  And what do you do at work?
6          PROSPECTIVE JUROR:  Doing maintenance work.
7          THE COURT:  And you do that at a high school?
8          PROSPECTIVE JUROR:  Correct.
9          THE COURT:  What does that involve?
10         PROSPECTIVE JUROR:  Mainly I do the property
11    upkeep.
12         THE COURT:  One thing you said is you repair
13    a lot of broken equipment, you do that, too?
14         PROSPECTIVE JUROR:  What's that again, sir?
15         THE COURT:  Repairing broken equipment.
16         PROSPECTIVE JUROR:  Correct.
17         THE COURT:  And you do volunteer work in
18    church?
19         PROSPECTIVE JUROR:  That's correct.
20         THE COURT:  And you learned how to do your
21    job with on-the-job training, is what happened?
22         PROSPECTIVE JUROR:  That's correct, sir.
23         THE COURT:  And how long have you done that
24    kind of work?
25         PROSPECTIVE JUROR:  About 20 -- 20 years.

1        THE COURT:  Basically the same kind of work
2   but at different places?
3        PROSPECTIVE JUROR:  That is correct.
4        THE COURT:  You have a son and a daughter,
5   the youngest is 24, they are both college graduates?
6        PROSPECTIVE JUROR:  That's correct, sir.
7        THE COURT:  You hired a lawyer once about a
8   car accident?
9        PROSPECTIVE JUROR:  Yes.
10       THE COURT:  How long ago was that?
11       PROSPECTIVE JUROR:  Maybe about 25 or so
12  years ago.
13       THE COURT:  Did anything happen?  Was there a
14  lawsuit filed?
15       PROSPECTIVE JUROR:  No, it was settled.
16       THE COURT:  Were you satisfied with the
17  service you got?
18       PROSPECTIVE JUROR:  Yes, sir.
19       THE COURT:  You served as a juror once in a
20  case?
21       PROSPECTIVE JUROR:  Yes, I did.
22       THE COURT:  And that was a criminal case?
23       PROSPECTIVE JUROR:  Correct.
24       THE COURT:  And it was 8 or 9 years ago?
25       PROSPECTIVE JUROR:  That's correct.

1          THE COURT:  And the jury reached a verdict?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Do you belong to any kind of

4   group, organization?  Is there someplace you belong,

5   some group you contribute to?

6          PROSPECTIVE JUROR:  No, I don't.

7          THE COURT:  And what's your relationship with

8   the church in Tinley Park?

9          PROSPECTIVE JUROR:  I'm a parishioner in

10  there.

11         THE COURT:  And you don't trust most

12  politicians, is that true?

13         PROSPECTIVE JUROR:  That's what I said on

14  that.

15         THE COURT:  What the jury in this case is

16  going to be asked to decide, it's going to be asked

17  to decide, after they hear evidence in court,

18  they're going to be asked for a decision based only

19  on the evidence in court as to whether the specific

20  individual on trial here, whether the government has

21  proven beyond a reasonable doubt that the

22  accusations are true.  So we're not going to be

23  dealing with most politicians or the general state

24  of affairs.  We're going to be dealing only with

25  specific allegations against an individual person

1  and whether there is sufficient proof of them, do
2  you understand that?
3          PROSPECTIVE JUROR:  Yes, sir.
4          THE COURT:  Do you think you'd be able to be
5  a fair juror on that issue?
6          PROSPECTIVE JUROR:  I think so.
7          THE COURT:  Okay.  Hobbies, interests,
8  anything you like to do?
9          PROSPECTIVE JUROR:  I put down there I play
10 golf.
11         THE COURT:  Right.  You also say you read
12 Golf Digest?
13         PROSPECTIVE JUROR:  Yes.
14         THE COURT:  Where do you get your news from?
15         PROSPECTIVE JUROR:  From the radio and
16 television programs.
17         THE COURT:  Do you use the Internet to get
18 news?
19         PROSPECTIVE JUROR:  No, I don't.
20         THE COURT:  Now, you did read or hear
21 something about this case, is that correct?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  The most important thing for a
24 juror to do is to decide the case on the basis of
25 the evidence in court and to disregard anything they

1  heard or read outside of court, do you think you'd

2  be able to do that?

3          PROSPECTIVE JUROR:  I think so.

4          THE COURT:  Okay.  You did answer one

5  question, I think maybe you checked the wrong box

6  but I want to make sure.  It's a question that says:

7      "This case is likely to receive ongoing media

8       attention.  The Court will advise you that you

9       must avoid reading about the case in the papers

10      or listening to any radio or television reports

11      about the case or reading anything about the

12      case on the Internet.  Will you be able to

13      follow the Court's instructions?

14       You checked "no," but based on the other

15  answers I think you meant yes, is that correct?

16          PROSPECTIVE JUROR:  I think so, yes.

17          THE COURT:  Yeah, I think so, too.

18          Thank you.

19      (Prospective juror exited the courtroom, and the

20       following proceedings were had herein:)

21      (Brief pause).

22      (Prospective juror entered the courtroom, and

23       the following proceedings were had herein:)

24          THE COURT:  Number 183?

25          PROSPECTIVE JUROR:  Yes.

1        THE COURT:  I'm just going to go over some of

2  the questions.  We're not going to do the whole

3  thing all over again.

4        You have a Master's degree?

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  What do you do at work.

7        PROSPECTIVE JUROR:  I work for social

8  security.  I'm a claims representative.

9        THE COURT:  And what does that mean?

10       PROSPECTIVE JUROR:  We don't do the claim for

11 filing for social security retirement, we do make

12 appointments for people.  It's the front line of

13 when you come into a social security office.

14       THE COURT:  You also do the same stuff over

15 the phone?

16       PROSPECTIVE JUROR:  Yes.

17       THE COURT:  And how long have you done that

18 work?

19       PROSPECTIVE JUROR:  11 years now.

20       THE COURT:  Did you do anything before that?

21       PROSPECTIVE JUROR:  Yes.

22       THE COURT:  And what was that?

23       PROSPECTIVE JUROR:  I worked for a

24 congressman?

25       THE COURT:  And which congressman is that?

1          PROSPECTIVE JUROR:  John Porter.
2          THE COURT:  And how long did you work for
3   him?
4          PROSPECTIVE JUROR:  7 years.
5          THE COURT:  And you were staff?
6          PROSPECTIVE JUROR:  Staff.
7          THE COURT:  Did you work in Chicago or in
8   D.C.?
9          PROSPECTIVE JUROR:  It was in Deerfield.
10          THE COURT:  Deerfield.
11          PROSPECTIVE JUROR:  The Deerfield office,
12   yes.
13          THE COURT:  The local office.
14          PROSPECTIVE JUROR:  The local office.
15          THE COURT:  And before that, did you do
16   anything?
17          PROSPECTIVE JUROR:  Little odd jobs, nothing
18   you know -- in fact, I was crafty and doing
19   photography, stuff like that; raising my kids.
20          THE COURT:  It says here that you were
21   president of Northfield Township School Trustees.
22          PROSPECTIVE JUROR:  Yes.
23          THE COURT:  Is that an elected position or
24   are you appointed?
25          PROSPECTIVE JUROR:  It is an elected position

Voir Dire                                    721

1  but it's -- the township trustee layer of government
2  is only in Cook County and it is a way that when
3  school districts have their money and they funnel it
4  through the township trustee and we -- we --
5  actually we sort of write their checks for them.  So
6  we make sure that everybody is paid correctly and
7  that different school districts can't fiddle around
8  with their money, it goes through us.
9          THE COURT:  Okay.  Did you say this was an
10 elected position?
11         PROSPECTIVE JUROR:  Yes; every 6 years.
12         THE COURT:  Right.  Are any of these
13 elections contested?
14         PROSPECTIVE JUROR:  No, we have to dig people
15 up to come on our board.
16         THE COURT:  Right.  So you don't have to go
17 around making speeches, promising peace on earth?
18         PROSPECTIVE JUROR:  No; very few people even
19 know what layer that is.
20         THE COURT:  Okay.  Do you like doing that
21 work?
22         PROSPECTIVE JUROR:  Yeah.
23         THE COURT:  Do you like doing the work at
24 social security, too?
25         PROSPECTIVE JUROR:  Yes, I did.

Voir Dire                                          722

1          THE COURT:  When you applied for the job in

2   social security, between the time of application and

3   the time you were hired, how much time passed?

4          PROSPECTIVE JUROR:  I want to say about

5   5 months.  When I was working for the congressman, I

6   was one of the people that knew about social

7   security and Medicare, very simple stuff, but I

8   was -- if somebody called and said I need a new

9   Medicare card, I was able to call the local social

10  security office and say so-and-so needs a Medicare

11  card and could you send it to them.

12         THE COURT:  Right.  Is most of the work in

13  the congressman's office work requested by his

14  constituent service?

15         PROSPECTIVE JUROR:  Absolutely.

16         THE COURT:  What does your husband do?

17         PROSPECTIVE JUROR:  He is an investment

18  adviser.  He's self-employed.

19         THE COURT:  He was in the Air Force?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  And you relate that two family

22  members were victims of a crime?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  When they were very young?

25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And somebody was prosecuted for
2   this?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  And was convicted?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  Were you basically satisfied with
7   the process and the results?
8          PROSPECTIVE JUROR:  Very much so.
9          THE COURT:  And you were actually a school
10  board member, too?
11          PROSPECTIVE JUROR:  Yes, I was elected to a
12  school board.
13          THE COURT:  That was three elections?
14          PROSPECTIVE JUROR:  Huh?
15          THE COURT:  That was three elections?
16          PROSPECTIVE JUROR:  Yes.  The first one was a
17  2-year fill-in and then two 4-year terms.
18          THE COURT:  Okay.  Now, was that a contested
19  election?
20          PROSPECTIVE JUROR:  It never was, but it
21  could have been.
22          THE COURT:  None of the three were contested.
23          PROSPECTIVE JUROR:  No.
24          THE COURT:  And you expressed views on public
25  officials considering their own personal financial

1  interests and the influence of campaign
2  contributions.  And we ask those questions because
3  their open-ended, but I want to make sure you
4  understand one thing:  If you sit on a jury in this
5  case, you're never going to be asked what your views
6  on political contributions or the motivations of
7  politicians, you're simply going to be asked whether
8  the government has proved beyond a reasonable doubt
9  a specific charge against one specific elected
10 official, do you understand that?
11          PROSPECTIVE JUROR:  I understand that, sir.
12          THE COURT:  And my concern is -- or my
13 question is is that you will understand that that is
14 the issue you are going to be asked to be decided,
15 not general policy about what elected officials
16 should or should not be doing, do you understand
17 that?
18          PROSPECTIVE JUROR:  I'm very clear on that.
19          THE COURT:  Hobbies, interests, stuff you
20 like to do?
21          PROSPECTIVE JUROR:  I'm a great gardener,
22 right now waiting for the grass to grow.
23          THE COURT:  Do you do anything else while you
24 are waiting for the grass to grow?
25          PROSPECTIVE JUROR:  I haven't had much time.

Voir Dire                                          725

1          THE COURT:  Okay.  Incidentally, what hours
2    do you work?  How many hours a week do you work for
3    social security?
4          PROSPECTIVE JUROR:  I'm usually at work at
5    7:00 o'clock, the office closes at 5:15.  I can
6    leave at 3:30, but I usually stay and work extra
7    because we are so overwhelmed with people coming in.
8    So I'm not home usually before quarter to 6:00.
9          THE COURT:  Right.  And are you at the
10   Metcalfe building?
11         PROSPECTIVE JUROR:  No, we're in Prospect
12   Heights.
13         THE COURT:  Okay.  Where do you get your news
14   from?
15         PROSPECTIVE JUROR:  Well, until a couple of
16   weeks ago, I was reading the newspaper.  I don't do
17   that now.  We get Time and News Week.  I'm an avid
18   reader, I like to read books.
19         THE COURT:  You don't use the Internet for
20   news?
21         PROSPECTIVE JUROR:  Absolutely not.  I don't
22   even know how to use the Internet that good.
23         THE COURT:  Do you, like, look forward every
24   day to getting the news or is this just something
25   that happens to you?  Or put another way, are you a

 1  news hound that has the latest information on
 2  everything?

 3          PROSPECTIVE JUROR:  I enjoy reading the
 4  newspaper, but I don't -- if I have to go without it
 5  for a day or two, you know, because it's wet in the
 6  driveway or something, I'm okay.  I'm not crazy
 7  about it.

 8          THE COURT:  And you did, in fact, during the
 9  early stages of this case, prior stages of this
10  case, you did read something about it or hear
11  something about it, is that correct?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  The rule is is that when you
14  decide this case when you're on the jury, you have
15  to consider as evidence only that which you hear in
16  the courtroom.  And what we tell jurors is is that
17  we don't expect you to forget what you previously
18  heard or read, pretty hard to do, all we ask is that
19  when you weigh the evidence you put the previous
20  stuff you heard or read off to one side and the only
21  thing you weigh is what you heard in the courtroom
22  and saw in the courtroom, do you understand?

23          PROSPECTIVE JUROR:  Absolutely.

24          THE COURT:  Would you be able to do that?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire                                      727

1      THE COURT:  Now, you did include a note at
2  the end on the practices which you admired of the
3  representative who formerly employed you, which is
4  fine.  That you have a positive opinion of the
5  congressman.  My question to you is, I want to be
6  sure that if you sit on this jury, the measure which
7  you will apply is not whether the accused here comes
8  up to the standards of your prior elected official
9  who employed you, and, in fact, you won't consider
10  that at all, you will consider only the evidence and
11  whether there's been sufficient proof, would you be
12  able to do that?
13      PROSPECTIVE JUROR:  I would, and I've been
14  working on that, mentally, ever since I got the
15  summons.
16      THE COURT:  Okay.  Thank you.
17    (Prospective juror exited the courtroom, and the
18     following proceedings were had herein:)
19    (Brief pause).
20    (Prospective juror entered the courtroom, and
21     the following proceedings were had herein:)
22      THE COURT:  You're number 184?
23      PROSPECTIVE JUROR:  Yes.
24      THE COURT:  I'm just going to go over some of
25  the things with you, I'm not going to go over the

 1  whole questionnaire.
 2          What do you do at work?
 3          PROSPECTIVE JUROR:  My title is Employee
 4  Service Representative.
 5          THE COURT:  Bring the mike a little closer.
 6          PROSPECTIVE JUROR:  I work for McDonald's
 7  Corporation, my title is Employee Service
 8  Representative.  I communicate with McDonald's
 9  employees all over the nation, just giving them
10  information about their benefits and payroll.
11          THE COURT:  Is this mostly them calling you?
12          PROSPECTIVE JUROR:  Yes.
13          THE COURT:  Because some employee wants to
14  know something about the company's policies or what
15  they're entitled to or what benefits they can get,
16  you're the person that answers those questions?
17          PROSPECTIVE JUROR:  Correct.
18          THE COURT:  And how long have you been doing
19  that?
20          PROSPECTIVE JUROR:  5 years.
21          THE COURT:  What jobs, if any, did you have
22  before that?
23          PROSPECTIVE JUROR:  I worked for the Chicago
24  Park District as a lifeguard about 7 years, I worked
25  at Starbucks for a couple of years, 3 years maybe,

Voir Dire                                               729

1  2.
2          THE COURT:  Have you ever volunteered, done
3  any kind of that work?
4          PROSPECTIVE JUROR:  Not that I can recall.
5          THE COURT:  What's the Galter LifeCenter?
6          PROSPECTIVE JUROR:  Oh, the Galter
7  LifeCenter, I'm currently also working there.  I'm a
8  courtesy desk representative.  It's the gym that's
9  associated with the Swedish Covenant Hospital.  Just
10 check people in, sign people for their classes.
11         THE COURT:  Okay.  Who owned the mini mart?
12 You were asked whether you or anyone close to you
13 ever owned a business.
14         PROSPECTIVE JUROR:  Mini mart?
15         THE COURT:  You said "small business/mini
16 mart."
17         PROSPECTIVE JUROR:  I had a roommate in
18 college, his family owned like a little shop that
19 sold, like a mini market.
20         THE COURT:  Okay.  Somebody hit-and-run your
21 car?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  A lot of damage, a little damage?
24         PROSPECTIVE JUROR:  A little damage.
25         THE COURT:  Fairly annoying?

1    PROSPECTIVE JUROR:  I'm sorry?

2    THE COURT:  Was that fairly annoying to you?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  You consulted a lawyer for

5    purchasing some property, is that it?

6    PROSPECTIVE JUROR:  Correct.

7    THE COURT:  Hire a lawyer for any other

8    reason?

9    PROSPECTIVE JUROR:  No.

10   THE COURT:  Apart from today, have you ever

11   been in a courtroom?

12   PROSPECTIVE JUROR:  Only for that hit-and-run

13   accident.

14   THE COURT:  Okay.  And what happened in court

15   on that case?

16   PROSPECTIVE JUROR:  The person who hit my car

17   showed up to the courtroom, they hired an attorney,

18   and the person was a minor who hit my car and just

19   got some community service.

20   THE COURT:  You were asked some questions

21   about public officials and their motivations and

22   campaign contributions, and you answered those

23   questions, which is fine.  I just want to make sure

24   you understand that if you're a juror on this case,

25   you're not going to be asked to express any views on

1  campaign contributions in general or politicians in

2  general.  The only thing you're going to be asked to

3  do is to decide whether the government has proved

4  specific charges against one particular defendant

5  beyond a reasonable doubt, do you understand that's

6  the only thing you're going to be asked to do?

7          PROSPECTIVE JUROR:  Understood.

8          THE COURT:  Hobbies, interests, stuff you

9  like to do?

10         PROSPECTIVE JUROR:  Sports, watching and

11 playing.

12         THE COURT:  Where do you get your news from?

13         PROSPECTIVE JUROR:  Newspaper, Internet,

14 applications on my phone, so ....

15         THE COURT:  What kind of news are you most

16 interested in?

17         PROSPECTIVE JUROR:  The crime on the north

18 side of Chicago.

19         THE COURT:  Okay.  What else?

20         PROSPECTIVE JUROR:  Then sports, what's going

21 on around my neighborhood, that's pretty much it,

22 that's what I focus on.

23         THE COURT:  What kind of websites -- are

24 there any particular news websites that you visit?

25         PROSPECTIVE JUROR:  CNN, MSNBC and WGN TV.

Voir Dire                                                  732

1          THE COURT:  Would you give me an estimate, if

2     you could, on an average day how many hours you

3     spend dealing with the news?

4          PROSPECTIVE JUROR:  I would say between 15

5     and 30 minutes.

6          THE COURT:  Okay.  Do you believe you can be

7     a fair juror in this case and consider only the

8     evidence in court, not anything you heard about or

9     remember in the past, do you think you can do that?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Thank you.

12     (Prospective juror exited the courtroom, and the

13      following proceedings were had herein:)

14     (Brief pause).

15          THE COURT:  We're going to take 15 minutes

16     recess.

17     (Recess.)

18     (The following proceedings were had in open

19      court:)

20          THE COURT:  All right, 185.

21     (Prospective juror entered the courtroom, and

22      the following proceedings were had herein:)

23          THE COURT:  185.

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  I'm going to ask you about some

Voir Dire                                      733

1  of the things that are in the questionnaire.  We're
2  not going to cover every subject.
3           PROSPECTIVE JUROR:  Okay.
4           THE COURT:  You list one condition, medical
5  condition, that might make it difficult for you to
6  serve as a juror on this case.  Why do you think it
7  might be a difficulty?
8           PROSPECTIVE JUROR:  Just recent diagnosis and
9  just adjusting to it, so --
10          THE COURT:  Would you pick up the mike.
11          PROSPECTIVE JUROR:  I'm sorry.  It's been
12 diagnosed recently within a year and it's just
13 something I've been adjusting with the medications
14 and what not.  So, honestly, I don't foresee it
15 being a problem, but I'm just taking it day by day,
16 week by week.
17          THE COURT:  So you don't perceive it as a
18 current problem but you're concerned it might become
19 a problem?
20          PROSPECTIVE JUROR:  No, just it's still new
21 to me, sir.  So they asked if there's anything that
22 I foresee, that could be foreseeable.
23          THE COURT:  Right.  But it's not a current
24 issue?
25          PROSPECTIVE JUROR:  Not at the moment.

1          THE COURT:  Okay.  Is this the kind of thing
2  where they're adjusting your medication now?
3          PROSPECTIVE JUROR:  Yeah.  Yes, sir.
4          THE COURT:  You have a BFA?
5          PROSPECTIVE JUROR:  Yes, sir.
6          THE COURT:  You also have a BS?
7          PROSPECTIVE JUROR:  Yes, sir.
8          THE COURT:  And you're a teacher and your
9  current employment has been for 13 years?
10          PROSPECTIVE JUROR:  That's correct, sir.
11          THE COURT:  And the grades you teach?
12          PROSPECTIVE JUROR:  I kindergarten through
13  6th.
14          THE COURT:  And you have a bunch of hobbies
15  and skills, all of which involve using your hands?
16          PROSPECTIVE JUROR:  Yes, sir.
17          THE COURT:  Did you have a job before your
18  present one?
19          PROSPECTIVE JUROR:  Yes, sir.
20          THE COURT:  And what was that?
21          PROSPECTIVE JUROR:  I was a jeweler on sales
22  and design.
23          THE COURT:  How long did you do that?
24          PROSPECTIVE JUROR:  About 7 years, sir.
25          THE COURT:  Did this include all jewelry or

:16PM
:16PM
:17PM
:17PM
:17PM

1  where you a specialist in something?

2       PROSPECTIVE JUROR:  It was all.

3       THE COURT:  If it was called jewelry it was

4  in your field?

5       PROSPECTIVE JUROR:  Pardon me?

6       THE COURT:  If it was called jewelry, it's

7  something you could deal with?

8       PROSPECTIVE JUROR:  Yes.

9       THE COURT:  Okay.  And you were a victim of a

10 crime?

11      PROSPECTIVE JUROR:  Yes, sir.

12      THE COURT:  And this was a robbery and a

13 physical assault?

14      PROSPECTIVE JUROR:  Yes, sir.

15      THE COURT:  Anybody ever caught for that?

16      PROSPECTIVE JUROR:  No, sir.

17      THE COURT:  How long ago was that?

18      PROSPECTIVE JUROR:  It was about 4 years ago,

19 I'd say.

20      THE COURT:  Would it affect your ability to

21 be a juror in this case?

22      PROSPECTIVE JUROR:  No, sir.

23      THE COURT:  You consulted a lawyer once for

24 medical malpractice?

25      PROSPECTIVE JUROR:  Yes, sir.

```
                              Voir Dire                        736
```

1         THE COURT:  How long ago was that?

2         PROSPECTIVE JUROR:  This past year, sir.

3         THE COURT:  Where?

4         PROSPECTIVE JUROR:  This past year.

:19PM   5         THE COURT:  Past year?

6         PROSPECTIVE JUROR:  Yes.

7         THE COURT:  Was a lawsuit filed?

8         PROSPECTIVE JUROR:  No, sir.

9         THE COURT:  Did you get any kind of remedy at

:19PM  10  all for that?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  Were you satisfied with the

13  services of a lawyer even though they were not

14  successful?

:19PM  15         PROSPECTIVE JUROR:  Yes, sir.

16         THE COURT:  Hobbies, interests, stuff you

17  like to do when you're not working?

18         PROSPECTIVE JUROR:  I've several varied, sir.

19  Mostly --

:20PM  20         THE COURT:  I'm having trouble hearing you.

21         PROSPECTIVE JUROR:  I'm sorry, sir.

22  Generally, most of my hobbies pertain hanging around

23  with friends and various activities with them, so

24  softball during summer.

:20PM  25         THE COURT:  One thing you teach is art?

Voir Dire                    737

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  What does that mean?

3          PROSPECTIVE JUROR:  Well, at the

4   case-specific level, I service two schools.  Usually

5   it's dealing with manipulatives, teaching the

6   fundamentals of arts, principles, elements,

7   handwrite coordination, motor skills with small

8   children.

9          THE COURT:  Is this drawing, painting, things

10  of this sort?

11         PROSPECTIVE JUROR:  All sorts of all

12  material, yes, sir.

13         THE COURT:  Sculpting clay, that kind of the

14  stuff?

15         PROSPECTIVE JUROR:  Yes, sir.

16         THE COURT:  Spend a lot of time in the

17  theater?

18         PROSPECTIVE JUROR:  When I can and money

19  permits.

20         THE COURT:  Most important source of news for

21  you, you indicated television.

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  You see a lot of news?

24         PROSPECTIVE JUROR:  Yes and no.  Sometimes I

25  watch it.  So I'd say your average amount the

Voir Dire                                    738

1  average person does.  I watch the nightly news.

2          THE COURT:  The basic question I'm asking is,

3  there are some people in the world who love the

4  24-hour news cycle --

5          PROSPECTIVE JUROR:  I'm not one of those.

6          THE COURT:  -- and they don't want to miss

7  any part of it.  You're not one?

8          PROSPECTIVE JUROR:  I'm not one of those.

9          THE COURT:  You saw some coverage of prior

10  proceedings in this case.

11          PROSPECTIVE JUROR:  Yes, sir.

12          THE COURT:  Is it fair to say, based on the

13  answer that you gave, that you do not have a high

14  opinion of the defendant in this case?

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  And you also answered another

17  question that's not quite the same thing, but I

18  actually think it's a continuation of your answer to

19  an earlier question.  You expressed your negative

20  view of the defendant and then there's another

21  answer here that says most of your friends and

22  family feel the same way.  Do those two sentences go

23  together?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  When you sit on a case like this,

:21PM
:21PM
:22PM
:22PM
:22PM

1  there's no part of the verdict form that says you

2  find the defendant is distasteful or bad or whatever

3  adjective you want to use.  The verdict form just

4  asks you if the defendant has been proved guilty

5  beyond a reasonable doubt and if the answer to that

6  one is no, there's a verdict form that says not

7  guilty.  There is sometimes difficulty in separating

8  your own personal opinion of the defendant with the

9  question of whether guilt has been proved.  My

10 question to you is, you understand you're not

11 judging, in general, the character of the defendant

12 --

13           PROSPECTIVE JUROR:  Yes, I do, sir.

14           THE COURT:  -- nor the quality of his

15 actions --

16           PROSPECTIVE JUROR:  That's correct, sir.

17           THE COURT:  -- you are just called on to

18 judge whether there's been proof beyond a reasonable

19 doubt that the charges have been proved, do you

20 understand that?

21           PROSPECTIVE JUROR:  Correct.  Yes.

22           THE COURT:  Now, could you, in fact, keep out

23 whatever relatively row opinion you have of the

24 defendant in reaching your verdict?

25           PROSPECTIVE JUROR:  I believe I could, sir.

1    THE COURT:  When you teach students, and

2  particularly when you do this teaching in art, which

3  I take it from your description of it that you do

4  not have a regular class of students who you are in

5  charge of, you are the art education teacher and you

6  teach a large number of students in different

7  classrooms and in different, in your case, maybe

8  different school buildings, is that right?

9    PROSPECTIVE JUROR:  That's correct, sir;

10  approximately 700.

11    THE COURT:  Do you wind up grading them in

12  any way?

13    PROSPECTIVE JUROR:  I grade all of them.

14    THE COURT:  Okay.  And what are they graded

15  on?  My question is, are we dealing with somebody

16  who does really well because they have an inherent

17  ability or somebody who doesn't do very well --

18    PROSPECTIVE JUROR:  It's a combination of

19  rubric based upon an objective goal and also effort

20  put in.  So the majority of the grade is based upon

21  a rubric of objective goals which is to be met and

22  then consideration of effort and students abilities

23  are also taken into consideration.

24    THE COURT:  So you can get a decent grade

25  even if you can't tell the difference between a

1  square and a rectangle?

2         PROSPECTIVE JUROR:  If it's that severe, sir,

3  no, you can't get a decent grade but ....

4         THE COURT:  Thank you.

5         PROSPECTIVE JUROR:  Thank you.

6       (Brief pause).

7       (Prospective juror exited the courtroom, and the

8        following proceedings were had herein:)

9       (Brief pause).

10      (Prospective juror entered the courtroom, and

11       the following proceedings were had herein:)

12         THE COURT:  You're number 186?

13         PROSPECTIVE JUROR:  Yes, Your Honor.

14         THE COURT:  You don't have to stand up.

15         PROSPECTIVE JUROR:  Thank you.

16         THE COURT:  What do you do for a living?

17         PROSPECTIVE JUROR:  I am --

18         THE COURT:  Just raise the microphone.

19         PROSPECTIVE JUROR:  I am a real estate agent,

20  but because right now it's kind of slow, I slow down

21  myself too, but also I'm a city worker because I

22  work for the water department, an MTD.

23         THE COURT:  So you are an employee of the

24  city's water department?

25         PROSPECTIVE JUROR:  Correct, sir.

Voir Dire                                      742

1        THE COURT:  And how long have you been there?

2        PROSPECTIVE JUROR:  About 23 years, something

3   like that.

4        THE COURT:  What do you do at work?

5        PROSPECTIVE JUROR:  We do different

6   construction prior to fixing water leaks around the

7   City of Chicago.  I am MTD, I mean motor truck

8   driver driving different kind of equipment, power

9   equipment and transportation equipment.

10       THE COURT:  What kinds of equipment?  What

11  kinds of trucks and vehicles do you --

12       PROSPECTIVE JUROR:  We got the compressor

13  trucks, we got pumps transaction, we have

14  semitrailers, we got dump trucks, we got leak

15  trucks, we got investigators trucks, all kinds.

16       THE COURT:  And you drive them all?

17       PROSPECTIVE JUROR:  I drive them all, yeah.

18       THE COURT:  Do you have any other jobs?  Do

19  you work on anything else?

20       PROSPECTIVE JUROR:  Yeah, real estate, but

21  for this year I don't practice at all because the

22  economy is not what --

23       THE COURT:  And what kind of real estate do

24  you deal with when you do that?

25       PROSPECTIVE JUROR:  Community residential,

Voir Dire                                        743

1   sometimes commercial.

2          THE COURT:  Okay.  And your wife is a special

3   education teacher's aide?

4          PROSPECTIVE JUROR:  Correct, Your Honor.

5          THE COURT:  You have three children and the

6   youngest is 22?

7          PROSPECTIVE JUROR:  Correct, Your Honor.

8          THE COURT:  Your son does some work for

9   Streets and Sanitation.

10         PROSPECTIVE JUROR:  Correct, he's part-time,

11  he's working the winter with the salt removal.

12         THE COURT:  And that's the youngest son?

13         PROSPECTIVE JUROR:  This is the middle.

14         THE COURT:  The middle son?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  And you have another son -- do

17  you have a son who is a police officer or applied to

18  be a police officer?

19         PROSPECTIVE JUROR:  Yes, my middle son, he's

20  in Iraq, Afghanistan veteran from the Air Force and

21  he applied to the City of Chicago to be law

22  enforcement but he is waiting.

23         THE COURT:  But he hasn't heard yet?

24         PROSPECTIVE JUROR:  Not yet, but he took the

25  test.

Voir Dire                                744

1          THE COURT:  And what branch of the service is
2    he in?
3          PROSPECTIVE JUROR:  I'm sorry?
4          THE COURT:  What branch of the service is he
5    in?
6          PROSPECTIVE JUROR:  The Air Force.  His base
7    was in California.
8          THE COURT:  And you may have been arrested
9    but no charges?
10          PROSPECTIVE JUROR:  No charges at all.  I was
11    drinking in a bar we had problems there.
12          THE COURT:  Do you have any hobbies, any
13    activities you like to do when you're not working?
14          PROSPECTIVE JUROR:  Real estate was my
15    activity after work, after my city job I used to do
16    real estate most of the time, and I like to read
17    books, sometimes I do exercises, stuff like that.
18          THE COURT:  Where do you get your news from?
19          PROSPECTIVE JUROR:  Just all over, but I
20    never pay attention.  Most of the papers, you know.
21    In our job we have access to the paper every day,
22    but I just read the weather, is it going to rain
23    tonight or not, and the editorial, but nothing else.
24    I never -- you know, I'm not a fanatic of the news
25    media.

1      THE COURT:  Okay.  Do you use the Internet at

2  all?

3      PROSPECTIVE JUROR:  Only for my work, but

4  that's my job when I used to do real estate, to do

5  the business Internet, because we have internet

6  access to get information, but not to get into all

7  that stuff.

8      THE COURT:  Do you remember anything about

9  this case, reading about it a little or a lot?

10      PROSPECTIVE JUROR:  Yeah, of course.  It was

11  all over the news last year, but I never follow up,

12  to be honest with you, to be interesting.  Now, this

13  is the first time I'm interested because, you know,

14  that's why I'm here.  But before, I always was

15  impartial, I never make my own judgment, I always

16  hear what they say sometimes, I never pay -- I never

17  follow up.

18      THE COURT:  Okay.  Do you understand that if

19  you remember things that people told you and you

20  read things in the papers, do you understand that

21  you can't use that, any of that in reaching a

22  decision in this case if you're on a jury?

23      PROSPECTIVE JUROR:  I'm clear, Your Honor,

24  because that's why I say, I never watch, I never --

25  I never was a fanatic of the news.  I never follow

1   up.
2          THE COURT:  Right.  But what you have to do
3   is decide this case just on the basis of the
4   evidence in court, you can't consider anything you
5   heard outside the courtroom, do you understand that?
6          PROSPECTIVE JUROR:  I understand completely,
7   Your Honor.
8          THE COURT:  And would you follow that rule?
9          PROSPECTIVE JUROR:  I would follow that rule
10  if you choose me.
11         THE COURT:  Now, when did you start doing the
12  real estate?
13         PROSPECTIVE JUROR:  I'm sorry?
14         THE COURT:  When did you start doing the real
15  estate?
16         PROSPECTIVE JUROR:  About 2000, 2001.
17         THE COURT:  And you wanted to do that to
18  supplement your income that you got from the city?
19         PROSPECTIVE JUROR:  Correct.  Yes, because my
20  kids, they went to private schools, and I help them
21  with their tuitions.  My middle kid before he going
22  to the Air Force surprised me because he was in
23  Loyola University and one day he said he already
24  signed, he got to serve his country, and I respected
25  his decision.  But that's why I'm working real

1  estate.

2      THE COURT:  Did you have to study to get your

3  license for that?

4      PROSPECTIVE JUROR:  Yes, I went to school.

5      THE COURT:  And you passed the examine?

6      PROSPECTIVE JUROR:  Yes, I did.

7      THE COURT:  Thank you.

8      PROSPECTIVE JUROR:  You're welcome, Your

9  Honor.

10     (Prospective juror exited the courtroom, and the

11      following proceedings were had herein:)

12     (Brief pause).

13     (Prospective juror entered the courtroom, and

14      the following proceedings were had herein:)

15     THE COURT:  You're 187?

16     PROSPECTIVE JUROR:  That's correct, Your

17  Honor.

18     THE COURT:  Do you recognize me?

19     PROSPECTIVE JUROR:  Yes, Your Honor.

20     THE COURT:  And I recognize you.

21     What do you do for a living?

22     PROSPECTIVE JUROR:  I'm a United States

23  probation officer.

24     THE COURT:  Do you sometimes work in this

25  building?

Voir Dire                                                    748

1    PROSPECTIVE JUROR:  Yes, Your Honor.

2    THE COURT:  Do you appear in court?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  And you have post-graduate degree

5    in criminal justice, is that true?

6    PROSPECTIVE JUROR:  That's correct.

7    THE COURT:  And how long have you been

8    employed by the Probation Office in this district?

9    PROSPECTIVE JUROR:  In this district,

10   approximately 5 years.

11   THE COURT:  And like some but not all

12   probation officers, you do have at least one

13   specialty, is that correct?

14   PROSPECTIVE JUROR:  That's correct.

15   THE COURT:  And what specialty is that?

16   PROSPECTIVE JUROR:  I'm a Mental Health

17   Treatment Specialist and I'm also a firearms

18   instructor.

19   THE COURT:  How long have you been a Mental

20   Health Treatment Specialist?

21   PROSPECTIVE JUROR:  For less than a year, for

22   about 8 months.

23   THE COURT:  And how long have you been a

24   firearms instructor?

25   PROSPECTIVE JUROR:  For approximately 2 and a

Voir Dire                    749

1  half years, 3 years.
2          THE COURT:  What did your father do?
3          PROSPECTIVE JUROR:  He is a retired Air Force
4  general.
5          THE COURT:  How long ago did he retire?
6          PROSPECTIVE JUROR:  I would say between 5 and
7  6 years ago.
8          THE COURT:  Did you have a job before you
9  became a probation officer?
10         PROSPECTIVE JUROR:  Yes, Your Honor.
11         THE COURT:  And what was that job?
12         PROSPECTIVE JUROR:  Before I was a federal
13 probation officer I worked in the state of
14 Washington as a probation officer.  I've been doing
15 this like approximately 19 years, prior to that I
16 think I worked for United Parcel Service.
17         THE COURT:  What did you do for UPS?
18         PROSPECTIVE JUROR:  I worked both in the
19 early mornings, that's what they call preloading, as
20 well as the evening shifts.  I think I was in
21 college at the time.
22         THE COURT:  A long time ago your house was
23 burglarized?
24         PROSPECTIVE JUROR:  Yes.
25         THE COURT:  Was anybody caught for that?

Voir Dire                                   750

1          PROSPECTIVE JUROR:  I don't believe so.
2          THE COURT:  It says has a family member or
3    close friend ever been a victim of a crime, the
4    answer is "yes, identity theft," what relationship
5    or a friend?
6          PROSPECTIVE JUROR:  Significant other.
7          THE COURT:  Okay.  Was anyone charged in
8    connection with that crime?
9          PROSPECTIVE JUROR:  Someone was charged with
10   a lesser offense and do not believe anything came to
11   fruition from that defense.
12         THE COURT:  And there was a lawsuit involving
13   a motor vehicle accident?
14         PROSPECTIVE JUROR:  Yes.
15         THE COURT:  Which side were you on, plaintiff
16   or defendant?
17         PROSPECTIVE JUROR:  I think I was the one
18   sued.  So I was the defendant.
19         THE COURT:  And the case was settled?
20         PROSPECTIVE JUROR:  Yes.
21         THE COURT:  Were you reasonably satisfied
22   with the settlement?
23         PROSPECTIVE JUROR:  I don't know of the
24   details of that.  It was involving my insurance
25   agent.

1          THE COURT:  So you really don't know what
2    happened?
3          PROSPECTIVE JUROR:  I don't know what
4    happened, no.
5          THE COURT:  You hired or consulted a lawyer
6    on two separate occasions, is that correct?
7          PROSPECTIVE JUROR:  That's correct.
8          THE COURT:  Were you satisfied with the
9    results?
10         PROSPECTIVE JUROR:  Yes.
11         THE COURT:  The only time you can recall, and
12   you're not absolutely sure, that you wrote to an
13   elected appointed government official, it was in the
14   state of Washington, involving adding safety
15   equipment for state probation officers?
16         PROSPECTIVE JUROR:  That's correct.
17         THE COURT:  Now, was that something you did
18   on your own or was that part of a group effort?
19         PROSPECTIVE JUROR:  That was something I did
20   on my own.
21         THE COURT:  Did you succeed?
22         PROSPECTIVE JUROR:  I believe they have
23   changed some of their safety equipment since I left
24   that agency, but don't believe necessarily that was
25   an impact from my suggestion.

1          THE COURT:  Right.  Belong to groups,
2  organizations, anything of that sort?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  What?
5          PROSPECTIVE JUROR:  Federal Law Enforcement
6  Officers Association.
7          THE COURT:  You have never contributed money
8  or done work for a candidate for political office,
9  is that correct?
10         PROSPECTIVE JUROR:  That's correct.
11         THE COURT:  I think, based on what I've read
12 here, your answers to questions, that there are not
13 too many elected officials or too many politicians
14 about whom you have strongly favorable opinions, is
15 that correct?
16         PROSPECTIVE JUROR:  Strongly favorable?
17         THE COURT:  Yeah.  There are not many of
18 those, right?
19         PROSPECTIVE JUROR:  I mean, do I like certain
20 politicians?  Yes.  I don't --
21         THE COURT:  No, no, the question is, as a
22 general rule, do you have a high opinion of
23 politicians.
24         PROSPECTIVE JUROR:  As a general rule, I
25 don't have a negative opinion, but overly favorable,

1  not necessarily.

2          THE COURT:  The thing a juror would have to

3  do in this case is not consider opinions about

4  politicians in general, or, for that matter, even

5  opinions about the particular elected official we

6  are dealing with here.  The question is simply

7  whether the government proved beyond a reasonable

8  doubt a specific offense as alleged or did not do

9  that.  My question is, can you separate whatever

10 general views you have about politicians and

11 politics and reach a conclusion solely based on the

12 evidence with respect to the proof of the charges

13 made here, can you do that?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  What do you do when you're not

16 working?  What's fun?

17         PROSPECTIVE JUROR:  I like to work out, I

18 like to walk along the lake, walk my dog, when the

19 weather is nice play golf, tennis, spend time with

20 my family, cook.

21         THE COURT:  Is one of them higher on the list

22 than the other?  What do you do most of?

23         PROSPECTIVE JUROR:  Well, unfortunately, I

24 probably do most of house projects and things like

25 that, but what I would enjoy most is probably

1  cooking or taking a run along the lake, that kind of
2  thing.
3          THE COURT:  What about newspapers or news in
4  general, where do you get it?
5          PROSPECTIVE JUROR:  I don't typically buy a
6  newspaper.  I do watch television on occasion, I do
7  pick up the Red Eye once in a while and I sometimes
8  listen to the radio.
9          THE COURT:  Do you use the web, the Internet
10 at all to get news?
11         PROSPECTIVE JUROR:  Very rarely.
12         THE COURT:  You listen to radio.  What kind
13 of radio do you listen to?
14         PROSPECTIVE JUROR:  I listen to --
15         THE COURT:  Music or talk?
16         PROSPECTIVE JUROR:  I listen to a little bit
17 of both.
18         THE COURT:  Okay.  And how much of this case
19 did you follow, if any?
20         PROSPECTIVE JUROR:  Just generalities, what I
21 hear maybe on headline news, but never specifically
22 reading articles and things like that to get
23 specific details.
24         THE COURT:  Do you recognize any of the
25 specific Assistant United States Attorneys in this

:44PM
:44PM
:44PM
:45PM
:45PM

1  case as people who you work with?

2        PROSPECTIVE JUROR:  I may have more than

3  likely worked with them in my occupation, I don't

4  specifically remember personal relationship with

5  them or what particular case.  I just indicated that

6  more than likely I probably do know someone from the

7  government based on my job.

8        THE COURT:  Okay.  Let's assume you're on the

9  jury in this case and you don't remember anything

10  about any particular Assistant U.S. Attorney.  You

11  recognize the possibility that you may have worked

12  with one or two of them, but you work with a lot of

13  them and you have no specific memory, and something

14  jars your memory during the course of the trial and

15  you remember that one of these Assistant United

16  States Attorney worked with you on a case and you

17  greatly admired their work, you thought they were

18  absolutely brilliant and extremely helpful to you,

19  saved you from dozens of possible guideline errors

20  that you might have made and you feel this

21  overwhelming sense of gratitude towards them.  My

22  question to you is, would anything like that affect

23  your ability to judge this case on the basis of the

24  evidence alone as opposed to some possible

25  professional relationship you might have had with

Voir Dire                                    756

1  the assistant in question?

2          PROSPECTIVE JUROR:  No, it would not impact

3  that.

4          THE COURT:  And it is possibly, actually,

5  that perhaps you might recognize one of the defense

6  counsel --

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  -- and you may very well have

9  thought well of them.  Would your personal opinion

10  of the quality of the lawyer affect your ability to

11  be fair and impartial in judging the evidence?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Thank you.

14     (Prospective juror exited the courtroom, and the

15      following proceedings were had herein:)

16     (Brief pause).

17          THE COURT:  189 is next.  188 did not appear.

18     (Brief pause).

19     (Prospective juror entered the courtroom, and

20      the following proceedings were had herein:)

21          THE COURT:  You're number 189?

22          PROSPECTIVE JUROR:  Yes, sir.

23          THE COURT:  Just moved to a new neighborhood?

24          PROSPECTIVE JUROR:  Yes, about a month ago.

25          THE COURT:  You have undergraduate degrees in

1  psychology and neuroscience and you went to medical
2  school?
3          PROSPECTIVE JUROR:  Yes, sir.
4          THE COURT:  You are currently board certified
5  in family medicine?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  And you are board eligible for
8  sports medicine?
9          PROSPECTIVE JUROR:  Yes.
10         THE COURT:  And you moved recently because
11 you changed hospitals?
12         PROSPECTIVE JUROR:  I completed my training
13 and my wife and I moved to the suburbs, yeah.
14         THE COURT:  Basically, what do you do in your
15 current position?
16         PROSPECTIVE JUROR:  I'm faculty at a family
17 medicine residency.  So I see patients three half
18 days a week and the remainder of the time I'm
19 teaching residents and then I also have a sports
20 medicine fellow that I teach.  So I do some didactic
21 and then some -- so I do some lectures and I also do
22 one-on-one teaching.
23         THE COURT:  It says here that you have
24 partial supervision of 36 residents?
25         PROSPECTIVE JUROR:  Yeah, there's 36

1 residents in the program and I oversee them during

2 their clinic or in the hospital during the time.

3          THE COURT:  And you're the direct supervisor

4 of one person on a fellowship?

5          PROSPECTIVE JUROR:  Correct.

6          THE COURT:  Where have you been in terms of

7 hospitals prior to the time that you took your

8 current job?

9          PROSPECTIVE JUROR:  I began my training at

10 Illinois Masonic Hospital in Lakeview and Lutheran

11 General in Park Ridge and I'm currently at McNeal

12 Hospital in Berwyn.

13          THE COURT:  What does your wife do?

14          PROSPECTIVE JUROR:  She's a physician as

15 well.  She's at Loyola.

16          THE COURT:  And her field?

17          PROSPECTIVE JUROR:  Physical medicine and

18 rehabilitation, similar to what they do at RIC.

19          THE COURT:  Okay.  And you have one child?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  You were a public safety officer?

22          PROSPECTIVE JUROR:  Yes, in college.

23          THE COURT:  And where was that?

24          PROSPECTIVE JUROR:  That was in Oxford, Ohio.

25          THE COURT:  And who did you work for?

Voir Dire                                    759

1          PROSPECTIVE JUROR:  I worked for the police
2  department in the Department of Public Safety.
3          THE COURT:  And what do the public safety
4  officers do?
5          PROSPECTIVE JUROR:  Mostly I wrote parking
6  tickets, I also did traffic direction for funerals
7  or a couple of other things like that, parades.
8          THE COURT:  And why were you in that town,
9  Oxford, Ohio?
10          PROSPECTIVE JUROR:  I was there for
11  undergraduate, that was where I did my college.
12          THE COURT:  And I noticed here you were an
13  editorial columnist for the student newspaper.
14          PROSPECTIVE JUROR:  Yeah, I had an editorial
15  column.
16          THE COURT:  And what did you write editorials
17  about?
18          PROSPECTIVE JUROR:  The fact that I
19  procrastinate, I wrote one about students being
20  irresponsible with their drinking; it was just
21  general things that concern a 20-year old, nothing
22  political.
23          THE COURT:  Right.  Have you actually found
24  out what the policy of the hospital is toward jury
25  service and compensation?

Voir Dire                                    760

1    PROSPECTIVE JUROR:  Yes, I'm paid for the
2  duration.
3    THE COURT:  Okay.  The only time you hired a
4  lawyer was for real estate transaction?
5    PROSPECTIVE JUROR:  Yes.
6    THE COURT:  Groups, organizations, clubs, do
7  you belong to anything?
8    PROSPECTIVE JUROR:  Just professional
9  societies.
10   THE COURT:  And your lobbying, you put quotes
11 around a word.  Your lobbying experience was
12 visiting congressmen and senators presumably issues
13 having to do with medical malpractice, is that
14 correct?
15   PROSPECTIVE JUROR:  Yeah, that was my Ohio
16 representatives during medical school regarding
17 medical malpractice.
18   THE COURT:  And you indicated with respect to
19 good practices with elected officials making
20 official decisions, campaign contributions, personal
21 interests, you believed that some but not all go off
22 the rails a little, is that correct?
23   PROSPECTIVE JUROR:  Yeah, I think there are a
24 lot of temptations when you have a lot of
25 opportunities, but I tend to hope and believe that

Voir Dire                                761

 1  most people don't succumb to those.
 2          THE COURT:  And, basically, what we will ask
 3  you to do if you're on this jury is to make a
 4  decision actually not about these general issues,
 5  but whether, in fact, a specific defendant violated
 6  certain specific statutes and whether that's been
 7  proved by the government, that's what we ask you to
 8  do, do you understand that?
 9          PROSPECTIVE JUROR:  Yes, I do.
10          THE COURT:  What are your hobbies, your
11  interests?
12          PROSPECTIVE JUROR:  I like music a lot,
13  listening, as well as I play the guitar, I read
14  quite a bit, and I enjoy watching TV.
15          THE COURT:  How about the news, where do you
16  get it and much of it do you get?
17          PROSPECTIVE JUROR:  I usually kind of catch
18  it in between things, so I use cnn.com, I kind of
19  basically check the headlines and then read further
20  if it interests me.
21          THE COURT:  Would it be fair to say much
22  of interest in the news is sports related?
23          PROSPECTIVE JUROR:  Much of it, yeah.
24          THE COURT:  And you did know something about
25  the prior history of this case?

1      PROSPECTIVE JUROR:  Yes.  Yeah, I remember
2   that there were 20-some odd charges and that he was
3   found guilty on one.

4      THE COURT:  Your reference is is that you
5   followed it peripherally, largely because you were
6   in a fellowship at the time and you had a newborn,
7   is that what basically happened?

8      PROSPECTIVE JUROR:  Yeah, the news was on in
9   the background.

10      THE COURT:  Which leads me to my next
11   question.  The rule is that you decide this case on
12   the basis of the evidence you hear in the courtroom
13   and not anything else.  It's possible when you hear
14   some of the evidence in the court you will remember
15   something from news reports that was playing in the
16   background a long time ago.  The rule is is that if
17   you do remember something you heard and you have to
18   weigh the evidence, what you do is you disregard
19   what you've heard or you read, you put it off the
20   scales, we don't ask you to forget it, and you put
21   on the scales that will lead to a decision only the
22   evidence that came into the courtroom, do you
23   understand that that's the rule?

24      PROSPECTIVE JUROR:  Yeah.

25      THE COURT:  Would you have any difficulty

Voir Dire                                    763

1   following the rule?

2       PROSPECTIVE JUROR:  No.

3       THE COURT:  Would you follow the rule?

4       PROSPECTIVE JUROR:  Yes.

5       THE COURT:  Thank you.

6     (Prospective juror exited the courtroom, and the

7      following proceedings were had herein:)

8     (Brief pause).

9     (Prospective juror entered the courtroom, and

10     the following proceedings were had herein:)

11      THE COURT:  You're number 190?

12      PROSPECTIVE JUROR:  Yes, sir.

13      THE COURT:  You have a college degree in

14  accounting?

15      PROSPECTIVE JUROR:  Yes, I do.

16      THE COURT:  What do you do at work?

17      PROSPECTIVE JUROR:  I am IT business

18  relationship manager.  I am a liaison between our

19  corporate finance department and our IT department.

20      THE COURT:  And how long have you been doing

21  that?

22      PROSPECTIVE JUROR:  Well, I worked for that

23  company for almost 5 years doing that.  I've been in

24  IT for my whole career, which is 17 years now.

25      THE COURT:  And what sort of things do you

1  actually today do day to day at work?

2        PROSPECTIVE JUROR:  Ah, I -- I don't know how

3  to explain it.  I manage the IT portfolio for our

4  corporate finance department so when they want some

5  related projects done, then I work with them to get

6  the requirements and find out it is they need to do,

7  help them strategize to see how IT can help them,

8  and I work with out IT department to get it done,

9  basically.

10        THE COURT:  Now, do you find yourself popular

11  with both sides, IT and finance?

12        PROSPECTIVE JUROR:  Truthfully, I'm not very

13  popular with finance.

14        THE COURT:  Right.

15        PROSPECTIVE JUROR:  Because IT doesn't give

16  them everything they want.

17        THE COURT:  Previous employment?

18        PROSPECTIVE JUROR:  I worked for JPMorgan.

19  Actually, it was originally First Chicago, that

20  became Bank One, that became JPMorgan, I worked

21  there for 12 years.

22        THE COURT:  What's the music thing?

23        PROSPECTIVE JUROR:  The music?

24        THE COURT:  You and music.

25        PROSPECTIVE JUROR:  I sing in my -- well, I

:00PM
:00PM
:00PM
:00PM
:01PM

1  used to sing in church choir.  I like to sing, I
2  play piano, I play flute, so my hobby is music.
3          THE COURT:  Are you married?
4          PROSPECTIVE JUROR:  I am married.
5          THE COURT:  What does your spouse do?
6          PROSPECTIVE JUROR:  Right now he works part
7  time as a loan officer doing small business lending
8  for a non-profit community bank.
9          THE COURT:  You have two children?
10          PROSPECTIVE JUROR:  Yes, I do.
11          THE COURT:  A boy nine and a girl six?
12          PROSPECTIVE JUROR:  Yes.
13          THE COURT:  And your mother baby-sits your
14  children?
15          PROSPECTIVE JUROR:  No, she -- unfortunately,
16  she lives about 3 hours away, so she baby sits other
17  people's children.
18          THE COURT:  Okay.  So I read the answer
19  wrong, it says your mother baby sits children.
20          PROSPECTIVE JUROR:  Yes.
21          THE COURT:  Not yours.
22          PROSPECTIVE JUROR:  Right.
23          THE COURT:  Okay.  You hired a lawyer for
24  house closing?
25          PROSPECTIVE JUROR:  Yeah; the typical.

Voir Dire                                      766

1    THE COURT:  The only time you dealt with the
2 police is reports on fender benders?
3    PROSPECTIVE JUROR:  Yes.
4    THE COURT:  What do you belong to other than
5 professional societies?
6    PROSPECTIVE JUROR:  Right now I personally
7 don't belong to anything.  My husband sits on our
8 church religious education advisory board, but I
9 don't really belong to anything right now.
10    THE COURT:  You indicate that before you were
11 married, your husband did some minor volunteer work
12 for the defendant in this case, for the campaign?
13    PROSPECTIVE JUROR:  Yes, he did.
14    THE COURT:  Do you remember what kind of work
15 he did?
16    PROSPECTIVE JUROR:  Honestly, this only come
17 up once, I think, when the governor was running for
18 governor, and he mentioned, oh, by the way, did I
19 ever mention that I, you know, worked on his
20 campaign when he ran for Congress.  So, you know, I
21 asked the obvious question, did you ever meet him,
22 what did you do.  And it sounds he, you know, talked
23 to him maybe once or twice when the governor came
24 through and, you know, said hey, thanks for helping
25 out.  I think he mainly just answered phone calls

:02PM
:02PM
:03PM
:03PM
:03PM

Voir Dire                                          767

1  and maybe hung up some signs, but as far as I know,
2  it wasn't real involved, as far as I know.  He
3  hasn't said much about it.
4           THE COURT:  Has he ever done volunteer work
5  or done anything for any other candidate for elected
6  office?
7           PROSPECTIVE JUROR:  No, not that I'm aware
8  of.
9           THE COURT:  And it indicates both of you
10 donated money to a particular party, is that
11 correct?
12          PROSPECTIVE JUROR:  Yes.
13          THE COURT:  A lot, a little?
14          PROSPECTIVE JUROR:  No, just little money,
15 once.
16          THE COURT:  And you attended one other dinner
17 for an alderman?
18          PROSPECTIVE JUROR:  Yeah.  Yeah, we were
19 invited as a guest.
20          THE COURT:  Do you follow politics?
21          PROSPECTIVE JUROR:  Me?  A whole lot, no. I
22 don't have a lot of time.
23          THE COURT:  Your husband?
24          PROSPECTIVE JUROR:  I think he's interested
25 in it, but, truthfully, I don't know how closely he

1  follows it right now.  We're kind of busy with our
2  kids.
3        THE COURT:  Hobbies, things you do for fun in
4  addition to the music?
5        PROSPECTIVE JUROR:  Like I said, right now
6  we're pretty involved in our kids' activities.  They
7  both play athletics and are involved with dancing
8  and things like that.  So our time is pretty well
9  spent between working and going to their activities
10 right now.
11       THE COURT:  What about you and newspapers, do
12 you read a lot of them?
13       PROSPECTIVE JUROR:  No; we get the Sunday
14 Tribune and I check sports every once in a while,
15 that's about it.
16       THE COURT:  What is your source of news?
17       PROSPECTIVE JUROR:  We do, you know, watch
18 local news at 10:00 o'clock if I'm awake that long,
19 but that's really the only source of news.  Every
20 once in a while I might hop on the Internet.
21       THE COURT:  Do you actually, like, make a
22 point of looking up the news on the Internet?  Like
23 your favorite websites of one kind or another?
24       PROSPECTIVE JUROR:  Not really.  Only if
25 there's something, you know, that I might be

1  interested that's going on.  And, truthfully, it's
2  more pop entertainment kind of stuff.
3          THE COURT:  You watch the Daily Show and the
4  Colbert Report?
5          PROSPECTIVE JUROR:  Yeah, every once in a
6  while.
7          THE COURT:  The Colbert Report, I'm sorry.
8          PROSPECTIVE JUROR:  Yeah.  I mean, every once
9  in a while I think they're kind of funny.
10         THE COURT:  Right.  When you say "every once
11 in a while" does this mean you don't see them all?
12         PROSPECTIVE JUROR:  Yeah.  Like I said, a lot
13 of times I'm not wake that late.
14         THE COURT:  Do you recall seeing the
15 defendant in this case on any of those shows?
16         PROSPECTIVE JUROR:  Ah, not recen- -- no, I
17 can't.
18         THE COURT:  Since you have some interest in
19 the political process, I'm going to ask you a
20 question, a little different than I ask other
21 jurors.
22         PROSPECTIVE JUROR:  Okay.
23         THE COURT:  Suppose you heard all the
24 evidence in this case and you're in a position where
25 the evidence has persuaded you the government has

:05PM

:06PM

:06PM

:07PM

:07PM

Voir Dire                                    770

1 proved its case, but you decided, all things
2 considered, you like the defendant.  Would it be
3 difficult for you to decide that it is proven
4 whether you like the person, it doesn't make any
:07PM 5 difference?
6         PROSPECTIVE JUROR:  No, it wouldn't make any
7 difference to me.
8         THE COURT:  Okay, let's put it on the reverse
9 side.  The government's evidence comes up short, but
:07PM 10 you decide on the basis of what you hear in various
11 recordings that you really don't like the defendant.
12 Would the fact that you don't like the defendant
13 make it difficult for you to return a verdict of not
14 guilty if you thought the government hadn't proven
:08PM 15 its case?
16         PROSPECTIVE JUROR:  No, I would -- I honestly
17 believe that I would make my decision based on the
18 facts.
19         THE COURT:  Okay.  Thank you.
:08PM 20         PROSPECTIVE JUROR:  Thank you.
21     (Prospective juror exited the courtroom, and the
22      following proceedings were had herein:)
23     (Brief pause).
24         THE COURT:  We're going to take a break now
:08PM 25 because we have a new group.

Voir Dire                                    771

1      (Recess.)
2      (The following proceedings were had in the
3       presence of the prospective jurors in open
4       court:)
5          THE CLERK:  All rise.
6      (Opening of court.)
7          THE CLERK:  Please be seated.
8          THE COURT:  This is going to be a short
9  speech.  You're here today as prospective jurors.  I
10 want to tell why jury service matters, why it's
11 important.  The first reason it's important and a
12 reason it's often forgotten is that we fought a
13 revolution so you can sit here today.  The American
14 colonists went to courts where everything was
15 decided by the king's judges, there was no jury of
16 one's peers, and this was in fact one of the reasons
17 for the events of July 4, 1776.  Your presence in
18 this courtroom is a living symbol of the birth of
19 our nation.
20         Second, no country entrusts as much to juries
21 as this nation does.  The American way with jury
22 speaks to the world that we trust or citizens to
23 decide important cases, to do justice under law, and
24 juries who are selected at random from things like
25 voters lists.  Jury service demonstrates the faith

1  of democracy that we are competent to govern

2  ourselves.

3         Third, the faithful performance of jury duty

4  is crucial to the parties in this case.  If juries

5  were not symbolic of our revolution and the crucial

6  part of our democratic way of life, your work here

7  would still matter, and matter a great deal, and

8  that's because the people in this case have

9  submitted the decision of it to you.  Your verdict

10 is significant to them, it matters to them, it is

11 important to them, and they are entitled to the very

12 best effort you can give as jurors.

13        I also want to say to you that in this case,

14 a criminal case, the jury will have to decide

15 whether the government has proved its case.  You

16 will not be asked to decide whether you like or

17 dislike, approve or disapprove of the person accused

18 here, you'll be asked only to decide whether the

19 government has proved the charges against the

20 defendant beyond a reasonable doubt.

21        Now, I believe strongly in the value of your

22 service today.  In a moment, I'm going to ask you to

23 take an oath to tell the truth just as witnesses do,

24 and then I'm going to ask you some questions.  These

25 questions will, in fact, be based on the

1  questionnaires that you've already filled out,
2  although I'm going to go over each and every
3  question.  These questions aren't asked out of idle
4  curiosity.  What I'm trying to do, and what the
5  parties are trying to do, and what the questions and
6  answers will help us do is to pick out of those who
7  have been called the best possible jury to hear this
8  particular case.  Not all jurors are equally suited
9  to all cases, but that does not mean that if you are
10 not selected to sit on this jury, that you're unfit
11 to serve as a juror or even that you're unfit to
12 serve on this particular case, it means only the
13 Court and counsel have an opinion that some other
14 jurors might be better for this case.
15       When you are questioned by me, you'll be
16 questioned in the order of your numbers.  The
17 numbers themselves were picked by a randomizing
18 program in the court's computer.  So the order of
19 the name is basically, is random.
20       One last thing, in simplified terms, very
21 simplified terms, the indictment in this case
22 charges the defendant Rod Blagojevich with several
23 counts of committing, as governor of Illinois,
24 various criminal acts referred to in various ways as
25 bribery or extortion or attempted conspiracy, using

1   phones to commit some of these offenses including

2   securing campaign contributions in exchange for

3   certain acts.  The defendant, Rod Blagojevich, has

4   pled not guilty to each and every count.

5         With that, Mr. Walker, would you administer

6   the oath and escort the jury to the holding room.

7         THE CLERK:  Would each of the prospective

8   jurors please stand and raise your right hand.

9      (Prospective jurors sworn.)

10        THE CLERK:  Thank you.

11        You may exit out the rear door.

12        Juror number 191, please remain in the

13  courtroom.

14     (Prospective jurors exited the courtroom."

15     (Brief pause).

16        THE COURT:  Hello.

17        PROSPECTIVE JUROR:  Hello.

18        THE COURT:  Hello.  You're 191.

19        PROSPECTIVE JUROR:  Yes, I am.

20        THE COURT:  At least for a while.

21        What do you do for a living?

22        PROSPECTIVE JUROR:  What do I do for living?

23        THE COURT:  Yeah.

24        PROSPECTIVE JUROR:  I'm a dental assistant.

25        THE COURT:  And how long have you done that?

Voir Dire                                775

1          PROSPECTIVE JUROR:  I'd say close to 2 plus
2    years.  Two plus years.
3          THE COURT:  Okay.  What do you do before
4    that?
5          PROSPECTIVE JUROR:  I worked at a cafeteria
6    service for a school.
7          THE COURT:  And before that?
8          PROSPECTIVE JUROR:  I also worked as a lunch
9    playground room mom for a school, a couple of hours
10   a day.  Prior to that, I was just a mom.
11         THE COURT:  Were you actually called a lunch
12   lady?
13         PROSPECTIVE JUROR:  Yes.
14         THE COURT:  That was the title that was used?
15         PROSPECTIVE JUROR:  That was the title.
16         THE COURT:  What do you do as a dental
17   assistant?
18         PROSPECTIVE JUROR:  I assist the dentist in
19   all the procedures that's necessary with cleanings,
20   Crowns, extractions, any way I can assist.
21         THE COURT:  What does your husband do?
22         PROSPECTIVE JUROR:  He's a manager of a
23   restaurant.
24         THE COURT:  Is it his restaurant or --
25         PROSPECTIVE JUROR:  No, he's just an

:42PM

:43PM

:43PM

:43PM

:44PM

1   employee.  He's just the manager.

2          THE COURT:  You have three children, the

3   youngest is 17?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Two of them are in graduate

6   school and the youngest is a high school senior?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  You consulted a lawyer only for

9   things like real estate closing, estate stuff and

10  trusts, is that correct?

11         PROSPECTIVE JUROR:  That's correct.

12         THE COURT:  No other purpose?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Ever been in a courtroom before?

15         PROSPECTIVE JUROR:  Probably my senior year

16  of high school when I had a mock trial as a history

17  class.

18         THE COURT:  Okay.  Do you remember the

19  subject matter of that trial?

20         PROSPECTIVE JUROR:  It was a car accident.

21         THE COURT:  And what role did you play?

22         PROSPECTIVE JUROR:  I was on the defense.

23         THE COURT:  You were on the defense.

24         Was the result predetermined or --

25         PROSPECTIVE JUROR:  The judge serving on the

1  case was just -- yeah, the result was predetermined

2  and it was just for a grade.  It wasn't for

3  anything --

4           THE COURT:  Do you belong to anything, any of

5  kind of group, union, church, charitable society, do

6  you belong to anything?

7           PROSPECTIVE JUROR:  I belong to St. Spyridon,

8  Greek Orthodox church.

9           THE COURT:  Have you worked there before or

10 donated money, done stuff like this?

11          PROSPECTIVE JUROR:  I volunteered my services

12 as a PTA vice president for a good 8 years, they

13 have a Greek school there, and I volunteer my

14 services on a weekly basis.

15          THE COURT:  PTA, was that a lot of work or a

16 little work?

17          PROSPECTIVE JUROR:  I have three children, so

18 while they attended preschool I was doing the PTA

19 vice president.  Did a fairly good amount of work.

20          THE COURT:  What kind of work?

21          PROSPECTIVE JUROR:  Raised money,

22 fundraisers, we tried to buy classroom materials for

23 the kids, desks supplies, we built a stage for their

24 performances.

25          THE COURT:  Okay.  You indicate that, at

Voir Dire                                                    778

1    least at the present time, you have an opinion that
2    politicians aren't doing a particularly good job, is
3    that true?
4              PROSPECTIVE JUROR:  Do you want a yes or a no
5    answer?
6              THE COURT:  Yeah.
7              PROSPECTIVE JUROR:  Yes.
8              THE COURT:  Okay.  But you also said that
9    that's not directed at any particular person?
10             PROSPECTIVE JUROR:  Correct.
11             THE COURT:  Because you're not going to be
12   asked to judge here, when you're on the jury,
13   politicians, in general, or a lot of politicians,
14   you're going to be asked to judge only one of them.
15             PROSPECTIVE JUROR:  Right.
16             THE COURT:  And you're also not going to be
17   asked to judge what kind of politician they've been,
18   as a whole.  You're just going to be asked to judge
19   whether the government has proven that the
20   particular politician who is a defendant here
21   committed certain federal offenses, certain specific
22   acts that they claim violated the law, and they have
23   to prove that.  That's the only decision you're
24   dealing with, is whether the case has been proved
25   against this defendant, do you understand that?

:46PM
:46PM
:47PM
:47PM
:47PM

Voir Dire                                      779

1        PROSPECTIVE JUROR:  Yes, I do.
2        THE COURT:  Okay.  Hobbies?  Now that you
3   don't have the PTA, what are your hobbies?
4        PROSPECTIVE JUROR:  I enjoy spending time
5   with my family, cooking, exercise.
6        THE COURT:  Where do you get your news from?
7        PROSPECTIVE JUROR:  The very little bit that
8   I do have time for could be the 10:00 o'clock news
9   on TV, or if I'm driving to work in the morning for
10  the dentist it could be News Radio 78.  Very
11  sparingly, I might check out the news if I'm looking
12  for something specific on the Internet.
13       THE COURT:  Okay.  But you are not a person
14  who, like, has to visit several websites every day
15  to see what's up?
16       PROSPECTIVE JUROR:  I don't have time.
17       THE COURT:  Okay.  If you did have time,
18  would you do it?
19       PROSPECTIVE JUROR:  Ah --
20       THE COURT:  Or are you not interested?  Or
21  not that interested, I think is the correct phrase.
22       PROSPECTIVE JUROR:  I think that several
23  issues I would be interested in as far as for the
24  catastrophes and, you know, earthquakes that have
25  happened around the world, I would be interested in

 1   that, but not necessarily on every detail of the
 2   news.
 3          THE COURT:  Now, you heard about this case
 4   before?
 5          PROSPECTIVE JUROR:  I'm sure.  Everyone has.
 6          THE COURT:  And you saw some stuff about it
 7   on television?
 8          PROSPECTIVE JUROR:  A little bit.
 9          THE COURT:  And you read some stuff about it
10   in the papers?
11          PROSPECTIVE JUROR:  Maybe some headlines.
12          THE COURT:  Okay.  The rule that applies here
13   is that you have to decide this case just based on
14   the evidence hear in this courtroom, that stuff from
15   the witness stand, you can't decide it at all on the
16   basis of anything you heard about or read about
17   outside the courtroom, do you understand that?
18          PROSPECTIVE JUROR:  I understand that.
19          THE COURT:  Now, sometimes that's a mental --
20   sometimes, for some people, that's mentally
21   difficult to do, because they think that the rule is
22   is that you have to somehow forget what you heard or
23   read or that you have to erase it from your mind,
24   that's not the instruction we give you.  The
25   instruction is, if you remember something about the

Voir Dire                                                781

1  case before, we actually want you to be able to
2  remember that you heard about it before, because we
3  then want you, when you weigh the evidence,
4  deliberately keep it off the scales.
5          PROSPECTIVE JUROR:  I understand.
6          THE COURT:  That all you do when you weigh
7  the evidence is you weigh the evidence you heard in
8  the courtroom, not on anything you heard or read
9  anywhere else.  Now, I know you understand that,
10 would you do that?
11         PROSPECTIVE JUROR:  I believe I could do
12 that.
13         THE COURT:  You wrote a comment about not
14 understanding a question, which was your ability to
15 follow the law, and you're really not the only one
16 who didn't understand this question.  What it means
17 is, that at the end of the case I give you
18 instructions on the law, I define what the law is,
19 and I actually read them to you, and the jury
20 actually gets them at the end of the case.  But what
21 I sometimes say is there are times when I'm reading
22 these transactions, even myself, and sometimes a
23 juror, believes that maybe the law is wrong, or
24 foolish, or an unwise law.
25         PROSPECTIVE JUROR:  Oh ...

Voir Dire                                                782

1          THE COURT:  And sometimes, in all honesty, I

2   think the same thing.  But the trial judges, and

3   that's what I am, and the jurors are bound by the

4   rule which says we have to follow the law as defined

5   by the higher courts and by the Congress of the

6   United States.  So when we ask you the question,

7   will you follow the law even if you disagree with

8   it, we mean that literally; that is, we know what

9   the law is, we also know that you might possibly

10  disagree with it as a matter of policy, but the rule

11  is you still have to follow it as part of your duty,

12  will you do that?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  With respect to the family issues

15  that you raised at the very end, what precisely is

16  the plan with respect to the family stuff?

17          PROSPECTIVE JUROR:  My son, who is a senior

18  in high school, is graduating from high school,

19  Thursday May 26th.  My father's condition has

20  improved.  He had angioplasty done on the 17th of

21  April, I believe, and his condition is doing much

22  better.  My son will be attending college, Loyola

23  University, in August, so I basically just have to

24  help him get ready for that.

25          THE COURT:  Am I correct in concluding that

Voir Dire                                          783

1  what you're concerned about is not so much what is
2  going to happen, and not so much the proposition
3  that you can't really serve during this period of
4  time, but I think what you're saying to me is some
5  things could happen, somebody could get sick, things
6  could go in the way that you don't expect now, and,
7  under those circumstances, you'd be unable to serve
8  at all, is that what you're telling me or is it
9  something different?
10          PROSPECTIVE JUROR:  With all honesty, Your
11  Honor, my father's health was an issue.  He is
12  improving, I cannot deny that.
13          THE COURT:  Right.
14          PROSPECTIVE JUROR:  That was the biggest
15  possibility of something that might happen.  So I'm
16  being honest with you.
17          THE COURT:  Right.
18          PROSPECTIVE JUROR:  He's stable.  He's fine.
19          THE COURT:  He's fine.
20          PROSPECTIVE JUROR:  Right, he's fine.
21          THE COURT:  Okay.  I can consider that, but I
22  just wanted to make sure what it is exactly what the
23  problem was.
24          Thank you.
25     (Prospective juror exited the courtroom, and the

```
                              Voir Dire                      784
```

```
 1        following proceedings were had herein:)
 2        (Brief pause).
 3        (Prospective juror entered the courtroom, and
 4         the following proceedings were had herein:)
 5            THE COURT:  You are number 192?
 6            PROSPECTIVE JUROR:  Yes, sir.
 7            THE COURT:  192.
 8            What do you do for a living?
 9            PROSPECTIVE JUROR:  Manufacturing, make
10  aerosol cans.
11            THE COURT:  How long have you been doing
12  that?
13            PROSPECTIVE JUROR:  Since '07.
14            THE COURT:  And is that basically what you've
15  been doing for this one employer, making aerosol
16  cans?
17            PROSPECTIVE JUROR:  Yes.
18            THE COURT:  What did you do before that?
19            PROSPECTIVE JUROR:  I was in a skill factory,
20  we did coil coating.
21            THE COURT:  What did you do there?
22            PROSPECTIVE JUROR:  We painted steel coils.
23            THE COURT:  Okay.  How long did you work
24  there?
25            PROSPECTIVE JUROR:  I was there from May of
```

:55PM
:55PM
:55PM
:56PM
:56PM

Voir Dire                                      785

1  '98 to '07.
2        THE COURT:  And how come you left that one?
3        PROSPECTIVE JUROR:  They got bought out and
4  closed.
5        THE COURT:  So you got laid off?
6        PROSPECTIVE JUROR:  Basically, yes.
7        THE COURT:  How long did you wait between
8  that job and the new job you have?
9        PROSPECTIVE JUROR:  I found it right away.
10       THE COURT:  Right away.
11       PROSPECTIVE JUROR:  Yeah.
12       THE COURT:  What does your wife do?
13       PROSPECTIVE JUROR:  My wife is a medical
14 biller.
15       THE COURT:  How long has she been doing that?
16       PROSPECTIVE JUROR:  Pretty much since I've
17 known her, so 10 years.
18       THE COURT:  You have three kids.
19       PROSPECTIVE JUROR:  Yes, I do.
20       THE COURT:  5 to 1?
21       PROSPECTIVE JUROR:  5 to 1.
22       THE COURT:  You have a brother in real
23 estate, a brother-in-law working at a prison jail or
24 probation, and a wife's cousin who's a police
25 officer?

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  Are any of these people

3  particularly close to you?

4        PROSPECTIVE JUROR:  Well, my brother.

5        THE COURT:  I mean, the question is, do you

6  see him often?

7        PROSPECTIVE JUROR:  Yes, I do.

8        THE COURT:  Okay.  Somebody in your family

9  was a victim of a robbery?

10        PROSPECTIVE JUROR:  Yes.

11        THE COURT:  Who was that?

12        PROSPECTIVE JUROR:  My grandma.

13        THE COURT:  Was that recently or a long time

14  ago?

15        PROSPECTIVE JUROR:  I would say 12 years ago.

16        THE COURT:  Okay.  Your primary leisure

17  activity is playing with your three young children?

18        PROSPECTIVE JUROR:  Yeah; basically it.  1, 2

19  and 5, they run me crazy.

20        THE COURT:  Well, it's not necessarily an

21  activity that you have a choice about whether to do

22  or not do.

23        Where do you get your news from?

24        PROSPECTIVE JUROR:  Probably mostly Internet.

25        THE COURT:  Do you see a lot of news, look at

Voir Dire                                              787

1  a lot of news?

2        PROSPECTIVE JUROR:  Mostly follow sports.

3        THE COURT:  Okay.  You heard something or

4  read something about this case, is that right?

5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  Do you remember a lot of details?

7        PROSPECTIVE JUROR:  Not really, because I

8  don't -- I don't believe everything I read.

9        THE COURT:  Okay.  What the rule is is that

10 you're supposed to decide this case on the basis of

11 the evidence you hear in court, basically it comes

12 from the witness stand.  In fact, it's not

13 everything you hear in court, it's only certain

14 things you hear in court.  What's important is is

15 that rule is followed, that you decide it only on

16 what you hear in court.  The problem sometimes comes

17 because, particularly in this case and others like

18 it, you may have heard or read something about it

19 before you ever got to the Court, and even if you

20 don't remember it now, it might be that as you hear

21 the testimony you'll remember that you read a

22 newspaper article about it.  And there's nothing

23 wrong with that.  The only thing is is that we want

24 to make sure that you're able to put any memories

25 you have of what you learned in the past to one side

Voir Dire                                    788

1  and when it comes to weighing the evidence, when you
2  put it on the scales, as people sometimes say, the
3  only evidence you put on the sales is that which you
4  heard in the courtroom and you just ignore anything
5  you remember you might have heard outside the
6  courtroom, could you do that?
7          PROSPECTIVE JUROR:  Yes, I could.
8          THE COURT:  Would you do that?
9          PROSPECTIVE JUROR:  Yes, I will.
10         THE COURT:  Thank you.
11     (Prospective juror exited the courtroom, and the
12      following proceedings were had herein:)
13     (Brief pause).
14     (Prospective juror entered the courtroom, and
15      the following proceedings were had herein:)
16         THE COURT:  You're number 193?
17         PROSPECTIVE JUROR:  Yes.
18         THE COURT:  I take it, I might be wrong about
19  this, but I take it, based on what you do for a
20  living, this is not your first time in a courthouse?
21         PROSPECTIVE JUROR:  You're correct.
22         THE COURT:  Do you have any idea how much of
23  the case law in -- is it Kane County?
24         PROSPECTIVE JUROR:  Kane County, yes.
25         THE COURT:  How much of the case law within

:00PM
:01PM
:01PM
:02PM
:02PM

Voir Dire                                      789

 1   Kane County winds up in arbitration?
 2          PROSPECTIVE JUROR:  Oh, you know, that I am
 3   not sure of.
 4          THE COURT:  Okay.
 5          PROSPECTIVE JUROR:  Yeah, I'm not sure what
 6   the percentage is.
 7          THE COURT:  And what you do is schedule
 8   arbitrations and assign arbitrators to each case?
 9          PROSPECTIVE JUROR:  Yes.
10          THE COURT:  Are these single arbitrator cases
11   or multiple arbitrators?
12          PROSPECTIVE JUROR:  Multiple.
13          THE COURT:  Usually 3.
14          PROSPECTIVE JUROR:  3.
15          THE COURT:  Any particular kind of case get
16   arbitrated more than any others?
17          PROSPECTIVE JUROR:  Well, up until about
18   6 months ago I'd say 90 percent were car accidents,
19   insurance companies.
20          THE COURT:  Right.
21          PROSPECTIVE JUROR:  But it's changed now.
22   There's a lot of credit card debt, a lot of that
23   now, and contract cases.
24          THE COURT:  And this is arbitration that's
25   offered as part of the program?

1          PROSPECTIVE JUROR:  It's mandatory for cases
2  between 10,000 and 50,000 dollars.
3          THE COURT:  Okay.  And your husband is now
4  retired?
5          PROSPECTIVE JUROR:  Yes.
6          THE COURT:  But he worked in the pressroom of
7  a local newspaper?
8          PROSPECTIVE JUROR: Yes.
9          THE COURT:  What is he doing with his time
10  these days?
11          PROSPECTIVE JUROR:  Nothing.  He worked for
12  43 years, he's enjoying doing nothing.
13          THE COURT:  You have two children who
14  graduated college?
15          PROSPECTIVE JUROR:  Yes.
16          THE COURT:  Are you paid by the state or the
17  county?
18          PROSPECTIVE JUROR:  State.
19          THE COURT:  Who was in the Army?
20          PROSPECTIVE JUROR:  My husband.
21          THE COURT:  And he served in Vietnam?
22          PROSPECTIVE JUROR:  Yes.
23          THE COURT:  Do you know -- oh, you answered
24  this question.
25          Only seen a lawyer to have a will done?

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  What did your husband do in the

3  pressroom?

4      PROSPECTIVE JUROR:  He was the pressroom

5  supervisor.  He worked his way up to that position.

6      THE COURT:  Right.

7      PROSPECTIVE JUROR:  And that's what he did

8  the last 10 years, but he always worked in the

9  pressroom.

10      THE COURT:  Okay.  And what did he start

11  doing in the pressroom when he first started there?

12      PROSPECTIVE JUROR:  Cleaned the press, got

13  the presses ready to actually do the paper.

14      THE COURT:  You have broken the record for

15  the largest number of any juror asking the question,

16  "how many attorneys, if any, have you known fairly

17  well."

18      PROSPECTIVE JUROR:  You know, that's probably

19  a low count on my part.  It's probably more than

20  that, because that's who I deal with.

21      THE COURT:  Well, if you went down by 90

22  percent, you'd still be the leader.  350 is a lot.

23      You were asked -- I mean, we did this

24  deliberately, we're not trying to tell you that we

25  wanted a legally correct answer, we just wanted what

1  your thought is, a series of three questions:
2      "Do you have strong opinions positive or
3       negative about politics."
4          And you said."
5      "I think it's obvious that Illinois governors in
6       the past have been very crooked."
7          You have no opinion on whether public
8  officials consider their own personal financial
9  interest in the course of making official decisions,
10 but you do believe that:
11     "... public officials make official decisions to
12      say benefit contributors in exchange for
13      campaign contributions."
14     And what you said is:
15     "... I don't like it but feel it is part of
16      being a politician."
17         And you're entitled to have all of those
18 views, but what you have to do if you're a juror,
19 what you'll be asked to do if you're a juror is not
20 to express any views on whether taking campaign
21 money in exchange for a vote, say, is illegal, but
22 there are certain specific charges made against this
23 defendant and what you're going to be asked to do is
24 whether this defendant, not politicians as a whole,
25 not other governors, whether this defendant violated

1  specific laws and whether the government has proved

2  this beyond a reasonable doubt, that's the question

3  you're going to be asked to decide.  Do you think

4  you can decide that question and only that request?

5          PROSPECTIVE JUROR:  I think I could listen to

6  the entire trial and -- and be open-minded.  I think

7  it would be interesting to hear both sides.

8          THE COURT:  It's also important that you

9  understand that the issue is whether it's proved

10 that this defendant committed these offenses beyond

11 a reasonable doubt, and it's the only question

12 you'll be asked.  You will not be able to consider

13 as an issue whether other people have done the same

14 thing and maybe not been charged or got away with

15 it.  The only question you're going to be asked to

16 decide, the only thing you should focus on is

17 whether the defendant in this particular case was

18 proven to have done what the government said he did,

19 and that's it, you limit yourself to that one?

20         PROSPECTIVE JUROR:  Sure.

21         THE COURT:  Hobbies, things you do?

22         PROSPECTIVE JUROR:  I read.

23         THE COURT:  Read novels?

24         PROSPECTIVE JUROR:  Novels.  I like to play

25 cards, I belong to several different card clubs.

1            THE COURT:  And it says you enjoy gardening.

2            PROSPECTIVE JUROR:  Yes, I like my flowers.

3            THE COURT:  So you play poker and gin?

4            PROSPECTIVE JUROR:  And bridge.

5            THE COURT:  And bridge.

6            And I don't want to ask you what you play

7    for, I actually would like to know, but I'm not

8    going to ask you.

9            You said your most important source of news

10   is the internal?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  And how do you get your news on

13   the Internet?

14           PROSPECTIVE JUROR:  Just sign in home page,

15   the Yahoo home page.

16           THE COURT:  And you, like, sit down at the

17   same time every day and go through your list of

18   favorite news media?

19           PROSPECTIVE JUROR:  You know what, I look at

20   the obituaries and the headlines.

21           THE COURT:  The reason I ask is, I want to

22   know if you're somebody who looks at a large daily

23   dose of news.

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  You have heard something about

1  this case?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  You read about and you heard

4  about it?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And you know, according to this,

7  a lot of people think he's guilty?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And, in fact, it says from what

10 you heard, "I think he's guilty of trying to sell a

11 position," that's what you think.  My question for

12 you is -- first of all, I will tell you, you're

13 entitled to think that, but what you're not entitled

14 to do is to keep that opinion once the trial starts.

15 You have to set that opinion aside.  You're not

16 going to forget that you thought that, but you have

17 to start out with a clean piece of paper, and what

18 fills that piece of paper for you to decide on is

19 the evidence you hear from the witness stand, and

20 the question is, will you be able to put your

21 opinion from what you've heard off to the side?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.  You were asked if you have

24 personal, religious, philosophical or other beliefs

25 that will make it difficult for you to sit in

1   judgment on another and you said:
2       "... yes, personally I feel no human has the
3        right to judge another."
4            We're not actually dealing with rights here,
5   we're dealing with people's duties as a citizen, and
6   the constitution, as long as there's a jury trial,
7   says that part of your duty as a citizen is to enter
8   these judgments.  Nobody claims that they're
9   infallible, nobody thinks that the jury is like God,
10  but a citizen does have a duty to decide a case if
11  they get selected for a jury and deciding a case
12  means that they're making a judgment about somebody.
13  And, in many cases, they are not even making a
14  judgment about somebody, they're making a judgment
15  on the evidence.  Now, if you understand it that
16  way, do you have any difficulty assuming that duty
17  as a citizen?
18            PROSPECTIVE JUROR:  No.
19            THE COURT:  You are concerned that if the
20  trial were to last a certain period of time you
21  would worry about the efficiency of the arbitration
22  system in Kane County, is that right?
23            PROSPECTIVE JUROR:  I was --
24            THE COURT:  Because you're it?
25            PROSPECTIVE JUROR:  Yes; right.  And I was

1    very concerned about that until I realized that
2    Fridays would be a day that I would still be at
3    work.
4              THE COURT:  So that's not a big issue for you
5    now?
6              PROSPECTIVE JUROR:  You know, I even have a
7    documentation that I was asked to bring if that was
8    going to be a problem from one of my supervisors,
9    but after being here last week, that one day, the
10   girl that did fill in for me did a very good job and
11   I don't think it would be that big of a hardship.
12             THE COURT:  We have found, this is not true
13   of everybody, we have found in cases like this that
14   lasts for a significant period of time, if the juror
15   has at least one day a week they don't clean up any
16   backlogs but they can take care of the current
17   stuff.
18             PROSPECTIVE JUROR:  Right.
19             THE COURT:  And this is particularly true
20   because during the down time, we don't lock jurors
21   up anymore, so they have telephones, they have
22   computers, and we've had people who actually
23   succeeded running a business while being on a jury
24   four days a week.  So I'm glad you found that out.
25   Thanks.

Voir Dire                                    798

1      (Prospective juror exited the courtroom, and the
2       following proceedings were had herein:)
3      (Brief pause).
4      (Prospective juror entered the courtroom, and
5       the following proceedings were had herein:)
6          THE COURT:  You are 194?
7          PROSPECTIVE JUROR:  I am.
8          THE COURT:  And now you have a microphone in
9  your hand.
10         PROSPECTIVE JUROR:  Yes.
11         THE COURT:  Good.  What do you do for a
12 living?
13         PROSPECTIVE JUROR:  I'm a secretary for an
14 insurance company.
15         THE COURT:  And how long have you done that
16 job?
17         PROSPECTIVE JUROR:  29 years.
18         THE COURT:  It says here that you assist
19 claim representatives and team managers in the claim
20 office.
21         PROSPECTIVE JUROR:  Yes.
22         THE COURT:  Has that been basically the same
23 work for all 29 years?
24         PROSPECTIVE JUROR:  Yes.
25         THE COURT:  Do you like that work?

:15PM
:16PM
:16PM
:16PM
:16PM

Voir Dire                                    799

1        PROSPECTIVE JUROR:  It's okay.

2        THE COURT:  You have two children, 19 and 20,

3    two daughters.

4        PROSPECTIVE JUROR:  Two daughters.  I'm a

5    single mom.

6        THE COURT:  Did you have a job before your

7    current one?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  What kind of work did you do?

10       PROSPECTIVE JUROR:  I worked for an

11   advertising agency downtown.

12       THE COURT:  And what did you do for them?

13       PROSPECTIVE JUROR:  Secretary.

14       THE COURT:  You had a lawyer for the divorce,

15   nothing else?

16       PROSPECTIVE JUROR:  That's all.

17       THE COURT:  Was the divorce contested or was

18   it agreed to?

19       PROSPECTIVE JUROR:  It was contested.

20       THE COURT:  Did you have to go to court?

21       PROSPECTIVE JUROR:  Yes; it was in Will

22   County.

23       THE COURT:  Did you have to go to court

24   often?

25       PROSPECTIVE JUROR:  I think I went twice.

1    THE COURT:  Did you have to testify?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  Once?

4    PROSPECTIVE JUROR:  Just once.

5    THE COURT:  Okay.  What was your experience

6  testifying like?

7    PROSPECTIVE JUROR:  Nervous.

8    THE COURT:  Okay.  I really don't know too

9  many people who testify who don't say they're

10 nervious.

11   You served on a jury.

12   PROSPECTIVE JUROR:  I did.

13   THE COURT:  And did the jury reached a

14 verdict?

15   PROSPECTIVE JUROR:  Uh-huh.

16   THE COURT:  This was a stabbing, criminal

17 case?

18   PROSPECTIVE JUROR:  Yes.  Yes.

19   THE COURT:  How long ago was that?  Oh, you

20 said 2007.

21   PROSPECTIVE JUROR:  2007 or '08.

22   THE COURT:  You have hobbies that you like to

23 do.

24   PROSPECTIVE JUROR:  Not really.

25   THE COURT:  Have you ever had them?

Voir Dire                                    801

1          PROSPECTIVE JUROR:  No.  I have kids; they
2     keep me busy.
3          THE COURT:  They're your hobby?
4          PROSPECTIVE JUROR:  They're my hobby.
5          THE COURT:  Do you read the news a lot, spend
6     a lot of time for news?
7          PROSPECTIVE JUROR:  No, not a lot.
8          THE COURT:  Where do you get news from?
9          PROSPECTIVE JUROR:  Newspaper, magazines, the
10    Internet.
11         THE COURT:  In a given day, how much time do
12    you spend with the news?
13         PROSPECTIVE JUROR:  About half hour.
14         THE COURT:  And if you missed the news for a
15    day or two, do you get withdrawal symptoms?
16         PROSPECTIVE JUROR:  No. Not at all.
17         THE COURT:  What you're sitting there now,
18    you say you believe the defendant is guilty?
19         PROSPECTIVE JUROR:  Uh-huh.
20         THE COURT:  And that's based on what you
21    heard and read?
22         PROSPECTIVE JUROR:  Exactly.
23         THE COURT:  If you sit on a jury, you're
24    supposed to disregard everything you heard and
25    read --

Voir Dire                                      802

1          PROSPECTIVE JUROR:  Right.

2          THE COURT:  -- and decide the case solely on

3    the basis of the evidence in the courtroom, you

4    could come to the same conclusion but you're only

5    supposed to consider what's --

6          PROSPECTIVE JUROR:  What's presented, I

7    understand.

8          THE COURT:  Do you think you could do that?

9          PROSPECTIVE JUROR:  I will try.

10         THE COURT:  You also say you don't feel

11   comfortable judging anyone.  For many people, it's

12   like testifying in court, it might work out fine but

13   you're nervous, and that stands for judging people

14   as a juror.

15         PROSPECTIVE JUROR:  Correct.

16         THE COURT:  And the question is not whether

17   you feel comfortable, the question is whether you

18   could do it fairly.

19         PROSPECTIVE JUROR:  I would do my best.

20         THE COURT:  Okay.  You provide caretaking

21   duties to your mother, is that correct?

22         PROSPECTIVE JUROR:  Right.  Right.

23         THE COURT:  What does that involve?

24         PROSPECTIVE JUROR:  Well, I spend the night

25   with her a couple of nights a week, stop after work

1 and see her for a couple of hours.

2          THE COURT:  So you see her every day?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And what time would that be?

5          PROSPECTIVE JUROR:  What time do I leave?

6          THE COURT:  Would you see her.

7          PROSPECTIVE JUROR:  Oh, after work.

8          THE COURT:  Okay, which would be about?

9          PROSPECTIVE JUROR:  I work until 4:30, a half

10 our to get there.  So a couple of hours, 7:00

11 o'clock, 8:00 o'clock.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR:  And then one night a week

14 I spend with her.

15          THE COURT:  What did you just say?

16          PROSPECTIVE JUROR:  One night a week I spend

17 the night, Thursday nights.

18          THE COURT:  Okay.  And your principal concern

19 is that serving on this jury would be no difficulty,

20 you just want to be geographically close.

21          PROSPECTIVE JUROR:  Correct.

22          THE COURT:  And how long does it take you to

23 get from your job and to your mother's?

24          PROSPECTIVE JUROR:  It takes me a half hour

25 to get to work.

Voir Dire                                                      804

1          THE COURT:  Where does your mother live in
2    relation to where you live?
3          PROSPECTIVE JUROR:  About five minutes from
4    me.
5          THE COURT:  Sort distance.
6          PROSPECTIVE JUROR:  Yes, she's close by.
7          THE COURT:  I will take this into
8    consideration.
9          PROSPECTIVE JUROR:  Okay.
10         THE COURT:  Part of it depends on what I need
11   for this case.  But it's a reasonable point and it's
12   possible we will try to honor your request.
13         PROSPECTIVE JUROR:  Okay.  I appreciate it.
14         THE COURT:  Thank you.
15       (Prospective juror exited the courtroom, and the
16        following proceedings were had herein:)
17       (Brief pause).
18         THE COURT:  195 is a no-show.
19
20       (Prospective juror entered the courtroom, and
21        the following proceedings were had herein:)
22         THE COURT:  You're 196?
23         PROSPECTIVE JUROR:  Yes.
24         THE COURT:  You have a Master's Degree?
25         PROSPECTIVE JUROR:  Yes.

:22PM
:22PM
:23PM
:23PM
:23PM

1        THE COURT:  And your Master's Degree was in
2  occupational therapy?
3        PROSPECTIVE JUROR:  It's Master's of Science
4  in Occupational Therapy, yeah.
5        THE COURT:  And, in fact, you are an
6  occupational therapist?
7        PROSPECTIVE JUROR:  Yes.
8        THE COURT:  How long have you been doing that
9  work?
10        PROSPECTIVE JUROR:  A little over a year.  A
11  year and, like, 3 months.
12        THE COURT:  And when did you get your degree?
13        PROSPECTIVE JUROR:  November 2009.
14        THE COURT:  And how soon after that did you
15  start being an occupational therapist?
16        PROSPECTIVE JUROR:  I had to sit for my exam
17  to get certified and I started my job February 1st.
18        THE COURT:  So it wasn't a long interval?
19        PROSPECTIVE JUROR:  No.
20        THE COURT:  What kind of work, basically, do
21  you do?  Do you have any kind of particular
22  specialty or do you do the whole range?
23        PROSPECTIVE JUROR:  My job is unique because
24  I work with both adults and kids, my days are split
25  in half.  In the mornings I work with adults in the

:24PM
:24PM
:24PM
:24PM
:25PM

1 hospital on all the different units, and then in the
2 afternoons I work with children with disabilities,
3 it's an outpatient setting, and they come in as
4 one-on-one treatment sessions.
5         THE COURT:  On the average, how long does the
6 session last?
7         PROSPECTIVE JUROR:  For the children?
8         THE COURT:  Yeah, for anybody.
9         PROSPECTIVE JUROR:  For an hour, yeah.
10         THE COURT:  Okay.  What other work did you
11 do, particular work you did while you were in
12 school?
13         PROSPECTIVE JUROR:  I was a waitress
14 part-time while I was in grad school.
15         THE COURT:  Anything else?
16         PROSPECTIVE JUROR:  No.  It was full-time
17 schooling, so I didn't have a lot of extra time.
18         THE COURT:  Your parents work for the Postel
19 Service?
20         PROSPECTIVE JUROR:  Yes.
21         THE COURT:  Do they still work for them?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  And you worked as a casual
24 carrier?
25         PROSPECTIVE JUROR:  For summers, for three

1  months, yes.

2         THE COURT:  As do, roughly, 90 percent of

3  children of postal workers.

4         PROSPECTIVE JUROR:  It's a good job.

5         THE COURT:  You have an uncle who was

6  arrested or convicted for DUI?

7         PROSPECTIVE JUROR:  Yes.

8         THE COURT:  Somebody close to you?

9         PROSPECTIVE JUROR:  Kinda.  He's my uncle, I

10 see him on holidays.

11        THE COURT:  Right.  Now, did this happen a

12 long time?

13        PROSPECTIVE JUROR:  Yeah.

14        THE COURT:  I just want --

15        PROSPECTIVE JUROR:  I don't even remember

16 when it happened.

17        THE COURT:  To put it in plain terms, I just

18 want to know if this is a big thing in your life or

19 not.

20        PROSPECTIVE JUROR:  No, I don't even remember

21 it happening.

22        THE COURT:  All right.  You were asked about

23 experience involving the police our law enforcement

24 agencies, which basically means did you ever have to

25 talk them, and you listed car vandalized and fight

1  at a party.  Does this mean that you talked to the
2  police about these things?
3          PROSPECTIVE JUROR:  I had my car vandalized
4  and --
5          THE COURT:  You reported it?
6          PROSPECTIVE JUROR:  I'm sorry?
7          THE COURT:  And you reported it to the
8  police.
9          PROSPECTIVE JUROR:  Yeah.  Uh-huh.
10          THE COURT:  And what was the fight at the
11  party?
12          PROSPECTIVE JUROR:  I had people over at my
13  house and two got in a fight, so the police were
14  called and I had to explain the story to them.
15          THE COURT:  Hobbies, stuff you do --
16          PROSPECTIVE JUROR:  I like --
17          THE COURT:  -- for fun?
18          PROSPECTIVE JUROR:  Friends, family, I play
19  on a coed softball team, go to the movies, go to
20  concerts.
21          THE COURT:  How often do you play on the
22  softball team?
23          PROSPECTIVE JUROR:  It's on Sundays during
24  the summer.
25          THE COURT:  Is this very serious?

Voir Dire                                              809

1          PROSPECTIVE JUROR:  No, it's for fun.
2          THE COURT:  And in talking about reading
3  books, basically what I read is you read books that
4  relate to your job?
5          PROSPECTIVE JUROR:  Yeah, since I'm new to
6  the field and --
7          THE COURT:  You want to learn more.
8          PROSPECTIVE JUROR:  Yeah; I don't have a lot
9  of extra time to do reading.
10         THE COURT:  Where do you get your news from?
11         PROSPECTIVE JUROR:  I don't watch the news a
12 lot.  Occasionally, I'll watch the news on TV before
13 I go to bed.  That's pretty much the extent of it.
14 I don't really read the newspaper.
15         THE COURT:  You did say you use the Internet.
16         PROSPECTIVE JUROR:  Yeah, Yahoo, Google.
17         THE COURT:  My question to you is, are you
18 the kind of person who sits down every day --
19         PROSPECTIVE JUROR:  No.
20         THE COURT:  -- opens the Internet and reads
21 at least some of the news, because if you don't read
22 the news every day you'll feel that something
23 crucial is missing from your life, do you fall in
24 that class?
25         PROSPECTIVE JUROR:  No.

Voir Dire                                    810

1          THE COURT:  Okay.  And I take it you didn't
2  follow this trial much?
3          PROSPECTIVE JUROR:  No.
4          THE COURT:  But you followed it a little?
5          PROSPECTIVE JUROR:  Very, very little.
6          THE COURT:  Right.  And you have some
7  memories of what the case was about?
8          PROSPECTIVE JUROR:  Very little, yeah.
9          THE COURT:  Okay.  And that part is good,
10 because we ask you to decide cases as a juror based
11 on the evidence you hear in court and only the
12 evidence you hear in court, and the less you
13 remember about it the better it is because it's
14 easier to focus that way.  But it's possible that
15 when you hear this evidence, you might start
16 remembering stuff you read before that will remind
17 you, and it's important when that happens that when
18 you weigh the evidence, that you keep stuff that you
19 remembered from the past, stuff that you've been
20 reminded of from the past, you keep that out of your
21 weighing of the evidence.  As we sometimes say, when
22 you use the scales of justice to weigh evidence, you
23 leave the stuff you didn't hear in the courtroom off
24 the scales; do you understand what I'm talking
25 about?

Voir Dire                                          811

1        PROSPECTIVE JUROR:  Uh-huh.  Yeah.

2        THE COURT:  Would you do that?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Could you do that?

:30PM    5        PROSPECTIVE JUROR:  Yes.

6        THE COURT:  Thanks.

7      (Prospective juror exited the courtroom, and the

8       following proceedings were had herein:)

9      (Brief pause).

:30PM    10     (Prospective juror entered the courtroom, and

11      the following proceedings were had herein:)

12        THE COURT:  Hi.  Have a seat.

13        You're 197?

14        PROSPECTIVE JUROR:  Yes.

:31PM    15        THE COURT:  197.  You're a college graduate?

16        PROSPECTIVE JUROR:  Yes, sir.

17        THE COURT:  Your major is criminal justice?

18        PROSPECTIVE JUROR:  Yes.

19        THE COURT:  What's your current employment?

:31PM    20        PROSPECTIVE JUROR:  I work for Loyola

21  University Hospital.

22        THE COURT:  And how long have you worked for

23  them?

24        PROSPECTIVE JUROR:  Between, like, 6 and

:32PM    25  7 years.

 1          THE COURT:  Okay.

 2          PROSPECTIVE JUROR:  I worked there when I was

 3  in high school, too.

 4          THE COURT:  Okay.  And which Loyola, what's

 5  the location of the hospital you work at?

 6          PROSPECTIVE JUROR:  It used to be in Maywood,

 7  but the department that I worked for transferred out

 8  to Westchester.

 9          THE COURT:  Okay.  And you deal with billing?

10          PROSPECTIVE JUROR:  Correct.

11          THE COURT:  Any other work you do?

12          PROSPECTIVE JUROR:  Construction part-time,

13  usually in the summer.

14          THE COURT:  Do you have any particular skill

15  for that one?

16          PROSPECTIVE JUROR:  I do not.

17          THE COURT:  Somebody you worked for for a

18  while?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And they call you when they need

21  you?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  You were asked if a family member

24  or close friend has been arrested or convicted of a

25  crime, you indicated the person was not convicted

1  but it's too personal.  You will have to answer that

2  question but you're not going to do it in open

3  court.

4          PROSPECTIVE JUROR:  Okay.

5          THE COURT:  We're going to do it somewhere

6  else.  And the same has to do with question 31.

7          Never hired a lawyer yourself for any reason?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And you served on a grand jury?

10         PROSPECTIVE JUROR:  I did.

11         THE COURT:  And it was for a couple of

12  months?

13         PROSPECTIVE JUROR:  Yeah, it was every

14  Tuesday, I believe, for 3 months.

15         THE COURT:  For what county was that?

16         PROSPECTIVE JUROR:  That was in Wheaton.

17         THE COURT:  Okay.  Do you belong to anything?

18  Clubs, groups, organizations, anything at all?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  You've done volunteer work for

21  local political groups?

22         PROSPECTIVE JUROR:  I have.

23         THE COURT:  What kind of political groups?

24         PROSPECTIVE JUROR:  In Bloomingdale, just

25  handing out fliers, and Glendale Heights as well.

Voir Dire                                          814

1      THE COURT:  And what do the fliers tell
2  people to do or not do?
3      PROSPECTIVE JUROR:  Just go out and vote,
4  basically.
5      THE COURT:  Okay.  Softball, basically,
6  travel?
7      PROSPECTIVE JUROR:  Correct.
8      THE COURT:  Tell me a little more.
9      PROSPECTIVE JUROR:  I play baseball for close
10 to 17 years, now I just play softball; I traveled to
11 a lot of different places, Australia, New Zealand,
12 Fiji, Europe.
13     THE COURT:  So that's basically your time
14 away from the office is you travel?
15     PROSPECTIVE JUROR:  Right.  If I had more
16 money, I'd be in a lot more places.
17     THE COURT:  Right.  And you traveled to
18 places that are very distant.
19     PROSPECTIVE JUROR:  Correct.
20     THE COURT:  And like your criterion is the
21 flight has to last at least 11 hours?
22     PROSPECTIVE JUROR:  I know I'm far away and
23 that's when I can't read the signs, that's exciting
24 for me.
25     THE COURT:  Where do you get your news from?

Voir Dire                                              815

1       PROSPECTIVE JUROR:  I try to stay away from

2  the news because I don't think -- it's too

3  depressing for me.  The good people are never put on

4  the news, it's always the bad things you hear about,

:36PM   5  so I stick to sports, that's about it.

6       THE COURT:  You were basically out of town

7  during the previous events in this case?

8       PROSPECTIVE JUROR:  That's correct.

9       THE COURT:  So you heard about it but not

:37PM  10  much?

11       PROSPECTIVE JUROR:  Correct.  I was away at

12  college.

13       THE COURT:  Yeah.  I gather from your point

14  of view, that you would be not necessarily in this

:37PM  15  case but you'd be interested in serving on a jury?

16       PROSPECTIVE JUROR:  I would.

17       THE COURT:  Let's come to the side.

18

19

:37PM  20     (Proceedings heard at sidebar on the record.)

21      THE COURT:  That buzzing you're hearing means

22       nobody can hear us unless somebody raises their

23       voice.

24       PROSPECTIVE JUROR:  Okay.

:44PM  25       THE COURT:  And the record with respect to

1 this will be sealed.

2          So has a family member or close friend been

3 arrested, and you said "too personal, not

4 convicted."

5          PROSPECTIVE JUROR:  My father was, years and

6 years ago, someone shot at him at a bar, he wasn't

7 hit though, and then they just wanted to detain him

8 because, obviously, he was going to go after this

9 guy, but he wasn't convicted, they released him.

10          THE COURT:  And is that the same thing having

11 to do with been a victim of a crime?

12          PROSPECTIVE JUROR:  No, no.

13          THE COURT:  Go ahead.

14          PROSPECTIVE JUROR:  Before I was born, my

15 mom's brother and sister were both murdered,

16 different times, but I wasn't even around during

17 that, so ...

18          THE COURT:  Right.  But someone was charged

19 with that?

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  Do you know what happened in that

22 case?

23          PROSPECTIVE JUROR:  It was two different

24 cases.  Her brother was killed in Florida and then

25 her sister was killed locally.  I don't know too

1  much about her brother's case, though.  But her

2  sister, I don't know where the guy's locked up at,

3  but he's serving life.

4          THE COURT:  Anything about that, if you wound

5  up on this jury, anything about that affect your

6  ability to be fair?

7          PROSPECTIVE JUROR:  Absolutely not.

8          THE COURT:  And you also raised an issue

9  about the location of this trial.

10          PROSPECTIVE JUROR:  Uh-huh.

11          THE COURT:  And the difficulty of getting

12  here.  Would you explain that to me?

13          PROSPECTIVE JUROR:  Well, when I received a

14  letter in the mail it was tampered with, so I really

15  didn't -- I didn't know if I should take it serious

16  or not.  So a lot of things I put to be dismissed

17  were just, you know -- but my dad changed his hours

18  recently, so he is home with my mom now in the

19  morning because my mom is disabled.

20          THE COURT:  So it's not possible?

21          PROSPECTIVE JUROR:  No, it is.

22          THE COURT:  It is possible.

23          PROSPECTIVE JUROR:  It is.  It's a very quick

24  train ride, so ....

25          THE COURT:  Okay.  That's what I wanted to

1  know.  Thank you.
2      (The following proceedings were had in open
3       court:)
4          THE COURT:  That's it.
5      (Prospective juror exited the courtroom, and the
6       following proceedings were had herein:)
7          THE COURT:  Is 198 here?
8      (Brief pause).
9      (Prospective juror entered the courtroom, and
10      the following proceedings were had herein:)
11         THE COURT:  Hello, 198.
12         PROSPECTIVE JUROR:  Hello, there.
13         THE COURT:  What do you do for a living?
14         PROSPECTIVE JUROR:  I work for a healthcare
15 services corporation.  I'm project coordinator for
16 the underwriting division.
17         THE COURT:  For the underwriting division?
18         PROSPECTIVE JUROR:  Uh-huh.
19         THE COURT:  And you're a college graduate in
20 political science?
21         PROSPECTIVE JUROR:  That's correct.
22         THE COURT:  And how long have you worked for
23 this particular place?
24         PROSPECTIVE JUROR:  30 years.
25         THE COURT:  Do you like the work?

:41PM
:41PM
:41PM
:42PM
:42PM

1       PROSPECTIVE JUROR:  I do.  It's a good
2  company.
3       THE COURT:  What?
4       PROSPECTIVE JUROR:  It's a good company.
5       THE COURT:  And at sometime in your positions
6  with this company you did supervise a fair number of
7  people.
8       PROSPECTIVE JUROR:  That's correct.
9       THE COURT:  But you don't do that now.
10       PROSPECTIVE JUROR:  Correct.
11       THE COURT:  What does your husband do?
12       PROSPECTIVE JUROR:  He is an evaluation
13  consultant for a company here in the city.
14       THE COURT:  What does he value?
15       PROSPECTIVE JUROR:  Businesses, if they were
16  possibly looking to buy other entities or the cost
17  of the business.
18       THE COURT:  Is he an employee of the firm?
19       PROSPECTIVE JUROR:  Yes.
20       THE COURT:  Okay.  Three kids, the youngest
21  is 13?
22       PROSPECTIVE JUROR:  Correct.
23       THE COURT:  You had a real estate license but
24  you never used it?
25       PROSPECTIVE JUROR:  That's correct.

:42PM
:42PM
:43PM
:43PM
:44PM

Voir Dire                                      820

1          THE COURT:  Is it sort of a pain in the neck
2    to study for an exam and never use it?
3          PROSPECTIVE JUROR:  It was something I always
4    wanted to do because I was interested in it and I
5    thought I might pursue it at sometime, but my
6    full-time job was more lucrative at the time.
7          THE COURT:  Right.  The only reason you ever
8    hired a lawyer was for house purchases?
9          PROSPECTIVE JUROR:  Correct.
10         THE COURT:  What do you belong to, if
11   anything?
12         PROSPECTIVE JUROR:  I'm sorry, any kind of?
13         THE COURT:  It ranges all the way from a
14   garden club on the block to the largest organization
15   in the world, everything in between, it doesn't
16   matter what type it is, do you belong to anything?
17         PROSPECTIVE JUROR:  Ah --
18         THE COURT:  How about the church?
19         PROSPECTIVE JUROR:  The church, the
20   neighborhood civic association, that's about it.
21         THE COURT:  In fact, it says here that you
22   were copresident of the civic association.
23         PROSPECTIVE JUROR:  Correct.
24         THE COURT:  High paying job?
25         PROSPECTIVE JUROR:  Strictly volunteer.

1        THE COURT:  And your hobbies, roughly stated,
2  you are dictated by what your children do.
3        PROSPECTIVE JUROR:  Absolutely.
4        THE COURT:  What's your principal source of
5  news?
6        PROSPECTIVE JUROR:  I'd say mostly the
7  Chicago Tribune and 10:00 o'clock news, if I happen
8  to be around at 10:00 o'clock and the TV is on.
9        THE COURT:  Are you a dedicated news
10 consumer?
11       PROSPECTIVE JUROR:  If by "dedicated" it's
12 what I can read in the mornings before heading off
13 to work and taking my kids to school.
14       THE COURT:  Yes.  That's what it is?
15       PROSPECTIVE JUROR:  Yes.
16       THE COURT:  But you did see some coverage of
17 the prior proceedings in this case, is that right?
18       PROSPECTIVE JUROR:  Absolutely.
19       THE COURT:  And there's some stuff you
20 remember.
21       PROSPECTIVE JUROR:  Yes.
22       THE COURT:  And there's some opinions you
23 formed at the time.
24       PROSPECTIVE JUROR:  Correct.
25       THE COURT:  The rule is very simple to state,

:45PM
:46PM
:46PM
:46PM
:46PM

1    but sometimes it's not so easy to follow.  The rule
2    is, you can remember what you read and you can even
3    have an opinion, the only thing you're required to
4    do is to keep them out of the decision process in
5    the case.  In other words, you have to put whatever
6    opinion you had aside and start fresh and anything
7    you heard or read you have to put off to one side.
8    Sometimes the way people talk about it is, there are
9    some scales of justice, and you have seen pictures
10   of it many times, what you then have to do is when
11   you decide the case the only things you can put on
12   the scales are the stuff you heard in the courtroom
13   and the stuff you heard from the witness stand.  In
14   fact, to be perfectly precise what you can put on
15   the scales is the evidence that is admitted in trial
16   and only that.  Now, the question is can you do
17   that, do you think you're capable of doing that?
18           PROSPECTIVE JUROR:  I did respond to yes, in
19   my questionnaire.
20           THE COURT:  Okay.  And your answer is still
21   yes?
22           PROSPECTIVE JUROR:  Yes, it is.
23           THE COURT:  And not only could you do it,
24   will you do it?
25           PROSPECTIVE JUROR:  Yes.

                        Voir Dire                        823

1          THE COURT:  Thanks.
2      (Prospective juror exited the courtroom, and the
3       following proceedings were had herein:)
4          THE COURT:  We may have somebody missing.
5  Let's see.
6      (Brief pause).
7          THE COURT:  She's here.
8          Okay.  Good.
9      (Prospective juror entered the courtroom, and
10      the following proceedings were had herein:)
11         THE COURT:  199?
12         PROSPECTIVE JUROR:  Yes.
13         THE COURT:  What do you do for a living?
14         PROSPECTIVE JUROR:  I'm a receptionist.
15         THE COURT:  How long have you been doing that
16  work?
17         PROSPECTIVE JUROR:  11 years.
18         THE COURT:  11 years at the same place?
19         PROSPECTIVE JUROR:  Yes.
20         THE COURT:  Did you start out doing the same
21  work or did it change as time went on?
22         PROSPECTIVE JUROR:  I started out as a
23  receptionist, so I'm now an office assistant or
24  office manager.
25         THE COURT:  What does your husband do?

Voir Dire                                     824

1    PROSPECTIVE JUROR:  He's a software
2 developer.
3    THE COURT:  And the question is, have you or
4 anyone close to you ever owned a business, the
5 answer is yes.  Who is that?
6    PROSPECTIVE JUROR:  My husband and myself.
7    THE COURT:  Okay.  What kind of restaurant?
8    PROSPECTIVE JUROR:  We didn't own a
9 restaurant.  Just he did computer-type work.  My
10 brother owns the restaurant.
11    THE COURT:  It's your brother who has the
12 restaurant.
13    Now, you went into Chapter 13?
14    PROSPECTIVE JUROR:  Yes.
15    THE COURT:  How long have you been in it?
16    PROSPECTIVE JUROR:  A few months.
17    THE COURT:  How's it working?
18    PROSPECTIVE JUROR:  Well, it won't be working
19 very well if I have to serve on a jury.
20    THE COURT:  But how's it working now?
21    PROSPECTIVE JUROR:  It's okay.
22    THE COURT:  You have a relative or close
23 friend who works for the State of Illinois?
24    PROSPECTIVE JUROR:  My brother-in-law.
25    THE COURT:  And what kind of work does he do?

Voir Dire                                   825

1          PROSPECTIVE JUROR:  He works on the tollway,
2   heavy equipment operator.
3          THE COURT:  Have you been satisfied with the
4   bankruptcy attorney?
5          PROSPECTIVE JUROR:  Sure.
6          THE COURT:  The age of your children?
7          PROSPECTIVE JUROR:  10 and 14.
8          THE COURT:  Do you belong to anything?
9          PROSPECTIVE JUROR:  I'm sorry?
10         THE COURT:  Do you belong to any kind of
11  group, club, organization?
12         PROSPECTIVE JUROR:  PTO, church.
13         THE COURT:  And you've contributed money to a
14  political party, is that correct?
15         PROSPECTIVE JUROR:  Yes.
16         THE COURT:  Large, small, medium?
17         PROSPECTIVE JUROR:  Small.
18         THE COURT:  Often or once in a while?
19         PROSPECTIVE JUROR:  Once in a while.
20         THE COURT:  Most important source of news for
21  you, you said it would be the Internet?
22         PROSPECTIVE JUROR:  Yes.
23         THE COURT:  And what do you do at the
24  Internet?
25         PROSPECTIVE JUROR:  I check different news

1 sites.

2      THE COURT:  How much time a day do you spend

3 doing that?

4      PROSPECTIVE JUROR:  20 minutes.

:52PM

5      THE COURT:  The one thing I do want to tell

6 you is, I will consider the financial hardship

7 deferral, but you got to send me paper.

8      PROSPECTIVE JUROR:  I brought a letter from

9 my employer.

:53PM

10      THE COURT:  Even better.  Well, it's not just

11 that, you also have to send me stuff, whatever plan

12 there is, and I'll make a decision based on that.

13 This does not necessarily mean I'm going to grant

14 it, but if you give me the paper, that will work.

:53PM

15 Okay?

16      PROSPECTIVE JUROR:  Yes.

17      THE COURT:  Thanks.

18   (Prospective juror exited the courtroom, and the

19    following proceedings were had herein:)

20   (Brief pause).

21   (Prospective juror entered the courtroom, and

22    the following proceedings were had herein:)

23      THE COURT:  You're number 200?

24      PROSPECTIVE JUROR:  I am.

:54PM

25      THE COURT:  What do you do for a living?

1      PROSPECTIVE JUROR:  I sell real estate.

2      THE COURT:  How long have you done that?

3      PROSPECTIVE JUROR:  19 years.

4      THE COURT:  Have you done that with more than

5  one agency?

6      PROSPECTIVE JUROR:  Three, in total.

7      THE COURT:  And it's mostly in DuPage County?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  Two kids, 12 and 16?

10     PROSPECTIVE JUROR:  Yes.

11     THE COURT:  How's business?

12     PROSPECTIVE JUROR:  Not very good.

13     THE COURT:  For how long has it been not very

14 good?

15     PROSPECTIVE JUROR:  For me, probably about

16 4 years.

17     THE COURT:  You indicate that there was

18 either an arrest or conviction, what was that?

19     PROSPECTIVE JUROR:  I had a DUI 17 years ago,

20 18 years ago.  I think it was in '92.

21     THE COURT:  And what was the disposition of

22 it?  What did the judge make you do?

23     PROSPECTIVE JUROR:  I had to do classes and I

24 had a suspension with a driver permit for an amount

25 of time.  I don't really remember exactly, but,

:54PM

:55PM

:55PM

:56PM

:56PM

1 yeah, just --
2         THE COURT:  Okay.  But I'm assuming you got
3 your license back?
4         PROSPECTIVE JUROR:  Yes.
5         THE COURT:  And you had to charge someone
6 with a domestic assault, is that correct?
7         PROSPECTIVE JUROR:  I did.
8         THE COURT:  And that's still pending?
9         PROSPECTIVE JUROR:  It is.
10        THE COURT:  And then you also had a suit and
11 you got a small settlement for that?
12        PROSPECTIVE JUROR:  Yeah.
13        THE COURT:  That was a long time ago?
14        PROSPECTIVE JUROR:  25 years ago or more,
15 yeah.
16        THE COURT:  Do you remember feeling satisfied
17 with the settlement, outraged with the settlement,
18 or somewhere in between?
19        PROSPECTIVE JUROR:  It never went to court,
20 it wasn't anything like that.  It was just a small
21 homeowner's claim where they picked out medical and
22 gave me a small -- it never went to court or
23 anything.  It was it an insurance --
24        THE COURT:  Were you satisfied with the
25 settlement?

```
                            Voir Dire                        829
```

1          PROSPECTIVE JUROR:  Sure.  Yeah.

2          THE COURT:  And you had a lawyer for various

3    things associated with dissolution of a marriage, is

4    that correct?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And child stuff a and everything

7    else?

8          PROSPECTIVE JUROR:  Yeah, custody and

9    divorce.

10         THE COURT:  Is any of that still pending?

11         PROSPECTIVE JUROR:  I would say yes, there's

12   open stuff still in the courts right now.

13         THE COURT:  Important open stuff or just

14   cleanup things?

15         PROSPECTIVE JUROR:  We'd go in and out about

16   every few years.

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR:  I mean, it's kind of

19   standard with my ex-husband.  We've been doing this

20   for 12 years.

21         THE COURT:  And with respect to child

22   custody, you testified in a proceeding?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  And you refer to the experience

25   of testifying as not pleasant.

Voir Dire                                    830

1          PROSPECTIVE JUROR:  It was a custody battle
2    for my children away from my ex-husband, so it was,
3    obviously, not where I wanted to be, but I probably
4    only answered a handful of questions and he ended up
5    backing down because he didn't want to take the
6    stand, so it was actually pretty short-lived.
7          THE COURT:  But not pleasant is the worst
8    thing you can say about him?
9          PROSPECTIVE JUROR:  (No response.)
10          THE COURT:  The reason I ask is is you fall
11    into the class of people who -- let's put it this
12    way, this is the nicest thing any prospective juror
13    has said about having to testify.
14          PROSPECTIVE JUROR:  You know, it was very --
15    it was our attorneys, it was one judge, my mother
16    was there, other than that, it was an empty
17    courtroom and I was in there just testifying.
18          THE COURT:  And it was quick?
19          PROSPECTIVE JUROR:  But I think my children
20    were best with me and that was pretty easy to
21    determine.  So, yeah, I was actually looking forward
22    to getting up and telling what I needed to tell
23    them, make sure of my kids, and I had sole custody
24    of my children, yes.
25          THE COURT:  And you occasionally have to deal

:58PM

:59PM

:59PM

:59PM

:59PM

1  with local police officers with the same kind of

2  matters?

3          PROSPECTIVE JUROR:  With my ex-husband, yes.

4          THE COURT:  Do you belong to anything other

5  than professional organizations?

6          PROSPECTIVE JUROR:  Not professional groups,

7  no.

8          THE COURT:  Other than professional groups?

9          PROSPECTIVE JUROR:  Oh, other than -- I mean,

10 the Y.

11         THE COURT:  Okay.  I take it you really don't

12 know much about politics and how it works?

13         PROSPECTIVE JUROR:  No, it's kind of

14 embarrassing when I was filling that out, but it's

15 true.

16         THE COURT:  Your hobbies are sports

17 activities, gardening, reading, and boating?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Which ranks number 1?

20         PROSPECTIVE JUROR:  Well, probably the sports

21 because of my kids.  We spend -- I spend probably 3

22 to 4 nights a week.  My son does sports, so we do a

23 lot of sports in the house.

24         THE COURT:  Where do you get your news from?

25         PROSPECTIVE JUROR:  I do watch the Today Show

Voir Dire                                                832

1  on Channel 5:00 in the morning.  It's usually on
2  while I'm getting ready and doing stuff.  And other
3  than that, my extensive reading, other than my
4  books, is People magazine.
5          THE COURT:  So you don't have to know what's
6  happening in Libya every day?
7          PROSPECTIVE JUROR:  I could not tell you.
8          THE COURT:  Okay.  And you did get some news
9  about prior proceedings in this case, is that
10 correct?
11         PROSPECTIVE JUROR:  Yes.  Very little, but
12 yes.  And I think it was almost impossible not to
13 hear a little bit here and there.
14         THE COURT:  But you don't remember much?
15         PROSPECTIVE JUROR:  No, I would say the only
16 thing I really can say that I know is something
17 about possibly selling our President's current
18 senate seat.
19         THE COURT:  Okay.
20         PROSPECTIVE JUROR:  And that was, I think, it
21 was only because it was so talked about because of
22 the election and everything.
23         THE COURT:  But that's the only thing you
24 remember?
25         PROSPECTIVE JUROR:  I couldn't tell you

:01PM
:01PM
:01PM
:02PM
:02PM

1  another count.

2       THE COURT:  Okay.  And that's fine, because

3  you're supposed to decide this case based solely on

4  the evidence that you hear from the witness stand

:02PM  5  and some documents you get and a bunch of other

6  things.  So the less you remember, the better and

7  you start out, basically, with an open mind, that's

8  what your duty is, do you understand that?

9       PROSPECTIVE JUROR:  I do.

:02PM  10       THE COURT:  The problem is is sometimes when

11  you hear the evidence, it reminds you of something

12  else you heard, something that you don't recall

13  today but then somebody testifies to something and

14  you remember that this was covered in the papers and

:02PM  15  on television.  What's important when that happens

16  is that you do not consider that in evidence, it's

17  not a part of your process in reaching a verdict,

18  that's what's important.  And we don't ask you to

19  forget it, we just ask you to put it to one side and

:03PM  20  leave it out of your decision process, do you think

21  you'd be able to do that?

22       PROSPECTIVE JUROR:  I do.  I really hate

23  to -- I really know nothing about it.  I mean, you

24  catch a blurb.  I never read anything, I never

:03PM  25  watched, I never followed any of the trials.  I

Voir Dire                                              834

1  really honestly don't know any specifics, any
2  details.  I've never read them, so I don't even --
3  I don't even think that they'll come into my head.
4           THE COURT:  Okay.  Thank you.
5      (Prospective juror exited the courtroom, and the
6       following proceedings were had herein:)
7      (Brief pause).
8      (Prospective juror entered the courtroom, and
9       the following proceedings were had herein:)
10          THE COURT:  Hello, 201.
11          PROSPECTIVE JUROR:  Hello.
12          THE COURT:  What do you do for a living?
13          PROSPECTIVE JUROR:  I work for a plastic
14  company as a plastic and molding technician.
15          THE COURT:  How long have you done that work?
16          PROSPECTIVE JUROR:  I've done that for close
17  to maybe, like, 20 years or more.
18          THE COURT:  But the company you do that for
19  now you've been for less than 20 years?
20          PROSPECTIVE JUROR:  Yeah, for this company --
21  I was unemployed for 2 years and it's been about a
22  year and 2 months with this company that I'm working
23  for right now.  I feel lucky that they made me
24  permanent, so it's great to be back in the work
25  force.

Voir Dire                                        835

1       THE COURT:  What does your wife do?

2       PROSPECTIVE JUROR:  My wife works for a fish

3  company where they package fish -- they pack fish,

4  actually, in jars, with vinegar and sour cream, and

5  stuff like that; cultured fish.

6       THE COURT:  How long has she worked for them?

7       PROSPECTIVE JUROR:  She's worked for them for

8  10 years.  She's still working there.

9       THE COURT:  Okay.  Just out of curiosity, do

10  you and your wife eat a lot of that kind of fish?

11       PROSPECTIVE JUROR:  Once in a while, yeah, my

12  wife prepares some.  They give her some salmon, some

13  big pieces of salmon, so sometimes she brings it

14  home and she prepares it with some spices and it's

15  real good.  Real healthy food.

16       THE COURT:  You have two children, the

17  youngest is 18?

18       PROSPECTIVE JUROR:  Well, I have four

19  children.  Yeah, my youngest is 18 years old, a

20  daughter.

21       THE COURT:  Who do you know served in the

22  Marine Corps?

23       PROSPECTIVE JUROR:  I have a son that was a

24  Marine for 5 years.

25       THE COURT:  And how old is that son?

Voir Dire                                    836

1        PROSPECTIVE JUROR:  He's, like, 22 years old
2   right now.  He went to the Marines and came back.
3   They sent him to Japan and came back married.
4        THE COURT:  How long ago was the crime
5   against your mother?
6        PROSPECTIVE JUROR:  It was like in '69.
7        THE COURT:  A long time?
8        PROSPECTIVE JUROR:  A long time, uh-huh.
9        THE COURT:  And you hired a lawyer because
10  you wanted to evict someone who was renting property
11  from you?
12       PROSPECTIVE JUROR:  Yes; a person didn't pay
13  their rent for, like, 3 months and I had no choice
14  but to evict the person.
15       THE COURT:  Was that the case where you
16  testified, on the eviction case?
17       PROSPECTIVE JUROR:  Yes.
18       THE COURT:  And you won your case?
19       PROSPECTIVE JUROR:  Yes, I did.
20       THE COURT:  And you live in a neighborhood
21  where people leave a lot of stolen cars?
22       PROSPECTIVE JUROR:  Used to, now it's real
23  good.  It was in the old days.
24       THE COURT:  Yeah.
25       PROSPECTIVE JUROR:  They used to actually

Voir Dire                                    837

1  blow a light and park the cars, and at night take
2  them apart.
3        THE COURT:  This physical problem you have
4  that you referred to twice, is this a continuing
5  problem?
6        PROSPECTIVE JUROR:  Right now, I've been
7  having that problem right now.  I guess maybe
8  because I'm diabetic and my sugar has been out of
9  control, so that's one of reasons right now I'm
10 having that problem.
11       THE COURT:  Have you sought medical treatment
12 for it?
13       PROSPECTIVE JUROR:  The doctor said to make
14 an appointment.  I have a card that I got to call
15 the doctor to make an appointment, but he's always
16 pretty busy, so I haven't been able to get in
17 contact lately.
18       THE COURT:  Is this a new problem for you,
19 something you haven't had before?
20       PROSPECTIVE JUROR:  This is a new problem,
21 uh-huh.
22       THE COURT:  Okay.  Do you have any hobbies,
23 things you like to do?
24       PROSPECTIVE JUROR:  I like helping people,
25 that's one thing, I respect everybody.  I like

:08PM

:09PM

:09PM

:09PM

:10PM

Voir Dire                                    838

1  fixing things, especially cars, and even things
2  around the house.  So I like to see when you fix
3  something, that it's working right, so it makes me
4  happy to do something that is working.
5          THE COURT:  You donated to Children's
6  Memorial Hospital?
7          PROSPECTIVE JUROR:  Yes, I donated to
8  Children's Memorial Hospital and also sometimes to
9  the firefighters and also to the police.
10         THE COURT:  Children's Memorial Hospital,
11 your daughter had a serious illness and she was
12 cured there?
13         PROSPECTIVE JUROR:  Yes, she was.  Uh-huh.
14         THE COURT:  Did you pay much attention to
15 this case?
16         PROSPECTIVE JUROR:  No.  No, I don't.
17         THE COURT:  Would you be able to decide this
18 case solely on the basis of the evidence you hear
19 from the witness stand and not consider anything you
20 might have heard about the case?
21         PROSPECTIVE JUROR:  Yes, I would.
22         THE COURT:  Thank you.
23         PROSPECTIVE JUROR:  You're welcome.
24         Thank you very much everybody for hearing me
25 out.

Voir Dire                                    839

1      (Prospective juror exited the courtroom, and the
2       following proceedings were had herein:)
3      (Brief pause).
4      (Prospective juror entered the courtroom, and
5       the following proceedings were had herein:)
6          THE COURT:  You're 202?
7          PROSPECTIVE JUROR:  Yes.
8          THE COURT:  What do you do for a living?
9          PROSPECTIVE JUROR:  I'm retired a software
10   deployment manager from a telecommunications
11   company.
12         THE COURT:  And what are you doing now?
13         PROSPECTIVE JUROR:  Pet City, I have a
14   personal business that I put on the form 2 years but
15   actually it's three but the first year was kind of a
16   hobby type of thing.  And it's very critical to keep
17   my head above water.  I'm the sole income coming
18   into the home.  And right now, since March 6th, a
19   lot of things have been in jeopardy with it.  I
20   can't work, this is my prime season, I bring pets
21   into my home, I don't know what I'm going to be
22   doing, and I'm losing customers, and it's just been
23   a very difficult time and I need this business.
24   And, actually, it's upon this third year, it's
25   really blossoming.  I have 29 part-timers and I have

:11PM

:12PM

:12PM

:13PM

:13PM

Voir Dire                                    840

1  5 full-time, Monday through Friday, which I do all
2  myself.  And today I have a volunteer and last
3  Wednesday I have a volunteer, and that was difficult
4  because people -- I put up out bio, I went and
5  talked to all the families, some were not very happy
6  with it and some are.  And I -- I just can't be gone
7  this long.
8          THE COURT:  You said that you worked for one
9  company for almost 33 years?
10         PROSPECTIVE JUROR:  32 years and 9 months.
11         THE COURT:  Right.  And then you said it was
12  a forced retirement?
13         PROSPECTIVE JUROR:  Yeah.  Basically, laid
14  off due to problem with CEO and economy.
15         THE COURT:  But did they layoff a lot of
16  people?
17         PROSPECTIVE JUROR:  Yeah.
18         THE COURT:  And you had a problem with the
19  401 K?
20         PROSPECTIVE JUROR:  Absolutely.
21         THE COURT:  What was that problem?
22         PROSPECTIVE JUROR:  I lost just about all of
23  it.  I had 45,000 in severance that I rolled into
24  401's so I wouldn't get taxed on it.  That's gone,
25  everything is gone, and it's just like crawling back

1 now.  But I have no retirement money, I have

2 upside-down houses like everybody else.

3        I mean, it's taken me this long to start

4 crawling back and seeing some progress, and I found

5 something that people really respect me and

6 appreciate and I love doing, and it's just starting

7 to grow now and then this pops up.

8        THE COURT:  Understood.

9        PROSPECTIVE JUROR:  And I need this money.  I

10 mean, I've got property taxes due, I've got --

11       THE COURT:  Let me ask you a couple of

12 questions.  Tell me about the business.

13       PROSPECTIVE JUROR:  The pet sitting business?

14       THE COURT:  Yeah.

15       PROSPECTIVE JUROR:  I go into people's homes

16 midday, which I call full-time Monday through

17 Friday.  It's whatever they need, whatever they

18 want, within a certain period.  I have what I call

19 part-time, which I've had to put off calls for right

20 now, that's your spring and your summer and

21 weekends, holidays or vacations, that people need

22 you.  And then I also take pets into my home, one

23 pet family at a time, because I have a pet too.  And

24 I wouldn't be able to bring any pets into my home,

25 that's where I make the most money.

1          THE COURT:  And what do you charge people for
2  their service?
3          PROSPECTIVE JUROR:  Well, it varies.  It
4  depends, if they have extra pets, extra animals.
5          THE COURT:  If it's one animal, what do you
6  charge, one dog?
7          PROSPECTIVE JUROR:  Okay, $16 a visit.  If
8  they're in my house, it's like the same as three
9  visits a day if you're going on vacation.  So it's
10 like $48 for 24 hours, and that's how I make the
11 money, because I have my regular rounds --
12         THE COURT:  Let me ask the questions.
13         What do the part-timers do?
14         PROSPECTIVE JUROR:  You mean what do I do for
15 the part-timers?
16         THE COURT:  What does the part-time part of
17 it.
18         PROSPECTIVE JUROR:  Okay, when people just
19 call.  They're not every day, like I do them every
20 day Monday through Friday, it's they call in and say
21 they're going to be gone for a few days or they're
22 going to be on vacation, that's what I call
23 part-time.
24         THE COURT:  And what do you do with the dog?
25         PROSPECTIVE JUROR:  Whatever the customer

:16PM

:16PM

:16PM

:17PM

:17PM

Voir Dire                                          843

1 wants.  Everybody is individual and everybody has
2 unique.
3          THE COURT:  What might a customer want?
4          PROSPECTIVE JUROR:  They might want a special
5 walk.  I have a pet that's got bladder stones that
6 he's got to be walked far.  It's -- every family is
7 different.  I go out and interview them, they
8 interview me.
9          THE COURT:  And how many of these things
10 would you do in a single day?
11          PROSPECTIVE JUROR:  It depends.  People call
12 and cancel.
13          THE COURT:  Your busiest day, how many would
14 you do?
15          PROSPECTIVE JUROR:  6 to 8.
16          THE COURT:  And how much would you charge for
17 that?  How much would you get for that day?
18          PROSPECTIVE JUROR:  Well, $15 per -- $15 per
19 household.
20          THE COURT:  So you make maybe $90 that day?
21          PROSPECTIVE JUROR:  (Nodding).
22          THE COURT:  Now, are you the only one who
23 does this work?
24          PROSPECTIVE JUROR:  Yes.
25          THE COURT:  And how long ago did you start

1 this business?

2      PROSPECTIVE JUROR:  2 years trying to get it

3 to blossom, 1 year prior was kind of hobbying, see

4 how it was going to work out, if I could get

5 customers, or whatever, then I started pounding the

6 pavement, putting out fliers, going to vets.  Each

7 year it got better.

8      THE COURT:  Wait, wait a second.  The way you

9 generated business is you put out a lot of fliers,

10 that was one thing you did?

11      PROSPECTIVE JUROR:  Uh-huh.

12      THE COURT:  And the other thing is you went

13 to veterinarians and said that this is a service

14 that we have?

15      PROSPECTIVE JUROR:  Yes, that I have.

16      THE COURT:  And you sort of tested it for

17 about a year?

18      PROSPECTIVE JUROR:  (Nodding).

19      THE COURT:  And where were you at the end of

20 the first year?  How many customers did you have?

21      PROSPECTIVE JUROR:  I don't even know because

22 it was like they just -- you know, they cancel, they

23 call, they inquire.  I really don't know.

24      THE COURT:  And how many customers do you

25 have now?

:18PM

:18PM

:18PM

:19PM

:19PM

Voir Dire                                    845

1          PROSPECTIVE JUROR:  I have 29 part-time, what
2    I call part-time, and I have 5 full-time, full-time
3    is Monday through Friday, I do them every day.
4          THE COURT:  And when it's a full-time, what
5    do you do?
6          PROSPECTIVE JUROR:  I go to their house, take
7    them out.
8          THE COURT:  Take the dog out?
9          PROSPECTIVE JUROR:  Yeah.
10         THE COURT:  Let's talk just about a dog, one
11   dog.
12         PROSPECTIVE JUROR:  Yes, take them for their
13   walk, and their business, or if they need pills.
14   It's whatever in the interview that the customer
15   wants.
16         THE COURT:  Right.  And then you take the dog
17   back to the house?
18         PROSPECTIVE JUROR:  (Nodding).
19         THE COURT:  And did I also understand that
20   you board some animals in your own house?
21         PROSPECTIVE JUROR:  Not really boarding.  I
22   take in one pet family at a time.  In other words,
23   you know, I'm not a kennel, but I have a pub myself
24   and I'll take in small dog, one pet family at a
25   time.  If somebody else calls up, I can't.

:19PM

:19PM

:19PM

:19PM

:20PM

1          THE COURT:  I'm willing to consider your

2    claim for financial hardship, but what you have to

3    do is you have to give me some numbers, you have to

4    give me a financial statement of some kind of.  You

5    don't necessarily have to come down here to do that,

6    you can fax it to us, and they'll give you some

7    information how to do it and I will consider it and

8    we'll do it take way; okay?

9          PROSPECTIVE JUROR:  What I do I --

10         THE COURT:  Talk to people outside, they'll

11   tell you what to send to me and where to send it,

12   and you'll have to do it pretty soon.

13         Thanks.

14         PROSPECTIVE JUROR:  Thank you.

15     (Prospective juror exited the courtroom, and the

16      following proceedings were had herein:)

17     (Brief pause).

18         THE COURT:  THE COURT:  204.

19     (Prospective juror entered the courtroom, and

20      the following proceedings were had herein:)

21         THE COURT:  You're number 204?

22         PROSPECTIVE JUROR:  Yes, I am.

23         THE COURT:  It's only a temporary name

24   change.

25         PROSPECTIVE JUROR:  It's okay.

1      THE COURT:  What do you do for a living?

2      PROSPECTIVE JUROR:  I'm retired.

3      THE COURT:  What did you do for a living?

4      PROSPECTIVE JUROR:  I was a printer,

5  lithographer.

6      THE COURT:  For how long?

7      PROSPECTIVE JUROR:  38 years.

8      THE COURT:  Do you miss it?

9      PROSPECTIVE JUROR:  No.

10      THE COURT:  You worked for a printing press?

11      PROSPECTIVE JUROR:  Uh-huh.

12      THE COURT:  Is that what you started with

13  when you started the business?

14      PROSPECTIVE JUROR:  Actually, no, I started

15  Rotar Revere, that was much bigger.

16      THE COURT:  Yeah.  And have you ever had any

17  other jobs other than lithography?

18      PROSPECTIVE JUROR:  I was a fireman for 2 and

19  a half years--excuse me--then I worked 5 years in

20  psychiatric healthcare.

21      THE COURT:  And what did -- that was at

22  Alexian Brothers?

23      PROSPECTIVE JUROR:  Yes.

24      THE COURT:  What did you do for them?

25      PROSPECTIVE JUROR:  Basically patient

1  transport, but I worked on the units and was trained

2  in crisis intervention.  So I was, literally, with

3  the patients.

4          THE COURT:  You have 4 children, the youngest

5  is 33?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Now that you've retired, what do

8  you do?

9          PROSPECTIVE JUROR:  Enjoy it.

10         THE COURT:  And how do you do that?

11         PROSPECTIVE JUROR:  Computer work.

12         THE COURT:  Computer work.

13         PROSPECTIVE JUROR:  I like doing computer

14  database programming, but I like the easier pace.

15         THE COURT:  You were asked if you were

16  arrested or convicted of a crime and you say you

17  were arrested and you list the offense here.  This

18  happened a long time ago?

19         PROSPECTIVE JUROR:  44 years ago.

20         THE COURT:  So you're not exactly quite clear

21  on what happened?

22         PROSPECTIVE JUROR:  I don't know the

23  resolution.

24         THE COURT:  Okay.  And that's the only

25  arrest?

1         PROSPECTIVE JUROR:  That's it.

2         THE COURT:  Okay.  You had a lawyer for a

3  divorce?

4         PROSPECTIVE JUROR:  Excuse me?

5         THE COURT:  You had a lawyer for a divorce?

6         PROSPECTIVE JUROR:  Yes.

7         THE COURT:  Was it contested or was it agreed

8  to?

9         PROSPECTIVE JUROR:  It was agreed to.

10         THE COURT:  Satisfied with the lawyer's work?

11         PROSPECTIVE JUROR:  Well --

12         THE COURT:  You don't have to be.

13         PROSPECTIVE JUROR:  The lawyer was fine.

14         THE COURT:  Right.  You testified, at a

15  hearing.

16         PROSPECTIVE JUROR:  It was, I think they call

17  it, a prove-up.  I said yes 16 times, and no twice,

18  and she wasn't even there.

19         THE COURT:  Okay.  Where do you get your news

20  from, if you do get news?

21         PROSPECTIVE JUROR:  Sometimes seeing the

22  evening news, Channel 5.  But even on news, it's

23  probably a half hour show and only about 6 minutes

24  of news, the rest is fluff.

25         THE COURT:  Is it safe to say you don't watch

1  or read a lot of news in a day?

2          PROSPECTIVE JUROR:  Not at all.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  I printed this stuff all

5  my life, I really don't need to look at it anymore.

6          THE COURT:  Right.

7          You were treated at Children's Memorial

8  Hospital?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Quite a long time ago?

11         PROSPECTIVE JUROR:  I was 3 years old.

12         THE COURT:  You said you saw something, you

13 said you attended with moderate coverage to the

14 prior proceedings in this case.

15         PROSPECTIVE JUROR:  Excuse me?  I'm sorry.

16         THE COURT:  You said that you watched, at

17 least to a moderate level, some of the news reports

18 of the prior proceeding.

19         PROSPECTIVE JUROR:  I seen bits and pieces of

20 it.

21         THE COURT:  If you served on a jury in this

22 case, would you be able to decide this case solely

23 on the basis of the evidence you hear from the

24 witness stand and the stuff that is admissible?

25         PROSPECTIVE JUROR:  Yes.

Voir Dire                                        851

1          THE COURT:  You may have forgotten a lot of
2   what you heard or read before, but sometimes some of
3   the evidence you hear will remind you of something
4   you heard or read before.  The rule is that when you
5   weigh that evidence, you have to leave it out of the
6   process everything that you remember having heard or
7   read before, do you think you'll be able to do that?
8          PROSPECTIVE JUROR:  Yes.
9          THE COURT:  You do say that you would not
10  like having your name published at the end of the
11  trial and you don't want media attention and you
12  would prefer not to serve on this case, and you are
13  expressing your view, is that correct?
14         PROSPECTIVE JUROR:  Well, I don't care for
15  the idea of the media frenzy.  Although, I'm sure
16  there's nothing I can do about it or that you can do
17  about it, it's just that way.
18         THE COURT:  Believe me, I understand that,
19  but the question is, would the fact that your name
20  might be released make it impossible for you to be a
21  fair juror?
22         PROSPECTIVE JUROR:  No.
23         THE COURT:  Okay.  Thank you.
24      (Prospective juror exited the courtroom, and the
25       following proceedings were had herein:)

Voir Dire                                    852

1    (Brief pause).

2         THE COURT:  Counsel, approach the lectern.

3    (Brief pause).

4         THE COURT:  Since they're still here, you can

5    do challenges for cause now.  What I propose to do

6    is, these challenges for cause -- did we do them for

7    the previous group yet?

8         MR. SCHAR:  No.

9         THE COURT:  I propose that we do challenges

10   for cause and then we go over our lists so that we

11   have an agreed-upon number of those who remain

12   unchallenged as of this date.

13        We have for tomorrow -- is it 15, Mr. Walker?

14        THE CLERK:  Yes, I think that is.

15        THE COURT:  More or less?

16        THE CLERK:  More or less.

17        THE COURT:  We have 15 more or less jurors

18   coming in for tomorrow, which is the last of the

19   special panel, and it would be useful for us to know

20   how many jurors we need, if any, which is why we're

21   doing these challenges for cause now.

22        We are also ordering in for tomorrow the

23   jurors from the ordinary petit jury call who

24   indicated that they would be willing to serve for 10

25   to 12 weeks, so they will be doing their

Voir Dire                                            853

1  questionnaires tomorrow.  It may turn out that we

2  don't need them, but they will, at least, be ready

3  for this.

4          So let's do challenges for cause now.  What

5  we're doing now is 191 through 204.

6          MR. SOROSKY:  Your Honor, since I understand

7  it, to the best of my knowledge, we have not done

8  any of the challenges for cause today.

9          THE COURT:  We're starting with 191 here

10 because they're still here.

11         MR. SOROSKY:  Oh, okay.

12         THE COURT:  And we will address the rest of

13 them in due course.

14         We're in the process of finding out whether I

15 have made a misstatement of fact.

16    (Brief pause)

17         MR. SOROSKY:  So we're clear on numbers, it's

18 my understanding that before today --

19         THE COURT:  No, no, don't do this, because we

20 are not going to be clear on numbers until we are

21 finished with this stuff.

22         MR. SOROSKY:  No, I meant before today.

23         THE COURT:  We're not clear until we're

24 finished with this stuff, and then we will start

25 from number 1.

1      MR. SOROSKY:  Okay.

2      THE COURT:  Somebody begin.  You're starting

3  with 191.  Anybody challenging 191?

4      MR. GOLDSTEIN:  Not from the defense, Your

5  Honor.

6      MR. SCHAR:  No objection.

7      THE COURT:  192?

8      MR. GOLDSTEIN:  No challenge from the

9  defense, Your Honor.

10      MR. SCHAR:  No, Judge.

11      THE COURT:  193?

12      MR. GOLDSTEIN:  Defense --

13      THE COURT:  The queen of arbitration.

14      MR. GOLDSTEIN:  Yes, defense challenges based

15  on cause, Your Honor.

16      THE COURT:  The government's position?

17      MR. SCHAR:  Objection, Judge.  We object to

18  cause.

19      THE COURT:  Grounds?

20      MR. GOLDSTEIN:  Your Honor, although she said

21  it seemed to be working better, she is an individual

22  that is extremely busy and relied heavy upon as far

23  as her work.

24      But as far as bias, she throughout,

25  throughout her questionnaire, she indicated that "I

Voir Dire                                    855

1 think he's guilty," said it more than once I
2 believe, and then went ahead and said "well, I don't
3 think I can judge another human," that, to me, is
4 just not being entirely honest, Your Honor.  On the
5 one hand, she was judging throughout the
6 questionnaire, and, on the other hand, she's saying
7 she can't judge an individual.
8        And while Your Honor asked further and said
9 some things that equivocated that a bit, this is an
10 individual who's clearly biased, has a lot of work
11 issues, and is inconsistent and said nicest
12 inconsistent, more likely not being completely
13 honest with the Court, Your Honor.
14        MR. SOROSKY:  I would add one thing.  After
15 Your Honor did his traditional and effective
16 rehabilitation based on very biased answers, the
17 best she could say is "I think I could listen to the
18 whole trial and be open-minded."  I don't think
19 that's a good enough answer considering, frankly,
20 her biased answers to questions and your very
21 effective rehabilitation.
22        She did not say, "oh, I now understand,
23 Judge, I will completely disregard.  I think I could
24 listen to the whole trial and be open-minded," that
25 is not a fair standard for a juror and she should be

Voir Dire                                    856

1  struck.

2         THE COURT:  You want to speak on this?

3         MR. SCHAR:  Judge, I thought you did the job

4  of getting from her that she thought she'd be a fair

5  juror.

6         THE COURT:  It's actually the judging part is

7  the one that gave me pause because she was careful

8  in the comments about where he stands in the current

9  view.  She doesn't say "I think he is guilty," she

10 says "from what I've heard."  And it's perfectly

11 possible, given the nature of the press coverage in

12 this case, that someone could reasonably say "from

13 what I've heard," I think she understands the

14 difference between reports and actually hearing

15 evidence.

16        And even on the other thing, on question 80,

17 she doesn't say "I think he's guilty" she says "most

18 people I know think he's guilty."  I think she's

19 distancing herself from this, and it's significant

20 in terms of the fact that when she fills this out,

21 she wants out, she doesn't want to be on this jury.

22 So I don't think that shows bias.

23        The judgment part, I think what she's

24 thinking of, and I think what most people think of

25 when they see this is is, when they don't want to

Voir Dire                                    857

1  write the judge another, it's one thing to sit back

2  in your chair after watching the evening news and

3  say about some individual who's been arrested in

4  Arizona, for one reason or another, and somebody at

5  the family table says, well, I think he's guilty, or

6  things that are much worse than that.  The

7  difference with the judicial process is, this is not

8  an offhand judgment, this is not a dinner table

9  conversation, this is something that's legally

10 binding, and that kind of judgment is what they're

11 talking about.  And what she said is -- I was very

12 careful, I thought I was very careful, not to

13 challenge her personal feeling that no human has the

14 right to judge another.  I didn't ask her about

15 that, I respected that this was her point of view

16 and it's not going to be changed, because I asked

17 her it's not a question of rights here, it's a

18 question of whether you will assume your duty as a

19 citizen to render a judgment.  So I don't think

20 she's inconsistent, I don't think I backed her up,

21 and I reject the challenge for cause.

22         Number 194?

23         MR. GOLDSTEIN:  Your Honor, we move for cause

24 on 194.

25         MR. SCHAR:  We don't agree.

```
                              Voir Dire                        858
```

1              THE COURT:  You don't agree?

2              MR. SCHAR:  We do not agree.

3              THE COURT:  I do agree.

4              MR. SCHAR:  Actually, Judge.  I just saw one

5  of the answers.  We'll withdraw it.

6              THE COURT:  No, I do agree.  It doesn't

7  matter if you withdraw it, I do agree.  This comes,

8  essentially, with the same territory, but my

9  judgment of this person is not appropriate for this

10 case.

11             195 is a no-show.

12             Give me one second.

13         (Brief pause).

14             THE COURT:  Let me make sure I'm not

15 confusing this with another person.

16         (Brief pause)

17             THE COURT:  This is a person who is not, as

18 is customarily with no-shows, answering a juror

19 questionnaire that bespeaks one of a variety of

20 things.  We had a couple here who obviously had very

21 little command of the English language.  I think

22 they didn't understand what they were filling out.

23 And we had some others which had problems which made

24 it clear that they may not have had the intelligent

25 capacity to sit as a juror.  And then we had a

1  couple whose personal lives were in such a mess that
2  it was clear that they couldn't.  This person is a
3  no-show, we have been told because she's in the
4  hospital.  Otherwise, it's perfectly respectable
5  thing.  So we're postponing this one.  We might wind
6  up in exactly the same place because if there's some
7  serious condition, it's going to be gone, anyway.
8  So this one is pending.
9          Number 196, the occupational therapist.
10         MR. SOROSKY:  No objection.
11         MR. SCHAR:  No, Judge.
12         THE COURT:  Number 97 is, I believe, the
13  fourth juror in this case, maybe the fifth, who
14  originally asked for deferral and has functionally
15  withdrawn the deferral, which is usually an
16  indication the attractiveness of the case to the
17  jury is outweighed whatever stuff there is on the
18  backside.  That's not actually what they tell us,
19  it's sort of what this guy told us, you know, that
20  he thought it was something else and -- and he wrote
21  a ridiculous excuse, not that the first part is
22  ridiculous, but his underlying "I refuse,"
23  underlined, "to drive all the way downtown for
24  something of this nature," "it's too far" also
25  underlined.  Now, because it's the kind of case that

1 he's willing to sit on, this has disappeared.  It's

2 also disappeared for some other practical reasons,

3 but it's interesting how we do get these withdrawals

4 or fervent requests for deferment.

5         Any challenges for cause?

6         MR. GOLDSTEIN:  Defense challenges.

7         MR. SCHAR:  Agreed, Judge.

8         THE COURT:  What a shock.

9         Number 198?

10         MR. GOLDSTEIN:  Defense moves for challenge,

11 Your Honor.

12         MR. SCHAR:  I don't agree, Judge.

13         THE COURT:  You do not agree?

14         MR. SCHAR:  Do not agree?

15         THE COURT:  Why would you challenge this

16 person?

17         MR. GOLDSTEIN:  Your Honor, number 78, she

18 indicated "based on what I read and the news stories

19 I heard it's my opinion that there was intent to try

20 to use the 'office' for political personal gain."

21 Your Honor questioned her and throughout much of the

22 questioning she gave affirmative answers, she

23 answered quickly and assertively, and then when Your

24 Honor asked questions as far as could you put it

25 aside or could be fair, there was a lot of

1  hesitation, there was a lot of pause.  While she
2  said yes, I wouldn't call it the strongest yes, the
3  most assertive yes, and she's shown an indication
4  that she's biased and she has formed an opinion
5  against the defendant.
6        THE COURT:  I think you'd have a better case,
7  and you might have one later, if she had said right
8  away.  This is, obviously, an intelligent person,
9  and this stuff about can you put this off to one
10  side is maybe not as easy as people think, and I
11  think she did understand that and I believe she will
12  do it.  So that one is rejected.
13        The next one 199 is the office manager.  The
14  office manager doesn't matter, it has to deal with
15  the bankruptcy that she's in.  She might actually
16  get out anyway on financial hardship.  So my
17  inclination is to believe once I get this number,
18  she's gone anyway, so do you want to postpone this
19  one?
20        MR. SCHAR:  Judge, I move for cause.  She,
21  clearly, doesn't want to be here.  So whether she
22  makes it on financial or not --
23        MR. GOLDSTEIN:  We're in agreement.
24        THE COURT:  Good decision.
25        Moving on to 200, the real estate broker, any

1  challenges for cause?

2          MR. GOLDSTEIN:  No, Your Honor.

3          MR. SCHAR:  Judge, we'll challenge for cause.

4  She's, obviously, in the middle of a criminal case

5  right now herself, and in addition to having been

6  the victim of a prior situation that also was

7  similar, and because of that and because we're just

8  not clear exactly where she's going to come out on

9  that, whether something happens in the middle of

10 this trial in the criminal case that might somehow

11 or another, frankly, bias her one way or the other

12 against one party, I don't think this is someone we

13 necessarily want on the jury at this time.  So that

14 would be a cause challenge from us.

15         MR. GOLDSTEIN:  Your Honor, we won't object

16 to their motion.

17         THE COURT:  You want her out?

18         MR. GOLDSTEIN:  We'll agree with that, yes,

19 Your Honor.

20         THE COURT:  Okay.  201.

21         201, I didn't say this on the public record,

22 but the answer to question 8 was also his request

23 not to serve, this is his deferral excuse.  And I

24 generally am not terribly sympathetic to this kind

25 of stuff because people will always raise some minor

Voir Dire                                          863

1  condition, but he said it's new, and I think maybe
2  he ought to be excused because if he's got what he
3  says he's got, it's not going to be good.  Are we on
4  the same page?

5          MR. GOLDSTEIN:  Correct.

6          MR. SCHAR:  Yes, Judge.

7          THE COURT:  Let's go back a second.  What did
8  we do with the medical receptionist?

9          MR. GOLDSTEIN:  What number was that, Your
10 Honor?

11         THE COURT:  99.  The question is, did I
12 mismark what we did.

13         MR. GOLDSTEIN:  99 was stricken by agreement.

14         MR. SOROSKY:  For financial hardship.

15         THE COURT:  Yes.  And we did that with 200,
16 right?

17         MR. GOLDSTEIN:  Correct.

18         THE COURT:  Good.

19         And we're doing that with 201?

20         MR. GOLDSTEIN:  Correct.

21         THE COURT:  202, I have no idea whether her
22 plea for not serving is legitimate or not, but after
23 listening to the dialogue, I don't think this is a
24 person who would give orderly consideration to the
25 evidence.  In fact, I'm deeply concerned that she

Voir Dire                                               864

1    would give orderly consideration to anything.  So
2    unless somebody pleads for this one, this is going
3    to be a challenge for cause.
4              MR. GOLDSTEIN:  No objection.
5              MR. SCHAR:  No objection, Judge.
6              THE COURT:  203, who was a no-show, falls
7    into the other class of no-shows as opposed to
8    dealing with the previous no-show who was in the
9    hospital and they had a good reason to do this.  I
10   have a 2 and a half page reason why, which is an
11   endless recitation of various problems, some of
12   which, if this is true, are good reasons to defer,
13   and if it turns out it's not true, it's sufficiently
14   incoherent that I don't think this is a person who
15   can serve on a jury, and I'm not talking about this
16   case, probably any case.  So unless somebody can
17   turn me around on this one, it's a challenge for
18   cause.
19             MR. SCHAR:  No objection.
20             MR. GOLDSTEIN:  No objection, Your Honor.
21             THE COURT:  Coming to the end of the list.
22             204, anybody?
23             MR. GOLDSTEIN:  Your Honor, defense moves for
24   cause.  It's just the one issue and that's the --
25             MR. SCHAR:  No objection, judge.  We agree.

Voir Dire                                                        865

1          THE COURT:  He did, incidentally, accurately
2   account his previous experience with Domery.
3          Okay, that takes us back.  They can go.
4       (Brief pause).
5          THE COURT:  Now we're dealing 176 through
6   190.
7          176, an attorney whose field of specialty is
8   far removed from anything that's going to be found
9   in this case.  Anybody have views on this?
10         MR. SOROSKY:  Yes, we would move to strike.
11         THE COURT:  What's the government's position?
12         They're conferring.
13      (Brief pause).
14         MR. SCHAR:  Judge, we do not agree with the
15  strike.
16         THE COURT:  Okay, now you can tell me why.
17         MR. SOROSKY:  I believe this person had a son
18  that was brought to Children's Memorial Hospital and
19  was treated successfully there and she has
20  contributed money to Children's Memorial Hospital.
21  Now, as I assessed this woman, although she's an
22  attorney, and very often, or some attorneys, tend to
23  be in a line of work where they are frequent
24  contributors to all sorts of entities, this attorney
25  is not of that category of persons.  She's an

1  employee for an insurance company and is not in the
2  business, if you will, of soliciting business and
3  trying to ingratiate herself with everyone and
4  creating good will and making contributions so, so
5  to speak, there will perhaps be a turnout.  I think
6  she has the potential to be, and understandably, an
7  extremely bias witness on a very sensitive victim in
8  this case, and, therefore, we would ask that she
9  should be excused.  I could think of no one holding
10 Children's Memorial Hospital in greater esteem than
11 a mother who brought a child there and the child was
12 cured.
13         THE COURT:  Well, maybe the father whose
14 daughter had cancer and was cured might be a little
15 more than someone who was brought there for a visit.
16         The government's position?
17         MR. SCHAR:  Judge, I think there were well
18 over a dozen, at this point, potential jurors who
19 have been in similar situations, some with more
20 extreme relationships.  Frankly, it's one of the
21 premiere children's hospitals in the city, so I'm
22 sure there are a vast majority of people who have
23 been at least either there or with some affiliation
24 of a visit, I don't think it causes anymore bias
25 than any of the other jurors that have gone through,

1  so we disagree.

2          THE COURT:  It's rejected.

3          The next one indicated he has difficulty with

4  English.  He does have difficulty with English.  So

5  unless somebody wants to persuade me to the

6  contrary, he's gone.

7          MR. GOLDSTEIN:  We agree, Your Honor.

8          MR. SCHAR:  Agreed, Judge.

9          THE COURT:  Number 178, he requested deferral

10 because he was unable to afford transportation, that

11 was his request.  Anyone want to express a view on

12 this person?

13         MR. SCHAR:  Judge, we move for cause of this

14 individual.

15         MR. SOROSKY:  We think he should be on the

16 jury because if he's paid $40 a day --

17         THE COURT:  Oh, no, I think he understands

18 that now.

19         MR. SOROSKY:  So I don't see any reason for

20 him to be off.  With all due respect --

21         THE COURT:  I'm denying the challenge for

22 cause.

23         MR. SOROSKY:  Thank you.

24         THE COURT:  179, this was what I believe to

25 be a withdrawal for request for deferment.

1  Although, this one was not directed specifically to
2  "I'm now interested in this case and I wasn't
3  before" it was statement that they in fact hired
4  another librarian, which apparently diminishes the
5  problem, and probably, I think, she might also
6  realize that she is there one day.
7          So views on this one?
8          MR. GOLDSTEIN:  We are not moving for cause.
9          MR. SCHAR:  No.
10         THE COURT:  Good.
11         Was 180 here?
12         MR. SCHAR:  No, was a no-show.
13         THE COURT:  No, 180 was a no-show.
14         MR. GOLDSTEIN:  Correct.
15         MR. SCHAR:  Correct.
16         THE COURT:  This is not sure, this is not
17 sure.  I'm going to excuse this person because I
18 think this individual is unlikely to survive any
19 kind of screening.  So is anybody opposed to that
20 person?
21         PROSPECTIVE JUROR:  No.
22         THE COURT:  Okay, 181.
23         MR. GOLDSTEIN:  We are not moving for cause
24 on 181.
25         MR. SCHAR:  No.

1          THE COURT:  182?

2          MR. GOLDSTEIN:  Your Honor, defense moves for

3    cause as to 182.  A couple of reasons; one,

4    indicated a medical issue -- or, actually, issues, I

5    believe it was.  It was his eyesight, as well as his

6    hearing, as well as on question number 9 he

7    indicated some other medical issues that required

8    maybe not something that would eliminate him but

9    fairly constant nuisance, it appears.

10         In addition, he did indicate a financial

11   hardship.  And I don't know if he is someone that

12   needs to be called back, but he indicated that this

13   would pose a financial hardship and his answer was

14   "not sure how many days the employer will pay,"

15   there was no other details filled in as to that

16   answer.  So those are the two bases for cause, Your

17   Honor.

18         MR. SCHAR:  Judge, he seemed to answer, he

19   said his hearing issue is going to be absolutely

20   fine.  Obviously, he filled out the questionnaire,

21   so the sight issue doesn't seem to be an issue.  I

22   can't, obviously, speak to the financial issue, but

23   he didn't raise it today.

24         THE COURT:  I don't think that hearing and

25   sight matters, I think he's fine with that, that's

:00PM

:01PM

:01PM

:01PM

:01PM

Voir Dire                                    870

1  what I thought he was fine with.  He looked
2  uncomprehending to me on some of the stuff, and he
3  does have a condition, similar to another condition
4  that we dismissed a juror for, and I'm uncomfortable
5  with him on this jury.  So he's gone.
6          183?
7          MR. GOLDSTEIN:  Challenge for cause on 183.
8          MR. SCHAR:  We're not in agreement with that,
9  Judge.
10         THE COURT:  Okay.  Your grounds?
11         MR. GOLDSTEIN:  Your Honor, 183, this is the
12 individual that worked for a particular congressman
13 and wrote a --
14         THE COURT:  A very admiring note, an
15 exceptionally admiring note.
16         MR. GOLDSTEIN:  A very admiring note.  And
17 the concern is is that she holds this individual in
18 such high esteem that it raises the burden in trying
19 to compare him in some way.  Not to mention, I think
20 --
21         THE COURT:  Yeah, but I asked her about that.
22         MR. GOLDSTEIN:  You did.  And I believe,
23 what's her answer -- she said she was working on it
24 to try and take it out of her mind.  The answer was
25 problematic for two reasons:  One, in and of itself,

:02PM

:02PM

:02PM

:02PM

:03PM

Voir Dire                                871

1  trying to get it out of her mind, it indicates it
2  still is and it's not necessarily something that can
3  be put aside.  And number two, this is an individual
4  that I think is crystal clear really, really wants
5  to be on this jury, and I think that is what has
6  given this Court pause in many other jurors, and
7  it's someone that, as Your Honor said, is
8  unpredictable.  Is ambitious to be on this jury, and
9  writing answers in such a way to do anything they
10 can to get on the jury, in addition to the standard,
11 I think, that she'll have problems applying, Your
12 Honor.
13         THE COURT:  Okay.  My view is, that she's
14 highly intelligent, highly capable, and given her
15 intelligence, if what she wanted to do is get on the
16 jury, there are lots of answers here that wouldn't
17 have been written that way.  I very much doubt she
18 would've written, particularly with the capitals in
19 the answer to question 53, question 55 A, question
20 56, the answer to 55 and 56, these are not the
21 answers of someone who's desperate to sit on the
22 jury if the question displayed the intelligence and
23 experience in government that this one did.  The
24 challenge is rejected.
25         Next, 184.

Voir Dire                                   872

1          Anybody have anything to say about 184?
2          MR. GOLDSTEIN:  Defense is not moving for
3    cause.
4          MR. SCHAR:  Neither is the government.
5          THE COURT:  Number 185?
6          MR. GOLDSTEIN:  Defense is moving for cause.
7          MR. SCHAR:  Not in agreement, Judge.
8          MR. GOLDSTEIN:  Your Honor, as to 185 --
9          THE COURT:  One thing you could say is, the
10   guy is a school teacher and he has basically very
11   been grammar.  It's discouraging.
12         MR. GOLDSTEIN:  He teachers art, Your Honor.
13         THE COURT:  Nonetheless, robbery,
14   r-o-b-e-r-y. There was one other one that --
15         MR. GOLDSTEIN:  If we could exclude someone
16   for bad spelling, we'll accept --
17         THE COURT:  I'm excusing -- I'm concerned
18   about a school teacher.  There was one other.
19         MR. GOLDSTEIN:  I thought this is the
20   individual that spelled opinion with two p's.
21         THE COURT:  "I part of the necessary process"
22   for "it is part of the necessary process."  "I think
23   lowly on these parties."  I'm looking for what I
24   thought is the best one and I'm not finding it.
25   "Keep up with standard daly news," "daily" spelled

Voir Dire                                        873

1  d-a-l-y.  His insult directed to your client is
2  misspelled.  Now, some ordinary citizen without much
3  of an education who wrote this thing I would
4  disregard, but I start out with like a little
:07PM  5  feeling here that maybe this person shouldn't be
6  here.  Who challenged him?  No one?
7          MR. GOLDSTEIN:  Defense, Your Honor.
8          MR. SCHAR:  We'll confer.
9          THE COURT:  Yeah, go ahead.
:08PM  10     (Brief pause)
11         MR. SCHAR:  We're in agreement.
12         THE COURT:  I would regard, if I could reveal
13  it, this is the best name so far.  Actual name of a
14  person.
:08PM  15         Anybody want to speak to this?
16         MR. GOLDSTEIN:  On 186, Your Honor?
17         THE COURT:  Yes.
18         MR. GOLDSTEIN:  We have no motion for cause
19  on 186.
:08PM  20         MR. SCHAR:  Neither does the government.
21         THE COURT:  So, okay with everybody.
22         The probation officer?
23         MR. SOROSKY:  This might be a surprise, Your
24  Honor, but we object to 187.
:09PM  25         MR. SCHAR:  We're not in agreement, Judge.

1        THE COURT:  Because of her occupation?

2        MR. SOROSKY:  Pardon me?

3        THE COURT:  Because of her occupation or

4  relationship to the prosecutor's office?

5        MR. SOROSKY:  Yes.

6        THE COURT:  Your view?

7        MR. SCHAR:  Judge, she works, obviously, with

8  the prosecutor's office, she's not an employee of

9  ours, but she also works with defense attorney, and

10  particularly given her job now, sounds like she

11  works primarily, if not exclusively, with defense

12  attorneys.

13        THE COURT:  Well, I believe what underlies

14  the position of the defense, which I could

15  understand, is the enormous alignment between the

16  Probation Office and the U.S. Attorney's Office.  I

17  have not, however, seen this alignment, I have seen

18  lots of disagreements between the two, the best

19  occurring after the United States Attorneys reached

20  a plea agreement on a carefully calculated guideline

21  and the carefully agreed sentence and the probation

22  officer comes in with something which is like 3 and

23  a half years above what was agreed upon, at which

24  time the defense lawyer looks like an idiot to his

25  client or her client, as the case may be, and the

Voir Dire                                        875

1   prosecutor looks like somebody who lied to the
2   defense lawyer to make a deal.  I don't think
3   there's that alignment, I think they remain remote,
4   which is why they aren't really in the same
5   department.  The United States Attorney's Office is
6   in the Department of Justice, the probation officers
7   are under the jurisdiction of the court and the
8   Administrative Office of the U.S. Court.  So I'm
9   rejecting the challenge.
10          MR. SOROSKY:  If I may just say one other
11  point.  Probation officers may disagree with the
12  United State's Attorney as to what someone's
13  sentence may be, however, we're not at that stage
14  yet, we're at a trial stage.
15          THE COURT:  But they have no occasion to
16  reach conclusions about whether somebody has not
17  been found guilty is or is not guilty.
18          MR. SOROSKY:  But they only deal with -- they
19  only deal with people who have either pled guilty or
20  been convicted.
21          THE COURT:  Right.
22          MR. SOROSKY:  So --
23          THE COURT:  So they have no prior experience
24  with people like your client.
25          MR. SOROSKY:  I understand that, but they

:10PM (line 5)
:11PM (line 10)
:11PM (line 15)
:11PM (line 20)
:11PM (line 25)

Voir Dire                                          876

1   only deal with people who have been convicted.  And
2   it's very, very difficult to be a fair and impartial
3   juror when their whole work existence is dealing
4   with people who have been convicted in this
5   courtroom and other courtrooms in this building.
6           THE COURT:  Okay.  I don't think so.  I'm
7   rejecting the challenge.
8           188 we already dealt with, because he was
9   part of an earlier group.  He substituted for a
10  missing person in the 140 series.
11          189, or more precisely, Doctor 189.
12          MR. SCHAR:  No objection, Judge.
13          MR. GOLDSTEIN:  Your Honor, we'll move to
14  strike 189.  Unfortunately, you can't find any bad
15  spelling, but the only issue I have is number 182.
16          THE COURT:  Okay, let me go to it.
17          MR. GOLDSTEIN:  Page 31.
18          In his answer indicated that it's factually
19  incorrect, but more importantly, it's something that
20  I'm concerned if you believe that, how that would
21  affect his ability to judge, will he think somehow
22  because this occurred that he will look adversely
23  towards Mr. Blagojevich on that, and that's my
24  concern, Your Honor.
25          MR. SCHAR:  Judge, you know, they filed a

Voir Dire                                          877

1  ridiculous motion in front of the Court which
2  attempted a ridiculous resolution to the case and
3  now they got a juror who, understandably, probably,
4  and I think it was reported this way at some level,
5  misinterpreted it, but nonetheless answered.  I
6  mean, he's an extremely bright individual, answered
7  every question appropriately and is clearly going to
8  be fair.
9           THE COURT:  I reject the challenge for cause.
10          190, this is the last in this series, I
11 think, because we started with 199 earlier.
12          MR. SCHAR:  We have no objection.
13          MR. GOLDSTEIN:  We have no objection.
14          THE COURT:  Okay.
15          Okay, now I think we need to get to the area
16 of the count.
17          MR. GOLDSTEIN:  Your Honor, there were, I
18 believe, three individuals that were left over from
19 the morning.
20          MR. SOROSKY:  6, actually.
21          MR. GOLDSTEIN:  I thought we resolved some of
22 them, but I know there were some people that we
23 dealt with in the jury room, as well as one
24 individual.
25          THE COURT:  Well, we're going to deal with

Voir Dire                                        878

1  it, that's why I was going to start at the
2  beginning.  We're going to start with juror 101.  I
3  don't anticipate that we're going to spend that much
4  time, but I'm checking to see that everybody's
5  record -- I'm checking the accuracy of my record
6  against other people's records, and the reason I'm
7  doing that is, I don't want to go down the list with
8  Mr. Walker or with the court reporter if I don't
9  have to.
10      (Brief pause).
11          THE COURT:  I'm waiting until everyone
12  finishes shuffling papers.  This was not a signal to
13  rush.
14      (Brief pause).
15          THE COURT:  Number 1, I have as a challenge
16  for cause.
17          Actually, what I'll do is I'll just start
18  down the list and you'll utter some word to indicate
19  when I should stop.
20          Number 2 is a challenge for cause.
21          Number 3 was not challenge for cause, and
22  number 3 has indicated to us in a communication that
23  her employer is fine with whatever arrangements
24  there are with her service.
25          Number 4, I have a challenge for cause.

Voir Dire                                                    879

1          Number 5 is a no-show, and I put him down
2   challenge for cause.  One reason may be that he
3   answered the question "have you ever been arrested
4   or convicted" and he answered "no" and he has many,
5   many cases.  This is not just I forgot about that
6   one.  But he didn't show up twice.
7          Number 6, I have a challenge for cause.
8   (Coughing).  I thought this kind of thing in your
9   chest doesn't start hitting you until you're 80.
10         Number 7 is an open question.  This is number
11  7 and the plane flight.
12         MR. SCHAR:  We'll make a motion for cause,
13  Judge, given her answers.
14         MR. GOLDSTEIN:  Your Honor, we think she
15  would be fair, but we understand what's going on.
16         THE COURT:  Yeah.  But considering the
17  purposes of the flight.
18         MR. GOLDSTEIN:  Certainly, Your Honor.
19         THE COURT:  Okay, she is out.
20         And then number 8 is a challenge for cause
21  for reasons that I think we all remember.  This was
22  the criminal history issue.
23         9 is a double no-show.  This is also someone
24  who has a criminal history.  It's not a fairly long
25  list that applies to number 5, but it's still there.

1           So we have two on Page 1.

2           Number 10, challenge for cause.

3           MR. SCHAR:  Judge, who is the second one?

4           THE COURT:  Oh, I'm sorry.  We have one.  We

5   have one.  Sorry.

6           Page 2, number 10 is challenge for cause.

7           Number 11 did appear.  He came in, spoke to

8   us.  This is the guy with the broken hand.  My

9   recollection is is that he did have a difficulty

10  with the law which he did not disclose, but I'm not

11  sure of that.  Anyone want to speak to this?

12          MR. SCHAR:  Your Honor, I think he was a

13  cause challenge.

14          THE COURT:  An agreed?  Yeah, okay.

15          MR. SOROSKY:  110 was stricken, Judge,

16  challenge for cause.

17          THE COURT:  Yeah, we already have that.

18          112, stricken for cause.

19          13, stricken for cause.

20          14, stricken for cause.

21          15 was today stricken for cause on agreement.

22          16 is still here.

23          117 is still here.

24          MR. SOROSKY:  And there was an issue there

25  concerning -- that was the young lady with --

:18PM

:19PM

:19PM

:19PM

:20PM

1          THE COURT:  Right.  Right.  Right.  And the
2    truth is, the next two, 117 and 118 are two live
3    issues.  They are undecided.  There's no decision.
4          Let's start with 117, anybody want to talk
5    about it?
6          MR. SCHAR:  Judge, we're okay with her.  I
7    know she was going to call in with the job at issue,
8    but I'm having trouble remembering exactly.
9          MR. GOLDSTEIN:  I thought she was supposed to
10   call.
11         MS. KAESEBERG:  Yes, I believe she was going
12   to call and report back to the Court.
13         THE COURT:  She did communicate with us on
14   the question of compensation.
15         MR. SOROSKY:  We would have no objection.
16         THE COURT:  They don't pay.
17         MR. SOROSKY:  We would have no objection if
18   the Court were to excuse her for financial hardship.
19   I think it's legitimate.
20         THE COURT:  I do, too.
21         Number 118?
22         MR. SOROSKY:  We would have no objection --
23         THE COURT:  We spoke to this one, too.
24         MR. SCHAR:  That's fine, Judge.  We're fine
25   with striking her.

1           THE COURT:  Good.

2           So we have Page 2, 1.

3           119, I didn't mark anything down.  I think

4  he's still alive, and the issue was if anyone had

5  anything else to say.

6           MR. SCHAR:  Judge, we had moved for cause on

7  this.  We still continue to think that it's a cause

8  challenge.  Again, along in the category of someone

9  who clearly wanted to be on the jury, and saying

10 that "history would reveal itself," there were a

11 number of different things.  I think he had multiple

12 arrests.  This is also thought he was a victim of a

13 substantial financial fraud, and remember the anger

14 management issue.  I mean we still think this is

15 legitimate cause challenge and not someone who

16 should be sitting on this jury.

17          MR. GOLDSTEIN:  Your Honor, we had gone over

18 this before, I believe Your Honor already ruled that

19 he was very honest, that there was no issues as to

20 what he reported to the Court showing dishonesty in

21 any way.

22          THE COURT:  But what bothered me was not this

23 other stuff, what bothered me was the first thing

24 that Mr. Schar started with, and I had forgotten

25 this until I re-read it.  And I'm quite confident

1  that in the history of world cultural, the strain of

2  mysticism is important, but I don't know about

3  juries.  When I originally dealt with this I was

4  reminded about "the history will reveal itself," he

5  said it at another time, and that was beginning to

6  bother me about him.  And there was some other

7  things that bothered me about him, but you try to

8  disregard that because you really don't know these

9  people well and there are plenty of people in the

10 world who are non-standard, they strike a little

11 wrong in the beginning but they're fine.  The

12 history-will-reveal-itself part, used the way it's

13 used twice, and in the context that it's used twice,

14 raises substantial doubts in my mind.  I'm taking

15 him off the list.  Challenge for cause is granted.

16         Number 20, I have a no challenge to that.

17         MR. SCHAR:  Yes, Judge.

18         THE COURT:  21 was something we clarified

19 today.  I have no challenge to that.

20         22 was an already awarded challenge for

21 cause.

22         23 is something I left open, but this was

23 someone who didn't appear the first time out, and in

24 the second time out struck me as --

25         MR. SOROSKY:  She's already been stricken.

Voir Dire                                          884

1          THE COURT:  Oh, she is.  Oh, that's right.
2    You told me this morning and I forgot.  This is one
3    of the things about extreme old age.
4          Number 24 is okay.
5          Number 25 is okay.
6          Number 26 is what we heard this morning.
7          MR. GOLDSTEIN:  Your Honor, we move for cause
8    on 126.
9          MR. SCHAR:  Judge, given the financial
10   situation, we're not objecting.
11         THE COURT:  Yeah.  And he was much clearer
12   this time.  What we had is a little kitchen sink
13   last time with the plane ticket and the kids and the
14   jobs and now he's much more concrete and there's one
15   job and I understood it and I'm taking him off.
16         And the last one was an agreed, I think,
17   challenge for cause.
18         So on Page 3 we have 4.
19         128, challenge for cause.
20         129, challenge for cause, that was a no-show
21   whose commands of English I doubt.
22         130 was a challenge for cause made this
23   morning without dissent.
24         131 is okay.
25         132 is okay.

Voir Dire                                                      885

1          133 is okay.

2          134 is a challenge for cause.

3          135 is okay.

4          And 136 is the one live issue.

5          MR. SCHAR:  I'm sorry, Judge --

6          THE COURT:  The last one is one that is sort

7    of open.

8          MR. SCHAR:  I lost you at 133.  134 is gone

9    and 135 is still in.

10         THE COURT:  135 is still in, 136 is the one

11   who -- actually, we may have talked about it a

12   little this morning.

13         MR. SCHAR:  I think 137 is the one that we

14   talked about this morning.

15         MS. KAESEBERG:  I think 136 wants to begin

16   nursing course, that is a live issue.

17         THE COURT:  Right, that was the school issue.

18         MR. SCHAR:  That was a school issue.

19         THE COURT:  Views?

20         MR. GOLDSTEIN:  My understanding is that

21   we're still waiting for more information.

22         THE COURT:  Yeah, we are waiting for more

23   information, the question is is how long do we wait.

24   But I'll leave this one open.

25         MR. SOROSKY:  No, I mean --

1        THE COURT:  What do you want to do?
2        MR. SCHAR:  I'm fine, Judge, if you want to
3   strike her for cause if she is going to go to
4   school.  I don't have an issue with that.
5        MR. GOLDSTEIN:  We object to moving for
6   cause, Your Honor.
7        THE COURT:  We'll hear some more.  I think
8   she's going to wind up going.  And I don't think
9   it's very significant for anybody because this is a
10  person who, in my opinion, which could be wrong, is
11  unlikely to be a leader of the jurors, but we will
12  check since we have tomorrow to do it.
13       So as it currently stands, on Page 4 I have,
14  1, 2, 3, 4.
15       Page 5, 137 I believe we agreed this morning
16  should be gone.
17       MR. GOLDSTEIN:  Oprah for good cause, Judge.
18       THE COURT:  Yeah.  138 was gone before.
19       139 is in.
20       140 is in.
21       MR. SCHAR:  I think 139 is gone, Judge.
22       MR. GOLDSTEIN:  Correct.
23       THE COURT:  Let me look that one up.
24     (Brief pause).
25       THE COURT:  140 is in.

1          141 is in.

2          142 is in.

3          The remaining three in the page are out.

4          So we have either 3 or 4 on this page.  I'll

5  put it down as a 3 so we know what our minimum count

6  is.

7          MR. GOLDSTEIN:  Your Honor, you said the

8  remaining 3 are out?  Which numbers?

9          THE COURT:  The ones who are in, the main 3

10 are 43, 44 and 45.

11         MR. SCHAR:  144 was in, Judge.

12         THE COURT:  Let me check that one too,

13 because my record is fairly clear on this.

14         MR. GOLDSTEIN:  We did make a motion for

15 cause as to 144, we wanted him stricken, but I do

16 not know Your Honor's rule.

17         THE COURT:  So we have three checkups.

18         Beginning with 146, I have 146 in; 147 out;

19 148 in; 149 in; 150 out; 151 in; the remaining 3

20 out.

21         MR. SOROSKY:  What are the remaining 3

22 numbers, just so we're clear?

23         THE COURT:  52, 53 and 54.

24         Moving on to Page 7:

25         155 is out.

Voir Dire                                      888

1        156 is out.

2        157 is awaiting financial stuff.

3        158 is out.

4        159 is out.

5        160 is in.

6        161 is out.

7        163 is in.

8        MR. SOROSKY:  I think 161 is in.

9        THE COURT:  Yeah, 161 is in.

10       160 is in, 161 is in, 162 is out, 163 is in.

11       So what we have on Page 7, the absolute

12  minimum is 3.  So 3 of them are in, there might be a

13  fourth, but I'm only concerned about what we know is

14  in.

15       Page 8:

16       164 is in.

17       165 is in.

18       186, awaiting financials.

19       Okay, we did get the note from 166's

20  employer.  They do not pay, they do not pay

21  anything, which is the thing we were looking for.

22  So I'm inclined to let her out.

23       So what I have on this page is three people

24  in, 164, 165, 170, everyone else is out.

25       MR. SCHAR:  170?

Voir Dire                                                        889

1         THE COURT:  170 is in.

2         Page 9:

3         173 is out.

4         174 is in.

:34PM    5         175 is in.

6         176 is in.

7         177 is out.

8         178 is in.

9         179 is in.

:34PM    10        180 is out.

11        181 is in.

12        Are we all on the same page?

13        MR. SCHAR:  Yes, Judge.

14        MR. SOROSKY:  Yes.

:35PM    15        THE COURT:  Page 10:

16        182 is out.

17        183 is in.

18        184 is in.

19        185 is out.

:35PM    20        186 is in.

21        187 is in.

22        188 is out.

23        189 is in.

24        190 is in.

:36PM    25        The next Page:

1          191 is in.

2          192 is in.

3          193 is in.

4          194 is out.

:37PM    5          195 is open.  I don't remember why we left

6    that open, we just dealt with it.

7              MR. SCHAR:  She was a no-show.

8              THE COURT:  That was a no-show.  Might have a

9    good reason.

:37PM   10             MR. SCHAR:  Correct.

11             THE COURT:  196 is in, 197 is in, 198 is in,

12   199 is out.

13             MR. SCHAR:  Judge, hold on.

14             MR. SOROSKY:  Excuse me, I think 197 is out.

:37PM   15             THE COURT:  Oh, that's right.  That was

16   agreed for other reasons.

17             Next page, and we've reached the end:

18             200 is out.

19             201 is out.

:38PM   20             202 is out.

21             203 is out.

22             205 is out.

23             So the current count shows 42 with a possible

24   3 or 4 more.  My listing is this, these are the 11

:38PM   25   pages, 1 in from Page 1, 1 in from Page 2 --

Voir Dire                                      891

1         MR. SCHAR:  Judge, what --

2         MR. SOROSKY:  It's --

3         THE COURT:  You don't have the list, okay.  I

4  have 42, at a minimum.  I would like to have more.

5  We have left on the special list 15, I believe we'll

6  do them tomorrow, and then we will have the check

7  list of people we have to make further inquiry

8  about.

9         MR. SCHAR:  Judge, is -- go ahead, I'm sorry.

10         THE COURT:  No, go ahead.

11         MR. SCHAR:  My understanding is that there

12  are 9 strikes, 13 strikes, and that's to include the

13  alternates?

14         THE COURT:  Yes.

15         MR. SCHAR:  And it's my understanding, and

16  we've had a little bit of discussion about various

17  methods, that assuming the plan as to the last trial

18  where we will go sequentially and we can use our

19  strikes whenever we like to use them, is that how we

20  plan on proceeding?

21         THE COURT:  Well, what I always do is, I give

22  you a sheets of paper and you put your peremptories

23  on there, I give them a sheet of paper, they put

24  peremptories on there, neither one knows what the

25  other side has, and they hand the sheet they wrote

Voir Dire                                      892

 1  to me.
 2          MR. SCHAR:  Understood.  I just want to make
 3  sure that the plan is they will be seated in the
 4  order that we've gone.
 5          THE COURT:  We can discuss that.
 6          MR. SCHAR:  Okay.
 7          THE COURT:  There are only three ways to deal
 8  with this, I suppose you could have more, one is is
 9  they're seated in the order in which they're
10  selected and the alternates are determined by the
11  ones with the highest numbers, which is customary in
12  this building.  There are courts that do that in
13  reverse, they do that in reverse because they find
14  that it discourages this enormous concern plotting
15  and strategy involved in knocking off the earliest
16  ones and then playing much less the standards at the
17  end because they're probably not going to sit, and
18  it's difficult to take that kind of approach when
19  you have no idea who the last ones are going to be,
20  so you get much more neutral and less tactical, very
21  few districts do it, but some do.  There's a
22  practice I don't applied in federal courts, but was
23  applied in state courts, some state courts in
24  Illinois for a period of time, which is they did
25  random selection, they drew them out of a hat.  I

Voir Dire                                            893

1   always like the drawing out of a hat.  But,
2   generally speaking -- and I like it when I was a
3   lawyer, despite the fact that my co-counsel thought
4   that I was bananas when I told him I liked the
5   drawing.
6           The two of you can discuss this and if you
7   agree, I'll do whatever you want, and if you by some
8   chance disagree, I'll pick one.
9           MR. SCHAR:  Okay, Judge.
10          THE COURT:  This will give you an incentive
11  in your negotiations with each other.
12          MR. SCHAR:  We'll talk to defense counsel and
13  hopefully resolve this amicably.
14          THE COURT:  Right.  Could you always flip a
15  coin, too.
16          MR. SCHAR:  Judge, since we have plenty of
17  jurors, I hope that you will at least at some point
18  perhaps reconsider our cause challenge on 178 who
19  was the individual with the disability, who is on
20  disability.  I raised the monetary issue, but my
21  thoughts go beyond that.
22          THE COURT:  This issue, did this list is
23  open.
24          MR. SCHAR:  Okay.
25          THE COURT:  First of all, we don't know what

Voir Dire                                                894

1  the whole list is.  I have to decide whether if I
2  don't give information on financial hardship,
3  whether based on what I have, I can determine that
4  there is no financial hardship and it's a phony
5  excuse, or whether based on what I have I am
6  inclined to believe that maybe it's a legitimate
7  excuse.  I like to wait until they send something in
8  to me.  And the fact that they do not send something
9  in to me says something.  So, basically --
10         MR. SCHAR:  You'll hold that one open, Judge?
11         THE COURT:  Yeah, this is not a final list.
12         MR. SCHAR:  Thank you, Judge.
13         THE COURT:  This list is assembled so that I
14  know where we are, so that I know whether I have to
15  summon others in the petit jury, who are still going
16  to fill out the questionnaire in case disaster
17  comes, and since we would have to spend, in any
18  event, a significant part of tomorrow on completion
19  of the jury, we're not going to begin until Monday.
20         MR. SCHAR:  Openings will be on Monday,
21  Judge?
22         THE COURT:  Opening will be on Monday.
23         MR. SCHAR:  Thank you.
24         MR. SOROSKY:  Just so we're clear as to the
25  numbers, I have 44 jurors now with two subject to

Voir Dire                                          895

1  question.
2        THE COURT:  I think there are actually 3 or 4
3  subject to question.  But we don't have to be
4  absolutely accurate now.  This is to get a
5  preliminary picture, and the operative number, in
6  theory, is 40.  Although, I don't have an ironclad
7  faith in that, I'd like to have more just in case.
8        So that's, basically, where we are.
9        MR. SCHAR:  9:30, Judge?
10       THE COURT:  9:30 is fine.
11    (Adjournment taken from 6:44 o'clock p.m. to
12     9:30 o'clock a.m. on August 28, 2011.)
13
14
15
16
17
18
19
20
21
22
23
24
25

:44PM

:44PM

```
    *      *      *      *      *      *      *      *
```

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
                        MATTER


  /s/Blanca I. Lara                          date



_____        _____

        Blanca I. Lara                          Date