968

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
    UNITED STATES OF AMERICA,      )
 4                                 )
                    Plaintiff,     )
 5                                 )
                                   )
 6  -vs-                           )   Case No. 08 CR 888
                                   )
 7                                 )   Chicago, Illinois
    ROD BLAGOJEVICH,               )   April 28, 2011
 8                                 )   2:05 p.m.
                    Defendant.     )
 9                                 )

10                       VOLUME 5 PM
                   TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE JAMES B. ZAGEL

12  APPEARANCES:

13  For the Government:

14          THE HONORABLE PATRICK J. FITZGERALD,
            UNITED STATES ATTORNEY
15          BY:  Reid J. Schar
                 Carrie E. Hamilton
16               Christopher Niewoehner
            219  S. Dearborn Street
17          Suite 500
            Chicago, IL  60604
18

19

20

21  Court Reporter:

22          KATHLEEN M. FENNELL, CSR, RMR, FCRR
                 Official Court Reporter
23             United States District Court
          219 South Dearborn Street, Suite 2144-A
24            Chicago, Illinois  60604
             Telephone:  (312) 435-5569
25                 www.Kathyfennell.com
```

1    APPEARANCES:   (Continued)

2    For Defendant Rod Blagojevich:

3            KAPLAN & SOROSKY
             BY:  Sheldon M. Sorosky
4            158 West Erie
             Chicago, Illinois  60610
5            (312) 640-1776

6            OFFICES OF AARON B. GOLDSTEIN
             BY:  Aaron Benjamin Goldstein
7            6133 South Ellis
             Chicago, Illinois  60637
8            (773) 752-6950

9            OFFICES OF LAUREN FAUST KAESEBERG
             BY:  Lauren Faust Kaeseberg
10           2140 N. Lincoln Park West
             Suite 307
11           Chicago, IL  60614
             (773) 517-0622

12

13           LAW OFFICE OF ELLIOTT RIEBMAN
             BY:  Elliott Riebman
14           158 West Erie
             Chicago, Illinois  60610
15           (847) 814-2900

16

17

18

19

20

21

22

23

24

25

1          (Proceedings heard in open court:)

2              THE COURT:  Counsel approach briefly.

3              We have resolved one of the -- 136 and 157 are the

4    two open ones, I believe.  We contacted 136, and 136 informed

5    us that she's perfectly able to serve.  Her issue had to be

6    that they would call her in.  Remember we called her in early.

7    The other issue with respect to school apparently is not an

8    issue, so she's okay.

9              Where are we with a number now?

10             MR. SCHAR:  We're at 216.

11             THE COURT:  No, no, I'm talking about total.

12             MR. SCHAR:  We were at -- through cause challenges, I

13   want to say we're at 43 or 44, although we haven't done all

14   challenges to the last group.

15             THE COURT:  Were we at 40 or 41?

16             MS. HAMILTON:  Before we started today?

17             THE COURT:  Yeah.

18             MS. HAMILTON:  With the inclusion of 136, I have 41.

19             THE COURT:  Yeah, that's what I thought, too.

20             So we have a potential from previous days to get to

21   42, depending on 157.  That's it.

22             Now for today, I see one.  What I see is 207.

23             MR. SCHAR:  Right.

24             THE COURT:  One, 212, I'm excusing because I think he

25   doesn't understand English very well.  I'm basing that on the

```
 1    way he spoke.  I'm basing it on the fact that he said he
 2    doesn't speak English very well and on the fact that he
 3    obviously did not understand most of the questions on the
 4    questionnaire.
 5              Anybody have a problem with this?
 6              MR. SCHAR:  No, Judge.
 7              THE COURT:  I failed to -- no, I didn't fail.  I'm
 8    sorry, I thought I did, but I hadn't.  We have 113, 114, and I
 9    haven't yet asked for challenges one way or the other, and I'm
10    not going to yet.  I'm going to take some more.  Maybe we'll
11    stop again at -- oh, let's just keep going for a while, and
12    I'll stop when it looks right.
13              216.
14              THE CLERK:  216?  216.
15        (Prospective Juror No. 216 enters courtroom.)
16              THE COURT:  216.
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  I'm just going to go over some of these
19    with you, not all of them.
20              PROSPECTIVE JUROR:  Okay.
21              THE COURT:  What do you do for a living?
22              PROSPECTIVE JUROR:  I work for a bank, Royal Bank of
23    Scotland.
24              THE COURT:  And what do you do at that bank?
25              PROSPECTIVE JUROR:  Collateral management globally
```

1    for the derivative trading book.  So it's risk mitigation

2    basically, collateralizing exposure.

3              THE COURT:  And how do you do this?

4              PROSPECTIVE JUROR:  We do this by receiving

5    information on all of the bank's activities globally and then

6    collateralizing that exposure with clients.

7              THE COURT:  And the method you do that is by wire, by

8    computers?

9              PROSPECTIVE JUROR:  Yes, computers.

10             THE COURT:  And does this involve getting consent of

11   account holders or customers?

12             PROSPECTIVE JUROR:  There is.  There's agreements

13   that are in place between the bank and the clients that are

14   legally binding.

15             THE COURT:  Preexisting agreements?

16             PROSPECTIVE JUROR:  Preexisting, yes.  So there's no

17   collateralization unless there's a preexisting agreement that

18   has all the pertinent terms and provisions.

19             THE COURT:  So they've permitted you to

20   collateralize -- use their assets as collateral.

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Okay.  Now, is this something on like in

23   each individual transaction you would accomplish very quickly?

24             PROSPECTIVE JUROR:  We do.  It's an aggregate

25   portfolio, so it's -- there's -- everything is preexisting in

1  the agreement, so whatever products are going to be covered
2  that are eligible for collateralization are going to be known
3  and then filtered in, so everything's done very quickly.  We
4  get one number that needs to be collateralized.
5          THE COURT:  Okay.  You supervise 14 people?
6          PROSPECTIVE JUROR:  That's correct.
7          THE COURT:  You have three children.  23 is the
8  oldest and 12 is the youngest?
9          PROSPECTIVE JUROR:  Yes, that's correct.
10         THE COURT:  And what does your husband do?
11         PROSPECTIVE JUROR:  He works for Chicago Truck.  It's
12 heavy duty Volvo.  He's in the mechanics union, so -- he's not
13 a mechanic, but he deals in parts and repairs.
14         THE COURT:  And I think you said this, you manage
15 collateral for the U.S. region.
16         PROSPECTIVE JUROR:  Yes, that's right.
17         THE COURT:  You -- you hired a lawyer for your
18 daughter's claim?
19         PROSPECTIVE JUROR:  Uh-huh.
20         THE COURT:  Did it take a long time to resolve?
21         PROSPECTIVE JUROR:  About three or four weeks it
22 took.  It was an automobile accident.
23         THE COURT:  Did you regard that as speedy?
24         PROSPECTIVE JUROR:  Yeah, yeah.
25         THE COURT:  Okay.  You're right.  It was speedy.

1    PROSPECTIVE JUROR:  It was a lot of information.
2    THE COURT:  I don't want to get into the details, but
3    you were once interviewed by the FBI?
4    PROSPECTIVE JUROR:  Yes.
5    THE COURT:  And how long an interview was that?
6    PROSPECTIVE JUROR:  Hour and a half, two hours maybe.
7    THE COURT:  Okay.  And how long ago was that?
8    PROSPECTIVE JUROR:  Just a few months.  It was in the
9    winter, so maybe six months.
10   THE COURT:  And you were also interviewed by the
11   State Department?
12   PROSPECTIVE JUROR:  Yes.
13   THE COURT:  And was that regarding a State Department
14   employee or an employee of yours?
15   PROSPECTIVE JUROR:  It was an employee of mine that
16   was looking to get a position within the United Nations.
17   THE COURT:  Right.  So this was more of a background
18   interview for you -- for her.
19   PROSPECTIVE JUROR:  Yes, for her, on her behalf, yes.
20   THE COURT:  Your childhood friend ran for alderman
21   but was not elected.  Did you participate in the campaign?
22   PROSPECTIVE JUROR:  Just fundraising, a couple of
23   cocktail parties and things like that.
24   THE COURT:  Right.  Was the election close?
25   PROSPECTIVE JUROR:  I don't think so.

1      THE COURT:  Okay.

2      PROSPECTIVE JUROR:  Unfortunately, no.

3      THE COURT:  Was it fun for you?

4      PROSPECTIVE JUROR:  Uh-huh.  It was.

5      THE COURT:  The contributions you made, would you

6  regard them as a lot of money, a little money, or somewhere in

7  between?

8      PROSPECTIVE JUROR:  No, it wasn't a lot of money.  A

9  little money.

10      THE COURT:  You were asked what your primary leisure

11  activities are, hobbies and interests, and basically it

12  involved your children's activities.

13      PROSPECTIVE JUROR:  It does, yes.

14      THE COURT:  So your hobbies and interests are your

15  children's activities.

16      PROSPECTIVE JUROR:  Yeah, they have quite full

17  schedules, and they're both -- two of the kids are in

18  competitive sports, and travel is required.

19      THE COURT:  So basically, the primary leisure

20  activities, hobbies and interests are not entirely chosen

21  voluntarily by you, is that correct?

22      PROSPECTIVE JUROR:  That's correct.

23      THE COURT:  Okay.  Your daughter was treated at

24  Children's Memorial when she was very small?

25      PROSPECTIVE JUROR:  Uh-huh.

1    THE COURT:  How long ago would you say that was?

2    PROSPECTIVE JUROR:  22 years.

3    THE COURT:  Okay.  And you've donated to the

4  hospital?

5    PROSPECTIVE JUROR:  Yes.

6    THE COURT:  Often or just one time?

7    PROSPECTIVE JUROR:  Uh-huh, annually.

8    THE COURT:  Large amounts of money, small amounts of

9  money?

10    PROSPECTIVE JUROR:  We usually do the annual raffles

11  for the car giveaways, I think it's around $200.

12    THE COURT:  Okay.  You didn't follow the case before

13  closely, is that correct?

14    PROSPECTIVE JUROR:  I did not, no.

15    THE COURT:  And so you have actually formed no

16  opinion.

17    PROSPECTIVE JUROR:  I don't.  I didn't -- I mean, I

18  saw headlines and various bits of it, but, no, in all honesty,

19  I don't have an opinion one way or the other.

20    THE COURT:  And you do understand that during the

21  course of this case, if you're on the jury, you would have to

22  avoid news coverage of this.

23    PROSPECTIVE JUROR:  Yes.

24    THE COURT:  And during the course of the trial,

25  you're supposed to depend upon, rely upon and weigh only the

1  evidence you hear in open court.  Do you understand that?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Sometimes some of that evidence may

4  remind you of something you heard or read before that you've

5  just forgotten about now.  You understand that could happen?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  If that happens, when you go back to

8  decide the case, you have to disregard, that is, to put off to

9  one side anything you remembered about coverage or remembered

10 from what happened at another time and judge this case only on

11 the basis of the evidence that you've heard or read in the

12 court.  Do you understand that?

13         PROSPECTIVE JUROR:  I do, yes.

14         THE COURT:  Could you do that?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  The one question you said you didn't

17 understand is a question that a few other jurors said they

18 didn't understand, so --

19         PROSPECTIVE JUROR:  Okay.

20         THE COURT:  -- I'll explain it to you.

21         It says, "At the conclusion of the case, the Court

22 will instruct you as to the law that you must apply to this

23 case.  Are you willing to follow that law as the Court gives

24 it even if you disagree with the law as the Court states it?"

25         What happens at the end of the case is you hear all

1    of the evidence, and then I sit up here and I read to you a

2    series of instructions about what the law is, and I define

3    various legal terms, and then when all that's said and done, I

4    give you everything I've written, everything I've said in

5    written form, and that's the law you have to follow.

6            Now, sometimes when I'm reading those instructions, a

7    juror may think, well, that may be what the law is, but I

8    don't think that's a good law, or the law ought to be changed.

9            PROSPECTIVE JUROR:  I see.

10           THE COURT:  And sometimes I have to tell you the same

11   thought crosses my mind; but under our rules, you, a juror,

12   and I, the trial judge, have to respond -- have to respect and

13   follow the rules which are laid down by the Congress of the

14   United States and by the higher courts.  That's what the

15   meaning of the question is.

16           Will you follow the law even if you happen to

17   disagree with it?

18           PROSPECTIVE JUROR:  Okay.

19           THE COURT:  Yes or no?

20           PROSPECTIVE JUROR:  I -- yes, to the best of my

21   ability, I would do that.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  You do volunteer work?

25           PROSPECTIVE JUROR:  Yes.

1        THE COURT:  A lot of it, a little of it?

2        PROSPECTIVE JUROR:  A little.

3        THE COURT:  Thank you.

4     (Prospective Juror No. 216 exits courtroom.)

5     (Prospective Juror No. 217 enters courtroom.)

6        THE COURT:  217?

7        PROSPECTIVE JUROR:  Yes.

8        THE COURT:  What do you do at work?

9        What do you do at work?

10        PROSPECTIVE JUROR:  I'm a human resource manager

11   director.

12        THE COURT:  And you have a college degree?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  Is that what you studied in college,

15   human resources management?

16        PROSPECTIVE JUROR:  No, business management.

17        THE COURT:  Okay.  And basically, you're in charge of

18   hiring and firing and unemployment claims and workmen's comp

19   and payroll and that kind of stuff.

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  And according to this, you supervise just

22   one other person.

23        PROSPECTIVE JUROR:  Directly, yes.

24        THE COURT:  And what does your husband do?

25        PROSPECTIVE JUROR:  He's a cook for a pizza

1  restaurant.

2         THE COURT:  How long has he been working there?

3         PROSPECTIVE JUROR:  Almost ten years.

4         THE COURT:  You had a family member in the military?

5         PROSPECTIVE JUROR:  Yes.

6         THE COURT:  A relative or a friend?

7         PROSPECTIVE JUROR:  Brother, relative.

8         THE COURT:  Your brother?

9         PROSPECTIVE JUROR:  Yes.

10        THE COURT:  When was he in the military?

11        PROSPECTIVE JUROR:  He's still serving.

12        THE COURT:  He's still serving?  Do you remember

13  which branch?

14        PROSPECTIVE JUROR:  He's in Fort Benning, Georgia.

15        THE COURT:  Okay.  Do you see him often?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Okay.  You have a brother who was

18  convicted of a crime?

19        PROSPECTIVE JUROR:  Yes.

20        THE COURT:  And he's out now?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  How's he doing?

23        PROSPECTIVE JUROR:  He's on house arrest now.

24        THE COURT:  Yeah.

25        PROSPECTIVE JUROR:  Doing better.

1      THE COURT:  Have you ever been arrested or convicted
2  of a crime?
3           PROSPECTIVE JUROR:  No.
4      THE COURT:  And you were once a victim of a crime for
5  which somebody was convicted?
6           PROSPECTIVE JUROR:  Yes.
7      THE COURT:  And got a 15-year sentence?
8           PROSPECTIVE JUROR:  Yes.
9      THE COURT:  Were you satisfied with the result?  You
10  don't have to be, just tell me one way or the other.
11           PROSPECTIVE JUROR:  No.
12      THE COURT:  You thought the sentence was too light or
13  too heavy?
14           PROSPECTIVE JUROR:  Too light.
15      THE COURT:  What do you do for hobbies?
16           PROSPECTIVE JUROR:  I scrapbook.  That's it.
17      THE COURT:  When did you start doing that?
18           PROSPECTIVE JUROR:  Right after I had my daughter.
19      THE COURT:  How much time do you spend doing the
20  scrapbooks?
21           PROSPECTIVE JUROR:  Not enough time, but at least a
22  few hours a week.
23      THE COURT:  How old is your daughter?
24           PROSPECTIVE JUROR:  She's going to be three on
25  Saturday.

1      THE COURT:  Where do you get your news from?

2      PROSPECTIVE JUROR:  Usually the Internet, CNN, MSNBC.

3      THE COURT:  Do you get a lot of news?  Is news a big

4  thing for you?

5      PROSPECTIVE JUROR:  No, not really.

6      THE COURT:  And you never saw news about this case.

7      PROSPECTIVE JUROR:  No, I didn't follow it.

8      THE COURT:  Right.

9      Is there lots of stuff in the news that you just

10  don't follow because you're not interested?

11      PROSPECTIVE JUROR:  That's true.

12      THE COURT:  So basically, your interests in life are?

13      PROSPECTIVE JUROR:  Say that one more time?

14      THE COURT:  Your interests in life are what?

15      PROSPECTIVE JUROR:  My interests in life, I guess

16  it's work and my family.

17      THE COURT:  Okay.  And how long have you worked for

18  your company?

19      PROSPECTIVE JUROR:  Five-and-a-half years.

20      THE COURT:  Did you replace somebody who was there?

21  Did you take somebody else's job?

22      PROSPECTIVE JUROR:  No.

23      THE COURT:  Is it a new company?

24      PROSPECTIVE JUROR:  No, it's a -- it's about a

25  50-year-old company, and the owners have had it for about 10,

1   15 years, and it's just been growing tremendously.  So I've

2   been there since they first started.

3           THE COURT:  Well, for what it's worth, they think

4   very highly of you.

5           PROSPECTIVE JUROR:  Thank you.

6           THE COURT:  If you served on this jury, would you be

7   a fair and impartial juror?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Thank you.

10      (Prospective Juror No. 217 exits courtroom.)

11      (Prospective Juror No. 218 enters courtroom.)

12          THE COURT:  You're No. 218?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  What do you do for a living?

15          PROSPECTIVE JUROR:  I'm an IT technician in a

16  freight-forwarding company.

17          THE COURT:  And how long have you been employed by

18  them?

19          PROSPECTIVE JUROR:  Approximately three years.

20          THE COURT:  And what do you actually do at work each

21  day?

22          PROSPECTIVE JUROR:  I take phone calls about

23  nationwide -- we have branches all over the United States, and

24  we take phone calls, computer -- about computer issues and we

25  fix them remotely.  Also locally at the branch we also take

1      care of computer problems.

2              THE COURT:  How much of your work is dealing with

3      computers and computer problems?

4              PROSPECTIVE JUROR:  Probably 90 percent of the time.

5              THE COURT:  Who has the car wash?

6              PROSPECTIVE JUROR:  It used to be my stepdad that

7      passed away and also his brother years ago.

8              THE COURT:  Does your wife work?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And what does she do?

11             PROSPECTIVE JUROR:  Same company.  She's an air

12     export agent.

13             THE COURT:  What did you do with respect to the Air

14     Force?

15             PROSPECTIVE JUROR:  Excuse me?

16             THE COURT:  What did you do with the Air Force?

17             PROSPECTIVE JUROR:  I was a fighter plane mechanic.

18             THE COURT:  And how long did you do that work?

19             PROSPECTIVE JUROR:  Four years active, four years

20     inactive.

21             THE COURT:  And where did you do that work?

22             PROSPECTIVE JUROR:  Most of my duty was in North

23     Carolina.

24             THE COURT:  What was your rank on discharge?

25             PROSPECTIVE JUROR:  Senior airman E3 -- I'm sorry --

1    E4.

2              THE COURT:  Ever been arrested or convicted of a

3    crime?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  What was that?

6              PROSPECTIVE JUROR:  Not convicted, arrested.

7              THE COURT:  Yeah, either one.  You were arrested for

8    what?

9              PROSPECTIVE JUROR:  I've been arrested for -- I think

10   it was a misdemeanor before the Air Force for shoplifting.

11             THE COURT:  And what happened to it?

12             PROSPECTIVE JUROR:  It got -- my record got expunged.

13   It got dropped.

14             THE COURT:  How long ago was that?

15             PROSPECTIVE JUROR:  Back in '97 I want to say, '96,

16   '97.

17             THE COURT:  And where was it?

18             PROSPECTIVE JUROR:  Here in Chicago.

19             THE COURT:  Okay.  Family member or close friend ever

20   been arrested or convicted?

21             PROSPECTIVE JUROR:  My wife years ago because she

22   didn't have a license.

23             THE COURT:  A driver's license?

24             PROSPECTIVE JUROR:  Correct.

25             THE COURT:  Okay.  And anybody else?

1          PROSPECTIVE JUROR:  My brother, my brother years ago
2     also for theft, misdemeanor theft.  I'm not sure exactly
3     what -- the specifics.
4          THE COURT:  Okay.  You hired a lawyer for your wife's
5     immigration status?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  Were you satisfied with the result?
8          PROSPECTIVE JUROR:  Yes.
9          THE COURT:  Okay.  You served on a jury.
10         PROSPECTIVE JUROR:  Yes, in DuPage County.
11         THE COURT:  You don't remember much of the details,
12    is that right?
13         PROSPECTIVE JUROR:  No, I do not.
14         THE COURT:  Okay.  You belong to anything?  Any
15    group, any club, any organization of any sort?
16         PROSPECTIVE JUROR:  No.
17         THE COURT:  Do you occasion -- it says that
18    occasionally you go to the local church.
19         PROSPECTIVE JUROR:  Occasionally for special
20    occasions.
21         THE COURT:  Is it fair for me to say you think that
22    our current system of electing people is not necessarily the
23    best in the world?
24         PROSPECTIVE JUROR:  Correct.
25         THE COURT:  If you sit on this jury what you're going

1    to be asked to decide is nothing about politicians in general
2    and nothing about the political system.

3          What you're going to be asked to decide is whether
4    the government has proved its case against one specific person
5    and whether they proved that that person violated certain
6    specific federal laws.  That's all you're going to be asked to
7    decide.

8          Will your -- will you be able to decide that on the
9    basis of all the evidence you hear and not some general ideas
10   that politicians are bad guys?

11          PROSPECTIVE JUROR:  Yes, I believe so.

12          THE COURT:  Favorite hobbies, favorite activities,
13   what do you do for leisure?

14          PROSPECTIVE JUROR:  Watch movies, hang out with
15   friends, watch TV, do things around the house.

16          THE COURT:  Where do you get your news from?

17          PROSPECTIVE JUROR:  Every so often, I watch morning
18   news getting ready for work or sometimes on the web,
19   headlines.

20          THE COURT:  Are you a big news hound or is it just
21   something you take a little of?

22          PROSPECTIVE JUROR:  No, just if someone's talking
23   about it or somebody might share a link or something.  That's
24   the only reason why I would take a look.

25          THE COURT:  And you were once treated at Children's

988

1  Memorial Hospital yourself?

2         PROSPECTIVE JUROR:  Years ago, probably '96, '95.

3         THE COURT:  How old were you then?

4         PROSPECTIVE JUROR:  Oh, I was -- probably even

5  younger than that.  I might have been 14, 15.

6         THE COURT:  Yeah.

7         PROSPECTIVE JUROR:  Something like that.

8         THE COURT:  You didn't follow any previous news

9  coverage in this case?

10        PROSPECTIVE JUROR:  No.

11        THE COURT:  Do you recall -- without remembering any

12  details, do you recall at least seeing it mentioned now and

13  then?

14        PROSPECTIVE JUROR:  The one where -- this one we're

15  talking?

16        THE COURT:  Yes.

17        PROSPECTIVE JUROR:  Yes.

18        THE COURT:  But you don't remember any of the

19  details?

20        PROSPECTIVE JUROR:  No, I was really just -- I might

21  have taken a look just to see what the whole jury issue is

22  going on.

23        THE COURT:  Okay.

24        PROSPECTIVE JUROR:  If I was going to get called back

25  because I have a work trip that's coming up.

1          THE COURT:  When does your work trip come up?

2          PROSPECTIVE JUROR:  May 11th through the 14th.

3          THE COURT:  And what's that for?

4          PROSPECTIVE JUROR:  It's we're building -- we're

5    moving an office in Charlotte, North Carolina.  I have a

6    letter from work.

7          THE COURT:  Yeah, I saw the letter.

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  I do want you to know I will consider

10   that, but there's no guarantee one way or the other.  Do you

11   understand that?

12         PROSPECTIVE JUROR:  I was going to book the travel

13   yesterday.

14         THE COURT:  Yeah.

15         PROSPECTIVE JUROR:  So I need to know when I can --

16         THE COURT:  You'll know --

17         PROSPECTIVE JUROR:  -- book the travel.

18         THE COURT:  You'll know very soon.

19         PROSPECTIVE JUROR:  Thank you.

20         THE COURT:  Would you be a fair and impartial juror

21   in this case?

22         PROSPECTIVE JUROR:  Say one more time, please?

23         THE COURT:  Would you be a fair and impartial juror

24   in this case?

25         PROSPECTIVE JUROR:  Yes.

1      THE COURT:  Thank you.

2      (Prospective Juror No. 218 exits courtroom.)

3      THE COURT:  Stop now.

4      One note for the record, Juror 219 is a no-show, so

5  that will have to be pursued.

6      So before moving on to the last few that we have,

7  we're going to go up and talk about the ones we haven't talked

8  about yet, so you can come to the lectern.

9      And I believe the open ones now are 213, 214, 216,

10  217, 218.

11      213.

12      MR. SCHAR:  Judge, the government will move for

13  cause.  Obviously, she's got conflicts with two court

14  appearances which also leads to an issue of litigation; but

15  probably just as importantly, she made clear she doesn't know

16  if she would have trouble judging in this particular case.

17      And you gave her an opportunity to -- her answer

18  actually indicated that as well, but you gave her an

19  opportunity and I think tried to rehabilitate her, and she

20  still hesitated and did not give a clear answer as to whether

21  or not she could judge in this case.

22      So given that and given the fact that, you know, we'd

23  have to take breaks to actually accommodate her court

24  appearances, we think that she's a cause challenge.

25      MR. SOROSKY:  We'd strongly object, your Honor,

1  strongly object.

2        First of all, I believe this woman answered Question

3  78, "I believe he's innocent until proven guilty," and of all

4  the jurors, this is the only juror who -- who gave the correct

5  standard, and I think that's what the government is fearful

6  of.

7        MR. SCHAR:  That's not what the government is fearful

8  of.

9        MR. SOROSKY:  Wait --

10       MR. SCHAR:  You know, and, Judge, I don't know what

11  it is with Mr. Sorosky today, but the attacks on the

12  government are not going to, I think, get us anywhere.  So if

13  we can just stick with whether or not it's a cause challenge

14  or not without being -- somehow trying to pidgeonhole the

15  government's view as to a concern.  I've articulated the

16  government's concern.

17       MR. GOLDSTEIN:  Is that similar to the criticism you

18  had of the defense in the motion that they filed that you

19  called crazy yesterday?  Is that in any way similar?

20       THE COURT:  No, it's actually not similar.

21       The reason --

22       MR. SOROSKY:  In any event --

23       THE COURT:  Wait, wait, stop.

24       The reason it's not similar, and I want to put an end

25  to this, if you start talking about the other side's intent,

1  why they're doing something, why they're making an argument,

2  at least in this particular context, you're crossing the line.

3          You are not crossing the line if you say, for

4  example, you think that Mr. Schar's objections are stupid.

5  This is okay.  But that's the difference between the two.

6          MR. SOROSKY:  Well --

7          THE COURT:  Unless you think, perhaps, the crazy

8  meant the state of mind of the lawyer as opposed to the

9  content of the motion, but I don't think that was what

10  Mr. Schar was talking about, and if he was, he shouldn't have

11  done it.

12          Go ahead.

13          MR. SOROSKY:  Your Honor, the last thing I think is

14  that the government is stupid.  They're intelligent and there

15  are --

16          THE COURT:  Yeah, but don't tell me why.  Just tell

17  me why this juror is swell.

18          MR. SOROSKY:  Well, first of all, her legal issues

19  are trivial and meaningless.  I think one involved one

20  customer of hers who was removed from the bus and he wanted to

21  get back on the bus.

22          I mean, it's a trivial issue.  Perhaps it's important

23  to that man who was off the bus, but that issue is not going

24  to affect her ability to decide this case.

25          And what was the other issue?

1        MS. KAESEBERG:  The other, I believe, she said she

2    made a 50 percent downpayment on a bathroom remodel.  There

3    was an issue about that.

4        MR. SOROSKY:  So in this case, she pays to have her

5    kitchen or home remodeled.  The person doesn't do what they

6    were supposed to do after she paid, and she should be

7    discriminated against because someone didn't do their job

8    after she paid?  It's silly.  Literally silly.

9        And with all due respect, I don't mean to violate

10   your Honor's order about talking about intent, but we could be

11   in *Batson* land here with -- with this type of objection to

12   this woman.

13       THE COURT:  My problem's on a different level, and

14   what -- with this potential juror.

15       The first thing that's fairly clear to me is this

16   juror has no desire to serve on this case, but that doesn't

17   make a big deal difference.  Lots of people don't want to sit

18   on these cases.

19       But this is what she says, and she has, I think, a

20   pretty good picture of herself:  "I am the president/CEO of a

21   company.  I create routes, dispatch, organize, plan the

22   overall business, payroll, billing, strategic planning,

23   manage, operate business."

24       I don't know how many of you are familiar with this

25   kind of medical transportation, but what it basically amounts

1  to, much of it paid by Public Aid but some of it paid for by
2  other agencies, these people are transported from wherever
3  they are to get medical assistance.

4         It's a tough business.  Lots of sick people on the
5  bus.  Lots of things you have to do to be in the business to
6  indicate your understanding of what you have to do if suddenly
7  somebody starts flipping themselves to the floor and going
8  into spasms.  It's not a huge profit.

9         But basically this is a business that she wants to
10 keep alive despite the difficulties she has with it, and I
11 think the litigation does matter to her, and I think the one
12 involving the mental patient is particularly important because
13 the problem with the mental patient is if you have somebody
14 running riot on a bus, it loses you other customers.

15        And she explains, in I think a fairly heart-felt way,
16 precisely why it is that -- I'm looking for the passage.  She
17 explains precisely why it is that she has a particular problem
18 and a particular relationship to this business.

19        She has two sons who pled guilty, and this is not the
20 kind of parent who takes the view that her children did
21 nothing wrong.  With respect to one she said, "I was relieved
22 that he would be off the streets to give himself some time to
23 sober up."  "Rescued," this is another one, "rescued before
24 someone else or himself got hurt."  His son -- "Her son was
25 sorry to keep drinking and messing up."

1        This is not somebody who is making apologies.  She
2   obviously has some tax difficulties, but they seem to be
3   working out because from her tone of voice, I think -- I
4   gather that her tax payment plan, which is being complied
5   with, may be over sooner than it was otherwise planned for.

6        She tithes to her church.  She has some charitable
7   work.

8        And then what I thought was a striking line, part of
9   the small parade of America we get every time we have jury
10  selection, this phrase:  "What are your primary leisure
11  activities, hobbies and interests?  Work.  Trying to build my
12  business up because my sons have felony records and will
13  always need a place to work."

14       So this business is pretty crucial to her and pretty
15  crucial for a sensible reason.  We had one juror here with a
16  business that she was creating and her description of it --
17  her urgency of her need for it was quite clear.  Description
18  of it, her business method, her motives seemed disorganized at
19  best.  This is somebody who was the juror I excused hopeful
20  but did not display any particular capability to do what she
21  wanted to do.

22       This prospective juror clearly is capable of doing
23  what she wants to do.  She has her goals, and she has a very
24  heartrending reason why she has to have that business intact.

25       I have to weigh that against the only indication

1    there is that serving is not a problem, and that's her answer

2    to Question 14:  "Will you be paid by your employer during

3    jury service?"

4         Well, it's not quite right for her because she's

5    self-employed practically, but she answered the question.  She

6    said, "Salary from profits."  "Does it pose a financial

7    hardship for you?"  "No."  And then, "I receive profits

8    quarterly and all work will still be done.  I will work

9    nights, weekends and days not in the jury -- not on jury

10   duty."

11        So this is somebody who's not trying to dodge

12   service.  This is somebody for whom I think the government is

13   making the argument that assuming she's a person of good will,

14   assuming that she's -- has no bias of any kind, she is still

15   nonetheless saying get me out of this and get me out of this

16   because I have to go to court.  And to the extent that one of

17   it has to do with money, I think that probably matters to her;

18   but the case of the guy she wants to keep off the bus I think

19   is very important to her, and that's why I think it's in her

20   trial questionnaire.

21        So this is arguably a tough call.  There are some

22   reasons to take her and some reasons not to take her, so

23   knowing what I'm thinking about, anybody can speak to this

24   again before I give you a decision.

25             MR. SOROSKY:  Well, I -- I can't help but comment on

1   the fact that there have been God knows how many jurors who

2   have answered in their questionnaires just let me use the

3   phrase I think he's guilty, although that might not have been

4   the specific answer in each one.  And your Honor has been

5   generous to us in excluding many of those people in an effort

6   to give us a fair trial.  I acknowledge that, and the record

7   reflects that.

8           However, there are a number of people still on the

9   panel who your Honor feels he has rehabilitated.  Now, it is

10  interesting that only two --

11          THE COURT:  Wait, stop for one second.  I don't think

12  that this juror is not an impartial juror.  I -- that's -- I

13  don't -- there is no factor in my decision on this which will

14  depend on the presumption that this juror will not be fair to

15  the government --

16          MR. SOROSKY:  Right.

17          THE COURT:  -- as well as fair to the defense.

18          MR. SOROSKY:  I understand that, but I can't help but

19  reflect on the fact that the government is moving to exclude

20  the only two people who have said, well, I think he's

21  innocent, or I don't know --

22          MR. SCHAR:  She didn't say that.

23          MR. SOROSKY:  And --

24          MR. SCHAR:  She applied the proper standard.  She can

25  be completely fair.  That's not the issue --

1          MR. SOROSKY:  Right, but --

2          MR. SCHAR:  -- with the exception of the judgment --

3          MR. SOROSKY:  Allow me to finish.

4          MR. SCHAR:  -- and what your Honor has raised.

5          MR. SOROSKY:  Let me finish.

6          THE COURT:  Let Mr. Sorosky.

7          MR. SOROSKY:  The only two people who come up with

8   the word innocence all of a sudden, the government has become

9   the kindest person to the world to these two people and say,

10  oh, my God, these people will have to suffer and lose

11  everything because they have to be in Judge Zagel's courtroom

12  for two months, and Mr. Schar's heart cannot allow that to

13  happen to these people.

14          MR. SCHAR:  Judge, I'd say your lecture did not work.

15          THE COURT:  Stop, stop.

16          MR. SOROSKY:  And -- and this woman also happens to

17  be a woman of color, and -- and -- and we're removing these

18  people from the jury, and -- and I think it's just not fair

19  and right, and this woman should serve as a juror.

20          THE COURT:  I do not believe that the race of this

21  juror has any bearing or any part of the reason that Mr. Schar

22  is seeking her excuse from the jury, and I think the statement

23  is made without warrant.

24          With respect to the point that Mr. Schar was going to

25  make, and he's got a point, and the reason I'm raising it is

1    it's as -- in the course of cross-examination on occasion,

2    what the defense has done is recasted the answer of the

3    witness in ways that are improper.

4            This juror did not say that your client's innocent.

5    This juror said your client is innocent until proven guilty.

6            MR. SOROSKY:  Correct.

7            THE COURT:  And that's the correct legal standard.

8            MR. SOROSKY:  Correct.

9            THE COURT:  And that is true of I believe every juror

10   who's thus far been accepted.

11           So the truth is is that we're talking about an issue

12   that's not material here.

13           I'm excusing her for cause because I do not want to

14   do to this woman what I believe will happen if she doesn't

15   attend to the business.  And I also believe that her anxiety,

16   and I think she will have anxiety, will distract her from her

17   duties.

18           Okay.  214.

19           MR. SOROSKY:  No objection.

20           MR. SCHAR:  No objection, Judge.

21           THE COURT:  Okay.  I do note for the record I was

22   going to call him back because I thought I had a CCH issue,

23   but it doesn't appear to be a match, so ...

24           116 -- 216.  Anybody have an objection to 216?

25           MR. SCHAR:  No, Judge.

1    MR. SOROSKY:  Well, she indicated that she had an

2    interview.  Maybe -- if the Court would want to do an

3    interview about that interview or do an ex parte interview.

4    THE COURT:  Where are we now?  Where did she say

5    this?

6    MS. HAMILTON:  Question 42.

7    THE COURT:  42?

8    42 you said.

9    MS. HAMILTON:  Yes.

10    THE COURT:  Okay, let me look.

11    Yeah, I'll do that.  We'll deal with that.  I have an

12    idea what it is, but I don't think it's a big deal; but you're

13    right that I should know the answer to that one.  So we'll

14    raise that with her inside the jury room.

15    Okay.  217.  217, anybody want to speak to 217?

16    MR. SOROSKY:  We have no objection to the jury, but

17    there is a financial situation.

18    MR. SCHAR:  Yes, Judge, I think we agree.

19    MR. SOROSKY:  Whatever the Court feels.

20    THE COURT:  Yeah, it's two things.  It's not only her

21    financial situation, but the letter of the employer was pretty

22    compelling, too.

23    This is basically a one-person shop, so I'll let her

24    off for that.

25    218.  Give me one second, I want to look at this

1 carefully.

2          His description of his criminal history is verified

3 by the report I have, so he was truthful and candid and

4 actually sort of had the right charge, although it's a little

5 different.  It's illegal receipt of goods, but that's usually

6 the guy who stands by the door and takes the handoff, but --

7 so we're okay with that one.

8          Now on the merits of it.  Anybody have objection to

9 him?

10          MR. SCHAR:  I don't have an objection, just falls

11 under the same hardship issue, Judge, I guess.

12          THE COURT:  What do you think?

13          MR. GOLDSTEIN:  Your Honor, there were two hardship

14 issues.  There was a financial and then the trip, the May

15 11th --

16          THE COURT:  Well, the trip I can fix.  The hardship

17 issue is another issue, and this is a different kind of

18 hardship issue largely because I have to get some kind of

19 financial data from him and partly because this falls within

20 the realm of maybe it's a problem and maybe it's not, so I can

21 get some more financial information from him assuming there is

22 no hardship.

23          MR. SOROSKY:  We would have no objection to your

24 Honor ruling on what you have now.

25          THE COURT:  Yeah, but assuming there's no hardship,

1     is there an objection to him?

2              MR. SOROSKY:  No, no, not from me.

3              MR. SCHAR:  No, Judge.

4              THE COURT:  Okay.  I'll think about it.

5              Our count is now 43?  Not including 218.

6              MR. SCHAR:  Are we including 216, Judge?

7              THE COURT:  Wait a minute, let me go back a second.

8              Yeah, I'm not -- assuming what is likely to come out,

9     I'm counting 216 as in.  Are we 43, 44, something like that?

10             MS. HAMILTON:  I think 44.

11             THE COURT:  Okay.

12             MS. HAMILTON:  We should have three from today --

13             THE COURT:  Right.

14             MS. HAMILTON:  -- and we had 41 before.

15             THE COURT:  I think that's enough, so I think

16    depending on what 216 says, we'll deal with it.

17             Now we turn to the issue that was posed

18    hypothetically last time.  In what order are you going to

19    exercise peremptory challenges?  You have two choices.  The

20    existing numerical order is number one.  The other choice is

21    we randomize them again.

22             Any one of you want to express a view on this?

23             MR. SCHAR:  Judge, I think it's the government's

24    view -- you're talking about randomizing after peremptories

25    have been --

1    THE COURT:  No, I was talking about randomizing them
2    now before you exercise the peremptories.  Ordinarily not an
3    option, but since you're not going to do the peremptories
4    until Monday morning, we can do it.
5    MR. SCHAR:  Can I have a moment, Judge?
6    THE COURT:  Right.
7    (Pause.)
8    MR. SOROSKY:  Could we have a ten-minute adjournment?
9    THE COURT:  Yes, not only can you have a ten-minute
10   adjournment, but it will take us ten minutes to get together
11   for our jury room hearing with respect to 216.
12   (Recess from 3:01 to 3:27, resuming in jury room with
13       Mr. Schar, Ms. Hamilton, Mr. Niewoehner, Mr. Reibman and
14       Mr. Goldstein present.)
15   (Prospective Juror No. 216 enters jury room.)
16   THE COURT:  Hello.
17   PROSPECTIVE JUROR:  Hello.
18   THE COURT:  I'll sit right here.
19   This little conversation is not as ominous as it may
20   seem to you.
21   PROSPECTIVE JUROR:  Hope not.
22   THE COURT:  And you're in here privately because we
23   don't want to embarrass anybody.  It was answer 42.  You've
24   been interviewed by the FBI regarding a neighbor and the State
25   Department regarding an employee.  The State Department

1  regarding an employee looked like a clear background
2  investigation.
3        What was the first one?
4        PROSPECTIVE JUROR:  I don't know honestly.  They just
5  came to the house and said that they were investigating my
6  neighbors.  They couldn't go into detail, but they had some
7  questions for me and asked if I'd be willing to answer them,
8  and it was all very strange questions.  If I've ever noticed,
9  you know, weapons, if I felt fearful at any time --
10        THE COURT:  Right.
11        PROSPECTIVE JUROR:  -- being near them, and the
12  neighbors were actually really mild-mannered, quiet, totally
13  kept to themselves people.  So I have no idea what it was
14  about, but they --
15        THE COURT:  Are they still your neighbors?
16        PROSPECTIVE JUROR:  No.  They just up and moved one
17  night and left the house as is, and they've been gone since.
18        THE COURT:  Okay.  Do you remember their names?
19        PROSPECTIVE JUROR:  It was a Vietnamese family.
20  Their last name was like N-Y-G-Y-E-N. I'm not sure how to
21  pronounce it.
22        THE COURT:  N-G --
23        PROSPECTIVE JUROR:  N-G-Y-G-E-N.
24        THE COURT:  U-Y-E-N?
25        PROSPECTIVE JUROR:  Yes, that's it.  I didn't know

1    them very well, so my answers --

2         THE COURT:  Okay.  And what was -- do you remember

3    what their address was?

4         PROSPECTIVE JUROR:  They were just to the right of

5    me, so it would have been 8644 Sheer Drive.

6         THE COURT:  But you don't know what they -- what this

7    interview was about.

8         PROSPECTIVE JUROR:  I have no idea.

9         THE COURT:  No.

10        PROSPECTIVE JUROR:  All right.  That's fine.

11        PROSPECTIVE JUROR:  Some sort of criminal

12   investigation of some sort --

13        THE COURT:  Okay.

14        PROSPECTIVE JUROR:  -- I'm guessing from their

15   questions.

16        THE COURT:  Okay, thanks.  You can go back to your

17   prior area.

18        PROSPECTIVE JUROR:  Okay.

19      (Prospective Juror 216 exits jury room.)

20        THE COURT:  We'll do some administrative stuff while

21   we're still here.  I'm leaving 216 on.

22        MR. SCHAR:  Judge, I think just on her and one other

23   juror, one of the case agents, Jay Hagstrom, thinks that she

24   looks familiar, is potentially the mother of someone who plays

25   hockey against his son.  She hasn't said anything, and I don't

Case: 1:08-cr-00888 Document #: 1058 Filed: 09/17/12 Page 39 of 66 PageID #:18236

1   know if she saw him or not.

2           He doesn't know her, but I, just for the record,

3   wanted to let you know that there's that.  And then 207 who I

4   think is the teacher teacher whose husband is the --

5           THE COURT:  Right.

6           MR. SCHAR:  Her husband, this is Agent Cain, either

7   taught at or was the principal in one of the schools which his

8   son went some years ago.  He doesn't know her.  He doesn't

9   know the principal.  The name just rang a bell, just wanted to

10  put it on the record so everyone was aware of it.

11          THE COURT:  Swell.

12          Now, I took a look just for the heck of it at the

13  upcoming ones.  The next one up is 220, and 220:  "Uncle is a

14  Chicago policeman for 30 years.  One of my good friends is

15  Patrick Elwood, Fox 32.  John Kass is also a dear friend."

16          I think you might not regard this as a desirable

17  juror, and I believe were you to make a challenge for cause, I

18  would grant it.  So I'm going to put him to one side on the

19  list of other possible interviewees in case we have to.

20          The next one has correctly answered:  Front desk

21  clerk of a legal department in South Shore, famous place in

22  its day, long before you were born, probably before I was

23  born.  Worked for off-track betting parlors.  Something in

24  here I pulled this out for -- oh, yeah, this is it.

25          Have you read, formed any views:  Thought he should

1  have taken a deal and been done with it rather than waste
2  money on second trial.

3          Might this cause you to make a challenge for cause?
4          MR. GOLDSTEIN:  Is there anything else in there?
5  Most likely, yes.

6          THE COURT:  Well, one other little thing.  What's the
7  arrest one?  What number is that, oh, No. 28.  Oh, she also
8  has an excuse.  I just started a job three months ago after
9  being off work for over a year.  I work three, four days a
10 week, Monday, Wednesday and Thursday and sometimes on Friday
11 and Saturday, in the mornings.  I can't take off for jury duty
12 at this time.

13         Not exactly why I'm sure that's the case because she
14 is married, her husband is a security guard, and I don't see
15 children, so maybe that's not so high, other than it's a minor
16 indication that she does not want to serve.

17         When I looked up the sheet, maybe this is not a
18 match, and it's not an offense anyway.  It's an order of
19 protection.  It's not enough of a match, and it's on NYPD, so
20 it's not her.  So that's all you've got is whatever it was I
21 just said which I've probably forgotten.  He should have taken
22 a deal --

23         MR. GOLDSTEIN:  Should have taken a deal.

24         THE COURT:  -- which is kind of interesting because
25 he didn't offer -- he was not offered a deal.  Interestingly

1  people -- something sticks in their mind.  He wasn't
2  offered -- he offered a deal.
3          MR. GOLDSTEIN:  It was that stupid motion.
4          THE COURT:  Right, the stupid motion.
5          He offered a deal, but that's not -- she's taxing him
6  with something he could not have done.
7          MR. GOLDSTEIN:  We would move for cause.
8          THE COURT:  Yeah, okay.
9          So let's take a look at 222.  This is -- oh, this is
10  the one I was looking for last time.  This is -- and this one
11  does have a sheet.  This one has a sheet.
12          She, I believe, lives in her parents' home, which
13  makes sense because she lists herself as single.  She is an
14  on-and-off employee.  She's a cashier.  Very scattered work
15  record.  Worked at one place almost two years question mark,
16  two weeks at a Comfort Inn, Denny's for five months.  I
17  cashiered, bagging and cleaning.  She has three children.
18  Lives alone except for three children.  She does have a rap
19  sheet.  She says that she's got a felony burglary, two years
20  probation, and misdemeanor supervision and then another
21  felony.
22          According to the rap sheet, I have only one
23  conviction, a burglary conviction.  Last arrest, 2008.  The
24  official record and it's an unusual name, so I think the
25  record's a valid record.

1    Okay.  2001, burglary, Mount Vernon, no disposition

2  listed.  2007, CPD issuance of a warrant.  2007, four months

3  later, three months later, criminal trespass to vehicle,

4  possession of cannabis.  2008, March, aggravated domestic

5  battery.  Maybe I've got more detail here.

6    Okay.  Oh, this is interesting.  Aggravated domestic

7  battery, aggravated domestic battery.  This comes from

8  March 11th, 2008.  Then literal description, attempt murder.

9  Disposition, nolled.  Oh, and then -- oh, they must have

10  nolled the lesser charge because the next thing is guilty on

11  attempt murder.  This must have been some -- don't record this

12  word -- bullshit attempt murder charge.  Disposition 183 days,

13  credit time served.

14    MR. GOLDSTEIN:  Yeah.

15    THE COURT:  That's a cute one.

16    MR. GOLDSTEIN:  Must have had a good lawyer.

17    THE COURT:  Turned herself in because they quashed

18  the warrant.  The vehicle and the cannabis.  Nolled both of

19  them.  18 months on domestic battery, special conditional

20  discharge.

21    Here's the Mount Vernon burglary.  Guilty the

22  burglary.  Restitution, fine, 833 bucks.  150 hours public

23  service.  30 months' probation.  Successfully completed.

24  That's it.

25    She does not feel that this is a financial burden

 1   since it replaced a zero-dollar-a-day income with a $40-a-day

 2   income, and she and the three kids are ensconced in their

 3   parents' home.  Not a challenged juror, but probably not the

 4   most attractive one.

 5          Let's take a look at 223 just for the heck of it.

 6          Another criminal history, although this one is

 7   perfectly understandable.  This guy runs a heating and

 8   electrical company.  All of his answers are fine.  He

 9   correct -- I believe correctly states -- I think I already

10   looked this up -- yeah, he correctly states his rap sheet,

11   which is his rap sheet is that 26 years ago, he took a fall

12   for possession of cannabis.  Got probation.

13          Operates a small heating and air conditioning

14   business.  It's him and one assistant.  He's got a kind of

15   hardship thing.  What he says is trial extends through warmer

16   weather, I may lose business.  This is the busy season.

17          And then we've got -- where are you?  Here you are.

18   No, you're not here.

19          So I would say that of the next ones up, this is not

20   a particularly stellar group, so I would like to go with what

21   we've got if we can, and I think we can.

22          Now, what do you want to do about randomizing?  Yes?

23   No?  Maybe?

24          MR. GOLDSTEIN:  We -- we do not want randomized.  We

25   want it the way your Honor did the first trial, which is

1  chronological.

2  MR. SCHAR:  Can I put maybe?  We're just are checking

3  a few cases; and depending upon that, we'll be able to give

4  you a position.

5  THE COURT:  Yeah.  It's a dice roll.  That's why some

6  judges do it.

7  There is also the other thing, which is to randomize

8  after you've elected the peremptory challenges.  Most people

9  do not like that.

10  MR. GOLDSTEIN:  We do not like that.

11  MR. SCHAR:  I think we're in agreement with that,

12  Judge.

13  THE COURT:  Right, right.  I actually would like to

14  have that as a matter of law, general law and general

15  practice; but I regard it as inappropriate for me to impose

16  that upon you because it's the way I like it.  Maybe some day

17  I'll be able to sell a court on it.  And in all honesty, if I

18  were a lawyer, I would hate it.  But that's that.

19  MR. GOLDSTEIN:  Just so I understand the two options,

20  the first option is the exact way you did it last time, which

21  is 1 through -- the first 18 go on.

22  THE COURT:  First 18 unperemptory challenges go on.

23  MR. GOLDSTEIN:  And 13 through 18.

24  THE COURT:  In the order in which their names were

25  drawn, the original randomization.

1    MR. GOLDSTEIN:  And then the randomization option is

2    you would take who you have right now, put it in the pot, and

3    it would come out reordered.

4    THE COURT:  No, what I would have now is, I would

5    probably take 40 and randomize those 40 and then you would

6    elect your peremptory challenges against that randomized group

7    with the understanding that if someone doesn't show up, the

8    two or three extras we have will replace the individuals, and

9    we'll do that on the basis of the lower number.

10    Or maybe we can do it on places of whatever number is

11    closest to the number they have, but I don't want to do that,

12    so the lower numbered one goes first into whatever vacant slot

13    there is.  Customarily, there isn't a vacant slot, but there

14    might be.

15    Then you have a randomized 40, and you select

16    whatever you want to select, but they are then ordered, they

17    are then placed in seats in the order of their new numbers.

18    MR. GOLDSTEIN:  Okay.

19    THE COURT:  In other words, you will know who the

20    alternates are going to be.

21    MR. GOLDSTEIN:  And you'll know the order of it

22    before you use your peremptories.

23    THE COURT:  Yeah.

24    MR. GOLDSTEIN:  Okay.  So you're basically just

25    reshuffling.

 1          THE COURT:  Yeah, I'm reshuffling.  So it's not the

 2    disaster that would be if you would deal with being flipped by

 3    true randomization, which I think is why it doesn't make a

 4    hell of a lot of difference to you, but it's only a slight

 5    advance from my point of view.

 6          But I'm perfectly willing to do it the way I did it

 7    the first time because that's the way I did it the first time,

 8    okay?

 9          MR. GOLDSTEIN:  We did, your Honor, have, I think --

10          THE COURT:  Three more.

11          MR. GOLDSTEIN:  -- three more that we're just typing

12    up right now.

13          THE COURT:  Right, right.  You didn't have to type

14    them.

15          MR. GOLDSTEIN:  Type, write, do you want to read

16    Shelly's handwriting?

17          THE COURT:  Sure.  When are we going to have this?

18          MR. GOLDSTEIN:  Very soon in the next couple of

19    minutes.

20          THE COURT:  Next couple of minutes is fine.

21          Okay.  Then I think we'll go out there and tell

22    everybody that we have completed the examination of all the

23    jurors, the last juror having been examined in court being, in

24    fact, the last prospective juror who will be interviewed.

25          We will deal with any remaining challenges, and then

1 | we will send the jurors home with instructions to report on
2 | Monday.

3 | MR. SCHAR: Before we leave, we'll confirm with your
4 | Honor the -- what we understand to be the ones that are
5 | remaining, is that possible?

6 | THE COURT: What do you mean the ones that are
7 | remaining?

8 | MR. SCHAR: The 42 or 43 just so everyone's on the
9 | same page in terms of who's actually --

10 | THE COURT: If you feel there has to be, we're going
11 | to do that. Of course, we're going to do that. We may do it
12 | twice. This is a place where you do not want to miscount
13 | under any circumstances.

14 | MR. SCHAR: 157 is still an open issue?

15 | THE COURT: 157 is in open play and I'm going to
16 | rule.

17 | MR. SCHAR: Okay. And I think I noted at 48 hours --
18 | whether you said it was 24- to 48-hour issue and it wasn't,
19 | but it's not moving into the issue. There's one kind of
20 | preopening issue we'd like to address.

21 | THE COURT: You can address absolutely anything after
22 | we're done with the jury.

23 | MR. SCHAR: Thank you, Judge.

24 | (Proceedings heard in open court:)

25 | THE COURT: Counsel, come to the lectern.

1    We have done the *in camera* hearing with respect to

2    one question asked of 216, and I am satisfied that it would

3    have no effect on the juror's service.

4    We now have one -- 218 to deal with, which I think we

5    already have dealt with, and it's basic, but since we last

6    dealt with this, I was handed a letter from his supervisor, or

7    from his boss, who says:  No. 218 -- I'm changing it a

8    little -- is a technician at freight services.  I'm omitting

9    the name.  It's a very technology-driven company.  We're

10   entering into our busiest time of the year.  Further, we're

11   moving our Charlotte, North Carolina branch to a new facility

12   in May.  This requires heavy involvement of our IT staff.  He

13   is scheduled to be in Charlotte the week of May 10th.  His

14   absence would leave us shorthanded.  We would appreciate his

15   being excused from jury duty at this time.

16   This particular request holds no weight.  It's mere

17   convenience.

18   The next line is:  The company has a policy to pay an

19   employee for up to three days of jury duty per calendar year,

20   and that going without pay for this extended period would be

21   an extreme financial hardship.

22   The employer is not actually saying that it would be

23   an extreme financial hardship.  He's saying that this is what

24   the prospective juror told him.  So it doesn't add anything to

25   the mix.

1    Considering his place on the list, I think we can ask

2    him to come in with his financial statements the next day and

3    see where we go from there.

4    The motion?

5    (Tendered.)

6    THE COURT:  I have read the motion, and I think I

7    understand the motion.  Can I have the government's response

8    to it?

9    MR. SCHAR:  Judge, I -- I don't disagree, and your

10   comment, your comment was it could be a basis, and people put

11   down various things and then your Honor went through the

12   specific individuals and in every single situation that's

13   addressed in this motion, I believe, rehabilitated those

14   individuals or didn't even need rehabilitation, I'm not sure

15   that's the right word.

16   What you did is you more accurately questioned them

17   about their initial reaction of what they wrote down and then

18   their now understanding of what the law required, whether they

19   could do it.  Your Honor made individual determinations as you

20   went with each individual juror using obviously your view of

21   the credibility in their answering questions as well as having

22   fully, more fully explained what was required of them, and

23   they all indicated they could do what was required to be a

24   fair and impartial juror.

25   So I don't think the comment that was made changes

1   the analysis of any of the jurors.

2           THE COURT:  Your turn.

3           MR. SOROSKY:  Well, I would submit the Court, in

4   ruling on Juror 193, set a certain standard or policy, and

5   we're just asking --

6           THE COURT:  What did I say?  What did I rule on 193?

7           MR. SOROSKY:  Pardon me?

8           THE COURT:  What did I rule on 193?

9           MR. SOROSKY:  We moved to exclude 193 because 193

10  answered -- what?

11          I believe she answered everyone thinks he's guilty,

12  and the Court did -- and the Court responded, well, that she

13  did not say I think he's guilty.  Had she said I think he's

14  guilty, Mr. Sorosky, you might have had a compelling argument.

15          THE COURT:  You noticed the word might is --

16          MR. SOROSKY:  Right, might, might.  I said that's

17  what you said.

18          THE COURT:  Okay.

19          MR. SOROSKY:  I'm trying to quote you exactly.

20          THE COURT:  Does somebody have 190?  I think that's

21  back in my chambers.

22          MR. SOROSKY:  193.

23          THE COURT:  193.

24          MR. SOROSKY:  And 193 stands, and as much as we would

25  love to have her be excused, we are accepting her being on the

1    jury.  We don't want it, but we live with that.

2            But in light of your Honor's ruling that I might have

3    had an effective argument, I would ask the Court to revisit

4    those three jurors who did say substantially I think he's

5    guilty.

6            Juror 116 -- and these were his answers:  My personal

7    bias is that he's guilty.  Every chance he gets, he keeps

8    saying he will testify.  I think I would hold it against him

9    if he does not testify.

10           Juror 121 answered:  Sounds like the defendant is

11   guilty.

12           Juror 160, who may be perhaps the most egregious,

13   says:  I believe he's guilty and has a different private

14   persona and a fake public persona.  I followed the trial

15   closely in the news, and my ringtones are downloaded with

16   bleeping quotes of Rod Blagojevich I got from the Springfield

17   newspaper website.

18           Now, how can a man be a fair juror if he goes home

19   tonight and -- and I'm very old fashioned, I'm a low-tech

20   person, but from what I understand this man is saying, instead

21   of the telephone ringing, "ring, ring ring," or whatever it

22   does, it's a quote, a derogatory quote from the defendant.

23   How would this man possibly be a fair juror?

24           THE COURT:  Okay, I have a question for you.

25           MR. SOROSKY:  Yes.

1    THE COURT:  We've been here for quite a while.

2    MR. SOROSKY:  Yes.

3    THE COURT:  Why am I here?

4    MR. SOROSKY:  Why are you here?

5    THE COURT:  Yeah.

6    MR. SOROSKY:  To get a fair jury.

7    THE COURT:  No, no, no.  Why am I here?  Why am I

8    necessary?

9    MR. SOROSKY:  To preside over a fair trial.

10   THE COURT:  No, but what you've got here is you

11   submit all of these things to a computer program and you say

12   what things appear on the answer that disqualify a jury or

13   don't disqualify a jury, and then you can rely entirely on

14   what they put in writing.

15   The reason I'm here is to make an individual judgment

16   of whether what the juror has to say, this juror has to say,

17   whether he means it and to what extent he means it and what

18   exactly it is that he means.

19   It would be nice if we had such a system like that

20   because it would save me a lot of time and effort here.  I'm

21   sitting here asking questions to the jurors.  I really am in a

22   position where I never take my eyes off the jurors except

23   maybe to look down at the next question I might want to ask,

24   and that whole thing is because you can have one juror, two

25   jurors, one saying I think the man is guilty and the other

1   saying I think the man is guilty, and one is qualified and one
2   isn't.

3           Your entire argument is based on the premise that the
4   only thing to be considered are the exact words; and if two
5   people who say exactly the same thing, which is favorable to
6   one side or favorable to the other must be ruled upon in the
7   same way, this is not the process.  This is not the law.  I
8   consider in every case the issue of what depth of feeling is
9   expressed.  Is the witness, in fact, the juror, in fact,
10  prospective juror, in fact, speaking inartfully in the
11  questionnaire?  Is the juror saying some things from which he
12  is able to withdraw?  That's all what the judge is supposed to
13  do.

14          You have, I think, an unjustified faith in the
15  proposition that what these people put down on these
16  questionnaires actually means something when you don't know
17  much about them that is still in writing or is still in
18  speech, and you draw all kinds of implications from that.  I
19  don't do that.  I sit there and listen to them, and the truth
20  is for the three you mentioned, I thought they would be fair
21  jurors.  Part of it rested on their demeanor.  Part of it
22  rested on their response to other questions.

23          So the argument fails, and I deny your motion to
24  recuse them.

25          So that's where we are with that.

1    Now, the most important thing for all of us is to
2    take a look at this sheet of paper and determine again who's
3    on and who's out, leaving one thing off, 137.
4         MR. SCHAR:   157?
5         THE COURT:   137.  I think it's 137.  No, it's not
6    137.
7         MR. SCHAR:   I think it's 157, Judge?
8         THE COURT:   It's 157.  I have that here, too.
9         This was a financial reason issue.  We have not heard
10   back from him.  On the face of the -- of the thing he filed,
11   and to some extent based on his demeanor, but very little,
12   this is a financial hardship for him.  Basically, it's him
13   alone.  He does this work.  So I believe that it will turn out
14   that it was too great a financial hardship.
15        Now, it is possible that he's been lying to us.  I
16   don't think so.  But if he has been, we are making a careful
17   effort not only to deal with all the no-shows, but 157's name
18   will be added to the list of people who the jury room will
19   check very carefully.
20        The increasing tendency in some jurisdictions in
21   state courts for people who blow off jury duty and give a lot
22   of phony excuses has been in some jurisdictions widely
23   tolerated and others punished with bloody vengeance, but the
24   federal courts are taking the view now that excuses have to be
25   monitored.  The truth is, we don't have the resources to

1    monitor them in all cases, but we have resources to monitor
2    them in some, and this is going to be one of them.
3              I do believe he was honest with me.  I'm accepting
4    his hardship.  I believe I am done with taking people off or
5    putting people on the list, and we can now get to a count.
6    And I will read off the numbers, and both sides will keep
7    track of how many numbers I have read off.
8              103, 116, 120, 121, 124, 125, 131, 132, 133, 135,
9    140.
10             MR. SCHAR:  136.
11             THE COURT:  13 -- oh, that's right.  I put her back
12   in.  Yeah, I circled her.  That's right.  136, 140, 141, 142,
13   144, 146, 148, 149, 151, 160, 161, 163, 164, 165, 170, 174,
14   175, 176, 179, 181, 183, 184, 186, 187, 189, 190, 191, 192,
15   193, 196, 198, 1 -- 207, 214, 216, 118.  Give me a total.
16             Don't say anything.  I want everybody to reach an
17   independent count, so tell me when you're done with your
18   count, but don't tell me what the count is.
19             MR. GOLDSTEIN:  We have a count.
20             THE COURT:  Okay.  But Mr. Schar raised his hand, and
21   you didn't raise your hand.
22             MR. GOLDSTEIN:  I wasn't aware of the format in which
23   we can --
24             THE COURT:  It's a good format.
25             MR. GOLDSTEIN:  -- submit our answer.

1    THE COURT:  But raising your pad's okay.

2    Do you have a count?

3    Okay.  You go first.

4    MR. SCHAR:  45.

5    MR. GOLDSTEIN:  We agree.

6    THE COURT:  Well, so do I.  So now we have 45.

7  Obviously, the majority of these people will not serve on the

8  jury, but this is the basic pool we're operating with.  I

9  expect you to give me your written peremptory challenges at

10  9:00 a.m. on Monday morning.

11    MR. SCHAR:  And, Judge, we're in agreement that we

12  can keep the order as it is now.

13    THE COURT:  Yeah, that's fine.

14    That being the case, I want to make sure I don't lose

15  anything here, so I'm going to straighten this enormous pile

16  of stuff I have here out, and then we're going to deal with

17  substantive issues.

18    Return this to the government.

19    (Tendered.)

20    THE COURT:  The issue of the admission, has this been

21  briefed, fully briefed yet?

22    MS. KAESEBERG:  We have not yet filed our response

23  yet, but we can do so by tomorrow if you'd like.

24    THE COURT:  By tomorrow?

25    MS. KAESEBERG:  Yes.

1          THE COURT:  Sure.

2          You wanted to bring up something?

3          MR. SCHAR:  I do, Judge.  It will take a moment of

4    background to explain the contours of the issue.

5          I believe in opening last time, and certainly through

6    cross-examination, the defense tried to present, for lack of a

7    better phrase, a pseudo-advice-of-counsel defense or an

8    advisor defense, and this obviously was subject to the motion

9    *in limine* which, your Honor has, I think, previously granted

10   and obviously reaffirmed the other day.

11         Specifically as it related to John Harris, the issue

12   is a little more stark and from the government's perspective

13   problematic particularly if they plan on either opening on it

14   or attempting through cross-examination to suggest something

15   that is never going to be proven up, and that is this:  As you

16   might recall from the testimony last time, Mr. Harris, while a

17   lawyer, was not special counsel to the defendant on the issue

18   of the Senate seat.

19         He was special counsel on one issue that was

20   completely immaterial to the matters at hand, and that was

21   fronted in terms of the fact he was special counsel on one

22   issue but was not special counsel in relation to the Senate

23   seat.

24         In his statement to the FBI after his arrest in

25   response to various questions related to the Senate seat,

1   while he did not say he was special counsel on the Senate
2   seat, he demurred answering further questions by stating that
3   he was special counsel.
4           Now, obviously at the time, the government expected
5   that the defendant would testify and somehow, despite the fact
6   Mr. Harris will deny there was ever a conversation with the
7   defendant in any context in relation to him being special
8   counsel on the issue of the Senate seat, somehow the defendant
9   might suggest that.  That clearly did not happen.
10          We also thought perhaps last time what the defendant
11  might try to do through cross-examination of Mr. Harris was
12  somehow impeach him by suggesting that his statement to the
13  FBI was inaccurate, but, in fact, he was not special counsel.
14          Obviously, they can't use the statement to the FBI
15  for the truth of the matter.  However, what ended up happening
16  during the cross-examination of Mr. Harris, was that, in fact,
17  they tried to suggest that what he said to the FBI was
18  truthful and, in essence, use the statement for the truth of
19  the matter, which was at the time improper.  That is to say,
20  they weren't suggesting he was lying then.  They were
21  suggesting he was telling the truth.
22          At this point, because we don't know what they're
23  going to open on, and particularly because we're concerned
24  about the confusion on what has now become a critical issue in
25  this case, a sense of whether or not the defendant somehow

1  surrounded himself with lawyers and that being a material
2  issue, which, again, I believe your Honor has now ruled they
3  can't go down that road in terms of that argument without some
4  additional prove-up, what we're asking is that they not be
5  permitted to raise the fact that the defendant was -- or
6  Mr. Harris was special counsel at all unless they're going to
7  at some point down the road prove that up through their own
8  case.
9           And in particular when it comes to the
10 cross-examination of Mr. Harris, while Mr. Harris is prepared
11 to say that he misled the FBI in order to stop the interview,
12 that understandably would be relevant; but to the extent that
13 they want to use his statement about special counsel to the
14 FBI and the fact that the only proper way to use that would be
15 for impeachment purposes, under 403 -- because, again, this
16 defense in effect is not proper at this point -- under 403,
17 we're asking that you bar them from asking whether or not he
18 told the FBI he was basically, in effect, special counsel or
19 suggest that he was special counsel on the Senate seat because
20 it can't be offered for the truth, and to the extent it's
21 impeaching at all, it's a confusion issue particularly on a
22 critical point here.  It's frankly misleading, and Mr. Harris
23 is going to admit that to the extent it is proper impeachment
24 that, in fact, he did mislead the FBI.
25           I think that is the crux of the issue.

1    THE COURT:  Okay.  Now maybe you should hear from the
2    defendant what it is they actually want to do.
3    MR. SOROSKY:  Well, we're taken a little bit by
4    surprise by this, and traditionally the government would file
5    a written motion.  We're not asking for a written motion
6    because we understand what they're saying, and we would like
7    some time to reply to this, whether it's orally or in writing,
8    and I -- I don't know how urgent this is in relation to the
9    proceedings.
10   I mean do you want it Monday, or, you know?
11   THE COURT:  I think he wants it Friday.
12   MR. SOROSKY:  That's tomorrow.
13   THE COURT:  Tomorrow.
14   MR. SOROSKY:  Okay.
15   THE COURT:  And while you're about it, you can deal
16   with the issue of whether you are going to suggest, as you
17   attempted to suggest in the last case, that the defendant
18   believed his actions were legal because a bunch of lawyers
19   didn't say anything when he made proposals.
20   I've dealt with this before in a variety of ways,
21   partly because as a defense, it doesn't work.  It's a very
22   narrowly circumscribed defense, and you cannot infer approval
23   from silence, and I don't want you to do that.  And the reason
24   I don't want you to do that is because I will give an
25   instruction to the jury which says that you can't infer

1  approval from silence and then tell them that it's an

2  illegitimate defense, which is the only way to stop them from

3  going down that path.

4          This is, incidentally, entirely different from -- and

5  that's basically what I'm going to stop you from doing, and I

6  can believe that I can stop you from doing it in a way that

7  will deprive -- which will take away any possible force from

8  the statements even during questions -- even if they're in the

9  form of questions.

10         I am not addressing the issue presented by the fact

11 that the defendant, if he does, gets on the witness stand and

12 said I did believe it was legal, which is something he's

13 entitled to say even if he doesn't have a lawyer to back him

14 up.  He can offer his own legal theory.  He can do what John

15 Cheek did in this very courtroom, explain why, in reading the

16 history -- the early colonial documents, John Cheek believed

17 that white men were exempt from the income tax.  Didn't do him

18 a lot of good with the jury, but if your client gets up and

19 testifies that he thought it was legal, I'm quite sure

20 whatever he says is not going to be off the wall the way what

21 Cheek said was, and that's a different issue.

22         But pretty much the only way you can get that defense

23 in at all is for somebody to stand up and say I thought it was

24 legal.  If I didn't think it was legal, I wouldn't have done

25 it, at which time if you have a defendant who says this, there

1   might be things you can introduce that might support his

2   belief in one way or another.  This is not an

3   advice-of-counsel defense, but the way you did try to do it is

4   you tried to get into evidence a belief of your client or a

5   jury can infer that your client believed that his act was

6   legal without having any evidence of that.

7           And the way you did that was this totally

8   inappropriate kind of suggestion that there were a bunch of

9   lawyers in the room and nobody said don't do it, and that

10  creates a problem in evidence, so I don't want you to do it.

11          If you want to say that Harris is a liar because he

12  told the FBI he was special counsel when he wasn't special

13  counsel and that for this reason you can't trust other things

14  Harris says, sure.  But to establish Harris as special counsel

15  like he was special counsel doesn't help you in any way unless

16  you want to try this, the thing that you tried last time,

17  which was he was special counsel and this is one of the patent

18  stones laid down to get you to the point where, when the

19  defendant takes the witness stand and says I thought it was

20  legal, there was no reason I should have thought it was

21  illegal because no one has said anything.

22          And I think the government had some objections there,

23  but they let some of it go, and the reason they let some of it

24  go is the lawyer got up and said he's going to take the stand.

25          They can't trust that he will do so.  The fact of the

1  matter is whoever makes the opening statement in this case, if
2  you stand up and say the governor's going to take the witness
3  stand, I'm not going to rely on that on my rulings, as I did
4  last time.  I let stuff in because I figured, well, this is
5  part of it.  If you want to foreshadow what the defense is
6  going to be, fine, I have no objections to that.

7          But if you want to do Harris and special counsel, the
8  only way you can do it is to use the fact that he said this to
9  the FBI because he wanted to stop talking to them and it
10 wasn't true.  That could have some use for you, but to hook it
11 up with some defense of I thought it was legal, I had a
12 good-faith belief that it was legal, no.  I think this is
13 fairly clear.

14         And the reason I'm giving you this caution is I
15 refrained from giving instructions in the first trial because
16 I believed that the defendant was going to take the stand and
17 he'd be cross-examined on this.  And his answers will be
18 better than John Cheek's were on cross when John Cheek said
19 some ancient documents from state governments at the time of
20 the Revolution -- and bear in mind this is a guy who, with his
21 lunatic theories, actually got the Supreme Court of the United
22 States to mandate that he be able to say them in court to a
23 jury, which is why I got the case on remand.

24         So you have a pretty broad right to say I thought it
25 was okay, but you can't do it on the basis of legal advice

1    unless you got the requirements, and it's a very, very tough
2    defense.  There have to be all kinds of prerequisites.  You've
3    got to cross T's and dot I's, and none of them were done here.
4             So basically that's where we are.  I think what I've
5    just said should be understood.
6             Do you have anything else?
7             MR. SCHAR:  Judge, just as an issue of clarification,
8    I understand the right certainly to suggest that Mr. Harris
9    was dishonest with the FBI.
10            THE COURT:  Yes.
11            MR. SCHAR:  I think our concern is that the --
12   there's still the -- will be out there the suggestion that
13   somehow he was special counsel.  And, as you pointed out, the
14   instruction, I'm not sure, while I think helpful, if the issue
15   is he misled the FBI and there's value in that point, which I
16   think there obviously is --
17            THE COURT:  They will not be allowed to suggest by
18   question or argument that he was special counsel, and I think
19   I've made that clear, which means, for example, you will not
20   start a question out with saying, well, when Mr. Harris was
21   your special counsel because that's a statement made without
22   support in the record.
23            MR. SCHAR:  Okay.
24            THE COURT:  I think -- anything else from you?
25            MR. SCHAR:  No, Judge.

1          THE COURT:  How about from you?

2          MR. SOROSKY:  No.

3          MR. GOLDSTEIN:  No, your Honor.

4          THE COURT:  Then I think we're done, and I don't

5    think I have to see you tomorrow unless something comes up,

6    and I will be here.

7          MR. SCHAR:  Thank you, Judge.

8          THE COURT:  Thanks.

9          MR. SOROSKY:  Monday at 9:00 or 9:30?

10          THE COURT:  9:00.

11          MR. SOROSKY:  9:00.  Okay.

12          THE COURT:  Oh, wait, wait, we forgot the most

13   important thing of all.  I can't believe I forgot this.

14          How long are you going to take in the opening?

15          MR. SCHAR:  Judge, we should not be more than an

16   hour, probably a little less.

17          MR. GOLDSTEIN:  About the same amount of time.

18          THE COURT:  Okay.  So we will have witnesses unless

19   some disaster occurs.

20          Now, the first witness you call, this is my second

21   question.

22          MR. SCHAR:  It would be Agent Cain, and I believe we

23   can -- it may take, depends what time we start, but I think we

24   could get through direct and cross on Monday.

25          THE COURT:  Okay.  You're prepared for the cross,

1033

1  right?

2          MR. SOROSKY:  Right.

3          THE COURT:  Okay.  That will be fine.

4          MR. SOROSKY:  So that would probably be the only

5  witness on Monday.

6          MR. SCHAR:  I think that's right.

7          THE COURT:  I think so, too.  Okay?  See you on

8  Monday.

9          (Court adjourned, to reconvene at 12:00 p.m. on

10         4/29/11.)

11                          CERTIFICATE

12      I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14  */s/Kathleen M. Fennell*

15  _____
    *Kathleen M. Fennell*
16  *Official Court Reporter*

17

18

19

20

21

22

23

24

25