1212

1       IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4           Government,              )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   May 3, 2011
                                     )
7           Defendant.               )   9:53 o'clock a.m.

8                          VOLUME 8
9                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES B. ZAGEL
10                       AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15              Assistant United States Attorneys
                219 South Dearborn Street;
16              Suite 500
                Chicago, Illinois 60604
17

18  Court Reporter:

19              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
20                   Room 2504
                Chicago, Illinois 60604
21                 (312) 435-5895

22

23

24

25

1213

1 | APPEARANCES   (continued:)

2

3 | For Defendant Rod Blagojevich:

4 |         KAPLAN & SOROSKY
          BY:   Sheldon M. Sorosky
5 |         158 West Erie
          Chicago, Illinois 60610
6 |         (312) 640-1776

7

8 |         LAW OFFICE OF Elliott Riebman
          BY:   Elliott Riebman
          158 East Erie
9 |         Chicago, Illinois 60610
          (847) 814-2900

10

11

12 |         OFFICES OF AARON B. GOLDSTEIN
          BY:  Aaron Benjamin Goldstein
          6133 South Ellis
13 |         Chicago, Illinois 60637
          (773) 752-6950

14

15 |         OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
16 |         2140 N. Lincoln Park West
          Suite 307
17 |         Chicago, Illinois 60614
          (773) 517-0622

18

19

20

21

22

23

24

25

1214

1     INDEX OF EXAMINATION

2  WITNESS                                          PAGE

3    DAN CAIN

4    Direct Examination By Mr. Schar................. 1221

5    Cross Examination By Ms. Kaeseberg.............. 1256

6    JOHN HARRIS

7    Direct Examination By Ms. Hamilton:............. 1270

8

9

10

11  EXHIBITS

12    Government's Exhibit Wiretap Chart 1 ............ 1238

13    Government's Exhibit 2008 Disk and Government     1250

14    Exhibit Transcript Binder 1 .....................

15    Government's Exhibit Government Exhibit           1255

16    Statement 1......................................

17    Government's Exhibit Ethics Legislation ......... 1294

18    Government Exhibit Tollway 1 .................... 1296

19    Government Exhibit Senate Seat ................. 1310

20    Government Exhibit Senate Seat 1................ 1318

21    Government Exhibit Photo Jarrett................ 1325

22

23

24

25

1215

1     (The following proceedings were had out of the

2      presence of the jury in open court:)

3        THE CLERK:  Please remain seated.

4        This court resumes in session.

5        Resuming with the case on trial.

6        MR. SCHAR:  Judge, several, I think, brief

7 things this morning and we can get started.  One is,

8 the second witness will be Mr. Harris who will get

9 into the transcripts potentially before the first

10 break.  I want to make sure if you wanted us to put

11 transcript binders on the chairs now or simply pass

12 them out at the first phone call.

13        THE COURT:  Pass them out.

14        MR. SCHAR:  Okay.  As you recall in the

15 motion in limine, there was something related to the

16 asterisks.

17        THE COURT:  Right.

18        MR. SCHAR:  Will you be giving that

19 instruction at the time the first call is played or

20 is there something you want me to address with Agent

21 Cain?

22        THE COURT:  You should address it with Agent

23 Cain.  It should come first from him.

24        MR. SCHAR:  Okay.  And lastly, Judge, we're

25 going to be using the Tribune article.  I understood

1216

1   there may be an objection to it, so I wanted to
2   address it now since it will be with Agent Cain and
3   I'm happy to provide Your Honor with a copy.
4        By way of background, Judge, the Ryan jury
5   returned a verdict of guilty and there were several
6   newspaper articles the day after, one of them
7   included a quote from the defendant directly on
8   point with the issues here in terms of personal
9   benefits.
10       I do not intend to elicit from Agent Cain who
11  the public official was that was convicted, I would
12  like a little bit of leeway to direct him with
13  leading questions in this area so it's clean, but
14  what we expect doing is simply noting that the
15  public official was convicted and the response in
16  the Tribune, there was a quote from the defendant.
17  We've redacted, as you can see, any reference to
18  Ryan at all, and certainly not going to mention a
19  prior governor being convicted.
20       That's the quote.
21   (Handing document.)
22       THE COURT:  Okay.
23   (Brief pause).
24       MR. SOROSKY:  We strongly object.  This is
25  just comment on the fact that someone is convicted.

1    What evidence does that bear to Mr. Blagojevich's
2    guilt or innocence in this case?  That would be no
3    different than if I were charged with selling drugs
4    and a month or two before I made a comment I think
5    drug dealing is bad, or I think all drug dealers
6    should go to jail, or whatever it is, the issue in
7    my case would be am I guilty of the offense before
8    the Court.  It's just highly prejudicial and has
9    zero probative value and I think it's going to be
10   pretty obvious to everyone who the public official
11   is.  That would be like someone saying we're not
12   saying who the presiding judge in the Blagojevich
13   trial is, we'll just say "the judge" so no will
14   knows it's Judge Zagel, well everyone knows you're
15   the presiding judge in this case.
16            MS. KAESEBERG:  And in addition, these
17   jurors, at least many of them, indicated in their
18   questionnaire their familiarity with the Ryan
19   prosecution, they also indicated negative feelings
20   toward politicians in general.  It's highly
21   inflammatory for this to come in, I think 403 bars
22   this evidence from coming in.
23            THE COURT:  And now you have to tell me the
24   purpose of this.
25            MR. SCHAR:  Judge, the purpose of this,

:56AM

:57AM

:57AM

:57AM

:57AM

1  obviously this is pre-2008, so it's very different,

2  and it goes directly to the issue that the

3  government needs to prove, which is his intent to

4  defraud and his lack of good faith in committing the

5  crimes that the government has charged he committed.

6          Here we have an individual who -- there's a

7  conviction in relation to an allegation not

8  dissimilar to the one here, which is attempting --

9  or actually trading action for personal benefits.

10  In response to that conviction, the defendant, I

11  mean point-blank, acknowledges, he understands

12  perfectly well that he cannot personally enrich

13  himself through his public office.

14          And, obviously, not only does it go directly

15  to something the government has to prove

16  affirmatively, which is that he had the intent to

17  defraud, he had the intent to do these things and

18  knew what he was doing, but it obviously clearly

19  rebuts any kind of defense, which already was

20  inserted in, that somehow, you know, there was some

21  implication that because I was on the phone or I was

22  doing other things with lawyers or advisers, that I

23  had no clue that this was improper.  But more

24  important, this one actually does go directly to the

25  intent of the defendant at the relevant time period.

1    THE COURT:  The objection is overruled.  For
2 one thing, I can't believe that the defendant would
3 in any way withdraw the sentiments expressed here.
4 And there is in this case, and it is a much stronger
5 version so far in the first trial than it is in this
6 one, but there is a flavor of not being fully
7 cognizant that the conduct of which he's accused and
8 the conduct to the extent that it involves
9 conversations with others patent in this case, that
10 his conduct was maybe not fully realized to be
11 wrongful.  And the government does have to prove
12 that element of knowledge and intent, particularly
13 with the offenses in this case which can be
14 characterized, I think at a minimum level, as
15 attempts, and one of the key to any kind of intent
16 prosecution is intent and acknowledge.  You can't
17 get there by implication the way you can with, for
18 example, a hand-to-hand transfer of money or relief
19 of goods.
20    I recognize the difficulty this puts almost
21 any public official in because public officials talk
22 a lot.  Sometimes they talk a lot because they like
23 to talk a lot and sometimes even if they don't, they
24 feel they have to, and wisely so under some
25 circumstances.  But the truth is is this is a

1220

1  position in which the government is entitled to

2  prove was one held by the defendant and known by the

3  defendant.

4           And I don't actually see the prejudice here.

5  This is not a governor saying well it wasn't so bad,

6  he was just doing what any other governor would do,

7  he's taking a position from which I don't think he'd

8  even withdraw today.  But the government is entitled

9  to prove it, I see no prejudice here, I don't even

10 think this comes close to 403.  The objection is

11 overruled.

12          Okay, we're ready or do we have any other

13 issues?

14          From the defense, do you have anything?

15          MR. GOLDSTEIN:  We have a stipulation that

16 we're just going to have the client sign, that's the

17 only thing.

18          THE COURT:  Sure.

19      (Brief pause).

20          THE COURT:  Is everybody absolutely ready?

21          MR. SCHAR:  Yes, I think we are, Judge.

22          THE COURT:  All right.

23          THE MARSHAL:  All rise.

24      (The following proceedings were had in the

25       presence of the jury in open court:)

1          THE COURT:  Please be seated.

2          You may proceed.

3          MR. SCHAR:  Judge, the government calls as

4  its first witness Special Agent Dan Cain.

:06AM  5          THE COURT:  Face me and raise your right

6  hand.

7      (Witness duly sworn.)

8          THE COURT:  Please be seated.

9          DAN CAIN, GOVERNMENT WITNESS, SWORN

:06AM  10                 DIRECT EXAMINATION

11  BY MR. SCHAR:

12  Q   Sir, would you please state and spell your name

13  for the jury.

14  A   My name is Daniel Cain, last name is spelled

:06AM  15  C-a-i-n.

16  Q   Where do you work?

17  A   For the Federal Bureau of Investigation.

18  Q   Sometimes referred to as the FBI?

19  A   Yes.

:07AM  20  Q   How long have you worked for the FBI?

21  A   Almost 25 years.

22  Q   What did you do before joining the FBI?

23  A   I worked in an agriculture company as an

24  accountant in central Illinois.

:07AM  25  Q   Briefly, what is your educational background,

1  Agent Cain?

2  A   I received a Bachelor of Science degree in

3  accounting from the University of Illinois in 1980

4  and afterwards I received a CPA certification.

:07AM  5  Q   Where are you currently assigned as part of the

6  FBI?

7  A   I'm assigned to the Chicago division, the office

8  Lisle, Illinois.

9  Q   Where is Lisle, Illinois?

:07AM  10  A   In the western suburbs of Chicago.

11  Q   What office in the FBI are you assigned to?

12  A   I'm assigned to a squad that works primarily

13  public corruption and financial fraud.

14  Q   And as part of those responsibilities, are you an

:08AM  15  investigator of various criminal activities?

16  A   I am.

17  Q   In addition to being an investigator, what other

18  responsibilities have you had in your time with the

19  FBI?

:08AM  20  A   In the past, I was a member of the Evidence

21  Response Team for approximately 10 years.

22  Q   What is the Evidence Response Team?

23  A   It's a specialized team that has received

24  training to search, collect, and record evidence at

:08AM  25  crime scenes.

1 Q   Based on your training and experience throughout
2 your career, Agent, are you familiar with what is
3 sometimes referred as a wiretap investigation?
4 A   Yes.
:08AM 5 Q   Could you briefly explain to the jurors what a
6 wiretap is.
7 A   A wiretap is a court authorized interception of
8 telephone calls or telephone communications that
9 allows agents to listen and record conversations
:08AM 10 without the knowledge of the people talking on the
11 telephone.
12 Q   You mentioned telephone, are you also familiar
13 with the interception of communications that occur
14 other than through the use of the telephone?
:09AM 15 A   Yes.
16 Q   Can you briefly explain what those other types of
17 wiretap -- or other types of communications being
18 recorded through wiretaps?
19 A   Yes; again, it's court authorized placement of
:09AM 20 listening devices or sometimes referred to as
21 microphones in places where conversations occur that
22 allow agents, again, to listen and record
23 conversations without the knowledge of the
24 participants.
:09AM 25 Q   For purpose of your testimony, Agent Cain, if I

1  refer to recordings over telephone lines or

2  recordings at locations as wiretaps, you understand

3  what I'm referring to?

4  A   Yes.

:09AM    5  Q   Have you yourself participated in wiretap

6  investigations as a special agent with the FBI?

7  A   Yes, I have.

8  Q   What kinds of investigations?

9  A   Investigations involving primarily public

:10AM   10  corruption and drugs.

11  Q   Were you assigned to the investigation that

12  ultimately led to the case currently on trial now?

13  A   Yes.

14  Q   Approximately when did the investigation that

:10AM   15  ultimately led to this trial begin?

16  A   In December of 2003.

17  Q   When were you assigned to it?

18  A   I was assigned in the beginning.

19  Q   What was your assignment in relation to the

:10AM   20  investigation?

21  A   I --

22  Q   The broader investigation.

23  A   I was initially assigned as a --

24         MR. SOROSKY:  Objection, "broader

:10AM   25  investigation."

1        THE COURT:  It was actually followed by a
2  question mark, I don't think he characterized it
3  that way.  The objection is overruled.
4  BY THE WITNESS:
5  A  I was initially assigned as a co-case agent in
6  the investigation and then the primary case agent.
7  BY MR. SCHAR:
8  Q  What were your -- or what are your
9  responsibilities as the case agent?
10 A  I decide what investigative steps to take,
11 conduct interviews, collective and review evidence,
12 sometimes administer wiretaps, and liaison with
13 other investigative agencies involved in the
14 investigation, including the U.S. Attorney's Office.
15 Q  How did the investigation begin?
16 A  A witness complained to the FBI about being
17 extorted in connection with a State of Illinois
18 board.
19 Q  What was -- going back to the time you began the
20 investigation, 2003, 2004, what was your general
21 area of investigation at that time?
22 A  Initially, it was the Health Facilities Planning
23 Board.  The witness mentioned Jacob Kiferbaum,
24 Stuart Levine, Nick Hurtgen being involved, and
25 subsequently it evolved into the investigation of

:11AM

:11AM

:11AM

:11AM

:12AM

1 corrupt activities at two boards, the Illinois

2 Health Facilities Planning Board and the Teachers

3 Retirement System.

4 Q   At that time, 2003 and 2004, did the

5 investigation focus on activities involving the

6 defendant?

7 A   No.

8 Q   As the investigation unfolded, did you continue

9 to follow the evidence wherever it went?

10 A   Yes, we did.

11 Q   Is that how you handle all your investigations?

12 A   Yes.

13 Q   Now, to approximately October of 2008, did your

14 investigation continue?

15 A   Yes.

16 Q   And did it focus on a variety of different

17 events, involve a variety of different individuals?

18 A   Yes.

19 Q   Among others, who was in the criminal activity

20 that you were investigating?

21 A   Stewart Levine, Nick Hurtgen, Jacob Kiferbaum,

22 Bob Weinstein, Ali Ata, Joe Cari, Bill Cellini,

23 Steve Loren, John Glennon, Ed Vrdolyak, Lon Monk,

24 Rod Blagojevich, and others.

25 Q   And in relation to -- did you follow leads

:12AM
:12AM
:12AM
:13AM
:13AM

1  related to each of those individuals?

2  A  Yes.

3  Q  In relation to the larger investigation, have a

4  variety of those individuals been charged with

:13AM  5  criminal activity?

6  A  Yes.

7  Q  At times did the investigation slow down so that

8  certain cases could be resolved?

9  A  Yes.

:13AM  10  Q  Did that include your participation getting ready

11  for trials, as well?

12  A  Yes.

13  Q  So in reference to Tony Rezko, he was charged

14  with corruption relating to state boards?

:14AM  15  A  Yes, he was.

16  Q  Approximately when?

17  A  Approximately October of 2006.

18  Q  And did he proceed to trial in 2008?

19  A  Yes, he did.

:14AM  20  Q  Were you one of the agents who was involved in

21  that trial?

22  A  Yes.

23  Q  Was the investigation at that point primarily

24  focused on that trial?

:14AM  25          MR. SOROSKY:  Objection, Your Honor.

1  Mr. Rezko is not on trial here.

2         THE COURT:  I think it's useful for the

3  chronology of this, so I'm overruling it.

4         MR. SCHAR:  Thank you, Judge.

:14AM  5  BY MR. SCHAR:

6  Q   You want me to repeat the question?

7  A   Please.

8  Q   Were you one of the agents involved in preparing

9  for and actually participating in that trial?

:14AM  10 A   Yes, I was.

11 Q   When did that trial occur?

12 A   From March into May of 2008.

13 Q   Was Chris Kelly also charged by federal

14 indictment with certain crimes?

:14AM  15 A   Yes, he was.

16 Q   Approximately when?

17 A   December of 2007.

18 Q   And did those charges also arise out of the

19 investigation that you've been describing?

:15AM  20 A   Yes.

21 Q   And were there -- did your investigation -- at

22 the time of Mr. Rezko's trial, did the investigation

23 focus on activity related to Mr. Rezko?

24 A   Yes.

:15AM  25 Q   Is it fair to say that throughout the time period

1  you've been involved in this case, the focus has
2  been on the activities of a variety of different
3  individual involved in criminal activity?
4  A   Yes.
5  Q   I'm going to direct your attention now to October
6  of 2008, Agent Cain.
7         In approximately that time frame, was the
8  investigation ongoing?
9  A   Yes.
10 Q   And by that time, was the investigation more
11 focused now on the activities involving this
12 defendant?
13 A   Yes.
14 Q   At a certain point in October 2008, did an
15 individual provide information related to
16 fundraising being done by the defendant?
17 A   Yes.
18 Q   Who is that individual?
19 A   John Wyma.
20 Q   What information, generally, what information did
21 Mr. Wyma provide?
22 A   Generally --
23         MR. SOROSKY:  Objection.
24         THE COURT:  Overruled.
25 BY THE WITNESS:

Cain - direct by Schar                    1230

1  A   Generally, that Mr. Blagojevich was involved in

2  corrupt activities involving campaign fundraising.

3          MR. SOROSKY:  Objection.  This is just the

4  agent's summary and conclusions.

5          THE COURT:  It does, however, explain why the

6  agent took the steps he took next, and it was my

7  understanding that we will hear from Mr. Wyma

8  himself.

9          MR. SCHAR:  That's exactly right, Judge.

10          THE COURT:  You may answer the question.

11 BY MR. SCHAR:

12 Q   Have you completed your answer?

13          THE COURT:  Did you complete your answer?

14          THE WITNESS:  Yes, I did, Judge.

15          THE COURT:  The answer may stand.

16 BY MR. SCHAR:

17 Q   Now, ultimately, did the information that

18 Mr. Wyma provided and other information lead to the

19 FBI seeking authorization from court for certain

20 wiretaps at a particular location and ultimately on

21 particular phones?

22 A   Yes.

23 Q   Was that authorization provided?

24 A   Can you please repeat the question?

25 Q   Was court authorization provided?

1  A   Yes.

2  Q   Okay.  What was the first location or I believe

3  the only location in which a listening device or a

4  microphone was played in relation to this

5  investigation in the October time frame?

6  A   The Friends of Blagojevich campaign office at

7  4147 North Ravenswood in Chicago.

8  Q   What was Friends of Blagojevich?

9  A   It was a campaign committee established primarily

10  for the purpose of the election of Rod Blagojevich

11  for governor.  It was the primary fundraising

12  vehicle for Mr. Blagojevich.

13  Q   Can you please put the microphone up just a

14  little closer.

15  A   Sorry.

16  Q   You indicated that Friends of Blagojevich

17  maintained an office in the north side of Chicago?

18  A   Yes.

19  Q   What kinds of -- ultimately, what kinds of

20  telephones were the subject of the wiretap

21  authority?

22  A   Both cellular telephones and landline telephones.

23  Q   When you say landline telephones, what are you

24  referring to?

25  A   It's a telephone associated with a telephone line

:17AM

:17AM

:18AM

:18AM

:18AM

1  at a particular location.

2  Q   Were among the phone lines that were wiretapped a

3  landline at the home of the defendant?

4  A   Yes.

:18AM   5  Q   Were you, Agent Cain, and your squad involved in

6  obtaining each of these wiretaps?

7  A   Yes.

8  Q   After obtaining -- well, let me ask this

9  question, what did the wiretaps actually authorize

:19AM   10  the agents to do?

11  A   The wiretaps authorized the agents to listen and

12  to record conversations related to the illegal

13  activities under investigation for a period of

14  30 days.

:19AM   15  Q   After you obtained the court orders, what

16  assistance did you get from the telephone company?

17  A   The telephone company routes the telephone lines

18  that are being wiretapped, the incoming and outgoing

19  calls to an FBI location known as a wire room where

:19AM   20  the calls can be listened to and recorded by agents.

21  Q   In relation to the phone call at issue in this

22  investigation, where did the interception of calls

23  actually take place?

24  A   Where did the interception of the calls actually

:20AM   25  take place?

1  Q   The location of the monitor.

2  A   I'm sorry, where the telephone lines were,

3  Mr. Schar, or --

4  Q   Not where --

:20AM   5  A   The FBI location?

6  Q   Exactly.

7  A   It's in a secure FBI office in the Chicago area.

8  Q   Is there a particular room, is there a name for

9  the room in that office?

:20AM   10  A   It's called the wire room.

11  Q   What is a wire room?

12  A   A wire room is simply a secure location within an

13  FBI facility where there is equipment located, and

14  the incoming and outgoing calls are routed that

:20AM   15  allows the agents to listen and record the

16  conversations.

17  Q   In terms of a wire room, can you just walk us

18  through how calls are intercepted and recorded

19  within the wire room.

:20AM   20  A   The audio for the calls are transmitted through

21  telephone lines to an FBI computer system in the

22  wire room.

23       At the computer system, the agents will

24  listen and record the calls.  The audio is

:21AM   25  transmitted to two computer disks in the FBI

1  mainframe computer and recorded onto those computer

2  disks digitally.

3  Q   What happens to each of the two disks?

4  A   One of the disks is marked original, one of the

5  disks is marked working copy.  The original disk

6  containing recordings from the first 30 days is

7  removed at the end of 30 days, brought before the

8  Chief Judge and sealed, and then it is transported

9  back to an evidence facility where it is stored.

10 The sealing prevents it from being altered.

11 Q   When does the recording of a call on a wiretap

12 actually begin?

13 A   When the telephone is taken off the hook for an

14 outgoing call and the digits are dialed or when an

15 incoming call, when the ring begins and the call is

16 actually activated on the line.

17 Q   Is there a built-in system used to identify each

18 particular what I'll call session?

19 A   Yes.

20 Q   What is that system?

21 A   When a telephone call comes into the main FBI

22 computer system, or any activity, it's called a

23 session, and the computer automatically assigns a

24 session number to that call or activity.

25         Each session number is assigned consecutively

Cain - direct by Schar                              1235

1    in sequential order to each telephone call for each

2    line.  So a session on line number 1 would be

3    assigned session 1; the second call would be

4    assigned session number 2; on the second line or a

5    third line if a call comes in, first call would be

6    number 1, the second call would be number 2, and so

7    on.

8    Q   Is each session number that is assigned an actual

9    different phone conversation?

10   A   No.

11   Q   How are -- well, let me ask you this, are session

12   numbers assigned for any activity that occurs on the

13   line?

14   A   Yes.

15   Q   Give us an example of that.

16   A   A session number will be assigned for a text

17   message, for instance; it comes over a cell phone, a

18   voicemail, a hang-up call, sometimes when a cell

19   phone tower communicates with the cell phone.  When

20   there's a call that comes in that an agent isn't

21   monitoring because the agent may be monitoring

22   another line, it's still assigned a session number.

23   Q   And if a single session -- let's say there's a

24   phone conversation that's interrupted by a call

25   waiting --

1  A   Yes.

2  Q   -- would each part of the conversation get a

3  separate session number or does it get one session

4  number?

5  A   A separate session number.

6  Q   So a single conversation may have multiple

7  session numbers?

8  A   Yes.

9  Q   And in terms of the actual monitoring that occurs

10 in the wire room, how do agents actually monitor a

11 call that comes in?

12 A   An agent sits in front of the computer system,

13 the computer system has speakers and buttons.  When

14 a call comes in, an incoming call, a ring tone is

15 usually heard.  Or when a call is going out, a dial

16 tone is usually heard, just like you would hear on

17 your telephone.

18      The agent has to activate the line that they

19 are monitoring.  When a call comes in or goes out, a

20 timer is automatically activated that tells the

21 agent how much time the recording is going on.  And

22 then the agent has buttons to either stop and turn

23 the listening device or recorder off or turn the

24 recorder and listening device on.

25 Q   Now, I think you indicated that the initial

1  authorization by the court is for 30 days.  What
2  happens at the end of 30 days?
3  A   At the end of 30 days, you have to supply new
4  information in the form of an affidavit to the court
5  and apply for another court order for a second 30
6  days.
7  Q   And in this case, it became that certain of these
8  phone lines or locations were monitored for multiple
9  30 day periods?
10 A   Yes.
11 Q   And were the original wiretap disks sealed after
12 they were -- after each 30 day sessions?
13 A   Yes, they were.
14 Q   What exactly is sealing?
15 A   Sealing is, again, the agent removing the
16 computer disk from the FBI computer system and with
17 an Assistant U.S. Attorney taking it before the
18 Chief Judge in an evidence package and sealing it
19 with evidence tape to prevent it from being altered.
20 The sealed evidence package is then taken back to an
21 FBI evidence room and then stored.
22 Q   I'd like to talk to you specifically about the
23 wiretaps obtained in this investigation.
24         Agent, did you put together a chart to
25 summarize various wiretaps that were authorized from

Cain - direct by Schar                                1238

1  October of 2008 on?

2  A  I did.

3  Q  Would it assist in your testimony to be able to

4  review that chart?

:26AM  5  A  Yes.

6        MR. SCHAR:  Judge, may I approach?

7        THE COURT:  You may.

8  BY MR. SCHAR:

9  Q  I show you what has been marked as Government

:27AM  10  Exhibit Wiretap Chart 1.

11        Ask you, Agent Cain, if you recognize that

12  exhibit?

13  A  I do.

14  Q  What is it?

:27AM  15  A  It is a chart summarizing the telephones, the

16  telephone numbers, and the date of interception that

17  was the subject of the wiretaps in 2008.

18  Q  And would that chart assist you in testifying

19  today?

:27AM  20  A  Yes.

21        MR. SCHAR:  Judge, we move Government Exhibit

22  Wiretap Chart 1 into evidence.

23        THE COURT:  Admitted.

24     (Government's Exhibit Wiretap Chart 1 was

:27AM  25      received in evidence.)

1          MR. SCHAR:  And move to publish.

2          THE COURT:  You may.

3       (Exhibit published to the jury.)

4    BY MR. SCHAR:

5    Q   Agent Cain, could you please just explain to the

6    ladies and gentlemen of the jury what exactly we're

7    looking at on the chart.

8    A   We're looking at a summary chart that I prepared

9    for the 2008 wiretaps.  On the far left hand corner,

10   under target description, primary user location is

11   the location of the wiretap, and sometimes the

12   subscriber to the cellular telephone when you see a

13   name, names down at the bottom of that column.

14          The second column, microphone or telephone

15   number, the first two instances is the microphones

16   that were implemented at the campaign office, and

17   then the remainder is the wiretaps on the telephone

18   numbers.

19          And then the third column is the dates of the

20   interception.

21   Q   By way of looking at the top, what was the first

22   wiretap obtained in October of 2008?

23   A   The first wiretap was for microphones installed

24   at the Friends of Blagojevich campaign office.

25   Q   And those are the first two entries?

Cain - direct by Schar                            1240

1   A   Yes.

2   Q   Over on the right side, what were the dates of

3   interception over those wiretaps?

4   A   October 22nd, 2008 until December 9th, 2008.

:29AM   5   Q   And what are the next four phone lines that were

6   wiretaps?

7   A   One is a cellular telephone of Robert

8   Blagojevich, telephone number (615) 417-2605.

9           Target phone number 2 is a telephone at the

:30AM   10  Friends of Blagojevich campaign office, telephone

11  number (773) 404-2006.

12          The next one is target phone number 3, that

13  telephone at Rod Blagojevich's home, telephone

14  number (773) 588-9475.

:30AM   15          And the next one is a telephone at the

16  Friends of Blagojevich campaign office, telephone

17  number (773) 404-8667.

18  Q   And do each of those wiretaps begin at

19  approximately the same date?

:30AM   20  A   Yes.

21  Q   What date was that?

22  A   October 29, 2008.

23  Q   And for three of the wiretaps, they continue

24  until December 9th of 2008?

:30AM   25  A   Yes.

1 Q   And did one end on November 26th, that would be
2 target phone 2, 2008?
3 A   Yes.
4 Q   Now, does that indicate to you that the
5 government did not seek an additional 30 days on
6 that particular phone line?
7 A   Yes.
8 Q   Now, two of the phone lines that are up there are
9 phone lines at the Friends of Blagojevich office.
10 Approximately how many phone lines are there at the
11 Friends of Blagojevich office?
12 A   According to the telephone records, there are
13 approximately ten telephone lines.
14 Q   And two of those lines were monitored?
15 A   Yes.
16 Q   The other eight were not?
17 A   Yes.
18 Q   Do you know which of the two lines, in terms of
19 overall lines, were monitored?
20 A   Do I know which of the two lines were monitored?
21 Q   I know you have a phone number, but do you know
22 in terms of incoming calls, which of the lines were
23 monitored?
24 A   No, I just know in terms of the telephone
25 numbers.

:30AM

:31AM

:31AM

:31AM

:31AM

1  Q   And the next series of phones, beginning at
2  target phone 5, could you just -- you don't need to
3  read the phone number, but just indicate which are
4  the phones and the period of interception.

:31AM   5  A   Okay.  Target phone number 5 was a cellular
6  telephone belonging to Alonzo Monk, and it was
7  intercepted November 26, 2008 to December 9, 2008.
8          The next is a cellular telephone belonging to
9  John Harris, intercepted November 29, 2008 to

:32AM   10  December 9, 2008.
11          The next one is John Harris' office
12  telephone, intercepted December 1, 2008 to December
13  8, 2008.
14          And the last one is Rod Blagojevich's

:32AM   15  cellular telephone, intercepted November 26, 2008 to
16  December 8, 2008.
17  Q   And were those wiretaps obtained later in
18  November as part of the investigation or even one in
19  December?

:32AM   20  A   They were all obtained in November.  The one
21  wiretap in December, the telephone company did not
22  get routed to the wire room until December 1st,
23  2008.
24  Q   And those were not monitored, obviously, for the

:33AM   25  full 30 days, is that fair to say?

Cain - direct by Schar                    1243

1  A   Yes.

2  Q   Now, in relation to all of those various phone

3  lines that were monitored, were they monitored 24

4  hours a day, every day?

5  A   No.

6  Q   Typically, when were they monitored?

7  A   They were typically monitored during the waking

8  hours of 7:00 a.m. to 11:00 p.m.

9  Q   Why those hours?

10 A   Because those were the times that Rod Blagojevich

11 was having conversations and others were having

12 conversations.  Those were the waken hours.

13 Typically, we don't monitor during the times when

14 the people are asleep unless we're aware of a

15 conversation.  If we're aware of a conversation

16 earlier, we would monitor it.  If a conversation was

17 occurring at 11:00 o'clock, we would continue

18 monitoring until the conversations were concluded.

19 Q   And did the wiretaps, basically, stop the day the

20 defendant was arrested?

21 A   Yes.

22 Q   December 9, 2008?

23 A   Yes.

24 Q   And were each of the disks sealed in the manner

25 that you previously testified to?

1  A   Yes, there were.

2  Q   Were any of the calls enhanced for sound quality?

3  A   Yes.

4  Q   Why were they enhanced?

5  A   They were enhanced to better allow listeners to

6  hear the conversations.

7  Q   Other than affecting basically the volume and

8  sound quality, did they change any of the words?

9  A   No.

10 Q   I'm going to show you --

11       MR. SCHAR:  If I may approach, Judge?

12       THE COURT:  You may.

13 BY MR. SCHAR:

14 Q   -- what's marked as Government Exhibit 2008 disk.

15       I ask you if you are familiar with Government

16 Exhibit 2008 disk?

17 A   I am.

18 Q   What is it?

19 A   It is a computer disk containing the recorded

20 conversations from the investigation that will be

21 presented at trial.

22 Q   How was the disk created?

23 A   It was created from the original computer disks

24 that were in the FBI computer system.  It was

25 created from working copies of those original

1  computer disks.

2  Q   Now, in addition to the disks, if you can put

3  aside for a moment, were transcripts prepared for

4  use at trial?

5  A   Yes.

6  Q   Briefly, Agent Cain, can you explain what a

7  transcript is.

8  A   A transcript is a document containing the words

9  that were spoken during the conversations, along

10 with the participants, the dates, times of the call.

11 Q   How was it translated into a transcript?

12 A   A recording is provided to a professional FBI

13 support person.  That person types the words that he

14 or she hears on to a transcript, along with the

15 other identifying information, the date, the time of

16 the call, the participants.  Then that transcript is

17 reviewed by agents and attorneys and sometimes later

18 participants in the call.

19        Finally, an agent, Jay Hagstrom, finalizes

20 the transcript and initials each page of the

21 transcripts signifying that he finalized that

22 transcript.

23        MR. SCHAR:  Again, Judge, may I approach?

24        THE COURT:  You only have to ask the first

25 time.

1       MR. SCHAR:  Thank you, Judge.

2   BY MR. SCHAR:

3   Q   I show you, Agent Cain, what has been marked

4   Government Exhibit Transcript binder.

5       Ask you if you recognize that exhibit.

6   A   I do.

7   Q   What is it?

8   A   It is a binder containing the transcripts of the

9   recorded conversations that will be played at trial.

10  Q   And is there a table of contents at the building?

11  A   Yes, there is.

12  Q   What is reflected, generally, on the table of

13  contents?

14  A   Generally, the tab number in which the transcript

15  is located is in the first column, the date of the

16  call, the time of the call, the call number.  We

17  talked about session numbers, this is the call

18  number or the session numbers from the FBI computer

19  system, and then the speakers on the call.

20  Q   And is that information also provided as header

21  to each of the particular transcripts contained

22  within the binder?

23  A   Yes.

24  Q   Now, on certain of the transcripts, are there

25  asterisks at various points?

1  A   Yes.

2  Q   Do the asterisks indicate a portion of the

3  conversation that has been properly removed pursuant

4  to court order?

5  A   Yes, they do.

6  Q   Now, could every word of every call be made out?

7  A   No.

8  Q   What would be a reason for a word or a phrase

9  cannot be understood or heard?

10 A   Sometimes the voices were very faint where you

11 couldn't make them out, and sometimes during calls

12 people may have mumbled or spoke over each other,

13 and sometimes they were poor quality telephone lines

14 or poor cellular telephone coverage.

15 Q   How would that be indicated in one of the

16 transcripts?

17 A   If we couldn't understand a word, we would -- the

18 phrase or the initials "UI" would be typed which

19 stands for unintelligible.

20 Q   And in particular, in relation to the microphones

21 at the Friends of Blagojevich offices, were you able

22 to make out every word of every conversation in

23 those offices?

24 A   No.

25 Q   Were there actually microphones in every room at

1 those offices?

2 A   No.

3 Q   Why were certain conversations difficult to hear?

4 A   Because there were times where voices were very

5 faint, indicating to us that they were outside of

6 the microphone coverage area.

7 Q   Was there also whispering that was difficult to

8 hear?

9 A   Yes.

10        MR. SCHAR:  I believe I have two stipulations

11 to read, if I may proceed?

12        THE COURT:  You may.

13        MR. SCHAR:  (Reading:)

14   "... it is hereby stipulated and agreed by and

15     between the United States of America, by and

16     through its attorney, Patrick J. Fitzgerald,

17     the United State's Attorney for the Northern

18     District of Illinois, and defendant Rod

19     Blagojevich, individually and through his

20     attorneys, Sheldon Sorosky and Aaron Goldstein,

21     that the following facts are and should be

22     considered by this jury to be true and

23     accurate:

24     Stipulation number 1:  Each of the recordings

25     appearing on Government Exhibit 2008 Disk is a

:39AM

:40AM

:40AM

:40AM

:40AM

1    true and accurate copy of the telephone
2    conversation recorded on telephone numbers:
3    (773) 588-9475, (773) 404-8667, (615) 417-2605,
4    (773) 910-9718, (312) 497-9943, and (312)
5    814-8466, or a recorded conversation occurring
6    at the offices of Friends of Blagojevich during
7    the period from October 22nd, 2008 until
8    December 6, 2008, as well as voicemail recorded
9    on telephone number (202) 431-2193 on
10   October 9, 2008.
11   Each of the recordings appearing on Government
12   Exhibit 2008 Disk accurately reproduces both
13   the words spoken and the sounds of the speakers
14   voices as those words were spoken and as those
15   sounds occurred in the original conversations
16   reproduced in each of the recordings.
17   Each of the recordings appearing on Government
18   Exhibit 2008 Disk occurred on the dates and at
19   the times listed on the transcripts that
20   correspond to the recordings.
21   Stipulation number 2:
22   Each of the transcripts contained in Government
23   Exhibit Transcript Binder 1 is an accurate
24   transcription of the recorded conversations to
25   which they correspond and accurately reflect

Cain - direct by Schar                        1250

1      the speakers in those conversations."
2      So stipulated?
3          MR. GOLDSTEIN:  So stipulated.
4          THE COURT:  You are done with the
5  stipulations?
6          MR. SCHAR:  We are, Judge.
7          THE COURT:  You just heard about the only
8  thing in this courtroom where evidence comes from
9  the well of the courtroom.  A stipulation is an
10 agreement between everybody that certain things are
11 true, and they usually deal with technical stuff of
12 this sort.  Otherwise, I pause to remind you what
13 you hear that counts, accept the stipulations as it
14 comes from the witness stand.
15         With that, you may proceed.
16         MR. SCHAR:  Thank you, Judge.
17         With that, Judge, we would move Government
18 Exhibit 2008 Disk and Government Exhibit Transcript
19 Binder 1 into evidence.
20         THE COURT:  Admitted.
21       (Government's Exhibit 2008 Disk and Government
22        Exhibit Transcript Binder 1 were received in
23        evidence.)
24 BY MR. SCHAR:
25 Q   Switching topics slightly, Agent Cain.  Based on

:42AM

:42AM

:42AM

:43AM

:43AM

Cain - direct by Schar                    1251

1  your investigation of this case, did you become
2  aware that the defendant was a criminal prosecutor
3  for a period of time?
4  A  Yes.
5  Q  Where?
6  A  Cook County State's Attorney's Office.
7  Q  For how long was he a criminal prosecutor?
8  A  For approximately 2 years.
9  Q  Now, after leaving the prosecutor's office, what
10 did the defendant do?
11 A  He was a defense attorney.
12 Q  In private practice?
13 A  In private practice and I think he also worked
14 for the City of Chicago.
15 Q  As part of his private practice, did the
16 defendant do criminal defense work?
17 A  Yes.
18 Q  And, generally speaking, based on your
19 investigation, approximately how many cases were you
20 aware that he was involved in as a criminal defense
21 attorney?
22 A  According to Cook County records, approximately
23 18 felony cases.
24 Q  And did those 18 felony cases involve a variety
25 of different criminal violations?

Cain - direct by Schar                                    1252

1   A   Yes.
2   Q   As part of that criminal defense work, was the
3   defendant active in filing legal motions?
4   A   Yes.
5   Q   Was he also --
6           MR. SOROSKY:  How did he know that?  Maybe
7   someone else did it for him.  I mean, this is
8   just --
9           MR. SCHAR:  Judge, I'm going to lay the
10  foundation.
11          THE COURT:  Go ahead.
12  BY MR. SCHAR:
13  Q   Did you actually subpoena the records and review
14  the files that the defendant was involved in?
15  A   Yes.
16  Q   And did those files reveal actual filings
17  hand-signed by the defendant himself?
18  A   Yes.
19  Q   In which it indicated that he was involved in
20  filing a variety of motions?
21  A   Yes.
22  Q   Did it also include transcripts of trials and
23  other pretrial activities that he was involved in?
24  A   Yes.
25  Q   Through those transcripts, were you able to

Cain - direct by Schar                    1253

1   determine whether the defendant actually put on

2   witnesses on the witness stand and cross-examined

3   witnesses in criminal cases?

4   A   Yes, I was; and yes, he did.

:45AM   5   Q   Now, after being in private practice for several

6   years, did the defendant actually run for office?

7   A   Yes.

8   Q   And did he run for governor in 2002?

9   A   Yes.

:45AM   10   Q   Just so the record is clear, did he win?

11   A   Yes, he did.

12   Q   How long a term was that for?

13   A   That was for a 4-year term.

14   Q   Did he run for reelection in 2006?

:45AM   15   A   Yes.

16   Q   Again, did he win?

17   A   Yes.

18   Q   What was the term that he won at that time?

19   A   Again, it was a 4-year term.

:45AM   20   Q   I want to take you back, Agent Cain, to April

21   of 2006.

22        At that time, was a public official convicted

23   for receiving personal benefits in exchange for

24   state action?

:46AM   25   A   Yes.

Cain - direct by Schar                                    1254

1    Q   And did those personal benefits include a variety
2    of different things, such as paid vacations and
3    things of that sort?
4    A   Yes.
5    Q   Reduced costs of construction?
6    A   I believe so.
7    Q   Did the conviction generate some media coverage?
8    A   Yes.
9    Q   And in response to the public official's
10   conviction for receiving personal benefits in
11   exchange for taking state action, did the defendant
12   make a statement?
13   A   Yes, he did.
14   Q   I'd like to show you what's marked as Government
15   Exhibit statement 1.
16       I understand the title is redacted, but what
17   is it?
18   A   It's a newspaper article from the Chicago Tribune
19   dated, it appears, Tuesday, April 18th, I think,
20   2006.
21   Q   Is that a true and accurate copy, a reproduction
22   of several pages of the Chicago Tribune from that
23   date?
24   A   Yes.
25       MR. SCHAR:  Judge, we move Government Exhibit

:46AM

:46AM

:46AM

:47AM

:47AM

```
                        Cain - direct by Schar                1255
```

 1  Statement 1 into evidence.

 2        MR. GOLDSTEIN:  Your Honor, we renew our

 3  original objection now.

 4        THE COURT:  You don't have to do that.  You

 5  don't have to renew it to preserve it.  The

 6  objection is overruled.

 7        MR. SCHAR:  Move to publish.

 8        THE COURT:  You may.

 9      (Government's Exhibit Government Exhibit

10       Statement 1 was received in evidence.)

11  BY MR. SCHAR:

12  Q   This is the Tribune from April 18th, 2006?

13  A   Yes.

14  Q   Is that the day after the public official was

15  convicted?

16  A   Yes.

17  Q   Moving to the second page of that exhibit, is

18  there a quote from the defendant in response to the

19  public official's conviction?

20  A   Yes, there is.

21  Q   And is it entitled "what others had to say"?

22  A   Yes.

23  Q   Would you read to the ladies and gentlemen of the

24  jury what the defendant had to say.

25  A   (Reading:)

1    ".... today's verdict proves that no one is

2     above the law.  And just as important, it

3     proves that government is supposed to exists

4     for the good of the people, not the other way

5     around, and certainly not for the personal

6     enrichment of those who hold public office.

7     That's why it is altogether fitting and proper

8     that on tax day, the jury made it clear that

9     the people come first.  Governor Rod

10     Blagojevich."

11        MR. SCHAR:  May I have a moment, Judge?

12        THE COURT:  Yes.

13      (Brief pause.)

14        MR. SCHAR:  Nothing else at this time, Judge.

15                CROSS EXAMINATION

16  BY MS. KAESEBERG:

17  Q   Good morning, Agent Cain.

18  A   Good morning.

19  Q   We represent Rod Blagojevich.  This would be much

20  more short than the government's direct with you.

21        So you talked about the wiretaps in this

22  case.  For about how long was Rod recorded?

23  A   How many days were the wiretaps?

24  Q   Yes.

25  A   The microphones were in place for about 49 days

1  and the telephones 42 days.

2  Q   And then you also talked about individual

3  sessions that would come through on the phone lines.

4  How many sessions were there?

5          MR. SCHAR:  Objection, Judge.

6          THE COURT:  The objection is sustained.

7  BY MS. KAESEBERG:

8  Q   How many hours of conversations came through?

9          MR. SCHAR:  (Counsel standing)

10         THE COURT:  The objection is sustained.

11         I should indicate that I didn't let Mr. Schar

12 actually say objections, but he stood up and that's

13 pretty much why he was standing up.

14         MS. KAESEBERG:  I saw him.

15 BY MS. KAESEBERG:

16 Q   Now, you did testify that the agents that were in

17 the wire rooms that saw the calls coming through had

18 buttons to turn the recorders on and off.  So is it

19 fair to say it was up to the agent to determine what

20 was actually recorded?

21         MR. SCHAR:  (Counsel standing.)

22         THE COURT:  The objection is sustained.

23 BY MS. KAESEBERG:

24 Q   You talked about -- you talked about asterisks in

25 the transcripts that are in the binders.  Those

1  asterisks indicate content that was removed and not
2  recorded pursuant to court order, is that correct?
3  A   Correct.
4          MR. SCHAR:  Judge --
5          THE COURT:  Maybe I can just explain the rule
6  to the jury.
7          MR. SCHAR:  Thank you.
8          THE COURT:  There are a couple of reasons why
9  things are deleted from recordings.  Actually,
10 there's a third reason, and the third reason is that
11 you might be here for a very long time listening to
12 stuff that's not very pertinent to the case.  Some
13 things are deleted because the Congress of the
14 United States, when it permitted wiretapping,
15 decided that certain personal matters should not be
16 recorded.  Because even assuming, and I'm going to
17 use a hypothetical that's very different from what
18 we're facing here, even if you're recording a
19 conversation of a person who is planning to rob a
20 bank, it's a possibility that that person would be
21 on the phone talking to his spouse, talking about
22 who is going to pick up kids for the next week.
23 They don't always talk about bank robberies.  The
24 law requires the law enforcement officers
25 overhearing this to make an initial determination

1  that some private matter is coming up, and if they

2  do, then they, basically, stop recording.  They have

3  the right to come back periodically and check to see

4  if the conversation hasn't changed.  That's what's

5  responsible for some of the things that are missing.

6          The other parts are parts that, for example,

7  the stuff that was recorded and the government

8  thinks that it doesn't really matter, it's not

9  relevant to the case.  When the government wishes to

10 delete stuff like that, the other side can object.

11 And when they do, I decide, the Court decides

12 whether the deleted portions are relevant or not.

13         Sometimes, of course, the decision is is that

14 it might or might not be relevant, but we allow, in

15 some cases, the defense, if it chooses, to ask that

16 certain portions be played, and the government can

17 object, and then I make the ruling one way or the

18 other.

19         So the decision to remove stuff from the

20 transcript is a decision which I have to validate or

21 overrule, one of the two, and that's where we get to

22 the point where you will see asterisks.

23         And, basically, you should draw no inference

24 from the fact that something has been deleted, at

25 least at the initial run-through.  It may come out

 1  later that the other side wants to introduce
 2  portions of it and I agree with that, and then you
 3  can consider it.  But the fact that not every single
 4  word is in the transcript is not a relevant
 5  consideration for you in reaching your verdict.
 6          Another thing I do want to point out, you're
 7  going to have these transcripts, and you're going to
 8  listen to recordings.  The thing that's important
 9  for you to know is the transcript is the very best
10  effort that people made to listen to the recordings
11  and put down in the transcript what they heard.  But
12  the transcripts aren't the evidence, the recordings
13  are.  And when you listen to the recordings and you
14  see the transcripts, if you think that the
15  transcript is incorrect or it differs from what you
16  heard in the recording, it's the recording that
17  counts, not the transcript, which is why you get to
18  both hear and read at the same time.
19          What you hear in the recording is the
20  evidence and not necessarily what you read in the
21  transcript.  Every effort has been made to make them
22  accurate, but the decision as to whether the
23  transcript is an accurate transcript of the
24  recording is a decision, if there's disagreement
25  about that, a decision that you will have to make,

:54AM
:54AM
:54AM
:55AM
:55AM

Cain - cross by Kaeseberg                    1261

1  and it is the recordings, not the transcripts that
2  are the evidence.
3        You can ask away now.
4        MS. KAESEBERG:  Thank you.
5  BY MS. KAESEBERG:
6  Q   So just to be clear, under the law of
7  minimization, the agent on the ground decides what
8  will be minimized?
9        MR. SCHAR:  Objection.
10       THE COURT:  The objection is sustained.
11 BY MS. KAESEBERG:
12 Q   Are the agents given instructions as to how to
13 conduct the minimizations in the recordings?
14       MR. SCHAR:  Objection.
15       THE COURT:  The objection is sustained.
16 These are issues --
17       MS. KAESEBERG:  I will ask something else.
18       THE COURT:  These are issues of law which
19 have been presented to me.
20       MS. KAESEBERG:  I'll move on.  Just a couple
21 of more questions on something else.
22 BY MS. KAESEBERG:
23 Q   You testified that you looked into
24 Mr. Blagojevich's background as a prosecutor.
25 A   I read his biography, his congressional

1  biography.

2  Q   And then you also testified that you subpoenaed

3  some records?

4  A   Yes.

5  Q   Why did you subpoena those records?

6         MR. SCHAR:  Objection.

7         THE COURT:  The objection is sustained.  It's

8  not relevant.

9  BY MS. KAESEBERG:

10 Q   Is it fair to say that the investigation is

11 ongoing?

12        MR. SCHAR:  Objection; relevance.

13        THE COURT:  The objection is sustained.  It's

14 not relevant.

15 BY MS. KAESEBERG:

16 Q   You testified that you've been an agent on this

17 case since the beginning?

18 A   Yes.

19 Q   And when did the investigation begin?

20 A   The investigation began in approximately December

21 of 2003.

22 Q   December of 2003?

23 A   Yes.

24        MS. KAESEBERG:  Nothing further, Your Honor.

25        MR. SCHAR:  No redirect, Judge.

1          THE COURT:  You can step down.

2          Let's take a fifteen-minute break.

3          THE MARSHAL:  All rise.

4        (The following proceedings were had out of the

5         presence of the jury in open court:)

6          THE COURT:  You can step down.

7        (Witness excused.)

8          THE COURT:  Who is the next witness?

9          You can be seated in the courtroom, if you

10   wish.

11          MS. HAMILTON:  John Harris.

12          THE COURT:  Anything we have to deal with

13   before?

14          MR. SCHAR:  Yes, Judge.  I mean, the issue

15   is, we filed motions in limine specifically to avoid

16   what just happened, which is one of us having to

17   stand up and object to questions that is actually

18   barred by Your Honor's rulings.

19          And, you know, I understand you've admonished

20   the jurors several times what happens in the well is

21   not evidence, but the reality is, those questions

22   are put in direct violation of what you had ordered

23   and the reason we brought it to your attention ahead

24   of time was to avoid this situation which looks like

25   we're hiding the ball because we're objecting and

 1  it's inappropriate.

 2        THE COURT:  Let me say this, because I

 3  understand what might be the difficulty here, asking

 4  those questions wasn't appropriate.  It was the

 5  subject of motions in limine.  Now, I understand

 6  that you may believe, and I in your position may

 7  very well believe this, that to preserve your record

 8  you need to ask the questions and maybe get an

 9  answer.  The way you do that is, you make an offer

10  of proof and we do it outside the presence of the

11  jury.  So if you were going to ask questions that

12  you believe would violate the rulings on my motions

13  in limine, then what you do is you indicate to me

14  that you would like to have an offer of proof, we'll

15  send the jury out at the appropriate time, and you

16  can ask the questions, and, better yet for you, on

17  the record you can get the answers.

18        So that's the way we're going to do it.  I

19  don't want to be sustaining objections to stuff that

20  I clearly ruled on in the motions in limine.  And

21  particularly the last question, the agent decides,

22  is really not appropriate in this context.  There

23  are cases where the agent does make an initial

24  decision, they are largely mandated by Congress,

25  mandated by instructions.  If you think there are

1  errors in the instructions, which I believe you did,
2  you made that motion, I considered it, I denied it.
3  If I made a mistake and this case ends badly for
4  your client, there's a place you can go to complain
5  about what it was that I did.  Don't do it in front
6  of the jury.
7          See you in about fifteen minutes.
8          MR. SOROSKY:  Your Honor, if I could make one
9  objection.  There appears to be a pattern of conduct
10 developing by the prosecutor which I think is
11 improper, and if I could address that now for one
12 minute.
13         THE COURT:  Why don't you address it when we
14 come back.
15         MR. SOROSKY:  Very good.
16         THE COURT:  I won't bring the jury out until
17 you do.
18         MR. SOROSKY:  Very good.
19     (Recess.)
20     (The following proceedings were had out of the
21      presence of the jury in open court:)
22         COURT'S LAW CLERK:  Please remain seated.
23         THE COURT:  Counsel, approach.
24     (Brief pause).
25         THE COURT:  Your turn.

 1          MR. SOROSKY:  Thank you.

 2          As I began, I see a pattern developing here,

 3   and let me explain the pattern.  Very often, if I

 4   could digress for a minute, in state court

 5   prosecutions the state's attorney would begin by

 6   describing the defendant as, oh, he's a member of

 7   the Gangster Disciples, he is a member of the

 8   El Rukns, and then they go on and present the

 9   evidence against the defendant, whatever it may be,

10   attempt murder, murder, robbery, whatever.  And very

11   often this was very, very damning evidence and

12   prejudicial evidence to the jury because the jury

13   would figure, oh, my God, this defendant is a member

14   of that gang, that gang is awful, and they would

15   think we better convict this guy because we got to

16   get the gang off the street.  And now in state

17   courts the prosecution is prohibited from saying

18   he's an El Rukn, he's a gangster Disciple, unless

19   it's got something to do with the case that's

20   prejudicial error and cases are reversed for that.

21          With that in mind, I see a similar pattern

22   here.  Let's substitute notorious politician for the

23   gang, and I see a smile on Your Honor's face.

24          THE COURT:  No, what I was thinking of is is

25   have we gotten to the point in Illinois where to say

1  somebody is a governor is to say something bad about

2  him.

3          MR. SOROSKY:  No, not at all.  Being governor

4  is a good, not a bad.  However, with all due

5  respect, first with the newspaper article and then

6  with Agent Cain testifying to his background in

7  various cases, a whole series of names were

8  mentioned that are not character references.  And

9  the only purpose of that is to somehow taint the

10 jury that if Agent Cain is involved with all those

11 investigations and he was involved in snarling those

12 supposed bad guys who were all public officeholders,

13 then the prejudice is obvious.

14         And this is a pattern that's developing, we

15 think it's improper, and it has no probative value,

16 it's very prejudicial, and we'd ask for a mistrial

17 and a whole new trial because of that.

18         THE COURT:  My only question to that is, how

19 many times do you think an FBI agent is going to

20 testify that most of his days are spent dealing with

21 people who are not fallen angels?

22         MR. SOROSKY:  I think you'd have to direct

23 that question to Mr. Schar.

24         THE COURT:  Well, I don't think it happens

25 very often.  And it's a problem that's inherent when

:22AM

:23AM

:23AM

:23AM

:24AM

1 you put a police officer in the witness stand.  A

2 police officer is in court and he's testifying for

3 the prosecution, you have this inherent stuff about

4 he's a law enforcement officer, and, obviously, if

5 he's dealing with the defendant in this case, there

6 must be something wrong with the defendant.  I don't

7 think the jury is that unsophisticated.

8         MS. KAESEBERG:  If I could add one thing.

9 Agent Cain testified he was in the public corruption

10 and financial fraud unit, that just incites whatever

11 the government is trying to elicit because they had

12 to go through a litany of names that have very

13 negative connotations that are not involved in this

14 case.

15         MR. SCHAR:  Well, that's an interesting

16 point, and it's interesting only because the opening

17 statement was an attack on the government, which we

18 didn't object to, I'm not admitting it was an

19 improper opening statement in this regard, but it

20 was basically an opening statement to suggest the

21 government has been out to get this defendant for

22 years and years.

23         MR. SOROSKY:  They have.

24         MR. SCHAR:  Well, what Agent Cain just

25 testified to was that, in fact, since 2003 and 2004

1  there's been a very broad range of investigation

2  that dealt with a number of different people.  So

3  it's a direct response to an issue that they've

4  inserted in.

5          THE COURT:  I'm glad you said that before I

6  got to it.  I don't see it as their pattern, I don't

7  see a lot of witnesses testifying to it.  Most of

8  the witnesses I remember from the previous trial did

9  not fall into the angels on high category

10  themselves.  I don't think it's an issue.  And the

11  fact that he worked in a particular field is the

12  kinds of things that happen in all cases of a law

13  enforcement officer.  The guy who testifies in a

14  murder case does not say, when he's asked his

15  assignment, that "I was in homicide, Area 4

16  homicide," he says "homicide," and he says "Area 4."

17  I don't think that this gets to a jury.

18          It's an interesting point.  The one I thought

19  was more interesting was the first one, and that was

20  not about Cain but the issue of have we gotten to

21  the point in time where we've had such a history in

22  the state that calling somebody a governor is saying

23  something negative.  But the truth of the matter is,

24  that's a backhanded joke which is not very funny and

25  clearly not true of the average citizen.

 1        So the objection is overruled and I don't see

 2   it as a pattern, anyway.

 3        MR. SCHAR:  Thank you, Judge.

 4      (Brief pause).

 5        THE COURT:  We'll break at about 12:30, just

 6   so you know.

 7      (Brief pause).

 8      (The following proceedings were had in the

 9       presence of the jury in open court:)

10        THE COURT:  There's always that panic moment.

11   Does everybody have a chair?

12      (Brief pause)

13        MS. HAMILTON:  Your Honor, the government

14   calls John Harris.

15        THE COURT:  Face me and raise your right

16   hand.

17      (Witness duly sworn.)

18        THE COURT:  Please be seated.

19        JOHN HARRIS, GOVERNMENT WITNESS, SWORN

20              DIRECT EXAMINATION

21   BY MS. HAMILTON:

22   Q   Good morning.

23        Could you please state and spell your name

24   for the jury.

25   A   John F. Harris, J-o-h-n H-a-r-r-i-s.

1  Q   Mr. Harris, how old are you?

2  A   49.

3  Q   What city do you live in?

4  A   Chicago.

5  Q   Could you briefly explain to the jury what your

6  educational background is.

7  A   I have a bachelor's degree from Northwestern

8  University and a law degree from Loyola University

9  of Chicago.

10 Q   Sir, at some point were you in the Army?

11 A   Yes, I was.

12 Q   When was that?

13 A   I was in the Reserves from 1984 till 1987 and on

14 active duty from 1988 until 1992.

15 Q   And where were you stationed?

16 A   Several places.  Fort Hood, Texas for a while,

17 and Turkey and other parts of the Middle East

18 between 1990 and 1991 --

19 Q   After --

20 A   -- and in Illinois in 1992.

21 Q   After you left the Army, what did you do?

22 A   I started working for the City of Chicago.

23 Q   How long were you at the City of Chicago?

24 A   Approximately 13 years.

25 Q   What positions did you hold at the City of

:29AM

:30AM

:30AM

:30AM

:31AM

1  Chicago?

2  A   Various administrative and management positions,

3  beginning with a position with the City of Chicago

4  Department of Aviation in 1992 as an assistant

5  commissioner of intergovernmental affairs and Chief

6  of Staff for the then Commissioner of Aviation.  We

7  oversaw the management and operation of Chicago's

8  O'Hare International Airport and Midway Airport.

9        After that I served as a deputy police

10 superintendent for the Bureau of Administrative

11 Services for the Chicago Police Department from 1995

12 till approximately 2000.

13       After that I served as the first deputy

14 commissioner for the Chicago Department of Aviation,

15 and the executive director of the O'Hare

16 Modernization Program, the expansion project at

17 O'Hare until 2004.

18       At that time I served, I was appointed by the

19 mayor to serve as the city budget director from 2004

20 through 2005, and then I went to work for the state.

21 Q   When you say you went to work for the state, what

22 position did you take?

23 A   I was given the position of Chief of Staff for

24 the governor's office, for governor Blagojevich.

25 Q   And when was that?

1  A   I started work in early September of 2005 in a
2  position called Chief Operating Officer for the
3  State of Illinois for a short time of approximately
4  two months; thereafter I was appointed Chief of
5  Staff to the governor starting in December of 2005.
6  Q   And how long did you hold the position of Chief
7  of Staff to the governor?
8  A   3 years.
9       MS. HAMILTON:  Is there a stipulation on
10 identification?
11      MR. GOLDSTEIN:  So stipulated.
12 BY MS. HAMILTON:
13 Q   And, sir, what do you do for a living now?
14 A   I'm a second year apprentice lineman electrician
15 for an electrical contracting company.
16 Q   Approximately how long have you done that line of
17 work?
18 A   Approximately 2 years.
19 Q   What led you to become an electrician?
20 A   I needed to provide for my wife and three boys
21 and it's a job that I was able to secure and have
22 been performing since then.
23 Q   At some point did you resign your position as
24 Chief of Staff for the defendant?
25 A   Yes, I resigned on or about December 12th, 2008.

1  Q   Why?

2  A   A few days prior to that, myself and the governor

3  were arrested by federal officials and it was

4  untenable for me to continue to serve in that

5  capacity effectively.

6  Q   After you were arrested, did you decide to

7  cooperate with the government in its investigation?

8  A   Yes.

9  Q   And did you ultimately plead guilty to having

10  committed a crime?

11  A   Yes.

12  Q   What crime did you plead guilty to?

13  A   Conspiracy to solicit a bribe.

14  Q   Did you plead guilty to conspiracy to solicit a

15  bribe as part of a written plea agreement with the

16  government?

17  A   Yes, I did.

18  Q   Sir, what is your understanding of what you are

19  required to do under that agreement with the

20  government?

21  A   To provide complete and truthful information to

22  the government.

23  Q   What is your understanding of what the government

24  is required to do under the agreement?

25  A   Under the agreement, the government will

1  recommend that, at the time of sentencing, that I
2  receive no more than a 35-month sentence.
3  Q   What is your understanding of the sentence that
4  you would be facing without the cooperation
5  agreement with the government?
6  A   It would be potentially higher than that.
7  Q   And you actually -- under the terms of the
8  agreement, do you have an opportunity to receive a
9  lower sentence?
10 A   Yes; ultimately, I can ask the judge presiding
11 for a sentence of below 35 months up to and
12 including no sentence or no time of confinement.
13 Q   What's your understanding of who will ultimately
14 decide what your sentence will be?
15 A   The judge in the case.
16 Q   What's your understanding of what happens to your
17 agreement if you lie?
18 A   The agreement would not be in effect and no one
19 would be bound by the agreement.
20 Q   Sir, I want to focus on the time that you spent
21 as Chief of Staff for the defendant.
22      And I think you went through this, but you
23 said you started in approximately the fall of 2005,
24 is that right?
25 A   Yes.

Q   Generally speaking, what were your duties as
Chief of Staff for the defendant when he was
governor?

A   Generally speaking, as Chief of Staff I was
responsible for ensuring the governor's policies and
initiatives were executed.

I accomplished that through coordination with
the governor's senior staff and members of the
cabinet.

I also set standards for the performance of
various agencies under the governor's direction and
control.  I would routinely monitor and evaluate
those agencies and their progress.  I'd also
performed other duties from time to time as assigned
by the governor.

Q   I want to focus on two things that you mentioned
in that response.  First, you mentioned something
called "senior staff," what do you mean by senior
staff?

A   The organization of the Governor's Office
includes a number of senior staff members that work
in close coordination with myself and the governor
on a daily basis.

Those people included the governor's general
counsel, three deputy governors, his press

1    secretary, a communications officer, his scheduler,

2    and other executive assistants.

3           Through the senior staff, we would exercise

4    oversight and control of the 40 or so state agencies

5    that reported to the governor and implemented our

6    initiatives and policies.

7    Q   You also mentioned that you dealt with the

8    governor's Cabinet, is that correct?

9    A   Yes, the Cabinet is comprised of the heads of the

10   state agencies, like the Illinois Department of

11   Transportation, the Director of State Police, the

12   Secretary of Health and Human Services or Family

13   Services, the Director of Health, the Director of

14   Revenue, the Director of the Budget Office, the

15   Director of the Illinois Tollway Authority.

16          These state agencies, human service agencies,

17   public safety agencies, regulatory agencies, the

18   heads of those agencies make up the governor's

19   Cabinet.

20   Q   I want to direct your attention to the fall

21   of 2006.

22          At that time as Chief of Staff, was a problem

23   involving a grant to a Chicago public school brought

24   to your attention?

25   A   Yes.

1  Q   Who was the recipient of this grant?

2  A   I understood at the time the recipient was a

3  school called the Chicago Academy, or it was

4  referred to me as the Chicago Academy.

5  Q   Did you learn about problems involving the grant

6  to Chicago Academy from someone within the Office of

7  the Governor?

8  A   Yes, then Deputy Governor Bradley Tusk.

9  Q   Did you also learn about the problems associated

10 with the grant Chicago Academy from someone outside

11 the Office of the Governor?

12       MR. GOLDSTEIN:  Objection; foundation.  When

13 he learned of it.

14       THE COURT:  Lay the foundation afterwards.

15       You can answer the question.

16 BY THE WITNESS:

17 A   Yes, I received a call from the office of

18 Congressman Rahm Emanuel.

19 BY MS. HAMILTON:

20 Q   And, again, was this sometime in the fall

21 of 2006?

22 A   Yes.

23 Q   And you indicated you received a call.  Do you

24 remember where you were when you received the call?

25 A   I would've been in my office, my state office at

1 the Thompson Center which is an office building in
2 downtown Chicago.
3 Q   I want to focus first on what, if anything -- you
4 indicated you heard about the problem from
5 Mr. Bradley Tusk who was then the Deputy Governor,
6 is that right?
7 A   That's right.
8 Q   What is it that you learned from Mr. Tusk?
9 A   That there was a problem in releasing the grant,
10 the grant being monies to the school for use in a
11 construction project that they were undertaking.
12 That the governor had stopped --
13        MR. GOLDSTEIN:  Objection; hearsay.
14        THE COURT:  It's admissible for purposes of
15 explaining his conduct and not for its truth.
16        You can answer.
17 BY THE WITNESS:
18 A   The governor had stopped authorization to release
19 the grant to the recipient.
20 BY MS. HAMILTON:
21 Q   What, if anything, did Mr. Tusk ask of you?
22 A   He asked me if I could intervene and assist him
23 in his efforts to get the governor to release the
24 grant.
25 Q   After you learned about this from Mr. Tusk, what,

1  if anything, did you do?

2  A   I approached the governor about the topic, among

3  other topics that particular day, and asked him

4  about any concerns he had about the grant and that I

5  was told that he had a hold on the grant.

6        MR. GOLDSTEIN:  Objection; foundation as to

7  when this conversation occurred.

8        THE COURT:  What's the foundation?

9  BY MS. HAMILTON:

10 Q   This conversation that you are describing with

11 the defendant, again was this in approximately the

12 fall of 2006?

13 A   Yes.

14 Q   Was this conversation in person or over the

15 phone?

16 A   I believe it was over the phone.

17 Q   And do you recall where you were when you had

18 this conversation?

19 A   In my office at the Thompson Center.

20 Q   All right.  And, again, if you would just repeat

21 what it is that you said to the defendant about the

22 grant.

23 A   I would have regular communications with the

24 governor over the phone or in person.  In this

25 particular conversation, I raised the issue of the

1  grant.  Told him that I understood that there may be

2  a -- he has a question or concern about the grant,

3  that I was told by Bradley Tusk that the governor

4  had held the grant or would have put a hold on the

5  grant, and I asked him whether that was true and

6  why.

7  Q   What, if anything, did the defendant tell you in

8  response?

9  A   He told me that he didn't want to release the

10  money, that perhaps Bradley Tusk overcommitted the

11  governor's office in awarding the grant, but that,

12  in any case, he didn't want to release the grant at

13  that time and that I should not release the grant.

14  Q   What, if anything, did you do next in relation to

15  the grant to Chicago Academy?

16  A   I made further inquiries about the grant, when it

17  was originated and what the status of the grant was.

18          According to my inquiry, I determined that

19  the school had been awarded the grant sometime

20  earlier, and that in reliance on the grant had

21  undertaken some capital improvement projects,

22  construction improvement projects at the school and

23  that the school had stopped making payments to the

24  contractors because the monies had not been released

25  by the state.  I then went back to the governor to

Harris - direct by Hamilton                    1282

1  explain my findings to him.
2  Q   And after you related your findings to the
3  defendant, did he respond?
4  A   Yes, I told the governor that we should release
5  the grant because the school had incurred expenses,
6  that there were invoices that the school had in its
7  possession and that contractors were going to stop
8  work if we did not release the payments.
9       I urged the governor to release the payments
10 because of the school's reliance on the grant.  He
11 initially resisted, but then when I explained to him
12 my belief that this would be a problem for us and
13 him, he ultimately agreed to releasing the monies to
14 pay for the invoices that had already been issued to
15 the school, but no more.
16 Q   And when you say "but no more," the invoices that
17 the school received after that point, was it the
18 full amount of the grant that had been awarded?
19 A   At the time I wasn't sure.  I later learned that
20 it was for work that had already been done and had
21 been invoiced, but it was not necessarily for the
22 full amount.
23 Q   What, if any, direction did the defendant give
24 you as to how you were to release the funds on this
25 grant going forward?

:44AM
:44AM
:44AM
:45AM
:45AM

1  A   That I should release only so much of the grant
2  that was necessary to satisfy the invoices after I
3  was given proof that the work was done and invoiced,
4  and I should release no more than that, and that I
5  should let him know when and how much I released.
6  Q   Did you follow that direction?
7  A   Yes.
8  Q   Because of that direction, did you have to go
9  back to the defendant on multiple occasions?
10 A   Yes; because of that direction, as well as the
11 fact that I discovered that some work had been done
12 but not yet invoiced, so I wanted to get
13 clarification from the governor about work that was
14 performed; in other words, work that had been put in
15 place at the school but not yet invoiced.  I wanted
16 to seek clarification and get his authorization to
17 release monies for those expenses, as well.
18 Q   The process that you just described for getting
19 the defendant's approval before particular payments
20 could be made to the school, was that typical for
21 the way that grants were dealt with while you were
22 the Chief of Staff?
23 A   No, I had not experienced that process before or
24 after.  Multiple visits with the governor and
25 authorizations for release of funds was the first

:45AM
:45AM
:46AM
:46AM
:46AM

1  time and the last time I experienced that process.

2  Q   I want to change topics.

3         During the time that you were Chief of Staff

4  for the defendant, did he run for reelection as

5  governor?

6  A   Yes.

7  Q   When was that?

8  A   2006.

9  Q   And when did he begin his second term as governor

10 of the State of Illinois?

11 A   2006 was a campaign year, the election was in

12 November of 2006, which the governor won reelection,

13 and started his second term in office in January

14 of 2007.

15 Q   When was the second term as governor scheduled to

16 be finished?

17 A   It would conclude in January of 2011.

18 Q   With the election being in the fall of 2010?

19 A   Yes.

20 Q   Based on your conversations with the defendant,

21 were you aware of any plan that he had in place for

22 what he was going to do at the end of his second

23 term as governor?

24 A   As early as election night 2006 when he won the

25 reelection, he had expressed his intent not to serve

1  again, meaning not to run for a third term, and he

2  would often repeat that to myself and other members

3  of the senior staff and others in my presence that

4  it was not his intent or desire to serve a third

5  term.

6  Q   Focusing on 2008, what, if anything, did the

7  defendant tell you about his fundraising goals for

8  2008?

9          MR. GOLDSTEIN:  Objection; foundation.

10         THE COURT:  You can lay the foundation later.

11 BY THE WITNESS:

12 A   I was present at meetings where the governor met

13 with members of his campaign staff, other

14 fundraisers, and other senior staff where he

15 expressed his goals for fundraising in 2008.  That

16 topic was not unusual, and it became more a sense of

17 urgency in late 2007 and early 2008.

18 BY MS. HAMILTON:

19 Q   Is it fair to say that what you just described is

20 your memory from a number of discussions and

21 meetings in 2007 and early 2008 with the defendant

22 and others?

23 A   Late 2007 and early 2008, yes.

24 Q   Were some of these discussions in person?

25 A   Yes.

1  Q   Were some over the phone?

2  A   Yes.

3  Q   Did you have an understanding -- I think you said

4  that there was an urgency?

5  A   In late 2007 there were some specific discussions

6  about the status of the governor's campaign

7  finances, his campaign war chest, and the amount of

8  money left in that campaign fund, and the amount of

9  bills the governor was facing that needed to be paid

10 out of that campaign fund, and he was very concerned

11 about paying off those bills and dwindling the

12 balance of his campaign fund and that that balance

13 would have to be revealed come the end of the year,

14 the beginning of 2008.

15         So there was some discussions that I was

16 present for where the governor discussed his desire

17 to either not pay the bill, reduce the bill, or

18 delay payment of the bills until after their

19 reporting period in early January of 2008.

20 Q   All right.  There are a couple of different

21 things I want to follow up on, you mentioned some

22 bills and you mentioned the need that things be

23 revealed before the end of the year.

24         Focusing first on the bills, that were the

25 particular bills that the defendant expressed

 1  concern in your presence about?

 2          MR. GOLDSTEIN:  Objection; relevance.

 3          THE COURT:  The objection is premature.

 4  Overruled.

 5  BY THE WITNESS:

 6  A   He expressed concern about legal bills, his

 7  campaign, and he had incurred as a result of federal

 8  investigation into his campaign and his

 9  administration, there were certain legal bills

10  incurred by the law firm of Winston & Strawn.  There

11  were approximately a million dollars of bills.

12          The governor was very concerned that not only

13  was it a large amount of money that would all but

14  wipe out the balance in his campaign fund, but it

15  would also reveal publicly that the governor's legal

16  expenses were very significant, which contradicted

17  his public statements that the legal investigation

18  into his campaign was not something that he was very

19  concerned about, or very active, or very involved,

20  the size of the bills might suggest otherwise.

21  BY MS. HAMILTON:

22  Q   When you say that this would be revealed

23  publicly, what are you referring to?

24          MR. SOROSKY:  Objection.

25          THE COURT:  Overruled.

1  BY THE WITNESS:

2  A   Under Illinois campaign finance laws, all

3  officeholders or candidates who raise funds for

4  campaigns need to disclose the issue of financial

5  report twice a year, I believe at the end of June,

6  in the beginning of July, or the end of December or

7  the beginning of January.

8          Those campaign finance reports indicate how

9  much money has been raised during that reporting

10  period, from whom, and what expenses the campaign

11  had, including TV commercials, consultants, polls

12  that were conducted, or in this case legal bills.

13          The legal bills were going to be presented to

14  the governor before the end of 2007, they would

15  needed to be paid and that would result in the draw

16  down of the balance of the account and it would be

17  reflected in the January campaign finance disclosure

18  report that would be issued at that time.

19  Q   Now, you indicated that the defendant repeatedly

20  expressed to you his disinterest in running for a

21  third term as governor?

22  A   Yes.

23  Q   Based on what the defendant said, why was it

24  important to raise so much money in 2008 if he

25  wasn't going to be running for governor then?

1       MR. GOLDSTEIN:  Objection; relevance,
2  speculation.
3       THE COURT:  The objection is overruled.
4  BY THE WITNESS:
5  A   The governor, like most politicians or
6  officeholders, are people that run for reelection or
7  help others in their election efforts.  A campaign
8  war chest is a visible sign of political support and
9  popularity.  One's campaign fund often demonstrates
10 to the rest of the world and other politicians how
11 much support a particular candidate or officeholder
12 has and how much influence they have over future
13 elections, because they can use those funds to
14 either help themselves or other politicians by
15 making donations to their campaign funds.
16       But it's generally understood that a campaign
17 fund is a sign of one's political popularity and
18 political strength.  A small campaign fund could
19 indicate weakness and make somebody more vulnerable
20 to being challenged.
21 Q   And I should make clear.  Mr. Harris, you've
22 indicated that the defendant told you and others he
23 was not interested in running for a third term, was
24 that ever anything, as far as you know, that he
25 stated publicly or that was publicly known?

1  A   No, he would not indicate publicly that he had no

2  intention to seek reelection.  That would

3  automatically make the governor a lame duck, in

4  other words, somebody who had no future political

5  influence.  So it would be against his interest or

6  any politician's interest to reveal their intent not

7  to seek reelection or at least under these

8  circumstances.

9  Q   Now, you mentioned the fact that someone's war

10 chest is symbolic of their strength and power.  In

11 fact, Mr. Harris, the reduction in the defendant's

12 war chest over the period of time that you were

13 Chief of Staff, did you experience problems dealing

14 with the legislature in Springfield, in part,

15 because of that reduction in his war chest?

16        MR. GOLDSTEIN:  Objection, Your Honor.

17        THE COURT:  Overruled.

18 BY THE WITNESS:

19 A   It was as early as 2007, we had a very

20 contentious legislative session in Springfield with

21 the general assembly.  The governor and his

22 initiatives introduced to the general assembly did

23 not fare well.  The battle lines were being drawn

24 between supporters of the governor and opponents of

25 the governor.

1          The people willing to contribute to the
2  governor were less so because of reports, media
3  reports, about the federal investigation into his
4  campaign and into his administration.
5          There was a noticeable decline in the amount
6  of monies that he was raising because his chief
7  fundraiser had been --
8          MR. GOLDSTEIN:  Objection, Your Honor.
9          THE COURT:  Overruled.
10
11  BY THE WITNESS:
12  A   A chief fundraiser had been indicted, another
13  fundraiser had been indicted, and people were shying
14  away from the governor, both personally and in terms
15  of financial support.
16  BY MS. HAMILTON:
17  Q   And was that something that you had personal
18  experience and that affected you in trying to follow
19  through the governor's policies in Springfield?
20  A   Yes, to the extent we are seeking -- we were
21  seeking allies or people to support our agenda and
22  legislation in Springfield, if the governor's office
23  or if the governor is perceived as weakened
24  politically, people are less willing to aligned
25  themselves with the governor and join with him in

1  his efforts to get certain legislation passed or

2  certain programs passed.  So the politics in the

3  governing tend to go hand-in-hand.

4  Q   I want to focus on something generally known as

5  the ethics bill.

6       What was the ethics bill?

7  A   The ethics bill you're referring to is a piece of

8  legislation that had surfaced as early as 2007

9  targeting the governor and trying to limit his

10  ability to raise campaign funds.

11       The governor was a very successful fundraiser

12  in both his first election and his reelection, and

13  certain people wanted to weaken his ability to raise

14  campaign funds.

15       The ethics bill was designed to limit the

16  governor's ability to raise funds from people doing

17  business with the state.  The ethics bill, in its

18  original form, would prohibit contractors or others

19  doing business with the state, making more than

20  $25,000 in state awards, from giving campaign

21  contributions to the governor who oversaw those

22  contracts and those agencies.

23  Q   Did you have conversations with the defendant

24  about the effect the ethics legislation would have

25  on his ability to fundraise?

1  A   It was a topic that was discussed often, both in

2  late 2007 and throughout 2008 when the bill

3  reemerged.

4          It failed to pass in 2007, in 2008 in the

5  spring it was reintroduced as House Bill 1,

6  indicating the level of importance to the then

7  Speaker of the House to pass this legislation.

8          It was something that would weaken the

9  governor, and he often talked to senior staff and

10 his political consultants about the consequences of

11 that legislation to him, ways around it, or what

12 strategy he might employ to stop it.

13 Q   And what did he say would be the consequence to

14 him in his fundraising efforts if this bill passed?

15 A   It would present significant harm to him and his

16 ability to fundraise because his prior fundraising

17 efforts -- many of his campaign contributions came

18 from state contractors that would now be prohibited

19 from making donations to his campaign if this bill

20 became law.

21 Q   Ultimately, did the bill become law?

22 A   Yes.

23 Q   When?

24 A   It became law, I believe, in the fall of 2008,

25 with an effective date of the end of 2008,

:00PM

:00PM

:01PM

:01PM

:01PM

1  December 31st, 2008.

2  Q   When you say with an effective date at the end of

3  2008, what do you mean?

4  A   Meaning all bills need to first pass both Houses,

5  the Illinois House, the representatives, and the

6  Illinois Senate, and then bills are either signed by

7  the governor or vetoed by the governor.

8        In this case, this was a bill that was vetoed

9  and then overwritten, that veto was overwritten by

10 the General Assembly.  That action was the final

11 action required for the bill to become law, and that

12 happened in the fall, but the effective date written

13 into the bill, when the bill would become law, was

14 December 31st.

15 Q   Mr. Harris, I want to show you what has been

16 marked as Government Exhibit Ethics Legislation.

17        MS. HAMILTON:  Your Honor, may I approach?

18        THE COURT:  You may.

19        MS. HAMILTON:  Your Honor, I would offer

20 Government Exhibit Ethics Legislation into evidence

21 as a public record and we have a certification.

22        THE COURT:  Admitted.

23      (Government's Exhibit Ethics Legislation was

24       received in evidence.)

25        MS. HAMILTON:  May I publish?

Harris - direct by Hamilton                    1295

1          THE COURT:  You may.

2       (Exhibit published to the jury.)

3   BY MS. HAMILTON:

4   Q   Mr. Harris, on this document, I actually want you

5   to go to the very final page, please.

6          And you testified that you believe it passed

7   in the fall of 2008.  Does this reflect the exact

8   date that it passed?

9   A   Yes, it reflects September 22nd, 2008, as the

10  date of final action, and now the bill is referred

11  to as House Bill 824.  I mentioned House Bill 1

12  earlier, but through its various changes and

13  amendments during the legislative season, it

14  eventually turned into House Bill 824.

15  Q   And the second entry is September 25th, 2008, and

16  it states effective date January 1, 2009, what does

17  that signify?

18  A   The date the bill becomes law or the terms of the

19  bill are state law, become law.

20  Q   All right.  I'm done with that exhibit for now.

21         Shortly after the passage of the ethics bill

22  in late September of 2008, did the defendant

23  announce anything with respect to the tollway?

24  A   Yes.

25  Q   And what is it that he announced?

1  A   A plan to continue a construction program to
2  improve and modernize the Illinois tollway system.
3  Q   I'm going to show you what has been marked
4  Government Exhibit Tollway 1.
5          MS. HAMILTON:  Your Honor, I again move for
6  the admission of this document pursuant to a 90211
7  certification.
8          THE COURT:  Admitted.
9
10
11     (Government Exhibit Tollway 1 was received in
12      evidence.)
13          MS. HAMILTON:  And I ask to publish, please.
14          THE COURT:  You may.
15     (Exhibit published to the jury.)
16  BY MS. HAMILTON:
17  Q   Mr. Harris, I'm just going to focus on the top
18  third or so of the document.
19          What is it that we're looking at?
20  A   It's a press release issued by the Governor's
21  office announcing a capital improvement program for
22  the tollway.
23  Q   And the date of that?
24  A   October 15, 2008.
25  Q   And I just now am going to show the first

1  paragraph.

2          Does this indicate the size of the tollway

3  project that was announced?

4  A   Yes, $1.8 billion.

5  Q   I'm finished with this document.

6          I want to focus, you said that this tollway

7  program was a second phase of an earlier program?

8  A   Yes.

9  Q   What were you referring to?

10  A   In the governor's first term in office, the

11  governor conceived of and launched a multibillion

12  dollar capital improvement program for the tollway

13  system, a construction program.

14          Many people will recognize certain elements

15  of it, like open road tolling or the I-Pass system,

16  the expansion of Highway 355, several interchanges

17  that were added to the system on-and-off ramps,

18  certain widening of the tollway system, certain

19  choke points.  This was a multiyear, multibillion

20  dollar construction program that was coming to a

21  close.

22          And we had had discussions internally and

23  with members of the industry about a second phase or

24  continuing the improvement program for the tollway

25  system in the second administration or the second

1  term in office.

2  Q   All right.  Focusing on that first phase that you

3  talked about with open road tolling and the

4  expansion of one of the highways, had state

5  contracts been issued in connection with that

6  tollway program?

7  A   Yes.

8  Q   What industries had benefited from those

9  contracts?

10 A   Numerous industries, generally under the heading

11 of the Road Builders, that would include

12 environmental consultants, architects, engineers,

13 contractors that actually build the road, material

14 providers like cement and gravel and stone and

15 asphalt, the building trades, operating engineers,

16 laborers, electricians, other companies; sign

17 makers, other manufacturers of light fixtures, the

18 open road towing system.

19 Q   Were those industries involved in fundraising on

20 behalf of the defendant?

21 A   The road builders were and had been traditionally

22 big fundraisers for governors in office.

23 Q   Would --

24 A   Big contributors, I should say.

25 Q   The ethics legislation that we just went through,

:07PM

:07PM

:07PM

:08PM

:08PM

1  would those industries be affected by the ethics
2  legislation?
3  A   Oh, yes.  They would all then become prohibited
4  from giving contributions to the government if they
5  wished to continue to do business with the state
6  under that ethics bill.
7  Q   Focusing now on the second phase that you talked
8  about being presented in 2008.
9       We just went through that the defendant
10 announced on October the 15th that he had committed
11 $1.8 billion to do that, right?
12 A   Yes, the funds would come from the tollway.  It
13 wasn't state funds, it would be monies raised by the
14 tollway system.
15 Q   So the 1.8 billion-dollar program that was
16 announced, was that the only program that had been
17 presented to the defendant at that time?
18 A   No.  In fact, the original proposal to the
19 governor was for a 7 billion dollar phase 2 that
20 would extend certain tollways, add new tollways,
21 interchanges, high occupancy vehicle lanes or hot
22 lanes for commuters, express lanes for public
23 transportation, but the program that was originally
24 presented to the governor was, in scope, about
25 $7 billion.

:08PM

:08PM

:09PM

:09PM

:09PM

1  Q   When you say "originally," what happened after
2  that original program?
3  A   The governor had instructed myself and members of
4  the staff that presented the proposal to him, to go
5  back and come back with variations on the scope of
6  the program, smaller variations on the scope of the
7  program.
8  Q   And, ultimately, were three smaller programs or
9  three different programs presented to the defendant
10 at that time?
11 A   Yes, there was the original 7 billion dollar
12 scope of the program, there was a 5 billion dollar
13 scope program, and a nearly 2 billion dollar scope
14 program, which is the $1.8 billion project that was
15 ultimately given the green light.
16 Q   Were you present when those three different
17 programs were presented to the defendant?
18 A   Yes.
19 Q   And at approximately when was that in 2008?
20 A   Late summer, early fall of 2008.
21 Q   At some point did you learn from the defendant
22 that he had chosen the 1.8 billion-dollar program?
23 A   Yes.
24 Q   And when was that?
25 A   Within a couple of weeks of the announcement or

:10PM
:10PM
:10PM
:10PM
:11PM

1  about two weeks before the announcement.

2  Q   When you say the announcement --

3  A   The public announcement.

4  Q   Okay, so you're referring to the October 15th,

5  that press release we just looked at?

6  A   Yes.

7  Q   So about two weeks before that is when you heard

8  from the defendant he had chosen the 1.8 program?

9  A   Yes.

10 Q   1.8 billion-dollar program; sorry.

11      Did the defendant indicate to you why he had

12 chosen the 1.8 billion-dollar program?

13 A   Yes, he indicated several reasons.

14 Q   And what were those reasons?

15 A   First he indicated that he did not want to fully

16 satisfy the appetite of the contractors, the

17 engineers, that would benefit from this program

18 being implemented.  He said words to the effect "I

19 don't want to fully satisfy their appetite."

20      He was going to see how well he did

21 fundraising from that industry before the end of the

22 year when the ethics bill deadline would be imposed.

23 And if they satisfied him, he would offer the larger

24 program or pursue the larger program but not until

25 sometime in 2009.

1     He also told me that he didn't want to seek
2  legislative approval for the program.  We had
3  advised him that the larger program, the 7 billion
4  dollar program, would require action by the Illinois
5  General Assembly to acquire certain land, whereas
6  this 1.8 billion-dollar program the governor could
7  authorize himself and had the power through his
8  Illinois Tollway Authority to move ahead with
9  implementation without any further legislative
10  approvals.
11     He wanted to be able to tell his fundraisers
12  that this was something he was doing all on his own
13  and that he should get credit for it.
14  Q   Did he indicate any other reasons?
15  A   He indicated that the Capital Bill, which is a
16  larger state construction program that we had been
17  pursuing for a couple of years to build roads around
18  the state other than tollways, improve roads,
19  bridges, docks, schools, hospitals, public
20  universities, that's normally referred to as the
21  state Capital Bill, we had been attempting to get
22  state authorization and funding to undertake a
23  larger capital program, and we relied on the road
24  builders and their influence in Springfield with
25  members of the General Assembly for their support in

Harris - direct by Hamilton                    1303

1  getting that legislation passed, a larger tollway
2  program might fully satisfy, or at least temporarily
3  satisfy, the road builders in terms of the amount of
4  work that was coming their way such that they would
5  not be that interested in joining us in our fight to
6  get a larger state wide Capital Bill passed.
7  Q   In the fall of 2008, what was the status of the
8  Capital Bill?
9  A   The Capital Bill had failed for a second year in
10 a row.  The governor was successful in getting a
11 Capital Bill through the Illinois Senate in 2007 and
12 we were also successful in getting the Capital Bill
13 through the Illinois Senate in 2008, both times the
14 bill failed and was stalled in the Illinois House.
15         There was a great deal of interest throughout
16 the state to get this bill passed, but there was
17 political battles in Springfield between the
18 governor and Speaker Madigan, and the prospects for
19 a Capital Bill were very dim.
20 Q   You testified about, generally, the industries
21 that had been awarded contracts under the initial
22 tollway program.  Did you have any discussions with
23 the defendant about contracts with respect to the
24 1.8 billion-dollar program that he announced?
25 A   Yes.

1  Q   And was this after the announcement had been
2  made?
3  A   It was around the same time.
4  Q   And what did the defendant say to you?
5  A   He told myself and John Mitola, the then director
6  of the Illinois Tollway Authority or chairman of the
7  Illinois tollway board, that he would like to see
8  contracts awarded before the end of the year, before
9  the effective date of the ethics bill.
10         I explained to him that that was not possible
11 because of the late start in the announcement.  We
12 were hoping to get this decision made in the summer
13 so that we could advertise for contracts from
14 engineering firms and environmental firms,
15 agricultural firms, and get work started over the
16 winter, but with the October 15th announcement,
17 there wasn't enough time to award contracts before
18 at the end of the year.
19         He then asked whether or not it would be
20 possible to at least advertise our intention to
21 award contracts or solicit proposals from various
22 vendors before the end of the year, and I told him
23 we would try to meet that objective by mid-December.
24 Q   I want to change topics again and I want to
25 direct your attention to November the 4th, 2008.

:15PM
:16PM
:16PM
:17PM
:17PM

1        What happened on that day?

2   A   There was a presidential election and

3   president-elect Barack Obama was elected.

4   Q   What was Barack Obama's position in politics

:17PM    5   prior to winning the general presidential election

6   on November 4th?

7   A   He was the U.S. Senator from Illinois.

8   Q   Once he won the general election, what did that

9   mean with respect to his position as a United States

:18PM    10  Senator from Illinois?

11  A   There would be a vacancy and under Illinois law

12  we understood it was the governor's power to appoint

13  somebody to fulfill that vacancy for the remainder

14  of the senator's term in office which would have

:18PM    15  been two more years.

16  Q   Were you part of a series of discussions

17  regarding how the defendant should fill Barack

18  Obama's senate seat?

19  A   Yes, myself and several others.

:18PM    20  Q   Approximately when did these discussions begin in

21  relation to the November 4th election?

22  A   They began as early as the Iowa caucuses

23  beginning of January of 2008, but really did not

24  happen frequently or with more regularity until

:19PM    25  around the time of the Democratic convention in the

1  summer of 2008 when it became apparent that Barack

2  Obama would be the Democratic nominee.

3  Q   At that time in the summer of 2008, who was the

4  defendant talking about appointing should Barack

5  Obama win the presidential election?

6  A   Himself.

7  Q   During the summer, from time to time, did he also

8  discuss the possibility of Emil Jones?

9  A   Yes, in the summer of 2008, we were having a

10  second unusually difficult year in Springfield with

11  the Illinois General Assembly passing a budget.

12  There was substantial deficits that we were facing,

13  budget deficits in 2008, as well as going into 2009.

14  Emil Jones was also a very strong ally of the

15  governor's and had helped us with our agenda in many

16  ways.  He was also --

17  Q   Who is Emil Jones or who was he at that time?

18  A   Emil Jones was the president of the Illinois

19  Senate.  Both chambers have a leader, in the House

20  it's the Speaker of the House, in the Senate it's

21  the Senate President.

22      Both gentlemen controlled the fate of

23  legislation in their respective chambers.  In order

24  for legislation to become law, it would have to pass

25  both Houses, and both leaders, for all practical

1  purposes, would have to be on board.

2          Senate President Emil Jones had been a

3  long-time ally of the governor's, a friend, and a

4  stalwart supporting the governor's agenda, including

:21PM  5  stopping the ethics bill from becoming law.  We

6  perceived that bill as unfair and targeting only the

7  governor and should not become law, or, in the

8  alternative, a broader ethics bill should become

9  law.

:21PM  10          Emil Jones, as an ally of the governor, the

11  governor would often joke and refer to Jones and say

12  "if you want it, it's yours," referring to the

13  senate seat, or words to that effect.  And at the

14  time, Emil Jones, at least in front of me, would

:21PM  15  express no interest in becoming a U.S. Senator.

16  Q   Moving forward, did discussions about the senate

17  seat continue from the summer of 2008 prior to and

18  up until the November 4th election?

19  A   Yes, they became more frequent and included

:22PM  20  myself and other members of the staff, as well as

21  outside consultants.

22  Q   Focusing on the October of 2008, at that time,

23  based on your discussions with the defendant, what

24  was your understanding as to who he was considering

:22PM  25  appointing at that time?

1  A  Well, at that time there was a significant

2  development that occurred right before then, and

3  that was the ethics bill passed the Illinois Senate.

4  Q  And why is that significant in relation to the

5  senate seat?

6  A  Up until that time, the discussions about the

7  senate seat tended to revolve around the governor

8  appointing himself to the vacated senate seat in the

9  event that Senator Obama won or appointing Emil

10  Jones, his long-time political ally.

11       In about September of 2008, Emil Jones

12  notified me, called me to tell me that he was going

13  to call the ethics bill for a vote to override the

14  governor's veto, an action that would have betrayed

15  the agreement he had with the governor earlier in

16  the summer not to allow that bill to become law.

17       After that happened and the bill passed the

18  Senate and was on its way to being law, the governor

19  had told me and others that there was no way now

20  that he would consider Senate President Jones for

21  the senate seat.

22  Q  Focusing on October of 2008, at that time did you

23  have any conversations with the defendant that were

24  significant to you with respect to the senate seat?

25  A  Yes.

1  Q   Approximately when?

2  A   It was in the first week of October, early

3  October in a car ride we shared from his campaign

4  office to Northwestern University Evanston campus.

5  I was briefing the governor on the upcoming meeting

6  we were about to go into.  At that time he turned to

7  me and asked me "what do you think I can get for

8  this," or words to that effect, referring to the

9  senate seat.

10        I was a little taken aback by the question

11 and said, "well, for you nothing, but you can reward

12 an ally or make an ally," kind of along the lines of

13 what he had been considering earlier with Emil

14 Jones.

15 Q   How, if at all, did the defendant respond?

16 A   He didn't respond, he simply turned away and

17 said, "we'll talk about it later," and didn't engage

18 me in the discussion any further.

19 Q   And why was that conversation significant to you

20 at that time?

21 A   Because it was the first time that he was

22 thinking of someone other than himself.  I found

23 that to be a new turn of events, thinking about

24 something he could get for himself --

25        MR. SOROSKY:  Objection.

1        THE COURT:  I think it's admissible on the
2   witness's state of mind at the time.  The objection
3   is overruled.
4   BY MS. HAMILTON:
5   Q   Is there any other reason it was significant?
6   A   (No response.)
7   Q   I just wasn't sure, since you got cut off by the
8   objection, I wasn't sure if you had anything else to
9   add.
10  A   No.
11  Q   All right.  And just so we can establish the
12  date, I want to show you Government Exhibit Senate
13  Seat 2.
14        MS. HAMILTON:  Your Honor, I move for the
15  admission of Government Exhibit Senate Seat 2
16  pursuant to a 90211 certification.
17        THE COURT:  Admitted.
18     (Government Exhibit Senate Seat was received in
19      evidence.)
20        MS. HAMILTON:  And may I publish?
21        THE COURT:  You may.
22     (Exhibit published to the jury.)
23  BY MS. HAMILTON:
24  Q   All right, focusing at the top, what is this
25  document we're looking at?

Harris - direct by Hamilton                    1311

1  A   A copy of the governor's schedule for Monday,
2  October 6th, 2008.
3  Q   And there is an entry in the middle of the page
4  at 12:30 p.m., do you see that?
:27PM  5  A   Yes.
6  Q   And what does that reflect?
7  A   The governor's scheduled meeting at the
8  Northwestern's Evanston campus with President Bienen
9  and myself and others.  That's the meeting we were
:28PM  10  on our way to when we had the conversation I
11  referred to earlier.
12  Q   All right.  So based on this document, it's the
13  discussion you testified about in the car on October
14  the 6th of 2008?
:28PM  15  A   Yes.
16          MS. HAMILTON:  Judge, I'll going to go into a
17  few other conversations.  Do you want me to start
18  with those or break now?
19          THE COURT:  You're asking me that question
:28PM  20  because you are observing me looking at my watch?
21          We're going to break, begin sometime between
22  1:30 and 1:45.
23          THE MARSHAL:  All rise.
24      (The following proceedings were had out of the
:29PM  25      presence of the jury in open court:)

Harris - direct by Hamilton                    1312

1          THE COURT:  We are adjourned.

2

3

4      (Luncheon recess taken from 12:39 o'clock p.m.

5       to 1:45 o'clock p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No.  08 CR 888
4           Government,            )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  May 3, 2011
                                   )
7           Defendant.             )  1:54 o'clock p.m.

8                      VOLUME 8
              TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE JAMES B. ZAGEL

10

11  For the Government:

12          THE HONORABLE PATRICK J. FITZGERALD,
            UNITED STATES ATTORNEY
13          BY:  Reid J. Schar
                 Carrie E. Hamilton
14               Christopher Niewoehner
                 Debra Riggs Bonamici
15           Assistant United States Attorneys
             219 South Dearborn Street
16           Suite 500
             Chicago, Illinois 60604

17

18

19  Court Reporter:

20              Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
21                  Room 2504
             Chicago, Illinois 60604
22                (312) 435-5895

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

          KAPLAN & SOROSKY
4         BY:  Sheldon M. Sorosky
          158 West Erie
5         Chicago, Illinois 60610
          (312) 640-1776

6
          LAW OFFICES OF AARON BENJAMIN GOLDSTEIN
7         BY:  Aaron Benjamin Goldstein
          Attorney at Law
8         6133 South Ellis
          Chicago, Illinois 60637
9         (773) 752-6950

10        LAW OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
11        Attorney At Law
          2140 N. Lincoln Park West
12        Suite 307
          Chicago, Illinois 60614
13        (773) 517-0622

14
          LAW OFFICE OF SAMUEL E. ADAM
15        BY:  Elliott Riebman, II
          6133 South Ellis Avenue
16        Suite 200
          Chicago, Illinois 60637
17        (312) 726-2326

18

19

:54PM  20

21

22

23

24

25

Harris - direct by Hamilton                    1315

1        THE MARSHAL:  All rise.

2     (The following proceedings were had in the

3      presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        You may resume.

6        MS. HAMILTON:  Thank you, Your Honor.

7    JOHN HARRIS, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8            DIRECT EXAMINATION (resumed)

9   BY MS. HAMILTON:

10  Q   Mr. Harris, before we broke for lunch you had

11  been discussing a car ride with the defendant on

12  October the 6th in which you had a conversation

13  which was significant to you, do you remember that?

14  A   Yes.

15  Q   Later in October, did you have any further

16  conversations with the defendant with respect to the

17  senate seat that were significant to you?

18  A   Yes.

19  Q   Approximately when in October?

20  A   The latter half of October.

21  Q   How many conversations were there?

22  A   Two, that I recall.

23  Q   Where did the conversations take place?

24  A   In the Governor's office in the Thompson Center.

25  Q   Who was present for the conversations?

1  A   Myself and his general counsel, Bill Quinlan.

2  Q   Do you remember these two conversations

3  individually or collectively?

4  A   Collectively.

5  Q   What did the defendant say that was significant

6  to you in those conversations with respect to the

7  senate seat?

8  A   It was after a meeting had broken up where

9  several others were present, the governor sat with

10 myself and Bill Quinlan in the back part of his

11 offices at the Thompson Center in the 16th floor,

12 and raised with Mr. Quinlan and myself the idea of

13 having some rich supporter, like J.B. Pritzker,

14 endow a charitable trust or advocacy organization

15 for the benefit of the governor in exchange for

16 appointing someone like Mr. Pritzker to the senate

17 seat or simply soliciting from Mr. Pritzker a large

18 campaign donation as part of a decision to appoint

19 him to the senate seat.

20         Mr. Quinlan and I told him that he couldn't

21 make such a deal, shouldn't consider such a deal of

22 exchanging the senate seat for anything for himself,

23 like a donation to his campaign fund or a charitable

24 foundation in which he could benefit, and

25 Mr. Quinlan told him that that would not be

1  permitted.

2  Q   Now, you've indicated that there were two

3  conversations and you remember collectively.  To the

4  best of memory, was the conversation basically the

5  same in both conversations?

6  A   Yes, they were basically the same except that

7  another name was mentioned, Blair Hall, another

8  local business millionaire who had previously run

9  for office for the U.S. Senate, spent a large amount

10  of his own fortune in that campaign, and he talked

11  about him, as well, in this context of giving him

12  the senate seat in exchange for campaign donations

13  or what he could possibly do for Governor

14  Blagojevich, what Mr. Hall or Mr. Pritzker could

15  possibly do.

16          In that conversation, Bill Quinlan was more

17  animated and more aggressive in his push-back in

18  saying you can't talk about that, you can't even

19  joke about this, don't ever say "appointment" --

20          MR. GOLDSTEIN:  Objection --

21          THE COURT:  What was that objection?

22          MR. GOLDSTEIN:  Hearsay as to Bill Quinlan

23  and what he said.

24          THE COURT:  Overruled.

25

BY THE WITNESS:

A   Told him that he could not talk about the two in the same sentence, not even if he was joking about it.

BY MS. HAMILTON:

Q   Prior to the November 4th election, what, if anything, were you working on regarding the potential filling of the senate seat?

A   Pursuant to the governor's direction, I was working up a suggested process that he might follow in appointing someone to fill the vacancy in the U.S. Senate in the event that Senator Obama won the election.

Q   Did you draft any documents in relation to that directive?

A   Yes, I did.

Q   I want to show you what has been marked Government Exhibit Senate Seat 1.

        MS. HAMILTON:  Your Honor, we move for the admission of Government Exhibit Senate Seat 1 pursuant to a 90211 certification.

        MR. GOLDSTEIN:  No objection.

        THE COURT:  Without objection, admitted.

     (Government Exhibit Senate Seat 1 was received in evidence.)

1      MS. HAMILTON:  May we publish?

2      THE COURT:  You may.

3    (Exhibit published to the jury.)

4  BY MS. HAMILTON:

5  Q   What is this document we're looking as Senate

6  Seat 1?

7  A   This is one of the documents I prepared in

8  response to the governor's direction to come up with

9  a process for him to use in filling the senate seat,

10  as well as talking points he might use in a press

11  conference or other public availability he would be

12  having in the days following the election.

13  Q   So was it your understanding, when you drafted

14  this, it was going to be used for something that

15  would be made public?

16  A   No, this was an internal document.  It was an

17  outline of the process that I was suggesting the

18  governor follow, as well as something he could use

19  and his press people could use to develop talking

20  points or remarks that he might make at a press

21  conference.

22  Q   All right.  I'm going to blown up the top half of

23  the document, it would be easier for everyone to

24  see, and I'd ask you to please read that for the

25  jury.

Harris - direct by Hamilton                    1320

1       This is a document you drafted, correct?

2  A  Yes.

3  Q  All right.

4  A  (Reading:)

5     "... as President-Elect Obama prepares to vacate

6      his senate seat, I will embark on fulfilling my

7      duties under the United States Constitution and

8      Illinois law to appoint his replacement.  I

9      will follow a thoughtful and deliberate

10      process.  It will be orderly and timely.  It is

11      important to have someone in place looking out

12      for interests for the people of Illinois as

13      soon as possible.  I will meet privately with a

14      select number of qualified candidates.  I will

15      not turn this into a public spectacle.  To

16      assist me in identifying suitable candidates, I

17      have formed a Senate search team made up of key

18      members of my administration who have devoted

19      themselves to public service and understand

20      what I am looking for."

21  Q  All right.  Sir, was there ever any formal senate

22  team put in place?

23  A  No; I had identified potential members of the

24  team but we never convened.

25  Q  And why is it that you never convened?

1  A   The governor did not give the go ahead for this
2  team to convene and begin work.
3  Q   All right.  Now I'd like to blow up the bottom
4  half of the document and ask you to read that,
5  please to the jury.
6  A   (Reading:)
7       "...  they will bring forward the type of
8           individuals that will, at a minimum, support
9           the President-Elect's agenda for the people,
10          effectively represent the interests of the
11          State of Illinois and the U.S. Congress, work
12          with my administration to achieve our goals of
13          expanding and ensuring access to affordable
14          healthcare, rebuilding Illinois infrastructure,
15          improving the economic security and livelihoods
16          of Illinois workers, and caring for our most
17          vulnerable, and, in short, care about the
18          average Illinoisan who is too burdened by taxes
19          and economic hardship."
20
21  Q   Now, did this document accurately reflect the
22  process that was in place in terms of searching for
23  a senate seat candidate prior to the November 4th
24  election?
25  A   NO.

1  Q   And, in fact, from what you observed, did the
2  defendant ever use this document that you created?
3  A   No; other than for talking points at the press
4  conference, we never followed this process.
5  Q   When you say other than for talking points at the
6  press conference, what are you referring to?
7  A   Some of the points raised in here were repeated
8  in his remarks at a press conference.
9  Q   So they were repeated publicly?
10 A   Yes.
11 Q   In terms of your knowledge of what happened
12 internally and privately, was this document ever
13 used?
14 A   No.
15 Q   Mr. Harris, I want to focus on a few days prior
16 to the November 4th election.
17     Did you receive any significant phone calls
18 in relation to the senate seat just prior to the
19 November 4th election?
20 A   Yes.
21 Q   When?
22 A   On November 2nd, it was the Sunday before the
23 election.
24 Q   Where were you?
25 A   At a Famous Footwear with my sons buying shoes.

1  Q   Who did you receive a call from?

2  A   Then Congressman Rahm Emanuel.

3  Q   When you say then congressman, who did you

4  represent?

5  A   He represented the 5th District of Illinois in

6  the United States Congress which was governor

7  Blagojevich's former congressional seat.  Rahm

8  Emanuel had been and was at that time congressman

9  from the 5th District.

10 Q   Did you know him at that time?

11 A   Yes.

12 Q   How did you know him?

13 A   I had worked with him both in my capacity as

14 Chief of Staff within his office for the State of

15 Illinois, and in several of my prior positions in

16 the City of Chicago.

17 Q   Was it at all strange for you to receive phone

18 calls from him?

19 A   No.

20 Q   At the time of the call November 2nd, what was

21 your understanding, if any, as to what his

22 relationship was to Barack Obama?

23 A   I knew that he was a supporter of Barack Obama's,

24 I knew he had been helping in the campaign, but I

25 wasn't aware of any official position in the

1  campaign that he held.

2  Q   What was said during this conversation on

3  November 2nd?

4  A   He asked me whether or not the governor had made

5  a decision yet on who he might appoint to the vacant

6  senate seat in the event that Barack Obama won the

7  election.

8        I told him no, no decision had been made, and

9  he told me that Senator Obama had a preferred

10 candidate that he would like to discuss with us.

11 Q   Did he provide any greater details about who that

12 candidate was?

13 A   He didn't provide the name at that time but he

14 described the candidate as somebody I understood --

15 as someone I understood him to be referring to

16 Valerie Jarrett, as a close personal female friend

17 and supporter of Senator Obama's, and the way he

18 described her I understood him to mean Valerie

19 Jarrett was the candidate.

20 Q   At this time I would like to show you Government

21 Exhibit Photo Jarrett.

22        Do you recognize the individual in that

23 picture?

24 A   Yes.

25 Q   And who is it?

1  A   Valerie Jarrett.

2  Q   Did you know Valerie Jarrett at that time?

3  A   Yes.

4  Q   And how did you know her?

5  A   She was also part of the Daley administration in

6  the mayor's office when I first began working with

7  the city, got to know her then.  We crossed paths

8  several times throughout her career and mine.

9        MS. HAMILTON:  Your Honor, I'd like to admit

10  and publish Government Exhibit Photo Jarrett.

11        MR. GOLDSTEIN:  No objection.

12        THE COURT:  Admitted.

13        You may publish.

14     (Government Exhibit Photo Jarrett was received

15      in evidence.)

16     (Exhibit published to the jury.)

17  BY MS. HAMILTON:

18  Q   Now, you indicated that Mr. Emanuel didn't

19  actually say her name but described her in a way you

20  believed him to be referring to Valerie Jarrett,

21  what is it that he said that lead you to believe

22  that?

23  A   A close friend, political supporter from Barack

24  Obama's neighborhood, somebody that I understood to

25  be from Hyde Park as well, or that general area, and

1  just how he described her is somebody that she had

2  worked on the campaign, was very involved, and

3  that's who he was referring to.

4  Q   Prior to this phone call from Mr. Emanuel, had

5  anyone else contacted you about the possibility of

6  Ms. Jarrett being considered for the senate seat?

7  A   Yes, Ms. Marilyn Katz called me weeks before.

8  Q   Who is Marilyn Katz?

9  A   Marilyn Katz is a Chicago area businesswoman,

10 owns her own public relations firm, does political

11 consulting work and public relations work.

12       I had worked with her in the past in my

13 capacity -- in my various capacities in city

14 government.  She is somebody who was a supporter of

15 Barack Obama's and I knew her to be a close friend

16 of Valerie Jarrett's.

17 Q   And you indicated she had contacted you a few

18 weeks before you heard from Mr. Emanuel?

19 A   Yes.

20 Q   And, generally, what did she relate to you with

21 respect to Ms. Jarrett?

22 A   She told me she had a suggestion for the

23 governor's consideration that she thought would make

24 an excellent U.S. Senator, and that it would be very

25 good for the governor as well, he would receive a

1  lot of accolades and a very positive response to his

2  appointing Valerie Jarrett to the senate seat.

3  Q   Had you informed the defendant about those

4  communications from Ms. Katz about Ms. Jarrett?

5  A   Yes, I had.

6  Q   And after -- at some point after the call from

7  Mr. Emanuel on November the 2nd, did you tell the

8  defendant about that phone call?

9  A   About which phone call?

10 Q   I'm sorry.  The phone call that you received on

11 November 2nd from then Congressman Rahm Emanuel.

12 A   Yes, I believe I told the governor about that the

13 next day during one of our calls.

14 Q   Have you heard a recording of the phone call that

15 you had with the defendant the following day,

16 November the 3rd, in which you relayed the substance

17 of your conversation with then Congressman Rahm

18 Emanuel?

19 A   Yes.

20 Q   And in the course of cooperating with the

21 government, had you heard a number of recorded

22 telephone conversations in which you were a

23 participant?

24 A   Yes.

25 Q   At the time that those conversations took place,

1 did you know that you were being recorded?

2 A   No.

3 Q   When did you learn that certain of your phone

4 conversations had, in fact, been recorded by the

5 government?

6 A   The day of my arrest.

7 Q   During the time that you were Chief of Staff to

8 the defendant, how would you communicate with him on

9 a regular basis?

10 A   Primarily by phone call.

11 Q   When you say primarily by phone call, why did you

12 talk with him by phone rather than in person?

13 A   The governor worked out of his home or campaign

14 office most days, and he would reach out to me and

15 other members of the staff through his assistant,

16 Mary Stewart, with the instructions to call him back

17 at either his home or his campaign office.

18 Q   Did you talk with the defendant virtually every

19 day?

20 A   Yes.

21 Q   How often would you talk with him on a given day?

22 A   It could be three or four or as many as ten to

23 twelve.

24 Q   In addition to the regular phone calls, were

25 there times when you did meet with him in person?

1  A   Yes.

2  Q   And where did those meetings take place?

3  A   Either at his office in the Thompson Center, the

4  Governor's office in the Thompson Center, or in the

5  Governor's office in Springfield when we were down

6  in Springfield together, or at various events where

7  I accompanied him.

8        I didn't often accompany him to events, but

9  from time to time I would join him for off-site

10 meetings or public events.

11 Q   Now, you stated that the defendant regularly

12 worked out of his home or his campaign office.  Did

13 the defendant explain to you why it was he was

14 working out of his home or campaign office more

15 regularly than his office at the State of Illinois

16 Building?

17 A   He explained it to me when I first started

18 working with him, as well as explaining to others

19 who often inquired in my presence about his choice

20 of where to work from, and he explained to me, as

21 well as to others, that he preferred to work at home

22 or the campaign office where he could engage in

23 fundraising activities in addition to government

24 activities, government work, because there was no

25 prohibition.

1    Under Illinois law, if the governor were in
2  the state offices, either in Chicago or in
3  Springfield, he would be prohibited from engaging in
4  any campaign fundraising activity.  And he would
5  often be on the phone raising funds or talking to
6  potential contributors and he was able to do that
7  without the conflict if he was at home or at the
8  campaign office.  So he could do government work and
9  campaign work out of home and in the campaign
10  office, whereas in the government office he could
11  only do government work.
12         MS. HAMILTON:  Your Honor, at this time I'd
13  ask permission to publish call session 117.
14         THE COURT:  It's granted.
15         MS. HAMILTON:  Maybe we could hand the CSO
16  the binders for the jury?
17         THE COURT:  Yes.
18         Each one of you is about to get a book filled
19  with transcripts.  The first thing I want to tell
20  you is, you can only open to the specific
21  transcripts you listen to.  It's not a book you can
22  browse through.  And you should just leave it under
23  your chair when you leave the jury box instead of
24  taking them back to the jury room.  It would save
25  wear and tear on your shoulders.

:12PM
:13PM
:13PM
:13PM
:14PM

1      (Brief pause).

2          MS. HAMILTON:  Your Honor, may I hand the

3  witness Government Exhibit Transcript Binder?

4          THE COURT:  Yes, you may hand it up to the

:14PM  5  witness.

6          Which one are we talking about?

7          MS. HAMILTON:  It's tab 7, session 117.

8          And may we publish, Your Honor?

9          THE COURT:  You may.

:18PM  10     (Tape played)

11  BY MS. HAMILTON:

12  Q  Mr. Harris, I want to focus you back on Page 1 of

13  the transcript behind tab 7.

14  A  Yes.

:21PM  15  Q  At the very top there's a date and time, what

16  does that reflect in terms of when this call took

17  place?

18  A  8:35 a.m. on November the 3rd, which would be

19  Monday morning.

:21PM  20  Q  So this is the day after your call with Rahm

21  Emanuel that you just talked about?

22  A  Yes.

23  Q  At line 4 when you say:

24     "Yeah, just typing up, ah, kind of remarks slash

:21PM  25      process for you."

1    You go on at line 6:

2    "I'll fax it to you this morning.  Give me an

3    idea of your reaction.  This kind of takes into

4    consideration, ah, Knapp's issues and concerns,

5    so."

6        What were you referring to there?

7  A   The document that you previously showed me, I had

8  typed it up and was preparing to send it to the

9  governor per his request of the week before.

10 Q   And when you mentioned "Knapp's issues," who is

11 Knapp?

12 A   Bill Knapp is -- was the governor's principal

13 political consultant.  He managed -- or was his

14 consultant for both of his campaigns for governor,

15 and Bill Knapp was involved in discussions with the

16 governor about the Senate selection process.

17 Q   On to Page 2, starting at the top of line 1 you

18 say:

19    "I've read papers, we've read papers, we, you

20    know, we you know, we know what the rumors are

21    out there, but again."

22        What are you relaying at that part of the

23 conversation?

24 A   I'm relaying the discussion I had with Rahm

25 Emanuel the day before and how I had come to the

1  conclusion that Rahm Emanuel was talking about

2  Valerie Jarrett.

3  Q   And at line 4 the defendant says:

4      "So he's talking about Valerie Jarrett."

5          And what did you understand him to be saying

6  to you?

7  A   That he understood -- that I understood that Rahm

8  was talking about Valerie Jarrett.

9  Q   Continuing at line 5 through 11, are you

10 continuing to relay your conversation with

11 Congressman Emanuel from the day before?

12 A   Yes.

13 Q   And at line 17 you say:

14     "I didn't mention her name, but like the Marilyn

15      Katz and all the other kind of people."

16      What were you saying there?

17 A   I was telling the governor that I had told Rahm

18 Emanuel that if President-Elect or Senator Obama had

19 a preference, he should let us know, and that I was

20 explaining to the governor I did not mention the

21 earlier call I received from Marilyn Katz or the

22 earlier communication from Marilyn Katz.

23 Q   And at line 20 defendant says:

24     "This is good."

25      And you go on line 21 saying:

1    "Hanging around out there, but it sounds as
2      though, at least if you're gonna believe Rahm,
3      that he very much cares about this and has a
4      definite desire for Valerie.  Because he didn't
5      mention Tammy."
6         Who is Tammy?
7  A   Tammy Duckworth is somebody I recruited into the
8  governor's administration as the Director of Veteran
9  Affairs.  She had run for Congress, she had come
10 close -- she had become close to Rahm Emanuel who
11 was then running Democratic congressional efforts to
12 win -- to have democrats win seats in the House of
13 Representatives, and that the way Rahm had described
14 a person of interest, it was clear to me he wasn't
15 talking about somebody close to himself like Tammy,
16 but rather Valerie, somebody close to Barack Obama.
17 Q   At line 31 defendant says:
18     "Okay.  Now we should get something for that,
19      couldn't I?"
20        You responded "yes."  What did you
21 understand him to saying there.
22 A   That he wanted to see what he could get as
23 consideration for appointing Valerie Jarrett, that
24 whether or not that was a possibility.
25 Q   Over on Page 3, line 4, the defendant says:

1      "How about Health and Human Services, can I get
2       that?"
3           What did you understand him to be saying
4  there?
5  A   He's suggesting the idea of appointing Valerie
6  Jarrett to the senate seat in exchange for the
7  President appointing the governor Secretary of
8  Health and Human Services, which is a federal
9  agency.
10 Q   And then at line 12 he says:
11      "What can I honestly think I could, might have a
12       shot at getting?"
13      And at line 14 you say:
14      "Well besides good things for Illinois."  What
15       were you saying there?
16 A   I was clarifying that what he was talking about
17 was something beyond what the President-Elect can do
18 for the governor and the people of Illinois in
19 exchange for making Valerie Jarrett the senator.
20 Q   And was that clarified for you in this
21 conversation?
22 A   Yes.
23 Q   And how was it clarified for you?
24 A   Well, in this conversation and in subsequent
25 conversations the governor made clear to me that he

1  was interested in something for himself.

2  Q   Now, at line 17 you say:

3       "For example, if it's, if he thinks Emil's your,

4        your top, you know, at the top of your short

5        list."

6        At line 20 the defendant responds:

7        "It's got no, no bargaining power at all."

8        And you say:

9        "It's got no bargaining power."

10       And he says:

11       "Yeah."

12          What did you understand the defendant saying

13  there?

14  A   That he saw the value in making Valerie Jarrett

15  the senator because if the President-Elect valued

16  that choice, he could bargain for something in

17  exchange for that, whereas if the governor would

18  appoint Emil Jones, President-Elect Obama may not

19  have any interest or any preference and thus would

20  not be willing to bargain with the governor.

21  Q   And then at line 28 you say:

22       "What can I realistically get, it really depends

23        on what's our realistic alternative?"

24        And at line 31 the defendant says:

25       "Go ahead, who is there?"

1        Over on to the next page at Line 1 he says
2  "Bill Daley" and at line 3 "Lisa Madigan."  What is
3  your understanding that the defendant was saying
4  there?
5  A   The governor was suggesting alternative
6  candidates that the governor would communicate to
7  Barack Obama or his people as candidates under
8  serious consideration so that Obama would be
9  motivated to do more in exchange for appointing
10 Valerie Jarrett.
11 Q   As far as you knew, at this time, November the
12 3rd, were Bill Daley and Lisa Madigan serious
13 candidates under consideration for the senate seat?
14 A   No.
15 Q   At line 7 the defendant says:
16     "It's Lisa Madigan."
17      And you say:
18      "Yeah, in terms of incredible bargaining power,
19      so it's a very delicate negotiation then."
20      And at line 11 the defendant says:
21      "I think we should leak it to Sneed about Lisa
22      Madigan."
23        What did you understand the defendant to be
24 saying there?
25 A   I understood the governor to be saying that in

:27PM

:28PM

:28PM

:28PM

:29PM

1 order for the governor to better position himself

2 for a possible discussion with Rahm Emanuel or

3 President-Elect Obama, that there needed to be

4 another serious candidate out there, like Lisa

:29PM 5 Madigan, under consideration in order to enhance the

6 governor's bargaining position in these discussions.

7 Q   When you say there needed to be one, are you

8 saying that he actually needed to seriously consider

9 Lisa Madigan?

:29PM 10 A   He actually needed Obama or his advisors to

11 believe that Lisa Madigan was under consideration.

12 Q   And so this comment "we should leak it to Sneed,"

13 what did you understand he was asking you?

14 A   He was asking whether one way to accomplish that

:29PM 15 would be to leak the rumor to Michael Sneed, who is

16 a political gossip columnist in one of the local

17 papers that often contains political gossip and a

18 source for many area politicians that look at the

19 paper each day as a way to get out the rumor that

:30PM 20 Lisa Madigan was under consideration.

21 Q   It goes on at line 15:

22    "In other words that, you know, Madigan, you

23       know, a scenario where,"

24       Line 18:

:30PM 25    "We get healthcare, we get --"

1      And you talk over and say:

2      "The two Madigans approached, you know, send,

3      you know, a message to the governor

4      blah-blah-blah something like that, about

5      Lisa."

6           What did you understand the defendant to be

7  saying?

8  A  Well, in order for the rumor to be credible, it's

9  really not about the governor's relationship with

10 Lisa as much as -- Lisa Madigan, who was the then

11 Illinois Attorney General.  The governor and

12 Attorney General Madigan didn't get along, so there

13 had to be an explanation as to why Lisa Madigan was

14 being considered, and the explanation is her father

15 is the Speaker of the House, a representative in

16 Illinois, and part of the rumor or part of the story

17 in Sneed's gossip column would be that Lisa Madigan

18 was under consideration because the governor is

19 having discussions with her father, the Speaker of

20 the Illinois House, about potentially moving forward

21 on some of the governor's legislative agenda that

22 had been blocked in Springfield.

23           So, in other words, the rest of the story

24 would be the governor is considering Lisa as part of

25 a larger deal with her father.

:30PM
:30PM
:31PM
:31PM
:31PM

1  Q   And as of this time, November the 3rd, was any of

2  that actually happening?

3  A   No.

4          MR. GOLDSTEIN:  Objection; basis of

5  knowledge.

6          THE COURT:  You can ask as to his knowledge.

7  BY MS. HAMILTON:

8  Q   To your knowledge, was that true?

9  A   No.

10  Q   At line 23 the defendant says:

11      "Do me a favor, look up Health and Human

12       Services, who's been there before, Tommy

13       Thompson, all these people, right?"

14       What did you understand the defendant was

15  saying to you there?

16  A   He's asking me to do research on prior

17  secretaries of Health and Human Services under past

18  administrations, presidential administrations.

19  Q   On Page 5, line 10, the defendant says:

20      I mean, what other Cabinet positions would be

21       not stupid?  How about UN ambassador?

22       Ridiculous?"

23       What did you understand the defendant to be

24  saying to you there?

25  A   I understood him to be running ideas by me what

Harris - direct by Hamilton                              1341

1  else might he ask for other than a Cabinet
2  appointment to the position of Secretary of Health
3  and Human Services, and he's suggesting throwing out
4  the idea of ambassador to the United Nations from
5  the United States.
6  Q   And you say:
7      "Yeah, I don't think that's realistic or
8       serious."
9      At line 15 he says:
10     "Right."
11        And you both laugh.
12       At line 19 he then says:
13     "Start putting down, get Health and Human
14      Services."
15        What is your understanding him to be saying
16  there?
17  A   Get going on the research for Health and Human
18  Services.
19  Q   At line 22 you say:
20     "Wednesday, if we say something publicly about
21      your process."
22      Going on to line 25:
23     "It's got to be very supportive of the
24      President-Elect's agenda, so that way people
25      don't think you're trying to undermine his

1    agenda."
2         What are you talking about with respect to
3  Wednesday?
4  A   That it was very likely that if Senator Obama won
5  the election, that would be known Tuesday night,
6  November 4th, Wednesday night, the question will be
7  asked of the governor who he's going to select to
8  fill the vacancy or how he's going to go about
9  selecting somebody to fill a vacancy.
10        So we were anticipating Wednesday as the
11 governor being -- or the governor making a public
12 statement on the subject.
13 Q   And over on Page 6 at Line 1, the defendant says:
14    "Right.  And, and, and, I'm very much want to
15     hear what his views are and, and any
16     suggestions he might have."
17        What did you understand him to be saying
18 there?
19 A   Well, I was highlighting earlier part of the
20 paper I had written that the governor ought to say
21 publicly that we're considering the president's
22 wishes will be taken into consideration.
23        At around this time, there was some belief
24 that the governor and Senator Obama didn't really
25 get along and this was an opportunity for the

:33PM

:34PM

:34PM

:34PM

:34PM

1  governor to demonstrate his support of the

2  president-elect and his agenda.

3          MS. HAMILTON:  Your Honor, I now ask

4  permission to publish call session 149 which

5  corresponds to the transcripts behind the next tab,

6  tab 8.

7          THE COURT:  You can turn to tab 8.

8          MS. HAMILTON:  And may we publish, Your

9  Honor?

10          THE COURT:  You may.

11          MS. HAMILTON:  Thank you.

12      (Tape played)

13  BY MS. HAMILTON:

14  Q   Mr. Harris, I want to direct your attention to

15  Page 1 of the transcript behind tab 8.

16          And focusing your attention on top, the date

17  and time, when did this call take place?

18  A   1:22 p.m. on November 3rd, 2008.

19  Q   So the same day the call we went through before,

20  just later that day?

21  A   Yes.

22  Q   At line 5 the defendant says to you:

23      "So Balanoff and Andy Stern are coming in to

24       talk about Valerie Jarrett."

25          What did you understand him to be telling

Harris - direct by Hamilton                    1344

1  you?

2  A   That the governor was going to have visitors that

3  day, Andy Stern and Tom Balanoff.

4  Q   Who are Andy Stern and Tom Balanoff?

5  A   Labor leaders.  Andy Stern was the then president

6  of the SEIU, which is Service Employees

7  International Union, which is a nationwide unionized

8  work force in the service industry, and Tom Balanoff

9  was his vice president for Illinois and I believe in

10 the Midwest, too.

11 Q   What was your understanding of what their

12 relationship, if any, was to the defendant at this

13 time?

14 A   Very close relationship, early political

15 supporters of the governor, and he, Andy Stern, and

16 Tom Balanoff were also very close and early

17 political supporters of Barack Obama's candidacy for

18 the presidency.  It's a very large, politically

19 influential union of approximately 2 million

20 members.

21 Q   At line 8 the defendant goes on and says:

22     "Yeah, Obama told Andy Stern he wants her."

23     Goes on at line 11:

24     "That's the tip-off we got from Doug, telling

25     Greenlee."

1      What did you understand he was saying there?

2  A   The governor was relating to me what he had

3  heard, and he was told that Obama told Andy Stern he

4  wants Valerie Jarrett and that we heard that from

5  Doug Scofield who told that to Bob Greenlee.

6      Doug Scofield was a prior employee of the

7  governor's who served as a Deputy Governor for a

8  short-term period of time but continued to be a

9  political consultant for the governor, and also

10 served as a political consultant for the SEIU union.

11     Doug Scofield apparently told Bob Greenlee,

12 who was then serving as one of the governor's deputy

13 governors, who relayed that to the governor.

14 Q  At line 13 you respond:

15    "So is, is, is Andy the chosen messenger?"  You

16      go on at line 16:

17    "I mean, we, we gotta find out from Andy when

18      he, how, how long ago did Andy Try to set this

19      meeting up?"

20     Prior to this phone call, had you been aware

21 that Andy Stern or Tom Balanoff had attempted to

22 arrange a meeting with the defendant?

23 A  I was not aware of that.

24 Q  And then at line 19 the defendant responds:

25    "Last week."

1    And you say at line 20:
2    "Okay, so it was before my discussion with
3     Rahm."
4         What were you saying there?
5  A  I was just trying to get clarification about when
6  the meeting was scheduled and whether or not this
7  was a response from Rahm when I asked him if Barack
8  Obama has a preferred choice, he should let us know,
9  and I was just wondering whether or not this was his
10 way of letting us know.
11 Q  And in light of the fact that the defendant said
12 they attempted to have a meeting the week before,
13 what did that mean to you?
14 A  That it could or may or may not have anything to
15 do with my discussion with Rahm earlier.
16 Q  On Page 2, line 3, the defendant said:
17    "And Emil's calling Balanoff."
18     And at line 6 you say:
19    "To do what?"
20        At line 7 the defendant says:
21    "For him."
22        What did you understand the defendant was
23 telling you there?
24 A  He was telling me that he, the governor, had
25 heard or understood that Emil Jones, the president

1 of the Illinois Senate, was reaching out to Tom

2 Balanoff, the vice president of SCIU, in an effort

3 to convince the governor to appoint Emil Jones to

4 the vacant senate seat if it should be vacated.

5 Q   At line 11 on page 2 the defendant says:

6     "Emil wants me to come to his box tomorrow, his

7       suite."

8         What did you understand the defendant to be

9 saying?

10 A   That Emil Jones had invited the governor to come

11 by his hotel suite on Michigan Avenue, across the

12 street from Grant Park, where there was a planned

13 rally on election night in anticipation of Senator

14 Barack Obama's election victory.  Emil Jones was

15 hosting a reception and was asking the governor for

16 him to stop by.

17 Q   At line 19 the defendant says:

18     "I want listen, I wanna, I wanna war game this a

19       little bit, okay?"

20         He goes on at line 22:

21     "You can't pull, you can't do the Health and

22       Human Services thing with them right now,

23       right?  We're just listening."

24         What did you understand him to be saying

25 there?

1  A   I understood him to begin to strategize how he

2  might handle the meeting with Andy Stern and Tom

3  Balanoff.

4  Q   And when you say "handle the meeting," what, if

5  anything -- what was your understanding as to

6  strategizing a meeting with Andy Stern and Tom

7  Balanoff had to do with the Health and Human

8  Services thing?

9  A   If in the event that Andy Stern and Tom Balanoff

10  communicated to the governor that Senator Obama

11  would like Valerie Jarrett to be the senator, he was

12  raising the question of whether or not he should at

13  that time, at that meeting, suggest an appointment

14  of himself to the position of Secretary of Health

15  and Human Services as part of that discussion.

16  Q   At line 26 he says:

17     "Right?  I don't throw that out now, do I?"  You

18      say:

19     "No, no, no, you don't throw that out now.  Too

20      soon."

21       Over on Page 3, at line 1, the defendant

22  says:

23     "And then the other thing is, you know, we

24      should talk, I want you to think about whether

25      I just say, hey, look what about, what about

1    Lisa Madigan and then explain, okay, there's a
2    carrot and a stick thing going on right now.
3    Calling everybody."  What did you understand
4    him to be saying there?

:48PM 5  A   He was continuing to strategize and he wanted me
6  to strategize with him about whether or not he
7  raises the possibility of a Lisa Madigan appointment
8  during the meeting with Andy Stern and Tom Balanoff
9  as part of the discussions about his filling the
:48PM 10 vacancy.

11 Q   Specifically, when he says "there's a carrot and
12 stick thing going on," what did you understand him
13 to be saying?

14 A   I'm not quite sure other than that if he didn't
:49PM 15 appoint Lisa, he was suggesting that he would tell
16 Tom Balanoff and Andy Stern that there may be bad
17 consequences for him and his administration and his
18 legislative agenda down in Springfield because of
19 retaliation by her father, the Speaker, as well as a
:49PM 20 possible carrot being what he could get for it.

21 Q   At line 8 you say:

22    "Certain people have approached us, telling us
23      that this is Madigan's design."

24        And as far as you knew, had anyone
:49PM 25 approached you or anyone else about a design that

1  Madigan had?

2  A   No, this was just rehearsing what he might say

3  and how he might say it, how he might bring Lisa

4  into the discussion.

5  Q   At line 14, the defendant says:

6      I mean, Emil is a possibility, I'm not going to

7       rule him out by any means."

8       Line 17:

9       "He's a fall back."

10      And then line 20 he says:

11      "I mean, he had John Kelly call me."

12      You say:

13      "Yeah, that's not right."

14          What did you understand the defendant was

15  telling you there?

16  A   That he wanted to consider, continue to consider

17  Emil Jones, and that going to his box would send a

18  message to Emil Jones that the governor has gotten

19  over his bad feelings about Emil Jones' betrayal on

20  the veto override of the ethics legislation.

21  Q   At line 22 the defendant says:

22      "I mean, when do you have this conversation with

23       him about that other thing we talked about."

24       And you say:

25       "Trying to meet with him off campus somewhere."

1      What did you understand the defendant was
2  asking you?
3  A   He was raising again an idea that he had talked
4  to me about several times before and had not yet
5  done anything about, and that was to have a
6  discussion with Emil Jones about the possibility of
7  appointing Emil Jones to the vacant senate seat.
8      And that the governor would also want Emil
9  Jones to give the governor some or all of the
10 remaining funds in Emil Jones' campaign war chest.
11 Because if he left the state legislature and went to
12 a federal post, that the campaign funds he had
13 collected and retained would not be available for
14 use in a federal reelection because the rules are
15 different on how you collect campaign funds, and
16 that the governor wanted Emil to know that the
17 governor would be looking to get some or all of that
18 money into the governor's campaign war chest.
19 Q   That he would be looking for that money why?
20 A   If he were -- if the governor were to appoint
21 Emil Jones to the senate seat.
22 Q   And just to be clear, prior to this conversation
23 on the afternoon of November the 3rd, had the
24 defendant directed you to have a conversation with
25 Emil Jones about that particular subject?

:50PM

:51PM

:51PM

:51PM

:52PM

Harris - direct by Hamilton                    1352

1  A   Yes, but I kept telling the governor that I
2  couldn't have that type of political discussion in
3  government buildings, and that's usually where I
4  would meet with Emil Jones, in government buildings.
5  And I was waiting to meet with him off campus,
6  meaning somewhere other than the state building as a
7  way to put off that meeting and not have that
8  meeting.
9  Q   All right.  At line 27 he says:
10      "Yeah, because an off campus, that's a tactical
11       thing, an off-campus discussion on that subject
12       will make him feel better about his chances."
13          What did you understand him to saying?
14  A   I understood the governor meaning that if I were
15  to have such a discussion with president Jones, then
16  president Jones will be left with the impression
17  that the governor was seriously considering
18  appointing him.
19  Q   Over on to Page 4, at line 4, you say:
20      "Or if he has no intention of doing it, it may
21       push him away."
22      And then line 7:
23      "All right, don't have a conversation with him,
24       then.  Forget it.  Don't even, don't even do
25       it.  I don't wanna -- I'll talk about it when I

1      see you."
2      And at line 13 he says:
3      "No, you've got the wrong thing.  That's not
4      what I'm talking about."
5      At line 18 he says:
6      "Prospective help."
7      And at line 20 he says:
8      "Is what I'm talking about."
9      At line 21 you say:  Right."
10         What did you understand the defendant was
11  talking about here?
12  A   I understood him to recognize that the concern
13  that I raised about having the discussion that he
14  wanted me to have with Senator Jones might be
15  received poorly by Senator Jones, he might reject
16  that idea of giving the governor campaign funds in
17  exchange for his appointment to the senate seat and
18  that might push Senator Jones away.
19         The governor tells me, no, no, no, words to
20  that effect, and then tells me that's not what he's
21  talking about, and then he clarifies by saying
22  "perspective help," I understood it to mean that if
23  there were to be a transfer of funds, it would be
24  sometime after the appointment.
25  Q   And on Page 4, going on at line 23 the defendant

1  says:
2      "Do they think that, they think that I would
3          just appoint Valerie Jarrett for nothing?  Just
4          to make him happy?"
5              What did you understand the defendant to be
6  saying there?
7  A  He was thinking out loud to me about what might
8  be on the minds of Senator Obama and his people, and
9  what they were thinking about with respect to the
10 governor's consideration of Valerie Jarrett.
11 Q  And you say in response on line 26:
12     "Yeah, along with what we talked about the other
13         ..."
14     And the defendant says:
15     "They'd help me."
16     And you say:
17     "Help, help the political, the political
18         agenda."
19     And over on to Page 5:
20     "Your governing agenda, not your political
21         agenda."
22     What were you referring to there?
23 A  I'm referring to his statement that they don't --
24 that earlier -- his earlier statement that says, "do
25 they think I wouldn't do it for nothing," and I'm

:54PM
:54PM
:54PM
:55PM
:55PM

1  simply suggesting that I'm sure they're thinking

2  that you're going to want help with your governing

3  agenda, the type of help the president can give to

4  the governor and getting things done.

5  Q   And, Mr. Harris, in your experience, what kinds

6  of things can a president help a governor in terms

7  of getting things done?

8  A   Quite a bit.  The federal government, in our

9  system of government, the federal government

10 provides a lot of resources to states in support of

11 federal programs, most notably Medicaid and how much

12 money states get out of the federal funds for

13 Medicaid reimbursements.  Illinois did not rank

14 among the highest in reimbursement rates, we were

15 not getting as much back from the federal taxes than

16 other states were, that's a way a president could be

17 helpful.  Each year we developed a federal

18 legislative agenda --

19 Q   When you say "we," who do you mean?

20 A   The governor's staff and myself and the

21 legislative affairs people, this is common in all

22 levels of government, cities and towns asks states

23 for help and states ask the federal government for

24 help.

25          And each year we prepared an agenda that we

 1  would transmit to members of the Illinois
 2  delegation, which is Illinois congressmen and women
 3  and Illinois senators, as well as the president and
 4  other head of agencies, which is basically the
 5  state's wish list of things that the federal
 6  government could help with.
 7          Having a friendly White House could be very
 8  beneficial for the state in its efforts to win much
 9  of what's on their wish list.  So I thought that it
10  would be reasonable that Obama's people would expect
11  us to ask them for more help on our wish list, our
12  federal agenda wish list.
13  Q   This federal agenda wish lift, as Chief of Staff
14  was it your understanding the defendant was aware of
15  this federal agenda wish list?
16  A   Yes, he was aware of the bigger items on the wish
17  list, not all.  It was a thick document with
18  hundreds of items, but he would be aware of the
19  major requests for help which basically would be the
20  governor's federal legislative agenda.
21          And he was also aware of it because as a
22  congressman having served in the U.S. Congress, he
23  was also the recipient of the federal agenda from
24  the State of Illinois for all the years he served in
25  the U.S. Congress.  So this is a routine annual

1  document.

2  Q   In your discussions with the defendant about

3  the possibility of asking for something from

4  president-elect Obama in exchange for making Valerie

5  Jarrett a senator, was there ever any discussions of

6  any of the items on the wish list?

7  A   No.

8  Q   All right, back to the transcript at Page 5, at

9  line 8, the defendant says:

10      "Well Marilyn Katz was their first emissary,

11       right?"

12       And line 11 he says:

13      "And she was talking about fundraising."

14           What did you understand the defendant was

15  saying there?

16  A   He was reiterating and highlighting a certain

17  portion of the conversation I had with him earlier

18  about the communication I received from Marilyn Katz

19  weeks before endorsing and supporting Valerie

20  Jarrett's appointment.

21  Q   And you say at line 12:

22      "Yeah, she was talking about friends around the

23       country that would be appreciative in their

24       ability to help with fundraising, and the media

25       would be all over you, crediting you for the

1  choice, such a wise choice, and that she would

2  work tirelessly as, as would other allies of

3  his to get you good press on this appointment."

4  What are you talking about there?

5 A I am summarizing again the conversation I had

6 with Marilyn Katz, downplaying the fundraising and

7 really talking more about friends and supporters

8 around the country, that aspect of the conversation

9 I had with Marilyn Katz.  And he was highlighting

10 the fundraiser part and I was downplaying that.

11 Q At line 22 he says:

12  "Good press.  That's all she's offering?" "No,

13  friends around the country."

14  What is your understanding as to what was he

15 referring to there.

16 A I simply understood him to be discouraged by the

17 explanation I gave.

18 Q On the next page, Page 6 starting at line 1 the

19 defendant says:

20  Yeah, and everything you you've talked about in

21  healthcare is what we've either done, or we're

22  working to try to get done.  Okay, who's done

23  more for healthcare in any state than me,

24  right?  Heck of a lot more than Tommy Thompson

25  did.  Is that fair to say or no?"

1      What did you understand the defendant to be

2      saying there?

3  A   I understood him to be articulating an argument

4  he would make to President Obama in support of

5  himself, meaning the governor's appointment to the

6  Secretary of Health and Human Services, that you,

7  "everything you've talked about," he's referring to

8  Barack Obama, about healthcare are things that we've

9  already done here in Illinois.  So he was basically

10  listing his credentials as a good choice for

11  Secretary of Health and Human Services.

12  Q   There have been a couple of references to Tommy

13  Thompson.  Who is Tommy Thompson?

14  A   Tommy Thompson was the former, past governor of

15  the State of Wisconsin who implemented some

16  healthcare reforms spanning the access to affordable

17  quality healthcare to the citizens of Wisconsin,

18  later was appointed to serve, I believe, under the

19  Clinton administration as Secretary of Health and

20  Human Services.  So the governor compared himself to

21  that governor.

22  Q   On Page 6, at line 15, the defendant says:

23      "Kaiser Foundation ranks as number one, I don't

24      know if we still are or were expanding

25      healthcare, can you get that, can you get that

1    for me, not right now, but that should be part
2    of, I mean we're not going to talk about that
3    with Balanoff, but you know what I'm saying."
4         What did you understand the defendant to be
5  saying there?
6  A  He wanted me to have research done about where
7  Illinois ranked with respect to providing access to
8  quality affordable healthcare.  And the Kaiser
9  Foundation is a private foundation issue advocacy
10 group, I'm not that familiar with their charter, but
11 they, among other things, rank state's performance
12 on healthcare.
13        MS. HAMILTON:  Judge, I'm going to take a
14 short break from the transcript binders if the
15 jurors want to put them down.
16        THE COURT:  Sure.
17     (Brief pause).
18 BY MS. HAMILTON:
19 Q  All right.  Mr. Harris, in that last call, at the
20 beginning, the defendant was talking about an
21 upcoming meeting with Andy Stern and Tom Balanoff,
22 is that right?
23 A  Yes.
24 Q  Did Mr. Stern and Mr. Balanoff come for a meeting
25 at the Thompson Center on November the 3rd?

:02PM

:02PM

:02PM

:02PM

:03PM

1  A   Yes, they did.

2  Q   Were you there?

3  A   Yes, I was.

4  Q   What happened -- just to be clear, it was you,

5  the defendant, and Mr. Stern and Mr. Balanoff, is

6  that right?

7  A   Yes, and I believe Doug Scofield was with us,

8  too.

9  Q   What happened at that meeting on November

10 the 3rd?

11 A   All the gentlemen exchanged greetings.  While the

12 governor met often with Tom Balanoff, Andy Stern was

13 a less frequent guest because he resided in, I

14 believe, Washington and was the head of the National

15 League.

16         The governor and Andy Stern talked about the

17 support of SCIU in president-elect Obama's campaign

18 or soon to be president-elect Obama's campaign.

19 Balanoff praised the governor's actions in support

20 of SCIU's agenda here in Illinois and the things

21 we've done here in Illinois, and then the topic

22 changed to the senate seat.

23         Andy Stern and Tom Balanoff raised a concern.

24 First asked the governor whether he had made a

25 decision, the governor said no, and then raised the

:03PM

:03PM

:03PM

:04PM

:04PM

1  concern about possible appointment of Congressman

2  Jesse Jackson, Jr.  They were not supportive of

3  that, and governor expressed his similar lack of

4  support for that.  There was no -- he was not

5  entertaining that possibility, and that seemed to

6  satisfy Andy Stern and Tom Balanoff.

7       And the governor talked about a possible deal

8  with Speaker Madigan in exchange for appointing Lisa

9  Madigan to the senate seat.  He talked about Emil

10  Jones, a close long-term ally as a possible

11  candidate.  Andy Stern and Tom Balanoff talked about

12  Valerie Jarrett as a possibility, Jan Schakowsky as

13  a possibility.

14  Q   And who is Jan Schakowsky?

15  A   She's another congresswoman from the Chicago

16  area, supporter and ally of SCIU's.

17       So they generally discussed the senate seat

18  and the governor's intentions.  And the governor

19  asked them whether or not Barack Obama wanted

20  Valerie Jarrett.  And they said they would be

21  willing to go back and ask Senator Obama whether or

22  not he wanted her to be appointed to the senate

23  seat.

24  Q   You indicated that Emil Jones was discussed in

25  this meeting.  What, if anything, did the defendant

:05PM

:05PM

:05PM

:06PM

:06PM

1  say with respect to what he was considering about
2  Emil Jones at that meeting?
3  A   He mentioned Emil Jones in the context of their
4  long friendship and political alliance, that Emil
5  Jones wants to be the senator, and that if the
6  governor were to bypass or not select Emil Jones and
7  select Valerie Jarrett instead, that that would be a
8  significant sacrifice by the governor to do so, and
9  he did so in an effort to explain to the gentlemen
10 that picking Valerie Jarrett would be a big request
11 to me.
12 Q   And, likewise, with respect to the possibility of
13 appointing Lisa Madigan?
14 A   Again, the governor suggested that there may be a
15 chance at peace or detente with Speaker Madigan in
16 Springfield, a breaking of the logjam in the
17 governor's agenda, and that that was something the
18 governor would value, and that appointing Lisa
19 Madigan could possibly achieve that, breaking of the
20 logjam, and that would be a significant benefit to
21 the people of Illinois and the governor, and that to
22 not appoint her and to appoint Valerie Jarrett
23 instead would, again, be a big request by Senator
24 Obama.
25 Q   And the reply by the defendant with respect to

1 Mr. Jones or Ms. Madigan, were they consistent with
2 the manner in which it had been discussed in the two
3 calls that we just listened to?
4 A  Yes.
5 Q  How were things left at the end of the
6 November 3rd meeting with Mr. Balance?
7 A  Mr. Stern and Mr. Balanoff indicated they would
8 be happy to go back to Senator Obama and his people
9 and come back with his request if, in fact, he
10 wanted Valerie Jarrett.
11 Q  You already testified that the following day,
12 November the 4th, Barack Obama won the general
13 election to be President of the United States.  At
14 that time, did you understand that the defendant was
15 also considering the possibility of appointing
16 himself to the senate seat?
17 A  Yes, that was always a possibility, and always --
18 and always in his discussions.
19        MS. HAMILTON:  Your Honor, at this time I'd
20 ask to publish the call behind tab 9.
21        THE COURT:  Go ahead.
22     (Tape played).
23        MS. HAMILTON:  Judge, now I would like to
24 publish the call behind tab 10, call session 186.
25        THE COURT:  This one is okay, too.

1    (Tape played).

2  BY MS. HAMILTON:

3  Q   Mr. Harris, focusing your attention on

4  November 4th, what, if anything, did you do that

5  evening?

6  A   I accompanied the governor to Emil Jones'

7  reception in his hotel suite on Michigan Avenue and

8  later a back stage of the rally celebrating Senator

9  Obama's election.

10  Q   Did you see anyone in relation to the senate seat

11  discussions that were happening at that time while

12  you were there?

13  A   I saw Tom Balanoff who was also back stage.

14  Q   Did you have discussions with Mr. Balanoff?

15  A   No, I did not.

16  Q   Are you aware if the defendant did?

17  A   They briefly huddled some distance from me, I

18  could not overhear the conversation, and then broke

19  apart and went separate ways, and then the governor

20  and I rejoined.

21  Q   And did the defendant indicate anything that

22  Mr. Balanoff said to him?

23  A   He briefly said the president-elect wants Valerie

24  "and he wants to come see me," meaning Tom Balanoff

25  wants to come see the governor to talk further about

:11PM
:12PM
:12PM
:12PM
:12PM

1  it.

2  Q   After that encounter on November the 4th, was a

3  meeting arranged between the defendant and Tom

4  Balanoff?

:13PM  5  A   Yes.

6  Q   And when was it scheduled for?

7  A   I believe it was for that Thursday, that would

8  have been the 6th.

9  Q   Prior to that meeting on November the 6th, did

:13PM  10  you have a series of discussions with the defendant

11  in preparation for that meeting?

12  A   Yes.

13  Q   Have you heard recordings of certain of these

14  conversations that were had over the phone?

:13PM  15  A   Yes.

16  Q   Did you also have in-person meetings?

17  A   Yes.

18  Q   And is it fair to say the in-person meetings were

19  consistent with what you talked about over the

:13PM  20  phone?

21  A   Yes.

22       MS. HAMILTON:  Your Honor, at this time I

23  would ask permission to publish call session 261

24  which corresponds to tab 13 in the binder.

:13PM  25       THE COURT:  You can turn to 13, but we're

1  going to take a short recess.  We're going to try to

2  fix the feedback.

3          THE MARSHAL:  All rise.

4      (The following proceedings were had out of the

5       presence of the jury in open court:)

6          THE COURT:  We are in recess.

7      (Recess.)

8

9      THE MARSHAL:  All rise.

10     (The following proceedings were had in the

11      presence of the jury in open court:)

12         THE COURT:  Please be seated.

13         MS. HAMILTON:  Judge, before we broke, I

14  asked permission to publish call session 261, which

15  is behind tab 13.

16         THE COURT:  You may do so.

17         MS. HAMILTON:  Thank you.

18         THE COURT:  I think we're okay.

19         MS. HAMILTON:  Sorry, Judge, we're now having

20  a little technical issue.

21     (Brief pause).

22     (Tape played.)

23  BY MS. HAMILTON:

24  Q  Mr. Harris, I ask to direct your attention to

25  Page 1 of the transcript behind tab 13, what is the

1  date and time of this call?

2  A  8:31 a.m. on November 5th, 2008.

3  Q  So this is the day after the election?

4  A  Yes.

5  Q  At line 2 the defendant says:

6     "All right, what do we do with Balanoff?  We

7      wait for him to call, right?"

8      You say:

9     "Right."

10     "So we don't call Axelrod until we meet with

11      Balanoff."

12         What did you understand the defendant to be

13  asking you?

14  A  He wanted to discuss with me planning the day,

15  and we had discussed earlier that he should call

16  David Axelrod, president-elect Obama's campaign

17  manager, with a congratulatory call.

18  Q  And you decided not to do that?

19  A  I wasn't sure when Balanoff was coming in, so I

20  told him we should wait for that meeting before

21  making the call, not knowing the gentleman's

22  schedules.

23  Q  On Page 2, at line 11, the defendant says:

24     "Uh-huh talked to Barack Obama.  Wants to come

25      and see me.  So he comes in and he says what?

1      Likes Valerie Jarrett."
2      At line 14 you say:
3      "Yeah, I'm trying to figure how much, how much
4      more they're willing to say, from the first
5      meeting.  I mean, it'd just be like an
6      incremental inch."
7      And at line 19 the defendant says:
8      "No, no, he was very explicit with me, "I
9      talked to Barack Obama about the senate seat.
10     Can I come see you?  Can I do it tomorrow?"
11     And I said "sure."
12          What did you understand the defendant to be
13   saying to?
14   A   We were role playing the meeting, how it might
15   go, how it might start, and what might be said by
16   Mr. Balanoff.  And the governor referred back to the
17   conversation he had with Mr. Balanoff the night
18   before at the rally back stage and said, I quote "I
19   talked to Barack Obama about the senate seat, can I
20   come see you, can I do it tomorrow," he just
21   reiterated that for me.
22   Q   At line 24 the defendant says:
23      He'll be explicit."
24          What did you understand the defendant to be
25   saying?

1  A   That Mr. Balanoff will be coming with a very

2  clear request from then president-elect Obama.

3  Q   And the request would be what?

4  A   To appoint Valerie Jarrett to the senate seat.

5  Q   On Page 3, at line 5, the defendant says:

6     "How bad he wants, how important is it to him,

7      do I say that?"

8        What did you understand him to be saying

9  there?

10  A   He was rehearsing with me what he might say

11  during the meeting with Mr. Balanoff, and how he

12  might respond to Mr. Balanoff's message from

13  president-elect Obama.

14  Q   And you say at line 7:

15     "Well, you know your relationship with Balanoff

16      better than I do."

17      And he responds at line 9:

18     "Yeah, don't worry about it."

19      And then starting at line 14 through line 25 he

20      says:

21    "Hold it, let's talk about this now.  So do I

22      say how bad does he want it?  I don't think so.

23      Maybe I say instead, I say listen, he's the

24      president-elect, he obviously has a lot of

25      weight.  You know, with, with his intere-, his

:57PM
:57PM
:57PM
:58PM
:58PM

1      interests in what he would like.  You know, I,
2      I, I clearly, I definitely respect that and,
3      and certainly value it.  I put a value, you
4      know, I certainly, it's a significant thing.
5      Emil thanks Obama wants him."
6           What did you understand the defendant to be
7  saying there?
8  A   I understood him to be rehearsing what he would
9  say to Mr. Balanoff.
10 Q   And going on at line 28 he says:
11      "That's, that's one factor.  The other factor
12      is, what do I do about Mad -- I'm, ah, okay, I
13      make this appointment, what do I do about
14      Madigan?  We'd had overtures that have been
15      indirect, I didn't know if they'll, they'll get
16      any more significant.  But I, I believe it's
17      possible, so ..." what did you understand him
18      to be saying?
19 A   He was rehearsing how to raise the notion of the
20 governor considering an alternative, Lisa Madigan,
21 because of the beneficial things that it might
22 provide to the state if he did that.
23 Q   As of this time, the morning of November the 5th,
24 did you have any knowledge of any overtures from
25 anyone with respect to a possible deal with the

1  Madigans?

2  A   No.

3  Q   So what was your understanding as to why the

4  defendant was rehearsing possibly raising this

5  notion if there had been overtures that had been

6  indirect?

7  A   To raise the value of their request; in other

8  words, that if president-elect Obama wants Valerie

9  Jarrett, the governor would be foregoing a possible

10  deal with Speaker Madigan, something that he valued,

11  that could do good things, and that if he went with

12  Valerie Jarrett he would be foregoing that

13  opportunity, thus making it clear to Mr. Balanoff

14  that, to appoint Valerie, the governor would be

15  giving up something very important or very valuable.

16  Q   Going on to Page 4, starting at line 24, the

17  defendant says:

18      "I have to my responsibility to the people of

19       Illinois, how can I best serve them to get best

20       things done with them if I got Madigan f'ing

21       screwing me?  And the Trib, Madigan and the

22       Tribune keeps screwing me, keeping me from

23       being able, and the only way I do things now is

24       going around them.  And that, and that's

25       something they're talking about impeaching me

1      on."

2         What did you understand the defendant to be

3   saying there?

4   A   Again he's rehearsing what he's going to say but

5   he's laying the groundwork for asking for something

6   in exchange for himself, because he's basically

7   making Balanoff aware that to appoint Valerie

8   Jarrett, the governor would be giving something up,

9   and that he would like something of significant

10  value to himself to do so.

11  Q   Over on to Page 5, at line 9 he says:

12         "See, the other thing is, how do I make a play

13          for something in that end over there, how do

14          you bring that up?  Do you bring it up with

15          Balanoff or no?"

16            What did you understand the defendant to be

17  saying there?

18  A   He's asking how he might introduce the topic of

19  an appointment for himself in exchange for the

20  senate seat, how he would work that into the

21  conversation after having laid the groundwork that

22  he rehearsed earlier.

23  Q   And on to line 24 the defendant says:

24         Do I say look, I'd be happy to send the senator

25          over, I'd be happy to, but I tell you what

:00PM

:00PM

:01PM

:01PM

:01PM

1    would be great, Tom, if the senator and I go to

2    Washington and do All Kids all across America,

3    sure could do a lot more, do I say that?  Do I

4    bring up Health and Human Services?

5        What did you understand the defendant to be

6 saying there?

7 A   He was questioning me on whether he should make

8 the request for the Health and Human Services

9 appointment at that time or in the meeting with

10 Balanoff that's soon to happen.

11 Q   And over on Page 6, at line 1, you say:

12    "I don't know if you do that today.  I think you

13     kinda lay the groundwork is listen, if I, if

14     he's not gonna help me here in Illinois, I'm

15     f'd, and I ain't gonna e able to get anything

16     else done."

17        And then skipping down to line 26 you say:

18    "Blah, blah, blah, so guys you know.

19     You, we have more work to do.  How, how do we,

20     how do we, how do we take care of

21     president-elect's wishes while at the same time

22     taking care of the people of Illinois?"

23     And at line 32 the defendant says:

24    "Yeah.  And, and, and my, and me, do I say me?"

25        What did you understand the defendant to be

1 saying there?

2 A  I was suggesting to him earlier that he should

3 ask Tom Balanoff what president-elect Obama could do

4 for the governor to make him stronger, to make good

5 things happen for the people of Illinois, and the

6 governor added to that things for himself in

7 addition to that.

8 Q  And you respond at line 34:

9     "Right.  By, by keeping me strong."

10     And over on Page 7, line 1, the defendant says:

11     "But I don't want that, I'm not looking for

12     that, I'd like to get out, the f' out of here."

13   What did you understand the defendant to be

14     saying to you there?

15 A  I understood him to not be interested in my

16 suggestion that he ask for something that makes him

17 a stronger governor, a more effective governor, but

18 rather, he's indicating to me his clear intent that

19 he doesn't want to be governor any longer and he

20 wants to leave and he wants to leave with an

21 appointment to a federal office.

22 Q  And you respond at line 4:

23     "Well, that's a whole different."

24     At line 7:

25     "If that's the objective."

Harris - direct by Hamilton                    1376

1    At line 8 he says:
2    "Yeah, the objectively is to, is to get a good
3    gig over there."
4        What did you understand him to be saying?
5  A  He was clarifying for me again that his objective
6  was to leave and get an appointment into federal
7  office.
8  Q  At the bottom of line 20 he says:
9    "Everybody get, everybody has a chance now to
10    play a role in history.  I've done all these
11    things in Illinois and now I'm left behind,
12    f'ing dynamic.  And unless I do something with
13    him, and the only thing I can think of is,
14    responding to these feelers on his daughter.
15    I'm looking at two years of just, crap, and
16    f'ing ineffectiveness.  And the very way I get
17    things done around him now is gonna be, a cause
18    for them to, to impeach me."
19        What did you understand he was saying at
20  that point?
21  A  He was rehearsing the argument that he would make
22  to Mr. Balanoff as to what's motivating him to want
23  to leave.
24  Q  And on to Page 8, line 6, the defendant says:
25    "I don't know, maybe we should have them there

:04PM

:04PM

:04PM

:04PM

:05PM

1    and then just say, you know, so, you know, what

2    do I do about that?  What do I do about that?

3    I'm happy to, you know, I'd strongly consider,

4    the president-elect's choice and happy, and be

5    happy to work with him, and do it for him, but

6    I can't, how can I do it and then leave myself

7    in this position?  How am I doing?"

8    You say:

9    "Right."  "Right.  Good.  Good."

:05PM    10    And he goes on at line 19:

11    "One thing we should consider Tom is maybe I'd

12    do it, and I, and with her, I get the f' outta

13    town."

14        What did you understand him to be saying?

:05PM    15  A   Again, I understood him to be rehearsing the

16  dialogue with Tom Balanoff and how he would pitch

17  the idea of appointing Valerie Jarrett as long as he

18  could go with her out of town, meaning to D.C.

19  Q   And continuing on line 23:

:05PM    20    "Maybe I say that, you know, I don't f'ing do

21    Lisa, I just f'ing take Valerie and the two of

22    us get the f' outta town together.  What if I

23    say it that way?"

24    You say:

25    "Yeah, and also, you know."

1      And he says:

2      "What the, you know, let's consider.  Okay?  Is

3      there, is there a role for me out there?  Do I

4      say that?"

5           What did you understand the defendant to be

6  saying there?

7  A   Same as before, just rehearsing different ways to

8  raise the subject.

9  Q   Moving forward to Page 10, at line 5, the

10  defendant says:

11      That's right.  And if Doug's telling 'em what

12      I'm tellin' Doug, that my last play is I'll

13      just send myself to Washington.  See?  That I

14      can send Valerie Jarrett, but how, how the f',

15      I'd like to follow her and get outta town."

16           What did you understand the defendant to be

17  saying there?

18  A   He was explaining to me that he had spoken to

19  Doug Scofield, again his consultant, as well as

20  SEIU's consultant, or Balanoff's consultant, that if

21  the governor doesn't get something that he wants for

22  appointing Valerie Jarrett, he'll simply just

23  appoint himself to the senate seat as a sure fire

24  way of getting himself out of town.

25  Q   Over on Page 11, at line 3, the defendant says:

1      "I gotta play to Emil, too, don't I?"

2      You respond:

3      "Sure.  Well, no you simply say that Emil tells

4      me that you want him."

5      At line 6 the defendant says:

6      "Obama wants him."

7          What did you understand the defendant to be

8  saying there?

9  A  He was again rehearsing what else he might say to

10 Tom Balanoff and he wanted to include in the

11 discussion that he always had the option of sending

12 Emil Jones and that he understood from Emil that

13 president-elect Obama would also like to have Emil

14 Jones appointed.

15          MS. HAMILTON:  Your Honor, at this time I'd

16 ask permission to publish call session 262, which is

17 the next tab, tab 14.

18          THE COURT:  Yes, you may publish it.

19          MS. HAMILTON:  Thank you, Your Honor.

20      (Tape played)

21 BY MS. HAMILTON:

22 Q  All right, Mr. Harris, drawing your attention to

23 Page 1 of the transcript behind tab 14.

24          What's the date and time of this call?

25 A  8:58 a.m. on November 5th, 2008.

1  Q   So after the call we heard just prior to this?

2  A   Soon after.

3  Q   On Page 1, line 14, the defendant says:

4        "Okay, good.  So I cannot dismiss that real

5         possibility.  If they f'ing treat me with

6         f'ing, you know, irrelevance and I don't get

7         something good.  I, you know, and I'm facing

8         what I'm facing.  We've always got that ace in

9         the hole, don't we?"

10            What did you understand the defendant to be

11  saying there?

12  A   I understood him to be saying that if he's not

13  satisfied with what they, meaning the Obama

14  administration, would give the governor in exchange

15  for Valerie Jarrett's appointment, he would simply

16  appoint himself to the senate seat.

17  Q   On Page 2, starting at the top, you say:

18        If they're, if they're f'ing me and they're not

19         even entertaining a reasonable

20          request?  The question now is, what is a

21         reasonable request."

22        You go on:

23        "And if, it's a function of how important it is

24         to him, too.  You know, if I were him, ah, you

25         know, a top cabinet post, I don't, I wouldn't

1    consider it.  I wouldn't do it if I were him."

2    At line 18 the defendant says:

3    "I agree with you."

4    And at line 20 the defendant says:

5    "Because of Rezko."

6        What did you understand the defendant to be

7    saying there?

8  A   I understood him to be agreeing with my view that

9    there was no way he was going to get an appointment

10   by the Obama administration of the type he was

11   requesting.

12 Q   And --

13 A   And it was because, in part, because of the

14   scandal related to the Rezko investigation and

15   indictment and conviction, he was a close supporter

16   of the governor's, a fundraiser of the governor's,

17   and his charges were related to government

18   corruption.

19 Q   At line 21 you say in response:

20    "Because of Rezko, and just because that's not

21     how I'm going to build my team.  It's like the

22     mayor, when we, whenever we filled, you know,

23     top positions in city government?  You know, we

24     never let political people tell us who to put

25     there.  You can have deputy commissioners, you

1   can have assistant commissioners, you can have
2   directors; right?  But his philosophy was you
3   never let somebody pick your top guy.  In your
4   Cabinet, you know in your, in your important
5   Cabinet positions.  And if, you know, if his
6   domestic agenda's important.  So, HHS is, I'm
7   not going to make that a political pick.  I
8   mean, meaning someone else's politics.  It's
9   going to be my politics."
10  And the defendant says:
11  "I totally agree with you.  So beyond Rezko,
12  it's beyond Rezko."
13  You say "right," and the defendant says:
14  "Yeah.  But, I know.  On the other hand, that
15  might be your pick, but your pick could be a
16  political guy."
17      What is your understanding the defendant to
18  be saying there?
19  A  I understood him to, first, agreeing with my
20  additional explanation as to why I thought there's
21  no way he would get an appointment for reasons
22  beyond Rezko, that being if I were the
23  president-elect I wouldn't appoint the governor or
24  anybody that was leveraging me or forcing me to pick
25  somebody for political reasons.

1       At first he agreed with me, but then he

2  suggested that it may be possible in this situation,

3  given these circumstances.

4  Q   That what may be possible?

5  A   That Obama might consider appointing the governor

6  to the Cabinet position of Health and Human Services

7  Secretary in exchange for Valerie Jarrett's

8  appointment.

9  Q   Over on Page 5, at line 2, you say:

10      "Say, oh come on.  F' that.  And then you kinda

11       shut down the negotiations."

12      And then you say:

13      "Okay, fine, I'll just keep going through my

14       process."

15      And the defendant responds:

16      "I think I rather be, I think I rather be a

17       senator."

18      And you say:

19      "Yeah."

20      And the defendant says:

21      "Right?"

22          What did you understand the defendant to be

23  saying there?

24  A   That he was again rehearsing what he might say if

25  the answer back from the Obama people to his request

:25PM

:26PM

:26PM

:26PM

:26PM

Harris - direct by Hamilton                    1384

1  for a Cabinet appointment were "no," how he might
2  respond or -- I'm sorry, no, or something other than
3  he requested, how he might respond to that in his
4  negotiating effort.
5  Q   At line 18 the defendant says:
6      "Let's go back to, what, okay.  So you rejected
7       the Department of Health and Human Services or
8       any Cabinet position like that.  An assistant
9       you think, oooph, forget that.  That's a, give
10      me, ah, let's go down the pecking order.  What
11      would be good?  Down the pecking order.  Ah,
12      ambassador to the U.N."
13          What did you understand the defendant to be
14  saying there?
15  A   I understood him to be engaging me in a
16  discussion of plan B or options or alternatives if
17  his request for his preferred choice of Secretary to
18  Health and Human Services were rejected, what else
19  he might ask for that might be more palatable or
20  acceptable to the Obama administration.
21  Q   So you say at line 27:
22      "No way."
23      He says:
24      "Aright?  Keep going."
25      You say:

:27PM (line 5)
:27PM (line 10)
:27PM (line 15)
:27PM (line 20)

1       "You know, I wouldn't do any ambassadorships.

2       I mean, Obama would do ambassadorships."

3       The defendant says:

4       "He would?"

5       And you say:

6       "Yeah, I think he'd do ambassadorships."

7       And over to page 6, line 1, the defendant says:

8       "Okay, I'm interested.  How about India?  South

9       Africa?  How about India?"

10          What did you understand the defendant to be

11  saying there?

12  A   I understood him to want to engage me in a

13  discussion of various positions that president-elect

14  Obama cared to appoint him to, appoint the governor

15  to, and he was asking me my opinion on whether or

16  not that was more realistic alternatives to ask for.

17  Q   Meaning the ambassador positions?

18  A   Yes.

19  Q   And did that discussion continue for several

20  pages after that?

21  A   Yes, we went through quite a few alternatives.

22  Q   Moving forward to Page 9, line 22, the defendant

23  says:

24      "What about the private sector?  How important

25      would that be?  Can he put something together

1    there?"

2    And you say:

3    "Help you get something in the private sector?"

4    And at line 27 he says:

5    "Something big."

6       What did you understand the defendant to be

7 saying there?

8 A  He was introducing a new possibility in the

9 potential negotiations where if he were told no on

10 federal appointed office, including ambassadorships,

11 that perhaps president-elect Obama could help the

12 governor secure a position in the private sector in

13 exchange for his appointing Valerie Jarrett, a

14 position that would satisfy the governor's

15 interests.

16 Q  And at line 29 you say:

17   "I don't, I don't see how."

18   The defendant says:

19   "No."

20     And then going on Page 10, at line 1, you

21 say:

22   "He gets a board directors.  I mean he can

23   probably get you on a board, or boards.  You

24   know, have influence there."

25   And then moving down to line 22, Page 10, you

Harris - direct by Hamilton                    1387

1    say:
2    "Like when Elizabeth Dole was head of the Red
3    Cross."
4    And the defendant says:
5    "That's what, that's, that's something like
6    that.  Right."
7    And you say:
8    "Something like that."
9    And he says:
10   "Right.  How do we do homework on that?"  And
11   you say:
12   "We'll start, start looking at all these
13   foundations."
14   And he says:
15   "Do it right away, will you?"
16       What did you understand the defendant to be
17   saying there?
18   A  He wanted me to begin research on potential
19   positions in the private sector, including private
20   foundations for his consideration and potential
21   request as part of these negotiations in making
22   Valerie Jarrett the senator.
23   Q  On Page 11, at the top, line 1, the defendant
24   says:
25   "See what they pay."

1    And what did you understand him to be saying

2 there?

3 A   That part of our research should include the

4 compensation paid for various positions in these

5 foundations.

6 Q   On Page 11, line 22 -- or, sorry, starting at

7 line 4 you say:

8    "The middle of road kind of, it's, it's more

9     philosophical than, you know, I want somebody

10     at the head of this organization and yeah,

11     yeah, I helped, I recommended him whatever.  It

12     doesn't have to be, I gave it to him, it's I

13     recommended him, it's got a buffer there.

14     Because he can impress upon the board."

15    And then the defendant says:

16    "And then I can be out there advocating like

17     healthcare, things like that."

18      What did you understand the defendant to be

19 saying?

20 A   He was discussing the advantages of that type of

21 position as part of his argument for helping and

22 securing that type of position, he would be out

23 there advocating healthcare expansion.

24 Q   And at line 22 you say:

25    "I mean it's gotta be a group that is dependent

Harris - direct by Hamilton                    1389

1    on Obama, you know heavy federal reliance."
2    On line 31 the defendant says:
3    "You're thinking right here, look into all of
4    them, get me something that would be -- what's
5    Family USA, what is that?"
6        What did you understand the defendant to be
7 saying to you?
8 A  He was directing me to do more research on this
9 possibility for his consideration in his
10 negotiations.
11 Q  And on Page 12, line 1, you say:
12    "Yeah, I don't know, I don't know who they are
13    or what they are and that kind of stuff, but
14    I'm sure the CEO positions pay, right, of those
15    foundations."
16    And at line 6 the defendant says:
17    "Should I have Greenlee look this up or you
18    wanna do it."
19        What did you understand the defendant to be
20 asking there?
21 A  He was asking me how I was going to go about the
22 research and he was suggesting that perhaps his
23 Deputy Governor, Bob Greenlee, who was more versed
24 in this area, should be the one doing the research.
25 Q  And you say:

1      "I was going to go to Greenlee's people since
2       they know all these foundations, if you want to
3       talk to him about it."
4      And the defendant says:
5      "But I don't want this spreading around."
6          What is your understanding he was saying
7  there?
8  A  He understood that Greenlee should be involved
9  but that he didn't want anyone else involved.  He
10 didn't want it to be known that he was considering
11 leaving.
12 Q  And on Page 13, line 1, the defendant says:
13     "Okay, fine, that's good, you can't do it, I get
14      it.  So can Greenlee do it, maybe Greenlee can
15      do it."
16     At line 15 he says:
17     "Can you, ah, call, get him on the phone and
18      conference him in?"
19         After this phone call, did you, in fact,
20 conference Bob Greenlee into the discussion?
21 A  Yes.
22 Q  And did you have a call with the defendant and
23 Mr. Greenlee shortly after this phone call?
24 A  Yes.
25 Q  Prior to having that call, did you meet with

1  Mr. Greenlee and relate to him, generally, the

2  conversation that you had had with the defendant?

3  A  Yes.

4        MS. HAMILTON:  Your Honor, at this time I was

5  going to ask permission to publish call 263 behind

6  tab 15.  I can tell you how long it is.

7        THE COURT:  Yeah.

8     (Brief pause).

9        MS. HAMILTON:  It's approximately 10 and a

10  half minutes.

11        THE COURT:  You can play it.

12     (Tape played)

13        THE COURT:  We're going to stop now.  9:30

14  tomorrow morning.

15        THE MARSHAL:  All rise.

16     (The following proceedings were had out of the

17      presence of the jury in open court:)

18        THE COURT:  You may step down.

19        (Witness temporarily excused.)

20        THE COURT:  You may be seated in the

21  courtroom, if you wish.

22        Counsel, approach the lectern.

23        (Brief pause).

24        THE COURT:  I believe that we have

25  encountered and solved most of the logistics issues,

1  the consequence is, we are actually going to make a

2  bona fide attempt to begin at 9:30 tomorrow morning,

3  I tell you this so that you know you should be here

4  so that we can at least make a good-faith effort.

5          Any last things you want to deal with?

6          MR. SCHAR:  No.

7          MR. SOROSKY:  My colleagues want to know why

8  you were looking at me when you said be on time at

9  9:30.

10          THE COURT:  It was not actually --

11          MR. SOROSKY:  I said it's from experience.

12          THE COURT:  No, no, that's totally not true.

13  That has not been my experience with you.  I

14  wouldn't say you were the most prompt lawyer, but

15  you're certainly nowhere near the bottom of the

16  list.

17          Yes?

18          MR. SCHAR:  Judge, I assume that, just like

19  the last trial, the witness exclusion is in effect.

20          THE COURT:  Yes, it is.

21          We have agents, but, otherwise, I don't think

22  we have --

23          MR. SOROSKY:  Was there any issue with it?

24          MR. SCHAR:  No.

25          THE COURT:  No.  No.  I think he just wants

1  to verify the fact that he's made the one motion

2  which I have no discretion to refuse.

3           See you tomorrow.

4

5        (Adjournment taken from 4:48 o'clock p.m. to

6         9:00 o'clock a.m. on May 4, 2011.)

Harris - direct by Hamilton                1394

1        *    *    *    *    *    *    *    *

2

3

4 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

5 FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

6                        MATTER

7

8

9   /s/Blanca I. Lara                    date

10

11

12

13

14 _____    _____

15       Blanca I. Lara                    Date

16

17

18

19

20

21

22

23

24

25