1602

```
                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
                             EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
             Plaintiff,        )
                               )
                               )
-vs-                           )   Case No. 08 CR 888
                               )
                               )   Chicago, Illinois
ROD BLAGOJEVICH,               )   May 5, 2011
                               )   2:02 p.m.
             Defendant.        )
                               )
```

VOLUME 10 PM
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL
AND A JURY

APPEARANCES:

For the Government:

    THE HONORABLE PATRICK J. FITZGERALD,
    UNITED STATES ATTORNEY
    BY:  Reid J. Schar
         Carrie E. Hamilton
         Christopher Niewoehner
    219 S. Dearborn Street
    Suite 500
    Chicago, IL 60604


Court Reporter:

    KATHLEEN M. FENNELL, CSR, RMR, FCRR
    Official Court Reporter
    United States District Court
    219 South Dearborn Street, Suite 2144-A
    Chicago, Illinois 60604
    Telephone: (312) 435-5569
    www.Kathyfennell.com

APPEARANCES: (Continued)

For Defendant Rod Blagojevich:

    KAPLAN & SOROSKY
    BY:  Sheldon M. Sorosky
    158 West Erie
    Chicago, Illinois  60610
    (312) 640-1776

    OFFICES OF AARON B. GOLDSTEIN
    BY:  Aaron Benjamin Goldstein
    6133 South Ellis
    Chicago, Illinois  60637
    (773) 752-6950

    OFFICES OF LAUREN FAUST KAESEBERG
    BY:  Lauren Faust Kaeseberg
    2140 N. Lincoln Park West
    Suite 307
    Chicago, IL  60614
    (773) 517-0622

    LAW OFFICE OF ELLIOTT RIEBMAN
    BY:  Elliott Riebman
    158 West Erie
    Chicago, Illinois  60610
    (847) 814-2900

1  (Proceedings heard in open court; jury in:)
2  THE COURT: Please be seated.
3  You may resume.
4  MS. HAMILTON: Thank you, your Honor.
5  JOHN HARRIS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,
6  DIRECT EXAMINATION (RESUMED)
7  BY MS. HAMILTON:
8  Q. Mr. Harris, before the break, we had played the call
9  behind Tab 66, is that correct?
10 A. Yes.
11 Q. Would you please go to Page 1 of that transcript. What's
12 the date and time of this call?
13 A. 11:23 a.m. on December 4th, 2008.
14 Q. Directing your attention to Line 3, defendant says, "All
15 right, so I'm war gamin' with Fred a little bit."
16 Who did you understand him to be referring to?
17 A. Mr. Fred Yang, his political pollster and consultant.
18 Q. Goes on, "I'm honestly going to objectively look at the
19 value of putting Jesse, Jr. there, as ridiculous as it is and
20 as painful and as offensive as it is." He goes on: "I'm
21 gonna think about it."
22 What did you understand him to be saying?
23 A. He's telling me he's now considering Jesse Jackson, Jr.
24 for the Senate seat.
25 Q. He goes on, "I mean, if I'm prepared to put Lisa Madigan

1 there and that doesn't work out, the fallback is, okay, well,
2 what's your next play? I mean there's, you know, if you can
3 cut a deal with the Jacksons that you can believe that
4 includes Meeks, no income tax Meeks, you know, doesn't run,
5 you know, we talk about running for a third term, but, you
6 know, even though I don't see that, I don't know. You know
7 what I'm saying?"
8     What did you understand him to be saying?
9 A. I understood him to begin to be -- beginning to explain to
10 me his rationale for reconsidering Jesse Jackson, Jr. These
11 are among the list of things that I had argued on behalf of
12 Jesse Jackson, Jr. the week before or a few days before.
13 Q. And when he says, "If I'm prepared to put Lisa Madigan
14 there and that doesn't work out," okay, at this point,
15 December the 4th, what was your understanding as to what, if
16 anything, was happening with respect to Lisa Madigan and the
17 Senate seat?
18 A. Nothing other than preparing a list of legislative items
19 that may be used in a negotiation with her father, the
20 Speaker, to reach an agreement for certain legislation to pass
21 as part of a deal to make Lisa Madigan the Senate seat.
22 Q. When you say -- you mentioned this list. Is this an
23 internal list?
24 A. Yes, an internal list.
25 Q. Was it your understanding that anything had happened

1 outside of that?
2 A. Nothing had happened outside of that to my knowledge.
3 Q. At Line 23, the defendant says, "The whole black politics
4 kind of thing, I've got the uber African-American with Jesse,
5 Jr. I'm gonna begin for the first time to objectively,
6 honestly consider him because I've dismissed him all along
7 and --" over on to Page 2, "-- I've, almost one tactical
8 mistake I've made is I've dismissed him too early on to some
9 people, like reassuring Balanoff. You know what I'm saying."
10 What did you understand him to be saying?
11 A. That he thought it was a mistake on his part to have told
12 people that he was not considering Jesse Jackson, Jr., and
13 among them Tom Balanoff, the SEIU vice president whom he told
14 early on he would not consider Jesse Jackson, Jr.
15 Q. Based on what he said, what did you understand he meant by
16 it being a tactical mistake?
17 A. In terms of potential discussions with others that -- to
18 make Jesse, Jr. a real threat to others who might be seeking
19 the seat and how he might use that threat to his advantage.
20 Q. At Line 7, you say: "Well, I mean, you'd have to meet
21 with Jesse. Jesse's going to tell you --" and at Line 9 the
22 defendant interrupts you and says, "I'm setting it up for
23 Monday."
24 What did you understand him to be telling you?
25 A. That he had already taken steps to advance this

1  possibility by trying to schedule Jesse Jackson, Jr. to meet
2  with the governor as early as the coming Monday.
3  Q. Prior to this phone call, did you know anything about
4  that?
5  A. No.
6  Q. You say, "Jesse's gonna tell you, you know what, I
7  apologize for some of the things I've done. He'll say it
8  privately, not publicly. He'll tell you that I shouldn't have
9  listened to my father and some of these other advisors."
10         What were you referring to there?
11 A. I was giving him my idea, my notion of what Jesse Jackson,
12 Jr. would say at a meeting with the governor.
13 Q. And when you're talking -- when you're saying "I shouldn't
14 have listened to my father," what specifically were you
15 referring to?
16 A. The governor had expressed to me his -- part of his
17 dislike and disapproval of Jesse Jackson, Jr. was the fact
18 that Jesse Jackson, Jr. had originally promised to endorse the
19 governor in his first election effort for governor during the
20 primary, and when Roland Burris entered the primary race for
21 governor, Jesse Jackson, Jr. endorsed Roland Burris, much --
22 did so much at the behest of his father, the Reverend Jesse
23 Jackson.
24 Q. At Line 17, the defendant says, "Well, he's come to me
25 with -- through third parties, you know, with offers of

1  campaign contributions and help."
2  You say: "Right."
3  And he goes on to say, "You know what I mean.
4  1.5 million they -- they're throwing numbers around."
5  What did you understand the defendant to be saying
6  there?
7  A. That he had been approached by others on behalf of Jesse
8  Jackson, Jr. with an offer of as much as $1.5 million to the
9  governor's campaign fund in an effort to get Jesse Jackson,
10 Jr. selected for the Senate seat.
11 Q. Prior to this phone call, did you have any knowledge of
12 that?
13 A. No.
14 Q. At line 24, you say, "Right," and say, "Well I mean --
15 that's not the factor, but I'm saying the Balanoff thing you
16 can always -- I think you can always repair that," and you go
17 on "issue with Balanoff."
18 What were you saying there?
19 A. That the campaign contributions should not be a factor in
20 his decision and that his earlier expressed concern about
21 reassuring Tom Balanoff that he wouldn't consider Jesse
22 Jackson is something I think he could overcome.
23 Q. At Line 32, the defendant says, "I'm gonna say, look,
24 these people -- there was nothing in it for Illinois.  The
25 Obama pick, people are pigs.  Ain't giving us anything, okay,

1  and f'ing Madigan wasn't for anything.  I couldn't get it done
2  with Madigan, painful as that is, so what the F."
3        What did you understand the defendant to be saying
4  there?
5  A.  That he would explain to those people that he had
6  earlier -- to whom he had earlier represented he would not
7  consider Jesse Jackson, Jr., that he is considering Jesse
8  Jackson, Jr. because his efforts to deal with the Obama
9  administration were not working out and that any effort to try
10 to work something out with Speaker Madigan was also not
11 working out.
12 Q.  All right.  And just to be clear, when he says, "There was
13 nothing in it for Illinois.  The Obama pick, people are pigs,"
14 did you have any knowledge that the defendant had ever asked
15 the Obama people for anything for Illinois in exchange for the
16 Senate seat?
17 A.  No knowledge.
18 Q.  And with respect to what he said on Page 3 with not being
19 able to get anything done with Madigan, did you have any
20 knowledge at this point that anything had been done to try to
21 do anything with Madigan to get a deal done for Illinois?
22 A.  I was not aware of any attempt to try to get anything
23 done.
24 Q.  He goes on at Line 8, "You know, that -- that -- you know,
25 if that's the case, then why should I be anything but f'ing

1 strengthen, you know, my position with my base. I mean among
2 blacks, that will be the best pick, won't it?"
3    What did you understand him to be saying there?
4 A. That there was some political benefit for him to select
5 Jesse Jackson, Jr. among his black base.
6 Q. At Line 22, you say, "I put him at the same level as maybe
7 a tier above a Cheryle Jackson, a Will Burns."
8    Who was Cheryle Jackson?
9 A. Cheryle Jackson was then the president of Chicago Urban
10 League, but previously served as the governor's communications
11 director. And Will Burns was an aide to then Senate president
12 Emil Jones and was running to fill a Senate seat.
13 Q. At Line 25, the defendant says, "Cheryle Jackson's an
14 f'ing -- there's no f'ing way."
15 A. I should say Will Burns was running to fill a state Senate
16 seat, not a U.S. Senate seat.
17 Q. "She's so f'ing incompetent and a f'ing liar. She bounced
18 a check. Forget about it, don't -- don't put her in there,
19 talking about her profile."
20    What did you understand the defendant to be saying
21 there?
22 A. He was telling me not to raise her name again. He
23 disliked her, and one of the reasons for that was the fact
24 that she had given him a campaign contribution in check form
25 that had bounced.

1  Q. Over on Page 4, at Line 17, the defendant says, "Hey, do
2  me a favor, don't even mention Cheryl. Just get her out of
3  there."
4        He goes on at Line 20, "But, you know, say Jackie
5  Collins or somebody. Don't give me Cheryl."
6        And you say: "Uh," at Line 24, "All right, Melanie
7  Spann-Cooper."
8        And the defendant says, "Good, that's my man."
9        You say, "All right."
10       He says, "That's my man."
11       What did you understand the defendant to be saying to
12 you there?
13 A. Not to mention Cheryle's name again, and it was okay --
14 Q. And with respect to your suggestion of Melanie
15 Spann-Cooper?
16 A. I was bringing the name up of another person, successful
17 African-American businesswoman named Melanie Spann-Cooper.
18 Q. And then you say at Line 28, "Well, when I mentioned Jesse
19 the other day, when I was trying to take an objective look at
20 it, you were, like, no f'ing way, rah, rah."
21       What are you referring to there?
22 A. While I thought there was some merit to considering
23 Cheryle Jackson, the governor had, as in this conversation,
24 told me in very strong terms not to mention her again, and I
25 was simply reminding him that a few days ago, I had advocated

1 on behalf of Jesse Jackson, Jr. what I thought was an
2 objective analysis of his strengths and why we should consider
3 him, and he similarly shut me down then in strong terms.
4 Q. At the top of Page 5, the defendant says, "She bounced a
5 check to me. She won't f'ing make it good."
6 What did you understand him to be saying?
7 A. Again, I think he was referring to the campaign check and
8 his efforts to try to get her to make the check good.
9 Q. With respect to Cheryle Jackson?
10 A. Yes.
11 Q. At Line 3, you say, "When I mentioned Jesse, you were --
12 you were all on me when I mentioned Jesse --"
13 And Line 7, the defendant says, "I know."
14 You say, "-- last week."
15 He says, "I know."
16 You say, "And I was just trying to be objective."
17 And at Line 11, he says, "Well, I know. And you
18 know, I checked myself and at some point I gotta say, hey,
19 wait a minute. You know, I can't let my emotions preclude me
20 from at least trying to dispassionately think through the
21 value of Jesse."
22 Between the time that you had the conversation with
23 him the week prior in which he dismissed the points you were
24 making about Congressman Jackson and this phone call, were you
25 aware of anything that had changed with respect to Congressman

1 Jackson?

2 A. No, I was not.

3 Q. Is there anything in this phone call that was a new factor
4 that you weren't aware of the week before?

5 A. The specific amount of campaign contributions that were
6 being suggested or offered to the governor.

7 Q. In exchange for Congressman Jackson?

8 A. Yes.

9 Q. On page 6, at the end of -- starting at the end of
10 Line 24, the defendant says, "They gave us a black candidate
11 and a bunch of whites. If it's a real black candidate, that's
12 one thing. If it's not, that's another, right?"

13     What did you understand him to be saying there?

14 A. I believe he was referring back to the list of acceptable
15 candidates that Rahm Emanuel had told me about the week
16 before, including Jesse Jackson, Jr., Tammy Duckworth, Jan
17 Schakowsky and Dan Hines.

18 Q. And over on to Page 7, at Line 28, the defendant says,
19 "When you calling Rahm?"

20     You say, "I got a call in to him already."

21     And he says, "Good."

22     Why is it that you would put a call in to -- had you
23 put a call in to Mr. Emanuel?

24 A. Yes, I had.

25 Q. And why?

1  A.  The governor had directed me earlier to verify with
2  Mr. Emanuel whether Jesse Jackson, Jr. was still considered
3  acceptable to the president-elect.
4       MS. HAMILTON:  May I have one minute?
5       THE COURT:  Yes.
6    (Counsel conferring.)
7       MS. HAMILTON:  Judge, I have no further questions at
8  this time.
9       THE COURT:  Okay.  Let's send the jury out.  I need
10 to confer with counsel.
11      COURT SECURITY OFFICER:  All rise.
12   (Jury exits courtroom.)
13      THE COURT:  Counsel approach the lectern.
14      Mr. Sorosky, since we no longer are at sidebar, and
15 there's no need to be at sidebar --
16      MR. SOROSKY:  Right.
17      THE COURT:  -- you can start where you started at
18 sidebar.
19      MR. SOROSKY:  Your Honor, because Mr. Goldstein is
20 sick, we'd ask if we could recommence on Monday.  It might be
21 a good time to break.
22      THE COURT:  And you are doing this because
23 Mr. Goldstein is under the weather.
24      MR. SOROSKY:  He's sick.
25      THE COURT:  Sick.

1  MR. SOROSKY: Sick, and he is going to cross-examine
2  Mr. Harris.
3  THE COURT: Right.
4  And having looked at Mr. Goldstein, I'm inclined to
5  believe you.
6  MR. SOROSKY: No, he is sick. He couldn't even be
7  here this afternoon.
8  THE COURT: And I'd asked the government if there was
9  possibly something they could fill in at the last minute,
10 since the government found this out at the sidebar, and the
11 answer is?
12 MR. SCHAR: Judge, we could put together probably
13 five or ten minutes of testimony at best. It would be
14 slightly out of order. So our preference is, since it won't
15 be substantial, to not do that if it's okay with your Honor.
16 THE COURT: I think it's okay. What I'm going to
17 tell the jury is that a lawyer who was scheduled to play a
18 significant role in the next phase is ill, since I operate on
19 the premise it's always nicer to tell the jury the truth.
20 MR. SOROSKY: Absolutely.
21 THE COURT: And then I'm not too disturbed by this
22 because this was the first week. There's always a certain
23 amount of adjustment with the jury as time goes on, and
24 usually by the end of the week, we've had 18 strangers begin
25 to coalesce as a group, and I see that happening with this

1 jury.

2 So I'm simply going to tell them that we'll have a
3 fuller week next week, and I'm going to let them go home
4 early.

5 I will inform you in the unlikely event that they
6 start pounding on tables and saying, no, they don't want to go
7 home, but I don't think that's likely to happen.

8 MR. SOROSKY: I would guess that will not happen.

9 THE COURT: Right. See you at 9:30 Monday morning.

10 MR. SCHAR: Thank you, Judge.

11 MS. HAMILTON: Thank you.

12 (Court adjourned, to reconvene at 9:30 a.m. on 5-9-11.)

13 CERTIFICATE

14 I certify that the foregoing is a correct transcript from
15 the record of proceedings in the above-entitled matter.

16 */s/Kathleen M. Fennell*

17 _____

18 *Kathleen M. Fennell*
*Official Court Reporter*