1617

1           IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4            Government,             )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   May 9, 2011
                                     )
7            Defendant.              )   9:53 o'clock a.m.

8
                          VOLUME 11
9                TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
10                     AND A JURY

11
    For the Government:
12
               THE HONORABLE PATRICK J. FITZGERALD,
13             UNITED STATES ATTORNEY
               BY:  Reid J. Schar
14                  Carrie E. Hamilton
                    Christopher Niewoehner
15             Assistant United States Attorneys
               219 South Dearborn Street;
16             Suite 500
               Chicago, Illinois 60604
17

18  Court Reporter:

19             Blanca I. Lara, CSR, RPR
               219 South Dearborn Street
20                    Room 2504
               Chicago, Illinois 60604
21                 (312) 435-5895

22

23

24

25

1618

1   APPEARANCES   (continued:)

2

3   For Defendant Rod Blagojevich:

4           KAPLAN & SOROSKY
            BY:  Sheldon M. Sorosky
5           158 West Erie
            Chicago, Illinois 60610
6           (312) 640-1776

7
            LAW OFFICE OF Elliott Riebman
8           BY:  Elliott Riebman
            158 East Erie
9           Chicago, Illinois 60610
            (847) 814-2900
10

11
            OFFICES OF AARON B. GOLDSTEIN
12          BY:  Aaron Benjamin Goldstein
            6133 South Ellis
13          Chicago, Illinois 60637
            (773) 752-6950
14

15          OFFICES OF LAUREN FAUST KAESEBERG
            BY:  Lauren Faust Kaeseberg
16          2140 N. Lincoln Park West
            Suite 307
17          Chicago, Illinois 60614
            (773) 517-0622
18

19

20

21

22

23

24

25

1619

```
1                    INDEX OF EXAMINATION
2    WITNESS                                      PAGE
3     JOHN HARRIS
4     Cross Examination By Mr. Goldstein............... 1620
5     JOHN HARRIS
6     Cross Examination (Resumed) By Mr. Goldstein..... 1719
7     THOMAS BALANOFF
8     Direct Examination By Mr. Schar.................. 1767
9     Cross Examination By Mr. Goldstein.............. 1807
10
11
12   EXHIBITS
13    ...............................................
14
15
16
17
18
19
20
21
22
23
24
25
```

1              THE MARSHAL:  All rise.

2          (The following proceedings were had in the

3           presence of the jury in open court:)

4              THE COURT:  Please be seated.

5              Are you tendering the witness?

6              MS. HAMILTON:  Yes, Your Honor.

7      JOHN HARRIS, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8                    CROSS EXAMINATION

9  BY MR. GOLDSTEIN:

10  Q   Good morning, Mr. Harris.

11  A   Good morning.

12  Q   Can you hear me okay?

13  A   I can hear you fine.  Thank you.

14  Q   Okay.  Please forgive me if I'm coughing

15  uncontrollably.  I apologize.

16          Have you and I ever met?

17  A   No, sir.

18  Q   My name is Aaron Goldstein.  I represent Rod

19  Blagojevich.

20          Are you aware that I requested to speak to

21  you about this case?

22  A   Yes, sir.

23  Q   Have you and I spoke about this case at all?

24  A   No, sir.

25  Q   You have an agreement in exchange for your

1  testimony with the government, is that correct?

2  A  Yes.

3  Q  And you and I don't have an agreement in exchange

4  for you're the testimony, is that correct?

5  A  Correct.

6  Q  And you were arrested on December 9th of 2008, is

7  that correct?

8  A  The correct.

9  Q  And when you were arrested, the FBI spoke to you

10 on that day, on the 9th, is that correct?

11 A  Yes.

12 Q  And one of the first things you did when you

13 spoke to the FBI was, you lied to them, is that

14 correct?

15 A  I'm not sure what you're referring to.

16 Q  Well, the FBI came and spoke to you, right?

17 A  (No response.)

18 Q  Is that right?

19 A  Yes.  They came to my home, yes.

20 Q  They came to your home at about 6:00 o'clock in

21 the morning, right?

22 A  Yes.

23 Q  Did they put you in handcuffs?

24 A  As I left, yes.

25 Q  Okay.  And then they took to the processing

1  center?

2  A  Yes.

3  Q  And then they sat you down and spoke to you, is
4  that right?

:04AM  5  A  Yes.

6  Q  And asked you a few questions, is that correct?

7  A  Yes.

8  Q  And they asked you questions about the senate
9  seat?

:04AM  10  A  Yes.

11  Q  And you told them certain things so that you
12  didn't have to give them any answers, is that
13  correct?

14  A  Yes.

:04AM  15  Q  You lied to them?

16  A  If you can tell me what you're referring to, I
17  can respond more accurately.

18       MR. GOLDSTEIN:  Your Honor, may we have a
19  brief sidebar?  I don't want to violate any rules
:04AM  20  that we discussed.

21       THE COURT:  Sure.

22     (Proceedings heard at sidebar on the record.)

23       MR. GOLDSTEIN:  Your Honor, this issue of
24  special counsel, I don't want to raise it because as
:11AM  25  the government said he basically lied.  I just want

1  to get out the fact that he lied to the FBI.

2      THE COURT:  About what.

3      MR. GOLDSTEIN:  Saying that he was special

4  counsel to the governor.

5      THE COURT:  Okay.

6      MR. GOLDSTEIN:  And I don't want to raise

7  it --

8      THE COURT:  And he wasn't?

9      MR. GOLDSTEIN:  Correct.

10      THE COURT:  Okay.

11      MS. HAMILTON:  I think that may be the issue

12  is, have you been asked something like in an effort

13  to not -- in an effort to not have to answer any

14  questions, you claimed something that, in fact, was

15  a lie, or something like that.

16      MR. GOLDSTEIN:  That's fine.

17      MS. HAMILTON:  That might help.

18      THE COURT:  That's probably better.

19      MR. GOLDSTEIN:  I just didn't want --

20      THE COURT:  No, that's fine.

21      (Proceedings resumed within the hearing of the

22      jury.)

23  BY MR. GOLDSTEIN:

24  Q  Sorry about that, Mr. Harris.

25  A  No problem.

1  Q   On December 9th when the FBI spoke to you, in an
2  effort to stop talking to them, you claimed
3  something that was not true, that was a lie, is that
4  correct?
:06AM  5  A   Correct.
6  Q   So that basically the first communication you had
7  with the FBI was a lie, is that correct?
8  A   About 30 minutes into our meeting.
9  Q   30 minutes into your meeting.
:06AM  10       And you had never spoken with the FBI --
11  strike that.
12       After you were arrested, that was the first
13  you spoke to them, is that correct?
14  A   That's correct.
:06AM  15  Q   So 30 minutes into it, you lied?
16  A   Yes.
17  Q   Have you ever been charged with that lie?
18  A   No.
19  Q   Now, from the day you were arrested,
:06AM  20  December 9th, 2008, to approximately April of 2010,
21  you spoke to the government about 31 times, is that
22  correct?
23  A   That sounds about right.
24  Q   And since April of 2010, you continued to speak
:07AM  25  to the government, is that correct?

1  A   Yes.

2  Q   And that includes the U.S. Attorneys?

3  A   Yes.

4  Q   And the FBI agents, is that correct?

:07AM  5  A   Yes.

6  Q   And any other federal agencies you spoke to?

7  A   No.

8  Q   Just FBI?

9  A   I'm not sure if there were from other branches of

:07AM  10  the federal government, but I understood them to be

11  agents.

12  Q   I understand.

13      And since April of 2010, how many times have

14  you spoken to the FBI and/or the U.S. Attorney's

:07AM  15  Office?

16  A   A dozen or more.

17  Q   A dozen or more?

18  A   Yes.

19  Q   Okay.  And you've been speaking to them all the

:07AM  20  way up to today, is that correct?

21  A   That's correct.

22  Q   Did you speak to them over the weekend?

23  A   No, sir.

24  Q   And while you testified last week, you were

:07AM  25  speaking to them, is that correct?

1   A   Yes.

2   Q   In fact, like when there was a break, you'd go

3   into that room right across the courtroom, is that

4   correct?

5   A   Yes; the witness room.

6   Q   And you would sit with your attorney, correct?

7   A   Yes.

8   Q   And the agents and/or the U.S. Attorneys would

9   come and speak to you some more?

10  A   Yes.

11  Q   And they'd buy you lunch and have lunch and talk

12  about your testimony?

13  A   My attorney would buy me lunch.

14  Q   Oh, okay.  That's good.

15      Now, during your discussions, you were

16  talking about your testimony, is that correct?

17  A   Yes.

18  Q   And this is from December '08 all the way to last

19  week, is that correct?

20  A   Yes.

21  Q   Now, it's fair to say that you have a

22  relationship with the government for now about 2 and

23  a half years, is that correct?

24  A   I've been talking to them for about 2 and a half

25  years, yes.

1  Q   Is it fair to say cooperating?

2  A   Yes; very much so.

3  Q   And the relationship you have with them is about

4  as long as the relationship you had with Rod, is

5  that correct?

6  A   Well, I believe the nature of the relationship is

7  very different.

8  Q   How?

9  A   I worked for the governor, was close to the

10  governor.

11  Q   What's your relationship to you?

12  A   My relationship to them is, pursuant to our plea

13  agreement where I agree to cooperate fully with them

14  in all my meetings with them are pursuant to that

15  agreement.

16  Q   Okay.  Let's talk about your agreement.

17       This agreement was signed by you May 14th,

18  2010, is that correct?

19  A   I don't recall the specific date.

20  Q   Could I show you the copy of the agreement?

21  A   If you would, please.

22       MR. GOLDSTEIN:  May I approach, Your Honor?

23       THE COURT:  You may.

24  BY MR. GOLDSTEIN:

25  Q   Let me show you Defendant's Exhibit John Harris

1 Plea Agreement, May 14, 2010.

2        Do you recognize that document?

3 A  Yes, I do.

4 Q  What is that document?

:10AM  5 A  It's the plea agreement with the government

6 between myself and the government.

7 Q  Okay.  And in that plea agreement, it details

8 basically your duties under this agreement, correct?

9 A  Correct.

:10AM  10 Q  You can hold on to that.

11        Now, the sentencing guidelines, as indicated

12 in your plea agreement, requires that you be

13 sentenced within 70 and 87 months, is that correct?

14 A  Yes.

:10AM  15 Q  And that's on Page 16 under paragraph D, it says:

16    "Anticipated advisory sentencing guidelines

17    range."

18 A  Yes.

19 Q  Okay.  But as you understand it, if you

:11AM  20 cooperate, the government will move for what's

21 called a downward departure, is that correct?

22 A  Yes.

23 Q  Okay.  And you have to be truthful in order to

24 get that downward departure, right?

:11AM  25 A  Yes.

1  Q   Now, it's the government that assesses whether
2  you're truthful or not, is that correct?
3  A   The government and then ultimately the judge.
4  Q   Who is the one that has to move for a downward
5  departure?
6  A   The government.
7  Q   Okay.  So if the government doesn't move for a
8  downward departure, your range is still 70 to
9  87 months, is that correct, as you understand it?
10 A   That's correct.
11 Q   Okay.  And the downward departure gets you to
12 half of that, is that correct?
13 A   Yes.
14 Q   So when we talked about your range, your
15 proximate range right now is 35 months if you
16 cooperate fully with the government, is that
17 correct?
18 A   Yes.
19 Q   And that only happens if they move for this
20 downward departure?
21 A   Yes.
22 Q   And they only move for a downward departure if
23 they, in their estimation, believe that you're
24 cooperating fully and truthfully?
25        MS. HAMILTON:  Objection.

:11AM
:11AM
:11AM
:12AM
:12AM

1        THE COURT:  The objection is sustained.

2   BY MR. GOLDSTEIN:

3   Q   Now, that plea agreement, that was signed by you,

4   right?

:12AM    5   A   Yes.

6   Q   And your lawyer?

7   A   Yes.

8   Q   And Ms. Hamilton, is that correct?

9   A   Yes.

:12AM   10   Q   As well as Mr. Fitzgerald, is that correct?

11   A   Or somebody for him, yes.

12   Q   Okay.  And you understand the government to be

13   Ms. Hamilton, and Mr. Fitzgerald, and all these

14   people at this table (indicating, is that correct?

:12AM   15   A   That's correct.

16   Q   Now, this downward departure, as we've talked

17   about the government's role in that, I have no say

18   in the downward departure, is that correct?

19   A   I believe that's correct.

:13AM   20   Q   Okay.  And the jury has no say, is that correct?

21   A   That's correct.

22        MS. HAMILTON:  Objection.

23        THE COURT:  The objection is sustained.

24   BY MR. GOLDSTEIN:

:13AM   25   Q   Now, Paragraph 11 of the plea deal, it's on

Page 17.
         Are you there?
A   Yes.
Q   Okay.  On Paragraph 11, on the last sentence, it
indicates that "the defendant," which is you,
"agrees to the postponement of the sentencing until
after the conclusion of his cooperation," is that
correct?
A   That's correct.
Q   It's your understanding that your cooperation has
not concluded, is that correct?
A   That's correct.
Q   Do you know when your cooperation will conclude?
A   I believe at the end of the disposition of this
case.
Q   As soon as something happens with
Mr. Blagojevich, that's when your cooperation ends?
         MS. HAMILTON:  Objection.
         THE COURT:  Sustained.
BY MR. GOLDSTEIN:
Q   And you agree to postpone it until then, is that
correct?
A   Yes.
Q   And you've been cooperating since late '08, is
that correct?

1  A  Yes.

2  Q  Okay.  Now, you understand that part of your

3  cooperation is your testimony here, is that correct?

4  A  Yes.

:14AM  5  Q  And that is, as you understand it, what will

6  determine the government's understanding of whether

7  you've been fully cooperative, is that correct?

8  A  Yes.

9  Q  Now, you said that you're a second year

:14AM  10  electrician, is that correct?

11  A  Apprentice electrician, yes.

12  Q  What exactly do you do?

13  A  I work for an electrical contracting company and

14  my duties include installation of electrical service

:15AM  15  and distribution service, as well as office work

16  from time to time, I also go to school, apprentice

17  school one night a week.

18  Q  And the reason why you got that job is to provide

19  for your family, is that correct?

:15AM  20  A  That's correct.

21  Q  And you'd do anything for your family?

22       MS. HAMILTON:  Objection.

23       THE COURT:  The objection is sustained.

24  BY MR. GOLDSTEIN:

:15AM  25  Q  Well, you do what's best for your family in

1  reference to this legal situation, is that correct?
2          MS. HAMILTON:  Objection.
3          THE COURT:  Sustained.
4  BY MR. GOLDSTEIN:
5  Q   You indicated that your attorneys are allowed to
6  argue for probation, is that correct?
7  A   Yes.
8  Q   Okay.  And probation would mean that you don't go
9  to jail?
10 A   Yes.
11 Q   And so basically if you get probation, you would
12 have freedom, is that fair to say?
13         MS. HAMILTON:  Objection.
14         THE COURT:  It's really a legal question.
15         MS. HAMILTON:  I'll rephrase.
16         THE COURT:  I'm sustaining the objection.
17 BY MR. GOLDSTEIN:
18 Q   If you would get probation, you would not be
19 incarcerated, is that correct?
20 A   That's my understanding, yes.
21 Q   Okay.  And you don't want to be incarcerated?
22 A   No.
23 Q   Of course.
24         And you understand that the best chance you
25 have of not being incarcerated is to cooperate with

1  the government?

2  A   To tell the truth, to cooperate, and to

3  demonstrate to the Court what I hope and believe

4  would be a fair sentence.

5  Q   Tell the truth and cooperate, what are the

6  difference?

7  A   Well, they're one in the same.

8  Q   They're one in the same, but you separated the

9  two.

10  A   Well, the phrasing is to fully and truthfully

11  cooperate.

12  Q   Okay.  So you're saying those are the same?

13  A   Yes.

14  Q   Okay.  But it's not me that determines that, is

15  that correct?

16        MS. HAMILTON:  Objection.

17        THE COURT:  I think we've gone over this,

18  that question.  It's sustained.

19  BY MR. GOLDSTEIN:

20  Q   Now, I want to turn your attention to the school,

21  okay, the Academy For Urban School Leadership, do

22  you recall that?

23  A   I believe I referred to it as the Chicago

24  Academy.

25  Q   Chicago Academy, okay.

1        This is the school that was in Rahm Emanuel's

2  district, is that correct?

3  A   Correct.

4  Q   Now, you said that you learned about a problem

:17AM    5  with the school grant, is that correct?

6  A   That's correct.

7  Q   When did you learn about a problem with the

8  school grant?

9  A   Sometime in 2006.

:17AM   10  Q   Can you narrow it down anymore?

11  A   Not at this time, no.  I don't believe I recall

12  exactly when.  I believe it was close to the fall

13  of 2006.

14  Q   How did you learn about it?

:17AM   15  A   From Deputy Governor Bradley Tusk and also from a

16  call from staff members in Congressman Rahm

17  Emanuel's office.

18  Q   And you said that at your best guess it was near

19  the fall of 2006?

:18AM   20  A   Yes.

21  Q   How certain are you of that?

22  A   Not too certain.

23  Q   You were -- you were apprised that some or all --

24  some of the grants had been approved?

:18AM   25        What was your understanding as far as how

1 much of the grant, if all or any of it, was approved

2 at this point when you learned from Tusk and other

3 people?

4 A  It wasn't clear to me, but that there was a

5 problem with the release of the grant, some or all

6 of it.

7 Q  Okay.  So you don't even know if some or all of

8 the had grant actual gone through, isn't that

9 correct?

10 A  That's correct.

11 Q  You then went to talk to Rod, is that correct?

12 A  The governor, yes.

13 Q  When you spoke to Rod, when was this?

14     You said you have spoken to him two times, is

15 that correct?

16 A  No, more than two times.

17 Q  More than two times about the grant?

18 A  Yes.

19 Q  The first time you spoke to him about the grant,

20 when was this?

21 A  Soon after I heard about the problem.

22 Q  Do you have a date?

23 A  No.

24 Q  A month?

25 A  No.

1  Q   You had mentioned it was the fall, is that

2  correct?

3  A   To the best of my recollection, around that time,

4  yes.  Late summer or early fall.

5  Q   Late summer or early fall.

6         And when you spoke to Rod about the school,

7  there was some mention about Tusk may have committed

8  funds without the governor's approval or knowledge,

9  do you recall that?

10  A   The governor said something to me to that effect.

11  Q   Did you follow up on that specific point?

12  A   I went and investigated and found that there was

13  a grant that had been approved.  I can't tell you

14  who originally proved it.

15  Q   Okay.  Well, when you say approved, you mean the

16  funds had gone through or approved?  I'm not

17  following you.

18  A   Approved meaning there were monies set aside for

19  that particular grant recipient, for a particular

20  purpose, and that paperwork was in the system.

21  Q   Where was that money approved from?

22  A   From a grant line item in the budget for these

23  types of purposes overseeing and administered by the

24  department of Commerce and Economic Opportunity.

25  Q   And do you recall when that grant was approved?

1  A   Sometime before that.  I don't recall the date.

2  Q   Okay.  How about to the point of Tusk may have

3  committed the funds without Rod's knowledge?

4  A   That would not be evident in the paperwork.

:20AM  5  Q   Well, did you speak to Rod about that at all?

6  A   I spoke to him about the fact that Bradley Tusk

7  had approached me, told me that the governor was not

8  releasing the funds, or put a hold on the funds, and

9  I asked him about that.

:21AM  10  Q   Did Rod tell you that the money was actually held

11  up?

12  A   I don't believe he told me the money was held up,

13  he told me not to release the money.

14  Q   Okay.  Where was this conversation?

:21AM  15  A   Either on the phone or in his office.

16  Q   Did Rod tell you how the actual -- how the funds

17  were actually held up?

18          MS. HAMILTON:  Objection.

19          THE COURT:  The objection is sustained.

:21AM  20          You know, there's a certain name similarity

21  here to first names that begin with "r-o," maybe you

22  want to use some last names.

23  BY MR. GOLDSTEIN:

24  Q   When the governor talked to you this first time

:21AM  25  over the phone, you said you're not exactly sure of

1  the date, were you aware of how the money was

2  actually being held up?  Was there an order placed?

3  Was there anything in writing?

4         MS. HAMILTON:  Objection.

5         THE COURT:  The question is compound.

6  BY MR. GOLDSTEIN:

7  Q   Was there anything in writing indicating that

8  this grant was being held up?

9  A   No, I said he told me to make sure the grant

10 wasn't released.  So he would leave it to me to make

11 sure it wasn't released and the mechanism would

12 be --

13 Q   That is when spoke to him on the phone, is that

14 correct?

15 A   Or in person.  I said I didn't recall which one

16 it was.

17 Q   Okay.  When you spoke to the governor about this

18 situation and you had learned from Tusk that this

19 was possibly being held up, how did you know from

20 the governor that it was being held up other than

21 talking to him?

22 A   Because Bradley told me that the governor had put

23 a hold on the grant, that's all it takes.

24 Q   Okay.  There's no paperwork or anything to that

25 effect?

1  A   Well, it doesn't get released until Bradley or I
2  release it.
3  Q   Okay.  So Tusk wasn't releasing it?
4  A   He told me the governor had put a hold on it and
5  thus was not releasing it, asked me if I could
6  intervene.
7  Q   You said it was the Department of Commerce and
8  Economic Opportunity that was providing the grant,
9  is that correct?
10 A   Those are the -- that's the agency that
11 administers the grants.  There's other people
12 involved in the release of funds, the documenting in
13 the release of funds, maintaining the balances in
14 the grant funds, but the primary agency is the
15 Department of Commerce and Economic Opportunity
16 which we referred as to as DCEO.
17 Q   And at this point when you spoke to the governor
18 the first time, you weren't sure whether some of the
19 grant had been approved or -- as far as going
20 through or none of it was?
21 A   That's correct.
22 Q   Okay.  And to this day, you're not sure of that?
23 A   That's correct.
24 Q   Did you ask the governor why the money was being
25 held up?

1  A   I asked him whether or not he had put a hold on

2  it.  He told me, yes, he didn't want it released,

3  and that part of his explanation to me was that he

4  believes that Bradley Tusk may have committed more

5  funds or committed a grant that he was not entirely

6  aware of, "he" being the governor.

7  Q   Did the governor tell you anything about campaign

8  contributions?

9  A   No, sir.

10 Q   Now, you talked about Bradley Tusk.  He was the

11 deputy governor at this time?

12 A   Yes.

13 Q   And in 2006 Tusk eventually left the Governor's

14 Office, is that correct?

15 A   Sometime around the end of 2006, the beginning of

16 2007.

17 Q   Is it fair to say that Tusk left the office on

18 bad terms?

19         MS. HAMILTON:  Objection.

20         THE COURT:  Sustained.

21 BY MR. GOLDSTEIN:

22 Q   As you understood it, what were the circumstances

23 of Tusk leaving the Governor's office?

24         MS. HAMILTON:  Objection.

25         THE COURT:  Sustained.

1

2  BY MR. GOLDSTEIN:

3  Q   Now, you talked about the fall of '06 or maybe

4  late summer, early fall, of '0 6 that you had this

5  conversation with the governor.  You then spoke to

6  him again, is that right?

7  A   That's correct.

8  Q   When was this discussion?

9  A   Soon after the first one.  Could've been a day or

10  two after that.

11  Q   Okay.  So you're not 100 percent certain, but

12  probably in the fall sometime?

13  A   Late summer or early fall, again.

14  Q   Okay.  And the second conversation you had with

15  the governor, you talked to him more about the

16  actual grant again, is that correct?

17  A   That's correct.

18  Q   And the grant ended up after this discussion

19  going forward, it went forward, is that correct?

20  A   Yes.

21  Q   Okay.  And the money, then, went to the school,

22  is that correct?

23  A   Some or all of it.  I'm not sure how much

24  ultimately went to the school.

25  Q   Okay.  And you said that there were multiple

1  grants that had to be approved after that?

2  A   No, there was a single grant but multiple

3  releases of monies out of the grant to satisfy

4  invoices that the school either had in its

5  possession or invoices that were coming for work

6  that had already been put in place.

7  Q   Okay.

8  A   It was limited to those types of circumstances.

9  Q   And those invoices that you saw, they ended up

10  totaling about $2 million, is that correct?

11  A   I don't recall the total of the invoices.

12  Q   Okay.  Are you aware that the school ended up

13  getting all their money?

14          MS. HAMILTON:  Objection.

15          THE COURT:  The objection is sustained.

16  BY MR. GOLDSTEIN:

17  Q   Are you aware that the school actually built what

18  they wanted the grant for?

19          MS. HAMILTON:  Objection.

20          THE COURT:  Sustained.

21  BY MR. GOLDSTEIN:

22  Q   Now, you talked about that you thought it was

23  early fall.  You had, as we talked about, several

24  conversations with the FBI, is that correct?

25  A   Yes.

1  Q   And on February 20th, 2009, you spoke with the
2  government and the FBI, is that correct?
3  A   I don't recall the specific date, but there were
4  several dates that I spoke to them on.
5  Q   Okay.  And you told them that you thought the
6  grant for the charter school in Emanuel's district
7  came up during your transition with former deputy
8  governor Bradley Tusk sometime in late 2006, but
9  that it possibly could have spilled over into early
10 2007, did you tell the agents and the government
11 that?
12 A   I don't recall right now what dates I told them.
13 To the best of my recollection, it was sometime in
14 2006.
15     MR. GOLDSTEIN:  May I have a moment, Your
16 Honor?
17     THE COURT:  Yeah.
18   (Brief pause).
19     MR. GOLDSTEIN:  May I approach?
20     THE COURT:  You may.
21     MS. HAMILTON:  Your Honor, I'm going to
22 object.  I don't think this is impeaching.  He was
23 very clear that he wasn't certain of the time frame.
24     MR. GOLDSTEIN:  Could I ask him to refresh
25 his recollection?

:27AM
:27AM
:28AM
:28AM
:29AM

1       THE COURT:  You can ask him to look at it,

2   sure.

3   BY MR. GOLDSTEIN:

4   Q   Mr. Harris, I'm showing you a report of an

5   interview that you had with the federal government.

6   This indicates that it was on February 20, 2009,

7   does that refresh your recollection about when you

8   had a conversation with the FBI?

9   A   Can you please show me?  Because I see a date

10  here of March 4th.

11  Q   That was the date of the transcription, this is

12  the day of the actual interview.

13  A   I see it's February 20th on the document, yes.

14  Q   Now, if I could just turn -- sorry about that.

15      Turn to Page 13 of your interview, and I want

16  you to look at the first paragraph, right around the

17  middle, starting at "again" and I'd like you to read

18  that sentence.

19      THE COURT:  To yourself.

20  BY MR. GOLDSTEIN:

21  Q   Yes, to yourself, and see if that refreshes your

22  recollection as to when this grant issue came up.

23      (Brief pause).

24  BY THE WITNESS:

25  A   Yes.

1

2  BY MR. GOLDSTEIN:

3  Q   Now is your memory refreshed as to when this

4  issue came up?

:30AM  5         THE COURT:  Go back to the lectern.

6  BY THE WITNESS:

7  A   Sometime in late 2006.

8  BY MR. GOLDSTEIN:

9  Q   So the grant issue, now as your memory is

:30AM  10  refreshed, came up more late in 2006, is that

11  correct?

12  A   Yes.

13  Q   And that corresponds with your conversations with

14  the governor, is that correct?

:31AM  15  A   Yes.

16  Q   Now, I want to move on to another subject, and

17  that is the issue of Patti and her work, okay.

18         Do you remember testifying about that?

19  A   Yes, I do.

:31AM  20  Q   Now, basically, as I understand it, you had

21  conversations, maybe even several conversations,

22  with the governor and Patti about getting a job in

23  2008, is that fair to say?

24  A   Yes.

:31AM  25  Q   And one of the things that was motivating it, as

1 you understood it, was that the Blagojeviches were

2 having financial trouble?

3 A  Yes, that's what I would say from the governor,

4 yes.

5 Q  Okay.  And he had basically complained to you

6 about Patti not being able to get a job, is that

7 fair to say?

8 A  Not being able to get real estate business and

9 that her real estate business had been suffering.

10 Q  Now, as you knew, Patti Blagojevich was a

11 licensed realtor, is that correct?

12 A  Yes.

13 Q  And a licensed appraiser, is that correct?

14        MS. HAMILTON:  Objection; relevance.

15        MR. GOLDSTEIN:  It goes to his understanding

16 as to how her business --

17        THE COURT:  It's sustained.

18 BY MR. GOLDSTEIN:

19 Q  And you understood she had this real estate

20 business, correct?

21 A  Yes.

22 Q  And it was struggling?

23 A  Yes.

24 Q  So the governor would talk to you about if there

25 was any way she can get a job in some way, is that

1  correct?

2  A  That's correct.

3  Q  Now, you spoke about the Pollution Control Board,

4  is that correct?

:32AM  5  A  That's correct.

6  Q  Now, did the governor ever direct you to put

7  Patti on the Pollution Control Board?

8  A  No.

9  Q  Did the governor or anyone in his stead direct

:32AM  10  you to put Patti on the Pollution Control Board?

11  A  No, he simply told me to be prepared to do so.

12  Q  Okay.  And did she ever get appointed to the

13  Pollution Control Board?

14  A  No.

:33AM  15  Q  Did Patti ever get a job within the state?

16  A  No.

17  Q  Other than her duties as First Lady?

18  A  No.

19  Q  Do you know as official title, "first lady,"

:33AM  20  she's not paid for that, is that correct?

21  A  That's correct.

22  Q  There's certain obligations but there is no

23  compensation?

24  A  That's correct.

:33AM  25  Q  Now, you said you had several conversations about

1 these jobs, is that correct?

2 A   That's correct.

3 Q   And when it came to the Pollution Control Board,

4 you said, or a job with the state generally, that it

5 was a bad political idea but it was legal, is that

6 correct?

7         MS. HAMILTON:  Objection.

8         THE COURT:  The objection is sustained.

9 BY MR. GOLDSTEIN:

10 Q   Did you have any conversations about how it would

11 look, the appearance of how it would look if Patti

12 were working with the state?

13 A   I had a discussion with him about

14 Mrs. Blagojevich working for the governor on his

15 staff, that that would be problematic

16 appearance-wise, specially because we had staff

17 meetings early in the morning and late in the

18 afternoon and early evening.  He suggested to me

19 that perhaps sometime she could work from home where

20 he was at.  I told him that would be a problem.

21 Q   But appearance-wise, you meant politically how

22 the public would view this, is that correct?

23         MS. HAMILTON:  Objection.

24         THE COURT:  The objection is sustained.

25 BY MR. GOLDSTEIN:

1  Q   Did you have any concerns of how it would look as

2  far as the public's view?

3        MS. HAMILTON:  Objection.

4        THE COURT:  Sustained.

:34AM   5  BY MR. GOLDSTEIN:

6  Q   Now, you also talked about these financial

7  institutions, Citibank and Ariel Investments, is

8  that correct?

9  A   Yes.

:34AM   10  Q   And this came about because Patti received her

11  Series 7 license, is that correct?

12  A   Yes.

13  Q   And that, as I understand it, that qualified her

14  to exchange in securities, is that correct?

:35AM   15  A   I'm not sure.  I understood it involved trading

16  in securities.

17  Q   Okay.  Now, the governor asked you if you knew

18  anyone in the business community that could help

19  guide her to getting a job, is that correct?

:35AM   20  A   Yes.  Among other conversations, that was one of

21  them, yes.

22  Q   There were several conversations, is that fair?

23  A   That's correct.

24  Q   Now, one person you forwarded Patti to is Ray

:35AM   25  Kljajic, is that correct?

1  A   That's correct.

2  Q   And he worked for Citibank?

3  A   Yes.

4  Q   And they ended up -- Ray Kljajic and Patti had a

5  meeting together, to your understanding, is that

6  correct?

7  A   Correct.

8  Q   You weren't present for the meeting, is that

9  correct?

10  A   I made the introduction and left.

11  Q   Okay.  And it was your understanding that Patti

12  couldn't work for any business that did business

13  with the State of Illinois, is that correct?

14  A   I advised the governor against that.

15  Q   Well, the governor had signed an executive order

16  preventing that, isn't that correct?

17         MS. HAMILTON:  Objection.

18         THE COURT:  Sustained.

19  BY MR. GOLDSTEIN:

20  Q   The point of the meeting with Kljajic was to help

21  her direct towards finding a job, is that correct?

22  Assisting her?

23  A   Mr. Kljajic and I discussed the nature of the

24  meeting beforehand.  And I asked him if he would

25  tell her about the industry, what he's learned,

Harris - cross by Goldstein                    1652

1  about he knows about it, where potential

2  opportunities may exist, but that in the nature of

3  the work.

4  Q   Okay.  And as you understood, that was what the

5  conversation was between Patti and Kljajic, is that

6  correct?

7  A   That's what I understood, yes.

8  Q   Now, did Patti ever get a job with Citibank?

9  A   No.

10 Q   You said you had a conversation with the governor

11 where he said some things about Citibank, is that

12 correct?

13 A   Correct.

14 Q   When was this conversation?

15 A   This was sometime after the meeting with

16 Mr. Kljajic.

17 Q   And when was the meeting with Mr. Kljajic?

18 A   Sometime in spring of 2008, to the best of my

19 recollection.

20 Q   So there was a meeting with Patti and Kljajic,

21 correct?

22 A   Correct.

23 Q   And then sometime after that the governor spoke

24 to you expressing anger that he wasn't helping her,

25 is that fair to say?

1  A   He was frustrated.

2  Q   He was frustrated.

3       And you said that he made a comment that they

4  shouldn't get any work with the state, is that

:37AM  5  correct?

6  A   Not initially.  Initially, he talked to me about

7  the fact that Ray Kljajic wasn't getting back to

8  Patti and asked me to look into that.

9       I told him I understood that there was no

:38AM 10  follow-up to the meeting expected by Mr. Kljajic,

11  but I would look into it.  And after I looked into

12  it, the governor had another conversation with me

13  about it.

14  Q   Okay.  And this is, again, probably in the spring

:38AM 15  of 2008?

16  A   Spring, perhaps early summer.

17  Q   Early summer?

18  A   Spread over several weeks.

19  Q   Okay.  And that conversation, then, that I'm

:38AM 20  talking about as far as the governor told you that

21  Citibank shouldn't do any business with the state,

22  is that correct?

23  A   Shouldn't get anymore business with the state.

24  Q   Shouldn't get anymore business with the state.

:38AM 25  And you testified that you took that as a directive,

1  an order?

2  A   Yes.

3  Q   In fact, the summer of 2008, Citibank actually

4  got a multimillion dollar bond deal, is that

5  correct?

6  A   Yes.

7  Q   Patti never got a job with Ariel Investments

8  either, is that correct?

9  A   No.

10 Q   There was -- did she meet with Mr. Rogers, to

11 your knowledge?

12 A   Not to my knowledge.

13 Q   Now, you understood that Patti could've also

14 worked for the Friends of Blagojevich office, is

15 that correct?

16         MS. HAMILTON:  Objection.

17         THE COURT:  The objection is sustained.

18 BY MR. GOLDSTEIN:

19 Q   Now, I want to change subjects again.

20         You talked about a sense of urgency in

21 fundraising around late 2007, 2008, for the

22 governor?

23 A   Yes.

24 Q   Okay.  When exactly, if you can pinpoint it, when

25 this urgency came to your knowledge?

Harris - cross by Goldstein                    1655

1  A   At a meeting I was present at where the governor

2  was discussing with his counsel the invoice that was

3  going to be sent, a bill that was going to be sent

4  from the law firm representing the governor and his

5  campaign.

6  Q   And when was that meeting?

7  A   Sometime in the fall late 2007.

8  Q   Fall of 2007.

9       Okay.  And in your experience, you worked

10 under Mayor Daley, is that correct?

11      MS. HAMILTON:  Objection.

12      THE COURT:  The objection is sustained.

13 BY MR. GOLDSTEIN:

14 Q   Have you ever met a politician who didn't have a

15 sense of urgency when it came to fundraising?

16      MS. HAMILTON:  Objection.

17      THE COURT:  The objection is sustained.

18      This is not an expert witness.  If you want

19 to put an expert witness on the stand, you're

20 welcome to do that.

21 BY MR. GOLDSTEIN:

22 Q   Now, you talked about -- in 2006 the governor ran

23 for reelection, is that correct?

24 A   That's correct.

25 Q   And you talked about the war chest of the

:40AM (lines 5, 10, 15, 20, 25)

1  governor, as well as politicians in general, is that
2  correct?
3  A  That's correct.
4  Q  And you talked about how a war chest is important
5  for reelection, number one, right?
6  A  Right.
7  Q  And for signifying power to opponents or the
8  public in general, is that right?
9  A  That's fair.
10 Q  Okay.  And as you understand it, a politician
11 with basically a zero war chest has very little
12 power?
13         MS. HAMILTON:  Objection.
14         THE COURT:  Sustained.
15 BY MR. GOLDSTEIN:
16 Q  One of the big reasons that you understood there
17 was a sense of urgency was the legislature was
18 starting to discuss impeachment in '07, do you
19 recall that?
20 A  Yes.
21 Q  And a big reason this impeachment was going on is
22 because the governor was doing things to go around
23 the legislature, is that fair to say?
24         MS. HAMILTON:  Objection.
25         THE COURT:  The objection is sustained.

1

2  BY MR. GOLDSTEIN:

3  Q   Now, you talked about the ethics bill, do you

4  recall talking about that?

5  A   Yes, I do.

6  Q   And that was in 2008?

7  A   There was a version in 2007 and then it came back

8  during the legislative session of 2008.

9  Q   Okay.

10         MR. GOLDSTEIN:  Your Honor, with your

11  permission, if I could publish Government Exhibit

12  Ethics Legislation.

13      (Brief pause).

14         THE COURT:  Without objection.

15         MR. GOLDSTEIN:  Thank you.

16      (Exhibit published to the jury.)

17         MR. GOLDSTEIN:  Can everyone see that okay?

18         Could we maybe dim the lights?

19      (Brief pause).

20         MR. GOLDSTEIN:  Thank you.

21         Is that good?  Okay.

22  BY MR. GOLDSTEIN:

23  Q   Now, I'm showing you, and we're putting it on the

24  big screen here, Mr. Harris, Government Exhibit

25  Ethics Legislation.

1          Do you recall testifying about that?

2  A  I recall testifying about the ethics bill, I'm

3  not sure what this document is, though.

4  Q  Well, this is basically the bill status, it goes

5  through when it was passed, who the sponsors are,

6  and it's an eight-page document.

7  A  Okay.

8  Q  Okay.  Now, I want to go to Page 2 here.

9          MS. HAMILTON:  Judge, could I ask the witness

10 to be handed a copy of the document?

11         THE COURT:  Yeah, that would be helpful.

12         MR. GOLDSTEIN:  I apologize.

13         May I approach.

14         THE COURT:  You may.

15         MR. GOLDSTEIN:  Sorry about that.

16 BY MR. GOLDSTEIN:

17 Q  Now, I want to go into it just a little bit.

18         The ethics bill was passed in late September

19 of 2008, is that correct?

20 A  Final action by the General Assembly was in late

21 September of 2008.

22 Q  And the governor was not opposed to it entirely,

23 is that fair to say?

24         MS. HAMILTON:  Objection.

25         THE COURT:  The objection is sustained.

1  BY MR. GOLDSTEIN:

2  Q   Well, the ethics bill basically limited the

3  governor's ability to fundraise, is that a fair

4  assessment of the bill?

5  A   Yes.

6  Q   Okay.  And he worked with Emil Jones to make sure

7  it didn't get passed because he thought it was

8  unfair, is that correct?

9          MS. HAMILTON:  Objection.

10         THE COURT:  Objection to the form of the

11 question is sustained.

12 BY MR. GOLDSTEIN:

13 Q   As you understood it, the governor worked with

14 Senate President Emil Jones to prevent this bill

15 from going forward, is that correct?

16 A   That's correct.

17 Q   Okay.  Do you understand why he worked with Emil

18 Jones to prevent this from going forward?

19         MS. HAMILTON:  Objection.

20         THE COURT:  The objection is sustained.

21 BY MR. GOLDSTEIN:

22 Q   Well, Emil Jones ended up, as you said before,

23 double crossed the governor, is that correct?

24 A   I don't know if I used the word "double crossed"

25 or "betrayed."

1  Q   Betrayed.

2  A   It was the same effect.

3  Q   Betrayal sounds better.

4          As you understood it, Emil betrayed the

5  governor?

6  A   Yes.

7  Q   And the betrayal was that Emil and the governor

8  had an agreement that Emil was not going to call

9  this bill, is that correct?

10  A   Yes, that he wouldn't call it for a veto

11  override.

12  Q   Correct.

13          And the governor, in his discussions with

14  Emil that you're aware of, would've just signed the

15  bill if Emil hadn't gone forward with calling the

16  bill?

17          MS. HAMILTON:  Objection.

18          THE COURT:  The objection is sustained.

19  BY MR. GOLDSTEIN:

20  Q   Well, I want you to look at Page 2 of the bill,

21  and that's towards the bottom.

22          Are you there?

23  A   Yes.

24  Q   Okay.  And it says "governor mandatory veto," do

25  you see that?

1  A   Yes.

2  Q   Now, that basically is the governor's mandatory

3  veto of the bill, is that correct?

4  A   That's correct.

5  Q   Can you just briefly explain what a mandatory

6  veto is?

7  A   A mandatory veto is when the governor does not

8  approve the bill as written, writes in changes to

9  the bill, and sends it back to both the House and

10  Senate for their consideration of his changes.

11      The effect of a mandatory veto is that if the

12  General Assembly does not accept the governor's

13  recommended changes -- well, they have two options,

14  they could either accept his or her changes with the

15  simple majority or they can vote to override with a

16  super-majority, but if they take no action, the bill

17  dies.

18      I should say there's three options:  Taking

19  no action, accepting his changes, or voting to

20  override his changes which would mean the bill goes

21  back to its original language.

22  Q   So if a governor makes a mandatory veto and the

23  legislature takes no action, the bill just does not

24  pass, in total?

25  A   Correct.

1  Q   Okay.  No, did you work with the governor in

2  preparing a mandatory veto?

3          MS. HAMILTON:  Objection.

4          THE COURT:  The objection is sustained.

5  BY MR. GOLDSTEIN:

6  Q   Well, as you understood it, you were aware of

7  what the governor's mandatory veto is, is that

8  correct?

9          MS. HAMILTON:  Objection.

10         THE COURT:  Sustained.

11 BY MR. GOLDSTEIN:

12 Q   Well, let's go over the mandatory veto, and it

13 starts on the bottom paragraph, and it indicates

14 that the Illinois government ethics act, which is

15 what we're talking about --

16         MS. HAMILTON:  Judge, I'm going to object on

17 relevance.

18         THE COURT:  I'm sustaining the objection.

19 BY MR. GOLDSTEIN:

20 Q   As you understand the mandatory veto, this wasn't

21 trying to overrule the entire bill, is that correct?

22         MS. HAMILTON:  Objection.

23         THE COURT:  Sustained.

24 BY MR. GOLDSTEIN:

25 Q   Are you aware -- well, there was a concern within

1  the Governor's office that this bill was even legal,

2  is that correct?

3          MS. HAMILTON:  Objection.

4          THE COURT:  The objection is sustained.

:49AM  5  BY MR. GOLDSTEIN:

6  Q   Are you aware of the status of the bill right

7  now?

8          MS. HAMILTON:  Objection.

9          THE COURT:  Sustained.

:49AM  10  BY MR. GOLDSTEIN:

11  Q   Now, I want to talk to you about the Capital bill

12  a little bit and the tollway plan, okay.

13          Now, the Capital bill you testified a little

14  about.  Do you understand what the Capital bill was

:49AM  15  as it was proposed in 2008?

16  A   In 2008?

17  Q   Correct.

18  A   Yes.

19  Q   Okay.  What exactly was the Capital bill?

:49AM  20  A   The Capital bill is a state-wide infrastructure

21  improvement bill or legislation that provides for

22  the funding and the identification of projects

23  throughout the state to improve infrastructure,

24  roads, bridges, rail lines, schools, hospitals,

:50AM  25  waterways, sewers, local public facilities,

1   libraries.

2   Q   Okay.  So compared to --

3   A   A public programs project.

4   Q   Infrastructure, generally?

:50AM   5   A   Yes.

6   Q   And the Capital bill as compared to the tollway

7   plan was much more expansive, is that fair to say?

8   A   Yes.

9   Q   And as you understood it, this was something that

:50AM   10   the governor wanted?

11          MS. HAMILTON:  Objection.

12          THE COURT:  The objection is sustained.

13   BY MR. GOLDSTEIN:

14   Q   Well, the capital bill went through the Illinois

:50AM   15   Senate in 2007, is that correct?

16   A   A version of the Capital bill did, yes.

17   Q   Another version, then, went through the Senate in

18   2008, is that correct?

19   A   That's correct.

:50AM   20   Q   And it went to the House, is that correct?

21   A   On both occasions.

22   Q   Okay.  And was there a vote in the House on the

23   Capital bill on both occasions?

24   A   No.

:51AM   25   Q   So it was never put up for a vote?

1   A   Correct.

2   Q   Do you know why?

3           MS. HAMILTON:  Objection.

4           THE COURT:  Sustained.

5   BY MR. GOLDSTEIN:

6   Q   Well, was a big road block Mike Madigan?

7           MS. HAMILTON:  Objection.

8           THE COURT:  Sustained.

9   BY MR. GOLDSTEIN:

10  Q   Was it difficult during this time period for the

11  governor to get any of his legislation passed in the

12  House?

13          MS. HAMILTON:  Objection.

14          THE COURT:  Sustained.

15  BY MR. GOLDSTEIN:

16  Q   Well, you talked about the tollway plan and you

17  said there were three possible plans, is that

18  correct?

19  A   Eventually we developed three alternatives for

20  the governor's consideration.

21  Q   And you said that the smallest plan was the one

22  that the governor went along with, is that correct?

23  A   That's correct.

24  Q   And all three of these plans were discretionary,

25  is that correct?

1  A   I'm not sure what you mean by "discretionary."

2  Q   The governor didn't have to do any of these

3  plans, is that correct?

4  A   He didn't need to support any plan, that's

5  correct.

6  Q   And the smallest plan, there were many reasons

7  why the smallest plan was picked, is that correct?

8  A   Yes.

9  Q   Okay.  And the smallest plan did not require any

10  legislative approval, is that correct?

11  A   That's correct.

12  Q   As opposed to the two others, is that correct?

13  A   That's my understanding, yes.

14  Q   And as you understood it then, the governor was

15  not getting a lot of his bills passed?

16          MS. HAMILTON:  Objection.

17          THE COURT:  The objection is sustained.

18  BY MR. GOLDSTEIN:

19  Q   Well, a big reason why the 1.8 billion dollar

20  plan was --

21          MS. HAMILTON:  Objection.

22          THE COURT:  Yes.  Don't go there.  I mean,

23  there's a way you can approach this, but not with

24  him.

25  BY MR. GOLDSTEIN:

1  Q   Okay.  Now, the smallest plan, $1.8 billion, was
2  the only plan of the three that was allowed to be
3  done without legislative approval?
4  A   Well, much of the second phase, but I'm not sure
5  about all of it, could have been done -- I'm sorry,
6  the second alternative.  I don't believe a third
7  plan, the largest, could be done without legislative
8  approval, but each plan was built on the proceeding
9  plan.  In other words, they were modular, if you
10 will.  A smaller plan is a subset of the middle
11 plan, and the middle plan is a subset of the larger
12 plan.
13 Q   The three plans, only the $1.8 billion plan, in
14 total, could be done solely by the governor, is that
15 correct?
16 A   By the governor through the governor's appointed
17 Illinois Tollway Authority Board.
18 Q   Without legislative approval?
19 A   That was my understanding, yes.
20 Q   The 1.8 billion dollar plan also did not raise
21 general toll rates, is that correct?
22 A   To the best of my recollection, it did not raise
23 general toll rates.
24 Q   It raised other rates like commercial, is that
25 correct?

Harris - cross by Goldstein                    1668

1  A  It had elements of increased tolls for commercial

2  trucks, it also had increased tolls for vehicles

3  using the high occupancy vehicle lanes or hot lanes,

4  those are commuter lanes or bus-only lanes, those

5  were elements in the smaller plan.

6       So the tolls for usage of dedicated lanes for

7  vehicles with more than one passenger, they would

8  pay a premium depending on the time of day and

9  location of that extra pavement or those extra

10 lanes.

11 Q  But as you understood it, it didn't increase the

12 rates for general use?

13       MS. HAMILTON:  Objection.

14       THE COURT:  The objection is sustained.

15 BY MR. GOLDSTEIN:

16 Q  Also, as you understood it, there was an issue as

17 to trying to get the Capital bill passed, is that

18 correct?

19 A  Yes.

20 Q  And there was a concern that if you went forward

21 with these larger plans, that potentially the people

22 wouldn't fight as hard for the capital bill, is that

23 a fair assessment?

24 A  Certain interested parties, the belief was, they

25 would be less motivated to engage in a fight to get

:54AM

:54AM

:55AM

:55AM

:55AM

1  the larger capital bill passed.

2  Q   And you understood that was something the

3  governor wanted?

4  A   Yes.

5  Q   And the governor had been talking about various

6  different tollway plans throughout this year, is

7  that correct?

8          MS. HAMILTON:  Objection.

9          THE COURT:  The objection is sustained.

10 BY MR. GOLDSTEIN:

11 Q   Are you aware of a gas relief plan that the

12 governor put forward?

13         MS. HAMILTON:  Objection.

14         THE COURT:  The objection is sustained.

15 BY MR. GOLDSTEIN:

16 Q   Now, do you know who Gerald Krozel is?

17 A   Yes.

18 Q   He was an influential individual in Springfield,

19 is that right?

20 A   He was one of many representatives of the road

21 builder industry.

22 Q   Is it fair to say he was the guy who was

23 potentially engaged in trying to get the capital

24 bill passed?

25         MS. HAMILTON:  Objection.

:55AM (line 5)
:55AM (line 10)
:56AM (line 15)
:56AM (line 20)
:56AM (line 25)

1         THE COURT:  The objection is sustained.
2    BY MR. GOLDSTEIN:
3    Q   Are you aware of a plan to build the western
4    access to O'Hare Airport?
5         MS. HAMILTON:  Objection.
6         THE COURT:  The objection is sustained.
7    BY MR. GOLDSTEIN:
8    Q   I want to change subjects with you.
9         MR. GOLDSTEIN:  I don't know, do you want to
10   go another couple of minutes?  I'm changing subjects
11   and I don't know if this is a time to break or not.
12        THE COURT:  Good suggestion.  Let's take a
13   break.
14        THE MARSHAL:  All rise.
15      (The following proceedings were had out of the
16       presence of the jury in open court:)
17        THE COURT:  Twenty minutes.
18      (Recess.)
19        THE MARSHAL:  All rise.
20      (The following proceedings were had in the
21       presence of the jury in open court:)
22        THE COURT:  Please be seated.
23        You may resume.
24        MR. GOLDSTEIN:  Thank you, Your Honor.
25   BY MR. GOLDSTEIN:

1  A   Mr. Harris, I want to talk to you about the

2  racetrack issue, but before we go there I just have

3  one question about the tollway plan.

4          You spoke about the green lanes, do you

5  recall talking about that, and that was in the 1.8

6  billion dollar plan?

7  A   I believe there were some green lanes or hot

8  lanes in the smaller program.

9  Q   And the green lanes or hot lanes indicated like

10 car pools, is that fair to say?

11 A   That's fair.

12 Q   And you said the toll rates increased in the

13 green lanes, is that correct?

14          MS. HAMILTON:  Objection.

15          THE COURT:  The objection is sustained.

16 BY MR. GOLDSTEIN:

17 Q   Did you say anything about the tolls in there,

18 whether they increase or not in the green lanes?

19          MS. HAMILTON:  Objection.

20          THE COURT:  To the form of the question is

21 sustained.

22 BY MR. GOLDSTEIN:

23 Q   Is it true that the green lanes would have toll

24 increases?

25          MS. HAMILTON:  Objection; relevance.

1      THE COURT:  Sustained.

2  BY MR. GOLDSTEIN:

3  Q   Do you recall talking in direct examination about

4  the green lanes and the toll increases?

:23AM  5  A   Yes.

6  Q   And following up with what you said in direct

7  examination, I want to ask you a question or two,

8  okay?

9  A   I don't believe I said it in direct examination,

:24AM  10  I said it in response to your earlier

11  cross-examination question.

12  Q   Okay.

13      The tolls increased for people that weren't

14  car pooling in those hot lanes, is that correct?

:24AM  15      MS. HAMILTON:  Objection; relevance.

16      THE COURT:  The objection is sustained.

17  BY MR. GOLDSTEIN:

18  Q   Now, I want to go on to the racetrack issue with

19  you.

:24AM  20      Now, as you understood it, the bill passed

21  the House and Senate November 20th of 2008, is that

22  correct?

23  A   Yes, sometime in November it passed, had final

24  action in the General Assembly.

:24AM  25  Q   And then it was November 24th that it came before

1  the governor, is that correct?

2  A   Based on the documents I saw, I believe it

3  arrived in the Governor's office on or about

4  November 22nd.

:24AM  5  Q   Now, you said that there were people calling you,

6  in particular, about this bill, is that correct?

7  A   There was a few people that called me, yes.

8  Q   And the three people I think you mentioned were

9  Jay Hoffman, Lon Monk, and Chris Kelly, is that

:25AM  10  correct?

11  A   That's correct.

12  Q   And Jay Hoffman, he was a downstate

13  representative?

14  A   Yes.

:25AM  15  Q   And Lon Monk was the governor's good friend, as

16  well as a lobbyist for Johnny Johntson, as you

17  understood it, is that correct?

18  A   That is my understanding.

19  Q   As well as Chris Kelly?

:25AM  20  A   That's correct.

21  Q   Now, in 2008, did Chris Kelly have any official

22  capacity with the Governor's office?

23  A   With the Governor's office?

24  Q   Correct.

:25AM  25  A   No.

1  Q   Now, you -- I'm sorry.

2       You said that Chris Kelly called you and it

3  was sometime after the bill was sent to the

4  Governor's office, is that correct?

:25AM  5  A   I believe so, yes.

6  Q   And as you recall it, Chris Kelly urged the

7  governor, through you, to sign the bill sooner

8  rather than later, that's correct?

9  A   That's correct.

:26AM  10  Q   And he told you that it was personal, is that

11  correct?

12       MS. HAMILTON:  Objection.

13       THE COURT:  The objection is sustained.

14  BY MR. GOLDSTEIN:

:26AM  15  Q   During this time in 2008, were you having a lot

16  of contact with Chris Kelly?

17       MS. HAMILTON:  Objection.

18       THE COURT:  Overruled.

19  BY THE WITNESS:

:26AM  20  A   No, not much.

21  BY MR. GOLDSTEIN:

22  Q   Were you surprised to get a call from Chris

23  Kelly?

24  A   It had been a while since I heard from him, yes.

:26AM  25  Q   When you say a while, about how long?

1  A   Weeks, months.

2  Q   And is it fair to say that contact between you

3  and Chris Kelly dropped off significantly after his

4  indictment for tax fraud?

:26AM  5          MS. HAMILTON:  Objection.

6          THE COURT:  The objection is sustained.

7  BY MR. GOLDSTEIN:

8  Q   Your last face-to-face meeting with Chris Kelly

9  was in the fall of 2007, is that correct?

:27AM  10          MS. HAMILTON:  Objection.

11          THE COURT:  The objection is sustained.

12  BY MR. GOLDSTEIN:

13  Q   When was the last time you had contact with Chris

14  Kelly where Chris Kelly was advocating for a bill?

:27AM  15          MS. HAMILTON:  Objection.

16          THE COURT:  The objection is sustained.

17  BY MR. GOLDSTEIN:

18  Q   And it was your understanding that Mr. Kelly was

19  advocating for the signature of this bill?

:27AM  20  A   Yes.

21  Q   Now, were you aware at the time that Chris Kelly

22  and the governor had no contact at that time?

23          MS. HAMILTON:  Objection.

24          THE COURT:  Sustained.

:27AM  25  BY MR. GOLDSTEIN:

1  Q   Were you aware that the governor was receiving
2  scrutiny from the media with his contact with Chris
3  Kelly?
4        MS. HAMILTON:  Objection.
5        THE COURT:  Sustained.
6  BY MR. GOLDSTEIN:
7  Q   Are you aware that Chris Kelly had a business
8  relationship with the racetrack?
9        MS. HAMILTON:  Objection.
10       THE COURT:  Sustained.
11 BY MR. GOLDSTEIN:
12 Q   Are you aware of any interest Chris Kelly had in
13 this bill other than wanting it signed?
14       MS. HAMILTON:  Objection.
15       THE COURT:  It would be nice if you stuck to
16 what occurred in the direct examination and to
17 matters which are relevant to the case.
18 BY MR. GOLDSTEIN:
19 Q   You talked about people calling, in direct
20 examination, people calling you about getting this
21 bill signed, is that correct?
22 A   That's correct.
23 Q   You had been called before about other bills to
24 get signed, is that fair?
25       MS. HAMILTON:  Objection.

:27AM

:28AM

:28AM

:28AM

:28AM

1        THE COURT:  The objection is sustained.

2  BY MR. GOLDSTEIN:

3  Q   Was this unique to you that three people were

4  calling to have the bill signed?

5        MS. HAMILTON:  Objection.

6        THE COURT:  Sustained.

7  BY MR. GOLDSTEIN:

8  Q   Now, were you aware of the governor's position as

9  to the bill?

10 A   Yes.

11 Q   And the governor was in favor of the bill, is

12 that correct?

13 A   Yes.

14 Q   And did the governor ever express any desire to

15 veto the bill to you?

16 A   No.

17 Q   And around this time, there were hundreds of

18 bills before him, is that correct?  During this veto

19 session?

20 A   Yes, the bills come in continually, various

21 points in time during the year, but it's not unusual

22 to have several hundred bills pending.

23 Q   From November 24, 2008 to December 9, 2008, are

24 you aware of any bill that was signed by the

25 governor?

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3    BY MR. GOLDSTEIN:

4    Q   You talked about the impacts that this bill had

5    on the racetrack industry, is that correct?

6    A   The bill was designed to provide a continuing

7    subsidy to the racetracks from the casino industry.

8    Q   When you say subsidy, this wasn't money that the

9    racetrack earned in any way, is that correct?

10   A   Yes, this was racetrack money that would go

11   to the -- I'm sorry, this would be casino money that

12   went to the racetracks.

13   Q   Okay.  Now, do you have the call binder in front

14   of you?

15   A   Yes.

16   Q   Okay.  Good.

17          I want to turn your attention to tab 56.

18          MR. GOLDSTEIN:  If everyone could go to tab

19   56?

20   BY THE WITNESS:

21   A   56 you said?

22   BY MR. GOLDSTEIN:

23   Q   Correct.

24          MR. GOLDSTEIN:  Is everyone there?

25   BY MR. GOLDSTEIN:

 1  Q   Are you there, Mr. Harris?

 2  A   Yes, I am.

 3  Q   Okay.  Now, this call took place on December 2nd,

 4  2008, is that correct?

 5  A   That's correct.

 6  Q   And that's between you and Mr. Quinlan?

 7  A   That's correct.

 8  Q   Who is Mr. Quinlan?

 9  A   The governor's general counsel.

10  Q   Was Mr. Quinlan a friend of yours?

11  A   Yes.

12  Q   And on the second line of Page 1, Mr. Quinlan

13  says:

14      "You know, I also with our mutual boss push that

15       other thing we were talking about generally."

16          When Mr. Quinlan said "mutual boss," what

17  did you understand him to be referring to?

18  A   The governor.

19  Q   Okay.  And it goes on, and on line 18 Quinlan

20  says:

21      "Yeah, yeah, so I will work on that day.  I

22       didn't have a chance to be, like, are you f'ing

23       kidding me, you know what I mean?  It was like

24       a two-second thing and I had the other two

25       right there and I, it wasn't a discussion I

1     wanted to have in front of people."

2          When Mr. Quinlan says "a two-second thing"

3  what did you understand him to be talking about?

4  A  That his conversation with the governor had been

5  brief.

6  Q  He had a brief conversation, as you understood

7  it, is that correct?

8  A  Yes.

9  Q  And in this conversation, or at least the

10  transcript that we have, there's nothing

11  specifically discussed as to what you guys are

12  talking about, is that correct?

13  A  No, he's referring back to our earlier

14  conversation.

15  Q  Okay.  So as I understand it, and based on this

16  conversation, you then took no action, you didn't go

17  speak to the governor anymore about the Recapture

18  Bill, is that correct?

19  A  That's correct.

20  Q  And this was based on what you understood

21  Mr. Quinlan to have a very brief conversation with

22  the governor, correct?

23  A  Yes.

24  Q  Okay.  And he understood, as you understood, that

25  this brief conversation was referring to what was

1 potentially your concern from an earlier

2 conversation with Mr. Quinlan?

3 A   Yes.

4 Q   Did that make any sense?

:33AM      5 A   Yes, it did.

6 Q   Okay.  Before this conversation goes in, you

7 actually are talking about Chris Kelly, do you

8 recall that?

9         MS. HAMILTON:  Objection.

:33AM     10         THE COURT:  The objection is sustained.

11 BY MR. GOLDSTEIN:

12 Q   Now, after December 2nd, 2008, did you ever

13 follow up with the governor on the issue of

14 recapture?

:33AM     15         MS. HAMILTON:  Objection.

16         THE COURT:  The objection is sustained.

17 BY MR. GOLDSTEIN:

18 Q   Did you ever talk to the governor specifically

19 about this issue --

:33AM     20         MS. HAMILTON:  Objection.

21 BY THE WITNESS:

22 A   After this call?

23         MR. GOLDSTEIN:  Sorry, there's an objection.

24     (Brief pause).

:34AM     25         THE COURT:  Did you mean after this call?

1       MR. GOLDSTEIN:  I'll specify.

2  BY MR. GOLDSTEIN:

3  Q   After this call.

4       THE COURT:  Your objection still stands?

5       MS. HAMILTON:  No.

6  BY THE WITNESS:

7  A   No.

8  BY MR. GOLDSTEIN:

9  Q   Okay.  Can I ask before this call, did you have

10 any conversations with the governor about the

11 Recapture Bill?

12 A   Yes, the racetrack bill in an earlier call --

13 Q   Okay.

14 A   -- related to his conversation and my

15 conversation with Lon Monk.

16 Q   Were you ever told by the governor that this

17 Recapture bill was being held up for campaign

18 contributions?

19       MS. HAMILTON:  Objection.

20       THE COURT:  You're asking if the governor

21 ever used those specific words, is that the question

22 you're asking?

23       MR. GOLDSTEIN:  Correct, Judge.

24       THE COURT:  You can answer that.

25 BY THE WITNESS:

Harris - cross by Goldstein                1683

1   A   No, he did not use those specific words.
2   BY MR. GOLDSTEIN:
3   Q   Now, as you understand it, as Chief of Staff, as
4   the Governor of Illinois there is nothing requiring
5   him to sign a bill within 60 days is that correct?
6           MS. HAMILTON:  Objection.
7           THE COURT:  Sustained.
8   BY MR. GOLDSTEIN:
9   Q   Are you aware of how long the governor has to
10  take action for the bill?
11  A   60 days.
12  Q   And that's from Article iv, Section (9)(b) of the
13  state Constitution, is that correct?
14          MS. HAMILTON:  Objection.
15          THE COURT:  The objection is sustained.
16  BY MR. GOLDSTEIN:
17  Q   Okay, I want to change subjects with you,
18  Mr. Harris.  I want to talk to you about the senate
19  seat, okay?
20  A   Okay.
21  Q   Now, just a few general things before we go into
22  this.  During 2008, you were a registered lawyer, is
23  that correct?
24          MS. HAMILTON:  Objection.
25          THE COURT:  The objection is sustained.

1

2  BY MR. GOLDSTEIN:

3  Q   You talked about in direct examination that you

4  had been a prosecutor for the military, is that

:36AM  5  correct?

6        MS. HAMILTON:  Objection.

7        THE COURT:  Sustained.

8  BY MR. GOLDSTEIN:

9  Q   Were you a prosecutor in the military?

:36AM  10        MS. HAMILTON:  Objection and ask for a

11  sidebar, Your Honor.

12        THE COURT:  Pass on to something else.

13  BY MR. GOLDSTEIN:

14  Q   You received your bachelor's degree from

:36AM  15  Northwestern University?

16  A   Yes.

17  Q   And you received your law degree from Loyola

18  University?

19  A   Yes.

:36AM  20  Q   And you worked for the city under Mayor Daley, is

21  that correct?

22  A   Yes.

23  Q   And some of your positions included deputy police

24  superintendent?

:36AM  25  A   Yes.

1  Q   And you were the budget director, is that
2  correct?
3  A   Yes.
4  Q   And you came to the State of Illinois and
5  eventually became the Chief of Staff, is that
6  correct?
7  A   That's correct.
8  Q   And your duties as the Chief of Staff included a
9  lot of things, is that fair to say?
10 A   Yes.
11 Q   And one of them was to advise the governor, is
12 that correct?
13         MS. HAMILTON:  Objection.
14         THE COURT:  The objection is sustained.
15 If this is going where I think it's going, it's
16 going to transgress one of my rulings.
17 BY MR. GOLDSTEIN:
18 Q   Now, you spoke to the governor frequently during
19 the period of October 2008 to the day both you were
20 arrested, is that correct?
21 A   That's correct.
22 Q   Now, you had said that this was as low as two to
23 three times a day, is that correct?  Two or three
24 times you talked to him on the phone?
25 A   As few as, yes.

1  Q   And I think you said that the high watermark was
2  about eight to ten times a day, is that correct?
3  A   There have been days like that, yes.
4  Q   I could imagine.
5        Did you -- did you speak to him on the
6  weekends, as well?
7  A   Yes.
8  Q   Okay.  So just ballpark, you're talking to him
9  approximately 35 times a week, is that a fair
10 estimate?
11 A   I never took a count.  Some weeks during the year
12 were more busy than others.
13 Q   Okay.  Now, you spoke so much with the governor,
14 a lot of times you would go and speak to Mr. Quinlan
15 as sort of to decompress?
16        MS. HAMILTON:  Objection.
17        THE COURT:  The objection is sustained.
18 BY MR. GOLDSTEIN:
19 Q   Is that fair to say, a lot of times you were a
20 sounding board for the governor?
21        MS. HAMILTON:  Objection.
22        THE COURT:  The objection is sustained.
23 BY MR. GOLDSTEIN:
24 Q   Now, in the discussions with the governor and in
25 discussing the issue of the senate seat, is that

:37AM
:37AM
:38AM
:38AM
:38AM

1 fair to say your understanding was that the governor

2 consulted with a whole range of people about this

3 issue?

4          MS. HAMILTON:  Objection.

5          THE COURT:  Sustained.

6 BY MR. GOLDSTEIN:

7 Q   You certainly spoke -- he certainly spoke to you

8 about it a lot, is that fair to say?

9 A   Yes.

10 Q   Now, as you understood it, Patti's opinion meant

11 a lot to the governor, is that correct?

12          MS. HAMILTON:  Objection.

13          THE COURT:  Sustained.

14 BY MR. GOLDSTEIN:

15 Q   Now, you know that several people contacted the

16 governor, as well as yourself, regarding the senate

17 seat, is that correct?

18 A   Several people spoke to the governor about the

19 senate seat, yes.

20 Q   Did people contact you in regard to the senate

21 seat?

22 A   Yes.

23 Q   And over this about two-month period in 2008,

24 there were several potential candidates discussed,

25 is that correct?

1          MS. HAMILTON:  Objection.

2          THE COURT:  The objection is sustained.

3   BY MR. GOLDSTEIN:

4   Q   In fact, you kept a small binder of potential

5   candidates that came and spoke to you?

6          MS. HAMILTON:  Objection.

7          THE COURT:  Sustained.

8   BY MR. GOLDSTEIN:

9   Q   Some candidates, you had mentioned, you talked

10  about Jesse Jackson, is that correct?

11         MS. HAMILTON:  Objection.

12         THE COURT:  Sustained.

13  BY MR. GOLDSTEIN:

14  Q   You had spoken on what's called direct

15  examination last week about different senatorial

16  candidates, is that correct?

17  A   That's correct.

18         MS. HAMILTON:  Objection.

19         THE COURT:  The problem is that there was

20  specific testimony about specific people and now

21  there's this cloud of candidates.  If you want to

22  cross-examine him on what he said on direct, talk

23  about the specific things, not about general stuff

24  that he did not testify about.

25  BY MR. GOLDSTEIN:

:39AM

:39AM

:40AM

:40AM

:40AM

1  Q   Mr. Harris, did you talk about Jesse Jackson in
2  direct examination?
3  A   Yes.
4  Q   Did you talk about Valerie Jarrett in direct
5  examination?
6  A   Yes.
7  Q   Okay.  Did you talk to the governor about Gery
8  Chico as a senatorial candidate?
9          MS. HAMILTON:  Objection.
10         THE COURT:  Sustained.
11 BY MR. GOLDSTEIN:
12 Q   Did you talk in direct examination about Lisa
13 Madigan?
14 A   Yes.
15 Q   Mr. Harris, did you ask for the senate seat?
16         MS. HAMILTON:  Objection.
17         THE COURT:  You mean for him personally?
18         MR. GOLDSTEIN:  Correct.
19         THE COURT:  Like out of idle curiosity you're
20 interested?  Because I'll let him answer.  I don't
21 have any idea what it has to do with this case.
22         Were you?
23         THE WITNESS:  No, sir.
24 BY MR. GOLDSTEIN:
25 Q   As you understood it, the governor wanted to

 1  appoint himself, is that correct?
 2          MS. HAMILTON:  Objection.
 3          THE COURT:  The objection is sustained.
 4  BY MR. GOLDSTEIN:
 5  Q   Now, even before October 2008, you all had
 6  various conversations about the senate seat, is that
 7  correct?
 8          MS. HAMILTON:  Objection.
 9          THE COURT:  The objection is sustained.
10  BY MR. GOLDSTEIN:
11  Q   Do you recall talking about the governor and Emil
12  Jones as two top candidates during the summer
13  of 2008?
14  A   Excuse me?  Can you say that again?
15  Q   During the summer of 2008 --
16  A   Yes.
17  Q   -- you had phone calls with the governor and the
18  two leading candidates, as you understood it, was
19  the governor and Emil Jones, is that correct?
20  A   That's correct.
21  Q   And before there were even discussions with
22  Balanoff and the like, your understanding in October
23  is that Emil Jones would be appointed, is that
24  correct?
25          MS. HAMILTON:  Objection.

1          THE COURT:  The objection to the form is

2   sustained.

3   BY MR. GOLDSTEIN:

4   Q   On October 31st, 2008, it was your understanding

:42AM   5   that all arrows pointed towards Emil as the senator?

6   A   That's not correct.

7   Q   That's not correct?

8          MR. GOLDSTEIN:  May I have a moment?

9          THE COURT:  Sure.

:42AM  10       (Brief pause).

11          MR. GOLDSTEIN:  May I approach, Your Honor?

12          THE COURT:  Sure.

13       (Brief pause).

14          MR. GOLDSTEIN:  May I approach?

:44AM  15          THE COURT:  Yeah.

16          MR. GOLDSTEIN:  Thank you.

17   BY MR. GOLDSTEIN:

18   Q    Now, Mr. Harris, I asked you a question, on

19   October 31st, 2008, I asked you if all arrows were

:44AM  20   pointing toward Emil Jones, do you recall being

21   asked that question.

22   A   Yes.

23   Q   And your answer was, that's not correct, is that

24   correct?

:44AM  25   A   That's correct.

1  Q   Now, as we've talked about, you had several

2  interviews with the FBI, and you specifically had an

3  interview on January 27, 2009, is that correct?

4  A   I don't recall the specific date.  I had several

5  interviews with them in the month of January.

6  Q   Can I show you Defendant's Exhibit FBI 302 from

7  January 27, 2008 of John Harris.

8  A   Yes.

9  Q   Does that refresh your memory as to whether

10 January 27, 2009, you had an interview with the FBI?

11 A   I have no reason to doubt the date on the form,

12 but I don't have a specific recollection of January

13 27th.

14 Q   Okay.  On that date, do you recall talking about

15 the specific phone call on October 31, 2008?

16 A   I may have.  I don't recall doing it that day.

17 Q   Okay.  Okay.  But do you recall talking about

18 that call session?

19 A   We talked about several call sessions.

20 Q   I understand.  I understand.

21      If you can look at the first page, does that

22 refresh your memory whether you possibly spoke about

23 that call session of October 31st, 2008?

24 A   Yes.

25 Q   Okay.  Now, during this call session, you're

1 talking about a plan as far as what to discuss or

2 your plan as far as choosing, or the governor's

3 choosing for a senator, is that correct?

4 A   Yes.

5 Q   What criteria?

6 A   Develop a process and some criteria for the

7 governor to use in selecting a senator.

8 Q   Correct.

9        And if you can turn to Page 2, and if you can

10 read the full second full paragraph, and if you

11 could read that first sentence to yourself.

12    (Brief pause).

13 BY THE WITNESS:

14 A   Yes.

15 BY MR. GOLDSTEIN:

16 Q   Now, is it fair to say that it was your

17 understanding that on October 31st, 2008, all arrows

18 were pointing towards Emil Jones at that time?

19 A   I don't recall using that phrase.  I do recall

20 that there was no serious discussion of anyone else

21 before that date.  The serious discussion had always

22 been the governor appointing himself or appointing

23 Emil Jones, but there was a time in late September

24 where the governor was upset with Emil Jones because

25 of the betrayal on the ethics bill that had severely

1   diminished Emil Jones' prospects for being

2   considered.  But I believe in that interview, I

3   spoke about the fact that there was only two people

4   that were seriously being discussed.

5  Q   Two people being?

6  A   The governor himself and Emil Jones.

7  Q   Now, I'd like to go over some calls with you, Mr.

8   Harris.  If you could turn to tab 7.

9  A   Tab 7?

10 Q   7, yes.

11     MR. GOLDSTEIN:  Is everyone there?

12 BY MR. GOLDSTEIN:

13 Q   Are you there, Mr. Harris?

14 A   Yes, I am.

15 Q   Now, if you could turn to Page 2, and I want you

16  to look at line 4, Mr. Blagojevich says:

17     "So he's talking about Valerie Jarrett."

18          What did you understand the governor to be

19  talking about when he said "he"?  Who was he

20  referring to, as you understood it?

21 A   Rahm Emanuel.

22 Q   And on that same page, line 18 -- actually we'll

23  start at line 17, you say:

24     "I didn't mention her name, but like the Marilyn

25      Katzes and all the other kind of people."

1      Who is Marilyn Katz?

2  A   She's a woman business owner in Chicago who runs

3  a public relations, public consulting, public

4  relations consulting firm, she had done business

5  before with the City of Chicago and I knew her

6  through that relationship.

7  Q   Did Marilyn Katz at any time approach you

8  regarding the senate seat?

9  A   Yes, she --

10 Q   When --

11      I'm sorry.

12 A   She recommended her friend, Valerie Jarrett.

13 Q   When was this recommendation given to you?

14 A   I would say sometime in October.

15 Q   And what did she specifically say in regards to

16 the senate seat?

17 A   She said she thought Valerie Jarrett would be an

18 Ideal choice and one that would win the governor a

19 lot of praise for his appointing her.

20 Q   And as you understood it, Valerie Jarrett wasn't

21 even a subject discussed with the governor until

22 before Marilyn Katz approached you, is that correct?

23 A   Yes, she was not a name under consideration.  As

24 I said before, the two names that seemed to be under

25 serious consideration were Emil Jones and the

1 governor himself.

2 Q   And the governor first learned of Jarrett's

3 interest from you who told him about Marilyn Katz,

4 is that correct?

5          MS. HAMILTON:  Objection.

6          THE COURT:  The objection is sustained.

7 BY MR. GOLDSTEIN:

8 Q   I apologize.

9          As you understood it, the governor first

10 learned about Valerie Jarrett being a possible

11 candidate from you after you were contacted by

12 Marilyn Katz?

13 A   Yes, I don't know whether he learned of it from

14 anyone else, but I briefed him about my call with

15 Marilyn Katz.

16 Q   And before that briefing of the governor with

17 your call about Marilyn Katz, had you had any

18 discussions with the governor about Valerie Jarrett?

19 A   Not to my recollection.

20 Q   And Marilyn Katz was offering campaign

21 contributions, is that correct?

22 A   No, she was offering fundraising support she

23 thought would be more forthcoming from people that

24 would be supportive and pleased with the governor's

25 appointment of Valerie Jarrett.  There was no

1  promise of campaign contributions.

2  Q   Could you tell me the difference between

3  fundraising support and campaign contributions?

4  A   Meaning that she thought -- I understood her to

5  mean that there would be a lot of supporters of

6  Valerie Jarrett that would then be supporters of the

7  governor because they would see -- they would

8  support him because of his support and appointment

9  of Valerie Jarrett.

10 Q   Okay.  Now, this call on tab 7, is it fair to say

11 most of this was just shooting the breeze about

12 politics?

13         MS. HAMILTON:  Objection.

14         THE COURT:  The objection to the form is

15 sustained.

16 BY MR. GOLDSTEIN:

17 Q   How would you describe most of this conversation?

18         MS. HAMILTON:  Objection.

19         THE COURT:  The objection is also sustained.

20 BY MR. GOLDSTEIN:

21 Q   You talked about a process being set up as far as

22 selecting a senator, is that correct?

23 A   That's correct.

24 Q   And you had drafted some points to go forward on

25 as far as selecting a senator, is that correct?

1  A   Yes.

2  Q   Remember that was the exhibit you discussed?

3  A   Yes, I do.

4  Q   Okay.  In those draft process that you had set

5  up, was there anything specifically saying the

6  governor will not appoint himself?

7  A   No, there was a discussion about that question

8  potentially coming up at a press conference in the

9  event that Senator Obama won the election and the

10 governor were to make himself available to discuss

11 the Senate selection process, that the question may

12 come up about him appointing himself.

13 Q   And this was before the November 5, 2008, press

14 conference, is that correct?

15 A   That's correct.

16 Q   And, in fact, during this conversation, there was

17 a conference call between you and the governor and

18 Lucio Guerrero and Doug Scofield?

19          MS. HAMILTON:  Objection.

20          THE COURT:  Sustained.

21 BY MR. GOLDSTEIN:

22 Q   Well, is that fair to say that a lot of the

23 discussions were an attempt to make sure the

24 governor was still a viable option as a Senate

25 candidate?

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3   BY MR. GOLDSTEIN:

4   Q   I want you to turn to tab 8.

5          Are you there?

6   A   Yes.

7   Q   Good.

8          Now, Page 1, line 16, you say:

9      "I mean, I, we, we gotta find out from Andy when

10      he, how, how long ago did Andy try to set this

11      meeting up."

12          Who were you referring to when you said

13   "Andy"?

14   A   Andy Stern, president of the SEIU labor union.

15   Q   And that's the national SEIU?

16   A   Yes.

17   Q   Are you aware of his connection to Barack Obama?

18   A   I understood that he was an early supporter of

19   Senator Obama's presidential campaign effort.

20   Q   And as you understood it, Andy Stern was coming

21   to the governor wanting to talk to him, is that

22   correct?

23   A   Based on what the governor told me, yes.

24   Q   Now, that same page, line 20, you say:

25      "Okay, so it was before my discussion with

1       Rahm."
2       And then on Page 2 the governor says:
3       "Yeah."
4           And you understood it, that meant that Andy
5  Stern contacted the governor before Rahm contacted
6  the governor, is that correct?
7  A  Andy Stern contacted somebody in the Governor's
8  office attempting set up a meeting, and I'm not
9  aware that Rahm contacted the governor other than
10 calling me on the 2nd of November.
11 Q  Okay.  So the first person was Marilyn Katz, is
12 that correct?
13          MS. HAMILTON:  Objection.
14          MR. GOLDSTEIN:  I'll rephrase it.  I
15 apologize.
16 BY MR. GOLDSTEIN:
17 Q  The first person to communicate to any one within
18 the governor's -- to you or the governor, the first
19 person advocating for Valerie Jarrett was Marilyn
20 Katz, is your understanding?
21          MS. HAMILTON:  Objection.
22          THE COURT:  The objection is sustained as to
23 form.
24 BY MR. GOLDSTEIN:
25 Q  Marilyn Katz came to you in late October,

 1  correct?  Regarding Valerie Jarrett?

 2  A   Sometime in October.

 3  Q   Okay.  Andy Stern came to the Governor's office

 4  regarding -- well, Andy Stern came to the Governor's

 5  office talking about the senate seat approximately a

 6  week before this November 3rd call, is that correct?

 7  A   Sometime before the call.

 8  Q   And it was Rahm Emanuel that came to speak to the

 9  governor or anyone in his office regarding the

10  senate seat before November 3rd, this phone call, is

11  that correct?

12          MS. HAMILTON:  Objection.

13          THE COURT:  The objection is sustained to

14  form.

15  BY MR. GOLDSTEIN:

16  Q   You said you had a discussion with Rahm, is that

17  correct?

18  A   A phone call on November 2nd, yes.

19  Q   November 2nd.  And that discussion was pertaining

20  to what?

21  A   To the president -- sorry, Senator Obama's strong

22  preference for Valerie Jarrett to be named senator

23  in the event he were elected.

24  Q   In the chronology of things, is it your

25  understanding that it was Katz and then Stern and

1  then Emanuel?

2          MS. HAMILTON:  Objection.

3          THE COURT:  A little vague.

4  BY MR. GOLDSTEIN:

:57AM  5  Q   Did Katz come before Stern?

6          MS. HAMILTON:  Objection.

7          THE COURT:  Objection to the form is

8  sustained.

9  BY MR. GOLDSTEIN:

:57AM  10  Q   In these discussions we're taking about regarding

11  Katz and Stern and Emanuel, Katz was the first

12  person of those three to approach the Governor's

13  office?

14          MS. HAMILTON:  Objection.

:58AM  15          THE COURT:  The objection is sustained.

16  BY MR. GOLDSTEIN:

17  Q   Now, Page 3 on tab 8, you start talking about  --

18  you and the governor start talking about Emil Jones,

19  is that a fair assessment of this part of the

:58AM  20  conversation?

21  A   Yes, the governor mentions it in line 13 or 14.

22  Q   And then you discuss this in direct examination,

23  but on line 27 the governor says -- or actually --

24  yeah, line 27:

:58AM  25      "That's an off-campus, that's a technical thing

1          an off-campus discussion on that subject."

2          Do you see the governor talking about that?

3     A   Yes, I do.

4     Q   And you discuss about what you understood this

5     off campus meeting to mean, is that correct?

6     A   That's correct.

7     Q   And on line 31 the governor says:

8          "Will make him feel better about his chances."

9          Do you see that line?

10    A   Yes, I do.

11    Q   And what did you understand the governor to be

12    saying when he said "will make him feel better about

13    his chances"?  Who is the "him"?

14    A   Emil Jones.

15    Q   Okay.  "And chances," what did you understand the

16    governor to be referring to?

17    A   His chances of being selected for the vacant

18    senate seat.

19    Q   So as you understood it, having that off-campus

20    meeting would make Emil Jones feel better about his

21    chances, is that correct?

22    A   That's correct.

23    Q   What was your understanding as to why it was

24    important to make Emil Jones feel better about his

25    chances?

Harris - cross by Goldstein                    1704

1  A   I understood part of the reason was that Emil

2  Jones had the power to strip the governor of his

3  legislative power or statutory power to make the

4  selection to fill the vacant senate seat.

5  Q   Was there also legislation pending that the

6  governor wanted passed during this time period?

7          MS. HAMILTON:  Objection.

8          THE COURT:  The objection is sustained.

9  BY MR. GOLDSTEIN:

10 Q   Was there any legislation pending before the

11 Illinois Senate during this time frame?

12         MS. HAMILTON:  Objection.

13         THE COURT:  Was there legislation pending

14 before the Senate at this time?

15         MR. GOLDSTEIN:  Correct.

16         THE COURT:  Any legislation?  Governing any

17 subject?

18         MR. GOLDSTEIN:  Correct.

19         THE COURT:  Then I'm sustaining the objection

20 on the grounds of relevancy.

21 BY MR. GOLDSTEIN:

22 Q   Now, if you could turn to Page 5, you talked

23 about Marilyn Katz had presented to you the

24 assistance in fundraising, is that correct?

25 A   The governor mentioned her assistance in

:00PM

:00PM

:00PM

:00PM

:01PM

1  fundraising.  I was trying to explain to him that

2  that was not her emphasis and that that was not the

3  focal point of her conversation with me or her

4  communication with me, but, rather, there would be

5  supporters that would praise the governor's choice

6  and would likely help out with fundraising, but

7  there was no offer by Marilyn Katz of any specific

8  campaign contribution or one for the other.

9  Q   Did you say that in the conversation?

10 A   I'm attempting to say that, yes.

11 Q   Okay, let's look at your attempt.

12      On line 12 you say:

13     "Yeah, she was talking about friends around the

14      country that would be appreciative in their

15      ability to help with fundraising."

16      Now, what were you saying when you said that

17 would be appreciative in their ability to help with

18 fundraising?  What were you saying there?

19 A   That there would be supporters of Valerie

20 Jarrett's and Barack Obama's that would be

21 appreciative of the governor appointing Valerie

22 Jarrett.

23 Q   And then the next part of that line in there,

24 "ability to help with fundraising"?

25 A   Yes, that these would be people that were active

1   politically and that could help with fundraising.

2   Q   So when you say "appreciative," what did you

3   mean?

4   A   That they would support the governor.

5   Q   Support the governor how?

6   A   Potentially with fundraising.

7   Q   Now, if you can turn to tab 13.

8          Are you there, Mr. Harris?

9   A   Yes, I am.

10  Q   Now, on Page 1, line 10, you say:

11       "You call Axelrod?"

12        And the governor said "yeah."  Who were you

13         referring to when you say Axelrod?

14  A   David Axelrod, Barack Obama's campaign manager.

15  Q   Okay.  And Page 2, line 19, the governor says:

16       "No, no, he was very explicit with me.  'I

17        talked to Barack about the senate seat, can I

18        come and see you, can I do it tomorrow,' I said

19        'sure.'"

20          What did you understand the governor to be

21  talking about there?

22  A   A conversation that he had with Tom Balanoff.

23  Q   And so this tab was on November 5th in the

24  morning, is that correct?

25  A   Yes.

1  Q   And the conversation he had with Balanoff, is

2  that referring to the November 4th conversation?

3  A   Yes, I believe he's referring to the conversation

4  he had with Mr. Balanoff back stage at the Grant

5  Park rally the night of the general election.

6  Q   During the election night celebration?

7  A   Yes.

8  Q   Okay.  And did you hear any of that conversation

9  between Balanoff and the governor?

10 A   No, I did not.

11 Q   Were you with the governor at this time?

12 A   Yes.

13 Q   But Balanoff basically took the governor to the

14 side and spoke to him where you couldn't hear them?

15      MS. HAMILTON:  Objection.

16      THE COURT:  Sustained.

17 BY MR. GOLDSTEIN:

18 Q   How did -- well, it was a conversation that the

19 governor and Balanoff had that was out of your

20 earshot of you, is that correct?

21 A   That's correct.

22 Q   Could you explain, to your knowledge, what kind

23 of relationship Tom Balanoff had with the governor?

24 A   I believe politically, they were very close.  The

25 governor was very supportive of Tom Balanoff's labor

1  agenda, and Tom Balanoff was very supportive of the

2  governor's candidacies as well as his

3  administration.

4  Q   And you reference it here on Page 3, on line 7,

5  you say:

6      "Well, you know your relationship with Balanoff

7      better than I do."

8      The governor:

9      "Yeah, don't worry about it."

10     And you say:

11     "Close relationship then."

12     And then the governor says:

13     "Pretty good."

14         So that was your understanding that this was

15  a fairly close relationship?

16  A   That's how I understood it, yes.

17  Q   Now, if you can turn to Page 9, line 19, you say:

18     "You know, thinking that, you know, there'll be

19     time to rebuild, you know, before the next

20     election, but I got this albatross around my

21     neck, the street --" I'm sorry, "around my

22     neck, down the street, that this guy's not

23     gonna let me shake even though it ain't going

24     anywhere, he's keeping this f'ing investigation

25     alive with this BS indictment of Cellini."

1          What were you at this time talking about
2  with the governor?

3          MS. HAMILTON:  Objection.

4          THE COURT:  The objection is sustained.

:07PM   5  BY MR. GOLDSTEIN:

6  Q   When you said the word "albatross," what were you
7  referring to?

8          MS. HAMILTON:  Objection.

9          THE COURT:  Overruled.

:07PM  10  BY THE WITNESS:

11  A   The federal investigation into the governor's
12  administration and campaign.

13  BY MR. GOLDSTEIN:

14  Q   So when you say "down the street," is that

:07PM  15  referring to this building here?

16  A   The federal building, yes.

17  Q   Okay.

18          Now, if you can turn to Page 11, on line 8,
19  the governor says:

:07PM  20      "UN ambassador impossible, huh."

21       Then you reply:

22       "Yeah, I put it in the extremely remote

23       column."

24          What did you understand the governor to be

:08PM  25  saying there?

1  A   He was asking me about alternative positions he

2  might ask for in the event that his request to be

3  appointed to the Secretary of Health and Human

4  Services were not well received or they told him no,

5  what other position the president had the power to

6  appoint he could ask for, and he made a suggestion

7  to me UN ambassador and I told him I thought it

8  would be extremely remote.

9  Q   When you said that, was that what you were

10 thinking at the time, when you said "extremely

11 remote"?

12 A   I actually thought there would be no chance.

13 Q   Why did you say "extremely remote"?

14 A   Seemed more polite.

15 Q   I understand.

16        If you could turn to tab 14, on line 14, the

17 governor says:

18       "Okay, good, so I cannot dismiss that real

19        possibility if they f'ing treat me with f'ing,

20        you know, irrelevance and I don't get something

21        good, I, you know, and I'm facing what I'm

22        facing, we've always got that ace in the hole,

23        don't we."

24        Is that fair to say that your understanding

25 was that Rod was going to appoint himself?

1          MS. HAMILTON:  Objection.

2          THE COURT:  The objection is sustained.

3   BY MR. GOLDSTEIN:

4   Q   As you understood it, a lot of this was just a

5   whole process for the governor to appoint himself?

6          MS. HAMILTON:  Objection.

7          THE COURT:  The objection is sustained.

8   BY MR. GOLDSTEIN:

9   Q   This one in particular, tab 14, on November 5th,

10  where were any of these discussions going?

11         MS. HAMILTON:  Objection.

12         THE COURT:  What do you mean "where"?

13         MR. GOLDSTEIN:  What was the end result.

14         THE COURT:  Sustained.

15  BY MR. GOLDSTEIN:

16  Q   On Page 2 you say, on line 1:

17      "If they're f'ing me and they're --"

18       and then you go down to Page 4:

19      "... not even entertaining any --" and then you

20       say "a reasonable request."

21       What were you calling a reasonable request?

22         MS. HAMILTON:  Objection.

23         THE COURT:  Where are we?

24         MS. HAMILTON:  Page 2, line 1 through 6.

25         MR. GOLDSTEIN:  Yeah.  I'm sorry.

:09PM

:10PM

:10PM

:10PM

:11PM

1          THE COURT:  Read the line again.

2  BY MR. GOLDSTEIN:

3  Q    (Reading:)

4       "If they're, if they're f'ing me and they're not

5        even entertaining a reasonable request."

6          THE COURT:  And you're asking what he means

7  when he said "a reasonable request"?

8          MR. GOLDSTEIN:  Correct, Judge.

9          THE COURT:  Didn't he sort of answer that in

10 line 8 and 9?

11         MR. GOLDSTEIN:  He could maybe give a

12 different understanding today, Your Honor.

13         MS. HAMILTON:  Judge, I'm going to object.

14 It's not relevant.

15         THE COURT:  Apart from that, I'm sustaining

16 the objection.

17 BY MR. GOLDSTEIN:

18 Q    Now, at line 14 you say:

19       "You know, if I were him, ah, you know, a top

20        Cabinet post, I don't, I wouldn't consider it,

21        I wouldn't do it if I were him."

22          When you said that, who were you referring

23 to when you say "him"?

24 A    The president-elect.

25 Q    And what were you saying when you said those

Harris - cross by Goldstein                    1713

1  things?

2          MS. HAMILTON:  Objection.

3          THE COURT:  Sustained.

4  BY MR. GOLDSTEIN:

:12PM  5  Q   Page 3, line 35, you say:

6      "And if, you know, if the, his domestic agenda

7       is important, so HHS is, I'm not going to make

8       that a political pick, I mean meaning someone

9       else's politics, it's going to be my politics."

:12PM  10          When you said "political pick," what did you

11  mean by that?

12          MS. HAMILTON:  Objection.

13          THE COURT:  Overruled.

14  BY THE WITNESS:

:13PM  15  A   What did I mean when I said that to the governor?

16  BY MR. GOLDSTEIN:

17  Q   When you said "political pick."

18  A   I was characterizing the governor's asking for

19  appointment of himself to be a political pick, and

:13PM  20  that I said that if I were president-elect Obama, I

21  wouldn't make that a political pick.

22  Q   You said the appointment of the governor, I don't

23  understand, "political pick," what do you mean

24  specifically by "political pick"?

:13PM  25          MS. HAMILTON:  Objection.

1        THE COURT:  Sustained.

2    BY MR. GOLDSTEIN:

3    Q   Now, on tab 15 --

4        THE COURT:  We're going to stop soon.  You

:14PM  5    have another one that's related?

6        MR. GOLDSTEIN:  We could do this tab, just a

7    few minutes, that's all.

8        THE COURT:  Okay.

9    BY MR. GOLDSTEIN:

:14PM  10   Q   On line 12, you say:

11       "Just us, so I, I briefly told Greenlee, ah, to,

12        that, you know, maybe, ah, a reasonable ask,

13        maybe not where we start from, but one that

14        takes care of your family's, you know,

:14PM  15        security, your political, keeping your

16        political options open as foundation CEO or

17        foundation president.  Ones that the

18        president-elect or president would have

19        influence with the boards in an area that

:14PM  20        you're passionate about and that he's

21        passionate about and that would make sense and

22        not raise the spectrum of, you know, deals

23        because he's got a buffer.  I just mentioned

24        Kaiser, family and Red Cross as kind of

:15PM  25        examples, I don't know what other ones out

1       there are."
2            When you say on line 14, "a reasonable ask,"
3   what were you saying?
4            MS. HAMILTON:  Objection.
5            THE COURT:  Sustained.
6   BY MR. GOLDSTEIN:
7   Q   Now, this call is on November 5th, 2008, is that
8   correct?
9   A   That's correct.
10  Q   And during this conversation, this is a
11  conference call between you, the governor, and
12  Mr. Greenlee, is that correct?
13  A   That's correct.
14  Q   And Mr. Greenlee was in the room with you, is
15  that correct?
16  A   That's correct.
17  Q   And it was your understanding at this time that
18  the governor still wanted to appoint himself, is
19  that correct?
20           MS. HAMILTON:  Objection.
21           THE COURT:  The objection is sustained.
22           MR. GOLDSTEIN:  We can take a break now, Your
23  Honor, I'm moving on to a different tab.
24           THE COURT:  1:30.
25           THE MARSHAL:  All rise.

1       This court will suspend until 1:30 p.m.

2   today.

3       (The following proceedings were had out of the

4        presence of the jury in open court:)

5       THE COURT:  Court is in recess, except is

6   there anything you want to raise with me?

7       (No response.)

8       THE COURT:  No?  Okay.  Fine.

9

10      (Luncheon recess taken from 12:16 o'clock p.m.

11       to 1:30 o'clock p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Harris – cross by Goldstein                    1717

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,    )
                                 )  No. 08 CR 888
4          Government,           )
                                 )
5   vs.                          )  Chicago, Illinois
                                 )
6   ROD BLAGOJEVICH,             )  May 9, 2011
                                 )
7          Defendant.            )  1:44 o'clock p.m.

8
                        VOLUME 11
9              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES B. ZAGEL
10                    AND A JURY

11
    For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15             Assistant United States Attorneys
               219 South Dearborn Street;
16             Suite 500
               Chicago, Illinois 60604
17

18  Court Reporter:

19            Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
20                  Room 2504
               Chicago, Illinois 60604
21               (312) 435-5895

22

23

24

25

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY:  Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

Harris - cross by Goldstein                    1719

1          THE MARSHAL:  All rise.

2        (The following proceedings were had in the

3         presence of the jury in open court:)

4          THE COURT:  Please be seated.

5          You may proceed.

6          MR. GOLDSTEIN:  Thank you, Your Honor.

7      JOHN HARRIS, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8              CROSS EXAMINATION (resumed)

9    BY MR. GOLDSTEIN:

10   Q   Okay, Mr. Harris, I think before we broke we were

11   on the day of approximately November 5th, 2008.

12          And you talked about a press conference was

13   had by the governor on November 5th?

14   A   Yes.

15   Q   And you understood, as far as the press

16   conference, the governor was trying to leave the

17   door open for himself to be appointed, as well as

18   publicly touting himself for HHS, is that correct?

19          MS. HAMILTON:  Objection.

20          THE COURT:  Give me a second.

21          (Brief pause.)

22          THE COURT:  Sustained to the form of the

23   question.

24   BY GOLDSTEIN:

25   Q   Now, if you can turn to tab 18, and turn to

1  Page 9.

2          Are you there, Mr. Harris?

3  A   Yes, I am.

4  Q   On line 26 you say:

:45PM    5      "Right.  And then at, then the meeting kinda

6          ends, then they got to deliver that message, it

7          was kind of the first round of negotiations."

8          What were you saying when you said that?

9          MS. HAMILTON:  Objection.

:46PM    10          THE COURT:  Sustained.

11  BY MR. GOLDSTEIN:

12  Q   You listened to this call, is that correct,

13  Mr. Harris?

14  A   Yes.

:46PM    15  Q   And you went over it with the government, as

16  well?

17  A   Yes.

18  Q   And you testified about it in direct examination,

19  is that correct?

:46PM    20  A   Yes.

21  Q   So this was November 6th, 2008, at 9:25 a.m., is

22  that correct?

23  A   Correct.

24  Q   Now, if you can turn to Page 15, on line 2, you

:46PM    25  say:

1       "Change To Win, SEIU's thing."

2        Is that you speaking there?

3   A   Yes.

4   Q   And then you go down on line 5:

5        "How about like the national coordinator of the

6         Change To Win campaign?"

7         Is that you speaking, as well?

8   A   Yes.

9   Q   Now, Change To Win, whose idea was that?

10  A   Mine.

11  Q   And on Page 17, on line 25, you say:

12       "On second thought, but if, you know, you know,

13        Andy, Andy and Tom, look you in the eye and say

14        we're going to make you our national

15        coordinator for change."

16        And then the governor interrupts and says:

17        "We'll publicly announce it."

18            What did you understand Mr. Blagojevich to

19  be saying when he said we'll publicly announce this

20  Change To Win?

21  A   After the governor -- after I talked to the

22  governor about the Change To Win idea, I also

23  expressed some concerns about the possibility that

24  if too much time passed between his discussion, the

25  governor's discussion, with Andy Stern and Tom

1  Balanoff about the idea, that circumstances can
2  change and they may not follow through on any
3  agreement, if they reached one, to make the governor
4  the director of Change To Win in exchange for
5  appointing Valerie Jarrett.
6          Again, we're talking about that concern and
7  the governor responds we'll publicly announce it,
8  and I understood that to mean he would have Andy
9  Stern and Tom Balanoff publicly announce their
10 intention to appoint the governor the director of
11 the Change To Win campaign in a very public way to
12 lock them in so they couldn't later not follow
13 through or make it less likely that they later would
14 not follow through.
15 Q   Was it your understanding that this whole deal
16 would be publicly announced?
17 A   No, just the appointment of the governor to a
18 Change To Win type of position.
19 Q   So it was your understanding that somehow this
20 Change To Win concept would be publicly announced
21 that it would become Change To Win right around the
22 same time that he appointed Valerie Jarrett to the
23 senate seat?
24 A   We didn't get into any particular discussion
25 about the logistics of it, when or how.

Harris - cross by Goldstein                    1723

1  Q   What did you understand the governor -- or what
2  did you understand the governor to be saying as far
3  as a timeline when this would be announced?
4        MS. HAMILTON:  Objection.
5        THE COURT:  Sustained as to the form of the
6  question.
7  BY MR. GOLDSTEIN:
8  Q   Did you have any understanding of when this would
9  be publicly announced?
10       MS. HAMILTON:  Objection.
11       THE COURT:  The objection is sustained.
12 BY MR. GOLDSTEIN:
13 Q   Was the Change To Win idea that you came up with,
14 was that ever publicly announced?
15 A   No.
16 Q   You said you spoke to Doug Scofield about the
17 Change To Win?
18 A   Yes.
19 Q   And what did you speak to Doug Scofield about?
20 A   To learn more about whether or not the idea was
21 something that -- I wanted to learn more about the
22 Change To Win organization, I should say.
23       Doug Scofield was a consultant for SEIU, Andy
24 Stern and Tom Balanoff, this was a very preliminary
25 idea.  I wasn't sure whether the organization -- how

:49PM

:49PM

:50PM

:50PM

:50PM

1  the organization was constituted or managed or

2  organized, and I thought Doug Scofield might have

3  more information about that.

4  Q   Is it fair to say, to use a phrase of yours, this

5  Change To Win was a preliminary conceptual idea?

6  A   Yes.

7  Q   And.

8  A   This was in response to the governor's earlier

9  direction to come up with a union-based organization

10 or institution, a labor supported organization as a

11 possible place of employment for himself.

12 Q   Are you aware if any ask or demand for Change To

13 Win was ever made?

14         MS. HAMILTON:  Objection.

15         THE COURT:  The objection is sustained.

16 BY MR. GOLDSTEIN:

17 Q   Now, there was a meeting on November 6th, 2008,

18 between the governor and Tom Balanoff, is that

19 correct?

20 A   That's correct.

21 Q   And you were not present for that meeting?

22 A   No, I was not.

23 Q   Do you know who requested that that meeting be

24 just the governor and Mr. Balanoff?

25 A   My understanding, it was Tom Balanoff's request.

:50PM
:51PM
:51PM
:51PM
:51PM

1 Q   Now, there's a lot of discussion about Health and

2 Human Services, isn't that correct?

3          MS. HAMILTON:  Objection.

4          THE COURT:  The objection is sustained.

5 BY MR. GOLDSTEIN:

6 Q   On direct examination, I think you probably spent

7 at least a day talking about Health and Human

8 Services, is that a fair analysis?

9 A   Yes.

10 Q   Okay.  And as you understood the governor, Health

11 and Human Services was a job that he wanted even

12 before this whole issue came up, is that fair?

13          MS. HAMILTON:  Objection.

14          THE COURT:  The objection is sustained.

15 BY MR. GOLDSTEIN:

16 Q   Well, as you understood the governor, he was an

17 individual that cared about healthcare, is that

18 correct?

19          MS. HAMILTON:  Objection.

20          THE COURT:  The objection is sustained.

21 BY MR. GOLDSTEIN:

22 Q   Now, after this meeting that you weren't present

23 for with Mr. Balanoff, there was a meeting with you,

24 the governor, Mr. Scofield, and Mr. Quinlan, is that

25 correct?

1  A   Yes.

2  Q   Was there anyone else present?

3  A   Not that I recall.

4  Q   And the four of you discussed basically what

5  happened at this meeting between Balanoff and the

6  governor?

7         MS. HAMILTON:  Objection.

8         THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

10  Q   Did you have a meeting after you met with

11  Balanoff?

12  A   I did not meet with him.  The governor did, yes,

13  there was a meeting afterwards.

14  Q   After the meeting with Balanoff, the governor met

15  with you, is that correct?

16  A   Yes.

17  Q   And there were other people present?

18  A   Yes.

19  Q   And you all talked about the things, is that

20  correct?

21         MS. HAMILTON:  Objection.

22         THE COURT:  Sustained.

23  BY MR. GOLDSTEIN:

24  Q   What was your understanding of the feeling in the

25  room as to what was going to happen with this HHS

1  request?

2         MS. HAMILTON:  Objection.

3         THE COURT:  It's sustained.

4         One of the things that you're doing with this

5  witness is asking for opinions which you

6  characterize as understanding, but they're opinions.

7  And even if he had an opinion, we have no idea what

8  the basis of the opinion is.  It may be hearsay,

9  maybe some stray remark somebody said.

10         This witness was offered to testify to

11  certain events and to his understanding of certain

12  statements, his understanding of certain statements.

13  It does not open the door to his opinion about what

14  happened and who was what, and what the general mood

15  in the room was.

16         And the truth of the matter is is that this

17  is all inadmissible from this witness.  There may be

18  another way to get it in.  Besides, you may be

19  opening a door to the government asking questions

20  about this witness' various opinions and it's

21  possible if that occurs you might not like those

22  opinions.  In fact, you might not like some of the

23  answers he gives to your question.

24         So why don't you confine yourself to what

25  happened on direct examination and, you know, you're

Harris - cross by Goldstein                    1728

1 free to recall him yourself as your witness.
2 BY MR. GOLDSTEIN:
3 Q   Do you recall what the governor said at this
4 meeting on November 6th after he met with Balanoff?
5 A   Yes.
6 Q   Did you ever follow up with Balanoff after this
7 meeting on November 6th?
8        MS. HAMILTON:  Objection.
9        THE COURT:  The objection is sustained.
10 BY MR. GOLDSTEIN:
11 Q   What was your understanding as to whether on
12 November 6th, whether the governor had made any
13 decision at this point?
14        MS. HAMILTON:  Objection.
15        THE COURT:  The objection is sustained.
16 BY MR. GOLDSTEIN:
17 Q   Did you take any action based on any decision
18 that the governor made after November 6th?
19        MS. HAMILTON:  Objection.
20        THE COURT:  The objection s to the form of
21 the question is sustained.
22 BY MR. GOLDSTEIN:
23 Q   Now, this conversation that you had with the
24 governor on November 6th, he indicated to you that
25 he would make the request for HHS open and public,

1  is that correct?

2         MS. HAMILTON:  Objection.

3         THE COURT:  The objection is sustained to the

4  form of the question.

5  BY MR. GOLDSTEIN:

6  Q   Let's move to tab 21, please.

7         Are you there?

8  A   Yes.

9  Q   Now, this is a tab that was played for you while

10  you were preparing your testimony with the

11  government, is that correct?

12  A   Yes.

13  Q   And it was a tab played for you while you

14  testified last week, is that correct?

15  A   Yes.

16  Q   And the governor asked you questions about this

17  tab, is that correct?

18  A   This one, yes.

19  Q   So now I'm going to ask you questions about it.

20         If you could move to Page 13.

21         Are you there?

22  A   Yes.

23  Q   Good.

24         You say:

25      "Now, there's a way I can get the message to her

1    without going through anybody else in Obama's

2    team in making sure Obama doesn't even hear

3    it."

4    The governor says:

5    "How."

6    And you say "Mosena."

7    Who is Mosena?

8        MS. HAMILTON:  Objection.

9        THE COURT:  Sustained.

10   BY MR. GOLDSTEIN:

11   Q   Are those your words, Mr. Harris?

12       MS. HAMILTON:  Objection.

13       THE COURT:  The objection is sustained.

14   BY MR. GOLDSTEIN:

15   Q   Are you aware of anyone called Mosena?

16       MS. HAMILTON:  Objection.

17       THE COURT:  Sustained.

18   BY MR. GOLDSTEIN:

19   Q   Turn to Page 15, please.

20       Now, in this call that's been admitted into

21   evidence that you've gone over in testimony, on

22   Page 15, line 9, the governor says:

23   "It's still an extremely, extremely, you know,

24   unlikely long shot."

25       What did you understand him to be saying

1  there?

2      MS. HAMILTON:  Objection.

3      THE COURT:  Overruled.

4  BY THE WITNESS:

5  A  The governor was -- I understood the governor to

6  be telling me that he thought the chance of him

7  getting a favorable response to his request for

8  appointment to Secretary Health and Human Services

9  was an extremely, extremely unlikely long shot.

10 Q  If you could turn to tab 25, please.

11      Now, this is a call with yourself and the

12 governor and Mr. Yang, is that correct?

13 A  That's correct.

14 Q  And who was Mr. Yang?

15 A  He was one of the governor's political

16 consultants and he is one of his pollsters.

17 Q  And it's a relatively long conversation, is that

18 fair to say there were several different Senate

19 candidates discussed in this conversation?

20 A  Yes.

21 Q  Okay.  And on Page 8 --

22 A  8?

23 Q  8, yeah.  I'm sorry.

24      Now, Fred Yang on line 25 says:

25     "Right, so they're gonna say no, I got to

1        think."
2        And the governor says:
3        "No question."
4        What did you understand Mr. Yang to be saying?
5  A   I understood Mr. Yang to be expressing his
6  opinion that, in response to the governor's request
7  for appointment to the cabinet, the answer he would
8  get back would be no from the Obama administration.
9  Q   When the governor said "no question," what did
10 you understand him to be saying here?
11 A   I understood him to be agreeing with Mr. Yang.
12 Q   And if you could turn to Page 14, starting on
13 line 22, the governor says:
14       "And, look here, I love Emil, but Emil has, Emil
15       really f'd me on the House Bill 1."
16       Then he goes on to talk about it a little
17 bit more in detail.  What did you understand the
18 governor to be talking about there?
19 A   I understood the governor to be expressing to
20 Mr. Yang his current view that Emil Jones betrayed
21 him on the -- I'm sorry, on the ethics bill and was
22 down on the idea of considering Emil Jones.
23 Q   Did you agree with that assessment?
24       MS. HAMILTON:  Objection.
25       THE COURT:  Sustained.

:00PM
:01PM
:01PM
:01PM
:02PM

1 BY MR. GOLDSTEIN:

2 Q   Now, on Page 15, on line 33, Fred Yang says:

3       "Great 'cause I'm, I know this is kind of

4         tiresome, guys, we're just going through this

5         parlor game but I really can't think of a lot

6         of picks that you really, governor, that

7         directly or indirectly help you."

8           When Mr. Yang said "parlor game," what did

9 you understand him to be saying there?

10 A   I wasn't sure.

11 Q   Now, on Page 23, on line 16--and before you were

12 mentioning the Change To Win--on line 16 you say:"

13       "Well, that would be pursuant to a

14         conversation."

15           What were you saying here, "pursuant to a

16 conversation"?

17 A   That if the governor wanted to pursue the Change

18 To Win concept, he would have to have a conversation

19 with Andy Stern.

20 Q   Are you aware of any conversation with Andy

21 Stern?

22           MS. HAMILTON:  Objection.

23           THE COURT:  Sustained.

24 BY MR. GOLDSTEIN:

25 Q   Did you have any conversation with Andy Stern

:02PM

:02PM

:03PM

:03PM

:04PM

Harris - cross by Goldstein                    1734

1  pertaining to Change To Win?

2       MS. HAMILTON:  Objection.

3       THE COURT:  Are you addressing if he

4  personally had the conversation?

5       MR. GOLDSTEIN:  Correct.

6       THE COURT:  He can and that.

7  BY THE WITNESS:

8  A  No.

9  BY MR. GOLDSTEIN:

10  Q  Page 28, the governor says, on line 5:

11     "Well I know --"

12       THE COURT:  Could you give me the page again?

13       MR. GOLDSTEIN:  I'm sorry.  Page 28.

14       THE COURT:  Okay.  Thanks.

15  BY MR. GOLDSTEIN:

16  Q  Line 5 the governor says:

17     "Well, I know, depends on his mood, usually he's

18      the prince of darkness."

19        What did you understand the governor to be

20  talking about here?

21       MS. HAMILTON:  Objection.

22       THE COURT:  Sustained.

23  BY MR. GOLDSTEIN:

24  Q  Are you aware of what the term "prince of

25  darkness" is?

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3  BY MR. GOLDSTEIN:

4  Q   Now, just a page before, on Page 27, line 28,

5  this is the last line, Fred Yang says:

6       "I just thought, governor, that John Harris is

7        where good ideas went to die, I didn't know

8        that's where good ideas started from."

9           What did you understand Fred Yang to be

10  saying?

11          MS. HAMILTON:  Objection.

12          THE COURT:  Sustained.

13  BY MR. GOLDSTEIN:

14  Q   Now, in this conversation, Change To Win is

15  discussed, is that correct?

16  A   Yes.

17  Q   And before this conversation about Change To Win,

18  you had a conversation with Bill Quinlan, is that

19  correct?

20          MS. HAMILTON:  Objection.

21          THE COURT:  Sustained.

22  BY MR. GOLDSTEIN:

23  Q   If you can move to tab 28.

24          Now, in this conversation, this is

25  November 11, 2008, is that correct?

 1  A   Yes.
 2  Q   And it's fair to say one of the things you're
 3  doing here is relaying to the governor what Wyma
 4  told you, isn't that correct?
 5  A   Yes.
 6  Q   And what Wyma told you was what Rahm Emanuel told
 7  Wyma, is that correct?
 8          MS. HAMILTON:  Objection.
 9          THE COURT:  The objection is sustained.
10  BY MR. GOLDSTEIN:
11  Q   On Page 1, line 19, the governor says:
12      "He's calling on Rahm's behalf."
13       And you say:
14      "Yeah."
15          What did you understand the governor to be
16  saying and what were you saying there?
17  A   I understood him to be asking me whether I
18  understood Wyma was calling me on behalf of Rahm
19  Emanuel.
20  Q   And your answer was "yeah"?
21  A   Yes.
22  Q   Now, on Page 2, at the top of the page, you relay
23  the message and you say, starting on line 3:
24      "That Rahm asked him to deliver the message that
25       president-elect would be very pleased if you

Harris - cross by Goldstein                1737

1    appointed Valerie Jarrett since he would be

2    thankful and appreciative, those are the

3    operative words."

4        What did you understand thankful and

5  appreciative to mean?

6  A  I understood it to mean the president-elect would

7  be thankful and appreciative but nothing more.  In

8  other words, he wouldn't be dealing with the

9  governor with respect to any request for position

10  for himself.

11  Q  Now, you later on had a conversation with Rahm

12  Emanuel about thankful and appreciative, do you

13  recall that?

14        MS. HAMILTON:  Objection.

15        THE COURT:  Sustained.

16  BY MR. GOLDSTEIN:

17  Q  Now, if you go to tab 30.

18        Now, this conversation took place on

19  November 12th, 2008, is that correct?

20  A  That's correct.

21  Q  And part of this conversation, there was

22  discussion about a 501(c)(4), is that correct?

23  A  Yes.

24  Q  Now, you had testified that you and Bill Quinlan

25  had a conversation with the governor about

1  501(c)(4), is that correct?

2  A   Yes.

3  Q   I'm sorry, let me give you some background on

4  this.  As far as approximately, I think you said,

5  October or maybe even September of 2008, you had a

6  conversation with the governor, along with Bill

7  Quinlan, about 501(c)(4) in context of the senate

8  seat, is that correct?

9  A   Yes.

10 Q   And I think the comment was, you said that you

11 can't even joke about that?

12 A   The governor had mentioned to Bill Quinlan and I

13 about talking to other people who were interested in

14 the senate seat and the possibility of asking them

15 for either campaign contributions or a donation to a

16 501(c)(4) to be established that would serve the

17 governor's interests.

18 Q   Now, on Page 3, at the top, the governor says:

19     "Get the contributors and others to put 10, 15

20      million in it so I can advocate healthcare and

21      other issues I care about."

22         As far as the 10 to 15 million, was it your

23 understanding that that 10 to 15 million dollars

24 would go to the governor?

25 A   I'm sorry?

1  Q   Is it your understanding that that 10 to

2  15 million dollars would go straight the governor?

3  A   No, it would endow the organization and the

4  organization would employ the governor.

:11PM  5  Q   And the organization, as you understood it, on

6  Page 3, would be to do what?

7  A   Issue advocacy.

8  Q   For what particular issue?

9  A   Healthcare was a suggestion the governor made,

:11PM  10  but it could have been that as well as others.

11  Q   Now, you said "don't even joke about it," did you

12  raise any concerns in this call about it?

13  A   No.

14  Q   Now, on Page 5, line 6, the governor says:

:11PM  15      "Oh, yeah, definitely, but I want that

16        organization up and running now.  We put a

17        board, we got a board, a board of directors

18        that Quinlan and I been working on, I'd be

19        sitting there, and the, and the organization

:11PM  20        --"

21      THE COURT:  Wait.  I think you misread it.

22  It's "I'd be sitting there," I think that's what you

23  said.

24      MR. GOLDSTEIN:  I apologize.  Forgive me.

:12PM  25  The cough and the head is all over the place.

1          THE COURT:  Just start from the beginning.

2    BY MR. GOLDSTEIN:

3    Q   Okay:

4        "Oh, yeah definitely, but I want that

5         organization up and running now, we put a

6         board, we got a board of directors that Quinlan

7         I been working on, it be sitting there and the,

8         and the organization would begin advocating

9         this stuff."

10          Now, when the governor said "we got a board

11   of directors that Quinlan and I been working on,"

12   what did you understand him to be saying?

13   A   I wasn't sure what exactly he was referring to

14   other than prior discussions the governor had with

15   Quinlan as it related to work around the ethics bill

16   limitations.

17          There was some discussion with Quinlan about

18   establishing a Political Action Committee or an

19   advocacy organization with a board of directors that

20   could receive campaign contributions -- I'm sorry,

21   could receive contributions to itself and that

22   organization, in itself, could make campaign

23   contributions to the governor.

24          This was something that he had talked about

25   with Quinlan as it related to the ethics bill and

1  the limitations on campaign fundraising.  In this

2  conversation, he seems to be discussing it in a

3  different context that I wasn't aware of.

4  Q   You're aware that the governor had other

5  501(c)(4) type organizations before, is that

6  correct?

7          MS. HAMILTON:  Objection.

8          THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

10 Q   Turn to Page 6.

11         On line 29 the governor says:

12      "And I don't know if we, if, if were, you know,

13       were, ah, I wouldn't even be adverse to being

14       upfront about it and saying that we established

15       this organization, they're all going to watch

16       and to push these things that we done in

17       Illinois and that we can help, help you push in

18       Illinois."

19         What did you understand the governor to be

20 saying when he said being upfront about it?

21 A   Other than he would be announcing his intention

22 to leave office at some time to take a position with

23 an organization that would advocate the types of

24 things we did in Illinois.

25 Q   And is this in relation to the senate seat?

1  A   I would think it would happen around the same

2  time, but I didn't understand it to be together with

3  the appointment of the senate seat.

4  Q   And you understood that this plan, this deal,

5  could be made public, is that correct?

6          MS. HAMILTON:  Objection.

7          THE COURT:  The objection is sustained.

8  BY MR. GOLDSTEIN:

9  Q   Now, Page 7, if you can turn to that.

10         Now, after the governor talks about being

11 upfront about it and this 501(c)(4) organization, on

12 line 13 he says:

13     "What do you think?"

14      And you answer:

15     "I like it."

16         When the governor said "what do you think,"

17 what did you understand him to be asking?

18         MS. HAMILTON:  Objection.

19         THE COURT:  I'm sustaining it to this

20 question, but you could ask the other question.

21 BY MR. GOLDSTEIN:

22 Q   What were you saying when you said "I like it"?

23 A   I was agreeing with his idea that he had just

24 laid out.

25 Q   Now, on Page 8 -- actually, stay on Page 7.  I'm

Harris - cross by Goldstein                    1743

1  sorry.

2         You say on line 22:

3      "I, I think if they can't even do that, then,

4       then we're not having good faith discussions."

5         What were you saying when you're saying "not

6  having good faith discussions"?

7             MS. HAMILTON:  Objection.

8             THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

10 Q  What were you talking about in these three lines

11 here?

12            MS. HAMILTON:  Objection.

13            THE COURT:  Sustained.

14 BY MR. GOLDSTEIN:

15 Q  Now, Page 8, on line 20, the governor says:

16     "Hey, do you, why don't we start looking for an

17      African-American Tammy Duckworth, we can, can't

18      we?"

19          What did you understand the governor to be

20 saying there?

21            MS. HAMILTON:  Objection.

22            THE COURT:  Sustained.

23 BY MR. GOLDSTEIN:

24 Q   Had you been looking for an African-American

25 Tammy Duckworth?

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3   BY MR. GOLDSTEIN:

4   Q   When you responded and said on line 23:

5       "I can look, I've been, I've been, look, I've

6         been looking and we've gotten nothing back yet.

7       I've got feelers out on that."

8           What were you communicating to the governor?

9          MS. HAMILTON:  Objection.

10          THE COURT:  Sustained.

11   BY MR. GOLDSTEIN:

12   Q   On Page 10, on line 5, the governor says:

13       "Which one would get, ah, maligned more, Hendon,

14         Emil Jones or Louanner?"

15           When the governor said that on line 5 to 7,

16   what did you understand him to be saying?

17   A   He was asking me my opinion as to which, if he

18   selected any of these individuals, which one would

19   he be criticized in the media and politically for

20   the most.

21   Q   Was that your understanding when he actually said

22   it?  Because the next line you say, "who would be

23   aligned with you more"?

24           Was your understanding when you said that,

25   who would be maligned more?

1  A   No, I didn't understand the term "maligned," at
2  the time, but later on it became clear.
3  Q   So you later had that understanding?
4  A   Yes. I thought he was saying "aligned" first.
5  Q   Because the government asked you that and you
6  said he would be maligned but you actually said
7  "aligned," so it appears you didn't have that
8  understanding, is that correct?
9          MS. HAMILTON:  Objection.
10         THE COURT:  This is not the time for
11 argument, you can save that for later, and I don't
12 want an argument disguised as a question.
13 BY MR. GOLDSTEIN:
14 Q   Page 14, on line 31, you say:
15     "No, it's not ridiculous.  I mean, I just
16      thought the unions would probably be the likely
17      way to do this, but this other 501(c)(3) is
18      fine."
19         When were you saying to the governor?
20 A   The governor was asking me about ways to get a
21 job for himself.  And I told him that I thought the
22 union position was probably more likely, a more
23 likely way to do it, but the way he had described
24 the 501(c)c(3) I told him it would be similar and it
25 would be fine.

Harris - cross by Goldstein                    1746

1  Q   And on Page 15, on line 4, you say:

2      "You could, 501(c)(3) and also be on the board

3       of Change To Win or something, be somewhat

4       involved, because that guy, what's his name?

5       Seco was saying.  Is he somebody you, ah, ever

6       relied upon in the past."

7      The governor says:

8      "Who's that?"

9      You say:

10     "The guy you had on the phone with us the other

11      day."

12     "Blagojevich says:

13     "Oh, Sosnick.  Ah, yeah, a little bit in the

14      reelection.  He was Clinton's political

15      director when he was president."

16         When you were referring to that on the phone

17  the other day, what were you discussing?

18         MS. HAMILTON:  Objection.

19         THE COURT:  Sustained.

20  BY MR. GOLDSTEIN:

21  Q   Now, you go on further to say:

22     "Okay."

23      And the governor says:

24     "Sosnick, yeah; no, he's smart.  I mean, what

25      would you rather do, be doing this for another

1     6 years or kind of develop, develop off of this

2     and go in the private sector and build a much

3     better life for your family, for you, you know,

4     improve your financial situation."

5          What did you understand the discussion to be

6  about here?

7          MS. HAMILTON:  Objection.

8          THE COURT:  To the form of the question is

9  sustained.

10  BY MR. GOLDSTEIN:

11  Q   Did you know a person by the name of Sosnick?

12          MS. HAMILTON:  Objection.

13          THE COURT:  In the context of this, the

14  objection is sustained.

15  BY MR. GOLDSTEIN:

16  Q   Page 17, you say on line 5:

17     "You also trusted the values that you held as

18      something that would be good for people."

19      When you said that, what were you saying?

20          MS. HAMILTON:  Objection.

21          THE COURT:  The objection is sustained.

22  BY MR. GOLDSTEIN:

23  Q   And you go on further, on line 9:

24     "Now, as opposed to Thompson, who, you know, as

25      governor he was a deal maker, when he left

 1    governor and went into the private sector, he
 2    remained a deal maker, right?"
 3    The governor says:
 4    "Right."
 5    You say:
 6    "Putting people, putting people together to
 7    make money."
 8    What were you saying there?
 9        MS. HAMILTON:  Objection.
10        THE COURT:  Sustained.
11  BY MR. GOLDSTEIN:
12  Q  Now, if you could turn to tab 34, this is a
13  conversation you had with the governor on
14  November 12th, 10:26 in the morning, and at Page 2,
15  line 25 you say:
16      "And, ah, if we got any questions, to call him
17      back or and Rahm's happy to talk to you, and I
18      said to him so is there anyone else out there
19      authorized to be having discussions with us on
20      this issue.  He said no, just him.  I said
21      contrary to representations that may have been
22      made ...." I think this might be a typo "--
23      made by others, he said yes."
24      And then on the next page:
25      "So you know what I was getting at with that."

1       And then the governor says "Balanoff."

2          What were you saying there starting at

3    Page 2 to the governor?

4    A   I was relaying to him more of the conversation I

5    had just had with Rahm Emanuel.  And I had asked

6    Rahm Emanuel whether anyone else was authorized to

7    have discussions with the governor about the Senate

8    appointment.  Because we were still waiting to hear

9    back from Tom Balanoff in person and had not heard

10   from him yet and I was just wondering whether or not

11   Tom Balanoff was going to be coming back or not.

12   Q   And when the governor says, "Balanoff," what did

13   you understand him to be saying there?

14   A   That he was -- he understood what I was getting

15   at in my questioning of Rod.

16   Q   Which was?

17   A   Is Balanoff going to come back and talk to us.

18   Q   And the answer was?

19   A   "No."

20   Q   And on Page 4, in the middle of the page, around

21   line 20, the governor says:

22       "You know, I wanna play some sort of role,

23         Howard Dean is Health and Human Services,

24         Hillary Clinton's Secretary of State, and

25         Arnold Schwarzenegger, EPA."

1          What did you understand the governor to be
2  saying there?
3          MS. HAMILTON:  Objection.
4          THE COURT:  Sustained.
:26PM  5  BY MR. GOLDSTEIN:
6  Q   Are you aware that Arnold Schwarzenegger was a
7  possible candidate?
8          THE COURT:  Don't ask "are you aware,"
9  because you're asking for hearsay, things that have
:26PM 10  no foundation, and it's way outside the scope of the
11  direct.  You have other avenues here and this
12  particular one you shouldn't go down, and I think I
13  made it clear.
14  BY MR. GOLDSTEIN:
:26PM 15  Q   Tab 42, now in this tab you're relaying a
16  discussion you had with Emil Jones, is that correct?
17  A   Yes.
18  Q   And you said you weren't completely accurate, is
19  that fair to say?
:27PM 20  A   Yes.
21  Q   On line 22 you say:
22      "I said and what about this big bucket of money,
23       you know.  I said you're gonna help like minded
24       candidates, right.  He said yeah, I'm going to
:27PM 25       stay politically active.  Anyway, I'll tell you

1      more in person on that."

2           You said, at least the first two lines, that

3  it's an inaccurate description of the conversation

4  you had with Emil Jones, is that correct?

5  A   I said that the conversation that I relayed to

6  the governor did not accurately describe the

7  conversation I had with Emil Jones.

8  Q   Now, you said "anyway, I'll tell you more in

9  person on that," did you ever have an in-person

10  conversation with the governor about that?

11  A   On this subject, no.  After this discussion.

12  Q   After this?

13  A   No.

14  Q   Are you aware of any conversations about this

15  after this call?

16           MS. HAMILTON:  Objection.

17           THE COURT:  You're talking about is he aware

18  of any conversation with anybody in the whole world,

19  don't do that.

20  BY MR. GOLDSTEIN:

21  Q   To your knowledge, did the governor have any

22  conversations with Emil Jones after this

23  conversation?

24           MS. HAMILTON:  Objection.

25           THE COURT:  That one is irrelevant.  The form

1  is okay.

2          MR. GOLDSTEIN:  The form is okay?

3          THE COURT:  The form is okay, but you're

4  calling for something that is not relevance.

5          MR. GOLDSTEIN:  Okay.  Close, I guess.  Can I

6  get half an answer?

7          THE COURT:  No.

8          MR. GOLDSTEIN:  Okay.

9  BY MR. GOLDSTEIN:

10 Q   If you turn to Page 4, you're relaying another a

11 conversation you had with Emil Jones, and on line 24

12 you say:

13     "Yeah, so I wanted to leave that impression only

14       because, you know, we're left here f' stuck in

15       the mud, you know, weakened because of that

16       f'ing ethics bill" and then you laugh.

17          What were you saying when you said "weakened

18 because of that f'ing ethics bill"?

19 A   That the governor's ability to fundraise to build

20 up his campaign war chest was severely restricted as

21 a result of the passage of the ethics bill that

22 passed with Emil's help.

23 Q   Now, on Page 6, on line 11, the governor says:

24     "You really think, he thinks, I, that I'm

25       considering myself or is this -- or is that

1    just 'cause you put it in his head?"
2    Then you say:
3    "Ah, I can't really tell you how he felt about
4    it before I came in there, I can tell you after
5    I left he thought it was more real or he
6    thought it was real.  I don't want to say more
7    because that implies I knew how, how he felt
8    about it before.
9        In this conversation between you and the
10   governor, these two paragraphs, what were you
11   communicating to the governor?
12   A   The governor was asking me whether I thought
13   Mr. Jones believed the governor was seriously
14   considering appointing himself.  And I said yes, and
15   I think part of that reason was because of my
16   explanation to Emil Jones that the ethics bill had
17   weakened the governor and he may have no choice but
18   to send himself, or very few other options, to the
19   Senate.
20   Q   And when the governor said I'm considering myself
21   or is this just could you put it in his head, what
22   did you understand him to be asking?
23   A   I understood him to be asking me what I
24   interpreted to be Emil Jones' view of that
25   possibility, before and after.

1  Q   What was your understanding as to why he was

2  concerned about that being put in Emil Jones' mind?

3          MS. HAMILTON:   Objection.

4          THE COURT:   Sustained.

5  BY MR. GOLDSTEIN:

6  Q   You understood at this point that the governor

7  wanted to appoint himself, is that correct?

8          MS. HAMILTON:   Objection.

9          THE COURT:   Sustained.

10  BY MR. GOLDSTEIN:

11  Q   Turn to tab 58.

12          Now, this conversation is December 3rd, 2008,

13  is that correct?

14  A   Yes.

15  Q   And you're discussing potential money going to

16  Wrigley Field, is that correct?

17  A   Yes.

18  Q   And on Page 3, line 18 and 19, the governor says:

19      "Okay, good, and you're working on Jim Hendry,

20       right."

21  A   Yes.

22  Q   What did you understand the governor to be saying

23  there?

24  A   He was asking whether I was making progress on

25  his directive to me earlier to prepare street signs

1   for an honorary street to be -- or section of

2   roadway to be dedicated to the Honorary Jim Hendry

3   Way, and I was working -- he was asking me what

4   progress I was making on that project.

:33PM  5   Q   And your understanding is trying to get this done

6   before he appointed himself, is that correct?

7          MS. HAMILTON:  Objection.

8          THE COURT:  The objection is sustained.

9   BY MR. GOLDSTEIN:

:33PM  10  Q   Now, in this conversation, it's fair to say that

11  the governor wants this money to get moving quickly?

12  Is that fair to say?

13  A   He had an interest this being done, yes.

14  Q   And the interest and urgency to provide these

:33PM  15  funds was so that he could appoint himself, it

16  couldn't be done if he appointed himself?

17          MS. HAMILTON:  Objection.

18          THE COURT:  Sustained.

19  BY MR. GOLDSTEIN:

:33PM  20  Q   Tab 66, now this is a conversation you had on

21  December 4th.

22  A   Yes.

23  Q   And you said that this so-called offer from Jesse

24  Jackson, this is the first time you were made aware

:34PM  25  of it?

Harris - cross by Goldstein                    1756

1  A   He mentions it in a couple of calls, I'm not sure
2  whether this is the first or the second call.
3  Q   Well, on this day, December 4th, I think you had
4  said in your direct testimony that this was the only
5  thing that changed, to your knowledge, this
6  so-called offer?
7  A   I wasn't aware that he was having discussions
8  about this and that the question, if I recall
9  correctly, was had anything changed between the time
10 the governor told me he felt Jesse Jackson, Jr. was
11 a repugnant thought and dismissed my making an
12 argument on his behalf earlier and this call, yes.
13 Q   So there's no discussions that you had in that
14 time frame discussing this offer, is that correct?
15 A   No.
16 Q   Okay.  So you're not aware of any other
17 discussions had even before then, is that correct?
18        MS. HAMILTON:  Objection.
19        THE COURT:  Sustained.
20 BY MR. GOLDSTEIN:
21 Q   Now, did you ever have conversations with Bob
22 Greenlee about this subject?
23        MS. HAMILTON:  Objection.
24        THE COURT:  Sustained.
25 BY MR. GOLDSTEIN:

:34PM

:34PM

:35PM

:35PM

:35PM

1  Q   Page 7, on line 28, the governor says:

2      "When you calling Rahm?"

3       And you said:

4       "I got a call in to him already."

5           What did you understand the governor to be

6  asking you?

7  A   Whether or not I had communicated with Rahm

8  Emanuel pursuant to an earlier directive of his to

9  call Rahm Emanuel.

10 Q   And the earlier directive of his was to call Rahm

11 Emanuel to throw out the name Jesse Jackson, Jr. to

12 the Obama camp, is that correct?

13 A   To confirm with the Obama camp whether Jesse

14 Jackson, Jr. was still an acceptable candidate.

15 Q   And that was to use Jesse Jackson, Jr. as

16 negative leverage for the Lisa Madigan play, is that

17 correct?

18           MS. HAMILTON:  Objection.

19           THE COURT:  Sustained.

20 BY MR. GOLDSTEIN:

21 Q   You answered on direct examination that it was

22 just to confirm with the Obama camp about Jesse

23 Jackson, Jr. being a viable candidate, is that

24 correct?

25           MS. HAMILTON:  Objection.

Harris - cross by Goldstein                    1758

1          THE COURT:  Sustained.
2  BY MR. GOLDSTEIN:
3  Q   You didn't say that, Mr. Harris?
4          MS. HAMILTON:  Judge, objection.
5          THE COURT:  Sustained.
6  BY MR. GOLDSTEIN:
7  Q   Now you talk about Lisa Madigan, that's correct?
8          MS. HAMILTON:  Objection.
9          THE COURT:  Sustained.
10 BY MR. GOLDSTEIN:
11 Q   In your testimony, did you ever talk about the
12 name Lisa Madigan?  Does that name sound familiar to
13 you, Mr. Harris?
14 A   Yes, it does.
15 Q   Very familiar probably, right?
16 A   Yes.
17 Q   Okay.  Good to know.
18         MS. HAMILTON:  Objection.
19         MR. GOLDSTEIN:  I'll take that back, it's not
20 good to know.
21 BY MR. GOLDSTEIN:
22 Q   Now, you talked about for a long time what's
23 called the Lisa deal in your conversations with the
24 governor, is that correct?
25         MS. HAMILTON:  Objection.

 1          THE COURT:  The objection is sustained.
 2    BY MR. GOLDSTEIN:
 3    Q   Is it fair to say from the summer of 2008 to the
 4    day the governor was arrested, Lisa Madigan was a
 5    subject discussed?
 6          MS. HAMILTON:  Objection.
 7          THE COURT:  The objection is sustained.
 8    BY MR. GOLDSTEIN:
 9    Q   Now, you made, and I'll get -- want to get the
10    answer exactly correct, that you were talking about
11    the Madigan deal and whether anything was done to
12    achieve it, is that correct?  Do you recall being
13    asked that type of question in your direct
14    examination?
15    A   Yes.
16    Q   Just so I get it straight, what was your exact
17    answer?
18    A   That I wasn't aware of any steps taken in that
19    direction with respect to communicating to the
20    Madigan camp.
21    Q   Now, you're aware, on December 1st through the
22    2nd, that the governor went to Philadelphia, is that
23    correct?
24    A   Yes.
25    Q   And that was with Quinlan, Greenlee, as well as

1  Fred Yang and Bill Knapp, is that correct?

2          MS. HAMILTON:  Objection.

3          THE COURT:  Sustained.

4  BY MR. GOLDSTEIN:

5  Q   And you're aware that this was a strategy meeting

6  about the Lisa Madigan deal?

7          MS. HAMILTON:  Objection.

8          THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

10  Q   You're aware that the governor spoke to several

11  people --

12          MS. HAMILTON:  Objection.

13          THE COURT:  Don't do that.  You could be

14  talking about somebody that somebody told him that

15  is a lie, and then he says I'm aware of it because

16  he believed the lie.  You're asking for any source

17  of information and a lot of that is inadmissible and

18  unreliability that's why I persistently sustained

19  these objections to general questions about his

20  awareness.

21          This is not a man on the street to be asked a

22  question about whether he is aware that the American

23  troops are in Pakistan.  This is a man called to

24  testify to things he witnessed, not things he's

25  generally aware of, because what people are

1  generally aware of sometimes is wrong.  This is why

2  we have witnesses testify to what they have seen and

3  heard, not to what they are generally aware of,

4  unless you have an expert opinion, and this is not

5  it.

6  BY MR. GOLDSTEIN:

7  Q  Mr. Harris, it was your understanding on

8  December 4th --

9        MS. HAMILTON:  There's going to be an

10  objection on hearsay.

11       THE COURT:  Yeah.  Maybe try starting it a

12  different way.

13       MR. GOLDSTEIN:  I was trying to copy what the

14  government does, but that doesn't work here.

15       THE COURT:  No, no, what the government was

16  doing was asking understanding of a statement made

17  directly to him, that's what that was for.  You're

18  talking about understanding of stuff that was not

19  directly with this witness, and you've done that

20  persistently.  There is a way to get these

21  contentions into evidence and I expect you some day

22  perhaps to use it.  This is not the way.

23  BY MR. GOLDSTEIN:

24  Q  Now, right before this tab, tab 66, at

25  11:23 a.m., you had a conversation with the governor

Harris - cross by Goldstein                1762

1  at 11:07 a.m., is that correct?

2          MS. HAMILTON:  Objection.

3          MR. GOLDSTEIN:  It's not in the book --

4          THE COURT:  Come to the side.

5       (Proceedings heard at sidebar on the record.)

6          THE COURT:  This is not in the book?

7          MS. HAMILTON:  No, and Mr. Goldstein knows

8  it's inappropriate because we went down this road at

9  Trial One when Sam Adam, Sr., started asking

10 questions about this call and, if you recall, you

11 excused the jury and there were a series of

12 questions outside the presence of the jury.

13         THE COURT:  Oh, is that the one that was

14 played --

15         MR. GOLDSTEIN:  Judge, that is actually an

16 incorrect assessment of what happened.  The

17 questions were asked, they were all answered, and

18 then we wanted to play the tape and the tape wasn't

19 allowed to be played.

20         THE COURT:  And you're going to ask him about

21 statements your client made?

22         MR. GOLDSTEIN:  Yes.

23         THE COURT:  Right.  So, in fact, you're

24 offering hearsay.

25         MR. GOLDSTEIN:  I'm impeaching him on his

:42PM

:48PM

:48PM

:48PM

:49PM

1  understanding --

2          THE COURT:  No, no, you're not impeaching at

3  all.  There is a joke.  Basically you're trying to

4  get stuff in through the back door and you're not

5  entitled to get it in this way.  There are other

6  ways to get it in.  And if you don't want to put on

7  a case, don't put yourself in the position where

8  you're inviting the jury to wonder why you don't

9  back up your questions.  This is, I think, a

10 dangerous tactic.  You're entitled to exercise it,

11 but you can't refer to the statement.

12     (Proceedings resumed within the hearing of the

13      jury.)

14 BY MR. GOLDSTEIN:

15 Q   Now, you're aware that -- strike that.

16          You prepared several lists regarding this

17 Lisa Madigan deal, is that correct?

18          MS. HAMILTON:  Objection.

19          THE COURT:  Sustained.  Sustained on

20 relevance grounds.

21 BY MR. GOLDSTEIN:

22 Q   Now, it was you that said that the Madigans

23 should come to the governor as opposed to the

24 governor to reach out to the Madigans, is that

25 correct?

1          MS. HAMILTON:  Objection.

2          THE COURT:  Sustained.

3   BY MR. GOLDSTEIN:

4   Q   In November of 2008, you had a conversation with

5   the governor where the governor asked you whether he

6   should reach out to Madigan and you told him "my gut

7   tells me --"

8          MS. HAMILTON:  Objection.

9   BY MR. GOLDSTEIN:

10  Q   -- we should let them come to us" --

11         THE COURT:  The objection is sustained.

12  BY MR. GOLDSTEIN:

13  Q   Rahm eventually contacted you, is that correct?

14         MS. HAMILTON:  Objection.

15         THE COURT:  Sustained.

16  BY MR. GOLDSTEIN:

17  Q   On December 1st of 2008, it was your

18  understanding that the governor wanted to appoint

19  himself, is that correct?

20         MS. HAMILTON:  Objection.

21         THE COURT:  Sustained.

22  BY MR. GOLDSTEIN:

23  Q   Did you have a conversation with the governor

24  about Oprah Winfrey as a possible candidate?

25         MS. HAMILTON:  Objection.

1      THE COURT:  Sustained on relevance grounds.

2  BY MR. GOLDSTEIN:

3  Q   Now, you talked in some of these conversations

4  that you were rehearsing what the governor should

5  say to particular people, do you recall that?

6  A   Yes; in preparation for his meeting with Tom

7  Balanoff, he asked me to help him rehearse war game

8  his discussion with Tom Balanoff and how to make the

9  best argument for his request in support of his

10  request.

11  Q   What do you mean by war game?

12  A   To rehearse how the conversation might go and how

13  the governor should phrase what he wanted to

14  communicate.

15  Q   In your 40 some odd conversations with the

16  government, were you rehearsing your testimony?

17      MS. HAMILTON:  Objection.

18      THE COURT:  The objection is sustained.

19  BY MR. GOLDSTEIN:

20  Q   Now, on December 9, 2008, you were arrested and

21  it was then that you decided to cooperate with the

22  government, is that correct?

23  A   After consultation with my attorney later that

24  day and the next day, I agreed to cooperate with the

25  government.

Harris - cross by Goldstein                    1766

1  Q   Had you listened to any tapes at that point?

2  A   No.

3  Q   Did you have any conversation with your attorney

4  as far as how much it would cost to go to trial --

5          MS. HAMILTON:  Objection.

6          THE COURT:  Sustained.

7  BY MR. GOLDSTEIN:

8  Q   Mr. Harris, did you commit any crimes here?

9          MS. HAMILTON:  Judge --

10         THE COURT:  Sustained.

11         MR. GOLDSTEIN:  Nothing further.

12         MS. HAMILTON:  May I have one moment, Your

13  Honor?

14         THE COURT:  Sure.

15     (Brief pause).

16         MS. HAMILTON:  No redirect, Your Honor.

17         THE COURT:  You may step down.

18     (Witness excused.)

19     MR. SCHAR:  Judge, we'll call Tom Balanoff to

20     the stand.

21     (Brief pause).

22         THE COURT:  It's over there.

23         Face me and raise your right hand.

24     (Witness duly sworn.)

25         THE COURT:  Please be seated.

1    THOMAS BALANOFF, GOVERNMENT WITNESS, SWORN

2              DIRECT EXAMINATION

3  BY MR. SCHAR:

4  Q   Sir, could you please state your name and spell

5  your name for us.

6  A   Thomas Balanoff, B-a-l-a-n-o-f-f.

7  Q   Where are you currently employed, Mr. Balanoff?

8  A   Service Employees International Union Local 1.

9  Q   Is the Service Employees Internation Union

10  sometimes referred to as SEIU?

11  A   Yes, sir.

12  Q   Is it okay if I referred to it as SEIU?

13  A   That's fine.

14  Q   What is SEIU?

15  A   SEIU is a union of service workers.  We represent

16  workers in many different industries.  My local

17  represents property service workers, janitors,

18  window washers, doormen, security.

19         Our broader national union represents

20  healthcare workers, public employees, many workers

21  in the service sector.

22  Q   How long have you worked at SEIU?

23  A   I've been the president of Local 1 since 2000 and

24  I first started SEIU in 1988.

25  Q   You indicate you are the president of Local 1,

1  what are your job responsibilities as the president
2  of Local 1?
3  A  Well, I'm the chief executive, so I run the union
4  overall, could run everything from heading up major
5  negotiations to staff issues and things of that
6  nature.
7  Q  What did you do before taking a full-time job at
8  SEIU?
9  A  I've been in the labor movements since 1973, so I
10 worked for other unions.
11 Q  What is your educational background, sir?
12 A  I have a bachelor's degree in history from the
13 university of Indiana and a master's degree in labor
14 industrial relations from the University of
15 Illinois.
16 Q  Are you familiar with an individual named Rod
17 Blagojevich?
18 A  Yes, I am.
19 Q  How are you familiar with the defendant?
20 A  He was the governor of Illinois.
21 Q  When did you first meet him?
22 A  I first met him, oh, probably 6 months before he
23 first ran for office, which I think would be 2001.
24 Q  Was SEIU a supporter of his election and
25 reelection?

Balanoff - direct by Schar                    1769

1  A   Yes, we were.

2  Q   And after he was elected, would you meet with him

3  from time to time?

4  A   Yes, I would.

5  Q   Directing your attention to his reelection in

6  2006.

7        After his recollection in 2006, about how

8  often would you meet with the defendant?

9  A   Not as often as I had in his first term.  I would

10 say probably, you know, 5, 6, maybe half a dozen

11 times.

12 Q   In total?

13 A   In total, yes.

14 Q   What were the purposes of these meetings?

15 A   Generally the purposes were to talk about policy,

16 legislation, things of that nature.

17 Q   Do you have a personal relationship or

18 professional relationship with him?

19 A   Professional.

20       MR. SCHAR:  I'm assuming there's a

21 stipulation on identity.

22       MR. GOLDSTEIN:  Yes.

23       MR. SCHAR:  Judge, if we could just ask the

24 record to reflect the stipulation.

25       THE COURT:  So stipulated that when he

1   mentions the name, he's talking about the defendant

2   in this case.

3        MR. SCHAR:  Thank you, Judge.

4   BY MR. SCHAR:

:52PM   5   Q   Mr. Balanoff, I would you like to direct your

6   attention to 2008, and specifically in the summer,

7   fall of 2008.

8        At that time were you involved in any way in

9   President Obama's presidential campaign?

:53PM   10   A   Yes.  Yes, I was and our union was.

11   Q   How so?

12   A   We supported him, we were helping him try to win

13   primaries, and then helping him trying to win the

14   general election.

:53PM   15        Our union, particularly, worked northern

16   Indiana in the hope of the winning Indiana general

17   election, because in Illinois we were pretty certain

18   he was going to win this state.

19   Q   Had you known him prior, had a long-standing

:53PM   20   relationship with Barack Obama?

21   A   Yes, I did.  Yes, I do.

22   Q   At some point, Mr. Balanoff, did you begin to

23   have interval discussions at SEIU about who might

24   fill President Obama's senate seat should he be

:53PM   25   elected?

1  A   Yes, we did.

2  Q   Generally speaking, who were you talking to?

3  A   Myself and Andy Stern who was the president of

4  our national union.

5  Q   Why did SEIU have an interest in the senate seat

6  in Illinois?

7  A   Well, we had an interest that we wanted a senator

8  who would represent the interests of our members and

9  the interests of working families, and that was

10 primarily the reason.

11 Q   Direct your attention to early fall, did you have

12 a conversation with Mr. Stern about particular

13 candidates who SEIU might favor for the senate seat

14 should it become available?

15 A   Yes, we did.

16 Q   Was that conversation in person or over the

17 phone?

18 A   Over the telephone.

19 Q   What did you and Mr. Stern discuss?

20 A   He asked me who I liked in the senate seat race.

21 I told him I like Jan Schakowsky, I thought she

22 would be a strong candidate.  I told him I didn't

23 believe that she would be chosen.

24         MR. GOLDSTEIN:  Objection; hearsay.

25         THE COURT:  It's admitted to explain his

1  subsequent conduct, and for that purpose only, not

2  for its truth.

3  BY THE WITNESS:

4  A   At that time, when I called, he asked me what I

5  thought about Valerie Jarrett.  When I said I

6  thought she would make a good candidate, I told him

7  then that I thought that President Obama would

8  probably want her in his administration, though.

9  Q   Did you know Ms. Jarrett at that time?

10 A   I knew of her.

11 Q   How?

12 A   Didn't know her personally.

13 Q   How did you know of her?

14 A   Well, she was a well-known person, she had served

15 in different positions in, I believe, the Daley

16 administration, a civic leader, business leader.

17 Q   At some point later, did you have another

18 conversation with Mr. Stern and about Ms. Jarrett in

19 particular?

20 A   Yeah, later, mid to late October, he called me

21 again, we talked about it, he raised Valerie Jarrett

22 again, and again I said to him I thought that the

23 President Obama would probably want her in the White

24 House.  He said that he had talked to Valerie

25 Jarrett and she was interested.

1  Q    Interested in what?

2  A    In the Senate position.

3  Q    And shortly before the actual election on

4  November 4th of 2008, did you talk to Mr. Stern

5  again over the phone?

6  A    Yes.  Yes, I did.

7  Q    And at this point, obviously it was fairly close

8  to the election, it was beginning to look more

9  positive for President Obama likelihood to be

10 elected?

11 A    Yes, it was.

12 Q    What, if anything, did you and Mr. Stern discuss

13 at that point?

14 A    Mr. Stern called me and told me he was going --

15 Andy as coming in to Chicago on Monday morning, the

16 Monday before the election, and was going to be in

17 the northwest Indiana in this election day and he

18 asked if I could set up a meeting with the governor

19 on Monday afternoon, of I think it was November 3rd.

20 Q    Did you agree to try to do that?

21 A    Yes, I did.

22 Q    After talking to Mr. Stern, what did you do?

23 A    I believe I talked to Doug Scofield and asked him

24 if he could reach out to the governor and set up a

25 meeting for Monday afternoon.

1  Q   How did you know Mr. Scofield?

2  A   Mr. Scofield was a consultant for us, he had done

3  PR work and relation work for our local, so I knew

4  him.

:57PM  5  Q   Was, in fact, a meeting set up?

6  A   Yes, there was.

7  Q   Where?

8  A   At the Governor's office at the Thompson Center.

9  Q   Did you attend a meeting at the Thompson Center

:57PM  10  on November 3rd?

11  A   Yes, I did.

12  Q   What happened when you got to the Thompson

13  Center?

14  A   We went up to the 16th floor and went into the

:57PM  15  Governor's office and had a meeting.

16  Q   When you say "we" who were you with?

17  A   I was with Andy Stern.

18  Q   Who was present for the meeting?

19  A   Governor Blagojevich, John Harris, and Doug

:57PM  20  Scofield, in addition to myself and Andy Stern.

21  Q   You mentioned John Harris, did you know John

22  Harris?

23  A   Yes.

24  Q   You met him before?

:58PM  25  A   I had.

1  Q   How often had you seen him before this meeting?

2  A   A few times.

3  Q   Did you ever talk to him on the phone?

4  A   No, I never had.

:58PM  5  Q   What, if anything, during this November 3rd

6  meeting was discussed in relation to the senate

7  seat?

8  A   Well, we talked about the senate seat.  I started

9  out the conversation by raising that I thought Jan

:58PM 10  Schakowsky would be an excellent candidate, moved

11  past that and talked about other candidates.

12  Q   Who else came up?

13  A   Well, at one point, and I'm not sure if it was

14  Andy Stern or myself, who raised Valerie Jarrett's

:58PM 15  name.

16  Q   What was discussed in relation to Ms. Jarrett?

17  A   Governor Blagojevich said that he thought that

18  she would make a good senator and that he assumed he

19  would hear from President Obama if that was his

:58PM 20  desire.

21  Q   You said if it was his desire, whose --

22  A   If it was the president's desire.

23  Q   To have Ms. Jarrett?

24  A   Yes.

:59PM 25  Q   Did other names come up during the discussion?

1  A   Yes, several names came up.

2  Q   Did Congressman Jackson's name come you?

3  A   Yes, it did.

4  Q   What was discussed?

5  A   It came up and both I and the governor didn't

6  think he was a good idea.

7  Q   You said didn't think it was a good idea?

8  A   Did not think it was a good idea.

9  Q   Referring to what?

10  A   To appointing Congressman Jackson to the Senate.

11  Q   Did Lisa Madigan's name come up?

12  A   Yes, it did.

13  Q   How so?

14  A   The governor raised it, said that he could

15  appoint Lisa Madigan and that would be a smart

16  political decision, as well, as he could perhaps

17  move some of his legislative agenda.

18  Q   Was there an individual named Robert Greenlee at

19  this meeting, to your recollection?

20  A   No.

21  Q   Did you know who he was?

22  A   Yes.

23  Q   Had you met him prior to this?

24  A   I had met him once.

25  Q   Did you ever talk to him on the phone?

Balanoff - direct by Schar                    1777

1  A   No.

2  Q   Now, the evening of November 3rd, that was

3  election evening, at some point did you receive a

4  phone call that you did not take?

5  A   Yes, I did.

6  Q   Why didn't you take the phone call?

7  A   It said "unknown" on it, I wasn't sure who it

8  was, so I figured they'd leave me a message and then

9  I'd know who it was.

10 Q   Did you check your messages?

11 A   Yes, I did.

12 Q   Who had left a message?

13 A   Then Senator Obama.

14 Q   What, if anything, did he ask you to do?

15 A   He said, "Tom, this is Barack, give me a call."

16 Q   And did you have a phone number to call him back?

17 A   I did have a phone number, a cell number for him

18 and I tried to return the call on that number but it

19 was disconnected.

20 Q   Did you eventually reach out to someone else in

21 the campaign to indicate that you were trying to get

22 in touch with then Senator Obama?

23 A   Yes, I reached out to one of his aides who I knew

24 and told him that the president, Senator Obama, had

25 tried to call me and if he'd call back I'd take the

:00PM

:00PM

:00PM

:00PM

:01PM

Balanoff - direct by Schar                          1778

1  call.

2  Q   At some point did you receive another call that

3  evening?

4  A   Yes, I did.

:01PM  5  Q   Where were you when you received the call?

6  A   I was pumping gas in my car on the corner of

7  Congress and Dearborn.

8  Q   Who was on the phone?

9  A   President -- Senator Obama.

:01PM  10  Q   What did you and then Senator Obama discuss?

11  A   Well, first thing I said to him is, "are we going

12  to bring it home tomorrow," I said, "are we going to

13  bring Indiana home," and he said, "well, that'll be

14  determined by turnout," and I said, "don't worry,

:01PM  15  we're going to get a big turnout."  And then he

16  said, "Tom, with regards to the U.S. senate seat,"

17  he said, "I have two criteria --"

18          MR. GOLDSTEIN:  Objection; hearsay.

19          THE COURT:  It's admitted only for the

:01PM  20  purpose of giving context to his conversation and

21  for the purpose of explaining the witness'

22  subsequent actions, if any.

23          MR. SCHAR:  Thank you, Judge.

24  BY THE WITNESS:

:02PM  25  A   He said, "I have two criteria.  One, that they be

1  good for the citizens of Illinois, and, two, that
2  they can be reelected."
3       Then he said that he was -- he thought there
4  were several people who met those criteria but he
:02PM  5  was not going to support anybody publicly.
6       He then told me that he preferred to have
7  Valerie Jarrett in the White House with him, but
8  that she would like to be the senator and he thought
9  she met both of those criteria.
:02PM  10 Q  What, if anything, did you indicate that you
11 would do after having talked to the President?
12 A  I said to him that I was going to reach out to
13 governor Blagojevich and talk about Valerie's
14 appointment.
:02PM  15 Q  And what was your understanding, based on that
16 conversation, was your role to communicate that to
17 the defendant?
18 A  It was my understanding he knew I was going to go
19 and talk to the governor about it.
:02PM  20 Q  That was the evening of November 3rd, the
21 following day was November 4th?
22 A  Yes.
23 Q  Election day.
24      Where were you on election day?
:03PM  25 A  I was in northwest Indiana.

1  Q   At some point, did you have a conversation with
2  Ms. Jarrett?
3  A   Yes, I did.
4  Q   Did you have Ms. Jarrett's phone number?
5  A   No, I didn't.  Andy Stern suggested that I call
6  her.  I didn't have her number, but his assistant,
7  who was with him, did, so she dialed the number and
8  I talked to Valerie.
9  Q   What did you and Ms. Jarrett discuss?
10 A   I said to Valerie, I said, "Hi, this is Tom
11 Balanoff."  I said, "I understand you're interested
12 in running for the U.S. Senate."  She said, "didn't
13 Barack called you last night."  I said he did, and I
14 said that I thought she would make a good senator
15 and that I was going to talk to governor Blagojevich
16 and advocate on her behalf.
17 Q   What did you do on election day?
18 A   Election day?
19 Q   Election night.
20 A   On election night, my wife and I went to the
21 Hilton Towers, which is right across the street from
22 Grant Park, there was a number of other officials
23 from SEIU, and we watched the election returns.
24 Q   What was occurring at Grant Park that evening?
25 A   That evening, that's where President Obama was

1  hopefully going to give his victory speech, which he
2  did, and that's where he had the rally.
3  Q   At some point did you leave the Hilton and head
4  over to Grant Park?
5  A   When it became apparent that he was going to win
6  the votes, we all left and started to walk to Grant
7  Park.
8  Q   What happened on your way to Grant Park?
9  A   On my way in, I saw governor Blagojevich and
10 Senator Emil Jones walking out together.
11 Q   What happened next?
12 A   I pulled the governor aside and said, "you know
13 the conversation we had the other day, well I want
14 to come in and talk to you more about it and I'll
15 give you a call."
16 Q   When you referred to a conversation the other
17 day, what were you --
18 A   About the Senate appointment.
19 Q   On November 3rd?
20 A   On November 3rd, yes.
21 Q   What was the defendant's response?
22 A   He said, "great, give me a call."
23 Q   What happened the next morning?
24 A   The next morning I called Doug Scofield and asked
25 Doug if he could set up a meeting with the governor.

1  Q   And was a meeting, in fact, scheduled?

2  A   Yes, it was.

3  Q   For when?

4  A   For the next day.

:05PM  5  Q   November 6th?

6  A   Yeah, November 6th.

7          MR. SCHAR:  Judge, do you want me to continue

8  going or do you want to break?

9          THE COURT:  I'm thinking.

:05PM  10         20 minutes.

11         THE MARSHAL:  All rise.

12     (The following proceedings were had out of the

13      presence of the jury in open court:)

14         THE COURT:  You can step down.

:06PM  15         THE WITNESS:  Thank you.

16     (Recess.)

17         THE MARSHAL:  All rise.

18

19     (The following proceedings were had in the

:32PM  20      presence of the jury in open court:)

21         THE COURT:  Please be seated.

22         You may resume.

23         MR. SCHAR:  Thank you, Judge.

24  BY MR. SCHAR:

:32PM  25  Q   Mr. Balanoff, when we broke you indicated that

Balanoff - direct by Schar                    1783

1  you had been able to set up a meeting for

2  November 6th with the defendant, is that accurate?

3  A   Yes.

4  Q   Did you, in fact, attend a meeting with the

5  defendant on November 6th?

6  A   I did.

7  Q   Where?

8  A   His office at the Thompson Center.

9  Q   Who was present at that meeting?

10 A   He and I were.

11 Q   How did the meeting begin?

12 A   When we got in his office, I said, you know, the

13 other day when we talked you said you'd assume you'd

14 hear from President Obama, I don't believe you will,

15 I said, you know, I'm close to President Obama, I'm

16 close to you, so I'm here to speak, and he

17 understood what I was conveying to him.

18 Q   What were you trying to convey to him?

19 A   I was trying to convey to him that I wasn't just

20 freelancing, that I had talked to someone of

21 importance and they knew I was there talking to him.

22 Actually, I was conveying to him that I had talked

23 to Obama, I didn't say that but that's what I was

24 trying to imply.

25 Q   What was the defendant's response to this?

1  A   He said he understood.

2  Q   What happened next?

3  A   Next I told him I was there to advocate for

4  Valerie Jarrett.  I told him that I thought she

5  would be a good senator, that she had the experience

6  in the business community and she was a civic

7  leader, and I thought, overall, she would be good

8  for the State of Illinois.

9  Q   What happened next?

10  A   He said he agreed, and then I went on to explain

11  to him that I thought it would be a smart political

12  decision for him.

13  Q   When you say a smart political decision, what did

14  you explain to him?

15  A   Well, I explained to him that in picking Valerie,

16  that more than likely he would make African-American

17  voters happy, he would make women happy, he would

18  make the business community, she was a business

19  leader, and would make labor happy, and would make

20  us, SEIU happy.

21  Q   What was the defendant's response to your

22  advocating for Ms. Jarrett?

23  A   He agreed that she would make a good senator and

24  that, politically, it would be smart.

25  Q   What did he say next?

1  A  He said, however, that he was in active

2  discussions with the Madigans about appointing Lisa

3  Madigan as the senator.

4  Q  What, if anything, did he say about appointing

5  Ms. Madigan to the senate seat?

6  A  Well, he said that if he appointed Lisa Madigan,

7  one, that he would probably remove who would

8  probably be his number one opponent in his

9  reelection.  He said also that he felt that what he

10 was negotiating is that he could move some of his

11 legislative priorities, the Capital bill, healthcare

12 reform.

13 Q  Did you know at the time whether, in fact, the

14 defendant was in active discussions?

15 A  I didn't --

16      MR. GOLDSTEIN:  Objection.  Objection to what

17 he knew.

18      THE COURT:  Yeah.

19      Ask him what he believed.

20 BY MR. SCHAR:

21 Q  Did you have a belief, one way or the other, as

22 to whether he was in active discussions?

23 A  I wasn't sure if he was in active discussions or

24 not.

25 Q  What was your response to the defendant's

1  statement that he in active discussions with the

2  Madigans?

3  A  Well, I said to him that -- I asked how he could

4  trust that Speaker Mike Madigan would move his

5  legislation, and he said he wouldn't appoint her

6  until that was done.

7  Q  He wouldn't appoint her, who are you referring

8  to?

9  A  Lisa Madigan.

10  Q  What happened next?

11  A  Well, I told him that could take months, and he

12  said yes, it could.  And I told him I didn't believe

13  that Valerie Jarrett had that much time.

14  Q  Why did it appear that Valerie Jarrett did not

15  have months to wait on the senate seat?

16  A  Well, I had talked to President Obama a few days

17  earlier, he told me his preference was to have her

18  in the White House, he was making his picks, trying

19  to put his team together in the White House, and I

20  just assumed that he or Valerie were not going to

21  wait for months to decide whether he would appoint

22  her to the senate seat or not.

23  Q  At some point did you continue to advocate for

24  Ms. Jarrett after this conversation?

25  A  I advocated for Ms. Jarrett throughout.

1  Q   And in continuing to advocate for Ms. Jarrett,
2  what was the defendant's response?
3  A   Well, at one point in the discussion after we,
4  quite frankly, had talked about the time question on
5  the Lisa Madigan appointment, he said to me, he
6  said, "well, Tom, my real passion," he said, "I love
7  being governor, but my real passion is healthcare,"
8  and he said, "if I could be the Secretary of Health
9  and Human Services, then I could really live out my
10 passion."
11 Q   What did you understand the defendant was
12 offering to do?
13        MR. GOLDSTEIN:  Objection.
14        THE COURT:  Overruled.
15 BY THE WITNESS:
16 A   I understood that if Valerie -- if he could be
17 appointed to that position, then Valerie Jarrett
18 could be appointed to the senate seat.
19 BY MR. SCHAR:
20 Q   When you say be pointed to that position, what do
21 you mean?
22 A   To secretary of Health and Human Services.
23 Q   And based on this conversation, what was your
24 understanding of what you were supposed to do with
25 that request for Health and Human Services in

Balanoff - direct by Schar                    1788

1  exchange for Valerie Jarrett?

2         MR. GOLDSTEIN:  Objection to his

3  understanding.

4         THE COURT:  Overruled.

5  BY THE WITNESS:

:37PM

6  A   I'm sorry, could you repeat the question?

7  BY MR. SCHAR:

8  Q   Based on this conversation, what was your

9  understanding as to what you were supposed to do in

10  relation to the request for Secretary of Health and

:38PM

11  Human Services position in exchange for Valerie

12  Jarrett?

13  A   Well, I think he was saying to me if you go back

14  and let them know to appoint me in this position,

15  then in exchange I would appoint --

:38PM

16         MR. GOLDSTEIN:  Objection to hearsay.

17         THE COURT:  He's being asked his

18  understanding of what was being said to him by

19  someone in his presence, directed at him, that he

20  can answer.

:38PM

21  BY THE WITNESS:

22  A   I understood that he was suggesting that if I

23  took that back and that could happen, then he would

24  appoint Valerie Jarrett as the senator.

25  BY MR. SCHAR:

:38PM

Balanoff - direct by Schar                    1789

1  Q   Take it back to whom?

2  A   To President Obama or to Valerie Jarrett.  I

3  wasn't sure who he was thinking I would take it back

4  to.

5  Q   How did you respond to the defendant's request to

6  be made Secretary of Health and Human Services?

7  A   Well, when he said it I said, "that's not going

8  happen."

9  Q   What was his response?

10  A   He said, "why not?  Because of the scandals or

11  because of the investigations?"

12  Q   What did you say?

13  A   I said, "aren't you worried about that?"

14  Q   What was his response?

15  A   He said, "no."

16  Q   What happened next?

17  A   Then he started to talk in general, that, you

18  know, I really do, healthcare is what I'm about, and

19  I love being governor but there's going to be a

20  point when I'm no longer governor, he said maybe I

21  could work with a foundation.  He said to me at one

22  point, "maybe I could run the healthcare for a

23  union," and I said to him, "unions don't work that

24  way, those positions are elected, not appointed."

25  Q   At this point in the conversation, what were you

1  trying to do?

2  A  Well, I was trying to bring the conversation back

3  to the question of time, that I didn't believe

4  Valerie Jarrett had a lot of time, and I told him

5  that.  And I said -- I told him that I was going to

6  reach out to Valerie and find out exactly how much

7  time she had.

8  Q  What, if anything, did you ask of the defendant?

9  A  I asked if we could get together on Saturday for

10 a cup of coffee and that I would reach out to

11 Valerie.  We met on a Thursday and I would reach out

12 to Valerie on Friday.

13 Q  What was the defendant's response as to whether

14 we was available for coffee on Saturday?

15 A  He said that would be fine.

16 Q  And did the meeting end shortly after that?

17 A  It ended right after that, yes.

18 Q  What happened -- well, did you arrange a meeting

19 with Ms. Jarrett for the following day?

20 A  Yes, I did.

21 Q  Who did you arrange the meeting through?

22 A  I called Alexi Giannoulias.

23 Q  Who was he?

24 A  At the time he was Treasurer of the state.

25 Q  At this point did you yourself have Ms. Jarrett's

1  phone number?

2  A  No, I didn't.  I didn't have it the day before,

3  but I knew Alexi Giannoulias was close to President

4  Obama and close to the campaign, so that's why I

5  reached out to him.

6  Q  Ws the following day November 7th.

7  A  Yes.

8  Q  What happened that morning?

9  A  I did go and I met with Valerie Jarrett.

10  Q  What did you indicate to Ms. Jarrett?

11  A  I told Ms. Jarrett that I met with governor

12  Blagojevich and had advocated for her.  I explained

13  to her that he said that he was in active

14  discussions with the Madigans about doing

15  appointment of her so that he could move some of his

16  legislative goals.

17  Q  What else did you indicate, if anything, about

18  the Madigans?

19  A  So I said to her, I said I wasn't sure if he was

20  -- if that was really happening or not, and that

21  although I knew the Madigans I didn't feel I had the

22  kind of relationship that I could call them up and

23  ask them, so ....

24  Q  What, if anything, did you discuss with

25  Ms. Jarrett regarding the time?

1  A   I asked her, you know, I said that his ideas that
2  they'll need time he needs to appoint this, I said,
3  you know, "Valerie, to do you have that type of
4  time" she said, "no, I don't."
5  Q   What, if anything, did you discuss with
6  Ms. Jarrett regarding the Secretary of Health and
7  Human Services position?
8  A   Towards the end of the conversation she asked me,
9  "did he say anything else," I said, well, he said
10  some goofy stuff, and I said that at one point he
11  had told me that his real passion was healthcare and
12  if he could be the Secretary of Health and Human
13  Services he could really live out his passion.
14  Q   What, if anything, did you indicate you would do
15  in terms of the timing in relation to addressing
16  Ms. Jarrett's interest in the senate seat?
17  A   I told her that I was going to have coffee with
18  the governor the next day and that I was going to
19  raise this issue that she didn't have the time.
20  Q   What happened after your conversation with
21  Ms. Jarrett?
22  A   I went back to my office and I called the
23  Governor's office and I got a hold of his assistant
24  and I asked her to have him give me a call.
25  Q   Did you have another conversation with the

1   defendant after that?

2   A   Yes, I did.

3   Q   In person or over the phone?

4   A   Over the phone.

5   Q   What did you and the defendant discuss?

6   A   I called him to say, "hey, I met with Valerie,

7   can we get together tomorrow for a cup of coffee."

8   Q   What was the defendant's response?

9   A   He said, "Tom, I'm really sorry, I'm going out of

10  town."  I think he said he was going to California,

11  but I wasn't exactly sure of that, but he did say he

12  was going out of town and wouldn't be able to meet.

13  Q   So on Friday he indicated he was no longer

14  available for Saturday coffee?

15  A   Right.

16  Q   Now, at some point during this time period, did

17  you yourself travel out of the Chicagoland area?

18  A   Yes, I did.

19  Q   Where did you go?

20  A   I went to Washington, D.C.

21  Q   Why did you go to Washington?

22  A   We had our SEIU national union executive board

23  meeting and division meetings.

24  Q   While you were in Washington, D.C. did you

25  receive several phone calls from the defendant on

Balanoff - direct by Schar                    1794

November 12th?

A   I received two phone calls.

Q   Since he had indicated to you he was no longer available for coffee, had you talked to the defendant?

A   No, I hadn't.

Q   Prior to testifying, Mr. Balanoff, did you have an opportunity to review certain recorded conversations?

A   Yes, I have.

        MR. SCHAR:  Judge, with your permission, I'd ask now for permission to play call 541 which is behind tab 36 in binder.

        THE COURT:  Give me a moment.

     (Brief pause).

        THE COURT:  Yes.

     (Tape played).

BY MR. SCHAR:

Q   Mr. Balanoff, I ask you to turn to Page 1 of the transcript.

        This call, according to the transcript, is on November 12th, 2008, at 10:34 a.m.?

A   I'm sorry?

Q   According to the transcript, the call is on November 12th, 2008, at 10:34 a.m.?

1  A   That's right.

2  Q   Beginning on Page 1, at line 10, the defendant

3  says:

4       "So, ah, we just heard from Rahm, okay."

5       And then moving over to Page 2, at line 24:

6       "On Monday night he called through a

7       third-party and had a message conveyed, you

8       know, Valerie Jarrett wants to be senator, the

9       president wants her to be senator, and the

10       president would be, quote/unquote, grateful and

11       appreciative if the governor picks her."

12       What did you understand the defendant to be

13  telling you in this conversation?

14  A   The defendant is telling me that he heard very

15  clearly the president's choice and that the

16  president's choice was Valerie Jarrett.

17  Q   Over on Page 3, at line 1, the defendant says:

18       Yeah, so that came Monday night and then

19       yesterday was yesterday, and no, now, you have

20       nothing, and now, you know, I, I, I was on the

21       phone with people in Washington who are sort of

22       on the inside there, giving me updates, and

23       then Rahm called Harris down in Springfield."

24       Line 11:

25       "And, ah, said she was going to be in the White

Balanoff - direct by Schar                          1796

1    House."
2    Down to line 18:
3    "But the President, there's four candidates he
4    wants and this is not public."
5    "Yeah."
6    "Jesse, Jr."
7        What did you understand the defendant to be
8  telling you in this part of the conversation?
9  A   I assume when he mentioned Jesse, Jr.'s name that
10 that was one of the four names that he was given by
11 Rahm.
12 Q   Four names in relation to what?
13 A   In relation to the appointment to the Senate,
14 candidates for appointment to the Senate.
15 Q   Over on Page 4, at the top:
16   "Who is the second one?"
17   He says:
18   "Tammy Duckworth, Dan Hynes, Jan Schakowsky."
19       What did you understand him to be telling you
20 there?
21 A   That Rahm Emanuel had told him there were four
22 names and that those were the four names.
23 Q   Over to Page 5, line 2, he says:
24   "You know, I think, you know, you have another
25   candidate for a whole lot of reasons that is

1    obviously valid."

2    The defendant says:

3    "Which one is that, Tom."

4         What did you understand the defendant is

5 asking in relation to what you're saying?

6 A  Well, when he asked, he didn't remember, it was

7 Lisa Madigan that he had discussed with me quite a

8 bit in our meeting earlier.

9 Q  You say:

10   "Well, the whole question of Lisa, I mean, you

11    know --"

12    He says:

13    "I got that one, right."

14         What did you understand him to be saying

15 there?

16 A  Well, when I reminded him, he remembered that,

17 oh, yeah, he had discussed, had that option.

18 Q  Based on that conversation, what did you conclude

19 about whether or not there were active discussions?

20 A  Well, earlier --

21         MR. GOLDSTEIN:  Objection, Your Honor:

22         THE COURT:  Overruled.

23 BY THE WITNESS:

24 A  I concluded that, in fact, he had not been in any

25 discussions or serious -- serious discussions, or

Balanoff - direct by Schar                                    1798

1  for that matter, I concluded any discussions with
2  the Madigans.
3  Q    Beginning on line 17, you say:
4        "Yeah, yeah, no, I'm not even going to raise
5         him.  Between you and me, I'm going to talk
6         directly to Valerie and ask so you want to keep
7         pushing this or not.  In our out, we'll know."
8        The defendant says:
9        "Hey, Tom, here's one thing I'd be interested
10       in okay."
11       At line 26:
12       "We're going to do this anyway but this would
13        sure expedite it, I want to create a 501(c)(4)
14        advocacy --"
15       Line 31:
16       "... organization that would be, you know,
17        there for if I'm not governor again or whatever
18        I do later, but right now ..."
19       Continuing on page 6, line 1:
20       "We'd have it, you know, run by people we
21        trust, it would be all about healthcare for
22        children, healthcare for working parents at the
23        level national and at the state level."
24           What do you understand the defendant to be
25  talking about in this section of the conversation.

1  A  Well, in that section he's talking about the
2  creation of a 501(c)(4), and that he was going to
3  get it set up around the issues of healthcare and
4  that it would be there when perhaps he wasn't
5  governor any longer.
6  Q  When you say it would be there, what did you
7  understand him to be telling you?
8  A  That they were going to create or he was going to
9  create a 501(c)(4).
10 Q  And it would be there when he is no longer
11 governor, what did you understand him to be saying?
12 A  At that point -- a little further in the
13 conversation I understood very clearly that what he
14 was saying that if this could be created in
15 exchange, he would put Valerie Jarrett in the
16 position.
17 Q  Did you understand whether or not it would be a
18 position for him to go to after he was done being
19 governor?
20 A  Yes.
21 Q  And right before that you raised the issue of
22 Ms. Jarrett at line 17 to 22 on Page 5?
23 A  Right.  Yes.
24 Q  Over on Page 7, line 9, the defendant says:
25     "I'm still, I embrace the things I believe in

Balanoff - direct by Schar                              1800

1       and so I would like a role to be able to do
2       something along those lines, in creating a
3       501(c)(4) that if I'm no longer an elected
4       official I can possibly work with, right now,
5       while I'm elected official it would help me
6       push stuff right at the federal level which
7       helps us in Illinois, that would be very
8       attractive, and, you know, George Soros and
9       Buffet, and all those guys, you know, overnight
10      can put 10, 15, 20 million dollars in an
11      advocacy group like that."
12      and then at line 28:
13      "And then we could help our new senator,
14      Valerie Jarrett, go out and push that."
15          What did you understand him to be telling
16  you?
17  A  Well, he was telling me that if this 501(c)(4)
18  could be set up and be set up with contributions
19  from a couple of probably billionaires, very wealthy
20  people, Soros and Buffet, if it could be put
21  together, he actually mentioned 10, 15 million
22  dollars put into it, if all that happened, then we
23  could help our new senator, Valerie Jarrett, go out,
24  and it was clear that he was, in my mind at least,
25  connecting, if this could be set up, then Valerie

1  Jarrett could become a senator.

2  Q   Who had the power to make Valerie Jarrett the

3  senator?

4  A   The governor.

:57PM  5  Q   She wasn't the senator at this time, was she?

6  A   No, she was not.

7  Q   On line 24 when he says, "overnight can put 10,

8  15, 20 million dollars in," what was your

9  understanding as to when the defendant wanted this

:58PM  10  done?

11  A   That he wanted --

12       MR. GOLDSTEIN:  Objection to his

13  understanding.  Doesn't show any interaction

14  whatsoever.

:58PM  15       MR. SCHAR:  I can rephrase it.

16       THE COURT:  Yes.

17  BY MR. SCHAR:

18  Q   Based on this conversation, what is your

19  understanding as to when the defendant wanted this?

:58PM  20  A   He wanted the 501(c)(4) set up as quickly at it

21  could be set up.

22  Q   And based on this conversation and the role you

23  had in terms of the Health and Human Services

24  request as well, what was your understanding as to

:58PM  25  where you were supposed to take this request?

Balanoff - direct by Schar                    1802

1  A   I believed he thought I was going to take it back
2  to Valerie Jarrett.
3  Q   After the phone call ended, Mr. Balanoff, what
4  did you do?
5  A   After the phone call ended, I called Valerie
6  Jarrett.
7  Q   Were you able to get through to her?
8  A   No, I was not.
9  Q   What were you trying to find out?
10 A   I just wanted to find out whether she was still
11 interested in being a senator or not.
12        MR. SCHAR:  Judge, at this time I ask
13 permission to play the call at tab 37 which does not
14 include Mr. Balanoff but it's the next call in the
15 binder.
16        THE COURT:  Go ahead.
17    (Tape played)
18        MR. SCHAR:  Judge, we ask permission to play
19 the call behind tab 38 in the binder.
20        THE COURT:  Give me a second here.  I've read
21 most of these and I've made little signatures,
22 autographs where I've looked at them and I can't
23 find it on this one, so I'm going to have to read
24 this one.
25        MR. SCHAR:  Yes, Judge.

Balanoff - direct by Schar                    1803

1      (Brief pause).
2          THE COURT:  Yeah, you can.
3          MR. SCHAR:  Thank you, Judge.
4      (Tape played).
5    BY MR. SCHAR:
6    Q   Mr. Balanoff, going back to Page 1, this is a
7    call on November 12th, 2008, at 10:47 a.m.?
8    A   Yes.
9    Q   Not long after your first call with the defendant
10   that morning?
11   A   No, not long at all.
12   Q   Lines 8 through 10 the defendant says:
13       "Ah, when you talk to her, just don't let her
14        know it's coming Rahm to Harris."
15           What did you understand the defendant to be
16   telling you there?
17   A   Well, what he was saying earlier in the call when
18   Rahm -- when he said that Rahm, in the first call,
19   that Rahm was the only emissary I think he was
20   saying there, don't let on to Val that I reached out
21   to you -- I'm sorry, that Rahm had reached out to
22   him, don't let that be known that he told me that
23   Rahm had reached out to him.
24   Q   And was it your understanding this was in the
25   context of your having this discussion with

:04PM

:04PM

:04PM

:05PM

:05PM

1  Ms. Jarrett?

2  A   Yes.

3  Q   Line 20, Page 1, the defendant says:

4      "Good."

5      And over to line 1, on Page 2, Mr. Balanoff:

6      "You know, if she really wants to be a senator,

7      it could, it's a very real possibility it could

8      happen."

9          What did you understand the defendant to be

10 telling you there?

11 A   Well, he was reinforcing in my mind what he had

12 told me before, that if the 501(c)(4) was set up,

13 (c)(4) was set up, that he could find his way to

14 appoint Valerie as the senator.

15 Q   When you say find his way, what do you mean?

16 A   Well, that would have the authority, that he

17 would appoint Valerie as a senator.

18 Q   You mean having the authority --

19 A   He had the authority as governor to make the

20 appointment.

21 Q   Was it your understanding that there was an

22 exchange?

23 A   Yes.

24 Q   After this call, Mr. Balanoff, what did you do?

25 A   I don't know, after about an hour or so, I hadn't

Balanoff - direct by Schar                    1805

1  heard anything from Valerie Jarrett so I called
2  Alexi Giannoulias and I --
3  Q   And --
4  A   -- and I asked him, I said that Governor
5  Blagojevich had called me and I said that Valerie
6  was out and I asked him is that true.
7  Q   What did he tell you?
8  A   He said, yeah, unfortunately it was, that she
9  decided to take a position in the White House.
10 Q   Was it your understanding based on that
11 conversation that Ms. Jarrett was no longer
12 interested in the senate seat?
13 A   Yes, that was my understanding.
14 Q   Did you have another conversation with the
15 defendant about Ms. Jarrett in relation to that?
16 A   With Governor Blagojevich after that?
17 Q   Yes.
18 A   No.
19 Q   Did that effectively end your communications
20 regarding Ms. Jarrett with the defendant?
21 A   Yes, it did.
22     MR. SCHAR:  May I have one moment, Judge.
23     (Brief pause).
24 BY MR. SCHAR:
25 Q   Mr. Balanoff, back on Page 1 of this transcript,

:06PM
:06PM
:07PM
:07PM
:08PM

Balanoff - direct by Schar                    1806

1  the call time is indicated at 10:47 a.m.?

2  A  Yes.

3       MR. SCHAR:  Judge, with Your Honor's

4  permission, we would ask to play the call behind tab

5  39.  It does not include Mr. Balanoff.

6       THE COURT:  Hang on.

7     (Brief pause).

8       THE COURT:  Yeah, you can do that.

9  BY MR. SCHAR:

10  Q  Before I play that call, Mr. Balanoff, is that

11  call also the morning of November 12, 2008?

12  A  Yes, it is.

13  Q  And is it at 10:50 a.m., shortly after --

14       MR. GOLDSTEIN:  Objection; foundation.  His

15  knowledge.

16       MR. SCHAR:  I'll rephrase the question.

17  BY MR. SCHAR:

18  Q  According to the transcript, it's a call that

19  indicates 10:50 a.m.?

20  A  Yes, it does.

21       MR. GOLDSTEIN:  Objection, Your Honor.

22       THE COURT:  Overruled.

23  BY MR. SCHAR:

24  Q  And the speakers are Rod Blagojevich and Patti

25  Blagojevich, according to the transcript?

Balanoff - cross by Goldstein                    1807

1       MR. GOLDSTEIN:  Same objection.

2       THE COURT:  Also overruled.

3    BY MR. SCHAR:

4    Q   Mr. Balanoff, are the speakers according to the

5    transcript Rod --

6    A   Yes, Rod Blagojevich and Patti Blagojevich.

7       (Tape played)

8          MR. SCHAR:  No further questions, Your Honor.

9          Approximately how long do you want me to go,

10   Your Honor?

11         THE COURT:  We'll adjourn sometime a little

12   before 5:00.

13                   CROSS EXAMINATION

14   BY MR. GOLDSTEIN:

15   Q   Now, Mr. Balanoff, you said that you had a

16   conversation with Andy Stern in September or October

17   of 2008 talking about the senate seat, is that

18   correct?

19   A   Yes, it is.

20   Q   Okay.  And you told Stern that you were for

21   Schakowsky?

22   A   Yes, I did.

23   Q   And Mr. Stern told you he talked about Valerie

24   Jarrett, is that correct?

25   A   In the first conversation he raised Valerie

Balanoff - cross by Goldstein                    1808

1  Jarrett's name, yes.

2  Q   And you didn't think she would be interested?

3  A   I said to him that I thought President Obama --

4  or Senator Obama, if he was selected president,

5  would be interested in having her in the White

6  House.

7  Q   Okay.  Did you communicate as far as whether

8  Ms. Jarrett would be interested?

9  A   No, I didn't.

10  Q   And, in fact, didn't Mr. Stern suggest putting

11  your name out there as senator?

12        MR. SCHAR:  Objection, Judge.

13        THE COURT:  The objection is sustained.

14  BY MR. GOLDSTEIN:

15  Q   You spoke to Mr. Stern again in October of 2008,

16  is that correct?

17  A   Yes.

18  Q   And he told you that Valerie Jarrett was

19  interested in the senate seat, is that correct?

20  A   Yes, he did.

21  Q   And he told you that he said it was your idea?

22  A   He told me that he told her it was my idea.

23  Q   Okay.  And he did so so you would look favorable

24  to Jarrett and Obama?

25        MR. SCHAR:  Objection, Judge.

Balanoff - cross by Goldstein                    1809

1      THE COURT:  The objection is sustained.

2  BY MR. GOLDSTEIN:

3  Q   Now, Mr. Stern then called you at the beginning

4  of November of 2008, is that correct?

5  A   Late October.

6  Q   Late October?

7  A   Yeah.

8  Q   And he told you that he wanted to meet with the

9  governor, is that correct?

10  A   That's correct.

11  Q   And you agreed to do that?

12  A   I agreed to set up the meeting, yes.

13  Q   Okay.  And it was you that set up this

14  appointment?

15  A   Doug Scofield, I called Doug Scofield and Doug

16  Scofield set it up.

17  Q   And Scofield was your consultant at that time, is

18  that correct?

19  A   Was a consultant for us, yes.

20  Q   So this was an appointment set up by Scofield or

21  by you via Scofield with the governor, is that

22  correct?

23  A   That's correct.

24  Q   And you met with the governor on November 3rd of

25  2008?

1  A  Yes.

2  Q  And it was you, John Harris, Andy Stern, and the

3  governor, is that correct?

4  A  And Doug Scofield.

5  Q  And Doug Scofield.

6       And at this meeting you told the governor who

7  you wanted to be senator, is that correct?

8  A  At this meeting we suggested candidates.

9  Q  And did you have a meeting with the governor back

10 in September of 2008 about the senate seat?

11       MR. SCHAR:  Objection, Judge.

12       THE COURT:  Outside the scope.  Granted.

13 BY MR. GOLDSTEIN:

14 Q  Now, you talked about there was discussion about

15 Lisa Madigan, is that correct?

16 A  Yes.

17 Q  And what exactly was discussed in terms of Lisa

18 Madigan?

19 A  In which meeting?

20 Q  Ah --

21 A  In the meeting with Stern?

22 Q  The meeting of November 3rd.

23 A  As I recall, Governor Blagojevich in discussing

24 different candidates raised the question that he

25 could always appoint Lisa and that would take out a

1  political rival, as well as be a way he could move

2  some of his legislative goals.

3  Q   And you had no knowledge -- did he talk about

4  active discussions at this point?

5  A   No.

6  Q   No.

7        And then the governor said if Barack Obama

8  was interested in Valerie Jarrett, he would expect

9  to hear from Mr. Obama, is that correct?

10 A   That's correct.

11 Q   And some time after that you then left the

12 meeting, is that correct?

13 A   Yes.

14 Q   And you said that evening you received a call

15 from Mr. Obama, is that correct?

16 A   Yes.

17 Q   And he told you that he wanted Valerie Jarrett,

18 is that correct?

19 A   No, he told me he wanted Valerie Jarrett in the

20 White House but Valerie wanted to be -- wanted the

21 senate seat.

22 Q   As you understood what he told you, it was that

23 he wanted you to advocate for Valerie Jarrett?

24 A   I took it what he was saying to me that it was

25 okay if I advocated for Valerie Jarrett.

1  Q   What kind of relationship did you have with
2  president-elect Obama?
3  A   I had known the president for quite a few years
4  and had been a supporter -- our union had been a
:22PM  5  supporter in most of his elections.
6  Q   And he understood you to be the president of
7  SEIU, Local 1?
8  A   Yes.
9  Q   And the chief bargainer for SEIU Local 1?
:22PM  10       MR. SCHAR:  Objection, Judge.
11       THE COURT:  Overruled.
12  BY MR. GOLDSTEIN:
13  Q   Did he send you to talk to Rod to negotiate for
14  Jarrett?
:22PM  15  A   Did he send me?  No.
16  Q   Did anyone send you to go speak to the governor
17  to speak for Valerie Jarrett?
18       MR. SCHAR:  Objection, Judge.
19       THE COURT:  The objection is sustained.
:22PM  20  BY MR. GOLDSTEIN:
21  Q   Now, you said you were going to speak to the
22  governor to advocate for Valerie Jarrett, is that
23  correct?
24  A   Yes.
:22PM  25  Q   And you told the president that you were going to

1  advocate for Valerie Jarrett, is that correct?

2  A  Yes.

3  Q  And after you got off the phone with Mr. Obama,

4  you then called Andy Stern, is that correct?

5          MR. SCHAR:  Objection, Judge.

6          THE COURT:  Sustained.

7  BY MR. GOLDSTEIN:

8  Q  Now, the next day did you speak to Valerie

9  Jarrett, November 4th?

10  A  Yes, I did.

11  Q  And did you ask her if she was interested in the

12  senate seat?

13  A  Yes, I did.

14  Q  And she responded by saying "didn't Barack call

15  you last night"?

16  A  Yes, she did.

17  Q  And as you understood it, she was communicating

18  to you that she was interested in the senate seat?

19  A  Yes, I took it as that.

20  Q  Okay.  And that same evening before you went to

21  this election celebration, is that correct?

22  A  Yes, I did.

23  Q  And you saw the governor, is that correct?

24  A  Yes, I did.

25  Q  And he was there with State Senate President Emil

Balanoff - cross by Goldstein                1814

1  Jones?

2  A   They were leaving.  As we were walking in, they

3  were walking out.

4  Q   So you were approaching one another?

5  A   Yes.

6  Q   Okay.  And you pulled him to the side, is that

7  correct?

8  A   Yes.

9  Q   And you spoke very briefly privately with him,

10 isn't that correct?

11 A   That's correct.

12 Q   And you told him, "you know what we talked about

13 yesterday, I got a call and I want to set up a

14 meeting with you," is that correct?

15 A   I believe.

16 Q   Okay.

17 A   I'm not sure those are my exact words, but that's

18 clearly what was my intent.

19 Q   Did you tell him I want to talk about Valerie

20 Jarrett?

21 A   I did not say Valerie Jarrett's name

22 specifically.

23 Q   Now, at that point you didn't just tell him,

24 "hey, governor, just want to let you know, Valerie

25 Jarrett, we want her as a senator"?

Balanoff - cross by Goldstein                    1815

1  A   In that short brief conversation?  No.

2  Q   Now, the next day, on November 5th, you heard a

3  news report that the governor was establishing a

4  panel to review candidates, is that correct?

5  A   Yes, it is.

6  Q   And once you heard that, you called Doug

7  Scofield, is that correct?

8  A   Yes, I did.

9  Q   And you told Doug Scofield to set up a meeting

10 with the governor, is that correct?

11 A   I asked him to set up a meeting, yes.

12 Q   Now, you didn't just tell Doug "could you tell

13 the governor just put Valerie Jarrett's name in the

14 mix"?

15 A   No.

16 Q   You wanted to have a meeting with him, isn't that

17 correct?

18 A   That's correct.

19 Q   So this wasn't the governor calling to meet you,

20 you called to meet him, is that correct?

21        MR. SCHAR:  Objection, Judge.

22        THE COURT:  Overruled.

23 BY THE WITNESS:

24 A   I called him.

25 BY MR. GOLDSTEIN:

Balanoff - cross by Goldstein                    1816

1  Q   Okay.

2  A   Or I had called Doug Scofield to set it up, yes.

3  BY MR. GOLDSTEIN:

4  Q   Sorry.

5         And on November 6th, you then met with the

6  governor, correct?

7  A   Yes.

8         I'm trying to keep straight in my mind the

9  calendar here.

10 Q   Yeah.  And I have notes.

11        Now, on the 6th you met with the governor and

12 it was just you two, is that correct?

13 A   That's correct.

14 Q   Who set up just the face-to-face meeting?

15 A   Doug Scofield did.

16 Q   Okay.  But did you request to have a one-on one

17 meeting with the governor?

18 A   No.

19 Q   Who requested it just be the two of you, do you

20 know?

21 A   I don't.

22        MR. SCHAR:  Objection, Judge.

23        THE COURT:  The answer is you don't know?

24        THE WITNESS:  I don't think either of us

25 requested that it would be a one-one one.  I

:25PM (line 5)
:26PM (line 10)
:26PM (line 15)
:26PM (line 20)
:26PM (line 25)

1  requested to meet with Rod Blagojevich and that's

2  who the meeting was with.

3          THE COURT:  The answer may stand.

4  BY MR. GOLDSTEIN:

5  Q   Now, you were there to advocate for Valerie

6  Jarrett, correct?

7  A   Yes, I was.

8  Q   Did you have a resume of Valerie Jarrett?  Did

9  you present credentials of Valerie Jarrett?

10 A   No, I did not.

11 Q   So you were, in essence, having a meeting to

12 negotiate to advocate?  What exactly were you doing?

13         MR. SCHAR:  Objection.

14         THE COURT:  Objection to the form of the

15 question is sustained.

16 BY MR. GOLDSTEIN:

17 Q   Now, at this meeting, you told the governor that

18 he wasn't going to hear from Barack Obama, is that

19 correct?

20 A   I told him I didn't believe he would.

21 Q   Okay.  What made you believe that?

22 A   Because Barack Obama told me that he was not, in

23 his conversation, he said, "Tom, I'm not going to

24 publicly advocate for anyone," and the reason he was

25 calling me is to basically tell me it was okay to

1  talk to the governor on behalf of Valerie.

2  Q   As you understood it.  He didn't say that

3  specifically --

4  A   No, as I understood it, that's right.

5  Q   And you did, though, say to the governor that

6  you're close to Barack Obama and you're close to

7  Rod, is that correct?

8  A   Yes, I did.

9  Q   Now, when you say you're close to Rod, you knew

10  the governor for how long in 2008?

11  A   Well, for approximately 8 years.

12  Q   And, politically, SEIU is closely aligned with

13  the governor, is that fair to say?

14  A   We supported the governor for election, in both

15  of his elections.

16  Q   When you say support, these are campaign

17  contributions, among other things?

18  A   This are members working, volunteering, campaign

19  contributions, yes.

20  Q   Now, when you said you were close to the

21  president, as well as close to the governor, you

22  wanted to communicate to the governor that you had

23  clearance to negotiate, is that correct?

24          MR. SCHAR:  Objection the form, Judge.

25          THE COURT:  Sustained.

:27PM
:27PM
:28PM
:28PM
:28PM

1  BY MR. GOLDSTEIN:

2  Q   When you indicated that you were close to the

3  governor and close to Obama, you wanted to indicate

4  that you had clearance just to speak?

:28PM    5  A   Yes.

6  Q   And that was -- was that speaking on behalf of

7  Barack Obama?

8  A   No.

9  Q   Now, you said you told the governor on

:29PM    10  November 6th that picking Valerie Jarrett would help

11  him with the business community, the labor

12  community, and overall it would be a very wise

13  political choice for him, is that correct?

14  A   That's correct.

:29PM    15  Q   When you said it would help him with the business

16  community, what were you communicating there?

17  A   What I was --

18      MR. SCHAR:  Objection, Judge.

19      THE COURT:  The objection is sustained.

:29PM    20  BY MR. GOLDSTEIN:

21  Q   You said it would be good, a good pick for SEIU

22  as well, is that correct?

23  A   Yes.

24  Q   And what were you communicating there?

:29PM    25      MR. SCHAR:  Objection.

Balanoff - cross by Goldstein                1820

1      THE COURT:  Sustained.

2  BY MR. GOLDSTEIN:

3  Q   What were you trying to communicate?

4      MR. SCHAR:  Same objection.

5      THE COURT:  Sustained.

6  BY MR. GOLDSTEIN:

7  Q   You also said it would make African-Americans

8  happy, women happy as well, is that correct?

9  A   That's correct.

10  Q   And you said it would be a wise political choice,

11  is that correct?

12  A   That's correct.

13  Q   When you said wise political choice, were you

14  communicating fundraising?

15      MR. SCHAR:  Objection, Judge.

16      THE COURT:  The objection is sustained.

17

18  BY MR. GOLDSTEIN:

19  Q   Now, the governor then brought up Lisa Madigan,

20  is that correct?

21  A   Yes, he did.

22  Q   And this is where you said he was -- he told you

23  he was in active discussions?

24  A   Yes, he did.

25  Q   Now, you had no knowledge, one way or the other,

:29PM

:29PM

:30PM

:30PM

:30PM

Balanoff - cross by Goldstein                    1821

1  whether that was true, is that correct?

2  A   That's correct.

3  Q   You weren't close to the Madigans, correct?

4  A   Politically close, but not personal level.

5  Q   In a way to call them and --

6  A   No, I wasn't in that kind of relationship to call

7  and ask them.

8  Q   Now, you then said the governor said "my passion

9  is healthcare," and there are a few words said

10 beyond that, but "I'd like to be secretary to Health

11 and Human Services," is that correct?

12 A   That's correct.

13 Q   Now, when he said "my passion is healthcare," did

14 you understand him to be telling you the truth?

15         MR. SCHAR:  Objection, Judge.

16         THE COURT:  The objection is sustained.

17 BY MR. GOLDSTEIN:

18 Q   Did you have a reason to not believe him that his

19 passion was healthcare?

20         MR. SCHAR:  Objection.

21         THE COURT:  You can't ask one witness whether

22 he believed another witness or somebody in a

23 conversation.  It's opinion evidence which is not

24 permitted.

25 BY MR. GOLDSTEIN:

Balanoff - cross by Goldstein                    1822

1  Q   Now, when Rod was speaking to you, and in
2  particular about HHS, he never said HHS for the
3  senate seat, is that fair to say?
4          MR. SCHAR:  Is that your question, those
5  specific words?
6          MR. GOLDSTEIN:  Correct.
7  BY THE WITNESS:
8  A   Those were not his specific words, but I thought
9  that's what he was implying.
10 BY MR. GOLDSTEIN:
11 Q   That's what you felt he was implying?
12 A   Yes.
13 Q   Is that what you felt he was implying or is that
14 what you understood?  I just want to know the
15 difference here.
16 A   Repeat that question.
17 Q   You said you felt that's what he was implying.
18 A   Yes.
19 Q   Yet on direct examination you talked about what
20 you understood.  I'm trying to figure out if there's
21 a difference between the two.
22 A   No, it was my understanding that that's what he
23 was saying, if that's what you're asking.
24 Q   Okay.  At that point you said, stop, you can't do
25 that?

Balanoff - cross by Goldstein                1823

1  A   At that point, no.

2        THE COURT:   The objection is sustained.

3  BY MR. GOLDSTEIN:

4  Q   At that point, you said "never going to happen,"

5  right?

6  A   I said that's not going happen.

7  Q   It's not going to happen.

8        And then after he said something that you

9  understood to be one for the other, you then brought

10 back up the timing issue of appointing a senator, is

11 that correct?

12 A   The timing issue was the issue that I was

13 concerned with, yes.

14 Q   Okay.  So was that the only issue you were

15 concerned with at that point?

16       MR. SCHAR:  (Standing up.)

17       THE COURT:   Objection is sustained.

18 BY MR. SOROSKY:

19 Q   Now, when the governor says passion was his

20 healthcare, you understood he was just pondering,

21 ruminating, is that correct?

22       MR. SCHAR:  I am going to object and if he

23 continues I would ask for a sidebar.

24       THE COURT:   The objection is sustained.

25 BY MR. GOLDSTEIN:

Balanoff - cross by Goldstein                    1824

1  Q   Now, you then said that the governor brought up
2  working with a union, is that correct?
3        Go ahead; sorry.
4  A   That's all right.
5        (Drinking water.)
6        Yes, he did.
7  Q   At that point, did you leave the meeting?
8  A   No, he -- he brought up working for a foundation,
9  or he said maybe I can do healthcare for a union.
10 Q   Did you stop him there?
11 A   Yes, I told him unions don't work that way, those
12 aren't appointed positions, those are elected
13 positions.
14 Q   Okay.  You didn't say stop talking about it, you
15 just said this doesn't happen?
16 A   Yes.
17 Q   But you continued to talk with the governor at
18 this point, is that correct?
19 A   I brought -- I brought the question back to time,
20 and I told him that --
21 Q   The timing of appointing --
22 A   Appointing a candidate, yes.
23 Q   -- a senator.
24        So after the union job discussion, you then
25 brought up the time discussion in terms of Valerie

:33PM

:33PM

:34PM

:34PM

:34PM

1  Jarrett?

2  A   I wouldn't characterize these as discussions.  It

3  was governor Blagojevich talking to me and when he

4  said unions then I corrected him -- or informed him

:34PM  5  that that's not the way it works in unions, that

6  people were elected, not appointed to those spots.

7  Q   You said you didn't categorize it as a

8  discussion?

9  A   I was listening to him.

:34PM  10  Q   At a meeting that you had set up?

11         MR. SCHAR:  Objection.

12         THE COURT:  The objection to the form of the

13  question, the argumentative form to the question, is

14  sustained.

:35PM  15  BY MR. GOLDSTEIN:

16  Q   Now, you eventually left the meeting, is that

17  correct?

18  A   Eventually the meeting ended, yes.

19  Q   How long was this meeting?

:35PM  20  A   Oh, I don't know, 40 minutes, maybe an hour; 45,

21  I'm not sure.

22  Q   After this meeting, did you call the authorities?

23         MR. SCHAR:  Objection, Judge.

24         THE COURT:  The objection is sustained.

:35PM  25  BY MR. GOLDSTEIN:

Balanoff - cross by Goldstein                1826

1  Q   Did you remove yourself from the situation?

2        MR. SCHAR:  Objection, Judge.

3        THE COURT:  If this is about the end of your

4  cross, you can stop now.

5        MR. GOLDSTEIN:  It is.

6  BY MR. GOLDSTEIN:

7  Q   Now, right after this, you immediately tried to

8  get in touch with Valerie Jarrett, is that correct?

9  A   After my meeting with Governor Blagojevich on the

10  6th?

11  Q   Correct.

12  A   When I went back to my office in a short period

13  of time I reached out to set up a meeting, yes.

14  Q   And you called Alexi Giannoulias to arrange a

15  meeting?

16  A   Yes, I did.

17  Q   And you ended up seeing Valerie Jarrett and Alexi

18  Giannoulias the next day, is that correct?

19  A   That's correct.

20  Q   And that's November 7th, 2008, is that correct?

21  A   That's correct.

22  Q   And you met Valerie Jarrett and Alexi Giannoulias

23  at the Aon Center, is that correct?

24  A   That's correct.

25  Q   And that was where Ariel Capital was?

:35PM

:35PM

:36PM

:36PM

:36PM

Balanoff - cross by Goldstein                1827

1   A   Yes.
2   Q   And that was the president-elect transition
3   headquarters, is that correct?
4   A   The temporary transition headquarters, yes.
5   Q   Did you have to get searched to get into this
6   building?
7           MR. SCHAR:  Objection.
8           THE COURT:  The objection is sustained.
9   BY MR. GOLDSTEIN:
10  Q   And you reported to Valerie Jarrett what you and
11  the governor had discussed, is that correct?
12  A   I reported some of the things, yes.
13  Q   Some of the things.
14          And you talked to her about the Madigans, is
15  that correct?
16  A   Yes.
17  Q   And after you had some discussion, Jarrett asked
18  if the governor said anything else, is that correct?
19  A   That's correct.
20  Q   And you said, "well, at some point he said some
21  goofy stuff," is that correct?
22  A   That's correct.
23  Q   And you told Jarrett that the governor said his
24  real love was healthcare and that if he could be
25  Secretary of Health and Human Services he could, you

Balanoff - cross by Goldstein                1828

1  know, be involved in his real passion, is that what
2  you told Valerie Jarrett?
3  A   Along those lines, I think, yes.
4  Q   And you told Jarrett that you told the governor
5  that this wasn't going to happen, is that correct?
6  A   Right.
7  Q   Did you communicate to Jarrett that you
8  understood that Rod was offering an exchange one for
9  the other?
10        MR. SCHAR:  Objection, Judge.
11        THE COURT:  I'm coming close to sitting you
12  down.  Don't do this.  I mean, this one is really
13  out of bounds which I will explain to you after
14  we're done.
15  BY MR. GOLDSTEIN:
16  Q   Did you take any action based on your
17  understanding of the meeting of November 6th?
18        MR. SCHAR:  Objection, Judge.
19        THE COURT:  Rephrase the question.  "Any
20  action" could be getting in the car and going home.
21  BY MR. GOLDSTEIN:
22  Q   Well, what action, if any -- I don't want to beat
23  around the bush or anything, but what action, if
24  any, did you take based on your understanding you
25  had on November 6th?

:37PM
:37PM
:38PM
:38PM
:38PM

Balanoff - cross by Goldstein                1829

1        MR. SCHAR:  Objection.

2        THE COURT:  Sustained.

3   BY MR. GOLDSTEIN:

4   Q   Did you communicate your understanding that you

5   had on November 6th of the meeting with the governor

6   to anyone?

7        MR. SCHAR:  Objection.

8        THE COURT:  Not relevant.  Sustained.

9   BY MR. GOLDSTEIN:

10  Q   Now, after you met with Jarrett and Giannoulias

11  -- actually, just one quick question about your

12  meeting with Jarrett and Giannoulias.  You talked

13  further as to what the next steps were as far as

14  trying to talk about the appointment of the senate

15  seat, is that fair to say?

16  A   I told Valerie Jarrett that I was expecting to

17  have a cup of coffee with the governor the next day.

18  Q   And did you tell Valerie Jarrett that you could,

19  quote, jam him on the issue?

20       MR. SCHAR:  Objection, Judge.

21       THE COURT:  The objection is sustained.

22  BY MR. GOLDSTEIN:

23  Q   Now, after you met with the two of them, Jarrett

24  and Giannoulias, you then reached out to the

25  governor again, is that correct?

:38PM

:39PM

:39PM

:39PM

:39PM

1    A   Yes, I did.

2    Q   He didn't call you at this point, is that

3    correct?

4    A   I called him.

:39PM    5    Q   Okay.  And you wanted to set up a meeting, is

6    that correct?

7    A   I wanted to affirm a meeting I thought we set up

8    the day before to have coffee on Saturday, yes.

9    Q   Okay.  And when you spoke to him, he indicated he

:40PM   10    was going to be out of town, is that correct?

11    A   That's correct.

12    Q   Now, you said you had a call -- you had a couple

13    of calls with the governor during this time period,

14    is that correct?

:40PM   15    A   That's correct.

16    Q   If you could turn to tab 36, please.

17           Now, on Page 2, the top of the page, the

18    governor says:

19        "So here, here's what is becoming clear I think

:41PM   20        is, Rahm was pushing, he doesn't say this but

21        from others I know who are close to that

22        operation, Rahm was pushing her real hard."

23           You understood "Rahm" was Rahm Emanuel, is

24    that correct?

:41PM   25    A   Yes, I did.

Balanoff - cross by Goldstein                    1831

1  Q   And the "her" is Valerie Jarrett, is that
2  correct?
3  A   Yes.
4  Q   What did you understand the governor to be saying
5  when he said "Rahm is pushing her real hard"?
6  A   I understood he was pushing her hard to be
7  appointed to the Senate.
8  Q   Now, on Page 2, you then on the same page, on
9  line 32, after the governor tells you about this
10  grateful and appreciative, you say:
11       "Well, that's a lot further than they would let
12        me say."
13            And then you say:
14        "But okay, cool."
15        Who is the "they" when you say "they would
16  let me say"?
17  A   President Obama.
18  Q   So that would be singular?  I mean, when you said
19  "they" you were actually --
20  A   I meant President Obama, yes.
21  Q   Okay.  And when you said "that's a lot further
22  than they would let me say," what conversation were
23  you referring to as far as being able --
24  A   I was referring to the phone call that President
25  Obama had made to me.  Governor Blagojevich said

Balanoff - cross by Goldstein                    1832

1  that the president wants her to be senator, he told
2  me he wanted her in the White House but that she
3  wanted to be senator.
4  Q   Okay.  Now, on Page 4, line 21, you say:
5       "Okay, well, that was, ah, you know, I'm going
6        to reach out just to make sure that, hey, I'm
7        going to reach out to someone else and make
8        sure that's true, okay."
9            Now you volunteered that, is that correct?
10 A   That's correct.
11 Q   And did you understand you to be an emissary for
12 the president?
13           MR. SCHAR:  Objection, Judge.
14           THE COURT:  The objection is sustained.
15 BY MR. GOLDSTEIN:
16 Q   When you said you were going to reach out to make
17 sure that was true, what were you going to find out
18 if that were true?
19           MR. SCHAR:  Objection, Judge.
20           THE COURT:  Sustained.
21 BY MR. GOLDSTEIN:
22 Q   Now, you said on Page 5, you bring up:
23       "You know, and I think, you know, you have
24        another candidate for a whole lot of reasons
25        that, ah, is obviously valid."

1    And then the governor says:

2    "Which one is that, Tom?"

3        And you say:

4    "Well, the whole question of Lisa.  I mean, you

5    know --" 7.

6        And the governor says:

7    "I got that one, right."

8        Now, you said based on this question and

9  answer, you felt the governor really wasn't serious

10  about Lisa Madigan, is that fair to say?

11  A  That's fair to say.

12  Q  Did you, other than this question and answer, did

13  you have any independent knowledge at this point

14  whether there was any discussions or active attempts

15  to conduct this deal?

16  A  Well, the knowledge -- the only knowledge I had

17  is what Rod Blagojevich said he had told me in the

18  meeting on -- the 6th, was it?

19  Q  Yes.

20  A  The meeting on the 6th that he was in active

21  discussions.

22  Q  Okay.  And besides that, you had no other

23  information?

24  A  I had no other information.

25  Q  Now, the same page, line 18 -- line 17, I'm

1  sorry, you say:
2      "Yeah, yeah, yeah, no, I, I'm not even going to
3       raise him.  I, between you and me, I'm going to
4       talk directly to Valerie and say, hey, sister,
5       you want me to keep pushing this or not.  In or
6       out, we'll know."
7          What were you saying here?
8  A   I was saying that I was going to call Valerie and
9  ask her are you still interested being in the
10 Senate.
11 Q   And the Valerie was referring to Valerie Jarrett,
12 is that correct?
13 A   Yes.
14 Q   Now, there was also a discussion of these list of
15 candidates, do you recall that in this conversation?
16 A   Yes.
17 Q   Who did you understand this list of candidates
18 was coming from?
19 A   I understood that this was a list that Rahm
20 Emanuel had given to Harris representing it was
21 coming from President Obama.
22 Q   And the line about grateful and appreciative, who
23 did you understand that to be coming from?
24          MR. SCHAR:  Objection.
25 BY THE WITNESS:

Balanoff - cross by Goldstein                1835

1  A   Rod had told him --
2           THE COURT:  I'm sustaining it.
3  BY MR. GOLDSTEIN:
4  Q   Now, on Page 7, the governor tells you about this
5  issue advocacy, is that correct, in this page?
6  A   On which page?
7  Q   Page 7.  I'm sorry.
8  A   At some point, yes, he raises the 501(c)(4).
9  Q   He talked about Soros and Buffet?
10 A   Yes.
11 Q   And he then says on line 28:
12       "Yeah, and then we could help our new senator
13        Valerie Jarrett go out and, ah --"
14        And then you say:
15       "Yeah, there you go."
16        And the governor says:
17       "-- push that."
18           When you say "there you go," what were you
19 saying there?
20           MR. SCHAR:  Objection, Judge.
21           THE COURT:  The objection is sustained.
22 BY MR. GOLDSTEIN:
23 Q   On Page 8 you say, on line 1:
24       "So let me, ah, let me, ah, see if I can't,
25        well, I can, let, let me move this idea and see

1    where it, let me put that flag up and see where
2    it goes."
3    What were you saying there?
4        MR. SCHAR:  Objection again, Your Honor.
5        THE COURT:  The objection is sustained.
6  BY MR. GOLDSTEIN:
7  Q   On tab 38.
8        You there?
9  A   Yes, I'm at tab 38.  I'm sorry.
10 Q   On Page 3 the governor, on line 7, asks you:
11   "What do you think about that concept, that
12    idea?"
13        What did you understand the governor to be
14 asking you?
15 A   About his idea of setting up a 501(c)(4).
16 Q   Okay.  And your answer was:
17   "Hey, I think it's great, you know, but hey,
18    what you, you and I a lot of times think
19    something's great --"
20    The governor says:
21    "Yeah."
22    "It's unfortunate that other people don't.  I
23    think it's a great idea."
24        What were you saying when you say "I think
25 it's a great idea"?

1          MR. SCHAR:  Objection, Judge.

2          THE COURT:  Overruled.

3   BY THE WITNESS:

4   A   I was -- I was placating the governor, I was

5   mollifying him here, and I was actually trying to

6   let him know that, you know, when I say "other

7   people don't think that," I was trying to let him

8   down that this ain't gonna happen.

9   Q   I mean, you did communicate that other people may

10  not think it's a great idea but you certainly

11  communicated that's what you thought, is that

12  correct?

13         MR. SCHAR:  Objection, Judge.

14         THE COURT:  The objection is sustained.

15  BY MR. GOLDSTEIN:

16  Q   Now, after this conversation, you then called

17  Alexi Giannoulias, is that correct?

18  A   Yes, I did.

19  Q   And Giannoulias told you that Valerie Jarrett was

20  not interested in the seat, is that correct?

21  A   That -- he told me that Valerie was going to stay

22  in the -- going to the White House and she wasn't

23  interested, that's right.

24  Q   Did you ask him if the governor in the next hour

25  picked Valerie, would she even consider it, did you

Balanoff - cross by Goldstein                1838

1  ask him that?

2         MR. SCHAR:  Objection, Judge.

3         THE COURT:  It's sustained.

4  BY MR. GOLDSTEIN:

:50PM  5  Q  Did you tell Alexi Giannoulias anything about the

6  501(c)(4)?

7         MR. SCHAR:  Objection.

8         THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

:50PM  10  Q  Did Alexi Giannoulias ask that his name be put in

11  the mix?

12         MR. SCHAR:  Objection.

13         THE COURT:  You're off the field now.  The

14  objection is sustained.

:51PM  15  BY MR. GOLDSTEIN:

16  Q  Now, you talked a lot about what you understood

17  the governor to be saying in a lot of these

18  conversations, is that correct?

19  A  Yes.

:51PM  20  Q  And you on December 9th --

21         THE COURT:  Let me stop you for a second.

22  Are you going away from these --

23         MR. GOLDSTEIN:  I'm away from the calls.

24         THE COURT:  Then we'll break now.

:51PM  25         MR. GOLDSTEIN:  Okay.

Balanoff - cross by Goldstein                1839

1    THE COURT:  9:30.

2    THE MARSHAL:  All rise.

3    (The following proceedings were had out of the

4    presence of the jury in open court:)

5    THE COURT:  Mr. Balanoff, you can step down.

6  And do me a favor and close that door.

7    Be seated in the courtroom.

8    Counsel, come to the lectern.

9    (Brief pause).

10    THE COURT:  Let me tell you what the problem,

11  the principal problem I have with the questioning

12  and why I'm sustaining it.  In many cases you are

13  going way beyond the scope.  You want to recall your

14  witness as your witness, call him.  Some of it I

15  think won't go in, some of it might possibly go in

16  but you won't be faced with beyond-the-scope

17  arguments.  I can understand why you may not want to

18  call him to the witness stand, but if you want to

19  get it in and you're asking questions outside the

20  scope of direct, the only way you can do it is to

21  call him.  And these witnesses are still under the

22  Court's order, they can be called by either side.

23    The other thing is is you are treading in a

24  different way toward this proposition of the defense

25  of the governor that he relied on legal advice,

Balanoff - cross by Goldstein                    1840

1  which you know it's a defense you can't make because
2  of the conditions for legal advice are very
3  stringent and you didn't meet them, because it
4  requires that you ask for a formal opinion from a
5  lawyer and you reveal all the facts to the lawyer
6  and the lawyer says what you did is legal.

7         What you seem to be approaching sometimes,
8  and seeking some bolstering effect from witnesses,
9  is the proposition that without asking for legal
10 advice he personally believed that what he was doing
11 was legal, but to do that you have to lay a
12 foundation, and that foundation will almost
13 certainly have to be laid in the defense case, and
14 if that foundation is laid in the defense case, then
15 you can recall some of these witnesses and get to
16 that point.

17        But the question that was really out of
18 bounds was the question to the witness:
19    "... after this conversation, did you go to the
20     authorities?"
21         the only purpose of that, in the context of
22 this case, that might be a little different if
23 you're talking about, say, the victim of a sex
24 offense or somebody who gets stabbed and doesn't
25 report this to the authorities, there are lots of

:53PM

:54PM

:54PM

:54PM

:55PM

Balanoff - cross by Goldstein                    1841

1  reasons why that might occur, those reasons are all

2  personal to the circumstances of the offense.  In

3  this case, what you are trying to build is the

4  proposition that the fact that the witness did not

5  go to the authorities is the equivalent of an

6  opinion of this witness that no crime occurred, and

7  it's an opinion evidence that you could not offer

8  even if he was on the witness stand testifying.  You

9  could not call him, if you chose to call him, and

10 say was it not your opinion that no crime occurred

11 and was it not your opinion, is that not shown by

12 the fact that you didn't go to the authorities.

13 It's opinion evidence.  The instructions on what is

14 the law are given by me.  Nonfactual descriptions,

15 opinion evidence of the kind you want doesn't go in.

16 And, on top of it, it's not even opinion evidence,

17 it's you're going to be dragging it in as an opinion

18 based on his conduct, that's the only purpose for

19 this, and this is really outside the realm of the

20 reasonable, and implicitly and now explicitly in

21 violation of my order.

22         If you're going to make a defense, make your

23 defense, don't nibble around the edges with stuff

24 that's inadmissible.  And the truth is, if you

25 continue to do this I will sit you down and I will

:55PM
:55PM
:56PM
:56PM
:57PM

Balanoff - cross by Goldstein                    1842

1  give you the same advise I gave to one of your
2  predecessor counsel in the course of closing
3  argument, if you're going to do something improper,
4  it's really wise that you save it to the end of the
5  cross-examination so that you get the legitimate
6  stuff in first; otherwise, you will not be serving
7  the best interest of your client, and I don't want
8  that to happen here.
9            MR. GOLDSTEIN:  May I be heard?
10           THE COURT:  No.
11           MR. SOROSKY:  Our Honor --
12           THE COURT:  I have made my ruling.  I have
13  made my ruling.  My ruling is very clear, and it's
14  not the first time I've made it.  I want you to
15  understand it.  And I don't want you to respond to
16  it now, I want you to comply with it, that's all I
17  want from you.  We are not rearguing this issue.
18           9:30 tomorrow morning.
19           THE MARSHAL:  All rise.
20        (Adjournment taken from 4:57 p.m. to 9:30
21         o'clock a.m. on May 10, 2011.)
22
23
24
25

\*      \*      \*      \*      \*      \*      \*      \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


 /s/Blanca I. Lara                      date




_____        _____
      Blanca I. Lara                        Date