2601

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )  No. 08 CR 888
4            Government,             )
                                     )
5   vs.                             )  Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )  May 17, 2011
                                     )
7            Defendant.             )  9:53 o'clock a.m.

8
                          VOLUME 16
9                 TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES B. ZAGEL
10                      AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15               Assistant United States Attorneys
                 219 South Dearborn Street;
16               Suite 500
                 Chicago, Illinois 60604
17

18  Court Reporter:

19               Blanca I. Lara, CSR, RPR
                 219 South Dearborn Street
20                     Room 2504
                 Chicago, Illinois 60604
21                 (312) 435-5895

22

23

24

25

2602

APPEARANCES  (continued:)


For Defendant Rod Blagojevich:


          KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
          158 West Erie
          Chicago, Illinois 60610
          (312) 640-1776


          LAW OFFICE OF Elliott Riebman
          BY:  Elliott Riebman
          158 East Erie
          Chicago, Illinois 60610
          (847) 814-2900


          OFFICES OF AARON B. GOLDSTEIN
          BY:  Aaron Benjamin Goldstein
          6133 South Ellis
          Chicago, Illinois 60637
          (773) 752-6950


          OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
          2140 N. Lincoln Park West
          Suite 307
          Chicago, Illinois 60614
          (773) 517-0622

2603

1                        INDEX OF EXAMINATION

2     WITNESS                                              PAGE

3      GERALD KROZEL

4      Direct Examination Resumed By Mr. Niewoehner..... 2615

5      Cross Examination By Mr. Goldstein............... 2622

6      Voir Dire Examination By Mr. Goldstein.......... 2667

7      Redirect Examination By Mr. Niewoehner.......... 2680

8      Recross Examination By Mr. Goldstein............ 2686

9      Further Redirect By Mr. Niewoehner.............. 2691

10     ALONZO MONK

11     Direct Examination By Mr. Niewoehner............ 2694

12

13

14    EXHIBITS

15      ..............................................

16

17

18

19

20

21

22

23

24

25

2604

1      (The following proceedings were had out of the
2          presence of the jury in open court:)
3          THE CLERK:  Please remain seated we will
4   resume with the case on trial.
5          MR. NIEWOEHNER:  Good morning, Your Honor.
6          Chris Niewoehner, Reid Schar and Carrie
7   Hamilton for the government.
8          MR. GOLDSTEIN:  Good morning, your Honor.
9          Aaron Goldstein, Elliott Riebman, Lauren
10  Kaeseberg and Shelly Sorosky on behalf of Mr.
11  Blagojevich.
12          MR. NIEWOEHNER:  Your Honor, there's two
13  things with Mr. Krozel's testimony that we thought
14  we should just bring up before the jury came in.
15          First, yesterday Mr. Krozel started to
16  describe a subpoena that the government gave to a
17  road builders organization.  It actually wasn't --
18  that particular part of his testimony wasn't
19  responsive to the question that he was asked and I
20  wasn't sure if that's why Your Honor -- there was an
21  objection, your Honor sustained it, but we did want
22  to let your Honor know what the purpose -- I do
23  expect to ask him questions about that subpoena this
24  morning, so I just wanted to let Your Honor explain
25  why we were doing that.

1      THE COURT:  Right.  You adequately explained
2 my ruling because of the complete disconnect.
3      MR. NIEWOEHNER:  Yes.  I recognized that,
4 too, Your Honor.
5      The reason we're going to get into it is
6 because in the last trial Mr. Krozel was asked
7 questions that related to it.  Mr. Krozel's
8 testimony at this trial and I expect it would be
9 this morning was that he never told Lon Monk he
10 would not raise money for the governor and he's
11 explained his reasons why, he was concerned that if
12 he that the 6-billion-dollar program wouldn't
13 happen.
14      And at the last trial the defense tried to
15 impeach him and they asked him if he had, in fact,
16 pulled out a statement he had made in the 302 and
17 impeached him with the suggestion that he, in fact,
18 had told Monk he was not going to raise any money.
19 Well, that conversation that I'm referring to was
20 specific to this road builders subpoena.
21      Krozel and Monk talked about the fact that
22 the road builders organization had gotten a subpoena
23 and Krozel told Monk that it would be hard for
24 people in road builders, they didn't want their
25 names in the papers, so he indicated it would be

hard to raise money from them.  He did not make an
overall global statement that he would not raise any
money.  But that's why I have to, anticipating that
the defense will do that again, I do intend to
elicit from Mr. Krozel sort of the circumstances of
that conversation.

THE COURT:  This is the only item on your
agenda or is there another?

MR. NIEWOEHNER:  There's one other, as well.
The second one was, we're again going to move on
cross-examination to preclude the defense from going
into a number of areas with Mr. Krozel similar to
what we did with Mr. Magoon, his personal wealth.
The wealth of Prairie Materials, that was an item
that was mentioned in the opening statement that
Prairie Materials had a half a billion dollars in
sales.  For the same reasons Your Honor excluded
that with Mr. Magoon we think is irrelevant for
Mr. Krozel.

In addition to that, while we clearly
elicited information about fundraising that Krozel
did with others in the industry, we don't think that
information is relevant as to other applicable
candidates that construction companies may have over
the years contributed in the past or Mr. Krozel's

2607

1   prior conversations with the previous governor or

2   with an Illinois State senator, or anything along

3   those lines.

4        We think that the proper procedure will be if

5   the defense has any intention of getting into that,

6   it would be an offer of proof and Your Honor can

7   determine what, if anything, should be asked of

8   Mr. Krozel.

9        MR. GOLDSTEIN:  Your Honor, there's no need

10  for an offer of proof.  This was done in the last

11  trial.  It was admitted into evidence.  In fact,

12  there was an objection, we discussed it at sidebar,

13  the government let it in, it was relevant evidence

14  then, it's relevant evidence now.  The offer of

15  proof does nothing because Your Honor has heard the

16  first trial in which Your Honor allowed all this

17  evidence to come in and now, all of a sudden, it's

18  not allowed in.

19       There was no motion in limine before trial as

20  to Prairie's wealth and how much business it does.

21  We say that in opening and now, all of a sudden,

22  once it's said in opening, they want to prevent it

23  from coming in.  They're changing the rules in the

24  middle of the game.

25       This was done in the first trial without a

2608

1 problem, there was no motion addressing it before
2 this trial, and now we say it in opening and all of
3 a sudden the record has to be removed.  This isn't
4 trying to contradict what we're saying, this is
5 trying to remove facts.
6        And as far as the impeachment, I mean, the
7 government is giving us permission to impeach
8 Mr. Krozel and we certainly intend on doing it, I
9 don't think it's a completely accurate statement of
10 what was said in the 302, Krozel was very clear he
11 was not going to fundraise for the governor, but
12 that's neither here nor there, if we're allowed to
13 go into the impeachment, we should be able to.
14        As far as the government fronting it, if
15 we're allowed to go into it, they should do it in
16 their redirect.  They don't have to front everything
17 in anticipation.
18        MR. SOROSKY:  If I could ask something, Your
19 Honor, just briefly.
20        THE COURT:  Sure.
21        MR. SOROSKY:  I don't know what the
22 government plans are, they certainly haven't told
23 me, but it appears they have, as good lawyers, and
24 they are good lawyers, very diligently gone over the
25 transcripts of the first trial, and as we lawyers

:53AM

:54AM

:54AM

:54AM

:55AM

2609

often say, all this side scored a granular sugar
here, we don't want that to happen again, let's go
before the judge and prevent them from doing it.
And that's what's occurring here.  And it clearly
infringes on Mr. Blagojevich's right to a fair trial
and effective cross examination by his counsel.

Secondly, secondly, when the allegation is
extortion and the allegation is that the governor is
allegedly extorting or attempting to extort a
contribution from someone, I think it's a
significant fact that the person that the governor
is talking to is a wealthy man, he works for a
multimillion-dollar company, this company in the
usual course of their business contributes to
political people, has in the past contributed to the
governor, and part of this company's way of doing
business is contributing favorable public officials
to get favorable legislation passed that helps their
industry, and I think that's a significant factor in
getting a fair trial.

THE COURT:  Anybody have anything else to
say?

MR. NIEWOEHNER:  Two small factual points.  I
don't believe in the first trial there was anything
mentioned about the half billion dollars of Prairie,

2610

1  I think that's a new fact.

2       MR. GOLDSTEIN:  That's not true.  That's not

3  true.

4       MR. NIEWOEHNER:  Well, Mr. Goldstein said

5  there was an objection last time and there was a

6  sidebar.  There was, but the government withdrew its

7  objection and Your Honor didn't rule on the

8  objection last time, so there was no prior ruling.

9       MR. SCHAR:  Judge, the only thing I would add

10  from a legal argument perspective, you don't get to

11  open with improper defenses without having moved

12  ahead of time, which they easily could have done and

13  say, "here are all the things we're going to do in

14  opening statement in our defense case," and try to

15  get a ruling from Your Honor that it's proper or

16  improper.  And then once you opened on it, somehow

17  they get to bootstrap an improper argument through

18  the questioning of a witness.

19       They had the opportunity to address whatever

20  they thought were proper legal argument before

21  opening statement.  They opened on a variety of

22  things, including government misconduct, which they

23  actually had been barred, and they went ahead and

24  did it, some we objected to, some got through.  Now

25  we're in the questioning of witnesses and the fact

2611

1  that they made the decision to open with an improper
2  defense doesn't insulate the inadmissibility of some
3  of the questions and issues that they want to
4  address.
5       THE COURT:  Okay, the subpoena is fine.
6       With respect to Krozel, I do want an offer of
7  proof, and I'll tell you why I want an offer of
8  proof.  One reason is that I get a lot of objections
9  stated in the most abstract terms possible.  In this
10 case, it was clearly interferes with the defense.
11 This is actually not an objection, it's like the
12 start of an objection followed by a list of specific
13 ways in which he does.  Don't offer it, stand up in
14 court and say you are depriving us of our right to
15 confront witnesses, to cross-examine witnesses.
16 It's true that I sustained objections to cross
17 examinations, but you simply don't want to show how
18 you were hurt, and the way you do that is do offers
19 of proof.
20      More importantly, we just had an of proof,
21 and the offer of proof decimated the factual premise
22 for many of the questions you intended to ask a
23 witness.
24      Now, when you do that, you demonstrate to the
25 Court that you're just taking a flier, "oh, let's

:58AM
:58AM
:58AM
:59AM
:59AM

2612

1   see if this thing, you know, just toss it up there,
2   I don't know if it's true, don't have any particular
3   reason to ask the question, but maybe I'll get a
4   good answer," and by doing that and demonstrating
5   that that's what you were doing with respect to
6   Magoon, you put me in a position where I want to see
7   exactly what it is you want to get in before I make
8   a decision on whether you can.  And you did it in
9   the first trial, too.
10          It's a perfect choice of strategy that you
11  can make, but there's a price you pay for it, and
12  the price you pay for it is, I can't be sure that
13  you have a reasonable basis to put certain
14  questions.  And I don't attribute this to some
15  deliberate subversive effort.  In the case of
16  Magoon, some of the stuff that he did put in the
17  offer of proof you could have found out for yourself
18  before trial.  But I'm concerned that you just --
19  there's a real risk that all you're going to do is
20  throw stuff in the wall and hope that it sticks,
21  and, in the context of this case, I'm not going to
22  let you do it.
23          Also, there is a certain amount of
24  tongue-in-cheek speech in the way you present this
25  stuff to me, because, basically, what was done in

2613

1   the first trial is deemed to be the rules of the
2   case forever, but that's only for this stuff that
3   worked in your favor; if it worked against you, all
4   of a sudden you want a change.  I don't blame you
5   for doing any of this, but I'm not going along with
6   it.

7           So when you get to Krozel's stuff on personal
8   wealth, other campaign contributions, we're doing it
9   by offer of proof first.  And you might be
10  optimistic about this because Magoon didn't go well
11  for you, Krozel might.  And the reason I say that
12  is, I don't know what he's going to say and I'd like
13  to know what he's going to say and then I can make a
14  determination as to whether it's relevant in any
15  way.

16          Also, the fact that somebody has routinely
17  contributed to other people, for years and years and
18  years, does not excuse a different situation where
19  an individual is feels compelled to make it for
20  reasons other than the reasons he went into before.
21  They may not be analogous situations, and since they
22  may not be analogous you may want to address that,
23  too, in the offer of proof.

24          There's actually a legal normality to this,
25  but I'm not going to use it because the crime to

2614

1 which it applies is very remote than the one we're

2 dealing with today.  So, basically, when you get to

3 that point in cross where you want to talk about his

4 personal wealth and those other political

5 contributions, you will ask for a moment outside the

6 presence of the jury.

7          Obviously, it's best, administratively, for

8 you to do that at the very end, but if it doesn't

9 fit with what you intend to do on cross-examination,

10 I'll do it at any time, at in the beginning, in the

11 middle, at the end, it's your choice.

12          Is there something left unruled on?

13          I don't think so.

14          MR. NIEWOEHNER:  No, Judge.

15          MR. SOROSKY:  Your Honor, if I could just

16 respond to what you said briefly.

17          THE COURT:  Wait, wait.  Wait.  This is not a

18 dialogue.  That was a ruling.

19          MR. SOROSKY:  I understand.  I understand.

20          THE COURT:  And unless you are going to ask

21 something that accepts the premise of the ruling, I

22 wouldn't go and do it.

23          MR. SOROSKY:  Well, I just feel I'm compelled

24 as Mr. Blagojevich's attorney to make one comment on

25 your ruling.

Krozel - direct by Niewoehner                    2615

1          THE COURT:  No.  You can make a comment on my
2   ruling, and you can make comment at an appropriate
3   place, and it's not this courtroom.  There's a
4   perfect place for lawyers to make comments on
:04AM 5   rulings that are meaningful and it's on a floor
6   higher than this one.
7          Thank you.
8          MR. NIEWOEHNER:  Should we bring the witness
9   in, Your Honor?
:04AM 10          THE COURT:  Yeah.
11      (Brief pause).
12
13       (The following proceedings were had in the
14       presence of the jury in open court:)
:06AM 15          THE COURT:  Please be seated.
16          Do you understand you're still under oath?
17          THE WITNESS:  Yes.
18          THE COURT:  Please be seated.
19        GERALD KROZEL, GOVERNMENT'S WITNESS,
:06AM 20                   PREVIOUSLY SWORN
21              DIRECT EXAMINATION resumed
22   BY MR. NIEWOEHNER:
23   Q  Mr. Krozel, when you testified yesterday you
24   recall you testified about a meeting you had at
:07AM 25   Friends of Blagojevich offices in September, do you

1  recall that?

2  A  Yes, I do.

3  Q  A conversation there about fundraising and the

4  tollway program?

:07AM  5  A  Yes.

6  Q  You've also talked yesterday about a phone call

7  you had on October 22nd of 2008, do you recall that?

8  A  Yes.

9  Q  And the defendant again brought up some of those

:07AM  10  same topics?

11  A  Yes, he did.

12  Q  After your October 22nd call with the defendant,

13  did you ever talk to him again?

14  A  No.

:07AM  15  Q  I'm going to direct your attention now to

16  December 9th of 2008.

17        On that date did you speak with an agent of

18  the Federal Bureau of Investigation?

19  A  Yes, I did.

:07AM  20  Q  Had you planned to speak with the FBI agents on

21  that day?

22  A  No, I did not.

23  Q  Where did you speak with the agents?

24  A  At my home.

:08AM  25  Q  What time did the agents come to your house?

Krozel - direct by Niewoehner                    2617

1  A   At 6:30 in the morning.

2  Q   Who was with you at your house when the agents
3  arrived?

4  A   My wife.

:08AM  5  Q   Was anyone else there?

6  A   No.

7  Q   What was your wife's physical condition at that
8  time?

9  A   Not very good.

:08AM  10  Q   When you say not very good, what do you mean?

11  A   She was suffering from -- she was suffering from
12  undiagnosed neurological problem.

13  Q   Was your wife physically able to take care of
14  hers?

:08AM  15  A   No, she wasn't.

16  Q   What did she need your help to do?

17  A   Well, everything.

18  Q   Particularly, could she talk?

19  A   She couldn't talk.

:08AM  20  Q   Could she walk?

21  A   No.

22  Q   Was she basically helpless without you?

23  A   Yes.

24  Q   How many of them agents came to your house that
:09AM  25  day?

1  A   Please repeat the question.

2  Q   How many FBI agents came to your house on

3  December 9th?

4  A   Two.

:09AM

5  Q   Did agents tell you about the defendant's arrest

6  that day?

7  A   Yes, they did.

8  Q   How were you feeling when the agents talked to

9  you?

:09AM

10  A   Frightened.

11  Q   What were you afraid of?

12  A   Because of the timing, they were at my house at

13  6:30 and they told me that the governor was arrested

14  at 6:15, fifteen minutes before, I thought they were

:09AM

15  coming there to take me away.

16  Q   Were you concerned for your wife if you were

17  taken away?

18  A   Very much so.

19  Q   What did you want the agents to do?

:09AM

20  A   Basically to leave.

21  Q   Did the agents ask you questions about your

22  fundraising with defendant?

23  A   Yes, they did.

24  Q   Were you asked questions about your September

:10AM

25  meeting with the defendant at the campaign office?

 1  A   Yes, they did.

 2  Q   Were you asked questions about the tollway

 3  program?

 4  A   Yes.

 5  Q   In that interview with the FBI on December 9th,

 6  were you asked any questions about whether you felt

 7  any pressure to raise money for the defendant during

 8  your meeting at the campaign office?

 9  A   Yes.

10  Q   What did you tell the agents?

11  A   No, I didn't have any.

12  Q   Was that the truth?

13  A   No, it wasn't.

14  Q   Did you tell the agents that you thought the

15  defendant was making a connection between the

16  tollway program and your fundraising at the meeting?

17  A   I don't exactly remember those words.

18  Q   Did you ever tell the agents about that interview

19  anything along those lines?

20  A   I might have implied that, yes.

21  Q   Did you lie to the agents?

22  A   Yes, I did.

23  Q   Why did you lie to the agents?

24  A   Well, I was concerned about my wife being

25  upstairs and there was no way I could communicate

1  with her.  When I went upstairs to help her dress, I
2  told her that there were two agents in the house,
3  and I knew she was watching the events on television
4  and she knew they were there and that -- it -- it
5  was quite difficult.

:11AM

6  Q   You're testifying today under an immunity
7  agreement, is that right?
8  A   Yes.
9  Q   What's the only way you can get in trouble with
10 the law today in your testimony?

:11AM

11 A   If I lied.  If I lied.
12 Q   Now, you mentioned your October 22nd conversation
13 with the defendant, did you continue to talk with
14 Lon Monk after that October 22nd conversation?

:11AM

15 A   Yes, I did.
16 Q   And I'm going to focus your attention in the time
17 period between October 22nd and December 9th.
18       About how many times did you speak with Lon
19 Monk in that time frame?

:12AM

20 A   About 2 or 3.
21 Q   In those conversations, what did Monk say to you?
22 A   Well, he was asking me how I'm doing with
23 fundraising.
24 Q   At that time were you trying to raise money for

:12AM

25 the defendant?

1   A   No.

2   Q   Did you tell Monk that you were not going to

3   raise any money for the defendant?

4   A   I did not.

5   Q   Did you bring up any reasons that would be hard

6   to raise money?

7   A   Well, I did say a couple of times maybe that, you

8   know, our district was being hard hit and conditions

9   were bad.

10  Q   Did you talk to him about any subpoenas that had

11  been issued?

12  A   Yes, I did.

13  Q   What did you tell Monk in that regard?

14  A   I told him that subpoenas were issued to the road

15  builders and that really stopped people from wanting

16  to contribute in any way.

17  Q   Were you referring to the people in the road

18  builders?

19  A   Just the road builders, yes, because there were

20  other people that did not do work with the state.

21  Q   So were there other construction companies that

22  were not in the road builders organization?

23  A   Correct.

24  Q   Could you have raised money from those companies

25  that were not in the road builders organization?

1  A   I could've.

2  Q   So between your September meeting and December

3  9th of 2008, did you ever tell Monk that you were

4  not going to raise any money for the defendant?

:13AM  5  A   I did not.

6  Q   Why not?

7  A   Because I was afraid that -- that with the

8  personal relationship Lon had with the governor,

9  that the 6-billion-dollar program would not go

:13AM  10  through.

11  Q   I direct your attention to December 9th.

12        Had you raised any funds for the defendant by

13  that date?

14  A   No, I did not.

:13AM  15  Q   By that date, had there been any announcement

16  from the defendant that there would be a

17  6-billion-dollar program?

18  A   There had not been.

19        MR. NIEWOEHNER:  Nothing further, Your Honor.

:14AM  20        May I proceed, Your Honor?

21        THE COURT:  You may.

22        MR. GOLDSTEIN:  Thank you.

23                CROSS EXAMINATION

24  BY MR. GOLDSTEIN:

:14AM  25  Q   Good morning, Mr. Krozel.

Krozel - cross by Goldstein                 2623

1   A   Good morning.

2   Q   Now, yesterday you testified that you always

3   thought there was a connection between the amount

4   you were going to raise and the project itself, is

5   that correct?

6   A   Yes.

7   Q   And I think you were then asked the question what

8   the connection was and you said "if I didn't raise

9   any money, I felt there wouldn't be a tollway bill,"

10  is that correct?

11  A   That's true.

12  Q   And you went further and you said you thought if

13  you didn't raise funds, the 6-billion-dollar program

14  wouldn't become reality, is that correct?

15  A   That's true.

16  Q   Now, I want to take you back to this December 9th

17  conversation you had with the FBI, okay?

18  A   Yes.

19  Q   Now, the FBI came to your home at 6:30 in the

20  morning, is that correct?

21  A   Yes.

22  Q   And it was special agents Jonathan Rouske,

23  R-o-u-s-k-e, and Brian Etchell, E-t-c-h-e-l-l, that

24  came to your house, correct?

25  A   I don't remember.

1  Q   There were two males special agents, is that
2  correct?
3  A   Yes.
4  Q   And they identified themselves and they said they
5  were with the FBI, correct?
6  A   Yes.
7  Q   And they said they wanted to ask some questions
8  about Rod Blagojevich, is that correct?
9  A   Yes.
10 Q   And they informed you that Rod had just been
11 arrested, is that correct?
12 A   Yes.
13 Q   And you invited them into your house, right?
14 A   They asked to come in because they had subpoenas.
15 Q   And you said come on in, is that correct?
16 A   I don't know what I said at that time.
17 Q   Well, you let them in, right?
18 A   They were in the house.
19 Q   Okay.  So you sat down at your kitchen table and
20 talked to these people?
21 A   Yes, I did.
22 Q   And how long was this conversation?
23 A   An hour, maybe.
24 Q   Did you tell the agents the problems you were
25 having with your wife and maybe if they can come

 1  back a little later?  Did you tell them that?
 2  A   No --
 3          MR. NIEWOEHNER:  Objection, Your Honor.
 4  BY THE WITNESS:
 5  A   -- I was too frightened.
 6          THE COURT:  The objection is sustained.
 7  BY MR. GOLDSTEIN:
 8  Q   You had mentioned you were frightened, is that
 9  right?
10  A   Yes.
11  Q   You were frightened by the FBI?
12  A   Yes.
13  Q   They came to your house and they frightened you?
14  A   They terrified me.
15  Q   They terrified you?
16  A   Yes.
17  Q   You were terrified by the Federal Bureau of
18  Investigation, is that correct?
19  A   Yes.
20  Q   And you didn't tell them you were terrified, did
21  you?
22          MR. NIEWOEHNER:  Objection, Your Honor.
23          THE COURT:  The objection is sustained.
24  BY MR. GOLDSTEIN:
25  Q   While you were sitting down talking to them, they

1  asked you questions about the case, right?

2  A  Yes.

3  Q  And they were taking notes while you were giving

4  them answers, right?

:17AM   5  A  Yes.

6  Q  And you told them background information, right?

7  About yourself?

8        MR. NIEWOEHNER:  Objection.

9  BY THE WITNESS:

:17AM   10  A  I answered their questions.

11  BY MR. GOLDSTEIN:

12  Q  You answered their questions?

13        MR. NIEWOEHNER:  Objection, Your Honor.

14        THE COURT:  The question is a little vague.

:17AM   15  BY MR. GOLDSTEIN:

16  Q  Well, they didn't just ask you if you felt

17  pressured, did they?  They asked you other

18  questions, right?

19  A  There was so much going on at that time.  If you

:17AM   20  ask me every word that was said, I just don't

21  remember every word that was said.

22  Q  But you do remember that you told them that you

23  did not feel any pressure from either Governor

24  Blagojevich or Lon Monk to raise money for the

:17AM   25  governor, is that correct?

1  A   I don't know if they said governor or Lon Monk or

2  one or the other.  I do believe they said the

3  governor, but I did answer that question that I did

4  not feel pressure.

:17AM

5  Q   And then you went further and you said you told

6  them that you never felt the tollway bill depended

7  upon your fundraising efforts, is that correct?

8  A   I don't remember that.

9  Q   Now, you just testified on direct examination

:18AM

10 what you told the FBI, is that correct?

11 A   Yes.

12 Q   Just so we're clear, you're testimony now is you

13 don't remember whether you told the FBI that you

14 never felt that the tollway bill depended upon your

:18AM

15 fundraising efforts?  Did you or did you not say

16 that to the FBI on December 9th, 2008?

17 A   Nobody has to go through what I went through,

18 counsel.

19 Q   What is that?

:18AM

20 A   I don't remember those exact words.  I told them

21 that I did not feel any pressure.

22 Q   So is your memory exhausted as to whether you

23 said that there was no connection between the

24 tollway bill and your fundraising efforts?

:18AM

25 A   I do not remember telling the FBI that.

1 Q   If I showed you the FBI report, would that help
2 refresh your recollection whether you said it?
3 A   Yes.
4          MR. GOLDSTEIN:  May I approach, Your Honor?
5          THE COURT:  Sure.
6 BY MR. GOLDSTEIN:
7 Q   I'm showing you Defendant's Exhibit Gerald Krozel
8 December 9th, 2008 interview with the FBI.
9          And this is a document that, as you see, is a
10 recitation of the interview that you had with them,
11 is that correct?
12 A   Yes.
13 Q   Okay.  And if we can turn to Page 3 of that
14 document and I've highlighted it.  If you could read
15 to yourself that last sentence that starts "Krozel
16 stated ..."
17     (Brief pause).
18 BY MR. GOLDSTEIN:
19 Q   Have you read it?
20 A   Yes, I have.
21 Q   Is your memory refreshed as to whether you told
22 the FBI on December 9th that you never felt that the
23 tollway bill depended upon your fundraising efforts?
24 Do you recall saying that to the FBI?
25 A   I don't recall saying that.  Again, I just wanted

1  to get them out of my house.

2  Q   And your testimony is that you were lying to the

3  FBI?

4  A   I did lie to the FBI, yes.

5  Q   And have you been charged with lying to the FBI?

6         MR. NIEWOEHNER:  Objection.

7         THE COURT:  The objection is sustained.

8  BY MR. GOLDSTEIN:

9  Q   You said that you received immunity from the

10  federal government, is that correct?

11  A   That is true.

12  Q   And as you understand the immunity, you have to

13  tell the truth, is that correct?

14  A   Yes.

15  Q   And you understand you don't need immunity, you

16  still have to tell the truth when you testify, you

17  understand that?

18         MR. NIEWOEHNER:  Objection.

19  BY THE WITNESS:

20  A   I understand.

21         THE COURT:  The objection is overruled.

22  BY MR. GOLDSTEIN:

23  Q   Who, to your understanding, has to determine

24  whether you're telling the truth or not?

25  A   I am telling the truth.

:20AM
:20AM
:20AM
:20AM
:21AM

1  Q   I'm asking who you understand to be the

2  determiners of whether you're telling the truth or

3  not and whether you get charged for perjury?

4          Is it me?  Is it them?  Who determines you're

5  telling the truth, Mr. Krozel?

6          MR. NIEWOEHNER:  Objection.

7          THE COURT:  The objection is sustained.

8  BY MR. GOLDSTEIN:

9  Q   Now, you said it was the FBI that frightened you,

10  right?

11  A   Yes.

12  Q   Okay.  And the FBI also did interviews with you

13  with the U.S. Attorneys, is that correct?

14  A   Yes.

15  Q   And it's those same people that are giving you

16  immunity, is that correct?

17          MR. NIEWOEHNER:  Objection.

18          THE COURT:  The objection is sustained.

19  BY MR. GOLDSTEIN:

20  Q   Now, Mr. Krozel, you talked a little bit about

21  yourself.  You said you were the chairman of the

22  Illinois Division of the American Concrete Pavement

23  Association, is that correct?

24          MR. NIEWOEHNER:  Objection.

25          THE COURT:  Sustained.

1  BY MR. GOLDSTEIN:

2  Q   Well, you're involved in the road builders and

3  that lot, is that correct?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  Sustained.

6  BY MR. GOLDSTEIN:

7  Q   You testified on direct examination about this,

8  is that correct?

9          THE COURT:  You know, if I sustained it

10  twice, maybe you should seek some other information.

11  BY MR. GOLDSTEIN:

12  Q   You've been involved in the material business, is

13  that correct?

14  A   Yes.

15  Q   Okay.  And it was about 52 years you've been

16  involvement in the materials business?

17  A   Yes.

18  Q   And you testified on direct examination while the

19  government was asking you questions, that you were

20  the vice president of Prairie Materials, is that

21  correct?

22  A   Yes.

23  Q   Now, you talked about this September 18th meeting

24  in which it was you, Rod, Lon Monk, and Robert

25  Blagojevich, is that correct?

1   A   Yes.

2   Q   And is it fair to say that before you came to the

3   meeting, you didn't want to go to this meeting, is

4   that correct?

5   A   Correct.

6   Q   You felt uncomfortable coming to the meeting, is

7   that correct?

8   A   Yes.

9   Q   And you had stopped fundraising for Rod before

10  this meeting, is that correct?

11  A   Yes.

12  Q   And coming into the meeting, you don't want to do

13  anymore fundraising for Rod, is that correct?

14  A   That's right.

15  Q   And you testified on direct examination when the

16  government asked you questions, that you had

17  fundraised for Rod in the past, is that correct?

18  A   Yes.

19  Q   It was several hundreds of thousands of dollars

20  that you had fundraised for Rod in the past, is that

21  correct?

22  A   Yes.

23  Q   Is it fair to say that you were one of the first

24  fundraisers for Rod when he first ran for governor,

25  is that correct?

:23AM

1           MR. NIEWOEHNER:  Objection, Your Honor.

2           THE COURT:  Sustained.

3    BY MR. GOLDSTEIN:

4    Q   Now, one of the reasons that you were

5    uncomfortable with talking to Rod, you weren't happy

6    with the family relationship, particularly his

7    father-in-law, is that correct?

8           MR. NIEWOEHNER:  Objection.

9           THE COURT:  Sustained.

10   BY MR. GOLDSTEIN:

11   Q   Well, when you first came in to the Friends of

12   Blagojevich office on September 18th, the first

13   thing you all talked about was these personal

14   matters, is that correct?

15          MR. NIEWOEHNER:  Objection, Your Honor.

16          THE COURT:  The objection is sustained.

17   BY MR. GOLDSTEIN:

18   Q   What did you talk about when you first came to

19   the Friends of Blagojevich office?

20          MR. NIEWOEHNER:  Objection, Your Honor.

21          THE COURT:  This is really not relevant.  The

22   objection is sustained.

23   BY MR. GOLDSTEIN:

24   Q   You also talked about whether -- you talked about

25   the Senate President Emil Jones retiring, is that

1  correct?

2       MR. NIEWOEHNER:  Objection, Your Honor;

3  relevance.

4       THE COURT:  Sustained.

:24AM  5  BY MR. GOLDSTEIN:

6  Q  Did you talk about the tollway plan?

7  A  Yes.

8  Q  And you said that Rod had talked about announcing

9  the 1.8 billion dollar plan, is that correct?

:24AM  10  A  Yes.

11  Q  Now, he told you that he was going to announce

12  this plan sometime in October or November, is that

13  correct?

14  A  Yes.

:25AM  15  Q  And to your knowledge, this plan was announced,

16  is that correct?

17  A  It was.

18  Q  And you said you talked about the

19  6-billion-dollar plan, is that correct?

:25AM  20  A  Yes.

21  Q  And you testified that Rod told you he would

22  announce it in January, is that correct?

23  A  Yes.

24  Q  Did Rod actually tell you that he was going to

:25AM  25  announce it in January?

1  A   Yes.

2  Q   Mr. Krozel, you signed a statement in this case,

3  is that correct?

4  A   Yes.

:25AM  5  Q   And this is a statement that was written and you

6  signed, is that right?

7  A   Yes.

8  Q   And this is a statement that you read and

9  testified to under oath in the grand jury, is that

:25AM  10  correct?

11  A   Yes.

12  Q   And in your statement you didn't indicate that

13  Rod said January 1st was the date for this

14  6-billion-dollar program?

:25AM  15  A   Can I please see what you're referring to?

16  Q   Certainly.

17       MR. GOLDSTEIN:  May I approach?

18       THE COURT:  Sure.

19     (Brief pause)

:26AM  20  BY MR. GOLDSTEIN:

21  Q   I'm showing you Defendant's Exhibit Statement of

22  Gerald Krozel.

23       Do you recall that document?

24  A   Yes.

:26AM  25  Q   What is it?

1  A   It's my statement in front of the grand jury.

2  Q   And this is a statement you're requesting me to

3  give to you for you to look at?

4  A   Yes.

5  Q   Okay.  And in that statement, did you indicate

6  that Rod said January 1st was when the 6 billion

7  dollar plan would be announced?

8  A   Can I briefly read through this, please?

9  Q   Certainly.

10     (Brief pause).

11 BY THE WITNESS:

12 A   I did say -- I did not mention January, but I did

13 say --

14 BY MR. GOLDSTEIN:

15 Q   Well, let me ask another question.

16     You did not mention January in that

17 statement, is that correct?

18 A   I did not mention the month of January.

19 Q   Okay.  So you didn't put in your statement --

20     May I take the statement back, please.

21     You didn't put in your statement that

22 January 1st is what Rod told you this announcement

23 would be made, is that correct?

24 A   The --

25 Q   Is that correct?

1  A   That's correct.

2  Q   Now, Rod also talked to you about the capital

3  bill, is that correct?

4  A   Yes.

:28AM  5  Q   And he indicated to you that if the capital bill

6  wasn't passed, then they would potentially work on

7  the 6-billion-dollar program, is that correct?

8  A   Yes.

9  Q   And you said that Rod mentioned the

:29AM  10  6-billion-dollar program and talked about some roads

11  that were to be impacted on the 6-billion-dollar

12  program, do you recall talking about that?

13  A   Yes, he did.

14  Q   Okay.  And you mentioned that he discussed in the

:29AM  15  6-billion-dollar program I-294 and I-57, is that

16  correct?

17  A   Yes.

18         MR. GOLDSTEIN:  May I publish the

19  announcement, the Government Exhibit?  May I publish

:29AM  20  that, Your Honor?

21         THE COURT:  Objection or no objection?

22         MR. NIEWOEHNER:  No, Your Honor.

23         THE COURT:  No objection?

24         MR. NIEWOEHNER:  To the publishing of the

:29AM  25  exhibit.

1          THE COURT:  Do you have an objection to the
2    publishing of the exhibit?
3          MR. NIEWOEHNER:  No, Your Honor.
4          THE COURT:  Good.
5          Publish it.
6       (Exhibit published to the jury.)
7    BY MR. GOLDSTEIN:
8    Q   So you said in the 6-billion-dollar program, the
9    governor talked about I-294 and I-57, is that right?
10   A   Yes.
11   Q   Okay.  And you recognize this document as the
12   announcement of the 1.8 billion-dollar program, is
13   that correct?
14   A   Yes.
15   Q   Now, if you could look to the middle of that
16   announcement where it says "projects and the
17   governor's new Illinois tollway congestion relief
18   program," do you see that?
19   A   Yes.
20   Q   And then as it goes down it talks about I-294 in
21   the second program, the tri-state tollway I-294, and
22   then the I-57 interchange, is that correct?
23   A   Yes.
24   Q   So that's what was indicated in the announcement
25   from the 1.8 billion-dollar program, is that

:30AM
:30AM
:30AM
:30AM
:31AM

1 correct?

2 A  Yes.

3       MR. GOLDSTEIN:  Can you take it down?  Thank

4 you.

5    (Brief pause)

6 BY MR. GOLDSTEIN:

7 Q  You said it didn't make any sense to you to delay

8 the 6-billion-dollar program, is that correct?

9 A  No.

10 Q  I'm sorry?

11 A  It should not have been.

12 Q  It should not have.

13       You understood that a lot of the politicians

14 would be less motivated to work for the capital bill

15 if the 6-billion-dollar program was announced, is

16 that correct?

17       MR. NIEWOEHNER:  Objection, Your Honor.

18       THE COURT:  Sustained.

19 BY MR. GOLDSTEIN:

20 Q  Well, you talked about the capital bill.  The

21 capital bill was a much bigger program than any of

22 these tollway programs, is that correct?

23 A  Yes.

24 Q  The tollway program would just entail the tolls,

25 is that correct?  The toll roads, is that correct?

1  A   Yes.

2  Q   And the toll roads primarily were Northern

3  Illinois, is that correct?

4  A   Yes.

5  Q   And the capital bill would involve not just roads

6  but involve schools and hospitals and other

7  infrastructure, is that correct?

8  A   It was an infrastructure bill, correct.

9  Q   And Rod talked to you about his work to try and

10 get the capital bill done, is that correct, during

11 this meeting?

12         MR. NIEWOEHNER:  Objection, Your Honor.

13         THE COURT:  The objection is sustained.

14 BY MR. GOLDSTEIN:

15 Q   Well, you testified that no bill, no capital bill

16 had passed or come close to passing, is that

17 correct?  Did you testify to that?

18 A   I did.

19 Q   Okay.  And you understood that the capital bill

20 had passed the Senate twice, is that correct?

21 A   Yes.

22 Q   Okay.  And it was the House that wasn't passing

23 it, is that correct?

24 A   Yes.

25 Q   And it was Mike Madigan that wasn't calling the

1  bill, is that correct?

2         MR. NIEWOEHNER:  Objection, Your Honor.

3         THE COURT:  Sustained.

4  BY MR. GOLDSTEIN:

5  Q   Now, the government asked you a question and it

6  was when the governor said the reason he wanted to

7  delay the larger announcement, the 6-billion-dollar

8  program, he told you so he could work on the capital

9  bill in 2008, do you recall that question?

10 A   Yes.

11 Q   Okay.  And the government asked you did you

12 believe him, do you recall being asked that

13 question?

14 A   I did not believe the governor.

15 Q   Okay.  So your testimony is, you did not believe

16 that the governor wanted to work on the capital

17 bill, is that your testimony?

18        MR. NIEWOEHNER:  Objection.

19        THE COURT:  Overruled.

20 BY THE WITNESS:

21 A   Would you please repeat the question.

22 BY MR. GOLDSTEIN:

23 Q   Is your testimony that you did not believe that

24 Rod wanted to work on the capital bill?

25 A   I believe that a capital bill could not be passed

1  in 2008.

2  Q   And that was based on your experience and your

3  knowledge with the legislature and the bills going

4  on at that time, is that correct?

5  A   That's true.

6  Q   But the government asked you a question whether

7  you believed that Rod wanted to work on the capital

8  bill and you said you didn't believe him, is that

9  correct?

10        MR. NIEWOEHNER:  Objection.

11        THE COURT:  Sustained to the form of the

12  question.

13  BY MR. GOLDSTEIN:

14  Q   The question you were asked was, when the

15  governor said --

16        THE COURT:  Don't ask him about his memory of

17  the question he was asked.  What you wish to do, I

18  believe, is try to test his answers, so why don't

19  you deal with what it was that he said.

20  BY MR. GOLDSTEIN:

21  Q   You said you didn't believe a capital bill would

22  be passed in 2008, correct?

23  A   That is correct.

24  Q   Did you believe that Rod was working on the

25  capital bill in 2008?

:34AM
:34AM
:34AM
:34AM
:34AM

 1          MR. NIEWOEHNER:  Objection, Your Honor.
 2          THE COURT:  You may answer that.
 3   BY THE WITNESS:
 4   A   How do I know what the governor was thinking?
 5   BY MR. GOLDSTEIN:
 6   Q   That's why I'm asking you, because you testified
 7   that you didn't believe him.
 8   A   That's right.
 9   Q   That he wasn't working on it.
10   A   That's right.  Because I knew it could not be
11   passed.
12   Q   You knew it couldn't be passed, but your
13   testimony now is, you don't know what was in his
14   mind, whether he was working on it, is that correct?
15   A   Well, if he told me he was -- he's working on a
16   capital bill, that doesn't necessarily mean I have
17   to believe him.
18   Q   When he said he was working on the capital bill,
19   you understood he was working with former U.S.
20   Speaker of the House Danny Hastert?
21          MR. SCHAR:  Objection.
22          THE COURT:  You are asking about his state of
23   mind, and his state of mind is that he didn't
24   believe what the governor said, and anything else
25   would, at least the path you're going down, is you

1  want to argue with him and I'm not going to allow

2  you to ask argumentative questions.

3  BY MR. GOLDSTEIN:

4  Q   Mr. Krozel, are you aware of the Illinois Works

:36AM  5  Commission?

6          MR. NIEWOEHNER:  Objection, Your Honor.

7          THE COURT:  Sustained.

8  BY MR. GOLDSTEIN:

9  Q   Are you aware of who Danny Hastert is?

:36AM  10  A   Yes.

11  Q   Okay.  Are you aware of who Glynn Poshard is?

12          MR. NIEWOEHNER:  Objection, your Honor.

13          THE COURT:  Sustained.

14  BY MR. GOLDSTEIN:

:36AM  15  Q   If we could just skip ahead for a second.

16          Mr. Krozel, you said you had a call with

17  Mr. Blagojevich on October 22nd, 2008, is that

18  correct?

19  A   Yes.

:36AM  20  Q   And in this call you talked about the capital

21  bill, among other things, is that correct?

22  A   He mentioned it.

23  Q   And Mr. Blagojevich mentioned to you about Danny

24  Hastert, is that correct?

:36AM  25  A   Yes.

Krozel - cross by Goldstein                    2645

1    Q   Now, back to the September 18th conversation, you
2    said that Rod talked about the ethics bill, is that
3    correct?
4    A   Please repeat that.
5    Q   In the discussion you had with Rod on September
6    18th, 2008, was the ethics bill discussed?
7    A   Yes.
8    Q   Okay.  And to your knowledge, on September 18th,
9    2008, the ethics bill had been passed, is that
10   correct?
11   A   I don't recollect if it was passed, but it was --
12   it was something that was heavily discussed.
13   Q   Your testimony yesterday was you thought it had
14   been passed.
15           MR. NIEWOEHNER:  Objection.
16           THE COURT:  Sustained.
17           MR. GOLDSTEIN:
18   BY MR. GOLDSTEIN:
19   Q   Now, as of September 2008, you understood that
20   the law at the time allowed contractors to
21   contribute to the governor, is that correct?
22           MR. NIEWOEHNER:  Objection.
23           THE COURT:  Overruled.
24   BY THE WITNESS:
25   A   Repeat the question.

:37AM
:37AM
:37AM
:37AM
:38AM

1  BY MR. GOLDSTEIN:

2  Q   September 2008, you understood that the law

3  allowed contractors to contribute to fundraise for

4  the governor for the State of Illinois?

5  A   Please that question.

6  Q   As of September 2008, when you were meeting with

7  the governor, okay?

8  A   Yes.

9  Q   At that time you understood, in September 2008,

10  you understood that contractors, people that had

11  contracts with the state, could contribute to the

12  governor?

13  A   As of September 18th, yes.

14  Q   Okay.  And you understood that on January 1st,

15  2009, that that could not happen anymore, is that

16  correct?

17  A   That's correct.

18  Q   And you knew that the road building community had

19  contracts with the State of Illinois.  I think you

20  mentioned it on direct, is that correct?

21  A   Yes.

22  Q   And Rod asked you for fundraising, is that

23  correct?

24  A   Yes.

25  Q   He asked you to fundraise for him, is that

1  correct?

2  A  Yes.

3  Q  And he asked you to do it before January 1st,

4  2009, is that correct?

:39AM  5  A  Yes.

6  Q  Okay.  And you understood fundraising before the

7  1st of the year was to comply with the law, is that

8  correct?

9        MR. NIEWOEHNER:  Objection, Your Honor.

:39AM  10        THE COURT:  The objection is sustained to the

11  form of the question.

12

13  BY MR. GOLDSTEIN:

14  Q  The time period that Rod asked you to fundraise,

:39AM  15  which was before January 1, 2009, you understood

16  that that was legal to do under the law at the time,

17  is that correct?

18        MR. NIEWOEHNER:  Objection, Your Honor.

19        THE COURT:  I think it's been asked and

:39AM  20  answered.

21  BY MR. GOLDSTEIN:

22  Q  Now, you talked a little bit about Rod asking you

23  to fundraise for him, is that right?

24  A  Yes.

:40AM  25  Q  And that was on September 18th, 2008, is that

1  right?

2  A   Yes.

3  Q   And you had mentioned that you had been a prior

4  fundraiser for Rod before, is that right?

5  A   Yes.

6  Q   And when he asked you on September 18th -- let me

7  actually rephrase the question.

8          On September 18th when the fundraising was

9  discussed, Rod asked you for fundraising, is that

10 correct?

11 A   Yes, he did.

12 Q   He didn't demand that you fundraise for him, is

13 that correct?

14          MR. NIEWOEHNER:  Objection.

15          THE COURT:  The objection is sustained.

16          MR. GOLDSTEIN:

17 BY MR. GOLDSTEIN:

18 Q   Rod didn't tell you that if you don't fundraise,

19 he's not going to announce the 1.8 billion-dollar

20 program?  Those exact words, did he tell you that?

21 A   Please repeat the question.

22 Q   Did Rod say exactly, "if you don't fundraise, I'm

23 not going to announce the 1.8 billion-dollar

24 program"?

25 A   No, he did not say that.

Krozel - cross by Goldstein                    2649

1  Q   Did he say exactly, "if you don't fundraise, I'm
2  not going to do the 6 billion dollar program"?
3  A   No, he did not say that.
4  Q   He didn't say that your fundraising efforts is
5  conditioned -- or the tollway is conditioned upon
6  your fundraising?  He didn't say that, did he?
7  A   He did not say that.
8  Q   Now, you said you left this meeting and you said
9  someone asked about fundraising, is that what you
10 testified to?
11 A   When I was leaving the meeting, yes.
12 Q   Who said this?
13 A   I said I didn't know.
14 Q   Okay.  Now, after this meeting, you left and went
15 to your car, is that correct?
16 A   Yes.
17 Q   And you immediately called Richard Olson, is that
18 right?
19 A   Not immediately.
20 Q   You called him in the car while you were outside
21 the Friends of Blagojevich office, is that correct?
22 A   I might have left the area.
23 Q   Okay.  You got on your phone when you were in
24 your car, correct?
25 A   Yes.

1  Q   And you called Richard Olson, right?

2  A   Yes.

3  Q   And he was the president of Prairie, is that

4  correct?

5  A   Yes.

6  Q   And you called him and asked him if he would meet

7  with Rod, is that right?

8  A   The main reason I called him is because of

9  another -- another situation.

10  Q   Besides the other situation, you asked Mr. Olson

11  when you called him if he would meet with Rod, okay?

12  A   I told him I thought it would be a good ide if he

13  would.

14  Q   And this was right after the September 18th

15  meeting at Friends of Blagojevich, is that right?

16  A   Yes.

17  Q   Now, on September 24, 2008, you said you met with

18  Rod and it was Mr. Olson, as well as yourself, and

19  Mr. Matson, is that correct?  And then Lon Monk, as

20  well, right?

21  A   At what date?

22  Q   On September 24th.

23  A   Well, yeah, it was 7 or 10 days after the 18th

24  meeting.  Yeah, it could be that day.

25  Q   Okay.  And I was correct, it was you, Mr. Matson,

1  Mr. Olson, Mr. Monk, and Mr. Blagojevich at this

2  meeting, correct?

3  A  Yes.

4  Q  And that was at the My Way Restaurant, right?

5  A  Yes.

6  Q  And before you went to this meeting, did Rod tell

7  you -- or did you tell Rod from not to talk about

8  fundraising at this meeting?

9         MR. NIEWOEHNER:  Objection, Your Honor.

10        THE COURT:  The objection is sustained.

11 BY MR. GOLDSTEIN:

12 Q  How long was this meeting at the My Way

13 Restaurant?

14 A  Hour, hour and a half.

15 Q  Hour, hour and a half.

16        And during this hour, hour and a half

17 meeting, there was not one mention of fundraising,

18 is that correct?

19 A  No, there was not.

20 Q  Rod didn't ask Mr. Olson to fundraise, is that

21 correct?

22 A  No, he did not.

23 Q  And Rod didn't connect the tollway project to

24 fundraising, is that correct?

25        MR. NIEWOEHNER:  Objection.

:43AM
:43AM
:43AM
:43AM
:44AM

1          THE COURT:  I think your first question sort

2    of took care of this.  It's repetitive.

3    BY MR. GOLDSTEIN:

4    Q   Now, you said Rod called you on October 22nd,

5    2008, is that correct?

6    A   Yes.

7    Q   And about how long was this conversation?

8    A   10 minutes.  5 minutes, 10 minutes.

9    Q   Okay.  And during this conversation, Rod never

10   said the money for the roads was conditioned on your

11   fundraising, is that correct?  Those exact words,

12   did he say that?

13   A   No, he did not.

14   Q   Did Rod specifically say, "tollway for

15   fundraising," did you tell you that on this October

16   22, 2008, phone conversation?

17   A   No, he did not.

18   Q   Rod didn't specifically tell you "if you don't

19   get me fundraising, I won't do the road building

20   project," did he say those specific words?

21          MR. NIEWOEHNER:  Objection, Your Honor.

22          THE COURT:  You can answer that.

23   BY THE WITNESS:

24   A   No, he did not.

25   BY MR. GOLDSTEIN:

1  Q   Now, the government asked you in direct

2  examination if you considered Rod a friend, is that

3  correct?

4  A   Yes.

5  Q   Okay.  And you said "not really" or "no," is that

6  right?

7  A   Yes.

8  Q   Now, on this October 22nd call, you've heard the

9  tape of this call, is that correct?

10          MR. NIEWOEHNER:  Objection, Your Honor.

11          THE COURT:  The objection is sustained.

12  BY MR. GOLDSTEIN:

13  Q   Now, Rod ended this call when you talked to him,

14  and he said specifically:

15      "Thanks again for your friendship."

16      "Yeah, all, all the best, Jerry.  Call me if

17      you need anything, okay?

18      "Okay."

19      "Bye."

20          That's how the conversation ended, is that

21  correct?

22          MR. NIEWOEHNER:  Objection.

23          THE COURT:  Sustained.

24  BY MR. GOLDSTEIN:

25  Q   Now, you had a relationship with the Blagojevich

 1 family, is that correct?
 2         MR. NIEWOEHNER:  Objection, Your Honor.
 3         THE COURT:  The objection is sustained.
 4 BY MR. GOLDSTEIN:
 5 Q   Now, you said that when Rod asked you for
 6 fundraising, you told him you'd work on it, is that
 7 correct?
 8 A   Yes.
 9 Q   And you said at that time your intention was not
10 to fundraise for Rod, is that right?
11         MR. NIEWOEHNER:  Objection, Your Honor.
12         THE COURT:  The objection is sustained.
13 BY MR. GOLDSTEIN:
14 Q   When you told Rod you were working on it, were
15 you telling him the truth?
16 A   No.  I was not working on it.
17 Q   And on October -- on October 22nd when you spoke
18 to Rod about fundraising and you told him you were
19 working on it, you didn't tell him the truth then,
20 did you?
21 A   I did not tell him the truth then.
22 Q   And you said that you were worried that Rod would
23 not announce the 6-billion-dollar program if you
24 didn't raise funds, is that correct?
25 A   Yes.

:46AM
:46AM
:47AM
:47AM
:47AM

1  Q   Now, on February 12th, 2009, you spoke with the
2  FBI again, isn't that correct?
3  A   If that's the record, yes, that's when I spoke
4  to.
5  Q   And at this meeting were FBI agents, is that
6  correct?
7  A   Yes.
8  Q   And one of the FBI agents that talked to you on
9  December 9th was there, Special Agent Rouske, is
10  that correct?
11         MR. NIEWOEHNER:  Objection.
12         THE COURT:  Sustained.
13  BY MR. GOLDSTEIN:
14  Q   Mr. Niewoehner was there, as well, when he
15  interviewed you on February 12th, 2009?
16  A   Yes, he was.
17  Q   And at this meeting you told the FBI and U.S.
18  Attorney that you were concerned that if you told
19  Blagojevich that you were not going to raise any
20  money, Blagojevich would take away the 1.5 billion
21  dollar program of new tollway money and, as such,
22  you told Blagojevich you were working on it, did you
23  make that statement to the FBI and the U.S. Attorney
24  on February 12th, 2009?
25  A   If the FBI says I made that statement, yes, I did

:47AM
:48AM
:48AM
:48AM
:48AM

1  make that statement.

2  Q   Would you like to take a look interview?

3  A   Yes.

4        MR. GOLDSTEIN:  May I approach, Your Honor?

5        THE COURT:  You may.

6      (Brief pause)

7  BY MR. GOLDSTEIN:

8  Q   I'm showing you Defense Exhibit Gerald Krozel

9  Interview February 12th, 2009.

10  A   Yes.

11  Q   Is that the interview you had with the FBI and

12  U.S. Attorney on February 12th, 2009?

13  A   Yes.

14        MR. NIEWOEHNER:  Your Honor, I'm going to

15  object; non-impeaching.

16        THE COURT:  The objection is sustained.

17        MR. GOLDSTEIN:  Your Honor, he said --

18        THE COURT:  No; don't.  The objection is

19  sustained.  Put another question.

20  BY MR. GOLDSTEIN:

21  Q   Now, as to the statement you made to the FBI, you

22  indicated that you don't recall if you made that

23  statement, is that correct?

24        MR. NIEWOEHNER:  Objection.

25        THE COURT:  The objection is sustained.

:48AM

:49AM

:49AM

:49AM

:50AM

1   BY MR. GOLDSTEIN:

2   Q   Now, Rod found this 1.8 billion-dollar program on

3   10/15/08, is that correct?  October 15th?

4   A   Whatever the date was on that, yes.

5   Q   It was in October of 2008, to your recollection?

6   A   Yes.

7   Q   And you never contributed or fundraised for Rod

8   in 2008, is that correct?

9   A   That's correct.

10  Q   And Rod never took away this 1.8 billion-dollar

11  program, is that correct?

12      MR. NIEWOEHNER:  Objection, Your Honor.

13      THE COURT:  The objection to scope, the

14  covering of time scope.

15  BY MR. GOLDSTEIN:

16  Q   You also said that you did not tell Rod or Lon

17  Monk that you had no intention of raising money for

18  Rod, is that correct?

19  A   Yes.

20  Q   Now, you had spoken to Lon Monk several times, is

21  that right?

22  A   Yes.

23  Q   And you understood that Monk was requesting

24  fundraising of you on behalf of Rod, is that

25  correct?

1  A   Yes.

2  Q   And you were aware that because they were close

3  friends, to your understanding, that any message you

4  gave to Monk would probable go to Rod, is that

5  correct?

6  A   Yes.

7  Q   And you called Monk before Thanksgiving of 2008

8  to meet with him, is that right?

9  A   Yes.

10 Q   And you met with Monk, it was either the Tuesday

11 or Wednesday before Thanksgiving at the Plush Pub,

12 is that correct, in Norridge?

13 A   Yes.

14 Q   And you had a fairly long conversation with

15 Mr. Monk?

16 A   I wouldn't say long, but we talked.

17 Q   About how long?  Was it a lunch meeting?

18 A   Half an hour.

19 Q   Half an hour.

20     And you spoke about a variety of issues, is

21 that correct?

22 A   Yes.

23 Q   And what you left with was, you told Monk that:

24     "There wasn't going to be any money raised for

25     Blagojevich because people didn't want their

1       names in the paper and neither do I."

2       Is that correct?

3  A   Can I see -- please see what you're referring to?

4  Q   Certainly.

:52AM  5          MR. GOLDSTEIN:  May I approach, Your Honor?

6          THE COURT:  You may.

7  BY MR. GOLDSTEIN:

8  Q   Now, Mr. Krozel, you have testified in this

9  matter before, is that correct?

:52AM  10  A   Yes.

11  Q   And when you testified before, you testified

12  under oath, is that correct?

13  A   Yes.

14  Q   And you understood that anything you said that

:52AM  15  was not true you could be prosecuted for perjury, is

16  that correct?

17  A   Yes.

18          MR. NIEWOEHNER:  Objection, Your Honor.  Is

19  this questioning or what are we doing?

:53AM  20          THE COURT:  Why don't you just ask the

21  question.

22          MR. GOLDSTEIN:  Okay.

23  BY MR. GOLDSTEIN:

24  Q   I'm showing you the transcript of your prior

:53AM  25  testimony, okay, and I want you to look at Page 101,

1   and if you could look at line 3 and see the question

2   and see your answer.

3           Just read it to yourself.

4       (Brief pause).

:53AM   5   BY THE WITNESS:

6   A   I did say that.

7   BY MR. GOLDSTEIN:

8   Q   Okay.  So your testimony is that you told Lon

9   Monk that:

:53AM  10       "There wasn't going to be any money raised for

11        Blagojevich because people don't want their

12        names in the paper and neither do I."

13          MR. NIEWOEHNER:  Could we clarify what

14   testimony he is talking about?

:53AM  15          THE COURT:  Yeah.

16   BY MR. GOLDSTEIN:

17   Q   You testified in your prior testimony in this

18   matter, correct?

19   A   Yes.

:53AM  20   Q   And in your testimony you testified that:

21       ".... there wasn't going to be any money raised

22        for Blagojevich because people don't want their

23        names in the paper and neither do I."

24          You testified that you said that on -- right

:54AM  25   before Thanksgiving to Lon Monk, is that correct?

1  A   I said those words that were referring to the
2  Illinois road builders that had contracts with the
3  state.
4  Q   Okay.  And the message you were communicating was
5  there was not going to be fundraising for Rod, is
6  that correct?
7        MR. NIEWOEHNER:  Objection, Your Honor.
8        THE COURT:  Sustained.
9  BY MR. GOLDSTEIN:
10  Q   And you understood that that message you told Lon
11  Monk would get to Rod, is that correct?
12  A   Yes.
13  Q   And after that meeting, was the 1.8
14  billion-dollar program taken back?
15        MR. NIEWOEHNER:  Objection, Your Honor.
16        THE COURT:  The objection is sustained.
17  BY MR. GOLDSTEIN:
18  Q   Now, in fact, you had told Monk before in the
19  spring of 2008 that you weren't going to raise funds
20  for Rod, is that correct?
21        MR. NIEWOEHNER:  Objection, your Honor.
22        THE COURT:  Overruled.
23  BY THE WITNESS:
24  A   I told him that I personally was not going to
25  contribute.

1  BY MR. GOLDSTEIN:

2  Q   And that was in the spring of 2008, is that

3  correct?

4  A   That's correct.

5  Q   Now, you talked a little bit about your immunity

6  agreement, is that correct?

7         Is that right?

8  A   I didn't understand the question.

9  Q   You have -- I apologize.

10        You have an immunity agreement with the

11  government, is that right?

12  A   Yes.

13  Q   And you said that under the agreement, you must

14  tell the truth or you will be charged with perjury,

15  is that correct?

16  A   Yes.

17  Q   And you testified to conversation that you had

18  with Rod, is that right?

19  A   Yes.

20  Q   Do you know what you have immunity for?

21        MR. NIEWOEHNER:  Objection, Your Honor.

22        THE COURT:  Sustained.

23  BY MR. GOLDSTEIN:

24  Q   Now, the immunity agreement was done in the form

25  of a letter, is that correct?

:55AM

:55AM

:55AM

:56AM

:56AM

1  A   Yes, it was.

2  Q   And that letter was given to you on March 4th,

3  2009, is that correct?

4  A   If it's dated, yes.

:56AM     5         MR. GOLDSTEIN:  May I approach, Your Honor?

6         THE COURT:  Sure.

7  BY MR. GOLDSTEIN:

8  Q   I'm showing you Defendant's Exhibit Gerald Krozel

9  Immunity Letter.

:56AM    10         Do you recognize that document?

11  A   Yes.

12  Q   And it's a two-page document, is that correct?

13  A   Yes.

14  Q   And on the last page it's signed by you, as well

:57AM   15  as Mr. Fitzgerald, is that correct?

16  A   Yes.

17  Q   And in the first paragraph of the immunity

18  agreement it says:

19         "Your attorneys have represented that such

:57AM   20         information ..."  --

21         MR. NIEWOEHNER:  Objection, Your Honor.

22         THE COURT:  No.  No.  No. You're not going to

23  read the immunity letter.

24         MR. GOLDSTEIN:  It's just one sentence.  I

:57AM   25  apologize, Your Honor.

1          THE COURT:  Is the one sentence you want to

2    read in there?

3          MR. GOLDSTEIN:  Yes.

4          THE COURT:  Show it to me and highlight it.

:57AM    5          MR. GOLDSTEIN:  Okay.

6       (Brief pause).  Objection, Your Honor.

7          THE COURT:  Sustained.

8    BY MR. GOLDSTEIN:

9    Q   Now, in this immunity agreement, you talked about

:58AM    10   that you had to tell the truth under the agreement,

11   is that correct?

12   A   Yes.

13   Q   And your understand that it's the government that

14   decides whether you complied with the agreement or

:58AM    15   not, is that correct?

16          MR. NIEWOEHNER:  Objection.

17          THE COURT:  Sustained.

18   BY MR. GOLDSTEIN:

19   Q   Mr. Krozel, how many times have you met with the

:58AM    20   government?

21   A   Ten, twelve times.

22   Q   Ten, twelve times.

23          And when are was the last time you met with

24   the government?

:58AM    25   A   This morning.

1  Q   Okay.  And you were going over the testimony, is

2  that correct?

3  A   Yes.

4  Q   And you spoke to them yesterday, as well, is that

5  right?

6  A   Yes.

7  Q   Now, you and I have not spoken outside this

8  courtroom, is that correct?

9  A   No.

10  Q   And you're aware that we requested to speak to

11  you, is that correct?

12  A   I beg your pardon?

13  Q   You're aware that I and the attorneys for

14  Mr. Blagojevich requested of your attorney to speak

15  to you about this case, is that correct?

16  A   I do remember something, yes, about that.

17  Q   And you refused to meet with us, is that correct?

18  A   I did not meet with you.

19  Q   Okay.  Now, your testimony is that you had, from

20  September of 2008 to December 9th of 2008, that you

21  had three conversations with Rod, is that correct?

22  A   From September 18th?

23  Q   Correct.

24  A   To when?

25  Q   To December 9th, 2008.

1  A   I had how many conversations?

2  Q   Three conversations with Rod, is that correct?

3  A   I did not.

4  Q   You did not.

5      How many conversations did you have?

6  A   Two.

7  Q   Two.

8      Now, you met with him September 18th,

9  correct?

10 A   Yes.

11 Q   You met with him September 24th, correct?

12 A   Oh, I'm sorry.  Yeah, there were three.  At the

13 My Way Restaurant.

14 Q   And then there was a phone call?

15 A   That's the phone call, yes.

16 Q   And not once did Rod say you must fundraise or

17 there'll be no tollway project?

18     MR. NIEWOEHNER:  Objection, Your Honor.

19     THE COURT:  You know, I think this question

20 has been asked and answered more than once.

21 BY MR. GOLDSTEIN:

22 Q   And in two of those conversations, on the phone

23 and in the first meeting, Rod asked you for

24 fundraising, is that correct?

25 A   Yes.

Krozel - voir dire exam by Goldstein                    2667

1        MR. GOLDSTEIN:  Your Honor, I don't know if
2   this would be a good time to take a break.
3        THE COURT:  Sure.
4        THE MARSHAL:  All rise.
:01AM   5     (The following proceedings were had out of the
6        presence of the jury in open court:)
7        THE COURT:  Please be seated in the
8   courtroom.
9        Ask away.
:01AM  10              VOIR DIRE EXAMINATION
11  BY MR. GOLDSTEIN:
12  Q   Mr. Krozel, in 2008 you were the chairman of the
13  Illinois Division of the American Concrete Pavement
14  Association, is that correct?
:01AM  15  A   Yes.
16  Q   And is that a lobbying organization?
17  A   Not really.
18  Q   Does it do lobbying?
19  A   Not really.
:02AM  20  Q   You were also vice-chairman of the National
21  American Concrete Pavement Association, is that
22  correct?
23  A   Yes.
24  Q   And you had been the chairman of the Illinois
:02AM  25  division as of 2009 for about 14 to 16 years, is

1  that correct?

2  A   Something like that.

3  Q   And you served on the government affairs

4  committees of the Illinois Road Builders Association

:02AM  5  and the National Ready Mix Concrete Association, is

6  that correct?

7  A   Yes.

8  Q   And you have been involved politically for

9  sometime, is that correct?

:02AM  10  A   Yes.

11  Q   And when I say "politically," do you understand

12  that to mean fundraising and contributions to

13  various politicians?

14  A   Yes.

:02AM  15  Q   And you got your start in 1982, is that correct?

16  A   Yes.

17  Q   Basically you advocate on behalf of the road

18  building industry as well as the concrete industry,

19  is that correct?

:03AM  20  A   Yes.

21  Q   And you fundraise on behalf of those industries?

22  A   Yes.

23  Q   And to quote you, you play both sides, you

24  contribute to Democrats and Republicans, is that

:03AM  25  correct?

1  A   Yes, I do.

2  Q   And your goal is to basically help your industry,

3  is that correct?

4  A   Yes.

:03AM   5  Q   Now, you're a consultant right now, so you're not

6  exactly what you once were, but I'm talking about in

7  2008 and before.

8  A   Yes.

9  Q   You were more active in that.

:03AM  10  A   Yes.

11  Q   Now, you got your start in 1982, that was from a

12  meeting you had from Governor Thompson, is that

13  correct?

14  A   Yes.

:03AM  15  Q   And you and others in the road building industry

16  were trying to get Governor Thompson to build the

17  Eisenhower expressway or rehabilitate the Eisenhower

18  expressway in concrete, is that correct?

19  A   Only a portion.

:04AM  20  Q   I'm sorry?

21  A   Only a portion of that.

22  Q   Only a portion.

23       Because it had -- it was being built in

24  asphalt, is that right?

:04AM  25  A   Yes.

1  Q   So you had a meeting with people from your
2  industry and Governor Thompson, is that correct?
3  A   Yes.
4  Q   And Governor Thompson told you that you needed to
5  get politically involved, is that right?
6  A   Yes, he did.
7  Q   And after that meeting, you and your constituency
8  got politically involved, is that correct?
9  A   Yes, we did.
10 Q   And there were contributions made to the
11 governor, is that correct?
12 A   I don't know exactly.
13 Q   Well, you understand that Prairie and other
14 individuals contributed to Thompson after that
15 meeting, is that correct?
16 A   Yes, but I did not personally.
17 Q   And, to your knowledge, Thompson then had
18 portions of the Eisenhower Expressway built in
19 concrete, is that correct?
20 A   One portion.
21 Q   One portion.  And that was between Kostner and
22 Independence Avenue, is that correct?
23 A   Yes.
24 Q   And it was since that time that you became
25 politically involved, is that right?

:04AM
:04AM
:04AM
:05AM
:05AM

Krozel - voir dire exam by Goldstein          2671

1  A   Yes.
2  Q   And since that time you contributed and
3  fundraised for various candidates, is that right?
4  A   Yes.
5  Q   And you and your various associations contributed
6  to people you support, is that a fair statement?
7  A   I've contributed to other people that I haven't
8  supported.
9  Q   And the biggest issue to you is road building, is
10 that fair to say?
11 A   Yes.
12 Q   And you contribute to politicians who support
13 road building, is that right?
14 A   Yes.
15 Q   And is it fair to say when you fundraise for
16 someone, that you will then be called back to ask to
17 fundraise again?
18 A   I -- well, I don't know what you really mean by
19 "fundraising."
20 Q   No, I'll ask it.  It wasn't a really good
21 question.
22        Fundraising, as you understand it, is the
23 process by raising money for a particular candidate.
24 It's not necessarily you contributing, but it's you
25 raising money from other people for a candidate, is

1  that correct?

2  A   Yes.

3  Q   And that can be done in a variety of ways.  It

4  can be held at events, correct?

:06AM   5  A   Yes.

6  Q   Or just you asking various people if they would

7  contribute, is that correct?

8  A   Yes.

9  Q   And you've done that for a whole lot of different

:06AM   10  politicians, is that correct?

11  A   Oh, no.

12  Q   You fundraised for other politicians before, is

13  that correct?

14  A   Very minimal.

:06AM   15  Q   Very minimal.

16          How many?

17  A   Maybe 4, 5, 6.

18  Q   Governor's, correct?

19  A   Only one governor.

:07AM   20  Q   You fundraised for?

21  A   Yes.

22  Q   And you've gone to fundraisers, as well, for

23  various politicians?

24  A   Yes.

:07AM   25  Q   And you've contributed to other politician also,

1  is that correct?

2  A   You can say it that way, yes.

3  Q   Okay.  In fact, on September 18th, 2008, you met

4  with the governor, right?

:07AM   5  A   Yes.

6  Q   And after the meeting, you said you made a phone

7  call to Mr. Olson, is that correct?

8  A   Yes.

9  Q   And later that day you attended a fundraiser for

:07AM   10  State Senator Martin Sandoval, is that correct?

11  A   Yes, I did.

12  Q   And you understood Mr. Sandoval was a State

13  Senator in the State of Illinois, is that correct?

14  A   Yes.

:07AM   15  Q   And he was on the transportation committee?

16  A   Yes.

17  Q   And he was on the appropriations committee?

18  A   I didn't know about that but I knew he was on

19  transportation.

:08AM   20  Q   Now, you talked a little bit about the capital

21  bill.  You were involved in trying to promote the

22  capital bill, is that correct?

23  A   Yes.

24  Q   And you were on the Illinois Works Commission

:08AM   25  which was an organization set up to try to get the

1  capital bill done, is that correct?

2  A  I don't even know who you're talking about.

3  Q  You never heard of the Illinois Works Commission?

4  A  Illinois Work Commission?

:08AM  5  Q  Works.

6  A  Illinois Works?

7  Q  Yeah.

8  A  Not really.

9  Q  Okay.

:08AM  10      Are you aware of an organization that the

11  governor set up to try and promote the capital bill?

12  A  I'm aware that he was doing things to promote the

13  capital bill, but I really didn't know about

14  Illinois Works.

:08AM  15  Q  Okay.  And one of the things that the governor

16  was doing was working with Danny Hastert, is that

17  correct?

18  A  Yes.

19  Q  And he was also working with Glen Poshard, is

:09AM  20  that correct?

21  A  Yes.

22  Q  And this was basically a state wide effort to try

23  and get this capital bill done?

24  A  Yes.

:09AM  25  Q  I apologize.  I had the wrong term.  Does the

1 Illinois Works Coalition ring a bell?

2 A  That's -- yes.

3 Q  Sorry, I used the wrong one.

4     Were you involved in the Illinois Works

5 Coalition?

6 A  Not directly, but I knew people involved in it

7 that I had discussions with.

8 Q  And you understood the Illinois Works Coalition

9 was an organization set up by the governor to try

10 and promote the capital bill, is that correct?

11 A  That's what I heard.

12 Q  Okay.  And that was doing work in 2008 to try and

13 get the capital bill done, is that right?

14 A  Yes.

15 Q  And the last time the capital bill did not get

16 passed was in 2008, is that correct?

17 A  Yes.

18 Q  So it passed the Senate and then didn't get out

19 of the House, is that correct?

20 A  No.  No, it didn't pass the house.

21 Q  And do you know if it was up for a vote in the

22 House?

23 A  I don't recall that.

24 Q  Okay.  You were involved in trying to get the

25 capital bill done?

Krozel - voir dire exam by Goldstein                2676

1   A   Yes.

2   Q   And you promised the governor on September 18th,

3   2008, that you would continue to work for the

4   capital bill, is that correct?

5   A   Yes.

6   Q   Now, you worked for Prairie Materials, is that

7   correct?

8   A   Yes.

9   Q   And Prairie Materials you were the vice president

10  of, is that correct?

11  A   Yes.

12  Q   And Prairie Materials, as late as 2006, made half

13  a billion dollars in sales annually, is that

14  correct?

15  A   Yes.

16          MR. GOLDSTEIN:  If I might have just one

17  moment, Your Honor.

18      (Brief pause.)

19          MR. GOLDSTEIN:  Nothing further.

20          MR. NIEWOEHNER:  Unless Your Honor has a

21  specific issue, there's nothing from the government.

22          THE COURT:  This is your offer of proof?

23          MR. GOLDSTEIN:  Yes.

24          THE COURT:  Okay.  And let's assume you're in

25  closing argument, what would you make of this?

Krozel - voir dire exam by Goldstein                2677

1          Actually, why don't you step down and step
2    out for a moment.
3          (Brief pause).
4          (Witness temporarily excused and exited the
5           courtroom and the following further proceedings
6           were had herein:)
7          MR. GOLDSTEIN:  Your Honor, Mr. Magoon,
8    Mr. Krozel, and then we'll hear from Mr. Johnston as
9    well, are all basically testifying that they have an
10   understanding of certain things going on, none of
11   them can say that the governor specifically ordered
12   them to do fundraising in exchange for state
13   actions.
14         THE COURT:  Well, that part you already got
15   in.
16         MR. GOLDSTEIN:  Correct.  Correct.
17         And Your Honor heard a good cross-examination
18   by Mr. Sorosky about an interesting word and an
19   interpretation of that.  Much of this case is based
20   on an understanding, an understanding of people for
21   whatever they're faults or not, had.
22         These are the same people who fundraise for
23   other people, for other politicians, their state
24   action always very close to their fundraising and
25   their contributions, and these are people that don't

1  feel uncomfortable.  The only difference of their

2  level of uncomfortableness is that we have now a man

3  on trial and we have witnesses who have been given

4  immunity, who have been talking to the government,

5  and talking to the U.S. Attorneys, they have a bias

6  and motive to give an understanding because they

7  cannot say that the governor ever said these things

8  one in exchange for another.  It all comes down to

9  their understanding.

10         How do we test what someone's understanding

11  is?  We look at their personal experiences, because

12  it's a very subjective thing.  So subjectively, they

13  are saying I felt pressured, I felt uncomfortable,

14  yet these are the same people who, to just use a

15  colloquial term, played the game.  And they're

16  involved in politics, and they fundraise, and they

17  contribute, and their state action very close to it

18  and they never see one for the another until there's

19  a man on trial and they have a bias and motive to

20  say these things.

21         That isn't necessarily my closing, I hope

22  it's much better in closing, but my point is this is

23  the relevance of it, Your Honor.

24         If they are exact quotes where the governor

25  is saying this for that, you gotta pay up or you're

1  not getting that tollway plan, then there's no

2  reason to interpret these stuff, it speaks for

3  itself.  But every single witness is giving you an

4  interpretation, giving the jury an interpretation,

5  and we should be allowed to question and elicit

6  evidence as to the relevance, as to their state of

7  mind which they're testifying to, how 900 times

8  before it doesn't seem to be a problem, but now in

9  this situation, oh, I'm just so pressured.

10         And we should also be allowed to elicit the

11  pressure of, for example, with Mr. Krozel.  The man

12  felt uncomfortable going into this meeting, he felt

13  uncomfortable going into this meeting because of

14  personal things that were going on.  The guy did not

15  want to contribute to the governor, that's fine, he

16  has every right not to, and that's his level of

17  uncomfortableness.

18         THE COURT:  Yeah, but the personal part of it

19  you got in.

20         MR. GOLDSTEIN:  Well, not completely.  I

21  mean, there was more to it.

22         THE COURT:  And that's your argument?

23         MR. GOLDSTEIN:  Correct.

24         THE COURT:  Your offer of proof is not

25  sufficient to raise that issue, so, no.

1    Do you have anything else with him?

2        MR. GOLDSTEIN:  No.

3        THE COURT:  Are you going to have redirect?

4        MR. NIEWOEHNER:  If I might confer?

5        THE COURT:  Sure.

6    (Brief pause).

7        MR. GOLDSTEIN:  Do we continue to break or --

8        THE COURT:  That's the very thing I'm

9  thinking of.

10       Okay, 11:30.

11       MR. GOLDSTEIN:  Thank you.

12    (Recess.)

13       THE MARSHAL:  All rise.

14    (The following proceedings were had in the

15     presence of the jury in open court:)

16       THE COURT:  Please be seated.

17       The defense has concluded his

18  cross-examination, do you have anything further on

19  redirect?

20       MR. NIEWOEHNER:  We do, Your Honor.

21       THE COURT:  Okay.

22              REDIRECT EXAMINATION

23  BY MR. NIEWOEHNER:

24  Q   Mr. Krozel, you were just asked on

25  cross-examination about some things that the

1  defendant didn't say to you, is that right?

2  A   Yes.

3  Q   I'm going to direct your attention to the

4  September 18th meeting at the campaign office for a

5  second.

6        In that meeting did the defendant indicate

7  who had the sole power to do the 6-billion-dollar

8  program?

9        MR. GOLDSTEIN:  Objection; leading.

10        THE COURT:  Overruled.

11  BY THE WITNESS:

12  A   Yes, he did.

13  BY MR. NIEWOEHNER:

14  Q   What did the defendant say in that regard?

15  A   The governor let me know that he was the person,

16  the person that could initiate the program and carry

17  it through and did not have to go to the House

18  legislators to do this.

19  Q   Did the defendant describe or tell you that in

20  that meeting when he was going to announce the

21  6-billion-dollar program?

22  A   He -- he told me at that particular meeting that

23  the 6-billion-dollar program would not be announced

24  in 2008, that it would be later.

25  Q   So sometime after the beginning of the year?

1  A   Yes.

2  Q   Did the defendant tell you when he wanted you to

3  raise money by?

4  A   He wanted me to raise money by January 1st of

5  2009.

6  Q   And when you wouldn't commit to raising a

7  particular amount of money, did the defendant again

8  bring up the 6-billon-dollar tollway program?

9        MR. GOLDSTEIN:  Objection.

10        THE COURT:  Are we talking about the same

11  time and the same conversation?

12        MR. NIEWOEHNER:  That's right.

13        THE COURT:  Okay, there's adequate

14  foundation.  You may answer.

15  BY THE WITNESS:

16  A   Would you please repeat the question.

17  BY MR. NIEWOEHNER:

18  Q   Sure.

19        During the meeting when you didn't commit to

20  raising a particular amount of money, did the

21  defendant then again return to the 6-billon-dollar

22  tollway program?

23  A   It was discussed again, yes.

24  Q   Did the defendant need to tell you explicitly

25  that if you didn't raise any money, that there

 1  wouldn't be any 6-billion-dollar program?
 2          MR. GOLDSTEIN:  Objection.
 3          THE COURT:  Sustained.
 4  BY MR. NIEWOEHNER:
 5  Q   Were you confused by what happened in that
 6  meeting?
 7          MR. GOLDSTEIN:  Objection.
 8  BY THE WITNESS:
 9  A   Not at all.
10          THE COURT:  Overruled.
11  BY THE WITNESS:
12  A   Not at all.
13  BY MR. NIEWOEHNER:
14  Q   What did you understand the defendant wanted you
15  to do?
16  A   He wanted me to fundraise by the end of the year,
17  and then after my fundraising was complete I believe
18  then he would announce or not announce the
19  6-billion-dollar program.
20  Q   What did you understand was going to happen if
21  you didn't raise enough money by the end of the
22  year?
23  A   I did not think the 6-billion-dollar program
24  would become reality.
25  Q   Now, you were also asked some questions about

1  what was not said during the September 24th meeting

2  with the defendant at the My Way Restaurant, do you

3  recall that?

4  A   Yes.

5  Q   Did you understand you were the person who was

6  supposed to raise this money from your conversation

7  with the defendant at his offices?

8  A   Yes, I was the person.

9  Q   Who did you understand -- where did you

10  understand the money was supposed to come from?

11  A   Because of the deadline, I was -- I was certainly

12  sure that it would be coming from the Illinois Road

13  Builders.

14  Q   And was it, in fact, broader than the road

15  builders?  Was it the construction industry?

16  A   Yes, the entire --

17         MR. GOLDSTEIN:  Objection.

18  BY THE WITNESS:

19  A   -- construction industry.

20         THE COURT:  Overruled.  The answer may stand.

21  BY MR. NIEWOEHNER:

22  Q   Since the defendant became governor in 2003, who

23  was the person at Prairie who handled all requests

24  for fundraising at Prairie?

25  A   I did.

1  Q   You had this meeting with these two executives
2  from Prairie, Richard Olson and Eric Matson, do you
3  recall that?
4  A   Yes.
5  Q   Where did those executives come from?
6  A   Canada.
7  Q   To your knowledge, did they have any Illinois
8  fundraising connections?
9       MR. GOLDSTEIN:  Objection.
10 BY THE WITNESS:
11 A   None.
12      THE COURT:  Overruled.
13      The answer may stand.
14 BY THE WITNESS:
15 A   None.
16 BY MR. NIEWOEHNER:
17 Q   Were you concerned that the defendant was going
18 to ask Olson and Matson to do fundraising at the
19 meeting at the My Way Restaurant?
20      MR. GOLDSTEIN:  Objection.
21      THE COURT:  Sustained.
22 BY MR. NIEWOEHNER:
23 Q   In fact, those executives, Richard Olson and Eric
24 Matson, to your knowledge, had they ever met the
25 defendant before?

1  A   No, they haven't.

2  Q   So this would have been the first time the

3  defendant met both of those two people?

4  A   Yes.

:50AM 5          MR. NIEWOEHNER:  Nothing further, Your Honor.

6                    RECROSS EXAMINATION

7  BY MR. GOLDSTEIN:

8  Q   Mr. Krozel, when you met with the governor on

9  September 18th, 2008, you brought up the idea of

:51AM 10 meeting with Mr. Olson and Mr. Matson, is that

11 correct?

12 A   That is correct.

13 Q   And Rod replied, he said, if it would help you

14 meeting with these people, he'd do it, is that

:51AM 15 correct?

16 A   Yes.

17          MR. NIEWOEHNER:  Objection, Your Honor.

18          THE COURT:  The objection is sustained.

19 BY MR. GOLDSTEIN:

:51AM 20 Q   Now, you talked a little bit about when this

21 6-billion-dollar program was to be announced, is

22 that right?

23 A   Yes.

24 Q   And what Rod told you was that if no capital bill

:51AM 25 were passed, he would then go forward with the

 1  6-billion-dollar program, is that correct?
 2          MR. NIEWOEHNER:  Objection.
 3          THE COURT:  The objection is sustained.
 4  BY MR. GOLDSTEIN:
 5  Q   Your testimony in the redirect examination was
 6  that Rod didn't give you a date when this
 7  6-billion-dollar program would be announced?
 8  A   It was at the beginning of the next year.
 9  Q   That's what you understood, is that correct?
10  A   Yes.
11  Q   But he never said January 1st?  He didn't give
12  thank you date, is that correct?
13  A   Somewhere down the path, I didn't -- I just
14  didn't think that.  Somewhere down the path, it was
15  there.
16  Q   But you cannot recall if Rod ever told you a
17  date?
18  A   I'm pretty sure at one time he said the beginning
19  of the year.
20  Q   As you testified in cross-examination, you never
21  but that in your sworn statement, is that correct?
22  That there was a date mentioned by Rod?
23  A   What I testified in the grand jury, I made
24  reference, I think, to the end of the year, or
25  something like that.

1  Q   What you did in the grand jury is read your
2  statement, is that correct?
3  A   I beg your pardon?
4  Q   What you did in the grand jury was read the
5  statement, is that correct?
6  A   Yes.
7  Q   And in your statement that you read to the
8  grand jury, you did not say that Rod mentioned a
9  date for this 6-billion-dollar program, is that
10 correct?
11 A   I did not mention January.
12 Q   And you didn't mention a date, period?
13 A   Can I see my grand jury statement?
14 Q   Certainly.
15         MR. GOLDSTEIN:  May I approach, Your Honor?
16         THE COURT:  You may.
17     (Brief pause).
18 BY MR. GOLDSTEIN:
19 Q   Statement of Gerald Krozel, is that the statement
20 you looked at before?
21     (Brief pause).
22 BY THE WITNESS:
23 A   I said --
24         Am I permitted to say my statement?
25 BY MR. GOLDSTEIN:

:54AM
:54AM
:54AM
:54AM
:55AM

1  Q   The question is, did you say in your statement
2  that Rod told you the 6-billion-dollar program would
3  be announced in January or any date?  Yes or no.
4  A   In my statement I said the announcement of 6
5  billion tollway is whether you received
6  contributions from my industry by the end of the
7  year.
8  Q   That's your understanding?
9  A   Yes.
10  Q   Now, let me ask you the question, did Rod give
11  you a date when the 6-billion-dollar program would
12  be announced?
13          MR. NIEWOEHNER:  Objection, your Honor.
14          MR. GOLDSTEIN:  He's not answered the
15  question, Your Honor.
16          MR. NIEWOEHNER:  It's a different question.
17          THE COURT:  It is a different question.
18          MR. GOLDSTEIN:  He hasn't answered the
19  question, then.
20          THE COURT:  The question you wanted is
21  whether he said to the grand jury and gave them a
22  date.
23  BY MR. GOLDSTEIN:
24  Q   Did you make in your statement, did write in your
25  statement that there was a date that Rod gave you

1 when the 6-billion-dollar program would be

2 announced?

3 A   No.

4 Q   But there was a date discussed during that

5 meeting and that was when the ethics bill would take

6 place, is that correct?

7 A   Yes.

8 Q   And the date of the ethics bill indicated that

9 after January 1st, 2009, contractors, people who had

10 contracts with the state, could no longer fundraise

11 or contribute to the governor, is that correct?

12 A   Yes.

13 Q   Now, you said that, in essence, you were the

14 point person for Blagojevich as far as fundraising

15 when it came to the road builders?

16         MR. NIEWOEHNER:  (Counsel standing.)

17         MR. SOROSKY:  I'll rephrase the question.

18 Apologize.

19 BY MR. GOLDSTEIN:

20 Q   You were the individual that Rod would talk to as

21 far as fundraising from Prairie, is that correct?

22 A   Yes.

23 Q   Okay.  So as you understood it, if Rod wanted

24 contributions from Prairie, he would talk to you?

25 A   Yes.

Krozel - further redirect by Niewoehner          2691

1  Q   And in your history, you would raise funds from
2  Prairie, as well as other people, is that correct?
3  A   Yes.
4  Q   And Mr. Olson and Mr. Matson were the new
5  presidents of Prairie, is that correct?
6  A   Olson was the president of Prairie, Eric was the
7  president of North America.
8  Q   And Rod did not ask you for contributions from
9  Olson or Matson, is that correct?
10  A   No, he just asked for contributions.
11          MR. GOLDSTEIN:  Nothing further.
12          MR. NIEWOEHNER:  One moment, Your Honor.
13       (Brief pause).
14                   FURTHER REDIRECT
15  BY MR. NIEWOEHNER:
16  Q   You were talking about the executives at Prairie,
17  is TCI Prairie the name of the company?
18  A   Yes.
19          MR. NIEWOEHNER:  Nothing further.
20          THE COURT:  Anything?
21          MR. GOLDSTEIN:  No, your Honor.  Thank you.
22          THE COURT:  You can step down.
23       (Witness excused.)
24          THE COURT:  Next witness.
25          MR. NIEWOEHNER:  May we read a statistician?

1          THE COURT:  You may.

2          MR. NIEWOEHNER:  (Reading:)

3      "... causing the Illinois Highway Toll Authority

4       to spend additional funds on road building

5       affected or had the potential to affect

6       interstate commerce.

7       VCNA Prairie is a construction supply company

8       that makes and distributes concrete to various

9       road construction companies within the State of

10      Illinois, and that customarily purchased goods

11      and equipment in interstate commerce.  If the

12      Illinois Highway Toll Authority spent

13      additional funds on road building, VCNA Prairie

14      would have had additional assets available to

15      purchase goods and equipment in interstate

16      commerce, thus affecting interstate commerce."

17      So stipulated?

18          MR. GOLDSTEIN:  So stipulated.

19          MR. NIEWOEHNER:  One additional one, Your

20  Honor.

21          THE COURT:  Sure.

22          MR. NIEWOEHNER:  (Reading:)

23      "Increasing the reimbursement rates that

24       Illinois Medicaid paid to pediatric specialists

25       affected or had the potential to affect

Krozel - further redirect by Niewoehner          2693

1    interstate commerce.  Children's Memorial
2    Hospital is a Children's Hospital that
3    customarily purchased goods and equipment in
4    interstate commerce.  If the State of Illinois
5    increased the reimbursement rates that Illinois
6    Medicaid paid to pediatric specialists,
7    Children's Memorial Hospital would have
8    additional assets available for the purchase of
9    goods and equipment in interstate commerce,
10   thus affecting interstate commerce."
11   So stipulated?
12       MR. GOLDSTEIN:  So stipulated.
13       MR. NIEWOEHNER:  Your Honor, the government
14   will call its next witness.
15       THE COURT:  Yes, but before that ...
16       You've just heard a stipulation, which is an
17   agreement that a fact is true, although you might've
18   thought that what they were stipulating to is a
19   little mysterious.  It isn't.  One of the
20   foundations for federal jurisdiction for hearing a
21   case in this court rather than another court is that
22   it involves interstate commerce under the United
23   States Constitution and that has just been
24   stipulated to.  So that's why we did that.
25       I think it'll be a short session, but I think

1 we should start.

2          MR. NIEWOEHNER:  Your Honor, the government

3 calls Alonzo Monk.

4      (Brief pause).

5          THE COURT:  Face me and raise your right

6 hand.

7      (Witness duly sworn.)

8          THE COURT:  Please be seated.

9        ALONZO MONK, GOVERNMENT WITNESS, SWORN

10                  DIRECT EXAMINATION

11 BY MR. NIEWOEHNER:

12 Q   Would you state your name and spell it, please.

13 A   Alonzo Monk, A-l-o-n-z-o M-o-n-k.

14 Q   If you would bring the microphone down a little

15 closer to you.

16          How old are you?

17 A   52.

18 Q   Where do you live?

19 A   Decatur, Illinois.

20 Q   What's your highest level of education?

21 A   Law school.

22 Q   Did you work in Illinois State government in

23 Illinois?

24 A   Yes.

25 Q   In what capacity?

1  A   As Chief of Staff for the governor.

2  Q   What's your current occupation?

3  A   I'm a part time consultant for a recycling

4  company in central Illinois.

:02PM  5  Q   Were you charged in this case?

6  A   Yes.

7  Q   Before you were charged, did you decide to

8  cooperate with the government in this investigation?

9  A   Yes.

:02PM  10  Q   Did you ultimately plead guilty of committing a

11  crime?

12  A   Yes.

13  Q   What crime have you pled guilty?

14  A   Conspiracy to solicit a bribe.

:02PM  15  Q   Did you plead guilty pursuant to a written plea

16  agreement with the government?

17  A   Yes.

18  Q   What's your understanding of what you are

19  required to do under that plea agreement?

:02PM  20  A   Cooperate and tell the truth.

21  Q   What's your understanding of what the government

22  is required to do under that plea agreement?

23  A   If I cooperate and tell the truth, recommend a

24  smaller sentence.

:03PM  25  Q   What's your understanding of the highest sentence

1  you could face without the cooperation agreement?

2  A  5 years.

3  Q  What sentence do you anticipate facing with the

4  cooperation agreement?

:03PM    5  A  2 years.

6  Q  What's your understanding of who is ultimately

7  going to decide what your sentence will be?

8  A  The judge.

9  Q  What's your understanding of what happens to your

:03PM   10  agreement if you lie?

11  A  It becomes null and void.

12  Q  Are you familiar with an individual named Rod

13  Blagojevich?

14  A  Yes.

:03PM   15       MR. NIEWOEHNER:  Is there a stipulation to

16  identity?

17       MR. GOLDSTEIN:  Yes.

18  BY MR. NIEWOEHNER:

19  Q  About when did you first meet the defendant?

:03PM   20  A  In August or September of 1981.

21  Q  How was it that you first met?

22  A  He and I were both going to the same law school

23  and met on a program abroad in London.

24  Q  What was -- which law school was that?

:04PM   25  A  Pepperdine Law School.

1  Q   What was your relationship like in law school?

2  A   Good.  Very close.

3  Q   Did you graduate from law school?

4  A   Yes.

5  Q   Did the defendant graduate from law school?

6  A   Yes.

7  Q   What kind of law did you practice after -- or

8  what did you do for a living after graduating from

9  law school?

10 A   I practiced law for almost 2 years and then

11 started working for a sports management company

12 representing athletes and promoting events.

13 Q   And about when did you start working for the

14 sports management company?

15 A   In 1986.

16 Q   After you stopped -- after you started working

17 with the sports management company, did you ever

18 again practice as a lawyer?

19 A   No.

20 Q   And what sorts of things did you do for the

21 sports management company?

22 A   Represented Olympic athletes, professional

23 athletes, got them endorsement deals, negotiation of

24 contracts, promotional events, that type of thing.

25 Q   About when did you stop working as a sports

1  agent?

2  A   In 2000.

3  Q   Where did you live while you were working as a

4  sports agent?

5  A   In Washington, D.C., Virginia, L.A., Boston.

6  Q   Did you keep in touch with the defendant over

7  that time frame?

8  A   Yes.

9  Q   At some point, did you start working for the

10 defendant?

11 A   Yes.

12 Q   About when did that begin?

13 A   In early 2001 I became his general counsel in his

14 congressional office in Washington, D.C.

15 Q   And what did you do in that job?

16 A   Help manage the mail, make sure that the

17 responses to constituents were being sent out on

18 time; that type of thing.

19 Q   Were you practicing as a lawyer there?

20 A   No.

21 Q   When the defendant ran for governor in Illinois

22 in 2002, did you have a role in that campaign?

23 A   Yes.

24 Q   What was -- what position did you have?

25 A   I was campaign manager.

1 Q   And about when did you become the defendant's
2 campaign manager?
3 A   In the middle of 2001.
4 Q   What were your responsibilities as campaign
5 manager?
6 A   Managed the staff, interview and hire
7 consultants, meet with donors, meet with other
8 elected officials, that type of thing.
9 Q   Did you also manage the budget?
10 A   Yes.
11 Q   Once the defendant became governor in 2003, what
12 position did you take?
13 A   His Chief of Staff.
14 Q   So about when did you become Chief of Staff?
15 A   In January of 2003.
16 Q   How long were you the defendant's Chief of Staff?
17 A   Almost 3 years.
18 Q   About when it end?
19 A   December of 2005.
20 Q   What were your responsibilities as the
21 defendant's Chief of Staff?
22 A   Help manage the office, manage the employees in
23 the office, meet with elected officials, help get --
24 help get certain issues passed in the House and
25 Senate, attend events.

:06PM
:06PM
:06PM
:06PM
:06PM
:07PM

1  Q   About how often would you interact with the
2  defendant when you were Chief of Staff?
3  A   Daily.
4  Q   Are you familiar with a school called the Chicago
5  Academy?
6  A   Yes.
7  Q   Where is that school located?
8  A   In Chicago.
9  Q   How did you first hear about the Chicago Academy?
10 A   It was in a meeting that I attended between the
11 governor and Congressman Emanuel.
12 Q   Congressman Rahm Emanuel?
13 A   Yes.
14 Q   Was anyone else present for that conversation?
15 A   No, just the three of us.
16 Q   Where did it take place?
17 A   In the Governor's office.
18 Q   About when -- and about what time period did that
19 meeting take place?
20 A   Sometime in '03 or early '04.
21 Q   What did Congressman Emanuel say about the
22 Chicago Academy in that meeting?
23 A   He was looking to get money from the state or get
24 a grant from the state for the school.
25 Q   Did the defendant have the power to make that

1 grant of money?

2 A   Yes.

3 Q   What was the defendant's response when

4 Congressman Emanuel indicated he'd like the state to

5 give grant money to the Chicago Academy?

6 A   He wanted to get it done.

7 Q   Did you have any involvement between the Chicago

8 Academy grant after that meeting?

9 A   Yes.

10 Q   Did the Chicago Academy receive its grant

11 immediately?

12 A   No.

13 Q   Did you have further conversations with

14 Congressman Emanuel about the Chicago Academy?

15 A   Yes.

16 Q   And what did Congressman Emanuel indicate in his

17 conversation?

18 A   We had a telephone conversation or a couple of

19 telephone conversations where he was calling up and

20 finding out what the status of getting the grant was

21 and was wondering why it was taking so long to get.

22 Q   And after you had those conversations with

23 Congressman Emanuel, did you have a conversation

24 with the defendant about the Chicago Academy?

25 A   Yes.

1  Q   Was anyone else present for that conversation?

2  A   No.

3  Q   What did you say in that meeting?

4  A   I wanted to find out what he wanted me to do with

5  trying to get the grant money for the Chicago

6  Academy.  And he indicated to me he wanted me to

7  hold off doing it until he found out how a

8  fundraiser that Rahm Emanuel's brother was hosting

9  was going to do before we gave -- before the state

10 gave the grant.

11 Q   And when you said -- when you talked about Rahm

12 Emanuel's brother, who did you understand that was?

13 A   Ari Emanuel.

14 Q   What did Ari Emanuel do for a living?

15 A   He was a talent agent out in Los Angeles, Beverly

16 Hills.

17 Q   In the Hollywood area?

18 A   Yes.

19 Q   Were you aware that Ari Emanuel was possibly

20 going to do a fundraiser?

21 A   Yes.

22 Q   What did you understand the defendant wanted you

23 to do with respect to the Chicago Academy grant?

24 A   Nothing at that point.

25 Q   What did you understand was going to happen if

1  you did nothing?

2  A   The school would not get the money.

3  Q   From what the defendant said, why did understand

4  he wanted you to wait on the grant?

5  A   He wanted to see how well the fundraiser did,

6  whether it was going to be his expectations or not

7  before giving the money to the school.

8  Q   And after your conversations with the defendant,

9  did you take any steps to get the grant to the

10 Chicago Academy?

11 A   No.

12 Q   At some point after that conversation, did

13 someone else do the handling of the Chicago Academy

14 grants?

15 A   Yes.

16 Q   Who was that person?

17 A   Bradley Tusk.

18 Q   What position did Bradley Tusk have?

19 A   He was deputy governor for the Governor's office.

20 Q   And after Tusk took over that matter, did you

21 have any further involvement with the Chicago

22 Academy?

23 A   No.

24         MR. NIEWOEHNER:  I'm going to switch topics,

25 if Your Honor would like to stop?

1        THE COURT:  No, we can keep going.

2   BY MR. NIEWOEHNER:

3   Q   Are you familiar with a man named Tony Rezko?

4   A   Yes.

:10PM   5   Q   About when did you first meet Tony Rezko?

6   A   Sometime in late 2001 or early 2002.

7   Q   Did Rezko have a role with the defendant's 2002

8   campaign?

9   A   Yes.

:11PM   10   Q   What was his role?

11   A   Primarily fundraiser.

12   Q   What did Rezko do for a living?

13   A   He was a real estate developer, owned some fast

14   food franchises around the area.

:11PM   15   Q   And in the 2002 campaign, about how much money

16   did Rezko raise for the defendant?

17   A   Well over 7 figures.

18   Q   Was Rezko one of the defendant's top fundraisers?

19   A   Yes.

:11PM   20   Q   After the defendant became governor in 2003, did

21   Rezko continue play a fundraising role?

22   A   Yes.

23   Q   Are you familiar with a man named Chris Kelly?

24   A   Yes.

:11PM   25   Q   About when did you first meet Kelly?

1  A   Sometime in 2001.

2  Q   Did Kelly have a role in the defendant's 2002

3  campaign?

4  A   Yes.

:12PM    5  Q   What was his primary role?

6  A   Fundraising.

7  Q   And what did Kelly do for a living?

8  A   He owned a roofing company.

9  Q   Now, what did Kelly do with respect to

:12PM    10  fundraising for the defendant?

11  A   He would go out and contact third-parties to try

12  to get them to host fundraisers or just get them to

13  make direct contributions.

14  Q   Did Kelly oversee fundraising for the entire

:12PM    15  campaign?

16  A   Yes.

17  Q   Did Kelly donate money himself, as well?

18  A   Yes.

19  Q   About how much money was Kelly responsible for

:12PM    20  raising during the defendant's 2002 campaign?

21  A   Millions of dollars.

22  Q   In the 2002 campaign, was there anyone more

23  important than Kelly in terms of fundraising for the

24  defendant?

:12PM    25  A   Other than the governor, no.

1  Q   After the defendant became governor in 2003, did

2  Kelly continue to raise funds for the defendant?

3  A   Yes.

4  Q   From 2003 and 2004, focusing on that time frame,

5  was there anyone more important than Chris Kelly and

6  Tony Rezko in terms of raising funds for the

7  defendant?

8  A   No.

9  Q   During the transition period, after the defendant

10  won the election as governor in November 2002, did

11  Rezko and Kelly play any role with the defendant

12  before he actually became governor?

13  A   Yes.

14  Q   What role did they play in that transition

15  period?

16  A   They were making -- they were still fundraising,

17  but they were making recommendations for people to

18  be hired in state agencies and boards and

19  commissions in the state and in the governor's

20  office.

21  Q   And did that include some of the top positions?

22  A   Yes; agency directors, general counsels, deputy

23  directors, that type of thing.

24  Q   Focusing on the years 2003 and 2004, after the

25  defendant became governor, did Rezko and Kelly

1  continue to make recommendations for government
2  jobs?
3  A   Yes.
4  Q   That include jobs or positions on boards and
5  commissions?
6  A   Yes.
7  Q   And did the defendant often appoint the people
8  that Rezko and Kelly recommended?
9  A   Yes.
10 Q   Did you talk with Rezko and Kelly about their
11 fundraising efforts for the defendant in 2003 and
12 2004?
13 A   From time to time, yes.
14 Q   Were there times that you understood that Rezko
15 and Kelly were obtaining transactions for the
16 defendant in exchange for some kind of state action?
17         MR. GOLDSTEIN:  Objection.
18         THE COURT:  Overruled.
19 BY THE WITNESS:
20 A   Yes.
21 BY MR. NIEWOEHNER:
22 Q   Can you give me an example of what you mean?
23 A   Yeah.  Prior to a fundraiser in 2003, a big
24 fundraiser in 2003, there was a meeting where Tony
25 indicated to -- indicated to us that he was going to

:14PM
:14PM
:14PM
:14PM
:14PM

1  go out and seek $25,000 contributions from people

2  who were being appointed to boards and commissions

3  because he thought that that's what they were worth.

4  Q   Was the defendant present for that conversation?

5  A   Yes.

6  Q   At times did you use your power as Chief of Staff

7  to help Kelly and Rezko get contributions for the

8  defendant?

9  A   Yes.

10 Q   Focusing on 2003 and 2004, do you recall any

11 conversations involving you, Rezko, Kelly, and the

12 defendant about the four of you making money

13 together?

14 A   Yes.

15 Q   How many conversations involving you, Kelly,

16 Rezko, and the defendant do you remember along those

17 lines?

18 A   Two.

19 Q   Where did those two conversations take place?

20 A   One of them took place in Tony Rezko's offices

21 here in Chicago, the other one took place at the

22 Beverly Wilshire Hotel in Los Angeles.

23 Q   About when did the first meeting take place?

24 A   Sometime in the summer of 2003.

25 Q   When did the second meeting take place?

1  A   In January 2004.

2  Q   Do you remember what was said in those meetings

3  specifically or generally?

4  A   Generally.

5  Q   Who did most of the talking at those meetings?

6  A   Tony Rezko.

7  Q   Who was present for those two meetings?

8  A   It was Tony Rezko, Chris Kelly, myself, and Rod.

9  Q   What did Rezko discuss in those meetings?

10  A   He discussed different ideas that we could pursue

11  for the four of us to make money.

12  Q   About how many different ideas did Rezko discuss?

13  A   It was somewhere between 8 and 10.

14  Q   How was the money that was going to be made from

15  these ideas going to be divided?

16  A   Equally among the four of us.

17  Q   As you sit here today, do you recall any of the

18  ideas that Rezko discussed in those meetings?

19  A   Yes.

20  Q   What do you recall?

21  A   Those was one idea where he talked about

22  acquiring an insurance company that would do

23  business in Illinois and Las Vegas and potentially

24  Los Angeles.

25  Q   Other than that insurance company -- was that

:16PM
:16PM
:16PM
:17PM
:17PM

1 insurance company going to do business for the State

2 of Illinois?

3 A   Yes.

4 Q   Other than that insurance company idea, do you

5 remember any other of the ideas that Rezko bought up

6 in his meetings?

7 A   Not specifically, no.

8 Q   Did all of the money-making ideas that Rezko

9 discussed actually involve the State of Illinois?

10 A   No.

11 Q   According to what Rezko said, when would you and

12 the defendant going to receive your share of the

13 money from these ideas?

14 A   Once the governor was no longer serving public

15 office.

16 Q   Prior to that first meeting you described, were

17 you aware that Rezko and Kelly were working on plans

18 for the four of you to make money?

19 A   Yes.

20 Q   How would you know that Rezko and Kelly were

21 working on those plans?

22 A   Because they wanted to have this meeting and they

23 needed to tell me what the purpose of the meeting

24 was before we got together.

25 Q   When was the first time that Kelly had mentioned

1  the idea of making money from the state to you?

2  A   It was just prior to the general election in

3  2002.

4  Q   At these meetings, did Rezko or Kelly ask you to

5  do anything in particular to help with those plans?

6  A   No.

7  Q   Did they ask the defendant to do anything in

8  particular to help with those plans?

9  A   No.

10 Q   Was there any need for any particular state

11 action in either of those meetings?

12 A   No.

13 Q   Did you ever get any of the money from any of the

14 ideas that Rezko discussed in those two meetings?

15 A   No.

16 Q   Did your conversations with the defendant, Rezko,

17 and Kelly about making money for state action stop

18 at some point?

19 A   Yes.

20 Q   Why did they stop?

21 A   Because we were made aware that Tony was under

22 investigation by the U.S. Attorney's Office and they

23 just came to a stop.

24 Q   About when did you learn that Rezko was being

25 investigated?

1   A   I think probably early part of 2005.

2        MR. NIEWOEHNER:  Your Honor, this is probably

3   a good time.

4        THE COURT:  Okay.  We will take a break.

5        We will resume again at 1:30.

6        THE MARSHAL:  All rise.

7        This court will suspend until 1:30 p.m. this

8   afternoon.

9

10

11     (Luncheon recess taken from 12:19 o'clock p.m.

12      to 1:30 o'clock p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

:19PM

1

2          *      *      *      *      *      *      *      *

3

4

5  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

6  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

7                          MATTER

8

9

10    /s/Blanca I. Lara                        date

11

12

13

14

15  _____          _____

16        Blanca I. Lara                      Date

17

18

19

20

21

22

23

24

25