2714

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3
UNITED STATES OF AMERICA,            )
4                                    )
                    Plaintiff,       )
5                                    )
                                     )
6  -vs-                              )   Case No. 08 CR 888
                                     )
7                                    )   Chicago, Illinois
ROD BLAGOJEVICH,                     )   May 17, 2011
8                                    )   1:49 p.m.
                    Defendant.       )
9                                    )

10              VOLUME 16 PM
             TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE JAMES B. ZAGEL
                  AND A JURY
12
APPEARANCES:
13
For the Government:
14
          THE HONORABLE PATRICK J. FITZGERALD,
15        UNITED STATES ATTORNEY
          BY:  Reid J. Schar
16             Carrie E. Hamilton
               Christopher Niewoehner
17        219  S. Dearborn Street
          Suite 500
18        Chicago, IL  60604

19

20

21  Court Reporter:

22        KATHLEEN M. FENNELL, CSR, RMR, FCRR
               Official Court Reporter
23         United States District Court
        219 South Dearborn Street, Suite 2144-A
24           Chicago, Illinois  60604
           Telephone:  (312) 435-5569
25              www.Kathyfennell.com

2715

APPEARANCES:   (Continued)

For Defendant Rod Blagojevich:

        KAPLAN & SOROSKY
        BY:  Sheldon M. Sorosky
        158 West Erie
        Chicago, Illinois  60610
        (312) 640-1776

        OFFICES OF AARON B. GOLDSTEIN
        BY:  Aaron Benjamin Goldstein
        6133 South Ellis
        Chicago, Illinois  60637
        (773) 752-6950

        OFFICES OF LAUREN FAUST KAESEBERG
        BY:  Lauren Faust Kaeseberg
        2140 N. Lincoln Park West
        Suite 307
        Chicago, IL  60614
        (773) 517-0622

        LAW OFFICE OF ELLIOTT RIEBMAN
        BY:  Elliott Riebman
        158 West Erie
        Chicago, Illinois  60610
        (847) 814-2900

1        (Proceedings heard in open court:)

2              MR. NIEWOEHNER:  Your Honor, Chris Niewoehner, Reid

3     Schar and Carrie Hamilton for the United States.

4              Your Honor, there's one matter -- there's a number of

5     matters that could come up with Mr. Monk's cross-examination.

6     Those can probably all wait unless your Honor wants to take

7     them up now.

8              There is one matter on the direct which goes to John

9     Johnston's history of contributions to the defendant.  The

10    government's going to make the same sort of motion to exclude

11    Johnston's history of contributions, just like Magoon and

12    Krozel's, but there's one exception to that which we want to

13    address with your Honor now to make sure we're not running

14    afoul of the ruling, which would be this:  There's a -- in one

15    of the -- in the conversation, there's a recorded conversation

16    between the defendant and Monk about Johnston, and in that

17    conversation, the defendant says along the lines of it's been

18    a year since Johnston's made a contribution.

19             Since that's in the flow of the conversation, we

20    would -- we would elicit Monk's understanding of what that

21    meant, but other than the fact that there hadn't been a

22    contribution for a year, we don't think there's, for the same

23    reason on the other individuals, there's any relevance to

24    Johnston's history and contributions.

25             MR. SOROSKY:  If I could ask a question, I would

1   assume Monk's understanding is there hasn't been a

2   contribution for a year.

3         MR. NIEWOEHNER:  Yes, that's right, that's what Monk

4   understands.

5         THE COURT:  You can do that, and then we can see

6   whether it opens the door, but we're going to do another offer

7   of proof.  And the reason we're doing an offer of proof with,

8   as we've done with two already, is they have different views,

9   and I cannot assume that we'll have the same result with an

10  offer of proof, so you'll do that at the appropriate time.

11        MR. SOROSKY:  The only thing I would say that may be

12  a little different here with Mr. Johnston is I don't think

13  there's any dispute that Mr. Johnston, or the race track

14  industry, however you want to categorize it, had been a

15  substantial supporter of Rod Blagojevich in contributions.  I

16  don't think that's in dispute.

17        THE COURT:  Actually, that's what I inferred, from

18  what the prosecutor just said.

19        MR. SOROSKY:  Right.

20        MR. NIEWOEHNER:  We're not disputing the fact, but

21  the relevance of that prior history is what's at issue.

22        THE COURT:  That's why we have to listen to the offer

23  of proof.  Okay?

24        MR. NIEWOEHNER:  Thank you, your Honor.

25        MR. SCHAR:  Thank you, Judge.

1    MR. SOROSKY:  Now, do you want to do a voir dire of

2  both Monk and Johnston or just Johnston?

3    THE COURT:  I don't think we really need Monk on this

4  issue, but if you want to do -- as a matter of fact, if you

5  want to do an offer of proof on anything with respect to Monk,

6  that's fine.

7    MR. NIEWOEHNER:  And, obviously, I presume the

8  defense is not going to ask Monk questions that they could not

9  ask Krozel or could not ask Magoon or could not ask Johnston,

10  so in terms of their personal wealth or their contribution

11  history, anything along those lines should be done in an offer

12  of proof as opposed to direct questions.

13    THE COURT:  Right.

14    MR. SOROSKY:  Now, just so we're clear also, the

15  Court's prior ruling concerning prior contributions is not any

16  limitation on the specific contribution in 2008, which is the

17  subject of the case.  I mean --

18    MR. NIEWOEHNER:  No, we're not trying to suggest that

19  the attempt to get a contribution in the fall and winter

20  of 2008 is out of bounds.

21    MR. SOROSKY:  Okay.  So any questions on that topic.

22    THE COURT:  Swell.

23    MR. SOROSKY:  Thank you.

24    THE COURT:  The witness on the stand.

25    (Jury enters courtroom.)

1          THE COURT:  Please be seated.

2          You may resume.

3          MR. NIEWOEHNER:  Thank you, your Honor.

4      ALONZO MONK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

5             DIRECT EXAMINATION (RESUMED)

6  BY MR. NIEWOEHNER:

7  Q.  Mr. Monk, right before we broke, you had been testifying

8  about some meetings you had with defendant, Rezko and Kelly

9  where you discussed making money.  Do you recall that?

10 A.  Yes.

11 Q.  Now, when you were the Chief of Staff, were you

12 interviewed by the FBI?

13 A.  Yes.

14 Q.  About when did that take place?

15 A.  In the summer of 2005.

16 Q.  And did you learn that Rezko was actually being

17 investigated prior to your interview with the FBI?

18 A.  Yeah.

19 Q.  About when did you actually learn that?

20 A.  Like the summer of '04, 2004.

21 Q.  But your own interview was in the summer of 2005?

22 A.  Correct.

23 Q.  During that interview with the FBI, were you asked about

24 Rezko and Kelly's involvement in state government?

25 A.  Yes.

1  Q.  In that interview, did you admit that you had planned to
2  make money or discussed those ideas through state actions with
3  Rezko, Kelly and the defendant?
4  A.  No.
5  Q.  Did you admit that you helped the defendant receive
6  campaign contributions in exchange for state action along with
7  Rezko and Kelly?
8  A.  No.
9  Q.  When the FBI asked questions about those topic matters,
10  what did you do?
11  A.  Lie.
12  Q.  And after the summer of 2005, when was the next time you
13  spoke with the government?
14  A.  I think it was early '09.
15  Q.  So when was the first time you told the FBI about any of
16  that information about your meetings with Rezko, Kelly and the
17  defendant or those campaign contributions?
18  A.  In February of '09.
19  Q.  In your interview with the FBI in 2005, did you admit to
20  the FBI that Rezko had been giving you cash?
21  A.  No.
22  Q.  Prior to the interview with the FBI, had Rezko been giving
23  you cash?
24  A.  Yes.
25  Q.  Did he give you cash on more than one occasion?

1  A.  Yes.

2  Q.  How much cash did Rezko typically give you?

3  A.  $10,000.

4  Q.  What were the circumstances that led to Rezko first giving

5  you cash?

6  A.  I had gone to him and asked him to recommend a car

7  dealership where I could go buy a particular car that I was

8  interested in, and he gave me that recommendation and at that

9  time told me that he wanted to help me buy the car.

10  Q.  Did that lead to Rezko giving you some cash for the car?

11  A.  Yes.

12  Q.  About when did you buy the car?

13  A.  In May of 2004.

14  Q.  Who first brought up the idea that Rezko would give you

15  cash for the car?

16  A.  He did.

17  Q.  Did you understand that you had to give the money back?

18  A.  No.

19  Q.  About how much cash did Rezko provide to you overall?

20  A.  Like 70 to $90,000.

21  Q.  And about when did Rezko stop giving you cash?

22  A.  Sometime in 2005.

23  Q.  Did you put the cash that Rezko gave you into the bank?

24  A.  No.

25  Q.  Why not?

1   A.  Because if anybody looked at my bank records, I didn't

2   want them to see large amounts of cash being deposited into my

3   account.

4   Q.  What did you do with the cash?

5   A.  Spent it on day-to-day expenses, clothing, meals, that

6   type of thing.

7   Q.  During the time period you were getting cash from Rezko,

8   did you need to withdraw cash from the bank?

9   A.  No.

10  Q.  Did you have to use an ATM machine?

11  A.  No.

12  Q.  Did that concern you?

13  A.  Yes.

14  Q.  Why?

15  A.  Because, again, if anybody looked at my bank records, they

16  would see that prior to May of 2004, I was taking out cash

17  from my account on a regular basis, and then all of a sudden

18  for, you know, approximately a year period, I wasn't taking

19  out cash at all.

20  Q.  Did you ever tell the defendant you were taking cash from

21  Rezko?

22  A.  No.

23  Q.  Why not?

24  A.  Because he wouldn't have approved of the method of getting

25  that money.  It could have led to an investigation of me and

Monk - direct

2723

1    potentially of him.

2    Q.  You earlier described meetings where Rezko, Kelly, you and

3    the defendant talked about making money together.

4         Were you concerned that the defendant wouldn't have

5    approved about your getting money from Rezko at all?

6    A.  No.

7    Q.  What was your concern?

8    A.  The method in which I was getting the money could have led

9    to an investigation of me and potentially him.

10   Q.  At some point, did Rezko get indicted?

11   A.  Yes.

12   Q.  About when did that take place?

13   A.  I think it was September or October, maybe November

14   of 2006, right before the general election.

15   Q.  Did Rezko continue to raise money for the defendant after

16   he was indicted?

17   A.  No.

18   Q.  Did you continue to talk with Rezko after he was indicted?

19   A.  No.

20   Q.  When the defendant ran for reelection in 2006, did you

21   have a role in that campaign?

22   A.  Yes.

23   Q.  What was your role?

24   A.  I was the campaign manager.

25   Q.  Did you perform a similar function in 2006 that you did in

Monk - direct

2724

1    2002?

2    A.  Yes.

3    Q.  About when did you become the campaign manager?

4    A.  In December of '05 or January of '06.

5    Q.  Did you continue working as Chief of Staff when you became

6    the campaign manager?

7    A.  No.

8    Q.  When did you stop being the Chief of Staff?

9    A.  The middle of December of '05.

10   Q.  Who replaced you as Chief of Staff?

11   A.  John Harris.

12   Q.  Who was in charge of fundraising for the defendant during

13   the 2006 campaign?

14   A.  Chris Kelly.

15   Q.  In the 2006 campaign, was there a more important

16   fundraiser for the defendant than Kelly?

17   A.  No.

18   Q.  What did you do after the November 2006 election?

19   A.  I started my own company.

20   Q.  What did the company do?

21   A.  It was a -- I was a lobbyist and political consultant in

22   Illinois.

23   Q.  Did you see the defendant as frequently once you began

24   working as a lobbyist?

25   A.  No.

 1  Q.  Did you do any fundraising for the defendant after you

 2  became a lobbyist?

 3  A.  Yes.

 4  Q.  What did you do in that regard?

 5  A.  I went to various individuals and companies and clients of

 6  mine to try and raise funds for his campaign.

 7  Q.  Did Chris Kelly get indicted at some point in 2007?

 8  A.  Yes.

 9  Q.  What kind of crimes was he charged with?

10  A.  He had some tax problems.  I don't know specifically.

11  Q.  At some point, did Kelly stop fundraising for the

12  defendant?

13  A.  Yes.

14  Q.  And about when did Kelly stop fundraising for the

15  defendant?

16  A.  In early to mid 2008, but he had slowed down considerably

17  before that.

18  Q.  After Kelly reduced his involvement in fundraising, did

19  the defendant become more active in fundraising?

20  A.  Yes.

21  Q.  Did you hear the defendant discuss Kelly's indictment in

22  the context of fundraising?

23  A.  Yes.

24  Q.  About when did you hear the defendant do that?

25  A.  It was either in late spring or early summer of 2008, we

1    had a meeting at the campaign office where Rod was there and

2    his brother and I was there and a number of other lobbyists

3    and consultants who had fundraised for him in the past all got

4    together, and he explained that he was going to get more

5    involved in fundraising, attend meetings, because Chris was no

6    longer going to be able to serve that role.

7    Q.  I'm going to direct your attention now to the summer and

8    fall of 2008.

9         In that timeframe, did you meet with the defendant at

10   his campaign office?

11   A.  Yes.

12   Q.  Typically for what purpose?

13   A.  To discuss fundraising.

14   Q.  Who would typically attend those meetings?

15   A.  Me and Rod and his brother Robert.

16   Q.  Why was Robert Blagojevich there?

17   A.  He had been hired by the campaign to head up fundraising

18   and manage the office.

19   Q.  What typically took place during those meetings?

20   A.  We'd go through lists of donors and potential donors and

21   find out the status of trying to get campaign contributions

22   from them and the amounts that were involved.

23   Q.  Who would lead those discussions?

24   A.  Typically, it was either Rod or Robert.

25   Q.  And in the course of those meetings, did the defendant

1  express any concerns about the status of his fundraising in
2  the fall of 2008?
3  A.  Yeah.
4  Q.  More than once?
5  A.  Yes.
6  Q.  And generally speaking, what did the defendant say?
7  A.  That we needed to maximize our fundraising by the end of
8  the year.  He was consistently concerned about the amount of
9  fundraising that was going on.  It was -- you know, it was
10 never enough.
11 Q.  Now, are you familiar with the Illinois Tollway?
12 A.  Yes.
13 Q.  In the summer of 2008, did you talk with the defendant
14 about any road building programs at the Illinois Tollway?
15 A.  Yes.
16 Q.  Did you have more than one conversation on that topic?
17 A.  Yes.
18 Q.  Do you recall those generally or specifically?
19 A.  Generally.
20 Q.  What potential road building programs did you discuss with
21 the defendant?
22 A.  There were two of them, both involving expansion of the
23 tollway.  One of them was for $1.8 billion, and one of them
24 was for $5 billion.
25 Q.  From what the defendant said to you, who had the power to

1  decide whether the tollway was going to go forward with those

2  two programs?

3  A.  He did.

4  Q.  Did the defendant have power to do both programs?

5  A.  Yes.

6  Q.  Did the defendant indicate whether the Illinois

7  legislature needed to approve either of those two programs?

8  A.  Yeah, he indicated that he did not need legislative

9  approval to do them.

10 Q.  From what the defendant said, was it significant to him

11 that he could do both tollway programs without the

12 legislature?

13 A.  Yes.

14 Q.  What did he indicate?

15 A.  That it would have been difficult to pass a bill that

16 would have approved these two programs because he and the

17 legislature weren't getting along.

18 Q.  Are you familiar with the term "capital bill"?

19 A.  Yes.

20 Q.  What's a capital bill?

21 A.  It's a -- it's a bill that involved the state raising

22 money to or borrowing money to build roads and bridges.  It

23 was an infrastructure bill to try and create jobs and increase

24 the infrastructure in Illinois.

25 Q.  Did you talk with the defendant in the fall of 2008 about

Monk - direct

2729

1  a capital bill?

2  A.  Yes.

3  Q.  In that timeframe, had the defendant been successful in

4  getting a capital bill passed?

5  A.  No.

6  Q.  Did the defendant talk to you in the fall of 2008 about

7  why not?

8  A.  Yeah, he -- he didn't think that there was a likelihood

9  that it would pass because of his problems with the

10 legislature.  It's one of the reasons why the tollway program

11 was being developed.

12 Q.  Did the defendant indicate to you that he thought he could

13 get a capital bill passed in 2008?

14 A.  No.

15 Q.  I'm going to direct your attention to September and

16 October of 2008.

17       In that timeframe, do you recall a particular

18 conversation you had with the defendant about the two

19 different tollway programs?

20 A.  Yes.

21 Q.  Where was this conversation?

22 A.  In the campaign office.

23 Q.  Was anyone else present?

24 A.  No, it was just he and I.

25 Q.  In that conversation, what did the defendant indicate he

1  planned to do with respect to these two different tollway

2  programs?

3  A.  He was going to announce the $1.8 billion program very

4  soon, and he was going to wait until after the first of the

5  year to announce the $5 billion program.

6  Q.  When he said he was going to announce the $1.8 billion

7  program, how did you understand he was going to announce it?

8  A.  Through some sort of press event, press conference.

9  Q.  When you had worked with the defendant as his Chief of

10  Staff, had you discussed with the defendant whether to have a

11  public -- a press conference or a public announcement about a

12  particular government decision?

13          MR. SOROSKY:  Objection to what occurred on prior

14  occasions.

15          THE COURT:  Overruled.

16  BY THE WITNESS:

17  A.  From time to time.

18  BY MR. NIEWOEHNER:

19  Q.  And on those prior occasions, had the defendant discussed

20  the advantages of doing a press conference in the context of a

21  decision?

22  A.  Yes.

23  Q.  What did the defendant indicate?

24  A.  That it would, you know, typically garner good publicity

25  for him and for the program that was being announced.

1  Q.  From what the defendant said, was getting good publicity

2  important to the defendant?

3  A.  Yes.

4  Q.  From what the defendant said, what was the effect on the

5  defendant once he made a public announcement about a

6  particular government decision?

7  A.  He was committed to going forward with it.

8  Q.  If the defendant wasn't certain he wanted to make a

9  particular decision, did he make a public announcement about

10 it?

11 A.  No.

12 Q.  Did he explain why not?

13 A.  Yeah, he -- it's one of the things where if you made the

14 public announcement, then you were committed to doing it; and

15 if he was uncertain he wanted to go forward with a particular

16 program or plan, then he wouldn't announce it.

17 Q.  Did the defendant indicate why he wouldn't announce it if

18 he wasn't certain he wanted to do it?

19 A.  That he wasn't committed to doing it.

20         MR. SOROSKY:  Objection, your Honor.

21         THE COURT:  Overruled.

22 BY THE WITNESS:

23 A.  If he didn't make the announcement for a particular

24 program or plan, then he wasn't committed to going forward

25 with it.

1  BY MR. NIEWOEHNER:

2  Q.  What was the problem the defendant indicated would exist

3  if he did make an announcement about a plan he didn't want to

4  do?

5  A.  That if he ultimately decided he didn't want to go forward

6  with it after announcing he did, he'd look bad.  He'd look

7  like he was flip flopping on decisions and was being

8  indecisive.

9  Q.  So based on your prior experience with the defendant, if

10  he made a public announcement on the $1.8 billion program, was

11  he committed to doing it?

12  A.  Yes.

13  Q.  I'm going to go back to your meeting with the defendant in

14  September and October.

15         Did the defendant discuss his plans with respect to

16  the $5 billion program?

17  A.  Yes.  He was going to wait until after the first of the

18  year to announce that program.

19  Q.  Were there companies that you expected were going to

20  benefit from the tollway building program?

21  A.  Yes.

22  Q.  Did you have any fundraising relationships with those

23  companies?

24  A.  Yeah.

25  Q.  What kind of companies were they?

1  A.  Engineering companies, construction companies that would

2  be involved in the construction of the tollway.

3  Q.  Did the defendant say anything about fundraising in this

4  meeting where he was talking about the two different tollway

5  programs?

6  A.  Yeah.

7  Q.  What did the defendant say?

8  A.  He said that -- he said that these programs were really

9  going to benefit engineering companies, construction companies

10  and companies that would be involved in that and that we

11  needed to really put a lot of pressure on those companies

12  between the time the meeting was taking place and the end of

13  the year to try and raise as much money as we could from them.

14       Also in play there was that, in all likelihood, many

15  of those companies weren't going to be able to donate to them

16  after the first of the year because of an ethics bill that had

17  been passed.

18  Q.  Did the defendant want you to do anything with respect to

19  fundraising?

20  A.  Yeah, he wanted me to be, you know, very aggressive and go

21  out there and, you know, tell people about this -- these

22  tollway programs in order to fundraise.

23  Q.  Did he say anything about what he would do if these firms

24  didn't contribute money?

25  A.  Yeah, his feeling was that these tollway programs were

1    going to be of real benefit to the engineering company, at one

2    point said, you know, "If they don't step up by the end of the

3    year, fuck 'em, I'm not going to do the $5 billion program."

4    Q.  What did you understand the defendant to mean when he

5    said, "If they don't step up, F 'em, I won't do the public

6    program"?

7    A.  That, you know, unless they gave him campaign

8    contributions, he was not going to take -- he wasn't going to

9    go forward with the $5 billion program.

10   Q.  Are you familiar with a man named Gerald Krozel?

11   A.  Yes.

12   Q.  In the summer of 2008, did you have a fundraising role

13   with respect to Krozel?

14   A.  Yes.

15   Q.  How well did you know Krozel at that point?

16   A.  Not that well.  I think we'd met in the 2002 campaign, and

17   our paths had crossed a number of times at events and that

18   type of thing; but, you know, we knew each other, but we

19   weren't that close.

20   Q.  Let me direct your attention to September of 2008.

21        Did you have a meeting with Krozel at that point?

22   A.  Yes.

23   Q.  Where was that meeting?

24   A.  Campaign office.

25   Q.  Who was present for that meeting?

1   A.   It was Jerry Krozel, me, Rod and Rod's brother Robert.

2   Q.   Did you discuss this meeting with the defendant before it

3   took place?

4   A.   Yes.

5   Q.   What was the purpose of the meeting?

6   A.   To ask Jerry Krozel for campaign contributions.  It was a

7   fundraising meeting.

8   Q.   Why were you going to be present at the meeting?

9   A.   Because I was at that point the point person in dealing

10  with Jerry Krozel in trying to garner campaign contributions,

11  and any follow-up that was going to happen as a result of that

12  meeting I was going to do.

13  Q.   Did the defendant discuss the two tollway programs in that

14  meeting?

15  A.   Yes.

16  Q.   What did he say about the two tollway programs?

17  A.   That there were two programs, one, the $1.8 billion

18  program he was going to announce shortly and that he was going

19  to wait until after the first of the year to announce the

20  $5 billion program.

21  Q.   Did the defendant discuss his power to go forward with the

22  two tollway programs?

23  A.   Yeah, he told -- he told Jerry that he did not need

24  legislative approval to go forward with these two programs,

25  which was important because he was trying to get a capital

1   bill passed and didn't think he could because he couldn't get

2   the legislature to pass a capital bill.

3   Q.  Did the defendant say anything about why he wasn't going

4   to announce the $5 billion program until after the beginning

5   of the next year?

6   A.  Yeah, he told -- he told Jerry that he didn't want to

7   announce the $5 billion program until after the first of the

8   year because he wanted to keep pressure on the legislature to

9   try and get a capital bill passed, and that if the $5 billion

10  program was announced with the $1.8 billion program, then the

11  legislature would feel less compelled to pass a capital bill.

12  Q.  Now, a few minutes ago, you discussed earlier

13  conversations you had with the defendant about the capital

14  bill.  Do you recall that?

15  A.  Yes.

16  Q.  In those earlier conversations about the capital bill with

17  just you and the defendant, did he indicate that he thought

18  the capital bill was going to be passed in 2008?

19  A.  No.

20  Q.  What was Krozel's response to the discussion about the two

21  different tollway programs?

22  A.  He was upbeat, excited about it.

23  Q.  Did Krozel say anything about the state of the road

24  building industry?

25  A.  Yes.  He said because of the economy, his industry was

1  really suffering.  In fact, he used as an example some company

2  in Dixon, Illinois, that had gone out -- recently gone out of

3  business and that, you know, his industry was fairly depressed

4  right then.

5  Q.  Did the defendant discuss fundraising at some point in the

6  meeting?

7  A.  Yes.

8  Q.  What did the defendant say in that regard?

9  A.  He asked Jerry, he said, you know, we're putting on a big

10 push by the end of the year.  We need to try and raise as much

11 money as we can before the end of the year, and he asked Jerry

12 to help out.

13 Q.  Did he talk about the ethics legislation at some point?

14 A.  He did.

15 Q.  What did he indicate about that?

16 A.  That it was important for his membership to step up before

17 the end of the year because in all likelihood after the first

18 of the year, many of his members weren't going to be able to

19 donate money to him because they were doing business with the

20 state.

21 Q.  Did Krozel leave the campaign office at some point?

22 A.  Yes.

23 Q.  What did the defendant say to you after Krozel left?

24 A.  That we should be able to raise at least a half-a-million

25 dollars from Jerry.

1   Q.  Who did you understand the defendant wanted to raise the
2   $500,000 from?
3   A.  From Jerry and the people he would raise it from.
4   Q.  And what industry was that?
5   A.  The road building -- road builders industry.
6   Q.  And at the meeting, who did the defendant indicate had the
7   sole power to do the $5 billion program?
8   A.  He -- him, Rod.
9   Q.  From what the defendant said at the meeting, when did you
10  understand the defendant was going to publicly commit to doing
11  the $5 billion program?
12  A.  After the the first of the year.
13  Q.  From what the defendant said at the meeting, when did you
14  understand he wanted Krozel to raise money?
15  A.  Before the end of the year.
16  Q.  From what the defendant said at the meeting, what did you
17  understand he wanted?
18  A.  That he wanted Jerry Krozel to raise money in exchange for
19  him announcing that $5 billion program.
20          MR. SOROSKY:  Objection, Judge.
21          THE COURT:  Overruled.
22  BY MR. NIEWOEHNER:
23  Q.  I'm going to direct your attention to the timeframe of
24  September 2008 through December 9th, 2008.
25          In that timeframe, did you meet or speak with Krozel?

1    A.  Yes.

2    Q.  More than once?

3    A.  Yes.

4    Q.  What was the primary reason you spoke with Krozel in that

5    timeframe?

6    A.  Fundraising.

7    Q.  Were you following the defendant's direction to get Krozel

8    to raise funds?

9    A.  Yes.

10   Q.  Did you discuss Krozel's efforts to raise money in those

11   conversations?

12   A.  Yes.

13   Q.  What did you generally say in those conversations?

14   A.  I was encouraging him to be as aggressive as he could,

15   find out what the status was on him raising money.

16   Q.  Did Krozel ever tell you he wasn't going to raise any

17   money?

18   A.  No.

19   Q.  Based on your conversations with Krozel, did you expect he

20   would arrange for some kind of contribution?

21   A.  Yes.

22   Q.  Did you have further conversations with the defendant

23   about the status of your efforts to get Krozel to raise money?

24   A.  Yes.

25   Q.  And did you do that more than once?

1   A.  Yes.

2   Q.  Did the defendant express interest in your efforts to get

3   Krozel to raise money?

4   A.  Yes.

5   Q.  Generally speaking, what did you tell the defendant about

6   the status of your efforts to get -- of your meetings with

7   Krozel?

8   A.  Well, given the status report based on my conversations

9   with Jerry and kind of the frustration that Jerry was

10  struggling with with the economy and raising money but that he

11  was trying to do it.

12  Q.  Did you ever tell the defendant that Krozel was not going

13  to raise any money?

14  A.  No.

15  Q.  I'm going to turn your attention now to a man named John

16  Johnston.  Are you familiar with him?

17  A.  Yes.

18  Q.  Who is John Johnston?

19  A.  He and his family owned two racetracks in Illinois.

20  Q.  About when did you begin -- did you do any work for

21  Johnston?

22  A.  Yes, he was a client of mine.

23  Q.  What kind of work did you do for him?

24  A.  Political lobbying and consulting.

25  Q.  Were you paid for it?

1    A.  Yes.

2    Q.  How much were you paid?

3    A.  $12,500 a month.

4    Q.  Now, you earlier described fundraising meetings that took

5    place at the campaign offices with the defendant.  Do you

6    recall that?

7    A.  Yes.

8    Q.  You said you went through lists of potential contributors?

9    A.  Yes.

10   Q.  I'm going to direct your attention to the fall of 2008.

11   In that timeframe, did you talk to the defendant about raising

12   funds from Johnston?

13   A.  Yes.

14   Q.  Did you do that more than once?

15   A.  Yes.

16            MR. NIEWOEHNER: Your Honor, may I approach?

17            THE COURT:  You may.

18            MR. NIEWOEHNER:  I'm going to show you what's been

19   marked as Government Exhibit F.O.B. 1.

20            Your Honor, that exhibit was previously admitted.

21   May I publish it to the jury?

22            THE COURT:  You may.

23   BY MR. NIEWOEHNER:

24   Q.  Mr. Monk, what is Government Exhibit F.O.B. 1?

25   A.  It's a list of potential donors and -- donors to the

1    campaign along with some information with respect to each one

2    of the donors.

3    Q.  And is this typical of the fundraising lists you would go

4    through at your meeting?

5    A.  Yes.

6    Q.  In fact, did you go -- did you attend a fundraising

7    meeting where you went through this particular fundraising

8    list?

9    A.  Yes.

10   Q.  And if you look at the very top of the screen, there's a

11   date on the header.  Do you see that?

12   A.  Yes.

13   Q.  And what is the date of that draft?

14   A.  October 6th, 2008.

15   Q.  In your experience, did you typically meet around the date

16   that was on these drafts?

17   A.  Yes.

18   Q.  But not necessarily on the date?

19   A.  Correct.

20   Q.  I'd like you to turn to the second page of the exhibit,

21   and there's some -- there's rows on the exhibit, is that

22   right?

23   A.  Yes.

24   Q.  If you could focus in about the top third, there's a name

25   John Johnston.  Do you see that?

1    A.  Yes.

2    Q.  And what does -- what is reflected on the columns across

3    the line from John Johnston?

4    A.  It shows the event or the timeframe when the event's going

5    to take place or when the donation would come in.  It shows

6    the -- how much may have been collected.  It shows the low

7    goal and the high goal for John Johnston, phone number, and

8    notes, and it just says Lon and RRB.

9    Q.  And in terms of the amount of money, what does the hundred

10   thousand dollars represent?

11   A.  The amount of money that we thought we were going to get

12   from John Johnston.

13   Q.  Who decided that the target for Johnston was going to be a

14   hundred thousand dollars?

15   A.  Rod.

16   Q.  And on the far right column, there's a note, Lon and RRB.

17   Do you see that?

18   A.  Right.

19   Q.  What did that indicate?

20   A.  That he -- he and/or I were going to follow up with John

21   Johnston to try and collect the $100,000.

22   Q.  Now, I'm going to direct your attention to the fall

23   of 2008.  Was there any particular issues that you were

24   working on with Johnston at that point?

25   A.  Yes.

1   Q.  What was that?

2   A.  It was a racing bill in the Illinois state legislature.

3   Q.  What did that racing bill do?

4   A.  It caused the casinos in Illinois to provide a subsidy, a

5   percentage of their revenue, to the racing industry, the

6   racetracks, the horsemen, the doctors and other entities

7   within the racetrack industry.

8   Q.  Had there been a similar law that had passed in 2006?

9   A.  Yes.

10  Q.  And in the course of being campaign manager and Chief of

11  Staff of the defendant, had you become familiar with his

12  positions on various issues?

13  A.  Yes.

14  Q.  What was the defendant's position with respect to the

15  Illinois horse racing industry?

16  A.  He was supportive of it.

17          MR. NIEWOEHNER:  Your Honor, I'm going to show -- the

18  government's going to move to admit Government Exhibit

19  Racetrack 2 pursuant to the 902(11) certificate.

20          THE COURT:  You may do so.

21  BY MR. NIEWOEHNER:

22  Q.  What is Government Exhibit Racetrack 2, Mr. Monk?

23  A.  It's a legislative history of the status of the particular

24  bill in May of 2006.

25  Q.  That's in reference to the 2006 law you're talking about?

1   A.  Correct.

2           MR. NIEWOEHNER:  Your Honor, may we publish?

3           THE COURT:  You may.

4   BY MR. NIEWOEHNER:

5   Q.  I'm going to direct your attention to the last page of the

6   exhibit and focus your attention on the last four or five

7   lines of the exhibit.

8           What is reflected, you see the line that says, "5/4,

9   2006, passed both houses"?

10  A.  Yes.

11  Q.  What does that reflect?

12  A.  That the bill was voted on in both houses and it passed.

13  Q.  On what date?

14  A.  May 4th, 2006.

15  Q.  And then what's -- the line below that, what does that

16  indicate?

17  A.  That on May 25th, the bill was sent to the governor.

18  Q.  Is that a procedural step that had to take place before

19  the defendant could act on a particular bill?

20  A.  Correct.

21  Q.  And what does the next line show?

22  A.  That on May 26th, the governor approved or signed the

23  bill.

24  Q.  So on the 2006 law, the defendant signed the bill one day

25  after it got to him?

1    A.  Correct.

2    Q.  And once the defendant signed the 2006 bill, did it become

3    law?

4    A.  Yes.

5    Q.  And under the 2006 racing law, how long did the horse

6    racing industry receive a subsidy?

7    A.  It was supposed to receive the subsidy for two years.

8    Q.  So did that law end two years later?

9    A.  Yes.

10   Q.  I'm going to direct your attention to November of 2008.

11   Was the Illinois legislature in session then?

12   A.  Yes.

13   Q.  In the November 2008 session, did the Illinois legislature

14   consider this racing bill that you described earlier?

15   A.  Yes.

16   Q.  So was this a similar bill in 2008 to the one that had

17   passed in 2006?

18   A.  Yes.

19   Q.  Under the 2008 racing bill, how long would the subsidy

20   last under that bill?

21   A.  It could last up to three years.

22   Q.  Were there things that could take place that would make it

23   last less than three years?

24   A.  Yes.

25   Q.  If the Illinois legislature passed the racing bill, would

1  it go to the governor for signature?

2  A.  Yes.

3  Q.  And what could the defendant do with the bill at that

4  point?

5  A.  Nothing -- oh, you mean what could he do?

6  Q.  Yes.

7  A.  He could sign it, veto it, amendatorily veto it and sign

8  it.

9  Q.  What would happen if the defendant signed it?

10  A.  It would become law.

11  Q.  Did you talk with Johnston prior to the November 2008

12  legislative -- excuse me.

13          Did you talk to Johnston before the 2008,

14  November 2008 legislative session?

15  A.  Yes.

16  Q.  Did you talk to him about fundraising?

17  A.  Yes.

18  Q.  Did you talk to Johnston more than once on that topic?

19  A.  Yes.

20  Q.  Generally, what did you say to Johnston in those

21  conversations?

22  A.  "How are we doing on getting the hundred thousand dollars

23  that he and Rod had talked about?"

24  Q.  And generally -- so that was Johnston's potential

25  contribution?

1   A.  Correct.

2   Q.  And, generally, how did Johnston respond to your questions

3   about the contribution?

4   A.  "I'm working on it."

5   Q.  Did Johnston ever make a specific promise that he'd

6   deliver the money?

7   A.  Not that I'm aware of, no.

8   Q.  I'm going to direct your attention to November 13th, 2008.

9           On that date, did you talk with Robert Blagojevich,

10  the defendant's brother?

11  A.  I believe so.

12  Q.  And in that conversation, did you discuss the status of

13  your fundraising efforts with Johnston?

14  A.  Yes.

15          MR. NIEWOEHNER:  Your Honor, at this time, the

16  government would ask permission to publish the call at Tab 43,

17  which is Session 610.

18          MR. SOROSKY:  What date is this?

19          MR. NIEWOEHNER:  November 13th.

20  BY MR. NIEWOEHNER:

21  Q.  Mr. Monk, if you could turn to Tab 43.

22          Oh, excuse me.

23      (Tendered.)

24          THE COURT:  Okay.

25      (Tape played.)

1    BY MR. NIEWOEHNER:

2    Q.  Now, Mr. Monk, just looking at the first page of the

3    transcript, that conversation was on November -- according to

4    the transcript, that conversation was on November 13th, is

5    that right?

6    A.  Yes.

7    Q.  Now, when you spoke with Robert Blagojevich that day, had

8    you generally indicated about the status of the fundraising

9    efforts for Johnston?

10   A.  Yes.

11   Q.  Generally speaking, what had you told Robert Blagojevich?

12   A.  That I was down in Springfield and I had conversations

13   with John Johnston about it, and, you know, things were

14   progressing.

15   Q.  And when you spoke with Robert Blagojevich, had you also

16   spoken about Gerald Krozel that day?

17   A.  Yes.

18   Q.  What had you said about fundraising with Krozel?

19   A.  That I was still pushing Jerry Krozel, and he was trying

20   to get something done.

21   Q.  I'm going to direct your attention back to the 2008 racing

22   bill.

23          Did the Illinois legislature pass that bill in its

24   November 2008 session?

25   A.  Yes.

1  Q.  What day did the bill pass the Illinois legislature?

2  A.  On November 20th.

3  Q.  After the racing bill was passed by the Illinois

4  legislature, did it become law?

5  A.  No.

6  Q.  Did the defendant -- did it need to go to the defendant

7  for signature?

8  A.  Yes.

9        MR. NIEWOEHNER:  Your Honor, at this time could I

10  publish the call at Tab 51, which is Session 951?

11        THE COURT:  You may do so.

12      (Tape played.)

13  BY MR. NIEWOEHNER:

14  Q.  Mr. Monk, if you could turn to Page 1 of the transcript.

15  A.  Yes.

16  Q.  According to the transcript, this call took place on

17  November 22nd, is that correct?

18  A.  Correct.

19  Q.  And can you turn to Page 2, at Line 6 or at Line 7, the

20  defendant says, "You didn't see Krozel yesterday 'cause you

21  were sick, right?"

22        What did you understand the defendant was saying

23  there?

24  A.  He's just confirming that I hadn't seen Jerry Krozel on

25  that Friday before this call.

1  Q.  Was it unusual in that timeframe for the defendant to

2  check on the status of your efforts with Krozel?

3  A.  No.

4  Q.  Then at Line 11, the defendant says, "What about the

5  Johnstons?  Nothing yet."

6          What did you understand the defendant was saying

7  there?

8  A.  He was asking for my status of trying to get the $100,000

9  from the Johnstons.

10 Q.  At Line 14 you say, "But I called him and had a

11 conversation with him, and he's kind of getting pissed off at

12 me 'cause he says, look, I've told you I'm good for it.

13 I'm -- I'm figuring out where to get the money and you can get

14 it in the next couple weeks."  And the defendant says, "Good,

15 okay."

16          Had you actually spoken with Johnston around that

17 time?

18 A.  I may have.  I don't remember specifically.

19 Q.  Had you actually had a conversation with Johnston roughly

20 in that timeframe?

21 A.  Yeah.  I was talking to him on a regular basis.

22 Q.  Did you in that portion we just went through, did you give

23 the defendant an accurate description of your interaction with

24 Johnston?

25 A.  No, not really.  He wasn't -- John Johnston wasn't really

1  pissed off.  I just wanted to relay a message to Rod that, you
2  know, I was working on it.  I wasn't being as aggressive as he
3  thought I might be, and I wanted him to kind of back off.
4  Q.  Were there times when you lied or exaggerated to the
5  defendant about the status of your fundraising efforts?
6  A.  Yeah.
7  Q.  Why did you do that?
8  A.  Because my fundraising efforts were different than his.
9  They weren't as, you know, aggressive, in your face, and I
10  didn't want to get into discussions with him about how often I
11  should be calling someone and that type of thing, so I would
12  from time to time mislead him.
13  Q.  Now turning back to the transcript, Line 22, you say, "And
14  he didn't say don't call me again, but you could just tell
15  there was an edge in his voice."
16        The defendant responds, "He knows by the end of the
17  year.  He knows."
18        What did you understand the defendant meant at that
19  point?
20  A.  Well, that John Johnston knows we need the contribution by
21  the end of the year.
22  Q.  Now, after -- after the racing bill was passed by the
23  Illinois legislature on November 20th, was it sent to the
24  defendant for his signature?
25  A.  Yes.

1  Q.  Or I should say was it presented to the governor?

2  A.  Yes.

3  Q.  And what day was the 2008 racing bill formally brought

4  over so the defendant could act on it?

5  A.  On November 24th.

6  Q.  After that event took place on November 24th, could the

7  defendant have signed the racing bill into law immediately?

8  A.  Yes.

9  Q.  Was there any significant difference between the 2008

10  racing bill and the 2006 racing law that the defendant had

11  signed?

12  A.  No.

13  Q.  How long did it take the defendant to sign the 2006 racing

14  bill?

15  A.  One day.

16        MR. NIEWOEHNER:  Your Honor, can I publish the call

17  at Tab 52, Session 1005?

18        MR. SOROSKY:  What date?

19        MR. NIEWOEHNER:  November 24th.

20        THE COURT:  Yes.

21     (Tape played.)

22  BY MR. NIEWOEHNER:

23  Q.  Mr. Monk, if you could turn to the first page of the

24  transcript.

25        According to the transcript, this call takes place on

1    November 24th, is that right?

2    A.  Yes.

3    Q.  And at Line 18 on Page 1, you say, "I pressed Johnny again

4    today.  He said I want to do something with Gupta.  I said no.

5    I need you to do it separately.  We're playing too many games

6    here.  He goes, okay, you and I get together Monday and we'll

7    work it out, I'll get you the money."

8            And the defendant responds at the top of Page 2,

9    "Okay, good, beautiful."

10           Had Johnston actually made an actual commitment to

11   you to raising funds at that point?

12   A.  No, but he did say we would get together Monday and, you

13   know, talk about it.

14   Q.  And then at Line 9 on Page 2, you say, "And then I met

15   with Jerry Krozel."

16           Had you, in fact, met with Jerry Krozel on that day?

17   A.  Yes.

18   Q.  And you continue at Line 10, you say, "He goes, I'm

19   working on it.  Everything looks like it's moving forward.

20   I'm not going to be able to come close to that number, but I'm

21   working really hard on it, looks good."

22           What were you indicating to the defendant there?

23   A.  That Jerry Krozel wasn't going to come close to raising

24   $500,000, but that he was still working on it.

25   Q.  And if you go to Page 3, at Line 8, you say, "Those are

1    the three things I was working on today."

2            And the defendant says, "Okay.  They'll do more than

3    a hundred, won't they, those, those guys?"

4            Who did you understand the defendant was talking

5    about?

6    A.   Jerry Krozel and the road builders.

7    Q.   What did you understand the defendant was saying?

8    A.   That they -- they'd get to at least a hundred thousand

9    dollars, wouldn't they?

10   Q.   And your response was at Line 12, "Uh, you know, I think

11   so.  It's a little painful talking to him."

12           What were you indicating to the defendant there?

13   A.   That I thought there was a chance that they could get to a

14   hundred thousand dollars.

15   Q.   Did you still think Krozel was going to make a

16   contribution or arrange for contributions at that point?

17   A.   Yes.

18   Q.   Is this the last conversation you had with the defendant

19   about Jerry Krozel?

20   A.   Yeah, I think it was.

21   Q.   So the last conversation you had with the defendant, the

22   defendant indicated he hoped they would raise about a hundred

23   thousand dollars, is that right?

24   A.   Right.

25   Q.   Now, did you talk with John Johnston after the racing bill

1 was sent to the defendant for possible signature on

2 November 24th?

3 A.  Yes.

4 Q.  Did you have more than one conversation with Johnston?

5 A.  Yes.

6 Q.  What did Johnston say to you in those conversations?

7 A.  He wanted to know what -- the timing of getting the racing

8 bill signed.  He was trying to get it signed as soon as

9 possible.

10 Q.  Did Johnston indicate why he wanted it signed as soon as

11 possible?

12 A.  Yeah, because every day that the bill didn't get signed

13 and wasn't law, his two tracks were losing $9,000 a day.

14 Q.  After you learned that the racing bill had gone to the

15 defendant for signature on November 24th, did you speak with

16 John Harris about the racing bill?

17 A.  Yes.

18        MR. NIEWOEHNER:  Your Honor, can we publish the call

19 at Tab 53, which is Session 1065?

20        MR. SOROSKY:  What date?

21        MR. NIEWOEHNER:  The 26th.

22        THE COURT:  You may.

23     (Tape played.)

24 BY MR. NIEWOEHNER:

25 Q.  If you'd turn to Page 1.  According to the transcript,

1  this conversation took place on November 26th, is that right?

2  A.  Yes.

3  Q.  Is that the day before Thanksgiving?

4  A.  Yes.

5  Q.  And on Page 2, Line 6, you indicate, "I just followed up

6  with John on the recapture bill."

7         The defendant says, "Yeah."

8         "And he told me you're struggling with it now."

9         Had you, in fact, spoken with John Harris?

10 A.  Yes.

11 Q.  And the defendant responds at Line 11, "No.  I'll talk to

12 you about that.  I'm not struggling with it."

13        What did you understand the defendant to mean there?

14 A.  That he's not going to have a problem signing the -- the

15 racing bill, and that he wanted to talk to me about it.

16 Q.  And he says at Line 12 that "It's a timing issue, that's

17 all."

18        Did you understand what the defendant meant at that

19 point?

20 A.  No.

21 Q.  At Line 14, you say, "Just so you know, all these guys are

22 just breathing down my neck."

23        And the defendant says, "I hear you."

24        What were you -- what did you mean when you said that

25 to the defendant?

1  A.  That John Johnston and a couple other lobbyists and a

2  couple other people who were interested in getting the bill

3  signed were calling me up and asking what the status of Rod

4  signing the bill was.

5  Q.  At Line 23, the defendant says, "I'll be back Wednesday

6  because I gotta be in Philadelphia for this governors pre --

7  President Obama."

8          What did you understand the defendant was saying

9  there?

10  A.  That he'd talk to me about it in more depth about the

11  signing of the racing bill after he got back from Philadelphia

12  the following Wednesday.

13  Q.  What did you understand that meant about the timing of the

14  signature of the racing bill?

15  A.  That it was going to be at least a week before it got

16  signed.

17  Q.  Did you want the defendant to wait another week before

18  signing it?

19  A.  No.

20  Q.  If you'd turn to Page 3.

21          You say, "Well, I'm going to see you Wednesday

22  anyway.  I'm going to see you at 3:00 o'clock on Wednesday at

23  the campaign office."

24          What were you indicating there?

25  A.  That he and I were scheduled to meet at 3:00 o'clock that

1    following Wednesday.

2    Q.  For what purpose?

3    A.  Talk about fundraising.

4    Q.  The defendant says, "Oh, excellent.  Then we can -- that's

5    perfect.  Yeah, that's perfect."

6           What did you understand him to mean?

7    A.  That he didn't -- he didn't know that that meeting had

8    been confirmed yet.  So he said, oh, excellent to that, and

9    he's kind of saying, yeah, that -- that's perfect.  We can

10   talk about it then.

11   Q.  At Line 8, you say, "You're not going to do anything,

12   you're not going to do anything before that."

13          And the defendant responds, "No, and it's not

14   gonna -- there's no negatives.  You know, you got nothing to

15   worry about."

16          What did you understand the defendant to be saying

17   there?

18   A.  That I didn't need to worry about the bill getting signed,

19   that he was going to sign the bill.

20   Q.  Were you concerned that the defendant wasn't going to sign

21   the bill?

22   A.  Not at that point, no.

23   Q.  What was your concern?

24   A.  That it was going to -- it wasn't going to get signed that

25   day immediately.

1  Q.  I'm going to direct your attention now to December 3rd.

2       Is that the Wednesday that you discussed in that

3  phone call?

4  A.  Yes.

5       THE COURT:  I think we're going to break now.

6       COURT SECURITY OFFICER:  All rise.

7     (Jury exits courtroom.)

8       THE COURT:  3:20.

9     (Recess from 2:55 to 3:28 p.m.)

10    (Jury enters courtroom.)

11      THE COURT:  Please be seated.

12      You may proceed.

13      MR. NIEWOEHNER:  Thank you, your Honor.

14 BY MR. NIEWOEHNER:

15 Q.  Mr. Monk, before we broke, I had asked you some questions

16 about the tollway and Jerry Krozel.  Do you recall that?

17 A.  Yes.

18 Q.  And in particular, I had asked you about a conversation

19 that you had related or that there had been a call you

20 listened to with yourself and the defendant on November 24th.

21 Do you recall that?

22 A.  Yes.

23 Q.  A couple days before Thanksgiving?

24 A.  Yes.

25 Q.  In that conversation, you indicated or the last statement

1    from the defendant was that his hope that Krozel would still
2    raise a hundred thousand dollars.  Do you recall that?
3    A.  Yes.
4    Q.  In fact, was that conversation you had had before your
5    conversation with the defendant, you had had a conversation
6    with Krozel?
7    A.  Yes.
8    Q.  Was that, in fact, your last conversation with Krozel as
9    well?
10   A.  Yes.
11   Q.  And prior to that point, had Krozel ever raised any issue
12   or any difficulty with raising money?
13   A.  Yes.
14   Q.  What did he raise?
15   A.  A couple reasons:  One, the economy.  What he had stated
16   in the meeting with Rod and I and Robert, that his industry
17   was depressed because of the economy so it was going to
18   difficult to fundraise from them.
19          And the other one was in one meeting I had with him,
20   he had raised the issue that he wasn't going to be able to ask
21   his members for money for about a two-week period because they
22   had just been served with subpoenas from the U.S. Attorney's
23   Office regarding fundraising in general.  And so they would
24   have all been kind of nervous to be talking about fundraising
25   at that point.

1    Q.  Road builders, is that the organization?

2    A.  Yes.

3    Q.  Did you understand that Krozel was still going to raise

4    money for the defendant notwithstanding those difficulties?

5    A.  I thought he was, yeah.

6    Q.  Let me take you back then to December 3rd and the racing

7    bill.

8            Was that the Wednesday that followed the last phone

9    conversation you -- we played with the defendant?

10   A.  Yes.

11   Q.  Did you meet with the defendant that day as you'd

12   originally planned?

13   A.  Yes.

14   Q.  What was the original purpose of the meeting?

15   A.  To talk about fundraising.

16   Q.  Where did the meeting take place?

17   A.  In the campaign office.

18   Q.  When you went to the campaign office that day, where did

19   you go first?

20   A.  Into the conference room.

21   Q.  Who was present at the start of the meeting?

22   A.  Rod, Robert and myself.

23   Q.  What happened at the very beginning of the meeting?

24   A.  Rod said, oh, let's go -- let's go into my office and talk

25   about your issue.

1  Q.  What did you understand the defendant was referring to?

2  A.  He wanted to talk about the signing of the racing bill.

3  Q.  Where did you go at that point?

4  A.  Into his office.

5  Q.  Did -- what happened with Robert Blagojevich?

6  A.  I think he just stayed in the conference room.  He did not

7  come into the -- into Rod's office.

8            MR. NIEWOEHNER:  Your Honor, at this time can we

9  publish the call at Tab 59, or the overhear, I should say?

10           THE WITNESS:  What number?

11           MR. NIEWOEHNER:  Would you turn to Tab 59.

12           THE COURT:  You may play it.

13       (Tape played.)

14  BY MR. NIEWOEHNER:

15  Q.  Mr. Monk, if you could turn to Page 1 of the transcript,

16  and what -- the transcript reflects what date and time for

17  this conversation?

18  A.  December 3rd at 2:13 p.m.

19  Q.  And at Line 4, the defendant says, "I'm not going to the

20  wake.  You going to sister's wake?"

21           And then at Line 8 you say, "Going to Oklahoma."  At

22  Line 12, "Tomorrow my dad, some army reunion."

23           What did you understand the defendant was saying

24  there?

25  A.  He was asking me whether I was going to the wake of John

1    Mitola's sister, just find out whether I was doing that or

2    not, and I told him I was going to Oklahoma for my dad's

3    reunion -- army reunion.

4    Q.  Were you actually going to Oklahoma for your father's

5    reunion?

6    A.  No.

7    Q.  At that time, was your father ill?

8    A.  Yes.

9    Q.  Where were you actually going?

10   A.  To the Dominican Republic to play golf with some friends.

11   Q.  Why didn't you tell the defendant you were going to go on

12   vacation?

13   A.  Because I didn't want him to know I was going on vacation.

14   I had done this once before during a fundraising period of

15   time, and we got into a big screaming match, and I didn't feel

16   like doing that again.

17   Q.  Now, Line 14, the defendant says, "What do you got?"

18         What did you understand the defendant to mean there?

19   A.  He wanted -- he was starting the beginning of the

20   discussion of the issue I wanted to talk about, which was the

21   signing of the bill.

22   Q.  And you respond at Line 15, "So what do I tell him?"

23         And he says at Line 16, "This bill's, let's go, I

24   mean, just say."

25         What did you understand the defendant was doing

1    there?

2    A.  We were starting to have a hypothetical conversation that

3    I would be having with John Johnston, and he's starting off

4    saying -- you know, he's just trying to figure out what I

5    should say to John Johnston.

6    Q.  So did you then talk with the defendant about what this

7    possible conversation might look like?

8    A.  Yeah.

9    Q.  So at Line 21, when you said, "And say, look, he's -- he's

10   concerned about signing the bill," what were you doing there?

11   A.  I was going through this hypothetical conversation that I

12   would have with John Johnston, and I'm saying, "Look, he,"

13   Rod, "Rod's concerned about signing the bill."

14   Q.  And then you continue at Line 22, you say, "But you got --

15   he's going to sign the bill and all of a sudden you guys are

16   going to say" -- was that still part of the possible

17   conversation?

18   A.  Yes.

19   Q.  What were you saying there?

20   A.  That he, Rod's going to sign the bill, and all of a sudden

21   you guys are going to say, you know, wait a second, we don't

22   want to give this contribution right now.

23   Q.  Who are the you guys you were referring to?

24   A.  The Johnstons.

25   Q.  And on Line 3, the defendant says, "Correct, or, you know,

1   all of a sudden, you're going to give him a contribution, now

2   we're concerned."

3          What did you understand the defendant was doing?

4   A.  He was, again, going through a potential conversation I

5   was going to have with John Johnston, and he was saying, you

6   know, all of a sudden, you're going to give me a contribution

7   and we're going to be concerned, being me and Rod.

8   Q.  And you respond at Line 6, "He's going to sign the bill,

9   and all of a sudden, you're going to give a contribution.

10  Yeah, I don't want to say that."  You continue "Because then

11  he's going to say, you're right.  You know, we can't do it

12  right now."

13         What were you saying there?

14  A.  That I didn't want to go down that line of thought with

15  John Johnston.  I didn't want to tell him that because I

16  didn't want to plant a seed of doubt that he could be giving

17  Rod a contribution right now.

18  Q.  You didn't want --

19  A.  I didn't want to give John Johnston this thought process

20  that he couldn't give a contribution once the bill was signed.

21  Q.  Did you want Johnston to make a contribution at that

22  point?

23  A.  Yeah.

24  Q.  Line 13, the defendant says, "Right," and then at Line 15,

25  he continues, "You could say he could sign the bill right

1    after the first of the year."

2            What did you understand the defendant was doing
3    there?

4    A.  That he was -- that I could tell John Johnston that he,
5    Rod, would sign the bill after the first of the year.

6    Q.  And he continues by saying, "I think you just say that,
7    he's going to sign all his bills, in signing all, he's doing
8    all his bills, right?"

9            What did you understand the defendant was suggesting?

10   A.  That he would delay signing the racing bill and sign them
11   in conjunction with all these other bills that were ready to
12   be acted upon or signed.

13   Q.  And at what point would he sign all those bills?

14   A.  After the first of the year.

15   Q.  Now, prior to this conversation, had the defendant ever
16   suggested to you that he was going to wait to sign the racing
17   bill to do it with other bills?

18   A.  No.

19   Q.  When you were Chief of Staff of the defendant, had you had
20   discussions with him about the timing of when he would sign
21   bills?

22   A.  Yes.

23   Q.  Did you have experience with the factors the defendant
24   considered when he was going to sign a bill?

25   A.  Yeah.

1  Q.  Were there times that the defendant did wait to sign a

2  bill to do it with other bills?

3  A.  Yes.

4  Q.  What were those circumstances?

5  A.  If it was a bill that he wasn't that excited about or

6  didn't like but he knew he had to sign, he would sign it in

7  conjunction with other bills so that it wouldn't get as much

8  publicity as it otherwise would if he signed it by itself or

9  in connection with a press event.

10  Q.  From what the defendant said to you, did he ever express

11  any concern about bad publicity in connection with this 2008

12  racing bill?

13  A.  No.

14  Q.  Is there any significant difference between the 2008

15  racing bill and the 2006 racing bill that he had already

16  signed?

17  A.  No.

18  Q.  What did you understand the purpose of suggesting that you

19  tell John Johnston that the defendant was going to sign the

20  racing bill after the first of the year to be?

21  A.  It was going to be -- the purpose was to delay signing the

22  bill so that we could try and get the contribution before the

23  end of the year.

24  Q.  And from your conversations with Johnston, did he want to

25  wait until after the first of the year to get the racing bill

1  signed?

2  A.  No.  He wanted it signed as soon as possible.

3  Q.  Why?

4  A.  Because every day it wasn't being signed, his two

5  racetracks were losing $9,000 a day.

6  Q.  So at Line 20, you respond, "No."

7          What were you indicating there?

8  A.  No, don't -- don't delay signing this until the end of the

9  year.  Let's not go to him and say that.

10  Q.  You continue at Line 20, "Look, I want to go to him

11  without crossing the line and say give us the f'ing money,"

12  and continue, "give us the money and one has nothing to do

13  with the other, but give us the f'ing money."

14          What were you doing when you said, "I want to go to

15  him without crossing the line and say give us the f'ing

16  money"?

17  A.  I was trying to -- you know, I was trying to justify in my

18  mind or make myself feel better that we weren't exchanging the

19  campaign contribution for the timing of signing this bill, so

20  I was, you know, trying to convince myself that somehow I

21  wasn't crossing the line and having that discussion --

22  potential conversation with him.

23  Q.  Did you think at that point in time the defendant was

24  exchanging the signing of the bill quickly for a contribution?

25  A.  Yes.

1  Q.  And you continue and say, "When you said give us the money

2  and one has nothing to do with the other but give us the f'ing

3  money, you actually said that to Johnston," what message do

4  you think you were going to send to Johnston?

5  A.  That the two are connected, the signing of the bill and

6  the campaign contribution are connected.  I wouldn't have had

7  to say that otherwise.

8  Q.  Going back to the transcript at Line 28, you say, "Because

9  they're losing, they're losing 9,000 a day," you continue "for

10 every day it's not signed."

11            What were you saying there?

12 A.  I was trying to make the point to Rod that he needed to

13 sign the bill because they're losing $9,000 a day every day

14 it's not signed.

15 Q.  The defendant responds, "Okay, and so" and then there's

16 going on to the next page, you say at Line 1, "But I feel like

17 leaving right now and going over there and saying give me the

18 money."

19            What were you saying there?

20 A.  That I wanted to leave the campaign office at that point

21 and go over and meet with John Johnston at his office.

22 Q.  Then at Line 4, you say, "How many bills are in question

23 right now?  I mean how many, how many need to be signed

24 approximately, ten or a hundred?"

25            The defendant responds, "A hundred."

1      What were you saying there?

2   A.  I was asking him how many bills were ready to be signed so

3   that, you know, if the conversation started going in the

4   direction of, you know, immediate signing, he could sign the

5   racing bill along with these immediately.

6   Q.  At Line 8, the defendant says, "This is a, you know, a key

7   month, you know, to get.  It's been a year now, a year last

8   December."

9      What did you understand the defendant to be saying

10  when he said, "It's been a year, a year last December"?

11  A.  That it had been a year since he'd gotten a contribution

12  from the Johnstons, and he thought that was a long period of

13  time.

14  Q.  Then at Line 11, he says, "I need Greenlee right away."

15      What was the defendant doing at that point?

16  A.  He was on the phone talking to, I'm assuming his

17  secretary, saying I need -- "I need Greenlee."  He needed to

18  talk to Bob Greenlee.

19  Q.  Did he subsequently have a conversation on the telephone?

20  A.  Yes.

21  Q.  Line 14, the defendant says, "Hey, how many bills do we

22  have that I have to act on right now?  30 bills, and they're

23  all the same timing.  Yeah, so don't do any of 'em.  I want to

24  do 'em all together.  Okay, in toto.  Okay, all 30."

25      What did you understand the defendant was saying

1    there?

2    A.  That Greenlee had told him that there were 30 bills to

3    sign, but he didn't want -- he didn't want anybody to act on

4    them right now.  He wanted to do them all together.

5    Q.  And then at Line 21, you say, "Can you do 'em -- are they

6    ready to go now, today?"

7         Line 23, the defendant says, "Can I do them all

8    today?  Okay, I don't -- don't do anything yet."

9         What did you understand the defendant was saying

10   there?

11   A.  That they were all ready to go that day but was telling

12   Greenlee don't -- don't do them right now.

13   Q.  And then at Line 29, the defendant says, "I think you just

14   say, look, it's been a year.  Let's just get this done, just

15   get it done.  Christ."

16        What did you understand the defendant was doing

17   there?

18   A.  He was telling me that I should go to John Johnston and

19   say, you know, it's been a year since you made a contribution.

20   Just make -- make another contribution.

21   Q.  And at Line 35, the defendant says, "When are you going to

22   see him?"

23        You say, "I want to see him right now."

24        The defendant continues, "I could have Greenlee or

25   someone call and say I'm going to have a bill-signing event

1    and schedule something during January or late December or

2    southern Illinois."

3          What did you understand the defendant was saying

4    there?

5    A.  That he could call up Greenlee and kind of reassure John

6    Johnston it was going to get signed, but that it was going to

7    be delayed until December, late December, early January.

8    Q.  Now, there's a reference to a bill-signing event.

9          What's a bill-signing event?

10   A.  That's a -- typically a press conference where he would

11   hold a press conference while he signs the bill into law,

12   signs a bill into law.

13   Q.  Had you, when you were Chief of Staff, had you

14   participated in bill-signing events with the defendant?

15   A.  Yes.

16   Q.  What was the purpose of having a bill-signing event?

17   A.  It was to get good -- good publicity for the governor and

18   for the program or project or bill that he was signing, get it

19   publicity.

20   Q.  What would be the purpose of having a bill-signing event

21   with the racing bill?

22   A.  To get --

23   Q.  Actually strike that.

24          Earlier in the same conversation, the defendant

25   talked about holding the racing bill to do it with other

1  bills.  Do you recall that?

2  A.  Yes.

3  Q.  What was the point of doing that?

4  A.  To come up with an excuse to delay signing the racing

5  bill.

6  Q.  Would that draw attention to the -- if you did a

7  bill-signing event, could you draw attention to a bill?

8  A.  Yes.

9  Q.  If you held up the bill to sign with other bills, were you

10  trying to draw attention to a bill?

11  A.  No.

12  Q.  Are those inconsistent?

13  A.  Yes.

14  Q.  What would the effect of doing either a bill-signing event

15  or delaying signing a bill to do it with others?

16  A.  It would delay -- it would cause a delay in signing the

17  racing bill and the other 30 bills.

18  Q.  At Line 5, you say, "Don't 'cause then" -- and you

19  continue saying "I think you'll have the opportunity right

20  now."

21       And the defendant says, "Okay, so you go see him?"

22       What were you indicating to the defendant there?

23  A.  Don't -- don't talk about scheduling an event for late

24  December, early January.  I think you'll have an opportunity

25  right now because I wanted to go over there and see if I could

1    get the contribution.

2    Q.  Then on Line 9, the defendant says, "What are you going to

3    say to him?  Be careful."

4         What did you understand the defendant was saying

5    there?

6    A.  That he wanted to go through -- he wanted to hear what I

7    was going to say to him and he wanted me to be careful.  He

8    didn't want me to be too blatant in talking about signing of

9    the racing bill in exchange for a campaign contribution.

10   Q.  At Line 11, you say, "I'm going to say to him stop

11   screwing around, get me the money."

12        What were you doing or what were you indicating

13   there?

14   A.  That this is what I would potentially say to John

15   Johnston.

16   Q.  And you continue at Line 13, you say, "The concern is is

17   that, um, you know, holding back and want to group all these

18   bills together, but what's affecting him is that he feels

19   you're going to get skittish if he signs the bill, get me?"

20        What were you saying there?

21   A.  I was -- I was, again, going through my hypothetical

22   conversation with John Johnston, and I was -- and I was

23   telling him that if Rod signed the bill, we're concerned that

24   you'd get skittish about making a contribution right away.

25   Q.  Who would -- when you said affecting him, is that he feels

1   like, who are you referring to?

2   A.  He, Rod.

3   Q.  And when you said you're going to get skittish, what were

4   you referring to there?

5   A.  That Rod felt like John Johnston would get skittish if he

6   signed the bill, skittish about making a contribution.

7   Q.  And at Line 18, you say, "I'm going to use the word

8   skittish," and the defendant says, "Yeah."

9        What were you indicating there?

10  A.  I wanted his sign-off or approval on using that particular

11  language because he told me to be careful above that.

12  Q.  What did you understand the defendant to indicate to you?

13  A.  That that was -- that was proper, that that's what I

14  should have used.

15  Q.  Why were you checking with the defendant on the precise

16  language you were going to use?

17  A.  Because he wanted me to be careful.  He did not want me to

18  be blatant about exchanging a campaign contribution for the

19  signing of this bill.

20  Q.  What message did you understand the defendant wanted

21  delivered to John Johnston?

22  A.  That they were in exchange for one another.

23  Q.  At Line 22, the defendant says, "And he likes some

24  separation between that and signing the bill."

25       What did you understand the defendant to be saying

1  there?

2  A.  He's saying that I should tell John Johnston that he, Rod,

3  would like some separation between the campaign contribution

4  and the signing of the bill.

5  Q.  What did you understand was supposed to happen first?

6  A.  That the campaign contribution should be made first.

7  Q.  And at Line 24, you say, "Define separation."  And the

8  defendant says, "A week."

9       What did you understand the defendant to mean?

10  A.  That once he got the contribution, he was going to wait at

11  least a week to sign the bill.

12  Q.  How much money would it cost John Johnston if the

13  defendant waited another week to sign the bill?

14  A.  $63,000.

15  Q.  What message did you understand you would be sending if

16  you told Johnston that it would be at least a week between

17  when the bill was signed and the contribution -- excuse me --

18  between when the contribution was being made followed by the

19  bill being signed?

20  A.  That the sooner he got us the contribution, the sooner he

21  could sign the bill.

22  Q.  At Line 28, you say, "John, how are you?"

23       What were you doing at that point?

24  A.  I was on the phone with John Johnston.

25       MR. NIEWOEHNER:  Your Honor, at this time, I'd ask

1  permission to publish the call at Tab 61, which is Session

2  431.

3        THE COURT:  Yes.

4      (Tape played.)

5  BY MR. NIEWOEHNER:

6  Q.  If you look at the -- according to the transcript, what

7  time did this conversation take place?

8  A.  2:21 p.m. on December 3rd.

9  Q.  And had you had a prior plan to talk with Johnston prior

10 to this phone conversation?

11 A.  No.

12 Q.  Did you leave the campaign offices shortly after this

13 call?

14 A.  Yes.

15       MR. NIEWOEHNER:  Your Honor, can I publish the call

16 at Tab 62?

17       THE COURT:  Yes, you may.

18     (Tape played.)

19 BY MR. NIEWOEHNER:

20 Q.  And what time was that conversation, according to the

21 transcript?

22 A.  At 2:35 on December 3rd.

23 Q.  After that call, what did you do?

24 A.  I went to John Johnston's office.

25 Q.  At that point, what did you understand the defendant was

1    doing with respect to the racing bill?

2    A.  He was holding up signing it in exchange for the campaign

3    contribution.

4    Q.  What did you want Johnston to do at that point?

5    A.  Make a contribution.

6    Q.  And had your understanding of what the defendant wanted

7    occurred during that conversation back at the offices?

8    A.  Yes.

9    Q.  And, I'm sorry, what did you want Johnston to do?

10   A.  Make a campaign contribution.

11   Q.  Why did you want Johnston to make the campaign

12   contribution?

13   A.  So that we could get the bill signed.

14   Q.  Did you decide to help the defendant get his contribution

15   in exchange for no longer delaying signing the bill?

16   A.  Yes.

17   Q.  Did you go have a conversation with Johnston to try to

18   make that happen?

19   A.  Yes.

20   Q.  Where did you go?

21   A.  To his office at Maywood Racetrack.

22   Q.  Where is that located?

23   A.  In Melrose Park.

24   Q.  What did you do once you reached the racetrack?

25   A.  I met with him and his father, Bill Johnston.

1   Q.  What did you discuss while -- or who is Billy Johnston?

2   A.  He's John's father, owns the two racetracks we've talked

3   about.

4   Q.  What did you discuss while Billy Johnston was present?

5   A.  Very briefly, the signing of the bill and Billy trying to

6   convince me to try to get Rod to sign the bill.

7           And then mostly it was small talk, talking about the

8   Yankees and George Steinbrenner.

9   Q.  Did you raise any issues about fundraising in front of

10  Billy Johnston?

11  A.  No.

12  Q.  Did you want to talk to John Johnston that day about

13  fundraising in front of anyone else?

14  A.  No.

15  Q.  Did you talk alone with John Johnston at some point?

16  A.  Yes.

17  Q.  How did that come about?

18  A.  I think I told John and Bill that I needed to get going,

19  and on my way out, I asked John if he could talk to me.

20  Q.  Where did you talk with Johnston?

21  A.  In the hallway leading to the reception area and in the

22  reception area.

23  Q.  Was anyone else present for that conversation?

24  A.  No.

25  Q.  What did you do after that conversation?

1  A.  I got in my car to go home.

2  Q.  Did you talk with the defendant after you got in your car?

3  A.  Yes.

4  Q.  About how soon after you got in your car did you talk to

5  the defendant?

6  A.  Within minutes.

7  Q.  Why did you call the defendant so quickly?

8  A.  Because I knew he'd be interested in the result of my

9  meeting with John Johnston because I had just left the

10  campaign office.

11        MR. NIEWOEHNER:  Your Honor, can we publish the call

12  at Tab 63?

13        THE COURT:  Yes, you may.

14      (Tape played.)

15  BY MR. NIEWOEHNER:

16  Q.  Turning to Page 1, Mr. Monk, according to the transcript,

17  what is the date and time of this conversation?

18  A.  December 3rd at 4:11 p.m.

19  Q.  And at Line 9 on Page 1, you say, "So I'm just leaving

20  there, um, I talked to him about his commitment."

21        What were you describing there?

22  A.  That I was just leaving John Johnston's office and that I

23  had talked to him about his campaign contribution.

24  Q.  And at Line 11, you say, "Yeah, I said, two separate

25  conversations, what about your commitment?"

1          Did you say something along those lines to Johnston?

2    A.  Yes.

3    Q.  Why did you do that?

4    A.  Because I wasn't -- I was trying to be, you know, subtle

5    in my conversation with John Johnston.  I didn't want to be

6    blatant in the discussion about exchanging the campaign

7    contribution for the timing of the signing of the bill.

8    Q.  Did you understand there was, in fact, a connection

9    between the contribution and the timing of the signing of the

10   bill?

11   A.  Yes.

12   Q.  Who was making that connection?

13   A.  Me and Rod.

14   Q.  Did you think that telling John Johnston those were two

15   separate matters would actually make him believe they were two

16   separate matters?

17   A.  No.

18          MR. SOROSKY:  Objection, your Honor, to this witness

19   saying Governor Blagojevich was making the connection.  This

20   witness can say he understood.

21          THE COURT:  He was just asked what he thought.

22          MR. SOROSKY:  Pardon me?

23          THE COURT:  I think you've misconstrued the question.

24   He was just asking what he thought, and he's entitled to

25   answer that.

1          MR. SOROSKY:  Well, but the witness answered --

2          THE COURT:  I overrule the objection.

3          MR. NIEWOEHNER:  Should I repeat the last question?

4          THE COURT:  Yes.

5          THE WITNESS:  Yes, please.

6   BY MR. NIEWOEHNER:

7   Q.  Did you think that telling John Johnston these were two

8   separate matters would actually make him believe that they

9   were two separate matters?

10  A.  No.

11  Q.  What message do you think you were sending to Johnston?

12  A.  That they weren't separate matters, that they were tied

13  together.

14  Q.  Turn your attention to Line 17, there you say, "And I

15  said, look, there's a concern that there's going to be some

16  skittishness if your bill gets signed because of the

17  timeliness of the commitment."

18          Did you say something like that to Johnston?

19  A.  Yes.

20  Q.  Did you use the phrasing that you had discussed with the

21  defendant back at the campaign office?

22  A.  Yes.

23  Q.  Why did you use the phrasing that you discussed earlier

24  with the defendant?

25  A.  Because I knew that he wanted me to be careful and not too

1    blatant in having this conversation with John Johnston.  It

2    was fresh in my mind, and I wanted to use that language.

3    Q.  When you told Johnston that there was some skittishness if

4    your bill gets signed because of the timeliness of the

5    commitment, what did you mean?

6    A.  That we were concerned that if he -- if Rod signed the

7    bill, there would be skittishness on his part about making the

8    commitment before the end of the year.

9    Q.  Why did you tell that to Johnston?

10   A.  Sorry?

11   Q.  Why did you say that to Johnston?

12   A.  Because I wanted to find out if there was any skittishness

13   there.

14   Q.  How did Johnston respond when you said something like some

15   skittishness if your bill gets signed because of the

16   timeliness of the commitment?

17   A.  Something, ah, I knew it, I knew that was the reason.  No,

18   absolutely not.

19   Q.  Turn your attention to Line 21.  You said, "He said

20   absolutely not, and would you want me to put some into next

21   quarter."

22        Did Johnston in your conversation suggest that he

23   would put some contribution into the next quarter?

24   A.  That's what he was asking, whether he should do that or

25   not.

1    Q.  What did you understand Johnston to mean?

2    A.  That he would divide up the hundred thousand dollars and

3    give some of it now and some of it next quarter -- or some of

4    it before the end of the year and some of it next quarter.

5    Q.  And at Line 23, you say, "I said no, that's not my point.

6    My point is this all has -- this all has got to be in now."

7            Did you tell Johnston words to the effect "it's all

8    got to be in now"?

9    A.  Yes.

10   Q.  What did you mean when you said that to Johnston?

11   A.  That we needed to have it by the end of the year.

12   Q.  Going back up for a moment to Line 13, you say, "He goes,

13   Lon, I have to leave in two weeks.  I'm going to be gone for

14   two weeks."

15           Did Johnston suggest in your conversation that he'd

16   leave in two weeks?

17   A.  Yes, that he was going to go on vacation.

18   Q.  Did Johnston talk about making contributions before he

19   left?

20   A.  Yes.

21   Q.  At that point, did you think Johnston was going to make a

22   contribution?

23   A.  Yes.

24   Q.  If you'd turn to Page 2, and at Line 6, you say, "The

25   reason it took so long is that Billy came in and started

1    talking about George Steinbrenner and not about the bill so

2    much, but just about his illness and all that, and I didn't

3    want to have that conversation in front of Billy."

4            What were you telling the defendant when you said you

5    didn't want to have that conversation in front of Billy?

6    A.  That I didn't want to have the fundraising discussion and

7    signing-of-the-bill discussion in front of Billy Johnston.

8    Q.  When the defendant responded, "Ya, I know.  Good job,"

9    what did you understand the defendant meant?

10   A.  That that was right, I should not have had that

11   conversation in front of Billy Johnston.

12   Q.  The next day is December 4th, is that right?

13   A.  Yes.

14   Q.  What did you do that morning?

15   A.  I flew to the Dominican Republic.

16   Q.  Did you talk with the defendant that day?

17   A.  Yes.

18   Q.  Where were you physically when you had that conversation

19   with the defendant?

20   A.  In the Miami airport.

21           MR. NIEWOEHNER:  Your Honor, can we publish the

22   tab -- the call at Tab 64?

23           THE COURT:  Yeah.  You may.

24       (Tape played.)

25   BY MR. NIEWOEHNER:

1    Q.  Going back to Page 1, according to the transcript, what's
2    the date and time of this call?
3    A.  9:09 a.m. on December 4th, 2008.
4    Q.  Is that the call you made from the Miami airport?
5    A.  Yes.
6    Q.  If you go to Page 2, at Line 12, you say, "You ought to
7    give, not today but maybe tomorrow, just give John Johnston a
8    call and say, you know, call, call him just to say hello, you
9    know, I'm working on the timing of this thing, but it's going
10   to get done."
11            What were you saying there?
12   A.  That I wanted Rod to have a conversation with John
13   Johnston and, you know, reassure him that it's going to get
14   signed and he's working on the timing of it.
15   Q.  What effect did you think it was going to have if the
16   governor of Illinois called John Johnston?
17   A.  It was going to put more pressure on John to make a
18   contribution than it would coming from me.
19   Q.  At Line 26, the defendant says, "Call Johnny Johnston or
20   should I call -- have Harris call him?"
21            He continues Line 1 on the next page, "I mean, you
22   want me to call him directly, I will.  Whatever's the best
23   thing."
24            What did you understand the defendant to be saying
25   there?

1  A.  He's asking whether he should call John Johnston or have

2  John Harris call him.

3  Q.  And at Line 4, you respond, "I think it's better if you do

4  it."  Line 6.  "It -- it's better if you do it just from a

5  pressure point of view."

6          What were you saying there?

7  A.  That it was going to put more pressure on John Johnston if

8  Rod was having a conversation with him about the signing of

9  the timing of the bill than it would if John Harris was

10 calling him.

11 Q.  And at Line 8, the defendant says, "Yeah, good.  I'll call

12 him and say, yeah, we'll -- and we want to do an event down,

13 down, downstate."

14         He continues at Line 12, "I'll say we want to do it,

15 we hope, we hope to do this, get together and start picking

16 some dates to do a bill signing, right?"

17         What did you understand the defendant was saying

18 there?

19 A.  That he was going to have a conversation with John

20 Johnston about scheduling a bill-signing event downstate, you

21 know, that would be some time off in the future.

22 Q.  What did you understand the effect of the defendant

23 talking about doing a bill-signing event downstate to be?

24 A.  That he was going to be delivering a message to John that

25 he was delaying signing the bill.

1   Q. Was that consistent with the defendant's earlier comments,

2   that he was going to hold the bill to sign it with others?

3   A. The effect of it was the same. Both of them were delay

4   tactics.

5   Q. At Line 16, you said, "What are the chances based on my

6   conversation with you yesterday that this gets done next

7   week?"

8           What were you saying there?

9   A. I was trying to get off the bill-signing scenario and try

10   and get back into trying to get this thing signed next week

11   based on the conversation I had with him because I was still

12   convinced the Johnstons were going to make the contribution,

13   can we get this bill signed next week.

14   Q. Did you understand that Johnston wanted the bill signed as

15   soon as possible?

16   A. Yes.

17   Q. And at Line 20, the defendant says, "You know, they're

18   good."

19           And you respond at Line 23, "He's, and I'm telling

20   you, he's going to be good for it. I got in his face."

21           What did you understand the defendant was saying?

22   A. You mean on Line 20?

23   Q. Yes.

24   A. He's saying, you know, they're good, that he can sign next

25   week.

1  Q.  At Line 23, you respond, "He's, and I'm telling you, he's

2  going to be good for it.  I got in his face."  What were you

3  saying there?

4  A.  That he was going to make the contribution and that, you

5  know, he should think about signing it next week.

6        You know, based on the inflexion in Rod's voice, I

7  wasn't convinced that he was going to be signing it next week,

8  and I wanted to tell -- I was telling him that I really did

9  think --

10        MR. SOROSKY:  Object.

11  BY THE WITNESS:

12  A.  -- Johnston was going to sign the bill -- I mean that

13  Johnston was going to make the contribution.

14        MR. SOROSKY:  Objection to the inflexion in his voice

15  on the tape.

16        THE COURT:  Oh, that's overruled.

17  BY MR. NIEWOEHNER:

18  Q.  Mr. Monk, I think your answer may have been interrupted a

19  little bit.

20        There was sort of a pause.  You mentioned the

21  inflexion of the defendant's voice.  What did that -- what did

22  you understand the defendant was doing at that point?

23  A.  He -- just kind of trying to put me off.  I didn't believe

24  that they were good that they were going to get signed next

25  week, which is why I said, look, he's going to be good for the

 1  contribution.  Let's get the bill signed.

 2  Q.  What did you understand the defendant wanted to happen

 3  first before he signed the bill?

 4  A.  Get the contribution.

 5  Q.  After this call, where did you go?

 6  A.  To the Dominican Republic.

 7  Q.  How long did you stay in the Dominican Republic?

 8  A.  For about four days.

 9  Q.  And did you return to Chicago on December 8th?

10  A.  Yes.

11  Q.  On December 9th, did you learn the defendant had been

12  arrested?

13  A.  Yes.

14  Q.  Did you speak with the defendant in between this

15  conversation on December 4th and December 9th before he was

16  arrested?

17  A.  No.

18  Q.  Had the defendant signed the racing bill as of December

19  9th?

20  A.  I don't believe so, no.

21        MR. NIEWOEHNER:  One moment, your Honor?

22      (Counsel conferring.)

23        MR. NIEWOEHNER:  Nothing further, your Honor.

24        THE COURT:  Whose is it?  Do you want to start now,

25  or do you want to start tomorrow morning?

1           MR. SOROSKY:  Tomorrow morning.

2           THE COURT:  9:30 tomorrow morning.

3           COURT SECURITY OFFICER:  All rise.

4       (Jury exits courtroom.)

5           THE COURT:  Please be seated in the courtroom.

6           You can step down.

7           You want to come to the lectern.

8           Scheduling, that's all we're talking about.  Do you

9  have an idea of how long?

10          MR. SOROSKY:  Hour, not that -- not that long.

11          THE COURT:  Well, what's after that?

12          MR. SCHAR:  John Johnston, Judge, and then I believe

13  Dr. Feinstein who was affiliated with the Chicago Academy.

14  Then Mr. Tusk.  And I think after Mr. Tusk, if the

15  cross-examination is as I think it will be, then we may recall

16  Doug Scofield for a prior consistent, which actually reminds

17  me of an issue we need to raise with your Honor at some point.

18  And if that doesn't take us through tomorrow, then we'd have

19  Agent Cain probably.

20          THE COURT:  Okay.  That's fine.

21          What issue would you like to raise?

22          MR. SCHAR:  In relation to Mr. Tusk, Mr. Tusk is

23  going to discuss the Chicago Academy.  I don't know what the

24  cross-examination will be, but last time the cross-examination

25  was a combination of suggesting that Mr. Tusk was not being

1   forthright about his conversation with the defendant in which

2   the defendant had directed him to talk to Mr. Emanuel about a

3   fundraiser in exchange for the release of the grant.

4           As you may recall at this point, Mr. Wyma has

5   testified about a conversation he had afterwards with Mr. Tusk

6   in relation to that.  It came in for a very limited purpose at

7   the time Mr. Wyma testified about it; however, if they in any

8   way suggest that Mr. Tusk isn't credible on that conversation,

9   then Mr. Scofield at the time had a similar conversation with

10  Mr. Wyma -- I mean with Mr. Tusk, and Mr. Wyma obviously had

11  that conversation and they would be prior consistent

12  statements.

13          That's not how Mr. Wyma's statement is in evidence

14  right now.  It's in evidence for a more limited purpose, and

15  we'd be seeking an instruction to the jury that they

16  previously heard evidence on this from Mr. Wyma, and it is now

17  also -- they may permissibly use it for a different reason.

18          THE COURT:  I don't think you're actually asking for

19  a ruling.  This falls in the category of advance warning.

20          MR. SCHAR:  Yes.

21          THE COURT:  Okay.  We'll see what happens when that

22  happens.

23          MR. SOROSKY:  If he could just repeat again what is

24  the sense -- let me use the generic word -- the sensitive

25  conversation that the government is referring to?

```
1           THE COURT:  My suggestion is that I leave the
2  courtroom --
3           MR. SOROSKY:  And I'll talk.
4           THE COURT:  -- you talk to Mr. Schar, and he'll tell
5  you.
6           MR. SOROSKY:  Thank you.
7           MR. SCHAR:  Very good, Judge.
8           THE COURT:  Okay.
9           MR. NIEWOEHNER:  Your Honor, there are two issues
10 with respect to Mr. Monk's cross-examination.  We can do it
11 now or tomorrow morning, whichever your Honor prefers.
12          THE COURT:  Now is good.
13          MR. NIEWOEHNER:  Okay.  There are two issues that we
14 believe the defense should be precluded from asking about with
15 Mr. Monk.  One is it was done in the first trial with a couple
16 different witnesses, including Mr. Johnston and Mr. Monk, sort
17 of questions along the lines --
18          THE COURT:  Say that again.
19          MR. NIEWOEHNER:  There were questions to both
20 Mr. Monk and Mr. Johnston at the last trial along the lines of
21 Johnstons didn't earn the $9,000 a day, sort of this jury
22 nullification idea that somehow there's something wrong with
23 the $9,000 a day being -- that he was going to get under the
24 racing bill.
25          I think those are improper, and there shouldn't be
```

1    questions of either witness along those lines.

2        MR. SOROSKY:  If I may respond, the government has

3    made a significant issue of the fact that every day the bill

4    was not signed by the governor, the racetracks were losing

5    $9,000 a day.

6        With all due respect, that is inaccurate because

7    let's say the bill is signed January 1st for the sake of

8    conversation.  The racetracks would still get their $9,000 a

9    day.  It's just -- or whatever it is, it just wouldn't begin

10   until January 1st, as opposed to whatever date the governor

11   signed the bill earlier.

12       The three years runs regardless of when the bill was

13   signed.  It's not like it's three years from a certain due

14   date and every date it's not signed that $9,000 a day is lost.

15       Secondly, at this period of time in Illinois in

16   December, all the racetracks are closed, so the urgency for

17   the $9,000 a day is not that great.

18       Thirdly, there was a civil lawsuit filed by the

19   casinos, saying that the State of Illinois did not have a

20   right to take money from casinos and give it to racetracks by

21   way of legislation; so as a result of that civil suit in the

22   Circuit Court of Cook County, I believe, all the money was put

23   into a fund and would not go to the racetracks until the --

24   that case was stopped.

25       THE COURT:  Give me a chronology.

1    MR. NIEWOEHNER:  Your Honor, to be clear --

2    THE COURT:  Beginning with the time when the governor

3    could sign the bill.

4    MR. NIEWOEHNER:  The chronology is this:  The bill

5    goes to him on November 24th.  At that point, he can sign it.

6    He never signs it before December 9th, so it's not -- it never

7    becomes law.

8    The bill goes up to three years, and that's been made

9    clear by a couple different witnesses.  There's a couple

10   different events that could happen between when it's signed

11   and when -- that would cut it short for three years, so it

12   doesn't necessarily go three years.  So, in fact, every day

13   that it doesn't get signed could cost $9,000.

14   THE COURT:  Yeah, I got that part.  Just the other

15   events, the court thing.

16   MR. NIEWOEHNER:  The court thing, what Mr. Sorosky is

17   referring to, there's possibly two things.  One, after the

18   racing bill becomes law, there is a civil suit filed that ends

19   up sort of staying the collection of the money so it is

20   sitting in an escrow fund.  That clearly shouldn't come in.

21   That's a post-December-9th activity of which nobody knew that

22   that would or wouldn't happen.

23   There is an earlier -- in 2006, there had been a

24   similar lawsuit which did stay the distribution of the money.

25   However, our view is that that isn't relevant because we're

1    talking about the 2008 racing bill, and there's no civil suit
2    in the period before it's signed.  There can't be because it's
3    not law yet.
4          MR. SOROSKY:  With all due respect --
5          THE COURT:  Wait, I'm asking actually simple
6    questions.  I'm not into argument yet.  When's the lawsuit
7    filed?
8          MR. NIEWOEHNER:  On the 2006 bill or the 2008?
9          THE COURT:  No, the later one.
10         MR. NIEWOEHNER:  I don't know the date other than
11   it's filed after the bill gets signed.
12         THE COURT:  Okay.  Now, is it filed as customarily is
13   the case in these situations the day after or did somebody
14   wait?
15         MR. NIEWOEHNER:  That I don't know, your Honor.
16         THE COURT:  I'd like to know.  It would be helpful to
17   me, so if somebody can find out.
18         MR. SOROSKY:  It is my belief that although the 2006
19   racing bill had expired, the racetracks had never got their
20   money because the court had not ruled as to the
21   appropriateness of it.  And one doesn't have to be naive to
22   accept the fact that the decision is eventually going to be
23   made by the Illinois Supreme Court, and I -- Johnny Johnston
24   was certainly aware of this.
25               And I will agree with the government that in one

1　sense, all of this is irrelevant; but with all due respect,

2　they opened the door by saying, oh, my God, these poor

3　racetracks are losing $9,000 a day, and that's just not the

4　case in reality.

5　　　　　THE COURT:  Are you claiming they would have no loss?

6　　　　　MR. SOROSKY:  I'm saying they knew --

7　　　　　THE COURT:  No, no, I'm asking the question.  Are you

8　claiming they have no loss?  Yes or no?

9　　　　　MR. SOROSKY:  Right, they had -- they have no loss

10　because if the governor signs the bill --

11　　　　　THE COURT:  The governor signs the bill on

12　November 24th, and November 25th, worst case for the

13　racetracks is $9,000 a day goes into some escrow fund.

14　　　　　MR. SOROSKY:  Right, which eventually did occur.

15　　　　　THE COURT:  Okay.  Now, suppose the -- when did it

16　take effect, the bill?

17　　　　　MR. NIEWOEHNER:  December 15th is when it was signed.

18　　　　　THE COURT:  Okay.  So December 15 it's signed, and

19　then we have to find out when the lawsuit was filed.

20　　　　　MR. SOROSKY:  It was filed shortly thereafter.

21　　　　　THE COURT:  Okay.  So we have got 21 days of no 9,000

22　bucks.  So it's not in escrow, it's not earning interest in

23　escrow, it's just -- so your position is the worst case is

24　they lost the float on 21 days times 9,000.

25　　　　　MR. SOROSKY:  Our position is I don't think the

1    tracks have lost anything because it is my understanding, and
2    I don't claim to know it all, but it's my understanding that
3    whenever the bill is signed, they get the $9,000 a day from
4    the three years of the signing.  So, therefore, if the
5    governor --

6              THE COURT:  Okay, what I want --

7              MR. SOROSKY:  Let's say the governor doesn't sign the
8    bill, and it becomes law --

9              THE COURT:  Wait, wait, wait.  I want you to tell me
10   why you think that, and maybe you can put it in writing, like
11   a paragraph, because I want to know -- because there's the
12   time value of money at the very minimum, and I'd like to know
13   what that story is, so we can talk about that.

14             The other thing is I'd actually like to know what the
15   procedure is.  There is also the government's argument that
16   because of the nature of the bill, he runs a risk that maybe
17   the bill stops short at, say, two years and one month, in
18   which case the delay matters to him.

19             But let's calculate this through.  So we'll see where
20   we are with it.

21             MR. NIEWOEHNER:  Where we started was on the issue of
22   whether they can question him about what he earns or not.

23             THE COURT:  No, the earned issue is out of bounds.
24   The earned issue, if there's a piece of legislation that says
25   you're entitled to this, we don't make judgments about whether

1    they worked hard enough for it or not.  If you're legally

2    entitled to it and somebody interferes with that legal

3    entitlement, this is a wrong.

4          The fact that it may be less morally wrong because

5    they got it for some other reason doesn't count here.

6          MR. GOLDSTEIN:  Can we correct, your Honor, the term

7    losing money, which is nowhere close --

8          THE COURT:  This is what we were just discussing,

9    losing money.

10         MR. GOLDSTEIN:  I mean, I don't -- we don't

11   necessarily have to use the word earned, but losing money is

12   the same jury nullification argument that the government's

13   making, that somehow this is a loss.  They're not --

14         THE COURT:  No, no, no.

15         MR. GOLDSTEIN:  It's not a loss.

16         THE COURT:  You know, you must not have been

17   listening to the first part of the conversation here.  The

18   first part of the conversation was about loss, and that's what

19   I'm trying to look at.

20         The second part of this about earning is only on the

21   grounds that you make an argument to the jury that, well, it's

22   okay -- let me take it out of this context of this particular

23   case.

24         You can't -- let me give you something out of law

25   school.  You steal a car.  You're very happy with the car.

1    You park it on the street, and some thief steals it from you.
2    The thief who stole it from you, the thief can go to jail for
3    stealing it from you.  Did you deserve to have that car in the
4    first place?  No.
5            This is an old rule.  Thief can be the victim of
6    another theft, and you cannot think of any higher level of
7    immorality than the guy acquiring the thing that's stolen by
8    stealing it himself.
9            So the fact that somebody may not have the high moral
10   ground, if they're entitled to the property, they are entitled
11   to the protection of the law.  And so we're not going to be
12   dealing with concepts of earned income, whether this was a
13   good deal, whether this was a contrivance of the horsemen's
14   lobby which was more powerful than the casino lobby.  We're
15   not going to go into any of that.
16           All we're going to deal with is the question of is
17   there a quantifiable monetary loss, and if there's a
18   quantifiable monetary loss, they can make the argument that it
19   cost them money.  There are other forms of loss as well having
20   to do with expectancy, but we're not dealing with that yet.
21           MR. SOROSKY:  We -- frankly, we never intended to use
22   the word earned, so we have no problem with --
23           THE COURT:  Yes, but this includes all known synonyms
24   of the word earned.
25           MR. SOROSKY:  But perhaps we can sit down with the

1    government and work out some --

2              THE COURT:  Some, right, neutral word.

3              MR. SOROSKY:  Some neutral word.

4              THE COURT:  Right.

5              MR. SOROSKY:  Some colloquy.

6              THE COURT:  Yeah, that would be good.

7              MR. SOROSKY:  Thank you.  We'll try to do that.

8              MR. NIEWOEHNER:  We'll try that, your Honor.  And, of

9    course, the central point is is what's in the defendant's

10   head, and what he's told on the tape is that they're losing

11   $9,000 a day.

12             THE COURT:  Well, yeah, there's that --

13             MR. SOROSKY:  That's a different issue.

14             THE COURT:  That is.

15             MR. GOLDSTEIN:  Losing maybe means gaining, who

16   knows?

17             THE COURT:  Well, the point, to make another very old

18   analogy, if the governor thinks that this is his leverage,

19   it's very much like somebody pointing an unloaded gun at

20   somebody else and thinking it's loaded.  You think you've got

21   leverage, and you don't have leverage because the guy can see,

22   since you're carrying a revolver, the weapon's unloaded.  But

23   the guy carrying the gun is just as guilty as if the weapon

24   was loaded.

25             So we have that issue as well.  And for all I know,

1   the government may reach the conclusion that the loss here,

2   the quantifiable loss here is not that great, and maybe they

3   won't go into the dollars; but the difficulty is, is I don't

4   think you can defend on the grounds that they wouldn't have

5   lost much because you've got a client who says on tape I think

6   they're losing 9,000 a day.

7         Now, there's a way you can ameliorate that, but it

8   would have to come in in your case, not theirs.

9         MR. NIEWOEHNER:  Relatedly, your Honor, a different

10   topic is in opening, the defense made an issue of the fact

11   that the Illinois legislature had a bill before it in April or

12   May or something like that of 2008, which they didn't act on

13   for four months so there was the suggestion being sort of

14   somehow that that's relevant to what the defendant's doing.

15         And the fact that the Illinois legislature may or may

16   not have signed a bill is irrelevant to what the defendant is

17   trying to do.  There's a period of time where it's not in

18   front of the defendant, but that's not in dispute.  What

19   matters is once it is before the defendant.

20         So we'd ask to preclude any -- the fact that the bill

21   ran out in the spring of 2008 is -- is not controverted, we're

22   not disputing that, but what the legislature was doing is

23   irrelevant.

24         MR. SOROSKY:  If I may respond, the inarticulated

25   premise of the government is that the governor is supposed to

1  sign this bill, and he is doing something wrong for not

2  signing the bill.  Suppose the governor felt there was some

3  reason why it may not be the wisest law in the world, or

4  suppose the governor had some questions as to whether the

5  legislation should be enacted.  Like many pieces of

6  legislation, there's an up side and a down side.

7           THE COURT:  Yeah, absolutely, but it's not going to

8  come in in this part of the case.

9           MR. SOROSKY:  No, no --

10          THE COURT:  And you're going to have to raise it

11  affirmatively because the truth of the matter is is he cannot

12  defend -- assuming the worst, assuming he's holding Johnston

13  up for 9,000 bucks a day and he's holding him up for these

14  21 days, assuming that's what's happening here, you can't

15  defend on the ground that the legislature did the same thing

16  and held him up for 60 or 70 days.  That's what they're

17  arguing about, saying you can't do that, and you can't do

18  that.

19          What you can do is raise issues where there's some

20  evidence that the governor was reluctant to sign the bill

21  because he thought it was too much money to the horsemen and

22  too much money away from the casino and didn't like the bill

23  in the first place.

24          Now, there's a fair amount of evidence in this case

25  that the governor is not reluctant to sign that bill, but that

1    evidence is subject to contradiction.  I mean somebody can

2    testify that this was not the case; but until that happens,

3    the time the General Assembly took to do whatever they were

4    going to do or even how they did it or why they did it is out

5    of bounds.  We are talking about the period of time when it is

6    in the governor's hands and the governor's hands only.  That's

7    all for the government's case.

8            Can you expand the ambit of that?  Yeah, probably you

9    can, but not in this case and not with this witness and not

10   with Johnston.

11           Anything else?

12           MR. GOLDSTEIN:  Just so I'm clear, your Honor.  I

13   understand -- I understand your ruling, but you mentioned that

14   there's another potential way at least in our case.

15           Very simply, the last trial the entire bill was

16   admitted into evidence, including when it was signed, and we

17   understand now that the ruling is that at least in the

18   government's case-in-chief, the issue of when it was signed or

19   that it was signed on December 15th is -- is, you know, out of

20   bounds, cannot be gone into.  We understand that.

21           The government before opening gave us an exhibit

22   binder, and that exhibit binder redacted when it was signed,

23   and we understand that; but they gave us an exhibit that

24   included the history of the bill that we anticipated coming

25   into evidence because certainly there's completeness issues.

1       We made an opening statement.  They heard the opening

2   statement, and then they provided us and provided a motion to

3   your Honor that now everything should be redacted just on the

4   period in which it was brought to the governor and it was

5   before the governor.

6       So all I'm asking your Honor is if we can't do it,

7   you know, bring it up in cross, I understand that; but if we

8   can submit the bill as the government originally put it in or

9   gave it to us before the second trial in our case-in-chief,

10  that's all I would like to know from your Honor.

11      THE COURT:  I want to wait and see what your proposed

12  case-in-chief looks like, and the answer is maybe you can, but

13  I want to see it attached to something.  We have had in this

14  case occasions where something is floating around, not

15  actually attached to the charges, the accusations or the

16  defense.  It's just something that is put out there for the

17  same reasons that lawyers, even myself would occasionally do

18  when I stood where you stood, which is to just put something

19  out so maybe some juror will think it's important.  But you're

20  not supposed to do it, and you're not going to do it here.

21      But all of this can be opened up.  You just have to

22  talk to me about the case-in-chief, whatever that

23  case-in-chief might be.  And you're really sort of going to

24  have to tell me.  And if you want to tell me outside the

25  presence of the government, I'll give you the opportunity to

1    do that in case you want somehow to preserve surprise.  I'll

2    make some efforts to permit you to do that, but it's got to be

3    attached to an actual case-in-chief, and I want to see what

4    the case-in-chief looks like before I make any rulings.

5            Anything else?

6            MR. NIEWOEHNER:  Not from the government, your Honor.

7            THE COURT:  See you tomorrow.

8        (Court adjourned, to reconvene at 10:00 a.m. on 5/18/11.)

9                        CERTIFICATE

10      I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12   */s/Kathleen M. Fennell*

13   _____
     Kathleen M. Fennell
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25