2808

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )   No. 08 CR 888
4            Government,              )
                                     )
5   vs.                              )   Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )   May 18, 2011
                                     )
7            Defendant.              )   9:49 o'clock a.m.

8
                              VOLUME 17
9                     TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JAMES B. ZAGEL
10                          AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15               Assistant United States Attorneys
                 219 South Dearborn Street;
16               Suite 500
                 Chicago, Illinois 60604
17

18  Court Reporter:

19              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
20                    Room 2504
                 Chicago, Illinois 60604
21                  (312) 435-5895

22

23

24

25

2809

1    APPEARANCES   (continued:)

2

3    For Defendant Rod Blagojevich:

4

5         KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
6         158 West Erie
          Chicago, Illinois 60610
7         (312) 640-1776

8         LAW OFFICE OF Elliott Riebman
          BY:  Elliott Riebman
9         158 East Erie
          Chicago, Illinois 60610
10        (847) 814-2900

11

12        OFFICES OF AARON B. GOLDSTEIN
          BY:  Aaron Benjamin Goldstein
13        6133 South Ellis
          Chicago, Illinois 60637
14        (773) 752-6950

15        OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
16        2140 N. Lincoln Park West
          Suite 307
17        Chicago, Illinois 60614
          (773) 517-0622
18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    WITNESS                                          PAGE

3     ALONZO MONK

4     Cross Examination By Mr. Sorosky................. 2811

5     Redirect Examination By Mr. Niewoehner.......... 2937

6     Recross Examination By Mr. Sorosky.............. 2951

7     Voir Dire Examination By Mr. Sorosky............ 2957

8     Voir Dire Examination By Mr. Niewoehner......... 2965

9     JOHN JOHNSTON

10    Direct Examination By Mr. Niewoehner............ 2980

11    Voir Dire Examination By Mr. Goldstein.......... 2994

12    Voir Dire Examination By Mr. Niewoehner......... 3009

13    Voir Dire Examination  By Mr. Goldstein......... 3009

14    Voir Dire Examination By Mr. Niewoehner......... 3010

15    Cross Examination By Mr. Goldstein.............. 3027

16

17

18    EXHIBITS

19     Government's Exhibit Racetrack 3 ................ 2983

20

21

22

23

24

25

1       THE MARSHAL:  All rise.

2     (The following proceedings were had in the

3      presence of the jury in open court:)

4       THE COURT:  Please be seated.

5       Does the government have any further

6  questions of the witness?

7       MR. NIEWOEHNER:  No, Your Honor.

8   ALONZO MONK, GOVERNMENT WITNESS, PREVIOUSLY SWORN

9                  CROSS EXAMINATION

10  BY MR. SOROSKY:

11  Q   Hello, Lon.  How are you?

12  A   Good morning.

13  Q   I believe you said you were the campaign manager

14  for the governor's first campaign in 2002, is that

15  correct?

16  A   Yes.

17  Q   And you had never managed a political campaign

18  before, had you?

19  A   No.

20  Q   And, of course, this was the campaign for the

21  governor of Illinois, was it not?

22  A   Yes.

23  Q   Were you even a resident of the State of Illinois

24  when you received this position as campaign manager?

25       MR. NIEWOEHNER:  Objection.

1          THE COURT:  Overruled.

2    BY THE WITNESS:

3    A  No, I don't think I was.

4    BY MR. SOROSKY:

5    Q  And you, of course, you realized that the first

6    campaign might involve a democratic primary against

7    primary opponents, right?

8    A  Yes.

9    Q  Now, did you know or have any relationship with

10   Mayor Daley?

11         MR. NIEWOEHNER:  Objection, Your Honor.

12   BY THE WITNESS:

13   A  No.

14         THE COURT:  The point he's about to make is

15   is this is not someone experienced in Illinois

16   politics, that's fine.  Just don't overdo it.

17         MR. SOROSKY:  Okay.  I won't overdo it.

18   BY MR. SOROSKY:

19   Q  Did you have any relationship with Mayor Daley?

20   A  No.

21   Q  Did you know Mayor Daley?

22   A  No.

23   Q  Did you have any relationship with Speaker of the

24   House and Chairman of the Democratic party, Michael

25   Madigan?

1  A   No.

2  Q   Did you even know the man?

3  A   No.

4  Q   Did you know any presidents or leaders of unions

:51AM  5  in the State of Illinois who might potentially be

6  supporters of Congressman Blagojevich when he was

7  running for governor?

8  A   You mean when I was hired as campaign manager?

9  Q   Right.

:51AM  10  A   No.

11  Q   So you didn't know very much about anything

12  concerning a campaign in Illinois when you were made

13  governor of Blagojevich's campaign chairman, isn't

14  that true?

:52AM  15  A   Yeah.

16  Q   Basically, he just hired you because he trusted

17  you and you were his friend, right?

18        MR. NIEWOEHNER:  Objection.

19        THE COURT:  Sustained.

:52AM  20  BY MR. SOROSKY:

21  Q   And what was your salary as campaign manager?

22        MR. NIEWOEHNER:  Objection.

23        THE COURT:  Overruled.

24  BY THE WITNESS:

:52AM  25  A   You know, I can't remember specifically when I

1  was hired.  I think it may have developed in like

2  $5,000 a month, I'm not sure at the beginning.

3  Q   And for that you were paid by check, were you

4  not?

5         MR. NIEWOEHNER:  Objection, Your Honor.

6         THE COURT:  Sustained.

7  BY MR. SOROSKY:

8  Q   Now, so then after Congressman Blagojevich or

9  then Congressman Blagojevich won the Democratic

10 primary and won the general election, he became

11 governor, right?

12 A   Correct.

13 Q   And he made you his Chief of Staff, did he not?

14 A   Yes.

15 Q   Have you ever been the Chief of Staff for any

16 public officeholder before you were governor

17 Blagojevich's Chief of Staff?

18 A   No.

19 Q   And once again, he made you his Chief of Staff

20 because he trusted you, did he not?

21        MR. NIEWOEHNER:  Objection.

22        THE COURT:  You're going to ask this every

23 time or is this like the once?

24        MR. SOROSKY:  Just that one last question.

25        THE COURT:  Okay.

1        You can answer.

2   BY THE WITNESS:

3   A   Yeah, he trusted me.

4   BY MR. SOROSKY:

:53AM   5   Q   And you and Rod met in law school in Southern

6   California, is that correct?

7   A   Yes.

8   Q   And you and Rod went to Pepperdine Law School in

9   Southern California, correct?

:54AM  10   A   Yes.

11   Q   And that's in Malibu, California?

12   A   Yes.

13   Q   And what town did you -- and you grew up in

14   Southern California, did you not?

:54AM  15        MR. NIEWOEHNER:  Objection.

16        THE COURT:  He can answer that one.

17   BY THE WITNESS:

18   A   Yes.

19   BY MR. SOROSKY:

:54AM  20   Q   What town did you grow up?

21   A   Palos Verdes.

22   Q   What town?

23   A   Palos Verdes.

24   Q   So would I be correct in saying you were the rich

:54AM  25   kid from Southern California and he was the poor kid

Monk - cross by Sorosky                    2816

1  from the northwest side of the City of Chicago?
2          MR. NIEWOEHNER:  Objection.
3          THE COURT:  Sustained.
4  BY MR. SOROSKY:
5  Q   Your father was a prominent doctor, wasn't he?
6          MR. NIEWOEHNER:  Objection.
7          THE COURT:  Sustained.
8  BY MR. GOLDSTEIN:
9  Q   Your mother wasn't a CTA ticket agent, was she?
10         MR. NIEWOEHNER:  Objection.
11         THE COURT:  Sustained.
12 BY MR. SOROSKY:
13 Q   You and Rod became good friends, is that correct?
14 A   Yes.
15 Q   And after law school, for the next 20 years, you
16 and he lived basically in separate cities, right?
17 A   (No response.)
18 Q   Until about --
19 A   Not quite 20.  Almost 20 years.
20 Q   Almost 20 years.
21 A   Right.
22 Q   You two lived in separate cities, right?
23 A   Yes.
24 Q   He became a lawyer and worked in Chicago and you
25 were a -- you worked for a company that basically

:54AM

:55AM

:55AM

:55AM

:55AM

1    represented athletes and sports -- people in sports
2    and entertainment, right?
3    A   Yes.
4    Q   And you primarily represented athletes to get
5    them higher fees or more money for endorsements and
6    better contracts, that type of thing, right?
7    A   Yes.
8    Q   So if you represented someone who played tennis,
9    you would try to get him an endorsement with a
10   tennis shoe company and get him as much money as you
11   could for that, right?
12   A   Yes.
13   Q   And to best of your knowledge, Rod was never
14   involved in those types of activities, was he?
15   A   No.
16   Q   And, by coincidence, both you and Rod happened to
17   be in Washington, D.C. in about the year 2000, 2001,
18   is that correct?  Or, rather, you both lived in
19   Washington, D.C. around that time, right?
20   A   Yeah.
21   Q   And now the poor kid from the northwest side is a
22   congressman and you're still trying to hustle
23   contracts for athletes, right?
24       MR. NIEWOEHNER:  Objection.
25       THE COURT:  To the form of the question,

 1  sustained.

 2  BY MR. SOROSKY:

 3  Q   Well, Rod at this time was a United States

 4  Congressman, wasn't he?

 5  A   What period of time?  I'm sorry.

 6  Q   2000, 2001.

 7  A   Yes.

 8  Q   But during those entire 20 years you and Rod were

 9  apart, Rod and you remained close friends, did you

10  not?

11  A   Yes.

12  Q   And, in fact, when Rod got married, you were the

13  best man at his wedding, were you not?

14  A   No.

15  Q   You stood up at his wedding, right?

16  A   I was an usher or attendant in the wedding.

17  Q   Now, the best man was his brother, is that

18  correct?

19  A   I think that's right, yeah.

20  Q   Now, this wedding was--what?--1991?

21  A   Yeah.  I don't remember the specific year, but

22  around then, yeah.

23  Q   So the wedding would be midway or pretty much

24  close to midway or in the middle between the time

25  you guys parted after graduation, after graduation

:57AM

:58AM

:58AM

:58AM

:58AM

1  from law school, and the time you two hooked up

2  again in Washington in about 2000, 2001, right?

3  A   Yes.

4  Q   And, going back to the campaign, Rod won a close,

5  highly contested democratic primary, didn't he?

6  A   Yes.

7  Q   And he won the general election, did he not?

8  A   Yes.

9  Q   What did you do to assist in winning those two

10 elections?

11 A   Help manage the staff, interview consultants, met

12 with elected officials, watched the budget.

13 Q   So, really, the most important thing Rod wanted

14 you to do is watch the budget, isn't that so?

15         MR. NIEWOEHNER:  Objection.

16         THE COURT:  Sustained to the form.

17 BY MR. SOROSKY:

18 Q   Wasn't that the primary reason or one of the main

19 reasons you were hired as campaign manager, didn't

20 Rod say to you, you're my friend, I need you, Lon,

21 to watch the budget?

22         MR. NIEWOEHNER:  Objection.

23         THE COURT:  Did he say those words to you?

24         THE WITNESS:  Not specifically, but that's

25 pretty close.

1  BY MR. SOROSKY:

2  Q   Pretty close?

3  A   If yeah.

4  Q   Rod didn't need you to get an endorsement from

5  Mayor Daley, did he?

6  A   No.

7  Q   Rod didn't need you to get an endorsement from

8  the various groups around Illinois that might

9  endorse someone, did he?

10  A   No.  Not initially, no.

11  Q   Now, let's change topics a little bit and let's

12  get into this trust and how you watched the budget;

13  okay?

14        Now, during this campaign, you met a man by

15  the name of Antoin Rezko, did you not?

16  A   Yes.

17  Q   And his nickname was Tony Rezko, is that correct?

18  A   Yes.

19  Q   That's R-e-z-k-o?

20  A   Yes.

21  Q   He was a well to do businessman, was he not?

22  A   Yes.

23  Q   He was a supporter of Governor Blagojevich, was

24  he not?

25  A   Yes.

1  Q   And he was a fundraiser for Governor Blagojevich,
2  was he not?
3  A   Yes.
4  Q   And to the best of your knowledge, Governor
:02AM  5  Blagojevich had met Rezko in Chicago prior to you
6  becoming campaign manager, right?
7  A   Yes.
8  Q   And you say Rezko was a real estate developer,
9  isn't that correct?
:02AM  10  A   Yeah.
11  Q   And he also owned some food chain franchises?
12  A   Yes.
13  Q   And you became Chief of Staff in about January
14  of 2003 when Rod became governor, right?
:02AM  15  A   Yes.
16  Q   And by the middle of 2004, a year and a half
17  later, there were controversies swirling around
18  about Mr. Rezko, were there not?
19  A   Yes.
:03AM  20  Q   And there were articles in the newspaper not very
21  favorable toward Mr. Rezko, were there not?
22  A   Yes.
23  Q   And this would certainly be a time when Rod would
24  want your advise and counsel as to how he should
:03AM  25  handle the Rezko matter?  Wouldn't that be such a

1 time?

2          MR. NIEWOEHNER:  Objection.

3          THE COURT:  Sustained.

4 BY MR. SOROSKY:

:03AM 5 Q   Now, you would admit that it is, say, a

6 coincidence that at the time there is this

7 controversy about Mr. Rezko, you start receiving

8 this cash from Mr. Rezko?  Would you say it's a

9 peculiar coincidence?

:04AM 10          MR. NIEWOEHNER:  Objection.

11          THE COURT:  Just ask the question.  Keep the

12 argument out of it until the appropriate time at the

13 end.

14          MR. SOROSKY:  I apologize.

:04AM 15 BY MR. SOROSKY:

16 Q   So you begin to receive this cash from Mr. Rezko

17 at the same time these controversies commenced and

18 began about Mr. Rezko, right?

19 A   I received initial cash in like May of 2004.

:04AM 20 Q   And that was just about the same time all these

21 controversies began, right?

22 A   They started a little bit after that, yeah.

23 Q   You never told Rod, "you know, Rod, I know Tony

24 is a good guy and he's your friend and all that, but

:05AM 25 maybe we better part company with him or maybe we

1 better watch it or stop dealing with him, he's not

2 the best guy in the world for you to be dealing

3 with," you never told him that, did you?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  The objection is sustained.

6          MR. SOROSKY:  I apologize.

7 BY MR. SOROSKY:

8 Q   Did you ever tell him words to that effect or

9 something like that, if not those exact words?

10          MR. NIEWOEHNER:  Objection, Your Honor.

11          THE COURT:  Overruled.  He can answer.

12 BY THE WITNESS:

13 A   No.

14 BY MR. SOROSKY:

15 Q   And although you may not have been schooled in

16 politics, you did graduate from law school, did you

17 not?

18 A   Yes.

19 Q   You're an intelligent person, are you not?

20 A   Sometimes.

21 Q   Rod is your friend, is he not?

22 A   Yes.

23 Q   At least he was your friend in 2004, was he not?

24 A   Yes.  Yes.  Yes.

25 Q   You know he was governor of the state, right?

:05AM (line 5)
:05AM (line 10)
:05AM (line 15)
:06AM (line 20)
:06AM (line 25)

1  A   Yup.

2  Q   You know it's not good for the governor to be

3  associated with someone who is accused of financial

4  improprieties?

5          MR. NIEWOEHNER:  Objection, Your Honor.

6          THE COURT:  The objection is sustained.

7  BY MR. SOROSKY:

8  Q   Now, all this cash that Tony Rezko gave you, did

9  you ever declare that on your income tax?

10  A   No.

11  Q   And you're saying you don't even know if he gave

12  you $70,000 or $90,000?

13          MR. NIEWOEHNER:  Objection.

14          THE COURT:  The objection is sustained.

15  BY MR. SOROSKY:

16  Q   Now, if you were to earn $90,000 in real money at

17  a job, you'd maybe have to earn 120 or 25,000

18  dollars a year because you got to pay some taxes,

19  right?

20          MR. NIEWOEHNER:  Objection.

21          THE COURT:  Sustained.

22  BY MR. SOROSKY:

23  Q   The point I want to make is, if this was

24  legitimate money you were receiving, it actually

25  would be more than $90,000 because, you know, maybe

:06AM

:07AM

:07AM

:07AM

:07AM

1  30 percent would go to taxes, right?

2        MR. NIEWOEHNER:  Objection.

3        THE COURT:  I think the jury probably

4  understands now that he didn't report it to the IRS.

5  BY MR. SOROSKY:

6  Q   And you said you spent this money on groceries?

7  A   Some of it, yeah.

8  Q   Were you not eating before you got this money?

9        MR. NIEWOEHNER:  (Counsel standing.)

10       THE COURT:  Sustained.

11 BY MR. SOROSKY:

12 Q   And you never said to your good friend Rod, "hey,

13 Rod, I just made, I made a bit of a score, could I

14 give you a few thousand"?  You never said that to

15 him, did you?

16       MR. NIEWOEHNER:  Objection.

17       THE COURT:  Sustained.

18 BY MR. SOROSKY:

19 Q   And you never told Rod about this, right?

20 A   No.

21 Q   And you said Rod would not approve of this,

22 right?

23 A   He wouldn't approve of the method in which I was

24 getting the money.

25 Q   Now, you alluded yesterday a little bit to the

:08AM

:08AM

:08AM

:09AM

:09AM

1  fact that you and Rod and Rezko and Mr. Kelly were

2  in this big conspiracy to get money illegally

3  through state action, right?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  To the form, sustained.

6  BY MR. SOROSKY:

7  Q   Well, you not alluded, I apologize, you actually

8  said under oath that you and Rod and Tony Rezko and

9  Chris Kelly had talked about attempting to make

10 money illegally through improperly using state

11 action to give contracts to friends and this type of

12 thing, right?

13         MR. NIEWOEHNER:  Objection.

14         THE COURT:  To the form, and it's a

15 misstatement, the objection is sustained.

16 BY MR. SOROSKY:

17 Q   Well, you certainly mentioned that there was a

18 conversation where Mr. Rezko said I have all these

19 ideas where we could make money illegally, do you

20 remember saying that?

21         MR. NIEWOEHNER:  Objection.

22         THE COURT:  Sustained.

23 BY MR. SOROSKY:

24 Q   Okay.  I'm not a good enough lawyer to do it, you

25 tell the ladies and gentlemen of the jury what did

1  Rezko tell you that day?

2          MR. NIEWOEHNER:  Foundation, Your Honor.

3          THE COURT:  Yeah, put the foundation in.

4  BY MR. GOLDSTEIN:

5  Q   All I want you to do is answer the same question

6  that Mr. Niewoehner asked you about what

7  Mr. Rezko --

8          THE COURT:  Mr. Sorosky, there's nothing

9  wrong with your asking this question, but the reason

10 you got to lay a foundation for this is that

11 everybody knows you're talking about the same

12 conversation at the same time and the same place,

13 and then you can ask it, that's fine.

14 BY MR. SOROSKY:

15 Q   I believe you said that there was a meeting at

16 Mr. Rezko's office in 2003 and a meeting in early

17 2004 at a hotel in California where you were

18 present, Governor Blagojevich was present, Mr. Kelly

19 was present, and Mr. Rezko was present, and certain

20 things were talked about, right?

21 A   Right.

22 Q   And Mr. Niewoehner asked you that very question,

23 right?

24 A   Right.

25 Q   So just there's no tricks, at those

1  conversations, Mr. Rezko, according to you,

2  mentioned ways in which the four of you could make

3  money illegally, did he not?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  Why don't you go back to the good

6  question you had asked before.

7          MR. SOROSKY:  Okay.

8  BY MR. SOROSKY:

9  Q   What did Mr. Rezko say.  I don't want to put

10 words in anyone's mouth.

11 A   He had listed a number of ideas up on an easel or

12 Chalkboard, different ideas, on the way the four of

13 us can make money and some of it involved state

14 action.

15 Q   And just to make -- just so we're clear, I think

16 you said he listed approximately 8 different ideas,

17 right?

18 A   Approximately, yes.

19 Q   And you don't remember 7 of them, you only

20 remember possibly buying an insurance company,

21 right?

22 A   Right.

23 Q   And that insurance company, to the best of your

24 knowledge, was never bought, right?

25 A   Correct.

1  Q   So if you're involved in this illicit plan, why
2  didn't you tell Rod, "hey, Tony, has just given me
3  10,000 regularly, are you getting your end"?
4          MR. NIEWOEHNER:  Objection.
5          THE COURT:  The objection is sustained.
6  BY MR. SOROSKY:
7  Q   Did you ever tell Mr. Rezko, "well, should I give
8  any of this to the governor"?
9          MR. NIEWOEHNER:  Objection.
10          THE COURT:  It's sustained.
11  BY MR. SOROSKY:
12  Q   Now, you received this cash over an almost
13  one-year period, right?
14  A   Approximately a year, yeah.
15  Q   And during that year, you practically saw Rod
16  every day, right?
17  A   I don't know if we saw each other every day, we
18  certainly communicated every day.
19  Q   And Rod certainly confided in you all the woes
20  and problems that he had as governor, did he not?
21          MR. NIEWOEHNER:  Objection.
22          THE COURT:  Objection to the form of the
23  question is sustained.
24  BY MR. SOROSKY:
25  Q   Did Rod confide in you all the problems and woes

1  he had as governor?

2      MR. SCHAR:  Objection.

3      THE COURT:  The objection is sustained.

4      You could make it perhaps a little more

5  neutral for him.

6  BY MR. SOROSKY:

7  Q  Did Rod confide in you, I'm not talking about the

8  governmental problems, but the problems:  "Oh, my

9  God, how do I deal with Madigan, how do I deal with

10  the bad articles in the paper, had do I deal with

11  Daley, how do I deal with the Rezko issues?  He

12  asked you, you talked about those types of things,

13  did you not?

14      MR. NIEWOEHNER:  Compound.

15      THE COURT:  It's sustained.

16  BY MR. SOROSKY:

17  Q  Well, did he ever say to you, "oh, my God, how do

18  I deal with Madigan"?

19  A  From time to time we talked about his

20  relationship with the Speaker.  I'm not sure I was

21  his number one go-to guy to talk about that, though.

22  Q  Did he talk to you about, "oh, my God, we've been

23  criticized in the press today about a certain topic,

24  how do we handle that"?  Did he ever talk to you

25  about those types of things?

1  A  He would talk to me about those things, he

2  wouldn't necessarily ask me how to handle it every

3  time.

4  Q  But he talked to you about it, right?

:16AM  5  A  Yes.

6  Q  And some of the times when you talked to him, you

7  would certainly give your opinion and your advise,

8  would you not?

9  A  Yes.

:16AM  10  Q  You are a law school graduate, are you not?

11       MR. NIEWOEHNER:  Objection, Your Honor.

12       THE COURT:  This is really repetitive.

13  BY MR. SOROSKY:

14  Q  Well, at this time, during the year that you were

:16AM  15  taking this cash, there were certainly derogatory

16  articles in the press about Mr. Rezko, weren't

17  there?

18  A  There were some, yeah.

19  Q  And would you say your advise or attitude toward

:16AM  20  Mr. Rezko was somewhat tainted or biased by this

21  cash you were receiving?

22       MR. NIEWOEHNER:  Objection, Your Honor.

23       THE COURT:  Maybe you could make the question

24  a little simpler.

:17AM  25

 1  BY MR. SOROSKY:

 2  Q   Okay.  Can't get simpler than this:  Did the cash

 3  Rezko gave you affect your attitude toward Rezko?

 4  A   No.

 5  Q   You realize you're under oath?

 6       MR. NIEWOEHNER:  Objection, Your Honor.

 7       THE COURT:  That is a violation of the rules,

 8  and particularly in this particular context.  Don't

 9  do it again, Mr. Sorosky.

10       MR. SOROSKY:  Okay.

11  BY MR. SOROSKY:

12  Q   Now, in 2005, the summer of 2005, you submitted

13  to an interview by the FBI, did you not?

14  A   Yes.

15  Q   And at that time you were Chief of Staff, right?

16  A   Yes.

17  Q   At that time, to the best of your knowledge, you

18  were not under investigation, were you?

19  A   To the best of my knowledge, no.

20  Q   That interview was maybe 3 hours or so?

21  A   Yes.  It seemed like a long time, but that's

22  probably right.

23  Q   You were there with your attorney, is that

24  correct?

25  A   Yes.

1  Q   And the FBI asked you a whole series of questions

2  about a variety of topics concerning your employment

3  as Chief of Staff to the governor, right?

4  A   Yes.

5  Q   Now, you never told the FBI -- oh, excuse me.

6  They certainly asked you about Mr. Rezko, did they

7  not?

8  A   I believe they did.  I mean, I don't remember

9  specifically, but I'm sure they did.

10 Q   But he certainly was a topic of inquiry, was he

11 not?

12 A   To the best of my recollection, yeah.

13 Q   And certainly was --

14         And Mr. Kelly was also a topic of inquiry,

15 was he not?

16 A   I'm pretty much he was, yeah.

17 Q   And one of the topics of inquiry was Mr. Kelly

18 and Mr. Rezko's relationship to the operation of the

19 governor, right?

20 A   Yes.

21 Q   Well, and you answered the questions, did you

22 not?

23 A   Yes.

24 Q   They also asked you your relationship with

25 Mr. Rezko and Kelly concerning the operation of

1  government, did they not?

2  A   Yes.

3  Q   Did you ever tell them that, well, things between

4  Rezko and I were running very smoothly because he

:20AM  5  was giving me $90,000 in cash?

6  A   No, I didn't say that.

7  Q   And, as a matter of fact, you were receiving this

8  cash before the interview, were you not?

9  A   Yes.

:20AM  10  Q   And you continued to receive this cash after the

11  interview, right?

12  A   I don't remember specifically when I got the

13  final payment from Tony.  I don't know if it was

14  before or after.  It could've been.

:20AM  15  Q   So you lied to the FBI, right?

16  A   Yes.

17  Q   Now, this interview you had with the FBI was in

18  the summer of 2005, correct?

19  A   Yes.

:21AM  20  Q   Now, at the end of 2005, you resigned as Chief of

21  Staff, isn't that correct?

22  A   Yes.

23  Q   And you become the campaign manager for Governor

24  Blagojevich's reelection, is that correct?

:22AM  25  A   Yes.

1  Q   So the entire year 2006, you received a salary as
2  a campaign manager, is that correct?
3  A   Yes.
4  Q   And you're formally not working for the State of
5  Illinois, you're paid by the Blagojevich campaign,
6  is that correct?
7  A   Correct.
8  Q   And what was your salary for that year?
9  A   Yeah, I think it was $20,000 a month.
10  Q   So that's $240,000 a year, correct?
11  A   Yeah, but I -- I stopped being campaign manager
12  after he was elected.
13  Q   So --
14  A   But it's close.
15  Q   So it was over $200,000, would that be a --
16  A   Yes.
17  Q   Once again, you got that job because Rod trusted
18  you and you were his friend, right?
19  A   Yes.
20  Q   You really were not an experienced campaign
21  manager, were you?
22  A   Compared to 2002 I was.
23  Q   Well, obviously, you learned a little more after
24  the first campaign, I recognize that.  But you
25  really were not an experienced campaign manager,

1 let's be frank, Mr. Monk, isn't that correct?

2 A   Correct.

3 Q   So this was another financial graciousness by Rod

4 to you, was it not?

5         MR. NIEWOEHNER:  Objection.

6         THE COURT:  Sustained as to its form.

7 BY MR. SOROSKY:

8 Q   And then after the reelection, you became a

9 lobbyist, did you not?

10 A   Yes.

11 Q   And tell the ladies and gentlemen of the jury

12 what a lobbyist does.

13 A   They represent the interests of various companies

14 who want to do business with the state or are

15 interested in certain legislation.

16 Q   And how much money did you make as a lobbyist,

17 your first year out in 2007?

18         MR. NIEWOEHNER:  Objection.

19         THE COURT:  Overruled.

20 BY THE WITNESS:

21 A   I think it was about $750,000.

22 BY MR. SOROSKY:

23 Q   And how much money did you make in 2008 as a

24 lobbyist?

25 A   A little bit over a million dollars.

Monk - cross by Sorosky                    2837

1   Q   And you made this money and people wanted to hire

2   you because they knew you were the best friend of

3   the governor, right?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  Sustained.

6   BY MR. SOROSKY:

7   Q   What other attribute did you bring to the table

8   other than I'm the governor's pal?

9          MR. NIEWOEHNER:  Objection.

10         THE COURT:  I don't really think you can ask

11  him questions which require making conclusions about

12  somebody else's intention.  You could, of course,

13  call some of these people to the witness stand.  I

14  don't think that's the point you're after.

15         MR. SOROSKY:  All right.

16  BY MR. SOROSKY:

17  Q   Could you tell ladies and gentlemen of the jury

18  one or two or three of your clients who hired you

19  and gave you these generous fees?

20         MR. NIEWOEHNER:  Objection.

21         THE COURT:  Sustained on the grounds of

22  relevance.

23  BY MR. SOROSKY:

24  Q   Could you name one client?

25         MR. NIEWOEHNER:  Objection.

1       THE COURT:  The objection is sustained.

2  BY MR. SOROSKY:

3  Q   Now, you had a background in representing sports

4  agents or you had a background as being a sports

:26AM    5  agent, correct?

6  A   Yes.

7  Q   Did any athlete hire you to say, oh, Mr. Monk, I

8  want something from the State of Illinois --

9       MR. NIEWOEHNER:  Objection.

:26AM   10       THE COURT:  Don't ask him to read minds

11  unless you got some underlying conversation to it.

12  BY MR. SOROSKY:

13  Q   Now, on December 8th, 2009, Governor Blagojevich

14  was charged with the matters that are before the

:27AM   15  Court today, right?

16  A   I don't think that's the right year.

17  Q   What?

18  A   I don't think that's the right year.

19  Q   In 2008, I apologize.  December 9th, 2008.

:27AM   20  A   Yes.

21  Q   Governor Blagojevich is charged with the matters

22  that are before this Court and this jury today,

23  right?

24  A   Yes.

:27AM   25  Q   Now, and you were not charged on that day, were

1  you?

2          MR. NIEWOEHNER:  Objection, Your Honor.

3          THE COURT:  Sustained.

4  BY MR. SOROSKY:

:27AM   5  Q   Well, you were arrested on December 9th, 2008 --

6          MR. NIEWOEHNER:  Objection.

7          THE COURT:  The objection is sustained.

8  BY MR. SOROSKY:

9  Q   Well, after that day or shortly after that day,

:28AM   10  you contacted your lawyer, right?

11          MR. NIEWOEHNER:  Objection.

12          THE COURT:  Overruled.

13  BY THE WITNESS:

14  A   Yes.

:28AM   15  BY MR. SOROSKY:

16  Q   And by the end of the month of December 2008, you

17  were cooperating with the government, right?

18  A   I don't know if it was right then, but around

19  there, yeah.

:28AM   20  Q   Did you ever call Rod up and say, sorry, "pal, I

21  gotta do this to you"?

22          MR. NIEWOEHNER:  Your Honor --

23          THE COURT:  Sustained.

24  BY MR. SOROSKY:

:29AM   25  Q   Now, you, of course, knew that you had this

1  matter of taking or receiving 70 to 90,000 dollars

2  in cash from Mr. Rezko, did you not?

3  A   Yes.

4  Q   And you also knew at this time that Mr. Rezko had

5  already been convicted and was in jail, right?

6  A   Yes.

7  Q   And press reports indicated that Mr. Rezko was

8  making statements to the government?

9         MR. NIEWOEHNER:  Objection, Your Honor.

10         THE COURT:  Objection to the form.

11         MR. SOROSKY:  What?

12         THE COURT:  Objection the form.  You're

13  asking --

14         MR. SOROSKY:  Okay.

15  BY MR. SOROSKY:

16  Q   Were you aware through reading newspaper articles

17  that Mr. Rezko was making statements to the

18  government?

19  A   I believe so, yeah.

20  Q   So after the governor was charged with these

21  matters that are before the Court, you realized I

22  got a problem with taking this money, didn't you?

23  A   Along with a number of other --

24  Q   This being the 70 to 90,000 dollars in cash.

25  A   Along with a number of other things that were

1  pointed out to me, yes.

2  Q   But before anything is pointed out to you, you

3  yourself knew "I got a problem taking that money,"

4  isn't that true, Mr. Monk?

5          MR. NIEWOEHNER:  Objection; time frame.

6  BY MR. SOROSKY:

7  Q   After the governor was charged with these

8  matters.

9  A   I was concerned about it before and after.

10 Q   But you certainly were more concerned -- well,

11 wait a minute.  You weren't concerned about it

12 enough before Governor Blagojevich was arrested to

13 go to the government and say, I want to confess all

14 my sins, I took 7 to 90,000 dollars in cash, you

15 didn't do that, did you?

16 A   No.

17 Q   And you certainly didn't tell the FBI, when you

18 were interviewed in 2005, well, I want -- I wasn't

19 taking this cash, did you?

20 A   No.

21 Q   So you lied about it in 2005 and you never

22 mentioned it until Blagojevich was charged, right?

23 A   Right; when I began cooperating.

24 Q   That calls for a yes or no, Mr. Monk.

25 A   Could you ask the question again?  I'm sorry.

1  Q   You lied about taking this cash in 2005, right?

2  A   Yes.

3  Q   And you didn't tell any legal authority or any

4  law enforcement official or admit that you were

5  taking this cash before Governor Blagojevich was

6  charged, did you?

7  A   No.

8  Q   But after he was charged, you promptly went to

9  the government and related it with swiftness and

10 promptness, did you not?

11         MR. NIEWOEHNER:  Objection, Your Honor.

12         THE COURT:  Maybe a fewer adjectives.

13 BY MR. SOROSKY:

14 Q   Okay, without adjectives, you related it to the

15 government, did you not?

16 A   Yes.

17 Q   When you first related it to the government, you

18 related it in a meeting at the FBI office or the

19 United States Attorney's Office and you had a number

20 of meetings and you told them this, correct?

21 A   Yes.

22 Q   And, in fact, you probably had about 30 meetings

23 with the government going over the facts of this

24 case, did you not?

25 A   Yeah; at least.

:32AM

:33AM

:33AM

:33AM

:34AM

1  Q   That was to prepare for trial, right?

2  A   Correct.

3  Q   You never met with your old friend's lawyers to

4  prepare for trial, did you?

5          MR. NIEWOEHNER:  Objection.

6          THE COURT:  The objection is sustained.

7  BY MR. SOROSKY:

8  Q   Now, and then after you had these 30 meetings and

9  prepared for trial, you testified before the grand

10 jury, is that correct?

11 A   Yes.

12 Q   And the grand jury consists of 23 people, right?

13 A   I don't recall how many people it is.

14 Q   You have jurors there like we have jurors here,

15 right?

16         THE COURT:  Maybe if I can just clarify it.

17         MR. SOROSKY:  Clarify it; by all means.

18         THE COURT:  A grand jury has 23 members,

19 there have to be at least 16 of them before they can

20 proceed.  So it can be anywhere from 16 to 23.

21 BY MR. SOROSKY:

22 Q   Now, at the grand jury, you certainly spoke about

23 this cash or receiving this cash from Mr. Rezko, did

24 you not?

25 A   Yes.

1  Q   And did you say at the grand jury:
2       "I understood that Rezko was making a gift to
3        me" --
4           MR. NIEWOEHNER:  Objection, Your Honor;
5  foundation.
6  BY MR. SOROSKY:
7  Q   -- concerning the cash"?
8           THE COURT:  You're asking if those were his
9  exact words?
10          MR. SOROSKY:  Yes.  I mean, those are his
11 words.  I don't think there's any dispute that those
12 are his words.
13          THE COURT:  You can answer.
14 BY MR. SOROSKY:
15 Q   Did you testify at the grand jury "I understood
16 that Rezko was making a gift to me," right?  You
17 testified to that under oath before the grand jury,
18 right?
19 A   Without looking specifically at the testimony, I
20 can't remember specifically what I said.  If you've
21 got a copy of it, can I see it?
22          MR. SOROSKY:  If I may approach the witness?
23          THE COURT:  Sure.
24 BY THE WITNESS:
25 A   Yes.

:36AM
:36AM
:36AM
:36AM
:37AM

1  BY MR. SOROSKY:

2  Q   Now, I believe you testified before, just a few

3  minutes ago, that you admitted that you were

4  concerned about taking this 70 to 90,000 dollars in

:37AM   5  cash from Mr. Rezko, right?

6  A   Yes.

7  Q   Why would you be concerned about receiving a

8  gift?  People receive gifts every day.

9          MR. NIEWOEHNER:  Objection.

:37AM   10          THE COURT:  The objection is sustained.

11  BY MR. SOROSKY:

12  Q   Now, I believe you previously testified in this

13  matter, did you not?

14  A   Yes.

:38AM   15  Q   And you certainly testified about this topic of

16  receiving cash from Mr. Rezko, did you not?

17  A   Yes.

18  Q   And you were under oath when you previously

19  testified in this matter just as you were under oath

:39AM   20  in the grand jury, correct?

21  A   Yes.

22  Q   And did you testify in this matter previously

23  that you thought of this cash as some sort of an

24  advance, an advance in salary for working for

:39AM   25  Mr. Rezko?

1  A   Yes.

2  Q   So let's get this right.  One time under oath you

3  testified before a grand jury that it's a gift --

4          MR. NIEWOEHNER:  Objection, Your Honor.

:39AM  5  BY MR. SOROSKY:

6  Q   -- and a second time --

7          THE COURT:  Wait.  Wait.

8          These are issues for argument, not for this

9  question.

:40AM  10  BY MR. SOROSKY:

11  Q   Well, just one last question on this topic and

12  then we'll leave.

13          One time under oath you said it's a gift and

14  a second time under oath you say it's an advance in

:40AM  15  salary?

16          MR. NIEWOEHNER:  Objection, Your Honor.

17          THE COURT:  Mr. Sorosky, you just, like, ran

18  over the sustained objection.  This is something

19  which you can stand up and point out to the jury.

:40AM  20  Just ask the guy questions and then you can make

21  your arguments, there'll be a time for that.

22  BY MR. SOROSKY:

23  Q   Well, did you say before the grand jury that it

24  was a gift?  Simple question, yes or no.

:40AM  25          MR. NIEWOEHNER:  Objection, Your Honor; asked

1  and answered.

2         THE COURT:  We're done with "did you say it."

3  BY MR. SOROSKY:

4  Q   At a prior trial you said this was an advance in

5  salary?

6         THE COURT:  Let's take a brief recess.

7         MR. SOROSKY:  I didn't think I was through.

8         THE MARSHAL:  All rise.

9      (The following proceedings were had out of the

10       presence of the jury in open court:)

11         THE COURT:  Please be seated.

12         What my concern is, if you laid the

13  foundation where --

14         MR. SCHAR:  You want the witness to leave?

15         THE COURT:  No, he can stay.

16         If you laid the foundation which indicate a

17  witness says I said this on occasion A, I said this

18  on occasion B, you know, that's fine.  I just don't

19  want you saying it in argument.  You can say it in

20  argument later.  This is the time to ask questions,

21  you make the record, and then you do the argument,

22  and this was the basis for my objection.  Because

23  this is my concern, I thought maybe I wasn't clear,

24  which is why we have this recess so you understand.

25         MR. SOROSKY:  Okay.

1          THE COURT:  One way to look at it is is that
2    maybe it's good if you don't ask questions that
3    begin with the word "so," usually that signals an
4    argument.
5          MR. SOROSKY:  I'll just ask on one occasion
6    you said this, on one occasion you said that.
7          THE COURT:  Now, is this one that's been
8    asked before?
9          MR. SOROSKY:  I just want to refer to this
10   topic.
11         THE COURT:  No, no, no.  If you're talking
12   about some new occasion --
13         MR. SOROSKY:  No, just these last two.
14         THE COURT:  No, it's repetitive.  The
15   objection was it was asked and answered.
16         MR. SOROSKY:  Okay, I'll go on to something
17   else.
18         THE COURT:  That's fine.
19         Tell them it's a very short break and then
20   they got to come back.
21          THE CLERK:  All right.
22      (Recess.)
23         THE COURT:  Do you have a time estimate for
24   how much?  I'm just asking because of a break.
25         MR. SOROSKY:  An hour, at the most.

Monk - cross by Sorosky                    2849

1          THE COURT:  Okay.

2          We may take another break before you finish,

3   but that's fine, the hour is fine.

4          MR. SOROSKY:  Should we break now?

:43AM   5          THE COURT:  No, we'll break later.

6          THE MARSHAL:  All rise.

7        (The following proceedings were had in the

8         presence of the jury in open court:)

9          THE COURT:  Please be seated.

:47AM  10          MR. SOROSKY:  Now --

11          THE COURT:  Wait, wait, wait.

12        (Brief pause).

13          THE COURT:  Okay, now.

14   BY MR. SOROSKY:

:48AM  15   Q   Now, referring back to this cash again, in what

16   amounts did you receive these payments?

17   A   $10,000.

18   Q   $10,000 would be a lot of bills, wouldn't it?

19   A   Yeah.

:48AM  20   Q   How -- how -- how did you receive them?

21   A   Usually in hundred-dollar bills.

22   Q   Well, could you tell the ladies and gentlemen of

23   the jury, you know, how these exchanges occurred, if

24   you will?  How this all happened?

:48AM  25   A   Yeah --

Monk - cross by Sorosky                    2850

1  Q   Or how, generally, it would have occurred.

2  A   I would meet with Tony on, you know, a fairly

3  regular basis during that period of time and from

4  time to time he'd give me $10,000 in an overnight

5  envelope.

6  Q   Would that be like something someone would send

7  through federal express, UPS, that type of envelope?

8         MR. NIEWOEHNER:  Your Honor, outside grand

9  jury impeachment.

10         THE COURT:  He can answer that question.

11 BY THE WITNESS:

12 A   It was usually in a used overnight envelope.

13 BY MR. SOROSKY:

14 Q   Didn't even give you a new one, huh?

15         MR. NIEWOEHNER:  Objection.

16         THE COURT:  That wasn't a question.

17 BY MR. SOROSKY:

18 Q   Did, as you refer to him, "Tony," did Tony say

19 anything to you when he would give this to you?

20         MR. NIEWOEHNER:  Objection, Your Honor.

21         THE COURT:  Sustained.

22 BY MR. SOROSKY:

23 Q   Did Mr. Rezko say anything when he would give you

24 these envelopes?

25         MR. NIEWOEHNER:  Objection.

:49AM

:49AM

:49AM

:49AM

:50AM

1          THE COURT:  Isn't that the same question that
2    I sustained the objection to?
3          MR. SOROSKY:  I thought the objection was to
4    my little slang, as you said --
5          THE COURT:  No, it was to the question.
6          MR. SOROSKY:  All right.
7    BY MR. SOROSKY:
8    Q   Now, after you were -- or after you started
9    cooperating with the government, you were told that
10   your telephone was wiretapped, were you not?
11   A   Yes.
12   Q   And you also were told that the governor's --
13   that the governor's telephone was wiretapped, were
14   you not?
15   A   Yes.
16   Q   And you were told the campaign office's
17   telephones were wiretapped, were you not?
18   A   Yes.
19   Q   And you were told there was actually a microphone
20   recorder within the campaign office to record the
21   in-person conversations, right?
22   A   Yes.
23   Q   And you also were told that you were overheard in
24   a number of conversations with both Governor
25   Blagojevich and Governor Blagojevich's brother, is

:50AM

:50AM

:51AM

:51AM

:51AM

1  that correct?

2  A   Yes.

3  Q   And in some or in many of your sessions with the

4  government, they played those recorded conversations

5  to you, did they not?

6  A   Yes.

7  Q   And you listened to those conversations and the

8  government asked you questions about the topics

9  being spoken about and you answered the government,

10  right?

11  A   Yes.

12         MR. SOROSKY:  And, by the way, just so the

13  Court knows, all the calls I'm referring to now are

14  calls that the government played, so there is no

15  issue.

16         THE COURT:  All right.  Sure.

17         MR. SOROSKY:  I'm talking about a call that

18  took place on November the 12th, 2008, between

19  Mr. Monk and Robert Blagojevich, the governor's

20  brother.

21         What session is it?

22         MR. GOLDSTEIN:  195.

23         MR. SOROSKY:  Session 195.

24  BY MR. SOROSKY:

25  Q   Now, I'm first going to ask you this question,

1  you may remember it based on your review of the
2  tapes, but on November 12th, 2008, you and Robert
3  Blagojevich had a telephone conversation and that
4  telephone conversation was tape recorded.  And I'm
5  going to ask you a question about it, and if you
6  remember you could answer, if not we'll play the
7  tape.
8        MR. NIEWOEHNER:  Objection to the question in
9  terms of inserting facts into evidence.
10        THE COURT:  Let me take a look at this one.
11     (Brief pause).
12        THE COURT:  Why don't you come to the side
13  partly because I don't understand your question and
14  partly because I don't understand his objection.
15        MR. SOROSKY:  I haven't asked the question.
16        THE COURT:  I just want to talk so we don't
17  go down the wrong path.
18     (Proceedings heard at sidebar on the record.)
19        THE COURT:  My understanding of this is not
20  that the governor ever said or implied that he would
21  never sign the bill, the issue was when would he
22  sign the bill.
23        And, now, maybe you're trying to do this
24  because you want to defend against the charge the
25  government has not made, which is that he wasn't

 1  going to sign the bill, but maybe it's just, you
 2  know, lots of complicated things in this case and
 3  you have, as I said, a simple defense.  But in this
 4  case, the issue was no one has ever said, the
 5  government has ever said that they thought he
 6  wouldn't sign the bill, they were talking only about
 7  when he would sign the bill; consequently, the
 8  question is profoundly misleading, and I don't want
 9  to mislead the jury.  And the reason it's profoundly
10  misleading is that the witness answers the question,
11  "no, I didn't think he was going to sign the bill
12  unless he gives a contribution," but what the
13  witness is talking about is I didn't think he was
14  going to sign it soon unless he got the
15  contribution, and the jury could easily misconceive
16  that.
17          So why don't you tie it to what his
18  understanding of the issue was.  And he has
19  testified at great length that the issue is when and
20  not whether, so I don't want you to re-characterize
21  what their position is.
22          MR. SOROSKY:  I'll go on to a different topic
23  of understanding.  Can I ask him that all these
24  understandings were first related to anyone after he
25  started cooperating with the government?  Whatever

1  his understandings were.  His understandings were as

2  stated on direct examination, whatever they were,

3  they were.

4       THE COURT:  I don't know how you can get to

5  that and I don't know what its relevance is.  I

6  mean, maybe he told it to somebody else, maybe he

7  told it to some relative of his, he told his --

8       MR. SOROSKY:  Well, I'll ask him.

9       THE COURT:  No, I don't think that that is

10  relevant.

11       MR. SOROSKY:  So what we feel we should be

12  able to ask regardless --

13       THE COURT:  You can make an offer of proof.

14  I'll leave him on the witness stand and you can make

15  your offer of proof afterwards.  Maybe there is

16  something in his answer that I'm not anticipating

17  that might be helpful to you that might be

18  admissible, but I don't want to answer in theory.  I

19  know on the record now, the question that implies or

20  from what recently is inferred that what the issue

21  is is that he would never sign it is an improper

22  question.

23     (Proceedings resumed within the hearing of the

24       jury.)

25  BY MR. GOLDSTEIN:

1  Q   In this phone call on November 12, 2008, you were

2  speaking to Robert Blagojevich and you told Robert:

3       "I ended up staying longer than I wanted to,"

4        referring to your stay in California."

5            Do you remember telling Robert "I ended up

6  staying longer than I wanted to"?

7  A   Yes.

8  Q   And that was a lie, you really didn't stay longer

9  in California, isn't that correct?

10 A   Correct.

11 Q   Now, in that same conversation, you told Robert

12 Blagojevich:

13      "I saw John Johnston on Friday of last week and

14       I gave him a deadline."

15           And that was a lie, too, because you truly

16 never gave Mr. Johnston a specific deadline, isn't

17 that correct?

18 A   I may have seen him, but I don't think I ever

19 gave him a specific deadline, no.

20 Q   Right.  So the statement, "I gave him," meaning

21 Mr. Johnston, "a deadline," that's a lie, right?

22 A   Yes.

23 Q   And you also had a similar conversation with the

24 governor wherein you said I gave Johnny Johnston a

25 deadline, did you not?

:57AM

:58AM

:58AM

:58AM

:59AM

1  A   I believe so.  I don't recall specifically.

2  Q   And that was a lie also, was it not?

3  A   If that's what I told him, then yes.

4  Q   Well, allow me to refresh your memory.

5          I'd ask you to look and just read to yourself

6  lines 7 through 11.

7      (Brief pause.)

8  BY MR. SOROSKY:

9  Q   Just so we're clear, you also told Governor

10 Blagojevich "I gave Johnny Johnston a deadline," you

11 lied to the governor about that, didn't you?

12 A   Again, basically what you showed me, I still

13 don't know whether I said that to him or not.  What

14 that says is that I was misrepresenting my

15 conversations with John Johnston to the governor to

16 show that I was being more aggressive than I really

17 was.

18 Q   Well, would you agree with me that

19 misrepresenting your conversations to be more

20 aggressive than you were was a lie?

21 A   Yeah.

22 Q   What?

23 A   Yeah.

24 Q   Then on November 20th, 2008, did you have a

25 conversation with Robert Blagojevich wherein you

:59AM

:00AM

:00AM

:00AM

:01AM

1  said to him "I'm hoping to get checks today from

2  Johnston," and wasn't that a lie because you really

3  weren't expecting to get checks today from Johnston?

4  A  I was hoping to.

5  Q  You were hoping to you, but you knew you wouldn't

6  get checks from Johnston, didn't you?

7  A  I didn't think there was a likelihood but I was

8  hoping to.

9  Q  Well, you didn't say, "I'm hoping to get checks

10  from Johnston but it's not very likely," you

11  expressed it in such a way where that hope might be

12  reality, didn't you?

13  A  Yes.

14  Q  So that was a lie, wasn't it?

15  A  I was hoping to get the check that day.

16  Q  Now, on November 13th, did you have a

17  conversation with the governor where you said

18  Johnston was good for the contribution and he's

19  trying to figure out where to get the money?  Do you

20  remember telling that to the governor in a telephone

21  conversation?

22  A  I could've.  Again, without looking at a

23  transcript, I can't remember specifically.

24      MR. SOROSKY:  May I refresh his memory?

25      THE COURT:  Yeah.

:01AM
:01AM
:01AM
:02AM
:03AM

1     (Brief pause).

2  BY MR. SOROSKY:

3  Q   Now, in this telephone conversation you had the

4  with the governor on November 13th, did you say that

5  Johnston was good for the contribution and he,

6  Johnston, was trying to figure out where to get the

7  money, did you say that?

8  A   Yes.

9  Q   And you certainly acknowledged that you were just

10 repeating old stale information, right?

11 A   Correct.

12 Q   So that was a lie, was it not?

13 A   Yes.

14 Q   Now, on December 2nd, 2008, you had a telephone

15 call with John Johnston, right?

16 A   Yes.

17 Q   Just so we're clear, John Johnston is your

18 client, right?

19 A   Yes.

20 Q   He's the owner of the racetrack, right?

21 A   Right.

22 Q   And you told Mr. Johnston:

23      "Rod didn't turned my call last night at about

24      10:30."

25      Did you not?

1  A   Yes.

2  Q   And that was a lie, you hadn't spoken to the

3  governor at all, right?

4  A   Right.

:05AM   5  Q   In fact, to the best of your knowledge, the

6  governor was actually at a governor's conference in

7  Philadelphia the night before, wasn't he?

8  A   Yes.

9  Q   Now, on December 3rd, 2008, you went to the FOB

:06AM   10  office, is that correct?

11  A   Yes.

12  Q   And just so we're clear, December 3rd is the day

13  you had these potential or hypothetical

14  conversations with the governor as to how best to

:06AM   15  approach and talk to John Johnston about getting the

16  contribution, right?

17  A   Yes.

18  Q   And on December 3rd you actually did go to

19  Mr. Johnston's office, right?

:06AM   20  A   Yes.

21  Q   And the events of December 3rd were referred to

22  in your direct examination when you were questioned,

23  right?

24  A   Yes.

:07AM   25  Q   Now, in your in-person conversation with the

1 governor, did you say that you were going to

2 Oklahoma tomorrow for my dad's Army reunion?

3 A   Yes.

4 Q   And you were telling your father -- excuse me.

:07AM   5 You were telling the governor that you had to take

6 your father to his old Army reunion because his

7 eyesight wasn't so good and he was so infirmed that

8 you had to take him, right?

9 A   I didn't tell him all that.

:07AM   10 Q   But that was what was implied, correct?

11 A   No.

12 Q   You were --

13 A   I was going to go to his Army reunion with him.

14 Q   You were going to go to his Army reunion?

:07AM   15 A   Yeah.

16 Q   And you wanted to be there with all these old

17 guys who were in the Army together, right?  That's

18 what you're telling the ladies and gentlemen of the

19 jury, right?

:08AM   20        MR. NIEWOEHNER:  Objection.

21        THE COURT:  Don't use that phrase.

22        MR. SOROSKY:  In fact --

23        THE COURT:  Mr. Sorosky, Mr. Sorosky --

24        MR. SOROSKY:  I apologize.

:08AM   25        THE COURT:  He's not telling stuff, he's just

Monk - cross by Sorosky                    2862

1 answering your questions, and I don't really want to
2 repeat it that often.
3          MR. SOROSKY:  I apologize.  I apologize.
4 BY MR. SOROSKY:
5 Q   Now, and that was a lie, too, about going to your
6 father's Army reunion, wasn't it?
7 A   Yes.
8 Q   You, in fact, were going to the Dominican
9 Republic to play golf, right?
10 A   Yes.
11 Q   And you wouldn't even tell that truthful
12 statement to your old friend, would you?
13          MR. NIEWOEHNER:  Objection, Your Honor.
14          THE COURT:  To the form of the question,
15 sustained.
16 BY MR. SOROSKY:
17 Q   Now, on December 4th when you were at the Miami
18 airport going to the Dominican Republic, the
19 governor called you at the Miami airport and you had
20 a telephone conversation with him, correct?
21 A   I don't remember whether he called me or I called
22 him.
23 Q   And you said that you got in Johnston's face and
24 that Johnston was good for a donation, didn't you?
25 A   Right.

:08AM
:08AM
:08AM
:09AM
:09AM

1  Q   That was a lie, too, because Johnston is in
2  Chicago and you're in Miami en route to the
3  Dominican Republic, right?
4  A   I was referring to my meeting with him the
5  previous day.
6  Q   But that was a lie also, wasn't it?
7  A   That I met with Johnston the previous day?
8  Q   No, that you got in his face.
9  A   For me, it was pretty aggressive.
10 Q   Now, after the governor was charged and arrested,
11 you spoke to a man by the name of Hodge, did you
12 not, on the telephone?
13         MR. NIEWOEHNER:  Objection, Your Honor.
14         MR. SOROSKY:  Sustained.
15 BY MR. SOROSKY:
16 Q   Well, did you lie to Mr. Hodge when you said, "I
17 spoke to Blagojevich on Sunday"?  Was that a lie?
18 A   I don't know who Mr. Hodge is.
19 Q   Okay.
20    (Whereupon, there was a conference had:)
21         MR. SOROSKY:  If I may refresh his memory?
22         THE COURT:  Yeah.
23    (Brief pause.)
24 BY THE WITNESS:
25 A   I know now who Mr. Hodge is.  If you could repeat

1  the question.

2  BY MR. SOROSKY:

3  Q   This phone call was perhaps the last taped

4  telephone call and you spoke to Mr. Hodge, right?

:11AM    5          MR. NIEWOEHNER:  Objection, Your Honor.

6          THE COURT:  Sustained.

7

8  BY MR. SOROSKY:

9  Q   And did you tell Mr. Hodge you talked to

:11AM   10  Blagojevich on Sunday?

11          MR. NIEWOEHNER:  Objection, Your Honor.

12          THE COURT:  Sustained.

13  BY MR. SOROSKY:

14  Q   And you told all those lies to benefit yourself,

:11AM   15  didn't you?

16  A   Yes.

17          THE COURT:  This is going to take some time?

18          MR. SOROSKY:  We can take a break.

19          THE COURT:  Yeah, this is a real break as

:13AM   20  opposed to the earlier fake break.

21          THE MARSHAL:  All rise.

22      (The following proceedings were had out of the

23        presence of the jury in open court:)

24          THE COURT:  11:25.

:13AM   25          You can step down.

Monk - cross by Sorosky                          2865

1          (Brief pause).

2              MR. SOROSKY:  You want to take this up when

3     we come back?  Just some minor issue.

4              THE COURT:  Are we all agreed on what we're

:13AM  5    talking about?

6              MR. NIEWOEHNER:  It's just a timeline that

7     they have.

8              MR. SOROSKY:  There's a little chart that we

9     have.

:13AM  10             THE COURT:  Let's do it when we come back so

11    everybody is on it.

12             MR. SOROSKY:  All right.

13         (Recess.)

14         (The following proceedings were had out of the

:35AM  15      presence of the jury in open court:)

16             COURT'S LAW CLERK:  Please remain seated.

17             THE COURT:  Counsel approach.

18         (Brief pause).

19             MR. NIEWOEHNER:  Your Honor, there's, I

:36AM  20    guess, a potential exhibit that they may want to

21    show to the jury.

22             MR. SOROSKY:  Yes.

23             MR. NIEWOEHNER:  Which --

24             THE COURT:  Where is it?  Always helpful if I

:36AM  25    can look at it.

Monk - cross by Sorosky                    2866

1      (Brief pause).

2          THE COURT:  Okay.

3          MR. NIEWOEHNER:  I mean, he doesn't know the

4    length of time of the wiretapping.

5          THE COURT:  I'm looking at it here, is this

6    the whole thing or can you scroll down?  That it's?

7          MR. SOROSKY:  That's it.

8          THE COURT:  Okay.

9          MR. SCHAR:  We know Mr. Monk is testifying,

10   I'm not sure what relevance.

11         MR. NIEWOEHNER:  Also not accurate in terms

12   of the timeline with his cooperation with the

13   government.

14         THE COURT:  And what use are you going to

15   make of this?

16         MR. SOROSKY:  Pardon me?

17         THE COURT:  What use are you going to make of

18   this?

19         MR. SOROSKY:  I just want to ask Mr. Monk if

20   this is accurate, that first the wiretapping

21   occurred, then Rod was charged, then he, Mr. Monk,

22   cooperated with the government, and then he

23   testified; just one, two, three, four.  I mean, I

24   don't think --

25         THE COURT:  You can keep it up there for two

1  minutes.

2      MR. NIEWOEHNER:  On the wiretapping, this

3  isn't helping him --

4      THE COURT:  Oh.  Wait.  Wait.

5      MR. SOROSKY:  Well, that --

6      THE COURT:  No, finish your thought.

7      MR. NIEWOEHNER:  Mr. Monk has no knowledge of

8  when the wiretapping took place, and it's not

9  relevant.  I mean, I don't know what the relevance

10 is for this witness, but it shouldn't be there.

11     The date of Mr. Blagojevich being charged, I

12 guess is fine.

13     The third one is accurate, the dates are

14 wrong.  He hadn't stopped in April of 2009 nor did

15 he actually start in December of 2008.

16     And the fourth one is self-evident.

17     THE COURT:  Okay.  He's saying it's factually

18 wrong.

19     MR. SOROSKY:  I don't think -- well, there's

20 no doubt the wiretapping occurred from those dates,

21 I mean, that's factually correct.

22     MR. NIEWOEHNER:  But not through this

23 witness.

24     MR. SOROSKY:  I don't know what -- if it's

25 the fall of 2008 --

Monk - cross by Sorosky                    2868

1      THE COURT:  But what does this have to do
2 with this witness?  What is the point you're trying
3 to make with respect to the witness?
4      MR. SOROSKY:  What is the point we're trying
5 to make?  We just want to establish that first there
6 was wiretapping, then the governor was charged, then
7 Mr. Monk cooperates with the government, and then he
8 testifies.
9      THE COURT:  Okay.  But if the dates -- why do
10 you need the dates for?  If you're concerned with
11 the order of it --
12      MR. SOROSKY:  Well, I mean, the dates, how
13 would the government want to amend the dates?  I
14 mean, we're not saying October 2nd to December 9 are
15 necessarily vital magic dates --
16      THE COURT:  All right, I'll tell you what
17 we're going to do --
18      MR. SOROSKY:  I mean, those are the dates the
19 wiretapping occurred.
20      THE COURT:  What we're going to do is, since
21 I now understand how you want to use this, you
22 really don't need him on the witness stand, you
23 don't have to show it to him on the witness stand.
24 If it's some kind of demonstrative exhibit you want
25 the use in closing argument where there's no dispute

:38AM

:38AM

:39AM

:39AM

:39AM

1  about the dates, okay.  It'll be a short period of

2  time, but it's okay.  And there's really no factual

3  dispute.

4          MS. KAESEBERG:  Would you be okay if we

5  changed the first section, instead of saying

6  "wiretapping," say "phone calls with Monk"?

7          THE COURT:  I might be okay with all of this

8  stuff, the only thing is is I don't think you need

9  him on this.

10         MS. KAESEBERG:  Well, what I'm saying is,

11 with him on the stand, I think it would be

12 appropriate if said with the number one bullet

13 point, "overheard calls between Monk and

14 Blagojevich," and then have those dates up there,

15 that would -- you know, certainly, he's already

16 testified about those dates and those occurrences.

17         THE COURT:  It's not -- it's the kind of

18 thing that like a summary you can use in closing

19 argument, facts that aren't in dispute.  It's a

20 little different from the government's timeline

21 because the government's timeline is much longer and

22 much more complex.  This seems to be fairly simple

23 and I think we can work something out so you can put

24 it up on the screen for a few moments and that's

25 fine, but not now.

1          MR. NIEWOEHNER:  Your Honor, can --

2          THE COURT:  Okay.

3          THE MARSHAL:  All rise.

4        (The following proceedings were had in the

5         presence of the jury in open court:)

6          THE COURT:  Please be seated.

7          You may proceed.

8          MR. SOROSKY:  Thank you.

9    BY MR. SOROSKY:

10   Q   Okay, Mr. Monk, let's get into the topic now of

11   the road builders and Mr. Krozel, okay.

12          Now, although you were a lobbyist, you did

13   not represent Mr. Krozel or the road builders, isn't

14   that correct?

15   A   Correct.

16   Q   And in, let's say, the early fall of 2008, you

17   received the assignment from the governor to try to

18   receive a campaign contribution from the road

19   builders, would that be correct?

20   A   Yeah.

21   Q   And did you know Mr. Krozel before the fall

22   of 2008?

23   A   Yes.

24   Q   And for how long had you known him?

25   A   I --

1  Q   Approximately.

2  A   I may have met him back in 2002.  We weren't --

3  Q   So you really didn't --

4  A   -- that close.

5  Q   I didn't mean to cut you off.

6        So you really didn't have much of a

7  relationship with him, you just happened to know who

8  he was, would that be a fair statement?

9  A   A little bit more than that.  I mean, you know,

10 we'd shake hands and make small talk, and that kind

11 of thing, but, I mean, our paths weren't crossing

12 all the time.

13 Q   Now, as best you could recall and remember, and

14 I'm just asking, were you at some fundraising

15 meeting where the topic of Mr. Krozel and the road

16 builders came up and you were assigned to him?  If

17 you know, how did it come about?

18        MR. NIEWOEHNER:  Objection.

19        THE COURT:  Objection to the form, sustained.

20 BY MR. SOROSKY:

21 Q   When and where, if you know, did you first

22 receive this assignment of trying to obtain a

23 contribution from the road builders, if you know or

24 best --

25 A   I don't recall specifically, but in all

:43AM

:43AM

:44AM

:44AM

:44AM

1  likelihood it was in a meeting, a fundraising
2  meeting, or a separate conversation I had with Rod.
3  Q   And was this at the meeting where Rod told you he
4  was going to announce the 1.8 billion-dollar tollway
5  project or was it before that?
6           MR. NIEWOEHNER:  Objection; foundation.
7  BY MR. SOROSKY:
8  Q   The meeting where you first received this
9  assignment.
10 A   It was before that.
11 Q   Before that?
12 A   Yeah.
13 Q   So before that meeting, Rod tells you that your
14 assigned was to attempt to get a contribution from
15 the road builders, is that correct?
16 A   Yeah.  I mean, he could've told me or I could've
17 said, you know, I'll take that over, or something to
18 that effect, but it was before the meeting.
19 Q   So pursuant to this assignment, you did begin
20 conversations with the road builders, did you not,
21 to attempt to get contributions?
22           MR. NIEWOEHNER:  Objection and beyond the
23 scope.
24           THE COURT:  Yeah.
25 BY MR. SOROSKY:

1  Q   Okay.  After the assignment, whenever the

2  assignment was, you said you don't remember the

3  exact date but you thought it was the fall of 2008,

4  after that assignment did you begin to contact the

5  road builders to try to get contributions?

6  A   My best recollection is, the first time that we

7  asked Jerry for money was in that meeting.

8  Q   So even though you had the assignment, you're

9  saying you really didn't do anything until you

10 brought Jerry to the meeting, would that be

11 correcting?

12 A   Well, I set up the meeting or asked someone to

13 set up the meeting because the goal was to set up a

14 meeting for Rod and Jerry to meet.

15 Q   And do you know or do you remember the date that

16 this meeting you had with Mr. Krozel?

17 A   I don't remember the specific date.

18 Q   But would it be fair to say it was in, say,

19 September of 2008?

20 A   I'd say late summer, early fall of 2008.

21 Q   And present at this meeting were you, the

22 governor, and Mr. Krozel, correct?

23 A   Right; and Rod's brother, Robert.

24 Q   Rod's brother was there, too.  And this was at

25 the campaign office?

1  A   Correct.

2  Q   And it was at this meeting where the governor

3  explained to Jerry Krozel that he was going to

4  announce the 1.8 billion dollar tollway project,

5  right?

6  A   Yes.

7  Q   Now, and at the end of this meeting, did not the

8  governor say:  Jerry, is there anything you could do

9  to help us with the contribution by the end of the

10  year?

11         MR. NIEWOEHNER:  Objection, Your Honor.

12         THE COURT:  You're asking literally?

13         MR. SOROSKY:  Not literally, did he say

14  something along those lines.

15  BY THE WITNESS:

16  A   Yes.

17  BY MR. SOROSKY:

18  Q   And did the governor also mention that we have a

19  fundraising push coming up?

20  A   He might.  I don't remember that specifically,

21  but he might have, yeah.

22  Q   And did the governor also mention the ethics

23  bill?

24  A   Yes.

25  Q   And did he say to Jerry Krozel:  Look, I've got

1  good news for you and bad news for you, I'm asking

2  you for a contribution, but you won't have to give

3  anymore thereafter because the ethics bill means you

4  won't have to give anymore after the first of year?

5  Did he say something along those lines?

6  A  Yes.

7         MR. NIEWOEHNER:  Objection, Your Honor.

8         THE COURT:  The answer may stand.

9  BY MR. SOROSKY:

10 Q  And the governor had already indicated to

11 Mr. Krozel that he was announcing the 1.8

12 billion-dollar program, right?

13 A  Yes.

14 Q  The governor did not say to Jerry Krozel:  You

15 know, Jerry, I could announce this program but I'm

16 only going to announce this program if you guys come

17 up with a contribution?  He didn't say that, did he?

18        MR. NIEWOEHNER:  Exact words, Your Honor?

19        MR. SOROSKY:  Generally.  I don't mean those

20 exact words.

21        MR. SCHAR:  Objection.

22        THE COURT:  Sustained.

23 BY MR. SOROSKY:

24 Q  Well, did he say those exact words, then?

25 A  No.

:49AM

:50AM

:50AM

:50AM

:50AM

1  Q   So just so we're clear, the governor's

2  conversation with Mr. Krozel is:  I'm announcing the

3  program, can you make a contribution, we'd like it

4  by the end of the year, and he mentions the ethics

5  bill that if you can get it in by the end of the

6  year, then you won't have to give anymore because I

7  can't get anymore contributions from you, right?

8          MR. NIEWOEHNER:  Objection.

9          THE COURT:  I'm sustaining the objection.

10 The question has been already asked and already

11 answered.

12         MR. SOROSKY:  Okay.  Okay.

13 BY MR. SOROSKY:

14 Q   Did Mr. Krozel say he would love to help, he

15 wanted to help if he could, and then did he explain

16 the financial problems that the industry was going

17 through?

18 A   Yes.

19 Q   Did the governor then say, when he got that sort

20 of answer:  Well, forget it, I'm not announcing the

21 program?

22         MR. NIEWOEHNER:  Objection.

23         THE COURT:  Sustained.

24 BY MR. SOROSKY:

25 Q   Did he say that?  Or sorry.

1      After Krozel indicated that he'd love to help
2  but it would be difficult because of financial
3  problems, did the governor say anything to back off
4  on the program?
5           MR. NIEWOEHNER:  Objection, Your Honor.
6           THE COURT:  Sustained.
7  BY MR. SOROSKY:
8  Q  Well, what did the governor say after Mr. Krozel
9  said he would love to help but it would be difficult
10  because of financial problems?
11  A  Is there anything he, the governor, could do to
12  help Jerry raise the money.
13  Q  And what did Mr. Krozel say?
14  A  Yes.
15  Q  What did he say?
16  A  It would it be helpful to meet with the new
17  president of his company, maybe have a lunch with
18  him.
19  Q  And did, in fact, the governor not meet with the
20  new president of the company?
21  A  He did.
22  Q  And you were at that meeting, right?
23  A  Yes.
24  Q  And there wasn't any fundraising talk at that
25  meeting, was there?

1    A   Not that I remember, no.

2    Q   And then you also met with Mr. Krozel on

3    November 24th at a restaurant called the Plush Pub,

4    is that correct?

:53AM    5    A   Correct.

6    Q   And was this before or after you met with

7    Mr. Krozel, the governor, and the new bosses of the

8    company for that luncheon dinner?

9    A   It was after.

:54AM    10   Q   After.

11           So just so we're clear, there were three

12   meetings that the governor had with Mr. Krozel,

13   isn't that correct, sir?

14           MR. NIEWOEHNER:  Objection, Your Honor.

:54AM    15           MR. SOROSKY:  Strike that.

16   BY MR. SOROSKY:

17   Q   There were two meetings the governor had with

18   Mr. Krozel, right?

19   A   In that time frame.

:54AM    20   Q   Yes, in that frame.

21           The first one was at the office when he asked

22   for the contribution and the second one was at the

23   luncheon dinner with the new bosses, right?

24   A   Correct.

:54AM    25   Q   And there were three meetings that you had with

1  Mr. Krozel, right?

2  A   Including the one with Rod and including the one

3  with the president?

4  Q   Right.

:54AM   5  A   There were more than that.

6  Q   More than that?

7  A   Yeah.

8  Q   And in these meetings with Mr. Krozel, you, of

9  course, asked Mr. Krozel for contributions, right?

:55AM   10  A   Asked him how he was doing on the contributions,

11  yeah.

12  Q   And you had telephone calls with Mr. Krozel where

13  you were asking him for contributions, did you not?

14  A   Yeah, how he was doing on fundraising.  The ask

:55AM   15  had already been made.

16  Q   Right.

17        And to the best of your knowledge, Mr. Krozel

18  certainly understood that you were making these

19  requests for money for campaign contributions on

:55AM   20  behalf of the governor, didn't you say so?

21  A   Yes.

22  Q   Now, did you ever once say to Mr. Krozel:  You

23  know, Jerry, I know the governor, if you don't -- if

24  you guy don't come up with a contribution, you're

:55AM   25  not going to get this tollway program?

1           MR. NIEWOEHNER:  Objection, Your Honor.

2           THE COURT:  Sustained.

3   BY MR. SOROSKY:

4   Q   Did you ever say anything to Mr. Krozel to

5   indicate that the governor would not do the program

6   if he didn't give a contribution, if the road

7   builders didn't give a contribution?

8           THE COURT:  Sustained.  Based on the evidence

9   in this case, sometimes that might be okay, but it

10  doesn't mesh with anything else here.

11  BY MR. SOROSKY:

12  Q   Well, collectively, in all your conversations

13  with Mr. Krozel, why don't you the tell the ladies

14  and gentlemen of the jury what you told him?

15          MR. NIEWOEHNER:  Objection, Your Honor.

16          THE COURT:  Objection to form is sustained.

17  BY MR. SOROSKY:

18  Q   Well, what did you tell Mr. Krozel in your

19  conversations with him?

20          MR. NIEWOEHNER:  Objection, Your Honor.

21          THE COURT:  The objection is sustained.

22  BY MR. SOROSKY:

23  Q   Well, after you had your first meeting, after

24  this original meeting at the Governor's office where

25  the governor asked for the contribution and the

1  governor asked you to follow up, what did you tell

2  Mr. Krozel?

3            MR. NIEWOEHNER:  Objection, Your Honor.

4            THE COURT:  I think he's answered those

5  questions.

6

7  BY MR. SOROSKY:

8  Q   Now, this famous line or famous comment where the

9  governor told you "if they don't perform f' 'em, I

10 won't do the project," when the governor told that

11 to you, who was present?

12 A   Just me.

13 Q   Mr. Krozel wasn't there, was he?

14 A   No.

15 Q   And you never related that comment to Mr. Krozel,

16 did you?

17 A   No.

18 Q   And you never heard the governor say that to

19 Mr. Krozel?

20 A   No.

21 Q   And you know the governor in his speech and

22 colloquy uses profanity a lot, doesn't he?

23 A   In conversations, yeah.

24 Q   This is just something the governor said to you,

25 right?  Just two ol' pals, right?

1          MR. SCHAR:  Objection, Your Honor.

2          THE COURT:  To the form of the question,

3 sustained.

4 BY MR. SOROSKY:

5 Q   Well, this is just a comment the governor said to

6 you, right?

7          MR. NIEWOEHNER:  Objection, Your Honor.

8          THE COURT:  You're characterizing it as "just

9 a comment."  This witness is first asked if there

10 was a comment made to him, and that question would

11 be fine.

12 BY MR. SOROSKY:

13 Q   Now, did you know of any threat made to

14 Mr. Krozel to contribute?

15          MR. NIEWOEHNER:  Objection, Your Honor.

16          THE COURT:  I think you already covered this

17 with respect to your client, so maybe you want to

18 rule out the rest of the world with which I permit

19 you to do.

20 BY MR. SOROSKY:

21 Q   Do you know of any intimating words spoken to

22 Mr. Krozel by Governor Blagojevich to compel him to

23 make a contribution?

24          MR. SCHAR:  Objection.

25          THE COURT:  Sustained.

:58AM
:58AM
:59AM
:59AM
:00PM

1  BY MR. SOROSKY:

2  Q   Now somewhere in your conversations with the

3  governor you told the governor that Krozel can't

4  come up with half a million dollars, right?

:00PM    5  A   Yes.

6  Q   I believe you first said the governor said to

7  you, I'm going to announce this 1.8 billion-dollar

8  program, I would like Krozel and the -- I would like

9  Krozel and the road builders to do a fundraiser and

:01PM   10  raise half a million, isn't that, in summary, what

11  the governor said?

12        MR. NIEWOEHNER:  Objection.

13        THE COURT:  To the form, it's sustained.

14  BY MR. SOROSKY:

:01PM   15  Q   Let's go back to this original meeting you had

16  with the governor, the original meeting that you had

17  with the governor where you were given the

18  assignment.

19        Did he say at that meeting he's going to

:01PM   20  announce the 1.8 billion-dollar program and he would

21  like the road builders to have fundraisers and raise

22  half a million-dollar dollars?

23        MR. NIEWOEHNER:  Objection, Your Honor.

24        THE COURT:  Compound question.

:01PM   25  BY MR. SOROSKY:

1  Q   I'll ask one at a time.
2          At this first original meeting, did the
3  governor tell you he was going to announce 1.8
4  billion-dollar program?
5          MR. NIEWOEHNER:  Foundation, Your Honor.
6          THE COURT:  Yeah.
7  BY MR. SOROSKY:
8  Q   At the original meeting that you were at with the
9  governor, and I think you said Robert Blagojevich
10 may have been there, it was a general fundraising
11 meeting where you were given the assignment to raise
12 money from the road builders, did the governor tell
13 you that he was going to announce a 1.8
14 billion-dollar program?
15         MR. NIEWOEHNER:  Objection to scope.
16         THE COURT:  Overruled.  You can answer.
17 BY THE WITNESS:
18 A   So, again, I don't know whether it was a meeting
19 that I had with he and Robert when road builders
20 were assigned to me.  It may have been just a
21 conversation that I had with him that he raised the
22 topic or I may have raised the topic, so I don't
23 know whether it was a meeting or not.
24         But when we talked about fundraising from the
25 road builders originally, I'm sure I'd even heard

1 about the tollway program.

2 Q   So you're saying he first asked you to raise

3 money from the road builders without even mentioning

4 the tollway project, right?

:03PM   5 A   Right.

6 Q   And I believe your testimony was that you really

7 didn't act on raising money immediately after you

8 were given that assignment, correct?

9        MR. NIEWOEHNER:  Objection, Your Honor.

:03PM   10        THE COURT:  The objection is sustained.

11 BY MR. SOROSKY:

12 Q   And it was sometime thereafter that you brought

13 Jerry Krozel to this meeting, is that correct?

14 A   Sometime after it was determined that I was going

:04PM   15 to be the point person for raising money from the

16 road builders, we set up the meeting for Jerry

17 Krozel and Rod.

18 Q   And it was at this meeting that Jerry Krozel

19 asked for -- that the governor asked Jerry Krozel

:04PM   20 for the contribution, right --

21        MR. NIEWOEHNER:  Objection, Your Honor.

22 BY MR. SOROSKY:

23 Q   -- at the fundraiser?

24        THE COURT:  The objection is sustained.

:04PM   25 BY MR. SOROSKY:

1  Q   And I believe you said the governor's words at

2  that meeting were, "Jerry, can you do anything to be

3  helpful by the end of the year"?

4           MR. NIEWOEHNER:  Objection; asked and

5  answered.

6           THE COURT:  Asked and answered.

7  BY MR. SOROSKY:

8  Q   And that's when -- okay.

9           Now, this comment when the governor said, "if

10 they don't perform f' them" and all that, Krozel

11 wasn't there for any of that, was he?

12 A   No.

13 Q   And was it at this meeting you had with

14 Mr. Krozel at the Plush Pub on November 24th when

15 Mr. Krozel told you that he couldn't raise anything

16 near half a million dollars?

17           MR. NIEWOEHNER:  Objection, Your Honor.

18           THE COURT:  Sustained.

19 BY MR. SOROSKY:

20 Q   What did Mr. Krozel tell you at the Plush Pub

21 meeting on November 24th?

22 A   We talked about his idea for a gas tax, he talked

23 --

24 Q   Other than --

25 A   -- he talked about -- I asked him how he was

:05PM

:05PM

:06PM

:06PM

:06PM

1  doing in fundraising.  You know, he led me to

2  believe that he was working on it and was making

3  some progress.

4  Q   So when did Mr. Krozel tell you he couldn't come

5  anywhere near that half a million dollars?

6  A   He didn't tell me that.

7  Q   You just told that to the governor, right?

8  A   Correct.

9  Q   And when you told that to the governor, did the

10 governor say:  Well, that's it, I'm not doing the

11 5-billion-dollar program?

12        MR. NIEWOEHNER:  Objection, Your Honor.

13        THE COURT:  The objection is sustained.

14 BY MR. SOROSKY:

15 Q   What did the governor say when you told him that?

16 What did the governor say when you told the governor

17 Krozel is never going to come anywhere near half a

18 million dollars?

19 A   That, you know, can they do 100, do you think

20 they'd be able to raise a hundred.

21 Q   So would I be correct in saying, really all the

22 governor wanted was to raise contributions, right?

23        MR. NIEWOEHNER:  Objection, Your Honor.

24        THE COURT:  The objection is sustained.

25 BY MR. SOROSKY:

1  Q   Isn't it true that governor just wanted to raise
2  contributions?  He didn't want to intimidate anyone?
3          MR. NIEWOEHNER:  Objection, Your Honor.
4          THE COURT:  The objection is sustained.
5  BY MR. SOROSKY:
6  Q   How many conversations did you have with
7  Mr. Krozel, let's say, both in person or over the
8  telephone during this period of time when you were
9  attempting to either get a contribution from him or
10 have the whole road builders group do a fundraiser,
11 or whatever?  How many conversations did you have
12 with Mr. Krozel, approximately?
13 A   5 to 7.
14 Q   Did, Mr. Krozel ever tell you, "hey, Lon, you
15 guys are intimating me," or anything like that?
16         MR. NIEWOEHNER:  Objection.
17         THE COURT:  This is good thing to say in
18 closing argument, not so good to say now and put
19 into a question.  I'm sustaining the objection.
20 BY MR. SOROSKY:
21 Q   When Mr. Krozel asked the governor to meet with
22 his new bosses, the governor did, right?
23 A   Yes.
24 Q   The governor didn't say, "hey, Jerry, it sure
25 would help if the new bosses gave us a

1  contribution," did he?

2          MR. NIEWOEHNER:  Objection, Your Honor.

3          THE COURT:  The objection is sustained.

4  BY MR. SOROSKY:

5  Q   Now, there certainly was an announcement of the

6  1.8 billion-dollar program, correct?

7  A   Correct.

8  Q   And when this announcement was made, the governor

9  had not received one cent in contributions from the

10 road builders, did he?

11         MR. NIEWOEHNER:  Objection, Your Honor.

12         THE COURT:  The objection is sustained.

13 BY MR. SOROSKY:

14 Q   Now, do you remember the topic of the capital

15 bill?

16 A   Yes.

17 Q   And just so we're clear, the capital bill was a

18 bill that would build roads and bridges and schools

19 and maybe hospitals, and so forth, all over the

20 state, right?

21 A   Correct.

22 Q   That would be distinguished from the tollway

23 project which only involved the tollways, correct?

24 A   Correct.

25 Q   And the way the tollways were located or where

1    the tollways are located, a tollway project would

2    really only benefit the people in the extreme

3    northern end of the state, correct?  In the

4    Chicagoland area, basically, because that's where

5    most of the tollways are, right?  Where the tollways

6    are?

7           MR. NIEWOEHNER:  Objection, Your Honor.

8           THE COURT:  The objection is sustained.

9    BY MR. SOROSKY:

10   Q   Well, wasn't that one of the concerns that the

11   governor had, that the tollway project would just

12   benefit the people at the northern end of the state

13   wheres the capital bill would help the people all

14   over the state?

15          MR. NIEWOEHNER:  Objection.

16          THE COURT:  The objection is sustained.

17   BY MR. SOROSKY:

18   Q   And to the best of your knowledge, the governor

19   wanted the capital bill to pass, right?

20          MR. NIEWOEHNER:  Objection, Your Honor.

21   BY THE WITNESS:

22   A   Yes.

23          THE COURT:  What?

24          MR. NIEWOEHNER:  Objection.

25          THE COURT:  The objection is sustained.  I

:11PM

:11PM

:12PM

:12PM

:12PM

 1  mean, you can introduce evidence of this but not
 2  from him.
 3  BY MR. SOROSKY:
 4  Q   And the capital bill and the tollway project were
 5  discussed with Mr. Krozel, were they not?
 6  A   Yes.
 7  Q   And it was Mr. Krozel's belief that the capital
 8  bill wouldn't likely pass, correct, because --
 9          MR. NIEWOEHNER:  Objection.
10          THE COURT:  Sustained.
11  BY MR. SOROSKY:
12  Q   The main opponent to the capital bill was Speaker
13  Madigan, right?
14          MR. NIEWOEHNER:  Objection.
15          THE COURT:  Sustained.
16  BY MR. SOROSKY:
17  Q   But if there was this deal on the senate seat
18  between Speaker Madigan and the governor --
19          MR. NIEWOEHNER:  Objection.
20          MR. SOROSKY:  -- then the capital bill might
21  have passed, right?
22          THE COURT:  Mr. Sorosky, don't do this again.
23  There are ways you can deal with this, I've informed
24  you of what they are, but asking this witness is
25  inappropriate.  And unless you have something that

 1  is appropriate, maybe you want to consider sitting

 2  down.  I'm not ordering you to sit down.

 3  BY MR. SOROSKY:

 4  Q   Let's get into the racetrack.

 5        Now, you were on assignment from the governor

 6  to get a contribution from Mr. Johnston and the

 7  racetrack bill industry, right?

 8        MR. NIEWOEHNER:  Objection, Your Honor;

 9  compound.

10        THE COURT:  Yeah, apart from that.  Yeah,

11  compound question.

12  BY MR. SOROSKY:

13  Q   You were on assignment from the governor to get a

14  contribution from the racetrack industry, is that

15  true?

16  A   No; just from the Johnstons.

17  Q   What?

18  A   From the Johnstons.

19  Q   From the Johnstons?

20  A   Right.

21  Q   And you also were a lobbyist representing the

22  Johntsons, correct?

23  A   Yes.

24  Q   And as this request for a contribution was

25  planned out, it became apparent that the governor

:14PM

:14PM

:15PM

:15PM

:15PM

1  wanted a contribution and the Johntsons were a

2  little hesitant in giving the contribution, correct?

3          MR. NIEWOEHNER:  Objection.

4          THE COURT:  You are asking for an opinion

:15PM  5  that I'm not going to permit.  The objection is

6  sustained.

7  BY MR. SOROSKY:

8  Q  Well, the governor continuously kept asking for a

9  contribution, right?

:16PM  10  A  He kept asking me for the status of getting a

11  contribution from the Johntsons, yes.

12  Q  And the governor wanted a contribution, right?

13  A  Yes.

14  Q  And you kept asking Johnston for contributions,

:16PM  15  right?

16  A  For the status of the contribution, yeah.

17  Q  And Johnston, bottom line, was not coming up with

18  any contribution, was he?

19          MR. NIEWOEHNER:  Objection, Your Honor.

:16PM  20          THE COURT:  Objection to the form is

21  sustained.

22  BY MR. SOROSKY:

23  Q  Johnston had not given a contribution or wasn't,

24  correct?

:16PM  25  A  During that period of time, yes.

1  Q   What?

2  A   During that period of time, yes.

3  Q   Okay.  So weren't you in a conflict there in that

4  Mr. Blagojevich is asking you, as a friend, to get a

5  contribution --

6          MR. NIEWOEHNER:  Objection, Your Honor.

7          MR. SOROSKY:  -- and your client --

8          THE COURT:  Mr. Sorosky --

9          MR. SOROSKY:  -- your client doesn't want to

10 give a contribution?

11         THE COURT:  Mr. Sorosky, it's beyond the

12 scope.

13         MR. SOROSKY:  Pardon me?

14         THE COURT:  It's beyond the scope.

15 BY MR. SOROSKY:

16 Q   Now, on September 12th, 2008, do you remember

17 being at a fundraising meeting at Friends of

18 Blagojevich office?

19 A   Not -- not specifically.  I mean, there could've

20 been.  I don't remember on that day.

21 Q   Well, without seizing on that specific date, you

22 certainly were at a fundraising meeting -- you

23 certainly attended fundraising meetings at the

24 Blagojevich campaign office in September of 2008,

25 right?

1  A   Yes.

2  Q   And you went over lists of prior donors, is that

3  correct?

4  A   Yes.

:18PM  5  Q   And do you remember Mr. Johnston being on the

6  list as a donor or prospective donor to give a

7  contribution as early as September of 2008?

8         MR. SCHAR:  Objection to scope.

9         THE COURT:  Sustained.  Rephrase it.

:18PM  10  BY MR. SOROSKY:

11  Q   Do you remember Johnston, do you remember

12  Mr. Johnston being listed or talked about as a

13  prospective donor in September of 2008?

14         MR. NIEWOEHNER:  Objection.

:19PM  15         THE COURT:  He can answer that one.

16  BY THE WITNESS:

17  A   Not specifically, but I would they were -- he was

18  on the list of September 8 when we were going over

19  the fundraising lists.

:19PM  20  BY MR. SOROSKY:

21  Q   I believe your answer was -- well, just so I'm

22  clear, what was your answer to my question whether

23  Johnston was on the list?

24         THE COURT:  Why don't we have it read back.

:19PM  25         MR. SOROSKY:  What?

1       THE COURT:  Why don't we have it read back.

2       MR. SOROSKY:  The question and answer read

3  back, please.

4     (Record read.)

5       MR. SOROSKY:  Could I refresh his memory?

6       THE COURT:  With respect to what?

7       MR. SOROSKY:  Well, the assumption, maybe we

8  could clarify the assumption.

9       MR. NIEWOEHNER:  Objection, Your Honor.

10       THE COURT:  I think you got the answer.

11       MR. SOROSKY:  What?

12       THE COURT:  I think you got the answer.

13       MR. SOROSKY:  Okay.

14  BY MR. SOROSKY:

15  Q   So could we agree that Mr. Johnston was a

16  prospective donor on the list in September?

17  A   Yeah.

18  Q   And when he was a prospective donor back in

19  September, there wasn't any talk about the Recapture

20  Bill or money going from casinos to racetracks, was

21  there?

22       MR. NIEWOEHNER:  Objection.

23       THE COURT:  Sustained.

24       (Brief pause.)

25       THE COURT:  I sustained, it.

 1          MR. SOROSKY:  All right.

 2    BY MR. SOROSKY:

 3    Q   And this list --

 4          Now, didn't Mr. Johnston make a commitment to

 5    make a contribution in September of 2008?

 6          THE COURT:  The problem with that question

 7    is, did he make a commitment to give a contribution

 8    at some date or did he make a commitment to give

 9    something in September.  You better parse that

10    question out.

11          MR. SOROSKY:  Okay.

12    BY MR. SOROSKY:

13    Q   I ask you to answer the question the way the

14    judge has --

15          THE COURT:  You can't do that.

16          MR. SOROSKY:  Oh, I can't do that.

17          You can see I want the help.

18          THE COURT:  Yeah.

19    BY MR. SOROSKY:

20    Q   Okay, let's do it piecemeal.

21          First, did Mr. Johnston make a commitment to

22    make a contribution, and then we'll get into when

23    and where the commitment was.

24          THE COURT:  Well, it might be useful to ask

25    if he made a commitment to him, because otherwise

1   the question might call for hearsay.

2   BY MR. SOROSKY:

3   Q   Did Mr. Johnston make a commitment to you in

4   September to make a contribution?

5   A   No.

6   Q   He did not.

7           Did he make a commitment to Rod?

8           MR. NIEWOEHNER:  Objection to the scope.

9   BY MR. SOROSKY:

10  Q   If you know?

11          THE COURT:  The objection is sustained.

12          MR. SOROSKY:  Well, may I show --

13          MR. NIEWOEHNER:  Your Honor, there's nothing

14  to impeach.

15          THE COURT:  No.

16          MR. SOROSKY:  If I could show Your Honor?

17          THE COURT:  No, I know what you're talking

18  about and you can't ask the question the way you're

19  asking it.

20  BY MR. SOROSKY:

21  Q   Now, when did you first get the assignment to

22  seek a contribution from the Johntsons?

23          MR. NIEWOEHNER:  Objection; time.

24          MR. SOROSKY:  In 2008, of course.

25  BY THE WITNESS:

1  A   Ah --

2  BY MR. SOROSKY:

3  Q   If you know?

4  A   I don't remember specifically.  You know,

5  probably in the summer or fall of 2008.

6  Q   And as best you can recall, do you remember what

7  did the governor tell you?

8         MR. NIEWOEHNER:  Objection.

9         THE COURT:  Sustained.

10 BY MR. SOROSKY:

11 Q   And after getting that assignment, what did you

12 say to Johnston?

13        MR. NIEWOEHNER:  Objection.

14        THE COURT:  Sustained.

15 BY MR. SOROSKY:

16 Q   Did you attempt to obtain a contribution from

17 Johnston?

18 A   Yes.

19 Q   Tell the ladies and gentlemen of the jury what

20 you did, how you went about trying to get a

21 contribution?

22        MR. NIEWOEHNER:  (Counsel standing.)

23        THE COURT:  Maybe we're getting a little

24 weary and we should have the lunch break.

25        MR. SOROSKY:  Okay.

1          THE MARSHAL:  All rise.

2       (The following proceedings were had out of the

3        presence of the jury in open court:)

4          THE COURT:  1:40.

5          THE MARSHAL:  This court will suspend until

6     1:40 p.m. today.

7       (The following proceedings were had out of the

8        presence of the jury in open court:)

9          THE COURT:  We are in recess.

10          Counsel, I'll see you about 1:30.

11

12       (Luncheon recess taken from 12:26 o'clock p.m.

13        to 1:30 o'clock p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Monk - cross by Sorosky                    2901

1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No.  08 CR 888
4          Government,             )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  May 18, 2011
                                   )
7            Defendant.            )  1:30 o'clock p.m.

8                     Volume 17

9               TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JAMES B. ZAGEL AND a JURY
10        (Excerpt - Page numbers should not be
                cited in appellate record.)
11

12  For the Government:

13              THE HONORABLE PATRICK J. FITZGERALD,
                UNITED STATES ATTORNEY
14              BY:  Reid J. Schar
                     Carrie E. Hamilton
15                   Christopher Niewoehner
                Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18
    Court Reporter:
19
                Blanca I. Lara, CSR, RPR
20              219 South Dearborn Street
                     Room 2504
21              Chicago, Illinois 60604
                     (312) 435-5895
22

23

24

25

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY:  Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14
           OFFICES OF LAUREN FAUST KAESEBERG
15         BY:  Lauren Faust Kaeseberg
           2140 N. Lincoln Park West
16         Suite 307
           Chicago, Illinois 60614
17         (773) 517-0622

18

19

20

21

22

23

24

:38PM  25

1      (The following proceedings were had out of the
2       presence of the jury in open court:)
3      THE COURT:  Any time.
4        MR. SCHAR:  Judge, what happened this morning
5   was just way, way over the top in terms of these --
6   I mean, it's hard to pick one particularly obvious
7   example because there were so many, but the one
8   about the Madigans and the senate seat, I mean,
9   Mr. Sorosky knows, he knows, how to ask proper
10  questions.
11      What this has turned into is a litany of
12  questions, which I'll assume were asked in good
13  faith, but really rise into closing argument.  I
14  would point out, you instructed him many times why
15  certain questions were improper, but perhaps the
16  highlight of it was Mr. Wyma's recross in which
17  Mr. Sorosky asked several questions about what was
18  in the defendant's head, there was an objection, you
19  explained to him they're improper questions, and you
20  tell him he could ask Mr. Wyma's understanding.
21  And, sure enough, he doesn't want Mr. Wyma's
22  understanding, he just wants to make the argument,
23  he won't ask the question, he sits down.
24      Here we are back today spending the better
25  part of the morning with the government having to

1  either cut him off or allow the question to go and
2  then object to it knowing full well it's never going
3  get to the witness.

4         And, Judge, we've been paying attention,
5  there are certain jurors who are actually writing
6  down the questions.  So maybe to his credit, he's
7  actually having the effect he wants to have, which
8  is, I'm just going to give the argument that I want
9  to give knowing full well the question is never
10  going to be answered and it doesn't matter.

11         It's improper and it puts us in the, frankly,
12  impossible position of either having to wait for the
13  entirety of the question, which is clearly improper,
14  it puts the top point out there, then we object and
15  it is sustained.

16         We're looking like we're cutting him off,
17  which is not the position that we want to be in, we
18  don't think it's proper decorum, anyway, but these
19  questions can't continue to go on.

20         And so I guess the point is, we would like a
21  remedy if this is going to continue in terms of
22  stopping the question immediately or vetting the
23  question through you first.

24         And for the purposes of now, and I've given
25  this to Mr. Sorosky just now, an instruction to the

1    jury which I think you made at the beginning but
2    it's certainly appropriate now, and I'll hand it up
3    to your Honor, which basically reminds them that the
4    questions are not evidence, when you sustain an
5    objection they must disregard the question, and we
6    have a duty to object.
7           And, you know, obviously there is a growing
8    concern that some members of this jury may think
9    that because Mr. Sorosky makes an argument through a
10   question, somehow it's meaningful.  And, of course,
11   as everyone knows, in a court of law the only
12   meaningful thing that occurs is what comes out of
13   the witness' mouth.
14          So it's really improper, I think it's gone on
15   long enough this morning, and it's really got to
16   stop.
17          MR. SOROSKY:  If I may respond.  First
18   concerning the Madigan issue:  The government
19   brought out very specifically when they put
20   Mr. Krozel on the witness stand, and with Mr. Krozel
21   they went through great length of explaining the
22   difference between the tollway project and the
23   Capital bill and the governor had the exclusive
24   prerogative to do that because that was within his
25   purview as chief executive officer; however, the

1  capital bill could only be passed by the legislature

2  and there was no chance of a capital bill being

3  passed because Mike Madigan was against it, and the

4  government even brought out how it had passed the

5  Senate.

6        And this was through Mr. Krozel's testimony,

7  that there was no chance, there was no chance of the

8  capital bill ever becoming law because Mike Madigan

9  would not pass it and this is why Mr. Krozel said he

10  supposedly didn't believe the governor about this

11  bit about the reason why the governor was holding

12  back on the second 5-billion-dollar project was

13  because he, the governor, didn't want to announce it

14  because, he, the governor, wanted to pass the

15  capital bill.

16        And Mr. Krozel, the government's witness,

17  said I thought the governor was lying when he said

18  that and not being truthful but that the real reason

19  was, he knew there was no chance of capital bill

20  being passed because Mike Madigan and Rod

21  Blagojevich were at war and Mike Madigan would not

22  pass the capital bill.

23        THE COURT:  Okay, move on to your next

24  subject.

25        MR. SOROSKY:  Well, with all due respect,

1  Your Honor, Mr. Krozel was not aware of the

2  potential negotiations --

3          THE COURT:  Move on to your next one.

4          MR. SOROSKY: -- and Mike Madigan --

5          THE COURT:  You are making an incoherent

6  argument, move on to your next subject.

7          MR. SOROSKY:  I'm just responding to the

8  Madigan thing.

9          THE COURT:  No, no, no.  If that's the only

10 thing you want to respond to, that's fine.  If there

11 is something else --

12         MR. SOROSKY:  Well, I'm just telling you why

13 we felt that question was proper.

14         THE COURT:  I understand why you felt it was

15 proper, I don't actually understand how you could

16 think that question was proper, but is there

17 anything other than that you want to talk about?

18 Any of you can speak to this because I want you to

19 speak to everything so that when I rule I don't get

20 an add-on from anybody.  So go ahead.

21         MR. SOROSKY:  We strongly object to this

22 instruction.  There isn't any basis.

23         THE COURT:  Okay, this is it?

24         MR. SOROSKY:  There is no basis for it.

25         The only thing the government is trying to

:43PM

:43PM

:44PM

:44PM

:44PM

1  do, as they've tried to do consistently with this

2  case, is use the court to diminish our case and help

3  their case and it's just wrong.

4          THE COURT:  Except for one small thing, I

5  really don't know what your case is except for one

6  thing, which is not at issue in any of this witness'

7  questions, and that is the theme of the opening

8  statement, which is none of this stuff actually

9  happened, which is an interesting thing to have in a

10 case which essentially alleges attempt because

11 that's true in all attempt cases, nothing happened.

12 But anything else you want to say, say it now.

13         MS. KAESEBERG:  I would add with the

14 instruction that the government is asking you to

15 give, I think to say there is a duty to object, but

16 it is inappropriate to tell the jury at this point.

17 You make a ruling on whether the objection is proper

18 or not, and clearly you sustained the majority of

19 the government's objections, but sometimes were not

20 sustained, at least a few, and to say there's a duty

21 for them to object, basically I think it raises the

22 level of how much credence to give to every

23 objection.  That's an improper instruction to give

24 at this point.

25         And I would argue the instruction shouldn't

1  be given until the end of the case, but if you are

2  inclined to give the instruction, we would ask that

3  at least that latter --

4          THE COURT:  I gave it once already, I gave it

5  once already without objection.

6          Okay, let me tell you what this is:  Your

7  basic approach, and this has been your approach in

8  some of the motions that are before me today, and

9  that is, you misconstrued, and I don't know how you

10  could, you misconstrued the government's position.

11          I'll give you an example unrelated to

12  Madigan, we'll get to Madigan in a second:  The

13  government says, we're not interested in any of the

14  defendant's actions and they shouldn't be put into

15  evidence after he's arrested.  And they're talking

16  basically about whether he did or did not sign the

17  racetrack bill, whether he did or did not let the

18  pediatric specialists go through.  You interpreted

19  this to mean that by discussing any subject that

20  occurred after the arrest, the government has opened

21  the door to absolutely everything and entitles you

22  to put in anything after that date.

23          This is not true.  This is kind of an equal

24  protection argument.  And with Krozel, it's even

25  worse, because they weren't asking Krozel about

1  Madigan, they were asking Krozel what he thought
2  about Madigan and what he believed.  However correct
3  or incorrect, this was the basis of his discussions
4  with Madigan.  It doesn't respond to Krozel and
5  doesn't aid you in any way by talking about what the
6  real story is with Madigan, whether there really was
7  a hope, whether there wasn't a hope.
8          The only place you could possibly have used
9  it was with Krozel, but you don't use it with
10 Krozel, you use it with this witness and you ask
11 this witness what somebody's intent was, what
12 somebody believed in circumstances where you are not
13 talking about interpreting what somebody said,
14 interpreting what they believed.
15         And let me tell you what the problem is,
16 because I'm not sure that what the government has
17 proposed is an adequate remedy.  The reason is is
18 that these questions hint at facts that haven't been
19 proved, in some cases there's no factual basis for
20 asking the questions, and in some cases you're not
21 talking about a fact, a specific fact, you're
22 talking about something the witness said he believed
23 and the only relevance to it is that he believed he
24 didn't believe it.  And you can possibly cross
25 examine the person who said that, but you're not

:47PM

:48PM

:48PM

:48PM

:49PM

1  doing that, you're cross-examining somebody else who

2  isn't Krozel.

3        And the problem for the government is is that

4  somehow the jury will think that these are facts

5  there and that we ought to consider them even though

6  the judge said we shouldn't, even though they know

7  this is a general principle.

8        And there is a remedy for that, and the

9  remedy for that is to specifically give a list or a

10 representative list of questions and tell the jury

11 to disregard them, and tell the jury also that the

12 defense is entitled to offer evidence on those

13 points, but it's evidence and not questions.

14       The problem with that is is that we do have

15 an instruction that says you shouldn't consider

16 against the defendant the fact that the defendant

17 does not testify or calls no witnesses, there's no

18 obligation to do so, but you are putting the

19 government in a position where it is unfair and

20 over-reading to say that unadorned.

21       And, in fact, there are several things in the

22 law that are entirely inconsistent with that

23 principle, one of which is, the government is

24 entitled in closing argument to argue that some of

25 their evidence is uncontradicted, the only

1  restriction on that is if it's a situation in which
2  the only way it could be contradicted is in the
3  testimony of the defendant.  They're free to make
4  that argument with respect to any position you take.
5  In fact, they're free to make that argument in a
6  general way simply by noting that other witnesses,
7  if there are other witnesses, that something is
8  uncontradicted by the defense.  It's a kind of I
9  argument really don't like to see, but it's a kind
10 of argument that you are inviting the government to
11 make.
12         I don't want you to ask any further questions
13 of the sort that you tried with Madigan when what we
14 are talking about is not whether Madigan would allow
15 the bill to pass and would not allow the bill to
16 pass, it's whether the witness believed something.
17         Now, you can when you get up in closing
18 argument and argue until you're blue in the face
19 that Krozel is lying to you and that he didn't
20 disbelieve the government.  But what you're doing is
21 making this argument in the form of questions, and
22 you've done it persistently.  And it was done in the
23 last trial, as well.
24         So I'm going to give this instruction to the
25 jury and I'm going to give this instruction to the

1  jury now, and I will remind the jury periodically of

2  it, and I will, I have not yet done this, but I

3  will, in fact, end an examination.

4       Now, in all honesty, because I do not want to

5  embarrass a lawyer, if I have to sit a lawyer down,

6  I will excuse the jury, then sit the lawyer down,

7  and the jury will simply believe that the

8  cross-examination is finished.

9       This is an abuse of cross-examination.  And

10  I'll point to something that is not so inflammatory:

11  I believe I told you twice that if the question you

12  ask is what happened this, who said what, when did

13  this happen, where did you go, who were you with,

14  who was present, fine.  "Please tell the ladies and

15  gentlemen of the jury" is not an appropriate

16  question, I told you that twice, and you did it

17  again.  And my difficulty with this is, that's not a

18  flagrant foul.  It's not a big deal, but what is a

19  big deal is that I tell you this and within a half

20  an hour, twice, within half an hour you do it again.

21       And the reason this is a problem for me is, a

22  lot of judge's rulings are based, particularly when

23  the question is a little on the line, are based on

24  the premise that you can trust what the lawyer is

25  going to do, that they're trying to follow your

:52PM

:53PM

:53PM

:53PM

:54PM

Monk - cross by Sorosky                    2914

1   rulings, and that they're capable of following your
2   rulings, and if that assumption and that premise is
3   gone, then it creates enormous problems for
4   everybody in this courtroom.  So I hope you take
5   this to heart and follow it.
6          And we are now done.
7          MR. SOROSKY:  I do, I follow whatever --
8          THE COURT:  No, no, I don't want to hear you
9   speak about it, I want to see you do it.  And this
10  is all I have to say.
11         MR. SOROSKY:  I understand.  But if I could
12  just make one comment --
13         THE COURT:  No.  The reason I did this was to
14  tell you what I want to rule on, I don't want a
15  comment.  Lawyers get to argue, I make a ruling, and
16  then you follow the ruling.  If you think the ruling
17  is wrong, you have a remedy, but it's not to reargue
18  it in front of me.
19         Bring in the jury, we're ready.
20         The witness back on the stand.
21      (Brief pause).
22         THE MARSHAL:  All rise.
23      (The following proceedings were had in the
24       presence of the jury in open court:)
25         THE COURT:  Please be seated.

Monk - cross by Sorosky                              2915

1          I have one brief instruction for you.  The
2    only reason I'm giving it is, you obviously sat
3    through this morning on an examination which there
4    were a fairly large number of objections, and a
5    fairly large number of my rulings many of which I
6    sustained, some of which I didn't.
7          There's a rule of law that covers this, it's
8    an instruction you'll actually receive at the end of
9    the case, as well, and it's an instruction I gave
10   you at the very beginning but I think it's worth
11   repeating:
12         Questions by the lawyers are not evidence.
13   When I sustain an objection to questions the lawyers
14   have asked, you must disregard the lawyer's
15   questions and you must not speculate on what the
16   answer would have been or might have been.
17   Attorneys also have a duty to object when they
18   believe the question is improper.  You should not be
19   influenced by the fact that a lawyer made an
20   objection.
21         With that, you may resume.
22    ALONZO MONK, GOVERNMENT WITNESS, PREVIOUSLY SWORN
23            CROSS EXAMINATION (resumed)
24   BY MR. SOROSKY:
25   Q   How are you?

1  A   Good.

2  Q   If you will remember, before the lunch hour we

3  talked about the fact that in early September you

4  had received your assignment or a job of attempting

5  to get a contribution from the Johntsons, that

6  assignment coming from the governor, correct?

7  A   Yes.

8  Q   And then I believe you related in your direct

9  examination many, many phone calls, some of which we

10 heard, that were recorded of your conversations with

11 Mr. Johnston attempting to get a contribution,

12 right?

13 A   Yes.

14 Q   And, of course, would it be fair to say in all

15 those conversations you were asking Mr. Johnston for

16 a contribution, correct?  Or in many of them?

17 A   Yes.

18 Q   And you were asking in the best most artful way

19 that you could -- that you could, in an effort to

20 get a contribution, would that be a fair statement?

21         MR. NIEWOEHNER:  Objection.

22         THE COURT:  Sustained as to form.

23 BY MR. SOROSKY:

24 Q   You were just asking to get contributions, right?

25 Or get contributions, right?

Monk - cross by Sorosky                          2917

1  A   Yes.
2  Q   And would it be accurate to say that Mr. Johnston
3  was always telling you he was trying to get it, he
4  was trying to get it, and he was working on it, that
5  type of thing, would that be a fair assessment of
6  Mr. Johnston's statements to you every time wherever
7  you asked for a contribution?
8  A   Yes.
9  Q   And many of those -- and after many of those
10 conversations, you reported back to Governor
11 Blagojevich, didn't you, about the status of the
12 contribution, did you not?
13 A   Yes.
14 Q   And would it be correct to say that you told the
15 governor that you felt Johnston is working on it,
16 Johnston is good for it, and Johnston will give the
17 contribution?
18 A   Yes.
19 Q   And let me ask you, did you honestly believe that
20 Johnston was going to give the contribution?
21 A   Yes.
22 Q   And in some of those conversations you had with
23 the governor, you asked the governor if he was going
24 to sign the Recapture Bill, did you not?
25 A   Yes.

:00PM

:00PM

:00PM

:00PM

:01PM

Monk - cross by Sorosky                              2918

1  Q   And did not Rod always tell you, you have nothing
2  to worry about, I'm going to sign the Recapture
3  Bill?
4  A   Yes.
5  Q   And Rod never told you in express words, "look,
6  Lon, I'm only going to sign this Recapture Bill if
7  the Johntsons come through with a contribution"?
8  A   I'm sorry, can you ask it again?  I'm sorry.
9  Q   Rod never said I'm only going to sign the
10 Recapture Bill if the Johntsons come through with
11 the contribution?
12 A   No, he never said that.
13 Q   Now, when you first started asking Mr. Johnston
14 for a contribution, would that be, let's say,
15 September of 2008?
16 A   I think that's the right time frame, yeah.
17 Q   So when you first started asking Mr. Johnston for
18 this contribution, the Recapture Bill wasn't even a
19 topic of conversation, was it?
20 A   Yeah, it was.
21        MR. NIEWOEHNER:  Objection.
22        THE COURT:  The objection is sustained.
23 BY MR. SOROSKY:
24 Q   And then all during September and October, you
25 had a number of conversations with Mr. Johnston

1  about the contribution, right?

2  A  Yes.

3  Q  And Mr. Johnston was always saying I'm working on

4  it, I'll get it to you, that type of thing, correct?

:03PM
5  A  Yes.

6  Q  And then by -- then on November 20th, 2008, the

7  Recapture Bill had passed the legislature?

8  A  Correct.

9  Q  And then four days later, November 24th, the

:03PM
10  Recapture Bill was sent to the Governor's office for

11  his possible signature, correct?

12  A  Correct.

13  Q  And while this Recapture Bill was being

14  considered by the legislature and eventually passed

:03PM
15  by the legislature and given to the governor, in

16  October, November of 2008, unrelated to all of that,

17  you were asking Johnston for a contribution, right?

18          MR. NIEWOEHNER:  Objection, Your Honor.

19          THE COURT:  The objection is sustained.

:04PM
20  BY MR. SOROSKY:

21  Q  Now, when you were asking Mr. Johntsons for

22  contributions in October -- September, October,

23  November of 2008, you were not monitoring the

24  Recapture Bill, were you?

:04PM
25          MR. NIEWOEHNER:  Objection.

1          THE COURT:  Sustained.

2    BY MR. SOROSKY:

3    Q   And in middle November of 2008, did you and Rod

4    discuss the issue or the problem that, here we're

:05PM    5    seeking a contribution from the Johntsons and this

6    Recapture Bill is awaiting the governor's signature?

7          MR. NIEWOEHNER:  Objection.

8          THE COURT:  Very out of bounds.  The

9    objection is sustained.

:05PM    10    BY MR. SOROSKY:

11    Q   Did you consider it a timing problem?

12          MR. NIEWOEHNER:  Objection.

13    BY MR. SOROSKY:

14    Q   What I mean --

:05PM    15          THE COURT:  Yeah, I think maybe you somehow

16    incorporated the previous question to which I

17    sustained the objection, and that's how I think the

18    "it" you're talking about here and maybe you can

19    more precise.

:05PM    20    BY MR. SOROSKY:

21    Q   Now, during this period of time in September,

22    October and November, even early December of 2008,

23    when this Recapture Bill was being considered and

24    eventually passed, did you know if the governor ever

:06PM    25    called Mr. Johnston?

Monk - cross by Sorosky                    2921

1        MR. NIEWOEHNER:  Objection.

2        THE COURT:  That calls for hearsay, unless

3    you're going to ask him --

4    BY MR. SOROSKY:

:06PM   5  Q   Do you have any knowledge -- didn't you suggest

6    to the governor that he call Johnston to assist with

7    the contribution?

8        MR. NIEWOEHNER:  To the content of that

9    conversation.

:06PM  10        THE COURT:  The objection is sustained.

11    BY MR. SOROSKY:

12  Q   Did you on December 4th tell the governor,

13    December 4th of 2008, tell the governor to call

14    Johnston?

:07PM  15  A   Yes.

16  Q   And to the best your knowledge, the governor

17    never called Johnston, did he?

18        MR. NIEWOEHNER:  Objection, Your Honor.

19        THE COURT:  To the best of his knowledge

:07PM  20    means maybe he doesn't know.

21    BY MR. SOROSKY:

22  Q   Do you know if the governor ever called --

23        THE COURT:  But also ask him, for example, if

24    in the governor's presence the governor called

:07PM  25    Johnston.

1  BY MR. SOROSKY:

2  Q   Did the governor ever call Johnston in your

3  presence?

4        MR. NIEWOEHNER:  Objection.  Time frame, Your

:07PM   5  Honor.

6        THE COURT:  Time frame.

7  BY MR. SOROSKY:

8  Q   At any time during this period of time,

9  September, October, November, December of 2008?

:07PM  10        THE COURT:  We started this question with

11  December, why don't we go back to the original

12  question.

13  BY MR. SOROSKY:

14  Q   Okay.  After you suggested that the governor call

:08PM  15  Mr. Johnston, did the governor ever call

16  Mr. Johnston in your presence after that suggestion

17  in December, on December 4th of 2008?

18  A   Not in my presence, no.

19  Q   At any time in your presence in September,

:08PM  20  October or November in 2008, when this topic was at

21  issue, did the governor ever call Mr. Johnston?

22        MR. NIEWOEHNER:  Objection.

23        THE COURT:  I'm sustaining it.

24  BY MR. SOROSKY:

:08PM  25  Q   Now, on December 3rd, you came to the governor's

1  campaign office to talk to the governor, did you

2  not?  That is December 3rd of 2008, did you not?

3  A   Yes.

4  Q   And at that meeting, the governor and you went

:09PM  5  over potential conversations that you might have

6  with Mr. Johnston as to how best get the

7  contribution, would that be a correct statement?

8        MR. NIEWOEHNER:  Your Honor, I object;

9  compound.

:09PM  10        THE COURT:  Why don't you shorten it out.

11        MR. SOROSKY:  That one I don't think it was

12  compound.  I only asked, on December 8th did you go

13  over --

14        THE COURT:  No, no, no, you said something a

:10PM  15  little more than that, and maybe if you try the next

16  one it might be possible.

17  BY MR. SOROSKY:

18  Q   On December 3rd, 2008, did you and the governor

19  go over potential conversations?

:10PM  20  A   Yes.

21  Q   And were those potential conversations about how

22  best to approach Johnston about getting this

23  contribution?

24  A   Yes.

:10PM  25  Q   And was not the purpose of these potential

1  conversations to make Johnston feel that he was not

2  being threatened and extorted?

3          MR. NIEWOEHNER:  Objection.

4          THE COURT:  Whose purpose?

5          MR. SOROSKY:  The purpose of the governor.

6          MR. NIEWOEHNER:  Objection.

7          THE COURT:  Sustained.

8  BY MR. SOROSKY:

9  Q   And in these potential conversations that you had

10 with the governor, did the governor ever say, I want

11 you to go there and tell him that if Johnston

12 doesn't give a contribution, I'm not going to sign

13 the bill?

14         MR. NIEWOEHNER:  The explicit words, Your

15 Honor?

16         THE COURT:  Explicit words?

17         MR. SOROSKY:  Yes.

18         THE COURT:  You can answer the question.

19 BY THE WITNESS:

20 A   No.

21 BY MR. SOROSKY:

22 Q   In fact, and did not the governor tell you to say

23 that there are two separate -- that these are two

24 separate conversations?

25         MR. NIEWOEHNER:  Objection.

:11PM
:11PM
:12PM
:12PM
:12PM

1       THE COURT:  Sustained.

2  BY MR. SOROSKY:

3  Q   Then you went over and spoke to Johnston, did you

4  not, after these potential conversations?

:12PM    5  A   Yes.

6  Q   Did you ever tell Johnston on December 8th when

7  you had this in-person -- on December 3rd, I

8  apologize, when you had this in-person meeting:

9  Johnny, the governor is not gonna sign the Recapture

:13PM   10  Bill unless you give a contribution?

11       THE COURT:  Exact words again?

12       MR. SOROSKY:  Exact words.

13  BY THE WITNESS:

14  A   Those exact words, no.

:13PM   15  BY MR. SOROSKY:

16  Q   Did you ever tell Mr. Johnston that there was a

17  concern about the timing?  And by "timing" I mean

18  the fact that the governor wanted a contribution and

19  the governor had to sign the bill?

:13PM   20       MR. NIEWOEHNER:  Objection.

21       THE COURT:  It's a compound question.

22  BY MR. SOROSKY:

23  Q   Well, I just ask -- the only question is, did you

24  ever tell Mr. Johnson there was a concern about

:13PM   25  timing?

Monk - cross by Sorosky                        2926

1        THE COURT:  Okay, if you stop there.

2        MR. SOROSKY:  I'll stop there.

3    BY THE WITNESS:

4    A  I'm sorry, you have to ask the question again.

5    BY MR. SOROSKY:

6    Q  Did you ever tell Mr. Johnston that the governor

7    had some concern or there was some concern about

8    timing?

9    A  Yes.

10   Q  And just so we get the timing, was timing the

11   fact that a contribution was being sought at the

12   same time that the governor was supposed to sign the

13   bill?

14       MR. NIEWOEHNER:  Objection.

15       THE COURT:  Sustained.

16   BY MR. SOROSKY:

17   Q   How do you define "timing"?

18       MR. NIEWOEHNER:  Your Honor --

19       THE COURT:  The question -- you're talking

20   about a conversation between two people, and you

21   want to know what, if anything, he communicated

22   about timing, why don't you ask him what he said

23   about timing.

24   BY MR. SOROSKY:

25   Q   If you could answer the judge's question.

1          THE COURT:  No, no, no, you got to put it

2     yourself.  I know it's a silly rule, but it's a rule

3     and we like to follow the rule.

4     BY MR. SOROSKY:

5     Q   Well, what was said about timing between Johnson

6     and you on December 3rd, 2008?

7     A   That the governor was concerned that if he signed

8     the bill, the Johntsons would be skittish and not

9     want to give a contribution so close in the time of

10    signing the bill.

11    Q   And did you interpret that as a public relations

12    concern by the governor?

13         MR. NIEWOEHNER:  (Counsel standing.)

14         THE COURT:  The objection is sustained.

15    BY MR. SOROSKY:

16    Q   Now, just so we're clear, just one or two more

17    questions on this topic.  The governor never told

18    you in any of your conversations with the governor

19    about the racetrack, "if I don't get a contribution,

20    I'm not going to sign the bill"?

21         MR. NIEWOEHNER:  Objection.

22         THE COURT:  What?

23         MR. NIEWOEHNER:  Objection, Your Honor.

24         THE COURT:  His exact words again?

25         MR. NIEWOEHNER:  Yes.

:15PM
:15PM
:15PM
:16PM
:16PM

1          THE COURT:  Okay.

2    BY THE WITNESS:

3    A   He never said that.

4    BY MR. SOROSKY:

:16PM   5    Q   But just so we're clear, you believe that was the

6    governor's understanding, is that correct?  That he

7    wouldn't sign a bill unless he got a contribution?

8          MR. NIEWOEHNER:  Objection to the form.

9          THE COURT:  Yeah.  Try it again.

:16PM   10   BY MR. SOROSKY:

11   Q   You believed that was the governor's position or

12   thought, whatever you want to call it, that the

13   governor wouldn't sign the bill unless he got a

14   contribution, correct?

:17PM   15         MR. NIEWOEHNER:  Objection, your Honor.

16   Misstates the testimony.

17         THE COURT:  The objection is sustained.

18   BY MR. SOROSKY:

19   Q   Well, you believe that was the governor's

:17PM   20   understanding, is that correct?

21         MR. NIEWOEHNER:  Objection.

22         THE COURT:  Same ruling.

23   BY MR. SOROSKY:

24   Q   Well, it was your understanding of the governor's

:17PM   25   words that what he was really saying, "if I don't

1  get a contribution, I won't sign the bill," is that
2  correct?
3          MR. NIEWOEHNER:  Objection.
4          THE COURT:  The objection is sustained.
5  BY MR. SOROSKY:
6  Q  Well, all right, just so we're clear, the
7  governor never said the words "if he doesn't sign
8  the bill" -- the governor never said the words, "if
9  I don't get a transaction, I won't sign the bill"?
10 A  Not to me.
11 Q  Did you ever hear him say it to anyone else?
12 A  No.
13 Q  You testified your understanding was something
14 different than what the governor said, correct?
15         MR. NIEWOEHNER:  Objection.
16         THE COURT:  Sustained as to form.
17 BY MR. SOROSKY:
18 Q  Well, what was your understanding of what the
19 governor said?
20         MR. NIEWOEHNER:  What conversation?
21         THE COURT:  I think you may want to rephrase
22 that.
23 BY MR. SOROSKY:
24 Q  What was -- well, you related certain
25 understandings of the governor when you testified on

1  direct examination, did you not?

2          MR. NIEWOEHNER:  Objection.

3          THE COURT:  Why don't you come to the side,

4  because the problem is is that I think what the

5  question you're asking is based on a premise that

6  was not included in the government's case, and I

7  think I can tell you my understanding of it and it

8  might enable you to ask a proper question.  So let's

9  come to the side.

10         MR. SOROSKY:  The government has consistently

11 made a point throughout its case that the governor

12 promised to do a 1.8 billion-dollar program

13 immediately, the billion dollar program immediately

14 and a 5-billion-dollar program next year, and he was

15 extorting Krozel and the road builders because he

16 wouldn't do this program unless they gave him a

17 contribution, we just want to establish to the jury

18 if he got arrested and charged and therefore he

19 couldn't possibly do the program after he just said

20 he got arrested and therefore couldn't possibly do

21 the program and never had an opportunity to do the

22 program.

23         THE COURT:  When was he degovernored?

24         MR. SOROSKY:  When was he what?

25         THE COURT:  Degovernored.

1          MR. SOROSKY:  Degovernored?  You mean

2     impeached?

3          THE COURT:  Yeah.

4          MR. SOROSKY:  I would say late January.  They

5     would know the exact date.

6          THE COURT:  And he had late January to

7     announce it.

8          MR. SOROSKY:  Well, I would also add, too,

9     you know, what's the ol' expression, what's good for

10    the goose is good for the gander, I don't know where

11    that expression comes from, but if we can't mention

12    anything after December 5th or December 8th why

13    should they have the advantage of saying, impliedly

14    saying, oh, he didn't do something?

15         THE COURT:  You want to speak to this?

16         MR. NIEWOEHNER:  Your Honor, we focused

17    everything before December 9th, all the questions

18    and public announcements are December 9th, we never

19    suggested anything beyond that time frame, for the

20    same reasons we moved on Children's Memorial

21    Hospital on --

22         THE COURT:  Yeah, I don't think they have

23    enough.  On top of it, it doesn't do you any good

24    because if he's soliciting campaign contributions in

25    exchange for some program, if he's not, then that's

Monk - cross by Sorosky                          2932

1  fine, if he is soliciting campaign contributions to
2  such programs, the fact that he kept his promise
3  does not bear on his possible innocence, it's more
4  like evidence of guilt.  I don't see where this gets
5  you.  It's like, okay, I got to do it, maybe he's
6  fishing for some more stuff.  Now, there are ways
7  for it to come in that you could possibly get this
8  into your case, but not -- this is and inference, at
9  best, goes both ways, so it's out.
10         Do you have anything else you're going to ask
11 so we can get the rulings on the side?  Because he
12 was fairly narrow.
13         MR. SOROSKY:  No, we're fine.
14         THE COURT:  Okay.
15
16 BY MR. SOROSKY:
17 Q  Now, on December 3rd, you went over to the
18 Johnston office, is that correct?
19 A  Yes.
20 Q  So just so we're clear on the events of December
21 3rd, 2008, you were at Blagojevich's office?
22 A  Yes.
23 Q  You had these potential conversations about what
24 you would say to Mr. Johntsons, then you called
25 Mr. Johnston and went over to Johnston's office, is

1  that correct?

2  A  Yes.

3  Q  And when you were at Johnston's office, you did

4  receive two checks for $12,000 each, did you not?

5          MR. NIEWOEHNER:  Objection.

6          THE COURT:  Sustained.

7  BY MR. SOROSKY:

8  Q  And then after finishing your meeting with

9  Mr. Johnston, you called the governor and reported

10 back the results of your meeting, correct?

11 A  Yes.

12 Q  This was on December 3rd, is that correct?

13 A  Yes.

14 Q  Then it was the next morning, December 4th,

15 that's when you left for your trip to the Dominican

16 Republic, right?

17 A  Yes.

18 Q  And when you were at the airport in Miami, you

19 and the governor had a telephone conversation,

20 right?

21 A  Yes.

22 Q  And portions of that telephone conversation were

23 played for the jury earlier, were they not, on

24 direct examination?

25          MR. NIEWOEHNER:  Objection.

1      THE COURT:  The jury heard what the jury

2  heard.

3      MR. SOROSKY:  Right.  Good.

4      THE COURT:  The objection is sustained.

:24PM  5  BY MR. SOROSKY:

6  Q   Now, in that telephone conversation the topic of

7  Mr. Johnston's hesitancy about giving a contribution

8  was discussed by the governor and you, is that

9  correct?

:25PM  10      MR. NIEWOEHNER:  Objection, Your Honor.

11      THE COURT:  The objection is sustained.

12  BY MR. SOROSKY:

13  Q   Did the name or the topic of Chris Kelly come up

14  in that conversation?

:25PM  15      MR. NIEWOEHNER:  Objection.

16      THE COURT:  Objection on relevance grounds is

17  sustained.

18  BY MR. SOROSKY:

19  Q   Did the governor indicate to you or tell you that

:25PM  20  he thought Chris Kelly might be responsible --

21      MR. NIEWOEHNER:  Objection, Your Honor, to

22  this whole line --

23      THE COURT:  You can't do that.  You're

24  talking about hearsay.  There's a way that you can

:25PM  25  get this in; this isn't it.  Your chance will come

1  later.

2  BY MR. SOROSKY:

3  Q   Now, just so we're clear, you pled guilty to the

4  charge of conspiring with the governor to extort

5  Mr. Johnston, is that correct?

6        MR. NIEWOEHNER:  Objection, Your Honor.

7        THE COURT:  Why don't you confer with

8  counsel, then we don't have to worry about this.

9     (Whereupon, there was a conference had between

10    counsel and the following further proceedings

11    were had herein:)

12 BY MR. SOROSKY:

13 Q   Excuse me.

14      You pled guilty to attempting to solicit --

15    (Whereupon, there was a conference had between

16    counsel and the following further proceedings

17    were had herein:)

18 BY MR. SOROSKY:

19 Q   Conspiracy to solicit a bribe from Mr. Johnston,

20 right?

21 A   Yes.

22 Q   So based on that theory, that contribution by

23 Mr. Johnston would be a bribe, right?

24      MR. NIEWOEHNER:  Objection, Your Honor.

25      THE COURT:  It's beyond this.

1        MR. SOROSKY:  Okay.

2        THE COURT:  It's an inappropriate witness to

3   ask that.

4   BY MR. SOROSKY:

:27PM    5   Q   Okay.  So you pled guilty to conspiracy to

6   solicit a bribe from Mr. Johnston, right?

7   A   Yes.

8   Q   However, you did not plead guilty to the money

9   from Mr. --

:27PM    10        MR. NIEWOEHNER:  Objection.

11        THE COURT:  No, you cannot ask that question,

12   and you know you can't ask that question.

13   BY MR. SOROSKY:

14   Q   Now, I believe that when you pled guilty, you

:28PM    15   pled guilty pursuant to some written plea agreement,

16   did you not?

17   A   Yes.  Yes.

18   Q   And in your written plea agreement, there are

19   certain things said in there -- well, first, you --

:28PM    20   strike that.

21        You said your fate was to be decided by Judge

22   Zagel as to whether you get a jail sentence or not,

23   right?

24   A   Correct.

:28PM    25   Q   And you're hoping to get a 2-year jail sentence,

1  is that correct?

2  A   Pursuant to the plea agreement, yes.

3  Q   And you're familiar with something called the

4  sentencing guidelines, are you not?

5  A   Yes.

6  Q   Those are calculations by judges that would

7  determine what someone's sentence should be, right?

8  A   Right.

9  Q   And pursuant to your agreement with the

10  government, you have an agreement where Judge Zagel

11  is not going to consider the money you received from

12  Mr. Rezko as a calculation in the sentencing

13  guidelines, correct?

14        MR. NIEWOEHNER:  I'll object.

15        THE COURT:  I'm sustaining this one.

16        MR. SOROSKY:  Nothing further from this

17  witness.

18     (Brief pause).

19        MR. NIEWOEHNER:  Just one moment, Your Honor?

20        THE COURT:  Sure.

21     (Brief pause).

22        MR. NIEWOEHNER:  A few questions, Your Honor?

23        THE COURT:  You may.

24                    REDIRECT EXAMINATION

25  BY MR. NIEWOEHNER:

1  Q   Mr. Monk, you were asked some questions about the

2  tollway, do you recall that?

3  A   Yes.

4  Q   Who directed you to contact Mr. Krozel to set up

5  that meeting in the September of 2008?

6  A   Rod.

7  Q   Who told you that the meeting was going to be

8  about fundraising?

9  A   Rod.

10  Q   Who was going to get the contributions that

11  Krozel was going to raise from the construction

12  industry?

13  A   Rod.

14  Q   Who did the talking at the September meeting?

15  A   Mostly Rod and Jerry Krozel.

16  Q   Now, Mr. Sorosky asked you about part of what

17  happened at that meeting, do you recall those

18  questions?

19  A   Yeah, I think it was about part of the tollway

20  program.

21  Q   Mr. Sorosky didn't ask you a single question

22  about the 5-billion-dollar program, did he?

23          MR. SOROSKY:  Objection.

24          MR. GOLDSTEIN:  Objection.

25          THE COURT:  The objection is sustained.

1  BY MR. NIEWOEHNER:

2  Q   Was the 5 billion-dollar program brought up

3  during the meeting in September of 2008 between you

4  and Jerry Krozel?

:31PM  5  A   Yes.

6  Q   By who?

7  A   Rod.

8  Q   What did the defendant say about the

9  5-billion-dollar program in that meeting?

:31PM  10  A   He said about the 5-billion-dollar program that

11  he was going to wait until after the first of the

12  year to announce that.

13  Q   Who asked Jerry Krozel to raise money in that

14  meeting?

:32PM  15  A   Rod.

16  Q   When did the defendant say he wanted the money

17  by?

18  A   By the end of the year.

19  Q   What did you think the defendant was doing in

:32PM  20  that meeting?

21  A   He was using the 5-billion-dollar program as

22  leverage to try and get the campaign contributions

23  by the end of the year.

24       MR. SOROSKY:  Objection to that, "leverage,"

:32PM  25  that's his interpretation.

1        THE COURT:  Yes, it's his interpretation and
2   it's clear this is not a statement made by the
3   governor, and for that reason it may stand.
4   BY MR. NIEWOEHNER:
5   Q   Who directed you to get money from Krozel right
6   after the meeting?
7   A   Rod.
8   Q   You understood that Krozel was going to raise
9   money from the entire construction industry, is that
10  right?
11  A   Yes.
12  Q   And you understood the road builders was part of
13  the entire -- the subset of the construction
14  industry?
15  A   Yes.
16  Q   You were asked some questions about when the
17  defendant -- you had that conversation with the
18  defendant where he said some along the lines of "if
19  they don't step up f' 'em, I won't do the bigger
20  announcement in January," do you recall that?
21  A   Yes.
22  Q   What did you understand the defendant to mean
23  when he said that?
24  A   He was talking about engineering companies --
25          MR. SOROSKY:  Objection to that.  Outside the

1  scope of the cross.

2        THE COURT:  I think he's right.  I'm

3  sustaining it.

4  BY MR. NIEWOEHNER:

5  Q   You were asked some questions about whether

6  Gerald Krozel was present for that conversation, do

7  you recall that, the conversation where the

8  defendant said, "if they don't step up, f' 'em," do

9  you recall those questions?

10 A   Yes.

11 Q   Mr. Krozel wasn't present for that conversation,

12 was he?

13 A   No.

14 Q   What did you understand the defendant's message

15 to Krozel was at the September meeting?

16       MR. SOROSKY:  Objection to "message."

17       THE COURT:  Overruled.

18 BY THE WITNESS:

19 A   That, you know, I'm announcing this 1.8 billion

20 dollar program and I'm going to announce this 5

21 billion dollar program, I'm really being good to

22 your industry, and so the people you're going to

23 fundraise from who are going to benefit from this

24 should step up by the end of the year.

25 Q   Okay.  And that was what you understood the

1  defendant said to you when it was just you and the

2  defendant, correct?

3  A   No, I thought you were talking about the verbiage

4  in the Krozel meeting.

5  Q   Okay.  In the Krozel meeting in September, what

6  did you understand the defendant's message to Krozel

7  was?

8  A   That his constituency, his members of the road

9  builders association and the construction industry

10  ought to be happy that he's announcing this plan and

11  that they should be raising money for him by the end

12  of the year.

13  Q   If they didn't raise money by the end of the

14  year, what did you understand the defendant said was

15  going to happen?

16        MR. SOROSKY:  Objection.  That assumes a fact

17  not in evidence since he didn't say the governor --

18        THE COURT:  I really didn't need that, it's

19  really out of bounds to do that, and it's

20  particularly improper to do that when I'm sustaining

21  the objection.

22  BY MR. NIEWOEHNER:

23  Q   Let me take you to your last conversation with

24  Jerry Krozel.

25        In your last conversation with Jerry Krozel,

1  did you understand he was going to raise money for

2  the defendant?

3  A  Yeah.  I thought he was, yeah.

4  Q  And your last conversation, the last conversation

5  with the defendant where you talked about Jerry

6  Krozel for the last time, do you recall that?

7  A  Yes.

8  Q  How much money did the defendant -- or did the

9  defendant asked you along the lines that "they'll do

10 more than 100, won't they" in reference to the road

11 builders?

12 A  Yes.

13 Q  What did you understand the defendant to mean?

14 A  That the road builders would raise at least

15 $100,000 for him by the end of the user.

16 Q  And that was the entire construction industry, is

17 that right?

18 A  Right.

19 Q  Now, you were also asked questions about Tony

20 Rezko, do you recall that?

21 A  Yes.

22 Q  Who was the person that Tony Rezko raised money

23 for?

24 A  The governor.

25 Q  How much money did Rezko raise for the defendant

1 during the course of 2002, 2003, 2004?

2         MR. SOROSKY:  Objection; Outside the scope of

3 cross.

4         THE COURT:  Overruled.

5 BY THE WITNESS:

6 A  Millions of dollars.

7 BY MR. NIEWOEHNER:

8 Q  In 2003 and 2004, was anyone more important to

9 raising money for the defendant than Tony Rezko and

10 Chris Kelly?

11 A  No.

12 Q  Who was present -- do you recall those two

13 meetings you described, one was at Rezmar Offices

14 and one was at a hotel in California?

15 A  Yes.

16 Q  Who was present at those meetings?

17 A  Myself, the governor, Chris Kelly, and Tony

18 Rezko.

19 Q  Who was going to make money out of those ideas

20 that were discussed at the meetings?

21 A  The four of us.

22 Q  When you said that you didn't think the defendant

23 would approve of the method that you took cash from

24 Tony Rezko, what did you mean?

25         MR. SOROSKY:  Objection to that.  He said

 1  what he said.
 2        THE COURT:  Overruled.
 3  BY THE WITNESS:
 4  A   That the way I was receiving the money and not
 5  depositing it in the bank and not using an ATM card
 6  could lead to an investigation of me and then
 7  ultimately him, potentially.
 8  BY MR. NIEWOEHNER:
 9  Q   So were you concerned that the defendant wouldn't
10  want you to make money from Rezko in some way?
11  A   No.
12  Q   Now, the money that Rezko gave you, did he ask --
13  did he ask you to give it back at any point?
14  A   No.
15  Q   Did he ask you to do anything in particular in
16  exchange for it?
17  A   No.
18  Q   Do you consider that as a kind of gift?
19  A   Yes.
20  Q   How did you justify it to yourself when you took
21  that money?
22        MR. SOROSKY:  Objection to this.
23        THE COURT:  Overruled.
24  BY THE WITNESS:
25  A   He and I had conversations about me working for

1  him after I became chief of staff, and I justified

2  it as an advance against salary from him.

3  BY MR. NIEWOEHNER:

4  Q   You were talking about Tony Rezko?

5  A   Correct.

6  Q   But he never said it was an advance in salary,

7  did he?

8  A   No.

9  Q   You understood he was just giving you the money?

10 A   Yes.

11 Q   You were asked a question that after the

12 defendant was arrested, if you knew you had a

13 problem with the cash that Rezko gave you before you

14 decided to cooperate and you said something along

15 the lines of "among other things," do you recall

16 that?

17 A   Yes.

18 Q   What were the other things that you were

19 referring to?

20     MR. GOLDSTEIN:  Objection.

21     THE COURT:  Overruled.

22 BY THE WITNESS:

23 A   The telephone conversations that had been

24 recorded, conversations with Rod about, you know,

25 fundraising from the Johntsons.

1  BY MR. SCHAR:

2  Q   And, in particular, when you say the Johntsons,

3  what are you referring to?

4  A   The conversations that we've talked about as far

5  as trying to get the 100-thousand-dollar

6  contribution in exchange for the timing of the

7  signing of the racing bill.

8  Q   You just said the time of the signing of the

9  racing bill, what did you mean when you said the

10  timing of the racing bill?

11  A   I thought when Rod was going to sign the bill was

12  an issue of the timing of the signing of the bill.

13  The Johnstons wanted it, my client wanted it signed

14  as soon as possible because they were losing this

15  $9,000 a day.  And so the issue was not so much the

16  signing of it but getting it signed quickly because

17  they were losing so much money.

18  Q   Were you concerned about what you had done on the

19  racing bill before you decided to cooperate with the

20  government?

21  A   Yes.

22  Q   Who was going to get all the contributions that

23  you made?

24  A   The governor's campaign.

25  Q   Who gave you the fundraising assignments to raise

1  money?

2  A   The governor.

3  Q   Who wanted reports to you on the status of your

4  fundraising?

5  A   The governor.

6  Q   Who sent you to get a contribution from John

7  Johntson?

8  A   The governor.

9  Q   Who was going to benefit from that contribution?

10 A   The governor.

11 Q   Who would bring up the status of your fundraising

12 efforts from Johnston?

13 A   The governor and his brother.

14 Q   You were asked about times that you exaggerated

15 or didn't accurately report the status of your

16 conversations with Johnston to the defendant, do you

17 recall those?

18 A   Yes.

19         MR. GOLDSTEIN:  Objection; misstates the

20 evidence.

21         THE COURT:  Wait a minute.

22    (Brief pause.)

23         THE COURT:  Overruled.

24 BY MR. NIEWOEHNER:

25 Q   You lied to the defendant and his brother about

1  that status, is that right?

2  A  Correct.

3  Q  Why did you do that?

4  A  Because I wasn't being as aggressive as he is in

5  fundraising and I didn't want to get into

6  conversations with him every time I was giving a

7  report on the Johntsons as to why I wasn't calling

8  every day or being as aggressive as he would've been

9  if he were in my shoes.

10  Q  Were you trying to get a contribution from the

11  Johntsons?

12  A  Yes.

13  Q  You were trying to do it your way?

14  A  Yes.

15  Q  On December 3rd you told the defendant you were

16  going to go Oklahoma, is that right?

17  A  Correct.

18  Q  And you were, in fact, going on vacation, is that

19  right?

20  A  Right.

21  Q  You mentioned -- or why did you tell the

22  defendant that?

23  A  Because I didn't want to tell him that I was

24  going down to the Dominican Republic to play golf

25  because I had done this before on a trip to

 1  Florida --
 2          MR. SOROSKY:  Objection; he repeats this all
 3  from direct examination.
 4          THE COURT:  Overruled.
 5  BY THE WITNESS:
 6  A   Because I had done this once before during a
 7  similar period of time when we were fundraising and
 8  he got very upset.  And I thought he would -- you
 9  know, I didn't think he was right to do that, so we
10  got into a big screaming match then and I wasn't
11  interested in getting into that discussion again.
12  BY MR. NIEWOEHNER:
13  Q   Why was the defendant upset with you or why did
14  he say about why he was upset with you when you
15  talked to him about that earlier trip?
16  A   That, you know, this is really an important
17  period of time, all hands on deck, we should be
18  fundraising, and what are you doing off down in
19  Florida playing golf.
20  Q   So on December 3rd, did you want to tell the
21  defendant you were going to be gone for four days?
22  A   Not playing gulf, no.
23          MR. NIEWOEHNER:  One moment, Your Honor.
24      (Brief pause)
25  BY MR. NIEWOEHNER:

1  Q   You were asked some questions about what happened

2  on December 3rd in the fundraising office, do you

3  recall that?

4  A   Yes.

5  Q   You and the defendant agreed on how you were

6  going to talk to John Johnston, is that correct?

7  A   Yes.

8  Q   You went through the potential conversations and

9  agreed as to how you would send a message to John

10 Johnston, is that right?

11 A   Yes.

12 Q   That was something that the -- you understood the

13 defendant wanted you to go and do?

14 A   Correct.

15        MR. NIEWOEHNER:  Nothing further, Your Honor.

16               RECROSS EXAMINATION

17 BY MR. SOROSKY:

18 Q   Mr. Niewoehner asked you a question where the

19 governor said in this meeting with Krozel that he's

20 going to announce the 1.8 billion-dollar program

21 immediately or soon and then after the first of the

22 year he's going to do the 5-billion-dollar program,

23 is that correct?

24 A   Correct.

25 Q   And I misspoke if I said "1.8 million," I meant

1  1.8 billion, is that correct?

2  A  Correct.

3  Q  And the governor was arrested and charged with

4  these issues here on December 9th, is that correct?

5        MR. NIEWOEHNER:  Objection.

6  BY MR. SOROSKY:

7  Q  2008, right?

8        THE COURT:  Come over to the side and tell me

9  where you're going with this.

10      (Proceedings heard at sidebar on the record.)

11        MR. SOROSKY:  The government has consistently

12  made a point throughout its case that the governor

13  promised to do a 1.8 billion-dollar program

14  immediately, the billion dollar program immediately

15  and a 5-billion-dollar program next year, and he was

16  extorting Krozel and the road builders because he

17  wouldn't do this program unless they gave him a

18  contribution, we just want to establish to the jury

19  if he got arrested and charged and therefore he

20  couldn't possibly do the program after he just said

21  he got arrested and therefore couldn't possibly do

22  the program and never had an opportunity to do the

23  program.

24        THE COURT:  When was he degovernored.

25        MR. SOROSKY:  When was he what?

Monk - recross by Sorosky                    2953

1        THE COURT:  Degovernored.

2        MR. SOROSKY:  Degovernored?  You mean

3  impeached?

4        THE COURT:  Yeah.

5        MR. SOROSKY:  I would say late January.  They

6  would know the exact date.

7        THE COURT:  And he had late January to

8  announce it.

9        MR. SOROSKY:  Well, I would also add, too,

10 you know, what's the ol' expression, what's good for

11 the goose is good for the gander, I don't know where

12 that expression comes from, but if we can't mention

13 anything after December 5th or December 8th why

14 should they have the advantage of saying, impliedly

15 saying, oh, he didn't do something?

16       THE COURT:  You want to speak to this?

17       MR. NIEWOEHNER:  Your Honor, we focused

18 everything before December 9th, all the questions

19 and public announcements are December 9th, we never

20 suggested anything beyond that time frame, for the

21 same reasons we moved on Children's Memorial

22 Hospital on --

23       THE COURT:  Yeah, I don't think they have

24 enough.  On top of it, it doesn't do you any good

25 because if he's soliciting campaign contributions in

Monk - recross by Sorosky                2954

1  exchange for some program, if he's not, then that's
2  fine, if he is soliciting campaign contributions to
3  such programs, the fact that he kept his promise
4  does not bear on his possible innocence, it's more
5  like evidence of guilt.  I don't see where this gets
6  you.  It's like, okay, I got to do it, maybe he's
7  fishing for some more stuff.  Now, there are ways
8  for it to come in that you could possibly get this
9  into your case, but not -- this is and inference, at
10 best, goes both ways, so it's out.
11        Do you have anything else you're going to ask
12 so we can get the rulings on the side?  Because he
13 was fairly narrow.
14        MR. SOROSKY:  No, we're fine.
15        THE COURT:  Okay.
16    (Proceedings resumed within the hearing of the
17      jury.)
18 BY MR. SOROSKY:
19 Q  Two things:  First, this racetrack loss of $9,000
20 a day, remember you talked about it to some extent?
21        MR. NIEWOEHNER:  Objection.
22        MR. SOROSKY:  I'm just talking about that
23 topic, I haven't asked the question.
24        THE COURT:  What we have here is his
25 assertion that this was his client's belief, and

1  we're going to leave it at that.

2         MR. SOROSKY:  Okay.

3  BY MR. SOROSKY:

4  Q   Okay, just so we're clear, this loss of $9,000 a

5  day was merely Mr. Johnston's belief, isn't that

6  correct?

7         MR. NIEWOEHNER:  Objection.

8         THE COURT:  The objection to the form of the

9  question is sustained.  You could leave out the

10  "merely" and I'd let you ask it.

11  BY MR. SOROSKY:

12  Q   This possible -- or this loss of $9,000 a day was

13  Mr. Johnston's belief?

14  A   That's what he told me.

15  Q   Right.  You don't know that as a fact?

16         MR. NIEWOEHNER:  Objection.

17         THE COURT:  Sustained.

18  BY MR. SOROSKY:

19  Q   Now, one last area of questioning and then we're

20  through.  70 to 90,000 dollars from Mr. Rezko, I

21  believe when Mr. Niewoehner first questioned you

22  just two minutes ago, you said it was a gift, is

23  that correct?

24  A   Yes.

25  Q   And then you said you justified this gift as the

1  possible advance payment for future work, is that
2  correct?
3  A  Right.
4  Q  Well, when you get paid for work you have to pay
5  taxes, do you not, Mr. Monk?
6         MR. SCHAR:  Objection.
7         THE COURT:  This has actually been asked and
8  answered and it wasn't specifically gone into on
9  redirect examination.
10 BY MR. SOROSKY:
11 Q  Just so we're clear, and this is the last
12 question, while you justify this money as an advance
13 payment to justify receiving it, that justification
14 didn't occur for paying taxes on the money, did it?
15        MR. NIEWOEHNER:  Objection.
16        THE COURT:  Same ruling.
17        MR. SOROSKY:  Nothing further.
18        THE COURT:  We're going to take a short break
19 now.
20        THE MARSHAL:  All rise.
21     (The following proceedings were had out of the
22      presence of the jury in open court:)
23        THE COURT:  Please be seated.
24        Time for an offer a plea, if you want to make
25 one.

1

2                    VOIR DIRE EXAMINATION

3  BY MR. SOROSKY:

4  Q   Mr. Monk, you testified throughout this trial

5  when the government questioned you about your

6  understanding of certain conversations, is that

7  correct.

8  A   Yes.  Yes.

9  Q   And without going into each specific question,

10 would it be accurate to say the government would

11 play a tape, words would be spoken, and first you

12 would relate the words that would be spoken and then

13 you would relate your understanding of those words,

14 is that correct?

15 A   Yes.

16 Q   And just take one example, there was one

17 conversation when you and the governor were talking

18 and either you said to the governor or the governor

19 said to you, "tell Mr. Johnston these are two

20 separate conversations"?  Do you remember a topic

21 like that being discussed?

22 A   Yes.

23 Q   And two actual wording, two separate

24 conversations would imply that the conversation for

25 receiving a campaign contribution was completely

1   unrelated to the conversation about signing the

2   racetrack bill, right?  That's what the actual words

3   indicate, right?

4   A  Right.

5   Q  However, you said your understanding was the

6   opposite of the spoken word, that your understanding

7   was that two separate conversations was just like a

8   ruse or a mirage, your understanding was the

9   governor really was relating the two, correct?

10  A  They were being related.  We were trying to

11  deliver a subtle message to the Johntsons.

12  Q  Right.  That was your understanding.

13  A  Uh-huh.

14  Q  And my little example here about the two separate

15  conversations, the wording of two separate

16  conversations, occurred a number of times throughout

17  your direct examination on different spoken words,

18  correct?

19  A  Yeah.

20  Q  Now, after Governor Blagojevich was arrested and

21  charged, you and your lawyer went in and cooperated

22  with the government, right?

23  A  Correct.

24  Q  And you had over 30 sessions or meetings or

25  debriefings with the government, right?

Monk - Voir Dire Examination                    2959

1  A   Prior to the first trial, yeah.

2  Q   And all these understandings that you testified

3  to were hashed and developed after you started

4  cooperating with the government?

5          MR. NIEWOEHNER:  (Counsel standing.)

6          THE COURT:  You know, there's no jury here.

7  You can forget the ruffles and flourishes.

8  BY MR. SOROSKY:

9  Q   Well, did you ever tell anyone these

10 understandings of the government conversation before

11 you started cooperating with the government?

12         THE COURT:  He's talking about anyone in the

13 world.

14         MR. NIEWOEHNER:  Your Honor, again, it's such

15 an overbroad question.

16         THE COURT:  Well, let me rephrase your

17 question.

18         MR. NIEWOEHNER:  Attorney-client privilege,

19 as well, Your Honor.

20         MR. SOROSKY:  I'm not talking about his

21 lawyer.  I don't want to pierce the attorney-client

22 privilege.  Didn't mean to do that in any way.

23         THE COURT:  So anything that's privileged.  I

24 mean, there is an obvious question, keep asking away

25 and if you don't ask it, I'll ask it.

:55PM
:55PM
:56PM
:56PM
:56PM

1         MR. SOROSKY:  Well, you could ask it and

2    it'll save time.

3         THE COURT:  Did you ever share your view with

4    any other person involved in Friends of Blagojevich?

5         THE WITNESS:  Regarding my understanding of

6    my conversations with Rod, my potential

7    conversations?

8         THE COURT:  Yeah.

9         THE WITNESS:  No.

10        THE COURT:  Did you ever do it with anybody

11   else associated with the governor or his staff?  Did

12   you ever voice, for example, this to Harris?

13        THE WITNESS:  No.

14        THE COURT:  Okay.  Go ahead.

15   BY MR. SOROSKY:

16   Q   Did you ever voice this view to anyone else --

17   we're not talking about your lawyer, I mean anyone

18   else the judge or I have not specifically referred

19   to or mentioned prior to your cooperating with the

20   government?

21        MR. NIEWOEHNER:  Again, your Honor, such an

22   overbroad question, and what is the significance?

23        THE COURT:  What did you say?  I didn't hear

24   you.

25        MR. NIEWOEHNER:  I mean, such an overbroad

1 question, what would the possible relevance be?

2      THE COURT:  Start over.  Start with the core

3 question.

4 BY MR. SOROSKY:

5 Q   Did you ever voice this understanding or these

6 understandings, that you related in your direct

7 testimony, to any other person involved in this case

8 prior to you cooperating with the government?

9 A   No.

10 Q   And these understandings are certainly a way that

11 you could help yourself with the government, are

12 they not?

13      MR. NIEWOEHNER:  Objection.

14      THE COURT:  Answer the question.

15 BY THE WITNESS:

16 A   Could you ask the question again?

17 BY MR. SOROSKY:

18 Q   These understandings that you had -- let me begin

19 with another question.  These understandings that

20 you have are all anti and against Blagojevich, are

21 they not?

22 A   Yes.

23 Q   And certainly being against Blagojevich is a way

24 you could help yourself with the government,

25 correct?

:57PM

:57PM

:58PM

:58PM

:58PM

1  A   Yeah.

2  Q   And these understandings, and by you helping

3  yourself with the government, that's a way of

4  helping you with your crimes, isn't it?

5  A   What's going to help me is --

6  Q   Mr. Monk, I think that calls for a yes or no

7  answer.

8          THE COURT:  He can answer it any way he wants

9  to, this is an offer of proof, and we're going to

10 get to it, anyway.

11         MR. SOROSKY:  I stand corrected.

12         THE COURT:  Go ahead.

13 BY THE WITNESS:

14 A   What's going to help me is to live up to my end

15 of the bargain of the plea agreement, which is to

16 cooperate and tell the truth.

17 BY MR. SOROSKY:

18 Q   I'm talking about before you reached your

19 agreement, you certainly knew going in to your

20 conversations with the government or interviews with

21 the government that Blagojevich was target number

22 one, didn't you?

23 A   Yes.

24 Q   And you knew that anything you said against

25 Blagojevich would certainly help you with the

1  government, didn't you?

2  A   Yes.

3  Q   And you also knew that you were looking for some

4  help from the government and mercy, were you not?

5  A   Yes.

6  Q   And you certainly knew that anything you said or

7  any information you related, which was against

8  Blagojevich, would certainly help you with your

9  problems, didn't you?

10  A   Any information I have them that I had is what

11  they were asking for.

12  Q   I'm not questioning what the government was

13  asking for, I'm merely asking you, you knew that any

14  information you gave to the government, since it was

15  against Blagojevich, would certainly help you?

16          THE COURT:  I think this question has been

17  answered.

18  BY MR. SOROSKY:

19  Q   Is the answer to that yes?

20  A   I don't know.

21  Q   You don't know?

22  A   I don't know, because they asked me to tell the

23  truth.

24  Q   Well --

25          THE COURT:  You're asking him to predict the

:00PM

:00PM

:00PM

:00PM

:01PM

Monk - Voir Dire Examination                    2964

1   government's reaction.  The question you asked, the
2   answer you wanted, you got, when you asked him if he
3   understood that it could help him, and he said yes.
4   BY MR. SOROSKY:
5   Q   You say the government asked you to tell the
6   truth, is that correct?
7   A   Yes.
8   Q   Now, would you agree that when you relate an
9   understanding as to a spoken phrase, like "two
10  separate conversations," that's subject to an
11  interpretation, is it not?  A subjective
12  interpretation, is it not?
13  A   Yes.
14  Q   And you certainly knew that any subjective
15  interpretation that you related unfavorable to
16  Blagojevich was something the government was --
17  something the government would find delightful,
18  didn't you?
19          MR. NIEWOEHNER:  Your Honor, I haven't been
20  objecting to this but --
21          THE COURT:  No, no, but this one is beyond
22  the pale.  Now you're asking him to read the mind of
23  the government, the collective mind of the
24  government.
25          MR. SOROSKY:  If I could just respond to your

:01PM
:01PM
:01PM
:02PM
:02PM

Monk - Voir Dire Examination                    2965

1  question.  Based on the interpretations that this
2  man has given, saying that one conversation is
3  completely the opposite of another --
4           MR. NIEWOEHNER:  (Counsel standing.)
5           MR. SOROSKY:  Hold on, hold on, let me
6  finish.
7           THE COURT:  Go ahead.
8           MR. SOROSKY:  I think he should be able to
9  answer the question, considering he's a law school
10 graduate, that he knew that any subjective
11 interpretation anti-Blagojevich that the government
12 would be happy with.  And to say he doesn't -- to
13 say he is not aware of that is --
14          THE COURT:  It's pointless at this point in
15 time.
16          Do you have another question?  Because I'm
17 going to give the government a chance and then I
18 have a question.
19          MR. SOROSKY:  No more the questions.
20                    VOIR DIRE EXAMINATION
21 BY MR. NIEWOEHNER:
22 Q  Mr. Monk, what's your understanding of what
23 you're supposed to do under your plea agreement?
24 A  Cooperate and tell the truth.
25 Q  Before you cooperated with the government, did

1  you know whether a particular information you had

2  would either help or hurt the government?

3  A   Yes.

4  Q   Did you know how every piece of information could

5  actually help or hurt?

6  A   No.

7  Q   Do you know everything the government knew?

8  A   No.

9  Q   Did the government ever tell you you were

10  supposed to say certain things?

11  A   No.

12  Q   So did you understand how the information you had

13  was necessarily going to impact the government's

14  case?

15  A   No.

16  Q   You've given your testimony of understandings of

17  a range of conversations, is that right?

18  A   Yes.

19  Q   Did you sit down with people before -- did you

20  have conversations about conversations you had with

21  the governor before you were cooperating with the

22  government --

23       MR. NIEWOEHNER:  This shows how broadly the

24  questions are, Your Honor.  Sorry.

25  BY MR. SCHAR:

1  Q   Bottom line, did you know how, what you thought
2  the government would -- if what you told the
3  government -- or what were you supposed to do in
4  your deal with the government?
5  A   Tell the truth and cooperate.
6  Q   Whether that would help or hurt the government,
7  what's your responsibility?
8  A   To tell the truth and cooperate.
9          MR. NIEWOEHNER:  Nothing further, Your Honor.
10         THE COURT:  Am I correct that your
11 understanding of the governor's conversation with
12 respect to Johnston was that Johnston should
13 understand, even if he did not exclusively say this
14 to him, that a prompter signing of the Recapture
15 Bill would be influenced by the giving and the size
16 of contribution, was that your understanding?
17         THE WITNESS:  Yes.
18         THE COURT:  And that's basically what you
19 were supposed to convey, however you did it, to
20 Johnston, is that correct?
21         THE WITNESS:  Yes.
22         THE COURT:  At the time you understood that
23 this was what you were supposed to do, did you think
24 this was both proper and legal for you to do?
25         THE WITNESS:  No.

2968

1          THE COURT:  Okay.  I'm done.

2          You can step down.

3     (Witness excused.)

4          THE COURT:  My ruling, I don't think one can

5  draw an adverse inference from the witness'

6  statement of his understanding being made

7  exclusively for the first time to some outsider,

8  some non-privileged person, be made to the

9  government and not someone else.

10         This is someone who knew what he was doing

11  was wrong, and to use Mr. Sorosky's reference, he's

12  a lawyer, and I don't think you could reasonably

13  expect him to say it to somebody else when he knew

14  he was doing something wrong.

15         So the offer of proof is made, I'm not

16  changing my rulings.

17         Who's next?

18         MR. NIEWOEHNER:  John Johntson.

19         THE COURT:  Okay, you want to talk about him,

20  too?

21         MR. NIEWOEHNER:  Your Honor, you had asked a

22  factual question at the end of the day yesterday.

23         THE COURT:  Right.  Yeah.  What he was

24  actually losing as opposed to what he thought he was

25  losing.

2969

MR. NIEWOEHNER:  Your Honor, what I've gotten
is a Seventh Circuit opinion which walks through the
chronology of some of the underlying lawsuits.  I
can either give it to you or there are some
notations on it and I can tell you the dates of what
I think you were asking about.

THE COURT:  Tell me.

MR. NIEWOEHNER:  The law as originally passed
I think were -- the original lawsuit in 2006 was
filed four days after the bill was signed.

THE COURT:  Yeah.

MR. NIEWOEHNER:  It was filed in Will County
court, that worked its way through state courts.  In
the summer of '08 the Supreme Court of Illinois came
down and ruled that the statute -- that the casinos
were challenging and the casinos lost, effectively.
So that is the status as of the time period of our
events that matter.

In January of '09, there was a cert.
petition on that.  The money was still stayed, the
money never got released during our time period.  So
the 2008 bill becomes law December 15th, and the
defendant signs it, and there's a lawsuit filed
against that on January 8th of 2009, which is
still -- that's filed in state court originally and

2970

1  ultimately both of those two end up in federal court
2  where they are still going.  My understanding of the
3  money in 2006 -- I don't have the precise date on
4  this.
5          THE COURT:  That's fine.
6          MR. NIEWOEHNER:  But the money was collected
7  and put in the fund from the beginning, it's never
8  been released, it's move effectively to a separate
9  escrow fund that has been held up ever since.
10          THE COURT:  An interest bearing account?
11          MR. NIEWOEHNER:  I don't know.
12          THE COURT:  Okay.
13          MS. KAESEBERG:  According to just on the
14  factual issue, just one thing to make clear is that
15  our understanding that the money was immediately
16  paid in protest by the casinos.
17          THE COURT:  Yeah, that's what they do.
18          MS. KAESEBERG:  Immediately.
19          THE COURT:  Yeah.
20          MS. KAESEBERG:  But I think as to one extent,
21  you know, we're sort of losing, what's the phrase,
22  the forest by the trees, or we're getting caught up
23  in this minutia --
24          THE COURT:  I asked this out of curiosity,
25  because the underlying issue is this, if Johnston

2971

1  believes he's losing 9,000 a day, and he's wrong

2  about it but he believes it, the issue is whether

3  they are using his erroneous belief to get him to

4  contribute money.

5       So that's basically what we're dealing with

6  and the issue is the level to which you can deal

7  with Johnston's belief and challenge his belief, and

8  that's, basically, what we're talking about here.

9       MS. KAESEBERG:  Right.  I mean, that's what

10  we're arguing we should be able to get into all

11  these other facts.  It's up to the jury to decide

12  whether or not they find Johnston credible when he

13  says that he believes that he was suffering a loss.

14       THE COURT:  But tell me how you're going to

15  challenge this.

16       MS. KAESEBERG:  Well, because the questions

17  about the bill pending for all these months in the

18  legislature and the concept that it went into

19  escrow, just all these other factors that's in our

20  motion --

21       THE COURT:  So wait, wait.  What you intend

22  to do, if I grasp this correctly, is, you couldn't

23  possibly have believed it's $9,000 a day because the

24  money got held up at the previous bill?  Because he

25  doesn't know exactly what's going to happen with the

:10PM

:11PM

:11PM

:11PM

:11PM

2972

1    2008 bill, and nobody knows what's going to happen
2    with the 2008, so you're all, I think, have to
3    reason from his acknowledge of what happened with
4    the 2006 bill?
5            MS. KAESEBERG:  To a degree, yes.  I mean, I
6    think the issue that Johntson is a very
7    sophisticated participant in this whole process.  He
8    is a lobbyist himself, he's hired a lobbyist, he
9    understands exactly what happened with the 2006
10   bill, and he knows that all of that money went into
11   an escrow account, he knows that once the bill
12   became effective on that effective date a two year
13   period began to run.  It's not that on every day the
14   bill is not signed, that's an absolute loss, it's
15   just that the money doesn't start getting collected
16   until the effective date.  And Johnston also, in his
17   sophisticated experience, in that he is a
18   sophisticated participant, he knows that the
19   governor has 60 days within which to sign the bill,
20   there's no immediate duty on the governor to sign
21   the bill that day.
22           The way the government presents these facts
23   is really half-truths.  It's not the full truth,
24   it's not the full picture of the jury.
25           THE COURT:  What are the 60 days have to do

2973

1 with it?

2          MS. KAESEBERG:  What?

3          THE COURT:  What are the 60 days have to do

4 with it?

5          MS. KAESEBERG:  Well, that's just another

6 issue, is that the government puts this piece of

7 their case on as if the date that it arrives in the

8 Governor's office there's some duty that he has to

9 sign it that day.

10          THE COURT:  I think you're reading something

11 into the government's case that isn't there, and

12 this is the third, fourth time you've done this.  I

13 don't think the government is operating on the

14 premise that he had to sign it.  I think the

15 government is operating on the premise that he had a

16 former Chief of Staff, now a lobbyist, saying please

17 sign it now for my client, and then the governor

18 starts talking about campaign contributions, and

19 what's at issue is not that the governor has some

20 duty to sign it right away, but there are

21 conversations, recorded conversations, that seem to

22 indicate that the governor is somehow linking his

23 signing it with the issue of contributions.  Now,

24 the premise that he had 60 days to sign it, this

25 plays no part in the government's analysis.

2974

1          MS. KAESEBERG:  No, but I think that the way
2   it's presented when we argued it before Your Honor
3   is the full truth of it.  And, respectfully, I
4   believe they're being intellectually dishonest in
5   the way that they elicited the facts from their
6   witnesses, because the way that it can be perceived
7   and I believed is being perceived by the jury is not
8   the full picture and that's what we're trying to put
9   in.
10          THE COURT:  Yeah, but this is, like, very
11  general language.  I don't believe that the
12  government has taken the position that he should
13  sign it immediately and that he has no right to
14  delay.  So if you think that the government is
15  arguing that he was under some duty to sign it as
16  soon as he possibly could, you are wrong, that is
17  not the government's argument.  And were it to be
18  the government's argument, I would refuse to let
19  them make it.
20          So what seems to me and what I am at least
21  now willing to let you do is challenge Johnston's
22  belief that it's $9,000 a day on the grounds of
23  whatever knowledge he has with respect to what
24  happened with the 2006 bill.
25          Now, there's a premise here, and the premise

2975

is that he was fully aware of it.

          MR. NIEWOEHNER:  Your Honor, we're not going
to elicit whether he believed it or not, because it
doesn't matter.  All that matters is that Johnston
said that to Monk, he said we're losing $9,000.

          THE COURT:  I see your point.

          MR. NIEWOEHNER:  So it's what matters to the
defendant that matters, and the only information
that's indicated there that is coming in is that it
was $9,000 a day in the recorded call from Monk.  So
they want to impeach Johnston on something that's
not at issue and irrelevant.  We're not arguing --
all year asking --

          THE COURT:  Okay, what I'm going to do is,
I'm going listen to his direct, then we're going to
recess and you're going to tell me what doors you
think have been opened, because I can't make this
decision on the basis of your general discussion,
and I don't want to make a decision until hear
specifically what he has to say and how he says it.

          MS. KAESEBERG:  I think as a general matter,
very, very briefly, is that the credibility of these
witnesses that's at issue.  Johnston says plainly
that they were losing $9,000 a day, he communicated
that to Monk and if he doesn't believe it to be

2976

1    true, that's a credibility issue for the jury to be
2    aware of.  And so I think with all of these
3    witnesses, it's part of this general principle that
4    we're not being allowed to ask them questions that
5    go directly to their credibility.
6              THE COURT:  And Johnston tells the governor
7    he's losing $9,000 a day?
8              MS. KAESEBERG:  If he told Monk that he's
9    losing $9,000 --
10             THE COURT:  No, no, no, I'm talking about
11   Johntson saying it to the governor.
12             MR. GOLDSTEIN:  He communicated, we know, to
13   Monk and through the wiretaps Monk communicated to
14   the governor.  I completely agree with the
15   government on the issue of Johnston raising, and I
16   think that's the fundamental point, Johnston
17   introduced the $9,000 a day loss, he introduced that
18   as a factor into signing the bill.  He brought that
19   specific issue --
20             THE COURT:  Right, because you opened up or
21   your co-counsel opened up with the proposition that
22   he's a sophisticated guy.  So your proposition is
23   he's sending a messenger back to the governor
24   asserting a disastrous consequence if his bill isn't
25   signed, which is pretty much what lobbyist do on all

2977

1  issues, and for this reason you can challenge his
2  original assertion.  Their comment is is it doesn't
3  matter what he said, and, frankly, it doesn't even
4  matter what Monk says because Monk being a lobbyist
5  can say they're losing $9,000.  If, for example, the
6  governor had said or the governor believes, and,
7  theoretically, if the day ever came the governor
8  could testify:  I knew the $9,000, you know, I knew
9  all about 2006, I knew this stuff about 9,000 a day
10  was just a bunch of hot air, but, you know, if
11  that's what he's telling me, my response is is give
12  me the money and then you don't have to worry about
13  it.  And this is the Government's point about what
14  matters is what your client was thinking.
15      I do not recall listening to any of the tapes
16  in which your client said something to the effect,
17  oh it's not 9,000 a day.  And, indeed, the
18  government can argue that his conduct was consistent
19  with his own misunderstanding that it was $9,000 a
20  day.
21      So, basically, I think I'm not going to let
22  this stuff in with Johnston, but this still leaves a
23  fairly open door for you, it's just not with this
24  guy.  But let me hear what he has to say, because I
25  could be wrong about what it is he's saying.  So

:17PM

:18PM

:18PM

:19PM

:19PM

2978

1  that's the way we'll do it and I'll call a recess
2  and then we can raise the issue, okay?
3        MR. SCHAR:  Judge, I don't know if we'll get
4  to the next witness today, but before the next
5  witness, certainly before cross-examination -- I
6  think, each of the witnesses coming up there's
7  something that we need to address.
8        THE COURT:  So who is the next witness?
9        MR. SCHAR:  Dr. Feinstein from the Chicago
10 Academy.
11       THE COURT:  Okay.  You want to bring
12 something up about that?  Feinstein, you have
13 something about him?
14       MR. SCHAR:  Why don't we address it if we get
15 to him today.  I think it probably be only an issue
16 on cross-examination.
17       THE COURT:  Feinstein is the next witness?
18       MR. SCHAR:  After Johnston.
19       THE COURT:  Okay.  That's fine.
20       MR. SCHAR:  And I think there were a number
21 of issues Mr. Niewoehner wanted to raise, maybe go
22 into some type voir dire related to how much of what
23 he made, salary, and all the things that we dealt
24 with Magoon and Krozel, but I'm not sure if you --
25       THE COURT:  No, we don't have to deal with

2979

1  that yet.  We'll deal with that Johnston.

2        MR. SOROSKY:  If you want, since Feinstein is

3  a shorter witness, do you want to do Feinstein and

4  Johnston tomorrow?

5        MR. SCHAR:  I think we'll decide the order in

6  which we go in.

7        MR. SOROSKY:  I just wanted to ask for

8  scheduling, how long do you anticipate going.

9        MR. GOLDSTEIN:  How long will we go, Your

10  Honor?

11        THE COURT:  We'll go to 4:30, possibly even

12  5:00 today.

13        How many witnesses do you have left?

14        MR. SCHAR:  Today or total?

15        THE COURT:  Total.

16        MR. SCHAR:  Potentially five, I think.

17        THE COURT:  Okay.

18        MR. SCHAR:  But most of them are going to be

19  shorter.

20        THE COURT:  Okay.  That's fine.

21        We'll start again in about five minutes.

22     (Recess.)

23        THE MARSHAL:  All rise.

24

25

:20PM (line 5)

:20PM (line 10)

:20PM (line 15)

:21PM (line 20)

:38PM (line 25)

1        (The following proceedings were had in the
2         presence of the jury in open court:)
3            THE COURT:  Please be seated.
4            It's time to call the next witness.
5            MR. NIEWOEHNER:  Your Honor, the government
6   calls John Johnston.
7            THE COURT:  Face me and raise your right
8   hand.
9        (Witness duly sworn.)
10            THE COURT:  Please be seated.
11          JOHN JOHNSTON, GOVERNMENT WITNESS, SWORN
12                  DIRECT EXAMINATION
13  BY MR. NIEWOEHNER:
14  Q   Would you please state your name and spell it,
15  please.
16  A   John Johnston, J-o-h-n-s-t-o-n.
17  Q   How old are you?
18  A   49.
19  Q   Where do you currently live?
20  A   Hinsdale, Illinois.
21  Q   What is your current occupation?
22  A   I am president of Maywood Park and Balmoral Park
23  racetracks.
24  Q   And is the Maywood Park Racetrack owned by the
25  Maywood Park Trotting Association, Incorporated?

1  A   Yes.

2  Q   And is the Balmoral track owned by the Balmoral

3  Racing Club, Incorporated?

4  A   Yes.

5  Q   Do you and your family have ownership interest in

6  those two companies?

7  A   Yes, we do.

8  Q   What do those two companies do?

9  A   They conduct horse racing at each of the

10 facilities.

11 Q   Where are those racetracks located?

12 A   Maywood Park is located in Melrose Park, Illinois

13 and Balmoral Park is located in Crete.

14 Q   How long have you worked with the tracks at those

15 two locations?

16 A   Over 20 years.

17 Q   What's your current responsibilities with respect

18 to those two tracks?

19 A   I have general management oversight for both

20 facilities.

21 Q   About how long have you been primarily

22 responsible for running those tracks?

23 A   Approximately 8 to 10 years.

24 Q   Do you have an agreement with the government that

25 governs your testimony today?

1  A   I do.

2  Q   Is it an immunity agreement?

3  A   Yes, it is.

4  Q   What do you understand the immunity agreement to

5  mean?

6  A   That I come here before the Court today and

7  testify in a straightforward honest manner and if I

8  breach that oath, that I could be prosecuted.

9  Q   If you lie does the immunity agreement protect

10  you?

11  A   No.

12  Q   Have you met Rod Blagojevich?

13  A   I have.

14      MR. NIEWOEHNER:  Is there a stipulation to

15  identity?

16      MR. GOLDSTEIN:  So stipulated.

17  BY MR. NIEWOEHNER:

18  Q   Did the Illinois -- I'm going to turn your

19  attention to November of 2008.

20      Did the Illinois legislature pass a bill

21  relating to the horse racing industry in November

22  of 2008?

23  A   Yes, it did.

24  Q   What did the bill do?

25  A   The bill put a tax for Chicagoland riverboat

1  casinos and that revenue from that tax was to be

2  earmarked for the racing industry.

3         MR. NIEWOEHNER:  Your Honor, may I approach?

4         THE COURT:  You may.

5  BY MR. NIEWOEHNER:

6  Q   I'm going to show you what has been marked

7  Government Exhibit Racetrack 3.

8         MR. NIEWOEHNER:  Move to admit that exhibit

9  into evidence pursuant to 90211 certificate.

10        MR. GOLDSTEIN:  No objection.

11        THE COURT:  Admitted.

12      (Government's Exhibit Racetrack 3 was received

13       in evidence.)

14        MR. NIEWOEHNER:  May we publish, Your Honor?

15        THE COURT:  You may.

16      (Exhibit published to the jury)

17  BY MR. NIEWOEHNER:

18  Q   Mr. Johnston, if you could turn to the second

19  page of that exhibit.

20        And what does this exhibit show?

21  A   It basically depicts that the bill that you were

22  just referring to passed the Illinois Senate and the

23  Illinois House on November 20th, 2008, and four days

24  later, after some procedural work was done, it was

25  sent to the governor's desk on November 24th, 2008.

1 Q   And after that procedural step took place on

2 November 24th, could the defendant sign the 2008

3 racing bill into law?

4 A   Yes, he could.

5 Q   I'm going to take you back to 2006 for just a

6 moment.

7        Was there a similar law to the 2008 racing

8 billed that passed in 2006?

9 A   Yes, there was.

10 Q   And how many days did it take the defendant to

11 sign the 2006 racing law once it reached him for

12 signature?

13        MR. GOLDSTEIN:  Objection; relevance.

14        THE COURT:  Overruled.

15 BY MR. NIEWOEHNER:

16 Q   You want me to repeat the question?

17 A   No, No.  One day.

18 Q   Was there a bill-signing event for the 2006

19 racing bill when it was signed into law?

20 A   No, there was not.

21 Q   I'm going to take you back now to the 2008 racing

22 bill.

23        When did you want the defendant to sign the

24 2008 racing bill into law?

25 A   As soon as possible, starting November 24th.

1  Q   Under the 2008 racing bill, how long were casinos

2  supposed to make payment?

3  A   Up to 3 years.

4  Q   And were there provisions in the 2008 racing bill

5  that could stop the payments before the 3-year

6  period?

7  A   Yes, there were.

8  Q   Are you familiar with Lon Monk?

9  A   Yes, I am.

10 Q   In November of 2008, was Monk working for you?

11 A   Yes, he was.

12 Q   What was he doing?

13 A   He was a lobbyist, consultant for us.

14 Q   Did you talk with Monk after the racing bill was

15 sent to the defendant for signature on

16 November 24th?

17 A   I did.

18 Q   Did you talk to him more than once?

19 A   Yes.

20 Q   And, generally, what did you say to Monk in those

21 conversations?

22 A   The general subject matter was that the bill had

23 reached the governor's desk and if he could

24 encourage the governor to sign it as soon as

25 possible, that it would be beneficial to us.

1  Q   Did you tell Monk that the tracks would lose

2  money every day if the bill wasn't signed?

3  A   I did.

4  Q   What did you say to Monk?

5  A   I said that the bill lasts up to 3 years and it

6  meant $4500 a day to each facility, or $9,000 total,

7  and that benefit not just us but the entire racing

8  industry began once the governor signed the bill.

9  Q   I'm going to direct your attention to

10  December 3rd, of 2008.

11          Did you go to work that day?

12  A   I did.

13  Q   Where?

14  A   Maywood Park.

15  Q   Did you have any plans to meet with Monk that

16  day?

17  A   No, I did not.

18  Q   Did you speak with Monk that day?

19  A   I did.

20  Q   Initially, did you meet -- did you speak with him

21  over the phone?

22  A   Yes.

23  Q   Have you reviewed the recordings of two phone

24  calls that you had Lon Monk that day, on December

25  3rd?

1  A   Yes, I have.

2  Q   Focusing on the second call you had that day,

3  what do you recall Monk saying to you about

4  physically where he was?

5  A   He had told me that he was at the Friends of

6  Blagojevich, Ravenswood downtown Chicago office, and

7  he asked me for directions of what he thought the

8  quickest way it would be to the track from that

9  office.

10 Q   Did Monk then come to see you at the Melrose

11 track that day?

12 A   He did.

13 Q   Who met with him?

14 A   Myself, Lon, and Billy Johnston.

15 Q   Who is Billy Johnston?

16 A   He's my father.

17 Q   Who invited your father?

18 A   I did.

19 Q   Where in your offices did you meet with your

20 father and Mr. Monk?

21 A   In the conference room.

22 Q   What did you discuss with Monk while your father

23 was present?

24 A   Just some small chitchat.  The legislation, and

25 basically we started to get into it and we -- we

1 said we basically covered these matters before and

2 it was -- it was a short conversation, it didn't

3 last more than 5 or 10 minutes.

4 Q   Did you talk about some social matters, as well?

5 A   Yes.

6 Q   At some point did Monk leave the conference

7 room?

8 A   He did.

9 Q   What happened when Monk left the conference room?

10 A   When he left the conference room he kind of

11 signaled to me if he could have a word with me in

12 private.

13 Q   Did you understand that Monk didn't want to speak

14 in front of your father?

15 A   That was my take on it, yes.

16 Q   Where did you and Monk go at that point in time?

17 A   I went to walk him to the parking lot.

18 Q   And at some point as you walked out, did you talk

19 with Mr. Monk?

20 A   Yes, we went down a stairwell and there's a

21 vestibule at the bottom of the stairs and he kind of

22 stopped and turned to me.

23 Q   Was anyone else present at that point?

24 A   No, there wasn't.

25 Q   What did Mr. Monk say at that point?

1  A  He turned to me and he said "one more thing," he

2  said, "I spoke with the governor and he's concerned

3  that if he signs the racing legislation you might

4  not be forthcoming with a contribution."

5  Q  How did you respond?

6  A  I kind of responded an agitated way.  I said, "I

7  thought that's what the governor might be thinking

8  and the concept of a contribution at this point in

9  time is totally inappropriate."

10  Q  What did Monk say in response?

11  A  He turned to me somewhat recognizing my agitation

12  and he kind of put his hands together and he says,

13  "okay, different subject matter:  I really need you

14  to get a contribution in by the end of the year."

15  Q  What did you say after Monk asked for the

16  contribution by the end of the year?

17  A  At that point I felt a very uncomfortable

18  situation.  I told him, "look, I supported the

19  governor in the past, getting ready to go on a

20  family Christmas vacation" and tried to deflect any

21  further questioning, I shut the conversation down

22  and kinda pointed towards the door.

23  Q  At that point did Monk leave?

24  A  He did.

25  Q  Now, I'm going to go back to the first thing that

:47PM
:47PM
:47PM
:48PM
:48PM

1  Monk said to you in that conversation.
2        Who did you understand -- when he said I
3  spoke with the governor and he's concerned if he
4  signs the bill you might not be forthcoming with
5  contribution, who did you understand that Monk had
6  spoken with?
7  A  I understood him to have been -- to have spoken
8  to and speaking for at that point the governor.
9  Q  And where did you understand Monk had been prior
10 to coming to meet you that day?
11 A  He had told me he was coming from the Friends of
12 Blagojevich office, and he had come from that
13 office.
14 Q  Who had control over the timing of when the
15 racing bill was signed?
16 A  The governor.
17 Q  Did anyone else have the power to do that?
18 A  No.
19 Q  What did you understand Monk to mean when Monk
20 said the governor is concerned that if he signs the
21 bill that you might not be forthcoming with the
22 contributions?
23 A  I meant him to mean that the governor was very
24 interested in getting the contribution in as part of
25 the bill signing and I was very uncomfortable with

1  that.

2  Q   From what Monk said what did you understand the

3  defendant wanted to happen first?

4  A   A contribution.

5  Q   When did Monk indicate the defendant wanted the

6  contribution by?

7  A   By the end of the year.

8  Q   What did you think was going to happen if you did

9  not make a contribution before the end of the year?

10         MR. GOLDSTEIN:  Objection.

11         THE COURT:  Overruled.

12  BY THE WITNESS:

13  A   That there would be, at a minimum, a delay in the

14  bill signing and possibly, you know, no signature at

15  all.

16  BY MR. NIEWOEHNER:

17  Q   What did you think was going to happen if you did

18  make the contribution?

19  A   If I did make a contribution, they would, in all

20  likelihood, cash the check and very shortly

21  thereafter sign the bill.

22  Q   In response to Monk's first statement you said

23  something to the effect of "I thought this was what

24  he might be thinking," who were you referring to?

25  A   The governor.

1  Q   And then when Monk sort of wiped his hands and
2  said "different subject," what subjects did you
3  understand he was referring to?
4  A   The contribution and the signing of the
5  legislation.
6  Q   Based on what Monk said in that conversation, did
7  you believe that the contribution and the bill
8  signing were two different matters?
9         MR. GOLDSTEIN:  Objection.
10        THE COURT:  Overruled.
11 BY THE WITNESS:
12 A   No, I did not.
13 BY MR. NIEWOEHNER:
14 Q   Why not?
15 A   Because he had just said that the governor was
16 concerned about signing the bill and may not be
17 forthcoming with the contribution, and in the very
18 next breath, even though he said "different subject
19 matter," he said "I need you to get a contribution
20 in by the end of the year.  And just because he said
21 "a different subject matter," clearly, didn't make
22 it so.
23 Q   Did Monk leave after that conversation?
24 A   Yes, he did.
25 Q   Did you talk with Monk again after that

1  conversation?

2  A  I never wrote a check, I never saw him again, and

3  I never spoken to him again.

4  Q  In December -- you were aware that the defendant

5  was arrested on December 9th?

6  A  Yes.

7  Q  And did the defendant sign the racetrack bill by

8  December 9th?

9  A  He did not.

10        MR. NIEWOEHNER:  One moment, Your Honor.

11      (Brief pause).

12        MR. NIEWOEHNER:  Nothing further.

13        THE COURT:  We're going to take a short

14  break.

15        THE MARSHAL:  All rise.

16      (The following proceedings were had out of the

17       presence of the jury in open court:)

18        THE COURT:  Be seated.

19        Want to do an offer of proof with him first

20  now?

21        MR. GOLDSTEIN:  That's fine, Your Honor.

22        THE COURT:  Yeah, let's do it that way.

23

24

25

```
 1                  VOIR DIRE EXAMINATION
 2   BY MR. GOLDSTEIN:
 3   Q   Good afternoon, Mr. Johnston.
 4           Get some water.
 5   A   Yes, I know.
 6   Q   I need some, too.
 7           (Brief pause.)
 8   BY MR. GOLDSTEIN:
 9   Q   Now, you met Mr. Blagojevich when he was running
10   for governor in 2002, is that correct?
11   A   Yes.
12   Q   And you contributed to Rod twice in 2002, is that
13   correct?
14   A   Best of my knowledge, yes.
15   Q   We can cut right to the chase, I'm going --
16           MR. GOLDSTEIN:  If I may approach, Your
17   Honor?
18           THE COURT:  Yes.
19   BY MR. GOLDSTEIN:
20   Q   I'm going to show you Government Exhibit
21   Racetrack 1, I believe you've seen this document.
22           Could you look at it and see if you recognize
23   this document?
24   A   Yes.
25   Q   This document that I just showed you, this is a
```

:53PM
:53PM
:54PM
:54PM
:54PM

1  chart of contributions, to the best of your
2  recollection, that you gave to Rod Blagojevich --
3      (Brief pause.)
4          While they're bringing it up let me ask, you
5  gave a significant amount of contributions to the
6  governor, is that correct?
7  A  Yes, it is.
8  Q  Okay.  And what we have here is Government
9  Exhibit Racetrack 1, this is a detail of all the
10 contributions that you provided to the governor to
11 the best of your recollection?
12 A  Correct.
13 Q  And it indicates that the contributions started
14 in May of 2002 and continued through 2003, 2004,
15 2005, 2006, and 2007, is that correct?
16 A  Yes.
17 Q  And the approximate total of contributions that
18 were given to the governor was $320,000, is that
19 correct?
20 A  Yes.
21 Q  And you've actually made hundred-thousand-dollar
22 contributions to the governor in the past, is that
23 correct?
24 A  Yes.
25 Q  And the last one was at the end of the year in

1  2007, is that correct?

2  A   Yes.

3       MR. GOLDSTEIN:  You can take that down.

4  Thank you.

5      (Brief pause.)

6  BY MR. GOLDSTEIN:

7  Q   The first bill that was passed in 2006, that

8  basically was the bill that took revenue from the

9  casinos and gave it to the racetrack industry, is

10 that correct?

11 A   Yes.

12 Q   And you understood it was to last for 2 years, is

13 that correct?

14 A   Yes.

15 Q   And that bill expired in May of 2008, is that

16 correct?

17 A   Yes.

18 Q   And that period of time, from May 2006 to

19 May 2008, the revenue that you were supposed to get

20 never came to you, is that correct?

21 A   Yes.

22 Q   There was basically a lawsuit, is that right?

23 A   Yes.

24 Q   And then that money from the casinos was put into

25 an protest fund?

Johnston - Voir Dire Examination                    2997

1  A   Yes.

2  Q   And to this day you haven't received any money

3  from that bill, is that correct?

4  A   Yes.

5  Q   And the bill for renewal in 2008 came before the

6  house in February of 2008, is that correct?

7  A   I believe May.

8  Q   I'm going to put up on the screen, Mr. Johnston,

9  the bill that was signed in 2008, okay?

10  A   Uh-huh.

11  Q   Now, this House Bill 4758, that's the renewal

12  bill for 2008, is that correct?

13  A   Yes.

14  Q   Okay.

15       MR. GOLDSTEIN:  Actually, you know, before

16  you scroll down, just stay at Page 1 for a second.

17  BY MR. GOLDSTEIN:

18  Q   Now, it says "house sponsors," is that right?

19       Do you see that, right under "short

20  description" it says "house sponsors"?

21  A   I do.

22  Q   Okay.  And it says Representative Robert Molaro,

23  is that right?

24  A   Yes.

25  Q   And you have contributed to Mr. Molaro, is that

1  right?

2  A  Yes.

3  Q  And, in fact, while this bill was before the

4  House and Senate, you were contributing to

5  Mr. Molaro, is that correct?

6  A  I don't recall the exact dates and times of any

7  contributions I've given to representative Molaro,

8  but I have contributed to him in the past.

9  Q  Okay.  And you're aware that you contributed to

10  Mr. Molaro in 2008, is that correct?

11  A  No, I just said I'm not aware of the time and the

12  dates that I did, but I do acknowledge that I have

13  supported representative Molaro.

14  Q  And you also contributed to several members of

15  the legislature, is that correct?

16  A  Yes.

17  Q  And your contributions to the Illinois

18  legislators occurred in 2008, is that correct?

19  A  I don't -- I don't know what contributions I made

20  in 2008 off the top of my head.  I do know that

21  whenever we do make a contribution, it is registered

22  and declared, I just don't have that list in front

23  of me.

24  Q  Now, you're familiar with the Racing Association

25  of Illinois, is that correct?

Johnston - Voir Dire Examination                    2999

1  A   Yes.

2  Q   Is that a facility that you're affiliated with?

3  A   Yes.

4  Q   Okay.  So have you given contributions to

5  politicians via the Racing Association of Illinois?

6  A   Yes.

7  Q   And on October 25th, 2008, you gave a

8  contribution to State Senator James Clayborne, is

9  that correct?

10  A   I don't know off the top of my head.

11      MR. GOLDSTEIN:  If I may approach and see if

12  he can refresh his recollection?

13      THE COURT:  Sure.

14    (Brief pause).

15  BY MR. GOLDSTEIN:

16  Q   I'm showing you a three-page document that

17  indicates contributions to Mr. Clayborne.  I want

18  you to look through that document and see if it

19  refreshes your recollection as to whether you gave

20  contributions to Mr. Clayborne and when you gave

21  those contributions.

22    (Brief pause.)

23  BY MR. GOLDSTEIN:

24  Q   Is your memory refreshed?

25  A   Yes.

1  Q   Did you give contributions to Senator Clayborne?

2  A   Yes.

3  Q   And did you give a contribution to Senator

4  Clayborne on October 25th, 2008?

5  A   According to that sheet, yes.

6          MR. GOLDSTEIN:  Okay, and if you can scroll

7  down?

8          Well, actually stop for one second.  Sorry.

9      (Brief pause.)

10 BY MR. GOLDSTEIN:

11 Q   If you can look on this page of the bill, it

12 indicates that on February 4th, 2008, that this bill

13 was filed with the clerk by a Representative Raymond

14 Poe, do you see that?

15         It's about two-thirds of the way down.

16         Can you see that better now?

17 A   Yes.

18 Q   Okay.  And, actually, that same day was the first

19 reading of that bill, is that correct?

20 A   Yes.

21         MR. GOLDSTEIN:  And so one more page down,

22 please.

23     (Brief pause.)

24

25 BY MR. GOLDSTEIN:

Johnston - Voir Dire Examination                    3001

1  Q   And so this indicates -- what you're looking at
2  right now is the fourth page of this bill history
3  and you could see the first date starts on April 8,
4  2008, is that correct?  If you can see it.
:02PM    5  A   Yes, I can see it.
6  Q   And the last date on that is November 19th, 2008,
7  is that correct?
8  A   Yes.
9  Q   Now, this bill was passed by the Illinois
:02PM   10  legislature on November 20th, 2008, is that right?
11  A   Yes.
12  Q   Now, less than a month before that, you gave a
13  contribution to State Senator Clayborne, is that
14  correct?
:02PM   15  A   Yes, that was the date that was on that sheet you
16  showed me.
17  Q   And did State Senator Clayborne request that
18  contribution with you?
19  A   No.
:02PM   20  Q   Did you just give it to him?
21  A   Yes.
22  Q   Okay.  And you did that while you knew this bill
23  was before the Senate and the House, is that
24  correct?
:03PM   25  A   Yes.

1  Q   And the bill had not been passed by the State

2  Senate or the State House when you gave that

3  contribution to State Senator Clayborne, is that

4  correct?

:03PM  5  A   Yes.

6  Q   And not to belabor the point, but you have given

7  to other state legislators, you gave contributions

8  to them during the year of 2008, is that correct?

9  A   I believe probably so, yes.

:03PM  10  Q   Okay.  And it was done while the bill was pending

11  before the House and Senate, is that correct?

12  A   Yes.

13  Q   Now, when you gave the contribution to State

14  Senator Clayborne, were you connecting the

:03PM  15  contribution to the passage of the bill?

16  A   No.

17  Q   Did you understand that the contribution you

18  provided to the senator less than a month before

19  this bill was to be passed to be connected to

:04PM  20  Mr. Clayborne voting for the bill?

21  A   No.

22  Q   And when you gave contributions to these various

23  Illinois legislators throughout the year of 2008

24  while this bill was still pending, did you connect

:04PM  25  the two, the contribution to signing of the bill, or

1  should I say voting for the bill?

2  A   Could repeat that?

3  Q   When you provided contributions to these various

4  Illinois legislators while this bill was pending

5  before them, did you see a connection between your

6  contribution and their vote on the respective bill?

7  A   No.

8  Q   And is it fair to say that the people you

9  contributed to ended up voting for this bill?

10  A   You'd to have be more specific.  I mean,

11  sometimes they do, sometimes they don't.  We

12  generally support candidates that support our

13  issues, though.

14  Q   Certainly.  Certainly.

15       And your goal was not to contribute to

16  someone who you knew was going to vote against that

17  bill, is that correct?

18  A   Yes, but sometimes it works out that way.

19  Q   Okay.  And also the opposite is true, people that

20  you understand are against the bill, the

21  contributions appears and they vote for that bill,

22  is that correct?

23  A   Yes.

24  Q   And you never see a connection between your

25  contribution and their voting for the bill, is that

:04PM

:04PM

:05PM

:05PM

:05PM

Johnston - Voir Dire Examination                    3004

1  correct?

2  A  Correct.

3      MR. GOLDSTEIN:  Just one more, Your Honor.

4      (Brief pause).

:05PM  5  BY MR. GOLDSTEIN:

6  Q  And I think we can go into this on regular

7  cross-examination, but just to follow up on the

8  point:  Your testimony today is that when Lon Monk

9  approached you on December 3rd, you saw a connection

:06PM  10  between signing the bill and the contribution, is

11  that correct?

12  A  Yes.

13      MR. NIEWOEHNER:  (Counsel standing.)

14      MR. GOLDSTEIN:  Was that an objection?

:06PM  15      MR. NIEWOEHNER:  Withdraw the objection.

16  BY MR. GOLDSTEIN:

17  Q  Now, on May 26th, 2008, it was your understanding

18  that the 2006 bill expired, is that correct?

19  A  Yes.

:06PM  20  Q  So from May 26th, 2008 up to November 20th, 2008,

21  that money that was supposed to come to you was not

22  coming to you, is that correct?

23  A  Well, nothing was supposed to come to us, but, I

24  mean, there was nothing, there was no legislation,

:07PM  25  it had expired and it hadn't been renewed.

Johnston - Voir Dire Examination                    3005

1  Q   Okay.

2  A   So we weren't expecting anything.

3  Q   Okay.  But the bill expiring on May 26th; on

4  May 27th there was no money going even into a

5  protest fund, is that correct?

6  A   Correct.

7  Q   And May 27th through November 24th, you weren't

8  receiving any money, whether it's in a protest fund

9  or to you directly, through this bill, is that

10 correct?

11 A   That's correct.  Yes.

12 Q   Did you raise the $9,000 that you said you were

13 losing to any of these state legislators in between

14 May 27th, 2008 and November 20th, 2008?

15 A   I don't believe that particular number, but

16 myself and others that represent the agriculture

17 industry and horse racing, in general, would

18 express, you know, generalization numbers in

19 totality.

20 Q   And you talked about this $9,000 a day.  Correct

21 me if I'm wrong, did you state that this was a loss?

22 A   I didn't view it -- yes, it was a loss.

23 Q   Just if I can ask you about what you were going

24 to say.  You didn't view it as a loss, is that a

25 fair statement?

1  A  Well, there's different ways to interpret it.  It
2  was being accrued in a protest fund, so we,
3  technically, were not receiving it, although we had
4  anticipation of receiving it at a future point in
5  time if we were victorious in contesting -- the
6  contesting of the bill.
7  Q  And to this day, both the 2006 legislation and
8  the 2008 legislation still has not been resolved and
9  there's a protest fund, correct?
10 A  Correct.
11 Q  And nothing is going to you, is that correct?
12 A  That's correct.
13 Q  And it was May 27th, 2008 through November 20th,
14 2008, that nothing was happening because the bill
15 had not passed, is that correct?
16 A  Yes.
17 Q  And you communicated to Lon Monk that you said
18 you were losing $9,000 a day, isn't that right?
19 A  Yes, I communicated that to him in December
20 of 2008.
21 Q  Okay.  Is that the first time you communicated
22 that to Mr. Monk?
23 A  Yes.
24 Q  But you didn't see this as a loss, is that
25 correct?

:08PM
:08PM
:09PM
:09PM
:09PM

1  A   I didn't think about it as a loss at that point
2  because we weren't expecting the funds in any near
3  budgetary cycle because it was being put into a
4  protest fund and we thought at that point that -- I
5  did see it as a loss, yes, I saw it as a loss, and
6  that's why I told them I saw it as a loss, but, I
7  mean, there's different ways to view it.
8  Q   Okay.  I understand.
9          MR. GOLDSTEIN:  Just one moment.  I
10 apologize, Your Honor.
11      (Brief pause).
12 BY MR. GOLDSTEIN:
13 Q   Why did you communicate to Lon Monk that you were
14 losing $9,000?
15 A   Because every day the governor didn't sign that
16 bill from the moment it hit his desk, we were losing
17 $9,000 a day and I wanted him to encourage the
18 governor to sign the bill as soon as possible.
19 Q   And is it a fair statement to say that every day
20 since May 27th, 2008, every day that passed by that
21 $9,000 a day you say you were losing was naturally
22 lost as well, is that correct?
23 A   (No response.)
24 Q   I mean, nothing was --
25 A   No, that's not correct, because it was

1  hypothetical.  There's just pending legislation, it

2  was a perpetual issue.  When I told Lon we were

3  losing $9,000 a day, it was reality.  I mean, the

4  bill had passed the State Senate and the State

:11PM    5  House, it wasn't just a proposal or a thought in

6  somebody's imagination.  It was sitting on the

7  governor's desk awaiting signature.  It could become

8  reality at that point.

9  Q   But that $9,000 a day loss started May 27th,

:11PM   10  2008, is that correct?  Because the 2006 bill

11  expired, is that correct?

12  A   Correct.

13          MR. GOLDSTEIN:  One moment.

14        (Brief pause).

:11PM   15  BY MR. GOLDSTEIN:

16  Q   Mr. Johnston, you talked about this protest fund.

17  You knew that once the 2008 legislation was passed,

18  or you understood, that immediately there would be a

19  lawsuit, is that correct?

:11PM   20  A   We presumed that would be the case, yes.

21  Q   And you understood that once this lawsuit which

22  would take place very soon after this bill was

23  signed, that that money would go into a protest fund

24  just like in the 2006 legislation, is that correct?

:12PM   25  A   Yes.

1        MR. GOLDSTEIN:  Nothing further as to voir

2   dire, Your Honor.

3                   VOIR DIRE EXAMINATION

4   BY MR. NIEWOEHNER:

:12PM   5   Q   In the 2008 context, even if it went into an

6   escrow fund, were you still hoping you would get

7   that money some day?

8   A   Yes, because there would be $9,000 a day less

9   going into the protest fund.

:12PM   10  Q   So some day you would get that $9,000?

11  A   Yes, that was our hopes.

12        MR. NIEWOEHNER:  Nothing further.

13     (Brief pause).

14                   VOIR DIRE EXAMINATION

:12PM   15  BY MR. GOLDSTEIN:

16  Q   The $9,000 a day that you would accrue once this

17  bill was passed, this would last for 3 years, is

18  that correct?

19  A   Yes, sir.

:12PM   20  Q   Okay.  So whether it started December 1st or

21  January 1st, that money would continue to -- would

22  accrue for 3 years, is that correct, to your

23  understanding?

24  A   Up to 3 years.  There were provisions that would

:13PM   25  prevent it from going the full 3 years.

Johnston - Voir Dire Examination                3010

1  Q   And you understood those provisions that would
2  prevent it from going 3 years would entail potential
3  situations in which the racetracks would receive
4  additional income, is that correct?
5          For example, for example --
6  A   Two of them would, one of them wouldn't.
7  Q   Okay.  For example, you could get video gaming in
8  the racetracks that would stop the stipend, is that
9  correct?
10 A   Correct.  Correct.
11          MR. GOLDSTEIN:  Nothing further.
12              VOIR DIRE EXAMINATION
13 BY MR. NIEWOEHNER:
14 Q   The 2008 racing bill would last up to 3 years, is
15 that right?
16 A   Up to 3 years.
17          MR. NIEWOEHNER:  Nothing further, Your Honor.
18          THE COURT:  Why don't you step off the
19 witness stand, go off and stand outside those two
20 doors for a moment.
21          THE WITNESS:  Okay.
22    (Witness temporarily excused and exited the
23      courtroom after which the following further
24      proceedings were had herein: )
25          THE COURT:  Come to the lectern.

3011

1    MR. GOLDSTEIN:  Okay, there are a few things
2  raised, and I've raised this issue before, Your
3  Honor, and I'm not going to --
4    THE COURT:  Just start.
5    MR. GOLDSTEIN:  What is it?
6    THE COURT:  Get to it.
7    MR. GOLDSTEIN:  The issue is as to the other
8  contributions.  Again, this is an individual who is
9  saying he felt uncomfortable, who is saying there
10 was a connection between the two.  In exact
11 situations on the same subject, he indicated he saw
12 no connection.  You know, the exact same situation.
13    THE COURT:  Wait.  Wait.  How do we know it's
14 the exact same situation?
15    MR. GOLDSTEIN:  He's giving contributions --
16    THE COURT:  No, no, no.  This is a situation
17 in which, from his perspective, the government's
18 representative does something that he regards as a
19 linkage or maybe it didn't happen on the previous
20 ones.
21    I mean, the problem is, we're dealing with
22 fine lines here, because you can be deeply worried
23 about the way some legislators are going to vote,
24 whether he's going to vote the way he's made
25 speeches about voting, you worry about that, you

3012

1    give them money, he hasn't necessarily been quid pro

2    quo.  Lots of campaign contributions are made simply

3    because they want somebody reelected.  It's not the

4    same at the granular level of which we judge cases,

5    so I don't think it's the same.

6         So start from a different premise other than

7    the same, unless you can prove it's the same, and I

8    don't know about any of those guys being on your

9    witness list.

10        MR. GOLDSTEIN:  As far as it being the same,

11   no two situations are exactly the same, but we have

12   a very similar scenario, and we have an individual

13   -- and Your Honor is 100 percent right, this is a

14   fine line, things are not necessarily quid pro quos.

15        What we have in this entire case is the

16   understanding of these individuals, and the

17   understanding is based on conversations that,

18   obviously, is painstakingly, as we've gone through

19   it, isn't communicated directly.  So they're taking

20   understandings of, at the very best, indirect

21   communications.

22        And here is an individual again, just as

23   Mr. Magoon and just as Mr. Krozel, who is involved

24   in this fundraising or contributing --

25        THE COURT:  Well, wait, wait, wait.  You

3013

1  didn't have real evidence with respect to Magoon.

2  You, obviously, did with Krozel.  So why don't you

3  stick with Krozel.

4         MR. GOLDSTEIN:  Well, not as much with

5  Johnston and Krozel to Magoon, but as to Magoon,

6  Magoon fundraised significantly.  He didn't

7  fundraise to the degree of Johnston and Krozel, but

8  he fundraised.

9         THE COURT:  I wouldn't really continue to

10 assert that.  Just why don't you deal with Krozel

11 because he's a good example for you.

12        MR. GOLDSTEIN:  Well, I'll stick with

13 Johnston because Johnston is before us, Your Honor.

14        And less than a month before this bill was

15 signed, as Mr. Johnston says, we are trying to

16 contribute to people who support our views.  The man

17 was lobbying for a particular bill, he was

18 contributing to particular individuals who had a

19 bill before them, and he didn't see a connection

20 between the two.  Is it the exact same situation?

21 It will never be the exact same situation, but it's

22 pretty darn close, pretty darn close of an

23 individual whose state of mind when he does not want

24 to contribute to the governor, and I'm not sure if

25 it was communicated in direct this time but it

3014

1  certainly was in the last trial, "I had a lot of
2  reasons why I didn't want to contribute to the
3  governor having nothing to do with this situation,"
4  those could be other reasons why he's feeling
5  uncomfortable.
6        And, let's face it, as the government always
7  acuses us of putting the government on trial, it's
8  not really anything about that.  We have an
9  individual who has an immunity agreement, he
10  certainly has, it may not be overtly but it's at
11  least indirectly, some pressure from the government,
12  a concern of being charged, and now being influenced
13  to communicate an understanding.
14        THE COURT:  Would you like to talk
15  about--well, I'm assuming you're done with that part
16  of it--with respect to prior contributions, you want
17  to express a view?
18        MS. KAESEBERG:  I have just some brief words
19  that Johnston gave on direct which I think are
20  relevant to this, that he said that "the contents of
21  a contribution at this time would be totally
22  inappropriate" and then he later said "I was very
23  uncomfortable with that," so based on those
24  assertions on direct, this should be able to asked
25  --

3015

1     THE COURT:  You can't prove the similarity of

2 the conversations.  And the truth of the matter is,

3 that's not what's at issue here and that's not why

4 you want the evidence.  You want the evidence

5 because you want to make that same argument you made

6 before that you can't condemn the governor because

7 everybody does it without ever proving that

8 everybody does it.

9     You could get some expert, you could --

10     MS. KAESEBERG:  That is actually not

11 accurate.

12     THE COURT:  Good.  Then I'm glad to see that

13 you're not going to make it and I don't expect to

14 hear it in closing argument.  The fact is, you can't

15 make that comparison, as I see it.

16     MS. KAESEBERG:  But it's not about the

17 comparison, it's about --

18     THE COURT:  No, no, no, no, I'm talking about

19 -- this is very difficult sometimes but I'm talking

20 about one aspect of this.  I have not addressed the

21 issue as to his conversations with Monk and his

22 views on the $9,000.  I'm talking just about one

23 thing and that's the prior contributions, and I

24 don't think you can tie it to this case.  I don't

25 think you've offered evidence and I'm not going to

:19PM

:19PM

:19PM

:19PM

:20PM

3016

1  let you do it.

2      Now, the other issue, and the government can

3  speak to this because this is where I'm -- well, I

4  don't know if you have an objection to this.  I am

5  leaning to that aspect of the defense offer of proof

6  that spoke about what his discussion was in December

7  and what was going through his mind, and I don't

8  think you're particularly concerned about that.  As

9  a matter of fact, you probably would introduce it

10  anyway, but that leads us, because he's going to

11  start talking about $9,000 a day, that leads us to

12  the issue of the $9,000 a day stuff, and you can

13  express your view on that one.

14      MR. NIEWOEHNER:  Your Honor, we specifically

15  did not elicit whether he believed he was or wasn't.

16  The only thing that was elicited was did he say it

17  to Monk, and he did.  Whether he believed it when he

18  told Monk or he didn't believe it when he told Monk,

19  it doesn't matter.  His state of mind as to whether

20  he actually was or wasn't losing $9,000 a day is

21  irrelevant.

22      THE COURT:  But his testimony, interestingly

23  enough, was that he did believe it.  Well, that's

24  fine, but then, of course, the issue is, if he did

25  believe it, is the defense entitled to point out on

3017

1 cross or to point out by some other witness that he
2 actually may very well be wrong.
3      MR. SCHAR:  But I think the issue is not
4 whether -- he may be wrong, but he's not lying about
5 it.  He believes it, and that's what he
6 communicates.  We didn't, obviously, in direct bring
7 out whether or not he believes it or not.  In voir
8 dire he indicated he genuinely believed it, now they
9 want to bootstrap on to that a suggestion that, for
10 a variety of reasons, he should not have believed
11 it.
12      THE COURT:  No, and this is the issue that we
13 want to --
14      MR. NIEWOEHNER:  Right.  They want extrinsic
15 evidence to prove up the supposed lie, which he's
16 going to deny.  They can ask the question "when you
17 told Monk it was 9,000 a day, that was a lie, wasn't
18 it?" and he's going to say "no," and they're stuck
19 with that answer, they cannot prove up through him
20 or through anybody else that, in fact, he didn't
21 believe that.
22      MR. GOLDSTEIN:  Well, can I challenge his
23 assertion that it's not a lie through
24 cross-examination?
25      MR. NIEWOEHNER:  No, that's proving up

1  extrinsic evidence by --

2       MR. GOLDSTEIN:  It's challenging --

3       THE COURT:  It basically doesn't do you any

4  good to prove that he was wrong about the $9,000 a

5  day.  It does you some good to prove that he said it

6  was $9,000 a day, may have told Monk it was $9,000 a

7  day, but he didn't believe it, that's what might get

8  you somewhere, but the examination you conducted

9  here was an examination of somebody saying, well,

10  you're mistaken about it, there's this fact and

11  there's that fact, and this other fact and you

12  shouldn't have believed it.

13      MR. SOROSKY:  Your Honor, if Mr. Johnston

14  would say "I believe my racetracks are the best in

15  the world" and let's say any reasonable person could

16  look at his racetracks compared to other race tracks

17  and say that --

18      THE COURT:  And might possibly disagree.

19      MR. SOROSKY:  Right.  It's absurd, but he has

20  a right to believe his racetracks are the best.  The

21  defense would not be hurt by that apparent and

22  obvious erroneous belief.  However, Mr. Johnston has

23  testified or the government has presented evidence

24  that somehow we have done something wrong because

25  the racetracks are losing $9,000 a day.  We merely

3019

1   want to be able to point out that this was maybe not

2   a percent accurate because all this money would go

3   into a protest fund and that he hadn't received

4   money even on the first Recapture Bill.  So his

5   statement that he was losing $9,000 a day doesn't

6   quite have all the teeth that it has, and, frankly,

7   our bringing this out would merely relate to the

8   jury the truth, and as Your Honor said many, many

9   times, we're here to relate to the jury the truth.

10          THE COURT:  Actually, it's the relevant

11   truth.

12          MR. SOROSKY:  Well, relevant truth, okay.

13          THE COURT:  Okay.  Now, in my notes on the

14   government's direct, I don't see an attack on the

15   grounds that they're doing actual harm to him with

16   $4,500 for each track, and most of that came out on

17   the voir dire of the cross, maybe all of it came out

18   on the voir dire of the cross, but you do raise

19   another point, and that is whether the government is

20   going to actually contend in closing argument and

21   its theory of the case that what the governor did

22   was to cost Johnston $9,000 a month.

23          MR. SCHAR:  Judge, the argument we're --

24   well, I don't want to give the entire argument, but,

25   I mean, what the state of the evidence is, and ht

3020

1  has always been, is that what Mr. Johnston
2  communicated was that it was his understanding
3  they're losing 9,000, Mr. Monk communicated that,
4  and there's a transcript to that.
5      So the argument, really what's at issue,
6  unrelated to Johnston at all, is what was in the
7  defendant's mind, because his intent is what the
8  jury will ultimately decide.  And the argument will
9  be that based on what he was told, he understood
10 that there was pressure to be had because there was
11 $9,000 a day that was being lost.  So we're not
12 going to vouch as to whether that was accurate or
13 not, the issue is what did the defendant understood
14 or believed and that's based on what the evidence --
15     THE COURT:  Your argument is that the
16 defendant thought he had leverage.
17     MR. SCHAR:  Exactly.
18     THE COURT:  And whether he had it or not is
19 immaterial.
20     MR. SCHAR:  Exactly.
21     THE COURT:  Okay, respond to that.
22     MR. SOROSKY:  Well, first of all, how do they
23 know what the governor thought?  They don't know
24 what the governor thought.  Maybe the governor was
25 aware of the protest fund and --

3021

1      THE COURT:  No, I think what they're going to
2  argue is, listen to the recording and this shows
3  what the governor said, and from this the jury can
4  infer what he thought.
5      Now, there are other paths to differing
6  interpretations of that, which I'm assuming will
7  come up some time in your case, but the government's
8  position is, we can argue that he thought that he
9  had leverage and made an attempt to use it, and you
10 can offer evidence that he didn't think he had
11 leverage and that the conversations have somehow
12 been misinterpreted on the basis of evidence that
13 you may offer.
14     So that's where I stand on that one.  Is
15 there anything else?
16     MR. SOROSKY:  Can we at least ask him that he
17 was aware that all the money that the racetracks
18 would potentially receive from the first bill went
19 into a protest fund and they hadn't actually
20 received any dollars and that he reasonably believed
21 that that would happen with this bill?
22     THE COURT:  I can't see how it's relevant in
23 the context of this case now.  It could become
24 relevant later on, but I don't really think so.
25 This case is not going to be fought over whether

3022

1    Johnston is out 9,000, whether he thought he was out
2    9,000, or whether he didn't think he was out 9,000.
3    It is an act in which the government is alleging an
4    attempted use of leverage and the defendant thought
5    he had that leverage, and they got enough to argue
6    that to the jury.  They may not necessarily win, but
7    they got enough to argue that to the jury and that's
8    all that's relevant.  So, basically, I don't like
9    anything in the voir dire.
10        MR. GOLDSTEIN:  There's one other issue, and
11   I understand your ruling, and that was the
12   contributions to the governor, the prior
13   contributions.
14        THE COURT:  Did he make contributions before?
15        MR. GOLDSTEIN:  Correct.
16        THE COURT:  And how would you use that in
17   closing argument?
18        MR. GOLDSTEIN:  Well, it's relevant to go to
19   state of mind as to believing that the contributions
20   were given to the governor before.  So this isn't
21   just some random, out of the blue, "oh, I got this
22   bill in front of me now, all of a sudden I'm going
23   to ask for a contribution from this individual,"
24   this is a relationship, over $300,000 relationship,
25   from 2002 all the way through 2007.  So it explains

3023

1  the request for contributions separate and apart

2  from this bill.

3         MR. SOROSKY:  And with all due respect,

4  that's the same position Mr. Johnston took when he

5  said, "oh, I give to Senator Clayborne, I give to

6  Senator Molaro."

7         THE COURT:  I might very well admit this in

8  your case-in-chief, but not until I've had some

9  foundation for it.  So that one at least I

10  understand your argument, but it's got to tie it to

11  something other than what they have already put in

12  this case.

13         So nothing, I don't like anything in voir

14  dire.  Do you want to ask him anything else or do

15  you just want to leave it that way?

16         MR. GOLDSTEIN:  In voir dire?  No.

17         THE COURT:  I mean, what else are you going

18  to ask him?

19         MR. GOLDSTEIN:  In cross?

20         THE COURT:  Yeah.

21         MR. GOLDSTEIN:  I haven't asked anything.

22         THE COURT:  You can tell me now because he's

23  out of here.

24         MR. SOROSKY:  A lot of questions.

25         MR. GOLDSTEIN:  A few questions.

3024

1          Just going through the circumstances of what
2     he said under oath, you know, about the December 3rd
3     meeting and then --
4          THE COURT:  So you're going to test his
5     recollection of the December 3rd meeting, that's
6     what you intend to do?
7          MR. GOLDSTEIN:  Well, I mean, there's a lot
8     of things that he discussed, I don't want to front
9     exactly what my cross-examination is, but it's not
10    going to be anything having to do with the voir
11    dire, that's for certain.  I understand, your
12    Honor's ruling.
13         THE COURT:  Yeah.  I mean, because it is of
14    some concern to me and I don't think you're fronting
15    anything because he's not in this room.
16         MR. SCHAR:  We can't talk to him.
17         THE COURT:  Yeah, they can't talk to him.
18         MR. GOLDSTEIN:  Oh, I know you don't.  You
19    just object.
20         MR. NIEWOEHNER:  We might do that, anyway.
21         THE COURT:  Yeah, there's a good chance.
22         MR. GOLDSTEIN:  I understand that's going to
23    happen.
24         MR. SOROSKY:  They've done that in the past.
25         MR. GOLDSTEIN:  Just a few.

3025

 1          THE COURT:  So just give me an idea.

 2          MR. GOLDSTEIN:  Here, he has a December 3rd

 3   meeting, I want to ask him about that, what he

 4   understood.  I want to ask him about the

 5   communications he had with Monk.  I want to ask him

 6   about the relationship he had with Monk and that

 7   Monk was his lobbyist.  I want to ask him about his

 8   immunity agreement.

 9          THE COURT:  Okay, so far it's all right.

10          MR. GOLDSTEIN:  I mean, the events leading up

11   from November 24th up to December 3rd, I want to

12   elicit how Monk asked him for contributions before,

13   in a relative time frame, not, you know, all the way

14   behind.

15          MR. NIEWOEHNER:  And there's nothing on

16   direct about that.

17          THE COURT:  Yeah.

18          MR. GOLDSTEIN:  But he certainly talked about

19   requests for contributions.

20          THE COURT:  No, he didn't.

21          MR. GOLDSTEIN:  He didn't?  I mean, it --

22          THE COURT:  I want you to bear one thing in

23   mind, I have not excused a single witness.  I told

24   them they can leave the stand, but I have not

25   excused them.  So everybody is here under whatever

3026

1  process they were and will be produced for you.  So

2  we're not going to be outside the scope of the

3  direct.  And there is an advantage to you because

4  you can present a nice cohesive defense with logical

5  steps in it as opposed to putting it in pieces where

6  somebody might forget.

7       So no, you can't go through -- December 3rd

8  was what you go through.  And don't ask him to read

9  Monk's mind, ask him what he thought what Monk

10  meant, his understanding.

11       MR. GOLDSTEIN:  So I can go into one

12  conversation and that's on December 3rd?

13       THE COURT:  Basically you can go through what

14  was gone through on direct and the witness will be

15  available to you later.

16       MR. GOLDSTEIN:  In our case in chief?

17       THE COURT:  Sure.

18       MR. GOLDSTEIN:  Okay.

19       THE COURT:  We're ready.

20       Get the jury.

21     (Brief pause).

22       MR. SOROSKY:  One last thing, can we ask that

23  Monk never said -- that Monk in these conversations,

24  I don't mean these specific words, but said things

25  like two separate conversations, this type of thing,

Johnston - cross by Goldstein                    3027

1 on December 3rd?

2        THE COURT:  You can ask him what Monk said to

3 him on December 3rdrd.

4        MR. SOROSKY:  Okay.

5     (Brief pause.)

6        THE MARSHAL:  All rise.

7     (The following proceedings were had in the

8      presence of the jury in open court:)

9        THE COURT:  Please be seated.

10        You may proceed.

11        MR. GOLDSTEIN:  Thank you, Your Honor.

12                    CROSS EXAMINATION

13 BY MR. GOLDSTEIN:

14 Q   Mr. Johnston, you spoke about the December 3rd

15 meeting you had with Mr. Monk, is that correct?

16 A   Yes.

17 Q   And at the time Mr. Monk was employed by you as a

18 lobbyist, is that correct?

19 A   Yes, it is.

20 Q   And he was compensated for that work, is that

21 correct?

22 A   Yes.

23 Q   It was $12,500 a month, is that correct?

24 A   Yes.

25 Q   Now, when you saw Mr. Monk, he called you first,

:33PM

:35PM

:35PM

:35PM

:35PM

Johnston - cross by Goldstein                    3028

1  is that right?

2       MR. NIEWOEHNER:  Objection.

3  BY MR. SOROSKY:

4  Q   December 3rd, I apologize.  On December 3rd

5  Mr. Monk called you?

6  A   Yes.  Correct.

7  Q   And he asked to see you, is that correct?

8  A   Yes, he did.

9  Q   And you said that you weren't expecting a call

10 from Mr. Monk at that time?

11 A   No, I think I said -- I don't know if I said

12 that.

13 Q   Okay.  You weren't expecting to see him that day,

14 is that correct?

15 A   Exactly; I think that's what I referred to.

16 Q   And Mr. Monk eventually came to see you and that

17 was at your office in Maywood, is that correct?

18 A   That's correct.

19 Q   And when Mr. Monk came to see you, it was you,

20 your father, and Mr. Monk, is that right?

21 A   Yes.

22 Q   And you all were in the front office, is that

23 correct?

24 A   Conference room, I said.

25 Q   Conference room.  Okay.

1        And when Monk came to see you, is it fair to

2   say your understanding was he wasn't there to talk

3   about the bill, is that correct?

4              MR. NIEWOEHNER:  Objection, Your Honor.

:36PM   5              THE COURT:  Sustained.

6   BY MR. GOLDSTEIN:

7   Q   When Mr. Monk came to see you, what was your

8   understanding of why he came to see you?

9              MR. NIEWOEHNER:  Objection, Your Honor;

:37PM  10   relevance.

11              THE COURT:  Sustained.

12   BY MR. GOLDSTEIN:

13   Q   Well, when Mr. Monk came, your father spoke to

14   Mr. Monk and basically tossed a pen in his

:37PM  15   direction, asked him to sign this bill, is that

16   correct?

17   A   No, what happened was, we had guest souvenir pens

18   on the middle of the conference table and Billy, as

19   a kind of joking gesture, grabbed several of them

:37PM  20   and threw them at Lon in kind of a humoristic type

21   way and Lon didn't recognize what he meant by that.

22   Q   He appeared confused when that happened, is that

23   correct?

24   A   He did.

:37PM  25   Q   So based on that, it was your understanding

1  Mr. Monk wasn't there to talk about the bill, is

2  that correct?

3          MR. NIEWOEHNER:  Objection.

4          THE COURT:  Sustained.

:37PM  5  BY MR. GOLDSTEIN:

6  Q   Well, there were then some unrelated matters that

7  you all talked about, is that correct?

8  A   Yes.

9  Q   Okay.  And eventually Mr. Monk and yourself

:38PM  10  walked out, is that right?

11  A   Yes.

12  Q   And Mr. Monk then spoke to you, was it in a

13  hallway, a stairway, where exactly was it?

14  A   In essence, in a stairwell.

:38PM  15  Q   And it was just you and Mr. Monk, is that

16  correct?

17  A   Yes.

18  Q   And you had no reason to believe that anyone was

19  listening to this conversation, is that correct?

:38PM  20  A   Yes.

21  Q   And Mr. Monk told you what he said the governor's

22  concern was, is that fair to say?

23          MR. NIEWOEHNER:  Objection.

24          THE COURT:  Yeah, you can ask a better

:38PM  25  question.

1  BY MR. GOLDSTEIN:

2  Q   Mr. Monk told you about fundraising, is that

3  correct?

4          MR. NIEWOEHNER:  Objection, Your Honor.

5          THE COURT:  I'm sustaining this.  Maybe you

6  want to start with his account and then test it.

7  BY MR. GOLDSTEIN:

8  Q   What did Mr. Monk tell you when you got into the

9  stairway?

10 A   We walked to the bottom of the stairs, I was

11 getting very close in proximity to the exit door

12 where we would go out, where people potentially

13 could be, and he turned to me and he said, "one more

14 thing," he said, "I spoke to the governor, he has a

15 concern that if he signs the racing legislation you

16 might not be forthcoming with the contribution."

17 Q   And you said you got agitated after that, is that

18 correct?

19 A   Yes.

20 Q   And you said some things to Mr. Monk and then he

21 sort of wiped his hands and said "two separate

22 conversations," is that correct?

23 A   Different subject matter.

24 Q   Different subject matter, okay.

25          And what you understand Mr. Monk was

:38PM

:39PM

:39PM

:39PM

:39PM

1  communicating to you was the bill and the

2  contribution were separate, is that correct?

3       I'm not saying whether you believed him or

4  not, I'm saying what you understood you believed to

5  be communicated to you.

6  A  Well, no, I actually thought just the opposite by

7  what he had initially told me, then he came back and

8  tried to clarify it through the hand gesture and by

9  saying "different subject matter."

10  Q  When Mr. Monk said "different subject matter,"

11  whether you believed it or not, did you understand

12  Mr. Monk to be communicating to you that they were

13  separate, the bill and the contribution?

14  A  Yes, I believe that's what he meant by when he

15  said that.

16  Q  But did not believe Mr. Monk, is that correct?

17  A  Correct.

18  Q  Now, you at this time had no intention to

19  contribute to Mr. Blagojevich, is that correct?

20       MR. NIEWOEHNER:  Objection.

21       THE COURT:  The objection is sustained.

22  BY MR. GOLDSTEIN:

23  Q  Well, after Mr. Monk told you two separate

24  subjects or conversations, you then said you've been

25  a supporter in the past, is that correct?

:40PM

:40PM

:40PM

:40PM

:41PM

1  A   I did say that, yes.

2  Q   Okay.  And what you were trying to communicate

3  is, hey, I can contribute, is that correct?

4          MR. NIEWOEHNER:  Objection.

5          THE COURT:  Is that what you were trying to

6  communicate, that you could contribute?

7          THE WITNESS:  No, what I was trying -- well,

8  to some degree.  What I was trying to contribute, in

9  a fast action, you know, set of sentences flying

10 back and forth was that, I supported the governor in

11 the past, and what I was trying to perceive to him

12 was that we -- we had supported the governor in the

13 past with contributions but at this point not only

14 weren't going to, but we're very uncomfortable with

15 you in having a discussion about it at this point in

16 time because there was legislation that affected us

17 and I viewed that as a conflict.

18 BY MR. GOLDSTEIN:

19 Q   So what you communicated to Mr. Monk was that you

20 were not going to contribute, is that correct?

21          MR. NIEWOEHNER:  Objection, Your Honor.

22          THE COURT:  Sustained.

23 BY MR. GOLDSTEIN:

24 Q   You talked about what you were trying to

25 communicate, is it fair to say you were trying to

1 communicate you would not contribute?

2          MR. NIEWOEHNER:  Objection, Your Honor.

3          THE COURT:  To the form of the question, yes.

4          MR. GOLDSTEIN:  Sustained?

5          THE COURT:  Sustained.  Sorry.

6 BY MR. GOLDSTEIN:

7 Q   Did you communicate to Mr. Monk on December 3rd

8 that you would not contribute to the governor?

9          MR. NIEWOEHNER:  (Counsel standing.)

10          THE COURT:  You may possibly want to address

11 this in a time frame which was the subject of his

12 answer.

13 BY MR. GOLDSTEIN:

14 Q   On December 3rd, 2008, while you were talking to

15 the governor -- or talking to Mr. Monk, I apologize,

16 and you responded to what Mr. Monk said as far as

17 separate subjects, were you trying to communicate to

18 Mr. Monk that you would not contribute to the

19 governor?

20          MR. NIEWOEHNER:  Objection, Your Honor.

21          THE COURT:  Sustained.

22 BY MR. GOLDSTEIN:

23 Q   Had you communicated to Lon Monk in your

24 conversations with him between September of '08 to

25 December of '08 that you would not contribute to the

Johnston - cross by Goldstein                    3035

 1 governor?
 2        MR. NIEWOEHNER:  Objection.
 3        THE COURT:  Sustained.
 4 BY MR. GOLDSTEIN:
 5 Q   At that time your concern was a perception
 6 problem, is that correct?
 7        MR. NIEWOEHNER:  Objection.
 8        THE COURT:  Sustained.
 9 BY MR. GOLDSTEIN:
10 Q   Did you have a concern over perception?
11        MR. NIEWOEHNER:  Objection.
12        THE COURT:  Sustained.
13 BY MR. GOLDSTEIN:
14 Q   Now, it was your understanding on December 3rd
15 that this bill would become law, is that correct?
16        MR. NIEWOEHNER:  Objection, Your Honor.
17        THE COURT:  Rephrase the question.
18 BY MR. GOLDSTEIN:
19 Q   You understood on December 3rd --
20        THE COURT:  Why don't you do it as a
21 non-leading question.
22 BY MR. GOLDSTEIN:
23 Q   What did you understand would happen to this bill
24 when it was sent to the Governor's office?
25        MR. NIEWOEHNER:  Objection on relevance.

:43PM
:43PM
:43PM
:43PM
:44PM
:44PM

Johnston - cross by Goldstein                3036

1    THE COURT:  You know, there's a simple way to
2 ask the question, why don't you try again.
3 BY MR. GOLDSTEIN:
4 Q   Did you believe this bill would be signed?
5 A   Yes.
6    MR. NIEWOEHNER:  Objection.
7    THE COURT:  The answer may stand.
8 BY MR. GOLDSTEIN:
9 Q   And is it fair to say you wanted it signed at a
10 particular time, you wanted it signed quickly, is
11 that correct?
12 A   Yes.
13 Q   In your conversations with Mr. Monk, did you ever
14 communicate to him that you would not contribute to
15 Mr. Blagojevich?
16    MR. NIEWOEHNER:  Objection, Your Honor.
17    THE COURT:  You know, this is like the fifth
18 one.  I don't want to hear a sixth.
19 BY MR. GOLDSTEIN:
20 Q   Now, you raised the issue on December 3rd, 2008,
21 this $9,000 a day, is that correct?
22    MR. NIEWOEHNER:  (Counsel standing.)
23    THE COURT:  No, he can answer.
24    MR. GOLDSTEIN:  It was brought up on direct
25 testimony.

:44PM
:44PM
:45PM
:45PM
:45PM

BY THE WITNESS:

A   I don't think it was December 3rd, I think it was

prior to that.

BY MR. GOLDSTEIN:

Q   When?

A   Four or five days earlier.

Q   And that was --

A   Between the time of the passage of the bill,

November 24th -- or 20th and the December 3rd.

Q   Okay.  And that was communicated to Mr. Monk?

A   Yes.

Q   And it had not been raised before that time, is

that correct?

        MR. NIEWOEHNER:  Objection.

        THE COURT:  Sustained.

BY MR. GOLDSTEIN:

Q   Now, all the communication you had, as far as

signing the bill and the contributions, was with

Mr. Monk, is that correct?

        MR. NIEWOEHNER:  Objection.

        THE COURT:  Sustained.

        MR. GOLDSTEIN:  Well --

        THE COURT:  You're outside the scope of the

direct.

BY MR. GOLDSTEIN:

1  Q   From November 24th, 2008 to December 9th, 2008,
2  did you have any conversations with Rod?
3  A   No.
4  Q   Now, when you raised the issue of the $9,000 a
5  day, were you trying to put pressure on Rod to sign
6  the bill?
7          MR. NIEWOEHNER:  Objection.
8          THE COURT:  Outside the scope; sustained.
9  BY MR. GOLDSTEIN:
10 Q   Were you mixing the legislation with the
11 fundraising?
12         MR. NIEWOEHNER:  Objection.
13         THE COURT:  Sustained.
14 BY MR. GOLDSTEIN:
15 Q   Now, you talked about you had an immunity
16 agreement, is that correct?
17 A   Yes.
18 Q   And you signed that immunity letter on December
19 19th of 2008, is that correct?
20 A   I'm not sure the date, but --
21 Q   Was it December of '08, approximately?
22 A   I'm not even sure about -- yeah, I signed it,
23 whatever the date.
24 Q   But you are aware of the agreement, right?
25 A   Yes, I am.

Johnston - cross by Goldstein                    3039

1  Q   Is it your understanding from this immunity
2  agreement that anything you say cannot be used
3  against you in a criminal prosecution?
4  A   It's my understanding that I'm supposed to come
5  here and tell the truth, and whether I had one or
6  not I would be coming here to tell truth if I was
7  called.
8  Q   Okay.  And anything you say cannot be used
9  against you by the government?
10 A   Yes.
11 Q   Pursuant to your immunity agreement?
12 A   Yes.
13 Q   Okay.  So I understand, your understanding of the
14 immunity agreement is, anything you testify to today
15 cannot be used against you in a criminal
16 prosecution, is that correct?
17 A   Only if it's non-truthful.
18 Q   Correct.
19         And you understand the people that determine
20 whether this is truthful or not is the government,
21 is that correct?
22         MR. NIEWOEHNER:  Objection.
23         THE COURT:  Sustained.
24
25 BY MR. GOLDSTEIN:

1 Q   You said that only if something is non-truthful
2 could you potentially be prosecuted, is that
3 correct?
4 A   You don't get prosecuted for the truth, yeah, I
5 mean, it would have to be, yes.
6 Q   And the individuals, as you understand it, to
7 prosecute you is the government for perjury,
8 correct?
9        MR. NIEWOEHNER:  Objection.
10        THE COURT:  Overruled.
11 BY THE WITNESS:
12 A   So what was the question now?  I'm sorry.
13        MR. GOLDSTEIN:  Could I have it read back?  I
14 don't want to misstate it.
15    (Question read.)
16 BY THE WITNESS:
17 A   Yes.
18 BY MR. GOLDSTEIN:
19 Q   And you've been cooperating with the government
20 for how long now?
21 A   Close to December 9th, 2008.
22 Q   And since that time up to today, how many times
23 have you spoken with the government?
24 A   Approximately ten times.
25 Q   And have you spoken to the government -- how

Johnston - cross by Goldstein                    3041

1  recently have you spoken to the government?
2  A   Today.
3  Q   Okay.  And that was in preparation for your
4  testimony?
5  A   Correct.
6  Q   Have you ever spoken to any of the members of the
7  defense team for Mr. Blagojevich?
8  A   No.
9  Q   Okay.  You understand that you were asked of your
10 if we could speak with you?
11 A   Yes.
12 Q   And you refused to speak with us?
13 A   Our discussion went along the lines that I had
14 testified at the prior trial and that there was a
15 transcript available and that should be sufficient.
16 Q   Okay.  And when you said your conversations, who
17 were those conversations with?
18 A   My attorney.
19 Q   Okay.  And did you communicate that to the
20 government when you spoke to them today?
21      Did you tell them, hey, you got the
22 transcript, that should be sufficient, we don't need
23 to talk, did you tell them that?
24      MR. NIEWOEHNER:  Objection.
25 BY THE WITNESS:

1   A   I didn't tell them that today, no.

2          MR. GOLDSTEIN:   Just one moment, Your Honor.

3       (Brief pause).

4          MR. GOLDSTEIN:   Just a few more questions,

5   Your Honor.

6   BY MR. GOLDSTEIN:

7   Q   Now, back to the December 3rd meeting that you

8   had with Mr. Monk.  Did you say to Mr. Monk during

9   this conversation that was in the stairway, did you

10  ask Mr. Monk "do you want me to put something in to

11  next quarter," referring to campaign contributions,

12  did you communicate that to Mr. Monk?

13  A   No.

14  Q   Did you communicate to Mr. Monk and did you say

15  the words "I'm good for it"?

16  A   No.

17         MR. NIEWOEHNER:   Your Honor, objection.

18         MR. GOLDSTEIN:   Exact words.

19         THE COURT:   The objection is sustained.

20         MR. GOLDSTEIN:   Okay.

21  BY MR. GOLDSTEIN:

22  Q   Did you say the exact words on December 3rd,

23  "you're just moving money through accounts"?

24  A   Not to my recollection, no.

25  Q   I'm talking about the December 3rd meeting in the

:50PM

:51PM

:51PM

:51PM

:51PM

Johnston - cross by Goldstein                3043

1  stairwell.

2  A   No.  No.

3  Q   Okay.

4        MR. GOLDSTEIN:  Nothing further.

5        MR. NIEWOEHNER:  Nothing from the government,

6  Your Honor.

7        THE COURT:  You can step down.

8      (Witness excused.)

9        THE COURT:  That's it.

10        We're going to begin again tomorrow morning

11  at 9:30 and we'll see how long we go.

12        THE MARSHAL:  All rise.

13      (The following proceedings were had out of the

14       presence of the jury in open court:)

15        THE COURT:  Please be seated in the

16  courtroom.

17        Come to the lectern.

18      (Brief pause).

19        THE COURT:  I just want to comment that there

20  is some vague recollection that the person who

21  decides whether somebody has perjured himself either

22  wears a black robe or sits in the junior box.  So

23  don't ask that question again who decides.

24        What's up for tomorrow?  How many?

25        MR. SCHAR:  Judge, it's our hope that we get

3044

1  through Dr. Feinstein, Bradley Tusk, potentially
2  Mr. Scofield again, and then the case agent.
3          THE COURT:  Feinstein, Tusk who else?
4          MR. SCHAR:  Mr. Scofield, that would be about
5  five minutes with Mr. Scofield, Judge, and then the
6  case agent, Agent Cain.
7          THE COURT:  And total time?
8          MR. SCHAR:  Total time on direct probably not
9  more than an hour and a half, the time on cross is
10 an open question.
11         MR. SOROSKY:  We don't anticipate any of the
12 crosses to be long.
13         THE COURT:  So it's conceivable the
14 government might rest before lunch or shortly
15 thereafter?
16         MR. SCHAR:  Yes, Judge.
17         THE COURT:  Which then leads us to --
18         MR. SOROSKY:  I don't know about before
19 lunch, but certainly --
20         THE COURT:  Right.  But not far off.
21         MR. SOROSKY:  Right.
22         THE COURT:  Then that leads us to the rest of
23 the schedule.
24         MR. SOROSKY:  If I could ask one other thing,
25 too.  We would ask if Mr. Monk could be recalled for

3045

1 one or two questions on one point we would like to
2 ask him on further cross-examination and I'll relate
3 it now to Your Honor if you want.  It would be very
4 short.
5          THE COURT:  Just give them to me in writing
6 and hand them to the clerk.  I'll make a decision.
7               I'm assuming he's not going far.
8          MR. NIEWOEHNER:  Well, he does live a couple
9 of hours away.
10          THE COURT:  Decatur to Chicago in a couple of
11 hours?
12          MR. NIEWOEHNER:  Apparently.
13          THE COURT:  In compliance with the speed
14 limits?  I don't think.
15          MR. NIEWOEHNER:  Well, I don't have personal
16 experience with that one.
17          THE COURT:  You can bring them to me, you can
18 give me the questions and we'll see how it works
19 out.
20          MR. SOROSKY:  I could tell Your Honor right
21 now.
22          THE COURT:  What?
23          MR. SOROSKY:  I'll relate it right now.
24          THE COURT:  Yeah, go ahead.
25          MR. SOROSKY:  The last few questions that

3046

1  Mr. Goldstein asked Mr. Johnston, Mr. Johnston

2  indicated that there was never any conversation by

3  Mr. Johnston to Mr. Monk that I'll make a

4  contribution next quarter, if you want to put

5  something in, if you want me to put something in

6  next quarter, that type of thing.  After the meeting

7  between Johnston and Monk at the racetrack, Monk

8  calls the governor, and this call was played in

9  prior tapes --

10       THE COURT:  Wait.  Wait a second.  I sort of

11  know where you're going but my question is this, I

12  don't recall Monk testifying that Johnston said

13  those things.

14       MR. SOROSKY:  Monk told -- well --

15       THE COURT:  He told the governor these

16  things, he told the governor that he's good for

17  it --

18       MR. SOROSKY:  Correct.

19       THE COURT:  -- he told the governor he was

20  looking around for accounts, but I thought he said

21  that those were not true.

22       MR. SOROSKY:  No, no, no, Monk said this is

23  what he told the governor.

24       MR. NIEWOEHNER:  He said there was

25  conversation along those lines, he didn't say that

3047

1  was a quote from Johnston to Monk.

2       MR. SOROSKY:  So we want to ask Monk did he

3  have those conversations with Johnston, because if

4  he had those conversations with Johnston, then Monk

5  is saying that Johnston is lying, if Monk did not

6  have those conversations with Johnston, then Monk is

7  lying to the government, and we are entitled to

8  relate to the jury that either Monk -- either

9  there's this contradiction between Monk --

10      THE COURT:  No, you don't need Monk, and the

11 reason you don't need Monk is, Monk gave his

12 answers, Johnston gave his answers, if you think

13 they are in conflict, and I'm not sure they are --

14      MR. SOROSKY:  Oh, they're definitely in

15 conflict.

16      THE COURT:  I'm not sure they are.  If

17 they're in conflict, it's a great thing to say in

18 closing argument.

19      MR. SOROSKY:  Well, we'd like to bring this

20 out to the jury tomorrow.

21      THE COURT:  It's been brought out to the

22 jury.  What you want to do is you want to use this

23 as a devise to argue your case when this is the

24 period of time when we ask questions and get answers

25 and the argument comes later.  So the answer is no,

3048

1  he can spend his time in lovely downtown Decatur.

2       So assuming we finish in the early afternoon,

3  what would you have in mind to do?  Because there

4  was a previous suggestion which was to go over

5  instructions.

6       MR. SCHAR:  Judge, I'm not sure we'll be

7  prepared to go over instructions tomorrow.  We could

8  probably by Friday, if that's what you wanted to do,

9  or, alternatively, we -- we'll do that on Your

10  Honor's schedule.

11       THE COURT:  Okay.  What I am basically trying

12  to do is save the defense from having to start its

13  defense tomorrow afternoon, that's basically what

14  I'm trying to do.

15       MR. SOROSKY:  Well, it'll be a long cross of

16  Tusk.

17       THE COURT:  The belief I have, then, is that

18  we can start on Monday with the defense case.  If it

19  turns out that there is no defense case, which in

20  the context of this case I would find it extremely

21  unlikely, but if there is none, then we will have to

22  make other appropriate arrangements.  If there is

23  and we are talking about a defense that can begin

24  and end, at least the direct part of it, can begin

25  and end in three, possibly three and a half days

1  that are available to us next week, then what we

2  will plan on is whatever closing that has to be done

3  and whatever rebuttal on the 31st of May, that gives

4  us four days of that week.  That's what my thinking

5  is.  If anybody has any views on this, you can

6  express them tomorrow, because a lot of this depends

7  on what the defense decisions are and not the

8  prosecution's.

9          MR. SOROSKY:  Are we going to be going -- is

10  there going to be trial Wednesday of next week?

11          THE COURT:  Yeah, there will be trial next

12  Wednesday.  I have been given permission to return

13  by people who have the authority to give me

14  permission.

15          MR. SCHAR:  Judge, the only thing we'd ask

16  is, obviously, regarding the same courtesies, not

17  all defense witnesses but whoever is going to be

18  called on Monday if we could know by, you know, 4:30

19  tomorrow afternoon, or the last time we're in court,

20  I think that would be appropriate.

21          MR. SOROSKY:  We have no desire to hide

22  witnesses from them.

23          THE COURT:  Sure.

24          MR. SCHAR:  And, obviously, when you say

25  closing rebuttal, you're talking about the

3050

1   government's potential rebuttal case?

2          THE COURT:  Right.  If there is a rebuttal

3   case and we'll see.

4          MR. SCHAR:  Okay.

5          THE COURT:  So, basically, we're fine.  I'll

6   see you tomorrow.

7          MR. SCHAR:  And, Judge, obviously, tomorrow

8   morning we can address the other witnesses issues.

9          THE COURT:  Sure.

10      (Adjournment taken from 5:00 o'clock p.m. to

11       9:30 o'clock a.m. on May 19, 2011.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3051

*   *   *   *   *   *   *   *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


/s/Blanca I. Lara                    date



_____          _____
     Blanca I. Lara                       Date