4012

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3

UNITED STATES OF AMERICA,      )
4                           )
             Plaintiff,   )
5                           )
                           )
6  -vs-                   )  Case No. 08 CR 888
                           )
7                        )  Chicago, Illinois
  ROD BLAGOJEVICH,          )  May 31, 2011
8                      )  1:45 p.m.
             Defendant.   )
9                      )

10                VOLUME 24 PM
            TRANSCRIPT OF PROCEEDINGS
11       BEFORE THE HONORABLE JAMES B. ZAGEL
               AND A JURY
12
  APPEARANCES:
13
  For the Government:
14
        THE HONORABLE PATRICK J. FITZGERALD,
15        UNITED STATES ATTORNEY
        BY:  Reid J. Schar
16            Carrie E. Hamilton
            Christopher Niewoehner
17        219  S. Dearborn Street
        Suite 500
18        Chicago, IL  60604

19

20

21  Court Reporter:

22        KATHLEEN M. FENNELL, CSR, RMR, FCRR
           Official Court Reporter
23        United States District Court
     219 South Dearborn Street, Suite 2144-A
24         Chicago, Illinois  60604
        Telephone:  (312) 435-5569
25          www.Kathyfennell.com

4013

APPEARANCES:  (Continued)

For Defendant Rod Blagojevich:

KAPLAN & SOROSKY
BY:  Sheldon M. Sorosky
158 West Erie
Chicago, Illinois  60610
(312) 640-1776

OFFICES OF AARON B. GOLDSTEIN
BY:  Aaron Benjamin Goldstein
6133 South Ellis
Chicago, Illinois  60637
(773) 752-6950

OFFICES OF LAUREN FAUST KAESEBERG
BY:  Lauren Faust Kaeseberg
2140 N. Lincoln Park West
Suite 307
Chicago, IL  60614
(773) 517-0622

LAW OFFICE OF ELLIOTT RIEBMAN
BY:  Elliott Riebman
158 West Erie
Chicago, Illinois  60610
(847) 814-2900

4014

1        (Proceedings heard at sidebar:)

2              THE COURT:  Okay.  I was told somebody has to say

3    something now.  Is this true?

4              MR. GOLDSTEIN:  Yes, your Honor.

5              THE COURT:  Go ahead.

6              MR. GOLDSTEIN:  There was one --

7              THE COURT:  It would have been very embarrassing.

8              MR. GOLDSTEIN:  Well, we could always -- I think

9    Shelly can think of something.

10             MR. SOROSKY:  Come up with something.

11             MR. GOLDSTEIN:  We wanted to address a call that we

12   did not present to your Honor that we would like to admit.  It

13   is a call on November 14th in which Mr. Blagojevich is

14   speaking to his brother, and his brother tells him that Wyma

15   was fired --

16             MR. SOROSKY:  From Children's Memorial Hospital.

17             MR. GOLDSTEIN:  -- from Children's Memorial Hospital.

18   It's relevant for two issues.  It goes to his state of mind

19   because they then talk about Mr. Magoon and what to do, and

20   specifically Rod tells Robert that he shouldn't call Mr. Wyma,

21   and it goes to --

22             THE COURT:  Say that to me again?

23             MR. GOLDSTEIN:  The defendant in this trial tells his

24   brother Robert to not call Mr. Magoon based on this Wyma --

25   the news of Wyma, so it explains his state of mind as well as

Blagojevich - direct

4015

1    his future conduct that he took afterwards.

2              THE COURT:  But why does it explain it better than

3    his getting up on the witness stand and saying the same thing?

4    That's my big question.

5              MR. GOLDSTEIN:  Well, I think it explains it better.

6    First, you get to hear the call, and it does fit within the

7    hearsay exception, so it's admissible.  And if it's

8    admissible, we deem it appropriate to be played, your Honor.

9    We do have an extra copy of the transcript.

10             MR. NIEWOEHNER:  We don't see that it is -- it is not

11   an exception to the hearsay rule.  It's just the defendant

12   talking to his brother who's his subordinate, and it's really

13   more Robert talking about what his thoughts are.  So if he

14   wants to testify that he told him don't call, that's fine, but

15   this tape shouldn't come in.

16             THE COURT:  I'm keeping it out.  I'm sustaining the

17   objection.

18        (Proceedings heard in open court:)

19        (Jury enters courtroom.)

20             THE COURT:  Please be seated.  You may proceed.

21             MR. GOLDSTEIN:  Thank you, your Honor.

22      ROD R. BLAGOJEVICH, DEFENDANT HEREIN, PREVIOUSLY SWORN,

23                  DIRECT EXAMINATION (RESUMED)

24   BY MR. GOLDSTEIN:

25   Q.  Now, Rod, I want to change subjects with you, talk about

Blagojevich - direct

4016

1    the issues regarding Patrick Magoon, okay?

2    A.  Okay.

3    Q.  Are you familiar with the allegations regarding

4    Mr. Magoon?

5    A.  Yes, I am.

6    Q.  Did you ever shake down Mr. Magoon?

7    A.  No.

8    Q.  Did you ever threaten Mr. Magoon to have a fundraiser for

9    you?

10   A.  No.

11   Q.  Did you ever threaten Mr. Magoon to contribute campaign

12   contributions to you?

13   A.  No.

14   Q.  Did you ever demand that Mr. Magoon give you a fundraiser?

15   A.  No.

16   Q.  Did you ever ask Mr. Magoon or have anyone ask Mr. Magoon

17   a fundraiser in exchange for going forward with this pediatric

18   rate increase?

19   A.  No.

20   Q.  Did you ever hold up this pediatric rate increase in order

21   to get a fundraiser from Mr. Magoon?

22   A.  No.

23   Q.  Now, Rod, are you familiar with Children's Memorial

24   Hospital?

25   A.  Yes, I am.

Blagojevich - direct

4017

1   Q.  And how did you first become familiar with Children's

2   Memorial Hospital?

3   A.  On October 14th, 1967 --

4           MR. SCHAR:  Judge, I'm going to object.

5           THE COURT:  I don't want to go that far back.

6   BY MR. GOLDSTEIN:

7   Q.  You have had a long understanding and relationship with

8   Children's Memorial Hospital, is that right?

9   A.  Yes.

10  Q.  And have you had family members treated at Children's

11  Memorial Hospital?

12  A.  My cousin Eli passed --

13          MR. SCHAR:  Objection, irrelevant.

14          THE COURT:  Objection sustained.

15  BY MR. GOLDSTEIN:

16  Q.  What, Rod, are your feelings towards that hospital?

17          MR. SCHAR:  Objection.

18          MR. GOLDSTEIN:  Your Honor, it's relevant.  It's

19  relevant to the exact charges of what their allegations are.

20  They're saying this man held up a rate increase.

21          THE COURT:  What I'm concerned about has to do with

22  the open invitation in the question for a long, narrative

23  answer, which was okay on the background stuff but not now.

24          I really don't want a speech, and it's not proper in

25  court.  So maybe you could lead him and get basically the same

1   information you want, so I'm allowing you to lead this witness

2   even though he's your witness.

3   BY MR. GOLDSTEIN:

4   Q.  Now, Rod, you've had family members treated at Children's

5   Memorial Hospital, is that right?

6   A.  Yes.

7             MR. SCHAR:  Judge --

8             THE COURT:  Okay.  That's fine, one thing.

9   BY MR. GOLDSTEIN:

10  Q.  The experiences you've had with Children's Memorial

11  Hospital and healthcare in general, how did that impact you in

12  your policies as governor?

13            MR. SCHAR:  Judge, objection.

14            THE COURT:  Objection sustained.  I give you leave to

15  lead him.

16  BY MR. GOLDSTEIN:

17  Q.  Okay.

18            Based on the experiences you had in your life, is it

19  fair to say that you cared very deeply about healthcare?

20  A.  Yes, very much.

21  Q.  And based on your concerns over healthcare, did you

22  initiate policies that helped that issue, to help people get

23  healthcare?

24  A.  My life experiences shaped my commitment and my --

25            THE COURT:  Wait, wait, wait.  It's a yes or no

1  question.

2  BY THE WITNESS:

3  A.  Can you repeat the question, Aaron?

4  BY MR. GOLDSTEIN:

5  Q.  Based on your experiences you had in life --

6  A.  Uh-huh.

7  Q.  -- did those experiences shape your policies and the

8  things you did as governor to advocate and promote and make

9  policies to help healthcare issues?

10  A.  Yes.

11  Q.  Now, Rod, I want to turn your attention to the pediatric

12  doctors rate increase, okay?

13         In the summer of 2008, were you aware of a pediatric

14  rate increase?

15  A.  In the summer of 2008, I had a general understanding that

16  there were different concerns in the healthcare delivery

17  system, adult doctors and other doctors, relating to the

18  timeliness of the state's payments of Medicaid bills for

19  doctors who served patients under Medicaid.

20  Q.  So during the summer you had a general understanding, is

21  that right?

22  A.  Yes.

23  Q.  Did you eventually become more aware of the pediatric rate

24  increase issue?

25  A.  Yes.

1    Q.   And how did you become aware of this?

2    A.   Sometime in I believe it was the third week of September

3    2008, I received a phone call from Dusty Baker, who at the

4    time was the manager of the Cincinnati Reds.  Before that he

5    had been the manager of the Chicago Cubs.

6    Q.   How do you know Dusty Baker?

7    A.   When I was first governor, I had the opportunity to meet

8    Dusty Baker -- he was the manager of the Cubs -- and get to

9    know him a little bit and developed a pretty good relationship

10   with him.

11   Q.   Had you had previous conversations with Dusty Baker

12   before?

13   A.   Yes.  Mostly about baseball.

14   Q.   And had you had -- well, let me -- let me go forward.

15            When Dusty Baker called you, what did you talk about?

16   A.   When he called me when?

17   Q.   In September of 2008.

18   A.   When he called me in September of 2008, third week, I

19   think, roughly third week of September, the first thing he

20   said was he told me that the Reds were playing the Milwaukee

21   Brewers.

22            In the late summer of 2008, the Cubs and the Brewers

23   were the two teams competing for the National League Central

24   title.  Dusty, knowing I'm a Cubs fan, gave me his insights on

25   the status of that race, and he told me, based on what he saw

Blagojevich - direct

4021

1    of the Brewers during that series, that they were basically

2    done, they'd lost their will to fight and that the Cubs were

3    going to win the division.

4    Q.  So you talked a little baseball.

5    A.  Yes.

6    Q.  And then what did you talk about?

7    A.  Then we talked about President Obama.  Barack Obama was a

8    candidate for President then.  We talked a little bit about

9    that.  Dusty had mentioned to me that he had raised money or

10   that he helped raise money for Senator Obama's campaign for

11   President.  We talked about that.

12   Q.  Okay.  And after you talked about that, what, if anything,

13   did you say?

14   A.  You know, so we talked baseball, we talked presidential

15   politics a little bit, and then I knew he wasn't calling me to

16   talk about baseball or presidential politics.  I knew he was

17   calling for a purpose, so I saved him the trouble of asking

18   me, and I basically preempted him and said, hey, Dusty, how

19   can I help you?  What are you looking for?  Something like

20   that.

21   Q.  And what did he say to you?

22   A.  He told me something along the lines of that there was

23   another issue relating to Children's Memorial Hospital and

24   that he didn't know the details or the particulars, but he had

25   been a board member there, which I knew, and that he -- he

Blagojevich - direct

4022

1  wondered if I could be helpful again because I had before

2  and -- and asked me if I could call, I believe he told me

3  Patrick Magoon, but call someone over at Children's Memorial

4  Hospital, get more details.  But it was basically something

5  along the lines of they need more money.

6  Q.  You said that when you first talked about the first two

7  subjects, you immediately asked him what did he need.  Why did

8  you believe he was calling to ask you for something?

9  A.  Well, back in 2006, two years before, right around the

10 same time, I was leaving the St. Louis *Post Dispatch*, heading

11 eastbound to the Mississippi River to cross back into the

12 Illinois.  I was in the middle of my campaign for governor.  I

13 was just done with the editorial board, and I received a phone

14 call from Mary Stewart, who was my administrative assistant,

15 saying that Dusty Baker had called and he was looking for me.

16 Q.  Did you ever talk to Dusty eventually?

17 A.  So whenever a baseball manager, Cubs or Red Sox or White

18 Sox calls me, I call him back.  So I had Mary Stewart get

19 Dusty immediately, and I was able --

20 Q.  Did you actually talk to Dusty?

21 A.  Within moments I was on the phone with him.  I was still

22 on the St. Louis side of the Mississippi River.  I remember

23 that.

24 Q.  And what did you all talk about?

25 A.  He told me that he was on the board of Children's Memorial

Blagojevich - direct

4023

1  Hospital, and then -- and he basically asked me as I --
2              MR. SCHAR:  Judge, we'd object.
3              THE COURT:  Objection sustained.
4  BY MR. GOLDSTEIN:
5  Q.  Prior to the 2008 conversation you had with Dusty Baker,
6  had Dusty Baker ever asked you for something regarding
7  Children's Memorial Hospital?
8  A.  He asked me for help in 2006.  I believe it was a grant of
9  some sort, some kind of money, and I was eager and happy to
10 help.
11 Q.  And when Dusty Baker raised the issue with you, did you
12 understand completely what it was he was requesting?
13 A.  Are you talking about the time I helped him in 2006?
14 Q.  In 2008.
15 A.  In 2008?  He wasn't quite sure what it was.  It was -- it
16 involved more money, which was no surprise, and that -- he
17 asked me if I would call I believe it was Patrick Magoon to
18 get more particulars and find out what it was.
19 Q.  Okay.  Now, at this time in September of 2008, was the
20 State of Illinois going through any budgetary issues?
21 A.  We had a -- we had a budget that was $2.5 billion in
22 deficit.
23 Q.  What does that mean, to be $2.5 billion in deficit?
24 A.  The State Constitution in Illinois requires every fiscal
25 year that the state budget is in balance.  Unlike the federal

Blagojevich - direct

4024

1    government, in the State of Illinois, there's an annual

2    requirement to balance the budget.  Revenues have to match

3    spending to the -- and that the legislature had passed a

4    budget that was $2.5 billion of overspending, and there wasn't

5    money in the checking account to pay for it.

6    Q.  So there was -- you received a budget that had more money

7    for spending than what was coming in.  Is that fair to say?

8    A.  That's correct.

9    Q.  And it was $2.5 billion?

10   A.  Give or take a couple of hundred dollars here or there,

11   but yes.

12   Q.  Okay.  And based on that budget that was presented to you,

13   what options did you have to try and resolve that?

14   A.  The Illinois State Senate --

15             MR. SCHAR:  I object to the relevancy of this.

16             THE COURT:  I actually think the question is calling

17   for something other than the answer he's giving.  I think you

18   meant to ask him questions about what he could do about

19   spending and revenue personally.  If that's not your question,

20   tell me.

21   BY MR. GOLDSTEIN:

22   Q.  What I'm asking you, Rod, is you were presented with a

23   budget that passed out of the Illinois House and Senate, is

24   that right?

25   A.  Yes.

1   Q.  And when the budget was passed and sent to the governor's
2   office, what options did you have as governor as far as
3   handling this budget?  Could you sign it?  Could you veto it?
4           MR. GOLDSTEIN:  Those types of options I'm talking
5   about, your Honor.
6           THE COURT:  Yeah, that's --
7           THE WITNESS:  Okay.  You want me to -- can I do all
8   the options, Judge, or tell him what I ultimately did?
9   BY MR. GOLDSTEIN:
10  Q.  Talk about the options that you had.
11  A.  Okay.  I could have done what I did the previous year and
12  called special sessions requiring the legislature, calling
13  them back to Springfield and make them sit there until they
14  passed a budget that met the Constitutional requirement that
15  was balanced, and I could have done that.  I chose not to do
16  that for a variety of reasons.
17          I could have possibly shirked my responsibility and
18  simply signed that budget, but it would have been out of
19  balance and I believe very irresponsible.
20          The third option is I could have vetoed the budget,
21  the whole thing, and then sent it back to the legislature for
22  whatever they were going to do.
23          A fourth option is what I did, and that is another
24  part -- power of the governor is that he or she has what they
25  call a reduction veto in Illinois.  Line-item veto.  So you

Blagojevich - direct

4026

1    can go line by line and cut different things in this

2    particular case to bring the budget into balance.  That's what

3    I had decided to do.

4              MR. SCHAR:  Just for foundation, can we get a timing

5    of when this occurred?

6              THE COURT:  Yes.

7    BY MR. GOLDSTEIN:

8    Q.  Approximately when did this occur, this -- this bill that

9    was presented to you?

10   A.  This was not unlike some of the other issues.  The

11   Illinois House passed an unbalanced budget.  The Senate passed

12   a balanced budget.  They passed the spending to meet the

13   revenue.  So this would have been the end of May, early June

14   of 2008.

15             In all likelihood, it was probably the very end of

16   May 2008.  And then when I was given -- when the budget came

17   to us --

18             MR. SCHAR:  I'm sorry.  Given the timing, I'm not

19   sure what the relevancy is.

20             THE COURT:  Yeah.

21             THE WITNESS:  Pardon me?

22             MR. GOLDSTEIN:  It's relevant, your Honor.  It goes

23   to --

24             THE COURT:  No, no -- oh, I see what you're saying.

25             I'm sustaining the objection.

Blagojevich - direct

4027

1  BY MR. GOLDSTEIN:

2  Q.  Did you ultimately do something based on the budget?  Did

3  you do something with the budget?

4  A.  I used the reduction veto and cut a lot of different

5  spending in a lot of places.

6          MR. SCHAR:  Objection, Judge.

7          MR. GOLDSTEIN:  This goes to his state of mind as to

8  what was going on in the budget at the time, which is a

9  critical issue here in this trial.

10         THE COURT:  You know, it's a huge budget, covers lots

11 of things.  We're covering a much narrower range of things, so

12 maybe you want to ask him questions about that.

13 BY MR. GOLDSTEIN:

14 Q.  Did you eventually decide to make a lot of cuts as

15 governor?

16 A.  I was compelled to do that, yes.

17 Q.  And were these spending cuts?

18 A.  Yes.

19         MR. SCHAR:  Objection.

20         THE COURT:  Come to the side.

21    (Proceedings heard at sidebar:)

22         THE COURT:  Maybe I don't understand your objection.

23 I certainly don't understand the justification for it.  Why

24 don't you state it.

25         MR. SCHAR:  Judge, my understanding -- we're dealing

1  with, as you say, a narrow set of time frames beginning

2  sometime in late September, October, eventually the November

3  timeframe.  He's talking about things that happened in May or

4  June related to a budget that he may have cut and sliced at a

5  time that's not relevant.

6       If the point -- I'm not sure what the point is, but

7  if the point is to suggest that there's a budget issue, I

8  think he defined that in one of his early questions, and I

9  sounds like this budget issue is actually addressed in the May

10  or June timeframe.  Now we're moving forward four or five

11  months.

12       If the point is to say that he had concerns about the

13  budget, I think that's what he said.  Now we're getting the

14  details that just have nothing to do it.

15       THE COURT:  Yeah, my concern is you have your client

16  saying on the tape talking about pediatric specialist bill

17  about budgetary considerations.  He's talking about budgetary

18  considerations November, December, and I don't understand why

19  you're going to this big lead-up to it because so far, none of

20  this is in dispute and none of it's particularly relevant.

21       MR. GOLDSTEIN:  It goes to two issues.  One is that.

22  Two is his state of mind at this time --

23       THE COURT:  I want his state of mind at the time that

24  we're dealing with the alleged things that he did wrong.

25       MR. GOLDSTEIN:  No, and this explains it.  What

1  happened was he -- he has a budget presented to him that's out
2  of balance.
3          THE COURT:  Yeah.
4          MR. GOLDSTEIN:  He decides to cut a lot of things.
5  He cuts a lot of things that are near and dear to his heart,
6  as well as a lot of other people that care about it.
7          THE COURT:  Right.
8          MR. GOLDSTEIN:  Based on that, he then is concerned
9  about any expenditures.  So this explains why he told Magoon
10  let's not talk about it a lot.  He was concerned about
11  budgetary issues.  That was something that was on his mind
12  prevalent from the time it was passed throughout this whole
13  time.
14          THE COURT:  This has -- was he born at Children's
15  Memorial Hospital, were you leading up to that?
16          MR. GOLDSTEIN:  He was not born at Children's.
17          THE COURT:  What happened in 1966?
18          MR. GOLDSTEIN:  He has a very close relationship with
19  Children's in that his cousin, who was two years older than
20  him, passed away, he had leukemia, at Children's.  He also had
21  a lot of other family members that were there, particularly
22  his daughter.  It's something he cares deeply about, something
23  that's important to him, and it goes to the motive to try and
24  hurt Children's in any way.  It explains how emotionally
25  connected he is to, A, to Children's Memorial and, B, to

1    healthcare, and it helps disprove the allegation that he would

2    do anything to harm the hospital and harm anything that had to

3    do with healthcare.  That's the relevance.

4              MR. SCHAR:  Judge, I'm sorry --

5              THE COURT:  Yeah, go ahead.

6              MR. SCHAR:  It's so outweighed by the 403 analysis

7    here.

8              THE COURT:  This is "I'm a nice guy, acquit me"

9    defense not recognized in the law.  I am deeply concerned

10   about the world as a whole, and being the kind of generous,

11   public-spirited citizen, I'm not guilty.  No.

12             And on the budget stuff, budget decisions are made,

13   and if you tell me that this guy's going to testify no, I'll

14   hear it in voir dire.  Budget decisions are made at the time

15   they are made for specific reasons that exist at that time,

16   not for what went on before.  If you want to establish with

17   this witness that this is not true in this case, then fine.

18   The answer is you are limited in dates.  Talk about what the

19   state of the budget was in November that -- that the budget

20   was tight in May, that he had to do line-item vetoes, you got

21   that in.  That's the necessary background.

22             MR. GOLDSTEIN:  But one thing, your Honor, the point

23   of what is going on in his mind, he has perception issues,

24   there are people writing about him that he's the bad guy that

25   he's got to cut all these things.

Blagojevich - direct

4031

1      THE COURT:  Yeah, and he can explain that this was
2  his mental state in November, that I was just -- I was really
3  upset because I was getting a lot of bad publicity, if that's
4  the way you want to go, and, consequently, it was the bad
5  publicity that caused me to cut Children's Memorial, fine.
6      MR. GOLDSTEIN:  How about September and October.
7  He -- Patrick Magoon testified --
8      THE COURT:  I want him at the time of these
9  decisions.
10      MR. GOLDSTEIN:  But they raised the conversation he
11  had with Patrick Magoon in which he's told him to keep it
12  secret.
13      THE COURT:  When was that conversation?
14      MR. GOLDSTEIN:  It's in October.
15      MR. SCHAR:  October 17th.
16      THE COURT:  Okay.  Start at October 17th.
17    (Proceedings heard in open court:)
18      THE COURT:  What we're going to do is we're going to
19  start with the events of October 17th.
20      MR. GOLDSTEIN:  There are some calls leading up to it
21  that I would like to discuss, your Honor.
22      THE COURT:  October 17th.  That was the ruling when I
23  left the side, and that's still the ruling.  If you want me to
24  augment your ability to increase the scope, that's fine, but
25  we're going to do it after we're done with this part.

Blagojevich - direct

4032

1      MR. GOLDSTEIN:  May I just, without the issues we

2  discussed, just talk about what led up to October 17th?

3      THE COURT:  Counsel, we interrupt the case, let the

4  jury sit there, I asked you to say anything you want to say, I

5  make a ruling after everybody has spoken, I said it's

6  October 17th, and we're going to continue starting with

7  October 17th.

8      And then after a recess, when the jury is sitting in

9  the jury room and you want to talk about expanding that, fine.

10  Not now.

11      And I only say this to you because I don't want this

12  to happen where we have a discussion, I make a ruling, and

13  then we start discussing it again and we have to go back to

14  sidebar.  It's an inconvenience for absolutely everybody and

15  leaves the jury sitting there staring at the wall.

16      So start at October 17th.

17  BY MR. GOLDSTEIN:

18  Q.  Okay, Rod, we're going to fast-forward a little bit.

19  We'll get back to it later.

20      Did you speak to Patrick Magoon on October 17th,

21  2008?

22  A.  Yes, I did.

23  Q.  Could you describe -- could you tell the -- could you tell

24  me who Patrick Magoon is?

25  A.  Patrick Magoon was and is the CEO of Children's Memorial

1    Hospital.  He was back then on October 17th of 2008.
2    Q.  Did you -- did you have a relationship with Patrick
3    Magoon?
4    A.  Yes.
5    Q.  And what kind of relationship did you have with
6    Mr. Magoon?
7    A.  It was a good relationship.  He -- he -- I was always
8    supportive of Children's Memorial Hospital.  Whenever I had a
9    chance to help them, I always did.
10         He was helpful to me.  He had contributed to my
11   campaigns, and I would visit Children's Memorial Hospital at
12   different times over the years as governor and before that as
13   a congressman.  I represented Children's Memorial Hospital
14   when I was a congressman, so I had a long relationship with
15   him.
16   Q.  And you said that Patrick Magoon had contributed to the
17   Friends of Blagojevich before?
18   A.  Yes.
19   Q.  And were you aware of Patrick Magoon's involvement in
20   political fundraising?
21   A.  Yes.  He'd been -- he had attended fundraising events for
22   me.  I can picture him at some of the smaller events that John
23   Wyma would sponsor for me.  They were small dinners with
24   healthcare providers like Patrick Magoon.  He -- he was
25   helpful to me over the years and --

Blagojevich - direct

4034

1  Q.  So you were aware he was involved in fundraising, is that

2  right?

3  A.  He was aware of fundraising for me, and I was aware at

4  that time that he had just gotten done raising money for

5  Senator John Cullerton who was running for Senate President

6  and also represents Children's Memorial Hospital.  He's the

7  senator.  I believe at the time, he was the senator where the

8  hospital is.

9  Q.  Now, on October 17th, 2008, when you spoke to Mr. Magoon,

10  what did you tell Mr. Magoon?

11  A.  This was a follow-up conversation.  I had a previous

12  conversation with him after I spoke to Dusty Baker.

13          THE WITNESS:  Your Honor, can I go into that one, or

14  just -- just --

15          THE COURT:  October 17th.

16          THE WITNESS:  Okay.

17  BY MR. GOLDSTEIN:

18  Q.  October 17th.

19  A.  Understand.

20  Q.  The conversation you had with Mr. Magoon, what did you

21  tell him?

22  A.  I told him the good news, that -- that -- that Bob

23  Greenlee, my deputy governor, had -- had gotten the

24  information I asked him to get.

25          I directed him to find money for Children's Memorial

Blagojevich - direct

4035

1    Hospital for this pediatric rate increase, and I finally was
2    able to call Patrick Magoon after it was confirmed that the
3    money was found after I directed Greenlee to do that, and I
4    called Patrick Magoon to tell him the good news, that we found
5    the money.  We're going to do the pediatric rate increase.
6    Q.  And what did he say to you after that?
7    A.  He was -- I can't quote him, but he was, as you can
8    imagine, appreciative, happy about it, and -- and, you know,
9    very thankful.
10   Q.  Did you talk to Mr. Magoon about not talking too much
11   about this rate increase?
12   A.  I was very clear to him that I was breaking a policy
13   because I was cutting billions of dollars out of the state
14   budget and cutting a lot of different things.  I was cutting
15   wide and thin, as opposed to deep.
16         So I was clear to him that I was making -- you know,
17   that I'd been told by my people like Greenlee because of the
18   budgetary concerns, don't be making too many exceptions here
19   because I'm cutting the budget and -- and making a lot of
20   different people unhappy about it.
21         And so I asked him to not tell anybody about this
22   because I didn't want the word to get out that I was making an
23   exception.
24   Q.  Why was that a concern for you that the word would get out
25   that you were making an exception as to putting an expenditure

Blagojevich - direct

4036

1    out there?

2    A.  Two reasons.  One, once I start losing the -- the

3    discipline to hunker down and stick to the plan, that that

4    would open up a Pandora's box of others who would come to me

5    and say, well, you made an exception here, how about making an

6    exception for our program?

7           And there were so many good things that I supported,

8    but there wasn't money to pay for.  So I was trying to protect

9    myself from that onslaught which I envisioned, and I'm

10   generally a soft touch, and if they get me, I'm apt to give it

11   to them.  So I thought that was just helpful to not be

12   available.

13   Q.  When you say you were not available, what do you mean by

14   that?

15   A.  At the Democratic Convention in August in Denver, I left

16   early because so many groups were all over me for the cuts.

17           MR. SCHAR:  Objection.

18           THE COURT:  This one's not his fault.  It's your

19   question.  Revise the question.

20   BY MR. GOLDSTEIN:

21   Q.  You explained that you had made yourself unavailable,

22   okay?  And you said that you were unavailable to -- to get any

23   requests for expenditures, is that right?

24   A.  That's right.

25   Q.  Why did you make yourself unavailable during that time

Blagojevich - direct

4037

1    period?

2    A.  Well, a couple of reasons.  Because if someone gets me, I

3    might lose my -- my discipline and make exceptions.

4              And the other reason was it's hard to say no, and

5    it's just nicer to not have to say no to people who are coming

6    to you for good purposes and you want to help, but you can't.

7    So I was frankly making it easy on myself, and some other

8    reasons why during that period, it wasn't the only reason, I

9    was working at home a lot.  I didn't want to be near the

10   governor's office where someone might be able to buttonhole me

11   and get me to -- get me engaged in their issue.  I felt I

12   needed -- well, I mean --

13   Q.  Well, if you were worried about expenditures, why did you

14   go forward with this expenditure for the pediatric rate

15   increase?

16   A.  Children's Memorial Hospital is a very personal place for

17   me.  I had a cousin who died there when he was 12 years old.

18             MR. SCHAR:  Judge --

19             THE COURT:  This is an issue that was discussed and

20   ruled on.  Is that the breach?  Why don't you move on and ask

21   a question removed from this area.

22   BY MR. GOLDSTEIN:

23   Q.  Now, on October 17th, you said you told Mr. Magoon the

24   good news --

25   A.  Yes.

Blagojevich - direct

4038

1    Q.  -- is that right?

2         What was the good news?

3    A.  The good news is that Greenlee got back to me, they found

4    the money, and I could tell Mr. Magoon that we were going

5    to -- that the pediatric rate increase was going to happen and

6    that it was going to -- I was told that it was going to happen

7    on or after January the 1st, and I told that to Mr. Magoon.

8         MR. GOLDSTEIN:  And, your Honor, if I may go back and

9    just go through the chronology?  I'm not going to talk --

10        THE COURT:  Just chronology.

11   BY MR. GOLDSTEIN:

12   Q.  Sure.

13        Where we left off before we went into the

14   October 17th meeting or phone conversation you had with

15   Mr. Magoon, you said you received a first phone call from

16   Dusty Baker, is that right?

17   A.  That's correct.

18   Q.  Okay.  And you talk about a variety of issues, and you

19   hung up the phone and then you had to make another call, is

20   that right?

21   A.  After I got off the phone with Dusty Baker.

22   Q.  Correct, and this is around September of 2008.

23   A.  That's correct.

24   Q.  Did you make another phone call after that?

25   A.  Immediately, yes.

Blagojevich - direct

4039

1  Q.  And who did you call?

2  A.  Patrick Magoon.

3  Q.  Okay.  And when you spoke to Patrick Magoon, this was you

4  said immediately, like within a day of speaking to Dusty

5  Baker?

6  A.  I believe it was within minutes of speaking with Dusty

7  Baker.

8  Q.  Okay.  And did you get ahold of Patrick Magoon?

9  A.  Yes.

10 Q.  And when you spoke to Patrick Magoon, what did you

11 discuss?

12 A.  I told him that Dusty Baker had called me.  I may have

13 told him that this had been the second time, and I may have

14 told him if you have an issue at Children's Memorial Hospital,

15 you don't have to have Dusty Baker call me, you should just

16 call me because I'm eager and happy to help.

17 Q.  And did he inform you at all about this pediatric rate

18 increase?

19 A.  I told him that Dusty wanted -- indicated that you guys

20 needed some help on some issue, and I asked him if he could

21 explain to me what it was.

22 Q.  And did he explain it?

23 A.  He did.

24 Q.  What did he tell you?

25 A.  He told me it was -- it was a rate increase for pediatric

Blagojevich - direct

4040

1  doctors, doctors that care for children, not only at

2  Children's Memorial Hospital, but as I recall it what he told

3  me was that this was something -- this was a rate increase for

4  doctors at other children's hospitals as well, and I took that

5  to mean La Rabida and some of the other children's hospitals,

6  too.

7  Q.  And when he told you that, did you say anything?

8  A.  I'm sorry?

9  Q.  When he told you that, did you say anything in response?

10  A.  I said could you send me something, you know, put

11  something down in writing so I can get some more information

12  and let me get right on it and I'll do the best I can and I'll

13  get back to you.

14  Q.  Did the conversation end at that point?

15  A.  Pretty much, yes.

16  Q.  And after that conversation, what did you do?

17  A.  Then I called Bob Greenlee, my deputy governor.  I'm sure

18  I did it right away.

19  Q.  Okay.  Explain who Bob Greenlee was.

20  A.  Yes.  Bob Greenlee I think you got to know a little bit.

21  He was the deputy governor.  He was in charge of policy

22  initiatives.  That was what the deputy governor's position was

23  that he had, that his predecessors had, and that I would work

24  very closely with my deputy governors on policy initiatives

25  and initiatives like this particular issue.

1  Q.  So was this a type of issue that Mr. Greenlee was familiar
2  with?
3  A.  Yes.  Greenlee, Bob Greenlee was very familiar with this
4  issue.  He was very familiar with the budget.  He'd worked in
5  the budget office.  And when I raised it with him, he was
6  fully aware of the issue and expressed to me that there were
7  budgetary concerns and admonished me, you know, wasn't sure
8  that we had the money and then admonished me to be careful,
9  that I don't make exceptions like this because it will create,
10 and he was right, a potential Pandora's box of other requests,
11 something along those lines is what we talked about.
12 Q.  What did you say to him after he told you that?
13 A.  I basically said, I don't want to hear all that.  Just
14 find the money.
15 Q.  And when you said that, what were you -- what were you
16 saying there?
17 A.  I mean, I understood his position, but I was basically --
18 what I told him was I really want to help Children's Memorial
19 Hospital.  I want to get this done.  Hey, Greenlee, go get me
20 that money.  Find the money.  You know, find the money.
21 Q.  Okay.  And after you spoke to Greenlee and told him to go
22 find the money, what happened next?
23 A.  What happened after that?
24 Q.  Yes.  Did Greenlee eventually get back to you?
25 A.  Oh.  Well, then I waited, you know, for the answer.

1  Ultimately sometime thereafter, Greenlee got back to me, or I

2  may have gotten back to him.  I don't know who initiated the

3  ultimate call, but ultimately I was given the good news.

4  Q.  And you had then a phone conversation with Mr. Greenlee?

5  A.  Yes.

6  Q.  And he indicated to you that this could be done?

7  A.  He did.  He indicated to me that they found a way to

8  increase the reimbursement rate for Patrick -- for pediatric

9  reimbursement rate for children, for doctors treating

10  children, and that he told me that it wasn't going to happen

11  until after the 1st of January, and, you know, I probably

12  commended him, told him good job.

13  Q.  And at that time when you had this conversation with

14  Mr. Greenlee, what was your state of mind as to whether this

15  pediatric rate increase was going forward or not?

16  A.  My state of mind was it was done.  It was a done deal, and

17  I was happy about it and, knowing me, I was frankly happy to

18  call Patrick Magoon to let him know that we did it for him.

19  Q.  And it was after this conversation, sometime after, that

20  you spoke to Mr. Magoon on October 17th, is that right?

21  A.  I have to believe that Bob Greenlee gave me the word that

22  they found a way to pay for the pediatric rate increase.  I

23  must -- I have to believe it had to be the very same day.

24          Knowing me, I would have taken that good news, I was

25  delighted with the result, and I would have been eager to let

1    Mr. Magoon, Patrick Magoon, know that I did something good.

2    That's what we like to do in politics.  When we can do

3    something good, you like to let someone know you did it.  In

4    this particular case, I was very happy to do it.

5    Q.  And as you said in October, when you spoke to Greenlee the

6    second time, you understood the rate increase was going

7    forward, is that right?

8    A.  I understood it was -- they found a way to do it.

9        Now, I believed when he gave him the direction to

10   find the money that it was going to get done, he was going to

11   find the money because I was pretty clear about that, and he

12   knew when I wanted something that they'd pretty much get it

13   done.

14   Q.  When you ordered Greenlee to go forward with it, did you

15   say "good to know"?

16   A.  No, I didn't.

17   Q.  Now, I want to shift a little bit.

18       In October of 2008, were you trying to fundraise for

19   Friends of Blagojevich?

20   A.  Yes.

21   Q.  And, generally speaking, who were you trying to fund --

22   fundraise from?

23   A.  Most of the time when we'd begin our fundraising push,

24   you -- with us, we would raise money from men and women,

25   organizations, Political Action Committees and others that had

1  been helpful in the past; in other words, previous supporters.

2  They're the low-hanging fruit, if you will, in that they have

3  a record and a history of contributing to you.  They clearly

4  support the things that you're doing, and so they're among the

5  easiest to seek help from when it comes to asking for campaign

6  contributions.

7  Q.  So previous supporters you were looking at?

8  A.  That's where we begin, we start doing that.

9  Q.  Were you also looking for people that supported your

10 policies?

11 A.  Of course, you're always looking for new supporters.

12 That's part of the process.  And then at that particular time,

13 we were actually looking to see who might have been former

14 supporters, old friends who we had lost contact with, who

15 hadn't helped recently.

16       And we had a discussion during the fall about some of

17 the old supporters and seeing if we might be able to get them

18 back to be interested in helping us raise money in this

19 fundraising push during that period.

20 Q.  I want to turn your attention to October 8th, 2008, okay?

21 A.  Okay.

22       MR. GOLDSTEIN:  May I approach, your Honor?

23       THE COURT:  You may.

24     (Counsel conferring.)

25 BY MR. GOLDSTEIN:

1   Q.  I'm showing you what's marked Government Exhibit F.O.B. 1.
2   Is this the chart that we went over a few days ago concerning
3   a fundraising chart?
4   A.  Yes.
5   Q.  Okay.  And if you can look at it and then look at the last
6   line -- or the last page, I'm sorry.
7   A.  This one?
8   Q.  Yes.
9   A.  Okay.
10  Q.  Is there handwriting on that last page?
11  A.  Yes.
12          MR. GOLDSTEIN:  Your Honor, I'd ask to publish this
13  last page of Government Exhibit F.O.B. 1?
14          MR. SCHAR:  No objection.
15          THE COURT:  Admitted.
16      (Government Exhibit F.O.B. 1 received in evidence.)
17  BY MR. GOLDSTEIN:
18  Q.  Now, before we put this up on the screen, this chart that
19  I showed you, Rod, is a chart of potential donors or
20  fundraisers, is that right?
21  A.  Yes.
22  Q.  Okay.  And on October 8th, 2008, you had a fundraising
23  meeting, is that right?
24  A.  Yes.
25  Q.  And who was present for that fundraising meeting?

Blagojevich - direct

4046

1   A.  It was me, my brother Robert, Lon Monk and John Wyma.

2   Q.  And the chart that you looked at, did you go over all the

3   names of that chart?

4   A.  At that meeting?

5   Q.  Correct.

6   A.  Yes.

7   Q.  Now, I want to show you what's on the last page of the

8   chart, blow this up.

9         MR. GOLDSTEIN:  Can everyone see that okay?

10        (Jury nodding.)

11  BY MR. GOLDSTEIN:

12  Q.  Now, this is the last page of that fundraising chart?

13  A.  Yes.

14  Q.  And do you know whose writing that is?

15  A.  Yes.  That's John Wyma's handwriting.

16  Q.  And while you were -- do you know if this was written on

17  October 8th, 2008?

18  A.  I believe it was.

19  Q.  Okay.  Now, you see a series of names.  It has seven

20  names.  Do you recognize those names on the -- on that piece

21  of paper?

22  A.  Yes, I do.

23  Q.  Okay.  Now, before we go into the names, who were these

24  individuals as far as the significance of when you had this

25  meeting?

1    Were these people you spoke about at this meeting?

2    A.  Yes.

3    Q.  Okay.  And in terms of what did you speak about these

4    people?

5    A.  These were old friends and old supporters who had helped

6    in the past who were not on that chart that you just showed

7    me.  They were seven who John Wyma had had relationships with

8    in the past to varying degrees.

9    There were other names that my brother was given and

10   other names I believe possibly Lon had, I don't know.  There

11   may have been some I had.  But these were names.  We were

12   resurrecting old relationships and that John had a connection

13   with to -- as I said, to varying degrees, some professional as

14   a lobbyist.  Others he just knew them, either as my chief of

15   staff as a congressman or, you know, as I was governor.

16   Q.  Okay.  And those seven names, were you familiar with those

17   individuals before they were written down?

18   A.  Yes.  They had been helpful and supporters in the past.

19   Number 7, yeah.

20   Q.  Number 1, it says G-L-U-N-Z.

21   A.  Yes.

22   Q.  Who is that?

23   A.  That's Jim and Jerry Glunz.  They're brothers.  They're

24   the Glunz family.  They are wine and beer distributors.

25   They've been friendly and supportive.  Good guys.

Blagojevich - direct

4048

1  Q.  Had they contributed to the Friends of Blagojevich before?
2  A.  Yes.
3  Q.  Okay.  And you discussed the possibility of them
4  contributing or fundraising for you on October 8th?
5  A.  Yeah.  It was all about reacquainting with old friends and
6  see if they'd be willing to help.
7  Q.  And No. 2, it says V-O-N-D-R-A, is that right?
8  A.  Yes.
9  Q.  Is that Vondra?
10  A.  That's Mike Vondra.  That's John Wyma's client.  Vondra in
11  the past had -- he's very successful.  He has a boat.  He had
12  a fundraiser for me on his boat once.  He had a fundraising
13  dinner for me once at a restaurant.  He was a supporter in the
14  past for me.
15  Q.  He was a prior contributor or fundraiser?
16  A.  A prior contributor and had, I believe, raised some money.
17  Q.  And then No. 3 looks like M-E-C-K-L-E-R.  Who is that?
18  A.  That's Bruce Meckler.  Bruce Meckler was an attorney.  His
19  daughter Barissa used to intern for us when I was in Congress.
20  That's where John Wyma and I got to know Bruce Meckler.  He
21  was recommended to us by David Axelrod.
22       He had called to see if we would put Barissa in our
23  congressional office as an intern.  And Meckler, Bruce, the
24  father, remained a friend and a supporter.  And John Wyma
25  developed a close relationship with him, and he was the go-to

1    guy to see if Meckler -- Bruce would help again.

2    Q.  So Meckler had contributed to the Friends of Blagojevich

3    before?

4    A.  He was a consistent supporter through the years.

5    Q.  And then I'm not even going to try No. 4?

6    A.  Schlofrock.

7    Q.  Schlofrock.

8    A.  That's John Schlofrock, the son of the late Leon

9    Schlofrock, a fascinating gentleman who had lived -- sorry,

10   you're right.  I'm sorry.

11              MR. SCHAR:  Objection, Judge.

12              THE WITNESS:  I'm sorry.

13              THE COURT:  I don't really think we need the

14   biographies --

15              THE WITNESS:  I know.

16              THE COURT:  -- of other people.  I'm sympathetic to

17   you because I have the same bad habits, but I don't try to do

18   it in court.

19              THE WITNESS:  Okay, Judge.

20              Can I say great minds think alike?

21              Sorry.  Okay.

22   BY MR. GOLDSTEIN:

23   Q.  Had Mr. Schlofrock or the son of Mr. Schlofrock --

24   A.  Yes.

25   Q.  -- had that individual contributed or fundraised for the

Blagojevich - direct

4050

1  Friends of Blagojevich?

2  A.  Leon, the father, had.  He had passed away, and his son

3  John, the idea was to see if John Wyma could ask John

4  Schlofrock to help us.

5  Q.  Okay.  And then No. 5, it says M-A-G-O-O-N.  Who is that?

6  A.  That's Patrick Magoon.

7  Q.  Okay.  And is that the Patrick Magoon that we were

8  discussing?

9  A.  Yes.

10  Q.  We're going to come back to him, but I just want to go

11  over 6 and 7 briefly.  It says No. 6, Dr. Michael, and then

12  there's a back slash that says Assyrians, is that correct?

13  A.  Yes.

14  Q.  Who is Dr. Michael?

15  A.  That's Dr. John Michael who's a doctor in the -- he's of

16  Assyrian descent, and we knew him, John and I did, John Wyma

17  and I did from the Assyrian community.  There's an Assyrian

18  community up on the North Side of Chicago, and in the past, we

19  had had small-dollar fundraisers that Dr. Michael helped us

20  with with people in the Assyrian community.

21  Q.  And then the last one is Orlinski, is that correct?

22  A.  Yes.  That's Elizabeth and Zenon Orlinski, a husband and

23  wife, immigrants from Poland.  Business people.  Very helpful

24  in the past.

25  Q.  Okay.  So they had contributed to the Friends of

1    Blagojevich before, is that correct?

2    A.  Yes.

3    Q.  Now, back to No. 5, Magoon, was Patrick Magoon discussed

4    on October 8th, 2008 regarding a fundraiser?

5    A.  Yes.

6    Q.  And how did his name come up?

7    A.  I brought it up.

8    Q.  And when you brought it up, what did you say?

9    A.  We were brainstorming on names of old friends who didn't

10   make the list and tried to figure out who's not on this list.

11   As we went down these names, I thought Patrick Magoon because

12   I had just been on the phone with him a couple of weeks

13   before.

14          And I said something to the effect of I just -- you

15   know, I just talked to Patrick Magoon.  We're doing something

16   for them.  I wonder if we can call and ask if he might be

17   willing to do a fundraiser, something along those lines.

18   Q.  Now, you said you were doing something for him.  What were

19   you talking about?

20   A.  I was talking about the pediatric rate increase, but I

21   don't think I was that specific on the 8th.  I think I just

22   said generally, you know, we're doing something for them.  I

23   wonder if we can call him and see if he'd be willing to help

24   again.

25   Q.  And when you talked about his help, what were you talking

1    about, him possibly contributing or fundraising?  What exactly

2    were you talking about?

3    A.   In my mind, what I was asking was whether or not he could

4    host a fundraiser.  I was aware he was doing -- had done one

5    just recently for Senator Cullerton.  Of course, I knew he had

6    helped me in the past, and the fact that I talked to him

7    triggered my memory he wasn't on that list, so I raised it

8    with John Wyma, who at the time was the lobbyist working for

9    Patrick Magoon.

10   Q.   Now, you said you wanted to have him host a fundraiser, is

11   that correct?

12   A.   Wanted to ask to see if he'd be willing to either host a

13   fundraiser or raise funds or whatever he was willing to do, I

14   broached the question on whether or not that was -- Patrick

15   Magoon was someone we might call.

16   Q.   And as far as hosting a fundraiser or fundraising, who did

17   you understand Patrick Magoon would be fundraising from?

18   A.   Again, I know that he'd helped me in the past and would

19   see him at some of my different events.  What I think I had in

20   my mind at that time was that -- certainly it wasn't

21   Children's Memorial Hospital because we all know legally they

22   don't -- Children's -- hospitals don't contribute money.

23          What I figured he might do was he might reach out to

24   some of his relationships, like most people do when they raise

25   money, in this particular case, the board.  There's two

Blagojevich - direct

4053

1  governing boards at the Children's Hospital, the board that
2  dealt with fundraising, the one that Dusty Baker used to be
3  on, the one the head of Zenith was on.
4        These are wealthy men and women who are active in the
5  community who help Children's Hospital.  In my mind, I thought
6  maybe he might be able to help us raise money from some of the
7  men or women on the board, or wherever he was going to raise
8  it, should he decide to do it.  I wasn't exactly clear, but I
9  basically asked Wyma, who, in the past, John was the one who
10 had raised money or get contributions from Mr. Magoon.  I was
11 basically asking John Wyma what he thought about the idea and
12 what he thought that Mr. Magoon might be willing to try to
13 raise.
14 Q.  So is it fair to say that you understood that Mr. Magoon
15 had connections with wealthy individuals, is that right?
16 A.  The board members at Children's Memorial Hospital that
17 would help raise money for the hospital, like the Dusty Bakers
18 and others.
19 Q.  And did you understand Dusty Baker and the head of Zenith
20 as well as some of these other people to be wealthy people?
21 A.  Yes.
22 Q.  And potential -- potential contributors to Friends of
23 Blagojevich?
24 A.  Yes.  But in my mind at that time, I didn't envision Dusty
25 Baker.  He was -- Dusty was the Cincinnati Reds manager.  I

1    didn't envision him helping us.  Frankly, I would have asked

2    him myself.

3    Q.  Now, up there, it says Magoon, and then it says 25K.

4         What do you understand that 25K to mean?

5    A.  I understood that -- I understand that to mean 25,000,

6    $25,000.

7    Q.  Was there a discussion at all about potentially how much

8    Magoon could fundraise for the Friends of Blagojevich?

9    A.  Yes.

10   Q.  Okay.  And what was that -- what did that discussion

11   entail?

12   A.  Well, I asked John Wyma first if he thought that Patrick

13   Magoon might be willing to help.  And when he said, yeah, he

14   might, I then asked do you think he might be willing to raise

15   $50,000?

16        John Wyma then said, he thought that was too high and

17   suggested the number $25,000 as a more reasonable request --

18   Q.  Okay.

19   A.  -- and a more reasonable expectation.

20   Q.  And did you agree to that?

21   A.  Yes.

22   Q.  Okay.  At this meeting, were there any decisions made as

23   far as what to do to try and ask Magoon for a fundraiser?

24   A.  As best as I recall, I understood that John Wyma was going

25   to do then what he had done in the past, and that is that he

1  was going to be responsible to -- to ask Patrick Magoon to see

2  if he might be able to raise money or organize a fundraising

3  event or however they would work it out.  It was John Wyma's

4  assignment, and I really believe and really recall that at

5  that time he was -- he said he would do it.

6  Q.  Now, on October 22nd, 2008, did you have another meeting

7  at the Friends of Blagojevich office?

8  A.  Yes.

9  Q.  And do you recall who was present?

10  A.  It was my brother Robert and me, John Wyma and I

11  believe -- yeah, and I believe Lon Monk was there.

12  Q.  Did you discuss the potential fundraiser from Patrick

13  Magoon?

14  A.  Yes.

15  Q.  And among other things, did you discuss other fundraisers

16  or potential donors during that meeting?

17  A.  Right.  This was a fundraising meeting update.  It was to

18  follow up on the meetings from a few -- that meeting from a

19  couple of weeks before just to get status updates, see how

20  it's going and see who has to call who to follow up so that we

21  could raise as much money as we could by the end of the year.

22  Q.  So on that date when the name Mr. Magoon came up, what did

23  you all talk about?

24  A.  We were going down the list of -- getting the status of

25  the progress we were making.  I think my brother was kind of

Blagojevich - direct

4056

1  briefing us, and when he came to the name Patrick Magoon, I

2  believe, as -- I believe what happened was that he looked at

3  John Wyma for a progress report.

4  Q.  And what did Mr. Wyma say?

5  A.  That he hadn't reached out to Patrick Magoon.  Nothing had

6  happened.  And as I recall, I think he went on to say that he

7  didn't feel like he wanted to make the phone calls.  He didn't

8  want to ask him.

9       So apparently nothing had been done from the 8th of

10  October until the 22nd of October when it came to asking

11  Patrick Magoon if he would see if he could raise $25,000 in

12  campaign contributions.

13  Q.  Did you further discuss who, if anyone, should make the

14  phone call?

15  A.  Yes.

16  Q.  Okay.  And what did you end up deciding?

17  A.  I think we discussed briefly whether I should make the

18  phone call.  I didn't want to.  I felt that that was -- I'm

19  the governor, and I didn't want to make the phone call to

20  Patrick Magoon.

21  Q.  Why did you not want to make the phone call?

22  A.  I didn't want to be -- I didn't want to mix government and

23  politics in that regard.  I just did this thing for Patrick

24  Magoon, and I didn't want him to feel obligated in that regard

25  if I called him.

1        I just felt it was -- I shouldn't make the phone

2    call.  I didn't feel right about making the phone call, asking

3    him for the contributions.  I didn't want him to feel

4    uncomfortable with me calling him for that purpose.

5    Q.  So was it then decided Robert to be the person to call

6    him?

7    A.  Then John Wyma suggested my brother be the one to call,

8    since my brother was the head of fundraising, and so that it

9    was your campaign fundraising, which is the way it always --

10   it best worked and let the fundraising team call and let me,

11   the governor, not call, and I was very -- I thought that was a

12   good suggestion.

13       My preference was John Wyma, but he didn't want to do

14   it and he hadn't done it.

15   Q.  So after this meeting, was it your understanding that

16   Robert would then call Mr. Magoon?

17   A.  Yes.

18   Q.  And what did you understand Robert would do in terms of

19   calling Mr. Magoon?

20   A.  That he would do with Mr. Magoon like he -- what I

21   understood, and he was -- he was always directed to do, and

22   that is to ask politely and try to be as effective as he could

23   to ask someone if they could raise money for us.

24       And that was my understanding, that he would ask

25   Mr. Magoon to see if it was possible whether he might be

Blagojevich - direct

4058

1   willing to do something and raise money for us, preferably by

2   the end of the year because we were trying to raise as much

3   money as we could by the end of the year.

4   Q.  And for the next two-and-a-half weeks or so, did you do

5   anything about the rate increase?

6   A.  No.  As far as I was concerned, that rate increase was a

7   done deal, and it was -- it was locked in and it was

8   happening.

9   Q.  And for the next two-and-a-half weeks or so, did you do

10  anything about pursuing Patrick Magoon to get a fundraiser?

11  A.  Me personally?

12  Q.  Correct.

13  A.  No.

14  Q.  Okay.  But you understood Robert would call.

15  A.  I understood my brother was calling all the different

16  people he was calling as my fundraiser out of my fundraising

17  office, and Patrick Magoon was one of many that he was calling

18  at that time, as he was building events and raising money.

19  Q.  Now I want to turn your attention to November 12th, 2008,

20  okay?

21  A.  Okay.

22  Q.  And if we can get the binders.

23          Do you have a binder, Rod?

24  A.  I've got the white one.  Is that the one?

25  Q.  We need the black one.  I'm sorry.

1        MR. GOLDSTEIN:  May I approach, your Honor?
2        THE COURT:  Yes, you may.
3   BY MR. GOLDSTEIN:
4   Q.  If you can turn to Tab 32.
5        Now, what does it indicate on the transcript on
6   Page 1 the date and time of this call?
7   A.  The date is November the 12th, 2008, and the time is
8   8:43 in the morning.
9   Q.  If you look on Page 1, Line 6, Robert says, "I think I
10  told you about that.  He just never sent the check, so I
11  called him yesterday.  I never heard from Magoon.  I've left
12  three messages there, so I'm gonna quit calling.  I feel
13  stupid now."
14       When Robert said, "I never heard from Magoon.  I've
15  left three messages there, so I'm gonna quit calling.  I feel
16  stupid" there, what did you understand Robert to be saying
17  there?
18  A.  That he had been, you know, pursuing his fundraising
19  responsibilities, and that he had called Mr. Magoon, as he
20  says, on three different occasions.  He left three messages.
21  It was obvious that Patrick Magoon hadn't called him back.  He
22  says, I'm going to quit calling, and he feels stupid now.
23  This is common when it comes to fundraising and very
24  understandable.
25  Q.  Why is that common?

1  A.  Again, I mean, it's -- that's a thankless job.  If you

2  have to call people and ask them to contribute money, it's not

3  an easy thing to do, and you get rejected a lot and people

4  don't call you back a lot and they avoid you.  It's human

5  nature, very understandable, and it's -- evidently my brother

6  was feeling some of it with regard to Mr. Magoon, and I'm sure

7  he was feeling it with a lot of people.

8        When you had 13 percent approval ratings as I did, he

9  was probably hearing it from a lot more people.

10 Q.  As you go down further --

11    (Phone ringing.)

12        MR. GOLDSTEIN:  Someone's phone.

13 BY MR. GOLDSTEIN:

14 Q.  Line 11 on the same page, you say, "When -- when's the

15 last phone call?"

16        Robert says, "Two days ago, two days ago Monday."

17        Then you said, "I'll call him."

18        Robert said, "Good."

19        When you were asking when the last phone call was and

20 then you said, "I'll call him," what were you saying there?

21 A.  Well, he hadn't called my brother back and so I felt that,

22 you know, you got to be willing sometimes to, as a leader, to

23 do what others are doing.  You know, in other words, get in

24 the trenches, too.  And I was trying to make my brother feel a

25 little less lonely, maybe, and said don't worry about it, I'll

Blagojevich - direct

4061

1  call him.

2  Q.  Did you intend to call -- and the him is Patrick Magoon?

3  A.  Patrick Magoon, yes.

4  Q.  Did you -- when you said that, did you intend to call

5  Mr. Magoon?

6  A.  I think when I said that at that time, I kind of -- I may

7  have.  I -- I may have.  I wasn't -- I probably wasn't sure

8  because I wanted to doublecheck on a couple of things, but I

9  may have wanted to call him.

10        I may not have.  It's kind of one of these things

11  where you kind of say don't worry about it, I'll call him, but

12  you're not sure that you will or not.  But I may have in the

13  morning, pending some information that I wanted clarification

14  on.

15  Q.  Okay.  Now, I want to turn to Tab 41, okay?

16  A.  Okay.

17  Q.  Is everyone there?

18        Now, Tab 41, what does the transcript indicate that

19  the date and time of this call is?

20  A.  This call is November the 12th, 2008, and it was 2:14 in

21  the afternoon.

22  Q.  And who were the speakers on this call?

23  A.  It was me and Bob Greenlee; Bob Greenlee, my deputy

24  governor.

25  Q.  So on Page 1, Line 2, we start out, you say, "Hey."

Blagojevich - direct

4062

1          Greenlee says, "Hey, what's going on?"

2          You say, "The pediatric doctors, the reimbursement,

3  has that gone out yet, or is that still on hold?"

4          What were you saying to Mr. Greenlee?

5  A.  I called Bob Greenlee because we were working on a

6  mortgage foreclosure issue and most of this phone call, it's

7  like a 15-minute call, we were dealing with that issue, Senate

8  seat, other issues; but I wanted to get this issue out of the

9  way based upon what I told my brother several hours before

10  that I might call -- that I would call Patrick Magoon.

11          So I wanted -- this is the information I wanted to

12  get before I decided whether I should or shouldn't call

13  Mr. Magoon.  So I asked him about the status of the pediatric

14  doctors reimbursement, and I asked him whether or not it had

15  gone out yet.

16          Evidently, I assumed it went out or I had forgotten

17  that it was due January 1st, but I wasn't sure.  So I asked

18  him if they had gotten it yet, had it gone out yet, or was it

19  still on hold, and --

20  Q.  Then Greenlee says, "The rate increase?"

21          You say, "Yeah."

22          Greenlee says, "It's January 1."

23          What did you understand Mr. Greenlee to be telling

24  you there?

25  A.  Well, the answer to my question.  He knew I was talking

1   about the pediatric rate increase, and then he told me the

2   answer was January the 1st, which was -- refreshed my

3   recollection from what he had told me before, but for some

4   reason, I thought it may have gone out.

5   Q.  And on Line 10 you said, "And we have total discretion

6   over it?"

7            Greenlee says, "Yep."

8            What were you saying when you said, "And we had total

9   discretion over it?"

10  A.  That, just that.  I mean, do we have the power over that,

11  or was that off and running through the bureaucracy?  I just

12  basically, do we have the power over that pediatric rate

13  increase, and I think my question is -- is -- continues when I

14  say the next thing.

15  Q.  Okay.  So you say further on Line 12, "So we could pull it

16  back if we needed to, budgetary concerns, right?"

17           And then Greenlee says, "We sure could, yep."

18           What were you asking Greenlee here?

19  A.  Well, again, when I directed Greenlee to get the

20  reimbursement rate increased, he had raised budgetary

21  concerns.  And so I was just basically saying, you know,

22  that's something we could pull back because of budgetary

23  concerns.  I was asking him that question, whether we had the

24  power to do that, and his answer was, "We sure could, yep."

25  Q.  Why were you asking that question?

1    A.  Because that was important to help me decide whether I

2    should call Patrick Magoon.  If we had the power over this

3    that we could still hold it up, I wasn't going to call him.  I

4    didn't want him to feel uncomfortable.  So I didn't -- this

5    was my way of finding out what the status of it was and to

6    give me the information that I wanted to know before I made a

7    decision to call Patrick Magoon or not, like I told my brother

8    a few hours before.

9    Q.  And Greenlee says, "We sure could, yep."

10            When Greenlee said, "We sure could," what did you

11   understand him to be saying there?

12   A.  Just that, we sure could.  We still have the control over

13   it.

14   Q.  And you said, "Okay, that's good to know."

15            And Greenlee says, "Yep.  So you hear the news on the

16   court front."

17   A.  Yep.

18   Q.  When you said, "That's good to know," what were you saying

19   here?

20   A.  Well, I was saying two things.  One, that's good to know;

21   therefore, I'm not going to call Patrick Magoon.  I'm not

22   going to call him and make him feel uncomfortable with this

23   pediatric rate increase still hovering because this had been

24   hard to get for him, he explained that to me, and I didn't

25   want to make that phone call I told my brother about.  This

Blagojevich - direct

4065

1    was the information that I wanted to have.

2              And then, of course, good to know also was it was a

3    relief.  I didn't want to call him anyway, so it's always nice

4    not to have to make a fundraising call.  So now I had my

5    excuse with my brother and I could tell him I'm not going to

6    call him because this thing was still hung up.  And that was

7    the reason I asked those questions, and that's the answer that

8    I was given.

9    Q.  When you said "good to know," was it your intent to hold

10   up this rate increase?

11   A.  Absolutely not.

12   Q.  When you said "good to know," was that an order you were

13   conveying to Mr. Greenlee?

14   A.  Absolutely not.

15   Q.  And when Greenlee said, "So you hear the news on the court

16   front," what do you understand him to be talking about?

17   A.  He was giving me good news.  We were in a court battle

18   with the Madigans over healthcare --

19              MR. SCHAR:  Objection.

20              THE COURT:  Objection sustained.

21   BY MR. GOLDSTEIN:

22   Q.  Now, when you had this conversation with Mr. Greenlee,

23   going into this conversation, what was your intent with

24   regards to the pediatric rate increase?

25   A.  To make sure that it happens and to make sure that

Blagojevich - direct

4066

1    Children's -- that the pediatric rate increase, the commitment
2    I made to Patrick Magoon, is fulfilled.
3            MR. GOLDSTEIN:  Your Honor, we ask to publish this
4    call.
5            MR. SCHAR:  We can play it.  It's up to your Honor.
6            THE COURT:  Go ahead.
7            MR. GOLDSTEIN:  Permission granted, your Honor?
8            THE COURT:  Yes.
9            MR. GOLDSTEIN:  Okay.
10         (Tape played.)
11   BY MR. GOLDSTEIN:
12   Q.  Now, after this call, Rod, did you call Patrick Magoon?
13   A.  No.
14   Q.  If you can turn to Tab 43.
15           Now, on this tab, what is the date and time of this
16   call as indicated by the transcript?
17   A.  This call is November 13th, 2008 at 10:05 in the morning.
18   Q.  And who are the speakers?
19   A.  It's a call between me and my brother Robert.
20   Q.  And if you can turn to Page 4, Line 1, Robert says, "So,
21   uh, you know, I might -- I've got a call in to him to go
22   through this stuff with him and see what we can do and then
23   I'll also talk to him about, you know, Magoon."
24           You say, "Mr. Magoo."
25           Robert says, "Mr. Magoo, Patrick."

Blagojevich - direct

4067

1    You say, "All right, sounds good."

2    Then Robert says, "Yeah."

3    What did you understand Robert to be talking about

4    when the -- in Lines 1 through 5?

5    A.  I think he's telling me that he's got a call in to John

6    Wyma.  That's my understanding.  And that he was going to go

7    through a lot of different stuff.  My understanding is he's

8    talking about updates from John Wyma, about different people

9    that John Wyma had been assigned to try to raise money from or

10   that he had offered or agreed to raise money from, and that --

11   that in connection with that, what my brother was saying is

12   that he would then raise with John Wyma the question of what

13   we can do, and I'll ask him, my brother, Rob, would ask John

14   Wyma if he would talk to Mr. Magoon, if he would be the one to

15   call.

16   And then I say Mr. Magoo.  The governor's about six.

17   That was just silly.  The cartoon character, Mr. Magoo.

18   That's what I say.  Stupid.

19   Q.  What was your understanding as far as the rate increase on

20   this day when you're talking to Robert?

21   A.  Oh, it was a done deal.  It -- it was happening.

22   Q.  Did you have any conversation with Robert here about the

23   rate increase being held up?

24   A.  No.

25   Q.  At this time, when you were speaking to Robert on

Blagojevich - direct
4068

1   November 13th, 2008, were you aware that the rate increase was
2   held up if it was held up at all?
3   A.  No.
4   Q.  In your mind, what was happening with the rate increase on
5   this day?
6   A.  That it was going to happen, as Greenlee had told me, on
7   January the 1st or thereafter.
8           MR. GOLDSTEIN:  I'm going to slightly change topics.
9   I don't know if your Honor wants to take a break or keep
10  going.
11          THE COURT:  Good time.
12          COURT SECURITY OFFICER:  All rise.
13      (Jury exits courtroom.)
14          THE COURT:  Court is in recess.  We'll resume again
15  at 3:15.
16      (Discussion held off the record at sidebar.)
17      (Recess from 3:59 to 3:24 p.m.)
18      (Jury enters courtroom.)
19          THE COURT:  Please be seated.
20          Go ahead.  You may proceed.
21          MR. GOLDSTEIN:  Thank you, your Honor.
22  BY MR. GOLDSTEIN:
23  Q.  Now, Rod, you talked about a call you had on
24  November 13th, 2008, and that was with your brother.  You
25  recall testifying to that?

Blagojevich - direct

4069

1   A.  Yes.

2   Q.  Okay.  And I want to go forward just a little bit.  Around

3   Thanksgiving time, did you ever have a phone conversation with

4   Bob Greenlee, your deputy governor, in which you informed him

5   that John Wyma had been fired from Children's Memorial and

6   that you wanted him to hold up the rate increase?

7   A.  No.

8   Q.  Did you ever have such a conversation with Mr. Greenlee?

9   A.  Never, ever had any kind of conversation like that with

10  Mr. Greenlee or anybody else.

11  Q.  Now, as far as John Wyma being fired, did it come to your

12  attention at some point that John Wyma was fired from

13  Children's Memorial?

14  A.  Yes.

15  Q.  And on November 14th, 2008, did you have a phone

16  conversation with your brother Robert about that topic?

17  A.  Yes.

18  Q.  And do you recall around what time that was?

19  A.  No.

20  Q.  Would anything help refresh your recollection as to the

21  time of that phone conversation?

22  A.  Yes.

23          MR. GOLDSTEIN:  May I approach, your Honor?

24          THE COURT:  Sure.

25  BY MR. GOLDSTEIN:

1  Q.  I'm showing you Defense Exhibit Phone Conversation
2  November 14th.  Do you recognize this document?
3  A.  Yes.
4  Q.  And what I want you to do is look at that document and
5  tell me when your memory's refreshed as to the time of that
6  call, just look up.
7         Is your memory refreshed as to the time of the call?
8  A.  Oh, I'm sorry, Aaron, forgive me.  I was reading it.
9         Yes, the time is 6:25 in the afternoon.  Is that what
10  you wanted?  I'm sorry.
11  Q.  Okay.
12         Now, during this conversation with Robert on the
13  14th, did Robert inform you that John Wyma had been fired as a
14  lobbyist from Children's Memorial Hospital?
15  A.  Yes.
16  Q.  And did you discuss that issue with Robert?
17  A.  Yes.  I was surprised to hear the news.
18  Q.  And did you eventually in that conversation talk about
19  Patrick Magoon?
20  A.  Yes.  My brother explained to me what he knew about John
21  being terminated from Children's Memorial Hospital.  Evidently
22  John had told him.  And that then my brother said something,
23  may have said something to the effect of -- I think he said he
24  had called Mr. Magoon three or four times and had suggested
25  that I give him a call.

Blagojevich - direct

4071

1  Q.  Was this referencing the November 12th conversation that
2  you all had?  I mean was it the same subject as far as Robert
3  had called him before?
4  A.  Right.  That was the call in the morning of the 12th when
5  I indicated to him that I might -- I would call Patrick
6  Magoon.
7          So two days later, he was informing me that John Wyma
8  had been terminated.  He was no longer the lobbyist for
9  Mr. Magoon, and that my brother then said you're going to have
10 to make that call, something to that effect, I think.  You
11 make the call.
12         And --
13 Q.  Did you tell Robert to do anything?
14 A.  I told -- my brother said he called Mr. Magoon three or
15 four times, and he said you should make the call or I'll make
16 the call, I think he said something like that, and I told him
17 don't call him.
18 Q.  Okay.  And between November 12th and November 14th, had
19 you called Patrick Magoon, you?
20 A.  No.
21 Q.  Now, why didn't you call Patrick Magoon?
22 A.  I didn't call Patrick Magoon because Bob Greenlee told me
23 on the 12th of November, he answered my question, that the
24 reimbursement rate increase was still pending, that they
25 hadn't received the money, and I didn't want to call him with

1    that hanging in the air based upon my relationship with him,

2    how happy I was that I was doing it, and I just -- and he had

3    called my brother three times, all of those things together

4    were very strong reasons for me to not call him.

5         It was clear he didn't -- he wasn't returning my

6    brother's phone calls.  I felt it would be -- it would just

7    be -- put him in a position -- I just didn't want to call

8    Patrick Magoon.  I didn't feel right about calling him under

9    those circumstances, knowing what I knew, which was that the

10   pediatric rate increase was still something that we had

11   control over.  I didn't want him to feel any uneasiness about

12   the governor calling and asking him for fundraising.

13   Q.  And as of November 14th, 2008, at the time of this call

14   and after this call, what was your intent with regard to the

15   pediatric rate increase?

16   A.  My intent was what it always was, which was to be sure

17   that it happened, that it went through and that they -- they

18   got the help they requested; and as far as I knew on the 14th

19   of November, right up until the day of my arrest, I believe

20   that that rate increase was a done deal and was going to

21   happen.

22   Q.  On December 4th, 2008, later in the evening, did you have

23   a phone conversation with Bill Quinlan and Lucio Guerrero?

24   A.  Yes.

25   Q.  Who is Bill Quinlan again?

1  A.  Bill Quinlan was my general counsel.  He was the lawyer to

2  the governor.

3  Q.  And who is Lucio Guerrero?

4  A.  Lucio Guerrero was my communications director.  He handled

5  the media, public relations out of the governor's office.

6  Q.  And at the time of this call, had you just recently

7  learned that there was a newspaper article that indicated John

8  Wyma may have had recorded conversations with you?

9  A.  What happened, I received a phone call, I believe it was

10 Lucio first, Lucio Guerrero, my communications director,

11 calling to let me know that he had received a phone call from

12 a reporter from the Chicago *Tribune*.

13        This call would have been sometime around 10:00,

14 10:30 at night, as I recall.  And that -- that the reporter

15 was writing a story for the next morning's papers that John

16 Wyma, my friend John Wyma, according to this reporter what

17 Lucio told me, that it was going to be reported that he had

18 been wearing a wire to record conversations with me.

19 Q.  When you learned of this news, was this a startling event

20 to you?

21 A.  It was startling and shocking, and there's all kinds of

22 emotions that go through your mind when you think about a

23 friend who might have been doing that, not to mention the fact

24 that it's frightening and terrifying.

25        So startling is among the many things I felt at that

Blagojevich - direct

4074

1    moment.

2    Q.  And did you have -- this conversation you had with Lucio

3    and Mr. Quinlan, was that concerning the article?  Were you

4    talking about the article?

5    A.  I immediately sought -- began to try to find Bill Quinlan

6    to get -- to call me.  That was my first instinct was to get

7    ahold of my lawyer, Bill Quinlan, and find out what he knew

8    and kind of share some insights with him.

9            So that's what we did, got ahold of Bill Quinlan

10   right away, and then he called.

11   Q.  And at the time of this call, were you still under the

12   stress and excitement caused by the news that you received?

13   A.  Yes.

14           MR. GOLDSTEIN:  Your Honor, we ask permission to play

15   Tab 3.  It's in the smaller binder, your Honor.

16           THE COURT:  Yours?

17           MR. GOLDSTEIN:  Yes.

18           THE COURT:  Go ahead.

19           MR. GOLDSTEIN:  Thank you, your Honor.

20       (Tape played.)

21   BY MR. GOLDSTEIN:

22   Q.  Now, Rod, according to the transcript on Page 1, what's

23   the date and time of this call?

24   A.  It's December the 4th at 10:41 in the evening.

25   Q.  And who were the speakers on this call?

1    A.  It's me, it's Bill Quinlan, my legal counsel, and Lucio

2    Guerrero, my communications director.

3    Q.  And on Page 1, you say, "They got approval to run a story

4    that they've got Wyma cooperating and I'm on tape saying

5    what?"

6            And then Guerrero says, "They didn't say what or if

7    it's a phone conversation or a personal, like, one-on-one

8    conversation in person."

9            What were you saying here "they got approval to run a

10   story"?

11   A.  I was following up on what Lucio apparently had told me

12   either moments before or on a previous call, and I was trying

13   to find out more information on what they were going to write

14   in the story regarding John Wyma wearing a wire on me and

15   taping apparently something I was saying to him or several

16   conversations.  I didn't know at that time.

17   Q.  And Quinlan says on line 24, "When did you talk to Doug?"

18           And you said, "I talked to Doug like an hour and a

19   half ago.  He didn't tell me any of this."

20           When Mr. Quinlan referred to Doug and then you said I

21   talked to Doug, who were you talking about?

22   A.  Doug Scofield.  Doug was someone who was close, a close

23   advisor.  He dealt with communications issues and was very

24   much part of our sort of immediate circle in many ways.

25           And he was a media person, communications person, and

1    would do a lot of communications stuff for me as sort of part

2    of what he -- he did.

3    Q.  On Line 40, Guerrero says, "They called Doug, they called

4    me, and then Doug called me to see if I had gotten the call

5    and then we compared the calls."

6            And then Quinlan says, "All right.  Well, let me do

7    this.  I'm going to try and call Wyma" on to Page 2, "reach

8    out to Lucio, call Doug and I'll -- the three of us can talk.

9    I want to know everything that, uh, what's his name said."

10           When Guerrero said, "They called me and then Doug

11   called me to see if I had gotten the call and we compared

12   calls," what did you understand Guerrero to be saying there?

13   A.  What part was this, is this the bottom of Page 1?

14   Q.  Page 1, Line 40.

15   A.  What he was telling me was that the *Tribune* called Doug as

16   well because all the reporters knew that Doug was close to me,

17   so if they couldn't get Lucio, the communications director,

18   they would call Doug.

19           And that Lucio was conveying to me that -- that Doug

20   then called him, and the two of them had pretty much compared

21   the phone calls that they both received from presumably the

22   reporter from the *Tribune*.

23   Q.  Then Quinlan said, "Let me do this.  I'm going to try and

24   call Wyma."

25           Who did you understand Quinlan was trying to call?

1   A.  Bill Quinlan, my lawyer, governor's lawyer, general

2   counsel, said he's going to try to call John Wyma.  Again, I

3   take it the purpose was to find out if there was any truth to

4   this.

5   Q.  Now, Quinlan says on line 9 that "Chase said so I'll call

6   you back," and you say, "That day Chase was at my office, Wyma

7   seemed weird, you know.  And I told him that, you know, we had

8   gotten Dusty Baker call me, you know, I was pressing for a

9   fundraiser from Vondra.  You know, I said, Vondra wants

10  something.  I may have said that.  I don't know."

11          Now, when Quinlan said Chase said.  Who did you

12  understand Quinlan to be talking about?

13  A.  This is John Chase.  He's the reporter from the *Tribune*

14  who apparently was the one who was writing the story, and so

15  Doug was raising John Chase's name.

16          And then are you asking me what I say after that?

17  Q.  When you say "that day Chase was at my office," what day

18  are you talking about?

19  A.  For some surprising reason at our campaign office on

20  Ravenswood, I believe it was the 22nd of October, I believe it

21  was that day, we had a fundraising meeting with my brother and

22  me and John Wyma and Lon Monk, that John Chase was right

23  outside.

24          And -- and in retrospect, looking back, picturing

25  that day, triggered by these apparent events, I -- I

Blagojevich - direct

4078

1    visualized John Wyma with this kind of blank-stare look that I

2    remembered.

3              At the time, I didn't pick up on it, but in

4    retrospect when I'm hearing that he may have been trying to --

5    wearing a wire or trying to set me up to say something or

6    whatever, I began -- my mind began to reconstruct that day

7    with this particular reporter and John Wyma.  And I believe

8    this was the last time I may have seen John Wyma was October

9    the 22nd.

10   Q.  And you said that, "And I told him that, you know, we had

11   gotten -- Dusty Baker called me."

12             What were you talking about there?

13   A.  Well, when this happens, you start saying, "My God, what

14   could I have said?"  I mean, is it possible I could have

15   crossed the line inadvertently?  Could I say something wrong

16   or stupid?

17             So I'm trying to quickly retrace what I could have

18   said to Wyma who may have been secretly recording what I'm

19   saying.  And I'm trying to think what was he trying to say to

20   me to get me to say something?  Was he trying to set me up?

21   All these things go through your mind, God forbid you'll never

22   go through this, you start thinking about it, especially an

23   old friend.

24             And then I was reconstructing for Bill Quinlan, my

25   lawyer, basically, you know, spilling whatever I knew,

1   whatever was coming into my mind to him about that call, about

2   that conversation about the fundraising requests from Patrick

3   Magoon in connection with Dusty Baker calling me.

4           And so I was relating this to Bill Quinlan and the

5   Vondra part of it as well because I was basically trying to

6   find out from Quinlan do you think I said something wrong?

7   Could I have done -- could I have stumbled into crossing a

8   line of some sort?  That's what I was doing here.

9   Q.  Why were you telling Bill Quinlan that?

10  A.  Because Bill Quinlan's my general counsel, he's my lawyer,

11  and he was in many ways, you know, a -- he was in many ways --

12  you know, he -- I talked to him about everything that was

13  remotely connected to anything that was on legal issues or

14  pending investigation and all the rest because I wanted to be

15  careful not to do anything wrong.

16  Q.  Then on Line 24, Quinlan says, "Look, let's not worry

17  about that."

18          And then you say, "Okay.  And -- and I'm thinking --"

19          Quinlan says, "Right."

20          And then you say, "Magoon.  Call Magoon and see if he

21  can do a fundraiser because, um, you know, we, uh, one was not

22  for the other, but, you know, Dusty Baker calling me and said

23  you're behind payments on, you know, children pediatric

24  doctors, so we're gon -- I got Greenlee to find the money and

25  accelerate, and I called Magoon and told him Dusty Baker

Blagojevich - direct

4080

1    called, okay.  And then after the fact, I told Wyma, look, we

2    just did something for Children's Memorial.  See if you can --

3    if they can do something for me."

4            Now, when you say, "Magoon, call Magoon and see if he

5    can do a fundraiser because, you know, we -- one was not for

6    the other, but, you know, Dusty Baker called," what were you

7    saying then?

8    A.  What I was saying there is what was in my mind at that

9    time, which was here's John Wyma at our office on the 22nd of

10   October, and now I'm being told that he may have been wearing

11   a wire and in my mind, I'm thinking he's trying to set me up.

12   And now all these recollections are racing through my head as

13   I'm trying to explain it to Bill Quinlan.

14           I'm looking for reassurance that I didn't do anything

15   wrong.  Now it's crossing my mind that Wyma, who had been in

16   the office a couple of weeks before on the 8th of October and

17   he was the one who was going to call Patrick Magoon for the

18   fundraiser on that very day when allegedly he might have been

19   wearing a wire to potentially set me up to say something not

20   proper, he was the one all of a sudden who said he wasn't

21   going to call Patrick Magoon, in fact, had suggested that my

22   brother do it.

23           So in my mind I'm thinking, could this be what he was

24   trying to do, to possibly set me up or my brother and put us

25   in a position where we didn't want to be.

Blagojevich - direct

4081

1  Q.  When you --

2  A.  So I'm just -- I'm just relaying to Quinlan, Bill Quinlan,

3  all these thoughts as they're coming to my head and basically

4  looking for reassurance from him, which is you didn't cross

5  any lines.  Don't worry about it.  I'm trying to -- I'm

6  imagining what Wyma could be trying to do to me if, in fact,

7  this is true, and there was a part of me that felt it wasn't

8  true.

9          MR. SCHAR:  Again, this is well past the responsive

10  part of this question.

11  BY MR. GOLDSTEIN:

12  Q.  When you said one was not for the other, what were you

13  saying there?

14  A.  I made it clear to Quinlan that when I asked him to see if

15  Mr. Magoon can do a fundraiser for him, that I was clear to

16  Quinlan that I was also clear at that meeting that, you know,

17  this was not on a condition of government action, it was not a

18  condition of the pediatric rate increase, that one was not for

19  the other, that they were, you know, separate in the sense

20  that there was the political track and then the government

21  side and that they were not conditioned one or the other.

22          And I was passing that along to Quinlan basically

23  saying, I never told Wyma anything like that.  I was just

24  telling him what I recalled, I may have said on the 22nd of

25  October relating to the Dusty Baker call and the pediatric

1    rate increase.

2    Q.  And when you said, "You're behind on payments, you know

3    children pediatric doctors," what were you talking about

4    there?

5    A.  That -- that Dusty Baker had told me about the issue, and

6    I don't know that Dusty expressly said that much detail, but

7    essentially I was conveying to Quinlan my understanding of

8    what the purpose of -- purpose of his conversation and that I

9    went on to tell Quinlan that I got Greenlee to find the money

10   and accelerate, in other words, get the money fast.

11          And then I called Magoon and told him that Dusty

12   Baker called and -- so I'm just rushing this stuff out and

13   telling Quinlan, as my mind is racing and I'm trying to let my

14   lawyer know what I may have said back then.

15   Q.  When you were telling Mr. Quinlan these facts, were you

16   trying to relay what you recalled had happened those days with

17   Wyma?

18   A.  On that particular day on the 22nd of October, yes, or

19   possibly the 8th, but I believe I was talking about the 22nd,

20   the day that I thought he might have been doing that to me

21   based upon this news report.

22   Q.  "And then after the fact, I told Wyma, look, we just did

23   something for Children's Memorial Hospital.  See if you can,

24   if they can do something for me."

25          What were you saying there?

Blagojevich - direct

4083

1    A.  So I'm saying after the fact, in other words, after the

2    pediatric rate increase was -- was in my mind done, that I'd

3    ordered that it get done, that afterwards, after it was done,

4    I -- I told Wyma, you know, we just did something for

5    Children's Memorial Hospital.  Can we see if they can -- they

6    can raise money for me, which would be the request to Patrick

7    Magoon that I testified to earlier.

8    Q.  And at this time on December 4th, 2008, had you spoken to

9    Mr. Magoon since October 17th, 2008?

10   A.  No.

11   Q.  And at this time, had you ordered to anyone to stop this

12   rate increase?

13   A.  To nobody.

14   Q.  And when did you find out that the rate increase was being

15   held up?

16   A.  I learned about it after I was arrested, and then I called

17   Barry Maram at the Department of Children and Family Services

18   and asked him what happened and instructed him to make sure

19   that Children's Memorial Hospital got the rate increase and

20   the other doctors as well.

21   Q.  When you found out that the rate increase was held up

22   right after you were arrested, what was your reaction?

23   A.  I was shocked.

24   Q.  Rod, at any time, were you shaking down Patrick Magoon for

25   a fundraiser?

Blagojevich - direct

4084

1    A.  No.

2    Q.  At any time, were you demanding of Patrick Magoon to give

3    you a fundraiser?

4    A.  No.

5    Q.  Did you at any time send someone to demand a fundraiser of

6    Patrick Magoon?

7    A.  No.

8    Q.  Were you in any way threatening Patrick Magoon to give you

9    a fundraiser?

10   A.  No.

11   Q.  And what was your intent with regard to having Robert ask

12   Magoon for a fundraiser?

13   A.  My intent was to ask -- have my brother ask whether

14   Patrick Magoon, who had helped me in the past, could help us

15   raise money before the end of the year, and it was recommended

16   by John Wyma that my brother should make the call.

17   Q.  And you said help you raise money by the end of the year.

18   Why the end of the year?

19   A.  Because, again, the end of year was -- the law

20   required full disclosure of who contributes money to you, and

21   we wanted to comply with the filing requirements to fully

22   disclose to the public all the different men, women,

23   organizations and others that were contributing.

24        Also, as I testified before, those are good deadlines

25   to be able to measure and try to get the people who were

1    helping you to have a deadline so that they have something to
2    work towards.
3         And so it was, you know, those general principles
4    that governed all of our fundraising applied in this
5    particular case as well.
6    Q.  Rod, at any time during this period in 2008, did you have
7    any intent to do any harm directly or indirectly to Children's
8    Memorial Hospital?
9    A.  Never.
10        MR. SCHAR:  Objection, Judge.
11        THE COURT:  Objection is sustained.
12   BY MR. GOLDSTEIN:
13   Q.  I want to change subjects with you, Rod.
14        THE COURT:  Go ahead.
15   BY MR. GOLDSTEIN:
16   Q.  And I want to talk about the Senate seat, and I want to
17   talk to you about some things as far as how you dealt with
18   things and some preliminary things relating to your state of
19   mind and how you handle things.
20        Have you heard all the recorded conversations in this
21   case?
22   A.  Yes.
23   Q.  And have you read all the transcripts?
24   A.  Yes.
25        Hold -- I've read all the ones with me on them.

Blagojevich - direct

4086

1   Q.  Understand, understand.

2   A.  Right.

3   Q.  And those are a significant amount, is that fair to say?

4   A.  Hundreds of hours.

5   Q.  And is it fair to say that you were talking a lot during

6   this time period?

7   A.  It's fair to say that I was talking a lot during that time

8   period.  It's fair to say I talk a lot even during this time

9   period.  It's fair to say I talk a lot.

10  Q.  And from October, you know, mid to late October, to the

11  day you were arrested, did you talk a lot about the Senate

12  seat?

13  A.  Absolutely, yes, incessantly.

14  Q.  And approximately how often were you on the phone on a

15  regular day?

16  A.  At what period of time?

17  Q.  This -- a normal weekday, this period about mid to late

18  October to the day you were arrested.

19  A.  I would be on the phone as a general practice on the

20  weekdays, I'd get up at 6:00, 6:30, depending upon the day.

21  I'd give it a half an hour, then I'd start calling my top

22  staff.

23          MR. SCHAR:  Judge, I guess we'd object to relevance

24  of this.

25          THE WITNESS:  Yeah.

Blagojevich - direct

4087

1     THE COURT:  Objection sustained.

2   BY MR. GOLDSTEIN:

3   Q.  Now, you had a lot of phone conversations from your home

4   phone, is that correct?

5   A.  Yes.

6   Q.  Why were you at your home so often?

7   A.  There were a couple of reasons.  One of them was, as I

8   explained earlier, the budget cuts and the fact that I wanted

9   to -- I actually modeled this from what Nixon did when he --

10     MR. SCHAR:  Objection, Judge.

11     THE COURT:  Not the source of his idea, just what his

12   purpose was.

13   BY MR. GOLDSTEIN:

14   Q.  Why -- why did you stay at home so often?

15   A.  Hunkering down to be away from all the different men,

16   women and interests who wanted money for their programs and

17   their initiatives.  Most of them were very good and worthwhile

18   and most of them I supported, but I was cutting it and I

19   wanted to, as I said earlier, not be available, one, I hate to

20   say no; two, hate to remind them that I'm cutting it; and,

21   three, if they get me, I might weaken and might do it.  So

22   that was one of the reasons.

23     The other reason was this was an election season, and

24   I -- I believe that I was among most leading politicians in

25   America who were not in their offices during that campaign

1    season for different reasons because people were campaigning.

2         I had decided to use this period to be more active in

3    fundraising than I had before while I was governor because of

4    circumstances that had accrued over the previous years and

5    because I'd asked my brother, who was a complete novice from

6    Nashville, Tennessee, to come in and help me, so I thought I

7    should be more involved in it in that period, because we were

8    and I was very scrupulous to not use government resources for

9    political activity.

10        You couldn't do fundraising from the government

11   office -- the governor's office, and so -- but you can do

12   anything you want on your home phone or your campaign office.

13   You can do government work.  You can do political work.  So it

14   was -- it was just a lot more convenient and more effective

15   and more productive to basically do the governor's work out of

16   my house or out of my campaign office, while at the same time

17   I could do political work as well along the lines of

18   fundraising.  So that was another reason why I did.

19        And then -- I mean there's another reason, but I

20   don't know that the judge --

21   Q.  What's the fourth reason?

22   A.  Pardon me?

23   Q.  What's the fourth reason?

24   A.  Big decisions sometimes you have to make in a position

25   like governor, and I remember reading a book by President

1    Clinton --

2          MR. SCHAR:  Objection.

3          THE WITNESS:  I knew that was going to happen, so
4    that's why.

5          THE COURT:  Forget the origin of the idea, just tell
6    them what you recall.

7    BY THE WITNESS:

8    A.  Okay.  You've got to stay -- you need a little time away
9    to make some of the decisions and not get input from too many
10   different places because you can -- it will be very difficult
11   for you to collect your thoughts and think through things.

12         And so I found that sometimes it was good for me to
13   be away from that office for different reasons, to try to get
14   the big picture in my head, and that was for me helpful, and
15   I --

16   BY MR. GOLDSTEIN:

17   Q.  When it came to the Senate seat, as well as other issues,
18   how did you arrive at decisions?

19   A.  Well, it depends.  If it was -- it literally depends.  Can
20   you rephrase that question, counselor?

21   Q.  Very important issues, such as the Senate seat
22   appointment --

23   A.  Yes.

24   Q.  -- how did you arrive at decisions that you would make in
25   those types of situations?

1    A.  Big -- a big decision like that, that's an unusual

2    decision.  There's just not a lot of people who ever have to

3    make a decision on picking a United States senator.  It's a

4    very rare occurrence.  There's not a lot of historical

5    precedence to it.  There's some.  We did some of our homework.

6    There's just not.  So that was never anything that I ever did,

7    so this was a big decision.

8            It was also at a time, the political dynamic being

9    what it is, my standing politically, you know, broken

10   relationships because of the political battles, other dynamics

11   that I felt that this Senate seat was one of my last best

12   opportunities to try to use this opportunity to make the best

13   decision I could, and I wanted to be very careful before I

14   made a decision on this to consider and think through a

15   variety of different options, to invite full discussion about

16   ideas:  Good ones, bad ones, stupid ones, ugly ones.

17           I wanted to do as -- I wanted to use this unique

18   opportunity to see that I could make the best decision, and --

19   and a lot --

20   Q.  Did you have a hard time, Rod?  Do you have a hard time

21   making decisions?

22   A.  Do I have a hard time making decisions?  Again, it depends

23   upon what the issue is.  I obviously had a hard time making

24   this decision, but I had -- there was a method to the madness,

25   and I really believe I was on the right track, and then

1   everything changed.

2   Q.  When -- when you were governor, particularly in 2008, who

3   would you generally consult with when you tried to make

4   decisions?  I'm talking specifically middle, all the way

5   towards the end of the year in 2008.

6   A.  The big decisions would be my senior staff.  It would be

7   John Harris, my chief of staff, relied very much on his

8   advice, on his judgment, and on using him as a sounding board

9   and inviting his -- his perspectives.

10       And one of the things that you -- that I think is

11  very important to understand is that when you want to make a

12  big decision, it's very important to get, in my judgment, the

13  different perspectives of some of your different top people

14  because they all come from different places and have different

15  perspectives.

16       So when I called John Harris the prince of darkness,

17  that was not a negative.  That was John Harris had a general

18  propensity to be more conservative in his advice and a little

19  bit more of the can't-do spirit, certain lack of -- he was

20  more of a conventional thinker in a lot of ways.  He had a lot

21  of pluses, too, in some of his thinking.

22       So when I would go to Harris, I'd generally expect a

23  certain kind of conventional thinking, very practical,

24  responsible, good, sound but conventional.  That -- Harris

25  would give me that.

Blagojevich - direct

4092

1  Q.  In addition to Harris, who else would you speak to as far

2  as your senior staff and close advisors?

3  A.  Always -- oh, I'm sorry, always Bill Quinlan who was my

4  general counsel, and there was nothing I would do of any

5  magnitude that I felt I needed to discuss with my general

6  counsel, my lawyer, Bill Quinlan.

7           There was a time where the federal investigations

8  were, I felt, at a critical point.  It was a fish-or-cut-bait

9  period I thought, and I thought I'd get my, quote-unquote,

10 clean bill of health, and I was super careful to make sure

11 that whatever I decided to do that I was -- properly discussed

12 it and thought it out and fully disclosed to Bill Quinlan, my

13 general counsel, and others, my ideas and my thoughts before I

14 reached any decision.

15          So Quinlan was -- in so many ways Bill Quinlan was --

16 he was indispensable.

17 Q.  Now, you spoke about Bill Quinlan.  He was your general

18 counsel.

19 A.  Yes.

20 Q.  What is a general counsel?

21 A.  A general counsel is the governor -- forgive me.  He's the

22 lawyer to the governor.  He or she are the governor's lawyer,

23 and their responsibility is to properly provide legal advice

24 on what a governor can and cannot do.

25          And so I relied heavily on Bill Quinlan, A, because I

Blagojevich - direct

4093

1   felt I should; B, this was a particularly dangerous time, as

2   far as I was concerned, and I wanted to make sure everything I

3   did was -- did not cross lines.

4   Q.  What -- what did you understand Bill Quinlan's experience

5   was as a lawyer and in government?

6   A.  Bill Quinlan worked for me from 2005 until it all came

7   tumbling down.  Prior to that, he was -- he was an attorney

8   for Mike Madigan's legislative staff.

9          So not only did he bring his legal know-how in terms

10  of just his education as a lawyer -- he went to Georgetown

11  University Law School, which is a very good school -- he had

12  the experience of state government having worked on Speaker

13  Madigan's staff as a lawyer.

14          His father was the corporation counsel, the lawyer to

15  Mayor Daley's father.

16          MR. SCHAR:  I'm going to object.

17          THE WITNESS:  Yeah.

18          THE COURT:  Not necessarily an inherited skill.

19      (Laughter.)

20          THE COURT:  So --

21          THE WITNESS:  Understand, Judge.

22          THE COURT:  -- talk about the people.

23  BY THE WITNESS:

24  A.  So that's Quinlan.  He was one of the top lawyers, top 40

25  under 40 lawyers he was recognized.  He was considered a very

Blagojevich - direct

4094

1    good lawyer.

2              MR. SCHAR:  Judge --

3              THE WITNESS:  Was that too much?

4              THE COURT:  Yes.

5              THE WITNESS:  I apologize.

6    BY MR. GOLDSTEIN:

7    Q.  Now you talked about John Harris.  He was your chief of

8    staff at that time, is that correct?

9    A.  Yes, yes.

10   Q.  And what did you understand John Harris's experience to be

11   in government and as a lawyer?

12   A.  I thought John Harris brought a great deal of experience

13   and know-how.  What was among his many attractive qualities to

14   me was that he had had a long experience in different big

15   places with Mayor Daley.

16             He was Mayor Daley's budget director.  He had been a

17   big shot, ran the airport, had a big spot, a deputy

18   commissioner or something was his position there at the

19   airport.  He had a big position with the Chicago Police

20   Department.  He also was in the military.  He was a prosecutor

21   in the military.

22             You know, he was -- very conservative guy.  I think

23   you had a chance to see him.  You know, a very military style

24   to him.  I thought all those things were very good, important

25   attributes.  He also knew the political dynamic in Illinois

1    and in Chicago from his years of experience with Mayor Daley.

2    We both come from a similar immigrant background.  He's Greek

3    and I'm Serbian, same Eastern Orthodox Church.  We had that in

4    common -- well, can I keep going?

5    Q.  Let me ask you another question.

6    A.  Okay.

7    Q.  In addition to Harris and Quinlan, did you also speak to

8    other people who you saw as advisors to you?

9    A.  I spent a lot of time consulting and talking to and

10   sharing ideas with Bill -- Bob Greenlee, my deputy governor.

11   Again, he -- that was the role of the deputy governor.

12   Q.  Now, what does a deputy governor do?

13   A.  When I became governor, we created the position of deputy

14   governor as we built our administration, and we had two or

15   three at a given time, mostly two.

16        There was a woman named Yolanda Peters who was one of

17   our deputy governors, and she did -- she was in charge of

18   different areas.

19        Greenlee, Bob Greenlee was the deputy governor who

20   worked closely with me, like his predecessors had -- Sheila

21   Nix, Bradley Tusk.  They would deal with policy issues.  So I

22   spent a lot of time on that sort of thing, communications,

23   policy, the sort of governing ideas issues, legislation, all

24   those sorts of things.  So I spent a lot of time with my

25   deputy governors.

1          They were, again, very important to me in terms of me

2     governing, making decisions, gaining their advice and input

3     and them getting me information to help me make the best

4     decisions I could.

5     Q.  What did you understand Mr. Greenlee's experience was in

6     government and as a lawyer?

7     A.  Greenlee, Bob Greenlee before that was in our budget

8     office, and I got to know him over the years when I was

9     governor.  He was a friend of Bradley Tusk's.  Bradley brought

10    him in to our administration, and he was a guy who apparently

11    was on the fast track in the budget office and was -- he would

12    sometimes come into the budget meetings with me and the

13    legislative leaders because he would have a know-how of

14    certain parts of the state budget.

15         So he was a guy who kind of rose pretty quickly, I

16    thought.  And then when Sheila Nix, our deputy governor, she

17    had been my deputy governor since my reelection, had decided

18    to leave in the spring of 2008, when Sheila left, she

19    recommended Greenlee as her successor, so Bob Greenlee came

20    on.

21         He's an Ivy leaguer, Yale University, University of

22    Chicago Law School, and he was a lawyer who clerked for a

23    federal district court judge in Indiana, so he brought that --

24         MR. SCHAR:  Judge, objection.

25         THE COURT:  It's like he's reciting a resumé, and

Blagojevich - direct

4097

1    maybe we can just talk about direct experience.

2    BY MR. GOLDSTEIN:

3    Q.  In -- in addition to Greenlee, Harris and Quinlan, were

4    there other close advisors that you had?

5    A.  When I was governor and before that as a congressman --

6    good government is good politics, good politics is good

7    government -- I always had my political advisors either on

8    retainer for my political campaign or as advisors to help me

9    try to get my governing agenda through.

10             THE COURT:  Can I stop you for a second?

11             The question was were there other close advisors that

12   you had?

13             THE WITNESS:  Right.

14             THE COURT:  That's a yes or no.

15   BY THE WITNESS:

16   A.  Yes.

17             THE WITNESS:  Yes, Judge.

18   BY MR. GOLDSTEIN:

19   Q.  And who were those other close advisors?

20   A.  Bill Knapp.

21   Q.  Who is Bill Knapp?

22   A.  Bill Knapp was my political consultant, my media

23   consultant.  He's based in Washington, D.C.  He's done

24   presidential races, helped me get elected governor in 2002,

25   helped me win the reelection in 2006.  Works for Mayor

Blagojevich - direct

4098

1    Bloomberg.  I believe he worked for Harry Reid in the
2    Democratic Senate Campaign Committee, too.
3    Q.  When you say political consultant, what does that mean?
4    A.  He would help craft the message for the campaign.  He made
5    all the commercials, the television commercials, the radio
6    commercials.  We always considered him the smartest guy in the
7    room, and he brought with him -- I also viewed him as a man
8    of -- of real character and deep integrity.  That means
9    something.
10   Q.  How long did you know Mr. Knapp?
11   A.  I met Bill Knapp in I think it was late 2000 or early
12   2001, as I was beginning my fledgling campaign for governor
13   and trying to begin to put the pieces together for a possible
14   run for governor, campaign for governor.
15   Q.  And in -- from late 2000, 2001, was -- to 2008, the day
16   you were arrested, was Knapp a close political consultant to
17   you?
18   A.  Yes, he was.
19   Q.  And was there anyone else that advised you or that you
20   relied on?
21   A.  Fred Yang.
22   Q.  Who is Fred Yang?
23   A.  He was my pollster, works in a firm Garin, Hart & Yang in
24   Washington, D.C.  They do polling for governors and senators
25   around the country.

Blagojevich - direct

4099

1    MR. SCHAR:  Judge, we'll object.

2    THE COURT:  The part of the answer that may stand is:

3    "He was my pollster."

4    BY MR. GOLDSTEIN:

5    Q.  And did you talk to Mr. Yang about political issues with

6    him?

7    A.  All the time.

8    Q.  And in addition to Mr. Yang, Knapp, Greenlee, Harris and

9    Quinlan, was there someone else that you talked to as far as a

10   close advisor?

11   A.  Can you -- can you rephrase that?  Or ask me again?  I'm

12   sorry.

13   Q.  Was Doug Scofield a close advisor to you?

14   A.  Oh, yes.  Yes, of course, Doug Scofield.  Doug was --

15   THE COURT:  Stop at yes.

16   THE WITNESS:  Yes, right.

17   BY MR. GOLDSTEIN:

18   Q.  Who is Doug Scofield?

19   A.  Doug Scofield was -- is -- well, at the time in 2008 was a

20   media -- communications person who was a lobbyist.  One of his

21   clients was SEIU.  He -- I viewed him as a friend.

22   Valedictorian of his high school class.

23   He advised me on politics, on the media, and on some

24   government issues.  He had been the chief of staff to

25   Congressman Luis Gutierrez in --

1        MR. SCHAR:  Objection, Judge.

2        THE WITNESS:  -- Congress.

3        THE COURT:  I think we'll stop at "I viewed him as a

4  friend," and we will strike everything after "valedictorian of

5  his high school class."

6  BY MR. GOLDSTEIN:

7  Q.  In 2008, what did you understand Doug Scofield's

8  occupation was?

9  A.  He was a -- he was in the communications -- he had his own

10  little boutique firm that did communications and lobbying.

11  Q.  And in 2008, did you speak to Doug Scofield a lot

12  regarding political issues?

13  A.  All the time.

14  Q.  Now, as to Mr. Knapp, Yang, Greenlee, Scofield, Harris and

15  Quinlan, did you trust all those individuals?

16  A.  Very much so.

17  Q.  Did you rely on their judgment?

18  A.  I did.  I relied on their judgment.  I sought out their

19  judgment.  I respected their judgment.  I didn't always agree

20  with them, but that's why I would talk to all the different

21  ones to check whether my judgment was flawed or right, so --

22  but I did.

23  Q.  Besides these -- these closer advisors, did you consult

24  with anyone else regarding the Senate seat during that time

25  period?

1    A.  Yes, I did.  I -- I consulted with former U.S. House

2    Speaker Dennis Hastert who gave me sound -- I believe it was

3    sound advice, and we had a long discussion, he and I.  I spoke

4    with Jerry Reinsdorf, the owner of the Chicago White Sox,

5    sought his input, shared some ideas with him and got some of

6    his ideas and insights on how to make the decision and

7    possibly make it happen.

8             I spoke to Gery Chico, who was someone who was

9    actually interested in the Senate seat but was very selfless

10   in the conversations I had with him about this.

11            I spoke to John Cole, who was head of the Teamsters

12   Union; a guy Ed Smith, who was the head of the laborers union.

13   I spoke to a guy named Marc Ganis who was doing work for the

14   Chicago Cubs on some other issues.  I spoke to --

15   Q.  Was it fair to say you spoke to a lot of people outside of

16   just your inner circle of advisors, is that right?

17   A.  Yes.

18   Q.  And did you talk to Patti about the Senate seat issue?

19   A.  Yes, I did, a lot.

20   Q.  Did you rely on her advice?

21   A.  Yes, I did.

22   Q.  And up to -- from -- from October, let's say, mid

23   October 2008 to the day you were arrested on December 9th,

24   2008, had you made any decisions regarding the Senate seat?

25   A.  No.

Blagojevich - direct

4102

1  Q.  And I want to turn your attention to the summer of 2008,
2  okay?
3          At that time, the general period of the summer, did
4  you realize that you had the power, you may potentially have
5  the power to appoint a senator?
6  A.  I knew it before the summer of 2008, but the answer is
7  yes.
8  Q.  And at that time in the summer of 2008, did you have any
9  potential candidates for the Senate seat in your mind?
10  A.  Yes.
11  Q.  And who were they?
12  A.  Well, I had me.  I had Lisa Madigan as a means to the end
13  of what I thought a very good legislative program that could
14  do good things for people.  Senate President Emil Jones was in
15  my mind as a serious contender.  Congressman Danny Davis, and
16  thinking outside the box, I had this idea if we could find
17  somebody outside of politics who was an African-American war
18  hero, I thought that would be kind of a cool thing if we can
19  find someone and appoint somebody like that, man or a woman
20  who had distinguished himself or herself in the military who
21  lived in Illinois to make that as a possible choice for
22  senator.  This was in my mind in the summer of 2008.
23  Q.  Now, when you talked about appointing yourself, why were
24  you considering yourself to appoint to the Senate?
25  A.  That was never something I felt deep down comfortable

1    with, but when I would think about the political dynamic in
2    Illinois, the gridlock that we were facing in Illinois, the
3    fight with Mike Madigan and me, the possibility -- the like --
4    well, the imminent departure of my ally, Emil Jones, and the
5    likely -- potential likely replacement as his Senate
6    President, losing that political alliance, thinking -- and
7    we'll talk more about this, I'm sure -- that if I don't
8    appoint Mike Madigan's daughter the senator, he'll be even
9    more punitive and, therefore, we'll get even more gridlocked,
10   the dynamic that was going on with the media, the Chicago
11   *Tribune* and Madigan were talking about impeaching me because
12   of, I felt, I was an activist governor who went around the
13   legislature to try to do things, those different things were
14   in my mind.  And if I didn't pick Mike Madigan's daughter,
15   that gloomy prospect was in my mind then and all the way to
16   the end.
17   Q.  Now, excuse me, you said you were considering Lisa
18   Madigan.
19   A.  Yes.
20   Q.  At this time, the summer of 2008, was Lisa Madigan a
21   friend or a foe?
22   A.  She was a -- she was the offspring of a foe.  She was a
23   qualified Attorney General who loves her father, and she has a
24   father who loves her, and they didn't love me, which was okay,
25   that's politics.

```
 1            So she was -- I didn't see her so much as a foe as I
 2    did -- her father was my nemesis, and --
 3    Q.  Did you have -- what kind of relationship did you have
 4    with Lisa Madigan?
 5    A.  It was not a -- it wasn't -- it was polite, but it
 6    wasn't -- I got along real well with Andrew Madigan, the
 7    younger brother.  He's a nice, young man.  I know I'll take
 8    that -- and I really admire Mike Madigan as a dad.  He's a
 9    very good dad, and I would ask him all the time what it was
10    like to raise kids in that political environment.
11            MR. SCHAR:  Objection.
12            THE WITNESS:  I know, there's no -- you're right.
13    I'm sorry.  I want to say something nice about him, Judge.
14            THE COURT:  No harm, no foul.
15            THE WITNESS:  Okay.
16    BY MR. GOLDSTEIN:
17    Q.  No harm, Rod.  Do no harm.
18            When it came to Lisa Madigan, obviously you didn't
19    have the best of relationships with her, is that right?
20    A.  Right.
21    Q.  And -- but you talked about this was a means to an end.
22    A.  Right.
23    Q.  What did you mean by that, and what was your intent in the
24    summer of 2008 with regards to Lisa Madigan and the Senate
25    seat?
```

1  A.  To seriously consider and strongly consider the

2  possibility of whether I might be able to broker a political

3  deal with her father, Mike Madigan, that I would appoint his

4  daughter to the coveted United States Senate seat that was

5  going to be vacated by President Obama and in exchange for

6  that --

7           MR. SCHAR:  Objection to the deal.

8           THE COURT:  To the extent this talks about something

9  he might do as opposed to something he did, the answer may

10 stand.

11          MR. SCHAR:  Thank you, Judge.

12 BY MR. GOLDSTEIN:

13 Q.  Now, Rod, you talked about this deal.  There was nothing

14 consummated particularly in the summer of 2008, is that right?

15 A.  Correct.

16 Q.  Okay.  So when you talk about a deal, you're talking about

17 in the future possibly something happening, is that right?

18 A.  Yes.

19 Q.  Okay.  Now, when you talked about this possible proposal

20 or deal, what exactly were the conditions?  What were exactly

21 going to be exchanged?  We understand you'd appoint Lisa

22 Madigan.  What would come back in return?

23 A.  He has to pass the capital bill.  I wanted a significant

24 increase in expanding affordable healthcare to people in

25 Illinois.  I was hoping for 300,000.  I would have settled for

1    50,000 if it got to that.

2          I wanted a written promise, a memorandum of

3    understanding, by him in writing no income tax increase on the

4    people of Illinois, and they couldn't override my veto if

5    they -- I wanted that in writing.

6          I was also hoping to get other things, like a bill

7    that would require insurance companies to cover --

8          THE COURT:  Wait, wait, wait.  Stop with the stuff

9    about hope.

10          THE WITNESS:  Right.

11          MR. SCHAR:  Also, Judge, can we just get a timeframe

12    when this was all --

13          THE COURT:  Well, we'll do that in a second.

14          MR. SCHAR:  Thank you, Judge.

15          THE COURT:  So what I have written down is three

16    terms.

17          THE WITNESS:  Yes.

18          THE COURT:  And when did you have these terms in

19    mind?

20          THE WITNESS:  In August of 2008.

21          THE COURT:  Okay.

22          MR. GOLDSTEIN:  Thank you.

23    BY MR. GOLDSTEIN:

24    Q.  And you said these were all thoughts in your mind, is that

25    right, around that time?

Blagojevich - direct

4107

1    A.  Yes.

2    Q.  Okay.  Who came up with the idea of appointing Lisa

3    Madigan in exchange for these legislative things?

4    A.  I think it was me.

5    Q.  And beyond that, you said Emil Jones during that time

6    period, the summer of 2008, was also a potential candidate, is

7    that right?

8    A.  Yes.

9    Q.  Why was Emil Jones a potential candidate in your mind?

10   A.  First of all, he and I had a -- notwithstanding the ethics

11   bill and what he did there, he -- I had a very good

12   relationship with Senate President Emil Jones, and so much of

13   what we accomplished was because of his steadfast support in

14   the State Senate and bringing the votes to pass these things.

15        He's -- in a perfect world, I wanted to pick an

16   African-American to fill that Senate seat, but I had to

17   balance that against whether or not I could do something

18   different or better, so the Madigan possibility.

19        But Emil was a leading African-American political

20   figure in Illinois, very close relationship with President

21   Obama, had been extremely helpful to me over the six years I

22   was governor to pass the All-Kids Program, healthcare

23   expansion, education funding, that and other things.

24        And he asked me very -- and strenuously advocated

25   himself to me privately on how he really wanted to be the

1    senator, and -- and, you know, he made a -- he certainly made

2    a persuasive case in terms of his relationship with me and

3    what he was helpful to -- to get done with me.  So he was a

4    very strong candidate in the summer of 2008.

5    Q.  Now, you also mentioned Danny Davis as a potential

6    candidate, is that right?

7    A.  Yes.

8    Q.  Why did you consider or think about Danny Davis?

9    A.  Danny Davis and I served in the Congress together.  He's

10   from the West Side, from the Austin neighborhood, Maywood, big

11   congressional district.  He would say his district was from

12   the Gold Coast to the Soul Coast.  He went from the lakefront

13   all the way out west.  Just a good man.

14           If I could -- I wanted to pick an African-American

15   for the Senate seat vacated by the only African-American

16   senator who was off to become President, so Danny was that.

17   Cares about poor people.  He's just a very good person, and I

18   like him a lot, and I felt like he was a good, solid possible

19   pick for Congress.  So he was always a front runner, you know,

20   one of the top five to eight as this whole thought process

21   unfolded over the next several months.

22   Q.  Who -- who came up with the idea of appointing Danny

23   Davis?

24   A.  That was me.

25   Q.  And you also mentioned an African-American war hero.

Blagojevich - direct

4109

1  A.  Yes.

2  Q.  Who came up with that idea?

3  A.  That was me.

4  Q.  And what was the concept behind that?

5  A.  The idea came because of Tammy Duckworth.  Tammy Duckworth

6  had -- she's a heroine who fought in the Gulf War and the War

7  in Iraq, and she came to my attention by Rahm Emanuel and Dick

8  Durbin.  They called me after I was reelected and recommended

9  her as the head of the Veterans Department, Department of

10  Veterans Affairs in Illinois, and I would eagerly put her in

11  that position.

12          I thought she was fantastic.

13          MR. SCHAR:  I think she's fantastic, too, but we'd

14  object.

15          THE WITNESS:  You're right.

16          MR. GOLDSTEIN:  Agreement.  You guys have agreement

17  here.

18          THE WITNESS:  Can we go home now?

19  BY MR. GOLDSTEIN:

20  Q.  The idea of an African-American war hero, you said that

21  was your idea.

22  A.  I wanted an African-American Tammy Duckworth.  I was

23  looking for that.  That's what I was looking for.

24  Q.  Now, we'll get into it later, but between October, let's

25  move to October of 2008 to the day you were arrested.  Were

1  there several potential candidates discussed by you?

2  A.  Yes.

3  Q.  And were there several potential candidates that you

4  thought about?

5  A.  Oh, yes.

6  Q.  And were there several potential candidates that you

7  considered?

8  A.  Yes.

9  Q.  Now, I want to turn your attention to October of 2008.

10 Did you have a trip to Northwestern at that time, do you

11 recall?

12 A.  Yes, I did.

13 Q.  And was that in October of 2008?

14 A.  I believe it was early October of 2008.

15 Q.  And who was on that trip with you?

16 A.  John Harris.

17 Q.  And what was the reason for going to Northwestern?

18 A.  We were going to Northwestern to have lunch with the

19 president of Northwestern, Mr. Bienen, and then we were going

20 to tour a science facility, a lab that dealt with the issue of

21 nano technology.

22          MR. SCHAR:  Objection, Judge.

23          THE COURT:  It seems extremist to me.  Something else

24 happened, right?

25 BY MR. GOLDSTEIN:

1  Q.  Who did you go to Northwestern with?

2  A.  John Harris.

3  Q.  And do you recall having a conversation with Mr. Harris

4  about the Senate seat?

5  A.  I don't.  I have a lot of recollections of talking to him

6  about the Senate seat a lot, and they're refreshed by

7  telephone calls, but I don't have a recollection of talking to

8  him about that on that day.

9        This was Northwestern's day.  I was going to give

10  them $5 million for this nano technology facility.

11     (Mr. Schar standing up.)

12        THE COURT:  I'm striking that.  It's not relevant to

13  this case.  The jury's instructed to disregard it.

14  BY MR. GOLDSTEIN:

15  Q.  Did you ask John Harris on the ride to Northwestern what

16  you can get for this, this Senate seat appointment?

17  A.  I don't have any recollection of that.

18  Q.  Now, you said you had a lot of conversations with Harris

19  about the Senate seat, correct?

20  A.  Yes.  And I asked that question with Harris in a lot of

21  other conversations.  I just don't remember us talking about

22  it on the way to Northwestern or on the way back.

23        I certainly asked that question of him on several

24  occasions, but not that -- I don't recall whether I did or

25  didn't on the way to Northwestern or on the way back.

1    Q.  You said you had several conversations with John Harris.

2    Did you also have several conversations with Bill Quinlan

3    about the Senate seat?

4    A.  Yes.  I talked to Bill Quinlan about it constantly,

5    continuously, almost every day.  Almost every day.

6    Q.  Did you have conversations with Bill Quinlan about a

7    501(c)(4) in relation to the Senate seat?

8    A.  I had several conversations with Bill Quinlan about a

9    501(c)(4) in relation to the Senate seat.

10   Q.  Do you recall at all having a conversation with

11   Mr. Quinlan and Mr. Harris in which there was a discussion

12   about a 501(c)(4), and Mr. Quinlan and/or Mr. Harris

13   specifically told you don't even joke about that when it comes

14   to the Senate seat?

15   A.  No, I don't recall anything like that because Quinlan and

16   I and Harris talked about 501(c)(4)s long after that a lot.

17   Q.  And did they ever say, hey, don't even joke about that

18   issue?

19   A.  No.  In fact, to varying degrees, they both encouraged me

20   to explore the idea and see whether or not it made sense in

21   connection with the Senate appointment.

22          Sorry.

23          MR. GOLDSTEIN:  Judge, I'm going to go into some

24   calls.  I don't know when -- how far --

25          THE COURT:  Go ahead.

1      MR. GOLDSTEIN:  Sorry?

2      THE COURT:  Go ahead.

3      MR. GOLDSTEIN:  Okay.

4   BY MR. GOLDSTEIN:

5   Q.  Rod, I want to go over some calls with you, and let's go

6   into the government's binder, Tab 2.

7      Are you there, Rod?

8   A.  Yeah, what number is it?

9   Q.  Tab 2.

10  A.  Okay.

11  Q.  And on Page 1, I want you to look at Line 26, I believe

12  it's 26.  Maybe it's 25.  And Robert says -- well, first let

13  me go back.

14      The transcript indicates what the date and time is on

15  this call.

16  A.  Yes.  The date is October the 28th, and the time is

17  4:01 p.m.

18  Q.  Okay.  And who were the speakers on this call?

19  A.  It was me and my brother Robert.

20  Q.  Okay.  And is your portion not recorded?

21  A.  That's right.

22  Q.  Okay.  And if we go down to -- actually, let's go to

23  Line 22.  Robert says, "But it has to do with a particular

24  person who's lobbying to be the senator and wants to talk to

25  you about his resumé, Jackson, and Raghu Nayak evidently

1  supported it and he had communicated through Rajinder that if,

2  in fact, um, that would be the case, uh, there would be some

3  accelerated fundraising on your behalf between now and the end

4  of the year through his network."

5          What did you understand Robert to be talking about

6  there?

7  A.  That he was -- that he was indicating to me that Rajinder

8  Bedi, who was from the Indo-American community, had passed

9  along to my brother what Raghu Nayak apparently had said to

10 him, that -- that if -- if I appointed Congressman Jackson to

11 the Senate seat, that they promised to do accelerated

12 fundraising, that they would -- accelerate fundraising I took

13 to mean that they would -- they would accelerate their

14 fundraising, right?  I mean they would go faster and more --

15 presumably they would do more fundraising.

16          And this was in the context of an Indo-American

17 fundraising event that the Indo-American community and

18 supporters of mine had scheduled for I think it was December

19 the -- December the 6th.  And so this is what my brother was

20 conveying to me.

21 Q.  And when -- what Robert had conveyed to you, did you have

22 a position regarding this offer?

23 A.  Yes.

24 Q.  What was your position?

25 A.  My position was no, not interested in it, and --

1   Q.  And why -- what were the reasons why?

2   A.  I wasn't interested in making an appointment of a United

3   States Senator in exchange for campaign funds or accelerated

4   fundraising from my Indo-American supporters.  I was -- I did

5   not want to do that.

6           In addition to that, I knew then that I was never

7   going to appoint Congressman Jackson to the United States

8   Senate.

9   Q.  On October 28th, 2008, who were you considering for the

10  Senate?

11  A.  Me, Senate President Emil Jones, Lisa Madigan, Congressman

12  Danny Davis, the yet-to-be-found African-American war hero.

13  We hadn't found that person yet, Congressman --

14  Q.  So that was similar --

15  A.  Congressman Luis Gutierrez was in my mind at that time.

16  Q.  So it was similar to the summer conversation, and Luis

17  Gutierrez started to come in your mind as far as someone you

18  were considering, is that right?

19  A.  Yes.

20  Q.  Okay.  On October 28th, 2008, had you made any decisions

21  regarding the Senate seat?

22  A.  No.

23  Q.  Now, between October 28th, 2008 and October 30th, 2008,

24  were the people you were considering for the Senate seat the

25  same people you just mentioned?

1    A.  So you're saying from October 28th until October 30th?

2    Q.  Yes, the next two days.

3    A.  I believe so.

4    Q.  And during that time period, had you made any decisions

5    regarding the Senate seat?

6    A.  No.

7    Q.  I want you to turn to Tab 5, please.

8            Now, if you look at Page 1, according to the

9    transcript, what is the date and time of this call?

10   A.  It's October the 31st at -- 2008 at 5:14 p.m.

11   Q.  And who were the speakers on this call?

12   A.  It was me and my deputy governor, Bob Greenlee.

13   Q.  And if we look further down the page, you say, "I got some

14   lady calling my house for Jesse, Jr., here a little while

15   ago."

16           Greenlee says, "I'm telling ya, that guy is

17   shameless."

18           You say, "Unbelievable, isn't it?  Then I -- we were

19   approached pay to play that's, you know, they'll raise me 500

20   grand.  An emissary came, the other guy would raise a million

21   if I made him a senator."

22           Greenlee says, "Uh, uh, uh."

23           Then Greenlee says, "I'm not -- you know, I'm not

24   surprised by him at all."

25           When you said, "I got some lady calling my house for

1  Jesse, Jr. here a little while ago," what were you talking
2  about?
3  A.  I was passing it on to Bob Greenlee that now, all of a
4  sudden, Congressman Jackson, before President Obama was even
5  elected, was having his supporters call my house.
6       And we never really got around to it, but I was
7  basically saying that that's no way to make friends and
8  influence people, something like that.  I mean, it was
9  irritating.  And if this was a portent of what others were
10 going to do, this was going to be a pretty, you know, busy
11 period.  But -- so I was telling him that.
12      And then he gave his answer, that he thought, you
13 know, that that was a shameless act.  And then I said it was
14 unbelievable.  Then I passed along to him --
15 Q.  When you said it was unbelievable, what were you talking
16 about?
17 A.  It's just -- it was just -- it just was over the top.  You
18 know, getting your -- it's one -- getting people to call my
19 house to start advocating his candidacy for senator I just
20 thought was, you know, over the top.
21      He had a right to do it, but it wasn't the kind of
22 thing that would make me say, hey, I think I'll make him a
23 senator, you know?  It's just -- there's a time and place and
24 all the rest, and I was just expressing that to Greenlee,
25 that's all.

1   Q.  When you said people or representatives of Congressman
2   Jackson were calling your house, were you reaching out to --
3   to Congressman Jackson at all regarding the Senate seat?
4   A.  No.
5   Q.  Okay.  So -- so did Congressman Jackson at this time call
6   you personally in any way?
7   A.  I don't think so.  Reverend Jackson called me later on
8   behalf of -- on the election night actually, on election night
9   and advocated his son, understandably.  But at this time --
10  what was your question again?
11  Q.  At this time, up to this point, had Congressman Jackson
12  approached you regarding the Senate seat?
13  A.  He did not personally approach me, no, he did not up to
14  that point.
15  Q.  But representatives of Mr. Jackson approached you as well
16  as staff and various allies of yours, is that correct?
17  A.  People who were purporting to be representing him were
18  calling my house, and then some of my supporters in the
19  Indo-American community were conveying what I just talked
20  about to my brother.
21  Q.  Okay.
22  A.  And -- and promises of a whole bunch of political support
23  in addition to fundraising.
24          My brother had told me that he was told by I believe
25  it was Raghu Nayak that in addition to fundraising, there

1    would be a whole bunch of political support that Congressman

2    Jackson would provide to me if I made him a senator.

3    Q.  And then you go on further that, "You know, he'd raise me

4    500 grand.  An emissary came, and the other guy would raise a

5    million if I made him a senator."

6              What were you saying there?

7    A.  The fundraising part I wasn't interested in already.  I

8    rejected that.  I was just adding that on in addition to the

9    phone call that I passed on to Bob Greenlee, but I just

10   relayed to Bob Greenlee what my brother told me, that -- that,

11   you know, an emissary, Raghu Nayak, had promised that he would

12   raise $500,000, then somebody else -- see, I'm not quite sure

13   who that is.

14             I guess it was -- my understanding was that

15   Congressman Jackson would raise 500,000 and then Raghu would

16   raise the other million if I made him a senator.  I think

17   that's how I understood that at that time, but I just passed

18   that along to Greenlee and I said pay -- did I say pay to play

19   here?  Yeah, pay to play which is --

20   Q.  When you said pay to play, what were you saying?

21   A.  That's illegal.  That's not something that I want to do

22   and he shouldn't want to do.

23   Q.  And --

24   A.  If, in fact, he was doing it.  I don't know.  This is

25   Raghu Nayak claiming -- saying this to my brother.

1           Oh, Rajinder Bedi saying what Raghu Nayak said to him

2   is what I understood.

3   Q.  When you said an emissary came, what did you understand

4   that to mean?

5   A.  The emissary was a combination of Rajinder Bedi and Raghu

6   Nayak.  My brother had told me sometime after that first call

7   that Raghu Nayak -- that actually, no, that was -- that came a

8   little later, so I'll withdraw that.

9   Q.  And when -- this was all in the context of appointing

10  Jesse Jackson, Jr., is that right?

11  A.  It was in the context of appointing Jesse Jackson, Jr.

12  Can I correct what I just said if I could?

13          I believe we had an Indo-American luncheon that day

14  in Schaumburg.  I believe it was on the 31st of October, I

15  believe.

16          Is it appropriate if someone can refresh my

17  recollection?  Is that a way -- is this appropriate, me asking

18  this?

19  Q.  Here, hold on --

20  A.  Okay.

21          MR. GOLDSTEIN:  Your Honor, this might be a good time

22  to break if you want, to get a document to refresh his

23  recollection.

24          THE COURT:  How long is it going to take you to get

25  the document?

```
 1              MR. SCHAR:  I think I might --
 2              MR. GOLDSTEIN:  Sure.
 3    BY MR. GOLDSTEIN:
 4    Q.  While we're getting that document, Rod, what was your
 5    position as to Jesse Jackson, Jr., appointing him to the
 6    Senate seat on this day, October 31st, 2008?
 7    A.  I was -- my position was I was not going to appoint him to
 8    the United States Senate.
 9         (Tendered.)
10              MR. GOLDSTEIN:  Thank you very much.
11              May I approach, your Honor?
12              THE COURT:  You may.
13    BY MR. GOLDSTEIN:
14    Q.  Showing you Government Exhibit Senate Seat 10.  Do you
15    recognize this document?
16    A.  Yes.
17    Q.  And what is that document?
18    A.  This is a schedule of October 31st, 2008.
19    Q.  And looking at this document, does it refresh your
20    recollection as to when that Indo-American event was?
21    A.  Yes, yes.  Thank you.
22    Q.  When was it?
23    A.  It was October 31st, that afternoon.
24              So what I was -- at that time, after that event, my
25    brother had told me that Raghu Nayak at that event had
```

1  rekindled this fundraising offer, but he said that if I

2  appointed Congressman Jackson, there was going to be a whole

3  bunch of political support, the Jackson political network plus

4  this fundraising that they were offering.

5          And my brother shared that with me, and so I was

6  correct in my recollection.  That's what I was -- was on my

7  mind when I was telling this to Greenlee later in the day.

8  Q.  And this proposed offer, what was your position regarding

9  this offer?

10 A.  I was opposed to the offer of fundraising in exchange for

11 the Senate seat, and I -- I had no intention of appointing

12 Congressman Jackson with or without that situation --

13 Q.  Why --

14 A.  -- at that time.

15 Q.  Why did you have no intention of appointing Jesse Jackson,

16 Jr.?

17 A.  That's a broad question.

18 Q.  Well, what was -- what was your relationship like on

19 October 31st, 2008, in that time period, in October, with

20 Jesse Jackson, Jr.?

21 A.  It was all right personally, but by then, I -- I had an

22 opinion of him that he wasn't the person that I thought he

23 was, and I wish I would be given some latitude because we're

24 all complicated, and people all have good qualities and

25 not-so-good qualities, and I don't want to just -- I'm

1  uncomfortable -- well, I'll do what I have to do, Judge, but

2  there were some qualities in him that I didn't think were that

3  great.

4  Q.  And it was that opinion that led you to believe you didn't

5  want to appoint Jesse Jackson, Jr., is that right?

6  A.  It was -- it was that experience with him, and it went way

7  beyond his promising me to support me for governor.  That

8  was -- that was a small thing compared to some of the other

9  dynamics that had occurred.

10         I would call him to get him to try to call lawmakers

11  to pass legislation.

12         MR. SCHAR:  Object, Judge.

13         THE COURT:  I'm sustaining it.

14  BY MR. GOLDSTEIN:

15  Q.  On October 31st, 2008, who were you considering as

16  candidates for the Senate seat?

17  A.  I was considering me, Lisa Madigan, Senate President Emil

18  Jones, Congressman Danny Davis and Congressman Luis Gutierrez.

19  Q.  So that was similar to the couple days prior, is that

20  right?

21  A.  Yeah, I think -- on that day, that was Halloween, I think

22  that's pretty much what was in my mind at that time.

23  Q.  On October 31st, 2008, had you made any decisions

24  regarding the Senate seat?

25  A.  No.

1      MR. GOLDSTEIN:  Your Honor, I'm going to slightly
2  change subjects.  I don't know what your --
3      THE COURT:  We'll do about ten more minutes.  Ten,
4  fifteen minutes.
5  BY MR. GOLDSTEIN:
6  Q.  Now, I want to turn your attention to Tab 7, and according
7  to the transcript, Rod, what is the date and time of this
8  call?
9  A.  The date is November the 3rd, 2008, and the time is
10 8:35 in the morning.
11 Q.  And who were the speakers on this call?
12 A.  It's me and John Harris.
13 Q.  And on Page 1, you say, "Hey."
14      Harris says, "Hey, how are you?"
15      You say, "Okay.  How you doing?"
16      Harris says, "Yeah, just typing up kind of
17 remarks/process for you."
18      You say, "Right."
19      Harris says, "So I'll fax it to you this morning.
20 Give me an idea of your reaction.  This kind of takes into
21 consideration, uh, Knapp's issues and concerns, so --"
22      And then you say, "Yeah, we have to consider, yeah, Q
23 and A, too, you know."
24      Harris says, "Yeah," and then Harris says, "Still
25 think McCain can pull it off."

1        When Harris mentions this remarks/process, what did

2    you understand him to be talking about?

3    A.  This was Monday before the Tuesday election, and by then

4    it was very clear that President Obama, then-Senator Obama,

5    was likely to win and likely to win in a pretty big way, so

6    that we needed now to get serious about making a decision and

7    figuring out a way to make the decision to pick his successor.

8        And so John Harris, pursuant to I have to believe my

9    directive, although he may have done this on his own, but he

10   began to put together a -- some thoughts apparently in writing

11   about a process on how to do it and what we should do, and I

12   took this to mean both internally and publicly.

13   Q.  And this was a process as far as making a decision

14   regarding the Senate seat?

15   A.  Yes.

16   Q.  And what -- was a process developed at this time on

17   November 3rd?

18   A.  It was a work in progress, and what he goes on to say that

19   is he's taking into consideration Bill Knapp's issues.  That's

20   Bill Knapp, our political consultant.

21       So now I directed him to do this and suggested to him

22   that he work with Bill Knapp and to get his insights on how we

23   should do this and what some of the considerations ought to be

24   and what kind of a process we should put together, as well as

25   what -- how we would announce it to the public when the

1  appropriate time presented itself.

2  Q.  When Harris said, "This kind of takes into consideration

3  Knapp's issues and concerns," what did you understand him to

4  be talking about there?

5  A.  That he had shared his initial thoughts about the process

6  he thought we should have with Bill Knapp and that Bill Knapp

7  had made -- had used the amendatory veto pen.  In other words,

8  he had basically made some adjustments and some changes to it

9  and put his insights in there.

10  Q.  What process did you end up developing regarding the

11  Senate seat?

12  A.  The process was, and part of the decision that we reached

13  was also made by -- with the advice of Speaker Hastert who I

14  spoke to the day after the election.  He called me on Tuesday,

15  the 5th -- Wednesday, the 5th of November, and he gave me his

16  insights as a leading political figure who I had a good

17  relationship with.  I saw him somewhat is a quasi-mentor.

18         And he had a whole bunch of suggestions and ideas on

19  what I should think about getting for the Senate seat, and he

20  was very clear to me that -- you know, I told him we were

21  putting together a process, we were going to announce the

22  process publicly, and he was pretty firm with me saying

23  whatever your process is, this is your decision and you've got

24  to make this decision.  It's yours, and -- and I was impressed

25  by that advice, and so that was part of the consideration as

1    this process unfolded.

2    Q.  And you said you never picked a senator before.

3    A.  No.

4    Q.  And at that time --

5    A.  Never want to again either.

6    Q.  At that time, what did you understand the qualifications

7    for a senator were?

8    A.  The qualifications, we did our research, were legal -- the

9    legal requirements were you had to be 30 years old or older, a

10   citizen of the United States, and I believe you had to be a

11   resident of Illinois I want to say for one day.  Don't

12   quote -- I'm not exactly sure about that; but 30 years old and

13   a citizen of the United States and a resident of Illinois.

14   Q.  And if you can turn to Page 2 -- actually, Harris on

15   Line 1 says, "I've read papers, we've read papers, we -- you

16   know, we know, we know what the rumors are out there, but

17   again."

18          And you said, "So he's talking about Valerie

19   Jarrett."

20          When you said, "So he's talking about Valerie

21   Jarrett," who were you talking about as far as he, do you

22   recall?

23   A.  I think Harris was telling me what Rahm Emanuel had told

24   him I believe the day before, and Rahm Emanuel -- I'm sorry,

25   no question.

1   Q.  When you were talking about Rahm Emanuel in this short

2   period of conversation, what did you understand, who was

3   having this conversation between Mr. Emanuel?

4   A.  My understanding was that Rahm Emanuel called John Harris

5   the day before --

6   Q.  Okay.

7   A.  -- on Sunday, November the 2nd.

8   Q.  Okay.  And you're -- you're talking about this

9   conversation that Mr. Harris had with Mr. Emanuel, is that

10  correct?

11  A.  Yes.

12  Q.  Okay.  Then Harris goes on and says, "Yeah, so he said,

13  well, do you think it would be helpful for Barack to call

14  Rod?"

15         Harris says, "I said, well, if he has strong feelings

16  about somebody, I would imagine he would.  He wouldn't leave

17  it to osmosis or, you know, the media, I would hope.  So you

18  may get a call from him or Dave."

19         You said, "Dave who?"

20         And then Harris says, "Axelrod."

21         And you say, "Oh, yeah."

22         When Harris said, "So he said, well, do you think it

23  would be helpful for Barack to call Rod?"  What did you

24  understand Harris to be telling you there?

25  A.  What he was telling me was that Rahm Emanuel had asked him

1   if it would be helpful if then-Senator but soon to be
2   President-Elect Obama were to call me to express his
3   preference for a senator.
4   Q.  And then Harris said, "I said, well, if he has strong
5   feelings about somebody, I would imagine he would.  He
6   wouldn't leave it to osmosis, you know, the media, I would
7   hope.  So you may get a call from him or Dave."
8           What did you understand Harris to be talking about
9   here?
10  A.  That he was conveying to me that something he understood
11  came from Rahm Emanuel, that either President -- then Senator
12  but soon to be President-Elect Obama would call me or that
13  David Axelrod, President-Elect Obama's campaign manager,
14  campaign consultant, would call me.
15  Q.  Did you ever get a call from Dave Axelrod?
16  A.  No.
17  Q.  Did you ever call Dave Axelrod?
18  A.  No.
19  Q.  And when it came to Rahm Emanuel, who did you understand
20  called whom regarding him and John Harris?
21  A.  My understanding was Rahm Emanuel called John Harris.
22  Q.  And then further down on Page 2, Harris says, "But I --
23  what I was trying to say is, you know, we're not waiting to
24  hear from, and I didn't mention her name, but like the Marilyn
25  Katzes and all the other kind of people."

1           And then you said, "This is good, so --"

2           And then Harris says, "Hanging around out there, but

3    it sounds as though at least if you're gonna believe Rahm that

4    he very much cares about this and, uh, has a definite, uh,

5    desire for Valerie because he didn't mention Tammy.  He would

6    have mentioned Tammy because he said very close to him,

7    somebody very close to him.  Obviously, Tammy's not very close

8    to him."

9           Now, when Harris says, "I didn't mention her name,

10   but like the Marilyn Katzes and all the other kind of people,"

11   what did you understand John Harris to be talking about there?

12   A.  What John Harris was telling me was that he was relating

13   to me the conversation that he had with Rahm Emanuel, and he

14   told me that he did not mention to Rahm that people like

15   Marilyn Katz -- Marilyn Katz was a -- she's a communications

16   person close to Rahm and David Axelrod and President Obama,

17   who had called Patti and then Patti -- to talk about Valerie

18   Jarrett and the Senate seat.

19          And Patti referred her to John Harris.  And she

20   called John Harris, and whether they did this over the phone

21   or had lunch, I don't remember, but Harris told me she said if

22   I appointed Valerie --

23          MR. SCHAR:  Judge, we'll object.

24          THE COURT:  Yeah, you're a little beyond.

25          THE WITNESS:  Yes, yes.

1    MR. SCHAR:  Also the relevance of the conversation,
2    but --
3    THE COURT:  Well, the objection is sustained.  The
4    relevance of the conversation seems unclear to me, so I'm
5    sustaining the objection.
6    MR. GOLDSTEIN:  Which conversation, your Honor?
7    THE COURT:  Just ask another question.
8    BY MR. GOLDSTEIN:
9    Q.  Did you understand -- did you or John Harris call Marilyn
10   Katz?
11   A.  No.
12   Q.  Okay.  Did you understand that Marilyn Katz called Patti
13   and/or John Harris?
14   A.  She called Patti, and then she called John Harris.
15   Q.  And when Harris goes on, "Hanging around out there, but it
16   sounds as though at least if you're gonna believe Rahm that he
17   very much cares about this and has a definite desire for
18   Valerie," what did you understand Harris to be saying here?
19   A.  He's -- he's explaining to me that -- that if you believe
20   Rahm, he's qualifying it, that President Obama very much cares
21   and has a desire for Valerie Jarrett to succeed him in the
22   Senate.  That's what I understood Harris was telling me, and
23   then -- should I go on --
24   Q.  No.
25   A.  -- about Tammy Duckworth?

1  Q.  Harris then talks about Tammy Duckworth because he said,

2  "very close to him, somebody very close to him.  Obviously,

3  Tammy's not very close to him."

4       What did you understand Harris to be saying here?

5  A.  He brought up Tammy Duckworth because John Harris and I

6  discussed this.

7       Rahm Emanuel approached me in February of 2008.

8       MR. SCHAR:  Objection, Judge.

9       THE COURT:  Sustained.

10      THE WITNESS:  Okay.

11 BY MR. GOLDSTEIN:

12 Q.  When Harris said "because it's somebody very close to him,

13 somebody very close to him.  Obviously, Tammy's not very close

14 to him," what did you understand Harris to be talking about

15 here regarding Tammy?

16 A.  That if -- my understanding was that if Rahm Emanuel had

17 indicated to John Harris that this potential candidate was

18 someone very close to President Obama, then it wouldn't have

19 been Tammy Duckworth because in John's mind, he says right

20 there that she's not that close to President Obama.

21 Q.  And then you say, "Okay, now we should get something for

22 that, couldn't I?"

23      What were you saying there, Rod?

24 A.  Just that.  I'm asking John Harris his advice and his

25 opinion on whether or not if, in fact, there's an interest by

1   President Obama or Rahm or whomever for Valerie Jarrett as a

2   senator, is there a potential horse trade -- legal, always

3   predicated on being legal -- where there's something that I

4   might be able to get as part of that horse trade.  That's what

5   I'm asking him, what does he think about that.

6   Q.  And on Page 2, further down, Harris says, "Yes."

7           And I said, "Well, if that's the case, I'm sure

8   there'll -- there'll need to be more discussions, so -- but

9   they ought to start with him expressing his interest because

10  up to now, frankly, we haven't heard anything, but we can

11  understand that because he's busy campaigning, so, you know,

12  it hasn't been the time."

13          And you say, "How about Health and Human Services?

14  Can I get that?"

15          What did you understand John Harris to be saying

16  here, starting on Page 2 and going on to Page 3?

17  A.  He answers my question with a yes, not with a no.  He says

18  yes.

19          And then he says, "And I sure -- well, if that's the

20  case," in other words, if President Obama's interested in

21  Valerie Jarrett, I think is what he's saying here, or Rahm is

22  interested, there'll need to be more discussions, we need to

23  talk some more about this.

24          I presume he's talking about discussions with Rahm,

25  not necessarily internally with us.  That's how I read that.

1          And then he -- he says -- he says understandably,
2     after he chuckles, "They ought to start with expressing his
3     interest."
4          In other words, if, in fact, President Obama really
5     is interested in Valerie Jarrett, my understanding of what
6     Harris is telling me is President Obama should call me and
7     tell me he's interested in Valerie Jarrett.
8     Q.  And when you say, "How about Health and Human Services,
9     can I get that?"  What were you saying there?
10    A.  And then he says, you know, he's busy campaigning so he
11    hasn't been able to call.
12         Yeah, so I throw out a healthcare position because I
13    wonder if there might be a role for me to be part of President
14    Obama's historic effort to expand healthcare to every
15    American, and I was asking Harris what he thought about any
16    chance of me getting something like that, which I must say
17    even on that day I viewed as remote at best, but, ah, but a
18    man's reach should exceed his grasp but what's a heaven for.
19    Q.  Why were you interested in Health and Human Services?
20    A.  Healthcare was the issue that motivated me as governor.  I
21    was shaped by my life experiences.  A cousin passed away
22    12 years old from leukemia --
23              MR. SCHAR:  Judge, object.
24              THE WITNESS:  None of that?
25              THE COURT:  Yeah, and you know that it's not because

1    I struck it the last time.  Don't do that again.

2              THE WITNESS:  Understand, Judge.

3    BY THE WITNESS:

4    A.  Healthcare from my life experience became my big priority,

5    and I fought real hard in Springfield to try to move it

6    forward.

7              MR. SCHAR:  Judge, we'd object.

8              THE COURT:  You know, you actually answered that

9    question some time ago.

10             THE WITNESS:  Okay, Judge.

11             THE COURT:  So you can leave it at that.

12   BY MR. GOLDSTEIN:

13   Q.  And then after that, Harris says, "I think now that he

14   cares a lot about it, he's willing to make the call, yeah, I

15   think, uh, you know, this is what I was trying to explain to

16   Knapp.  I was, like, they got to ask.  We can't just go out

17   there to start calling people."

18             And then you say, "What can I honestly think I

19   could -- I might have a shot of getting?"

20             Then Harris says, "Um, well, good -- well, besides

21   good thing -- good things for Illinois, um," what did you

22   understand John Harris to be talking about at the beginning on

23   Line 6, "I think now he cares a lot about it and he's willing

24   to make the call?"  What did you understand he was saying

25   there?

1   A.  What he's telling me there is that in his mind, he

2   believes President Obama cares a lot about healthcare -- not

3   healthcare, but about Valerie Jarrett for the Senate.  And he

4   is suggesting to me that I should anticipate getting a phone

5   call from President Obama.  That's how I interpret that.

6           And then he goes on to say that he had this

7   conversation with Bill Knapp, and he was trying to explain

8   something along those lines to Bill Knapp.  Basically they

9   need to ask us.  We're not going to reach out and ask them for

10  anything.  If they're interested, they should come to us and

11  ask us.

12          We can't just go out and start calling people, is

13  what Harris is indicating, and that's -- and that's the

14  position that we took, which was we're not going to ask

15  anybody.  If they're interested, they should come to us.

16          And then I ask him, in the event that somebody comes

17  to us, I then reiterate after asking about Health and Human

18  Services, which I viewed as being very unrealistic but

19  something I would have very like -- much wanted to do, I then

20  asked him, what can I honestly think I could have a shot at

21  getting?  Meaning what's realistic?  What could be potentially

22  realistic?

23          Then Harris says, "Um, well, besides good things for

24  Illinois, good things for Illinois," and I know what I

25  answered here, but there's stars here, Judge, and I don't know

1    how to say this, but it's been deleted.  How do I do this?

2    Q.  What did you respond to Mr. Harris?

3    A.  I told Harris, good things for Illinois is our priority,

4    something along the lines of that.  I expressed to him what my

5    operating principle was going to be moving forward when it

6    came to making this Senate seat.  This is essentially my

7    definition of f'ing golden, if you will.

8    Q.  When you saw operating principle, what was your operating

9    principle?

10   A.  I expressed it later the next day on the 4th of November

11   on another call to Harris.  He was at the Hollywood Grill at

12   Ashland and North Avenue, and I was on the phone from my

13   house, and I told him --

14              THE COURT:  Stop.

15              I think we'll stop now since we're on a different

16   day.

17              9:30 tomorrow morning.

18              COURT SECURITY OFFICER:  All rise.

19        (Jury exits courtroom.)

20              THE COURT:  Please be seated.  You can step down.

21              Approach the bench.

22              Any issues anybody wants to raise?

23              MR. SCHAR:  A couple at the side, Judge.

24              THE COURT:  Anything you want to do in open court?

25              MR. SCHAR:  Judge, we'll just address it.

1          One of the things is the concept of reference to Bill

2    Quinlan as my lawyer.  The reality is this defendant had

3    multiple criminal counsel and has yet to fully waive the

4    privilege as to one lawyer who's actually standing several

5    feet away from me and then additional lawyers at Winston &

6    Strawn.  And one of these individuals was a lawyer at the time

7    and was his criminal counsel at the time.

8          And it's now inserted a very difficult issue into

9    this case, and as you've noted repeatedly, this is not an

10   advice-of-counsel defense, and that's clearly how he's trying

11   to present it.  And I think it also begs the question as to

12   whether or not now, as opposed to later, there ought to be an

13   instruction that this is not an advice-of-counsel case and

14   whether or not we're going to be able to have an opportunity

15   to talk to Mr. Sorosky or the lawyers at Winston in some

16   detail about exactly additional advice that they have provided

17   over the years related to these issues.

18         And he's complicated it particularly about how he

19   continues to phrase things, and I think there's a motion *in*

20   *limine* regarding -- different issue slightly -- politics as

21   usual, and again we have today, you know, got to be horse

22   trading, horse trading is fine, and trying to insert in

23   defenses that are clearly barred.

24         THE COURT:  The problem as I see it is a bigger

25   problem for the defense than it is for you because even if the

1   issue is not raised explicitly, if it's raised implicitly by

2   his testimony -- and it is, the advice of counsel clearly

3   raised implicitly -- I will instruct on it. And the problem

4   with this instruction is you give an advice-of-counsel defense

5   instruction, you say something like, "The defendant relies on

6   advice of counsel, and this is what have you to have."

7          The instruction in this case as it stands now is

8   going to be, "There is no advice-of-counsel defense in this

9   case. Defendant is not entitled to argue that he wasn't

10  advised. In order to have an advice-of-counsel defense, you

11  have to prove the following things," and then you give the

12  standard advice-of-counsel defense.

13         That's a tough instruction for a defendant, and --

14  but it's given sometimes because it is the only way to deal

15  with a vague suggestion that this might be the law and leaving

16  the jury to -- to conclude that this is somehow a factor, and

17  it isn't a factor. It's not a defense. Could be an element

18  in mitigation if he is ever convicted, but it's not a defense.

19         We are past the privilege issue with respect to

20  Quinlan, are we not?

21         MR. SCHAR: With respect to Mr. Quinlan, we are,

22  Judge.

23         THE COURT: Because he's the office of the governor.

24         MR. SCHAR: Correct.

25         THE COURT: And, of course, the problem is is that

1    they tell him don't even joke about it, and he runs roughshod

2    over them.  Never stops.  And I think that that's a problem

3    for you.

4              But the truth of the matter is, I'm not going to let

5    that sit there.  And as far as this is politics as usual, I'm

6    going to have to give an instruction on that, too, unless you

7    call some kind of expert witness because there's some deals

8    you can make and some deals you can't make.  And I don't like

9    this subtext here, and I particularly don't like the subtext

10   here because I think it's deliberate.

11             MR. SOROSKY:  Think it's what?

12             THE COURT:  Deliberate.

13             MR. SOROSKY:  Oh.

14             THE COURT:  I don't think this is an accident.  And

15   we've actually had an incident here, where it was not just the

16   attorneys who can stand around the borders.  We've had a

17   defendant here who has brought up something that I

18   specifically struck and refused and did in his presence.  And

19   this case takes a bad turn for the administration of the trial

20   if this happens very often because it just gets to more

21   instructions.

22             And usually we don't give exclusionary instructions.

23   We don't say to jurors, you may not consider except for a few

24   things, like, for example, a prior conviction.  And even then

25   when we say you may not consider this, we usually do it for a

1    specific purpose.

2         But the only thing we talk about generally speaking

3    that says you should not consider this is unrelated to

4    defenses.  It's you may not consider -- I pass sentence.  You

5    can't consider what the possible sentence might be.

6         And this is something I really don't want to go down

7    that path.  It is possible that when the government is done

8    with cross-examination this may not be necessary, but it's

9    basically a warning of where we're going in this case, and

10   warning you a place that I think it is better for the defense

11   not to go.

12        I understand why it's tempting in the context of

13   public debate.  It's not particularly useful where we have

14   very defined issues.

15        So that's my word and it's my guidance for future

16   conduct of this, and it's something that ought to be explained

17   to the defendant so that he understands this fully.  I

18   understand his roping some things into the trial to make

19   himself more sympathetic.  Defendants do that all the time.

20   Because he was a professional politician, he's a lot better at

21   it than your average defendant.  That I'm willing to give

22   leeway on.

23        But this suggestion that nobody stopped me;

24   therefore, I thought it was legal, even if he never says those

25   exact words, it's floating around here, and so is the idea

1    that horse trading is normal in politics because there is

2    legal horse trading.  There's also illegal horse trading, and

3    generally speaking, I don't want to give an instruction that's

4    that specific.  The ordinary instruction would say you have to

5    find X, Y and Z.  We don't usually go into a lot more

6    definition.  And, in fact, we may get to the point where

7    somebody's got to call an expert witness and say what is legal

8    and what isn't, and it's going to be very difficult, since the

9    law is clear on most of these points to get beyond one expert.

10        So that's basically my view.  Now somebody want to do

11   something at the side?

12        MR. SCHAR:  No, Judge.

13        THE COURT:  That was it?

14        MR. SCHAR:  That was it.

15        THE COURT:  Okay.  I thought that might be it.  See

16   you tomorrow at 9:30.

17        MR. SOROSKY:  9:00 or 9:30?

18        THE COURT:  9:30.

19        MR. SOROSKY:  9:30.

20        (Court adjourned, to reconvene at 9:30 a.m. on 6-1-11.)

21                          CERTIFICATE

22        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
23
     /s/Kathleen M. Fennell
24   _____
     Kathleen M. Fennell
25   Official Court Reporter