4143

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )  No. 08 CR 888
4          Government,              )
                                    )
5  vs.                             )  Chicago, Illinois
                                    )
6  ROD BLAGOJEVICH,                 )  June 1, 2011
                                    )
7          Defendant.              )  9:56 o'clock a.m.

8
                        VOLUME 25
9              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
10                  AND A JURY

11
   For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15                 Debra Bonamici
               Assistant United States Attorneys
16            219 South Dearborn Street;
              Suite 500
17            Chicago, Illinois 60604

18
   Court Reporter:
19
                 Blanca I. Lara, CSR, RPR
20               219 South Dearborn Street
                       Room 2504
21               Chicago, Illinois 60604
                    (312) 435-5895
22

23

24

25

4144

APPEARANCES   (continued:)


For Defendant Rod Blagojevich:

        KAPLAN & SOROSKY
        BY:  Sheldon M. Sorosky
        158 West Erie
        Chicago, Illinois 60610
        (312) 640-1776

        LAW OFFICE OF Elliott Riebman
        BY:  Elliott Riebman
        158 East Erie
        Chicago, Illinois 60610
        (847) 814-2900

        OFFICES OF AARON B. GOLDSTEIN
        BY:  Aaron Benjamin Goldstein
        6133 South Ellis
        Chicago, Illinois 60637
        (773) 752-6950

        OFFICES OF LAUREN FAUST KAESEBERG
        BY:  Lauren Faust Kaeseberg
        2140 N. Lincoln Park West
        Suite 307
        Chicago, Illinois 60614
        (773) 517-0622

1                           INDEX OF EXAMINATION

2   WITNESS                                                  PAGE

3     ROD BLAGOJEVICH

4     Voir Dire Examination By Mr. Goldstein........... 4150

5     Direct Examination (Resumed) By Mr. Goldstein.... 4185

6

7

8   EXHIBITS

9     Defendant's Exhibit Group Photo Number 1......... 4187

10    Defendant's Exhibit Photo Blagojevich Library ... 4189

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4146

1      (The following proceedings were had out of the
2       presence of the jury in open court:)
3          THE CLERK:  Please remain seated.
4          THE COURT:  Okay.  Come to sidebar.
5      (Proceedings heard at sidebar on the record.)
6          THE COURT:  Okay.
7          MR. GOLDSTEIN:  Couple of things, Your Honor.
8  One, we intend on asking the defendant did he
9  honestly believe that what he was doing was legal.
10 This is what we discussed a while ago.
11         THE COURT:  Right.
12         MR. GOLDSTEIN:  And we want to ask why he
13 believed it.
14         THE COURT:  Okay.  Any idea what his answer
15 is?
16         MR. SOROSKY:  Yes.
17         MR. GOLDSTEIN:  His will be threefold:  One,
18 through all the conversations he had with all the
19 people he spoke to about it.  Two --
20         MR. SOROSKY:  Excuse me.  All the
21 conversations he had that we've heard in the tapes.
22         MR. GOLDSTEIN:  Yeah.
23         MR. SOROSKY:  That we've heard on the tapes,
24 the recorded conversations played previously.  So
25 just referring from what is in evidence.

1          THE COURT:  Okay.  I got that one.

2          MR. GOLDSTEIN:  Second point is, his

3   experience in politics and government.  And the

4   third point is, his understanding of history.

5          MR. SOROSKY:  We like to give one example;

6   only one.

7          THE COURT:  Which is?

8          MR. SOROSKY:  He would say that in 1975, when

9   Gerald Ford was president, Ford's people foresaw

10  Reagan as a possible potential opponent in the

11  Republican '76 primaries and they offered Reagan

12  ambassadorships and cabinet positions and Reagan

13  turned them down, he ran against Ford in the primary

14  and lost.

15         Is that a fair summary of what he would say?

16         MR. GOLDSTEIN:  Yes.

17         THE COURT:  Judge, we're going to object on

18  various points.  First of all, the issue is not

19  whether he thought it was legal or illegal.  In

20  fact, he doesn't need to know it was illegal to be

21  convicted.

22         Secondly, this is a clearly inserting not

23  only a specific example but the general theme of

24  politics as usual, and whatever his experience may

25  have been or not have been in the past, again it's

4148

1    just going to be an attempt to say this is just how
2    it works, this is the way how it gets done, and that
3    is not an issue for this jury.

4              If he wants to say, you know --
5              MS. KAESEBERG:  Well, he already testified --
6              THE COURT:  We're going to do something very
7    simple here, we're going to make an offer of proof
8    first.  There are parts of this that may work, parts
9    that may not work.  I got to hear it.

10             I mean, let's put it this way, there's some
11   aspects of this that might verge on suicidal for
12   him, but I got to hear this.  Ordinarily I wouldn't
13   require it, but you have a witness who has a
14   specific agenda, things he wants the jury to know,
15   some of which are relevant, some of which aren't,
16   and he just shoves it into an answer that is not
17   particularly responsive to the question.

18             I can understand why somebody with his
19   background would do it, but a courtroom proceeding
20   is not a press conference, not a bunch of reporters
21   asking what he plans for "x."

22             So I'm going to have to hear it and we'll see
23   how it goes.  So we'll do that now so we have some
24   kind of idea.  And it might be of some help to the
25   defense because we might see exactly what he is

4149

1  going to say.

2      MR. SOROSKY:  Just so we're clear, you want

3  us to ask him in voir dire the three reasons why?

4      THE COURT:  Yeah, and we'll see what it is

5  and we'll go for that.

6      MR. GOLDSTEIN:  As far as the honest belief

7  part, the answer is yes, do you need to hear that,

8  too?

9      THE COURT:  I'd like to.  I'd like to.  And

10 then we have an argument as to what its relevance is

11 in the context of this particular case.  So we'll

12 see.

13     MR. SOROSKY:  Are there any guidelines --

14     THE COURT:  No.  It's an offer of proof, you

15 ask him whatever you want to.

16     MR. SOROSKY:  What about --

17     THE COURT:  He can say whatever he wants to.

18     MR. SOROSKY:  And just a second unrelated

19 issue --

20     MR. GOLDSTEIN:  Your Honor, we wanted to

21 present the Rachel Maddow interview.

22     MR. SOROSKY:  We'd like to present it upfront

23 if the government is going to use it.  If the

24 government is not going to cross-examine on it, well

25 then we won't use it.  But if they are going to

:55AM

:55AM

:55AM

:56AM

:56AM

R. Blagojevich - voir dire examination by Goldstein  4150

1  cross examine him on it, we'd like to use it in the
2  kind of slang phrase "upfront."
3      MR. SCHAR:  I really prefer not to front out
4  the entirety of the cross, including things like
5  this.  If they want to impeach --
6      THE COURT:  Stop.  Stop.  I'm not going to
7  let him front it on this one.  It's not like they
8  are going to surprise you.  He knows it's there.
9  Whatever answer he gives, he gives, and it doesn't
10 matter.  Ordinarily I would let him do it, I would
11 let him front the conviction, which is, I think,
12 much more important, and they may actually may or
13 may not decide to use it, but not.
14      Let's go.  I'm going to inform the jury that
15 we have some legal issues to deal with first which
16 is why they're waiting.
17    (Proceedings heard at sidebar on the record.)
18      COURT'S LAW CLERK:  Remain seated, please.
19      THE COURT:  Offer of proof.
20      THE WITNESS:  Good morning, Judge.
21    ROD BLAGOJEVICH, DEFENDANT, PREVIOUSLY SWORN
22              VOIR DIRE EXAMINATION
23 BY MR. GOLDSTEIN:
24 Q  Rod, we spoke a little bit about the Senate seat
25 yesterday.  Are you aware of the allegations

R. Blagojevich - voir dire examination by Goldstein   4151

1  regarding the senate seat?

2  A   Yes.

3  Q   And in talking about these discussions, did you

4  honestly believe that what you were talking about

5  was legal?

6  A   Yes, I did.

7  Q   Did you honestly believe that what you were doing

8  was legal?

9  A   Yes, I did.

10 Q   Did you honestly believe that the idea of

11 exchanging the senate seat for Health and Human

12 Services was legal?

13 A   Yes, I did.

14 Q   Did you honestly believe that the idea of

15 exchanging the senate seat for a 501(c)(4) was

16 legal?

17 A   Yes, I did.

18 Q   Did you honestly believe that the idea of

19 exchanging the senate seat for an ambassadorship was

20 legal?

21 A   Yes, I did.

22 Q   In your mind, Rod, why did you believe those

23 things were legal?

24 A   Three reasons:  First, all of the conversations I

25 was having with my senior staff, political

R. Blagojevich - voir dire examination by Goldstein   4152

1  consultants, and others.  Second, my experience in
2  politics and government for 15 years, understanding
3  how the process works.  And, third, my readings in
4  history, the history books that I've read, and
5  examples in history that I actually talked about in
6  some of those calls.
7  Q   And what examples formed your state of mind?
8  A   One discussion that I had and one idea that was
9  in my mind at that time was President Ford and
10  Ronald Reagan in 1975.
11        When Ronald Reagan was potentially going to
12  challenge President Ford in the Republican primaries
13  for the Republican nomination for president,
14  President Ford offered Ronald Reagan a cabinet
15  position to not run against him.  It was the
16  Department of Transportation.  Ronald Reagan ejected
17  that.  Then President Ford offered him an
18  ambassadorship, the ambassadorship to the Court of
19  St. James, England.  Ronald Reagan rejected that.
20        And then after Ronald Reagan created an
21  organization called Citizens for Reagan and became
22  even more likely that he was going to challenge the
23  incumbent president, President Ford dispatched his
24  Chief of Staff at that time, Donald Rumsfeld, to
25  offer future President Reagan a cabinet position in

R. Blagojevich - voir dire examination by Goldstein   4153

1  the Department of Commerce, ran against President

2  Ford, actually received more votes in the primary

3  and lost a very narrow decision in the Kansas City

4  convention in August of 1976.  So that was one

5  example.

6          I can give you a whole bunch, Judge, I don't

7  know if you want me to do that.

8          THE COURT:  Go ahead.

9          THE WITNESS:  Well, Earl Warren became a

10  Supreme Court Justice when he was governor of

11  California in 1952, and at the Republican convention

12  a then young senator named Richard Nixon had

13  engineered the Republican delegation to back General

14  Eisenhower who was in a tough race against Senator

15  Taft.

16          The California governor, Earl Warren, was the

17  favorite son of the California delegation.  After

18  Nixon engineered that political move, the governor,

19  Earl Warren, was unhappy.  As part of a deal to sway

20  his concerns and endorse the ticket, future

21  President Eisenhower offered Earl Warren the next

22  vacancy in the United States Supreme Court, that

23  happened a year later in 1953.

24          I can -- can I keep going, Judge?

25          THE COURT:  Keep going.

:55AM
:55AM
:55AM
:55AM
:56AM

R. Blagojevich - voir dire examination by Goldstein  4154

1  BY THE WITNESS:

2  A  Well, Abraham Lincoln, in order to get the

3  Pennsylvania delegation to back him at the

4  Republican convention in 1980 at the Wigwam here in

5  Chicago, made a political deal with the Governor of

6  Pennsylvania, a guy by the name of Simon Cameron.

7  Now this was talked about in Doris Kearns Goodwin's

8  book, Team of Rivals, and other books on Abraham

9  Lincoln.

10       He appointed Simon Cameron to a cabinet

11  position, and it was an important, the Secretary of

12  War at a time when our country was tearing apart and

13  American boys were killing each over the issues of

14  slavery and the union.

15       So that was very much on my mind.  What was

16  on my mind in more recent history was what I

17  perceived to be and believed was part of a political

18  deal between candidate Obama and candidate Hillary

19  Clinton, and we talked about this.

20       And the deal was that when she decided to get

21  out of the race for president and endorse Obama,

22  unify our party, that soon to be President Obama

23  agreed to contribute 10 million dollars to the

24  Clinton campaign fund which was owing to the

25  Clintons personally, and as part of that deal she

R. Blagojevich - voir dire examination by Goldstein  4155

1 was promised a position of Secretary of State, got

2 out of the race, endorsed President Obama, we had a

3 unified party and he went on to win.

4        We talked about an example that I gave

5 regarding how our nation's capitol was founded.  It

6 was founded on a political deal between Thomas

7 Jefferson and Alexander Hamilton.  They were

8 fighting over the power of the central government.

9 Hamilton had his vision and idea that the federal

10 government should assume the debts of the states to

11 unify the country around a strong central

12 government.  Thomas Jefferson, James Madison, and at

13 that time they were called the Republicans, opposed

14 that idea.  But as part of a political deal for

15 votes to support Hamilton's assumption plan, is what

16 it was called, Jefferson asked in exchange for that

17 that Hamilton would bring northern votes from his

18 fellow federalists to support the creation of a

19 nation's capitol in a swamp along the Potomac called

20 Washington, D.C., because our nation's capitol at

21 that time was either in Philadelphia or New York.

22 So part of that deal is what ultimately led to the

23 creation of Washington, D.C.  as our nation's

24 capital.

25        I can just go on and on.

R. Blagojevich - voir dire examination by Goldstein   4156

1      President Kennedy vacated his senate seat
2  sometime around December 20, 1960--we did some
3  research on this--and they appointed a guy by the
4  name of, I think it was Edward Smith, as a
5  placeholder to hold the seat for his younger
6  brother, Teddy, who wasn't old enough, and then
7  ultimately in 1962, just turned 30's, Ted Kennedy
8  ran for the United States Senate and then won.
9       So a lot of these sort of political deals
10 were constantly on my mind, and I could just keep
11 going if you'd like me to.
12 Q   Did the conversations you had with your
13 consultants and advisors and staff, as well as your
14 experience in politics and government, as well as
15 the history that you knew, did that help form your
16 state of mind and your intent with regards to the
17 senate seat?
18 A   It very much did.  And my desire to comply with
19 the law and to make sure that whenever I was going
20 to make this decision, that when I ultimately did
21 make this decision that through our brainstorming
22 and discussions and tossing around ideas, that I
23 would land in a legal place was always on my mind at
24 that time, as it always was, but certainly at that
25 time.

R. Blagojevich - voir dire examination by Goldstein  4157

1          And I was particularly careful, I thought, I
2    believe this is the -- I believe this is the genesis
3    of these conversations was a full desire to make
4    sure that whatever idea I might have had or an idea
5    that was brought to me, it was fully discussed by
6    all my senior advisors, and Mr. Quinlan was among
7    them, my political consultants, to just test the
8    idea to see what others who I believed had
9    experience, know-how, knowledge, thought of it.
10          Well, I can say this since this is voir dire,
11   Judge:  I mean, they liked the idea, some of them,
12   they didn't like others, but no one ever said you
13   can't do it, it's illegal.
14          Whenever there was a discussion on something
15   that was indicated as not being legal, we dropped
16   the idea and moved on.  I was determined to make
17   sure I followed the law when I made my ultimate
18   decision.
19          And, again, these discussions were
20   brainstorming discussions, exploring ideas, and they
21   were my kind of way of trying to end up in the best
22   place considering a variety of options, because I
23   felt that this was a unique opportunity, that I
24   should give strong consideration to and basically
25   raise a whole bunch of ideas, throw them out, end up

R. Blagojevich - voir dire examination by Goldstein  4158

1  with good ones.

2      MR. GOLDSTEIN:  That's all I have.

3      THE COURT:  What about the middle one?

4      MR. GOLDSTEIN:  Sorry, the middle one?

:00AM  5      THE COURT:  Yeah, you had all these

6  conversations and what he knew about history, but

7  you never asked him about his personal experience in

8  politics.

9      MR. GOLDSTEIN:  Oh, I'm sorry.

:01AM  10 BY MR. GOLDSTEIN:

11 Q  Explain how your personal experience in politics

12 and government formed your state of mind as to the

13 issue of the Senate seat.

14 A  I used to sometimes privately vent to Patti and

:01AM  15 others how disappointing it was sometimes for me as

16 governor where you would try to sit down and think

17 you could persuade another political figure in a

18 high place who had the power to do something on just

19 the righteousness of what you're trying to do, and

:01AM  20 that would never persuade them.  Everything was a

21 deal.

22      You couldn't just make the argument "look,

23 it's the right thing to do for healthcare for

24 children" because there was always something else

:01AM  25 that these political leaders wanted, and that's sort

1 of the nature of the business.

2       So, for example, with the All Kids program,

3 part of the deal for me to get the All Kids program

4 in the budget of 2005 was I had to support something

:01AM 5 that I was against.  And actually big supporters of

6 mine, the trial community, trial lawyers community,

7 the democrats were getting hit in places like

8 southern Illinois on the issue of medical

9 malpractice reform and both Speaker Madigan and

:02AM 10 Senate President Jones were concerned about their

11 downstate members.  As part of their concern, they

12 wanted to actually pass a law that would put caps on

13 medical malpractice damages.  All three of us, at

14 least Madigan and I, philosophically, were on the

:02AM 15 other side of that issue.  All of us three democrats

16 raised a lot of money from the trial bar.  I think I

17 raised something like a million dollars in the first

18 election, in that area.

19       And so part of their agreement to support my

:02AM 20 budget that was going to get me All Kids, I had

21 agreed to sign a bill that would limit caps on

22 damages though I was philosophically not for it.  To

23 me, that was the nature of the business.

24       That was constantly the case when I was

:02AM 25 governor, that we'd have to horse trade and get

1   results.  And sometimes, in my experience, there
2   would be these additional things that these
3   legislative leaders and others would want.  Some of
4   them would ask for jobs for political supporters,
5   appointments of their political supporters, some of
6   them even asked for things for their family.  Those
7   were sort of things that went along with the
8   process, and so it was my experience as the
9   governor, that was very much front and center.
10          As a congressman I saw that, too.  I was able
11  to get a post office named after a slain Chicago
12  police officer on Kedzie and Grace.  It seemed like
13  a not too difficult thing to do, yet when I went to
14  then Chairman of the Judiciary community, Henry
15  Hyde, a very good person, a very good man who was
16  for the idea, though he told me at the time there
17  was never a post office named after a slain police
18  officer.  He said to me, you know, if I do this for
19  you, help you get this done, I'd like you to
20  support, my recollection is, I believe a federal
21  judge in Alabama who wanted to post the Ten
22  Commandments.  And it was a very controversial
23  issue, it's one of these social issues that the
24  conservatives wanted to raise, and I was happy to
25  support that, and Henry Hyde was able to get my Post

R. Blagojevich - voir dire examination by Goldstein   4161

1   Office.
2        Again, there are just so many examples, if
3   given the opportunity, I can keep talking about it.
4   I don't want to bore you here.  But that was clearly
5   my understanding and my personal experience that
6   these are the sorts of things that are expected.
7   And I felt, part of me felt that I had a
8   responsibility to try to explore these ideas to see
9   that I can do the best I could with the potential
10  Senate seat.  And we discussed personal things, but
11  those didn't survive.
12       THE COURT:  You wish to examine?
13       MR. SCHAR:  No.
14       THE COURT:  You can step down.
15       (Brief pause.)
16       THE COURT:  Okay.  Mr. Schar.
17       MR. SCHAR:  If we could have just one minute
18  to talk?
19       THE COURT:  Sure.
20     (Brief pause).
21       MR. SCHAR:  Judge, of the three, it seems
22  very clear that two and three have no place in this
23  trial.  It's impossible to -- first of all, many of
24  those examples are not even on point with the
25  situation here.  Some of them are clearly legal,

:04AM
:04AM
:04AM
:05AM
:06AM

R. Blagojevich - voir dire examination by Goldstein    4162

1    some of them are potentially illegal, and it's

2    impossible for us to test the entire situation for

3    the accuracy of them.  And it's 403, it inserts

4    defenses in the case that are inappropriate.

5          As to the issue of the first, I mean, I

6    assume he can opine -- I shouldn't assume anything.

7    Obviously, his understanding -- I mean, I think it

8    needs to be clear to the jury whether he thought it

9    was legal or illegal does not ultimately matter, as

10   a matter of law; that's not the standard.

11         He's already inserted, obviously, his view at

12   some level in this case that he thinks clearly, and

13   also inserting some advise, a back-door advice of

14   counsel defense in a certain way the fact that no

15   one objected, again which we've heard which is not a

16   proper advice of counsel argument.

17         And so clearly he's going to be able to opine

18   that he thought it was legal or even if he thought

19   what he was doing was appropriate in any way even if

20   he doesn't use the term "legal," then we want to be

21   able to obviously vigorously challenge that as well,

22   but clearly the last two are just a morass, it's

23   just going to bog down.

24         THE COURT:  You want to respond?

25         MR. GOLDSTEIN:  Yes, I think we're confusing

R. Blagojevich - voir dire examination by Goldstein  4163

1  some issues, one is the challenge of the factual

2  issues here.  This is not an advice of counsel case,

3  this is an intent case, this is a state of mind

4  case, this is a good faith case.  Whether the

5  witness believed something that the government

6  thinks that he shouldn't have believed, that's fine

7  and they can cross him on that, and I'm sure they

8  will; that doesn't matter, though.

9          If this individual reasonably believed these

10 things, that goes to the heart of the entire case,

11 and he has the right to explain what --

12         THE COURT:  Believed what?

13         MR. GOLDSTEIN:  I'm sorry?

14         THE COURT:  This is my problem, believed

15 what?  His historical recitation involved some

16 things which I think are generally accepted as true,

17 some things which are, at least the current state of

18 the historical record, speculative.

19         This stuff about his experiences actually in

20 doing stuff in political life about "you vote for my

21 bill and I vote for yours" is not analogous to the

22 issues that we're dealing with here.  And it is, not

23 surprisingly, quite vague; no names, no places, no

24 specificity.  Don't blame him for that, but it

25 doesn't make your case, it's just a bunch of

:08AM

:08AM

:08AM

:09AM

:09AM

R. Blagojevich - voir dire examination by Goldstein   4164

1  irrelevant stuff.

2       The part that Mr. Schar is talking about,

3  which is really the most important part for you, is

4  his honest belief that it was legal based on what

:10AM 5  everybody agrees he heard, because it's on tape.  No

6  dispute that he failed to hear this stuff.  And

7  you're carefully confining your basis to that, not

8  only because you don't want to get in a position

9  like the one that the defendant arguably opened

:10AM 10  yesterday, and I'm not making a determination, as to

11  other legal advice he had gotten, it's very vague.

12  He did not confine his statements to exactly what we

13  heard on tape when he was talking about it

14  yesterday, but I'm not really concerned about that

:11AM 15  now.

16       So what you've got is is his assertion that

17  because of those conversations, he believed it was

18  legal.  So it's not all of the conversations he may

19  have had, it's just what's on the tape, which is, I

:11AM 20  think, something that is open to you to limit right

21  now.  I don't think what he did yesterday made it

22  absolutely clear that he was -- or even particularly

23  clear that he was relying on stuff not only that was

24  on tape but other stuff.

:12AM 25       So I accept that you're asking him if he

R. Blagojevich - voir dire examination by Goldstein  4165

1  honestly believed that it was legal, and his only
2  basis for believing it was legal is the stuff the
3  jury has already heard.  That proposition itself
4  presents a little bit of difficulty because it's
5  probably pretty clear that he heard other stuff, as
6  well.  And I don't know that it'll be all that easy
7  to separate in his own mind his honest belief at the
8  time based solely on the taped conversations,
9  because based on what has been discussed in this
10 case, before this trial, and throughout the course
11 of this case is, he was talking to other people at
12 the time.
13        So what you're basically getting is something
14 that looks like a hypothetical question.  The
15 question maybe should be phrased:  Governor, is your
16 opinion that this was legal based entirely and
17 solely on the conversations that have been taped?
18        A tough question to answer because it's
19 really a hypothetical question, and so it's a
20 hypothetical question because there is more there.
21 Some of it is protected by attorney-client
22 privilege, some of it may not be.  So you've got
23 somebody who you want to confine to a question that
24 essentially doesn't relate to anything, anything
25 that was a real life circumstance at the time.

:12AM

:12AM

:13AM

:13AM

:14AM

R. Blagojevich - voir dire examination by Goldstein   4166

1         MR. SOROSKY:  Can we say the tapes --
2         THE COURT:  Wait.  Wait.
3         The basic problem is, you're asking him that
4    on a series of days prior to December 9th he
5    honestly believed it was legal to do what he was
6    doing.  And most specifically, it was legal with
7    respect to the 501(c)(4), which presents a
8    significant legal difficulty for the defense in this
9    case because the 501(c)(4) means money in his
10   pocket, not changing a vote for a vote, not changing
11   an appointment for political support, for policy
12   issues, it's money in his pocket.
13        MR. GOLDSTEIN:  It's not entirely true.
14        THE COURT:  It doesn't matter if it's
15   entirely true, if it's partially true it's a problem
16   for you, and you know it's a problem for you.
17        Now, let's say he says "I honestly believed
18   it was legal at the time," how does that back up
19   into and link with this stuff that's on the tape?
20   Because his belief at the time must be based, must
21   at least be influenced or have the potential of
22   being influenced not only by what was recorded but
23   by whatever else he was dealing with at the time.  I
24   don't think you can get to that any other way.  All
25   which leads me to the point that the government has

:14AM

:14AM

:15AM

:15AM

:15AM

R. Blagojevich - voir dire examination by Goldstein   4167

1  not yet raised but they surely will raise, and that
2  is what doors are you opening.  Because his basic
3  proposition is, I honestly believed at the time I
4  was doing this stuff it was legal.

5          Bear in mind, I'm assuming for purposes of
6  this that this honest belief that it was legal is
7  admissible in this case because, as you remember the
8  case I have often cited with respect to this, which
9  is United States versus Cheek, there is a specific
10 law with respect to that which says you can't
11 convict somebody of tax evasion if they had a good
12 faith belief that they were not evading taxes.

13         There are plenty of instances in the criminal
14 code where it's no defense where you thought
15 something you were doing was completely legal; it's
16 a crime, period.  There's some statutes, for
17 example, that will reduce the level of the offense,
18 manslaughter is one of them, imperfect self-defense,
19 you didn't reasonably believe you were acting in
20 self-defense but you did believe it, ergo it's not
21 murder, it's manslaughter; we have a few of those.

22         But leaving all that aside, how do you get to
23 asking the questions "did you honestly believe it
24 was legal" without opening the door to a series of
25 questions about why he exactly thought that, who he

R. Blagojevich - voir dire examination by Goldstein   4168

1   had talked to, were there other lawyers you talked

2   to; in addition to what we hear on the tape, were

3   there other persons you spoke to that told you this

4   was legal.  It may even open the door to the

5   question of:  Look, they told you at one point in

6   time that you shouldn't do something and yet again

7   you suggested it despite the fact that they gave you

8   a hint, maybe a very strong hint, that it was

9   illegal and you raised the same possibility in

10  another conversation.  Had you, for example, talked

11  to another lawyer in the interim and reached this

12  conclusion?  Did you ever ask anybody directly?

13          This is terrible stuff, I think.  So the

14  basic premise of what you're asking me to do, which

15  is to say let him do this based solely on what

16  conversations are on tape, doesn't work.

17          MR. GOLDSTEIN:  We're not asking for that,

18  we're asking for the three reasons we stated.

19          THE COURT:  Well, the two and three are out.

20          MR. GOLDSTEIN:  Why is that?

21          THE COURT:  It's out because, first of all,

22  they are not necessarily analogous.  Second of all,

23  it's extremely vague.  And third of all, what he's

24  dealing with is a discussion, a fully discussed

25  issue, about what he should do, under what

:18AM

:18AM

:18AM

:19AM

:19AM

R. Blagojevich - voir dire examination by Goldstein  4169

1  circumstances, and you have somebody--and this is
2  not exactly an elephant in the room but it is a
3  large animal in the room--in which he just never
4  says to anybody on tape:  Is this legal, can I do
5  this, should I talk to another lawyer, is there an
6  expert here.
7       Basically his contention is that nobody said
8  to him it's illegal and therefore he was justified
9  in thinking it was legal, the rest of it is a bunch
10  of analogies that I don't think work.  And I'm not
11  so sure, and this is the last thing we're going to
12  address, whether his belief in legality belongs in
13  the case.  So maybe you want to address that, too.
14  And since it's the government's position that it
15  doesn't, we'll let them talk first.
16       MR. SCHAR:  Judge, it's clear the jury is
17  going to be instructed that he does not need to
18  believe that his actions were illegal to be
19  convicted.  So, obviously, there's a line between
20  that and good faith.  It is an intent to defraud
21  situation.  The actual understanding of legality, I
22  think, they tip the scale, beyond that --
23       MR. GOLDSTEIN:  One moment, Judge.
24       MR. SOROSKY:  Your Honor --
25    (Brief pause).

:19AM
:20AM
:20AM
:20AM
:21AM

 1        MS. HAMILTON:  Judge, I would just add, based
 2   on the jury instructions, the good-faith defense
 3   simply means that he did not have the intent to
 4   trade state action for personal benefit.  It has
 5   nothing to do whether he thought it was illegal or
 6   illegal.  And by inserting this concept, it really
 7   provides the jury with something that is not a
 8   defense and shouldn't even be considered as part of
 9   the good faith analysis.
10        MS. KAESEBERG:  Briefly --
11        THE COURT:  Wait.  Wait.
12        You said it kind of fast.  Repeat it.
13        MS. HAMILTON:  The jury instructions that the
14   jury will be given is that good faith simply means
15   that he didn't intend to trade state action for
16   personal benefit.  Whether or not he thought what he
17   was doing was legal is a concept that is not
18   properly before this jury.  It inserts something to
19   them that is not a defense, it's misleading.
20        MS. KAESEBERG:  The jury instruction is
21   actually that good faith is inconsistent with
22   willfulness which is an element of the offense.  To
23   be able to show that -- the government has to prove
24   beyond a reasonable doubt that there's willfulness,
25   that he acted willfully, and good faith is a defense

R. Blagojevich - voir dire examination by Goldstein  4171

1  to that.  In this case, good faith is established by
2  his belief, his honest belief that the things that
3  he was doing was legal.
4          You know, I think there's a problem here
5  which is that the government, and, frankly, the
6  Court, operates from a presumption of guilt.
7  There's not a presumption of innocence in this case.
8  The politics-as-usual argument isn't what's
9  happening here, which to my understanding is the way
10 the Court is interpreting it --
11         THE COURT:  Wait.  Wait.  Wait.  You're
12 telling me the politics-as-usual argument is not
13 being made?
14         MS. KAESEBERG:  I'll explain what I mean.
15         THE COURT:  Okay.  Go ahead.
16         MS. KAESEBERG:  Which is that there's a
17 presumption that i knew I was committing a crime but
18 because all the politicians do it --
19         THE COURT:  No, forget presumption, my
20 question is, what my question was, answer that one.
21         MS. KAESEBERG:  I think I'm answering it, so
22 maybe I don't follow your question.
23         THE COURT:  My question is, your good faith
24 comes from the fact that?
25         MS. KAESEBERG:  That under these

R. Blagojevich - voir dire examination by Goldstein   4172

1  circumstances, through these conversations, through
2  his personal experience, and through his historical
3  knowledge, he understood that he couldn't cross
4  particular lines.  The way that he knew what lines
5  he could and could not cross comes from those three
6  things.  And during the time period of these
7  allegations, he reasonably believed and honestly
8  believed he wasn't crossing any lines based on those
9  three things, and that's good faith, and that good
10  faith is that he honestly thought he was following
11  the law.
12         MR. SOROSKY:  And we also would add, Your
13  Honor, that there are sometimes in the tapes where
14  when governor Blagojevich is speaking to his
15  counsel, and I don't want to get into a whole
16  argument about what type of counsel he was, but his
17  counsel, Mr. Quinlan, and the governor does say on
18  tapes is this legal, I want to do things right.  And
19  Quinlan either says it's okay or goes on and talks
20  about it as if there is a clear indication that it's
21  absolutely correct.
22         And I think if we were in a law school
23  classroom, and I recognize we are not, but if we
24  were, there are two potential defenses:  Advice of
25  counsel and the good-faith defense.  And there isn't

R. Blagojevich - voir dire examination by Goldstein  4173

1  any doubt that the advice of counsel defense is much
2  more specific and much more demanding.  We are not
3  asserting that defense.  However, the government is
4  arguing to Your Honor as if we were and saying we
5  are not meeting the advice-of-counsel requirement.
6         THE COURT:  Actually the government's
7  argument is a little different.  The government's
8  argument is is that you're not actually arguing it
9  directly, you just want the jury to get the idea
10  that he had some advice of counsel, but I think
11  we're past that point.
12         MR. SOROSKY:  But that's not so.  That's not
13  so.  Part of our good-faith defense that we honestly
14  believed that what we were doing is legal and proper
15  would be, "I spoke to Mr. Quinlan and Quinlan told
16  me how we do this or how we go about it," that
17  certainly is a granule of sugar in the governor's
18  mind that what he was doing was legal.
19         And I grant you, it may not be a
20  multimillionaire businessman calling up a very
21  prominent lawyer, making an appointment, paying a
22  huge fee, and saying "can I do this" and the
23  multimillionaire businessman is told by the very
24  prominent lawyer yes, you could do it.  It turns out
25  to be perhaps not the best advise and that

:25AM

:25AM

:26AM

:26AM

:26AM

R. Blagojevich - voir dire examination by Goldstein   4174

1  multimillionaire businessman perhaps has a golden

2  defense, well, prominent attorney "X" told me I

3  could do it, so there is an advice of counsel

4  defense.

5          THE COURT:  You are contrasting with some

6  implicit contrast here that your client, Governor of

7  the state that has spent billions of dollars every

8  year is like a peanut compared to a

9  multimillionaire?

10         MR. SOROSKY:  No, I'm just saying his --

11         THE COURT:  No, I'm commenting on the fact

12 that you picked a multimillionaire businessman.

13         MR. SOROSKY:  Well, those are usually the

14 types of people who have this golden advice of

15 counsel Defense.

16         THE COURT:  Right.  And governors of the

17 fifth largest state in the United States who are

18 also themselves lawyers don't?

19         MS. KAESEBERG:  Well, if I can, part of the

20 point here is that he never believed that what he

21 was doing --

22         THE COURT:  I am --

23         MS. KAESEBERG:  Can I just finish?

24         THE COURT:  I'm not talking about that with

25 Mr. Sorosky, I am addressing the analogy he used

R. Blagojevich - voir dire examination by Goldstein  4175

1  because I think it verges on the economical, but I

2  thought it was nicely done, Mr. Sorosky.  It doesn't

3  work quite in this situation.  That's all we're

4  discussing now.

5          The government's turn.

6          MR. SCHAR:  Judge, if he wants to say that he

7  didn't think he was exchange one for the other, then

8  he can say I didn't think I was exchanging one for

9  the other, but the legality issue has no place, I

10  think Ms. Hamilton explained why.

11          MS. KAESEBERG:  But the point is that there

12  are certain exchanges that are legal or that he

13  believed to be legal based on those three things,

14  and on that belief he has to be able to testify

15  based on Cheek --

16          THE COURT:  No, no, not based on Cheek.

17          MS. KAESEBERG:  Well, because I know that

18  Cheek is a tax case but it's about willfulness.

19          THE COURT:  No, no, no.  Cheek is confined to

20  the tax law.

21          MS. KAESEBERG:  But it's willfulness.

22          THE COURT:  It was confined to the tax law

23  for a very specific reason.  What we are dealing

24  with here and what your client clearly understood,

25  because it's evident from the tape that he clearly

R. Blagojevich - voir dire examination by Goldstein  4176

1 understood it, was you can't exchange one for the
2 other.  He said that, and he said that repeatedly.
3 He said it like really quickly, not one for the
4 other, not connected, things of this sort, that he
:29AM 5 clearly understood he couldn't do that.
6 　　　　And he is perfectly entitled to say, as he
7 said many times on the tape, not one for the other;
8 good faith.  Not honest belief that it was legal.
9 His belief was, quite clearly, at least as expressed
:29AM 10 on the tape, that one for the other was illegal.  He
11 is not claiming that he thought that that was okay.
12 　　　　MS. KAESEBERG:  When he is saying those
13 things on the tape is to other individuals who also
14 had the same understanding of that legal definition.
:30AM 15 　　　　MR. GOLDSTEIN:  Your Honor, the campaign
16 contributions, the whole subjects before this
17 testimony had to do with campaign contributions
18 which he will absolutely say you cannot exchange
19 campaign contributions for state action.  This is a
:30AM 20 different context.  These are jobs, these are
21 appointments, this is different in his mind, which
22 is the only reason we're here is what is in his
23 mind.
24 　　　　And these were questions, to my
:30AM 25 understanding, were presented by Your Honor to

R. Blagojevich - voir dire examination by Goldstein   4177

1  present in our case.  So we actually followed Your

2  Honor's advise, put these questions together --

3          THE COURT:  You think I misled you by citing

4  Cheek?  Down the garden path --

5          MS. KAESEBERG:  It wasn't just Cheek, it

6  was --

7          MR. GOLDSTEIN:  We asked the question you

8  told us to ask a couple of days ago --

9          THE COURT:  The only thing that was left to

10 you was Cheek, and the problem with Cheek for you is

11 is, and the reason Cheek is a tax law case is, the

12 tax laws are very complicated, extremely

13 complicated, you can step over the line in an

14 instant.  The line is not very clear.  So Cheek is

15 broad in its application.

16          In this case, I don't think you and the

17 government are disagreeing about what the line is.

18 The line is one for the other.  And your client says

19 one for the other is not legal, the government says

20 one for the other is not legal --

21          MS. KAESEBERG:  In one context.

22          MR. SOROSKY:  But there are other context

23 where an exchange one for the other is perfectly

24 legal.

25          THE COURT:  Yeah, but, first of all, which

R. Blagojevich - voir dire examination by Goldstein  4178

1  ones does he think are illegal and which ones does
2  he think are legal?
3       MR. SOROSKY:  That's what we want him to
4  testify to.
5       THE COURT:  Well, no, that's not what I
6  heard.
7       MR. SOROSKY:  I guess that's what we're here
8  for trial about.
9       THE COURT:  No, no, obviously there is some
10 stuff that he thinks one for the other is not legal,
11 he says it on the tapes.
12      MR. SOROSKY:  Well, suppose for the sake --
13      THE COURT:  And he said it on the witness
14 stand.
15      MR. SOROSKY:  Suppose for the sake of
16 conversation the governor were to believe it was
17 legal to do what we commonly refer to as the
18 501(c)(4) in return for a Senate appointment,
19 suppose that's his belief.  Isn't he not entitled to
20 relate that belief?  And why --
21      THE COURT:  Let me see that I understand this
22 clearly.  He gets up on the witness stand and he
23 says:  I was, in fact, offering something in my
24 power in exchange for the 501(c)(4), no question
25 about it, it was one for the other, but I cannot be

:32AM
:32AM
:32AM
:32AM
:33AM

R. Blagojevich - voir dire examination by Goldstein  4179

1  found guilty because I thought that was legal.
2  Where does he go with that one?  Because that's
3  where I think you're posing to me, and if I'm wrong
4  about that, tell me.
5       MR. SOROSKY:  Well, I think in the scenario
6  that we have here -- and, by the way, 501(c)(4)
7  delves into your complicated tax code -- not your
8  complicated tax code, but the complicated tax code
9  because it's expression from the tax code 501(c)(4)
10  under the subsection of the tax code.
11       So if any defendant were to testify "I
12  thought that that was a legal exchange and talked
13  about it with my advisors, we talked about how best
14  to go about it, that's another granule of sugar why
15  I thought it was legal," and to use the blasphemy,
16  if I could borrow a phrase from religion, no one
17  ever told me it was illegal and I had this whole
18  cadre of advisors and experienced people, I think
19  that does show some intent in the defendant's mind
20  that he did not -- he was acting in good faith and
21  did not have any intent to violate the law.
22       MS. HAMILTON:  It's not the intent that is
23  relevant.  For example, on the honest services
24  charges, the intent that is relevant is whether or
25  not he had the intent to defraud the citizens of his

R. Blagojevich - voir dire examination by Goldstein   4180

1  honest services because he was trying to get a
2  personal benefit in exchange for a state action.  On
3  the hypothetical that you gave, by admitting I was
4  going to do this state action in exchange for a
5  501(c)(4), if that is a personal benefit, he is
6  admitting to the intent to defraud.  It does not
7  matter if he thinks what he is doing is legal unless
8  he had an advice of counsel defense.  Without the
9  advice of counsel defense, the add-on of "yes, I had
10 this intent to defraud but I thought it was legal"
11 is misleading and irrelevant to the jury.
12         THE COURT:  Okay.
13         MR. SOROSKY:  He is not saying he had an
14 intent to defraud --
15         THE COURT:  The point is we're talking about
16 my hypothetical question, and since Mr. Sorosky said
17 this is like a law school discussion, I believe his
18 answer to the hypothetical is significantly less
19 accurate than the prosecution's answer of my
20 hypothetical.
21         And I just asked the question because I want
22 to make it clear precisely what it is we're talking
23 about.  And what we're talking about is not his
24 basic view of legality, it's his basic view of -- or
25 to put it another way, if he doesn't know, perfectly

R. Blagojevich - voir dire examination by Goldstein  4181

1 convinced that it's a legal transaction or he
2 doesn't know one way or the other and he's
3 exchanging one for the other for his personal
4 benefit, he's in the same box that everybody else is
5 in who didn't know it was illegal when they did it,
6 but they did it, and they did it with the purpose
7 which makes it illegal under the law.
8      I don't see the admissibility of his general
9 proposition that it was legal.  I see the
10 admissibility of his basic belief that he was acting
11 in good faith, but his legal opinion doesn't count,
12 so it's out.
13      And in all honesty, I'm not too sure you're
14 hurt by it because I think lots of doors are open,
15 but that's a hypothetical observation of no
16 significance.
17      MR. GOLDSTEIN:  Your Honor, what you're
18 saying is, the questions that are permissible are
19 all those words except in good faith, did you
20 honestly believe that what you were doing, you were
21 doing it in good faith, is that what Your Honor is
22 saying?
23      MR. SCHAR:  What is the "it"?
24      MS. KAESEBERG:  Fill in the blank.
25      MR. SCHAR:  Judge, if they're going to

R. Blagojevich - voir dire examination by Goldstein  4182

1  suggest -- that is the equivalent of suggesting he
2  thought it was legal and did you think in good faith
3  you could do whatever the particular trade might be.
4  The issue is whether he thought he was actually
5  doing the trade, once he says he was doing the
6  trade, then good faith is not a defense to that.
7        THE COURT:  But we know from everything he
8  said thus far, and, in fact, virtually everything in
9  the tape, that he understands that one for the other
10  is not what you should be doing.  He has never said
11  he did one for the other, not in the tapes, not on
12  the witness stand.  And I don't actually understand
13  from the point of view of the defendant in this case
14  why now that he would want to say something so
15  different from what he'd said before which is not
16  one for the other.  And that, in fact, is the
17  argument that he's made all along, and he's done it
18  in the tapes, he said it in direct examination thus
19  far, and he said it more than once.  And basically
20  given his testimony, his position is not one for the
21  other.
22        So what the defense wants to do, as I
23  understand it, is put him in a position where he can
24  say even if it is one for the other, I still acted
25  in good faith, which I don't think he can say.  What

:38AM

:38AM

:39AM

:39AM

:39AM

R. Blagojevich - voir dire examination by Goldstein   4183

1   he could say is, or what he wants to say is, one for

2   the other is legal.  But the problem with that is,

3   he's got that instruction which says he doesn't have

4   to know it's legal.  So the fact that what he thinks

:40AM   5   is legal or illegal -- or the fact that he thinks

6   it's legal, maybe the fact that he thinks it's

7   illegal is not so good for him, but the fact that he

8   thinks it is legal is not relevant here.

9           So my ruling is my ruling:  His opinions

:40AM   10  about the legality of something is out, and I don't

11  want to see that by implication.

12          His position stated thus far, or what the

13  position that the law opens to him is, he didn't

14  think it was one for the other, which is fine and

:40AM   15  consistent with his position all along before he was

16  ever arrested, that it wasn't one for the other.

17          MR. SCHAR:  My only concern, Judge, is the

18  way the question is being formulated to suggest the

19  legality to it as opposed to, in good faith I didn't

:41AM   20  think I was trading one for the other as opposed to

21  in good faith I thought I could do this.

22          THE COURT:  What I think you mean to say is,

23  he's perfectly free to say I thought I could do this

24  because I didn't think it was one for the other.

:41AM   25  That's what he can say and that's what we're going

R. Blagojevich - voir dire examination by Goldstein   4184

1   to limit it to.  And I think that that is, in the
2   context of the law, a better alternative than the
3   other thing that sort of falls in the fight fire
4   with fire ruling law mostly frowned on, which is "I
5   said it was legal" and "well who told you it was
6   legal," and then the entire sphere of the advise he
7   received over the years is opened up.  It sounds
8   kind of like something that might work on the street
9   but it doesn't work in the courtroom because it's
10  not anchored with legal principles that we're
11  operating under.  So I've made my ruling.
12          With that, I think we're ready.
13          MR. SOROSKY:  Could we have a five-minute
14  recess?
15          THE COURT:  Absolutely.
16          MR. SOROSKY:  Just to digest all this.
17          THE COURT:  You can have more than
18  five minutes because this may have altered your
19  plans.
20          MR. SOROSKY:  Thank you.
21          THE COURT:  Fifteen minutes.
22          MR. SOROSKY:  Thank you.
23      (Recess.)
24          THE MARSHAL:  All rise.
25      (The following proceedings were had in the

R. Blagojevich - direct by Goldstein          4185

1      presence of the jury in open court:)

2         THE COURT:  Please be seated.

3         Do you understand you're still under oath?

4         THE WITNESS:  Yes, Judge.

:22AM  5         THE COURT:  You can proceed.

6         MR. GOLDSTEIN:  Thank you, Your Honor.

7            DIRECT EXAMINATION (resumed)

8  BY MR. GOLDSTEIN:

9  Q   Now, Rod, yesterday we spoke a little bit about

:23AM 10  the Senate seat, okay.  I want to ask you some

11  questions and go back just a little bit.

12         Rod, did you ever decide who you were going

13  to appoint to the Senate seat?

14  A   No.

:23AM 15  Q   Did you ever decide what you wanted to do with

16  regards to the Senate seat?

17  A   No, I never got there.

18  Q   Did you ever attempt to shake down anybody for

19  the Senate seat?

:23AM 20  A   Absolutely not.

21  Q   Did you ever threaten anybody in exchange for the

22  Senate seat?

23  A   Absolutely not.

24  Q   Did you ever demand anything in exchange for the

:23AM 25  Senate seat?

R. Blagojevich - direct by Goldstein                    4186

1  A   Absolutely not.

2  Q   Now, you talked about -- you were talking a lot

3  this time period and a lot of it had to do with the

4  Senate seat, is that right?

5  A   What was that question again?

6  Q   You talked about how you spoke a lot during this

7  time period of, let's say, mid October to

8  December 9, 2008, about the Senate seat, is that

9  right?

10  A   Talked a lot about the Senate seat, yes.

11  Q   These discussions you had about the Senate seat,

12  did you have them in good faith?

13  A   Yes, I did.

14  Q   Now, you --

15          MR. GOLDSTEIN:  May I approach, Your Honor?

16          THE COURT:  You may.

17  BY MR. GOLDSTEIN:

18  Q   I'm showing you defense exhibit group photos

19  number 1.

20          Look through the binder photos and when

21  you're done, please let me know.

22      (Brief pause).

23  BY MR. GOLDSTEIN:

24  Q   And just briefly let's go to the first one.

25          Who is depicted in the first picture?

1  A   John Harris.

2  Q   And the second, who is depicted?

3  A   That's Bill Quinlan.

4  Q   And the third picture?

5  A   That is Bob Greenlee.

6  Q   And in the fourth picture, who is depicted?

7  A   That's Bill Knapp.

8  Q   And in the fifth picture, who is depicted?

9  A   Fred Yang.

10 Q   And in the sixth picture?

11 A   That's Doug Scofield.

12 Q   Are those true and accurate depictions of the

13 individuals that you've just identified?

14 A   Yes.

15         MR. GOLDSTEIN:  Your Honor, we ask to admit

16 Defense Exhibit Group Photos Number 1.

17         MR. SCHAR:  No objection, Your Honor.

18         THE COURT:  Admitted.

19      (Defendant's Exhibit Group Photo Number 1 was

20       received in evidence.)

21 BY MR. GOLDSTEIN:

22 Q   Now, Rod, you mentioned that much of your work

23 and many of your phone conversations were from home,

24 is that correct?

25 A   Yes.

R. Blagojevich - direct by Goldstein            4188

1   Q   And in particular, where did a lot of your phone
2   conversations take place?
3   A   Is your question where?
4   Q   Where in the house.  I'm sorry.
5   A   All over the house.  At different times,
6   different places.
7   Q   And in particular, did you talk on the phone in
8   your study?
9   A   My library.
10  Q   Your library.
11  A   Yes.
12      MR. GOLDSTEIN:  May I approach, Your Honor?
13      THE COURT:  You may.
14  BY MR. GOLDSTEIN:
15  Q   I'm showing you Defense Exhibit Photos Library,
16  Blagojevich Library.
17      Do you recognize those photos?
18  A   Yes, I do.
19  Q   And what are those photos of?
20  A   This is the photos of the little library that we
21  have in our home that has all my books and my
22  history and I like to work out of here a lot and
23  it's a very comfortable, warm place, and I love the
24  smell of old books, so I like to work out of there.
25      MR. GOLDSTEIN:  Your Honor, ask to admit

R. Blagojevich - direct by Goldstein          4189

1  Defense Exhibit Photos of Blagojevich Library.
2          MR. SCHAR:  No objection, Judge.
3          THE COURT:  Without objection, admitted.
4        (Defendant's Exhibit Photo Blagojevich Library
5         was received in evidence.)
6          MR. GOLDSTEIN:  Permission to publish?
7          THE COURT:  You may publish.
8        (Exhibit published to the jury.)
9  BY MR. GOLDSTEIN:
10 Q   Now, as the photos are coming up, this photo,
11 Rod, what does this depict?
12 A   Well, this is a part of that room that I -- is --
13 the library in our house, and this is the -- this is
14 the northeast corner of the room, and there's
15 different books in there.
16          There's my bust of Winston Churchill, do you
17 see it?
18          MR. GOLDSTEIN:  Can you zoom in there?
19          (Brief pause.)
20 BY MR. GOLDSTEIN:
21 Q   Is that him right there?
22 A   Yup; blood, toil, tears and sweat.
23 Q   And you talked about how history is so important
24 to you, is that right?
25 A   Yes.

R. Blagojevich - direct by Goldstein          4190

1  Q   And Winston Churchill is someone that you looked
2  up to, is that right?
3  A   Very much so.  One of my biggest heros in
4  history.
5  Q   Okay.  And you have a lot of books.  A lot of
6  these are history books, is that right?
7  A   Yes, of -- I think -- well, a lot of them are,
8  probably the majority of them, but there are other
9  books in there.  Charles Dickens, a collection of
10 Charles Dickens, there's Shakespeare, and some
11 American authors like Hawthorn and others.  There's
12 different ones.  There's some philosophy books, I
13 have a few Bibles in there.  There's books on
14 religion.  There's a real good book called God's
15 Politics --
16         Is he going to do that?
17         MR. SCHAR:  (Counsel standing.)
18 BY THE WITNESS:
19 A   I'll withdraw that.
20 BY MR. GOLDSTEIN:
21 Q   Rod, did you read all those books?
22 A   I'm under oath, right?  No, but I have to say, I
23 actually read, you know, a pretty good number of
24 them, and for better or for worse.
25 Q   Go to the next photo.

1          And what does this photo depict?

2   A  Well, this is the -- this would be the north --

3   or the south -- the southwest corner of the room.

4   There's the little fireplace there.  That's a

:29AM 5   working fireplace.  These are more books.  That's a

6   bust of Shakespeare behind me.  And there's a

7   collection of works by Charles Dickens here, these

8   are Shakespeare books over here.  Over there at the

9   top, that Dickens up at the top, there's history

:29AM 10   books there.

11   Q  And do you see that phone right there?

12   A  Yeah, that's --

13   Q  Is that the phone that you used a lot in regards

14   to a lot of these phone conversations?

:29AM 15   A  Yes, that's where I sat and I was on the phone

16   when I spoke to Rahm Emanuel on Saturday, November

17   the 8th.  This is where I sat on Wednesday, November

18   the 5th, at about 10:00 o'clock in the morning when

19   I had a long conversation with Speaker Hastert

:30AM 20   discussing what to do with the Senate seat and how

21   to handle it.

22          This is the place where I sat and had a large

23   number of the telephone conversations, but this is

24   was not nearly the only place.  I would pretty much

:30AM 25   be on the phone just about every part of the house

1  at different times.

2  Q   Now, I want to turn your attention to November

3  1st, 2008.

4  A   Okay.

5  Q   On that date you had a series of conversations

6  regarding the senate seat, is that right?

7  A   Yes.

8  Q   And on November 1st, 2008, did you have a

9  conversation in the morning with Robert Greenlee?

10 A   Yeah, I believe I did, yes.

11 Q   And in that conversation with Mr. Greenlee, did

12 you ask him to start jotting down a list that you

13 would like in terms of Lisa Madigan and that

14 proposed deal that you talked about?

15 A   Yes, I did.

16 Q   And on that same day, a little later in the

17 morning, did you have a conversation with Bill

18 Quinlan?

19 A   I believe I did, yes.

20 Q   How often did you speak to Bill Quinlan?

21 A   I would speak to Bill Quinlan constantly and

22 continuously, I think, on average three times a day,

23 some days I would speak to him five times a day,

24 there may be days where I spoke to him more than

25 that.

:30AM
:30AM
:31AM
:31AM
:31AM

1      These are just over the telephone, there
2  would be other times I would be with him in person.
3  But I would say, comfortably on average, three times
4  a day, including weekends, Saturday and Sundays.  So
5  if you would take all seven days and quantify them,
6  those phone calls with Quinlan would reach an
7  average of somewhere around three times a day.
8  Q   And during this conversation you had on November
9  1st, 2008, a little later in the morning, did you
10 talk about the Senate seat with Mr. Quinlan?
11 A   Yes, I did.
12 Q   And did you talk to Mr. Quinlan frequently about
13 the Senate seat?
14 A   Yes; I spoke to Bill Quinlan about the Senate
15 seat throughout this whole period of time and even
16 before this period of time, constantly,
17 continuously, repeatedly, and repetitively.
18 Q   And did you talk to Mr. Quinlan on this
19 conversation about possibly having president-elect
20 Obama contribute a lot of money for the State of
21 Illinois regarding the Senate seat?
22 A   Yes, that was a conversation where I raised the
23 issue with Bill Quinlan that if, in fact,
24 president-elect had a candidate that he was
25 interested in the Senate seat, that we might be able

1    the leverage that for billions of dollars of federal
2    money for the State of Illinois.
3    Q   And that was a conversation you had with Quinlan
4    on this, is that right?
5    A   To the best of my recollection, that's correct,
6    yes.
7    Q   And in discussing the Senate seat some more, did
8    Mr. Quinlan tell you, "I mean, either way, we've got
9    a ton to bargain with, it's just a question of how
10   bad, you know, how engaged is Obama in it, how much
11   does he care about it, you know, probably whoever
12   wants it, how badly does he want to push for them,"
13   did Mr. Quinlan tell you that?
14   A   Yes.
15           MR. SCHAR:  Objection, Judge.
16           THE COURT:  It can stand.
17   BY MR. GOLDSTEIN:
18   Q   Did this conversation with Mr. Quinlan on
19   November 1st impact the way you viewed the Senate
20   seat issue?
21   A   Yes.
22   Q   Now, on November 1st, had you made any decisions
23   regarding the Senate seat?
24   A   No, I hadn't.
25   Q   And is it fair to say on November 1st, that you

:33AM
:33AM
:33AM
:34AM
:34AM

1 discussed various candidates, is that right?

2 A   Yes.

3 Q   Now, if we can turn to November 2nd, 2008.

4        Had you made any decisions regarding the

5 Senate seat on November 2nd, 2008?

6 A   No.

7 Q   Had you decided -- I'm sorry.

8        Had you considered or discussed any potential

9 candidates on November 2nd, 2008?

10 A   Yes.

11 Q   Now, I want to turn your attention to

12 November 3rd, 2008.

13        Did you have some conversations with

14 Mr. Greenlee on November 3, 2008?

15 A   Yes, I did.

16 Q   And during those conversations, did you talk

17 about putting together a list of things you may want

18 to do before you appointed yourself to the Senate

19 seat?

20 A   I believe I did, yes.

21 Q   Are you sure of that?  Would anything help

22 refreshing your recollection?

23 A   Yes.

24        MR. GOLDSTEIN:  May I approach, Your Honor?

25        THE COURT:  You may.

1  BY MR. GOLDSTEIN:

2  Q   I'm showing you two groups of documents, Rod.

3  Look through these documents and when your memory is

4  refreshed as to the conversation you had with

:35AM   5  Mr. Greenlee regarding appointing yourself, just

6  look up.

7      (Brief pause).

8  BY THE WITNESS:

9  A   Read the whole thing?

:36AM  10  BY MR. GOLDSTEIN:

11  Q   Just to refresh your recollection.

12      (Brief pause).

13  BY THE WITNESS:

14  A   Yes.

:36AM  15       And what was your question?

16  BY MR. GOLDSTEIN:

17  Q   Did you have a conversation with Mr. Greenlee

18  discussing putting together a list of things you

19  wanted to do before you appointed yourself to Senate

:36AM  20  seat?

21  A   Yes.

22  Q   Okay.  So your memory is refreshed as to that

23  day?

24  A   Yes, we called it Operation Empty the Cupboard, I

:37AM  25  think.

R. Blagojevich - direct by Goldstein          4197

1  Q   Describe for the ladies and gentlemen of the
2  jury -- and let me take that document --
3  A   Well, we didn't call it Operation Empty the
4  Cupboard, I just said develop the list emptying the
5  cupboard.
6  Q   There's no "operation" here?
7  A   Not to my recollection, no.
8  Q   Let me take that back.
9  A   Okay.
10 Q   When you said emptying the cupboard, what did you
11 mean by that?
12 A   That if, in fact, I ultimately decided to make
13 myself the senator, which I had the power to do the
14 moment President Obama resigned his Senate seat,
15 that we should think about different organizations,
16 different schools, different causes, and things that
17 I believed in and liked and --
18       MR. SCHAR:  Objection.
19       THE COURT:  The objection is sustained.
20 BY MR. GOLDSTEIN:
21 Q   On November 3rd, 2008, had you made any decisions
22 with regard to appointing yourself to the Senate
23 seat?
24 A   I made no decision to appoint myself to the
25 Senate seat on November the 3rd, 2008.

1  Q   And later in the morning on November 3rd, did you

2  have a conversation with Bill Quinlan?

3  A   Yes.

4  Q   And did you talk about the Senate seat with

5  Mr. Quinlan?

6  A   Yes.

7  Q   And in this conversation about the Senate seat,

8  did Mr. Quinlan tell you, after you said "he wants

9  Valerie Jarrett regarding Obama, it looks like," did

10  Mr. Quinlan tell you, "fine, the more interested he

11  is, the better it is for you, do you know what I

12  mean," did Mr. Quinlan tell you that?

13  A   Yes.

14  Q   Now, when Mr. Quinlan told you that, did that

15  help frame your state of mind with regards to the

16  Senate seat?

17  A   Yes.

18          MR. SCHAR:  Judge, we're going to object.

19          THE COURT:  The objection is sustained.

20  BY MR. GOLDSTEIN:

21  Q   Were your conversations with Mr. Quinlan

22  influential in the process of trying to make a

23  decision regarding the Senate seat?

24          MR. SCHAR:  Objection.

25          THE COURT:  The objection is sustained.

R. Blagojevich - direct by Goldstein          4199

1  BY MR. GOLDSTEIN:

2  Q   Now, if we could --

3        MR. GOLDSTEIN:  Can I approach, Your Honor?

4        THE COURT:  You may.

:39AM    5  BY MR. GOLDSTEIN:

6  Q   I want to go over the bigger binder, Rod.

7        MR. GOLDSTEIN:  If everyone can turn to tab

8  7, please.

9        THE COURT:  Tab what?

:39AM   10        MR. GOLDSTEIN:  7.

11        THE COURT:  7.  Thank you.

12      (Brief pause).

13        MR. GOLDSTEIN:  Is everyone there?

14  BY MR. GOLDSTEIN:

:40AM   15  Q   We talked a little bit about tab 7, Rod, so I

16  want to start from where we left off.

17        There was a discussion about a process, do

18  you recall that discussion on November 3rd, in this

19  tab 7?

:40AM   20  A   Yes.

21  Q   Okay.  When Mr. Harris was talking about a

22  process, was a process developed at this time on

23  November 3rd, 2008?

24  A   You're on the first page, is that where you are?

:41AM   25  Q   Yes.  I'm sorry.  I apologize.

1  A   No, it was still work in progress, but the -- the
2  basic idea was formed.
3  Q   And what was the basic idea that was formed?
4  A   The issue was, there would be a process that
5  would be a public process, then there would be a
6  process that we would have internally.
7       The internal process would mirror the public
8  process so that it was not misleading, but there was
9  an element that was a little bit different as events
10 unfolded.
11 Q   What was the internal process?
12 A   The internal process was still a work in
13 progress, it hadn't been completely done, but it was
14 basically that this was a unique opportunity having
15 a chance to appoint a United States Senator, and
16 that I -- I was determined to be, to quote, slow and
17 deliberate in this process.
18       That I envisioned, that we discussed, that I
19 would make a decision sometime before Christmas,
20 that was the original idea, that I was not going to
21 allow outside forces to pressure me into a premature
22 decision, and that we were going to take this time,
23 a slow and deliberate process, to engage in what we
24 call preliminary conceptual discussions.  That we
25 would have all of these discussions where we would

1  gather ideas, talk about ideas, we would collect

2  ideas, measure one idea against the other, and that

3  we would gather potential options, discuss those

4  options, and also discuss them one in connection to

5  the other.

6         And that we would do, when it came to these

7  discussions and these ideas, a lot of brainstorming,

8  a lot of exploring, and I invited and encouraged a

9  lot of creative thinking.  And that we would --

10 basically the best way to get good ideas is to get

11 lots of ideas and throw them out.

12 Q   Was that a principle that you used in trying to

13 make the decision regarding the Senate seat?

14 A   That was the principle that was -- that was

15 stated from the very beginning, that we wanted to

16 gather -- the way to get good ideas is to get a lot

17 of ideas and throw them out.  And that's not me

18 saying that, that's a Nobel prize winning scientist

19 --

20         MR. SCHAR:  Judge, we're going to object.

21 It's not responsive to the question.

22         THE COURT:  That is just beyond what was

23 responsive to the question.  I'm sustaining the

24 objection.

25 BY MR. GOLDSTEIN:

R. Blagojevich - direct by Goldstein          4202

1  Q   On Page 3, Rod, I think that's where we left of
2  yesterday.
3  A   Yeah.
4  Q   On line 12, you said:
5      "What can I honestly think I could, I might have
6       a shot at getting."
7      Harris says:
8      "Ah, well, besides good things for Illinois,
9       ah, good things for Illinois, ah."
10         What were you saying what can I honestly
11 think I could, might have a shot at getting, what
12 were you saying there?
13         MR. SCHAR:  Objection.
14         THE COURT:  Objection sustained.
15 BY MR. GOLDSTEIN:
16 Q   Did you respond to Mr. Harris when he said,
17 "well, besides good things for Illinois, good things
18 for Illinois"?
19 A   Yes, I did.
20 Q   And what did you say?
21         MR. SCHAR:  (Counsel standing.)
22         THE COURT:  Objection sustained.
23 BY MR. GOLDSTEIN:
24 Q   Now, if we could go to the same page, line 28,
25 and Harris says:

R. Blagojevich - direct by Goldstein          4203

1      "What can I realistically get, it really depends
2       on what's our realistic alternative."
3      You say:
4      "Go ahead, who is there."
5      Harris says, "ah," you say, "Bill Daley,"
6      Harris says, "Bill Daley," you say "Lisa
7      Madigan," Harris says "Lisa Madigan," you say,
8      "that's right," Harris says, "ah," you say,
9      "it's Lisa Madigan."
10         Now, when Harris says, "what can I
11  realistically get, it really depends on realistic
12  alternatives," what did you understand Mr. Harris to
13  be saying there?
14  A   What John Harris is saying is that he's answering
15  my question, what can I honestly get.  And then when
16  he said "besides good things for people of Illinois"
17  what I answered there, which I probably can't say.
18  So then he goes on to continue that conversation,
19  "what can I realistically get," he says "it depends
20  upon what a realistic alternative is," he is
21  suggesting the idea that that should be measured
22  against something else.
23         I threw out Bill Daley, who is Mayor Daley's
24  brother who is now President Obama's Chief of Staff,
25  and Harris said Bill Daley but I threw out Lisa

R. Blagojevich - direct by Goldstein          4204

1  Madigan, again the ideas were coming out.

2          And, again, the way I -- a lot of how I

3  reach, come to an idea is --

4          MR. SCHAR:  I'm going to object as

5  nonresponsive.

6          THE COURT:  The objection is sustained.

7  BY MR. GOLDSTEIN:

8  Q   You go further and "Bill Daley" is repeated twice

9  and Lisa Madigan is repeated twice, and you say

10  "that's right, it's Lisa Madigan," what were you

11  saying there when you said "that's right, it's Lisa

12  Madigan"?

13  A   That's right, Lisa Madigan is a credible

14  alternative.  In other words, that's something, that

15  deal with her father for a jobs bill for healthcare

16  and a promise not to raise the income taxes on the

17  people was very much on my mind.

18          And a credible alternative, in my mind, meant

19  just that, that that is something I would do.  And

20  that that measured against other possibilities, that

21  perhaps President Obama might be willing to do would

22  be part of this whole process to reach the best

23  decision I could.

24  Q   Now, at this time, November 3rd, 2008, was Lisa

25  Madigan a potential candidate in your mind in terms

:45AM

:46AM

:46AM

:46AM

:46AM

1  of the Senate seat?

2  A  She was very much.

3  Q  Now, if we go to Page 4 -- we're on Page 4.

4  Sorry.

5       Line 23, and you say:

6    "Do me a favor, look up Health and Human

7     Services, who, who's been there before, Tommy

8     Thompson, all these people, right."

9       What were you saying there, Rod?

10  A  I was asking John Harris if he could look up who

11  the previous secretaries of Health and Human

12  Services were, the cabinet position.

13       I knew that Tommy Thompson had been because I

14  had lobbied him when I was governor and he was there

15  as President Bush's Health and Human Services

16  Secretary, he had been the Governor of Wisconsin.

17       And so what I was asking John Harris to do

18  was to find out who some of the other predecessors

19  were before Tommy Thompson.  In other words,

20  President Clinton's Health and Human Services

21  Secretary, President Bush's fathers, Ronald

22  Reagan's, and where would we get that information.

23  Q  Why did you want that information?

24  A  I wanted to get a sense of whether or not I

25  measured up, in my mind.  Whether or not my record

1  on healthcare and see how I compared with Tommy

2  Thompson, and before that with Donna Shalela, before

3  that with Marvin Heckler, and before that I think

4  Richard Schweiker who was a senator from

5  Pennsylvania who Reagan made Health and Human

6  Services Secretary.

7  Q   Was Health and Human Services a desire of yours

8  before October 2008?

9  A   Health and Human Services would've been a

10  potential cabinet position that I would have been

11  interested in certainly before the presidential

12  election, but that would have been a natural place

13  in my mind for me to go if I was no longer a

14  governor.

15  Q   And if we turn to Page 5, and if we look on line

16  10, you say:

17      "I mean, what other cabinet position would be

18       not stupid?"  How about UN ambassador,

19       ridiculous?"

20      Harris says:

21      "Yeah, I don't think that is a ridiculous or

22       serious."

23          You say "right," you both laugh, and you

24  say:

25      "S, that would be cool, huh?"

R. Blagojevich - direct by Goldstein          4207

1      Harris says "yeah," and then you say:
2      "Start putting down get Health and Human
3      Services."
4          Now, when you say "I mean what other cabinet
5  position would be not stupid," what were you saying
6  there, Rod?
7  A  Basically I was just asking John Harris' opinion
8  on what might potentially be a realistic place that
9  I might have a chance of going to.  And then I
10  pointed out UN ambassador, which I thought would be
11  a pretty cool place.
12          But when I say "ridiculous," this is the way
13  to get good ideas is to get lots of ideas and throw
14  the bad ones out.  This was I thought had no chance
15  at it.  Although a former governor previously, Adlai
16  Stevenson, was actually a UN ambassador --
17          MR. SCHAR:  Objection, Judge.
18          THE COURT:  The objection is sustained.
19  BY MR. GOLDSTEIN:
20  Q  And when Harris says:
21      "I don't think that's a realistic or serious."
22          You said "right," what do you understand
23  Harris to be saying there?
24  A  I trusted Harris' judgment and agreed with him on
25  that assessment, that I had no chance for Health and

1  Human Services or United Ambassador -- Ambassador to
2  the United Nations.
3  Q   At this time, had you made any decisions
4  regarding Health and Human Services or UN
5  Ambassador?
6  A   I made no decisions about either one of those
7  positions, I was just gathering ideas.
8  Q   Now, if we can turn to tab 8, and if you look on
9  page 1, according to the transcript, what is the
10  date and time of this call?
11  A   This was November the 3rd, 2008, at 1:22 in the
12  afternoon.
13  Q   And who are the speakers on this call?
14  A   It's me and John Harris.
15  Q   And if we look on the same page, line 5, you say:
16     "So Balanoff and Andy Stern are coming in to
17      talk about Valerie Jarrett."
18         What were you saying there?
19  A   I was saying a couple of things.  I was basically
20  saying here it comes, now the -- the emissaries,
21  potential emissaries, purported emissaries, and
22  other third-parties who would be interested in me
23  appointing a senator, that even before President
24  Obama was elected, that this process, this
25  inevitable stampede was coming my way, and that tom

:50AM
:50AM
:50AM
:51AM
:51AM

R. Blagojevich - direct by Goldstein          4209

1  Balanoff and Andy Stern were the beginning of this
2  process, among the early stages of the people who
3  would come to me and lobby me for their particular
4  candidate in what they were looking or interested to
5  see happen.
6  Q   Had you called Andy Stern to talk about Valerie
7  Jarrett?
8  A   No.
9  Q   Had you called Tom Balanoff to talk about Valerie
10  Jarrett?
11  A   No, I did not.
12  Q   If we go down further down the page, line 20,
13  Harris says:
14      "Okay, so it was before my discussion with
15       Rahm."
16          What did you understand Harris to be talking
17  about here?
18  A   What Harris was telling me was that he had
19  received a phone call from then Congressman Rahm
20  Emanuel on the Sunday before this day, which was
21  November the 2nd, and that Rahm had indicated to him
22  that -- that President Obama was interested in
23  Valerie Jarrett.
24          And part of our process, again, was I didn't
25  want --

R. Blagojevich - direct by Goldstein                    4210

1          MR. SCHAR:  Objection.

2          THE COURT:  Sustained.

3   BY MR. GOLDSTEIN:

4   Q   Now, you were talking about part of your process.

5   What was your process at this time regarding the

6   Senate seat?

7   A   This process of preliminary conceptual

8   discussions in the gathering of ideas and options be

9   slow and deliberate was also don't reach out to

10  anybody, don't seek anything until I make a final

11  decision and know exactly what I want to do and

12  where I want to end up.

13         And we had to be disciplined because what was

14  going to happen, we knew, was that people were going

15  to come to me pursue or pushing candidates they were

16  interested in and potentially offering deals to us.

17         And so I wanted to be determined to make sure

18  we stuck to our schedule, which I envisioned was

19  gonna be sometime in December before Christmas.  It

20  was also contingent upon the unfolding of events.

21  So there was uncertainty in terms on how all this

22  was all going to shake out, but I wanted to take my

23  time and be slow and deliberate and wait until as

24  long as I could to pull the trigger and finally make

25  a decision, and we'd have to weather the storm of

1   people coming at me who had candidates they wanted.
2          MR. SCHAR:  For purposes of clarification,
3   "we," "us," if we could have a clarification as to
4   who else is involved to whether the storm.
5          THE COURT:  You can ask that question.
6   BY MR. GOLDSTEIN:
7   Q   When you say "we" and "us" who are you talking
8   about?
9   A   I'm taking about me and my senior staff and those
10  who were talking to me about reaching a decision,
11  helping me make this decision.
12  Q   And when you talk about "we" and "us" and your
13  senior staff, is it fair to say they were very close
14  to you at this time?
15  A   Yes, they were.
16  Q   And they helped you make decisions, is that
17  correct?
18  A   They did in a lot of thing, and certainly big
19  important decisions like this I relied heavily on
20  their insights and their advise and that's why I
21  shared with them my thoughts and used them as
22  sounding boards.
23  Q   In fact, a lot of times you sort of saw this as a
24  group decision, is that fair to say?
25         MR. SCHAR:  Objection.

R. Blagojevich - direct by Goldstein                4212

1          THE COURT:  Sustained.

2

3    BY MR. GOLDSTEIN:

4    Q   If you can turn to Page 3, and at the top of the

5    page you say:

6          "Right, and then the other thing is, you know,

7           we should talk.  I want you to think about

8           whether I just say, hey, look, what about, what

9           about Lisa Madigan, and then explain okay

10          there's a carrot and a stick thing going on

11          right now, calling everybody."

12          And then Harris goes on to say:

13          "Certain people have approached us, telling us

14           that this is Madigan's design."

15          And you say:

16          "That he wants."

17              Now, Rod, is it fair to say in this portion

18   of the conversation you are talking about

19   potentially what to tell Mr. Stern or Mr. Balanoff,

20   is that right?

21   A   That's -- that's correct, but it reflects --

22          THE COURT:  Ah --

23          THE WITNESS:  You're right, Judge.

24          THE COURT:  "That's correct.

25          THE WITNESS:  Yes, Judge.  You're right.

R. Blagojevich - direct by Goldstein          4213

1  BY MR. GOLDSTEIN:

2  Q   Now, is this paragraph you say:

3      "Lisa Madigan, then you explain there's a carrot

4       and a stick thing going on right now."

5          What were you saying when you said carrot and

6  a stick?

7  A   The carrot and stick was what I expressed in

8  other conversations at that time, again war gaming

9  and thinking through this and understanding the

10 principal participants in this whole drama, Mike

11 Madigan in particular.

12         In my mind what I envisioned was, that he

13 would be possibly prepared to do the carrot, good

14 things:  Public works bill, healthcare expansion,

15 promise not to raise taxes on people, if I appointed

16 his daughter senator.  I wasn't sure of it.  This

17 was part of this whole story, see if we can actually

18 do that.

19         My other concern was that there's an

20 alternative to this side, a flip side to it, you

21 don't make his daughter the senator, you don't get

22 the carrot, you get the stick.  You get the shaft,

23 you get more gridlock, you get impeachment, you get

24 all these political things that were going on

25 between he and I.

1       And so that part of the consideration for
2  Lisa Madigan was, we put her there, we can get a lot
3  of good stuff potentially; I don't put her there,
4  what's it going to be like, how much worse will the
5  gridlock be than it has been before, as well the
6  talk of political impeachment and all these other
7  things that were very much swirling around in the
8  newspapers and were some of the things that were
9  actually being said by some of the Madigoons.
10 Q   The Madigan situation and your relationship with
11 Michael Madigan, did that impact your thoughts in
12 regard to the Senate seat?
13 A   Yes; I saw this potentially a golden opportunity
14 to do good things for people.  He's a very practical
15 man and it's all business with him.  And so he could
16 be for or against anything.  And if it's something
17 for his daughter, he'd be for that, in all
18 likelihood.  As I said before, he's a very good dad.
19 And I believed because he doesn't really have any
20 strong political principles, they're just part of
21 political tactics for him, this would be good --
22       MR. SCHAR:  I'm going to object.
23       THE COURT:  We're a little bit beyond, maybe
24 more than a little beyond that question.
25 BY MR. GOLDSTEIN:

1  Q   On that same page, line 22 -- and actually let me
2  go up the lines, on line 13 you say:
3      "What do you, what do you do to keep him, I
4       mean, Emil's a possibility, I'm not going to
5       rule him out by any means."
6      Harris says:
7      "No, no, I think, they're just gonna --"
8      You say:
9      "He's a fall back."
10     "Going to the box is more than enough message
11      warm and comfort stroke."
12     You say:
13     "I mean, he had John, Kelly call me."
14     Harris says:
15     "Yeah, that's not right."
16         Now, in this short conversation you're
17  having with Harris at this point, you're talking
18  about when you said "Emil," who were you referring
19  to?
20  A   I was referring to Senate President Emil Jones,
21  but I'm not quite sure what I'm saying here because
22  you have those stars there, you see?
23         And I said something there that's not there
24  now, so I can't tell you definitively what I was
25  saying here.

R. Blagojevich - direct by Goldstein                4216

1          MR. SCHAR:  Objection.

2          THE COURT:  We're going to take a short

3   break.

4          THE MARSHAL:  All rise.

5        (The following proceedings were had out of the

6          presence of the jury in open court:)

7          THE COURT:  Please be seated in the

8   courtroom.

9              Let's talk about this.

10         MR. SCHAR:  Judge, this is the second time.

11  He did it yesterday where he suggested that

12  something had been deleted.  I believe you already

13  have explained to this jury that all this was done

14  properly.  We've already had a preliminary

15  instruction conference where the jury is going to be

16  instructed that, in fact, not only there is

17  minimization or a redaction, to the extent it's a

18  redaction, were appropriately legally done.

19             This defendant obviously has an agenda, but

20  his effort now is to somehow suggest there is all

21  types of conversations that have been purposely

22  removed by the government either through

23  minimization or through Your Honor's rulings on

24  redactions that he continues to insert in front of

25  this jury.  So we would like an instruction at this

1 point that everything has been removed properly

2 pursuant to court order.  I think you gave something

3 similar to that when Agent Cain was on the stand.

4 Or, alternatively, I believe there is a jury

5 instruction that is going to be given at the end of

6 the case which I think should be given now to

7 indicate that it was appropriate.

8          And, I'm sorry, Judge, of course, although

9 I'm sure the defendant is well aware of it, the

10 instruction has got to be made that this has got to

11 stop.

12          THE COURT:  What did you just say?

13          MR. SCHAR:  This has got to stop, the

14 comments in regard to this.

15          MR. SOROSKY:  Look, it seems like everything

16 the defense does, whether it's attorneys or

17 Mr. Blagojevich, there is some challenge to the

18 integrity every single time.

19          Mr. Blagojevich has an agenda, it's to tell

20 the truth.  He's a witness, he swore on the Bible

21 and swore to tell the truth.  He is telling the

22 truth --

23          THE COURT:  I have a question:  Is there

24 unredacted transcripts around?

25          MR. SCHAR:  Are there other unredacted

1  transcripts?

2          THE COURT:  Yes.

3          MR. SCHAR:  I don't have the unredacted

4  transcripts.

5          THE COURT:  But there are --

6          MR. SCHAR:  I don't know if the call at this

7  point is minimization or redactions.

8          MR. RIEBMAN:  It's minination.

9          MR. SCHAR:  We have to go back and check.  If

10  Mr. Riebman says it's minimization, I would trust

11  him.

12          MR. RIEBMAN:  It's minimization, Judge.

13          THE COURT:  I think it is entirely

14  inappropriate for him to refer to something which is

15  minimized.  If you were referring to something that

16  was redacted, the problem is is you can go over this

17  with him before the testimony, he can look at the

18  transcripts--this is the second time around--and he

19  can say I'd like to know what was there, and it is

20  possible, if it's only redacted, he can see what is

21  there.

22          And the reason the government is raising this

23  issue is because in this case I agree with the

24  government, this is a back door, this is a

25  deliberate effort by this witness to raise something

R. Blagojevich - direct by Goldstein                    4219

1  that he can't raise, to suggest that something that
2  was good was eliminated.
3          And interestingly enough, particularly if
4  it's minimization, he ought to know that he can't
5  draw that inference.  This is not fair.  This is a
6  repeated example of a defendant who wants to say
7  certain things smuggling them in.  And he did that
8  yesterday or the day before yesterday with something
9  about Children's Memorial Hospital and he actually
10 was there when I ruled it out and he forced it into
11 an answer where, frankly, it didn't belong.
12         This is not right.  And I am going to give an
13 instruction to the jury, but I'm instructing the
14 witness directly that he is not to refer to stuff
15 that's been deleted on the witness stand at any time
16 in the presence of the jury.  If he wants to raise
17 an issue afterwards, he can do that.  You can't do
18 it in front of the jury.
19         MS. KAESEBERG:  He cannot say this has
20 been, you know, with reference to this asterisk, "I
21 don't know what is here," but certainly minimization
22 doesn't mean that that conversation never happened.
23 If he has an independent recollection of that
24 conversation, he can testify to it.
25         THE COURT:  If he has an independent

1  recollection, that's fine, but that is not what he

2  is doing.  What he is doing is attempting to suggest

3  by the back door that the government has

4  deliberately eliminated favorable evidence, that's

5  what he is doing.  And his intent is very clear and

6  my instruction is very clear, no reference at all to

7  deletions.  And if he's got some very clear memory

8  of this, he can talk about what that very clear

9  memory of that is.  Do you understand what I have

10 just said?

11        MS. KAESEBERG:  I do, but I have another

12 question.

13        THE COURT:  Yes.

14        MS. KAESEBERG:  When you give an instruction,

15 is there a way to tailor the instruction so it

16 doesn't tell the jury they can't speculate or

17 consider what he is saying didn't happen.  If

18 there's an instruction, you can't speculate about

19 what could potentially be contained in the

20 transcripts where there is an asterisk, that's one

21 thing, but if the instruction is don't speculate

22 about what was said on a call that is not in the

23 transcript in front of you or something to that

24 effect, it tells them not to consider the veracity

25 of what he's saying.

R. Blagojevich - direct by Goldstein          4221

1          THE COURT:  We're not going to really be
2    dealing with this because he's going to obey my
3    order in which he's never going to refer to those
4    asterisks again, is that clear?
5          MS. KAESEBERG:  That's clear.
6          THE COURT:  Do you think it's possibly clear
7    to your client?
8          MS. KAESEBERG:  I'm sure it is.
9          THE COURT:  Good.
10         MS. KAESEBERG:  Are you going to give the
11   instruction now or --
12         THE COURT:  No, I'm going to give the
13   instruction a little later.
14         You know, one of the difficulties is is I
15   make a ruling and then the ruling is disregarded,
16   and then I have to say don't do it.  And when you do
17   that more than once or twice, it is inevitable that
18   I am going to believe and find that there is some
19   purpose other than the pursuit of truth.  And for
20   all I know, whatever he wants to say about a
21   conversation, whatever he says occurred, fine; but
22   some of it, he's not talking about what's occurred,
23   he's talking about what isn't there, and he's making
24   a point to the jury that it's not there.
25         MS. KAESEBERG:  Well, I can assure you, we're

:04PM

:05PM

:05PM

:05PM

:05PM

R. Blagojevich - direct by Goldstein                4222

1  just trying to get the truth out, that's what we are
2  doing.
3          THE COURT:  But the truth of the matter is,
4  there's lots of stuff that's true that's
5  inadmissible because it's not relevant to the trial
6  process and --
7          MS. KAESEBERG:  You said that we may be
8  perverting the truth.  I just want to make clear,
9  we're just trying to get the truth out.
10         THE COURT:  No, no, what I said you were
11 doing is not perverting the truth, what I said you
12 were doing is perverting the orderly process of the
13 trial.
14         And there is all kinds of truth that doesn't
15 get admitted.  And, in my experience, there is a lot
16 of truth with respect to this case or alleged truth
17 with respect to this case that the government would
18 like to admit but they can't because we have rules
19 that governed as well.  So you will play by the same
20 rules.  You open the door to anything that is true,
21 I think you would deeply regret it, and I think the
22 government would deeply regreet it.  That is not our
23 process here, the process is having to deal with
24 relevance and materiality and you are disregarding
25 it and your client is disregarding it and I don't

:06PM
:06PM
:06PM
:06PM
:07PM

R. Blagojevich - direct by Goldstein                4223

1  want you to do that again.

2          I think we are fairly clear.  Bring back the

3  jury.

4          MR. SCHAR:  Judge, the only other matter I

5  would ask is, to the extent they want to ask a

6  question about a call that has been minimized as

7  opposed to pointing to a particular section, that he

8  be instructed to say was there anything else

9  discussed in this call that you remember, so they're

10 not highlighting the issue, if he has apparently a

11 very clear memory of exactly what happened to be

12 missing from a particular call nearly three years

13 ago.

14         THE COURT:  Well, we're going to do it in

15 entirely different way.  Before the transcript is

16 referred to on the witness stand, they will their

17 client if he has any recollection of any of this,

18 and if that is the case, we'll talk about it.

19         MR. SCHAR:  Very good, Judge.  Thank you.

20         THE MARSHAL:  All rise.

21     (The following proceedings were had in the

22      presence of the jury in open court:)

23         THE COURT:  Please be seated.

24         One second.

25     (Brief pause).

1          THE COURT:  Go ahead.

2          MR. GOLDSTEIN:  Thank you, Your Honor.

3  BY MR. GOLDSTEIN:

4  Q   We were on tab 8, Rod, and I want you to turn to

5  Page 3, and on that page, on line 22, you say:

6      "I mean, when do you have the conversation with

7       him about that other thing we talked about."

8      Harris says:

9      "Trying to meet with him off campus somewhere."

10      You say:

11      "Yeah, 'cause off camp -- that's a tactical

12       thing, an off-campus discussion on that

13       subject."

14      Harris says:

15      "Uh-huh."

16      You say:

17      "Will make him feel better about his chances."

18      Harris says, "uh-huh."

19          When you say "I mean, when do you have the

20  conversation with him about the other thing we

21  talked about," what are you talking about there,

22  Rod?

23  A   I was talking to John Harris about having a

24  meeting with Senate President Jones.  "Off campus"

25  refers to off of government property, that would

1  have been a discussion that would be political and
2  it was about -- to the best of my recollection, this
3  was about the Senate President's race and seeing if
4  Emil Jones would be more active and help the
5  candidate Clayborne who was the one we were hoping
6  was going to be successful in the next Senate
7  President race.
8  Q   When you say "off campus," that means off the
9  state property as far as the capitol building?
10 A   That's right, off of government property.  We
11 were very scrupulous because of the unfolding of
12 rules changes, for lack of a better way of saying
13 it, to try to not use government property for
14 political purposes.
15      So when I would call Mike Madigan, for
16 example, on a political issue --
17      MR. SCHAR:  Judge, I object.
18      THE COURT:  I think this has already been
19 covered.
20 BY MR. GOLDSTEIN:
21 Q   When you wanted Harris to talk to Emil Jones
22 about the Senate President race, that you saw as a
23 political discussion to be had off campus, is that
24 right?
25 A   Very much so, yes.

R. Blagojevich - direct by Goldstein                4226

1          There was more to that conversation.  It was
2    also to talk to Senate President Jones about his
3    Senate aspirations --
4          THE COURT:  Wait.  Wait.  There's question.
5    Wait for the question.
6          THE WITNESS:  Okay, Judge.
7    BY MR. GOLDSTEIN:
8    Q   When he says, "when do we have that conversation
9    with him, that other thing we talked about," you
10   said one thing was about the Senate President's race
11   and you mentioned there's another thing that that
12   conversation was to be about?
13   A   Right; I wanted John to talk to Senate President
14   Jones just to remind him that he was still very much
15   a potential candidate for U.S. senator.
16          That I was still very much thinking about him
17   as a possibility, but that I wanted John Harris to
18   impress upon Senate President Jones that if I make
19   him a senator, he had expressed to me that he was
20   only going to be there for 2 years, that he wasn't
21   going to run for reelection, he just wanted it for
22   2 years.  And what I wanted John Harris to convey to
23   Senate President Jones was, you know, the beginning
24   of an understanding that if I did, in fact, decide,
25   no promises but if I ultimately went in that

R. Blagojevich - direct by Goldstein          4227

1  direction to elect Senate President Jones, like to
2  convince him to run again, but if he's not going to
3  run again, don't publicly announce that you're not
4  going to run again in the event I would decide to
5  run for the Senate in 2 years and so that Emil could
6  be there as -- there is a phrase in politics called
7  stalking horse, where he would be kinda the stalking
8  horse for the possibility of me ultimately running
9  in 2010.  These were, again, ideas that we were
10 discussing and it was part of this gathering of
11 options.
12 Q   So you had some thoughts about possibly running
13 for the Senate in 2010, is that right?
14 A   I had thoughts about making myself a senator in
15 2008, I had thoughts about possibly running for the
16 Senate in 2008, I had thoughts about making myself a
17 senator and announcing that I wasn't going to run in
18 2010, that I would be a placeholder.  I had a whole
19 bunch of thoughts and ideas.
20 Q   How would that help your chances in running for
21 senator in 2010 that Emil Jones would not run and
22 would not publicly announce that he would not run?
23 A   My strongest political support in Illinois
24 politics came from the African-American community
25 and from the Latino community, and that Emil Jones

R. Blagojevich - direct by Goldstein                    4228

1  is an African-American senator, the incumbent

2  democrat.  If he were to announce that he wasn't

3  going to run again, there was a very good chance

4  that congressman Jackson, for example, he was one of

5  many others but --

6           MR. SCHAR:  Objection.

7           THE COURT:  Sustained.

8  BY MR. GOLDSTEIN:

9  Q   And then you say on line 3 -- or Page 3, line 31,

10 "will make him feel better about his chances," what

11 we are you saying there, Rod?

12 A   Emil was very important to me at this particular

13 time as my ally in the Senate.  There was going to

14 be a veto session and I didn't want them to override

15 all the budget cuts that I made.  The House either

16 did or was going to, and if the Senate left me, we'd

17 have a 2.5 billion dollar budget deficit and it

18 would be a disaster.

19           Senate President Jones was going to hold

20 those vetoes for me, he had worked with me on those,

21 but he had left me on the ethics bill, so there was

22 always the possibility that if he didn't feel like I

23 was having an open mind of his chances being a

24 senator, who knows, he might do to me again on that

25 budget stuff what he did to me on the ethics thing.

R. Blagojevich - direct by Goldstein          4229

1  So it was important to keep him thinking that he was
2  a realistic candidate, and he was at that time, but
3  to kinda make him happy and let him know i haven't
4  forgotten him.  So that conversation I thought would
5  make him feel better about his chances.
6  Q  So is it fair to say you wanted to be sensitive
7  to the relationship you had with Mr. Jones?
8  A  That's right.  And he was candidate.  I hadn't
9  decided that he was going to be the senator, but I
10 hadn't ruled him out either.  He was among, at that
11 period of time, among the top tier candidates in my
12 mind.
13 Q  If you turn to page 4, at the top of the page,
14 you say:
15     "Right."
16      Harris says:
17      "Uh-huh."
18      You say:
19     "In his mind, you agree with that."
20      Harris says:
21      "Uh-huh, or if he had no intention of doing it,
22      it may push him away, if he thinks, you know,
23      if that's the --"
24      Then you say:
25      "All right, don't have the conversation with

R. Blagojevich - direct by Goldstein          4230

1     him, then, forget it, don't even, don't even do
2     it, I don't wanna, I'll talk to you about it
3     when I see you."
4     Harris says:
5     "Okay, you see what I mean, it could backfire."
6     You say:
7     "No, you got the wrong thing."
8     Harris says, "okay."
9     You say:
10    "That's not, that's not what I'm talking
11    about."
12    Harris says:  "Okay."
13    You say:
14    "Perspective help."
15    Harris says:
16    "Right."
17    And you say:
18    "Is what I'm talking about."
19    And Harris says:
20    "Right."
21        Now, when you were saying "in his mind, do
22    you agree with that," what were you talking about
23    there, Rod?
24 A  I was asking John if he agreed with my assessment
25 that raising the issue of him being appointed by me

1 to the United States Senate, but what I was

2 interested in him at least not announcing that he

3 wasn't going to run again would make him feel better

4 about, you know, my state of mind in terms of what

5 his chances were that he was, in fact, you know,

6 under serious consideration for me to appoint him,

7 and he was at that time.

8 Q   When Harris says "or if he has no intention of

9 doing it, it may push him away," what did you

10 understand Harris to be talking about here?

11 A   I think what Harris was talking about there was

12 the Senate President race.  I think what he was

13 saying there is he might not want to get in the

14 middle of that race for Senate President Clayborne

15 and Cullerton, and what I was hoping that we could

16 ask Emil to do was to raise some money or contribute

17 some money to Senator Clayborne.

18        Senator Cullerton was raising a lot of money

19 and contributing to senate democrats --

20        MR. SCHAR:  Objection, Judge.

21        THE COURT:  We're beyond the question.

22 BY MR. GOLDSTEIN:

23 Q   You say:

24    "All right, don't have that conversation with

25     him, forget it, don't even, don't even do it, I

R. Blagojevich - direct by Goldstein          4232

1    don't wanna, I'll talk to you about when I see
2    you."
3    Then Harris says:
4    "You see what I mean, it could backfire."
5    You say:
6    No, you got the wrong thing."
7    Harris says:
8    "Okay."
9    You say:
10   "That's not, not what I'm talking about.
11   Harris says:
12   "Okay."
13   You say:
14   "Perspective help."
15        When you said "don't have that conversation
16   with him then, forget it," what were you telling
17   Harris then?
18   A  That, you know, we'll talk about it later.  He
19   had -- when I said, "you got the wrong thing," he
20   was not understanding what I was saying and so I
21   just basically said we'll talk about it later, then
22   I went on to talk about perspective help.
23   Q  What did you mean by perspective help?
24   A  This was, again, help Senator Clayborne, and we
25   wanted to talk to him, too, about if he left and I

1  made him a senator, what involvement are you going

2  to have if I'm left here in gridlock, will you help

3  me with your former colleagues in the senate and

4  support those senators and urge them to support some

5  of our initiatives.  I wanted to know whether he'd

6  be willing to help us in the future if I did make

7  him a senator and I was left in Springfield.

8          MR. SCHAR:  Objection, Judge.

9          THE COURT:  Maybe you should just lead your

10 client, because the answers are much longer than the

11 questions.

12         MR. GOLDSTEIN:  A lot of these questions

13 require longer answers, some go to state of mind.

14         THE COURT:  Some do.  And in many cases there

15 have been long answers, which are fine, but there is

16 always frequently an extra there.  If it's

17 important, you can bring it out in a different

18 question.

19 BY MR. GOLDSTEIN:

20 Q   Later down on the page, Rod, line 23, you say:

21         "Do they think that, they think that I would

22         just appoint Valerie Jarrett for nothing just

23         to make them happy."

24         What were you saying there, Rod?

25 A   I was saying to John Harris do they think, and I

R. Blagojevich - direct by Goldstein                4234

1  believe I was referring to Rahm Emanuel and Andy
2  Stern and Tom Balanoff, and this is before, I think,
3  the meeting that happened later, and I was asking
4  him whether they thought that I would just appoint
5  Valerie Jarrett just to make them happy, and I think
6  I'm referring to President Obama but I would think
7  that's what I'm talking about there.
8  Q   And if we go down to the next line, Harris says:
9          "Yeah, along with what we talked about the
10         other."
11         And then you say:
12         They'd help me."
13         And then Harris says:
14         "Help, help the political, your political
15         agenda, your, meaning your --"  on to Page 5,
16         "your governing agenda, not your political
17         agenda."
18         And then you say:
19         "My governing agenda."
20         And Harris says "yeah."
21  A   Uh-huh.
22  Q   When Harris was saying, "the political agenda,
23  meaning your governing agenda, not your political
24  agenda," what did you understand Harris to be
25  talking about there?

R. Blagojevich - direct by Goldstein          4235

1  A   Well, he told me in my governing agenda, that
2  triggered -- that was an excited utterance there, my
3  governing agenda, I thought that was nice, that's
4  good.  If they're offering to help me to perhaps
5  break the gridlock in Springfield and get things
6  done, that would be a great, political deal, Valerie
7  Jarrett in exchange for jobs bill, et cetera, et
8  cetera.
9          And so that's what he was saying to me, and
10 then he brought me back down to earth and indicated
11 what he was talking about was the political agenda
12 on a previous conversation he had with Marilyn Katz
13 who had offered fundraising if I appointed Valerie
14 Jarrett --
15 Q   Let's finish it up, Rod.
16 A   Pardon?
17 Q   Let's get into that next line.
18 A   Okay.
19 Q   You say:
20     "Well, Marilyn Katz was their first emissary,
21      right?"
22      Harris says:
23      "Right."
24      You say:
25      "And she was talking about fundraising."

R. Blagojevich - direct by Goldstein                4236

1    Harris says:
2    "Yeah, she was talking about friends around the
3    country that would be appreciative and their
4    ability to help with fundraising and the media
5    would be all over you, crediting you for your
6    choice, a wise, such a wise choice, and that
7    she would work tirelessly as would other allies
8    of his to get you good press on this
9    appointment."
10   You say "good press," you laugh, and then you
11   said "that's all she's offering."
12   Then Harris goes on to say "uh-huh."
13   And you say:
14   "Friends around the country."
15   And Harris says:
16   "Yeah, friends around the country with positive
17   local media."
18        When you said Marilyn Katz was their first
19   emissary, what were you talking about?
20        And first, when you say "their first
21   emissary," who were you talking about?
22   A   At the time I believed their emissary was the top
23   people around President Obama but not President
24   Obama.  Rahm Emanuel would call Harris, Marilyn Katz
25   I connected the two, maybe David Axelrod, in my

R. Blagojevich - direct by Goldstein                4237

1   mind, and maybe they were/weren't discussing this
2   with SEIU with Andy Stern or Tom Balanoff, I don't
3   know, but that's what we're talking about "they."
4   In my mind, it was more likely Rahm Emanuel and
5   David Axelrod.  I didn't connect it to Valerie
6   Jarrett but --
7   Q   And when you say Marilyn Katz was their first
8   emissary, did you or any of your staff or anyone on
9   your behalf reach out to Marilyn Katz?
10  A   No.
11  Q   Did Marilyn Katz reach out to you or anyone you
12  knew or any of your staff?
13  A   She called Patti, and Patti told me, and I told
14  her to not meet with her, and Patti then suggested
15  that she call John Harris.
16  Q   It was your understanding that she did speak to
17  John Harris?
18  A   That's right.
19  Q   And then Harris says:
20      "She was talking about friends around the
21       country that would be appreciative and their
22       ability to help with fundraising, the media
23       would be all over you, crediting you for the
24       choice, such a wise choice, and that she would
25       work tirelessly as would other allies of his to

1       get you good press on this appointment."

2            What did you understand John Harris to be

3   talking about here?

4   A   Just that, that what Marilyn Katz had told her,

5   what he had indicated to me, was that if I appointed

6   Valerie Jarrett, that it would get me good press and

7   she would work to get me good press, and that

8   president-elect Obama's friends around the country

9   would help me raise money.

10           When he told me that in the beginning, I

11  rejected it, didn't want it.  And I was essentially

12  saying the same thing, I wasn't interested in

13  campaign funds in exchange for the Senate seat nor

14  was I, frankly, in love with the idea of good press

15  for the Senate seat.  I thought that the Senate seat

16  could serve a better purpose, I didn't know what it

17  was, and that's why I thought the discussions were.

18  But good press was not -- at that time was not that

19  important to me.

20  Q   Was --

21  A   I was getting so much bad press, I was getting

22  used to it.

23  Q   When you said "that's all she's offering," what

24  were you saying there, Rod?

25  A   Just that, fundraising and good press, that's all

R. Blagojevich - direct by Goldstein                4239

1  she's offering.  You know, this is --
2       MR. SCHAR:  Objection.
3       THE COURT:  He answered.
4  BY MR. GOLDSTEIN:
5  Q  Now, if you turn to Page 6, you say at the top of
6  the page:
7      "Yeah, and everything you talked about in
8       healthcare is what we either done or were
9       working to try to get done, okay.  Whose done
10      more for healthcare in any state than me,
11      right?  A lot more than Tommy Thompson did, is
12      that fair to say or no?"
13      Harris says:
14      "Don't know.  Probably."
15          What were you saying there, Rod?
16  A  Well, I was talking to John Harris about our
17  record of accomplishment in expanding healthcare to
18  700,000 men, women and children in Illinois while I
19  was there, and that president-elect Obama, soon to
20  be president-elect Obama's healthcare plan, a lot of
21  it was the stuff that we had already done in
22  Illinois.  In fact, some of my top people in
23  healthcare helped them craft that plan --
24       MR. SCHAR:  Judge, nonresponsive.
25       THE COURT:  Yeah.

R. Blagojevich - direct by Goldstein 4240

1  BY MR. GOLDSTEIN:
2  Q  Harris says on line 10:
3      "If it were repeated nationwide, oh, yeah, it
4       would be and what he did in Wisconsin, yeah,
5       absolutely."
6      You say:
7      "What I've done."
8      Harris says:
9      "Right.  Right, what you've done in Illinois."
10     You say:
11     "Kaiser Foundation ranked as number one.  I
12      don't know if we still are, but we are
13      expanding healthcare under me."
14     When Harris said:
15     "If it were repeated nationwide, it would be and
16      what he did in Wisconsin, yeah, absolutely."
17         What did you understand Harris to be talking
18  about there?
19  A  What John was saying to me was that if what we've
20  achieved in Illinois in terms of expanding
21  healthcare was expanded across the country
22  nationwide, then -- then he's agreeing -- "if it
23  would be repeated nationwide what he did in
24  Wisconsin," what I think he is saying is that --
25  that I did more for healthcare in Illinois than Tom

R. Blagojevich - direct by Goldstein          4241

1 Thompson in Wisconsin, I think that's what I

2 understand he is saying here.  And then he says,

3 "what you've done in Illinois," so I think he is

4 saying two things:  One, if you repeat across the

5 country what we did in Illinois, I think he saw that

6 as a positive, but then he is saying that we've done

7 a lot more in Illinois than Tommy Thompson did when

8 he was governor of Wisconsin.

9 Q   Then you say:

10     "Kaiser ranked number one, I don't know if we

11      still are, but we were in expanding

12      healthcare."

13     And Harris says:

14     "Uh-huh."

15     You say:

16     "Can you get that, can you get that for me, not

17      right now but that should be part of a, I mean,

18      we're not gonna talk about that with Balanoff,

19      but you know what I'm saying."

20     Harris says:

21     "Right.  Right."

22         When you said "can you get that for me,"

23 what were you talking about, Rod?

24 A   I was asking him for the information on the

25 Kaiser Foundation.  I wanted to make sure that the

R. Blagojevich - direct by Goldstein          4242

1   information I had was updated.  The Kaiser

2   Foundation is an organization that monitors --

3           MR. SCHAR:  Objection.

4           THE COURT:  Yeah, you answered the question.

5           THE WITNESS:  Okay.

6   BY MR. GOLDSTEIN:

7   Q   When you say:

8       "I mean, we're not going to talk about that with

9        Balanoff, but you know what I'm saying."

10          What were you saying there, Rod?

11  A   I was saying that I -- I don't think I'm going

12  raise this with Tom Balanoff later in the day, but I

13  wanted to get the information as part of the whole

14  process of gathering potential options and

15  collecting ideas to be discussed and compared

16  against each other.

17  Q   Now, on November 3, 2008, had you discussed

18  various candidates for the Senate seat?

19  A   Yes.

20  Q   And were you considering on November 3, 2008,

21  various candidates for the Senate seat?

22  A   Yes, I was.

23  Q   And on November 3, 2008, had you made any

24  decisions regarding the Senate seat?

25  A   I made no decisions on November 3, 2008.

R. Blagojevich - direct by Goldstein                4243

1  Q   I want to turn to November 4th.
2      On November 4th, did you have a conversation
3  with Mr. Harris in the morning?
4  A   What tab is that?
5  Q   I'm just asking from your own recollection.
6  A   Ah --
7  Q   Did you have a conversation with Mr. Harris in
8  the morning of November 4th?
9  A   Yes, I did.
10 Q   Did you discuss the Senate seat?
11 A   I'm sure I did, yes.  Yes, I did.
12 Q   And did you discuss -- did you discuss basically
13 your operating principle, your thoughts, how you
14 wanted to approach the Senate seat?
15 A   This call I vividly remember, it was about 8:00,
16 8:30 in the morning, I was at home, John Harris was
17 at the Hollywood Grill on Ashland Avenue, North
18 Avenue, having breakfast, I don't know -- having
19 breakfast, I knew that.  I got him there.
20     We were talking about -- this was election
21 day.
22     Is this the 4th we're talking about?
23 Q   The 4th.
24 A   Yeah, so this is the morning of election day.
25 And I told him -- I expressed to him what was my

R. Blagojevich - direct by Goldstein                4244

1   operating principle that was going to be the
2   measurement that I was going to ultimately used to
3   decide who should be the senator.  And I told him
4   exactly these words, I said, "there's opportunity
5   here, I'm going to make this decision in good faith,
6   it's gotta be good stuff for the people of Illinois
7   and good for me, but it's not coming for free,"
8   that's a direct quote, that's what I told Harris.  I
9   know that quote because that was always in my mind
10  when I threw ideas out and one was measured against
11  the other --
12  Q   What did that mean, Rod?
13  A   That means that that was the bathroom, and all
14  the ideas that we discussed about, whether I should
15  go to Health and Human Services or 501(c)(4) was
16  measured up against good stuff for the people of
17  Illinois and good for me, and good stuff for the
18  people of Illinois came first.
19          And could I get something that reached that
20  level is what my objective was, that I would make
21  that decision in good faith, and take advantage of
22  this unique opportunity to pick a senator to try to
23  achieve that goal and get to that place.
24          And all these other ideas and discussions
25  were measured against that, that's why so many of

1  them fell by the wayside and went nowhere.

2  Q   When you said you had this conversation with Mr.

3  Harris on the 4th describing your principles about

4  the Senate seat, when did that formulate in your

5  mind, that principle?

6  A   That principle was -- was already there.  It was

7  in my mind, it was in my heart, but I fully

8  expressed it to him as we now realized on the

9  morning of November 4th, barring some unbelievably

10  unexpected event, that President Obama was going to

11  be the next president.  He was going to win big, and

12  I was gonna be in real life have a decision to make

13  who the actual senator was going to be.

14  Q   And from November 4th on to December 9th, 2008,

15  was that your operating principle when you analyzed

16  the Senate seat?

17  A   It was always the standard by which everything

18  else was measured and it was among the reasons why I

19  never made a decision.  All these ideas never

20  measured up to that until the very end when I felt

21  the Madigan deal was the good one and I believe we

22  were close to getting that and me deciding that, but

23  we never quite were allowed to finish.

24  Q   And on November 4th, 2008, that morning when you

25  were talking about your principle, as far as

R. Blagojevich - direct by Goldstein          4246

1  analyzing this issue, had you made any decisions in

2  terms of the Senate seat?

3  A   No.

4  Q   If you can turn to tab 9.

5       And, Rod, if you can look on Page 1, this is

6  just a one-page transcript, what is the date and

7  time of this conversation according to the

8  transcript?

9  A   This conversation is November the 4th, 2008, at

10 9:39 in the morning.

11 Q   Who were the speakers?

12 A   It was me and Patti.

13 Q   And Patti says on line 2:

14     "Ah, hey, senators make 169,300."

15     You say:

16     "Okay."

17     And Patti says:

18     "Just for your information."

19     You say:

20     "Or more than what I make."

21     And then Patti says:

22     "I don't know, I think you make the same, about

23     the same, I think you make like 170."

24     You said:

25     "No I make 160."

R. Blagojevich - direct by Goldstein          4247

1        Patti says "160."

2            When Patti said senators make 169,300, what

3    did you understand her to be talking about here?

4    A  Well, she was telling me what the salary for the

5    United States Senators was.

6    Q  Why did you care about that?

7    A  Well, the -- the possibility that I could

8    possibly appoint myself was -- was something that

9    was in my mind before the election, during the

10   election, after the election, and depending upon how

11   events unfolded, could've possibly been a decision I

12   could have possibly made, which I never did but it

13   could've been.

14           That's something that you need to share with

15   your wife, the possibility that you might take

16   another job.  I didn't even know what I was getting

17   paid as governor.  Patti always got the check, it

18   just went to them, I never saw anything like that.

19           So, you know, I had some explaining to do if

20   I ultimately make a decision like that.  She has to

21   be part of that decision, clearly, because it's a

22   dramatic life change for us as a family.

23   Q  How involved was Patti in your decision-making

24   process regarding the Senate seat?

25   A  Patti is my soul mate, and so I shared everything

1 with her, all my ideas and thoughts with her.  So I

2 don't want to get her in trouble here, but, I mean,

3 she was certainly part of these discussions.

4 Q   And was her input important to you?

5 A   Very much so.  And, of course, the decisions that

6 I would make that would be about us, whether it be a

7 job change, a career change, or whatever the case

8 may be, she was an absolute precondition.  I

9 couldn't do it, it would be wrong to make a decision

10 like that without consulting with my spouse, my

11 wife.

12 Q   Now, at this point--and we're going to take one

13 step back because I skipped it for a second--at this

14 point it was your understanding that Marilyn Katz

15 and Rahm Emanuel, as well as Tom Balanoff and Andy

16 Stern had approached you or your staff regarding

17 Valerie Jarrett and the Senate seat, is that right?

18 A   That's right.

19 Q   And in this conversation you're talking about how

20 much a senator would make and that's in the context

21 of appointing yourself, is that right?

22 A   That's correct.

23 Q   Now, if we could just take a step back to

24 November 3rd, okay.

25       Did you have a meeting with Tom Balanoff,

1  Andy Stern and Doug Scofield?

2  A   Yes.

3  Q   And do you recall where that meeting was?

4  A   It was in the Governor's office, in the late

5  afternoon, I think.

6  Q   Late afternoon?

7  A   Of November 3rd.

8  Q   And do you know who set up this meeting?

9  A   Yes, Andy Stern and Tom Balanoff I believe worked

10  through Doug Scofield to set the meeting up.

11  Q   Was this meeting set up by you?

12  A   It was not set up by me.

13  Q   And what was discussed during this meeting?

14  A   It was -- there's a lot to this meeting, and I'm

15  a little --

16  Q   To the best of your knowledge, as much

17  chronologically as you can, what was the first thing

18  you all discussed?

19  A   Andy Stern and Tom Balanoff walked in to my

20  office with Doug.  There's a couch there.  They

21  offered him the couch, offered him coffee, soda or

22  tea, whatever we had.  We always had those kinds of

23  things for our guests.

24       Andy Stern is the top dog in SEIU.  He's the

25  head of the international union.  They're featured

R. Blagojevich - direct by Goldstein          4250

1  in 60 minutes.  Tom is significant, he's the top guy
2  in Illinois, but Andy is their national guy.  And I
3  knew Andy Stern a little bit through the years.  Tom
4  was my friend and at that time I considered perhaps
5  my strongest political ally that I had.
6        So the two of them came in as supporters and
7  friends, Tom a lot more so than Andy.  And Doug was
8  there because he works for them, but I also knew
9  Doug as someone I could trust, someone's whose
10 advise I had respect for, who did communications
11 stuff for us.
12        And I'm sure we began by talking about, you
13 know, some pleasantries.  I'm sure we probably began
14 talking about how things looked in places like
15 Indiana for Senator Obama.
16 Q   This is the day before the election?
17 A   It was the evening before the election, late
18 afternoon before the election.
19 Q   You had some discussion about political talk as
20 far as the upcoming election, is that right?
21 A   I have to believe we did, yes, and probably went
22 over different states.  You know, it was -- Obama
23 looked like he was going to win state --
24        MR. SCHAR:  Objection, Judge.
25        THE COURT:  This started with what topics

:37PM
:37PM
:37PM
:37PM
:38PM

R. Blagojevich - direct by Goldstein                4251

1  were discussed, and you didn't ask for content of

2  the discussion, and maybe you could lead him to the

3  topic you are interested in.

4  BY MR. GOLDSTEIN:

5  Q   There was political discussion regarding the

6  election, was there any discussion regarding the

7  Senate seat?

8  A   Yes, as best I recall, they asked me, Tom and/or

9  Andy, got a sense of they had indicated that -- that

10 they were interested in what I was thinking about

11 doing for United States Senator.

12        I think Tom mentioned Jan Schakowsky,

13 congresswoman, who I had a good relationship with. I

14 served in Congress with her and liked her a lot.  He

15 may have mentioned her, that was his personal

16 choice.

17 Q   Did Andy Stern mention anyone in particular?

18 A   What I remember was that both Tom and Andy both

19 indicated that if I was interested in running for

20 reelection, that it was important for me to make

21 sure that I showed -- that I -- that I was sensitive

22 to my political base, which was the African-American

23 community.

24        And so that was brought to my attention, and

25 I acknowledged that that was certainly the case.  I

R. Blagojevich - direct by Goldstein                    4252

1  think it was in that context that, as I recall, we

2  began a fuller discussion on potential candidates

3  for the Senate.

4        I believe what I did was, before they got in

5  any specific candidate, as best I recall, I believe

6  what I began to do was to kind of share with them my

7  political dynamic and where I was at that particular

8  time in Illinois.

9  Q   When you said you shared your political dynamic

10  with them, what exactly is it that you said?

11  A   I explained to Tom and to Andy that, you know,

12  I've got to be mindful of certain realities here.

13      (Sneezing.)

14        THE WITNESS:  God bless you.

15        And I talked about -- I talked about Madigan

16  and what do I do if I don't -- on the one hand, I

17  said, look, what if I could make a potential

18  political deal with Mike Madigan and get the jobs

19  bill, healthcare expansion, and no taxes, I probably

20  threw some other things in there that I was

21  interested in.

22        I remember saying something like, the test

23  for me is going to be a moral dilemma, if I could

24  get that, how much do I love the people of Illinois,

25  that was a rephrase I used a lot.  How much do I

1  love the people of Illinois, could I put aside

2  Patti's feelings and animosities of a personal

3  nature to do something good for the people of

4  Illinois.

5  Q   How did Tom Balanoff and Andy Stern respond to

6  this?

7  A   They were respectful and they listened politely.

8  And they said, well, that would mean that you're not

9  running for reelection because if you don't appoint

10 an African-American, it's going to really hurt you

11 in the African-American community.  So you would be

12 appointing Madigan's daughter, but you'd hurt

13 yourself politically in your base, the

14 African-American community.

15        And I said you can argue the same if I don't

16 appoint a leading Latino candidate, like Anita

17 Alvarez that I talked about, or Congressman Gutierez

18 who was someone I had thought about, or Gary Chico

19 who are other names that I discussed as possible

20 appointments.

21 Q   Was the name Jesse Jackson, Jr. raised during

22 this meeting?

23 A   It was.  And I, after the meeting was over, I

24 believed that the primary purpose of that meeting

25 was not --

R. Blagojevich - direct by Goldstein                    4254

1          THE COURT:  You're still on the topics of the

2   discussion.

3          THE WITNESS:  You're right.

4   BY MR. GOLDSTEIN:

5   Q   Was Jesse Jackson, Jr., Congressman Jackson's

6   name, raised during this meeting?

7   A   Yes.

8   Q   And what was discussed about Jesse Jackson, Jr.?

9   A   They didn't want him me to appoint him and I was

10  quick to assure him that I wasn't going to appoint

11  him.

12  Q   When you say "they didn't want him," who we are

13  you referring to?

14  A   Tom Balanoff and Andy Stern.

15  Q   You indicated to them that you were not going to

16  appoint Jesse Jackson, Jr.?

17  A   I think I said something like "you got nothing to

18  worry about there," something along those lines.

19  Q   In terms of the Senate seat, was anything else

20  discussed during this meeting with Balanoff, Stern

21  and Scofield?

22  A   I believe -- I believe, talking about Madigan and

23  that dynamic, I believe I brought up Senate

24  President Jones, I believe I did.

25  Q   What was the response to Senate President Jones?

R. Blagojevich - direct by Goldstein                    4255

1  A   Again, Senate President Jones would satisfy --
2         MR. SCHAR:  Objection, Judge, as
3  nonresponsive.
4         THE COURT:  You're not asking the question he
5  asked.
6         THE WITNESS:  Right.  I'm sorry.
7  BY MR. GOLDSTEIN:
8  Q   What did you say in terms of Emil Jones, Senate
9  President Jones, to Balanoff and Andy Stern?
10 A   To the best of my recollection, Emil Jones was
11 interested in the Senate seat, leading
12 African-American political figure.  I could appoint
13 Emil Jones, he would be good for -- it would be
14 supportive to the African-American base that I
15 enjoyed strong political support from, and that that
16 would address the political concern that Tom
17 Balanoff and Andy Stern and/or Andy Stern raised to
18 do me moments before.
19 Q   Do you recall if anything else was discussed
20 during this meeting?
21 A   I think we talked about -- we talked about -- I
22 do remember this, I was happy to report to them that
23 we were going to -- that we were taking care of home
24 healthcare workers who took care of children who
25 were mentally disabled in their homes versus the

:42PM
:42PM
:43PM
:43PM
:43PM

R. Blagojevich - direct by Goldstein                    4256

1  institutions.  So I was happy to report that we

2  found funding to be able to give them an increase in

3  pay for the home healthcare workers who helped kids

4  with developmental disabilities.  They were members

5  of the Service Employees Union, so I was happy to

6  report that to Tom Balanoff.

7          MR. SCHAR:  Objection, Judge.

8          THE COURT:  I think we're going to take a

9  recess now.

10          THE MARSHAL:  All rise.

11      (The following proceedings were had out of the

12       presence of the jury in open court:)

13          THE COURT:  Be seated in the courtroom.

14          You can step down.

15          Counsel, approach.

16      (Brief pause).

17          THE COURT:  I think it would be better for

18  the administration of justice if you got your client

19  to stick to the point of the question, and it would

20  also be good if you do not repeat an answer he's

21  already given in your question.

22          We are taking a great deal of time here.

23  Unless there's something very surprising, I expect

24  you to conclude his direct by the end of today.

25          There is a certain value to you of having

:43PM

:44PM

:44PM

:45PM

:45PM

R. Blagojevich - direct by Goldstein          4257

1  this defendant speak at some length so the jury can

2  get an understanding of the way his mind works and

3  what he's like, but there's some things now that

4  have been repeated for the 15th and 16th time.  And

5  I said this, I've said this in some other trials, if

6  the jury doesn't get what his position is or what

7  his thinking is by now, then you may as well give up

8  all hope because they're never going to understand

9  it.

10          And there's a certain flavor of campaign

11 speeches here.  You have to exercise some control

12 over your witness.  I permitted you to do something

13 which is rarely done with a defendant in a criminal

14 case, I permitted you to lead him, to ask him

15 leading questions, and I think you're going to have

16 to start doing that.

17          And I think, in all honesty, you need to

18 start doing that for the benefit of your client

19 because this repetitiveness will diminish the

20 attention span of the jury.

21          So instead of eating lunch today, perhaps you

22 can go over this with your client and see if you can

23 make his testimony more concise.

24          The flavor of him as a speaker and his

25 personality has been, in my view, adequately

R. Blagojevich - direct by Goldstein                4258

1  developed.

2          Now, it's possible I might allow you maybe
3  perhaps an hour tomorrow, but I'm not going to allow
4  much more than that.  This is very repetitive and I
5  do have the right under Rule 403 to prevent
6  unnecessary duplication.  If you find you can't do
7  this for some reason, I can, of course, alter the
8  schedule involving the interruption of direct
9  examination to permit some interlocutory
10 cross-examination, which I might be willing to do on
11 Thursday.

12         And I am not of the view that you're trying
13 to run out the clock, it's a tactic that's often
14 used, but in this particular case I don't think
15 you're trying to do it.  I think you have a client
16 who likes to talk about stuff and likes to give some
17 version of a campaign speech, but I think we've
18 reached the point where it's not doing the trial any
19 good and probably not doing your client any good.

20         So why don't you spend the interval to see if
21 you can inculcate in your client the value of
22 answering only the questions that are asked and
23 doing so in as few words as possible.  It might help
24 him.

25         Thanks.  We're going to resume again at --

1      MR. SOROSKY:  Can we have until 2:00 if we

2  have to spend a little extra time with our client?

3      THE COURT:  Can you have 2:00 o'clock?

4      MR. SOROSKY:  Yes.

5      THE COURT:  Sure.

6

7

8     (Luncheon recess taken from 12:49 o'clock p.m.

9      to 2:00 o'clock p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\*     \*     \*     \*     \*     \*     \*     \*

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


  /s/Blanca I. Lara                          date




_____          _____

        Blanca I. Lara                          Date