4495

1             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

UNITED STATES OF AMERICA,     )
4                           )
             Plaintiff,  )
5                           )
                          )
6 -vs-                    )  Case No. 08 CR 888
                          )
7                           )  Chicago, Illinois
                          )  June 2, 2011
ROD BLAGOJEVICH,          )  1:52 p.m.
8                           )
             Defendant.  )
9                           )

10                    VOLUME 26 PM
             TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE JAMES B. ZAGEL
                 AND A JURY
12
APPEARANCES:
13
For the Government:
14
      THE HONORABLE PATRICK J. FITZGERALD,
15       UNITED STATES ATTORNEY
      BY:  Reid J. Schar
16           Carrie E. Hamilton
          Christopher Niewoehner
17       219  S. Dearborn Street
      Suite 500
18       Chicago, IL  60604

19

20

21 Court Reporter:

22       KATHLEEN M. FENNELL, CSR, RMR, FCRR
         Official Court Reporter
23        United States District Court
     219 South Dearborn Street, Suite 2144-A
24         Chicago, Illinois  60604
        Telephone:  (312) 435-5569
25           www.Kathyfennell.com

1    APPEARANCES:   (Continued)

2    For Defendant Rod Blagojevich:

3         KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
4         158 West Erie
          Chicago, Illinois  60610
5         (312) 640-1776

6         OFFICES OF AARON B. GOLDSTEIN
          BY:  Aaron Benjamin Goldstein
7         6133 South Ellis
          Chicago, Illinois  60637
8         (773) 752-6950

9         OFFICES OF LAUREN FAUST KAESEBERG
          BY:  Lauren Faust Kaeseberg
10        2140 N. Lincoln Park West
          Suite 307
11        Chicago, IL  60614
          (773) 517-0622

12

13        LAW OFFICE OF ELLIOTT RIEBMAN
          BY:  Elliott Riebman
14        158 West Erie
          Chicago, Illinois  60610
15        (847) 814-2900

16

17

18

19

20

21

22

23

24

25

Blagojevich - direct

4497

1        (Proceedings heard in open court:)

2            COURT SECURITY OFFICER:  All rise.

3        (Jury enters courtroom.)

4            THE COURT:  Please be seated.

5            You may resume.

6            MR. GOLDSTEIN:  Thank you, your Honor.

7      ROD R. BLAGOJEVICH, DEFENDANT HEREIN, PREVIOUSLY SWORN,

8                    DIRECT EXAMINATION (RESUMED)

9    BY MR. GOLDSTEIN:

10   Q.  Rod, if you could turn to Tab 65.

11   A.  Okay.

12   Q.  Are you there?

13   A.  Yes.

14   Q.  Okay.  According to the transcript, what's the date and

15   time of this call?

16   A.  It's December the 4th, 2008 at 11:17 in the morning.

17   Q.  And who are the speakers on this call?

18   A.  It's me and Fred Yang.

19   Q.  If you can turn to Page 2, on Line 7, you say, "I mean,

20   uh, just between you and me, they've offered a whole bunch of

21   different things they want to do for me."

22            Yang says, "Like what?"

23            You say, "You know, again, the question is whether

24   you can believe it or not, but, uh --"

25            Yang says, "Right."

1           And you say, "You know, fundraising."

2           What were you saying there, Rod?

3   A.   I was conveying to Fred what had been conveyed to me on a

4   couple of occasions, that -- that there were -- there were

5   individuals from the Indo-American community who had conveyed

6   to my brother that Congressman Jackson had -- had asked them

7   to approach us, my brother in that particular case, that if I

8   appointed him to the United States Senate that they were

9   offering political support and fundraising support, and the

10  fundraising support was $1.5 million, and some of it would be

11  up front and some of it would be accelerated.

12          I was conveying to Fred what I had talked about

13  before earlier, what had been -- what had been conveyed to my

14  brother from Rajinder Bedi and Raghu Nayak.

15  Q.   Had this offer of campaign contributions, was that ever

16  directly sent to you or offered to you?

17  A.   No.   Nobody came to me directly from the Indo-American

18  community, Congressman Jackson or anybody, offering campaign

19  funds in exchange for me appointing him to the Senate.

20  Q.   How many times were you aware that an offer was made to

21  Robert?

22  A.   The first I heard of it was the end of October when my

23  brother told me that Rajinder Bedi had approached him and

24  indicated that Raghu Nayak had said that if I appointed

25  Congressman Jackson -- I'm doing the best I can to reconstruct

1    it -- that Congressman Jackson, that there would be

2    accelerated fundraising on my behalf.  My brother told me that

3    and told me, as he should, that he rejected that to Rajinder

4    Bedi.

5              Then he told me after an event in Schaumburg, as we

6    were driving back, he told me that Raghu Nayak had approached

7    him and had offered the promise of the Jackson political

8    network, political support and $1.5 million in campaign

9    contributions.  He had said something like Congressman Jackson

10   would do something like 500,000 and that they would do another

11   million or something.  Basically that's kind of, as I remember

12   it, what he -- what he said.  My brother correctly said no.

13             Then in the middle of November, don't know the exact

14   day, I can't remember, but it was well before Thanksgiving, my

15   brother told me about a meeting he had with another individual

16   from the Indo-American community by the name of Babu Patel.

17             MR. SCHAR:  Objection, Judge.

18             THE COURT:  Objection sustained.

19   BY MR. GOLDSTEIN:

20   Q.  Is it -- is it your understanding that Robert had a

21   meeting with Babu Patel?

22   A.  Yes.

23             MR. SCHAR:  Objection, Judge.

24             THE COURT:  The objection is sustained.

25   BY MR. GOLDSTEIN:

1  Q.  As of December 4th, 2008, what was the status of this

2  offer regarding campaign contributions that was made to your

3  brother?

4  A.  My brother rejected it on numerous occasions, as well he

5  should, and it was not something that I was interested in

6  doing or going to do and he certainly wasn't going to do.

7  Q.  On December 4th, 2008, what was your desire regarding

8  Jesse Jackson, Jr. as a Senate candidate appointment?

9  A.  I was not going to appoint Jesse Jackson, Jr. to the

10 Senate.

11 Q.  And on Page 2, going down Line 16, you say, "No, no, no.

12 This is -- no, Lisa's got the leg up to get the deal for

13 people."

14        Yang says, "No, no.  Yeah, I know, I know."

15        You say, "No political stuff."

16        Yang says, "Yeah, yeah, yeah, okay."

17        You said, "Political."

18        Yang says, "Okay."

19        You say, "Okay."

20        And then Yang says, "Yes, sir."

21        You say, "You know."

22        And Yang says, "You're right, you're right."

23        And then it goes down, and you say, "I could

24 engineer -- look, let's say I wanted to run for reelection."

25        What were you saying here when you said "Lisa's got

1    the leg up to get the deal for people"?

2    A.  I'm reiterating with Fred, which, you know, the

3    discussions we'd had before as well as the meeting we had in

4    Washing -- in Philadelphia two days before that -- no, Lisa's

5    the first option, that's what we want to get done.  Lisa and

6    the deal for the people.

7           But if I can't get that, then what's the fallback?

8    Lisa offers me good stuff for people.  Jesse, Jr. offers me

9    good politics because of my African-American base and a lot of

10   other factors, political support and other factors, the

11   political network, political allies, African-American, all of

12   that.  That's what I'm saying to Fred.  First option, good

13   stuff for people of Illinois through Lisa, but fallback we

14   need to objectively hear the argument for Jesse, Jr. that you

15   could make, a plausible political argument on him being

16   objectively considered.

17   Q.  On this day in December 4th, had you come to a conclusion

18   as to who this fallback would be?

19   A.  No.  I was spending a lot of the time on several elements

20   of this, and one of them was if I don't get the Madigan deal,

21   what will be my fallback position, and I was certainly a very

22   strong candidate in my mind because I felt if I couldn't get

23   something good like that and make this guy's daughter a

24   senator, Lord have mercy, how bad will this be moving forward.

25   Maybe I need to parachute myself in the Senate.  That was in

Blagojevich - direct

4502

1  my mind.

2  Q.  Turn to Tab 66.

3        Now, according to the transcript, Rod, what's the

4  date and time of this call?

5  A.  It's December the 4th, 2008 at 11:23 in the morning.

6  Q.  And who are the speakers?

7  A.  Me and John Harris.

8  Q.  And on Page 1 at Line 10, you say, "I'm gonna think about"

9  and you laugh, "I mean, if I'm prepared to put Lisa Madigan

10  there and that doesn't work out, the fallback is, okay, well,

11  what's your next play?  I mean there's -- you know, if you can

12  cut a deal with the Jacksons that you can believe that

13  includes Meeks, no income tax Meeks, you know, does not run,

14  you know, we talk about running for a third term, but, you

15  know, even though I don't see that, I don't know, you know

16  what I'm saying."

17        And Harris says, "Uh-Huh."

18        And you say, "The whole black politics kind of thing

19  and I've got the uber African-American with Jesse, Jr."

20        When you said, "I mean if I'm prepared to put Lisa

21  Madigan there and that doesn't work out, the fallback is

22  what's your next play," what were you saying there?

23  A.  I'm making the argument to John Harris that if you look

24  objectively, if you just take a look at the objective politics

25  of it, that you can possibly put together a pretty impressive

1    political deal that can also serve a public purpose.  And this

2    was me laying this out with this paragraph.

3           When I say, for example, you can cut a deal with the

4    Jacksons that you can believe -- unfortunately, with

5    Congressman Jackson, that was an issue with us -- that that

6    would also include Reverend Senator James Meeks who was a

7    strong ally of the Jackson family.  He's a reverend at the

8    House of Hope, has a very significant, large congregation, and

9    I had a good relationship with Reverend Meeks for a lot of

10   reasons, and a very effective state senator with a following

11   and influence.

12          He was a strong advocate of an income tax increase

13   for good purposes.  He wanted a lot of more revenue for

14   education spending.  And had a tremendous amount of influence

15   in Springfield because of his skill, talent, all the rest.

16          He was also the one who suggested a billion dollars

17   in the capital program for low-income communities, so he was

18   helpful to us to move that.

19          MR. SCHAR:  Judge, objection.

20          THE COURT:  You can stop there.

21          THE WITNESS:  Okay.

22   BY MR. GOLDSTEIN:

23   Q.  Senator Meeks, you said, was a friend of yours, is that

24   right?

25   A.  Good relationship with Reverend Meeks.

Blagojevich - direct

4504

1    Q.  Were you potentially concerned, though, that he may run

2    against you in 2010?

3    A.  He had talked about running against me because of the

4    income tax increase.  We differed on that.

5            In my reelection in 2006, he talked about creating a

6    third party, which would have hurt me in the general election

7    against my Republican opponent because of the African-American

8    base.

9            MR. SCHAR:  Objection.

10           THE WITNESS:  Yeah.

11   BY MR. GOLDSTEIN:

12   Q.  And if you go to Page 2, Rod, Line 17, you say, "Well,

13   he's come to me with -- through third parties, you know, with

14   offers of campaign contributions and help."

15           Harris says, "Right."

16           You say, "You know what I mean, 1.5 million, they --

17   they've -- they're throwing numbers around."

18           Harris says, "Right.  Sighs.  Well, I mean, that's

19   not the factor, but I'm saying the Balanoff thing you can

20   always -- I think you can always repair that."

21           You say, "Oh, yeah."

22           Harris says, "Issue with Balanoff."

23           You say, "Oh, yeah."

24           Now, when you said he's come to me through third

25   parties, you know, with offers of campaign contributions and

Blagojevich - direct

4505

1    help, what were you saying there, Rod?

2    A.  I was raising the same issue with John that I had raised

3    with Fred, and I was letting him know those third parties that

4    I just spoke about a moment ago had -- had approached my

5    brother, and -- and the numbers were what I said.  They were

6    what we were told that the offer was $1.5 million.

7            Again, I'm not -- I didn't know that Jesse, Jr. -- it

8    was purported that he was asking this, but that was unclear.

9    What I was suggesting to John was this is what we've been

10   told, and that's what I said to John.

11   Q.  And when Harris says, "Right, well, I mean that's not the

12   factor, but I'm saying the Balanoff thing, you can always -- I

13   think you can always repair that issue with Balanoff," what

14   did you understand Mr. Harris to be saying?

15   A.  Two things:  One, the campaign contributions for the

16   Senate seat is not a factor, to which I say, yeah.  And the

17   second thing is I'm saying the Balanoff thing, you can always

18   repair, I think you can always repair that.  And he says issue

19   with Balanoff, and I say yeah.

20           Now, the -- should I explain the Balanoff thing?

21   Q.  Well, when you say, "Oh, yeah," the first time, what were

22   you saying there, Rod?

23   A.  I was agreeing with John Harris that the $1.5 million

24   would not be a factor.  Then I agreed with him on him saying

25   that we can always repair that thing with Balanoff.

1   Q.  What did you understand was to be repaired with Balanoff?
2   A.  Again, as I had testified earlier, Tom Balanoff came to me
3   early on that first meeting on the 3rd of November.  I
4   interpreted that meeting with Tom Balanoff and Andy Stern as
5   more about getting reassurances that I wasn't going to appoint
6   Congressman Jackson than it had to do with Valerie Jarrett or
7   any other issue, and that I was quick to tell them don't worry
8   about it, I'm not going to appoint him.  I'll never appoint
9   him.
10          In conversations -- so that's what I'm -- I'm
11  referring to that.
12          Then as weeks went by, Tom Balanoff had called me and
13  had asked me as a favor to him to make an appointment to at
14  least see Jesse Jackson, Jr. and let him come in and pitch his
15  case and make his case.  I think Balanoff wanted to be able to
16  do him a favor, get him access and do that.
17          I wanted to now let Balanoff -- let the -- Tom
18  Balanoff and anybody else who was listening who had contacts
19  with the new Obama administration or the national Democrats or
20  whomever, that, you know what?  Maybe I was too quick to say
21  there's no chance for Jesse, Jr.  If you look at it
22  objectively, Jesse Jackson, Jr. and the politics of it all
23  could make a lot of sense, particularly with my
24  African-American base, and, therefore, don't think if I don't
25  get this Madigan deal I may not do something crazy like Jesse,

Blagojevich - direct

4507

1    Jr., me or Senate President Jones.

2    Q.  And when you talk about crazy enough to do Jesse Jackson,

3    Jr., is that related to what you had mentioned earlier about

4    negative leverage?

5    A.  It was all about negative leverage.  Basically saying

6    there's a carrot and a stick here.  You got a carrot, you're

7    going to --

8            MR. SCHAR:  Objection, Judge.

9            THE COURT:  Objection sustained.

10   BY MR. GOLDSTEIN:

11   Q.  On Page 3, Line 8, you say, "You know, that -- that, you

12   know, if that's the case, then why should I be anything but

13   f'ing strengthened, you know, my position with my base, I

14   mean, among blacks, that that will be the best pick, won't

15   it?"

16           What were you saying there, Rod?

17   A.  If it was a choice between politics over good results for

18   people, this was clearly the better political move for me.

19   Putting aside personal feelings on either side, Congressman

20   Jackson's appointment for me would have been very good for my

21   politics with the African-American community and some of the

22   other dynamics that I talked about.

23           So that's what I was saying.  It would strengthen

24   what was a very strong position in the African-American

25   community that I was privileged to have, and this -- Jesse,

1    Jr., if I made him a senator, would make it even stronger, I
2    believed.
3    Q.  On Page 7, Line 28, you say, "When you calling Rahm?"
4           Harris says, "I got a call in to him already."
5           You say, "Good."
6           What were you talking about there, Rod?
7    A.  Where was that, Aaron?
8    Q.  On Page 7, Line 28.
9    A.  And this is the same date, the 4th, right?
10   Q.  Tab 66.
11   A.  Right.  I -- I was asking him whether he had gotten -- I
12   wanted him to call Rahm Emanuel who, by then, was the
13   announced going to be chief of staff to President Obama.
14   Still a congressman, but he was going to be the chief of
15   staff.  He was publicly designated at this time.
16          And I wanted John Harris to call him and kind of
17   chide him and say, so you're still okay with Jesse, Jr.,
18   right?  Because they gave us that list that I believed was
19   bogus.  And if that's the case, you should know, you know,
20   we're taking a good look at him, and he's coming in to see me
21   on Monday, the 8th of December.
22          And I wanted him to also say that he was going to
23   play a big role in our poverty summit.  I believe I wanted him
24   to do that, which was going to be the 9th of December, where
25   Congressman Jackson and I would appear together at a summit --

1          MR. SCHAR:  Objection.

2          THE COURT:  Objection sustained.

3   BY MR. GOLDSTEIN:

4   Q.  You had mentioned earlier that you had called Harris

5   earlier that day to tell him to call Rahm Emanuel, is that

6   right?

7   A.  Yes.

8   Q.  And when you say on Page 7, "When you calling Rahm," was

9   that referencing the previous call you had with Harris to tell

10  him to call Rahm Emanuel?

11  A.  Yes.  He didn't -- generally, Harris would let me know,

12  fill me in on stuff that he did when I would tell him to do

13  it.  So since he hadn't done it, I just assumed he hadn't, so

14  I wanted to know when you're going to do it, and he told me he

15  had a call in to him already.

16  Q.  And this was part of the negative leverage strategy, is

17  that right?

18  A.  Very much so.

19  Q.  If you can turn to Tab 67, and according to the

20  transcript, what's the date and time of this call?

21  A.  It's December the 4th, 2008 at 2:09 in the afternoon.

22  Q.  And who are the speakers?

23  A.  It's me and Bob Greenlee and Fred Yang.

24  Q.  And if you go to Page 3 and on Line 19, you say, "Hey,

25  Fred, can I -- I'm on the other line, though, let me get --

1    let me get this done.  I just wanted you to just take a look

2    at this and just see what -- what your thoughts are on it

3    'cause I just learned of it, but, um, but I want you to

4    consider all the politics about Jesse, Jr. as objectively as

5    we can."

6              Then Yang says, "Uh-Huh."

7              And then you say, "And the deal that I might be able

8    to cut politically with him."

9              Yang says, "Will -- well, see, that's -- that's one

10   thing I need to know more about is what exactly do you get

11   from him."

12             And you say, "Yeah."

13             When you said "I want you to consider all the

14   politics about Jesse, Jr. as objectively as we can," what were

15   you saying there, Rod?

16   A.   Fred was very much against me appointing Congressman

17   Jackson to the Senate, had said previously that out of a list

18   of a thousand candidates, Jesse, Jr. would be 999 on his list.

19   So I knew what his position was, that he was against it.

20             But what I wanted him to do was to consider -- first

21   of all, I wanted to pass along to him this new poll that came

22   out by Rasmussen that had Congressman Jackson in first place

23   and Lisa Madigan getting zero percent of the African-American

24   vote.

25             And I wanted Fred, my pollster, who was also the firm

1  who worked for Senator Durbin and was also close to Bill Knapp
2  to convey to them that, look, when you consider the polling
3  information, the political support that the Jackson -- that
4  the Jackson appointment would mean, the fact that he's got a
5  poll showing how well he's doing with the public,
6  predominantly with the African-American community, and she's
7  getting zero support, that, hey, you guys are professional
8  politicians.  You know the politics of it.  You can make a
9  strong, objective case in terms of the wisdom of me going
10 straight politics with Jesse Jackson, Jr.
11        And I wanted Fred to objectively start looking at it.
12 I wanted to let him see that objectively the politics made a
13 lot of sense for me.
14 Q.  When -- when you say "in the deal that I might be able to
15 cut politically with him," what were you saying there?
16 A.  Cut a political deal with him, the possibility of cutting
17 a political deal with him, which would mean, as it was
18 expressed to us by Raghu Nayak, political support that would
19 be the Jackson family political network, Operation PUSH,
20 Reverend Jackson, African-American ministers who were allied
21 with Reverend Jackson and Jesse Jackson, Jr., elected
22 officials, a couple state representatives, Senator Meeks,
23 Reverend Senator Meeks, and, of course, the African-American
24 community as a whole would be pleased with me.  And, of
25 course, the polling information, just the whole political

Blagojevich - direct

4512

1  network that would come with that if I were to build a

2  political alliance with the Jacksons and sort of resurrect

3  what used to be a pretty good relationship between me and

4  Jesse, Jr.  Still had a good one with Reverend Jackson, but

5  Jesse Jackson, Jr. and I were pretty close at one time.

6  Q.  If you'd turn to Page 5, and Greenlee says on Line 18, "I

7  mean, so -- well, how could you possibly say I'm gonna give

8  you the biggest prize in the world and he'd say, of course,

9  oh, I'll do this for you when you know twice before he said he

10  was going to do it and he didn't."

11       You said, "No, but some of that -- that tangible

12  stuff can happen before it all happens.  There are tangible

13  things that can happen before, you see."

14       Greenlee says, "Yeah, no, no, I know what you mean,

15  but it's just --"

16       And then you say, "I'll tell you right now, if I had

17  to make the decision, you know, you make the Lisa Madigan

18  play, you get everything you want and then some, they turn it

19  down, they don't get it done, fine, then it's Jesse, Jr."

20       What were you saying or what did you understand

21  Greenlee to be saying as far as "I'm going to give the biggest

22  prize in the world, I'll do this for you when you know twice

23  before he said he was going to do it and he didn't"?

24  A.  Well, Bob Greenlee is referring to the appointing him to

25  the United States Senate.  He expressed it as the biggest

1   prize in the world, and you could make a plausible argument

2   that he's right, it's a great job to have in many ways, but

3   then why would you do that for a guy who twice before said he

4   was going to do -- was going to support you politically and

5   didn't.

6          And what he was talking about was Jesse Jackson,

7   Jr.'s promise to endorse me for governor.  He was a critical

8   piece before I decided to run for governor and give up my

9   congressional seat, and then when the rubber hit the road and

10  it was time to have him step up and make the endorsement,

11  he -- he didn't do it, and then he ended up endorsing one of

12  my opponents.

13         So that was one of the two things, political examples

14  that I think Bob Greenlee was -- I'm certain Bob Greenlee was

15  talking about at that time.  How could you trust this guy to

16  support you politically now when he didn't do it and lied to

17  you the first time, or broke a promise to you the first time

18  that you relied on.

19  Q.  When you said down further, "No, but some of that tangible

20  stuff can happen before it all happens, there are tangible

21  things that can happen before," what were you saying there,

22  Rod?

23  A.  That there could be, you know, a manifestation or

24  expression of supporting me politically up front that I could

25  see before I make a decision that this is someone that I

Blagojevich - direct

4514

1    should elevate, in my own thinking, and I was referring to

2    that, political support.

3    Q.  And then further you say, "I'll tell you right now, if I

4    had to make the decision, you know, you make the Lisa Madigan

5    play, you get everything you want and then some."  What are

6    you saying here, Rod?

7    A.  I'm saying just that, that throughout this entire

8    conversation in all the conversations in this period that had

9    to do with Congressman Jackson, that he was -- he was not --

10   that Lisa Madigan was the first option, and the Madigan deal

11   was the first option.

12          The question was could you use the negative leverage,

13   the political leverage, the possibility of Jesse Jackson, Jr.

14   to help us to get this Madigan deal signed, sealed and

15   delivered.  And if that Madigan deal didn't happen, what are

16   your fallbacks, what would they be and who would they think

17   the Senate Democrats and the Obama people and the others, who

18   would they think my fallback might be.

19   Q.  Is that what you're potentially discussing further down

20   when you say, "They turn it down, they don't get it done,

21   fine, then it's Jesse, Jr."  You go on to Page 6, "I mean

22   that's it, I mean Jesse, Jr., or, you know, or me."

23          What were you saying there?

24   A.  Yeah, I mean, I suppose there's a bit of a -- what I'm

25   saying there is, and -- what I'm saying there is -- is we got

Blagojevich - direct
4515

 1   all these great results.  Democrats say they're for him.  You
 2   guys help me get this done, and if you don't --
 3            THE COURT:  Please, just be concise.
 4            THE WITNESS:  Okay, Judge.
 5            Except that's what I was thinking, that was in my
 6   mind and I felt that.
 7            But I was petty and expressing you're not going to
 8   help me?  Here's Jesse, Jr., here's me, here's Emil Jones, and
 9   go -- that's kind of the thinking.
10   BY MR. GOLDSTEIN:
11   Q.  Page 6, Rod, on Line 9, Fred Yang says, "Is this -- is
12   essentially the deal with Jesse, Jr. will be that the Jacksons
13   will sport you for reelection?"
14            You say, "No, there's another to it."
15            Yang says, "What else?"
16            You say, "There's tangible -- concrete, tangible
17   stuff from supporters."
18            Yang says, "Like what?"
19            You say, "Well, like, you know, you know what I'm
20   talking about."
21            Greenlee says, "Uh, later."
22            You say, "Political, tangible political support,
23   Fred."
24            And Yang says, "Okay, all right."
25            And you say, "You know, specific amounts and

Blagojevich - direct

4516

1    everything and while, you know, I don't know that all of that

2    is achievable, there is some of it up front, but go ahead,

3    Fred."

4         When Mr. Yang says is essentially the deal with

5    Jesse, Jr. will be that the Jacksons will support you for

6    reelection, what did you understand him to be saying?

7    A.  What Fred's asking me there is that so you figure, you

8    know, that all you'll get from -- that what you'll get from

9    Jesse Jackson, Jr. is they'll support you for reelection.

10        Now, Fred knew that I was unlikely to run for

11   reelection, so --

12        MR. SCHAR:  Objection.

13        THE COURT:  Objection sustained.

14        THE WITNESS:  Yeah, yeah, sorry.

15        That is that what you think the deal is, Jesse, Jr.

16   will support you for reelection, and then I say, "There's more

17   to it."

18   BY MR. GOLDSTEIN:

19   Q.  What are you saying there?

20   A.  I'm saying that there was an offer of political support

21   and the Jacksons -- not the Jacksons, but Raghu Nayak and

22   Rajinder had indicated that Congressman Jackson had sent them

23   to offer political support and fundraising support, and I went

24   on to explain to Fred what was said to us, what was conveyed

25   to us, and I was being honest with Fred that it was -- that

Blagojevich - direct

4517

1   there was political support that's tangible and that there was

2   also specific amounts of campaign funds that were being

3   purportedly promised from Congressman Jackson by Raghu Nayak

4   and Rajinder Bedi and Babu Patel.

5   Q.  Okay.  So when you said political, tangible political

6   support, what were you saying there, Rod?

7   A.  That the political network of the Jackson family, the

8   alliances potentially with Senator Meeks, some of the state

9   reps that had close alliances with the Jacksons, the political

10  support that I talked about a while ago, the African-American

11  ministers, the African-American community in general, that

12  sort of thing, and then I'll talk -- and Jesse, Jr. being a

13  strong public advocate for my initiatives to help me fight the

14  gridlock against Mike Madigan, and I will -- go ahead, I'm

15  sorry.

16  Q.  And turn to Page 7, on Line 4, you say, "Well, that's

17  right, that's part of it, but, here, again, this is -- you try

18  to make the mega deal for the people, and it falls apart, it

19  doesn't happen, okay."

20          Yang says, "Right."

21          You say, "Or they don't want it, right?"

22          Yang says, "Right."

23          And you say, "Okay.  So then what's my fallback?

24  Eric Whitaker."

25          When you say, "That's part of it, but here again you

Blagojevich - direct

4518

1   try to make the mega deal for the people and it -- it falls

2   apart, it doesn't happen," what were you saying there, Rod?

3   A.  Again, I was reiterating that in all these conversations

4   about objectively looking at the pros and cons of Congressman

5   Jackson as a senator for the political situation, that he was

6   never the first option, it was always the Lisa Madigan mega

7   deal for the people, that was the first option.

8           The question was what's the fallback and whether or

9   not the -- as I said, the fear of me and Jesse, Jr. and Emil

10  Jones, would that spur the D.C. people to help us get it done.

11          I then raise Eric Whitaker.  That's Dr. Eric

12  Whitaker, President Obama's friend, maybe he'd be a good

13  fallback.  I'm asking Fred what do you think of Eric Whitaker

14  as a fallback.

15  Q.  And on Page 9, Rod, Fred Yang says on Line 13, "Uh, right,

16  because, um, depending on things, um, if Senator Madigan,

17  yeah, she'll not do anything for you, but you'll either be

18  running for reelection and winning or you'll just, you know,

19  you're -- you're just, look, we -- you'll be better off having

20  done, having had a great two years."

21          Greenlee says, "More accomplishments means more

22  friends."

23          You say, "Yeah, hold it.  You guys are missing the

24  point.  First option is getting things done for people.  Look,

25  you got two equally repugnant picks, okay?"

1       What did you understand Mr. Yang to be saying there?

2  A.  Evidently, part of what I was trying to do with Fred was

3  to make a compelling argument on why politically Congressman

4  Jackson made sense and that he might convey that to Bill Knapp

5  in particular so that they might not -- they would take my

6  early rejections of Jesse, Jr. as -- as being not what they

7  were but that, in fact, who knows?  Maybe if I don't get this

8  Madigan deal, I might do something like that.

9       So I was evidently doing a pretty good job scaring

10  them a little bit because I think he then brought up, you

11  know, the Lisa Madigan situation were she a senator and

12  Greenlee, Bob, correctly says, "More accomplishments means

13  more friends."

14       In other words, you end up doing good things, nature

15  takes its course, you'd hope and think.  And I make it clear

16  here, look, you guys, hold it.  You're missing the whole point

17  here.  I'm not saying Lisa Madigan is not the first option.

18  She is the first option, as I say, getting thins done for

19  people.

20       Then I say, and I regret saying this because it

21  just -- I shouldn't say it.  They're repugnant picks for me

22  personally.  I didn't have good relationships with either one

23  of them personally, and, you know, I'd like to add them to the

24  list of the Russians, the Macedonians and apologize to them.

25  Q.  Who were the two picks, when you said two equally

Blagojevich - direct

4520

1   repugnant picks, who were you talking about?

2   A.   Congressman Jackson and Lisa Madigan on a personal level

3   with me.

4   Q.   Page 10 on Line 25, you say, "I mean that -- that --

5   that's all I'm saying, and I thought this through as well, if

6   you can believe this guy, which is a big if, but maybe there's

7   some conditions that we state in -- in the announcement that

8   he's going to really active -- he's going to be really active

9   as a U.S. senator to help me break the logjam in Springfield

10  and hold the Democratic party chairman accountable to get

11  these Democratic principles done.  He's got a bully pulpit and

12  he starts advocating that right in the beginning, maybe

13  there's some plus there.  What do you say to that?"

14           And Greenlee says, "I think that's not plausible."

15           What were you saying here, Rod?

16  A.   This is the tangible political support I'd like to see

17  from the -- from Jesse Jackson, Jr., show me something so I

18  might be able to believe you on some stuff based upon the

19  false promises, the unkept promises politically from the past.

20           So why don't we, can you get out there, up front out

21  there with me now, is what I'm saying, and -- and say that

22  you're going to join me if you're a United States senator to

23  break the gridlock that's being held by one guy, Mike Madigan,

24  who's our party chairman, and that Jesse Jackson, Jr. could

25  use his bully pulpit as a senator and his very persuasive

1   natural skills, which he's very good at, on that bully pulpit,

2   advocating for the things that I wanted to get done in the

3   Lisa Madigan deal, and he can help me break that logjam if

4   Mike Madigan turns me down on this deal for his daughter.

5           This is what I'm thinking and what I'm saying here,

6   and I'd like to see him do some of that up front so I could

7   actually believe this guy because he had lied to me previously

8   on several occasions.

9   Q.  On Page 12, Line 5, you say, "It doesn't matter, Bob.

10  Don't worry, don't you worry about it.  You know, again, the

11  first option is, uh, Lisa.  Right now in second place, it's

12  either me or Jesse, Jr., I mean he's ahead of Gery Chico.

13  Gery Chico is the best pick, Fred, but Gery does nothing for

14  me politically or governmentally, does nothing for me, and,

15  you know, there's some nebulous thing that I have a senator

16  who can get reelected and he might help me down the road,

17  Fred, okay, maybe, but I haven't figured out what I'm doing

18  down the road.  That's the other problem, right?  Are you

19  there, Fred?  Hello Greenlee."

20          When you said it doesn't matter, don't worry about

21  it, the first option is Lisa.  Right now in second place it's

22  either me or Jesse, Jr., what were you saying there, Rod?

23  A.  Well, that.  That, again, always the first option in these

24  discussions was the Lisa Madigan deal.  She was the means to

25  the ends.

1     The question then was if that didn't happen, then

2  it's either me or Jesse, Jr., which is what I'm, you know, was

3  saying.  Then I raised the name of Gery Chico.  I tell Fred

4  that he doesn't do anything for me politically or

5  governmentally, which is how I saw the politics of Gery,

6  though Gery was one of my most significant fundraisers and

7  raised me a lot of money.  But the politics politically and

8  governmentally, I didn't see how Gery can be that helpful.

9     Then I said -- I'm sorry.

10  Q.  You said, "And there's some nebulous thing that I have a

11  senator who can get reelected, might help me down the road,

12  Fred, okay?"  What were you saying there?

13  A.  Right.  In other words, the favor bank of politics, which

14  is very much the way the business works, is that you do a

15  favor for somebody, do something nice, and then later on, you

16  hope he or she remembers it and when you need something, help,

17  that they could support you.

18     So you're looking at something that is, you know, out

19  there in the future, it's nebulous, and -- and probably

20  likely.  I mean, if you're going to make a United States

21  senator, in all likelihood, that person, there would be some

22  gratitude in some respect to do -- to be someone who

23  understood that that's a big thing you did for them.

24  Q.  On Page 13, Line 12, you say, "Yeah, listen, Fred, if --

25  if we cut the deal with them, she's the one."

1        Yang says, "Right."

2        You say, "Listen, Jackson's not realistic unless they

3    reject the deal."

4        What were you saying there?

5    A.  Just that.  Again, it was always that.  The Lisa Madigan

6    deal was the first option, and I -- at this point, I really

7    wanted that to happen.

8        If, however, they -- Mike Madigan won't do those

9    things I want him to do, then -- then, you know, Jesse

10   Jackson, Jr. and others become possible alternatives.  And so

11   I make it clear to him, hey, Fred, I know you don't want him,

12   so he's not realistic unless the Madigans reject the offer.

13   And I was hoping that they wouldn't if we got to that point.

14   Q.  And Page 14, you say, "But, I mean, you craft a deal where

15   he's publicly advocating for our stuff and publicly going

16   after, you know, the gridlock and the, uh, and the principal

17   architect of the gridlock.  In part, that's part of the deal

18   we cut.  You got to compare him only against the other ones,

19   not her.  Hers is the whole deal.  That's the first choice."

20       Yang says, "No, I understand, I understand."

21       What were you saying there, Rod?

22   A.  That that's what I had in mind.  You know, if Jesse, Jr.

23   had any chance for me to objectively think about him, you

24   know, I wanted to see him get out there up front before I move

25   in that direction and show me whether or not he's prepared to

1  publicly advocate for our stuff, go after Madigan, go after

2  the gridlock, the principal architect of that gridlock, show

3  me something that I can rely on you that I might have an ally

4  who helps me govern if I make you a senator.

5          And there was a particular bill that day that I was

6  thinking of having June --

7          MR. SCHAR:  Objection.

8          THE COURT:  Wait a second.  What was the question?

9  BY MR. GOLDSTEIN:

10 Q.  What were you saying in this -- this paragraph right here

11 on Page 14?

12         THE COURT:  Right.  It seems to me he was answering

13 more of the question why he said it rather than what he said.

14 Maybe you want to clarify it.

15 BY MR. GOLDSTEIN:

16 Q.  Well, when you talked about "You craft a deal where he's

17 publicly advocating for our stuff, publicly going after the

18 gridlock and the principal architect of the gridlock," you

19 talked about what you were saying there and you mentioned

20 something about the bill that was pending.

21         Why were you talking about the gridlock and the

22 principal architect of the gridlock?

23 A.  It's Mike Madigan --

24         THE COURT:  That question I think he's actually

25 answered.

1  BY MR. GOLDSTEIN:

2  Q.  As you go down, "That's part of the deal we cut, you got

3  to compare him only against the other ones, not her.  Hers is

4  the whole deal, that's the first choice."

5          What were you saying there, Rod?

6  A.  Right.  The Lisa Madigan deal was, by leaps and bounds,

7  better than all these other alternatives at this point.  It

8  had tremendous potential, was very excited about it.

9          But then you got to compare him only against the

10  others, compare the politics of me appointing Congressman

11  Jackson to the politics of me appointing me, for example.  The

12  politics of me appointing Congressman Jackson --

13          MR. SCHAR:  Objection.

14          THE COURT:  I think he's answered the question.

15  BY MR. GOLDSTEIN:

16  Q.  Page 18, Rod, Line 33, you say, "And she's ahead because

17  she can offer tangible things for people.  The guy, the -- the

18  other guy is the better public -- is -- is a straight-up

19  political move.  We can cut a political deal there."

20          When you said, "She's ahead because she can offer

21  tangible things for people," what were you saying there?

22  A.  Just that.  She can offer tangible results for people with

23  her father and the things that we can do for the people of

24  Illinois if they would get those things passed, not --

25  Q.  And you said, "The other guy is the better public, is

1  the -- is a straight-up political move, you can cut a
2  political deal there."
3          What were you saying there, Rod?
4  A.  Here again, the Jackson political network, everything I
5  said about the African-American ministers, Reverend Senator
6  Meeks, State Representatives Miller, Will Davis, other allies
7  of the Jacksons, all of that would be political support, as
8  well as legislative support.
9          At least two of them are members of Madigan's House
10 caucus.  He could help me develop an African-American caucus
11 in the House that might be willing to rebel against Mike
12 Madigan's leadership if he's blocking things.  Reverend Meeks
13 had a tremendous amount of influence in Springfield, that sort
14 of thing that you can get --
15         MR. SCHAR:  Objection.
16         THE COURT:  Stop.
17         THE WITNESS:  Yep.
18         THE COURT:  Maybe I'm the only one, but this seems
19 repetitive to me.
20 BY MR. GOLDSTEIN:
21 Q.  If you can turn to Page 22.
22         Line 7, Fred Yang says, "So, so, um, all right, I got
23 to jump off now, but, um, well, we'll -- I'll think about this
24 more, and, um, hey, Bob, one thing, that one thing I forgot to
25 talk to you about is, uh, when we talked this morning, um,

Blagojevich - direct

4527

1    another thing the governor said he wanted in the deal --"

2              Greenlee says, "Yeah."

3              Yang says, "-- is something to do with small

4    business."

5              Greenlee says, "Uh-Huh."

6              Yang says, "So I'm going to make some calls and look,

7    um, but you should also have some of our staff folks, um, Bob,

8    see what other states have done that -- that's pretty

9    innovative."

10             What did you understand Mr. Yang to be saying when he

11   talked about "another thing in the deal"?

12   A.  Fred and I had talked about sweetening the Madigan deal

13   and adding help for small businesses, some innovative ideas

14   that were being done in other states to help small ma-and-pop

15   businesses.

16             MR. SCHAR:  Objection, Judge.

17             THE COURT:  Objection is sustained.

18   BY MR. GOLDSTEIN:

19   Q.  You had spoken with Fred Yang about this Madigan deal, is

20   that right --

21   A.  Incessantly.

22   Q.  -- before?

23   A.  Yes, over and over again, and others.

24   Q.  And we saw the list up there.  You discussed potential

25   things you wanted in the Lisa Madigan deal, is that right?

Blagojevich - direct

4528

1  A.  Yes.

2  Q.  And one thing that was brought up recently was this small

3  business initiative, is that right?

4  A.  Yes.

5         MR. SCHAR:  Objection, Judge.

6         THE COURT:  Objection sustained.

7  BY MR. GOLDSTEIN:

8  Q.  Now, if we could turn to Tab 68 now, according to the

9  transcript, Rod, what's the date and time of this call?

10  A.  It's December the 4th, 2008.  It's 2:36 in the afternoon.

11  Q.  And who were the speakers on that call?

12  A.  It's me and Bob Greenlee.

13  Q.  Now, right before this call was the call we went over with

14  Mr. Yang and Mr. Greenlee, is that right?

15  A.  Let me just doublecheck that.

16         Well, that one was at 2:09, so it sure looks like it,

17  right?

18  Q.  Yeah.

19  A.  Okay.

20  Q.  Now, when you were speaking to Mr. Yang, you were talking

21  about Jesse Jackson, Jr. as a potential candidate, is that

22  right?

23  A.  I was explaining to Fred the -- the objective arguments on

24  why he made political sense and if I made him a senator.

25  Q.  And you understood -- Fred Yang was a pollster of yours as

1    well as a consultant of yours, is that right?

2    A.  Yes.

3    Q.  Okay.  And it was your understanding he worked in

4    Washington, D.C.?

5    A.  I knew he worked in Washington, D.C.

6    Q.  And you knew that he had political connections in

7    Washington, D.C., is that correct?

8    A.  His firm did the polling for Senator Durbin, as well as

9    other senators, and he talked to Bill Knapp a lot.  And Bill

10   Knapp, my understanding was, was working for Harry Reid and

11   the Senate Democrats at the time or certainly was talking to

12   him.

13   Q.  Was there a reason why you were talking about Jesse

14   Jackson being a higher option in your ranking to Mr. Yang?

15   A.  Both Fred and Bill Knapp, Fred Yang and Bill Knapp were

16   there when I was running -- about to run for governor in 2002.

17   Like me, we all relied on Congressman Jackson's promise to

18   support me.  Bill was even looking at making commercials.

19            MR. SCHAR:  Objection.

20            THE COURT:  Sustained.

21   BY MR. GOLDSTEIN:

22   Q.  Why were you telling Fred Yang that you were elevating,

23   that Jesse Jackson was becoming a higher option for you?

24   A.  Because early on I told both Fred Yang and Bill Knapp

25   there was no way I'm making Jesse Jackson, Jr. senator, and

1    they believed it.  They knew it based on the previous history.

2    I wanted Fred to think that, you know what, maybe I need to

3    reconsider this, maybe you know what, put personal stuff

4    aside, maybe the politics makes sense, and I wanted him to let

5    Bill Knapp know that, hey, I don't know, this guy might

6    actually be thinking about Jesse Jackson, Jr. as a realistic

7    alternative if he doesn't get the Madigan deal.

8             I thought Knapp then might let Harry Reid and

9    Menendez and others and Durbin potentially know that that was

10   happening, and they'd be more determined to help me make this

11   Madigan deal.  They get the senator they want, and I get all

12   these things for people that I want.

13   Q.  Now, on Tab 68, you indicated that this call is shortly

14   after the call with Yang and Greenlee, is that right?

15   A.  Yes.

16   Q.  And on Page 1, Line 7, you say, "Okay, now listen, now

17   listen to me.  You don't know what's going on here, so you got

18   to be careful.  Don't be talking too much."

19            Greenlee says, "I hear ya."

20            You say, "I mean you're contradicting me here.

21   You're, you know, uh, it's a repugnant idea, but I need to

22   leverage that Jesse, Jr. with these f'ing national people."

23            Greenlee says, "I see what your play is."

24            You said, "To get the deal for Lisa and I got to

25   f'ing --"

1           Greenlee says, "Play."

2           And you say, "You follow what I'm saying."

3           And Greenlee says, "That's your play."

4           When you told Greenlee, "Now, listen, you don't know

5  what's going on here, you got to be careful," what were you

6  saying there?

7  A.  I was -- I was telling him, because he wasn't picking up

8  on it, that I had no intention whatsoever of making Jesse

9  Jackson, Jr. senator, and Greenlee was clear on those other

10 calls he didn't like the idea.

11          So I'm telling him don't worry about it, I'm not

12 going to make him senator essentially.  What I'm saying to

13 Greenlee is don't contradict me here because what I'm doing

14 here is I'm trying to indicate to Fred that it's not

15 impossible.  I want that leverage with those national people

16 so that they can help me get this Madigan deal done.

17 Q.  Okay.  And on Page 2, Line 18, you say, "I want them to

18 f'ing see, holy F, it's going to be Jesse, Jr. if we don't

19 f'ing get this Lisa thing done."

20          Greenlee says, "I got your play.  Yeah, I like it."

21          When you said, "I want them f'ing see, holy F, it's

22 going to be Jesse, Jr. if we don't get -- if we don't f'ing

23 get this Lisa thing done," what were you saying there, Rod?

24 A.  That I wanted the Washington establishment -- Rahm Emanuel

25 and the others, Harry Reid, Menendez, Senator Durbin and

Blagojevich - direct

4532

1  others, even Tom Balanoff -- I wanted them to see that --

2  that -- what I was saying here was that I'm jacking up Jesse,

3  Jr.  I'm elevating him in a way so that they believe I might

4  actually do him.

5        We've got him coming to the poverty summit now.  He's

6  come to my office.  We got the word out that he's -- his

7  polling --

8        THE COURT:  Wait, wait, wait.  This is not about what

9  he's saying.  This is about all background prior to what he's

10 saying.

11       I think he's saying that he was appearing to promote

12 Jesse Jackson because he thought this would, the fear of

13 Jackson, would cause people in Washington to support him in

14 the Lisa Madigan issue.  And I think he's said this very

15 often.

16       Maybe you could move it along a little quicker.

17       MR. GOLDSTEIN:  Your Honor, we ask to publish Tab 68.

18       THE COURT:  Which tab?

19       MR. GOLDSTEIN:  68, the one we just --

20       THE COURT:  Sure.

21       MR. GOLDSTEIN:  Thank you.

22       THE COURT:  Good.

23    (Tape played.)

24 BY MR. GOLDSTEIN:

25 Q.  Rod, I want you to turn to Tab 69.  And according to the

Blagojevich - direct

4533

1  transcript, what's the date and time of this call?

2  A.  It's December the 4th, 2008 at 2:43 in the afternoon.

3  Q.  On Page 1, if you look at Line 19, you say, "This whole

4  Jesse, Jr. thing, you -- you gotta understand something.  I --

5  I'm f'ing elevating him now because that's -- that whole

6  Washington establish -- establishment's freaking out."

7        Robert says, "Yeah."

8        What were you saying there to Rob?

9  A.  I was calling my brother to tell him that, just that,

10  that, you know, I was sensing that the negative leverage was

11  starting to connect with some people, and the indications were

12  positive, that it was working.  And so I was excited about

13  that, and I wanted to let my brother know what this was and

14  that the Washington establishment was freaking out.

15  Q.  Okay.  On Page 2, Line 17, you say, "And they're already

16  freaking out, and a Rasmussen poll came out today.  He gets

17  36 percent of the Democrats.  Tammy Duckworth, 28 or

18  29 percent.  Lisa Madigan 17.  Emil Jones, 2.  Lisa Madigan,

19  no support, zero support among African-Americans."

20        Robert says, "Uh-Huh."

21        You say, "In that field."

22        Robert says, "Uh-Huh."

23        And you say, "With him, okay, so why the F should I

24  send f'ing Lisa Madigan, who gets zero support among

25  African-Americans, piss off my base."

1          Robert says, "Right."

2          What were you saying here, Rod?

3     A.  I was sharing with my brother that this Rasmussen poll had

4     come out that I talked about moments before.  I believe it

5     appeared in the Congressional Quarterly the day before out in

6     Washington, so the Washington people knew about it.

7          And then I was telling -- I gave my brother the

8     numbers, as you can see, and then I raised the politics of it.

9     "So why should I just send Lisa Madigan who gets zero support

10    among African-Americans," and then, again, I think this

11    language, clearly I'm sorry about that, "I would do that to my

12    base, P off my base."

13         And then I -- that's where you stopped, right.  Then

14    my brother said, "Right."  Why would I do that?

15    Q.  When -- you were talking about this poll.  When did you

16    learn about this poll on December 4th?

17    A.  Either December 3rd or December 4th.  I think December

18    the 4th.  I think that day.  It could have been the day

19    before.

20    Q.  And if you look at Page 3, Line 2, you say, "You know,

21    here's f'ing Jesse.  People want him and take -- and so do --

22    you know what?  You're not giving me S so there, and I can cut

23    a better political deal with these Jacksons, and most of it

24    you probably can't believe but some of it can be tangible up

25    front."

1    Robert says, "Yeah."

2    And you say, "And if nothing else, I've done

3    something for the black community."

4    What were you saying here, Rod?

5    A.   That I'm talking to my brother that basically what I was

6    conveying to Fred, which was, okay, I don't get the Madigan

7    deal, so here's Jesse Jackson, Jr.  Look at my politics.

8    You're not willing to work with us and get that done.  I can

9    cut a political deal with Jesse, Jr., and the Jacksons, and

10   you can't -- because of my previous experience with Jesse,

11   Jr., you can't believe a lot of it, but there could be some of

12   it manifested, shown tangible up front, tangible political

13   support up front.

14   And then I say, if nothing else, you know, if you do

15   it and he -- and he -- he's not an ally or doesn't do anything

16   for you, I've done something for the black community, which

17   was something important to me.

18   Q.   And when you said "cut a better political deal," what were

19   you saying there?

20   A.   A political deal, meaning the support of the Jackson

21   network and Reverend Meeks and all the other stuff I talked

22   about, the African-American community.  I was not talking

23   about fundraising.  Fundraising was fundraising.  We were

24   offered political --

25   THE COURT:  Wait, wait, wait.

Blagojevich - direct

4536

1     THE WITNESS:  Yep, yep.

2     THE COURT:  I don't see the words there, so maybe you

3     ought to move on.

4     BY MR. GOLDSTEIN:

5     Q.  On Page 3, Line 30, Robert says, "Yeah, nice, nice," and

6     laughs.  "Now are you -- you're not going to jack him up and,

7     you know, create expectations in him and then F him in the

8     end."

9          You say, "Yeah, but, oh, I'm not going to rule that

10    out."

11         What did you understand Robert to be saying there?

12    A.  In other words, my brother was going to say you're not

13    going to create expectations in Jesse Jackson, Jr., lead him

14    on, I guess, is what he's saying, and then let him down in the

15    end.

16         In other words, that's what I understood him to be

17    saying to me.  You're going to jack him up, elevate him, give

18    him the impression that his star was rising, and then he

19    doesn't get it in the end.

20    Q.  When you said, "I'm not going to rule that out," what were

21    you saying, Rod?

22    A.  I'm not going to rule that out.  If he could be helpful to

23    me --

24         THE COURT:  Stop, stop.

25         THE WITNESS:  Yep.

Blagojevich - direct

4537

1    THE COURT:  You answered the question.

2    BY MR. GOLDSTEIN:

3    Q.  And Page 5, Rod.  Line 5, Robert says, "Yeah, well, I

4    would think if you do appoint him, and I don't know who the

5    money centers are in the black community, but you got to get

6    me focused on them or somebody focused on them."

7        What did you understand Robert to be saying here?

8    A.  My understanding was my brother was thinking about whether

9    or not I would send him -- I'd give -- I'd give him some

10   guidance on where he would go in the African-American

11   community to raise money.  That's what I understand he's

12   saying there.  He's asking me that.

13   Q.  And then you say, "What, here's -- here's what you've got

14   to do.  You've got to talk to Raghu.  You got to call him and

15   say, hey, look, you know, Jesse, Jr., you know, I think --

16   Rod's meeting with him at some point, very much a real -- a

17   realistic, and you should just let him know, you know, the

18   Durbins and the others behind the scenes, they don't want him.

19   They're afraid."

20       What were you saying here, Rod?

21   A.  I called my brother to tell him about the whole negative

22   leverage maneuver I was working on to try to get the Madigan

23   deal, and -- and then he -- and then this conversation shifted

24   to this thing that my brother said about raising money in the

25   African-American community.  I was not interested in that.

1       What I wanted him to do then, the idea was beginning

2  to cross my mind was that maybe he should talk to Raghu, who

3  has a close relationship with both Reverend Jackson and

4  Congressman Jackson, and say to him, hey, look, you know, your

5  guy might have a shot here.  And that, you know, leading

6  Democrats in Washington, like Senator Durbin who was second in

7  the Senate next to Harry Reid in terms of power, they didn't

8  want him.  That's what I'm saying to my brother.  Let's think

9  about the idea of you going to see Raghu Nayak and have that

10 conversation with him.

11 Q.  On Page 5, Line 31, you say, "And the other point, you

12 know, all these promises of help, that's all well and good,

13 but he's had an experience with Jesse and Jesse promised to

14 endorse him for governor and lied to him, okay?"

15      What were you saying there?

16 A.  That my brother -- that my brother would tell Raghu Nayak,

17 remind Raghu Nayak -- he knew this -- that in the past Jesse

18 Jackson, Jr. had promised to support me politically, that he

19 was going to endorse me for governor and that he didn't and

20 broke that promise, and that my brother should tell Raghu and

21 remind him of something Raghu knew.

22 Q.  Now, on Page 6, you say, "So you know, we -- if -- if, in

23 fact, there's -- there's -- this is, you know, this is

24 possible, then some of this stuff's got to start happening

25 now."

Blagojevich - direct

4539

1       Robert says, "Yep."

2       And you say, "Right now."

3       And Robert says, "Very good."

4       And you say, "And we got to see it."

5       What were you saying here, Rod?

6   A.   That, you know, if I'm going to think about elevating

7   Jesse Jackson, Jr. in my mind, then I need to see some --

8   start seeing some of this political support up front, needed

9   to show me that I could rely on him as someone who will

10  support me in the political and governmental side of things,

11  publicly advocating my stuff, that sort of stuff, and that I

12  needed to see that now and that I liked that because that

13  would send a signal to the Washington establishment that

14  Jesse, Jr. and I were resurrecting an old friendship and the

15  Jacksons and I were resurrecting an old political alliance.

16  Q.   And on Line 10, you say, "You understand -- now, you got

17  to be careful how you express that and assume everybody's

18  listening, the whole world's listening."

19      Robert says, "Right."

20      You say, "You hear me."

21      And Robert says, "Right, right, right."

22      What were you saying here?

23  A.   I was telling my brother, you know, again, should he go

24  and meet with Raghu Nayak, you've got to be careful how you

25  express that.   And this phrase, assume the whole world is

Blagojevich - direct

4540

1      listening, is a phrase I would use all the time.

2              In other words, when you talk to somebody and there's

3      politics and other dynamics, you talk like everybody's

4      listening.  You know, whatever you're going to say to

5      somebody, you don't mind saying it on national television.

6      That's what that phrase means.

7              Raghu was particularly sensitive because of those

8      things that he --

9              THE COURT:  Stop.

10             THE WITNESS:  Yep.  Sorry, Judge.

11             THE COURT:  You answered the question before the word

12     Raghu.

13             THE WITNESS:  Right.

14     BY MR. GOLDSTEIN:

15     Q.  On Line 17, you say, "But if there's tangible political

16     support like you've said, start showing us now."

17             Robert says, "Yeah, okay."

18             You say, "Okay."

19             And Robert says, "Very good."

20             What were you saying there?

21     A.  I was saying that he should have that conversation with

22     Raghu and make it -- and indicate that we'd like to see, I'd

23     like to see some political support publicly advocating maybe

24     the mortgage foreclosure bill that was being held up, maybe

25     the --

Blagojevich - direct

4541

1    THE COURT:  Wait, wait, wait.  There's nothing in

2    here about the mortgage foreclosure bill.  He's adding.

3    You're asking him to add.

4    MR. GOLDSTEIN:  No, I'm asking him what he was saying

5    here.

6    THE COURT:  No, I think -- you're not asking him what

7    he was saying here because there's nothing specific in this.

8    He says, "But if there's tangible political support, like

9    you've said, start showing us now."  That's all he said.

10    MR. GOLDSTEIN:  Yeah, and I'm asking him to explain

11    what it was he said.

12    THE COURT:  Explain what it was he said in the sense

13    that he's communicating this to his brother or in the sense

14    what's in his mind?

15    THE WITNESS:  That's it.

16    MR. GOLDSTEIN:  In his mind.

17    THE WITNESS:  Right.

18    THE COURT:  Okay.  Go ahead.

19    THE WITNESS:  Thank you, Judge.

20    BY THE WITNESS:

21    A.  In my mind, that day and the day before, we were working

22    on the mortgage foreclosure bill by Senator Collins that had

23    passed the Senate that Mike Madigan --

24    THE COURT:  Wait, wait.  The first way you started to

25    answer that was a little more concise.

Blagojevich - direct

4542

1    THE WITNESS:  Okay.

2    BY THE WITNESS:

3    A.  In my mind that day was a desire to pass a mortgage

4    foreclosure bill.  I wanted to see possibly, this was an idea

5    that was not even formed because my words were outpacing my

6    ideas.  I was thinking with my brother on what might be

7    something he might want to say to Raghu Nayak.  And that was

8    in my mind, that mortgage foreclosure bill, as well as

9    possibly the gridlock and other things.

10   BY MR. GOLDSTEIN:

11   Q.  Did you call Robert on December 4th at this time, 2:43, to

12   talk about fundraising?

13   A.  I did not.

14   Q.  Your purpose, is it fair to say, calling Robert was to

15   tell him about this negative leverage idea, is that right?

16   A.  Yeah.  It's the little brother calling the big brother to

17   say, hey, look at this great idea I got, you know.  That's

18   kind of what it was.

19   Q.  Page --

20   A.  And what do you think of it?  Yeah.

21   Q.  Page 6, Line 26, you say -- or at Line 24, Robert says,

22   "I'll make that call, I'll make that call this afternoon."

23        You say, "I would do it in person.  I would not do it

24   on the phone."

25        What were you saying there?

Blagojevich - direct

4543

1   A.  What I'm telling my brother was that he should meet with

2   Raghu Nayak in person.  Sometimes when --

3             THE COURT:  Stop.

4             THE WITNESS:  Yeah.

5             THE COURT:  He answered your question.

6   BY MR. GOLDSTEIN:

7   Q.  Why did you want Robert to meet Raghu in person and not

8   over the phone?

9   A.  Because I wanted my brother to be clear with Raghu, there

10  were several -- there were a couple of issues.  Language

11  issues, he's from India, and communication problems.  I didn't

12  want any misunderstandings on what we were doing or the idea I

13  was trying to form, so I wanted him to make sure he could meet

14  him in person and fully explain it.

15            And I wanted him to do that, for the most part, just

16  so that he could properly explain whatever idea I was

17  ultimately going to decide to do here, as I was forming this

18  idea, but that he should do whatever he does in person.  And I

19  was really worried about the fact that -- that Raghu, because

20  of what he had been -- had offered to my brother before that

21  he had rejected before might misunderstand that.  So he needed

22  a personal meeting from my brother to communicate properly

23  with him, you know, what that -- what I was interested in

24  doing and what I was certainly not interested in doing.

25  Q.  Go on to page 7, and Robert on Line 4 says, "Yeah, I --

1    yes, I can do that, that's good."

2        And you say, "Okay, and then we'll talk some more

3    about it, how to do it."

4        What were you telling Robert here?

5    A.  I was telling my brother we'll talk later about this.

6    I'll tell you exactly what I'm interested in doing and how to

7    do it after you and I get a chance to sit down and talk about

8    this because I wasn't even sure at that time.

9        The ideas were coming out of my mouth.  I was

10   thinking this might be an additional thing that might be able

11   to help elevate Jesse, Jr. in a public way and others.  I

12   wasn't quite sure.  So I said, we'll talk later about how to

13   do it.  I'll sit down with you, and then we'll decide what to

14   do and how to do it.

15   Q.  And what was in your mind when you told Robert we'll talk

16   some more about it?

17   A.  It was that -- that we would then decide what to say and

18   how to say it and how to deal or handle this potential meeting

19   that I had the idea on the spur of the moment that might help

20   me leverage Jesse Jackson, Jr. in a way that I can get the

21   Madigan deal.

22       MR. GOLDSTEIN:  Your Honor, we ask permission to

23   publish this tab.

24       THE COURT:  Sure.

25       (Tape played.)

Blagojevich - direct

4545

1    BY MR. GOLDSTEIN:

2    Q.  Now, Rod, after this call, as far as your ranking of

3    potential candidates you wanted to appoint to the Senate, who

4    were your top two or three picks?

5    A.  Lisa Madigan.  The Lisa Madigan option was the first

6    option.  Failing that, possibly me, possibly Eric Whitaker,

7    possibly Danny Davis, possibly Gery Chico.

8    Q.  Was Jesse Jackson a potential candidate?

9    A.  I was never going to appoint Congressman Jackson.

10   Q.  If we could turn -- before we turn to the next tab, you've

11   heard calls in which you were informed that John Wyma

12   potentially was wearing a -- a wire, is that right?

13   A.  Yes.

14   Q.  When did you first learn of that?

15   A.  It was later that evening.  Later the evening of December

16   the 4th.  I want to say around 10:00 or 10:30 at night, I

17   think.  I received a phone call from, I think, Lucio Guerrero,

18   my communications director, to tell me that the *Tribune*

19   apparently was going to write a story the next day that John

20   Wyma may have been wearing a wire.

21   Q.  And turn to tab 71.  What's the date and time of this

22   call, according to the transcript?

23   A.  It's December the 4th, 2008 at 10:29 in the afternoon.

24   Q.  P.m., I guess?

25   A.  P.m., yes -- oh, forgive me.  What am I talking about?

1   Nighttime, p.m.

2   Q.  Late afternoon.

3   A.  Right, right.

4   Q.  Who were the speakers on this call?

5   A.  It's me, Patti and Lucio, Lucio Guerrero, my

6   communications director.

7   Q.  And is it on this call that you're informed of this story

8   about John Wyma?

9   A.  Yes.

10  Q.  If you can turn to Tab 72, and according to the first page

11  on the transcript, Rod, what's the date and time of this call?

12  A.  7:25 a.m. the morning of December the 5th, 2008.

13  Q.  Okay.  Who were the speakers on this call?

14  A.  It's me, it's my brother Robert, Patti and Bill Quinlan.

15  Q.  And if you'd turn to Page 2, Robert says, "I got -- I got

16  a meeting, you there?  Yeah, I got a meeting today at 1:00."

17          You say, "Raghu."

18          THE COURT:  You're at Line 4, right?

19          MR. GOLDSTEIN:  Line 4, did I get that right?

20  Line 4, I apologize.

21  BY MR. GOLDSTEIN:

22  Q.  Robert says, "I got -- I got a meeting.  You there?"

23          You say, "Yeah."

24          Robert says, "I got a meeting today at 1:00."

25          You say, "Raghu?"

1          Robert says, "Yeah."

2          You say, "Yeah, I don't know if you should do it."

3          Robert says, "Right."

4          And you say, "Yeah."

5          What did you understand Robert to be asking you here?

6   A.  That my brother had called Raghu based on the conversation

7   that we just had a moment ago to set up that meeting to have

8   coffee with him, and -- and it was scheduled for 1:00 p.m. and

9   he reminded me that he had that meeting.

10          And then I said, oh, Raghu, or Raghu, and he said

11   yeah.  And I then said, "I don't know if you should do it."

12   My -- at this time -- well, what I'm saying to him is

13   basically we're not going to have a chance to get together,

14   sit down, figure out what we want to do and how to do it, and

15   so maybe, since I won't have a chance to go over this with

16   him, he shouldn't do it.

17   Q.  You eventually on Line 23 say, "Yeah, I'm sure it's going

18   to be a no."

19          Then Robert says, "Okay, very good."

20   A.  Right.

21   Q.  What were you saying there, Rod?

22   A.  I mean, I thought about -- I've now got this crisis with

23   John Wyma and this potential thing that he was wearing a wire

24   on me.  I had all this other stuff that I was working on, and

25   I didn't think I'd have a chance to sit down with my brother

Blagojevich - direct

4548

1    and discuss what I said, that we would go over this and how to

2    do it and what to say.

3            And I felt since that was the case, just don't do it,

4    and we'll see Raghu tomorrow night at the Indo-American

5    fundraiser that they were holding for us.

6    Q.  Okay.  You talked about an Indo-American fundraiser.  That

7    was the next night on the December 6th?

8    A.  Right.  That was an event that was scheduled sometime from

9    October for the night of December, December the 6th.

10   Q.  And did you talk to Raghu at that fundraiser to your

11   recollection?

12   A.  Did I?

13   Q.  Yes.

14   A.  I believe -- I'm sure I did.  You know, I'm sure I did.

15   Q.  Were there any discussions of campaign contributions for

16   Jesse Jackson, Jr. during this December 6th event?

17   A.  No, there were not.

18   Q.  And if you'd turn to Tab 75, according to the transcript,

19   what is the date and time of this call?

20   A.  This call is December the 5th, 2008 at 9:36 in the

21   morning.

22   Q.  And who were the speakers on this?

23   A.  This is me and my brother Robert.

24   Q.  And on Line 5, you say, "Yeah, I know, I know all that,

25   so, yeah, undo your Raghu thing."

Blagojevich - direct

4549

1      Robert says, "Uh, duh."

2      And you say, "Yeah."

3      What were you saying here?

4  A.  Evidently I'd forgotten that I told him that a little

5  while ago, caught up with all the other stuff, and then he

6  just told me that he did that again.

7      Since we didn't have a chance to sit down to go over

8  what to say and how to say it, I told him don't do it.  We'll

9  see him the following night at the fundraiser.

10 Q.  From December 4th, 2008 up through December 7th, 2008, who

11 was the number one candidate for the Senate seat in your mind?

12 A.  Lisa Madigan.

13 Q.  And had any decisions been made up to that point between

14 the 4th and the 7th of 2008?

15 A.  No.

16 Q.  I want to turn your attention to December 8th, 2008.

17 Did -- you mentioned that you wanted Harris to go to Rahm

18 Emanuel, is that right?

19 A.  That's correct.

20 Q.  And at that talk about Jesse Jackson being elevated, is

21 that right?

22 A.  That's right.

23 Q.  Okay.  And on December 8th, 2008 in the morning, did you

24 have a conversation with Mr. Harris?

25 A.  Yes.

Blagojevich - direct

4550

1    MR. GOLDSTEIN:  Your Honor, at this time I'd ask to
2  publish our Tab 4.  I don't know if you want to take a break
3  now or play the call.
4    THE COURT:  No, we can play it.
5    MR. GOLDSTEIN:  Okay.  Your Honor, do you have a copy
6  of that?
7    THE COURT:  Why don't you hand it up.  I might, but
8  I've got a lot of stuff up here and it would help.
9    (Tendered.)
10   THE COURT:  Thanks.
11   (Tape played but interrupted.)
12   MR. GOLDSTEIN:  Does everyone -- it's the white
13 binder.
14   Everyone have it?
15   (Tape played.)
16 BY MR. GOLDSTEIN:
17 Q.  All right.  Rod, if you'd turn to Page 1.
18 A.  Okay.
19 Q.  You got it all over there?
20 A.  Yeah.
21 Q.  According to the transcript, what's the date and time of
22 this conversation?
23 A.  It's December the 8th, 2008 at 8:29 in the morning.
24 Q.  And who are the speakers?
25 A.  It's me and John Harris.

Blagojevich - direct

4551

1  Q.  So Harris on Line 24 says, "So Rahm called me yesterday."
2          You say, "Oh, yeah?"
3          Harris says, "Finally returned my calls."  He laughs
4  and says, "Um, I told him we were seeing Jesse today.  He
5  didn't seem too thrilled."
6          What did you understand Mr. Harris to be saying
7  there?
8  A.  That -- that he had finally -- that he had spoken to Rahm
9  Emanuel on Sunday, December the 7th, the day before, and that
10  he told him what I wanted him to know, and that was that I was
11  seeing Jesse Jackson, Jr. in my office that day at
12  4:00 o'clock, and that he -- when he gave him the news, Rahm
13  didn't seem too thrilled.
14  Q.  And was that your intent?
15  A.  Very much so my intent, yes.
16  Q.  And why did you want Rahm Emanuel to not be too thrilled?
17  A.  Because I wanted Rahm's help to help me make the Madigan
18  deal, and if there wasn't a Madigan deal, I wanted Rahm to
19  think, who knows?  Maybe this crazy guy will make Jesse
20  Jackson, Jr. the senator.
21  Q.  Turn to Page 3.  Harris on Line 18 says, "I said but we
22  got lots of names.  I'm not going to keep running a name by
23  him every day.  He knows she -- she knows she's out there.  We
24  know who she is, so in other words, I didn't promise to get
25  back to him on anything."

1       And then you said, "So they don't want Danny Davis

2  either."

3       Did you understand what Mr. Harris was talking about

4  there?

5  A.  Give me one second to read this one, Aaron.

6       I believe what Harris is telling me here is, you

7  know, he's just not going to keep -- keep throwing names at

8  Rahm Emanuel, different names of potential candidates that

9  Rahm knows that she -- I understand that to mean Lisa Madigan

10  is out there.  We know who she is.  "So I didn't promise to

11  get back to him on anything."

12       That's what I understand he's saying there.

13  Q.  When you said, "So they don't want Danny Davis either,"

14  what were you saying there?

15  A.  That John Harris had said that they wanted to go young and

16  electable, and Danny Davis is a veteran political figure and a

17  congressman who was probably approaching 70 at the time, and

18  he was not that -- he didn't fit that -- fit that criterion.

19  Q.  On Page 3, Line 41, you say, "Okay, so how did you leave

20  it with him?"

21       And Harris said, "I said we were meeting with Jesse

22  today."

23       What did you understand Mr. Harris to be saying?

24  A.  So I asked him, you know, how did you leave it with Rahm?

25  And he -- mission accomplished.  He made it clear to him that

Blagojevich - direct

4553

1  I was meeting with Jesse Jackson, Jr. that day, that we had a

2  meeting with him, so that was what I wanted him to do.

3           And then he went on to say, okay, so that's -- that's

4  what he did.  That was good.

5  Q.  And on Page 4, you say, Line 4, "Good.  And Jesse is going

6  to be at the poverty conference tomorrow."  What were you

7  talking about there?

8  A.  I thought it was a nice one-two punch of sending a signal

9  to the powers that be, Rahm and the Washington establishment,

10  that not only was he coming to my office at 4:00 o'clock that

11  day, but he's going to be a headliner at our poverty

12  conference the next day, standing there with me, publicly

13  advocating stuff that we were supporting.  That would be an

14  indication that he and I were resurrecting our relationship.

15  Q.  And on Page 4, Line 18, you say, "I'm doing this Republic

16  Windows thing at 10:00."

17           What were you saying there?

18  A.  Republic Windows was a company --

19           THE COURT:  No.  It's not a part of this case.

20  BY MR. GOLDSTEIN:

21  Q.  On Page 7, Line 14, you say, "Yeah, I like a race -- I

22  like her, Lisa Madigan, Giannoulias, Bill Daley, he wouldn't

23  run, and Jesse, Jr. for governor.  Jesse, Jr. can win that,

24  you know what I'm saying?"

25           What were you saying here to Mr. Harris?

1   A.  We were talking about Tammy Duckworth, who I really liked

2   a lot, and I saw her as possibly running, succeeding me as

3   governor and me supporting her to run for governor, and I was

4   envisioning a possible race of Tammy Duckworth in a

5   multi-candidate field that would include Lisa Madigan, Alexi

6   Giannoulias, who was the treasurer, Mayor Daley's brother Bill

7   Daley.  I went on to say that he wouldn't run in that field,

8   and that Jesse Jackson, Jr. might.  These were all

9   hypotheticals.

10          And that in a field like that, based on that

11  Rasmussen poll, Jesse Jackson, Jr. could win that.

12  Q.  And on Page 8, Line 42, you say, "Yeah, so what do you

13  think?  Let's see, okay, so we got -- in the Senate thing, we

14  got to start thinking about starting to make some decisions

15  and acting, huh?"

16          Harris says, "Yes, sir."

17          You say, "Like the next couple of days, how did you

18  leave it with him?"

19          When you said, "So what do you think, let's see, we

20  got to start making -- we got to start thinking and starting

21  to make some decisions here," what were you saying there?

22  A.  A little less conversation, more action.  I was saying

23  it's time to make a decision.  I got to make a decision,

24  and --

25  Q.  At this time, December 8th, 2008, had you made any

Blagojevich - direct

4555

1   decision in terms of the Senate seat?

2   A.  No.

3   Q.  Now, you talked about Lisa Madigan being a front runner in

4   your mind throughout a lot of this time period.

5         On this day, was she a front runner?

6   A.  She was.  She was -- she was the first option.

7   Q.  And you go -- you go on further on Line 6 and say, "Like,

8   the next couple days, how did you leave it with him?"

9         What were you saying there?

10  A.  What page are you on?

11  Q.  Page 9, I'm sorry.

12  A.  Okay.  And Line 6 you're saying?

13  Q.  Correct.

14  A.  Right.  In other words, I've got to make this decision and

15  begin to act, and I want to do this in the next couple of

16  days, December the 9th, December the 10th.  How did you leave

17  it with him, meaning Rahm, who was going to be a key player in

18  this hopefully.

19  Q.  And further down the page on Page 9, Line 44, you say, "Do

20  we ever try to make a move with Madigan, or do we just forget

21  about the whole thing?"

22         And Harris says, "I think it's worth -- worth the

23  ask."

24         What were you saying there?

25  A.  I was saying to John Harris, you know, this is time to put

1  up -- basically, you know, start doing the walk.  We've done

2  the talk, and one last time.

3           Part of me was very afraid I was going to get

4  rejected, and I was afraid to get that rejection.  And what I

5  was saying here was do we just forget the whole thing because

6  there were some, like John Harris, who didn't think this was

7  possible or -- he didn't think it was -- he wasn't as

8  optimistic about this potentially happening as -- as my good

9  angels did.  I mostly thought it was, but there's always times

10 you feel like maybe it won't, and I was afraid if I don't get

11 this, man, I don't know what I'm going to do.

12          And so I was afraid of the rejection, and so I just

13 said we should ask him or forget the whole thing.  And happily

14 John said I think it's worth the ask, and I was quick to say

15 yes, so do I.  And then the question is how do you do it.

16 Q.  And that's what you go on to say on Line 3, "So the

17 question is how do you do it?"

18          Harris says, "Right."

19          And you say, "Huh.",

20          And Harris says, "Right."

21          And you say, "Reinsdorf suggested, said you get Rahm

22 to go in and Rahm to say, uh --"

23          And then Harris says, "Yeah, I didn't -- I didn't ask

24 Rahm to."

25          And you said, "No, I know that.  No, I know, nor

Blagojevich - direct

4557

1   should you right now.  You got Rahm to go in and Rahm to say,

2   um, we think she would be a good senator, blah, blah, blah,

3   for all these reasons, you got to, you know, here's what you

4   got to give the governor.  I mean in other words, Rahm's --

5   Rahm is the one who says, suggests to Madigan what -- what the

6   deal is."

7           When you said, "Reinsdorf suggested, said to get Rahm

8   to go in and Rahm to say," are you referencing the phone call

9   that you'd testified to earlier today about you and Jerry

10  Reinsdorf?

11  A.  I spoke to Jerry Reinsdorf on December the 4th.  I talked

12  about that phone call.  Jerry Reinsdorf, I sought his advice

13  and advised me --

14          MR. SCHAR:  Objection.

15          THE COURT:  Wait.  Let me just check.

16          The question was:  Were you referencing that phone

17  call that you testified earlier to today.

18          THE WITNESS:  Uh-huh.

19          THE COURT:  And the answer is yes?

20          THE WITNESS:  One word:  Yes, Judge.

21          Come on, give me another question.

22  BY MR. GOLDSTEIN:

23  Q.  And you talk about what Jerry Reinsdorf suggested to

24  Mr. Harris, is that correct?

25  A.  Yes, I did.

Blagojevich - direct

4558

1    Q.  Okay.  And when you said, "No, I know, nor should you

2    right now, you get Rahm to go in and Rahm to say, um, we think

3    she would be a good senator, blah, blah, blah, for all these

4    reasons."

5           And when you said "nor should you right now," what

6    were you saying there, Rod?

7    A.  Right up to that point, I hadn't made the decision to

8    begin to act on a senator; so, therefore, he was -- he was

9    doing right by not doing anything.

10          Now it was time to reach out and begin the process of

11   making the ask.

12   Q.  When you say "making the ask," who did you intend on

13   making the ask of?

14   A.  Wanted to get Rahm Emanuel to go to Mike Madigan and be

15   the one to broker this deal, and pursuant to Jerry Reinsdorf's

16   advice, he should go there and say, hey, Mike Madigan, you

17   know what you ought to do if you want your daughter to be a

18   senator?  I got an idea, why don't you give him X, Y and Z,

19   the things I talked about.  If it came from Rahm, Jerry

20   Reinsdorf thought, he might be more willing to see that in a

21   positive way than if he thought it came from me.  That, I

22   thought, was an astute recommendation from Jerry Reinsdorf.

23   Q.  On Page 10, you said, on Line 43, "All right.  Why don't

24   you spend some time and start thinking about the tactics of

25   this, okay?"

Blagojevich - direct

4559

1        And Harris says, "All right."

2        And you say, "I mean, I feel like making the ask and

3    getting rejected is a plus.  Always having that so we can tell

4    labor and all these people that we, you know, huh --"

5        When you said, "Why don't you spend some time and

6    start thinking about the tactics of this," what were you

7    saying there?

8    A.  To think about how to get this done, how to get Rahm to do

9    it, how to properly approach Mike Madigan, how to take into

10   account Jerry Reinsdorf's advice and then to get back to him

11   with these insights.  This was going to be the ask, and before

12   we make this move, let's make sure we do it right so hopefully

13   we can get the right answers I'm hoping to get.

14   Q.  When you said, "I mean, I feel like making the ask and

15   getting rejected is a plus," what were you saying at that

16   there?

17   A.  That's a psychological thing in me to prepare myself for

18   being disappointed, God forbid they don't want to do this.  I

19   had -- my hopes were so high for this at this point, I was

20   just kind of psychologically bracing myself for the

21   possibility that maybe they don't want to do this and the

22   prospects of all the future held if they didn't want to do

23   this, I'm trying to find a way to find some positive in it.

24   Q.  On Line 13, you say, "Right now, if I had to make the pick

25   today, it would be Gery Chico, I think.  What do you think of

1   that?"

2          Then Harris says, "I can live with that."

3          What were you saying here?

4   A.   That if I was rejected by Mike Madigan, then it would be

5   Gery Chico and that Gery's mother is of Mexican descent and

6   he's Hispanic, and this would be the first Hispanic senator in

7   Illinois history, and I liked that.

8   Q.   Is that what you're talking about in "we can call him

9   Hispanic, right?"

10  A.   Right, Gery's mother -- his father was Mexican, his mother

11  was Greek, so he's -- he's not a hundred percent Latino.

12  That's why I said would he count politically as a

13  representative from the Latino community, Mexican community.

14  Q.   And you then go on further, Line 34, and you say, "All

15  right, you'll think about the tactics, right?"

16         And he says, "Yes, sir, and should I tell Tammy we

17  are going to see her at least some day soon?"

18         And you said, "Who, me?"

19         Harris says, "Yeah."

20         You said, "Sure.  I mean, you think I have to,

21  right?"

22         Again, you said you'd think about the tactics, right?

23  Is this referencing what you had previously talked about on

24  Page 10?

25  A.   That's right.

Blagojevich - direct

4561

1    Q.  Okay.

2    A.  The tactics on the Madigan deal.

3    Q.  And you then left the conversation with John Harris, is

4    that right?

5    A.  Yes.

6    Q.  Now, in talking -- when you had this conversation with

7    Harris, as you understood it, Rahm Emanuel had come back to

8    respond to Mr. Harris when he said Jesse Jackson, is that

9    right?

10   A.  Can you ask that again?

11   Q.  I'm sorry, it was a confusing question.

12           As you understand it from this phone call, Mr. Harris

13   was relaying to you that Rahm Emanuel had come back to -- to

14   him based on the fact that Jesse Jackson, Jr.'s name was

15   raised with Rahm Emanuel, is that right?

16   A.  Yes.

17   Q.  Okay.  Now, that day, on December 8th, 2008, you said your

18   front runner was Lisa Madigan.

19   A.  She was the first option, yes.

20   Q.  And you had mentioned you woke up thinking Gery Chico, is

21   that right?

22   A.  If I don't get the Madigan deal, the fallback, the first

23   fallback over me, over Eric Whitaker, over Danny Davis.

24   Q.  On that day, had you made any decisions at all?

25   A.  On that day?

Blagojevich - direct

4562

1  Q.  On December 8th, 2008, had you made any decisions in terms

2  of the Senate seat?

3  A.  Okay.  So your question is at any time that day?

4  Q.  Correct.  On December 8th.

5  A.  No, not quite.  Almost.

6  Q.  Okay.  When you say almost, what do you mean?

7  A.  I needed Rahm Emanuel to say he was going to be the

8  go-between and that it was done, and then we were off and

9  running on the Lisa Madigan deal, and I believed it was

10  imminent.

11  Q.  Rod, later that evening, on December 8th, did you have a

12  phone call with Bob Greenlee?

13  A.  Yes.

14          MR. GOLDSTEIN:  Your Honor, I'd like to publish the

15  call.

16          THE COURT:  Sure.

17          MR. GOLDSTEIN:  It's Tab 5.

18          Do you want to take a break before the call?

19          THE COURT:  No.

20       (Tape played.)

21  BY MR. GOLDSTEIN:

22  Q.  Okay.  Rod, according to the transcript, what's the date

23  and time of this call?

24  A.  It's December the 8th, 2008 at 8:43 in the evening.

25  Q.  And on Line 35, you say, "Yeah, that's working out.  Rahm

Blagojevich - direct

4563

1    is worried about Jesse, Jr. now and he is pressing Harris

2    about Lisa, and he has actually offered to possibly get

3    involved in trying to make the deal, but he is suggesting --"

4              Greenlee says, "Did he?  Did he?"

5              "He is suggesting," you say, "Durbin, but then Harris

6    pushed back and said what about you?  And he said, well, I

7    guess I could do it.  I don't know if Obama wants -- you know,

8    Barack wants me to, but, so it's kind of shaken out okay so

9    far, you know what I mean."

10             What were you saying there, Rod?

11   A.  I was -- I was passing along to Bob Greenlee that as the

12   day unfolded, John Harris, when I was at the governor's

13   office, filled me in on -- on -- on a conversation he had with

14   Rahm Emanuel that day.  Rahm had called him around 10:30 or

15   10:45 in the morning.  Harris -- with a message to call back

16   immediately.  John called him back, and they had a

17   conversation.

18   Q.  So this is after your call that we just went over on

19   December 8th at 8:29 in the morning, your understanding was

20   that Rahm called John Harris again?

21   A.  Rahm called around 10:40 in the morning or something and

22   left a message.  John Harris told me that he then called him

23   back, I would imagine quickly, whenever he got it, which I --

24   and filled me in on the conversation that he had with Rahm

25   Emanuel.

1   Q.   Okay.  And were you communicating this conversation as
2   Harris understood it to Mr. Greenlee?
3   A.   Yes.  I was telling him some of it, of what Rahm had
4   told -- what John Harris had told me he and Rahm Emanuel
5   talked about.
6   Q.   Okay.
7   A.   And what they were -- we were working on doing.
8   Q.   And when you said, "and he has actually offered to
9   possibly get involved and try to make the deal," what were you
10  saying there?
11  A.   That John Harris told me that Rahm and David Axelrod and
12  Senator Durbin had met earlier the morning of December the
13  8th, and they discussed Lisa as the -- Lisa Madigan as the
14  candidate they thought made sense and discussed whether Rahm
15  should be the one to broker the deal; that Rahm had called
16  Harris to fill him in and let him know that; and that Rahm
17  said that he would do it.  He suggested first Durbin, and then
18  Harris properly conveyed what I wanted, which was we want you,
19  not Durbin.  And then Rahm said, yeah, I guess I can do it.
20  I'll just need to get permission from -- from President-Elect
21  Obama.  I think he said from Barack.
22  Q.   Okay.  And Greenlee then says, "Yeah, and you're -- the
23  way you're playing it is working out well, just quietly do
24  it."
25          What did you understand Mr. Greenlee to be saying

Blagojevich - direct

4565

1   there?

2   A.  That Bob Greenlee was saying that the -- that the fear,

3   threat of Jesse Jackson, Jr. being appointed was working

4   perfectly and that we should just play it out quietly the way

5   we are because it was looking good.

6   Q.  And what did you understand would be the next steps

7   regarding this Lisa Madigan deal?

8   A.  I went to bed that night thinking I was a day or two away

9   from beginning to make that Lisa Madigan deal happen.  I

10  believed everything was lined up, that I had the president's

11  chief of staff likely going to help, that Harry Reid and

12  Senator Menendez and Senator Durbin had offered to help.  I

13  would engage and enlist them as well.

14          So the leading Democrats in the Senate and the

15  president's chief of staff converging and descending on Mike

16  Madigan here in Illinois, offering frankly the gift of making

17  your daughter a senator, pass the jobs bill, healthcare and

18  don't raise taxes on people.  I felt I was a day or two away

19  from that.

20          MR. GOLDSTEIN:  May I approach, your Honor?

21          THE COURT:  You may.

22      (Counsel conferring.)

23  BY MR. GOLDSTEIN:

24  Q.  Rod, I'm showing you Defense Exhibit Group Photos No. 2.

25  What I want you to do, you don't have to name anything.  Is

1  this a series of photos of individuals?

2  A.  Yes.

3  Q.  Okay.  And just look through it briefly and look through

4  those photos.

5  A.  Where's Oprah?  Is she in here?

6  Q.  Okay.  In that binder, Rod, is it a series of several

7  photographs of various individuals?

8  A.  Yes.

9  Q.  And in this binder, are these individuals, not all, but

10  some of the individuals who you discussed and thought about as

11  potential candidates for the Senate seat?

12        And I'm talking about the period of October 2008 to

13  December 9th, 2008.

14  A.  Yes.

15  Q.  And do all these photos truly and accurately depict the

16  individuals that you thought about and considered during your

17  thought process on the Senate seat?

18  A.  Yes.

19        MR. GOLDSTEIN:  Your Honor, we ask to admit Defense

20  Exhibit Group Photos No. 2.

21        MR. SCHAR:  Judge, we're going to object.  We were

22  obviously just handed this; but putting that aside, there's a

23  lot of issues --

24        THE COURT:  The objection is sustained.

25  BY MR. GOLDSTEIN:

Blagojevich - direct

4567

1  Q.  Approximately how many people between mid October 2008 to
2  December 9th, 2008 --
3  A.  34.
4  Q.  -- did you consider?
5  A.  Gotcha.
6          THE COURT:  There's one thing I think that's very
7  important.  You're a witness.
8          THE WITNESS:  I'm sorry.
9          THE COURT:  Your job is to answer questions.  I don't
10 want any asides, funny, serious or otherwise.  Just answer the
11 question.
12         THE WITNESS:  I understand, Judge.
13         THE COURT:  Do you want to finish the question?
14         MR. GOLDSTEIN:  Yes.
15 BY MR. GOLDSTEIN:
16 Q.  Approximately how many people --
17         THE COURT:  No, start from where you stopped.
18         MR. GOLDSTEIN:  Okay.  I'll try my best.
19         THE COURT:  You don't remember, do you?
20         MR. GOLDSTEIN:  What?
21         THE COURT:  You don't remember exactly.
22         MR. GOLDSTEIN:  I don't know exactly where I stopped.
23         THE COURT:  I know, and that's why these comments are
24 distracting.  You can start from the beginning.
25         MR. GOLDSTEIN:  There was an objection right in the

Blagojevich - direct

4568

1  middle.  I think that's why I stopped.

2          THE COURT:  That's precisely the problem.  Now start

3  from the beginning.

4  BY MR. GOLDSTEIN:

5  Q.  Okay.  Approximately how many people from October 2008 to

6  December 9th, 2008 did you think about and consider as

7  potential candidates for the Senate seat?

8          MR. SCHAR:  Objection, Judge.

9          THE COURT:  Sustained.

10 BY MR. GOLDSTEIN:

11 Q.  Rod, from October 2008 to December 9th, 2008, did you ever

12 make a decision regarding the Senate seat?

13 A.  No.

14 Q.  Did you ever decide who you were going to select to put in

15 the Senate seat position?

16 A.  No.

17 Q.  Rod, did you ever attempt to shake anyone down in exchange

18 for the Senate seat?

19 A.  No, absolutely not.

20 Q.  Rod, did you ever threaten anybody in exchange for the

21 Senate seat?

22         MR. SCHAR:  Objection, Judge.

23         THE COURT:  Sustained.

24 BY MR. GOLDSTEIN:

25 Q.  Did you ever demand anything in exchange for the Senate

Blagojevich - direct

4569

1    seat?

2              MR. SCHAR:  Objection.

3              THE COURT:  Sustained.

4    BY MR. GOLDSTEIN:

5    Q.  Rod, going back to this call on December 8th, 2008, at

6    8:43 p.m., you talked a little bit about how Rahm came back to

7    Harris to talk about being the person to go to Madigan, is

8    that right?

9    A.  Yes.

10   Q.  And you talked about how you thought the decision was

11   coming closer to potentially work on this deal in the next few

12   days, is that right?

13   A.  Yes.

14   Q.  Rod, on December 9th, what happened?

15   A.  At 6:00 o'clock in the morning --

16             MR. SCHAR:  Judge, objection.

17             THE COURT:  Objection is sustained.

18   BY MR. GOLDSTEIN:

19   Q.  Rod, were you arrested the next day?

20   A.  Yes.

21             MR. GOLDSTEIN:  Nothing further.

22             THE COURT:  Five-minute recess.

23             COURT SECURITY OFFICER:  All rise.

24        (Jury exits courtroom.)

25             THE COURT:  Be seated in the courtroom.  You can sit

Blagojevich - cross

4570

1    down.  Don't go far.

2            Counsel, approach the lectern.

3            You, if you wish, have the opportunity to begin

4    cross-examination now.  Now, the jury had asked some time ago

5    for notification if they're going to stay past 4:30.  I gave

6    them that notification.  You would have until about 5:00 if

7    you wish to use it.

8            MR. SCHAR:  I do.

9            THE COURT:  Good.

10           We're going to get the jury back out here very

11   quickly.

12           MR. SOROSKY:  How long, about ten minutes?

13           THE COURT:  No, in about two minutes.

14           MR. SOROSKY:  Oh.

15           MS. KAESEBERG:  Is it okay if Mr. Blagojevich goes to

16   the restroom?

17           THE COURT:  Yes, sure.

18        (Recess from 3:51 to 4:00 p.m.)

19         (Jury enters courtroom.)

20           THE COURT:  Please be seated.

21           You may proceed.

22           MR. SCHAR:  Thank you, Judge.

23                        CROSS-EXAMINATION

24   BY MR. SCHAR:

25   Q.  Mr. Blagojevich, you are a convicted liar, correct?

1     MR. SOROSKY:  Objection, your Honor.

2  BY THE WITNESS:

3  A.  I would --

4         THE COURT:  Overruled.

5  BY MR. SCHAR:

6  Q.  Yes or no?

7  A.  Yes.

8  Q.  Convicted of lying to the FBI, correct?

9  A.  Yes.

10  Q.  And it's fair to say, sir, is it not, that within hours of

11  being convicted of lying to the FBI, you were, in fact, lying

12  again, weren't you?

13         MR. SOROSKY:  Objection.

14         THE COURT:  The question is -- objection to form is

15  sustained.

16  BY MR. SCHAR:

17  Q.  After your conviction, sir, you went downstairs to the

18  lobby of this building, correct?

19  A.  Yes, I did.

20  Q.  You gave a press conference, right?

21  A.  I was at a press conference, yes.

22  Q.  You gave a statement, correct?

23  A.  I said several things there, yes.

24  Q.  And you wanted to communicate after your conviction to the

25  public that your conviction was unfair, didn't you?

Blagojevich - cross

4572

1           MR. SOROSKY:  Objection.

2           THE WITNESS:  Well, I have a strong opinion about it

3    if you'd like to hear it.

4           THE COURT:  The objection is waived.  The answer may

5    stand.

6           THE WITNESS:  This is why we have appellate courts.

7           THE COURT:  Wait, wait --

8           THE WITNESS:  Oh, sorry.

9    BY MR. SCHAR:

10   Q.  It's fair to say that you wanted people to believe you had

11   not lied to the FBI.  Yes or no?

12   A.  I wanted them to know what the truth is, and there's a

13   process that will still unfold, and we're determined to pursue

14   that -- that process.

15   Q.  The answer is yes.

16   A.  Pardon me?

17   Q.  The answer is yes to my question.

18   A.  What is your question again?

19          THE COURT:  Read the question back.

20         (Record read.)

21   BY THE WITNESS:

22   A.  As I said I wanted to know what the truth is, which is

23   there's a process that is there, we're going to pursue that

24   process, and, yes, I want them to know what the truth is.

25   BY MR. SCHAR:

Blagojevich - cross

4573

1  Q.  Sir, you wanted people to believe that the process that
2  led to your conviction was unfair.
3         MR. GOLDSTEIN:  Objection.
4         MR. SOROSKY:  Objection.
5  BY THE WITNESS:
6  A.  No.
7         THE COURT:  Okay.  He answered.
8  BY THE WITNESS:
9  A.  That it was erroneous.
10  BY MR. SCHAR:
11  Q.  Well, what you stated in the lobby of this building is
12  that you were unfairly convicted because the FBI had refused
13  to allow a court reporter into the interview in which you were
14  convicted of lying, didn't you?
15  A.  That was among --
16  Q.  Yes or no?
17  A.  It was the among the things I said, yes.
18  Q.  You left something out, though, didn't you?
19         MR. SOROSKY:  Objection.
20  BY THE WITNESS:
21  A.  I don't know, I say a lot.  What did I say -- what did I
22  miss?
23  BY MR. SCHAR:
24  Q.  Well, what you didn't tell everybody was that, in fact,
25  the FBI had brought recording equipment to record the

1    interview, didn't you?

2              MR. SOROSKY:  Objection.

3              THE COURT:  Overruled.

4    BY THE WITNESS:

5    A.  My lawyers who were there with me, yes --

6    BY MR. SCHAR:

7    Q.  My question is a simple one.

8    A.  Yes.

9    Q.  You gave a statement, correct?

10   A.  I remember the statement.

11   Q.  In the statement, you said your conviction was unfair, the

12   process that led to it was unfair because you had not been

13   allowed to have a court reporter present for your interview

14   with the FBI.

15             Did you make that statement, sir?

16   A.  What I remember saying was not that the process in the

17   court was unfair and that led to the conviction.  What I said

18   was that the interview back in 2005 --

19   Q.  Was unfair.

20   A.  -- was -- I was informed we were not allowed by my lawyers

21   to have a court reporter there.  That's what I was told.  No

22   court reporter.  That's what I said.

23   Q.  You said no court reporter.  You went downstairs after

24   your conviction and said the process that led to my

25   conviction, not the court process, the FBI process, the

1   government process, was unfair because you weren't allowed to
2   have a court reporter, right?
3           MR. GOLDSTEIN:  Objection.  Asked and answered.
4   BY THE WITNESS:
5   A.  I don't know that I said unfair.  I simply said I did not
6   lie to the FBI.  I expressed that.  We didn't put a defense on
7   in the first case, never answered the charge, and that --
8           MR. SCHAR:  Going to move to strike everything that's
9   non-responsive, Judge.
10          THE COURT:  Let me explain something to you that will
11  make this a lot easier, and it will make it a lot easier
12  because, generally speaking, when witnesses argue with
13  lawyers, the witness loses in the end.
14          If you can answer a question with a yes or no, answer
15  it.  You may feel that things are left out that should be
16  added.  If that's your feeling, wait for your lawyer to stand
17  up on redirect examination, and you can clarify it.  That way
18  we'll go through this in less time and in less suffering for
19  everybody in the courtroom.
20  BY MR. SCHAR:
21  Q.  What you said, sir, in the interview or in your statement,
22  in part, was that there was no court reporter, and so it was
23  unfair in terms of how you ended up getting convicted, right?
24  A.  What I remember saying was that we were not allowed to
25  have a court reporter at that first FBI interview.  The second

Blagojevich - cross

4576

 1    one I had one.

 2    Q.  What you did not tell everyone in that statement

 3    afterwards that was -- the fact was the FBI had agreed to

 4    record the entire interview, did you?

 5    A.  They never told me that.

 6              MR. GOLDSTEIN:  Objection to what the fact was.

 7    BY THE WITNESS:

 8    A.  I never knew that.  They never told me that.

 9    BY MR. SCHAR:

10    Q.  Sir, isn't it the fact was --

11              THE COURT:  Wait, wait, stop.

12              MR. SCHAR:  Sorry, Judge.

13              THE COURT:  Don't talk when your lawyer objects.

14              THE WITNESS:  Okay, Judge.

15              THE COURT:  Is that clear?

16              THE WITNESS:  Yes, Judge.

17              THE COURT:  The objection is overruled.  Start with

18    the question.

19    BY MR. SCHAR:

20    Q.  Sir, they brought recording equipment to the interview and

21    talked about recording it right in front of you.  Are you

22    saying now you have no recollection of that whatsoever?

23    A.  I don't --

24              MR. GOLDSTEIN:  Objection, your Honor, objection.

25              THE COURT:  Overruled.

1  BY THE WITNESS:

2  A.  I said court reporter.  If they brought recording

3  equipment, that's a different issue.  I said a court reporter,

4  like this woman here, transcribing it.  That was my

5  understanding by my lawyers that we're not allowed at the

6  first interview.  They allowed it the second interview.

7  BY MR. SCHAR:

8  Q.  Sir, you sat in this courtroom during the testimony at the

9  last trial, correct?

10  A.  Yes.

11  Q.  And the agents stood on the stand -- sit on the stand and

12  testified they brought recording equipment.

13         MR. GOLDSTEIN:  Objection to what they testified to.

14  BY THE WITNESS:

15  A.  I said a court reporter --

16         MR. GOLDSTEIN:  Objection, your Honor.

17  BY THE WITNESS:

18  A.  -- Mr. Schar, not recording equipment.  I said we were not

19  allowed to have a court reporter there like my second

20  interview.

21         We're --

22         THE COURT:  Stop.  Your client basically is

23  withdrawing your objection for you.

24  BY MR. SCHAR:

25  Q.  I understand what you said.  What you failed to say to

1    everyone that was listening was that, in fact, the entire

2    interview could have been recorded, but you were the one who

3    refused to record it.

4    A.  What kind of an answer can I give you?  My lawyers advised

5    me to go to an interview with you guys.  They're telling me

6    that there -- that they won't allow a court reporter.  When

7    you guys came back a second time and wanted to interview me, a

8    precondition --

9              MR. SCHAR:  Judge --

10   BY THE WITNESS:

11   A.  -- was a court reporter.

12             MR. SCHAR:  Not responsive to the question.

13             THE COURT:  What might happen here is that I'm going

14   to let him keep asking the same question, and we're going to

15   be here for a long time if you keep giving the same answer.

16             Go ahead.

17   BY MR. SCHAR:

18   Q.  You said nothing downstairs in your press conference about

19   the fact that the FBI agreed to record the entire interview.

20   Yes or no?

21             MR. GOLDSTEIN:  Objection, your Honor, to the fact.

22             THE COURT:  Overruled.

23             MR. GOLDSTEIN:  He's assuming facts not in evidence.

24   BY THE WITNESS:

25   A.  I wasn't aware that that was the case.  All I knew was

1    that there was no court reporter.

2    BY MR. SCHAR:

3    Q.  You have no -- your answer is, as I understand it, is you

4    have zero recollection of the FBI bringing recording equipment

5    with them and asking in front of you if you wanted the

6    interview recorded.  That's your testimony as I understand it.

7    A.  I remember a court reporter being requested.  That's all I

8    remember.

9    Q.  I'm asking you if you have no recollection of the FBI

10   sitting in a room with you with recording equipment and asking

11   whether or not you wanted the interview recorded?

12            MR. GOLDSTEIN:  Objection, asked and answered.

13   BY THE WITNESS:

14   A.  I had --

15            THE COURT:  The last thing it was that was not asked

16   and answered.

17   BY MR. SCHAR:

18   Q.  Yes or no, is it your testimony you have no recollection?

19   A.  What kind of recording equipment was it?  I don't --

20   I'm -- I don't -- I want to answer truthfully.  I just don't

21   remember seeing --

22   Q.  This is the first time --

23   A.  -- recording equipment.

24   Q.  -- you've ever been interviewed by the FBI, correct?

25   A.  That's correct, one of two.

Blagojevich - cross

4580

1    Q.  A significant event.

2    A.  Yes.

3    Q.  Is it your testimony -- a simple yes or no question -- you

4    have, as you sit here, no recollection of the FBI offering to

5    record the entire interview for you.

6    A.  I don't remember recording devices or anything like that

7    in that interview.

8    Q.  Going to try it one more time, Judge.

9         Is it your testimony that you have no recollection of

10   the FBI offering to record the entire interview for you?

11        MR. SOROSKY:  Objection to the form of the question,

12   "is it your testimony."

13        THE COURT:  Overruled.

14        Do you want the question repeated?  Because this was

15   interrupted by the objection.

16        THE WITNESS:  Sure.  Go ahead.

17        THE COURT:  Would you read it back?

18      (Record read.)

19   BY THE WITNESS:

20   A.  I don't remember that.

21   BY MR. SCHAR:

22   Q.  Sir, over and over again, you have said on TV that you

23   believe the process that led to that interview was unfair

24   because you weren't allowed to have a court reporter.  Yes or

25   no?

1      MR. SOROSKY:  Objection.

2      THE COURT:  Overruled.

3   BY THE WITNESS:

4   A.  How do you define over and over?  How many times would

5   that be?

6   BY MR. SCHAR:

7   Q.  How about as recently as three months ago you've said on

8   TV that you believe that the process was unfair because you

9   didn't have a court reporter present, correct?

10  A.  I don't think --

11  Q.  Yes or no?

12  A.  I didn't say process was unfair.  I simply said that I did

13  not lie to the FBI, that I answered every question honestly as

14  I knew them, that's what I said, and that I was not allowed a

15  court reporter, as I was told by my lawyers.

16  Q.  And not once have you said that, in fact, the FBI agreed

17  to record the interview.  Have you?

18      MR. GOLDSTEIN:  Objection, your Honor.

19  BY THE WITNESS:

20  A.  I don't remember that.

21  BY MR. SCHAR:

22  Q.  Sir --

23      THE COURT:  The objection is -- comes too late.  He's

24  answered the question.

25  BY MR. SCHAR:

Blagojevich - cross

1   Q.  You can remember that you were eastbound west of the
2   Mississippi River from the St. Louis *Dispatch* editorial board
3   interview when Dusty Baker called you several years ago, and
4   it is your testimony you do not recall the FBI offering to
5   record the entire interview of you in March of 2005, is that
6   your testimony?
7           MR. GOLDSTEIN:  Objection.  Argumentative.
8           THE COURT:  Overruled.
9   BY THE WITNESS:
10  A.  You never talked to me about that meeting.  The FBI talked
11  to my lawyers.
12  BY MR. SCHAR:
13  Q.  Yes or no.
14  A.  He hasn't talked to me.  You didn't arrange that meeting
15  with me.  We have lawyers you guys talked to.  You guys
16  communicated with my attorneys, not me.
17  Q.  Are you indicating, sir, that in your presence, you're
18  saying in your presence at that interview, nobody offered to
19  record that interview?
20  A.  I have --
21          MR. SOROSKY:  I believe the witness --
22          THE WITNESS:  Asked and answered.
23          MR. SOROSKY:  It was asked and answered, and second
24  he said he didn't remember.
25  BY THE WITNESS:

1    A.  But I'll answer it again.  I just -- I don't remember

2    that.  I remember no court reporter, and that's why the second

3    time we insisted on that as a precondition.  That's what my

4    lawyers advised me to do.

5    BY MR. SCHAR:

6    Q.  Sir --

7            THE COURT:  Let me clarify this.

8            MR. SCHAR:  Go ahead.

9            THE COURT:  You don't remember if the FBI ever

10   offered to record the conversation, is that correct?

11           THE WITNESS:  I don't remember that.

12           THE COURT:  Okay.  That means you don't remember if

13   they did or if they didn't.  You have no recollection of the

14   incident.

15           THE WITNESS:  Of recording it, yes.

16           THE COURT:  So if he --

17           THE WITNESS:  A recorder.

18           THE COURT:  Right.  So you could not, for example,

19   say that they didn't offer for the same reason you can't say

20   that they did because you have no recollection, is that

21   correct?

22           THE WITNESS:  I have no recollection about recording.

23   I remember --

24           THE COURT:  No, no, all I'm asking about --

25           THE WITNESS:  Right.

Blagojevich - cross

4584

1      THE COURT:  -- is recording.

2      THE WITNESS:  I don't remember --

3      THE COURT:  One way or the other.

4      THE WITNESS:  -- recording.  I don't remember that.

5      THE COURT:  Thanks.

6  BY MR. SCHAR:

7  Q.  Do you remember that at your second interview, the FBI

8  also agreed to record that?

9  A.  I don't.

10  Q.  And --

11  A.  I remember we had a court reporter there though.

12  Q.  And you refused to have that one recorded as well.  No

13  recollection of that.

14  A.  I don't remember that.  My lawyers were there.

15  Q.  Is it fair to say, sir, that as a politician, not

16  infrequently you lie to the public?

17      MR. GOLDSTEIN:  Objection, your Honor.

18      THE WITNESS:  I'd object to that.

19  BY MR. SCHAR:

20  Q.  So you don't.

21      MR. SOROSKY:  Objection.

22      MR. RIEBMAN:  There's an objection.

23  BY MR. SCHAR:

24  Q.  Withdraw that question.

25      Is it fair to say at times, you caused messages to be

Blagojevich - cross

4585

1    sent to the public that are not true?

2           MR. GOLDSTEIN:  Objection, your Honor.

3           MR. RIEBMAN:  Objection.

4           THE COURT:  Overruled.

5    BY THE WITNESS:

6    A.  You want to give me an example?

7    BY MR. SCHAR:

8    Q.  Can you answer it yes or no?  Are you unsure?

9    A.  I try to be as truthful as possible.

10   Q.  Okay.

11   A.  Politics is a difficult business.  It's not all one thing

12   or all the other.

13   Q.  Well, point you to November 10th.  That was a Monday.

14   A.  Yes.

15   Q.  And on that day, you had conversation with Doug Scofield,

16   correct?

17   A.  Can you -- I want to be careful here because I want you to

18   show me what you're referring to so I know so you can refresh

19   my recollection.

20   Q.  I'll ask the question.

21          Do you remember telling Mr. Scofield you wanted him

22   to put into the newspaper information that you had had a long,

23   good conversation over the prior weekend with Congressman

24   Jackson?

25   A.  I'd have to see what you're referring to.

Blagojevich - cross

4586

1    MR. SCHAR:  I'll show the witness what's marked
2 Government Exhibit CX 460 TR.
3        May I approach, Judge?
4        THE COURT:  You may.
5 BY MR. SCHAR:
6 Q.  Look at the bottom of Page 3, and at Line 31 on Page 4,
7 tell me when you're done with that document, sir.
8 A.  Yes, I see that.
9 Q.  Do you now recall, Mr. Blagojevich, that you asked
10 Mr. Scofield to provide information to the newspaper that
11 indicated that you had had a long and good conversation with
12 Congressman Jackson over the prior weekend?
13 A.  I told Doug to get that to the gossip column that we were
14 talking.
15 Q.  That was a lie.
16 A.  That was a misdirection play in politics.
17 Q.  My question, sir, was --
18 A.  It was not factual.  It was not factual.
19 Q.  If by not factual you mean it was untrue.
20 A.  It was not true.
21 Q.  It was a lie.
22 A.  I don't see it that way, not that.
23 Q.  You knew the information was false.
24 A.  Yes.
25 Q.  You didn't have a conversation with Congressman Jackson,

Blagojevich - cross

4587

1    correct?

2    A.  I had several conversations with Congressman Jackson, but

3    not that weekend.

4    Q.  Well --

5    A.  And that's apparently what I said.

6    Q.  You didn't have a long one, correct?

7    A.  I did not --

8    Q.  Long conversation over the weekend.

9    A.  On that weekend, I did not, no.

10   Q.  You didn't have a good conversation over the weekend,

11   correct?

12   A.  No.

13   Q.  You didn't have any conversation over the weekend.

14   A.  To the best of my recollection, I did not.

15   Q.  And that was a lie that you thought you could get away

16   with because no one would contradict you, correct?

17   A.  That's not how I saw that.

18   Q.  Well, you didn't think Congressman Jackson would deny it,

19   did you?

20   A.  I thought Congressman Jackson would be -- that that would

21   be help -- that would help his politics.

22   Q.  You didn't think there was anyone who was going to

23   contradict the false information you were putting in the

24   newspaper, is that correct?

25           MR. GOLDSTEIN:  Objection, your Honor.

1    BY THE WITNESS:

2    A.  For political reasons, I was floating that information

3    because I was trying to develop the dynamic to get the Madigan

4    deal that I've talked a lot about and would love to answer

5    questions about, but I'm sorry, that was a run-on answer.

6    BY MR. SCHAR:

7    Q.  You didn't think anyone was going to contradict that lie,

8    did you?

9             MR. GOLDSTEIN:  Objection, your Honor.

10            THE COURT:  To that question, overruled.

11   BY THE WITNESS:

12   A.  What was your question again?

13   BY MR. SCHAR:

14   Q.  You did not think anyone was going to contradict that lie.

15   A.  I don't know.  I don't know that I thought that far ahead.

16   I just wanted the information out that Congressman Jackson --

17   that I was possibly considering Congressman Jackson.  That's

18   what I was -- that was the purpose of that.

19   Q.  You did think that far ahead, Mr. Blagojevich, because on

20   November 10th, a little bit later, you talked to Mr. Harris,

21   Mr. Quinlan.

22            What you said was, "Doug is trying to get a Sneed

23   item in saying that Jesse, Jr. and I had a real good

24   conversation this weekend."

25            Mr. Harris said, "Did you?"

Blagojevich - cross

4589

1    You said, "No.  So who's going to contradict that,

2 you know?"

3 A.  Right, in other words, Jesse Jackson, Jr.  --

4    MR. GOLDSTEIN:  Objection.

5 BY MR. SCHAR:

6 Q.  Yes or no?

7    MR. GOLDSTEIN:  Objection.

8 BY THE WITNESS:

9 A.  Well, I did say that.

10    MR. GOLDSTEIN:  Objection, misstates the facts, as

11 well as compound question.

12    THE COURT:  It is a compound question.

13 BY MR. SCHAR:

14 Q.  Didn't you say to Mr. Harris and Mr. Quinlan, "Doug is

15 trying to get a Sneed item in, saying that Jesse, Jr. and I

16 had a real good conversation this weekend."

17    Mr. Harris said, "Did you?"

18    You said, "No.  So who's going to contradict that,

19 you know?"

20 A.  Can I see that?  I'm -- maybe I should take your word on

21 it, but I just want to doublecheck.

22    MR. GOLDSTEIN:  Objection.  This is not impeaching.

23    THE COURT:  That one's overruled.

24    Are you going to show it to him?

25    MR. SCHAR:  Yes, Judge.

1          THE COURT:  Sure.

2          MR. SCHAR:  Got what's marked as Government Exhibit

3   CX 0477 TR, showing the defendant Page 13, Lines 7 through 14.

4          THE WITNESS:  Yes, okay, and your question?

5          I'm sorry, Judge.

6   BY MR. SCHAR:

7   Q.  The question was:  You said to Mr. Harris and Mr. Quinlan,

8   "Doug is trying to get a Sneed item in saying that Jesse, Jr.

9   and I had a real good conversation this weekend."

10          Mr. Harris said, "Did you?"

11          You said, "No, so who's going to contradict that, you

12   know?"

13   A.  Right.  Jesse, Jr. would not contradict that.  That would

14   make him look good.  That would advance what he's trying to do

15   and advance my politics.

16   Q.  So the answer is yes.

17   A.  With that explanation.  That was good politics.

18   Q.  Well, the point of the article was to deceive other public

19   officials, correct?

20          MR. GOLDSTEIN:  Objection.

21   BY THE WITNESS:

22   A.  It's the quarterback faking a handoff and throwing long.

23   It's part of the business.  You know what I'm saying?  It's

24   like --

25   BY MR. SCHAR:

Blagojevich - cross

4591

1  Q.  In the process, you were going to deceive the public, too,
2  weren't you?
3  A.  That was -- that was designed for the inside political
4  world.  That's what -- that's what that was.
5  Q.  You were going to deceive the public as well.
6  A.  That's not how I saw that.  I saw that as showing the
7  political establishment that Congressman Jackson and I -- that
8  I was resurrecting an old relationship and that he, as the
9  Senate race, Senate choice unfolded, that his chances were not
10 out of the realm of possibility.  That was the purpose of
11 that.
12 Q.  So putting false information into the newspapers that the
13 public will read in your view is not deceiving the public.
14        MR. GOLDSTEIN:  Objection, your Honor.
15 BY THE WITNESS:
16 A.  I view it as the part --
17        MR. GOLDSTEIN:  Objection.
18        THE WITNESS:  I'm sorry, Aaron.
19        THE COURT:  I think he's answered the question.
20        THE WITNESS:  Thank you, Judge.
21 BY MR. SCHAR:
22 Q.  Now, according to you, Mr. Blagojevich, you were always
23 interested in possibly taking the Senate seat yourself, is
24 that right?
25 A.  Yes.

1    Q.  Even before the election.

2    A.  Yes.

3    Q.  Now, from time to time as governor, you held press

4    conferences, right?

5    A.  Yes.

6    Q.  And that was a way for you to communicate to the public,

7    correct?

8    A.  Yeah, yes.

9    Q.  I think you testified you wanted to do it as honestly as

10   you could, correct?

11   A.  What's your question?

12   Q.  When you went to a press conference, I think what you

13   testified to is you tried to be as honest as you could.

14   A.  As you could, considering the political dynamic and the

15   nuances of the business.

16   Q.  I want to direct your attention to November 5th, 2008.

17   A.  I remember that day.

18   Q.  You held a press conference, right?

19   A.  I believe that was that day.

20   Q.  To talk about the Senate seat --

21   A.  Yes.

22   Q.  -- right?

23        You practiced what you were going to say.

24   A.  To be very --

25   Q.  And you knew --

Blagojevich - cross

4593

1  A.  Yeah, yeah.

2  Q.  -- you knew you were going to get a question about the

3  Senate seat, correct?

4  A.  Oh, yes.

5  Q.  And whether you were interested, right?

6  A.  I anticipated the possibility of that.

7  Q.  The answer is yes.

8  A.  Yes.

9  Q.  And, in fact, you got such a question, didn't you?

10  A.  Refresh my recollection.

11  Q.  You were asked, "How about yourself?"

12      And your response was, "I'm not interested in the

13  U.S. Senate."

14  A.  Right.

15  Q.  That was a lie.

16  A.  I try -- what I did that --

17  Q.  Yes or no, sir?  That was a lie.

18  A.  You know, I hadn't decided what I was going to do, so I

19  would say no, I hadn't reached a decision.

20      I guess, it's -- it's a political answer, but I -- I

21  can't say that I was completely false.  I didn't know what I

22  was going to do, so --

23  Q.  The question, Mr. Blagojevich, that was asked of you was

24  not what are you going to do.  The question was, "Are you

25  interested in a U.S. Senate seat?"  Your answer was "I'm not

1    interested in the U.S. Senate."

2            It was a lie, wasn't it?

3    A.  It was not an accurate answer.  If you want to call it

4    that, I won't quarrel with you, but the reality is I really

5    wasn't interested.  It was a fallback position if things got

6    real bad.

7            I really wasn't interested in making me the senator,

8    but that was always a very real option to me.  Ultimately, if

9    I ever made a decision, I would be among the different

10   candidates to consider, which was part of what happened.

11   Q.  Sir, we heard you testify for three days about how you

12   were always interested in the U.S. Senate seat.  I think your

13   testimony was before, during and after.

14   A.  This is --

15           MR. GOLDSTEIN:  Objection to "we heard you testify."

16   BY THE WITNESS:

17   A.  I said it --

18           MR. GOLDSTEIN:  Objection, Rod.

19           THE WITNESS:  Sorry.

20   BY MR. SCHAR:

21   Q.  Mr. Blagojevich, at that press conference --

22           MS. KAESEBERG:  Can we get a ruling on the objection?

23           MR. SCHAR:  I'll withdraw the question.

24           THE COURT:  He withdrew the question.

25   BY MR. SCHAR:

Blagojevich - cross

4595

1  Q.  At that press conference, you looked the camera straight

2  in the eye, correct?

3  A.  Show me if I was looking at the camera or was I looking at

4  somebody else?  I don't know.

5          MR. SCHAR:  Judge, we have it.  Are we allowed to

6  play it?

7          THE COURT:  Sure.

8      (Video played.)

9  BY THE WITNESS:

10  A.  What else do I say there, is there more?

11  BY MR. SCHAR:

12  Q.  There's a whole conference.

13  A.  Could we hear a little more on that?

14  Q.  Well, why don't we focus on the lie.

15  A.  Well, I'd like to know what I said after that, because

16  there's a tendency -- I'd like to see what I said after that.

17  Q.  We'll get the whole transcript.  I'll tell you what.

18  A.  What'd I say after that?

19  Q.  You'll have the whole weekend, sir.

20  A.  Yeah.

21  Q.  If there's anything in that transcript in which you say

22  I'm interested in the U.S. Senate seat --

23          MR. SOROSKY:  I object.

24  BY MR. SCHAR:

25  Q.  -- you can let us know.

1  A.  Why won't you let me see what I said after that?  I'd like
2  to know so I can honestly answer your question.
3         THE COURT:  Okay.  The reason I'm overruling your
4  objections is that what's happening is the defendant is, I
5  think, sort of acting as his own lawyer and has a rejoinder,
6  and I'm not going to stop him from making those rejoinders.
7         MS. KAESEBERG:  Well, Mr. Schar is not stopping his
8  questions either.
9         THE COURT:  I understand it, but as soon as you have
10 a client who starts saying I want to see something else, it's
11 not really unfair for them to have a little debate about
12 something.  You may have some time to see if you can repair
13 this over the weekend.
14        Go ahead.
15        MR. SCHAR:  Thank you, Judge.
16 BY MR. SCHAR:
17 Q.  Sir, the fact of the matter is --
18 A.  What did I say after that?
19 Q.  -- that was a lie that you didn't think anyone was going
20 to contradict, did you?
21 A.  I can't answer your question unless I see what I said
22 right after that.  As you know, I say a lot, so I can't
23 honestly answer your question because I don't remember
24 everything I said at that press conference.
25 Q.  You can't tell us whether or not that was a truthful

1  statement or not.

2  A.  I'd like to see it in its full context.

3  Q.  My question is you can't tell us whether that was a

4  truthful statement or not.

5  A.  To honestly answer your question as best as I can, I'd

6  like to see the full context so I can honestly answer your

7  questions as best as I can.

8  Q.  Your lawyers have the entire interview, so they'll have a

9  chance to review it with you, but as you sit here now, you

10  cannot tell us whether or not that's an honest answer when you

11  said "I'm not interested in the U.S. Senate"?

12  A.  Mr. Schar, I'd like to answer you question if I could see

13  the full context so I can honestly answer it because I don't

14  remember everything I said.  I remember very little of what I

15  said in that press conference back in November of 2008.

16        And so to honestly answer your question, if I could

17  see the fuller context, then I'd be better prepared to give

18  you the answer.

19  Q.  According to you, Mr. Blagojevich, your mantra on the

20  Senate seat is or was "What is good for the people of Illinois

21  and for me."  Correct?

22  A.  On November the 4th, around 8:30 in the morning --

23  Q.  Yes or no question, sir.

24  A.  -- I said that was -- I told John Harris that I was going

25  to measure everything up against that, good, bad, ugly things

1   like that.  I said good stuff for the people of Illinois, good

2   for me, it's not coming for free, I'm going to make this

3   decision in good faith.  On the morning of November the 4th,

4   that's exactly what I said.

5   Q.  So the answer to my question is yes.

6   A.  I said it on November the 4th that morning, that that was

7   what I told Harris was going to be my operating principle as I

8   measured the different options against it.

9   Q.  So it wasn't just about the people of Illinois, correct?

10  A.  It was good stuff for the people of Illinois and good for

11  me.

12  Q.  Right.  It was also about you, right?

13  A.  Yes.

14  Q.  Your oath, sir, doesn't say that you can make decisions

15  based on what's good for you, does it?

16  A.  The oath says to follow the laws of the state, the

17  Constitution, to faithfully discharge your duties to the

18  people, and I -- I interpret that to do good stuff for the

19  people of Illinois and if it's good stuff for the people of

20  Illinois, that would be good for me.  That's what I --

21  Q.  Is that --

22  A.  -- like about that.

23  Q.  When you say good for people of the Illinois and good for

24  me, do you simply mean if it's good for Illinois, it's good

25  for me?

1   A.  If I determine as governor that I'm getting good stuff for

2   the people of Illinois, that I would feel that's good for me

3   and that's among the reasons why the Madigan deal looked so

4   good to me.

5   Q.  But when you had the press conference on November 5th, did

6   you say, "I'm going to make this decision based on what's good

7   for the people of Illinois and good for me, Rod R.

8   Blagojevich"?

9   A.  Can I see the press conference?  I can answer your

10  question.

11  Q.  You don't know as you sit here.  You think you might have?

12  A.  I don't know.  I'd like to see it.

13  Q.  Did you tell anyone during that press conference you were

14  considering a position as secretary of Health and Human

15  Services?

16  A.  I'd like to see the press conference.  I can probably

17  answer that for you.   I -- I can say that that's highly

18  unlikely that I said that.

19  Q.  Highly unlikely.

20  A.  Highly unlikely.

21  Q.  You don't remember.  You think it's possible you mentioned

22  "I might be interested in secretary of Health and Human

23  Services"?

24  A.  I have to think I didn't, but I'm afraid to give you a

25  complete answer just because I haven't seen the press

1    conference.

2    Q.  Did you -- do you think you said anything in the press

3    conference about having talked to your advisors that morning

4    about private foundation jobs for you?

5              MR. GOLDSTEIN:  Objection.

6              THE COURT:  Overruled.

7    BY MR. SCHAR:

8    Q.  Yes or no?

9    A.  I don't imagine -- I don't believe I would have talked

10   about that at the press conference, but I haven't seen it.

11   Q.  Do you think you might have?

12   A.  Don't --

13             MR. GOLDSTEIN:  Objection.

14             THE COURT:  Overruled.

15   BY THE WITNESS:

16   A.  I don't think I would have talked about that, but --

17   BY MR. SCHAR:

18   Q.  You don't think you would have stood up and said, "One of

19   the things I'm considering with this Senate seat is private

20   foundation jobs for me."  You think you might have said that?

21   A.  I don't think so.

22   Q.  Now, according to your testimony, sir, the internal

23   process for picking a senator, I think you said mirrored the

24   external process, is that your testimony?

25   A.  Say it again, please?

1    Q.  The internal process mirrored the external process.

2    A.  Are you quoting me?

3    Q.  I'm just trying to get your -- I believe that's what you

4    said, but if I'm wrong, was it --

5    A.  Can you show me a transcript?

6    Q.  Let's try it a different way.

7    A.  Okay.

8    Q.  Did the internal process mirror the external process?

9         MR. SOROSKY:  Could we have the date and time of this

10   press conference?

11        MR. SCHAR:  I'm not talking about the press

12   conference, Judge.

13        THE COURT:  Okay.

14        MS. KAESEBERG:  I can't hear Mr. Schar.

15        THE COURT:  He's not talking about the press

16   conference.

17        MR. GOLDSTEIN:  Could we have foundation as to what

18   he's talking about?

19        THE COURT:  I think he's asking about during the

20   entire time there was a process.

21   BY MR. SCHAR:

22   Q.  Correct.

23        I believe yesterday or the day before, you testified

24   with words to the effect of "the internal process was meant to

25   mirror the external process."

Blagojevich - cross

4602

 1    A.  I like that better when you say words to the effect.

 2            The answer is I tried I tried very hard to try to put

 3    together a process -- I tried hard, we had discussions, John

 4    Harris and I, Bill Knapp was involved in those discussions, I

 5    spoke to Speaker Hastert, too, about what he recommended I

 6    should do with the process --

 7    Q.  We're --

 8    A.  -- to try to announce --

 9            THE COURT:  Stop.  You may have misunderstood his

10    question.

11            THE WITNESS:  Okay.

12            THE COURT:  Ask the question again.

13    BY MR. SCHAR:

14    Q.  Did you say your purpose was to have the internal process

15    mirror the external process?  Yes or no question.

16            MR. SOROSKY:  We object.  We'd just like to know

17    when --

18            THE COURT:  Ever.

19            MR. SOROSKY:  -- the governor supposedly said this.

20            THE COURT:  Ever.

21            MR. SOROSKY:  What?  Ever --

22            THE COURT:  Ever.

23            MR. SOROSKY:  -- anyone can say anything ever.

24            THE COURT:  Your objection is really out of bounds.

25            MR. SOROSKY:  Ever.

1    THE COURT:  You understood the question.

2         Ask it again and put the word "ever" in it.

3  BY MR. SCHAR:

4  Q.  Did you ever indicate that the purpose was to have the

5  internal process mirror the external process?  Yes or no

6  question, sir.

7  A.  And you're saying did I say those exact words?

8  Q.  No, I'm not saying --

9  A.  Okay.  All right.

10  Q.  Did you intend ever to have the internal process mirror

11  the external process?

12  A.  And by that, when you say internal process mirroring the

13  external process, what does that mean, the external process

14  versus the internal process?

15  Q.  You tell me.  They're your words, sir.

16  A.  Are they?

17  Q.  Yes, from your direct testimony.

18  A.  That whatever we were going to announce publicly would be

19  as close to being what it was going to be.  Louanner Peters

20  was raised, but then she was no longer part of that because

21  she was a candidate, and that I would make the decision with

22  senior staff and that was -- that was what I was doing, and I

23  believe that's what we announced, that senior staff were going

24  to help me make the decision.

25         So I think it was as close as we could.  Again, we

1   live in a world where not everything lines up perfectly, but

2   that's what I was attempting to do and I think I did.

3   Q.  You talked about this conversation with Mr. Harris in

4   which you remember vividly, in fact verbatim, that it was

5   going to be good for the people of Illinois and good for me.

6   A.  Right.  I would say that a lot.

7   Q.  But that's actually not the mantra.  I think you called it

8   the mantra?

9   A.  No, did I?  Did I call it that?  Because internally we

10  called that a matrix.  Then we decided to call it an operate

11  principle.  I thought I called it an operating principle.

12  Q.  Sir, isn't it a fact that you purposely decided to keep

13  the "good for me" part from the people of Illinois?

14  A.  Are you asking me did I make a conscious decision at some

15  point to not talk about those things?

16          I don't know that it was conscious, but when we went

17  through this whole period of exploring ideas, discussing the

18  good, the bad and the ugly and all the rest, I wasn't

19  announcing all the dumb, ugly, stupid ideas that we were

20  coming with.  Part of them hadn't even arrived yet.  This was

21  done the day after the election.  There was still a lot of

22  discussing and ideas yet to come.

23  Q.  So you can remember the quote verbatim from that

24  conversation basically, correct?

25  A.  What conversation?

1   Q.  With Mr. Harris.  Remember you told us he was at some
2   diner?
3   A.  Yeah, why don't you play the tape.  It's on the morning of
4   Tuesday, November the 4th.
5   Q.  Why don't you tell us what comes next after you discuss
6   your mantra of good for the people of Illinois and good for
7   me.
8   A.  I'm not giving -- it's not coming for free, I think I
9   said.
10  Q.  What comes after that?
11  A.  I don't know.
12  Q.  Well, what Mr. Harris says is, "I think just publicly" --
13  let me ask you this:  Is this what Mr. Harris and you
14  discussed:
15          "I think just publicly we gotta make sure we're
16  always talking about best interests of the state, best
17  interests of the state."
18          You say, "Right."
19          Mr. Harris says, "Best interests of the state."
20          You say, "Right."
21          Mr. Harris:  "That's kind of the mantra."
22          You say, "Best interests of the state and somebody
23  who can do the most good for the state, for the people of
24  Illinois, most good for the people of Illinois."
25          Mr. Harris says, "Right.  Not the most good for

1    Barack, not the most good for you."

2              You say, "Right."

3              Isn't that what comes next?

4              MR. GOLDSTEIN:  Objection, Judge.

5    BY THE WITNESS:

6    A.  I have to think you're telling me the truth there, so I

7    would have to say yes.  Maybe I should see it, but, yes, and I

8    said right, which is something -- that's a sentiment I would

9    agree with.

10   BY MR. SCHAR:

11   Q.  So you agree that there was a decision that was made that

12   the mantra of "good for the people of Illinois and good for

13   me" wasn't actually going to be the public mantra?

14   A.  Oh, no, I'm not saying that by any means.  No, not at all.

15   John Harris is bringing up the public mantra.  That was him

16   saying that, isn't it?  Not me.

17   Q.  And you agree.

18   A.  That's a public -- saying that publicly and meaning it

19   internally and privately, I don't disagree with that.  That's

20   certainly a fair expression of how I felt and what I believed.

21   Q.  At any time, sir, during this -- let's say mid October to

22   the date of your arrest, did you ever tell the public that

23   part of the Senate seat analysis was what was good for you?

24   A.  Can you be specific?  What dates?

25   Q.  At any date -- tell you what --

1   A.   Yeah.

2   Q.   -- between November 1st --

3   A.   Right.

4   Q.   -- and December 9th.

5   A.   You know, I could have said -- if I see this press

6   conference, I could have said my commitment to healthcare,

7   having a senator who believed in my commitment to healthcare,

8   that was something I was looking for, that would have been

9   good for me.

10          It's very possible I could say something like that.

11  I'm not saying I said that at that press conference.  So

12  you're asking me to give you an answer on conversations that

13  took place from the end of October in a six-week period to

14  December the 9th and give you a definitive yes or no answer.

15  I don't think I can do that because you're asking me to try to

16  remember that.  I'm not ruling out the possibility I could

17  have said something like that.

18  Q.   Did you ever tell the public that you were having your

19  staff doing research on ambassadorships for you?

20  A.   No.  I didn't want other staff -- I'm sorry, no.

21  Q.   Did you ever tell the public you were having your staff

22  research past Health and Human Services people?  Yes or no?

23  A.   No.

24  Q.   Did you ever tell your public -- did you ever tell the

25  public you were having your staff research salaries you could

```
 1  make at foundations?
 2  A.  No, and I apologized to the people --
 3          MR. SOROSKY:  Objection.
 4  BY THE WITNESS:
 5  A.  -- for that for having my staff do that work.  I think
 6  that's wrong.
 7          MR. SOROSKY:  Objection.
 8  BY THE WITNESS:
 9  A.  -- and I didn't realize at the time when I was doing it.
10          THE COURT:  Are you objecting to --
11          THE WITNESS:  Why are you objecting to me?
12          THE COURT:  Are you objecting to his answer?
13          MR. SOROSKY:  It's irrelevant though.
14          THE COURT:  But are you objecting to his answer?
15          MR. SOROSKY:  What difference does it make what he
16  told --
17          THE COURT:  Are you objecting to his answer?
18          MR. SOROSKY:  No.
19          THE COURT:  Good.
20          MR. SOROSKY: The question.
21          THE COURT:  It's too late for the question.
22  BY MR. SCHAR:
23  Q.  Did you ever tell the public that you were considering a
24  position at Change to Win?
25  A.  No.  That lasted a day or two.  That went nowhere.
```

1  Q.  Did you ever tell the public you wanted a salary of
2  $750,000?

3  A.  I never said that to the public, no.

4  Q.  Did you ever tell the public that you thought maybe the
5  President-Elect could remove the head of Families USA and give
6  you that job?

7  A.  Nope.

8  Q.  Did you ever tell the public you were trying to figure out
9  how much your wife could make lobbying if you took the Senate
10  seat yourself?

11  A.  No.

12  Q.  Did you ever tell the public that you were considering a
13  placeholder in the Senate seat who might remove herself in
14  case you might get impeached so you could take it yourself?

15  A.  Right, the ugly idea, no -- of course -- no.

16  Q.  I think you testified, sir, on direct that that press
17  conference was an effort to be transparent.  Is that what you
18  said?

19  A.  To try to explain what our process was going to be.  It
20  was not designed for me to disclose every private thought or
21  consideration that was crossing my mind at that time or would
22  cross my mind in the days and the weeks after that event,
23  which is some of the things that you were reciting because
24  some of those things happened after that press conference that
25  we talked about and not on the day of the press conference,

1    but I did talk publicly about announcing a 501(c)(4) publicly,

2    and Health and Human Services was certainly a public thing,

3    very transparent.

4           If anything like that did happen, it would require

5    Senate confirmation, and obviously President Obama and I would

6    have to answer the questions of the public.

7    Q.  Just yes or no.

8    A.  What was the question again?  I'm sorry.

9    Q.  If you can't remember the question, I think we have a

10   fundamental problem.

11          MS. KAESEBERG:  Objection.

12   BY THE WITNESS:

13   A.  What was the question?

14   BY MR. SCHAR:

15   Q.  Step back.  I want you to focus on the question, okay?

16   A.  Go ahead, ask it.

17   Q.  Did you say that the press conference was an effort to be

18   transparent?

19   A.  And I said it recently?  Do you have a transcript?  It --

20   the press conference --

21   Q.  If you don't remember saying it on direct, that's fine.

22   A.  Yeah, the press conference was to announce to the public

23   what our process was going to be, and --

24   Q.  Again, my question was do you remember saying the point of

25   the press conference was to be transparent?

1    If you don't remember saying that on direct, you

2  don't remember saying that on direct.

3  A.  I may have said that.  I'm not -- I'd like to see

4  something, but I could very well have said that.  That was my

5  intention.

6  Q.  Tell you what, why don't we move over to December 8th.

7  A.  Okay.

8  Q.  Okay?

9    Now, I think you just testified in the last hour and

10  a half or so that as of the morning of December 8th, you had

11  not yet selected who you wanted to be U.S. senator, correct?

12  A.  That I had not had -- I had yet to make a final decision

13  on who my -- who I was going to choose as a United States

14  senator.

15  Q.  And we heard a conversation between you and Mr. Harris

16  that morning, correct?

17  A.  Yes.

18  Q.  The first conversation you had with Mr. Harris that

19  morning, right?

20  A.  Is it the first one?  It could be.

21  Q.  Okay.

22  A.  You want to show me something?

23  Q.  If you want, I can show you all the other people you

24  talked to before you talked to Mr. Harris.

25  A.  Can I see it?

1    (Documents tendered.)

2         THE WITNESS:  Where is it?

3         MR. SOROSKY:  Can we ask what he's being shown?

4         MR. SCHAR:  He's shown, and I'll put them into the

5    record later, if I may, Judge, a series of transcripts that

6    morning of calls before he talked to Mr. Harris.

7         MS. KAESEBERG:  Judge, can we be told the session

8    numbers so we can also access them?

9         THE COURT:  You can confer.

10        MS. KAESEBERG:  I can go?

11        THE COURT:  Yeah, right, sure.

12        MS. KAESEBERG:  Do you have what session numbers?

13    (Counsel conferring.)

14        THE WITNESS:  There's several calls early that

15   morning up until this last call, which was 8:51 in the

16   morning, between me and Lucio Guerrero, and all these others

17   that you gave me preceded that.

18   BY MR. SCHAR:

19   Q.  My question simply was that was your first call with

20   Mr. Harris that morning, correct?

21   A.  I didn't see any phone calls with John Harris, so I assume

22   that is accurate.

23   Q.  And we heard that call, correct?  It's a call you played.

24   A.  Oh, on the 8th of December.

25   Q.  Correct.

1    A.  Yes, that's right.

2    Q.  And I think what you indicated, you had not quite made any

3    decisions, right?

4    A.  Yes.

5    Q.  And in that call, you made clear, I believe, to

6    Mr. Harris, that you didn't want him to actually reach out to

7    anyone at this point, correct?

8    A.  We just -- we just heard that call.

9    Q.  Yes, we did.

10   A.  And I think that was the call where I told John Harris to

11   start thinking about the tactics, is that right?

12   Q.  Correct.

13   A.  Right.  That's right.

14   Q.  You told him not to reach out to anyone, to think about

15   the tactics, right?

16   A.  I told him to think about the tactics.

17          Can I see it?  Did I actually say don't reach out to

18   anybody?  Why don't you show it to me.

19   Q.  I'm not asking if you said any specific words.

20   A.  Oh, okay, so why don't you show me that because you're

21   good at that.

22   Q.  It's right in front of you, it's your Transcript No. 5?

23          MR. GOLDSTEIN:  4.

24   BY MR. SCHAR:

25   Q.  4, sorry.

1    A.  Okay.  I've got it, Mr. Schar.  What portion should I look
2    at?
3    Q.  My question is just about the call.  By the end of that
4    call, you had asked Mr. Harris to think about the tactics,
5    correct?
6    A.  I did.
7    Q.  And you had not specifically informed him there was anyone
8    he should reach out to at this point, correct?
9    A.  Okay.  So you've changed your question then.  It's a
10   different question now.
11          So your question now is that I didn't -- as I
12   understand it, your question now is did I -- did I instruct
13   John Harris to reach out to someone, right?
14   Q.  Correct.
15   A.  As opposed to telling him not to, is that right?
16   Q.  Did you ask Mr. Harris to reach out to anyone?
17   A.  I'm pretty sure I know the answer.  I just want to
18   doublecheck.
19          My answer -- I wanted Harris to work with Rahm
20   Emanuel and reach out to Rahm Emanuel on the tactics of this.
21   They had been talking that weekend on the 7th and on the 6th,
22   and so in my mind, I viewed discussion -- discussing with him
23   the tactics would be part of this effort to reach out to Rahm
24   that we were doing over that weekend, and so this was --
25   Q.  Why don't you go ahead to Page 10.  The jurors can go

1    ahead to Page 10.  This is Transcript 4 in the white binder.

2            At Line 16, Mr. Harris says, "Yeah, I didn't ask Rahm

3    to --"

4            You say, "No," at Line 19, "No, I know that.  No, I

5    know, nor should you right now."

6            Correct?

7    A.  Right.  I asked him to reach out to Rahm.  I did -- over

8    those several days on our other issues, Jesse, Jr. and the

9    others.

10   Q.  My question was simply in this phone call, you didn't --

11   you actually specifically directed him not to reach out at

12   this point.

13   A.  I didn't say don't reach out.  I simply said -- he told me

14   he hadn't, and that I said that's fine, you don't -- you

15   shouldn't have, which is fine.

16   Q.  Okay.

17   A.  Right.

18   Q.  Now, your testimony, sir, put that aside for a second.

19   A.  Yes.

20   Q.  Your testimony, sir, is not the first time you've actually

21   talked about December 8th, is it?

22   A.  In my book, I talked about how --

23           MR. SOROSKY:  Objection to the form of the question

24   "your testimony is."  I think Mr. Schar can ask --

25           THE COURT:  Wait, wait.

1    BY THE WITNESS:

2    A.  In my book I talked about how I wanted John Harris to

3    reach out to Rahm Emanuel.  I did write that in my book

4    because I did, and I had him working on that that whole

5    weekend because he had talked to him on the 6th, he talked to

6    him on the 7th, and I wanted to get that negative leverage

7    situation going.

8              And then ultimately that day, we wanted to --

9    BY MR. SCHAR:

10   Q.  Let's talk about your book.  You did write a book.

11             THE COURT:  Just for the elucidation of the witness,

12   if you had not started to talk, I actually would have

13   sustained your lawyer's objection, so maybe you ought to wait.

14             THE WITNESS:  Okay, Judge.

15             THE COURT:  Go ahead.  You answered.

16   BY MR. SCHAR:

17   Q.  You did write a book about December 8th, didn't you?

18   A.  I wrote a book about my experiences here, yes, before we

19   had a chance to see all the conversations.

20   Q.  Actually, it was -- that book came out after you had all

21   the conversations, didn't it?

22   A.  Right, but that book was by the editor before that, but

23   it's okay.  I stand by, you know, my best recollections that I

24   wrote in my book when I was writing it at that time before I

25   had a chance to sit down with my lawyers and listen to the

1  conversations.

2  Q.  Well, you took the time to write the book, correct?

3  A.  Yes.

4  Q.  You wanted to be careful, right?  Yes or no.

5  A.  Yes.

6  Q.  You wanted to be accurate?  Yes or no.

7  A.  As best as I could remember, yes, my best recollections.

8  Q.  And you wanted, I believe the subtitle of the book is

9  "Finally, the Truth," correct, "Behind the Political Scandal,"

10 right?  Yes or no?

11 A.  Yes, the publisher named it that.

12 Q.  And you talked about December 8th, correct?

13 A.  Yes.

14 Q.  And what you said in your book was that "Early Monday

15 morning, over the phone, I had informed my chief of staff that

16 I had selected my first choice to be the new U.S. senator from

17 Illinois, filling the vacancy left by President-Elect Barack

18 Obama."

19 A.  Uh-huh.

20 Q.  That's not true.

21 A.  Oh, that is true.  She was my first option.  Absolutely

22 true and in that --

23 Q.  So you had selected her.

24 A.  That -- as the first choice and the first option, and then

25 when I tell Harris that he should -- we should call Madigans

1  or we forget the whole thing, we decided we should make the

2  decision and begin to move forward.  That's -- that's what

3  was --

4  Q.  Well, what you said --

5  A.  -- in my mind.

6  Q.  -- in the book was, "I directed him to reach out to the

7  parties and see if we could work out the deal," correct?

8  A.  That's right.  The whole process was unfolding.  The

9  different parties were being reached out.  Rahm was one of

10  them.

11  Q.  This is the question, yes or no --

12  A.  Go ahead.

13  Q.  -- what you said was "I directed him to reach out to the

14  parties and see if we could work out the deal," correct?

15  A.  I -- if I -- if I said that in the book, reach out to the

16  parties to -- that's what we were beginning to do, that's

17  right, we were beginning the process.

18  Q.  Okay.  Show us, behind Tab 4, show us in the phone call

19  where you directed John Harris to reach out to the parties and

20  make sure -- or try to make the deal happen behind Tab 4?

21  Show us where you said that, sir.

22          MR. SOROSKY:  Objection.

23  BY THE WITNESS:

24  A.  John and I talked --

25          MR. SOROSKY:  Objection, your Honor.  It presupposes

1  the only way he could reach out to the parties is on a phone

2  call.  There are many other ways he can reach out to parties.

3          THE COURT:  I don't think that that's a valid

4  objection in the context of this question.  There's no mention

5  of phones here.

6          Go ahead.

7  BY THE WITNESS:

8  A.  John Harris and I --

9  BY MR. SCHAR:

10  Q.  I'm asking you --

11  A.  Yeah.

12  Q.  -- to show us in the transcript behind Tab 4 where you

13  directed John Harris to reach out to the parties and make the

14  deal happen.

15  A.  It's not in this particular call.  There were a bunch of

16  calls that day, and I met with John Harris in person that day.

17  Q.  What you said was, "Early Monday morning, over the phone,

18  I had informed my chief of staff that I had selected my first

19  choice to be the new U.S. senator from Illinois, filling the

20  vacancy left by President-Elect Barack Obama.  I directed him

21  to reach out to the parties involved and see if we could work

22  out the deal."

23  A.  That was my best recollection when I wrote the book.  That

24  was also --

25  Q.  My question is did you say that?

1  A.  In this particular call, I don't say exactly what I wrote

2  in the book.  I did not.

3         THE COURT:  Wait.  Maybe before you answer the

4  question, you could pause for a moment and think about exactly

5  what the question is because you're answering now a question

6  that wasn't asked.

7         THE WITNESS:  Okay.  Did you want to ask it again?

8  BY MR. SCHAR:

9  Q.  Sir, nowhere in the transcript did you direct John Harris

10  to reach out to the parties, correct?

11        MR. SOROSKY:  Objection.

12  BY THE WITNESS:

13  A.  What parties are we talking about?

14        THE COURT:  No.  And the problem with this is, is

15  that it interrupts the witness's train of thought.

16        Go ahead.

17  BY THE WITNESS:

18  A.  In this call, John tells me he had been reaching out to

19  Rahm, which is what I wanted him to do; that Harris says,

20  finally, he returned my calls.  That's John Harris telling me

21  that he's responding to his reaching out, and that was

22  probably my best recollection when I wrote the book in the

23  spirit of this, which was I told him to reach out to Rahm, and

24  I believe Rahm is the parties, as we were beginning to put

25  this process together once I made the final decision to do it,

1    but she was the first option well before December the 8th.
2    BY MR. SCHAR:
3    Q.  I think what you said on your direct testimony, sir, is
4    you went to bed that night thinking that in several days, this
5    deal would be basically moving forward and potentially done
6    soon, correct?
7    A.  In my mind, I felt that we might be able to possibly get a
8    deal like that done.  I envisioned making a final -- making
9    the pick no later than January the 6th is my best
10   recollection, but that if, in fact, this happened and I was
11   able to get as much as I wanted that I thought was going to be
12   good, all the things that we talked about, that I would have
13   certainly changed the timetable if I had all those national
14   Democrats brokering the deal with Mike Madigan and I could get
15   a good thing done for people.

16           In my mind, I wasn't going to wait until January
17   the 6th, which was a date that I expressed as a possible time
18   for me to ultimately make the final, final decision.
19   Q.  I think in the book you actually wrote if you could have
20   gotten those bills passed sooner, you would have named her
21   sooner, being Lisa Madigan, right?
22   A.  I know in my heart that I would have absolutely done that.
23   Q.  In your heart, there's no doubt in your mind that if you
24   could have gotten it done prior to January 6th, you would have
25   done it.  That's what you're testifying to.

1          MR. SOROSKY:  Objection to the --

2          THE COURT:  The objection is overruled.

3          THE WITNESS:  If --

4          THE COURT: Yes or no.

5   BY MR. SCHAR:

6   Q.  Yes or no?

7          THE COURT:  You want the question read back?

8          THE WITNESS:  Yeah, read it back to me.  I mean, I'm

9   sorry, could you, if you could.

10         (Record read.)

11  BY THE WITNESS:

12  A.  It's a speculative thing because you don't really know,

13  right?  I mean, because I'm -- you imagine that.  I wanted to

14  wait until January the 6th --

15         THE COURT:  Stop.  Are you telling me that you are

16  unable to answer that question yes or no?

17         THE WITNESS:  You want to read it back again?

18         THE COURT:  Sure.

19         (Record read.)

20  BY THE WITNESS:

21  A.  This is -- I believe I would have, but I can't say

22  definitively --

23  BY MR. SCHAR:

24  Q.  That's right.

25  A.  -- because you never know.

1  Q.  Fine.  But that -- that's what you believed going to bed

2  that night.

3  A.  No.  What I believed was that I thought that we -- that we

4  were close to possibly getting this deal; that I thought the

5  next day offered great opportunities, follow-up from Rahm,

6  which I was hoping and thinking --

7  Q.  Let me -- let me stop you.

8          MR. SCHAR:  And I move to strike as non-responsive.

9          THE COURT:  The answer is stricken.

10  BY MR. SCHAR:

11  Q.  As of December 8th, sir, you knew Tony Rezko had been

12  convicted, correct?

13  A.  I did.

14  Q.  And you were actually talking to various people about

15  whether or not Mr. Rezko was cooperating in the investigation

16  of you.  Yes or no?

17  A.  I talked about that all --

18  Q.  Yes or no.

19  A.  Yes, all the time.

20  Q.  And you knew as of December 8th that Mr. Rezko was going

21  to be sentenced on January 6th, correct?

22  A.  That's why I picked that date.

23  Q.  And you were concerned that he was cooperating, weren't

24  you?

25          Yes or no, either you were or you weren't.

1   A.  I was told --

2            THE COURT:  Wait.

3            MR. SOROSKY:  Your Honor --

4            THE COURT:  Yes or no or a statement that you cannot

5   answer it yes or no.

6            MR. GOLDSTEIN:  Your Honor, objection, scope.

7            THE COURT:  The objection is overruled.

8            MR. SOROSKY:  I don't think he said anything about

9   that gentleman.

10           THE COURT:  Only one person objects.

11           MR. SOROSKY:  Oh, well.

12           THE COURT:  The objection is overruled.

13  BY THE WITNESS:

14  A.  I believed I was going to get the clean bill of health.

15           THE COURT:  Maybe you didn't hear me.

16           THE WITNESS:  Okay.  I'm sorry.

17           THE COURT:  You have three choices:  Yes, no, or I

18  can't answer that question yes or no.  And the problem with

19  giving the third answer is you might get a bunch of other

20  questions that show that you could have answered it yes or no.

21           And I'm going to remind you again, there will be a

22  redirect examination, and if there's something --

23           THE WITNESS:  Right.

24           THE COURT:  -- you think has to be said in addition

25  to your answer here, then your lawyers will bring it out.  So

1   just answer the question he asks, as opposed to trying to
2   answer the question you wished he'd asked.
3          THE WITNESS:  I don't mind answering -- I'm sorry,
4   Judge.  What was your question again?
5   BY MR. SCHAR:
6   Q.  You were concerned that Mr. Rezko was cooperating against
7   you, weren't you?
8   A.  I was --
9   Q.  Yes or no?
10  A.  I was afraid --
11         MR. GOLDSTEIN:  Object to the term cooperate.
12  BY THE WITNESS:
13  A.  Yes.  What does that mean?
14  BY MR. SCHAR:
15  Q.  You were concerned that Mr. Rezko was talking to federal
16  investigators.  Yes or no?
17  A.  I was told he was put in solitary confinement to lie about
18  me.
19  Q.  Yes or no, sir.
20         THE COURT:  You --
21  BY THE WITNESS:
22  A.  I was concerned about published reports that were in the
23  *Tribune* that said you were trying to make Mr. Rezko lie about
24  me and President Obama, and I was afraid of that and I talked
25  about that all the time, and that's why -- that's why I -- I

1    raised the issue of if I can get cleansed, my senator would

2    have less baggage if that sentencing happened on January

3    the 6th.

4    BY MR. SCHAR:

5    Q.  So you were -- I'm sorry, Judge.

6            THE COURT:  Try it one more time.

7    BY MR. SCHAR:

8    Q.  I want to follow up on that, but were you concerned he was

9    talking to federal investigators, yes or no?

10    A.  Yes.

11    Q.  Okay.  And you were concerned that your Senate choice

12    wouldn't be cleansed until that sentencing was done, is that

13    your testimony I just heard you say?  Yes or no?

14    A.  That's --

15    Q.  Yes or no?

16    A.  That's a piece of it.

17    Q.  Okay.  Now, didn't you tell Mr. Scofield the night before

18    that "Rezko's f'ing likely, you know, what we're hearing is,

19    you know, don't repeat this, among the lawyers, we're hearing

20    his lawyers saying no cooperation, it's over, they're gonna,

21    you know, as far as they're concerned, the sentencing

22    January 6th and he's on his way.  Okay, now that's huge, isn't

23    it?"

24            Didn't you say that?  Yes or no?

25    A.  Yes.

1   Q.  All right.  Now, behind Tab 5, you played a portion of a
2   call, correct?
3   A.  I didn't, my lawyer did.
4   Q.  All right.  Have the jurors turn to Tab 5, please?
5           THE COURT:  Yes.
6   BY MR. SCHAR:
7   Q.  The call ends on Page 2.
8   A.  Right.
9   Q.  What did you and Mr. Greenlee discuss next?
10          MR. GOLDSTEIN:  Objection, your Honor.
11  BY THE WITNESS:
12  A.  No, I -- well --
13          THE COURT:  Overruled.
14  BY THE WITNESS:
15  A.  I told Bob Greenlee that I wanted to wait until the
16  sentencing of Tony Rezko January the 6th, that was certainly
17  something that I -- you know, I was thinking of doing and
18  putting it in my mind; but, again, if I could get the Madigan
19  deal done the next few days, who knows whether I would have
20  done that or not.
21  BY MR. SCHAR:
22  Q.  Well, what you said was, "I'm not -- I'm thinking
23  January 6th.  I'm going to wait till the Rezko stuff,"
24  correct?
25  A.  That's right.

1    Q.  And what you said was, "I'm telling you right now, I'm not

2    doing it until after Rezko's sentencing.  It's got to be

3    January -- after January 6th, just in case I got to throw

4    myself in there, God forbid."

5           Didn't you say that, sir?

6    A.  And if I'm --

7    Q.  Yes or no?

8    A.  I absolutely did say that.  Absolutely.

9           Can I explain it?

10          THE COURT:  This is why we have redirect.

11          THE WITNESS:  Okay.  Got you, Judge.

12   BY MR. SCHAR:

13   Q.  You said, "I'm waiting, I'm definitely waiting."

14   A.  Yeah.  I said a lot of things that -- you know,

15   circumstances changed and I changed my mind.

16   Q.  What you said was you were going to wait until Mr. Rezko

17   was sentenced to make a decision in case you needed to take

18   the Senate seat yourself.  Isn't that what you said in that

19   phone call?  Yes or no?

20   A.  Can you -- quote it again, then I can answer your

21   question.

22   Q.  "I'm telling you right now, I'm not doing it till after

23   Rezko's sentencing.  It's got to be January -- January --

24   after January 6th just in case I got to throw myself there" --

25   A.  Yeah.

1    Q.  -- "God forbid."

2    A.  That's right, I said that.

3              MR. SCHAR:  Judge, we'd ask to play, we have

4    transcripts for the jurors, the next session of this call.

5              THE COURT:  I think we're going to save that.

6              MR. SCHAR:  Very good, Judge.

7              MS. KAESEBERG:  Judge --

8              THE COURT:  We are done for the day.  9:30 Monday

9    morning.

10             COURT SECURITY OFFICER:  All rise.

11             MR. SOROSKY:  Monday, right, Judge?  9:30 Monday,

12   right?

13        (Jury exits courtroom.)

14             THE COURT:  You can step down.  Be seated in the

15   courtroom.

16             Counsel approach.

17             MS. KAESEBERG:  Judge, while this call is still fresh

18   in our minds, I just want to make an objection clear, which is

19   that we asked for permission to play that entire call, and now

20   for the government to mislead the jury and give an

21   interpretation as if we purposely left something out and say

22   let's play this for the jury is wholly inappropriate when we

23   asked to play the whole call.

24             MR. SCHAR:  They did not ask to play the whole call.

25   They had, and you'll look at it, if you want, Judge, in your

1    binder, they had just the portion you played.  Mr. Reibman can
2    address this as well.
3              THE COURT:  Well, but what you could do is, to mirror
4    what your client said, show me the transcript.
5              MS. KAESEBERG:  Okay.
6              THE COURT:  We'll do it that way.
7              MR. SCHAR:  Just for the record, I showed the witness
8    CX 1621 TR, CX 1622 TR, CX 1623 TR, CX 1624 TR, CX 1625 TR, CX
9    1626 TR, CX 1627 TR, CX 1628 TR, CX 1631 TR, CX 1632 TR, and
10   CX 1633 TR in a group at one point, just so the record's
11   clear.
12             THE COURT:  Okay.  I have a couple -- you want to
13   raise something else?  Go ahead.
14             MS. KAESEBERG:  Judge, there was just an issue that I
15   spoke to your clerk about just we wanted to move when we were
16   done with Mr. Blagojevich to move to admit the additional
17   calls that we requested for the record.  We believe that --
18             THE COURT:  Yeah, don't worry.
19             MR. SCHAR:  Just for a matter of clarity, the call
20   that they played behind tab is it 4, I think, is partially
21   redacted.  At the request of the defense, we did not object to
22   them removing a section of that call that they thought was
23   prejudicial.
24             So just so the record's clear, a portion, I don't
25   think it was clear, a portion of that call was removed, and we

1    had agreed on that ahead of time.  I don't think we let your

2    Honor know that, though.

3              MR. GOLDSTEIN:  That is correct, your Honor.

4              THE COURT:  Okay.  A couple of observations.  The

5    first is a minor one.  With respect to the scope objection,

6    scope objections when defendants get on the witness stand are

7    significantly narrower than they are for other witnesses

8    largely because the reason scope objections, the reason we

9    have a scope rule is because if you want to ask a question

10   that's outside the scope, you can call the witness in your own

11   case.  This is not true with defendants.

12             This does not mean that there is no scope rule for

13   the defendants, but the ambit of the scope rule is a little

14   broader -- it's a little narrower when it comes to

15   cross-examination of defendants.

16             The second thing is that this is going -- this

17   cross-examination is going to be a mess and not particularly

18   helpful to the defendant if this mode of his response to

19   government questions does not change and, in particular, his

20   response before anybody has a chance to make an objection.

21             And the problem with that is, is that if I stop the

22   answer to deal with the objection, I have a witness who

23   doesn't remember the question or, in the alternative, he's a

24   witness who, maybe for good reasons, wants to know precisely

25   what he was asked.  Not an unreasonable position.  But the

1    fact is, is he starts answering.

2         Absent exceptional circumstances, I'm going to regard

3    him as having waived the objection.  So it would be good if

4    you told him what the consequences of this are.

5         It also would be significant for him to understand

6    that he has to ask -- answer the questions they asked, not the

7    questions he'd prefer that they ask; and if he continues doing

8    this the way he's doing it, I would likely respond to a motion

9    by the government for sanctions.  I recognize that the

10   government may never ask for sanctions because I don't think

11   the defendant is doing himself any favors with his demeanor on

12   the witness stand, so the issue may never arise.

13        But this -- except for the fact that I'm dealing with

14   at least two experienced defense counsel and two others who,

15   while not having a great deal of experience, seem to be

16   intelligent enough --

17             MS. KAESEBERG:  Thanks.

18             MR. GOLDSTEIN:  He's not talking about me.

19             MS. KAESEBERG:  (Laughing) That's right.

20             THE COURT:  -- the first thought that crossed my mind

21   is -- the first thought that would ordinarily cross my mind is

22   the witness has not been prepared for cross at all, but I

23   don't think that's the case.

24        I'd like not to see repetition of what happened this

25   afternoon; but if we do have a repetition, we'll deal with it

Blagojevich - cross

4633

1    as it arises.

2         I do have a question for the prosecution.  Can you

3    give me a planned estimate -- a rough estimate of the duration

4    of this cross-examination?

5         My guess is if it continues the way it has continued,

6    we are looking for a cross that might be almost as long as the

7    direct.

8         MR. SCHAR:  If it continues the way it continues, the

9    leaves will start turning, Judge.

10        My hope is -- I'm sure at the rate we're going, it's

11   going to be at least through Monday and I would suspect into

12   Tuesday.  If it continues at this rate, it could be much

13   longer.

14        My hope is certainly not to go much longer than that,

15   but it's going to be entirely dependent upon how much

16   refreshing recollection has to occur and how many

17   non-responsive answers I get.

18        MR. SOROSKY:  If I may briefly respond to Mr. Schar's

19   comment.

20        THE COURT:  Sure.

21        MR. SOROSKY:  Briefly.

22        Not once in any question did Mr. Schar say, "On

23   November 8th, you had a conversation with Jones and you said

24   X, Y and Z."

25        Mr. Schar's questions were, "You said X, Y and Z."

1    And with all due respect, although we, the defense lawyers,

2    have been the victim of your Honor's, just let me say,

3    colloquy, I'll use that generic phrase.

4         THE COURT:  Maybe you'll be more diplomatic to say

5    recipients rather than victims.

6         MR. SOROSKY:  Recipients of colloquy, I think maybe

7    what's good for the goose is good for the gander.

8         And I think some of Mr. Schar's questions promote

9    some of the responses from the witness, and -- and, you know,

10   when you -- if I were to say to you, Judge Zagel, didn't you

11   say once that a defendant can't do that, you might say, what

12   case?  Under what circumstances?  Maybe it was very

13   appropriate for me to say that.  Maybe in -- you know, and

14   that's what we have here.

15        THE COURT:  Possibly what you've just said applies to

16   two of the many questions that Mr. Schar asked, and the

17   response, unfortunately, was typical with respect to all or

18   almost all of the questions he asked.

19        I don't doubt that Mr. Schar might possibly alter his

20   question-asking process if for no other purpose than to

21   relieve the relatively painful nature of what's happening in

22   this courtroom, but if you want to give Mr. Schar some

23   suggestions about how he asks the questions, I'm sure he'll

24   receive them because if you give it to him and he complies

25   with your suggestions, he'll figure you won't object, which

1    might also save us a little time.

2         MR. SOROSKY:  Mr. Schar's a good lawyer.  He doesn't

3    need my suggestions.

4         THE COURT:  I'm just giving you -- I'm giving you a

5    chance --

6         MR. SOROSKY:  Okay.

7         THE COURT:  -- to give him the advice that you have

8    because I believe that you might possibly have more experience

9    at the bar than Mr. Schar.  That's just my rough guess.

10        MR. SOROSKY:  I have more age than Mr. Schar.  I

11   don't know about experience.  However, however, perhaps that's

12   his trial technique.  You know -- and, you know, and I don't

13   know.  But I'm just saying that technique might be eliciting

14   some of the responses from the witness.

15        THE COURT:  I've said all I'm going to say on this

16   one.

17             I think we can save the final instruction conference

18   for an afternoon next week.  Anything anyone else wants to

19   bring up?

20        MR. SCHAR:  Judge, I guess the only other question is

21   do we anticipate any more defense witnesses after the

22   defendant?  Because I'm sure we will have a rebuttal case of

23   some sort, and we're trying to plan timing, which is, I know,

24   a fluid situation.

25        THE COURT:  I remember you were thinking of a couple

Blagojevich - cross

4636

1    relatively short witnesses.

2         MR. SOROSKY:  They would be very short.  It would not

3    affect the flow of the trial.

4         THE COURT:  Okay.

5         MR. GOLDSTEIN:  And we'll communicate with the

6    government.

7         THE COURT:  Okay, that's fine.

8         MR. SOROSKY:  It will not affect the flow of the

9    trial.

10        THE COURT:  Okay.  See you Monday.

11        MR. SCHAR:  Thank you, Judge.

12      (Court adjourned, to reconvene at 9:30 a.m. on 6-6-11.)

13                         CERTIFICATE

14      I certify that the foregoing is a correct transcript from

15   the record of proceedings in the above-entitled matter.

16   */s/Kathleen M. Fennell*

17   _____
     Kathleen M. Fennell
18   Official Court Reporter

19

20

21

22

23

24

25