```
 1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    UNITED STATES OF AMERICA, )
                                )
 4           Plaintiff,         )
                                )   No. 08 CR 888
 5       vs.                    )   Chicago, Illinois
                                )   June 7, 2011
 6    ROD BLAGOJEVICH,          )   1:45 p.m.
                                )
 7           Defendant.         )

 8
                                   VOLUME 28
 9                       TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE JAMES B. ZAGEL
10                            AND A JURY

11    For the Plaintiff:          THE HONORABLE PATRICK J. FITZGERALD
                                  UNITED STATES ATTORNEY
12                                219 South Dearborn Street
                                  Chicago, Illinois 60604
13                                BY:  MR. REID J. SCHAR
                                       MS. CARRIE E. HAMILTON
14                                     MR. CHRISTOPHER NIEWOEHNER
                                       MS. DEBRA BONAMICI
15

16
      Official Court Reporter:    MAELLEN E. PITTMAN, CSR-IL, FCRR-RDR
17                                219 South Dearborn Street
                                  Room 2342
18                                Chicago, Illinois 60604
                                  (312) 435-5576
19

20

21

22

23

24

25
```

```
 1  APPEARANCES:   (Continued)

 2
    For the Defendant:              KAPLAN & SOROSKY
 3                                  158 West Erie Street
                                    Chicago, Illinois 60610
 4                                  BY:  MR. SHELDON M. SOROSKY

 5                                  LAW OFFICES OF AARON B. GOLDSTEIN
                                    6133 South Ellis Avenue
 6                                  Chicago, Illinois 60637
                                    BY:  MR. AARON B. GOLDSTEIN
 7
                                    LAW OFFICES OF LAUREN F. KAESEBERG
 8                                  2140 North Lincoln Park West
                                    Chicago, Illinois 60614
 9                                  BY:  MS. LAUREN FAUST KAESEBERG

10                                  LAW OFFICES OF ELLIOTT RIEBMAN
                                    158 West Erie Street
11                                  Chicago, Illinois 60610
                                    BY:  MR. ELLIOTT RIEBMAN
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Jury in.)

2        THE COURT:  You may proceed.

3        MR. GOLDSTEIN:  Thank you, your Honor.

4      ROD BLAGOJEVICH, DEFENDANT HEREIN, PREVIOUSLY SWORN

5              REDIRECT EXAMINATION (Resumed)

6  BY MR. GOLDSTEIN:

7  Q.  Okay, Rod.  Where we left off before lunch, we were talking

8  about a phone conversation you had with Rahm Emanuel on November

9  8th, is that right?

10  A.  Right.

11  Q.  This was discussing the Fifth Congressional District possible

12  appointments, is that right?

13  A.  Yes.

14  Q.  And when Rahm Emanuel was asking about it, you said in this

15  call, I am happy to appoint your guy.  If I can do it, I'll do

16  it.

17        Did you say that?

18  A.  Yes.

19  Q.  And before you spoke to him -- actually, after you spoke to

20  Emanuel about this issue you had legal research done, is that

21  right?

22  A.  Yes.

23  Q.  And that was predominantly Bill Quinlan that did this for

24  you?

25  A.  It was principally -- Bill Quinlan is the one I talked to

1 several times that day about this issue.

2 Q.  Okay.  And in talking to Mr. Quinlan about that issue, what

3 was your understanding as far as whether the appointment could be

4 made?

5 A.  That I called him to say that Rahm believes there's a way

6 constitutionally where I could make an appointment to succeed him

7 in the Fifth Congressional District.

8         I didn't believe I could, because I had experience with

9 a previous congressional district where I had set a special

10 election.

11        I asked Bill Quinlan what his legal understanding was.

12        MR. SCHAR:  I'm going to object.

13        THE COURT:  Objection is sustained.

14 BY MR. GOLDSTEIN:

15 Q.  After you spoke with Mr. Quinlan, what was your understanding

16 of this issue?

17 A.  That I did not have the constitutional authority to do what

18 Congressman Emanuel wanted me to do.  But that we were -- that

19 was what he told me.  But there were other conversations about

20 that.

21 Q.  In talking to Mr. Quinlan did you discuss the possibility of

22 seeing if there were arguments to be made on the other side?

23 A.  We have had several conversations.  I remember being at a

24 David --

25        MR. SCHAR:  Objection, Judge.

1          THE COURT:  Objection sustained.

2  BY MR. GOLDSTEIN:

3  Q.  Now, you were asked, Rod, about a conversation with Fred Yang

4  on November 10th, is that right?

5  A.  Yes.

6  Q.  And you were discussing the issue of the congressional

7  district that Rahm Emanuel approached you on, is that right?

8  A.  Yes.

9  Q.  Okay.  And they asked you a question in which Mr. Yang said

10  he wants you to break the Constitution of the United States,

11  correct, and you said right, this is a favor worth doing, isn't

12  it.

13          What did you understand Mr. Yang to be saying and what

14  were you saying there in this conversation?

15  A.  I was telling Fred about what Congressman Emanuel asked me to

16  do.  I passed that along to Fred.

17          And Fred was intrigued that Congressman Emanuel was

18  asking me to break the Constitution.  His understanding was I

19  didn't have the constitutional ability to do it, and I answered

20  the question that way.

21  Q.  And --

22  A.  Which is what I said yesterday.

23  Q.  What was your intent as far as this issue regarding the

24  congressional district?

25          MR. SCHAR:  Objection.

1           THE COURT:  Objection sustained.

2  BY MR. GOLDSTEIN:

3  Q.  Did you ever make an appointment?

4           MR. SCHAR:  Objection.

5           I'll withdraw that.

6           THE COURT:  Go ahead, Mr. Goldstein.

7  BY MR. GOLDSTEIN:

8  Q.  Did you ever make an appointment?

9           THE COURT:  Objection -- I can't overrule the objection

10 because it was withdrawn.  So just go ahead and ask the question.

11 BY MR. GOLDSTEIN:

12 Q.  Did you ever do what Rahm Emanuel requested of you to do, to

13 make an appointment to the Fifth Congressional District?

14          MR. SCHAR:  Objection.

15          THE COURT:  Objection sustained.

16 BY MR. GOLDSTEIN:

17 Q.  Do you know if there was a special election set or an

18 appointment made to the Fifth Congressional District?

19          MR. SCHAR:  Objection, Judge.

20          THE COURT:  Sustained.

21 BY MR. GOLDSTEIN:

22 Q.  Was this issue discussed much after this call with Mr. Yang?

23 A.  No, because I didn't do it.

24          MR. SCHAR:  Objection.

25          THE COURT:  The answer "no" may stand.

1 BY MR. GOLDSTEIN:

2 Q.  Now, just to go back a little bit, Rod, in talking about the

3 issue of Jesse Jackson, Jr.

4       Now in these tabs, in December, December 4th in

5 particular, you were talking to Fred Yang as well as John Harris

6 and Bob Greenlee, is that right?

7 A.  Yes.

8 Q.  And there were discussions in which you raised the issue of

9 fundraising, is that right?

10 A.  Yes.

11 Q.  Okay.  And when you raised the issue of fundraising to Mr.

12 Yang and Greenlee and Harris, why did you do that?

13 A.  I was conveying to Messrs. Yang, Greenlee and Harris what

14 purportedly was an offer from Congressman Jackson through the

15 -- Rob and I and Raginder Bedi could tell triumvirate.  That's

16 what I was conveying to Fred and Greenlee and John Harris, what I

17 was -- what I was told that Jesse, Jr. presumably purportedly was

18 prepared to do.

19       MR. SCHAR:  Object.  It's not responsive to the

20 question.

21       THE COURT:  The objection is sustained.  The answer

22 stricken.

23       The jury is instructed to disregard it.

24       Just put another question.

25 BY MR. GOLDSTEIN:

1  Q.  Is it fair to say when you were talking to Greenlee and your

2  brother and Yang about this issue, you were just relaying what

3  was relayed to you?

4  A.  Yes.

5  Q.  Now, if you can turn to tab -- back to tab 72?

6  A.  I don't have a book.

7       What was it?

8  Q.  This is tab 72.  Are you there?

9  A.  Yes.

10  Q.  Okay.  On page 2, line 25, you talked a little bit about it

11  but I want to get your understanding of what you were saying here

12  or what you meant by what you said here, where you said in fact,

13  if you'd go ahead and just call him right now, and say well, it's

14  too obvious right now because of the story.

15       What were you saying there to Robert?

16       MR. SCHAR:  Asked and answered.

17       MR. GOLDSTEIN:  Your Honor, it was not.

18       This particular question, as far as what he meant when

19  he was saying it, was pressed in cross examination.  I asked a

20  question about it, but I didn't ask what he meant when he said it

21  was too obvious.

22       THE COURT:  Let me look at this.

23       (Pause.)

24       THE COURT:  You're asking him about what he meant, not

25  what he said, right?

1      MR. GOLDSTEIN:  Correct.

2      THE COURT:  He can answer that question.

3 BY MR. GOLDSTEIN:

4 Q.  What did you mean when you said go ahead, just call him,

5 well, it's too obvious right now because of the story?

6 A.  What I meant was when he calls Raghu and gives him his

7 explanation on why he was cancelling the meeting, it's too

8 obvious to say Harish Bhatt is the reason, because of this --

9 these glaring headlines.  Just be upfront and tell them --

10 because these news stories, because I've got to deal with the

11 media, fall on all the rest, just be upfront and tell him we're

12 going to not do this meeting because of the news stories that are

13 in the paper.

14      It's too obvious to try to explain it was the Harish

15 Bhatt, or some other thing that I said there a second ago.

16 Q.  Were you trying to conceal this meeting that you asked Robert

17 to have with Raghu on the 4th?

18 A.  No.

19 Q.  Now, if we could just change subjects right now, Rod.  I want

20 to talk to you about the press conference you had on November

21 5th, 2008, okay?

22 A.  Okay.

23 Q.  And you were asked some questions about not saying that you

24 were going to appoint yourself, is that right?

25 A.  Yes.

1  Q.  Okay.  Is it fair to say that you didn't want to lead anyone

2  on as to appointing yourself because you hadn't made any

3  decisions at that point?

4  A.  That was certainly part of it, yes.

5  Q.  Were you trying, though, in this press conference, to at

6  least leave the door open of that possibility?

7  A.  We discussed how to handle this press conference.

8           MR. SCHAR:  Objection, Judge.

9           THE COURT:  Why don't you answer the question asked.  Do

10  you want it read back?

11          THE WITNESS:  Yes.  Thanks, Judge.

12     (Question read.)

13          THE WITNESS:  Yes.

14  BY MR. GOLDSTEIN:

15  Q.  And you had mentioned that you were thinking about appointing

16  yourself, is that right?

17  A.  Yes.

18  Q.  And that was a thought in your mind during this entire

19  period, October to the day you were arrested, is that right?

20  A.  Yes.

21  Q.  And in fact, you talked about, amongst yourselves, several

22  other candidates, is that right?

23  A.  Yes.

24  Q.  Including Oprah Winfrey as a possible candidate.

25  A.  I spent two days advocating.

1          THE COURT:  Not relevant.  Objection sustained.

2  BY MR. GOLDSTEIN:

3  Q.  Now, if you could turn to tab 17.

4          Now, on page 3 -- page 3 of tab 17, you talk about --

5  starting on line 13 -- you say you like my job -- or, I like my

6  job, and then you go on to talk about --

7          MR. SCHAR:  Just object as outside the scope of cross.

8          THE COURT:  This is a scope objection?

9          MR. SCHAR:  Well, relevance.

10          MR. GOLDSTEIN:  Your Honor, I won't verbatim-quote this.

11  What I'm trying to explain is that in essence there was an

12  implication that somehow he lied to the media when he said he

13  wasn't going to appoint himself, but in here he is talking about

14  a lot of the accomplishments that he achieved.  And that's what

15  he is going to look into becoming a senator, and that was leaving

16  the door open to appoint himself.

17          This was an effort --

18          THE COURT:  Sustained.

19  BY MR. GOLDSTEIN:

20  Q.  During this tab, on tab 17, you are talking about possibly

21  what to say in the press conference, is that right?

22          MR. SCHAR:  Objection.

23          THE COURT:  Objection sustained.

24  BY MR. GOLDSTEIN:

25  Q.  Now, you talked about -- and you were asked questions about

1 this on cross examination -- about your operating principal,

2 right?

3 A.  Yes.

4 Q.  And you expressed this on a call on November 4, 2008, is that

5 right?

6 A.  Yes.

7 Q.  And you had mentioned that you were going to do this in good

8 faith, among other things, is that right?

9 A.  I'll quote myself.  I said there is an opportunity here.

10          MR. SCHAR:  Objection, Judge.

11          THE COURT:  Objection sustained.

12 BY MR. GOLDSTEIN:

13 Q.  Among the things you said, you said you were going to make

14 this decision in good faith, is that right?

15 A.  Yes.

16 Q.  And you had discussions about the possibility of the Health

17 and Human Services, is that right?

18 A.  Yes.

19 Q.  What did you understand if you were ever to be selected as a

20 possible appointee, what would happen if you were selected as

21 appointee of HHS?

22          MR. SCHAR:  Objection, Judge.

23          THE COURT:  On relevance grounds?

24          MR. SCHAR:  Objection, Judge.

25          THE COURT:  Sustained.

1 BY MR. GOLDSTEIN:

2 Q.  Well, you talked about it, for example, on the 501(c)(4)

3 context, that you were not adverse to being up front about this

4 situation, is that right?

5 A.  In addition to the press conference with President Obama and

6 me.

7          MR. SCHAR:  Objection.

8          THE COURT:  Objection sustained.

9 BY MR. GOLDSTEIN:

10 Q.  You talked about Change to Win, is that right?

11 A.  Yes.

12 Q.  And John Harris you had said had mentioned that possibility?

13 A.  That was his idea, yes.

14 Q.  And that idea didn't go anywhere, is that right?

15 A.  I was -- it was maybe a flavor for a day or so.

16          I'm sorry.  The answer is, it didn't go anywhere, no.

17 Q.  And when you talked to Mr. Harris about this idea that he

18 presented to you, you said you would announce it publicly, is

19 that right?

20 A.  Yes.

21 Q.  Now, you talked a little bit about your conversations you had

22 with Tom Balanoff, is that right?

23 A.  Yes.

24 Q.  And on November 6th, 2008, you met with Balanoff, right?

25 A.  Yes.

1  Q.  And this was the appointment that you testified to that he

2  had set up, is that right?

3  A.  He asked me to meet, yes.

4  Q.  And you said that you floated the idea of Health and Human

5  Services to Mr. Balanoff, is that right?

6  A.  That's right.  On the 6th of November, yes.

7  Q.  And what did you see Tom Balanoff as when you were talking to

8  him there?

9  A.  I saw him as friend, as a big political supporter of mine in

10  a very significant labor union.  I saw him as an emisary from

11  President Obama, that's what he indicated to me, a messenger.

12  And he was a channel that was open in what I called the probing

13  period, where he would feel me out in terms of what my interests

14  were and what I was interested in doing.

15         And he would also be a messenger, in this case from

16  President Obama, indicating what he indicated President Obama was

17  interested in.

18  Q.  Now, Mr. Balanoff in this conversation indicated to you that

19  you would not hear from President Obama, is that right?

20  A.  I asked him early on in the beginning, would President Obama

21  be calling me?  And he told me right up in the beginning he would

22  not be calling me.

23  Q.  When he told you that, how did that affect your thinking

24  regarding this issue?

25  A.  That Tom Balanoff was at best just a messenger.  He had no

506615

4974

1  authority.  He was just testing the waters and floating ideas

2  back and forth.  That's how I saw it.

3  Q.  When you said Tom Balanoff had no authority as you understood

4  it, what did you mean by that, "no authority"?

5  A.  He had no authority to make any decisions or do anything

6  regarding Valerie Jarrett other than convey what he indicated

7  President Obama's wishes were, and to get a sense of what my

8  thoughts might be.

9  Q.  And if you had made any decisions with regards to what you

10  wanted to do, who did you understand you should talk to as far as

11  someone with authority?

12  A.  David Axelrod.  That's what Tom Balanoff told me on the 3rd

13  of November, and what Andy Stern said, and of course, President

14  Obama.

15       If President Obama called me, then I would obviously

16  know he had the authority.

17  Q.  And when you said Mr. Stern and Mr. Balanoff communicated to

18  you, this is the meeting on November 3rd at your office?

19  A.  That's correct.

20  Q.  Okay.  And they informed you that you should speak to

21  Axelrod, is that right?

22  A.  That's correct.  They said they were not speaking for

23  President Obama.  If you wanted to know -- basically if you

24  wanted to know what they want to do in the Senate seat, call

25  Axelrod.

1          MR. SCHAR:  Objection.

2          THE COURT:  Maybe some of these could be yes's and no's.

3  BY MR. GOLDSTEIN:

4  Q.  From November 1st through November 4th, you had a series of

5  conversations relaying this idea as far as having to talk to

6  David Axelrod, is that right?

7  A.  We discussed whether I should call David Axelrod or not,

8  that's correct.

9  Q.  And when you said you discussed whether you should call David

10 Axelrod or not, what was the discussion about specifically?

11 A.  It was about Valerie Jarrett in infinity.

12         MR. SCHAR:  Objection.

13         THE COURT:  Objection is sustained.  I think he has

14 gotten off the page.

15 BY MR. GOLDSTEIN:

16 Q.  As to David Axelrod, was David Axelrod ever called by you?

17 A.  No.

18 Q.  Was David Axelrod ever called by someone you sent out to call

19 him?

20 A.  No.

21 Q.  And you said when you were talking to Mr. Balanoff,

22 particularly on November 6 of 2008, you threw out the idea of

23 Health and Human Services, is that right?

24 A.  Yes.

25 Q.  And it's your testimony that this was not in connection to

1 the Senate seat, is that right?

2 A.  Absolutely not.

3 Q.  And you didn't promise it explicitly or implicitly, that this

4 was in exchange for the Senate seat, is that right?

5 A.  That's correct.  I made no decision.

6 Q.  And you said you were throwing this idea out to Obama as a

7 feeler.  Is that the term you used?

8 A.  Yes.

9 Q.  What do you mean by a feeler?

10 A.  In other words, test the waters.  It is very common in

11 politics.  He came to me for that purpose.

12          MR. SCHAR:  Objection.

13          THE COURT:  That objection is sustained.

14 BY MR. GOLDSTEIN:

15 Q.  What do you mean when you say the term feeler?

16 A.  I was -- a feeler means -- if someone comes to you as a

17 feeler, they want to get a sense of what you might be interested

18 in, something like that.  Get -- get -- what are your ideas?

19 What are your thoughts?

20          And I viewed Tom Balanoff's mission as an emissary or

21 messenger, was to come to me, as he did, and to get a sense of

22 what I was thinking, after he expressed to me what he indicated

23 President Obama was interested in doing, and that he came for the

24 purpose of sort of, you know, being between the two of us, we

25 said we're both his friends, and feeling us out.

1          You know, or at least feeling me out.

2   Q.   Rod, if you could turn to tab 25.

3          Now, on page 3 you say on the top of the page, line 2,

4   tab 25, so Thursday Balanoff came back with a message directly

5   from Obama-Valerie Jarrett.  When you said that, what did you

6   mean by that line?

7   A.   I'm talking to Fred Yang.  I'm telling him that Tom Balanoff

8   came to get a sense of where I was, and he came Thursday with a

9   message directly from President Obama-Valerie Jarrett.

10  Q.   When you said this, were you communicating that Tom Balanoff

11  had authority to do anything like that?

12         MR. SCHAR:  Objection, Judge.

13         THE COURT:  Objection is sustained.

14  BY MR. GOLDSTEIN:

15  Q.   If you could turn to tab 29, Rod.  And on page 6, line 27,

16  you say I assume you were sent to talk to me.  I believe him.

17  Somebody else, it's all baloney.  This was the channel that was

18  open to me, right.

19         What were you saying there, Rod?

20  A.   I'm talking to Doug Scofield, who works for SEIU --

21         MR. SCHAR:  Objection.

22         THE COURT:  Objection sustained.

23  BY MR. GOLDSTEIN:

24  Q.   When you said this is a channel that was open to me, you are

25  talking about Tom Balanoff, is that right?

1  A.  Yes.

2  Q.  And you had indicated that Tom Balanoff was a feeler?

3  A.  A messenger, a feeler, and this was the channel that was open

4  to me, Tom Balanoff.

5  Q.  When you say channel was open to me, were you saying anything

6  as far as Tom Balanoff having the authority to do any of this?

7  A.  No.  Only that Tom Balanoff was sort of the appointed guy to

8  come and go between President Obama and me in terms of expressing

9  what our thoughts and interests might be, to -- back and forth to

10 each other.

11 Q.  Was the Axelrod channel open to you?

12 A.  I never took it.

13       MR. SCHAR:  Objection.  Objection.

14       THE COURT:  I'm going to strike the answer because

15 obviously he doesn't know.

16 BY MR. GOLDSTEIN:

17 Q.  Turn back to tab 25.  And on page 4, line 16, you say

18 where -- whereas I want to be active to do things that I care

19 about, so I threw out, so I said to him, you know, I told him

20 health -- Department of Health and Human Services.  When you said

21 "I threw out," what were you saying there, Rod?

22 A.  I threw the idea out.

23 Q.  And that's what you had been talking about before as far as

24 this conversation from November 6th with Tom Balanoff, is that

25 right?

1 A.  That's right.

2 Q.  And if you turn to page 5.  On page 5, line 10, you talk

3 about and if I get that, ah, if that was something available to

4 me -- and maybe it's really unrealistic -- but if that was

5 available to me, I could do Valerie Jarrett in a heart beat.

6        When you said "I could do Valerie Jarrett in a heart

7 beat," is that what you said to Tom Balanoff?

8 A.  No.

9 Q.  Did you say anything close to that to Tom Balanoff?

10 A.  No.

11 Q.  And if you had been offered the position of HHS --

12        MR. SCHAR:  Objection.

13        THE COURT:  Objection is sustained.

14 BY MR. GOLDSTEIN:

15 Q.  Had you made any decisions to take this appointment if it

16 were ever offered?

17        MR. SCHAR:  Objection.

18        THE COURT:  Sustained.

19 BY MR. GOLDSTEIN:

20 Q.  Now, if we can turn to page 7.  When you said, line 18, and

21 how bad he wants her, you know, remains to be seen, but I think

22 he really wants her.  She is part of the top three in the

23 transition team, right.

24        What were you saying there?

25 A.  I was talking to Fred about it remains to be seen how bad

1  President Obama really wants Valerie Jarrett.  She is one of the

2  top three people in President Obama's transition team.

3          So it was unclear whether she really was that interested

4  in the Senate seat.  I think that's what I'm saying.  It remains

5  to be seen, because she has got that big spot on the transition

6  team.

7  Q.  You were asked a series of questions about looking into -- in

8  exchange for Valerie Jarrett to the Senate seat, getting federal

9  funding from President Obama.  Do you recall those questions?

10 You were asked about that.

11 A.  Yes.

12 Q.  Did you discuss the possibility on various phone

13 conversations of getting federal funding in exchange for the

14 Senate seat for Valerie Jarrett?

15 A.  I did several times.

16          I spoke to Bob Greenlee on the 3rd of November about I

17 think billions of dollars of federal funds to help us with our

18 budget in exchange for Valerie Jarrett, is one idea.

19          Bob Greenlee and I spoke in some detail about elective

20 reimbursement right that comes from Washington.  Illinois would

21 get a larger share of federal tax dollars back which would give

22 it a chance to afford expanding healthcare more.  We discussed

23 that.

24          That actually comes from the Department of Health and

25 Human Services.  And increasing Illinois share --

1          MR. SCHAR:  Objection.

2          THE COURT:  Objection sustained.

3   BY MR. GOLDSTEIN:

4   Q.  You were asked questions about Lisa Madigan being a stalking

5   horse, do you recall that?

6   A.  Yes.

7   Q.  And you said that she was a stalking horse as well as

8   everyone else was a stalking horse.

9   A.  Every potential option I was trying to gather would

10  potentially pit one against the other, measured one against the

11  other, to see which one would be the better ultimate decision.

12          So she was, as was possibly Emil Jones, Valerie Jarrett,

13  me, and all the others.

14  Q.  And one of those ideas, as far as measuring against the

15  others, was the possibility of federal funding for the State of

16  Illinois for Valerie Jarrett, is that right?

17  A.  That was one of them.

18          MR. SCHAR:  Objection.

19          THE COURT:  Objection sustained.

20          The jury -- the answer is stricken.

21          The jury is instructed to disregard it.

22  BY MR. GOLDSTEIN:

23  Q.  Turn to tab 21.  And if you turn to page 11, at line 20 you

24  said yeah, I'm telling you this is good, John, they didn't say

25  no.  They didn't say oh, now, maybe again look at Balanoff

1  probably got to be one other messenger to tell me that.

2        When you said they didn't say no, I believe in cross

3  examination you testified that in response you're a Cubs fan?

4  A.  Yes.

5  Q.  When you said that, what did you mean by that?

6        MR. SCHAR:  Objection.  Vague.

7        THE COURT:  Objection --

8  BY MR. GOLDSTEIN:

9  Q.  Your answer was at this time on this call, which is November

10  7, 2008, okay?

11  A.  Um-hum.

12  Q.  What was your understanding as to Mr. Balanoff's response to

13  your request for HHS?

14  A.  He basically said I had no chance for it.  It wasn't going to

15  happen.  Something like that.  That was his opinion, that's what

16  I took it as.

17  Q.  When you said they didn't say no, what were you talking about

18  there?

19  A.  I think I was talking about the whole -- that they didn't say

20  no.  I think I'm -- I'm talking about, you know, the people

21  around President Obama possibly.

22  Q.  And you said I'm telling you, this is good, John.

23        When you were saying that, what were you saying there?

24  A.  Well, that, you know, like I said before, keep hope alive.  I

25  mean, Tom Balanoff thought it was an idea.

```
1            MR. SCHAR:  Objection.
2            THE COURT:  "Keep hope alive" is the answer.
3   BY MR. GOLDSTEIN:
4   Q.  Now, Rod, you were asked a series of questions about things
5   you discussed regarding the Senate seat, okay?
6   A.  Yes.
7   Q.  And you were asked about private sector jobs, do you recall
8   that?
9   A.  Yes.
10  Q.  Did you ever get a private sector job in exchange for this?
11           MR. SCHAR:  Objection.
12           THE COURT:  Sustained.
13  BY MR. GOLDSTEIN:
14  Q.  Did you ever offer to trade the Senate seat in exchange for a
15  private job?
16           MR. SCHAR:  Objection.
17           THE COURT:  Objection sustained.
18  BY MR. GOLDSTEIN:
19  Q.  Did you ever make any decisions regarding this private sector
20  job?
21           MR. SCHAR:  Objection.
22           THE COURT:  Sustained.
23  BY MR. GOLDSTEIN:
24  Q.  As to the private foundations, do you recall being asked
25  questions about the private foundations?
```

1  A.  Yes.

2  Q.  And there was some discussions about the various private

3  foundations, is that right?

4  A.  Yes.

5  Q.  Did you ever make a decision to do any of that?

6        MR. SCHAR:  Objection, Judge.

7        THE COURT:  On the basis of the evidence in this case,

8  I'm sustaining the objection.

9  BY MR. GOLDSTEIN:

10  Q.  Now, we talked a little bit about Lisa Madigan being a

11  stalking horse, is that right?

12  A.  All of us were stalking horses.  It was a big horse race.

13  Q.  When you say all of us, you are including yourself, is that

14  right?

15  A.  Yes.

16  Q.  Nonetheless, even early in the process Lisa Madigan was the

17  top goal for you, is that right?

18  A.  Lisa Madigan was a means to the ends that I testified to so

19  often.  And I think I was very frank that if she couldn't do

20  that, then she very probably wasn't a very strong candidate.  But

21  she was a means to an end.  And that Madigan deal, from beginning

22  to end, was great.

23        MR. SCHAR:  Objection.

24        THE COURT:  Maybe you want to put the question again,

25  have him rephrase it so it's in accordance with what he has

1 already testified to.

2        MR. GOLDSTEIN:  I will move on.

3 BY MR. GOLDSTEIN:

4 Q.  And you testified that the Lisa Madigan idea was something

5 that you were thinking and talking about even in the summer of

6 2008, is that right?

7 A.  That's correct.

8 Q.  And the Lisa Madigan appointment and the deal, so to speak,

9 you had been talking about and thinking about even before the

10 name Valerie Jarrett even popped up, is that right?

11 A.  Long before Valerie Jarrett's name was brought to me.

12 Q.  And when Valerie Jarrett's name was brought to you, even

13 during that time you were discussing the possibility of doing a

14 Lisa Madigan deal, is that right?

15 A.  That's correct.

16 Q.  And you talked about in the context of Health and Human

17 Services whether someone should go to Valerie Jarrett and ask

18 her, is that right?  Do you recall being --

19 A.  Yes.

20 Q.  -- asked about that?

21 A.  Yes.

22 Q.  Did you yourself go and talk to Valerie Jarrett about Health

23 and Human Services?

24 A.  No.

25 Q.  Did you send anyone to talk to Valerie Jarrett about Health

1  and Human Services?

2          MR. SCHAR:  Objection.

3          THE COURT:  Sustained.

4  BY MR. GOLDSTEIN:

5  Q.  And on tab 21, there was discussion about someone came back

6  and discussed Lisa Madigan possibly being appointed Deputy

7  Attorney General.  Do you recall that?

8  A.  Yes.

9  Q.  And is that what you understood one of the answers that came

10  back to you, when you threw out this feeler?

11  A.  Yeah.  Absolutely.  Yes.

12  Q.  And when you said you spoke to Tom Balanoff on November 6

13  during this in-person meeting, you raised the issue of Lisa

14  Madigan, is that right?

15  A.  Yes, I did.

16  Q.  And an answer, as you understood it, that came back to you

17  was that they would possibly appoint Lisa Madigan as Deputy

18  Attorney General, is that right?

19  A.  That's correct.  If I appointed Valerie Jarrett.

20  Q.  And you were asked about a conversation on November 10th with

21  Doug Scofield.  Do you recall being asked -- and let me refresh

22  you a little bit.  They said that -- what you said, you talked

23  about the arrogance of these people.  Do you remember that quote?

24  A.  Yes.

25  Q.  When you said the arrogance of these people, what were you

1 saying there, Rod?

2 A.  Well, I had asked Tom Balanoff, who came to me purportedly

3 from President Obama with a request that I appoint his choice for

4 Senator Valerie Jarrett.

5        And I asked if President Obama is really interested in

6 that, then I would expect that he would call me himself

7 personally to ask me.

8        Tom said that wasn't going to happen.

9        Further discussions throughout the weekend, you know,

10 the emissaries, the third parties, this sort of thing, and then

11 discussions we were having that day.  We had a two-hour

12 conference call with several of my top advisors -- too much

13 answer.  Yeah.

14 Q.  You talked about a conference call that you had with your

15 advisors on November 10th?

16 A.  Yes, yes.

17 Q.  And it is behind tab 26.

18        In that conference call were you asked by your top

19 advisors what is it you want, Rod, and then you said just some

20 respect?

21        MR. SCHAR:  Objection.

22        THE COURT:  Objection sustained.

23 BY MR. GOLDSTEIN:

24 Q.  Now, I want to talk to you a little bit, Rod, about

25 501(c)(4)s, okay?

1  A.  Okay.

2  Q.  And as of November 10th, 11th or 12th, had this organization,

3  this 501(c)(4), been set up?

4  A.  No.

5  Q.  And it was something that you talked a lot about, is that

6  right?

7  A.  Yes.

8  Q.  And you discussed it again even before the name Valerie

9  Jarrett came up, is that right?

10  A.  Before Valerie Jarrett, yes.

11  Q.  And why did you want this organization?

12  A.  Because I saw it as a vehicle that would help me be able to

13  play a role while I was governor, that would not pay me, that I

14  would go out and try to advocate healthcare around the gridlock

15  in Springfield, so I could take my case to the people with

16  television commercials and things like that.

17          MR. SCHAR:  Objection.

18          THE COURT:  Maybe you could be a little more concise.

19  We have been here a long time.

20  BY MR. GOLDSTEIN:

21  Q.  Rod, you mentioned that this would not pay you.

22  A.  Correct.

23  Q.  Yet you had discussions about 10, 12, 15, 20 million being

24  put into this organization.

25          What was your understanding as to that money going to?

1  A.  To advocate for healthcare for children in Illinois and

2  across America, and advocate for healthcare for men and women who

3  didn't have it.  I saw this as a vehicle to help President Obama

4  pass his healthcare.

5          MR. SCHAR:  Objection.

6          THE COURT:  Everything beginning after the words "I saw"

7  is stricken.

8          The jury is instructed to disregard it.

9  BY MR. GOLDSTEIN:

10 Q.  When you say going to advocate, okay, this money would be

11 used for advertising and other advocating type things, is that

12 right?

13         MR. SCHAR:  Objection, Judge.

14         THE COURT:  Sustained.

15 BY MR. GOLDSTEIN:

16 Q.  And if you could turn to tab 44, Rod.

17         Now, tab 44, as well as some of these other calls right

18 before, talk about the 501(c)(4), is that right, Rod?

19 A.  Yes.

20 Q.  And you were asked a series of questions whether or not

21 these -- the 501(c)(4) and the appointment of Valerie Jarrett

22 were connected.

23         Do you recall being asked those questions?

24 A.  Yes.  Yes.

25 Q.  Were the appointment and the 501(c)(4) connected?

1  A.   No.  I expressly told Doug Scofield not to connect them.

2  Q.   On page 3, when you talk about that on line 28, when you said

3  not in connection with Senate appointment or anything in his

4  Fifth CD.  Is that what you meant when you were saying that to

5  Doug Scofield?

6  A.   Yes.

7  Q.   And on tab 45, you were asked some questions about whether or

8  not you wanted to be the one to talk to John Wyma, do you recall

9  that?

10  A.   Yes.

11  Q.   If you could turn to page 2, and line 17, you say not that I

12  worry about him with me, but him not feeling comfortable with me

13  asking him, then he won't do it.  Do you see what I'm saying?

14       What were you saying here, Rod, in terms of talking to

15  John Wyma?

16  A.   I think I was expressing a concern.  There were -- these

17  issues that he had to help us with his planning board were

18  getting press.  I was concerned he might feel uncomfortable with

19  me asking him to do something like that, then he wouldn't do it.

20  He wouldn't reach out to Rahm Emanuel.

21       So I was raising that as a potential reason why I just

22  thought he might not be the right guy to ask, but then ultimately

23  I decided that he was.

24       MR. GOLDSTEIN:  Your Honor, may I have a brief sidebar?

25       THE COURT:  Sure.

1    (Proceedings heard at sidebar:)

2       THE COURT:  Okay.

3       MR. GOLDSTEIN:  Your Honor, the reason I called the

4 sidebar, I wanted to ask the question, which I believe the door

5 was opened.  On cross examination there was a series of questions

6 to the defendant about Jesse Jackson, and did he believe it was a

7 crime, and it was illegal and then there obviously a series of

8 questions on bribe.

9       Based on that, and ask him his understanding of what the

10 law was on that, I want to be able to ask the defendant the

11 501(c)(4) and the HHS and these issues with Valerie Jarrett, did

12 he believe these things were legal and the basis for it.

13       MR. SCHAR:  Several responses.

14       Judge, I don't think the door was opened.  The defendant

15 specifically said in the context of the Jesse Jackson, Jr.

16 situation, that he knew the offer was illegal.  That's what I

17 followed up with on cross examination.

18       I caveated it to Jesse Jackson, Jr. specifically on that

19 issue, and actually it just confirms what he had said on direct.

20 I don't think it opened any doors generally, and we were very

21 careful actually to stay away from any conversations, either in

22 the HHS context or the private foundation context or the

23 501(c)(4) context, as to whether this defendant thought it was

24 legal or illegal, because it doesn't ultimately matter.

25       The reason it was relevant in the Jesse Jackson

1 situation was, first, he actually raised it on his own direct,

2 and second, it also goes to his knowledge of the illegality,

3 which he raised on direct, goes to the specific issue as to what

4 he had been doing that day.

5       MR. GOLDSTEIN:  Judge, to just briefly respond, there

6 was further follow-up beyond what was said on direct, which was

7 it was bribery, to understand bribery, basically asking for his

8 legal point on this issue.

9       THE COURT:  The objection is sustained.  What was

10 happening on cross examination with Jackson is whether he knew

11 the name of the offense.  That's basically what it came down to.

12       It was his position all along that the Jackson

13 transaction was illegal.  And he didn't open -- he is not

14 actually empowered to open the door to his opinion as to the

15 other acts.

16       So the objection is sustained.  Don't raise it.

17   (Proceedings heard in open court:)

18       THE COURT:  You can proceed.

19       MR. GOLDSTEIN:  Thank you, your Honor.

20 BY MR. GOLDSTEIN:

21 Q.  I want to change topics with you and talk to you about the

22 Tribune, okay?

23       Do you remember being asked a series of questions about

24 the Tribune?

25 A.  Yes.

1  Q.  Now, you had a conversation with John Harris regarding the

2  issue of the Tribune, is that right?

3  A.  Yes.

4  Q.  You had several obviously, right?

5  A.  Yes.

6  Q.  And during the conversation you had with John Harris talking

7  about going to speak to Nils Larsen, do you recall that?

8  A.  Yes.

9  Q.  And you said you know what to say when you said that to John

10  Harris.  What were you saying there?

11  A.  I was telling John Harris to convey to Nils that the Chicago

12  Tribune was advocating I should be impeached because of a

13  healthcare issue, that I went around the legislature and I

14  believed I had the legal authority to do it.

15          And the way we were helping the Chicago Tribune get the

16  funding through the Illinois Finance Authority, to help the Cubs

17  and Wrigley Field renovate their ballpark like the Red Sox did at

18  Fenway Park -- this was modeled on this -- and that we were going

19  take over ownership like with the White Sox Park, was I couldn't

20  pass it through the legislature, so we found a way legally

21  through the use of the IFA, and that's how --

22          THE COURT:  I think this is too much detail.  Answer the

23  question asked.

24  BY MR. GOLDSTEIN:

25  Q.  As to the issue of the Tribune, the State of Illinois was

1  working with the Tribune to try to help renovate Wrigley Field,

2  is that right?

3  A.  Yes.

4  Q.  And this action was being done without legislative approval,

5  correct?

6  A.  Correct.

7  Q.  And as you said, that you figured out a way to make sure that

8  that could be done, is that right?

9  A.  Legally, yes.

10  Q.  And as you were working on this, the Tribune was also writing

11  negative editorials against you, is that right?

12  A.  Correct.

13  Q.  And one of the issues that the Tribune was raising as far as

14  these negative editorials, they were advancing impeachment of

15  you, is that right?

16  A.  That's correct.

17  Q.  And one of the reasons they said you should be impeached is

18  because you went around the legislature too much, is that right?

19  A.  That's right.

20  Q.  And you saw the Tribune issue, as far as helping out Wrigley

21  Field, as something that was going on in the legislature, is that

22  right?

23  A.  I was doing the exact same thing to help the Tribune that

24  they were advocating I should be impeached for.  The sort of

25  end-running the legislature through legal means.

1           MR. SCHAR:  Objection.

2           THE COURT:  The answer can stand.

3  BY MR. GOLDSTEIN:

4  Q.  Were you concerned that these negative editorials would

5  affect the state's ability to advance this renovation of Wrigley

6  Field?

7           MR. SCHAR:  Objection, Judge.

8           THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

10 Q.  What were your -- did you have concerns regarding this deal

11 in Wrigley Field?

12          THE COURT:  Too vague.  Sustained.

13 BY MR. GOLDSTEIN:

14 Q.  Well, you talked about these editorials regarding

15 impeachment, is that right?

16 A.  Yes.

17 Q.  And you talked about one of the reasons they were advocating

18 impeachment against you, right?

19 A.  Yes.

20 Q.  And we talked about one of the reasons was the going around

21 the legislature, right?

22 A.  Yes.

23 Q.  And as you said, the exact same thing that was going on with

24 Wrigley Field was what they were saying was a problem why you

25 should be impeached, right?

1  A.  The ways around the legislature that I --

2           MR. SCHAR:  Objection, Judge.

3           THE COURT:  You can answer that one yes or no.

4           THE WITNESS:  Can you ask that question, again?

5           MR. GOLDSTEIN:  Can I have that read back, please.

6           THE COURT:  Go ahead.

7  (Pause.)

8           THE COURT:  Start over again.

9  BY MR. GOLDSTEIN:

10  Q.  As we were talking about the Tribune and the negative

11  editorials, right, and these negative editorials were advancing

12  your impeachment, right?

13  A.  Yes.

14  Q.  And we talked about going around the legislature, right?

15  A.  Yes.

16  Q.  And that this is what was going on with the Wrigley Field

17  renovation?

18  A.  Yes.

19  Q.  And the editorials, as you understood it, put into jeopardy

20  this Wrigley Field deal, is that right?

21           MR. SCHAR:  Objection, Judge.

22           THE COURT:  Sustained.

23  BY MR. GOLDSTEIN:

24  Q.  Were you concerned at all with what these editorials would do

25  to the attempt to try and renovate Wrigley Field?

1          MR. SCHAR:  Objection.

2          THE COURT:  Sustained.

3          MR. GOLDSTEIN:  I think we can move on.

4    BY MR. GOLDSTEIN:

5    Q.  Let's talk about the school, okay, Rod?

6    A.  Okay.

7    Q.  Now, you talked a little bit about a school grant that Rahm

8    Emanuel had approached you on, is that right?

9    A.  Yes.

10   Q.  And you talked about as this being like a favor to Rahm or to

11   help Rahm out, is that right?

12   A.  It was both.  Happy to do it.  Happy to help.

13   Q.  Why were you happy to help?

14   A.  Happy to help him, and certainly happy to help the school.

15   Q.  And you also talked about a favor that you did regarding this

16   ultimate fighting legislation, is that right?

17   A.  Yes.

18   Q.  And that was legislation that was passed in 2007, right?

19   A.  Correct.  After the school.

20   Q.  Okay.  After the Chicago Academy grant went through, is that

21   right?

22   A.  Yes.

23   Q.  And this request by Rahm Emanuel regarding ultimate fighting

24   was done after the grant had gone through, is that right?

25   A.  Correct.

1  Q.  And you were also asked that, various favors that you asked

2  of Rahm Emanuel, is that right?

3  A.  Yes.

4  Q.  You asked for favors of Rahm Emanuel in the past, is that

5  right?

6  A.  Yes.

7  Q.  And what were these favors that you asked of Rahm Emanuel?

8          MR. SCHAR:  Objection.

9          THE COURT:  Sustained.

10  BY MR. GOLDSTEIN:

11  Q.  Did you talk with Rahm Emanuel in ways to try and get

12  legislative things passed?

13          MR. SCHAR:  Objection.

14          THE COURT:  Objection is sustained.

15  BY MR. GOLDSTEIN:

16  Q.  Now, when Mr. Harris approached you in -- it was around

17  August of 2006 regarding the Chicago Academy school grant, do you

18  recall that?

19  A.  Yes, I do.

20  Q.  And you had said that Mr. Harris came to you and said there

21  was some problem with this grant, is that right?

22  A.  Yes, that's right.

23  Q.  And at that point, before Mr. Harris approached you, you were

24  unfamiliar with any problems, let alone the grant, is that right?

25  A.  That's correct.

1 Q.  And after Mr. Harris gave you some information you then said

2 to Mr. Harris to go look into it, is that right?

3 A.  Correct.

4 Q.  When you told Mr. Harris to go look into it, what were you

5 telling him to do?

6 A.  Just find out what the story is with this grant, whatever it

7 is, is it a new one, is it the same one, whatever it might be,

8 just get to the bottom of it.

9         Find out what it is, get the information, and let me

10 know.

11 Q.  Because you had mentioned some concerns involving whether

12 this was giving a grant a second time, a repeat grant, is that

13 right?

14 A.  That's correct.  That was among the things.  I was

15 speculating on what it might be.

16 Q.  And that's one of the things that you wanted Mr. Harris to

17 look into, is that right?

18 A.  Yes.

19         MR. SCHAR:  Objection.

20         THE COURT:  Overruled.

21 BY MR. GOLDSTEIN:

22 Q.  Now, Mr. Harris then came back to you shortly thereafter,

23 after he looked into it, right?

24 A.  Yes.

25 Q.  And you received more information on this school, is that

1  right?

2  A.  Yes.

3  Q.  And you told Mr. Harris -- well, before you told Mr. Harris

4  anything, he informed you that they had incurred expenses, is

5  that right?

6  A.  That's right.

7  Q.  Okay.  And you told Mr. Harris to pay those expenses, is that

8  right?

9  A.  Correct.

10 Q.  Okay.  And to make sure that there wasn't anything wrong

11 going on, you made sure that they would pay any expenses that

12 came in, is that right?

13 A.  That he should pay it as the invoices and bills came in.  Pay

14 as you go.  That kind of thing.  Yes.

15 Q.  And you understood all these invoices were paid, is that

16 right?

17 A.  Yes.

18 Q.  And the Field was billed?

19 A.  Yes.

20 Q.  Now I want to turn your attention to the race track issue,

21 okay?

22 A.  Yes.

23 Q.  You were asked a series of questions about reviewing bills.

24 Do you recall that?

25 A.  Yes.

1 Q.  Specifically during this time period, in fall of 2008, what
2 was your bill review process, if you had one?
3 A.  Right.  Our general practice was that we have a group of men
4 and women who are assigned the responsibility to work on -- I
5 think it's called the legislative affairs portion of the
6 governor's office, and their responsibility was to monitor and
7 follow all of the different bills that were filed by lawmakers,
8 whether they were house members, state senate members, track them
9 all.
10        And then when the bills were passed, that they would
11 review all the different bills.  And then would prepare briefings
12 that would come to me.  And the briefings would be, as I think I
13 described earlier, they could be a couple of pages.  If it was a
14 more complicated kind of issue it could be several pages.
15        But they were concise, sort of like cliff notes
16 for -- of the bill.
17 Q.  When you talked about the bill review process and you
18 mentioned you wanted to review these bills, is that right?
19 A.  Correct.
20 Q.  And was it your understanding that when you reviewed these
21 bills a lot of it would be reviewing sort of the cliff notes
22 version on these bills, is that right?
23 A.  That's how it always worked with me after that point.  But I
24 would do it with my deputy governor usually, Bill Quinlan, the
25 general counsel, would be a lot of it, and a policy person or

1   two, depending upon the subject matter.  They might be involved,

2   depending upon the particular nature of that bill, and perhaps

3   the given political situation or the governmental situation at

4   any given time.

5        But as general practice, we would sit there and go over

6   the bills.  Sometimes I would do it on the state plane, in

7   between flights, with Bill Quinlan or Bob Greenlee.

8   Q.  Now, regarding the recapture bill specifically, had you been

9   given a bill review analysis as of December 8th, 2008?  Had you

10   been given a bill review analysis of the recapture bill?

11   A.  No.

12   Q.  And what was your intent during this period regarding

13   reviewing the recapture?

14   A.  I wanted to review the recapture bill with all the other

15   bills that had passed out of the veto session.  The synopsis, the

16   briefing, was likely what I would have reviewed.

17        I wanted to sit down with my deputy governor, with Bill

18   Quinlan, my lawyer, and with the relevant policy people and go

19   over each one of those briefing papers on each bill and make sure

20   that we talked about whether or not there was some hidden

21   language, poison pills, maybe they snuck -- Madigan snuck some

22   stuff in there to take some things away.

23        And whether any given bill might offer an opportunity

24   for my Read Write to do Right campaign which I was -- I thought

25   we had success with.

1          MR. SCHAR:  Objection.

2          THE COURT:  The objection to the last sentence is

3 sustained.

4          The jury is instructed to disregard it.

5 BY MR. GOLDSTEIN:

6 Q.  You talked about concerns you had regarding Chris Kelly and

7 the recapture bill, is that right?

8 A.  Yes.

9 Q.  Now, November 27, 2008, this was Thanksgiving, right?

10 A.  Yes.

11 Q.  And you received a call from Chris Kelly, is that right?

12 A.  Yes.

13 Q.  And you had not spoken to Chris Kelly in approximately a

14 year, is that right?

15 A.  That's right.

16 Q.  And you understood he was indicted for a tax charge, is that

17 right?

18 A.  Yes.

19 Q.  And is it fair to say you were surprised when he called you

20 on the 27th?

21 A.  Very surprised.

22 Q.  Now, on the 27th of November he mentioned a party, is that

23 right?

24 A.  Yes.

25 Q.  And he didn't mention the recapture bill, is that right?

1  A.  He did not.

2  Q.  You understood at this time that Chris Kelly did have a

3  business relationship with John Johnston, is that right?

4  A.  Yes.

5  Q.  And you said after November 27th was then the Thanksgiving

6  weekend, right?

7  A.  Correct.

8  Q.  And it wasn't something that popped into your mind instantly,

9  but over the weekend did you start to have concerns with Chris

10  Kelly and the recapture bill?

11  A.  The thought kind of triggered in my mind on that Saturday or

12  Sunday during the Thanksgiving weekend, that this idea he had

13  about a presidential pardon, and the Florida connection with

14  Governor Bush, Jeb Bush, the governor, whose brother was the

15  president of the United States.

16        And that he had mentioned Bernie Kosar.  Again, he is a

17  University of Miami football star, played for the Cleveland

18  Browns, Dallas Cowboys, lives down there in Florida, was active

19  there.

20        But then he -- I also thought about Chris's relationship

21  with the Johnstons and the Steinbrenner family.  They lived in

22  Tampa, Florida.  They are very significant community leaders down

23  there.

24        And that it came to my mind that Chris might be perhaps

25  trying to link that -- his relationship with the Johnstons and

1 try to leverage that to get the Steinbrenners to go to Jeb Bush,

2 who would then go to President Bush, and that he was putting in

3 my -- this recapture bill to bring this plan he had for a

4 possible presidential pardon.

5 Q.  And on November 27th this isn't something that you linked

6 right away, is that right?

7 A.  No, I did not.

8 Q.  So over the weekend you started to think about it more, is

9 that right?

10 A.  It just triggered in my mind a little bit.  I had a little

11 bit of a suspicion, and I wanted to raise that, which I did later

12 on.

13 Q.  And you then talked about it with Mr. Quinlan, is that right?

14 A.  The very next day, on our way down to Philadelphia.

15 Q.  And then there were one of the conversations that we played

16 the tape that was regarding your concern over Chris Kelly, is

17 that right?

18 A.  That's why Bill Quinlan indicated to me that he --

19         MR. SCHAR:  Objection.

20         THE COURT:  Answer the question that he asked.

21         THE WITNESS:  Yes.  Yes.  I'm sorry.

22 BY MR. GOLDSTEIN:

23 Q.  Rod, if you could turn to tab 59.

24         Now, Rod, on this conversation, this occurred on

25 December 3rd, 2008, is that right?

1  A.  Yes.

2  Q.  And if you could turn to page 2, line 20, Lon Monk says no,

3  look, I want to go to him without crossing the line and say give

4  us that, the money, and you say right, and you say -- and Monk

5  says give us the money, and one has nothing do with the other,

6  and you said right.

7        What was the significance of what Mr. Monk said to your

8  state of mind regarding this issue?

9  A.  He was expressly -- he was reassuring me, He was informing

10  me, he was telling me, that he was going to expressly follow the

11  law.  He wasn't going to cross the line.  That means I'm not

12  going to cross the line, I'm going to stay within the law.

13        And then one has nothing to do with the other.  That he

14  was not going to condition the promise of campaign contributions

15  from the Johnstons in exchange for any action I might make with

16  regard to the recapture bill.

17        That's what I understood that to mean.

18  Q.  And eventually, after this meeting, it was your understanding

19  that Mr. Monk went to go see Mr. Johnston, is that right?

20  A.  Yes.

21  Q.  And it was this phrase, as far as not crossing the line, one

22  has nothing to do with the other, that was your understanding of

23  what Mr. Monk was going to do with Mr. Johnston, is that right?

24  A.  That's absolutely right.

25  Q.  And if you can actually turn to page 4, you talk about this

1  on this page, and you said -- and he liked some separation --

2  that's line 22 -- he'd like some separation between that and

3  signing the bill.

4          Now, when you were talking about separation, you weren't

5  saying that the money had to come in before the bill, is that

6  right?

7  A.  That's correct.  I was not saying that.  Right.

8  Q.  And if you could turn to tab 63, and on page 1, line 9, Monk

9  says hey, so I'm just leaving there, and I talked to him about

10  his commitment, he goes yeah, I said two separate

11  conversation -- conversations, what about your commitment.

12          This was a conversation you had with Mr. Monk on

13  December 3rd.  And it was your understanding that Mr. Monk was

14  coming back from a meeting with Johnston, is that right?

15  A.  Yes.

16  Q.  Okay.  And when Mr. Monk said "two separate conversations,"

17  what did you understand him to be saying there?

18  A.  That there were two independent separate topics that would

19  rise or fall on their own.  And that they were not one for the

20  other.  That's what I understood that to mean.

21  Q.  Now, if you could turn to tab 64.  Now, you had various

22  conversations with Mr. Monk about campaign contributions, is that

23  fair to say?

24  A.  Yes.

25  Q.  Just so we're clear, campaign contributions isn't money that

1  personally goes to you, is that right, Rod?

2  A.  Absolutely does not go to me.  It does not.

3  Q.  That's money that goes to the Friends of Blagojevich campaign

4  fund, or whoever the politician is, is that right?

5  A.  It goes -- that's correct.  It goes to your campaign fund to

6  be used for purposes of the campaign fund.

7  Q.  And on tab 64, you can turn to page 3, and you say on line 1,

8  I mean, you want me to call him directly, I will, whatever is the

9  best thing, I'm just a little bit.  And then Monk says I think

10 it's better if you do it.  You say okay.  And Monk says for

11 it's -- it's better if you do it just from a pressure point of

12 view.

13       When Mr. Monk said from a pressure point of view, what

14 did you understand him to be saying there?

15 A.  Just that.  Here I am asking my friend Lon Monk for his

16 advice and recommendations on how to follow up with his client.

17       And then I asked him what I asked him, which is should I

18 call him directly?  I'll do whatever is the best thing.  I'm just

19 a little bit -- I think I'm -- I got cut off.

20       Anyway, pressure point of view is just what he said.

21 That I should give him some call so he would feel some pressure.

22 That's what I took that to mean.

23 Q.  When you then replied and said yeah, good, I'll call him and

24 say yeah, well, we want to the do an event down -- downstate, you

25 said that, right?

1  A.  Yes.

2  Q.  After this call did you call John Johnston?

3  A.  I did not.

4  Q.  Up to the day you were arrested did you call John Johnston?

5  A.  I did not call John Johnston.  And after thinking about what

6  that meant, I chose not to.

7          MR. SCHAR:  Objection.

8  BY MR. GOLDSTEIN:

9  Q.  And as you testified before, it was -- as you understood it

10 November 26th, this bill -- you became aware that this bill was

11 sent to the governor's office, is that right?

12 A.  That's right.

13 Q.  So it's a little over two weeks or so that this bill was in

14 the governor's office by the time you got arrested, is that

15 right?

16 A.  Yes.

17 Q.  Now, I want to turn your attention and change subjects with

18 you, Rod, and talk about the issue of the road builders and Mr.

19 Krozel.

20         MR. GOLDSTEIN:  Whenever your Honor wants to take a

21 break?

22         THE COURT:  Go ahead.

23 BY MR. GOLDSTEIN:

24 Q.  Now, you were asked some questions about a comment that

25 you're accused of making to Mr. Wyma, okay?

1           MR. SCHAR:  Objection.

2           THE COURT:  Objection to the form of the question

3  sustained.

4  BY MR. GOLDSTEIN:

5  Q.  Did you ever tell John Wyma regarding Jerry Krozel, if they

6  don't perform, F-'em?

7  A.  No.

8  Q.  And you talked about one reason why you know you didn't say

9  it is you wouldn't talk to Wyma about Krozel, is that right?

10 A.  Right.

11 Q.  And were there other reasons why you know you didn't say it?

12 A.  I wouldn't do that.  So I wouldn't say that because I

13 wouldn't do that.

14 Q.  And you know --

15 A.  When I say I wouldn't do that -- because I, I'm so used to

16 that word -- what I'm saying is I wouldn't do, screw somebody

17 because they wouldn't help me.  Screw somebody politically or

18 governmentally because I didn't get political help, I wouldn't do

19 that.

20          That's what I'm saying.

21 Q.  And you're absolutely certain that you did not make that

22 comment?

23 A.  I'm absolutely certain I never made that comment.

24 Q.  And when it comes to a similar comment to Lon Monk, as far as

25 performing and F-'em?

1   A.   Bunk.

2   Q.   Bunk?

3   A.   Not true.  I never said that.

4   Q.   Now, you were asked a series of questions about a meeting you

5   had on September 24th.  And this was at the My Way restaurant, do

6   you recall that?

7   A.   Yes.

8   Q.   And you were asked questions about whether you raised the $6

9   billion tollway plan, is that right?

10  A.   Correct.  Correct.

11  Q.   Was the $6 billion tollway plan raised with the gentleman

12  from Prairie as well as Mr. Krozel?

13  A.   My recollection of that is that any discussion of any

14  potential tollway plan beyond the first one --

15          MR. SCHAR:  Objection.

16          THE COURT:  Your objection is sustained.

17          THE WITNESS:  Yeah.

18  BY MR. GOLDSTEIN:

19  Q.   The $6 billion tollway plan, okay, when this was -- if it was

20  raised at all in this meeting, it was only in the context of the

21  capital bill, is that right?

22  A.   It was the capital bill that we talked about in that meeting,

23  a lot of.

24  Q.   And independently you didn't raise the issue of the $6

25  billion of the tollway plan, is that right?

1  A.  I did not.

2  Q.  And you were asked some questions about a meeting you had in

3  October with John Wyma and Mike Vondra.  Do you recall that?

4  A.  Yes.

5  Q.  Who besides Mike Vondra and John Wyma, who was at this

6  meeting?

7  A.  The gentleman from the British Petroleum, Mr. Schar mentioned

8  his name.  I forgot it.  But that man, the man -- the

9  representative from British Petroleum, who was seeking help from

10  state government.

11  Q.  So this was at the Friends of Blagojevich office?

12  A.  Yes.

13  Q.  And this discussion that you were having with this individual

14  from British Petroleum as well as Mike Vondra, they were asking

15  for something from the state regarding their business, is that

16  right?

17  A.  Yeah.  They were asking for some kind of tax credits or some

18  money, sort of money to encourage them to come and take a

19  facility from, I believe, northwest Indiana into the Calumet

20  River-South Chicago area.  And their argument was that they would

21  be able to hire people in Illinois.

22        MR. SCHAR:  Objection.

23        THE COURT:  Ask another question.

24  BY MR. GOLDSTEIN:

25  Q.  After this meeting, the proposal that they presented to you,

1 do you know if the State of Illinois went forward with that?

2 A.  They were turned down later that day because British

3 Petroleum had more than enough money.  And they were told, a

4 project like this, if you are a big company with all that kind of

5 money we will -- we're not --

6         MR. SCHAR:  Objection.

7         THE COURT:  You can eliminate the payment part of it.

8 BY MR. GOLDSTEIN:

9 Q.  Yet even after this proposal was rejected and it didn't go

10 forward, you still requested fundraising from Mr. Vondra, is that

11 right?

12 A.  Yes, I did.

13 Q.  And Mr. Vondra had fund-raised for you before, is that right?

14 A.  That's correct.

15 Q.  Now, the meeting you had with Mr. Krozel on September 18th,

16 2008, you were asked a series of questions about that, is that

17 right?

18 A.  Yes.

19 Q.  And there were questions regarding the topics that you

20 discussed, right, Rod?  For example, the tollway plan was

21 discussed with Mr. Krozel, is that right?

22 A.  Yes.

23 Q.  Why was the tollway plan discussed with Mr. Krozel during

24 that meeting?

25 A.  Well, Jerry had -- I asked him how things were going.  The

1  economy was bad.  And he comisserated with me on how tough things

2  were, and he mentioned because they were so bad they were closing

3  down their facility in Dixon, Illinois.

4          I then told him well, we've got some good news for you.

5  Jerry, your friend -- somewhere along those lines, don't quote

6  me -- but that we are going to announce the tollway plan, and

7  this might help you guys a little bit.  And I believe I asked him

8  would this sort of thing help keep that facility open in Dixon.

9  Q.  So he was talking about business, that business was

10  struggling, and you said you had this plan that you were going to

11  do, is that right?

12  A.  Right.  I was hoping to give him some good news that maybe,

13  you know, would give them some encouragement.  And who knows,

14  maybe they would keep that plant in Dixon open.

15  Q.  And you understood that Jerry Krozel was interested in that

16  tollway plan, is that right?

17  A.  He thought it was -- he -- I think he viewed it favorably,

18  yes.  His response was positive.  I don't think he thought it was

19  some great thing, but I think he liked it.

20  Q.  Because you had mentioned that the 1.8 billion, not being

21  something that he was excited about necessarily?

22  A.  Right.  I don't think he felt that this was nearly as big as

23  he would have liked it to be.

24  Q.  And you said that one of the purposes of this meeting was to

25  discuss fundraising, is that right?

 1  A.  Yes.

 2  Q.  And you said there was another purpose to this meeting, and

 3  that was to discuss the capital bill, is that correct?

 4  A.  To begin to the work to try to get the capital bill passed if

 5  we could.

 6  Q.  Why did you want to discuss the capital bill with Jerry

 7  Krozel?

 8  A.  Jerry Krozel had very strong interest in it through his

 9  industry.  Again, they were talking about how tough times were

10  economically, they were closing the plant --

11          THE COURT:  Stop.  Stop.

12          THE WITNESS:  Yes, Judge.  I'm sorry.

13          THE COURT:  One little clue, you might want to stop

14  answering a question is if you start with the word "again."

15  Because it usually means you said it before.

16          THE WITNESS:  Thank you, Judge.

17  BY MR. GOLDSTEIN:

18  Q.  Is it fair to say that you understood Jerry Krozel first

19  wanted the capital bill done, is that correct?

20  A.  Yes.

21  Q.  And you understood that Jerry Krozel also was someone that

22  would work to be effective and get the capital bill done, is that

23  right?

24  A.  That's correct.

25  Q.  And those were the reasons, when it came to discussing the

1  capital bill with Mr. Krozel, that you wanted to speak with him,

2  is that right?

3  A.  And that November veto session, and maybe we might be able to

4  try to pack the capital bill into a veto session if we could

5  build up enough support with people like Jerry Krozel and others.

6  Q.  Now, there was discussion about this $6 billion plan.  Do you

7  recall being asked these questions?

8  A.  Yes.

9  Q.  As to the $6 billion plan, were you holding up the $6 billion

10  plan to get fundraising?

11  A.  No.

12  Q.  Did you have a reason why you didn't want to do this plan?

13  A.  I had several reasons.

14  Q.  What were your several reasons?

15  A.  I didn't have the legislative authority to do it, even if I

16  wanted to, one.

17        Two, it required toll increases.  I was opposed to

18  those.

19        Last, and yet this was the most important reason, I

20  wanted the capital bill, and I didn't want to weaken our efforts

21  to be able to get everybody who had the influence to help us pass

22  that capital bill.

23        That was the principal reason.  I didn't want that

24  medium-sized plant or that bigger $7.1 billion plant.  That would

25  undermine my efforts to pass the big job bills across the whole

1  state.

2  Q.  And is that what you communicated to Jerry Krozel on

3  September 18th?

4  A.  I did very much, yes.

5  Q.  Now, I want to change subjects and talk about the issue of

6  Mr. Magoon and Children's Memorial Hospital, okay?

7  A.  Yes.

8  Q.  Now, Rod, just to briefly go through this, it was late

9  September 2008 that you received your first call from Dusty

10 Baker, is that right?

11 A.  Yes.  I believe it was about the third week of September

12 2008, that's right.

13 Q.  And he presented an issue regarding Children's Memorial as

14 well as these healthcare issues.  But you weren't quite certain

15 exactly what he was proposing, is that right?  You just knew he

16 wanted help from the State of Illinois?

17 A.  For the Children's Memorial Hospital and for -- for doctors

18 who treat children, that's correct.

19 Q.  You then called Patrick Magoon to talk about it, is that

20 right?

21 A.  Yes.

22 Q.  And you received more information from Mr. Magoon, is that

23 right?

24 A.  Yes.

25 Q.  And he informed you that this was regarding a rate increase

1 for pediatric doctors, is that right?

2 A.  That's right.

3 Q.  You then called Mr. Greenlee to talk about the subject, is

4 that right?

5 A.  That's correct.

6 Q.  And you asked him questions about it, and you talked about

7 the budgetary issues, is that right?

8 A.  He raised those with me.

9 Q.  Okay.  And he was to look into it to see if it could get

10 done, is that right?

11 A.  Correct.

12 Q.  And it was your understanding at this time that this is

13 something you wanted to do, is that right?

14 A.  I directed him to find the money and get it done.

15 Q.  Okay.  And you wanted to get this done, is that right?

16 A.  Yes.

17 Q.  And you mentioned it was October 17th that you told

18 Mr. Magoon, and you said "the good news," right?

19 A.  Correct, yes.

20 Q.  And you told him that the rate increase was going forward,

21 and that it would start January 1, is that right?

22 A.  Yes.

23 Q.  Now, you talked about a meeting that you had on October 8th

24 with Mr. Wyma and your brother, is that right?

25 A.  Yes.

1  Q.  And there is a discussion -- we put the charts up there --

2  about Patrick Magoon, is that right?

3  A.  And others, yes.

4  Q.  So not just Patrick Magoon, but this is a long fundraising

5  meeting where you discussed a lot of potential fundraisers and

6  contributors, is that right?

7  A.  Yes.

8  Q.  And Mr. Magoon's name was discussed.  And the first issue was

9  could he raise $50,000, is that right?

10  A.  Well, the first issue was he was part of a sort of like a

11  let's-see-if-we-can-find-old-friends-who-aren't-on-this-list

12  discussion, which came I think after the review of the full list.

13  So he was on that shorter list with Glunz and Orlinski and Dr.

14  Michael and Meckler, with Mr. Magoon.  They were on that sort of

15  handwritten list.

16          We all were sort of like adding people that we would

17  sort of be assigned to be responsible for.  My brother probably

18  had some names.  Lon Monk had some names.  John Wyma wrote some

19  names down.  And I very well may have had some as well.

20  Q.  And the issue of how much Mr. Magoon could raise was

21  discussed, is that right?

22  A.  That's correct.

23  Q.  And the number $50,000 was discussed, is that right?

24  A.  I asked whether John Wyma thought that was a realistic or

25  reasonable request.

1  Q.  And Mr. Wyma told you 25,000 was more, was a better number,

2  is that right?

3  A.  He did.  He said the 50,000 was not -- was too ambitious, and

4  that he recommended that we make the -- we write them down for

5  potential ask of $25,000.

6  Q.  And you agreed with that?

7  A.  Yes.

8  Q.  Okay.  Now, there was a lot of talk about Mr. Wyma was given

9  this assignment to call Mr. Magoon.  Do you recall talking about

10 that?

11 A.  Yes.

12 Q.  When you say he was given the assignment, what do you mean by

13 that?

14 A.  Just that John had the list of those names he wrote down:

15 Glunz, Meckler, Magoon, Orlinski, Dr. Michael, those names.  And

16 so those were names that he was going to be responsible for to

17 see if he could raise money from.

18          Lon was given some names like that, I believe.  My

19 brother.  And I believe I had some too.

20 Q.  Did you tell Wyma at that meeting that he should call Mr.

21 Magoon right away?

22 A.  No.

23 Q.  And in fact, it was October 22nd that you had another

24 meeting, is that right?

25 A.  Yes.

1  Q.  And at that point it was discussed and then decided that

2  Robert would be the individual to call Mr. Magoon, is that right?

3  A.  That's right.  It was John Wyma's recommendation that my

4  brother should call them.

5  Q.  And when Mr. Wyma recommended that your brother call, you

6  agreed, is that right?

7  A.  Yes.

8  Q.  And Robert agreed?

9  A.  Yes.

10  Q.  And it was your understanding after that that Robert was to

11  call and ask Mr. Magoon for a fundraiser, is that right?

12  A.  That's right.

13  Q.  And after that you never called Mr. Magoon, is that right?

14  A.  That's correct.

15  Q.  In fact, after October 17th, 2008, you never called Mr.

16  Magoon?

17  A.  I never talked to Mr. Magoon after October 17th.

18  Q.  And you talked about the fact that the day you were arrested

19  you didn't even know the rate increase was held up, is that

20  correct?

21  A.  That's correct.  I had no idea.

22  Q.  And we discussed a little bit about the conversation you had

23  with Mr. Greenlee on November 12th?

24  A.  Yes.

25  Q.  Do you recall that?

1          And there was a series of questions asking you about the

2    questions you asked Mr. Greenlee, is that right?

3    A.   Yes.

4    Q.   And the questions you asked Mr. Greenlee was so that you

5    understood whether you would have any specific control over this

6    rate increase, right?

7    A.   Right.  That's exactly right.

8    Q.   And one of the issues also was whether the rate increase had

9    gone out, is that right?

10   A.   I think I asked that first, and then I asked -- that's

11   correct.

12   Q.   And you -- you called Mr. Greenlee hours after you had spoken

13   to Robert earlier that day, is that right?

14   A.   Yes.

15   Q.   And Robert had informed you that he was calling Mr. Magoon

16   but wasn't getting any phone calls back, is that right?

17   A.   Yeah.  He said he called him I think three times.  I'm not

18   calling him back, I feel stupid.  Something like that.

19   Q.   And based on that you said I'll call him?

20   A.   Okay, I'll call him.

21   Q.   And after that conversation, hours later, you then called

22   Greenlee, is that right?

23   A.   Yes.

24   Q.   And you called Greenlee to get the information to see whether

25   you wanted to decide to call Mr. Magoon, is that right?

1 A.  That's right.

2 Q.  And after this conversation -- well, actually during this

3 conversation when Mr. Greenlee gave you those answers to the

4 questions you had, you said that was good to know, is that right?

5 A.  Good to know.

6 Q.  And when you said good to know, you meant that was thank you

7 for the information, is that fair to say?

8 A.  That's right.

9 Q.  Okay.  This was not an order to Mr. Greenlee to hold up this

10 rate increase?

11 A.  Absolutely not.

12 Q.  And after this conversation you had with Mr. Greenlee, you

13 never called Mr. Magoon, is that right?

14 A.  I never called Mr. Magoon.  That information locked that

15 decision down.  I'm not calling Mr. Magoon.

16 Q.  And then you had a later conversation, a couple days later,

17 where you talked to Robert about Mr. Magoon, is that right?

18 A.  Right.

19 Q.  And you specifically told Robert not to call Mr. Magoon?

20 A.  Right after, yes.  That's right.  I believe it's two days

21 later.

22 Q.  And after November 12th, it was your understanding the rate

23 increase was going through, right?

24 A.  Absolutely.

25 Q.  And you didn't first learn about the rate increase being held

1 up in any way until you were arrested, is that right?

2 A.  That's right.

3 Q.  And you said your response was that you were shocked when you

4 heard that?

5 A.  I was shocked.

6 Q.  If we can change subjects?

7        THE COURT:  We will take a break now.

8     (Jury out.)

9        THE COURT:  You can step down now.

10        Please be seated.

11        Counsel, come to the lectern.

12        How much longer have you got?

13        MR. GOLDSTEIN:  Short, your Honor.  At most 20, 25

14 minutes.

15        THE COURT:  And then you will be prepared to go?

16        MR. SCHAR:  Yes.  I'll be prepared to go if we decide to

17 recross.

18        THE COURT:  Some of this questioning reminds me of

19 the -- I'm not going to say.

20        MR. GOLDSTEIN:  I think you were going to compliment me,

21 Judge.  I just have a feeling.

22        THE COURT:  It's not -- it's not that.

23        MR. GOLDSTEIN:  I understand the way you are looking.  I

24 think you want to say what great lawyering.

25        MR. SOROSKY:  With all due respect, I disagree.

 1          THE COURT:  It reminds me of the story about the lawyer

 2  who has a witness who when asked, after this happened what did

 3  you do?

 4          I got up, I got dressed, I put on my shoes.

 5          Did you tie your shoes?

 6          Well, I tied the left one first and then I tied -- well,

 7  maybe that's wrong.  Maybe I tied the right one first and I tied

 8  the left one after.

 9          But if you've only got a relatively short time of this

10  left, you can keep going on.

11          MR. SOROSKY:  I was right.  It was not a compliment.

12          MR. GOLDSTEIN:  That's how you understand it.

13      (Recess.)

14          THE COURT:  You may resume.

15          MR. GOLDSTEIN:  Thank you, your Honor.

16  BY MR. GOLDSTEIN:

17  Q.  Okay, Rod.  I just want to ask you, before we go onto the

18  next subject regarding Children's Memorial Hospital, two

19  questions.

20          On October 17th, 2008, that's when you called Patrick

21  Magoon to tell him the good news, right?

22  A.  Yes.

23  Q.  And it was October 22nd, 2008, that there was a decision to

24  -- a decision was made to have Robert call Mr. Magoon, is that

25  right?

1 A.   Yeah.  That was the -- can you repeat that date, please?

2 Q.   On October 22nd -- I'm sorry if I misspoke -- on October

3 22nd, 2008, the decision was made to have Robert call Mr. Magoon,

4 right?

5 A.   Right.  That's correct.

6 Q.   And Robert was to ask for fundraising from Mr. Magoon, is

7 that right?

8 A.   That's correct.

9 Q.   Now, I just want to change subjects with you.  You were asked

10 a series of questions about Lisa Madigan and Lisa Madigan deals,

11 is that right?

12 A.   Yes.

13 Q.   And on December 8th you testified about a conversation you

14 had with John Harris early in the morning, is that right?

15 A.   Yes.

16 Q.   And you talked about this, I believe it's tab 4, about you

17 told John Harris to look into the tactics of that, is that right?

18 A.   That's correct.

19 Q.   And you were asked a series of questions about the book that

20 you wrote, is that right?

21 A.   Yes.

22 Q.   And there were quotes taken out of the book about how that

23 you were ordered that this Lisa Madigan deal go forward, do you

24 recall that?

25 A.   I remember the questions, yes.

1  Q.  Did you also say in the book, so in the morning on December

2  8th, when I directed my chief of staff, John Harris, to get the

3  ball rolling and see if we could make this deal, because

4  everything was properly positioned.

5          Did you say that?

6  A.  Yes.

7  Q.  Did you also say in the book, when he arrested me and my

8  chief of staff, he didn't stop a crime spree --

9          MR. SCHAR:  Objection, Judge.

10          MR. GOLDSTEIN:  Can I just say the last sentence?

11          THE COURT:  Objection sustained.

12  BY MR. GOLDSTEIN:

13  Q.  Did you talk about in the book that the Lisa Madigan deal was

14  in the embryonic stages?

15  A.  Yes, I did.

16  Q.  And when you say em- -- when you wrote "embryonic stages,"

17  what did you mean by that?

18  A.  I meant that if Rahm Emanuel got back to us with permission

19  from President Obama to be the one to broker the Madigan deal,

20  then my decision would be made, and we would try to put the

21  Madigan deal together and achieve these things that I have talked

22  about over the last several days.

23  Q.  And as you've said a lot, no decision had been made at that

24  point, is that right?

25  A.  That's correct.

1  Q.  But on late December 8th, you had an understanding that
2  potentially the ball was moving in this direction, is that right?
3  A.  That's correct.
4  Q.  Now, you heard a further portion of the call you had with Mr.
5  Greenlee, talking about you wanted to hold or at least make the
6  decision on January 6th of 2009, is that right?
7  A.  Correct.
8  Q.  Now, throughout many of your conversations about the Senate
9  seat, you discussed many possible dates when this decision would
10 be made, is that right?
11 A.  Yes.
12 Q.  Okay.  In fact, there was some conversations you had where
13 December 10th was a possible date that this appointment would be
14 made, is that right?
15 A.  Yes.
16 Q.  And January 6th you talked about in this call was selected
17 because of the Tony Rezko sentencing, is that right?
18 A.  That's correct.
19 Q.  Okay.  And you were concerned about the Tony Rezko sentencing
20 because you were worried about potentially that Tony Rezko was
21 lying about you, is that right?
22 A.  Correct.
23          MR. SCHAR:  Objection.
24          THE COURT:  Objection is sustained.
25 BY MR. GOLDSTEIN:

1  Q.  Well, you weren't concerned that somehow Tony Rezko -- you

2  were somehow doing criminal things with Tony Rezko, were you?

3  A.  No.

4          MR. SCHAR:  Objection.

5          THE WITNESS:  Yeah.  I see that.  I think.

6          THE COURT:  Objection sustained.  The answer is

7  stricken.

8  BY MR. GOLDSTEIN:

9  Q.  Why -- January 6, it was your understanding that the Tony

10  Rezko sentencing is occurring on that date, is that right?

11  A.  There were news reports that indicated that, yes.

12  Q.  Okay.  And that was right around December 8th?

13  A.  Could very well have been that day, or the day before.

14  Q.  Why were you concerned about -- or why did your decision

15  potentially go to January 6th regarding the Rezko sentencing?

16  A.  In my mind, if Mr. Rezko was sentenced, then that would have

17  cleared me, given me the clean bill of health I expected and

18  hoped for.

19          It would give me a much better opportunity to try to

20  make the Madigan deal, because all the different parties would be

21  more willing to work with me and make it happen.

22          Or if the Madigan deal failed, and God forbid it then

23  fell back on me as a option, I would have been cleared and,

24  therefore, would have been less objectionable to the United

25  States Senators and the democratic establishment, as I was told

1 previously by some of my advisors.

2 Q.  When you say clear me, what did you mean by that?

3          MR. SCHAR:  Objection.

4          THE COURT:  Objection sustained.

5 BY MR. GOLDSTEIN:

6 Q.  Now January 6 was a date that you discussed on December 8,

7 right?

8 A.  Yes.

9 Q.  And did January 6 prevent the Lisa Madigan deal from going

10 forward or --

11          MR. SCHAR:  Objection, Judge.

12          MR. GOLDSTEIN:  I'll ask a new question.

13          THE COURT:  Yes.

14 BY MR. GOLDSTEIN:

15 Q.  What effect did your thought of January 6 for selecting a

16 Senate appointment have on going forward with the Lisa Madigan

17 deal?

18 A.  It could possibly help us get the Lisa Madigan deal.

19 Q.  Why?

20 A.  Because the cloud would be removed from me, and then others

21 would be even more willing to work with me to get the Madigan

22 deal done.  Or, as I said, if it didn't happen, then possibly me

23 going to the Senate.

24 Q.  And what you said was that -- you said January 6 you would

25 still want the Madigan deal, right?

1  A.  Yes.

2  Q.  And you went to bed with the Madigan as deal number one

3  thought in your mind, is that right?

4  A.  Very much so.

5  Q.  And you also mentioned possibly appointing yourself if you

6  couldn't get the Madigan deal on January 6, is that right?

7  A.  Yes.

8  Q.  And this call that you had with Mr. Greenlee on December 8th,

9  2008, this was the last call you had that day, is that right?

10  A.  That was the last call before I was arrested the next day.

11       MR. GOLDSTEIN:  Nothing further.

12       MR. SCHAR:  Judge, we have nothing else for this

13  witness.

14       THE COURT:  You may step down.

15    (Witness excused.)

16       THE COURT:  Do you have a witness?

17       MR. SOROSKY:  I think if we could have a sidebar, your

18  Honor?

19       THE COURT:  Sure.

20     (Proceedings heard at sidebar:)

21       THE COURT:  Yes.

22       MR. SOROSKY:  Unfortunately we don't have any witnesses

23  for today.  They could not come.

24       THE COURT:  Why couldn't they come?

25       MR. SOROSKY:  Sameer, one -- one fellow --

 1      MR. RIEBMAN:  Mr. Talcherkar had to work.  He will be
 2 here at 9:00 a.m. tomorrow ready.  We --
 3      THE COURT:  I could have ordered him here.  I could have
 4 ordered him here.
 5      MR. RIEBMAN:  Judge, we didn't expect to have to begin.
 6      THE COURT:  I don't care.  I told you to have those two
 7 witnesses here.  I told you to have them.
 8      What are those witnesses going to testify to?
 9      MR. SOROSKY:  They are going to be very brief.
10      THE COURT:  Yeah, very brief.
11      The thing I want to do next, if you don't call the
12 witnesses, is have the rebuttal.
13      MR. SOROSKY:  Have what?
14      THE COURT:  Have the rebuttal.  We are getting to the
15 point where things are going to be very difficult in terms of
16 scheduling.  These are the reasons I said to have the two
17 witnesses here.
18      MR. SOROSKY:  Lipinski -- retired Congressman Lipinski,
19 he is no longer a congressman, but he was a congressman.
20      THE COURT:  Bill Lipinski.
21      MR. SOROSKY:  Yeah.  Bill Lipinski.  He would testify
22 that he never asked Congressman Jackson for a campaign
23 contribution.  That's it.
24      THE COURT:  What was the evidence with Lipinski?  Was it
25 William or was it Dan?

1          MR. SOROSKY:  William.  2002, Dan was not a --

2          THE COURT:  Dan is the junior.  William is the senior.

3          MR. NIEWOEHNER:  I believe it's William.

4          MR. SOROSKY:  It's always --

5          MR. NIEWOEHNER:  My conversation ten minutes ago with

6   the Congressman is that he is not under subpoena, and he wasn't

7   known to be here.

8          THE COURT:  Is the other guy under subpoena?

9          MR. RIEBMAN:  No, Judge.  He is willing to come.  We can

10  call him.

11         MR. SOROSKY:  People don't get subpoenas.

12         MR. RIEBMAN:  If you give us a moment to reach out.  We

13  have had scheduling difficulties.  He is certainly available

14  immediately tomorrow morning, if we can have a short break and

15  try to contact him and bring him in immediately.

16         THE COURT:  I'm sending this jury out to sit in a room

17  while we are contacting a witness who should be here, should have

18  been under subpoena, could have been ordered by the Court to be

19  here.

20         What was he doing?  What is his work?

21         MR. RIEBMAN:  He had work obligations.

22         MS. KAESEBERG:  I would just reassure the Court, we have

23  done everything.

24         THE COURT:  You haven't done everything you could have

25  if you haven't asked me for an order.

1          MS. KAESEBERG:  Well, I'm just explaining how we got to

2    this point.  If the people don't want to talk to us, it's been

3    very difficult.  I just wanted to reassure, we're not taking your

4    orders lightly.

5          We are really talking to these people.

6          And I understand what you are saying about getting an

7    order.  We fully expected the government to do a recross.

8          We are sort of surprised at this point as well.

9          THE COURT:  The reason yesterday I said to have the two

10   witnesses here is because you don't know.

11         MS. KAESEBERG:  Well, I just want you to know we did

12   try.  I understand your order, and where you are coming from.

13         THE COURT:  This is very bad.

14         MR. SOROSKY:  We apologize.

15         THE COURT:  Well, it's very bad because the thing is I'm

16   going to send these jurors out.

17         MR. SOROSKY:  I don't think both witnesses will be more

18   than a half hour.

19         THE COURT:  Half hour is a half hour that I have today.

20         MR. SOROSKY:  You are right.

21         THE COURT:  And in theory, we could have closing

22   argument in this case on Thursday.  I could ask the jurors if

23   they are willing to sit on Friday.

24         Otherwise, what I've got is I've got a day that goes

25   blank.  And I've got a three-day interval before we go.

 1          The one thing you will do is you will issue subpoenas

 2   for these two guys.  You will serve them this evening.  I don't

 3   care what lengths you have to go to.  And I want them both here

 4   at 8:00 in the morning.

 5          Because otherwise I don't have any assurance.

 6          How about your witnesses?

 7          MR. SCHAR:  Judge, we have witnesses available tomorrow.

 8   There may be one out-of-town witness that's an issue, but one

 9   out-of-town witness is not an issue and could be here.

10          Otherwise, everyone who is present can be here.

11          THE COURT:  How long is your --

12          MR. SCHAR:  Not long.  I'd say -- we will have to decide

13   between the witnesses tonight and see what type of a case they

14   put on.  Judge, I don't think any one of them is more than 20

15   minutes.

16          THE COURT:  And how many tomorrow?

17          MR. SCHAR:  At this point, four to six.  Probably more

18   likely four.

19          THE COURT:  Okay.  We are going to discuss schedule

20   because we may start closing argument tomorrow.

21          MR. SCHAR:  Can I just add one thing, Judge --

22          THE COURT:  Yes.

23          MR. SCHAR:  -- which was completely out of line:  The

24   defendant walked off the stand and tried to shake my hand in

25   front of the jury, putting me in the position of either having to

1   shake his hand in front of the jury, or do what I did, which was

2   to effectively ignore him in front of the jury.

3         Completely out of line. I don't know what the jurors

4   are thinking right now. But it put me in one of those impossible

5   situations.

6         And I don't know, if there were an instruction --

7         THE COURT: No. I will instruct the jury.

8         MR. SOROSKY: Could we find out who the witnesses are?

9         THE COURT: No. You are not going to do anything until

10  I finish with this.

11        (Proceedings heard in open court:)

12        THE COURT: The defense has two more witnesses -- maybe

13  only one -- to call in the defense.

14        They are not here. So we're going to have to put that

15  over till tomorrow.

16        There is one thing you might have noticed. As the

17  witness left the stand, I believe he offered to shake hands with

18  the prosecutor.

19        The lawyers are instructed not to have that kind of

20  contact with any witness, both sides are.

21        With that, I'm going to send you back. But I do have

22  one question to ask you, which I'll do before you leave.

23        Take the jury out.

24     (Jury out.)

25        THE COURT: We will resume again in about ten minutes.

 1      (Recess.)

 2          THE COURT:  Counsel approach.

 3          Based on my discussions with the jury, in the likelihood

 4  that the case will be fully submitted to them on Thursday, which

 5  is what I believe will occur in light of what I have been told,

 6  they are willing to sit on Friday.

 7          The defense will present its two remaining witnesses

 8  tomorrow morning.  The government will begin its rebuttal shortly

 9  thereafter.

10          I anticipate that by sometime in the afternoon,

11  Wednesday afternoon, we will have enough time to begin with the

12  government's opening argument.  And then on Thursday, I believe

13  Thursday morning will consume the rest of the argument time, and

14  the case will be submitted to the jury sometime Thursday.  My

15  hope is early afternoon, but even if it's the end of the day.

16  And then the jury will go to deliberate.

17          The reason I'm doing this is I anticipate, under any

18  circumstances, given what has happened thus far, that the case

19  would be submitted to the jury sometime on Thursday.  If that is

20  the case -- and by "submitted" I mean closing arguments and

21  instructions are given -- I think it is a bad idea to tell the

22  jury to go home for three days before they begin deliberating.

23          If they have started deliberations on Friday and they

24  don't finish, at least they will have gone through a significant

25  part of deliberations.  They will have become engaged in the

1 deliberations, and what happens after a two-day weekend I don't
2 think will make much difference.

3        This is the reason I'm having the process as it is.

4        If anybody's witness is not available tomorrow, and it
5 isn't extraordinary circumstances, that will be the only
6 opportunity you will have to call them.

7        Consequently, if any attorney feels the need for a Court
8 order instructing a witness to be present, I will issue one, and
9 I will issue it today if you want it.

10        Which leaves us next with a short session having to do
11 with the instructions.  I expect after the end of this to have
12 the instruction issues, if there are any left, to be confined to
13 a very small number of instructions, and we can finish that off
14 tomorrow.

15        With that, somebody ought to grab the instruction book
16 and probably some of the lawyers can sit down.

17        MR. SOROSKY:  Can Mr. Blagojevich leave?

18        THE COURT:  If he wishes he may.

19        MS. BONAMICI:  Your Honor, I've provided a modified set
20 based on our prior instruction conference to the defense this
21 morning.  If you'd like, I'll pass one up to you.

22        THE COURT:  That would be good.

23        MS. KAESEBERG:  And just so that you know, I did receive
24 it this morning.  With the events of the day I haven't had a
25 chance to look through it today, so I'm going to do my best.

1    THE COURT:  Okay.  And my guess is there won't be too

2  many left.  But we'll go through them 1 through the end just to

3  make sure.

4    MS. BONAMICI:  I will say to you, as I said to the

5  defense this morning, whatever changes haven't been made, I

6  apologize.  It was inadvertent.  I think I made them all, but --

7    THE COURT:  Government instruction 1, I think there was

8  no change from the original.

9    MS. BONAMICI:  That's correct.

10    MS. KAESEBERG:  Agreed.

11    THE COURT:  And the same for government 2?

12    MS. BONAMICI:  Yes.

13    MS. KAESEBERG:  Yes.

14    MS. BONAMICI:  That's correct.

15    THE COURT:  Government 3 has been modified because the

16  defendant did take the witness stand.

17    MS. BONAMICI:  That's correct.

18    MS. KAESEBERG:  Yes.

19    THE COURT:  Government 4 is without objection.

20    MS. BONAMICI:  Correct.  No change.

21    MS. KAESEBERG:  Right.  Correct.

22    THE COURT:  Government 5 is without objection.

23    MS. KAESEBERG:  That's right.

24    MS. BONAMICI:  No change, your Honor.

25    THE COURT:  Government 6, standard instruction.

1          MS. KAESEBERG:  I think this one you just were giving

2    over our objection.  I don't believe there has been a change, is

3    that correct?

4          THE COURT:  Right.

5          MS. BONAMICI:  That's my understanding too, your Honor.

6          THE COURT:  Instruction 7?

7          MS. KAESEBERG:  No change.

8          THE COURT:  We are on the same page with this?

9          MS. KAESEBERG:  Yes.

10          THE COURT:  Instruction 8?

11          MS. KAESEBERG:  Same.

12          MS. BONAMICI:  Same.

13          THE COURT:  Instruction 9?

14          MS. KAESEBERG:  Same.

15          MS. BONAMICI:  Same.

16          THE COURT:  Instruction 10?

17          MS. KAESEBERG:  Same.

18          MS. BONAMICI:  Yes.  No change.

19          THE COURT:  Instruction 11?

20          MS. KAESEBERG:  I think there was a slight -- a typo in

21    this one maybe.

22          MS. BONAMICI:  I think that's right.  We have said "a

23    defendant" rather than "the defendant."

24          MS. KAESEBERG:  The last sentence of the second

25    paragraph.

```
 1              THE COURT:  Yes.  We are fine with it now.

 2              All right.  Government 12 is withdrawn.

 3              MS. KAESEBERG:  Right.

 4              MS. BONAMICI:  Excuse me, your Honor.  I'm sorry.  Going

 5    back to instruction 11.

 6              I did make the change that we had previously identified,

 7    but the question is do you want the "a defendant" in the last

 8    paragraph also to read "the"?

 9              THE COURT:  Do you care?

10              MS. KAESEBERG:  I'm okay with that the way it is now.

11              THE COURT:  I'm okay too.

12              MS. BONAMICI:  Okay.

13              THE COURT:  12 I'm assuming is withdrawn.

14              MS. KAESEBERG:  Right.  I think with 13, the defense

15    submitted the old version, I believe, and you were going to refer

16    back to defendant's 3 on this one.  That's what my notes

17    indicate.

18              The government in number 13 provided a modified

19    instruction.  And in our objections, we provided the original

20    non-modified instruction.  And my notes indicate that the

21    government didn't object to going back to the old instruction and

22    that that was the way that you ruled.

23              MS. BONAMICI:  And I agree with all of that.  And I

24    don't know whether this -- I don't have an independent

25    recollection of whether I modified this back or not, so I'm going
```

1 to check.

2          MS. KAESEBERG:  It's not modified back to the old one.

3 But we can work on that one.

4          MS. BONAMICI:  I'll fix it.

5          THE COURT:  You will do that.  Okay.

6          MS. BONAMICI:  I got it.

7          MS. KAESEBERG:  Okay.

8          MS. BONAMICI:  Oh, here actually, I believe it's 13 A.

9          THE COURT:  Yeah, it is.

10         MS. BONAMICI:  So I did do it.  But I will delete this

11 and I will keep this.

12         THE COURT:  So 13 A is given without objection.

13         MS. BONAMICI:  Correct.

14         MS. KAESEBERG:  Right.

15         THE COURT:  14?

16         MS. KAESEBERG:  14 we had requested that some language

17 be added to the first sentence, which I believe is reflected in

18 the government's new instruction, which is, the defendant may

19 have made statements.  So --

20         THE COURT:  And it does say "may have."

21         MS. KAESEBERG:  I said, yes.

22         THE COURT:  So they made it.  That's done.  Okay.  Good.

23 So that's given without objection.

24         MS. KAESEBERG:  And if I could, for the record, we do

25 object to this instruction as being cumulative to the one before

1 it, which addresses the impeaching or inconsistent statements of

2 all the witnesses.

3      I just wanted to make sure that that objection is made

4 clear.

5      THE COURT:  Okay.  Objection is overruled.  The

6 instruction is given.

7      MS. BONAMICI:  15, no objection.

8      MS. KAESEBERG:  Agreed.

9      THE COURT:  15, given without objection.

10      16, given without objection.

11      MS. KAESEBERG:  We objected to it initially, but for

12 this version, according to your ruling, we don't object to this

13 version now.

14      THE COURT:  Fine.

15      17 is given, but there was an objection to this.

16      MS. KAESEBERG:  Correct.  There was.  I believe they

17 were going to turn them into two instructions.  Is that what's

18 happened?

19      MS. BONAMICI:  Right.  17 A.  The second of those two

20 instructions is the modification.

21      THE COURT:  Right.  That's right.  That's right.  I

22 remember.  Because they are two separate issues.

23      MS. BONAMICI:  Right.  And there was a modification,

24 just for the record, on number 17.  We have added the word

25 "financial" before "summaries" in the first line of government

1 instruction 17.

2          THE COURT:  Okay.  But it's still given over objection.

3          MS. KAESEBERG:  Correct.

4          THE COURT:  17 A, this is okay?

5          MS. KAESEBERG:  That's the timelines issue.

6          That one is fine.  17 A is without objection.

7          THE COURT:  The standard 18, government 18.

8          MS. KAESEBERG:  I believe we previously objected, but

9 this is in accord with your ruling.

10          THE COURT:  Right.

11          Okay.  Now, before we go further, you have your version

12 of 305.

13          MS. KAESEBERG:  Let me see.  Do you have a number on

14 that?

15          THE COURT:  I'll tell you what -- I'll just read it back

16 to you.  This is his conviction.

17          MS. KAESEBERG:  Oh, okay.

18          THE COURT:  You have heard evidence that the defendant

19 was convicted of a crime after the first trial in this case.  You

20 may consider this evidence only in deciding whether the

21 defendant's testimony is credible.  You may not consider it for

22 any other purpose.

23          A conviction of another crime is not evidence of the

24 defendant's guilt of any crime for which the defendant is now

25 charged.

1          The principal modifications is the parenthetical phrase,

2     "after the first trial in this case."  And I also think we were

3     doing "truthful in whole or part, or not as all," as opposed to

4     "credible."

5          MS. BONAMICI:  Right.

6          THE COURT:  Which the last one I don't think you care

7     about.  The only one we might have an argument about is "after

8     the first trial in this case."

9          Do you argue about that?

10         MS. BONAMICI:  Yes.  We don't see any purpose in that,

11    your Honor.  We think that it should read just the way the

12    pattern reads:  You have heard evidence that the defendant has

13    been convicted of a crime.

14         MS. KAESEBERG:  I think it just -- it raises the issue

15    of the fact, sort of what we argued, and I believe what you are

16    looking at is our objections to the conviction being admitted.

17         And I believe the issue is that it's not an old

18    conviction, it's a recent conviction.  This is what was testified

19    to, just to be clear, exactly what it is.

20         I'm not sure if you would be willing to -- I know you

21    want to get through a lot today.  But this one, I would be

22    willing to talk to the government and modify it somewhat.  I was

23    intending on doing that prior to the instructions conference, the

24    final instructions, and haven't had the opportunity.

25         THE COURT:  My concern with this is there is no chance

1  I'm going to talk about it, "after the first trial in this case."

2        MS. KAESEBERG:  Right.

3        THE COURT:  But I think you might reach the conclusion

4  that you don't want this modified by referring to what it is

5  related to, which is the incidents in this case.

6        I think you are probably better off without that

7  parenthetical.

8        If you want time to discuss and confer with them, that's

9  fine with me.

10        MS. KAESEBERG:  Okay.  Thank you.

11        THE COURT:  So we are going to leave what we will

12  characterize -- did you have numbers on yours?

13        MS. KAESEBERG:  Yes.  But that -- that instruction --

14        THE COURT:  Is not numbered.

15        MS. KAESEBERG:  Correct.  So I did have numbers, which I

16  did at 31, which makes that 32.

17        THE COURT:  Okay.  Defense 32, criminal conviction.  So

18  that remains open.

19        MS. BONAMICI:  Your Honor, where we were going to add

20  it, do you care where it is placed in the instructions?

21        THE COURT:  The one reason I raised it is we have a

22  series of before -- that I think before the tape thing but after

23  they pled guilty they did this.  It should go somewhere in there.

24        MS. BONAMICI:  Okay.  So go after the benefits

25  instructions?

1           THE COURT:  Yeah.  Yeah.

2           Okay.  Government's 18.

3           MS. KAESEBERG:  Just pursuant to our original objection.

4           THE COURT:  No.

5           MS. KAESEBERG:  There is no change in the language.

6           THE COURT:  Right.

7           MS. BONAMICI:  Your Honor, one thing that we have not

8   had a chance to address on our side was that you had talked about

9   possibly making a modification to this piece, or having a

10  supplemental instruction.  I'm guessing that we won't, but if we

11  wish --

12          THE COURT:  So 19.

13          MR. BONAMICI:  No.  This would be 18.

14          THE COURT:  I thought you already had an 18.

15          MS. BONAMICI:  I'm sorry.

16          THE COURT:  18 is the transcript instruction.

17          MS. BONAMICI:  Correct.  That's the one I just want to

18  flag and ask for permission to submit something --

19          THE COURT:  You want to flag 18?

20          MS. BONAMICI:  Yes.

21          THE COURT:  Okay.  Fine.

22          MS. BONAMICI:  Thank you.

23          THE COURT:  Purple marker for the ones.

24          19, no objection?

25          MS. KAESEBERG:  Correct.

1    THE COURT:  20?

2    MS. KAESEBERG:  No objection to that one.

3    THE COURT:  21?

4    MS. KAESEBERG:  We submitted an instruction that was

5  refused, I think, so this one --

6    THE COURT:  Over objection.

7    MS. KAESEBERG:  Correct.

8    THE COURT:  22.

9    MS. KAESEBERG:  I believe there is no objection to this

10  one.

11    THE COURT:  22 is okay?

12    MS. KAESEBERG:  Correct.

13    THE COURT:  All right.  23?

14    MS. KAESEBERG:  I don't have a note here if we initially

15  objected to this one.  I think we did, yeah.

16    MS. BONAMICI:  No.

17    MS. KAESEBERG:  Without objection.

18    MS. BONAMICI:  Without objection.

19    MS. KAESEBERG:  The language hasn't changed so this is

20  fine.

21    THE COURT:  Government 30 -- to government's 24.

22    MS. KAESEBERG:  We objected to this one, but I believe

23  the language is the same.

24    THE COURT:  Yes.  Okay.  Here we go, we begin the

25  elements instructions, right about now?

1          MS. BONAMICI:  Right about now.

2          THE COURT:  Government 24 -- 25.  Sorry.  Objections or

3  not?

4          MS. KAESEBERG:  We objected to this entire series.  So

5  as long as the government, the language is changed in accordance

6  with your prior rulings, I don't know that I need to object.  I

7  know we objected to all of them.

8          MS. BONAMICI:  Judge, my notes reflect that this one

9  was -- that 25 was given over objection, and there were no

10  modifications.

11          THE COURT:  And what?

12          MS. BONAMICI:  There were no modifications requested and

13  none were made.

14          THE COURT:  Okay.  25, over objection.

15          When we are done with this, I will run down my list of

16  numbers with objection and without objection, and the numbers of

17  those that are open.

18          MS. KAESEBERG:  Okay.

19          THE COURT:  Okay.  26, are we in the same position with

20  that one?

21          MS. KAESEBERG:  Yes.

22          MS. BONAMICI:  My notes say that there was a

23  modification on this one.

24          THE COURT:  Do we remember what that modification was?

25          MS. BONAMICI:  No.  Sorry.

1              MS. KAESEBERG:  I know I have a lot of notes here.  Oh,

2  I do see.  I know we objected to the use of the word "fiduciary."

3              MS. BONAMICI:  As soon as you say "fiduciary," I recall.

4              THE COURT:  "Fiduciary" is out now, right?

5              MS. BONAMICI:  Correct.

6              THE COURT:  Do you still have an objection?

7              MS. BONAMICI:  Do you still object?

8              MS. KAESEBERG:  Well, just the original objection to the

9  instruction as a whole stands, but I agree with the language that

10 they removed.

11             THE COURT:  Okay.  So the fact that the fiduciary is

12 taken out, you have no objection to.

13             MS. KAESEBERG:  Just less objectionable.

14             THE COURT:  But the instruction as a whole you do.

15             MS. KAESEBERG:  Correct.

16             THE COURT:  Got it.

17             27 A, does this mean the original 27 is gone?

18             MS. BONAMICI:  This is --

19             MS. KAESEBERG:  I believe this one, there is the issue

20 about the use of the phrase "be communicated in express terms,"

21 is that right?

22             MS. BONAMICI:  And that is -- that is correct.  But I do

23 notice that on this copy I have highlighted it.  It needs to be

24 deleted.  So I will just finish that up and delete it.

25             The only change to this instruction was in the second

1 sentence of the first paragraph.

2          THE COURT:  Yeah.  I remember.  We had a debate over

3 this.  So I remember that objection.

4          MS. BONAMICI:  Right.

5          MS. KAESEBERG:  Right.

6          THE COURT:  Quite clearly.

7          Yeah.  This is given over objection.

8          MS. KAESEBERG:  Right.

9          THE COURT:  And the original 27 is withdrawn.

10          MS. KAESEBERG:  So I'm a little -- just looking at this

11 for the first time, I'm just a bit confused by it.

12          So the language --

13          THE COURT:  You want me to put it on the open?

14          MS. KAESEBERG:  Is that okay?  And then I can look at it

15 later.

16          THE COURT:  Sure.

17          28?

18          MS. BONAMICI:  My notes say given over objection.  There

19 were no modifications made.

20          MS. KAESEBERG:  That's correct.

21          THE COURT:  Okay.  Government 29, I think these are all

22 objected to.

23          MS. KAESEBERG:  They were, yes.

24          THE COURT:  All right.  Given over objection.

25          Government 30, I think this is -- well, oh, no.

1          MS. KAESEBERG:  Okay.

2          MS. BONAMICI:  This one says "okay" on my notes.

3          THE COURT:  Yeah.  This one is okay.

4          MS. KAESEBERG:  I know we objected as a whole based on

5    Skilling.  That was part of that in what we filed.  So if you

6    remember, we objected to the whole series.  But there was no

7    special extra objection to this one.

8          THE COURT:  I will put it in the given-over-objection

9    category.

10         The one thing I may need you to do for the red books is

11   reprint the binders -- reprint the separators for the tabs.

12         MS. BONAMICI:  Okay.

13         THE COURT:  Okay.  Government 31, given over objection?

14         MS. KAESEBERG:  Correct.

15         THE COURT:  Government 32?

16         MS. KAESEBERG:  Same, I believe.

17         MS. BONAMICI:  Yes.  Agreed.  Same.

18         THE COURT:  Something interesting about 31.

19         MS. KAESEBERG:  It was the actual --

20         THE COURT:  No, no.  What's interesting about this is

21   this would be -- if there weren't this instruction here, this

22   would be a perfect defense.  Because the defendant would testify

23   I didn't foresee that anyone would have a loss.  They would make

24   money; I would make money.

25         MS. KAESEBERG:  I'm guessing that's why the government

 1  put it in their instructions.

 2          THE COURT:  Yeah.

 3          MS. KAESEBERG:  If you want to take it out, we can.  I

 4  wouldn't object to that.

 5          MS. BONAMICI:  I'd say we should leave in it there,

 6  Judge.

 7          THE COURT:  Fine.

 8          Interstate communications, do you object to this one?

 9          MS. KAESEBERG:  We objected to some -- the language

10  "further" versus "carry out" but it's -- you've already ruled on

11  it.

12          THE COURT:  Yeah.  Given over objection.

13          Telephone call?

14          MS. KAESEBERG:  I don't think there was an objection.

15          MS. BONAMICI:  I agree.  That's what my notes say.

16          THE COURT:  Okay.  This is 35, over which there is

17  clearly an objection.

18          MS. KAESEBERG:  Correct.

19          MS. BONAMICI:  Well, just so the record is clear, it's

20  my understanding that the defense made the same objection they

21  made in the last trial, which was the last paragraph, the last

22  sentence.

23          THE COURT:  Yeah, the last paragraph, not the first.

24          MS. BONAMICI:  Okay.

25          MS. KAESEBERG:  Right.

1          MS. BONAMICI:  Your Honor, my notes reflect that
2    this -- that government instruction 36 is the one that carried
3    over to the next page, and that was the defendant's only
4    objection, and we have corrected that.
5          THE COURT:  Okay.  Although the way I have it
6    printed -- oh, wow, that doesn't make any difference because the
7    jury isn't going to see that.
8          MS. BONAMICI:  Right.
9          MS. KAESEBERG:  I think there was -- the question about
10   this one was the language about the actual or threatened fear had
11   been removed, and the government indicated they would be striking
12   that from the indictment.  So I think that was the other
13   outstanding issue.
14         MS. BONAMICI:  That's on 37, right?
15         MR. NIEWOEHNER:  And we do anticipate still doing.
16         THE COURT:  Okay.  Government 37?  Okay.  Are we all set
17   on this?
18         MS. KAESEBERG:  Just pursuant to our original objection.
19         THE COURT:  The original objection.  Are we okay with
20   this?
21         MS. BONAMICI:  Um-hum.
22         THE COURT:  Okay.  That goes into the
23   given-over-objection category.
24         MS. KAESEBERG:  Right.
25         THE COURT:  38?

1          MS. KAESEBERG:  Same category.  I believe given over
2  objection.
3          MS. BONAMICI:  Yeah.  That's what my notes reflect,
4  Judge.
5          THE COURT:  39?
6          MS. BONAMICI:  Your Honor, this is an instruction that
7  was held for modification in accordance with the earlier
8  express-explicit.  We have made a modification here.
9          THE COURT:  Oh, yeah, right.  Let me read it.
10          I believe this will be objected to.
11          MS. KAESEBERG:  This is one of those damned if you do,
12  damned sometimes if you ask for a modification and it ends up
13  worse.
14          But, I mean, if we could put this one potentially in the
15  return-to-it column.  I don't know if there is a way I can look
16  at it with a little bit more time tonight.
17          MR. NIEWOEHNER:  Your Honor, this may be one for closing
18  arguments, we may need a little more certainty on this.
19          THE COURT:  No, we will be doing this by the afternoon
20  break.  So you can put it on some fabulous screen.
21          MS. BONAMICI:  Right.  Will that be enough?  We'll try
22  to squeeze it in at lunch.
23          MR. NIEWOEHNER:  Your Honor remembers we have -- I
24  expect we are going to do sort of the slide show we did last one,
25  if we can get certainty.  If we can do this one over lunch?

```
1          THE COURT:  Or we can do it in the morning before.

2          MS. BONAMICI:  Okay.

3          MR. NIEWOEHNER:  Before.  Okay.

4          THE COURT:  So this is government 39.

5          Government 40?

6          MS. KAESEBERG:  This is the same.

7          THE COURT:  Same thing you are objecting to.  It's given

8   over objection.

9          MS. BONAMICI:  Right.

10         THE COURT:  Government 41.

11         MS. KAESEBERG:  I think it's just a minor grammatical

12  change from the defendant's actions were some -- the consequences

13  of the defendant's actions were some effect on interstate

14  commerce.  It's been changed to would have some effect.  Or would

15  have been.

16         MS. BONAMICI:  Once again, it's still messed up.  This

17  means that the natural consequences of the defendant's actions

18  would have had.

19         MS. KAESEBERG:  Right.  Or would have.

20         MS. BONAMICI:  No.  Would have been to have.  No, it's

21  actually correct.  It just looks funny.

22         So it's the second sentence, Judge, and --

23         THE COURT:  I am reading:  This means that the natural

24  consequences of the defendant's actions would have been to have

25  some effect on interstate commerce, however minimal.
```

1           That is actually English.

2           MS. BONAMICI:  That is.  That is.  It didn't look like

3   it at first, but it appears to be.

4           THE COURT:  Are you objecting to this one?

5           MS. KAESEBERG:  Not to the new language, no.

6           THE COURT:  Okay.  42?

7           MS. KAESEBERG:  This one was given over objection.

8           MS. BONAMICI:   That's correct.  And there were no

9   changes made.

10          THE COURT:  43?

11          MS. KAESEBERG:  Same, I believe.

12          MS. BONAMICI:  Correct.

13          THE COURT:  Government 44?

14          MS. KAESEBERG:  No objection to this one.

15          THE COURT:  Government 45?

16          MS. KAESEBERG:  I have a blue sticky note on my page,

17  which usually means there was an objection, but I don't have a

18  note, and I don't know if there was a modified version of the

19  original pattern instruction.  I'm not sure.

20          MS. BONAMICI:  I can't speak to your notes, but my notes

21  say given without objection.

22          THE COURT:  Yeah.  This is pretty standard now.  So you

23  can -- I'm putting it in given without objection.

24          Okay.  46?

25          MS. BONAMICI:  This is another one.  My notes reflect

1  that the only objection to this was that the last two paragraphs

2  be held together on a single page.

3          MS. KAESEBERG:  That's correct.

4          THE COURT:  And you can do that?

5          MS. BONAMICI:  And we did it.

6          THE COURT:  Oh, I see what you mean.  Yeah.  Right.

7  Sure.  Fine.

8          Okay.  47 A?

9          MS. BONAMICI:  The objection that was raised to this,

10 according to my notes, was that the -- this instruction, the good

11 faith -- I'm sorry -- the corruptly instruction and the partially

12 motivated instruction were to be combined into a single

13 instruction, and we have done that.

14         THE COURT:  Right.

15         MS. KAESEBERG:  Right.  I think we objected to the -- to

16 both instructions, but in order make them somewhat better I think

17 our request was that they be put into the one, which the

18 government has done.

19         THE COURT:  So that's given over objection.

20         MS. KAESEBERG:  Correct.

21         MS. BONAMICI:  And with that, the original government 48

22 has been withdrawn.

23         THE COURT:  The original government what?

24         MS. BONAMICI:  48.

25         MS. KAESEBERG:  48.

1          THE COURT:  48, okay.  So even if they believe the

2    defendant is interested in doing good things for people.

3          MS. KAESEBERG:  I don't know where they'd get that from.

4          THE COURT:  Good things for people?  I understand that

5    choice of words, to distinguish it from good things for

6    businesses.  Or worse, good things for corporations.

7          I understand it's -- it's actually an interesting

8    variance.

9          Okay.  49?

10         MS. KAESEBERG:  There is no objection to this one.

11         THE COURT:  50?

12         MS. KAESEBERG:  Given over objection.

13         MS. BONAMICI:  That's what my notes reflect as well,

14   your Honor.  There were no modifications.

15         THE COURT:  Fine.

16         51?

17         MS. KAESEBERG:  This is another one, I'm not sure if

18   we -- yeah, I think we did not object.

19         THE COURT:  Government 52 A, which is a change from the

20   original.

21         MS. BONAMICI:  This the third of three modifications

22   that deal with the express-explicit issue.

23         THE COURT:  Okay.  All right.  Because we discussed

24   those as a whole.  These are obviously given over objection.

25         MS. KAESEBERG:  This is the one we may address over

1  lunch potentially, is that the same issue?

2          MS. BONAMICI:  Or --

3          MS. KAESEBERG:  Or morning.  By lunch.

4          MS. BONAMICI:  This is the -- it's the same issue.

5          MS. KAESEBERG:  So it's the same new language, in place

6  of the term express.

7          THE COURT:  Is this basically 27 A, another version of

8  27 A?

9          MS. BONAMICI:  Yes.  So we can do that --

10         THE COURT:  Okay.  So that's still open.

11         53?

12         MS. KAESEBERG:  No objection to this one.

13         MS. BONAMICI:  Well, this was that last sentence.

14         MS. KAESEBERG:  Oh, yes.  This is the last sentence.  We

15  have done this one a couple of times.

16         THE COURT:  Sorry.  It goes into the over-objection

17  pile.

18         MS. BONAMICI:  Correct.

19         THE COURT:  Government 54?

20         MS. BONAMICI:  My notes reflect given without objection.

21         MS. KAESEBERG:  I believe that's accurate.

22         THE COURT:  Government 55?

23         MS. KAESEBERG:  Given over objection, I believe.

24         MS. BONAMICI:  Yes.  That's what my notes reflect.  No

25  modifications were made.

1          THE COURT:  Okay.  Government 56, 57, 58, 59, 60, and 61

2 are all conduct of the jury.

3          MS. KAESEBERG:  Right.

4          THE COURT:  And they are given without objection.

5          MS. KAESEBERG:  That's correct.

6          I believe there were two minor typo grammatical issues.

7 One was in 56, and one was in 59.  So I'm assuming those are done

8 or I can -- we will make sure.

9          MS. BONAMICI:  I don't see anything for 59, but it is

10 true that my notes also reflect a change from "a defendant" to

11 "the defendant" in 56, and otherwise given without objection.

12          THE COURT:  Okay.

13          MS. KAESEBERG:  59, what my notes -- the very last

14 sentence, the last line, where it starts "should not control your

15 decision as to that defendant under any other count," I have in

16 my note is that it was to the defendant.  But it's such a minor

17 thing, it's not --

18          MS. BONAMICI:  Can you show me where?

19          MS. KAESEBERG:  Yeah.  It's --

20          THE COURT:  Yeah.  It's "as to that defendant."

21          MS. BONAMICI:  That's correct, your Honor.  I just

22 missed that.

23          THE COURT:  Okay.  So there is an agreed correction.

24          The verdict form, do you have any objections to the

25 basic form of the verdict form?

1          MS. KAESEBERG:  No.

2          THE COURT:  Obviously whatever motions there are at the

3   close of the evidence might require modification of the verdict

4   form, but that's fairly easy to do, and might require the

5   modification of some of the introductory counts -- if the count

6   disappears we'll have to make some changes -- but otherwise it's

7   fine.

8          MS. BONAMICI:  I didn't -- you're right, if something

9   happens.

10         THE COURT:  Right.

11         MS. BONAMICI:  So that you are aware, your Honor, we

12  have modified the verdict form to reflect the changes we

13  anticipate making on the indictment.

14         THE COURT:  That's right.  And we talked about that.

15         MS. BONAMICI:  Okay.  The one last thing I'd like, your

16  Honor, before we move away from the instructions --

17         THE COURT:  Well actually, the one last thing is I'm

18  going to read you my number list.

19         MS. BONAMICI:  Oh, I'm sorry.

20         THE COURT:  But go ahead.

21         MS. BONAMICI:  I have it marked as defendant's 3 was

22  still open.

23         MS. KAESEBERG:  It's not.  That's your 13, I believe.

24         MS. BONAMICI:  Okay.

25         MS. KAESEBERG:  Which you have now made 13 A.

1          MS. BONAMICI:  I just wanted to make sure we didn't --

2          MS. KAESEBERG:  Very conscientious.

3          THE COURT:  With respect to the defense instructions, we

4    can rely on the record that was made at the time.

5          What I have as instructions given without objection are

6    government's 1 through 5, government's 7 through 11, government

7    13 -- 13 A through 16, government 17 A, government 19, 20, 22,

8    23, 34, 36, 41, 44, 45, 46, 49, 51, 54, and 56 through and

9    including 61.

10         I have withdrawn government 12 and government 27.  That

11   list I think is not exhaustive, but it's the two that were

12   separately noted.

13         I have listed under the category of instructions which

14   if given will be given over objection, I say "if given" because I

15   have made marks with respect to some that are not -- where our

16   rulings are not concluded, or at least they are open further.

17         Given over objection are government's 6, government's

18   17, government 18, government 20, government 24 through 26,

19   government 27 A through government 33, government 35, government

20   37 through government 40, government 42, government 43,

21   government 47 A, government 50, government 52 A, government 53,

22   government 55.

23         The issues that the ones that I marked in purple are

24   government 18, government 27 A, government 39, government.

25         47 A and defense 32.

1          So we have five left over to deal with.  And we will
2    deal with them through the day.  Maybe we can deal with them in
3    the morning.  We will deal with them no later than the noon hour.
4          MS. BONAMICI:  Okay.
5          THE COURT:  So I think we're okay.  See you tomorrow.
6          MS. KAESEBERG:  Okay.
7          MS. NIEWOEHNER:  Your Honor, just one logistical thing.
8    I assume it would be okay if we put up transcript from the tapes
9    recorded, put transcripts on the screen.  Is that acceptable to
10   the Court?
11         THE COURT:  Sure.
12         MR. NIEWOEHNER:  Thank you.
13         MS. KAESEBERG:  Sorry.  One last final-final thing is
14   with the indictment.  Is that going to go back to the jury again?
15   We are going to need to work on --
16         THE COURT:  Yes.  Otherwise they have no way of figuring
17   out what charges there are.  But the summary redactment, we take
18   out the grand jury form and signatures.  The usual stuff.
19         MS. BONAMICI:  So we are submitting a redacted
20   indictment tomorrow.
21         THE COURT:  You will have the redacted one tomorrow, you
22   say?
23         MS. BONAMICI:  Yes.
24         THE COURT:  That's fine.
25         MS. KAESEBERG:  I guess -- I mean, I think we need to

1  know.  Because there is a lot of allegations that weren't brought
2  up at all in the -- I don't know if you are intending on bringing
3  any of them up in the rebuttal case, but there would be things I
4  don't know how extensively it will be redacted.
5          Do you have a sense of that now, or would you rather
6  talk about it tomorrow?
7          MR. NIEWOEHNER:  Why don't we talk with the defense and
8  then we will see you.
9          THE COURT:  That would be fine.  Thanks.
10          MS. KAESEBERG:  Thank you.
11      (Proceedings adjourned at 4:45 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5066107

1

```
              *     *     *     *     *     *     *     *
```

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

                              MATTER



  /s/Maellen E. Pittman                              date



  _____          _____

          Blanca I. Lara                    Date