5336

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )   No. 08 CR 888
4          Government,             )
                                   )
5   vs.                            )   Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )   June 9, 2011
                                   )
7          Defendant.              )   9:43 o'clock a.m.

8
                        VOLUME 30
9             TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES B. ZAGEL
10                    AND A JURY

11
    For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15                 Debra Bonamici
               Assistant United States Attorneys
16            219 South Dearborn Street;
              Suite 500
17            Chicago, Illinois 60604

18
    Court Reporter:
19
              Blanca I. Lara, CSR, RPR
20            219 South Dearborn Street
                    Room 2504
21            Chicago, Illinois 60604
                 (312) 435-5895
22

23

24

25

5337

1 APPEARANCES  (continued:)

2

3 For Defendant Rod Blagojevich:

4

5       KAPLAN & SOROSKY
      BY:  Sheldon M. Sorosky
6       158 West Erie
      Chicago, Illinois 60610
7       (312) 640-1776

8       LAW OFFICE OF Elliott Riebman
      BY:  Elliott Riebman
9       158 East Erie
      Chicago, Illinois 60610
10       (847) 814-2900

11

12       OFFICES OF AARON B. GOLDSTEIN
      BY:  Aaron Benjamin Goldstein
13       6133 South Ellis
      Chicago, Illinois 60637
14       (773) 752-6950

15       OFFICES OF LAUREN FAUST KAESEBERG
      BY:  Lauren Faust Kaeseberg
16       2140 N. Lincoln Park West
      Suite 307
17       Chicago, Illinois 60614
      (773) 517-0622
18

19

20

21

22

23

24

25

5338

1                          INDEX OF EXAMINATION

2    WITNESS                                              PAGE

3      OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

4      By Ms. Hamilton.................................. 5339

5    CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

6      By Mr. Goldstein................................ 5406

7    CLOSING ARGUMENT IN REBUTTAL BY THE GOVERNMENT

8      By Mr. Schar.................................... 5489

9    INSTRUCTIONS TO THE JURY

10     By the Court................................... 5524

11     (Jury Retired to Deliberate At 5:28 O'clock    5557

12     p.m.)..........................................

13

14

15   EXHIBITS

16     ...............................................

17

18

19

20

21

22

23

24

25

1        THE MARSHAL:  All rise.

2      (The following proceedings were had in the

3       presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        The government has consumed 1 hour and

6   35 minutes of its allotted time.

7        You may resume.

8        MS. HAMILTON:  Thank you, Your Honor.

9      OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

10        BY MS. HAMILTON:  When we left off yesterday

11   we had finished the wire fraud charges on the Senate

12   seat and we were just getting started with the

13   remaining three charges on the Senate seat.

14        The first charge I'm going to go through with

15   you that remains on the Senate seat is Count 19, and

16   that's an attempted extortion count on the Senate

17   seat.

18        And these are the four elements we need to

19   prove to you on the attempted extortion counts, and

20   I'll go through each one of these individually:

21        First, that there was an attempt to obtain

22   money or property;

23        Second, that the extortion was under color of

24   official right;

25        Third, that the defendant believed that the

1   money or property would be given because of the
2   extortion;
3        Last, that there was an effect on interstate
4   commerce.
5        That last element, there's a stipulation on.
6   There's an agreement between the parties, and you'll
7   have the stipulations on the part that were read to
8   you, so that part you don't need to worry about.
9   It's agreed to by the parties.
10        So on the attempt, he had to attempt to get
11   money or property.  Under the law, all of these
12   things are considered money or property:  A job, the
13   HHS job, the millions of dollars in the 501(c)(4)
14   organization, and the campaign contributions.
15        MR. SOROSKY:  Objection, Your Honor.
16        THE COURT:  Overruled.
17        MR. SCHAR:  The law considers each one to be
18   a source of wealth, so it's money or property for
19   this count.
20        Now, this is an attempt charge.  Again, it's
21   not about the success, it's about the attempt.  So
22   what we need to show is that the defendant took a
23   substantial step to make the extortion occur.  It
24   doesn't have to be close to success, you just need
25   to find that he took a step to try to make it

1   happen, a substantial step.
2          So what I've done for you are just my short
3   bullet points on some of the substantial steps the
4   defendant took in this case.  So when go back and
5   you're looking at Count 19 and you need to find a
6   substantial step, here is my list for you.  You got
7   the November 6th meeting with Tom Balanoff when he
8   actually makes the request for HHS.  You got the two
9   calls to Tom Balanoff, we've already gone through
10  those, Tab 36 and 38, those are charged calls,
11  they're also substantial steps.  He makes the ask
12  for the 501(c)(4) in exchange for the Senate seat.
13         You got the two Doug Scofield calls, again we
14  went through them yesterday, Tab 40 -- actually,
15  that's not right, Tab 46 and 48, I believe.  Those
16  are the calls to Doug Scofield.  You have John Wyma
17  sending the message to Rahm Emanuel about the
18  501(c)(4).  And then you got a direction to his
19  brother to call Raghu Nayak and get the campaign
20  contributions in now.  So those are the substantial
21  steps for Count 19.
22         Okay, the second element, that the extortion
23  was under color of official right.  All this means
24  is that the public official, in this case the
25  defendant, attempted to get money or property, we

1   already went through, it covers all three here for
2   the Senate seat, which he was not entitled in
3   exchange for taking an official act.  So again, it
4   really boils down to the basic question I talked
5   about:  Was he trying to get those three things in
6   exchange for an official act.  He was.  The official
7   act was the Senate seat.  So that is what that
8   element means, extortion under color of official
9   right.
10          All right, so the last one, do you believe
11  that the money or property would be given because of
12  the extortion.  All this really means is that he
13  thought that if he made the request there was a
14  chance that he would get it back because he was
15  using the official act.
16          So, in other words, I'll just give this to
17  you as an example, and this is from Tab 25, the call
18  is Fred Yang and John Harris, they're talking about
19  whether or not he's going to get HHS, and one of the
20  things that he said, and he says it repeatedly, is
21  that, his response is, "I think I'm in a stronger
22  place than I would've been."  He thinks he has a
23  better chance of getting HHS because he gets to link
24  it to the Senate seat.  Because he has put it out
25  there, "hey, if you want Valerie Jarrett, I want

1  HHS," that's the extortion and that's how he thinks
2  he's going to be able to get it.  So that's the
3  attempted extortion count, that's Count 19.  He's
4  guilty on Count 19, attempted extortion.  Again, all
5  it comes down to is that same basic question, is he
6  trying to trade the official act for the personal
7  benefit.

8          All right, so Count 18, the extortion
9  conspiracy.  It's similar to the attempt but it's a
10  conspiracy instead of an attempt.

11          So here's what we need to prove:  That the
12  charged extortion conspiracy existed and the
13  defendant knowingly was a member of that conspiracy
14  and wanted to further it.

15          So what is a conspiracy?  A conspiracy is
16  simply an agreement between two or more people to do
17  something unlawful.  So in this case, it's an
18  agreement between two people to try to trade the
19  Senate seat for something of personal benefit to the
20  defendant.  You don't need to find a substantial
21  step, you just need to find an agreement.

22          So this is the question, did he agree with at
23  least one other person to try to trade the Senate
24  seat for a benefit to himself.  You know the answer
25  is yes.

1          All right, he agreed with at least two
2    different people, John Harris, I'm going to start
3    with him.
4          So John Harris pled guilty to trying to help
5    the defendant trade the Senate seat in exchange for
6    a benefit for the defendant.  He testified about
7    that, he told you all about it, and you got it on
8    tape.  You have him participating, you have him
9    agreeing, you have him helping him, giving him
10   ideas, rehearsing with him, talking to him about the
11   ideas.  That's not only the scheme, it's also the
12   agreement.  So you know right there, there is a
13   conspiracy.
14         You also have the defendant's brother.  You
15   got the defendant's brother agreeing with him on the
16   Jesse Jackson part of the conspiracy.  What you know
17   is the brother is the one who receives the bribe
18   offer and he relays it to the defendant.  You know
19   that the defendant tells his brother to go out and
20   take that bribe.  The brother does it.  He puts the
21   wheels in motion, he makes the calls to Nayak.  You
22   got these calls, you heard them, we talked about it.
23   Then he sets up the meeting, then when they think
24   that they might get caught because of the John Wyma
25   article, they undo it.  They agree to undo it.

1 They're covering up their crime, that's still part
2 of the conspiracy.  Trying to cover up what you've
3 done is still part of the conspiracy.  So that's
4 another agreement.  Another person he's agreed to
5 try to trade the Senate seat in exchange for a
6 personal benefit, that's truly all there is to
7 extortion conspiracy count, he's guilty.
8          All right, the final charge on the Senate
9 seat, is called a solicitation conspiracy.  And,
10 again, it's similar to the extortion conspiracy but
11 it's a conspiracy, an agreement, to try to solicit a
12 bribe, that's the solicitation part.  And
13 solicitation simply means requesting.  I don't want
14 to -- I should point out, there were a lot of
15 questions to witnesses about no one ever demanded a
16 campaign contribution, and the defendant repeatedly
17 testified "I never demanded anything."  It doesn't
18 matter, it doesn't matter if the defendant, his
19 brother says "pretty please," that is not what the
20 law requires, it's simply a request.
21          So this is a solicitation of conspiracy and
22 these are the elements we need to prove:  The
23 charged bribery conspiracy existed, the defendant
24 knowingly became a member of the conspiracy with the
25 intent to further it, and on this charge we need to

:16AM

:17AM

:17AM

:17AM

:18AM

1 prove to you an overt act, so this is different than

2 the last charge, we need to prove an overt act and I

3 got a list for you.

4        But the first thing I need to go through with

5 you because of the bribery conspiracy and we need to

6 prove that the bribery conspiracy existed, it's

7 important for you to know the element of the bribery

8 charge, and this will come back in later episodes

9 this count is charged again, but for now, so in

10 order to find a bribery conspiracy you need to know

11 what bribery is.

12        This is what bribery is:  That the defendant

13 was an agent of the State of Illinois.  Okay, that's

14 easy, he was the governor.  The next two I'm going

15 to talk about a little bit more because that's

16 really the heart of what this case is about, so I'll

17 skip down to 4: The business or transaction involved

18 anything of value of $5,000 or more.  Well, you know

19 in this case at the time we're talking about, the

20 Senate seat, salary is a lot more than $5,000 and

21 he's looking for a 1.5 million-dollar bribe, so

22 that's easy.

23        The last one, the State of Illinois received

24 federal funds.  Again, you got a stipulation on

25 this.  It'll be on the cart, so you don't need to

opening argument - by Hamilton                    5347

1  worry about it.  The two in the middle:  That the
2  defendant solicited anything of value from another
3  person.  Here is what you are going to see in the
4  instructions that you got:  Anything of value,
5  includes, again, the three things he was looking for
6  in the Senate seat, the job --
7            MR. GOLDSTEIN:  Objection, Your Honor.
8            THE COURT:  The objection is overruled.
9            MS. HAMILTON:  -- the millions of dollars
10 into the organization, and the campaign
11 contributions, those are all considered anything of
12 value for purposes of bribery.
13        Okay, and so you know that he asked for those
14 things, he solicited those things.  So again, it
15 it's going to boil down to the same question, and on
16 this charge this is the way it is phrased, that the
17 defendant acted corruptly with the intent to
18 influence or rewarded in connection with some
19 business or transaction of the State of Illinois.
20        All right, so what does it mean to act
21 corruptly?  And you'll have this in the
22 instructions.  It doesn't mean you have to know what
23 you're doing is illegal.  All "corruptly" means is
24 that you're trying to get something of value to him
25 in exchange for state action.  So, again, as I've

1  been talking about, it comes back to the same

2  question, is he trying to get something of value for

3  him in exchange for the Senate seat.  Well, you know

4  he did.  And again, I talked about this before in

5  the wire fraud:  Once you find that he's trying to

6  get, he's trying to trade state action for something

7  for him, there is no good faith.  You have found a

8  corrupt intent, once you found that he's trying to

9  trade in that way, there is no good faith.

10         So as I said, you need to find overt acts on

11  Count 20.  When you're back there, there is a bullet

12  point for you, it should look very familiar, we've

13  just went through them for the previous counts on

14  the substantial steps for the attempt, they're the

15  same thing, they're overt acts for the conspiracy.

16         The meeting with Tom Balanoff on the 6th, the

17  calls to Tom Balanoff on the 501(c)(4), the calls to

18  Doug Scofield on the 501(c)(4), and the direction to

19  his brother to actually go forward and meet with

20  Nayak about the $1.5 million in campaign

21  contributions, he's guilty on Count 20, that's all

22  the elements that you need to find.

23         So those are the charges on the Senate seat.

24  So we're going to move on from there, but as we move

25  on what I want you to remember is for the racing

1   bill, the tollway, and Children's Memorial Hospital,
2   they're all happening at the same time as what we
3   just went through on the Senate seat.  All of the
4   evidence works together, and when you listen to the
5   calls in order and you think about the testimony,
6   remember it's all happening at the same time, all
7   the tapes, all the witnesses point to one person in
8   the middle of the scheme to get personal benefit for
9   the defendant in exchange for his acts as governor.
10       All right, so let's move on to the racing
11  bill.  All right, so this is the one where the
12  defendant sends out Lon Monk to get the campaign
13  contributions from John Johnston before he's going
14  to sign the racing bill.
15       The charges on the racing bill, one count of
16  wire fraud, one count of conspiracy to commit
17  extortion, and one count of conspiracy to solicit a
18  bribe.  And we've already gone through the elements
19  of each one of those in relation to the Senate seat.
20  On the racing bill, I'm going to do the same thing I
21  did on th Senate seat, I'm going to take you through
22  summaries of the evidence and then we're going to
23  look at the law.
24       And again, as you know, because we went
25  through the three charges on the Senate seat, you

 1  know that this is the question that all of them come
 2  down to, so think about it as we're going through
 3  the evidence --
 4          MR. GOLDSTEIN:  Objection to that, Your
 5  Honor.
 6          THE COURT:  Overruled.
 7          MS. HAMILTON:  Okay.  So on the racing bill,
 8  here are what the tapes, the witnesses, and even the
 9  defendant's testimony tell you, these things are not
10  in dispute about the racing bill:  As of the
11  November 24th, the racing bill had passed the
12  legislature.  It was awaiting the defendant's
13  signature.  The exact bill had passed 2 years before
14  and was signed in one day by the defendant.  The
15  defendant was told that John Johnston was losing
16  $9,000 a day every day that bill was not signed.
17  And the defendant wanted $100,000 campaign
18  contribution from John Johnston.  And Lon Monk was
19  the point person he had getting that campaign
20  contribution from Johnston.
21          All right, so this really comes down to, has
22  he tied the campaign contribution to when he signs
23  the bill, that's what this really comes down to.
24  You know he did and here is how:  All right, you got
25  the testimony of John Harris and you've got this

1 exhibit, it's Racetrack 5, this is the e-mail chain
2 that John Harris went through on the morning of
3 November 26th.  What this e-mail chain tells you is
4 that everyone working for the defendant, his staff,
5 had put a green light on this bill, that's what John
6 Harris told you, they had checked it for JCAR, they
7 had checked it for anything else they need to --
8           MR. GOLDSTEIN:  Objection, Your Honor.  It's
9 not the evidence.
10          THE COURT:  Occasionally you'll hear
11 objections by counsel for either side about what was
12 or was not the evidence.  When that happens, I can
13 stop and pause and look through my notes and make a
14 determination of whether it was the evidence or not
15 the evidence, but I'm not going to do that, I'm
16 simply going to instruct you that if you think a
17 lawyer's argument is not based on the evidence, then
18 you disregard that argument.  If you think it is
19 based on the evidence, then you can take it for what
20 it's worth.  In other words, you decide what the
21 evidence is, and after you've done that or while
22 you're doing that you can determine whether or not
23 the lawyer's argument was valid.  The final decision
24 as to what is the evidence and what its meaning was
25 is for you to make, the lawyers are simply making

opening argument - by Hamilton                    5352

1  arguments to suggest the appropriate way to view

2  this case, the final decision is yours.

3          With that admonition, you may proceed.

4          MS. HAMILTON:  Thank you, Your Honor.

5          The whole reason that Bill Quinlan is on this

6  e-mail chain, according to the testimony you

7  received from John Harris, is because he needed to

8  check the bill for the JCAR legislation.  And what

9  you see is that at 9:43 in the morning of November

10 26th Bill Quinlan says it's okay to sign, and John

11 Harris' testimony was that was him saying there is

12 no poison toll language in this bill.

13         The next thing you know, that day, at about

14 noon, John Harris talks to the defendant, and you

15 got that call at Tab 54, and he asks him what to do

16 about the racing bill because what he knows is he

17 has approved it, there's a green light.  The

18 defendant tells him in that call "I'm sitting on the

19 bill."  He already had a hold on that bill as of

20 noon of November the 26th.  What John Harris told

21 you is that the excuse that he got from the

22 defendant on that call made no sense to him, it was

23 a red flag.  He said something to him like "I want

24 to see how it all fits together."  What Harris told

25 you there is there was nothing to see on this bill

1 about how it fit in with anything else that was

2 pending at that time.  And so what John Harris says,

3 "I bet he's holding this up for a campaign

4 contribution."

:27AM 5         John Harris goes to Bill Quinlan, he tells

6 him what his concern is, and he asks him to talk to

7 the defendant and find out if that's what he's

8 doing.  And you got the call at Tab 56 where Bill

9 Quinlan confirms that's exactly what the defendant

:28AM 10 is doing.  And what John Harris testified is once he

11 knew that, he stepped out, and he left it to the

12 defendant and Lon Monk to figure out.  He knew he

13 wasn't going to be able to do anything once he had a

14 hold on that bill waiting for a campaign

:28AM 15 contribution.

16         Now, you also got the overhear from

17 December 3rd, the meeting between the defendant and

18 Lon Monk before Lon Monk goes out and meets with

19 John Johnston where they rehearse exactly what Lon

:28AM 20 Monk is going to say in relation to getting that

21 campaign contribution before the bill is signed.

22         You got this at Tab 59, what Lon Monk says,

23 he tells the defendant this is what I'm gonna say,

24 this is what I'm actually going to say to John

:29AM 25 Johnston, "I'm going to say stop screwing around,

1 get the money," he says "what is affecting him,"
2 talking about the defendant, "what's affecting the
3 governor is that he feels like you," John Johnston,
4 "are going to get skittish if he signs the bill,"
5 you, John Johntson, are not going to pay your money
6 if he goes ahead and signs the bill.  In other
7 words, you need to get your campaign contribution in
8 before he's going to sign the bill, he is not going
9 to sign the bill and wait for your campaign
10 contribution.
11         And the defendant's response, when Monk tells
12 him he's going to do this is what you see, "yes, and
13 he'd like some separation between that and signing
14 the bill."  What the defendant is saying is I, you
15 tell him, even after he gets this contribution in,
16 not going to sign the bill right away, I'm going to
17 wait.  He says he's going to wait a week.  He's
18 going to put some separation between getting the
19 contribution in and signing the bill.
20         So think about what that message is to John
21 Johnston.  That message is, you better pay up soon,
22 because not only is he not going to sign this bill
23 until you get your campaign contribution in, even
24 once you get your money in, he's going to make you
25 wait a week.  And John Johnston is losing $9,000 a

1  day.  This is what they agreed was going to be said.
2        Now, when the defendant testified, he says he
3  really was concerned, he really was concerned about
4  the appearance, and that there needed to be
5  separation between the contribution and the bill
6  because of what happened last time.  All right, if
7  you're really concerned about appearances, if you're
8  really concerned that it might look like they're
9  related or they're not, do you know what you do?
10 You sign the bill and you tell them to wait on the
11 contribution because you're worried about how it
12 might look.  Easy.  You don't have to wait for the
13 campaign contribution and then put in some sort of
14 false separation.  You sign the bill on the merits
15 and you forgo the contribution, that's what you do
16 if you're really concerned about appearances and
17 they're not linked.  But, of course, that's not what
18 he does because they are linked.
19       And you know that was the message that was
20 delivered by Lon Monk to John Johnston.  He
21 testified about it and John Johnston testified about
22 it.  He got the message, he understood immediately
23 what was being said, what was being communicated,
24 which is you want that bill signed quickly, if you
25 want to stop losing $9,000 a day, you need to pay

:30AM
:31AM
:31AM
:31AM
:31AM

1  up.

2          And remember when I talked about these calls

3  between Doug Scofield and the defendant on the

4  Senate seat and that it told you so much about the

5  mindset?  This is a time when you can think about

6  this call, okay.  This call with Doug Scofield where

7  he says "I don't want it said, I don't want it said

8  out loud directly, but I want it in his head," it's

9  the same thing with John Johnston.  The defendant

10  knows as soon as you say well, "I think he's

11  skittish, he'd like some separation," it's in John

12  Johnston's head, John Johnston knows, it's the same

13  thing, it's the way he communicates.

14          Now, the defendant says, well, I know he said

15  that they were two separate conversations, so they

16  couldn't have been linked one for the other.  All

17  right, let me just say something obvious about this,

18  they were not two separate conversations, there was

19  one conversation, and the message was delivered in

20  one sentence, they were not two separate

21  conversations.

22          And we'll go back to our police officer

23  analogy.  What the defendant wants you to believe is

24  that a police officer can walk up to a car, knock on

25  a window and say, do you know how fast you were

1  going, do you have any idea how many tickets I could

2  write you, separate conversation, I'd like to see

3  seatbelt.  There are no magic words that somehow

4  make that anything other than what it is.  Saying

5  two separately conversations doesn't make it so.

6  It's one conversation, it's one message, pay up or

7  else.  That's the message.

8         And, in fact, Lon Monk said he knew that by

9  saying two separate conversations John Johntson

10 would know they were linked, and that's exactly what

11 John Johnston's testimony was.  He said as soon as

12 Lon Monk said that they were two different subjects,

13 he knew that they weren't two different subjects.

14 And it's the same thing, again you could look at the

15 Senate seat, it was exactly the same thing, John

16 Wyma said part of the reason he didn't pick up the

17 phone and call Rahm Emanuel is because it was too

18 transparent, it was too obvious.  By saying "these

19 are not related" you are say actually they are

20 related, because if they weren't related you

21 wouldn't be talking about them in the same

22 conversation, in the same sentence.

23         Now, beyond December 3rd, you got a follow-up

24 call on December the 4th, and this is the call --

25 actuality, this is Count 9, this call is Count 9,

 1  and this is the call Lon Monk is following up with
 2  the defendant on what's going to happen with the
 3  racing bill.  And this is another one, really listen
 4  to the call, what is said, the tone of both of them,
 5  they both know exactly what they were talking about.
 6  Monk asks the defendant, "so what are the chances
 7  based on my conversation with you yesterday, which
 8  you've got, that this gets done next week?"  And
 9  when you listen to this call you'll hear the
10  defendant pauses, and he says, "you know, they're
11  good."  He doesn't say, "oh, they're good," he says,
12  "you know, they're good," Monk says, "okay," and
13  then listen and look to the very next thing that Lon
14  Monk says, he says, "I'm telling you, he's gonna be
15  good for it, I got in his face."  When the defendant
16  says "they're good," his response is he's coming
17  through on the money, he knows exactly what the
18  defendant is thinking.  He's thinking, well, I don't
19  know, it depends on the money, and so Lon Monk says,
20  "he's good for it, I'm tell you, I got in his face,"
21  and the defendant's response?  "Okay, good."  He
22  doesn't say, hey, what are you talking about, two
23  separate conversations, why are you bringing up the
24  campaign contribution, that has absolutely nothing
25  to do with whether I sign this bill next week or

opening argument - by Hamilton                    5359

1    not, I don't even know what you're talking about.
2    He says, "okay, good."  They both know exactly
3    what's going on.  Again, listen to the call and
4    think about the testimony, you will have no doubt as
5    to what's happening in that call.
6            All right, so what does the defense say about
7    the racing bill, all of this?  First of all, Lon
8    Monk is a liar, that's what you're going to hear.
9    He's trying to save himself.  They're going to say
10   he's twisting the words, he's trying to save
11   himself.  Think about this, if he were truly just
12   making things up in order to save himself and try
13   and help the government, rather than admitting that
14   he got that cash from Tony Rezko and never told the
15   defendant, why wouldn't he just say, yeah, I got the
16   cash from Rezko and I not only told the defendant I
17   split it with him?  Why not make his lies so much
18   better and rope this guy in on that?  He easily
19   could have made that.  He easily could've brought
20   him in, but he didn't and that tells you he's
21   telling the truth.
22           You also know he does have a plea agreement
23   with the government and part of that plea agreement
24   rests on him telling the truth.  The only way he
25   loses that plea agreement is if he lies under oath

1  to you.  He has every incentive to tell you the
2  truth, unlike the defendant.  The defendant has
3  every incentive to come in here and lie.  He's
4  trying to save himself.  Lon Monk, to save himself,
5  needs to tell the truth.
6          And when you consider all of the evidence,
7  the recordings, the testimony, the person who is
8  lying about the racing bill is the defendant, not
9  Lon Monk.
10         What Monk says actually makes sense in light
11  of the calls and the testimony that you've got that
12  these two things were connected.  The defendant
13  wants to pretend like they weren't connected at all,
14  and he's giving you two false stories to try to
15  prove it.
16         Okay, first, he says Mike Madigan must have
17  put poison pill language into it and that's what I
18  was waiting for.  Well, we already went through
19  that.  You know that's not true.  First of all,
20  Harris had already had someone do the check, there
21  was no poison pill language.  Beyond that, and more
22  telling, what he is saying to you now is not borne
23  out anywhere on the recordings that you have.  He
24  never once says to anyone that he has any concern
25  about the poison pill language.  Go back and listen

1 to the call with John Harris, he doesn't say, hey,
2 check for that poison pill language, I'm really
3 worried about that.  No, he doesn't say that at all,
4 he doesn't say it to Lon Monk, he doesn't say it to
5 anyone.
6          So the next thing he offers up:  Chris Kelly
7 wanted him -- was somehow involved because Chris
8 Kelly wanted a pardon and that's what he was really
9 worried about.  Okay, there is a major timing
10 problem with this.  What you know from the
11 defendant's testimony is that the first time he ever
12 even hears anything about a pardon is Thanksgiving,
13 which is November 27th.  What you know from the
14 calls you have, he has already put a hold on the
15 bill.  You have the call with John Harris, he says
16 to him, "I am sitting on the bill," that's
17 November 26th.  It's the day before he hears
18 anything about Chris Kelly and a pardon.
19          And also, he doesn't even connect Chris Kelly
20 and the pardon.  And so the evening of the
21 December 4th, after Lon Monk has already been sent
22 out to John Johnston, this is exactly what it
23 appears to be, made up after the fact in attempt to
24 confuse you.  The Chris Kelly has nothing to do with
25 what actually happened and the evidence you have.

 1          All right, and then the last one, and I've
 2   touched on this a bit already, that somehow the
 3   defendant thought it was fine for Lon Monk to go out
 4   and make sure John Johnston made that contribution
 5   even though the racetrack bill was pending because
 6   somehow he thought Lon Monk was going to do this
 7   without crossing the line, and he claims that the
 8   light bulb doesn't go on for him that they've
 9   crossed the line until this December the 4th call,
10   this is the one where he agrees to call Lon Monk and
11   put -- or call John Johnston and put more pressure
12   on him, and his testimony was that he got off the
13   phone and said, whoa, I don't want to be doing that,
14   I'm not going to do that, the racetrack bill is
15   pending, I shouldn't make the call for the campaign
16   contribution.  That's ridiculous.  The only reason
17   he didn't pick up the phone and call John Johnston
18   and to put pressure on him is because you know what
19   else is going on on December the 4th, he's got
20   everybody working on the Jesse Jackson bribe, he's
21   trying to take 1.5 million dollars, you got the
22   calls on the 4th.  And then you also know what
23   happens on the evening of the 4th, he finds out
24   about the John Wyma article.  The John Wyma article
25   is the reason that the bribe gets pulled and he

1  never picks up the phone and calls John Johnston.
2  It's not because he suddenly realizes that maybe
3  they did something and he doesn't want putting more
4  pressure on John Johnston.
5          All right, so let's talk about the charges on
6  the racetrack bill.  There are three, as I said:
7  Wire fraud, extortion conspiracy, solicitation
8  conspiracy.  So we'll start with the wire fraud,
9  this is Count 9, this is the call that I've been
10  talking about that he has with Lon Monk on December
11  the 4th after they shake down John Johnston.
12          And, again, the same elements we went through
13  for the Senate seat, for the Senate seat wire fraud
14  charges, you need to find with respect to Count 9,
15  there was a scheme to defraud, which we talked
16  about, the overall criminal scheme for the defendant
17  to get personal benefits in exchange for official
18  acts, that he had the intent to defraud.  And,
19  again, you know what that means is that he had the
20  intent to trade one for the other, to try to get a
21  personal benefit in exchange for state action, that
22  there was a material concealment and that there was
23  an interstate wire.
24          So I just went through the intent to defraud.
25  All right, so, how do you know on the racetrack that

opening argument - by Hamilton                5364

1  he had the intent to defraud, that he was trying to
2  the trade signing of the bill for the contribution?
3  Well, it's everything we just went through.  There
4  was absolutely no legitimate reason to delay the
5  signing of this bill.  In 2006 the same bill was
6  signed in one day, and he won't sign the bill even
7  though his staff has totally signed off on it.  And
8  everybody involved understands he's connecting the
9  two, John Harris, Lon Monk, John Johnston, they all
10 get it.
11         And, obviously, I didn't put it up there, but
12 you've got the overhear that we got on December 3rd,
13 the calls on the December 3rd and the call on
14 December 4th, those all tell you for the reasons I
15 have already gone through, he is holding up signing
16 this bill until he gets the contribution from
17 Johnston.
18         All right, the material concealment, this is,
19 again, we talked about this in the Senate seat,
20 would the public want to know what he was up to,
21 would they want to know that he is not signing this
22 bill because he's waiting for a campaign
23 contribution?  Absolutely.  Remember, the crime is
24 the corruption of the process.  The people are
25 entitled to honest government, they are entitled to

1  him making his decisions in an honest way, not based

2  on his own interest, and what you know is that's

3  exactly what he was doing.

4          Now, there were a lot of questions about

5  this, and it's absolutely true, the defendant had

6  60 days to sign the bill, he did, but he can't use

7  the 60 days as leverage to try to get a campaign

8  contribution.  He can't use that 60 days

9  dishonestly.  He doesn't get it to try to leverage a

10 campaign contribution for himself.  That's the

11 fraud, that's the fraud here.  It's the fraud on

12 other people because the process he is going through

13 is dishonest.

14         All right, so the call, the call that's

15 charged on Count 9, I already mentioned it, was the

16 December 4th call.  And this is the one that we went

17 through where Monk asks him what are the chances of

18 getting it signed next week, and this is another

19 part of the call, and this is where Lon Monk is

20 telling him it's better for you to call John

21 Johnston from a pressure point of view, it's better

22 for the sitting governor of Illinois to call and try

23 to get that campaign contribution that will

24 absolutely put pressure on John Johnston to get the

25 campaign contribution in.  And he agrees on that

1 call and says, "yeah, good, I'll call."  I've
2 already gone through, you know the reasons why he
3 doesn't pick up the phone and do it right away, he's
4 got other things going and then you got the Wyma
5 article.  That's Count 9, you know it's in
6 furtherance because they're talking about what more
7 they can do to try to get that campaign contribution
8 out of John Johnston.  So that's Count 9, he's
9 guilty.
10       All right, the next charge on the racing bill
11 is the extortion conspiracy and we just went through
12 this in relation to the Senate seat.  It's the same
13 elements.  The charge of extortion conspiracy
14 existed, the defendant was a member of the
15 conspiracy and intended to further it.  Again, this
16 is the same thing, a conspiracy is an agreement
17 between two people to do something illegal, there's
18 no substantial step, you just need to find the
19 agreement.
20       So on Count 14, the question is, did the
21 defendant agree with Lon Monk to demand a campaign
22 contribution from John Johnston in exchange for
23 quickly signing the racing bill.  The answer is yes,
24 and you know it based on what happens on December
25 3rd and December 4th.  You go back and listen to

1  those and think about the testimony, there is
2  absolute agreement between the defendant and Lon
3  Monk to try to get that campaign contribution before
4  the bill is signed.

5          And I'm going to go back to my police officer
6  analogy to try better explain what I just said.  The
7  police officer sits in the car with his partner and
8  they agree, they're going to pull over that car and
9  they're going to ask for 50 bucks.  And they then go
10 through and they talk about, again, who should do
11 it, how they should do it, should they do it like
12 last time, it's the same thing I talked to you about
13 with scheming yesterday, that is the conspiracy,
14 that is the agreement.  It's the two of them
15 agreeing and figuring out how they're going to do
16 it.

17         Now, just because one of them comes up with
18 an idea, one of them comes up with a different idea
19 and ultimately they decide together, they're both
20 guilty.  So just because Lon Monk is in the middle
21 of this and Lon Monk is coming up with things, it
22 doesn't make the defendant any less guilty, it just
23 makes Lon Monk guilty, too.

24         So let's say the partner, not our main
25 corrupt police officer, gets out of the car and

opening argument - by Hamilton                    5368

1    makes the ask, and later on the guy sitting in the
2    car is actually caught on tape, they're conversation
3    is actually caught on tape, and he says, oh, well,
4    yeah, I know we talked about all that but I thought
5    my partner was actually going to get out of that car
6    and ask for that 50 bucks in a way that it was
7    legal, in a way that didn't cross the line.  It's
8    ridiculous, it's completely ridiculous.  And it also
9    tells you why the agreement is the crime, because it
10   keeps people who sit in the shadows and sends other
11   people out to do things from being able to say, hey,
12   I didn't go out and do anything, I just, you know, I
13   just had a conversation and talked about how it
14   should all happen but I didn't actually do anything
15   and I certainly didn't know they were going to d
16   what they did.  The crime is the agreement that
17   happens between those two people and how they plan
18   and how they plot, and once Lon Monk goes out and
19   does it, you know the agreement is there, and you
20   also know it because Lon Monk is going to ask for a
21   campaign contribution for the defendant, not for Lon
22   Monk, it's for the defendant.  So he's guilty on
23   Count 14.
24          All right, the final charge on the racetrack,
25   Count 15, it's solicitation conspiracy and we just

opening argument - by Hamilton                    5369

 1  talked about this in relation to the Senate seat.
 2  It was an agreement with Lon Monk to solicit, to ask
 3  for the contribution from John Johnston in
 4  connection with the pending racetrack legislation.
 5  The elements are the same as what we went through
 6  for the Senate seat.  As to the charged bribery
 7  conspiracy existed, the defendant was a member and
 8  an overt act was committed.  So again, you need to
 9  understand, you're going to need to look at the
10  bribery elements to make sure that you can find that
11  the bribery conspiracy existed.
12          So since we just went through them for the
13  Senate seat, you know what it really comes down to,
14  which is that middle element, that the defendant
15  acted corruptly with the intent to be influenced,
16  and it comes back to that same basic question we
17  keep talking about, was he trying to get something
18  of value in exchange for state action  --
19          MR. GOLDSTEIN:  Objection, Your Honor; that
20  is not the law.
21          (Noise interruption.)
22          THE COURT:  THE COURT:  They're back.
23          The Court will struck as to the law and you
24  will follow the law as I state it.
25          With that, you may proceed.

1    MS. HAMILTON:  Thank you.

2    So this is the question that it comes back

3 to, and you know the answer is yes:  Yes, he was

4 absolutely trying to get the $100,000 from John

5 Johntsons in exchange for the racing bill.

6    The overt acts:  So for Count 15, this is my

7 bullet point for you on the overt acts for the

8 bribery conspiracy on the racetrack:  On November

9 26th the defendant puts a hold on that bill, you've

10 got the calls, Tab 54.  You got the December 3rd

11 overhear, the rehearsal with Lon Monk, that's

12 another overt act, you got that, you know Monk goes

13 out and makes that demand to Johnston.  That is an

14 overt act even though the defendant wasn't the one

15 who went and to go do it, it was an overt act of the

16 conspiracy.  You know that Lon Monk immediately

17 calls the defendant and tells him what just

18 happened, another overt act.  And then you've got

19 the charged call that we've gone through, it's not

20 only a charged call, it's also an overt act, the

21 defendant is agreeing to call John Johnston and put

22 more pressure on him.  That is Count 15, the

23 solicitation conspiracy on the racetrack, guilty.

24    All right, so let's move on to the tollway.

25 And this is the defendant asking Jerry Krozel to

1 raise hundreds of thousands of dollars in campaign
2 contributions before he's going to approve the
3 additional billions of dollars in state funding.
4          Two charges on this one, attempted extortion
5 and solicitation of a bribe.  And as you know, it
6 all comes back to the same question, was he trying
7 to get a benefit for himself in exchange for an
8 official act.
9          Now, what you know and what is not in dispute
10 is he was trying to get hundreds of thousands of
11 dollars in campaign contributions from Jerry Krozel
12 at this time, you also know that he announced the
13 1.8 billion dollar tollway program.  So what you
14 need to decide, what it comes down to on the tollway
15 is was he connecting the hundreds of thousands of
16 dollars in campaign contributions from Krozel to the
17 additional state money.  Was he using the additional
18 state money as leverage over Jerry Krozel to try to
19 get the campaign contributions.
20          You know from the evidence that the answer is
21 yes, and you know it, first off, because you heard
22 from three different witnesses about three different
23 conversations they had with the defendant where he
24 told them this was precisely what he was going to
25 do.  He tells Lon Monk, he's talking about the

opening argument - by Hamilton                    5372

1  industry, "if they don't step up, if they don't step
2  up and give me campaign contributions, f' them, I
3  won't do the larger program."  He's talking about
4  the larger tollway program.  He tells John Wyma the
5  exact same thing.  On October the 6th he tells John
6  Wyma he's going to announce the 1.8 billion dollar
7  tollway program, which he then did on October 15th,
8  that he's got Lon Monk going to Jerry Krozel for
9  $500,000, which he did, that he's going to wait and
10 see how they perform by the end of the year, meaning
11 I'm going to wait and see how Krozel and his
12 industry fundraise for me, and again, it's the same
13 language, if they don't perform, if they don't come
14 through for me on campaign contributions, f' them,
15 meaning he's not going to do the larger program.
16        And you've also got the same thing from John
17 Harris.  He tells John Harris he's doing the smaller
18 program in part because he wants to wait and see how
19 these industry fundraise for him and if he is
20 satisfied, then he's going to do the larger program
21 in 2009.
22        Three different people, three different
23 conversations with the defendant, all tell you
24 exactly what he is doing, you don't have to guess at
25 his intent, you don't have to guess as to what the

:54AM
:55AM
:55AM
:55AM
:56AM

opening argument - by Hamilton                5373

1   message is he's trying to get across to Jerry
2   Krozel.
3           But you do have the testimony from Jerry
4   Krozel and Lon Monk about what happens in this
5   meeting on September 18th, and this is the meeting
6   that the defendant calls Jerry Krozel into the FOB
7   offices, into his campaign offices.  Lon Monk is
8   there, and he tells Jerry Krozel a series of things.
9   He says he is going to announce the 1.8 billion
10  dollar program, he is going to wait and the announce
11  the larger program after January, he specifically
12  asks Jerry Krozel to fundraise for him, he points
13  out the fact that he's not going to be able to
14  fundraise for him after the 1st of the year, he
15  needs it done before the end of the year.  Jerry
16  Krozel said that he wouldn't admit he was telling
17  him how hard things were and how difficult things
18  are going to be, and what does the defendant do?  He
19  reminds him about the larger program out there that
20  he is going to wait and announce after the 1st of
21  the year.  And he makes it clear in this meeting
22  that he alone, he has the power to do the
23  1.8 billion dollar program and the 5-billion-dollar
24  program.  And Lon Monk told you it was clear exactly
25  what he was doing in this meeting, he was using the

1  5-billion-dollar program as leverage to get Jerry
2  Krozel to fundraise for him by the end of the year.
3         And you know that it doesn't stop there.
4  After the September 18th meeting he directs Lon Monk
5  to try to get Jerry Krozel to raise half a million
6  dollars for him by the end of the year.  And he
7  follows through on the first part of the plan, on
8  October 15th he announces the 1.8 billion dollar
9  program, he holds back on the larger program.  He
10 holds back on the $5 billion, he announces the
11 1.8 billion dollar, and then he follows up with
12 Jerry Krozel.
13        He has a call with him on October the 22nd
14 and Jerry Krozel told you, this was just a reminder
15 of what had happened before, he tells him he's
16 announced the first tollway program, there's going
17 to be more coming, and he asks how his fundraising
18 is going.
19        And, again, just think about these three
20 statements.  You don't have to guess what he's
21 trying to get across to Krozel.  Krozel told you it
22 was clear to him, Lon Monk was there, he said it was
23 clear to him, and you have these three statements
24 that he said to three different people exactly what
25 he's doing, he's holding out that $5 billion as

opening argument - by Hamilton                5375

1  leverage on Jerry Krozel.
2        Now, Jerry Krozel admitted to you that he
3  lied to the FBI when he was interviewed by them on
4  the day of the defendant's arrest, and he told you
5  why, he explained why.  And what you know is not
6  only did he admit that he lied and explained why,
7  but his testimony is consistent with Lon Monk, John
8  Harris, and John Wyma, and the conversations that
9  they had with the defendant, and you've also got the
10 testimony and the witnesses of the other episodes
11 that were happening at exactly the same time.  It's
12 the exact same thing happening over and over in a
13 number of different situations.
14       So what's the defense response on the
15 tollway?  Well, what the defendant said when he
16 testified is that he never told Jerry Krozel or
17 Jerry Krozel's bosses that he was going to do the
18 larger program after January 1st.  He claims he
19 didn't have the authority to do it, he never would
20 have said it, and he didn't say it.
21       Well, he lied.  He lied.  And he got caught.
22 He got caught because -- he lied because he thought
23 he could get away with it, because he thought, well,
24 it's my word against Jerry Krozel's and some they'll
25 believe me.  He never planned on Jerry Krozel's

1  bosses coming in here and testifying.  And what they
2  testified is that at that My Way lunch the defendant
3  himself said he wanted to do the larger tollway
4  program and he told them it would be done after
5  January 1st, 2009, and Eric Madsen even remembered
6  the defendant explaining that he had the authority
7  and could do the larger tollway program on his own.
8        What that means is that there are six
9  witnesses, just on the tollway, contradicting the
10 defendant's testimony:  John Harris, Jerry Krozel,
11 Lon Monk, and Mr. Olsen and Mr. Madsen.  Again,
12 think about who has the motive to lie about what
13 happened here.  The defendant does.  He knows he
14 cannot admit that he said he was going to do that
15 5-billion-dollar program in January.  He knows he
16 can't admit that he did that in the context of these
17 conversations because he would be admitting to a
18 crime, so he lied about it.
19       So let's move on to the tollway charges,
20 there are two, attempted extortion and solicitation
21 of a bribe.  So let's start with Count 16, that's
22 the attempted extortion.
23       And the elements are the same as what we've
24 already gone through, that he attempted to get money
25 or property, that's the campaign contributions, so

:01AM
:01AM
:01AM
:02AM
:02AM

1  you know that that is met, that he believed the

2  campaign contributions would be given in relation to

3  the state action, again on the last one, interstate

4  commerce you have a stipulation on that.

5          So again, you know that what this really

6  comes down to is the same basic question.  So how do

7  you know he was trying to get the campaign

8  contributions in complaining for the additional

9  money at the tollway.

10         You know that he's desperate for fundraising

11  money.  You know that this industry is not going to

12  be able to give to him after January 1st and his

13  message is clear, I need the money by the end of the

14  year and then at the beginning of the year I'll give

15  you this additional money.  You also know because

16  everybody else understands what's going on here,

17  everyone who is involved knows exactly what the

18  defendant is doing.

19         Now, on this one, you need to find that there

20  was a substantial step.  So here is my list for you:

21  On Count 16, on the tollway, on the attempted

22  extortion, these are substantial steps:  You've got

23  the September 18th meeting with Jerry Krozel, and

24  that's the one where he delivers his message.  He

25  goes through with him what he's going to do, that's

 1  a substantial step.
 2       He directs Monk to go get the half million
 3  dollars from Jerry Krozel, that's a substantial
 4  step.
 5       He actually announces the 1.8 billion dollar,
 6  that's also a substantial step, it's part of his
 7  plan.  Remember what he said to everyone, I'm gonna
 8  announce the smaller program but I'm gonna wait and
 9  I'm gonna see how they perform, if they don't give
10  me what I'm looking for, f' them I won't do the
11  bigger program.  So the 1.8 billion dollar program
12  is absolutely part of his plan.  He holds back on
13  the 5-billion-dollar plan, that's another
14  substantial step.  And then he calls Jerry Krozel on
15  October 22nd and he repeats the same thing to him
16  that he said at the September 18th meeting, that's
17  also a substantial step.  So he's guilty on
18  Count 16.
19       Count 17, solicitation of a bribe.  And this
20  is asking for the campaign contributions from Krozel
21  in connection with the additional state money at the
22  tollway.  It's the same evidence -- sorry, the
23  elements, we went through these in relation to the
24  other episodes.  On this one, it's not charged as a
25  conspiracy, it's just a flat-out solicitation.  So

1  you need to do these five elements.  So you know
2  he's an agent of the state, he's the governor, you
3  know he solicited for something, he asked for the
4  campaign contributions, the business or transaction
5  was something of $5,000 or more, you know how much
6  money was out there for the tollway and you know
7  what he was looking for in campaign contributions,
8  and the last one got a stipulation on, so you know
9  that.
10        So again, this comes back to the same basic
11 question that you need to find.  And on Count 17,
12 the solicitation of the bribe, it's the same
13 evidence that we've already gone through.  You know
14 what he said to Monk, to Wyma, to Harris, he makes
15 clear exactly what is in his head and what he's
16 going to do, and then you know he goes through these
17 steps.  So these are not only substantial steps on
18 16, they're also the proof of the solicitation of
19 the bribe on Count 17.  He's guilty of Count 17, the
20 solicitation of the bribe on the tollway.
21        So the next one, Children's Hospital
22 shakedown.  This is the defendant directing John
23 Wyma and his brother to get Pat Magoon to have a
24 $25,000 fundraiser in exchange for following through
25 on the money to Children's Memorial Hospital.

1      There are three charges on the Children's
2 Memorial:  Wire fraud, attempted extortion, and
3 solicitation of a bribe.  The question for all of
4 these comes back to the same basic question I keep
5 repeating, and what you know on Children's Memorial
6 is that he did, in fact, send John Wyma and his
7 brother out to get Pat Magoon for a $25,000
8 fundraiser.  And you know that he said he was going
9 to approve the pediatric rate increase as of January
10 1st.  So the issue boils down to whether those --
11 the defendant connected those two things.  The issue
12 boils down to whether he was using the pediatric
13 rate increase to try to get the campaign
14 contribution for himself.  You know the answer is
15 yes.
16      The first thing that happens is on September
17 the 23rd, the question is made.  Pat Magoon wants
18 the rate increase, the defendant calls him, they
19 have a discussion about it, the defendant doesn't
20 commit to it, he's going to look into it.  So late
21 September, the idea is out there, Pat Magoon has
22 asked for the money.  The next thing that happens,
23 before the defendant gets back to Pat Magoon, so he
24 wants the money, Pat Magoon wants the rate increase
25 and he hasn't been told yes or no.  Within a few

:07AM

:07AM

:07AM

:08AM

:08AM

opening argument - by Hamilton                    5381

1  weeks the defendant says to John Wyma, I'm gonna do
2  the money for Children's, I want to get Magoon for
3  50.  He has connected the two.  They are in the same
4  sentence.  On October the 8th he believes John
5  Wyma -- the assignment is that John Wyma is going to
6  go out and get Pat Magoon and is actually, by the
7  end of the meeting, down to $25,000.
8          Now, what John Wyma testified to is he
9  understood exactly what the defendant was saying,
10  which is he had connected the two.  The reason he
11  was having him go to Pat Magoon was absolutely
12  because of the rate increase.  And he also told you
13  that part of the reason he knew that is because what
14  the defendant had said to him two days before about
15  the tollway, okay.
16          What happens is John Wyma has a meeting with
17  the defendant on October the 6th and that's when he
18  says to him what he said about the tollway, that if
19  they don't perform, f' them, then two days later he
20  tells John Wyma this, "I'm gonna do Children, I want
21  to get Magoon for 50."  John Wyma knows the
22  defendant, he's known him for over 10 years, and he
23  said he knew exactly what was going on, it was the
24  same thing with the tollway, he was linking the two.
25          And this is confirmed for John Wyma the next

 1  day, and you've got this voicemail at Tab 1.  This
 2  is a call to the defendant's brother.  Again, he is
 3  his chief fundraiser, he is the head of FOB, he is
 4  not supposed to be involved in state action at all,
 5  and the voicemail that he leaves for John Wyma is
 6  about following up on the contribution from Pat
 7  Magoon and what he says in that call is that
 8  Children's Memorial has the potential to do well by
 9  us.  He is talking about the pediatric rate
10  increase, it hasn't gone through.  Pat Magoon
11  doesn't even know that it's a yes yet, and Robert is
12  talking about the fact that they might get this
13  money, so let's move on this fundraiser.  John Wyma
14  says this is confirmation for him that they are
15  connected.
16          The next thing that happens, the defendant
17  calls Pat Magoon on October 17th and gave him the
18  good news, and good news isn't the money is coming
19  right now, it's coming January 1st and he tells him
20  to keep it quiet.  Now, think about that, this guy
21  is the healthcare governor.  Pat Magoon told you it
22  was totally out of character for him to not get as
23  much publicity, good publicity right away about
24  these things.  He is doing something positive for
25  Children's healthcare, why doesn't he want it out

opening argument - by Hamilton                5383

1  there right away, why doesn't he want to announce
2  it?  Well, five days later Pat Magoon gets his
3  answer, the defendant's brother, Robert, calls him
4  on October 22nd to request the fundraiser.  And
5  again, for Pat Magoon, this is the police officer
6  knocking at the window, it clicks for him, because
7  what Robert says to him is that they want him to do
8  a fundraiser by the end of the year.  And Pat Magoon
9  has nothing to do with the ethics legislation, he's
10 never raised anywhere near $25,000 before, he
11 doesn't know Robert Blagojevich, he is the head of
12 the defendant's campaign fund and he is calling him
13 out of the blue five days after the defendant
14 himself has called and said I'm going to give you
15 that rate increase, so not until January 1st and
16 keep it quiet.  It clicks for Pat Magoon, now I know
17 why I need to keep it quiet, now I know why you're
18 saying January 1st.  And you know that the
19 defendant's brother keeps calling Pat Magoon and he
20 doesn't call him back.
21        Now, admittedly, of all of the shakedowns,
22 the one on Pat Magoon is the least blatant.  It's in
23 two different parts, different people involved, but
24 again, the defendant didn't need to be that explicit
25 in order to get his message across.  Pat Magoon got

:11AM

:12AM

:12AM

:12AM

:13AM

1  it.  He absolutely understood that the funding
2  wasn't going to come through January 1st, the
3  defendant had complete control over it, and he
4  wanted the $25,000 fundraiser before January 1st.
5          This should sound familiar, this should sound
6  just like the message to Jerry Krozel, the 5 billion
7  isn't going to come until January 1st, I have total
8  discretion, fundraise before January 1st.  It's the
9  same message to two different people at the exact
10 same time by the defendant.  And again, what you
11 know the law doesn't distinguish between someone
12 being really direct or being more subtle, they are
13 both criminal.
14         And if you think about it, again from our
15 corrupt police officer, let's say a driver gets
16 shaken down and then a week later finds out the same
17 thing happened to the guy in front of him and the
18 guy behind him and somebody a couple of days before,
19 the same police officer doing the exact same thing.
20 That person would know exactly what was going on,
21 and that's the position you are in.  Pat Magoon
22 didn't know about Jerry Krozel, he didn't know about
23 Tom Balanoff, but you do, you know about all of
24 them, you know about all of them happening at the
25 same time, and you know who is at the middle of all

1  of them, the defendant.

2        Now, the other way you know that Pat Magoon

3  when he heard that message he got it right is

4  because what happens after he has this conversation

5  with the defendant, and that's November the 12th.

6  You've got the call with Bob Greenlee on November

7  the 12th.  In this call the defendant confirms he

8  still has total discretion over the money to

9  Children's and can pull it back if he needs to.

10        Now, Bob Greenlee told you what he did based

11  on this call.  He said based on his working

12  relationship with the defendant he understood the

13  defendant wanted him to hold up that money.  And

14  when you think about that testimony, think about who

15  Bob Greenlee is and who the defendant is and what

16  they're relationship is to one another.  And you

17  should also listen to the calls that you have

18  between Bob Greenlee and the defendant.  Listen to

19  the way the defendant talks to him.  He calls him

20  naive, he threatens to fire him.  The defendant was

21  a sitting governor, he called the shots, Bob

22  Greenlee worked for him.  Bob Greenlee wasn't going

23  to take some flier and guess as to what the

24  defendant wanted with respect to a healthcare

25  matter.  He told you, if he was wrong about this, he

opening argument - by Hamilton                5386

1  could lose his job.  He worked closely with the
2  defendant, it was his boss, he understood that what
3  the defendant was doing was telling him to hold up
4  that money.  Now, the defendant said no way, nope, I
5  was just checking to see if the money had gone out
6  so I could decide whether or not to call Pat Magoon.
7  He says he was so concerned about the budget at this
8  time, that's why he told Pat Magoon to keep quiet
9  and that is part of what he was confirming with
10 Greenlee.  In fact, he even testified he was so
11 concerned about the budget this time, that's part of
12 the reason he was working at home because he wanted
13 to avoid people who might ask him for money on the
14 budget.  That's ridiculous.
15        And I want to point out for you a couple of
16 calls that really put the lie directly to that.  You
17 may remember but you may not the end of John Harris
18 testimony.  He testified about two calls on December
19 the 3rd involving trying to get $15 million to the
20 Cubs.  When we played these calls you probably had
21 absolutely no idea why you were hearing them or
22 where they fit in, so let me tell you.  Those calls,
23 and you got them at Tab 57 and 58 and listen to
24 them, what those calls tell you is that when the
25 defendant cares about a project and wants to get

opening argument - by Hamilton                    5387

1   money to it, he directs his staff to find a way and
2   he doesn't care about the budget.  He isn't
3   concerned about breaking rules.  In those calls, the
4   defendant is at home, directing John Harris to get
5   the Cubs $15 million just because, just because
6   that's what the Sox got, so that's what he wants the
7   Cubs to get.  That's almost twice the money that
8   they were talking about for the pediatric rate
9   increase at the exact same time.  He's not concerned
10  about the budget.  He wants the Cubs to get
11  $15 million.  And Harris even says to him, I don't
12  think we should do this, they are a for-profit
13  entity, they don't need the money, and his response
14  is, "yeah, I know, I know you think that," and he
15  says "find a way to justify it."  Find a way to do
16  it, I want them to get the money, you go do it.
17          So don't believe for one second that any of
18  this about Children's had anything to do with the
19  concern of the budget.  He wasn't concerned about
20  the budget.  He was concerned about his fundraising.
21  Now, he makes that whole story up about the budget
22  and his concern because he knows, otherwise this
23  call to Bob Greenlee on November the 12th makes no
24  sense, okay.  The call to Bob Greenlee on the 12th
25  is otherwise totally out of the blue except for one

1  thing, the morning of the 12th he learns for the
2  first time Pat Magoon is not calling his brother
3  back.  So the call to Bob Greenlee totally out of
4  the blue about the pediatric rate increase tells you
5  the two things are connected.  There is no other
6  reason for him to be calling Bob Greenlee to be
7  asking about that pediatric rate increase unless
8  it's connected to his fundraising, it absolutely is.
9        So the defense response to this, I've gone
10 through some of it, the defendant wants you to
11 believe he was absolutely not using the pediatric
12 rate increase to try to pressure Pat Magoon into
13 fundraising for him.  And again, he lied to you.
14 First, he really demonstrated by his own testimony
15 that he was pressuring Magoon, and I went through
16 the timeline on this.  Pat Magoon asked for the
17 money in late September and before he ever hears a
18 yes, the defendant had dispatched John Wyma to go
19 get that fundraiser.  The time is ripe, he's asked
20 for money, he wants something for me, I want
21 something for him, you go get him for $25,000.
22        The next thing he wants you to believe is
23 that it was a done deal, it was a done deal, it was
24 a done deal until, magically, it wasn't a done deal
25 on November the 12th and that's why I called Bob

:19AM
:19AM
:20AM
:20AM
:20AM

opening argument - by Hamilton                    5389

1  Greenlee.  Again, he then says, "I found out that
2  the money hadn't gone out yet," which he already
3  knew because he told Pat Magoon the money's not
4  coming until January 1st, but he suddenly claims
5  amnesia on that and he needs Bob Greenlee to confirm
6  for him that it hasn't gone out and it's not going
7  out until January 1st.  And then he says, one thing
8  the money hadn't gone out, I wasn't going to go
9  after money for Pat Magoon, I didn't want it
10 anymore.  Well, what you now have, and we put the
11 call on our rebuttal case and you got it, is the
12 call that evening after all this happens where he's
13 still talking about getting the money from Pat
14 Magoon, and in fact he's talking about enlisting Lon
15 Monk, yet a third person, to try to get money.  He's
16 already got John Wyma, he's already got his brother,
17 and now on the evening on November the 12th, once
18 he's confirmed it's still pending and he has total
19 discretion to pull it back, he's got a third person
20 out there trying to get the money.
21          I'm going to move on to the charges.
22          THE COURT:  We'll take a break.
23          THE MARSHAL:  All rise.
24      (The following proceedings were had out of the
25       presence of the jury in open court:)

1       THE COURT:  Recess for fifteen minutes.

2     (Recess.)

3       THE MARSHAL:  All rise.

4     (The following proceedings were had in the

5      presence of the jury in open court:)

6       THE COURT:  Please be seated.

7       You may resume.

8       MS. HAMILTON:  Thank you, Your Honor.

9       All right, so the charges on the Children's

10  Hospital shakedown:  One count of wire fraud, one

11  count of attempted extortion, and one count of

12  solicitation of a bribe.

13       So let's focus on the wire fraud first,

14  that's Count 1.  Remember I said yesterday, the wire

15  fraud counts are actually in chronological order.

16  So the first count you're going to get on the wire

17  fraud, that's the one that's going to lay out the

18  whole scheme and then it's going to have the

19  October 17th call to Pat Magoon about the pediatric

20  rate increase being approved as of January 1st.

21       So it's the same four elements we've been

22  through on the wire fraud with respect to the Senate

23  seat and the racing bill.  And you know that this is

24  the question it really comes down to, was he trying

25  to get that $25,000 fundraiser in exchange for the

1  pediatric rate increase.

2        So here's how you know that was his intent,

3  again the intent to defraud means he's got the

4  intent to trade, he's trying to trade state action

5  for personal benefit.  You got John Wyma's testimony

6  about what he says to him on October the 8th, he's

7  doing the money for Children's and he wants to get

8  Pat Magoon for a fundraiser.  You also got the

9  timeline we went through just before the break, if

10 you walk through the timeline it absolutely tells

11 you the two of them are connected.

12       September 23rd Pat Magoon makes the request.

13 October 8th, the defendant dispatches Wyma to go get

14 him for a fundraiser, that issue is pending.  The

15 next thing, tells Pat Magoon you're going to get the

16 money but not until January 1st, keep it quiet until

17 then.  Five days later, his brother follows up, we

18 need $25,000 before January 1st.  Then you got the

19 call to Bob Greenlee -- actually, you got the calls

20 with his brother first, I'm sorry, where he learns

21 Pat Magoon is not calling me back, not coming

22 through on the fundraiser, and that's when he calls

23 Bob Greenlee and confirms he's still got total

24 discretion and he can hold it up and Bob Greenlee

25 told you he took that to mean hold it up.

opening argument - by Hamilton                5392

1          The other thing I want to point out, and
2    again this is what you'll see when you go through
3    and you listen to these calls in chronological
4    order, November 12th, the same day he learns Pat
5    Magoon is not coming through on the money, the same
6    day he calls Bob Greenlee, got this call from him on
7    November the 12th he's talking about the bribe in
8    relation to Jesse Jackson, Jr., and what Barack
9    Obama is willing to do for him, he says, "I mean,
10   Jesse, jr., it's a repugnant thought to me, but what
11   he's got third-parties saying," he's talking about
12   1.5 million-dollar bribe, "is a heck of a lot more
13   substantial than what we're get from the Obama
14   people," this is the mindset of the defendant.  He
15   is offended by people who won't pay him.  He's
16   talking about bribes at the exact same time that
17   this is happening with Children's Memorial.
18          Now, the call that is charged, as I said, is
19   the October 17th call with Pat Magoon, that's
20   actually not in your binders.  As you know from the
21   testimony, it's before the wiretaps went up.  The
22   evidence on this is Pat Magoon's testimony, the
23   defendant testified about this call as well, and
24   you've got the e-mail that tells you the day of the
25   call and what happened in the call.

1    And you know that's in furtherance of the who
2 overall scheme, the overall scheme to get benefits
3 for himself in relation to Children's because this
4 is part of the whole message, right.  He is putting
5 the money out there, he's dangling it, he's saying
6 yeah, I'm going to do this for you but not until
7 January 1st, so you know this call is in furtherance
8 of the scheme.  That's Count 1, that's the wire
9 fraud on Children's, he's guilty.
10    All right, I'm going to talk about the two
11 remaining counts on Children's together.  Count 12
12 is an attempted extortion and Count 13 is a
13 solicitation of a bribe.  When you consider the
14 counts, you're going to need to consider them
15 separately.  I'm folding them into one for you
16 because we've already been through the elements, you
17 know the elements of these, you're going to have
18 them back there in the jury instructions, and you
19 know that it still comes back to the same basic
20 question, was he trying to get the campaign
21 contributions in exchange for the pediatric rate
22 increase.  On both of those counts, that's what
23 you're going to need to focus on.
24    Now, on County 12 it's an attempted
25 extortion, so you're going to need to find a

opening argument - by Hamilton                    5394

1   substantial step, this is my list for you on
2   Count 12, and it's going to be the exact same
3   evidence for Count 13, but I'm going through it on
4   substantial step so you got it where you're looking
5   at Count 12.
6           You got the direction to Wyma to go get
7   Magoon on October 8th, that's a substantial step.
8   You got the brother's phone call following up with
9   John Wyma, "I got the potential to do well by it,"
10  that is a substantial step, they want Wyma to go get
11  the money from Magoon to get Children's, it has the
12  potential to do well by the state.
13          October 17th, the call we just went through,
14  the charged call, that is also a substantial step.
15  October 22nd, he's got his brother following up five
16  days later, also a substantial step.  That's a call
17  from the brother to Pat Magoon asking for the
18  fundraiser before the end of the year.
19          And then you got the November 12th call with
20  Bob Greenlee, that's also a substantial step.
21          Now, I said this before, that the defendant
22  did not need to be the one to make the request.  If
23  you think that he dispatched John Wyma and his
24  brother, he is responsible for what they've done
25  because he is directing them, he is possible for his

opening argument - by Hamilton                    5395

1  brother's phone call because he is the one who is
2  directing.  So he is guilty on Counts 12 and 13.
3          So the last one we need to talk about is the
4  school.  And this is the one where he directed
5  Bradley Tusk, this is in 2006, who is then his
6  Deputy Governor, to hold up state grant money
7  because he wanted Rahm Emanuel to arrange for Rahm
8  Emanuel's brother to have a fundraiser for him, and
9  he directed Bradley Tusk, "hold that money, I want
10 my fundraiser."
11         There's one charge, this is our last charge
12 to talk about, there's one charge on the school and
13 it's attempted extortion.  And again, you know it
14 comes back to the same basic question, is he trying
15 to get a fundraiser for himself in exchange for that
16 grant money.  The answer is yes.
17         What you know on the school shakedown, the
18 defendant told then Congressman Emanuel he would
19 approve the grant for the Chicago Academy.  You know
20 from the testimony you heard, the grant was publicly
21 announced and the school started work on it.  You
22 know that the defendant tells Bradley Tusk "hold up
23 that grant, tell Rahm Emanuel to have his brother
24 have a fundraiser."  You know that at the time the
25 defendant said those words to Bradley Tusk, Bradley

opening argument - by Hamilton                    5396

1   Tusk told John Wyma and Doug Scofield about it and
2   he enlisted John Wyma for help.  And what John Wyma
3   told him is I'm not going to be able to help you,
4   there's nothing I'm going to be able to do on this
5   one.  He also says the exact same thing to Lon Monk.
6   He also tells Lon Monk to hold the grant, he wants
7   to wait and see how fundraising goes in California.
8          And, finally, what you know is that when push
9   comes to shove, which is Harris coming to him and
10  saying they got bills, they have acted in reliance
11  on this grant, what do you want me to do, the
12  defendant himself institutes a never before and
13  never since use process --
14          MR. GOLDSTEIN:  Objection.
15          THE COURT:  Overruled.
16          MS. HAMILTON:  What John Harris told you, the
17  process that he directs Harris to do had never been
18  done before and has never been done since, and what
19  that process was is John Harris had to go back to
20  the defendant every time he was going to release
21  funds.  They released the funds, dribs and drabs,
22  and he approved each one of them, $2 million, and he
23  is sitting there holding it up piece by piece.
24          Now, so what does the defendant say when he
25  testifies about this?  Before he testifies, he knows

1  he's stuck with some things he can't do anything
2  about.  Emanuel asks for a school grant and he said
3  yes, Emanuel's brother turned down the fundraiser
4  request, and the grant money went through this
5  process where it wasn't paid out all at once but it
6  was paid in pieces, he knows he's got to deal with
7  that.  And so he's got to come up with some way to
8  make it appear like he slowed up the grant but it
9  doesn't have anything to do with the fundraiser.
10        So while he's testifying about this grant, on
11 the one hand he claims an unbelievable loss of
12 memory about really important points in the
13 chronology, but then on the other hand he's got a
14 perfect memory that his request for a fundraiser was
15 actually turned down before August 2006 before
16 anyone comes to him.  And this is the testimony, you
17 will remember it, it was the one where he was in
18 California, it was a beautiful night, he described
19 where he was, what the night was like, and he said I
20 think it was May 31st or June 1st.  He has an
21 unbelievable memory as to when someone else's
22 fundraiser in California was but he can't remember
23 where he was when Rahm Emanuel asked for the grant,
24 or who the grant was for.  So that's what I mean, he
25 comes up with -- when he thinks it hurts him, he

1  can't remember details and when he thinks it's going
2  to help him he comes up with a lot of them.
3          So what he tells you is that when Harris
4  comes to him and says what are we going to do about
5  this grant, he claims I thought that money went out
6  a long time before, and he slow-walks the payments
7  because he thinks this might just be a second grant
8  and he just completely dismisses Bradley Tusk's
9  testimony, I don't remember talking to him at all,
10  that's how he wipes away Bradley Tusk, just doesn't
11  remember Bradley Tusk at all.
12          And of course, his testimony about this makes
13  no sense.  If he's concerned somehow that this is
14  actually a second grant, this one's easy:  Harris,
15  is this a second grant?  Walk down the hall ask Tusk
16  is this a second grant, get Rahm on the phone is
17  this a second grant.  This is not hard.  Any number
18  of people can tell the governor it is not a second
19  granted or is the second grant.  He doesn't do that,
20  that's because it's made up.  This whole idea that
21  he thought this was a second grant didn't happened
22  at the time.  He knows exactly what happened.  He
23  knows.  He told Bradley Tusk hold that grant, I want
24  my fundraiser.
25          And, of course, his lack of memory, as I've

opening argument - by Hamilton                    5399

1  already gone through, is just not credible.  He
2  quoted verbatim exact portions of calls from 2 and a
3  half years ago.  Without even looking at the
4  transcript he says I remember it perfectly and he
5  quoted it verbatim.  He remembers where Jerry Krozel
6  sat during a meeting and that he offered him coffee
7  or soda.  He remembers details when he thinks it's
8  going to help him and he suddenly has amnesia on the
9  facts that hurt.
10        And think about this, politics is a world of
11 favor making, right?  He testified about this, it's
12 favor making.  Rahm Emanuel at this time, he's an up
13 and coming congressman, and for some reason now he
14 continually can't remember whether he gave him one
15 or two grants.  You better believe at the time he
16 knew exactly what he had done for Rahm Emanuel.  He
17 knew if it was one grant, he knew if it was two
18 grants, he knew exactly what that grant was for.
19 That was his former district, he claims he knew it
20 better than Rahm Emanuel.  You better believe he
21 knew all the details, and he wasn't going to have
22 any problem cashing in on that favor he done for
23 Rahm.  And if there were two grants, even better,
24 and in an election year, cash in double, I want Rahm
25 to do more for me, I did two grants for him.  You

:58AM
:59AM
:59AM
:59AM
:00PM

 1  know he lied about that grant.
 2          One other thing about the school:  What
 3  happens with the school tells you a lot about the
 4  defendant's mindset about what happens later.  The
 5  lesson learned from the school is this, don't
 6  publicly announce anything because then you can't
 7  use it as leverage.  What happens on the school is,
 8  the grant had been publicly announced and the school
 9  acts on reliance on it.  And then when he wants to
10  use it as leverage, he really can't, he's got to pay
11  out because the school is acting on reliance and
12  he's going to look terrible if he doesn't pay that
13  grant.
14          So he learns his lesson.  On Children's and
15  the tollway?  He doesn't announce anything.  He
16  doesn't publicly announce the pediatric rate
17  increase, he only publicly announces the 1.8
18  billion.  He learn his lesson, hold those little
19  carrots back because then if people don't come
20  through, you can pawn.  If it's not public, it's
21  still leverage, that's the lesson he learned from
22  the school.
23          So our last charge, Count 11, attempted
24  extortion in relation to the school.  Again, it's an
25  attempt charge.  And the key is whether or not he's

1   trying to get that campaign contribution in exchange
2   for the $2 million.  And these are the elements,
3   we've been through them before, that's the key
4   question, as you know.  The evidence we've just gone
5   through proves he was absolutely trying to use that
6   grant to try to get a fundraiser.  You heard it from
7   Bradley Tusk, his testimony could not have been
8   anymore clear.  He fully understood the directive
9   that he got from the defendant; hold the grant, I
10  want the fundraiser from Rahm's brother.  You know
11  he tells John Wyma and Doug Scofield the same thing
12  at the time.  You know he says the same thing to Lon
13  Monk.  You know he's held up this money for no
14  reason other than the fundraiser.  And you know that
15  the school is forced to jump through a whole bunch
16  of hoops never before instituted in order to get
17  their money.
18          So it's an attempt, so you need to find a
19  substantial step, the attempted extortion.  These
20  are the substantial steps and this is Count 11:
21  First, he tells Emanuel he will provide the money,
22  he then directs Lon Monk to hold back the money, and
23  he directs Bradley Tusk to hold back the money, both
24  of those are substantial steps.
25          He also directs Tusk to send the message to

1   Rahm Emanuel he wants his brother to have a
2   fundraiser.  Now, Tusk doesn't do it, but that
3   doesn't matter, the defendant still made the
4   directive, it is still a substantial step.  And you
5   also know that at the same time he sent John Wyma to
6   do the same thing, to get Emanuel to do the
7   fundraiser, that's also a substantial step.  He's
8   guilty on Count 11.
9           So those are the charges on the summary of
10  the evidence that you have that proves the defendant
11  guilty on each one of them.  There are a couple more
12  things I want to talk to you about before I sit
13  down.  Again, I want to strongly encourage you to
14  please go back and listen to all the calls and
15  listen to them in order.  Most of the calls are
16  about the Senate seat, but remember, the calls are
17  happening at the exact same time as the shakedown on
18  the racing bill and the tollway and Children's, and
19  there is one person in the middle of it all, the
20  defendant.
21          He is the one person in the middle directing
22  each one of them and he is the one person who is
23  going to personally benefit from them, and he is
24  exactly the same person who just a few years earlier
25  tried to do the same thing in relation to the

1  school.

2        When you listen to the calls, listen not just

3  to what is said, listen to the tone, listen to the

4  tenor, listen to how the defendant says what he

5  says.  He is detailed, serious, he is focused.  What

6  you hear are the discussions of a sophisticated and

7  very desperate man to try to get a number of things

8  for himself in relation to his job as governor.

9        Now, I want to give are you one example of

10  what I mean in terms of listening to what's said and

11  also thinking about the overall context of what's

12  being said, and I use this one example because I

13  think it really speaks volumes about the defendant's

14  mindset, about his intent, about how he views what's

15  happening at this time.

16        And let me just set the stage before I play

17  it.  This is a call on November 10th when he thinks

18  he's not going to be able to get anything for

19  himself in exchange for Valerie Jarrett and he's

20  really unhappy about it, and in this call he is

21  talking about himself, he is not talking about the

22  People of Illinois and this is what he says.

23        (Tape played).

24        MS. HAMILTON:  So think about that.  That is,

25  in his mind, his response to the president-elect of

:04PM

:05PM

:05PM

:05PM

:06PM

opening argument - by Hamilton                    5404

1    the United States, "you want something from me for
2    nothing!  For nothing!"  Talking about for him.  The
3    man who is about to be the leader of the free world,
4    his response to him "I get nothing from you?"
5    That's his mindset about the president-elect of the
6    United States giving him nothing in exchange for his
7    power as governor.  You think for one second he
8    didn't have exactly the same intent with respect to
9    John Johnston on the racing bill?  You want me to
10   sign this for nothing?  He didn't have exactly the
11   same mindset on Jerry Krozel, you want that extra
12   $5 billion from me for nothing?  The same thing with
13   Pat Magoon on the Children's money, you want this
14   extra money for your hospital from me for nothing?
15   The same thing from Rahm Emanuel, you want your
16   grant for your school from me, what, for nothing?
17   This little bit tells you so much about how he views
18   his power as governor in these shakedowns.  You want
19   something from me, not for nothing.
20           Now, I've gone through a number of things
21   that the defendant said at a time when he thought
22   they would certainly never see the light of day and
23   not be played in a courtroom to a jury, and I want
24   to conclude today with a different statement by the
25   defendant, a public statement by the defendant, and

opening argument - by Hamilton                    5405

1   this is where we began our case.  When Agent Cain
2   testified, he testified about a statement that the
3   defendant made after a different public official was
4   convicted.  He put this statement out there
5   intentionally for the world, and on this statement I
6   think we can actually all agree with him, he said:
7        "Today's verdict proves that no one is above
8        the law.  And just as important, it proves that
9        government is supposed to exist for the good of
10       the people, not the other way around, and
11       certainly not for the personal enrichment of
12       those who hold public office, the people come
13       first."
14       Now, what you know after sitting through
15  this trial is that this statement for this defendant
16  was actually and sadly all talk.  What you know is
17  that this defendant repeatedly tried to use the
18  office of the governor to get personal benefits for
19  himself.  What the evidence supports and what the
20  law commands is that you find the defendant guilty
21  as charged.  Hold him to these words, the people
22  come first and no one is above the law.
23       Thank you.
24     (Brief pause).
25       MR. GOLDSTEIN:  May I proceed, Your Honor?

closing argument - by Goldstein                5406

1      THE COURT:  You may.

2    CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

3      BY MR. GOLDSTEIN:  We're here.  A little over

4  a month ago I told you (coughing) excuse me -- this

5  case was about nothing.  I told you you would hear

6  the sounds and the fury and at the end you would get

7  nothing.

8      The government just took over the last two

9  days approximately three hours, and let me see if I

10  can sum up what they just told you.  You will get

11  nothing, that's what they told you, they just talked

12  about what Rod said and then nothing for the people.

13  He didn't get a dime, a nickle, a penny, not in

14  campaign contributions, not in his pocket, nothing!

15      You heard about shakedowns, and demands.  Rod

16  didn't make one shakedown and one demand!  You heard

17  about HHS and the private sector jobs and the

18  501(c)(4), all of these, on and on and on.  You

19  heard him talk about it, and we told you, we told

20  you he was going to talk about it.  We told you you

21  were going to hear things about it.  Did he come

22  anywhere close to doing any of that?  Absolutely

23  not.

24      He talked about it, and he talked about it,

25  and he talked about it, and that's all he did.

closing argument - by Goldstein                5407

1  Didn't make one decision to do any of this stuff.
2  No, absolutely not.  The government told you, well,
3  if he doesn't make a decision it's no big deal.
4  Absolutely it's a big deal.  If you don't make a
5  decision, you don't have any intent to do any of it.
6         MR. NIEWOEHNER:  Objection, Your Honor.
7         THE COURT:  The objection is sustained to
8  that phrase.
9         MR. GOLDSTEIN:  The man didn't intend to do
10 anything they're saying, and that's what this case
11 is about.
12        Ms. Hamilton told you that there is this one
13 question that has to be answered, did Rod try to get
14 some personal benefit from state action.  You're
15 going to get jury instructions, you're not going to
16 get that question in there.  The Judge will give you
17 the law.  That question isn't in any of your jury
18 instructions.  That isn't the law.  The law is about
19 intent.  What they want to do is simplify this case,
20 say it was too complex, so they want to simplify it
21 for you.  If it's too complex, that means they
22 haven't met their burden.  They can give you any
23 hypothetical they want.  And let's talk about them,
24 talk about a police officer bribing someone who is
25 stopped for a ticket.

:13PM
:13PM
:13PM
:13PM
:14PM

closing argument - by Goldstein                    5408

1       You were presented a case for over a month,
2  what you heard on that witness stand, what you heard
3  in those tapes and the documents you're going to
4  get, a lot of it may not be true, and we'll go into
5  it, the government witnesses, but that's reality,
6  that's the reality we saw in this courtroom.  They
7  want to give you a hypothetical that's nowhere near
8  this reality just to make it simple for you.
9       Why do they want to make it simple for you?
10 Just so you can take that red stamp and say guilty,
11 just put it on there, they want a rubber stamp,
12 that's who they think you are, stamp it guilty, do
13 what we say.  That's not what it's about.
14      Let's talk about this cop analogy.  A police
15 officer goes to an individual that pulled this
16 person over and they're about to give a ticket, and
17 they go and give the ticket and then the cop says
18 this all will go away for $50, or whatever the
19 amount is.  First of all, again, reality?
20 Hypothetical.  Let's deal with reality, let's talk
21 about this just for a second.  First of all, not
22 ever does a police officer have the right to ask for
23 cash from anyone.  A politician has the right to ask
24 for campaign contributions, and you're going to get
25 an instruction that specifically tells you a

closing argument - by Goldstein                    5409

1  politician, a public official demanding, soliciting,
2  seeking or asking for, directly or indirectly, or
3  agreeing to accept a campaign contribution by itself
4  does not constitute bribery or extortion, even if
5  the person making the contribution has business
6  pending before the official, that's the law.  So the
7  hypothetical makes no sense.
8          Take the hypothetical some more.  You do not
9  have anywhere near that hypothetical what is going
10 on in this reality.  But you want to make it a
11 little more real?  This cop analogy that makes no
12 sense?  You want to make it a little more real?
13 This is what the government wants you to believe on
14 this cop analogy.  The cop goes, pulls over
15 somebody, writes that person a ticket, gives that
16 person a ticket and walks back to the cop car,
17 drives off, goes about his or her way.  Then the
18 government comes in and talks to the person who got
19 the ticket, hey, we got you on something, you know,
20 you need to talk, I heard you got this cop, this cop
21 gave you a ticket, was he bribing you?  You know
22 your freedom is on the line, your freedom is on the
23 line.  Well, you know, come to think of it, the way
24 he looked at me I felt it was a bribe, you know, the
25 way he sort of talked, it just felt like a bribe.

closing argument - by Goldstein                5410

1        That's the reality!  They brought witness
2   after witness after witness in here to tell you
3   something what they understood.  And look at those
4   witnesses, look at those witnesses.  You're going to
:17PM  5   get instructions about those witnesses.  These
6   witnesses came in here with plea deals and immunity
7   agreements and prosecution hanging over their head.
8        You heard from Rod, he came in here and he
9   talked to you on that stand.  I know it was a long
:18PM  10   time, I understand that, you don't have to say, and
11   I don't think I'm fooling anyone or tricking anyone,
12   he likes to talk.  Rod, he talked so much even
13   overruled my objections.  He likes to talk, no doubt
14   about it.  But you know what?  From that chair, from
:18PM  15   that chair he took a walk that looks pretty short,
16   but it's a walk that took courage.  He walked all
17   the way to that witness stand and he told you the
18   truth.  He walked all the way here, something he did
19   not have to do.  The law tells you, a man charged
:18PM  20   does not have to prove a thing.  That man did not
21   have to go up there, did not have to testify.
22        They say, oh, he's just going up there to
23   lie, he's got everything, everything to lose, so he
24   just goes up there and wing it.  That's garbage,
:19PM  25   that's absolute garbage.  He took that walk.  It was

closing argument - by Goldstein                    5411

1  a voluntary walk, a walk he did not have to do.  A
2  walk that the law says if he doesn't do it, you
3  can't hold it against him.  This was an absolutely
4  voluntary walk to that witness stand and he told you
5  the truth.

6          Now, let's just do comparison, because I want
7  to deal with reality.  The government witnesses,
8  they came through that door, that walk from that
9  door is a whole lot different from that walk to that
10  chair.  The walk that these people that came from
11  that door, that wasn't a voluntary walk.  You heard
12  these witnesses with immunity agreements and plea
13  agreements and the threats.

14          Jerry Krozel.  Jerry Krozel, what did he tell
15  you?  The first thing that happened to him, December
16  9th, 6:30 in the morning, Rod Blagojevich is
17  arrested, they go to Jerry Krozel's house.  What was
18  his testimony?  I was afraid.  I asked him,
19  Mr. Krozel, you were frightened?  No, I was
20  terrified.  The FBI came into his house, the
21  authorities, law enforcement, came into his house
22  and terrified that man.

23          What happened next?  Jerry Krozel gets
24  immunity.  Jerry Krozel is their victim.  He's the
25  one who's been shaken down, he's got immunity from

:19PM

:20PM

:20PM

:20PM

:21PM

closing argument - by Goldstein                    5412

1  them.  That walk from that door to that chair is a
2  whole lot different.
3          And what does he say on December 9th?  The
4  governor had nothing to do with it, he wasn't
5  pressuring me.  He is terrified, he gets immunity,
6  oh, I understood it was clear as day.  That's what
7  Jerry Krozel said.
8          Who else has immunity?  John Wyma.  Oh, good,
9  good hearted John Wyma.  I'm just trying to follow
10 the law.  Oh, wait, here's a subpoena, we're
11 investigating one of your clients, John.  You know,
12 it just sort of accelerated my desire to talk to the
13 feds about stuff that he refused to tape on Rod.
14 John Wyma gets immunity.  They won't prosecute if he
15 testifies for them.
16         And think about the immunity agreement.
17 Think about it.  What did every witness up here say?
18 My agreement is just to tell the truth.  Isn't that
19 interesting?  Every witness gets up there and swears
20 to tell the truth, the whole truth, and nothing but
21 the truth.  Why did he get an immunity agreement
22 just to tell the truth?  That's not what an immunity
23 agreement is.
24         Why do you need an immunity agreement to get
25 up there and tell the truth?  They're supposed to.

closing argument - by Goldstein                  5413

1  Wyma, immunity; Krozel, immunity.  Johnny Johnston,
2  immunity, he's their victim.  He's the one that's
3  been shaken down by this man and he needs immunity?
4  Why?  Why do any of these people have immunity?
5         Then you hear about John Harris, plea deal;
6  Lon Monk, plea deal.  What did Lon Monk tell you?
7  According to Lon Monk two separate conversations you
8  take one separate conversation.  And the government
9  told you, it's obvious, whenever you say two
10 separate conversations it's one; up means down, blue
11 means green, stop means go, that's according to Lon
12 Monk, the cooperating witness.
13        And what is he fighting for?  What is he
14 fighting for?  The man is fighting for his freedom.
15 That walk from that door is a whole lot different
16 than that walk from that chair.  Lon Monk is up
17 there fighting for his freedom, and who gives him
18 that freedom?  It ain't me.  It's the government.
19 The government.
20        Lon Monk got up there, two separate
21 conversations means one, up means down, not crossing
22 any lines means don't cross lines.  And here's the
23 kicker, and to quote Ms. Hamilton, "oh, this is a
24 good one,"  70 to 90,000 dollars in cash in a Fed Ex
25 envelope from Tony Rezko.  It's a gift.  It's a

closing argument - by Goldstein                    5414

1  gift.  What made it a gift?  They put a bow on it?
2  Could you just imagine the discussions the
3  government had with Lon Monk?  You know, Mr. Monk,
4  you got 70 to 90 thousand dollars in cash in a used
:25PM  5  Fed Ex envelope, did you report that gift or that
6  advanced payment?  No, I didn't report it to the
7  IRS.  Did you pay taxes on it?  No, I didn't.  Oh,
8  it's a gift?  Oh, oh, okay, okay.  The only gift
9  that Lon Monk got was the gift of not being
:25PM  10  prosecuted on that.
11          And then the government tells you, believe
12  Lon Monk because he told you I didn't tell the
13  governor.  He could've, he could've even made the
14  story even grander.  The man who took 70 to 90
:25PM  15  thousand dollars in cash in a bribe in a used Fed Ex
16  envelope, he's trustworthy.  And he's so
17  trustworthy, he's taken his freedom from these
18  people.  Why is it so important, why is so
19  important?  Because I know, and I'm sure Mr. Schar
:25PM  20  is going to tell you, oh, they're just trying to
21  distract you, just trying to rip the government, the
22  case is about him.  And it absolutely is, but why is
23  it so important the bias and motive of these
24  witnesses who take that walk from that door, why is
:26PM  25  it so important?

closing argument - by Goldstein                 5415

1          This entire case depends on the understanding
2   of what was said by Rod.  An entire case depends
3   upon it.  So Lon Monk tells you, two separate
4   conversations means one separate conversation.  If
5   two separate conversations means two separate
6   conversations, there's no shakedown going on.  If
7   not crossing lines means not crossing lines, there's
8   no shakedown going on.  It's all in the
9   interpretation of those people who come through that
10  door.  Everything comes from that interpretation.
11  So why is it so important that these people are
12  fighting for their freedom?  And how are they
13  fighting for their freedom?  'cause these guys own
14  it (indicating)!
15          MR. NIEWOEHNER:  Objection, Your Honor.
16          THE COURT:  The objection is sustained.
17          MR. GOLDSTEIN:  They get a deal to testify
18  and you get more freedom, that's their deal.  This
19  isn't implicit, you don't have to talk about magic
20  words, you don't have to talk about wink and nods,
21  these are agreements, written agreements, and
22  they're getting up here and telling you I understood
23  Rod meant this and meant that and meant this, that's
24  what they want you to find him guilty on, and it's
25  these people that you're supposed to look at him and

closing argument - by Goldstein                    5416

 1   decide this case based on.

 2        Rod got up there and he took that walk and he
 3   told you the truth and he answered every question.
 4   We were talking from day one with Rod all the way to
 5   the day we are right now, and the reason why we
 6   talked about everything about Rod is so you get to
 7   know him.  And why is it important to know him?  You
 8   have to know how he thinks, you have to know how he
 9   acts in order to understand when you hear these
10   tapes and you hear all this evidence, you have to
11   know him, and I hope you got to know him just a
12   little bit.

13        And Rod would be the first one to tell you
14   and I'll be the second, and maybe the government
15   might be the first person, he's not perfect.  The
16   man told you about his ups and downs and he told you
17   about his flaws, and one thing we all know is that
18   he likes to talk.  He got up there and he answered
19   the questions, went through the tapes and told you
20   all about it, and he told you the truth, and the
21   truth is he didn't commit one crime.

22        Now, he also answered the questions of the
23   government.  Mr. Schar got up there, he got up there
24   and cross-examined Rod.  Two and a half years, two
25   and a half years the government is waiting for their

closing argument - by Goldstein                    5417

1   chance to cross-examine Rod --
2           MR. NIEWOEHNER:  Objection, Your Honor.
3           THE COURT:  The objection is sustained.
4           MR. GOLDSTEIN:  They cross Rod and he
5   answered every question.  They asked him, here's
6   their chance.  Rod, what did you mean when you said
7   this.  They just put in all these witnesses to tell
8   you all what they understood he was saying.  There's
9   Rod sitting right there, go through it, what did you
10  mean by this.  Instead Rod, or "defendant" they call
11  him, did you say these words, did you say these
12  words?  They don't even want to know what he meant
13  by it, they don't even want to know what he meant.
14  This whole case comes down --
15          MR. NIEWOEHNER:  Objection, your Honor.
16          THE COURT:  It's not an appropriate remark to
17  make about opposing counsel.
18          MR. GOLDSTEIN:  And let me just say, just so
19  we're crystal clear and what's very important is
20  that Mr. Schar, who cross-examined Rod, is a skilled
21  and experienced U.S. Attorney, an extremely skilled
22  good attorney, and Rod answered his questions, and
23  he told all the truth.
24          There is no dispute what is on those tapes
25  and who it is, Rod said whenever it says

closing argument - by Goldstein                    5418

1  "Blagojevich," that's Rod talking.  No dispute about
2  it.  Don't ever forget whose burden this is.  The
3  government must prove Rod guilty beyond a reasonable
4  doubt each and every element of each and every
5  count.  They must prove him guilty beyond a
6  reasonable doubt.  You heard them in opening
7  statement say we embrace that burden.  They can
8  embrace that burden like it's a long lost relative.
9  It doesn't matter if they embrace that burden, they
10 have to prove it, they have to prove it beyond a
11 reasonable doubt and they haven't, they haven't.
12      What you heard throughout this trial is a lot
13 of talk.  You heard a man thinking out loud on and
14 on and on.  The man talked over and over and over
15 again.  And you heard his testimony.  He talked over
16 me, over the judge, over the prosecutor.  He likes
17 to talk and he does talk, and that's him, and that's
18 all you heard, that's all you heard.
19      They want you to believe that his talk is a
20 crime.  It's not.  It's not.  He floated ideas and
21 discussed things.  These are not crimes.  Don't let
22 them simplify and just say well, let me give you an
23 analogy, that isn't an analogy because it's
24 completely different.  Let me give you that
25 pseudo-analogy and if you find it this way, that's

closing argument - by Goldstein                    5419

1   the way it should be, guilty.  Don't let them do

2   that.  Don't let them do that.  They have to prove

3   their case beyond a reasonable doubt.

4         Now, they asked you about a question, they

5   talked about a question, the one question we need to

6   talk about, you're going to get an instruction to

7   talk about what your job is.  Your job is to decide

8   what the facts are.  First duty is to decide the

9   facts from the evidence in the case, this is your

10  job and yours alone, that's why you're here.

11        The second duty is to apply the law that I,

12  "I" is His Honor, Judge Zagel, give you to the

13  facts.  The Judge will give you the law.  I don't

14  give you the law and the government doesn't give you

15  the law.  It is your job to decide the facts, that

16  is why you are here.  Don't ever, ever, ever forget

17  that it's their burden.  Don't ever forget that.

18        Now, I talked to you about the walk that Rod

19  took, a short walk but a courageous walk that he

20  took.  He did not have to do that.  You're going to

21  get another instruction, a defendant is never

22  required to prove his innocence or to produce any

23  witnesses or evidence at all.  He doesn't have to do

24  it.  But he did.  He took that walk and he told you

25  the truth.

closing argument - by Goldstein            5420

1          Now, I talked to you a little bit about these
2    witnesses, these witnesses that the government wants
3    you to believe, that you basically have to believe
4    in order to believe their side of the case.  These
5    tainted, compelled, involuntary witnesses that
6    walked through the door --
7          (Woman walking into the courtroom:)
8          MR. GOLDSTEIN:  Oh, she's not a witness.  Bad
9    timing.
10         (Laughter in the courtroom).
11         MR. GOLDSTEIN:  No deals with her, I think,
12   is my understanding.
13         They walk through that door as government
14   witnesses, compelled, and they told you various
15   understandings.  You heard John Harris, he's got a
16   deal, he's fighting for his freedom, and he's
17   telling you what he understood Rod said on a
18   particular day at a particular time.
19         You must look at those witnesses as
20   skeptically as you can.  And when this case depends
21   on their understanding, you better look pretty darn
22   hard at that.  And always remember where they're
23   walking from compared to where he's walking because
24   that man told you the truth.
25         Now, Rod talked to you about his life, no

closing argument - by Goldstein                    5421

1   need to rehash it, right?  And he told you about who
2   he is, and he talked about how he talks, and you
3   heard these tapes.  And we have absolute agreement
4   with the government, listen to those tapes, and
5   listen to them chronologically, and we'll get into
6   it later, listen to every single one of those tapes,
7   please, please, please, please listen to them as
8   much as you need, read the transcripts, we want you
9   to listen to those tapes.  And it's as I said over a
10  month ago, what ends up happening, what ends up
11  happening, why is it so important.  This case is all
12  about the talk and the government is telling you
13  that that talk is a crime --
14          MR. NIEWOEHNER:  Objection, Your Honor.
15          THE COURT:  The jury will follow my
16  instructions on this issue.
17          MR. GOLDSTEIN:  Throughout this case the most
18  important issue in this entire case is what's in
19  that man's mind.  You heard the word "knowingly,"
20  the "intent," that's what this case is about.  And
21  Rod told you exactly what was in his mind when he
22  said it, he told you about that, and that's so
23  important, what is in his mind.
24          Now, he didn't intend anything, anything that
25  they're saying he did.  What's important about this

closing argument - by Goldstein                5422

1   when you talk, how do you determine what's in his
2   mind, besides the fact that he sat there and told
3   you line by line what he was saying?  How else do
4   you determine it?  Simple phrase, actions speak
5   louder than words.  If you want to know what's in a
6   person's heart, what's in a person's mind, see what
7   that person does.  Throughout this case his actions
8   are nothing.  Absolutely nothing.  That's why when
9   you look at this case, the tapes, listen to them,
10  then look and see what happened.  Nothing.  This
11  isn't about anything but nothing.  And I told you
12  that from the very beginning.  And I told you to
13  listen to those tapes and I told you when you hear
14  everything, I'll be back before you with nothing.
15  And you know what?  He testified for seven days.
16  You know what?  He gave you nothing, too.  How did
17  he give you nothing?  He didn't commit a crime.
18        He told you about the indecision he had, the
19  whole Senate seat.  He couldn't make one decision.
20  The decisions are important because the man couldn't
21  intend to do anything.  Listen to what he said,
22  understand what he did.  If you look at what he did
23  and you look at what ended up happening, you will
24  know what was in his mind.  He had no criminal
25  intent whatsoever.  He didn't intend to do any of

closing argument - by Goldstein                5423

1  these things and you'll see, you'll see.
2          Whenever Your Honor wants to break for lunch,
3  I'm about to go into a particular subject.
4          THE COURT:  It's a good time for a break.
5  We'll break.
6          THE MARSHAL:  All rise.
7          Ladies and gentlemen, this court is suspended
8  for about an hour, 1:38 p.m.
9
10
11
12     (Luncheon recess taken from 12:40 o'clock p.m.
13      to 1:38 o'clock p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

:40PM

closing argument - by Goldstein                    5424

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )   No. 08 CR 888
4          Government,             )
                                   )
5   vs.                            )   Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )   June 9, 2011
                                   )
7           Defendant.             )   1:54 o'clock p.m.

8
                          VOLUME 30
9                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES B. ZAGEL
10                      AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15                   Debra Bonamici
                 Assistant United States Attorneys
16              219 South Dearborn Street;
                Suite 500
17              Chicago, Illinois 60604

18
    Court Reporter:
19
                    Blanca I. Lara, CSR, RPR
20                  219 South Dearborn Street
                         Room 2504
21                  Chicago, Illinois 60604
                        (312) 435-5895
22

23

24

25

closing argument - by Goldstein                5425

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4

5          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
6          158 West Erie
           Chicago, Illinois 60610
7          (312) 640-1776

8          LAW OFFICE OF Elliott Riebman
           BY:  Elliott Riebman
9          158 East Erie
           Chicago, Illinois 60610
10         (847) 814-2900

11

12         OFFICES OF AARON B. GOLDSTEIN
           BY:  Aaron Benjamin Goldstein
13         6133 South Ellis
           Chicago, Illinois 60637
14         (773) 752-6950

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

closing argument - by Goldstein                    5426

1      (The following proceedings were had out of the
2       presence of the jury in open court:)
3          THE COURT:  All right, call them in.
4          THE MARSHAL:  All rise.
5      (The following proceedings were had in the
6       presence of the jury in open court:)
7          THE COURT:  Please be seated.
8          You may resume.
9          MR. GOLDSTEIN:  Thank you, Your Honor.
10     (Brief pause)
11         MR. GOLDSTEIN:  I hope everyone had a good
12 lunch.
13         I want to talk to you about the school, okay.
14         In the late summer, early fall of 2005 there
15 was an announcement for this grant, for the Chicago
16 Academy, and for approximately a year after that, so
17 from about August of 2005 to August of 2006, the
18 grant had not been paid out.
19         There is not one piece of evidence that shows
20 in any way this grant was held up by that man.  And
21 just focus on that one year, August '05 to August
22 '06, you don't have a stop order, you don't have
23 someone from the budget office that told you we got
24 an order from up high that this grant can't go
25 forward.  What did you get?  You heard yesterday

closing argument - by Goldstein                    5427

1  from a man -- oh my God, his name is -- his name is
2  Sameer Talcherkar, okay.  What did he tell you?  He
3  told you he was working in the budget office in
4  2006.  Now, his memory wasn't that great, and we're
5  going to talk a little bit about that because
6  Ms. Hamilton told you about, you know, the amnesia
7  she called it of Rod, we're going to go into that a
8  little bit.  But Mr. Talcherkar didn't remember
9  quite too well, but he looked at his e-mails and he
10 refreshed his memory about what was going on.  He
11 remembered a specific time of May 2005 and he told
12 you that looking through his e-mails he called it a
13 challenging case.
14          And I'm not going to get up here and talk to
15 you about budget issues, I'm not a CPA, couldn't
16 tell you exactly what was going on, but the problem
17 is there were problems with this grant.  And you
18 didn't hear any evidence that somehow in that year,
19 some miraculously long amount of time for that
20 grant.  In fact, you have seen in those documents, a
21 lot of those exhibits, you'll see the date range in
22 which this grant is to be paid out.  The date grant
23 is from '05 to '07.  These grants take into account
24 this amount of time.  And this is not a criticism on
25 the government, this is not a criticism on

closing argument - by Goldstein                5428

1  bureaucracies, but this takes time.  You have to go
2  through a process.  And as I told you in opening
3  statement, these things have to be gone through and
4  sometimes it's just difficult where to get the
5  money.  For example, it was a school but they were
6  building an athletic field and the athletic field
7  sort of complicated matters because it's primarily
8  for education, is this for something else, they have
9  determined exactly where it was coming from, and
10 that's what was taking the time it was taking, from
11 August '05 to August '07.
12      Now, you heard from various witnesses and
13 they told you that this grant was held up by Rod.
14 And let's look at all these things.  Lon Monk, the
15 man who said it was a bribe.  Take that away for
16 just a second, take that away, his bias and motives
17 and agreement with the government, take that away,
18 what he told you makes no sense.
19      Just look at it on the facts.  Lon Monk said
20 that Rahm Emanuel asked Rod for a grant, and Rod
21 says I want to wait for a fundraiser before I see
22 what's going on with that grant.  The grant hadn't
23 even been announced, hadn't been decided on, nothing
24 was going on.  This is way earlier.
25      And then in 2005, there's an announcement,

closing argument - by Goldstein                    5429

1  Monk's statement and Monk's testimony is illogical,
2  he doesn't make sense, because according to Monk,
3  Rod is telling him that it's being held up, but then
4  right there in '05 there's an announcement, there's
5  a public announcement of the grant.  His testimony
6  on that issue makes no sense.
7          Now, John Harris, another man with a plea
8  agreement, but listen and remember what John Harris
9  said about this.  And remember, look through your
10 notes and go through your memory when you go over
11 these facts, because there's no tapes on this issue,
12 okay, you are going to have to remember as much as
13 you can.
14         John Harris told you that he became Chief of
15 Staff and that in '06 he said Tusk told him there
16 was a problem with the grant.  So he goes to talk to
17 Rod, okay, and he told you that Rod told him hold up
18 on it and, you know, go look into it, and Harris
19 comes back and they try to resolve this.
20         But remember what Harris said under
21 cross-examination?  I asked Mr. Harris when was
22 this, do you remember exactly when you spoke to Rod
23 after you talked to Tusk.  Because his original
24 testimony was in the fall of 2006.  When I asked him
25 further, I said are you sure of that, is there

closing argument - by Goldstein                    5430

1  anything that would refresh your recollection, and I
2  showed him an interview, one of the many interviews
3  that he had with the government in which he
4  recollected, his memory then became refreshed that
5  it was actually late '06 maybe even early '07 that
6  Harris had this conversation with Rod about the
7  grant.  That makes no sense.  The grant was resolved
8  in December of '06.  Harris just doesn't remember.
9  And again, take away the bias, take away the motive
10 and you should always analyze it, don't ever forget
11 it, but just for a second, as you go on with this,
12 Harris' testimony just doesn't make sense.
13        And then he said another thing, he talked
14 about the grant and he talked about how much they
15 had to go through this process where there was one
16 grant and then another, they broke it up as the
17 payments were made.  Again, on cross-examination
18 when I was asking Mr. Harris, do you know if some,
19 all, or none of the actual grant, of the split-up
20 grant had been paid when you first got involved.  He
21 said I don't know.  He wasn't sure.  He's coming
22 into it and he does not even know if it was on grant
23 number 2 or grant number 3.  What I mean by that is,
24 those pieces of grants that were paying the actual
25 payments and he's not even sure.

closing argument - by Goldstein                    5431

1       So here, look at his memory, look at what he
2   remembers.  And again, always be cynical because
3   this man is trying to fight for his freedom, but
4   just listen to the testimony at face value, it makes
5   no sense, he doesn't recall.
6       Then you heard Bradley Tusk, and what did
7   Mr. Tusk tell you?  In about late August of '06 he
8   has this late night conversation with Rod.  And he
9   has this conversation with Rod on what's going on
10  with the grant and then Rod says "hold it up, I want
11  a fundraiser from Rahm Emanuel."  It's not a direct
12  quote of what Tusk says happened, but I think you
13  understand the point.  Completely false.  It's
14  absolutely false.  You heard Rod testify and he told
15  you he never had a conversation with Bradley Tusk
16  about this.  And he didn't.  Yes, he talked to
17  Bradley Tusk frequently, but he never had a
18  conversation like that.
19      And remember what's going on in 2006.  Rod is
20  running for reelection.  He is doing a lot of
21  things, there are a lot of things that he is dealing
22  with.  And that leads me to the point about the
23  memory.  It was called selective amnesia to whatever
24  conveniently helps Rod.  That's just wrong.  That's
25  just absolutely false.

:01PM

:01PM

:02PM

:02PM

:02PM

closing argument - by Goldstein                    5432

1          We can all agree that Rod has an excellent
2   memory, there's no doubt about it.  He understands
3   how he remembers things.  We don't remember dates
4   and the times, we remember events.  And why do we
5   remember events?  We remember events because they're
6   significant in our minds.  I remember my daughter's
7   birthday, you remember something bad happens,
8   something significant to you.  For example,
9   Mr. Schar asked the question well, you remember when
10  you were going eastbound on the Mississippi when
11  you're talking to Dusty Baker.  And maybe to many of
12  you you're going to say, wow, he remembers that.
13  That man loves the Cubs, anything that has to do
14  with Dusty Baker, who was the manager of the Cubs,
15  he's going to remember because that's significant to
16  him.
17          In 2006 he is running for reelection and this
18  doesn't ring a bell in any way because nothing bad
19  happened.  Nothing, he was doing nothing wrong.  It
20  was an innocuous idea, it was just a grant.  It was
21  a significant thing, it was very important at the
22  school to receive this grant, don't get me wrong,
23  but in Rod's mind as governor, what he's going
24  through, that doesn't ring a bell.  So to just
25  disingenuously say well, he's got a great memory but

closing argument - by Goldstein                5433

1  he just selectively doesn't remember that, is just
2  not true.
3          Rod didn't have a conversation with Bradley
4  Tusk about any of this.  And Tusk told you, there
5  was just one conversation.  That doesn't quite make
6  sense either because they have not explained to you
7  why at this point when Bradley Tusk claims that he
8  was told, why is it being held up.  You don't have a
9  document that says "hold it up."  You don't have
10 just a regular staffer or someone in the budget
11 office to say, hey, we were told don't even work on
12 it.  You heard Mr. Talcherkar, he was working on it.
13 And, yeah, he had two potential pots of money, as
14 they call it, two potential places to take the grant
15 from, you heard him talk about it, those are two
16 possibilities, he told you they're challenging
17 things.  He didn't tell you anything about "I was
18 told don't even work with that."  They don't have
19 that evidence because it wasn't held up by Rod.
20         There's an argument that can be made that it
21 wasn't held up at all, but whatever it is, whether
22 it was slowed or not, there was bureaucracy.
23         So what happened, what happened was John
24 Harris and Rod talk about this.  And Rod was told
25 that this school was taking on expenses.  He didn't

closing argument - by Goldstein                5434

1  know about the grant and wasn't aware of it.  He's
2  informed that there's this grant and he says look
3  into it.  What does "look into it" mean?  Look into
4  it, make sure, you know, everything is okay.  Harris
5  gets back to him and Rod says, okay, I hear they
6  have expenses, let's make sure it gets paid, and
7  that's all that happens.
8        Ask yourself over and over again, because
9  remember, this is 2006, no wiretaps, there's no
10 intervening circumstance to cut Rod off, if Rod is
11 doing what they say he's doing, he could hold on to
12 this forever.  And we'll go into a bit of future
13 action that Rod engages in that shows you nothing
14 was going on.
15       So Rod is told about this, Rod is told that
16 there's some issues to make sure it gets done.  The
17 school gets the grant, gets their money, and builds
18 a field.  This is a good thing.  You see it up
19 there, as it's going on.  You saw what it was
20 originally.  It was an empty lot.  What ends up
21 happening?  Rod doesn't get a fundraiser, the school
22 gets their money, they get their field.
23       Here is the opportunity to look, and this is
24 why it's so important.  The entire case is
25 important, obviously, but here's the opportunity.

:05PM

:06PM

:06PM

:06PM

:07PM

closing argument - by Goldstein                    5435

1    And Ms. Hamilton is absolutely right, look at these
2    issues, sometimes sort of cross-reference, okay.  If
3    you want to look at the Senate seat and there's an
4    issue on the Senate seat, look at these other
5    issues, absolutely, we absolutely agree.  Look at
6    how the school is handled.  There is no intervening
7    circumstance, there's no arrest, there's nothing
8    that stops it.  To say, oh, got you caught.  It just
9    ends up working out because Rod had no intent to do
10   any of this stuff.  He doesn't know about it, he's
11   told about it and the problem is resolved.
12           Now, 2007 what happened?  Rahm Emanuel, the
13   man who supposedly is shaken down by Rod, early 2007
14   Rahm Emanuel approaches Rod about legislation.
15   Think about it, take the government's theory, think
16   about this, Rod just tried to shake Rahm Emanuel
17   down, he failed.  Not only does he give the grant to
18   Rahm, he does a good thing for Rahm, he gets no
19   fundraiser.  On that theory, isn't Rahm pretty
20   upset?  What are his actions right after that?  Rahm
21   gives him a call and says, hey, Ari Emanuel would
22   like to help on legislation, Rod says this whole
23   thing about, odd thing, you know, wasn't necessarily
24   in favor of it, okay, Rod, sure.  He goes forward
25   with it.  Rahm, the person he is shaking down, the

closing argument - by Goldstein                    5436

1   person who's having his grant held up, he goes
2   forward and continues to talk to Rod.  I mean, just
3   look at it.  Go all the way to 2008,
4   cross-reference.  What is Rahm Emanuel doing?
5   Coming to talk to Rod about the Senate seat; hey,
6   this person, that person, I recommend this, I
7   recommend that.  This isn't a man who has an adverse
8   relationship with Rod.  And he doesn't have an
9   adverse relationship with Rod because none of this
10  stuff happened.  Look at it, look at it from how it
11  all happened.  The answer is nothing happened, other
12  than the good thing that this school got its field
13  built.  That is all you have to do.  That is all you
14  have to do.
15          Now, there was talk of a fundraiser and Rod
16  told you.  Why was this a memorable event?  Remember
17  how, you know, they said, oh, how does he remember
18  if it was May 31st, June 1st, and all of that stuff.
19  He went to Brentwood and had a fundraiser -- it
20  actually wasn't a fundraiser, he went to Ari
21  Emanuel's fundraiser, he had come to a different
22  event.  How does he remember it?  I don't need to go
23  into details, you recall him talking about it.  He
24  got to meet Larry David and talked to all these
25  other people, that to him is a significant event.

:09PM
:09PM
:09PM
:10PM
:10PM

1  He likes Seinfeld, Larry David, that rings a bell,
2  it was a beautiful night, a beautiful home, that's
3  what he remembers, like we all do; remember events.
4          And what happens?  What happens?  He asks
5  John Wyma, he says, wow, this looks nice, would Rahm
6  Emanuel ask Ari if they could do something like that
7  for me.  Wyma and Rod talk again, Wyma says it's not
8  going to happen, but Rahm offers to write what's
9  called an endorsement letter, and he writes this
10 endorsement letter for Rod's campaign.  All of these
11 activities, all of these actions show that nothing
12 wrong was going on, absolutely nothing wrong was
13 going on.
14         Don't blow up what is very obvious.  Just a
15 delay, if you want to call it that, in this grant.
16 Ask yourself over and over and over again--and I'm
17 gonna sound repetitive and I apologize for it--what
18 ends up happening?  Nothing, nothing, nothing.  Look
19 at this case, over and over and over again.  You
20 want to know what's in a man's mind?  You want to
21 know his state of mind, his intent?  Look at his
22 actions.  That's all you have to do throughout this
23 case, look at his actions.
24         Now, let's go on and I want to talk to you
25 about the issue of Jerry Krozel and the road

:10PM
:10PM
:11PM
:11PM
:12PM

closing argument - by Goldstein                    5438

1  builders issue.
2       Ask yourself what did Rod do to shake down
3  Jerry Krozel.  Let's just look at this.  In about a
4  3 to 4 month period Rod had three conversations with
5  Jerry Krozel, three conversations, two in person,
6  one on the phone.  And Rod got up there and he told
7  you the truth.  Now, he talked about the capital
8  bill, and you guys are probably sick of hearing
9  about the capital bill.  He talked about it over and
10  over again, but that was something very relevant.
11  And why is it relevant?  The capital bill is very
12  relevant in this case and very important to Rod.
13  Number one, he did a lot of things, he had the
14  tollway plan, and there were three possible plans,
15  and the tollway plan only did work on the tollway.
16  And that's good, it puts people to work and helps
17  the tollway, but it only helps a certain sector of
18  the state; north okay, because that's only where the
19  tollways are, and only the toll road.  So Rod
20  believes in the capital bill because the capital
21  bill did all these other things, hospitals, schools,
22  in the entire state.
23       So he told you what he was exactly thinking.
24  He wants the capital bill passed and he was
25  presented with this idea of the tollway, but he had

closing argument - by Goldstein                    5439

1   a problem.  You heard over and over again about his
2   relationship with Mike Madigan.  So he came up with
3   a strategy how to get the capital bill passed which
4   he was unable to do, it wouldn't be voted on in the
5   House.  So he told you, my desire on the capital
6   bill would be hurt, in other words, the attempt to
7   try to get the capital bill would be hurt if he had
8   a bigger tollway program.
9          What's the theory behind that?  He explained
10  to you and you heard it on that call, and you got to
11  listen to that call again, "tell him, look, you
12  know, we want it in a capital plan, they need to
13  bring all their influence to bear on that process to
14  get a capital bill."
15         I'm just taking a part of this, okay, and
16  this is our tab number 1 in our binder.  Remember,
17  listen to all the calls, even the smaller binder,
18  okay.  Listen to them all and try to listen to them
19  chronologically.  What is Rod saying there when it
20  comes to the capital bill?  He's saying if these
21  people, particularly remember Schillerstrom and
22  Mayor Daley, if they get this western access road to
23  O'Hare Airport, they're going to be less motivated
24  to push for the capital bill.
25         And it makes perfect sense, Mayor Daley and

:13PM

:14PM

:14PM

:14PM

:15PM

closing argument - by Goldstein                    5440

1    Schillerstrom, who was from DuPage County, were
2    powerful individuals.  And if they're happy and
3    satisfied and their constituency is happy and
4    satisfied, there's less motivation, that's just
5    simple logic.  So Rod says, look, if we're going to
6    give western access, we're going to lose that
7    opportunity for the capital bill.  Why is that
8    relevant?  It's the same logic when it comes to the
9    6-billion-dollar program, and it's the same logic
10   with the bigger program.  You make the bigger
11   program, people aren't going to be as motivated to
12   work for the capital bill, it's just that simple.
13          So Rod told you that was his reason for doing
14   the smaller plan.  He also told you some others, the
15   6-billion-dollar plan and the even bigger plan
16   required legislative approval.  He told you that.
17   You see what he was going through with Madigan, he
18   didn't want to go through that.  The bigger plans
19   also required an increase in tolls for regular
20   commuters.  He didn't want that.  The 1.8 billion
21   dollar plan, as he told you, was a small enough plan
22   so people would still be motivated to get the
23   capital bill.  They had these green lanes so people
24   can drive in car pools, they can go faster and
25   faster in lanes, and the tolls would be increased,

closing argument - by Goldstein                5441

1  not to mention he can do that as governor, he had
2  the authority to do that unlike the bigger plan.
3          See, Jerry Krozel and the government wants
4  you to believe that because he picked the smaller
5  plan, therefore he is trying to shake him down.
6  It's not that at all.  He had absolutely legitimate
7  government reasons to go forward with this plan, and
8  he told you.  And, actually, if you listen to
9  Mr. Krozel and listen to his testimony, he
10 corroborates it in many ways.  There really isn't
11 much difference as to what happened during the
12 meeting on September 18th.  Just think about it.
13 Yeah, the order of events slightly change, but they
14 discussed basically the same topics that they talked
15 about.
16          And what was it they discussed?  They
17 discussed the capital bill.  Jerry Krozel said Rod
18 was talking about it.  They discussed this tollway
19 plan, they discussed fundraising, and Rod told, I
20 wanted to talk to Krozel about fundraising.  Why?
21 Jerry Krozel had been a big fundraiser of his for a
22 very long time.  It made perfect sense.  It made
23 perfect sense.
24          What the government wants you to believe is
25 the fact that somehow these conversations happened

closing argument - by Goldstein                    5442

1  at the same time that it's automatically a
2  shakedown.  It's not that at all.  Jerry Krozel went
3  into his office, had a relaxed conversation, they
4  talked about their families.  There's no shaking
5  down.  There was no shaking down at all.  Now, think
6  about it, Jerry Krozel, you heard from Mr. Madsen
7  and Mr. Olsen these people from VCNA, Prairie, a
8  company from Canada, they talked to you about it.
9  What did they say?  Jerry Krozel is the point
10  person, he's the point person for fundraising, he's
11  the guy they go to when it has to do with
12  fundraising.  Think about this.  What business is
13  Jerry Krozel in?  The construction business,
14  particularly road building.  What do we say in
15  Chicago, there's two seasons, right?  Winter and
16  construction.  Under that theory, Jerry Krozel, who
17  is the point man for fundraising, is basically going
18  to fundraise every time there's some plan before
19  some government official.
20          But see, that is not a crime.  The key is,
21  you always have to remember, you always have to
22  remember, a politician, a governmental official is
23  allowed to demand, solicit, seek, ask for, directly
24  or indirectly, campaign contributions.  We may not
25  like it, we may not like the system, that is what we

closing argument - by Goldstein                    5443

 1   have.  That is politics today, and that is the law.
 2   You have the right as a public official to request
 3   campaign contributions even if there's official
 4   business pending before that official.  You're going
 5   to get the instructions, you'll be able to go
 6   through it.
 7           Now, we all know you can't, you know, force
 8   someone to do it.  Campaign contributions are
 9   voluntary.  But remember this all the time, this
10   isn't the cop analogy, because a cop can never go up
11   to someone and ask for cash.  A public official can
12   ask someone for campaign contributions.  That's the
13   law.  Again, this isn't a ballot, this isn't a
14   petition.  We're not here to decide whether this is
15   a good thing or a bad thing.  You're here to decide
16   whether that man committed crimes.  He didn't, he
17   absolutely didn't.  He had a conversation with
18   Mr. Krozel where he specifically said I'd like to
19   talk to you about fundraising and they talked about
20   fundraising.
21           Jerry Krozel, Rod says how's business, how's
22   everything going, and Krozel says it's not so good,
23   and Rod says, well there's some good things going
24   your way.  Because he's involved in road building.
25   Rod, you know, not to be silly, but Rod isn't going

closing argument - by Goldstein                5444

1  to say, you know, I got some good policy on gun
2  control, I want to tell you about them, Jerry.  He's
3  talking to someone who is involved in road building
4  and he's telling him what is going on because he was
5  involve in it.  You heard Rod, Krozel was involved
6  in trying to get the capital bill done.  Yeah, he's
7  a fundraiser, but he's also very involved in
8  government as an advocate.  They had a conversation,
9  they talked about several things, and that's all
10 that happened.
11         And then look, look at what happens
12 afterwards.  That same conversation on
13 September 18th, 2008, what do they talk about?  They
14 talked about a lot of things, but how does it end?
15 Hey, do you want to meet the new president from
16 Prairie, the people from Canada.  Rod says sure, and
17 they go see each other.  Krozel, the man who is just
18 shaken down by Rod, says, hey, come meet my new
19 bosses.  I mean, think about that.  Just look at the
20 actions.  What a great way to treat your new bosses,
21 introduce them to the guy that just shook you down.
22 Because it didn't happen.
23         And then you heard from Mr. Olsen and
24 Mr. Madsen, what did they talk to you about?  First
25 they said the point person was Jerry Krozel, right?

closing argument - by Goldstein                5445

1  And second, they talked about this meeting, no
2  fundraising was discussed.  Did they tell you
3  anything?  Hey, you know, Krozel, he was really
4  uncomfortable?  You didn't hear anything about that.
5        Why did they come up, why does the government
6  bring them up?  To talk about the capital bill.  And
7  what did you learn from these two individuals when
8  it came to the capital bill?  First of all, they're
9  not from the State of Illinois and they don't have
10 many connections.  They didn't even know what the
11 capital bill is.  One of them said I don't think the
12 capital bill was discussed, another said it was
13 discussed.  Who do you want to believe?  They're
14 their witnesses.  They are talking about a meeting
15 that they had on September 24th, 2008, and they
16 testified just yesterday.  What is it, June 8th,
17 2011?  Close to three years and now they're talking,
18 oh, it was separate and apart this 6-billion-dollar
19 program.  No, Rod told you the truth, Rod told you
20 the truth, he talked about the 6-billion-dollar
21 program, if he did at all, in the context of the
22 capital bill.
23        You mean to tell me that these people that
24 have no connection to any of this, they're not
25 thinking of any of this whatsoever, they get called

closing argument - by Goldstein                5446

1 as witnesses, and now their memory is so great, talk
2 about great memory:  I remember the capital bill, I
3 remember how that was discussed, and the more I
4 think about it, it's actually separate and apart.  I
5 mean, just that distinction is a bit silly, if you
6 think about it.  Let alone the memory, the ability
7 to remember that somehow there was a specific
8 separate and apart.  I don't even know how it gets
9 separate and apart.  Rod specifically told you, the
10 6-billion-dollar plan, anytime he discussed it, it
11 was in the context of the capital bill, and he told
12 Krozel about it.  That's what you have.  That's what
13 you have.
14         Go on further.  October, October 22nd, Rod
15 calls Krozel and he has a conversation with him.
16 It's a routine conversation, hey, what's going on
17 with fundraising.  Yeah, they talk about the
18 tollway, and yeah they talk about the capital bill,
19 and that's all.  That is all.
20         Look at the actions after and you'll see
21 what's going on.  Krozel didn't want to fundraise
22 for Rod, and this is a pattern.  You're going to see
23 this.  A lot of these people didn't want to
24 fundraise for Rod, let's be honest.  In 2008, he was
25 not very popular.  People didn't want to fundraise

:24PM
:24PM
:24PM
:25PM
:25PM

closing argument - by Goldstein                    5447

1  or donate for him, not to mention it was not a

2  gubernatorial election.  This was just a

3  Presidential election.  They weren't fundraising for

4  Rod, and that's fine, they have an absolute right.

5  But any uncomfortableness they -- they just didn't

6  want to fundraise for the guy, they didn't want to

7  contribute to him, and that is it, that is all.

8          So what happens with Krozel after the 22nd?

9  He continues to talk to Monk and right before

10 Thanksgiving he talks to Monk and he specifically

11 tells Monk it's not going happen, no fundraising.

12 Now, you heard, I'm not talking about one particular

13 group versus another particular group, the point is

14 the same, there wasn't going to be fundraising for

15 Rod.  And he knew that that message would go to Monk

16 and then go to Rod.

17          Krozel told you he was scared, he was the

18 governor, I wanted to put him off.  He was not

19 scared, he told him, he told Monk, no fundraising,

20 it's not going to happen.

21          And what happened?  Rod was told and he

22 talked about in, on December 6th he has a

23 conversation with Robert.  They put Krozel down for

24 a zero, that means he wasn't going to do anything.

25 What does Rod do?  He does nothing.  He was always

:25PM

:26PM

:26PM

:26PM

:26PM

closing argument - by Goldstein                    5448

1   going to do the 1.8 billion dollar plan, he told
2   Krozel the truth, and he ends up doing it, and is
3   going forward.
4          What ends up happening?  The plan goes
5   forward and, of course, Rod doesn't have the ability
6   to go forward with the capital bill.  And remember
7   what Krozel talked about:  I didn't believe him, I
8   didn't believe him when it came to the capital plan.
9   But remember, Rod said we're going to try and work
10  and get the capital bill done this year.  Remember
11  those words, we're going to try and get the capital
12  bill done this year.
13         Krozel said, well, I didn't believe because
14  it was never going to get done.  That's actually --
15  that is not a basis to not believe him.  Rod wanted
16  to get it done, that was whether you believe him or
17  not.  If you think he's lying you have to say, well,
18  I think he's lying because I knew he wasn't trying.
19  He knew good and well, Krozel, that Rod was trying.
20  You heard about Speaker Hastert and Glynn Poshard,
21  and this Illinois works coalition or commission, I
22  forget it all the time, the point is, they had an
23  organization set up to try and get the capital bill
24  done.  And there can be no doubt that that's what
25  Rod wanted, this capital bill.

closing argument - by Goldstein                    5449

1    There was every single legitimate reason to
2  go forward with this 1.8 billion dollar plan, he
3  didn't want to go with the 6-billion-dollar plan and
4  it had nothing, nothing to do with fundraising,
5  absolutely nothing.
6    And who do we have?  Good ol' John Wyma,
7  mister immunity man, the man who comes as a witness,
8  gets a subpoena, that "accelerates my desire,"
9  "accelerates my desire to talk to the government."
10 Oh, just shortly after I get a subpoena I just want
11 to let you know Rod said these things.  The same man
12 who refused to wear a wire.  He didn't have a
13 problem reporting to the government what he claims
14 was said by Rod, I just don't want to wear a wire.
15 It would record every single word that was said, but
16 he refused.  John Wyma, mister immunity, he is
17 walking through that door.
18    Who else is walking through that door?  Lon
19 Monk.  Lon Monk tells you a similar-type story.  You
20 don't believe that.  Really?  Really?  The plea
21 agreement Lon Monk, the man who said the $90,000 in
22 cash from Tony Rezko isn't a bribe, it's a gift.
23 That man?  That's who we're going to believe?
24 That's who we're going to believe on this?  Come on!
25 Come on!  Walking through that door, walking through

1    that door.

2          John Harris, same situation.  Same situation.

3    Rod wanted the 1.8 billion dollar plan, he told

4    Krozel that, and he went forward with it.  Rod

5    wanted the capital bill, he told you, and he tried

6    to get it done.  Rod told you about fundraising and

7    he wanted fundraising, and he's absolutely telling

8    you that's the case, and he has every right to do

9    so, and that's all that happened; that's absolutely

10   all that happened.  There was no shakedown here.

11   There was no shakedown here.

12         Jerry Krozel, the man who was terrified, the

13   man who said no pressure at first, terrified,

14   immunity, he's their victim, has an immunity

15   agreement.  I don't know why.  That's what's going

16   on.  That man is telling you I felt pressured.  From

17   what?  A man he's known for a good 10 years, had a

18   good relationship with, has a conversation in an

19   office and he feels uncomfortable?

20         And again, just to go back real quick,

21   September 24th meet with the individuals from

22   Canada.  What did they tell you?  Those people from

23   Canada, from VCNA, they told you we set up the

24   meeting.  They wanted to meet with Rod.  They're

25   coming to him, and that's a theme throughout this

closing argument - by Goldstein                 5451

1   case, they're coming to him to try to get something
2   for the State of Illinois.  Rod asked for campaign
3   contributions within his rights to do so and that's
4   all that happened.  Jerry Krozel was not shaken down
5   in any way whatsoever.
6           What ends up happening?  Absolutely nothing.
7   There is a 1.8 billion dollar plan that was
8   announced and went forward and Rod doesn't get a
9   cent in campaign contributions.  Again, the constant
10  theme, I apologize for constantly talking about it,
11  but that's where we're at, this case is about
12  nothing.
13          Now, I want to talk to you about the
14  racetrack.  Now, when it comes to the racetrack, we
15  have to go through it, and there are more calls and
16  I want to, as we always do, listen to those calls,
17  listen to those calls.  If we go through them, John
18  Johnston was a contributor to Rod.  He contributed
19  to him from 2002 on.  And Johnston had told Rod
20  through Monk that he was going, going to contribute.
21  You hear it on call after call after call.  And --
22          Can everyone see that okay?
23          If we just look at it.  Again, if we can
24  highlight it.  So November 13th, 2008, Rod says, "I
25  talked to Lon, he says Johnny Johnston's good for

closing argument - by Goldstein                5452

1  it -- " that's actually, I apologize, that's Rob,
2  Robert.  Rod says okay, Robert says, "he's gonna
3  give it, you know, he didn't get it, but he says,
4  you know, I'm good for it.  I got to just decide
5  what, what accounts to get it out of."  Every reason
6  to believe that this contribution is coming forward.
7  Again, Rod isn't entitled to this.  No one is saying
8  that, no one is saying that at all.  The point of
9  the matter is that Rod understood that Johnston was
10  going to contribute to him and that's why he's
11  talking about it here.
12          Go on to the next one.  So November 22nd, Rod
13  says to Monk, "what about the Johnstons?"  Monk
14  says, "he says, look, I told you, I'm good for it,
15  I'm figuring out where to get the money."  Now, the
16  tape recordings start a little later in the whole
17  process, but for a while Rod understood that there
18  had been this commitment made and it had been around
19  for sometime.  Rod understood that the Johnstons
20  were going to contribute to him, he said even as a
21  far back as the middle of the year, June, July,
22  2008.  He understood the Johnstons were going to
23  contribute to him and that's his state of mind going
24  into it.
25          Now, Rod testified and told you about what

closing argument - by Goldstein                    5453

1    his state of mind was going in on this bill and with
2    the contributions.  And I told you in opening
3    statement that a governor has 60 days to sign a
4    bill.  That governor can sign it, can veto it, can
5    do nothing.  A governor doesn't have to sign it on
6    anyone's timeframe.  And that's the case.  Look at
7    the time.  And you heard Rod talk about it, and you
8    see, look at the history of the bill.  As I've told
9    you in opening statement, and here's where we're
10   really going to have to look, really analytically
11   look at what's going on.
12          From approximately February of 2008 this bill
13   is before the legislature, and the bill goes all the
14   way to the end of November --
15          MR. NIEWOEHNER:  Objection, Your Honor.
16          THE COURT:  The objection is sustained.
17          MR. GOLDSTEIN:  John Johnston says he was
18   losing $9,000 a day.  You heard the government talk
19   about it and you heard Mr. Johnston talk about it,
20   and you hear a call where it's stated.  You really
21   believe that?  Do you really believe that's the
22   issue?
23          And just look at the timeline.  All of a
24   sudden, on November 24th when this gets sent to the
25   governor's office, all of a sudden this has got to

closing argument - by Goldstein                    5454

1  be signed instantly?  Why?  At $9,000 a day, that
2  wasn't $9,000 a day he was losing.  He wasn't
3  entitled to that money.  And you heard Rod talk
4  about it --
5           MR. NIEWOEHNER:  Objection, Your Honor.
6           THE COURT:  The objection is sustained.
7           MR. GOLDSTEIN:  Now, you heard Rod talk to
8  you about the bill and some of the issues he had
9  with the bill.  He was it for the bill and was going
10 to sign the bill.  Remember, December 9th he gets
11 arrested.  So from November 24th to December 9th he
12 doesn't sign the bill, but he gets arrested
13 approximately two weeks after the bill gets sent to
14 his office.  So two weeks, this is what we're
15 talking about.  And Rod told you, there were three
16 issues with the bill, just that gave him pause, he
17 wasn't holding anything up, just slowed it down and
18 made him think about it.  He told you long, long
19 stories about the legislative process, the concerns
20 he has with this in any legislation, the potential
21 for this JCAR, the potential for this poison bill.
22 And, honestly, I've known Rod for a while and he
23 talks about JCAR.  I don't know what JCAR is, I just
24 know it's something Rod was concerned about, and he
25 explained it.  And he wanted to look at these bills

closing argument - by Goldstein                5455

1   altogether.  And you hear that on the call.  He told
2   Harris, I want to look at these altogether.  He
3   wasn't holding this up for campaign contributions.
4   That was something he wanted to do, and he told you,
5   even though it was passed and sent to the governor's
6   office November 24th, it was November 26th that he
7   really became aware.  On November 26th he talks to
8   Harris that he wants to review.  And you saw this,
9   he ran over to Mr. Quinlan, Mr. Harris and
10  Mr. Greenlee, he said, is that okay to sign.
11         There's a couple of problems with this.
12  First of all, you didn't hear any testimony
13  whatsoever that Rod was informed of any of this.
14  Second, as far as it being okay to sign, Harris
15  talks about this poison pill language, but there is
16  also other issues that Rod wanted to look at it
17  altogether, so that's an issue he wants to look
18  into.  Remember, he is not mandated to sign a bill
19  on any timeline, whatsoever.  He could sign on the
20  fifty-ninth day, he could sign it on the first day.
21         And he told you, and this leads me to the
22  second issue, he told you about the first bill that
23  he signed and he signed quickly.  What happened?  He
24  gets a contribution afterwards and there's a fire
25  storm.  It's bad in the media, it looks bad.  When a

closing argument - by Goldstein                    5456

1  politician -- I mean, understand what politicians go
2  through.  They have a lot of decisions to make and
3  they have a lot of pressures, there's things to
4  think about, okay.  We'd be blind if we thought
5  somehow a politician has to ignore what the media
6  scrutiny does, and that was a consideration.  It
7  wasn't fundraising, there was a perception issue.
8  Here he's got Johnston who had promised it, at least
9  as Rod understood it, this contribution for
10 sometime, and he sees it coming any day, he's told
11 any day, and then the bill comes before him and all
12 of a sudden everyone's got to tell him sign it, sign
13 it, sign it.  There's perception problems.  This
14 isn't being held up for fundraising, absolutely not,
15 absolutely not.
16         Rod told you another issue, told you the
17 issue of Chris Kelly.  And you heard another call,
18 and this is our Tab 2, on December 4th.  Rod told
19 you about Chris Kelly.  Chris Kelly was a friend of
20 his.  Chris Kelly, for approximately a year, had not
21 spoken to Rod at all.  They were close friends and
22 they stopped talking.  At the time, Chris Kelly was
23 under indictment for a tax evasion, has nothing to
24 do with this case.  Kelly all of a sudden calls him,
25 calls him on Thanksgiving.  It's a long

1  conversation, he mentions the whole thing about the
2  pardon.  And Rod told you, "at first it didn't
3  register with me," but then look at the timeline.
4  November 27th is Thanksgiving, so you got the
5  holiday, Friday, Saturday, Sunday.  As days go by,
6  it starts to go through Rod's mind, he's putting it
7  together, and he starts to get concerned.  What is
8  Chris Kelly's angle here.  He knows Chris Kelly has
9  a relationship with the Johnstons and now he's got
10 some angle with the bill.  And what happens on
11 December 4th?  Rod says:
12     "He's got some bill with these Johntsons, you
13        know, and I don't want to talk to him abut it
14        because I'm inclined, I'm for the bill,
15        generally, I'll do it on my own timeline, I
16        don't want him contaminating it with him
17        talking to him."
18        He's being recorded, he doesn't know he's
19 being recorded, he's explaining what is in his state
20 of mind.  That could be crazy, that could not be
21 crazy, that's what was going through his mind.  He
22 had concerns.
23        Remember, you know, when you get these tapes,
24 remember something, that is a huge binder and a lot
25 of calls.  It feels like it took years and years of

closing argument - by Goldstein                    5458

1  calls.  But it's a very short time.  It makes it

2  seem like this is going on forever, and ever and

3  ever.  This is not what's going on.  On November

4  24th to December 9th, a little over two weeks, two

5  weeks that the government is telling you he has to

6  sign, he has to do something right away.  And that's

7  just not true.

8          So we have Mr. Monk.  And again, Mr. Monk

9  coming in from that door, walking that walk from

10 that door.  And here is what we have with Mr. Monk:

11 On December 3rd, Rod and Lon Monk are meeting at the

12 Friends of Blagojevich office.  Now, look at this

13 from the lens of what's going on exactly at that

14 time.  Obviously, Rod doesn't know that Lon Monk is

15 taking cash bribes, Rod doesn't know that Lon Monk

16 has betrayed him, and certainly no one knows that

17 what's going on that Lon Monk is now a government

18 witness, at that time --

19          MR. NIEWOEHNER:  Objection, Your Honor.

20          THE COURT:  The statement is incorrect.  The

21 objection is sustained.

22          MR. GOLDSTEIN:  At that time Rod and Lon are

23 close friends, and Rod and Lon trust each other, at

24 least Rod trusts Lon.  And they have a conversation,

25 it's a private conversation amongst close friends.

:42PM

:42PM

:43PM

:43PM

:43PM

closing argument - by Goldstein                    5459

1  It's just the two of them in this office and they're
2  discussing this issue.
3       MR. GOLDSTEIN:  And if you can pull the next
4  one?  Thanks.
5     (Brief pause).
6
7       MR. GOLDSTEIN:  So the December 3rd, Monk
8  tells Rod:
9    "I wanna go to him without crossing the line and
10      say, give us some money and one has nothing to
11      do with the other."
12       According to Lon Monk, "without crossing the
13  line" means crossing the line.  According to Lon
14  Monk "one has nothing to do with the other" means
15  one has everything to do with the other.  That's his
16  testimony.
17       Now, remember, Rod and Lon are close friends.
18  They don't know they're being taped.  They're in a
19  meeting room by themselves.  How simple is it "go
20  ahead, do what you gotta do, Lon"?  No, because they
21  both knew they didn't want to cross lines.  That's
22  clear.  Sometimes, sometimes in the real world the
23  words you actually say actually mean what you said.
24  Sometimes, don't ever forget, because even though
25  there's a lot of witnesses coming through that door

:44PM
:44PM
:44PM
:44PM
:45PM

closing argument - by Goldstein                    5460

1   that you got to be skeptical of, the common sense
2   doesn't walk out that door, sometimes those words
3   actually mean something.  "Nothing to do with the
4   other" means nothing to do with the other, "without
5   crossing the line" means without crossing the line,
6   it's that simple.
7        He is telling his good friend in a private
8   conversation, where no one is being heard, when he
9   has every opportunity to tell him this is what I'm
10  gonna do, and he tells him exactly what is in his
11  mind at that time, "I'm not going to cross lines and
12  one has nothing to do with the other."  And that's
13  the principle for Rod, once he hears that, he's
14  okay.  That's all that happens.  The words mean what
15  exactly they said.
16       Now, again, on December 3rd, in that same
17  conversation -- actually, this is not the same
18  conversation, I apologize.  The next one.
19      (Brief pause).
20       MR. GOLDSTEIN:  So Monk has a meeting with
21  Johnston, comes back from the meeting with Johnston
22  and tells Rod what happened, "I'm just leaving there
23  and I talked to him about his commitment," he goes
24  "yeah," "I said two separate conversations."  "Two
25  separate conversations," please, two separate

closing argument - by Goldstein                    5461

1   conversations means two separate conversations.  The
2   words actually mean what was said.  Sometimes that
3   actually happens.
4            Please do me a favor, please do me a favor,
5   and I'm going to talk to you at the end, you
6   obviously know we want you to find that man not
7   guilty, and if you look through the evidence and you
8   see that that is the case, and you absolutely can,
9   if you think that man is not guilty, please don't
10  sign the guilty form thinking "guilty" means not
11  guilty.  Please, for him.  Sometimes the words mean
12  exactly what's said.  Look at the words.  You're
13  going to trust Lon Monk, the gift man, the man
14  walking through that door to tell you "one is not
15  for the other" means something else, "two separate
16  conversations" means something else.  Please, too
17  much is at stake here.  Don't do it.  Don't do it.
18  The words mean what exactly they're saying.
19           And you heard Mr. Johnston, and he talked to
20  you.  This is again another individual with
21  immunity.  He's got immunity.  It's their victim
22  with immunity.  Really?  Two separate conversations,
23  according to Johnston.  Isn't it convenient?
24  Johnston and Monk agree.  Don't they have an
25  interest?  Why are they saying what they're saying?

closing argument - by Goldstein                    5462

1  They're coming through that door.
2        I want to talk to you about Children's
3  Memorial Hospital.  And you got to know Rod a
4  little, and Rod testified, and he told you about his
5  passion.  He was honest with you.  He was absolutely
6  honest with you.  He cares about healthcare.
7  There's no doubt.  And, you know, the government
8  says, he's the healthcare governor.  It doesn't
9  really matter if he' the healthcare governor or not,
10 the point is his passion and his concern is
11 healthcare.  He cares about healthcare, particularly
12 healthcare for children.  Why is that important?
13 You don't do things that hurt what you love and you
14 care about.  You just don't do it.  So you have to
15 understand Rod.  The man cares about this issue.  It
16 means a lot to him.  And you have to understand why
17 this issue, in particular, means so much and is so
18 offensive, because this man cares about that issue
19 so much.  And to say, and that's exactly what the
20 charges are saying, he doesn't care about
21 healthcare --
22        MR. NIEWOEHNER:  Objection, Your Honor.
23        THE COURT:  The objection is sustained.
24        MR. GOLDSTEIN:  What it's saying is that a
25 campaign contribution is more important than helping

closing argument - by Goldstein                    5463

 1  Children's healthcare --
 2          MR. NIEWOEHNER:  Objection, Your Honor.
 3          THE COURT:  The objection is sustained.
 4          MR. GOLDSTEIN:  Let's go through the
 5  timeline.  Rod told you, and there's a lot of
 6  witnesses that actually talk about this as well, but
 7  in September Rod gets a call from Dusty Baker.
 8  Dusty Baker gives him a call, tells him there's an
 9  issue, not very specific on it.  And Rod told you he
10  talked about the presidential race, they talked
11  about the Cubs, and then they talked about this
12  issue.  And Rod eventually says, look, I knew he was
13  asking for something, "what do you need, Dusty."
14  Dusty tells him, tells him something related to
15  healthcare, something related to Children's
16  Memorial, doesn't know exactly what.  So what does
17  Rod do?  He goes, he calls Patrick Magoon who Dusty
18  told him to call.
19          And they have a conversation and Magoon fills
20  Rod in more about it.  And Rod is interested in it.
21  So he calls Bob Greenlee.  Now, when he calls
22  Mr. Greenlee, he talks to Mr. Greenlee about the
23  issue.  And he says, go look into it, go make sure,
24  you know, see if we can get the money; right.  At
25  that point, you know it's absolutely not a done

closing argument - by Goldstein                5464

1   deal.  Rod is very much interested in wanting to get
2   this done, and you heard him testify to it.  You
3   absolutely heard him testify to it.
4          So what happens?  After he talks to Greenlee,
5   he eventually finds out--Rod--that this rate
6   increase is good to go; right.  So Rod, after he
7   gets this information, he tells Magoon, and he tells
8   him the good news, the rate increase is going.  And
9   Rod testified and told you what he was thinking and
10  what he said and why he said it.  He said Patrick,
11  or Mr. Magoon, I don't know how he addressed him,
12  the point is, he told him I'd like you not to talk
13  about it, keep it quiet for now.
14         Now, the government wants you to believe that
15  that is the reason to show that Rod had a nefarious,
16  nefarious intention to try and hold up the rate
17  increase to make sure he got a fundraiser from
18  Mr. Magoon, that's their theory.
19         But Rod told you exactly the reason, there
20  were budgetary problems.  Billion of dollars of
21  budget deficits going on, a lot of programs had to
22  be cut.  And Rod explained it, that he had a lot of
23  different options, the option that put in was an
24  that hurt him in many ways, it hurt him in many ways
25  because he was the bad guy, he's the one that had to

closing argument - by Goldstein                5465

1  cut a lot of these programs.  He's getting all these
2  calls and trying to get this done, this done, or
3  that done.
4          And look, Rod gets a call from Dusty Baker,
5  someone he likes a lot, about an issue of
6  healthcare, and that's something he wanted to do.
7  And he goes forward with it and his intention
8  absolutely was to go forward with this rate
9  increase.  Don't confuse anything whatsoever.  Rod,
10 from day one, once he was presented with it, wanted
11 this rate increase and wanted it to go through and
12 there's no doubt.  He tells Magoon just to keep
13 quiet about it because of these issues.  He's got to
14 cut left and right.  He can't make a big press
15 conference about it.  And that's what he told you,
16 and that's the truth.  That's absolutely the truth.
17         Now, before, before, before in October,
18 there's a meeting.  October 8th they have a
19 fundraiser meeting, and that's with Mr. Wyma, the
20 immunity man.  Mr. Wyma and Rod and Robert was
21 there, I believe Mr. Monk was there, they have a
22 conversation.  They talk about a variety of
23 potential fundraisers, and they talk about
24 Mr. Magoon.
25         Think logically, think logically.  Why ask

closing argument - by Goldstein                    5466

1  Mr. Magoon for a fundraiser?  The government is
2  telling you the only reason, the only reason he's
3  doing this is because of this rate increase, to hold
4  this rate increase, to dangle it in front of
5  Mr. Magoon to get him to give a fundraiser.  That is
6  not true.
7        They had a conversation where they're talking
8  about a variety of different potential fundraisers.
9  Mr. Magoon had been a prior contributor to Rod.
10 Mr. Magoon had been involved in this kind of stuff.
11 Mr. Magoon was on the Board of Children's Memorial
12 Hospital.  The Board had many wealthy people.  It
13 made sense.  It made sense to ask him.  There's
14 nothing nefarious about this whatsoever.  Absolutely
15 nothing.
16        And just ask yourselves some common sense.
17 Yeah, we talked about fundraising, this is an issue
18 throughout this entire case.  You're not here to
19 decide whether fundraising is good or bad.  You're
20 here to decide whether that man committed crimes,
21 and he didn't.  He asked for fundraising, which he
22 has every right to do.
23        So what happens?  October 22nd they have a
24 meeting.  Nothing's been done.  And they talk about
25 it, Wyma, and Ron and Rob, and they discuss the

closing argument - by Goldstein                    5467

1   potential of Mr. Magoon, who should call ask him and
2   ask him for a fundraiser.  And they decided Robert:
3   Ask for a fundraiser.  He had Robert ask Mr. Magoon
4   ask for a fundraiser.  You're going to get the
5   indictment and the government told you, the crime
6   there is the ask.  No, not at all.  Not at all.  He
7   asked for fundraising and had no intent whatsoever
8   that these two were connected.

9        So now we go to November 12th and Rod had a
10  conversation with Robert and Robert says Magoon
11  hasn't called me back, what should I do.  Rod says,
12  I'll call him.  You'll notice, just the fast
13  forward?  Rod never calls him.  Look at the actions
14  of a man.  He never calls him.  What does he do?  He
15  calls Greenlee and he asks him these three
16  questions, and you've heard the call, it's been
17  played a couple of times, listen to it again, you've
18  seen the transcript, this is the crux of it:
19      "So we can pull it back it back if we needed to,
20       budgetary concerns, right."
21      "Greenlee:  We sure could.  Yup."
22      "Rod:  Okay, that's good to know."
23       Good to know.  "Good to know" is not an
24  order, it's not an order.  Ms. Hamilton told you
25  about how Rod was directing all this money to go to,

closing argument - by Goldstein                5468

1  you know, the Cubs.  Yeah, he knows how to direct
2  people, "good to know" is not a direction.  There is
3  not a city, a state, a country, anywhere in the
4  English language where "good to know" is "hold it
5  up."  Ever, ever, ever.  Words mean something.
6  "Good to know" meant good to know.  Rod was given
7  information, he goes forward with it, he does
8  nothing, and he does nothing.  He didn't order, he
9  didn't hold this up in any way.
10         And look at what happens afterwards.  Later
11  that evening, Rod talks to Robert, how do we get
12  Wyma to call him, what do we do with this guy
13  Magoon.  Ladies and gentlemen, if he just ordered
14  this rate increase be held up, it's a very simple
15  conversation that needs to be had, "Robert, don't
16  worry about it, don't worry about it, it's taken
17  care of."  Right?  Taken care, we held up that rate
18  increase, now we got something on Magoon, oh, he'll
19  come a-calling now.
20         November 14th Rod tells his brother, don't
21  call Magoon.  Now, that's not a played call, but
22  that's what was described to you in testimony,
23  "don't call Magoon."  Look at his actions.
24         Then on December 4th, Rod talks to Quinlan.
25  And this is in our Tab, defense Tab 3:

closing argument - by Goldstein                      5469

1      "I'm thinking Magoon, call Magoon and see if he
2       can do a fundraiser, one was not for the
3       other."
4           He is describing what had happened to
5  Quinlan.  One was not for the other, one was not for
6  the other whatsoever.  He asked Robert to ask Magoon
7  for a fundraiser, and that is it.  And then look at
8  what ends up happening.  Rod told you, he doesn't
9  know anything about this rate increase being held
10 up.
11          And just one quick thing, one quick thing.
12 You heard Mr. Greenlee, he told you there was this
13 call around Thanksgiving, this call that supposedly
14 Rod said "hold it up."  It's not recorded, you don't
15 have any tapes of it, it's Mr. Greenlee telling you
16 this.
17          Now, Mr. Greenlee doesn't have immunity and
18 he hasn't been charged with anything, he doesn't
19 have a plea deal, but understand, understand where
20 he's coming from.  He's telling you about a call
21 that's not recorded and he's telling you about a
22 call that absolutely did not happen, whatsoever;
23 whatsoever.  And just look at the fact of it, look
24 at the fact of it.  Rod supposedly tells Greenlee
25 that Wyma just got fired from Children's Memorial,

closing argument - by Goldstein                    5470

1  he says this happened after Thanksgiving --
2          MR. NIEWOEHNER:  Objection, Your Honor,
3  "fired from Children's Memorial."
4      (Looking at the court reporter's realtime feed:)
5          THE COURT:  I think he made a slight
6  misstatement about Wyma.  I don't think it matters
7  much.
8          MR. GOLDSTEIN:  About the firing?
9          THE COURT:  Yeah.
10          MR. GOLDSTEIN:  Well, Greenlee said some
11  things to Rod that just weren't accurate.  And if
12  you look at it, you heard Rod talk about when he
13  found out Wyma was fired, and the call doesn't make
14  any sense because it's after, it's a lot further
15  after that this happened.  That call never happened,
16  it makes no sense, it's a phantom call.
17          And Greenlee, to a certain degree, is telling
18  you the truth, he told you he held it up.  His
19  understanding is 100 percent wrong, "good to know"
20  does not mean hold up the rate increase, it just
21  doesn't, it just doesn't.
22          And Greenlee made a mistake.  It happens.
23  But that's all that happened.  When Rod is first
24  told that the rate increase was held up, you heard
25  what he said he did, he was absolutely shocked and

closing argument - by Goldstein                    5471

1   he instantly makes sure it gets done.  Look at his
2   actions.  You heard Mr. Magoon testify, he knew
3   nothing about the rate increase being held up.  If
4   this was some way to try and extort or hold this
5   over in any way, Mr. Magoon, he's gonna, that's the
6   whole point.  Look at the actions, actions speak
7   louder than words.  What ends up happening?
8   Absolutely nothing.  Rod doesn't get a fundraiser,
9   doesn't pursue it, and doesn't hold anything up, and
10  that's clear, that is absolutely clear.
11          Now, I want to talk to you about the Senate
12  seat.  And as I told you and as you've seen, Rod
13  talks a lot.  You heard those tapes and you heard it
14  on the stand.  He talks, he talks, and he talks.
15  And that's what you're going to hear about the
16  Senate seat.  As I said, he talks so much it even
17  overruled my objections.
18          What you saw on the stand is who he is.  When
19  he came to every single one of these issues, HHS,
20  501(c)(4), all these things, nothing ever happened.
21  Why did nothing ever happen?  Because these are
22  ideas that were discussed, and that's it.  No action
23  was taken, no intent was had, not talked about.  And
24  if you look at the context of all these things that
25  were discussed:  November 1st through November 6th,

closing argument - by Goldstein                    5472

1  the government told you how Rod is talking about

2  this HHS.  At that very same time period, Rod is

3  talking about appointing himself, at that very same

4  time period, Rod is talking about the Lisa Madigan

5  deal.  You heard him, on November 1st he tells

6  Greenlee, hey, let's start putting together a list

7  on the Lisa Madigan deal.  He's talking about all

8  these various options.  Why is he talking about

9  these various options?  Because he's collecting

10 thoughts, he's collecting ideas, he hadn't made one

11 decision.  What you're hearing is a thought process,

12 that is all, that is all.

13        And again, the government told you decisions,

14 whether decisions were made doesn't matter.  It

15 absolutely matters.  This whole issue is his intent,

16 his state of mind, what's going on in his mind.  He

17 didn't decide anything, and he didn't decide

18 anything because he wasn't going forward on

19 anything, he had no intent to do any of this.

20        Now, remember, remember what's going on, and

21 I sort of talked to you a little bit about it, Rod

22 is not calling anyone, all these people are coming

23 to him.  Tom Balanoff, Andy Stern, Rahm Emanuel,

24 Marilyn Katz, a lot of talk about fundraising;

25 Marilyn Katz offering fundraising for Valerie

closing argument - by Goldstein                    5473

1  Jarrett.  What does Rod do?  He doesn't pursue it at

2  all.  Everyone is pursuing Rod.  And what does Rod

3  do?  He talks.

4        And he talks with Tom Balanoff, who's a

:06PM   5  friend.  And he told you, Rod told you the

6  significance of Tom Balanoff.  He's a friend, he's a

7  guy he talks about certain things with, he saw him

8  as the prober.  And this was the feeling out, they

9  were throwing out feelers back and forth.  And Rod

:07PM  10  told you, exactly if he wanted to do anything, the

11  guy he knew, who Tom Balanoff says this, had no

12  authority.  It wasn't even clear who he was speaking

13  on behalf of.  But what was very clear is that David

14  Axelrod was the guy to talk to.  If anything was to

:07PM  15  be done, that's the guy to talk to.  You're not

16  going to get one call because it didn't happen.  Rod

17  never calls David Axelrod, absolutely never calls

18  David Axelrod.

19        Look at the actions.  Again, look at the

:07PM  20  actions.  Tom Balanoff says he meets with Rod on

21  November 6th.  This is not taped, it's in the

22  Thompson Center.  Balanoff meets with Rod as

23  one-on-one meeting called Balanoff.  They meet and

24  they discuss a lot of different things.  And Rod

:08PM  25  does say talks about HHS, that's all they talk

closing argument - by Goldstein                5474

1    about.  Rod didn't condition one for the other, he
2    didn't say give me this, I'll give you that, he
3    didn't apply it, wasn't a-winking and a-nodding,
4    wasn't doing any of that.
5            And how do you know that?  Look at Balanoff,
6    look at the actions he takes.  This man, according
7    to the government, is just shaken down by Rod --
8            MR. SCHAR:  Objection, Your Honor.
9            THE COURT:  The objection is sustained.
10           MR. GOLDSTEIN:  Tom Balanoff was given this
11   offer, he says he understood it.  He absolutely says
12   it, there's agreement between Rod and Tom Balanoff,
13   again it goes to the understanding.  Balanoff says
14   he understood it to mean this, he understood to mean
15   this, what did he do afterwards?  Immediately, the
16   next day he's calling for another meeting --
17           MR. NIEWOEHNER:  Objection.
18           THE COURT:  The objection is sustained.
19           MR. GOLDSTEIN:  He goes and talks to Valerie
20   Jarrett --
21           MR. NIEWOEHNER:  Objection.
22           THE COURT:  The objection is sustained.
23           MR. GOLDSTEIN:  The government talked to you,
24   the government talked to you about Rod and Jesse
25   Jackson and these so-called bribe offers.  And they

:08PM

:08PM

:09PM

:09PM

:09PM

closing argument - by Goldstein                    5475

1   told you, what did he do?  Did Rod call the
2   authorities?  They told you that.  The answer is no.
3   What did Tom Balanoff do?
4           MR. NIEWOEHNER:  Objection, Your Honor.
5           THE COURT:  The objection is sustained.
6           MR. GOLDSTEIN:  What is clear, what is
7   absolutely clear, look at the actions of all these
8   people.  We know after the 6th Tom Balanoff is
9   talking to Rod on the 12th, we know Tom Balanoff
10  talks to him after that.  This is not a man that was
11  in any way offered anything improper.
12          MR. NIEWOEHNER:  Objection, Your Honor.
13          THE COURT:  Maybe you want to rephrase.  It's
14  hard to tell who he talked to.
15          MR. GOLDSTEIN:  Mr. Balanoff.
16          THE COURT:  Who?
17          MR. GOLDSTEIN:  Mr. Balanoff, Tom Balanoff.
18          THE COURT:  The argument may stand.  I'm
19  overruling the objection.
20          MR. GOLDSTEIN:  Now, let's go in to this
21  501(c)(4) issue.  And you heard a series of calls
22  from the 12th and the 11th, I think there's even a
23  call on the 14th.  Please listen to the words,
24  please listen t other words, the words mean what
25  they say.

:09PM
:10PM
:10PM
:10PM
:11PM

1      On Tab 44, this is the government's call, Rod
2 specifically says:
3      "Not in connection ..." talking about this
4      501(c)(4) "... not in connection a Senate
5      appointment or anything in his Fifth CD."
6      Fifth CD is his congressional district,
7      "... not in connection ...."
8       Scofield may have interpreted it one way,
9 and that's fine, but it wasn't.  In that man's mind,
10 it was not in connection, absolutely not in
11 connection.  What you have to understand, again this
12 whole case is about what's in his mind, his intent.
13 The government told you he knew he was --
14          MR. NIEWOEHNER:  Objection, Your Honor.
15          THE COURT:  The whole case?
16          MR. GOLDSTEIN:  Most.  95 percent.
17          THE COURT:  No, I think maybe you want to be
18 a little more careful.
19          MR. GOLDSTEIN:  Understand something, since
20 we're talking about the whole case.  The whole case
21 isn't about a question of whether Rod tried to get
22 something in exchange for state action, that is not
23 the whole case.  You need to understand that.
24       Again, you're going to look at those
25 instructions, you're going to look at the verdict

closing argument - by Goldstein                5477

1  forms.  You have to understand something, if it's
2  confusing, it's confusing because you have
3  reasonable doubt --
4          MR. NIEWOEHNER:  Objection, Your Honor.
5          THE COURT:  The objection is sustained.
6          MR. GOLDSTEIN:  Analogies aren't going to
7  make it any better, an attempt to simplify something
8  with analogies that don't equate what is going on in
9  reality aren't going to help.  Don't rubber stamp
10 it.  Don't do it.  Don't do it.
11         Again, a very important piece in this case is
12 what is in that man's mind.  And you heard a lot
13 from these calls, but you heard a lot from that
14 chair, and he told you what was in his mind.  The
15 government said he was trying to cross lines.  They
16 said he was trying to cross lines.  This man was not
17 trying to cross lines.  He was absolutely not trying
18 to cross lines.  "How do you make a deal like
19 that --"
20         MR. NIEWOEHNER:  Objection, Your Honor.
21         THE COURT:  You're quoting from a transcript?
22         MR. GOLDSTEIN:  Yes.
23         THE COURT:  Overruled.
24         MR. GOLDSTEIN:  "How do you make a deal like
25 that, and it's got to be legal, obviously."  Is this

:12PM
:13PM
:13PM
:13PM
:13PM

closing argument - by Goldstein                    5478

1   a man trying to commit a crime?  A recorded
2   conversation that he doesn't know is recorded, this
3   is what's going on in his mind.  "How do you make a
4   deal like that?  It's gotta be legal, obviously."
5   Look at that.  This is a man trying to cross lines?
6   This is a man with the intent to commit a crime?
7          You heard about the attempt to conceal,
8   right?  Keeping all this concealed.  Look at some of
9   the calls.  November 7th, Rod, "in talking about
10  Change To Win, we'll publicly announce it."  It's
11  not a man trying to conceal.  Think of Health and
12  Human Services, the thing is inherently public and
13  he's just talking about it.  When it came to the
14  501(c)(4), November 12th, "I wouldn't even be
15  adverse to being upfront about it, saying that we've
16  established this organization.  They're all going to
17  Washington to push these things that we've done in
18  Illinois, that we can help you, push in Illinois."
19  "Wouldn't be adverse to being upfront about it,"
20  this is not a man trying conceal anything, this is
21  not a man committing a crime whatsoever.
22          Legal, obviously being upfront, publicly
23  announce?  No, he is talking about these ideas.  And
24  you saw him, you saw him when he testified, and you
25  hear these calls.  Listen to these calls.  He's not

:14PM

:14PM

:15PM

:15PM

:15PM

closing argument - by Goldstein                    5479

1  a man trying to commit a crime, whatsoever.  It
2  doesn't come anywhere close to it.  Doesn't take any
3  action in furtherance of it.  Absolutely not.
4          Now, let's talk about Jesse Jackson.  And
5  remember, as you listen to a lot of these calls --
6  and before we get into Congressman Jackson, if you
7  listen to the calls, look at who's talking to Rod.
8  Who are these people, the call the government played
9  for you right at the end?  It's a call with, like,
10 7, 10 people.  It's a bunch of people, lawyers and
11 advisers, and all of these individuals.  This is not
12 a man trying to conceal, this is not a man with any
13 criminal intent whatsoever.  Look at how he acts.
14 Look at the entire case and listen to every call.
15 He's not trying to conceal anything.
16         Now, when it comes to Congressman Jackson,
17 here's what we have.  And the government told you
18 this, and a lot of this is not in dispute, this
19 offer was made, n October 28th this offer was made,
20 and you heard the call and listen to it again.  Then
21 on October 31st there's another call and they
22 discuss it.  Listen to it again; absolutely.  And as
23 Rod told you, the offer was made, the offer was
24 rejected.  It was reject several times.  And he knew
25 that.  And that was what was in his state of mind.

:16PM
:16PM
:16PM
:17PM
:17PM

closing argument - by Goldstein                5480

1    And he told you that.

2         December 4th and leading up to December 4th,
3    because that's where the issue is, Rod goes to
4    Philadelphia on December 1st and December 2nd and
5    they have a meeting with Mr. Quinlan, Mr. Yang and
6    Mr. Greenlee and Mr. Knapp.  I think there might've
7    been some other people, but those are the people.
8    And they talk about the Senate seat.  The number one
9    option at that point is Lisa Madigan, and they
10   discussed Lisa Madigan.  And Rod told you, he
11   absolutely told you that Lisa Madigan was his number
12   one goal, but he said he didn't make any decisions,
13   he hadn't moved on it, hadn't decided to go forward.
14   And what you hear through these calls is
15   indecisiveness, no doubt, no doubt.

16        So they go and they come back from
17   Philadelphia with Lisa Madigan being the number one
18   option.  December 3rd, you heard Rod testify, he had
19   several conversations about the Madigan deal.  Talks
20   to Jerry Reinsdorf, the owner of the White Sox, he
21   talks to John Coley, a labor leader, he talks to
22   Senator Harry Reid, and he talks to Robert Menendez,
23   also a senator from New Jersey.  They're talking
24   about the Madigan deal, all talking about the
25   Madigan deal.  Yeah, no, decisions have been made

closing argument - by Goldstein                    5481

1   and he hadn't acted on it, but he's excited about

2   it, you heard him.  You heard Rod talk, you heard

3   Rod talk about this Madigan deal.  You heard how

4   excited he got.

5          Remember that document we showed?  I'm not

6   going to go through the whole thing.  This is what

7   Mr. Greenlee had come together with, it's just a

8   list.  You'll get it in your binders, so don't worry

9   too much about it, but these are the issues that he

10  was caring about.  Really, this reflects Rod.  The

11  capital bill, when it comes to Mr. Krozel, the

12  capital bill is the big issue; healthcare expansion,

13  when it comes to Mr. Magoon, that's the big issue;

14  no tax increase, will heard all that with these

15  issues with Madigan.  This was his prize, this was

16  his baby.  And he is really excited about it.  And

17  there was a problem, his relationship with Madigan.

18  It made it difficult.

19          But that is what Rod wanted, and that's what

20  Greenlee prepared for.  Understand, that's what is

21  in his mind when December 4th comes around.

22     (Brief pause).

23          MR. GOLDSTEIN:  How many lawyers does it take

24  to get a certain screen up, right?

25     (Brief pause).

closing argument - by Goldstein                    5482

1           MR. GOLDSTEIN:  So December 4th comes around
2   and Jesse Jackson is discussed.  Rod told you, the
3   whole issue when it came to Jesse Jackson was this
4   issue of negative leverage.  Raise Jesse Jackson up
5   because no one liked Jesse Jackson, at least that
6   was Rod's understanding, and I thought that was
7   pretty clear.  No one wanted Jesse Jackson to be the
8   senator.  So Rod, in an attempt to try and get this
9   deal moving, he understands if those people in D.C.
10  understand Jesse Jackson is a potential candidate,
11  they'll get scared and really work with Rod.  They
12  told you that and it's clear.
13          If we go to Tab 68:
14      "Okay, now listen, now listen to me, you don't
15       know what's going on here.  So you gotta be
16       careful, don't be talking, don't be talking too
17       much.  I mean, you're contradicting me here,
18       it's a repugnant idea, but I need to leverage
19       that Jesse, jr. with these f'ing national
20       people to get the deal for Lisa Madigan."
21          Go to Tab 69, this is the call with Robert:
22      "So here, listen, this, hold Jesse, jr. thing,
23       you, you gotta understand something, I'm f'ing
24       elevating him now, because the whole Washington
25       establishment is freaking out, my play here is

 1          to make him look like if this Lisa Madigan
 2          thing doesn't, if they can't put it together,
 3          then I'm going to him."
 4              That's exactly what is on Rod's mind, exactly
 5     what he is talking about.
 6              And you know what?  He did talk about the
 7     fundraising, he absolutely did.  He talked about it
 8     in the sense that he communicated exactly what was
 9     going on.  Rod talks a lot and he communicated
10     everything, he wasn't hiding anything.  He was
11     telling Yang, Greenlee, and Harris what was going
12     on, and that's all, he was delivering what had been
13     offered to him.
14              But as he said, the offer was rejected
15     several times.  It was not what he wanted to do.
16     And then later in that call with Rod, and listen to
17     the call, listen, you'll see right towards the end,
18     it's less than a minute and a half, there is a
19     discussion about going to see Raghu, and look at it:
20          "Okay, and then we'll talk some more about how
21          to do it."
22          "Then we'll talk some more about it, how to do
23          it."
24              They were going to discuss whatever issues
25     there were.  Rod and Robert were going to talk about

closing argument - by Goldstein                 5484

1  it.  And that's the operative phrase here.  He
2  wasn't sending him for campaign contributions
3  whatsoever.  He's talking about Jesse in the sense
4  of negative leverage, he's also talking about Jesse
5  Jackson in the sense of coming out and supporting
6  his policies.
7          Then the government told you why are you
8  going to send Raghu, why are you going to send
9  Robert to talk to Raghu because these issues?  Raghu
10 is close with Jesse Jackson, Jr., of course Jesse
11 Jackson, Jr. was the son of senior, and we all know
12 Jesse Jackson senior and junior, this is what
13 they're involved in.  You're talking about why are
14 you talking to Raghu about mortgage foreclosures.
15 No, it's to go speak to Jesse Jackson about mortgage
16 foreclosures, that makes sense, and that's exactly
17 what was going on.  This was all for negative
18 leverage.
19          And remember, no decisions had been made and
20 Lisa Madigan -- you hear the calls over and over and
21 over again, Lisa Madigan is the number one option,
22 Lisa Madigan the number one option.  And look,
23 December 8th, look at December 8th, the government
24 told you listen to all these calls and listen to
25 them chronologically and put them altogether.  This

closing argument - by Goldstein                    5485

1   call and the next call are the last two calls made
2   that you're going to hear.  This is on December 8th,
3   so we got the Senate thing, "we got to start
4   thinking about, starting to make some decisions and
5   acting."  "Yes, sir."  "Like the next couple of
6   days, how did you leave it with Rahm."
7           Remember the whole thing about Rahm Emanuel?
8   On December 4th Rod is telling John Harris go talk
9   to Rahm Emanuel.  What was he doing?  Tell Rahm
10  Emanuel Jesse Jackson, what do you think about Jesse
11  Jackson.  Negative leverage, raise Jesse so they'll
12  come back to Lisa Madigan, that's exactly what's
13  going on, that's exactly what's going on.
14          Look at the next call, look at the next call,
15  it's the last call you will hear.
16      "Reinsdorf suggested, said you get Rahm to go in
17       and Rahm to say we think he would be a good
18       senator.  Here's what you got to give the
19       governor, Rahm is the one who says, suggests to
20       Madigan what, what the deal is.
21      "Harris:  Right.
22      "What do you think" Rod says.
23       Harris says:
24      "Yeah, I think that's certainly a workable
25       strategy."

closing argument - by Goldstein                    5486

1      Rod says:
2      "All right, why don't you spend some time and
3       start thinking about the tactics of this."
4           This is actually the same call with John
5  Harris, "start working on the tactics" "start
6  working on the tactics of this."  This is where it's
7  December 8th.  Later that day, in the evening, the
8  last call Rod makes that day, the last call he makes
9  before he's arrested, talking to Greenlee:
10      "Yeah, that's working out.  Rahm is worried
11       about Jesse Jackson now and he's pressing
12       Harris about Lisa, and he's actually offered to
13       possibly get involved and try to make the deal.
14       Yeah, in your -- the way you're playing it is
15       working out well, so just quietly do it."
16           That's the last call, that's the last call,
17  it's the last call you will hear if you listen to it
18  chronologically.  From the middle of October 2008
19  all the way to December 9th he was being wiretapped.
20  This is the last call Rod made before he was
21  arrested.
22      (Tape played)
23           MR. GOLDSTEIN:  That's the last call,
24  December 8th, 2008.  And there's more to that call.
25  Rod talks about Tony Rezko, and you heard that about

closing argument - by Goldstein                    5487

1  January 6th.  There's more to it, there's absolutely
2  more to it.  This is the last call he makes, and he
3  talks about those two things:  One, it's working out
4  well, and Greenlee says, "quietly, keep working,"
5  then he talks about, well, I might do it on
6  January 6th because of Rezko.  And he told you the
7  whole issues with Rezko.  I ask you, in this case
8  about nothing, after this call, what happens next?
9  Ask yourself that question.  What happens next?  The
10 last call you will hear is that one.  They've been
11 wiretapping his phones for a month and a half --
12          MR. NIEWOEHNER:  Objection, Your Honor.
13          THE COURT:  The objection is sustained.
14          MR. GOLDSTEIN:  Now, I talked to you a couple
15 of hours, I want to wrap up.  It's been a long
16 trial.  I want to thank you sitting and listening to
17 the evidence.  You all know how serious it is.  You
18 all know the stakes here.  The Judge told you when
19 you first sat as jurors, you are a living example of
20 independence.  When this country fought a
21 revolution, we didn't have juries.  You are the
22 living example of why we fought this revolution.
23 Way back when, it was the kings and their judges who
24 decided whether a man's liberty was taken or not.
25 You are that example.  You have a serious task

:28PM
:29PM
:29PM
:30PM
:30PM

closing argument - by Goldstein                5488

1  before you, absolutely.  And you have to take the
2  time and look through all of this.  But you are the
3  jury.  I don't control you, the government doesn't
4  control you, the judge doesn't control you, it's
5  you, it's just you.  Don't be that red stamp, don't
6  be that rubber stamp, don't do it.  Because they say
7  guilty, you're just going to go along.  Don't do it.
8  Look at this case and decide it on the facts.  I
9  know you will, I know you will.  And if you do that,
10 if you do that, if you do that and look at this case
11 on the facts and see all that happened and all that
12 didn't happen, you will see right there is an
13 innocent man.  Right there, Rod is an innocent man.
14 And if you look and if you take your time with these
15 calls, you will see that he is innocent, and you
16 will find that he is not guilty.
17       Rod, it's an honor to represent you, and I
18 mean that.  It's a burden that I hold representing
19 him for the last two and a half years.  That burden
20 is now yours.  Hold them to that burden.
21       Thank you.
22       THE COURT:  We'll take a break.
23       THE MARSHAL:  All rise.
24    (The following proceedings were had out of the
25     presence of the jury in open court:)

closing argument in rebuttal - by Schar          5489

1      THE COURT:  Be seated in the courtroom.

2      You have about 55 minutes left.

3      MR. SCHAR:  Thank you, Judge.

4      About fifteen minutes.

5   (Recess.)

6

7      THE MARSHAL:  All rise.

8   (The following proceedings were had in the

9    presence of the jury in open court:)

10      THE COURT:  Please be seated.

11      You may begin.

12      MR. SCHAR:  Thank you, Judge.

13    CLOSING ARGUMENT IN REBUTTAL BY THE GOVERNMENT

14      BY MR. SCHAR:  Mr. Goldstein gave you a

15  variety of different arguments and I'll try to

16  address as many as I can, as precisely as I can, as

17  quickly as I can.

18      He had one over-arching theme and that is

19  that you, in fact, have been the victims of one of

20  the largest government frame-ups that you have ever

21  seen, that a number of people come in and lied to

22  you --

23      MS. KAESEBERG:  Objection.

24      THE COURT:  Overruled.

25      MR. SCHAR:  It was a desperate argument, not

closing argument in rebuttal - by Schar          5490

1  borne out by the evidence.  What I want to start
2  with, though, is this concept of decisions, because
3  the defense focuses of course on things don't really
4  matter.  They want to say to you, they have said to
5  you, well we didn't pick a senator, we didn't
6  actually get HHS to make a decision, so somehow
7  there is no crime.
8          Now, he made decisions and he did take
9  action.  He made decisions over and over and he took
10  actions over and over, and you see that on the
11  tapes, you heard it from the witnesses.  He's the
12  one who decided to ask for HHS in return for
13  political action, he's the one who talked to Tom
14  Balanoff and asked for it, he's the one who decided
15  that he wanted money for the 501(c)(4), and he's the
16  one who picked up the phone and had Tom Balanoff
17  call and he asked, he's the one who decided to send
18  his brother to Raghu Nayak, he's the one who sat in
19  the room with Lon Monk and decided how to send a
20  message, he's the one who decided not to sign the
21  racetrack bill legislation, he's the one who decided
22  to send a message to Bradley Tusk about a
23  fundraiser.
24          Over and over again, he made decisions and he
25  took action.  And when you have crimes like you do

closing argument in rebuttal - by Schar          5491

1 here, which are largely scheming crimes, plotting
2 crimes, and trying crimes, attempting crimes, it's
3 largely the talks and the decision to execute them
4 that show that a person is guilty.  Talking a lot
5 gives you a lot of evidence, deciding to ask for
6 multiple things gives you a lot of evidence, liking
7 to talk too much is even better.
8          As I said, the fact that he ultimately didn't
9 name Valerie Jarrett or Jesse Jackson, Jr., the fact
10 that he didn't get what he wanted, that doesn't
11 matter, as Ms. Hamilton told you.  And, second, the
12 concept that he hadn't made the decision as to what
13 he wanted is ludicrous.  He says on tapes he would
14 do Valerie Jarrett in a heartbeat.  The guy was
15 looking for a cabinet position.  Now to come here
16 and suggest to you that, yeah, maybe I would have
17 taken it and maybe I wouldn't?  Not only does it not
18 legally matter, it doesn't really make any sense.
19 Were some of them long shots?  Yeah, for a guy who
20 didn't like long shots, they were.  But that's not a
21 defense.
22          I mean, it's like the bank robber who goes
23 in, hands the demand to a teller, gets arrested for
24 attempt of a crime, but then his defense is, she put
25 the money on the counter but I didn't take it.

1 That's ridiculous.

2        In fact, you heard this in Mr. Goldstein's
3 opening and you heard it in his closing, he didn't
4 get a dime.  He's not charged for getting a dime.
5 That's a different crime.  Again, there's this guy
6 who goes into the bank, puts the note down, makes
7 the ask and he gets arrested, and his defense is,
8 yeah, they didn't give me the money.  Well, that's a
9 defense to bank robbery, but that is not a defense
10 to attempted bank robbery.  He is charged with
11 scheming crimes, attempting, solicitation crimes,
12 asking crimes, and these are not a defense.

13        Does he talk a lot?  Yeah, he does.  He sinks
14 himself on these tapes.  But it's interesting, he
15 also knows, or seems to know when not to talk too
16 much.  He sends John Wyma on the phone call with
17 Rahm Emanuel, and he's the one who tells his brother
18 to act like the whole world is listening.

19        Over and over again, ladies and gentlemen,
20 you see him do things that indicate he knows what
21 he's doing is illegal.  He's the one who cancels the
22 Raghu Nayak meeting.  And when he doesn't have a
23 whole lot to say, it's pretty clear.  He's a
24 convicted liar, I asked him that and he answered
25 yes.  He's got a whole bunch of stuff he wants to

closing argument in rebuttal - by Schar            5493

1  add, he knows now when not to talk.

2        I'm going to try to say again on a variety of

3  different points, no rhyme or reason for all of

4  them, but I'll do my best.

5        Tom Balanoff.  Tom Balanoff wasn't a

6  messenger, that's one of the things you heard him

7  say.  Well, actually, Tom Balanoff was very good

8  when he testified.  He went through all these calls,

9  also on cross-examination.  He actually said on

10  tape, Tom Balanoff came and he had a message from

11  Obama about Valerie Jarrett, Tab 29, here is what

12  the defendant says:

13      "Look, as far as I'm concerned, the only one I'm

14      talking to about this in any tangible way is

15      Balanoff.  I assumed he was sent to talk to me,

16      I believe him, somebody else is all alone, this

17      is the channel that is open to me."

18      Tab 29, page 6.

19        He's the one who said that he understood that

20  Balanoff was the go-between for this back and forth

21  between the president-elect and him.  And the

22  Axelrod thing is priceless, that goes on

23  November 3rd meeting?  He testified on direct

24  examination, he testified on direct examination for

25  about 5 to 6 pages, at least several minutes, here's

closing argument in rebuttal - by Schar          5494

1  what we talked about, there was this whole
2  healthcare issue, then we talked about Congressman
3  Jackson, and then Jan Schakowsky, and this and that
4  and the other.  When did David Axelrod come up?
5  Who?  On cross-examination, on June 6th, that's the
6  first time the defendant mentioned, oh, by the way,
7  in this critical meeting where I understood
8  everything else was formed by David Axelrod, it came
9  up on cross-examination, then it gets inserted.  He
10  makes it up as he goes.
11          MS. KAESEBERG:  Objection.
12          THE COURT:  Overruled.
13          MR. SCHAR:  It's all in the interpretation?
14  I think Mr. Goldstein used that line in a couple of
15  lines, interpretation of those people who come
16  through that door.  Not really.  Go back and listen
17  to the tapes, they're very clear, actually.  They're
18  very clear.
19          And the witnesses that the government called
20  came in and we said what did you understand it to
21  mean.  It's an effective way, I think, to try to
22  highlight certain sections for you so you can go and
23  see what's said, but it's not as if they added some
24  strange spin that you couldn't figure out largely by
25  reading the transcripts.

closing argument in rebuttal - by Schar          5495

1          But there is one person, this guy
2   (indicating), who, when he comes in, the words don't
3   mean what they mean.  He's the only one:
4          Well, when I said to my wife she can still be
5   a senator, I want my 501(c)(4), that wasn't
6   literally accurate, that's not what I meant.  When
7   it looks like I'm saying I will trade HHS for
8   Valerie Jarrett, it's a clumsy literary reference.
9          He is the one, and he is the only one who is
10  coming here and trying to walk away from those words
11  he said in 2008 and come up with a different and new
12  interpretation.  The other witnesses said like it
13  is, yeah, here's what we discussed and here's what
14  we understood we were doing.
15         Now, you didn't hear a huge amount from
16  Mr. Goldstein's argument, you heard a little bit
17  about it, but you heard from the defendant a lot on
18  his direct examination, he had to suggest, I think,
19  that somehow this was all okay because I had my
20  lawyer, my lawyer, my lawyer, my lawyer, Bill
21  Quinlan, my lawyer.  First of all, you are going to
22  be instructed, and it may be slightly
23  counterintuitive, but you're going to be instructed
24  that it is not a defense to think what you're doing
25  here is completely legal.  You probably heard the

closing argument in rebuttal - by Schar          5496

1  phrase "ignorance of the law is no excuse."  He
2  could have gone out and gotten someone to the Senate
3  seat, or something for himself, it's perfectly fine,
4  completely above board, but if he's trying to trade
5  state action for something for himself, it's not a
6  defense.  When you see the phrase "good faith" and
7  Ms. Hamilton told you several times, good faith
8  simply means I did not think that I would create one
9  for the other.  If you decide he was trying to or
10  make efforts to, good faith is not a defense.
11          In fact, the instruction is, he doesn't need
12  to know what he was doing was illegal.  But he
13  clearly did know, he said I have a lawyer, a lawyer.
14  You know who Bill Quinlan is?  He's the guy who
15  works for the City of Illinois as general counsel,
16  these are state issues.
17          You saw the e-mail chain, I think
18  Ms. Hamilton had it up earlier, that dealt with the
19  racetrack bill.  Quinlan is on this for that reason.
20  He had at this entire time period a personal
21  attorney whose area, primary area of expertise was
22  criminal law, and he didn't mention word one during
23  his direct examination, did he?  He didn't mention
24  it at all.  Of course, did not mention to you he had
25  an outside attorney --

closing argument in rebuttal - by Schar          5497

1      MR. GOLDSTEIN:  Objection, Your Honor.

2      THE COURT:  Overruled.

3      MR. SCHAR:  -- he could have talked to about

4  any of this. And that was a stipulation, the last

5  thing the government did in its rebuttal.

6      Bill Quinlan does not have background with

7  criminal law.  He does (indicating), he was a

8  prosecutor, he was a criminal defense attorney.

9  What happens when Bill Quinlan says you shouldn't do

10  something?  He states on cross examination "right,

11  that's a favor worth doing, though."  But Fred Yang,

12  who is not a lawyer, stands up and says, you know,

13  in the sense of needing a replacement for

14  congressman, "it's probably not legal," and his

15  response for him is, yeah, by the time anybody sued

16  to stop me, they would be off on their special

17  election.

18      And if there is any doubt that this guy does

19  what he wants to do, you have the opportunity to see

20  it in this courtroom.  He's got four lawyers over

21  there and they couldn't stop him from doing exactly

22  what he wanted on that stand, he rode right over a

23  federal judge.  The judge struck testimony in this

24  courtroom about irrelevant --

25      MR. GOLDSTEIN:  Objection, your Honor.

closing argument in rebuttal - by Schar          5498

1          THE COURT:  Overruled.

2          MR. SCHAR:  -- testimony and he decided he

3    wanted you to hear that.  And so despite the fact

4    that this federal judge cut him off, don't do that,

5    he snuck it in, got it in again after instructing

6    him not to.  The rules do not apply to him.

7          And what about one more, he was a prosecutor,

8    he was a trial lawyer, he knows what the rules are.

9    When a lawyer stands and objects, you wait for the

10   judge to decide --

11         MR. GOLDSTEIN:  Objection, Your Honor.

12         THE COURT:  Overruled.

13         MR. SCHAR:  -- if the question is improper.

14   If the question is proper, great, if the question is

15   improper, we don't ask.  What's his attitude?

16   "Gotcha."  Remember that one?  This isn't a game.

17   There are rules.  But they don't apply to him.  The

18   "gotcha," did he get it in?  Of course he did.  If

19   he can get it in, he'll do it.

20         And Quinlan, he's telling Quinlan everything?

21   He's suggesting that he would?  He didn't tell him

22   he was going to call Raghu Nayak or have his brother

23   call Raghu Nayak.  He waited until Quinlan got off

24   the phone to cancel the meeting because it was too

25   obvious.

closing argument in rebuttal - by Schar          5499

1     So Harris, he told him, "you can't even joke
2  about the 501(c)(4)."  And, again, this concept that
3  he didn't know somehow, even though it's not a
4  defense, even though he didn't know he was breaking
5  the law in a general sense, the quote Ms. Hamilton
6  left you with at the end of her close, which was in
7  2006, he knows that you cannot use your official
8  action for personal benefit.  And not only did he
9  know it because in fact you see him quoted on it --
10  remember, and you'll have it back there, Government
11  Exhibit Ethics 2, that's the ethics training he
12  took.  They use examples in the training, you can't
13  trade state actions for free bar drinks, you can't
14  trade it in for free bar drinks.  So somehow he was
15  mistaken he could trade it for a cabinet-level
16  position that paid over $100,000?
17          MR. GOLDSTEIN:  Objection.
18          THE COURT:  That argument can stand.
19          MR. SCHAR:  Thank you, Judge.
20          For millions of dollars for a 501(c)(4)?
21          He knows he can't.
22          And again, for someone who talks and argues
23  to you, hey, I didn't know, he also knew exactly,
24  "the whole world is listening, it's too obvious."
25          I think Mr. Goldstein put up a couple of

closing argument in rebuttal - by Schar          5500

1   quotes of press conferences.  You press conferences,
2   those are bold moves by Mr. Goldstein, bold, given
3   what you have seen about this guy's press
4   conferences.  What Mr. Harris told you is not that
5   they're going to have a press conference to announce
6   this trade, what Mr. Harris told you is that this a
7   way a lot of SEIU's do their job, because the
8   concern of the defendant's was that in the Change To
9   Win was that the job was going to disappear in a
10  couple of years if he stayed as governor and they
11  wouldn't be committed.  So have a press conference
12  and announce this is the position you could take
13  once you leave if SEIU forms that job.  There was no
14  suggestion that this somehow is going to be about
15  whether you do one for the other.  The press
16  conference you saw, the only clip of the press
17  conference you saw in this case was the defendant
18  lying to everyone in Illinois about the fact he
19  wasn't interested in the Senate seat, and by
20  omission, failing to mention the fact that he was
21  looking for a whole bunch of different things for
22  himself, that is how he handles press conferences.
23          The 501(c)(4), I don't have a lot to say
24  about that, Ms. Hamilton handled it in closing
25  argument.  I'm not here to repeat it back to you,

closing argument in rebuttal - by Schar          5501

1   you heard it.  Go ahead and look at those calls with

2   Doug Scofield, the concept of "it was unsaid but

3   what I really meant was they weren't connect it,"

4   not only did Mr. Scofield testify about he gets it,

5   the calls were clear, he's tying one to the other.

6   In fact, he explains it to his wife the day before.

7          But Mr. Goldstein put this little section of

8   calls.  What he fails to put up yet was that he had

9   talked, he had talked, there was testimony to

10  Mr. Quinlan about making sure 501(c)(4) was set up

11  legally, and he also -- I'm sorry, that's exactly

12  how Doug Scofield understood it, because he didn't

13  put up Doug Scofield's response to his statement,

14  which is that kind of a 501(c)(4) is not unusual.

15  So Scofield understood it exactly as, yeah, you want

16  to set up a 501(c)(4), that is not unusual or hard

17  thing to do.  And, in addition, what he didn't put

18  up in that quote was the defendant's comments, which

19  again makes it clear he's talking about 501(c)(4)

20  getting set up, these types of deals are

21  commonplace.  Okay, you got two possible

22  interpretations there, either the two he's talking

23  about is setting up a 501(c)(4) make sure it's done

24  correctly, or the deal he's talking about as

25  commonplace is trading a Senate seat for millions of

closing argument in rebuttal - by Schar          5502

1  dollars to a 501(c)(4), I'm fairly confident that
2  would be a first.  So there's only one reasonable
3  interpretation.
4         And, by the way, if he thought it was all
5  above board, either pick up the phone and call Rahm
6  Emanuel yourself and say, well, look, even if you
7  didn't know, but here is what I want to do, can we
8  get this done quickly.  Instead, Rahm Emanuel is
9  calling him at this time, trying to talk to him.
10 This is all above board?  No, it's not above board.
11 What's with the I'm going to call Scofield, Scofield
12 can call Wyma, I want to talk to Wyma, Wyma was
13 being scrutinized by the FBI, he sure seems to think
14 something wrong was going on.
15        HHS, go back and listen at the tapes.
16 Remember, one thing Ms. Hamilton told you to keep in
17 mind, it just takes one ask to convict this
18 defendant, just one.  Whether it's HHS or the
19 501(c)(4), or Jesse Jackson, Jr.; frankly, the
20 scheme to try to get a job at a private organization
21 or private corporation, just one and he's guilty.
22 Mr. Scofield didn't say a whole lot on HHS other
23 than Mr. Balanoff got it wrong.  Look at all the
24 calls on November 7th in relation to HHS, over and
25 over again, on November 7th he makes clear, he asks

closing argument in rebuttal - by Schar          5503

1    for it, he asked for it, it's a long shot, but as he

2    says, he was encouraged, and it's not ludicrous.

3          Jesse Jackson, Jr., what's in his mind,     i

4    think Mr. Goldstein asks what's in his mind on

5    December 4th.  Go through the calls that day.

6    What's in his mind?  The talks he made that morning

7    and he mentions the bribes, and he talks to

8    Mr. Harris, and he mentions the bribes; then he goes

9    to a fundraiser where he gets the money for himself;

10   then he comes back, he talks to Mr. Yang,

11   Mr. Greenlee, and by his own admission, he mentions

12   the bribes again; then he calls his brother, and

13   when his brother mentions money centers, if you're

14   going to name Congressman Jackson, his response is

15   why bother, just go to Raghu Nayak.  That is what is

16   in his mind.

17          And a couple of things that maybe are a

18   little less but worth focusing on a little bit.  Tap

19   70, this is a call to Robert, his brother, his chief

20   fundraiser, to Raghu Nayak, and what did he say?  "I

21   want to talk to you about the stuff we talked about

22   late last month."  The only testimony you've heard

23   about in tapes about what Raghu Nayak was offering

24   was money, was money.  His brother gets what he's

25   talking about in that case with Raghu Nayak.  But

:13PM

:14PM

:14PM

:14PM

:15PM

closing argument in rebuttal - by Schar                5504

1  there's another one, in the very call to his
2  brother, he says to him, "tell Raghu Nayak if
3  there's tangible political support like you offered"
4  like you offered "then start showing us now."
5         All these political ideas, that's him.  The
6  only thing Raghu Nayak had offered was money.  And
7  that's telling.  And if this is about political,
8  this idea of political help, you don't need to
9  send your chief fundraiser to the guy offering the
10 bribe, have someone from state government if he
11 wanted help.
12        And I keep getting stuck, here is -- I know
13 it's a little difficult trying to explain it because
14 they never take it to its logical conclusion:  Okay,
15 I'm never, ever going to pick Jesse Jackson, Jr.,
16 but I want you to send word to Jesse Jackson, Jr.
17 that I want a bunch of stuff that isn't going to
18 really be possible to happen for weeks and weeks,
19 endorsements, help with the mortgage foreclosure
20 bill that the veto isn't even going on right now,
21 wait until January, but all this help wouldn't
22 necessarily come down for me, so I want you to get
23 serious about that because even though I'm never
24 going to pick him, I'll take it, I'll double cross
25 him later, but at the same time, no, no, no, I

:15PM
:15PM
:16PM
:16PM
:16PM

closing argument in rebuttal - by Schar          5505

1   really want Lisa Madigan, which means that within
2   days, he's got a few weeks, all this word is going
3   to be out that this Lisa Madigan deal is going on,
4   and what do you think Jesse Jackson, Jr. is going to
5   say?  It's not -- it's not internally inconsistent.
6   He's got so many different themes, but he won't take
7   any, he won't take any of his themes to a logical
8   conclusion because they are completely contrary,
9   they don't make sense, but there's a simple thing
10  that does make sense that is consistent with the
11  evidence of who Raghu Nayak is, the bribe offer, and
12  why you send your chief fundraiser, and that is
13  they're talking about money, the money Raghu Nayak
14  is offering.

15          And he talked a little bit about the December
16  8th.  December 8th, frankly, doesn't really matter
17  in this case, because from the Senate seat
18  perspective, December 4th is the last -- well, the
19  5th is when they cancelled the meeting, the last
20  significant date in terms of him trying to get
21  bribes.  But for goodness sakes, if you're going to
22  mention December 8th and it was all about, you know,
23  Mr. Goldstein said the last five to seven minutes in
24  his closing, this is the last thing that happened?
25  At least add on the part of the call where he said

closing argument in rebuttal - by Schar          5506

1  "I'm going to wait till January 6th in case I got to
2  throw myself in there, God forbid, because of
3  Rezko."  It doesn't sound like a guy who's made up
4  his mind to do a Lisa Madigan deal.
5          And by the way, the first hour of
6  cross-examination, what he explained was the reason
7  that he was going to wait until January 6th was so
8  that he can get a clean bill of health for the
9  senator he is going to name.
10         And the Lisa Madigan deal, you'll have the
11 calls, November 1st through November 13th.  Go back
12 and look at the calls and see how many times Lisa
13 Madigan is actually mentioned --
14         MR. GOLDSTEIN:  Objection.
15         MR. SCHAR:  That's one, and two, how often is
16 she mentioned in a way that she is not a stalking
17 horse, and you're not going to find it.  She was a
18 stalking horse.  In fact, even at Tab 18 the
19 defendant is talking about leaving Lisa Madigan the
20 seed and then the quote is "that someone runs to
21 Valerie Jarrett and says give him the Department of
22 Health and Human Services."  Lisa Madigan during
23 this entire time period, and he admitted it because
24 he had to because there is a call on November 10th,
25 was a stalking horse for what he can get for the

:18PM

:18PM

:18PM

:19PM

:19PM

closing argument in rebuttal - by Schar          5507

1  president-elect transition, that's what that is.
2          Does it get more formalistic in terms of Lisa
3  Madigan, or at least his interest, after Valerie
4  Jarrett takes a job and he's already asked for the
5  HHS?  Absolutely, I don't dispute that, absolutely.
6  But it doesn't matter.  It doesn't matter, it
7  doesn't somehow blends the requested money from
8  Jesse Jackson, Jr. supporters.  As Ms. Hamilton
9  again told you in her analogy, you can think about
10 doing a variety of different things.  What's charged
11 here is what the actual ask was and the crimes that
12 were committed.  Once he asks or suggests for the
13 money to the 501(c)(4), he schemes about getting
14 jobs, about organizations, once he asks his brother
15 about Raghu Nayak, December 8th, December 7th,
16 December 6th, November 25th, it doesn't matter.
17         Let's go to the racetrack briefly.  I'm not
18 going to rehash all of the evidence, let me say a
19 couple of things.  The Chris Kelly pardon in this, I
20 still don't follow all the machinations between
21 Steinbrenner or Kosar, but what you know is this,
22 and it's the timeframe that matters:  By the
23 defendant's own recording that he put into evidence,
24 he doesn't know, he doesn't put it altogether until
25 after, December 1st after Lon Monk had already

:19PM

:19PM

:20PM

:20PM

:20PM

closing argument in rebuttal - by Schar          5508

1  decided about the message he's going to send.  He
2  says -- on December 4th, excuse me, he says, "now I
3  know," on the evening of December 4th his phone call
4  is "now I know" why Chris called a meeting, he
5  hadn't put it together.  And the other reason you
6  know he hadn't put it together is because he never
7  mentioned it in terms of the connection.
8        On cross-examination he wanted to stay away
9  from the pardon and Mr. Monk at all, because, of
10  course, if he mentions the pardon and Mr. Monk, he
11  had no reason to mention or summarize this very good
12  friend of his, so he says, well, no, on December 3rd
13  I didn't raise it in that meeting because I hadn't
14  talked to Mr. Monk about it, I didn't want to talk
15  to Mr. Monk about the pardon, but of course he
16  actually did on December 4th, he just hadn't
17  connected it.
18        Again, JCAR is in there.  Where is that in
19  the call?  Where is it?  If these are his concerns,
20  it's easy, it's easy, look, go tell John Johnston
21  I can't sign the bill right now, I got to review to
22  review the tollway, and on top of that, I want to do
23  right to do right, he just can't sign.  Why?
24  Johnston is look for a reason, why aren't you
25  signing my bill.  Give him all the legitimate

closing argument in rebuttal - by Schar          5509

1   reasons.  He doesn't mention one word, because
2   that's not what is going on, that is a
3   post-rationalization --
4          MS. KAESEBERG:  Objection.
5          THE COURT:  The objection is overruled.
6          MR. SCHAR:  He talks about, well, Lon Monk
7   says go with him without crossing the line.  And
8   maybe it's not only him, but it doesn't really
9   matter, what matters is the message they agreed to
10  send, and the message they agreed to send was they
11  are talking it up in the same sentence, the governor
12  is concerned that if he signs the bill you're not
13  going to give money, that is a single sentence,
14  tying the two, criminal scheme.  And he says yeah,
15  and then he wants to add separation.  And you heard
16  from Mr. Goldstein well, you know, there was this
17  fire storm last time when he signed the bill and the
18  contribution came in and so that's what he was
19  concerned about.  How does he define separation?
20  One week, one week.  Give me the funds, by the 1st,
21  then I'll sign the bill.  That's the separation?
22  It's ridiculous.  It's ridiculous.
23          Again, a call on December 4th is actually the
24  charged call, "from pressure point of view I'll call
25  him."  What does he say?  "I'll call him."  Is it

:22PM

:22PM

:23PM

:23PM

:23PM

closing argument in rebuttal - by Schar          5510

1    going to get signed next week?  The only explanation
2    to Mr. Monk, I don't know if it's going to get
3    signed next week, I gotta look at JCAR, the poison
4    pill, Chris Kelly. "No, they're good.  I got in his
5    face, good."

6          And this concept that it's two separate
7    conversations, Ms. Hamilton again addressed that
8    topic.  It's a single sentence that he sends him out
9    with that they agree on, that's the conspiracy,
10   they're tied together.

11         The tollway, I'm not going to spend a lot of
12   time on the tollway.  Ms. Hamilton covered that as
13   well.  Mr. Madsen and Mr. Olsen, apparently they're
14   liars.  The two guys that came in from Canada
15   somehow are lying about what the defendant said?
16   How could they possibly remember it?  Well, it was a
17   big deal for them.  A, they were meeting the
18   governor of the State of Illinois, B, the governor
19   was giving them pretty significant financial news,
20   which is I'm going to do this 6-billion-dollar
21   project sometime next year, which is significant for
22   them because they're struggling and it's three times
23   the amount that had just been announced, and there's
24   another one, which is two and a half months later
25   the defendant gets arrested, but they remember.  But

closing argument in rebuttal - by Schar        5511

1  to hear this defendant tell you, or Mr. Goldstein
2  tell you, you know, this defendant sat on the
3  witness stand thinking that probably he wouldn't get
4  caught, "no, I didn't say any of those things in
5  that conversation."  Well, he did, and if he's lying
6  about that, and he is, what does that tell you about
7  everything else that's going on in the tollway?
8        And this concept that he was interested in
9  the capital bill?  Again, I'm not disputing he's
10 interested in the capital bill, but it doesn't
11 matter, it doesn't ultimately matter.  In fact, in
12 some ways, it's worst for him, because if he was
13 never going to do the 6-billion-dollar program but
14 was only using it as leverage to get campaign
15 contributions, it's even worse.  There's no doubt,
16 based on what the two gentlemen had to say and
17 Mr. Krozel, he did mention the 6 billion.  If he
18 never intended to actually do that, not only was he
19 down in the sense of getting campaign contributions
20 from them, he was actually lying to them in the way
21 he was doing it.
22        Now, Mr. Goldstein repeatedly put up on the
23 screen something that said "campaign contributions."
24 Really?  Of course, you can ask for campaign
25 contributions in the United States; of course.  What

closing argument in rebuttal - by Schar          5512

1  he didn't do, you'll be instructed, after the part
2  he put up about campaign contributions, "however, if
3  a public official demands, solicits, seeks or ask
4  for, directly or indirectly, or agrees to accept
5  money or property believing it will be given in
6  exchange for a specific requested exercise of his
7  official power, he has committed bribery or
8  extortion even if the money or property is to be
9  given to the official in the form of campaign
10 contributions."  The issue is not whether campaign
11 contributions can legally be given.  Of course it
12 can.  The issue is whether this defendant was tying
13 the giving of it for state action, that's what the
14 rest of the instruction says and that is what is
15 really at issue.
16          And then Mr. Goldstein says the cop story
17 doesn't make sense because you can ask for a
18 campaign contribution but a police officer can't
19 actually ask for money.  Fine, we'll change the
20 analogy:  Knock, knock, I have a ticket here, I'd
21 like a contribution to Friends of Blagojevich.
22 Okay, he can legally ask for a contribution but he's
23 tying them together, and that's the crime, and
24 that's what's at issue.  In the tollway the
25 defendant is clearly tying them together.  And he

closing argument in rebuttal - by Schar          5513

1  said it to Mr. Krozel, he talked about different

2  programs to Mr. Olsen and to Mr. Madsen.

3        And there's one final thing I want to get on

4  the tollway.  Clearly, they think Mr. Wyma was lying

5  about this.  Well, you heard from Dan Cain

6  yesterday.  And, remember, according to the

7  defendant when he testified, I would never have

8  talked to John Wyma about Jerry Krozel, wouldn't

9  have done it, it would never have come up, there

10  would be no discussion of the tollway plan, no

11  discussion of Lon Monk going to Mr. Krozel, none of

12  that.  Okay.  Well, we know the tollway plan doesn't

13  get announced until October 15th.  Who is the

14  defendant going to talk to John Wyma about Jerry

15  Krozel and therefore John Wyma would have no ability

16  or no understanding that Lon Monk was going to Jerry

17  Krozel.  Why is it relevant to what Dan Cain said

18  yesterday?  Because John Wyma reported that

19  statement to the FBI on October 13th prior to the

20  tollway plan being announced and prior to any time

21  period, apparently, where this defendant would have

22  had a conversation or had a reason to have a

23  conversation with John Wyma.  Wyma is reporting that

24  statement to the FBI at a time where the only way he

25  could have known about those things is if, in fact,

closing argument in rebuttal - by Schar                5514

1  the defendant said it.

2       Children's Memorial Hospital, Ms. Hamilton

3  went over the facts with you.  Again, it's not a

4  done deal, it's a done deal, I've got Wyma going

:30PM  5  while it's pending.  Basically, what Mr. Goldstein

6  focused on was, well, he really did check on the

7  12th and he didn't do anything else after that.  In

8  fact, he did do something else after that, he didn't

9  personally call, he just tried to get somebody else

:30PM  10  to call.  You heard that call yesterday, he sent his

11  brother to try to get in touch with Mr. Monk to see

12  if Mr. Monk would get involved to try to get the

13  money.

14       He didn't give up.  A couple of days later,

:30PM  15  he found out John Wyma was fired, that kind of puts

16  a hole in it.  Well, he didn't give up.  He says,

17  ah-ha, he was shocked to find out, shocked to find

18  out that this was held up, it was held up after his

19  arrest to make.  You know what the evidence is of

:31PM  20  that?  One person, this guy.  Nothing else supports

21  that at all, nothing else.

22       And the other thing Mr. Goldstein didn't

23  touch on because it puts the whole lie to what

24  Ms. Hamilton said, you know the budget was killing

:31PM  25  him.  Mr. Goldstein had no explanation for a guy

closing argument in rebuttal - by Schar        5515

1  who's all about healthcare as to why a couple of
2  weeks later he tried to shovel $15 million off to
3  the Chicago Cubs.  There was no explanation.  Did he
4  love the Cubs?  I'm sure he loves the Cubs, but you
5  got to love more the sick kids.
6        Their phone call on December 4th to Bill
7  Quinlan.  Again, this is in their binder, take a
8  look at that call.  This is a call where -- take a
9  look at that call as to what was said and what
10  wasn't said and the way it's been acted on the call.
11  The call is less about what happened than what the
12  defendant kind of wished would happen.
13        First, first December 4th, the call is on
14  December 4th, weeks and weeks and weeks after he had
15  multiple meetings with Mr. Wyma where he talked
16  about all types of different fund-raising clients.
17  In fact, I think he said he looked at the entire FOB
18  chart.  Remember there's a very small chart with all
19  the names on it.  He went through that entire chart
20  with Mr. Wyma and he finds out he can possibly take,
21  what is the first thing he's concerned about?  Boom,
22  it's Magoon.  He keys in immediately.  Oh, oh, if
23  Wyma is taping me, I gotta be concerned about
24  Children's Memorial and Magoon.  Second, as the
25  defendant told you, this call was about reassurance.

:31PM
:32PM
:32PM
:33PM
:33PM

closing argument in rebuttal - by Schar                5516

1  And he says things in the call that aren't even true

2  to Mr. Quinlan.  He says something along the lines

3  well, they came to me and then I gave the money and

4  after the fact I went to -- I went to Mr. Magoon.

5  In fact, the timeline shows that's not accurately

6  true.  It wasn't after the fact, it was while the

7  decision had not yet been made between the third

8  week of September and October 17th.  He has to be

9  accurate in his explanation as to what he says

10  happened.  Then he says, well, I was having this

11  conversation with Wyma and he come to me and one

12  wasn't for the other, blah-blah-blah.  Well, first

13  what that shows you is, he knew full well in every

14  context for the Senate seat and everything else, one

15  can't be for the other.  Second, what it tells you

16  is he's just inserting facts that aren't true.  Not

17  even Mr. Wyma, not even the defendant testified.  In

18  fact as part of the conversation with Mr. Wyma, he

19  said, "hey, one is not for the other," he's just

20  adding, seeking reassurance that, okay, if they tape

21  me, I immediately think if he knows Children's

22  Memorial Hospital is a problem for me, so I'm going

23  to add "one is not for the other."

24          And, finally, what does he omit?  He omits

25  the entire story.  He doesn't say, well, look, I

:33PM

:34PM

:34PM

:34PM

:35PM

closing argument in rebuttal - by Schar          5517

1  don't think there's going to be a problem because on
2  November 12th my brother came to me, he said, we're
3  having an issue with fundraising and I said no
4  problem, let me check to see whether I can even call
5  him, so I called up Bob Greenlee and I said to Bob
6  Greenlee, hey, what's going on with this thing, I
7  found out it's still pending and I was, like, whoa,
8  I'm not calling this guy, that would be completely
9  wrong.  It's not on the call because it didn't
10  happen.  On December 4th he didn't say any of that,
11  he didn't say any of that.  That call doesn't save
12  the defendant, it further sinks him.
13          The school, I want to talk briefly about the
14  school.  Again, I don't want to rehash the facts
15  over and over with you, but what Mr. Goldstein
16  focused on is, look, we don't know why the money was
17  held up.  A couple of things:  First, the gentleman
18  that came in from OMB yesterday, all he can tell you
19  is that by May 30th he had two ways to fund the
20  school, and the hold up appeared to be the governor.
21  But you know what?  It's focusing on the wrong
22  thing, it doesn't matter.  This could've been a
23  completely legitimate hold-up of the money.  The
24  issue you need to decide is did he send or attempt
25  to send Bradley Tusk out to send a message that he

closing argument in rebuttal - by Schar          5518

1  wanted a fundraiser to release the money that was
2  apparently held up, for whatever reason it was held
3  up.  And so what it comes down to, really, is a very
4  simplistic level on this, for the school, if you
5  believe the defendant or do you believe Bradley
6  Tusk, at base, that's what this comes down to.  Do
7  you believe the defendant or did do you believe
8  Bradley Tusk.
9       Well, Mr. Goldstein told you Bradley Tusk
10 came in here and lied to you, just made it up, made
11 the whole conversation up, it was false, is what he
12 said.  Of course he would say because if Bradley
13 Tusk is telling the truth, he's convicted.
14      All right, who is Bradley Tusk and why is he
15 in a federal courtroom lying to you?  At least have
16 the courtesy to give a motivation for the guy.
17 Bradley Tusk, a former deputy governor, and he
18 doesn't even live in the State of Illinois, he lives
19 in New York, he works out there.
20      MR. GOLDSTEIN:  Objection, Your Honor.
21      THE COURT:  Overruled.
22      MR. SCHAR:  He shows up here, he tells you
23 what he remembers from that conversation.  I think
24 he was awfully credible, you will determine that,
25 you will be the judge of that, you will determine

closing argument in rebuttal - by Schar          5519

1  that.  What motivation does he come in to sit on

2  that witness stand, swear to tell the truth, and

3  then lie in front of you?  What's the motivation?

4          MS. KAESEBERG:  Judge, objection.  This is a

5  pretrial issue.

6          THE COURT:  Overruled.

7          MR. SCHAR:  I can't give you one.  And if

8  they could've given you one, you would have heard

9  it.

10          MS. KAESEBERG:  Objection.

11          THE COURT:  Overruled.

12          MR. SCHAR:  They don't have it.  He has no

13  reason to lie.  Now, on the other side of the

14  equation, you have the defendant.  Who is, in fact,

15  a convicted liar.  Whose got every reason to try to

16  get out from under this.  You saw him on the stand

17  for days, you'll judge his credibility.  But not

18  only is he a convicted liar, somehow he then went

19  downstairs and suggested, well, things are unfair,

20  my conviction, the FBI was unfair, I didn't have a

21  court reporter there, even though as you heard

22  yesterday from the two agents they sat in that

23  office and recorded the entirety, he skips that part

24  of it and then says, you know, I didn't remember

25  that even though he was --

closing argument in rebuttal - by Schar          5520

1      MR. GOLDSTEIN:  Objection, Your Honor.

2      THE COURT:  Overruled.

3      MR. SCHAR:  -- even though he was convicted,

4  he said it from that witness stand he was convicted.

5      A guy who tells you my internal process here

6  is an external process, a guy who tells you, I'm

7  really all about what's good for the people of

8  Illinois.  Listen to those tapes.  He lies over and

9  over again if he thinks it's in his best interest to

10  do that.  He has every motivation to lie.

11      THE COURT:  You have ten minutes remaining.

12      MR. SCHAR:  Thank you, Judge.

13      Now, I want to come back where I started

14  with, which is that somehow we forced a bunch of

15  people to come in here and lie to you to frame an

16  innocent man, that we at this table encouraged

17  everyone to tell mistruths and we're framing Rod

18  Blagojevich.  Well, so let's look at the start of

19  this.  Is the defendant lying or is everyone else

20  lying?  On one side of the equation you have the

21  defendant when he made that walk from there to there

22  and every week to tell you what he needed to tell

23  you in order to not be convicted in this court, and

24  he has already been convicted, and according to him,

25  if you believe him, and according to Mr. Goldstein,

closing argument in rebuttal - by Schar          5521

1  Richard Olsen came in here and lied to you; Eric
2  Madsen came in here and lied to you; Patrick Magoon
3  lied to you; Bradley Tusk came in and lied to you;
4  Gerald Krozel came in and lied to you as well; John
5  Wyma came in, he's a liar too; Tom Balanoff, he lied
6  as well; Doug Scofield, he's a liar too; Bob
7  Greenlee, according to the defendant, a liar as
8  well; John Harris, also according to the defendant,
9  a liar, all here at the government's urging to frame
10 the defendant.
11         They're on one side and the defense today in
12 the 2011 version of Rod Blagojevich is on the other
13 side, but there is an interesting version -- oh,
14 Mr. Monk as well.  His on words on tape, because
15 back in 2008, in the recordings that you have, the
16 defendant apparently is framing himself, he's
17 framing himself because what he says is completely
18 consistent with what the other people say, with what
19 the evidence is, and what the crimes he's been
20 charged with.  So, apparently, somehow all these
21 people got him back in 2008 when no one knew they
22 were being recorded to say a bunch of things that
23 are actually incriminating of himself, that's what
24 you have on one side, a great frame-up, according to
25 the defendant who is on the other side, and the only

closing argument in rebuttal - by Schar          5522

1  one who came in here is a convicted liar.

2        I should have added John Harris, John Harris

3  was lying as well, John Johnston; it's ridiculous.

4  It's ridiculous.  All it shows you is the evidence

5  is overwhelming.

6        And what about motive?  Who's got motive?

7  Back in 2008 he tells you, he doesn't want to be

8  governor anymore.  He is personally cash-strapped

9  because he overspent.  He overspent and you will

10  have the charts back there.  And his campaign funds

11  is low.  And the FBI and the U.S. Attorney's Office

12  is going to frame the defendant, what's the last

13  thing we'd do?  The last thing we'd do is 2008 when

14  we knew we had an informant man is don't have a

15  wiretap.  That's the last thing we'd do because an

16  innocent man on a wiretap would say, Senate seat?

17  Forget it, we do what's right for the People of

18  Illinois.  Someone talking about a bribe?  Are you

19  kidding?  Just report it to the FBI.  We can't ask

20  Johntson, Magoon, Krozel for money, they're in the

21  middle.  Significant legislative issues or bills?  I

22  don't want to touch that.  We'll do what we have to

23  do and we'll get the money in another way.  Those

24  are the words of an informant man.

25        What you hear back in 2008 are the words of

:42PM

:42PM

:43PM

:43PM

:43PM

closing argument in rebuttal - by Schar          5523

1    guilty.  This is not some large government frame-up,
2    but that's what they want you to believe.
3            Ladies and gentlemen, the people of Illinois,
4    the people of Illinois put their trust on this
5    defendant.  He had the power, he had a lot of power
6    in him, the power to become senator, help the
7    schools, help hospitals, sign legislation.  He had
8    the power and people trusted him and he didn't do
9    that.
10           Now, you as a group collectively are trusted
11   with the law.  You have the power to do justice.
12   This is now your power.  And it is a serious
13   responsibility.  It's a serious responsibility, but
14   your burden enforces the law and the lack of
15   responsibility this defendant has demonstrated.
16   You, as the jury, know it is right and you are the
17   only ones who can show this defendant what is right.
18   You are the only ones who can show him he should not
19   have abused the trust given to him.  You are the
20   only ones, you are the only ones who can show him
21   the difference between both right and wrong, that is
22   the power you have.  That is a power you have.  Your
23   work will speak the truth.  Your word will speak the
24   truth, and the truth is he is guilty, find him
25   guilty.

Jury Charge                                              5524

1          THE COURT:  Counsel, I'd like one attorney
2    from each side to come to the side.
3       (Proceedings heard at sidebar on the record.)
4          THE COURT:  This is the alternate juror,
5    okay.  I'll write it down.
6       (Proceedings resumed within the hearing of the
7        jury.)
8                   INSTRUCTIONS TO THE JURY
9          BY THE COURT:  I'm now going to read the
10   instructions to you.  Don't bother to take notes
11   unless you feel some compulsion to write them down,
12   because you'll have a book.
13         Members of the jury, you have seen and heard
14   all the evidence and the arguments of the attorneys,
15   now I will instruct you on the law.
16         And some of these instructions you heard
17   before because I gave them to you in the beginning,
18   but most of them you haven't.
19         You have two duties as a jury.  Your first
20   duty is to decide the facts from the evidence in
21   this case, this is your job and yours alone.
22         Your second duty is to apply the law that I
23   give you to the facts.  You must follow these
24   instructions even if you disagree with them.  Each
25   of these instructions is important and you must

Jury Charge                                    5525

1  follow all of them.
2       Perform these duties fairly and impartially.
3  Do not allow sympathy, prejudice, fear of public
4  opinion to influence you.
5       Nothing I say now, and nothing I said or did
6  during the trial is meant to indicate any opinion on
7  my part about what the facts are or what your
8  verdict should be.
9       The evidence consists of it the testimony of
10 the witnesses, the exhibits admitted in evidence,
11 and stipulations.
12      A stipulation is an agreement between both
13 sides that certain facts are true or that a person
14 would have given certain testimony.
15      You are to decide whether the testimony of
16 each of the witnesses is truthful and accurate, in
17 part, in whole or not at all, as well as what
18 weight, if any, you give to the testimony of each
19 witness.
20      In evaluating the testimony of any witness
21 you may consider, among other things:
22      The witness's age;
23      The witness's intelligence;
24      The ability and the opportunity the witness
25 had to see, hear, or know the things that the

1 witness testified about;

2        The witness's memory, any interest, bias or
3 prejudice the witness may have;

4        The manner of the witness while testifying;
5 and the reasonableness of the witness's testimony in
6 light of all the evidence in the case.

7        You should judge the defendant's testimony in
8 the same way you judge the testimony of any other
9 witness.

10        You should use common sense in weighing the
11 evidence and considering the evidence in light of
12 your own observations in life.

13        In our lives, we often look at one fact and
14 conclude from it that another fact exists.  In law
15 we call this "inference."  A jury is allowed to make
16 reasonable inferences.  Any inferences you make must
17 be reasonable and must be based on the evidence in
18 the case.

19        Some of you have heard, probably all of you,
20 have heard the phrases "circumstantial evidence" and
21 "direct evidence."  Direct evidence is evidence
22 that, if you believe it, directly proves a fact.
23 Circumstantial evidence is evidence that, if you
24 believe it, indirectly proves a fact.  The law makes
25 no distinction between the weight to be given either

Jury Charge                                    5527

1  direct or circumstantial evidence.  You should
2  decide how much weight to give to any evidence.  All
3  the evidence in the case, including the
4  circumstantial evidence, should be considered by you
5  in reaching your verdict.
6          Certain things are not evidence.  I will list
7  them for you now:
8          First, testimony that I struck from the
9  record or that I told you to disregard is not
10 evidence and must not be considered;
11         Second, anything you may have seen or heard
12 outside the courtroom is not evidence and must be
13 entirely disregarded.  This includes any press,
14 radio, or television reports you may have seen or
15 heard.  Such reports are not evidence and your
16 verdict must not be influenced in any way by such
17 publicity;
18         Third, questions and objections by lawyers
19 are not evidence.  Attorneys have a duty to object
20 when they believe a question is improper.  You
21 should not be influenced by the fact that a lawyer
22 made an objection.  If I sustain an objection to a
23 question that the lawyer asked, you must disregard
24 the question and must not speculate on what the
25 answers might have been.

Jury Charge                                      5528

1        Fourth, the lawyers' statements are not
2   evidence.  The purpose of these statements is to
3   discuss the issues and the evidence.  If the
4   evidence, as you remember it, differs from what the
5   lawyer said, your memory is what counts.
6        Any notes you have taken during this trial
7   are only aids to your memory.  The notes are
8   themselves not evidence.  If you have not taken
9   notes you should rely on your independent
10  recollection of the evidence and not be unduly
11  influenced by the notes of the other jurors.  Notes
12  are not entitled to any greater weight than the
13  recollections or impressions of each juror about the
14  testimony.
15       It is proper for an attorney to interview any
16  witness in preparation for trial.
17       You may find the testimony of one witness or
18  a few witnesses more persuasive than the testimony
19  of a larger number.  You need not accept the
20  testimony of the larger number of witnesses.
21       The indictment in this case is the formal
22  method of accusing the defendant of an offense and
23  placing him on trial.  It is not evidence against
24  the defendant and does not create any inference of
25  guilt.

1        The Defendant Rod Blagojevich is charged with
2    wire fraud, Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, and
3    10, attempted extortion, Counts 11, 12, 16 and 19,
4    conspiracy to commit extortion, Counts 14 and 18,
5    soliciting bribes, Counts 13 and 17, and conspiracy
6    to solicit and accept bribes, Counts 15 and 20.  The
7    defendant has pled not guilty to each of these
8    charges.
9        The defendant is presumed to be innocent of
10   each of these charges.  This presumption continues
11   during every stage of the trial and your
12   deliberations on the verdict.  The presumption of
13   innocence is not overcome unless from all the
14   evidence in this case you are convinced beyond a
15   reasonable doubt that the defendant is guilty as
16   charged.  The government has the burden of proving
17   the guilt of the defendant beyond a reasonable
18   doubt.  The burden of proof stays with the
19   government throughout the case.  A defendant is
20   never required to prove his innocence or to produce
21   any witnesses or evidence at all.
22       You have heard evidence that before the trial
23   witnesses made statements that may be inconsistent
24   with the witness's testimony here in court.  If you
25   find that it is inconsistent, you may consider the

Jury Charge                                                    5530

1   earlier statement only in deciding the truthfulness
2   and accuracy of that witness's testimony in this
3   trial.  You may not use it as evidence of the truth
4   of the matters contained in that prior statement.
5          You have heard evidence that before the trial
6   a witness may have made a statement that may be
7   consistent with the witness's testimony here in
8   court.  If you find that such a statement is
9   consistent with the witness's testimony, you may
10  consider the earlier statement in deciding the
11  truthfulness and accuracy of that witness's
12  testimony in this trial.
13         You have heard evidence that before the trial
14  the defendant may have made statements that may be
15  inconsistent with his testimony here in court.  You
16  may consider an inconsistent statement by the
17  defendant made before trial to help you to decide
18  how believable the defendant's testimony was here in
19  court and also as evidence of the truth of whatever
20  the defendant said in the earlier statement.
21         You have heard testimony from Rajinder Bedi,
22  John Johnston, Gerald Krozel and John Wyma who
23  received immunity, that is a promise from the
24  government that any testimony or information they
25  provided would not be used against them in a

Jury Charge                                          5531

1  criminal case.

2         You may give the testimony of Rajinder Bedi,

3  John Johnston, Gerald Krozel, and John Wyma such

4  weight as you feel it deserves, keeping in mind that

5  it must be considered with caution and great care.

6         You have heard testimony from John Harris and

7  Alonzo Monk who have pled guilty to offenses related

8  to certain of the occurrences for which the

9  defendant is now on trial.  Their guilty pleas are

10 not to be considered as evidence against the

11 defendant.

12        John Harris and Alonzo Monk have also each

13 received benefits from the government, including a

14 promise by the government to recommend a reduced

15 sentence in return for their truthful cooperation.

16 You may give the testimony of John Harris and Alonzo

17 Monk such weight as you feel it deserves, keeping in

18 mind that it must be considered with caution and

19 great care.

20        You have heard evidence that the defendant

21 has been convicted of a crime.  You may consider

22 this evidence only in deciding whether the

23 defendant's testimony is truthful in whole, in part,

24 or not at all.  You may not consider it for any

25 other purpose.  A conviction of another crime is not

Jury Charge                                    5532

1  evidence of the defendant's guilty of any crime for
2  which the defendant is now charged.
3          Certain financial summaries are in evidence.
4  They truly and accurately summarize the contents of
5  voluminous books, records, or documents and should
6  be considered together with and in the same way as
7  all other evidence in the case.
8          Certain timelines are in evidence.  The
9  original material upon which the timelines are based
10 has also been admitted into evidence.  The timelines
11 are not independent evidence of the subject matter.
12         You have heard recorded conversations.  These
13 recorded conversations are proper evidence and you
14 may consider them just as any other evidence.  When
15 the recordings were played during trial you were
16 furnished with transcripts of the recorded
17 conversations prepared by government agents.  The
18 recordings are the evidence and the transcripts were
19 provided to you only as a guide to help you follow
20 as you listen to the recordings.  The transcripts
21 are not evidence of what was actually said or who
22 said it.  It is up to you to decide whether the
23 transcripts correctly reflect what was said and who
24 said it.
25         If you noticed any differences between what

Jury Charge                          5533

1   you heard on the recordings and what you read in the

2   transcripts, you must rely on what you heard, not

3   what you heard.  If after careful listening you

4   could not hear or understand certain parts of the

5   recordings, you must ignore the transcripts as far

6   as those parts are concerned.

7           Some of the transcripts you have received are

8   marked at various points with asterisks.  The

9   asterisks indicate a portion of the conversation

10  that has been properly removed pursuant to court

11  order.  You must not speculate regarding the content

12  of any conversation or any portion of a conversation

13  that has not been presented to you either by way of

14  a recording or through testimony.  You can consider

15  conversations described in testimony.

16          I will provide you with recordings and a

17  computer which will play the recordings.  You are

18  not required to play the recordings in part or in

19  whole.  You may rely instead on your recollections

20  of these recordings as you heard and saw them at

21  trial.  I'm also providing you with copies of the

22  transcripts you had in court.  You may, however,

23  choose to listen to the audio recordings without the

24  transcript.

25          The indictment charges that the offenses were

Jury Charge                                          5534

1   committed on or about certain dates.  The government
2   must prove that the offenses happened reasonably
3   close to the dates alleged, but is not required to
4   prove that the alleged offenses happened on those
5   exact dates.
6          When the word "knowingly" or the phrase "the
7   defendant knew" is used in these instructions, it
8   means that the defendant realized what he was doing
9   and was aware of the nature of his conduct and did
10  not act through ignorance, mistake, or accident.
11         Knowledge may be proved by the defendant's
12  conduct and by all the facts and circumstances
13  surrounding the case.
14         To "attempt" means that the defendant
15  knowingly took a substantial step toward the
16  commission of the offense with the intent to commit
17  that offense.
18         An offense may be committed by more than one
19  person.
20         The defendant's guilt may be established
21  without proof that the defendant personally
22  performed every act constituting the crime charged.
23         Any person who knowingly aids, counsels,
24  commands, induces, or procures the commission of an
25  offense may be found guilty of that offense.  That

Jury Charge                                              5535

1  person must knowingly associate with the criminal
2  activity, participate in the activity, and try to
3  make it succeed.
4          If the defendant knowingly caused the acts or
5  omissions of another, the defendant is responsible
6  for those acts as though he personally committed
7  them.
8          The law allowed the government to use various
9  deceptive and disguised investigative techniques,
10 including covert or hidden wiretaps.  These are
11 permissible and recognized means of criminal
12 investigation.  Any opinions you may hold regarding
13 the use of investigative techniques to detect
14 unlawful activities are not to enter into your
15 deliberations in any way.
16         The next series of instructions basically
17 define the offense and what it is that must be
18 proved.
19         Counts 1 through 10 of the indictment charge
20 the defendant with wire fraud.
21         To sustain the charge of wire fraud as
22 charged in Counts 1 through 10 the government must
23 prove the following propositions beyond a reasonable
24 doubt:
25             First, that the defendant knowingly devised

Jury Charge                                                5536

1  or participated in a scheme to defraud the public of
2  its right to the honest services of Rod Blagojevich
3  or John Harris by demanding, soliciting, seeking,
4  asking for, or agreeing to accept a bribe in the
5  manner described in the particular count you are
6  considering;
7          Second, that the defendant did so with the
8  intent to defraud;
9          Third, that the scheme to defraud involved a
10 materially false and fraudulent pretense,
11 representation, promise or concealment;
12         And fourth, that for the purpose of carrying
13 out the scheme, or attempting to do so, the
14 defendant used or caused the use of interstate wire
15 communications to take place in the manner charged
16 in the particular count you are considering.
17         If you find from your consideration of all
18 the evidence that each of these propositions has
19 been proved beyond a reasonable doubt, you should
20 find the defendant guilty of the particular count
21 you are considering.
22         If, on the other hand, you find from your
23 consideration of all the evidence that any of these
24 propositions has not been proved beyond a reasonable
25 doubt, you should find the defendant not guilty of

Jury Charge                                    5537

1   the particular count you are considering.

2        A scheme, a scheme is a plan or course of

3   action formed with the intent to accomplish some

4   purpose.

5        A scheme to defraud is a scheme that is

6   intended to deceive or cheat the public in order to

7   deprive the public of the intangible right to honest

8   services through bribery.  A public official owes a

9   duty of honesty and loyalty to act only in the

10  public's interest.

11       In considering whether the government has

12  proven a scheme to defraud it is essential that one

13  or more of the acts charged in the portions of the

14  indictment describing the scheme be proved

15  establishing the existence of the scheme beyond a

16  reasonable doubt.  The government, however, is not

17  required to prove all of them.

18       As officials and employees of the State of

19  Illinois, Rod Blagojevich and John Harris were

20  public officials who owed a duty of honest services

21  to the People of the State of Illinois.

22       A public official commits bribery when he

23  directly or indirectly demands, solicits, seeks, or

24  asks for, or agrees to accept something of value

25  from another person in exchange for a promise for or

Jury Charge                                    5538

1  performance of an official act.  The proposed

2  exchange may be communicated in any manner and need

3  not be communicated in any specific or particular

4  words so long as the public official intends to seek

5  or accept something of value in exchange for a

6  specific official act.

7        The term "something of value" includes money,

8  property, and prospective employment.

9        An official act is any decision or action on

10 any question which may at any time be pending before

11 the public official in his official capacity or in

12 his position of trust.  It is not necessary that the

13 exchange or proposed exchange be communicated in

14 expressed terms.  It is not necessary that the

15 public official have the power to or did perform the

16 act for which he was promised or which he agreed to

17 receive something of value.  It is sufficient if the

18 matter was one that was before him in his official

19 capacity.  Nor is it necessary that the public

20 official, in fact, intended to perform the specific

21 official act.  It is sufficient that the public

22 official knew that the thing of value was offered

23 with the intent to exchange the thing of value for

24 the performance of an official act.

25        A public official's demanding, soliciting,

Jury Charge                                    5539

1   seeking or asking for, directly or indirectly, or
2   agreeing to accept a campaign contribution, by
3   itself, does not constitute bribery, even if the
4   person making the contribution has business pending
5   before the official.
6          It is not enough that the contributor is
7   making the contribution to create good will or with
8   the vague expectation of help in the future;
9   however, if a public official demands, solicits,
10  seeks or asks for directly or indirectly, or agrees
11  to accept money or property believing that it would
12  be given in exchange for a specific requested
13  exercise of his official power, he has committed
14  bribery even if the money or property is to be given
15  to the official in the farm of a campaign
16  contribution.
17         A scheme to defraud must involve the material
18  misrepresentation, false statement, false pretense,
19  or concealment of fact.
20         A misrepresentation, false statement, false
21  pretense, or concealment is material if it has a
22  natural tendency to influence or is capable of
23  influencing a decision or action of the public.
24         It is not necessary that the
25  misrepresentation, false statement, false pretense,

Jury Charge                                    5540

1 or concealment actually have that influence or be
2 relied on by the public so long as it had the
3 potential or capability to do so.
4        A person acts with the intent to defraud if
5 he acts knowingly with the intent to deceive, or
6 cheat the public in order to deprive the public of
7 the public's official's honest services through
8 bribery.
9        In order to prove a scheme to defraud, the
10 government does not have to prove that the defendant
11 contemplated actual or foreseeable financial loss to
12 the victim of a scheme.
13       The wire fraud statute can be violated
14 whether or not there is any actual financial loss or
15 damage to the victim of a crime or actual financial
16 gain to the defendant.  The government need not
17 prove that the scheme to defraud actually succeeded.
18       The government must prove that interstate
19 communication facilities were used to carry out the
20 scheme or were an incident to an essential part of
21 the scheme.  In order to use or cause the use of an
22 interstate wire communication the defendant need not
23 actually intend that use to take place, you must
24 find that the defendant knew that this use would
25 actually occur or that the defendant knew it would

Jury Charge                              5541

1    occur in the ordinary course of business or that the
2    defendant knew facts from which that use could
3    reasonably have been foreseen.
4         The government does not have to prove that
5    the defendant knew that the wire communication was
6    of an interstate nature.
7         Although an interstate communication need not
8    itself contain a demand, solicitation, or a request
9    for a bribe it must further or attempt to further
10   the scheme.
11        Each separate use of interstate
12   communications facility in furtherance of a scheme
13   defraud constitutes a separate offense.
14        A telephone call constitutes a transmission
15   by means of wire communication in interstate
16   commerce within the meaning of the wire fraud
17   statute if the call occurs across state lines.
18        For purposes of Counts 1 through 10, good
19   faith on the part of the defendant is inconsistent
20   with the intent to defraud which is an element of
21   the charges.
22        In the context of this case, good faith means
23   that the defendant acted without intending to
24   exchange official actions for personal benefits.
25        The burden is not on the defendant to prove

Jury Charge                                    5542

1  his good faith; rather, the government must prove

2  beyond a reasonable doubt that the defendant acted

3  with the intent to defraud.

4          The government is not required to prove that

5  the defendant knew his acts were unlawful.

6          The next series of instructions deals with

7  the charged extortion, attempted extortion in this

8  case.

9          The defendant is charged with attempted

10 extortion in Counts 11, 12, 16 and 19.  To sustain

11 the charge of attempted extortion as charged in

12 Counts 11, 12, 16 and 19 the government must prove

13 the following propositions:

14         First, that the defendant knowingly attempted

15 to obtain money or property from the person or

16 entity described in the particular count you are

17 considering;

18         Second, that the defendant did so by means of

19 extortion under color of official right as that term

20 is defined in these instructions;

21         Third, that the defendant believed that the

22 person or entity described in the particular count

23 you are considering would have parted with the money

24 or property because of the extortion;

25         Fourth, that the conduct of the defendant

Jury Charge                                        5543

1  would have affected or had the potential to affect
2  interstate commerce.

3         Again, if you find from your consideration of
4  all the evidence that each of these propositions has
5  been proved beyond a reasonable doubt, you should
6  find the defendant guilty of the particular count
7  you are considering.

8         If, on the other hand, you find from your
9  consideration of all the evidence that any of these
10 propositions has not been proved beyond a reasonable
11 doubt, you should find the defendant not guilty of
12 the particular count you are considering.

13        Extortion under color of official right
14 occurs when a public official receives or attempts
15 to obtain money or property to which he is not
16 entitled believing that the money or property would
17 be given in return for the taking, withholding, or
18 other influencing of official action.

19        Although the official must receive or attempt
20 to obtain the money or property, the government does
21 not have to prove that the public official first
22 suggested the giving of money or property or that
23 the official asked for or solicited it.

24        While the official must receive or attempt to
25 obtain the money or property in return for the

1  official action, the government does not have to
2  prove the official actually took or intended to take
3  that action or that the initially could have
4  actually taken the action in return for which
5  payment was made or demanded or that the official
6  would not have taken the same action even without
7  payment.
8        Acceptance by a public official of a campaign
9  contribution by itself does not constitute extortion
10 under color of official right even if the person
11 making the contribution has business pending before
12 the official.  However, if an official receives or
13 attempts to obtain money or property believing that
14 it would be given in exchange for specific requested
15 exercise of his official power, he has committed
16 extortion under color of official right even if the
17 money or property is to be given to the official in
18 the form of a campaign contribution.
19       The term "property" as used in these
20 instructions includes any valuable right considered
21 as a source of wealth.
22       In order to prove attempted extortion or
23 conspiracy to commit extortion the government must
24 prove that the defendant attempted or conspired to
25 obtain property or money knowing or believing that

1  it would be given to him in return for the taking,

2  withholding, or other influencing of specific

3  official action.

4        The exchange or proposed exchange may be

5  communicated in any manner and need not be

6  communicated in any specific or particular words as

7  long as the public official intends to seek or

8  accept the money or property in return for the

9  taking, withholding, or other influencing of a

10  specific act.

11        For the purposes of Counts 11, 12, 14, 16, 18

12  and 19, good faith on the part of the defendant is

13  inconsistent with intent to commit extortion, an

14  element of the charges.  In the context of this

15  case, good faith means that the defendant acted

16  without intending to exchange official actions for

17  personal financial benefits.

18        The burden is not on the defendant to prove

19  his good faith; rather, the government must prove

20  beyond a reasonable doubt that the defendant acted

21  with intent to commit extortion.  The government is

22  not required to prove that the defendant knew his

23  acts were unlawful.

24        With respect to the attempted extortion

25  counts, the government must prove that the

Jury Charge                                          5546

1  defendant's actions affected or had the potential to
2  affect interstate commerce in any way or degree.
3  This means that the natural consequences of the
4  defendant's actions would have been to have some
5  effect on interstate commerce, however minimal, this
6  would include reducing the assets of a business that
7  customarily purchased its goods from outside the
8  State of Illinois or actually engaged in business
9  outside the State of Illinois, if those assets would
10 have been available to the business for the purchase
11 of such goods or the conducting of such business if
12 not for the defendant's conduct.
13      It is not necessary for you to find that the
14 defendant knew or intended that his actions would
15 effect interstate commerce or that there would have
16 been any actual effect on interstate commerce.
17      The defendant is charged in Counts 14 and 18
18 with conspiracy, conspiracy to commit extortion.
19      To sustain the charge of conspiracy as
20 charged in those counts the government must prove
21 the following propositions:
22      First, that the conspiracy as charged in the
23 particular count you are considering existed;
24      Second, that the defendant knowingly became a
25 member of the conspiracy with the intention to

1  further the conspiracy.

2      If you find from your consideration of all

3  the evidence that each of these propositions has

4  been proved beyond a reasonable doubt, you should

5  find the defendant guilty of the particular count

6  you are considering.

7      If, on the other hand, you find from your

8  consideration of all the evidence that any of these

9  propositions has not been proved beyond a reasonable

10 doubt, you should find the defendant not guilty of

11 the particular count you are considering.

12     A conspiracy is an agreement between two or

13 more persons to accomplish an unlawful purpose.  A

14 conspiracy may be established even if its purpose is

15 not accomplished.

16     To establish the existence of the charged

17 conspiracy and its common purpose or purposes the

18 government need not establish that there existed a

19 formal agreement to conspire.  The agreement may be

20 inferred from all of the circumstances and the

21 conduct of all the alleged participants.  The

22 conspiracy may be proved by circumstantial evidence

23 and reasonable inferences drawn from that evidence

24 concerning the relationship of the parties and the

25 totality of their conduct.

Jury Charge                                    5548

1       The government need not prove that the
2  defendant participated in all of the events of the
3  conspiracy.  The government must prove beyond a
4  reasonable doubt that the defendant was aware of the
5  common purpose and was a willing participant.
6       In deciding whether the charged conspiracy
7  exists, you may consider the actions and statements
8  of every one of the alleged participants.
9       An agreement may be proved from all the
10  circumstances and the words and conduct of all the
11  alleged participants which are shown by the
12  everyday.
13       In deciding whether the defendant joined the
14  charged conspiracy, you must base your decision only
15  on what the defendant did or said.
16       In determining what the defendant did or
17  said, you may consider the defendant's own words or
18  acts.  You may also consider the words and acts of
19  other persons to decide what that defendant did or
20  said and you may use them to help you understand
21  what that defendant did or said.
22       The last set of these instructions, other
23  than some final ones, concerns soliciting bribes.
24  The defendant is charged in Counts 13 and 17 with
25  soliciting bribes.

1    To sustain the charge of soliciting bribes as
2  charged in Counts 13 and 17, the government must
3  prove the following propositions:
4    First, that the defendant Rod Blagojevich was
5  an agent of the State of Illinois;
6    Second, that the defendant solicited or
7  demanded anything of value from another person;
8    Third, that the defendant did so corruptly
9  with the intent to be influenced or rewarded in
10 connection with some business, some transaction, or
11 series of transactions of the State of Illinois;
12   Fourth, that this business or transaction or
13 series of transactions involved anything of value
14 $5,000 or more;
15   And fifth, that the State of Illinois in any
16 one year received benefits of more than $10,000
17 under any federal program involving a grant,
18 contract subsidy, loan guarantee, insurance, or
19 other assistance.
20   This one-year period must begin no more than
21 12 months before the defendant committed these acts
22 and must end no more than 12 months afterwards.
23   This is true of all of offenses which have
24 elements or propositions that have to be proven.
25   If you find from your consideration of all

Jury Charge                                      5550

1  the evidence that each of these propositions has
2  been proved beyond a reasonable doubt as to
3  particular count, you should find the defendant
4  guilty of that count.
5        If, on the other hand, you find from your
6  consideration of all the evidence that any of these
7  propositions has not been proved beyond a reasonable
8  doubt as to a particular count, you should find the
9  defendant not guilty of that count.
10       For purposes of Counts 13, 15, 17 and 20, a
11 person acts corruptly when that person acts with the
12 understanding that something of value is to be
13 offered or given to reward or influence him in
14 connection with his official duties.
15       A defendant may act corruptly even if he's
16 only partially motivated by the expectation or
17 desire for reward.
18       For the purpose of determining whether the
19 defendant was an agent of the State of Illinois as
20 charged in the Counts 13, 15, 17 and 20, an agent of
21 the State of Illinois is a person, including an
22 employee, officer, or representative who is
23 authorized to act on behalf of the State of
24 Illinois.
25       The term "anything of value" may include

Jury Charge                                    5551

1  campaign contributions and potential salaries from a
2  job.
3          A public official solicitation of campaign
4  contributions by itself does not constitute bribery
5  even if the person making the contribution has
6  business pending before the official.
7          It is not enough that the contributor making
8  the contribution create good will or with the vague
9  expectation of help in the future.  However, if a
10 public official demands, seeks or asks for, directly
11 or indirectly, or agrees to accept money or property
12 believing it will be given in exchange for a
13 specific requested exercise of his official power,
14 he has committed bribery even if the money or
15 property is to be given to the official in the form
16 of a campaign contribution.
17         It is not necessary that the defendant's
18 solicitation or demand for a thing of value in
19 exchange for influence or reward with respect to
20 state business be communicated in expressed terms.
21 The proposed exchange may be communicated in any
22 manner and need not be communicated in any specific
23 or particular words so long as the public official
24 intends to solicit or demand something of value in
25 exchange for influence or reward with respect to a

1  specific item of state business.

2          For purposes of 13, 15, 17 and 20, again,

3  good faith on the part of the defendant is

4  inconsistent with having acted corruptly an element

5  of the charges.  In the context of this case, good

6  faith means that the defendant acted without

7  intending to exchange official action for personal

8  benefits.  The burden is not on the defendant to

9  prove his good faith; rather, the government must

10 prove beyond a reasonable doubt that the defendant

11 acted with the requisite intent.  The government is

12 not required to prove that the defendant knew his

13 acts were unlawful.

14         The defendant is charged in Counts 13, and 17

15 with conspiracy to solicit or accept bribes.  A

16 conspiracy--and I'm repeating this as I do for each

17 set of offenses charged--a conspiracy is an

18 agreement between two or more persons to accomplish

19 an unlawful purpose.

20         A conspiracy may be established even if its

21 purpose is not accomplished.

22         To sustain the charge of conspiracy to

23 solicit or accept bribes as charged in Counts 13 and

24 17 the government must prove the following

25 propositions:

Jury Charge                                    5553

1       First, that the conspiracy as charged in the
2  particular count you are considering existed;
3       Second, that the defendant knowingly became a
4  member of the conspiracy with an intention to
5  further the conspiracy;
6       And third, that the overt act was committed
7  by at least one conspirator in furtherance of the
8  conspiracy.
9       Again, if you find from your consideration of
10 all the evidence that each of these propositions has
11 been proved beyond a reasonable doubt as to a
12 particular count, you should find the defendant
13 guilty of that count.
14      If, on the other hand, you find from your
15 consideration of all the evidence that any of these
16 propositions has not been proved beyond a reasonable
17 doubt as to a particular count, you should find the
18 defendant not guilty of that count.
19      The government need not prove that the
20 defendant participated in all of the events of the
21 conspiracy, the government must prove beyond a
22 reasonable doubt that the defendant was aware of the
23 common purpose and was a willing participant.
24      It is not necessary that all the overt acts
25 charged in the conspiracy count of the indictment be

Jury Charge                                    5554

1   proved and the overt act proved may itself be a
2   lawful act.  Moreover, you need not to agree
3   unanimously on which overt act the government has
4   proved.
5           It is not necessary that all of the acts
6   charged in the conspiracy count be proved as long as
7   the government has proved the elements of the
8   conspiracy as I have described them to you beyond a
9   reasonable doubt.
10          The rest of these instructions are general
11  instructions of what happens next.
12          If you find the defendant guilty, it will
13  then be my job to decide what punishment should be
14  imposed.
15          In considering the evidence and arguments
16  that have been given during the trial, you should
17  not guess about the punishment.  It should not enter
18  into your consideration or discussions at any time.
19          You should not speculate why any other person
20  whose name you may have heard during the trial or
21  who is named in the indictment is not currently on
22  trial before you.
23          Upon retiring to the jury room you will
24  select one of your numbers as your foreperson.  Your
25  foreperson will preside over your deliberations and

Jury Charge                                                    5555

 1  will be your representative here in court.
 2        Forms of verdict have been prepared for you.
 3  It's basically a very simple verdict form, not short
 4  but simple.  It lists each count and then says "we,
 5  the jury, find the defendant" and there's a box for
 6  guilty and a box for not guilty.
 7        What happens is, you indicate your verdict by
 8  checking the box which represents your verdict, and
 9  then when you are done with that, when have reached
10  unanimous agreement on your verdict, your foreperson
11  will fill in and date the appropriate form and each
12  of you will sign it.  There are lines at the end for
13  you to sign.
14        Each count of the indictment charges the
15  defendant with having committed a separate offense.
16  You must give separate consideration to each count,
17  considering the evidence related to each count
18  separate and apart from every other count.
19        You should return a separate verdict as to
20  each count.  Your verdict of guilty or not guilty as
21  to an offense charged in one count should not
22  control your decision as to the defendant under any
23  other count.
24        I do not anticipate that you will need to
25  communicate with me.  If you do, the only proper way

Jury Charge                                         5556

1  is in writing, signed by the foreperson, or if he or
2  she is unwilling to do so by some other juror and
3  given to the marshal.  I caution you, however, with
4  respect to any note or question you might send that
5  you should never state or specify your numerical
6  division, if you have one, at that time.
7        The marshal, please step forward and raise
8  your right hand.
9     (Marshal sworn)
10        THE COURT:  I don't know if I already said
11 this:  When go back to the jury room you should not
12 begin deliberating until each of you has received a
13 copy of this red book which contains the
14 instructions.
15        There is one minor typographical error with
16 respect to one of general instructions which we will
17 correct later.  It's not significant for our
18 purposes here.
19        This is my final instruction:
20        The verdict must represent the considered
21 judgment of each juror.  Your verdict, whether it be
22 guilty or not guilty, must be unanimous.
23        You should make every reasonable effort to
24 reach a verdict.  In doing so, you should consult
25 with one another, express your own views, and listen

1  to the opinions of your fellow jurors.  Discuss your

2  differences, if you have them, with an open mind.

3  Do not hesitate to reexamine your own views and

4  change your opinion if you come to believe it is

5  wrong.  You should not, however, surrender your

6  honest beliefs about the weight or effect of

7  evidence solely because of the opinions of your

8  fellow jurors or for the purpose of returning a

9  unanimous verdict.

10       All of you should give fair and equal

11  consideration to all the evidence and deliberate

12  with a goal of reaching an agreement which is

13  consistent with the individual judgment of each

14  juror.

15       You are impartial judges of the facts.  Your

16  sole interest is to determine whether the government

17  has proved its case beyond a reasonable doubt.

18       With that, to the jury room.

19       THE MARSHAL:  All relies.

20   (Jury retired to deliberate at 5:28 o'clock

21    p.m.)

22   (The following proceedings were had out of the

23    presence of the jury in open court:)

24       THE COURT:  You may be seated in the

25  courtroom.

Jury Charge                              5558

1        For the record, Page 10 of the instructions,

2   a minor issue.  "The indictment in this case is the

3   formal method of accusing the defendant of an

4   offense and placing them on trial," it should be

5   "him."

6        MR. SCHAR:  Right.  I see that.  I think

7   there may be one other.

8        THE COURT:  Do you find one other?

9        MR. SCHAR:  Judge, I think in the extortion

10  good faith instruction, a word left in --

11       MS. HAMILTON:  Page 44, second sentence.

12       THE COURT:  Okay, on Page 44.

13       MS. HAMILTON:  The sentence, "in the context

14  of this case, good faith means that the defendant

15  acted without intending to exchange official

16  actions," it still reads "for personal financial

17  benefits."

18       MS. BONAMICI:  It reads that from the prior

19  draft.  Your Honor, if you will recall that you

20  approved yesterday the terms "personal benefits"

21  that was what was approved yesterday and the

22  bribery -- the good faith instructions for bribery

23  and wire fraud both take for personal benefits.

24       THE COURT:  So "financial" is where it should

25  have been taken out?

Jury Charge                                              5559

1        MS. BONAMICI:  Yeah, it should come out.
2   Now, in terms of materiality, extortion requires the
3   exchange or an agreement to exchange money or
4   property, which, arguably, is financial, but the one
5   concern that we would have is that this error might
6   create confusion.
7        THE COURT:  Because it's not consistent with
8   the others.
9        MS. BONAMICI:  Correct.  Absolutely right.
10       THE COURT:  Any objection to my simply
11  striking it?
12       MS. KAESEBERG:  Our objection is just our
13  overall objection.
14       THE COURT:  Other than that.
15       MS. KAESEBERG:  Other than that, I apologize.
16       THE COURT:  You're not waiving your
17  objection.
18       Probably what we're going to do, since I'm
19  quite sure the jury is going to come back tomorrow
20  morning and not deliberate tonight, don't ask me how
21  I know but it's my best guess, we'll either have
22  this retyped or we'll just black out "financial."  I
23  personally prefer retyped.  Okay?
24       MS. BONAMICI:  That sounds fine.  We're going
25  to look tonight just to make absolutely sure no need

Jury Charge                                              5560

1  to review the instructions --

2          THE COURT:  Well, this is the reason why I

3  tell them not to deliberate, one of the reasons why,

4  until they get the instructions from us.

5          Why don't you wait around in case there is

6  some bulletin, but I think we're done for today.

7          MR. SCHAR:  Judge, the other issue is the

8  binders.  Obviously, what should go back --

9          THE COURT:  We can deal with that tomorrow

10  morning.

11          MR. SCHAR:  And I think there may be some

12  issues related to exhibits.  We can deal with that

13  in the morning.

14          THE COURT:  We can deal with that in the

15  morning, too, then I have some motions that we have

16  to deal with that we left by the wayside.

17          MR. SCHAR:  What time tomorrow?

18          THE COURT:  If you're here at 9:00, that's

19  fine.

20

21   (Adjournment taken from 5:33 o'clock p.m. to 9:00

22          o'clock a.m. on June 10, 2011.)

23

24

25

1

2

3            *       *       *       *       *       *       *       *

4

5

6  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

7  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

8                            MATTER

9

10

11   /s/Blanca I. Lara                        date

12

13

14

15

16  _____        _____

17        Blanca I. Lara                        Date

18

19

20

21

22

23

24

25