5562

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,      )
                                  )   No. 08 CR 888
4          Government,            )
                                  )
5  vs.                            )   Chicago, Illinois
                                  )
6  ROD BLAGOJEVICH,               )   June 10, 2011
                                  )
7          Defendant.             )   9:43 o'clock a.m.

8
                        VOLUME 31
9              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES B. ZAGEL
10                    AND A JURY

11
   For the Government:
12
              THE HONORABLE PATRICK J. FITZGERALD,
13            UNITED STATES ATTORNEY
              BY:  Reid J. Schar
14                 Carrie E. Hamilton
                   Christopher Niewoehner
15                 Debra Bonamici
               Assistant United States Attorneys
16            219 South Dearborn Street;
              Suite 500
17            Chicago, Illinois 60604

18
   Court Reporter:
19
               Blanca I. Lara, CSR, RPR
20             219 South Dearborn Street
                    Room 2504
21             Chicago, Illinois 60604
                  (312) 435-5895
22

23

24

25

5563

1  APPEARANCES  (continued:)

2

3  For Defendant Rod Blagojevich:

4

5          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
6          158 West Erie
           Chicago, Illinois 60610
7          (312) 640-1776

8          LAW OFFICE OF Elliott Riebman
           BY:  Elliott Riebman
9          158 East Erie
           Chicago, Illinois 60610
10         (847) 814-2900

11

12         OFFICES OF AARON B. GOLDSTEIN
           BY:  Aaron Benjamin Goldstein
13         6133 South Ellis
           Chicago, Illinois 60637
14         (773) 752-6950

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

5564

1    (The following proceedings were had out of the
2     presence of the jury in open court:)
3    THE CLERK:  2008 CR 888, United States versus
4     Rod Blagojevich.
5        THE COURT:  Do we have any idea where the
6  attorneys are?
7        MS. HAMILTON:  I looked in the hall.  I have
8  to see where.
9    (Brief pause).
10       MS. HAMILTON:  They're not in the hallway.
11  Mr. Walker said he can't find them.
12    (Brief pause)
13       MR. GOLDSTEIN:  Good morning, Your Honor.
14       Aaron Goldstein, Lauren Kaeseberg, Elliott
15  Riebman, and Mr. Sorosky will be here shortly, on
16  behalf of Rod Blagojevich.
17       MR. SCHAR:  Reid Schar, Carrie Hamilton, and
18  Chris Niewoehner on behalf of the United States.
19       THE COURT:  What's left over from yesterday
20  which I wanted to address now because it's an issue
21  with the jury instructions--the just has just
22  arrived--and that was the misprint or the
23  typographical error on Page 44 of the instructions.
24  This has now been, I believe, corrected in the
25  books.  Is everybody satisfied with this?

:18AM

:19AM

:22AM

:22AM

:22AM

5565

1          MR. SCHAR:  Judge -- sorry.

2          THE COURT:  Go ahead.

3          MR. SCHAR:  I was just going to say I believe

4   you're absolutely correct.  And I think it's the

5   government's position that, you know unless the

6   defense insists, I don't think the jury needs to be

7   brought out and re-read the instructions.

8          MS. KAESEBERG:  We're okay with that.

9          THE COURT:  That's fine.

10         For the purpose of the rest of the day,

11  obviously if the jury has any questions, we're going

12  to bring everybody back.  So don't go far.

13         Another thing is, I have I think now two

14  motions for a mistrial which I am going to attempt

15  to rule on today.  I don't think we're going to have

16  any idea of how long this jury is going to sit with

17  two possible exceptions:

18         They might tell the Court security officer

19  what their schedule is.  It's my practice for the

20  schedule to be left in the hands of the jury and not

21  imposed by me.  And frequently, they will send a

22  message out telling us what their schedule is.  That

23  might give us some hint as to how long they intend

24  to deliberate.

25         And the second thing, of course, is if they

5566

1  send a question which will give us an idea.

2       So that's what we're going to do with that.

3       I have a prolonged sentencing hearing today
4  which has not yet started.  If I need you back here
5  for some reason, you can count on about 15 minutes
6  notice.

7       Anything else?

8       MS. KAESEBERG:  Just one minor thing.  I just
9  wanted to be sure for the record that our motions
10 for judgment of acquittal at the close of all the
11 evidence is renewed and I believe entered continued.

12      THE COURT:  Entered and continued, that's
13 right.

14      MR. SCHAR:  Judge, a couple quick things.
15 You want the defendant present for notes or are they
16 waiving his presence?

17      THE COURT:  For that I'm willing to permit
18 his waiver, but he's got to do it in person.
19 Because the questions sometimes are very pointed and
20 you may need to consult with him.  If it's a
21 question of can we see some exhibit that we didn't
22 send back to them, fine, otherwise....  So he's got
23 to be here relatively early.  Whenever he arrives,
24 you can signal Mr. Walker and we can dispose of that
25 quickly.

5567

1          MR. SCHAR:  Judge, the only other thing is, I
2     think we're pretty close on exhibits.  There are a
3     couple of things that you conditioned rulings on
4     which need to be resolved.  Mr. Niewoehner will
5     speak to those, I believe.
6          THE COURT:  Sure.
7          MR. SCHAR:  And the only other piece of
8     business is, Mr. Walker was very helpful last time
9     in letting us know at the end of the day when the
10    jury had left, would it be possible to get that
11    notice again?
12         THE COURT:  Have you done anything to cause
13    me to change my policy?
14         MR. SCHAR:  I don't believe we have, but --
15         THE COURT:  Yeah, those are our policies.
16         MR. SCHAR:  Thank you, Judge.
17         THE COURT:  And I don't anticipate that what
18    we do in court is going to take a great deal of
19    time, so we'll just basically interrupt whatever
20    proceeding we're doing and move to that and do what
21    we have to do.
22         But basically what I'm going to do is, I'm
23    now going to give the jury their instruction books,
24    which means they can start talking.
25         MR. SCHAR:  And do you want the exhibits to

5568

1  go back now or do you want to address --

2          THE COURT:  No, you can address those later.

3  There's a certain period where they're looking at

4  the instructions and wondering about stuff and

5  they're organizing themselves and they're electing a

6  foreperson, so you got a few minutes with the

7  exhibits.  How many exhibits are there that are in

8  question?

9          MR. NIEWOEHNER:  I think there's only three.

10         MR. SCHAR:  We can address those.

11         THE COURT:  Which three?

12         MR. NIEWOEHNER:  I'll be quick.

13         Working backwards, there is a Chicago Academy

14  grant funding e-mail that were shown to

15  Mr. Talcherkar, we'd object to that, it's hearsay.

16  The content of the e-mails is hearsay.  He testified

17  it was used to refresh his recollection potentially;

18  he testified to it.  I'm not sure the foundation was

19  laid anyway, but --

20         THE COURT:  Well, whatever it is, I actually

21  haven't seen them.

22         MR. NIEWOEHNER:  I can show you, Your Honor.

23  This is the defense exhibit binder and it's Tab 11.

24         THE COURT:  Do you want this, assuming that

25  it was properly admitted?  Because I recall it was

5569

1  only used to refresh recollection, and I think you

2  moved for its admission, and you can correct me if

3  I'm wrong, but I think I admitted it and reserved

4  the issue of publication.

5          MR. SCHAR:  At this point you did not admit.

6  There are two others that we'll get to which you are

7  exactly right.

8          THE COURT:  Okay.  That's fine.

9          MR. GOLDSTEIN:  Go ahead, as far as the

10 content.

11         MR. RIEBMAN:  As far as the content, Judge,

12 this is how Mr. Talcherkar communicated in the

13 ordinary course of business with Mr. Filan as to

14 this grant and how to obtain the funding.  The

15 e-mails explains the efforts made to obtain the

16 funding and they are an exception to the hearsay

17 rule under business records as they constitute clear

18 communications from their office.

19         This is how they discuss this particular

20 issue with the grant and it provides insights that's

21 relevant and it's clearly reliable and accurate and

22 explains the testimony on that issue and should be

23 admitted.

24         MR. GOLDSTEIN:  This was discovery the

25 government provided to us.

5570

1          THE COURT:  Yes.

2          MR. SCHAR:  Your Honor, it's got multiple

3    levels of hearsay going on.  There are statements by

4    Mr. Filan that wouldn't be admissible through the

5    witness who testified, there's statements about lots

6    of other people in there, and there's a lot of

7    detail in it that, quite frankly, would be confusing

8    that wasn't explained.  So just putting aside the

9    foundational issues, they would be seeking to put in

10   the statements of Mr. Filan that there is an issue

11   here for their truth.

12         MR. RIEBMAN:  Judge, we would be willing to

13   redact the portions.

14         THE COURT:  That's the thought that was

15   crossing my mind.  I think they can redact this and

16   it's fine.  So why don't you do that.  If you have a

17   dispute about the redactions you can approach.

18         MR. NIEWOEHNER:  So it's really just

19   Mr. Talcherkar's statement -- e-mail out?

20         THE COURT:  Right.  And there may be some

21   stuff of Filan that's just, like, you know, why are

22   we doing this, or whatever it is.  I think the

23   defense can resolve the difficulties, in which case

24   it's not really that big a deal.

25         Okay, what's the other one?

1          MR. NIEWOEHNER:  I don't know the number.
2  The racetrack bill, they put in a legislative
3  history of -- I think there's an index in the front
4  that tells you.
5          THE COURT:  Number 9.
6          MR. NIEWOEHNER:  And we'd object to that on
7  relevance grounds.  There is a fair amount of back
8  and forth on that, which I imagine Your Honor
9  recalls, but the fact that the racetrack bill might
10  have been pending in the legislature for some months
11  is irrelevant to the charge, which is that once it
12  came to the defendant, that's the time period that
13  matters.
14          It goes to an argument that somehow there's
15  no harm here because the legislature could've signed
16  if it was given to the governor the bill 6 months
17  earlier, but that's not the point.  The extortion
18  here only took place once it got to the governor, so
19  those earlier 8 months don't matter.
20          MR. GOLDSTEIN:  Your Honor, this was history
21  that the defendant testified to he explained --
22          THE COURT:  You can have it.  You can have
23  it.
24          MR. GOLDSTEIN:  Okay.  Thank you.
25          THE COURT:  What's the next one.

5572

1      MR. GOLDSTEIN:  The manual endorsement
2  letter, right?
3      MR. NIEWOEHNER:  Yes, I think that's the
4  other one.  Our view is --
5      THE COURT:  Number 6.
6      MR. NIEWOEHNER:  Again, it's a hearsay
7  statement by someone who didn't testify about it
8  and, quite frankly, there's no date on it, there's
9  no foundation particularly for its admission in
10  terms of when it happened and what's said in it, and
11  the relevance of it is also -- there isn't any.
12      MR. GOLDSTEIN:  Your Honor, the letter was
13  testified to by the defendant.  He explained that he
14  asked for a fundraiser from Mr. Emanuel via -- well,
15  Ari Emanuel from Rahm Emanuel from John Wyma, and
16  this is in late May of 2006.  The response back was
17  "no, we're not going to do a fundraiser, but we'll
18  write an endorsement letter."  Mr. Blagojevich
19  testified to the endorsement letter, he laid the
20  foundation for it, he gave the approximate time in
21  which he received that letter, and it explains
22  exactly what he was saying as far as this
23  fund-raising issue, which is at the heart of the
24  Chicago Academy issue.  So it's clearly relevant,
25  the foundation is laid, and we ask that it be

:31AM

:32AM

:32AM

:32AM

:33AM

5573

1 admitted.

2     THE COURT:  One of my concerns is that it's
3 undated.  You really don't know where it fits in the
4 chronology.

5     MR. GOLDSTEIN:  It is and that is the
6 original document --

7     THE COURT:  Yeah, it's not his fault that
8 it's not dated.

9     MR. GOLDSTEIN:  He did testify, though, when
10 he received it.  He gave an approximate time period
11 when he received that letter, which was mid-summer
12 of 2006.

13     MR. SOROSKY:  And I would also add that the
14 government certainly did interview Mr. Emanuel and I
15 cannot believe the government did not go over this
16 letter with him.

17     THE COURT:  Well, you don't want to say,
18 because what that are going to say is he was on the
19 witness stand and you never asked him.

20     MR. SOROSKY:  No, but I meant the government
21 cannot really argue that there isn't any accuracy or
22 legitimacy.

23     THE COURT:  No, but there is a chronology to
24 this and it's important, so this one is out.

25     So I'm sustaining the objection to 6, 11 is

5574

1  going to be redacted, and 9 I'm overruling the
2  objection.
3        MR. GOLDSTEIN:  And, Your Honor, as to the
4  Government Exhibits, I've looked through all of
5  them, these are all the exhibits that were admitted,
6  we're just preserving the objections to any
7  objections we made.
8        THE COURT:  Yeah, by agree to that these are
9  the exhibits, you're not waiving your objections.
10       Okay, thanks.
11       MR. GOLDSTEIN:  Thank you, Judge.
12       MR. SCHAR:  Judge, we'll leave the Government
13  Exhibits, the computer as well.
14       THE COURT:  Do you want to take out the ones
15  that -- redo that so that you can get it back to the
16  jury quickly?  If you do it very quickly, I want to
17  put it on the same basket that they get the
18  government ones on.
19       MR. RIEBMAN:  We'll do that right away.
20       THE COURT:  Okay.
21       MR. GOLDSTEIN:  Your Honor, as far as the
22  exhibits that we admitted, we've been getting
23  requests from the press as to when these are to be
24  released.  Whatever Your Honor says as far as what
25  we should do.

5575

1          THE COURT:  Let's wait until the end of the
2   day.  And usually when I grant that request, the
3   release is always at the end of the day that I grant
4   the request.
5          MR. GOLDSTEIN:  Thank you.
6          THE COURT:  We will deliver the instruction
7   books to the jury.
8          (Recess.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5576

1          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )  No. 08 CR 888
4           Government,              )
                                     )
5   vs.                              )  Chicago, Illinois
                                     )
6   ROD BLAGOJEVICH,                 )  June 10, 2011
                                     )
7           Defendant.               )  3:22 o'clock p.m.

8
                        VOLUME 31
9              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES B. ZAGEL
10                  AND A JURY

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15                   Debra Bonamici
                 Assistant United States Attorneys
16              219 South Dearborn Street;
                Suite 500
17              Chicago, Illinois 60604

18
    Court Reporter:
19
                    Blanca I. Lara, CSR, RPR
20              219 South Dearborn Street
                      Room 2504
21               Chicago, Illinois 60604
                     (312) 435-5895
22

23

24

25

5577

APPEARANCES   (continued:)


For Defendant Rod Blagojevich:


        KAPLAN & SOROSKY
        BY:  Sheldon M. Sorosky
        158 West Erie
        Chicago, Illinois 60610
        (312) 640-1776


        LAW OFFICE OF Elliott Riebman
        BY:  Elliott Riebman
        158 East Erie
        Chicago, Illinois 60610
        (847) 814-2900


        OFFICES OF AARON B. GOLDSTEIN
        BY:  Aaron Benjamin Goldstein
        6133 South Ellis
        Chicago, Illinois 60637
        (773) 752-6950


        OFFICES OF LAUREN FAUST KAESEBERG
        BY:  Lauren Faust Kaeseberg
        2140 N. Lincoln Park West
        Suite 307
        Chicago, Illinois 60614
        (773) 517-0622









        (The following proceedings were had out of the

5578

1     presence of the jury in open court:)

2     THE CLERK:  08 CR 888, United States versus

3 Blagojevich.

4     MR. SCHAR:  Good afternoon, Judge.

5     Reid Schar, Chris Niewoehner, Carrie Hamilton

6 on behalf of the United States.

7     MR. GOLDSTEIN:  Your Honor, Aaron Goldstein,

8 Sheldon Sorosky, Lauren Kaeseberg, Elliott Riebman

9 on behalf of Rod Blagojevich.

10     THE COURT:  I have two motions for a

11 mistrial, which since the trial is not over should

12 be addressed with some alacrity.  We also have

13 remaining the question of the presence of the

14 defendant if the jury passes out questions.

15     And I understand he's on his way?

16     MR. SOROSKY:  Yes.

17     THE COURT:  It was estimated he'd be here at

18 4:30.  So we'll deal with some of the stuff on the

19 motion for a mistrial.  And we've dealt with motions

20 before outside his presence, so I don't think that's

21 an issue, and maybe he'll waive presence with

22 respect to jury questions.

23     I do have one piece of information.  The jury

24 has elected a foreperson, the jury as set forth a

25 schedule on what days they're going to meet, and

5579

 1  they have set a starting time and a closing time.
 2  They will be ending at a somewhat earlier hour than
 3  the hour that they usually ended at, but it's a full
 4  day.  And they also indicated the obvious, which is
 5  is that if they are in the midst of reaching a
 6  decision, all bets are off as for when they're going
 7  to leave.
 8          So what I have is a large volume of motion
 9  for a mistrial filed on June 9th and a little motion
10  for a mistrial filed -- is it today or yesterday?
11          MS. KAESEBERG:  It's today and it's just
12  additional grounds to supplement.
13          THE COURT:  Right.
14          I would like to hear a short answer of the
15  government to the mistrial motion with some
16  exceptions I'm omitting because they are not issues
17  directed to the prosecution, they're issues directed
18  to the Court, and that is the first issue in the
19  large motion.
20          MR. SCHAR:  Which one is that?  The title of
21  the --
22          THE COURT:  The title is the one that reads
23  "The Court Made Findings of fact ..."
24          MR. SCHAR:  Judge, I don't think the Court
25  made any findings of fact --

5580

1          THE COURT:  Yeah, well, you don't have to say
2     that.
3          MR. SCHAR:  Okay.
4          THE COURT:  That's why it's addressed to
5     something I did, not something you did.
6          I think that's also true of the rulings.  You
7     can answer the "prejudicial comments" issue because
8     that has to do with effect on trial.  "Biasing
9     influences" is for me.  "Improper assignment" I
10    don't think you have to address because it's really
11    not addressed to anybody who can rule on that now
12    and it's a little late in the game and there were
13    other remedies to be used, and I don't even think
14    they use it for that purpose, they use it to
15    establish that the government might like one judge
16    more than they might like another, a startling
17    revelation which no one has ever thought of before.
18    The rest of them I think are all things that you can
19    answer briefly.
20         MR. SCHAR:  Judge, you want to go on a
21    one-by-one basis or just go through all of them?
22         THE COURT:  Yeah, just go through all of them
23    briefly.
24         MR. NIEWOEHNER:  Your Honor, starting on
25    Page 8, the prejudicial comments one.  I think if

5581

 1  you look at the transcript of that, Your Honor made
 2  a direct ruling at the end of sidebar which was that
 3  the next part of the testimony should start on
 4  October 17th and then defense asked to essentially
 5  do something other than what your direct order had
 6  been.  So in the government's view, it was entirely
 7  appropriate to point out what your ruling had just
 8  been, time shouldn't be wasted, and made the
 9  observation.  And, ultimately, the defense did get
10  in all the content that they wanted to to lead up to
11  October 17th, they did work that in later.  So
12  there's no prejudice in terms of content and it was
13  a short statement that was A, accurate, and B, not
14  unduly prejudicial.
15          THE COURT:  The next one for you is "Denial
16  of Requests to Play Relevant Recordings."
17          MR. SCHAR:  Judge, this goes -- this issue, I
18  assume, is a rehash of the same issue, which is the
19  defense provided a number of different recordings,
20  they argued that huge chunks of them were
21  state-of-mind exceptions even though the law is
22  clear, as Your Honor has pointed out.  I believe
23  it's briefed extensively, at least in the last
24  trial, that, in fact, you can't just argue that an
25  entire call is state of mind, there have to be

5582

1  particular statements and not just even large
2  segments of the statement.
3      In addition to that, I think Your Honor is
4  clear that not only was it not state of mind, but
5  the best argument that the defense had was it was
6  prior consistent statements if the defendant was
7  actually challenged on the issues that the
8  recordings would have gone to.
9      In fact, I guess two things, the first is,
10 largely, most of the recordings that they wanted in
11 were not in dispute in terms of the underlying
12 testimony and the defendant wasn't challenged, if
13 not, frankly, all of them in terms of what it would
14 have supported, that's issue number one.
15     Issue number two is, it wasn't trying to put
16 in any prior consistent statement without the
17 challenge to the witness that required it.
18     And third, I would point out, to the extent
19 the defense thought in some way that we had
20 challenged anything that would have been properly
21 rebutted with a prior consistent statement with one
22 of the recordings, after the defendant left the
23 witness stand the defense made no motion whatsoever
24 to try to admit any of those recordings as prior
25 consistent statements, which they would have been in

5583

1   their right to do, if in fact they thought that, A,
2   there had been a challenge to the defendant, and B,
3   there was a recording that actually supported his
4   version had it been challenged, that never happened.
5         THE COURT:  The defendant "Was Improperly
6   Driven to Testify By the Court."
7         MR. SCHAR:  Judge, that's entirely, entirely
8   untrue.  There was not a single time that Your Honor
9   indicated that he had to testify or was required to
10  testify.  In fact, the jury instructions make it
11  patently clear, he doesn't.
12        On top of that, what Your Honor did is
13  enforce the rules of evidence in the context of
14  scope, as well as other rules of evidence that dealt
15  with trying to get in information through the
16  government's case through cross-examination that are
17  properly put into the defense case.
18        There were all types of things available to
19  the defense.  They could have recalled any
20  government witness that they wanted to if they
21  thought in fact they wanted to put in information
22  that was outside the scope.  They didn't need to
23  call the defendant to do any of that.
24        In terms of the Cheek -- is this the section
25  that has the Cheek analysis?

5584

1        In terms of the Cheek analysis, Judge, you
2   never said pursuant to Cheek if the defendant wants
3   to insert things in term of the willfulness
4   argument, this is how he can or should testify.
5        What Your Honor did repeatedly -- I shouldn't
6   say "repeatedly" but several times cited Cheek was
7   noting that the reason that the defense was able to
8   get in certain information was because the defendant
9   in Cheek did testify, and, likewise in this case, if
10  the defense wanted to get in certain information the
11  defendant would have had to testify.
12       However, we're talking about apples and
13  oranges type of analysis.  In Cheek, the defense
14  seems to have misinterpreted Your Honor's comments
15  even though you never, ever said this:  That somehow
16  if this defendant testifies he can then talk about
17  his understanding of the law.  Your Honor never said
18  that.  And in Cheek, the reason the defendant could
19  talk about his understanding is because it was a
20  willfulness standard.
21       I understand, for whatever reason, including
22  in this motion, the defense seems to consider these
23  charges wilfulness charges, but they're not.  You
24  won't find the word -- I believe you won't find the
25  word "willfulness" in the jury instructions at all.

:30PM

:30PM

:31PM

:31PM

5585

1        So it seems we're in two different tracks.
2   You never forced him or suggest that he absolutely
3   had to testify.  You indicated that if he wanted
4   certain information in, only he could provide it,
5   and that's true in every single case that there is
6   only certain information that the defendant can
7   provide.
8        And to the extent that somehow they thought
9   that if they put him on the stand because of the
10  Cheek case that they'd be able to talk about his
11  understanding of the law, that's not what you ever
12  said, and that could've easily, if they had any
13  doubt about that, been resolved with questions to
14  Your Honor and/or a motion in limine as to what they
15  thought they would be able to get into if this
16  defendant testified and that never happened.
17       Judge, you want me to address healthcare --
18       You want to address those?
19       MR. NIEWOEHNER:  Yeah.
20       The healthcare policies, Your Honor?
21       THE COURT:  I think that that one was tongue
22  in cheek.  He had plenty of references to his
23  passion for healthcare.
24       MR. NIEWOEHNER:  We actually embraced that in
25  our closing argument.

5586

1          THE COURT:  Yeah.  And they don't spend a lot
2  of time on it.  So I think they just don't want to
3  waive their point and they're entitled not to waive.
4          "Improper Rulings On Objections and the
5  Government's Asking of Impermissible Questions" I
6  will deal with myself.
7          It's your turn.
8          Oh, wait, wait.
9      (Brief pause).
10          THE COURT:  Oh, Tusk.
11          MR. SCHAR:  Yes, Judge.  We need some clarity
12  as to what the defense thinks that they were barred
13  from doing.
14          THE COURT:  We come to that point in time,
15  anyway.
16          Go ahead.  Either one of you, or both.
17          MS. KAESEBERG:  I mean, if I can just start,
18  just generally, to say, I mean, what we filed is a
19  fairly extensive motion meant to use examples and
20  illustrations to show sort of fundamental problems
21  with fairness that we believe existed throughout the
22  entire trial.  I know it's extensive, so I'm not
23  going to go through each one.
24          If I could just say --
25          THE COURT:  Yeah, but what I want you to do

5587

1  is answer what they've said.

2      MS. KAESEBERG:  No, I know that, but, I mean,

3  this isn't -- I do want to make a couple of

4  comments, which is that this isn't meant to be an

5  attack on the Court, not meant to be an attack on

6  the government.  What it is is a response to and a

7  request for a mistrial based on what we believe are

8  denials of our request and our pleas for fairness

9  throughout this entire trial.

10      You know, I think that at some point maybe

11  there's a perspective that's lost, so we stand here

12  as lawyers representing a client that we to be

13  innocent and we believe that we are fighting for his

14  life, and there's just fairness aspects to this case

15  that we believe has been overlooked and just cast

16  aside.

17      THE COURT:  Would it be any different if you

18  knew that he was guilty?

19      MS. KAESEBERG:  But that's not -- I mean --

20      THE COURT:  I don't understand the known to

21  be innocent part, because you are obliged --

22      MS. KAESEBERG:  Well I --

23      THE COURT:  -- you are obliged to defend

24  him --

25      MS. KAESEBERG:  Absolutely.

5588

1          THE COURT:  -- to defend him fully whether
2     you think he's guilty or not guilty.
3          MS. KAESEBERG:  Absolutely.  But in this
4     particular case, where we know there's evidence that
5     if we were able to put it into the trial it would
6     result in a not guilty verdict and we feel that
7     we've been prevented from putting that in and from
8     advocating for our client.
9          You know, I think the core matter here is
10    that it doesn't -- you know, in our motion there is
11    some language in here that there's indication from
12    the Court that you're sort of mistrustful of us.  It
13    seems like every time there was an issue it was
14    always sort of we never go the benefit of the doubt,
15    it was always that we were trying to do some running
16    out the clock or asking questions purposely to
17    violate your order, which really wasn't the case.
18          And the truth is is that, you know, you may
19    not like us, you may not even like our client, you
20    may have formed opinions from the first trial for
21    whatever reason, all we ask is that, and what we've
22    asked from the beginning, is that you sort of do
23    what you asked the jury to do, which is to set aside
24    any opinions that may be formed.  And these rulings
25    from the Court, frankly, give a perception and an

5589

1  indication that that didn't occur.  And the truth of
2  the matter is that we believe we did not receive a
3  fair trial based on those rulings which are
4  explained throughout the motion.  I think we will
5  rest on what's in the motion instead of going
6  through each one individually.  You know, at the end
7  of the day, we just seek a fair trial and that's
8  what this motion is about.
9          THE COURT:  I'm going to rule now, unless you
10 have something you would deeply like to say.
11         MR. SCHAR:  I mean, I obviously vehemently
12 disagree with any suggestion that Your Honor was
13 biased, but I don't want to get into heavy arguments
14 about the quality of questioning and the abilities,
15 so I think if Your Honor is ready to rule and there
16 isn't a particular Tusk issue that needs to be
17 addressed --
18         MS. KAESEBERG:  I think I did overlook the
19 Tusk issue.  From our perspective, we were
20 prevented -- I know the one instance, early on in
21 the case, John Harris was the first government
22 witness.  We were prevented from asking questions of
23 Mr. Harris about the circumstances under which Mr.
24 Tusk left the governor's office, which was there was
25 some anger on the part of Mr. Tusk making comments

5590

1　about Greenlee, about the fact that, oh, I can get

2　this guy, I forget the exact language.

3　　　　　THE COURT:  Yeah.

4　　　　　MS. KAESEBERG:  So we're prevented from

5　asking that of Mr. Harris, and then I believe it was

6　right before Mr. Tusk testified, I think the

7　government tendered to us the documents that they

8　prevented us from getting into anything with Mr.

9　Tusk.  But at the end of the day, I mean, this sort

10　of doesn't even really matter because the truth of

11　it is the government knows that whether they

12　disagree with what we say about what Mr. Tusk meant

13　by statements about Bob Greenlee, that there is an

14　argument being made that he did have a motive to

15　lie.  So to stand in front of the jury and say, look

16　that jury in the eye and say Mr. Tusk had no motive

17　to lie, it's just not true, it's just not true.

18　　　　　It doesn't matter what your interpretation of

19　what Mr. Tusk said or didn't say, it's the fact that

20　they government can't say it's certain.  So for them

21　to get up and say that was, frankly, was not true.

22　We objected, I believe I objected and said there's a

23　pretrial issue with this, which I guess was a

24　mid-trial issue so maybe that wasn't the right

25　language, but there was an issue about Mr. Tusk's

5591

1  motive to lie in this case.  So for the government
2  to get up and indicate that there wasn't is just
3  false.
4          So I may have misstated in our motion, I did
5  do it quickly this motion, that there was a motion
6  in limine about it, I believe that's not accurate,
7  but whatever the issue is, that was false what they
8  said to the jury.
9          MR. SCHAR:  Well, Judge, this one I would
10 like to respond to.  I take her at her word that it
11 was inaccurate and not false in terms of what she
12 put in the motion.
13         A couple of things; the first is, they did
14 ask a couple of questions to Mr. Harris, those were
15 properly objected to because he was the wrong
16 witness.  It would have been hearsay and improper to
17 try to impeach another witness who had yet
18 testified, or they weren't even sure was going to
19 testify in terms of going through Mr. Harris.
20         Now, on May 17th I did tender to them a
21 letter, which I believe is what they're talking
22 about, that laid out some of the background of Mr.
23 Tusk leaving.  We expected them, frankly, to
24 cross-examine.  I spent time with Mr. Tusk.  There
25 is zero, I say zero evidence at all that he holds

5592

any grudge whatsoever against this particular
defendant or the administration.  He left under
terms that he was unhappy with at the time on one
particular issue and he was over it almost
immediately.  I'm the one that spent time with him.
So to impugn my integrity in suggesting that somehow
I knew that he had a bias and misled the jury is
just inaccurate.

But I understand they haven't spent time with
him, that's why we gave them the letter.  We gave
them the letter, and frankly, if they wanted to
cross-examine him on it, we did not move Your Honor
to bar it, that's, to me, the irony of the
situation.

We provided them with the information.  If
they wanted to cross on it, they were free to cross
on it.  Mr. Sorosky, I believe, is the one who did
the cross--I could be wrong--he never raised the
information in the letter we provided them.  That's
their decision.  We didn't move Your Honor to bar it
and Your Honor didn't bar it.

Now, maybe they're mistaken and misunderstood
what was going on and maybe they don't remember it
exactly how it happened, and I give them the benefit
of the doubt on that, but to suggest somehow we

5593

barred them mid-trial from doing something when we
actually gave them information to do it.

And then I got up, Judge, and given the
information that I know and, frankly, given the
evidence that was here, what I said was, I believe,
that Mr. Aaron Goldstein did not provide any motive
for this individual to lie, and he didn't.  So I
think my statements were not only literally accurate
in terms of what happened at the trial, they're
based in good faith based on the time I spent with
Mr. Tusk and what I know.

THE COURT:  Okay.  With respect to the issues
in order raised by these motions, and Tusk I regard
as those invited to by defense as the last item on
the original motion, the first premise about factual
findings is wrong.  I made no factual findings at
all.  I have made findings with respect to the
admissibility of evidence which requires
consideration of the content of the evidence, but it
is not finding of a fact in issue.

Evidence which is offered to prove a fact
requires consideration of its relevance and to
consider its relevance on whether it tends even in
the most minimal way to prove facts for which it is
offered does require a court to examine the context

5594

1 of the defense or the prosecution theory of the
2 case, either one, sometimes both.
3      To do this requires the lawyer who proposes
4 its use to tell the Court how the evidence fits in.
5 In this case, defense counsel was, for its own
6 reasons, generally vague about the contours of the
7 defense, inviting me to rule without clear
8 information.
9      So I offered possible lines of defense, all
10 of them hypothetical, in order to elicit from
11 defense counsel whether my hypothetical is, in fact,
12 the basis of their defense.  Neither of the
13 two-sided examples is a statement of my finding of
14 fact.  It is a statement of arguments or positions
15 that counsel might take.  In one case it was, I
16 believe, a possible defense position and the other a
17 possible prosecution position.  Both examples were
18 designed to elicit some clarification from counsel
19 as to what exactly they were trying to do.
20      The fact is that the tapes would justify a
21 prosecution argument, I'm not making a finding, that
22 the tapes would justify an argument that the
23 defendant was told not to do something and then just
24 ran over it.  The fact is that this argument does
25 present a problem for the defense, this is not a

5595

1 conclusion, this is a fact about the trial process
2 itself and not about the charges.  Those findings of
3 fact, I reiterate, are not findings of fact about
4 the charges, they are findings of fact about the
5 nature of the trial and they bear on the relevance
6 of the evidence.  In fact, they are not, I think,
7 strictly even findings of fact, they are findings of
8 what something might mean in the context of this
9 trial.

10        This is really true of also of the continued
11 practice of counsel and defendant referring to a
12 deal with the Madigans, as if it were in the process
13 of negotiation with the Madigans.  It was important
14 for me to understand something which defense counsel
15 did not make clear, and, indeed, the defendant in
16 his own testimony did not make clear until the very
17 end, and that was my understanding of whether the
18 deal was in fact under consideration by the Madigans
19 or only a possible option that the defendant and his
20 staff were themselves considering.

21        It was important for me to understand that no
22 deal had been proposed and this was not at all clear
23 to me--"proposed" meaning proposed to the
24 Madigans--this was not at all clear to me until I
25 examined the tapes that were tendered by the

5596

defense.  If it was unclear to me that there had not
been a proposal made to the Madigans but merely the
possibility that one might or might not be made, it
was possible that this may be unclear to the jury.
The entire colloquy on this point could have been
obviated had defense counsel clearly stated at its
beginning that there was no Madigan deal presented
to the Madigans, but defense counsel did not admit
this.  Ironically, the defendant himself when he
finally got on the stand was quite clear on that
point, that he had not actually made the proposal.
In fact, I think his statement on the witness stand
was, when he was talking about going to bed on the
night of December 8th, he actually made a point of
inserting in an answer to a question he was asked by
Mr. Schar, this was the beginning of possibly a
Madigan deal.  This was not the way defense counsel
spoke during the course of this trial, this was not
the way the defendant spoke during most of his
examination.  But he was, when it came to those
final days, quite clear that there had been no
Madigan deal proposed.  He was looking for somebody
to be an intermediary.  Why defense counsel were
reluctant to make this clear to me and why when I
said, for example, dealing with the tape on

5597

1  December 3rd, I looked at a dialogue and I said,
2  "well, based on this dialogue on December 3rd no
3  Madigan deal had been made, in fact the Madigan deal
4  hadn't been presented," I got no concession from
5  defense counsel.
6          And this I think is an example on which they
7  place a great deal of weight.  There is evidence in
8  this case against the defendant that has significant
9  weight, but I have consistently stated to defense
10 counsel that the defendant has a path to acquittal
11 and that he could well save himself by testifying.
12 It was an opinion that I had when I uttered it and
13 it is an opinion that I still have.  And the truth
14 of the matter is, in federal cases in this court,
15 that possibility isn't always there.  In fact, it's
16 relatively rare, which accounts for the
17 extraordinarily large number of cases that end in
18 guilty pleas in this court.  It is the jury's call
19 to decide whether the charges have been proved
20 beyond a reasonable doubt.  It is not a question
21 that has been presented to me.  And I follow the
22 practice of almost any judge who has been on the
23 bench for more than 6 months, which is not to make a
24 decision until the question has been presented to
25 you, sometimes judges try to avoid even that, and I

:46PM

:46PM

:46PM

:47PM

:47PM

5598

have followed that practice here.  I have not been
called upon to decide whether the defendant in this
case is guilty of anything or not guilty of
anything.  That's the jury's job, not mine, and I'm
not interested in doing someone else's work.

     The fact that I heard the evidence at the
first trial has not had any influence on my state of
mind of this trial.  There, too, the judgment was
made by the jury, not by me.  Although, in the end,
that jury didn't make a lot of judgments.  I was
never called to rule upon or decide the question of
guilt.  I reiterate that I follow the wise rule that
judges shouldn't decide what they do not have to
decide.

     It is true that I have expressed lack of
confidence in the statements made to me by defense
counsel.  This is based on conduct of defense
counsel both in this case, this particular trial,
and the trial which preceded it.  I have seen
attempts to smuggle inadmissible evidence into the
courtroom while the jury sat in box.  I've seen
conduct clearly in violation of my pretrial rulings.
I have seen stalling efforts, and I regret this has
occurred, but I never presumed that this was the
case, I have found that this was the case.  I have

5599

1  found also and stated on the record that some

2  defense counsel in this case have operated on the

3  premise that it would be easier to do what everyone

4  pleases and apologize later rather than ask

5  permission.

6          And, in fact, one of the problems I think the

7  defense has had in this case is situations in which

8  had they asked permission, they might have gotten

9  it.  But as Mr. Schar pointed out with respect to

10  one thing that's raised, that's the Tusk matter,

11  there apparently was maybe no desire, maybe a

12  reasonable decision, not to approach the Court to

13  ask for permission.

14          I believe that a few critical comments I made

15  in open court were necessary to insure that everyone

16  involved in the trial understood that certain

17  evidence offered or sought to be offered should not

18  be considered on the merits.

19          There were times when defense counsel sought

20  to invoke an impression amongst jurors that they had

21  worthwhile evidence that was being unfairly

22  excluded, an invitation to the jury to the

23  possibility that evidence which they did not hear

24  was wrongfully excluded in reaching their verdict

25  and then to speculate on what it might have been.

5600

1    If I have erred at the side or in prior rulings in
2    excluding evidence, the place to challenge that, if
3    the defendant is in fact found guilty, is in the
4    Court of Appeals, not in the presence of the jury.
5            It is also true that -- well, let me add one
6    other point.  I don't believe, to my recollection,
7    that I have admonished either counsel or a witness
8    in the presence of the jury without having first
9    delineated my rulings outside the presence of the
10   jury.
11           Admonitions to counsel or parties given
12   outside the presence of the jury, at times, may be
13   regarded by lawyers, defense, and prosecutors for
14   that matter, as relatively meaningless in the
15   context of the trial and in fact provide no
16   deterrent to asking previously barred questions in
17   the juror's presence or raising a suggestion
18   suggesting previously barred arguments or
19   assertions.
20           This was true in the first trial where the
21   same lawyers representing the defendant, where the
22   same lawyers representing the defendant in this
23   case, one of the first if not the first
24   cross-examination included a series of questions
25   which were clearly barred by pretrial rulings,

5601

1 objections were sustained after the first objection,

2 perhaps counsel would have paused to realize that

3 this was an area that was barred to them, but

4 several questions followed it and in each case I had

5 to sustain the objection.

6      It is my judgment that when I admonished

7 persons in the presence of the jury, that was, in

8 the context of this case, the only effective remedy

9 against repetition of barred conduct, and that

10 remedy was to admonish as I did.

11      The challenge to the manner of assignment of

12 this case comes so late that I wonder why it was

13 included.  And that challenge, if any, can be

14 brought only effectively before trial begins and

15 then, arguably, is to be brought to the Chief Judge

16 of the district and the Executive Committee over

17 which he presides.  It is, in any event, a complaint

18 against the prosecutor, and not the Court.

19      The claim that a disproportionate number of

20 evidentiary rulings were made in favor of the

21 prosecution rather than the defense is clearly

22 stated as a ground for a mistrial.  I'd estimate

23 that this is usually true in virtually all criminal

24 cases because it's a product with the different

25 incentives our legal system gives the prosecutors

5602

1    and defenders.  A prosecutor has to be more careful
2    in questioning and motions.  If a conviction is
3    obtained, the defendant may appeal and challenge the
4    prosecution's conduct and there's a consequence the
5    prosecution might lose a verdict it had gained.  If
6    the defender -- a defender, obviously, has far less
7    need to be careful.  If there's an acquittal caused
8    by defenders overreaching, there is no deal on it
9    for the prosecution.
10          If someone were to search a year's worth of
11   criminal trials in the district, I would predict
12   that the prosecution would be disproportionately,
13   very disproportionately successful in defeating
14   objections in opposition than would the defense.
15          Finally, the defender has the unrestricted
16   power to create a disproportion by frequent
17   objections, invalid though they may be.  The
18   prosecutor is institutionally restrained from making
19   a lot of baseless objections to even up the rulings
20   count.
21          The prior recording ruling I made is, in my
22   view, indisputably correct.  What was offered was
23   hearsay under the rules.  The requisites of the
24   catch-all exception does not apply to this evidence.
25   The argument offered that this evidence is the best

5603

available evidence the defendant's stream of
consciousness thought process, but the stream of
conscious thought process does not, by itself,
demonstrate anything more than he engaged in I guess
a kind of stream consciousness speedy talk.

There was a lot of evidence, actually, of
this method both in other tapes and, frankly, in
some moments of his testimony.  It's not actually
the stream that the defendant offers.  What the
defendant might have wanted to hear is the right to
use what was said in the stream as a prior
consistunt statement, but he wasn't impeached with
an inconsistent statement, and if that is not the
case, the prior consistent statement doesn't come
in.

The other thing perhaps the defendant
would've liked is to use the stream--which covered a
lot of subjects, in great rapidity--was to use the
stream to allow the defendant in either to say what
he meant, not what he said, or he can explain what
he meant, but he did that without the recording and
the recording adds nothing to it.  He is basically
seeking to arm himself on an attack that the
government did not make.  They didn't say that his
statements were inconsistent, they argued that they

5604

1 were lies.

2      With respect to his being driven to testify,
3 I have not only the power and authority under
4 Rule 611 of the Federal Rules of Evidence to control
5 the order of evidence, in fact 611(b) defines the
6 scope rule as the stated rule.  It is the default
7 rule.  It is true that strict enforcement of the
8 scope rule is far less frequent than it used to be,
9 but I thought it was entirely appropriate in this
10 case, because in this case it's the most efficient,
11 fairest way to present the case.  And I had before
12 me the example of a prior defense on these various
13 charges that made a defense theory out of suggestive
14 questions rather than proof of facts.

15      With respect to the Cheek case, the
16 government has I think clearly stated that the
17 defense has misread what I said about Cheek.  But
18 let's assume they haven't, let's assume I told them
19 that this stuff that they wanted to get in comes in,
20 and I said this to them, I said this to them at
21 sidebar.  The fact of the matter is is that
22 defendant to do their defense in this case ought to
23 at the very minimum, leaving aside the distinctions
24 that it's willfulness and it's tax law, at its very
25 minimum before they make the decision to put a

5605

1  defendant on the stand and get his concurrence with
2  that, they really ought to read Cheek, it wouldn't
3  hurt to read it a second time, and realize it is
4  based on the complexity of the tax code.
5          From my point of view, I see no evidence that
6  defense counsel had made its own independent reading
7  of Cheek.  That they did not do so might possibly be
8  raised on a 2255 petition if the occasion to file
9  one arises in the future.  But the truth is is that
10 the defendant was not compelled to testify, not by
11 his understanding that something was legal.  This,
12 after all, constituted a very tiny part of his
13 testimony.  He testified because it was clearly his
14 best choice.  He knew, as did his counsel, that he
15 narrowly escaped conviction on several charges by a
16 vote of a single juror, he knew, too, that the
17 government had simplified its case because of the
18 reaction of the jurors to the complexity of the
19 first case.  The record does not support any claim
20 that he was forced to testify.  This is an
21 individual decision and made by an individual who
22 I've been told has eagerly awaited and announced
23 that he has eagerly awaited the chance to tell his
24 story, that's why he testified.
25          I leave to one side the fact that defense

:58PM

:58PM

:59PM

:59PM

:59PM

5606

1  counsel knew or should have known that the jury
2  would be instructed at the end of the case that it
3  was not necessary that the defendant knew his acts
4  were unlawful.  The defendant was entitled to make a
5  good faith defense, the basic outlines of which were
6  known to him because he said it over and over again
7  in the recordings, "not one for the other"; these
8  are two additional reasons but I'm not at this
9  particular moment relying on them.
10       With respect to his passion for healthcare, I
11  don't think he missed too many chances of being able
12  to get that in, frequently at the end of an answer,
13  but he also got it in in many of the recordings
14  --"got it in" is the wrong statement, it's unfair to
15  him--he also mentioned it consistently in the
16  recordings which the government played.  That he had
17  some passion for healthcare, I did not see any labor
18  of argument in what the prosecution said in nearly
19  four hours that indicated any disagreement with the
20  proposition that he had a passion for healthcare.
21  Didn't, I think, touch on it in any way.
22       With respect to the rulings on objections,
23  the example they gave is, in my view, a classic
24  example of no significant differences.  The
25  government's cross-examination of the governor "you

5607

are a convicted liar" followed by specific
references to one act of lying which the governor
was convicted of having perpetrated.

        MR. SCHAR:  Yes, Judge.

        THE COURT:  What we had with --

        Was it Rajinder Bedi?

        MR. SCHAR:  Yes, Judge.

        THE COURT:  What we had with Rajinder Bedi
was one conviction for theft and the opening is "so
you were a thief," which is a form that implies that
this was a profession of his, a frequent occurrence.
It would've been a good question if you just said
"so you have been convicted as a thief," but those
niceties I found rarely in the defense.  And there's
nothing wrong with the question from a tactical
point of view, "so you're a thief," the defense
would like to have the suggestion, so I understand
why it was made, but there was in my mind a very
different approach by the prosecution which made it
clear to the jury it was talking about one instance.
Now, it is true they talked about other instances as
well, but each one of them is separately identified
and each one of them had a separate root.  I thought
the way the question was supposed to Bedi twice made
the single incident seem much broader than it was, I

5608

thought it was objectionable and I so ruled.

There is also an issue raised about my willingness to interrupt the defense direct testimony to allow preliminary cross-examination, at least part of it. That was based on my finding, not my presumption, but my finding based on what I saw before me that defense counsel was stalling to end out the day without having the defendant cross-examined. I actually had originally thought that the reason for that is, you would leave a defendant uncross-examined for the next three days and then somehow the testimony would sink in. It appears after I saw the cross-examination that maybe defense counsel was concerned about something else rather than leaving it as it is, I don't know. But I do know that they were stalling, I know that there were repeated questions, I counted at least two or three times in which the same question was repeated either two or three times, I was in front of my court reporter's realtime where there may have been a couple where the same question was asked four times. The pacing of the question was quite clear to me. And the reason I made the decision I made is because I could understand the tactical value, and I had heard counsel ask questions in a different and

1  more expeditious way.

2       I also noticed that at the end of the cross

3  where I believe the defendant was stalling, this was

4  Wednesday not the Thursday --

5       MR. SCHAR:  The direct, Your Honor.

6       THE COURT:  Yeah, in the direct, sorry,

7  sorry.  I believe this was on Wednesday and not

8  Thursday, it was at the end of the day and I offered

9  counsel the chance to speak to this the next day in

10 the morning and counsel did not choose to speak.  I

11 adhere to my view that it was an attempt to stall.

12 I understand it, I'm just unwilling to permit it.

13      With respect to Tusk, what you said about

14 Tusk may very well come within the ambit of Brady,

15 but whatever Brady or Giglio obligations rested on

16 the prosecution, they complied with them.  And all

17 of this stuff was known, it wasn't used.  And in

18 fact, I don't think the government has to accept or

19 did accept that this was a motive to lie.

20      That Tusk was angry with Blagojevich,

21 accepting that as the truth, does not mean that Tusk

22 would lie about Blagojevich.  It's something that

23 the defense could use, if it chose, and could argue

24 from it that Tusk had a motive, but it does not

25 represent an instance in which in closing argument

:05PM

:05PM

:06PM

:07PM

:07PM

5610

the prosecutor can fairly be said that the
prosecutor made a statement that he knew was not the
truth.  So that motion for a mistrial is denied.

Obviously, this ruling was made on short
notice, there may have been arguments that I have
neglected, but because it's a motion for a mistrial
while the jury is sitting, it has to be ruled on
promptly because I don't want them to go to verdict.
There will probably be a rehearsal of this if there
is a conviction in a motion for a new trial and can
be dealt with in greater detail later.

Is your client here?

MR. SOROSKY:  Yes.

THE COURT:  Just come up here, Governor.

(Brief pause).

DEFENDANT BLAGOJEVICH:  Yes.

(Brief pause).

THE COURT:  The one thing I wanted to ask you
about, Governor, is, the jury is out now.  It may be
from time to time that the jury asks a question.
Usually it's a question about law.  Whenever a jury
asks a question, I summon all of the lawyers and we
go over the question and we decide what should be
done.  Your attorney has indicated to me that you
might wish to be excused than being called back to

5611

1  court for those things.  I'm quite willing to do
2  that but I have to hear it from your own lips.  So
3  is it your wish not to come when the jury asks
4  questions?

5          DEFENDANT BLAGOJEVICH:  If it's okay with
6  you, Judge.

7          THE COURT:  Yeah, it's fine with me, but I
8  just want to make sure that have you discussed it
9  with your lawyers?

10         DEFENDANT BLAGOJEVICH:  Yes, I have, Judge.

11         THE COURT:  Well, if that's the case then,
12 Governor, you are excused from coming in.  You're
13 free to come in any time, you're not barred, but if
14 you don't want to come in, you don't have to.

15         DEFENDANT BLAGOJEVICH:  You don't mind if I
16 don't, Judge?

17         THE COURT:  No, I don't.  It's fine.  It's
18 you decision.

19         Anything else?

20         MR. SCHAR:  Judge, one quick sidebar matter,
21 if we could?

22         THE COURT:  Sure.

23

24

25

5612

1    (Proceedings heard at sidebar on the record.)

2    MR. SCHAR:  I just wanted to let you know

3    something that Sanborn brought to our

4    attention.  Apparently the jurors went and got

5    lunch today in the cafeteria where the press is

6    hanging out.

7       THE COURT:  Yeah.

8       MR. SCHAR:  I'm not -- I don't think they are

9    probably bothered, but apparently several members of

10   the press picked up very quickly, I don't know how

11   they do this by face, that that one juror that got

12   moved to the back knew her number and noticed that

13   she was not there.  So they don't know whether she's

14   been booted, or removed, or moved to the back.

15   We're obviously not saying anything, but to the

16   extent the jurors are going to be in the cafeteria,

17   there is a potential that they're going to be

18   observed by the press.

19      THE COURT:  This was observed by the court

20   security officer.  We are going to try to avoid that

21   in the future.

22      Based on this case and the previous trial in

23   this case and Family Secrets, the practice was to

24   try the cafeteria.  And Family Secrets had worked,

25   like, a week before they caught on.  This one is

5613

1    more difficult because they don't actually eat in

2    the cafeteria, they go to the room and the media

3    room is right there.  So we do have a room for them

4    on the 10th floor and we're going to go back to

5    ordering food so that this doesn't come again.

6            Also, apparently the press is asking for the

7    jury verdict form, obviously under the impression

8    there is some information in that.  The jury verdict

9    is about as opaque as it you can possibly get.  So

10   we're going to release the blank jury verdict form

11   to them.

12           MR. SCHAR:  In terms of schedule, Judge?

13           THE COURT:  I'll tell you what time they plan

14   to leave, but I'm not telling to the press.  They

15   leave sometime between 3:00 and 3:30, depending on

16   how things are going, because it simplifies

17   everybody's work schedule.  And obviously if they

18   send me a note which says Monday through Thursday,

19   which is what they said, this is likely not to be a

20   short deliberation.  In a case like this, even if

21   all the jurors are unanimous from the first day on

22   some counts, either way, on every count either way,

23   my bet is is this is well, we can't sign it now, we

24   got to read all this stuff.  So I think we're going

25   to be here for a while.

5614

1          MR. GOLDSTEIN:  Your Honor, how did you
2   want -- last time I think you wanted us to, like,
3   check in every day like at 9:30 or something like
4   that, do you want that to happen again?
5          THE COURT:  Since I got that note, my views
6   have changed, you can check telephonically.
7          MR. SOROSKY:  What's that?
8          THE COURT:  Telephonically.
9          MR. SOROSKY:  Telephonically.
10         THE COURT:  The only thing is is somebody
11   from each side, at least one lawyer from each side
12   has to be like ten or fifteen minutes away, okay?
13         MR. SOROSKY:  Yes.
14         THE COURT:  Okay?  We're set?
15         MR. SOROSKY:  Yes.
16         MR. SCHAR:  Thank you, Judge.
17         MR. SOROSKY:  Thank you.
18         MR. SCHAR:  Have a good weekend.
19         THE COURT:  Thank you.
20      (Proceedings resumed within the hearing of the
21       jury.)
22         THE COURT:  See when I see you.
23         MR. SCHAR:  Thank you, Judge.
24         MR. SOROSKY:  Thank you, Judge.
25         MS. KAESEBERG:  Thank you, Your Honor.

5615

1          THE COURT:  All right.

2

3       (Adjournment taken from 4:13 o'clock p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5616

*    *    *    *    *    *    *    *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER

/s/Blanca I. Lara                          date

_____          _____
     Blanca I. Lara                          Date