1235 - A

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                    )   No.  08 CR 888
4           Government,             )
                                    )
5   vs.                            )   Chicago, Illinois
                                    )
6   ROD BLAGOJEVICH,                )   June 14, 2010
    ROBERT BLAGOJEVICH,             )
7                                   )
            Defendants.     )   9:30 o'clock a.m.
8
                    VOLUME 7- A
9
                TRANSCRIPTS OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL

11
    For the Government:
12
                THE HONORABLE PATRICK J. FITZGERALD,
13              UNITED STATES ATTORNEY
                BY:  Reid J. Schar
14                   Carrie E. Hamilton
                     Christopher Niewoehner
15                   Debra Riggs Bonamici
                 Assistant United States Attorneys
16              219 South Dearborn Street
                Suite 500
17              Chicago, Illinois 60604

18

19

20  Court Reporter:

21              Blanca I. Lara, CSR, RPR
                219 South Dearborn Street
22                   Room 2504
                Chicago, Illinois 60604
23                   (312) 435-5895

24

25

1236 - A

1  APPEARANCES  (continued:)

2

   For Defendant Rod Blagojevich:
3
           KAPLAN & SOROSKY
4          BY:  Sheldon M. Sorosky
           158 West Erie
5          Chicago, Illinois 60610
           (312) 640-1776
6
           LAW OFFICE OF SAMUEL E. ADAM
7          BY:  Samuel Forbes Adam
                Samuel Adam, Jr.
8          6133 South Ellis Avenue
           Suite 200
9          Chicago, Illinois 60637
           312-726-2326
10

11 Also present:  Michael Gillespie
                  Arron Goldstein
12                Lauren Kaeseberg

13

14 For Defendant Robert Blagojevich:

15         ETTINGER, BESBEKOS, PARISI
           BY:  Michael D. Ettinger
16              Cheryl Ann Schroeder
           12413 South Harlem
17         Suite 203
           Palos Hills, Illinois 60453
18         (708)598-1111

19
           Edelman, Combs, Latturner & Goodwin LLC
20         BY:  Robyn S. Molaro
           120 S. LaSalle
21         Suite 1800
           Chicago, Illinois 60603
22         (708) 598-1111

23

24

25

1237 - A

1     INDEX OF EXAMINATION

2   WITNESS                                    PAGE

3       LON MONK

4       Direct Examination (Resumed) By Mr.        1239

5       Niewoehner.............................

6       Cross Examination By Mr. Ettinger........ 1375

7       Cross Examination By Adam, Jr............ 1411

8

9

10  EXHIBITS

11      Government's Exhibit 2008 Racetrack        1283

12      Legislative History....................

13      Government's Exhibit 2006 Racetrack        1291

14      Legislative History....................

15      Government's Exhibit Monk Travel Record . 1354

16

17

18

19

20

21

22

23

24

25

1238 - A

1

2          (The following proceedings were had out of the
3           presence of the jury in open court:)
4              THE CLERK:  Please remain seated.
5              We'll resume with the case on trial.
6              THE COURT:  We are ready?
7              MR. SCHAR:  Yes, Judge.
8              THE COURT:  Could I have the witness back on
9     the stand.
10             THE MARSHAL:  All rise.
11          (The following proceedings were had in the
12           presence of the jury in open court:)
13             THE COURT:  You may be seated.
14             Mr. Monk, I want to remind you that you are
15    still under oath, do you understand that?
16             THE WITNESS:  Yes.
17             THE COURT:  And, members of the jury, I want
18    to remind you of what I ended with last Thursday.
19    Again, be careful to avoid contact with any media
20    about this trial, the proceedings inside.  You must
21    not communicate with anyone in any way or let anyone
22    else communicate with you.  Basically, you can't
23    discuss the case at all, even amongst yourselves,
24    until you've heard all the evidence.
25             With those two reminders, you may proceed.

1          MR. NIEWOEHNER:  Thank you, Your Honor.

2      LON MONK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

3              DIRECT EXAMINATION (resumed)

4  BY MR. NIEWOEHNER:

5  Q   Mr. Monk, are you familiar with Children's

6  Memorial Hospital?

7  A   Yes.

8  Q   What is that?

9  A   It's a children's hospital here in Chicago.

10 Q   I'm going to direct your attention to 2008.

11          Did you have any conversations with Defendant

12 Blagojevich about Children's Memorial Hospital in

13 that time frame?

14 A   Yes.

15 Q   Did you have more than one conversation?

16 A   Yes.

17 Q   What did Defendant Blagojevich want to do with

18 respect to Children's Memorial Hospital?

19          MR. ADAM, JR.:  Objection; foundation.

20          THE COURT:  Are you referring to one

21 conversation or more than one?

22          MR. NIEWOEHNER:  Generally speaking, Your

23 Honor.

24          THE COURT:  The conversations to which he's

25 already testified?

Monk - direct by Niewoehner                  1240 - A

1       MR. NIEWOEHNER:  That's correct.

2       THE COURT:  Given that, the objection is

3  overruled.

4  BY MR. NIEWOEHNER:

:59AM    5  Q   Would you like me to repeat the question?

6  A   Please.

7  Q   Generally, what did Defendant Blagojevich

8  indicate he wanted to do with respect to Children's

9  Memorial Hospital?

:59AM   10  A   Seek campaign contributions.

11  Q   Was there a particular time frame by which

12  Defendant Blagojevich wanted to get a contribution

13  from Children's Memorial Hospital?

14  A   Yes.

:59AM   15  Q   What was that?

16  A   By the end of the year 2008.

17  Q   I'm going direct your attention to October 22nd,

18  2008.

19       Did you have a meeting with Defendant

:59AM   20  Blagojevich on that day?

21  A   Yes.

22  Q   Where was that meeting?

23  A   At the campaign office.

24  Q   Who was present for that meeting?

:59AM   25  A   Myself, Rod, Rob, and John Wyma.

1  Q   What was the purpose of the meeting at the FOB

2  offices that day?

3  A   Discuss fundraising, go through fundraising

4  lists.

5  Q   Why was John Wyma there?

6  A   Because he from time to time did fundraising and

7  he was responsible for, I think, some of the people

8  on that list.

9  Q   Was there a conversation about Children's

10  Memorial Hospital that day?

11  A   Yes.

12  Q   What was said about Children's Memorial Hospital

13  that day?

14  A   Talk about the possibility of getting a campaign

15  contribution, and how to go about doing it, and who

16  to approach, and, you know, when could we get the

17  donation.

18  Q   Did John Wyma say anything about Children's

19  Memorial Hospital in that conversation?

20  A   Yeah.

21  Q   What did he say?

22  A   He said that, you know, there was a pretty good

23  likelihood that he'd be able to get a donation but

24  he wasn't sure he'd be able to do it by the end of

25  the year because Children's Memorial Hospital was a

1  nonprofit organization and the people chosen more

2  who would be helping with fundraising would have to

3  go to private donors to get money and that would

4  take time.

:01AM  5  Q   Did you understand from what Wyma said whether

6  Children's Memorial Hospital itself could make a

7  contribution?

8  A   No, he was saying or leading me to believe they

9  couldn't because they were a nonprofit organization.

:01AM  10  Q   Did Wyma leave the meeting at some point?

11  A   Yes.

12  Q   Did you continue to talk with Defendant

13  Blagojevich and Robert Blagojevich after that point?

14  A   Yes.

:01AM  15  Q   Did you discuss fundraising after John Wyma left

16  the meeting?

17  A   Yes.

18  Q   Did you have any subsequent meetings at the FOB

19  offices with Defendant Blagojevich and Robert

:01AM  20  Blagojevich?

21  A   Yes.

22  Q   I'm going to direct your attention to the

23  October, November time frame of 2008.

24          In that time frame, did you have any further

:01AM  25  conversation with Defendant Blagojevich about

1  whether you personally would contact Children's

2  Memorial Hospital about fundraising?

3  A   Yeah, we -- yes, we had a conversation among the

4  three of us, Rob, Rod and myself, about who would

5  approach Children's Memorial Hospital to try and get

6  a donation by the end of the year.

7  Q   And in relation to this October 22nd meeting you

8  testified a moment earlier, when was this

9  conversation between yourself, Defendant Blagojevich

10 and Robert Blagojevich?

11 A   With respect to that specific matter, it was -- I

12 mean, that -- that conversation could've taken place

13 after John Wyma left the meeting on October 22nd, I

14 don't recall.  But if it didn't get discussed then,

15 it got discussed within a week or two of that

16 October 22nd meeting.

17 Q   All right.  And in this conversation that you're

18 referring to with just yourself, Defendant

19 Blagojevich and Robert Blagojevich, what was said?

20 A   We talked about whether Rob or myself should

21 approach Children's Memorial for a campaign

22 contribution.

23 Q   What was decided to do?

24 A   That Rob would contact them.

25 Q   Why weren't you going to be the person who would

1  approach Children's Memorial Hospital?

2  A   Because I didn't know anyone there.

3  Q   After that conversation in which it was discussed

4  that Robert Blagojevich would approach Children's

5  Memorial Hospital, did you have any further

6  conversations about Children's Memorial Hospital?

7  A   Yes.

8  Q   Where did that conversation take place?

9  A   At the campaign office.

10  Q   Who was present for that conversation?

11  A   Rod, Rob and myself.

12  Q   And in relation to the conversation where it was

13  decided that Robert Blagojevich would approach

14  Children's Memorial Hospital, where did that

15  conversation take place?

16  A   I think it was about a week, maybe two weeks

17  after.

18  Q   What was discussed in that conversation?

19  A   The status of Rob's efforts to solicit donations

20  from Children's Memorial.

21  Q   What did Robert Blagojevich say about that?

22  A   When we got to Children's Memorial, he said, "I'm

23  not going to call them anymore, they haven't

24  returned a number of my phone calls."

25  Q   How did Defendant Blagojevich react upon hearing

:03AM

:03AM

:03AM

:03AM

:04AM

 1  that?
 2  A  He wasn't happy.  He got up and, you know, said,
 3  "screw these guys" and went and got on the phone.
 4  Q  And when he said, "screw these guys," who did you
 5  understand he was referring to?
 6  A  Children's Memorial.
 7  Q  What did -- I think you said Defendant
 8  Blagojevich got on the telephone, is that correct?
 9  A  Correct.
10  Q  What did you understand he was going to do?
11          MR. ADAM, JR.:  Objection.
12          THE COURT:  He can testify as to his
13  understanding.
14  BY THE WITNESS:
15  A  Well, initially -- initially I wasn't -- I wasn't
16  sure exactly what it was that he was going to do,
17  but once he got on the phone I understood that he
18  was calling the Governor's Office.
19  Q  And what did he say?
20  A  He talked to somebody in the Governor's Office
21  and asked what the status of the Children's Memorial
22  money or grant was from the state.
23  Q  Did you understand who he was trying to speak
24  with?
25  A  Bob Greenlee.

:04AM
:04AM
:04AM
:05AM
:05AM

1  Q   Who is Bob Greenlee?

2  A   I'm not sure exactly what his title was, but he

3  worked in the Governor's Office.

4  Q   Could you hear both sides of that conversation?

5  A   No.

6  Q   Do you know who Defendant Blagojevich actually

7  spoke with?

8  A   No.

9  Q   What did Defendant Blagojevich say when he was on

10  the phone?

11  A   He asked what it the timing and status was of

12  Children's Memorial Hospital in getting the amount

13  of money or grant.

14  Q   And did you know what exactly -- what money or

15  grant Defendant Blagojevich was talking about?

16  A   No.

17  Q   Could you hear the answer to Defendant

18  Blagojevich's question about the status of that

19  money or grant?

20  A   No.

21  Q   What did Defendant Blagojevich say next?

22  A   He said, "okay, fine, don't do anything with it

23  until I talk to you, until I let you know."

24  Q   Did you hear the response on the phone?

25  A   No.

:05AM
:05AM
:05AM
:06AM
:06AM

1  Q   What did you understand Defendant Blagojevich was
2  saying to the person on the phone?
3  A   Don't -- don't let the money go to Children's
4  Memorial until he let them know that it was okay to
5  do that.
6  Q   Why did you understand Defendant Blagojevich was
7  issuing that instruction?
8  A   Because he was angry that Children's Memorial
9  wasn't returning Rob's phone calls and was not
10 talking about fundraising.
11 Q   After that conversation, did you hear anything
12 further about whether Children's Memorial Hospital
13 ever made a contribution?
14 A   No.
15 Q   Prior to Defendant Blagojevich's arrest, did you
16 learn whether Children's Memorial Hospital ever got
17 the money or the grant that Defendant Blagojevich
18 was talking about?
19 A   No.
20 Q   I'm going to turn your attention now to an
21 individual named John Johnston.
22         Are you familiar with that person?
23 A   Yes.
24 Q   Who is he?
25 A   He is part of the family that owns racetracks in

:06AM

:06AM

:06AM

:07AM

:07AM

1  Illinois.  He's a former client of mine, donor to

2  the campaign.

3  Q   Which horse racetracks are you referring to?

4  A   Balmoral and Maywood.

:07AM  5  Q   When did you first hear of John Johnston?

6  A   I think it was in 2002.

7  Q   In what context?

8  A   He was a donor to the campaign; fairly

9  significant.

:07AM  10  Q   Do you recall approximately how much money

11  Johnston or his family arranged to contribute?

12  A   Not specifically, but I think it was at least

13  $100,000.

14  Q   Were you the primary point of contact in terms of

:08AM  15  fundraising from Johnston in the 2002 campaign?

16  A   No.

17  Q   Who was?

18  A   Chris Kelly.

19  Q   In the 2006 campaign, was Johnston still a

:08AM  20  significant fundraiser for the Governor?

21  A   I believe he was.

22  Q   Did you have an understanding of how much money

23  Johnston arranged to contribute in the 2006

24  campaign?

:08AM  25  A   Not specifically, but I think it was, again, in

1  the minimum of $100,000.

2  Q   Who was the principal point of contact for

3  Johnston in the 2006 campaign?

4  A   Chris Kelly.

:08AM  5  Q   At some point did Kelly stop handling the

6  fundraising relationship with John Johnston?

7  A   Yes.

8  Q   About when did that happen?

9  A   I'd say sometime in late 2007, early first

:08AM  10  quarter of 2008.

11  Q   Who handled Johnston, from a fundraising

12  perspective, after that point?

13  A   Me.

14  Q   Did you do any work for Johnston?

:09AM  15  A   Yes.

16  Q   What kind of work did you do for him?

17  A   I was a lobbyist and consultant for him in

18  Illinois.

19  Q   What types of issues did you work on for

:09AM  20  Johnston?

21  A   Legislative issues and issues that dealt with the

22  Governor's Office.

23  Q   About when did you begin to work with Johnston?

24  A   It was about the summer of 2007.

:09AM  25  Q   Were you paid for your work?

1  A   Yes.

2  Q   About how much did Johnston pay you for your

3  work?

4  A   $12,500 a month.

:09AM   5  Q   So on an annual basis about how much does that

6  translate to?

7  A   $150,000.

8  Q   I'm going to direct your attention now to 2008.

9       Were there any particular issues that you

:09AM   10  worked on for Johnston in that time frame?

11  A   Yes.

12  Q   What did you work on?

13  A   He was looking to get -- well, there were two

14  issues, one was kind of an ongoing where racetracks

:10AM   15  wanted to get slot machines, wanted the Illinois

16  legislature to pass a law allowing racetracks to

17  have slot machines at the tracks.

18       And then the other was a piece of legislation

19  that had passed in 2006 and was going to expire in,

:10AM   20  I believe, May of 2008, and he wanted to get that

21  renewed or extended.

22  Q   All right.  This 2006 piece of legislation, about

23  when did it become law?

24  A   I think it was May of 2006, May or June.

:10AM   25  Q   Did you understand if I refer to that law as the

1  2006 law?

2  A   Yes.

3  Q   Or the 2006 racetrack law?

4  A   Yes.

5  Q   What did the 2006 racetrack law do?

6  A   It required the riverboat casinos to provide a

7  subsidy to the horse racing industry to help the

8  horse racing industry, including tracks.

9  Q   When the 2006 racetrack law passed in May of

10 2006, what were you doing?  What was your job at

11 that point?

12 A   I was campaign manger for the Governor.

13 Q   Did you have any particular involvement in this

14 law when it passed?

15 A   No.

16 Q   And so for this 2006 racetrack law, where was

17 this money supposed to come from that would be paid

18 for the subsidy?

19 A   From the revenue generated by the casinos.

20 Q   Who was going to pay for the subsidy?

21 A   The horse racing industry, including the tracks,

22 the horsemen, other people involved in horse racing.

23 Q   What was the purpose of the bill, of the law?

24 A   To try and help the horse racing industry that

25 was financially in trouble.

:10AM
:11AM
:11AM
:11AM
:12AM

1  Q   In terms of number of dollars, was this in the
2  millions of dollars?
3  A   Yes.
4  Q   Under the 2006 racetrack law, was money going to
5  go to the racetracks that were owned by John
6  Johnston's family?
7  A   Yes.
8  Q   Under the 2006 racetrack law, how long are the
9  casinos required to pay for the subsidy?
10 A   2 years.
11 Q   What happened at the end of the 2 years?
12 A   The law would expire and the casinos were no
13 longer required to pay the subsidy.
14 Q   So about when was the law due to expire in 2008?
15 A   I believe in May.
16 Q   Did you talk with Johnston about the 2006
17 racetrack law before it expired in May of 2008?
18 A   Yes.
19 Q   What did Johnston indicate he wanted to do with
20 respect to the 2006 racetrack law?
21         MR. ADAM, JR.:  Objection; foundation.
22         THE COURT:  Lay a foundation.
23 BY MR. NIEWOEHNER:
24 Q   In these conversations before the 2006 racetrack
25 law expired, did you have more than one conversation

1  with Johnston?

2  A  I believe I did.

3  Q  And in these conversations before May of 2008,

4  what did Johnston indicate he wanted to do with

:13AM  5  respect to the 2006 racetrack law?

6  A  He wanted to get legislation drafted and passed

7  in order to extend that law.

8  Q  And in May of 2008, were there any legislative

9  steps undertaken to possibly do that?

:13AM  10  A  I believe the bill may have been drafted by then.

11  Q  Did the Illinois legislature sit in session all

12  year round?

13  A  No.

14  Q  Did the Illinois legislature meet around

:14AM  15  May 2008?

16  A  I think so, yeah.

17  Q  Was there any legislation passed around 2008 that

18  would extend the subsidy that was being paid for the

19  racetracks?

:14AM  20  A  No.

21  Q  As a result, did the casinos have to pay any

22  further subsidies after the 2006 racetrack law

23  expired?

24  A  No.

:14AM  25  Q  I'm now going to turn your attention to the fall

1   of 2008.

2        In that time frame did you talk with

3   Defendant Blagojevich about raising funds from

4   Johnston?

:14AM   5   A   Yes.

6   Q   Did you have more than one conversation on that

7   topic?

8   A   Yes.

9   Q   Was Robert Blagojevich present for any of those

:14AM   10  conversations?

11  A   I believe he was.

12  Q   Do you recall any particular meetings with

13  Defendant Blagojevich and Robert Blagojevich in

14  which raising funds from Johnston was discussed?

:14AM   15  A   Yes.

16  Q   In the first meeting, if you can recall, where

17  did that one take place?

18  A   At the campaign office.

19  Q   What were you doing at that meeting?

:15AM   20  A   We were going through lists of potential donors

21  and talking about how much we should be raising from

22  certain donors and what action, steps, we should be

23  taking for others.

24  Q   Was Johnston discussed in the course of the

:15AM   25  meeting?

1  A   Yes.

2  Q   What happened with reference to Johnston?

3  A   Rod called John Johnston and had a conversation

4  with him and asked him if he would make a donation.

:15AM  5  Q   Did you hear both sides of that conversation?

6  A   No.

7  Q   Did you talk with Defendant Blagojevich after the

8  call?

9  A   Yes.

:15AM  10  Q   And did Defendant Blagojevich ask you to do

11  anything?

12  A   Yeah, in follow-up to the telephone conversation

13  that he had with the Johnstons, he asked me to

14  follow up with them and try and collect the donation

:16AM  15  that he had asked them for.

16  Q   Did you understand that there was any particular

17  amount of money you were trying to raise from

18  Johnston?

19  A   Yes, $100,000.

:16AM  20  Q   And prior to this conversation, had you

21  understood that Johnston had promised to give

22  100,000 before that point?

23  A   Not that I am aware, no.

24  Q   I'm going to direct your attention now to the

:16AM  25  November of 2008.

1        Was the Illinois legislature in session then?

2  A  Yes.

3  Q  Did you talk with Johnston prior to this

4  November 2008 legislative session?

:16AM    5  A  Yes.

6  Q  Did you talk more than once with Johnston?

7  A  Yes.

8  Q  And generally speaking, in these conversations,

9  what did you talk about with Johnston?

:16AM   10  A  Strategy for getting the racetrack bill passed

11  and fundraising.

12  Q  And in reference to fundraising, generally

13  speaking, what were you doing?

14  A  Trying to raise $100,000 that Rod had talked

:17AM   15  about earlier.

16  Q  Did you ever ask Johnston for a specific amount

17  of money?

18  A  I -- I -- I may have, but I know that Rod had

19  asked for $100,000.  I mean, there was never a

:17AM   20  question as to the amount.

21  Q  Did Johnston ever promise you that on a certain

22  date he was going to give you a certain amount of

23  money?

24  A  Not on a certain date, no.

:17AM   25  Q  In the November 2008 session, did the Illinois

1  legislature consider any bills that would have

2  extended the 2006 racetrack law?

3  A   Yes.

4  Q   Was there a particular bill that dealt with that

5  idea?

6  A   Yes.

7  Q   Did you hear that bill referred to by different

8  names?

9  A   Yes.

10  Q   What names did you hear it referred to by?

11  A   The Racetrack Bill and the Recapture Bill and

12  sometimes it was referred to by its number.

13  Q   Did you understand what I'm talking about if I

14  refer to it as the Racetrack Bill?

15  A   Yes.

16  Q   What did you understand the Racetrack Bill would

17  do?

18  A   It would renew or extend the law from the law

19  that was passed in May of 2006 for a 3-year period.

20  Q   Under this Racetrack Bill which entities were

21  going to pay the money?

22  A   The riverboat casinos.

23  Q   Which entities were going to receive the money?

24  A   The horse racing industry.

25  Q   And, again, was this bill contemplating millions

:17AM

:17AM

:18AM

:18AM

:18AM

1  of dollars of subsidies?

2  A   Yes.

3  Q   Were John Johnston's racetracks going to benefit

4  potentially from the Racetrack Bill?

:18AM   5  A   Yes.

6  Q   How would they benefit?

7  A   The combined two racetracks were going to receive

8  $9,000 a day from the subsidy.

9  Q   Did you talk with Johnston about the Racetrack

:19AM  10  Bill that was being considered by the Illinois

11  legislature by 2008?

12  A   Yes.

13  Q   Did you have more than one conversation about

14  that?

:19AM  15  A   Yes.

16  Q   What did Johnston indicate to you he wanted with

17  respect to that Racetrack Bill?

18        MR. ADAM, JR.:  Objection; foundation; some

19  time frame.

:19AM  20  BY MR. NIEWOEHNER:

21  Q   Were these conversations in the November 2008

22  time frame?

23  A   Yes.

24  Q   And, generally speaking, what did Johnston

:19AM  25  indicate he wanted to do with respect to the

1  Racetrack Bill?

2  A   Convince the House and Senate to pass the bill

3  and ultimately get it signed by the Governor.

4  Q   If the Illinois legislature pass the Racetrack

5  Bill, what would happen to it?

6  A   It would get sent to the Governor for signature.

7  Q   What could Defendant Blagojevich do once he

8  received the bill?

9  A   Sign it, veto it, or mandatorily veto it.

10  Q   If Defendant Blagojevich did nothing, what would

11  happen?

12  A   After a certain passage of time it would become

13  law.

14  Q   Now, did you have any concerns about fundraising

15  from Johnston close in time when Defendant

16  Blagojevich might have to make a decision about

17  signing the Racetrack Bill?

18  A   Yes.

19  Q   What was your concern?

20  A   That there would be an appearance of an exchange

21  of signing the bill for campaign donations.

22  Q   Why were you concerned about that appearance?

23  A   If it was perceived that he was signing the bill

24  in exchange for the campaign donation, it would be

25  improper.

1  Q   Did you try to do anything to ensure that there
2  would not be a problem in terms of the timing of the
3  contribution?
4  A   I was trying to get the contribution as quickly
5  as I could so that there was more time in between
6  the contribution and the signing of the bill.
7          MR. NIEWOEHNER:  Your Honor, may we publish
8  the call at tab 51, Transcript Binder 2?
9          THE COURT:  Yes, you may.
10 BY MR. NIEWOEHNER:
11 Q   Are you there, Mr. Monk?
12 A   Yes.  Yes.
13     (Tape played).
14 BY MR. NIEWEOHNER:
15 Q   Mr. Monk, I'm going to turn your attention to the
16 first page of the transcript.
17 A   Yes.
18 Q   And you're still on tab 51, is that right?
19 A   Yes.
20 Q   The date of this call is November 12th of 2008,
21 is that correct?
22 A   Yes.
23 Q   Was the November 2008 legislative session going
24 on at that point in time?
25 A   Yes.

:21AM

:22AM

:27AM

:27AM

:27AM

1  Q   Now, down at line 10, page 1, Robert Blagojevich
2  says:
3       "... how's your dad?"
4        And you respond:
5        ".. he's, you know, he's fine."
6            What were you discussing with Robert
7  Blagojevich at that point.
8  A   The status of my dad's eyesight.
9  Q   And, in fact, what was the situation with your
10 father's physical situation at that point?
11 A   Physically he was -- he was okay.  He was dealing
12 with the onset of dementia and potentially
13 Alzheimer's.
14 Q   And on line 11 you indicated:
15       "... I ended up staying longer than I wanted
16        to."
17       What were you referring to there?
18 A   That I was telling Rob that I stayed a couple of
19 extra days in California than I originally planned.
20 Q   Had you actually gone to California as you were
21 describing when you said that?
22 A   Yes.
23 Q   Had you gone to California as long as you
24 indicated to Robert Blagojevich?
25 A   No.

1  Q   Why were you telling Robert Blagojevich you'd

2  stayed in California longer than you actually had?

3  A   Because I had been slow in returning some of his

4  calls and it was just easy to say one of the reasons

:29AM  5  I did that is because I stayed a couple of extra

6  days to deal with my dad.

7  Q   So why were you not telling Robert Blagojevich

8  the truth about where you were?

9  A   Because I didn't want to have to deal with

:29AM  10  fundraising for that -- for those couple of days.

11  Q   What did you think was going to happen if you

12  remained -- if Robert Blagojevich knew you were

13  going to be in the Chicago area during that time

14  frame?

:29AM  15  A   We would be having discussions about fundraising,

16  and the status of my fundraising efforts, and where

17  I was on collecting certain amounts from donors.

18  Q   At times, did you feel pressured from Robert

19  Blagojevich to raise funds?

:29AM  20  A   Yes.

21  Q   How did you feel pressured?

22  A   Well, I know he was -- he'd call me to find out

23  the status because I know he was talking to Rod

24  about it and Rod was talking to him about how's Lon

:29AM  25  doing, and that type of thing.

1  Q   Did you also feel at times pressure from
2  Defendant Blagojevich to raise funds?
3  A   Yes.
4  Q   At times did you lie to Defendant Blagojevich
5  about where you were because of that pressure?
6  A   Yes.
7  Q   I'm going to turn your attention back to Page 2
8  of the transcript, and on line 20 you indicate:
9     "... I saw John Johnston on Friday of last week
10    and I gave him a deadline of today."
11         What were you indicating to Robert
12 Blagojevich at that point in the conversation?
13 A   That I'd seen him on Friday and that I had told
14 John Johnston that he needed to get his money in by
15 today.
16 Q   Had you actually given Johnson a deadline of
17 providing a contribution?
18 A   I don't think I gave him a specific deadline, but
19 I told him that we needed to have the money soon
20 because it was getting to a timing issue.
21 Q   Why did you indicate Defendant Blagojevich that
22 you gave John Johnston a deadline?
23 A   To portray that I was being more aggressive than
24 I really was in terms of fundraising.
25 Q   Why did you want Robert Blagojevich to think you

:30AM
:30AM
:30AM
:30AM
:31AM

1  were more aggressive than you actually were?

2  A   It sounded better that I was putting more

3  pressure on the Johnstons to fundraise and other

4  donors than I really was.  I was giving he and Rod

5  more of a sense that more was getting done than

6  actually was.

7  Q   And did you have similar conversations with

8  Defendant Blagojevich where you presented yourself

9  as being more aggressive in fundraising than in fact

10 you were?

11 A   Yes.

12 Q   Why did you do that?

13 A   For the same reason, that I wanted to -- I wanted

14 them to think I was being more aggressive than I

15 was.

16 Q   So when you said you gave Johnston a deadline, is

17 that an example one of those times when you

18 presented yourself as being more aggressive than in

19 fact you were?

20 A   Yeah, except in this particular instance I was

21 letting John know that the sooner, the better, in

22 terms of the timing.  So I don't think I gave him a

23 specific deadline, so it wasn't altogether a lie.

24 Q   Than if you turn to Page 3 -- actually, I'm

25 sorry, to the very end of Page 2, on line 27, you

1  indicated:

2      "... I'm on my way down to Springfield right

3      now."

4      Do you see that?

5  A  Yes.

6  Q  Were you actually going to Springfield in that

7  time period?

8  A  I believe I was, yeah.

9  Q  Why were you going to Springfield?

10 A  To, I think, deal with the legislation in terms

11 of trying to talk to certain legislatures about

12 getting it passed, I May have had some other

13 meetings down there.

14 Q  Turning your attention to pay 3 at line 4, when

15 you said:

16     "... what he said on Friday is that I'm good for

17     it, I'm good for it, I'm just trying to figure

18     out the different sources to get it."

19     What were you referring to there?

20 A  I was referring to a conversation that I had with

21 John Johnston and his response to me asking the

22 status of the donation and timing of the donation.

23 Q  And at line 7 you say:

24     "... I said Johnson, you've been telling this to

25     me for six months."

1      Did you actually say that to John Johnston?

2  A   No.

3  Q   Had, in fact, you've been telling John Johnston

4  that he should make a contribution for six months at

5  that point?

6  A   I don't think I'd been dealing with him that long

7  on the specific $100,000.

8  Q   So why did you say that to Robert Blagojevich?

9  A   Embellishing, exaggerating, lying about my

10 aggressiveness with my conversations with John.

11 Q   On line 18 you say:

12     "... I want to get down there, see what he has

13       to say, but I may have to have Rod call him

14       again."

15     What will were you indicating there?

16 A   That once I got down to Springfield and talked to

17 John about the status of the donation, if he didn't

18 give me assurance that made be comfortable that

19 $100,000 was going to be coming in by the end of the

20 year, I may ask Rod to call him again.

21 Q   Why would you ask Defendant Blagojevich to call

22 Johnson again?

23 A   Because it's more significant for a potential

24 donor to be hearing directly from a Governor than

25 from me about a donation.

1  Q   Would it put more pressure on the donor to give a
2  contribution if Defendant Blagojevich was the one
3  doing the asking?
4         MR. ADAM, JR.:  Objection.
5         THE COURT:  The objection is sustained.
6  BY MR. NIEWOEHNER:
7  Q   What did you understand the effect when you asked
8  to -- or when you suggested to Robert Blagojevich
9  that Defendant Blagojevich would be the one to make
10 the call, what effect did you understand it would
11 have on John Johnston if Defendant Blagojevich were
12 to make the call?
13 A   It would put more pressure on John Johnston to
14 make the donation.
15 Q   At line 26, going on to line 29 you say:
16     "Because Rod called him about a month ago and
17       asked him for the money."
18     What were you referring to there?
19 A   The conversation that Rod originally had with
20 John Johnston when he originally asked him for
21 $100,000.
22 Q   Turning to Page 4, at line 2, you discuss an
23 individual named Niranjan Shah, do you see that?
24 A   Yes.
25 Q   Who is Niranjan Shah?

1  A   He owns an engineering company here in Chicago,

2  donor to the Governor, former client of mine.

3  Q   Why were you discussing Niranjan Shah with Robert

4  Blagojevich?

:36AM  5  A   Because he was going to host fundraisers for Rod

6  before the end of the year.

7  Q   And when you indicated that Niranjan Shah, on

8  line 2, that Niranjan Shaw needed two days probably

9  a cocktail party to get to his hundred, what were

:36AM  10  you referring to there?

11  A   That he needed to be able to host a cocktail

12  party and a dinner with a variety of people he was

13  going to be asking money from for Rod.

14  Q   How much money were you expecting to get from

:36AM  15  Niranjan Shah?

16  A   At the time I believe $100,000.

17  Q   Turning your attention now to Page 5, at line 1,

18  Robert Blagojevich says:

19      "... ah, anything with Krozel?"

:36AM  20      Who did you understand Robert Blagojevich was

21      referring to there?

22  A   Jerry Krozel.

23  Q   And in what context did you understand Robert

24  Blagojevich was interested about Jerry Krozel?

:37AM  25  A   He wanted to get the status of the potential

1  donation from Jerry Krozel to Rod.

2  Q   At line 7 on Page 5, Robert Blagojevich

3  indicates:

4      "So here are the follow-ups that I got ..."

5      and it continues on line 10:

6      "...  Johnston, Krozel, Niranjan Shah."

7      What did you understand Robert Blagojevich to

8      you saying there?

9  A   That in terms of donations to the campaign, those

10 were the three individuals I was responsible for

11 following up with.

12 Q   And at line 13 when Robert Blagojevich said:

13     "These to me are the big ticket items that would

14     be great to be resolved."

15     What did you understand him to mean?

16 A   That these were, in the context of fundraising at

17 that time, these were big amounts of money that the

18 campaign was expecting from these three individuals.

19 Q   And at line 20 when Robert Blagojevich indicated:

20     "... they raised a half million dollars for the

21     reporting period so far."

22     What did you understand he was referring to?

23 A   That from June 1st, 2008 to date they'd raised a

24 half a million dollars.

25 Q   At lines 27 when Robert Blagojevich says:

1

2       "... you got nothing to do with Magoon, so I

3        won't pass that on to you."

4            What did you understand Robert Blagojevich

:38AM   5  was referring to?

6  A   That he wasn't going to ask me for the status or

7  ask me to follow up with Magoon and fundraising.

8  Q   Who was Patrick Magoon?

9  A   He was either head of or very high up at

:38AM   10  Children's Memorial Hospital.

11  Q   Was that the individual who you understood Robert

12  Blagojevich was discussing fundraising from

13  Children's Memorial Hospital with?

14  A   Yes.

:39AM   15  Q   If you could turn to Page 6, at line 2, Robert

16  Blagojevich says:

17       "... you'll help us push, ah, you know, near

18        that million dollars assuming Krozel comes in

19        with some number ..."

:39AM   20            What did you understand Robert Blagojevich to

21            be referring to there?

22  A   That if Krozel came in with a big donation, that

23  that would help get the campaign to the

24  million-dollar mark for that reporting period.

:39AM   25  Q   And at that period of time, how much money did

1  Defendant Blagojevich instruct you to raise from
2  Jerry Krozel?
3  A   A half a million dollars.
4  Q   At line 6 you say:
5      "... John Johnston is the one who is kinda
6       pissing me off right now."
7       Do you see that?
8  A   Yes.
9  Q   Were you concerned about whether John Johnston
10 was going to give a contribution at that point in
11 time?
12 A   Yeah.
13 Q   At line 15 you say:
14      ".. he kinda begged a little bit about, you
15       know, the radar and all that stuff.
16       What did you mean there?
17 A   That John Johnston was potentially concerned
18 about making a donation to the campaign because of
19 the investigation that we knew was going on with the
20 campaign in the Governor's Office.
21 Q   At line 23 when you said:
22      "... that's not going to shake them up but, you
23       know, it shakes Andalcio up."
24       Who is Andalcio?
25 A   David Andalcio was on the -- was a member of the

1  Tollway Highway Authority board.

2  Q   What were you referring to Robert Blagojevich

3  when you said it shakes Andalcio up?

4  A   I'd had a conversation previously with David

5  Andalcio where he told me that he was --

6          MR. ADAM, JR.:  Objection.

7          THE COURT:  The objection is sustained.

8  BY MR. NIEWOEHNER:

9  Q   Had you spoken with David Andalcio prior to this

10  conversation with Robert Blagojevich?

11  A   Yes.

12  Q   Approximately when in this conversation did you

13  have this conversation with Andalcio?

14  A   Sometime within probably 3 or 4 weeks prior to

15  this conversation.

16  Q   What did Andalcio indicate in that conversation?

17          MR. ADAM, JR.:  Objection.

18          THE COURT:  For what purpose are you offering

19  this?

20          MR. NIEWOEHNER:  I'm trying to explain the

21  reference to Robert Blagojevich, explain the basis.

22          THE COURT:  I don't see the relevance.

23          MR. NIEWOEHNER:  Okay.

24          THE COURT:  I'm sustaining the objection.

25  BY MR. NIEWOEHNER:

:40AM

:41AM

:41AM

:41AM

:41AM

Monk - direct by Niewoehner                    1273 - A

1  Q   So when you indicate at line 23:
2      "... that's not going to shake him up,"
3      what were you indicating in that particular
4      line?
5  A   That even though John is expressing some concerns
6  about potential investigations in his previous
7  comment, that he's a pretty savvy guy and I don't
8  think ultimately that's going to be a reason why he
9  wouldn't give a deposition.
10         MR. NIEWOEHNER:  Your Honor, at this time can
11  I publish the call at tab 58, please?
12         THE COURT:  Yes, you may.
13      (Tape played).
14  BY MR. NIEWEOHNER:
15  Q   If you could turn your attention to the first
16  page of the transcript.
17  A   Yes.
18  Q   Now, this call takes place on November 13, 2008,
19  is that right?
20  A   Yes.
21  Q   Is that the day prior to the call you just heard?
22  A   Yes.
23  Q   And if you could turn your attention to Page 4,
24  on Line 1 you say:
25      "... I saw John Johnston last night."

:41AM
:42AM
:49AM
:49AM
:49AM

1      Do you see that?

2  A  Yes.

3  Q  Had you spoken with John Johnston the prior

4  night?

5  A  It was either the prior afternoon or that night.

6  Q  And at line 3 you say:

7      "... I was expecting kind of a, you know, excuse

8       of a conversation."

9      What did you mean when you said that?

10 A  That he was going to give me the same or

11 additional reasons why the donation wasn't

12 forthcoming immediately.

13 Q  And at line 6 you continue saying:

14     "And he said go tell the big guy I'm going for

15      it, I'm good, I, I'm just figuring out where

16      check is from."

17     What were you referring to there?

18 A  What John Johnston told me as far as the status

19 of the donation.

20 Q  So based on your conversation with Johnston, what

21 did you understand he was going to do?

22 A  That he was going to get the donation to us and

23 it was going to come from some different accounts at

24 his company.

25 Q  Then on line 24 you said:

1       "... I'm going to see Rod tonight."
2        What were you referring to there?
3   A   That I was going to either meet Rod or go with
4   Rod to what turned out to be the basketball game at
5   the United Center.
6   Q   On line 7 you continue:
7       "... and I want to talk to him about the timing
8        because there is absolutely no connection
9        between the two but there's a legislative issue
10       down here that I don't want to get in the way."
11       What were you talking about at that point?
12  A   I was talking about the timing of the potential
13  signing of the bill and the timing of the donation.
14  Q   Now, did you actually want to talk to Defendant
15  Blagojevich about that issue that night at the Bulls
16  game?
17  A   Yes.
18  Q   Did you have concern about the timing of the
19  contribution at that point?
20  A   Yes.
21  Q   What was that concern?
22  A   That if the donation and the signing of the bill
23  were too close in the time, that there would be a
24  perception that one was being exchanged for the
25  other.

1  Q   Had the Racetrack Bill actually passed through

2  the Illinois legislature as of November 13th?

3  A   No.

4  Q   So why did you want to talk to Defendant

5  Blagojevich about the timing of the possible

6  contribution and the possible signing of the

7  Racetrack Bill?

8  A   Because I thought there was a very good

9  likelihood that it was going to pass and I wanted to

10 get his opinion on how big an issue this was in

11 terms of the timing of the donation versus the

12 signing of the bill and see what his concerns were.

13 Q   At line 27 on Page 4 you say:

14    "... because there is absolutely no connection

15     between the two."

16       What were you indicating to Robert

17 Blagojevich at that point in time.

18 A   I was trying to tell him that there was no

19 connection between the legislative issue and the

20 timing of the donation.

21 Q   At that point in time did you think there was a

22 connection?

23 A   Yeah, there could be.

24 Q   Why were you telling Robert Blagojevich that

25 there would be no connection?

1  A  Because I didn't -- I didn't want him to think

2  that.  And I had seen, you know, Rod kind of try and

3  have discussions with Rob that did not include state

4  action, try to keep him out of that -- that area.

5  Q  At that point were you concerned that Defendant

6  Blagojevich was going to refuse to sign the

7  Racetrack Bill unless there was a contribution made?

8  A  No, I thought he would sign it if it passed.

9  Q  Why would you think Defendant Blagojevich was

10  going to sign it?

11  A  Because he had signed a similar bill -- in fact,

12  there was an identical bill other than the term in

13  2006, and he'd shown no indication when the topic

14  had come up that he was against the bill.

15  Q  All right.  Turning your attention back to Page 5

16  of the transcript, at line 3 you indicated:

17      "... I felt there was a good chance I was going

18       to have to have Rod call him, he does not need

19       to do that."

20      What were you referring to there?

21  A  The day before I had indicated to Rob that

22  because I wasn't making the progress I had hoped to

23  in collecting the donation from the John Johnstons

24  that I was going to have to have Rod call the John

25  Johnston and put some pressure on him, and based on

:53AM

:53AM

:53AM

:54AM

:54AM

1 my conversation with John Johnston the previous day,

2 I felt pretty good that the donation was going to

3 come in so as a result Rod did not need to make the

4 call.

5 Q   Going down to line 21, Robert Blagojevich says:

6       "Anything on Krozel?"

7       And you respond:

8       "I want to do the same thing with Krozel that I

9       did with Johnson."

10      What were you referring to there?

11 A   That, you know, if I -- if I felt like I wasn't

12 making any progress in collecting a donation from

13 Jerry Krozel, that I may have to have Rod call him

14 again and do the same thing.

15 Q   And, from your perspective, what would be the

16 point of having Defendant Blagojevich call Krozel

17 again?

18 A   Puts more pressure on Krozel to fundraise than

19 just hearing it from me.

20 Q   Now, are you familiar with an individual named

21 Paul Rosenfeld?

22 A   Yes.

23 Q   Who is Paul Rosenfeld?

24 A   He is somebody who had worked on the campaign in

25 2002, he's known Rod for quite a while, he's a

:54AM

:54AM

:55AM

:55AM

:55AM

1  lobbyist and consultant and fundraiser.

2  Q   And you mentioned he was fundraiser.  Over what

3  time period did Rosenfeld raise money for Defendant

4  Blagojevich?

5  A   I'm not sure exactly when it started.  I mean, it

6  may have been 2002, but certainly after he became

7  Governor he was a fundraiser.

8  Q   I'm going to direct your attention to the summer

9  of 2008.

10        Did you have any conversation with Rosenfeld

11 about law enforcement?

12 A   Yes.

13 Q   Was anyone else present for that conversation?

14 A   No.

15 Q   What did Rosenfeld tell you in that conversation?

16        MR. ADAM, JR.:  Objection.

17        THE COURT:  Purpose of this?

18        MR. NIEWOEHNER:  The background for a

19 conversation that Mr. Monk then had with Defendant

20 Blagojevich.

21        THE COURT:  He may answer.

22 BY THE WITNESS:

23 A   Can you repeat the question?

24 BY MR. NIEWOEHNER:

25 Q   What did Rosenfeld tell you in that conversation?

1  A   That the FBI had come to his house to talk to him

2  and that he wasn't there, he was at a Cub game and

3  that his wife had answered the door.

4  Q   Did Rosenfeld indicate whether he actually spoken

5  with the government?

6  A   No.

7  Q   After you talked with Rosenfeld, did you speak

8  with Defendant Blagojevich?

9  A   Yes.

10  Q   And about when in relation to your conversation

11  with Rosenfeld?

12  A   I think it was within a day or two.

13  Q   What did you say in your conversation with

14  Defendant Blagojevich?

15  A   I told him of my conversation with Rosenfeld.

16        MR. NIEWOEHNER:  Your Honor, at this time can

17  I publish the call at tab 59?

18        THE COURT:  59?

19        Yes, you may.

20     (Tape played.)

21  BY MR. NIEWOEHNER:

22  Q   Mr. Monk, turning your attention to Page 1, this

23  conversation takes place on November 13th about

24  10:05 a.m. is that right?

25  A   Yes.

1  Q   Is that within minutes from the prior call you
2  just heard?
3  A   I need -- what's the previous tab?
4  Q   The tab is tab 58.
5          MR. ADAM, JR.:  Objection, Your Honor.  This
6  witness was not a party to this conversation.
7          THE COURT:  Overruled.
8  BY THE WITNESS:
9  A   Yes.
10 BY MR. NIEWOEHNER:
11 Q   "Yes," is the answer, it was within minutes of
12 the prior conversation?
13 A   Yes.
14 Q   All right.  Did you talk about attending a Bulls
15 game on the evening of November 13th with Defendant
16 Blagojevich, do you recall that?
17 A   Yes.
18 Q   Did you, in fact, attend that event?
19 A   Yes.
20 Q   Who else was there?
21 A   Some people from Motorola, a guy named Marc
22 Ganis.
23 Q   What did Defendant Blagojevich do at the game?
24 A   He sat watching the game and talked to the
25 president of Motorola for a large part of it, too.

:04AM
:04AM
:05AM
:05AM
:05AM

1  Q  Why were you present for the game?

2  A  It wasn't unusual for him to have someone go to

3  the game with him to, you know, potentially have

4  someone to talk to and to follow up if there was a

5  follow-up as a result of the meet with Motorola.

6  Q  Did you discuss John Johnston during the course

7  of the evening with Defendant Blagojevich?

8  A  Yes.

9  Q  What was discussed?

10  A  I think I told him of my discussion with John

11  Johnston the day before and I wanted to get his

12  opinion on his concern for where the timing of the

13  Johnston donation and the potential signing of the

14  bill.

15  Q  What did Defendant Blagojevich -- did you raise

16  that concern with Defendant Blagojevich?

17  A  Yes.

18  Q  What did Defendant Blagojevich say about your

19  concern about the timing?

20  A  He didn't seem really concerned.  He said get the

21  money as soon as possible.

22  Q  I'm going to direct your attention back to the

23  Racetrack Bill.

24       Did the legislature pass that bill in the

25  November session?

1  A   Yes.

2          MR. NIEWOEHNER:  Your Honor, the government

3  moves into evidence Government Exhibit 2008

4  Racetrack Legislative History as a public document.

:07AM   5          THE COURT:  Admitted without objection.

6          (Government's Exhibit 2008 Racetrack Legislative

7           History was received in evidence.)

8          MR. NIEWOEHNER:  May I approach and publish,

9  Your Honor?

:07AM  10          THE COURT:  You may.

11          (Exhibit published to the jury.)

12          THE COURT:  You are going to blow up parts of

13  that?

14          MR. NIEWOEHNER:  We are.

:07AM  15          THE COURT:  Why don't you do that now.

16  BY MR. NIEWOEHNER:

17  Q   I direct your attention to the top of the

18  exhibit.

19          THE COURT:  Stop for a second.

:07AM  20          Can everybody see that?

21          Okay, go ahead.

22  BY MR. NIEWOEHNER:

23  Q   Generally speaking, what does this exhibit show,

24  Mr. Monk?

:07AM  25  A   The number of the bill, the name of the bill, and

1  it says the bill status.

2  Q   And does this exhibit generally just give the

3  legislative history of that particular bill?

4  A   Yes.

5  Q   I'm going to direct your attention to the last

6  page of the exhibit, and near the bottom of that

7  legislative bill.

8  A   Okay.

9          THE COURT:  Can everybody see that number?

10         The reason I ask is, sometimes with that

11 screen it is difficult to see and one of the things

12 we can do is we can dim the lights.  So if you find

13 yourself with difficulty seeing that, just tell the

14 marshal and we'll try to fix it.

15 BY MR. NIEWOEHNER:

16 Q   Mr. Monk, on the very top line of the portion

17 that's blown up, what does that show?

18 A   That on November 20th the bill passed both

19 Houses.

20 Q   Did the bill become law after it was passed by

21 both Houses?

22 A   No.

23 Q   What needed to happen next before the bill could

24 become law?

25 A   It needed to be signed by the Governor.

1  Q   And after -- strike that.

2       MR. NIEWOEHNER:  Your Honor, at this time can

3  we publish the transcript at tab 68.  We previously

4  played the call, I would just like to fresh with the

:09AM  5  transcript.

6       THE COURT:  Go ahead.

7  BY MR. NIEWEOHNER:

8  Q   Mr. Monk, if you could turn to tab 68.

9       Do you have tab 68, Mr. Monk?

:09AM  10  A   Yes.

11  Q   And that call takes place on November 20th at

12  approximately 9:44 a.m. in the morning, is that

13  correct?

14  A   Yes.

:10AM  15  Q   Had the bill passed as of 9:44 a.m. in the

16  morning that day?

17  A   No.

18  Q   And at line 11 do you see Defendant Blagojevich

19  asks:

:10AM  20       "... any updates on the John Johnstons?"

21        And you respond:

22        "Yeah, I just told Rob that I actually may

23        think I may get a check today."

24        What were you indicating to Defendant

:10AM  25  Blagojevich at that point?

1 A   That there was a chance I might get the donation
2 from the Johnstons.
3         MR. NIEWOEHNER:  Your Honor, may I publish
4 the call at tab 70, please?
5         THE COURT:  Which tab?
6         MR. NIEWOEHNER:  Tab 70.
7         THE COURT:  You may.
8     (Tape played)
9 BY MR. NIEWOEHNER:
10 Q   Now, Mr. Monk, turning your attention to the
11 first page of the transcript, this call takes place
12 on November 20th at 9:37 in the evening, is that
13 correct?
14 A   Yes.
15         MR. NIEWOEHNER:  Your Honor, may we publish
16 the call at 73?
17         THE COURT:  You may.
18     (Tape played).
19 BY MR. NIEWOEHNER:
20 Q   So, Mr. Monk, turning your attention to the first
21 page of the exhibit, this call takes place on
22 November 22nd around 10:54 a.m., is that right?
23 A   Yes.
24 Q   It indicates you actually called on a home line,
25 do you see that?

:10AM
:12AM
:12AM
:15AM
:15AM

1          Up at the top on the activity line it

2  indicates phone line.

3  A   Yes.

4  Q   Do you recall the phone number you used on this

5  call?

6  A   Yes.

7  Q   What was it?

8  A   773 588-9475.

9  Q   And where did that phone number connect to?

10  A   His home.

11  Q   In this time period, is that the number that you

12  primarily used to speak to Defendant Blagojevich?

13  A   Yes.

14  Q   And you used that number in the past, as well?

15  A   Yes.

16  Q   Why did you use that particular phone line to try

17  to speak with Defendant Blagojevich?

18  A   That's the line that he typically used and would

19  pick up.

20  Q   And did this house have another phone line?

21  A   Yes.

22  Q   Did you typically use that phone line when you

23  wanted to speak with Defendant Blagojevich?

24  A   No.

25  Q   Why not?

1   A   Because the other line was more -- I think he was

2   a little more skeptical of picking it up, it would

3   be more uncertain as to who was at the other line.

4   Q   Turning your attention to Page 2, at line 7,

5   Defendant Blagojevich says:

6         "... you didn't see Krozel yesterday because you

7          were sick, right."

8   A   Yes.

9   Q   Who did you understand he was referring to?

10  A   Jerry Krozel.

11  Q   And, in fact, had you been sick the prior day?

12  A   Yes.

13  Q   But you talked about seeing him on line 9 at 2:00

14  o'clock on Monday, is that correct?

15  A   Yes.

16  Q   And then at line 11 Defendant Blagojevich says:

17         "What about the Johnstons?"

18          Who did you understand Defendant Blagojevich

19          was inquiring at that point?

20  A   What was the status of collecting the $100,000

21  from the Johnstons.

22  Q   And at line 25 when Defendant Blagojevich says:

23         "He knows by the end of the year, he knows."

24          What did you understand Defendant Blagojevich

25          to mean?

1  A   That I communicated to the Johnstons and the

2  Johnstons knew that we wanted the money by the end

3  of the year.

4  Q   Then line 30 you indicate:

5      "... I do have a call on Reinsdorf."

6       Do you see that?

7  A   Yes.

8  Q   Who are you referring to there?

9  A   Jerry Reinsdorf.

10 Q   Who is Jerry Reinsdorf?

11 A   He's the owner of the Chicago White Sox and

12 Chicago Bulls.

13 Q   And Page 3, at line 2, when you say "for 50,"

14 what were you indicating there?

15 A   That I was going to ask Jerry Reinsdorf for

16 $50,000 by the end of the year.

17 Q   For who?

18 A   For Rod.

19 Q   As a campaign contribution?

20 A   As a campaign contribution, fundraising.

21 Q   Now, at some point after the Racetrack Bill was

22 passed by the Illinois legislature, was the bill

23 sent to Defendant Blagojevich for possible

24 signature?

25 A   Yes.

1          MR. NIEWOEHNER:  Your Honor, may I publish

2    Government Exhibit 2008 Legislative History?

3          THE COURT:  You may.

4        (Exhibit published to the jury.)

5    BY MR. NIEWOEHNER:

6    Q   And, again, I'm going to direct your attention to

7    the back page of the exhibit and direct your

8    attention to the line that says "November 24, 2008,"

9    do you see that line?

10   A   Yes.

11   Q   What does that line indicate?

12   A   That the bill was sent to the Governor for

13   action.

14   Q   Could Defendant Blagojevich just signed the bill

15   before it was sent to him?

16   A   I don't believe so.

17   Q   And after the bill was sent to him, could he have

18   signed the bill into law immediately?

19   A   Yes.

20   Q   So as of November 24th, 2008, if Defendant

21   Blagojevich had signed the bill, would it become

22   law?

23   A   Yes.

24   Q   Now, in reference to the 206 racetrack law, you

25   testified previously you didn't see a significant

1 difference between the 2006 racetrack law and the
2 2008 Racetrack Bill except for the length of years,
3 is that correct?
4 A   Yes.
5          MR. NIEWOEHNER:  Your Honor, the government
6 moves into evidence Government Exhibit 2006
7 Racetrack Legislative History as a public record.
8          THE COURT:  Admitted.
9       (Government's Exhibit 2006 Racetrack Legislative
10       History was received in evidence.)
11          MR. NIEWOEHNER:  May I approach and publish,
12 Your Honor?
13          THE COURT:  You may.
14       (Exhibit published to the jury.)
15 BY MR. NIEWOEHNER:
16 Q   And focusing at the very top of this exhibit,
17 generally speaking, what does this exhibit show?
18 A   The legislative history of the 2006 Racetrack
19 Bill.
20 Q   And I'd like to direct your attention to the back
21 page of that exhibit, and starting in the top line,
22 what date was the 2006 Racetrack Bill originally
23 passed by the Illinois legislature?
24 A   May 4th, 2006.
25 Q   What does the line below that show?

:20AM
:20AM
:20AM
:20AM
:20AM
:21AM

1  A   That on May 25th the bill was sent to the

2  Governor.

3  Q   And upon what date did Defendant Blagojevich sign

4  that bill?

5  A   On May 26th.

6  Q   So what day did that bill become law?

7  A   May 26, 2006.

8          MR. NIEWOEHNER:  Your Honor, may I publish

9  the call at tab 74?

10          THE COURT:  Yes, you may, and we will break

11  after this.

12          MR. NIEWOEHNER:  Thank you, Your Honor.

13          THE MARSHAL:  All rise.

14          THE COURT:  No, no, too soon.

15      (Tape played).

16          THE COURT:  Now.

17          THE MARSHAL:  All rise.

18      (The following proceedings were had out of the

19       presence of the jury in open court:)

20          THE COURT:  Be seated in the courtroom.

21          Counsel, approach the lectern.

22          Two matters that I want to put on the record.

23          First, I was informed by my clerks and later

24  informed by counsel that a story appeared today in

25  one of the media about a prospective juror who did

Monk - direct by Niewoehner          1293 - A

1  not serve indicating that a person currently sitting
2  on the jury overheard other potential jurors
3  speaking about -- well, I will quote from the
4  article.  This deals with potential juror 169 who
5  initiated the contact:
6      "... Hallstrom said the potential jurors
7       referenced news coverage involving how Zagel
8       'smacked down' one potential juror who was
9       trying to get out of service.
10      I distinctly remember that being discussed.  I
11      don't know that I remember anything else being
12      talked about, Maybe there were almost half a
13      dozen people having that conversation, Maybe it
14      was four.
15      One of the people in the room, a female, is now
16      on the panel, he said.  That woman was not
17      taking part in the discussion with others but
18      was present, according to Hallstrom."
19      It's my understanding from a very brief off
20  the record conversation that there is no need to go
21  further with this considering the substance of what
22  it was that was discussed.  I just wanted to put
23  that on the record.
24      There are other things about the story that
25  indicated some lack of understanding on the part of

Monk - direct by Niewoehner                1294 - A

1  the prospective juror as to the status, but it's of
2  no material here.  So that's on the record.
3       The second thing is, I received a letter from
4  Assistant General Counsel of the Tribune, and I note
5  the record will say with a tone of irony and humor,
6  I received this from Assistant General Counsel which
7  may mean it's not that important, raising the issue
8  of my not permitting distribution of copies of the
9  recordings and transcripts after they're admitted
10 and stating that no reporter can recall any such
11 restrictions being imposed upon the release of
12 evidence.
13      Actually, when I thought about this, I tried
14 to recall what I did with respect to the Family
15 Secrets case.  I thought in the Family Secrets case
16 I might have released them before cross-examination,
17 I don't remember, but I'm willing to consider doing
18 that since the anonymity of the jury seemed to hold
19 up.  So counsel can express their views on this in
20 writing to me sometime before noon tomorrow.
21      That's it.
22      MR. ADAM, JR.:  What time, Your Honor?
23      THE COURT:  Before noon tomorrow.
24      MR. ADAM, JR.:  No, for the break?
25      THE COURT:  Oh, for the break.  A different

:29AM
:30AM
:30AM
:30AM
:31AM

Monk - direct by Niewoehner                    1295 - A

1   question.  We'll resume again at 11:45 and we will

2   go for no more than 45 minutes from that time.

3       (Recess.)

4          THE CLERK:  All rise.

5       (The following proceedings were had in the

6        presence of the jury in open court:)

7          THE COURT:  Please be seated.

8          You may resume.

9          MR. NIEWOEHNER:  Your Honor, may I publish

10  the call at tab 74?

11         THE COURT:  You may.

12      (Tape played)

13  BY MR. NIEWOEHNER:

14  Q   Mr. Monk, looking at Page 1 of tab 74, the date

15  and time of that call is November 24, 2008, do you

16  see that?

17  A   Yes.

18  Q   Was that the date that the Racetrack Bill was

19  actually sent to the Governor so he could possibly

20  sign it?

21  A   Yes.

22  Q   And on line 18, on Page 1, you say:

23      "... I pressed Johnny again today."

24       Who were you referring to there?

25  A   John Johnston.

1  Q   And you continue to say:

2      "... he said I want to do something with Gupta."

3       Who was Gupta?

4  A   David Gupta is a local businessman who owns his

5  own company in Chicago.  He's been a donor in the

6  past to the Governor and Johnston was talking about

7  doing a fundraiser with Gupta or being included in

8  Gupta's fundraiser.

9  Q   And on line 20 -- or on line 19 and 20, you said:

10     "I said no, I need you to do them separately."

11         Did you want Johnston to do a fundraiser with

12 David Gupta?

13 A   No.

14 Q   Why not?

15 A   Because I wasn't positive about David Gupta

16 hosting a fundraiser and I didn't want there to be

17 another issue for delaying a donation from the

18 Johnstons.

19 Q   Turning your attention to Page 2, line 9, you

20 say:

21     "... then I met with Jerry Krozel."

22      Had you, in fact, met with Jerry Krozel?

23 A   Yes.

24 Q   And you continue on line 10 to say:

25     "... and he goes, I'm working on it, everything

1          looks like it's moving forward."

2          What were you referring to there?

3    A    His efforts to fundraise for the Governor.

4    Q    And at line 13 you indicate:

5          "... I'm not going to be able to come close to

6             that number but I'm working really hard on it."

7              What were you indicating to Defendant

8    Blagojevich there.

9    A    That I was telling him that Krozel was not going

10   to be able to come close to the half million dollars

11   that I had talked to Rob and Rod about earlier in

12   terms of fundraising for the Governor.

13   Q    Now, had you actually talked to Jerry Krozel

14   about that 500-thousand-dollar number?

15   A    No.

16   Q    So when you said, "I'm not going to be able to

17   come close to that number," did Jerry Krozel

18   actually say those words?

19   A    No.

20   Q    What were you doing in that instance with

21   Defendant Blagojevich?

22   A    Lowering expectation and preparing him to the

23   fact that the road builders were not going to come

24   in with half a million-dollars.

25   Q    And on Page 3 of the transcript at line 10,

1  Defendant Blagojevich says:

2      "... they'll do more than a hundred, won't they?

3       Those, those guys."

4          What did you understand Defendant Blagojevich

5  to be saying there?

6  A  He is saying whether Jerry Krozel and the road

7  builders would raise at least $100,000.

8  Q  And in response at line 12 you said:

9      "... I think so, but it's a little painful

10      talking to him."

11      What are you indicating there?

12 A  That they may come in at over $100,000 but that,

13 you know, it's tough talking to Jerry Krozel about

14 it.

15 Q  Why was it tough talking to Jerry Krozel about

16 it?

17 A  Because the conversations tend to be long, they

18 sometimes get off point, that's what I mean.

19 Q  All right.

20      Now, turning aside the binder for a moment.

21      Did you talk with Johnston about the

22 Racetrack Bill after it was sent to Defendant

23 Blagojevich for possible signature?

24 A  Yes.

25 Q  And did you have more than one conversation with

:56AM
:56AM
:56AM
:57AM
:57AM

1 Johnston after that event took place?

2 A  Yes.

3 Q  And in relation to when the bill was sent,

4 November 24th, when were you having those

5 conversations with Johnston?

6 A  After the bill was sent to the Governor.

7 Q  And what time frame?

8 A  2 weeks, a little over 2 weeks.

9 Q  And, in fact, were they -- in terms of how soon

10 did you start having those conversations after the

11 bill was sent?

12 A  I can't remember specifically but soon, soon

13 after.

14 Q  In those conversations soon after the bill was

15 sent to Defendant Blagojevich, what did Johnston

16 indicate he wanted you to do, generally?

17 A  Get Rod to sign the bill.

18 Q  And how soon did Johnston indicate he wanted the

19 bill signed?

20 A  As soon as possible.

21 Q  Did he indicate why he wanted this signed as soon

22 as possible?

23 A  Yes.

24 Q  Why was that?

25 A  The racing industry, and he specifically, were

:57AM

:57AM

:58AM

:58AM

:58AM

1  losing money every day that the bill wasn't signed.

2  Q   What did you indicate to Johnston you would do?

3  A   Try and prevail upon Rod to sign it as soon as

4  possible.

:58AM   5       MR. NIEWOEHNER:  Your Honor, may we publish

6  the call at tab 75?

7           THE COURT:  Yes.

8      (Tape played).

9           MR. NIEWOEHNER:  Your Honor, may I publish

:00PM  10  the call at tab 76?

11           THE COURT:  Yes.

12      (Tape played).

13  BY MR. NIEWEOHNER:

14  Q   Mr. Monk, this call takes place on November 26th

:02PM  15  at around 12:19 p.m., do you see that?

16  A   Yes.

17  Q   And in relation to Thanksgiving, is this call

18  near Thanksgiving?

19  A   Yeah, I think it's the day before.

:03PM  20  Q   And if you go to Page 2, on line 6, you say:

21      "I just followed up with John on the Recapture

22       Bill."

23       Who is John?

24  A   John Harris.

:03PM  25  Q   And what was John Harris' position?

Monk - direct by Niewoehner          1301 - A

1  A   He was the Chief of Staff of the Governor at the
2  time.
3  Q   Had you, in fact, spoken with John Harris about
4  the Racetrack Bill prior to this call?
5  A   Yes.
6  Q   About when?
7  A   I think that day.
8  Q   And did you talk to him in person or on the
9  phone?
10 A   On the phone.
11 Q   Who had brought up the topic of the Racetrack
12 Bill?
13 A   I did.
14 Q   Why did you want to talk to Harris about the
15 Racetrack Bill?
16 A   I wanted from his perspective get a status on
17 when he thought the bill was going to be signed, if
18 and when it was going to be signed, and in that
19 conversation if the opportunity presented itself try
20 and get him to do something proactive.
21 Q   What did Harris tell you about the status of the
22 Racetrack Bill?
23 A   That he wasn't sure why it hadn't been signed to
24 date and he speculated why it might not have been --
25        (Cellular phone interruption.)

:03PM
:03PM
:03PM
:04PM
:04PM

Monk - direct by Niewoehner          1302 - A

1          THE COURT:  Stop.

2          (Brief pause)

3   BY MR. NIEWOEHNER:

4   Q   What did Harris speculate?

5          MR. ADAM, JR.:  Objection.

6          THE COURT:  For what are you offering this?

7          MR. NIEWOEHNER:  I'm sorry, Your Honor, I

8   didn't hear you.

9          THE COURT:  For what purpose are you offering

10  this?

11         MR. NIEWOEHNER:  Because this conversation

12  with Harris then gets discussed with Defendant

13  Blagojevich, so it informs.

14         THE COURT:  For that purpose, it's admitted.

15  BY MR. NIEWOEHNER:

16  Q   So what did Harris indicate in his speculation?

17  A   That potentially it hadn't been signed yet

18  because the Governor was waiting for a number of

19  other bills to get to his desk so that he could sign

20  them all together.

21  Q   From what Harris said, did you understand

22  Defendant Blagojevich was going to sign the

23  Racetrack Bill?

24  A   I'm sorry, can you repeat the question?

25  Q   From what Harris said, did Harris indicate that

:04PM

:04PM

:05PM

:05PM

:05PM

1  the Defendant Blagojevich was now not going to sign
2  the bill?
3  A   No, but there was concern in his voice because he
4  didn't understand why it hadn't been signed yet.  So
5  I don't -- I don't know that John was intensely
6  worried about it not getting signed, but he was just
7  expressing he didn't understand why it hadn't been
8  signed yet.
9  Q   Now, when you had been Chief of Staff to
10 Defendant Blagojevich, had you participated in
11 decisions as to when to sign bills?
12 A   From time to time.
13 Q   Did you have some experience with the factors
14 that Defendant Blagojevich considered when making
15 the decision as to when to sign a bill?
16 A   Yes.
17 Q   Were there times that Defendant Blagojevich
18 waited to sign a bill before he signed other bills
19 at the same time?
20 A   Yes.
21 Q   Why did you understand Defendant Blagojevich did
22 that?
23 A   Because some bills that he was going to sign into
24 law were controversial and he might not want the
25 focus to be on that one bill when he signs it and if

:05PM

:06PM

:06PM

:06PM

:06PM

1  he signed it with a number of other bills that were

2  less controversial there might not be any

3  controversy regarding the signing of one

4  controversial bill.

:06PM  5  Q   Did you think that any of that reasoning applied

6  to the 2008 Racetrack Bill?

7       MR. ADAM, JR.:  Objection; basis of

8  knowledge.

9       MR. NIEWOEHNER:  I'll rephrase, Your Honor.

:07PM  10  BY MR. NIEWEOHNER:

11  Q   From your perspective, was there any reason that

12  the Racetrack Bill in 2008 needed to wait because it

13  was a controversial measure?

14  A   No.

:07PM  15  Q   Why not?

16  A   Because this is -- this bill encompassed a law

17  that had been in effect since May 2006.  It was just

18  a continuation of that law, so there wasn't anything

19  really controversial about it.

:07PM  20  Q   Did you think that Harris's speculation that

21  Defendant Blagojevich was waiting to sign a

22  Racetrack Bill made sense?

23  A   No.

24  Q   Did you tell Harris you were going to do

:07PM  25  anything?

1  A   Yeah, I told him that I was going to call Rod and
2  talk to him about it.
3  Q   Why did you want to call Defendant Blagojevich?
4  A   To see if I could push him to try to get the bill
5  signed and find out why it wasn't being signed.
6  Q   Were you concerned at this point as to why this
7  bill was not being signed?
8  A   Yeah.
9  Q   Now, going back to the call at line 6 when you
10 say:
11     "... I just followed up with John on the
12      Recapture Bill."
13     What was were you referring to there?
14 A   My conversation with John Harris wherein we
15 talked about when he thought the bill was going to
16 get signed.
17 Q   And at line 11 Defendant Blagojevich responds:
18     "... I'm not struggling with it."
19     What did you understand he to be saying there?
20 A   That he eventually will sign the bill.
21 Q   When Defendant Blagojevich said:
22     "... it's a timing issue, that's all."
23     Did you understand what Defendant Blagojevich
24      meant?
25 A   Not specifically at that time, no.

1  Q   At line 14 when you said:
2        "... just so you know, all these guys are just
3         now breathing down my neck."
4         What did you mean?
5  A   That John Johnston and a couple of other people
6  who were interested in having this bill signed were
7  calling me up and finding out what the status of
8  getting it signed was and in some cases asking why
9  it hadn't been signed.
10 Q   All right, on line 23 Defendant Blagojevich says:
11        "... I'll be back Wednesday because I got to be
12         in Philadelphia for this Governor's, ah,
13         President Obama."
14         What did you understand Defendant Blagojevich
15         was indicating there?
16 A   That he is going out of town to Philadelphia for
17 a Governor's conference or meeting and that he'd be
18 back on Wednesday, the following week.
19 Q   And if you turn the page to Page 3, at line 4,
20 you indicate:
21        ".. I'm going to see you at 3:00 o'clock on
22         Wednesday at the campaign office."
23         What were you indicating there?
24 A   That we were going to have a meeting at 3:00
25 o'clock on Wednesday at the campaign office.

:09PM
:09PM
:09PM
:09PM
:10PM

1  Q   Had you already planned to have that meeting?

2  A   Yes.

3  Q   And going on to line 8 you say:

4       ".. you're not going to do anything before

:10PM  5       that."

6       What were you indicating there?

7  A   I was trying to find out whether he's going to

8  potentially sign the bill before that Wednesday

9  meeting.

:10PM  10  Q   Did you want Defendant Blagojevich to wait a week

11  to sign -- before potentially to sign the bill?

12  A   No.

13  Q   Why not?

14  A   Because I was -- pressure was being brought to

:10PM  15  bear on me by Johnston and others to get this bill

16  signed as soon as possible and this would relieve

17  that pressure.

18  Q   On line 10 Defendant Blagojevich says:

19       "There's no negatives, you know, you got nothing

:10PM  20       to worry about."

21       What did you understand Defendant Blagojevich

22       to mean there

23  A   That, you know, stop worrying, the bill is going

24  to get signed.

:11PM  25  Q   At that point were you concerned about whether

1  Defendant Blagojevich was going to sign the bill or
2  not?
3  A   No, I was worried about the timing of the
4  signing.
5  Q   And at line 14 when you said:
6      "... you know, it's now just a timing issue for
7       me."
8      What were you indicating?
9  A   That the sooner it gets signed, the better it is
10 for me.
11 Q   And turning to Page 4, when Defendant Blagojevich
12 said:
13      "... I'll talk to you about your thing, but the,
14       the, nothing bad's going to happen, okay."
15      What did you understand Defendant Blagojevich
16 to mean there.
17 A   That he was not going -- that the bill was going
18 to be signed, he was not going to veto it and he was
19 going to talk to me that following Wednesday about
20 it.
21 Q   Again, at that point were you concerned about
22 whether the bill was going to get signed or not?
23 A   Not really, no.
24 Q   Did Defendant Blagojevich explain to you in this
25 call why he was not signing the Racetrack Bill at

:11PM
:11PM
:11PM
:11PM
:12PM

Monk - direct by Niewoehner          1309 - A

1  that time?

2  A   No.

3       MR. NIEWOEHNER:  Your Honor, may I play the

4  call at tab 79?

:12PM   5       THE COURT:  Yes.

6     (Tape played).

7  BY MR. NIEWEOHNER:

8  Q   If you could turn to Page 1, Mr. Monk, this call

9  is dated December 2nd of 2008, do you see that?

:14PM  10  A   Yes.

11  Q   And is this day -- excuse me.

12       In line 5 on the call Johnston indicates:

13     "... Billy was asking, asking yesterday, he was

14      asking about that bill."

:14PM  15       What did you understand Johnston to be saying

16  there?

17  A   That his father was asking him about the status

18  of the bill getting signed.

19  Q   Who is Johnston's father?

:15PM  20  A   Billy Johnston.

21  Q   What relationship is Billy Johnston to the

22  Racetrack Bill?

23  A   An owner.

24  Q   And at line you respond:

:15PM  25     "... Rod returned my call last night about

1    10:30."

2       Had you spoken with Defendant Blagojevich the

3  night before at about 10:30?

4  A  I don't think so.

5  Q  When was the last time you actually spoken to

6  Defendant Blagojevich about the Racetrack Bill?

7  A  I think that day before Thanksgiving.

8  Q  Was that the call that you heard a moment ago?

9  A  Yes.

10  Q  Why did you tell Johnston that you had spoken

11  with Defendant Blagojevich the night before at

12  10:30?

13  A  I wanted him to think Rod and I were in more

14  communication over this issue than we were and that

15  I was being more proactive trying to get the bill

16  signed.

17  Q  So that wasn't a true statement, is that right?

18  A  Right.

19  Q  And on line 11 you say:

20     "... he said he wanted to talk to me tomorrow

21      about the timing of it."

22       What were you indicating to Johnston there?

23  A  That Rod wanted to talk to me about the timing of

24  the signing of the bill the next day.

25  Q  Had, in fact, Defendant Blagojevich indicated he

1  wanted to talk to you the next day about the signing

2  of the bill?

3  A   He indicated to me the previous week that he

4  wanted to talk to me about the signing of the bill,

5  he didn't that night.

6  Q   In fact, was the next day December 3rd?

7  A   Yes.

8  Q   Is that when you were supposed to have a meeting

9  with Defendant Blagojevich?

10 A   Yes.

11 Q   And on line 13 -- excuse me, at line 17 you say:

12     "... I pressed him on the time, he goes, look, I

13        understand you got to get this done but I want

14        to get to a couple of other bills that we're

15        working on rights now."

16        Had Defendant Blagojevich indicated to you

17 prior to this point that he was waiting on the

18 Racetrack Bill because of other bills?

19 A   No.

20 Q   Who had done that?

21 A   John Harris.

22 Q   Why were you indicating to Johnston that

23 Defendant Blagojevich was the one who was saying it?

24 A   Because I felt like I needed to give him a reason

25 why the bill hadn't been signed.  That's the only

Monk - direct by Niewoehner                    1312 - A

1  one that had been given to me.

2  Q   At that point did you think that that was the

3  reason that the bill was not getting signed?

4  A   Not really.

5  Q   And a line 20 when you said:

6      "... but we're going to get it done, you know."

7      What were you indicating there?

8  A   That Rod had indicated to me in the previous week

9  that the bill was going to get signed, don't worry

10 about it.

11 Q   If we could turn your attention to the top of

12 Page 2, line 1, you indicate:

13     "... he's coming back tonight from Philadelphia

14      and I am scheduled to see him tomorrow at

15      9:30."

16     What are you indicating there?

17 A   That he was coming back tonight from Philadelphia

18 and that I was scheduled to see him at the campaign

19 office the next day.

20 Q   And at line 5 when Johnston says:

21     "... I just hit 83,000 a day and racing is 80,

22      so 11 percent of that is our."

23     What did you understand Johnston to be saying?

24 A   That the Recapture Bill would mean $83,000 a day

25 to the racing industry once the law went into

:17PM

:17PM

:18PM

:18PM

:18PM

 1  effect.
 2  Q   And when --
 3  A   And that 11 percent of that 83,000 was going to
 4  be going to his group.
 5  Q   And at line 11, you said:
 6      "... how much of that a day you're losing right
 7       now by him not signing it?"
 8      And Johnston responded:
 9      "Our group is 9,000 a day."
10      What did you Johnston to mean?
11  A   That his group was losing $9,000 a day.
12  Q   And at line 18 when Johnston says:
13      "Just in the last six days, it's like 50 grand."
14      What did you understand Johnston to mean there?
15  A   That for the last six days -- for the last
16  six days because the law wasn't in effect, they lost
17  $50,000.
18  Q   Now, I'm going to direct your attention to
19  December 3rd.
20          Did you meet with Defendant Blagojevich that
21  day as you had originally planned?
22  A   Yes.
23  Q   What was the purpose of that meeting?
24  A   To talk about fundraising.
25  Q   Where did that meeting take place?

1  A   At the campaign office.

2  Q   Who was supposed to be present for the meeting?

3  A   Me and Rod and Rob.

4  Q   When you went to the FOB offices that day, where

5  did you go?

6  A   Into the conference room.

7          MR. NIEWOEHNER:  Your Honor, may I publish

8  FOB office diagram?

9          THE COURT:  You may.

10     (Exhibit published to the jury).

11  BY MR. NIEWEOHNER:

12  Q   And so looking at the office diagram, where did

13  you go when you started the meeting?

14  A   The room indicated by number 5.

15  Q   What was in that room?

16  A   It's a conference room with a big conference

17  table.

18  Q   Who was present at the start of the meeting?

19  A   Rod and Rob.

20  Q   What did you start talking about when you started

21  the meeting in the conference room?

22  A   Going down the fundraising lists.

23  Q   Did you stay in the conference room for your

24  entire meeting that day?

25  A   No, very shortly after going into the conference

1  room, Rod told me he wanted to meet with me in his
2  office.
3  Q   Where was Defendant Blagojevich's office?
4  A   The room indicated by number 2.
5  Q   And where did you go after Defendant Blagojevich
6  indicated that?
7  A   Into his office.
8  Q   Did Robert Blagojevich come along after that
9  point?
10 A   No.
11 Q   Did Defendant Blagojevich explain to you at that
12 point why he wanted to meet in his office?
13 A   He said, "let's go down there, I want to talk to
14 you about your issue."
15 Q   When he said "I want to talk to you about your
16 issue," what did you understand Defendant
17 Blagojevich to mean?
18 A   About the signing of this Racetrack Bill.
19 Q   Did you understand -- or from what Defendant
20 Blagojevich said, why did you understand he wanted
21 you to go to his office to talk about that issue?
22 A   We can discuss it privately.
23 Q   Privately from who?
24 A   From Rob.
25 Q   And, in fact, after Defendant Blagojevich said

:21PM
:21PM
:21PM
:22PM
:22PM

Monk - direct by Niewoehner                    1316 - A

1  that, where did you go?

2  A   Into his office.

3       MR. NIEWOEHNER:  Your Honor, I think the next

4  call may go longer than you had sort of

5  contemplated.

6       THE COURT:  Which is the next call?

7       MR. NIEWOEHNER:  It's at tab 87.  We can do

8  that after the break, that would be --

9       THE COURT:  How long is the duration of the

10 call itself?

11      MR. NIEWOEHNER:  Your Honor, I don't know.  I

12 think it may be approximately --

13      THE COURT:  Give me a moment.

14   (Brief pause).

15      THE COURT:  We'll break now.  One hour.

16      THE MARSHAL:  All rise.

17   (The following proceedings were had out of the

18    presence of the jury in open court:)

19      THE COURT:  All right, one hour.

20   (Luncheon recess taken from 12:24 o'clock p.m.

21    to 1:35 o'clock p.m.)

22

23

24

25

Monk - direct by Niewoehner          1317 - A

1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )  No.  08 CR 888
4          Government,              )
                                    )
5  vs.                              )  Chicago, Illinois
                                    )
6  ROD BLAGOJEVICH,                 )  June 14, 2010
   ROBERT BLAGOJEVICH,              )
7                                   )
             Defendants.            )  1:35 o'clock p.m.
8
                      VOLUME 7
9
                 EXCERPT OF PROCEEDINGS
10       BEFORE THE HONORABLE JAMES B. ZAGEL
        (Excerpt - Page numbers should not be
11          cited in appellate record.)

12
   For the Government:
13
             THE HONORABLE PATRICK J. FITZGERALD,
14           UNITED STATES ATTORNEY
             BY:  Reid J. Schar
15                Carrie E. Hamilton
                  Christopher Niewoehner
16                Debra Riggs Bonamici
             Assistant United States Attorneys
17           219 South Dearborn Street
             Suite 500
18           Chicago, Illinois 60604

19

20

21  Court Reporter:

22             Blanca I. Lara, CSR, RPR
               219 South Dearborn Street
23                    Room 2504
               Chicago, Illinois 60604
24                (312) 435-5895

25

1
APPEARANCES   (continued:)
2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7          LAW OFFICE OF SAMUEL E. ADAM
           BY:  Samuel Forbes Adam
8               Samuel Adams, Jr.
           6133 South Ellis Avenue
9          Suite 200
           Chicago, Illinois 60637
10         312-726-2326

11
Also present:  Michael Gillespie
12                Arron Goldstein
                  Lauren Kaeseberg
13

14
For Defendant Robert Blagojevich:
15

           ETTINGER, BESBEKOS, PARISI
16         BY:  Michael D. Ettinger
                Cheryl Ann Schroeder
17         12413 South Harlem
           Suite 203
18         Palos Hills, Illinois 60453
           (708)598-1111
19

20         Edelman, Combs, Latturner & Goodwin LLC
           BY:  Robyn S. Molaro
21         120 S. LaSalle
           Suite 1800
22         Chicago, Illinois 60603
           (708) 598-1111
23

24

25         THE MARSHAL:  All rise.

1      (The following proceedings were had in the
2       presence of the jury in open court:)
3          THE COURT:  Please be seated.
4          You may resume.
5          MR. SCHAR:  Thank you, Your Honor.
6      LON MONK, GOVERNMENT WITNESS, PREVIOUSLY SWORN
7             DIRECT EXAMINATION (resumed)
8   BY MR. NIEWOEHNER:
9   Q   Mr. Monk, just before the break you were
10  testifying about a meeting you had at the FOB
11  offices, do you recall that?
12  A   Yes.
13  Q   Do you recall you had originally walked in to the
14  conference room and then from there you pointed out
15  that you had gone with Defendant Blagojevich to his
16  office, do you recall that?
17  A   Yes.
18         MR. NIEWOEHNER:  Your Honor, at this time can
19  the government publish the call at tab 87?
20         THE COURT:  You may.
21     (Tape played)
22  BY MR. NIEWOEHNER:
23  Q   Mr. Monk, if you could turn to the first page of
24  the transcript.
25         Now, this transcript shows a conversation

:33PM
:33PM
:33PM
:34PM
:41PM

1 starting at approximately 2:13 p.m. on December 3rd,

2 is that right?

3 A  Yes.

4 Q  This is not a phone call, is that right?

:41PM    5 A  No.

6 Q  At line 2 Defendant Blagojevich says "Mitola,"

7 who did you understand Defendant Blagojevich was

8 talking about at that point?

9 A  John Mitola.

:41PM    10 Q  And Defendant Blagojevich goes on at line to say:

11    "You going sister's wake?"

12       What did you understand Defendant Blagojevich

13 was talking about there?

14 A  He asked whether I was going to Mitola's sister's

:41PM    15 wake, she had recently passed away.

16 Q  And then on line 8 and 10 and 12 you respond:

17    ".. going to Oklahoma tomorrow my dad's some

18     army reunion."

19    Were you actually going to Oklahoma to see your

:42PM    20     father's reunion?

21 A  No.

22 Q  What were you doing?

23 A  I was going down to the Dominican Republic and

24 meeting some friends down there to play golf on a

:42PM    25 vacation.

1  Q   Why did you tell Defendant Blagojevich you were

2  going to Oklahoma?

3  A   Because I didn't want to get into a discussion

4  with him about where I was going.  I had this

5  experience with him before going and playing golf

6  out of state and vacation and at that time he got

7  angry because it was the same period of time when

8  there was a big fundraising push going on at the end

9  of '06, beginning of '07.

10 Q   So at this point in December of 2008, was this an

11 important fundraising time?

12 A   Yeah.

13 Q   And you were describing a prior occasion at the

14 end of 2006 or 2007, is that what you said?

15 A   End of 2006, beginning 2007.

16 Q   And on that occasion, had you gone on a trip?

17 A   Yeah, I went down to Florida with John Filan and

18 John Wyma to play golf for two or three days.

19 Q   Before you went on that trip, did you tell

20 Defendant Blagojevich that you were going on that

21 trip?

22 A   No.

23 Q   What happened when you returned from that trip?

24 A   He found out that we'd gone on the trip and he

25 left a really angry message where he's yelling and

1  screaming on my phone, I think it was while I was

2  flying back, as to, you know, why could I be going

3  down on that trip during this period of time and,

4  you know, he was angry.

:43PM  5  Q   Did you return that phone call?

6  A   Yes.

7  Q   What happened when you returned the phone call?

8  A   We got into it, yelling and screaming matches as

9  to whether I had the right to go down on a golf

:43PM  10  vacation or not.

11  Q   And returning to your December 3rd conversation

12  at the FOB offices, was that prior experience

13  related to why you told Defendant Blagojevich you

14  were going to go to Oklahoma?

:44PM  15  A   I wasn't going to get into a discussion with him

16  about whether I could go on a golf trip or not.

17  Q   At line 14 on Page 1, Defendant Blagojevich says:

18      "What have you got?"

19      And you responded:

:44PM  20      "So what do I tell him?"

21      What were you both referring to at this point?

22  A   The signing of the Racetrack Bill and the

23  donation from the Johnstons.

24  Q   Had you had any conversation explicitly about the

:44PM  25  Racetrack Bill prior to this point?

1  A   Not on that day.

2  Q   And on line 8 you say:

3      "I want to have a more pointed conversation."

4       What did you mean at point, on that line?

:44PM  5  A   That I wanted to have a conversation with John

6  and tell him why -- tell him that we wanted the

7  donation and why it wasn't -- the bill wasn't being

8  signed.

9  Q   After you indicated you wanted to have a pointed

:45PM  10  conversation with Johnston, what did you and

11  Defendant Blagojevich then do?

12  A   We started preparing for a potential conversation

13  that I would have with Johnston in terms of trying

14  to get the donation from him.

:45PM  15  Q   So at line 21 when you say:

16      "Say look, he's, he's concerned about signing

17       the bill."

18       Was that part of this possible conversation you

19       were going to have with Johnston?

:45PM  20  A   Yeah, that's me -- that's me talking about --

21  talking to Johnston in a potential conversation.

22  Q   So what were you indicating you might say to

23  Johnston in this possible conversation?

24  A   That I would tell Johnston that Rod was concerned

:45PM  25  about signing the bill and then all of a sudden you

1  give a donation and they would be too close in the

2  time, people might perceive it as he's getting a

3  donation for having signed the bill.

4  Q   So in that first part at line 21 where he says:

5      "He's concerned about signing the bill."

6      What were you referring to right there?

7  A   I'm talking about a potential conversation I

8  would be having with John Johnston and I'm saying

9  that he, Rod, is concerned about signing the bill.

10 Q   And you keep going:

11     "But you got ..."

12     and on top of the next page:

13     "... you sign the bill and all of a sudden you

14     guys are going to say ..."

15     What were you doing there?

16 A   I was continuing with a potential conversation

17 with John Johnston saying that Rod would sign the

18 bill and all of a sudden you, John Johnston, are

19 going to say, you know, wait a second, why would I

20 want to give a donation right now, it's too close in

21 time for the signing of the bill.

22 Q   Would that have been a problem if John Johnston

23 decided that he did not want to make a contribution

24 at that time?

25 A   Yeah.

:46PM

:46PM

:46PM

:46PM

:47PM

1  Q   Now, line 3 Defendant Blagojevich says:
2      "Correct."
3          What did you understand Defendant Blagojevich
4  was saying was correct.
5  A   He's agreeing with my potential conversation here
6  with John Johnston.
7  Q   And then Defendant Blagojevich says at line 3:
8      "You know, all of a sudden you're going to give
9       him a contribution, now we're concerned."
10         What did you understand Defendant Blagojevich
11 was doing there?
12 A   He's saying -- he's -- he's telling me what I
13 could be saying to John Johnston, that, you know:
14 John, all of a sudden you're going to be giving Rod
15 a contribution, now he and I are concerned.
16 Q   And when you say "he and I," who did you mean?
17 A   Rod and I were concerned.
18 Q   In fact, were you concerned if Johnston gave a
19 contribution?
20 A   Immediately after signing the bill?  Yeah, at
21 this point, yeah.
22 Q   Now, in the line 6 you say:
23      "He's going to sign the bill and all of a sudden
24       you're going to give a contribution."
25         What are you doing there?

1 A   I'm kind of repeating what I had earlier said and
2 what Rod said right above that, in terms of a
3 potential conversation I'd be having with John.
4 Q   And on the next line you say:
5     "Yeah, I don't want to say that ..."
6     and you continue:
7     "... because then he's going to say you're
8     right, we can't do it right now."
9     What were you indicating there?
10 A   That I didn't actually want to go down that --
11 that road, thinking about it, I didn't want to go
12 down the road with Johnston, I didn't want to give
13 him a reason not to give a contribution before the
14 end of the year.
15 Q   What reason did you think you would be giving him
16 based on what was going on in the conversation?
17 A   That Rod would sign the bill, and then all of a
18 sudden the Johnstons would say, oh, wait a second,
19 we can't give a contribution right now because it's
20 going to look like we're making a contribution for
21 the signature of the bill, we want to wait a while,
22 we want some time to pass before we give that
23 contribution.  I didn't want to get into the
24 discussion with Johnston, I didn't want to give him
25 a reason for further delaying the contribution.

1  Q   And on line 13 when Defendant Blagojevich said
2  "right," what did you understand him to mean?
3  A   That he agreed with what I said.
4  Q   At line 15 when Defendant Blagojevich said:
5      "... you could say -- he could sign the bill
6       right after the first of the year."
7       What did you understand Defendant Blagojevich
8       was doing at that point?
9  A   Suggesting that I tell John Johnston:  Look, he
10 can sign the bill right after the first of the year,
11 give us the contribution right now, he can sign the
12 bill after the first of the year, that'll be enough
13 time that had passed.
14 Q   And then Defendant Blagojevich continues on line
15 16:
16      "I think you could say that, he is going to sign
17       all the bills, he is doing all, doing all the
18       bills right."
19       What did you understand Defendant Blagojevich
20 to be saying there?
21 A   He is telling me what I could tell John Johnston
22 in this discussion and he's saying:  Look, I want to
23 make sure, it's going to get signed, and it's going
24 to be signed after the first of the year after, in
25 conjunction with all those other bills getting

:49PM

:50PM

:50PM

:50PM

:50PM

1  signed.

2  Q   Did you want Defendant Blagojevich to wait until

3  after the first of the year to sign the Racetrack

4  Bill?

5  A   No.

6  Q   Why not?

7  A   Because every day that passed the Johnstons were

8  going to be losing this $9,000 a day, and the

9  pressure that they were going to bring to bear on me

10  to get Rod to sign this is going to increase every

11  day.

12  Q   So what did you try to do next in the

13  conversation?

14  A   Redirect the conversation, to getting away from

15  the notion of signing the bill after the first of

16  the year.

17  Q   And at line 20 you say:

18      "Look, I want to go with him without crossing

19       the line and say give us the f'ing money."

20      What were you indicating there?

21  A   That, yeah, I was -- I was saying, you know, I

22  want to go there without -- without trying to mix

23  the two issues, the giving of the contribution and

24  the signing of the bill and get the money from him.

25  Q   And then you continue at line 24 to say:

1      "Give us the money and one has nothing to do
2       with the other, but give us the f'ing money."
3       What were you suggesting there?
4  A   That, again, this is a projected conversation
5  that I'd be having with John Johnston and I would,
6  you know, be trying to make him feel more
7  comfortable with the discussion by saying one has
8  nothing to do with the other but give us the money.
9  Q   Should there have been a relationship between
10 Johnston's contribution and the signing of the bill?
11 A   No.
12 Q   Why not?
13 A   Because it was improper.  It's wrong.
14 Q   Had you actually said to Johnston give us the
15 money and one has nothing to do with the other, what
16 message did you think you would be sending to
17 Johnston?
18 A   That they're linked.  I wouldn't have to -- I
19 wouldn't have to say that if they weren't linked.
20 Q   And when you said to Defendant Blagojevich on
21 line 20:
22      "I want to go with him without crossing the
23       line."
24      Why did you say that?
25 A   Yeah, I was trying to convince myself,

:51PM
:52PM
:52PM
:52PM
:53PM

1  potentially Rod, that somehow in having the

2  conversation about these two things at the same time

3  I really wasn't crossing the line in linking the two

4  things.

5  Q   Did you think you were linking the campaign

6  contribution and the Racetrack Bill being signed?

7  A   Yes.

8  Q   And you suggested you weren't going to cross the

9  line, did you believe it?

10  A   No.

11  Q   You continue on at line 28:

12      "Because they're losing, losing 9,000 a day for

13       every day it's not signed."

14      What were you indicating there?

15  A   I'm trying to make the point to Rod, you know, we

16  need to try to get this bill signed because there

17  was a 9-thousand-dollar a day.

18  Q   Why were you trying to indicate that to Defendant

19  Blagojevich?

20  A   Because I wanted him to sign the bill.

21  Q   And at that point based on the conversation you

22  were having, did you think that Defendant

23  Blagojevich was linking the signing of the Racetrack

24  Bill and the contributions?

25  A   Yes.

1  Q   Now, you continue on at Page 3, line 1, and you
2  said:
3       "But I feel like leaving right now and going
4        over there and saying give me the money."
5       What were you indicating there?
6  A   That instead of staying in the campaign office
7  and going over the list of the potential donors and
8  the status of the donation and what can be done to
9  get the donation, you know, my time might be better
10 spent with meeting with Johnston and trying to get
11 the donation from him.
12 Q   And on line 4 you say:
13      "How many bills are in question right now?  I
14       mean, how many need to be sign, approximately
15       10 or 100?"
16      What were you indicating there?
17 A   I wanted to find out whether there was other
18 bills that could be signed, like the Racetrack Bill
19 at that time, so that if the discussion started
20 going in that direction, you know, there's the
21 possibility that he would sign the Racetrack Bill
22 along with those other group of bills.
23 Q   And in response on line 8 Defendant Blagojevich
24 says:
25      "A hundred...  "

1    and then continues:

2    "... this is, you know, a key month, you

3  know, to get."

4    What did you understand Defendant Blagojevich

5  meant there?

6  A  He's saying again that this month, December, it's

7  the last month to collect the money before at the

8  end of the year.

9  Q  And when on line 10 Defendant Blagojevich says:

10    "It's been a year now, a year last December."

11    What did you understand him to mean?

12 A  That it had been a year since the Johnstons

13 had made a donation.

14 Q  Why did you understand the significance that it

15 had been a year since the Johnstons had given a

16 donation?

17 A  Because he felt that it was too long a period of

18 time, too long a period of time had passed without

19 John Johnston giving a deposition.

20 Q  And then at line 11 Defendant Blagojevich says:

21    "I need Greenlee right away."

22    What was Defendant Blagojevich doing at that

23    point in time?

24 A  Trying to get ahold of Bob Greenlee.

25 Q  How was Defendant Blagojevich doing that?

1  A   I assume he is calling his assistant, Mary
2  Stewart.
3  Q   And then some time later did Defendant
4  Blagojevich talk to somebody you understood to be
5  Bob Greenlee?
6  A   Yes.
7  Q   And is that reflected starting on line 14 of the
8  transcript?
9  A   Yes.
10 Q   And when Defendant Blagojevich says:
11     "Hey, how many bills do we have f'ing right now?
12      30 bills."
13      What did you understand Defendant Blagojevich
14      meant?
15 A   That there were 30 bills ready for him to take
16 action on.
17 Q   Could you hear the other side of that
18 conversation?
19 A   No.
20 Q   And when Defendant Blagojevich says:
21     "And they're all in the same timing."
22      What did you understand Defendant Blagojevich
23      to be asking?
24 A   They're all ready for signing immediately if
25 that's what he wanted to do.

1  Q   And when he continued to say:

2      Yeah, don't do any of them, I want to do them

3        all together, okay, in toto, okay, all 30."

4        What did you understand Defendant Blagojevich

5        to be saying?

6  A   Don't take any action, don't have the bill signed

7  until you hear from me.

8  Q   Did you understand that those 30 bills included

9  the Racetrack Bill?

10 A   Yeah, it could've.

11 Q   Did Defendant Blagojevich indicate to you that he

12 knew what was in the other 29 bills that he was

13 discussing there?

14 A   No, he never talked about it.

15 Q   Did you know what was in the other 29 bills?

16 A   No.

17 Q   What did you understand was going to happen to

18 those other 29 bills based on Defendant

19 Blagojevich's instructions?

20 A   Nothing.

21 Q   Are they going to be signed?

22 A   Possibly, but not until he gave the direction to

23 do so.

24 Q   Why did you understand Defendant Blagojevich was

25 holding all 30 of those bills?

:57PM

:57PM

:57PM

:58PM

:58PM

1  A  I don't know.

2  Q  Did you understand he was holding the Racetrack

3  Bill at that time?

4  A  Yes.

5  Q  So did you understand there was a relationship

6  between him signing the Racetrack Bill and the other

7  29 bills?

8  A  There could've been.

9  Q  All right.  Now, on line 21 when you said:

10      "Can you do them, are they ready to go now

11       today?"

12      What are you meaning there?

13  A  I was confirming with him what I thought I had

14  heard him say on the phone that the bills were ready

15  to go.

16  Q  And then on line 23 when Defendant Blagojevich

17  said "can I do them all today" and then he said

18  "okay" what did you understand him to mean?

19  A  That he's confirming that all the bills were

20  ready to be signed.

21  Q  And at that point from what Defendant Blagojevich

22  said, why did you understand he was holding off on

23  signing the Racetrack Bill?

24  A  In relation to this, I'm not sure.  In talking

25  about the number of bills, I'm not sure.

1  Q   In the broader context of your conversation at
2  that point, what did you understand Defendant
3  Blagojevich was holding off on signing the Racetrack
4  Bill?
5  A   He wanted to see if he was going to get the
6  donation from the Johnstons by the end of the year.
7  Q   At line 29 Defendant Blagojevich says:
8      "I think you said, look, it's been a year, let's
9      just get this done, just get it done."
10      What did you understand Defendant Blagojevich
11      to mean there?
12  A   It was -- he was just trying to suggest that
13  maybe I just be more direct with John Johnston and
14  take a different tactic and say:  Look, it's been a
15  year, over a year since you last given a deposition,
16  just get us the money.
17  Q   Did you think John Johnston was going to respond
18  to that type of argument?
19  A   No.
20  Q   At line 35, Blagojevich says:
21      "When you going to see him?
22      You responded:
23      "I want to see him right now."
24      What did you mean to say that?
25  A   That I wanted to leave the office and go see John

:59PM

:00PM

:00PM

:00PM

:00PM

1  Johnston.

2  Q   At line 7 Defendant Blagojevich said:

3      "I could have Greenlee or someone call and say

4        I'm going to have a bill signing event and

5        schedule something late January or December."

6          What did you understand Defendant Blagojevich

7  to be saying there?

8  A   That he'd have Greenlee call John Johnston, tell

9  him that they wanted to schedule a bill signing for

10 the Racetrack Bill and that would somehow give John

11 Johnston the assurance the bill was going to get

12 signed.

13 Q   Did you want Defendant Blagojevich to have a bill

14 signing event?

15 A   Unless it was the next day, no.

16 Q   When you discussed scheduling something during

17 January or late December, was that a time frame that

18 you wanted Defendant Blagojevich to have a bill

19 signing event?

20 A   No.

21 Q   What would be the effect of having a bill signing

22 event in late December or early January?

23 A   That it would be, you know, somewhere between 25

24 and however many days that the bill wouldn't be

25 signed and the Johnstons would be losing that amount

Monk - direct by Niewoehner                1338 - A

1  of money.  It would be too late.

2  Q   In line 9 Defendant Blagojevich says:

3       "What are you going to say to him, be careful."

4          What did you understand Defendant Blagojevich

:02PM  5  to be saying there?

6  A   That somehow -- somehow I needed to have a

7  conversation -- somehow I needed to have a

8  conversation with John Johnston where there wasn't a

9  perception that the signing of the bill and the

:02PM  10  contribution were linked.

11 Q   Did you understand -- well --

12         And why would that be -- why did you

13 understand that would be a problem if the two were

14 linked?

:02PM  15 A   Because you'd be -- you can't do state action or

16 do something that related to state action

17 specifically in exchange for a contribution.

18 Q   So on line 11, on Page 4 you say:

19      "I'm going to say to him stop screwing around

:03PM  20       and get me the money."

21         What are you doing in this particular point

22 of the conversation.

23 A   Get back to talking about a potential

24 conversation I'm going to have with John Johnston.

:03PM  25 Q   And then you continue saying:

Monk - direct by Niewoehner                    1339 - A

1    "The concern is that, ah, he, you know, pulling
2     back you want to group all these bills
3     together."
4     What were you doing there?

:03PM  5  A   I'm starting off this potential conversation with
6  John Johnston by saying he's holding off so he can
7  group all these bills together.

8  Q   Did you understand that was the real reason that
9  the Racetrack Bill wasn't being signed?

:03PM  10  A   No.

11  Q   And then you continue on line 15 and say:
12     "Well, what's affecting him is that he feels
13      like you're going to get skittish if he signs
14      the bill."
:04PM  15     What are you doing at that point?

16  A   I'm still projecting a potential conversation
17  with John Johnston but I'm starting to tell him the
18  real reason why the bill isn't getting signed.

19  Q   What were you suggesting you would say at that
:04PM  20  point in time?

21  A   That Rod's not signing the bill right now because
22  he's concerned if he signs the bill, you all are
23  going to say, you know, we're going to hold off
24  giving the donation because it's going to look like
:04PM  25  it's an exchange for me signing the bill.

1  Q   So when you said "you're going to get skittish,"
2  who are you referring to?
3  A   The Johnstons.
4  Q   What would they get skittish about?
5  A   Making the donation.
6  Q   And at line 18 when you say:
7      "I'm going to use the word skittish."
8       What are you doing there?
9  A   Looking for Rod's agreement that that is the
10 proper word to use.
11 Q   Why were you checking with Defendant Blagojevich
12 about the language you were going to use?
13 A   Because there was an important conversation and
14 he had told me previously to be careful, so I'm
15 trying to get his comments and agreement that this
16 is the right way to go.
17 Q   Did you want Defendant Blagojevich to approve of
18 the language you used with Johnston?
19 A   Yeah.
20 Q   And at line 20 when Blagojevich said "yeah," what
21 did you understand he was indicating?
22 A   That that was the right way to go, the right
23 language to use.
24 Q   At line 22 when Defendant Blagojevich said:
25     "And he likes separation between that and

:05PM
:05PM
:05PM
:05PM
:06PM

1      signing the bill."

2          What did you understand Defendant Blagojevich

3  was doing at that part of the conversation.

4  A   That he thought I should tell John Johnston that

5  he, Rod, would like some period of time to pass

6  before signing the bill, some period of time before

7  signing the bill after he got the contribution.

8  Q   And, again, is this potential conversation you're

9  going to have?

10  A   Yes.

11  Q   And line 24th when you said:

12      "Define separation."

13      Defendant Blagojevich said:

14      "A week."

15          What did you understand Defendant Blagojevich

16  was saying?

17  A   That he would wait a week after receiving the

18  contribution to sign the bill.

19  Q   What did you understand was going to happen

20  first?

21  A   The contribution would be made.

22  Q   And at that point in time how long was it going

23  to be based on what Defendant Blagojevich said

24  before he was going to sign bill?

25  A   A week.

Monk - direct by Niewoehner                1342 - A

1  Q   What did you understand the affect that would
2  have on John Johnston?
3  A   That it would be another 6 to 7 days that they're
4  losing $9,000 a day.
5  Q   So when you had this conversation with Defendant
6  Blagojevich, were you being careful not to link the
7  two or not to say directly that they were linked?
8  A   Not to say directly they were linked.
9  Q   Now at line 28 there's a line where you say:
10      "John, how are you, it's Lon."
11       Do you see that?
12 A   Yes.
13 Q   What were you doing at that point in time in the
14 conversation?
15 A   I'm still in the office and I am now talking to
16 John Johnston about trying to come over and see him.
17        MR. NIEWOEHNER:  Your Honor, at this time can
18 we publish the call at tab 383?
19        THE COURT:  Which one?
20        MR. NIEWOEHNER:  383.
21        THE COURT:  383.
22     (Brief pause).
23        THE COURT:  Yes.
24     (Tape played).
25 BY MR. NIEWEOHNER:

:07PM

:07PM

:07PM

:08PM

:08PM

1 Q   Mr. Monk, that conversation takes place
2 December 3rd at about 2:18 p.m., do you see that?
3 A   Yes.
4 Q   Is that conversation where you heard one side of
:09PM  5 it on the previous tape?
6 A   Yes.
7        MR. NIEWOEHNER:  Your Honor, could we publish
8 the call at tab 84?
9        THE COURT:  Yes.
:09PM 10    (Tape played)
11 BY MR. SCHAR:
12 Q   Mr. Monk, this conversation takes place at
13 approximately 2:21 p.m. on December 3rd, do you see
14 that?
:10PM 15 A   Yes.
16 Q   Is this the conversation that you heard at the
17 end of the other recording at the FOB offices?
18 A   Yes.
19 Q   And had you planned to see John Johnston --
:10PM 20 strike that.
21        Had you spoken with John Johnston about
22 meeting you and Johnston that day prior to this?
23 A   No.
24        MR. NIEWOEHNER:  Your Honor, if we could
:10PM 25 publish the call at tab 85?

1      THE COURT:  Yes.

2     (Tape played).

3  BY MR. NIEWOEHNER:

4  Q   Mr. Monk, this call took place 2:35 p.m.

5  December 3rd, do you see that?

6  A   Yes.

7  Q   This was about 14 minutes after the last call?

8  A   Yes.

9  Q   And where were you going at that point in time?

10  A   To John Johnston's office.

11  Q   Where was that located?

12  A   At Maywood Racetrack in Melrose Park.

13  Q   At that point what did you understand Defendant

14  Blagojevich was going to do with respect to the

15  Racetrack Bill?

16  A   Wait to see if he got a contribution from the

17  Johnstons before signing it.

18  Q   Were you concerned that Defendant Blagojevich

19  ultimately would not sign the bill?

20  A   No, just be delayed.  I'm trying to convince him

21  to sign the bill earlier than later.

22  Q   And what did you want Johnston to do at this

23  point?

24  A   Make the contribution.

25  Q   Why did you want Johnston to make the

1  contribution?

2  A   So that Rod would sign the bill as soon as

3  possible.

4  Q   Now, did you arrive at the racetrack out in

5  Melrose Park?

6  A   Yes.

7  Q   What did you do once you reached the racetrack?

8  A   Went into the conference room there.

9  Q   Who was there?

10 A   John Johnston and very shortly thereafter his

11 father walked in.

12 Q   Who is his father?

13 A   Billy Johnston.

14 Q   What was your relationship like with Billy

15 Johnston?

16 A   It was fine.  I mean, I only met him a few times.

17 I wasn't that -- we didn't know each other real

18 well.

19 Q   Who did you typically deal with from the

20 racetrack?

21 A   John Johnston.

22 Q   What did you discuss while Billy Johnston was

23 present?

24 A   Briefly, Billy trying to push me to get Rod to

25 sign the bill and then at some length we somehow got

1  on the topic of New York Yankees and George

2  Steinbrenner and started talking about his health.

3  The Johntsons know the Steinbrenners.

4  Q   Did you raise any issues of fundraiser in front

5  of the Bill Johnston?

6  A   No.

7  Q   Why not?

8  A   Because I'd been having the conversations with

9  John, I didn't want to talk about in front of Bill

10 the signing of the bill and fundraising.  Quite

11 frankly, I didn't think John wanted me to talk in

12 front of Bill because I didn't know if John had

13 communicated to Billy about making a contribution or

14 not.

15 Q   Did you talk with John alone at some point?

16 A   Yes.

17 Q   How did that happen?

18 A   I think I stood up and said I needed to go, and

19 we all stood up and I asked John if I could talk to

20 him and would he walk out with me.

21 Q   What happened next?

22 A   We had a conversation in the stairwell, kind of

23 leading to the lobby of his office.

24 Q   Was anybody else present for that conversation?

25 A   No.

Monk - direct by Niewoehner                1347 - A

1   Q   After that conversation, where did you go?

2   A   I got in my the car and drove home.

3   Q   Did you talk with Defendant Blagojevich after you

4   left?

5   A   Yes.

6   Q   How did you do that?

7   A   On my cell phone.

8   Q   And about how soon after you left the racetrack

9   did you call Defendant Blagojevich?

10  A   Three or four minutes.

11  Q   Why did you call Defendant Blagojevich so

12  quickly?

13  A   Because I just had the meeting with Johnston, I

14  previously just had the meeting with Rod and I knew

15  he was going to want to know how my meeting with the

16  Johnstons went.

17         MR. SCHAR:  Your Honor, could we publish at

18  this time the call at tab 86?

19         THE COURT:  Yes.

20      (Tape played.)

21  BY MR. NIEWOEHNER:

22  Q   All right.  At line 9 on Page 1, you said:

23      "I'm just leaving there, ah, and I talked to him

24       about his commitment."

25      What were you referring to there?

1  A   That I was just leaving his office and I was

2  talking to him about his donation.

3  Q   You continue on line 11 saying:

4      "Yeah, I said two separate conversations, what

5       about your commitment."

6       Did you indicate to Johnston something about

7       two separate conversations?

8  A   Yes.

9  Q   Why did you do that?

10 A   I wanted to make -- I wanted to try to make him

11 feel a little more comfortable about the

12 conversation we were about to have in terms of the

13 donation and the timing of the signing of the bill.

14 Q   Did you understand at that point that there was a

15 connection between the donation and the signing of

16 the bill?

17 A   Yes.

18 Q   Who was making that connection?

19 A   Rod and me.

20 Q   Did you think that by telling Johnston that they

21 were two separate conversations you would actually

22 convince Johnston that they were not linked?

23 A   No.

24 Q   And I'm going to direct your attention now to

25 line 17, you said:

1          "And I said, look, there's a concern that
2            there's going to be some skittishness if the
3            bill gets signed because of the timeliness of
4            the commitment."
5          Did you indicate that to Johnston?
6    A   Yes.
7    Q   Did you use the phrasing that you discussed with
8    Defendant Blagojevich back at the FOB offices that
9    day?
10   A   Yes.
11   Q   Why did you do that?
12   A   Because I just left -- I just left Rod, it was
13   fresh in my mind, and I knew that based on my
14   conversation with him, he was comfortable with what
15   I was doing.
16   Q   When you talked with Johnston and indicated that
17   there was some skittishness if the bill gets signed
18   because of the timeliness of the commitment, what do
19   you mean?
20   A   That John, we thought you would be reluctant to
21   make the donation by the end of the year if the bill
22   got signed now because he wasn't going to want to
23   make the donation that close in time to the signing
24   of the bill and have there be a perception that the
25   signing of the bill was an exchange for the

1  contribution.

2  Q   When you talked to Johnston, who were you

3  concerned about being skittish?

4  A   Johnston.

5  Q   Skittish about what?

6  A   Giving a donation, the $100,000.

7  Q   Did you think that Johnston -- well, why were you

8  telling that to Johnston?

9  A   Because I wanted to let him know why the bill

10  wasn't getting signed and that, you know, as a

11  result, he should give the contribution now because

12  of his concern about us being concerned about him

13  being skittish.

14  Q   Did you think that Johnston would feel pressured

15  to contribute if he knew that Defendant Blagojevich

16  was concerned about signing the bill?

17  A   Yes.

18  Q   Did you think the fact that you said you were

19  having two separate conversations would reassure

20  Johnston that the contribution and the bill signing

21  were not linked?

22  A   Not really, no.

23  Q   Did you think Johnston would concerned only about

24  the perception that the two were linked?

25  A   No.

Monk - direct by Niewoehner                1351 - A

1  Q   What did you think you would be concerned about?

2  A   That we were all doing something wrong in linking

3  the signing of the bill and the donation.

4  Q   How did Johnston respond when you said along the

5  lines of some skittishness if your bill gets signed

6  because of the timeliness of the commitment?

7  A   Saying to the effect, you know, that I knew it, I

8  knew that this was probably the reason that it

9  wasn't getting signed.

10 Q   What did you understand Johnston to mean?

11 A   That the signing of the bill was linked to his

12 donation.

13 Q   Now, turning your attention to line 21 where you

14 said:

15     "He said actually not, I mean, you want me to

16      put something in the next quarter."

17         Did Johnston in your conversation suggest he

18 would put something in the next quarter?

19 A   Yeah, I mean, he would make a portion of $100,000

20 before the end of the year and half of it after the

21 first of the year.

22 Q   And on the next line, on line 23, where you say:

23     I said no, that's not my point, my point is that

24      this all gotta be now."

25         Did you indicate that to Johnston?

:20PM

:21PM

:21PM

:21PM

:21PM

Monk - direct by Niewoehner                1352 - A

1  A   Yes.

2  Q   What did you mean when you said that to Johnston?

3  A   That we needed the money by the end of the year.

4  Q   And on line 13 where you said:

5       "He's, Lon, I have to leave in two weeks and I'm

6        going to be gone for two weeks."

7        Did Johnston say words to that effect?

8  A   Yes.

9  Q   What did you understand Johnston to mean when he

10 said that?

11 A   That he was leaving in two weeks for a two-week

12 vacation.

13 Q   Did Johnston talk about making a contribution

14 before he left?

15 A   Yes.

16 Q   Did you want Johnston's entire contribution

17 before the end of the year?

18 A   Yes.

19 Q   At that point when you left your conversation

20 with Johnston, what did you think Johnston was going

21 to do?

22 A   I still thought he was going to make the

23 contribution within that two-week period.

24 Q   If you turn your attention to Page 2, line 6,

25 when you say:

Monk - direct by Niewoehner          1353 - A

1      "The reason it took so along is Billy came in
2       and start talking about George Steinbrenner and
3       not about the bill so much, but just about his
4       illness and all that."
5      What were you indicating there?
6  A   That the conversation I was going to have with
7  John or the meeting I was going to have with John
8  took longer than I anticipated because of Billy
9  Johnston's presence.
10 Q   And when you said at line 11:
11      "I didn't want to have that conversation in
12       front of Billy.
13      And Defendant Blagojevich said:
14      "Yeah, I know.  Good job."
15       What did you understand Defendant Blagojevich
16 to be saying?
17 A   That I shouldn't have had the conversation we
18 talked about in front of Billy Johnston.
19 Q   Now, that was on December 3rd, the next day,
20 December 4th, what did you do?
21 A   I left for the Dominican Republic.
22 Q   Why were you going to the Dominican Republic?
23 A   To see friends and play golf for a couple of
24 days.
25      MR. NIEWEOHNER:  Your Honor, the government

1  moves to admit Monk Travel Record pursuant to 90211

2  certificate.

3          THE COURT:  Admitted.

4      (Government's Exhibit Monk Travel Record was

5        received in evidence.)

6          MR. NIEWEOHNER:  May I publish and approach,

7  Your Honor?

8          THE COURT:  You may.

9          MR. NIEWOEHNER:  Your Honor, we're going to

10 publish Page 1.

11     (Exhibit published to the jury)

12 BY MR. NIEWOEHNER:

13 Q  Mr. Monk, what do you see on this section that is

14 reflected on the screen?

15 A  My name and the itinerary and the flight and date

16 of the flight and the airline.

17 Q  Were you flying directly to the Dominican

18 Republic you?

19 A  No, I was first flying in to Miami.

20 Q  If you could turn your attention, look at the

21 lower right hand corner of the page to the page

22 labeled "EG 918 9," do you see that?

23 A  Yes.

24 Q  And directing your attention to the top third of

25 that page, there's something that says "AA" at the

1 top in bold, "AA 78 departing Chicago-O'Hare ORD on

2 4 December 2008," do you see that?

3 A  Yes.

4 Q  What was that?

5 A  That would the airline and the flight number I

6 took from O'Hare to Miami.

7 Q  And a few lines down it says -- there's that says

8 "FAD depart" and below that it says "ACTL depart",

9 do you see that?

10 A  Yes.

11 Q  What does that show?

12 A  The scheduled departure and the actual departure.

13 Q  Was that a.m. or p.m. that you left?

14 A  a.m.

15 Q  And then on the right side of the column where it

16 says "SAED arrival" and "ATL arrival," what does

17 that show?

18 A  Scheduled arrival time in Miami and the actual

19 arrival flight of the time in Miami.

20 Q  Did your flight actually arrive at 9:51 a.m.?

21 A  Yes.

22 Q  And is Miami on Eastern standard time?

23 A  Yes.

24 Q  Would that be 8:51 a.m. Chicago time?

25 A  Yes.

:25PM

:25PM

:25PM

:26PM

:26PM

1 Q   And if you turn your attention to the page of the
2 exhibit on the lower right hand corner "DG 918," do
3 you see that?

4 A   Yes.

5 Q   Highlighting the section near the top third, what
6 does that show?

7 A   My name and my seat assignment.

8 Q   And then if you could turn your attention to the
9 lower right hand corner "9:18," and again focusing
10 on the top section of the exhibit, it says "AA 275
11 departing Miami on 4 December 2008," what does that
12 reflect?

13 A   The schedule -- I'm sorry.  American Airlines
14 lines flight 275 from Miami to the Dominican
15 Republic.

16 Q   Is that the flight you took?

17 A   Yes.

18 Q   And then it shows "SAED depart" and "ACTL depart"
19 what does that show?

20 A   The scheduled departure and the actual departure
21 from Miami to the Dominican Republic.

22 Q   Is that about actually when your flight left?

23 A   Yes.

24 Q   Did you talk with Defendant Blagojevich on
25 December 4th?

:26PM

:27PM

:27PM

:27PM

:27PM

1  A   Yes.

2          MR. NIEWOEHNER:   Your Honor, if we could

3  publish tab 88?

4          THE COURT:   Yes.

5      (Tape played.)

6  BY MR. NIEWEOHNER:

7  Q   Turning your attention to Page 1, this call is

8  dated December 4, 2008 about 9:09 a.m., do you see

9  that?

10  A   Yes.

11  Q   Where were you when you made this phone call?

12  A   In the airport in Miami.

13  Q   And line 12 Defendant Blagojevich says:

14      "I got a call into Bruce again this morning."

15          What did you understand Defendant Blagojevich

16  to mean there?

17  A   That he called Bruce Lementimen.

18  Q   What did you understand Defendant Blagojevich

19  wanted to talk to Bruce Lementimen about?

20  A   Fundraising.

21  Q   And then at line 18 Defendant Blagojevich says:

22      "Now what about Gupta?"

23      Who did you understand Defendant Blagojevich

24      was talking about there?

25  A   David Gupta.

1  Q   And what was David Gupta potentially doing?

2  A   Fundraising.

3  Q   And when Defendant Blagojevich said:

4      "I feel like that guy is a big BS'er,."

5      What did you understand him to mean?

6  A   That he is not going to deliver on his commitment

7  to fundraiser for Rod or at least not meeting

8  expectations.

9  Q   Had you heard Defendant Blagojevich use that

10 term, BS'er before?

11 A   Yes.

12 Q   You testified previously about conversations you

13 had with Defendant Blagojevich about when you were

14 Chief of Staff about instances when lobbyists and

15 consultants would come and ask things from Defendant

16 Blagojevich, do you recall that testimony?

17 A   Yes.

18 Q   In that testimony you indicated at times you

19 talked to Defendant Blagojevich about the lobbyists

20 and consultants who wanted something, do you recall

21 that?

22 A   Yes.

23 Q   And in those context -- in that context, did

24 Defendant Blagojevich ever use the term "B'ser"?

25 A   Yeah.

1  Q   What did you understand Defendant Blagojevich

2  meant when he used the term in that context?

3  A   That, you know, these are people who did a lot of

4  talking and didn't really deliver anything in terms

5  of fundraising.

6  Q   And when Defendant Blagojevich was talking about

7  these lobbyists and consultants who didn't deliver

8  on fundraising, what did he typically do on their

9  request?

10 A   Didn't -- didn't fulfill them, didn't want to

11 waste time with them.

12 Q   All right.  I'm going to turn your attention now

13 to Page 2, and on line 12 when you say:

14     "Not today but maybe tomorrow, just give John

15      Johnston a call."

16         What were you indicating Defendant

17 Blagojevich to do there?

18 A   Call John Johnston and talk about the signing of

19 the bill.

20 Q   Why did you want Defendant Blagojevich to call

21 John Johnston at that point in time?

22 A   Because I thought it would put an additional

23 pressure on the Johnstons to make the donation by

24 hearing from the Governor and I also thought that,

25 you know, John Johnston would have an opportunity to

1  explain to Rod directly, not through me but

2  directly, the importance of getting the bill signed.

3  Q   At that point did you understand that Defendant

4  Blagojevich was not signing the Racetrack Bill

5  because he wanted the contributions?

6  A   Yes.

7  Q   At that point did you think Defendant Blagojevich

8  was concerned just about the perception of getting a

9  contribution?

10         MR. ADAM, JR.:  Objection to the leading,

11  Your Honor.

12         THE COURT:  It's a fine point, but he's

13  right, the objection is sustained.

14  BY MR. NIEWOEHNER:

15  Q   You said a moment ago that you understood that

16  Defendant Blagojevich was not signing the bill

17  because he did not -- because Johnston had not made

18  a contribution, is that right?

19  A   Yes.

20  Q   And at that time from what Defendant Blagojevich

21  had said, did you understand that Defendant

22  Blagojevich was not going to sign the bill because

23  he was concerned about a perception?

24         MR. ADAM, JR.:  Objection.

25         THE COURT:  Overruled.

1  BY THE WITNESS:
2  A   I think he was concerned about perception and --
3  and the actual fact that the two things may be
4  happening together very closely and get tied
5  together.
6  BY MR. NIEWEOHNER:
7  Q   All right.  Now, returning on line 15 when you
8  say:
9        "Well, you know, I'm working on the timing of
10        this thing but it's going to get done."
11        What were you suggesting there?
12  A   That Rod call John Johnston and confirm with John
13  Johnston what I had been telling him of my
14  conversations with Rod that this bill is going to
15  get signed.
16  Q   What would be the purpose of having Defendant
17  Blagojevich reassure Johnston that the bill was
18  going to get signed?
19  A   You know, put pressure and incentivize Johnston
20  to make a donation.  It's not the same hearing from
21  me as hearing from Rod.
22  Q   And on line 26 when Defendant Blagojevich says:
23        "Call Johnny Johnston or should I have, have
24        Harris call him."
25        What did you understand him to be suggesting

:36PM

:36PM

:36PM

:36PM

:37PM

Monk - direct by Niewoehner                    1362 - A

1  there?

2  A  He's questioning whether he should make the call

3  I just suggested he make or whether John Harris

4  should make the call.

5  Q  And on line 4, on Page 3, when you say:

6      "I think it's better if you do it."

7      Why did you say that?

8  A  Because I thought it would be better coming

9  directly from Rod than from John Harris.

10 Q  You continued on line 6 to say:

11      "It's better if you do it just from a pressure

12      point of view."

13      What do you mean there?

14 A  That by John Johnston hearing from Rod, it would

15 put more pressure on him to make the donation.

16 Q  And when Blagojevich responded on line 8:

17      "Yeah, I could."

18          What did you understand Defendant Blagojevich

19 to be saying?

20 A  I get it, I hear you.

21 Q  And when he continues to say:

22      "I'll call him, yeah, I will, I want to do an

23      event down, downstate. "

24      What did you understand Defendant Blagojevich

25      was suggesting there?

:37PM (line 5)
:37PM (line 10)
:37PM (line 15)
:37PM (line 20)
:38PM (line 25)

1  A   That in all likelihood the bill wasn't going to

2  get assigned for a while because he wanted to

3  schedule an event.

4  Q   And when he continued at line 12:

5       "I'll say we want to do it and we hope, we hope

6        to do this thing so we get together so we can

7        start picking a date for bill signing."

8          What did you understand Defendant Blagojevich

9  to mean?

10 A   That that's what he was going to tell John

11 Johnston, that we were going to try and find some

12 dates and do a bill signing.

13 Q   What did you understand the effect would be

14 Defendant Blagojevich telling John Johnston that he

15 wanted to pick some dates for bill signing?

16 A   That it wasn't going to be signed imminently.

17 Q   Why is that?

18 A   Because scheduling a bill signing takes some time

19 in terms of looking at the site, finding the right

20 time for everybody's schedules to work, and, you

21 know, putting some sort of crowd together to make it

22 look like, you know, this is an important bill to be

23 signed.

24 Q   Did the logistics of a bill-signing event at the

25 end of December pose particular problems?

1  A   Yeah.

2  Q   Why is that?

3  A   People are on vacation, they're not focused on

4  governmental action.

:39PM   5  Q   Now, you said before you had experience when you

6  were Chief of Staff in conversations with Defendant

7  Blagojevich in deciding when to sign bills, is that

8  right?

9  A   From time to time.

:39PM   10  Q   And what did you understand the point of having

11  bill signing ceremonies to be?

12  A   Make a big deal out of the particular bill

13  signing and have people around or put in the

14  location that was going to be impacted by the actual

:40PM   15  law that was going to be implemented as a result of

16  the bill signing.

17  Q   And what would be the advantages of having the

18  bill signing in the place where it would be

19  impacted?

:40PM   20  A   Make it a big deal.

21  Q   And would that be an advantage if you made a big

22  deal?

23  A   I suppose, yeah.

24  Q   Would there be media attention to such event?

:40PM   25  A   Hopefully, yeah.

Monk - direct by Niewoehner                    1365 - A

1  Q  Did you understand that Defendant Blagojevich
2  actually wanted to have bill-signing event to get
3  good press about the Racetrack Bill?
4  A  No.
5  Q  Why not?
6  A  Because it's a law that had been in existence
7  since 2006, and continuing that law was a big deal
8  to a handful of people, the horse racing industry.
9  Q  Now, the effect of doing bill-signing ceremony
10 would draw attention to the bill you were signing,
11 is that right?
12 A  Hopefully, yeah.
13 Q  You earlier discussed the possibility that
14 Defendant Blagojevich would hold the Racetrack Bill
15 to sign with other bills, is that right?
16 A  Yes.
17 Q  And you had earlier testified that the point of
18 doing that would be to downplay the Racetrack Bill
19 because you didn't want to draw attention to it, do
20 you recall that testimony?
21 A  Yes.
22 Q  Is having a bill signing ceremony consistent with
23 waiting on the Racetrack Bill to sign with other
24 bills?
25 A  Can you ask that again?

Monk - direct by Niewoehner                1366 - A

1  Q   Did you understand the reasons for having a
2  bill-signing ceremony was to draw attention to the
3  bill, was that your testimony?
4  A   Yes.
5  Q   Was that the same reason that you might hold the
6  Racetrack Bill to sign with other bills?
7  A   I don't understand the question.
8  Q   I'm sorry.
9      Was the point -- when you held a bill to sign
10 with other ones, were you trying to draw attention
11 to the bill or not?
12 A   No.
13 Q   And if you were holding a bill-signing ceremony,
14 were you trying to draw attraction to the bill?
15 A   No -- I mean, yes.  Yes.
16 Q   So turning back to line 16 on the transcript,
17 when you said:
18     "What are the chances based on my conversation
19      with you yesterday that this gets done next
20      week?"
21     What were you referring to?
22 A   Signing the bill next week, hopefully signing the
23 bill next week.
24 Q   At line 20 Defendant Blagojevich says:
25     "You know, they're good."

:41PM (line 5)
:42PM (line 10)
:42PM (line 15)
:42PM (line 20)
:42PM (line 25)

Monk - direct by Niewoehner                    1367 - A

1      What did you understand Defendant Blagojevich
2  to be saying there?
3  A   There was a, you know, chance that it might get
4  signed next week.
5  Q   Did you believe Defendant Blagojevich was going
6  to sign it index week?
7  A   No.
8  Q   And on line 23 when you said:
9      "I'm telling you, he's going to be good for it,
10     I got in his face."
11     Why did you say that?
12 A   Because I didn't think Rod saying "you know
13 they're good" meant that it was good.  I mean, I
14 could just tell from the inflection of his voice and
15 the manner in which he said it that he was trying to
16 get me off the subject.  I didn't he was trying to
17 get it signed next week and I was telling him, look,
18 the Johnstons are going to get you the donation,
19 just, you know, sign the bill.
20 Q   And on line 29 when Defendant Blagojevich said:
21     "I feel there's someone else holding him back
22     --"
23     and he continues to the next page and he says:
24     "I believe it's Chris Kelly."
25         What did you Defendant Blagojevich is saying

1 there.

2 A   That Chris Kelly had been communicating with John

3 Johnston and he was somehow convincing John Johnston

4 not to make the donation.

5 Q   Now, had you been talking to Chris Kelly

6 separately about the Racetrack Bill in this time

7 period?

8 A   Yeah, I believe I had a conversation with him;

9 maybe two.

10 Q   And approximately when in relation to

11 December 4th did you talk to Kelly about the

12 Racetrack Bill?

13 A   Within one, two, maybe three days of that.

14 Q   What had Kelly indicated to you in those

15 conversations?

16 A   That he wanted Rod to sign the bill.

17 Q   Did Kelly explain to you why he wanted Defendant

18 Blagojevich to sign the bill?

19 A   Yeah, he was telling me that it was for very

20 personal reasons.

21 Q   Did you understand what that meant necessarily?

22 A   Not in that conversation, no.

23 Q   Had you talked with Defendant Blagojevich prior

24 to this conversation in December 4th about Chris

25 Kelly and the Racetrack Bill?

1  A   Yes.

2  Q   And approximately when in relation to this

3  December 4th conversation had you spoken with

4  Defendant Blagojevich?

5  A   Very close in time.  Again, within the three days

6  prior to that.

7  Q   Had you spoken with Defendant Blagojevich about

8  this topic when you were at the FOB offices on

9  December 3rd?

10  A   I believe I did, yeah.

11  Q   And in that conversation, what did Defendant

12  Blagojevich say to you about Chris Kelly and the

13  Racetrack Bill?

14  A   That Chris had had some conversation with a guy

15  named Bernie Kosar who suggested that Chris go to

16  Jeb Bush who in turn then would go to President Bush

17  and Chris and -- and that somehow they were linked

18  to the signing of this horse racing bill.

19  Q   What was Defendant Blagojevich's reaction to what

20  Kelly wanted to have happen?

21  A   He -- he -- his reaction was, you know, it seems

22  kind of far-fetched.

23  Q   Did Defendant Blagojevich indicate to you that he

24  wasn't going to sign the Racetrack Bill because of

25  something to do with Chris Kelly?

1  A   No.

2  Q   Now -- oh, excuse me.

3          Going back to the transcript of the call --

4          MR. ADAM, JR.:  Which call?

5          MR. NIEWOEHNER:  Excuse me.  Tab 88.

6  BY MR. NIEWOEHNER:

7  Q   On Page 4, on line 3, Defendant Blagojevich says:

8      "Well, let's take-down a whole year."

9          What did you understand Defendant Blagojevich

10 to be saying there?

11 A   He is still talking about the year, that it had

12 been a year since the Johnstons had last made a

13 donation.

14 Q   And at line 5 you say:

15     "I don't think he's been talking to Chris."

16     What did you mean there?

17 A   That I don't think John Johnston had been talking

18 to Chris.

19 Q   At that point did you think John Johnston had

20 been talking to Chris Kelly?

21 A   No.

22 Q   At line 14 Defendant Blagojevich says:

23     "Freveletti kind of dancing."

24     Who did you understand Freveletti to be a

25     reference to?

:46PM

:46PM

:47PM

:47PM

:47PM

1  A   Tony Freveletti.

2  Q   Who is Tony Freveletti?

3  A   A lobbyist in the State of Illinois, fundraised

4  in the past.

:47PM  5  Q   And in the fall of 2008 had you been having

6  conversations with Defendant Blagojevich about

7  fundraising with Tony Freveletti?

8  A   This is the first specific conversation I

9  remember talking with Rod about this.

:47PM  10  Q   I'm going to show you what's been marked as

11  Government Exhibit --

12          MR. NIEWOEHNER:  Your Honor, may I approach?

13          THE COURT:  You may.

14  BY MR. NIEWOEHNER:

:48PM  15  Q   Previously admitted as Government Exhibit Monk

16  fundraising List 2.

17          Mr. Monk, what is that?

18  A   It's one of the fundraising lists that we would

19  go over when we would go over fundraising.

:48PM  20  Q   In about when is the date on that particular

21  fundraiser?

22  A   October 6th, 2008.

23  Q   Is there an entry for Tony Freveletti on that

24  list?

:48PM  25  A   Yes.

1  Q   And what does it reflect going on with Tony
2  Freveletti?
3  A   An event in mid November with the low goal being
4  10,000, the high goal would be 10,000, and a note
5  that says we'll get back to Rod with a date.
6  Q   And based on that notation, "we'll get back to
7  Rod with date" who did you understand was the point
8  of contact with Tony Freveletti?
9  A   Rod Blagojevich.
10 Q   Now, line 15 Defendant Blagojevich says or
11 continues:
12     "Freveletti kind of dancing saying, you know,
13      they're firm doesn't get any bond work or
14      something that somebody was hired."
15        What did you understand Defendant Blagojevich
16 to be saying there?
17 A   That his -- that the law firm that he represented
18 wasn't getting any bond work and that someone else
19 was probably hired on some bond offering.
20 Q   And when Defendant Blagojevich indicated
21 Freveletti kind of dancing, what did you understand
22 him to mean?
23 A   That he is not committing giving a firm
24 commitment to either hosting a fundraiser or
25 donating money.

1  Q   And Defendant Blagojevich went on and said:

2      "I mean boy."

3       Line 17:

4       "Some of these people are blatant how they say

5       some of these things."

6           What did you understand Defendant Blagojevich

7  to be saying?

8  A   That there were some people that had no problem

9  talking about connecting donations to state action.

10 Q   And who in particular did you understand

11 Defendant Blagojevich was talking about there?

12 A   Tony Freveletti.

13 Q   And what state action did you understand

14 Defendant Blagojevich was talking about?

15 A   The firm that Tony Freveletti represented or

16 worked for, the law firm, wasn't getting any bond

17 work.

18 Q   Now, Mr. Monk, after this call, where did you go?

19          THE COURT:  We're going to take a break.

20          THE MARSHAL:  All rise.

21      (Recess.)

22          THE MARSHAL:  All rise.

23      (The following proceedings were had in the

24       presence of the jury in open court:)

25          THE COURT:  Please be seated.

1      You may resume.

2  BY MR. NIEWEOHNER:

3  Q   Mr. Monk, when we broke you were describing a

4  conversation you had at the Miami airport on

5  December 4th, do you recall that?

6  A   Yes.

7  Q   Where did you go after -- did you go to the

8  Dominican Republic after that?

9  A   Yes.

10 Q   How long did you stay at the Dominican Republic?

11 A   3 or 4 days.

12 Q   Did you come back to Chicago at some point?

13 A   Yes.

14 Q   About when did you come back to Chicago?

15 A   After midnight on the 8th, sometime early morning

16 on the 9th.

17 Q   Did you talk to Johnston at any point -- well,

18 actually, on December 9th, did you learn that

19 Defendant Blagojevich had been arrested?

20 A   Yes.

21 Q   Between December 4th and December 9th did you

22 have any further conversations with John Johnston?

23 A   No.

24 Q   After you conversation at the Miami airport with

25 Defendant Blagojevich, did you have anymore

1 conversations with Defendant Blagojevich until the

2 point you learned he had been arrested?

3 A   No.

4 Q   Had Defendant Blagojevich signed the Racetrack

5 Bill as of December 9th?

6 A   No.

7         MR. NIEWOEHNER:  No further questions, Your

8 Honor.

9                   CROSS EXAMINATION

10 BY MR. ETTINGER:

11 Q   Good afternoon, Mr. Monk.

12 A   Good afternoon.

13 Q   My name is Michael Ettinger.  I represent Robert

14 Blagojevich.

15         You originally are from California, correct?

16 A   Correct.

17 Q   And I believe you testified on direct that

18 sometime in the middle to end of 2001 you came to

19 Illinois to become the campaign manger for Rod

20 Blagojevich's first run for Governor?

21 A   Yes.

22 Q   Is that right?

23 A   Yes.

24 Q   Prior to that, you were in Washington as his

25 consult for the -- he was a United States

1  Representative, is that right?

2  A  Yes.

3  Q  Is it safe to say prior to coming to Illinois in

4  the middle of 2001 you were not involved in

5  politics?

6  A  Correct.

7  Q  Is it safe to say that prior to the middle of

8  2001 you were not involved in political fundraising?

9  A  Correct.

10  Q  All right.  So when you came here and you agreed

11  to be the campaign chairman for Rod Blagojevich's

12  run for Governor, I think you told us before it was

13  new to you?

14  A  Campaign manger.

15  Q  Or campaign manger.

16  A  Yes.

17  Q  Okay.  What were your duties as campaign manger?

18  A  To manage the staff, keep an eye on the budget,

19  make sure that money wasn't getting spent that we

20  wouldn't know about, make sure we weren't

21  overspending on certain things.

22  Q  So you were aware, is it true -- and from the

23  middle of 2001 until I believe the end of 2002, you

24  had that position as campaign manger?

25  A  To the first part of the November 2002, yes.

1  Q   Okay.  So that's the period I'm talking about
2  right now.
3  A   Okay.
4  Q   So during that period, you were aware of the
5  campaign finances, is that right?
6  A   Yes.
7  Q   You were aware of how much money was raised, is
8  that right?
9  A   Yes.
10 Q   Now, when you came here, you didn't know much
11 about Illinois politics, true?
12 A   Correct.
13 Q   You didn't know much about political fundraising,
14 correct?
15 A   Correct.
16 Q   All right.  So what you did was, when you came
17 here, I think you told us on direct, there were
18 these fundraising lists that you would work off of?
19 A   Yes.
20 Q   Okay.  And these lists contained names of people
21 that had given donations previously, right?
22 A   Some of them may also have included potential
23 donors that hadn't given in the past.
24 Q   Okay.  And then I think you told us about
25 bundlers.

:18PM
:18PM
:18PM
:18PM
:19PM

1  A   Yes.

2  Q   Okay.  And a bundler, as I recall, was someone

3  that would go to various individuals and have them

4  have fundraisers and raise money, is that true?

5  A   Yes.

6  Q   Is that true?

7  A   Yes.

8  Q   And you dealt with bundlers during your role as

9  campaign manager from 2001 to the middle of 2002, is

10 that correct?

11 A   Very little at the beginning and gradually as

12 time went on more and more.

13 Q   Okay.  Well, tell us, as time went on, what

14 period of time are you talking about?  How many

15 months would it take until you dealt with them more?

16 A   Again, it was over a period of time.  I'd say

17 from the middle of 2001 up until the primary in 2002

18 my dealing with them increased over that period of

19 time.

20 Q   So it took you at least 6 months to get

21 acclimated, is that right?

22 A   At least.

23 Q   At least.  Right.

24     So prior -- in those first six months, you

25 were learning the political process in Illinois and

1  about political fundraising, correct?

2  A  Yes.

3  Q  Okay.  Now, when you dealt with these bundlers

4  during your role as campaign manger, you didn't tell

5  them how to raise funds, did you?

6  A  Not that I recall specifically.  I don't know if

7  we got into discussions about how specifically they

8  were raising funds.

9  Q  Right.

10 A  Some of them had experience doing it, anyway.

11 Q  Okay.  Well, they would have fundraisers with

12 their clients, correct?

13 A  Yeah.

14 Q  Were some of them lobbyists?

15 A  I believe so, yes.

16 Q  And what you would do is check on the progress

17 and how much was coming in, is that right?

18 A  Yes.

19 Q  Okay.  And after the election, the primary you

20 say in 2002, your role changed?

21 A  No, I just started spending more time with some

22 of the bundlers.  I got to know them, I got to see

23 some of the interaction between Rod and them, and

24 Chris Kelly and them, and my role increased in that

25 area.

1  Q   Okay.  So it's a fact, isn't it, sir, that in

2  2001 Robert Blagojevich was not in Illinois taking

3  part in any political group action for his brother?

4  A   No.

:21PM  5  Q   Is that correct?

6  A   Yes.

7  Q   2002, he wasn't here, was he?

8  A   He wasn't.  He did -- I think he hosted a

9  fundraiser at some point in late -- I think in the

:22PM  10  primary at some point with his -- I think the bank

11  he was working with.

12  Q   Okay, other than that, you didn't see him here,

13  right?

14  A   No.  No.

:22PM  15  Q   2003, you didn't see Robert Blagojevich here, did

16  you?

17  A   No.  Other than socially, no.

18  Q   Nothing to do with the campaign or his brother's

19  role as Governor of the State of Illinois?

:22PM  20  A   No.

21  Q   He had no part in that, correct?

22  A   Correct.

23  Q   2004, you didn't see him, did you?  Politically,

24  is what I mean.

:22PM  25  A   Correct.

1  Q   Okay.  2005, he wasn't active with his brother in

2  campaign or politics, correct?

3  A   Correct.

4  Q   Same thing in 2006, is that right?

5  A   He played a small role in the campaign in 2006.

6  Q   Okay.  2006 he had some -- that was an election

7  year?

8  A   Yes.

9  Q   Yeah, for the Governor, where Rod ran for

10 Governor again a second term, right?

11 A   Correct.

12 Q   And what was your role, by the way, in 2006?

13 A   I was a campaign manger.

14 Q   And Robert had a couple of fundraisers in the

15 Serbian community, if you recall?

16 A   I think that's right.

17 Q   He wasn't a paid employee of the campaign fund,

18 Friends of Blagojevich?

19 A   No.

20 Q   Friends of Blagojevich was in existence, isn't

21 that true?

22 A   Yes.

23 Q   In fact, it started prior to the election in

24 2002, is that correct?

25 A   Ah, I -- I think so it was either Friends of

1  Blagojevich or Blagojevich for Governor, one of the
2  two, but they were basically the same thing.
3  Friends of Blagojevich may have been in existence, I
4  can't remember.
:23PM  5  Q   Okay.  Is it fair to say, though, from 2002
6  through the end of 2008 it was in existence, Friends
7  of Blagojevich, or a prior entity, correct?
8  A   Right.
9  Q   All right.  So in 2006 Robert Blagojevich had no
:24PM  10  official role with that, is that correct?
11  A   He wasn't getting paid.  He was asked to do a few
12  things, but he wasn't getting paid for it.
13  Q   And that was in 2006?
14  A   Correct.
:24PM  15  Q   Now, 2007, what was your position?
16  A   I was a lobbyist and consultant.
17  Q   So you were no longer part of the campaign
18  office?
19  A   I would come in occasionally and talk about
:24PM  20  fundraising and attend some other political meetings
21  that were going on.
22  Q   You were a lobbyist in 2007, is that right?
23  A   Yes.
24  Q   Who was the head of Friends of Blagojevich in
:24PM  25  2007?

1  A   I think it might have been Chris Kelly, I'm not
2  positive.
3  Q   Okay.  At some point Chris Kelly got charged with
4  various crimes and someone else took over, is that
5  right?
6  A   He got charged with crimes, I don't know when
7  someone else took over.  I don't know the exact
8  timing.
9  Q   Jeanne Ahren, you know her?
10 A   Yes.
11 Q   She ran Friends of Blagojevich in the end of
12 2007, do you recall that?
13 A   That's probably right.
14 Q   In fact, Jeanne Ahren stayed as the head of
15 Friends of Blagojevich until she was replaced by
16 Robert Blagojevich in August of 2008, is that right?
17 A   I don't know the exact timing of that.  And
18 Jeanne may have been chairman, I don't know whether
19 she was the head of Friends of Blagojevich.
20 Q   Well, okay, chairman.
21 A   Chairman.
22 Q   And that's the position Robert Blagojevich took
23 over, is that right?
24 A   I think so.  I'm not acutely aware of that, but I
25 think so.

1  Q   So to the best of your recollection, did Robert
2  Blagojevich--and I know you weren't part of
3  it--become chairman of Friends of Blagojevich in
4  August 2008?
5  A   Again, I don't know the timing of him becoming
6  chairman.
7  Q   I'm going to show you what's been marked as a
8  Government Exhibit and it's --
9  A   Okay.
10 Q   -- and it's a picture of the Friends of
11 Blagojevich office.
12 A   Okay.
13 Q   I think you testified about it before.
14     And this picture is the conference room, is
15 that correct?
16 A   Yes.
17 Q   Now, you see the telephone by the lower, as I'm
18 facing it, right corner of the screen?
19 A   Yes.
20 Q   Okay.  There's a telephone there and there's some
21 papers, is that correct?
22 A   Yes.
23 Q   And that was Robert Blagojevich's office, wasn't
24 it?
25 A   When I came in the office, typically that's where

1  he was sitting, yeah.

2  Q   Okay.  And I think you went over the other parts

3  of this suite, correct?

4  A   Yes.

5  Q   And we showed Rod Blagojevich's office.  That's

6  all the way at the end, that was "5," correct?

7  A   Correct.

8  Q   Okay.

9      (Brief pause).

10  BY MR. ETTINGER:

11  Q   Number 5, is what we just saw, the conference

12  room?

13  A   Correct.

14  Q   Number 4, is an office?

15  A   Yes.

16  Q   And I believe that's Chrissie Jacobs', Chrissie

17  Jacobs' office?

18  A   That's where she sat.

19  Q   And she is the secretary, right?

20  A   She was the secretary, uh-huh.

21  Q   For a while of Friends of Blagojevich?

22  A   Yes.

23  Q   And we don't have to go back to her, there is

24  pictures in it, she had a desk and computer, right?

25  A   Yes.

:27PM
:27PM
:27PM
:28PM
:28PM

1  Q   And number 3 is another office?

2  A   Correct.

3  Q   Right.  And that had a desk and a chair and a

4  computer, right?

:28PM  5  A   Yes.

6  Q   That's Jeanne Ahren's office, correct?

7  A   That's where she sat, yeah.

8  Q   Number 1 was an empty space, that wasn't an

9  office, correct?

:28PM  10  A   Correct.

11  Q   And number 2 was Rod's office, correct?

12  A   Yes.

13  Q   All right.  If we can we go back to 5.

14     (Brief pause).

:28PM  15  BY MR. ETTINGER:

16  Q   Now, we're back to Robert's office.

17         Does this picture generally show the

18  condition of Robert's office or the conference room

19  throughout 2008?  Is that how it was?

:29PM  20  A   Yeah.

21  Q   And -- and when you'd have some meetings and you

22  sat in the conference room, this is what you're

23  talking about the conference room, right?

24  A   Correct.

:29PM  25  Q   All right.  Also in the conference room is the

Monk - cross by Ettinger                    1387 - A

1  water cooler, right?

2  A  Yes.

3  Q  There's the microwave, right?

4  A  Yes.

:29PM  5  Q  And if you would look up from the edge of

6  Robert's desk, you could see the kitchen sink,

7  couldn't you?

8  A  Yes.

9  Q  Clear view of it?

:29PM  10  A  Yes.

11  Q  Okay.  There's the fridge right next to it,

12  right?

13  A  Yes.

14  Q  Okay.  And once again, through 2008, that hadn't

:29PM  15  changed much, right?

16  A  No.

17  Q  Now, you testified about a meeting on December

18  3rd 2008 in the Friends of Blagojevich office, okay?

19  A  Yes.

:30PM  20  Q  And it started off in the conference room with

21  you and Rod and Robert, correct?

22  A  Correct.

23  Q  Okay.  It then, I think you said, Rod wanted to

24  talk to you in private, correct?

:30PM  25  A  Yes.

1  Q   And he asked you to step into his office, right?

2  A   Yes.

3  Q   You went all the way down the hall past office 4,

4  3, the open space, and went to Rod's office,

:30PM  5  correct?

6  A   Yes.

7  Q   Robert stayed right there, didn't he?

8  A   As far as I know, yeah.

9  Q   He wasn't invited in, was he?

:30PM  10  A   No.

11  Q   Now, when you went in that office, you talked

12  about certain political events, correct?

13  A   Political and fundraising, yeah.

14  Q   Okay.  And Robert wasn't asked to be a party to

:30PM  15  that, correct?

16  A   No.  Correct.

17  Q   Mr. Johnston was discussed in that private

18  meeting, is that correct?

19  A   Yes.

:30PM  20  Q   Okay.  And Rod didn't want Robert to be part of

21  that meeting was your impression, is that true?

22  A   Yes.

23  Q   And also, I think, there's a Bulls game around

24  that time, December 2008?  Or do I have my dates

:31PM  25  wrong?

1      With Motorola, do you remember?

2  A   Right.  I think it was November 13th.

3  Q   Okay.  Good.  November 13th.

4      And the topic of Mr. Johnston came up or was

5  to come up at that game, right?

6  A   Yes.

7  Q   And Robert was not invited to that, was he?

8  A   No.

9  Q   Okay.  And Robert was basically kept out of the

10 political line, correct?

11 A   That was my impression, Rod was keeping him out

12 of that.

13 Q   Okay.  And, in fact, just to stick on Johnston,

14 with Mr. Johnston, the government played a tape and

15 you had said on that tape, and correct me if I'm

16 wrong, and you told Robert that fundraising had

17 nothing to do with -- or any political action had

18 nothing to do with any fundraising with

19 Mr. Johnston?

20     MR. NIEWOEHNER:  Your Honor, I'm going to ask

21 for some foundation.

22     MR. ETTINGER:  Okay, I'll go to the exact

23 call.

24     THE COURT:  Yeah.

25   (Brief pause).

Monk - cross by Ettinger                    1390 - A

BY MR. ETTINGER:

Q   I got it here.  It's tab 58, and if you go to
Page 4 --

        THE COURT:  Mr. Ettinger, is this to fresh
recollection?

        MR. ETTINGER:  Yes, sir.

        THE COURT:  You don't have to open it.

BY THE WITNESS:

A   I'm sorry, what page?

BY MR. ETTINGER:

Q   4, lines 27 to 30.

A   Yes.

Q   That's the time that you told -- one of the times
that you told Robert Blagojevich that there's
absolutely no connection between the two, that is
the contribution from Johnston and a legislative
issue, is that correct?

A   Yes.

Q   And that is your position to Robert, is that
correct?

A   Yes.

Q   Now, Robert Blagojevich never talked to
Mr. Johnston, to your knowledge?

A   To my knowledge, no.

Q   Okay.  He was your client, Mr. Johnston, correct?

1  A   He was my client and I was the one responsible
2  for collecting the donation from him.
3  Q   Okay.  And you were paid by Mr. Johnston,
4  correct?
5  A   Yes.
6  Q   Okay.  And, in fact, the first time with
7  Mr. Johnston, I think you said the Governor asked
8  for a contribution, it was somewhere in the
9  beginning of November, was it not, from
10  Mr. Johnston?
11  A   Yeah, I think -- I think it was earlier than
12  that.
13  Q   October, do you believe?
14  A   Maybe.
15  Q   Okay.
16  A   Maybe just a bit earlier.
17  Q   Now, when Rod asked for a contribution from
18  Mr. Johnston, I think you talked to him personally
19  on the phone, is that right?
20  A   Yes.
21  Q   So if it was in October, the Illinois State
22  legislature had not passed the racing bill, correct?
23  A   Correct.
24  Q   That wasn't until November 24th that it actually
25  went to the Governor's desk, correct?

1 A   Correct.

2 Q   So when Rod asked for the contribution, it was

3 prior to any bill -- the bill hadn't been passed

4 yet, right?

:35PM 5 A   Correct.

6 Q   Now, Mr. Johnston was represented by Mr. Kelly

7 prior to you, correct?

8 A   In terms of fundraising, yes.  He wasn't -- he

9 wasn't paid by the Johnstons, as far as I know.

:35PM 10 Q   Okay.  But he was the representative, is that

11 fair to say?

12 A   Yeah, he was the point of contact from the

13 campaign to the Johntsons.

14 Q   Okay.  And he did fundraising with them?

:35PM 15 A   Yes.

16 Q   Okay.  And you were aware of that, correct?

17 A   Yes.

18 Q   And the Johnstons had interests in certain

19 racetracks in Illinois, is that right?

:35PM 20 A   Yes.

21 Q   And, in fact, from 2002 and maybe through 2007,

22 maybe through 2008, their primary goal was to get

23 slot machines in the racetracks, wasn't it?

24 A   I think that's right, yeah.

:36PM 25 Q   Okay.  And that never happened, did it?

Monk - cross by Ettinger                    1393 - A

1  A   No.
2  Q   They contributed before to Friends of Blagojevich
3  prior to 2008?
4  A   Yes.
5  Q   In fact, they were contributors from 2002 on, is
6  that true?
7  A   I believe that's right, yes.
8  Q   I believe in 2006 or 2005, didn't?
9        THE WITNESS:  They have a fundraiser in
10 Yankee Stadium with George Steinbrenner?
11 A   I remember that trip, they may have been the host
12 of it.  I remember Rod going on that trip, I didn't
13 go.
14 Q   Okay.  Do you remember that they raised about a
15 quarter of a million for Friends of Blagojevich?
16 A   I don't remember the specific amount.  I do
17 remember the event but not the specific amount.
18 Q   So you would agree from 2002 on they were
19 involved, they were contributors?
20 A   Yes.
21 Q   Now, this is Monk Fundraising List 1, we're going
22 to look at Page 2.
23        And the date on this, Mr. Monk, if you agree
24 with me, is September 12, 2008?
25 A   (No response.)

1  Q   I can show you where it is.

2      There you go.  Right?

3  A   Yes.

4  Q   See where Mr. Johnston is up there?

5  A   Yes.

6  Q   And the amount $100,000?

7  A   Yes.

8  Q   And the high and low goal is $100,000?

9  A   Yes.

10 Q   And that's of September 12th, 2008, correct?

11 A   Yes.

12 Q   And that is before Rod Blagojevich called him up

13 and asked for a fundraiser?

14 A   I don't know if that is true or not.

15 Q   Okay.  But at least as of September 12, 2008, he

16 was down on the list?

17 A   Yes.

18 Q   Correct?

19 A   Yes.

20 Q   And this list basically was comprised of prior

21 donors to Friends of Blagojevich?

22 A   Without looking at the list, I don't know that

23 they were all prior donors.  Some of them may have

24 been new names that we got that we were going to

25 pursue.

Monk - cross by Ettinger                    1395 - A

1  Q   Okay.  But basically these lists --

2  A   I would say most of them were priors that gave

3  money in the past.

4  Q   That's fine.

5         Now, you were connected with Friends of

6  Blagojevich and Governor Rod Blagojevich regarding

7  fundraising, is that fair to say?

8  A   Yes.

9  Q   From 2002 on, is that right?

10  A   Yes.

11  Q   And there's certain reporting periods for any

12  political campaign in this state, is that right?

13  A   Yes.

14  Q   And those two dates are June 30th of each year

15  and December 31st, is that right?

16  A   Correct.

17  Q   And you and along with the other fundraisers and

18  Friends of Blagojevich were focused on these dates

19  as deadlines throughout your term from 2002 to the

20  present, to 2008, is that fair to say?

21  A   Yes.

22  Q   And you wanted to get -- the goal was to get

23  sufficient funds in or as much as you can by those

24  dates, is that right?

25  A   Yes.

1  Q   And why was that?

2  A   So that the campaign could show a big number

3  having been raised in the previous 6 -- 6 months and

4  show a big balance in the bank.

5  Q   Okay.  And I think you told us before with the

6  balance in the bank, it makes you -- makes other

7  candidates hesitant to run against you if you have a

8  lot of money?

9  A   That's one of the reasons, yeah.

10 Q   In our system, our elections are privately

11 funded, right?

12 A   Yes.

13 Q   Now, on occasion you'll get someone -- I forget

14 the guy.  Fitzgerald ran for United States Senate in

15 2004.  For United States Senate, he wanted his own

16 campaign.

17 A   Yeah from the state office point of view they

18 were privately funded.  The state didn't help fund

19 campaigns.

20 Q   So if I wanted to run for office and you wanted

21 to run for office, you'd have to go out and raise

22 funds, right?

23 A   Yes.

24 Q   And you'd use those funds to pay for advertising,

25 TV, correct?

:40PM
:40PM
:40PM
:40PM
:41PM

Monk - cross by Ettinger                    1397 - A

1   A   Correct.

2   Q   You got to get your candidate's name out there,

3   right?

4   A   Correct.

:41PM    5   Q   TV, radio, newspapers, correct?

6   A   Correct.

7   Q   That's where it's spent, right?

8   A   A lot of it.

9   Q   Now, when -- you're an attorney, too, aren't you?

:41PM   10   A   I went to law school, I don't think I'm an

11   attorney anymore.

12   Q   Well, 2008, 2007, right?

13   A   I wasn't licensed to practice law.

14   Q   But you were in California?

:41PM   15   A   Well, I was here -- I was in California, that's

16   right.  That's right.

17   Q   Well, I think you told us during your testimony

18   in the last two or three days what a candidate could

19   do with that campaign fund, are you aware of that?

:41PM   20   A   Yes.

21   Q   Okay.  And that's through your position with the

22   Friends of Blagojevich, is that right?

23   A   What was the question?

24   Q   You learned what could be done with campaign

:42PM   25   funds, right?

1  A   Yes.

2  Q   You were the campaign manger, correct?

3  A   Yes.

4  Q   And is it true, it used to be a candidate can

5  take the money in the campaign fund, put it in his

6  bank account and pay income tax on it?

7  A   I heard about that, yeah.

8  Q   It used to be.  Not like that anymore, is it?

9  A   I don't think so.

10  Q   So what you can do with the money now is run a

11  campaign, correct?

12  A   Yes.

13  Q   With few exceptions, but none of which let's you

14  keep the money, the candidate?

15  A   Not personally, no.

16  Q   Now, you told us and you just told us recently,

17  regarding Mr. Johnston, you did not want to link the

18  contribution to any state action, is that right?

19  A   Yeah.  In an ideal world, no.

20  Q   I'm sorry?

21  A   In an ideal world, no.

22  Q   And you didn't -- you did not tie the timing of

23  this contribution from Johnston to the ethics bill

24  either, did you?

25  A   No.

1  Q   In fact, you told Mr. Johnston that you wanted
2  his contribution by the end of the year because of
3  the year-end push, isn't that what you the told him?
4  A   Correct.
5  Q   Now, there's a Patrick Magoon, do you know who he
6  is?
7  A   I know of him, yeah.
8  Q   He's the head of Children's Memorial Hospital,
9  correct?
10 A   I think that's right.
11 Q   Have you ever met him?
12 A   I don't think so, but that doesn't mean I didn't.
13 I have no recollection of it.
14 Q   Okay.  Are you aware in 2002 that he personally
15 contributed $1,000 to the Friends of Blagojevich?
16 A   No.
17 Q   Are you aware in 2003 he personally contributed
18 $1,000 to the Friends of Blagojevich?
19 A   No.
20 Q   Are you aware in 2003, 4 and 5, all the way up to
21 2007, he was a personal donor to Friends of
22 Blagojevich?
23 A   No.
24 Q   You weren't aware of that?
25 A   No.

:43PM
:43PM
:44PM
:44PM
:44PM

1  Q   All right.  You were aware, were you not, that
2  Patrick Magoon had a lobbyist either through
3  Children's Memorial Hospital or personally and it
4  was John Wyma, am I right?

:44PM  5  A   Yes.

6  Q   Okay.  And were you aware that Mr. Magoon also
7  was on the Board of Directors of the Illinois
8  Hospital Association?

9  A   I didn't know that.

:44PM  10  Q   Do you know what the Illinois Hospital
11  Association is?

12  A   In general.

13  Q   A political action group?

14  A   Yeah.

:44PM  15  Q   They contribute to candidates, right?

16  A   Right.

17  Q   To further their interests, correct?

18  A   Yes.

19  Q   Are you aware that presently or in 2009

:45PM  20  Mr. Magoon became president of that organization?

21  A   No, I wasn't aware of that.

22  Q   Now, in 2008, John Wyma represented Children's
23  Memorial Hospital or Patrick Magoon, one of the two,
24  is that right?

:45PM  25  A   I believe so.

1  Q   Okay.  Were you aware that Children's Memorial
2  Hospital is a not-for-profit corporation?
3  A   Yes.
4  Q   Right?
5        And they can't give political contributions,
6  can they?
7  A   No.
8  Q   In fact, the employees or Mr. Magoon could,
9  right?
10  A   I think that's right, yeah.
11  Q   And the Illinois Hospital Association could, is
12  that right?
13  A   Yes.
14  Q   Okay.  And Mr. Patrick Magoon could run a
15  fundraiser, couldn't he?
16  A   I believe so.
17  Q   Okay.  And do you know what -- strike that.
18        At some point you became -- you were asked to
19  talk to Mr. Magoon to have a fundraiser or political
20  contributions by Rod Blagojevich, is that right?
21  A   That was a brief discussion about it, yeah.
22  Q   And do you remember when that was?
23  A   I think it was sometime in late October or early
24  November of 2008.
25  Q   Okay.  And you said -- what did you say to him?

1  A   No, that Robert was in a better position, I

2  didn't know anyone at Children's Memorial Hospital.

3  Q   Okay.  Well, to your knowledge, did Robert know

4  anyone?

5  A   No.

6  Q   So it was decided Robert would call Mr. Magoon,

7  is that right?

8  A   Yeah.

9  Q   And, to your knowledge, did Robert call

10  Mr. Magoon?

11  A   Yes.

12  Q   Okay.

13  A   He said he did.

14  Q   Did he tell you he asked for him to have a

15  fundraiser, correct?

16  A   I don't remember that specifically.

17  Q   Okay.

18  A   He could've.

19  Q   Well, but the point was, no one was asking

20  Children's Memorial Hospital for a donation or a

21  fundraiser, that's right, isn't it?

22  A   Again, I wasn't involved in trying to raise money

23  for them, so I don't know that specifically.

24  Q   But you do know that Patrick Magoon was asked,

25  correct?

1  A   I don't because to my knowledge he wasn't

2  returning his phone calls.

3  Q   Oh, okay.  Well, to your knowledge -- well, let's

4  put it this way, there was a meeting at some point

:47PM    5  in 2008, November, that you testified about

6  regarding Patrick Magoon, correct?

7  A   Yes.

8  Q   And you recall that my client, Robert

9  Blagojevich, was there?

:48PM    10  A   Yes.

11  Q   And Rod Blagojevich was there, is that right?

12  A   Yes.

13  Q   And you were there?

14  A   Yes.

:48PM    15  Q   Just the four of you?

16  A   The three of us.

17  Q   The three of you, right.

18      Did it take place in the conference room that

19  we saw?

:48PM    20  A   Yes.

21  Q   And what's your best recollection of what the

22  date of it was?

23  A   I want to back up because there was a discussion

24  in October 22nd among the three of us at John Wyma

:48PM    25  regarding Children's Memorial Hospital and then

1  there was a subsequent discussion or discussions
2  that I think took place a week or two weeks after
3  have.
4  Q   So sometime in November, the middle of November,
5  is that fair?
6  A   Yeah, early November to mid November, yeah.
7  Q   2008?
8  A   Yes.
9  Q   And the discussion between you, Robert
10 Blagojevich, and Rod Blagojevich took place in the
11 conference room, correct?
12 A   Yes.
13 Q   There were phones working in that conference room
14 at the time?
15 A   Yes.
16 Q   Okay.  And your testimony is that during that
17 meeting, Robert Blagojevich told his brother, Rod
18 Blagojevich, and you that he had called Patrick
19 Magoon and he wouldn't return his calls?
20 A   My recollection is that he called Children's
21 Memorial Hospital and they weren't returning his
22 phone call.
23 Q   Okay.  And I think you told us before that Robert
24 then said I'm not calling anymore, right?
25 A   Yes.

:48PM

:49PM

:49PM

:49PM

:49PM

1  Q   So he's done with Children's Memorial Hospital,
2  according to what he said, right?
3  A   Right.
4  Q   They put him on the pay-no-mind list, right?
5  A   That's what Robert said.  I don't know that they
6  put him on the pay-no-mind list, but he said I'm not
7  going to call him anymore.
8  Q   Okay.
9  A   You know, I'm tired of him not calling me back.
10 Q   Okay.  And Robert's been truthful with you during
11 your relationship with him, hasn't he?
12 A   Yes.
13 Q   Always acted like a gentleman with you, right?
14 A   Yes.
15 Q   Professional, correct?
16 A   Yes.
17 Q   And after when Robert said that, Rod reacted,
18 didn't he?
19 A   Yes.
20 Q   And what you told this jury was -- and was Rod
21 surprised at that time?  Did he act surprised?
22 A   I don't remember so much surprised as angry.
23 Q   Angry.
24     But instant reaction to someone not calling
25 his brother back?

1  A  Right.

2  Q  Correct?

3       Like he heard it for the first time, correct?

4  A  I don't know whether he heard it for the first

5  time or not.

6  Q  Well, would you characterize his reaction of

7  anger from Robert saying, "I called three time and

8  they won't call back," would you characterize that

9  is your opinion of him hearing it for the first

10  time?

11  A  No, I characterize as Rod being angry that

12  they're not returning the phone calls.  I don't know

13  whether Robert had conversation with him prior to

14  that or not.

15  Q  Okay.  But right after Robert said it, Rod

16  reacted, according to your testimony, correct?

17  A  Yes.

18  Q  And your testimony is that Rod called someone

19  from the phone in the conference room at the FOB

20  office?

21  A  Yes.

22  Q  The same one we saw up here.

23       And you don't know who he called?

24  A  I don't know who was on the other end.  I think

25  he was trying to reach Bob Greenlee.

Monk - cross by Ettinger                    1407 - A

1  Q   You don't know who he talked to, do you?

2  A   No.

3  Q   And after the phone call, the three of you were

4  still there, correct?

:51PM  5  A   Yes.

6  Q   Now, you had conversations with the government

7  about your conversations with Rob and Rod throughout

8  the period of your cooperation, right?

9  A   Yes.

:52PM  10 Q   And during that, we'll call it debriefing, and

11 that happened about 35 times, right?  That you met

12 with them?

13 A   38, 35 times.

14 Q   Okay.  And from time to time they'd play tapes,

:52PM  15 is that right?

16 A   Yes.

17 Q   Okay.  Did they ever play you a tape with a

18 conversation that showed the phone call that you

19 just told this jury about?

:52PM  20 A   I don't believe they did.

21 Q   Okay.  Did they ever play you a tape that

22 reflected the conversations that took place in the

23 conference room at Friends of Blagojevich that

24 reflected what you just testified to?

:52PM  25 A   No.

Monk - cross by Ettinger                    1408 - A

1       MR. ETTINGER:  One second, Judge.

2     (Brief pause).

3       MR. ETTINGER:  This is my last line.

4       THE COURT:  Sure.

:53PM   5     (Brief pause).

6  BY MR. ETTINGER:

7  Q   Tab 51, Mr. Monk, if you would look at it to

8  refresh your recollection, please.

9       That is a transcript dated where there's a

:54PM  10  phone call on November 12, 2008, is that right?

11  A   Yes.

12  Q   And on that -- in that phone call you're speaking

13  about your dad, right?

14  A   Yes.

:54PM  15  Q   And you tell Robert that how your -- he asks how

16  your dad is and you said fine, correct?

17  A   Yes.

18  Q   And you told him he had surgery on Monday and you

19  took him back for follow-up, right?

:54PM  20  A   Yes.

21  Q   And you told him about the big black wrap-around

22  glasses he wears to protect his eyes from the sun,

23  right?

24  A   Yes.

:55PM  25  Q   The fact of the matter is, you never went to

1  California then, did you?

2  A  I did, but I wasn't there during that period of

3  time.  I didn't stay extra days.

4  Q  Well, do you remember you had a conversation with

5  the FBI and certain members of the U.S. Attorney's

6  Office on February 4, 2009?

7  A  I don't remember that specific day, but that's an

8  accurate time frame.

9  Q  You remember that you were asked about -- and you

10 were asked certain questions by the FBI agents and

11 the U.S. Attorney's Office about this trip to

12 California?

13 A  Yes.

14 Q  And it's a fact, sir, you told the FBI and an

15 Assistant from the U.S. Attorney's Office on

16 February 4, 2009, that you told Governor Blagojevich

17 and Rob Blagojevich that you were going with your

18 dad for cataract surgery but you did not actually

19 go, your sister went with your father and reported

20 the results to you, you were not in Los Angeles at

21 all during that time?

22 A  Correct.  I was there just before that.

23 Q  I'm sorry?

24 A  I was there just before that, but I was not there

25 for my father's cataract surgery, no.

1   Q   Okay.  For any of it, is that right?

2   A   For my father's cataract surgery, right.

3   Q   Or afterwards?

4   A   Correct.

5   Q   So when you told Robert all this about your

6   father and being with him, it was a lie, is that

7   right?

8   A   Yes.

9   Q   Okay.  And that wasn't the first time you lied to

10  him, correct?

11  A   Correct.

12  Q   And you lied to benefit yourself every time,

13  didn't you?

14  A   Yes.

15          MR. ETTINGER:  That's all, Judge.

16          MR. ADAM, JR.:  May I just have a moment,

17  Your Honor?

18          THE COURT:  What?

19          MR. ADAM, JR.:  May just have a moment?

20          THE COURT:  Sure.

21      (Brief pause).

22          MR. ADAM, JR.:  May I proceed, Your Honor?

23          THE COURT:  You may.

24

25

                          CROSS EXAMINATION

BY ADAM, JR.:

Q   Good afternoon, Mr. Monk.  My name is Sam Adam,
Jr. and I represent Rod, so we have an introduction.

A   Good afternoon.:

Q   Now, Mr. Monk, you gave us three days of
testimony, is that correct, approximately?

A   Yes.

Q   So if there are some things that I ask you that
that may reflect back to other parts of the
testimony, if you don't understand the question I'm
asking, please just say, Mr. Adam, I don't
understand, could you rephrase, is that fair?

A   Yes.

Q   Now, Mr. Monk, you come from California, is that
right?

A   Yes.

Q   Where in California do you come from?

A   Southern California.

Q   And is there a particular town?

A   Palos Verdes.

Q   And Palos Verdes, you grew up there with your
father and your mother in the same household, is
that right?

A   Yes.

Monk - cross by Adam, Jr.                    1412 - A

1  Q   And, in fact, your father was a gynecologist, is
2  that true?
3  A   Correct.
4  Q   In fact, a rather good gynecologist, he actually
5  helped birth many of the stars that are out there,
6  is that fair to say?
7  A   No.
8  Q   Well, how about a couple of tennis players that
9  had babies?
10 A   One that I remember.
11 Q   Who was that?
12 A   Tracy Austin.
13 Q   That was his client, is that correct?
14 A   Yes.
15 Q   Now, in growing --
16 A   His mother was.
17 Q   His mother.  The mother of Tracy was?
18 A   Right.
19 Q   Now, you and your father had a very good
20 relationship, is that fair?
21 A   I think so, yeah.
22 Q   And, in fact, your father is a very -- a big
23 runner.  He runs in marathons, is that true?
24 A   Used to.
25 Q   And in fact -- he's older now, but when you were

1  in say high school, college, and law school he ran a

2  number of marathons?

3  A   That's right.

4  Q   And, in fact, the first time that you and

5  Mr. Blagojevich went to your House, that was when

6  you were in law school, is that right?

7  A   Yes.

8  Q   And Rod went there and met your father, is that

9  correct?

10 A   Yes.

11 Q   And, in fact, throughout law school, he had a

12 relationship with both your mother and your father?

13 Rod that is.

14 A   Yes.

15 Q   And, in fact, they did a lot of running together?

16 A   They ran a few times together.

17 Q   And Rod got to see how your father and you

18 interacted, didn't he?

19 A   Yes.

20 Q   Rod got to see how you we raised, basically,

21 since you were right down there in California, to

22 understand the principles that your father taught

23 you, didn't he?

24 A   Yes.

25 Q   You and Rod had a good relationship at that time,

:59PM

:00PM

:00PM

:00PM

:00PM

Monk - cross by Adam, Jr.                    1414 - A

1  didn't you?

2  A  Yes.

3  Q  Is it fair to say that you went to Pepperdine

4  together and became good solid friends?

:00PM  5  A  We met at Pepperdine and became good solid

6  friends, yes.

7  Q  So much so you lived together, didn't you?

8  A  Yes.

9  Q  So much so he got a chance to talk to you about

:00PM  10 personal things, didn't he?

11 A  Yes.

12 Q  So much so that you guys shared secrets together,

13 didn't you?

14 A  None that I can remember right now, but probably,

:01PM  15 yeah.

16 Q  But, I mean, if he was dating a girl and you were

17 dating a girl, you guys would talk about those type

18 of things back then?

19 A  Yes.  Yes.

:01PM  20 Q  Or if he wanted to date somebody, maybe he'd have

21 you try to get a hold of her for him, was that fair

22 to say?  Things like that?

23 A  Yes, things like that.

24 Q  And vice versa, is that right?

:01PM  25 A  Yes.

Monk - cross by Adam, Jr.                    1415 - A

1  Q  And he got a sense of who you were when you guys
2  were together there in Pepperdine, isn't that right?
3  A  Yes.
4  Q  You were not committing crimes at Pepperdine,
5  were you?
6  A  Other than occasional drug use, yes.
7  Q  Marijuana and things like that?
8  A  Yes.
9  Q  Well, this was in the '80s, right?
10 A  Yes.
11 Q  I mean, marijuana and those types of things, I'm
12 not asking about that.  I mean, you weren't
13 committing frauds, were you?
14 A  No.
15 Q  You were not out there robbing banks, were you?
16 A  No.
17 Q  He got a sense of who you were from the way that
18 you were raised by your father, didn't he?
19 A  Yes.
20 Q  Your father raised you to be honest, didn't he?
21 A  He set a good example.
22 Q  He set a good example, didn't he?
23 A  Yes.
24 Q  As well as your mother, too, didn't she?
25 A  Yes.

:01PM
:01PM
:01PM
:01PM
:02PM

Monk - cross by Adam, Jr.                    1416 - A

1  Q   Your mother set a good example and Rod got to see

2  that, didn't he?

3  A   Yes.

4  Q   And Rod trusted you back then, as far as you

5  knew, didn't he?

6  A   Yes.

7  Q   And you trusted him?

8  A   Yes.

9  Q   Was there anything about the relationship that

10 you and Rod had back in Pepperdine in your formative

11 years that would ever give him pause to think you'd

12 be here and he'd there be?

13 A   No.

14 Q   And, in fact, he told you that when he met you in

15 Colorado and asked you to come on to his

16 congressional staff, didn't he?

17 A   Yeah.

18 Q   That was --

19 A   Something to that effect, yeah.

20 Q   That was 2000, wasn't it?

21 A   December of 2000, yes.

22 Q   And you were there with his family, weren't you?

23 A   Yes.

24 Q   You knew his children?

25 A   His daughters were there, yeah.

Monk - cross by Adam, Jr.                    1417 - A

1   Q   You knew his wife?

2   A   Yes.

3   Q   And of all the people in the world he could call

4   to help him, he called you, didn't he?

5   A   Yeah.

6   Q   And he brought you in to Colorado and said, Lon,

7   I'm thinking about running for Governor, there's

8   nobody I trust more than you, didn't he?

9   A   I don't know if that was the point of the trip.

10  Q   Well, tell us --

11  A   Yeah, we decided we wanted to go on vacation

12  together, we had done that before, once before, and

13  the subject came up, he told me for the first time

14  that he was thinking about running for Governor.

15  Q   And he wanted you to be there?

16  A   Yeah.

17  Q   Because he trusted you?

18  A   Yes.

19  Q   Now, you had no experience whatsoever in Illinois

20  politics, did you?

21  A   That's right.

22  Q   You had no experience with Springfield, did you?

23  A   No.

24  Q   When you became Chief of Staff, you learned about

25  Springfield, didn't you?

1  A   Yes.

2  Q   They're sharks, aren't they?

3  A   I don't know that I would use that term, but --

4  Q   Well, everybody -- strike that.

5       There are a number of people that are out for

6  themselves down there, aren't there?

7  A   Yes.

8  Q   They want that money, don't they?

9  A   Me personally?

10  Q   Well, I mean -- well, let's talk about --

11  A   For constituents.

12  Q   For constituents, is that fair to say?

13  A   Yeah.

14  Q   And not only that, you have lobbyists who work in

15  Springfield, don't you?

16  A   Yes.

17  Q   In fact, you became one?

18  A   Yes.

19  Q   What's the purpose of a lobbyist?

20  A   To advocate on your client's behalf whatever

21  their interest may be in state politics.

22  Q   Well, and most of time people hire a lobbyist so

23  they can get state business, would that be fair?

24  A   Yes.

25  Q   They're not down there because they happen to

Monk - cross by Adam, Jr.                    1419 - A

1  like a particular hair style, are they?  Right?
2  A  No, some of the clients wanted to do business
3  with the state.
4  Q  They want something from that particular
5  politician, correct?
6  A  Yes.
7  Q  Now, in becoming the Chief of Staff, prior to
8  that you were the campaign manger for the FOB,
9  correct?
10  A  Yes.
11  Q  And as the campaign manger for the FOB, you
12  learned a number of the rules and regulations
13  regarding how to raise funds and what you can and
14  cannot do, didn't you?
15  A  Yeah.
16  Q  And, in fact, you were a lawyer at the time when
17  you first came on as the campaign manger, isn't that
18  correct?
19  A  I wasn't licensed to practice law but --
20  Q  Well, you were in California?
21  A  I was but I still -- my license had expired, but
22  I was in California.
23  Q  But you went to law school?
24  A  Yes.
25  Q  You understand the idea of, as we all hated in

:05PM
:05PM
:05PM
:05PM
:05PM

1 law school, research and writing, things like that,

2 correct?

3 A   Yes.

4 Q   And you knew how to research, is that fair to

5 say?

6 A   Yes.

7 Q   And you were interested in doing the best job you

8 could, weren't you?

9 A   Yeah.  If you're suggesting I researched the

10 rules and regulations of fundraising, I didn't do

11 that.

12 Q   Well, then, tell us how you learned them?

13 A   From Rod and from Chris and from other people who

14 had fundraised before.

15 Q   And, in fact, you had known at the time you came

16 on as campaign manger for the Governor, you knew

17 that Rod had been in Congress, didn't you?

18 A   Yes.

19 Q   And you knew that Rod learned the ins and outs of

20 campaign fundraising in Congress, didn't you?

21 A   Yeah.

22 Q   And, in fact, you and Rod had numbers of

23 conversations about his understanding of what you

24 can and cannot do, didn't you?

25 A   Yeah.

Monk - cross by Adam, Jr.                1421 - A

1  Q   And, in fact, Rod told you that his
2  understanding--and this is back in 2000, 2001--his
3  understanding of what you can, can do with campaign
4  contributions is accept them.  You can accept
5  campaign contributions, can't you?
6  A   Yes.
7  Q   And as the Governor, not only did he tell you he
8  could accept campaign contributions, he also told
9  you there was no problem with that contributor
10  having state business, didn't he?
11        MR. NIEWOEHNER:  Objection; hearsay.
12        THE COURT:  The objection is sustained.
13  BY MR. ADAM, JR.:
14  Q   Well, was it your understanding that there is not
15  a problem in state politics where a person who gives
16  a campaign contribution also having state business?
17  A   That's correct.
18  Q   It was your understanding in 2008 that it is not
19  a crime for a politician to accept a campaign
20  contribution from someone doing state action unless
21  there's a quid pro quo, isn't that right, Mr. Monk?
22        MR. NIEWOEHNER:  Objection; legal conclusion.
23        THE COURT:  It is a legal conclusion and I
24  will instruct the jury on the law with respect to
25  that.

1          MR. ADAM, JR.:  Yes, your Honor.

2    BY MR. ADAM, JR.:

3    Q   What is a quid pro quo in your understanding as

4    you did these things with Johnston?

5    A   That you're exchanging a campaign contribution

6    for taking specific state action.

7    Q   It has to be, in your understanding, as related

8    to the Johnstons, it had to be one, the campaign

9    contribution in exchange for the state action, isn't

10   that what your understanding was related to

11   Johnston?

12         MR. NIEWOEHNER:  Objection; relevance; legal

13   conclusion.

14         THE COURT:  You know, whatever this man says

15   is not going to be the measure of the law.  And he,

16   actually, sort of answered the question you could've

17   asked already, so I'm sustaining the objection as

18   asked and answered.

19         MR. ADAM, JR.:  Yes, your Honor.

20   BY MR. ADAM, JR.:

21   Q   Well, you have told us, Mr. Monk, that you went

22   to Mr. Johnston in 2008 and said to Mr. Johnston we

23   are having two separate conversations, one about

24   fundraising and one about the Racetrack Bill, didn't

25   you?

1  A   Yes.

2  Q   Now, you used the term "separate conversations,"

3  didn't you?

4  A   Yes.

5  Q   Explain to the ladies and gentlemen of the jury

6  why it was important to you that it be in two

7  separate conversations.

8  A   I was trying to somehow justify in my mind and

9  make myself feel better of the conversation that I

10  was about to have with him regarding fundraising and

11  the signing of the bill.

12  Q   And when you say make yourself feel better, what

13  you mean by that is, your underwriting of the law

14  was, as long as it's not the state action in

15  exchange for the contribution, you were fine?

16          MR. NIEWOEHNER:  Objection; asked and

17  answered.

18          THE COURT:  He did.  It's the second time

19  around.

20          MR. ADAM, JR.:  Yes, your Honor.

21  BY MR. ADAM, JR.:

22  Q   When -- you have told us, Mr. Monk, that you had

23  conversations with Mr. Blagojevich regarding what

24  you should and should not say to Mr. Johnston, is

25  that correct?

:09PM

:09PM

:09PM

:09PM

:10PM

1  A   Yes.

2  Q   And during those conversations, you and

3  Mr. Blagojevich, Rod that is, discussed what you

4  should and should not say, isn't that correct?

:10PM   5  A   Yes.

6  Q   And one of the things that you said to

7  Mr. Blagojevich was, in those conversations, I'm

8  going to keep it two separate conversations with

9  Mr. Johnston, didn't you?

:10PM   10  A   I don't know if I used that specific wording.  I

11  said I didn't -- I wanted to go there and not cross

12  the line.

13  Q   When you say not cross the line, tell us what you

14  meant?

:10PM   15  A   That I wanted to try and see if I could somehow

16  have this conversation with the Johnstons where I

17  wasn't linking the state action and the

18  contribution.

19  Q   Well, when you say "link," that's not exchange

:11PM   20  one for the other, is it?

21  A   Yeah, it kinda is.

22  Q   When you say it kinda is, when did Mr. Johnston

23  tell you that he was going to make a contribution

24  for the first time?

:11PM   25  A   When did he tell me?

1          When he told me -- best of my recollection is
2    in November, early November.
3    Q   Were you his lobbyist in September?
4    A   Yes.
5    Q   And in September, as the counsel here showed you,
6    he had already been put down on the list for
7    100,000, isn't that correct?
8    A   Yes.
9    Q   And, in fact, as you being a lobbyist paid for by
10   Mr. Johnston, you certainly knew that he made a had
11   made a commitment in September, didn't you?
12   A   Yeah, I think he had made that commitment to Rod.
13   Q   And, in fact, you were present when Rod was on
14   the phone, weren't you?
15   A   Yes.
16   Q   You heard that conversation?  Or strike that.
17          You heard Rod's part of that conversation?
18   A   Correct.
19   Q   And when you heard Rod's part of that
20   conversation, did you ever hear Rod mention the
21   Racetrack Bill in that conversation?
22   A   Not that I remember, no.
23   Q   Did you ever hear him say:  You give me a hundred
24   grand, and I'm going to sign the bill?
25   A   No.

:11PM
:12PM
:12PM
:12PM
:12PM

1 Q   Did you ever hear, ever from September of '08 to

2 December 9th of '08, Rod ever tell you one time he

3 wasn't signing the Racetrack Bill?

4 A   No.

:12PM 5 Q   And, in fact, it was your understanding

6 throughout all of this, no matter what, at some

7 point Rod was going to sign the bill, didn't you?

8 A   That's what I believed, yeah.

9 Q   And, in fact, when Johnston -- strike that.

:13PM 10      You had to come to Rod on a number of

11 occasions or at least talk to him on the phone in

12 which you told him that the Johnstons are supposed

13 to be giving you money, is that correct?

14 A   Yes.

:13PM 15 Q   How many times would you say you told him that?

16 A   Three or four.

17 Q   And on the first time he told you that, did Rod

18 ever say to you, he better give me that money or I'm

19 signing the bill?

:13PM 20 A   No.

21 Q   On the second time you told him that, did Rod

22 even intimidate to you, he better give me that money

23 or I'm not signing the bill?

24 A   No.

:13PM 25 Q   Did he ever tell you on the third time, he better

Monk - cross by Adam, Jr.                    1427 - A

1  give me that money or I'm not signing the bill?

2  A   No.

3  Q   Did he ever tell you on the fourth time, he

4  better give me that money in exchange for me signing

5  the bill?

6  A   No.

7  Q   Now, you're his best friend, aren't you?

8  A   Yeah.  Good friend.

9  Q   Good friend.

10      You talked to him -- strike that.

11      They played for you here a number of

12  conversations between the two of you on the phone,

13  isn't that right?

14  A   Yes.

15  Q   And you talked to him just about every day,

16  correct?

17  A   During that period of time not quite.  We weren't

18  communicating as much but --

19  Q   But --

20  A   Three or four times a week, four or five times a

21  week, yeah.

22  Q   And, in fact, Mr. Monk, you stood up, you sat

23  there last week and earlier today and talked about

24  the fact that you were in a criminal conspiracy

25  throughout 2003 and 2004 with Mr. Blagojevich, do

Monk - cross by Adam, Jr.                    1428 - A

1  you recall that?

2  A   Yeah.  Regarding our meetings, yeah.

3  Q   That you had no problem between you and him

4  conspiring to steal from the State of Illinois, do

5  you remember that?

6  A   Yes.

7  Q   That you guys had meetings in which you discussed

8  exchanging state action for your personal benefit,

9  remember that?

10 A   Yes.

11 Q   And again in 2008, that's the same guy that

12 you're having these conversations with about

13 Mr. Johnston, right?

14 A   Yes.

15 Q   And at no point did he ever say to you:  Look,

16 Lon, I just want my money, that's when I'll sign the

17 bill?  At no point did he ever say that to you?

18 A   He never said that.

19 Q   At no point did he ever say:  Look, man, we've

20 done this before, baby, we've done this before, this

21 is just another example how we're going to get some

22 money to line the campaign fund here, just tell them

23 I'll sign it when they give it?

24 A   No.

25 Q   In fact, is it fair to say that a number of calls

1 they played for us today, you guys are figuring out

2 a way to make Johnston not feel extorted, isn't that

3 right?

4 A  Yeah.

:16PM    5 Q  For one thing, this is an extortion case.  You

6 know because you read the indictment.  You know he's

7 charged with extortion, don't you?

8 A  Yes.

9 Q  Are you telling the ladies and gentlemen of the

:16PM   10 jury that he's spent his time with you in 2008

11 extorting Mr. Johnston by telling him he's not

12 getting extorted?  Is that what you're telling us to

13 believe?

14          MR. NIEWOEHNER:  Objection to the conclusion.

:16PM   15          THE COURT:  The objection is sustained.

16          MR. ADAM, JR.:  May I have a moment?  I'm

17 sorry.

18          THE COURT:  Sure.

19      (Brief pause).

:16PM   20 BY MR. ADAM, JR.:

21 Q  During this time in which you say you and the

22 Governor--and this is what you said--you and the

23 Governor were trying to figure out a way to make the

24 Johnstons not feel extorted, did you know a person

:17PM   25 by the name of Bill Quinlan?

1  A   Yes.

2  Q   Who is Bill Quinlan?

3  A   He was the general counsel for the Governor's

4  Office.

:17PM  5  Q   And when you say general counsel, can you tell us

6  what that job entails?

7  A   He's like the lead lawyer in the Governor's

8  Office in a variety of matters.

9  Q   And so if the Governor had a legal question,

:17PM  10  that's the person you should talk to is Bill

11  Quinlan?

12  A   Regarding state matters.

13  Q   With regard to state matters, correct?

14  A   Yeah.

:17PM  15  Q   Also, well, you spent a lot of time with Bill

16  Quinlan, didn't you?

17  A   Yeah.

18  Q   In fact, in one of the phone calls showed you

19  were down in Springfield with him, isn't that right?

:17PM  20  A   Yes.

21  Q   In fact, you came back sick, isn't that right?

22  A   Yes.

23  Q   You even told him you were sick, didn't you?

24  Remember that phone call?

:17PM  25  A   Right.

1  Q   Right.

2      Now, Bill Quinlan and you had a number of

3  discussions regarding the Johnston deal, didn't you?

4  A   I'm sure I did, I just can't remember specific

5  discussions about the Racetrack Bill and Bill

6  Quinlan, but I'm sure I did.

7  Q   And in fact, to your knowledge, Bill Quinlan

8  understood that the Johnstons had given money

9  before, isn't that right?

10      MR. NIEWOEHNER:  Objection; relevance.

11      THE COURT:  The objection is sustained.

12 BY MR. ADAM, JR.:

13 Q   Well, did you and Bill Quinlan discuss whether or

14 not the Johnstons could give money in 2008?

15      MR. NIEWOEHNER:  Objection; relevance.

16      THE COURT:  Still sustained.

17 BY MR. ADAM, JR.:

18 Q   Did you have any discussions with Bill Quinlan,

19 yourself, and the Governor regarding Johnston's

20 contribution?

21 A   Not that I remember.  I don't remember discussing

22 fundraising with the Johnstons with Bill.

23      MR. ADAM, JR.:  May I have one moment?

24      THE COURT:  Sure.

25    (Brief pause).

:18PM

:18PM

:18PM

:18PM

:19PM

Monk - cross by Adam, Jr.                1432 - A

BY MR. ADAM, JR.:

Q   You have told us that on a number of occasions in 2008 you lied to Rod about what the Johntsons were telling you, is that correct?

A   Yes.

Q   Now, you were a lobbyist earning $150,000 a year, is that right?

A   Right.

Q   From the Johntsons?

A   Right.

Q   It was your job to be truthful with the Johntsons, wasn't it?

A   Yes.

Q   And you betrayed that trust, is that right?

A   Yeah, I overstated conversations I was having with Rod.

Q   When you say you overstated, you were telling them conversations you never had, didn't you?

A   Yeah.  Yes.

Q   Like the one in which you heard something from Harris and you attributed it to the Governor, isn't that right?

A   That's correct.

Q   And that was the people that have hired you and paid you $12,500 a month, correct?

Monk - cross by Adam, Jr.                    1433 - A

1  A   Correct.

2  Q   And you were to give them the best you could,

3  weren't you?

4  A   I was supposed to, yes.

:20PM  5  Q   Not only at that time, at that time, not only are

6  you a friend and former employee of the Governor,

7  but you're acting on his campaign fund trying to get

8  funds at the same time, is that right?

9  A   Yes.

:20PM  10  Q   And you understand that the Governor of the State

11  of Illinois has to make decisions that affect

12  everyone in the community in Illinois, don't you?

13  A   Yes.

14  Q   You understand how important that is, correct?

:21PM  15  A   Yes.

16  Q   You understand that when it comes to certain

17  things, the Governor was relying upon you in 2008 to

18  give him accurate information so that he could make

19  decisions that affects everyone in Illinois, isn't

:21PM  20  that right?

21  A   No, he and I were talking about fundraising.

22  Q   But you were also talking about the signing of

23  the Recapture Bill, correct?

24  A   Correct.

:21PM  25  Q   And that affected a number of people in that

1  industry, didn't it?

2  A  Yes.

3  Q  You have told us that even your clients were

4  supposed to be getting, not earning, but getting

5  $9,000 a day, is that correct?

6  A  Yes.

7  Q  And when I say not earning, tell us what the

8  Johntsons did to earn $9,000 a day?

9  A  Nothing that I can think of.

10 Q  And, in fact, that's $9,000 a day they are taking

11 away from casinos that actually earn the money,

12 isn't that right, Mr. Monk?

13      MR. NIEWOEHNER:  Objection; relevance.

14      THE COURT:  The objection is sustained.

15 BY MR. ADAM, JR.:

16 Q  Well, is it fair to say that on direct

17 examination you said they were losing $9,000 a day,

18 is that right?

19 A  They weren't getting $9,000 a day that they

20 otherwise would have gotten if the law was in

21 effect, yes.

22 Q  If the law were passed, isn't that right?

23 A  If the law were in effect; signed.

24 Q  It's got to -- in order to be in effect, it has

25 to be signed, doesn't it?

 1  A   Correct.

 2  Q   And as you know from your years in state

 3  government, how long does the Governor have to sign

 4  a bill?

:22PM    5  A   I'm not positive.  I think it's 90 days.

 6  Q   If I told you --

 7  A   I don't know.

 8  Q   If I told you the constitution of Illinois said

 9  60 days, would that be approximately right?

:22PM   10  A   Yeah.

11  Q   60 days, is that right?

12  A   Yeah.

13  Q   And even if he doesn't sign that bill after

14  60 days, it still becomes law, isn't that right?

:23PM   15  A   Yes.

16  Q   So the only way in which the Johntsons -- strike

17  that.

18       The only way th Racetrack Bill would not take

19  effect would only be if he actually vetoed the bill?

:23PM   20  A   Right.

21  Q   At any time on any conversation that you had with

22  the Governor, did he ever tell you he was going to

23  veto the bill?

24  A   No.

:23PM   25  Q   In fact, did you ever have a discussion with him

Monk - cross by Adam, Jr.                 1436 - A

1  in which he used the term "veto" and the Recapture
2  Bill?
3  A   No.
4  Q   From day one through day whatever he told you he
5  is going to sign it, right?
6  A   Yeah, he said don't worry about it.
7  Q   And you had a problem with the timing of the
8  contribution and the signing, didn't you?
9  A   I thought it could be a problem, yeah.
10 Q   And, in fact, you saw that prior to the actual
11 November 20th when the legislature passed it, didn't
12 you?
13 A   Yeah.
14 Q   You saw that as a possible problem that was
15 coming up as far as perception was concerned,
16 correct?
17 A   Yeah.
18 Q   At no time prior to November 20th did Rod
19 Blagojevich ever express to you the signing of the
20 bill would be in exchange for the contributions,
21 correct?
22 A   No.
23 Q   And you felt so strongly about this perception,
24 that there might be seen as one for the other, that
25 you raised it with the Governor at a basketball

:23PM
:23PM
:24PM
:24PM
:24PM

1  game, correct?

2  A  Yeah.

3  Q  You came to him and said, there very well may be

4  a timing issue here between when you get the

5  contribution and the signing of the bill, correct?

6  A  Once it passes, yeah.

7  Q  Once it passes, right?

8  A  Right.

9  Q  And you expressed that to him, right?

10 A  Right.

11 Q  And at the same time you're expressing to him

12 that there is a problem between the timing of the

13 contribution and the signing, you're lying to him

14 about the Johntsons saying they're going to come in

15 with the money today, aren't you?

16 A  I don't think so.  I didn't think I told him the

17 money was going to come in that day.

18 Q  When do you say you went to the basketball game?

19 A  I believe it was November 13th.

20 Q  And that's where you tell him -- well, no, strike

21 that.

22      He couldn't sign the bill between the 13th

23 and 20th, right?

24 A  The bill hadn't passed, right.

25 Q  In fact, he couldn't even sign it until the 24th?

:24PM

:24PM

:25PM

:25PM

:25PM

1  A   Correct.

2  Q   Because it had not reached his desk, as we

3  learned?

4  A   Correct.

5  Q   So on the 24th, did you have a conversation with

6  the Governor regarding whether or not the Johntsons

7  were going to bring in money?

8  A   I don't remember.  Can I look at the transcript?

9  Q   I got to find it first.  One second.

10      (Brief pause).

11  BY MR. ADAM, JR.:

12  Q   Right here.

13         On the 24th didn't you have a conversation

14  with the Governor in which you told him that you

15  were talking to the Johntsons and they said:  Don't

16  worry about it, I'll try and get it in Monday, I'll

17  see you Monday, we'll do it Monday, didn't you tell

18  him that?

19  A   If it's the same conversation I think you're

20  talking about, I think I said, "I'll meet with you

21  on Monday and we'll work it out."

22  Q   Correct.  And you explained that to the Governor,

23  didn't you?

24  A   Yes.

25  Q   So at the very same time you express this idea

:25PM

:26PM

:26PM

:27PM

:27PM

1  that there's a timing issue that "you don't,

2  Governor, want to sign the bill and get the money at

3  the same time," you're telling him he's about to get

4  the money, aren't you?

5  A  Again, if you're talking about the call I think

6  you're talking about, I don't think I thought we

7  were going to get the money, but John Johnston was

8  telling me we'll get together on Monday and work

9  out, work it out.  He didn't say I'm going to give

10 you the money on Monday.

11 Q  Please turn to 74.

12       MR. ADAM, JR.:  May I ask, Your Honor, to

13 publish this to the jury?

14       THE COURT:  Not if you're just going to use

15 it to refresh his recollection.

16       Page?

17       MR. ADAM, JR.:  That would be tab 74, Your

18 Honor, Page 1.

19 BY MR. ADAM, JR.:

20 Q  Could you please go to line 18.

21 A  Okay.

22 Q  And would you please read what you say to the

23 Governor from 18 through 24.

24 A  (Reading:)

25       "...  okay, I pressed Johnny again today.  He

1      said I want to do something with Gupta.  I said
2      no, I, I need you to do it separately where
3      we're playing too many games here.  He goes,
4      okay, you and I get together Monday and we'll
5      work it out, I'll get you the money?"
6  Q   That was what I just asked you, wasn't it,
7  Mr. Monk?
8  A   Yes.
9  Q   You said:
10     "... okay, you and I get together Monday and
11      we'll work it out, I'll get you the money."
12         Isn't that what you told the Governor
13  Johnston said?
14  A   Yes.
15  Q   You're expressing to the Governor that he's about
16  to give him the Monday common, Mr. Monk?
17  A   No, I'm expressing with him that I'm going to
18  meet with Johnny on Monday, that eventually I'm
19  going to get the money but we'll work it out on
20  Monday.
21  Q   Well, if you said --
22  A   I didn't think we were going to get the money on
23  Monday.
24  Q   Well, whether you thought you were or not, you
25  didn't tell him that, did you?

1  A   This is what I told him.

2  Q   You know he's relying on you to give him the

3  information about your client, correct?

4  A   Yes.

:29PM   5  Q   He wasn't talking to the Johnstons then, was he?

6  A   Not that I'm aware of.

7  Q   Not that you're aware of.

8       He didn't call the Johntsons and ever express

9  any threats that you know of, did he?

:29PM  10  A   No.

11  Q   You also told him in other conversations:

12  Governor, the Johntsons keep saying I'm good for it,

13  I can have it tomorrow?  Or words to that effect.

14  Or very soon?

:30PM  15  A   (No response.)

16  Q   Correct?

17  A   I'm sorry, can you repeat the question?

18  Q   Bad question.  Bad question.

19       You had a conversation with the Governor on

:30PM  20  December 2nd, didn't you, regarding the Johntsons,

21  correct?

22  A   I don't think I did.

23  Q   You don't believe you did?

24  A   No.

:30PM  25  Q   Well, let me ask you, did you have a conversation

Monk - cross by Adam, Jr.                    1442 - A

1  with the Governor at 8:12 p.m. on your cell phone in
2  which you tell the Governor -- strike that.
3       In which the Governor asks you, "well, how
4  about the Johntsons," this is December 2nd, and you
5  tell him, "you know, the same thing, he says,"
6  meaning Mr. Johnston, "look, I know what I have to
7  do, I'm gonna get it done, I'm just moving, account,
8  I'm moving money," did you tell that to the
9  Governor?
10 A  It sounds like something that I would say related
11 to Rod, I don't know whether I did it on December
12 2nd.
13 Q  Would seeing the transcript of that help you?
14 A  I think so.
15       MR. ADAM, JR.:  May I approach, Your Honor?
16       THE COURT:  Sure.
17 BY MR. ADAM, JR.:
18 Q  And when you're done, just let me know.
19    (Brief pause).
20 BY THE WITNESS:
21 A  I'm done.
22 BY MR. ADAM, JR.:
23 Q  Isn't that a conversation you had?
24 A  This sounds like a conversation that I would have
25 had with him.  I can't swear I had it on

1  December 12th, but that's what that says.
2  Q   If it were played for you, would you recognize
3  your voice?
4  A   Yeah.
5       MR. ADAM, JR.:  Your Honor, I ask to play
6  session 360, if I may, Your Honor?
7       THE COURT:  Yes.
8       MR. NIEWOEHNER:  For who?
9       MR. ADAM, JR.:  For the jury, Your Honor.
10       MR. NIEWOEHNER:  Objection.
11       THE COURT:  What tab are we at?
12       MR. ADAM, JR.:  It's not a tab, Your Honor.
13     (Brief pause).
14       THE COURT:  Yeah, you can play this.  Just
15  that part of it.
16       MR. ADAM, JR.:  Yes, your Honor.
17     (Brief pause).
18       MR. NIEWOEHNER:  Your Honor, is this
19  refreshing recollection or is this affirmative
20  evidence?
21       THE COURT:  I think it's affirmative evidence
22  because you have a witness who says "I think that's
23  what I said" and he was asked if he would know if he
24  heard it.  Although those are not the exact words
25  that Mr. Adam used, the witness said this will help

Monk - cross by Adam, Jr.                    1444 - A

1  him remember if precisely he said it.

2        MR. NIEWOEHNER:  If it's for -- well, to the

3  degree it is helping him to remember, wouldn't that

4  be appropriate to play --

:33PM  5        THE COURT:  I believe that given it's

6  shortness, I think it's more efficient to have it

7  played in front of the jury.  Although we could've

8  used another method, I think this is adequate for

9  this purpose.

:34PM  10       (Tape played).

11  BY MR. ADAM, JR.:

12  Q   Did you recognize the two voices on there?

13  A   Yes.

14  Q   Was that you?

:34PM  15  A   Yes.

16  Q   Was that Rod?

17  A   Yes.

18  Q   And, again, you're telling him the Johntsons are

19  coming in with the payment, aren't you?

:34PM  20  A   They're good for the money, yeah.

21  Q   And at the same time you're telling him that,

22  you're also expressing to him that taking the money

23  at the same time of signing it is a problem, aren't

24  you?

:34PM  25  A   Not in that phone call.

1  Q   I'm not asking about that phone call --

2  A   I'm sorry.

3  Q   -- but the same period of time.

4  A   It could be a problem, yeah.

5  Q   And so he -- strike that.

6        You know, as a politician, the thing to do is

7  hold off until you're sure of what's gonna happen,

8  that's how you handle it the right way, hold off on

9  everything until it's handled appropriately,

10 correct?

11        MR. SCHAR:  Objection.

12        THE COURT:  Sustained.

13 BY MR. ADAM, JR.:

14 Q   Well, you have told the ladies and gentlemen of

15 the jury that the reason you say now that the

16 Governor was holding off was because he didn't get

17 his contribution, correct?  That's what you say now?

18 A   Yes.

19 Q   At the time did you say to him:  Gov, I've known

20 you a long time, are you holding off on this because

21 you're not getting your contribution?

22 A   No.

23 Q   You're his pal, his buddy?

24 A   Right.

25 Q   And you never took it upon yourself to say:

1  Look, this is just the two of us here, tell me
2  really why you're not doing this?
3  A  I didn't think I needed to.
4  Q  And, in fact, what you say you needed to do was
5  go into a secret room with him in the FOB office and
6  work out just how you're going to tell the Johntsons
7  it's not an extortion, correct?
8        MR. NIEWOEHNER:  Objection.
9        THE COURT:  The objection is sustained.
10 BY MR. ADAM, JR.:
11 Q  Rod explained to you that it wasn't about him not
12 getting the contribution but that for him it was a
13 timing issue, didn't he?
14 A  Yeah.
15 Q  At the time in which you're having these
16 discussions--I'll come right back to it--at the time
17 you are having these discussions, say November 1st
18 through December 9th, you had no reason to believe
19 the phones were tabbed, did you?
20 A  No.
21 Q  You had no reason to believe that the FOB office
22 was tabbed, did you?
23 A  No.
24 Q  You had no reason to believe that what you and
25 your darn near best friend was saying to one another

1 was being recorded, did you?

2 A   No.

3 Q   There was nothing prevented you, as far as you

4 knew, from talking to him and him talking to you in

5 an open, truthful manner, was there?

6 A   No.

7 Q   And Rod told you on -- Rod told you on the 25th,

8 the day after that bill hits his desk, the 25th of

9 November, Rod told you that it was about a timing

10 issue, didn't he?

11 A   Yeah.

12 Q   And by "timing issue" meant he saw the potential

13 problem you saw, that if I take this money at the

14 same time I sign it, my critics are going to say it

15 was one for the other, didn't he?

16        MR. NIEWOEHNER:  Objection.

17        THE COURT:  The objection is sustained.

18 BY MR. ADAM, JR.:

19 Q   What did you understand him to mean when he says

20 "timing issue"?

21 A   That he was concerned about the signing of the

22 bill and the Johntsons getting worried about giving

23 him a contribution after he signed the bill.

24        MR. ADAM, JR.:  Your Honor, I think this is a

25 good place to stop.

Monk - cross by Adam, Jr.                1448 - A

1    THE COURT:  How much longer do you have to go
2  actually for the whole thing?
3    MR. ADAM, JR.:  Probably tomorrow.
4    THE COURT:  Sure.
5    9:30 tomorrow morning.
6    THE MARSHAL:  All rise.
7    (The following proceedings were had out of the
8    presence of the jury in open court:)
9    THE COURT:  Counsel, just in case you manage
10 to do this in less than an entire day, what would be
11 next for you?
12    MS. HAMILTON:  Our next witness is David
13 Abel, and then Vinnie Mazarro, they're both short
14 witnesses regarding the pension obligation bonds.
15    THE COURT:  Okay.  And then after that?
16    MR. NIEWOEHNER:  Joseph Aramanda.
17    THE COURT:  Okay.
18    Anything else anybody wants to raise?
19    MR. NIEWOEHNER:  Your Honor, yes, just on the
20 possibility that there's going to be more segments
21 played by defense on cross with Mr. Monk, they gave
22 us on Saturday some transcripts that they suggested
23 they would intend to use and our view is that a
24 number of those transcripts are problematic because
25 they mislabel speakers, they do not identify

:38PM

:40PM

:40PM

:40PM

:40PM

```
                         Monk - cross by Adam, Jr.              1449 - A
```

1   correctly the exact words that are spoken and so we
2   would object, and we have a number of other
3   objections depending on how they're used.
4           So I wanted to raise that issue now because
5   we may have a 403 objection to certain transcripts
6   being shown to the witness because they are flat out
7   inaccurate.  In addition, we're likely to have
8   hearsay objections, relevancy objections based on
9   the sections that were provided to us.  So I guess
10  we're flagging the issue for Your Honor.
11          THE COURT:  Have you flagged the issue to
12  your opponent?
13          MR. NIEWOEHNER:  I didn't know how quite they
14  were going to use it.  We could certainly talk after
15  court today and get a better fix on what they are
16  planning to do.
17          THE COURT:  What you ought to do is speak
18  with each other and see what is controversial and
19  what isn't and then maybe some discovery can be
20  presented to me before you get started on it.
21          Basically the line that's being walked here
22  by the defense it's not, I think, what would be
23  their free choice to walk this line but the law
24  requires them to walk it is, they can impeach the
25  witness in some respects, although that's an iffy

Monk - cross by Adam, Jr.          1450 - A

1  proposition because if you are using what's on the
2  recording because it's probably what the witness
3  identified as the speech in the first place, so
4  there's not going to be any inconsistency, there
5  could be some inconsistency with what he said at the
6  time and what he is saying now, which is essentially
7  the theme already stated which is that he lies,
8  which he's freely admitted.  The one thing they
9  can't do is use a recording to say well, Rod said
10 this and this is what it meant.
11          They might, it's not for certain, they might
12 be able to use it if the defendant takes the witness
13 stand, as was promised to me in opening statement,
14 and he says I said this and this is what I meant;
15 two entirely different things.
16          But I think the defense understands that they
17 cannot put their client's statements in through the
18 medium of this particular witness.  He's going to
19 have to do it himself.  And even he is not going to
20 be taking generally about what he said on certain
21 days and give an entire recitation -- he can give an
22 entire recitation but he can't use the tapes to do
23 it.  And there are even some limitations with
24 respect to 403 because we're going to have this
25 trial go on to the point where it's an unnecessary

:42PM
:43PM
:43PM
:43PM
:44PM

1  burden on everybody, including the defendants for
2  that matter.
3       But, basically, I think that line has been
4  clearly drawn.  I think that, by and large, defense
5  counsel understands that.  If defense counsel on
6  occasion tries to stretch the envelope, which
7  defense counsel do, every now and then they're
8  entitled to try, it's just that so they don't do it
9  too often.  And in some cases, if it's something you
10 really want to take a shot at, why don't you front
11 it with me first.
12      MR. ADAM, JR.:  Yes, your Honor.
13      THE COURT:  And I think maybe we can get
14 along that way, okay?
15      MR. ADAM, JR.:  Yes.
16      MR. NIEWEOHNER:  Just as a general principle,
17 as I understand it, if they're trying to impeach
18 Mr. Monk with something, the section of the call
19 that would impeach him might be pertinent, but
20 anything else in the call that didn't relate to that
21 impeachment should not be introduced.
22      THE COURT:  Right, it shouldn't be
23 introduced.  And, in many cases, we can -- there are
24 only so many times without wasting time that you can
25 impeach a witness, successfully impeach a witness

Monk - cross by Adam, Jr.                    1452 - A

1  who has said repeatedly that he has lied to the
2  defendant and lied to others.
3        You know, you can do a little of it, but
4  after a while it becomes too much of the same thing
5  and I have the right to exclude it under Rule 403.
6  Defense counsel are not there yet.  If they get
7  there, we can deal with that when it comes up.
8        Okay.  Thanks.
9      (Adjournment taken from 4:45 o'clock p.m. to
10      9:40 o'clock a.m. on June 15, 2010.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24        *     *     *     *     *     *     *     *
25

:45PM

:48PM

Monk - cross by Adam, Jr.                1453 - A

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER


        /s/Blanca I. Lara                June 9, 2013