1531

1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3   UNITED STATES OF AMERICA,      )
                                   )  No. 08 CR 888
4          Government,             )
                                   )
5   vs.                            )  Chicago, Illinois
                                   )
6   ROD BLAGOJEVICH,               )  May 5, 2011
                                   )
7          Defendant.              )  9:53 o'clock a.m.

8
                        VOLUME 10
9              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES B. ZAGEL
10                  AND A JURY

11
    For the Government:
12
            THE HONORABLE PATRICK J. FITZGERALD,
13          UNITED STATES ATTORNEY
            BY:  Reid J. Schar
14              Carrie E. Hamilton
                Christopher Niewoehner
15           Assistant United States Attorneys
            219 South Dearborn Street;
16          Suite 500
            Chicago, Illinois 60604
17

18  Court Reporter:

19              Blanca I. Lara, CSR, RPR
              219 South Dearborn Street
20                  Room 2504
              Chicago, Illinois 60604
21                (312) 435-5895

22

23

24

25

1532

1  APPEARANCES   (continued:)

2

3  For Defendant Rod Blagojevich:

4          KAPLAN & SOROSKY
           BY:  Sheldon M. Sorosky
5          158 West Erie
           Chicago, Illinois 60610
6          (312) 640-1776

7
           LAW OFFICE OF Elliott Riebman
8          BY:  Elliott Riebman
           158 East Erie
9          Chicago, Illinois 60610
           (847) 814-2900
10

11
           OFFICES OF AARON B. GOLDSTEIN
12         BY:  Aaron Benjamin Goldstein
           6133 South Ellis
13         Chicago, Illinois 60637
           (773) 752-6950
14

15         OFFICES OF LAUREN FAUST KAESEBERG
           BY:  Lauren Faust Kaeseberg
16         2140 N. Lincoln Park West
           Suite 307
17         Chicago, Illinois 60614
           (773) 517-0622
18

19

20

21

22

23

24

25

1533

1                           INDEX OF EXAMINATION

2    WITNESS                                              PAGE

3     JOHN HARRIS

4     Direct Examination (Resumed) By Ms. Hamilton:.... 1534

5

6

7    EXHIBITS

8     Government's Exhibit Racetrack 5 ................ 1572

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1534

1    THE MARSHAL:  All rise.

2     (The following proceedings were had in the

3      presence of the jury in open court:)

4        THE COURT:  Please be seated.

5        You may resume.

6        MS. HAMILTON:  Thank you, Your Honor.

7   JOHN HARRIS, GOVERNMENT WITNESS, PREVIOUSLY SWORN

8            DIRECT EXAMINATION (resumed)

9   BY MS. HAMILTON:

10  Q   Mr. Harris, when we broke yesterday we were at

11  tab 30 in the binder.  If you could go there,

12  please.  And, specifically, we had left off

13  publishing this call at Page 12, line 26.

14        And just to remind the jury, this call took

15  place on the morning of 2008, is that correct?

16  A   Yes.

17  Q   And where were you when this call took place?

18  A   In my car on the way to Midway Airport.

19  Q   And where were you going that day?

20  A   Flying to Springfield to participate in the fall

21  veto session of the General Assembly.

22  Q   What do you mean when you say the fall veto of

23  the General Assembly?

24  A   As I explained yesterday, each year the General

25  Assembly concludes work sometime in early summer and

1535

1 takes a long summer break and resumes work again in

2 the fall, typically in November, and convenes for

3 approximately two weeks to take up matters of

4 unfinished business, legislation that was vetoed by

5 the governor or mandatorily vetoed by the governor

6 and other issues that come up.  It's a busy two-week

7 period of the General Assembly activity.

8         MS. HAMILTON:  Your Honor, at this time I'd

9 ask permission to continue publishing call session

10 521 where we left off at Page 12, line 27.

11         THE COURT:  Yeah, I've already looked at it,

12 go ahead.

13         MS. HAMILTON:  Thank you.

14     (Tape played)

15 BY MS. HAMILTON:

16 Q  All right.  Mr. Harris, I want to direct your

17 attention to Page 12, please, of the transcript

18 behind tab 30.

19         And starting at line 27 you say:

20     "I mean, for example, you bring down, you bring

21      Valerie in, right?  You talk to her, and you

22      say to her, okay, we've gotten, you know,

23      we've, all we've gotten from Obama is grateful

24      and appreciative, right."

25      And you go on:

1536

1      "But you sit down and talk to Valerie and say
2      listen, you know, I need somebody that's gonna
3      accompany me on trade missions.  I need
4      somebody that's gonna stand with me when we
5      push our agenda downstate ...."
6     and you go on from there.  What is it that
7 occurred just prior to you starting to talk in this
8 particular session?
9 A   The governor had asked whether or not he should
10 consider making Valerie Jarrett the senator without
11 any specific promise of reward or benefit from the
12 Obama administration.  And I was, as some of his
13 other advisers had suggested he consider doing, and
14 I was also urging him and suggesting that there was
15 some value in appointing Valerie Jarrett to the
16 senate seat, that she could become a strong
17 influential ally of his.  The good will that he
18 would engender from the White House having appointed
19 the president's best friend to be the senator from
20 Illinois could help him in his efforts to be a more
21 effective governor, increase his own political
22 standing, and help him deal with some of the
23 negatives that he was facing at that time.
24 Q   And is it fair to say that's what you were
25 attempting to articulate here?

1537

1  A   Yes.

2  Q   And on Page 13, at line 32, the defendant says:

3       "Right, I, I, I agree with everything you're

4        say, but what does that do for you?"

5           What did you understand the defendant to be

6  saying there?

7  A   That while he agreed with the points I was

8  making, that's not what he wanted.  He didn't want

9  to necessarily continue to serve as governor, he

10 didn't want something that didn't satisfy his

11 priorities, his first needs, which were more

12 financial at this time and just getting out of the

13 governorship.

14 Q   On Page 14, starting at line 18, the defendant

15 says:

16      "We gotta, we really have to develop, and I

17       include you in this, but really develop a good

18       plan to develop relationships and all the rest

19       that we can take with us into the private

20       sector, and then figure, somehow figure out a

21       way where, ah, I can use that private sector,

22       you know, position, somehow get in the mix over

23       there.  If ever.  You know what I'm saying?"

24          What did you understand the defendant to be

25 saying?

1538

1  A   I understood him to be returning the discussion
2  to where he wanted it to be, and that was on things
3  that he could get for himself in the private sector,
4  a job, a job preferably that would position him to
5  go to Washington or otherwise remain politically
6  viable.
7  Q   And, again, be able to get this position how?
8  A   As part of a deal for the senate seat
9  appointment.
10 Q   I want to move forward to Page 17, starting at
11 bottom at line 30, the defendant says:
12     "Right.  But you understand, it's very important
13        for me to make a lot of money.  I need the
14        independence, I need the freedom.  You know
15        among the things that we've dealt with that
16        I've learned, that I knew anyway, but I really
17        know and experienced the feel is, that the
18        vulnerability of my family is under because of
19        my public responsibilities that I made my
20        children and my wife vulnerable."
21         What did you understand the defendant to be
22 saying there?
23 A   I understood the governor to be expressing to me
24 again his motivation for wanting -- to want to make
25 a lot of money to gain the freedom, the financial

1539

freedom he desired.  And that although I suggested
that he was a good candidate to serve in some sort
of advocacy group or foundation for the causes he
believed in and I thought that that is where he
might logically end up after he leaves the
governorship, he wanted to ensure that he was in a
position in those types of organizations or
somewhere in the private sector that would be
substantial enough and pay enough to satisfy his
needs.

     MS. HAMILTON:  Your Honor, at this time I'd
ask permission to publish the call behind tab 33,
which are sessions 533 and 535.

     THE COURT:  Yes.

     SECOND MS. HAMILTON:  Thank you.

BY MS. HAMILTON:

Q   Mr. Harrison, if you look at the transcript
behind tab 33, this call takes place on November the
12th after the call you just had at 9:35 a.m., is
that right?

A   Yes.

Q   And you are not a participant on the call, is
that right?

A   No, I am not.

    (Tape played).

1540

1  BY MS. HAMILTON:

2  Q   All right.  Mr. Harris, focusing you on November

3  the 12th while you were in Springfield, at some

4  point that morning did you receive a call from

5  someone with respect to the senate seat?

6  A   Yes, I did.

7  Q   Who called you?

8  A   Rahm Emanuel.

9  Q   And, generally, what did Mr. Emanuel convey to

10 you with respect to the senate seat?

11 A   That Valerie Jarrett would be taking an

12 appointment to the White House, that the

13 president-elect has a list of recommended candidates

14 for the governor to consider for the vacant senate

15 seat.

16 Q   Did you relay the substance of that call with

17 Mr. Emanuel to the defendant?

18 A   Yes, I did.

19        MS. HAMILTON:  Your Honor, at this time I'd

20 ask to publish call session 539 which is tab 34.

21    (Brief pause).

22        THE COURT:  Yes.

23    (Tape played)

24 BY MS. HAMILTON:

25 Q   Mr. Harris, focusing on Page 1 of the call behind

1541

1  tab 34, what date and time did this call take place?

2  A   10:26 a.m. November 12th, 2008.

3  Q   Were you in Springfield at the time of this call?

4  A   Yes, I had just arrived.

5  Q   At line 3 on Page 1, the defendant says:

6      "Knapp tells me Valerie Jarrett's out."

7         What did you understand him to be saying

8  there?

9  A   That he had heard from his political consultant,

10  Bill Knapp, that Valerie Jarrett is out of the

11  running for Senate.

12  Q   At line 5 you say:

13      "Yeah, I just got a call from Rahm."

14       And then going to line 7 you say:

15      "Three issues."

16         And do you then go on to describe to the

17  defendant the conversation that you had had with

18  Mr. Emanuel that morning?

19  A   Yes.

20  Q   And what did you relay to the defendant that

21  Mr. Emanuel had said to you?

22  A   That Ms. Jarrett was going to be appointed to a

23  position in the White House and that the president

24  wanted -- president-elect wanted to pass on four

25  names that he found acceptable for the governor's

1542

1    consideration for the vacated senate seat.
2  Q   And at line 20 you say:
3      "Not in any rank order."
4       And then at line 22 you say:
5      "Jesse Jackson, Jr."
6          And then at page 2, line 2, you say:
7      "Jan Schakowsky."
8          And could you just remind the jurors, I
9  think you said yesterday who that is.
10 A   Yes, it was Congressman Jesse Jackson, Jr.,
11 congresswoman Jan Schakowsky also from Illinois
12 representing a district from the lake front in
13 Chicago, Tammy Duckworth who was again our state's
14 director of Veterans Affairs, and Dan Hynes who at
15 the time was the Illinois State Comptroller.
16 Q   You then go on to say:
17     "He doesn't, doesn't want to say who he doesn't
18      like, but take it basically if they're not in
19      the list, he's not high on them."
20         And at line 13 you say:
21     "The unspoken there was Emil."
22         What were you saying there?
23 A   That in the phone call with Rahm, Rahm suggested
24 that they would not -- president-elect would not
25 want to see Emil Jones be appointed to the senate

1543

1 seat.

2 Q   At the bottom of Page 2, starting at line 25, you

3 say:

4       "If we got any questions to call him back and,

5        ah, Rahm's happy to talk to you."

6            Had, in fact, Mr. Emanuel told you that he

7 would be happy to talk to the defendant directly

8 about this?

9 A   Yes, if the governor wanted to talk to him, he

10 would talk to him.

11 Q   And then continuing on at line 27 you say:

12      "And I said to him, so is there anyone else out

13       there authorized to be having discussions with

14       us on this issue."

15           Had you, in fact, asked Mr. Emanuel that?

16 A   Yes.

17 Q   And why did you ask Mr. Emanuel that?

18 A   Because at this time, if you will recall, we were

19 still waiting to hear back officially, if you will,

20 from Tom Balanoff as to what the response was.  I

21 had a sense that we got the response when we got the

22 thankful and appreciative call, but we still had not

23 yet had a meeting with Mr. Balanoff.

24 Q   And you go at line to say:

25      "He said no, just him."

1544

1       And was that, in fact, what Mr. Emanuel said
2  to you?
3  A  Yes.
4  Q  You go on to say:
5     "Contemporary to representations that may have
6     been made by others, he said yes."
7     And going on at the top of Page 3 you say.
8     "So you know what I was getting at with that."
9     And at line 3 the defendant says:
10     "Balanoff."
11       What did you understand the defendant to be
12  saying there?
13  A  That he understood the conversation I had with
14  Mr. Emanuel.
15  Q  At the bottom of page 3, at line 26, the
16  defendant says:
17     "Knapp tells me Rahm was pushing Valerie."
18     You say:
19     "Interesting."
20     And he goes on at line 28:
21    "Because he wants more control of the president,
22     doesn't want somebody close to her to him in
23     there."
24       What did you understand the defendant to be
25  saying to you there?

1 A   I understood the governor to be telling me his

2 analysis or view of the events surrounding the

3 shaping of the White House team, and that Bill

4 Knapp, his advisor, consultant, had told him that

5 Rahm Emanuel was the one behind suggesting Valerie

6 Jarrett for the vacant senate seat.

7 Q   And on Page 4, at line 8, the defendant then

8 says:

9       "who calls him and asks him, what about an issue

10       advocate PAC, issue advocate thing.  Can we got

11       George Soros and these guys to put 10,

12       15 dollars in something?  Who makes that

13       request?  To Rahm."

14          What did you understand the defendant to be

15 saying there?

16 A   I understood him to again be resurrecting the

17 idea of asking the president-elect through Rahm

18 Emanuel to help establish a private 501(c)(4) issue

19 advocacy group or foundation, help fund it, and give

20 the governor control of it for his use at some time.

21 Q   Based on the context of when this comes up in

22 this call, what was your understanding as to why the

23 defendant was considering having the request made to

24 Rahm Emanuel?

25 A   Because Rahm Emanuel was the one that held

1546

1    himself out as the only one authorized to be talking

2    about the senate seat, and that's who we received

3    the call from, and that Rahm Emanuel was then Chief

4    of Staff designate to president-elect Obama.

5    Q   Moving forward to Page 5, starting at line 22,

6    you say:

7         "What was interesting about the list."

8          and you then go on to describe the list, and at

9          line 28 the defendant says:

10        "Right, it's a BS list."

11            What did you understand him to be saying?

12   A   Just that he did not believe that president-elect

13   Obama was really endorsing any of the candidates,

14   but was really merely preparing a political list in

15   case it became apparent that the president-elect had

16   expressed a preference.

17   Q   And then at line 31 the defendant says:

18        "Right.  Why don't you bounce that, why don't

19         you go back and talk to him about the

20         healthcare PAC, I mean the advocacy thing."

21            What did you understand him to be saying there?

22   A   He was directing me to call Rahm Emanuel and

23   raise this suggestion to have Rahm Emanuel help

24   create PAC, the foundation, the advocacy group along

25   the lines that the governor had outlined, thinking

1547

1  that Rahm Emanuel would be motivated to do so if, in
2  fact, Rahm Emanuel was the one that wanted Valerie
3  Jarrett to be the senator, that Rahm Emanuel may be
4  willing to do this.
5  Q   And on Page 6, at line 4, the defendant says:
6      "What do you think."
7       And you say:
8      "I think we should strategize a little bit
9      before we do that."
10      He says "okay" at line 7, and then you say:
11      "A little more."
12      At line 9 the defendant says:
13      "All right, let's think about it."
14      And at line 10 you say:
15      "Okay."
16      "And who might be the best person to bring that
17      message forward."
18          What did you understand the defendant was
19  saying there?
20  A   I understood him to be accepting my suggestion
21  that we not go forward with this call to Rahm
22  Emanuel until we talk about it internally some more,
23  and I thought I had successfully accomplished that
24  delay.
25  Q   At the bottom of Page 6, at line 24, the

1548

1 defendant says:

2     "Emil still wants it, right?"

3         What did you understand him to be asking you

4 there?

5 A   Whether I believed Emil Jones, Senator Emil

6 Jones, still wanted to be appointed to the senate

7 seat.

8 Q   And over on to Page 7, at line 1, the defendant

9 says:

10     "When are you going to have that off-campus

11       conversation?"

12         What did you understand the defendant to be

13 saying there?

14 A   I understood him to be asking me when I was going

15 to have that discussion that the governor had

16 directed me to have with Emil Jones before, a

17 conversation he referred to always as the off-campus

18 conversation, about Emil Jones getting appointed to

19 the vacant senate seat and the governor expecting

20 Emil Jones to give him some or all of his campaign

21 war chest as part of that transaction.

22 Q   At line 3 you say:

23     "I told him I wanted to see him after today's

24       business was done off site."

25         And the defendant says:

1549

1      "Yeah."

2      And then you say:

3      "He said okay."

4      And at line 9 the defendant says:

5      "All right, good.  All right, let's keep, give

6      it some more thought, talk to Emil about that

7      and let me take this call."

8      What did you understand the defendant to be

9  saying to you?

10 A  He was telling me that we would be talking again

11 later in the day for me to continue to think about

12 the idea he had just suggested and the direction he

13 had given me, but also directing me to go ahead and

14 have that conversation with Emil Jones.

15      MS. HAMILTON:  Your Honor, at this time I'd

16 ask permission to publish call session 540 which is

17 behind tab 35.

18      THE COURT:  Yes.

19 MS. HAMILTON:

20 Q  And, Mr. Harris, if you look at the transcript

21 behind tab 35, the date and time of this call is on

22 November 12th at 10:32 a.m., is that right?

23 A  Correct.

24 Q  And is this the session immediately following the

25 one that we just listened to between you and the

1550

1  defendant?

2  A   Right after we hung up, yes.

3  Q   And you were not a participant on this call,

4  right?

:30AM  5  A   No, I am not.

6       (Tape played)

7  MS. HAMILTON:

8  Q   Mr. Harris, just to be clear, the session we

9  listened before behind tab 34, at any point in that

:31AM  10  call with the defendant did he indicate to you he

11  was considering calling Tom Balanoff with respect to

12  his request for a 501(c)(4) in exchange for making

13  Valerie Jarrett the senator?

14  A   No.

:31AM  15  Q   In fact, what was your understanding as to where

16  things stood with respect to the defendant asking

17  for money into a 501(c)(4) in exchange for Valerie

18  Jarrett?

19  A   That we were going to have several more

:31AM  20  conversations on that topic, internally.

21       MS. HAMILTON:  Your Honor, I'd now ask

22  permission to publish call session 558 which is at

23  tab 40.

24       THE COURT:  Yes.

:32AM  25     (Tape played).

1 BY MS. HAMILTON:

2 Q   All right.  Mr. Harris, before I ask you

3 questions about that call, I just want to clarify

4 something about my last question with respect to Tom

5 Balanoff.

6        So it's your understanding that Mr. Balanoff

7 was part of the internal group having discussions

8 about the senate seat or someone outside the

9 internal group?

10 A   Someone outside the internal group.

11 Q   Now focusing on the call behind tab 40, what's

12 the date and time of this call?

13 A   12:36 p.m. on November 12th, 2008.

14 Q   At line 2 the defendant says:

15    "Here's my criterion, you want to hear it now?

16     I told Patti."

17     It goes on at line 5:

18    "These three criterion in this order, our legal

19     situation, our personal situation, my political

20     situation.  This decision like every other one

21     needs to be based on, on that, legal, personal,

22     political, what do you think?

23        What did you understanding the defendant to

24 be saying there?

25 A   I understood him to be articulating for me the

1552

1 criterion he would be following in making his Senate
2 selection decision.
3 Q   And what was that criterion?
4 A   Legal, personal, and political.
5 Q   And as he goes on to describe it, what was your
6 understanding of what he meant by "legal"?
7 A   Someone that could help him deflect or otherwise
8 reduce the problems he was facing with the federal
9 investigation into his campaign and administration.
10 Q   All right.  So at line 14 when you say:
11      "Legal is the hardest to, ah, satisfy.  You
12       know, that would argue most for somebody who's
13       real close to you or somebody who owes it all
14       to you."
15      And at line 19 the defendant says:
16      "Including myself."
17      And you say:
18      "including yourself."
19      And he goes on to say:
20      "I mean, think about that.  I mean, they want
21       me here in Illinois, that's far away Illinois
22       problem from my own life."
23      He goes on to say:
24      "The governor's got that problem with Rezko,
25       boom, but if I'm in the Senate ...."

1   and over Page 2:
2   "... it's not just mine anymore, it's his, too,
3   isn't it, if the Rezko thing got worse?"
4       What did you understand the defendant to be
5   saying there?
6   A   He was talking about the investigation into the
7   activities of his former campaign fundraiser, Tony
8   Rezko, a local businessman who was a chief
9   fundraiser for the governor and also had done some
10  fundraising and also had some involvement at
11  President Barack Obama earlier political career, and
12  the governor was expressing his opinion that if he
13  were a senator himself, if the governor appointed
14  himself to the senate seat, then it would be more
15  likely that the Justice Department would not be as
16  aggressive or follow through on the investigation if
17  he were the senator, somebody that was more closely
18  aligned to Washington than out in Illinois.
19  Q   So on Page 2, at line 6, he continues:
20      "And, and from a legal standpoint on the
21      substance of, you know, did you do something
22      wrong or didn't you do something wrong, it
23      doesn't change that, but in terms of the, the
24      people who are trying to chase all that down
25      and does it shape any dynamics if you're there

1554

1     versus being back here."
2     You say:
3     "Right."
4     He says:
5     "If you're closer to the king or out in the
6     provinces far away."
7     What did you understand him to be saying there?
8  A  Again, I understood him to be expressing to me
9  his belief and opinion that there was a different
10 dynamic and it may affect the behavior of the
11 Justice Department if he appointed himself to the
12 senate seat.
13 Q  So is it fair to say that, based on what the
14 defendant said in this call, that was your
15 understanding of what he was talking about in terms
16 of when he said "our legal situation"?
17 A  Yes.
18 Q  And in terms of "our personal situation," when he
19 says the three criterion are our legal situation,
20 our personal situation, my political situation,
21 based on this call and other conversations you had
22 with the defendant, what was understanding of what
23 he meant when he said "our personal situation"?
24 A  His family's personal financial situation.
25 Q  And the third one on the list, "my political

1  situation," what was your understanding of what he
2  meant by that?
3  A   A position or career path that kept him
4  politically viable.
5  Q   Mr. Harris, at some point on November the 12th,
6  did you have an in-person meeting with Emil Jones?
7  A   Yes.
8  Q   And did you have this meeting based on the
9  directive that you received from the defendant that
10 you've already testified about?
11 A   Among other reasons.
12 Q   Where did the meeting take place?
13 A   Mr. Jones' office in the state capitol.
14 Q   Who was there?
15 A   Myself and Senator Jones.
16 Q   Generally, what did the two of you talk about?
17 A   Matters that were pending during the veto
18 legislative session, boards and commission
19 questions, and just generally the future career
20 plans of Senator Jones.
21 Q   Did you also discuss with him the senate seat?
22 A   Yes.
23 Q   And what did you discuss in that respect?
24 A   That the governor was considering appointing
25 himself, but next on his list was the senator,

:40AM
:40AM
:40AM
:41AM
:41AM

1556

1 Senator Jones.

2 Q   Did you follow the defendant's directive in terms

3 of letting Mr. Jones know that if he wanted the

4 senate seat, the defendant expected some or all of

5 Mr. Jones' campaign war chest?

6 A   No.

7 Q   Later that day, did you have a telephone

8 conversation with the defendant about the meeting

9 you had with Mr. Jones?

10 A   Yes.

11 Q   Were you truthful to the defendant about your

12 meeting with Mr. Jones?

13 A   Not entirely.

14 Q   How were you not entirely truthful?

15 A   I let him to believe that I had talked to Senator

16 Jones about the issues that the governor wanted me

17 to talk to him about when I had not.

18 Q   Why did you lie to him about that?

19 A   Because I knew he would be angry, upset, and

20 either direct me to go back and have that

21 conversation or that he would undertake that

22 conversation himself.

23 Q   And have you heard a recording of the telephone

24 conversation that you had with the defendant with

25 respect to your meeting with Mr. Jones?

:41AM
:41AM
:42AM
:42AM
:42AM

1557

1  A   Yes.

2        MS. HAMILTON:   Your Honor, I'd ask to publish

3  call session 589 which is behind tab 42.

4      (Brief pause).

5        THE COURT:   You may.

6      (Tape played)

7  MS. HAMILTON:

8  Q   Mr. Harris, focusing on Page 1 of the call behind

9  tab 42, what is the date and time of this call?

10  A   5:30 p.m. November 12th, 2008.

11  Q   Still in Springfield at this time?

12  A   Yes.

13  Q   Starting at line 12 you say:

14      "Well, I talked to him about life after the

15      Senate and how, you know, everyone's going to

16      go off to Washington and live happily ever

17      after, and Rod's, you know, stuck here with

18      this unable to get anything done.  Regardless

19      of who the Senate President is and, you know,

20      how, how might Emil, Emil, Emil is helpful.

21      And he says, I says, "you know, because next to

22      him, you're his favorite candidate."  I mean

23      next to yourself."

24      What were you talking about there?

25  A   Generally the conversation I had with Emil Jones.

1  Q  On to Page 2, starting at line 2, you say:
2       "Right, "but, you know, I still think we gotta,
3       we gotta demonstrate to him how, you know,
4       you're, you're, you know, he's not forgotten
5       back here.  You know, so if he picks anyone
6       else, you know, they're not gonna help him."  I
7       says, "they're not even gonna return his call."
8       Right.  I kinda put it to him like that.  I
9       said "you, on the other hand, you know, you'd
10      lobby for him, you'd stand up with him, you'd
11      travel with him, you'd be for him.  You know,
12      and you got all of your friends and allies, and
13      as a senator you'd have new friends and allies
14      and you'd help someone like Rod." "Oh, yeah,
15      absolutely."  I says, "you know, well, what are
16      you gonna do with this big, bucket of money?"
17      And at line 21 the defendant says:
18      "What did he say?"
19      And at line 22 you go on:
20      "I said "and what about this big bucket of
21      money?" You know, I said "you're going to have
22      like minded candidates, right?"  And he said,
23      "yeah, I'm gonna stay politically active."
24      Anyway, I'll tell you more in person on that."
25      What are you saying there?

1559

1 A   I was describing to the governor the nature of
2 the conversation I had with Senate President Jones
3 but not in its entirety and not as accurately as it
4 actually occurred.

:53AM  5 Q   What do you mean by that?
6 A   Well, Senator Jones and I did have discussion
7 about the governor's relationship with Senator
8 Jones, the fact that they had been allies in the
9 past and that if Senator Jones was appointed to the
:54AM  10 senate seat we would hope and expect to continue
11 that strong alliance in the future going forward.

12        When it came to his campaign chest, we didn't
13 talk about it in the context of the senate seat at,
14 but rather president Jones' announced retirement.
:54AM  15 There was an article in the paper we were talking
16 about that announced President Jones' retirement
17 from the Senate.

18        And President Jones was unique among Illinois
19 legislators and state employees in that if you had
:54AM  20 money in your campaign war chest before a certain
21 date--a grandfathering date, if you will, I believe
22 it was 1998, I can't be certain--that those monies
23 could be converted to personal use after paying
24 taxes on it.

:54AM  25        And we talked about President Jones' future,

1560

1    what he planned to do, and he said he wanted to go
2    out and make some money.  I said, well, you have
3    this money that you could convert to personal use.
4    And he said he intended to perhaps convert some of
5    that for personal use but he would use the remainder
6    of it to remain politically active.
7         That was a more accurate description of what
8    the conversation was, not the translation that I
9    gave the governor on the phone.
10   Q   How was the discussion that you had with
11   Mr. Jones different from the directive you had had
12   received from the defendant on that topic?
13   A   I did not tell Senator Jones that the governor
14   expected and was asking for the senator to be
15   prepared to give the governor some or all of his
16   campaign chest in exchange for appointing him to the
17   senate seat; rather, I focused more on the fact that
18   they could be strong allies going forward.
19   Q   Moving forward to page 3, at line 35, the
20   defendant says:
21        "Right, one thing we should say is, look, what
22        if I want to run for the senate, we need him as
23        a stalking horse in there to keep junior and
24        these, you know, keep it from getting ..." and
25        it goes on at line 41:

1561

1    "... two white guys and a black guy, right?
2        What did you understand him to be saying
3  there?
4  A   The governor was responding to my portion of the
5  call that informed him that Senator Jones told me
6  that if he were appointed, he would only serve for
7  the remainder of the term in office, the unexpired
8  term of then president-elect Barack Obama, which was
9  2 years, and that when the seat was up for
10 reelection again, Senator Jones had expressed to me
11 that he was not interested and would not run again
12 for re-election, or in this case first election.
13       I explained to Senator Jones that was
14 problematic, that would make it more difficult for
15 the governor to consider him a favorite to be
16 appointed.
17       The governor was expressing to me there may
18 be some value in that scenario, the value being
19 Senator Jones would occupy the senate seat, give the
20 impression he was going to run for re-election and
21 thus keep other possible contenders away for as long
22 as possible and then the governor himself may
23 announce his intention to run in the last minute for
24 the next term of office of the U.S. senate seat.
25 Q   Moving on on Page 4, at line 4 you say:

1     "So it's good, you know, and then he, you know,
2     about Obama.  I said to him, you know, how, how
3     confident are you that he wants you?  So he
4     kinda looked at me, you know, and I kinda
5     looked at him, so he knew.  And I says, well,
6     and he said, well, I don't think he'll go out
7     of his way to stop it."
8     At line 12 the defendant said:
9     "He did say that, I don't think he'll go out of
10    his way to it stop?"
11    And you said "right" and he says "wow."
12          What did you understand the defendant to be
13    saying there?
14  A   He found that portion of the conversation which I
15    relayed, which was a fairly accurate representation
16    of the discussion I had with Senator Jones, to be
17    quite revealing in that Senate President Jones was
18    somewhat of a political godfather to Senator Barack
19    Obama.  As a young elected official in the Illinois
20    Senate, Senate President Emil Jones helped shape,
21    promote, and nurture the political career of Senator
22    Barack Obama, and publicly Barack Obama and Senator
23    Jones were very close, Senate President Jones held
24    himself out as Barack Obama's political godfather,
25    but he acknowledged to me that he recognized that

1563

1 Barack Obama would not necessarily view President

2 Emil Jones as his first choice or go out of his way

3 to support Senator Jones' appointment to the senate

4 seat, that was just quite revealing.

5 Q   Going on the Page 5, at line 13, the defendant

6 says:

7     "So what's your sense of this?"

8      You say:

9      "I think he really wants it."

10     And at line 16 you go:

11    "And, you know, I think he'd be helpful in a lot

12     of ways.  Obviously, you know, not as helpful

13     as you would be to yourself, but, you know, in

14     terms of any other elected official?  You know,

15     he'd be as helpful as them."

16     And at line 24 the defendant says:

17     "As helpful or more helpful?"

18          What did you understand the defendant to be

19 saying there?

20 A   We were just, I believe, comparing the merits of

21 Senator Jones' appointment as compared to other

22 politicians that may be considered for the senate

23 seat.

24          I just simply expressed my opinion that

25 Senator Jones was a much more effective and seasoned

1564

1  political veteran that would be a strong ally to the
2  governor if he were appointed to the senate seat.
3  Q   And moving on to Page 6 at the bottom, at line 21
4  the defendant says:
5      "So he's not going to do anything to take away
6       that power from me, is he?"
7       And you say:
8      "No, no."
9       And at line 24 the defendant says:
10     "And I, you know what I'm saying?"
11     You say:
12     "No, no, not at all."
13         What did you understand the defendant to be
14  saying?
15  A   As I mentioned yesterday, the governor had
16  inquired and we advised him that the state
17  legislature, the General Assembly, could take away
18  the power the governor possessed to appoint someone?
19  To fill the vacancy in the senate seat and the
20  governor simply asking me whether I got the sense
21  that President Jones was entertaining an idea to
22  take away that power, and I told him I did not
23  believe that was the case and that's why I said "no,
24  no."
25         MS. HAMILTON:  Your Honor, would this be a

1565

1  good time to take our morning break?

2        THE COURT:  Probably.

3        THE MARSHAL:  All rise.

4      (The following proceedings were had out of the

5       presence of the jury in open court:)

6        THE COURT:  About 15 minutes.

7        We are in recess.

8      (Recess.)

9        THE MARSHAL:  All rise.

10     (The following proceedings were had in the

11      presence of the jury in open court:)

12        THE COURT:  Please be seated.

13        You may resume.

14        MS. HAMILTON:  Thank you, Your Honor.

15  BY MS. HAMILTON:

16  Q   Mr. Harris, before the break you had testified

17  about a meeting that you had with Mr. Emil Jones

18  which is referred to in various calls as the

19  off-campus discussion, is that right?

20  A   Yes.

21  Q   Prior to November the 12th, had the defendant

22  directed you, in fact, numerous times to have this

23  meeting?

24  A   Yes.

25  Q   Why is it that you actually had the meeting on

1566

1    November the 12th as opposed to an earlier date?

2    A   Because I was with Emil Jones down in Springfield

3    and it was harder to avoid the meeting or at least I

4    had told the governor in the past that I was

5    attempting to meet with Emil Jones off-cite.  When

6    we were both in Chicago, it was less likely that I

7    would encounter Emil Jones, but we were somewhat of

8    a captive audience in Springfield during a

9    legislative session.

10   Q   Focusing your attention on November 12th, what

11   was your understanding at that time as to, based on

12   what the defendant said to you, his first choice

13   remained with respect to the senate seat?

14   A   He still believed that there was a chance that he

15   could make a deal to appoint Valerie Jarrett.

16   Q   In exchange for something for himself?

17   A   Yes.

18   Q   And what was your understanding as to why you had

19   been directed to have this meeting with Emil Jones

20   with respect to the possibility of him getting the

21   senate seat in exchange for some or all of his

22   campaign war chest?

23   A   Well, because we've been informed that Valerie

24   Jarrett would be going to the White House, there was

25   the very real possibility that that would not or

1  could not happen even though he believed there was
2  still a slight chance it could.  Emil Jones'
3  appointment would have been a backup or a fall-back
4  plan.
:31AM    5  Q  Mr. Harris, I want to change topics, and I want
6  to direct your attention to legislation involving
7  gaming and the horse track industry, and I want to
8  specifically focus on what, if any, legislation was
9  pending in November of 2008 involving gaming and the
:31AM    10  horse track industry.
11        Are you familiar with what I'm asking you?
12  A  Yes, I am.
13  Q  What, exactly, was pending or, generally, what
14  was your understanding of what was pending in
:32AM    15  November of 2008?
16  A  A piece of legislation that had passed both
17  Houses, the Illinois House and the Illinois Senate,
18  earlier in the summer, was pending the governor's
19  final action on the bill, which would be the
:32AM    20  governor's approval of the bill or veto of the bill.
21  Q  What was your general understanding of what the
22  bill involved?
23  A  The bill we referred to commonly as the racetrack
24  bill or the horse track bill was a piece of
:32AM    25  legislation that would direct a subsidy, in terms of

1568

1   money, from casino owners and operators to Illinois
2   horse racing tracks.
3           The history of that bill goes back for years.
4   There was a subsidy paid by casino owners to race
5   track owners at a time when Illinois first got
6   casinos, in an effort to keep the horse track
7   industry viable, sustainable, and to continue to
8   provide economic benefit to the regions that had
9   horse tracks, as well as the industries that
10  supported horse racing in Illinois.
11  Q   When you say the industries that supported the
12  horse racing industry in Illinois, what are you
13  referring to?
14  A   Primarily the agricultural industries, the
15  breeding of horses, the care of horses, the feeding
16  of horses.  So people that provided the oats and the
17  grains and other products needed to support racing.
18  So it's primarily the agricultural industry, as well
19  as the people that worked at the tracks, the
20  Jockeys, the announcers, people that maintained the
21  facilities and such.
22  Q   In 2008 what was your involvement in the bill
23  that was pending at that time?
24  A   Well, the subsidy -- the legislation that granted
25  the subsidy in the past had expired, and there was

1 new legislation introduced that would continue the
2 subsidy for another period of years, I don't recall
3 if it was two or three years, and that piece of
4 legislation was one that our administration
5 supported, it was a bill that passed without much
6 controversy or resistance, both Houses of the
7 Illinois General Assembly, and was pending the
8 governor's final action to make it law.
9 Q   At some point after the bill passed the House and
10 Senate and was awaiting the governor's signature,
11 did you begin to receive calls with respect to when
12 that bill was going to be signed?
13 A   Yes, there was sense of urgency on the part of
14 some people that the bill be signed sooner rather
15 than later.
16 Q   Who did you receive calls from?
17 A   I received a call from Lon Monk, the governor's
18 former Chief of Staff; I received a call from Chris
19 Kelly, the governor's campaign finance chairman and
20 friend; and a call from Jay Hoffman, a State
21 Representative.  There may have been others but
22 those are the three that I recall.
23 Q   Let's focus first on the call that you received
24 from Mr. Lon Monk.
25        What, if anything, did Mr. Monk say to you

1 with respect to the racing bill in that call?

2 A   He asked me whether or not the bill was ready for

3 signature and if I could help expedite the

4 governor's action on the bill because it was costing

5 the racetrack tens of thousands of dollars a day in

6 loss subsidy each day the governor did not sign it.

7 Q   Did you have an understanding as to why Mr. Monk

8 was calling you with respect to the racing bill?

9 A   Yes, I understood he was a lobbyist representing

10 the interest of one of the horse track owners, or

11 maybe more but I knew at least one.

12 Q   And who was that horse track owner?

13 A   I believe it was John Johnston or Johnson.

14 Q   With respect to the call that you received from

15 Mr. Hoffman, generally what was your understanding

16 as to why Mr. Hoffman was calling you on the bill?

17 A   Because he was getting calls.  Jay Hoffman was a

18 representative from downstate Illinois in the

19 heartland of the agribusiness sector that was

20 survived because of the horse racing industry, he

21 also was the governor's legislative floor leader, if

22 you will, somebody that worked closely with the

23 governor on legislation in the House and Senate,

24 somebody who was generally known as having access to

25 the governor and would not be uncommon for him to be

1571

1 calling myself, other members of the governor's
2 staff or the governor himself on legislative
3 questions, and he was eager for action on the bill,
4 as well.
5 Q  With respect to Mr. Chris Kelly, what was your
6 understanding as to why Mr. Kelly was calling you
7 with respect to when the defendant was going to sign
8 the racing bill?
9 A  Just that he had friends that were interested in
10 the bill.  I know he was friends with Johnson
11 Johntson, there may have been others, but I know he
12 also had similar interest in seeing fast action on
13 the bill.
14 Q  What, if anything, did you do after you received
15 the calls from Mr. Monk and Mr. Kelly in relation to
16 the racing bill?
17 A  I made inquires of the staff about whether the
18 bill was ready to be signed and spoke to the
19 governor after that.
20 Q  Mr. Harris, I'm going to show you what has been
21 marked Government Exhibit racetrack 5.
22      Do you recognize that document?
23 A  Yes.
24 Q  What is this document?
25 A  An e-mail chain.

:37AM
:37AM
:38AM
:38AM
:39AM

1572

1  Q   Is this e-mail chain with respect to the racing

2  bill that you began?

3  A   Yes.

4          MS. HAMILTON:   Your Honor, we'd move for the

5  admission of Government Exhibit Racetrack 5.

6          THE COURT:   Admitted.

7      (Government's Exhibit Racetrack 5 was received

8       in evidence.)

9          MS. HAMILTON:   And ask permission to publish?

10          THE COURT:   You may.

11      (Exhibit published to the jury.)

12  BY MS. HAMILTON:

13  Q   Mr. Harris, we'll start with the very bottom

14  entry, the first e-mail that you sent that starts

15  this e-mail chain.

16  A   Yes.

17  Q   And when did you send this e-mail?

18  A   9:01 a.m. on November 26th, 2008.

19  Q   Who did you send this e-mail to?

20  A   Mathew Summy, Bob Greenlee, and William Quinlan.

21  Q   Who was Matthew Summy at this time?

22  A   He was on the governor's staff, he was a

23  legislative affairs policy director.  He reviewed

24  all the bills that were ready for the governor's

25  action and would prepare them for action by the

1573

1  governor.

2  Q   The next individual you sent this to is Bob

3  Greenlee, is that right?

4  A   Yes.

5  Q   Now, you already testified that he was the deputy

6  governor at this time.  Why did you include him on

7  this e-mail?

8  A   Bob Greenlee supervised Matt Summy in the

9  legislative affairs section of the governor's

10 office.  Bob Greenlee was a deputy governor, he also

11 supervised the communications and press operation.

12 So he would have also been somebody that would've

13 needed to review, and he was the one that usually

14 brief the governor on action pending the

15 governor's -- or legislation pending the governor's

16 action.

17 Q   You also sent this e-mail to William Quinlan, is

18 that right?

19 A   Yes.

20 Q   Why did you include Mr. Quinlan on this e-mail?

21 A   William Quinlan was the general counsel in the

22 Governor's Office.  He oversaw the governor's legal

23 operation.  Legal division would also be involved in

24 review of legislation for its opinion before the

25 governor would act on legislation.

1574

1   Q   And could you read for the jurors what is it that
2   you wrote to Mr. Summy, Mr. Greenlee, and
3   Mr. Quinlan with respect to the racing bill?
4   A   (Reading:)
5       "Horse racing recapture, any reason we can't
6        sign today?"
7   Q   And why is it that you were asking that?
8   A   Because these are the individuals that would know
9   whether the legislation was ready for action,
10  whether there was any issues that would cause us not
11  to act on the bill.
12  Q   Let's move up to the first response back, and who
13  was that from?
14  A   Bob Greenlee.
15  Q   When did you receive a response from Mr. Greenlee
16  to your e-mail?
17  A   A few minutes after my inquiry.
18  Q   And just so it's clear to the jury, where on the
19  e-mail does it show the date and time?
20  A   On the third line under each section where it
21  says "sent."
22  Q   So Wednesday, November 26, and that's the time,
23  9:03:23?
24  A   Yes.
25  Q   What did Mr. Greenlee write back?

1575

```
1   A   (Reading:)
2        "Not from my end, assume RRB okay."
3   Q   What did you understand Mr. Greenlee to be
4   communicating to you there?
5   A   No problems from legislative affairs or
6   communications or policy action, the bill is ready
7   for action, assume the governor is okay.
8   Q   When you say "the governor," how did you know he
9   was referring to the governor there?
10  A   "RRB," those are his initials.
11  Q   Thank you.
12       When he said "assume "RRB okay," what did you
13  understand him to be communicating?
14  A   Assuming nothing has changed, everything was
15  ready for final action because we were supportive of
16  this legislation from its start.
17  Q   All right.  The next response you received was
18  from whom?
19  A   William Quinlan.
20  Q   And when did you receive that response?
21  A   A few minutes after that.
22  Q   At 9:10 a.m.?
23  A   Yes.
24  Q   And what did Mr. Quinlan write back to you?
25  A   (Reading:)
```

:43AM
:43AM
:43AM
:43AM
:44AM

1576

1     "Let me check on rules language contained in the
2     bill before we go ahead."
3  Q  What did you understand Mr. Quinlan to be
4  communicating to you?
5  A  That he wanted to check to make sure that the
6  language in the legislation did not contain what we
7  had seen in some other legislation that we
8  considered a poison pill.
9      The Speaker of the House had around this time
10  undertaken a practice of including language in
11  several pieces of legislation unrelated to the
12  legislation but that was targeted to limit the
13  governor's administrative rule-making powers and his
14  agencies.  That was an assault on the executive
15  branch that we resisted and would veto bills that
16  had such offensive language in them, and Bill was
17  just double-checking to make sure the offensive
18  language was not contained in this bill.
19  Q  All right.  The next entry was a response from
20  you, is that right?
21  A  Yes.
22  Q  And it looks as though you wrote back almost
23  immediately?
24  A  Yes.
25  Q  And what did you write back?

:44AM
:44AM
:44AM
:45AM
:45AM

1577

1  A   Well, actually I write back over an hour later.

2  Q   Well, look at the date and the time on the "sent"

3  line.  It's Wednesday, November 26th, 9:10.

4  A   Oh, I'm sorry.  I read it as "10:39."  I'm sorry,

5  9:10, yes.

6       "Need answer quickly."

7  Q   And why is it that you wrote that?

8  A   Because I wanted Bill to look at it himself and

9  not just put it in the in-box for staff review,

10 because I wanted to get an answer quickly because,

11 again, this was costing the industry tens of

12 thousands of dollars a day.

13 Q   All right.  And then the final e-mail exchange is

14 at the top, right, is that right?

15 A   Yes.

16 Q   And this is an e-mail from Mr. Quinlan to you at

17 9:43 a.m.?

18 A   Yes.

19 Q   And what did Mr. Quinlan write back?

20 A   "Okay to sign."

21 Q   And are those his initials below that?

22 A   Yes.

23 Q   What did you understand Mr. Quinlan to be

24 communicating to you in this e-mail?

25 A   That he was satisfied, from a legal standpoint,

1578

1    that this bill had no objectionable language.

2    Q   Now, after you -- I guess for you, this e-mail

3    chain, what did it all signify to you in terms of

4    the internal review of the racing bill?

5    A   All lights are green, ready to go.

6    Q   And so what did you do next?

7    A   On a call with the governor, I raised the

8    subject.

9    Q   And have you heard a recording of that phone

10   call?

11   A   Yes.

12       MS. HAMILTON:  Your Honor, I'd ask permission

13   to publish session 1068 which is tab 54.

14       THE COURT:  Yes.

15     (Tape played)

16   BY MS. HAMILTON:

17   Q   Mr.  Harris, focusing on Page 1 of the transcript

18   behind 54, what is the date and time of this call?

19   A   12:53 p.m. on November 26th, 2008.

20   Q   All right.  So does this call take place a few

21   hours after the e-mail string we just looked at?

22   A   Yes.

23   Q   And I want to focus on line 17, the defendant

24   says"

25       "So Lon called and you obviously talked to him.

1579

1     You say:
2     "Yes.  Yes."
3         What did you understand the defendant to be
4  referring to there?
5  A   That he had recently just spoken to Lon Monk and
6  that Lon had mentioned that he had spoken to me.
7  Q   And at line 21 you say:
8     "So what about Lon."
9     And over on Page 2 the defendant says:
10    "I told him I'm not doing anything till, you
11    know, for a while."
12    You say:
13    "Okay."
14    And then at line 4 he says:
15    "But I think he's got nothing to fear, okay."
16        What did you understand the defendant to be
17 saying there?
18 A   That he told Lon that he is not prepared to sign
19 the bill but that he assured Lon that he would be
20 signing it eventually.
21 Q   When you say "the bill" are you referring to the
22 racing bill?
23 A   Yes.
24 Q   At line 7 the defendant says:
25    "He's worried about the other, and I said no, I

1580

1      said I'm not going to do anything, want to sit

2      on it till I sort things through on all kinds

3      of bills, you know, and see how it all fits

4      in."

5        What did you understand the defendant to be

6   saying?

7   A  Explaining to me how he put Lon off, told Lon

8   that he wanted to not sign the bill until he

9   reviewed other things.  I wasn't quite sure what he

10  was referring to.

11  Q   When you say you weren't quite sure what he was

12  referring to, what do you mean?

13  A  How the bill fits in to other things, I'm not

14  sure what he was referring to on that.

15  Q  Based on what you knew at that time about other

16  bills that were pending, did you understand that

17  this bill fit in in any way with the other bills?

18  A  No, not based on what I knew.  There was no

19  reason not to act on this bill.

20  Q  At some point after the phone call with the

21  defendant, did you talk with someone else within the

22  Office of the Governor about this issue?

23  A  Yes.

24  Q  Who?

25  A  Mr. Quinlan.

1581

1  Q    And when did you talk with Mr. Quinlan about the
2  defendant not signing the racing bill?
3  A    It was later that week before Mr. Quinlan was
4  scheduled to accompany the governor on an
5  out-of-town trip the beginning of the following
6  week.
7  Q    And what is it that you said to Mr. Quinlan with
8  respect to the defendant not signing the racing
9  bill?
10 A    I talked to him about several matters that he
11 should be discussing with the governor on their trip
12 together.  I was staying in Illinois, they were
13 leaving town.
14       I told him that I had concerns about the
15 racetrack bill, that the governor may be holding it
16 up for an opportunity to leverage more campaign
17 contributions out of racetrack owners and operators.
18 I asked Mr. Quinlan to try to get the governor to
19 sign off on the bill while they were together on the
20 trip.
21 Q    At some point while Mr. Quinlan was on this trip
22 with the defendant, did you have a conversation with
23 Mr. Quinlan about this particular topic?
24 A    Yes.
25 Q    Have you heard a recording of that call?

1582

1  A   Yes.

2      MS. HAMILTON:  Your Honor, at this time I'd

3  ask permission to publish the call behind tab 56

4  designated as session 139.

5      And, Judge, for the record, I'm offering this

6  call, the statements therein, not for their truth

7  but for the effect that they had on Mr. Harris and

8  the decisions that he makes as a result of this

9  conversation.

10     THE COURT:  For that purpose, it's admitted.

11     (Tape played)

12  BY MS. HAMILTON:

13  Q   Mr. Harris, focusing on Page 1 of the transcript

14  behind tab 56, what's the date and time of this

15  phone call?

16  A   7:41 a.m. on December 2nd, 2008.

17  Q   And starting at line 2, Mr. Quinlan says:

18     "Yeah, ah, and then, you know, I also with our

19      mutual boss pushed that other thing we were

20      talking about generally."

21     And then he goes on line 6:

22     "And it, I didn't get very far, but I had a lot

23      of people interrupting me."

24      What did you understand Mr. Quinlan to be

25  saying there?

1583

1  A  That he had made an attempt to talk to the

2  governor about signing the racetrack bill.

3  Q  At line 8 you say:

4    "I mean, did he express a reason why the delay?"

5    And at line 10 Mr. Quinlan says:

6    "Ah, let's just say, it is what you think."

7      What did you understand Mr. Quinlan to be

8  saying there?

9  A  He was telling me that the reason for the delay

10  was the concern that I had expressed to him earlier.

11  Q  Which was what?

12  A  That he was holding the bill because he wanted to

13  talk to Lon about getting campaign contributions

14  from the racetrack owners before he signed the bill.

15  Q  At line 12, you say:

16    We're talking about the thing that, ah --"

17    And at line 13 Mr. Quinlan says:

18    "Yeah, yeah, we're talking about the same

19    thing, you and I we're talking about."

20    And you say:

21    A lot of our, a lot of our friends are

22    interested in?"

23    And he says:

24    "Yeah, yeah."

25      What did you understand Mr. Quinlan was

1584

1  saying to you there?

2  A  That we were talking about the racetrack bill.

3  Q  And he goes on to say:

4      "I will work on that today.  I didn't have a

5      chance to be, like are you f'ing kidding me,

6      you know what I mean.  It was like a two second

7      thing, and I had other two right there, and I,

8      it wasn't a discussion I wanted to have in

9      front of people."

10          What did you understand Mr. Quinlan to be

11  saying?

12  A  That he didn't have a chance to talk much more

13  about it with the governor.

14  Q  And over on Page 2, at line 1 you say:

15          "No, no, and it's what, it's what I feared."

16          And at line 3 Mr. Quinlan says:

17          "Yeah."

18          And at line 4 you say:

19          Ah, f'."

20          What were you saying there?

21  A  My fear was confirmed and I was discouraged.

22  Q  After this phone call with Mr. Quinlan --

23          THE COURT:  Stop.  Stop.

24          A couple of times I said that I would admit

25  something just to show someone's state of mind, and

1585

1  maybe I'll give you an illustration of what that

2  means.

3         If somebody walked in the back of this room

4  right now, maybe wearing a firearm's helmet, and

5  said "there's a fire in the building," and we all

6  left, went down the stairs, followed the protocol

7  that we do here.  If somebody wanted to introduce

8  evidence about somebody walking in the door and

9  saying there's a fire in the building, they're not

10 allowed to offer that evidence for the proposition

11 that there actually was a fire in the building.  We

12 don't know.  It might've been somebody impersonating

13 a firefighter, there's no proof apparent to any of

14 us, there was no smoke, there was no fire.  But it's

15 admitted because it might be important to know why

16 we all got up out of the room and left the building

17 in the middle of a trial.

18        So the evidence is offered to explain

19 somebody's state of mind or why they did the next

20 thing that they did, that's when I say to you it's

21 offered only for the purpose to explain somebody's

22 state of mind or someone's actions.

23        With that, you can proceed.

24        MS. HAMILTON:  Thank you, Your Honor.

25 BY MS. HAMILTON:

1586

1  Q   Mr. Harris, based on this phone call that you had
2  with Mr. Quinlan, what decision, if any, did you
3  make with respect to what actions you should take
4  with respect to trying to get the defendant to sign
5  the racing bill?
6  A   That I would take no further action because I
7  viewed this as a matter between the governor and his
8  best friend of 25 years, Lon Monk, and they would
9  work it out.
10 Q   Mr. Harris, I want to change topics again and ask
11 you, at this period of time in the late fall
12 of 2008, did the defendant raise with you his
13 interest in getting millions of dollars in state
14 money to the Chicago Cubs?
15 A   Yes.
16 Q   Based on what he said to you, what was your
17 understanding of what he wanted you to do?
18 A   To find a way to give a grant to the Chicago Cubs
19 organization.
20 Q   For how much money?
21 A   Well, the initial discussions were in the range
22 of a million or a million and a half and then they
23 went up as high as 15 million.
24 Q   Based on what the defendant said to you, what was
25 your understanding as to why he wanted to give the

1587

1 Chicago Cubs millions of dollars in state money?
2 A  Other than to ingratiate himself with them and
3 get their goodwill, I didn't know exactly what the
4 reason was, what the motive was, other than he
5 wanted to be friendly to the Cubs organization.
6 Q  And have you heard recordings of some of the
7 conversations that you had with the defendant on
8 this topic?
9 A  Yes.
10      MS. HAMILTON:  Your Honor, I'd ask permission
11 to publish tab 57 which is call session 1255.
12      THE COURT:  Yes.
13    (Tape played).
14 BY MS. HAMILTON:
15 Q  Now, Mr. Harris, focusing on Page 1 of that
16 transcript, what's the date and time of this call?
17 A  9:26 a.m. on December 3rd, 2008.
18 Q  At line 3 the defendant says:
19    "Okay, I talked to Ganis, I got some ideas on,
20     you know, the Cub stuff."
21      What did you understand the defendant to be
22 saying there.
23 A  That he had just gotten off the phone or recently
24 spoken to Marc Ganis and he had some ideas on a
25 grant or more ideas on the grants he intended to

:00PM

:00PM

:01PM

:01PM

:02PM

1588

1  give to the Cubs.  Marc Ganis was a sports

2  facilities consultant that worked closely with the

3  Cubs organization.

4  Q   Prior to this call, had you had discussions with

5  the defendant about this particular idea he had?

6  A   Yes.

7  Q   At line 7 he goes on:

8      "So like 15 million dollars that the Sox got,

9       did they get 15 million from the sports

10      authority?"

11         What did you understand the defendant to be

12  saying there?

13  A   He was specifying the amount that he was

14  interested in giving the Cubs and that he told me

15  that he believed the White Sox got $15 million from

16  the Illinois Sports Authority.

17  Q   At line 10 you say:

18         "Ah, not to my knowledge, I don't --"

19         And he said:

20      "Yeah, apparently they did.  Can you look into

21       that."

22       At line 14:

23      "See what that was."

24         What did you understand the defendant to be

25  saying to you there?

1589

1 A   Wanted me to verify whether the Sox organization
2 received that money and report back to him.
3 Q   It goes on at line 14:
4       "But his thinking was, you know, like you were
5         saying, some sort of green initiative and you
6         can kinda promote it."
7             What did you understand the defendant to be
8 saying there?
9 A   When we talked about it before, he asked me
10 whether or not he could give a grant to the Cubs
11 organization.
12            I initially discouraged him.  He asked me
13 whether he could and I said there were some monies
14 available in environmental initiative funds and
15 technology grant funds for certain
16 demonstration-type projects or research and
17 development type projects that could create a
18 greater benefit for the Illinois economy or produce
19 jobs or start new industries in the state.
20            I told him that perhaps we can come up with
21 half a million or a million dollars if we found the
22 right type of project to help sponsor along with a
23 private entity like the Cubs organization.
24            He had come back and told me that he wanted
25 the amount to be somewhere closer to 10 or

1  15 million dollars, a number that he had come to a
2  conclusion on after speaking to Marc Ganis who
3  apparently told him that the Sox got that.
4       But the Sox are different because the stadium
5  that the Sox play in is owned by the state and the
6  investment went into state property.
7  Q   And the idea of the green initiative, was that
8  something that you had come up with in response to
9  the defendant's interest in trying to get the Cubs
10 organization money?
11 A   Yes, I told him that we --
12 Q   Pardon?
13 A   I told him that we had some money and potentially
14 could give a grant out of our green initiative fund
15 or technology fund.
16 Q   Over on Page 2, at line 1, the defendant says:
17      "Who do we talk to about developing a concept or
18       idea in our operation?"
19          What did you understand him to be asking you
20 there?
21 A   That he not only wanted to come up with the
22 money, but he wanted to come up with the idea that
23 the money would fund.
24 Q   You say:
25      "I talked to, if we, if we, I mean, if we're

:04PM

:04PM

:05PM

:05PM

:05PM

1591

1 limited to green, I mean not limited, but I'm
2 saying if we're trying to further go down the
3 green initiative, I'd talk to Frankel."
4 At line 8 the defendant says:
5 "Science and technology, you know, green,
6 electricity, utilities, reducing utility cost
7 at the ballpark, that kinda thing, right?"
8 What did you understand the defendant to be
9 saying?
10 A   He was repeating back to me some of the things
11 that I had mentioned to him as possible scope of
12 projects in our earlier conversation.
13 Q   And when you say possible scope of projects,
14 again was this a creative way to try to get the Cubs
15 organization state money?
16 A   Yes.
17 Q   And, again, in response to the defendant's
18 directive that he wanted them to get millions of
19 dollars?
20 A   For me to find a way to do it, yes.
21 MS. HAMILTON:  And I ask permission to
22 publish the call behind tab 58, designated as
23 session 111.
24 THE COURT:  Yeah.
25 (Tape played)

:05PM
:05PM
:06PM
:06PM
:06PM

1592

1  BY MS. HAMILTON:

2  Q   Mr. Harris, focusing on Page 1 of the transcript

3  behind tab 58, what is the date and time of this

4  call?

:09PM  5  A   9:57 a.m., December 3rd, 2008.

6  Q   At line 5 the defendant says:

7      "I talked to both Ganis and Crane Kenny."

8          You already said who Ganis was, who is Crane

9  Kenny?

:09PM  10  A   He was president of the Cubs organization and

11  general counsel for the Tribune Company.

12  Q   And in response at line 6 you say "okay, so," and

13  you laughed, what did you understand the defendant

14  to be saying to you there?

:09PM  15  A   That he went out and promised this level of

16  funding and grant to them.

17  Q   Prior to this call, had you indicated that you

18  wanted to talk with anyone internally before the

19  defendant had such a conversation?

:09PM  20  A   Yes, we had not concluded the legal research on

21  the initiative giving them a grant, and we couldn't

22  conclude that until we finished scoping the project

23  and coming up with more definition before I can give

24  him a final view on whether we can do this.

:10PM  25  Q   Had you actually told the defendant that?

1593

1 A   Yes, I said we still need to have legal review it
2 and come up with a project.
3 Q   So when he said that he talked to both Ganis and
4 Crane Kenny, what was your understanding that meant
5 with respect to what you had told the defendant you
6 needed to do?
7 A   The commitment had been made.
8 Q   And at line 7 he goes on to say:
9     "You know, 10 to 15 I said, but I need, I need a
10     nexus to science and technology, you know, a
11     green thing, you know."
12     And he goes on:
13     "So he, Crane Kenny, like it.  They've got some
14     whole bunch of ideas on what they wanna do with
15     an old ballpark like that, like some of the
16     wireless, you know, wired up to modern age,
17     some green, green stuff.  He thinks it's a
18     great idea."
19         What did you understand him to be saying to
20 you?
21 A   That he had, in his discussions with Mr. Kenny
22 and Mr. Ganis, told them that it would need to be
23 limited to technology, and they liked the idea, and
24 they were going to come back with some ideas on what
25 projects they needed funded.

1594

1  Q   And he goes on at line 20 to say:

2     "They're gonna work some stuff up."

3     And at line 21 you say:

4     "Can I ask why, why you're fixated on that,

5     that level of money?"

6     And at line 23 he says:

7     "'cause that's what the White Sox got."

8       What did you understand him to be saying?

9  A  He was again telling me that he wanted to give a

10 state grant in amounts equal to what the White Sox

11 -- what he had reportedly heard the White Sox

12 organization recently received from the state.

13 Q   And on Page 2, at line 1 he says:

14     "You know what I'm saying?"

15     You say:

16     "Uh-huh."

17     He says:

18     "10 to 15."

19     You say:

20     "Uh-huh."

21     He says:

22     "Ganis says 1.5 million is nothing."

23       What did you understand him to be saying to

24 you?

25 A  That he apparently had a discussion with Marc

1595

1  Ganis about the initial numbers we were talking
2  about and Mr. Ganis thought that wasn't sufficient,
3  and the governor agreed.
4  Q   At line 8 he says:
5       "What do you think?"
6       At line 9 you say:
7       "Well, my opinion is, you give them nothing.  I
8       mean, they're for profit entity, they don't
9       need the subsidy."
10      At line 12 he says:
11      "Yeah, I know.  All right."
12          What did you understand the defendant to be
13  saying there?
14  A   That he knew my opinion, understood my opinion,
15  but didn't agree with it.
16  Q   And you go on you say:
17      "But that's, I was just wondering why or how you
18      arrived at that number."
19      And he says:
20      "The number is because the White Sox got that."
21      And you say:
22      "Right.  Different animal, though."
23      And at line 19 he says:
24      "Well, I understand."
25          What did you understand him to be saying?

1596

1   A   He understood that the White Sox organization
2   operated in a state sports facility Sox Park.
3   Q   Why is that a different animal?
4   A   Because the investment of public funds in that
5   park are going into a public building, a public
6   structure, and we lease it to the -- or the state
7   leases it to the Sox organization.
8   Q   And how is that different from the Cubs?
9   A   This would be an out and out gift to a private
10  entity for reasons that we're backing into, we're
11  trying to figure out the justification after the
12  promise of the gift was made.
13  Q   And based on what the defendant said to you, was
14  it your belief that he understood that they were
15  different animals?
16  A   Yes.
17  Q   He goes on at line 19 to say:
18      "Well, we gotta justified it.  So in a way,
19       Mr. Harris, that, you know, is a plus, you know
20      what I'm saying?"
21          What was he saying?
22  A   He wanted me to come up with a publicly
23  justifiable reason for giving the grant.
24  Q   And you say:
25      "Uh-huh."

1597

1    And at line 24 he says:
2    "I think I gotta do like a public private
3    thing."
4        What did you understand him to be saying?
5  A  Searching for a way to make it more publicly
6  justifiable or acceptable.
7  Q  And you say:
8    "Yeah, I think, I think it helps that if they
9    match it, and two, it's cutting edge, so least
10   we're trying to set a trend here."
11   At line 30 he says:
12   "Well, that's it, that's what they gotta do and
13   they gotta match it, don't they?"
14       What did you understand him to be saying?
15 A  I understood him to be beginning to develop with
16 me a public justification or other explanation and
17 to justify the use of the public funds, that it
18 would be better if the Cubs organization contributed
19 some of their own money, as well, and that the
20 project be of a demonstration level project.
21 Q  Over on Page 3, at line 18, the defendant says:
22   "Okay, good, and you working on Jim Hendry,
23   right?"
24       What did you understand the defendant to be
25 asking you?

1598

1  A   He was following up on an earlier directive that
2  he had given me to make up street signs and dedicate
3  a section of a state roadway as an honorary Jim
4  Hendry stretch of road.
5  Q   Who is Jim Hendry?
6  A   I believe he's the Cubs manager.
7  Q   All right.  Mr. Harris, I want to focus back on
8  the senate seat.
9  A   Okay.
10 Q   At some point in mid November, did it become
11 clear that Valerie Jarrett was not, in fact,
12 interested in the senate seat?
13 A   Yes.
14 Q   And after that point, generally, how did -- how,
15 if at all, did this affect the discussions that you
16 were having with the defendant about his process on
17 filling the senate seat?
18 A   It -- it changed dramatically into a search for a
19 number of candidates to be found, discussed, and
20 debated with some specific direction from time to
21 time for the type of persons he was looking for.
22 Different names were being floated around, coming in
23 from various sources.
24 Q   And although different names were coming in, who
25 maintained the control and focus of that senate seat

:15PM
:15PM
:16PM
:16PM
:17PM

1599

1 process?

2 A  He did; very closely.

3 Q  At some point did the defendant tell you that he

4 was considering appointing Congressman Jesse

5 Jackson, Jr., to the senate seat?

6 A  There was times we talked about Jesse Jackson,

7 Jr.  I had advanced Jesse Jackson, Jr. as a

8 candidate for consideration and made strong, what I

9 believe to be a strong argument on his behalf, the

10 governor had rejected that possibility, but later

11 suggested to me he was seriously considering Jesse

12 Jackson, Jr.

13        MS. HAMILTON:  Your Honor, at this time I'd

14 ask permission to publish call sessions 1334 and

15 1335 which are at tab 66.

16        THE COURT:  What's the running time?

17        MS. HAMILTON:  Seven minutes.

18        THE COURT:  Okay.  And then I think we'll

19 adjourn after you run it.

20        MS. HAMILTON:  After?

21        THE COURT:  You run it.

22        MS. HAMILTON:  But you don't want me to ask

23 questions about it?

24        THE COURT:  Right.

25    (Tape played).

1    THE COURT:  We're going to adjourn now.
2 Probably around 1:45 today.  I may have to have a
3 short hearing, so it might be 2:00.
4    THE MARSHAL:  All rise.  This court is
5 suspended until 1:45 p.m.
6    (The following proceedings were had out of the
7     presence of the jury in open court:)
8    THE COURT:  We're adjourned.
9
10
11    (Luncheon recess taken from 12:26 o'clock p.m.
12     to 2:00 o'clock p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

:26PM

1601

* * * * * * * *

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED
MATTER

/s/Blanca I. Lara                              date


_____        _____

      Blanca I. Lara                              Date