# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **No. 08 CR 888** |
| ) | |
| *Plaintiff,* ) | |
| ) | **Judge James B. Zagel** |
| **vs.** ) | |
| ) | |
| **ROD BLAGOJEVICH,** ) | |
| ) | |
| *Defendant.* ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Now comes the defendant, ROD BLAGOJEVICH, by his attorney, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits the Defendant's Position Paper and Commentary on Sentencing Factors.

## A. Introduction and Procedural History.

Rod Blagojevich was elected governor of Illinois in 2002 and reelected in 2006 to a second four-year term. He had previously served six years in the U.S. House representing the Illinois 5th Congressional District, and before that four years in Springfield as a State Representative.

In December 2008, Blagojevich was arrested and later charged with numerous

federal crimes relating to political corruption. In 2011, following a hung jury and a retrial, Blagojevich was convicted of 16 counts relating to political corruption and one count of making a false statement to law enforcement. This Court sentenced him to 168 months incarceration, a $20,000 fine, and an $1800 special assessment. The Court of Appeals vacated his convictions on five counts that were based on Blagojevich's attempt to make a deal with Senator Barack Obama to appoint Obama's choice for his old Senate seat, Valerie Jarrett, in exchange for an appointment to the Obama Cabinet. The Court found that the proposal "to trade one public act for another [was] a form of logrolling" and was not illegal; the Cabinet appointment he sought was a "public job" which paid only a "bona fide salary ...." *United States v. Blagojevich*, 794 F.3d 729, 734-38 (7th Cir. 2015). On remand, the government dismissed the vacated counts.

In November, 2015, Blagojevich filed a petition for writ of certiorari, again challenging the adequacy of the instructions on the law given to his trial jury. The government opposed in part on the ground that review was premature because five counts had been vacated and remanded for retrial and resentencing. The Court denied the Petition on March 28, 2016. Two days later, the government filed a motion in the district court announcing dismissal of the vacated counts and asking to schedule Blagojevich's resentencing hearing. R. 1226. On May 23, 2016, the Supreme Court denied rehearing.

**B.      The Offense Conduct.**

Rod Blagojevich stands convicted of three separate criminal acts, each relating to his attempts to obtain political contributions for his campaign fund in late 2008.

**1.      Counts 2, 3, 10, 18, 19 and 20.**

Counts 2, 3, 10, 18, 19 and 20 involve Blagojevich's attempt to obtain campaign contributions from supporters of Rep. Jesse Jackson, Jr. After Senator Barack Obama was elected president on November 4, 2008, Governor Blagojevich had the authority to appoint Obama's successor in the Senate.  Tr. 1305. In October, 2008, Rajinder Bedi, a supporter of both the Governor and of Rep. Jesse Jackson, Jr., approached Robert Blagojevich (the Governor's brother and fundraising chairman) with an offer that Bedi's associate, Raghu Nayak, would raise funds for Blagojevich's campaign in exchange for the appointment of Jackson, Jr. to the Senate. Tr. 2039. Robert told Bedi that he did not think his brother would appoint Jackson who has "never supported us ...." Tr. 2041.

On October 31, 2008, Blagojevich told his deputy about the Jackson offer: "Unbelievable, isn't it, ... we were approached pay to play, you know, he'd raise me 500 grand. An emissary came. The other guy would raise a million if I made him a senator." Tr. 2110. After October 31, there were no discussions about the Jackson offer until early December. On December 4, 2008, Blagojevich's pollster advised the Governor that Jackson was polling better than any of the other prospective candidates for the Senate seat.  Tr. 2113. Later that day, Blagojevich told his Chief of

Staff, John Harris, that he was "honestly going to objectively look at the value of putting Jesse, Jr. there ...." Tr. 1604. Blagojevich said, "he's come to me with -- through third parties, you know, with offers of campaign contributions and help... 1.5 million they -- they're throwing numbers around." Tr. 1608.

Later on December 4, 2008, Blagojevich told his brother to meet with Nayak and tell him that Jackson was "very much real realistic ....  And the other point you know all these promises of help.  That's all well and good but he's had an experience with Jesse and Jesse promised to endorse him for governor and lied to him okay ... then some of this stuff's got to start happening now." Tr. 2135, 4538. Robert Blagojevich then called Raghu Nayak and arranged to meet for coffee "to follow up on those brief conversations we had earlier in the month or late last month middle of last month." Tr. 2136. The next day, Robert Blagojevich cancelled his meeting with Nayak. Tr. 2141. No campaign contributions were received from Jackson's supporters.

## 2.    Counts 1, 12 and 13.

Counts 1, 12 and 13 involve Blagojevich's attempt to obtain a campaign contribution from Patrick Magoon, the president of Children's Memorial Hospital. In June, 2008, Magoon began lobbying for an increase in the rate of reimbursement under medicaid for pediatric specialists. Tr. 2145, 2506-10. On September 23, Blagojevich called Magoon and said he "was supportive of our issue," and requested additional information which Magoon sent the Governor. Tr. 2508-10.

At an October 8, 2008, fundraising meeting, Blagojevich said "he was going to give the hospital $8 million, and he wanted … to get Pat Magoon for [$50,000]." Blagojevich then decided to reduce the ask to $25,000. Tr. 2364-71, 2415-18. On October 17, 2008, Blagojevich called Magoon to tell him that he had approved the rate increase, which would take effect after January 1, 2009. Tr. 2513. Five days later, Robert Blagojevich called Magoon, introduced himself, and then asked if he would raise $25,000 for the Governor's campaign fund. Magoon said that he would "have to give some thought to this and talk to a few folks about it" and he gave Robert his cell phone number. Tr. 2515-19.

Magoon decided not to raise the funds for Blagojevich, although he never told Robert Blagojevich about his decision. Instead, he just told his staff not to put through Robert's calls. Tr. 2522-23. Robert left benign messages for Magoon on October 28 and November 10 but received no response. Tr. 2524. On November 12, Robert told the Governor that he had left three messages for Magoon but never got a call back. "So I'm gonna quit calling," Robert said. "I feel stupid now." Blagojevich made no further attempts to contact Magoon.

During a November 12, 2008, recorded call, Blagojevich's deputy advised that he still had "discretion over" the rate increase, and Blagojevich responded, "that's good to know." Tr. 2159-61. The deputy testified that he interpreted Blagojevich's response as a direction to put a hold on the rate increase, which he did, causing a delay in the start date of the increase. Tr. 2161-65, 2247.

### 3.    Counts 9, 14 and 15.

Counts 9, 14 and 15 involve Blagojevich's efforts to obtain a campaign contribution from an Illinois horse racing executive John Johnston, a long-time supporter of the Governor. As governor, Blagojevich was a consistent supporter of the Illinois horse racing industry. Tr. 2744.  In September, 2008, Johnston made a commitment to raise $100,000 for the Blagojevich campaign. Tr. 2781-83, 3770.

Johnston also had an interest in a "revenue recapture bill" pending in the Illinois legislature which would require Illinois casinos to pay a percentage of their revenue to the horse racing industry.  This bill was similar to a law that had passed in 2006 but had run its term.  Tr. 2742-48.

During November 2008, Blagojevich pressed Johnston, through an intermediary and lobbyist, Lon Monk, to fulfill his commitment. Tr. 2748-54, 2856-59. The recapture bill passed both houses of the Illinois legislature and was sent to the Governor's desk on November 24, 2008.  Tr. 1569, 2742-49.  On November 26, the Governor's general counsel declared the recapture bill "okay to sign." Tr. 1572.

Monk and others then began lobbying the governor for a quick signing of the recapture bill. Tr. 1569, 2756, 2769, 2986. In a recorded conversation on December 3, Monk told Blagojevich, "I want to go to him [Johnston] without crossing the line … give us the money and one has nothing to do with the other, but give us the f'ing money." Blagojevich responded, "I think you just say, look, it's been a year. Let's just get this done, just get it done. Christ." Monk said he would try to see Johnston right

away.  The following colloquy ensued:

> BLAGOJEVICH: What are you going to say to him?  Be careful.
>
> MONK: I'm gonna say to him stop screwin' around get me the money....  but what's affecting him is that he feels like you're gonna get skittish if he signs the bill, get me?  I'm going to use the word skittish.
>
> BLAGOJEVICH: Yeah....  And he'd like some separation between that and signing the bill.
>
> MONK: Define separation.
>
> BLAGOJEVICH: A week.

Tr. 2769-76.

On December 3, 2008, Monk met with Johnston and told him that the Governor is "concerned that if he signs the racing legislation you might not be forthcoming with a contribution." Tr. 2989. Following this meeting, Monk told Blagojevich that he told Johnston: "two separate conversations, what about your commitment? ...  And I said, look, there's a concern that there's going to be some skittishness if your bill gets signed because of the timeliness of the commitment." Tr. 2781-83.

On December 4, 2008, Blagojevich told Monk that he would sign the recapture bill "next week." Tr. 2787. On December 9, Blagojevich was arrested. He had not signed the recapture bill by the time of his arrest. Tr. 2993. Johnston never made the contribution.

**4.    The Defendant's Position on Appeal.**

In his appeals, Blagojevich's lawyers have made proper legal challenges to his conviction; some were successful while others failed. We continue to believe that the trial jury was improperly instructed and that a properly instructed jury would not have convicted Blagojevich on the political corruption counts.

This does not mean that the defendant's conduct was blameless. It was not. Blagojevich sincerely regrets his conduct, which was distasteful or worse and showed extremely poor judgment. Indeed, Blagojevich's sincere expressions of remorse during his prior sentencing hearing caused this Court to find that he had accepted responsibility for his actions. His pursuit of legal challenges to his conviction that, among other things, have sought clarity in the murky area of the law relating to solicitation of campaign funds, does not in any way lessen the remorse that he feels for his behavior.

## C.    Computation of the Advisory Guideline Range.

At the prior sentencing hearing, Blagojevich raised several objections to the Court's application of the Sentencing Guidelines. Without waiving those objections, Blagojevich agrees with the Probation Officer that the Court's previous findings are law of the case and that the scope of the remand from the Court of Appeals does not open the door to a re-litigation of these guidelines calculations.

**D.     Position Paper and Commentary on Sentencing Factors.**

The Federal Sentencing Guidelines serve only as a "starting point" and "initial benchmark" in the determination of a just and appropriate sentence. See *Gall v. United States*, 552 U.S. 38, 49 (2007). This Court considers the now advisory Guidelines, on the one hand, and the more general factors set forth in 18 U.S.C. § 3553(a), on the other. Those factors are: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *United States v. Booker*, 543 U.S. 220, 260 (2004).

In the District Court, a defendant may argue for a non-Guidelines sentence (1) on the basis of traditional departure grounds, (2) "because the Guidelines sentence itself fails properly to reflect §3553(a) considerations," or (3) "because a case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338 (2007). "In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.*

Here, the extraordinary features of this case, which now relates exclusively to Blagojevich's efforts to raise funds for his political campaign, coupled with

compelling evidence of Blagojevich's efforts to rehabilitate himself over the past four years, which includes more than a hundred letters from fellow inmates describing how the former Governor's optimism, faith and generosity have enriched their lives and inspired them to be better husbands, fathers, friends and citizens, all warrant a reduced sentence for Mr. Blagojevich.

At the prior sentencing hearing in 2011, this Court found that the recommended guideline range, which now stands at 292-365 months, "is simply not appropriate in the context of this case." Sent. Tr., at 59. The sentencing guidelines make no distinction between the elected official who seeks to sell his office for personal enrichment and the official who, like Blagojevich, is convicted of violating the law in order to raise campaign funds to advance his political and legislative goals.

Thus, under the guidelines formula, Blagojevich is sentenced as if he had attempted to obtain $1.625 million in cash bribes. But Blagojevich never sought cash bribes, gifts or loans from donors. Instead, he sought campaign donations which he would have used to advance his political agenda. And as we know from the hundreds of hours of his recorded calls, Blagojevich's political agenda in 2008 included pushing the Illinois legislature to pass a big public works or "capital" bill and expanding access to healthcare in Illinois. Tr. 1776, 1785, 3941, 3967, 3946-53, 3984-86. Letters written and submitted to the Court by supporters of the former Governor also remind us of the former Governor's priorities in office and that, despite his flaws, he cared deeply about the people of Illinois.

Clearly, the elected official convicted of breaking the law in order to achieve political goals is far less culpable than the one convicted of selling his office for personal enrichment. Yet, under the sentencing guidelines, no such distinction is made.

Moreover, as the government effectively conceded at trial, Blagojevich was scrupulous about using his campaign funds only for political purposes. Tr. 2001-11, 4767, 4779-81. During his two terms as Governor, he raised tens of millions of dollars, none of which was used for personal enrichment. Blagojevich bought his own clothes and baseball tickets even though those items had both personal and political uses. When he brought his family along on political trips, he reimbursed the campaign fund in order to avoid the appearance of impropriety. Further, even if Blagojevich had left office with significant funds in his campaign account, he could not have converted these funds to personal use under Illinois law. See 10 ILCS 5/9-5. Rather, those left-over funds would have been donated to the campaigns of other officials who support the Governor's agenda.

Finally, there is no evidence that Blagojevich ever acted against the interests of the people of Illinois in order to obtain campaign funds. The record shows that Blagojevich believed in the merits of the pay increase for the doctors at Children's Memorial Hospital, requested by Magoon; he was a long-time supporter of the Illinois horse racing industry and of the revenue recapture bill that John Johnston had asked him to sign; and he sought to appoint only candidates that he believed

were qualified for the Senate seat.

The biggest driver of the high guideline number was Blagojevich's attempt to obtain campaign contributions from Raghu Nayak after Nayak had reportedly offered $1.5 million in campaign donations if Blagojevich would appoint Rep. Jackson Jr. to the Senate. Approaching Nayak for campaign donations after learning of Nayak's illegal offer was certainly a lapse in judgment. On the other hand, the message Blagojevich told his brother to deliver to Nayak – that Jackson was "very much real realistic" for the Senate and that "some of this stuff's [ie., campaign contributions] got to start happening now" – was a common (and presumably lawful) message that is routinely delivered to persons seeking political appointments. For example, persons seeking an ambassadorship to a European country are told to show their support for the President [by raising money] and that, while no promises can be made, they will then have a "realistic" chance for the appointment. This is precisely the message that would have been delivered to Nayak, had the meeting taken place.

Blagojevich never sought to offer or promise the Senate seat to Jackson, as the Appellate Court erroneously held. See *United States v. Blagojevich*, 794 F.3d at 733. Rather, he merely sought to encourage Nayak to donate campaign funds in the hope that his candidate (Jackson) might receive the appointment. And while Blagojevich's decision to approach Nayak and deliver this message may have been wrong, it was far less egregious than the actions of a politician who seeks $1.5 million in under-the-

table cash bribe. Yet the guidelines make no distinction between these two acts. For all of these reasons, the Court was correct in its prior finding that the guidelines numbers overstate the seriousness of the offense. Sent. Tr., at 257.

A.   **The Reversal and Dismissal of all the Counts that Charged Blagojevich with Seeking Personal Enrichment Warrants a Reduced Sentence.**

At the prior sentencing hearing, the government framed its case against Blagojevich as a scheme to obtain personal benefits. This Court agreed with the government that the case was about efforts "to secure personal benefits to the defendant ...." Sent. Tr., at 61.

The centerpiece of the government's case was the Governor's attempt to make a deal with Barack Obama to appoint Obama's choice for his old Senate seat, Valerie Jarrett, in exchange for a position in the Obama Cabinet. The government argued that the deal was motivated by greed because the Health and Human Services (HHS) position sought by Blagojevich paid a salary of more than $100,000. Tr. 5499. But as the Appellate Court has found, that proposed deal was "a form of logrolling" and was not illegal; and the Cabinet appointment he sought was a "public job" which paid only a "bona fide salary ...." *United States v. Blagojevich*, 794 F.3d at 734-38.

Blagojevich clearly wanted to earn an income sufficient to support his family. But there is no evidence that he ever sought to cash in on his position by, for example, becoming a lobbyist or a rainmaker for a law firm. Instead, he sought only positions where he could continue to advance his political goals, such as expanding

access to healthcare. In private discussions with his aides, Blagojevich explained why he believed his appointment to a post such as HHS would serve the public interest due to his unique qualifications to advocate for health care expansion as he had done in Illinois. Tr. 1358, 2224, 4285. While some may disagree about Blagojevich's suitability for the HHS position, the undisputed fact is that he was motivated by a desire to do public service rather than by greed.

Thus, while this case was previously viewed as a scheme to obtain personal benefits, such a view can no longer be justified. The crimes for which Blagojevich stands convicted and on which he is now being sentenced all relate exclusively to his attempts to raise funds for his political campaign. His crimes can no longer be portrayed as selfish or greedy. Instead they are the crimes of an overly zealous politician seeking to advance his political goals.

Indeed, Blagojevich's notorious phrase, uttered during a private conversation with an aide, that "I've got this thing and it's f'ing golden ... and I'm not giving it up for f'ing nothing" must also now be seen in a different light. Tr. 1879. Yes, the Senate seat had value to Blagojevich, but its value was political and not personal. Had Blagojevich appointed Obama's choice for the Senate seat and sought nothing in return, he would have done a disservice to his political supporters. The men and women who worked and donated to see Blagojevich reelected in 2006 did so, as some of the letter writers remind us, because they believed in his agenda and in his ability to get things done for the people of Illinois. It was therefore natural that a

professional politician like Blagojevich would seek to use his power to appoint a U.S. Senator to advance his political goals.

Blagojevich's conviction for crimes exclusively related to political activity and not financial gain takes this case outside the heartland of ordinary political corruption cases. In deciding upon Blagojevich's original sentence, this Court looked at the sentences given to other politicians who sold their offices for political gain. But this time, those comparisons are not appropriate.

Counsel can find no other case in which a politician has been prosecuted and jailed solely for violations of laws relating to raising campaign funds, laws which have been described as "murky" by another federal judge. See *United States v. McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012). The closest case we could find (since *McCormick v. United States*, 500 U.S. 257 (1991)), is *United States v. Siegelman*, 640 F.3d 1159 (11th Cir. 2011). Former Alabama Governor Don Siegelman is serving a 78-month sentence following convictions that related to a corrupt agreement involving campaign contributions. However, the Appellate Court also found that Siegelman personally enriched himself by taking money from a donor for the purchase of a motorcycle.

Therefore, Blagojevich's case as it currently stands, following the dismissal of all charges relating to personal enrichment, would appear to stand alone in the universe of political corruption cases. A reduced sentence is therefore warranted for Mr. Blagojevich. See e.g., U.S.S.G. 2B1.1; app note 20(C) ("There may be cases in

which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.")

**B.      Blagojevich's Extraordinary Post-Offense Rehabilitation Warrants a Further Reduction in Sentence.**

At the original sentencing hearing, this Court found that a significant factor in aggravation was Blagojevich's disrespect for the judicial system and for the government. This Court further found that Blagojevich had attempted to "delegitimize the entire proceeding." Sent. Tr., at 115. While this Court undoubtably had legitimate reasons to make such a finding, the evidence from the past four years shows a very different side to Mr. Blagojevich, and qualities in the man which perhaps could not be seen at the prior proceeding.

Following his original sentencing hearing, Blagojevich paid his fines and he surrendered to prison to begin serving his 14-year sentence. Blagojevich could have spent his time consumed in bitterness and anger. He has chosen a very different path and one that has enriched the lives of his fellow inmates. Blagojevich has spent his time behind bars improving himself as a person, through hard work, while also being of service to other inmates.

The Probation Officer reports that Blagojevich has no disciplinary infractions during his four-plus years of incarceration. He has learned to be a teacher and a tutor to other inmates, and he has assisted in the GED program. PSR, at p. 5. His first two and a half years of incarceration were spent at FCI Englewood, a low security federal prison. While there, he worked in the kitchen warehouse and he taught Civil War

history and World War II history. He also tutored inmates who were near the end of their sentences on how to conduct themselves during job interviews.

More than one hundred inmates from the Federal Prison Camp in Englewood, Colorado have submitted letters describing their experiences in prison with Blagojevich and asking the Court for leniency at the resentencing. These letters are remarkable in many respects.

Many fellow inmates report that they have been inspired by Blagojevich's classes and his generosity of spirit. Fellow inmate TW writes:

> "Before I met the Governor, I never had any wishes or thoughts about education. But as the Governor explained to me, if I used my time in prison to work to get the education I didn't have earlier in life, I would have more opportunities to climb the ladder when I get out of prison. As a result of my conversations with the Governor, I decided to take GED courses. The Governor was one of my teachers. As of right now, I passed all my GED courses, except math. Which I'm currently working on right now. I am writing this letter to thank the Governor for pushing and encouraging me to better myself by getting an education. I also want to thank him for the time he took to teach me."

Former cellmate CF writes:

> "Rod was a very influential teacher in the education department to hundreds of inmates. His lectures felt like listening to my favorite college professor. He also spent countless hours teaching classes and doing one-on-one interviews with inmates to help them with job reentry. He did mock interviews with them. He would critique them and would always stress the importance of being totally honest in interviews with future employers. I believe the help he gave these men will provide them huge success rates in getting jobs. These are men that have never had a job before in their lives. After spending hours with Rod, they had a confidence about them that I know will benefit them in attaining good employment after incarceration."

Blagojevich has also studied music in prison, which is a passion of his

youngest daughter who studies classical piano. Their shared interest in music has helped Blagojevich stay connected to Annie during his absence. Blagojevich studied guitar and vocals with another inmate, an accomplished musician named Ernie B. They formed a band called "The Jailhouse Rockers" and performed for the GED graduation ceremony in June 2013 and again on the 4th of July. Blagojevich was the lead singer and the Rockers performed 21 songs.

After these performances, Ernie was released and the Rockers had to break up. Blagojevich also lost his music teacher and mentor. In November 2014, Blagojevich was transferred from the prison to the prison camp where he currently works in the library.

In his legal challenges to his conviction, Blagojevich has made only proper legal arguments. Some of his arguments have been successful; others have failed. In each case, he has accepted the decision of the Court with grace and dignity.

The letters written by his fellow inmates provide evidence of Blagojevich's respect for the legal system. Fellow inmate FH writes:

> "Your Honor, there are many men in Federal prison who are bitter about their imprisonment or long length of sentence. Rod Blagojevich is not one of them. It is refreshing to be around someone of his character who may disagree with his conviction and fights on with the legal battle for justice, all the while, Rod maintains respect for the judicial system and our Federal government leaders. How is that possible? I believe a part of the strength Rod Blagojevich relies on comes from his spiritual growth. To forgive and not hold resentment is not an easy thing to do. Rod has taught me that it only harms myself to be bitter about my circumstance. He has taught me that the 'wheels of justice' do turn, even at times if justice seems slow in coming."

Fellow inmate JP writes:

"In the classes that Rod Blagojevich has taught here at Englewood, he has shared important instruction on Civics and Leadership. His greatest shining example has been for us to not be bitter towards the government, but in patience, do our part and be outstanding citizens and use this time for self-improvement so we as citizens, can make our community and government better. I join Rod Blagojevich in that effort to serve other inmates and emphasize how we must use this time to grow, to learn, and to practice self-improvement every day of our lives. As Rod says so often, 'We must not sit here and waste or squander this opportunity that this adversity offers us.' This is a message that all of our fellow inmates here needs to hear."

Blagojevich's co-worker in the law library, RB, writes:

"As I've indicated before it is a great pleasure working with Mr. Blagojevich, who I personally feel is a humbled man now, a very loving family man, and has truly learned a valuable lesson from this experience. And to see a man of his stature and pedigree from a high office position in our Government system humble himself, and who still believes in our American Legal system and our founding fathers core foundational principals, and continues to maintain a positive attitude and have a great influence on other inmates is truly a blessing."

Blagojevich's number one priority during his four plus years of incarceration has been to repair and mitigate the harm that his actions have done to his wife and children. Blagojevich speaks to his family nearly every evening. Each month, he purchases the maximum allotted minutes of phone time (normally 300 minutes per month but increased to 400 on holidays). Each month, he uses every one of these minutes to talk with his family. He also communicates by email. He provides fatherly advice to his daughters. He tries to lift their spirits when they are feeling down. He quizzes them to help them get ready for an exam.

During the first part of his incarceration, Patty Blagojevich brought her two girls every month to visit their father. The frequency of visits has decreased during

the last two years, partly because of the expense, but also because his daughters are getting older and have other demands on their time. This fall, Amy Blagojevich will be a Junior in college and Annie Blagojevich will begin the eighth grade.

Many of the letter writers report that Blagojevich's devotion to his family has been an inspiration to them. They hear him speak of his wife and daughters and they observe his family during visits. Blagojevich has inspired other inmates to improve their own relationships with their loved ones.

Fellow inmate RD writes:

"I am often moved by how Rod speaks about his wife and daughters with a genuine affection. It is obvious to any who knows him that he has a deep love for his wife and daughters. His family has been a great source of strength to endure this difficult time."

Fellow inmate JB writes:

"Rod is a very nice guy and has been very helpful to me. He has spent a lot of time listening and giving input to me concerning my reunification with my daughter and new grandson. Because of my criminal history and years of incarceration, I have never really been able to get to know [my] daughter. She has just turned 21 and I have only seen he 4 or 5 times prior to this past year, but things are changing. She now visits me every weekend and Rod has been a big part of helping me adjust and become a part of their lives. As a father of two daughters, he has helped me with thoughts and advice on how best to be a father to her and a grandfather to my 20 month old grandson."

Fellow inmate KC writes:

"I have been in the visiting room while he is at a visit with his family and it warned my heart to see him interacting in such a loving way with family."

Of course, phone calls, emails and semi-regular visits are not the same as being in the home. Because of his misconduct, Blagojevich has missed important

milestones in his daughter's life. Amy Blagojevich had her senior prom and high school graduation, all without her father's presence and support. A reduced sentence would allow Blagojevich to support his daughter Annie at these important events in her life.

For all of these reasons and because of the extraordinary efforts Blagojevich has made towards his own rehabilitation, we believe a reduced sentence is warranted.

**CONCLUSION**

Counsel submits, therefore, that in light of all the §3553(a) factors, a sentence in the neighborhood of five years incarceration accompanied by the a period of supervised release would be sufficient, but not greater than necessary, to achieve the purposes of the §3553(a) sentencing factors.


Respectfully submitted,

 /s/   Leonard C. Goodman

Leonard C. Goodman
53 W. Jackson
Suite 1650
Chicago, Illinois 60604

## <u>CERTIFICATE OF SERVICE</u>

I, LEONARD C. GOODMAN, certify that in accordance with FED. R. CRIM. P. 49, LR5.5, and the General Order on Electronic Case Filing (ECF), the defendant's **Sentencing Memorandum,** was served pursuant to the district court's ECF system as to ECF filers, on July 11, 2016, and if any, were sent by first-class mail or by hand deliver to non-ECF filers.

/s/   Leonard C. Goodman

Leonard C. Goodman
53 W. Jackson
Suite 1650
Chicago, Illinois 60604
(312) 986-1984